## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF (A) LIEN CLAIMANTS, (B) 503(B)(9) CLAIMANTS, (C) PACA/PASA CLAIMANTS, AND (D) CRITICAL VENDORS, (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY FOR OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF**

---

**Emergency relief has been requested. Relief is requested not later than 5:00 p.m. (prevailing Central Time) on November 12, 2024.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on November 12, 2024, at 5:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Perez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Perez's homepage. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Perez's homepage. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1]   A complete list of the Debtors (as defined below) in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Wellpath. The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this emergency motion (this "Motion"):[2]

## Relief Requested

1.     By this Motion, and pursuant to sections 105, 363, 503(b), and 507(a)(2)of

title 11of the United States Code (the "Bankruptcy Code") and rules 6003 and 6004 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors seek entry of interim and

final orders, substantially in the forms annexed hereto (the  "Interim Order" and "Final Order"),

(a) authorizing, but not directing, the Debtors to pay, in the ordinary course of business and in their

sole discretion, certain prepetition claims of (i) Lien Claimants, (ii) 503(b)(9) Claimants,

(iii) PACA/PASA Claimants, and (iv) Critical Vendors (each as defined below), (b) confirming

administrative expense priority for outstanding orders, (c) authorizing the applicable banks and

financial institutions to receive, process, honor, and pay all checks or wire transfers used by

the Debtors to pay the foregoing, and (d) granting related relief.

## Jurisdiction and Venue

2.     The United States Bankruptcy Court for the Southern District of Texas

(the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and

the *Order of Reference to Bankruptcy Judges,* General Order 2012-6 (S.D. Tex. May 24, 2012)

(Hinojosa, C.J.).

3.     This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  In addition,

the Debtors confirm their consent to the entry of a final order by the Court in connection with

---

[2]     The facts and circumstances supporting this Motion are set forth in the *Declaration of Timothy J. Dragelin as Chief Restructuring Officer and Chief Financial Officer of Wellpath Holdings, Inc. and Certain of its Affiliates and Subsidiaries in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") filed contemporaneously herewith and incorporated by reference herein.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

4.      Venue of these chapter 11 cases and related proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**<u>Background</u>**

5.      Wellpath is the premier provider of localized, high quality, compassionate care to vulnerable patients in challenging clinical environments. Wellpath is the leading medical and mental health services provider in correctional facilities, inpatient and residential treatment facilities, forensic treatment facilities, and civil commitment centers.  Headquartered in Nashville, Tennessee with operations in approximately 420 facilities across 39 states, Wellpath provides outsourced solutions to the correctional healthcare and behavioral healthcare industries.  Wellpath offers an array of healthcare services to its federal, state, and local government partners, including on-site medical services, telehealth and mental health programs, and pharmacy management. Wellpath employs more than 13,000 people and serves nearly 200,000 patients daily.[3]

6.      On November 11, 2024 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

7.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Local Rules</u>").  The Debtors are operating their businesses and managing

---

[3]     Additional information about the Debtors' businesses and affairs, capital structure, and prepetition indebtedness, and the events leading up to the Petition Date, can be found in the First Day Declaration.

their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no statutory committee has been appointed or designated.

### Overview of the Debtors' Vendors and Related Claims

8. The vendors and suppliers are critical components of the Debtors' ability to manage safe medical facilities and provide high-quality care to patients. The Debtors require uninterrupted delivery of goods and services essential to the Debtors' business operations. Any disruption in the delivery of these critical goods and services would have a far-reaching and adverse economic and operational impact on the Debtors' businesses and could jeopardize the well-being of the Debtors' patients.

9. The Debtors work with numerous providers of goods and services, including distributors of medical supplies and highly specialized medical equipment. In many cases, these goods and services are highly specialized and technologically complex, and in some cases may give rise to mechanic's, possessory, or other liens. In most cases, the ability to find replacement vendors for these goods and services would be difficult, if not impossible. Even where alternative vendors may exist, the time and costs associated with switching from one vendor to another could irreparably harm the Debtors' businesses and ultimately harm the quality of the Debtors' patient care. In addition, suppliers of certain goods utilized by or provided to the Debtors may have delivered goods within the 20 days immediately preceding the Petition Date, thereby giving rise to claims that are accorded administrative priority under section 503(b)(9) of the Bankruptcy Code.

10. The Debtors respectfully request authorization to pay certain outstanding prepetition claims of (a) Lien Claimants, (b) 503(b)(9) Claimants, (c) PACA/PASA Claimants, and the (d) Critical Vendors (collectively, the "Trade Claimants" and, such claims, collectively, the "Trade Claims"), subject to the limitations set forth in the Interim Order and the Final Order.

4

11.     The following table summarizes the categories of claims that the Debtors request

authority to pay and the estimated prepetition amounts outstanding:

| Category | Description of Goods or Services Provided | Estimated Amount to be Paid Within 30 Days after the Petition Date | Estimated Amount Outstanding as of Petition Date |
|---|---|---|---|
| Lien Claimants | Suppliers, shippers, couriers, maintenance workers, and other service providers of goods or services utilized by or provided to the Debtors that may assert mechanic's, possessory, or other similar liens, absent payment. | $80,000 | $100,000 |
| 503(b)(9) Claimants[4] | Suppliers that provided goods to the Debtors that were received within 20 days of the Petition Date. | $10,000,000 | $18,000,000 |
| PACA/PASA Claimants | Suppliers of certain Fresh Goods with claims arising under PACA or PASA (each as defined below). | $320,000 | $580,000 |
| Critical Vendors | Specialized suppliers of goods and services that are critical to maintain the Debtors' day-to-day operations, or which are sole or limited-source providers of the goods and services necessary for the uninterrupted operations of the Debtors' business. | $18,000,000 | $26,000,000[5] |
| **Total:** | | **$28,400,000** | $44,680,000 |

## I.     Lien Claimants.

12.     The Debtors routinely conduct business with a number of vendors that may be able

to assert a variety of statutory, common law, or possessory liens against the Debtors and their

property    if    the    Debtors    fail    to    pay    for    certain    goods    delivered    or    services

---

[4]     Many of the 503(b)(9) Claimants could also be categorized as Lien Claimants, PACA/PASA Claimants, or Critical Vendors, but they have been placed in this category to highlight that these suppliers provided goods within 20 days of the Petition Date.

[5]     The Debtors incur certain pass-through costs on behalf of governmental entities that are included in the total amount outstanding as of the Petition Date.  Although the Debtors are ultimately reimbursed for such expenses, the Debtors included these amounts out of an abundance of caution and due to the critical nature of these claims.

rendered (the "Lien Claimants").   These Lien Claimants perform various services for the Debtors, including (a) the installation and repair of certain equipment located in the facilities in which the Debtors operate, (b) the maintenance, repair, renovation, and improvement of the facilities in which the Debtors operate, (c) logistics services, including transporting, shipping, delivery, and storing goods needed for the Debtors' business operations.

13.     The Debtors' medical facilities require specialized maintenance and repair services provided by third parties on a regular or *ad hoc* basis.   Repairing defects in the Debtors' medical equipment, an essential part of the Debtors' operations, also requires the skill of specialized third-party servicers.   Such specialized maintenance and repairs ensure the uninterrupted operations of the facilities in which the Debtors operate and that the Debtors continue to provide patient care in accordance with their high standards of service and safety for patients and employees.

14.     Non-payment of the claims of Lien Claimants hired in connection therewith could lead to an inability to obtain skilled labor, labor disputes, work stoppages, and disputes with contractors or subcontractors.   Any of these events would affect the Debtors' operations and anticipated costs and timetables for such projects.   The cost of a project may vary significantly from initial expectations, and the Debtors may have a limited amount of capital resources to fund cost overruns that, in turn, would delay the completion of the project until adequate funding becomes available.   Such delay would be value-destructive to the Debtors' businesses and their estates.

15.     The Debtors partner with certain shippers and couriers to conduct smooth and fast deliveries of expensive medical equipment and highly perishable medical supplies, such as intravenous liquids and injections.   Possible loss of long-term relationships and the delay or

non-delivery of critical goods transported by these shippers and couriers could result in catastrophic injuries to patients requiring treatment in the facilities in which the Debtors operate and, this, may cause serious reputational, financial, and logistical damage to the Debtors' businesses.

16.     Under certain non-bankruptcy laws, the Lien Claimants may be able to assert liens on the goods in their possession or on the property they improved, as applicable, to secure payment of the charges or expenses incurred in connection with these prepetition obligations (the "Lien Claims").  In the event that these claims remain unpaid, the Lien Claimants could attempt to assert liens or otherwise impede the Debtors' use of property until their claims are satisfied and their liens redeemed.  The Lien Claimants' possession and retention of the Debtors' goods and supplies, or enforcement of a mechanic's lien, would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer these chapter 11 cases.  The cost of such disruption to the Debtors' estates in many cases would very likely be greater than the applicable Lien Claims.  Additionally, pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would further exhaust the assets of the Debtors' estates.

17.     In 2024, the Debtors paid on average approximately $80,000 per month on account of Lien Claims.  The Debtors estimate that, as of the Petition Date, approximately $100,000 remains outstanding on account of Lien Claims, approximately $80,000 of which is due or will become due within the first 30 days of these chapter 11 cases.

18.     To continue using the Lien Claimants' services, the Debtors request authority to pay the prepetition Lien Claims as they become due and payable and to continue paying the Lien Claims in the ordinary course of business.  The Debtors seek authority to pay only those amounts

of Lien Claims that the Debtors determine, in their sole discretion, to be necessary or appropriate to (a) obtain release of critical or valuable goods, (b) maintain reliable, efficient, and smooth distribution systems, and (c) induce the Lien Claimants to continue performing and otherwise supporting the Debtors' operations on a post-petition basis.

**II.     503(b)(9) Claimants.**

19.     The Debtors may have received certain inventory, supplies, goods, and/or materials from various vendors (the "503(b)(9) Claimants") within the 20 days immediately preceding the Petition Date, thereby giving rise to claims that are accorded administrative priority under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims").   Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.   Instead, the Debtors obtain much of their medical supplies, pharmaceuticals, and equipment from such claimants on an order-by-order or as needed basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its 503(b)(9) Claims.   Such refusal could negatively affect the Debtors' estates, as the Debtors' businesses depend on the steady flow of medical equipment and supplies to provide patient care.

20.     Certain 503(b)(9) Claimants supply goods or materials that are critical to the Debtors' ongoing operations.   Even though the manufacture of certain goods, such as prescription medicine, eyecare, medical supplies, dental supplies, office supplies, and uniforms may be completed, the 503(b)(9) Claimants may refuse to ship on a post-petition basis unless the Debtors pay some or all of the prepetition claims owing to such vendors.  Any interruption in the flow of these goods would be highly disruptive to the Debtors' operations and ultimately value-destructive for the Debtors' businesses and estates.

21.     In light of these consequences, payment of the 503(b)(9) Claimants is essential to avoid disruptions to the Debtors' operations.   Many of the 503(b)(9) Claims could also be

considered Lien Claims, PACA/PASA Claim, or Critical Vendors and have been characterized as such for the purposes of this Motion; however, to the extent that an undisputed 503(b)(9) Claim is not otherwise classified as Lien Claim, PACA/PASA Claim, or Critical Vendors Claim, the Debtors seek authority to pay such claims. The Debtors do not seek to accelerate or modify existing payment terms with respect to any 503(b)(9) Claims; rather, the Debtors, in their discretion, intend to pay the applicable 503(b)(9) Claims as they come due and in the ordinary course of business.

22.     The Debtors estimate that, as of the Petition Date, approximately $18,000,000 is outstanding on account of 503(b)(9) Claims, approximately $10,000,000 of which is due or will become due within the first 30 days of these chapter 11 cases.

### III.    PACA/PASA Claimants.

23.     The Debtors receive a constant supply of fresh produce, meats, poultry, and livestock (the "Fresh Goods") to serve to patients in their facilities. Certain Fresh Goods delivered to the Debtors may qualify as "perishable agricultural commodities" under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a et seq. ("PACA"). The definition of "perishable agricultural commodity" under PACA generally includes "[f]resh fruits and fresh vegetables of every kind and character [whether or not frozen or packed in ice]." 7 U.S.C. § 499a(b)(4). Under PACA, eligible Fresh Goods suppliers and their agents (collectively, the "PACA Claimants") are the beneficiaries of a statutory trust (the "PACA Trust") in all of the buyer's perishable agricultural commodity inventory or other derivatives of perishable agricultural commodities, the products derived therefrom, and the proceeds related to any sale of the commodities or products (collectively, the "PACA Trust Assets"). *See* 7 U.S.C. § 499e(c)(2). Importantly, by virtue of PACA, the PACA Trust Assets are preserved as a non-segregated floating trust and may be commingled with non-trust assets. PACA Trust Assets are not property of a

debtor's estate.  *See In re Delta Produce, L.P., 845 F.3d 609, 614* (5th Cir. 2016);  *In re Long John Silver's Restaurants, Inc.*, 230 B.R. 29, 32 (Bankr. D. Del. 1999); *Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F. Supp. 346, 348 (S.D.N.Y. 1993); *In re Kornblum & Co.*, 81 F.3d 280, 284 (2d Cir. 1995).

24.     Similarly, certain of the Debtors' suppliers (collectively, the "PASA Claimants" and, together with the PACA Claimants, the "PACA/PASA Claimants") may be eligible to assert claims under the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. § 181 et seq. ("PASA"), which prescribes the conditions of operations for businesses dealing in livestock and poultry.  PASA creates a statutory trust (the "PASA Trust" and, together with the PACA Trust, the "Statutory Trusts") scheme, which is virtually identical to the PACA Trust in respect of the delivery of livestock, meat products and related products, products derived therefrom, and the proceeds related to the sale of such commodities or products (collectively, the "PASA Trust Assets" and, together with the PACA Trust Assets, the "Trust Assets").  *See In re W.L. Bradley Co.*, 75 B.R. 505, 509 (Bankr. E.D. Pa. 1987) ("The Legislative history expressly notes that the [PACA Trust] was modeled on the trust amendment to the Packers and Stockyards Act.").

25.     The PACA/PASA Claimants may be eligible to assert claims under the respective statutes for outstanding payments owed by the Debtors on account of applicable Fresh Goods (collectively, the "PACA/PASA Claims").   In particular, the Debtors estimate that, as of the Petition Date, approximately $580,000 is outstanding on account of the PACA/PASA Claims, of which approximately $320,000 is due or will become due within the first 30 days of these chapter 11 cases.  Because the PACA/PASA Claimants may impose Statutory Trusts on certain of the Fresh Goods and, thereby, obtain priority ahead of all other secured and unsecured creditors of the Debtors' estates, the Debtors' payment of valid PACA/PASA Claims will not prejudice or

affect the amount of recoveries available to other creditors.  Accordingly, the Debtors seek authority to pay PACA/PASA Claims in the ordinary course of business in accordance with the terms of any contracts under which such claims arose.

## IV. Critical Vendors.

26.     The Debtors are in the highly complex and heavily regulated business of providing essential healthcare to patients all around the country.  The Debtors' ability to continue generating revenue and operating their businesses, and thus the success of these chapter 11 cases, fundamentally depends on the Debtors' ability to effectively manage the complex process by which they treat their patients.  While the Debtors believe that many of their vendors provide invaluable goods and/or services, the Debtors and their advisors carefully reviewed the Debtors' books and records and consulted key personnel to identify those vendors that are critical to the Debtors' businesses, which include the following:  (a) Patient Care and Safety Vendors; (b) IT and Administrative Service Providers; and (c) Pass-Through Vendors (collectively, the "Critical Vendors").  In identifying the Critical Vendors, the Debtors considered a variety of factors, including the following:

- which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue operations without disruption;

- the Debtors' ability to find timely alternative sources of supply that can provide the requisite volumes of similar goods or services on equal (or better) terms and in a reasonable time;

- the Debtors' ability to continue operating while transitioning business to an alternative supplier, if available, and how long such a transition would take;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- which suppliers would be prohibitively expensive or practically difficult to replace;

- whether the vendor or supplier is party to an executory contract with the Debtors;

- which suppliers would present an unacceptable risk to the Debtors' operations given the volume of essential services or products that such suppliers provide;

- whether the vendor is currently refusing to supply the Debtors with goods or services or is refusing to do so without cash up front; and

- whether the vendor meeting the foregoing criteria is able or likely to refuse to provide product or services to the Debtors post-petition, or experience significant financial hardship that it would affect the delivery of the products or services, if its prepetition balances are not paid.

27. The Debtors' selection process balanced (a) the need to ensure that these chapter 11 cases do not disrupt their operations or negatively impact patient care versus (b) the need to limit the expenditure of estate resources. In that regard, the Debtors undertook a lengthy process to ensure that the Critical Vendors truly represent those vendors that are most vital to the Debtors' ongoing operations. Paying targeted prepetition claims of Critical Vendors (the "Critical Vendor Claims") benefits the Debtors' estates, both monetarily and operationally, by preserving liquidity and going-concern value by enabling the Debtors to operate smoothly during these chapter 11 cases.

28. Additionally, many of the Debtors' Critical Vendors are located and provide services in rural areas where access to replacement vendors is extraordinary limited, if not completely impossible. Due to the difficulty and, in some cases, impossibility of finding replacement vendors, providing for the Debtors' Critical Vendors herein is crucial to the Debtors' business operations and the success of these chapter 11 cases. Furthermore, due to the nature of the Debtors' businesses, new vendors must undergo intensive background checks and certifications before being permitted to work in the facilities in which the Debtors operate. These processes can take anywhere from three months to over one year depending on whether state, local, or federal government clearance is required. This further underpins the need to maintain

relationships with the Critical Vendors and highlights the severity of the disruption that can occur if these relationships are not maintained.

29.     The Debtors estimate that, as of the Petition Date, approximately $26,000,000 remains outstanding on account of Critical Vendor Claims, approximately $18,000,000 of which is due or will become due within the first 30 days of these chapter 11 cases.

30.     ***Patient Care and Safety Vendors.***  As healthcare providers, the Debtors operate in an industry that is heavily regulated and closely scrutinized in each of the states in which they operate.  The Debtors' ability to provide continuity of care to their patients depends on, among other things, a steady flow of supplies and services, including medical supplies, medical equipment, necessary cleaning and janitorial services, and routine maintenance services. The Debtors' ability to succeed in the healthcare industry relies on, among other things, their business relationships with vendors that supply such goods and services (the "Patient Care and Safety Vendors").  The Patient Care and Safety Vendors include those vendors who provide equipment, supplies, technology, products, facility maintenance, and services that are mission-critical to the operation of the Debtors' businesses, such as prescription drugs, medical equipment and supplies, lab services, and on-site and off-site medical services.  In many instances, the Patient Care and Safety Vendors are the only vendors capable of producing or delivering the products or services required to meet the Debtors' operational needs.  If certain Patient Care and Safety Vendors refuse to provide products or services to the Debtors due to unpaid prepetition claims, the Debtors would be left scrambling to procure new vendors.  This process could take several months, which would negatively impact the Debtors' operational stability and would be significantly detrimental to the Debtors' estates and ability to provide high-quality patient care.

31.     Furthermore, the Patient Care and Safety Vendors have a direct, profound impact on the Debtors' ability to operate medical service facilities and meet regulatory requirements, as the extensive, comprehensive regulations and requirements to which the Debtors must adhere can only be fulfilled through uninterrupted access to the essential goods and services provided by the Patient Care and Safety Vendors.  Without the ability to continue payment of Patient Care and Safety Vendors, the Debtors risk harming not only the going-concern value of their business, but also the integrity of their facilities, compliance with regulatory laws, the quality of medical care provided, and the safety of doctors, staff, and patients.  Moreover, in some cases, local, state, and/or federal law require that the Debtors maintain contracts with certain Patient Care and Safety Vendors, including those needed to comply with regulations applicable to the Debtors' medical facilities.

32.     The Debtors estimate that, as of the Petition Date, approximately $18,700,000 remains outstanding on account of Critical Vendor Claims owed to Patient Care and Safety Vendors, approximately $10,745,000 of which is due or will become due within the first 30 days of these chapter 11 cases.

33.     ***IT and Administrative Service Providers***.  The Debtors also rely on certain vendors to provide accounting and payment services, administrative services, revenue cycle management services, and specialized information technology infrastructure necessary for the administration of the Debtors' day-to-day operational activities, including certain finance, human resources, medical operations, and billing support functions (the "IT and Administrative Service Providers").

34.     Even a short interruption in the provision of any of these services would have potentially disastrous effects on the Debtors' estates.  The services supplied by the IT and Administrative Service Providers have been highly integrated into the Debtors' business

operations and, in some instances, are custom designed specifically for use by the Debtors.  Even where alternative vendors may exist, the time and costs associated with transitioning from an IT and Administrative Service Provider to a new provider would likely be significant and detrimental to the Debtors' estates due to the extensive development timeline required to produce replacement technologies.

35.     The IT and Administrative Service Providers include certain vendors specifically tied to the Debtors' ability to generate revenue in certain of its facilities—without these vendors, the Debtors would be unable to bill and collect payments for services provided to a handful patients in its inpatient facilities.  More specifically, certain IT and Administrative Service Providers collect information from patients, such as insurance coverage, coding medical procedures and diagnoses, determining the appropriate billable charges for medical services provided, collecting patient treatment history, reviewing insurance information, submitting claims to insurance companies, collecting and processing payments from patients, and collecting payments from third-party payors.

36.     If the IT and Administrative Service Providers are not paid prepetition amounts, they may refuse to continue providing services to the Debtors, thereby destabilizing the Debtors' day-to-day operations, endangering a critical mechanism of generating revenue, and irrevocably damaging the Debtors' relationships with the various third parties.  Accordingly, the Debtors request authority to satisfy certain of the prepetition claims of these IT and Administrative Service Providers.

37.     The Debtors estimate that, as of the Petition Date, approximately $300,000 remains outstanding on account of Critical Vendor Claims owed to IT and Administrative Service

Providers, approximately $255,000 of which is due or will become due within the first 30 days of these chapter 11 cases.

38.     ***Pass-Through Vendors.***  The Debtors are required by the Federal Bureau of Prisons (the "<u>FBOP</u>") and certain local government contracts to incur certain expenses from various vendors (the "<u>Pass-Through Vendors</u>").  Such expenses are pass-through expenses that are not actually incurred by the Debtors, but rather, are initially paid by the Debtors and subsequently reimbursed by the FBOP and certain local governments.  Despite the pass-through nature of such expenses, the Debtors seek authority to continue paying the Pass-Through Vendors out of an abundance of caution and due to the critical nature of these claims.  Without such relief, the Debtors would jeopardize their good standing with its customers and the Pass-Through Vendors. The Debtors estimate that, as of the Petition Date, approximately $7,000,000 remains outstanding on account of obligations owed to the Pass-Through Vendors, approximately $7,000,000 of which is due or will become due within the first 30 days of these chapter 11 cases.

39.     Jeopardizing the Debtors' relationships with any of the Critical Vendors, and attempting to procure the products or services that Critical Vendors provide from replacement vendors (where available), would impose a severe strain on the Debtors' business operations and would likely result in significant revenue loss.  Even a temporary interruption of the provision of the products or services provided by the Critical Vendors would impede the Debtors' operations, and the cumulative impact of such events could have a catastrophic adverse effect on the Debtors' businesses and, in turn, these chapter 11 cases.  Such harm would likely far outweigh the cost of payment of the Critical Vendor Claims.[6]  To maintain stability during these chapter 11 cases and

---

[6]     Notwithstanding the relief requested here, the Debtors reserve all rights and remedies under the Bankruptcy Code and other applicable law to pursue any cause of action against any Critical Vendor on account of, among other things, any violation of the automatic stay pursuant to section 362(a)(6) of the Bankruptcy Code.

to avoid jeopardizing the Debtors' business operations going forward, the Debtors request authority to pay the Critical Vendor Claims as they become due and to continue paying the Critical Vendor Claims in the ordinary course of business, including on account of prepetition claims.

## V.    Customary Trade Terms.

40.    Subject to the Court's approval, the Debtors intend to pay the Trade Claims only to the extent necessary to preserve the value of their estates.  To that end, in return for paying the Trade Claims either in full or in part, the Debtors propose that they be authorized to require the Trade Claimants to provide favorable trade terms for the post-petition procurement of their goods and services.  Specifically, the Debtors seek authorization, but not direction, to condition payment of Trade Claims upon each Trade Claimant's agreement to continue—or recommence—providing goods and services to the Debtors in accordance with trade terms (including credit limits, pricing, timing of payments, availability, and other terms) at least as favorable to the Debtors as those in place during the 12 months prior to the Petition Date, or as otherwise agreed by the Debtors in their reasonable business judgment (the "Customary Trade Terms").  The Debtors also seek authorization, but not direction, to require certain Trade Claimants to enter into a contractual agreement evidencing such Customary Trade Terms, the form of which is attached hereto as **Exhibit A** (the "Trade Agreement"); *provided, however*, that the Debtors' inability to enter into a Trade Agreement shall not preclude them from paying a Trade Claim when, in their sole discretion, such payment is necessary to the Debtors' businesses or operations or the preservation and maximization of the value of the Debtors' estates.

41.    As a further condition to receiving payment on account of a Trade Claim, the Debtors also request authority to require, in their sole discretion, that the applicable Trade Claimant agree to take whatever action is necessary to remove any existing liens at such Trade

Claimant's sole cost and expense and waive any right to assert a lien on account of the paid Trade Claim of such Trade Claimant.

42.    In addition, the Debtors request that, if any party accepts payment pursuant to the relief requested by this motion and thereafter ceases to provide goods and services in accordance with the Customary Trade Terms, (a) the Debtors may take any and all appropriate steps to recover from such Trade Claimant any payments made to it on account of its prepetition Trade Claim to the extent that such payments exceed the post-petition amounts then owing to such party, (b) upon recovery by the Debtors, any prepetition Trade Claim of such party shall be reinstated as if the payment on account thereof had not been made, and (c) if an outstanding post-petition balance is due from the Debtors to such party, (i) the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this Motion to such outstanding post-petition balance and (ii) such party will be required to repay to the Debtors such paid amounts that exceed the post-petition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

## VI.    Outstanding Orders.

43.    Before the Petition Date, and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (collectively, the "Outstanding Orders").  To avoid the risk of becoming general unsecured creditors with respect to such goods, certain vendors may refuse to ship or transport such goods (or may recall certain shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders post-petition.  To prevent any disruption to the Debtors' business operations, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all

undisputed obligations of the Debtors arising from the acceptance of goods subject to the Outstanding Orders and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

**Basis for Relief**

**I.     Payment of the Trade Claims Constitutes a Sound Exercise of the Debtors' Business Judgment and is Necessary for the Preservation of the Debtors' Estates.**

44.     Section 363(b)(1) of the Bankruptcy Code empowers a court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A debtor's decision to use, sell, or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor. *See In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"). Courts emphasize that the business judgment standard is not an onerous standard; rather it "is flexible and encourages discretion." *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011); *In re Perez*, 339 B.R. 385, 399 n. 14 (Bankr. S.D. Tex. 2006), *aff'd sub nom. Perez v. Peake*, 373 B.R. 468 (S.D. Tex. 2007) ("Section 363(b) should be interpreted liberally to provide a bankruptcy judge with substantial freedom to tailor his orders to meet differing circumstances and to avoid shackling the judge with unnecessary rigid rules." (cleaned up)). As such, courts exhibit "[g]reat judicial deference . . . to [a debtor's] exercise of business judgment." *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005). Indeed, as long as a transaction "appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to [enter into the transaction] should only be withheld if the debtor's judgment is clearly erroneous, too

speculative, or contrary to the Bankruptcy Code." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (cleaned up).

45.     The Debtors submit that, to the extent that the use of property of the estate is implicated here, the relief requested in this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm, and is justified under section 363 of the Bankruptcy Code.  Indeed, the relief sought herein is amply justified by the critical need for the continued receipt and/or distribution of goods and services.  The prompt payment of the Trade Claims, which may be necessary to obtain the delivery and/or provision of the related goods and services, is within the Debtors' ordinary course of business and crucial for orderly and efficient operation of the Debtors' businesses.  Unless the Debtors have the authority to pay for these essential goods and services, their businesses will suffer irreparable harm.

46.     Finally, the Debtors submit that payment of the Trade Claims is necessary and appropriate and, therefore, may be authorized by this Court under section 105(a) of the Bankruptcy Code, pursuant to what is referred to interchangeably as the "doctrine of necessity" or "necessity of payment rule."  The doctrine of necessity functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable powers to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code.  *See In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (applying the rule where the "Debtors' businesses [would be] seriously damaged by the delay required to satisfy the court that a particular creditor should be paid its prepetition claim outside of a confirmed plan"); *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (noting that a court may authorize payment of prepetition claims when payment is essential to continued operation of the debtor, such as where there is a "possibility that the creditor will employ an immediate economic sanction, failing such payment"); *In re Just*

*for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for the payment of pre-petition claims" under the doctrine of necessity).

47.     The United States Supreme Court first articulated the doctrine of necessity 140 years ago, in *Miltenberger v. Logansport Ry. Co.*, in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership.  *See Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286, 311–12 (1882); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989). This doctrine has become an accepted component of modern bankruptcy jurisprudence, and courts' application of it largely adheres to the Supreme Court's reasoning in *Miltenberger*.  *See Ionosphere Clubs.*, 98 B.R. at 175–76; *In re Equalnet Commun. Corp.*, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000) (noting that "courts in this district" have applied this doctrine "primarily out of common sense and the presence of a legal or factual inevitability of payment"); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity").

48.     The Court's power to utilize the "doctrine of necessity" in these chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see also U.S. v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) (section 105(a) of the Bankruptcy Code is "consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships").  "The debtor-in-possession's role as the equivalent of a trustee under § 1107(a) and its duty to protect the going-concern value of an operating business in a Chapter 11 provides the bridge that makes application

to the Doctrine of Necessity necessary or appropriate to carry out the provisions of the Bankruptcy Code." *In re CEI Roofing, Inc.*, 315 B.R. 50, 56 (Bankr. N.D. Tex. 2004) (cleaned up).

49.     The doctrine of necessity is frequently invoked early in a reorganization, particularly in connection with those chapter 11 sections that relate to payment of prepetition claims.   For instance, courts have acknowledged "the principle that a bankruptcy court may exercise its equity powers under § 105(a) to authorize payment of prepetition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'" *In re StructureLite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) (citations omitted).   In some situations, a "per se rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." *Id.* at 932.   Accordingly, pursuant to section 105(a) of the Bankruptcy Code, the Court is empowered to grant the relief requested herein.

50.     Here, the Debtors submit that the relief requested herein is essential, appropriate, and in the best interests of the Debtors' estates and stakeholders.   The Debtors believe that payment of the Trade Claims is necessary to preserve operations, dramatically reduce the financial burden on the Debtors' estates, maintain goodwill and positive relationships with the Trade Claimants, and maximize the value of the Debtors' assets for the benefit of all stakeholders.   The need for the flexibility to pay such claims is particularly acute in the period immediately following the Petition Date.   While the Debtors are distracted with stabilizing their businesses and strategic planning during these chapter 11 cases, Trade Claimants may attempt to assert considerable leverage and deny goods and services going forward, suddenly and without notice, in an effort to cripple operations and coerce payment.   Furthermore, if the relief sought herein is not granted, such Trade Claimants would have no incentive to continue to supply goods and services on customary trade

terms.  The Debtors therefore submit that the relief requested herein is appropriate under the doctrine of necessity and section 105(a) of the Bankruptcy Code.

51.     Based upon the foregoing, the Debtors submit that the relief requested herein is essential, appropriate, and in the best interests of the Debtors' estates and stakeholders.  Absent this relief, the value of the Debtors' estates would suffer, possibly precipitously.  Consequently, the Debtors' stakeholders would benefit if the requested relief is granted.

### A.     The Court Should Authorize the Payment of Lien Claims.

52.     Certain Lien Claimants may be entitled under applicable non-bankruptcy law to assert certain mechanic's or possessory liens on the Debtors' goods or equipment in their possession in an attempt to secure payment on account of their prepetition claims.  Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay. *See* 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires right in such property before the date of perfection.").  Indeed, the Debtors anticipate that certain of the Lien Claimants may assert or perfect liens, simply refuse to turn over goods in their possession, or stop performing their ongoing obligations.  Even absent a valid lien, the Lien Claimants' possession and retention of the Debtors' goods and supplies would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer these chapter 11 cases.

53.     Paying the Lien Claimants should not impair unsecured creditor recoveries in these chapter 11 cases.  In instances where the amount owed to a Lien Claimant is less than the value of the goods that could be held to secure a Lien Claim, such party may be a fully secured creditor.  In such instances, payment now only provides such party with what they might be entitled to receive under a chapter 11 plan, without any interest costs that might otherwise accrue during these chapter

11 cases.  Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy.

54.     Furthermore, the Debtors require steady provision of the services related to the Lien Claimants to maintain operational stability.  Without the Lien Claimants, the Debtors could be forced to unexpectedly halt operations while they search for substitute vendors and service providers, thereby preventing the Debtors from capturing revenue and, more critically, maintaining standards of care and service.  Any disruption to the Debtors' supply chain could result in a significant loss of operational efficiency, which could irreparably harm the Debtors' business.  Accordingly, the Debtors request authority to the Lien Claims, in their sole discretion, to avoid disruption in operations and to support the ongoing viability of the Debtors' businesses.

**B.      The Court Should Authorize the Payment of 503(b)(9) Claimants.**

55.     Under section 507(a)(2) of the Bankruptcy Code, the 503(b)(9) Claims would be afforded priority status.  Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9).  As priority claims, the 503(b)(9) Claims must be paid in full for the Debtors to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(A).  Payment of such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan, unless they consented otherwise.  The timing of such payments also lies squarely within the Court's discretion.  *See In re Global Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court").  Moreover, since they are administrative claims incurred in the ordinary course of the Debtors' businesses, the Debtors request authority to pay the 503(b)(9) Claims pursuant to section 363(c)(1) of the

Bankruptcy Code.  The Debtors' ongoing ability to obtain medical equipment and other goods is key to their survival and necessary to preserve the value of their estates.  Absent payment of the 503(b)(9) Claims at the outset of these chapter 11 cases, the Debtors could be denied access to the medical equipment and other goods necessary to maintain the Debtors' business operations and maximize the value of the Debtors' estates.

### C.    The Court Should Authorize the Payment of PACA/PASA Claims.

56.    The disposition of Trust Assets is subject to the jurisdiction of the bankruptcy court. *See Monterey Mushrooms, Inc. v. Carolina Produce Distribs., Inc.*, 110 B.R. 207, 209 (W.D.N.C. 1990); *Allied Growers Co-Op, Inc. v. United Fruit and Produce Co.*, 86 B.R. 14, 16 (Bankr. D. Conn. 1988).  Assets governed by PACA or PASA, however, do not constitute property of the Debtors' estates.  *See In re Kornblum & Co.*, 81 F.3d 280, 284 (2nd Cir. 1995); *Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F. Supp. 346, 348 (S.D.N.Y. 1993).  As a result, the distribution of assets to the PACA/PASA Claimants falls outside the priority scheme of the Bankruptcy Code and the PACA/PASA Claimants holding PACA/PASA Claims are, thus, entitled to payment from their respective Statutory Trusts ahead of the Debtors' other creditors. *See*, *e.g., In re Magic Rests., Inc.*, 205 F.3d 108, 110 (3d Cir. 2000); *Consumers Produce Co., Inc. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1377-78 (3d Cir. 1994).  Accordingly, the requested relief would not prejudice the Debtors' creditors.  In fact, payment made to PACA/PASA Claimants on account of PACA/PASA Claims is consistent with the intent of PACA and PASA and, moreover, will inure to the benefit of the Debtors and all parties in interest by (a) facilitating the continued purchase and receipt of fresh produce and other products and (b) avoiding potential disruption to the Debtors' business operations.

57.    Notably, in certain circumstances, shareholders, officers, or directors of a corporate entity who are in a position to control trust assets, but breach the fiduciary duty to preserve those

25

assets, may be held personally liable under PACA or PASA, as applicable.  See *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 283 (9th Cir. 1997); *see also Goldman-Hayden Co. v. Fresh Source Produce, Inc.*, 217 F.3d 348, 350 (5th Cir. 2000).  Thus, to the extent that any valid obligations arising under PACA or PASA remain unsatisfied by the Debtors, the Debtors' officers and directors or members may be subject to lawsuits during the pendency of these chapter 11 cases.  Any such lawsuit (and the ensuing potential liability) would distract the Debtors and their officers and directors from administering the Debtors' estates and, moreover, could lead to the assertion of substantial indemnification claims under the Debtors' governing documents, employment agreements, and applicable laws.

58.    Finally, payment of PACA/PASA Claims will inure to the benefit of the Debtors' estates by preserving goodwill between the Debtors and certain of the vendors of Fresh Goods.  Without the relief requested herein, the Debtors could be subject to numerous claims, adversary proceedings, and motions, including motions by PACA/PASA Claimants for relief from the automatic stay and/or complaints for injunctive relief, which would result in the unnecessary expenditure of time, effort, and money by the Debtors.

**D.    The Court Should Authorize the Payment of Critical Vendor Claims.**

59.    The Debtors require the provision of the goods and services provided by the Critical Vendors to continue operating their businesses and maintaining operational stability.  Without the products and services provided by the Critical Vendors, the Debtors could be forced to unexpectedly halt operations while they search for substitute vendors or service providers, and may have to forego existing favorable trade terms as a result of their haste to find new vendors; thus, preventing the Debtors from capturing revenue.  Critical Vendors Claims must be processed quickly and timely, as any delay in scheduled payments could risk disruption to the Debtors' businesses.  Any such disruption to the provision of goods and services provided by the Critical

Vendors could jeopardize the Debtors' ability to provide care for their patients and pay for physicians, significantly decreasing the value of the Debtors' business, which could impair stakeholder value at the outset of these chapter 11 cases.

## II.   Payment of the Trade Claims is in Furtherance of the Debtors' Fiduciary Duties under Sections 1107(a) and 1108 of the Bankruptcy Code.

60.    The Debtors, operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners." *CoServ*, 273 B.R. at 497.  Implicit in the duties of chapter 11 debtors in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id.*

61.    Courts have noted that there are instances in which debtors in possession can fulfill their fiduciary duties "only . . . by the preplan satisfaction of a prepetition claim." *Id.*  The *CoServ* court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment was to "sole suppliers of a given product." *Id.* at 498. The *CoServ* court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant.  Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim.  Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.*

62.    Payment of the Trade Claims meets each element of the standard articulated by the court in *CoServ*.  The failure to timely pay the Trade Claims could jeopardize patient well-being

and diminish the value of the Debtors' estates.  The harm and economic disruption that would stem from the failure to timely pay the Trade Claims is grossly disproportionate to the amount of the prepetition claims that would have to be paid.  Finally, with respect to each of the classes of Trade Claims, the Debtors have determined that no practical or legal alternative to payment of the Trade Claimants and Trade Claims exists, so continued partnership with the Trade Claimants and Trade Claims is necessary to avoid significant diminution in value of the Debtors' estates.  The Debtors can only meet their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code through payment of the Trade Claims.

III. **The Court Should Confirm that Outstanding Orders are Entitled to Administrative Expense Priority and Payment of Such Claims is within the Ordinary Course of Business.**

63.     Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the post-petition delivery of goods and services, including goods ordered prior to the commencement of a chapter 11 case, constitute administrative expense priority claims because they benefit the estates on a post-petition basis.[7]  To be awarded an administrative expense claim, a claimant must demonstrate that it conducted a transaction with a debtor in possession that, in turn, provided a benefit to such debtor's estate.  *See Matter of Whistler Energy II, L.L.C.*, 931 F.3d 432, 440 (5th Cir. 2019) (noting that section 503(b)(1)(A) of the Bankruptcy Code "grants priority status to certain necessary expenses incurred after the filing of a bankruptcy petition that benefit the bankruptcy estate"); *Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527, 532–33 (3d Cir. 1999).

---

[7]     *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses).

64.     The Debtors submit that, pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the post-petition delivery of desired and necessary goods are in fact administrative expense priority claims in virtually all instances.  Indeed, even if the goods had been received in the ordinary course of the Debtors' businesses 20 days before the Petition Date, the related claims would receive administrative expense priority under section 503(b)(9) of the Bankruptcy Code.  *See In re Chateaugay Corp.*, 10 F.3d 944, 956 (2d Cir. 1993) (holding that an obligation from post-petition performance related to a prepetition transaction is entitled to administrative expense priority); *In re John Clay & Co.*, 43 B.R. 797, 809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered post-petition are entitled to administrative priority).  Further, where transactions involve both the delivery of goods and associated services, courts have granted priority under section 503(b)(9) of the Bankruptcy Code to the portion of the claim relating to the sale of goods.  *See In re NE Opco, Inc.*, 501 B.R. 233, 257 (Bankr. D. Del. 2013).

65.     Granting the relief sought with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have received if the relief were not granted, and will not prejudice any other party in interest.  Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to assure suppliers of their administrative priority status.  Disruption of the continuous and timely flow of critical products and other goods would critically jeopardize the Debtors' ability to fill customer orders, damage the Debtors' business reputation, erode the Debtors' customer base, and ultimately lead to a loss of revenue, all to the detriment of the Debtors and their creditors and estates. The Debtors, therefore, respectfully request that the Court confirm the administrative priority

status for the Outstanding Orders and authorize the Debtors to meet their obligations thereunder in the ordinary course of business.

**IV.    The Court Should Authorize Applicable Banks and Financial Institutions to Honor and Process Related Checks and Transfers.**

66.    The Debtors also request that the Court authorize all applicable banks and financial institutions to (a) receive, process, honor, and pay all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to, the claims that the Debtors request authority to pay in this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before, on, or after the Petition Date (provided that funds are available in the Debtors' accounts to cover the checks and fund transfers), and (b) rely on the Debtors' designation of any particular check as approved by the Interim Order or Final Order.

67.    The Debtors believe that they have sufficient liquidity to pay the amounts set forth in this Motion in the ordinary course of business and have implemented controls to ensure that prepetition claims will not be paid out except as authorized by the Court.  The Debtors, therefore, submit that the payment-processing procedures described in this Motion are appropriate.

<u>**Emergency Consideration**</u>

68.    Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003.  Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ." Fed. R. Bankr. P. 6003.  As set forth in this Motion and the First Day Declaration, the Debtors believe that an orderly transition into chapter 11 is critical to the viability of the Debtors'

businesses, operations, and estates and that any delay in granting the relief requested herein could cause immediate and irreparable harm.  The Debtors also believe that they may need to make upcoming payments to Trade Claimants during the first 21 days of these chapter 11 cases.  Failure to receive the requested relief during the first 21 days of these chapter 11 cases could imperil the Debtors' restructuring and cause immediate and irreparable harm.  Accordingly, the Debtors submit that the relief requested herein satisfies the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

### **Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)**

69.     To implement successfully the relief sought herein, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances.  The Debtors also request that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates and economic stakeholders.  Accordingly, the Debtors respectfully submit that ample cause exists to justify the (a) finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and (b) waiving of the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

### **Reservation of Rights**

70.     Nothing contained herein or any actions taken pursuant to the relief requested in this Motion is intended or shall be construed as (a) an admission as to the amount of, basis for, or

validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law, (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds, (c) a promise or requirement to pay any claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim, (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates, (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law, or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  The Debtors also expressly reserve their rights to contest any Trade Claims under applicable bankruptcy and non-bankruptcy law.  Likewise, if the Court grants the relief sought herein, any payment or transfer made pursuant to the Court's order is not intended, and should not be construed as, an admission as to the amount, priority, character, or validity of any claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## **Notice**

71.     Notice of this Motion will be provided to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Lenders; (d) counsel to the Ad Hoc Group; (e) counsel to the Prepetition

First Lien Administrative Agent; (f) counsel to the Prepetition Second Lien Administrative Agent; (g) the Office of the United States Attorney for the Southern District of Texas; (h) the state attorneys general for states in which the Debtors conduct business; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; and (k) any party identified in section E of the Procedures for Complex Cases in the Southern District of Texas (collectively, the "Notice Parties").   A copy of this Motion and the orders approving it will also be made available on the Debtors' case information website located at https://dm.epiq11.com/Wellpath.   Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested, the Debtors respectfully submit that no other or further notice is required.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and the Final Order, substantially in the forms annexed hereto, granting the relief requested herein and such other and further relief as the Court deems appropriate under the circumstances.

Dated:  November 12, 2024
Dallas, Texas

*/s/ Marcus A. Helt*

Marcus A. Helt (Texas Bar #24052187)
MCDERMOTT WILL & EMERY LLP
2501 N. Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone:     (214) 295-8000
Facsimile:      (972) 232-3098
Email:           mhelt@mwe.com

-and-

Felicia Gerber Perlman (*pro hac vice* admission pending)
Bradley Thomas Giordano (*pro hac vice* admission pending)
Jake Jumbeck (*pro hac vice* admission pending)
Carole Wurzelbacher (*pro hac vice* admission pending)
Carmen Dingman (*pro hac vice* admission pending)
MCDERMOTT WILL & EMERY LLP
444 West Lake Street, Suite 4000
Chicago, Illinois 60606-0029
Telephone:     (312) 372-2000
Facsimile:      (312) 984-7700
Email:           fperlman@mwe.com
                     bgiordano@mwe.com
                     jjumbeck@mwe.com
                     cwurzelbacher@mwe.com
                     cdingman@mwe.com

-and-

Steven Z. Szanzer (*pro hac vice* admission pending)
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, New York 10017
Telephone:     (212) 547-5400
Facsimile:      (212) 547-5444
Email:           sszanzer@mwe.com


*Proposed Counsel to the Debtors and Debtors in Possession*

## **Certificate of Accuracy**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and accurate to the best of my knowledge, information, and belief.  This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Marcus A. Helt*
Marcus A. Helt

## **Certificate of Service**

I certify that, on November 12, 2024, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Marcus A. Helt*
Marcus A. Helt