**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE
DEBTORS TO (A) OBTAIN POSTPETITION FINANCING
AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS
AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION
SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Emergency relief has been requested.  Relief is requested not later than 5:00 p.m. (prevailing Central Time) on November 12, 2024.

If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.

A hearing will be conducted on this matter on November 12, 2024, at 5:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002.

Participation at the hearing will only be permitted by an audio and video connection.

Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number.  Judge Perez's conference room number is 282694.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Perez's homepage.  The meeting code is "JudgePerez".  Click the settings icon in the upper right corner and enter your name under the personal information setting.

Hearing appearances must be made electronically in advance of both electronic and in person hearings.  To make your appearance, click the "Electronic Appearance" link on

---

[1]	A complete list of the Debtors (as defined below) in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Wellpath.  The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

> **Judge Perez's homepage.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state the following in support of this emergency motion (this "<u>Motion</u>"):[2]

### Relief Requested

1.      By the Motion, the Debtors respectfully request entry of an interim order (the "<u>Interim DIP Order</u>"), substantially in the form attached hereto, and a final order (the "<u>Final DIP Order</u>"[3] and, together with the Interim DIP Order, the "<u>DIP Orders</u>"):

(a)      authorizing Wellpath Holdings, Inc., as borrower (the "<u>Borrower</u>"), to obtain, and the other Debtors, as guarantors (each, a "<u>Guarantor</u>," and collectively, the "<u>Guarantors</u>"), to guarantee, on a joint and several basis, the Borrower's obligations under, a priming senior secured, superpriority debtor-in-possession term loan facility in the aggregate principal amount of $522,375,000 (the "<u>DIP Term Facility</u>" and the commitments thereunder, the "<u>DIP Commitments</u>," and the term loans advanced (or deemed advanced) thereunder, the "<u>DIP Term Loans</u>") under that certain Senior Secured Superpriority Debtor In Possession Credit Agreement among the Borrower, CCS-CMGC Intermediate Holdings, Inc., as Holdings ("<u>Holdings</u>"), CCS-CMGC Intermediate Holdings 2, Inc., and the DIP Lenders (as defined below), and UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacities, the "<u>DIP Administrative Agent</u>" and the "<u>DIP Collateral Agent</u>", respectively, and together the "<u>DIP Agents</u>"), which is attached to the Interim DIP Order as <u>Exhibit A</u> (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "<u>DIP Credit Agreement</u>") comprised of:

(i)      a "new money" multiple draw term loan facility in an aggregate principal amount of $105,000,000, of which (A) an initial amount of up to $45,000,000 (the "<u>Initial Term Loans</u>") will be made available to be drawn

---

[2]    The facts and circumstances supporting this Motion are set forth in the *Declaration of Timothy J. Dragelin as Chief Restructuring Officer and Chief Financial Officer of Wellpath Holdings, Inc. and Certain of its Affiliates and Subsidiaries in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "<u>First Day Declaration</u>") filed contemporaneously with the filing of this Motion and incorporated by reference herein and the *Declaration of Christian Tempke in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "<u>DIP Declaration</u>") filed contemporaneously herewith and incorporated herein by reference.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration, the DIP Declaration, or the DIP Credit Agreement, each as defined herein and as applicable.

[3]    The Debtors will file the form of Final DIP Order prior to the Final Hearing (as defined below).

2

in a single drawing upon entry of the Interim DIP Order and satisfaction of the other applicable conditions to the Initial Term Loans set forth in the DIP Term Loan Documents (as defined below) (such initial draw, the "Initial Draw"), and (B) an additional amount of $60,000,000 (the "Delayed Draw Term Loans" and, together with the Initial Term Loans, the "New Money DIP Term Loans") will be made available to be drawn in a single drawing upon entry of the Final DIP Order and satisfaction of the other applicable conditions to the Delayed Draw Term Loans set forth in the DIP Term Loan Documents (the "Delayed Draw"); plus

(ii)   "roll-up" term loans in an aggregate principal amount of up to $417,375,000, consisting of (A) upon entry of the Interim DIP Order and funding of the Initial Draw, up to $178,875,000 (the "Interim Roll-Up Amount"), which will be drawn down and immediately applied in repayment of an equivalent principal amount of (i) Prepetition First Lien Term Loans (as defined below) held by each DIP Lender or its affiliate that is also a Prepetition First Lien Lender (as defined below) or their affiliates or related funds, representing a 3.95:1.00 ratio (the "First Lien Roll-Up Ratio") of Prepetition First Lien Term Loans to New Money DIP Term Loans, in an amount equal to three and ninety-five hundredths (3.95) times the sum of (A) the amount of the Initial Term Loans, allocated to such DIP Lender or its affiliates attributable to their 1L Backstop Amount (as defined in the DIP Commitment Letter) plus (B) the quotient of (1) the aggregate Initial Term Loans allocated to Prepetition Second Lien Lenders or their affiliates attributable to their respective 2L Backstop Amount (as defined in the DIP Commitment Letter), times (2) such DIP Lender's and its affiliates' pro rata share (expressed as a percentage) of the aggregate 1L Backstop Amount (the "Initial First Lien Roll-Up") and (ii) Prepetition Second Lien Term Loans (as defined below) held by each DIP Lender or its affiliate that is also a Prepetition Second Lien Lender (as defined below) or their affiliates or related funds, representing a 0.50:1.00 ratio (the "Second Lien Roll-Up Ratio" and, together with the First Lien Roll-Up Ratio, the "Roll-Up Ratios") of Prepetition Second Lien Term Loans to New Money DIP Term Loans (the "Initial Second Lien Roll-Up" and, together with the Initial First Lien Roll-Up, the "Initial Roll-Up"), and (B) upon entry of the Final DIP Order and funding of the Delayed Draw, consistent with the applicable Roll-Up Ratios, up to $238,500,000 (the "Final Roll-Up Amount," and together with the Interim Roll-Up Amount, the "Roll-Up Amount") which will be deemed drawn down and immediately applied in repayment of an equivalent principal amount of (i) Prepetition First Lien Term Loans held by each DIP Lender or its affiliate that is also a Prepetition First Lien Lender or their affiliates or related funds and (ii) Prepetition Second Lien Term Loans held by each DIP Lender or its affiliates that is also a Prepetition second Lien Lender or their affiliates or related funds (the "Final Roll-Up" and, together with the Initial Roll-Up, the "Roll-Up"), in each case on a cashless basis

3

(the "Roll-Up Loans"), subject to the terms and conditions set forth in the DIP Credit Agreement, the Interim DIP Order and the Final DIP Order;

which shall be funded on behalf of certain Prepetition Lenders (as defined below) or their affiliates or related funds, in their capacities as postpetition financing lenders (collectively, the "DIP Lenders") pursuant to the terms and conditions set forth in (i) the DIP Credit Agreement, (ii) the DIP Term Sheet attached to the Interim DIP Order as Exhibit B, (iii) that certain Senior Secured Superpriority Debtor in Possession Credit Facility and Equity Financing Backstop Commitment Letter (the "DIP Commitment Letter"), executed by certain of the Prepetition Lenders (each, a "Backstop Party," and collectively, the "Backstop Parties"), and (iv) all agreements, documents and instruments delivered or executed in connection with the DIP Credit Agreement (such agreements, documents, and instruments, including, without limitation, the DIP Credit Agreement, the DIP Term Sheet, and the DIP Commitment Letter, collectively, the "DIP Term Loan Documents");

(b)     authorizing the Debtors to (a) enter into the DIP Credit Agreement and the other DIP Term Loan Documents, and (b) to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Credit Agreement and the other DIP Term Loan Documents or the DIP Term Facility;

(c)     granting the DIP Collateral Agent, for the benefit of itself and the DIP Lenders, allowed superpriority administrative expense claims in each of the Debtors' chapter 11 cases and any successor cases, including any chapter 7 cases, with respect to the DIP Term Facility and all obligations and indebtedness owing thereunder, under the DIP Credit Agreement and the other DIP Term Loan Documents (collectively, the "DIP Obligations");

(d)     granting the DIP Collateral Agent, for the benefit of itself and the DIP Lenders, automatically perfected priming security interests in, and liens on, with respect to the DIP Term Loans, on any and all presently owned and hereafter acquired assets and real and personal property of the Debtors as set forth in the DIP Term Loan Documents (collectively, the "DIP Collateral"), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), and the Prepetition Collateral (as defined below), in each case, to secure the DIP Term Loans and the other DIP Obligations, subject only to the Carve Out (as defined below) and the terms and priorities set forth in the Interim DIP Order;

(e)     authorizing the Debtors, subject to and pursuant to the terms and conditions set forth in the DIP Orders, to continue to (a) use Cash Collateral and (b) provide adequate protection on account of any diminution in the value of the Prepetition Collateral, including Cash Collateral, as a consequence of the Debtors' use, sale, or lease of the Prepetition Collateral, including any Cash Collateral, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (as defined below), with section 361 of the Bankruptcy Code to the Prepetition Secured Parties;

(f)     authorizing the Debtors to pay, on the terms set forth the Interim DIP Order and in the DIP Term Loan Documents the principal, interest, reasonable and documented fees, expenses, and other amounts payable under the DIP Credit Agreement and the other DIP Term

Loan Documents as such amounts become earned, due and payable, including reasonable and documented professional fees of the DIP Agents' and DIP Lenders' advisors, all to the extent provided in, and in accordance with, the DIP Credit Agreement and the other DIP Term Loan Documents;

(g)     waiving (i) subject to entry of the Final DIP Order, the Debtors' and their estates' right to surcharge against the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code, (ii) subject to entry of the Final DIP Order, the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, and (iii) subject to entry of the Final DIP Order to the extent provided therein, the "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(h)     authorizing the DIP Agents and the DIP Lenders to exercise remedies under the DIP Credit Agreement and the other DIP Term Loan Documents on the terms described in the Interim DIP Order, the DIP Credit Agreement, and the other DIP Term Loan Documents upon the occurrence and during the continuation of a DIP Termination Event (as defined in the Interim DIP Order);

(i)     modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Orders; and

(j)     scheduling a final hearing on the Motion to consider entry of the Final DIP Order (the "Final Hearing") no later than 30 days after the entry of the Interim DIP Order.

**Preliminary Statement**

2.     Wellpath is the leading medical and mental health services provider in correctional facilities, inpatient and residential treatment facilities, forensic treatment facilities, and civil commitment centers. Despite Wellpath's historical and continued market leading position and its critical role in addressing the healthcare needs of its clients, Wellpath faced substantial financial challenges in recent years. Those issues stemmed from, among other things, escalating operating and labor costs, a transitory increase in professional liability insurance expenses, and underperformance on several significant contracts. These financial challenges, combined with a high-rate interest environment, led to increasing liabilities, deferred payables, and liquidity

shortfalls.  Compounding matters, the maturity date of the Debtors' Prepetition Revolving Credit Facility (as defined below) would occur in October 2024.

3.       To address the challenges, in early 2024, Wellpath, with the assistance of its advisors, embarked on a review of strategic initiatives.  The result of that process was the pursuit of an out-of-court recapitalization transaction involving a sale of the Wellpath's behavioral health division, Recovery Solutions (the "RS Division").  The goal of the sale process was to use proceeds from a potential sale of the RS Division to pay down a significant portion of the Prepetition First Lien Credit Facility to facilitate an extension of the remaining debt amounts.

4.       In April 2024, Wellpath launched the RS Division sale process.  Initial indications from the sale process resulted in promising interest from potential buyers.  Based on the market's positive response, the Debtors and their advisors advanced the marketing process throughout the summer.  During that time, the Debtors and their advisors began engaging with the Ad Hoc Group to discuss the preliminary framework of a potential amend-and-extend transaction.  But despite the Debtors' robust marketing efforts, the sale process stalled, and the Debtors did not receive any acceptable bids at the conclusion of the bidding process.  Efforts to reengage other bidders were also unsuccessful.

5.       With a successful sale transaction unlikely in the near-term, and faced with ongoing liquidity challenges, growing vendor payables, and the approaching debt maturity, the Debtors pivoted to negotiating the terms of an in-court restructuring with the Ad Hoc Group. These negotiations ultimately led to the execution of the Restructuring Support Agreement, dated November 11, 2024 (the "RSA"), among the Debtors and the Consenting Stakeholders (as defined in the RSA).

6.      A critical component of the RSA is the DIP Term Facility, which will supply the Debtors with critical and necessary postpetition debtor-in-possession financing in these chapter 11 cases.  As set forth in the DIP Credit Agreement, the DIP Term Facility provides the Debtors with a much-needed capital injection in the form of the New Money DIP Term Loans in the principal amount of $105,000,000, in which all Prepetition Lenders will be offered the opportunity to participate through a syndication process to be completed by no later than the earlier of (x) 14 calendar days after the date on which the Syndication Procedures are published or (y) 21 days after the Petition Date.  Any amounts of New Money DIP Term Loans unfunded after the syndication process will be funded by certain Prepetition Lenders that have agreed to backstop the DIP Term Facility subject to the terms and conditions set forth in the DIP Commitment Letter.

7.      Obtaining access to the DIP Term Facility, including the use of Cash Collateral, on the first day of these chapter 11 cases is critical for the success of the Debtors' restructuring. Moreover, the DIP Term Facility and the Debtors' ability to use Cash Collateral are essential to the Debtors' ability to continue to provide high quality healthcare to their vulnerable patients; maintain their business relationships with their employees, vendors, and suppliers; and to meet their ongoing obligations to their customers while engaged in the restructuring process.  At bottom, access to the proceeds of the DIP Term Facility and the use of Cash Collateral is crucial to the Debtors' continued viability, the success of the Debtors' restructuring efforts, and the health and safety of their patients.  Any disruption in operations would have a grave and immediate impact on their constituents and would negatively impact the outcome of these chapter 11 cases.

8.      As described in greater detail in the DIP Declaration, substantially all of the Debtors' assets are encumbered by valid and perfected liens held by the Prepetition Secured Parties, meaning that in order to avoid protracted and expensive priming litigation, the Debtors

would need to either (a) obtain the consent of the Prepetition Secured Parties to the priming of their liens or (b) locate a lender willing to provide postpetition financing on a junior or unsecured basis.  *See* DIP Decl. ¶ 17.  Neither of the foregoing options were feasible for the Debtors.  As described in the DIP Declaration, the Debtors searched for actionable alternative proposals and, in short, none of the solicited potential financing sources were willing to provide postpetition financing on a junior or unsecured basis.  *See* DIP Decl. ¶ 17.  Therefore, in their exercise of sound business judgment, the Debtors negotiated extensively with the Ad Hoc Group, at arm's-length and in good faith, for access to critical and necessary postpetition financing in the form of the DIP Term Facility and the use of Cash Collateral.  The DIP Term Facility, including the Debtors' use of Cash Collateral, is being consented to, or is deemed consented to, by the Prepetition Secured Parties, meaning that the DIP Term Facility pending before the Court is the Debtors' best option and one supported by the Prepetition Secured Parties.

9.      For the reasons set forth herein, as well as in the DIP Declaration and the First Day Declaration, the Debtors believe that the authority to obtain the DIP Term Facility, including the use of Cash Collateral, is in the best interests of the Debtors, their estates, and their creditors. Accordingly, the Debtors respectfully request approval of the Motion and authority to enter into the DIP Term Facility and to use Cash Collateral, as more fully detailed herein and in the DIP Declaration, subject to the terms and conditions set forth in the DIP Orders granting such relief.

## Jurisdiction and Venue

10.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Order of Reference to Bankruptcy Judges,* General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.).

11.     Venue of these chapter 11 cases and related proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 365, 503, 506, 507, and 552 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 2002-1, 4001-1, 4002-1(i), and 9013-1(b) of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and section C(8) of the *Procedures for Complex Chapter 11 Cases in the Southern District of Texas* (the "Complex Case Procedures").

## Background

13.     Wellpath is the premier provider of localized, high quality, compassionate care to vulnerable patients in challenging clinical environments. Wellpath is the leading medical and mental health services provider in correctional facilities, inpatient and residential treatment facilities, forensic treatment facilities, and civil commitment centers.  Headquartered in Nashville, Tennessee with operations in approximately 420 facilities across 39 states, Wellpath provides outsourced solutions to the correctional healthcare and behavioral healthcare industries.  Wellpath offers an array of healthcare services to its federal, state, and local government partners, including on-site medical services, telehealth and mental health programs, and pharmacy management. Wellpath employs more than 13,000 people and serves nearly 200,000 patients daily.

14.     On November 11, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

15.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no statutory committee has been appointed or designated.

### Concise Statement of the Material Terms of the Interim DIP Order Pursuant to Bankruptcy Rule 4001 and the Complex Case Procedures

16.     The following chart contains a summary of the material terms of the proposed Interim DIP Order, together with references to the applicable sections of the Interim DIP Order and other relevant source documents, including the DIP Credit Agreement, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the Complex Case Procedures.[4]

| SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER | |
| --- | --- |
| **Parties to the DIP Credit Agreement**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Loan Parties**:<br><br>Borrower:   Wellpath Holdings, Inc., in its capacity as debtor and debtor in possession<br><br>**(Interim DIP Order, at 1; DIP Credit Agreement, at 1)**<br><br>Guarantors:   CCS-CMGC Intermediate 2 Holdings, Inc., Holdings, and each of the Borrower's direct and indirect subsidiaries that are Debtors, each in their respective capacities as debtors and debtors in possession in these chapter 11 cases.<br><br>Each Guarantor shall jointly and severally, irrevocably, and unconditionally guarantee, on a superpriority basis, the payment in full in cash of all DIP Obligations in accordance with the Interim DIP Order and the applicable DIP Term Loan Documents. Notwithstanding the foregoing, however, any of the Guarantors described above that were not "Guarantors" under the Prepetition |

---

[4]   The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced herein.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Term Loan Documents, including the DIP Credit Agreement, or the Interim DIP Order, as applicable.

| SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER | |
|---|---|
| | Credit Agreements, shall not constitute a "Guarantor" or "Loan Party" solely with respect to the obligations under the Roll-Up Loans.<br><br>**(Interim DIP Order, at 1–2; DIP Credit Agreement, § 6.14)**<br><br>**DIP Secured Parties:**<br><br>DIP Administrative Agent:    UBS AG, Stamford Branch<br><br>DIP Collateral Agent:    UBS AG, Stamford Branch<br><br>**(Interim DIP Order, at 3; DIP Credit Agreement, § 12)**<br><br>DIP Lenders:    The Backstop Parties and such other financial institutions or entities who become party to the DIP Credit Agreement in accordance with its terms and pursuant to the Syndication Procedures.<br><br>**(DIP Credit Agreement, at 1)** |
| **DIP Facilities**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Senior secured, superpriority, multiple draw term loan facility in an aggregate principal amount of $522,375,000 comprised of<br><br>• New Money DIP Term Loans in the form of up to (a) subject to entry of the Interim DIP Order and satisfaction of the conditions set forth in the DIP Term Loan Documents, $45,000,000 of Initial Term Loans and (b) subject to entry of the Final DIP Order and satisfaction of the conditions set forth in the DIP Term Loan Documents, $60,000,000 of Delayed Draw Term Loans.<br><br>• Roll-Up Loans in the form of up to (a) subject to entry of the Interim DIP Order and satisfaction of the conditions set forth in the DIP Term Loan Documents, an initial Roll-Up of $178,875,000 of outstanding Prepetition First Lien Term Loans and Prepetition Second Lien Term Loans and (b) upon entry of the Final DIP Order and satisfaction of the conditions set forth in the DIP Term Loan Documents, a Final Roll-Up of $238,500,000 of outstanding Prepetition First Lien Term Loans and Prepetition Second Lien Term Loans.<br><br>• The principal amount of the Roll-Up Loans is a combination of (a) a 3.95:1.00 roll-up of Prepetition First Lien Term Loans compared to New Money DIP Term Loans funded by Prepetition First Lien Term Loan Lenders that elect to participate in the DIP Term Facility and (b) a 0.50:1.00 roll-up of Prepetition Second Lien Term Loans compared to New Money DIP Term Loans funded by Prepetition Second Lien Term Loan Lenders that elect to participate in the DIP Term Facility.<br><br>The Initial Term Loans, Delayed Draw Term Loans and the Roll-Up Loans shall be secured by the DIP Collateral on a *pari passu* basis, but the Initial Term Loans and Delayed Draw Term Loans shall have senior payment |

11

| SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER | |
|---|---|
| | priority over the Roll-Up Loans.  The Roll-Up Loans shall also be subject to the Roll-Up Reduction Provision.<br><br>**(Interim DIP Order, at 2; DIP Credit Agreement, § 2.01(a)–(c))** |
| **Maturity**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(iii), 4001(c)(1)(B)* | The DIP Term Facility will mature on the earliest to occur of:<br><br>• (i) 210 days after the Petition Date;<br><br>• (ii) 31 days after the Petition Date if the Final DIP Order has not been entered by the Court, unless otherwise extended by the Required Lenders;<br><br>• (iii) the consummation of one or more section 363 sales resulting in the sale of all or substantially all of the Debtors' assets;<br><br>• (iv) the effective date of a chapter 11 plan of any Debtor, which has been confirmed by an order entered by the Court in any of these chapter 11 cases; and<br><br>• (vi) the acceleration of the DIP Loans and the termination of the commitments under the DIP Term Facility.<br><br>**(DIP Credit Agreement, §§ 1.01, "Maturity Date" definition, 2.16)** |
| **Lending Conditions**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Credit Agreement include conditions to closing that are customary and appropriate for similar debtor-in-possession financings of this type, including, without limitation, that (i) the DIP Administrative Agent shall have received requisite loan notices, security agreement, and executed certificates, (ii) the Borrower shall have paid all required fees and expenses, (iii) no Event of Default or Default shall have occurred, (iv) the Interim DIP Order shall have been entered at least two Business Days after the Petition Date, (v) the RSA shall be in full force and effect, and no breach, default, or event of default shall have occurred and be continuing thereunder, and (vi) the DIP Agents and the DIP Lenders shall have received the Initial DIP Budget.<br><br>**(DIP Credit Agreement, §§ 6, 7)** |
| **Interest Rates**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | <u>New Money DIP Term Loans</u>.  SOFR plus 7.25% *per annum*, payable semi-annually partially in cash (at a rate of SOFR plus 1.00% *per annum*) and the remainder in kind; <u>provided</u>, that if prior to the first interest payment date to occur after the Final Funding Date, any portion of the outstanding New Money DIP Term Loans is cancelled as the result of a credit bid of the New Money DIP Term Loans, any accrued and unpaid interest as of the date of such credit bid shall be capitalized and added to the amount of the credit bid.<br><br><u>Roll-Up Loans</u>:  SOFR + 6.93% *per annum*, payable monthly in kind<br><br>**(DIP Credit Agreement, § 2.08(a)–(b), (d))**<br><br><u>Default Rate</u>:  2.00% *per annum* above the otherwise applicable rate.<br><br>**(DIP Credit Agreement, § 2.08(c))** |

| SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER | |
|---|---|
| **Parties with an Interest in Cash Collateral**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(i)* | As of the Petition Date, the Prepetition Secured Parties have an interest in Cash Collateral.<br><br>**(Interim DIP Order, ¶ E(x))** |
| **Fees**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Commitment Premium:  To the Backstop Parties, a commitment premium in an amount equal to 10.0% of the principal amount of the New Money DIP Commitments, which shall be earned and paid in kind on the Closing Date when the Initial Term Loans are funded by such Backstop Parties, ratably based on their respective New Money DIP Commitments.<br><br>**(DIP Credit Agreement, § 4.01)**<br><br>Closing Fee:  A closing fee in an amount equal to 5.0% of the principal amount of the New Money DIP Term Loans (the "Closing Fee") shall be paid in kind to each DIP Lender, ratably based on its respective New Money DIP Commitments as follows: (i) on the Closing Date with respect to the Initial Term Loans funded by such DIP Lender on the Closing Date and (ii) when drawn with respect to the Delayed Draw Term Loans funded by such DIP Lender on such draw date. The Closing Fee shall be shared with the other DIP Lenders ratably based on their respective New Money DIP Commitments funded by such DIP Lender on such draw date.<br><br>**(DIP Credit Agreement, § 4.01)**<br><br>Other Fees: The Debtors shall pay to the DIP Agents and the Fronting Lender such other fees that have been separately agreed to, including all reasonable and documented out-of-pocket expenses incurred by the DIP Agents and the DIP Lenders, subject to the terms and conditions set forth in the DIP Credit Agreement and the Interim DIP Order.<br><br>DIP Administrative Agent Fee: a $75,000 per annum agent gee payable in cash to the DIP Administrative Agent for its own account upon entry of the Interim DIP Order and on each anniversary thereafter.<br><br>**(Interim DIP Order, ¶ 2(b); DIP Credit Agreement, § 4.01)** |
| **Approved Budget**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The use of cash and proceeds from loans under the DIP Term Facility is subject to the Initial DIP Budget, attached to the Interim DIP Order as Exhibit C.  The Initial DIP Budget and each Updated DIP Budget approved in writing (email being sufficient) by the Required Lenders or their advisors shall be deemed the "Approved DIP Budget" until superseded by another Approved DIP Budget, as set forth in greater detail in the Interim DIP Order.<br><br>Each Updated DIP Budget shall be delivered to the Required Lenders every four weeks no later than five (5) calendar days prior to the Monday of the first week covered on such proposed Updated DIP Budget (it being understood that the first delivery of the proposed Updated DIP Budget shall be on or prior to December 4, 2024 with respect to the 13-week starting from December 9, 2024 and the second delivery of the proposed Updated DIP Budget shall be |

| SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER | |
|---|---|
| | on or prior to January 2, 2025 with respect to 13-week starting from January 6, 2025, <u>provided</u>, that if the Required Lenders have not approved in writing a proposed Updated DIP Budget within three (3) business days of receipt of such proposed Updated DIP Budget, the then-current Approved DIP Budget shall continue to be the Approved DIP Budget, and until any such updated budget, amendment, supplement or modification has been approved by the Required Lenders, the Debtors shall be subject to and be governed by the terms of the Approved DIP Budget then in effect.<br><br>**(Interim DIP Order, ¶ 6(i), Ex. C)** |
| **Liens and Priorities**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(i), (ii), and (xi)* | **DIP Liens**.  Subject to the Carve Out, as security for the DIP Obligations, the DIP Collateral Agent, for the benefit of itself and each of the other DIP Secured Parties, shall be granted automatically and properly perfected security interests in and liens on the DIP Collateral,[5] subject and subordinate to the Carve Out and subject to the relative priorities and provisions set forth in the Interim DIP Order.<br><br>The DIP Liens shall have the following priorities (subject in all cases to the Carve Out):<br><br>• ***First Priority Liens on Unencumbered Property***.   Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected first-priority senior security interest in and lien upon all of the DIP Collateral, including, without limitation, all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to Prepetition Liens or any other valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), subject |

---

[5]   "DIP Collateral" means all assets (whether tangible, intangible, real, personal or mixed) of the Debtors (and their bankruptcy estates) of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date (including the Prepetition Collateral), now owned or hereafter acquired, including all accounts, chattel paper, claims and causes of action (including, subject to entry of the Final DIP Order, any proceeds or property recovered, unencumbered, or otherwise, from claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code whether pursuant to federal law or applicable state law (collectively, the "Avoidance Actions"), whether by judgment, settlement or otherwise), commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods (including fixtures), instruments, inventory, investment property, money, cash, cash equivalents, and all deposit accounts, securities accounts, commodities accounts and lockboxes together with all money, cash, securities and other investment property on deposit from time to time therein, letters of credit, letter-of-credit rights and other supporting obligations, real property, books and records, and to the extent not otherwise included, all substitutions, replacements, accessions, products and other proceeds and products (whether tangible or intangible and including, without limitation, insurance proceeds (including all proceeds from any directors'/officers' liability insurance policies), licenses, royalties, income, payments, claims, damages and proceeds of suit) of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing, the right, title or interest in any capital stock, investment property, partnership, membership or other equity or similar interests in any entity (whether or not such entity is a Debtor), including all capital stock, securities accounts, investment property, partnership, and membership, other equity or similar interests (and including all rights, beneficial interests, causes of action and choses of action related thereto) of the Debtors, whether existing as of the Petition Date or after acquired.

| SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER |
|---|

to and subordinate in all respects to the Carve Out and as to the Carve Out Reserves and funds therein, to the extent of any Carve Out Security Interest.

- *Junior Liens*. Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected junior priority security interest in and lien upon all of the DIP Collateral, including, without limitation, all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter created, acquired or arising or wherever located, that, on or as of the Petition Date is subject to (i) Prepetition Liens or (ii) any other valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)) (such liens in the preceding clause (ii), the "Permitted Prior Liens"), subject to and subordinate in all respects to the Carve Out and as to the Carve Out Reserves and funds therein, to the extent of any Carve Out Security Interest.

- *Priming Liens*. Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, fully perfected first-priority priming security interest and lien (the "Priming Liens") on all DIP Collateral, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, to the extent that such DIP Collateral is subject to any of the Prepetition Liens, subject to and subordinate in all respects to the Carve Out and as to the Carve Out Reserves, and funds therein, to the extent of any Carve Out Security Interest. The Priming Liens shall prime in all respects the liens and security interests of the Prepetition Secured Parties, with respect to the Prepetition Collateral (including, without limitation, the Prepetition Liens, the Adequate Protection Liens granted to the Prepetition Secured Parties, and any purported prepetition liens (the "Primed Liens"). Notwithstanding anything herein to the contrary, the Priming Liens (w) shall be subject to and subordinate in all respects to the Carve Out and will have no recourse to the Carve Out Reserves, or the funds therein (other than to the extent of the Carve Out Security Interest on the terms therein), and (x) shall be subject and junior to the Permitted Prior Liens in all respects and (y) shall be senior in all respects to the Primed Liens, and (z) shall also be senior to the Adequate Protection Liens.

The Limited Guarantors shall not be deemed to have granted DIP Liens solely with respect to the Roll-Up Loans (but, for the avoidance of doubt, shall be deemed to have granted DIP Liens with respect to the New Money DIP Loans and all other DIP Obligations); and provided, further, that the DIP Agents and the Prepetition Agents shall have a security interest in any residual cash balance remaining in the Carve Out Reserves after all obligations benefitting from the Carve Out have been indefeasibly paid in full in cash pursuant to a final non-appealable order of the Court (or such other Court of competent jurisdiction), which residual balance shall be paid to the DIP Agents for application in accordance with the DIP Credit Agreement and the other DIP

| | SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER |
|---|---|
| | Term Loan Documents, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all commitments under the DIP Term Facility have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as set forth herein (such security interest on residual cash balances, in accordance with this proviso, the "Carve Out Security Interest").<br><br>**(Interim DIP Order, ¶ 4)**<br><br>**Superpriority DIP Claims and Priorities**. Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b) and any and all administrative expenses or other claims ("Administrative Expense Claims") arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject to entry of the Final DIP Order to the extent set forth therein), 507(a), 507(b), 726, 1113, or 1114 (including the Adequate Protection Obligations (as defined below)), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b), and which DIP Superpriority Claims shall be payable from and have recourse to all of the DIP Collateral and all proceeds thereof in accordance with the DIP Credit Agreement and the other DIP Term Loan Documents, subject only to payment of the Carve Out.<br><br>**(Interim DIP Order, ¶ 5; DIP Credit Agreement, § 2.15(a)(i))** |
| **Use of Proceeds**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(ii), 4001(c)(1)(B)* | The proceeds of the DIP Term Facility may be used only for the following purposes: the proceeds of (i) the Initial Term Loans and Delayed Draw Term Loans shall be used (a) to pay transaction costs, fees and expenses that are incurred in connection with the DIP Term Facility, for working capital and general corporate purposes of the Borrower and the Guarantors, (b) to make adequate protection payments, (c) to pay certain critical vendors, pay costs relating to the sale of the Debtors' assets and make other payments authorized under first-day orders approved by the Court, (d) to pay professional fees due and payable under the DIP Term Facility and to finance administration of these chapter 11 cases; and (ii) the Roll-Up Loans shall be used to repay the equivalent principal amount of the loans outstanding under the Prepetition First Lien Credit Agreement.<br><br>**(Interim DIP Order, ¶ 13(c); DIP Credit Agreement, § 9.10)** |

| SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER | |
|---|---|
| **Use of Cash Collateral**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(ii), 4001(c)(1)(B)* | The Debtors are authorized to use Cash Collateral in accordance with the Approved DIP Budget (subject to Prohibited Variances) and subject to the terms and conditions of the DIP Term Loan Documents and the Interim DIP Order.<br><br>**(Interim DIP Order, ¶ 12)** |
| **Adequate Protection**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii)* | **Adequate Protection**.  Subject only to the Carve Out and the terms of the Interim DIP Order, pursuant to Bankruptcy Code sections 361, 363(e) and 364, and in consideration of the stipulations and consents set forth in the Interim DIP Order, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for any postpetition diminution in value of such interests (such diminution, a "<u>Diminution in Value</u>"), resulting from the imposition of the Priming Liens on the Prepetition Collateral, the Carve Out, the sale, lease or use of the Prepetition Collateral (including Cash Collateral), and any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition Agents and the Prepetition Secured Parties, are hereby granted the following (collectively, the "<u>Adequate Protection Obligations</u>") in each case, subject in all respects to the Carve Out:<br><br>• Adequate Protection Liens:  As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable, non-avoidable, effective and automatically perfected additional and replacement liens on, and security interest in the DIP Collateral, (the "<u>Adequate Protection Liens</u>"), subject in all cases to the priorities set forth on <u>Exhibit D</u> attached to the Interim DIP Order, without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents.<br><br>• Adequate Protection Claims:  As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), an allowed Administrative Expense Claim in these chapter 11 cases of each of the Debtors to the extent of any postpetition Diminution in Value (the "<u>Adequate Protection Claims</u>").  The Adequate Protection Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof.  The Adequate Protection Claims shall have the same relative priorities as the Adequate Protection Liens (as set forth on <u>Exhibit D</u> attached to the Interim DIP Order) and be subject to the Carve Out and the DIP Superpriority Claims in all respects.  Except as set forth in the Interim DIP Order, the Adequate Protection Claims will not be junior or *pari passu* to any other claims and shall have priority over all Administrative Expense Claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation and to the extent permitted by law, Administrative Expense Claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 506(c) (subject to entry of the Final DIP Order to |

| | |
|---|---|
| **SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER** | |

the extent provided for therein), 507(a), 507(b), 546(d) (subject to entry of the Final DIP Order to the extent provided for therein), 726, 1113 and 1114. The Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Claims from the Debtors under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or as otherwise provided in the DIP Credit Agreement or the DIP Term Loan Documents.

- <u>Fees and Expenses</u>: As further adequate protection, payment of the reasonable and documented fees and expenses of the advisors to the Ad Hoc Group and counsel to the Prepetition Agents.

- <u>Budget Compliance</u>: Compliance with the Approved DIP Budget and all budget requirements set forth in the Interim DIP Order and in the DIP Term Loan Documents;

- <u>Financial Reporting</u>: delivery of certain financial reporting, including:

  - (i) *Updated Budget* – The Debtors shall deliver an updated rolling 13-week cash forecast of the Loan Parties on a consolidated basis in form and substance satisfactory to the Required Lenders (an "<u>Updated DIP Budget</u>", and upon the approval by the Requisite Lenders and together with the Initial DIP Budget, collectively, the "<u>Approved DIP Budget</u>"), which proposed Updated DIP Budget shall be delivered to the Required Lenders every four weeks no later than five (5) calendar days prior to the Monday of the first week covered on such proposed Updated DIP Budget (it being understood that the first delivery of the proposed Updated DIP Budget shall be on or prior to December 4, 2024 with respect to the 13-week starting from December 9, 2024 and the second delivery of the proposed Updated DIP Budget shall be on or prior to January 2, 2025 with respect to 13-week starting from January 6, 2025), <u>provided</u>, that if the Requisite Lenders have not approved in writing a proposed Updated DIP Budget within five (5) business days of receipt of such proposed Updated DIP Budget, the then-current Approved DIP Budget shall continue to be the Approved DIP Budget, and until any such updated budget, amendment, supplement or modification has been approved by the Requisite Lenders, the Debtors shall be subject to and be governed by the terms of the Approved DIP Budget then in effect.

  - (iii) *Variance Report* – on Thursday (or the immediately subsequent business day if such Thursday is not a business day) of the third full calendar week after the date of entry of the Interim DIP Order by no later than 5:00 p.m. (prevailing Eastern Time) (the "<u>Initial Variance Report</u>

| | SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER |
|---|---|
| | Date"), and on each Thursday (or the immediately subsequent business day if such Thursday is not a business day) thereafter, by no later than 5:00 p.m. (prevailing Eastern time) (together with the Initial Variance Report Date, a "<u>Variance Report Date</u>"), the Debtors or their advisors shall deliver by email to the Backstop Parties' advisors and, on a non-cleansing basis, the DIP Lenders, a variance report (each, a "<u>Variance Report</u>") for the immediately preceding Variance Test Period (as defined below) (i) setting forth, in reasonable detail, "receipts" and "disbursements" of the Debtors and any variances between the actual amounts and those set forth in each corresponding cumulative two-week, three-week or four-week period in the then in-effect Approved DIP Budget for such Variance Test Period and (ii) describing any material variances.<br><br>"<u>Variance Period</u>" shall mean beginning after the first full cumulative two-week period after the Petition Date, which shall be covered by the first Variance Report to be delivered hereunder (the "<u>Initial Variance Test Period</u>"), each successive cumulative two-week, three-week, or four-week period, as applicable, which shall be covered by each successive Variance Report to be delivered hereunder with respect to the then-in-effect Approved DIP Budget. For the avoidance of doubt, the Variance Test Period for the then-in-effect Approved DIP Budget shall never be less than a cumulative two-week period and shall reset to a cumulative two-week period beginning with the first full cumulative two-week period after each Variance Test Period comprised of four cumulative weeks; <u>provided</u>, that if the Required Lenders have not approved a proposed Updated DIP Budget in accordance with the procedures below, the Variance Test Period shall continue to extend using the cumulative four-week period from the then-in-effect Approved DIP Budget, plus each successive week until a proposed Updated DIP Budget is approved.<br><br>(a) For the Initial Variance Test Period and each cumulative two-week Variance Test Period thereafter, (i) the aggregate receipts of the Debtors shall not be less than 80.0% of the estimated receipts for such items in the then-in-effect Approved DIP Budget and (ii) the aggregate operating disbursements of the Debtors (exclusive of professional fees and expenses, and any amounts required to be cash collateralized to maintain surety bonds, letters of credit or similar arrangements) shall not exceed 120.0% and (b) for any Variance Test Period of three cumulative weeks or more, (i) the aggregate receipts of the Debtors shall not be less than 85.0% of the estimated receipts for such items in |

| SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER | |
|---|---|
| | the then-in-effect Approved DIP Budget and (ii) the aggregate operating disbursements of the Debtors (exclusive of professional fees and expenses, and any amounts required to be cash collateralized to maintain surety bonds, letters of credit or similar arrangements) shall not exceed 115.0% (any variance prohibited in this paragraph, the "Prohibited Variance").

• (iv) *Cash Flow Reporting Information* – (a) On or before December 4, 2024 and each two-week period thereafter, delivery to the Backstop Parties' advisors and, on a non-cleansing basis, the DIP Lenders of a 13-week cash forecast for each of the Corrections Business (the "Corrections CF Forecast") and the RS Business (the "RS CF Forecast") inclusive of cash receipts and direct cash disbursements (other than professional fees and expenses, and any amounts required to be cash collateralized to maintain surety bonds, letters of credit or similar arrangements) specific to each of the Corrections Business and the RS Business; provided, that the Corrections CF Forecast and the RS CF Forecast shall not be subject to the variance testing described above; provided, further, that the obligation to deliver the RS CF Forecast shall cease upon the consummation of the RS Sale.

• (vi) *RFP Contracts* – On a bi-weekly basis, the Debtors shall provide to the Backstop Lenders' advisors and, on a non-cleansing basis, the DIP Lenders the list of all RFP Contracts (as defined in the RSA) delivered under the RSA.

• (vi) *Monthly Reporting* – Not later than 5:00 p.m. (prevailing Eastern time) on the 20th Business Day after the last Business Day of each month (commencing with November 2024), the Debtors shall deliver a monthly report for such month to the Backstop Parties' advisors and, on a non-cleansing basis, the DIP Lenders a 13-week forecast containing updated Budgeted Cash Receipts covering the 13-week period that commences with such week, consistent with the form and level of detail set forth in the Initial DIP Budget for Budgeted Cash Receipts.

**(Interim DIP Order, ¶ 6(i)–(iii); DIP Credit Agreement, § 9.12)** |
| **Carve-Out**

*Fed. R. Bankr. P. 4001(c)(1)(B)* | The Prepetition Liens, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Claims, and the Adequate Protection Liens shall be subject and subordinate to the Carve Out.

As used in the Interim DIP Order, "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in |

| SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER | |
|---|---|
| | (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") including any restructuring fee, sale fee, financing fee or other success fee that was fully earned, due and payable to estate professionals prior to the delivery of a Carve Out Trigger Notice ("Success Fees"), incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals"), the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals"), and, if a patient care ombudsman (a "Patient Ombudsman") is appointed in the Chapter 11 Cases by order of the Court, by the Patient Ombudsman pursuant to section 327, 328, or 333 of the Bankruptcy Code (together with the Patient Ombudsman, the "Patient Ombudsman Professionals," and together with the Debtor Professionals and the Committee Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Administrative Agent (or, if following the indefeasible payment in full, in cash of the DIP Obligations and the termination of all commitments under the DIP Term Facility, the Prepetition Agents) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3,000,000 incurred after the first business day following delivery by the DIP Administrative Agent (or, if following the indefeasible payment in full, in cash of the DIP Obligations and the termination of all commitments under the DIP Term Facility, the Prepetition Agents) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). Within three (3) business days after delivery of a Carve Out Trigger Notice, each Professional Person shall provide the Debtors with an estimate of its unpaid fees and expenses as reasonably determined by a good faith estimate of the applicable Professional Person to calculate the Carve Out. |
| | For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agents (or, if following the indefeasible payment in full, in cash of the DIP Obligations and the termination of all commitments under the DIP Term Facility, the Prepetition Agents) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following (x) the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Term Facility or (y) if the DIP Obligations have been indefeasibly paid in full, in cash, and all commitments under the DIP Term Facility have been terminated, stating that the Post-Carve Out Trigger Notice Cap has been invoked. Notwithstanding the foregoing, the Carve Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the Prepetition |

21

| SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER |
|---|

|  | Secured Parties or any of the DIP Lenders or DIP Agents, including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the Prepetition Credit Documents in favor of the Prepetition Secured Parties (whether in such capacity or otherwise) or the DIP Term Loan Documents in favor of the DIP Lenders or the DIP Agents, including, without limitation, for lender liability or pursuant to Bankruptcy Code sections 105, 510, 544, 547, 548, 549, 550, or 552, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the Prepetition Secured Parties, DIP Lenders, or DIP Agents hereunder; (c) attempts to prevent, hinder or otherwise delay any of the Prepetition Secured Parties', DIP Lenders', or DIP Agents' assertion, enforcement or realization upon any Collateral in accordance with the Prepetition Credit Documents, the DIP Credit Agreement, the other DIP Term Loan Documents, or the Interim DIP Order; or (d) paying any amount on account of any claims arising before the Petition Date unless such payments are approved by an order of the Court.  On the day on which a Carve Out Trigger Notice is given by the DIP Agents (or, if following the indefeasible payment in full, in cash of the DIP Obligations and the termination of all commitments under the DIP Term Facility, the Prepetition Agents) to the Debtors with a copy to counsel to the DIP Lenders and counsel to the Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for Delayed Draw Term Loans from DIP Lenders having DIP Commitments (each as defined in the DIP Credit Agreement) (on a pro rata basis based on the then outstanding DIP Commitments), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute Delayed Draw Term Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agents in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for Delayed Draw Term Loans from DIP Lenders having DIP  Commitments (on a pro rata basis based on the then outstanding DIP Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute Delayed Draw Term Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agents in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  On the first business day after the DIP  Agents gives such notice to such DIP Lenders, notwithstanding |

| SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER | |
|---|---|
| | anything in the DIP Credit Agreement or other DIP Term Loan Document to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for the borrowing of Delayed Draw Term Loans under the DIP Facility, any termination of the DIP Commitments following an Event of Default, or the occurrence of the Maturity Date, each DIP Lender with an outstanding New Money DIP Commitment (on a pro rata basis based on the then outstanding DIP Commitments) shall make available to the DIP Agents such DIP Lender's pro rata share with respect to such borrowing in accordance with the terms of the DIP Term Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "<u>Pre-Carve Out Amounts</u>"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agents for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties (as defined in the DIP Credit Agreement) in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "<u>Post-Carve Out Amounts</u>"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agents for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP Term Loan Documents, or the Interim DIP Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in the Interim DIP Order, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in the Interim DIP Order, prior to making any payments to the DIP Agents or the Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Term Loan Documents or the Interim DIP Order, following delivery of a Carve Out Trigger Notice, the DIP Agents and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agents for application in accordance with the DIP Term Loan Documents or, if applicable, to the Prepetition Agents for the benefit of the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  Further, notwithstanding anything to the contrary in the Interim DIP Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Credit Agreement) or increase or |

| SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER | |
|---|---|
| | reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Approved DIP Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.<br><br>For the avoidance of doubt and notwithstanding anything to the contrary in the Interim DIP Order, the terms of the DIP Term Facility, or in any prepetition secured facilities, the Carve Out shall be senior to all liens and claims securing the DIP Term Facility, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations. Notwithstanding the payment of any amounts contained in the Carve Out Reserves (including any residual amounts contained therein) to the Prepetition Secured Parties as contemplated by the Interim DIP Order, all parties' rights with respect to any such payments solely to the Prepetition Secured Parties are expressly preserved<br><br>**(Interim DIP Order, ¶ 7(a)–(b))** |
| **Limitations on DIP Term Facility, DIP Collateral, Prepetition Collateral, Cash Collateral, the Carve-Out, and Other Funds.**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | As set forth in the Interim DIP Order, none of the DIP Term Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, or the Carve Out may be used, or any other funds may be used by the Debtors, any statutory or non-statutory committee appointed or formed in these chapter 11 cases, or any other party-in-interest (including without limitation any chapter 7 trustee or chapter 11 trustee or examiner appointed in these chapter 11 cases or any successor cases) to investigate, prepare, assert, initiate, support, or prosecute any claim, counterclaim, or cause of action against the DIP Secured Parties or the Prepetition First Lien Secured Parties, subject to a $50,000 investigation carve-out in favor of any official committee of unsecured creditors to investigate the validity, enforceability, extent, perfection, or priority of the Prepetition Secured Parties, the Prepetition Secured Obligations and the Prepetition Liens.<br><br>**(Interim DIP Order, ¶ 23)** |
| **Challenge Period**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The Interim DIP Order provides for a challenge deadline no later than the date that is the earlier of (A) 45 days after the date of entry of the Interim DIP Order and (B) the date of the hearing on approval of the Recovery Solutions Sale (as defined in the RSA), in each case subject to further extension by written agreement of the Prepetition Agents (acting at the direction of the requisite Prepetition Lenders pursuant to the applicable Prepetition Credit Documents) and the Debtors, each in their sole discretion.<br><br>**(Interim DIP Order, ¶ 24(a))** |

| SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER | |
|---|---|
| **Covenants**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Affirmative and Negative Covenants**. The DIP Credit Agreement contains affirmative and negative covenants that are usual and customary for financings of this type.<br><br>**(DIP Credit Agreement, §§ 9, 10)** |
| **Events of Default**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Credit Agreement contains usual and customary events of default for DIP facilities of this type.<br><br>**(DIP Credit Agreement, § 11)** |
| **Milestones**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vi)* | The Loan Parties shall comply with the following Milestones (collectively, the "Milestones"):<br><br>• (i) no later than November 11, 2024, the Petition Date shall have occurred;<br><br>• (ii) no later than November 11, 2024, the Debtors shall have filed a motion seeking approval by the Court for the procedures governing the sale and marketing process (the "Bidding Procedures Motion") for the Recovery Solution Business and the Corrections Business (each as defined in the RSA);<br><br>• (iii) no later than November 14, 2024, the Court shall have entered the Interim DIP Order;<br><br>• (iv) no later than November 19, 2024, the Court shall have entered an order approving the Bidding Procedures Motion;<br><br>• (v) no later than December 6, 2024, the Debtors shall have filed (a) a joint chapter 11 plan of reorganization in accordance with the RSA (the "Plan"), (b) the accompanying disclosure statement for the Plan (the "Disclosure Statement"), and (c) a motion for entry of an order approving the Disclosure Statement and approving voting and solicitation procedures with respect to the Plan (the "Disclosure Statement Motion");<br><br>• (vi) no later than December 13, 2024, the Court shall have entered the Final DIP Order;<br><br>• (vii) no later than December 13, 2024, the deadline for parties to submit bids for the Recovery Solutions Sale (as defined in the Bidding Procedures Motion) shall have occurred;<br><br>• (viii) no later than December 16, 2024, the auction for the Recovery Solutions Sale, if any, shall have occurred;<br><br>• (ix) no later than December 23, the Court shall have entered the Recovery Solutions Sale Order (as defined in the RSA);<br><br>• (x) no later than January 9, 2025, the Recovery Solutions Sale shall have been consummated; |

| SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER | |
|---|---|
| | • (xi) no later than January 22, 2025, the hearing to consider approval of the Disclosure Statement (the "<u>Disclosure Statement Hearing</u>") shall have been held; |
| | • (xii) no later than January 22, 2025, the Company Parties shall make the Corrections Business Sale Election (as defined in the RSA) (if they determine to make such election); |
| | • (xiii) no later than January 12, 2025, the Court shall have entered an order approving the Disclosure Statement; |
| | • (xiv) no later than February 25, 2025, the Court shall have held a hearing to consider confirmation of the Plan; |
| | • (xv) no later than February 26, 2025, the Court shall have entered an order confirming the Plan; and |
| | • (xvi) no later than March 17, 2025, the effective date of the Plan shall have occurred. |
| | **(DIP Credit Agreement, § 9.13, Sched. 1.01(C))** |
| **Repayment** <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | **Mandatory Prepayments**. Except as otherwise directed by Required Lenders, mandatory prepayments of the DIP Term Loans shall be required with 100% of net cash proceeds from (i) the sale or other disposition of assets (including, for the avoidance of doubt, any sale of the RS Business or the Corrections Business), subject to exceptions to be agreed; (ii) casualty events, subject to exceptions to be agreed; (iii) any sale or issuance of debt (other than permitted debt to be agreed) and (iv) other extraordinary receipts to be agreed between the Debtors and the Backstop Parties. <br><br> **(DIP Credit Agreement, § 5.02)** <br><br> **Voluntary Prepayments**. The Debtors may prepay in full or in part the DIP Term Loans, subject to customary notice periods, payment of any applicable fees and breakage costs. <br><br> **(DIP Credit Agreement, § 5.01)** |
| **Acknowledgements** <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)(iii)* | Upon entry of the Interim DIP Order, the Loan Parties shall stipulate to the extent, validity, security, enforceability, priority, and perfection of the Prepetition Liens, and that all cash of the Loan Parties constitutes "cash collateral" of the Prepetition Secured Parties for purposes of section 363 of the Bankruptcy Code (subject to the Challenge Period). <br><br> **(Interim DIP Order, ¶¶ E, 24)** |
| **Automatic Stay** <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | The Interim DIP Order provides for the modification of the automatic stay as necessary to permit the actions, rights, and remedies contemplated thereunder. <br><br> **(Interim DIP Order, ¶ 37)** |
| **Indemnification** | The Interim DIP Order and DIP Credit Agreement provides for customary indemnification by each of the Loan Parties, on a joint and several basis, of |

| SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER | |
|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | each of the DIP Secured Parties (together with their related parties and representatives).<br><br>**(Interim DIP Order, ¶ 22(b); DIP Credit Agreement, § 12.06)** |
| **Waivers and Consents**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vii-x)* | Upon entry of Final DIP Order, the Loan Parties shall:<br><br>• (i) waive any right to surcharge the DIP Collateral, pursuant to section 506(c) of the Bankruptcy Code, with respect to the DIP Secured Parties and the Prepetition Collateral with respect to the Prepetition Secured Parties;<br><br>• (ii) waive the equitable doctrine of "marshalling" against the DIP Collateral with respect to the DIP Secured Parties and the Prepetition Collateral with respect to the Prepetition Secured Parties; and<br><br>• (iii) waive the "equities of the case exception" under section 552(b) of the Bankruptcy Code with respect to the Prepetition Secured Parties.<br><br>**(Interim DIP Order, ¶¶ 8–10)**<br><br>As of the date of entry of the Interim DIP Order, the Loan Parties shall waive and forever release and discharge any and all claims and causes of action against each of the DIP Secured Parties and Prepetition Secured Parties (and their respective related parties and representatives).<br><br>**(Interim DIP Order, ¶ 25)**<br><br>Upon entry of the Interim DIP Order:<br><br>• (i) None of the DIP Term Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, or the Carve Out may be used (a) to investigate, initiate, prosecute, join, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, or other litigation of any type (a) against any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties (each in their capacities as such) under the DIP Term Loan Documents, the Interim DIP Order, the DIP Credit Agreement or the Prepetition Credit Documents, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any official committee of unsecured creditors, if appointed, in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral, or seeking affirmative relief against any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties related to the DIP Obligations, or the Prepetition Secured Obligations, (b) seeking to invalidate, set aside, |

| SUMMARY OF MATERIAL TERMS OF THE PROPOSED INTERIM DIP ORDER | |
| --- | --- |
| | avoid or subordinate, in whole or in part, the DIP Obligations, the DIP Superpriority Claims, or the DIP Agents' and the DIP Lenders' liens or security interests in the DIP Collateral or the Prepetition Secured Obligations or the Prepetition Liens in the Prepetition Collateral or (c) for monetary, injunctive, or other affirmative relief against the DIP Agents, the DIP Lenders or the Prepetition Secured Parties (each in their capacities as such), or their respective liens on or security interests in the DIP Collateral or the Prepetition Collateral, or the DIP Superpriority Claims, that would impair the ability of any of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties to assert or enforce any lien, claim, right or security interest or to realize or recover on the DIP Obligations or the Prepetition Secured Obligations to the extent permitted or provided hereunder; (ii) for objecting to or challenging in any way the legality, validity, extent, priority, perfection or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations or by or on behalf of the DIP Agents and the DIP Lenders related to the DIP Obligations; (iii) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition Secured Obligations, or the Prepetition Liens; and (iv) for prosecuting an objection to, contesting in any manner or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of: (x) any of the DIP Liens, the DIP Superpriority Claims or any other rights or interests of the DIP Agents or the DIP Lenders related to the DIP Obligations or the DIP Liens or (y) any of the Prepetition Liens or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Secured Obligations.<br><br>• (ii) The DIP Agents shall have the unqualified right to "credit bid" up to (x) the full amount of any DIP Obligations with respect to the New Money DIP Loans, and (y) subject to entry of the Final DIP Order, the full amount of any DIP Obligations with respect to the Roll-Up Loans in any sale of any of the Debtors' assets, and the Prepetition Agents (on behalf, and at the direction, of the requisite Prepetition Lenders pursuant to the applicable Prepetition Credit Documents) shall have the unqualified right to "credit bid" up to (x) the full amount of any Prepetition Secured Obligations and (y) the Adequate Protection Obligations.<br><br>• (iii) The DIP Secured Parties and the Prepetition Secured Parties shall be entitled to good faith protection under section 364(e) of the Bankruptcy Code.<br><br>• (iv) The DIP Obligations and Adequate Protection Obligations shall not be discharged by entry of an order confirming the Plan.<br><br>**(Interim DIP Order, ¶¶ 20(e), 21, 23 29)** |

## **Statement Regarding Significant Provisions**

17.     The Interim DIP Order contains certain of the provisions (the "Significant Provisions")[6] identified in section C, paragraph 8 of the Complex Case Procedures, as set forth below:

| PROVISIONS TO BE HIGHLIGHTED PURSUANT TO COMPLEX CASE PROCEDURES | |
|---|---|
| **Sale or Plan Confirmation Milestones**<br><br>*Complex Case Procedure C(8)(a)* | The DIP Credit Agreement provides the following sale-related and plan-confirmation-related milestones:<br><br>• (i) no later than November 11, 2024, the Debtors shall have filed the Bidding Procedures Motion;<br><br>• (ii) no later than November 19, 2024, the Court shall have entered an order approving the Bidding Procedures Motion;<br><br>• (iii) no later than December 6, 2024, the Debtors shall have filed the (a) Plan (b) the Disclosure Statement, and (c) the Disclosure Statement Motion;<br><br>• (iv) no later than December 13, 2024, the deadline for parties to submit bids for the Recovery Solutions Sale shall have occurred;<br><br>• (v) no later than December 16, 2024, the auction for the Recovery Solutions Sale, if any, shall have occurred;<br><br>• (vi) no later than December 23, the Court shall have entered the Recovery Solutions Sale Order;<br><br>• (vii) no later than January 9, 2025, the Recovery Solutions Sale shall have been consummated;<br><br>• (viii) no later than January 22, 2025, the Disclosure Statement Hearing shall have been held;<br><br>• (ix) no later than January 22, 2025, the Disclosure Statement Hearing shall have been held;<br><br>• (x) no later than January 23, 2025, the Court shall have entered an order approving the Disclosure Statement; |

---

[6]     Significant Provisions refer to those provisions that:  (a) grant cross-collateralization protection (other than replacement liens or other adequate protection) to prepetition secured creditors; (b) deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(b) of the Bankruptcy Code; (c) bind the bankruptcy estates or any parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against the secured creditor; (d) waive or limit the estate's rights under section 506(c) of the Bankruptcy Code; (e) grant prepetition secured creditors liens on the debtor's claims and causes of action arising under chapter 5 of the Bankruptcy Code; (f) impose deadlines for the filing of a plan or disclosure statement; and (g) grant an administrative claim.

| PROVISIONS TO BE HIGHLIGHTED PURSUANT TO COMPLEX CASE PROCEDURES | |
|---|---|
| | • (xi) no later than February 25, 2025, the Court shall have held a hearing to consider confirmation of the Plan; <br><br> • (xii) no later than February 26, 2025, the Court shall have entered an order confirming the Plan; and <br><br> • (xiii) no later than March 17, 2025, the effective date of the Plan shall have occurred. <br><br> **(DIP Credit Agreement, § 9.13, Sched. 1.01(C))** |
| **Cross-Collateralization Provisions** <br><br> *Complex Case Procedure C(8)(b)* | The Interim DIP Order does not authorize, and the DIP Term Facility does not provide for, any cross-collateralization of the Debtors' funded debt. |
| **Provisions (I) Deeming Prepetition Debt to be Postpetition Debt and (II) Requiring Proceeds of Postpetition Loans to be Used to Repay Prepetition Debt** <br><br> *Complex Case Procedure C(8)(c)* | The Debtors are seeking approval of the roll-up of a portion of the outstanding Prepetition First Lien Term Loans and a portion of the Prepetition Second Lien Term Loans.  Given that a significant portion of the Roll-Up Amount is subject to the entry of the Final DIP Order, parties in interest will have sufficient notice and an opportunity to object. <br><br> **(Interim DIP Order, ¶ 30)** |
| **Liens on Avoidance Actions** <br><br> *Complex Case Procedure C(8)(d)* | The Interim DIP Order provides that, subject to entry of the Final DIP Order, the DIP Secured Parties will be granted liens on proceeds of Avoidance Actions. <br><br> **(Interim DIP Order, ¶ 4)** |
| **Default Provisions and Remedies** <br><br> *Complex Case Procedure C(8)(e)* | The Debtors shall promptly provide notice to counsel to the DIP Agents, the DIP Lenders and the Prepetition Agents of the occurrence of any DIP Termination Event.  Upon the occurrence of a DIP Termination Event (regardless of whether the Debtors have given the notice described in the previous sentence), and following two (2) business days' written notice (email being sufficient) by the DIP Collateral Agent to lead restructuring counsel to the Debtors, lead restructuring counsel to the Committee (if any), and the U.S. Trustee, and the DIP Administrative Agent (acting at the direction of the Required Lenders) may take any or all of the following actions, unless the Court orders otherwise prior to the expiration of such two (2) business day notice period: (i) the Debtors shall be charged the default interest rate set forth in the DIP Credit Agreement; (ii) the commitment of each DIP Lender to make DIP Term Loans will be terminated (to the extent any such commitment remains under the DIP Term Facility) and all obligations under the DIP Term Facility shall become due and payable; (iii) the Debtors' authority to use Cash |

| PROVISIONS TO BE HIGHLIGHTED PURSUANT TO COMPLEX CASE PROCEDURES | |
|---|---|
| | Collateral shall immediately terminate, except that the Debtors may use Cash Collateral to (a) fund the Carve Out and (b) make payroll of the Debtors and fund critical expenses of the Debtors necessary to avoid immediate and irreparable harm to the Debtors' estates, in each case in accordance with the terms of the Approved DIP Budget; and (iv) the DIP Lenders shall be required to file a motion with the Court seeking emergency relief from the automatic stay (the "Stay Relief Motion") upon no less than three (3) business days' written notice (the "Notice Period") to counsel to the Debtors, the U.S. Trustee, and the Committee.<br><br>At the hearing on the Stay Relief Motion, the Court may fashion any appropriate remedy, including that (i) the DIP Collateral Agent, acting at the direction of the Required Lenders, may exercise any rights and remedies against the DIP Collateral available to it under the Interim DIP Order, the DIP Credit Agreement, the other DIP Term Loan Documents, and applicable non-bankruptcy law, and the DIP Agents, acting at the direction of the Required Lenders, and the DIP Lenders may exercise such other rights available to them under the DIP Term Loan Documents or the Interim DIP Order, as applicable, and (ii) the Prepetition Secured Parties may exercise any rights and remedies in accordance with the Prepetition Credit Documents and applicable non-bankruptcy law and the Interim DIP Order to satisfy the Prepetition Secured Obligations, the Adequate Protection Claims, and any other Adequate Protection Obligations, subject to the DIP Obligations, the DIP Superpriority Claims and, in each case, subject to the Carve Out. The DIP Agents and the DIP Lenders agree not to oppose a request by the Debtors for an expedited hearing filed during such Notice Period to determine whether a DIP Termination Event has occurred in accordance with the Interim DIP Order, the DIP Credit Agreement, or the other DIP Term Loan Documents<br><br>**(Interim DIP Order, ¶ 17)** |
| **Releases of Claims**<br><br>*Complex Case Procedure C(8)(f)* | Upon entry of Final DIP Order, the Loan Parties shall:<br><br>• (i) waive any right to surcharge the DIP Collateral, pursuant to section 506(c) of the Bankruptcy Code, with respect to the DIP Secured Parties and the Prepetition Collateral with respect to the Prepetition Secured Parties;<br><br>• (ii) waive the equitable doctrine of "marshalling" against the DIP Collateral with respect to the DIP Secured Parties and the Prepetition Collateral with respect to the Prepetition Secured Parties; and<br><br>• (iii) waive the "equities of the case exception" under section 552(b) of the Bankruptcy Code with respect to the Prepetition Secured Parties<br><br>**(Interim DIP Order, ¶¶ 8–10)**<br><br>As of the date of entry of the Interim DIP Order, the Loan Parties shall waive and forever release and discharge any and all claims and causes of action against each of the DIP Secured Parties and Prepetition Secured Parties (and |

| PROVISIONS TO BE HIGHLIGHTED PURSUANT TO COMPLEX CASE PROCEDURES | |
|---|---|
| | their respective related parties and representatives) (subject to the Challenge Period). **(Interim DIP Order, ¶ 25)** |
| **Limitation on Use of Cash Collateral or DIP Proceeds** *Complex Case Procedure C(8)(g)* | As set forth in the Interim DIP Order, none of the DIP Term Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, or the Carve Out may be used by the Debtors, any statutory statutory committee appointed or formed in these chapter 11 cases, or any other party-in-interest (including without limitation any chapter 7 trustee or chapter 11 trustee or examiner appointed in these chapter 11 cases or any successor cases) to investigate, prepare, assert, initiate, support, or prosecute any claim, counterclaim, or cause of action against the DIP Secured Parties or the Prepetition Secured Parties, subject to a $50,000 investigation carve-out in favor of any official committee of unsecured creditors, if appointed, to investigate the validity, enforceability, extent, perfection, or priority of the Prepetition Liens, the Prepetition Secured Obligations, and the Prepetition Credit Documents. **(Interim DIP Order, ¶ 23)** |
| **Non-Consensual Priming Liens** *Complex Case Procedure C(8)(h)* | The Interim DIP Order does not contain any provisions authorizing the non-consensual priming of pre-petition liens. |
| **No Limitation on the Ability of Estate Fiduciaries to Fulfill Their Duties** *Complex Case Procedure C(8)(i)* | The Interim DIP Order imposes limitations on the use of DIP Term Facility proceeds, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, and the Carve Out to, among other things, investigate or finance the prosecution of claims and causes of action against the DIP Secured Parties, Prepetition Secured Parties (each in their capacities as such), and other related parties related to the DIP Obligations, the Prepetition Secured Obligations, the DIP Liens, or the Prepetition Liens, *provided, however*, that such limitations shall not apply to investigations any official committee of unsecured creditors, if any, in an aggregate amount not to exceed $50,000. **(Interim DIP Order, ¶ 23)** |

18.     As required by Section C, paragraph 8 of the Complex Case Procedures, the inclusion of each of the applicable Significant Provisions in the DIP Term Facility is appropriate and necessary to permit the Debtors' access to the DIP Term Facility. The terms and conditions of each of the Significant Provisions are the result of arm's-length and hard-fought negotiations between the Debtors and the DIP Lenders. The DIP Lenders are unwilling to provide the DIP

Term Facility absent the inclusion of these provisions and no other existing stakeholder has presented a lower cost or otherwise better postpetition financing proposal. As set forth herein and in the DIP Declaration, granting the relief requested pursuant to the Interim DIP Order is critical to the continued operation of the Debtors' businesses and will permit the Debtors to smoothly transition into these chapter 11 cases, preserving the value of the Debtors' estates for all parties in interest. In light of the foregoing, the Debtors submit that the Significant Provisions in the Interim DIP Order are appropriate and necessary under the facts and circumstances of these chapter 11 cases and should be approved.

**The Debtors' Prepetition Capital Structure**

**I.      Overview**

19.      As of the Petition Date, the Debtors' prepetition capital structure includes approximately $644,096,041 in aggregate principal amount of funded debt obligations, as summarized below:

| Funded Debt | Maturity | Approx. Principal Amount Drawn/Outstanding |
|---|---|---|
| Revolving Credit Facility | October 1, 2024 | $61,596,041 |
| First Lien Term Loan Facility | October 1, 2025 | $472,500,000 |
| Second Lien Term Loan Facility | October 1, 2026 | $110,000,000 |
| **Total Funded Debt Obligations** | **$644,096,041** | |

**II.      Secured Debt Obligations**

**A.      Prepetition First Lien Obligations**

20.      Certain of the Debtors are party to that certain First Lien Credit Agreement (as amended, amended and restated, supplemented, and otherwise modified from time to time prior to the date hereof, the "<u>Prepetition First Lien Credit Agreement</u>"), by and among Wellpath Holdings, Inc., as borrower (the "<u>Borrower</u>"), CCS-CMGC Intermediate Holdings, Inc., as holdings

("Holdings"), and each of the Borrower's subsidiaries that is a party thereto as a guarantor (collectively, with the Borrower and Holdings, the "Prepetition First Lien Loan Parties"), the lenders party thereto, UBS AG, Stamford Branch, as the administrative agent and as collateral agent (the "Prepetition First Lien Agent") for the lenders.  The Prepetition First Lien Credit Agreement provided for two credit facilities: (a) a $65,000,000 revolving loan credit facility (the "Prepetition Revolving Credit Facility," and the loans provided thereunder, the "Prepetition Revolving Loans") provided by certain lenders party to the Prepetition First Lien Credit Agreement (the "Prepetition Revolving Lenders"); and (b) a $500,000,000 term loan credit facility (the "Prepetition First Lien Term Loan Facility," and together with the Prepetition Revolving Credit Facility, the "Prepetition First Lien Credit Facility," and the loans provided under the Prepetition First Lien Term Loan Facility, the "Prepetition First Lien Term Loans") provided by certain lenders party to the Prepetition First Lien Credit Agreement (the "Prepetition First Lien Term Loan Lenders," and, together with the Prepetition Revolving Lenders, collectively, the "Prepetition First Lien Lenders"; the Prepetition First Lien Lenders, together with the Prepetition First Lien Agent, collectively, the "Prepetition First Lien Secured Parties").

21.     The Prepetition First Lien Obligations (as defined below) are secured by valid and perfected first priority liens on, and security interests in (the "Prepetition First Lien Liens"), substantially all the assets of the Prepetition First Lien Loan Parties (the "Prepetition First Lien Collateral").  The Prepetition Revolving Credit Facility and the Prepetition First Lien Term Loan Facility are *pari passu* with respect to the Prepetition First Lien Collateral.

22.     As of the Petition Date, the aggregate principal amount outstanding under the Prepetition First Lien Credit Facility is approximately $534,096,041, consisting of approximately $61,596,041 on account of the Prepetition Revolving Loans and approximately $472,500,000 on

account of the Prepetition First Lien Term Loans (such amounts, together with all other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition First Lien Credit Agreement, collectively, the "<u>Prepetition First Lien Obligations</u>").

**B.      Prepetition Second Lien Obligations**

23.      Certain of the Debtors are party to that certain Second Lien Credit Agreement (as amended, amended and restated, supplemented and otherwise modified from time to time prior to the date hereof, the "<u>Prepetition Second Lien Credit Agreement,</u>" and, together with the Prepetition First Lien Credit Agreement, the "<u>Prepetition Credit Agreements</u>"), by and among the Borrower, Holdings, and each of the Borrower's subsidiaries that is a party thereto as a guarantor (collectively, with the Borrower and Holdings, the "<u>Prepetition Second Lien Loan Parties</u>"), the lenders party thereto, UBS AG, Stamford Branch, as the administrative agent and as the collateral agent (the "<u>Prepetition Second Lien Agent</u>," and, together with the Prepetition First Lien Agent, the "<u>Prepetition Agents</u>") for the lenders party thereto.  The Prepetition Second Lien Credit Agreement provided for a $110,000,000 term loan credit facility (the "<u>Prepetition Second Lien Term Loan Facility</u>," and, together with the Prepetition First Lien Credit Facility, collectively the "<u>Prepetition Secured Credit Facilities,</u>" and the loans provided under the Prepetition Second Lien Term Loan Facility, the "<u>Prepetition Second Lien Term Loans</u>") provided by certain lenders party to the Prepetition Second Lien Credit Agreement (the "<u>Prepetition Second Lien Lenders,</u>" and together with the Prepetition First Lien Lenders, the "Prepetition Lenders"; the Prepetition Second Lien Lenders, together with the Prepetition Second Lien Agent, collectively, the "<u>Prepetition Second Lien Secured Parties</u>"; the Prepetition Second Lien Secured Parties, together with the Prepetition First Lien Secured Parties, collectively the "<u>Prepetition Secured Parties</u>").

24.     The Prepetition Second Lien Obligations (as defined below) are secured by valid and perfected second priority liens on, and security interests in (the "Prepetition Second Lien Liens," and, together with the Prepetition First Lien Liens, the "Prepetition Liens"), substantially all the assets of the Prepetition Second Lien Loan Parties (the "Prepetition Second Lien Collateral," and, together with the Prepetition First Lien Collateral, the "Prepetition Collateral").

25.     As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Second Lien Term Loan Facility is approximately $110,000,000 on account of the Prepetition Second Lien Term Loans (such amounts, together with all other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition Second Lien Credit Agreement, the "Prepetition Second Lien Obligations," and, together with the Prepetition First Lien Obligations, collectively, the "Prepetition Secured Obligations").

### C.     Intercreditor Agreement

26.     The relative contractual rights of the Prepetition Secured Parties are governed by that certain Intercreditor Agreement, dated as of October 1, 2018 (as may be amended, restated, supplemented or otherwise modified from time to time, among the Prepetition First Lien Agent, the Prepetition Second Lien Agent, and acknowledged by the Borrower and Holdings.

### III.    Unsecured Debt Obligations

27.     In addition to the secured debt obligations, the Debtors are liable for certain unsecured debt obligations, which include, among other things, other unsecured obligations, including various trade and vendor claims.

**The DIP Term Facility**

I.    **Overview**

A.    **The DIP Term Facility**

28.    By the Motion, Debtors seek approval of the DIP Term Facility under which certain Prepetition First Lien Lenders and Prepetition Second Lien Lenders have committed to provide senior secured, superpriority debtor-in-possession financing consisting of two tranches: (a) $105,000,000 in New Money DIP Term Loans; and (b) subject to the entry of the Interim DIP Order and the Final DIP Order, as applicable, $417,375,000 of Roll-Up Loans.  The New Money DIP Term Loans and the Roll-Up Loans shall be secured by the DIP Collateral on a *pari passu* basis, but the New Money DIP Term Loans shall have senior payment priority over the Roll-Up Loans.

29.    All Prepetition Lenders will have an opportunity to participate in the DIP Term Facility on the terms set forth in the DIP Term Sheet and the DIP Commitment Letter pursuant to a syndication process to be completed by no later than the earlier of (x) 14 calendar days after the date on which the Syndication Procedures are published or (y) 21 days after the Petition Date.  In the event any New Money DIP Commitments unallocated when the syndication process ends, certain Prepetition Lenders have agreed to backstop the DIP Term Facility, subject to the terms and conditions set forth in the DIP Commitment Letter.

30.    The proceeds of the DIP Term Facility will provide the much needed liquidity to fund the Debtors' operations and meet their administrative obligations during these chapter 11 cases, and also emerge as a reorganized business enterprise.  The Debtors' business is cash-intensive, and without sufficient liquidity to satisfy obligations to the Debtors' contract counterparties, landlords, vendors, workforce, and other stakeholders, the Debtors will be unable

to maintain their critical role as a healthcare provider to their vulnerable patients. The proceeds of the DIP Term Facility are therefore essential to the Debtors' continued viability.

**B.      Use of Cash Collateral**

31.      The proposed DIP Term Facility is accompanied by the Debtors' request for immediate access to and use of the Cash Collateral of the Prepetition Secured Parties on a consensual basis, subject to the terms and conditions of the DIP Credit Agreement and the DIP Orders. Coupled with the liquidity provided under the DIP Term Facility, immediate access to the Cash Collateral will (a) ensure that the Debtors have sufficient working capital to, among other things, continue providing high quality healthcare services to their patients (b) make payments to their employees, certain critical vendors, other costs relating to the sale of the Debtors' assets, and make other payments authorized under first-day orders approved by the (c) enable the Debtors to make certain adequate protection payments under and in accordance with the proposed DIP Orders if approved by the Court, and (d) satisfy the administrative expenses of these chapter 11 cases. By providing the Debtors with the immediate ability to use Cash Collateral in whichever of the Debtors' accounts it is currently held, the Debtors will avoid unnecessary business disruptions that would otherwise be costly and potentially damaging to their businesses.

**C.      Forms of Adequate Protection.**

32.      After extensive arm's-length, good faith negotiations, the Prepetition Secured Parties have agreed to consent to the use of their Prepetition Collateral, including Cash Collateral, subject to the provision by the Debtors of adequate protection. Among other things, the adequate protection contemplated by the DIP Term Facility is designed to protect the Prepetition Secured Parties from any Diminution in Value of their interests in the Prepetition Collateral, including any Cash Collateral, during the pendency of these chapter 11 cases. Specifically, the Debtors have

agreed to provide the following forms of adequate protection for the Prepetition Secured Parties (collectively, the "Adequate Protection Obligations"):

- **Adequate Protection Liens**: Additional and replacement valid, binding, enforceable, non-avoidable, effective and automatically perfected additional and replacement liens on, and security interest in the DIP Collateral.

- **Adequate Protection Claims**: An allowed Administrative Expense Claim in these chapter 11 cases of each of the Debtors to the extent of any postpetition Diminution in Value. The Adequate Protection Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof.

- **Adequate Protection Payments**: As set forth in paragraph 13(c) of the Interim DIP Order and subject to the terms and conditions set forth therein, the Debtors shall pay all prepetition and postpetition reasonable and documented out-of-pocket fees and expenses incurred by the Prepetition Secured Parties.

- **Adequate Protection Budget Compliance**: The Debtors shall comply with the Approved DIP Budget and all budget requirements set forth in the Interim DIP Order and in the DIP Term Loan Documents.

- **Adequate Protection Financial Reporting**: The Debtors shall provide the Prepetition Agents and the advisors to the Prepetition Lenders with all financial reporting and other periodic reporting that is required to be provided to the DIP Agents and the DIP Lenders, as applicable, under the DIP Credit Agreement or the other DIP Term Loan Documents and in accordance with the time periods set forth therein.

## II. The Debtors' Need for Immediate Access to the DIP Term Facility and Cash Collateral.

33. As set forth in greater detail below and in the DIP Declaration and the First Day Declaration, the Debtors require immediate access to the DIP Term Facility in addition to continued use of Cash Collateral to fund operations, capital expenditures, and the administrative costs of these chapter 11 cases. As of the Petition Date, the Debtors' cash on hand was approximately $47,000,000, which is insufficient to operate their enterprise and continue paying their obligations as they come due. First Day Decl. ¶ 68. As a result, in the week prior to the Petition Date, the Debtors were unable to make any payments due to inventory vendors in the

ordinary course and were forced to forego all such payments.  *Id.*  Although the Debtors attempted to manage relationships with suppliers, vendors, and surety providers near-term payment demands and supply chain disruptions indicated that this stopgap measure was not sustainable.  *Id.*  Facing a liquidity crisis and the risk of jeopardizing key relationships with their vendor partners, the Debtors, with the assistance of their advisors, determined that they required obtaining incremental and immediate liquidity to address their postpetition financing needs.  *Id.* ¶ 69.  Absent the ability to access the funds available under the DIP Term Facility and Cash Collateral, the Debtors would likely face a value-destructive and immediate interruption to their operations and lose support from key stakeholders on which the Debtors' business depends, including vendors, suppliers, and employees.  *Id.*

34.     As part of the Debtors' financial review and analysis, the Debtors developed the Initial DIP Budget, a copy of which is attached as <u>Exhibit C</u> to the Interim DIP Order.  *Id*. ¶ 72; DIP Decl. ¶ 14.  The Initial DIP Budget incorporates a number of factors and reasonable assumptions, including the effect of the chapter 11 filings on the Debtors' operations, material cash disbursements, vendor/supplier payments, cash flows from the Debtors' ongoing operations, and the cost of necessary supplies and equipment.  DIP Decl. ¶ 14.  Furthermore, the Initial DIP Budget includes an estimate of all the expenditures for which the Debtors seek authority to pay pursuant to various "first day" pleadings, if approved by the Court.

35.     With the consent, or deemed consent, of the Prepetition Secured Parties, the Debtors will use Cash Collateral to fund working capital, capital expenditures, and other general corporate purposes.  Cash Collateral alone, however, will be insufficient to fund the costs associated with the Debtors' restructuring.  Therefore, the Debtors, with the assistance of their advisors, determined that the additional postpetition financing being provided by the DIP Term

Facility is necessary to provide up to $105,000,000 of new money working capital for the Debtors' businesses, fund adequate protection payments, and satisfy the costs associated with consummating the restructuring.  As such, the DIP Term Facility is fundamental to the preservation and maintenance of the Debtors' going-concern value during these chapter 11 cases and critical for the Debtors' successful reorganization.

36.     Importantly, the Debtors' business requires immediate liquidity to satisfy their obligations owed to employees, vendors, and service providers, all of whom are critical to ensuring the Debtors' patient population receives safe, high-quality healthcare.  Furthermore, obtaining access to the DIP Term Facility will allow the Debtors to send a clear message to the Debtors' stakeholders—including, most critically, vendors on whose continued partnership the Debtors rely to provide high quality care to patients—that the Debtors will continue to be a reliable partner in spite of the difficulties facing the Debtors' business.  The proposed DIP Term Facility will provide much needed stabilization to the Debtors' business operations.  The DIP Term Facility will also provide the funding means to accomplish a comprehensive restructuring and ensure the Debtors' ability to operate as a going concern, preserving value of the Debtors' estates for the benefit of all their stakeholders.

37.     Therefore, the Debtors have an immediate need to access the DIP Term Facility on an interim basis and throughout the pendency of these chapter 11 cases, and absent doing so would result in immediate and irreparable harm to the Debtors' estates.

## III.     The DIP Term Facility is Necessary to Preserve the Value of the Debtors' Estates.

38.     Absent the liquidity infusion to be provided by the DIP Term Facility, the Debtors will likely need to curtail their operations significantly.  *See* DIP Decl. ¶ 28; First Day Decl. ¶ 69. Even if the Debtors had the ability to access Cash Collateral, cash on hand and expected inflows

would not be sufficient to fund their operations as a going concern in the near term. First Day Decl. ¶ 69–71. Without a new source of liquidity, the Debtors' businesses may be irreparably harmed by their inability to maintain the minimum liquidity necessary to fund certain operating and business expenses of the Debtors and provide a backstop for intercompany liquidity throughout the duration of the Debtors' chapter 11 cases. *Id.* Consequently, the DIP Term Facility is necessary to preserve the value of the Debtors' estates.

**IV.     Alternative Sources of Financing are Not Available on Better Terms.**

39.     As described in the DIP Declaration and in the First Day Declaration, the Debtors and their advisors engaged in extensive restructuring discussions and diligence with the Ad Hoc Group and its advisors to reach a framework for a comprehensive restructuring. DIP Decl. ¶¶ 18–20; First Day Decl. ¶¶ 11–12, 62. This framework contemplates that postpetition financing will be necessary to implement the transactions contemplated under the RSA, which provides a clear path to emergence from chapter 11 with a significantly deleveraged capital structure.

40.     The Debtors do not believe that alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital structure and the nature of the Debtors' business. Substantially all the Debtors' existing assets, including Cash Collateral, are encumbered by the Prepetition Liens, and the Prepetition Secured Parties were unwilling to consent to priming of their existing liens. As set forth in the DIP Declaration, the Debtors searched for actionable alternative financing proposals, and no external financing sources were willing to provide DIP financing on a junior or unsecured basis. DIP Decl. ¶ 17. The Debtors' advisors approached over 20 potential financing sources and provided parties who signed a confidentiality agreement with an overview of the Debtors' business, financial situation, their existing capital structure, and the financing opportunity. *Id.* In response to this solicitation, none of the

prospective lenders (aside from the existing Ad Hoc Group) proposed a DIP facility under the facts and circumstances facing the Debtors. *Id.* Therefore, the Debtors submit that there are simply no workable alternative sources of financing with terms better than those of the DIP Term Facility presently available to them.

**V.      The Debtors' Proposed Adequate Protection is Fair and Reasonable.**

41.      The Adequate Protection Obligations provided in the Interim DIP Order are fair and reasonable under the circumstances.  The adequate protection package proposed for the Prepetition Secured Parties includes (a) the Adequate Protection Liens, (b) the Adequate Protection Claims, (c) the payment of certain fees and expenses, (d) budget compliance, and (e) the delivery of certain financial reporting and, critically, does not include current cash pay interest or payment of accrued but unpaid prepetition interest.  Taken together, the cumulative effect of all these provisions is to provide reasonable and appropriate adequate protection for the Prepetition Secured Parties.  The proposed adequate protection package is sufficient to protect the Prepetition Secured Parties from any Diminution in Value to the Prepetition Collateral, including Cash Collateral. Moreover, the Required Lenders have consented to the proposed adequate protection.  In light of the foregoing, the proposed adequate protection to be provided for the benefit of the Prepetition Secured Parties is appropriate.

42.      As set forth herein, access to the Prepetition Secured Parties' Cash Collateral will provide liquidity that is vital for the Debtors to maintain operations, pay employees, and fund these chapter 11 cases.  Thus, the Debtors' provision of the adequate protection is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using Cash Collateral for the benefit of all parties in interest and their estates.

**Basis for Relief**

I.    **The Debtors Should be Authorized to Obtain Postpetition Financing Through the DIP Term Loan Documents.**

A.    **Entry into the DIP Term Loan Documents is an Exercise of the Debtors' Sound Business Judgment.**

43.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Credit Agreement, obtain access to the DIP Term Facility, and continue using Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  *See* 11 U.S.C. § 364.  Courts grant a debtor in possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Express Energy Servs. Operating, LP*, No. 09-38044, 2010 WL 11820790, at *3 (Bankr. S.D. Tex. May 28, 2010) (order approving postpetition financing as exercise of debtors' "prudent business judgment"); *In re Erickson Retirement Communities, LLC*, No. 09-37010, 2011 WL 6014883, at *3 (Bankr. N.D. Tex. Aug. 22, 2011) (same); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy

process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

44.     To determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

45.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  Courts may also appropriately take into consideration non-economic benefits to a debtor offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.* This is particularly true in a bankruptcy setting where cooperation

> and establishing alliances with creditor groups can be a vital part of
> building support for a restructuring that ultimately may lead to a
> confirmable reorganization plan. That which helps foster consensus
> may be preferable to a notionally better transaction that carries the
> risk of promoting unwanted conflict.

No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

46.     The Debtors' determination to move forward with the DIP Term Facility is an exercise of their sound business judgment following an arm's-length process and careful evaluation of available alternatives.  Specifically, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support their operational and chapter 11 activities.  The Debtors and their advisors determined that the DIP Term Facility provides financing on more favorable economic terms than other alternatives, of which there were none.  *See* DIP Decl. ¶ 17.  The Debtors and their advisors also determined that the DIP Term Facility not only provides certainty with respect to the capital necessary for the administration of these chapter 11 cases and the Debtors' ongoing business operations, but also to successfully execute on their proposed restructuring strategy.

47.     The DIP Term Facility will allow the Debtors to fund the operational and administrative cost of these chapter 11 cases and provide a path to emergence by allowing the Debtors to implement the restructuring contemplated by the RSA.  The Debtors negotiated the DIP Term Facility and other DIP Term Loan Documents with the DIP Lenders in good faith, at arm's-length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best financing available under the circumstances.  *Id.* ¶ 18–20.  Indeed, as discussed above and in the DIP Declaration, no lenders were willing to provide sufficient postpetition financing on a junior lien or an unsecured or administrative priority basis.  *Id.* ¶ 17.  Accordingly, the Court should authorize the Debtors' entry into the DIP Credit Agreement, as it is a reasonable exercise of the Debtors' business judgment.

**B.     The Roll-Up Loans Should Be Approved.**

48.     In addition, the Court should approve the incurrence of the Roll-Up Loans as an exercise of the Debtors' sound business judgment.  Bankruptcy Code section 363(b) permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of Prepetition Secured Obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).

49.     The DIP Term Facility provides for a roll-up of approximately $417.375 million of Prepetition First Lien Term Loans and Prepetition Second Lien Term Loans.  The principal amount of the Roll-Up Loans is a combination of (a) a 3.95:1.00 roll-up of Prepetition First Lien Term Loans compared to New Money DIP Term Loans funded by Prepetition First Lien Term Loan Lenders that elect to participate in the DIP Term Facility and (b) a 0.50:1.00 roll-up of Prepetition Second Lien Term Loans compared to New Money DIP Term Loans funded by Prepetition Second Lien Term Loan Lenders that elect to participate in the DIP Term Facility.

50.     Repayment of prepetition secured claims are routinely paid outside of a plan of reorganization, including through a "roll-up" where the proceeds of the debtor in possession financing are used to pay off or replace the prepetition debt.  Refinancing prepetition debt is a common feature in debtor-in-possession financing arrangements.  The importance of a roll-up feature in DIP facilities has been repeatedly recognized by bankruptcy courts and such courts have

granted relief similar to the relief requested herein. *See, e.g.*, *In re American Tire Distributors, Inc., et al.*, No. 24-12391 (CTG) (Bankr. D. Del. Oct. 25, 2024) (authorizing on an interim basis a $1 billion DIP facility, including a $842 million roll-up (3.37:1 roll-up)); *In re Vyaire Med., Inc., et al.*, No. 24-11217 (BLS) (Bankr. D. Del. June 10, 2024) (authorizing a $180 million DIP facility, including a $135 million roll-up (3:1 roll-up)); *In re Yellow Corp.*, No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15, 2023) (authorizing an approximately $644 million DIP facility, including a $501 million roll-up of the prepetition debt obligations (approximately 3.5:1 roll-up)); *In re Bed Bath & Beyond Inc., et al.*, No. 23-13359 (VFP) (D.N.J. June 14, 2023) (authorizing an approximately $240 million DIP facility, including a $200 million roll-up of prepetition debt obligations (5:1 roll-up)); *In re MLCJR LLC, et al.*, No. 23-90324 (CML) (Bankr. S.D. Tex. June 13, 2023) (authorizing a $345 million DIP facility, including a $270 million roll-up (3.6:1 roll-up)); *In re Mountain Express Oil Company, et al.*, No. 23-90147 (DRJ) (Bankr. S.D. Tex. Apr. 25, 2023) (authorizing a $209 million DIP facility, including a $172 million roll-up (4.53:1 roll-up)); *In re Thrasio Holdings, Inc., et al.*, No. 24-11840 (CMG) (Bankr. D.N.J. April 4, 2024) (authorizing a $270 million DIP facility, including a $90 million roll-up of the prepetition debt obligations (3:1 roll-up)); *In re The Rockport Company, LLC, et al.*, No. 23-10774 (BLS) (Bankr. D. Del. July 27, 2023) (authorizing a $45 million DIP facility, including a $36 million roll-up (4.1:1 roll-up)); *In re Sientra, Inc., et al.*, No. 24-10245 (JTD) (Bankr. D. Del. Mar. 11, 2024) (authorizing a $90 million DIP facility, including a $67 million roll-up of the prepetition debt obligations (2.9:1 roll-up)).

51.     Here, the Roll-Up Loans are a reasonable exercise of the Debtors' business judgment.  As described in the DIP Declaration, inclusion of the Roll-Up Loans was a topic of extensive negotiation between the Debtors and the Ad Hoc Group and was a necessary condition to securing the DIP Lenders' commitment to fund the new money under the DIP Term Facility.

DIP Decl. ¶¶ 24–27.  As such, the Debtors would not have access to up to $105,000,000 in new money financing without the Roll-Up Loans.  *Id.* ¶ 25 Accordingly, given these circumstances, the Roll-Up Loans are reasonable, appropriate, a sound exercise of the Debtors' business judgment, and should be approved.

        **C.**      **The Debtors Should be Authorized to Grant Liens and Superpriority Claims.**

52.     The Debtors propose to obtain financing under the DIP Term Facility by providing security interests and liens as set forth in the DIP Term Loan Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lenders postpetition security interest in and liens on the DIP Collateral and Prepetition Collateral that are valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute or subordination immediately upon entry of the Interim DIP Order.

53.     The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c); *see In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

     (a)     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

     (b)     the credit transaction is necessary to preserve the assets of the estate; and

     (c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*Crouse Grp., Inc.*, 71 B.R. at 549; *see also Los Angeles Dodgers,* 457 B.R. at 312–13; *Ames Dep't Stores*, 115 B.R. at 37–40; *In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988).

54.     The Debtors meet each part of this test.  As described in the DIP Declaration, no lenders or alternative sources of financing were willing to provide sufficient postpetition financing on a junior lien or an unsecured basis.  *See* DIP Decl. ¶ 17.  The DIP Lenders will not fund the DIP Term Facility on any other terms, and no other existing stakeholder has presented a higher or otherwise better debtor-in-possession financing proposal.  Absent the DIP Term Facility, which will provide certainty that the Debtors will have sufficient liquidity to administer these chapter 11 cases, and comfort to their employees and vendor constituencies that business will continue in the ordinary course, the value of the Debtors' estates would be impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Term Facility, as set forth in the DIP Term Loan Documents, are fair, reasonable, and meet the standard for obtaining postpetition financing.

55.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien."  11 U.S.C. § 364(c).  As described above, the Debtors are unable to obtain unsecured credit.  Therefore, approving (a) a DIP Superpriority Claim in favor of the DIP Secured Parties, (b) the DIP Liens in favor of the DIP Secured Parties on unencumbered property of the estate, and

(c) junior liens in favor of the DIP Secured Parties on encumbered property of the estate is reasonable and appropriate.

56.     Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtors may incur "priming" liens under the DIP Term Facility if either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interest in collateral are adequately protected. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

57.     Furthermore, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Accordingly, the Debtors may incur "priming" liens under the DIP Term Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

58.     Here, the Prepetition Secured Parties have affirmatively consented to the DIP Term Facility and adequate protection package and actively participated in facilitating the proposed DIP Term Facility. As set forth more fully herein and in the Interim DIP Order, the Debtors propose

to provide the Adequate Protection Obligations to protect the interests of the Prepetition Secured Parties.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

      **D.**      **No Comparable Alternative to the DIP Term Facility is Reasonably Available on More Favorable Overall Terms.**

59.      A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  In circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames Dep't Stores*, 115 B.R. at 37–39 (explaining that a debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

60.      As noted above and in the DIP Declaration, the Debtors do not believe that more favorable alternative postpetition financing is reasonably available, given the Debtors' existing capital structure.  Additionally, the Debtors were unable to identify any external financing sources willing to provide DIP financing on a junior or unsecured basis, given the unwillingness of the Debtors' lenders to consent to priming of their existing liens and security interests.  *See* DIP Decl.

¶ 17.   Moreover, the DIP Term Facility provides the Debtors with the liquidity they need while simultaneously placing the Debtors on an optimal path for a successful restructuring in accordance with the terms of the RSA.   Thus, the Debtors have determined that the DIP Term Facility provides the most favorable terms because it offers the most efficient transaction costs while reducing execution risks.   Therefore, the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**II.     The Debtors Should be Authorized to Use Cash Collateral.**

61.     Section 363 of the Bankruptcy Code generally governs the use of estate property. *See generally* 11 U.S.C. § 363.   Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use Cash Collateral with the consent of the secured party.   Here, the DIP Secured Parties and the Prepetition Secured Parties consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order.   As described above and in the DIP Declaration, access to Cash Collateral on an interim basis is essential to the continued operation of the Debtors' businesses and smooth entry into these chapter 11 cases.   *See* DIP Decl. ¶ 28.   Use of Cash Collateral is in the best interests of the Debtors' estates and all of their stakeholders, including the Prepetition Secured Parties, and as such, the Debtors should be authorized to use Cash Collateral during these chapter 11 cases.

**III.    Adequate Protection Provided to the Prepetition Secured Parties is Appropriate.**

62.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.   Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.   *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).   While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting

replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("[T]he circumstances of the case will dictate the necessary relief to be given.") (citation omitted); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("[W]hat interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis."); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding") (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993)).

63.     As described more fully herein, and as set forth in the Interim DIP Order, the Debtors propose to provide the Prepetition Secured Parties with the Adequate Protection Obligations to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay. The Adequate Protection Obligations include (a) the Adequate Protection Liens, (b) the Adequate Protection Claims, (c) the payment of certain fees and expenses, (d) budget compliance, and (e) delivery of certain financial reporting. In light of the foregoing, the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties

is appropriate.[7]   The Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order, for the benefit of all parties in interest and their estates.

## IV.   The Debtors Should be Authorized to Pay the Interest and Fees Required by the DIP Agent and the DIP Lenders Under the DIP Term Loan Documents.

64.   In connection with negotiating the DIP Term Facility, the Debtors have agreed, subject to Court approval, to pay certain interest, fees, and premiums to the DIP Agent and the DIP Lenders.  In particular, as noted above, the Debtors have agreed to pay:

- *Interest*:  interest on the (i) New Money DIP Term Loans at a rate per annum equal to SOFR plus 7.25% per annum, payable semi-annually partially in cash (at a rate of SOFR plus 1.00% *per annum*) and the remainder in kind; provided, that if prior to the first interest payment date to occur after the Final Funding Date, any portion of the outstanding New Money DIP Term Loans is cancelled as the result of a credit bid of the New Money DIP Term Loans, any accrued and unpaid interest as of the date of such credit bid shall be capitalized and added to the amount of the credit bid, and (ii) Roll-Up Loans at a rate per annum equal to SOFR plus 6.93% per annum, payable monthly in kind;

- *Commitment Premium*: to the Backstop Parties, a commitment premium in an amount equal to 10.0% of the principal amount of the New Money DIP Commitments, which shall be earned and paid in kind on the Closing Date when the Initial Term Loans are funded by such Backstop Party, ratably based on their respective New Money DIP Commitments;

- *Closing Fee*: to each DIP Lender, ratably, a closing fee in an amount equal to 5.0% of the principal amount of the New Money DIP Term Loans, which shall be paid in kind to each DIP Lender, ratably based on its respective New Money DIP Commitments as follows: (i) on the Closing Date with respect to the Initial Term Loans funded by such DIP Lender on the Closing Date and (ii) when drawn with respect to the Delayed Draw Term Loans funded by such DIP Lender on such draw date; and

---

[7]   Pursuant to the Interim DIP Order, the Prepetition Secured Parties are permitted to seek additional adequate protection in accordance with the terms thereof.  *See* Interim DIP Order, ¶ 39.

- ***DIP Agent Fees and Fronting Lender Fee***:  to the DIP Agents and the Fronting Lender, for their own account, the administrative fees set forth in the Fee Letter at the times and in the amounts specified therein, which are paid in cash.[8]

65.     As set forth in the DIP Declaration, the interest and fees to be paid under the DIP Term Facility are consistent with those approved in connection with other similar DIP financings, reasonable, and appropriate, particularly in light of the circumstances of these chapter 11 cases and represent the only viable option presently available to the Debtors.  *See* DIP Decl. ¶ 22–23.  The fees and rates to be paid under the proposed DIP Term Facility (a) were the subject of good faith, arm's-length negotiations between the Debtors and the DIP Lenders and (b) are an integral component of the overall terms of the proposed DIP Term Facility.  *Id.* ¶ 23.  The Debtors considered the fees described above when determining in their sound business judgment that the DIP Term Facility is reasonable and constitutes the best terms on which the Debtors can obtain the postpetition financing necessary to continue their operations, prosecute their cases, and benefit the Debtors' estates.  Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Term Loan Documents in connection with the DIP Term Facility.

**V.    The DIP Lenders Should be Deemed Good-Faith Lenders Under Section 364(e) of the Bankruptcy Code.**

66.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any

---

[8]     The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary but not otherwise defined have the meanings ascribed to them in the DIP Term Loan Documents, including the DIP Credit Agreement.

> debt so incurred, or any priority or lien so granted, to an entity that extended
> such credit in good faith, whether or not such entity knew of the pendency
> of the appeal, unless such authorization and the incurring of such debt, or
> the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

67.     As explained above and in the DIP Declaration, the DIP Term Loan Documents are

the result of:  (a) the Debtors' reasonable and informed determination that the DIP Lenders

provided the best postpetition financing alternative available under the circumstances; and

(b) extensive arm's-length, good-faith negotiations between the Debtors and the DIP Lenders.

DIP Decl. ¶¶ 18, 20–21.   The terms and conditions of the DIP Term Loan Documents are

reasonable under the circumstances, and the proceeds of the DIP Term Facility will be used only

for purposes that are permissible under the Bankruptcy Code.   Furthermore, the Debtors market-

tested the terms of the DIP Term Facility before determining that the DIP Term Facility provided

the best terms available.  *Id.* ¶ 17.   Accordingly, the Court should find that the DIP Lenders are

"good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled

to all of the protections afforded by that section.

## VI.     The Automatic Stay Should be Modified on a Limited Basis.

68.     The proposed Interim DIP Order provides that the automatic stay provisions of

section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing

statements, security agreements, notices of liens, and other similar instruments and documents in

order to validate and perfect the liens and security interests granted to them under the Interim DIP

Order.  *See* Interim DIP Order, ¶ 37.   The Interim DIP Order further provides that the automatic

stay is modified as necessary to permit the Debtors to grant liens to the DIP Lenders and the

Prepetition Secured Parties and to incur all liabilities and obligations set forth in the Interim DIP

Order.  *See id.*  The automatic stay should be modified to allow the Debtors and the DIP Lenders to effectuate the terms of the Interim DIP Order.

**VII.    Failure to Obtain Interim Access to the DIP Term Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

69.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Fed. R. Bankr. P.  4001(b)(2). Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]."  11 U.S.C. § 363(c)(3). Furthermore, the Complex Case Procedures provide that "on motion by the debtors, a hearing will routinely be conducted as a first day hearing to consider either cash collateral and/or interim debtor-in-possession financing."  Complex Case Procedures, ¶ 23.

70.     As set forth in the DIP Declaration and the First Day Declaration, the Debtors have an immediate postpetition need to use Cash Collateral, and access the liquidity provided by the DIP Term Facility.  *See* DIP Decl. ¶ 27; First Day Decl. ¶ 70.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to cash.  *Id.* ¶ 28–29.  In particular, the Debtors require immediate liquidity to satisfy their obligations to, among others, employees, pay suppliers, vendors, and utility providers, all of whom are critical to ensuring that the Debtors can continue to provide critical healthcare services to their patients.  *Id.* Absent funds available from the DIP Term Facility and access to cash collateral, the Debtors could

face value-destructive interruptions to their business and lose support from important stakeholders on which the Debtors' business depends, including employees, customers, vendors, and other contract counterparties.  *See* First Day Decl. ¶¶ 71–72.

71.     The Debtors will therefore be unable to operate their business or otherwise fund these chapter 11 cases without access to Cash Collateral and the liquidity provided by the DIP Term Facility and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  *See id.* ¶ 73; DIP Decl. ¶¶ 20, 27.  In short, the Debtors' ability to administer these chapter 11 cases through the use of Cash Collateral and the liquidity provided by the DIP Term Facility is vital to preserve and maximize the value of the Debtors' estates.

## Request for a Final Hearing

72.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim DIP Order authorizing the Debtors, from and after entry of the Interim DIP Order until the Final Hearing, to receive initial funding under the DIP Term Facility and to utilize Cash Collateral.  The Debtors require the initial funding under the DIP Term Facility prior to the Final Hearing and entry of the Final DIP Order to continue operating, pay their administrative expenses, and to implement the relief requested in the Debtors' other "first day" pleadings.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## Emergency Consideration

73.     Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003.  Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting . . . (b) a

motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ." Fed. R. Bankr. P. 6003.  As set forth in this Motion, the DIP Declaration, and the First Day Declaration, the Debtors believe that an orderly transition into chapter 11 is critical to the viability of the Debtors' businesses, operations, and estates and that any delay in granting the relief requested herein could cause immediate and irreparable harm.  The Debtors also believe that they may need to make upcoming payments to critical vendors, suppliers, surety providers, and other contractual counterparties during the first 21 days of these chapter 11 cases.  Failure to receive the requested relief during the first 21 days of these chapter 11 cases could imperil the Debtors' restructuring and cause immediate and irreparable harm.  Accordingly, the Debtors submit that the relief requested herein satisfies the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

### Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)

74.     To implement successfully the relief sought herein, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances.  The Debtors also request that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates and economic stakeholders.  Accordingly, the Debtors respectfully submit that ample cause exists to

justify the (a) finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and (b) waiving of the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## Reservation of Rights

75.     Nothing contained herein or any actions taken pursuant to the relief requested in this Motion is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended, and should not be construed as, an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

76.    Notice of this Motion will be provided to the following parties or their respective counsel:   (a) the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee"); (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Lenders; (d) counsel to the Ad Hoc Group; (e) counsel to the Prepetition First Lien Administrative Agent; (f) counsel to the Prepetition Second Lien Administrative Agent; (g) the Office of the United States Attorney for the Southern District of Texas; (h) the state attorneys general for states in which the Debtors conduct business; (i) the Internal Revenue Service; (j) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (k) all financial institutions at which the Debtors maintain deposit accounts; and (l) any party identified in section E of the *Procedures for Complex Cases in the Southern District of Texas* (collectively, the "Notice Parties").   A copy of this Motion and the orders approving it will also be made available on the Debtors' case information website located at https://dm.epiq11.com/Wellpath.   Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested, the Debtors respectfully submit that no other or further notice is required.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors request entry of orders, substantially in the form of the Interim DIP Order filed with this Motion and the Final DIP Order to be filed prior to the Final Hearing, granting the relief requested herein and such other and further relief as the Court deems appropriate under the circumstances.

| | |
|---|---|
| Dated:   November 12, 2024<br>Dallas, Texas | */s/ Marcus A. Helt*<br>Marcus A. Helt (Texas Bar #24052187)<br>MCDERMOTT WILL & EMERY LLP<br>2501 North Harwood Street, Suite 1900<br>Dallas, Texas 75201-1664<br>Telephone:    (214) 295-8000<br>Facsimile:     (972) 232-3098<br>Email:          mhelt@mwe.com<br><br>-and-<br><br>Felicia Gerber Perlman (*pro hac vice* admission pending)<br>Bradley Thomas Giordano (*pro hac vice* admission pending)<br>Jake Jumbeck (*pro hac vice* admission pending)<br>Carole Wurzelbacher (*pro hac vice* admission pending)<br>Carmen Dingman (*pro hac vice* admission pending)<br>MCDERMOTT WILL & EMERY LLP<br>444 West Lake Street, Suite 4000<br>Chicago, Illinois 60606-0029<br>Telephone:    (312) 372-2000<br>Facsimile:     (312) 984-7700<br>Email:          fperlman@mwe.com<br>                    bgiordano@mwe.com<br>                    jjumbeck@mwe.com<br>                    cwurzelbacher@mwe.com<br>                    cdingman@mwe.com<br>-and-<br><br>Steven Z. Szanzer (*pro hac vice* admission pending)<br>MCDERMOTT WILL & EMERY LLP<br>One Vanderbilt Avenue<br>New York, New York 10017<br>Telephone:    (212) 547-5400<br>Facsimile:     (212) 547-5444<br>Email:          sszanzer@mwe.com<br><br><br>*Proposed Counsel to the Debtors and Debtors in Possession* |

**<u>Certificate of Accuracy</u>**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and accurate to the best of my knowledge, information, and belief.  This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Marcus A. Helt*
Marcus A. Helt

**<u>Certificate of Service</u>**

I certify that on November 12, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Marcus A. Helt*
Marcus A. Helt