**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF**
**TIMOTHY J. DRAGELIN AS**
**CHIEF RESTRUCTURING OFFICER AND**
**CHIEF FINANCIAL OFFICER OF WELLPATH HOLDINGS, INC.**
**AND CERTAIN OF ITS AFFILIATES AND SUBSIDIARIES IN SUPPORT**
**OF THE DEBTORS' CHAPTER 11 PROCEEDINGS AND FIRST DAY PLEADINGS**

I, Timothy J. Dragelin, hereby declare under penalty of perjury:

1. I am a Senior Managing Director with FTI Consulting, Inc. ("FTI") and, since June 2024, I have served as the Interim Chief Financial Officer of Wellpath Holdings, Inc. ("WHI" and, collectively with its debtor affiliates, the "Debtors" and, collectively with their non-Debtor affiliates, "Wellpath") and, since October 2024, I have served in a dual role of Chief Restructuring Officer and Chief Financial Officer. In addition, from December 2022 through April 2023 I served as Wellpath's Chief Transformation Officer.

2. I joined FTI in August 2002 and specialize in providing financial advisory services to the various corporate stakeholders, including borrowers, creditors, and equityholders. I have more than 30 years of experience across multiple industries, most notably healthcare, real estate, structured finance, and government contracting. I lead FTI's Healthcare Interim Management

---

[1] A complete list of the Debtors (as defined below) in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Wellpath. The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

group and co-lead FTI's Healthcare Restructuring practice.  My experience ranges from advising not-for-profit entities to privately held companies to multinational publicly traded corporations.  I am regularly involved in interim management, bankruptcy planning and management, turnaround consultation, lender advisory, buy-side due diligence, sell-side mandates, valuation, and performance improvement engagements.

3.     Prior to joining FTI, I was employed by PricewaterhouseCoopers in various capacities within the financial advisory services practice.  I have been proffered and appeared as an expert witness relative to restructuring, accounting, financial, and valuation topics in several venues.  I earned a B.B.A. in accounting from the College of William & Mary in Virginia, and previously held both certified public accountant and certified valuation analyst designations.

4.     In connection with the filing of this declaration (this "Declaration"), each of the Debtors filed a voluntary petition (collectively, the "Petitions") in the United States Bankruptcy Court for the Southern District of Texas (the "Court") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  To minimize the potential adverse impact of the commencement of these chapter 11 cases, the Debtors have requested certain "first day" relief in various applications and motions filed with the Court, each of which is listed in Section V.A below (collectively, the "First Day Pleadings").  I have reviewed the First Day Pleadings or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' businesses and to the success of these chapter 11 cases.  The First Day Pleadings seek relief intended to preserve the value of the Debtors by, among other things, satisfying certain prepetition claims and granting certain administrative and procedural relief to facilitate an orderly transition into and out of these chapter 11 cases.  This relief is critical to the Debtors' restructuring and reorganization efforts.

5. As a result of my tenure with Wellpath, I am generally familiar with the Debtors' capital structure, day-to-day operations, business and financial affairs, and financial records. I am also familiar with the Debtors' corporate structure and the status of the Debtors' relationships with various vendors and service providers. I submit this Declaration in support of the Petitions and the First Day Pleadings and to assist the Court and other parties in interest in understanding Wellpath's corporate history, business operations, and prepetition capital structure and the circumstances that compelled the commencement of these chapter 11 cases as of November 11, 2024 (the "Petition Date").

6. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents of the Debtors, other information prepared or collected by the Debtors' employees, my conversations with the Debtors' advisors, information supplied to me by other members of the Debtors' management and third-party advisors, or my opinion based on my experience with the Debtors' operations and financial condition. In making my statements based on documents and other information prepared or collected by the Debtors' employees or my conversations with the Debtors' counsel or other advisors, I have relied upon the accuracy of such documentation and other information. If called upon to testify, I would testify competently to the facts set forth in this Declaration. Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis.

**Preliminary Statement**

7. Wellpath is the premier provider of localized, high quality, compassionate care to vulnerable patients in challenging clinical environments. Wellpath is the leading medical and mental health services provider in correctional facilities, inpatient and residential treatment

facilities, forensic treatment facilities, and civil commitment centers.  Headquartered in Nashville, Tennessee with operations in approximately 420 facilities across 39 states, Wellpath provides outsourced solutions to the correctional healthcare and behavioral healthcare industries.  Wellpath offers an array of healthcare services to its federal, state, and local government partners, including on-site medical services, telehealth and mental health programs, and pharmacy management. Wellpath employs more than 13,000 people and serves nearly 200,000 patients daily.

8.     Despite Wellpath's historical and continued market leading position and its critical role in addressing the healthcare needs of its clients, Wellpath faced significant financial challenges in recent years.  Those issues stemmed from, among other things, escalating operating and labor costs, a transitory increase in professional liability insurance expenses, and underperformance on several significant contracts.  These financial challenges, combined with a high-rate interest environment, led to increasing liabilities, deferred payables, and liquidity shortfalls.  Compounding matters, the maturity date of the Debtors' Prepetition Revolving Credit Facility (as defined below) would occur in October 2024.

9.     Starting in January 2024, to address the Debtors' significant maturity wall, Lazard Frères & Co. LLC ("Lazard"), as the Debtors' restructuring investment banker, worked closely with the Debtors' legal counsel, McDermott Will & Emery LLP ("McDermott"), to pursue an out-of-court recapitalization transaction involving a sale of the Debtors' behavioral health division, Recovery Solutions (the "RS Division").  The Debtors sought to use proceeds from a potential sale of the RS Division to pay down a significant portion of the Prepetition First Lien Credit Facility to facilitate an extension of the remaining debt amounts.  As such, between January and March of 2024, Lazard prepared for the marketing process of the RS Division.

10.     The sale process of the RS Division was launched in April 2024.  Lazard, together with the Debtors' healthcare investment banker, MTS Health Partners L.P. ("MTS"), contacted over 140 parties, including financial sponsors and strategic parties, to solicit proposals to acquire the RS Division.  In connection with the solicitation, Lazard and MTS prepared, among other things, a confidential information presentation and an electronic data room to which prospective bidders that executed confidentiality agreements received access.  In total, more than 70 prospective bidders executed confidentiality agreements and received access to private-side information.  By the end of June 2024, the Debtors received six preliminary indications of interest as part of a first-round process.  The Debtors continued and further advanced the marketing process during July and August of 2024.

11.     During that time, the Debtors and Lazard began engaging with an ad hoc group of lenders (the "Ad Hoc Group") represented by Akin Gump Strauss Hauer & Field LLP, as counsel, Houlihan Lokey Capital, Inc., as investment banker, and Ankura Consulting Group LLC, as financial advisor, to begin discussions about potential out-of-court balance sheet solutions. On August 30, 2024 (as later amended on September 30, 2024 and October 31, 2024), the Debtors and the Ad Hoc Group executed the Forbearance Agreements (as defined below) to forbear from taking enforcement actions relating to the events of default in connection with the cash interest and amortization payments on the prepetition credit facilities as well as maturity of the Prepetition Revolving Credit Facility, with the goal to preserve liquidity and extend the runway to continue working toward an amicable solution.

12.     However, despite the Debtors' robust marketing process, after several weeks of further diligence and management presentations, the Debtors only received one formal second-round check-in bid, which was at a reduced valuation from the preliminary indication of interest.

While Wellpath and its advisors tried to keep the bidder engaged, the Debtors also attempted to reengage with other bidders between August and September of 2024. The Debtors did not receive any acceptable bids at the conclusion of the Debtors' bidding process.  Consequently, the Debtors temporarily put the marketing process on hold and pivoted to negotiating the terms of an in-court restructuring with the Ad Hoc Group. These negotiations ultimately led to the execution of the Restructuring Support Agreement, dated November 11, 2024 (the "RSA"), attached hereto as **Exhibit B**.

13.     The RSA provides a flexible structure that will enable the parties to explore the most value-maximizing restructuring alternative available.  Under the RSA, the Debtors' proposed restructuring has several components.

14.     ***First***, to fund these chapter 11 cases and the processes and transactions contemplated by the RSA, subject to Court approval, the Debtors secured access to a debtor-in-possession financing facility in the aggregate principal amount of $522,375,000 consisting of up to (a) $105,000,000 in new money term loans and (b) $417,375,000 in "rolled up" prepetition secured loans (the "DIP Term Facility").  All Prepetition Lenders (as defined below) will have the opportunity to participate in the $105,000,000 new money term loan financing, which will be syndicated following the "first day" hearing in these chapter 11 cases.  The Prepetition Lenders party to the RSA have agreed to backstop the new money term loan financing.  All Prepetition Lenders that participate in the new money financing will have certain of their prepetition debt holdings rolled up into the DIP Term Facility.

15.     ***Second***, the RSA contemplates an active, open marketing process for a value-maximizing sale for substantially all or one or more subsets of the Debtors' assets.  To that end, on the Petition Date, the Debtors have filed a motion asking the Court to approve the proposed

Bidding Procedures (as defined in the Bidding Procedures Motion)[2] for such a sale and certain related dates and deadlines.  The Bidding Procedures provide for a dual track process that will allow the Debtors flexibility to market assets associated with the RS Division, the LG Division, and the SF Division.  Although the proposed Bidding Procedures and the RSA provide for a longer runway for the LG Division assets and SF Division assets, the Debtors propose a faster timeline— approximately six weeks after the Petition Date—to market and consummate the sale of the RS Division assets.  As further explained below and in the Bidding Procedures Motion, given both (a) the extensive marketing process the occurred prepetition, (b) upcoming contract renewals, and (c) the vulnerable patients the RS Division serves, this expeditious timeline is warranted under the circumstances.

16.    ***Third***, the Debtors' proposed lenders under the DIP Term Facility (the "DIP Lenders") and the Prepetition Lenders party to the RSA have agreed that they will cap any credit bid of the loans outstanding under the DIP Term Facility for the Debtors' RS Division assets and related business lines.  Although the credit bid cap does not prevent the DIP Lenders from including cash as part of any overbid, this structure assures interested bidders that they are not competing against "credit bid currency" up to the full amount of the Debtors' post-petition debt.  The Debtors believe that the credit bid cap will increase the likelihood of a robust auction process for the Debtors' assets.  Indeed, the Debtors and their prepetition secured lenders are eager

---

[2]    "Bidding Procedures Motion" means the *Debtors' Emergency Motion for Entry of Orders (I)(A) Approving the Bidding Procedures for the Sale of the Debtors' Assets, (B) Approving Entry into a Stalking Horse Purchase Agreement for the Recovery Solutions Assets, (C) Authorizing the Recovery Solutions Expense Reimbursement, (D) Authorizing Potential Selection of Stalking Horse Bidders for the Corrections Assets and Approving Related Corrections Asset(s) Bid Protections, (E) Establishing Related Dates and Deadlines, (F) Approving the Form and Manner of Notice Thereof, and (G) Approving the Assumption and Assignment Procedures, (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* filed contemporaneously herewith.

to (a) ensure a true market test on the value for the Debtors and their assets and (b) maximize the value of the Debtors' estates for the benefit of all stakeholders.

17.     **Fourth**, with respect to the Debtors' LG Division and SF Division, under the RSA, the DIP Lenders have committed to purchase in a direct private placement new equity interests in Reorganized Wellpath pursuant to a chapter 11 plan of reorganization, subject to a post-petition marketing process for a sale of these assets under section 363.  The DIP Lenders party to the RSA as of the Petition Date have agreed to backstop the Debtors' proposed equity financing in respect of Reorganized Wellpath.

18.     **Finally**, the Debtors propose an expeditious chapter 11 process that appropriately balances the Debtors' restructuring goals, the health and safety of their patients, and notice and due process considerations.  It is critical that the Debtors emerge from these chapter 11 cases as soon as reasonably practicable due to the nature of their business and their vulnerable patient population.  The Debtors believe that consummation of the transactions contemplated in the RSA will ensure continued operations of their healthcare services, employment of their physicians, and safety of their patients.  Any delay puts the well-being of the Debtors' patients at risk and increases the likelihood of irreparable harm to the Debtors' businesses.

19.     The Debtors expect to continue operations normally throughout these chapter 11 cases and remain focused on providing the quality healthcare services that their patients require.  The Debtors are committed to working collaboratively with their stakeholders, including creditors, employees, and clients, to move through these chapter 11 cases in an efficient, structured manner.

20.     To familiarize the Court with the Debtors, their businesses, the circumstances leading up to these chapter 11 cases, and the relief that the Debtors are seeking in the First Day Pleadings, this Declaration is organized into five parts.  **Part I** provides a general overview of the

Debtors' corporate history and business operations. *Part II* provides an overview of the Debtors' prepetition capital structure. *Part III* describes the circumstances leading to the filing of these chapter 11 cases. *Part IV* provides an overview of the RSA and the proposed path for these chapter 11 cases. *Part V* discusses the First Day Pleadings.

I.    **Wellpath's History and Operations.**

    A.    **Corporate History.**

21.    Wellpath's roots trace back to two legacy businesses that offered out-sourced healthcare services to the corrections industry:  (a) Correctional Medical Group Companies ("CMGC"); and (b) Correct Care Solutions ("CCS").  CMGC was a healthcare provider specializing in medical services for correctional facilities.  Founded in 1983, CMGC focused on delivering comprehensive healthcare solutions to inmates in jails and prisons across the United States.  CMGC offered a range of services, including primary care, dental care, mental health services, and chronic disease management.  In 2012, funds affiliated with H.I.G. Capital, LLC (collectively, "HIG") acquired CMGC.

22.    CCS was founded in 2003 and quickly grew to become one of the largest providers of healthcare services to correctional facilities across the United States.  CCS specialized in offering comprehensive medical and mental health services to inmates, including primary care, dental care, chronic disease management, and mental health treatment.

23.    In 2018, CCS merged with CMG through a transaction led by HIG.  The combined entity rebranded under the banner "Wellpath" to reflect its broader focus on integrated healthcare solutions, including behavioral health, medical, and dental care.  Since the merger, Wellpath has

become the leading and largest provider of healthcare services in correctional and custodial behavioral health settings in the United States.

**B.      Wellpath's Revenue Model and Business Operations.**

24.     Wellpath's revenue model is largely based on long-term contracts with government entities, which provide stable, recurring revenue.  Most contracts contain built-in cost escalators tied to inflation, particularly in the LG Division, helping to protect margins from rising operational costs.  Wellpath also benefits from strong client satisfaction, as illustrated by its long-standing relationships—*e.g.*, approximately 50 of Wellpath's customers have partnered with the company for at least 20 years.

25.     Because Wellpath contracts directly with government entities, it must often go through a request for proposal ("RFP") process when, for example, a contract expires or when Wellpath seeks to enter a new area.  Although the RFP process varies depending on the governmental entity, the process essentially involves a competitive bidding process among similar service providers.

26.     Wellpath's business operations are structured into three key divisions: (a) State & Federal (the "SF Division"); (b) Local Government (the "LG Division"); and (c) the RS Division.

**1.      SF Division.**

27.     The SF Division delivers medical services to a total patient population of approximately 135,000 individuals in approximately 131 state and federal prisons across 10 states. With a staff of approximately 1,600 healthcare professionals, the SF Division's operations focus on chronic care and disease management for incarcerated individuals (with an average sentence of approximately three years).  Patients require ongoing care with more targeted treatment fulfilled by a large in-house, on-site staff equipped to offer extensive medical treatment.  The SF Division

offers a comprehensive on-site suite of medical services, including recruiting and staffing, dental, lab, and x-ray services, behavioral healthcare programs, off-site emergency services coordination, and pharmacy services.

28.     The SF Division generally negotiates its contracts directly with state government entities and the Federal Bureau of Prisons for five-to-ten-year terms (subject to extensions).  The contracts provide a stable revenue stream on a monthly basis and contain prenegotiated terms to account for off-site and on-site services and pharmacy costs during the RFP bidding process. In 2023, the SF Division generated approximately $775,000,000 in revenue, which accounted for approximately 35% of Wellpath's total 2023 revenue.[3]

### 2.     LG Division.

29.     With a staff of approximately 1,600 healthcare professionals, the LG Division delivers medical, dental, and mental healthcare services to a total patient population of approximately 138,000 adult and juvenile patients in more than 240 local detention facilities across 29 states.  The LG Division's patients require care in the most efficient manner possible because of the short duration of their stay (approximately two weeks on average) in local correctional facilities.

30.     Like the SF Division, the LG Division offers a comprehensive on-site suite of medical services in accordance with client requirements and applicable accrediting body rules. Such services include, among others, comprehensive medical and behavioral healthcare programs, off-site hospital contracting, and dental care.

31.     To operate successfully, the LG Division must overcome challenges not found in other healthcare settings.  The LG Division's patients move frequently and are in-and-out of

---

[3]     These figures include revenue from three contracts that were terminated in 2024.  Excluding the revenue from those contracts, the SF Division generated revenue of approximately $332,000,000 in 2023.

facilities in a short amount of time, making patient care management difficult.  To address those obstacles, the LG Division built its own provider networks that can provide care off-site if Wellpath is unable to provide healthcare services within the facility.

32.     The LG Division's client base primarily consists of municipal and county government entities, such as county sheriffs, county health departments, and other various local government officials.  The LG Division negotiates its contracts directly with local governmental entities, which may require going through an RFP process for contracts that typically span three-to-five years (plus possible extension terms).  The LG Division contracts provide stable, recurring revenue on a monthly basis with annual revenue escalators, and many include structured spending caps to mitigate risks associated with off-site treatment (*e.g.*, hospitalization) and pharmacy costs.

33.     In 2023, the LG Division generated approximately $1,000,000,000 in revenue, which accounted for approximately 45% of Wellpath's total 2023 revenue.[4]

### 3.     RS Division.

34.     Founded in 1997, the RS Division is the largest U.S. provider of behavioral health, residential treatment, and community-based services for public entities.  Recognized as a pioneer in the development of evidence-based, patient-centered models of therapeutic intervention for individuals with serious mental illness, the RS Division's business model addresses behavioral health needs, focusing on patients underserved by traditional mental health services, and provides a broad range of outsourced behavioral health services.  Since its founding, the RS Division has grown to become the largest player in an underserved, high barrier-to-entry market for acute patient populations suffering from long-term conditions that reside in public facilities has been.

---

[4]     These figures include revenue from contracts the Debtors rationalized in 2024.  Excluding the revenue from those contracts, the LG Division generated revenue of approximately $918,000,000 in 2023.

With a staff of approximately 3,700 healthcare professionals, the RS Division provides health services to approximately 3,000 patients and operates approximately 70 facilities across 10 states.

35.     The RS Division differentiates itself from private behavioral health facilities by focusing on higher-acuity patients that require longer treatment durations.  Indeed, the RS Division's services fill an underserved need in the correction healthcare space.  States and counties struggle to meet needs of specialized patients due to complex health diagnoses, bed shortages, and a lack of specialized mental health staff.  The RS Division fills this need by offering comprehensive, "one-stop-shop" service offerings that allow public entities to efficiently outsource all their complex behavioral health populations needs to a single provider.

36.     The RS Division benefits from a "capex-light" model, as state and county entities typically fund facility construction and improvements.  Many of the RS Division's contracts contain price escalators tied to the Consumer Price Index to protect margins.  In addition, the RS Division's contracted revenue model, which is based on beds rather than occupancy, provides stable revenue streams (unlike private facilities that are subject to patient volume fluctuations).

37.     The RS Division has demonstrated strong financial growth, with a 14% annual growth rate in revenue since 2021.  In 2023, the RS Division generated approximately $425,000,000 in revenue, which accounted for approximately 20% of Wellpath's total 2023 revenue.

## II.     Wellpath's Prepetition Corporate and Capital Structure.

38.     Wellpath's corporate structure chart is attached hereto as **Exhibit A**.

39.     As of the Petition Date, the Debtors' prepetition capital structure includes approximately $644,096,041 of outstanding principal funded debt obligations, as summarized below:

| Funded Debt | Maturity | Approx. Principal Amount Drawn/Outstanding |
|---|---|---|
| Prepetition Revolving Credit Facility | October 1, 2024 | $61,596,041 |
| Prepetition First Lien Term Loan Facility | October 1, 2025 | $472,500,000 |
| Prepetition Second Lien Term Loan Facility | October 1, 2026 | $110,000,000 |
| **Total Funded Debt Obligations** | | **$644,096,041** |

A.     **Prepetition First Lien Obligations.**

40.     Certain of the Debtors are party to that certain First Lien Credit Agreement (as amended, amended and restated, supplemented, and otherwise modified from time to time prior to the date hereof, the "Prepetition First Lien Credit Agreement"), by and among WHI, as borrower ("Borrower"), CCS-CMGC Intermediate Holdings, Inc. ("Holdings"), and each of Borrower's direct or indirect subsidiaries that is a party thereto as a guarantor (collectively, with Borrower and Holdings, the "Prepetition First Lien Loan Parties"), the lenders party thereto, and UBS AG, Stamford Branch, as the administrative agent (the "Prepetition First Lien Administrative Agent") and as collateral agent (the "Prepetition First Lien Collateral Agent") for such lenders.   The Prepetition First Lien Credit Agreement provides for two credit facilities:  (a) a $65,000,000 revolving loan credit facility (the "Prepetition Revolving Credit Facility" and, the loans provided thereunder, the "Prepetition Revolving Loans") provided by certain lenders party to the Prepetition First Lien Credit Agreement (the "Prepetition Revolving Lenders"); and (b) a $500,000,000 term loan credit facility (the "Prepetition First Lien Term Loan Facility," and, together with the Prepetition Revolving Credit Facility, the "Prepetition First Lien Credit Facility"; and the loans provided under the Prepetition First Lien Term Loan Facility, the "Prepetition First Lien Term Loans," and, together with the Prepetition Revolving Loans, the "Prepetition First Lien Loans") provided by certain lenders party to the Prepetition First Lien Credit Agreement (the "Prepetition

First Lien Term Lenders" and, together with the Prepetition Revolving Lenders, the "Prepetition First Lien Lenders" and, together with the Prepetition First Lien Administrative Agent and the Prepetition First Lien Collateral Agent, the "Prepetition First Lien Secured Parties").

41.      As of the Petition Date, the aggregate principal amount outstanding under the Prepetition First Lien Loans is approximately $534,096,041, consisting of approximately $61,596,041 on account of the Prepetition Revolving Loans and approximately $472,500,000 on account of the Prepetition First Lien Term Loans (such amounts, collectively with all other amounts incurred or accrued but unpaid prior to the Petition Date pursuant to the Prepetition First Lien Credit Agreement, the "Prepetition First Lien Obligations").

### B.      Prepetition Second Lien Obligations.

42.      Certain of the Debtors are party to that certain Second Lien Credit Agreement (as amended, amended and restated, supplemented and otherwise modified from time to time prior to the date hereof, the "Prepetition Second Lien Credit Agreement"), by and among Borrower, Holdings, and each of Borrower's direct or indirect subsidiaries that is a party thereto as a guarantor (collectively, with Borrower and Holdings, the "Prepetition Second Lien Loan Parties"), the lenders party thereto, and UBS AG, Stamford Branch, as the administrative agent (the "Prepetition Second Lien Administrative Agent") and as the collateral agent (the "Prepetition Second Lien Collateral Agent") for such lenders.  The Prepetition Second Lien Credit Agreement provides for a $110,000,000 term loan credit facility (the "Prepetition Second Lien Term Loan Facility" and, the loans provided thereunder, the "Prepetition Second Lien Term Loans") provided by certain lenders party to the Prepetition Second Lien Credit Agreement (the "Prepetition Second Lien Term Lenders" and, together with the Prepetition Second Lien Administrative Agent and the

Prepetition Second Lien Collateral Agent, the "<u>Prepetition Second Lien Secured Parties</u>" and, together with the Prepetition First Lien Secured Parties, the "<u>Prepetition Secured Parties</u>").

43.     As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Second Lien Term Loan Facility is approximately $110,000,000 on account of the Prepetition Second Lien Term Loans (such amounts, collectively with all other amounts incurred or accrued but unpaid prior to the Petition Date pursuant to the Prepetition Second Lien Credit Agreement, the "<u>Prepetition Second Lien Obligations</u>" and, together with the Prepetition First Lien Obligations, the "<u>Prepetition Secured Obligations</u>").

**III.   Circumstances Leading to These Chapter 11 Cases.**

      **A.     Rising Cost Pressures and Effect on Financial Performance.**

44.     Over the past three years, Wellpath's year-over-year financial performance experienced fluctuations driven by both external and internal challenges.  In 2022, Wellpath reported total revenue of approximately $2.059 billion, an 18% annual growth rate since 2006. Wellpath attributed its revenue growth to strong performances across state and local government contracts, as well as contributions from the RS Division.

45.     In 2023, however, the foregoing trend did not continue.  This reversal was due to, among other things, escalating operating and labor costs, rising professional liability expenses, and underperforming contracts.

          **1.     Operating and Labor Costs.**

46.     The COVID-19 pandemic altered the healthcare landscape and imposed substantial costs on providers of medical and mental health services driven by increased demand for medical supplies (*e.g.*, PPE and vaccines) and service professionals (including bonuses and retention programs aimed at addressing labor shortages).  Although Wellpath was not unique in

experiencing labor shortages and wage increases during the COVID-19 pandemic, Wellpath felt their impacts more acutely than other healthcare providers.  Wellpath was not eligible to directly receive funding from the American Rescue Plan Act or Coronavirus Aid, Relief, and Economic Security Act, despite the purpose of such funds being to cover COVID-related medical expenses of public medical facilities and support public health expenditures, respectively.  Thus, to attract and retain healthcare professionals and employees, Wellpath had to offer higher salaries and wages—but without the benefit of the federal stimulus programs available to other healthcare providers.

47.     These pandemic-driven material and labor costs amounted to over approximately $30,000,000 and $50,000,000, respectively, between fiscal years 2020 and 2022.  Although these costs were short-lived in nature, the overall healthcare industry experienced a structural shift in labor costs due to inflation, minimum wage hikes, and other macroeconomic factors.  As a result, post-pandemic, Wellpath's labor expenses continued to rise, particularly for the LG Division.

### 2.     Professional Liability Expenses.

48.     Wellpath also faced a short-term increase in professional liability insurance expenses, primarily driven by case settlements associated with terminated contracts and the lack of available third-party liability insurance.  For example, in 2023, approximately 70% of all executed settlements related to incidents that allegedly occurred prior to 2018.  The settlements generally arose from claims against the Debtors associated with healthcare services provided pursuant to the contracts with their government partners.  The short-term spike in legal costs further

strained Wellpath's financials, with cash settlements totaling approximately $110,000,000 between 2019 and 2023.

49.     In response, Wellpath undertook a series of mitigation efforts that the Debtors believe will result in reduced professional liability expense exposure.  For example, as part of Wellpath's contract rationalization efforts discussed below, Wellpath terminated approximately 65 underperforming contracts that carried outsized risk and for which it was difficult to obtain insurance coverage.  In addition, Wellpath increased provider training and awareness.  Because of these efforts, Wellpath anticipates a meaningful decline in professional liability expenses and expense exposure.

### 3.     Underperforming Contracts.

50.     A number of Wellpath's contracts underperformed in 2023.  In particular, two material contracts for facilities located in Michigan and Georgia failed to meet projected financial performance because (a) Wellpath priced the economic terms for such contracts utilizing historical pre-COVID data provided by the clients, which did not reflect the post-pandemic operational challenges and increased costs borne by the healthcare industry and (b) medically necessary off-site care and pharmacy costs for the impacted facilities exceeded projections which were based on the information provided by the clients.  In addition, high levels of turnover necessitated temporary retention bonuses to retain staff, further straining Wellpath's budget.  In other words, Wellpath's labor and other operating costs increased, but Wellpath could not reprice the contracts to adjust for the higher costs.

51.     Further, in Michigan, a large backlog of care from the prior vendor resulted in higher patient acuity and increased utilization, whereas in Georgia, wage inflation and other incidents exacerbated the losses.  As a result, Wellpath experienced a combined negative gross

profit of approximately $40,000,000 from 2022 through the first half of 2024 from these two contracts alone.

52.     In response to these financial pressures, Wellpath implemented a dual track strategy to address unprofitable customer contracts.  ***First***, Wellpath employed a contract rationalization strategy to exit from unprofitable or high-risk contracts, especially in connection with local government healthcare services.  In doing so, from 2022 through the first half of 2024, Wellpath rationalized approximately 65 underperforming contracts.

53.     ***Second***, Wellpath embarked on a repricing initiative across its portfolio, particularly with respect to contracts with local governments, to account for increased professional liability expenses and labor costs.  As part of this strategy, Wellpath institutionalized the negotiation process to accelerate execution and focused on leveraging its differentiated service offerings compared to its competitors.

54.     While these repricing initiatives were effective, they did not provide material near-term financial relief.  On June 25, 2024, Wellpath retained me as its Interim Chief Financial Officer to replace the former Chief Financial Officer and to assist Wellpath in its restructuring efforts.

**B.      The Debtors' Prepetition Efforts to Address Declining Liquidity.**

55.     By July 2023, rising costs began to strain Wellpath's cash flow and liquidity. Compounding matters, the Debtors' Prepetition Revolving Credit Facility matured only three months later.  To preserve liquidity, Wellpath approached the Prepetition Revolving Lenders and negotiated an extension of the maturity date (the "Prepetition Revolving Facility Maturity Date") to October 1, 2024.  In exchange for securing this extension, Wellpath agreed to maintain minimum liquidity of at least $20,000,000.

56.     Wellpath's management and board of directors recognized that the cost pressures would continue, so they began to evaluate strategic alternatives.  Starting in January 2024, to

address the Debtors' significant maturity wall, Lazard worked closely with the Debtors' legal counsel, McDermott, to pursue an out-of-court recapitalization transaction involving a sale of the RS Division.  The Debtors sought to use proceeds from a potential sale of the RS Division to pay down a significant portion of the Prepetition First Lien Credit Facility to facilitate an extension of the remaining debt amounts.  As such, between January and March of 2024, Lazard prepared for the marketing process of the RS Division.

57.     The sale process of the RS Division was launched in April of 2024.  Lazard, together with MTS, contacted over 140 parties, including financial sponsors and strategic parties, to solicit proposals to acquire the RS Division.  In connection with this solicitation, Lazard and MTS prepared, among other things, a confidential information presentation and an electronic data room to which prospective bidders that executed confidentiality agreements received access.  In total, more than 70 prospective bidders executed confidentiality agreements and received access to private-side information.  By the end of June 2024, the Debtors received six preliminary indications of interest as part of a first-round process.  The Debtors continued and further advanced the marketing process during July and August of 2024.  During that time, the Debtors and Lazard began engaging with the Ad Hoc Group to discuss the preliminary framework of a potential amend-and-extend transaction.

58.     However, despite the Debtors' robust marketing process, after several weeks of further diligence and management presentations, the Debtors only received one formal second-round check-in bid, which was at a reduced valuation from the preliminary indication of interest. While Wellpath and its advisors tried to keep the bidder engaged, the Debtors also attempted to reengage with other bidders between August and September of 2024.  The Debtors did not receive any acceptable bids at the conclusion of the Debtors' bidding process.

### C.      Engagement with Stakeholders to Address Wellpath's Capital Structure.

59.      The inability to secure an acceptable and committed third-party bid for the RS Division, ongoing liquidity challenges, growing vendor payables, and the approaching Prepetition Revolving Facility Maturity Date (*i.e.*, October 1, 2024) prompted the Debtors to temporarily put the marketing process on hold and to pivot to negotiating the terms of an in-court restructuring with the Ad Hoc Group.

60.      As the parties negotiated the terms of a potential restructuring, the Debtors' declining liquidity, upcoming interest and amortization payments, and pending debt maturity made it clear a from forbearance from the lenders would be necessary to extend the Debtors' liquidity runway so the parties could continue negotiations.  Accordingly, on August 30, 2024, the Debtors, the Ad Hoc Group, the Prepetition First Lien Administrative Agent, and the Prepetition Second Lien Administrative Agent, as applicable, executed both the Forbearance Agreement to First Lien Credit Agreement (as amended, the "First Lien Forbearance Agreement") and the Forbearance Agreement to Second Lien Credit Agreement (as amended, the "Second Lien Forbearance Agreement" and, together with the First Lien Forbearance Agreement, the "Forbearance Agreements").  Under the Forbearance Agreements, the Prepetition Secured Parties agreed to forbear until September 30, 2024 from exercising certain rights and remedies available to them under the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement, as applicable.  That deadline was later extended to November 15, 2024. The Forbearance Agreements provided the Debtors with much needed breathing room and liquidity relief to negotiate a comprehensive restructuring with the Ad Hoc Group and explore strategic alternatives.

61.     On November 11, 2024, in connection with the board's ongoing review of strategic alternatives, Wellpath's board appointed two independent and disinterested directors, Patrick J. Bartels and Carol Flaton, who together comprise a special committee of disinterested directors. Wellpath's board of directors delegated to the new directors the authority to, among other things, review and act upon strategic transactions, including authorizing the filing of these chapter 11 cases.

## IV.     The Restructuring Support Agreement and Path for the Chapter 11 Cases.

62.     Following the execution of the Forbearance Agreements, Wellpath and the Ad Hoc Group continued discussions about the terms of an in-court or out of court restructuring.   On November 11, 2024, those discussions culminated in the execution of the RSA between the Debtors and the Consenting Stakeholders (as defined in the RSA).   In conjunction therewith, the Debtors entered into a purchase agreement with RS Purchaser LLC (the "Recovery Solutions Stalking Horse") to serve as stalking horse bidder for the Debtors' RS Division assets.

63.     The RSA establishes a clear and value-maximizing framework—with the necessary financing—for these chapter 11 cases and provides for the continuation of the RS Division sale process and the initiation of a sale process for the LG Division assets and the SF Division assets. The sales may be consummated pursuant to one or more of (a) an asset purchase agreement, (b) a share purchase agreement, or (c) a plan of reorganization.   As set forth above, the Recovery Solutions Stalking Horse will serve as the stalking horse bidder for the Debtors' RS Division assets.

64.     Concurrently with the contemplated sale process, the Debtors will file and seek confirmation of a chapter 11 plan (the "Plan").   Among other things, the Plan will provide for the sale of 97% of the equity interests in Reorganized Wellpath to the DIP Lenders (subject to dilution

in connection with any management incentive plan or post-effective date issuances) pursuant to a private placement issuance, in addition to a distribution of 3% of the equity interests in Reorganized Wellpath under the Plan to holders of claims under the Prepetition First Lien Credit Agreement. The Plan will be withdrawn or modified and prosecuted based on the results of the Debtors' sale process.

65.     A key aspect of the RSA is the Debtors' ability to move through chapter 11 in an efficient and timely manner. Although the proposed Bidding Procedures and the RSA provide for a longer runway for the LG Division assets and SF Division assets, the Debtors propose a faster timeline—approximately six weeks—to market and close the sale of the RS Division's assets. The timeline for the post-petition marketing process, though expeditious, proposes a reasonable schedule that is appropriate under the circumstances when considering both the (a) extensive prepetition marketing process the occurred prepetition and (b) vulnerable patients the RS Division serves.

66.     In short, the RSA provides Wellpath with the flexibility it needs to pursue value-maximizing transactions and reorganize for continued operation on a quick timeframe. Indeed, minimizing time in chapter 11 is crucial to both Wellpath's stakeholders and its patients. Wellpath intends to proceed with a fair and efficient process to preserve and maximize value for all stakeholders, which ultimately will inure to the substantial benefit of all parties in interest.

## V.    First Day Pleadings and Related Relief Requested.

### A.    The Debtors' Need for DIP Financing and Access to Cash Collateral.[5]

67.    Pursuant to the DIP Motion, the Debtors seek authority to enter into the DIP Term Facility, use Cash Collateral, and obtain related relief.  The DIP Term Facility, if approved, would provide the Debtors with access to $105,000,000 of desperately needed new money capital.

68.    As of the Petition Date, the Debtors will have approximately $47,000,000 of unrestricted cash on hand, which is insufficient to operate their enterprise and continue paying their obligations as they come due.  Indeed, in the weeks prior to the Petition Date, the Debtors were unable to make any payments due to inventory vendors in the ordinary course and were forced to forego all such payments.  Although the Debtors attempted to manage relationships with suppliers, vendors, and surety providers near-term payment demands and supply chain disruptions indicated that this stopgap measure was not sustainable.

69.    Facing a liquidity crisis and the risk of jeopardizing key relationships with their vendor partners, the Debtors, with the assistance of their advisors, determined that they required obtaining incremental and immediate liquidity to address their post-petition financing needs.  Absent the ability to access the funds available under the DIP Term Facility and Cash Collateral, the Debtors would likely face a value-destructive and immediate interruption to their operations and lose support from key stakeholders on which the Debtors' business depends, including vendors, suppliers, and employees.

---

[5]    Evidentiary support for the DIP Motion is included in the *Declaration of Christian Tempke in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* filed contemporaneously herewith.

70.     The Debtors will require immediate access to the DIP Term Facility and use of Cash Collateral to ensure they have sufficient liquidity during the interim period to fund essential costs and expenses and avoid irreparable harm to the Debtors' operations.  In addition, the Debtors will require full access to the DIP Term Facility after a final hearing to continue providing uninterrupted patient care, fund working capital needs, and consummate the transactions contemplated in the RSA.  The Debtors, with the assistance of their advisors, have concluded that the proposed DIP Term Facility will be sufficient to support operations and maintain necessary liquidity on the currently contemplated schedule for these chapter 11 cases.

71.     The Debtors, in consultation with their advisors, have also determined that the proposed DIP Term Facility is necessary to ensure a positive message to the market that these chapter 11 cases are sufficiently funded, which is critical to address the concerns raised by the Debtors' patients, customers, employees, and vendors.  Thus, immediate access to the DIP Term Facility and Cash Collateral is crucial to the Debtors' efforts to preserve value for their stakeholders during these chapter 11 cases.

72.     Based upon my personal knowledge and participation in the development and review of the proposed budget (the "Initial DIP Budget"), without the DIP Term Facility and authorized use of Cash Collateral, the Debtors will not have sufficient sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business throughout these chapter 11 cases.

**B.     Other First Day Pleadings.**

73.     In connection with the filing of the Petitions, the Debtors filed the below-listed First Day Pleadings, which are explained in greater detail in **Exhibit C**, requesting relief that the Debtors believe is necessary to enable them to administer their estates with minimal disruption

25

and loss of value during these chapter 11 cases.  The facts set forth in each of the First Day Pleadings are incorporated herein in their entirety.[6]

1.     **Administrative Motions.**

(a)     Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>").

(b)     Debtors' <u>Emergency</u> *Ex Parte* Application for Entry of an Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent (the "<u>Claims and Noticing Agent Retention Application</u>").

(c)     Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Redact Personally Identifiable Information, (II) Approving the Form and Manner of Notifying Creditors of Commencement of These Chapter 11 Cases and Other Information and (III) Granting Related Relief (the "<u>Creditor Matrix Motion</u>").

(d)     Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Implementation of Procedures to Maintain and Protect Confidential Health Information and (II) Granting Related Relief (the <u>Patient Confidentiality Motion</u>").

(e)     Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (B) Bankruptcy Rule 2015.3 Financial Reports, and (II) Granting Related Relief (the "<u>SOFA Extension Motion</u>").

---

[6]     Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Pleadings.

2.      **Operational Motions Requiring Immediate Relief.**

(a)      Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, and (B) Maintain Existing Business Forms and Books and Records, (II) Waiving Deposit Requirements, (III) Allowing Intercompany Transactions and Affording Administrative Expense Priority to Post-Petition Intercompany Claims, and (IV) Granting Related Relief (the "<u>Cash Management Motion</u>").

(b)      Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Lien Claimants, (B) 503(B)(9) Claimants, (C) PACA/PASA Claimants, and (D) Critical Vendors, (II) Confirming Administrative Expense Priority for Outstanding Orders, and (III) Granting Related Relief (the "<u>Critical Vendors Motion</u>").

(c)      Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor and Incur Obligations to Professional Corporations and (B) Obtain New Professional Corporation Contracts, (II) Extending Statutory Protections to Professional Corporations, and (III) Granting Related Relief (the "<u>PC Motion</u>").

(d)      Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Honor and Renew the Premium Financing Agreements Entered into Prepetition and Satisfy Obligations Related Thereto, (C) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (D) Continue to Pay Brokerage Fees, and (E) Maintain the Surety Bond Program and Letters Of Credit, and (II) Granting Related Relief (the "<u>Insurance Motion</u>").

(e)      Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Equity of the Debtors and (II) Granting Related Relief (the "<u>NOL Motion</u>").

(f)      Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "<u>Taxes Motion</u>").

(g)     Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "<u>Utilities Motion</u>").

(h)     Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, (B) Continue Employee Benefits Programs, and (II) Authorizing Current and Former Employees to Proceed with Outstanding Workers' Compensation Claims, and (III) Granting Related Relief (the "<u>Wages Motion</u>").

(i)     Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief (the "<u>Customer Programs Motion</u>").

(j)     Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Order to Enforce the Automatic Stay or in the Alternative Extend the Automatic Stay to Non-Debtor Defendants (the "<u>Stay Extension Motion</u>").

74.     The First Day Pleadings request authority to, among other things, enter into the DIP Term Facility and continue use of the Debtors' Cash Collateral, honor workforce-related compensation and benefits obligations, pay claims of prepetition critical vendors, continue to honor certain customer programs, and continue the Debtors' cash management system and other operations in the ordinary course of business to ensure minimal disruption of the Debtors' business operations during these chapter 11 cases.  For the avoidance of doubt, the Debtors request authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Pleadings.

75.     The Debtors have tailored their requests for immediate relief to those circumstances when the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates.  An orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief described below could hinder the Debtors'

operations and cause irreparable harm. Other requests for relief will be deferred for consideration at a later hearing.

76.     I have reviewed each of the First Day Pleadings and am familiar with the content and substance contained therein. The facts set forth in each First Day Pleading are true and correct to the best of my knowledge and belief with appropriate reliance on other corporate officers and advisors and I can attest to such facts. The relief requested in each of the First Day Pleadings (a) is necessary to allow the Debtors to operate with minimal disruption and productivity losses during these chapter 11 cases, (b) is critical to ensure the maximization of value of the Debtors' estates through preserving customer, supplier and other partner relationships, among other things, (c) is essential to achieving a successful reorganization and ultimately emerging as a sustainable enterprise, and (d) serves the best interests of the Debtors' stakeholders.

## Conclusion

77.     The Debtors' ultimate goal in these chapter 11 cases is to achieve an orderly, efficient, consensual, and successful reorganization to maximize the value of the Debtors' estates for their stakeholders. To minimize any loss of value, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the course of these chapter 11 cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and completing a successful reorganization of the Debtors' businesses will be substantially enhanced.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: November 12, 2024

/s/ *Timothy J. Dragelin*
Name: Timothy J. Dragelin
Title: Chief Restructuring Officer and
   Chief Financial Officer.