IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING THE BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS, (B) APPROVING ENTRY INTO A STALKING HORSE PURCHASE AGREEMENT FOR THE RECOVERY SOLUTIONS ASSETS, (C) AUTHORIZING THE RECOVERY SOLUTIONS EXPENSE REIMBURSEMENT, (D) AUTHORIZING POTENTIAL SELECTION OF STALKING HORSE BIDDERS FOR THE CORRECTIONS ASSETS AND APPROVING RELATED CORRECTIONS ASSET(S) BID PROTECTIONS, (E) ESTABLISHING RELATED DATES AND DEADLINES, (F) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (G) APPROVING THE ASSUMPTION AND ASSIGNMENT PROCEDURES, (II)(A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

---

**Emergency relief has been requested.  Relief is requested not later than 1:00 p.m. (prevailing Central Time) on November 18, 2024.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on November 18, 2024, at 1:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number.  Judge Perez's conference room number is 282694.  Video communication will be**

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Wellpath.  The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

> **by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Perez's homepage.  The meeting code is "JudgePerez".  Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Perez's homepage.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this emergency motion (this "Motion"):[2]

**Preliminary Statement**

1.      On November 11, 2024, the Debtors entered into that certain Restructuring Support Agreement (the "RSA"), by and among the Debtors and the Consenting Stakeholders, that provides for an expedited sale for the Recovery Solutions Assets (as defined below) followed by (assuming a Consolidated Asset Sale does not occur) two paths to a comprehensive restructuring

---

[2]      The facts and circumstances supporting this Motion are set forth in the (a) *Declaration of Timothy J. Dragelin as Chief Restructuring Officer and Chief Financial Officer of Wellpath Holdings, Inc. and Certain of its Affiliates and Subsidiaries in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") filed contemporaneously herewith and incorporated by reference herein, (b) *Declaration of Christian Tempke in Support of Debtors' Emergency Motion for Entry of Orders  (I)(A) Approving The Bidding Procedures for the Sale of the Debtors' Assets, (B) Approving Entry into a Stalking Horse Purchase Agreement for The Recovery Solutions Assets, (C) Authorizing the Recovery Solutions Expense Reimbursement, (D) Authorizing Potential Selection of Stalking Horse Bidders for the Corrections Assets and Approving Related Corrections Asset(s) Bid Protections, (E) Establishing Related Dates and Deadlines, (F) Approving the Form and Manner of Notice Thereof, and (G) Approving the Assumption and Assignment Procedures, (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "Tempke Declaration"), which is attached hereto as **Exhibit A** and incorporated by reference herein, and (c) *Declaration of Jason Schoenholtz in Support of Debtors' Emergency Motion for Entry of Orders (I)(A) Approving The Bidding Procedures for the Sale of the Debtors' Assets, (B) Approving Entry into a Stalking Horse Purchase Agreement for The Recovery Solutions Assets, (C) Authorizing the Recovery Solutions Expense Reimbursement, (D) Authorizing Potential Selection of Stalking Horse Bidders for the Corrections Assets and Approving Related Corrections Asset(s) Bid Protections, (E) Establishing Related Dates and Deadlines, (F) Approving the Form and Manner of Notice Thereof, and (G) Approving the Assumption and Assignment Procedures, (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief*] (the "Schoenholtz Declaration"), which is attached hereto as **Exhibit B** and incorporated by reference herein.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration, the Tempke Declaration, the Schoenholtz Declaration, or the RSA (as defined below), as applicable.

of the Corrections Assets (as defined below) pursuant to a chapter 11 plan: an equitization restructuring (an "Equitization Restructuring") or a sale of all, substantially all, or a material portion of the Corrections Assets (a "Corrections Asset(s) Sale Transaction").

2.      To that end, prior to commencing these chapter 11 cases, the Debtors and their advisors conducted a robust and multi-month marketing process for the sale of the assets associated with the Debtors' business and operations in its behavioral health division, Recovery Solutions (the "Recovery Solutions Assets") that commenced in April 2024. As contemplated in the RSA, on November 11, 2024, the Debtors and Recovery Solutions Stalking Horse Bidder (as defined below) entered into the Recovery Solutions Stalking Horse Agreement (as defined below) for the sale of substantially all of the Recovery Solutions Assets. The Recovery Solutions Stalking Horse Agreement is subject to higher or otherwise better offers pursuant to the post-petition marketing process described herein and, therefore, will only enhance the Debtors' continued marketing process by attracting competitive offers to ensure a value-maximizing transaction for the Recovery Solutions Assets.

3.      To the extent that the foregoing Sale Transaction (as defined herein) does not involve a sale of all or substantially all of the Assets (as defined herein) (a "Consolidated Asset Sale"), the Debtors will continue marketing all of the Debtors' remaining assets, if applicable, following the Recovery Solutions / Consolidated Sale Transaction (the "Corrections Assets"). The Bidding Procedures (as defined below) will afford the Debtors the flexibility to market substantially all of the Corrections Assets to Potential Bidders (as defined below) to maximize the value of the Debtors' estates for the benefit of all parties in interest.

4.      The Debtors believe that the proposed timeline for the post-petition marketing process, though expeditious, constitutes a reasonable schedule that provides sufficient time to

continue canvassing the market for Potential Bidders or plan sponsors and is appropriate under the circumstances. Given, among other things, that the Debtors will accrue considerable expenses the longer these chapter 11 cases remain open, it is essential that the Debtors consummate value-maximizing restructuring transactions and promptly emerge from chapter 11.

### Relief Requested

5. By this Motion, and pursuant to sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002, 6004, 6006, and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors request entry of the following:

> (a) an order, substantially in the form attached hereto (the "Bidding Procedures Order"),
>
>> i. authorizing and approving the bidding procedures, substantially in the form attached to the Bidding Procedures Order as **Exhibit 1**, as otherwise modified by the Debtors in accordance with the bidding procedures (the "Bidding Procedures"), in connection with the sale of all or substantially all, or individual or any combination of, the Assets (as defined herein)[3] (each a "Sale Transaction")[4];
>>
>> ii. authorizing and approving the terms of, and the Debtors' entry into, the equity interest and asset purchase agreement by and among the Debtors and RS Purchaser LLC (the "Recovery Solutions Stalking Horse Bidder") (as amended, supplemented, or otherwise modified by the parties thereto, and including the disclosure schedules and exhibits attached thereto, the "Recovery Solutions Stalking Horse Agreement" and, the Bid contemplated thereby, the "Recovery Solutions Stalking Horse Bid") for

---

[3] Notwithstanding the Debtors' request for authorization and approval of the Bidding Procedures, the Debtors reserve the right to seek by separate motion, in the exercise of their sound business judgment and fiduciary duties (in consultation with the Consultation Parties (as defined herein)), the authority to sell assets of the Debtors' estates (that do not constitute all or substantially all of the Debtors' assets) pursuant to section 363 of the Bankruptcy Code.

[4] As described below, the Bidding Procedures provide that there may be one or several Sale Transactions. To the extent that this Motion refers to the Sale Transaction, or terms related thereto, in the singular it shall include the plural, and vice versa.

the sale of substantially all of the Recovery Solutions Assets, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**;

iii. approving the Recovery Solutions Expense Reimbursement (as defined below) for the Recovery Solutions Stalking Horse Bidder, in accordance with the terms and conditions set forth in the Recovery Solutions Stalking Horse Agreement;

iv. authorizing, but not obligating, the Debtors to select a Corrections Asset(s) Stalking Horse Bidder (as defined herein);

v. approving the Corrections Asset(s) Bid Protections (as defined below) that the Debtors may offer to prospective Corrections Asset(s) Stalking Horse Bidders, if any, in accordance with the terms and conditions set forth in the Bidding Procedures;

vi. scheduling the auction(s) of the Assets (each an "Auction") and hearings to consider approval of the Sale Transactions (each a "Sale Hearing");

vii. authorizing and approving the notice of the sale of the Assets, the Bid Deadlines, the Auctions, and the Sale Hearings, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Sale Notice");

viii. authorizing and approving procedures for the assumption and assignment of the Contracts and the determination of Cure Costs with respect thereto (collectively, the "Assumption and Assignment Procedures");

ix. authorizing and approving notice to each relevant non-Debtor counterparty (each a "Counterparty") to an executory contract or unexpired lease listed on the Potential Assumed Contracts Schedule (as defined below) (collectively, the "Contracts" and each an "Assumed Contract") regarding the Debtors' potential assumption and assignment of such Counterparty's Assumed Contracts (collectively, the "Potential Assumed Contracts") and the amount necessary to cure any defaults thereunder (the "Cure Costs"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 4** (the "Potential Assumption and Assignment Notice");

x. authorizing and approving the notice to each Counterparty listed on the Proposed Assumed Contracts Schedule (as defined herein), substantially in the form attached to the Bidding Procedures Order as **Exhibit 5** (the "Proposed Assumption and Assignment Notice"); and

    (b)    an order (the "Sale Order") authorizing and approving,

        i.  any sale of the Assets free and clear of all liens, claims, interests, and encumbrances, except certain permitted encumbrances as determined by the Debtors and any purchaser of the Assets; and

        ii.  the assumption and assignment of the proposed Assumed Contracts (collectively, the "Proposed Assumed Contracts") in connection with any proposed Sale Transaction; and

    (c)    granting related relief.

## Jurisdiction and Venue

6.    The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges,* General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.).

7.    This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  In addition, the Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

8.    Venue of these chapter 11 cases and related proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

9.    Wellpath is the premier provider of localized, high quality, compassionate care to vulnerable patients in challenging clinical environments. Wellpath is the leading medical and mental health services provider in correctional facilities, inpatient and residential treatment facilities, forensic treatment facilities, and civil commitment centers.  Headquartered in Nashville, Tennessee with operations in approximately 420 facilities across 39 states, Wellpath provides

outsourced solutions to the correctional healthcare and behavioral healthcare industries.  Wellpath offers an array of healthcare services to its federal, state, and local government partners, including on-site medical services, telehealth and mental health programs, and pharmacy management.  Wellpath employs more than 13,000 people and serves nearly 200,000 patients daily.[5]

10.     On November 11, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

11.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Local Rules").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no statutory committee has been appointed or designated.

### The Debtors' Assets

12.     As described more fully in the First Day Declaration, Wellpath is a vital player in the healthcare sector, providing care to a population that often faces significant barriers to receiving treatment.  A key factor to Wellpath's long-term success is its revenue model, which is largely based on long-term contracts with government entities that provides stable, recurring revenue.

13.     The Recovery Solutions Assets constitute the operations of the Debtors' RS Division, which addresses behavioral health needs, focuses on patients underserved by traditional

---

[5]     Additional information about the Debtors' businesses and affairs, capital structure, and prepetition indebtedness, and the events leading up to the Petition Date, can be found in the First Day Declaration.

mental health services, and offers a variety of services, including inpatient psychiatric hospitals, residential treatment centers, mental health rehabilitation centers, and community-based services. The RS Division operates approximately 70 facilities across 10 states, employs over 4,000 healthcare professionals, and has consistently demonstrated strong financial growth.

14.     The Corrections Assets largely comprise of (a) the SF Division and (b) the LG Division.  Each of these divisions is distinct and provides separate business functions.  The SF Division provides chronic care and disease management services to incarcerated individuals in state and federal prisons; whereas the LG Division provides a full suite of medical services to patients in local jails or juvenile detention facilities, focusing on short-term stabilization and triage given that the patient population in such jails and facilities remains incarcerated or detained for a shorter length of time.  To ensure high-quality care to its patients, both the SF Division and the LG Division operate on-site suites of medical services.

<u>**Prepetition Marketing Process**</u>

15.     Since being retained by the Debtors in January 2024, Lazard Frères & Co. LLC ("<u>Lazard</u>") worked closely with the Debtors' legal advisor McDermott Will & Emery LLP, to pursue an out-of-court recapitalization transaction involving a sale of the Recovery Solutions Assets.  The Debtors sought to use proceeds from a potential sale of the Recovery Solutions Assets to pay down a significant portion of the Prepetition First Lien Term Loan to facilitate an extension of the remaining debt amounts. As such, between January and March of 2024, Lazard prepared for the marketing process of the Recovery Solutions Assets.

16.     The sale process of the Recovery Sale Assets launched in April of 2024.  Lazard, together with the Debtors' healthcare investment banker MTS Health Partners L.P. ("<u>MTS</u>"), contacted over 140 parties, including financial sponsors and strategic parties, to solicit proposals to acquire the RS Division.  In connection with this solicitation, Lazard and MTS prepared, among

other things, a confidential information presentation and an electronic data room to which prospective bidders that executed confidentiality agreements received access. In total, more than 70 prospective bidders executed confidentiality agreements and received access to private-side information. By the end of June 2024, the Debtors received six preliminary indications of interest as part of a first-round process. The Debtors continued and further advanced the marketing process during July and August of 2024.

17.     In evaluating various value-maximizing strategic alternatives, in July 2024, the Debtors, in conjunction with their advisors, began engaging with an ad hoc group of lenders (the "Ad Hoc Group") about potential out-of-court balance sheet solutions. On August 30, 2024 (and as later amended on September 30, 2024 and October 31, 2024), the Debtors and the Ad Hoc Group executed forbearance agreements to forbear from taking enforcement actions relating to the events of default in connection with the cash interest and amortization payments on the prepetition credit facilities as well as the maturity of the Prepetition First Lien Credit Facility with the goal to preserve liquidity and extend the runway under the prepetition credit facilities to continue working toward an amicable solution.

18.     However, despite the Debtors' robust marketing process, after several weeks of further diligence and management presentations, the Debtors only received one formal second-round check-in bid, which was at a reduced valuation from the preliminary indication of interest. While Wellpath and its advisors tried to keep the bidder engaged, the Debtors also attempted to reengage with other bidders between August and September of 2024. The Debtors did not receive any acceptable bids at the conclusion of the Debtors' bidding process. Consequently, the Debtors temporarily put the marketing process on hold and pivoted to negotiating the terms of an in-court restructuring with the Ad Hoc Group. These negotiations ultimately led to the execution of the

RSA, which contemplates the sale of substantially all of the Recovery Solutions Assets to the Recovery Solutions Stalking Horse Bidder via the credit bid memorialized in the Recovery Solutions Stalking Horse Agreement.

19.     To maximize the value of the estates' assets and elicit the highest or otherwise best offers for the Assets, the Debtors and their advisors (in consultation with key stakeholders) developed the proposed Bidding Procedures to allow interested parties to provide Bids that are superior to the Recovery Solutions Stalking Horse Bid and submit Bids (a) with respect to the Recovery Solutions, for all or substantially all of the Recovery Solutions Assets and (b) for the Corrections Assets, which Bids may be for (i) all or substantially all of the Corrections Assets, (ii) the SF Assets, or (iii) the LG Assets, in each case, subject to the terms and provisions of the Bidding Procedures.  Pursuant to the Bidding Procedures, the Debtors intend to continue marketing the Assets to potential buyers and facilitating access to diligence materials.  Such materials, for those executing a confidentiality agreement with the Debtors and receiving access to a virtual data room, would include confidential presentation materials, additional legal, financial, operational, and other information on the Debtors, and, as appropriate, meetings with management.

20.     The Debtors and their advisors have carefully evaluated a number of qualitative and quantitative factors in designing a process that they believe would maximize the value of their estates and produce maximum recoveries.  This process principally includes approval of the Bidding Procedures that are designed to promote active bidding and obtain the highest or otherwise best offers available for the Assets.  Moreover, the Bidding Procedures provide the Debtors with the flexibility to consider bids in the form of chapter 11 plans of reorganization.

21.     The Debtors, in consultation with their advisors, believe that the process and time periods set forth in the Bidding Procedures are reasonable and would provide parties with

sufficient time and information necessary to formulate bids to purchase the Assets.  In formulating the Bidding Procedures and time periods contained therein, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and to potential purchasers with the need to efficiently sell the Assets on an expedited timeline to maximize realizable value, all the while preventing the disclosure of confidential and sensitive information to competitors that could be damaging to the business.  As described above and more fully in the Tempke Declaration and the Schoenholtz Declaration, the Recovery Solutions Assets have been marketed by the Debtors, with the assistance of Lazard and MTS, to a broad group of strategic and financial buyers and substantial information regarding the Recovery Solutions Assets has been made available during the marketing process.  Accordingly, the Debtors believe that numerous parties that may have an interest in bidding at the Auction for the Recovery Solutions Assets are already familiar with such assets for the purposes of formulating their Bids.  Furthermore, Potential Bidders would have access to updated information prepared by the Debtors, with the assistance of Lazard and MTS, and a substantial body of information that resides in the Debtors' virtual data room.

22.     Speed and efficiency are critical, in light of the Debtors' business profile and line of businesses they operate, liquidity profile and the Debtors' obligations under the DIP Facilities, and the completion of the sale process in a timely and efficient manner would help maximize the value of the Assets for the benefit of all stakeholders.  An expedited sale is critical to preserving both the Recovery Solutions Assets and Corrections Assets, as several of the Debtors' customer contracts are subject to the competitive dynamics of RFP (request for proposal) processes.  Further, the time periods set forth in the Bidding Procedures are consistent with the case milestones under the RSA and DIP Facilities (the "RSA and DIP Milestones") and were negotiated and agreed to among the Debtors, with the advice of their advisors, the DIP Agent and DIP Lenders, and the Ad

Hoc Group, and failure to adhere to such time periods could jeopardize the closing of a Sale Transaction and the success of these chapter 11 cases.  Thus, the Debtors have determined that pursuing one or more transactions in the manner and within the time periods prescribed in the Bidding Procedures is in the best interest of the Debtors' estates and would provide interested parties with sufficient opportunity to participate.

23.     Accordingly, the Debtors believe that approval of the Bidding Procedures and the related relief requested in this Motion would allow the Debtors to efficiently maximize value and is in the best interests of the Debtors, their estates and creditors, and all other parties in interest. Therefore, the Debtors respectfully request that the Court grant the relief requested herein.

### **The Bidding Procedures**

**I.      The Proposed Schedule.[6]**

24.     The Debtors believe that a prompt schedule is in the best interests of all stakeholders in these chapter 11 cases.  The key dates for the Recovery Solutions / Consolidated Sale Transaction are as follows:

| Date and Time<br>(all times in Central Time) | Event or Deadline |
|---|---|
| November 27, 2024 | Target date for the Debtors to file a schedule listing all potential Assumed Contracts |
| December 11, 2024 at 4:00 p.m. | Cure Objection Deadline |
| December 13, 2024 at 4:00 p.m. | Recovery Solutions / Consolidated Bid Deadline |
| December 16, 2024 at 9:00 a.m. | Recovery Solutions / Consolidated Auction (if required) |
| December 18, 2024 at 4:00 p.m. | Deadline for objections to the approval of the Recovery Solutions / Consolidated Sale Transaction(s) contemplated by any designated Successful Bid(s) (or Alternate Bid(s), as applicable) |

---

[6]     Capitalized terms used but not otherwise defined in this section shall have the meaning ascribed to them below or in the Bidding Procedures, as applicable.

| Date and Time (all times in Central Time) | Event or Deadline |
|---|---|
| December 23, 2024, subject to Court availability | Sale Hearing as to the Recovery Solutions / Consolidated Sale Transaction(s) contemplated by any designated Successful Bid(s) (or Alternate Bid(s), as applicable) |

25.     In the event that the Recovery Solutions / Consolidated Sale Transaction does not constitute a Consolidated Asset Sale, the key dates for any Corrections Asset(s) Sale Transaction are as follows:

| Date and Time (all times in Central Time) | Event or Deadline |
|---|---|
| November 27, 2024 | Target date for the Debtors to file a schedule listing all potential Assumed Contracts |
| December 11, 2024 at 4:00 p.m. | Cure Objection Deadline |
| January 20, 2025 at 4:00 p.m. | Corrections Asset(s) Bid Deadline |
| January 28, 2025 at 9:00 a.m. | Corrections Assets Auction (if required) |
| January 31, 2025 at 4:00 p.m. | Deadline for objections to the approval of any Corrections Asset(s) Sale Transaction(s) contemplated by any designated Successful Bid(s) (or Alternate Bid(s), as applicable) |
| February 4, 2025, subject to Court availability | Sale Hearing as to the Corrections Asset(s) Sale Transaction(s) contemplated by any designated Successful Bid(s) (or Alternate Bid(s), as applicable) |

26.     The Debtors believe that the foregoing timelines provide them with a sufficient opportunity to conduct a thorough marketing process for the Assets.  In addition to the Debtors' transaction efforts thus far, the Debtors will utilize the time prior to entry of the Bidding Procedures Order to actively market the Assets to expedite the solicitation bids in advance of the Bid Deadline (as defined in the Bidding Procedures).  The Debtors believe the proposed schedule is in the best interests of their creditors, other stakeholders, and all other parties in interest, and should be approved.

II.      **The Bidding Procedures.**

27.      The Bidding Procedures are designed to promote a competitive and efficient sale process to maximize the value of the Assets.  If approved, the Bidding Procedures would allow the Debtors to solicit and identify bids from potential buyers or investors that constitute the highest or otherwise best offer for the Recovery Solutions Assets on a schedule consistent with the deadlines under the Recovery Solutions Stalking Horse Agreement, the RSA and DIP Milestones, and the Debtors' strategy for maximizing value for their stakeholders.  Similarly, the proposed Bidding Procedures would allow the Debtors to solicit and identify bids from potential buyers or investors that constitute the highest or otherwise best offer for the Corrections Assets on a schedule consistent with the RSA and DIP Milestones and the Debtors' strategy for maximizing value for their stakeholders.

28.      Finally, the Bidding Procedures explicitly provide that any Successful Bid (even a credit bid) for a Corrections Asset(s) Sale Transaction or a Consolidated Asset Sale shall be subject to (a) the Debtors having sufficient cash at the consummation of any such sale, as determined in consultation with the Consultation Parties, to satisfy the Wind-Down Budget to pay all allowed, (i) post-petition claims, (ii) administrative expense and priority claims, and (iii) professional fees and expenses necessary to wind-down the Debtors' estates in a reasonable and appropriate timeline and in consultation with the Consultation Parties, and (b) the requirement that the net proceeds of any Corrections Asset(s) Sale Transaction(s) or a Consolidated Asset Sale, pursuant to the Bidding Procedures, shall first satisfy the Wind-Down Budget before repayment from such proceeds of any other claims against the Debtors.  As a result, the Debtors would have sufficient cash to administer the wind-down of the Debtors' estates subsequent to the closing of the Corrections Asset(s) Sale Transaction or the Consolidated Asset Sale.  Moreover, at the closing of a Corrections Asset(s) Sale Transaction or a Consolidated Asset Sale, the Debtors intend to deposit the sale proceeds

realized therefrom into a segregated account held by the Debtors pending the ultimate resolution (either by agreement or Court determination) and funding of the appropriate amount on account of the Wind-Down Budget.  The Debtors shall not distribute any proceeds of any Corrections Asset(s) Sale Transaction or a Consolidated Asset Sale prior to the funding of the Wind-Down Budget.

29.     As the Bidding Procedures are attached to the Bidding Procedures Order as **Exhibit 1**, they are not restated herein in their entirety.  The following describes certain material points of the Bidding Procedures:[7]

| Requirement | Description |
|---|---|
| **Potential Bidders & Acceptable Bidders** | To participate in the bidding process or otherwise be considered for any purpose under the Bidding Procedures, a person or entity interested in consummating a Sale Transaction (a "Potential Bidder") must deliver or have previously delivered to the Debtors and each of their advisors the following documents and information (unless the Debtors, in their reasonable business judgment after consultation with the Consultation Parties, choose to waive any of the requirements set forth in Section III of the Bidding Procedures for any Potential Bidder):<br><br>A.  a statement and other factual support demonstrating, to the Debtors' satisfaction, that the Potential Bidder has a *bona fide* interest in purchasing any or all of the Assets and is likely to be able to submit a Qualified Bid by the Bid Deadline;<br><br>B.  a description of the nature and extent of any due diligence the Potential Bidder wishes to conduct and the date in advance of the applicable Bid Deadline by which such due diligence will be completed;<br><br>C.  a description of any connections that the Potential Bidder, its affiliates, and related persons have to the Debtors, any current or former directors and officers of the Debtors, their non-Debtor affiliates, and their primary creditors as identified by the Debtors;<br><br>D.  an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement");<br><br>E.  identification of the Potential Bidder and any principals and representatives thereof who are authorized to appear and act on such |

---

[7]   This summary is qualified in its entirety by the Bidding Procedures attached as **Exhibit 1** to the Bidding Procedures Order.  All capitalized terms used in this summary but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures.  To the extent that there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

| Requirement | Description |
|---|---|
| | Potential Bidder's behalf for all purposes regarding the contemplated proposed Sale Transaction(s);<br><br>F. sufficient information, as determined by the Debtors in their reasonable business judgment, that the Potential Bidder has the financial capacity and any required internal corporate, legal, or other authorizations to close a proposed Sale Transaction, which shall include current audited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, of the party that will bear liability for a breach), the adequacy of which must be reasonably acceptable to the Debtors (after consultation with the Consultation Parties);<br><br>G. a statement that Potential Bidder is not partnering or otherwise working with any other interested party in connection with the potential submission of a joint Bid or post-closing arrangements; and<br><br>H. an optional non-binding written indication of interest specifying, among other things, with respect to any proposed Sale Transaction, the identity of the Assets to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a Bid by such Potential Bidder.<br><br>The Debtors, in consultation with their advisors, will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate documents and information so that such Potential Bidder may proceed to conduct due diligence and submit a Bid (such Potential Bidder, an "<u>Acceptable Bidder</u>"). |
| **Due Diligence** | The Debtors, with their advisors, shall establish an electronic data room or rooms (the "<u>Data Room</u>") that provides standard and customary diligence materials, including the necessary information to allow Acceptable Bidders to submit a Bid and to seek and obtain financing commitments.<br><br>Only Acceptable Bidders shall be eligible to receive due diligence information and access to the Data Room and to additional non-public information regarding the Debtors.  The Debtors will provide to each Acceptable Bidder reasonable due diligence information, as requested by such Acceptable Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post all written due diligence provided to any Acceptable Bidder to the Data Room.  The Debtors will promptly provide written due diligence materials that have been made available to any other Acceptable Bidder to a Stalking Horse Bidder on the same basis provided to the Acceptable Bidder, to the extent such information has not previously been provided to or is not simultaneously provided to the Stalking Horse Bidder.  The due diligence period will end on the applicable Bid Deadline, and subsequent to the applicable Bid Deadline the Debtors may, in their reasonable business judgment after consultation with the Consultation Parties, |

| Requirement | Description |
|---|---|
| | but shall have no obligation to, furnish any additional due diligence information to any person in connection with the Sale Transaction(s). |
| | The Debtors and their advisors shall coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access; *provided* that the Debtors may decline to provide such information to Acceptable Bidders who, at such time and in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, have not established, or who have raised doubt, that such Acceptable Bidder intends in good faith, or has the capacity , to consummate the applicable proposed Sale Transaction. |
| | The Debtors also reserve the right to withhold or redact any diligence materials that the Debtors determine, in consultation with the Consultation Parties, are sensitive or otherwise not appropriate for disclosure to an Acceptable Bidder who is a competitor of the Debtors or is affiliated with any competitor of the Debtors (including any equity sponsor or strategic investor that holds an ownership stake in such competitor) (a "Competitor"), and the Debtors shall require that any Acceptable Bidder that is a Competitor enter into a "clean team" or similar arrangement acceptable to the Debtors, in consultation with the Consultation Parties, which arrangement shall prohibit any such information from being accessed by any personnel or other representatives of the Competitor who make competitive decisions for such Competitor or that would permit such information from being used for any other purpose other than in connection with the making of a Bid. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be an Acceptable Bidder. |
| | **All due diligence requests directed to the Debtors must be directed to: project.starburst.2024@lazard.com and raikin @mtspartners.com.** |
| | **Each Acceptable Bidder and Qualified Bidder shall comply with all reasonable requests with respect to information and due diligence access by the Debtors or their advisors regarding such Acceptable Bidder or Qualified Bidder, as applicable, and its contemplated proposed Sale Transaction.** |
| **Bid Requirements** | Any proposal, solicitation, or offer to consummate a Sale Transaction (each a "Bid") must be submitted in writing and must satisfy the following requirements (collectively, the "Bid Requirements"): |
| | A. **Proposed Sale Transaction.** Each Bid must propose a Sale Transaction as to the Recovery Solutions Assets or the Corrections Assets (each, an "Asset Package"), or both for a Consolidated Asset Sale, in the form of an asset purchase agreement or a chapter 11 plan of reorganization. Each Bid must specify which of such Assets (including equity interests of some or all of the Debtors (if applicable)) are to be included in or excluded from |

| Requirement | Description |
|---|---|
| | the proposed Sale Transaction, and which liabilities the Potential Bidder agrees to assume, including any indebtedness to be assumed, if any (the "Assumed Liabilities"); *provided*, *however*, that (1) any Bid for the Recovery Solutions Assets must be for all or substantially all of the Recovery Solutions Assets and (2) any Bid for the Corrections Assets must be a Bid for (a) all or substantially all of the Corrections Assets, (b) those assets associated with the business and operations associated with the Debtors' state and federal division (the "SF Assets"), or (c) those assets associated with the business and operations of the Debtors' local government division (the "LG Assets").  A Bid that includes the Recovery Solutions Assets, or sale of all or substantially all of the Assets, shall constitute a "Recovery Solutions / Consolidated Bid" and a Sale Transaction that includes the Recovery Solutions Assets, or sale of all or substantially all of the Assets, shall constitute a "Recovery Solutions / Consolidated Sale Transaction."  In the event the Recovery Solutions / Consolidated Sale Transaction is not a Consolidated Asset Sale, a Bid that includes all or substantially all of the Corrections Assets, or sale of either the SF Assets or LG Assets, shall constitute a "Corrections Asset(s) Bid" and a Sale Transaction that includes all or substantially all of the Corrections Assets, or sale of either the SF Assets or LG Assets, shall constitute a "Corrections Asset(s) Sale Transaction."  A Chapter 11 Plan Bid must specify structure, the confirmability and feasibility of any proposed chapter 11 plan (including the proposed time and costs estimated to be necessary to negotiate, document, and obtain confirmation of such proposed chapter 11 plan).<br><br>**B.** **Purchase Price.**  A Bid must clearly specify a cash purchase price, Assumed Liabilities, and identify separately any other non-cash components (the "Purchase Price").  Other than a Chapter 11 Plan Bid, a Bid with respect to the Corrections Assets must specify how the Purchase Price is to be allocated among the SF Assets and the LG Assets to be included in the proposed Sale Transaction.  A Bid for both Asset Packages must specify how the Purchase Price is to be allocated among each Asset Package to be included in the proposed Sale Transaction.  A Bid for Assets in both Asset Packages must specify how the Purchase Price is to be allocated among such Assets.  The Purchase Price must be at least equal to the following:   (1) for a Recovery Solutions / Consolidated Sale Transaction, (a) the consideration set forth in the Recovery Solutions Stalking Horse Bid (as defined below), *plus* (b) $5,000,000, *plus* (c) the Recovery Solutions Expense Reimbursement (as defined below); and (2) for a Corrections Asset(s) Sale Transaction, (a) the consideration set forth in any Corrections Asset(s) Approved Stalking Horse Bid (as defined below) *plus* (b) the aggregate amount of any Corrections Asset(s) Approved Bid Protections, *plus* (c) such additional amount as determined |

| Requirement | Description |
|---|---|
| | by the Debtors in their reasonable business judgment, in consultation with the Consultation Parties. |
| | **C.  Deposit.**  Each Bid (other than the Recovery Solutions Stalking Horse Bid) must be accompanied by a cash deposit in amount equal to ten percent of the aggregate cash Purchase Price to be held in an escrow account on terms acceptable to the Debtors (the "Deposit"); *provided, however*, that the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, may elect to waive or modify the requirement of a Deposit on a case-by-case basis; *provided further*, that no Deposit shall be required for the credit portion of any Bid that includes a credit bid.  To the extent a Qualified Bid is modified before, during, or after the Auction in a manner that increases the originally contemplated Purchase Price, the Debtors reserve the right, after consultation with the Consultation Parties, to require that the applicable Qualified Bidder increase its Deposit so that it equals ten percent of the increased Purchase Price. |
| | **D.  Transaction Documents.**  Other than for a Qualified Bid in the form of a chapter 11 plan of reorganization ("Chapter 11 Plan Bid"), each Bid must be accompanied by an executed purchase agreement with respect to the proposed Sale Transaction, including the exhibits, schedules, and ancillary agreements related thereto and any other related material documents integral to such Bid (including a schedule of contracts and/or leases to be assumed and/or assumed and assigned to the extent applicable to the Bid). In addition, (1) for the Recovery Solutions Assets or all or substantially all of the Assets, the executed purchase agreement accompanying such Potential Bidder's Bid must be further accompanied by a redline copy marked to reflect any amendments or modifications to the Recovery Solutions Stalking Horse Agreement (as defined below) and (2) for the Corrections Assets, the executed purchase agreement accompanying such Potential Bidder's Bid must be further accompanied by a redline copy marked to reflect any amendments or modifications to (a) the form purchase agreement provided by the Debtors (through their advisors) or (b) any  Corrections Asset(s) Stalking Horse Agreement.   For the avoidance of doubt, a "conceptual" or "issues list"-style markup of the form asset purchase agreement would not satisfy this requirement.  Each Chapter 11 Plan Bid must be accompanied by an executed investment agreement, signed by an authorized representative of such Potential Bidder, pursuant to which the bidder proposes to effectuate the transactions contemplated by the Chapter 11 Plan Bid and must provide for a fully committed investment of capital in exchange for substantially all of the equity of the reorganized Debtors. |
| | **E.  Alternate  Bidder  Commitment.**   A Bid must include a written commitment by the applicable Acceptable Bidder to serve as an Alternate Bidder in the event that such Acceptable Bidder's Bid is not selected as |

| Requirement | Description |
|---|---|
| | the Successful Bid; *provided* that the foregoing shall not apply to any Potential Bidder that (1) both (a) qualifies as a Secured Party (as defined below) and (b) submits a Bid that contemplates providing consideration pursuant to section 363(k) of the Bankruptcy Code or a chapter 11 plan of reorganization or (2) is expressly exempted from such requirement pursuant to each applicable Stalking Horse Agreement (as defined below). |

F. **Proof of Financial Ability to Perform.**  A Bid must include written evidence to allow the Debtors to reasonably conclude that the Potential Bidder has the necessary financial ability to close the proposed Sale Transaction.  Such information must include the following:

  1. contact names and telephone numbers for verification of financing sources;

  2. evidence of the Potential Bidder's internal resources and, if applicable, proof of unconditional, fully executed, and effective financing commitments from one or more reputable sources in an aggregate amount equal to the cash portion of such Bid (including, if applicable, the payment of cure amounts), in each case, as are needed to close the proposed Sale Transaction;

  3. a description of the Potential Bidder's pro forma capital structure; and

  4. any other financial disclosure or credit-quality support information or enhancement reasonably requested by the Debtors or their advisors to demonstrate that such Potential Bidder has the ability to close the proposed Sale Transaction.

G. **Contingencies; No Financing or Diligence Outs.**  A Bid shall not be conditioned on (1) the bidder obtaining financing or (2) the outcome or review of due diligence, or otherwise subject to contingencies more burdensome than those set forth in the applicable Stalking Horse Agreement.

H. **Identity.**  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid— including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the proposed Sale Transaction contemplated by such Bid— and the complete terms of any such participation.  Each Bid should also include contact information for the specific person(s) and counsel whom the Debtors (and their advisors) should contact regarding such Bid.

I. **Regulatory and Third-Party Approvals.**  A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the proposed Sale Transaction, if any, and the date by which the Potential Bidder expects to receive such approvals, and those actions

| Requirement | Description |
|---|---|
| | the Potential Bidder will take to ensure receipt of such approvals as promptly as possible. |
| | **J.** **Authorization.** Each Bid must contain evidence acceptable to the Debtors that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body) with respect to the submission of its Bid and the consummation of the proposed Sale Transaction contemplated by such Bid. |
| | **K.** **Contracts and Leases.** The Bid must identify each and every executory contract and unexpired lease to be assumed and assigned in connection with the proposed Sale Transaction (collectively, the "Assumed Contracts"), and provide the Potential Bidder's agreement to pay all Cure Costs associated with any Assumed Contracts. Each Bid must include evidence of the Potential Bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including audited and unaudited financial statements, tax returns, bank account statements, and a description of the business to be conducted at the premises, and such other documentation as the Debtors may request in their reasonable business judgment (the "Adequate Assurance Package"). The Adequate Assurance Package should be submitted in its own compiled .pdf document. |
| | **L.** **Management and Employee Obligations.** The Bid must indicate whether the Potential Bidder intends to hire all or some of the employees who are primarily employed in connection with the Assets to be included in the proposed Sale Transaction. |
| | **M.** **As-Is, Where-Is.** Each Bid must include a written acknowledgement and representation that the Potential Bidder (1) has had an opportunity to conduct any and all due diligence regarding the proposed Sale Transaction prior to making its Bid, (2) has relied solely upon its own independent review, investigation, or inspection of any documents in making its Bid, and (3) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, by the Debtors or their advisors or other representatives regarding the proposed Sale Transaction or the completeness of any information provided in connection therewith or the Auction (if any). |
| | **N.** **No Collusion.** Each Potential Bidder must acknowledge in writing  the following:  (1) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or any Sale Transaction, specifying that it did not agree with any Potential Bidders to control the Purchase Price; and (2) it agrees not to engage in any collusion that would be subject to section |

| Requirement | Description |
|---|---|
| | 363(n) of the Bankruptcy Code with respect to any Bids, any Auction, or any Sale Transaction. |
| | **O.** <u>**No Break-Up Fee.**</u>  Each Bid shall indicate that such Potential Bidder will not seek any transaction break-up fee, termination fee, expense reimbursement, working fee, or similar type of payment; *provided* that (1) the Recovery Solutions Stalking Horse Bidder shall be entitled to the Recovery Solutions Expense Reimbursement and (2) the Debtors are authorized in their discretion to offer Corrections Asset Bid Protections to one or more Corrections Asset(s) Stalking Horse Bidders, in each case, in accordance with these Bidding Procedures and the Bidding Procedures Order. |
| | **P.** <u>**Indication of Interest.**</u>  To the extent that a Potential Bidder provided a non-binding indication of interest pursuant to section III.H of the Bidding Procedures, each Bid must describe any material deviations from such indication of interest. |
| | **Q.** <u>**Commitment to Close.**</u>  A Bid by a Potential Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations in the Debtors' reasonable business judgment, after consultation with the Consultation Parties) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors. Each Potential Bidder must commit to closing the proposed Sale Transaction contemplated by the Bid as soon as practicable, and in no event later than any deadline set forth in the applicable Stalking Horse Agreement. |
| | **R.** <u>**Irrevocable Bid.**</u>  Each Bid must contain a statement by the applicable Potential Bidder acknowledging and agreeing that such Bid and each of its provisions is binding upon the Potential Bidder and irrevocable in all respects unless and until the Debtors have accepted a Successful Bid with respect to the relevant Assets and the relevant Potential Bidder is not selected as the Alternate Bidder with respect to such Assets. |
| | **S.** <u>**Compliance with Bidding Procedures.**</u>  Each Bid must contain a statement that (1) the Potential Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code, (2) the Bid constitutes a *bona fide* offer to consummate the proposed Sale Transaction embodied therein, and (3) the Potential Bidder agrees to be bound by these Bidding Procedures. |
| | **T.** <u>**Consent to Jurisdiction.**</u>  Each Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, the Auction (if held), the construction and enforcement of these Bidding Procedures or any sale documents, and the consummation of a Sale Transaction. |

| Requirement | Description |
|---|---|
| | By submitting a Bid, each Potential Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of these Bidding Procedures and to refrain from (a) submitting a Bid after conclusion of the Auction (if any) or (b) seeking to reopen the Auction (if any) once closed.  **The submission of a Bid shall constitute a binding and irrevocable offer (a) for the Successful Bidder, until consummation of the proposed Sale Transaction, (b) for the Alternate Bidder (if any), as provided in the Bidding Procedures, including section VIII in the Bidding Procedures, and (c) for any Bidder other than the Successful Bidder and Alternate Bidder, until two business days after entry of the Sale Order approving the Successful Bid and (if applicable) the Alternate Bid for the applicable Assets, and each Bid must include a written acknowledgement and representation to such effect.** |
| **No Communications Among Bidders Without Consent** | There shall be no communications between or among Potential Bidders and/or Acceptable Bidders unless the Debtors' advisors have authorized such communication in writing.  The Debtors reserve the right, in their reasonable business judgment and upon consultation with the Consultation Parties, to disqualify any Potential Bidders or Acceptable Bidders that have communications between or amongst themselves without the prior authorization of the Debtors' advisors.  For the avoidance of doubt, the joining of Bids between Potential Bidders or Acceptable Bidders may be permitted by the Debtors, after consultation with the Consultation Parties; *provided* that, the Debtors will be authorized to approve joint Bids in their reasonable discretion on a case-by-case basis. |
| **Designation of an Alternate Bidder** | If for any reason a Successful Bidder fails to consummate its Successful Bid within the time permitted after the entry of the Sale Order approving the Sale to such Successful Bidder, then the Qualified Bidder or Qualified Bidders with the next-highest or otherwise second-best Bid (each an "Alternate Bidder"), as determined by the Debtors after consultation with their advisors and the Consultation Parties, at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein, will automatically be deemed to have submitted the highest or otherwise best Bid or Bids (each an "Alternate Bid"), and the Alternate Bidder will be required to consummate the transaction pursuant to the Alternate Bid as soon as is commercially reasonable without further order of the Court upon at least 24 hours' advance notice, which notice will be filed with the Court; *provided* that the foregoing shall not apply to any Qualified Bidder that (a) both (i) qualifies as a Secured Party and (ii) submits a Bid that contemplates providing consideration pursuant to section 363(k) of the Bankruptcy Code or (b) is expressly exempted from such requirement pursuant to an applicable Stalking Horse Agreement.<br><br>Upon designation of the Alternate Bidder at the Auction, the Alternate Bid must remain open, notwithstanding any outside date set forth in such Alternate Bidder's proposed purchase agreement or a chapter 11 plan, until the earlier of |

| Requirement | Description |
|---|---|
| | (a) the Closing of the Successful Bid or (b) the date that is 60 days following the conclusion of the Auction.  Each Alternate Bidder's Deposit will be held in escrow until the closing of the Sale Transaction with the applicable Successful Bidder. |
| **Qualified Bids & Qualified Bidders** | A Bid is deemed a "Qualified Bid" if the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, determine that such Bid (a) satisfies the Bid Requirements set forth above and (b) is reasonably likely to be consummated if selected as the Successful Bid (or Alternate Bid, as applicable) for the applicable Assets no later than the Applicable Outside Date (as defined below); *provided* that any Stalking Horse Bid shall constitute and be deemed a Qualified Bid, and the Stalking Horse Bidders may participate in the Auctions. |
| | The "Applicable Outside Date" is, (a) in the case of any Recovery Solutions / Consolidated Bid, January 9, 2025 and (b) in the case of any Corrections Asset(s) Bid, March 31, 2025. |
| | An Acceptable Bidder that submits a Qualified Bid is a "Qualified Bidder" with respect to the Assets to which such Qualified Bid relates.  A Qualified Bid for the Recovery Solutions Assets, or sale of all or substantially all of the Assets, shall constitute a "Recovery Solutions / Consolidated Qualified Bid."  A Qualified Bid for all or substantially all of the Corrections Assets, or sale of non-overlapping SF Assets and LG Assets, shall constitute a "Corrections Asset(s) Qualified Bid." |
| | As soon as reasonably practicable after the applicable Bid Deadline, the Debtors will notify each Acceptable Bidder whether such party is a Qualified Bidder and shall provide the Consultation Parties' counsel with a copy of each Qualified Bid. If an Acceptable Bidder's Bid is determined not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit (if any) on the date that is three business days after the applicable Bid Deadline.  The Debtors shall have the right (upon consultation with the Consultation Parties) to deem a Bid a Qualified Bid even if such Bid does not conform to one or more of the Bid Requirements. |
| | Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the date set for the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtors following consultation with the Consultation Parties, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the Purchase Price, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in the Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction (if any) as set forth in the |

| Requirement | Description |
|---|---|
| | Bidding Procedures.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in the Bidding Procedures.<br><br>Notwithstanding anything in the Bidding Procedures to the contrary, the Debtors, in consultation with the Consultation Parties, reserve the right to work with (a) Potential Bidders and Acceptable Bidders to aggregate two or more Bids into a single consolidated Bid prior to the applicable Bid Deadline and (b) Qualified Bidders to aggregate two or more Qualified Bids into a single Qualified Bid prior to the conclusion of the Auction (if any).  The Debtors, in consultation with the Consultation Parties, reserve the right to cooperate with any Acceptable Bidder to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid. The Debtors reserve the right to accept a single Qualified Bid or multiple Bids that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple bidders shall be treated as a single Qualified Bidder and their Bid a single Qualified Bid for purposes of the Auction (if any)). |
| **Right to Credit Bid** | Any Qualified Bidder that has a valid and perfected lien on any of the Assets of the Debtors' estates (a "<u>Secured Party</u>") shall be entitled to credit bid all or a portion of the face value of such Secured Party's remaining claims against the Debtors toward the Purchase Price specified in such Qualified Bidder's Bid; *provided* that (a) a Secured Party shall be entitled to credit bid its claim(s) only with respect to those Assets that are subject to a valid and perfected lien in favor of such Secured Party as to such claim(s) and (b) any such credit bid must be submitted on or before the applicable Bid Deadline and include cash consideration sufficient to satisfy the Carve-Out (as defined in the DIP Orders) any senior liens on the collateral that is subject to the credit bid, except to the extent otherwise agreed by the holders of such senior liens in their sole and absolute discretion.  Notwithstanding anything to the contrary herein, the DIP Lenders and the First Lien Lenders (if applicable), subject to section 363(k) of the Bankruptcy Code, may submit a credit bid of all or any portion of the aggregate amount of their respective remaining secured claims.  Any credit bid submitted by any DIP Lender or any Prepetition First Lien Secured Party, subject to section 363(k) of the Bankruptcy Code, shall be deemed a Qualified Bid (without the need for any Deposit), unless otherwise ordered by the Court. |
| **Auction** | **<u>Date, Time, and Location</u>.** The Auction for the Recovery Solutions / Consolidated Sale Transaction (the "<u>Recovery Solutions / Consolidated Auction</u>") shall be conducted at McDermott Will & Emery LLP, 444 West Lake Street, Suite 4000, Chicago, Illinois 60606 on **December 16, 2024 at 9:00 a.m. (prevailing Central Time)**, or such later time on such day or such other place as the Debtors shall notify all Participating Parties (as defined below).  The Auction for the Corrections Assets (the "<u>Corrections Asset(s) Auction</u>") shall be conducted at McDermott Will & Emery LLP, 444 West Lake Street, Suite 4000, Chicago, Illinois 60606 on **January 28, 2025 at 9:00 a.m. (prevailing Central** |

| Requirement | Description |
|---|---|
| | **Time)**, or such later time on such day or such other place as the Debtors shall notify all Participating Parties. |

If (a) no more than one Qualified Bid is submitted by the applicable Bid Deadline (whether the Recovery Solutions Stalking Horse Bid, a Corrections Asset(s) Approved Stalking Horse Bid, or otherwise) or (b) multiple Partial Bids (as defined below) are submitted by the applicable Bid Deadline for non-overlapping the SF Assets and LG Assets, the Debtors may elect to cancel the applicable Auction and seek approval of the proposed Sale Transaction(s) contemplated in the Recovery Solutions Stalking Horse Bid, such Corrections Asset(s) Approved Stalking Horse Bid, Qualified Bid that is not either a Recovery Solutions Stalking Horse Bid or Corrections Asset(s) Approved Stalking Horse Bid, or Partial Bids, as applicable, at the applicable Sale Hearing.

If any of the Qualified Bids submitted by the applicable Bid Deadline are structured as a purchase of less than all or substantially all of the Corrections Assets (each such bid, a "Partial Bid"), the Debtors may, in consultation with the Consultation Parties, conduct separate auctions at the Auction for the SF Assets and the LG Assets (each, an "Auction Lot"). The Debtors may combine Partial Bids into an Auction Lot to compete against a Corrections Asset(s) Approved Stalking Horse Bid for all or substantially all of the Corrections Assets (as applicable). The Debtors may designate such Auction Lot at any time prior to the Auction. Only representatives or agents of the Debtors, the Consultation Parties, and the Qualified Bidders (including the Recovery Solutions Stalking Horse Bidder and any Corrections Asset(s) Approved Stalking Horse Bidder, and the legal and financial advisors to each of the foregoing (collectively, the "Participating Parties"), will be entitled to attend the Auction, and only Qualified Bidders will be entitled to make any Subsequent Bids (as defined in the Bidding Procedures) at the Auction. The Participating Parties participating in the Auction must appear in person, telephonically, or through a video teleconference, as determined by the Debtors.

**Starting Bid.** Prior to each Auction, the Debtors will (a) notify each applicable Qualified Bidder that has timely submitted a Qualified Bid that its Bid is a Qualified Bid and (b) provide all applicable Qualified Bidders with (i) copies of the Qualified Bid or combination of Qualified Bids that the Debtors believe, in consultation with the Consultation Parties, is the highest or otherwise best offer (the "Starting Bid") for the applicable Asset Package, (ii) an explanation of how the Debtors value the Starting Bid, and (iii) a list identifying all of the applicable Qualified Bidders.  For the avoidance of doubt, the Starting Bid for the Corrections Assets may be comprised of Qualified Bids for non-overlapping SF Assets and LG Assets if the aggregate consideration of such Qualified Bids is higher and better than the Corrections Asset(s) Approved Stalking Horse Bid for all or substantially all of the Corrections Assets (as applicable).  The Debtors shall also provide copies of such Starting Bid (if applicable, marked against the

| Requirement | Description |
|---|---|
| | Recovery Solutions Stalking Horse Bid or Corrections Asset(s) Approved Stalking Horse Bid) to all of the applicable Qualified Bidders (including the applicable Stalking Horse Bidder(s)) and the Consultation Parties. |
| | Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (a) it has not engaged in any collusion with respect to the bidding process and (b) its Qualified Bid is a good faith offer and it intends to consummate the Sale Transaction contemplated by its Qualified Bid if such Qualified Bid is the Successful Bid (or Alternate Bid, as applicable) for the applicable Assets or Asset Package(s). |
| | The Debtors may (upon consultation with the Consultation Parties) employ and announce at each Auction additional procedural rules for conducting the Auction (e.g., the amount of time allotted to submit Subsequent Bids); provided that such rules shall (a) not be inconsistent with the Bankruptcy Code, the Bidding Procedures Order, or any other order of the Court entered in connection herewith and (b) be disclosed to all applicable Qualified Bidders. |
| | **Subsequent Bid.**  Bidding at each Auction will begin with the applicable Starting Bid and continue, in one or more rounds of bidding in the presence of all parties at the Auction, so long as during each round at least one subsequent bid (a "<u>Subsequent Bid</u>") is submitted by a Qualified Bidder that (a) improves upon such Qualified Bidder's immediately prior Qualified Bid and (b) the Debtors determine, in consultation with the Consultation Parties, that such Subsequent Bid is (i) with respect to the first round, a higher or otherwise better offer than the Starting Bid and (ii) with respect to subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below), in each case respecting the Corrections Assets taking into account other Qualified Bids for non-overlapping SF Assets and LG Assets; *provided* that, with respect to the first round, any Qualified Bid must include a minimum overbid of two percent over the Starting Bid.  Notwithstanding anything to the contrary herein, the Debtors, in their discretion and in consultation with the Consultation Parties, may determine appropriate minimum bid increments or requirements for each round of bidding. |
| | **Highest and Best Offer.**  After the first round of bidding and between each subsequent round of bidding, as applicable, the Debtors, in their discretion and in consultation with the Consultation Parties, will determine and announce the Bid or Bids that they believe to be the highest or otherwise best offer or combination of offers (the "<u>Leading Bid</u>") for each applicable Asset Package. Additional consideration in excess of the amount set forth in the applicable Starting Bid may include cash and/or non-cash consideration; *provided* that the value for such non-cash consideration shall be determined by the Debtors, in their discretion and in consultation with the Consultation Parties.  A round of bidding will conclude after each participating Qualified Bidder has had the opportunity |

| Requirement | Description |
|---|---|
| | to submit a Subsequent Bid with full knowledge and written confirmation of the Leading Bid.<br><br>For the purpose of evaluating Subsequent Bids, the Debtors may require a Qualified Bidder submitting a Subsequent Bid to submit, as part of its Subsequent Bid, additional evidence (in the form of financial disclosure or credit-quality support information or enhancement acceptable to the Debtors in their discretion, after consultation with the Consultation Parties) demonstrating such Qualified Bidder's ability to close the proposed transaction. The Debtors shall maintain a transcript of all Bids made and announced at each Auction, including the Starting Bid(s), all Subsequent Bid(s), the Leading Bid(s), the Alternate Bid(s), and the Successful Bid(s). If a Qualified Bidder increases its bid at an Auction and is the Successful Bidder or Alternate Bidder, such Qualified Bidder must increase its Deposit to an amount equal to ten percent of the proposed Purchase Price submitted at the Auction within two days after the Auction.<br><br>**Successful Bid.** Prior to the conclusion of each Auction, the Debtors, in consultation with the Consultation Parties, shall (a) review and evaluate each Bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale transaction (in the case of a Chapter 11 Plan Bid, the structure, confirmability, and feasibility of any proposed chapter 11 plan (including the proposed time and costs estimated to be necessary to negotiate, document and obtain confirmation of such proposed chapter 11 plan)), (b) determine and identify the highest or otherwise best offer or collection of offers (the "Successful Bid(s)"), (c) determine and identify the Alternate Bid(s) and (d) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of (i) the identity of the party or parties that submitted the Successful Bid(s) (the "Successful Bidder(s)"), (ii) the amount and other material terms of the Successful Bid(s), (iii) Alternate Bidders, and (iv) the amount and other material terms of the Alternate Bid(s). As soon as reasonably practicable after the completion of the applicable Auction, the Successful Bidder(s) and the applicable Debtors shall complete and execute all agreements, instruments, and other documents necessary to consummate the applicable Sale Transaction(s) contemplated by the applicable Successful Bid(s). |
| **Fiduciary Out** | Notwithstanding anything to the contrary in the Bidding Procedures or any document filed with or entered by the Court, nothing in the Bidding Procedures or the Bidding Procedures Order shall require a Debtor or its board of directors, board of managers, or similar governing body to take any action or to refrain from taking any action with respect to any proposed Sale Transaction or the Bidding Procedures to the extent such Debtor or governing body determines in good faith, in consultation with outside counsel, that taking or failing to take such |

| Requirement | Description |
|---|---|
| | action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.<br><br>Further, notwithstanding anything to the contrary in the Bidding Procedures or any document filed with or entered by the Court, until the closing of the applicable Auction (if any), the Debtors and their respective directors, managers, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to (a) consider, respond to, and facilitate alternate proposals for sales or other transactions involving any or all of the Assets (each an "Alternate Proposal"), (b) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity, (c) maintain or continue discussions or negotiations with respect to Alternate Proposals, (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternate Proposals, and (e) enter into or continue discussions or negotiations with any person or entity regarding any Alternate Proposals. |
| **"As Is, Where Is"** | Consummation of any Sale Transaction will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors or their estates, except as specifically accepted or agreed to by the Debtors in the executed definitive documentation for the Sale Transaction ("Definitive Sale Documents"). Consummation of any Sale Transaction will be without any representations or warranties whatsoever by the Debtors' representatives or advisors. Unless otherwise specifically accepted or agreed to by the Debtors in Definitive Sale Documents, and other than as contemplated by a transaction pursuant to a chapter 11 plan of reorganization with respect to the Corrections Assets, all of the Debtors' right, title, and interest in and to the Assets disposed of in a Sale Transaction will be transferred to the Successful Bidder (or Alternate Bidder, as applicable) free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests in accordance with sections 363(f) of the Bankruptcy Code.<br><br>By submitting a Bid, each Potential Bidder will be deemed to acknowledge and represent that it (a) has had an opportunity to conduct adequate due diligence regarding the Debtors and the proposed Sale Transaction prior to making its Bid, (b) has relied solely on its own independent review, investigation, and inspection of any document, including executory contracts and unexpired leases, in making its Bid, and (c) did not rely on or receive from any person or entity (including any of the Debtors or their advisors or other representatives) any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the proposed Sale Transaction or the completeness of any information provided in connection with the proposed Sale Transaction or the Auction (if any). |

| Requirement | Description |
|---|---|
| **Commissions** | The Debtors shall be under no obligation to pay any commissions, fees, or expenses to any Potential Bidder's agent, advisor, or broker.  All commissions, fees, or expenses for any such agents, advisors, or brokers may be paid by Potential Bidders at such Potential Bidder's discretion.  In no case shall any commissions, fees, or expenses for any Potential Bidder's agent, advisor, or broker be deducted from any proceeds derived from any Sale of the Assets.  This paragraph shall not apply to any Recovery Solutions Expense Reimbursement or Corrections Asset(s) Bid Protections that become(s) payable pursuant to, respectively, the terms of the Recovery Solutions Stalking Horse Bid or any Corrections Asset(s) Stalking Horse Agreement. |
| **Reservation of Rights** | The Debtors shall be entitled to modify the Bidding Procedures in their reasonable business judgment, in consultation with the Consultation Parties, in any manner that will best promote the goals of the Bidding Procedures, or impose, at or prior to the Auction (if any), additional customary terms and conditions on a Sale Transaction, including (a) extending the deadlines set forth in the Bidding Procedures, (b) adjourning the Auction, (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction (if any), (d) canceling the Auction, and (e) rejecting any or all Bids or Qualified Bids.  Any modification to the Bidding Procedures, or adoption of new rules, procedures, or deadlines, is without prejudice to a party in interest's right to seek relief from the Court that such modification, or adoption of new rules, procedures, or deadlines, is inconsistent with this paragraph or the Bidding Procedures. |
| **Consent to Jurisdiction** | All Qualified Bidders shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction or the construction and enforcement of these Bidding Procedures. |
| **Wind-Down Budget** | Notwithstanding anything contained in the Bidding Procedures, any Bid (including a credit bid) of any Corrections Asset(s) Sale Transaction(s) or a Consolidated Asset Sale shall be subject to (a) the Debtors having sufficient cash at the consummation of any such sale, as determined in consultation with the Consultation Parties, to satisfy the reasonable wind-down budget negotiated in good faith (the "Wind-Down Budget") to pay all allowed (i) post-petition claims, (ii) administrative expense claims and priority claims, and (iii) professional fees and expenses necessary to wind-down the Debtors' estates in a reasonable and appropriate timeline, subject to the consent of the Required Backstop Parties (which shall not be unreasonably withheld) and in consultation with the Consultation Parties, and (b) the requirement that the net proceeds of any Corrections Asset(s) Sale Transaction(s) or a Consolidated Asset Sale, pursuant to the Bidding Procedures, shall first satisfy the Wind-Down Budget before repayment from such proceeds of any other claims against the Debtors.  At the closing of each Corrections Asset(s) Sale Transaction(s) or a Consolidated Asset |

| Requirement | Description |
|---|---|
| | Sale, the Debtors shall deposit the sale proceeds from such Corrections Asset(s) Sale Transaction or such Consolidated Asset Sale into a segregated account held by the Debtors pending the ultimate resolution (either by agreement or Court determination) and funding of the appropriate amount on account of the Wind-Down Budget; *provided, however*, that the Debtors shall be authorized to use a portion of such sale proceeds to pay all allowed (x) post-petition claims, (y) administrative expense claims and priority claims, and (z) professional fees and expenses necessary to administer the Debtors' estates accrued through the closing of these chapter 11 cases in an amount determined by the Debtors, or as otherwise determined by the Court. The Debtors shall not distribute any proceeds of any Corrections Asset(s) Sale Transaction or a Consolidated Asset Sale prior to the funding of the Wind-Down Budget. |
| **Return of Deposit** | Any Deposits provided by Qualified Bidders shall be held in a noninterest-bearing escrow account on terms acceptable to the Debtors. Any such Deposits will be returned to Qualifying Successful Bidders that are not designated Successful Bidders (or Alternate Bidders, as applicable) on the date that is four business days after the Auction (if any). Any Deposit provided by a Successful Bidder (or Alternate Bidder, as applicable) shall be applied to the Purchase Price of the applicable Sale Transaction at closing. <br><br> If a Successful Bidder (or Alternate Bidder, as applicable) fails to consummate the proposed Sale Transaction contemplated by its Successful Bid (or Alternate Bid, as applicable) because of a breach by such Successful Bidder (or Alternate Bidder, as applicable), the Debtors will not have any obligation to return any Deposit provided by such Successful Bidder (or Alternate Bidder, as applicable), which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors and their estates. |

30.     The Bidding Procedures recognize the Debtors' fiduciary obligations to maximize value and, as such, do not impair the Debtors' ability to consider all proposals. As noted above, the Bidding Procedures preserve the Debtors' right to modify the Bidding Procedures to best promote the goals of the marketing and bidding process, including, maximizing value for the Debtors' estates. Importantly, the Bidding Procedures also allow the Debtors to abandon the pursuit of the sale process respecting the Corrections Assets and solely focus on the Equitization

Restructuring if no actionable Bids are received or if continuing such sale process appears to become, on balance, a waste of estate resources.

**The Recovery Solutions Stalking Horse Agreement and the Recovery Solutions Expense Reimbursement**[8]

**I.    The Recovery Solutions Stalking Horse Agreement.**

31.    Following arms'-length and good faith negotiations, the Debtors and RS Purchaser LLC (the "Recovery Solutions Stalking Horse Bidder") have agreed in principle to the Recovery Solutions Stalking Horse Agreement, whereby the Recovery Solutions Stalking Horse Bidder will purchase substantially all of the Recovery Solutions Assets.  The Recovery Solutions Stalking Horse Agreement includes various customary representations, warranties and covenants by and from the parties thereto.  In addition, the Recovery Solutions Stalking Horse Agreement includes certain conditions to closing the contemplated Recovery Solutions and rights of termination related to these chapter 11 cases.

32.    The Recovery Solutions Stalking Horse Bidder has also agreed to act as an Alternate Bidder (as defined below) and, as such, if selected as an Alternate Bidder, hold open its binding offer to purchase the Recovery Solutions Assets for a period of time after the Auction in case the Successful Bid (as defined below) is not timely consummated, in accordance with the Bidding Procedures.

33.    The Debtors submit that the Recovery Solutions Stalking Horse Agreement promotes competitive bidding and maximizes of the value of the Recovery Solutions Assets by establishing a baseline Bid for the Recovery Solutions Assets, which is subject to higher or otherwise better offers at the Auction, including a Bid for a Consolidated Asset Sale Transaction.

---

[8]    Capitalized terms used but not otherwise defined in this section shall have the meaning ascribed to them in the Bidding Procedures or the Recovery Solutions Stalking Horse Agreement, as applicable.

34.    The material terms of the Recovery Solutions Stalking Horse Agreement are summarized in the following table:[9]

| Requirement | Description |
|---|---|
| **Parties**<br><br>*See preamble* | <u>Seller</u>:   Wellpath Holdings, Inc., and the subsidiaries listed in the Recovery Solutions Stalking Horse Agreement<br><br><u>Purchaser</u>: RS Purchaser LLC |
| **Purchase Price**<br><br>*See § 3.1* | The aggregate consideration shall be (a) the full release of Sellers that are obligors or guarantors under the DIP Facility of all Liabilities arising under, or otherwise relating to, the DIP Facility, in an aggregate amount equal to $375,000,000 under Section 363(k) of the Bankruptcy Code, as the same may be increased by Buyer at the direction of the Required Lenders with respect to the DIP Facility; and (b) the assumption by Buyer or any of its applicable Buyer Designees, as applicable, of the Assumed Liabilities from Sellers. |
| **Acquired Assets**<br><br>*See § 2.1* | All of Sellers' direct or indirect right, title and interest in, to or under the RS Business, including all of Sellers' properties, rights, Claims and assets (other than the Excluded Assets) of every kind and description (wherever situated or located, real, personal or mixed, tangible or intangible, whether identifiable or contingent, owned, leased or licensed) primarily used, held for use in, or useful in, or intended to be primarily used in, the RS Business, whether or not reflected on the books and records of Sellers, as the same shall exist on the Closing Date, including the following:<br><br>(a)     all Accounts Receivable;<br><br>(b)     all Pre-Paid Expenses;<br><br>(c)     all cash and cash equivalents in an amount not to exceed the Cash Cap, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, instruments and investments of Sellers primarily involving or primarily related to the RS Business, excluding prepaid deposits related to professional fee retainers; <u>provided</u>, <u>however</u>, the Parties acknowledge and agree that the Sellers shall use reasonable best efforts to have an amount of cash and cash equivalents in an amount equal to the Cash Cap as of the Closing;<br><br>(d)     all Intellectual Property owned by the Sellers;<br><br>(e)     all Equipment, whether owned or leased (and, to the extent leased, any Contract or rights related thereto if such Contract is an Assumed Contract); |

---

[9]    All capitalized terms used in this summary but not otherwise defined herein shall have the meanings ascribed to such terms in the Recovery Solutions Stalking Horse Agreement.  To the extent that there are any conflicts between this summary and the Recovery Solutions Stalking Horse Agreement, the terms of the Recovery Solutions Stalking Horse Agreement shall govern.

| Requirement | Description |
| --- | --- |
| | (f)     all record and beneficial ownership in Equity Interests owned by the Sellers (and all rights related thereto of the Sellers) in each Acquired Company; provided, however, that Buyer may, in its sole and absolute discretion, amend or revise Schedule 2.1(f)(i) at any time and from time to time prior to the date that is two (2) Business Days prior to the Closing Date, in order to add any one or more of the direct or indirect Subsidiaries of the Sellers to such Schedule 2.1(f)(ii) (and such added Subsidiary shall be automatically included as an Acquired Company for purposes of the Agreement), or remove any direct or indirect Subsidiary of the sellers from such Schedule 2.1(f)(i) (and such removed Subsidiary shall be automatically deemed an Excluded Company for purposes of the Agreement);<br><br>(g)     all inventory and products of any kind or nature, primarily involving or primarily related to the RS Business and maintained, held or stored by or for the Sellers on the Closing Date, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same ("**_Inventory_**");<br><br>(h)     to the extent permitted by Legal Requirements, all Documents and other books and records (including financial and accounting files (but excluding the general corporate files and records of Sellers, insofar as they primarily involve or primarily relate to the RS Business)), and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, business software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, other technical information and data, vendor lists, supplier lists, and all other business and other records solely to the extent primarily related to the RS Business;<br><br>(i)     all Assumed Contracts, and, with respect to any Plan that is an Assumed Contract and not an Acquired Company Plan, any and all assets, trust agreements, insurance policies, administrative services agreements, and other contracts, files, and records in respect thereof;<br><br>(j)     all Leased Real Property under any Lease that is an Assumed Contract (and any agreement and rights related thereto or under the applicable Lease to the extent that such agreement or Lease is an Assumed Contract) together with all interests in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof including all Other Rights and Interests in respect thereof;<br><br>(k)     all security deposits with respect to any Lease that is an Assumed Contract;<br><br>(l)     all rights under or arising out of all third-party insurance policies related to the RS Business (other than director and officer insurance policies), including third-party property and casualty insurance proceeds and other insurance proceeds (solely for the sake of clarity, this subsection (n) shall not include any self-insured policies of Sellers or any of their Affiliates); |

| Requirement | Description |
|---|---|
| | (m)    all goodwill and customer referral relationships, other intangible property and all privileges, set-offs, indemnification rights, causes of action, actions, Claims and demands and rights of any kind as against others (whether by contract or otherwise) exclusively involving or exclusively relating to, arising from or associated with any of the Acquired Assets, the Assumed Liabilities and/or the RS Business; |
| | (n)    all Acquired Avoidance Actions; |
| | (o)    all Permits that primarily involve or primarily relate to the RS Business, to the extent transferable, including those designated as "Transferred Permits" on <u>Schedule 2.1(o)</u> (the "***Transferred Permits***"); |
| | (p)    all Causes of Actions of the Sellers of any kind relating to the RS Business against any Buyer Employee (excluding the proceeds of any insurance policies held by the Sellers or any of their Affiliates related to any such Causes of Action) arising at any time prior to the Closing, which such Causes of Actions shall be, and effective immediately upon Closing hereby are, waived and released in full by Buyer or Buyer Designee immediately upon Closing; |
| | (q)    all claims, interests, rights, rebates, refunds, abatements, remedies, recoveries and benefits of Sellers, and all claims and causes of action (other than with respect to Taxes), arising under or relating to any of the Acquired Assets, the Assumed Liabilities or the RS Business, including those arising out of Assumed Contracts, express or implied warranties, representations, licenses and guarantees from suppliers, manufacturers, contractors or others solely to the extent relating to the operation of the RS Business or affecting the Equipment, Improvements, Inventory or other tangible Acquired Assets or ordered by the Sellers prior to the Closing Date (and in any case, any component thereof); |
| | (r)    all rights, but not obligations, under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with former employees and agents of Sellers or with third parties with respect to the RS Business (including any non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with or in contemplation of the Auction); |
| | (s)    all telephone, telex and telephone facsimile numbers and other directory listings; and |
| | (t)    all assets, if any, listed on <u>Schedule 2.1(t)</u> (regardless of whether such assets are covered by any of the foregoing). |
| **Excluded Assets**<br><br>*See § 2.2* | (a)    subject to <u>Section 2.1(h)</u>, the limited liability company, partnership and corporate books and records of internal limited liability company, partnership and corporate proceedings, minute books, organizational or governing documents, stock ledgers, Tax records, work papers and other records |

| Requirement | Description |
|---|---|
| | of Sellers as they pertain to ownership, organization, qualification to do business or existence of Sellers; <u>provided</u>, <u>however</u>, that copies of the foregoing items (including copies of Tax records and work papers of Sellers) shall be made available by Sellers to Buyer at Buyer's reasonable request, <u>provided</u>, <u>however</u>, that with respect to Tax Returns of the Seller, at the reasonable request of Buyer, Seller shall make available to Buyer all information contained in its Tax Returns relating to the Tax attributes or otherwise to the Tax matters of the RS Business or the Acquired Assets for periods (or portions thereof) commencing after the Closing Date or of the Acquired Companies;<br><br>(b)     any Contract that is not an Assumed Contract;<br><br>(c)     any Excluded Company;<br><br>(d)     all assets not primarily used, held for use in, or useful in, or not intended to be primarily used in the RS Business, including those primarily used, held for use in, or useful in, or intended to be used in, the Corrections Business;<br><br>(e)     all current and prior director and officer insurance policies of the Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;<br><br>(f)     all Causes of Action, including any proceeds thereof, other than any such Causes of Action that relate to, or constitute a part of, the Acquired Assets (including the Acquired Assets described in <u>Section 2.1(n)</u>);<br><br>(g)     all rights under or arising out of all (i) self-insurance policies of Sellers or any of their Affiliates related to the RS Business or otherwise and (ii) third-party insurance policies related to the Corrections Business, including third party property and casualty insurance proceeds and other insurance proceeds;<br><br>(h)     any employment-related or compensation-related Contracts (including the Non-Acquired Company Plans not otherwise assumed pursuant to <u>Section 2.1(i)</u>), collective bargaining agreements, and books and records, in each case, relating to employees who are not directly employed by an Acquired Company as of the Closing and any Contracts listed on <u>Schedule 2.2(h)</u> (including any personnel and employment records for such employees and former employees of the Sellers or the Acquired Companies);<br><br>(i)     the general corporate files and records of Sellers, insofar as they relate to the organization, existence or capitalization of the applicable Seller, as well as any other records or materials relating to the Sellers generally and not primarily involving or primarily related to the Acquired Assets or the operations of the RS Business; <u>provided</u>, that copies of such files and records shall be made available to Buyer upon reasonable request to the extent permitted by applicable law and related to the RS Business;<br><br>(j)     all insurance policies of the Sellers; |

| Requirement | Description |
|---|---|
| | (k)      documents (i) that Sellers are required by Legal Requirements to retain, (ii) that if transferred would violate any applicable Legal Requirements (including with respect to privacy) or (iii) that are subject to any attorney-client, work product or similar privilege with respect to work performed in anticipation of or in connection with the preparation or administration of the Bankruptcy Cases, the Recovery Solutions Stalking Horse Agreement or the transactions contemplated by the Recovery Solutions Stalking Horse Agreement;<br><br>(l)      all Causes of Action, including any proceeds thereof, other than any such Causes of Action that relate to, or constitute a part of, the Acquired Assets (including the Acquired Avoidance Actions described in Section 2.1(n);<br><br>(m)      all credits, deposits, prepaid amounts and other rights to refunds of (i) Taxes of the RS Business paid by or with respect to the Sellers which refunds are attributable to Pre-Closing Tax Periods, (ii) Taxes that are attributable to the Corrections Business and (iii) Taxes that are Excluded Liabilities;<br><br>(n)      all cash and cash equivalents in excess of the Cash Cap, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, instruments and investments of Sellers primarily involving or primarily related to the RS Business, excluding prepaid deposits related to professional fee retainers; and<br><br>(o)      any rights, claims or causes of action of Sellers under the Recovery Solutions Stalking Horse Agreement or any other Transaction Document. |
| **Assumed Liabilities**<br><br>*See § 2.3* | (a)      all Liabilities under the Assumed Contracts that are required to be performed after the Closing Date (including sponsorship of any Plan that is an Assumed Contract and all Liabilities under or related thereto), solely to the extent they arise or relate to periods of time after the Closing Date; provided, however, that Buyer shall assume the obligations to pay all (i) outstanding trade payables in accordance with Section 2.3(b) and (ii) Cure Costs in excess of the Seller Cure Cap.<br><br>(b)      trade payables related to the Acquired Assets incurred in the ordinary course of the RS Business, as agreed in good faith by the Sellers and Buyer prior to the Closing;<br><br>(c)      Liabilities arising out of operation of the Acquired Assets for periods on or following the Closing Date; and<br><br>(d)      all Liabilities with respect to Taxes imposed on the RS Business or the Acquired Assets that are attributable to any Post-Closing Tax Period.<br>. |
| **Excluded Liabilities**<br><br>*See § 2.4* | (a)      all Liabilities with respect to the Deferred One Year Cash Payment and any related Liabilities arising under either the Alpine Purchase Agreement or Settlement Agreement; |

| Requirement | Description |
|---|---|
| | (b)    all Liabilities with respect to Employees, former employees, or current or former directors, officers, consultants or contractors (and, in each case, their respective representatives or beneficiaries) of the Sellers or Acquired Companies for any action or inaction of any of the Sellers or Acquired Companies occurring prior to or on the Closing Date, including payroll, vacation, sick leave, unemployment benefits, notice pay, retirement benefits, pension benefits, collective bargaining agreements, disputes, grievances, arbitrations, claims, employment agreements or arrangements, severance, WARN Act, retention or termination agreements or arrangements, employee stock option, equity compensation, equity-based compensation, employee stock purchase, employee benefits, Plans, compensation arrangements, profit sharing plans, health care and other welfare plans or benefits, or any other employee plans, agreements, policies, or arrangements or benefits or other compensation of any kind;<br><br>(c)    all Liabilities, whether arising before, on or after the Closing Date, with respect to any employee or former employee of any Seller or Acquired Company who does not become a Buyer Employee; and<br><br>(d)    all Liabilities arising out of, relating to or with respect to any Non-Acquired Company Plan that is not an Assumed Contract. |
| **Representations and Warranties of the Sellers**<br><br>*See Article 5* | The Recovery Solutions Staking Horse Agreement contains customary representations and warranties, including, but not limited to, representations of the Sellers regarding: (a) organization and qualification; (b) authorization of agreement; (c) conflicts, consents; (d) financial statements; (e) title to properties; (f) contracts; (g) litigation; (h) permits, compliance with laws; (i) environmental matters; (j) intellectual property; (k) tax matters; (l) assumed benefit plans; (m) employees; (n) affiliate transactions; (o) brokers; and (p) disclaimer of other representations and warranties. |
| **Representations and Warranties of Buyer**<br><br>*See Article 6* | The Recovery Solutions Staking Horse Agreement contains customary representations and warranties, including, but not limited to, representations of Purchaser regarding: (a) organization and qualification; (b) authorization of agreement; (c) brokers; (d) litigation; (e) conflicts, consents; and (f) disclaimer of additional representations or warranties. |
| **Sell Free and Clear**<br><br>*See § 7.7* | Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Liens (including, for the avoidance of doubt, all successor liability, including any successorship obligations with respect to any Plan) of, against or created by Sellers or their bankruptcy estate, shall be fully released from and with respect to the Acquired Assets. On the Closing Date, the Acquired Assets shall be transferred to Buyer and/or one or more Buyer Designees, as applicable, free and clear of all obligations, Liabilities and Liens (including, for the avoidance of doubt, all successor liability, including any |

| Requirement | Description |
|---|---|
| | successorship obligations with respect to any Plan or Contract), other than the Permitted Liens and the Assumed Liabilities. |
| **Closing Conditions**<br><br>*See § 4.2* | The Recovery Solutions Stalking Horse Agreement is subject to customary closing conditions, including: (a) accuracy of Seller and Buyer representations; (b) performance of covenants and agreements; (c) no Order shall be in effect that would restrain or prevent the consummation of or imposing material modifications on the transactions contemplated by the Recovery Solutions Stalking Horse Agreement; (d) expiration of any HSR or other applicable antitrust waiting period; (e) Buyer and Seller closing deliveries (as described below); (f) the Interim DIP Financing Order and the Final DIP Financing Orders shall have become Final Orders; (g) the Bankruptcy Court shall have entered the Sale Order in form and substance reasonably acceptable to Buyer, and the Sale Order shall have become a Final Order; (h) the Bankruptcy Court shall have approved and authorized the assumption and assignment of the Assumed Contracts; (i) Buyer shall have received each consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority listed on <u>Schedule 9.9</u>, in each case, in a form reasonably satisfactory to Buyer; (j) no Material Adverse Effect shall have occurred; (k) no Termination Event and no Event of Default (as defined in the DIP Facility and DIP Financing Orders, as applicable) shall have occurred; and (l) the RSA shall not have been terminated and shall be in full force and effect.<br><br><u>Buyer's Deliveries</u>. At the Closing, Buyer shall deliver (or cause one or more of its Affiliates or Buyer Designees to deliver) to Sellers:<br><br>(a) the Assumption Agreement, duly executed by Buyer or the applicable Buyer Designee;<br><br>(b) the Bills of Sale;<br><br>(c) the Intellectual Property Assignment Agreement, duly executed by Buyer or the applicable Buyer Designee;<br><br>(d) the Transition Services Agreement, duly executed by Buyer;<br><br>(e) each other Transaction Document to which Buyer is a party, duly executed by Buyer;<br><br>(f) the certificates of Buyer to be received by Sellers pursuant to <u>Sections</u> 10.1 and <u>10.3</u>; and<br><br>(g) such other documents as Sellers may reasonably request that are customary for a transaction of this nature and necessary to evidence or |

| Requirement | Description |
|---|---|
| | consummate the transactions contemplated by the Recovery Solutions Stalking Horse Agreement.<br><br>Sellers' Deliveries. At the Closing, Sellers shall deliver to Buyer:<br><br>(a) the Bills of Sale, the Assumption Agreement, the Intellectual Property Assignment Agreement, the Transition Services Agreement, and each other Transaction Document to which any Seller is a party, duly executed by the applicable Sellers;<br><br>(b) a copy of the Sale Order;<br><br>(c) the certificates of Sellers to be received by Buyer pursuant to Sections 9.1 and 9.2;<br><br>(d) a valid IRS Form W-9 from each Seller or other certification of non-foreign status for Sellers in a form and manner which complies with the requirements of Section 1445 of the Code and the Treasury Regulations promulgated thereunder;<br><br>(e) a certificate of good standing from each Acquired Company, certified by the appropriate Governmental Authority in its jurisdiction of incorporation or formation;<br><br>(f) the stock books, stock ledgers, minute books, corporate seals, certificates of incorporation (or other organizational documents), check books and statutory books of the Acquired Companies, in each case, to the extent in the possession of the Sellers;<br><br>(g) a securities transfer agreement in substantially the form attached to the Recovery Solutions Stalking Horse Agreement as **Exhibit G** in respect of the Equity Interests of the Acquired Companies, duly executed by the applicable Sellers, together with any required registrations thereof under applicable law; and<br><br>(h) such other documents as Buyer may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by the Recovery Solutions Stalking Horse Agreement, including the documents and instruments described in Article 9 of the Recovery Solutions Stalking Horse Agreement. |
| **General Release**<br><br>*See § 12.17* | (a) Effective immediately following the Closing, each Seller for itself and for its successors and assigns hereby fully and forever releases Buyer and its directors, officers, control persons (as defined in Section 15 of the Securities Act, or Section 20 of the Exchange Act), members, employees, agents, attorneys, financial advisors, consultants, legal representatives, shareholders, partners, estates, successors and assigns solely in their capacity as such (collectively |

| Requirement | Description |
|---|---|
| | referred to as the "***Buyer Group***" and each is individually a member of the Buyer Group), from any liability whatsoever on or otherwise in relation to all Seller Released Claims.  For purposes of this Section 12.17(a), the term "***Seller Released Claims***" means any claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever and other similar rights, demands, lawsuits and complaints, debts, losses, obligations, liabilities, rights, rights of recovery and damages of every kind or nature whatsoever, whether known or unknown, asserted or un-asserted, and whether for general, special, statutory, punitive or other damages, sanctions, costs, or attorney's fees, or for equitable, declaratory, injunctive, reimbursement, or other relief, in each case including all derivative claims and whether currently pending or in process and whether arising in the past, present or future and in respect of any period of time (each a "***Released Claim***") that Seller has or is entitled to make or assert, file or bring against the Buyer Group or any Person who is a member of the Buyer Group, including but not limited to any Released Claim that directly or indirectly arises out of, or is based upon, or in any manner connected with, or is in any way related to, (1) any loan, security, or forbearance or related agreement to which Buyer and/or Sellers are or were parties, (2) any act or omission by any Person that is or was a member of the Buyer Group, including in their capacity as a member on, or arising from their involvement with the activities of, the board of directors or similar governing body of any Seller or any Affiliate thereof (including pursuant to board observer rights), (3) any involvement of any Person that is or was a member of the Buyer Group with the Sellers or any business, litigation, or other activities of Sellers, (4) any oral or written statement made by any Person that is or was a member of the Buyer Group to any other Person regarding Sellers or any business, litigation, or other activities of Sellers, (5) any action taken by any Person that is or was a member of the Buyer Group regarding or relating to Sellers or any business, litigation, or other activities of Sellers, or (6) any personal, contractual, employment, business, or professional relationship, contact or communication between any Person that is or was a member of the Buyer Group and Sellers occurring at any time prior to the Closing Date. Notwithstanding anything set forth herein to the contrary, the releases set forth herein do not extend to (A) any obligations that are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the willful misconduct or gross negligence of such Person or (B) any obligations of the Parties under this Agreement (and any ancillary agreements or instruments delivered pursuant hereto, the DIP Facility, the First Lien Credit Agreement, and the transactions contemplated hereby and thereby). <br><br> (b) Effective immediately following the Closing, Buyer, for itself and its successors and assigns, hereby fully and forever releases and discharges each Seller and its Affiliates and each of their respective former, current or future, direct or indirect, equity holders, officers, employees, directors, agents, advisory board members, representatives, owners, members, partners, employees, management companies, direct and indirect parent entities, "controlling persons" |

| Requirement | Description |
|---|---|
| | (within the meaning of federal securities law), heirs, administrators and executors, financial advisors, legal advisors, shareholders, managers, principals, consultants, accountants, attorneys, actuaries, investment bankers and other professionals in each case acting in such capacity whether current or former, including in their capacity as directors of the Seller, as applicable (all such Persons collectively referred to as the "***Sellers Group***" and each is individually a member of the Seller Group), from any liability whatsoever on or otherwise in relation to all Buyer Released Claims.  For purposes of this <u>Section 12.17(b)</u>, the term "***Buyer Released Claims***" means any Released Claim that Buyer has or is entitled to make or assert, file or bring against any Person who is a member of the Seller Group based on or relating to, or in any manner arising from, in whole or in part, the business operations of the RS Business, including but not limited to (i) any Released Claim that directly or indirectly arise out of, are based upon, or in any manner connected with any Prior Event and (ii) any Causes of Actions included in the Acquired Assets pursuant to <u>Section 2.1(p)</u>.  For purposes of this <u>Section 12.17(b)</u>, the term "***Prior Event***" means any transaction, event, circumstances, action, failure to act or occurrence of any sort or type based on or relating to, or in any manner arising from, in whole or in part, the business operations of the RS Business, including without limitation any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken, permitted or begun prior to the consummation of the transactions contemplated hereunder. For the avoidance of doubt, "Prior Event" shall include but is not limited to any transaction, event, circumstances, action, failure to act or occurrence of any sort or type which occurred, existed, was taken, permitted or begun in accordance with, pursuant to or by virtue of: (i) any terms of this Agreement, (ii) the transactions referred to herein, or (iii) any oral or written agreement relating to the foregoing (i) and (ii) of this sentence.<br><br>(c) Without limiting in any way the scope of the release contained in subparagraph (a) or (b) of this <u>Section 12.17</u> and effective upon the Closing Date, each Seller and Buyer, to the fullest extent allowed under applicable law, hereby waives and relinquishes for itself and the other members of the Sellers Group and Buyer Group, as applicable, all statutory and common law protections purporting to limit the scope or effect of a general release, whether due to lack of knowledge of any claim or otherwise, including, waiving and relinquishing the terms of any law which provides that a release may not apply to material unknown claims. Each Seller and Buyer hereby affirm its intent to waive and relinquish such unknown Claims and to waive and relinquish any statutory or common law protection available in any applicable jurisdiction with respect thereto. |

## II.   The Recovery Solutions Expense Reimbursement.

35.    The Debtors seek authorization to enter into the transaction contemplated by the

Recovery Solutions Stalking Horse Agreement unless a higher or otherwise better Qualified Bid

(as defined below) is submitted with respect to the Recovery Solutions Assets, as determined by the Debtors (in consultation with the Consultation Parties) in accordance with the Bidding Procedures, and for the Recovery Solutions Stalking Horse Bid to serve as the minimum bid for the Recovery Solutions Assets.

36.     Recognizing the Recovery Solutions Stalking Horse Bidder's expenditure of time, energy and resources in connection with the proposed transaction set forth in the Recovery Solutions Stalking Horse Agreement, and the benefit that those efforts provided to the Debtors, their estates and creditors, and all other parties in interest, the Debtors agreed that, in the event that the Recovery Solutions Stalking Horse Agreement is terminated, pursuant to the provisions thereof (other than for breach thereof by the Recovery Solutions Stalking Horse Bidder), or in the event that the purchase of the Recovery Solutions Assets is ultimately consummated by any person other than the Recovery Solutions Stalking Horse Bidder, the Debtors will reimburse the Recovery Solutions Stalking Horse Bidder (at the time required under the Recovery Solutions Stalking Horse Agreement) for its reasonable and documented out-of-pocket expenses in conjunction with the Recovery Solutions Stalking Horse Bid up to a maximum amount of $2,000,000 (the "Recovery Solutions Expense Reimbursement"); *provided* that the payment of Recovery Solutions Expense Reimbursement shall be subject to the terms and conditions of the Recovery Solutions Stalking Horse Agreement and the Bidding Procedures Order.

**III.     The Stalking Horse Bidder(s) and Bid Protections for the Corrections Assets.**

37.     The Debtors believe that having the maximum flexibility to run their sale process would produce the highest recovery for all stakeholders.   Accordingly, the Debtors seek authorization, but not direction, in accordance with the Bidding Procedures, to exercise their business judgment (in consultation with the Consultation Parties) to select one or more Acceptable

Bidders to act as a Corrections Asset(s) Stalking Horse Bidder (such Acceptable Bidder's Bid, the "Corrections Asset(s) Stalking Horse Bid") and enter into a purchase agreement with respect to such proposed Corrections Asset(s) Sale Transaction with such Corrections Asset(s) Stalking Horse Bidder (each such agreement, a "Corrections Asset(s) Stalking Horse Agreement" and, together with the Recovery Solutions Stalking Horse Agreement, the "Stalking Horse Agreements").

38.     In order to incentivize prospective purchasers to agree to become a Corrections Asset(s) Stalking Horse Bidder, the Debtors seek authorization, but not direction, to exercise their business judgment to offer (in consultation with the Consultation Parties) the following bid protections to such Corrections Asset(s) Stalking Horse Bidder(s), payable if the Debtors consummate a sale pursuant to a Qualified Bid other than the Corrections Asset(s) Stalking Horse Bid (if the assets subject to such sale include those to which the Stalking Horse Bid relates): (a) payment of a breakup fee (other than a Corrections Asset(s) Stalking Horse Bidder that is a Secured Party (as defined herein)) in an amount not to exceed three percent of the cash portion of the applicable Purchase Price (the "Corrections Asset(s) Breakup Fee") and (b) reimburse the Corrections Asset(s) Stalking Horse Bidder's reasonable and documented out-of-pocket fees and expenses incurred in connection with preparation and negotiation of the Corrections Asset(s) Stalking Horse Bid in an amount up to $1,000,000 (the "Corrections Asset(s) Expense Reimbursement" and, together with the Corrections Asset(s) Breakup Fee, the "Corrections Asset(s) Bid Protections"); *provided* that (y) the payment of any Corrections Asset(s) Bid Protections shall be subject to the terms and conditions of the definitive agreement(s) executed between the Debtors and such Corrections Asset(s) Stalking Horse Bidder(s) and (ii) any Corrections Asset(s) Bid Protections will not be binding on the Debtors until the approval of such

Corrections Asset(s) Bid Protections in accordance with these Bidding Procedures.   To the extent payable, any Corrections Asset(s) Bid Protections would be paid out of the proceeds of the sale to which they relate.

39.     In the event that the Debtors, in consultation with the Consultation Parties, desire to designate a Qualified Bid as a Corrections Asset(s) Stalking Horse Bid, the Debtors would file with the Court a notice (a "Corrections Asset(s) Stalking Horse Notice") that (a) sets forth the identity of the Corrections Asset(s) Stalking Horse Bidder, (b) sets forth the amount of the Corrections Asset(s) Stalking Horse Bid and what portion of the Corrections Asset(s) Stalking Horse Bid (if any) would be in the form of cash, (c) identifies the Corrections Assets (or Auction Lot) to be purchased and the contracts and leases to be assumed, (d) states whether the Corrections Asset(s) Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Corrections Asset(s) Stalking Horse Bid, (e) specifies any proposed Corrections Asset(s) Bid Protections, and (f) attaches a copy of the Corrections Asset(s) Stalking Horse Agreement (or chapter 11 plan of reorganization), including all exhibits, schedules, and attachments thereto, and serve the Corrections Asset(s) Stalking Horse Notice on the U.S. Trustee, counsel to each of the Consultation Parties, and those parties who have filed the appropriate notice pursuant to Bankruptcy Rule 2002 requesting notice of all pleadings filed in these chapter 11 cases (collectively, the "Corrections Asset(s) Stalking Horse Notice Parties"), with no further notice being required.

40.     The Corrections Asset(s) Stalking Horse Notice would also specify the deadline to file objections (the "Corrections Asset(s) Stalking Horse Objections") to the designation of the Corrections Asset(s) Stalking Horse Bidder, the terms of the Corrections Asset(s) Stalking Horse Bid, or the Corrections Asset(s) Bid Protections set forth therein, which deadline (the "Corrections

Asset(s) Stalking Horse Objection Deadline") shall be no earlier than three business days after service of the Corrections Asset(s) Stalking Horse Notice on the Corrections Asset(s) Stalking Horse Notice Parties.  The Corrections Asset(s) Stalking Horse Objections must (a) be in writing, (b) comply with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Procedures"), (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Court and served on the Debtors and the Corrections Asset(s) Stalking Horse Notice Parties by the Corrections Asset(s) Stalking Horse Objection Deadline.

41.     If a timely Corrections Asset(s) Stalking Horse Objection is filed and served, to the extent not resolved consensually, the Debtors may schedule a hearing before the Court to be held on an expedited basis (on not less than three-days' notice) seeking authorization to enter into the Corrections Asset(s) Stalking Horse Agreement (including the Corrections Asset(s) Bid Protections contained therein) (a "Corrections Asset(s) Stalking Horse Hearing").

42.     If no timely Corrections Asset(s) Stalking Horse Objection is filed and served, upon the expiration of the Corrections Asset(s) Stalking Horse Objection Deadline, the Debtors may file with the Court a certificate of no objection and, upon such filing, (a) the Debtors' designation of the Corrections Asset(s) Stalking Horse Bidder and agreement respecting the Corrections Asset(s) Bid Protections shall be deemed approved and (b) the Debtors may enter into the Corrections Asset(s) Stalking Horse Agreement (including a chapter 11 plan of reorganization), in each case without further notice or opportunity to be heard.  Upon the approval by the Court at a Corrections Asset(s) Stalking Horse Hearing for the Debtors to enter into the Corrections Asset(s) Stalking Horse Agreement (including the Corrections Asset(s) Bid Protections contained therein), or upon the Debtors' filing a CNO, the Corrections Asset(s) Stalking Horse Bidder shall be the

"Corrections Asset(s) Approved Stalking Horse Bidder," its Corrections Asset(s) Stalking Horse Bid shall be the "Corrections Asset(s) Approved Stalking Horse Bid," and the Corrections Asset(s) Bid Protections contained therein (if any) shall be the "Corrections Asset(s) Approved Bid Protections."

### The Noticing Procedures

43.     The Debtors propose the following "Noticing Procedures":

a. **Sale Notice and Publication**.  As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall cause the Sale Notice to be served (by email if available or otherwise by first class mail) upon the following: (i) the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee"); (ii) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (iii) counsel to the DIP Lenders; (iv) counsel to the Ad Hoc Group; (v) counsel to the Prepetition First Lien Administrative Agent; (vi) counsel to the Prepetition Second Lien Administrative Agent; (vii) Counterparties to Contracts; (viii) all potential buyers previously identified or solicited by the Debtors or their advisors and any additional parties who have previously expressed an interest to the Debtors or their advisors in potentially acquiring the Debtors' assets; (ix) all other entities known to have asserted or hold any lien, claim, interest, or encumbrance in or upon the applicable Assets; (xi) the state attorneys general for states in which the Debtors conduct business; (xii) the Internal Revenue Service; (xiii) the Securities and Exchange Commission; and (xiv) any party identified in section E of the *Procedures for Complex Cases in the Southern District of Texas* (collectively, the "Sale Notice Parties"); *provided* that the Debtors need not serve the Sale Notice on any party for whom the Debtors are unable to obtain, after reasonable diligence, an email or physical address as of the entry of the Bidding Procedures Order; *provided*, *further*, that the Debtors shall not be obligated to provide supplemental service of the Sale Notice with respect to any Sale Notice that is returned as undeliverable so long as the Debtors have confirmed that any such Sale Notice was sent to the applicable email or physical address on file in the Debtors' books and records and no other email or physical address could be obtained after reasonable diligence.  The Debtors would also cause the Sale Notice to be published once in the national edition of *USA Today* or another publication with similar national circulation as soon as practicable following entry of the Bidding Procedures Order and would post the Sale Notice and the Bidding Procedures Order on the Debtors' case information website located at https://dm.epiq11.com/Wellpath (the "Case Information Website").  This publication of the Sale Notice would provide notice of the sale to any other interested parties whose identities are unknown to the Debtors.  The Sale Notice would include, among other things, the date, time, and place of any Auction and Sale Hearing and the deadline for filing any objections relating to the Bidding Procedures or any Sale Transactions, once they are set by the Court.

b. **Notice of Determination of Qualified Bids**.  The Debtors, in consultation with the Consultation Parties, would make a determination regarding which Bids qualify as

Qualified Bids.  Prior to any Auction, the Debtors would (i) notify each Qualified Bidder that has timely and properly submitted a Qualified Bid that its bid is a Qualified Bid and (ii) provide all Qualified Bidders with respect to the Assets such Qualified Bid relates with (A) a copy of the Starting Bid, (B) an explanation of how the Debtors value the Starting Bid, and (C) a list identifying all of the Qualified Bidders and their respective Qualified Bids.

c.  **Notice of Hearing if Auction Not Held**.  If (i) no more than one Qualified Bid is submitted by the applicable Bid Deadline (whether the Recovery Solutions Stalking Horse Bid, a Corrections Asset(s) Approved Stalking Horse Bid, or otherwise) or (ii) multiple Partial Bids are submitted by the applicable Bid Deadline for non-overlapping SF Assets and LG Assets, the Debtors may elect to cancel the applicable Auction and seek approval of the proposed Sale Transaction(s) contemplated in the Recovery Solutions Stalking Horse Bid, such Corrections Asset(s) Approved Stalking Horse Bid, Qualified Bid that is not either a Recovery Solutions Stalking Horse Bid or Corrections Asset(s) Approved Stalking Horse Bid, or Partial Bids, as applicable, at the applicable Sale Hearing.  If no Auction is conducted, the Debtors would file with the Court, serve on the Sale Notice Parties, and cause to be published on the Case Information Website a notice (i) indicating that the Auction for the Assets has been canceled, (ii) indicating that the Recovery Solutions Stalking Horse Bid, the Corrections Asset(s) Approved Stalking Horse Bid, the Qualified Bid, or the Partial Bid(s) (as applicable) is or are the Successful Bid(s) with respect to any of the Assets, and (iii) setting forth the date and time of the Sale Hearing.

d.  **Post-Auction Notice**.  Promptly following the selection of the Successful Bid(s) and Alternate Bid(s), the Debtors shall file a notice of the Successful Bid(s) and any Alternate Bid(s) (the "Post-Auction Notice") with the Court and cause the Post-Auction Notice to be published on the Case Information Website.

44.    The Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the objection deadline, the Bid Deadlines, and the times and locations of the Auctions and Sale Hearings.  Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002 and the Complex Procedures.

## Assumption and Assignment Procedures

45.    In connection with the Sale Transaction(s), the Debtors anticipate that they would assume and assign to the Successful Bidder (or its designated assignee(s)) all or certain of the Assumed Contracts pursuant to section 365(b) of the Bankruptcy Code.  Accordingly, the Debtors

hereby also seek approval of the proposed Assumption and Assignment Procedures set forth herein, which are designed to, among other things, (a) outline the process by which the Debtors would serve notice to all Counterparties regarding the potential assumption and assignment, related Cure Costs, if any, and information regarding the Successful Bidder's adequate assurance of future performance and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of the Assumed Contracts.   Specifically, the Assumption and Assignment Procedures are as follows:

a. **Potential Assumed Contracts Schedule**.  As soon as reasonably practicable following entry of the Bidding Procedures Order, the Debtors shall file with the Court, and cause to be published on the Case Information Website, the Potential Assumption and Assignment Notice and a list of the Potential Assumed Contracts (the "Potential Assumed Contracts Schedule") that specifies (i) each of the Contracts that potentially could be assumed and assigned in connection with the sale of the Assets, including the name of each Counterparty, and (ii) the proposed Cure Cost with respect to each Potential Assumed Contract.

b. **Potential Assumption and Assignment Notice**.  The Debtors shall, as soon as reasonably practicable after entry of the Bidding Procedures Order (but in any event, so as to provide sufficient notice such that any required responses from any Counterparties are due prior to the scheduled date of the Auction as specified in the Bidding Procedures), file, cause to be published on the Case Information Website, and serve on each relevant Counterparty the Potential Assumption and Assignment Notice, which shall (i) include the Potential Assumed Contracts Schedule, (ii) list the Debtors' good faith calculation of the Cure Costs with respect to the Potential Assumed Contracts identified on the Potential Assumed Contracts Schedule, (iii) expressly state that assumption or assignment of an Assumed Contract is not guaranteed and is subject to designation by the Successful Bidder and Court approval, (iv) prominently display the deadline to file an Assumption and Assignment Objection (as defined herein), and (v) prominently display the date, time, and location of the Sale Hearing.

c. **Proposed Assumption and Assignment Notice**.  The Debtors shall, in conjunction with the filing of the Post-Auction Notice, file, cause to be published on the Case Information Website, and serve on each relevant Counterparty the Proposed Assumption and Assignment Notice, which shall (i) include a schedule of the Proposed Assumed Contracts (the "Proposed Assumed Contracts Schedule") as agreed between the Debtors and the Successful Bidder, (ii) expressly state that assumption or assignment of an Assumed Contract is not guaranteed and is subject to Court approval, (iii) prominently display the

deadline to file an Assumption and Assignment Objection, and (iv) prominently display the date, time, and location of the Sale Hearing.

d.  **Assumption and Assignment Objections.**

    i.   Objection Deadlines.  A Counterparty may object to the potential or proposed assumption or assignment of its Assumed Contract, the Debtors' proposed Cure Costs, if any, or the ability of a Successful Bidder to provide adequate assurance of future performance (an "Assumption and Assignment Objection").  All Assumption and Assignment Objections must (A) be in writing, (B) comply with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Complex Procedures, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs the Counterparty believes are required to cure any alleged defaults under the relevant Assumed Contract, (D)(1) for objections relating to proposed Cure Costs, be filed no later than **December 11, 2024 at 4:00 p.m. (prevailing Central Time)** (the "Cure Objection Deadline") and (2) for all other objections, (x) **December 18, 2024 at 4:00 p.m. (prevailing Central Time)** for the Recovery Solutions / Consolidated Sale Transaction, and (y) **January 31, 2025 at 4:00 p.m. (prevailing Central Time)** for any Corrections Asset(s) Sale Transaction (each an "Assumption and Assignment Objection Deadline"), and (E) be served on (1) proposed counsel to the Debtors, (i) proposed counsel to the Debtors, McDermott Will & Emery, LLP, 444 West Lake Street, Suite 4000 Chicago, Illinois 60606-0029, Attn: Felicia Gerber Perlman, Bradley Thomas Giordano, Jake Jumbeck, Carole Wurzelbacher, and Carmen Dingman, and One Vanderbilt Avenue New York, New York 10017, Attn: Steven Z. Szanzer, (ii) counsel to the DIP Lenders and the Ad Hoc Group, Akin Gump Strauss Hauer & Feld, LLP, 2001 K Street N.W. Washington, DC 20006, Attn.: Scott L. Alberino and Kate Doorley, (iii) counsel to the Prepetition First Lien Administrative Agent and Prepetition Second Lien Administrative Agent, Cahill Gordon & Reindel LLP, 32 Old Slip, New York, NY 10005, Attn: Joel H. Levitin (jlevitin@cahill.com) and Jordan A. Wishnew (jwishnew@cahill.com) and Norton Rose Fulbright US LLP, 1550 Lamar Street, Suite 2000, Houston, TX 77010, Attn: Bob Bruner (bob.bruner@nortonrosefulbright.com), (iv) counsel to the Committee, and (v) the U.S. Trustee, 515 Rusk Street, Suite 3516, Houston, Texas 77002, Attn: Susan Hersch and Ha Nguyen (collectively, the "Assumption and Assignment Objection Notice Parties").

    ii.   Resolution of Assumption and Assignment Objections.  If a Counterparty timely files an Assumption and Assignment Objection, such objection shall be heard at the applicable Sale Hearing or such later date that the Debtors, in their discretion and in consultation with the Successful Bidder, shall determine (subject to the Court's calendar).  If such objection has not been resolved prior to the closing of the Sale Transaction (whether by an order of the Court or by agreement with the Counterparty), each Successful Bidder may elect one of the following options: (A) treat such Counterparty's Contract as property excluded from the Assets (an "Excluded Contract") or (B) temporarily treat the Proposed Assumed Contract as an Excluded Contract (a "Designated Agreement"), proceed to the closing of the

Sale Transaction with respect to all other Assets, and determine whether to treat the Designated Agreement as an Assumed Contract or an Excluded Contract, within ten business days after resolution of such objection (whether by the Court's order or by agreement of the Counterparty, the Debtors, and the applicable Successful Bidder).

iii.   <u>Failure To File Timely Assumption and Assignment Objection</u>.  If a Counterparty fails to timely and properly file with the Court and serve on the Assumption and Assignment Objection Notice Parties a timely Assumption and Assignment Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the assumption or assignment of its Assumed Contract. Notwithstanding anything to the contrary in the Assumed Contract, or any other document, the Cure Costs set forth in the Potential Assumed Contracts Schedule or the Supplemental Assumed Contracts Schedule (as defined herein) shall be controlling and would be the only amount necessary to cure any alleged outstanding defaults under the applicable Assumed Contract under section 365(b) of the Bankruptcy Code arising out of or related to any events occurring prior to the closing of any Sale Transaction or other applicable date upon which such assumption and assignment would become effective, whether known or unknown, due or to become due, accrued, absolute, contingent, or otherwise, and the Counterparty shall be forever barred from asserting any additional cure or other amounts with respect to such Assumed Contract against the Debtors, the Successful Bidder, or the property of any of them.

**e.  <u>Modification of Potential Assumed Contracts Schedule or Proposed Assumed Contracts Schedule.</u>**

i.   In addition to the rights of the Successful Bidder described above with respect to an Assumption and Assignment Objection at or prior to the closing of a Sale Transaction, each Successful Bidder may elect to (A) exclude any Contract on the Potential Assumed Contracts Schedule as an Assumed Contract (in which case it shall become an Excluded Contract) or (B) include on the Proposed Assumed Contracts Schedule any Contract listed on the Potential Assumed Contracts Schedule, by providing to the Debtors written notice of its election to exclude or include such Contract, as applicable.

ii.   If the Debtors or any Successful Bidder identify during the pendency of these chapter 11 cases (before or after the closing of the applicable Sale Transaction) any Contract that is not listed on the Proposed Assumed Contracts Schedule, and such Contract has not been rejected by the Debtors, such Successful Bidder may elect by written notice to the Debtors to treat such Contract as an Assumed Contract and the Debtors shall seek to assume and assign such Assumed Contract in accordance with the Assumption and Assignment Procedures.

iii.   Following the conclusion of the applicable Auction, if any, and the selection of the Successful Bidder(s), the Debtors reserve the right, at any time before the closing of the Sale Transaction(s), to modify the previously-stated Cure Costs associated

with any Proposed Assumed Contract, subject to notice requirements in the Assumption and Assignment Procedures.

iv.    In the event that any Contract is added to the Potential Assumed Contracts Schedule or Proposed Assumed Contracts Schedule or previously-stated Cure Costs are modified, in accordance with the procedures set forth in this Motion, the Debtors would promptly file, cause to be published on the Case Information Website, and serve a supplemental assumption and assignment notice, by email or ECF where available, or otherwise by first class mail, on the applicable Counterparty (each a "<u>Supplemental Assumption and Assignment Notice</u>").    Each Supplemental Assumption and Assignment Notice shall (A) include a schedule of the modified Potential Assumed Contracts Schedule or Proposed Assumed Contracts Schedule (the "<u>Supplemental Assumed Contracts Schedule</u>"), (B) expressly state that assumption or assignment of an Assumed Contract or is not guaranteed and is subject to Court approval, (C) prominently display the deadline to file a Supplemental Assumption and Assignment Objection (as defined below), and (D) prominently display the date, time, and location of the Sale Hearing.

v.    Any Counterparty listed on a Supplemental Assumed Contracts Schedule whose Contract is proposed to be assumed and assigned may object to the proposed assumption or assignment of its Assumed Contract, the Debtors' proposed Cure Costs (to the extent modified from the previously-stated amount), or the ability of a Successful Bidder to provide adequate assurance of future performance (a "<u>Supplemental Assumption and Assignment Objection</u>").    All Supplemental Assumption and Assignment Objections must (A) be in writing, (B) comply with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Complex Procedures, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs the Counterparty believes are required to cure any alleged defaults under the relevant Assumed Contract, and (D) no later than 14 days from the date of service of such Supplemental Assumption and Assignment Notice, (1) be filed with the Court and (2) be served on the Assumption and Assignment Objection Notice Parties.    Each Supplemental Assumption and Assignment Objection, if any, shall be resolved in the same manner as an Assumption and Assignment Objection.

f.    **<u>Reservation of Rights</u>**.  The inclusion of an Assumed Contract or Cure Costs with respect thereto on a Potential Assumption and Assignment Notice, Proposed Assumption and Assignment Notice, Potential Assumed Contracts Schedule, Proposed Assumed Contracts Schedule, Supplemental Assumption and Assignment Notice, or Supplemental Assumed Contracts Schedule shall not constitute, nor be deemed, a determination or admission by the Debtors, the Successful Bidder(s), or any other party in interest that such Contract is an executory contract or unexpired lease within the meaning of the Bankruptcy Code.  The Debtors reserve all of their rights, claims, and causes of action with respect to each Assumed Contract listed on a Potential Assumption and Assignment Notice, Proposed Assumption and Assignment Notice, Supplemental Assumption and Assignment Notice, Potential Assumed Contracts Schedule, Proposed Assumed Contracts Schedule, or Supplemental Assumed Contracts Schedule.  The Debtors' inclusion of any Assumed

Contract on a Potential Assumption and Assignment Notice, Proposed Assumption and Assignment Notice, Supplemental Assumption and Assignment Notice, Potential Assumed Contracts Schedule, Proposed Assumed Contracts Schedule, and/or Supplemental Assumed Contracts Schedule shall not be a guarantee that such Assumed Contract ultimately would be assumed or assumed and assigned.

**Basis for Relief**

**I.    The Bidding Procedures are Fair and Appropriate and Should Be Approved.**

46.    The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate.  *See In re Johnson*, 433 B.R. 626, 638 (Bankr. S.D. Tex. 2010) (citing *Cheng v. K&S Diversified Invs. (In re Cheng)*, 308 B.R. 448, 455 (B.A.P. 9th Cir. 2004)) ("The debtor in possession performing the duties of the trustee is the representative of the estate and is saddled with the same fiduciary duty as a trustee to maximize the value of the estate available to pay creditors."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564─65 (8th Cir. 1997) (recognizing that the main goal of any proposed sale of property of a debtor's estate is to maximize value).  Courts uniformly recognize that procedures established to enhance competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate.  *See In re ASARCO, L.L.C.*, 650 F.3d 593, 603 (5th Cir. 2011) (affirming the bankruptcy court's approval of bid procedures designed to maximize the value of the debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

47.    The Bidding Procedures provide for an orderly, uniform, and appropriately competitive process through which interested parties may submit offers to purchase the Assets or serve as an investor with respect to a Chapter 11 Plan Bid.  Given the time constraints, the Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active

bidding by interested parties and to elicit the highest or otherwise best offer(s) reasonably available for the Assets.  Additionally, the Bidding Procedures would allow the Debtors to conduct the Auction in a fair and transparent manner that would encourage participation by financially capable bidders with demonstrated ability to consummate a timely Sale Transaction.  Finally, the Bidding Procedures explicitly provide that any Successful Bid (even a credit bid) for a Corrections Asset(s) Sale Transaction or a Consolidated Asset Sale shall be subject to (a) the Debtors having sufficient cash at the consummation of any such sale, as determined in consultation with the Consultation Parties, to satisfy the Wind-Down Budget to pay all allowed, (i) post-petition claims, (ii) administrative expense and priority claims, and (iii) professional fees and expenses necessary to wind-down the Debtors' estates in a reasonable and appropriate timeline and in consultation with the Consultation Parties, and (b) the requirement that the net proceeds of any Corrections Asset(s) Sale Transaction(s) or a Consolidated Asset Sale, pursuant to the Bidding Procedures, shall first satisfy the Wind-Down Budget before repayment from such proceeds of any other claims against the Debtors.  As a result, the Debtors would have sufficient cash to administer the wind-down of the Debtors' estates subsequent to the closing of the Corrections Asset(s) Sale Transaction or the Consolidated Asset Sale.  Moreover, at the closing of a Corrections Asset(s) Sale Transaction or a Consolidated Asset Sale, the Debtors intend to deposit the sale proceeds realized therefrom into a segregated account held by the Debtors pending the ultimate resolution (either by agreement or Court determination) and funding of the appropriate amount on account of the Wind-Down Budget.  The Debtors shall not distribute any proceeds of any Corrections Asset(s) Sale Transaction or a Consolidated Asset Sale prior to the funding of the Wind-Down Budget.

II.   **Designation of the Recoveries Solutions Stalking Horse Bidder, the Procedures for Designating a Corrections Asset(s) Stalking Horse Bidder, and Offering the Recovery Solutions Expense Reimbursement and the Corrections Asset(s) Bid Protections Have Sound Business Purposes and Should Be Approved.**

48.     Recognizing the Recovery Solutions Stalking Horse Bidder's expenditure of time, energy, and resources in connection with the proposed transaction set forth in the Recovery Solutions Stalking Horse Agreement, and the benefit of those efforts provided to the Debtors and their respective stakeholders, the Debtors agreed to provide the Recovery Solutions Expense Reimbursement, payable if the Debtors consummate a sale pursuant to a Qualified Bid other than the Recovery Solutions Stalking Horse Bid.   Moreover, the Recovery Solutions Expense Reimbursement was a necessary condition that was negotiated in good faith and at arm's-length as part of the Recovery Solutions Stalking Horse Agreement and is not anticipated to chill bidding.

49.     In addition, to further facilitate a value-maximizing transaction for the Corrections Assets, the Debtors recognized the importance of offering the Corrections Asset(s) Bid Protections to, both to set a floor for the value of the Assets and to attract potential buyers to bid for such assets.   Accordingly, the Debtors believe that the Corrections Asset(s) Bid Protections would maximize the realizable value of the Corrections Assets for the benefit of the Debtors' estates, their creditors, and all other parties in interest.

50.     Approval of the Corrections Asset(s) Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.   The Fifth Circuit has held that bid protections should be approved in chapter 11 cases so long as (a) there was no "self-dealing or manipulation among the parties who negotiated" the bid protections, (b) the bid protections would "facilitate[]," rather than "hinder[]," the bidding process, and (c) the bid protections are "reasonable in comparison to the size of" the contemplated transaction. *ASARCO*, 650 F.3d at 603.

51.    Here, the Corrections Asset(s) Bid Protections satisfy the *ASARCO* factors.  As for the first factor, the Debtors would only offer the Corrections Asset(s) Bid Protections to the extent that they believe, in the exercise of their business judgment and consistent with their fiduciary duties (and in consultation with the Consultation Parties), that offering these protections would enhance the ultimate recovery to be received by all stakeholders.  In addition, the Corrections Asset(s) Bid Protections are not being offered to an insider of the Debtors.  Accordingly, there should be no basis to conclude that any offer of Corrections Asset(s) Bid Protections might be infected by manipulation or self-dealing.

52.    Second, the Corrections Asset(s) Bid Protections facilitate the bidding and marketing process.  The Corrections Asset(s) Bid would enable the Debtors to secure an adequate floor for the value of the Corrections Assets contemplated and ensure that competing bids be materially higher or better than the Corrections Asset(s) Approved Stalking Horse Bid. *See ASARCO*, 650 F.3d at 602 n.9 (noting that break-up fees "provide an incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders" (quotation omitted)); *Official Comm. of Unsecured Creditors of Walker Cty. Hosp. Corp. v. Walker Cty. Hosp. Dist.  (In re Walker Cty. Hosp. Corp.)*, 3 F.4th 229, 231 n.2 (5th Cir. 2021) (same).  A prospective Corrections Asset(s) Stalking Horse Bidder would not likely agree to hold out its bid and act as a stalking horse without Court approval of the Corrections Asset(s) Bid Protections; thus, the Debtors could risk losing out on the opportunity to obtain the highest or otherwise best offer for the Corrections Assets and would certainly lose out on the downside protection that a Corrections Asset(s) Approved Stalking Horse Bid would provide.

53.     Third, for the reasons set forth in the Tempke Declaration, the Corrections Asset(s) Bid Protections are reasonable relative to the size, nature, and complexity of the contemplated Corrections Asset(s) Sale Transaction(s), and particularly in light of the efforts that would necessarily have been expended by a Corrections Asset(s) Stalking Horse Bidder.  The Corrections Asset(s) Bid Protections would make up only a small percentage of any reasonable price for the Assets that a Corrections Asset(s) Stalking Horse Bidder might offer –the Corrections Asset(s) Breakup Fee, for instance, would represent only three percent of the consideration that would be offered by a Corrections Asset(s) Stalking Horse Bidder, and even then only of the cash portion of such consideration.

## III.    The Proposed Sale Transactions Satisfy the Requirements of Section 363 of the Bankruptcy Code.

54.     Ample authority exists for approval of the potential Sale Transactions contemplated by this Motion.  Section 363(b)(1) of the Bankruptcy Code empowers the Court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A debtor's decision to use, sell, or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor.  *See, e.g.*, *Int'l Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale . . . ."); *In re Cowin*, No. 13-30984, 2014 WL 1168714, at *38 (Bankr. S.D. Tex. Mar. 21, 2014); *In re St. Marie*

*Clinic PA*, No. 10-70802, 2013 WL 5221055, at *9 (Bankr. S.D. Tex. Sept. 17, 2013); *In re Particle Drilling Techs., Inc.*, No. 09-33744, 2009 WL 2382030, at *2 (Bankr. S.D. Tex. July 29, 2009); *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988).

55.    Courts emphasize that the business judgment rule is not an onerous standard that it is instead "flexible and encourages discretion." *ASARCO*, 650 F.3d at 601.  "Great judicial deference is given to the [debtor's] exercise of business judgment." *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.  (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (N.D. Tex. 2005).  A sound business justification for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders.  *See, e.g., In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *Four B. Corp. v. Food Barn Stores, Inc.* (*In re Food Barn Stores, Inc.*), 107 F.3d 558, 566 n.16 (8th Cir. 1997) (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).  As long as a transaction "appears to enhance a debtor's estate, court approval of a debtor in possession's decision to [enter into the transaction] should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the Bankruptcy Code." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (citation and internal quotation marks omitted).

56.    Moreover, section 105(a) of the Bankruptcy Code confers a bankruptcy court with broad equitable powers to confer relief in alignment with bankruptcy policies.  *See United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986) (holding that section 105(a) of the Bankruptcy Code authorizes bankruptcy courts to fashion equitable remedies "in a manner consistent with the provisions of the Bankruptcy Code"); *see also In re Young*, 416 F. App'x 392, 398 (5th Cir. 2011) (recognizing that "[s]ection 105(a) of Title 11 permits the bankruptcy court to exercise broad

authority"); *In re Trevino*, 599 B.R. 526, 542–43 (Bankr. S.D. Tex. 2019) (noting that the bankruptcy court has "broad authority" under section 105(a) of the Bankruptcy Code); *In re Padilla*, 379 B.R. 643, 667 (Bankr. S.D. Tex. 2007) (citations omitted) ("Section 105(a) gives bankruptcy courts broad authority to take actions necessary and appropriate for administering and enforcing the Bankruptcy Code and . . . 'authorizes a bankruptcy court to fashion such orders as are necessary to further the purposes of the substantive provisions of the Bankruptcy Code.'").

### A. The Debtors Have Demonstrated a Sound Business Justification for the Potential Sale Transactions.

57.    For the reasons set forth in the Tempke Declaration and the Schoenholtz Declaration, a strong business justification exists for the sale of the Assets as described herein. Exploring an orderly but expeditious sale of the Assets is critical to maximizing the value of the Debtors' estates and recoveries for the Debtors' economic stakeholders.  To that end, the RSA and DIP Credit Agreement expressly require that the Debtors timely consummate a Recovery Solutions / Consolidated Sale Transaction by no later than January 9, 2025 and any Corrections Asset(s) Sale Transaction by March 31, 2025.  Additionally, the Debtors believe that any Sale Transaction consummated in accordance with the Bidding Procedures would produce fair and reasonable purchase prices for the Assets.

58.    The Bidding Procedures were carefully designed to facilitate a flexible, robust, and competitive bidding process.  This is especially true where, as here, the Recovery Solutions Assets have been subjected to an extensive prepetition and ongoing post-petition marketing process.  The Bidding Procedures provide an appropriate framework for the Debtors to review, analyze, and compare all bids received to determine which Bids are in the best interests of the Debtors' estates and their economic stakeholders.   Any transaction governed by the Bidding Procedures

undoubtedly would serve the important objectives of obtaining a fair and reasonable purchase price for the Assets, which would inure to the befit of all parties in interest in these chapter 11 cases.

59.    Finally, nothing in the Bidding Procedures requires the Debtors' board of directors to take any action, or to refrain from taking any action, with respect to the Bidding Procedures, to the extent that the Debtors' board of directors determines that taking such action, or refraining from taking such action, is required to comply with applicable law or its fiduciary duties under applicable law, thereby allowing the Debtors to pivot to an alternative transaction.

60.    For the foregoing reasons, the Debtors submit that a strong business justification exists for approving the Sale Transactions and related relief requested herein.

**B.  The Noticing Procedures Are Reasonable and Appropriate.**

61.    "[A] sale of assets under § 363 requires notice and a hearing and is subject to court approval." *In re Moore*, 608 F.3d 253, 262 (5th Cir. 2010).  The Noticing Procedures described above are reasonably calculated to provide all of the Debtors' known relevant creditors and all other parties in interest with adequate, timely notice of, among other things, the potential Sale Transactions, Bidding Procedures, Auction, and Sale Hearing.

**IV.    The Successful Bidders Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code.**

62.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) of the Bankruptcy Code states the following:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the

> appeal, unless such authorization and such sale . . . were stayed
> pending appeal.

11 U.S.C. § 363(m). "The purpose of § 363(m)'s stay requirement is in furtherance of the policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely." *In re TMT Procurement Corp.*, 764 F.3d 512, 521 (5th Cir. 2014) (citation and internal quotation marks omitted). "Section 363(m) patently protects, from later modifications on appeal, an authorized sale where the purchaser acted in good faith and the sale was not stayed pending appeal." *Matter of Gilchrist*, 891 F.2d 559, 560 (5th Cir. 1990).

63.     Although the Bankruptcy Code does not define "good faith," the Fifth Circuit has defined the term in two ways in the context of section 363(m) of the Bankruptcy Code.  First, it has "defined a 'good faith purchaser' as 'one who purchases the assets for value, in good faith, and without notice of adverse claims.'" *TMT Procurement Corp.*, 764 F.3d at 521 (citations omitted). Second, the Fifth Circuit has "noted that 'the misconduct that would destroy a purchaser's good faith status . . . involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" *Id.*  (citations omitted).

64.     The Debtors submit that each Successful Bidder would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.  The Debtors have engaged independent, sophisticated counsel and other professional advisors to represent their interests with respect to the sale process and, to the best of the Debtors' knowledge, information, and belief, no party has engaged in any conduct that would cause or permit a Sale Transaction to be set aside under section 363(m) of the Bankruptcy Code.

65.     Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process.  Each Qualified Bidder participating in the Auction

must confirm on the record that it has not engaged in any collusion with respect to the bidding or the sale of any of the Assets.  *See* Bidding Procedures § V.N.  The Recovery Solutions Stalking Horse Agreement was negotiated at arm's-length and in good faith, and any asset purchase agreement with a Successful Bidder for any of the Corrections Assets executed by the Debtors would also be negotiated at arm's-length and in good faith.  Accordingly, the Debtors seek a finding that any Successful Bidder under the Bidding Procedures is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

66.    Based on the foregoing, the Debtors submit that the Debtors' entrance into a Sale Transaction pursuant to the Bidding Procedures is a sound exercise of the Debtors' business judgment and should be approved as a good faith transaction.

## V.    The Assets Should be Sold Free and Clear of Liens, Claims, Interests, and Encumbrances Under Section 363(f) of the Bankruptcy Code.

67.    In the interest of attracting the best offers, the Court should authorize the sale of the Assets free and clear of any and all liens, claims, interests, and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances attaching to the proceeds of the applicable sale.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances of an entity other than the estate if any one of the following conditions is satisfied:

    a.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

    b.    such entity consents;

    c.    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

    d.    such interest is in bona fide dispute; or

    e.    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Patriot Place, Ltd.*, 486 B.R. 773, 814 (Bankr. W.D. Tex. 2013) ("Section 363(f) of the Bankruptcy Code sets forth five alternative conditions that must be satisfied by the Court to authorize a debtor . . . to sell its property . . . free and clear of interests of a third party.").

68.     Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

69.     The Debtors submit that any sale of the Assets free and clear of liens, claims, interests, and encumbrances would satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.  For example, to the extent that a party objects to a Sale Transaction on the basis that it allegedly holds a prepetition lien or encumbrance on the applicable Assets, the Debtors believe that any such party could be compelled to accept a monetary satisfaction of such claims, under section 363(f)(5) of the Bankruptcy Code, or that such lien is in bona fide dispute, under section 363(f)(4) of the Bankruptcy Code.

70.     Moreover, the Debtors have sent or will send the Sale Notice to any purported prepetition lienholders.  If such lienholders do not object to the proposed Sale Transaction, then their consent should be presumed.  Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim, interest, or encumbrance on any of the Assets (other than those assumed or permitted, if any, in connection with a Sale Transaction) timely and properly objects to this

Motion, such party shall be deemed to have consented to any Sale Transaction approved at the Sale Hearing. *See Hargrave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein).

71.     The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens, interests, and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.  Moreover, without such assurances, potential bidders may choose not to participate in the Auction, to the detriment of the Debtors' economic stakeholders.  Accordingly, the Debtors request that the Court authorize the sale of the Assets free and clear of any liens, claims, interests, and encumbrances in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests, and encumbrances attaching to the proceeds thereof in the same order of relative priority and with the same validity, force, and effect as prior to such sale.

## VI.     The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.

72.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  The decision to assume or reject an unexpired lease is a matter within the "business judgment" of the debtor. *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989).  "As long as assumption of a lease appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *Richmond Leasing Co.*, 762 F.2d at 1309 (citation and internal quotation marks omitted).

73.     Any assumption of the Proposed Assumed Contracts is an exercise of the Debtors' sound business judgment because the transfer of such Contract is necessary to the Debtors' ability to obtain the best value for their Assets.  The assumption and assignment of Proposed Assumed Contracts is a critical element of the value of the Assets.  Given that the ability to consummate an agreed Sale Transaction is critical to the Debtors' efforts to maximize value for their estates and stakeholders, the Debtors' assumption of Proposed Assumed Contracts is an exercise of sound business judgment and, therefore, should be approved.

74.     The consummation of any Sale Transaction involving the assignment of a Proposed Assumed Contract would be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Contracts to be assumed be cured and that the Debtors provide adequate assurance that such defaults would be promptly cured.  The Debtors' assumption and assignment of Proposed Assumed Contracts would be contingent upon payment of the Cure Costs and effective only upon the closing of an applicable Sale Transaction or any later applicable effective date.  As set forth above, the Debtors propose to file with the Court and serve on each Counterparty a Potential Assumption and Assignment Notice, which would set forth the Debtors' good faith calculations of Cure Costs with respect to each Contract listed on the Potential Assumed Contracts Schedule.  As a result, Counterparties would have a meaningful opportunity to raise any objections to the proposed assumption of their respective Contracts in advance of the applicable Sale Hearing.

75.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract if "adequate assurance of future performance by the assignee of such contract or lease is provided." The meaning of "adequate assurance of future performance" depends on the

facts and circumstances of each case, but should be given "practical, pragmatic construction." *In re Tex. Health Enters., Inc.*, 246 B.R. 832, 834 (Bankr. E.D. Tex. 2000) (citation and internal quotation marks omitted). "Assurance of future performance is adequate if performance is likely (i.e. more probable than not) and the degree of assurance necessary to be deemed adequate falls considerably short of an absolute guaranty." *In re PRK Enters., Inc.*, 235 B.R. 597, 603 (Bankr. E.D. Tex. 1999). "Some helpful factors include 'whether the debtor's financial data indicated its ability to generate an income stream sufficient to meet its obligations, the general economic outlook in the debtor's industry, and the presence of a guarantee.'" *In re Tex. Health Enters. Inc.*, 72 F. App'x 122, 126 (5th Cir. 2003) (citation omitted).

76.    As set forth above and in the Bidding Procedures, for a Bid to qualify as a Qualified Bid, a Potential Bidder must include with its Bid information regarding its ability (and the ability of its designated assignee, if applicable) to perform under applicable Proposed Assumed Contracts. Each affected Counterparty would have an opportunity to object to the ability of a Successful Bidder to provide adequate assurance as provided in the Bidding Procedures Order. Further, the Debtors propose to file with the Court a Proposed Assumption and Assignment Notice, which would set forth a list of the Proposed Assumed Contracts, in advance of the Sale Hearing. To the extent necessary, the Debtors would present facts at the Sale Hearing to demonstrate the financial wherewithal, willingness, and ability of each Successful Bidder to perform under the Proposed Assumed Contracts.

77.    In addition, to facilitate the assumption and assignment of Proposed Assumed Contracts, the Debtors further request that the Court find that all anti-assignment provisions contained therein, whether such provisions expressly prohibit or have the effect of restricting or

limiting assignment of such Assumed Contract, are unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[10]

**Emergency Consideration**

78.      Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion.  As set forth in this Motion, the Tempke Declaration, and the Schoenholtz Declaration, the Debtors believe that continuing a sale process pursuant to the Bidding Procedures, and in accordance with the milestones under the RSA and DIP Credit Agreements, will maximize the value of the Assets for the benefit of all stakeholders.  Accordingly, shortening notice of this Motion is warranted.

**Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)**

79.      To implement successfully the relief sought herein, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances.  The Debtors also request that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  The Debtors further request that the Court waive the stay imposed by Bankruptcy Rule 6006(d), which provides that an "order authorizing the trustee to assign an executory contract or

---

[10]      Section 365(f)(1) of the Bankruptcy Code provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . ." 11 U.S.C. § 365(f)(1).  Section 365(f)(3) of the Bankruptcy Code further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

unexpired lease under section 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

80.     As described above, The Debtors have already commenced the marketing and sale process to maximize value for their estates and stakeholders.  Accordingly, the Debtors request that the Bidding Procedures Order, any Sale Order, and any order authorizing the assumption and assignment of a Proposed Assumed Contract in connection with a Sale Transaction be effective immediately upon entry and that the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) be waived.

## Notice

81.     Notice of this Motion will be provided to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Lenders; (d) counsel to the Ad Hoc Group; (e) counsel to the Prepetition First Lien Administrative Agent; (f) counsel to the Prepetition Second Lien Administrative Agent; (g) the Office of the United States Attorney for the Southern District of Texas; (h) the state attorneys general for states in which the Debtors conduct business; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; and (k) any party identified in section E of the *Procedures for Complex Cases in the Southern District of Texas* (collectively, the "Notice Parties").  A copy of this Motion and the Bidding Procedures Order approving it will also be made available on the Case Information Website located at https://dm.epiq11.com/Wellpath.  Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested, the Debtors respectfully submit that no other or further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order, substantially in the form annexed hereto, and the Sale Order granting the relief requested herein and such other and further relief as the Court deems appropriate under the circumstances.

| | |
|---|---|
| Dated:  November 12, 2024<br>Dallas, Texas | */s/ Marcus A. Helt*<br><br>Marcus A. Helt (Texas Bar #24052187)<br>MCDERMOTT WILL & EMERY LLP<br>2501 N. Harwood Street, Suite 1900<br>Dallas, Texas 75201-1664<br>Telephone:      (214) 295-8000<br>Facsimile:       (972) 232-3098<br>Email:            mhelt@mwe.com<br><br>-and-<br><br>Felicia Gerber Perlman (*pro hac vice* admission pending)<br>Bradley Thomas Giordano (*pro hac vice* admission pending)<br>Jake Jumbeck (*pro hac vice* admission pending)<br>Carole Wurzelbacher (*pro hac vice* admission pending)<br>Carmen Dingman (*pro hac vice* admission pending)<br>MCDERMOTT WILL & EMERY LLP<br>444 West Lake Street, Suite 4000<br>Chicago, Illinois 60606-0029<br>Telephone:      (312) 372-2000<br>Facsimile:       (312) 984-7700<br>Email:            fperlman@mwe.com<br>                      bgiordano@mwe.com<br>                      jjumbeck@mwe.com<br>                      cwurzelbacher@mwe.com<br>                      cdingman@mwe.com<br>-and-<br><br>Steven Z. Szanzer (*pro hac vice* admission pending)<br>MCDERMOTT WILL & EMERY LLP<br>One Vanderbilt Avenue<br>New York, New York 10017<br>Telephone:      (212) 547-5400<br>Facsimile:       (212) 547-5444<br>Email:            sszanzer@mwe.com<br><br><br>*Proposed Counsel to the Debtors and Debtors in Possession* |

**<u>Certificate of Accuracy</u>**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and accurate to the best of my knowledge, information, and belief.  This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Marcus A. Helt*
Marcus A. Helt

**<u>Certificate of Service</u>**

I certify that, on November 12, 2024, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Marcus A. Helt*
Marcus A. Helt
