## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 58** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO
(A) OBTAIN POSTPETITION FINANCING, AND (B) USE CASH COLLATERAL;
(II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS; (III) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES; (IV) MODIFYING THE AUTOMATIC STAY;
(V) SCHEDULING FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(each, a "Debtor" and collectively, the "Debtors") in these chapter 11 cases (the "Chapter 11

Cases") pursuant to sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), 503, 506(c),

507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*

(the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of

Bankruptcy Procedures (the "Bankruptcy Rules") and the rules 2002-1, 4001-1(b), 4002-1(i), and

9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy

Court for the Southern District of Texas (the "Bankruptcy Local Rules"), seeking entry of this

interim order (this "Interim Order") among other things:

---

[1] A complete list of the Debtors in the Chapter 11 Cases (each as defined below) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Wellpath. The Debtors' service address for the Chapter 11 Cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

[2] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the DIP Credit Agreement, as applicable.

(i)    authorizing Wellpath Holdings, Inc., as borrower (the "<u>Borrower</u>"), to obtain, and the other Debtors, as guarantors (each, a "<u>Guarantor</u>," and collectively, the "<u>Guarantors</u>"), to guarantee, on a joint and several basis, the Borrower's obligations under, a priming senior secured, superpriority debtor-in-possession term loan facility in the aggregate principal amount (exclusive of capitalized DIP Fees (as defined below) and interest) of $522,375,000 (the "<u>DIP Term Facility</u>" and the commitments thereunder, the "<u>DIP Commitments</u>," and the term loans advanced (or deemed advanced) thereunder, the "<u>DIP Term Loans</u>") under that certain Senior Secured Superpriority Debtor In Possession Credit Agreement among the Borrower, CCS-CMGC International Holdings, Inc., as Holdings ("<u>Holdings</u>"), CCS-CMGC Intermediate Holdings 2, Inc., and the DIP Secured Parties (as defined below), which is attached hereto as **<u>Exhibit A</u>** (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "<u>DIP Credit Agreement</u>") (*provided*, that any Guarantor that was not a "Guarantor" under the Prepetition Credit Agreements (as defined below) shall not constitute a "Guarantor" or "Credit Party" under the DIP Term Facility solely with respect to the obligations under the Roll-Up Loans (as defined below) (such entities, the "<u>Limited Guarantors</u>"; *provided, further* that CCS-CMGC Parent Holdings, LP and CCS-CMGC Parent GP, LLC shall not constitute Guarantors), and references herein to any Guarantor or Loan Party shall be deemed to exclude the Limited Guarantors for purposes of the Roll-Up Loans), comprised of:

    a.    a "new money" multiple draw term loan facility in an aggregate principal amount (exclusive of capitalized DIP Fees and interest) of $105,000,000, of which (A) an initial amount of up to $45,000,000 (the "<u>Initial Term Loans</u>") will be made available to be drawn in a single drawing upon entry of the Interim Order and satisfaction of the other applicable conditions to the Initial Term Loans set forth in the DIP Term Loan Documents (as defined below) (such initial draw, the "<u>Initial Draw</u>"), and (B) an additional amount of $60,000,000 (the "<u>Delayed Draw Term Loans</u>" and, together with the Initial Term Loans, the "<u>New Money DIP Term Loans</u>") will be made available to be drawn in a single drawing upon entry of the Final Order and satisfaction of the other applicable conditions to the Delayed Draw Term Loans set forth in the DIP Term Loan Documents (the "<u>Delayed Draw</u>"); plus

    b.    "roll-up" term loans in an aggregate principal amount (exclusive of capitalized interest) of up to $417,375,000 consisting of:

        i.    upon entry of the Interim Order and funding of the Initial Draw, up to $91,125,000 (the "<u>Interim Roll-Up Amount</u>") which will be drawn down and immediately applied in repayment of an equivalent principal amount of (i) Prepetition First Lien Loans (as defined below) held by each DIP Lender or its affiliate that is also a Prepetition First Lien Lender (as defined below) or their affiliates or related funds, representing an amount equal to a two-to-one (2.00:1.00) (the "<u>Initial First Lien Roll-Up Ratio</u>") roll-up of the outstanding principal amount

of the loans under the Prepetition Credit Agreement held by each DIP Lender or its affiliate that is a lender under the Prepetition First Lien Credit Agreement, as applicable, in an amount equal to two (2.00) times the sum of (A) the amount of the Initial Term Loans, allocated to such DIP Lender or its affiliates attributable to their 1L Backstop Amount (as defined in the DIP Commitment Letter) *plus* (B) the product of (1) the aggregate Initial Term Loans allocated to Prepetition Second Lien Lenders or their affiliates attributable to their respective 2L Backstop Amount (as defined in the DIP Commitment Letter), *times* (2) such DIP Lender's and its affiliates' pro rata share (expressed as a percentage) of the aggregate 1L Backstop Amount (the "Initial First Lien Roll-Up") and (ii) Prepetition Second Lien Term Loans (as defined below) held by each DIP Lender or its affiliates that is also a Prepetition Second Lien Lender (as defined below) or their affiliates or related funds, representing a 0.50:1.00 ratio (the "Second Lien Roll-Up Ratio") of Prepetition Second Lien Term Loans to New Money DIP Term Loans (the "Initial Second Lien Roll-Up" and, together with the Initial First Lien Roll-Up, the "Initial Roll-Up"), in an amount equal to one half (0.50) of the amount of the Initial Term Loans allocated to such DIP Lender or its affiliates attributable to their 2L Backstop Amount;

ii.  upon entry of the Final Order, and payable solely to the DIP Lenders that funded the Initial Draw, up to $87,750,000 (the "Delayed Roll-Up Amount") which will be drawn down and immediately applied in repayment of an equivalent principal amount of (i) Prepetition First Lien Loans held by each DIP Lender or its affiliate that is also a Prepetition First Lien Lender or their affiliates or related funds, representing an amount equal to a one and ninety-five hundredths-to-one (1.95:1.00) (the "Delayed First Lien Roll-Up Ratio") roll-up of the outstanding principal amount of the loans under the Prepetition Credit Agreement held by each DIP Lender or its affiliate that is a lender under the Prepetition First Lien Credit Agreement, as applicable, in an amount equal to one and ninety-five hundredths (1.95) times the sum of (A) the amount of the Initial Term Loans, allocated to such DIP Lender or its affiliates attributable to their 1L Backstop Amount (as defined in the DIP Commitment Letter) *plus* (B) the product of (1) the aggregate Initial Term Loans allocated to Prepetition Second Lien Lenders or their affiliates attributable to their respective 2L Backstop Amount (as defined in the DIP Commitment Letter), *times* (2) such DIP Lender's and its affiliates' pro rata share (expressed as a percentage) of the aggregate 1L Backstop Amount (the "Delayed First Lien Roll-Up"); and

iii.  upon entry of the Final Order and funding of the Delayed Draw, up to $238,500,000 (the "Final Roll-Up Amount," and together with the Interim Roll-Up Amount and the Delayed Roll-Up Amount, the "Roll-Up Amount") which will be deemed drawn down and immediately applied in repayment of an equivalent principal amount of (i) Prepetition

First Lien Loans held by each DIP Lender or its affiliate that is also a Prepetition First Lien Lender or their affiliates or related funds, representing an amount equal to three and ninety-five hundredths-to-one (3.95:1.00) roll-up of the outstanding principal amount of the loans under the Prepetition Credit Agreement held by each DIP Lender or its affiliate that is a lender under the Prepetition First Lien Credit Agreement, as applicable, in an amount equal to three and ninety-five hundredths (3.95) times (the "<u>Final First Lien Roll-Up Ratio</u>" and together with the Initial First Lien Roll-Up Ratio, the Second Lien Roll-Up Ratio, and the Delayed First Lien Roll-Up Ratio, the "<u>Roll-Up Ratios</u>") the sum of (A) the amount of the Delayed Draw Term Loans, allocated to such DIP Lender or its affiliates attributable to their beneficial holdings of loans under the Prepetition First Lien Credit Agreement plus (B) the product of (1) the aggregate Delayed Draw Term Loans allocated to Prepetition Second Lien Lenders or their affiliates attributable to their respective beneficial holdings of the Prepetition Second Lien Term Loans, times (2) such DIP Lender's and its affiliates' pro rata share (expressed as a percentage) of the aggregate loans under the Prepetition First Lien Credit Agreement held by participating DIP Lenders (the "<u>Final First Lien Roll-Up</u>"), and (ii) Prepetition Second Lien Term Loans held by each DIP Lender or its affiliates or its affiliates that is also a Prepetition Second Lien Lender or their affiliates or related funds, representing the Second Lien Roll-Up Ratio of Prepetition Second Lien Term Loans to New Money DIP Term Loans, in an amount equal to one half (0.50) of the amount of the Delayed Draw Term Loans allocated to such DIP Lender or its affiliates attributable to their beneficial holdings of the Prepetition Second Lien Term Loans (the "<u>Final Second Lien Roll-Up</u>" and together with the Final First Lien Roll-Up, the "<u>Final Roll-Up</u>" and the Final Roll-Up together with the Initial Roll-Up and the Delayed First Lien Roll-Up, the "<u>Roll-Up</u>"), in each case on a cashless basis (the "<u>Roll-Up Loans</u>"), subject to the terms and conditions set forth in the DIP Credit Agreement, the Interim Order and the Final Order;

which shall be funded on behalf of certain Prepetition Lenders (as defined below) or their affiliates or related funds, in their capacities as postpetition financing lenders (collectively, the "<u>DIP Lenders</u>") pursuant to the terms and conditions set forth in (i) the DIP Credit Agreement, (ii) the DIP Term Sheet attached hereto as **Exhibit B**, (iii) that certain Senior Secured Superpriority Debtor in Possession Credit Facility and Equity Financing Backstop Commitment Letter executed by certain of the Prepetition Lenders (each, a "<u>Backstop Party</u>," and collectively, the "<u>Backstop Parties</u>"), and (iv) all agreements, documents and instruments delivered or executed in connection with the DIP Credit Agreement, in each case in form and substance satisfactory to the Debtors, UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacities, the "<u>DIP Administrative Agent</u>" and the "<u>DIP Collateral Agent</u>", respectively, and together the "<u>DIP Agents</u>" and, together with the DIP Lenders, the "<u>DIP Secured</u>

Parties") and the Backstop Parties (such agreements, documents, and instruments, including, without limitation, the DIP Credit Agreement, the DIP Term Sheet, and the DIP Commitment Letter, collectively, the "DIP Term Loan Documents");

(ii)     authorizing the Debtors to (a) enter into the DIP Credit Agreement and the other DIP Term Loan Documents, and (b) to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Credit Agreement and the other DIP Term Loan Documents or the DIP Term Facility;

(iii)    granting the DIP Collateral Agent, for the benefit of itself and the DIP Lenders, allowed superpriority administrative expense claims in each of the Debtors' chapter 11 cases and any successor cases, including any chapter 7 cases, with respect to the DIP Term Facility and all obligations and indebtedness owing thereunder, under the DIP Credit Agreement and the other DIP Term Loan Documents (if any) and this Interim Order (collectively, the "DIP Obligations"), subject to the priorities set forth herein;

(iv)    granting the DIP Collateral Agent, for the benefit of itself and the DIP Lenders, automatically perfected priming security interests in, and liens on, with respect to the DIP Term Loans (including, for the avoidance of doubt, the Roll-Up Loans (other than with respect to the Limited Guarantors)), all of the DIP Collateral (as defined below), including but not limited to, Cash Collateral (as defined below) and the Prepetition Collateral (as defined below), in each case, to secure the DIP Term Loans and the other Obligations (as defined in the DIP Credit Agreement), subject only to the Carve Out (as defined below) and the terms and priorities set forth herein;

(v)     authorizing the Debtors, subject to and pursuant to the terms and conditions set forth in this Interim Order, to continue to (a) use Cash Collateral and (b) provide adequate protection on account of any diminution in the value of the Prepetition Collateral, including Cash Collateral, as a consequence of the Debtors' use, sale, or lease of the Prepetition Collateral, including any Cash Collateral, the imposition of the automatic stay pursuant to Bankruptcy Code section 362, the Debtors' incurrence of Indebtedness (as defined in the DIP Credit Agreement) under the DIP Credit Agreement and the priming of the liens and security interests of the Prepetition Secured Parties (as defined below) by liens and security interests granted by the DIP Credit Agreement and the other DIP Term Loan Documents (including this Interim Order), and any other basis consistent with section 361 of the Bankruptcy Code to the Prepetition Secured Parties;

(vi)    authorizing the Debtors to pay, on the terms set forth herein and in the DIP Term Loan Documents, on a final and irrevocable basis, the principal, interest, reasonable and documented fees, expenses, and other amounts payable under the DIP Credit Agreement and the other DIP Term Loan Documents as such amounts become earned, due and payable, including, without limitation, the DIP Commitment Premium, the Closing Fee, the Fronting Fee and the Agency Fee (each as defined

below), audit fees, appraisal fees, valuation fees, agent fees, and reasonable fees and disbursements of the DIP Agents' and DIP Lenders' attorneys, advisors, accountants, appraisers, bankers and other consultants, all to the extent provided in, and in accordance with, the DIP Credit Agreement and the other DIP Term Loan Documents;

(vii)    waiving (i) subject to entry of the Final Order, the Debtors' and their estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c), (ii) subject to entry of the Final Order, the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, and (iii) subject to entry of the Final Order to the extent provided therein, the "equities of the case" exception under Bankruptcy Code section 552(b), each effective as of the Petition Date;

(viii)   authorizing the DIP Agents and the DIP Lenders to exercise remedies under the DIP Credit Agreement and the other DIP Term Loan Documents on the terms described herein and therein upon the occurrence and during the continuation of a DIP Termination Event (as defined below);

(ix)    modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Interim Order;

(x)    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order; and

(xi)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

This Court having considered the relief requested in the Motion, the DIP Declaration, the First Day Declaration, and the evidence submitted, including the First Day Declaration, and arguments of counsel made at the initial hearing on the Motion on November 12, 2024 (the "Hearing"); and notice of the Motion and the Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and all applicable Bankruptcy Local Rules, and it appearing that no other or further notice is necessary; and the Hearing to consider the relief requested in the Motion having been held and concluded; and all objections and reservations of rights, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled on the merits by this Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates

pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the

Debtors, their estates, and all parties in interest, and is essential for the continued operation of the

Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that

the Debtors' performance with respect to the DIP Credit Agreement and if applicable, entry into

the other DIP Term Loan Documents is a sound and prudent exercise of the Debtors' business

judgment; and after due deliberation and consideration, and good and sufficient cause appearing

therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE HEARING, THIS COURT MAKES THE FOLLOWING PRELIMINARY FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.     <u>Petition Date</u>.  On November 11, 2024 (the "<u>Petition Date</u>"), the Debtors filed their

voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States

Bankruptcy Court for the Southern District of Texas (this "<u>Court</u>").

B.     <u>Debtors in Possession</u>.  The Debtors are operating their businesses and properties

as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.  As of the date

hereof, no trustee, examiner or official committee of unsecured creditors (the "<u>Committee</u>") has

been appointed in any of the Chapter 11 Cases.

C.     <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Chapter 11 Cases, the

Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.

This Court's consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2).  This Court may enter a final order consistent with Article III of the United States

---

[3]     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.

Constitution.  Venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     <u>Notice</u>. Notice of the Motion and the relief requested thereby and granted in this Interim Order has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, and was appropriate under the circumstances.  No other or further notice of the Motion or entry of this Interim Order is required.

E.     <u>Prepetition Secured Debt</u>.  Subject to the limitations thereon contained in paragraphs 23 and 24 of this Interim Order, the Debtors represent, admit, stipulate and agree as follows as to each of (i) through (xiii) below:

(i)     <u>Prepetition First Lien Credit Facility</u>.  Pursuant to that certain First Lien Credit Agreement, dated as of October 1, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition First Lien Credit Agreement</u>" and together with the other Credit Documents (as defined in the Prepetition First Lien Credit Agreement) as each may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition First Lien Credit Documents</u>"), among the Borrower, Holdings, the financial institutions from time to time party thereto as lenders (collectively, the "<u>Prepetition First Lien Lenders</u>"), UBS AG, Stamford Branch (as successor to Credit Suisse AG, Cayman Islands Branch), as administrative agent and collateral agent (in such capacities, the "<u>Prepetition First Lien Agent</u>" and together with the Prepetition First Lien Lenders, the "<u>Prepetition First Lien Secured Parties</u>"), the Prepetition First Lien Lenders provided secured term loans (the "<u>Prepetition First Lien Term Loans</u>") and secured revolving loans (the "<u>Prepetition First Lien Revolving Loans</u>" and together with the Prepetition First Lien Term Loans, the "<u>Prepetition First Lien Loans</u>") to the Borrower (the "<u>Prepetition First Lien Credit Facility</u>").

(ii)    <u>Prepetition First Lien Guarantee</u>.  Pursuant to the Prepetition First Lien Credit Agreement, Holdings unconditionally and irrevocably guaranteed the obligations in respect of the Prepetition First Lien Credit Documents.  Pursuant to that certain Subsidiaries Guaranty, dated as of October 1, 2018, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the subsidiaries of Holdings party thereto (together with the Borrower and Holdings, the "<u>Prepetition First Lien Obligors</u>") unconditionally and irrevocably guaranteed on a joint and several basis the obligations in respect of the Prepetition First Lien Credit Documents.

(iii)    <u>Prepetition First Lien Credit Facility Obligations</u>.  As of the Petition Date, the Prepetition First Lien Obligors were jointly and severally indebted and liable, without defense, counterclaim, objection or offset of any kind, to the Prepetition First Lien Secured Parties under the Prepetition First Lien Credit Documents in the aggregate amount of not less than $534,096,041, which consists of (x) approximately $472,500,000 in principal amount of Prepetition First Lien Term Loans advanced under the Prepetition First Lien Credit Agreement, and (y) approximately $61,596,041 in principal amount of Prepetition First Lien Revolving Loans advanced under the Prepetition First Lien Credit Agreement, *plus* accrued and unpaid interest and all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, additional interest, any other "Obligations" (as defined in the Prepetition First Lien Credit Agreement), and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition First Lien Credit Documents (collectively, the "<u>Prepetition First Lien Credit Facility Obligations</u>").  The Prepetition First Lien Credit Facility Obligations constitute legal, valid, binding, enforceable and non-avoidable obligations against each of the Debtors which are party to the Prepetition First Lien Credit

Documents and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, recoupment, subordination, other claim, cause of action, or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law, or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition First Lien Secured Parties by or on behalf of any of the Debtors prior to the Petition Date under or in connection with the Prepetition First Lien Credit Facility are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  The Prepetition First Lien Credit Facility Obligations constitute an allowed secured claim within the meaning of Section 502 and 506 of the Bankruptcy Code.

(iv)    Prepetition First Lien Liens.  Pursuant to (i) that certain First Lien Security Agreement, dated as of October 1, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition First Lien Security Agreement"), among the Prepetition First Lien Obligors and the Prepetition First Lien Agent and (ii) the other Security Documents (as defined in the Prepetition First Lien Credit Agreement) (together with the Prepetition First Lien Security Agreement, the "Prepetition First Lien Security Documents"), prior to the Petition Date, the Prepetition First Lien Obligors granted to the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties valid, binding, perfected and enforceable first priority liens and security interests (the "Prepetition First Lien Liens") in the Collateral (as defined in the Prepetition First Lien Credit Documents, the "Prepetition First Lien Collateral").  As of the Petition Date: (a) the Prepetition First Lien  Liens were legal, valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition First Lien Secured Parties for fair consideration and

reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby; (b) the Prepetition First Lien Liens were senior in priority over any and all other liens on the Prepetition First Lien Collateral, subject only to certain senior liens as permitted by the Prepetition First Lien Credit Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition First Lien Liens as of the Petition Date or were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b)); (c) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition First Lien Liens or Prepetition First Lien Credit Facility Obligations exist, and no portion of the Prepetition First Lien Liens or Prepetition First Lien Credit Facility Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Debtors and their estates have no claims, objections, challenges, causes of action, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including claims and causes of action under Bankruptcy Code sections 105, 502(d), 510 or 542 through 553, or any other avoidance actions under the Bankruptcy Code whether pursuant to federal law or applicable state law or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition First Lien Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to the Prepetition First Lien Credit Documents and the Prepetition First Lien Credit Facility Obligations; and (e) the Debtors waive, discharge, and release any right to challenge any of the

Prepetition First Lien Credit Facility Obligations, the priority of the applicable Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition First Lien Liens securing the Prepetition First Lien Credit Facility Obligations.

(v)     _Prepetition Second Lien Credit Facility_. Pursuant to that certain Second Lien Credit Agreement, dated as of October 1, 2018, (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "_Prepetition Second Lien Credit Agreement_", and together with the other Credit Documents (as defined in the Prepetition Second Lien Credit Agreement) as each may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "_Prepetition Second Lien Credit Documents_," and together with the Prepetition First Lien Credit Documents, the "_Prepetition Credit Documents_"), among the Borrower, Holdings, the financial institutions from time to time party thereto as lenders (collectively, the "_Prepetition Second Lien Lenders_", and together with the Prepetition First Lien Lenders, the "_Prepetition Lenders_"), UBS AG, Stamford Branch (as successor to Credit Suisse AG, Cayman Islands Branch), as administrative agent and collateral agent (in such capacities, the "_Prepetition Second Lien Agent_", and together with the Prepetition First Lien Agent, the "_Prepetition Agents_" and the Prepetition Agents together with the Prepetition Lenders, the "_Prepetition Secured Parties_"), the Prepetition Second Lien Lenders provided secured term loans (the "_Prepetition Second Lien Term Loans_") to the Borrower (the "_Prepetition Second Lien Facility_").

(vi)     _Prepetition Second Lien Guarantee_.  Pursuant to the Prepetition Second Lien Credit Agreement, Holdings unconditionally and irrevocably guaranteed the obligations in respect of the Prepetition Second Lien Credit Documents.  Pursuant to that certain Subsidiaries Guaranty, dated as of October 1, 2018, as amended, restated, amended and restated, supplemented,

or otherwise modified from time to time, the subsidiaries of Holdings party thereto (together with the Borrower and Holdings, the "Prepetition Second Lien Obligors") unconditionally and irrevocably guaranteed on a joint and several basis the obligations in respect of the Prepetition Second Lien Credit Documents.

(vii)   Prepetition Second Lien Credit Facility Obligations.   As of the Petition Date, the Prepetition Second Lien Obligors were jointly and severally indebted and liable, without defense, counterclaim, objection or offset of any kind, to the Prepetition Second Lien Agent and the Prepetition Second Lien Lenders (together, the "Prepetition Second Lien Secured Parties") under the Prepetition Second Lien Credit Documents in the aggregate amount of not less than $110,000,000, *plus* accrued and unpaid interest and all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, additional interest, any other "Obligations" (as defined in the Prepetition Second Lien Credit Agreement), and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Second Lien Credit Documents (collectively, the "Prepetition Second Lien Credit Facility Obligations," and together with the Prepetition First Lien Credit Facility Obligations, the "Prepetition Secured Obligations").   The Prepetition Second Lien Credit Facility Obligations constitute legal, valid, binding, enforceable and non-avoidable obligations against each of the Debtors which are party to the Prepetition Second Lien Credit Documents and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, recoupment, subordination, other claim, cause of action, or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law, or otherwise.   No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Second Lien Secured Parties by or on behalf of any of the Debtors

prior to the Petition Date under or in connection with the Prepetition Second Lien Credit Facility are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  The Prepetition Second Lien Credit Facility Obligations constitute an allowed secured claim within the meaning of Section 502 and 506 of the Bankruptcy Code.

(viii)   Prepetition Second Lien Liens.  Pursuant to (i) that certain Second Lien Security Agreement, dated as of October 1, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Second Lien Security Agreement"), among the Prepetition First Lien Obligors and the Prepetition Second Lien Agent and (ii) the other Security Documents (as defined in the Prepetition Second Lien Credit Agreement) (together with the Prepetition Second Lien Security Agreement, the "Prepetition Second Lien Security Documents"), prior to the Petition Date, the Prepetition Second Lien Obligors granted to the Prepetition Second Lien Agent for the benefit of the Prepetition Second Lien Secured Parties valid, binding, perfected and enforceable second priority liens and security interests in (the "Prepetition Second Lien Liens" and together with the Prepetition First Lien Liens, the "Prepetition Liens") the Collateral (as defined in the Prepetition Second Lien Credit Documents, the "Prepetition Second Lien Collateral" and together with the Prepetition First Lien Collateral, the "Prepetition Collateral").  As of the Petition Date: (a) the Prepetition Second Lien Liens were legal, valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Second Lien Secured Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial

accommodations secured thereby; (b) the Prepetition Second Lien Liens were senior in priority over any and all other liens on the Prepetition Second Lien Collateral, subject only to the Prepetition First Lien Liens and certain senior liens as permitted by the Prepetition Second Lien Credit Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Second Lien Liens as of the Petition Date or were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b)); (c) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Second Lien Liens or Prepetition Second Lien Credit Facility Obligations exist, and no portion of the Prepetition Second Lien Liens or Prepetition Second Lien Credit Facility Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Debtors and their estates have no claims, objections, challenges, causes of action, or choses in action, including claims and causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, and 550, or any other avoidance actions under the Bankruptcy Code whether pursuant to federal law or applicable state law or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Second Lien Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to the Prepetition Second Lien Credit Documents and the Prepetition Second Lien Credit Facility Obligations; and (e) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Second Lien Credit Facility Obligations, the priority of the applicable Debtors' obligations thereunder, and the

validity, extent, and priority of the Prepetition Second Lien Liens securing the Prepetition Second Lien Credit Facility Obligations.

(ix)     1L/2L Intercreditor Agreement. The Prepetition First Lien Agent, the Prepetition Second Lien Agent, the Borrower and Holdings are parties to that certain First Lien/Second Lien Intercreditor Agreement, dated as of October 1, 2018 (the "1L/2L Intercreditor Agreement"), which governs the respective rights, obligations and priorities of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties with respect to the Prepetition Collateral and other matters referred to therein.  The 1L/2L Intercreditor Agreement shall continue to govern the rights of the respective parties thereto with respect to the Prepetition Collateral and other matters referred to therein.

(x)     Cash Collateral.  The Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, existing as of the Petition Date, and any amounts generated by the collection of accounts receivable or other disposition of the Collateral, existing as of the Petition Date, and the proceeds of any of the foregoing, wherever located is the Prepetition Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").

(xi)     No Control.  As of the Petition Date, none of the Prepetition Secured Parties or the DIP Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted, or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from this Interim Order, the DIP Term Facility, the DIP Credit Agreement, the DIP Term Loan Documents, or the Prepetition Credit Documents.

(xii)   <u>Superpriority Claims</u>.  There are no other superpriority claims other than the DIP Superpriority Claims and the Adequate Protection Claims.

(xiii)   <u>Credit Bidding</u>.  The Debtors intend to file a motion (the "<u>Bid Procedures Motion</u>") to, among other things, establish bidding procedures for a sale of all or substantially all of the RS Business and the Corrections Business (a "<u>363 Sale</u>").  No Debtor, or Debtor controlled affiliate, or successor to any of the foregoing, shall object to any DIP Lender's, DIP Agent's or Prepetition Secured Party's right to credit bid up to the full amount of its DIP Obligations, Prepetition Secured Obligations and/or Adequate Protection Obligations (as defined below), in each case including, without limitation, any accrued interest and expenses, in any sale, as applicable, whether such sale is effectuated through Bankruptcy Code section 363, in a chapter 11 or chapter 7 proceeding, under Bankruptcy Code section 1129, by a chapter 7 or chapter 11 trustee, or otherwise.

F.   <u>Findings Regarding the DIP Term Facility and Use of Cash Collateral</u>.

(i)   Good and sufficient cause has been shown for the entry of this Interim Order and for authorizing the Debtors to obtain financing pursuant to the DIP Credit Agreement and to use the Cash Collateral of the Prepetition Secured Parties and to authorize the provision of adequate protection.

(ii)   As set forth in the DIP Declaration and the First Day Declaration, the Debtors have an ongoing and immediate need to continue the use of Cash Collateral, and the need to obtain credit pursuant to the DIP Term Facility, in order to, among other things: (a) to pay transaction costs, fees and expenses that are incurred in connection with the DIP Term Facility, for working capital and general corporate purposes of the Borrower and the Guarantors, (b) to make adequate protection payments as set forth in paragraph 13 below, (c) to pay certain critical

vendors, pay costs relating to the sale of the Debtors' assets and make other payments authorized under first day orders approved by the Court, and (d) to pay professional fees due and payable under the DIP Term Facility and to finance administration of the Chapter 11 Cases. The Roll-Up Loans shall be used to repay the equivalent principal amount of the DIP Lenders' Prepetition First Lien Loans outstanding under the Prepetition First Lien Credit Agreement and Prepetition Second Lien Term Loans outstanding under the Prepetition Second Lien Credit Agreement, as applicable, subject to the terms of this Interim Order and the Final Order. Absent granting the relief set forth in this Interim Order, the Debtors' estates and their businesses will be irreparably harmed.

(iii)     As set forth in the DIP Declaration and the First Day Declaration, the Debtors are unable to obtain financing and other financial accommodations on more favorable terms under the circumstances from sources other than from the DIP Lenders under the DIP Credit Agreement and the DIP Term Loan Documents and are unable to obtain satisfactory unsecured credit allowable under Bankruptcy Code section 503(b)(1). The Debtors are also unable to obtain secured credit with liens equal or junior to existing liens and therefore must grant priming liens under Bankruptcy Code section 364(d)(1) and a DIP Superpriority Claim (as defined below) on the terms and conditions set forth in this Interim Order and the DIP Credit Agreement. The Roll-Up Loans, as provided for under the DIP Term Facility and this Interim Order, are appropriate because the DIP Lenders would not be willing to provide the DIP Term Facility or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Loans within the DIP Term Facility.

(iv)     Based on the Motion, the First Day Declaration, the DIP Declaration, and the record presented to the Court at the Hearing, the terms of the DIP Credit Agreement and DIP Term Loan Documents, and the terms of the adequate protection granted to the Prepetition Secured Parties as provided in this Interim Order are fair and reasonable under the circumstances, reflect

the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and provide the Debtors reasonably equivalent value and fair consideration.

(v) The Prepetition Secured Parties have consented to (or, as applicable, have been directed to consent to), upon entry of this Interim Order, the Debtors' entry into the DIP Term Facility, including the granting of priming liens and claims in connection therewith, and the continued use of Cash Collateral, on the terms and conditions set forth in this Interim Order.

(vi) The DIP Term Facility and the Debtors' continued use of Prepetition Collateral (including Cash Collateral), to fund the administration of the Debtors' estates, the continued operation of their businesses, and the incurrence and payment of any Adequate Protection Obligations (as defined below), including the granting of Adequate Protection Liens (as defined below), in accordance with the terms hereof and the Adequate Protection Claims (as defined below), to the Prepetition Secured Parties (and their successors and assigns) pursuant to this Interim Order, the DIP Credit Agreement and the DIP Term Loan Documents, have been negotiated in good faith and at arm's-length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Term Facility, the DIP Credit Agreement and the DIP Term Loan Documents, including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Credit Agreement and the DIP Term Loan Documents, and any DIP Obligations shall be deemed to have been extended by the DIP Agents and the DIP Lenders and their respective affiliates in good faith, as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e), and the DIP Agents and the DIP Lenders (and their successors and assigns) shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision

hereof is vacated, reversed, or modified, on appeal.  The Prepetition Secured Parties have agreed to the use of Cash Collateral in good faith and shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is reversed or modified on appeal.

G.      Permitted Prior Liens; Continuation of Prepetition Liens.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice any rights of any party in interest, including, but not limited to, any of the Debtors, the DIP Secured Parties or the Prepetition Secured Parties to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien or security interest. Subject to entry of the Final Order to the extent set forth therein, the right of a seller of goods to reclaim goods under Bankruptcy Code section 546(c) is not a Permitted Prior Lien and is expressly subject and subordinate to the DIP Liens.

H.      Sections 506(c) and 552(b).  Subject to entry of the Final Order, the Debtors and the DIP Secured Parties have agreed as a condition to the Debtors obtaining financing under the DIP Term Facility, as a material inducement to the DIP Secured Parties to agree to provide the DIP Term Facility, and in exchange for (a) the DIP Secured Parties' willingness to provide the DIP Term Facility to the extent set forth herein, (b) the DIP Agents' and DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve Out, (c) the Prepetition Secured Parties' agreement to subordinate their liens and Adequate Protection Claims to the DIP Obligations, and (d) the consensual use of Cash Collateral consistent with the Approved DIP Budget (as defined below) and the terms of this Interim Order, each of the DIP Secured Parties and the Prepetition Secured Parties have negotiated for, and the Debtors intend to seek, (1) a waiver

of any equities of the case exceptions or claims under Bankruptcy Code section 552(b) and a waiver of unjust enrichment and similar equitable relief as set forth below, and (2) a waiver of the provisions of Bankruptcy Code section 506(c) subject to the terms hereof.

I.      Immediate Entry.  Good and sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  Consummation of the DIP Term Facility and the use of Cash Collateral in accordance with this Interim Order, the DIP Credit Agreement and the DIP Term Loan Documents is in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.  Based upon the foregoing findings and conclusions, the Motion and the record before this Court with respect to the Motion, and after due consideration and good and sufficient cause appearing thereof:

**IT IS HEREBY ORDERED THAT**:

1.      Motion Granted.  The interim relief sought in the Motion is granted to the extent set forth herein.  Any and all objections to this Interim Order, to the extent not withdrawn, waived, settled, or otherwise resolved, and all reservations of rights included therein, are hereby overruled on the merits.

2.      Authorization of the DIP Term Facility and the DIP Term Loan Documents.

(a)      The Debtors are hereby expressly authorized and directed to enter into and perform under the DIP Credit Agreement and the other DIP Term Loan Documents, which are hereby approved.

(b)      Upon entry of this Interim Order, the Debtors are immediately authorized, subject to the terms and conditions of this Interim Order, the DIP Credit Agreement and the other DIP Term Loan Documents (any limitations on availability or borrowing under the DIP Credit Agreement and the other DIP Term Loan Documents), to borrow up to an aggregate principal

amount of $45,000,000 of New Money DIP Term Loans, to repay (i) Prepetition First Lien Loans in aggregate principal amount of $90,000,000 and (ii) Prepetition Second Lien Term Loans in aggregate principal amount of $1,125,000 (the foregoing (i) and (ii) is the Interim Roll-Up Amount) pursuant to the Roll-Up Ratios on a cashless basis (effective upon the Initial Draw) pursuant to the terms and provisions of the DIP Credit Agreement, the other DIP Term Loan Documents, and this Interim Order, and to incur and pay the principal, interest, premium, fees (including the DIP Fees (as defined below), indemnities, expenses and other amounts provided for in the DIP Credit Agreement, the other DIP Term Loan Documents, and this Interim Order, subject to any limitations on availability or borrowing under the DIP Credit Agreement and the other DIP Term Loan Documents, which shall be used for all purposes as permitted under the DIP Credit Agreement, the other DIP Term Loan Documents, and this Interim Order (including pursuant to the Approved DIP Budget.  Upon entry of this Interim Order and the Initial Draw, without any further action by the Debtors or any other party, the Debtors shall be authorized and deemed to have repaid (on a cashless basis) and thereby discharged the Interim Roll-Up Amount of Prepetition First Lien Loans and Prepetition Second Lien Term Loans, as applicable, using amounts borrowed by way of Roll-Up Loans, subject to the conditions set forth in the DIP Credit Agreement, the other DIP Term Loan Documents, and this Interim Order, including the Roll-Up Reduction Provision.

(c)     In furtherance of the foregoing and without further approval of this Court, the Debtors are authorized and directed to perform all acts, to make, execute, and deliver all instruments, certificates, agreements and documents (including, without limitation, the execution or recordation of pledge and security agreements, financing statements, and other similar documents) and to pay all reasonable and actual fees and expenses in connection with or that may

be reasonably required, appropriate or desirable for the Debtors' performance of their obligations under or related to the DIP Term Facility, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Credit Agreement and the other DIP Term Loan Documents and any collateral documents contemplated thereby;

(ii)    the non-refundable and irrevocable payment to the Fronting Lender (as defined below), the DIP Agents and the DIP Lenders, as the case may be, of all reasonable and documented fees and expenses, including the DIP Fees (as defined below) (which fees and expenses, in each case, were deemed to have been approved upon entry of this Interim Order, whether or not the fees and expenses arose before or after the Petition Date, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise), and any amounts due (or that may become due) in respect of the indemnification and expense reimbursement obligations, in each case referred to in the DIP Credit Agreement or the other DIP Term Loan Documents, including (A) with respect to the Backstop Parties, a commitment premium in an amount equal to 10% of the principal amount of each Backstop Party's respective Backstop Commitments in respect of the DIP Term Facility as, payable in kind, ratably based on their respective Backstop Commitments, earned and payable on the Closing Date when the Initial Term Loans are funded by such Backstop Party (the "DIP Commitment Premium"); (B) with respect to the DIP Lenders, a closing fee in an amount equal to 5% of the principal amount of the New Money DIP Term Loans, payable in kind, to each DIP Lender, ratably based on their respective DIP Commitments as follows: (x) on the Closing Date with respect to the Initial Term Loans funded by such DIP Lender on the Closing Date, and (y) on the Final New Money Funding Date with respect to the Delayed Draw Term Loans funded by such DIP Lender on the Final New Money Funding Date (the "Closing Fee"); (C) with respect to the DIP Agents, an agency fee as set forth in the letter agreement between the DIP Agents and the Debtors (the "Agency Fee"); (D) with respect to the Fronting Lender, a fronting fee as set forth in the letter agreement between UBS AG, Stamford Branch (the "Fronting Lender") and the Debtors (the "Fronting Fee" and together with the Agency Fee, the DIP Commitment Premium and the Closing Fee, the "DIP Fees") and (E) with respect to the DIP Lenders and DIP Agents, fees of the Backstop Parties' counsel, investment bankers and financial advisors and all reasonable and documented costs and expenses as may become due from time to time under the DIP Credit Agreement, the other DIP Term Loan Documents and this Interim Order, including, without limitation, fees and expenses of professionals retained by the DIP Agents and the DIP Lenders, as provided for in the DIP Credit Agreement, the other DIP Term Loan Documents and this Interim Order, subject to paragraph 22 below;

(iii)    the granting of all liens and claims with respect to, and the making of any payments in respect of the Adequate Protection Obligations (as defined below) to the extent provided for in this Interim Order; and

(iv)    the performance of all other acts required under or in connection with the DIP Credit Agreement and the DIP Term Loan Documents.

3.    <u>DIP Obligations</u>.  Upon execution and delivery of the DIP Term Loan Documents, the DIP Term Loan Documents shall constitute legal, valid, binding, and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of this Interim Order, the DIP Credit Agreement and the other DIP Term Loan Documents, against the Debtors and their estates and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases or any other chapter of the Bankruptcy Code, or in any other proceedings superseding or related to any of the foregoing.  The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall cease on the Termination Declaration Date (as defined below) or the occurrence of any event or condition set forth in paragraphs 16 and 17 of this Interim Order; *provided, however*, that the Debtors may utilize Cash Collateral for up to five (5) additional business days in amounts not to exceed the Approved DIP Budget pending a hearing solely for the purpose of making payroll of the Debtors and to fund critical expenses of the Debtors necessary to avoid immediate and irreparable harm to the Debtors' estates; *provided, further* that other than as permitted in the preceding proviso, during such period, the Debtors shall not utilize any Cash Collateral to contest or interfere with the DIP Agents' or DIP Lenders' enforcement of any rights provided under this Interim Order.  Except as permitted by this Interim Order, no obligation, payment, transfer, or grant of security hereunder or under the DIP Credit Agreement or the other DIP Term Loan Documents to the DIP Agents and/or the DIP Lenders shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under applicable law

(including, without limitation, under Bankruptcy Code sections 502(d), 544, and 547 to 550 or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or challenge, whether under the Bankruptcy Code or any other applicable law or regulation by any person or entity for any reason.

4.    DIP Liens.   Subject to the provisions set forth in this paragraph 4 effective immediately upon entry of this Interim Order, the DIP Obligations shall be secured by valid, binding, continuing enforceable, fully-perfected, non-avoidable, automatically and properly perfected liens on, and security interests in (such liens and security interests, the "DIP Liens"), subject only to the Carve Out, all assets (whether tangible, intangible, real, personal or mixed) of the Debtors (and their bankruptcy estates) of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date (including the Prepetition Collateral), now owned or hereafter acquired, including all accounts, chattel paper, claims and causes of action (including, subject to entry of the Final Order, any proceeds or property recovered, unencumbered, or otherwise, from claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code whether pursuant to federal law or applicable state law (collectively, the "Avoidance Actions"), whether by judgment, settlement or otherwise), commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods (including fixtures), instruments, inventory, investment property, money, cash, cash equivalents, and all deposit accounts, securities accounts, commodities accounts and lockboxes together with all money, cash, securities and other

investment property on deposit from time to time therein, letters of credit, letter-of-credit rights and other supporting obligations, real property, books and records, and to the extent not otherwise included, all substitutions, replacements, accessions, products and other proceeds and products (whether tangible or intangible and including, without limitation, insurance proceeds (including all proceeds from any directors'/officers' liability insurance policies), licenses, royalties, income, payments, claims, damages and proceeds of suit) of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing, the right, title or interest in any capital stock, investment property, partnership, membership or other equity or similar interests in any entity (whether or not such entity is a Debtor), including all capital stock, securities accounts, investment property, partnership, and membership, other equity or similar interests (and including all rights, beneficial interests, causes of action and choses of action related thereto) of the Debtors, whether existing as of the Petition Date or after acquired (all such property, the "DIP Collateral"); *provided*, the Limited Guarantors shall not be deemed to have granted DIP Liens solely with respect to the Roll-Up Loans (but, for the avoidance of doubt, shall be deemed to have granted DIP Liens with respect to the New Money DIP Term Loans and all other DIP Obligations); and *provided, further*, that the DIP Agents and the Prepetition Agents shall have a security interest in any residual cash balance remaining in the Carve Out Reserves after all obligations benefitting from the Carve Out have been indefeasibly paid in full in cash pursuant to a final non-appealable order of this Court (or such other Court of competent jurisdiction), which residual balance shall be paid to the DIP Agents for application in accordance with the DIP Credit Agreement and the other DIP Term Loan Documents, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all commitments under the DIP Term Facility have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in

accordance with their rights and priorities as set forth herein (such security interest on residual cash balances, in accordance with this proviso, the "Carve Out Security Interest").  The DIP Liens will otherwise have the following priorities:

(a)    Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected first-priority senior security interest in and lien upon all of the DIP Collateral, including, without limitation, all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to Prepetition Liens or any other valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), subject to and subordinate in all respects to the Carve Out and as to the Carve Out Reserves and funds therein, to the extent of any Carve Out Security Interest;

(b)    Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected junior priority security interest in and lien upon all of the DIP Collateral, including, without limitation, all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter created, acquired or arising or wherever located, that, on or as of the Petition Date is subject to (i) Prepetition Liens or (ii) any other valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)) (such liens in the preceding clause (ii), the "Permitted Prior Liens"), subject to and subordinate in all respects to the Carve Out and as to the Carve Out Reserves and funds therein, to the extent of any Carve Out Security Interest; and

(c)    Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, fully perfected first-priority priming security interest and lien (the "Priming Liens") on all DIP Collateral, whether in existence on the Petition Date or thereafter

created, acquired, or arising and wherever located, to the extent that such DIP Collateral is subject to any of the Prepetition Liens, subject to and subordinate in all respects to the Carve Out and as to the Carve Out Reserves, and funds therein, to the extent of any Carve Out Security Interest. The Priming Liens shall prime in all respects the liens and security interests of the Prepetition Secured Parties, with respect to the Prepetition Collateral (including, without limitation, the Prepetition Liens, the Adequate Protection Liens granted to the Prepetition Secured Parties, and any purported prepetition liens (the "Primed Liens"). Notwithstanding anything herein to the contrary, the Priming Liens (w) shall be subject to and subordinate in all respects to the Carve Out and will have no recourse to the Carve Out Reserves, or the funds therein (other than to the extent of the Carve Out Security Interest on the terms therein), and (x) shall be subject and junior to the Permitted Prior Liens in all respects and (y) shall be senior in all respects to the Primed Liens, and (z) shall also be senior to the Adequate Protection Liens.

5.     DIP Superpriority Claims. Subject in all respects to the Carve Out, pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b) and any and all administrative expenses or other claims ("Administrative Expense Claims") arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject to entry of the Final Order to the extent set forth therein), 507(a), 507(b), 726, 1113, or 1114 (including the Adequate Protection Obligations (as defined below)), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which

allowed claims (the "<u>DIP Superpriority Claims</u>") shall for purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b), and which DIP Superpriority Claims shall be payable from and have recourse to all of the DIP Collateral and all proceeds thereof in accordance with the DIP Credit Agreement and the other DIP Term Loan Documents, subject only to payment of the Carve Out and provided that the DIP Superpriority Claims will have no recourse to the Carve Out Reserves, or the funds therein except to the extent of any Carve Out Security Interest on the terms therein.  The DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) if this Interim Order or any provision hereof is vacated, reversed, or modified on appeal.

6.      <u>DIP Budget Compliance and Reporting</u>.

(i)   Attached to this Interim Order as **<u>Exhibit C</u>** is (i) a 13-week cash forecast in form and substance satisfactory to the Backstop Parties, which shall consist of forecasted receipts and disbursements (including, without limitation, professional fees) of the Debtors for the 13 weeks commencing on the Petition Date (the "<u>Initial DIP Budget</u>").  The Debtors shall deliver an updated 13-week cash forecast of the Loan Parties on a consolidated basis in form and substance satisfactory to the Required Lenders (an "<u>Updated DIP Budget</u>", and upon the written approval (email being sufficient) by the Required Lenders or their advisors, and together with the Initial DIP Budget, collectively, the "<u>Approved DIP Budget</u>"), which proposed Updated DIP Budget shall be delivered to the Required Lenders every four weeks no later than five calendar days prior to the Monday of the first week covered on such proposed Updated DIP Budget (it being understood that the first delivery of the proposed Updated DIP Budget shall be on or prior to December 4, 2024 with respect to the 13-week period starting from December 9, 2024 and the second delivery of the

proposed Updated DIP Budget shall be on or prior to January 2, 2025 with respect to 13-week period starting from January 6, 2025).  Any amendments, supplements or modifications to the Approved DIP Budget or Variance Report (as defined below) shall be subject to the prior written approval (email being sufficient) of the Required Lenders in their sole discretion prior to the implementation thereof.  If the Required Lenders have not approved in writing (email being sufficient) a proposed Updated DIP Budget within five (5) business days of receipt of such proposed Updated DIP Budget, the then-current Approved DIP Budget shall continue to be the Approved DIP Budget.  Until any such updated budget, amendment, supplement or modification has been approved by the Required Lenders, the Debtors shall be subject to and be governed by the terms of the Approved DIP Budget then in effect.

(ii) <u>Variance Reports</u>.  The Debtors shall at all times comply with the Approved DIP Budget, subject to the Prohibited Variances (as defined below).  Commencing on Thursday (or the immediately subsequent business day if such Thursday is not a business day) of the third full calendar week after the date of entry of the Interim Order by no later than 5:00 p.m. (prevailing Eastern Time) (the "<u>Initial Variance Report Date</u>"), and on each Thursday (or the immediately subsequent business day if such Thursday is not a business day) thereafter, by no later than 5:00 p.m. (prevailing Eastern time) (together with the Initial Variance Report Date, a "<u>Variance Report Date</u>"), the Debtors or their advisors shall deliver by email to the Backstop Parties' advisors and, on a non-cleansing basis, the DIP Lenders, a variance report (each, a "<u>Variance Report</u>") for the immediately preceding Variance Test Period (as defined below) (i) setting forth, in reasonable detail, "receipts" and "disbursements" of the Debtors and any variances between the actual amounts and those set forth in each

corresponding cumulative two-week, three-week or four-week period in the then in-effect Approved DIP Budget for such Variance Test Period and (ii) describing any material variances.  "Variance Test Period" shall mean, beginning after the first full cumulative two-week period after the Petition Date, which shall be covered by the first Variance Report to be delivered hereunder (the "Initial Variance Test Period"), each successive cumulative two-week, three-week, or four-week period, as applicable, which shall be covered by each successive Variance Report to be delivered hereunder with respect to the then-in-effect Approved DIP Budget.  For the avoidance of doubt, the Variance Test Period for the then-in-effect Approved DIP Budget shall never be less than a cumulative two-week period and shall reset to a cumulative two-week period beginning with the first full cumulative two-week period after each Variance Test Period comprised of four cumulative weeks; provided, that if the Required Lenders have not approved a proposed Updated DIP Budget in accordance with the procedures below, the Variance Test Period shall continue to extend using the cumulative four-week period from the then-in-effect Approved DIP Budget, plus each successive week until a proposed Updated DIP Budget becomes the Approved Budget.

(iii) Variance Testing. With respect to the Initial Variance Test Period and each cumulative two-week Variance Test Period thereafter, (i) the aggregate receipts of the Debtors shall not be less than 80.0% of the estimated receipts for such items in the then-in-effect Approved DIP Budget and (ii) the aggregate operating disbursements of the Debtors (exclusive of professional fees and expenses, and any amounts required to be cash collateralized to maintain surety bonds, letters of credit or similar arrangements) shall not exceed 120.0%.  With respect to an any Variance Test Period of three cumulative weeks

or more, (i) the aggregate receipts of the Debtors shall not be less than 85.0% of the estimated receipts for such items in the then-in-effect Approved DIP Budget and (ii) the aggregate operating disbursements of the Debtors (exclusive of professional fees and expenses, and any amounts required to be cash collateralized to maintain surety bonds, letters of credit or similar arrangements) shall not exceed 115.0% (any variance prohibited in this paragraph, the "Prohibited Variance").

Except as otherwise agreed to by the DIP Agents, acting at the direction of the Required Lenders, or the requisite Prepetition Secured Parties, as applicable, or as expressly permitted herein or in the DIP Credit Agreement or the other DIP Term Loan Documents, the Debtors' use of the DIP Term Loans and Cash Collateral shall only be permitted pursuant to the terms of, and in accordance with, the Approved DIP Budget.  The DIP Lenders and the DIP Agents or the Prepetition Secured Parties, as applicable, shall have no obligation with respect to the Debtors' use of the DIP Term Loans and Cash Collateral, and shall not be obligated to ensure or monitor the Debtors' compliance with the Approved DIP Budget or to pay (directly or indirectly from the DIP Term Loans or Cash Collateral) any expenses incurred or authorized to be incurred pursuant to the Approved DIP Budget.  The consent of the DIP Lenders or DIP Agents or the Prepetition Secured Parties, as applicable, to the use of DIP Term Loans or Cash Collateral pursuant to this Interim Order and the DIP Credit Agreement shall not be construed as consent to the use of any DIP Term Loans or Cash Collateral after the occurrence of an Event of Default (as defined in the DIP Credit Agreement) (other than funding the Carve Out as set forth herein), regardless of whether the aggregate funds shown on the Approved DIP Budget have been expended.  The Debtors shall provide the DIP Lenders with all reporting and other information required to be provided to the DIP Agents under the DIP Credit Agreement and the other DIP Term Loan Documents.  In addition to, and without

limiting, whatever rights to access the DIP Agents and the DIP Lenders have under the DIP Credit Agreement or the other DIP Term Loan Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, advisors, agents, and employees of the DIP Agents and the DIP Lenders to:  (i) have access to and inspect the Debtors' book and records; and (ii) discuss the Debtors' affairs, finances, and condition with the Debtors' attorneys and financial advisors.

7. <u>Carve Out</u>.

(a) <u>Carve Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Bankruptcy Code section 726(b)  (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") including any restructuring fee, sale fee, financing fee or other success fee that was fully earned, due and payable to estate professionals prior to the delivery of a Carve Out Trigger Notice ("<u>Success Fees</u>"), incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>"), the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>"), and, if a patient care ombudsman (a "<u>Patient Ombudsman</u>") is appointed in the Chapter 11 Cases by order of this Court, by the Patient Ombudsman pursuant to section 327, 328, or 333 of the Bankruptcy Code (together with the Patient Ombudsman, the "<u>Patient Ombudsman Professionals</u>," and together with the Debtor Professionals and the Committee Professionals, the "<u>Professional Persons</u>") at any time

before or on the first business day following delivery by the DIP Administrative Agent (or, if following the indefeasible payment in full, in cash of the DIP Obligations and the termination of all commitments under the DIP Term Facility, the Prepetition Agents) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3,000,000 incurred after the first business day following delivery by the DIP Administrative Agent (or, if following the indefeasible payment in full, in cash of the DIP Obligations and the termination of all commitments under the DIP Term Facility, the Prepetition Agents) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  Within three (3) business days after delivery of a Carve Out Trigger Notice, each Professional Person shall provide the Debtors with an estimate of its unpaid fees and expenses as reasonably determined by a good faith estimate of the applicable Professional Person to calculate the Carve Out.  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agents (or, if following the indefeasible payment in full, in cash of the DIP Obligations and the termination of all commitments under the DIP Term Facility, the Prepetition Agents) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following (x) the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Term Facility or (y) if the DIP Obligations have been indefeasibly paid in full, in cash, and all commitments under the DIP Term Facility have been terminated, stating that the Post-Carve Out Trigger Notice Cap has been invoked.  Notwithstanding the foregoing, the Carve Out shall not include, apply to or be available for any fees or expenses

incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the Prepetition Secured Parties or any of the DIP Lenders or DIP Agents, including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the Prepetition Credit Documents in favor of the Prepetition Secured Parties (whether in such capacity or otherwise) or the DIP Term Loan Documents in favor of the DIP Lenders or the DIP Agents, including, without limitation, for lender liability or pursuant to Bankruptcy Code sections 105, 510, 544, 547, 548, 549, 550, or 552, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the Prepetition Secured Parties, DIP Lenders, or DIP Agents hereunder; (c) attempts to prevent, hinder or otherwise delay any of the Prepetition Secured Parties', DIP Lenders', or DIP Agents' assertion, enforcement or realization upon any Collateral in accordance with the Prepetition Credit Documents, the DIP Credit Agreement, the other DIP Term Loan Documents, or this Interim Order; or (d) paying any amount on account of any claims arising before the Petition Date unless such payments are approved by an order of this Court.

(b)     Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the DIP Agents (or, if following the indefeasible payment in full, in cash of the DIP Obligations and the termination of all commitments under the DIP Term Facility, the Prepetition Agents) to the Debtors with a copy to counsel to the DIP Lenders and counsel to the Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for Delayed Draw Term Loans from DIP Lenders having DIP Commitments (each as defined in the DIP Credit Agreement) (on a pro rata basis based on the then outstanding DIP Commitments), in an amount equal to the then unpaid amounts of the

Allowed Professional Fees (any such amounts actually advanced shall constitute Delayed Draw Term Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agents in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for Delayed Draw Term Loans from DIP Lenders having DIP Commitments (on a pro rata basis based on the then outstanding DIP Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute Delayed Draw Term Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agents in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. On the first business day after the DIP Agents gives such notice to such DIP Lenders, notwithstanding anything in the DIP Credit Agreement or other DIP Term Loan Document to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for the borrowing of Delayed Draw Term Loans under the DIP Term Facility, any termination of the DIP Commitments following an Event of Default, or the occurrence of the

Maturity Date, each DIP Lender with an outstanding New Money DIP Commitment (on a pro rata basis based on the then outstanding DIP Commitments) shall make available to the DIP Agents such DIP Lender's pro rata share with respect to such borrowing in accordance with the terms of the DIP Term Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agents for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties (as defined in the DIP Credit Agreement) in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agents for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP Term Loan Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 7, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 7, prior to making any payments

to the DIP Agents or the Prepetition Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Term Loan Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agents and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agents for application in accordance with the DIP Term Loan Documents or, if applicable, to the Prepetition Agents for the benefit of the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Approved DIP Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.

(c) <u>Carve Out Priority</u>. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the terms of the DIP Term Facility, or in any prepetition secured facilities, the Carve Out shall be senior to all liens and claims securing the DIP Term Facility, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations. Notwithstanding the payment of any amounts contained in the Carve Out Reserves (including any residual amounts contained therein) to the Prepetition Secured Parties as

contemplated by this paragraph 7, all parties' rights with respect to any such payments solely to the Prepetition Secured Parties are expressly preserved.

(d)  <u>Payment of Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees, or on or following the Termination Declaration Date if on account of Allowed Professional Fees incurred on or prior to the Termination Declaration Date, shall not reduce the Carve Out.

(e)  <u>No Direct Obligation to Pay Allowed Professional Fees</u>.  None of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)  <u>Payment of Carve Out On or After the Termination Declaration Date.</u>  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Term Loan Documents, the Bankruptcy Code, and applicable law.

(g)     Notwithstanding anything to the contrary in this Interim Order, the Debtors' obligations to the DIP Secured Parties and Prepetition Secured Parties and the liens, security interests, and superpriority claims granted herein, under the DIP Term Loan Documents, and/or under the Prepetition Credit Documents, including, without limitation, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Prepetition Liens, the Adequate Protection Obligations, and the Prepetition Secured Obligations, shall be subject in all respects and subordinate to the Carve Out.

8.      Limitation on Charging Expenses against Collateral.  Subject to entry of the Final Order and effective as of the Petition Date, in light of the agreement of the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties to allow (i) the Debtors to use Cash Collateral as provided for herein, (ii) the Carve Out, and (iii) for the subordination of the Primed Liens to the DIP Liens, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve Out) pursuant to Bankruptcy Code section 506(c) or any similar principle of law, without the prior written consent of the DIP Agents, the Required Lenders and the Prepetition Agents, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence.

9.      No Marshaling/Application of Proceeds.  Subject to entry of the Final Order and effective as of the Petition Date, the DIP Agents and the Prepetition Agents shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition Collateral in accordance with the provisions of the Final Order, the DIP Credit Agreement, the other DIP Term Loan Documents, and the Prepetition Credit Documents, as applicable, and in no event shall the DIP

Agents, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, as applicable.

10.     Equities of the Case.  Subject to entry of a Final Order and effective as of the Petition Date, in light of, among other things, the agreement of the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties to allow the Debtors to use Cash Collateral on the terms set forth herein (i) the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties shall be entitled to the rights and benefits of Bankruptcy Code section 552(b), if any, and (ii) the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to such parties with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable.

11.     Payments Free and Clear.  Any and all payments or proceeds remitted to the DIP Agents on behalf of the DIP Lenders pursuant to the provisions of this Interim Order, the DIP Credit Agreement and any other DIP Term Loan Document or any subsequent order of this Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including, without limitation, and subject only to entry of a Final Order to the extent provided therein, any claim or charge arising out of or based on, directly or indirectly, Bankruptcy Code sections 506(c) or 552(b), whether asserted or assessed by, through or on behalf of the Debtors.

12.     Use of Cash Collateral.  The Debtors are hereby authorized to use all Cash Collateral solely in accordance with this Interim Order, the DIP Credit Agreement, and the other DIP Term Loan Documents, to the extent set forth in the Approved DIP Budget, including, without limitation, to make payments on account of the Adequate Protection Obligations (as defined below) and other obligations provided for in this Interim Order, the DIP Credit Agreement, and

the other DIP Term Loan Documents.  Except as pursuant to the Approved DIP Budget, or on the terms and conditions of this Interim Order, or an order of the Court, or as otherwise agreed to by the DIP Agents (acting at the direction of the Required Lenders), or, following payment in full in cash of the DIP Obligations and termination of the DIP Term Facility, the Prepetition Agents (acting at the direction of the requisite Prepetition Secured Parties, as applicable), the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral.

13.     <u>Adequate Protection for the Prepetition Secured Parties</u>.  Subject in all respects to the Carve Out and the terms of this Interim Order, pursuant to Bankruptcy Code sections 361, 363(e) and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for any postpetition diminution in value of such interests (such diminution, a "<u>Diminution in Value</u>"), resulting from the imposition of the Priming Liens on the Prepetition Collateral, the Carve Out, the sale, lease or use of the Prepetition Collateral (including Cash Collateral), and any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition Agents and the Prepetition Secured Parties, are hereby granted the following (collectively, the "<u>Adequate Protection Obligations</u>"); *provided* that the Prepetition Agents shall have no recourse to the Carve Out Reserves except to the extent of the Carve Out Security Interests on the terms herein, and the adequate protection will otherwise include:

(a)     <u>Adequate Protection Liens</u>.  As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable, non-avoidable, effective and automatically perfected upon the Petition Date additional and replacement liens on, and security interest in the DIP Collateral, (the "<u>Adequate Protection Liens</u>"), subject in all cases to the priorities set forth on **<u>Exhibit D</u>** hereto, without the necessity of the execution by the Debtors

(or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents.  The Adequate Protection Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any lien or security interest arising after the Petition Date, except as expressly provided for in this Interim Order.

(b)  Adequate Protection Claims.  As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), an allowed Administrative Expense Claim in the Chapter 11 Cases of each of the Debtors to the extent of any postpetition Diminution in Value (the "Adequate Protection Claims").  The Adequate Protection Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof.  The Adequate Protection Claims shall have the same relative priorities as the Adequate Protection Liens (as set forth on **Exhibit D**) and be subject to the Carve Out and the DIP Superpriority Claims in all respects.  Except as set forth in this Interim Order, the Adequate Protection Claims will not be junior or *pari passu* to any other claims and shall have priority over all Administrative Expense Claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation and to the extent permitted by law, Administrative Expense Claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 506(c) (subject to entry of the Final Order to the extent provided for therein), 507(a), 507(b), 546(d) (subject to entry of the Final Order to the extent provided for therein), 726, 1113 and 1114.  The Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Claims from the Debtors under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP

Obligations have been indefeasibly paid in full, in cash, or as otherwise provided in the DIP Credit Agreement or the DIP Term Loan Documents.

(c)     Fees and Expenses.    As further adequate protection, the Debtors are authorized and directed to pay, without further Court order, the reasonable and documented fees and expenses (the "Adequate Protection Fees"), whether incurred before or after the Petition Date, of (A) (i) Akin Gump Strauss Hauer & Feld, LLP, Houlihan Lokey, Inc., and Ankura Consulting Group, LLC, in their capacities as lead counsel, investment banker, and financial advisor, respectively, to the Ad Hoc Group, and one local counsel to the Ad Hoc Group in each applicable jurisdiction, and (B) Cahill Gordon & Reindel LLP, as legal counsel to the Prepetition Agents, and Norton Rose Fulbright US LLP, as local counsel to the Prepetition Agents.  Such professionals shall not be required to file applications or motions with, or obtain approval of, this Court for compensation and reimbursement of fees and expenses; *provided, however*, that any time such professionals fees payment of fees and expenses from the Debtors, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to counsel to the Debtors, the U.S. Trustee and counsel to the Committee (collectively, the "Fee Notice Parties").  If no objection to payment of the requested Adequate Protection Fees and expenses is made, in writing (email being sufficient), by any of the Fee Notice Parties within ten (10) calendar days after delivery of such invoices (the "Fee Objection Period"), then such invoice shall be promptly paid, without further order of, or application to, this Court or notice to

any other party, and, in any case, within five (5) calendar days following the expiration of the Fee Objection Period and shall not be subject to any further review, challenge, or disgorgement. If within the Fee Objection Period, a Fee Notice Party sends to the affected professional a written objection to such invoice, then only the disputed portion of such Adequate Protection Fees shall not be paid as set forth above until the objection is resolved by the applicable parties in good faith or by order of this Court.

(d)     Information Rights. As additional adequate protection to the Prepetition Secured Parties, the Debtors shall provide the Prepetition Agents and the advisors to the Prepetition Lenders with all financial reporting and other periodic reporting that is required to be provided to the DIP Agents and the DIP Lenders, as applicable, under the DIP Credit Agreement or the other DIP Term Loan Documents and in accordance with the time periods set forth therein.

14.     Perfection of DIP Liens and Adequate Protection Liens.

(a)     The DIP Agents and the Prepetition Agents are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) security agreements, pledge agreements, financing statements, intellectual property filings, deeds of trust, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the DIP Liens and the Adequate Protection Liens. Whether or not the DIP Agents or the Prepetition Agents shall, in their sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such DIP Liens and Adequate Protection Liens shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Interim Order), at the time and on the date

45

of this Interim Order.  Upon the request of the DIP Agents or the Prepetition Agents, as applicable, each of the Prepetition Secured Parties and the Debtors, without any further consent of any party, is authorized to take, execute, deliver, and file such instruments (in the case of the Prepetition Secured Parties, without representation or warranty of any kind) to enable the DIP Agents or the Prepetition Agents, as applicable, to further validate, perfect, preserve and enforce the DIP Liens and the applicable Adequate Protection Liens, respectively.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A copy of this Interim Order may, in the discretion of the DIP Agents or the Prepetition Agents, as applicable, be filed with or recorded in filing or recording offices in addition to or in lieu of such security agreements, pledge agreements, financing statements, intellectual property filings, deeds of trust, mortgages, depository account control agreements, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(c)     Subject to entry of the Final Order, and to the extent provided therein, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any the Debtors' interests in any lease, license, or other agreement, or the proceeds thereof, or other collateral related thereto in connection with the granting of the DIP Liens and the Adequate Protection Liens, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Thereupon, any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on the Debtors' interests in any lease, license, or other agreement or

the proceeds of any assignment, and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreement or this Interim Order.

15.     Section 507(b) Reservation.  Nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Chapter 11 Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

16.     DIP Termination Event.  Subject to any applicable notice periods and other terms set forth in paragraph 17, solely to the extent the DIP Obligations have not been indefeasibly paid in full in cash or satisfied in connection with one or more sales of substantially all of the Debtors' assets, then the DIP Obligations shall accelerate and become due and payable in full and the DIP Commitments and use of Cash Collateral will terminate, in each case, without further notice or action by the Court following the earliest to occur of any of the following (each a "DIP Termination Event"):  (i) the occurrence and continuation of any Event of Default, which Events of Default are explicitly incorporated by reference into this Interim Order; (ii) the Debtors' failure to comply with any material provision of this Interim Order; (iii) the occurrence of the Maturity Date (as defined in the DIP Credit Agreement); (iv) the entry of an order authorizing the use of Cash Collateral of the DIP Lenders on a non-consensual basis or financing under Bankruptcy Code section 364 that is *pari passu* or senior to the DIP Term Loans or the Prepetition Term Loans or the filing by the Debtors of a motion seeking such authority; and (v) unless otherwise agreed to in writing by the Required Lenders in their sole discretion, the consummation

of a sale or disposition of any material assets of the Debtors other than (a) a sale or disposition in the ordinary course of business or (b) pursuant to the terms of the Restructuring Support Agreement.

17.     <u>Remedies Upon a DIP Termination Event</u>.  The Debtors shall promptly provide notice to counsel to the DIP Agents, the DIP Lenders and the Prepetition Agents of the occurrence of any DIP Termination Event.  Upon the occurrence of a DIP Termination Event (regardless of whether the Debtors have given the notice described in the previous sentence), and following two (2) business days' written notice (email being sufficient) by the DIP Collateral Agent to lead restructuring counsel to the Debtors, lead restructuring counsel to the Committee (if any), and the U.S. Trustee, and the DIP Administrative Agent (acting at the direction of the Required Lenders) may take any or all of the following actions, unless the Court orders otherwise prior to the expiration of such two (2) business day notice period: (i) the Debtors shall be charged the default interest rate set forth in the DIP Credit Agreement; (ii) the commitment of each DIP Lender to make DIP Term Loans will be terminated (to the extent any such commitment remains under the DIP Term Facility) and all obligations under the DIP Term Facility shall become due and payable; (iii) the Debtors' authority to use Cash Collateral shall immediately terminate, except that the Debtors may use Cash Collateral to (a) fund the Carve Out and (b) make payroll of the Debtors and fund critical expenses of the Debtors necessary to avoid immediate and irreparable harm to the Debtors' estates, in each case in accordance with the terms of the Approved DIP Budget; and (iv) the DIP Lenders shall be required to file a motion with the Court seeking emergency relief from the automatic stay (the "<u>Stay Relief Motion</u>") upon no less than three (3) business days' written notice (the "<u>Notice Period</u>") to counsel to the Debtors, the U.S. Trustee, and the Committee. At the hearing on the Stay Relief Motion, the Court may fashion any appropriate remedy, including

that (i) the DIP Collateral Agent, acting at the direction of the Required Lenders, may exercise any rights and remedies against the DIP Collateral available to it under this Interim Order, the DIP Credit Agreement, the other DIP Term Loan Documents, and applicable non-bankruptcy law, and the DIP Agents, acting at the direction of the Required Lenders, and the DIP Lenders may exercise such other rights available to them under the DIP Term Loan Documents or this Interim Order, as applicable, and (ii) the Prepetition Secured Parties may exercise any rights and remedies in accordance with the Prepetition Credit Documents and applicable non-bankruptcy law and this Interim Order to satisfy the Prepetition Secured Obligations, the Adequate Protection Claims, and any other Adequate Protection Obligations, subject to the DIP Obligations, the DIP Superpriority Claims and, in each case, subject to the Carve Out.  The DIP Agents and the DIP Lenders agree not to oppose a request by the Debtors for an expedited hearing filed during such Notice Period to determine whether a DIP Termination Event has occurred in accordance with this Interim Order, the DIP Credit Agreement, or the other DIP Term Loan Documents.

18.     <u>Joint and Several</u>.  The Debtors are jointly and severally liable for the DIP Obligations, Adequate Protection Obligations, and all other obligations hereunder.

19.     <u>No Waiver for Failure to Seek Relief</u>.  The failure or delay of the Debtors, the DIP Agents, the DIP Lenders or any of the Prepetition Secured Parties to exercise rights and remedies under this Interim Order, the DIP Credit Agreement, the other DIP Term Loan Documents, the Prepetition Credit Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

20.     <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)     Subject to the Carve Out, and other than as set forth in this Interim Order, neither the DIP Liens nor the Adequate Protection Liens shall be made subject to or *pari passu*

with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and neither the DIP Liens nor the Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(b)     In the event this Interim Order or any provision hereof is reversed or modified on appeal, the validity and priority of any liens or claims granted to the Prepetition Secured Parties hereunder arising prior to the effective date of any such reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Secured Parties shall be entitled to the protections afforded in Bankruptcy Code section 364(e).

(c)     Subject to the Carve Out, unless and until all DIP Obligations, Prepetition Secured Obligations, and Adequate Protection Obligations are indefeasibly paid in full, in cash, or all commitments under the DIP Credit Agreement are otherwise terminated in accordance with the terms thereof, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:  (i) except as permitted under the DIP Credit Agreement or the other DIP Term Loan Documents, or with the prior written consent of the DIP Agents (acting at the direction of the Required Lenders) (x) any modification, stay, vacatur, or amendment of this Interim Order, (y) a priority claim for any administrative expense, secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a), or 507(b)) in any of the Chapter 11 Cases, equal or superior to the DIP Superpriority Claims, the Adequate Protection Claims, and the Prepetition Secured Obligations

(or the liens and security interests secured such claims and obligations), or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Credit Agreement and the other DIP Term Loan Documents, any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens, or the Prepetition Liens, as the case may be; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Credit Agreement, the other DIP Term Loan Documents and this Interim Order (including compliance with the Approved DIP Budget); (iv) an order converting or dismissing any of the Chapter 11 Cases; (v) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (vi) an order appointing an examiner with expanded powers in any of the Chapter 11 Cases.  Each Debtor irrevocably waives any right to seek any amendment, modification or extension of this Interim Order without the prior written consent of the DIP Agents (acting at the direction of the Required Lenders in their sole discretion), and no such consent shall be implied by any action, inaction or acquiescence of the applicable DIP Agents or the DIP Lenders.

(d)     Notwithstanding any order dismissing the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims and the other administrative claims granted pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Claims, and other administrative claims granted pursuant to this Interim Order, shall notwithstanding such dismissal, remain binding on all parties in interest); and (y) this Court shall retain jurisdiction,

notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(e)    Except as expressly provided in this Interim Order, the DIP Credit Agreement or in the other DIP Term Loan Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims and all other rights and remedies of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order, the DIP Credit Agreement and the DIP Term Loan Documents shall survive, shall maintain their priority as provided in this Interim Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of the Chapter 11 Cases or by any other act or omission, or (ii) the entry of an order confirming a plan in any of the Chapter 11 Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order, the DIP Credit Agreement and the DIP Term Loan Documents shall continue in the Chapter 11 Cases, in any successor cases under any chapter of the Bankruptcy Code, if the Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Claims and all other rights and remedies of the DIP Agents, DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the DIP Lenders).  Notwithstanding anything to the contrary in this Interim Order, the DIP Credit

Agreement or the DIP Term Loan Documents, nothing in this Interim Order, the DIP Credit Agreement or the DIP Term Loan Documents shall affect any right of any DIP Lender to object to any sale of the Debtors' assets or chapter 11 plan that does not pay the DIP Obligations and DIP Superpriority Claims in full, and all such rights are expressly preserved.

21.     <u>Good Faith Under Bankruptcy Code Section 364(e); No Modification or Stay of this Interim Order</u>.  The DIP Agents, DIP Lenders and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order and are entitled to rely upon the protections granted herein and by Bankruptcy Code section 364(e).  Based on the findings set forth in this Interim Order and the record made during the Hearing, and in accordance with Bankruptcy Code section 364(e), in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Agents, DIP Lenders and Prepetition Secured Parties are entitled to the protections provided in Bankruptcy Code section 364(e).  Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.

22.     <u>Expenses and Indemnification</u>.

(a)     The Debtors are authorized and directed to pay, without further Court order, the reasonable and documented fees and expenses whether incurred before or after the Petition Date, by professionals or consultants retained by the DIP Agents and the DIP Lenders, including the fees and expenses of (i) (a) Akin Gump Strauss Hauer & Feld, LLP, Houlihan Lokey, Inc. and Ankura Consulting Group, LLC, in their capacities as lead counsel, investment banker and financial advisor, respectively, to the Backstop Parties and the DIP Lenders and (b) one local counsel to the Backstop Parties and DIP Lenders in each applicable jurisdiction, and (ii) (x) Cahill

Gordon & Reindel LLP, as legal counsel to the DIP Agents and (y) one local counsel to the DIP Agents in each applicable jurisdiction including Norton Rose Fulbright US LLP (collectively, the "DIP Professionals"), incurred in connection with the Chapter 11 Cases (in any capacity) and the DIP Term Facility, including the reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of DIP Professionals) of the DIP Agents and the DIP Lenders, for enforcement costs and documentary taxes associated with the DIP Term Facility and the transactions contemplated thereby (collectively, the "DIP Professional Fees"). The DIP Professionals shall not be required to file motions or applications with respect to the DIP Professional Fees; *provided*, *however* that any time the DIP Professionals seek payment of fees and expenses from the Debtors, each DIP Professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the Fee Notice Parties. If no objection to payment of the requested DIP Professional Fees and expenses is made, in writing, by any of the Fee Notice Parties within the Fee Objection Period, then such invoice shall be promptly paid, without further order of, or application to, the Court or notice to any other party, and, in any case, within five (5) calendar days following the expiration of the Fee Objection Period and shall not be subject to any further review, challenge, or disgorgement. For the avoidance of doubt, the provisions of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine. If within the Fee Objection Period, a Fee Notice Party sends to the affected professional and files with the Court a written objection to such

invoice, then only the disputed portion of such DIP Professional Fees shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and any undisputed portion shall be paid within five (5) calendar days following the expiration of the Fee Objection Period.  For the avoidance of doubt, counsel to the DIP Agent, who is also counsel to the Prepetition Agents, shall be permitted to submit a consolidated fee statement covering both the firm's DIP Professional Fees and its Adequate Protection Fees without having to distinguish or allocate its fees among the different agents.

(b)     As set forth in the DIP Credit Agreement, the Debtors will, jointly and severally, indemnify the DIP Lenders and the DIP Agents, and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, counsel, controlling persons, and members of each of the foregoing (each an "Indemnified Person"), and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the execution or delivery of the DIP Credit Agreement and the DIP Term Loan Documents, transactions contemplated hereby and thereby, and any actual or proposed use of the proceeds of any loans made under the DIP Term Facility in accordance with the terms of the DIP Credit Agreement; *provided* that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of gross negligence or willful misconduct of such person (or their related persons).  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent

such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence or willful misconduct.

23.      Limitation on Use of DIP Term Facility Proceeds, DIP Collateral, and Cash Collateral.  Subject to paragraph 24, none of the DIP Term Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, or the Carve Out may be used:  (i) to investigate, initiate, prosecute, join, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, or other litigation of any type (a) against any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties (each in their capacities as such) under the DIP Term Loan Documents, this Interim Order, the DIP Credit Agreement or the Prepetition Credit Documents, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any official committee of unsecured creditors in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral, or seeking affirmative relief against any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties related to the DIP Obligations, or the Prepetition Secured Obligations, (b) seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the DIP Superpriority Claims, or the DIP Agents' and the DIP Lenders' liens or security interests in the DIP Collateral or the Prepetition Secured Obligations or the Prepetition Liens in the Prepetition Collateral or (c) for monetary, injunctive, or other affirmative relief against the DIP Agents, the DIP Lenders or the Prepetition Secured Parties (each in their capacities as

such), or their respective liens on or security interests in the DIP Collateral or the Prepetition Collateral, or the DIP Superpriority Claims, that would impair the ability of any of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties to assert or enforce any lien, claim, right or security interest or to realize or recover on the DIP Obligations or the Prepetition Secured Obligations to the extent permitted or provided hereunder; (ii) for objecting to or challenging in any way the legality, validity, extent, priority, perfection or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations or by or on behalf of the DIP Agents and the DIP Lenders related to the DIP Obligations; (iii) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition Secured Obligations, or the Prepetition Liens; and (iv) for prosecuting an objection to, contesting in any manner or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of:  (x) any of the DIP Liens, the DIP Superpriority Claims or any other rights or interests of the DIP Agents or the DIP Lenders related to the DIP Obligations or the DIP Liens or (y) any of the Prepetition Liens or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Secured Obligations; *provided* that up to $50,000 of aggregate proceeds of the DIP Term Facility, the DIP Collateral or the Prepetition Collateral, including the Cash Collateral, may be used by any official committee of unsecured creditors to investigate the foregoing matters solely with respect to the Prepetition Secured Parties, the Prepetition Secured Obligations and the Prepetition Liens within the Challenge Period (such proceeds, the "Investigation Budget").

24.    <u>Effect of Stipulations on Third Parties</u>.

(a)    The acknowledgments, stipulations, admissions, waivers and releases contained in paragraph E shall be binding upon the Debtors (including their representatives) and any successor or assigns thereto upon entry of this Interim Order.  The acknowledgments, stipulations, admissions, waivers and releases contained in this Interim Order shall also be binding upon all other parties in interest, including any official committee of unsecured creditors, or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "<u>Trustee</u>"), unless (i) such party with requisite standing granted by an order of this Court (or such other court of competent jurisdiction), has duly filed a proceeding challenging the validity, perfection, priority, extent, or enforceability of the Prepetition Liens, or the Prepetition Secured Obligations, or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests, or defenses (each such proceeding or contested matter, a "<u>Challenge</u>") against the Prepetition Secured Parties or any such parties' affiliates or representatives in connection with any matter related to the Prepetition Credit Documents, the Prepetition Collateral, the Prepetition Liens or the Prepetition Secured Obligations by any creditors' committee and all other parties in interest by the date that is the earlier of (A) 45 days after the date of entry of this Interim Order and (B) the date of the hearing on approval of the Recovery Solutions Sale (as defined in the Restructuring Support Agreement), in each case subject to further extension by written agreement (which writing may be in the form of e-mail by counsel) of the Debtors and the Prepetition Agents (acting at the direction of the requisite Prepetition Lenders pursuant to the applicable Prepetition Credit Documents) each in their sole discretion, the "<u>Challenge Period</u>"); *provided* that in the event that, prior to the expiration of the Challenge Period, (x) the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code or (y) a

chapter 11 trustee is appointed in the Chapter 11 Cases, then in each such case, the Challenge Period shall be extended for a period of 10 calendar days solely with respect to any Trustee, commencing on the occurrence of either of the events described in the foregoing clauses (x) and (y); and (ii) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge or claim in any such duly filed adversary proceeding.  If no such adversary proceeding is timely filed prior to the expiration of the Challenge Period, without further order of this Court: (x) the Prepetition Secured Obligations shall constitute allowed claims, not subject to any Challenge (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in the Chapter 11 Cases and any subsequent chapter 7 cases, if any; (y) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and of the priority specified in paragraph E, not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery; and (z) the Prepetition Secured Obligations, the Prepetition Liens on the Prepetition Collateral and the Prepetition Secured Parties (in their capacities as such) shall not be subject to any other or further challenge and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period).  If any proceeding is timely filed by a party that has been

granted standing as provided above prior to the expiration of the Challenge Period, (i) the stipulations and admissions contained in this Interim Order shall nonetheless remain binding and preclusive on all other parties in interest, including any Trustee, except with respect to any party that timely files a Challenge and solely as to any stipulations or admissions that are specifically and expressly challenged in such adversary proceeding; *provided* that the filing of a motion by any official committee of unsecured creditors or any other party in interest seeking standing with respect to a Challenge, attaching a draft of the complaint setting forth such Challenge, shall toll any such committee's or party's Challenge Period in respect of such Challenge, solely as to any stipulations or admissions that are specifically and expressly challenged in such adversary proceeding, until the date that is one business day after the entry of a final order of the Court (which order, on request of any party, will be issued within 7 days of the filing of the Motion) ruling on such standing motion with respect to such Challenge (or to such later date as agreed by the challenging party, the DIP Agents, the Debtors, and the Prepetition Agents); and (ii) any Challenge not brought in such adversary proceeding shall be forever barred; *provided* that, if and to the extent any challenges to a particular stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such stipulation also shall be binding on the Debtors' estates and all parties in interest.  For the avoidance of doubt, none of the DIP Collateral (including any proceeds thereof) shall be used to fund any professional fees or expenses of any party in connection with any Challenge (other than such fees and expenses of the Committee Professionals which subject to entry of the Final Order to the extent provided therein shall not exceed the Investigation Budget) whether pursuant to this Interim Order or otherwise.

(b)     Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any official committee of unsecured creditors, standing or

authority to pursue any claims or causes of action belonging to the Debtors or their estates, including, without limitation, any challenge with respect to the Prepetition Credit Documents, the Prepetition Liens or the Prepetition Secured Obligations.

25.     <u>Release</u>.  Effective upon entry of this Interim Order, subject to the rights of parties in interest, other than the Debtors, pursuant to paragraphs 23 and 24 of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present, and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally, and irrevocably releases and forever discharges and acquits the DIP Agents and DIP Lenders, the Fronting Lender, the Prepetition Agents, the Prepetition Secured Parties and their respective affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, solely in their capacities as such (collectively, the "<u>Released Parties</u>"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions, and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract tort or under any state or federal law or otherwise, arising out of or related to the DIP Term Facility, the DIP Obligations, the DIP Liens, the DIP Credit Agreement, the other DIP Term Loan Documents, the Prepetition Credit Documents, the Prepetition Secured Obligations, the Prepetition Liens, the obligations owing and the financial obligations made thereunder, the

negotiation of any of the foregoing and the deal reflected thereby, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause, or thing whatsoever arising at any time on or prior to the date of this Interim Order, other than acts arising from actual fraud, bad faith, gross negligence, or willful misconduct; _provided_, that nothing herein shall relieve the Released Parties from fulfilling their obligations under the DIP Credit Agreement, the other DIP Term Loan Documents, and this Interim Order.

26.   <u>Turnover.</u>   If at any time prior to the repayment or satisfaction of the DIP Obligations, any Prepetition Secured Party (including the Prepetition Agents) receives or recovers from any person or entity, any payment or distribution on account of any Prepetition Secured Obligations (excluding, for the avoidance of doubt, on account of the Roll-Up Loans), such Prepetition Secured Party must promptly pay an amount equal to such recovery (in the currency so received) to the DIP Agents for application against the then-outstanding DIP Obligations pursuant to the terms of the DIP Credit Agreement and the other DIP Term Loan Documents.

27.   <u>Priming Liens.</u> Each of the Prepetition Agents is authorized and directed to take all steps required to give full force and effect to the Priming Liens granted pursuant to the terms of this Interim Order including, but not limited to: (i) entering into and adhering to an intercreditor agreement with the DIP Agents on terms sufficient to: (a) give full force and effect to the priority of the Priming Liens provided for in this Interim Order over any other competing lien, security interest or encumbrance of any kind or nature (including Prepetition Liens); and (b) implement the turnover provisions provided for in this Interim Order or any other DIP Term Loan Documents; and (ii) facilitating in all respects the effective registration and priority of the DIP Liens in all

relevant jurisdictions of any and all DIP Collateral envisaged by and required under the DIP Credit Agreement and the other DIP Term Loan Documents (including this Interim Order).

28.     <u>Insurance</u>.  At all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date.  Upon entry of this Interim Order, the DIP Agents are, and will be deemed to be, without any further action or notice, named as an additional insured and lender's loss payee on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

29.     <u>Credit Bidding</u>.  (i) The DIP Agents, or any assignee or designee of the DIP Agents, acting at the direction of the Required Lenders and on behalf of the DIP Lenders shall have the unqualified and unconditional right to credit bid up to (X) the full amount of any DIP Obligations with respect to the New Money DIP Term Loans, and (Y) except as expressly provided for in the Restructuring Support Agreement in connection with the Recovery Solutions Sale, the full amount of any DIP Obligations with respect to the Roll-Up Loans in any sale of any of the Debtors' assets, including pursuant to (a) Bankruptcy Code section 363, (b) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (c) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725, in all cases subject to section 363(k) of the Bankruptcy Code, and (ii) the Prepetition Agents (on behalf, and at the direction, of the requisite Prepetition Lenders pursuant to the applicable Prepetition Credit Documents) shall have the unqualified and unconditional right to credit bid, subject to the rights of parties in interest, other than the Debtors, pursuant to paragraphs 23 and 24 of this Interim Order, (x) up to the full amount of the Prepetition Secured Obligations and (y) the Adequate Protection Obligations in the sale or other disposition of any assets of the Debtors, including, without limitation, sales occurring

pursuant to Bankruptcy Code section 363, pursuant to a plan of reorganization or liquidation or by a chapter 7 trustee in a chapter 7 proceeding, and each DIP Secured Party shall automatically be deemed a "qualified bidder" with respect to any disposition of assets by the Debtors under or pursuant to (a) Bankruptcy Code section 363, (b) a plan of reorganization or plan of liquidation under Bankruptcy Code section 1129, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under Bankruptcy Code section 725, in all cases subject to section 363(k) of the Bankruptcy Code.  The DIP Agents, at the direction of the Required Lenders and on behalf of the DIP Lenders, and the Prepetition Agents on behalf, and at the direction, of the requisite Prepetition Lenders pursuant to the applicable Prepetition Credit Documents, shall have the absolute right to assign, sell, or otherwise dispose of its right to credit bid in connection with any credit bid by or on behalf of the DIP Secured Parties or Prepetition Secured Parties, as applicable, to any acquisition entity or joint venture formed in connection with such bid.

30.    _Refinancing of Certain Prepetition Loans_.    The Interim Roll-Up Amount of (i) Prepetition First Lien Loans held by DIP Lenders or their designated affiliates and (ii) Prepetition Second Lien Term Loans held by DIP Lenders or their designated affiliates will be, upon the occurrence of the Closing Date and the funding of the Initial Draw, immediately, automatically, and irrevocably repaid using amounts borrowed by way of Roll-Up DIP Obligations (as defined below) and, except as otherwise provided in this Interim Order and the DIP Term Loan Documents, shall be entitled to all the priorities, privileges, rights, and other benefits afforded to the other DIP Obligations under this Interim Order, the DIP Credit Agreement and the other DIP Term Loan Documents; _provided_, that at any time following the closing of the sale of the Recovery Solutions Sale, the Required Lenders may elect to recharacterize all or any portion of the remaining Roll-Up DIP Obligations relating to rolled-up Prepetition First Lien Loans as Prepetition First Lien

Loans (the "Roll-Up Reduction Provision").  The refinancing of certain Prepetition First Lien Loans and Prepetition Second Lien Term Loans with Roll-Up DIP Obligations in the Interim Roll-Up Amount as described in this paragraph 30 shall be authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the DIP Lenders to fund amounts pursuant to the terms of the DIP Term Facility and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Term Loans.  As used herein, the term "Roll-Up DIP Obligations" shall mean the Roll-Up Loans and all interest accrued and accruing thereon and all other amounts owing by the respective Debtors in respect thereof.  The Initial Term Loans, the Delayed Draw Term Loans and the Roll-Up Loans shall be secured by the DIP Collateral on a *pari passu* basis; *provided*, that the Initial Term Loans and the Delayed Draw Term Loans shall have senior payment priority over the Roll-Up Loans.

31.     No Obligation to Extend Credit.  The DIP Agents and DIP Lenders shall have no obligation to make any loan or advance under the relevant DIP Term Loan Documents or the DIP Credit Agreement unless all of the conditions precedent under the DIP Credit Agreement, the DIP Term Loan Documents and this Interim Order have been satisfied in full or waived by the DIP Lenders and in accordance with the terms of the applicable DIP Term Loan Documents.

32.     Restrictions on Transfer of DIP Collateral or Prepetition Collateral to Non-Debtor Affiliates.  Except to the extent permitted pursuant to any order entered by the Court in connection with the "first day" relief and the Approved DIP Budget, the Debtors shall not transfer or use any DIP Collateral or Prepetition Collateral, including Cash Collateral, to or for the benefit of any direct or indirect non-debtor affiliate or subsidiary of the Debtor absent the express written consent of the DIP Lenders.

33.     <u>Binding Effect; Successors and Assigns</u>.  The DIP Credit Agreement, the other DIP Term Loan Documents, and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, any official committee of unsecured creditors, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties; *provided* that neither the DIP Agents, the DIP Lenders nor the Prepetition Secured Parties shall have any obligation to permit the use of DIP Collateral or Prepetition Collateral (including Cash Collateral) or to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

34.     <u>Limitation of Liability</u>.  Solely in determining to make any loan under the DIP Credit Agreement and the other DIP Term Loan Documents, permitting the use of Cash Collateral, or exercising any rights or remedies (excluding any actions taken after an exercise of remedies) as and when permitted pursuant to this Interim Order, the DIP Term Loan Documents, the Prepetition Credit Documents, the DIP Agents, the DIP Lenders and the Prepetition Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business, nor shall they owe any fiduciary duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.  Furthermore, nothing in this Interim Order, the DIP Credit Agreement, the other DIP

Term Loan Documents or the Prepetition Credit Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in Bankruptcy Code section 101(2)).

35.     <u>Amendment of the DIP Credit Agreement and Other DIP Term Loan Documents</u>. The DIP Credit Agreement and the other DIP Term Loan Documents may from time to time be amended, restated, waived, modified, or supplemented by the Debtors and the DIP Agents (acting at the direction of the Required Lenders) in accordance with the terms and conditions of this Interim Order, the DIP Credit Agreement or other DIP Term Loan Document without further order of the Court, if the amendment, restatement, waiver, modification, or supplement does not (a) shorten the original stated maturity of the DIP Term Loans, (b) increase the aggregate commitments or the rate of interest payable thereunder or (c) amend the Events of Default or covenants under the DIP Credit Agreement or the other DIP Term Loan Documents to be materially more restrictive to the Debtors (taken as a whole) than the Events of Default as originally attached to this Interim Order (and such amendment, restatement, waiver, modification or supplement, an "<u>Approved Modification</u>"); *provided that*, for the avoidance of doubt, other than as explicitly set forth in the DIP Credit Agreement or another DIP Term Loan Document, updates and supplements to the Approved DIP Budget required to be delivered by the Debtors under the DIP Credit Agreement or this Interim Order shall not require further order of the Court.  Before or promptly after the effectiveness of any Approved Modification, the Debtors shall provide notice (which may be provided through e-mail) to counsel to any official committee of unsecured creditors (if appointed), the U.S. Trustee, the DIP Agents, and the Prepetition Agents.  In the case

of an amendment, restatement, waiver, supplement or other modification of the DIP Credit Agreement or any other DIP Term Loan Documents that is not an Approved Modification, the Debtors shall (a) provide notice (which may be provided through e-mail) to counsel to any official committee of unsecured creditors (if appointed), the U.S. Trustee, the DIP Agents, and the Prepetition Agents and (b) obtain approval of the Court.

36.    <u>Master Proofs of Claim</u>.    None of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties shall be required to file proofs of claim in any of the Chapter 11 Cases or any successor cases for any claim allowed herein, and the stipulations in paragraph E shall be deemed to constitute a timely filed proof of claim with respect to the Prepetition Secured Obligations against each of the applicable Debtors in the Chapter 11 Cases.    Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or any successor cases to the contrary, the DIP Agent, on behalf of the DIP Lenders, and each of the Prepetition Agents, on behalf of itself and the other Prepetition Secured Parties, are authorized and entitled, but not directed or required to file (and amend or supplement, as the respective agents see fit) a master proof of claim on account of any and all of the respective claims arising under the DIP Term Facility or Prepetition Credit Documents, as applicable (the "<u>Master Proof of Claim</u>").    For administrative convenience, any Master Proof of Claim authorized herein may be filed in the case of Debtor Wellpath Holdings, Inc. with respect to all amounts asserted in such Master Proof of Claim, and such Master Proof of Claim shall be deemed to be filed and asserted by the applicable entity or entities against every Debtor asserted to be liable for the applicable claim.    For the avoidance of doubt, the provisions set forth in this paragraph and any Master Proof of Claim filed pursuant to the terms hereof are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party in interest or

their respective successors in interest, including, without limitation, the numerosity requirements set forth in Bankruptcy Code section 1126. The DIP Administrative Agent and the Prepetition Agents, as applicable, shall not be required to attach any instruments, agreements, or other documents evidencing the obligations owing by each of the Debtors to the DIP Agents and the DIP Lenders or the Prepetition Secured Parties, as applicable, which instruments, agreements, or other documents will be provided upon written request to counsel to the DIP Agents or Prepetition Agents, as applicable. Any order entered by the Court in relation to the establishment of a bar date for any claim (including any administrative claim) in any of the Chapter 11 Cases or successor cases shall not apply to the DIP Agents, the DIP Lenders or the Prepetition Secured Parties. For the avoidance of doubt, none of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties will be required to file any request for allowance and/or payment of any administrative expenses, and this Interim Order shall be deemed to constitute a timely filed request for allowance and/or payment of any Prepetition Secured Obligations constituting administrative expenses or any DIP Obligations, as applicable.

37.    <u>Automatic Stay Modified</u>.  The automatic stay under Bankruptcy Code section 362 shall be modified and lifted to the extent necessary to allow the DIP Agents, the DIP Lenders or the Prepetition Secured Parties, as applicable, to provide any notices to the Debtors or take any other action as contemplated by and in accordance with this Interim Order.

38.    <u>Necessary Action</u>.  The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms and conditions of this Interim Order.

39.    <u>Right to Seek Additional Adequate Protection</u>.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to request additional forms of adequate protection at any time, subject

to the consent of the DIP Agents (acting at the direction of the Required Lenders in their sole discretion) and any party in interest's right to object thereto.  Nothing herein shall be deemed a finding by the Court or an acknowledgment by the Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect the Prepetition Secured Parties against any Diminution in Value.

40.    Surety Bonds.  Nothing in this Interim Order shall modify, prime, limit, alter, or expand any terms of any Surety Bonds, any related indemnity agreements, and/or any rights of the Debtors' sureties in any of their collateral.

41.    Effectiveness.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect as of the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule or Local Rule, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

42.    Interim Order Governs.  In the event of any inconsistency between the provisions of the DIP Credit Agreement, the other DIP Term Loan Documents and this Interim Order, the provisions of this Interim Order shall govern.

43.    Bankruptcy Rules.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

44.    Final Hearing.  A final hearing on the Motion will be held on December 5, 2024 at 3:00 p.m. (prevailing Central Time).  The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the further interim hearing) to the parties having been given notice of the Hearing, and to any other party that has filed a request for notices with this Court.

45.     <u>Objections</u>.  Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon (a) proposed counsel to the Debtors, McDermott Will & Emery LLP (i) 2501 N. Harwood Street, Suite 1900, Dallas, TX 75201, Attn: Marcus Helt, (mhelt@mwe.com), (ii) 444 West Lake Street, Suite 4000, Chicago, IL 60606, Attn: Felicia Gerber Perlman (fperlman@mwe.com), Bradley Thomas Giordano (bgiordano@mwe.com), and Jake Jumbeck (jjumbeck@mwe.com) <u>and</u> (iii) One Vanderbilt Avenue, New York, NY 10017, Attn: Steven Z. Szanzer (sszanzer@mwe.com), (b) counsel to the DIP Lenders and the Ad Hoc Group, Akin Gump Strauss Hauer & Feld LLP, 2001 K St NW, Washington, DC 20006, Attn: Scott L. Alberino (salberino@akingump.com) and Kate Doorley (kdoorley@akingump.com); (c) counsel to the Prepetition Agents, Cahill Gordon & Reindel LLP, 32 Old Slip, New York, NY 10005, Attn: Joel H. Levitin (jlevitin@cahill.com) and Jordan A. Wishnew (jwishnew@cahill.com) and Norton Rose Fulbright US LLP, 1550 Lamar Street, Suite 2000, Houston, TX 77010, Attn: Bob Bruner (bob.bruner@nortonrosefulbright.com), and (d) counsel to the DIP Agents, Cahill Gordon & Reindel LLP, 32 Old Slip, New York, NY 10005, Attn: Joel H. Levitin (jlevitin@cahill.com) and Jordan A. Wishnew (jwishnew@cahill.com) and Norton Rose Fulbright US LLP, 1550 Lamar Street, Suite 2000, Houston, TX 77010, Attn: Bob Bruner (bob.bruner@nortonrosefulbright.com), in each case to allow actual receipt by the foregoing no later than December 2, 2024 at 4:00 p.m. (prevailing Central Time).

46.     <u>Retention of Jurisdiction</u>.  The Court shall retain exclusive jurisdiction to resolve any and all disputes arising under or related to the DIP Obligations, the DIP Credit Agreement, the other DIP Term Loan Documents and/or the provisions of this Interim Order, and to enforce all of the conditions of the DIP Term Loan Documents and this Interim Order.

Houston, Texas
Dated: _____, 2024

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**DIP Credit Agreement**

Execution Version

---

**$522,375,000**

**SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT**

**among**

**WELLPATH HOLDINGS, INC., A DEBTOR AND DEBTOR IN POSSESSION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AS THE BORROWER,**

**CCS-CMGC INTERMEDIATE HOLDINGS, INC., A DEBTOR AND DEBTOR IN POSSESSION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AS HOLDINGS,**

**CCS-CMGC INTERMEDIATE HOLDINGS 2, INC., A DEBTOR AND DEBTOR IN POSSESSION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AS INTERMEDIATE HOLDINGS,**

**THE LENDERS PARTY HERETO FROM TIME TO TIME,**

**and**

**UBS AG, STAMFORD BRANCH,
as ADMINISTRATIVE AGENT and COLLATERAL AGENT**

_____

**Dated as of November 13, 2024**

_____

---

# TABLE OF CONTENTS

Page

SECTION 1.       DEFINED TERMS.............................................................................1

1.01    Other Definitional Provisions, etc. ...........................................34
1.02    Accounting Terms ........................................................................35
1.03    Rounding ......................................................................................35
1.04    Times of Day ................................................................................35
1.05    Timing of Payment or Performance ...........................................35
1.06    [Reserved].....................................................................................35
1.07    [Reserved].....................................................................................35
1.08    Currency Translation ...................................................................35
1.09    Calculations, Computations ........................................................36
1.10    Interest Rate and Fee Calculations .............................................36
1.11    [Reserved].....................................................................................36
1.12    [Reserved].....................................................................................36
1.13    Rates .............................................................................................36

SECTION 2.       AMOUNT AND TERMS OF CREDIT. ....................................37

2.01    The Commitments .........................................................................37
2.02    [Reserved].....................................................................................38
2.03    Notice of Borrowing ....................................................................38
2.04    Disbursement of Funds ................................................................38
2.05    Notes .............................................................................................39
2.06    Conversions ..................................................................................40
2.07    Pro Rata Borrowings ....................................................................40
2.08    Interest ..........................................................................................40
2.09    Interest Periods ............................................................................41
2.10    Increased Costs, Illegality, etc. ..................................................42
2.11    Compensation ...............................................................................44
2.12    Change of Lending Office ............................................................44
2.13    Replacement of Lenders ..............................................................45
2.14    [Reserved].....................................................................................46
2.15    Priority and Liens .........................................................................46
2.16    Payment of Obligations ...............................................................47
2.17    No Discharge; Survival of Claims ..............................................47
2.18    [Reserved].....................................................................................47
2.19    Benchmark Replacement Setting .................................................47

SECTION 3.       [RESERVED].........................................................................48

SECTION 4.       FEES; REDUCTIONS OF COMMITMENT. ...........................48

4.01    Fees................................................................................................48
4.02    Mandatory Reductions of Commitments .....................................49

SECTION 5.       PREPAYMENTS; PAYMENTS; TAXES. .................................49

Page

5.01    Voluntary Prepayments .................................................................................... 49
5.02    Mandatory Repayments .................................................................................... 50
5.03    Method and Place of Payment .......................................................................... 51
5.04    Net Payments .................................................................................................... 51
5.05    Presumption of the Administrative Agent as to Payments of the Borrower ............ 55
5.06    Order of Prepayments ...................................................................................... 56

SECTION 6.        CONDITIONS PRECEDENT TO THE CLOSING DATE. ........................................ 56

6.01    Closing Date; Notes .......................................................................................... 56
6.02    Officer's Certificate .......................................................................................... 56
6.03    Lien Searches ................................................................................................... 57
6.04    Company Documents; Proceedings; etc. ........................................................ 57
6.05    Interim DIP Order ............................................................................................ 57
6.06    Collateral .......................................................................................................... 57
6.07    Initial DIP Budget ............................................................................................ 57
6.08    Chapter 11 Cases; "First Day" Motions ......................................................... 57
6.09    Approvals, Consents and Authorizations. ....................................................... 58
6.10    Security Documents .......................................................................................... 58
6.11    Material Adverse Effect .................................................................................... 58
6.12    Asset Purchase Agreement ............................................................................... 58
6.13    Loan Proceeds Account .................................................................................... 58
6.14    Subsidiaries Guaranty ...................................................................................... 59
6.15    KYC Information .............................................................................................. 59
6.16    Fees, etc. ........................................................................................................... 59
6.17    No Dismissal or Conversion ............................................................................ 59
6.18    No Appointment ............................................................................................... 59
6.19    Default .............................................................................................................. 60
6.20    Representations and Warranties ...................................................................... 60
6.21    Restructuring Support Agreement; Milestones ............................................... 60
6.22    Notice of Borrowing ......................................................................................... 60

SECTION 7.        CONDITIONS PRECEDENT TO ALL CREDIT EVENTS ...................................... 60

7.01    No Default; Representations and Warranties ................................................... 60
7.02    Notice of Borrowing ......................................................................................... 61
7.03    No Violation ..................................................................................................... 61
7.04    Fees, etc. ........................................................................................................... 61
7.05    Final DIP Order ............................................................................................... 61
7.06    Approved DIP Budget ....................................................................................... 61
7.07    Restructuring Support Agreement; Milestones ............................................... 61
7.08    Officer's Certificate .......................................................................................... 62
7.09    Second Day Orders .......................................................................................... 62
7.10    Perfection ......................................................................................................... 62
7.11    No Dismissal or Conversion ............................................................................ 62
7.12    No Appointment ............................................................................................... 62
7.13    Fronting Arrangement ...................................................................................... 62

SECTION 8.        REPRESENTATIONS AND WARRANTIES. ....................................................... 63

8.01    Company Status ................................................................................................ 63

Page

8.02   Power and Authority.................................................................................................... 63
8.03   No Violation.................................................................................................................. 63
8.04   Approvals; Governmental Authorizations.................................................................... 64
8.05   Financial Statements; Financial Condition; Undisclosed Liabilities; No Material Adverse
        Effect............................................................................................................................ 64
8.06   Litigation...................................................................................................................... 64
8.07   True and Complete Disclosure..................................................................................... 65
8.08   Margin Regulations....................................................................................................... 65
8.09   Tax Returns and Payments........................................................................................... 65
8.10   Compliance with ERISA............................................................................................... 65
8.11   Security Documents...................................................................................................... 66
8.12   Properties...................................................................................................................... 67
8.13   Subsidiaries................................................................................................................... 67
8.14   Compliance with Statutes, etc...................................................................................... 67
8.15   Investment Company Act.............................................................................................. 67
8.16   Environmental Matters................................................................................................. 67
8.17   Employment and Labor Relations................................................................................ 68
8.18   Intellectual Property, etc.............................................................................................. 68
8.19   USA Patriot Act; OFAC; FCPA.................................................................................. 68
8.20   Practice Groups............................................................................................................ 69
8.21   Healthcare Matters....................................................................................................... 69
8.22   Reorganization Matters................................................................................................ 70
8.23   Beneficial Ownership.................................................................................................... 70

SECTION 9.       AFFIRMATIVE COVENANTS................................................................. 71

9.01   Information Covenants................................................................................................. 71
9.02   Books, Records and Inspections.................................................................................. 73
9.03   Maintenance of Property; Insurance............................................................................ 74
9.04   Existence; Franchises................................................................................................... 75
9.05   Compliance with Laws, etc.......................................................................................... 75
9.06   Compliance with Environmental Laws........................................................................ 76
9.07   Business, etc................................................................................................................. 76
9.08   Deposit Accounts and Securities Accounts................................................................. 76
9.09   Payment of Taxes......................................................................................................... 76
9.10   Use of Proceeds........................................................................................................... 77
9.11   Additional Security; Further Assurances; etc.............................................................. 77
9.12   Approved DIP Budget; Additional Chapter 11 Reporting........................................... 79
9.13   Bankruptcy Covenants................................................................................................. 81
9.14   Maintenance of Ratings............................................................................................... 82
9.15   Compliance with PATRIOT Act, FCPA, OFAC, Anti-Terrorism and Anti-Money
        Laundering Laws.......................................................................................................... 83
9.16   Loan Proceeds Account................................................................................................ 83

SECTION 10.     NEGATIVE COVENANTS........................................................................ 83

10.01  Liens.............................................................................................................................. 83
10.02  Consolidation, Merger or Sale of Assets, etc.............................................................. 87
10.03  Restricted Payments..................................................................................................... 89
10.04  Indebtedness................................................................................................................. 90

Page

10.05    Advances, Investments and Loans........................................................................ 92
10.06    Transactions with Affiliates................................................................................. 94
10.07    Financial Covenant.............................................................................................. 95
10.08    Certificate of Incorporation, By-Laws and Certain Other Agreements; Limitations on
          Voluntary Payments, etc.................................................................................. 96
10.09    Limitation on Certain Restrictions on Restricted Subsidiaries........................... 97
10.10    Passive Holding Company................................................................................... 97
10.11    Accounting Changes............................................................................................ 98
10.12    Additional Restrictions; Chapter 11 Cases......................................................... 98

SECTION 11.        EVENTS OF DEFAULT AND REMEDIES. ..................................... 99

11.01    Payments............................................................................................................. 99
11.02    Representations, etc............................................................................................. 99
11.03    Covenants............................................................................................................ 99
11.04    Default Under Other Agreements........................................................................ 100
11.05    [Reserved]........................................................................................................... 100
11.06    ERISA.................................................................................................................. 100
11.07    Security Documents............................................................................................. 101
11.08    Guaranties........................................................................................................... 101
11.09    Judgments............................................................................................................ 101
11.10    Change of Control............................................................................................... 101
11.11    Invalidity of Credit Documents.......................................................................... 101
11.12    Additional Bankruptcy Events of Default........................................................... 102

SECTION 12.        THE ADMINISTRATIVE AGENT. ................................................... 104

12.01    Appointment........................................................................................................ 104
12.02    Nature of Duties.................................................................................................. 105
12.03    Lack of Reliance on the Administrative Agent.................................................... 105
12.04    Certain Rights of the Administrative Agent......................................................... 106
12.05    Reliance............................................................................................................... 107
12.06    Indemnification.................................................................................................... 107
12.07    The Administrative Agent in its Individual Capacity.......................................... 109
12.08    Credit Bidding..................................................................................................... 109
12.09    Resignation by the Administrative Agent............................................................ 109
12.10    Collateral Matters................................................................................................ 110
12.11    Right to Realize on Collateral and Enforce Guarantees...................................... 111
12.12    Delivery of Information....................................................................................... 111
12.13    [Reserved]........................................................................................................... 111
12.14    Withholding Tax.................................................................................................. 111
12.15    Certain ERISA Matters........................................................................................ 112
12.16    Delegation of Duties............................................................................................ 112
12.17    Survival............................................................................................................... 113

SECTION 13.        MISCELLANEOUS. ......................................................................... 113

13.01    Payment of Expenses, etc.................................................................................... 113
13.02    Right of Setoff..................................................................................................... 115
13.03    Notices................................................................................................................. 115
13.04    Benefit of Agreement; Assignments; Participations............................................ 118

                                                                                                   Page

13.05   No Waiver; Remedies Cumulative ................................................................... 122
13.06   Payments Pro Rata ........................................................................................... 123
13.07   [Reserved] ......................................................................................................... 123
13.08   Several Obligations .......................................................................................... 123
13.09   GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF
           JURY TRIAL ................................................................................................. 123
13.10   Counterparts ...................................................................................................... 124
13.11   [Reserved] ......................................................................................................... 125
13.12   Headings Descriptive ....................................................................................... 125
13.13   Amendment or Waiver; etc. ............................................................................. 125
13.14   Survival .............................................................................................................. 126
13.15   Domicile of Loans ............................................................................................ 126
13.16   Register .............................................................................................................. 127
13.17   Confidentiality .................................................................................................. 127
13.18   No Advisory or Fiduciary Responsibility ....................................................... 128
13.19   PATRIOT ACT .................................................................................................. 128
13.20   Post-Closing Actions ....................................................................................... 129
13.21   Interest Rate Limitation .................................................................................... 129
13.22   [Reserved] ......................................................................................................... 129
13.23   Lender Action .................................................................................................... 129
13.24   Incorporation of DIP Orders by Reference ..................................................... 129

SECTION 14.      HOLDINGS GUARANTY. ......................................................... 130

14.01   Guaranty ............................................................................................................ 130
14.02   Bankruptcy ......................................................................................................... 130
14.03   Nature of Liability ............................................................................................ 130
14.04   Independent Obligation .................................................................................... 130
14.05   Authorization ..................................................................................................... 131
14.06   Reliance .............................................................................................................. 132
14.07   Subordination .................................................................................................... 132
14.08   Waiver ................................................................................................................ 133
14.09   Payments ............................................................................................................ 133
14.10   Maximum Liability ........................................................................................... 133
14.11   Acknowledgement and Consent to Bail-In of EEA Financial Institutions ............. 133


SCHEDULE 1.01(a)      Lender Addresses
SCHEDULE 1.01(b)(i)   New Money Term Loan Commitments
SCHEDULE 1.01(b)(ii)  Roll-Up Term Loan Commitments
SCHEDULE 1.01(c)      Milestones
SCHEDULE 1.01(d)      Practice Groups
SCHEDULE 1.01(e)      Subsidiary Guarantors
SCHEDULE 1.01(f)      Limited Guarantors
SCHEDULE 1.01(g)      RS Business
SCHEDULE 1.01(h)      Corrections Business
SCHEDULE 8.12         Real Property
SCHEDULE 8.13         Subsidiaries
SCHEDULE 8.16         Environmental Matters

Page

SCHEDULE 10.01        Existing Liens
SCHEDULE 10.02        Dispositions
SCHEDULE 10.04        Permitted Surviving Debt
SCHEDULE 10.05        Existing Investments
SCHEDULE 10.06        Transactions with Affiliates
SCHEDULE 10.09        Contractual Obligations
SCHEDULE 13.20        Post-Closing Matters


EXHIBIT A-1           Form of Notice of Borrowing
EXHIBIT A-2           Form of Notice of Conversion/Continuation
EXHIBIT B             Form of Term Note
EXHIBIT C             [Reserved]
EXHIBIT D-1           Form of U.S. Tax Compliance Certificate for Foreign Lenders That Are Not Partnerships
EXHIBIT D-2           Form of U.S. Tax Compliance Certificate for Foreign Participants That Are Not Partnerships
EXHIBIT D-3           Form of U.S. Tax Compliance Certificate for Foreign Participants That Are Partnerships
EXHIBIT D-4           Form of U.S. Tax Compliance Certificate for Foreign Lenders That Are Partnerships
EXHIBIT E             Form of Subsidiaries Guaranty
EXHIBIT F             Form of Pledge Agreement
EXHIBIT G             Form of Security Agreement
EXHIBIT H             Form of Compliance Certificate
EXHIBIT I             Form of Assignment and Assumption Agreement
EXHIBIT J             Initial DIP Budget
EXHIBIT K             Interim DIP Order

## SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT

This SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT is entered into as of November 13, 2024, by and among Wellpath Holdings, Inc., a Delaware corporation (the "Borrower"), CCS-CMGC Intermediate Holdings, Inc., a Delaware corporation and the direct parent of the Borrower ("Holdings"), CCS-CMGC Intermediate Holdings 2, Inc., a Delaware corporation ("Intermediate Holdings"), UBS AG, Stamford Branch, as administrative agent (in such capacity, including any permitted successor thereto, the "Administrative Agent") and as collateral agent (in such capacity, including any permitted successor thereto, the "Collateral Agent", and together with the Administrative Agent, the "Agents") under the Credit Documents, and each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender").

## PRELIMINARY STATEMENTS

WHEREAS, on or about November 11, 2024 (the "Petition Date"), CCS-CMGC Parent Holdings, LP, a Delaware limited partnership, CCS-CMGC Parent GP, LLC, a Delaware limited liability company, Intermediate Holdings, Holdings, the Borrower and certain subsidiaries of Holdings (collectively, the "Debtors" and each individually, a "Debtor") commenced jointly administered cases under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

WHEREAS, from and after the Petition Date, each of the Debtors will continues to operate its business and manage its property as a debtor and a debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code unless otherwise ordered by the Bankruptcy Court.

WHEREAS, the Borrower has requested that the Lenders make post-petition loans and advances and provide other financial or credit accommodations to the Debtors, and the Lenders have agreed, subject to the conditions set forth herein, to extend a senior secured superpriority debtor-in-possession credit facility to the Borrower, in an aggregate principal amount not to exceed $522,375,000 (consisting of $105,000,000 in aggregate principal amount of New Money Term Loans and $417,375,000 in aggregate principal amount of Roll-Up Term Loans).

WHEREAS, the Lenders have indicated their willingness to lend the Loans on the terms and subject to the conditions set forth herein.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

SECTION 1.     Defined Terms.

As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Act" shall have the meaning provided in Section 8.19(a).

"Additional Security Documents" shall have the meaning provided in Section 9.11(a).

"Adequate Protection Claims" shall have the meaning specified in the Applicable DIP Order.

"Adequate Protection Liens" shall have the meaning specified in the Applicable DIP Order.

"<u>Adequate Protection Obligations</u>" shall have the meaning specified in the Applicable DIP Order.

"<u>Adjusted Term SOFR</u>" shall mean, for purposes of any calculation, the rate per annum equal to Term SOFR for such calculation; <u>provided</u> that, if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"<u>Administrative Agent</u>" shall mean UBS AG, Stamford Branch, in its capacity as Administrative Agent for the Lenders hereunder and under the other Credit Documents, and shall include any permitted successor to the Administrative Agent appointed pursuant to Section 12.09.

"<u>Administrative Agent Fee Letter</u>" shall mean that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement Administrative Agent Fee Letter, dated as of November 11, 2024, by and among, inter alia, the Administrative Agent and the Borrower.

"<u>Affiliate</u>" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person.  A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities or by contract; <u>provided</u>, <u>however</u>, that none of the Administrative Agent, any Lender or any of their respective Affiliates shall be considered an Affiliate of Holdings or any Subsidiary thereof as a result of this Agreement, the extension of credit hereunder, or its actions in connection herewith or any other Credit Document.

"<u>Agents</u>" shall have the meaning provided in the first paragraph of this Agreement.

"<u>Agent Advisors</u>" collectively, each of the advisors, counsel, consultants and other professionals as are reasonably required by the Agents in connection with the Loans (including, without limitation, Cahill Gordon & Reindel LLP and Norton Rose Fulbright US LLP).

"<u>Agreement</u>" shall mean this Senior Secured Superpriority Debtor in Possession Credit Agreement, as modified, supplemented, amended, restated (including any amendment and restatement hereof), extended, refinanced or renewed from time to time.

"<u>Applicable DIP Order</u>" means the Interim DIP Order or, upon entry thereof by the Bankruptcy Court, the Final DIP Order.

"<u>Applicable Margin</u>" shall mean (x) a percentage per annum equal to, with respect to New Money Term Loans, 7.25% for Term SOFR Loans and 6.25% for Base Rate Loans, and (y) a percentage per annum equal to, with respect to Roll-Up Term Loans, 6.93% for Term SOFR Loans and 5.93% for Base Rate Loans.

"<u>Approved DIP Budget</u>" means collectively, the Initial DIP Budget and each Updated DIP Budget, as approved in accordance with Section 9.12(b).

"<u>Approved Fund</u>" shall mean any Fund that is administered, advised or managed by a Lender or an Affiliate of the entity that administers, advises or manages any Fund that is a Lender.

"<u>Asset Purchase Agreement</u>" shall have the meaning provided in Section 6.12.

"<u>Asset Sale</u>" shall mean any sale, transfer or other disposition (including through division) by Holdings or any of its Restricted Subsidiaries to any Person (including by way of redemption by such

Person) other than to Holdings, a Holdings Guarantor, the Borrower or a Subsidiary Guarantor of any asset (including any Equity Interests in another Person) but excluding (i) any such sales, transfers or other dispositions that generate aggregate Net Sale Proceeds of less than $50,000 during any Fiscal Year, (ii) Recovery Events and (iii) any such sale, transfer or other disposition permitted by Section 10.02 (other than clauses (iii) and (xxvi) thereto).

"Assignee" shall have the meaning provided in Section 13.04(b)(i).

"Assignment and Assumption Agreement" shall mean an Assignment and Assumption Agreement substantially in the form of Exhibit I (appropriately completed).

"Authorized Officer" shall mean, with respect to (i) delivering Notices of Borrowing, Notices of Conversion/Continuation and similar notices, any person or persons that has or have been authorized by the board of directors of Holdings or the Borrower to deliver such notices pursuant to this Agreement, (ii) delivering financial information and officer's certificates pursuant to this Agreement, the chief executive officer, the president, the chief financial officer, the treasurer, the principal accounting officer or any other officer having substantially the same responsibilities of Holdings or the Borrower, and (iii) any other matter in connection with this Agreement or any other Credit Document, any officer (or a person or persons so designated by the board of directors of Holdings or the Borrower) of Holdings or the Borrower.

"Available Tenor" shall mean, as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark or payment period for interest calculated with reference to such Benchmark, as applicable, that is or may be used for determining the length of an Interest Period or otherwise, for determining any frequency of making payments of interest calculated pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (d) of Section 2.19.

"Auction Agreement" means the Auction, Subscription and Sale Framework Agreement, dated as of November 11, 2024, among RS Purchaser LLC, UBS and each of the participating lenders party thereto.

"Bail-In Action" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means title 11 of the United State Code, as amended, or any similar federal or state law for the relief of debtors.

"Bankruptcy Court" has the meaning set forth in the Preliminary Statements to this Agreement.

"Base Rate" shall mean, for any day, a fluctuating rate per annum equal to the highest of (i) the Prime Lending Rate at such time, (ii) 1/2 of 1% per annum in excess of the overnight Federal Funds Rate for such day and (iii) Adjusted Term SOFR for a one-month tenor in effect on such day as published two (2) U.S. Government Securities Business Days prior to such day (or if such day is not a U.S. Government Securities Business Day, the immediately preceding U.S. Government Securities Business Day) plus 1.00% per annum.  For purposes of this definition, Adjusted Term SOFR shall be determined using Adjusted Term SOFR as otherwise determined by the Administrative Agent in accordance with the

definition of "Adjusted Term SOFR," except that (x) if a given day is a Business Day, such determination shall be made on such day (rather than two (2) Business Days prior to the commencement of an Interest Period) or (y) if a given day is not a Business Day, Adjusted Term SOFR for such day shall be the rate determined by the Administrative Agent pursuant to preceding clause (x) for the most recent Business Day preceding such day.  Any change in the Base Rate due to a change in the Prime Lending Rate, the Federal Funds Rate or Adjusted Term SOFR shall be effective as of the opening of business on the day of such change in the Prime Lending Rate, the Federal Funds Rate or Adjusted Term SOFR, respectively.

"Base Rate Loan" shall mean each Loan that bears interest based on the Base Rate.

"Base Rate Term SOFR Determination Day" shall have the meaning specified in the definition of "Term SOFR".

"Benchmark" shall mean, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.19.

"Benchmark Replacement" shall mean, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(1) the sum of: (a) Daily Simple SOFR and (b) 0.11448% (11.448 basis points);

(2) the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for syndicated credit facilities in the North American market denominated in the applicable currency at such time and (b) the related Benchmark Replacement Adjustment;

If the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Credit Documents.

"Benchmark Replacement Adjustment" shall mean, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Conforming Changes" shall mean, with respect to either the use of administration of the Term SOFR Rate or any Benchmark Replacement, any technical, administrative or

operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Credit Documents).

"Benchmark Replacement Date" shall mean the earliest to occur of the following events with respect to the then-current Benchmark:

(1)     in the case of clause (1) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof); or

(2)     in the case of clause (2) of the definition of "Benchmark Transition Event," the first date on which all Available Tenors of such Benchmark (or the published component used in the calculation thereof) has been or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) have been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that for any Loans denominated in dollars, such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (2) and even if such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, if such Benchmark is a term rate, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) above with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein solely to the extent such event applies to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" shall mean the occurrence of one or more of the following events with respect to the then-current Benchmark:

(1)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board, the Federal Reserve Bank of New York, the Term SOFR Administrator, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" shall mean, with respect to any Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.19 and (y) ending at the time that a Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.19.

"Beneficial Ownership Certification" shall mean a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" shall mean 31 C.F.R. § 1010.230.

"Benefit Plan" shall mean any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Borrower" shall have the meaning provided in the first paragraph of this Agreement.

"Borrowing" shall mean the borrowing of one Type of Loan of a single Class from all the Lenders having Commitments with respect to such Class on a given date (or resulting from a conversion or conversions on such date) having in the case of Term SOFR Loans the same Interest Period.

"Budgeted Cash Receipts" shall mean the projected cash receipts of the Debtors on a consolidated basis set forth in the row titled "Total Cash Receipts" in each applicable Approved DIP Budget.

"Budgeted Disbursements" shall mean the sum of the projected disbursements of the Debtors on a consolidated basis set forth in the rows titled "Total Operating Disbursements" and "Total Non-Operating Disbursements" in each applicable Approved DIP Budget.

"Business Day" shall mean (i) for all purposes other than as covered by clause (ii) below, any day except Saturday, Sunday and any day which shall be in New York, New York, a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close and (ii) if used in connection with an amount that bears interest at a rate based on SOFR or any direct or indirect calculation or determination of SOFR, any such day that is also a U.S. Government Securities Business Day.

"C Corporation Subsidiary" shall mean any Subsidiary of Holdings treated as a corporation or association taxable as a corporation for U.S. federal income Tax purposes.

"Capital Expenditures" shall mean, with respect to any Person, for any period, the aggregate, without duplication, of all expenditures by such Person which should be capitalized in accordance with GAAP during such period; provided that "Capital Expenditures" shall not include (i) any capitalized interest expense reflected as additions to property, plant or equipment in the consolidated balance sheet of Holdings and its Restricted Subsidiaries, and (ii) any non-cash compensation or other non-cash costs reflected as additions to property, plant or equipment in the consolidated balance sheet of Holdings and its Restricted Subsidiaries.

"Capitalized Lease Obligations" shall mean, with respect to any Person, all obligations under Capitalized Leases of such Person which, under GAAP, are or will be required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with such principles; provided that for all purposes hereunder, subject to Section 1.02, the amount of obligations under any Capitalized Leases shall be the amount thereof accounted for as a liability on a balance sheet (excluding the notes thereto) in accordance with GAAP.

"Capitalized Leases" shall mean, subject to Section 1.02, all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases.

"Carve Out" has the meaning set forth in the Applicable DIP Order.

"Cash Collateral" has the meaning specified in section 363(a) of the Bankruptcy Code.

"Cash Equivalents" shall mean, as to any Person, (i) securities issued or directly and fully guaranteed or insured by the United States, or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than 12 months from the date of acquisition, (ii) marketable direct obligations issued by any state of the United States, or any political subdivision of any such state or any public instrumentality thereof maturing within 12 months from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's, (iii) Dollar denominated time deposits, certificates of deposit and bankers acceptances of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's with maturities of not more than 12 months from the date of acquisition by such Person, (iv) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (iii) above, (v) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by S&P or at least P 1 or the equivalent thereof by Moody's and in each case maturing

not more than six months after the date of acquisition by such Person (vi) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (v) above, and (vii) in the case of any Foreign Subsidiary, (x) such local currencies in those countries in which such Foreign Subsidiary transacts business from time to time in the ordinary course of business and (y) investments of comparable tenor and credit quality to those described in the foregoing clauses (i) through (vi) customarily utilized in countries in which such Foreign Subsidiary operates for short term cash management purposes.

"<u>Cash Management Order</u>" shall mean that certain Interim Order (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and Maintain Existing Bank Accounts, and (B) Maintain Existing Business Forms and Books And Records, (II) Waiving Deposit Requirements, (III) Allowing Intercompany Transactions and Affording Administrative Expense Priority to Post-Petition Intercompany Claims, and (IV) Granting Related Relief, Docket No. 63, as such order may be amended, supplemented or modified in a manner not adverse to the Agents or the Lenders.

"<u>Change in Law</u>" shall mean the occurrence, after the Closing Date, of any of the following: (a) the adoption of any law, rule, regulation or treaty (excluding the taking effect after the Closing Date of a law, rule, regulation or treaty adopted prior to the Closing Date), (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority, requiring compliance by any Lender (or lending office of such Lender).  It is understood and agreed that (i) the Dodd–Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203, H.R. 4173), all laws relating thereto and all interpretations and applications thereof and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall, for the purpose of this Agreement, be deemed to be adopted subsequent to the Closing Date.

"<u>Change of Control</u>" shall mean (i) Holdings shall at any time cease to own directly 100% of the Equity Interests of the Borrower or (ii) the Permitted Holders shall at any time and for any reason fail to own, directly or indirectly, at least a majority of the voting interests (for the election of directors or other similar governing body) in Holdings' Equity Interests (determined on a fully diluted basis) or (iii) a change of control or similar event shall occur as provided in (x) any Prepetition Credit Agreement or (y) any indenture or other agreement governing indebtedness issued in respect of any Permitted Refinancing of any Prepetition Credit Agreement, or any other Junior Financing Documentation.

"<u>Chapter 11 Cases</u>" means the chapter 11 case of the Debtors jointly administered under chapter 11 of the Bankruptcy Code and pending in the Bankruptcy Court.

"<u>Claims</u>" shall have the meaning provided in the definition of "<u>Environmental Claims</u>."

"<u>Class</u>" (a) when used with respect to Lenders, refers to whether such Lenders are Initial New Money Term Lenders, Delayed-Draw New Money Term Lenders, Initial Roll-Up Term Lenders, or Delayed-Draw Roll-Up Term Lenders, (b) when used with respect to Commitments, refers to whether such Commitments are Initial New Money Term Commitments, Delayed-Draw New Money Term Commitments, Initial Roll-Up Term Commitments, or Delayed- Draw Roll-Up Term Commitments and (c) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are Initial New Money Term Loans, Delayed-Draw New Money Term Loans, Initial Roll-Up Term Loans or Delayed-Draw Roll-Up Term Loans, in each case, under this Agreement, of which such Loan, Borrowing or Commitment shall be a part.

-8-

"Closing Date" shall mean the first date that all of the conditions precedent in Section 6 are satisfied or waived in accordance with Section 6, which date is November 13, 2024.

"Closing Fee" shall have the meaning provided in Section 4.01(b).

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Collateral" shall mean all property (whether real or personal) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document, including all Pledge Agreement Collateral, all Security Agreement Collateral, all Mortgaged Properties but, for the avoidance of doubt, excluding all Excluded Collateral.

"Collateral Agent" shall mean the Administrative Agent acting as collateral agent for the Secured Creditors pursuant to the Security Documents.

"Commitment" shall mean any of the commitments of any Lender to extend credit hereunder (i.e., an Initial New Money Term Loan Commitment, a Delayed-Draw New Money Term Loan Commitment, an Initial Roll-Up Term Loan Commitment, a Delayed-Draw Roll-Up Term Loan Commitment, or commitments in respect of any additional term loans that are designated as an additional Class of Term Loans).

"Commitment Parties" shall have the meaning of "Backstop Commitment Parties" specified in the DIP Commitment Letter.

"Commitment Premium" shall have the meaning specified in Section 4.01(a).

"Commodity Exchange Act" shall mean the Commodity Exchange Act (7 U.S.C. 1 et seq.) and any successor statute.

"Company" shall mean any corporation, limited liability company, partnership or other business entity (or the adjectival form thereof, where appropriate).

"Confirmation Order" shall have the meaning specified in the Restructuring Support Agreement.

"Consolidated Subsidiary" shall mean at any date any Subsidiary which would be consolidated with those of Holdings (or any other Person, as the context may require hereunder) in its consolidated financial statements if such statements were prepared as of such date, it being agreed that each Practice Group shall be deemed a Consolidated Subsidiary.

"Contingent Obligation" shall mean, as to any Person, any obligation of such Person as a result of such Person being a general partner of any other Person, unless the underlying obligation is expressly made non-recourse as to such general partner, and any obligation of such Person guaranteeing or intended to guarantee any Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term

-9-

Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary indemnity obligations in effect on the Closing Date or customary and reasonable indemnity obligations entered into in connection with any contractual arrangement, including any acquisition, capital expenditure, investment or disposition of assets permitted under this Agreement (other than any such obligations with respect to Indebtedness). The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"Corporate Practice Rules" shall mean any law relating to the practice of medicine, fee splitting or the sharing of revenues related to the practice of medicine, the employment of physicians or other healthcare professionals and the "corporate practice of medicine doctrine" or otherwise applicable to (i) the organization, control or ownership of entities that employ physicians or other medical or clinical service providers or that engage individuals to provide medical or clinical services and (ii) the unauthorized or unlicensed practice of medicine or other clinical services by entities that are not wholly owned by physicians or other medical or clinical service providers.

"Corrections Business" shall mean the Credit Parties that are not in the RS Business, and which are set forth on Schedule 1.01(h).

"Corrections Business Sale" shall mean the sale of the Corrections Business, whether by a sale under section 363 of the Bankruptcy Code or otherwise, and which shall have been approved by the Required Lenders in writing.

"Corrections CF Forecast" has the meaning set forth in Section 9.12(d).

"Corresponding Tenor" with respect to any Available Tenor shall mean, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding Business Day adjustment) as such Available Tenor.

"Credit Documents" shall mean this Agreement, the Subsidiaries Guaranty, the Pledge Agreement, the Security Agreement, the Intellectual Property Security Agreements, the Interim DIP Order, the Final DIP Order, the DIP Commitment Letter, the Fee Letter, the Administrative Agent Fee Letter, the Fronting Fee Letter, all Approved DIP Budgets, all approved Variance Reports, all Loan Withdrawal Requests, the Loan Proceeds Account Control Agreement and, after the execution and delivery thereof pursuant to the terms of this Agreement, each Note (if any) and each other Security Document.

"Credit Event" shall mean the making of any Loan.

"Credit Party" shall mean each Holdings Guarantor, the Borrower and each Subsidiary Guarantor.

"Creditors' Committee" means any official committee of unsecured creditors appointed in the Chapter 11 Cases.

"Daily Simple SOFR" shall mean, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided that, if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the

Administrative Agent may establish another convention in its reasonable discretion (in consultation with the Borrower).

"Default" shall mean any event, act or condition set forth in Section 11 which with notice or lapse of time, in each case, as set forth in such Section, or both, would (without cure or waiver hereunder) constitute an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans required to be funded by it or (ii) pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Borrower or the Administrative Agent or any other Lender in writing that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a Loan cannot be satisfied), (c) has failed, within three (3) Business Days after request by the Administrative Agent or any other Lender, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations to fund prospective Loans under this Agreement; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Administrative Agent's or other Lender's receipt of such certification in form and substance satisfactory to it and the Administrative Agent, or (d) after the date of this Agreement, has become the subject of a bankruptcy or insolvency event.

"Delayed-Draw New Money Term Lender" shall mean any Lender that holds Delayed-Draw New Money Term Loans or any Delayed-Draw New Money Term Loan Commitments.

"Delayed-Draw New Money Term Loan Commitment" shall mean, for each Lender party to this Agreement on the Closing Date, the amount set forth opposite such Lender's name on Schedule 1.01(b)(i) directly below the column entitled "Delayed-Draw New Money Term Loan Commitment," as the same may be adjusted in connection with Fronting Arrangements, the New Money Term Loan Syndication, or other re-allocation set forth in the DIP Commitment Letter and/or terminated pursuant to the terms herein."Delayed-Draw New Money Term Loans" shall have the meaning provided in Section 2.01(b).

"Delayed-Draw Roll-Up Term Lender" shall mean any Lender that holds Delayed-Draw Roll-Up Term Loans or any Delayed-Draw Roll-Up Term Loan Commitments.

"Delayed-Draw Roll-Up Term Loan Commitment" shall mean, for each Roll-Up Term Lender party to this Agreement on the Closing Date, the amount set forth opposite such Lender's name on Schedule 1.01(b)(ii) directly below the column entitled "Delayed-Draw Roll-Up Term Loan Commitment," as the same may be adjusted in connection with the New Money Term Loan Syndication, other re-allocation set forth in the DIP Commitment Letter and/or terminated pursuant to the terms herein.

"Delayed-Draw Roll-Up Term Loans" shall have the meaning provided in Section 2.01(c).

"DIP Commitment Letter" shall mean that certain Commitment Letter, dated as of November 11, 2024, among Holdings, the Borrower, the other Debtors party thereto and the Commitment Parties from time to time party thereto, including the "DIP Term Sheet" (as defined therein) attached thereto.

-11-

"Disqualified Equity Interests" shall mean any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests or solely at the election of the issuer), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests and cash in lieu of fractional shares), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Latest Maturity Date of the Loans at the time of issuance; provided that if such Equity Interests are issued pursuant to a plan for the benefit of employees of Holdings (or any direct or indirect parent thereof), or its Restricted Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by Holdings (or any direct or indirect parent thereof), or any of its Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"Disqualified Institutions" shall mean those Persons that are competitors (and any such entities' Affiliates clearly identifiable solely on the basis of name) other than bona fide debt funds (other than as separately identified) of the Borrower and its Subsidiaries identified on or prior to the Closing Date to the Administrative Agent. Notwithstanding the foregoing, each Credit Party and the Lenders acknowledge and agree that the Administrative Agent will not have any responsibility or obligation to determine whether any Lender or potential Lender is a Disqualified Institution and the Administrative Agent will have no liability with respect to any assignment made to a Disqualified Institution. The Borrower shall confirm, upon the written request of the Administrative Agent or any Lender, whether a particular Person is a Disqualified Institution.

"Dollars" and the sign "$" shall each mean freely transferable lawful money of the United States.

"Domestic Subsidiary" of any Person shall mean any Subsidiary of such Person incorporated or organized in the United States or any state thereof or the District of Columbia.

"EEA Financial Institution" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Transferee" shall mean and include a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act) (other than a natural person) but in any event

-12-

excluding (i) Disqualified Institutions (with respect to participations, so long as the list of Disqualified Institutions is available to the Lenders) and (ii) Sponsor, Sponsor Affiliates, the Holdings Guarantors, the Borrower or any of their respective Subsidiaries.

"Environmental Claims" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of noncompliance or violation, investigations and/or adjudicatory proceedings relating in any way to any noncompliance with, or liability arising under, Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereafter, "Claims"), including (a) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, or remedial actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief arising out of or relating to an alleged injury or threat of injury to occupational health or safety or the environment, in both cases, due to the presence or Release of Hazardous Materials.

"Environmental Law" shall mean any applicable federal, state, local or foreign law (including principles of common law), rule, regulation, ordinance, code, directive, judgment, or order, now or hereafter in effect and in each case as amended, and any enforceable or binding judicial or administrative interpretation thereof, relating to the protection of the environment, or to occupational health (as it relates to the exposure to environmental hazards) or to the presence, Release or threatened Release, or the manufacture, use, transportation, treatment, storage, disposal or recycling of Hazardous Materials, or the arrangement for any such activities.

"Equity Interests" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interest in (however designated) equity of such Person, including any common stock, preferred stock, any limited or general partnership interest and any limited liability company membership interest; provided, that any instrument evidencing Indebtedness convertible or exchangeable for Equity Interests shall not be deemed to be Equity Interests, unless and until any such instruments are so converted or exchanged.

"ERISA" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" shall mean any person that for purposes of Title I or Title IV of ERISA or Section 412 of the Code would be deemed at any relevant time to be a single employer or otherwise aggregated with Holdings or any of its Restricted Subsidiaries under Section 414(b) or (c) of the Code or Section 4001 of ERISA.

"ERISA Event" shall mean any one or more of the following:

(a)     any Reportable Event;

(b)     the filing of a notice of intent to terminate any Plan, if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA, the filing under Section 4041(c) of ERISA of a notice of intent to terminate any Plan or the termination of any Plan under Section 4041(c) of ERISA;

(c)     the institution of proceedings, or the occurrence of an event or condition which would reasonably be expected to constitute grounds for the institution of proceedings by the PBGC under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan;

(d)      the failure to make a required contribution to any Plan that would result in the imposition of a lien or other encumbrance or the provision of security under Section 430 of the Code or Section 303 or 4068 of ERISA, or the arising of such a lien or encumbrance or the provision of such security; the failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, whether or not waived, under any Plan; the filing of any request for or receipt of a minimum funding waiver under Section 412 of the Code or Section 302 of ERISA with respect to any Plan; or a determination that any Plan is, or is reasonably expected to be, considered an at-risk plan within the meaning of Section 430 of the Code or Section 303 of ERISA;

(e)      engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA with respect to any Plan;

(f)      the failure to make any required contribution to a Multiemployer Plan; the complete or partial withdrawal of Holdings or any of its Restricted Subsidiaries or any ERISA Affiliate from a Multiemployer Plan, the reorganization or insolvency under Title IV of ERISA of any Multiemployer Plan, or the receipt by Holdings or any of its Restricted Subsidiaries or any ERISA Affiliate, of any notice that a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA; or

(g)      Holdings or any of its Restricted Subsidiaries or an ERISA Affiliate incurring any liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA).

"EU Bail-In Legislation Schedule" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" shall have the meaning provided in Section 11.

"Exchange Act" shall mean the Securities Exchange Act of 1934, and the rules and regulations promulgated thereunder.

"Excluded Collateral" shall have the meaning provided in the Security Agreement.

"Excluded Equity Interests" shall have the meaning provided in the Pledge Agreement.

"Excluded Taxes" shall mean with respect to any Lender or the Administrative Agent (a) Taxes imposed on or measured by its overall net income (however denominated), branch profits Taxes, and franchise Taxes, in each case, (i) imposed as a result of such Lender or the Administrative Agent being organized under the laws of, or having its principal office or, in the case of any Lender or Administrative Agent (in its capacity as a Lender), its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes; (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.13) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 5.04, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Lender's failure to comply with Section 5.04(g) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"<u>Facilities</u>" means the term loan facilities under which the Loans are made.

"<u>Fair Market Value</u>" shall mean, with respect to any asset (including any Equity Interests of any Person), the price at which a willing buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset, as determined in good faith by the board of directors or other governing body or, pursuant to a specific delegation of authority by such board of directors or governing body, a designated senior officer, of Holdings, or the Subsidiary of Holdings selling such asset.

"<u>FATCA</u>" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"<u>FCPA</u>" shall mean the Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder.

"<u>Federal Funds Rate</u>" shall mean, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by depository institutions, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three depository institutions of recognized standing selected by the Administrative Agent (rounded upward, if necessary, to a whole multiple of 1/100 of 1.00%).

"<u>Fee Letter</u>" shall mean that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement Administrative Agent Fee Letter, dated as of November 13, 2024, by and among the Company and the Administrative Agent.

"<u>Fees</u>" shall mean all amounts payable pursuant to or referred to in Section 4.01.

"<u>Final DIP Order</u>" shall mean a final order with respect to the Facilities, in form and substance satisfactory to the Administrative Agent, the Required Lenders and reasonably satisfactory to the Debtors, granting final approval of the Facilities and the Credit Documents.

"<u>Final DIP Order Entry Date</u>" shall mean the date on which the Bankruptcy Court enters the Final DIP Order.

"<u>Final New Money Funding Date</u>" means the date that is three (3) Business Days after the Final DIP Order Entry Date, or such later date that may be mutually agreed by the Borrower, the Fronting Lender and the Required Lenders.

"<u>Fiscal Quarter</u>" shall mean, for any Fiscal Year, (i) the fiscal period commencing on January 1 of such Fiscal Year and ending on March 31 of such Fiscal Year, (ii) the fiscal period commencing on April 1 of such Fiscal Year and ending on June 30 of such Fiscal Year, (iii) the fiscal period commencing on July 1 of such Fiscal Year and ending on September 30 of such Fiscal Year and (iv) the fiscal period commencing on October 1 of such Fiscal Year and ending on December 31 of such Fiscal Year.

"Fiscal Year" shall mean the fiscal year of Holdings and its Restricted Subsidiaries ending on December 31 of each calendar year.

"Flood Insurance Laws" shall mean, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Floor" shall mean a rate of interest per annum equal to 2.00%.

"Foreign Disposition" shall have the meaning provided in Section 5.02(l).

"Foreign Lender" shall mean a Lender that is not a U.S. Person.

"Foreign Pension Plan" shall mean any plan, fund (including any superannuation fund) or other similar program established or maintained outside the United States by Holdings or any one or more of its Restricted Subsidiaries primarily for the benefit of employees of Holdings or such Restricted Subsidiaries residing outside the United States, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code; provided that a Foreign Pension Plan shall not include any plan, fund or other similar program exclusively sponsored or maintained by a Governmental Authority.

"Foreign Recovery Event" shall have the meaning provided in Section 5.02(l).

"Foreign Subsidiary" of any Person shall mean any Restricted Subsidiary of such Person that is not a Domestic Subsidiary.

"Fronting Arrangement" shall mean a customary arrangement whereby the Fronting Lender shall facilitate the funding of the Initial New Money Term Loans and/or the Delayed-Draw New Money Term Loans and the New Money Term Loan Syndication, in each case, in terms mutually acceptable to the Fronting Lender and the Required Commitment Parties.

"Fronting Lender" shall mean UBS AG, Stamford Branch.

"Fronting Fee Letter" shall mean that certain DIP Financing Fronting Fee Letter, dated as of November 11, 2024, by and among, inter alia, the Borrower and the Fronting Lender.

"Fund" shall mean any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"GAAP" shall mean generally accepted accounting principles in the United States as in effect from time to time.

"Governmental Authority" shall mean the government of the United States, any other nation or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

-16-

"Governmental Programs" shall mean (i) the Medicare and Medicaid Programs, and (ii) other similar federal, state or local governmental health care programs.

"Granting Lender" shall have the meaning provided in Section 13.04(i).

"Guaranteed Obligations" shall have the meaning provided in Section 14.01.

"Guarantor" shall mean each Holdings Guarantor and each Subsidiary Guarantor; *provided*, that solely with respect to the Roll-Up Term Loans, "Guarantor" shall exclude each Limited Guarantor, and each reference in any Credit Document to a Guaranty or any guarantee of the Obligations otherwise by a Limited Guarantor shall only refer to a guarantee the Obligations with respect to the New Money Term Loans.

"Guaranty" shall mean each of the Holdings Guaranty and the Subsidiaries Guaranty.

"Hazardous Materials" shall mean (a) any petroleum or petroleum products, radioactive materials, asbestos that is friable, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls, medical or biological wastes or materials and radon gas; and (b) any chemicals, materials, wastes, pollutants, contaminants or substances in any form that are prohibited, limited or regulated pursuant to any Environmental Law.

"Health Care Laws" shall mean all laws relating to the following, in each case applicable to or binding upon any Person or any of such Person's property or to which such Person or any of such Person's property is subject, including:  (i) federal fraud and abuse laws and regulations, including, the Ethics in Patient Referral Act (42 U.S.C. §1395nn and §1395(q)), the federal Anti-Kickback Statute  (42 U.S.C. § 1320a-7b(b)), the civil False Claims Act (31 U.S.C. § 3729 et seq.) and Sections 1320a-7 and 1320a-7a and 1320a-7b of Title 42 of the United States Code; (ii) the Food, Drug and Cosmetic Act (21 U.S.C. § 301 et seq.); (iii) the Anti-Inducement Law (42 U.S.C. § 1320a-7a(a)(5)); (iv) state laws similar to any of the foregoing; (v) HIPAA; (vi) the Social Security Act; (vii) laws governing the Medicare program (Title XVIII of the Social Security Act) and the regulations promulgated thereunder; (viii) laws governing the Medicaid program (Title XIX of the Social Security Act) and the regulations promulgated thereunder; (ix) the Corporate Practice Rules; (x) the licensure or regulation of physician and health care providers, healthcare professionals, facilities or payors; (xi) patient health care; (xii) quality, safety certification and accreditation standards and requirements; and (xiii) any and all other applicable federal, state or local health care laws, rules, codes, statutes, regulations, manuals, orders, ordinances, statutes, policies, professional or ethical rules, administrative guidance and requirements.

"HIPAA" shall mean the:  (i) Health Insurance Portability and Accountability Act of 1996; (ii) the Health Information Technology for Economic and Clinical Health Act (Title XIII of the American Recovery and Reinvestment Act of 2009); and (iii) any state and local laws regulating the privacy and/or security of individually identifiable information, including state laws providing for notification of breach of privacy or security of individually identifiable information.

"Holdings" shall mean CCS-CMGC Intermediate Holdings, Inc., a Delaware corporation, and any successor thereto, whether by merger, conversion or otherwise.

"Holdings Guarantor" shall have the meaning set forth in Section 14.01.

"Holdings Guaranty" shall mean the guaranty of each Holdings Guarantor pursuant to Section 14.

-17-

"Indebtedness" shall mean, as to any Person, without duplication, (i) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services, (ii) the maximum amount available to be drawn or paid under all letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations issued for the account of such Person and all unpaid drawings and unreimbursed payments in respect of such letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations, (iii) all indebtedness of the types described in clause (i), (ii), (iv), (v), (vi) or (vii) of this definition secured by any Lien on any property owned by such Person, whether or not such indebtedness has been assumed by such Person (provided that, if the Person has not assumed or otherwise become liable in respect of such indebtedness, such indebtedness shall be deemed to be in an amount equal to the lesser of (x) the Fair Market Value of the property to which such Lien relates or (y) the aggregate unpaid amount thereof), (iv) all Capitalized Lease Obligations of such Person, (v) all Contingent Obligations of such Person in respect of indebtedness of the types described in clauses (i), (ii), (iv), (vi) or (vii) of this definition, (vi) [reserved] and (vii) all obligations of such Person in respect of Disqualified Equity Interests. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is directly liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. Notwithstanding the foregoing, Indebtedness shall not include trade payables, accrued expenses and deferred tax and other credits incurred by any Person in accordance with customary practices and in the ordinary course of business, deferred compensation or any earn-out obligation (until such obligation is then due and owing and a non-contingent liability on the balance sheet of such Person in accordance with GAAP) of such Person or amounts owed pursuant to any contractual arrangement with, and for services to be performed by, an original equipment manufacturer incurred in the ordinary course of business.

"Indemnified Person" shall have the meaning provided in Section 13.01(a).

"Indemnified Taxes" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Credit Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Information" shall mean all information received from Holdings or the Borrower and related to Holdings, the Borrower or their business, other than any such information that was available to the Administrative Agent, the Collateral Agent or any Lender on a nonconfidential basis prior to its disclosure by Holdings or the Borrower.

"Initial DIP Budget" means the 13-week cash flow forecast attached hereto as Exhibit J.

"Initial Final Roll-Up Term Loan Commitment" shall mean, for each Roll-Up Term Lender, the amount set forth opposite such Lender's name on Schedule 1.01(b)(ii) directly below the column entitled "Initial Final Roll-Up Term Loan Commitment," as the same may be terminated pursuant to the terms herein.

"Initial Final Roll-Up Term Loans" shall have the meaning provided in Section 2.01(c).

"Initial Interim Roll-Up Term Loan Commitment" shall mean, for each Roll-Up Term Lender, the amount set forth opposite such Lender's name on Schedule 1.01(b)(ii) directly below the column entitled "Initial Interim Roll-Up Term Loan Commitment," as the same may be terminated pursuant to the terms herein.

"Initial Interim Roll-Up Term Loans" shall have the meaning provided in Section 2.01(c).

"Initial New Money Term Lender" shall mean any Lender that holds Initial New Money Term Loans or any Initial New Money Term Loan Commitments.

"Initial New Money Term Loan Commitment" shall mean, for each Lender party to this Agreement on the Closing Date, the amount set forth opposite such Lender's name on Schedule 1.01(b)(i) directly below the column entitled "Initial New Money Term Loan Commitment," as the same may be terminated pursuant to the terms herein.

"Initial New Money Term Loans" shall have the meaning provided in Section 2.01(a).

"Initial Roll-Up Term Lender" shall mean any Lender that holds Initial Roll-Up Term Loans or any Initial Roll-Up Term Loan Commitments.

"Initial Roll-Up Term Loan Commitment" shall mean, collectively, the Initial Interim Roll-Up Term Loan Commitment and the Initial Final Roll-Up Term Loan Commitment.

"Initial Roll-Up Term Loans" shall have the meaning provided in Section 2.01(c).

"Intellectual Property Security Agreements" shall mean any Copyright Security Agreements, Patent Security Agreements, and Trademark Security Agreements (as each such term is defined in the Security Agreement).

"Intercompany Loans" shall have the meaning provided in Section 10.05(viii).

"Intercompany Note" shall mean a promissory note evidencing Intercompany Loans, duly executed and delivered in form reasonably satisfactory to the Administrative Agent in its reasonable discretion, with blanks completed in conformity herewith.

"Interest Determination Date" shall mean, with respect to any Term SOFR Loan, the second Business Day prior to the commencement of any Interest Period relating to such Term SOFR Loan.

"Interest Payment Date" means the date that is the last Business Day of each Interest Period.

"Interest Period" shall have the meaning provided in Section 2.09.

"Interim DIP Order" means an order of the Bankruptcy Court (as the same may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms hereof) approving the Credit Documents on an interim basis and in the form attached hereto as Exhibit K, with any changes to such form as are satisfactory to the Agents and the Required Lenders. For the avoidance of doubt on the Closing Date, all references to the Interim DIP Order shall be to that certain Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, and (B) Use Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; (V) Scheduling Final Hearing; and (VI) Granting Related Relief, Docket No. [●].

"Investments" shall have the meaning provided in Section 10.05.

"IRS" shall mean the U.S. Internal Revenue Service.

"Junior Financing" shall mean, collectively, the Prepetition First Lien Obligations, the Prepetition Second Lien Obligations, any other Indebtedness that is secured on a junior basis to the Obligations,

-19-

unsecured or contractually subordinated to the Obligations or any Permitted Refinancing Indebtedness in respect thereof.

"Junior Financing Documentation" shall mean any documentation governing any Junior Financing.

"Katsumi Securitization Facility" means the receivables factoring arrangement evidenced by (i) the Receivables Sale Agreement dated September 27, 2023, by and among Wellpath LLC, Wellpath Recovery Solutions, LLC, California Forensic Medical Group, Inc., California Health and Recovery Solutions, P.C., and Perimeter Hill RPA, LLC and (ii) the Receivables Purchase Agreement dated September 27, 2023 by and among Perimeter Hill RPA, LLC, Wellpath LLC, KARS Funding, LLC, and Katsumi Servicing, LLC.

"Latest Maturity Date" shall mean, at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time.

"Leaseholds" of any Person shall mean all the right, title and interest of such Person as lessee, sublessee or licensee in, to and under leases, subleases or licenses of land, improvements and/or fixtures.

"Lender" shall have the meaning provided in the first paragraph of this Agreement.

"Lender Advisors" shall mean Akin Gump Strauss Hauer & Feld LLP, Houlihan Lokey, Inc., Ankura Consulting Group, LLC and any other advisors, counsel, consultants and other professionals as are reasonably required by the Required Lenders in connection with the Loans and the Chapter 11 Cases.

"Lien" shall mean any mortgage, pledge, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including any conditional sale or other title retention agreement), and any lease having substantially the same effect as any of the foregoing.

"Limited Guarantor" shall mean (i) Intermediate Holdings and (ii) the Guarantors set forth on Schedule 1.01(h).

"Loans" shall mean the Term Loans.

"Loan Participant" shall mean any Person who participates in the Loans pursuant to Section 13.04, provided that only Eligible Transferees may be Loan Participants.

"Loan Proceeds Account" shall mean that certain segregated account ending in 0406 in the name of the Borrower and held at Bank of America and any replacement account opened in accordance with Section 9.16(d).

"Loan Proceeds Account Control Agreement" shall mean a springing account control agreement between the Collateral Agent and the account bank in form and substance reasonably satisfactory to the Collateral Agent and the Required Lenders that provides for "control" over the Loan Proceeds Account in favor of the Collateral Agent (for purposes of Articles 8 and 9 of the Uniform Commercial Code).

"Margin Stock" shall have the meaning provided in Regulation U.

"Material Adverse Effect" shall mean a material adverse change, or any event or occurrence, other than the commencement of the Chapter 11 Cases, which could reasonably be expected to result in a

material adverse change, in (i) the business, operations, performance, properties, contingent liabilities, material agreements or prospects of the Credit Parties and their respective subsidiaries, taken as a whole, since the Petition Date, (ii) the ability of the Borrower or the Guarantors to perform their respective obligations under the Credit Documents or (iii) the ability of the Agents and the Lenders to enforce the Credit Documents.

"<u>Management Conference Call</u>" shall have the meaning provided in Section 9.12(e).

"<u>Management/Services Agreement</u>" shall mean a management agreement, service agreement or other similar agreement entered into between Holdings, the Borrower or any of their respective Restricted Subsidiaries and a Practice Group, pursuant to which Holdings, the Borrower or such Restricted Subsidiary provides management and administrative services to such Practice Group in exchange for a management fee paid to Holdings, the Borrower or such Restricted Subsidiary.

"<u>Maturity Date</u>" shall mean the earliest of: (a) the date that is 210 days after the Petition Date; (b) 31 days after the entry of the Interim DIP Order by the Bankruptcy Court if the Final DIP Order has not been entered by the Bankruptcy Court (unless otherwise extended with the prior written consent of the Required Lenders); (c) the consummation of one or more section 363 sales resulting in the sale of all or substantially all of the Debtors' assets; (d) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date") of a plan of liquidation or reorganization filed in the Cases that is confirmed pursuant to an order entered by the Bankruptcy Court (including any Plan of Reorganization); and (e) the acceleration of the Loans hereunder pursuant to Section 11; <u>provided</u>, <u>further</u>, that if any such day is not a Business Day, the Maturity Date shall be the Business Day immediately succeeding such day.

"<u>Maximum Rate</u>" shall have the meaning provided in Section 13.21.

"<u>Milestones</u>" shall mean the milestones set forth on Schedule 1.01(c).

"<u>Minimum Borrowing Amount</u>" shall mean, at any time, $5,000,000.

"<u>Moody's</u>" shall mean Moody's Investors Service, Inc., together with its successors.

"<u>Mortgage</u>" shall mean a mortgage, leasehold mortgage, deed of trust, leasehold deed of trust, deed to secure debt, leasehold deed to secure debt, debenture or similar security instrument pursuant to which the Borrower or a Guarantor grants to the Collateral Agent a Lien.

"<u>Mortgage Policy</u>" shall mean an ALTA Lender's title insurance policy (Form 2006).

"<u>Mortgaged Property</u>" shall mean any Real Property owned in fee simple by Holdings or any of its Restricted Subsidiaries which is encumbered (or required to be encumbered) by a Mortgage pursuant to the terms hereof.

"<u>Multiemployer Plan</u>" shall mean any multiemployer plan as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is an obligation to contribute of) Holdings or any of its Restricted Subsidiaries or with respect to which Holdings or any of its Restricted Subsidiaries has any liability (including on account of an ERISA Affiliate).

"<u>NAIC</u>" shall mean the National Association of Insurance Commissioners.

"<u>Net Debt Proceeds</u>" shall mean with respect to any incurrence of Indebtedness, the gross cash proceeds (net of underwriting discounts and commissions, fees and other costs associated therewith, including those of attorneys, accountants and other professionals) received by Holdings and its Restricted Subsidiaries from the respective incurrence of such Indebtedness.

"<u>Net Recovery Event Proceeds</u>" shall mean, with respect to any Recovery Event, the cash proceeds received by Holdings and its Restricted Subsidiaries in connection with such Recovery Event, net of (i) costs, expenses and Taxes incurred in connection with such Recovery Event, (ii) in the case of any Recovery Event regarding a Non-Wholly Owned Subsidiary, the <u>pro rata</u> portion of such proceeds that is contractually required (including pursuant to the organizational documents of such Subsidiary) to be paid to third Persons holding minority interests of such Subsidiary at the time of such Recovery Event (with such portion not to exceed such third Person's proportionate share of such proceeds based on its relative holding of Equity Interests in such Subsidiary), (iii) any funded escrow established in connection with any such Recovery Event (<u>provided</u> that to the extent that any amounts are released from such escrow to Holdings or a Restricted Subsidiary thereof, such amounts, net of any related expenses, shall constitute Net Recovery Event Proceeds), (iv) any Taxes paid or reasonably estimated to be payable in connection therewith, (v) the amount of such gross cash proceeds required to be used to permanently repay any Indebtedness (other than Indebtedness pursuant to this Agreement) which is secured by a Lien (other than (i) a Lien that ranks subordinated to the Lien securing the Obligations or (ii) a Lien ranking pari passu with the Liens securing the Obligations unless such Indebtedness provides for ratable sharing of such proceeds as described in the third proviso to Section 5.02(g)) on the respective assets which were the subject of such Recovery Event and (vi) without duplication of <u>clause (iii)</u> above, the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any Taxes deducted pursuant to <u>clause (iv)</u> above) (x) related to any of the applicable assets and (y) retained by Holdings or any of its Restricted Subsidiaries including, without limitation, pension plan and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Recovery Event Proceeds with respect to such Recovery Event on the date of such reduction).

"<u>Net Sale Proceeds</u>" shall mean for any sale, transfer or other disposition of assets, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received by Holdings and its Restricted Subsidiaries from such sale, transfer or other disposition of assets, net of (i) transaction fees, expenses and costs (including any underwriting, brokerage or other customary selling commissions, legal, advisory and other fees and expenses (including title and recording expenses), associated therewith and sales, VAT and transfer Taxes arising therefrom), (ii) payments of unassumed liabilities relating to the assets sold, transferred or otherwise disposed of at the time of, or within 60 days after, the date of such sale, transfer or other disposition, (iii) the amount of such gross cash proceeds required to be used to permanently repay any Indebtedness (other than Indebtedness pursuant to this Agreement) which is secured by a Lien (other than (i) a Lien that ranks subordinated to the Lien securing the Obligations or (ii) a Lien ranking pari passu with the Liens securing the Obligations unless such Indebtedness provides for ratable sharing of such proceeds as described in the third proviso to Section 5.02(e)) on the respective assets which were sold, transferred or otherwise disposed of, (iv) Taxes paid or reasonably estimated to be payable in connection therewith, (v) any funded escrow established pursuant to the documents evidencing any such sale, transfer or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale, transfer or disposition (<u>provided</u> that to the extent that any amounts are released from such escrow to Holdings or a Restricted Subsidiary thereof, such amounts, net of any related expenses, shall constitute Net Sale Proceeds) and (vi) without duplication of <u>clause (v)</u> above, the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the

sale price or any liabilities (other than any Taxes deducted pursuant to <u>clause (iv)</u> above) (x) related to any of the applicable assets and (y) retained by Holdings or any of its Restricted Subsidiaries including pension plan and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Sale Proceeds of such sale, transfer or disposition of assets occurring on the date of such reduction); <u>provided</u>, that notwithstanding the foregoing, payments in connection with cures/critical vendors, any expenses of the Prepetition Lenders or the Lenders, wind down expenses or other similar costs and expenses in connection with the Chapter 11 Cases may not be netted out from such gross cash proceeds.

"<u>New Money Term Lender</u>" shall mean any Initial New Money Term Lender or any Delayed-Draw New Money Term Lender.

"<u>New Money Term Loan Commitment</u>" shall mean, for each Lender, its Initial New Money Term Loan Commitment and Delayed-Draw New Money Term Loan Commitment.

"<u>New Money Term Loans</u>" shall mean the Initial New Money Term Loans and any Delayed-Draw New Money Term Loans made by any Lender hereunder.

"<u>New Money Term Loan Syndication</u>" shall mean the subscription by, and assignment to, of a portion of the New Money Term Loan Commitment, the New Money Term Loans and the related Roll-Up Term Loan Commitment, to certain Prepetition Lenders or their designees pursuant to the Syndication Procedures (as defined in the DIP Term Sheet) and the re-allocation of the Commitment as a result thereto.

"<u>Non-Defaulting Lender</u>" shall mean and include each Lender, respectively, other than any Defaulting Lender.

"<u>Non-Wholly Owned Subsidiary</u>" shall mean, as to any Person, each Subsidiary of such Person which is not a Wholly-Owned Subsidiary of such Person.

"<u>Notice of Borrowing</u>" shall have the meaning provided in Section 2.03(a).

"<u>Notice of Conversion/Continuation</u>" shall have the meaning provided in Section 2.06.

"<u>Notice Office</u>" shall mean 600 Washington Boulevard, Stamford, Connecticut 06901, Attention: Agency & Portfolio Management, Telephone No.: (203) 719-4319 and Email: Agency-UBSAmericas@ubs.com or, in either case such other office or person as the Administrative Agent or the Collateral Agent may hereafter designate in writing as such to the other parties hereto.

"<u>Obligations</u>" shall mean all now existing or hereafter arising debts, liabilities, obligations, covenants, and duties of payment or performance by the Borrower and the other Credit Parties of every kind, matured or unmatured, direct or contingent, owing, arising, due, or payable by any Credit Party arising out of this Agreement or any other Credit Document, including, without limitation, all obligations to repay principal or interest (including interest, fees and other amounts accruing during the Chapter 11 Cases, any other proceeding under the Bankruptcy Code or other bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, and to pay interest, fees (including, but not limited to, the Commitment Premium and the Closing Fee), costs, charges, expenses, professional fees, and all sums chargeable to any Credit Party or for which any Credit Party is liable as indemnitor under the Credit Documents, whether or not evidenced by any note or other instrument.

"OFAC" shall have the meaning provided in Section 8.19(b).

"Other Connection Taxes" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

"Other Taxes" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to a request of the Borrower under Section 2.13).

"Participant Register" shall have the meaning provided in Section 13.04(j).

"Patriot Act" shall mean the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (as amended from time to time).

"Payment Office" shall mean the office of the Administrative Agent located at 600 Washington Boulevard, Stamford, Connecticut 06901 or such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"PBGC" shall mean the U.S. Pension Benefit Guaranty Corporation.

"Periodic Term SOFR Determination Day" shall have the meaning specified in the definition of "Term SOFR".

"Permitted Encumbrance" shall mean, with respect to any Mortgaged Property, Permitted Liens and other such exceptions to title as are set forth in the Mortgage Policy delivered with respect thereto, all of which exceptions must be reasonably acceptable to the Collateral Agent in its reasonable discretion.

"Permitted Holders" shall mean collectively, (i) the Sponsor and its Affiliates, (ii) any management or board members (or equivalent governing body) of Holdings or its Subsidiaries and any Affiliate thereof as of the Closing Date, and (iii) co-investors identified to the Administrative Agent by the Sponsor as of the Closing Date.

"Permitted Liens" shall have the meaning provided in Section 10.01.

"Permitted Refinancing" shall mean, with respect to any Person, any modification, refinancing, replacement, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, replaced, refunded, renewed or extended except by an amount equal to unpaid accrued interest, fees (including original issue discount), expenses and premium thereon and by an amount equal to any existing commitments unutilized thereunder, unless the incurrence of the Indebtedness and, if applicable, Liens above such amount are otherwise permitted hereby, (b) such modification, refinancing, replacement, refunding, restructuring, renewal or extension has a final stated maturity date equal to or later than the final stated maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to

Maturity of, the Indebtedness being modified, refinanced, replaced, refunded, renewed, or extended (other than to the extent of nominal amortization for periods where amortization has been eliminated or reduced as a result of prepayments of such Indebtedness), (c) at the time thereof, no Event of Default shall have occurred and be continuing, (d) such modification, refinancing, replacement, refunding, renewal or extension does not add guarantors or security from that which applied to such Indebtedness being modified, refinanced, replaced, refunded, renewed or extended, unless in connection with an acquisition (so long as such guarantors, or security are also added to support the Obligations to the extent required by Section 9.11), (e) to the extent such Indebtedness being modified, refinanced, replaced, refunded, renewed or extended is subordinated in right of payment to the Obligations, such modification, refinancing, replacement, refunding, renewal or extension is subordinated in right of payment to the Obligations (i) on terms (taken as a whole) at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended or (ii) on terms reasonably satisfactory to the Administrative Agent, (f) to the extent such Indebtedness being modified, refinanced, replaced, refunded, renewed or extended is secured by Liens that are subordinated to the Liens securing the Obligations, such modification, refinancing, replacement, refunding, renewal or extension is unsecured or secured by Liens that are subordinated to the Liens securing the Obligations on terms (taken as a whole) at least as favorable to the Lenders as those contained in the documentation (including any intercreditor or similar agreements) governing the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended, (g) such modification, refinancing, replacement, refunding, renewal or extension is incurred by the Person or Persons who are the obligors of the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended and (h) such modification, refinancing, replacement, refunding, renewal or extension contains terms and conditions (excluding pricing, and optional prepayment or redemption terms which shall be determined by Borrower) of any such Indebtedness that reflect market terms and conditions at the time of incurrence or issuance of such Indebtedness (as reasonably determined by Borrower).  Notwithstanding the foregoing, any Permitted Refinancing of any Indebtedness under the Prepetition Credit Agreements shall require the consent of the Required Lenders.

"Permitted Refinancing Indebtedness" shall mean, with respect to any Indebtedness being modified, refinanced, replaced, refunded, renewed or extended, any Indebtedness implemented in respect thereof pursuant to, and in accordance with the requirements of, a Permitted Refinancing.

"Permitted Surviving Debt" shall have the meaning provided in Section 10.04(ii).

"Person" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any Governmental Authority.

"Petition Date" shall have the meaning provided in the Preliminary Statements to this Agreement.

"PIK Interest" shall have the meaning provided in Section 2.08(d).

"Plan" shall mean an "employee pension benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA maintained or contributed to by the Borrower or any of its Restricted Subsidiaries or with respect to which  the Borrower or any of its Restricted Subsidiaries has any liability (including on account of an ERISA Affiliate).

"Pledge Agreement" shall have the meaning provided in Section 6.10(a).

"Pledge Agreement Collateral" shall mean all "Collateral" as defined in the Pledge Agreement, but excluding any Excluded Collateral.

"<u>Practice Group</u>" shall mean any Person (a) that provides medical, healthcare or related professional services; (b) the Equity Interests of which are not owned by Holdings, the Borrower or any of their respective Restricted Subsidiaries; (c) that is party to a Management/Services Agreement pursuant to which Holdings, the Borrower or any of their respective Restricted Subsidiaries manages, without exercising any professional medical judgment, the day-to-day non-clinical, administrative operations of such Person and (d) that pays to Holdings, the Borrower or any of their respective Restricted Subsidiaries fees pursuant to any Management/Services Agreement to which such Person is a party. As of the Closing Date, each Person listed as a "Practice Group" on Schedule 1.01(d) shall be a Practice Group.

"<u>Prepetition Agents</u>" means each "Agent", "Administrative Agent", "Collateral Agent" and other similar terms as defined in the Prepetition Credit Agreements.

"<u>Prepetition Credit Agreements</u>" means each of the Prepetition First Lien Credit Agreement and Prepetition Second Lien Credit Agreement.

"<u>Prepetition Credit Documents</u>" means the "Credit Documents" as defined in and under each of the Prepetition Credit Agreements.

"<u>Prepetition First Lien Credit Agreement</u>" means that certain First Lien Credit Agreement, dated as of October 1, 2018 (as amended by Amendment No. 1, dated as of July 3, 2023, Amendment No. 2, dated as of August 7, 2023 and as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time), among the Borrower, Holdings, the lenders from time to time party thereto and UBS as administrative agent and collateral agent.

"<u>Prepetition First Lien Obligations</u>" means the "Obligations" as defined in the Prepetition First Lien Credit Agreement.

"<u>Prepetition Lenders</u>" means the "Lenders" as defined in the Prepetition Credit Agreements.

"<u>Permitted Prior Liens</u>" shall have the meaning set forth in the Applicable DIP Order.

"<u>Prepetition Second Lien Credit Agreement</u>" means that certain Second Lien Credit Agreement, dated as of October 1, 2018 (as amended by Amendment No. 1, dated as of July 3, 2023, and as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time), among the Borrower, Holdings, the lenders from time to time party thereto and UBS as administrative agent and collateral agent.

"<u>Prepetition Second Lien Obligations</u>" means the "Obligations" as defined in the Prepetition Second Lien Credit Agreement.

"<u>Prime Lending Rate</u>" shall mean the rate which the Administrative Agent determines from time to time as its prime lending rate in effect at its principal office in New York City and notified to the Borrower.  The Prime Lending Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer by the Administrative Agent, which may make commercial loans or other loans at rates of interest at, above or below the Prime Lending Rate.

"<u>Professional Fees and Financing Costs</u>" shall mean (i) all professional fees, including professional fees and expenses incurred by the Debtors, the Agents, the Lenders and the Creditors' Committee, if any, (ii) all interest and fees due and payable pursuant to this Agreement, (iii) any payment with respect to the Adequate Protection Obligations, and (iv) all fees due and payable pursuant to 28 U.S.C. § 1930(a)(6) plus any interest due and payable under 31 U.S.C. § 3717.

"Prohibited Variance" shall have the meaning provided in Section 10.07.

"PTE" shall mean a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Qualified Equity Interests" shall mean any Equity Interests that are not Disqualified Equity Interests.

"Quarterly Payment Date" shall mean the last Business Day of each March, June, September and December occurring after the Closing Date.

"Real Property" of any Person shall mean all the right, title and interest of such Person in and to land, improvements and fixtures, which constitute real property, including Leaseholds, to the extent constituting an interest in real property.

"Recipient" shall mean (a) the Administrative Agent or (b) any Lender, as applicable.

"Recovery Event" shall mean any event that gives rise to the receipt by Holdings or any of its Restricted Subsidiaries of any cash insurance proceeds or condemnation awards payable (i) by reason of theft, loss, physical destruction, damage, taking or any other similar event with respect to any property or assets of Holdings or any of its Restricted Subsidiaries (but not by reason of any loss of revenues or interruption of business or operations caused thereby) and (ii) under any policy of insurance required to be maintained under Section 9.03, in each case except to the extent such proceeds or awards constitute reimbursement or compensation for amounts previously paid by the Borrower or any of its Restricted Subsidiaries in respect of any such event (as certified to the Administrative Agent by the Borrower pursuant to an officer's certificate delivered by an Authorized Officer not later than the fifth Business Day following the date of the receipt of such proceeds or awards).

"Register" shall have the meaning provided in Section 13.16.

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation X" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Related Parties" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents, partners, members, sub-agents, representatives, shareholders, attorneys, attorneys-in-fact, controlling persons, counsel and other advisors of such Person and such Person's Affiliates and their heirs, successors and permitted assigns.

"Release" shall mean disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping, or migrating, into, through or upon any land or water or air, or otherwise entering into the environment.

"<u>Relevant Governmental Body</u>" shall mean the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"<u>Reorganization Plan</u>" means a chapter 11 plan of reorganization (including the plan of reorganization contemplated in the term sheet attached as Exhibit F to the Restructuring Support Agreement) in the Chapter 11 Cases of the Credit Parties (including all related schedules, supplements, exhibits and orders, as applicable) which (a) shall provide for the payment in full of all Obligations in cash unless the Required Lenders agree to a different treatment of the Loans and any accrued and unpaid interest thereon and (b) be otherwise acceptable to the Required Lenders.

"<u>Replaced Lender</u>" shall have the meaning provided in Section 2.13.

"<u>Replacement</u>" shall mean any modification, refinancing, refunding, renewal, replacement, redemption, repurchase, defeasance, exchange and/or extension of any Indebtedness.

"<u>Replacement Lender</u>" shall have the meaning provided in Section 2.13.

"<u>Reportable Event</u>" shall mean an event described in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan that is subject to Title IV of ERISA other than those events as to which the 30-day notice period is waived under applicable regulations.

"<u>Required Commitment Parties</u>" shall have the meaning provided in the DIP Commitment Letter.

"<u>Required Lenders</u>" shall mean (i) until the date that is five (5) Business Days after the Closing Date, the Required Commitment Parties and (ii) thereafter, Non-Defaulting Lenders (until the date that is five (5) Business Days after the Final New Money Funding Date, excluding the Fronting Lender) the sum of whose outstanding Term Loans and Commitments (unused) at such time represents at least a majority of the sum of all outstanding Term Loans and Commitments (unused) of Non-Defaulting Lenders in effect at such time; <u>provided</u> that, following the date that is five (5) Business Days after the Final New Money Funding Date, any Term Loans and Commitments (unused) that are still held by the Fronting Lender thereafter shall be included for purposes of making such determination.

"<u>Restricted</u>" shall mean, when referring to cash or Cash Equivalents of Holdings or any of its Restricted Subsidiaries, that such cash or Cash Equivalents appears (or would be required to appear) as "restricted" on a consolidated balance sheet of Holdings or of any such Restricted Subsidiary (unless such appearance is related to the Credit Documents or the Prepetition Credit Documentation or Liens created thereunder).

"<u>Restricted Payment</u>" shall mean, with respect to any Person, that such Person has declared or paid a dividend, distribution or returned any equity capital to its stockholders, partners or members or authorized or made any other distribution, payment or delivery of property (other than Qualified Equity Interests of Holdings  (or any direct or indirect parent of Holdings, including any Holdings Guarantor)) or cash to its stockholders, partners or members in their capacity as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for a consideration any shares of any class of its capital stock or any other Equity Interests outstanding on or after the Closing Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests), or set aside any funds for any of the foregoing purposes, other than the payment of compensation or benefits in the ordinary course of business to holders of any such Equity Interests who are employees, consultants or other service providers of Holdings, the Borrower or any of their respective Restricted Subsidiaries, any of their respective direct or indirect parent companies or any of the Practice Groups.

"Restricted Subsidiary" shall mean any Subsidiary; provided that, for purposes of this Agreement, any reference to the Restricted Subsidiaries of Holdings shall be deemed to include each of the other Holdings Guarantors and all of their respective Subsidiaries.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of November 11, 2024, among the Borrower, the other Debtors and the Commitment Parties and other consenting stakeholders party thereto.

"Returns" shall have the meaning provided in Section 8.09.

"Roll-Up Term Lender" shall mean any Initial Roll-Up Term Lender or any Delayed-Draw Roll-Up Term Lender.

"Roll-Up Term Loan Commitment" shall mean the Initial Roll-Up Term Loan Commitment and the Delayed-Draw Roll-Up Term Loan Commitment.

"Roll-Up Term Loans" shall mean the Initial Roll-Up Term Loans and the Delayed-Draw Roll-Up Term Loans.

"RS Business" shall mean the Credit Parties involved in the business of (i) providing inpatient behavioral health services outside of correctional facilities, including inpatient and residential treatment, partial hospitalization and outpatient programs, and community-based services on behalf of Governmental Authorities, and (ii) providing behavioral health and/or substance use disorder services inside correctional facilities to the extent such services are paid by or on behalf of local or state mental health departments and result solely from an involuntary treatment order related to a behavioral health and/or substance use disorder diagnosis, which Credit Parties are set forth on Schedule 1.01(g).

"RS Business Sale" shall mean the RS Stalking Horse Sale or sale of the RS Business, whether by a sale under section 363 of the Bankruptcy Code or otherwise, and which shall have been approved by the Required Lenders in writing.

"RS CF Forecast" has the meaning set forth in Section 9.12(d).

"RS Stalking Horse Sale" shall have the meaning provided in Section 6.12.

"S&P" shall mean Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc., and any successor owner of such divisions.

"SEC" shall have the meaning provided in Section 9.01(h).

"Secured Creditors" shall mean and include each of (i) the Administrative Agent, (ii) the Collateral Agent and (iii) each Lender.

"Securities Act" shall mean the Securities Act of 1933 and the rules and regulations promulgated thereunder.

"Security Agreement" shall have the meaning provided in Section 6.10(b).

"Security Agreement Collateral" shall mean all "Collateral" as defined in the Security Agreement, but excluding any Excluded Collateral.

"<u>Security Document</u>" shall mean and include each of the Applicable DIP Order, the Security Agreement, the Pledge Agreement, the Intellectual Property Security Agreements, each Mortgage, the Loan Proceeds Account Control Agreement and each other agreement, instrument or document that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Creditors and, after the execution and delivery thereof, each Additional Security Document and any security agreement, pledge agreement or other similar agreement delivered to the Collateral Agent pursuant to Section 9.11 or Section 13.20.

"<u>SOFR</u>" shall mean a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"<u>SOFR Administrator</u>" shall mean the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"<u>SPC</u>" shall have the meaning provided in Section 13.04(i).

"<u>Sponsor</u>" shall mean, collectively, H.I.G. Capital, L.L.C., together with each of its Sponsor Fund Affiliates.

"<u>Sponsor Affiliate</u>" shall mean, with respect to the Sponsor, any other Person directly or indirectly controlling (including all directors and officers of Sponsor), controlled by, or under direct or indirect common control with, the Sponsor (but excluding any portfolio company of the Sponsor).  The Sponsor shall be deemed to control another Person if the Sponsor possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Sponsor Fund Affiliates</u>" shall mean, with respect to Sponsor, any fund or investment vehicle that (i) is organized, administered or managed by Sponsor, or a Sponsor Affiliate, or any entity that administers or manages Sponsor or (ii) has the same principal fund advisor as Sponsor, but, in each case, not including Sponsor's portfolio companies.

"<u>Stock Certificates</u>" shall mean Collateral consisting of certificates representing Equity Interests held by the Borrower or any Guarantor (<u>provided</u> that the Borrower and the Guarantors shall not be required to deliver Stock Certificates constituting Excluded Collateral) for which a security interest can be perfected by delivering such Stock Certificates, together with undated stock powers or other appropriate instruments of transfer executed in blank for each such certificate.

"<u>Subsidiaries Guaranty</u>" shall have the meaning provided in Section 6.14.

"<u>Subsidiary</u>" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time.  Unless otherwise qualified, all references to (i) a "<u>Subsidiary</u>" or to "<u>Subsidiaries</u>" in this Agreement shall refer to a Subsidiary or Subsidiaries of Holdings, and (ii) a Subsidiary of Holdings shall be deemed to include each of the other Holdings Guarantor and all of their respective Subsidiaries. Notwithstanding anything contained to the contrary in this Agreement or any other Credit Document, Practice Groups shall not be deemed to be Subsidiaries of the Borrower, any other Credit Party or any Subsidiary thereof, unless the

Borrower, such other Credit Party or such Subsidiary actually acquires Equity Interests of such Practice Group and such Practice Group otherwise satisfies the conditions set forth above in the first sentence above.

"Subsidiary Guarantor" shall mean (i) as of the Closing Date, the Subsidiaries of Holdings listed on Schedule 1.01(e), which in any event will include all Subsidiaries that are Debtors as of the Closing Date (excluding Borrower) and any other "Subsidiary Guarantor" as defined in the Prepetition 1L Credit Agreement and as defined in the Prepetition 2L Credit Agreement and (ii) each other Subsidiary of Holdings that executes and delivers a Subsidiaries Guaranty pursuant to Section 9.11 or otherwise (including by becoming a Debtor in the Chapter 11 Case unless waived by the Required Lenders).

"Tax" or "Taxes" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Tax Group" shall have the meaning provided in Section 10.03(ii)(B).

"Term Loans" shall mean the Initial New Money Term Loans, Delayed-Draw New Money Term Loans, the Initial Roll-Up Term Loans and the Delayed-Draw Roll-Up Term Loans.

"Term Note" shall have the meaning provided in Section 2.05(a).

"Term SOFR" shall mean,

(a)        for any calculation with respect to a Term SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)        for any calculation with respect to an Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "Base Rate Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Base Rate SOFR Determination Day.

"Term SOFR Administrator" shall mean CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Loan" shall mean a Loan that bears interest at a rate based on Term SOFR, other than pursuant to clause (iii)(x) of the definition of "Base Rate".

"Term SOFR Reference Rate" shall mean the forward-looking term rate based on SOFR.

"Threshold Amount" shall mean $20,000,000.

"Total Commitment" shall mean, at any time, the sum of the Commitments of each of the Lenders at such time.

"Trading with the Enemy Act" shall have the meaning provided in Section 8.19(a).

"Transactions" shall mean, collectively, (i) the execution, delivery and performance by each Credit Party of the Credit Documents to which it is a party, the incurrence of Loans hereunder and the use of proceeds thereof, (ii) the consummation of any other transaction on the Closing Date contemplated under the Restructuring Support Agreement and (iii) the payment of all fees and expenses in connection with the foregoing (the "Transaction Expenses").

"Transaction Expenses" shall have the meaning provided in the definition of "Transaction."

"Type" shall mean the type of Loan determined with regard to the interest option applicable thereto, i.e., whether a Base Rate Loan or a Term SOFR Loan.

"UBS" means UBS AG, Stamford Branch.

"UCC" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"UCC Filing Collateral" shall mean Collateral, including Collateral constituting investment property, for which a security interest can be perfected by filing a UCC-1 financing statement.

"Unadjusted Benchmark Replacement" shall mean the Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unfunded Pension Liability" of any Plan shall mean the amount, if any, by which the value of the liabilities under the Plan, as defined in Section 4001(a)(16) of ERISA, exceeds the fair market value of all plan assets determined in accordance with the assumptions used for funding the Plan pursuant to Section 412 of the Code for the applicable Plan year.

"United States" and "U.S." shall each mean the United States of America.

"Unrestricted" shall mean, when referring to cash or Cash Equivalents of Holdings, the Borrower or any of their respective Restricted Subsidiaries, that such cash or Cash Equivalents are not Restricted.

"Updated DIP Budget" has the meaning set forth in Section 9.12(b).

"U.S. Government Securities Business Day" shall mean any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that

the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 5.04(g)(ii)(B)(3).

"U.S. Trustee" means the United States Trustee for the Chapter 11 Cases assigned by the Bankruptcy Court.

"Variance Test Period" means, beginning after the first full cumulative two-week period after the Petition Date, which shall be covered by the first Variance Report to be delivered hereunder (the "Initial Variance Test Period"), each successive cumulative two-week, three-week, or four-week period, as applicable, which shall be covered by each successive Variance Report to be delivered hereunder with respect to the then-in-effect Approved DIP Budget. For the avoidance of doubt, the Variance Test Period for the then-in-effect Approved DIP Budget shall never be less than a cumulative two-week period and shall reset to a cumulative two-week period beginning with the first full cumulative two-week period after each Variance Test Period comprised of four cumulative weeks; provided, that if the Required Lenders have not approved an updated DIP Budget in accordance with the procedures below, the Variance Test Period shall continue to extend using the cumulative four-week period from the then-in-effect Approved DIP Budget, plus each successive week until a new DIP Budget is approved.

"Variance Report" has the meaning set forth in Section 9.12(c).

"Weighted Average Life to Maturity" shall mean, when applied to any Indebtedness, at any date, the quotient obtained by dividing (a) the sum of the products of (i) the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness multiplied by (ii) the amount of such payment; by (b) the sum of all such payments.

"Wholly-Owned Domestic Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Domestic Subsidiary.

"Wholly-Owned Subsidiary" shall mean, as to any Person, (i) any corporation 100% of whose capital stock is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time (other than, in the case of a Foreign Subsidiary of Holdings with respect to the preceding clauses (i) and (ii), director's qualifying shares and/or other nominal amount of shares required to be held by Persons other than Holdings, the Borrower and their respective Subsidiaries under applicable law).

"Withholding Agent" shall mean the Borrower, the Administrative Agent and any other applicable withholding agent.

"Write-Down and Conversion Powers" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

      1.01    <u>Other Definitional Provisions, etc.</u>

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Credit Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Credit Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (ii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iii) unless the context otherwise requires, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Equity Interests, securities, revenues, accounts, leasehold interests and contract rights, (iv) the word "will" shall be construed to have the same meaning and effect as the word "shall", (v) unless the context otherwise requires, any reference herein (A) to any Person shall be construed to include such Person's permitted successors and assigns and (B) to Holdings, the Borrower or any other Credit Party shall be construed to include Holdings, the Borrower or such Credit Party as debtor and debtor-in-possession and any receiver or trustee for Holdings, the Borrower or any other Credit Party, as the case may be, in any insolvency or liquidation proceeding, (vi) all references to "knowledge" of any Credit Party or a Subsidiary of Holdings means the actual knowledge of an Authorized Officer, (vii) references to "the best of an officer's knowledge" or similar phrases referring to "best knowledge" of an officer shall be interpreted to mean that such officer has made such diligent investigation or inquiry as would be customary and prudent for such officer to make in the context of the applicable circumstances and (viii) all references to any Governmental Authority, shall include any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(c)    The words "<u>hereof</u>," "<u>herein</u>" and "<u>hereunder</u>" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)    Unless otherwise expressly provided herein, (i) all references to documents, instruments and other agreements (including the Credit Documents) and all other contractual instruments shall be deemed to include all subsequent amendments, restatements, amendments and restatements, extensions, supplements, modifications, refinancings, renewals, replacements and restructurings thereto, but only to the extent that such amendments, restatements, amendments and restatements, extensions, supplements, modifications, refinancings, renewals, replacements and restructurings are permitted by the Credit Documents; and (ii) references to any law (including by succession of comparable successor laws) shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

(f)    All certifications to be made hereunder by an officer or representative of a Credit Party shall be made by such person in his or her capacity solely as an officer or a representative of such Credit Party, on such Credit Party's behalf and not in such person's individual capacity.

(g)    Any reference herein to a merger, transfer, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of

such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, Restricted Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

      1.02     <u>Accounting Terms</u>

      All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein. Notwithstanding any other provision contained herein, any lease that is treated as an operating lease for purposes of GAAP as of the date hereof shall not be treated as Indebtedness or as a Capitalized Lease Obligation and shall continue to be treated as an operating lease (and any future lease, if it were in effect on the date hereof, that would be treated as an operating lease for purposes of GAAP as of the date hereof shall be treated as an operating lease), in each case for purposes of this Agreement, notwithstanding any actual or proposed change in or application of GAAP after the date hereof.

      1.03     <u>Rounding</u>

      Any financial ratios required to be maintained pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

      1.04     <u>Times of Day</u>

      Unless specified, all references herein to times of day shall be references to Eastern Time (daylight or standard, as applicable).

      1.05     <u>Timing of Payment or Performance</u>

      When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance (including delivery of any documents or notices) required on a day which is not a Business Day, the date of such payment (other than as specified otherwise herein) or performance shall extend to the immediately succeeding Business Day and such extension shall be reflected in the computation of interest or fees, as the case may be.

      1.06     [Reserved]

      1.07     [Reserved]

      1.08     <u>Currency Translation</u>

      For purposes of determining compliance as of any date with Section 10 or any Event of Default under Section 11 or for any other specified purposes hereunder, amounts incurred or outstanding in currencies (other than Dollars) shall be translated into Dollars at the exchange rates in effect on the first Business Day of the Fiscal Quarter in which such determination occurs or in respect of which such determination is being made, as such exchange rates shall be determined in good faith by the Borrower

based on commonly used financial reporting sources.  No Default or Event of Default shall arise as a result of any limitation or threshold set forth in Dollars in Section 10, Section 11.04 or Section 11.09 or any defined term used therein being exceeded solely as a result of changes in currency exchange rates from those applicable on the first day of the Fiscal Quarter in which such determination occurs or in respect of which such determination is made (it being understood that such changes shall nonetheless be taken into account in determining the remaining availability (if any) under any such limitation or threshold).

       1.09    <u>Calculations, Computations</u>

The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with GAAP consistently applied throughout the periods involved (except as set forth in the notes thereto or as otherwise disclosed in writing by the Borrower to the Lender Advisors and, on a non-cleansing basis, to the Administrative Agent and the Lenders); <u>provided</u> that if at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Credit Document (including as a result of the effect of such change on any definition that includes accounting terms) used in calculating such ratio or determining compliance with such requirement) (the "<u>Accounting Change</u>") and the Borrower or the Administrative Agent shall so request, the Administrative Agent and the Borrower shall negotiate in good, faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders), <u>provided</u> <u>however</u>, that, until so amended, such ratio or requirement shall continue to be computed in conformity with those accounting principles and policies in effect immediately prior to such Accounting Change.  Notwithstanding anything to the contrary contained herein, all such financial statements shall be prepared without giving effect to any election under FASB ASC 825 (or any similar accounting principle) permitting a Person to value its financial liabilities at the fair value thereof.

       1.10    <u>Interest Rate and Fee Calculations</u>

All computations of interest and other Fees hereunder shall be made on the basis of a year of 360 days (except for interest calculated by reference to the Base Rate, which shall be based on a year of 365 or 366 days, as applicable) for the actual number of days (including the first day but excluding the last day) occurring the period for which such interest or Fees are payable.

       1.11    <u>[Reserved]</u>

       1.12    <u>[Reserved]</u>

       1.13    <u>Rates</u>

The Administrative Agent does not warrant or accept any responsibility for, and shall not  have any liability with respect to, (x) the continuation of, administration of, submission of, calculation of or any other  matter related to the rates referred to in the definition of "Base Rate", "Term SOFR Reference Rate" or "Term SOFR", or  any component definition thereof, or any alternative, successor or replacement reference rate thereto (including any  Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or  replacement reference rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, Base Rate, the Term SOFR Reference Rate, Term  SOFR or any other Benchmark prior to its discontinuance or unavailability), or (y) the effect, implementation or composition of any Benchmark Replacement Conforming Changes.  The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of Base Rate or a Benchmark, any alternative, successor or replacement rate (including any Benchmark Replacement) or

any relevant adjustments thereto, in each case, in a manner adverse to the Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain Base Rate, the Term SOFR Reference Rate, Term SOFR or any other Benchmark, or any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

SECTION 2.    Amount and Terms of Credit.

2.01    The Commitments

(a)    Initial New Money Term Loans.  Subject to and upon the terms and conditions set forth herein and in the DIP Orders, each Lender with an Initial New Money Term Loan Commitment severally agrees to make a term loan (the "Initial New Money Term Loan" and, collectively, the "Initial New Money Term Loans") to the Borrower, which Initial Term Loans (i) shall be incurred pursuant to a single drawing on the Closing Date, (ii) shall be denominated in Dollars, (iii) except as hereinafter provided, shall, at the option of the Borrower, be incurred and maintained as, and/or converted into, Base Rate Loans or Term SOFR Loans, and (iv) shall be equal to such Lender's Initial New Money Term Loan Commitment.

(b)    Delayed-Draw New Money Term Loans.  Subject to and upon the terms and conditions set forth herein and in the DIP Orders, each Lender with a Delayed-Draw New Money Term Loan Commitment severally agrees to make a term loan or term loans (each, an "Delayed-Draw New Money Term Loan" and, collectively, the "Delayed-Draw New Money Term Loans") to the Borrower, which Delayed-Draw New Money Term Loans (i) shall be funded on the Final New Money Funding Date, (ii) shall be denominated in Dollars, (iii) except as hereinafter provided, shall, at the option of the Borrower, be incurred and maintained as, and/or converted into, Base Rate Loans or Term SOFR Loans, and (iv) shall be equal to such Lender's Delayed-Draw New Money Term Loan Commitment.

(c)    Roll-Up Term Loans.  Subject to and upon the terms and conditions set forth herein and in the DIP Orders, (i) each Roll-Up Term Lender holding an Initial Roll-Up Term Loan Commitment shall be deemed to have made, (x) on the date that is five (5) Business Days after the funding of the Initial New Money Term Loans on the Closing Date (or, with respect to any Initial New Money Term Loans that have not been assigned from the Fronting Lender to the applicable DIP Commitment Party by such date, such other date that the Administrative Agent and the Required Commitment Parties may mutually agree),  a Term Loan (each, an "Initial Interim Roll-Up Term Loan" and collectively, the "Initial Interim Roll-Up Term Loans") by such Roll-Up Term Lender and borrowed by the Borrower hereunder on the Closing Date in an amount equal to such Roll-Up Term Lender's Initial Interim Roll-Up Term Loan Commitment and (y) on the Final DIP Order Entry Date, a Term Loan (each, an "Initial Final Roll-Up Term Loan" and collectively, the "Initial Final Roll-Up Term Loans", together with the Initial Interim Roll-Up Term Loan, each an "Initial Roll-Up Term Loan" and collectively, the "Initial Roll-Up Term Loans") by such Roll-Up Term Lender and borrowed by the Borrower hereunder on the Closing Date in an amount equal to such Roll-Up Term Lender's Initial Final Roll-Up Term Loan Commitment, and (ii) on the date that is five (5) Business Days after the funding of the Delayed-Draw New Money Term Loans on the Final New Money Funding Date (or, with respect to any Delayed-Draw New Money Term Loans that have not been assigned from the Fronting Lender to the applicable Lender pursuant to the New Money Term Loan Syndication by such date, such other date that the Administrative Agent and the Required Commitment Parties may mutually agree), each Roll-Up Term Lender holding a Delayed-Draw Roll-Up Term Loan Commitment shall be deemed to have made a Term Loan (each, a "Delayed-Draw

Roll-Up Term Loan" and collectively, the "Delayed-Draw Roll-Up Term Loans") by such Roll-Up Term Lender and borrowed by the Borrower hereunder on the Final New Money Funding Date in an amount equal to such Roll-Up Term Lender's Delayed-Draw Roll-Up Term Loan Commitment. The deemed borrowing by the Borrower of such Roll-Up Term Loans shall entitle the Borrower to receive for cancellation an equivalent aggregate principal amount of Prepetition First Lien Obligations from each Roll-Up Term Lender based upon such Roll-Up Term Lender's Roll-Up Term Loan Commitment and shall not entitle the Borrower to receive any cash or other consideration from any Roll-Up Term Lender and, notwithstanding that no such cash is exchanged, the Borrower shall owe the aggregate principal amount of the Roll-Up Term Loans to the Roll-Up Term Lenders under this Agreement and not under the Prepetition First Lien Credit Agreement.

(d)     Amounts borrowed (or, in the case of Roll-Up Term Loans, deemed borrowed) under this Section 2.01 and repaid, prepaid or otherwise satisfied in accordance with the Restructuring Support Agreement may not be reborrowed.

(e)     At any time from and after consummation of the RS Business Sale, the Required Lenders may elect to recharacterize all or any portion of the remaining Roll-Up Term Loans as Prepetition First Lien Obligations.

2.02     [Reserved]

2.03     Notice of Borrowing

When the Borrower desires to incur (i) the Initial New Money Term Loans hereunder on the Closing Date, the Borrower shall give the Administrative Agent at the Notice Office notice of the proposed Borrowing of such Initial New Money Term Loans to be incurred hereunder, which such notice shall be provided no later than the entry date of the Interim DIP Order, and (ii) the Delayed-Draw New Money Term Loans hereunder on the Final New Money Funding Date, the Borrower shall give the Administrative Agent at the Notice Office notice of the proposed Borrowing of such Delayed-Draw New Money Term Loans to be incurred hereunder, which such notice shall be provided at least three (3) U.S. Government Securities Business Days prior to the date of the proposed Borrowing (or such shorter period of time as the Administrative Agent may permit in its reasonable discretion), provided that, in each case, any such notice shall be deemed to have been given on a certain day only if given before 12:00 noon on such day. Each such notice (a "Notice of Borrowing"), except as otherwise expressly provided in Section 2.10, shall be irrevocable and shall be in writing, or by telephone promptly confirmed in writing, substantially in the form of Exhibit A-1, appropriately completed to specify: (i) the aggregate principal amount of the Loans to be incurred pursuant to such Borrowing, (ii) the date of such Borrowing (which shall be a Business Day), (iii) whether the Loans to be incurred are Initial New Money Term Loans or Delayed-Draw New Money Term Loans, (iv) location and number of the Borrower's account to which funds are to be disbursed, and (v) whether the Loans being incurred pursuant to such Borrowing are to be initially maintained as Base Rate Loans (which shall require the prior written consent of the Required Lenders, which consent shall solely be in the form of an email or other form of written communication from Akin Gump Strauss Hauer & Feld LLP, and each Lender hereby acknowledges and agrees that any such email or other communication from Akin Gump Strauss Hauer & Feld LLP shall be conclusively presumed to have been authorized by a written direction or instruction from the Required Lenders) or, to the extent permitted hereunder, Term SOFR Loans.  The Administrative Agent shall promptly give each Lender which is required to make Loans of the Class specified in the respective Notice of Borrowing, notice of such proposed Borrowing, of such Lender's proportionate share thereof and of the other matters required by the immediately preceding sentence to be specified in the Notice of Borrowing.

2.04     Disbursement of Funds

On the date specified in each Notice of Borrowing, each Lender with a New Money Term Loan Commitment of the respective Class will make available its pro rata portion (determined in accordance with Section 2.07) of each such Borrowing requested to be made on such date.  All such amounts pursuant to the foregoing two sentences will be made available in Dollars and in immediately available funds, and the Administrative Agent will, make available to the Borrower, or to such other account as the Borrower may specify in writing to the Administrative Agent, the aggregate of the amounts so made available by the Lenders.  Unless the Administrative Agent shall have been notified by any Lender prior to the date of Borrowing that such Lender does not intend to make available to the Administrative Agent such Lender's portion of any Borrowing to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing in accordance with the Fronting Arrangements and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the Borrower a corresponding amount. If such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to the Administrative Agent.  The Administrative Agent also shall be entitled to recover on demand from such Lender or the Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower until the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to (i) if recovered from such Lender, the overnight Federal Funds Rate for the first three days and at the interest rate otherwise applicable to such Loans for each day thereafter and (ii) if recovered from the Borrower, the rate of interest applicable to the respective Borrowing, as determined pursuant to Section 2.08. Nothing in this Section 2.04 shall be deemed to relieve any Lender from its obligation to make Loans hereunder or to prejudice any rights which the Borrower may have against any Lender as a result of any failure by such Lender to make Loans hereunder.

2.05    Notes

(a)    The Borrower's obligation to pay the principal of, and interest on, the Loans made by each Lender shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 13.16 and shall, if requested by such Lender, also be evidenced by a promissory note duly executed and delivered by the Borrower substantially in the form of Exhibit B, with blanks appropriately completed in conformity herewith (each, a "Term Note" and, collectively, the "Term Notes").

(b)    Each Lender will note on its internal records the amount of each Loan made by it and each payment in respect thereof and prior to any transfer of any of its Notes will endorse on the reverse side thereof the outstanding principal amount of Loans evidenced thereby.  Failure to make any such notation or any error in such notation shall not affect the Borrower's obligations in respect of such Loans.

(c)    Notwithstanding anything to the contrary contained above in this Section 2.05 or elsewhere in this Agreement, the Borrower shall only be required to deliver Notes to Lenders promptly following written request for the delivery of such Notes.  No failure of any Lender to request or obtain a Note evidencing its Loans to the Borrower shall affect or in any manner impair the obligations of the Borrower to pay the Loans (and all related Obligations) incurred by the Borrower which would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties therefor provided pursuant to the various Credit Documents.  Any Lender which does not have a Note evidencing its outstanding Loans shall in any event be required to make the notations otherwise described in preceding clause (b).

2.06    Conversions

The Borrower shall have the option to convert, on any Business Day, all or a portion equal to at least the Minimum Borrowing Amount of the outstanding principal amount of Loans  made pursuant to one or more Borrowings (so long as of the same Class) of one or more Types of Loans into a Borrowing (of the same Class) of another Type of Loan, provided that, (i) except as otherwise provided in Section 2.10(b), Term SOFR Loans may be converted into Base Rate Loans (x) only with the prior written consent of the Required Lenders (which consent shall solely be in the form of an email or other form of written communication from Akin Gump Strauss Hauer & Feld LLP, and each Lender hereby acknowledges and agrees that any such email or other communication from Akin Gump Strauss Hauer & Feld LLP shall be conclusively presumed to have been authorized by a written direction or instruction from the Required Lenders) and (y) only on the last day of an Interest Period applicable to the Loans being converted unless the Borrower pays any amounts due under Section 2.11 and no such partial conversion of Term SOFR Loans shall reduce the outstanding principal amount of such Term SOFR Loans made pursuant to a single Borrowing to less than the Minimum Borrowing Amount applicable thereto, (ii) Base Rate Loans may not be converted into Term SOFR Loans if any Event of Default exists on the date of conversion, and (iii) if any Event of Default (other than as referred to in preceding clause (ii)) is in existence on the date of the proposed conversion of a Term SOFR Loan, (x) Base Rate Loans may not be converted into Term SOFR Loans if the Administrative Agent or the Required Lenders have notified the Borrower that conversions will not be permitted during the existence of such Event of Default and (y) in the absence of the notification referred to in preceding clause (x), Base Rate Loans may only be converted into Term SOFR Loans with an Interest Period of one month (for Roll-Up Term Loans) or six months (for New Money Term Loans), and (iv) no conversion pursuant to this Section 2.06 shall result in a greater number of Borrowings of Term SOFR Loans than is permitted under Section 2.02.

Each such conversion shall be effected by the Borrower by giving the Administrative Agent at the Notice Office prior to 12:00 noon at least (x) in the case of conversions of Base Rate Loans into Term SOFR Loans, three (3) U.S. Government Securities Business Days' prior notice and (y) in the case of conversions of Term SOFR Loans into Base Rate Loans, one U.S. Government Securities Business Day's prior notice (each, a "Notice of Conversion/Continuation"), in each case substantially in the form of Exhibit A-2, appropriately completed to specify the Loans to be so converted, the Borrowing or Borrowings pursuant to which such Loans were incurred and, if to be converted into Term SOFR Loans, the Interest Period to be initially applicable thereto.  The Administrative Agent shall give each applicable Lender prompt notice of any such proposed conversion affecting any of its Loans.

2.07    Pro Rata Borrowings

All Borrowings or deemed Borrowings of Term Loans under this Agreement shall be incurred from the Lenders of the applicable Class pro rata on the basis of their applicable New Money Term Loan Commitments or their applicable Roll-Up Term Loan Commitments, as the case may be.  It is understood that no Lender shall be responsible for any default by any other Lender of its obligation to make Loans hereunder and that each Lender shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans hereunder.

2.08    Interest

(a)    The Borrower agrees to pay interest in respect of the unpaid principal amount of each Base Rate Loan from the date of Borrowing or conversion thereof until the earlier of (i) the maturity thereof (whether by acceleration or otherwise) and (ii) the conversion of such Base Rate Loan to a Term SOFR Loan pursuant to Section 2.06 or 2.09, as applicable, at a rate per annum which shall be equal to the sum of the relevant Applicable Margin plus the Base Rate, each as in effect from time to time.

-40-

(b)     The Borrower agrees to pay interest in respect of the unpaid principal amount of each Term SOFR Loan from the date of Borrowing or conversion thereof until the earlier of (i) the maturity thereof (whether by acceleration or otherwise) and (ii) the conversion of such Term SOFR Loan to a Base Rate Loan pursuant to Section 2.06, 2.09 or 2.10, as applicable, at a rate per annum which shall, during each Interest Period applicable thereto, be equal to the sum of the relevant Applicable Margin plus the Adjusted Term SOFR Rate for such Interest Period.

(c)     Upon the occurrence and during the continuance of an Event of Default, overdue principal and, to the extent permitted by law, overdue interest in respect of each Loan (other than Loans owed to a Defaulting Lender) shall, in each case, at the election of the Required Lenders, bear interest at a rate per annum equal to the rate which is 2% in excess of the rate then borne by such Loans, or in the event there is no applicable rate, shall bear interest at a rate per annum equal to the rate which is 2% in excess of the rate applicable to Base Rate Loans.  Interest that accrues under this Section 2.08(c) shall be payable in cash on written demand.

(d)     Accrued (and theretofore unpaid) interest shall be payable (i) in respect of each Base Rate Loan, (x) quarterly in arrears on each Quarterly Payment Date, and (y) at maturity (whether by acceleration or otherwise) and, after such maturity, on written demand, and (ii) in respect of each Term SOFR Loan, (x) on the last day of each Interest Period, and (y) on the date of any repayment or prepayment (on the amount repaid or prepaid) at maturity (whether by acceleration or otherwise) and, after such maturity, on written demand. Accrued (and theretofore unpaid) interest on the Roll-Up Term Loans shall be payable in kind and capitalized on each applicable Interest Payment Date or Quarterly Payment Date by adding such amount to the outstanding principal amount of such applicable Loan; accrued (and theretofore unpaid) interest on the New Money Term Loans shall be payable partially in cash (at a rate of Adjusted Term SOFR Rate plus 1.00% for Term SOFR Loans and the Base Rate for Base Rate Loans) and the remainder paid in kind and capitalized on each applicable Interest Payment Date by adding such amount to the outstanding principal amount of such applicable Loan provided, that if prior to the first Interest Payment Date to occur after the Final New Money Funding Date, any portion of the outstanding New Money Term Loans is cancelled as the result of a credit bid of the New Money Term Loans, any accrued and unpaid interest as of the date of such credit bid shall be capitalized and added to the amount of the credit bid.  Any interest on any Loan that is paid in kind and capitalized pursuant to this Section 2.08(d) ("PIK Interest") shall accrue and be capitalized and added to the outstanding principal balance of such Loans on each applicable Interest Payment Date or Quarterly Payment Date.  From and after each applicable Interest Payment Date or Quarterly Payment Date, the outstanding principal amount of each Loan shall, without further action by any party hereto, be deemed to be increased by the aggregate amount of PIK Interest so capitalized and added to such Loans in accordance with this Section 2.08(d), whereupon such amount of PIK Interest so capitalized and added shall also accrue interest in accordance with the terms of this Section 2.08.

(e)     Upon each Interest Determination Date, the Administrative Agent shall determine the Adjusted Term SOFR for each Interest Period applicable to the respective Term SOFR Loans and shall promptly notify in writing the Borrower and the applicable Lenders thereof.  Each such determination shall, absent manifest error, be final and conclusive and binding on all parties hereto.

(f)     The provisions of this Section 2.08 (and the interest rates applicable to the various extensions of credit hereunder) shall be subject to modification as expressly provided in Section 2.19.

2.09     Interest Periods

At the time the Borrower gives any Notice of Borrowing or Notice of Conversion/Continuation in respect of the making of, or conversion into, any Term SOFR Loan (in the case of the initial Interest

Period applicable thereto) or prior to 12:00 noon on the third U.S. Government Securities Business Day prior to the expiration of an Interest Period applicable to such Term SOFR Loan (in the case of any subsequent Interest Period applicable thereto), the interest period (each, an "Interest Period") applicable to such Term SOFR Loan shall be either a one month period (for any Roll-Up Term Loans) or six month period (for any New Money Term Loans); provided that (in each case):

(i)     all Term SOFR Loans comprising a Borrowing shall at all times have the same Interest Period;

(ii)     the initial Interest Period for any Term SOFR Loan shall commence on the date of Borrowing of such Term SOFR Loan (including the date of any conversion thereto from a Base Rate Loan) and each Interest Period occurring thereafter in respect of such Term SOFR Loan shall commence on the day on which the next preceding Interest Period applicable thereto expires;

(iii)     if any Interest Period for a Term SOFR Loan begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of such calendar month;

(iv)     if any Interest Period for a Term SOFR Loan would otherwise expire on a day which is not a Business Day, such Interest Period shall expire on the next succeeding Business Day (unless such Business Day falls in another month, in which case such Interest Period shall expire on the next preceding Business Day);

(v)     no Interest Period in respect of any Borrowing of any Class of Loans shall be selected which extends beyond the Maturity Date for such Class of Loans; and

(vi)     during the term of this Agreement, the Borrower shall be deemed to have elected to continue at the expiration of any applicable Interest Period any Loan outstanding as a Term SOFR Loan as a Term SOFR Loan with a new Interest Period, subject to the provisions of Section 2.06, unless the Borrower gives the Administrative Agent written notice electing otherwise.

2.10     Increased Costs, Illegality, etc.

(a)     In the event that any Lender shall have reasonably determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto but, with respect to clause (i) below, may be made only by the Administrative Agent):

(i)     on any Interest Determination Date that, by reason of any changes arising after the date of this Agreement affecting the London interbank market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of "Adjusted Term SOFR"; or

(ii)     at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any Term SOFR Loan because of (x) any change since the Closing Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, guideline or request, such as, but not limited to: (A) a change in the basis of taxation of payment to any Lender of the principal of or interest on the Loans or the Notes or any other amounts payable hereunder (except for increased costs attributable to (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of Excluded Taxes, and (C) Connection Income Taxes); or (B) a change in official reserve requirements, but, in all events, excluding

reserves required under Regulation D to the extent included in the computation of Adjusted Term SOFR and/or (y) other circumstances arising since the Closing Date affecting such Lender, the London interbank market or the position of such Lender in such market (including that the Term SOFR Rate with respect to such Term SOFR Loan does not adequately and fairly reflect the cost to such Lender of funding such Term SOFR Loan); or

(iii)     at any time, that the making or continuance of any Term SOFR Loan has been made (x) unlawful by any law or governmental rule, regulation or order, or (y) impossible by compliance by any Lender in good faith with any governmental request (whether or not having force of law);

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall promptly give written notice to the Borrower and, except in the case of clause (i) above, to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders).  Thereafter (x) in the case of clause (i) above, Term SOFR Loans shall no longer be available until such time as the Administrative Agent notifies in writing the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist, and any Notice of Borrowing or Notice of Conversion/Continuation given by the Borrower with respect to Term SOFR Loans which have not yet been incurred (including by way of conversion) shall be deemed rescinded by the Borrower (or if requested by the Borrower, deemed a request for Base Rate Loans), (y) in the case of clause (ii) above, the Borrower agrees, subject to the provisions of Section 2.11(b) (to the extent applicable), to pay to such Lender, promptly following such Lender's written request (including documentation reasonably supporting such request) therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion (in accordance with generally accepted financial practices) shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts received or receivable hereunder (a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent manifest error, be final and conclusive and binding on all the parties hereto) and (z) in the case of clause (iii) above, the Borrower shall take one of the actions specified in Section 2.10(b) as promptly as possible and, in any event, within the time period required by law.

(b)     At any time that any Term SOFR Loan is affected by the circumstances described in Section 2.10(a)(ii), the Borrower may, and in the case of a Term SOFR Loan affected by the circumstances described in Section 2.10(a)(iii), the Borrower shall, either (x) if the affected Term SOFR Loan is then being made initially or pursuant to a conversion, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed in writing) on the same date that the Borrower was notified by the affected Lender or the Administrative Agent pursuant to Section 2.10(a)(ii) (or convert such request to a Base Rate Loan) or (iii) or (y) if the affected Term SOFR Loan is then outstanding, upon at least three (3) Business Days' written notice to the Administrative Agent, require the affected Lender to convert such Term SOFR Loan into a Base Rate Loan, provided that, if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this Section 2.10(b).

(c)     If any Lender determines that after the Closing Date the introduction of or any change in any applicable law or governmental rule, regulation, order, guideline, directive or request (whether or not having the force of law) concerning capital adequacy, or any change in interpretation or administration thereof by the NAIC or any Governmental Authority, central bank or comparable agency, will have the effect of increasing the amount of capital required or expected to be maintained by such Lender or any corporation controlling such Lender based on the existence of such Lender's Commitments hereunder or its obligations hereunder, then the Borrower agrees to pay to such Lender, promptly following its written demand therefor (including the reasonable detail set forth in the last sentence of this clause (c)), such additional amounts as shall be required to compensate such Lender or such other corporation for the

increased cost to such Lender or such other corporation or the reduction in the rate of return to such Lender or such other corporation as a result of such increase of capital.  In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable and customary, <u>provided</u> that such Lender's determination of compensation owing under this Section 2.10(c) shall, absent manifest error, be final and conclusive and binding on all the parties hereto.  Each Lender, upon determining that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice thereof to the Borrower, which notice shall show in reasonable detail the basis for calculation of such additional amounts.

(d)     Notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III shall in each case be deemed to be a change after the Closing Date in a requirement of law or government rule, regulation or order, regardless of the date enacted, adopted, issued or implemented (including for purposes of this Section 2.10).

2.11     <u>Compensation</u>

(a)     The Borrower agrees to compensate each Lender, promptly following its written request (which request shall set forth in reasonable detail the basis for requesting such compensation), for all losses, expenses and liabilities (including any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its Term SOFR Loans but excluding loss of anticipated profits) which such Lender may sustain:  (i) if for any reason (other than a default by such Lender or the Administrative Agent) a Borrowing of, or conversion from or into, Term SOFR Loans does not occur on a date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation (whether or not withdrawn by the Borrower or deemed withdrawn pursuant to Section 2.10(a)); (ii) if any prepayment or repayment (including any prepayment or repayment made pursuant to Section 5.01, Section 5.02 or as a result of an acceleration of the Loans pursuant to Section 11) or conversion of any of its Term SOFR Loans occurs on a date which is not the last day of the Interest Period with respect thereto; (iii) if any prepayment of any of its Term SOFR Loans is not made on any date specified in a notice of prepayment given by the Borrower; or (iv) as a consequence of (x) any other default by the Borrower to repay Term SOFR Loans when required by the terms of this Agreement or any Note held by such Lender or (y) any election made pursuant to Section 2.10(b).

(b)     Notwithstanding anything to the contrary, with respect to any Lender's or any Loan Participant's claim for compensation under Section 2.10(a) or (c), 2.11, 3.06 or 5.04, the Borrower shall not be required to compensate such Person for any amount incurred more than 180 days prior to the date that such Person notifies the Borrower in writing of the event that gives rise to such claim; <u>provided</u> that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

2.12     <u>Change of Lending Office</u>

Each Lender agrees that on the occurrence of any event giving rise to the operation of Section 2.10(a)(ii) or (iii), Section 2.10(c) or (d) or Section 5.04 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event, <u>provided</u> that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage in any material respect, with the object of avoiding the consequence of the event

giving rise to the operation of such Section.  Nothing in this Section 2.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Sections 2.10, 3.06 and 5.04.

2.13    Replacement of Lenders

If any Lender becomes a Defaulting Lender, (x) upon the occurrence of any event giving rise to the operation of Section 2.10(a)(ii) or (iii), Section 2.10(c) or (d) or Section 5.04 with respect to any Lender which results in such Lender charging to the Borrower increased costs in excess of those being generally charged by the other Lenders, (y) in the case of a refusal by a Lender to consent to a proposed change, waiver, discharge or termination with respect to this Agreement as contemplated by clauses (i) through (v) of the first proviso to Section 13.13(a) or clauses (1) through (5) of the second proviso to Section 13.13(a), in each case, which has been approved by the Required Lenders or at least a majority (in dollar amount) of such directly and adversely affected Lenders, as applicable or (z) if a Lender rejects (or is deemed to reject) the Extension under Section 2.16(a) which Extension has been accepted under Section 2.16(a) by the Required Lenders, the Borrower shall have the right, in accordance with Section 13.04(b), to (i) replace such Lender (the "Replaced Lender") with one or more other Eligible Transferees, none of whom shall constitute a Defaulting Lender at the time of such replacement (collectively, the "Replacement Lender") but in the case of a replacement where the consent of the respective Lender is required with respect to less than all Classes of its Loans or Commitments, to replace the Commitments and/or outstanding Loans of such Lender in respect of each Class where the consent of such Lender would otherwise be individually required, with identical Commitments and/or Loans of the respective Class provided by the Replacement Lender or (ii) if no Event of Default then exists or would exist after giving effect to such termination, terminate the Commitment of such Lender, and (1) in the case of a Lender, repay all Obligations (other than contingent obligations not then due and payable) of the Borrower owing to such Lender relating to the Loans and participations held by such Lender as of such termination date; provided that in the case of any such termination of Commitments pursuant to this clause (ii), such termination shall be sufficient (together with all other consenting Lenders or other Commitments being terminated in connection with the adoption of the applicable proposed change, waiver, discharge or termination) to cause the adoption of the applicable proposed change, waiver, discharge or termination and such termination shall be in respect of any applicable facility only in the case of clause (x) or, with respect to a Class vote, clause (y); provided that:

(i)      at the time of any replacement pursuant to this Section 2.13, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to Section 13.04(b) (and with all fees payable pursuant to said Section 13.04(b) to be paid by the Replacement Lender and/or the Replaced Lender  (as may be agreed to at such time by and among the Borrower, the Replacement Lender and the Replaced Lender)) (provided that the failure of any such Replaced Lender to execute an Assignment and Assumption Agreement shall not render such assignment invalid and such assignment shall be recorded in the Register) pursuant to which the Replacement Lender shall acquire all of the Commitments and outstanding Loans of the Replaced Lender and, in connection therewith, shall pay to the Replaced Lender in respect thereof an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the respective Replaced Lender under each Class with respect to which such Replaced Lender is being replaced, (B) [reserved] and (C) an amount equal to all accrued, but theretofore unpaid, Fees owing to the Replaced Lender (but only with respect to the relevant Class, in the case of the replacement of less than all Classes of Loans then held by the respective Replaced Lender) pursuant to Section 4.01; and

(ii)      all obligations of the Borrower then owing to the Replaced Lender (other than those (i) specifically described in clause (a) above in respect of which the assignment purchase price has been, or is concurrently being, paid, but including all amounts, if any, owing under Section 2.11(a) or (ii) relating to any Class of Loans and/or Commitments of the respective Replaced Lender which will remain

-45-

outstanding after giving effect to the respective replacement) shall be paid in full to such Replaced Lender concurrently with such replacement.

Upon receipt by the Replaced Lender of all amounts required to be paid to it pursuant to this Section 2.13, the Administrative Agent is authorized (which authorization is coupled with an interest) (but not obligated) to execute an Assignment and Assumption Agreement on behalf of such Replaced Lender, and any such Assignment and Assumption Agreement so executed by the Administrative Agent and the Replacement Lender shall be effective for purposes of this Section 2.13 and Section 13.04 (it being understood that the failure of any such Replaced Lender to execute an Assignment and Assumption Agreement shall not render such assignment invalid and such assignment shall be recorded in the Register).  Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in clauses (a) and (b) above, recordation of the assignment on the Register by the Administrative Agent pursuant to Section 13.16 and, if so requested by the Replacement Lender, delivery to the Replacement Lender of the appropriate Note or Notes executed by the Borrower, the Replacement Lender shall become a Lender hereunder and, unless the respective Replaced Lender continues to have outstanding Loans hereunder, the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement (including Sections 2.10, 2.11, 3.06, 5.04, 12.06, 13.01 and 13.06), which shall survive as to such Replaced Lender to the extent contemplated herein.

2.14    [Reserved]

2.15    Priority and Liens

(a)    Each Credit Party hereby covenants, represents and warrants that, upon entry of the applicable DIP Orders, the Obligations of such Credit Party hereunder and under the Credit Documents (subject to the Carve Out and Permitted Prior Liens) shall be pursuant to:

(i)    section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Chapter 11 Cases with priority over any and all administrative expenses, whether incurred before or after the Petition Date, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code;

(ii)    section 364(c)(2) of the Bankruptcy Code, secured by a fully perfected first-priority Lien on the Collateral, to the extent that the Collateral is not encumbered;

(iii)    section 364(c)(3) of the Bankruptcy Code, secured by a fully perfected junior Lien on the Collateral, to the extent the Collateral is subject to a Permitted Prior Lien; and

(iv)    section 364(d)(1) of the Bankruptcy Code, secured by a fully perfected first-priority priming Lien on the Collateral (including the Liens securing the Prepetition First Lien Obligations and the Prepetition Second Lien Obligations); *provided* that such Lien shall be subject and subordinate to the Carve Out in all respects and subordinate to the Permitted Prior Liens.

The Liens described in clauses (ii), (iii) and (iv) above shall not be made *pari passu* with, or subordinated to, any other Liens or security interests (whether currently existing or hereafter created), subject in each case only to the Carve Out and Permitted Prior Liens.

2.16    Payment of Obligations

Without limiting Section 5, subject to the provisions of Section 11 and the DIP Orders, upon the maturity (by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Credit Documents of the Borrower and the other Credit Parties, the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

2.17    No Discharge; Survival of Claims

Each Credit Party agrees that except as otherwise agreed by the Required Lenders and as otherwise provided for in the Restructuring Support Agreement: (i) its Obligations under this Agreement or any of the Credit Documents shall not be discharged by the entry of an order confirming any Reorganization Plan (and each Credit Party, pursuant to section 1131(d)(4) of the Bankruptcy Code hereby waives any such discharge) or converting the Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code, (ii) the superpriority claims granted to the Administrative Agent and the Lenders pursuant to the DIP Orders and described in Section 2.15 and the Liens granted to the Administrative Agent and the Lenders pursuant to the DIP Orders and described in Section 2.15 shall not be affected in any manner by the entry of any order by the Bankruptcy Court, including an order confirming any Reorganization Plan, and (iii) notwithstanding the terms of any Reorganization Plan, its Obligations hereunder and under each other Credit Document shall be repaid in full in accordance with the terms hereof and the terms of the DIP Orders and the other Credit Documents.

2.18    [Reserved]

2.19    Benchmark Replacement Setting

(a)    Benchmark Replacement. If a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Credit Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Credit Document and (y) if a Benchmark Replacement is determined in accordance with clause (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Credit Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Credit Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.  If the Benchmark Replacement is based upon Daily Simple SOFR, all interest payments will be payable on a monthly basis.

(b)    Benchmark Replacement Conforming Changes.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make  Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document.

(c)      Notices; Standards for Decisions and Determinations.  The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.19(d) and (v) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.19, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Credit Document, except, in each case, as expressly required pursuant to this Section 2.19.

(d)      Unavailability of Tenor of Benchmark.  Notwithstanding anything to the contrary herein or in any other Credit Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)      Benchmark Unavailability Period.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, (i) the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Term SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans and (ii) any outstanding affected Term SOFR Loans will be deemed to have been converted to Base Rate Loans at the end of the applicable Interest Period.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Base Rate.

SECTION 3.      [Reserved]

SECTION 4.      Fees; Reductions of Commitment

4.01   Fees.

(a)      The Borrower shall pay the Fronting Lender, for the account of the DIP Commitment Parties, the "Commitment Premium" as defined in the DIP Commitment Letter; provided that the amount of such "Commitment Premium" shall be earned on the Closing Date when the Initial Term Loans are

funded payable in kind and added to the outstanding principal amount of the New Money Term Loans on the Closing Date.

(b)      The Borrower agrees to pay to the Administrative Agent, for the ratable account of each Lender, a closing fee (the "Closing Fee") in an amount equal to 5.00% of the New Money Term Loan Commitment of such Lender as of the Closing Date, the Closing Fee shall be fully earned, due and payable on (i) the Closing Date, with respect to such Lender's Initial New Money Term Loans and (ii) the Final New Money Funding Date, with respect to such Lender's Delayed-Draw New Money Term Loans; provided that the amount of such Closing Fee shall be payable in kind and added to the outstanding principal amount of the New Money Term Loans.  For the avoidance of doubt, no Closing Fee shall be earned or payable on any Roll-Up Loan Commitments.

(c)      The Borrower agrees to pay to the Administrative Agent such fees as may be agreed to in writing (including, without limitation, the Fee Letter and the Administrative Agent Fee Letter) from time to time by Holdings or any of its Subsidiaries and the Administrative Agent.

(d)      The Borrower agrees to pay to the Fronting Lender such fees as may be agreed to in writing (including, without limitation, the Fronting Fee Letter) by the Borrower and the Fronting Lender.

4.02      Mandatory Reductions of Commitments.  The Initial New Money Term Loan Commitment and the Delayed-Draw New Money Term Loan Commitment of each Lender shall be automatically and permanently reduced on a dollar-for-dollar basis upon the making of such Lender's New Money Term Loans pursuant to Section 2.01(a) and (b), respectively, in each case, by the principal amount of such applicable New Money Term Loans.  After the Final New Money Funding Date, the Delayed-Draw New Money Term Loan Commitment shall be reduced to zero.  The Initial Roll-Up Term Loan Commitment and the Delayed-Draw Roll-Up Term Loan Commitment of each Lender shall be automatically and permanently reduced on a dollar-for-dollar basis upon the deemed making of such Lender's applicable Roll-Up Term Loans pursuant to Section 2.01(c), by the principal amount of such Roll-Up Term Loans.

SECTION 5.      Prepayments; Payments; Taxes.

5.01      Voluntary Prepayments

The Borrower shall have the right to prepay the Loans, without premium or penalty (subject to Section 2.11) in whole or in part at any time and from time to time on the following terms and conditions: (i) the Borrower shall give the Administrative Agent prior to 12:00 noon at the Notice Office (x) at least one Business Day's prior written notice (or telephonic notice promptly confirmed in writing) of its intent to prepay Base Rate Loans and (y) at least three (3) Business Days' prior written notice (or telephonic notice promptly confirmed in writing) of its intent to prepay Term SOFR Loans, which notice (in each case) shall specify which Term Loans (Initial New Money Term Loans, Delayed-Draw New Money Term Loans, Initial Roll-Up Term Loans or Delayed Draw Roll-Up Term Loans) are to be prepaid, the amount of such prepayment and the Types of Loans to be prepaid and, in the case of Term SOFR Loans, the specific Borrowing or Borrowings pursuant to which such Term SOFR Loans were made, and which notice the Administrative Agent shall promptly transmit to each of the applicable Lenders; provided that a notice of prepayment under this Section 5.01 may state that such notice is conditional upon the effectiveness of other credit facilities, the receipt of proceeds from the issuance of other Indebtedness or equity or consummation of an asset sale in which case such notice of prepayment may be rescinded by the Borrower (by notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied; (ii) each partial prepayment of Term Loans pursuant to this Section 5.01 shall be in an aggregate principal amount of at least $500,000 (or such lesser amount as is reasonably

acceptable to the Administrative Agent in any given case); <u>provided</u> that if any partial prepayment of Term SOFR Loans made pursuant to any Borrowing shall reduce the outstanding principal amount of Term SOFR Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount applicable thereto, then such Borrowing may not be continued as a Borrowing of Term SOFR Loans (and same shall automatically be converted into a Borrowing of Base Rate Loans) and any election of an Interest Period with respect thereto given by the Borrower shall have no force or effect and (iii) each prepayment pursuant to this Section 5.01 in respect of any Loans made pursuant to a Borrowing shall be applied pursuant to Section 5.06.

    5.02   <u>Mandatory Repayments</u>

    (a)    [Reserved]

    (b)    [Reserved]

    (c)    [Reserved]

    (d)    In addition to any other mandatory repayments pursuant to this Section 5.02, on each date on or after the Closing Date upon which Holdings or any of its Restricted Subsidiaries receives any cash proceeds from any issuance or incurrence by Holdings or any of its Restricted Subsidiaries of Indebtedness (other than Indebtedness permitted to be incurred pursuant to Section 10.04), an amount equal to 100% of the Net Debt Proceeds of the respective incurrence of Indebtedness shall be applied on such date as a mandatory repayment of Term Loans in accordance with the requirements of Section 5.06.

    (e)    In addition to any other mandatory repayments pursuant to this Section 5.02, on each date on or after the Closing Date upon which Holdings or any of its Restricted Subsidiaries receives any cash proceeds from any Asset Sale (including, for the avoidance of doubt, the RS Business Sale and the Corrections Business Sale), an amount equal to 100% of the Net Sale Proceeds therefrom shall be applied on such day as a mandatory repayment of Term Loans in accordance with the requirements of Section 5.06.

    (f)    [Reserved]

    (g)    In addition to any other mandatory repayments pursuant to this Section 5.02, within five (5) Business Days after each date on or after the Closing Date upon which Holdings or any of its Restricted Subsidiaries receives any cash proceeds from any Recovery Event, an amount equal to 100% of the Net Recovery Event Proceeds from such Recovery Event shall be applied on such fifth Business Day as a mandatory repayment of Term Loans in accordance with the requirements of Section 5.06.

    (h)    [Reserved].

    (i)    [Reserved].

    (j)    In addition to any other mandatory repayments pursuant to this Section 5.02, all then outstanding Loans of a respective Class shall be either repaid in full or otherwise satisfied in accordance with the Restructuring Support Agreement on the respective Maturity Date for such Class of Loans; provided, however, that at the election of the Required Lenders , the outstanding principal amount of Roll-Up Term Loans and any accrued and unpaid interest thereon may be subject to a different treatment, including pursuant to a plan of liquidation filed in the Cases.

    (k)    [Reserved].

(l)     Notwithstanding any other provisions of this Section 5.02, (A) to the extent that any or all of the Net Sale Proceeds of any Asset Sale by a Foreign Subsidiary giving rise to a prepayment event pursuant to Section 5.02(e) (a "Foreign Disposition"), the Net Recovery Event Proceeds of any Recovery Event from a Foreign Subsidiary giving rise to a prepayment event pursuant to Section 5.02(g) (a "Foreign Recovery Event") are (x) prohibited or delayed by applicable local law from being repatriated to the United States or (y) restricted by applicable material organizational documents as a result of minority ownership, an amount equal to the portion of the Net Sale Proceeds, Net Recovery Event Proceeds will not be required to be applied to repay Loans at the times provided in this Section 5.02 so long, but only so long, as the applicable local law or the applicable material organizational documents will not permit repatriation to the United States, (B) to the extent that the Borrower has determined in good faith that repatriation of any of or all the Net Sale Proceeds of any Foreign Disposition, Net Recovery Event Proceeds of any Foreign Recovery Event would have an adverse tax cost consequence (taking into account any foreign tax credit or benefit actually realized in connection with such repatriation) with respect to such Net Sale Proceeds or Net Recovery Event Proceeds, the Net Sale Proceeds or Net Recovery Event Proceeds so affected shall not be required to be applied in accordance with Section 5.02 and (C) to the extent that the Borrower has determined in good faith that distribution to the Borrower of any of or all the Net Sale Proceeds of any Asset Sale or Net Recovery Event Proceeds in each case attributable to a C Corporation Subsidiary would have an adverse tax cost consequence to the Borrower or its direct and indirect beneficial owners, the Net Sale Proceeds, Net Debt Proceeds or Net Recovery Event Proceeds so affected shall not be required to be applied in accordance with Section 5.02.  The Borrower hereby agrees to use all commercially reasonable efforts to overcome or eliminate any such restrictions on repatriation, even if the Borrower does not intend to actually repatriate such cash, so that an amount equal to the full amount of such Net Sale Proceeds or Net Recovery Event Proceeds will otherwise be subject to repayment under this Section 5.02(l), and if at any time within one year following the date on which the respective prepayment would otherwise have been required such repatriation of any of such affected Net Sale Proceeds or Net Recovery Event Proceeds is permitted under the applicable local law or applicable organizational documents (even if such cash is actually not repatriated) an amount equal to the amount of such Net Sale Proceeds or Net Recovery Event Proceeds that could be repatriated or are no longer restricted, will be promptly (and in any event not later than five (5) Business Days) applied (net of additional Taxes payable or reserved against as a result of a repatriation and any additional costs that would be incurred as a result of a repatriation, whether or not a repatriation actually occurs) by the Borrower to the repayment of the Loans pursuant to this Section 5.02 to the extent provided herein.

5.03     Method and Place of Payment

Except as otherwise specifically provided herein, all payments under this Agreement and under any Note shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 2:00 p.m. on the date when due and shall be made in Dollars in immediately available funds at the Payment Office.  All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day (in the Administrative Agent's sole discretion) and any applicable interest or fee shall continue to accrue.  Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

5.04     Net Payments

(a)     Defined Terms.  For purposes of this Section, the term "applicable law" includes FATCA.

(b)     Payments Free of Taxes.  All payments made by the Borrower hereunder and under any Note will be made without setoff, counterclaim or other defense.  All payments by or on account of any

obligation of the Borrower under any Credit Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)     Payment of Other Taxes by Borrower.  The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)     Indemnification by Borrower.  The Borrower shall indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)     Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 13.04(j) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)     Evidence of Payments.  As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)     Status of Lenders.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative

-52-

Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (g)(ii)(A), (ii)(B) and (ii)(D) of this Section 5.04) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)        Without limiting the generality of the foregoing,

(A)        any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)        any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)        in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Credit Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Credit Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such income tax treaty;

(2)        executed copies of IRS Form W-8ECI;

(3)        in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit D-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10-percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)        to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-2 or Exhibit D-3, IRS Form W-9, and/or other certification documents from

each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(E)     Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.  Notwithstanding any other provision of this Section 5.04, a Lender shall not be required to deliver any documentation that such Lender is not legally eligible to deliver.

(F)     Each Lender authorizes the Administrative Agent to deliver to the Credit Parties and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to this Section 5.04(g).

(h)     Status of Administrative Agent.  On or prior to the date on which it becomes a party to this Agreement, (I) each Administrative Agent, and any successor or supplemental Administrative Agent, that is a U.S. Person shall provide to the Borrower two duly completed original signed copies of IRS Form W-9, and (II) UBS AG, Stamford Branch, as the Administrative Agent, and any successor or supplemental Administrative Agent that is not a U.S. Person shall deliver to the Borrower two duly completed original signed copies of IRS Form W-8ECI with respect to payments to be received under the Credit Documents for its own account and two duly completed original signed copies of IRS Form W-8IMY assuming primary responsibility for withholding under Chapters 3 and 4 of the Code with respect to payments to be received under the Credit Documents for the account of Lenders.  Whenever a lapse in time or change in circumstance renders any such documentation expired, obsolete or inaccurate in any material respect, the Administrative Agent shall deliver promptly to the Borrower updated or other

-54-

appropriate documentation or promptly notify the Borrower of its legal ineligibility to do so. Notwithstanding anything to the contrary in this Section 5.04(h), no Administrative Agent shall be required to deliver any documentation that such Administrative Agent is not legally eligible to deliver as a result of any Change in Law.

(i)     Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes for which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (i) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (i), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (i) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(j)     Survival.  Each party's obligations under this Section shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.

5.05     Presumption of the Administrative Agent as to Payments of the Borrower

Unless the Administrative Agent shall have been notified by the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower does not intend to make available to the Administrative Agent such payment, the Administrative Agent may assume that the Borrower has made such amount available to the Administrative Agent on such date in accordance herewith and may (but shall not be obligated to), in reliance upon such assumption, make available to the appropriate Lenders the amount due. If such amount is not in fact made available to the Administrative Agent by the Borrower, the Administrative Agent shall be entitled to recover such amount on demand from the Borrower.  If the Borrower does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the applicable Lenders and such Lenders shall immediately pay the amount made available to them by the Administrative Agent to the Administrative Agent.  The Administrative Agent also shall be entitled to recover on demand from the Borrower or any such Lender, as the case may be, interest on such amount in respect of each day from the date such amount is recovered by the Administrative Agent, at a rate per annum equal to the greater of (i) if recovered from a Lender, the overnight Federal Funds Rate for the first three days and at the interest rate otherwise applicable to the Loans with respect to which such payment was required to be made for each day thereafter and (ii) if recovered from the Borrower, the rate of interest applicable to the Loan with respect to which such payment was required to be made, as determined pursuant to Section 2.08.  Nothing in this Section 5.05 shall be deemed to relieve the Borrower from its obligation to make any payment hereunder or to

-55-

prejudice any rights which the Administrative Agent and Lenders may have against the Borrower as a result of any failure by the Borrower to make any payment hereunder.

5.06    Order of Prepayments

(a)    The application of any prepayment of Loans pursuant to Section 5 and any amount received by the Administrative Agent or the Collateral Agent from any Credit Party (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement or following any Event of Default that has occurred and is continuing shall be made, first, to the payment of all fees, indemnities, expenses and other amounts payable in accordance with Section 13.01(a) to the Administrative Agent and the Collateral Agent in their capacities as such, second, to the Initial New Money Term Loans and Delayed-Draw New Money Term Loans, on a pro rata basis between such applicable Classes, until the payment in full (other than unasserted contingent obligations) of all outstanding New Money Term Loans and, third, to the Initial Roll-Up Term Loans and the Delayed-Draw Roll-Up Term Loans, on a pro rata basis between such applicable Classes, until the payment in full (other than unasserted contingent obligations) of all outstanding Roll-Up Term Loans.  Each prepayment of Loans under this Section 5 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid. Each repayment or prepayment of any Loans under this Section 5 shall be applied on a pro rata basis among the applicable Class or Classes being repaid.

(b)    With respect to each repayment of Loans required by Section 5.02, (i) repayments of Term SOFR Loans pursuant to Section 5.02 may only be made on the last day of an Interest Period applicable thereto unless the Borrower makes payments to Lenders in accordance with Section  2.11; (ii) if any repayment of Term SOFR Loans made pursuant to a single Borrowing shall reduce the outstanding Term SOFR Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount applicable thereto, such Borrowing shall be automatically converted into a Borrowing of Base Rate Loans; and (iii) in the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its sole discretion with a view, but not an obligation, to minimize breakage cost owing under Section 2.11.

SECTION 6.    Conditions Precedent to the Closing Date.

The obligation of each Lender to make the Initial New Money Term Loans on the Closing Date is subject solely to the satisfaction of the following conditions at the time of the making of such Loans to the satisfaction or waiver by the Administrative Agent and the Required Commitment Parties of the following conditions; provided that, and for the avoidance of doubt, once the Fronting Lender has funded any portion of the Facility, the Lenders' Commitments and agreements shall be unconditional with respect to any such funded amounts:

6.01    Closing Date; Notes

On or prior to the Closing Date, (i) there shall have been delivered to the Administrative Agent an executed counterpart of Holdings, any other Holdings Guarantor and the Borrower to this Agreement and (ii) there shall have been delivered to the Administrative Agent for the account of each of the Lenders that has requested same at least three (3) Business Days prior to the Closing Date the appropriate Term Note executed by the Borrower in the amount, maturity and as otherwise provided herein.

6.02    Officer's Certificate

On the Closing Date, the Administrative Agent shall have received a certificate, dated the Closing Date and signed on behalf of the Borrower by an Authorized Officer of the Borrower, certifying on behalf

of the Borrower that all of the conditions in Sections 6.05, 6.07, 6.08, 6.09, 6.11, 6.16, 6.17, 6.19, 6.20 and 6.21 and have been satisfied on such date.

6.03    Lien Searches

On the Closing Date, the Administrative Agent shall have received copies of a recent Lien and judgment search in each jurisdiction reasonably requested by the Required Commitment Parties at least five (5) Business Days prior to the Closing Date with respect to the Credit Parties.

6.04    Company Documents; Proceedings; etc.

(a)      On the Closing Date, the Administrative Agent and Lenders shall have received a certificate from each Credit Party, dated the Closing Date, signed by an Authorized Officer of such Credit Party, and attested to by the Secretary or any Assistant Secretary of such Credit Party, with appropriate insertions, together with copies of the certificate or articles of incorporation and by-laws (or other equivalent organizational documents), as applicable, of such Credit Party and the resolutions and specimen signatures of authorized signatories of such Credit Party referred to in such certificate, and each of the foregoing shall be in form and substance reasonably acceptable to the Required Commitment Parties.

(b)      On the Closing Date, the Administrative Agent shall have received good standing certificates from the jurisdiction of organization as of a recent date, for each of the Credit Parties which the Administrative Agent reasonably may have requested, certified by proper Governmental Authorities.

6.05    Interim DIP Order

The Administrative Agent and the Lenders shall have received a certification that the Interim DIP Order has been entered by the Bankruptcy Court (which may be satisfied by providing the Administrative Agent with a copy of the signed Interim DIP Order).  The Interim DIP Order shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in any manner without the consent of the Required Commitment Parties, and the Debtors shall be in compliance in all respects with the Interim DIP Order.

6.06    Collateral

The Required Commitment Parties and the Collateral Agent shall be satisfied that all of the security interests with respect to the Collateral shall be effective and perfected by the Interim DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements or other agreements.

6.07    Initial DIP Budget

The Debtors shall have timely delivered to the Lender Advisors and, on a non-cleansing basis, to the Administrative Agent and the Lenders the Initial DIP Budget, which shall be acceptable to the Required Commitment Parties.

6.08    Chapter 11 Cases; "First Day" Motions

The Chapter 11 Cases shall have been commenced by the Borrowers and the Guarantors and the same shall each be a debtor and a debtor in possession.  All material first-day orders (including, without limitation, any orders related to the Facilities, cash management and any critical vendor or supplier motions)

entered by the Bankruptcy Court in the Chapter 11 Cases shall, in each case, be in form and substance satisfactory to the Administrative Agent and the Required Commitment Parties.

6.09    Approvals, Consents and Authorizations.

Subject to Bankruptcy Court approval, (i) each Debtor shall have the Company power and authority to make, deliver and perform its obligations under this Agreement and the Interim DIP Order, (ii) other than as a result of or in connection with the commencement of the Cases, the necessary governmental and third party consents and approvals necessary in connection with the Facilities and the Transactions shall have been obtained (without the imposition of any materially adverse conditions that are not acceptable to the Required Lenders) and shall remain in effect and (iii) no law or regulation shall be applicable, in the reasonable judgment of the Required Lenders, that restrains, prevents or imposes materially adverse conditions upon the Facilities or the Transactions.

6.10    Security Documents

(a)    On the Closing Date, each Credit Party shall have duly authorized, executed and delivered the Pledge Agreement substantially in the form of Exhibit F (as amended, modified, restated, supplemented or extended from time to time, the "Pledge Agreement") and shall have delivered to the Collateral Agent (or its agent), all of the Pledge Agreement Collateral, if any, referred to therein and then owned by such Credit Party, together with executed and undated endorsements for transfer in the case of Equity Interests constituting certificated Pledge Agreement Collateral, and the Pledge Agreement shall be in full force and effect.

(b)    On the Closing Date, each Credit Party shall have duly authorized, executed and delivered the Security Agreement, which shall be in full force and effect, substantially in the form of Exhibit G (as amended, modified, restated, supplemented or extended from time to time, the "Security Agreement"), covering all of such Credit Party's Security Agreement Collateral, together with:

(i)    proper financing statements (Form UCC-1 or the equivalent) for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary to perfect the security interests purported to be created by the foregoing Security Agreement;

(ii)    Nothing in Section 6.10(b) or otherwise contained in this Agreement shall require any Credit Party to seek to register or patent, or file any applications for registrations or patents, any intellectual property.

6.11    Material Adverse Effect

The Administrative Agent and the Lenders shall be satisfied that there is an absence of a Material Adverse Effect, or any event or occurrence, other than the commencement of the Chapter 11 Cases, which could reasonably be expected to result in a Material Adverse Effect, since the Petition Date.

6.12    Asset Purchase Agreement

The Borrower, the applicable other Debtors and RS Purchaser LLC shall have duly executed an asset purchase agreement (the "Asset Purchase Agreement") with respect to the sale (the "RS Stalking Horse Sale") of the RS Business, which shall name RS Purchaser LLC as the "stalking horse bidder" and otherwise shall be on terms and conditions acceptable to the Required Lenders in their sole discretion.

6.13    Loan Proceeds Account

The Loan Proceeds Account shall be in existence and the Loan Proceeds Account Control Agreement shall have been duly executed and be effective.

6.14    Subsidiaries Guaranty

Each Subsidiary Guarantor shall have duly authorized, executed and delivered the Subsidiaries Guaranty substantially in the form of Exhibit E (as amended, modified, supplemented or extended from time to time, the "Subsidiaries Guaranty"), and the Subsidiaries Guaranty shall be in full force and effect.

6.15    KYC Information

(a)    At least two (2) Business Days prior to the Closing Date, the Administrative Agent and the Commitment Parties shall have received all documentation and other information reasonably requested in writing with respect to the Credit Parties that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act, including for the avoidance of doubt, a duly executed IRS Form W-9.

(b)    At least two (2) Business Days prior to the Closing Date, to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, any Lender that has requested in writing a Beneficial Ownership Certification in relation to the Borrower shall have received such Beneficial Ownership Certification.

(c)    Each Commitment Party and each Participating DIP Lender (as defined in the DIP Commitment Letter) that has an allocation with respect to the New Money Term Loan Commitment in connection with the New Money Term Loan Syndication shall either (i) be a Prepetition Lender, or (ii) otherwise be approved by the Fronting Lender prior to the Closing Date for purposes of compliance with applicable "know your customer" requirements under the Patriot Act, the Beneficial Ownership Regulation or other applicable anti-money laundering laws.

6.16    Fees, etc.

All fees (including, without limitation, the Commitment Premium and the Closing Fee with respect to the Initial New Money Term Loans) and expenses (to the extent, in the case of reimbursement of expenses, invoices are received on or before the Closing Date, including all invoiced reasonable out-of-pocket costs, fees and expenses (including invoiced reasonable and out-of-pocket legal fees and expenses reimbursable hereunder)) due and payable to the Administrative Agent and the Lenders that are required to be paid on the Closing Date shall have been paid , which shall include (i) all fees and expenses contemplated by the Administrative Agent Fee Letter and the Fronting Fee Letter and (ii) all outstanding and documented fees and out-of-pocket expenses of (a) Akin Gump Strauss Hauer & Feld, LLP, Houlihan Lockey, Inc. and Ankura Consulting Group, LLC, in their capacities as counsel, investment banker and financial advisor, respectively, to the Commitment Parties and the Lenders, (b) Cahill Gordon & Reindel LLP in its capacity as counsel to the agents under the Prepetition Credit Agreements and (c) Cahill Gordon & Reindel LLP in its capacity as counsel to the Administrative Agent, the Collateral Agent and the Fronting Lender.

6.17    No Dismissal or Conversion

The Chapter 11 Cases shall not have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

6.18    No Appointment

No trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with expanded powers shall have been appointed in any of the Chapter 11 Cases.

6.19   Default

The Administrative Agent and the Lenders shall be satisfied that there shall not occur as a result of, and after giving effect to, the initial extension of credit under this Agreement, a Default (or any event which with the giving of notice or lapse of time or both would be a Default) under any of the Loan Parties' or their respective subsidiaries' debt instruments and other material agreements which would permit the counterparty thereto to exercise remedies thereunder (other than any Default which the exercise of remedies is stayed by the Bankruptcy Code).

6.20   Representations and Warranties

The representations and warranties set forth in Section 8 and the other Credit Documents shall be true and correct in all material respects on and as of the Closing Date (except in the case of any representation and warranty that expressly relates to a given date or period, such representation and warranty shall be true and correct in all material respects as of the respective date or for the respective period, as the case may be); provided that if any representations and warranties are qualified by or subject to a "material adverse effect", "material adverse change" or similar term or qualification, the definition thereof shall be a Material Adverse Effect for purposes of any such representations and warranties made or deemed made on, or as of, the Closing Date (or any date prior thereto).

6.21   Restructuring Support Agreement; Milestones

The Restructuring Support Agreement shall be in full force and effect and the Debtors are in compliance in all respects with the Milestones.

6.22   Notice of Borrowing

On the Closing Date, the Administrative Agent shall have received a Notice of Borrowing with respect to the Initial New Money Term Loans in accordance with Section 2.03(a).

In determining the satisfaction of the conditions specified in this Section 6, to the extent any item is required to be satisfactory to any Lender, such item shall be deemed satisfactory to each Lender which has not notified the Administrative Agent in writing prior to the occurrence of the Closing Date that the respective item or matter does not meet its satisfaction.


SECTION 7.   Conditions Precedent to All Credit Events

The obligation of each applicable Lender to make any Loans hereunder is subject, at the time of each such Credit Event (including, for the avoidance of doubt, the making of the Initial New Money Term Loan), except as hereinafter indicated, to the satisfaction or waiver by the Administrative Agent and the Required Lenders of the following conditions; provided that, and for the avoidance of doubt, once the Fronting Lender has funded any portion of the Facility, the Lenders' Commitments and agreements shall be unconditional with respect to any such funded amounts:

7.01   No Default; Representations and Warranties

At the time of each such Credit Event and also after giving effect thereto (i) no Default or Event of Default shall have occurred and be continuing or would result therefrom and (ii) all representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on the date of such Credit Event (it being understood and agreed that (x) any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date and (y) any representation or warranty that is qualified as to "<u>materiality</u>," "<u>Material Adverse Effect</u>" or similar language shall be true and correct in all respects on such date).

       7.02    <u>Notice of Borrowing</u>

The Administrative Agent shall have received a Notice of Borrowing meeting the requirements of Section 2.03(a).

       7.03    <u>No Violation</u>

The making of such DIP Term Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

       7.04    <u>Fees, etc</u>.

All fees (including, without limitation, the Closing Fee) and expenses (to the extent, in the case of reimbursement of expenses, invoices are received at least two days before the date of such Credit Event, including all invoiced reasonable out-of-pocket costs, fees and expenses (including invoiced reasonable and out-of-pocket legal fees and expenses reimbursable hereunder)) due and payable to the Administrative Agent and the Lenders that are required to be paid on shall have been paid, including, without limitation, all fees and expenses due under the Administrative Agent Fee Letter and the Fronting Fee Letter.

       7.05    <u>Final DIP Order</u>

Solely with respect to any Credit Event occurring after the Closing Date, the Administrative Agent shall have received a certification that the Final DIP Order has been entered by the Bankruptcy Court no later than 31 days of the Petition Date (which may be satisfied by providing the Administrative Agent with a copy of the signed Final DIP Order). The Final DIP Order shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in any manner without the consent of the Required Lenders, and the Debtors shall be in compliance in all respects with the Final DIP Order.

       7.06    <u>Approved DIP Budget</u>

       (a)    The Debtors shall have timely delivered to the Lender Advisors and, on a non-cleansing basis, to the Administrative Agent and the Lenders the Approved DIP Budget or any update thereto then required to be delivered, which shall be acceptable to the Required Commitment Parties.

       (b)    The borrowing of the Loans contemplated by such Credit Event complies with the Approved DIP Budget.

       7.07    <u>Restructuring Support Agreement; Milestones</u>

The Restructuring Support Agreement shall be in full force and effect and the Debtors are in compliance in all respects with the Milestones.

7.08    Officer's Certificate

On the date of such Credit Event, the Administrative Agent shall have received a certificate, dated the Closing Date and signed on behalf of the Borrower by an Authorized Officer of the Borrower, certifying on behalf of the Borrower that all of the conditions in Sections 7.01, 7.05, 7.06, 7.07, 7.09, 7.10, 7.11 and 7.12 have been satisfied on such date.

7.09    Second Day Orders

All other material "second day orders" intended to be entered on or prior to the Final DIP Order Entry Date and any order establishing material procedures for the administration of the Chapter 11 Cases, shall have been entered by the Bankruptcy Court. Such second day orders shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in any manner without the consent of the Required Lenders, and the Debtors shall be in compliance in all respects with such second day orders.

7.10    Perfection

The Collateral Agent, for the benefit of the Secured Parties, shall have valid, binding, enforceable, non-avoidable, and automatically and fully and perfected Liens on, and security interests, in the Collateral, in each case, having the priorities set forth in the Applicable DIP Orders and subject only to the payment in full in cash of any amounts due under the Carve Out.

7.11    No Dismissal or Conversion

The Chapter 11 Cases shall not have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

7.12    No Appointment

No trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with expanded powers shall have been appointed in any of the Chapter 11 Cases.

7.13    Fronting Arrangement

(a)     No later than one (1) Business Day prior to each Credit Event, an authorized representative for the Commitment Parties (which can be Akin Gump Strauss Hauer & Feld LLP) shall provide the Administrative Agent with a written confirmation that (i) the conditions precedent set forth in the DIP Commitment Letter to the commitments and agreements of the Commitment Parties thereunder (including, without limitation, those contemplated by Section 8 of the DIP Commitment Letter) have been satisfied and (ii) each Commitment Party is prepared to fund their New Money Term Loan Commitments and acquire Initial New Money Term Loans and Delayed-Draw New Money Term Loans, as applicable, by assignment from the Fronting Lenders in accordance with the DIP Commitment Letter.

(b)     With respect to any Credit Event occurring following the Closing Date with respect to the funding of the Delayed-Draw New Money Term Loans and the New Money Term Loan Syndication, each Commitment Party and each Participating DIP Lender (as defined in the DIP Commitment Letter) that has an allocation with respect to the New Money Term Loan Commitment in connection with the New Money Term Loan Syndication shall either (i) be a Prepetition Lender, or (ii) otherwise be approved by the Fronting Lender prior to the date of such applicable Borrowing for purposes of compliance with applicable "know your customer" requirements under the Patriot Act, the Beneficial Ownership

Regulation or other applicable anti-money laundering laws.

SECTION 8.    Representations and Warranties.

On the dates and to the extent required pursuant to Section 6 or Section 7 hereof, as applicable, the Holdings Guarantors and the Borrower make the following representations and warranties (each with respect to itself and, if applicable, their respective Restricted Subsidiaries and, if applicable, in the case of Sections 8.04, 8.05, 8.07, 8.20 and 8.21, the Practice Groups), to the extent provided in this Section 8.

8.01    Company Status

Each of Holdings and each of its Restricted Subsidiaries (i) is a duly organized and validly existing Company in good standing (or existing, as applicable) under the laws of the jurisdiction of its organization, (ii) has the Company power and authority to own its material property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is, to the extent such concepts are applicable under the laws of the relevant jurisdiction, duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except in the case of clauses (i) (other than with respect to the Borrower), (ii) and (iii) for failures to be so qualified or authorized or have such power which, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

8.02    Power and Authority

Each Credit Party has the Company power and authority to execute, deliver and perform the terms and provisions of each of the Credit Documents to which it is party and has taken all necessary Company action to authorize the execution, delivery and performance by it of each of such Credit Documents.  Each Credit Party has duly executed and delivered each of the Credit Documents to which it is party, and each of such Credit Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent (i) that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law), (ii) of the need for filings and registrations necessary to create or perfect the Liens on the Collateral granted by the Credit Parties in favor of the Collateral Agent and (iii) the effect of foreign laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries and intercompany Indebtedness owed by Foreign Subsidiaries.

8.03    No Violation

Neither the execution, delivery or performance by any Credit Party of the Credit Documents to which it is a party, nor compliance by it with the terms and provisions thereof, (i) will contravene any provision of any material law, statute, rule or regulation or any order, writ, injunction or decree of any court or Governmental Authority, except in the case of any contraventions that would not reasonably be expected, enter individually or in the aggregate, to result in a Material Adverse Effect, (ii) after giving effect to the DIP Orders, will conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents or Permitted Liens) upon any of the property or assets of any Credit Party or any of its Restricted Subsidiaries pursuant to the terms of any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, in each case to which any Credit Party or any of its Restricted Subsidiaries is a party or by which it or any its property or assets is bound or to which it may be subject,

except for any such contravention, breach, default, conflict or Lien that would not reasonably be expected, either individually or in the aggregate, to result in a Material Adverse Effect or (iii) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of any Credit Party or any of its Restricted Subsidiaries.

8.04    Approvals; Governmental Authorizations

Other than the DIP Orders, no order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, any Governmental Authority is required to be obtained or made by, or on behalf of, any Credit Party (except for (w) those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date, (x) filings which are necessary to release liens granted pursuant to the document related to the Indebtedness to be refinanced, (y) filings which are necessary to perfect the security interests created under the Security Documents, and (z) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect) to authorize, or is required to be obtained or made by, or on behalf of, any Credit Party in connection with, (i) the execution, delivery and performance of any Credit Document or (ii) the legality, validity, binding effect or enforceability of any such Credit Document. Each of Holdings', the Borrower's, Holdings' Restricted Subsidiaries' and the Practice Groups' employees and contractors providing additional professional medical services to patients is, and has at all times been, while serving in such capacity under employment of or contract with Holdings, the Borrower, their respective Restricted Subsidiaries or the Practice Groups (i) duly licensed and certified (as and where required) by each regulatory body having jurisdiction over services rendered by such Person and (ii) eligible (as and where required) to participate in Governmental Programs, except to the extent that such failure to be licensed, certified or eligible, as the case may be, would not reasonably be expected to have a Material Adverse Effect, either individually or in the aggregate.

8.05    Financial Statements; Financial Condition; Undisclosed Liabilities; No Material Adverse Effect

(a)    The most recently provided financial statements provided pursuant to Section 9.01(a) or (b), as applicable, present fairly, in all material respects, the consolidated financial position and results of operations and cash flows of Holdings on a consolidated basis as of such dates and for such periods in accordance with GAAP, (x) except as otherwise expressly noted therein, (y) subject, in the case of unaudited financial statements, to the absence of footnotes and normal year-end adjustments and (z) except as may be necessary to reflect any differing entity and/or organizational structure prior to giving effect to the Transactions.

(b)    [Reserved].

(c)    Since the Petition Date, and other than the Chapter 11 Cases, nothing has occurred that has had, or would reasonably be expected to have, a Material Adverse Effect.

8.06    Litigation.  Except for the Chapter 11 Cases, there are no actions, suits or proceedings pending or, to the knowledge of Holdings or the Borrower, threatened in writing (i) with respect to the Credit Documents or (ii) that have a reasonable likelihood of adverse determination, and, if adversely determined, have had, or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

-64-

8.07     <u>True and Complete Disclosure</u>.  All factual information (when furnished and taken as a whole) furnished by or on behalf of Holdings or the Borrower in writing to the Administrative Agent or any Lender (including all information contained in the Credit Documents but excluding information of a general economic or industry nature) for purposes of or in connection with this Agreement, the other Credit Documents or any transaction contemplated herein or therein is, and all other such factual information as supplemented (when furnished and taken as a whole) hereafter furnished by or on behalf of Holdings or the Borrower in writing to the Administrative Agent or any Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (when furnished and taken as a whole) not materially misleading at such time in light of the circumstances under which such information was provided, it being understood and agreed that for purposes of this Section 8.07, such factual information shall not include the projections contained in the Approved DIP Budget, any pro forma financial information, other forward looking information or information consisting of statements, estimates or forecasts regarding the future condition of the industries in which they operate.

8.08     <u>Margin Regulations</u>.  No part of any Credit Event (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock.  Neither the making of any Loan nor the use of the proceeds thereof nor the occurrence of any other Credit Event will violate the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

8.09     <u>Tax Returns and Payments</u>.  Each of Holdings and each of its Restricted Subsidiaries has timely filed or caused to be timely filed (or filed for extension) with the appropriate taxing authority all federal and other returns, statements, forms and reports for taxes (the "<u>Returns</u>") required to be filed by, or with respect to the income, properties or operations of, Holdings and/or any of its Restricted Subsidiaries, except where the failure to timely file or cause to be timely filed such Returns would not result in a Material Adverse Effect.  The Returns accurately reflect in all material respects all liability for Taxes of Holdings and its Restricted Subsidiaries, as applicable, for the periods covered thereby.  Each of Holdings and each of its Restricted Subsidiaries has paid all Taxes and assessments payable by it that have become due, other than (i) those that are being contested in good faith and are adequately disclosed and fully provided for on the financial statements of Holdings and its Restricted Subsidiaries in accordance with GAAP or (ii) those the failure of which to pay would not reasonably be expected to result in a Material Adverse Effect.

8.10     <u>Compliance with ERISA</u>.

(a)     Each Plan is in compliance in form and operation with its terms and with ERISA and the Code (including the Code provisions compliance with which is necessary for any intended favorable tax treatment) and all other applicable laws and regulations, except where any failure to comply would not reasonably be expected to have a Material Adverse Effect.  Except as would not have a Material Adverse Effect, each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code covering all applicable tax law changes or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS, and to the knowledge of the Borrower, nothing has occurred since the date of such determination that would reasonably be expected to result in the revocation of such determination (or, in the case of a Plan with no determination, to the knowledge of the Borrower, nothing has occurred that would reasonably be expected to materially adversely affect the issuance of a favorable determination letter).  No ERISA Event has occurred or is reasonably expected to occur other than as would not, individually or in the aggregate, have a Material Adverse Effect.

(b)       There exists no Unfunded Pension Liability with respect to any Plan that would have a Material Adverse Effect.

(c)       Except as would not have a Material Adverse Effect, none of Holdings, the Borrower or any of their Restricted Subsidiaries or any ERISA Affiliate has incurred, or is reasonably expected to incur a complete or partial withdrawal from any Multiemployer Plan.

(d)       There are no actions, suits or claims pending against or involving a Plan (other than routine claims for benefits) or, to the knowledge of Holdings, the Borrower or any of their Restricted Subsidiaries, threatened in writing, which would reasonably be expected to be asserted successfully and, if so asserted successfully, would reasonably be expected either singly or in the aggregate to have a Material Adverse Effect.

(e)       Holdings, its Restricted Subsidiaries and any ERISA Affiliate have made all material contributions to or under each Plan and Multiemployer Plan required by law within the applicable time limits prescribed thereby, the terms of such Plan or Multiemployer Plan, respectively, or any contract or agreement requiring contributions to a Plan or Multiemployer Plan save where any failure to  make such contributions, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(f)       Except as would not, individually or in the aggregate, have a Material Adverse Effect: (i) no Plan which is subject to Section 412 of the Code or Section 302 of ERISA has applied for or received an extension of any amortization period, within the meaning of Section 412 of the Code or Section 302 of ERISA; (ii) Holdings, its Restricted Subsidiaries and any ERISA Affiliate have not ceased operations at a facility so as to become subject to the provisions of Section 4062(e) of ERISA, withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA or ceased making contributions to any Plan subject to Section 4064(a) of ERISA to which it made contributions; and (iii) neither Holdings or its Restricted Subsidiaries or any ERISA Affiliate has any liability under Section 4069 or 4212(c) of ERISA.  Except as would not have a Material Adverse Effect, no lien imposed under the Code or ERISA on the assets of Holdings or its Restricted Subsidiaries or any ERISA Affiliate,  exists or is reasonably likely to arise on account of any Plan.

(g)       Except as would not individually or in the aggregate, have a Material Adverse Effect, (i) each Foreign Pension Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities, (ii) all contributions required to be made with respect to each Foreign Pension Plan have been timely made, (iii) neither Holdings nor any of its Restricted Subsidiaries has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan and (iv) the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Pension Plan, determined as of the end of Holdings'  most recently ended Fiscal Year on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Foreign Pension Plan allocable to such benefit liabilities.

8.11    Security Documents.

The Security Agreement, the Pledge Agreement and the other Security Documents, upon execution and delivery thereof by the parties thereto and entry of the Applicable DIP Order (and subject to the terms therein), will create in favor of the Collateral Agent, for the benefit of the Secured Creditors, a legal, valid and enforceable security interest in the Collateral described therein and the proceeds thereof, which security interest shall be deemed valid and perfected as of the Closing Date by entry of the Applicable DIP Order with respect to each Credit Party and which shall constitute continuing Liens on the

Collateral having priority over all other Liens on the Collateral, securing all the Obligations, other than the Carve Out and as otherwise set forth in the Applicable DIP Order. Neither the Agents nor the Lenders shall be required to file or record (but shall have the option and authority to file or record) any financing statements, mortgages, notices of Lien or similar instruments, in any jurisdiction or filing office or to take any other action in order to validate, perfect or establish the priority of the Liens and security interest granted by or pursuant to this Agreement, any other Credit Document or the Applicable DIP Orders.

8.12    Properties.

All Real Property owned or leased by Holdings or any of its Restricted Subsidiaries as of the Closing Date, and the nature of the interest therein, is correctly set forth in Schedule 8.12. Each of Holdings and each of its Restricted Subsidiaries has good and marketable title to all material Real Properties owned in fee simple by it (except as sold, transferred or otherwise disposed of as permitted by the terms of this Agreement), free and clear of all Liens, other than Permitted Liens. Each of Holdings and each of its Restricted Subsidiaries has a valid and leasehold interest in the material Real Properties (other than leaseholds disposed in accordance with the terms hereof) leased by it free and clear of all Liens other than Permitted Liens.

8.13    Subsidiaries.

On and as of the Closing Date, Holdings Guarantors have no Subsidiaries other than those Subsidiaries listed on Schedule 8.13. Schedule 8.13 sets forth, as of the Closing Date, the percentage ownership of each Holdings Guarantor in each class of capital stock or other Equity Interests of each of its Subsidiaries and also identifies the direct owner thereof. On the Closing Date, (i) the other Holdings Guarantors own 100%, directly or indirectly, of the Equity Interests of Holdings, and (ii) Holdings owns 100% of the Equity Interests of the Borrower. All outstanding Equity Interests of the Borrower and each other Restricted Subsidiary of the Holdings Guarantors have been duly and validly issued, are fully paid and non-assessable (to the extent applicable). As of the Closing Date, neither the Borrower, any Holdings Guarantor nor any Restricted Subsidiary has outstanding any securities convertible into or exchangeable for its Equity Interests or outstanding any right to subscribe for or to purchase, or any options or warrants for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of or any calls, commitments or claims of any character relating to, its Equity Interests or any stock appreciation or similar rights except as disclosed on Schedule 8.13.

8.14    Compliance with Statutes, etc.

Each of Holdings, the Borrower and each of Holdings' Restricted Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property, including all Health Care Laws, except such non-compliances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.15    Investment Company Act. Neither any Holdings Guarantor, the Borrower nor any of Holdings Guarantors' Restricted Subsidiaries is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

8.16    Environmental Matters

Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or as set forth on Schedule 8.16: (a) each of Holdings and each of its Restricted Subsidiaries is in compliance with all Environmental Laws and has obtained and is in compliance with

the terms of any permits required under such Environmental Laws; (b) there are no Environmental Claims pending, or to the knowledge of the Borrower, threatened in writing against Holdings or any of its Restricted Subsidiaries; (c) no Lien, other than a Permitted Lien, has been recorded, or to the knowledge of the Borrower, threatened in writing under any Environmental Law with respect to any Real Property owned by Holdings or any Restricted Subsidiary; (d) neither Holdings nor any of its Restricted Subsidiaries has agreed to contractually assume or accept responsibility for any liability of any other Person under any Environmental Law; and (e) to the knowledge of Borrower and Holdings, there are no facts, circumstances, conditions or occurrences with respect to the past or present business or operations of Holdings or any of its Restricted Subsidiaries that would reasonably be expected to give rise to any Environmental Claim against Holdings or any of its Restricted Subsidiaries or any liability of Holdings or any of its Restricted Subsidiaries under any Environmental Law.

8.17    Employment and Labor Relations

Neither Holdings nor any of its Restricted Subsidiaries is engaged in any unfair labor practice that would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect. There (i) is no unfair labor practice complaint pending against Holdings or any of its Restricted Subsidiaries or, to the knowledge of the Borrower or Holdings, threatened in writing against any of them, before the National Labor Relations Board, and no grievance or any arbitration proceeding arising out of or under any collective bargaining agreement is so pending against Holdings or any of its Restricted Subsidiaries or, to the knowledge of the Borrower or Holdings, threatened in writing against any of them, (ii) is no strike, labor dispute, concerted slowdown or concerted stoppage pending against Holdings or any of its Restricted Subsidiaries or, to the knowledge of the Borrower or Holdings, threatened in writing against Holdings or any of its Restricted Subsidiaries, (iii) is no union representation question existing with respect to the employees of Holdings or any of its Restricted Subsidiaries, (iv) are no equal employment opportunity charges or other claims of employment discrimination pending or, to the knowledge of the Borrower or Holdings, threatened in writing against Holdings or any of its Restricted Subsidiaries and (v) to the knowledge of the Borrower or Holdings, there is no wage and hour department investigation that has been made of Holdings or any of its Restricted Subsidiaries, except (with respect to any matter specified in clauses (i) – (v) above, either individually or in the aggregate) such as would not reasonably be expected to have a Material Adverse Effect.

8.18    Intellectual Property, etc.

Each of Holdings and each of its Restricted Subsidiaries owns or has the right to use all the patents, trademarks, permits, domain names, service marks, trade names, copyrights, licenses, inventions, trade secrets, proprietary information and know-how of any type, whether or not written (including rights in computer programs and databases) and formulas, or rights with respect to the foregoing, without any known conflict with the rights of others which, or the failure to own or have which, as the case may be, would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

8.19    USA Patriot Act; OFAC; FCPA.

(a)    To the extent applicable each of Holdings, the Borrower and their respective Subsidiaries is in compliance, in all material respects, with (i) the Trading with the Enemy Act of the United States of America (50 U.S.C. App. §§ 1 et seq.) (as amended, the "Trading with the Enemy Act"), and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (ii) the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (as amended from time to time, the "Act"), (iii) the FCPA and (iv) OFAC.

(b)     None of Holdings, the Borrower, any of Holdings' other Subsidiaries nor, to the knowledge of the Borrower or Holdings, any director or officer of Holdings, the Borrower or any Subsidiary is subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC"); and the Borrower will not directly or (to its knowledge) indirectly use the proceeds of the Loans or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person subject to any U.S. sanctions administered by OFAC.

(c)     No part of the proceeds of the Loans will be used by Holdings, the Borrower or their respective Restricted Subsidiaries, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.  No Credit Party (i) is a Person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or to its knowledge is otherwise associated with any such Person in any manner that violates Section 2 of such executive order or (iii) is a Person on the list of "Specially Designated Nationals and Blocked Persons" or subject to the limitations or prohibitions under any other OFAC regulation or executive order.

8.20     Practice Groups.  No Practice Group has (a) incurred any Indebtedness in excess of $3,000,000 in the aggregate when taken together with all such Indebtedness of all Practice Groups (other than Indebtedness consisting of Investments permitted to be outstanding in or to a Practice Group pursuant to Section 10.05), (b) granted any Liens (other than Permitted Liens) or (c) owns any assets (whether in the form of personal or real property) other than, with respect to this clause (c), (i) operational equipment which is worth less than $500,000 per Practice Group, (ii) cash which is paid to a Practice Group under and pursuant to the applicable Management/Services Agreement and (iii) accounts generated by such Practice Group in the ordinary course of business and cash and non-cash proceeds received by such Practice Group on account thereof.

8.21     Healthcare Matters.

(a)     Each of Holdings, the Borrower and each of their respective Restricted Subsidiaries and each Practice Group and, to the Borrower's or Holdings' knowledge, each of their licensed employees, and, with respect to their activities pertaining to the business, their agents or contractors, are in compliance with all Health Care Laws applicable to such entity or person, as applicable, such entity's or person's, as applicable, business or operations, except for such non-compliance as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)     None of Holdings, the Borrower and each of their respective Restricted Subsidiaries or Practice Groups, nor any officer, director or managing employee thereof, is (i) excluded from any Governmental Program pursuant to 42 U.S.C. § 1320a-7b and related regulations or (ii) "suspended" or "debarred" from selling products to the U.S. government or its agencies pursuant to the Federal Acquisition Regulation, relating to debarment and suspension applicable to federal government agencies generally (42 C.F.R. Subpart 9.4), or other applicable laws or regulations, (iii) debarred, disqualified, suspended or excluded from participation in Medicare, Medicaid or any other health care program (collectively, "Healthcare Programs") or is listed on the General Services Administration list of excluded parties, nor is any such debarment, disqualification, suspension or exclusion threatened in writing or pending or (iv) party to any other action by any Governmental Authority that would reasonably be expected to result in such Person being prohibited by any Health Care Law from selling products or providing services to any governmental or other purchaser pursuant to any federal, state or local laws or

-69-

regulations, in each case except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    There are no pending or, to Holdings' knowledge, threatened in writing non-ordinary course inquiries, inspections, audits, overpayments, qui tam actions, appeals, investigations or claims or other actions which relate to a violation of any Health Care Laws or legal requirement pertaining to Healthcare Programs or which are reasonably likely to be, if resolved in a manner adverse to the Borrower, Holdings, their respective Restricted Subsidiaries  or any Practice Group, would result in the imposition of any penalties, restrict their ability to conduct their respective businesses as currently conducted in any respect or their exclusion from participation in any Healthcare Program, in each case except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.22    <u>Reorganization Matters</u>

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance in all material respects with applicable law and proper notice thereof and the proper notice of (x) the motion seeking approval of the Credit Documents and the Interim DIP Order and, as applicable, the Final DIP Order, (y) the hearing for the approval of the Interim DIP Order, and (z) when applicable, the hearing for the approval of the Final DIP Order will be given.

(b)    The Interim DIP Order (with respect to the period prior to entry of the Final DIP Order) or the Final DIP Order (with respect to the period on and after entry of the Final DIP Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended in a manner adverse to the Agents or Lenders without the Required Lenders' consent.

(c)    Each Approved DIP Budget delivered to the Administrative Agent were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed in good faith by the Borrower to be fair in light of the conditions existing at the time of delivery of such budget.

(d)    After the entry of the Interim DIP Order, and pursuant to and to the extent permitted in the Applicable DIP Orders, the Obligations of the Debtors will constitute allowed superpriority claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject and subordinate to (i) the Carve Out and (ii) the priorities set forth in the Applicable DIP Orders.

(e)    Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Applicable DIP Orders, as the case may be, upon the Maturity Date (whether by acceleration or otherwise), the Administrative Agent, the Collateral Agent and the Lenders shall be entitled to immediate repayment of the Obligations in full and to enforce the remedies provided for hereunder or under applicable laws, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court (other than as set forth in the Applicable DIP Orders, as the case may be).

8.23    <u>Beneficial Ownership</u>.  As of the Closing Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

SECTION 9.      Affirmative Covenants.

Each of the Holdings Guarantors and the Borrower hereby covenants and agrees (as to itself and, if applicable, their respective Restricted Subsidiaries and, solely in the case of Section 9.05, the Practice Groups) that on and after the Closing Date and until the Total Commitments have terminated and the Loans, Notes (in each case together with interest thereon), Fees and all other Obligations (other than contingent obligations which are not then due and payable) incurred hereunder and thereunder, are paid in full:

9.01      Information Covenants.  Holdings and the Borrower will furnish to the Administrative Agent (for each Lender):

(a)      Quarterly Financial Statements.  Within 45 days after the close of each of the first three (3) quarterly accounting periods in each Fiscal Year of Holdings, beginning with the quarterly accounting period ended September 30, 2024 (within 60 days in the case of the quarterly accounting periods ending September 30, 2024), the consolidated balance sheet of Holdings and its Consolidated Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of income and retained earnings and statement of cash flows for such quarterly accounting period and for the elapsed portion of the Fiscal Year ended with the last day of such quarterly accounting period, in each case setting forth (x) beginning with the quarterly accounting period ending March 31, 2020, comparative figures for the corresponding quarterly accounting period in the prior Fiscal Year and (y) beginning with the quarterly accounting period ending March 31, 2019, comparable budgeted figures for such quarterly accounting period as set forth in the respective projections delivered pursuant to Section 9.01(d), together with management's discussion and analysis describing results of operations in the form customarily prepared by management of the Borrower, all of which shall be certified by an Authorized Officer of the Borrower that they fairly present in all material respects in accordance with GAAP the financial condition of Holdings and its Consolidated Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes.

(b)      Annual Financial Statements.  Within 120 days after the close of each Fiscal Year of Holdings, the consolidated balance sheet of Holdings and its Consolidated Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income and retained earnings and statement of cash flows for such Fiscal Year setting forth  comparative figures for the preceding Fiscal Year, together with management's discussion and analysis describing results of operations in the form customarily prepared by management of the Borrower, and certified by an independent certified public accounting firm of recognized national standing or any other independent certified public accounting firm reasonably acceptable to the Administrative Agent, accompanied by an opinion of such accounting firm.

(c)      Management Letters.  Promptly after the Borrower's, Holdings' or any of their respective Restricted Subsidiaries' receipt thereof, a copy of any final "management letter" received from its certified public accountants and management's response thereto in connection with each annual audit of the financial statements of Holdings made by such accountants, subject to such confidentiality limitations as may be required by such independent public accountants in writing.

(d)      [Reserved].

(e)      Officer's Certificates.  No later than five (5) Business Days after the delivery of the financial statements provided for in Section 9.01(a) (solely with respect to each of the first three quarterly accounting periods in each Fiscal Year of Holdings) and Section 9.01(b), a compliance certificate from an Authorized Officer of the Borrower in substantially the form of Exhibit H (with blanks appropriately completed and with any deviations from such form as may be acceptable to the Administrative Agent)

certifying on behalf of the Borrower and Holdings that, to such officer's knowledge after due inquiry, no Default or Event of Default has occurred and is continuing or, if any Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof.

(f)     [Reserved].

(g)     <u>Notice of Default, Litigation and Material Adverse Effect</u>.  Promptly, and in any event within five (5) Business Days after any senior officer of the Borrower, Holdings or any of their respective Restricted Subsidiaries obtains knowledge thereof, notice of (i) the occurrence of any event which constitutes an Event of Default, (ii) any litigation or governmental investigation or proceeding pending against the Borrower, Holdings or any of their respective Restricted Subsidiaries (x) which, either individually or in the aggregate, has been adversely determined or has a reasonable likelihood of adverse determination and such adverse determination has had, or would reasonably be expected to have, a Material Adverse Effect or (y) with respect to any Credit Document, (iii) the proceeds of the Term Loans being deposited into an account other than the Loan Proceeds Account or (iv) any other event, change or circumstance that has had, or would reasonably be expected to have, a Material Adverse Effect.

(h)     <u>Other Reports and Filings</u>.  Promptly after the filing or delivery thereof, copies of all material financial information, proxy materials and reports, if any, which Holdings, the Borrower or any of their respective Restricted Subsidiaries shall publicly file with the Securities and Exchange Commission or any successor thereto (the "<u>SEC</u>") or deliver generally to holders (or any trustee, agent or other representative therefor) of any Prepetition Credit Documentation or any other Junior Financing Documentation for Junior Financing in excess of the Threshold Amount (in each case to the extent not otherwise provided hereunder).

(i)     <u>Other Information</u>

(i)     Promptly following written request, such other information or documents (financial or otherwise) regarding the operations, business affairs and financial condition of the Borrower, Holdings or any of their respective Restricted Subsidiaries as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request.

(ii)     (1) Promptly following written request, information and documentation reasonably requested by the Administrative Agent or any Lender (including any prospective Lender) for purposes of compliance with applicable "know your customer" requirements under the Patriot Act, the Beneficial Ownership Regulation or other applicable anti-money laundering laws and (2) promptly upon actual knowledge thereof by an Authorized Officer, written notice of any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

(j)     <u>Pleadings, Motions and Other Documents</u>.  At least two (2) Business Days prior to the date when the Company Parties intend to file such documents or as promptly as practicable, draft copies of all material (i) motions, (ii) documents, and (iii) other pleadings to be filed in the Chapter 11 Cases (excluding any retention applications), in each case along with any other requirements set forth in Section 7.01(q) of the Restructuring Support Agreement.

Notwithstanding anything to the contrary contained in this Section 9.01, neither Holdings, the Borrower nor any of their respective Subsidiaries shall be required to deliver to the Administrative Agent or any Lender any information (i) subject to confidentiality agreements or attorney client or similar privilege or constitutes attorney work-product, (ii) that constitutes non-financial trade secrets or non-

financial proprietary information or (iii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by applicable law.

Notwithstanding the foregoing, the obligations in Section 9.01(a), the first paragraph of Section 9.01(b) and Section 9.01(h) shall be satisfied with respect to financial information or other information of Holdings and its Consolidated Subsidiaries by furnishing (A) the applicable financial statements of Holdings (or any direct or indirect parent company thereof that, directly or indirectly, holds all of the Equity Interests of the Borrower and holds no other material assets other than the Equity Interests of the Borrower) or (B) the Borrower's or Holdings' (or any direct or indirect parent company thereof that, directly or indirectly, holds all of the Equity Interests of the Borrower and holds no other material assets other than the Equity Interests of the Borrower) Form 8-K, 10-K or 10-Q, as applicable, filed with the SEC; provided, that (x) with respect to clauses (A) and (B), to the extent such information is in lieu of information required to be provided under Section 9.01(b), such materials are accompanied by a report and opinion of an independent registered public accounting firm of recognized nationally standing or other public accounting firm reasonably acceptable to the Administrative Agent, which report and opinion shall otherwise comply with the requirements related thereto in Section 9.01(b) and (y) the information required by the last paragraph of Section 9.01(b) is also so furnished or otherwise provided to the Administrative Agent.

Financial information required to be delivered pursuant to Sections 9.01(a), (b), (e), or (h) (in each case, solely to the extent such financial information is included in materials filed with the SEC or posted on the relevant website, as the case may be) shall be deemed to have been delivered to the Administrative Agent on the date on which such information has been posted on the Borrower's behalf on IntraLinks (or another relevant website identified by the Borrower to the Administrative Agent and reasonably acceptable to the Administrative Agent) or is available via the EDGAR system of the SEC on the Internet; provided that in each case the Borrower shall (i) promptly notify the Administrative Agent of the posting of any such information, (ii) to the extent such information is in lieu of information required to be provided under the first paragraph of Section 9.01(b), the Borrower separately delivers to the Administrative Agent a report of an independent certified public accounting firm of recognized national standing or other independent certified public accounting firm reasonably acceptable to the Administrative Agent, which report shall otherwise comply with the requirements related thereto in Section 9.01(b) and (iii) (A) promptly deliver paper copies of any such documents required to be delivered pursuant to Section 9.01(e) to the Administrative Agent and (B) promptly deliver paper copies of any such other documents to the Administrative Agent if the Administrative Agent or any Lender (through the Administrative Agent) reasonably requests in writing the Borrower to furnish such paper copies until written notice to cease delivering such paper copies is given by the Administrative Agent.

9.02    Books, Records and Inspections

(a)     The Borrower and Holdings will, and will cause each of their respective Restricted Subsidiaries to, keep proper books of record and accounts in which full, true and correct (in all material respects) entries in conformity with GAAP (it being understood and agreed that Foreign Subsidiaries may maintain individual books and records in conformity with generally accepted accounting principles that are applicable in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder) and all requirements of law shall be made of all material dealings and transactions in relation to its business and activities. The Borrower and Holdings will, and will cause each of their respective Restricted Subsidiaries to, permit officers and designated representatives of the Administrative Agent and the Required Lenders to visit and inspect, under guidance of officers of the Borrower, Holdings or such Restricted Subsidiary, any of the properties of the Borrower, Holdings or such Restricted Subsidiary, and to examine the books of account of the Borrower, Holdings or such Restricted Subsidiary and discuss the affairs, finances and accounts of the

Borrower, Holdings or such Restricted Subsidiary with, and be advised as to the same by, its and their officers, independent accountants, attorneys and/or other advisors, all upon reasonable prior written notice and at such reasonable times as mutually agreed and to such reasonable extent as the Administrative Agent may reasonably request; provided that the Administrative Agent shall give the Borrower an opportunity to participate in any discussions with its accountants; and provided, further, that when an Event of Default exists, the Administrative Agent (at the direction of the Required Lenders) and its designees may do any of the foregoing at the reasonable expense of the Borrower at any time during normal business hours and upon reasonable advance written notice; provided, further that neither Holdings, the Borrower nor any Restricted Subsidiary shall be required to disclose (i) records of the Board of Directors of Holdings, the Borrower or such Restricted Subsidiary, (ii) information restricted by a third party confidentiality agreement and (iii) other information (x) that constitutes non-financial trade secrets or non-financial proprietary information, (y) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by applicable law or (z) that is subject to attorney client or similar privilege or constitutes attorney work-product.

9.03    Maintenance of Property; Insurance

(a)    The Borrower and Holdings will, and will cause each of their respective Restricted Subsidiaries to, (i) keep all tangible property necessary to the business of the Borrower, Holdings, and their respective Restricted Subsidiaries in good working order and condition, ordinary wear and tear excepted and subject to the occurrence of casualty and condemnation events, except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (ii) maintain with financially sound and reputable insurance companies insurance on all such property and against all such risks as is consistent and in accordance with industry practice for companies similarly situated owning similar properties and engaged in similar businesses as the Borrower, Holdings, and their respective Restricted Subsidiaries (after giving effect to any self-insurance reasonable and customary for similar situated Persons engaged in the same or similar business as the Borrower, Holdings, and their respective Restricted Subsidiaries) as reasonably determined by the Borrower, and (iii) furnish to the Administrative Agent, promptly following its reasonable written request therefor, full information as to the insurance carried; provided, so long as no Event of Default has occurred and is continuing, the Administrative Agent may only make such request one time in any Fiscal Year.  Such insurance shall include physical damage insurance on all material real and personal property (whether now owned or hereafter acquired) on an all risk basis and business interruption insurance.  The provisions of this Section 9.03 shall be deemed supplemental to, but not duplicative of, the provisions of any Security Documents that require the maintenance of insurance.

(b)    Holdings and the Borrower will, and Holdings and the other Holdings Guarantors will cause each other Credit Party to, at all times keep its Collateral insured to the extent required above in favor of the Collateral Agent, and all policies or certificates (or copies thereof) with respect to such insurance (and any other insurance maintained by Holdings, the Borrower and/or such other Credit Party) (i) shall be endorsed to the Collateral Agent's reasonable satisfaction for the benefit of the Collateral Agent (including by naming the Collateral Agent as loss payee and/or additional insured), (ii) shall state that such insurance policies shall not be canceled without at least 10 days' prior written notice thereof by the respective insurer to the Collateral Agent, and (iii) shall request that such insurance provide that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Collateral Agent and the other Secured Creditors.

(c)    If Holdings, the Borrower or any of their respective Restricted Subsidiaries shall fail to maintain insurance in accordance with this Section 9.03, or if Holdings, the Borrower or any of their respective Restricted Subsidiaries shall fail to so endorse such policies or certificates with respect thereto, the Administrative Agent shall have the right (but shall be under no obligation), upon seven (7) Business

-74-

Days' prior written notice from the Administrative Agent, to procure such insurance and Holdings and the Borrower jointly and severally agree to reimburse the Administrative Agent for all reasonable out-of-pocket costs and expenses of procuring such insurance in accordance with Section 13.01(a) hereof.

(d)      If at any time any improvement on a Mortgaged Property is located in an area identified as a special flood hazard area by the Federal Emergency Management Agency or any successor thereto or other applicable agency with respect to which flood insurance has been made available under the Flood Insurance Laws, then Holdings will and will cause each of its Restricted Subsidiaries to (i) at all times, maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and on such terms sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent. Following the Closing Date, the Borrower shall deliver to the Administrative Agent annual renewals of such flood insurance. As a condition precedent to any amendment to this Agreement pursuant to which any increase, extension, or renewal of Loans is contemplated, the Borrower shall cause to be delivered to the Administrative Agent for any Mortgaged Property, a completed "life of the loan" Federal Emergency Management Agency Standard Flood Hazard Determination, duly executed and acknowledged by the appropriate Credit Parties, and evidence of flood insurance, as may be required pursuant to the Flood Insurance Laws.

(e)      Holdings and the Borrower will, and Holdings will cause each other Credit Party to, take, or cause to be taken, all appropriate action to remain the sole owner of the Collateral, free of Liens other than the Permitted Prior Liens, Liens permitted to be incurred or exist pursuant to Section 10.01, Liens granted or incurred after the Petition Date in the ordinary course of business or other Liens granted or imposed pursuant to an order of the Bankruptcy Court that is in form and substance acceptable to the Required Lenders.

9.04    Existence; Franchises

Holdings and the Borrower will, and Holdings will cause each of its Restricted Subsidiaries to, do or cause to be done, all things necessary, to preserve and keep in full force and effect its existence and its rights, franchises, licenses, permits, copyrights, trademarks, patents and other intellectual property; provided, however, that nothing in this Section 9.04 shall prevent (i) sales of assets, dispositions and other transactions by Holdings, the Borrower or any of their respective Restricted Subsidiaries in accordance with the terms herein, (ii) the withdrawal by Holdings, the Borrower or any of their respective Restricted Subsidiaries of its qualification as a foreign Company in any jurisdiction or (other than with respect to the Borrower) failure to otherwise preserve or keep in full force and effect its existence or rights, franchises, licenses, permits, copyrights, trademarks, patents or other intellectual property, if such withdrawal or failure would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (iii) the expiration of copyrights or patents at the end of their statutory term.

9.05    Compliance with Laws, etc.

The Borrower and Holdings will, will cause each of their respective Restricted Subsidiaries to, and will use commercially reasonable efforts to cause each Practice Group to, comply with all applicable laws, statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property (including applicable laws, statutes, regulations, orders and restrictions arising under Health Care Laws and Environmental Laws and those laws and regulations referred to in Section 8.19), except such non-compliances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

9.06    Compliance with Environmental Laws

(a)    The Borrower and Holdings will comply, and will cause each of their respective Restricted Subsidiaries to comply, with all Environmental Laws and permits issued under Environmental Laws applicable to the Borrower's, Holdings' or their respective Restricted Subsidiaries' ownership, lease or use of any Real Property now or hereafter owned, leased or operated by the Borrower, Holdings or any of their respective Restricted Subsidiaries, except such noncompliances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and will promptly pay or cause to be paid all costs and expenses incurred in connection with such compliance, and conduct all remedial or corrective actions required under Environmental Laws in connection with such compliance, and will keep or cause to be kept all such Real Property free and clear of any Liens (other than Permitted Liens) imposed pursuant to such Environmental Laws, except for Liens imposed on leased Real Property resulting from the acts or omissions of the owner of such leased Real Property or of other tenants of such leased Real Property who are not within the control of a Credit Party.

(b)    (i) at any time that the Borrower, Holdings or any of their respective Restricted Subsidiaries is not in compliance with Section 9.06(a) or (ii) in the event that the Administrative Agent or the Lenders have exercised any of the remedies pursuant to Section 11 relating to an Event of Default, the Borrower will provide, at the sole expense of the Borrower and at the written request of the Administrative Agent, an environmental site assessment report concerning the Real Property owned, leased or operated by the Borrower, Holdings or any of their respective Restricted Subsidiaries related to such noncompliance with Section 9.06(a) or such Event of Default, prepared by an environmental consulting firm reasonably approved by the Administrative Agent, reasonably related in scope to such noncompliance with Section 9.06(a) or Event of Default, indicating, where relevant to the subject matter of the request, the presence of Hazardous Materials and the reasonably expected cost of any removal or remedial action required under Environmental Law in connection with such Hazardous Materials on such Real Property.  If the Borrower fails to provide the same within 45 days after such request was made, the Administrative Agent may order the same, the reasonable cost of which shall be borne by the Borrower, and the Borrower shall grant to the Administrative Agent and the Lenders and their respective agents access to such Real Property to undertake such an assessment at any reasonable time upon reasonable written notice to the Borrower, all at the sole expense of the Borrower.

9.07    Business, etc.

Holdings will only, and will only permit its Restricted Subsidiaries to, engage directly or indirectly in the businesses engaged in by the Borrower and the Restricted Subsidiaries as of the Closing Date and reasonable extensions thereof and businesses ancillary, corollary, synergistic or complementary thereto.

9.08    Deposit Accounts and Securities Accounts

Maintain its cash management system in a manner reasonably acceptable to the Required Lenders (which shall be deemed satisfied if the cash management system is substantially the same as the cash management system in existence on the Petition Date, with such modifications as set forth under the Cash Management Order).

9.09    Payment of Taxes

Subject to the Approved DIP Budget and any stay imposed as a result of the Chapter 11 Cases, Holdings will pay and discharge, and will cause each of its Restricted Subsidiaries to pay and discharge, all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or

-76-

upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims that, if unpaid, might become a Lien or charge upon any properties of the Borrower, Holdings or any of their respective Restricted Subsidiaries not otherwise permitted under Section 10.01(i); provided that none of the Borrower, Holdings or any of their respective Restricted Subsidiaries shall be required to pay any such tax, assessment, charge, levy or claim that (i) is being contested in good faith and by proper proceedings if it is maintaining adequate reserves with respect thereto in accordance with GAAP or (ii) the failure to pay such amounts would not reasonably be expected to have a Material Adverse Effect.

9.10    Use of Proceeds

(a)    Subject to Bankruptcy Court approval, use the proceeds of the Facilities and Cash Collateral strictly in accordance with this Agreement, the other Credit Documents, the DIP Orders and the Approved DIP Budget (subject to Prohibited Variances) for (a) costs and expenses related to the Facilities, (b) working capital and general corporate purposes of the Debtors in the ordinary course of business, (c) making adequate protection payments to or for the benefit of the Secured Parties (as defined in the Prepetition First Lien Credit Agreement), (d) making payments to certain critical vendors and costs relating to the sale of the Debtors' assets, (e) bankruptcy-related costs and expenses in respect of the Chapter 11 Cases, including for the payment of Debtor professional fees allocated to the Chapter 11 Cases consistent with the terms of the Restructuring Support Agreement, (f) making repayments under the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement, in each case with the proceeds of the Roll-Up Term Loans and (g) any other purposes specifically set forth in the Approved DIP Budget, approved by the Bankruptcy Court or approved by the prior written consent of the Required Lenders in their sole discretion.

(b)    No Cash Collateral or proceeds of the Facilities may be used by the Debtors or any other entity to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the Liens or claims granted under or in connection with, the Facilities or the Prepetition First Lien Credit Agreement; provided that the Creditors' Committee may use up to $50,000 in the aggregate to investigate (but not otherwise commence any challenge or object to or otherwise prosecute) any claims or causes of action solely with respect to the Prepetition First Lien Obligations, the Prepetition Second Lien Obligations or the Liens securing the Prepetition First Lien Obligations or Prepetition Second Lien Obligations (the "Investigation Expenses").

(c)    No Cash Collateral or proceeds of the Facilities may be distributed by the Debtors to, or used by the Debtors for the benefit of any direct or indirect parent entity of Holdings (such entity, "Parent") or any non-Debtor affiliates of Parent, including, in each case, for payment of any Professional Fees and Financing Costs, except for line item disbursements specifically provided for in the Approved DIP Budget.  Moreover, other than with respect to the Investigation Expenses, no Cash Collateral or proceeds of the Facilities may be used to pay any fees and expenses associated with any Creditors' Committee, and payment of such fees and expenses shall be the sole responsibility of Parent.

9.11    Additional Security; Further Assurances; etc.

(a)    Holdings, the other Holdings Guarantors and the Borrower will, and will cause each other Credit Party to, grant to the Collateral Agent for the benefit of the Secured Creditors security interests in and Mortgages on such assets and Real Property of Holdings, the other Holdings Guarantors, the Borrower and such other Credit Party (other than Excluded Collateral) as are not covered by the Security Documents in effect on the Closing Date and as may be reasonably requested in writing from time to time by the Administrative Agent or the Collateral Agent (collectively, as amended, restated, supplemented or otherwise modified from time to time, the "Additional Security Documents").  All such security interests and Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance

to the Collateral Agent and the Borrower and shall constitute valid, enforceable (except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law)) first-priority Liens under applicable U.S. law and perfected security interests and Mortgages superior to and prior to the rights of all third Persons and subject to no other Liens, in each case, except for Permitted Liens.  The Additional Security Documents or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by U.S. law to establish, perfect (if and to the extent the assets subject to the applicable Additional Security Document can be perfected by the actions required by such Additional Security Document), preserve and protect the Liens in favor of the Collateral Agent required to be granted pursuant to the Additional Security Documents and all material taxes, fees and other charges payable in connection therewith shall be paid in full by the Borrower to the extent due and owing.

(b)     Holdings, the other Holdings Guarantors and the Borrower will, and will cause each of the other Credit Parties to, at the expense of the Borrower, but subject to the limitations set forth herein and the other Security Documents, make, execute, endorse, acknowledge, authorize, file and/or deliver to the Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory collateral assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, real property surveys, reports, assignments, and other documents, assurances or instruments and take such further steps relating to the Collateral  covered by any of the Security Documents as the Collateral Agent may reasonably require in writing.  Furthermore, Holdings and the other Holdings Guarantors will, and will cause the other Credit Parties to, deliver to the Collateral Agent with respect to each of the Mortgaged Properties such customary opinions of counsel, Mortgage Policies, completed "life of the loan" Federal Emergency Management Agency Standard Flood Hazard Determinations with respect to such Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance), duly executed and acknowledged by the applicable Credit Party if required by the Flood Insurance Laws, together with evidence of flood insurance, to the extent required under Section 9.03(d) hereof and other related documentation as and when may reasonably be requested in writing by the Collateral Agent in order to assure itself that Section 9.11(a) has been complied with.  Notwithstanding the foregoing, nothing in this Agreement shall require any Credit Party to (i) make any filings or take any other action to record or perfect the Collateral Agent's Lien in any Collateral (including, but not limited to, intellectual property) outside the United States or (ii) take any actions in any non-U.S. jurisdiction or that are required by the laws of any non-U.S. jurisdiction in order to (x) create any security interests in assets located or titled outside of the U.S. or (y) perfect such security interests (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction).

(c)     If the Administrative Agent or the Required Lenders reasonably determine that they are required by law or regulation to have appraisals prepared in respect of any Mortgaged Property, Holdings, the other Holdings Guarantors and the Borrower will, at their own expense, provide to the Administrative Agent appraisals which satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of the Financial Institution Reform, Recovery and Enforcement Act of 1989, as amended, and which shall otherwise be in form and substance reasonably satisfactory to the Administrative Agent.

(d)     Holdings, the other Holdings Guarantors and the Borrower agree that each action required by clauses (a) through (c) of this Section 9.11 shall, (i) be completed within 60 days after such action is requested in writing to be taken by the Administrative Agent, the Collateral Agent or the Required Lenders (or such later date as extended by the Administrative Agent in its reasonable discretion), or (ii) with respect to any Closing Date Mortgaged Property, be completed within 90 days after the Closing Date (or such later date as extended by the Administrative Agent in its reasonable discretion).

(e)      After the Closing Date, upon the formation (including by division) or acquisition of any Restricted Subsidiary by any Credit Party: upon such formation, acquisition, cessation or designation, or such longer period as the Administrative Agent may agree in its reasonable discretion, the Borrower will (I) cause each such Restricted Subsidiary to duly execute and deliver to the Administrative Agent or the Collateral Agent (as appropriate) joinders to the applicable Security Documents, as reasonably requested by and in form and substance reasonably satisfactory to the Administrative Agent (consistent with the Security Documents in effect on the Closing Date), in each case granting first-priority Liens (subject to Permitted Liens) required by this Section 9.11 or the Security Documents, (II) cause such Restricted Subsidiary to take whatever action (including the recording of Mortgages, the filing of UCC financing statements and delivery of stock and membership interest certificates) as may be necessary in the reasonable opinion of the Collateral Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid and perfected Liens to the extent required by the Credit Documents, and to otherwise comply with the requirements in this Section 9.11 or the Security Documents, (III) cause each such Restricted Subsidiary (and the parent of each such Restricted Subsidiary) to deliver any and all certificates representing Equity Interests (to the extent certificated) and intercompany notes (to the extent certificated) that are required to be pledged pursuant to the Security Documents, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and (IV) cause each such Restricted Subsidiary to duly execute and deliver to the Administrative Agent a guaranty or guaranty supplement, in form and substance reasonably satisfactory to the Administrative Agent, guaranteeing the Obligations.

(f)      Notwithstanding anything to the contrary contained in this Section 9.11, the Administrative Agent shall not require perfection in, and no Credit Party shall be required to perfect, any assets constituting Collateral as to which the Administrative Agent shall determine in its reasonable discretion that the cost of perfecting a security interest in such asset is excessive in relation to the value of the security to be afforded thereby.

(g)      [Reserved].

(h)      No Credit Party shall be required to obtain landlord lien waivers, bailment lien waivers or estoppels letters with respect to any leased property of such Credit Party.

(i)      Liens required to be granted from time to time pursuant to this Section 9.11 shall be subject to exceptions and limitations set forth in this Agreement and the Security Documents.

9.12    Approved DIP Budget; Additional Chapter 11 Reporting

(a)      Initial Budget/Approved Budget.  The Credit Parties shall ensure that the Initial DIP Budget shall be in effect as the Approved DIP Budget at all times until superseded in accordance with Section 9.12(b).

(b)      Updated Budget.  Not later than 5:00 p.m. New York City time on the Wednesday of every fourth week (or, if such day is not a Business Day, the immediately succeeding Business Day), the Credit Parties shall deliver by email to the Lender Advisors and on, a non-cleansing basis, to the Administrative Agent and the Lenders a proposed updated an updated 13-week cash forecast of the Debtors on a consolidated basis in form and substance satisfactory to the Required Lenders (each, an "Updated DIP Budget") covering the 13-week period that commences with the week in which such Updated DIP Budget is delivered (it being understood that the first delivery of the proposed Updated DIP Budget shall be on or prior to December 4, 2024 with respect to 13-week starting from December 9, 2024 and the second delivery of the proposed Updated DIP Budget shall be on or prior to January 2, 2025 with respect to 13-week starting from January 6, 2025), consistent with the form and level of detail set forth in

-79-

the Initial DIP Budget and showing, among other things, Budgeted Cash Receipts and Budgeted Disbursements on a line item and aggregate basis (including, without limitation, Professional Fees and Financing Costs as a separate line item).  If the Required Lenders find such proposed Updated DIP Budget to be in form and substance satisfactory, such Updated DIP Budget shall become the Approved DIP Budget for all purposes of this Agreement until such time as an updated Approved DIP Budget is agreed between the Credit Parties and the Required Lenders; provided, that if the Required Lenders have not approved, in writing, a proposed Updated DIP Budget within five (5) Business Days of receipt of such proposed Updated DIP Budget, the then-current Approved DIP Budget shall continue to be the Approved DIP Budget, and until any such updated budget, amendment, supplement or modification has been approved by the Required Lenders, the Debtors shall be subject to and be governed by the terms of the Approved DIP Budget then in effect.

(c)    Variance Reporting.  Not later than 5:00 p.m. New York City time on the Thursday of each week (or, if such Thursday is not a Business Day, the Friday of such week), commencing on Thursday of the third full calendar week after the entry of the Interim DIP Order, with respect to the Variance Test Period most recently ended, the Debtors or their advisors shall deliver by email to the Lender Advisors and, on a non-cleansing basis, the Administrative Agent and the Lenders, a variance report on a line item and aggregate basis, in form and substance reasonably acceptable to the Required Lenders, (i) setting forth, in reasonable detail, the actual cash receipts and, separately, actual cash disbursements for such Variance Test Period (in each case, for the Credit Parties taken as a whole) and the Budgeted Cash Receipts and Budgeted Disbursements set forth in each corresponding cumulative two-week, three-week, or four-week period in the then in-effect Approved DIP Budget for such Variance Test Period and (ii) describing any material variances (such report, a "Variance Report").

(d)    Cash Flow Reporting.

(i)    Not later than 5:00 p.m. New York City time on the fifth day of every week (or, if such date is not a Business Day, the immediately succeeding Business Day), commencing on December 6, 2024, the Credit Parties shall deliver by email to the Lender Advisors and, on a non-cleansing basis, to the Administrative Agent and the Lenders a 13-week forecast containing updated Budgeted Cash Receipts covering the 13-week period that commences with such week, consistent with the form and level of detail set forth in the Initial DIP Budget for Budgeted Cash Receipts.

(ii)    Not later than 5:00 p.m. New York City time on the Friday of every other week (or, if such Friday is not a Business Day, the Thursday of such week), commencing on December 4, 2024, the Credit Parties shall deliver by email to the Lender Advisors and, on a non-cleansing basis, to the Administrative Agent and the Lenders a 13-week cash forecast for each of the Corrections Business (the "Corrections CF Forecast") and the RS Business (the "RS CF Forecast") inclusive of cash receipts and direct cash disbursements (other than professional fees and expenses, and any amounts required to be cash collateralized to maintain surety bonds, letters of credit or similar arrangements) specific to each of the Corrections Business and the RS Business; provided, that the Corrections CF Forecast and the RS CF Forecast shall not be subject to the variance testing described herein; provided, further, that the obligation to deliver the RS CF Forecast shall cease upon the consummation of the RS Business Sale.

(e)    Management Conference Calls.  The Debtors shall participate in a teleconference (the "Management Conference Call") to take place at least once per calendar week (at such time as is reasonably satisfactory to the Required Lenders and the Debtors and their respective advisors), which Management Conference Call shall (i) involve participation by at least one senior member of the Borrower's management team and permit participation by such professional advisors to the Borrower as are required by the Borrower and such Lenders and Lender Advisors as elect to participate therein and (ii) be intended for purposes of discussing the Debtors' restructuring (including any budget proposed to be

-80-

the Approved DIP Budget, Variance Reports and any other projections) and such other information and matters reasonably related thereto or reasonably requested by any Lender (it being understood that no such response by the Debtors shall require them to disclose or permit the discussion of, any document, information or other matter (x) that constitutes any Credit Party's trade secrets or proprietary information, (y) in respect of which disclosure to the Administrative Agent or any Lender (or their representatives or contractors) is prohibited by law, fiduciary duty or any binding agreement or (z) that is subject to attorney client or similar privilege or constitutes attorney work product).

(f)      Monthly Reporting.  Not later than 5:00 p.m., New York City time on the 20th Business Day after the last Business Day of each month (commencing with November 2024), the Debtors shall deliver a monthly report for such month to the Lender Advisors and, on a non-cleansing basis, to the Administrative Agent and the Lenders containing materials and other information reasonably requested by the Required Lenders during such month.

(g)      Certain Contracts.

(i)      The Debtors shall provide to the Lender Advisors and, on a non-cleansing basis, the Administrative Agent and Lender Advisors a copy of each report delivered pursuant to the requirements of Section 7.01(r) of the Restructuring Support Agreement, substantially concurrently with the delivery of such under the Restructuring Support Agreement.

(ii)      The Debtors shall provide the Administrative Agent and Lender Advisors with (a) three (3) Business Days' notice prior to terminating any contract or contracts by Holdings and/or its Subsidiaries, that, when terminated, represents a loss or disruption of operations or partnership greater than $1,000,000 in annual disbursements or any customer contracts that represent greater than $500,000 annual margin (b) notice promptly following a counterparty termination of such contract(s) and in no event later than (3) business days following a counterparty termination of such contract(s), in each case if commercially practicable under the circumstances.

9.13    Bankruptcy Covenants

(a)      Keep the Cash Management Order in effect at all times on and after the Closing Date, and maintain a cash management system in compliance with the Cash Management Order.

(b)      Ensure the satisfaction of the Milestones on or before the applicable dates (or any later date approved by the Required Lenders in their sole discretion).

(c)      Use commercially reasonable efforts (i) to prepare or cause to be prepared the applicable Credit Documents within the Debtors' control (including all relevant motions, applications, orders, any other required agreements and other documents to effectuate and consummate the restructuring transactions) and to negotiate such documents in good faith, (ii) to provide draft copies of all motions, documents and other pleadings to be filed in the Chapter 11 Cases to counsel to the Required Lenders and the Lenders as soon as reasonably practicable, and (iii) to consult in good faith with counsel to the Required Lenders regarding the form and substance of any of the foregoing documents in advance of the filing, execution, distribution or use (as applicable) thereof;

(d)      Use commercially reasonable efforts to (a) file a motion with the Bankruptcy Court seeking approval of the RS Business Sale and related bidding procedures (which shall, among others things, seek approval of the designation of RS Purchaser LLC as the stalking horse bidder for the RS Business) on terms and conditions acceptable to the Required Lenders and reasonably acceptable to the Debtors and (b) file motion with the Bankruptcy Court seeking approval of the sale of the Corrections

-81-

Business and related bidding procedures on terms and conditions acceptable to the Required Lenders and reasonably acceptable to the Debtors;

(e)        Oppose any motion filed with the Bankruptcy Court by any person seeking the entry of an order (a) directing the appointment of an examiner or a trustee, (b) converting any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (c) dismissing the Chapter 11 Cases;

(f)        inform the Agent Advisors and the Lender Advisors as soon as reasonably practicable after becoming aware of: (a) any matter or circumstance which they know, or believe is likely, to be a material impediment to the implementation or consummation of the restructuring transactions; (b) a breach of any Credit Document; and (c) any representation or statement made or deemed to be made by any Credit Party under any Credit Document which is or proves to have been incorrect or misleading in any material respect when made or deemed to be made;

(g)        to the extent reasonably practicable, participate in once-a-week telephonic conferences with the Lenders that agree to receive material non-public information about the Borrower, the Credit Parties or their respective securities (without any advance determination of whether such information is material) and the Lender Advisors, to provide updates and information related to the Debtors' restructuring;

(h)        pay and reimburse all Professional Fees and Financing Costs required to be paid pursuant to the Interim DIP Order and the Final DIP Order or this Agreement in full in cash in immediately available funds subject to any applicable orders of the Bankruptcy Court (including the Interim DIP Order and the Final DIP Order) but without the need to file fee or retention applications, all expenses incurred prior to (to the extent not previously paid) the effective date of the Reorganization Plan;

(i)        upon reasonable request of any of the Lender Advisors and to the extent permitted under any bidding procedures approved by the Bankruptcy Court, inform the applicable advisors and the Agent Advisors as to (a) the status and progress of the marketing and sale process for the RS Business and (b) the status and progress of the negotiations with any governmental regulatory authorities;

(j)        not file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with the Credit Documents without obtaining the prior written consent of the Required Lenders;

(k)        not file any motion for any sale process, or bidding procedures (other than approval of a sale or bidding procedures pursuant to the terms of the Restructuring Support Agreement) with respect thereto, without obtaining the prior written consent of the Required Lenders (not to be unreasonably withheld or conditioned);

(l)        consult with the Required Lenders with respect to the development and adoption of any retention plan, bonus plan or severance program for key employees and management;

(m)        not file a motion to assume or reject any material agreement, contract or lease pursuant to section 365 of the Bankruptcy Code without providing three (3) Business Days' prior written notice to the Required Lenders; and

(n)        not direct any direct or indirect Subsidiary of the Debtors to take any action, or fail to take any action, that would be inconsistent with the Credit Documents.

9.14        Maintenance of Ratings

The Debtors, with the assistance of their advisors, shall use commercially reasonable efforts to obtain, on or before forty-five (45) calendar days following the Closing Date, and thereafter, maintaining a private corporate credit rating from S&P and a private corporate family rating from Moody's, in each case, with respect to the Borrower, and a private credit rating from S&P and Moody's with respect to the New Money DIP Term Loans, but not any specific rating.

9.15    Compliance with PATRIOT Act, FCPA, OFAC, Anti-Terrorism and Anti-Money Laundering Laws

The Borrower and Holdings will, and will cause each of their respective Restricted Subsidiaries to, comply with the PATRIOT Act, FCPA, OFAC and all other anti-terrorism, anti-corruption and anti-money laundering laws applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

9.16    Loan Proceeds Account.

(a)    Notwithstanding anything to the contrary contained herein, the Borrower shall deposit or credit all net proceeds of the Term Loans, after giving effect to the payments of all expenses and other disbursements projected to be paid pursuant to the Approved DIP Budget on the date of the applicable Borrowing, into the Loan Proceeds Account and which shall be at all times subject to Loan Proceeds Account Control Agreement after the execution and delivery thereof pursuant to the terms of this Agreement.

(b)    Prior to the delivery of an Activation Notice (as defined in the Loan Proceeds Account Control Agreement) by the Collateral Agent (at the direction of the Required Lenders), amounts withdrawn by the Borrower from the Loan Proceeds Account shall (i) only be permitted to the extent the proceeds of such withdrawal shall be used in compliance with the Approved DIP Budget and (ii) only be used solely for the purposes described under Section 9.10 or to make interest payments with respect to the Term Loans.

(c)    The Borrower shall ensure that no amounts shall be deposited in the Loan Proceeds Account other than the proceeds of the Term Loans as described above and the proceeds of any investments held in or credited to such account and to the extent any such other amount is deposited in the Loan Proceeds Account, the Borrower shall promptly withdraw such amount from the Loan Proceeds Account. The Borrower shall not be permitted to redesignate or replace the Loan Proceeds Account without (i) the prior written consent of the Required Lenders and (ii) the delivery to the Collateral Agent of executed counterparts of the Loan Proceeds Account Control Agreement with respect to such new Loan Proceeds Account.  Nothing in this Section 9.16 shall limit the Carve Out or funding of any amounts contemplated by the Carve Out.

SECTION 10.    Negative Covenants.

Each of the Holdings Guarantors and the Borrower hereby covenants and agrees that on and after the Closing Date and until the Total Commitment has terminated and the Loans, Notes (in each case, together with interest thereon), Fees and all other Obligations (other than any contingent obligations not then due and payable) incurred hereunder and thereunder, are paid in full:

10.01    Liens

Holdings and the Borrower will not, and will not permit any of their respective Restricted Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property of

Holdings or any of its Restricted Subsidiaries, whether now owned or hereafter acquired; <u>provided</u> that the provisions of this Section 10.01 shall not prevent the creation, incurrence, assumption or existence of the following (Liens described below are herein referred to as "<u>Permitted Liens</u>"); and provided, further, that except for Permitted Prior Liens and Liens of the type described in this Section 10.01(xxx) and (xxxi), in order to be permitted hereunder, a Lien must be junior to the Liens securing the Obligations:

(i)        Liens for taxes, assessments or governmental charges or levies that are not required to be paid pursuant to Section 9.09;

(ii)       Liens imposed by law, which do not secure Indebtedness for borrowed money, such as carriers,' warehousemen's, materialmen's and mechanics' liens and other similar Liens, in each case, arising in the ordinary course of business, and (x) which do not in the aggregate materially detract from the value of Holdings', the Borrower's or such Restricted Subsidiary's property or assets or materially impair the use thereof in the operation of the business of Holdings, the Borrower or such other Restricted Subsidiary or (y) which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(iii)      Liens with respect to any Permitted Surviving Debt, which are listed, and the property subject thereto described, in Schedule 10.01, plus renewals, replacements, refinancings, restructurings and extensions of such Liens; <u>provided</u> that (x) the aggregate principal amount of the Indebtedness, if any, secured by such Liens does not increase from that amount outstanding at the time of any such renewal, replacement or extension, plus accrued and unpaid interest, fees and expenses (including premium) incurred in connection with such renewal, replacement or extension and an amount equal to any unutilized commitments in respect of such Indebtedness and (y) any such renewal, replacement, refinancing, restructuring or extension does not encumber any additional assets or properties (other than the proceeds and products thereof and accessions thereto) of Holdings, the Borrower or any of their respective Restricted Subsidiaries, unless such Lien is otherwise permitted under separate provisions of this Section 10.01;

(iv)      Liens created by or pursuant to this Agreement and the Security Documents;

(v)       (x) licenses, sublicenses, leases or subleases granted by Holdings, the Borrower or any of their respective Restricted Subsidiaries to other Persons not materially interfering with the conduct of the business of Holdings, the Borrower or any of their respective Restricted Subsidiaries, (y) any interest or title of a lessor, sublessor, licensor or sublicensor under any lease or license agreement permitted by this Agreement to which Holdings, the Borrower or any of their respective Restricted Subsidiaries is a party, and (z) licenses or sublicenses granted by Holdings, the Borrower or any of their respective Restricted Subsidiaries to customers;

(vi)      Liens upon assets of Holdings, the Borrower or any of their respective Restricted Subsidiaries subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by Section 10.04(iv); <u>provided</u> that (x) such Liens only serve to secure the payment of Indebtedness arising under such Capitalized Lease Obligation (or other permitted obligation) and (y) the Lien encumbering the asset giving rise to the Capitalized Lease Obligation does not encumber any asset of Holdings, the Borrower or any of their respective Restricted Subsidiaries other than the proceeds of the assets giving rise to such Capitalized Lease Obligation; <u>provided</u>, <u>further</u>, that individual financings provided by one lender may be cross collateralized to other financings provided by such lender;

(vii)     Liens placed upon equipment, machinery or other fixed assets acquired or constructed after the Closing Date and used in the ordinary course of business of Holdings or any of its Restricted Subsidiaries and placed at the time of the acquisition or construction thereof by Holdings, the Borrower or

-84-

such other Restricted Subsidiary or within 270 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition or construction of any such equipment, machinery or other fixed assets or extensions, renewals, refinancings, restructurings or replacements of any of the foregoing for the same or a lesser amount, provided that (x) the Indebtedness secured by such Liens is permitted by Section 10.04(iv) and (y) in all events, the Lien encumbering the equipment, machinery or other fixed asset so acquired or constructed does not encumber any asset of Holdings, the Borrower or any of their respective Restricted Subsidiaries (other than the proceeds and products thereof and accessions thereto); provided, further, that individual financings provided by one lender may be cross collateralized to other financings provided by such lender;

(viii)    Liens which may arise as a result of zoning, building codes, and other land use laws regulating the use or occupancy of Real Property or the activities conducted thereon which are imposed by any Governmental Authority and which are not violated in any material way by the current use or occupancy of such Real Property, easements, rights-of-way, restrictions, encroachments, minor survey defects and other similar charges or encumbrances, minor title defects or irregularities affecting Real Property, in each case not securing Indebtedness and not materially interfering with the ordinary conduct of the business of Holdings, the Borrower or any of their respective Restricted Subsidiaries, taken as a whole;

(ix)    Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the ordinary course of business;

(x)    attachment and judgment Liens in respect of decrees and judgments to the extent, and for so long as, such judgments and decrees do not, individually or in the aggregate constitute an Event of Default under Section 11.09;

(xi)    statutory and common law landlords' liens under leases to which Holdings, the Borrower and their respective Restricted Subsidiaries is a party;

(xii)    Liens (other than Liens imposed under ERISA) incurred in the ordinary course of business in connection with workers compensation claims, unemployment insurance and social security benefits and Liens securing the performance of bids, tenders, public utilities or private utilities, leases and contracts in the ordinary course of business, statutory obligations, surety or appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business (exclusive of obligations in respect of the payment for borrowed money), and obligations in respect of letters of credit or bank guaranties that have been posted to support payment of the Liens described in this clause (xii);

(xiii)    Permitted Encumbrances;

(xiv)    [reserved];

(xv)    Liens arising out of any conditional sale, title retention, consignment or other similar arrangements for the sale of goods entered into by Holdings, the Borrower or any of their respective Restricted Subsidiaries in the ordinary course of business to the extent such Liens do not attach to any assets other than the goods subject to such arrangements;

(xvi)    Liens (x) incurred in the ordinary course of business in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or assets, and (y) in favor of

customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(xvii)      (w) bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by Holdings, the Borrower or any of their respective Restricted Subsidiaries, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank or banks with respect to cash management, automated clearing house transfers and operating account arrangements, (x) Liens of a collection bank arising under Section 4-210 of the UCC on items in the course of collection, (y) Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes and (z) Liens that are contractual rights of setoff or rights of pledge relating to purchase orders and other agreements entered into by Holdings, the Borrower or any of their respective Restricted Subsidiaries in the ordinary course of business;

(xviii)     [reserved];

(xix)      Liens granted in the ordinary course of business on insurance policies and proceeds thereof securing liability for premiums or reimbursement or indemnification obligations thereunder to the extent the financing is permitted under Section 10.04;

(xx)      Liens arising from an agreement to dispose of any property in a disposition permitted under Section 10.02;

(xxi)      [reserved];

(xxii)      Liens on assets of Foreign Subsidiaries or a Restricted Subsidiary that is not a Credit Party securing Indebtedness permitted to be incurred by such Subsidiary pursuant to Section 10.04;

(xxiii)      additional Liens of Holdings, the Borrower or any of their respective Restricted Subsidiaries in addition to those otherwise permitted by this Section 10.01 that do not secure obligations, in excess of at any time outstanding $1,000,000;

(xxiv)      in the case of any Non-Wholly Owned Subsidiary, any put and call arrangements or restrictions on disposition related to its Equity Interests set forth in its organizational documents or any related joint venture or similar agreement;

(xxv)      ground leases in respect of Real Property on which facilities owned or leased by Holdings, the Borrower or any of their respective Restricted Subsidiaries are located;

(xxvi)      [reserved];

(xxvii)      Liens securing any Indebtedness incurred under the Katsumi Securitization Facility;

(xxviii)      [reserved];

(xxix)      Liens on cash collateral (y) deposited with issuers of performance or surety bonds or performance and completion guarantees or similar instruments or issuers of letters of credit issued to an issuer of performance or surety bonds or performance and completion guarantees or similar instruments, in each case issued or created in the ordinary course of business or (z) supporting letters of credit issued pursuant to Section 10.04(xxii) and (xxiii);

-86-

(xxx)     Liens securing the Prepetition First Lien Obligations and the Prepetition Second Lien Obligations;

(xxxi)     any Adequate Protection Liens expressly provided by the DIP Orders; and

(xxxii)     the Carve Out.

In connection with the granting of Liens of the type described in clauses (iii), (vi), (vii), (viii), (xiv), (xxi), (xxiii), (xxvi), (xxvii), (xxviii) and (xxix) of this Section 10.01 by Holdings or any of its Restricted Subsidiaries, the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate by it in connection therewith (including by executing appropriate lien releases or lien subordination agreements in favor of the holder or holders of such Liens, in either case solely with respect to the item or items of equipment or other assets subject to such Liens).

10.02   Consolidation, Merger or Sale of Assets, etc.

The Borrower and Holdings will not, and will not permit any of their respective Restricted Subsidiaries to, wind up, liquidate or dissolve, enter into any partnership, joint venture, or transaction of merger or consolidation, or convey, sell, lease or otherwise dispose of all or any part of its property or assets (other than sales of inventory in the ordinary course of business), or enter into any sale-leaseback transactions, except that:

(i)     Holdings, the Borrower and their respective Restricted Subsidiaries may liquidate or otherwise dispose of obsolete or worn-out property, worn-out, uneconomical, surplus or no longer used property in the ordinary course of business or dispose of inventory, goods held for sale in the ordinary course of business and immaterial assets (including allowing any registrations or any applications for registration of any intellectual property to be cancelled, to lapse or go abandoned) in the ordinary course of business;

(ii)     Investments may be made to the extent permitted by Section 10.05;

(iii)     Holdings, the Borrower and their respective Restricted Subsidiaries may sell assets in connection with the RS Business Sale and the Corrections Business Sale;

(iv)     Holdings, the Borrower and their respective Restricted Subsidiaries may lease (as lessee) or license (as licensee) real or personal property (so long as any such lease or license does not create a Capitalized Lease Obligation except to the extent permitted by Section 10.04(iv));

(v)     [reserved];

(vi)     Holdings, the Borrower and their respective Restricted Subsidiaries may grant (x) licenses, sublicenses, leases or subleases to other Persons not materially interfering with the conduct of the business of Holdings, the Borrower or any of their respective Restricted Subsidiaries or (y) licenses or sublicenses to customers, in each case in the ordinary course of business and consistent with past practice;

(vii)     Holdings, the Borrower and any Subsidiary Guarantor may convey, sell or otherwise transfer property to Holdings, the Borrower or any other Subsidiary Guarantor;

(viii)     any Restricted Subsidiary may merge, amalgamate or consolidate with and into, or (other than with respect to the Borrower) be dissolved or liquidated into, (x) the Borrower; provided that the Borrower shall be the continuing or surviving Person or (y) one or more other Subsidiary Guarantors (or a

Person that becomes a Subsidiary Guarantor substantially concurrently with the transaction and the Borrower complies with the applicable requirements of Section 9.11);

    (ix)    any Restricted Subsidiary may change its legal form with the prior written consent of the Required Lenders;

    (x)    [reserved];

    (xi)    Holdings, the Borrower and their respective Restricted Subsidiaries may dispose of Cash Equivalents in accordance with the Approved DIP Budget;

    (xii)    [reserved];

    (xiii)    Holdings, the Borrower and their respective Restricted Subsidiaries may cancel or abandon or allow lapse of any intellectual property rights which are, in the reasonable business judgment of Holdings, the Borrower or any Restricted Subsidiary, no longer material to, or no longer used or useful in, the business of the Borrower or such Restricted Subsidiary;

    (xiv)    [reserved];

    (xv)    Holdings, the Borrower and their respective Restricted Subsidiaries may dispose of property and assets to the extent they were the subject of a casualty or of condemnation proceedings upon the occurrence of the related Recovery Event;

    (xvi)    Holdings, the Borrower and their respective Restricted Subsidiaries may dispose of property to the extent that (x) such property is exchanged for credit against the purchase price of similar replacement property or (y) the proceeds of such disposition are promptly applied to the purchase price of such replacement property;

    (xvii)    to the extent constituting dispositions, Holdings, the Borrower and their respective Restricted Subsidiaries may grant liens in the form of Permitted Liens and issue Restricted Payments permitted by Section 10.05;

    (xviii)    [reserved];

    (xix)    [reserved];

    (xx)    [reserved];

    (xxi)    [reserved];

    (xxii)    [reserved];

    (xxiii)    [reserved];

    (xxiv)    [reserved];

    (xxv)    [reserved];

    (xxvi)    Holdings, the Borrower and their respective Restricted Subsidiaries may make dispositions of property, for cash and Cash Equivalents only, not otherwise permitted under this Section 10.02; provided that (x) such dispositions shall not exceed $100,000 in any calendar year;

-88-

(xxvii)     Holdings, the Borrower and their respective Restricted Subsidiaries may terminate leases, subleases, licenses and sublicenses in the ordinary course of business consistent with past practice;

(xxviii)     [reserved]; and

(xxix)     Holdings, the Borrower, or any of their respective Restricted Subsidiaries may undertake transactions in order to comply with corporate practice of medicine regulations.

To the extent the Required Lenders waive the provisions of this Section 10.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 10.02 (other than to a Credit Party), such Collateral shall be sold free and clear of the Liens created by the Security Documents, and the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect and/or evidence the foregoing.

10.03   Restricted Payments

Other than adequate protection payments in respect of prepetition Indebtedness as expressly provided for in the DIP Orders or the Approved DIP Budget, the Borrower and Holdings shall not, nor shall Holdings or the Borrower permit any of their respective Restricted Subsidiaries to, declare, pay or make, directly or indirectly, any Restricted Payment, except that:

(i)     any Restricted Subsidiary of Holdings (including the Borrower) may pay Restricted Payments to its equity holders on a pro rata basis; provided that, in the case of any Restricted Payments paid by a non-wholly owned Restricted Subsidiary, Holdings, the Borrower or their respective Restricted Subsidiaries which owns the Equity Interest in such Restricted Subsidiary paying such Restricted Payments receives at least its proportionate share thereof (based upon its relative holding of the Equity Interest in the Restricted Subsidiary paying such Restricted Payments and taking into account the relative preferences, if any, of the various classes of Equity Interests of such Restricted Subsidiary);

(ii)     to the extent permitted by the Approved DIP Budget, Holdings may pay cash dividends to any direct or indirect parent of Holdings so long as the proceeds thereof are reasonably promptly used by such direct or indirect parent to:

(A)     pay franchise Taxes and other fees, Taxes and expenses required to maintain its corporate existence to the extent such Taxes, fees and expenses are attributable to the operations of Holdings and its Restricted Subsidiaries;

(B)     pay, for any taxable period for which Holdings or any of its Subsidiaries are members of a consolidated, combined, unitary or similar tax group for U.S. federal or applicable state or local income Tax purposes of which a direct or indirect parent of Holdings is the common parent (a "Tax Group"), the portion of any U.S. federal, state or local Taxes (as applicable) of such Tax Group for such taxable period that are attributable to the taxable income of Holdings and its Subsidiaries; provided that Restricted Payments made pursuant to this clause (B) shall not exceed the Tax liability that Holdings and/or its Subsidiaries (as applicable) would have incurred if such Taxes were determined as if such entities were a stand-alone taxpayer or a stand-alone group);

(C)     [reserved];

(D)     pay operating and overhead costs and expenses of such direct or indirect parent to the extent such costs and expenses are incurred in the ordinary course of

business and attributable to the ownership or operations of Holdings and its Restricted Subsidiaries;

(E)      pay costs (including all professional fees and expenses) incurred by such direct or indirect parent in connection with reporting obligations under or otherwise incurred in connection with compliance with applicable laws, applicable rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, including in respect of any reports filed with respect to the Securities Act, the Exchange Act or their respective rules and regulations promulgated thereunder;

(F)      pay (x) obligations under or in respect of director and officer insurance policies to the extent reasonably attributable to the ownership or operation of Holdings and its Restricted Subsidiaries, (y) [reserved] or (z) Transaction Expenses; and

(G)      be used to pay customary salary, bonus and other benefits payable to officers and employees of such direct or indirect parent to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of Holdings and its Restricted Subsidiaries.

(iii)      [reserved];

(iv)      [reserved];

(v)      [reserved];

(vi)      [reserved]; and

(vii)      to the extent constituting Restricted Payments, Holdings, the Borrower and their respective Restricted Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 10.02 (other than Section 10.02(xvii)), Section 10.05 (other than Section 10.05(x)(y) and 10.05(xviii)) or Section 10.06 (other than Section 10.06(i)).

10.04    Indebtedness

Holdings and the Borrower will not directly or indirectly, and will not permit any of their respective Restricted Subsidiaries directly or indirectly to create, incur, assume or suffer to exist any Indebtedness, except:

(i)      Indebtedness incurred pursuant to this Agreement and the other Credit Documents;

(ii)      Indebtedness outstanding on the Closing Date and listed on Schedule 10.04 (as reduced by any repayments of principal thereof), without giving effect to any subsequent extension, renewal, replacement, restructuring or refinancing thereof except through one or more issuances of Permitted Refinancing Indebtedness in respect thereof (the foregoing Indebtedness, the "Permitted Surviving Debt");

(iii)      [reserved];

(iv)      Indebtedness of Holdings, the Borrower and their respective Restricted Subsidiaries evidenced by Capitalized Lease Obligations and purchase money Indebtedness, in each case whether created or incurred by Holdings, the Borrower or any of their respective Restricted Subsidiaries or

assumed in connection a permitted Investment; provided that in no event shall the sum of the aggregate principal amount of all Capitalized Lease Obligations and purchase money Indebtedness incurred after the Closing Date under this clause (iv) exceed at any time outstanding $3,000,000;

(v)     Indebtedness constituting Intercompany Loans;

(vi)     guarantees by Holdings, the Borrower and any of their respective Restricted Subsidiaries in respect of Indebtedness of Holdings, the Borrower or any of their respective Restricted Subsidiary otherwise permitted hereunder; provided that (x) no guarantee of any Prepetition Obligations or other Junior Financing shall be permitted unless such guaranteeing party shall have also provided a guarantee of the Obligations on the terms set forth herein and (y) if the Indebtedness being guaranteed is subordinated to the Obligations, such guarantee shall be subordinated to the Guaranty of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(vii)     [reserved];

(viii)     Indebtedness arising under customary cash management services, netting arrangements, automated clearing house transfers, or the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished within ten (10) Business Days of its incurrence and is consistent with the Cash Management Order;

(ix)     Indebtedness with respect to performance bonds, surety bonds, appeal bonds or customs bonds required in the ordinary course of business consistent with past practice, or in connection with any letters of credit or bank guarantees posted to support any such bonds, or in connection with the enforcement of rights or claims of the Borrower or any of its Restricted Subsidiaries or in connection with judgments that do not result in an Event of Default;

(x)     [reserved];

(xi)     [reserved];

(xii)     Indebtedness owed to any Person providing property, casualty, liability, or other insurance to Holdings, the Borrower, or any of its Restricted Subsidiaries, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of (and reasonable fees and expenses in connection therewith) and shall be incurred only to defer the cost of such insurance for the period in which such Indebtedness is incurred;

(xiii)     [reserved];

(xiv)     [reserved];

(xv)     [reserved];

(xvi)     additional Indebtedness incurred by Holdings, the Borrower and their respective Restricted Subsidiaries in an aggregate principal amount not to exceed at any time outstanding $1,000,000;

(xvii)     [reserved];

(xviii)     Indebtedness of the Credit Parties under the Prepetition Credit Agreements;

(xix)      [reserved];

(xx)      Indebtedness representing deferred compensation or similar obligations to employees incurred in the ordinary course of business consistent with past practice;

(xxi)      Indebtedness consisting of take-or-pay obligations contained in supply arrangements in the ordinary course of business consistent with past practice;

(xxii)      Indebtedness in respect of letters of credit, bank guarantees, supporting obligations, bankers' acceptances, performance bonds, surety bonds, statutory bonds, appeal bonds, warehouse receipts or similar instruments issued or created in the ordinary course of business consistent with past practice, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; provided that any reimbursement obligations in respect thereof are reimbursed within 30 days following the due date thereof;

(xxiii)      obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by Holdings, the Borrower or any of their respective Restricted Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business consistent with past practice;

(xxiv)      [reserved];

(xxv)      [reserved];

(xxvi)      to the extent constituting Indebtedness, Holdings, the Borrower and their respective Restricted Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 10.05 (other than Sections 10.05(vii) and (viii));

(xxvii)      Indebtedness owing to any Practice Group under any Management/Services Agreement (including, but not limited to, a deficit funding loan agreement);

(xxviii)      to the extent constituting Indebtedness, guarantees by Holdings, the Borrower, or a Restricted Subsidiary of the obligations of a Practice Group to any of such Practice Group's customers or clients in the ordinary course of business consistent with past practice; and

(xxix)      all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described above.

10.05      Advances, Investments and Loans

The Borrower and Holdings will not, and will not permit any of its Restricted Subsidiaries to lend money or credit or make advances to any other Person, or purchase or acquire any stock, obligations or securities of, or any other Equity Interest in, or make any capital contribution to, any other Person, or the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person (each of the foregoing an "Investment" and, collectively, "Investments"), except that the following shall be permitted:

(i)      Holdings, the Borrower and their respective Restricted Subsidiaries may acquire and hold accounts receivables, notes receivable and other extensions of trade credit owing to any of them, if created or acquired in the ordinary course of business consistent with past practice and payable or dischargeable in accordance with customary trade terms of the Borrower or such Restricted Subsidiary;

(ii)      Holdings, the Borrower and their respective Restricted Subsidiaries may acquire and hold cash and Cash Equivalents (and assets that were Cash Equivalents when such Investment was made);

(iii)      Holdings, the Borrower and their respective Restricted Subsidiaries may hold the Investments held by them on the Closing Date and described on Schedule 10.05 (and any increase in the value of such Investments not resulting from an additional Investment), provided that any additional Investments made with respect thereto shall be permitted only if permitted under the other provisions of this Section 10.05;

(iv)      Holdings, the Borrower and their respective Restricted Subsidiaries may acquire and own investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers or in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business or upon foreclosure with regard to any secured Investment or other transfer of title with regard to a secured Investment;

(v)      Holdings, the Borrower and their respective Restricted Subsidiaries may make loans and advances to their officers, directors, employees or consultants for moving, relocation and travel expenses and other similar expenditures, in each case in the ordinary course of business in an aggregate amount not to exceed $50,000 at any one time outstanding (determined without regard to any write-downs or write-offs of such loans and advances);

(vi)      [reserved];

(vii)      [reserved];

(viii)      (I) Holdings, the Borrower or any Subsidiary Guarantor may make Investments in (or for the benefit of) Holdings, the Borrower or any Subsidiary Guarantor (such Investments in the form of intercompany loans and advances, collectively, the "Intercompany Loans"); provided that each Investment in the form of an Intercompany Loan that is evidenced by an Intercompany Note owned or held by Holdings, the Borrower or any Subsidiary Guarantor shall be pledged to the Collateral Agent pursuant to the Security Agreement (to the extent required therein);

(ix)      [reserved];

(x)      Investments consisting of (x) transactions permitted under Sections 10.01 and 10.02 (other than Section 10.02(ii)), (y) Restricted Payments permitted by Section 10.03 and (z) repayments or other acquisitions of Indebtedness of Holdings, the Borrower or any other Restricted Subsidiary not prohibited by Section 10.08;

(xi)      Contingent Obligations (x) permitted by Section 10.04 or (y) to the extent not constituting Indebtedness, incurred in the ordinary course of business consistent with past practice, in each case to the extent constituting Investments;

(xii)      [reserved];

(xiii)      [reserved];

(xiv)　　Investments in deposit accounts, securities accounts and commodities accounts maintained by Holdings, the Borrower or such Subsidiary Guarantor;

(xv)　　Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(xvi)　　[reserved];

(xvii)　　[reserved];

(xviii)　　[reserved];

(xix)　　[reserved];

(xx)　　Investments in the nature of pledges or deposits with respect to leases or utilities provided to third parties in the ordinary course of business;

(xxi)　　Investments in Practice Groups; provided that in no event shall the sum of the aggregate principal amount of all Investments made after the Closing Date under this clause (xxi) exceed at any time outstanding $3,000,000;

(xxii)　　[reserved];

(xxiii)　　[reserved];

(xxiv)　　[reserved]; and

(xxv)　　to the extent constituting an Investment, guarantees by Holdings, the Borrower, or a Restricted Subsidiary of the obligations of a Practice Group to any of such Practice Group's customers or clients.

　　10.06　　Transactions with Affiliates

　　The Borrower and Holdings will not, and will not permit any of their respective Restricted Subsidiaries to, enter into any transaction or series of related transactions with a value or where payments by Holdings, the Borrower or any Restricted Subsidiary are required in excess of $500,000 on an annual basis, in each case, with any Affiliate of Holdings or any of its Restricted Subsidiaries, other than in the ordinary course of business and on terms and conditions (taken as a whole) substantially as favorable to Holdings, the Borrower or such Restricted Subsidiary as would reasonably be obtained by Holdings, the Borrower or such Restricted Subsidiary at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that the following in any event shall be permitted:

(i)　　Restricted Payments may be paid to the extent provided in Section 10.03;

(ii)　　loans may be made and other transactions may be entered into by and among the Borrower and/or one or more Restricted Subsidiaries to the extent permitted by Sections 10.01, 10.02, 10.04, 10.05 and 10.08;

(iii)　　to the extent set forth in the Approved DIP Budget, customary fees, indemnities and reimbursements may be paid to officers, directors, consultants and employees of Holdings (or any direct or indirect parent), the Borrower, and the Restricted Subsidiaries;

-94-

(iv)     [reserved];

(v)     to the extent set forth in the Approved DIP Budget, Holdings, the Borrower and their respective Restricted Subsidiaries may enter into, and may make payments under, employment agreements, consulting agreements, employee benefits plans, stock option plans, indemnification provisions, other similar compensatory arrangements and severance agreements with officers, employees, consultants and directors of Holdings, the Borrower and its Restricted Subsidiaries in the ordinary course of business;

(vi)     to the extent set forth in the Approved DIP Budget, Restricted Subsidiaries of Holdings and the Borrower may pay management fees, licensing fees and similar fees to the Borrower or to any of the Subsidiary Guarantors;

(vii)     [reserved];

(viii)     [reserved];

(ix)     the Transaction and the payment of fees and expenses (including Transaction Expenses) as part of or in connection with the Transaction;

(x)     Holdings, the Borrower and their respective Restricted Subsidiaries may enter into transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 10.06;

(xi)     [reserved];

(xii)     [reserved];

(xiii)     to the extent set forth in the Approved DIP Budget, entering into Management/Services Agreements and performing its obligations under any of the foregoing, and other transactions among Practice Groups and Holdings and its Restricted Subsidiaries, in each case in the ordinary course of business consistent with past practice;

(xiv)     to the extent set forth in the Approved DIP Budget, Holdings and its Restricted Subsidiaries may make the payment of guarantee and intercompany loan fees required under applicable Law and for tax purposes;

(xv)     to the extent not otherwise prohibited under this Agreement, transactions among the Credit Parties; and

(xvi)     to the extent set forth in the Approved DIP Budget, payments by Holdings, the Borrower or any of their respective Subsidiaries pursuant to tax sharing agreements with any direct or indirect parent of Holdings to the extent attributable to the ownership or operation of Holdings, the Borrower and their respective Subsidiaries but only to the extent permitted by Section 10.03(ii).

10.07    <u>Financial Covenant</u>.

The Borrower and Holdings will not permit (i) with respect to the Initial Variance Test Period and each cumulative two-week Variance Test Period thereafter, (A) the actual aggregate receipts to be less than 80.0% of the Budgeted Cash Receipts in the then-in-effect Approved DIP Budget and (B) the actual aggregate operating disbursements to exceed 120.0% of the Budgeted Disbursements in the then-in-effect Approved DIP Budget and (ii) with respect to an any Variance Test Period  of three cumulative weeks or

more (A) the acual aggregate receipts to be less than 85.0% of the Budgeted Cash Receipts in the then-in-effect Approved DIP Budget and (B) the actual aggregate operating disbursements to exceed 115.0% of the Budgeted Disbursements in the then-in-effect Approved DIP Budget (any variance allowed in the preceding clauses (i) and (ii) the "Prohibited Variance"); *provided* that for purposes determining compliance with this Section 10.07, (x) disbursements for Professional Fees and Transaction Costs and (y) any necessary cash collateralization of surety bonds during the applicable Variance Test Period shall be excluded from both the amount of actual disbursements and Budgeted Disbursements.

10.08   Certificate of Incorporation, By-Laws and Certain Other Agreements; Limitations on Voluntary Payments, etc.

Holdings and the Borrower will not, and the Borrower will not permit any of its Restricted Subsidiaries to:

(i)     amend, modify or change its certificate or articles of incorporation (including by the filing or modification of any certificate or articles of designation), certificate of formation, limited liability company agreement or by-laws (or the equivalent organizational documents), as applicable, if such amendment, modification or change is in a manner materially adverse to the interests of the Lenders without obtaining the prior written consent of the Required Lenders, except as required by the Bankruptcy Code or plan of reorganization consistent with the Restructuring Support Agreement;

(ii)     make, or give any notice in respect of (other than any such notice that is expressly contingent upon the repayment in full in cash of all Obligations (other than contingent obligations not then due and payable)) any voluntary or optional payment or prepayment on or redemption, defeasance, repurchase or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control or similar required "repurchase" event of (including, in each case by way of depositing with the trustee with respect thereto or any other Person money or securities before due for the purpose of paying when due), in respect of any Prepetition First Lien Obligations (other than a cancellation of any Prepetition First Lien Obligations as a result of the deemed borrowing of any Roll-Up Term Loan pursuant to the terms hereunder or as a result of credit bidding of the Prepetition First Lien Obligations as approved by the Required Lenders), any Prepetition Second Lien Obligations or any other Junior Financing other than as expressly permitted by the Required Lenders in connection with the Chapter 11 Cases (including the RS Business Sale and/or the Corrections Business Sale);

(iii)     amend or modify, or permit the amendment or modification of, any provision of, on and after the execution and delivery thereof, any Prepetition Credit Agreement or any other Junior Financing other than as expressly permitted by the Required Lenders in connection with the Chapter 11 Cases (including the RS Business Sale and/or the Corrections Business Sale);

(iv)     amend or waive any provision of any Management/Services Agreement or direct any Practice Group to take any action in violation of the applicable Management/Services Agreement, in each case, without the prior written consent of the Required Lenders, except to the extent any such amendment, modification, assignment, novation or waiver is required to comply with applicable law (including applicable Health Care Laws and state corporate laws), in each case, as reasonably required, in the good faith judgment of McDermott Will & Emery LLP or such other nationally recognized law firm acting as the Borrower's corporate and/or healthcare counsel; and

(v)     amend, modify or compromise any material term or material amount owed in a manner that would be adverse to the interests of the Lenders or a Credit Party under a material real property lease without obtaining the prior written consent of the Required Lenders.

-96-

10.09    Limitation on Certain Restrictions on Restricted Subsidiaries

Holdings and the Borrower will not, and will not permit any of their respective Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any such Restricted Subsidiary to (a) pay dividends or make any other distributions on its Equity Interest owned by Holdings or any of its Restricted Subsidiaries or pay any Indebtedness owed to Holdings or any of its Restricted Subsidiaries, (b) make loans or advances to Holdings or any of its Restricted Subsidiaries or (c) transfer any of its properties or assets to Holdings or any of its Restricted Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, rule, regulation or order, (ii) this Agreement and the other Credit Documents, (iii) the Prepetition Credit Documents or any Junior Financing Documentation, (iv) customary provisions restricting subletting, transfer, license or assignment of any lease governing any leasehold interest of Holdings or any of its Restricted Subsidiaries or otherwise relating to the assets subject thereto, (v) customary provisions restricting transfer, license or assignment of any licensing agreement or other contract (or otherwise relating to the assets subject thereto) entered into by Holdings or any of its Restricted Subsidiaries in the ordinary course of business, (vi) restrictions on the transfer of any asset or Subsidiary pending the close of the sale of such asset or Subsidiary, (vii) restrictions on the transfer of any asset subject to a Lien permitted by Section 10.01(iii), (vi), (vii), (xv), (xvi), (xx), (xxi), (xxii), (xxiii), (xxiv), (xxvii), or (xxix); (viii) [reserved]; (ix) [reserved]; (x) negative pledges and restrictions on Liens in favor of any holder of Indebtedness for borrowed money permitted under Section 10.04 but only if such negative pledge or restriction expressly permits Liens for the benefit of the Administrative Agent and/or the Collateral Agent and the Lenders with respect to the credit facilities established hereunder and the Obligations under the Credit Documents on a senior basis and without a requirement that such holders of such Indebtedness be secured by such Liens equally and ratably or on a junior basis; (xi) encumbrances or restrictions on cash or other deposits or net worth imposed by customers under agreements entered into in the ordinary course of business consistent with past practice; (xii) [reserved] ; (xiii) contractual obligations which (x) exist on the Closing Date and (to the extent not otherwise permitted by this Section 10.09) are listed on Schedule 10.09 hereto and (y) to the extent contractual obligations permitted by clause (x) are set forth in an agreement evidencing Indebtedness, or any agreement evidencing any permitted modification, replacement, renewal, extension or refinancing of such Indebtedness so long as such modification, replacement, renewal, extension or refinancing is not (taken as a whole) materially less favorable to the Lenders; (xiv) restrictions binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary of Holdings, so long as such contractual obligations were not entered into solely in contemplation of such Person becoming a Restricted Subsidiary of Holdings; (xv) restrictions on (x) cash or other deposits constituting Permitted Liens or (y) cash earnest money deposits in favor of sellers in connection with acquisitions not prohibited hereunder; (xvi)  restrictions imposed by documentation governing Indebtedness permitted by Section 10.04(iv), (x), (xiv), (xvii) or (xix); and (xvii) an agreement effecting a refinancing, replacement or substitution, extension, renewal or restructuring of Indebtedness issued, assumed or incurred pursuant to an agreement or instrument referred to in clause (i) through (xvi) above, provided, that the provisions relating to such encumbrance or restriction contained in any such refinancing, replacement or substitution agreement (taken as a whole) are no less favorable to Holdings or the Lenders in any material respect than the provisions relating to such encumbrance or restriction contained in the agreements or instruments referred to in such clauses (i) through (xvi).

10.10    Passive Holding Company

Holdings shall not engage in any material operating or business activities; provided that the following shall be permitted in any event: (i) its ownership of the Equity Interests of the Borrower and other Subsidiaries and activities incidental or reasonably related thereto; (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance); (iii) the

-97-

performance of its obligations with respect to the Credit Documents, the Prepetition Credit Documents and any other Indebtedness permitted hereunder and in respect of the Transaction; (iv) any public offering of its common stock or any other issuance or sale of its Equity Interests (and activities related to an entity being public) or making (or receiving) of any Restricted Payments or Investments not prohibited by this Agreement; (v) financing activities, including the issuance of securities, incurrence of debt, payment of dividends, making contributions to the capital of the Borrower and guaranteeing the obligations of the Borrower or any other Credit Party; (vi) participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and the Borrower; (vii) holding any cash or property (but not operating any property); (viii) providing indemnification to officers, managers and directors; (ix) [reserved], (x) [reserved], (xi) [reserved] and (xii) any activities incidental or reasonably related to the foregoing.  Holdings shall not incur any consensual Liens on Equity Interests of the Borrower other than those for the benefit of the Obligations, the Prepetition First Lien Obligations and the Prepetition Second Lien Obligations.

       10.11    <u>Accounting Changes</u>

       Holdings and the Borrower shall not, nor shall Holdings and the Borrower permit any of their respective Restricted Subsidiaries to, make any change to its Fiscal Year (other than with respect to a Restricted Subsidiary that is acquired after the Closing Date, to change its fiscal year end to align with that of Holdings' and the Borrower's Fiscal Year and other than as required pursuant to GAAP); <u>provided</u>, that the Borrower may, upon written notice to the Administrative Agent, change its Fiscal Year to any other fiscal year reasonably acceptable to the Administrative Agent, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders, to make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

       10.12    <u>Additional Restrictions; Chapter 11 Cases</u>

       Without limiting the restrictions set forth in Sections 10.01 through 10.11 above, Holdings and the Borrower shall not, and shall not permit any of the other Debtors to:

       (a)    create or permit to exist any other claim (other than in connection with an application for financing provided by a third party which seeks authority to pay all of the Obligations in full in cash upon the closing of such financing) which is *pari passu* with or senior to the claims of the Lenders under the Loans, the Adequate Protection Claims or the Prepetition First Lien Obligations, except for the Carve Out and except as expressly permitted in this Agreement or the Applicable DIP Order;

       (b)    file or propose any plan of reorganization that is inconsistent with the Restructuring Support Agreement;

       (c)    make or permit to be made any change to the Applicable DIP Order, without the prior written consent of the Required Lenders;

       (d)    commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against the Agents, any Lender, any other Secured Creditor and any "Secured Creditor" as defined in and under each of the Prepetition Credit Agreements with respect to this Agreement, the other Credit Documents, the transactions contemplated hereby or thereby, the Prepetition Credit Documents, the other documents or agreements executed or delivered in connection therewith or the transactions contemplated thereby, in each case, solely in response to actions, if any, taken by the Agent, Lender or other Secured Creditor in contravention of the commitments set forth in the Restructuring Support Agreement;

(e)      file any material motion or application with the Bankruptcy Court, including with regard to actions taken outside the ordinary course of business, without providing advance notice and a copy of the same to counsel to the Agents and the Lenders in accordance with the Restructuring Support Agreement;

(f)      pay prepetition Indebtedness, except for (i) payments expressly permitted by this Agreement and the Applicable DIP Order, (ii) payments authorized by an order of the Bankruptcy Court that is in form and substance acceptable to the Required Lenders, subject to the Approved DIP Budgets and (iii) adequate protection payments as set forth in the Applicable DIP Order;

(g)      engage in any activities that would result in any of the Debtors becoming an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940;

(h)      make any Restricted Payment or other direct or indirect payment to, or incur obligations on behalf of, (i) the Sponsor or (ii) any current or former direct or indirect equity holder of Holdings or any Affiliate thereof, including but not limited to payment for the engagement of financial, legal or other advisors for such parties and payment of existing obligations of or owed to such parties, in each case not in accordance with the Approved DIP Budgets;

(i)      transfer any cash or cash equivalents that constitute Collateral to any Parent or a subsidiary or other affiliate of any Parent that is not a Debtor, in each case without the prior written consent of the Required Lenders; or

(j)      other than as permitted under the Restructuring Support Agreement, make any direct or indirect management retention bonuses or other similar payments to any Person in connection with any key employee incentive program, key employee retention program and/or any other similar program or arrangement not in accordance with the Approved DIP Budgets.

SECTION 11.    Events of Default and Remedies.

Upon the occurrence and during the continuance of any of the following specified events (each, an "Event of Default"):

11.01    Payments

The Borrower shall (i) default in the payment when due of any principal of any Loan or any Note or (ii) default, and such default shall continue unremedied for  five (5) or more Business Days, in the payment when due of any interest on any Loan or Note, or any Fees or any other amounts owing hereunder or under any other Credit Document or any Adequate Protection Obligations; or

11.02    Representations, etc.

On the Closing Date, any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or in any certificate (other than any representation, warranty, or statement regarding projections, estimates, or forward looking information, budgets or general market data) delivered to the Administrative Agent or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made; or

11.03    Covenants

Holdings, the Borrower or any of their respective Restricted Subsidiaries shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in Section 9.01(g)(i), Section 9.04 (solely with respect to the preservation of Holdings' or the Borrower's existence), 9.12, 9.13 or Section 10; or (ii) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement or any other Credit Document (other than those set forth in Sections 11.01, 11.02 and 11.03(i)) and such default shall continue unremedied for a period of (x) in the case of a default in respect of the performance or observance of the covenants contained in Sections 9.01(a), (b), and (e), ten (10) Business Days, and (y) otherwise, 30 days, in each case, after the date on which written notice thereof is given to the Borrower by the Administrative Agent or the Required Lenders; or

11.04   <u>Default Under Other Agreements</u>.  (i)  Holdings, the Borrower or any of their respective Restricted Subsidiaries shall (x) default in any payment of any Indebtedness (other than the Obligations and other than any Indebtedness for which the exercise of remedies upon a default thereunder has been stayed as a result of the Chapter 11 Cases and other than, for the avoidance of doubt, any surety that matures or expires during the pendency of the Chapter 11 Cases) beyond the period of grace (after delivery of any notice if required and after giving effect to any waiver, amendment, cure or grace period), if any, provided in an instrument or agreement under which such Indebtedness was created or (y) default in the observance or performance of any agreement or condition relating to any Indebtedness (other than the Obligations and other than any Indebtedness for which the exercise of remedies upon a default thereunder has been stayed as a result of the Chapter 11 Cases and other than, for the avoidance of doubt, any surety that matures or expires during the pendency of the Chapter 11 Cases) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause (after delivery of any notice if required and after giving effect to any waiver, amendment, cure or grace period), any such Indebtedness to become due prior to its stated maturity, or (ii) any Indebtedness (other than the Obligations and other than any Indebtedness for which the exercise of remedies upon a default thereunder has been stayed as a result of the Chapter 11 Cases and other than, for the avoidance of doubt, any surety that matures or expires during the pendency of the Chapter 11 Cases) of Holdings, the Borrower or any of their respective Restricted Subsidiaries shall be declared to be (or shall become) due and payable, or required to be prepaid other than by a regularly scheduled required prepayment, prior to the stated maturity thereof (other than, in the case of this clause (ii), (x) any secured Indebtedness that is required to be prepaid as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, (y) any Indebtedness that is required to be converted into Qualified Equity Interests upon the occurrence and during the continuance of certain designated events so long as no payments (other than such conversion and Restricted Payments paid in lieu of fractional shares permitted under Section 10.03(ii)(C)) in cash or otherwise are required to be made in accordance with such conversion and the issuance of such Equity Interests is otherwise permitted under Section 10.04), and (z) any failure under clause (i) or (ii) if such failure is remedied or waived by the holders of such Indebtedness prior to any acceleration of the Loans pursuant to Section 11); <u>provided</u> that it shall not be a Default or an Event of Default under this Section 11.04 unless the aggregate principal amount of all outstanding Indebtedness as described in the preceding clauses (i) and (ii) is at least $10,000,000; or

11.05   [Reserved].

11.06   <u>ERISA</u>

(i)      one or more ERISA Events shall have occurred,

(ii)     there is or arises an Unfunded Pension Liability (taking into account only Plans with positive Unfunded Pension Liability), or

(iii)     there is or arises any potential withdrawal liability under Section 4201 of ERISA if Holdings, the Borrower, any Restricted Subsidiary of Holdings or the ERISA Affiliates were to withdraw completely from any and all Multiemployer Plans;

(b)     there shall result from any such event or events described in clause (a) the imposition of a lien, the granting of a security interest, or a liability or a material risk of incurring a liability; and

(c)     such lien, security interest or liability, individually or in the aggregate, has had or would be reasonably expected to have, a Material Adverse Effect; or

11.07   Security Documents

Any of the Security Documents shall cease to be in full force and effect (other than in accordance with its terms), or shall cease to give the Collateral Agent for the benefit of the Secured Creditors the Liens, rights, powers and privileges purported to be created thereby (including a perfected security interest (if and to the extent such Collateral can be perfected by the filing of UCC-1 financing statements and the taking of such other actions required by the applicable Security Document)) in, and Lien on, all of the Collateral, in favor of the Collateral Agent, superior to and prior to the rights of all third Persons (except as permitted by Section 10.01), and subject to no other Liens (except as permitted by Section 10.01); or

11.08   Guaranties

Any Guaranty or any provision thereof shall cease to be in full force or effect as to any Guarantor (except as a result of a release of any Subsidiary Guarantor in accordance with the terms thereof), or any Guarantor or any Person acting for or on behalf of such Guarantor shall deny or disaffirm in writing such Guarantor's obligations under the Guaranty to which it is a party; or

11.09   Judgments

One or more final judgments or decrees shall be entered against Holdings, the Borrower or any of their respective Restricted Subsidiaries involving in the aggregate for Holdings, the Borrower or any of their respective Restricted Subsidiaries a liability and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal for any period of 60 consecutive days, and the aggregate amount of all such judgments to the extent not paid or covered by a reputable and solvent insurance company or third party indemnities equals or exceeds the Threshold Amount; or

11.10   Change of Control

A Change of Control (except as contemplated by the Applicable DIP Order or the Restructuring Support Agreement) shall occur; or

11.11   Invalidity of Credit Documents

Any material provision of the Credit Documents, taken as a whole, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or the satisfaction in full of all the Obligations (other than contingent obligations not then due and payable),

ceases to be in full force and effect; or Holdings, the Borrower, the other Credit Parties or any of their respective Restricted Subsidiaries contests in writing the validity or enforceability of the Credit Documents, taken as a whole; or Holdings, the Borrower, the other Credit Parties or any of their respective Restricted Subsidiaries denies in writing that it has any or further liability or obligation under the Credit Documents to which it is a party, taken as a whole (other than as a result of repayment in full of the Obligations (other than contingent obligations not then due and payable) and termination of the Total Commitments), or purports in writing to revoke or rescind the Credit Documents, taken as a whole; or

11.12   <u>Additional Bankruptcy Events of Default</u>

Any of the following has occurred and is continuing:

(i)       the entry of a final order with respect to the Facilities, granting final approval of the Facilities and the Credit Documents, in form or substance that is not acceptable to the Required Lenders in their sole discretion;

(ii)      without the prior written consent of the Required Lenders, any request made to the Bankruptcy Court by any Debtor for the reversal, modification, amendment, stay, reconsideration or vacatur of any of the Interim DIP Order or Final DIP Order, is entered by the Bankruptcy Court;

(iii)     termination of the Restructuring Support Agreement, other than a termination of the Restructuring Support Agreement resulting from a breach thereof, or a breach of any Credit Document or any of the Interim DIP Order and Final DIP Order, in each case, by any Lenders (whether in their capacities as Lenders or parties to the Restructuring Support Agreement), or the Restructuring Support Agreement otherwise fails to be effective;

(iv)     failure of any Milestone to be satisfied by the specified deadline therefor (in each case, as then in effect on either the Closing Date or the Final New Money Funding Date and after giving effect to any extensions, waivers or amendments thereto made in accordance with the requirements of the Restructuring Support Agreement);

(v)      the filing of any application by any Debtor (other than the application for financing provided by a third party which seeks authority to pay all of the Obligations in full in cash upon the closing of such financing) for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other Lien in any of the Chapter 11 Cases which is *pari passu* with or senior to the Obligations, Liens securing the Obligations, excluding the Carve Out, Adequate Protection Claims, Adequate Protection Liens, or Prepetition First Lien Obligations, the Permitted Prior Liens and Liens arising under the Interim DIP Order and the Final DIP Order;

(vi)     any Debtor (or any direct or indirect non-Debtor affiliate of a Debtor) commences (or supports) any action (other than an action permitted by the Applicable DIP Order) against the Administrative Agent or any Lender or any of their agents or employees, to subordinate or avoid any Liens granted hereunder, under any other Credit Document or under any of the Interim DIP Order and Final DIP Order in favor of the Lenders or Administrative Agent;

(vii)    any Debtor (or any direct or indirect non-Debtor affiliate of a Debtor) commences (or supports) any action (other than an action permitted by the Applicable DIP Order) against any Agent or Lender (each as defined in the Prepetition Credit Agreements) or any of their agents or employees, to challenge, subordinate or avoid any claims or obligations arising, or liens granted, under the Prepetition

Credit Agreements or under any other Credit Documents (as defined therein) or any other action against any Secured Party (as defined in the Prepetition First Lien Credit Agreement), in its capacity as such;

(viii)   (a) any Debtor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify this Agreement, any other Credit Document, the Interim DIP Order or the Final DIP Order, or the disallowance of any Obligations, in whole or in part, or (b) any provision of this Agreement, any other Credit Document or any of the Interim DIP Order or the Final DIP Order, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral, shall for any reason cease to be valid and binding, in each case, without the prior written consent of the Required Lenders);

(ix)   without the prior written consent of the Required Lenders, the filing with the Bankruptcy Court of a motion seeking approval of a sale of all or substantially all assets of the Debtors under section 363 of the Bankruptcy Code (other than approval of a sale pursuant to the terms of the Restructuring Support Agreement) that, in either case, does not provide for payment in full in cash to the Administrative Agent and the Lenders of all Obligations upon closing of such sale or the effective date of a plan pursuant to which such sale is made;

(x)   the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers (beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code) relating to the operation of the business of any Debtor;

(xi)   the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the Collateral with an aggregate value of at least $1,000,000;

(xii)   termination of the Applicable DIP Order, other than as a result of repayment in full of the Obligations (other than unasserted contingent indemnification obligations);

(xiii)   the conversion of any Chapter 11 Case into a case pursuant to chapter 7 of the Bankruptcy Code;

(xiv)   the termination of any of the Debtors' exclusive right to propose a plan of reorganization under chapter 11 of the Bankruptcy Code;

(xv)   a dismissal of any of the Chapter 11 Cases;

(xvi)   the filing of any chapter 11 plan or related disclosure statement that is inconsistent with the Restructuring Support Agreement;

(xvii)   the filing of any motion seeking approval of a sale of any Collateral (other than any sale permitted under Section 10); or

(xviii)   the aggregate Gross Profit of (x) the sum of (i) 100% of Terminated Contracts, (ii) 50% of At-Risk Terminated Contracts, (iii) 16.66% of At-Risk RFP Contracts and (iv) 33.33% of RFP Contracts; less (y) 100% of New Contract Wins exceeds $40 million at any time within 105 days of the Petition Date; provided, that a contract can only be included in one of subclause (i), (ii), (iii) or (iv) under clause (x) above and, provided further that any contract included in any of such subclauses (i) through (iv) shall be reclassified as reasonably appropriate based on reasonable and prudent business judgment if new information or facts become known to the CEO or CFO, and the Company shall provide reasonably

prompt notice of such change to the Consenting Stakeholders (all capitalized terms used in this Section 11.12(xviii) having the meanings set forth in the Restructuring Support Agreement),

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent, upon the written request of the Required Lenders, shall by two (2) Business Days' prior written notice to the Debtors and their lead restructuring counsel (email being sufficient), take any or all of the following actions, subject to the Applicable DIP Order (including any prior notice required thereunder): (i) declare the Total Commitment terminated, whereupon all Commitments of each Lender shall forthwith terminate immediately; (ii) declare the principal of and any accrued interest in respect of all Loans and the Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived (to the extent permitted by applicable law) by each Credit Party; (iii) charge the default rate of interest in accordance with Section 2.08(c); (iv) [reserved]; (v) enforce, as Collateral Agent, all of the Liens and security interests created pursuant to the Security Documents in accordance with the terms therein; (vi) enforce each Guaranty in accordance with the terms therein; and (vii) immediately terminate the Debtors' limited use of cash collateral ; provided that upon the occurrence of a DIP Termination Event (as defined in the Applicable DIP Order), the obligation of each Lender to make Loans shall automatically terminate and the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender; provided further that prior to exercising any rights and remedies provided for in the Credit Documents or at law, including, without limitation, giving instructions to the Collateral Agent to enforce against the Collateral, the Administrative Agent, acting at the direction of the Required Lenders, shall be required to file a motion with the Bankruptcy Court seeking emergency relief on not less than three (3) Business Days' prior notice; provided, further, that during the two (2) Business Day period following the delivery of notice from the Administrative Agent to the Debtors and their lead restructuring counsel, the Debtors may use cash collateral solely to (1) fund the Carve Out and (2) make payroll and fund critical expenses of the Debtors to avoid immediate and irreparable harm of the Debtors' estates, including, without limitation, to make payroll of the Debtors and to preserve the DIP Collateral or the Prepetition Collateral, and in each case in accordance with the Approved DIP Budget. Notwithstanding anything to the contrary herein, the enforcement of Liens or remedies with respect to the Collateral and the exercise of all other remedies provided for in this Agreement and the other Credit Documents, shall be subject to the provisions of the Interim DIP Order (and, when entered, the Final DIP Order).

SECTION 12.    The Administrative Agent.

12.01    Appointment

The Lenders hereby irrevocably designate and appoint UBS as Administrative Agent (for purposes of this Section 12 and Section 13.01, the term "Administrative Agent" also shall include UBS in its capacity as Collateral Agent pursuant to the Security Documents) to act as specified herein and in the other Credit Documents. Each Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of such Note shall be deemed irrevocably to authorize, the Administrative Agent to take such action on its behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof and such other powers as are reasonably incidental or related thereto. The Administrative Agent may perform any of its respective duties hereunder by or through its officers, directors, agents, employees or Affiliates.

12.02   Nature of Duties

(a)      The Administrative Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement and in the other Credit Documents.  Neither the Administrative Agent nor any of its officers, directors, agents, employees or Affiliates shall be liable for any action taken or omitted by it or them hereunder or under any other Credit Document or in connection herewith or therewith, unless caused by its or any of their gross negligence, fraud, willful misconduct, bad faith, or material breach of a Credit Document (in each case, as determined by a court of competent jurisdiction in a final and non-appealable decision).  The duties of the Administrative Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have by reason of this Agreement or any other Credit Document a fiduciary relationship in respect of any Secured Creditor or the holder of any Note; and nothing in this Agreement or in any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless and until the Administrative Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default."  The Administrative Agent will notify the Lenders of its receipt of any such notice.  The Administrative Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders in accordance with Section 11; provided that unless and until the Administrative Agent has received any such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

12.03   Lack of Reliance on the Administrative Agent

(a)      Independently and without reliance upon the Administrative Agent, each Lender and the holder of each Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of Holdings and its Subsidiaries in connection with the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of Holdings and its Subsidiaries and, except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter.

(b)      The Administrative Agent or any of its Related Parties shall not be responsible to any Lender, other Secured Creditor, or the holder of any Note, or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Credit Document, (ii) the contents of any certificate, report, statement or other document delivered, referred to, provided for, or delivered hereunder or thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, the use of proceeds of the Loans, or the occurrence of any Default or Event of Default, (iv) the execution, validity, enforceability, effectiveness, genuineness, collectability or sufficiency of any Credit Document or any other agreement, instrument or document, or the creation, preservation, perfection, maintenance or continuation of perfection, or priority of any Lien created or purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, (vi) whether the Collateral exists, is owned by the Borrower, another Credit Party or any of their Subsidiaries or Affiliates, is cared for, protected, or insured or has been encumbered, or meets the eligibility criteria applicable in respect thereof, (vii) the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations or (viii) the satisfaction of any condition set forth in Section 7

-105-

or elsewhere in any Credit Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent. The Administrative Agent shall not be under any duty or obligation to inspect the properties, books or records of any Credit Party or any Affiliate thereof.

(c)     The Administrative Agent or any of its Related Parties shall not be liable to any Lender, other Secured Creditor, or the holder of any Note for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Credit Documents) (and such consent or request and such action or action not taken pursuant thereto shall be binding upon all the Lenders) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable judgment (which shall not include any action taken or omitted to be taken in accordance with clause (g), for which the Administrative Agent shall have no liability).

(d)     The Administrative Agent or any of its Related Parties shall, except as expressly set forth herein and in the other Credit Documents, have no duty to disclose, and shall not be liable to any Lender, other Secured Creditor, or the holder of any Note for the failure to disclose, any information relating to the Credit Parties or any of their Affiliates that is communicated to or obtained by any Person serving as the Administrative Agent or any of its Related Parties in any capacity.

(e)     Nothing in this Agreement or any other Credit Document shall require the Administrative Agent or its Related Parties to expend or risk their own funds or otherwise incur any financial liability in the performance of any duties or in the exercise of any rights or powers hereunder.

(f)     The Administrative Agent shall not be responsible or liable to any Lender, other Secured Creditor, or the holder of any Note for any failure or delay in the performance of its obligations under this Agreement or any other Credit Document, in each case, arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; pandemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(g)     For the avoidance of doubt, and without limiting the other protections set forth in this Section 12, with respect to any determination, designation, or judgment to be made by the Administrative Agent herein or in the other Credit Documents, the Administrative Agent shall be entitled to request that the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Credit Documents) make or confirm such determination, designation, or judgment.

12.04   Certain Rights of the Administrative Agent

If the Administrative Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, the Administrative Agent shall be entitled to act (or refrain from taking such action) unless and until the Administrative Agent shall have received instructions from the Required Lenders; and the Administrative Agent shall not incur liability to any Lender by reason of so acting (or refraining).  Without limiting the foregoing, neither any Secured Creditor nor the holder of any Note shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders.

12.05    Reliance

The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that the Administrative Agent believed in good faith to be the proper Person, and, with respect to all matters pertaining to this Agreement and any other Credit Document and its duties hereunder and thereunder, upon advice of counsel selected by the Administrative Agent (or counsel for the Borrower). The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Credit Document unless it shall first receive such direction, advice or concurrence of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary) and such certifications as it deems appropriate, provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may (i) expose the Administrative Agent to liability or that is contrary to any Credit Document or applicable Law or (ii) be in violation of the automatic stay under any requirement of law relating to bankruptcy, insolvency, reorganization, or relief of debtors; provided, further, that if the Administrative Agent so requests, it shall first be indemnified to its satisfaction (including reasonable advances as may be requested by the Administrative Agent) by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such directed action; provided, further, that the Administrative Agent may seek clarification or further direction prior to taking any such directed action and may refrain from acting until such clarification or further direction has been provided. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Credit Documents in accordance with a request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans. The Administrative Agent may also consult with and rely upon advice and statements of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary).

12.06    Indemnification

To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agents, the Collateral Agent or any other Indemnified Person under Section 13.01(a), each Lender severally agrees to indemnify the Administrative Agent and each of their Related Parties in their capacity as such (to the extent not reimbursed by the Credit Parties and without limiting the obligation of the Credit Parties to do so), ratably according to the amount of Loans and/or Commitments they hold on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the applicable Loans and/or Commitments shall have been paid in full, ratably in accordance with the amount of such Loans and/or Commitments they held in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (including at any time following the payment of the Loans) be imposed on, incurred by or asserted against the Administrative Agent in any way relating to or arising out of the applicable Term Loans and/or Commitments, this Agreement, any of the other Credit Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent under or in connection with any of the foregoing; provided that no Lender shall be liable to the Administrative Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's gross negligence, fraud, bad faith or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction; provided, further, that no action taken by

-107-

the Administrative Agent in accordance with the written direction of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Credit Documents) shall be deemed to constitute gross negligence, fraud, bad faith or willful misconduct for purposes of this Section 12.06. In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans), this Section 12.06 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including attorneys' fees) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, this Agreement, any other Credit Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower or the other Credit Parties; provided that such reimbursement by the Lenders shall not affect the Borrower's or the other Credit Parties' continuing reimbursement obligations with respect thereto. If any indemnity furnished to the Administrative Agent for any purpose shall, in the opinion of the Administrative Agent, be insufficient or become impaired, the Administrative Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Lender to indemnify the Administrative Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's pro rata portion thereof; and provided, further, this sentence shall not be deemed to require any Lender to indemnify the Administrative Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement resulting from the Administrative Agent's gross negligence, fraud, bad faith or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction; provided, further, that no action taken by the Administrative Agent in accordance with the written direction of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Credit Documents) shall be deemed to constitute gross negligence, fraud, bad faith or willful misconduct for purposes of this Section 12.06. The indemnity provided to the Administrative Agent under this Section 12.06 shall also apply to the Administrative Agent's respective Affiliates, directors, officers, members, controlling persons, employees, trustees, investment advisors, sub agents, representatives, counsel and other advisors and agents and successors.

The provisions of this Section 12.06 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Term Loans, the expiration or termination of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Credit Document, or any investigation made by or on behalf of the Administrative Agents, the Collateral Agent, or any Lender. All amounts due under this Section 12.06 shall be payable on demand therefor.

The Credit Parties will indemnify the Prepetition Agents, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, a  "Prepetition Agent Indemnified Person" ) and hold them harmless from and against all costs, expenses (including reasonable and documented out-of-pocket fees, disbursements and other charges of outside counsel) and liabilities of such Prepetition Agent Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Prepetition Agent Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of their affiliates) that relates to the Credit Documents or the transactions contemplated thereby, including the Prepetition Agents' compliance with the terms of the DIP Orders and all actions taken pursuant to or in accordance with the DIP Orders; provided that, no Prepetition Agent Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the

final, non-appealable judgment of a court of competent jurisdiction to have resulted solely from its gross negligence, actual fraud, bad faith or willful misconduct.

12.07   The Administrative Agent in its Individual Capacity

With respect to its obligation to make Loans under this Agreement, the Administrative Agent shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lender," "Required Lenders," or any similar terms shall, unless the context clearly indicates otherwise, include the Administrative Agent in its respective individual capacities.  The Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Credit Party or any Affiliate of any Credit Party (or any Person engaged in a similar business with any Credit Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Credit Party or any Affiliate of any Credit Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders.

12.08   Credit Bidding.

Upon entry of the Interim DIP Order, the Agents (at the direction of the Required Lenders) shall have the right to credit bid (either directly or through one or more acquisition vehicles) the outstanding Obligations in connection with any non-ordinary course sale of the Debtors' assets pursuant to an order of the Bankruptcy Court (in whole or in part), including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code, or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code. With respect to any RS Business Sale where the New Money Term Loans are used for credit bidding, all amounts of accrued and unpaid interest on such New Money Term Loans as of the date of such transaction shall be paid in kind and capitalized in accordance with Section 2.08(d) and will be deemed to increase the amount of such credit bid.

12.09   Resignation by the Administrative Agent.

(a)      The Administrative Agent may resign from the performance of all its respective functions and duties hereunder and/or under the other Credit Documents at any time by giving twenty (20) Business Days' prior written notice to the Lenders and, unless an Event of Default then exists, the Borrower.  Such resignation shall take effect upon the appointment of a successor Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)      Upon any such notice of resignation by the Administrative Agent, the Required Lenders shall appoint a successor Administrative Agent hereunder or thereunder who shall be a commercial bank or trust company reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld or delayed (provided that the Borrower's approval shall not be required if an Event of Default under Section 11.01 then exists).

(c)      If a successor Administrative Agent shall not have been so appointed within such 20 Business Day period, the Administrative Agent, with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed, provided that the Borrower's consent shall not be required if an Event of Default under Section 11.01 then exists), shall then appoint a successor Administrative Agent who shall serve as Administrative Agent hereunder or thereunder until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(d)        If no successor Administrative Agent has been appointed pursuant to clause (b) or (c) above by the 20th Business Day after the date such notice of resignation was given by the Administrative Agent, the Administrative Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Credit Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(e)        Upon a resignation of the Administrative Agent pursuant to this Section 12.09, the Administrative Agent shall remain indemnified to the extent provided in this Agreement and the other Credit Documents and the provisions of this Section 12 (and the analogous provisions of the other Credit Documents) shall continue in effect for the benefit of the Administrative Agent for all of its actions and inactions while serving as the Administrative Agent.

12.10    Collateral Matters

(a)        Each Lender authorizes and directs the Collateral Agent to enter into the Security Documents (including any intercreditor agreement contemplated hereby) for the benefit of the Lenders and the other Secured Creditors. Each Lender and other Secured Creditor hereby agrees, and each holder of any Loan or Note or other Secured Creditor by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Collateral Agent in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Collateral Agent of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.  The Collateral Agent is hereby authorized on behalf of all of the Lenders and other Secured Creditors, without the necessity of any notice to or further consent from any Lender and other Secured Creditor, from time to time, to take any action with respect to any Collateral or Security Documents which may be necessary to create, perfect and maintain perfected the security interest in and Liens upon the Collateral granted pursuant to the Security Documents.  The Lenders and the other Secured Creditors irrevocably agree that the Collateral Agent may rely exclusively on a certificate of an Authorized Officer of the Borrower as to whether any such other Liens are not prohibited.

(b)        The Lenders hereby authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral (i) upon termination of the Commitments and payment and satisfaction of all of the Obligations (other than contingent obligations not due and payable), (ii) constituting property being sold or otherwise disposed of (to Persons other than Credit Parties) upon the sale or other disposition thereof in compliance with this Agreement, (iii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders hereunder, to the extent required by Section 13.13), (iv) as otherwise may be expressly provided in the relevant Security Documents or the last sentence of each of Sections 10.01 and 10.02, (v) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty in accordance with the terms therein and (vi) in connection with any successful credit bid by or on behalf of the Lenders in the Chapter 11 Cases.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 12.10.

(c)        The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Credit Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this

Section 12.10 or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders.

12.11    Right to Realize on Collateral and Enforce Guarantees

Anything contained in any of the Credit Documents to the contrary notwithstanding, the Borrower, the Administrative Agent, the Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Security Agreement or to take any other enforcement action hereunder or under any other Credit Document, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Credit Documents may be exercised solely by the Administrative Agent or the Collateral Agent, as applicable, for the benefit of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), the Collateral Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code) may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon instructions from the Required Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other disposition.

12.12    Delivery of Information

The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Credit Party, any Restricted Subsidiary, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Credit Document except as specifically provided in this Agreement or any other Credit Document.

12.13    [Reserved].

12.14    Withholding Tax

To the extent required by any applicable Requirement of Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the IRS or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding Tax ineffective), such Lender shall indemnify the Administrative Agent in accordance with Section 5.04(e).

12.15    Certain ERISA Matters

(a)      Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement,

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)      such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)      In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Credit Document or any documents related hereto or thereto).

12.16    Delegation of Duties

The Administrative Agent may, in its discretion, perform any and all of its duties and exercise its rights and powers hereunder or under any other Credit Document by or through its respective Related Parties (including its affiliates, agents, sub-agents, designees, employees or attorneys-in-fact), and shall be

entitled to advice of counsel concerning all matters pertaining to such duties. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. All provisions of this Section 12 and Section 13 (including Section 13.01) and all other rights, privileges, protections, immunities, and indemnities granted to the Administrative Agent hereunder and under the other Credit Documents shall apply to its Related Parties (including agents, sub-agents, designees, employees or attorneys-in-fact). The Administrative shall not be responsible for the negligence, fraud or misconduct of any agents, sub-agents, designees, or attorneys-in-fact selected by it with reasonable care. For the avoidance of doubt, the exculpatory and indemnification provisions of this Section shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the New Money Term Loan Syndication as well as activities as the Administrative Agent.

12.17    Survival

The agreements in this Section 12 shall survive the resignation, removal or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the repayment, satisfaction or discharge of any or all Obligations under this or any other Credit Document, and the termination of this Agreement or any other Credit Document.

SECTION 13.    Miscellaneous.

13.01    Payment of Expenses, etc.

(a)    The Borrower hereby agrees to:  (i) (a) to pay or reimburse the Administrative Agent, the Collateral Agent, Fronting Lender and the Commitment Parties for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, fronting, syndication, administration, and execution of this Agreement and the other Credit Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof, and the consummation and administration of the transactions contemplated hereby and thereby (including due diligence expenses, syndication expenses, travel expenses but in the case of legal fees and expenses, limited to reasonable and documented out-of-pocket fees and reasonable and documented out-of-pocket charges and disbursements of Cahill Gordon & Reindel LLP, as primary counsel to the Administrative Agent, the Collateral Agent and the Fronting Lender, Akin Gump Strauss Hauer & Feld LLP, as primary counsel to the Commitment Parties (and, if reasonably necessary, of one local counsel each applicable material jurisdiction, which, in each case, shall exclude allocated costs of in-house counsel) and fees and expenses of Houlihan Lokey, Inc. and Ankura Consulting Group, LLC, as financial advisers to the Commitment Parties (and in the case of other consultants and advisors, to the fees and expenses of such persons approved by the Borrower), and (b) from and after the Closing Date, to pay or reimburse the Administrative Agent, the Collateral Agent, Fronting Lender and each Lender for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this Agreement or the other Credit Documents (including all such costs and expenses incurred during any insolvency, bankruptcy or other legal proceeding, which in the case of legal fees and expenses, shall be limited to the reasonable and documented out-of-pocket fees and expenses of Cahill Gordon & Reindel LLP, as  primary counsel to the Administrative Agent, the Collateral Agent and the Fronting Lender collectively and Akin Gump Strauss Hauer & Feld LLP, as primary counsel to the Lenders (and one local counsel in each applicable relevant jurisdiction and, in the event of any actual conflict of interest, one additional counsel of each type to the affected parties), taken as a whole, and in each case, excluding allocated costs of in-house counsel) and fees and expenses of Houlihan Lokey, Inc. and Ankura Consulting Group, LLC, as financial advisers to the Lenders, taken as a whole (in the case of other consultants or advisors, to the fees and expenses of such persons approved by the Borrower),  within thirty days of receipt by the Borrower of an invoice relating thereto setting forth

-113-

such expenses in reasonable detail; (ii) indemnify the Administrative Agent, the Collateral Agent, Fronting Lender, each Lender and each of their affiliates, and each of their respective directors, officers, employees, partners, advisors, agents and other representatives of each of the foregoing and their respective successors (each, an "<u>Indemnified Person</u>") from and hold each of them harmless against any and all actual liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements, joint or several (in the case of legal fees and expenses limited to the reasonable and documented out-of-pocket fees. disbursements, other charges and expenses of one counsel to the Administrative Agent, the Collateral Agent, Fronting Lender, one counsel to the Lenders, taken as a whole, and one counsel to the other Indemnified Persons taken as a whole (and, if reasonably necessary, of one local counsel in each relevant jurisdiction to the Indemnified Persons, taken as a whole) (and, in the event of an actual or perceived conflict of interest, one additional counsel of each type to the affected Indemnified Persons taken as a whole, and in each case, excluding allocated costs of in-house counsel)) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, (a) any investigation, litigation or other proceeding (whether or not the Administrative Agent, the Collateral Agent or any Lender is a party thereto and whether or not such investigation, litigation or other proceeding is brought by or on behalf of any Credit Party) related to the entering into and/or performance of this Agreement or any other Credit Document or the proceeds of any Loans hereunder or the consummation of the Transaction or any other transactions contemplated herein or in any other Credit Document or the exercise of any of their rights or remedies provided herein or in the other Credit Documents or (b) the actual or alleged presence, Release or threatened Release of Hazardous Materials on or from any Real Property at any time owned, leased or operated by Holdings or any of its Subsidiaries, or any Environmental Claim, or any other liability arising pursuant to any Environmental Law, related in any way to Holdings or any of its Subsidiaries, including, in each case, without limitation, the reasonable and documented out-of-pocket fees, disbursements, other charges and expenses of one counsel incurred in connection with any such investigation, litigation or other proceeding (but excluding any losses, liabilities, claims, damages or expenses to the extent they arise from the (x) gross negligence, bad faith, fraud or willful misconduct of the Indemnified Person to be indemnified (or any such Indemnified Person's affiliates or any of its or their respective directors, officers, employees, advisors, agents and other representatives) as determined by a court of competent jurisdiction in a final and nonappealable decision, (y) a breach of the obligations of such Indemnified Person (or any such Indemnified Person's affiliates or any of its or their respective directors, officers, employees, partners, advisors, agents and other representatives) under the Credit Documents as determined by a court of competent jurisdiction in a final and non-appealable decision or (z) any dispute solely among Indemnified Persons (other than claims against the Administrative Agent, the Collateral Agent, or any of their Affiliates in its capacity or in fulfilling its role as Administrative Agent, Collateral Agent or any other similar role hereunder and under any of the other Credit Documents). To the extent that the undertaking to indemnify, pay or hold harmless the Administrative Agent, the Collateral Agent or any Lender set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Borrower shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law. This Section 13.01(a) shall not apply with respect to Taxes other than any Taxes that represent losses arising from any non-Tax claim.

(b)     To the full extent permitted by applicable law, each party hereto shall not assert, and hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or incidental damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnified Person shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, including SyndTrak, Intralinks, LendAmend, the internet, email or similar electronic transmission systems, in each case, except to the extent any such damages are found in a final non-appealable

judgment of a court of competent jurisdiction to have resulted from the gross negligence, bad faith, fraud or willful misconduct of, or material breach of this Agreement or the other Credit Documents by, such Indemnified Person (or its officers, directors, employees or Affiliates). None of the Indemnified Persons or Holdings, the Sponsor, the Borrower or any of their respective Affiliates or the respective directors, officers, employees, advisors, and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Agreement, the other Credit Documents or the transactions contemplated hereby or thereby; provided, that nothing contained in this sentence shall limit the Borrower's indemnification and reimbursement obligations to the extent set forth herein. The Borrower shall not be liable for any settlement of any legal proceeding effected without its consent (which consent shall not be unreasonably withheld or delayed), but if settled with the Borrower's written consent, or if there is a judgment against an Indemnified Person in any such legal proceeding, the Borrower agrees to indemnify and hold harmless each Indemnified Person in the manner set forth above. The Borrower shall not, without the prior written consent of an Indemnified Person (which consent shall not be unreasonably withheld or delayed), effect any settlement of any pending or threatened in writing legal proceeding against such Indemnified Person in respect of which indemnity could have been sought hereunder by such Indemnified Person unless (a) such settlement includes an unconditional release of such Indemnified Person from all liability or claims that are the subject matter of such legal proceeding and (b) such settlement does not include any statement as to any admission of fault, culpability or wrongdoing or failure to act. Notwithstanding the foregoing, each Indemnified Person shall be obligated to refund and return any and all amounts paid by the Borrower under this Section 13.01 to such Indemnified Person for any such fees, expenses or damages to the extent such Indemnified Person is not entitled to payment of such amounts in accordance with the terms hereof.

13.02    Right of Setoff

In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent and each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived (to the extent permitted by applicable law), to set off and to appropriate and apply any and all deposits (general or special) (other than accounts used exclusively for payroll, Taxes, fiduciary and trust purposes, and employee benefits and cash on deposit in accounts used exclusively to hold cash that has been received by any Credit Party from third parties and to be remitted by such Credit Party to any court or other Governmental Authority) and any other Indebtedness at any time held or owing by the Administrative Agent or such Lender (including by branches and agencies of the Administrative Agent or such Lender wherever located) to or for the credit or the account of any Credit Party against and on account of the Obligations then due and owing (whether at stated maturity, by acceleration or otherwise) and any other liabilities of the Credit Parties then due and owing to the Administrative Agent or such Lender under this Agreement or under any of the other Credit Documents, including all interests in Obligations purchased by such Lender pursuant to Section 13.04(b), and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document in each case, to the extent then due and owing.

13.03    Notices

(a)    Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including telegraphic, telecopier or cable communication) and mailed, telegraphed, telecopied, cabled or delivered: if to any Credit Party, at the address specified opposite its signature below or in the other relevant Credit Documents; if to any Lender, at its address specified on Schedule 1.01(a) or in the Assignment and Assumption Agreement pursuant to which such Lender became a Party hereto, as applicable; and if to the Administrative Agent, at the Notice Office; or,

as to any Credit Party or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to the Borrower and the Administrative Agent.  All such notices and communications shall, when mailed, telegraphed, telecopied, or cabled or sent by overnight courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telecopier, except that notices and communications to the Administrative Agent and the Borrower shall not be effective until received by the Administrative Agent or the Borrower, as the case may be.

(b)       Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender.  Each of the Administrative Agent, Holdings and the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)       Each of Holdings and the Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by, or on behalf of, Holdings or the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on SyndTrak, Intralinks, LendAmend or another similar electronic system (each, a "Platform") and (b) certain of the Lenders may be "*public-side*" Lenders (i.e., Lenders that do not wish to receive material nonpublic information with respect to Holdings, the Borrower or their respective securities) (each, a "Public Lender").  Each of Holdings and the Borrower hereby agrees that (i) it will use commercially reasonably efforts to ensure that all Borrower Materials that are to be made available to Public Lenders are clearly and conspicuously marked "*PUBLIC*" which, at a minimum, shall mean that the word "*PUBLIC*" shall appear prominently on the first page thereof, (ii) by marking Borrower Materials "*PUBLIC*," Holdings and the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material nonpublic information with respect to Holdings, the Borrower or their respective securities for purposes of United States Federal and state securities laws (provided that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 13.17), (iii) all Borrower Materials marked "*PUBLIC*" are permitted to be made available through a portion of the Platform designated as "*Public Investor*" and (iv) the Administrative Agent shall be entitled to treat any Borrower Materials that are marked "*PUBLIC*" as being suitable for posting on a portion of the Platform not marked as "*Public Investor*."  Notwithstanding the foregoing, the following Borrower Materials shall be deemed to be marked "*PUBLIC*," to the extent the Borrower has had a reasonable opportunity to review, unless the Borrower notifies the Administrative Agent promptly that any such document contains material nonpublic information:  (1) the Credit Documents and (2) any notification of changes in the terms of the credit facilities under this Agreement and (3) all information delivered pursuant to Sections 9.01(a), 9.01(b) and 9.01(e).

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "*Private Side Information*" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to communications that are not made available through the "*Public Side Information*" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "*AS IS*" AND "*AS AVAILABLE.*" NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY CREDIT PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND ARISING OUT OF ANY CREDIT PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH PERSON'S GROSS NEGLIGENCE, FRAUD, BAD FAITH OR WILLFUL MISCONDUCT.

The Administrative Agent agrees that the receipt of notices or other communications by the Administrative Agent at its electronic mail address set forth above shall constitute effective delivery of notices or other communications to the Administrative Agent for purposes of the Credit Documents. Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that notices or other communications have been posted to the Platform shall constitute effective delivery of notices or other communications to such Lender for purposes of the Credit Documents. Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's electronic mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address. Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

Notwithstanding anything to the contrary in this Agreement, a written direction or instruction from, or a consent or approval by, DIP Commitment Parties constituting the Required Commitment Parties or Lenders constituting the Required Lenders may be in the form of an email or other form of written communication from Akin Gump Strauss Hauer & Feld LLP.  Each Lender hereby acknowledges and agrees that any such email or other communication from Akin Gump Strauss Hauer & Feld LLP shall be conclusively presumed to have been authorized by a written direction or instruction from the Required Commitment Parties or the Required Lenders, as applicable, and Akin Gump Strauss Hauer & Feld LLP shall be conclusively presumed to have acted on behalf of and at the direction or instruction from the Required Commitment Parties or Required Lenders, as applicable (and the Agents and Credit Parties shall be entitled to rely on such presumption). For the avoidance of doubt, with respect to each reference herein to (i) documents, agreements or other matters being "satisfactory," "acceptable," "reasonably satisfactory" or "reasonably acceptable" (or any expression of similar import) to the Required Commitment Parties or the Required Lenders, as applicable, such determination may be communicated as contemplated above and/or (ii) any matter requiring the consent or approval of, or a determination by, the Required Commitment Parties or the Required Lenders, as applicable, such consent, approval or determination may be communicated as contemplated above. The Agents and Credit Parties shall be entitled to rely upon, and shall not incur any liability for relying upon, any purported direction of the Required Commitment Parties or the Required Lenders, as applicable as contemplated above, and the Agents and Credit Parties shall not have any responsibility to independently determine whether such direction has in fact been authorized by the Required Commitment Parties or the Required Lenders, as applicable.

13.04   Benefit of Agreement; Assignments; Participations

(a)      This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective permitted successors and assigns of the parties hereto; provided, however, neither Holdings nor the Borrower may assign or transfer any of its rights, obligations or interest hereunder without the prior written consent of the Administrative Agent and each of the Lenders and, provided further, that, although any Lender may grant participations to Loan Participants in its rights hereunder, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Commitments hereunder except as provided in Sections 2.13 and 13.04(b)) and the Loan Participant in its capacity as such shall not constitute a "Lender" hereunder and, provided, further, that no Lender shall transfer or grant any participation under which the Loan Participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (i)(x) extend the final scheduled maturity of any Loan or Note or any Commitment in which such Loan Participant is participating, or (y) reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates, which shall not be considered to be a reduction in the rate of interest or fees) or reduce the principal amount thereof, or increase the amount of the Loan Participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Total Commitment or a mandatory prepayment of the Loans shall not constitute a change in the terms of such participation, and that an increase in any Commitment (or the available portion thereof) or Loan shall be permitted without the consent of any Loan Participant if the Loan Participant's participation is not increased as a result thereof), (ii) release all or substantially all of the Collateral under the Security Documents or all or substantially all Guarantors (except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such Loan Participant is participating or (iii) consent to the assignment or transfer by Holdings or the Borrower of any of its rights and obligations under this Agreement.  The Administrative Agent shall have no responsibility of any kind to ensure that the provisions hereof applicable to participations in Loans are observed by the Lenders.  Without limiting Section 13.04(j), in the case of any such participation, the Loan Participant shall not have any rights under this Agreement or any of the other Credit Documents (the Loan Participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the Loan Participant relating thereto) and all amounts payable by the Borrower hereunder shall be determined as if such Lender had not sold such participation.

(b)      (i)  Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees constituting an Eligible Transferee (an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)      the Borrower (with such consent being deemed to have been given with respect to any assignment if the Borrower has not responded within five (5) Business Days after its receipt of delivery of written notice of such assignment in accordance with the notice provisions set forth in Section 13.03); provided that no consent of the Borrower shall be required for an assignment of all or a portion of a Term Loan to a Lender, an Affiliate of a Lender or an Approved Fund or for assignments of all or a portion of the Commitment or Term Loans in connection with the Fronting Arrangement or the New Money Term Loan Syndication; and

(B)      the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Term Loan to a Lender or an Affiliate of a Lender or an Approved Fund or for assignments of all or a portion of the Commitment or Term Loans in connection with the Fronting Arrangement or the New Money Term Loan Syndication.

-118-

Notwithstanding the foregoing or anything to the contrary set forth herein, no assignment of any Loans or Commitments may be made to Sponsor, any Sponsor Affiliate, Holdings or any Subsidiary of Holdings and no assignment of any unfunded Commitments may be made other than, for any Lender other than the Fronting Lender, (i) to an Affiliate or Approved Fund of a Lender or (ii) in connection with the Fronting Arrangement or the New Money Term Loan Syndication.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or in connection with the Fronting Arrangement or the New Money Term Loan Syndication or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption Agreement with respect to such assignment is delivered to the Administrative Agent) shall not be less than an amount of $1,000,000, and shall be in increments of $1,000,000 in excess thereof unless each of the Borrower and the Administrative Agent otherwise consents; provided that such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(B)     the parties to each assignment shall execute (i) and deliver to the Administrative Agent an Assignment and Assumption Agreement via an electronic settlement system acceptable to the Administrative Agent or (ii) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Assumption, in each case, together with a processing and recordation fee of $3,500; provided that (x) the Administrative Agent, in its sole discretion, may elect to waive such processing and recordation fee, (y) no fee shall apply to any assignments in connection with the Fronting Arrangement or the New Money Term Loan Syndication and (z) no fee shall apply for assignments among any Lender and any of its Approved Funds; and

(C)     other than assignments by the Fronting Lender in connection with the New Money Term Loan Syndication or the Fronting Arrangement, (1) if the assigning Lender is assigning any Initial New Money Term Loans (other than to an Affiliate or Approved Fund of such Lender), such Lender (or a designated Affiliate or Approved Fund thereof) must concurrently assign to the Assignee Initial Roll-Up Term Loans that are then held by such assigning Lender (or such designated Affiliate or Approved Fund thereof) in an aggregate principal amount equal to the product of (x) the aggregate principal amount of the Initial Roll-Up Term Loans held by such assigning Lender (or such designated Affiliate or Approved Fund thereof) at such time, multiplied by (y) a fraction, the numerator of which is the aggregate principal amount of the Initial New Money Term Loans proposed to be assigned to such Assignee by such assigning Lender, and the denominator of which is the aggregate principal amount of the Initial New Money Term Loans held by such assigning Lender immediately prior to the proposed assignment, (2) if the assigning Lender is assigning any Initial Roll-Up Term Loans (other than to an Affiliate or Approved Fund of such Lender), such Lender (or a designated Affiliate or Approved Fund thereof) must concurrently assign to the Assignee Initial New Money Term Loans that are then held by such assigning Lender (or such designated Affiliated or Approved Fund thereof) in an aggregate principal amount equal to the product of (x) the aggregate principal amount of the Initial New Money Term Loans held by such assigning Lender (or such designated Affiliate or Approved Fund thereof) at such time, multiplied by (y) a fraction, the numerator of which is the aggregate principal amount of the Initial Roll-Up Term Loans proposed to be assigned to such Assignee by such assigning Lender, and the denominator of which is the aggregate principal amount of the Initial Roll-Up Term Loans held by such assigning Lender

-119-

immediately prior to the proposed assignment, (3) if the assigning Lender is assigning any Delayed-Draw New Money Term Loans (other than to an Affiliate or Approved Fund of such Lender), such Lender (or a designated Affiliate or Approved Fund thereof) must concurrently assign to the Assignee Delayed-Draw Roll-Up Term Loans that are then held by such assigning Lender (or such designated Affiliated or Approved Fund thereof) in an aggregate principal amount equal to the product of (x) the aggregate principal amount of the Delayed-Draw Roll-Up Term Loans held by such assigning Lender (or such designated Affiliated or Approved Fund thereof) at such time, multiplied by (y) a fraction, the numerator of which is the aggregate principal amount of the Delayed-Draw New Money Term Loans proposed to be assigned to such Assignee by such assigning Lender, and the denominator of which is the aggregate principal amount of the Delayed-Draw New Money Term Loans held by such assigning Lender immediately prior to the proposed assignment and (4) if the assigning Lender is assigning any Delayed-Draw Roll-Up Term Loans (other than to an Affiliate or Approved Fund of such Lender), such Lender (or a designated Affiliate or Approved Fund thereof) must concurrently assign to the Assignee Delayed-Draw New Money Term Loans that are then held by such assigning Lender (or such designated Affiliate or Approved Fund thereof) in an aggregate principal amount equal to the product of (x) the aggregate principal amount of the Delayed-Draw New Money Term Loans held by such assigning Lender (or such designated Affiliate or Approved Fund thereof) at such time, multiplied by (y) a fraction, the numerator of which is the aggregate principal amount of the Delayed-Draw Roll-Up Term Loans proposed to be assigned to such Assignee by such assigning Lender, and the denominator of which is the aggregate principal amount of the Delayed-Draw Roll-Up Term Loans held by such assigning Lender immediately prior to the proposed assignment, and in each case for the foregoing clauses (1), (2), (3) and (4), such assigning Lender and Assignee shall (x) also comply with the requirements set forth in Section 13.04(e) with respect to such assignment, and (y) acknowledge and agree that (i) the Initial New Money Term Loans and the Initial Roll-Up Term Loans held by such Lenders (or their designated Affiliates or Approved Funds) are all "stapled to" each other, and shall only be assigned in equal percentages across all such Term Loans and (ii) the Delayed-Draw New Money Term Loans and the Delayed-Draw Roll-Up Term Loans held by such Lenders (or their designated Affiliates or Approved Funds) are all "stapled to" each other, and shall only be assigned in equal percentages across all such Term Loans; and

(D)    no such transfer or assignment will be effective until recorded by the Administrative Agent on the Register pursuant to Section 13.16.

This paragraph (b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Classes on a non-pro rata basis among such Classes.  To the extent of any assignment pursuant to this Section 13.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments and outstanding Loans.  At the time of each assignment pursuant to this Section 13.04(b) to a Person that is not already a Lender hereunder and that is not a U.S. Person, the respective Assignee shall, to the extent legally entitled to do so, provide to the Borrower the appropriate IRS Forms (and, if applicable, a U.S. Tax Compliance Certificate) and documentation under FATCA described in Section 5.04(g).  To the extent that an assignment of all or any portion of a Lender's Commitments and related outstanding Obligations pursuant to Section 2.13 or this Section 13.04(b) would, at the time of such assignment, result in increased costs under Section 2.10 or Section 3.06 from those being charged by the respective assigning Lender prior to such assignment, then the Borrower shall not be obligated to pay such increased costs (although the Borrower, in accordance with and pursuant to the other provisions of this Agreement, shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment).

(c)     Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans and Notes hereunder to a Federal Reserve Bank in support of borrowings made by such Lender from such Federal Reserve Bank, and any Lender may pledge all or any portion of its Loans and Notes to its trustee or to a collateral agent providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of such obligations, as the case may be.  No pledge pursuant to this clause (c) shall release the transferor Lender from any of its obligations hereunder.

(d)     Any Lender which assigns all of its Commitments and/or Loans hereunder in accordance with Section 13.04(b) shall cease to constitute a "Lender" hereunder, except with respect to indemnification provisions under this Agreement (including Sections 2.10, 2.11, 3.06, 5.04, 12.06, 13.01 and 13.06), which shall survive as to such assigning Lender.

(e)     Any Lender which assigns any Commitments and/or Loans to an Assignee hereunder shall cause such Assignee to execute, concurrently with the effectiveness of such assignment, all joinders and other agreements as may be necessary for such Assignee to become party to the Restructuring Support Agreement as a Consenting Stakeholder (as defined in the Restructuring Support Agreement) and to the Auction Agreement as a Participating Lender (as defined in the Auction Agreement) and any other applicable documents (including the DIP Commitment Letter), such that such Assignee shall be bound to the same obligations (including, without limitation, the obligation to participate in and fund any debt or equity financing contemplated in the DIP Commitment Letter, Restructuring Support Agreement and/or the Auction Agreement) to the same extent as the assigning Lender and/or its Affiliates (to the extent that such Affiliates hold the obligations under the DIP Commitment Letter, the Auction Agreement and/or the Restructuring Agreement).

(f)     [Reserved].

(g)     [Reserved].

(h)     [Reserved].

(i)     Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "SPC") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided, that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 2.10, 2.11 or 5.04), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Credit Document, remain the lender of record hereunder.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500 (which processing fee may be waived by the Administrative Agent in its sole discretion), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or guarantee or credit or liquidity enhancement to such SPC.

(j)      The Borrower agrees that each Loan Participant shall be entitled to the benefits of Sections 2.10, 3.06 and 5.04 (subject to the requirements and limitations therein, including the requirements under Sections 5.04(g) (it being understood that the documentation required under Section 5.04(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment; provided that such Loan Participant (A) agrees to be subject to the provisions of Section 2.13 as if it were an Assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Sections 2.10, 3.06 or 5.04, with respect to any participation, than its participating Lender would have been entitled to receive except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Loan Participant and the principal amounts (and stated interest) of each Loan Participant's interest in the Loans or other obligations under the Credit Documents (the "Participant Register"); provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Loan Participant or any information relating to a Loan Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in "registered form" under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.  Upon reasonable notice, the Borrower shall have the right to review the Participant Register from time to time.

(k)      The Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Institutions or maintain the list of Disqualified Institutions.  Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans or Commitments, or disclosure of confidential information, to any Disqualified Institution. The list of Disqualified Institutions shall be made available to any Lender upon request to the Administrative Agent, subject to customary confidentiality requirements.

13.05    No Waiver; Remedies Cumulative

No failure or delay on the part of the Administrative Agent, the Collateral Agent or any Lender in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between the Borrower or any other Credit Party and the Administrative Agent, the Collateral Agent or any Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder.  The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent, the Collateral Agent or any Lender would otherwise have.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent, the Collateral Agent or any Lender to any other or further action in any circumstances without notice or demand.

13.06    Payments Pro Rata

(a)    Except as otherwise provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Borrower in respect of any Obligations hereunder, the Administrative Agent shall distribute such payment to the Lenders of the Class or Classes entitled thereto (other than any Lender that has consented in writing to waive its pro rata share of any such payment) pro rata based upon their respective shares, if any, of the Class or Classes of Obligations with respect to which such payment was received.  For the avoidance of doubt, (i) solely for purposes of this Section 13.06, the Initial New Money Term Loans and Delayed-Draw New Money Term Loans shall be treated as a single Class and the Initial New Roll-Up Term Loans and Delayed-Draw Roll-Up Term Loans shall be treated as a single Class and (ii) the application of payments in the order specified in Section 5.06 shall be deemed to have been made in accordance with this Section 13.06.

(b)    Each of the Lenders agrees that, except as otherwise provided in this Agreement (including Section 5.06), if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise), which is applicable to the payment of the principal of, or interest on, the Loans of a Class of a sum which with respect to the related sum or sums received by other Lenders of such Class is in a greater proportion than the total of such Obligations of such Class then owed and due to such Lender bears to the total of such Obligation of such Class then owed and due to all of the applicable Lenders of such Class immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other applicable Lenders of such Class an interest in the Obligations of such Class of the respective Credit Party to such Lenders of such Class in such amount as shall result in a proportional participation by all the applicable Lenders of such Class in such amount; provided that if all or any portion of such excess amount is thereafter recovered, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

(c)    Notwithstanding anything to the contrary contained herein, the provisions of the preceding Sections 13.06(a) and (b) shall be subject to the express provisions of this Agreement which, among other things, require, or permit, differing payments to be made to (i) Non-Defaulting Lenders as opposed to Defaulting Lenders or (ii) New Money Term Lenders as opposed to Roll-Up Term Lenders.

13.07    [Reserved].

13.08    Several Obligations

The obligation of the Lenders to make Loans and to make payments pursuant to Section 12.06 are several and not joint.  The failure of any Lender to make any Loan or to fund any such participation or to make any payment under Section 12.06 on any date required hereunder shall not relieve any other Lender or its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or, to fund its participation or to make any payment required under Section 12.06.

13.09    GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL

(a)    THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN ANY MORTGAGE, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK AND, AS MAY BE APPLICABLE,

THE BANKRUPTCY CODE).  NOTWITHSTANDING ANY OTHER PROVISION OF THIS SECTION 13, THE BANKRUPTCY COURT AND THE FEDERAL DISTRICT COURT OF WHICH THE BANKRUPTCY COURT IS A SUBDIVISION SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, EACH PARTY HERETO HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. EACH PARTY HERETO HEREBY FURTHER IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH PARTY, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH PARTY.  EACH PARTY HERETO FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS SET FORTH OPPOSITE ITS SIGNATURE BELOW.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF (i) ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR (ii) THE ADMINISTRATIVE AGENT, ANY LENDER OR THE HOLDER OF ANY NOTE TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST HOLDINGS OR THE BORROWER IN ANY OTHER JURISDICTION.

(b)     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

13.10   <u>Counterparts</u>

This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  Delivery of a counterpart via facsimile or other electronic transmission shall constitute delivery of an original counterpart.  A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Administrative Agent.

13.11    [Reserved].

13.12    Headings Descriptive.  The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

13.13    Amendment or Waiver; etc.

(a)        Neither this Agreement nor any other Credit Document (other than the Fee Letter, the Administrative Agent Fee Letter and the Fronting Fee Letter) nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the respective Credit Parties party hereto or thereto and the Required Lenders (although additional parties may be added to (and annexes may be modified to reflect such additions), and Subsidiaries of the Borrower may be released from, the Subsidiaries Guaranty and the Security Documents in accordance with the provisions hereof and thereof without the consent of the other Credit Parties party thereto or the Required Lenders), provided that no such change, waiver, discharge or termination shall, without the consent of each directly and adversely affected Lender (but not the Required Lenders and except with respect to following clause (i), any Defaulting Lender), (i)(x) extend the final scheduled maturity of any Loan or Note of such Lender holding such Loan or Note or extend the Commitment of such Lender holding such Commitment, or (y) reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with the waiver of applicability of any post-default increase in interest rates or waivers of defaults or events of default), or reduce (or forgive) the principal amount of any Loan or Note of such Lender holding such Loan or Note, (ii) release all or substantially all of the Collateral under the Security Documents or all or substantially all of the Guaranties (except in connection the RS Business Sale, the Corrections Business Sale or other disposition approved by an order of the Bankruptcy Court with the prior written consent of the Required Lenders), (iii) amend, modify or waive any provision of this Section 13.13(a) which would result in the reduction of the voting thresholds specified herein (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to the Term Loans on the Closing Date or as otherwise provided herein), (iv) amend, modify or waive any provision of Section 13.06 other than as provided herein (including in connection with Replaced Lenders pursuant to Section 2.13) or (v) reduce the "majority" voting threshold specified in the definition of "Required Lenders", (vi) impose any additional restrictions on any Lender's ability to assign any of its rights or obligations hereunder (including any amendment to Section 12.09 or Section 13.04) without the prior written consent of the Lenders adversely affected thereby, or (vii) waive, amend or modify the superpriority claim status of the Lenders under the Applicable DIP Orders or under any Credit Document without the prior written consent of the Lenders adversely affected thereby; provided further, that no such change, waiver, discharge or termination shall (1) increase the Commitments of any Lender over the amount thereof then in effect without the consent of such Lender holding such Commitment as well as the consent of Required Lenders if such increase is effectuated other than pursuant to provisions in this Agreement specifically permitting increases of commitments without the further approval of non-increasing Lenders (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the Total Commitment or a mandatory repayment or commitment reduction of Loans shall not constitute an increase of the Commitment of any Lender and any increase, pursuant to the provisions hereof, in the available portion of any Commitment of any Lender shall not constitute an increase of the Commitment of such Lender), (2) without the consent of each Lender, subordinate any of the Obligations hereunder, or any of the Liens granted hereunder or under the other Credit Documents, to any other Indebtedness or Lien on any of the Collateral, (3) without the consent of the Administrative Agent, amend, modify or waive any provision of Section 12 or any other provision as same relates to the rights or obligations of the Administrative Agent, (4) without the consent of Collateral Agent, amend, modify or waive any provision

-125-

relating to the rights or obligations of the Collateral Agent and (5) without the consent of the Fronting Lender, amend modify or waive any provision relating to the rights or obligations of the Fronting Lender.

(b)     Notwithstanding the foregoing, (x) any provision of this Agreement may be amended by an agreement in writing entered into by Holdings, the Borrower, the Required Lenders and the Administrative Agent if (i) by the terms of such agreement the Commitment of each Lender not consenting to the amendment provided for therein shall terminate upon the effectiveness of such amendment and (ii) at the time such amendment becomes effective, each Lender not consenting thereto receives payment (including pursuant to an assignment to a replacement Lender in accordance with Section 13.04) in full of the principal of and interest accrued on each Loan made by it and all other amounts owing to it (including, if applicable, pursuant to Sections 2.11 and 4.11(f)) or accrued for its account under this Agreement and (y) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (A) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Credit Documents with the Term Loans and the accrued interest and fees in respect thereof and (B) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

(c)     [Reserved].

(d)     [Reserved].

(e)     Notwithstanding anything to the contrary contained in this Section 13.13, (x) Security Documents (including any Additional Security Documents) and related documents executed by Restricted Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be amended, modified, supplemented and waived with the consent of the Administrative Agent and the Borrower without the need to obtain the consent of any other Person if such amendment, modification, supplement or waiver is delivered in order (i) to comply with local Law (including any foreign law or regulatory requirement) or advice of local counsel, (ii) to cure ambiguities, inconsistencies, omissions, mistakes or defects or (iii) to cause such Security Document or other document to be consistent with this Agreement and the other Credit Documents and (y) if following the Closing Date, the Administrative Agent and any Credit Party shall have jointly identified an ambiguity, inconsistency, obvious error, or mistake or any error, mistake  or omission of a technical or immaterial nature, in each case, in any provision of the Credit Documents (other than the Security Documents), then the Administrative Agent and the Credit Parties shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Credit Documents if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

13.14   Survival

All indemnities set forth herein including in Sections 2.10, 2.11, 3.06, 5.04, 12.06 and 13.01 shall survive the execution, delivery and termination of this Agreement and the Notes and the making and repayment of the Obligations.

13.15   Domicile of Loans

Each Lender may transfer and carry its Loans at, to or for the account of any office, Subsidiary or Affiliate of such Lender (other than to a Disqualified Institution). Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Loans pursuant to this Section 13.15 would, at

the time of such transfer, result in increased costs under Section 2.10, 2.11(a), 3.06 or 5.04 from those being charged by the respective Lender prior to such transfer, then the Borrower shall not be obligated to pay for or otherwise indemnify such Lender for such increased costs (although the Borrower shall be obligated to pay for and indemnify such Lender for any other increased costs of the type described above resulting from changes after the date of the respective transfer to the extent provided for in Sections 2.10, 2.11(a), 3.06 or 5.04).

13.16   Register

The Borrower hereby designates the Administrative Agent to serve as its agent, solely for purposes of this Section 13.16, to maintain a register (the "Register") on which it will record the Commitments from time to time of each of the Lenders, the Loans made by each of the Lenders and each repayment in respect of the principal amount of, or stated interest on, the Loans of each Lender.  Failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligations in respect of such Loans.  With respect to any Lender, the transfer of the Commitments of such Lender and the rights to the principal of, and interest on, any Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Commitments and Loans and prior to such recordation all amounts owing to the transferor with respect to such Commitments and Loans shall remain owing to the transferor.  The registration of assignment or transfer of all or part of any Commitments and Loans shall be recorded by the Administrative Agent on the Register upon and only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to Section 13.04(b).  Upon such acceptance and recordation, the assignee specified therein shall be treated as a Lender for all purposes of this Agreement.  Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender the Note (if any) evidencing such Loan, and thereupon one or more new Notes in the same aggregate principal amount shall be issued to the assigning or transferor Lender and/or the new Lender at the request of any such Lender.  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding anything to the contrary.  The Register shall be available for inspection by the Borrower at any reasonable time and from time to time upon reasonable prior notice.  The Parties intend that all extensions of credit to the Borrower and its Affiliates hereunder shall at all times be treated as being in registered form within the meaning of Treasury Regulation Section 5f.103-1(c) and shall interpret the provisions herein regarding the Register consistent with such intent.

13.17   Confidentiality

Each Lender agrees that it will not disclose (without the prior consent of the Borrower) (other than to its employees, agents, representatives, auditors, advisors or counsel, its Affiliates involved in the Transaction or the administration of the Credit Documents on a "need to know" basis or to another Lender if such Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information, provided such Persons shall be subject to the provisions of this Section 13.17 to the same extent as such Lender) any information with respect to Holdings or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement or any other Credit Document, provided that any Lender may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this Section 13.17(a), (ii) as may be required in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or

elsewhere) or their successors (<u>provided</u> that the applicable Lender shall give the Borrower prompt notice of such disclosure to the extent permitted by law, rule or regulation), (iii) as may be required in respect to any summons or subpoena or in connection with any litigation (<u>provided</u> that the applicable Lender shall give the Borrower prompt notice of such disclosure to the extent permitted by law, rule or regulation), (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender or as requested by a Governmental Authority (<u>provided</u> that the applicable Lender shall give the Borrower prompt notice of such disclosure to the extent permitted by law, rule or regulation), (v) to the extent such information is received by the Administrative Agent or Lender from a third party that is not known by the Administrative Agent or such Lender to be subject to confidentiality arrangements to Holdings, its Affiliates, any of its Subsidiaries or the Sponsor, (vi) to the Administrative Agent or the Collateral Agent, (vii) to any direct or indirect contractual counterparty in any swap, hedge or similar agreement or to any such contractual counterparty's professional advisor (other than a Disqualified Institution)), so long as such contractual counterparty (or such professional advisor) agrees to be bound by the provisions of this Section 13.17, (viii) to any prospective or actual Eligible Transferee in connection with any contemplated transfer or participation of any of the Notes or Commitments or any interest therein by such Lender otherwise permitted by this Agreement, <u>provided</u> that such prospective transferee agrees to be bound by the confidentiality provisions contained in this Section 13.17, (ix) for purposes of establishing any appropriate defense, (x) to Moody's and S&P in connection with obtaining and maintaining the ratings described in Section 9.14 in the event the Borrower has failed to comply with such Section, (xi) to enforce its rights under any of the Credit Documents, (xii) solely to the extent that such information is independently developed by the Administrative Agent or such Lender without any confidential information provided by (or on behalf of) any Credit Party and (xiii) to the CUSIP Service Bureau or any similar agency solely to the extent that such information is necessary in connection with the issuance and monitoring of CUSIP numbers with respect to the facilities and on a confidential basis.

       13.18   <u>No Advisory or Fiduciary Responsibility</u>

       In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document), the Borrower and each other Credit Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i)(A) the services regarding this Agreement provided by the Administrative Agent are arms-length commercial transactions between the Borrower, each other Credit Party and their respective Affiliates, on the one hand, and the Administrative Agent, (B) each of the Borrower and each other Credit Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower and each other Credit Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents; (ii) (A) the Administrative Agent is, and have been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, any other Credit Party or any of their respective Affiliates, or any other Person and (B) the Administrative Agent does not have any obligation to the Borrower, any other Credit Party or any of their respective Affiliates with respect to the transactions contemplated hereby, except those obligations expressly set forth herein and in the other Credit Documents or as expressly agreed in writing by the relevant parties and (C) the Administrative Agent and its Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, the other Credit Parties and their respective Affiliates, and the Administrative Agent does not have any obligation to disclose any of such interests to the Borrower, any other Credit Party or any of their respective Affiliates.

       13.19   <u>PATRIOT ACT</u>

Each Lender subject to the Act hereby notifies Holdings and the Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies Holdings, the Borrower and the other Credit Parties and other information that will allow such Lender to identify Holdings, the Borrower and the other Credit Parties in accordance with the Act.

13.20    Post-Closing Actions

Notwithstanding anything to the contrary contained in this Agreement or the other Credit Documents, the parties hereto acknowledge and agree that Holdings, the Borrower and its Restricted Subsidiaries shall be required to take the actions specified in Schedule 13.20 attached hereto as promptly as practicable, and in any event within the time periods set forth in Schedule 13.20 (which time periods may be extended by the Administrative Agent at the direction of the Required Lenders in their reasonable discretion).  The provisions of Schedule 13.20 shall be deemed incorporated by reference herein as fully as if set forth herein in its entirety.

13.21    Interest Rate Limitation

Notwithstanding anything to the contrary contained in any Credit Document, the interest paid or agreed to be paid under the Credit Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

13.22    [Reserved].

13.23    Lender Action

Each Lender, in its capacity as such, agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Credit Party or any other obligor in each case, under any of the Credit Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Credit Party as a Lender, unless expressly provided for herein or in any other Credit Document.

13.24    Incorporation of DIP Orders by Reference

Each of the Credit Parties, the Administrative Agent and the Lenders agrees that any reference contained herein to (i) the Interim DIP Order shall include all terms, conditions and provisions of such Interim DIP Order and that the Interim DIP Order is incorporated herein for all purposes and (ii) the Final DIP Order shall include all terms, conditions and provisions of such Final DIP Order and that the Final DIP Order is incorporated herein for all purposes. To the extent there is any inconsistency between the terms of this Agreement and the terms of the Applicable DIP Order, the terms of the Applicable DIP Order shall govern.

SECTION 14.    Holdings Guaranty.

14.01    Guaranty

In order to induce the Administrative Agent, the Collateral Agent and the Lenders to enter into this Agreement and to extend credit hereunder:  each of Holdings and Intermediate Holdings (collectively, the "Holdings Guarantors") hereby unconditionally and irrevocably guarantees as primary obligor and not merely as surety the full and prompt payment when due, whether upon maturity, acceleration or otherwise, of any and all of the Obligations (including Obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code would become due) (collectively, the "Guaranteed Obligations").  If any or all of the Guaranteed Obligations owed to the Secured Creditors becomes due and payable hereunder, the Holdings Guarantors, unconditionally and irrevocably, promises to pay the amounts so due and payable to the Administrative Agent and/or the other Secured Creditors, or upon order, on written demand, together with any and all expenses which may be incurred by the Administrative Agent and the other Secured Creditors in collecting any of the Guaranteed Obligations to the extent reimbursable hereunder.  If a claim is ever made upon any Secured Creditor for repayment or recovery of any amount or amounts received in payment or on account of any of the Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including the Borrower), then and in such event each Holdings Guarantor agrees that any such judgment, decree, order, settlement or compromise shall be binding upon such Holdings Guarantor, notwithstanding any revocation of this Holdings Guaranty or other instrument evidencing any liability of the Borrower, and such Holdings Guarantor shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

14.02    Bankruptcy

For the avoidance of doubt, the guarantee provided in Section 14.01 shall not be affected in any way by the commencement of the Chapter 11 Cases.

14.03    Nature of Liability

The liability of each Holdings Guarantor hereunder is primary, absolute and unconditional, exclusive and independent of any security for or other guaranty of the Guaranteed Obligations, whether executed by any other guarantor or by any other party, and the liability of such Holdings Guarantor hereunder shall not be affected or impaired by (a) any direction as to application of payment by the Borrower or by any other party, or (b) any other continuing or other guaranty, undertaking or maximum liability of a guarantor or of any other party as to the Guaranteed Obligations, or (c) any payment on or in reduction of any such other guaranty or undertaking, or (d) any dissolution, termination or increase, decrease or change in personnel by the Borrower, or (e) any payment made to any Secured Creditor on the Guaranteed Obligations which any such Secured Creditor repays to the Borrower pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding (including the Chapter 11 Cases), and each Holdings Guarantor waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, or (f) any action or inaction by the Secured Creditors as contemplated in Section 14.05, or (g) any invalidity, irregularity or enforceability of all or any part of the Guaranteed Obligations or of any security therefor.

14.04    Independent Obligation

The obligations of each Holdings Guarantor hereunder are independent of the obligations of any other guarantor, any other party or the Borrower, and a separate action or actions may be brought and prosecuted against each Holdings Guarantor whether or not action is brought against any other guarantor, any other party or the Borrower and whether or not any other guarantor, any other party or the Borrower be joined in any such action or actions. Each Holdings Guarantor waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof. Any payment by the Borrower or other circumstance which operates to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to the Holdings Guarantors.

14.05    <u>Authorization</u>

Each Holdings Guarantor authorizes the Secured Creditors without notice or demand (except as shall be required by applicable statute and cannot be waived), and without affecting or impairing its liability hereunder, from time to time to:

(a)    change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Holdings Guaranty shall apply to the Guaranteed Obligations as so changed, extended, renewed or altered;

(b)    take and hold security for the payment of the Guaranteed Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset there against;

(c)    exercise or refrain from exercising any rights against the Borrower, any other Credit Party or others or otherwise act or refrain from acting;

(d)    release or substitute any one or more endorsers, guarantors, the Borrower, other Credit Parties or other obligors;

(e)    settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrower to its creditors other than the Secured Creditors;

(f)    apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrower to the Secured Creditors regardless of what liability or liabilities of the Borrower remain unpaid;

(g)    consent to or waive any breach of, or any act, omission or default under, this Agreement, any other Credit Document or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify or supplement this Agreement, any other Credit Document or any of such other instruments or agreements; and/or

(h)    take any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of any Holdings Guarantor from its liabilities under this Holdings Guaranty.

-131-

14.06    Reliance

It is not necessary for any Secured Creditor to inquire into the capacity or powers of any Holdings Guarantor or any of its Subsidiaries or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Guaranteed Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

14.07    Subordination

Any Indebtedness of a Credit Party now or hereafter owing to any Holdings Guarantor, and all interest, premiums, costs, expenses or indemnification amounts payable in respect thereof, are hereinafter referred to as the "Subordinated Debt". Each Holdings Guarantor agrees that the Subordinated Debt is hereby subordinated to the Guaranteed Obligations owing to the Secured Creditors, to the extent and in the manner set forth in this Section 14.07, to the prior payment in full of the Guaranteed Obligations.  For the purposes of this Section 14.07, all Guaranteed Obligations shall be deemed to have been paid in full upon the payment in full in cash of the Guaranteed Obligations (other than contingent obligations not yet due and owing).

(a)    If an Event of Default has occurred and is continuing, the Secured Creditors shall be entitled to receive payment in full of the Guaranteed Obligations before any Holdings Guarantor is entitled to receive any payment of all or any of the Subordinated Debt; and if the Administrative Agent so requests at a time when an Event of Default exists, all such Subordinated Debt shall be collected, enforced and received by any Holdings Guarantor for the benefit of the Secured Creditors and be paid over to the Administrative Agent on behalf of the Secured Creditors on account of the Guaranteed Obligations.

(b)    In the event that any Event of Default shall have occurred and be continuing, then no payment shall be made by or on behalf of a Credit Party for or on account of any Subordinated Debt, and each Holdings Guarantor shall not take or receive from the Borrower, directly or indirectly, payment of all or any of the Subordinated Debt, unless and until (x) the Guaranteed Obligations shall have been paid in full or (y) such Event of Default shall have been cured or waived.

(c)    Except as otherwise expressly set forth in Sections 14.07(a) and (b) above, nothing in this Section 14.07 shall prohibit any Credit Party from making any payment or prepayment of principal and interest on the Subordinated Debt. All payments or distributions upon or with respect to the Subordinated Debt which are received by any Holdings Guarantor contrary to the provisions of this Section 14.07 shall be received and thereafter held in trust for the benefit of the Secured Creditors, and shall be forthwith paid over to the Administrative Agent on behalf of the Secured Creditors on account of the Guaranteed Obligations in accordance with the terms hereof

(d)    Prior to the transfer by any Holdings Guarantor of any note or negotiable instrument evidencing any Subordinated Debt to any Person other than a Credit Party, such Holdings Guarantor shall mark such note or negotiable instrument with a legend that the same is subject to this subordination.

(e)    Without limiting the generality of the foregoing, each Holdings Guarantor hereby agrees with the Secured Creditors that it will not exercise any right of subrogation which it may at any time otherwise have as a result of this Holdings Guaranty (whether contractual, under Section 509 of the Bankruptcy Code or otherwise) until all Guaranteed Obligations have been paid in full in cash (other than contingent obligations not yet due and owing).

If, at any time, all or part of any payment with respect to Guaranteed Obligations theretofore made is rescinded, avoided or must otherwise be returned by any holder of Guaranteed Obligations for any reason whatsoever, the provisions set forth in this Section 14.07 shall continue to be effective or be reinstated, as the case may be, all as though such payment had not been made.

14.08    <u>Waiver</u>

Each Holdings Guarantor waives any right (except as shall be required by applicable law and cannot be waived) to require any Secured Creditor to (i) proceed against the Borrower, any other guarantor or any other party, (ii) proceed against or exhaust any security held from the Borrower, any other guarantor or any other party or (iii) pursue any other remedy in any Secured Creditor's power whatsoever.  Each Holdings Guarantor waives any defense based on or arising out of any defense of the Borrower, any other guarantor or any other party, other than payment of the Guaranteed Obligations (other than contingent obligations not due and owing)  to the extent of such payment, based on or arising out of the disability of the Borrower, any Holdings Guarantor, any other guarantor or any other party, or the validity, legality or unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrower other than payment of the Guaranteed Obligations to the extent of such payment.  To the fullest extent permitted by applicable law, the Secured Creditors may, at their election, foreclose on any security held by the Administrative Agent, the Collateral Agent or any other Secured Creditor by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Secured Creditors may have against the Borrower or any other party, or any security, without affecting or impairing in any way the liability of the Holdings Guarantors hereunder except to the extent the Guaranteed Obligations (other than contingent obligations not due and owing) have been paid.  Each Holdings Guarantor waives any defense arising out of any such election by the Secured Creditors, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of such Holdings Guarantor against the Borrower or any other party or any security.

14.09    <u>Payments</u>

All payments made by the Holdings Guarantors pursuant to this Section 14 shall be made in Dollars and will be made without setoff, counterclaim or other defense and shall be subject to the provisions of Sections 5.03 and 5.04.

14.10    <u>Maximum Liability</u>

It is the desire and intent of the Holdings Guarantors and the Secured Creditors that this Holdings Guaranty shall be enforced against each Holdings Guarantor to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  If, however, and to the extent that, the obligations of each Holdings Guarantor under this Holdings Guaranty shall be adjudicated to be invalid or unenforceable for any reason (including because of any applicable state or federal law relating to fraudulent conveyances or transfers), then the amount of the Holdings Guarantors' obligations under this Holdings Guaranty shall be deemed to be reduced and the Holdings Guarantors shall pay the maximum amount of the Guaranteed Obligations which would be permissible under applicable law.

14.11    <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>

Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability

-133-

of any Lender that is an EEA Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

      (a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

      (b)     the effects of any Bail-in Action on any such liability, including, if applicable:

        (i)     a reduction in full or in part or cancellation of any such liability;

        (ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

        (iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

<p align="center">*      *      *</p>

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**WELLPATH HOLDINGS, INC.,**
as the Borrower


By: _____
Name:
Title:


**CCS-CMGC INTERMEDIATE HOLDINGS, INC.,**
as Holdings


By: _____
Name:
Title:


**CCS-CMGC INTERMEDIATE HOLDINGS 2, INC.,**
as Intermediate Holdings


By: _____
Name:
Title:

**UBS AG, STAMFORD BRANCH**,
as the Administrative Agent and Collateral Agent

By: _____
Name:
Title:


By: _____
Name:
Title:

[●],
as a Lender


By: _____
Name:
Title:

## Exhibit B

**DIP Term Sheet**

**Final Version**

WELLPATH HOLDINGS INC., ET. AL
**$522.375 MILLION SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION CREDIT FACILITY**

*The terms set forth in this Summary of Principal Terms and Conditions (the "Term Sheet") are being provided on a confidential basis as part of a comprehensive proposal, each element of which is consideration for the other elements and an integral aspect of the proposed DIP Term Facility (as defined below). Reference is made to that certain Restructuring Support Agreement, dated as of November 11, 2024, among the Borrower, the other Debtors and the Backstop Parties and other consenting stakeholders party thereto (the "Restructuring Support Agreement").*

*This Term Sheet provides an outline of a proposed debtor in possession financing and does not purport to summarize all the terms, conditions, representations, warranties and other provisions with respect to the transactions referred to herein. Any agreement to provide the DIP Term Facility or any other financing arrangement will be subject to the execution and delivery of definitive documentation consistent with this Term Sheet and otherwise satisfactory to the DIP Agents (as defined below) and the Backstop Parties (as defined below), each acting in its reasonable discretion.*

*This Term Sheet is strictly confidential and may not be shared with anyone other than its intended recipients. It is proffered in the nature of a settlement proposal in furtherance of settlement discussions and is intended to be entitled to the protections of Rule 408 of the Federal Rules of Evidence and all other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions.*

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

| | |
|---|---|
| *Borrower:* | Wellpath Holdings, Inc., a Delaware corporation (the "Borrower"), as a debtor and a debtor in possession under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in a voluntary case (the "Borrower's Case") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") to be filed on or about November 11, 2024 (the date of the commencement of the Cases (as defined below), the "Petition Date"). |
| *Guarantors:* | All debtors and debtors in possession in voluntary cases (collectively, the "Debtor Guarantors' Cases" and, together, as jointly administered with the Borrower's Case, the "Cases") under chapter 11 of the Bankruptcy Code to be filed contemporaneously and jointly administered with the Borrower's Case, including each "Guarantor" (as defined in (x) that certain First Lien Credit Agreement, dated as of October 1, 2018, (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition 1L Credit Agreement"), among the Borrower, CCS-CMGC Intermediate Holdings, Inc. ("Holdings"), the financial institutions from time to time lender party thereto (collectively, the "Prepetition 1L Lenders"), UBS AG, Stamford Branch (as successor to Credit Suisse AG, Cayman Islands Branch), as administrative agent and collateral agent (in such capacities, the "Prepetition 1L Agent") and (y) that certain Second Lien Credit Agreement, dated as of October 1, 2018, (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition 2L Credit Agreement", and together with the Prepetition 2L Credit Agreement, the "Prepetition Credit Agreements"), among the Borrower, Holdings, the financial institutions from time to time lenders party thereto (collectively, the "Prepetition 2L Lenders", and together with the Prepetition 1L Lenders, the "Prepetition Lenders"), UBS AG, Stamford Branch (as successor to Credit Suisse AG, Cayman Islands Branch), as administrative agent and collateral agent (in such capacities the "Prepetition 2L Agent", and |

together with the Prepetition 1L Agent, the "<u>Prepetition Agents</u>" and the Prepetition Agents together with the Prepetition Lenders, the "<u>Prepetition Secured Parties</u>")) (collectively, the "<u>Guarantors</u>") but excluding CCS-CMGC Parent Holdings, LP and CCS-CMGC Parent GP, LLC.  The Borrower and the Guarantors are referred to herein as "<u>Loan Parties</u>" and each, a "<u>Loan Party</u>" or as "<u>Debtors</u>" and each, a "<u>Debtor</u>".  Notwithstanding the foregoing, however, any of the Guarantors described above that were not "Guarantors" under the Prepetition Credit Agreements, shall not constitute a "Guarantor" or "Loan Party" hereunder solely with respect to the obligations under the Roll-Up Loans (such entities, the "<u>Limited Guarantors</u>"), and references herein to "Guarantors" or "Loan Parties" shall be deemed to exclude the Limited Guarantors for purposes of the Roll-Up Loans .

*Backstop Commitments:*

Certain lenders under the Prepetition Credit Agreements and/or funds or accounts affiliated with, or managed and/or advised by, such lenders (together with their respective successors and permitted assignees, each a "<u>Backstop Party</u>" and collectively, the "<u>Backstop Parties</u>") will, severally and not jointly, backstop the DIP Term Facility (the "<u>Backstop Commitments</u>") pursuant to that certain Senior Secured Superpriority Debtor-in-Possession Credit Facility and Equity Financing Backstop Commitment Letter, dated November 11, 2024 to which this Term Sheet is attached as <u>Exhibit A</u> (the "<u>Commitment Letter</u>").

The financial advisor to the Backstop Parties shall deliver to the Debtors a schedule of commitments of each DIP Lender on the Closing Date under the DIP Term Facility to the DIP Agents on or prior to the Closing Date. Such commitments are subject to the Syndication Procedures (as defined below). Upon the Closing Date, such schedule shall be deemed to be the register of the DIP Term Loans and the DIP Lenders under the DIP Term Facility.

*Administrative Agent:*

UBS AG, Stamford Branch or any other financial institution acceptable to the Backstop Parties shall act as administrative agent (the "<u>DIP Administrative Agent</u>") and UBS AG, Stamford Branch shall act as collateral agent (the "<u>DIP Collateral Agent</u>" and together with the DIP Administrative Agent, and in such capacities, the "<u>DIP Agents</u>).

*DIP Lenders:*

Following the execution and delivery of the DIP Commitment Letter by the Backstop Parties, (i) the other Prepetition 1L Lenders shall be offered the right to participate in, together with the Backstop Parties, 95% of the New Money DIP Commitments (the "<u>1L Participation Share</u>") on a ratable basis in accordance with their 1L Backstop Amount and (ii) the other Prepetition 2L Lenders shall be offered the right to participate in, together with the Backstop Parties, 5% of the New Money DIP Commitments (the "<u>2L Participation Share</u>") on a ratable basis in accordance with their 2L Backstop Amount ("the "<u>DIP Participation Rights</u>") pursuant to procedures reasonably satisfactory to the Backstop Parties, the DIP Agents, the Fronting Lender, the Prepetition Agents and the Borrower (the "<u>Syndication Procedures</u>"); provided that any such participating lender will be able to designate affiliates, funds or accounts affiliated with, managed and/or advised by, or under common management or advisement with, such participating lender to participate in the DIP Term Facility (subject to any requirements of the Administrative Agent, including know-your-customer requirements, set forth in such Syndication Procedures) and have the loans under the Prepetition 1L Credit Agreement and Prepetition 2L Credit Agreement held by such participating lender rolled up into the DIP Term Facility in the amount and

based on the ratios set forth herein (the lenders participating in such offer, together with the Backstop Parties, collectively, the "<u>DIP Lenders</u>").   Any amounts of the 1L Participation Share not so allocated shall be allocated to the Backstop Parties that are Prepetition 1L Lenders on a ratable basis based on their respective Backstop Commitments attributable to their 1L Backstop Amount, and any amounts of the 2L Participation Share not so allocated shall be allocated to the Backstop Parties that are Prepetition 2L Lenders on a ratable basis based on their respective Backstop Commitments attributable to their 2L Backstop Amount. The Syndication Procedures are expected to be published on or around five (5) business days after the Petition Date, and would allow Prepetition Lenders the ability to elect whether to exercise DIP Participation Rights prior to an election period deadline to be no later than the earlier of (x) fourteen (14) calendar days after the date on which the Syndication Procedures are published or (y) twenty-one (21) days after the Petition Date, by taking the necessary actions specified in the Syndication Procedures.  Funding of amounts pursuant to the Syndication Procedures are expected to occur in conjunction with the Final Funding Date.

*DIP Term Facility:*    A senior secured multiple draw term loan facility in an aggregate principal amount of $522.375 million (the "<u>DIP Term Facility</u>") comprised of (i) term loans in a principal amount of up to $45.0 million that will be available to be drawn in a single drawing on or after the Closing Date (the "<u>Initial Term Loans</u>") upon satisfaction of the conditions set forth in the DIP Term Loan Documents and described in Section 8 of the Commitment Letter and the entry of the Interim Order (as defined below), (ii) term loans in a principal amount of up to $60.0 million that will be available to be drawn in a single draw after the Closing Date (the "<u>Delayed Draw Term Loans</u>" and, together with the Initial Term Loans, the "<u>New Money DIP Term Loans</u>" and the commitment to provide the New Money DIP Term Loans as determined pursuant to the Syndication Procedures, the "<u>New Money DIP Commitments</u>") upon satisfaction of the conditions set forth in the DIP Term Loan Documents and described in Section 8 of the Commitment Letter and the entry of the Final Order (as defined below) (the date of such draw, the "<u>Final Funding Date</u>"); and (iii) on the date that is five (5) business days after the funding of each of the Initial Term Loans and the Delayed Draw Term Loans (or, with respect to any New Money DIP Term Loans not acquired from the Fronting Lender by such date, a date mutually agreed by the Administrative Agent and the Required Backstop Parties), and subject to the entry of the Interim Order and the Final Order, as applicable, (x) a three and ninety-five hundredths-to-one (3.95:1.00) roll-up of the outstanding principal amount of the loans under the Prepetition 1L Credit Agreement held by each DIP Lender or its affiliate that is a lender under the Prepetition 1L Credit Agreement, as applicable, in an amount equal to three and ninety-five hundredths (3.95) times the sum of (A) the amount of the Initial Term Loans and the Delayed Draw Term Loans, respectively, allocated to such DIP Lender or its affiliates attributable to their 1L Backstop Amount *plus* (B) the product of (1) the aggregate Initial Term Loans and the Delayed Draw Term Loans, respectively, allocated to Prepetition 2L Lenders or their affiliates attributable to their respective 2L Backstop Amount, *times* (2) such DIP Lender's and its affiliates' pro rata share (expressed as a percentage) of the aggregate 1L Backstop Amount and (y) a one half-to-one (0.50:1.00) roll-up of the outstanding principal amount of the loans under the Prepetition 2L Credit Agreement held by each DIP Lender or its affiliate that is a lender under the Prepetition 2L Credit Agreement, as applicable, in an amount equal to one half (0.50) of the amount of the Initial Term Loans and the Delayed Draw Term Loans, respectively, allocated to such DIP Lender

or its affiliates attributable to their 2L Backstop Amount, in each case of the foregoing (x) and (y) into "second-out" term loans under the DIP Term Facility (the "Roll-Up Loans" and, together with the New Money DIP Term Loans, the "DIP Term Loans"), in each case on the date that such Initial Term Loans or the Delayed Draw Term Loans, as applicable, are made, and subject to the entry of the Interim Order and the Final Order, as applicable; *provided*, that there shall be no roll-up under the DIP Term Facility on account of any fees or premiums provided under the DIP Term Facility or the Backstop Commitment Letter. If a DIP Lender does not beneficially own a sufficient amount of loans under the Prepetition 1L Credit Agreement to roll up into the amount of Roll-Up Loans it would otherwise be entitled to on account of its 1L Backstop Amount or a sufficient amount of loans under the Prepetition 2L Credit Agreement to roll up into the amount of Roll-Up Loans it would otherwise be entitled to on account of its 2L Backstop Amount, the amount of Roll-Up Loans in excess of the amount of such loans of such DIP Lender shall be instead allocated to the Backstop Parties on a ratable basis in accordance with their respective New Money DIP Commitments allocated to them (as Backstop Parties) attributable to their 1L Backstop Amount or 2L Backstop Amount, as applicable. Notwithstanding the foregoing, the Roll-Up Loans shall be subject to the Roll-Up Reduction Provision. Once borrowed and either repaid or otherwise satisfied in accordance with the Restructuring Support Agreement, the DIP Term Loans may not be reborrowed.

The Initial Term Loans, Delayed Draw Term Loans and the Roll-Up Loans shall be secured by the Collateral on a *pari passu* basis, but the Initial Term Loans and Delayed Draw Term Loans shall have senior payment priority over the Roll-Up Loans.

*Use of Proceeds:*    In accordance with the DIP Budget and the DIP Orders (in each case, as defined below), the proceeds of (i) the Initial Term Loans and Delayed Draw Term Loans shall be used (a) to pay transaction costs, fees and expenses that are incurred in connection with the DIP Term Facility, for working capital and general corporate purposes of the Borrower and the Guarantors, (b) to make adequate protection payments as set forth in the section below entitled "Adequate Protection", (c) to pay certain critical vendors, pay costs relating to the sale of the Debtors' assets and make other payments authorized under first-day orders approved by the Bankruptcy Court, (d) to pay professional fees due and payable under the DIP Term Facility and (e) to finance administration of the Cases; and (ii) the Roll-Up Loans shall be used to repay the equivalent principal amount of the loans outstanding under the Prepetition 1L Credit Agreement and Prepetition 2L Credit Agreement, respectively. Notwithstanding the foregoing, no portion or proceeds of the DIP Term Loans, the Carve Out or the Collateral (in each case, as defined below) may be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Prepetition Lenders, the Prepetition Agents, the DIP Agents or the DIP Lenders; *provided*, that cash collateral and the New Money DIP Term Loans may be used for allowed fees and expenses, in an amount not to exceed $50,000 (the "Investigation Budget") in the aggregate, incurred solely by an official committee of unsecured creditors (if any, the "Committee") appointed in the Cases, to investigate the liens and claims of the Prepetition Agents and the Prepetition Lenders. The use of proceeds of the DIP Term Facility shall in all cases be in accordance with the DIP Budget (including any permitted variances).

4

The proceeds of the New Money DIP Term Loans shall be placed into a segregated deposit account of the Borrower at Bank of America that is subject to a "springing" control agreement (the "<u>Loan Proceeds Account</u>"), and withdrawals from the Loan Proceeds Account shall only be made in accordance with the Approved DIP Budget.

*Term:*

Subject to the proviso in the immediately succeeding paragraph below, all DIP Term Loans shall become due and payable and all commitments to provide the DIP Term Loans shall be terminated on the Maturity Date.  The "<u>Maturity Date</u>" shall be the earliest of: (a) the date that is 210 days after the Petition Date; (b) 31 days after the Petition Date if the Final Order has not been entered by the Bankruptcy Court, unless otherwise extended by the Requisite Lenders; (c) the consummation of one or more section 363 sales resulting in the sale of all or substantially all of the Debtors' assets; (d) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date") of a plan of liquidation or reorganization filed in the Cases that is confirmed pursuant to an order entered by the Bankruptcy Court; and (e) after the occurrence and during the continuation of an "Event of Default" as defined in the DIP Credit Agreement (defined below), the acceleration of the loans and the termination of the commitment with respect to the DIP Term Facility in accordance with the DIP Term Loan Documents.

On the Maturity Date, all DIP Term Loans and all other obligations under the DIP Term Facility shall be either repaid in full in cash or satisfied in accordance with the Restructuring Support Agreement; <u>provided</u>, <u>however</u>, that upon the Requisite Lenders' consent the outstanding principal amount of Roll-Up Loans and any accrued and unpaid interest thereon may be subject to a different treatment, including pursuant to a plan of liquidation filed in the Cases.

*Amortization*:

None.

*DIP Term Loan Documents*:

The DIP Term Facility will be documented by a Senior Secured Superpriority Debtor-in-Possession Credit Agreement (the "<u>DIP Credit Agreement</u>") and other guarantee, security and other relevant documentation (together with the DIP Credit Agreement, collectively, the "<u>DIP Term Loan Documents</u>") reflecting the terms and provisions set forth in this Term Sheet and otherwise in form and substance satisfactory to the DIP Agents, the Backstop Parties and the Borrower.

*Security and Priority:*

Pursuant to sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, subject to and subordinate to the Carve Out, all amounts owing by the Debtors under the DIP Term Facility and the obligations of the Guarantors in respect thereof will be secured by a perfected, first-priority security interest in and lien on (the "<u>DIP Liens</u>") all assets of the Borrower and the Guarantors, wherever located, and the proceeds thereof, including, without limitation, upon entry of the Final DIP Order, a valid, enforceable, fully perfected lien on the proceeds recovered from claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code (the "<u>Collateral</u>"), with the priority set forth in the immediately succeeding paragraph and subject to customary limitations and exclusions.

The liens and security interests granted under the DIP Term Facility (i) will prime and be senior to the liens and security interests in the Collateral securing any prepetition indebtedness under the Prepetition Credit Agreements and any other prepetition indebtedness secured by the Prepetition Collateral, (ii) will be senior to

the Adequate Protection Liens and (iii) will be junior to (a) the Carve Out and (b) valid, perfected, and unavoidable liens in favor of third parties (other than liens on the Prepetition Collateral) that were in existence immediately prior to the Petition Date.

In the Cases, the DIP Agents and DIP Lenders will also be granted in each of the Interim Order and the Final Order a super-priority administrative claim under section 364(c)(1) of the Bankruptcy Code for the payment of the obligations under the DIP Term Facility with priority above all other administrative claims to the extent allowed under the Bankruptcy Code, and subject and subordinate to the Carve Out.

| | |
|---|---|
| *Carve Out:* | The carve-out as set forth at <u>Exhibit 1</u> to this Term Sheet (the "<u>Carve Out</u>") shall be set forth in the DIP Term Loan Documents and the DIP Orders. |
| *Interim and Final Orders:* | The order approving the DIP Term Facility on an interim basis and authorizing the use of prepetition cash collateral, which shall be satisfactory in form and substance to the DIP Agents and the Backstop Parties and reasonably satisfactory to the Borrower (the "<u>Interim Order</u>"), shall authorize and approve (i) the Debtors' entry into the DIP Term Loan Documents, (ii) the making of the DIP Term Loans (including the deemed making of the Roll-Up Loans upon the funding of each of the Initial Term Loans and the Delayed Draw Term Loans), (iii) the granting of the super-priority claims and liens against the Loan Parties and their assets in accordance with the DIP Term Loan Documents with respect to the Collateral, (iv) the payment of all fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Agents and the DIP Lenders as described in "Indemnification and Expenses" by the Loan Parties, (v) the granting of Adequate Protection Liens and Adequate Protection Claims (each as defined below) and the payments of the Adequate Protection Fees and Expenses, (vi) the use of prepetition cash collateral, and (vii) turn over provisions requiring all Prepetition Secured Parties (as defined below) secured by liens on the Prepetition Collateral to turn over any proceeds received on account of such Prepetition Collateral to the DIP Agents for the benefit of the DIP Lenders.  The order approving the DIP Term Facility and the deemed making of the Roll-Up Loans upon the funding of the Delayed Draw Term Loans on a final basis and authorizing the use of prepetition cash collateral shall be in form and substance satisfactory to the DIP Agents and the Backstop Parties and reasonably satisfactory to the Borrower (the "<u>Final Order</u>" and, together with the Interim Order, the "<u>DIP Orders</u>"). |
| *Interest:* | The New Money DIP Term Loans shall bear interest at a *per annum* rate equal to SOFR plus 7.25% *per annum*, payable semi-annually partially in cash (at a rate of SOFR plus 1.00% *per annum*) and the remainder in kind; <u>provided</u>, that if prior to the first interest payment date to occur after the Final Funding Date, any portion of the outstanding New Money DIP Term Loans is cancelled as the result of a credit bid of the New Money DIP Term Loans, any accrued and unpaid interest as of the date of such credit bid shall be capitalized and added to the amount of the credit bid. |

The Roll-Up Loans shall bear interest at a *per annum* rate equal to SOFR plus 6.93% *per annum*, payable monthly in kind.

Interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year.

| | |
|---|---|
| *Default Interest:* | Upon the occurrence and during the continuance of an event of default (as defined in the DIP Term Loan Documents), upon the election of the Requisite Lenders, the DIP Term Loans will bear interest at an additional 2.00% *per annum* and any overdue amounts (including overdue interest) will bear interest at the applicable non-default interest rate plus an additional 2.00% *per annum*.   Default interest shall be payable on written demand. |
| *Commitment Premium:* | To the Backstop Parties, a commitment premium in an amount equal to 10.0% of the principal amount of the New Money DIP Commitments, which shall be earned and paid in kind on the Closing Date when the Initial Term Loans are funded by such Backstop Parties, ratably based on their respective New Money DIP Commitments (the "Commitment Premium"). |
| *Closing Fee:* | A closing fee in an amount equal to 5.0% of the principal amount of the New Money DIP Term Loans (the "Closing Fee") shall be paid in kind to each DIP Lender, ratably based on its respective New Money DIP Commitments as follows: (i) on the Closing Date with respect to the Initial Term Loans funded by such DIP Lender on the Closing Date and (ii) when drawn with respect to the Delayed Draw Term Loans funded by such DIP Lender on such draw date. The Closing Fee shall be shared with the other DIP Lenders ratably based on their respective New Money DIP Commitments funded by such DIP Lender on such draw date. |
| *Mandatory Prepayments:* | Except as otherwise directed by Requisite Lenders, mandatory prepayments of the DIP Term Loans shall be required with (i) 100% of net cash proceeds from (i) the sale or other disposition of assets (including, for the avoidance of doubt, any sale of the RS Business or the Corrections Business), subject to exceptions to be agreed; (ii) casualty events, subject to exceptions to be agreed; (iii) any sale or issuance of debt (other than permitted debt to be agreed) and (iv) other extraordinary receipts to be agreed between the Debtors and the Backstop Parties. |
| *Optional Prepayments:* | The Debtors may prepay in full or in part the DIP Term Loans, subject to customary notice periods, payment of any applicable fees and breakage costs.<br><br>Any optional or mandatory prepayments of the DIP Term Loans shall be applied to prepay the New Money DIP Term Loans until all such New Money DIP Term Loans are repaid in full and then to prepay any Roll-Up Loans until all such Roll-Up Loans are repaid in full. |
| *Conditions Precedent to the Closing:* | The closing date (the "Closing Date") under the DIP Term Facility shall be subject solely to the satisfaction of the following conditions, which are satisfactory to the Backstop Parties in their sole discretion:<br><br>A.  The DIP Credit Agreement and other DIP Term Loan Documents shall have been executed by all Loan Parties in form and substance consistent with this Term Sheet and otherwise satisfactory to the Backstop Parties and their counsel.  The Restructuring Support Agreement shall remain in full force and effect.<br><br>B.  The DIP Agents and DIP Lenders shall have received evidence that the Bankruptcy Court shall have entered the Interim Order, which Interim Order shall not have been vacated, reversed, modified, amended or stayed. |

C.  The Cases shall have been commenced by the Borrower and the Guarantors and the same shall each be a debtor and a debtor in possession.   All material first-day orders (including, without limitation, any orders related to the DIP Term Facility, cash management and any critical vendor or supplier motions) entered by the Bankruptcy Court in the Cases and their related motions shall, in each case, be in form and substance satisfactory to the DIP Agents and the Backstop Parties.

D.  All fees and all reasonable and documented out-of-pocket fees and expenses (including the hourly and monthly, as applicable, fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Agents and the DIP Lenders on or before the Closing Date shall have been paid, which shall include all outstanding, reasonable and documented fees and reasonable and documented out-of-pocket expenses of (a) Akin Gump Strauss Hauer & Feld, LLP, Houlihan Lokey, Inc. and Ankura Consulting Group, LLC, in their capacities as counsel, investment banker and financial advisor, respectively, to the Backstop Parties and the Ad Hoc Group (as defined in the Restructuring Support Agreement), (b) Cahill Gordon & Reindel LLP in its capacity as counsel to the Prepetition Agents and Norton Rose Fulbright, LLP, in its capacity as local counsel to the Prepetition Agents and (c) Cahill Gordon & Reindel LLP in its capacity as counsel to the DIP Agents and Norton Rose Fulbright, LLP, in its capacity as local counsel to the DIP Agents, in each case to the extent invoices for any such accrued and unpaid amounts are provided to the Debtors no later than two (2) business days prior to the Closing Date.

E.  Other than as a result of, or in connection with, the Cases, the Backstop Parties shall be satisfied that there shall not occur as a result of, and after giving effect to, the initial extension of credit under the DIP Term Facility, a default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Loan Parties' or their respective subsidiaries' debt instruments and other material agreements which would permit the counterparty thereto to exercise remedies thereunder (other than any default which the exercise of remedies is stayed by the Bankruptcy Code).

F.  The DIP Agents shall have received officer's certificates, in form and substance, satisfactory to the Backstop Parties.

G.  The absence of a material adverse change, or any event or occurrence, other than the commencement of the Cases, which could reasonably be expected to result in a material adverse change, in (i) the business, operations, performance, properties, contingent liabilities or material agreements of the Loan Parties and their respective subsidiaries, taken as a whole, since the Petition Date, (ii) the ability of the Borrower or the Guarantors to perform their respective obligations under the DIP Term Loan Documents or (iii) the ability of the DIP Agents and the DIP Lenders to enforce the DIP Term Loan Documents (any of the foregoing being a "Material Adverse Change").

H.  Other than as a result of, or in connection with, the commencement of the Cases, the necessary governmental and third party consents and approvals

8

necessary in connection with the DIP Term Facility and the transactions contemplated thereby shall have been obtained (without the imposition of any materially adverse conditions that are not acceptable to the Backstop Parties) and shall remain in effect; and no law or regulation shall be applicable in the reasonable judgment of the Backstop Parties that restrains, prevents or imposes materially adverse conditions upon the DIP Term Facility or the transactions contemplated thereby.

I.   The Borrower, the applicable other Debtors and Lender BidCo shall have duly executed an asset purchase agreement (the "<u>Asset Purchase Agreement</u>") with respect to the sale (the "<u>RS Sale</u>") of the Recovery Solutions division of the Debtors (the "<u>RS Business</u>"), which shall name Lender BidCo as the "stalking horse bidder" and otherwise shall be on terms and conditions acceptable to the DIP Lenders in their sole discretion.

J.   The DIP Agents and each DIP Lender who has requested the same in writing at least two (2) business days prior to the Closing Date shall have received "know your customer" and similar information.

K.   The DIP Agents and DIP Lenders shall have a valid and perfected senior priority lien on and security interest in the Collateral; the Loan Parties shall have delivered Uniform Commercial Code financing statements and shall have executed and delivered any other security agreements, in each case, in suitable form for filing, if applicable; and provisions satisfactory to the Backstop Parties for the payment of all fees and taxes for such filings shall have been duly made.

L.   The DIP Agents and the DIP Lenders shall have received a 13-week cash forecast in form and substance satisfactory to the Backstop Parties, which shall consist of forecasted receipts and disbursements (including, without limitation, professional fees) of the Debtors for the 13 weeks commencing on the Petition Date (the "<u>Initial DIP Budget</u>").

M.   The DIP Agents and the DIP Lenders shall have received satisfactory lien searches requested at least five (5) business days prior to the Closing Date

N.   The DIP Agents and the DIP Lenders shall be satisfied that there is an absence of a Material Adverse Effect (to be defined in the DIP Credit Agreement), or any event or occurrence, other than the commencement of the Cases, which could reasonably be expected to result in a Material Adverse Effect, since the Petition Date.

For the avoidance of doubt, once the Fronting Lender has funded any portion of the DIP Term Facility, the DIP Lenders' commitments and agreements shall be unconditional with respect to any such funded amounts.

| | |
|---|---|
| *Conditions Precedent to Each DIP Term Loan:* | On each date of a borrowing (i) there shall exist no default or an event of default under the DIP Term Loan Documents, (ii) the representations and warranties of the Borrower and each Guarantor therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding, (iii) the making of such DIP Term Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently, (iv) with respect to the borrowing of Delayed Draw Term Loans, no later than thirty-one (31) calendar days after the Petition Date, the Bankruptcy Court shall have entered a Final Order, (v) the Interim Order or Final Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the consent of the Requisite Lenders, (vi) the Restructuring Support Agreement shall remain in full force and effect, (vii) the DIP Administrative Agent shall have received a borrowing notice, and (viii) the Cases shall not have been dismissed or converted into cases under chapter 7 of the Bankruptcy Code, and no trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with expanded powers shall have been appointed in any of the Cases. For the avoidance of doubt, once the Fronting Lender has funded any portion of the DIP Term Facility, the DIP Lenders' commitments and agreements shall be unconditional with respect to any such funded amounts. |
| *Representations and Warranties:* | The DIP Term Loan Documents will contain representations and warranties customarily found in loan agreements for similar debtor in possession financings and other representations and warranties deemed by the Backstop Parties appropriate to the specific transaction (which will be applicable to Loan Parties and their respective subsidiaries and subject to certain exceptions and qualifications to be agreed), including, without limitation, representation that no action, suit, investigation, litigation or proceeding is pending or (to the knowledge of the Loan Parties) threatened in writing in any court or before any arbitrator or governmental instrumentality (other than (i) the Cases, (ii) any action, suit, investigation or proceeding arising from the commencement and continuation of the Cases or the consequences that could result from the commencement and continuation of the Cases and (iii) as set forth on Schedule A attached hereto) that is not stayed or could reasonably be expected to result in a Material Adverse Change. |
| *Financial Covenants* | The DIP Term Loan Documents will contain the following financial covenants:<br><br>Commencing on Thursday (or the immediately subsequent business day if such Thursday is not a business day) of the third full calendar week after the date of entry of the Interim Order by no later than 5:00 p.m. (prevailing Eastern Time) (the "Initial Variance Report Date"), and on each Thursday (or the immediately subsequent business day if such Thursday is not a business day) thereafter, by no later than 5:00 p.m. (prevailing Eastern time) (together with the Initial Variance Report Date, a "Variance Report Date"), the Debtors or their advisors shall deliver by email to the Backstop Parties' advisors and, on a non-cleansing basis, the DIP Lenders, a variance report (each, a "Variance Report") for the immediately preceding Variance Test Period (as defined below) (i) setting forth, in reasonable detail, "receipts" and "disbursements" of the Debtors and any variances between the actual amounts and those set forth in each corresponding cumulative two-week, three-week |

or four-week period in the then in-effect DIP Budget for such Variance Test Period and (ii) describing any material variances.

"Variance Test Period" shall mean, beginning after the first full cumulative two-week period after the Petition Date, which shall be covered by the first Variance Report to be delivered hereunder (the "Initial Variance Test Period"), each successive cumulative two-week, three-week, or four-week period, as applicable, which shall be covered by each successive Variance Report to be delivered hereunder with respect to the then-in-effect Approved DIP Budget.  For the avoidance of doubt, the Variance Test Period for the then-in-effect Approved DIP Budget shall never be less than a cumulative two-week period and shall reset to a cumulative two-week period beginning with the first full cumulative two-week period after each Variance Test Period comprised of four cumulative weeks; provided, that if the Requisite Lenders have not approved an updated DIP Budget in accordance with the procedures below, the Variance Test Period shall continue to extend using the cumulative four-week period from the then-in-effect Approved DIP Budget, plus each successive week until a new DIP Budget is approved.

With respect to the Initial Variance Test Period and each cumulative two-week Variance Test Period thereafter, (i) the aggregate receipts of the Debtors shall not be less than 80.0% of the estimated receipts for such items in the then-in-effect Approved DIP Budget and (ii) the aggregate operating disbursements of the Debtors (exclusive of professional fees and expenses, and any amounts required to be cash collateralized to maintain surety bonds, letters of credit or similar arrangements) shall not exceed 120.0%.

With respect to an any Variance Test Period of three cumulative weeks or more, (i) the aggregate receipts of the Debtors shall not be less than 85.0% of the estimated receipts for such items in the then-in-effect Approved DIP Budget and (ii) the aggregate operating disbursements of the Debtors (exclusive of professional fees and expenses, and any amounts required to be cash collateralized to maintain surety bonds, letters of credit or similar arrangements) shall not exceed 115.0% (any variance prohibited in this paragraph and the paragraph above, the "Prohibited Variance").

|  |  |
|---|---|
| *Reporting Covenants, Affirmative Covenants and Negative Covenants:* | The DIP Term Loan Documents will contain reporting requirements, affirmative covenants and negative covenants customarily found in loan documents for similar debtor in possession financings and other customary reporting requirements, affirmative covenants and negative covenants deemed by the Backstop Parties appropriate to the specific transaction, including (i) the delivery of an updated 13-week cash forecast of the Loan Parties on a consolidated basis in form and substance satisfactory to the Requisite Lenders (an "Updated DIP Budget", and upon the written approval (email being sufficient) by the Requisite Lenders or their advisors, and together with the Initial DIP Budget, collectively, the "Approved DIP Budget"), which proposed Updated DIP Budget shall be delivered to the Requisite Lenders every four weeks no later than five (5) calendar days prior to the Monday of the first week covered on such proposed Updated DIP Budget (it being understood that the first delivery of the proposed Updated DIP Budget shall be on or prior to December 4, 2024 with respect to the 13-week starting from December 9, 2024 and the second delivery of the proposed Updated DIP Budget shall be on or prior to January 2, 2025 with respect to 13-week starting from January 6, 2025), provided, |

that if the Requisite Lenders have not approved in writing a proposed Updated DIP Budget within three (3) business days of receipt of such proposed Updated DIP Budget, the then-current Approved DIP Budget shall continue to be the Approved DIP Budget, and until any such updated budget, amendment, supplement or modification has been approved by the Requisite Lenders, the Debtors shall be subject to and be governed by the terms of the Approved DIP Budget then in effect; (ii) on each Variance Report Date, the delivery of the Variance Report to the Backstop Parties' advisors and, on a non-cleansing basis, the DIP Lenders; (iii) monthly delivery to the Backstop Parties' advisors and, on a non-cleansing basis, the DIP Lenders of a reporting package to be agreed to by the Backstop Parties and the Debtors, (iv) on or before December 4, 2024 and each two-week period thereafter, delivery to the Backstop Parties' advisors and, on a non-cleansing basis, the DIP Lenders of a 13-week cash forecast for each of the Corrections Business (the "Corrections CF Forecast") and the RS Business (the "RS CF Forecast") inclusive of cash receipts and direct cash disbursements (other than professional fees and expenses, and any amounts required to be cash collateralized to maintain surety bonds, letters of credit or similar arrangements) specific to each of the Corrections Business and the RS Business; provided, that the Corrections CF Forecast and the RS CF Forecast shall not be subject to the variance testing described above; provided, further, that the obligation to deliver the RS CF Forecast shall cease upon the consummation of the RS Sale; (v) compliance with milestones specifically set forth in the Restructuring Support Agreement (the "Milestones"); (vi) the Debtors shall provide the DIP Agents' and DIP Lenders' counsel with reasonable advance notice and copies of any material motions or other material documents to be filed in the Cases; (vii) compliance with covenants set forth in the section below entitled "Bankruptcy Covenants", insurance certificates and endorsements and other matter to be agreed, (viii) not to permit the existence of any claims, other than those arising under the DIP Term Facility and the replacement liens and super-priority claims as described in "Adequate Protection" below, entitled to a super-priority under section 364(c)(1) of the Bankruptcy Code, (ix) on a bi-weekly basis, the Debtors shall provide to the Backstop Lenders' advisors and, on a non-cleansing basis, the DIP Lenders the list of all RFP Contracts (as defined in the Restructuring Support Agreement) delivered under the Restructuring Support Agreement, (ix) the Debtors shall notify the DIP Agent's counsel and the Backstop Lenders' counsel with (a) three (3) business days' notice prior to terminating of any vendor contracts that represent greater than $1,000,000 in annual disbursements or any customer contracts that represent greater than $500,000 annual margin and (b) notice, promptly following a counterparty termination of such contract(s) and in no event later than (3) business days following a counterparty termination of such contracts, in each case, if commercially practicable under the circumstances, and (x) the Debtors, with the assistance of their advisors, shall use commercially reasonable efforts to obtain, on or before forty-five (45) calendar days following the Closing Date and thereafter, maintaining a private corporate credit rating from S&P and a private corporate family rating from Moody's, in each case, with respect to the Borrower, and a private credit rating from S&P and Moody's with respect to the New Money DIP Term Loans, but not any specific rating.

*Bankruptcy Covenants:*    The DIP Term Loan Documents will contain restructuring covenants customary for debtor-in-possession financing facilities of this size, type, and purpose, including, without limitation, requiring that the Debtors:

(i) use commercially reasonable efforts (a) to prepare or cause to be prepared the applicable DIP Term Loan Documents within the Borrower's control (including all relevant motions, applications, orders, any other required agreements and other documents to effectuate and consummate the restructuring transactions) and to negotiate such documents in good faith, (b) to provide draft copies of all motions, documents and other pleadings to be filed in the Cases to counsel to the DIP Lenders as soon as reasonably practicable, and (c) to consult in good faith with counsel to the Requisite Lenders regarding the form and substance of any of the foregoing material documents in advance of the filing, execution, distribution or use (as applicable) thereof;

(ii) use commercially reasonable efforts to (a) file a motion with the Bankruptcy Court seeking approval of the RS Sale and related bidding procedures (which shall, among others things, seek approval of the designation of Lender BidCo as the stalking horse bidder for the RS Business) on terms and conditions acceptable to the Requisite Lenders and reasonably acceptable to the Debtors and (b) file motion with the Bankruptcy Court seeking approval of the sale of the Corrections Business and related bidding procedures on terms and conditions acceptable to the Requisite Lenders and reasonably acceptable to the Debtors.

(iii) oppose any motion filed with the Bankruptcy Court by any person seeking the entry of an order (a) directing the appointment of an examiner or a trustee, (b) converting any Case to a case under chapter 7 of the Bankruptcy Code, or (c) dismissing the Cases;

(iv) inform counsel to the DIP Lenders as soon as reasonably practicable after becoming aware of: (a) any matter or circumstance which they know, or believe is likely, to be a material impediment to the implementation or consummation of the restructuring transactions; (b) a breach of any DIP Term Loan Document; and (c) any representation or statement made or deemed to be made by any Debtor under any DIP Term Loan Document which is or proves to have been incorrect or misleading in any material respect when made or deemed to be made;

(v) to the extent reasonably practicable, participate in once-a-week telephonic conferences with the DIP Lenders that agree to receive material nonpublic information and the DIP Lenders' advisors to provide updates and information related to the Debtors' restructuring;

(vi) pay and reimburse all professional fees and expenses required to be paid pursuant to the provisions of the DIP Term Loan Documents in full in cash in immediately available funds, subject to any applicable orders of the Bankruptcy Court (including the orders with respect to the DIP Term Facility) but without the need to file fee or retention applications, all expenses incurred prior to (to the extent not previously paid) the effective date of the Plan (as defined in the Restructuring Support Agreement);

(vii) upon reasonable request of any of the advisors to the DIP Lenders and to the extent permitted under any bidding procedures approved by the Bankruptcy Court, inform the applicable advisors as to (a) the status and progress of the

RS Sale and the sale of the Corrections Business and (b) the status and progress of the negotiations with any governmental regulatory authorities;

(viii)    not file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with the DIP Term Loan Documents without obtaining the prior written consent of the Requisite Lenders; provided, however that the Debtors shall be allowed to file such motion, pleading, or other document with respect to the matters set forth in Schedule A attached hereto but not to agree to any settlement or cash payment with respect thereto without obtaining the prior written consent of the Requisite Lenders;

(ix)    not file any motion for any sale process, or bidding procedures with respect thereto, without obtaining the prior written consent of the Requisite Lenders;

(x)    consult with the Requisite Lenders with respect to the development and adoption of any retention plan, bonus plan or severance program for key physicians and management;

(xi)    not file a motion to assume or reject any material agreement, contract or lease pursuant to section 365 of the Bankruptcy Code without providing three (3) business days' prior written notice to the Requisite Lenders; and

(xii)    not direct any direct or indirect subsidiary of the Debtors to take any action, or fail to take any action, that would be materially inconsistent with the DIP Term Loan Documents.

*Events of Default:*    The DIP Term Loan Documents will contain events of default customarily found in loan agreements for similar debtor in possession financings and other events of default deemed by the Backstop Parties to be reasonably appropriate to the specific transaction, including, without limitation, (i) any breach or failure to comply with the terms of the Interim Order or the Final Order, as applicable; (ii) any breach or failure to comply with any of the Milestones (unless waived or extended by the Requisite Lenders); (iii) conversion of any of the Cases to cases under chapter 7 of the Bankruptcy Code; (iv) the appointment of a receiver, receiver and manager, interim receiver or similar official over all or substantially all of the assets of any Debtor; (v) the commencement of any winding up or liquidation proceeding for the Debtors under any applicable law; (vi) the dismissal of the Cases; (vii) the appointment of a chapter 11 trustee or an examiner with expanded powers over the Cases; (viii) failure of the Borrower to use the proceeds of the DIP Term Facility in accordance with the Approved DIP Budget; (ix) any termination of the use of prepetition cash collateral pursuant to the DIP Orders, as applicable; (x) any occurrence of any Prohibited Variance; and (xi) the termination of the Restructuring Support Agreement (other than pursuant to Section 13.01(t) therein).

*Remedies:*    The DIP Term Loan Documents and the DIP Orders shall contain usual and customary remedies including, without limitation, that upon the occurrence of an Event of Default under the DIP Term Loan Documents or the DIP Orders, and following two (2) business days' written notice (email being sufficient) by the DIP Collateral Agent to lead restructuring counsel to the Debtors, lead restructuring counsel to the Committee, and the U.S. Trustee, the DIP Administrative Agent,

acting at the direction of the Requisite Lenders, may take any or all of the following actions, unless the Bankruptcy Court orders otherwise prior to the expiration of such two (2) business day notice period: (i) charge the default rate set forth in the section entitled "Interest" above and (ii) immediately (a) terminate any remaining commitments and cease permitting any DIP Term Loans to be made under the DIP Term Facility to the Borrower and (b) declare all obligations under the DIP Term Facility to be immediately due and payable, (iii) immediately terminate the Debtors' authority to use cash collateral, except that the Debtors may use cash collateral to (a) fund the Carve Out and (b) make payroll of the Debtors and fund critical expenses of the Debtors necessary to avoid immediate and irreparable harm to the Debtors' estates, in each case in accordance with the terms of the Approved DIP Budget, and (iv) the DIP Lenders shall be required to file a motion with the Court seeking emergency relief from the automatic stay (the "Stay Relief Motion") upon no less than three (3) business days' written notice (the "Notice Period") to counsel to the Debtors, the U.S. Trustee, and counsel to any official committee of unsecured creditors.   At the hearing on the Stay Relief Motion, the Bankruptcy Court may fashion any appropriate remedy, including that (i) the DIP Collateral Agent, acting at the direction of the Requisite Lenders, may exercise any rights and remedies against the collateral securing the obligations under the DIP Term Facility available to it under this DIP Orders, the DIP Credit Agreement, the other DIP Term Loan Documents, and applicable non-bankruptcy law, and the DIP Agents, acting at the direction of the Requisite Lenders, and the DIP Lenders may exercise such other rights available to them under the DIP Term Loan Documents or the DIP Orders, as applicable, and (ii) the Prepetition Secured Parties may exercise any rights and remedies in accordance with the Prepetition Credit Documents (as defined in the DIP Orders) and applicable non-bankruptcy law and the DIP Orders to satisfy the Prepetition Obligations (as defined in the DIP Orders), the Adequate Protection Claims (as defined in the DIP Orders), and any other Adequate Protection Obligations (as defined in the DIP Orders), subject to the DIP Obligations, the DIP Superpriority Claims (as defined in the DIP Orders) and, in each case, subject to the Carve Out.   The DIP Agents and the DIP Lenders agree not to oppose a request by the Debtors for an expedited hearing filed during such Notice Period to determine whether a DIP Termination Event has occurred in accordance with the DIP Orders, the DIP Credit Agreement, or the other DIP Term Loan Documents.

*Adequate Protection:*   As adequate protection for the use of the collateral securing the prepetition obligations under the Prepetition Credit Agreements (the "Prepetition Obligations") (such collateral, the "Prepetition Collateral") (including cash collateral) (i) the Prepetition 1L Agent, the Prepetition 1L Lenders and the Prepetition 2L Agent shall, during the pendency of the Cases, receive payments in cash on a current basis of all reasonable and documented fees, costs and expenses, including the reasonable and documented fees, costs and expenses of one restructuring counsel and one local counsel in any materially relevant jurisdiction for the Prepetition 1L Agent and the Prepetition 2L Agent and one restructuring counsel, one local counsel in any materially relevant jurisdiction, one investment banker and one financial advisor for the Prepetition 1L Lenders, taken as a whole (collectively, the "Adequate Protection Fees and Expenses"), and (ii) the Prepetition Agents shall, during the pendency of the Cases, be granted (a) additional and replacement liens on all property of the Debtors' estates which would have constituted collateral securing the Prepetition Obligations and (b) liens on all property constituting Collateral (collectively, the "Adequate Protection Liens") and   super-priority claims pursuant to section

507(b) of the Bankruptcy Code (which claim will, for the avoidance of doubt, be assertable solely against the Borrower and Guarantors) (the "Adequate Protection Claims"), in each case, of the same relative priority solely to the extent of any diminution in value of the Prepetition Agents' and Prepetition Lenders' interest in the Prepetition Collateral, subject and subordinate, in each case, only to the Carve Out and DIP Liens.   Additionally, the DIP Orders shall provide the Prepetition Lenders with customary credit bidding rights in accordance with section 363(k) of the Bankruptcy Code.   The foregoing shall be without prejudice to the right of any Prepetition Secured Party to later request or otherwise seek additional forms of adequate protection.

*Right to Credit Bid:*    Upon entry of the Interim Order, the DIP Lenders shall have the right to credit bid (either directly or through one or more acquisition vehicles) during any sale of Debtors' assets pursuant to an order of the Bankruptcy Court (in whole or in part), including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code.

*Roll-Up Reduction Provision*    At any time from and after consummation of the Recovery Solutions Sale (as defined in the Restructuring Support Agreement), the Requisite Lenders may elect to recharacterize all or any portion of the remaining Roll-Up Loans as Prepetition 1L Loans (the "Roll-Up Reduction Provision").

*Indemnification and Expenses:*    The Loan Parties will indemnify the DIP Agents, the DIP Lenders, the Fronting Lender, their respective investment advisors, affiliates and related funds/accounts, successors and assigns and the officers, directors, managers, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "Indemnified Person") and hold them harmless from and against all costs, expenses (including reasonable and documented fees, disbursements and other charges of outside counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of their affiliates) that relates to the DIP Term Facility or the transactions contemplated thereby; provided that, no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted solely from its gross negligence, actual fraud, bad faith or willful misconduct.   In addition, (a) all reasonable and documented out-of-pocket expenses (including, without limitation, reasonable and documented fees, disbursements and other charges of outside counsel and financial advisors) of the DIP Agents, the Fronting Lender, and DIP Lenders in connection with the DIP Term Facility and the transactions contemplated thereby, including for enforcement costs and documentary taxes associated with the DIP Term Facility and the transactions contemplated thereby, shall be paid by the Loan Parties from time to time, whether or not the Closing Date occurs, and (b) all reasonable and documented out-of-pocket expenses (including, without limitation, reasonable and documented out-of-pocket fees, disbursements and other charges of outside counsel and financial advisors) of the DIP Agents, the Fronting Lender, and the DIP Lenders (limited to professionals specifically set forth in this Term Sheet) incurred in connection with the Cases will be paid by the Loan Parties. The Loan Parties will indemnify the Prepetition Agents, their respective affiliates, successors and assigns and the officers, directors,

employees, agents, advisors, controlling persons and members of each of the foregoing (each, a "Prepetition Agent Indemnified Person") and hold them harmless from and against all costs, expenses (including reasonable and documented out-of-pocket fees, disbursements and other charges of outside counsel) and liabilities of such Prepetition Agent Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Prepetition Agent Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of their affiliates) that relates to the DIP Term Facility or the transactions contemplated thereby, including the Prepetition Agents' compliance with the terms of the DIP Orders and all actions taken pursuant to or in accordance with the DIP Orders; provided that, no Prepetition Agent Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted solely from its gross negligence, actual fraud, bad faith or willful misconduct.   All fees and expenses described above shall be payable by the Loan Parties, on a joint and several basis, whether accrued or incurred prior to, on, or after the Petition Date.

|                                        |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                 |
| -------------------------------------- | --- |
| *Assignments and Participations:* | No assignment of unfunded New Money DIP Commitments (other than from a DIP Lender to an affiliate thereof and other than in connection with the fronting arrangements described in Section 1 of the Commitment Letter) may be made under the DIP Term Facility. Any assignments of the DIP Term Loans (other than from a DIP Lender to an affiliate thereof) and other than in connection with the fronting arrangement described in Section 1 of the Commitment Letter prior to the earlier of: (i) the Final Funding Date and (ii) the date that is 60 days after the Petition Date are subject to the consent of the Borrower (which, in each case, shall not be unreasonably withheld, conditioned or delayed, and which consent, as to the Borrower, shall be deemed granted if not otherwise denied within five (5) business days) and all assignments are subject to confirmation by the DIP Administrative Agent; it being understood and agreed that to the extent that the DIP Participation Right accrues to a DIP Lender prior to settlement of its trade, such DIP Lender may designate its assignee as a participant with respect to the DIP Participation Rights to the extent permitted by the DIP Credit Agreement and will assign any Roll-Up Loans attributable to the DIP Participation Rights so assigned subject to the transfer on account of funding via the DIP Participation Rights to the extent permitted and in accordance with the procedures of the DIP Credit Agreement. Furthermore, in connection with the exercising of any DIP Participation Rights or any assignment of DIP Term Loans, all participating Lender or assignees shall be required to execute all joinders and other agreements as may be necessary to become party to the Restructuring Support Agreement as a Consenting Stakeholder (as defined in the Restructuring Support Agreement) and to the Auction Agreement as a Participating Lender (as defined in the Auction Agreement).  Notwithstanding the rights of the Backstop Parties to assign their pro rata share of the DIP Term Loans, no Backstop Party shall be relieved, released or novated from its obligations hereunder (including its obligation to fund the DIP Facility on the Final Funding Date, subject to the satisfaction (or waiver) of the conditions precedent set forth in the DIP Credit Agreement. |
| *Requisite Lenders under the DIP Term Facility:* | "Requisite Lenders" shall mean (i) until the date that is five (5) business days after the Closing Date, the "Required Backstop Parties" (as defined in the Commitment Letter) and (ii) thereafter, non-defaulting DIP Lenders (until the date that is five (5) |

Business Days after the Final Funding Date, excluding the Fronting Lender) holding at least a majority of the sum of all outstanding term loans and unused commitments under the DIP Term Facility; *provided*, that following the date that is five (5) Business Days after the Final Funding Date, any outstanding term loans and unused commitments under the DIP Term Facility that are still held by the Fronting Lender thereafter shall be included for purposes of making such determination.

| | |
|---|---|
| *Amendments:* | Requisite Lenders, except for provisions customarily requiring approval by each affected DIP Lender. |
| *Miscellaneous:* | The DIP Term Loan Documents will include, in each case customary to debtor-in-possession financing facilities of this size, type, and purpose (i) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes (in each case, subject to customary qualifications)), (ii) waivers of consequential damages and jury trial, and (iii) customary agency, set-off and sharing language. |
| *Governing Law and Submission to Exclusive Jurisdiction:* | State of New York (and to the extent applicable, the Bankruptcy Code). Each party to the Loan Documents will waive the right to trial by jury and will consent to jurisdiction of the state and federal courts located in The City of New York or, during the pendency of the Cases, to the jurisdiction of the Bankruptcy Court and the federal district court of which the Bankruptcy Court is a subdivision. |
| *Counsel to Backstop Parties:* | Akin Gump Strauss Hauer & Feld LLP. |
| *Counsel to DIP Agents* | Cahill Gordon & Reindel LLP. |

EXHIBIT 1
CARVE OUT

1.   <u>Carve Out</u>.

     (a)   <u>Carve Out</u>.   As used in this [Final/Interim] Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and quarterly to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>"), including any restructuring fee, sale fee, financing fee or other success fee that was fully earned, due and payable to estate professionals prior to the delivery of a Carve Out Trigger Notice ("<u>Success Fees</u>"), incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>"), the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>"), and, if a patient care ombudsman (a "<u>Patient Ombudsman</u>") is appointed in the Chapter 11 Cases by order of this Court, by the Patient Ombudsman pursuant to section 327, 328, or 333 of the Bankruptcy Code (together with the Patient Ombudsman, the "<u>Patient Ombudsman Professionals</u>," and together with the Debtor Professionals and the Committee Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Administrative Agent (or, if following the indefeasible payment in full, in cash of the DIP Obligations and the termination of all commitments under the DIP Term Facility, the Prepetition Agents) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3,000,000 incurred after the first business day following delivery by the DIP Administrative Agent (or, if following the indefeasible payment in full, in cash of the DIP Obligations and the termination of all commitments under the DIP Term Facility, the Prepetition Agents) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").   Within three (3) business days after delivery of a Carve Out Trigger Notice, each Professional Person shall provide the Debtors with an estimate of its unpaid fees and expenses as reasonably determined by a good faith estimate of the applicable Professional Person to calculate the Carve Out.   For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Administrative Agent (or, if following the indefeasible payment in full, in cash of the DIP Obligations and the termination of all commitments under the DIP Term Facility, the Prepetition Agents) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following (x) the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Term Facility or (y) if all commitments under the DIP Term Facility have been terminated and the Debtors' use of cash collateral has been terminated, stating that the Post-Carve Out Trigger Notice Cap has been invoked. Notwithstanding the foregoing, the Carve Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the Prepetition Secured Parties or any of the DIP Lenders or DIP Agents, including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the Prepetition Credit Documents in favor of the Prepetition Secured Parties (whether in such capacity or otherwise) or the DIP Term Loan Documents in favor of the DIP Lenders or the DIP Agents, including, without limitation, for lender liability or pursuant to Bankruptcy Code sections 105, 510, 544, 547, 548, 549, 550, or 552, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the Prepetition Secured Parties, DIP Lenders, or DIP Agents hereunder; (c) attempts to prevent, hinder or otherwise delay any of the Prepetition Secured Parties', DIP Lenders', or DIP Agents' assertion, enforcement or realization upon any Collateral in accordance with the Prepetition Credit Documents, the DIP Credit Agreement, the other DIP Term Loan Documents, or

this Interim Order; or (d) paying any amount on account of any claims arising before the Petition Date unless such payments are approved by an order of this Court.

(b)     <u>Carve Out Reserves</u>.   On the day on which a Carve Out Trigger Notice is given by the DIP Administrative Agent (or, if following the indefeasible payment in full, in cash of the DIP Obligations and the termination of all commitments under the DIP Term Facility, the Prepetition Agents) to the Debtors with a copy to counsel to the DIP Lenders and counsel to the Committee (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for Delayed Draw Term Loans under the Delayed Draw Term Loan Commitment (each as defined in the DIP Credit Agreement) (on a pro rata basis based on the then outstanding Delayed Draw Term Loan Commitments), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute Delayed Draw Term Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.   The Debtors shall deposit and hold such amounts in a segregated account at the DIP Administrative Agent in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.   On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a draw request and notice of borrowing by the Debtors for Delayed Draw Term Loans under the Delayed Draw Term Loan Commitment (on a pro rata basis based on the then outstanding Delayed Draw Term Loan Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute Delayed Draw Term Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.   The Debtors shall deposit and hold such amounts in a segregated account at the DIP Administrative Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>" and, together with the Pre-Carve Out Trigger Notice Reserve, the "<u>Carve Out Reserves</u>") prior to any and all other claims.   On the first business day after the DIP Administrative Agent gives such notice to such Delayed Draw Term Lenders (as defined in the DIP Credit Agreement), notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for Delayed Draw Term Loans under the DIP Term Facility, any termination of the Delayed Draw Term Loan Commitments following an Event of Default, or the occurrence of the Maturity Date, each Delayed Draw Term Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Administrative Agent such Delayed Draw Term Lender's pro rata share with respect to such borrowing in accordance with the Delayed Draw Term Facility.   All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "<u>Pre-Carve Out Amounts</u>"), until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Administrative Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties (as defined in the DIP Credit Agreement) in accordance with their rights and priorities as of the Petition Date.   All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "<u>Post-Carve Out Amounts</u>"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Administrative Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Agent for the benefit of the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.   Notwithstanding anything to the contrary in the DIP Term Loan Documents, or this [Final/Interim] Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph [●] or otherwise is insufficient to satisfy the Allowed Professional Fees, then, any excess funds in one of the Carve Out Reserves following the payment

of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph [●], prior to making any payments to the DIP Administrative Agent or the Prepetition Secured Parties, as applicable.   Notwithstanding anything to the contrary in the DIP Term Loan Documents or this [Final/Interim] Order, following delivery of a Carve Out Trigger Notice, the DIP Administrative Agent and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Administrative Agent for application in accordance with the DIP Term Loan Documents, or, if applicable, to the Prepetition Agents for the benefit of the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.   Further, notwithstanding anything to the contrary in this [Final/Interim] Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, DIP Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.

(c)     Carve Out Priority. For the avoidance of doubt and notwithstanding anything to the contrary in this [Final/Interim] Order, the DIP Term Facility, or in any Prepetition Credit Agreement, the Carve Out shall be senior to all liens and claims securing the DIP Term Facility, the Adequate Protection Liens, and the Adequate Protection Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Obligations.   Notwithstanding the payment of any amounts contained in the Carve Out Reserves (including any residual amounts contained therein) to the Prepetition Secured Parties as contemplated by this paragraph [●], all parties' rights with respect to any such payments solely to the Prepetition Secured Parties (including whether such amounts constitute Prepetition Collateral) are expressly preserved.

(d)     Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees, or on or following the Termination Declaration Date if on account of Allowed Professional Fees incurred on or prior to the Termination Declaration Date, shall not reduce the Carve Out.

(e)     No Direct Obligation To Pay Allowed Professional Fees.   None of the DIP Agents, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.   Nothing in this [Interim/Final] Order or otherwise shall be construed to obligate the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)     Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.   Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the Collateral and shall be otherwise entitled to the protections granted under this [Final/Interim] Order, the DIP Term Loan Documents, the Bankruptcy Code, and applicable law.

(g)     Notwithstanding anything to the contrary in this [Final/Interim] Order, the Debtors' obligations to the DIP Secured Parties and Prepetition Secured Parties and the liens, security interests, and

superpriority claims granted herein, under the DIP Term Loan Documents, and/or under the Prepetition Credit Agreements, including, without limitation, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Prepetition Liens, the Protection Claims, and the Prepetition Obligations, shall be subject in all respects and subordinate to the Carve Out.

SCHEDULE A
MATERIAL LITIGATION

1.   None.

## Exhibit C

**Initial DIP Budget**

**Wellpath Holdings, Inc. et al.**

Debtor-in-Possession Cash Flow Forecast

| | | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Week Ended 11/10/2024 Sunday | Week Ended 11/17/2024 Sunday | Week Ended 11/24/2024 Sunday | Week Ended 12/1/2024 Sunday | Week Ended 12/8/2024 Sunday | Week Ended 12/15/2024 Sunday | Week Ended 12/22/2024 Sunday | Week Ended 12/29/2024 Sunday | Week Ended 1/5/2025 Sunday | Week Ended 1/12/2025 Sunday | Week Ended 1/19/2025 Sunday | Week Ended 1/26/2025 Sunday | Week Ended 2/2/2025 Sunday | Week Ended 2/9/2025 Sunday |
| | *$ in thousands* | | | | | | | | | | | | | | |
| | *Cash Flow* | | | | | | | | | | | | | | |
| | **Total Cash Receipts** | | $ 4,145 | $ 38,307 | $ 44,583 | $ 22,444 | $ 39,460 | $ 39,536 | $ 37,128 | $ 36,314 | $ 27,430 | $ 27,430 | $ 27,430 | $ 27,365 | $ 27,201 |
| | *Operating Disbursements* | | | | | | | | | | | | | | |
| [A] | Payroll Related | | 17,169 | 25,654 | 17,162 | 25,638 | 17,145 | 25,621 | 16,488 | 24,691 | 12,386 | 21,891 | 9,536 | 21,859 | 10,188 |
| [B] | Other Operating Disbursements | | 27,607 | 8,697 | 9,868 | 8,506 | 18,047 | 11,631 | 11,587 | 10,868 | 10,597 | 16,661 | 9,020 | 7,825 | 6,722 |
| | **Total Operating Disbursements** | | 44,777 | 34,351 | 27,030 | 34,145 | 35,192 | 37,252 | 28,076 | 35,560 | 22,983 | 38,552 | 18,557 | 29,683 | 16,910 |
| [C] | **Operating Cash Flow** | | (40,632) | 3,956 | 17,554 | (11,701) | 4,268 | 2,283 | 9,052 | 754 | 4,447 | (11,122) | 8,873 | (2,319) | 10,291 |
| | *Non-Operating Disbursements* | | | | | | | | | | | | | | |
| | Professional Fees & US Trustee | | - | - | - | - | 5,486 | - | - | - | - | 9,997 | - | - | - |
| [D] | RS Separation Capital | | - | - | - | - | - | - | - | - | 16,728 | - | - | - | - |
| | Other Non-Operating Disbursements | | 5,035 | 8,000 | - | - | - | - | - | - | - | - | - | - | - |
| | **Total Non-Operating Disbursements** | | 5,035 | 8,000 | - | - | 5,486 | - | - | - | 16,728 | 9,997 | - | - | - |
| | **Net Cash Flow** | | $ (45,667) | $ (4,044) | $ 17,554 | $ (11,701) | $ (1,219) | $ 2,283 | $ 9,052 | $ 754 | $ (12,281) | $ (21,120) | $ 8,873 | $ (2,319) | $ 10,291 |
| | *Beginning Debtor Cash* | | $ 46,685 | $ 46,018 | $ 41,975 | $ 59,528 | $ 47,827 | $ 106,609 | $ 108,892 | $ 117,944 | $ 118,699 | $ 106,418 | $ 85,298 | $ 94,172 | $ 91,853 |
| | Net Cash Flow | | (45,667) | (4,044) | 17,554 | (11,701) | (1,219) | 2,283 | 9,052 | 754 | (12,281) | (21,120) | 8,873 | (2,319) | 10,291 |
| | DIP Draws | | 45,000 | - | - | - | 60,000 | - | - | - | - | - | - | - | - |
| | *Ending Debtor Cash* | 46,685 | 46,018 | 41,975 | 59,528 | 47,827 | 106,609 | 108,892 | 117,944 | 118,699 | 106,418 | 85,298 | 94,172 | 91,853 | 102,144 |
| | Less: Estimated Minimum Operating Liquidity | | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) |
| | *Cash After Minimum Operating Liquidity* | | 11,018 | 6,975 | 24,528 | 12,827 | 71,609 | 73,892 | 82,944 | 83,699 | 71,418 | 50,298 | 59,172 | 56,853 | 67,144 |
| | *DIP Ending Available Balance* | 105,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

[A] Payrolls are paid one week in arrears under two separate payroll cycles. In addition, forecast includes a partial payment under a potential KEIP/KERP in January 2025 subject to court approval.

[B] Includes offsite, pharmacy, insurance, cash taxes, capital expenditures, critical vendors, 503(b)(9) claims and other costs.

[C] Excludes RS receipts and disbursements after the sale of RS on December 31, 2024. Includes adjustments for NBH run-off.

[D] Includes cash allocated for accounts payable and operating cash.

**Exhibit D**

**DIP/Adequate Protection Lien Priorities**

|    | Non-Limited Guarantor Debtors | Limited Guarantors |
|----|-------------------------------|--------------------|
| 1. | Carve Out and Permitted Prior Liens | Carve Out and Permitted Prior Liens |
| 2. | DIP Liens (including obligations with respect to both the New Money DIP Terms Loans and the Roll-Up Loans) | DIP Liens (solely with respect to the obligations under the New Money DIP Terms Loans and excluding any obligations with respect to the Roll-Up Loans) |
| 3. | Prepetition First Lien Adequate Protection Liens | Prepetition First Lien Adequate Protection Liens |
| 4. | Prepetition First Lien Liens | Prepetition Second Lien Adequate Protection Liens |
| 5. | Prepetition Second Lien Adequate Protection Liens | |
| 6. | Prepetition Second Lien Liens | |