**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
| | (Joint Administration Requested) |
| Debtors. | **Re: Docket No.** |

**ORDER (I) APPROVING THE BIDDING PROCEDURES FOR THE SALE OF THE
DEBTORS' ASSETS, (II) APPROVING ENTRY INTO A STALKING HORSE
PURCHASE AGREEMENT FOR THE RECOVERY SOLUTIONS ASSETS,
(III) AUTHORIZING THE RECOVERY SOLUTIONS EXPENSE REIMBURSEMENT,
(IV) AUTHORIZING POTENTIAL SELECTION OF STALKING HORSE BIDDERS
FOR THE CORRECTIONS ASSETS AND APPROVING RELATED CORRECTIONS
ASSET(S) BID PROTECTIONS, (V) ESTABLISHING RELATED DATES AND
DEADLINES, (VI) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
(VII) APPROVING THE ASSUMPTION AND ASSIGNMENT PROCEDURES,
AND (VIII) GRANTING RELATED RELIEF**

Upon the emergency motion (the "Motion")[2] of the above-captioned debtors and debtors

in possession (collectively, the "Debtors") for entry of orders (a)(i) approving Bidding Procedures

for the sale of the Debtors' Assets, (ii) authorizing and approving the terms of and the Debtors'

entry into the Recovery Solutions Stalking Horse Agreement, (iii) approving the Recovery

Solutions Expense Reimbursement, (iv) authorizing the potential selection of the Corrections

Asset(s) Stalking Horse Bidder(s), (v) approving the Corrections Asset(s) Bid Protections, (vi)

scheduling Auctions for, and Sale Hearings to approve, the sale of the Assets, (vii) approving the

Noticing Procedures, and (viii) approving the Assumption and Assignment Procedures,

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims
and noticing agent at https://dm.epiq11.com/Wellpath.  The Debtors' service address for these chapter 11 cases
is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the
Bidding Procedures, as applicable.

(b)(i) approving the sale of the Debtors' assets free and clear of liens, claims, interests, and encumbrances and (ii) authorizing the assumption and assignment of certain Contracts, and (c) granting related relief, in each case, as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.); and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157; and the Court having found that it may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of these chapter 11 cases and related proceedings being proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties, such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed and considered the Motion and the Declarations; and the Court having held a hearing to consider the relief requested in the Motion on a final basis (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion, the Tempke Declaration, the Schoenholtz Declaration, and the First Day Declaration and at the Hearing establish just cause for the relief granted herein; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and all objections and reservations of rights filed or asserted in respect of the Motion, if any, having been withdrawn, resolved, or overruled; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding

pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, and to the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      The Debtors' proposed notice of the Motion, the Bidding Procedures, the Hearing, and the proposed entry of the Bidding Procedures Order is (i) appropriate and reasonably calculated to provide all interested parties with timely and proper notice, (ii) in compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Complex Procedures, and (iii) adequate and sufficient under the circumstances of these chapter 11 cases, and no other or further notice is required.  A reasonable opportunity to object or be heard regarding the relief requested in the Motion (including with respect to the Bidding Procedures, the Recovery Solutions Expense Reimbursement, and the Corrections Asset(s) Bid Protections) has been afforded to all interested persons and entities, including the Notice Parties.

C.      The Bidding Procedures in the form attached hereto as **Exhibit 1** are fair, reasonable, and appropriate, are designed to maximize recoveries from a sale of the Assets and permit the Debtors to comply with their obligations under the DIP Credit Agreements and RSA.

D.      The Debtors have demonstrated a compelling and sound business justification for this Court to enter this Bidding Procedures Order and, thereby, (i) approve the Bidding Procedures, (ii) authorize and approve the Recovery Solutions Stalking Horse Agreement, (iii) authorize, but not direct, the Debtors to select a Corrections Asset(s) Stalking Horse Bidder (if any) under the terms and conditions of the Bidding Procedures, (iii) authorize the Recovery Solutions Expense Reimbursement and the Corrections Asset(s) Bid Protections under the terms and conditions set forth in the Bidding Procedures, (iv) set the dates of the Bid Deadlines, Auction(s) (if needed),

Sale Hearings, and other deadlines set forth in the Bidding Procedures, (v) approve the Noticing Procedures and the forms of notice, and (vi) approve the Assumption and Assignment Procedures and the forms of relevant notice.  Such compelling and sound business justification, which was set forth in the Motion, the Tempke Declaration, and the Schoenholtz Declaration and on the record at the Hearing, are incorporated herein by reference and, among other things, forms the basis for the findings of fact and conclusions of law set forth herein.

       E.      The Recovery Solutions Expense Reimbursement and the Corrections Asset(s) Bid Protections, as approved by this Bidding Procedures Order, are fair and reasonable and provide a benefit to the Debtors' estates and stakeholders.

       F.      The payment of the Recovery Solutions Expense Reimbursement and the Corrections Asset(s) Bid Protections, if triggered in accordance with this Bidding Procedures Order and the Bidding Procedures, (i) would constitute actual and necessary costs of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code and (ii) are reasonably tailored to facilitate, rather than hinder, bidding for the Assets by providing a baseline of value, increasing the likelihood of competitive bidding at the Auction, and encouraging the participation of other bidders in the sale process, thereby increasing the likelihood that the Debtors would receive the best possible price for the Assets.  The Recovery Solutions Expense Reimbursement and the Corrections Asset(s) Bid Protections are, accordingly, (i) of substantial benefit to the Debtors' estates, their stakeholders, and all parties in interest, (ii) reasonable and appropriate, (iii) a material inducement for, and condition necessary to, the successful designation of any Stalking Horse Bidder, and (iv) reasonable in relation to the magnitude of effort that would be required of such Stalking Horse Bidder, the magnitude and complexity of the Sale Transaction, and the loss of opportunities such Stalking Horse Bidder would

suffer as a result of the time spent pursuing a Sale Transaction. Without the Recovery Solutions Expense Reimbursement and the Corrections Asset(s) Bid Protections, no Qualified Bidder would agree to become a Stalking Horse Bidder and remain obligated to consummate the Sale Transaction (including the obligation to maintain its committed offer while such offer is subject to higher or better offers, as contemplated by the Bidding Procedures).

G.      The Recovery Solutions Stalking Horse Bidder is a third-party purchaser and is unrelated to any of the Debtors. Neither the Recovery Solutions Stalking Horse Bidder, nor any of its affiliates, subsidiaries, officers, directors, members, partners or principals, or any of their respective representatives, successors or assigns is an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

H.      The process for filing the Corrections Asset(s) Stalking Horse Notice and granting any Corrections Asset(s) Bid Protections is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of (i) the identity of any Corrections Asset(s) Stalking Horse Bidder, (ii) the amount of the Corrections Asset(s) Stalking Horse Bid and what portion of the Corrections Asset(s) Stalking Horse Bid (if any) would be in the form of cash, (iii) identifies the Assets (or Auction Lot) to be purchased and the Contracts to be assumed, (iv) whether the Corrections Asset(s) Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Corrections Asset(s) Stalking Horse Bid, (v) any proposed Corrections Asset(s) Bid Protections, (vi) the Corrections Asset(s) Stalking Horse Agreement, including all exhibits, schedules, and attachments thereto, and (vii) the Corrections Asset(s) Stalking Horse Objection Deadline.

I.      The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Bidding Procedures Order is in the best interests of the Debtors and their estates, creditors, interest holders, and all other parties in interest herein.

J.      The form and manner of notice to be delivered pursuant to the Noticing Procedures and the Assumption and Assignment Procedures (including the Sale Notice attached hereto as **Exhibit 3**, the Potential Assumption and Assignment Notice attached hereto as **Exhibit 4**, and the Proposed Assumption and Assignment Notice attached hereto as **Exhibit 5**) are reasonably calculated to provide each Counterparty to the Potential Assumed Contracts and the Proposed Assumed Contracts with proper notice of (i) the potential assumption and assignment of such Proposed Assumed Contracts by the Successful Bidder(s) (including any Stalking Horse Bidder) or any of their known proposed assignees (if different from the applicable Successful Bidder) and (ii) the requirement that each such Counterparty assert any objection to the proposed Cure Costs by the Cure Objection Deadline or otherwise be barred from asserting claims arising from events occurring prior to the effective date of the assumption and assignment of such Proposed Assumed Contracts or any later applicable effective date following assumption and assignment of such Proposed Assumed Contracts.

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      Any objections to or reservations of rights regarding the Motion or the relief requested therein that have not been adjourned, withdrawn, or resolved are overruled in all respects on the merits.

2.      The Bidding Procedures, in substantially the form attached hereto as **Exhibit 1**, are approved and fully incorporated into this Bidding Procedures Order; the Debtors are authorized, but not directed, to act in accordance therewith.  The failure to specifically include a reference to

any particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision.

3.  Nothing herein shall prejudice the rights of the Debtors to seek, by separate motion, in the exercise of their sound business judgment and fiduciary duties, the authority to sell assets of the Debtors' estates (that do not constitute all or substantially all of the Debtors' assets) pursuant to section 363 of the Bankruptcy Code.

4.  The Recovery Solutions Stalking Horse Bidder is deemed a Qualified Bidder for all purposes, and the Recovery Solutions Stalking Horse Bid, as set forth in the Recovery Solutions Stalking Horse Agreement, is deemed a Qualified Bid. In the event that no other Qualified Bids are submitted for the Recovery Solutions Assets, the Debtors shall deem the Recovery Solutions Stalking Horse Bidder to be the Successful Bidder.

5.  The Debtors are authorized, but not obligated, in an exercise of their business judgment and in consultation with the Consultation Parties, to (a) agree with any Qualified Bidder(s) that such Qualified Bidder(s) shall be the Corrections Asset(s) Stalking Horse Bidder(s) and (b) enter into a definitive agreement with such Corrections Asset(s) Stalking Horse Bidder(s) in accordance with the terms and conditions set forth in the Bidding Procedures.

6.  Bid Deadlines. As further described in the Bidding Procedures, the Recovery Solutions / Consolidated Bid Deadline shall be **December 13, 2024 at 4:00 p.m. (prevailing Central Time)** and the Corrections Asset(s) Bid Deadline shall be **January 20, 2025 at 4:00 p.m. (prevailing Central Time)**.

7.  Auctions. In the event that the Debtors receive, on or before the applicable Bid Deadline, one or more Qualified Bids an Auction shall be conducted at McDermott Will & Emery LLP, 444 West Lake Street, Suite 4000, Chicago, Illinois 60606 on (a) **December 16, 2024**

at 9:00 a.m. (prevailing Central Time) for the Recovery Solutions / Consolidated Sale Transaction, (b) **January 28, 2025 at 9:00 a.m. (prevailing Central Time)** for any Corrections Asset(s) Sale Transaction, or (c) in either case, such later time on such day or such other place as the Debtors shall notify all Participating Parties.  The Debtors are authorized to conduct any Auction in accordance with the Bidding Procedures.

8.      If (a) no more than one Qualified Bid is submitted by the applicable Bid Deadline (whether the Recovery Solutions Stalking Horse Bid, a Corrections Asset(s) Approved Stalking Horse Bid, or otherwise) or (b) multiple Partial Bids are submitted by the applicable Bid Deadline for non-overlapping SF Assets and LG Assets, the Debtors may elect to cancel the applicable Auction and seek approval of the proposed Sale Transaction(s) contemplated in the Recovery Solutions Stalking Horse Bid, such Corrections Asset(s) Approved Stalking Horse Bid, Qualified Bid that is not either a Recovery Solutions Stalking Horse Bid or Corrections Asset(s) Approved Stalking Horse Bid, or Partial Bids, as applicable, at the applicable Sale Hearing.

9.      The form of Sale Notice attached hereto as **Exhibit 3** is hereby approved.

10.      As soon as reasonably practicable after entry of this Bidding Procedures Order, the Debtors shall cause the Sale Notice to be served (by email if available or otherwise by first class mail) upon the following:  (a) U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Lenders; (d) counsel to the Ad Hoc Group; (e) counsel to the Prepetition First Lien Administrative Agent; (f) counsel to the Prepetition Second Lien Administrative Agent; (g) Counterparties to Contracts; (h) all potential buyers previously identified or solicited by the Debtors or their advisors and any additional parties who have previously expressed an interest to the Debtors or their advisors in potentially acquiring the Debtors' assets; (i) all other entities known to have asserted or hold any lien, claim, interest,

or encumbrance in or upon the applicable Assets; the Office of the United States Attorney for the Southern District of Texas;  (j) the state attorneys general for states in which the Debtors conduct business; (k) the Internal Revenue Service; (l) the Securities and Exchange Commission; and (m) any party identified in section E of the *Procedures for Complex Cases in the Southern District of Texas* (collectively, the "Sale Notice Parties"); (collectively, the "Sale Notice Parties"); *provided* that the Debtors need not serve the Sale Notice on any party for whom the Debtors are unable to obtain, after reasonable diligence, an email or physical address as of the entry of the Bidding Procedures Order; provided, further, that the Debtors shall not be obligated to provide supplemental service of the Sale Notice with respect to any Sale Notice that is returned as undeliverable so long as the Debtors have confirmed that any such Sale Notice was sent to the applicable email or physical address on file in the Debtors' books and records and no other email or physical address could be obtained after reasonable diligence.  The Debtors will also cause the Sale Notice to be published once in the national edition of *USA Today* or another publication with similar national circulation as soon as practicable following entry of this Bidding Procedures Order.

11.     Service of a Sale Notice on the Sale Notice Parties in the manner described in this Bidding Procedures Order constitutes good and sufficient notice of any Auction and Sale Hearing. No other or further notice is required.

12.     Promptly after the conclusion of the Auction (if any) and the selection of the Successful Bid(s) and Alternate Bid(s), the Debtors shall file with the Court and post on the Case Information Website a notice identifying such Successful Bid(s) and Alternate Bid(s).

13.     Sale Objections.  Objections to the relief sought through any Sale Order must (a) be in writing, (b) comply with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local

Rules, and the Complex Procedures, (c) state, with specificity, the legal and factual bases thereof, (d) be filed with the Court no later than (i) **December 18, 2024 at 4:00 p.m. (prevailing Central Time)** for the Recovery Solutions / Consolidated Sale Transaction or (ii) **January 31, 2025 at 4:00 p.m. (prevailing Central Time)** for the Corrections Asset(s) Sale Transaction and (e) be served on (a) proposed counsel to the Debtors, McDermott Will & Emery, LLP, 444 West Lake Street, Suite 4000 Chicago, Illinois 60606-0029, Attn: Felicia Gerber Perlman, Bradley Thomas Giordano, Jake Jumbeck, Carole Wurzelbacher, and Carmen Dingman, and One Vanderbilt Avenue New York, New York 10017, Attn: Steven Z. Szanzer, (b) counsel to the DIP Lenders and the Ad Hoc Group, Akin Gump Strauss Hauer & Feld, LLP, 2001 K Street N.W. Washington, DC 20006, Attn.: Scott L. Alberino and Kate Doorley, (c) counsel to the Prepetition First Lien Administrative Agent and Prepetition Second Lien Administrative Agent, Cahill Gordon & Reindel LLP, 32 Old Slip, New York, NY 10005, Attn: Joel H. Levitin (jlevitin@cahill.com) and Jordan A. Wishnew (jwishnew@cahill.com) and Norton Rose Fulbright US LLP, 1550 Lamar Street, Suite 2000, Houston, TX 77010, Attn: Bob Bruner (bob.bruner@nortonrosefulbright.com) (d) counsel to the Committee, and (e) the U.S. Trustee, 515 Rusk Street, Suite 3516, Houston, Texas 77002, Attn: Susan Hersch and Ha Nguyen (collectively, the "Objection Notice Parties").

14.     Sale Hearing.  The Sale Hearing shall be held in the United States Bankruptcy Court for the Southern District of Texas, Houston, Texas 77002, on (a) **December 23, 2024 at 10:00 a.m. (prevailing Central Time)**[3] for the Recovery Solutions / Consolidated Sale Transaction (b) **February 4, 2025 at 9:00 a.m. (prevailing Central Time)**[4] for the Corrections Asset(s) Sale Transaction, or (c) in either case, such other date and time that the Court may later direct; *provided*

---

[3] This date remains subject to Court approval.

[4] This date remains subject to Court approval.

that either Sale Hearing may be adjourned by the Debtors (in consultation with the Consultation Parties) by announcement of the adjournment in open court or on the Court's docket.

15.     As soon as reasonably practicable after the completion of the applicable Auction (if any), the Debtors shall file a final form of order approving the Sale Transaction(s) as agreed upon between the Debtors and the Successful Bidder(s).

16.     Recovery Solutions Expense Reimbursement.   In the event that the Recovery Solutions Stalking Horse Agreement is terminated, pursuant to the provisions thereof (other than for breach thereof by the Recovery Solutions Stalking Horse Bidder), or in the event that the purchase of the Recovery Solutions Assets is ultimately consummated by any person other than the Recovery Solutions Stalking Horse Bidder, the Debtors will reimburse the Recovery Solutions Stalking Horse Bidder (at the time required under the Recovery Solutions Stalking Horse Agreement) for its reasonable and documented out-of-pocket expenses in conjunction with the Recovery Solutions Stalking Horse Bid up to a maximum amount of $2,000,000; *provided* that the payment of Recovery Solutions Expense Reimbursement shall be subject to the terms and conditions of the Recovery Solutions Stalking Horse Agreement and this Order.

17.     Bid Protections.   In accordance with the Bidding Procedures, the Debtors may designate a Qualified Bid as the Corrections Asset(s) Stalking Horse Bid and, in accordance therewith, offer to pay the Bid Protections to one or more Corrections Asset(s) Stalking Horse Bidders (if any), subject to the terms of the Bidding Procedures and this Bidding Procedures Order.

18.     In the event that the Debtors designate a Corrections Asset(s) Stalking Horse Bidder and enter into a Corrections Asset(s) Stalking Horse Agreement, the Debtors may file a notice (the "Corrections Asset(s) Stalking Horse Notice") with the Court that (a) sets forth the identity of the Corrections Asset(s) Stalking Horse Bidder, (b) sets forth the amount of the Corrections

11

Asset(s) Stalking Horse Bid and what portion of the Corrections Asset(s) Stalking Horse Bid (if any) would be in the form of cash, (c) identifies the Corrections Assets (or Auction Lot thereof) to be purchased and the contracts and leases to be assumed, (d) states whether the Corrections Asset(s) Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Corrections Asset(s) Stalking Horse Bid, (e) specifies any proposed Corrections Asset(s) Bid Protections, and (f) attaches a copy of the Corrections Asset(s) Stalking Horse Agreement (or chapter 11 plan of reorganization), including all exhibits, schedules, and attachments thereto and serve such Corrections Asset(s) Stalking Horse Notice on the U.S. Trustee, counsel to each of the Consultation Parties, and those parties who have filed the appropriate notice pursuant to Bankruptcy Rule 2002 requesting notice of all pleadings filed in these chapter 11 cases (the "Corrections Asset(s) Stalking Horse Notice Parties"), with no further notice being required.

19.     The Corrections Asset(s) Stalking Horse Notice shall also specify the deadline to file objections (the "Corrections Asset(s) Stalking Horse Objections") to the designation of the Corrections Asset(s) Stalking Horse Bidder, the terms of the Corrections Asset(s) Stalking Horse Bid, or the Corrections Asset(s) Bid Protections set forth therein, which deadline (the "Corrections Asset(s) Stalking Horse Objection Deadline") shall be no earlier than three business days after service of the Corrections Asset(s) Stalking Horse Notice on the Corrections Asset(s) Stalking Horse Notice Parties.  The Corrections Asset(s) Stalking Horse Objections must (a) be in writing, (b) comply with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Complex Procedures, (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Court and served on the Debtors and the Corrections Asset(s) Stalking Horse Notice Parties by the Corrections Asset(s) Stalking Horse Objection Deadline.

20.     If a timely Corrections Asset(s) Stalking Horse Objection is filed and served, to the extent not resolved consensually, the Debtors may schedule a hearing before the Court to be held on an expedited basis (on not less than three-days' notice) seeking authorization to enter into the Corrections Asset(s) Stalking Horse Agreement (including the Corrections Asset(s)  Bid Protections contained therein) (a "Corrections Asset(s) Stalking Horse Hearing").  If no timely Corrections Asset(s) Stalking Horse Objection is filed and served, upon the expiration of the Corrections Asset(s) Stalking Horse Objection Deadline, the Debtors shall file with the Court a certificate of no objection and, upon such filing, (a) the Debtors' designation of the Corrections Asset(s) Stalking Horse Bidder and agreement respecting the Corrections Asset(s) Bid Protections shall be deemed approved and (b) the Debtors may enter into the Corrections Asset(s) Stalking Horse Agreement (including a chapter 11 plan of reorganization), in each case without further notice or opportunity to be heard, in each case without further notice or opportunity to be heard. Upon the approval by the Court at a Corrections Asset(s) Stalking Horse Hearing for the Debtors to enter into the Corrections Asset(s) Stalking Horse Agreement (including the Corrections Asset(s) Bid Protections contained therein), or upon the Debtors' filing a CNO, the Corrections Asset(s) Stalking Horse Bidder shall be the "Corrections Asset(s) Approved Stalking Horse Bidder," its Corrections Asset(s) Stalking Horse Bid shall be the "Corrections Asset(s) Approved Stalking Horse Bid," and the Corrections Asset(s) Bid Protections contained therein (if any) shall be the "Corrections Asset(s) Approved Bid Protections."

21.     Assumption and Assignment Procedures.   The assumption and assignment procedures set forth in the Motion (the "Assumption and Assignment Procedures") are hereby approved.

22.     As soon as reasonably practicable following entry of this Bidding Procedures Order, the Debtors shall file with the Court, and cause to be published on the Case Information Website, the Potential Assumption and Assignment Notice and a list of the Potential Assumed Contracts (the "Potential Assumed Contracts Schedule") that specifies (a) each of the Contracts that potentially could be assumed and assigned in connection with the sale of the Assets, including the name of each Counterparty, and (b) the proposed Cure Cost with respect to each Potential Assumed Contract.

23.     Potential Assumption and Assignment Notice.  The Debtors shall, as soon as reasonably practicable after entry of this Bidding Procedures Order (but in any event, so as to provide sufficient notice such that any required responses from any Counterparties are due prior to the scheduled date of the Auction as specified in the Bidding Procedures), file, cause to be published on the Case Information Website, and serve on each relevant Counterparty the Potential Assumption and Assignment Notice, which shall (a) include the Potential Assumed Contracts Schedule, (b) list the Debtors' good faith calculation of the Cure Costs with respect to the Potential Assumed Contracts identified on the Potential Assumed Contracts Schedule, (c) expressly state that assumption or assignment of an Assumed Contract is not guaranteed and is subject to Court approval, (d) prominently display the deadline to file an Assumption and Assignment Objection (as defined herein), and (e) prominently display the date, time, and location of the Sale Hearing.

24.     Proposed Assumption and Assignment Notice.  The Debtors shall, in conjunction with the filing of the Post-Auction Notice, file, cause to be published on the Case Information Website, and serve on each relevant Counterparty the Proposed Assumption and Assignment Notice, which shall (a) include a schedule of the Proposed Assumed Contracts (the "Proposed Assumed Contracts Schedule") as agreed between the Debtors and the Successful Bidder,

(b) expressly state that assumption or assignment of an Assumed Contract is not guaranteed and is subject to Court approval, (c) prominently display the deadline to file an Assumption and Assignment Objection, and (d) prominently display the date, time, and location of the Sale Hearing.

25.     <u>Objection Deadlines</u>.  Any Counterparty may object to the potential or proposed assumption or assignment of its Assumed Contract, the Debtors' proposed Cure Costs, if any, or the ability of a Successful Bidder to provide adequate assurance of future performance (an "<u>Assumption and Assignment Objection</u>").  All Assumption and Assignment Objections must (a) be in writing, (b) comply with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Complex Procedures, (c) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs the Counterparty believes are required to cure any alleged defaults under the relevant Assumed Contract, (d) (1) for objections relating to proposed Cure Costs, be filed with the Court no later than (x) **December 11, 2024 at 4:00 p.m. (prevailing Central Time)** (the "<u>Cure Objection Deadline</u>") and (2) for all other objections, (x) **December 18, 2024 at 4:00 p.m. (prevailing Central Time)** for the Recovery Solutions / Consolidated Sale Transaction, and (y) **January 31, 2025 at 4:00 p.m. (prevailing Central Time)** for the Corrections Asset(s) Sale Transaction, (each an "<u>Assumption and Assignment Objection Deadline</u>"), and (e) be served on the Objection Notice Parties.

26.     <u>Resolution of Assumption and Assignment Objections</u>.  If a Counterparty files a timely Assumption and Assignment Objection, such objection shall be heard at the Sale Hearing or such later date that the Debtors determine, in their discretion and in consultation with the Successful Bidder and the Consultation Parties (subject to the Court's calendar).  If such objection has not been resolved prior to the closing of the Sale Transaction (whether by an order of the Court

or by agreement with the Counterparty), each Successful Bidder may elect, in its sole and absolute discretion, one of the following options: (a) treat such Counterparty's contract or lease as property excluded from the Assets (an "Excluded Contract") or (b) temporarily treat the Proposed Assumed Contract as an Excluded Contract, as applicable (a "Designated Agreement"), proceed to the closing of the Sale Transaction with respect to all other Assets, and determine whether to treat the Designated Agreement as an Assumed Contract, as applicable, or an Excluded Contract, as applicable, within 10 business days after resolution of such objection (whether by order of the Court or by agreement of the applicable Successful Bidder, the Counterparty, and the Debtors).

27.     Failure to File Timely Assumption and Assignment Objection.  If a Counterparty fails to timely and properly file with the Court and serve on the Objection Notice Parties a timely Assumption and Assignment Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the assumption or assignment of its Assumed Contract. Notwithstanding anything to the contrary in the Assumed Contract, or any other document, the Cure Costs set forth in the Potential Assumed Contracts Schedule or the Supplemental Assumed Contracts Schedule (as defined below) shall be controlling and shall be the only amount necessary to cure any alleged outstanding defaults under the applicable Assumed Contract under section 365(b) of the Bankruptcy Code arising out of or related to any events occurring prior to the closing of the Sale Transaction or other applicable date upon which such assumption and assignment shall become effective, whether known or unknown, due or to become due, accrued, absolute, contingent, or otherwise, and the Counterparty shall be forever barred from asserting any additional cure or other amounts with respect to such Assumed Contract against the Debtors, the Successful Bidder, or the property of any of them.

28.     <u>Modification of Potential Assumed Contracts Schedule or Proposed Assumed Contracts Schedule</u>.  In addition to a Successful Bidder's rights described above with respect to an Assumption and Assignment Objection, at or prior to the closing of the Sale Transaction, each Successful Bidder may elect, in its sole and absolute discretion, to (a) exclude any Contract on the Potential Assumed Contracts Schedule as an Assumed Contract, as applicable (in which case it shall become an Excluded Contract, as applicable), or (b) include on the Proposed Assumed Contracts Schedule any Contract listed on the Potential Assumed Contracts Schedule, by providing to the Debtors written notice of its election to exclude or include such contract or lease, as applicable.

29.     If the Debtors or any Successful Bidder identifies during the pendency of these chapter 11 cases (before or after the closing of the applicable Sale Transaction) any contract or lease that is not listed on the Proposed Assumed Contracts Schedule, and such Contract has not been rejected by the Debtors, such Successful Bidder may, in its sole and absolute discretion, elect by written notice to the Debtors to treat such Contract as an Assumed Contract, as applicable, and the Debtors shall seek to assume and assign such Assumed Contract in accordance with the Assumption and Assignment Procedures.

30.     Following the conclusion of an Auction, if any, and the selection of the Successful Bidder(s), the Debtors reserve the right, at any time before the closing of the Sale Transaction(s), to modify the previously-stated Cure Costs associated with any Proposed Assumed Contract, subject to notice requirements in the Assumption and Assignment Procedures.

31.     In the event that any contract or lease is added to the Potential Assumed Contracts Schedule or Proposed Assumed Contracts Schedule or previously-stated Cure Costs are modified, in accordance with the Assumption and Assignment Procedures, the Debtors will promptly file,

cause to be published on the Case Information Website, and serve a supplemental assumption and assignment notice, by email or ECF where available, or otherwise by first class mail, on the applicable Counterparty (each a "Supplemental Assumption and Assignment Notice"). Each Supplemental Assumption and Assignment Notice shall (a) include a schedule of the modified Potential Assumed Contracts Schedule or Proposed Assumed Contracts Schedule (the "Supplemental Assumed Contracts Schedule"), (b) expressly state that assumption or assignment of an Assumed Contract is not guaranteed and is subject to Court approval, (c) prominently display the deadline to file a Supplemental Assumption and Assignment Objection (as defined herein), and (d) prominently display the date, time, and location of the Sale Hearing.

32.     Any Counterparty listed on a Supplemental Assumed Contracts Schedule whose Contract is proposed to be assumed and assigned may object to the proposed assumption or assignment of its Assumed Contract, the Debtors' proposed Cure Costs (to the extent modified from the previously-stated amount), or the ability of a Successful Bidder to provide adequate assurance of future performance (a "Supplemental Assumption and Assignment Objection"). All Supplemental Assumption and Assignment Objections must (a) be in writing, (b) comply with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Complex Procedures, (c) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs the Counterparty believes are required to cure any alleged defaults under the relevant Assumed Contract, (d) no later than **14 days from the date of service of such Supplemental Assumption and Assignment Notice**, (i) be filed with the Court and (ii) be served on the Objection Notice Parties. Each Supplemental Assumption and Assignment Objection, if any, shall be resolved in the same manner as an Assumption and Assignment Objection.

33.    <u>Wind-Down Budget</u>.  Notwithstanding anything contained herein or in the Bidding Procedures, any Bid (including a credit bid) of any Corrections Asset(s) Sale Transaction(s) or a Consolidated Asset Sale shall be subject to (a) the Debtors having sufficient cash at the consummation of any such sale, as determined in consultation with the Consultation Parties, to satisfy the reasonable wind-down budget negotiated in good faith (the "<u>Wind-Down Budget</u>") to pay all allowed (i) post-petition claims, (ii) administrative expense claims and priority claims, and (iii) professional fees and expenses necessary to wind-down the Debtors' estates in a reasonable and appropriate timeline and in consultation with the Consultation Parties, and (b) the requirement that the net proceeds of any Corrections Asset(s) Sale Transaction(s) or a Consolidated Asset Sale, pursuant to the Bidding Procedures, shall first satisfy the Wind-Down Budget before repayment from such proceeds of any other claims against the Debtors.  At the closing of each Corrections Asset(s) Sale Transaction(s) or a Consolidated Asset Sale, the Debtors shall deposit the sale proceeds from such Corrections Asset(s) Sale Transaction or such Consolidated Asset Sale into a segregated account held by the Debtors pending the ultimate resolution (either by agreement or Court determination) and funding of the appropriate amount on account of the Wind-Down Budget; *provided, however*, that the Debtors shall be authorized to use a portion of such sale proceeds to pay all allowed (x) post-petition claims, (y) administrative expense claims and priority claims, and (z) professional fees and expenses necessary to administer the Debtors' estates accrued through the closing of these chapter 11 cases in an amount determined by the Debtors, or as otherwise determined by the Court.  The Debtors shall not distribute any proceeds of any Corrections Asset(s) Sale Transaction or a Consolidated Asset Sale prior to the funding of the Wind-Down Budget.

34.     <u>Reservation of Rights</u>.  The inclusion of an Assumed Contractor, in each case, Cure Costs with respect thereto on a Potential Assumption and Assignment Notice, Proposed Assumption and Assignment Notice, Potential Assumed Contracts Schedule, Proposed Assumed Contracts Schedule, Supplemental Assumption and Assignment Notice, or Supplemental Assumed Contracts Schedule shall not constitute, nor be deemed, a determination or admission by the Debtors, the Successful Bidder(s), or any other party in interest that such Contract is an executory contract or unexpired lease within the meaning of the Bankruptcy Code.  The Debtors reserve all of their rights, claims, and causes of action with respect to each Assumed Contract listed on a Potential Assumption and Assignment Notice, Proposed Assumption and Assignment Notice, Supplemental Assumption and Assignment Notice, Potential Assumed Contracts Schedule, Proposed Assumed Contracts Schedule, or Supplemental Assumed Contracts Schedule.  The Debtors' inclusion of any Assumed Contract on a Potential Assumption and Assignment Notice, Proposed Assumption and Assignment Notice, Supplemental Assumption and Assignment Notice, Potential Assumed Contracts Schedule, Proposed Assumed Contracts Schedule, and/or Supplemental Assumed Contracts Schedule shall not be a guarantee that such Assumed Contract ultimately will be assumed or assumed and assigned.

35.     Notwithstanding anything to the contrary in this Bidding Procedures Order, in the event of any conflict or inconsistency between the terms of this Bidding Procedures Order and the terms of any order of the Court approving the post-petition secured debtor-in-possession financing facility and the use of cash collateral (any such order, a "<u>Financing Order</u>"), including any documentation with respect to such financing and any budget or cash flow forecasts in connection therewith, the terms of the applicable Financing Order (including any documentation with respect to such financing and any budget or cash flow forecasts in connection therewith) shall govern.

Nothing herein is intended to modify, alter, or waive, in any way, any terms, provisions, requirements, or restrictions of any Financing Order.

36.    To the extent any provisions of this Bidding Procedures Order shall be inconsistent with the Motion, the terms of this Bidding Procedures Order shall control.

37.    This Bidding Procedures Order shall be binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

38.    All time periods set forth in this Bidding Procedures Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

39.    Any Bankruptcy Rule or Bankruptcy Local Rule that might otherwise delay the effectiveness of this Bidding Procedures Order is hereby waived, and the terms and conditions of this Bidding Procedures Order shall be effective and enforceable immediately upon its entry.

40.    The Debtors are authorized to take any action necessary or appropriate to implement and effectuate the terms of, and the relief granted in, this Bidding Procedures Order without seeking further order of the Court.

41.    The Court retains exclusive jurisdiction over any matter arising from or related to the implementation, interpretation, and enforcement of this Bidding Procedures Order.

Signed: November 18, 2024

Alfredo R Pérez
United States Bankruptcy Judge

## **Exhibit 1**

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
|  | (Joint Administration Requested) |
| Debtors. |  |

## BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS

On November 11, 2024 (the "Petition Date"), Wellpath Holdings, Inc. and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court").

On November 11, 2024, the Debtors entered into that certain restructuring support agreement (the "RSA") with the Consenting First Lien Lenders and Consenting Second Lien Lenders.

To facilitate the Debtors' ability to attain the highest or otherwise best offer for their assets, including the Recovery Solutions Assets (as defined below), and to maximize the value of their estates, on November [●], 2024, the Court entered the *Order (I) Approving the Debtors' Entry Into a Stalking Horse Purchase Agreement and the Bidding Procedures, (II) Establishing Certain Related Dates and Deadlines, (III) Approving the Form and Manner of Notice Thereof, and (IV) Granting Related Relief* (the "Bidding Procedures Order"), by which the Court approved the bidding procedures set forth herein (these "Bidding Procedures").[2]

These Bidding Procedures set forth the process by which the Debtors are authorized to conduct a marketing and auction process for the sale (the "Sale") of some or all of the Debtors' assets (the "Assets") through one or more transactions (a "Sale Transaction"), which transaction(s) may be effectuated through either a chapter 11 plan of reorganization or a sale pursuant to section 363 of the Bankruptcy Code and which transactions may contemplate the sale of one or more of the following:

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Wellpath.  The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

[2]    Unless otherwise specified herein, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the RSA or Bidding Procedures Order, as applicable.

- any and all assets associated with the Debtors' business and operations in its behavioral health division, Recovery Solutions (the "Recovery Solutions Assets"); and

- any and all remaining assets, if applicable, following consummation of the Recovery Solutions / Consolidated Sale Transaction (as defined below), including those relating to its Corrections business (the "Corrections Assets").

These Bidding Procedures describe, among other things, (i) the Assets offered for sale, (ii) the manner in which bidders and bids become Qualified Bidders and Qualified Bids (each as defined below), respectively, both as to bids for the Recovery Solution Assets and the Corrections Assets and Chapter 11 Plan Bids (each as defined below), (iii) the conduct of the Auctions (as defined below), if necessary, (iv) the selection of the Successful Bidder(s) (as defined below), (v) the process for designating a Corrections Asset(s) Stalking Horse Bidder (the "Corrections Asset(s) Stalking Horse Bidder") and offering the Corrections Asset(s) Bid Protections (as defined below), and (vi) the approval by the Court of the sale of the Assets to the Successful Bidder(s).

For the avoidance of doubt, the Debtors, in the exercise of their reasonable business judgment and after consultation with the Consultation Parties, may elect to exclude any Assets from these Bidding Procedures and sell such Assets at either a private or public sale, subject to Court approval of any alternative sale method. Furthermore, the Debtors may determine, after consultation with the Consultation Parties, whether to proceed with a Sale of any Asset in accordance with these Bidding Procedures.

## I.   KEY DATES AND DEADLINES[3]

The key dates for the Recovery Solutions / Consolidated Sale Transaction:

| Date and Time (all times in Central Time) | Event or Deadline |
| --- | --- |
| November 27, 2024 | Target date for the Debtors to file a schedule listing all potential Assumed Contracts |
| December 11, 2024 at 4:00 p.m. | Cure Objection Deadline |
| December 13, 2024 at 4:00 p.m. | Recovery Solutions / Consolidated Bid Deadline |
| December 16, 2024 at 9:00 a.m. | Recovery Solutions / Consolidated Auction (if required) |
| December 18, 2024 at 4:00 p.m. | Deadline for objections to the approval of the Recovery Solutions / Consolidated Sale Transaction(s) contemplated by any designated Successful Bid(s) (or Alternate Bid(s), as applicable) |
| December 23, 2024, subject to Court availability | Sale Hearing as to the Recovery Solutions / Consolidated Sale Transaction(s) contemplated by |

---

[3]   Capitalized terms used but not otherwise defined in this Section I shall have the meaning ascribed to them below.

| Date and Time (all times in Central Time) | Event or Deadline |
|---|---|
| | any designated Successful Bid(s) (or Alternate Bid(s), as applicable) |

In the event that the Recovery Solutions / Consolidated Sale Transaction is not a Consolidated Asset Sale, the key dates for any Corrections Asset(s) Sale Transaction:

| Date and Time (all times in Central Time) | Event or Deadline |
|---|---|
| November 27, 2024 | Target date for the Debtors to file a schedule listing all potential Assumed Contracts |
| December 11, 2024 at 4:00 p.m. | Cure Objection Deadline |
| January 20, 2025 at 4:00 p.m. | Corrections Asset(s) Bid Deadline |
| January 28, 2025 at 9:00 a.m. | Corrections Assets Auction (if required) |
| January 31, 2025 at 4:00 p.m. | Deadline for objections to the approval of any Corrections Asset(s) Sale Transaction(s) contemplated by any designated Successful Bid(s) (or Alternate Bid(s), as applicable) |
| February 4, 2025, subject to Court availability | Sale Hearing as to the Corrections Asset(s) Sale Transaction(s) contemplated by any designated Successful Bid(s) (or Alternate Bid(s), as applicable) |

## II.   SUBMISSIONS TO THE DEBTORS; CONSULTATION PARTIES

All submissions to the Debtors required or permitted under these Bidding Procedures must be directed to each of the following persons or entities unless otherwise provided (collectively, the "Notice Parties"):

**A.**   Debtors:  Wellpath Holdings, Inc., 3340 Perimeter Hill Drive, Nashville, Tennessee 37211, Attn.: Ben Slocum, Chief Executive Office.

**B.**   Debtors' Proposed Counsel:  McDermott Will & Emery LLP, 2501 N. Harwood Street, Suite 1900, Attn.: Marcus A. Helt (mhelt@mwe.com), and McDermott Will & Emery LLP, 444 West Lake Street, Suite 4000, Chicago, Illinois 60606, Attn.: Felicia Gerber Perlman (fperlman@mwe.com), Bradley Thomas Giordano (bgiordano@mwe.com), Jake Jumbeck (jjumbeck@mwe.com), Carole Wurzelbacher (cwurzelbacher@mwe.com), and Carmen Dingman (cdingman@mwe.com), and McDermott Will & Emery LLP, One Vanderbilt Avenue, New York, New York 10017, Attn: Steven Z. Szanzer (sszanzer@mwe.com).

3

C.     <u>Debtors' Proposed Investment Bankers</u>:   (a) Lazard Frères & Co. LLC, 30 Rockefeller Plaza, New York, New York 10112, Attn.: Christian Tempke (christian.tempke@lazard.com), Daniel Klodor (daniel.klodor@lazard.com) and Jennifer Wild (jenn.wild@lazard.com); and (b) MTS Health Partners, L.P., 623 Fifth Avenue, 14th Floor, New York, New York 10022, Attn: Jason Schoenholtz (schoenholtz@mtspartners.com).

D.     <u>Debtors' Proposed Financial Advisor</u>:  FTI Consulting, Inc., 201 South College Street, Charlotte, North Carolina 28202, Attn: Timothy J. Dragelin (timothy.dragelin@FTIConsulting.com).

Throughout the Bidding Process, the Debtors in their reasonable business judgment, with the assistance of their advisors, will regularly and timely consult with the following parties (in such capacity, collectively, the "<u>Consultation Parties</u>"): (a) the DIP Lenders; (b) the Prepetition First Lien Collateral Agent (acting at the direction of the First Lien Consenting Lenders), (c) the Prepetition Second Lien Collateral Agent (acting at the direction of the Second Lien Consenting Lenders), and (d) counsel to any statutory committee appointed in the Chapter 11 Cases (the "<u>Committee</u>"); *provided* that, to the extent that any party in clause (a), (b), or (c) is a Potential Bidder or a Stalking Horse Bidder (each, as defined below) in connection with any Sale Transaction (including the Stalking Horse Bids), such party shall not be a Consultation Party to the extent that doing so would violate the Procedures for Complex Cases in the Southern District of Texas (the "<u>Complex Procedures</u>") or, in the Debtors' sole discretion and business judgment, would not be in the best interests of the Debtors' estates, and such Consultation Party shall only receive the same diligence, information, and notice as all other Potential Bidders, unless and until such Consultation Party unequivocally revokes its Bid (as defined below) and waives its right to continue in the Auction process; *provided*, *further* that any materials related to any Sale Transaction shall be provided to the Consultation Parties on a professional eyes only basis, absent of written consent of the Debtors which shall not be unreasonably withheld or delayed.

## III.    POTENTIAL BIDDERS & ACCEPTABLE BIDDERS

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale Transaction (a "<u>Potential Bidder</u>") must deliver or have previously delivered to the Debtors and each of their advisors the following documents and information (unless the Debtors, in their reasonable business judgment after consultation with the Consultation Parties, choose to waive any of the requirements set forth in this Section III for any Potential Bidder):

A.     a statement and other factual support demonstrating, to the Debtors' satisfaction, that the Potential Bidder has a *bona fide* interest in purchasing any or all of the Assets and is likely to be able to submit a Qualified Bid by the Bid Deadline;

B.     a description of the nature and extent of any due diligence the Potential Bidder wishes to conduct and the date in advance of the applicable Bid Deadline by which such due diligence will be completed;

C.      a description of any connections that the Potential Bidder, its affiliates, and related persons have to the Debtors, any current or former directors and officers of the Debtors, their non-Debtor affiliates, and their primary creditors as identified by the Debtors;

D.      an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement");

E.      identification of the Potential Bidder and any principals and representatives thereof who are authorized to appear and act on such Potential Bidder's behalf for all purposes regarding the contemplated proposed Sale Transaction(s);

F.      sufficient information, as determined by the Debtors in their reasonable business judgment, that the Potential Bidder has the  financial capacity and any required internal corporate, legal, or other authorizations to close a proposed Sale Transaction, which shall include current audited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, of the party that will bear liability for a breach), the adequacy of which must be reasonably acceptable to the Debtors (after consultation with the Consultation Parties);

G.      a statement that Potential Bidder is not partnering or otherwise working with any other interested party in connection with the potential submission of a joint Bid or post-closing arrangements; and

H.      an optional non-binding written indication of interest specifying, among other things, with respect to any proposed Sale Transaction, the identity of the Assets to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a Bid by such Potential Bidder.

The Debtors, in consultation with their advisors, will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate documents and information so that such Potential Bidder may proceed to conduct due diligence and submit a Bid (such Potential Bidder, an "Acceptable Bidder").

## IV.    DUE DILIGENCE

The Debtors, with their advisors, shall establish an electronic data room or rooms (the "Data Room") that provides standard and customary diligence materials, including the necessary information to allow Acceptable Bidders to submit a Bid and to seek and obtain financing commitments.

Only Acceptable Bidders shall be eligible to receive due diligence information and access to the Data Room and to additional non-public information regarding the Debtors.  The Debtors will provide to each Acceptable Bidder reasonable due diligence information, as requested by such Acceptable Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post all written due diligence provided to any Acceptable Bidder to the Data Room.  The Debtors will promptly provide written due diligence materials that have been made available to

any other Acceptable Bidder to a Stalking Horse Bidder on the same basis provided to the Acceptable Bidder, to the extent such information has not previously been provided to or is not simultaneously provided to the Stalking Horse Bidder.  The due diligence period will end on the applicable Bid Deadline, and subsequent to the applicable Bid Deadline the Debtors may, in their reasonable business judgment after consultation with the Consultation Parties, but shall have no obligation to, furnish any additional due diligence information to any person in connection with the Sale Transaction(s).

The Debtors and their advisors shall coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access; *provided* that the Debtors may decline to provide such information to Acceptable Bidders who, at such time and in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, have not established, or who have raised doubt, that such Acceptable Bidder intends in good faith, or has the capacity , to consummate the applicable proposed Sale Transaction.

The Debtors also reserve the right to withhold or redact any diligence materials that the Debtors determine, in consultation with the Consultation Parties, are sensitive or otherwise not appropriate for disclosure to an Acceptable Bidder who is a competitor of the Debtors or is affiliated with any competitor of the Debtors (including any equity sponsor or strategic investor that holds an ownership stake in such competitor) (a "Competitor"). The Debtors shall require that any Acceptable Bidder that is a Competitor enter into a "clean team" or similar arrangement acceptable to the Debtors, in consultation with the Consultation Parties, which arrangement shall prohibit any such information from being accessed by any personnel or other representatives of the Competitor who make competitive decisions for such Competitor or that would permit such information from being used for any other purpose other than in connection with the making of a Bid. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be an Acceptable Bidder.

**All due diligence requests directed to the Debtors must be directed to: project.starburst.2024@lazard.com and raikin@mtspartners.com.**

**Each Acceptable Bidder and Qualified Bidder (as defined below) shall comply with all reasonable requests with respect to information and due diligence access by the Debtors or their advisors regarding such Acceptable Bidder or Qualified Bidder, as applicable, and its contemplated proposed Sale Transaction.**

## V.    BID REQUIREMENTS.

Any proposal, solicitation, or offer to consummate a Sale Transaction (each, a "Bid") must be submitted in writing on or before the applicable Bid Deadline and satisfy the following requirements (collectively, the "Bid Requirements"):

A.    **Proposed Sale Transaction.**  Each Bid must propose a Sale Transaction as to the Recovery Solutions Assets or the Corrections Assets (each, an "Asset Package"), or both for a Consolidated Asset Sale, in the form of an asset purchase agreement or a chapter 11 plan of reorganization.  Each Bid must specify which of such Assets (including equity interests of some or all of the Debtors (if applicable)) are to be

included in or excluded from the proposed Sale Transaction, and which liabilities the Potential Bidder agrees to assume, including any indebtedness to be assumed, if any (the "<u>Assumed Liabilities</u>"); *provided*, *however*, that (1) any Bid for the Recovery Solutions Assets must be for all or substantially all of the Recovery Solutions Assets and (2) any Bid for the Corrections Assets must be a Bid for (a) all or substantially all of the Corrections Assets, (b) those assets associated with the business and operations associated with the Debtors' state and federal division (the "<u>SF Assets</u>"), or (c) those assets associated with the business and operations of the Debtors' local government division (the "<u>LG Assets</u>").  A Bid that includes the Recovery Solutions Assets, or sale of all or substantially all of the Assets, shall constitute a "<u>Recovery Solutions / Consolidated Bid</u>" and a Sale Transaction that includes the Recovery Solutions Assets, or sale of all or substantially all of the Assets, shall constitute a "<u>Recovery Solutions / Consolidated Sale Transaction</u>."  In the event the Recovery Solutions / Consolidated Sale Transaction is not a Consolidated Asset Sale, a Bid that includes all or substantially all of the Corrections Assets, or sale of either the SF Assets or LG Assets, shall constitute a "<u>Corrections Asset(s) Bid</u>" and a Sale Transaction that includes all or substantially all of the Corrections Assets, or sale of either the SF Assets or LG Assets, shall constitute a "<u>Corrections Asset(s) Sale Transaction</u>."  A Chapter 11 Plan Bid must specify structure, the confirmability and feasibility of any proposed chapter 11 plan (including the proposed time and costs estimated to be necessary to negotiate, document, and obtain confirmation of such proposed chapter 11 plan).

B.     **<u>Purchase Price</u>.**  A Bid must clearly specify a cash purchase price, Assumed Liabilities, and identify separately any other non-cash components (the "<u>Purchase Price</u>").  Other than a Chapter 11 Plan Bid, a Bid with respect to the Corrections Assets must specify how the Purchase Price is to be allocated among the SF Assets and the LG Assets to be included in the proposed Sale Transaction.  A Bid for both Asset Packages must specify how the Purchase Price is to be allocated among each Asset Package to be included in the proposed Sale Transaction.  A Bid for Assets in both Asset Packages must specify how the Purchase Price is to be allocated among such Assets.  The Purchase Price must be at least equal to the following: (1) for a Recovery Solutions / Consolidated Sale Transaction, (a) the consideration set forth in the Recovery Solutions Stalking Horse Bid (as defined below), *plus* (b) $5,000,000, *plus* (c) the Recovery Solutions Expense Reimbursement (as defined below); and (2) for a Corrections Asset(s) Sale Transaction, (a) the consideration set forth in any Corrections Asset(s) Approved Stalking Horse Bid (as defined below) *plus* (b) the aggregate amount of any Corrections Asset(s) Approved Bid Protections, *plus* (c) such additional amount as determined by the Debtors in their reasonable business judgment, in consultation with the Consultation Parties.

C.     **<u>Deposit</u>.**  Each Bid (other than the Recovery Solutions Stalking Horse Bid) must be accompanied by a cash deposit in amount equal to ten percent of the aggregate cash Purchase Price to be held in an escrow account on terms acceptable to the Debtors (the "<u>Deposit</u>"); *provided, however*, that the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, may elect to

waive or modify the requirement of a Deposit on a case-by-case basis; *provided further*, that no Deposit shall be required for the credit portion of any Bid that includes a credit bid.  To the extent a Qualified Bid is modified before, during, or after the Auction in a manner that increases the originally contemplated Purchase Price, the Debtors reserve the right, after consultation with the Consultation Parties, to require that the applicable Qualified Bidder increase its Deposit so that it equals ten percent of the increased Purchase Price.

D.    **Transaction Documents.**  Other than for a Qualified Bid in the form of a chapter 11 plan of reorganization ("Chapter 11 Plan Bid"), each Bid must be accompanied by an executed purchase agreement with respect to the proposed Sale Transaction, including the exhibits, schedules, and ancillary agreements related thereto and any other related material documents integral to such Bid (including a schedule of contracts and/or leases to be assumed and/or assumed and assigned to the extent applicable to the Bid).  In addition, (1) for the Recovery Solutions Assets or all or substantially all of the Assets, the executed purchase agreement accompanying such Potential Bidder's Bid must be further accompanied by a redline copy marked to reflect any amendments or modifications to the Recovery Solutions Stalking Horse Agreement (as defined below) and (2) for the Corrections Assets, the executed purchase agreement accompanying such Potential Bidder's Bid must be further accompanied by a redline copy marked to reflect any amendments or modifications to (a) the form purchase agreement provided by the Debtors (through their advisors) or (b) any Corrections Asset(s) Stalking Horse Agreement.  For the avoidance of doubt, a "conceptual" or "issues list"-style markup of the form asset purchase agreement would not satisfy this requirement.  Each Chapter 11 Plan Bid must be accompanied by an executed investment agreement, signed by an authorized representative of such Potential Bidder, pursuant to which the bidder proposes to effectuate the transactions contemplated by the Chapter 11 Plan Bid and must provide for a fully committed investment of capital in exchange for substantially all of the equity of the reorganized Debtors.

E.    **Alternate Bidder Commitment.**  A Bid must include a written commitment by the applicable Acceptable Bidder to serve as an Alternate Bidder in the event that such Acceptable Bidder's Bid is not selected as the Successful Bid; *provided* that the foregoing shall not apply to any Potential Bidder that (1) both (a) qualifies as a Secured Party (as defined below) and (b) submits a Bid that contemplates providing consideration pursuant to section 363(k) of the Bankruptcy Code or a chapter 11 plan of reorganization or (2) is expressly exempted from such requirement pursuant to each applicable Stalking Horse Agreement (as defined below).

F.    **Proof of Financial Ability to Perform.**  A Bid must include written evidence to allow the Debtors to reasonably conclude that the Potential Bidder has the necessary financial ability to close the proposed Sale Transaction.   Such information must include the following:

1.    contact names and telephone numbers for verification of financing sources;

2.     evidence of the Potential Bidder's internal resources and, if applicable, proof of unconditional, fully executed, and effective financing commitments from one or more reputable sources in an aggregate amount equal to the cash portion of such Bid (including, if applicable, the payment of cure amounts), in each case, as are needed to close the proposed Sale Transaction;

3.     a description of the Potential Bidder's pro forma capital structure; and

4.     any other financial disclosure or credit-quality support information or enhancement reasonably requested by the Debtors or their advisors to demonstrate that such Potential Bidder has the ability to close the proposed Sale Transaction.

**G.**     **Contingencies; No Financing or Diligence Outs.**  A Bid shall not be conditioned on (1) the bidder obtaining financing or (2) the outcome or review of due diligence, or otherwise subject to contingencies more burdensome than those set forth in the applicable Stalking Horse Agreement.

**H.**     **Identity.**  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid—including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the proposed Sale Transaction contemplated by such Bid—and the complete terms of any such participation.  Each Bid should also include contact information for the specific person(s) and counsel whom the Debtors (and their advisors) should contact regarding such Bid.

**I.**     **Regulatory and Third-Party Approvals.**  A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the proposed Sale Transaction, if any, and the date by which the Potential Bidder expects to receive such approvals, and those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible.

**J.**     **Authorization.**  Each Bid must contain evidence acceptable to the Debtors that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body) with respect to the submission of its Bid and the consummation of the proposed Sale Transaction contemplated by such Bid.

**K.**     **Contracts and Leases.**  The Bid must identify each and every executory contract and unexpired lease to be assumed and assigned in connection with the proposed Sale Transaction (collectively, the "Assumed Contracts"), and provide the Potential Bidder's agreement to pay all Cure Costs associated with any Assumed Contracts. Each Bid must include evidence of the Potential Bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including audited and unaudited financial statements, tax returns, bank account statements, and a description of the business to be conducted at the premises, and such other

documentation as the Debtors may request in their reasonable business judgment (the "<u>Adequate Assurance Package</u>").  The Adequate Assurance Package should be submitted in its own compiled .pdf document.

L.  **<u>Management and Employee Obligations</u>.**  The Bid must indicate whether the Potential Bidder intends to hire all or some of the employees who are primarily employed in connection with the Assets to be included in the proposed Sale Transaction.

M.  **<u>As-Is, Where-Is</u>.**  Each Bid must include a written acknowledgement and representation that the Potential Bidder (1) has had an opportunity to conduct any and all due diligence regarding the proposed Sale Transaction prior to making its Bid, (2) has relied solely upon its own independent review, investigation, or inspection of any documents in making its Bid, and (3) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, by the Debtors or their advisors or other representatives regarding the proposed Sale Transaction or the completeness of any information provided in connection therewith or the Auction (if any).

N.  **<u>No Collusion</u>**.  Each Potential Bidder must acknowledge in writing  the following: (1) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or any Sale Transaction, specifying that it did not agree with any Potential Bidders to control the Purchase Price; and (2) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, any Auction, or any Sale Transaction.

O.  **<u>No Break-Up Fee</u>.**  Each Bid shall indicate that such Potential Bidder will not seek any transaction break-up fee, termination fee, expense reimbursement, working fee, or similar type of payment; *provided* that (1) the Recovery Solutions Stalking Horse Bidder shall be entitled to the Recovery Solutions Expense Reimbursement and (2) the Debtors are authorized in their discretion to offer Corrections Asset Bid Protections to one or more Corrections Asset(s) Stalking Horse Bidders, in each case, in accordance with these Bidding Procedures and the Bidding Procedures Order.

P.  **<u>Indication of Interest</u>**.  To the extent that a Potential Bidder provided a non-binding indication of interest pursuant to section III.H herein, each Bid must describe any material deviations from such indication of interest.

Q.  **<u>Commitment to Close</u>.**  A Bid by a Potential Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations in the Debtors' reasonable business judgment, after consultation with the Consultation Parties) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors. Each Potential Bidder must commit to closing the proposed Sale Transaction contemplated by the Bid as soon as

practicable, and in no event later than any deadline set forth in the applicable Stalking Horse Agreement.

R. **Irrevocable Bid**. Each Bid must contain a statement by the applicable Potential Bidder acknowledging and agreeing that such Bid and each of its provisions is binding upon the Potential Bidder and irrevocable in all respects unless and until the Debtors have accepted a Successful Bid with respect to the relevant Assets and the relevant Potential Bidder is not selected as the Alternate Bidder with respect to such Assets.

S. **Compliance with Bidding Procedures**. Each Bid must contain a statement that (1) the Potential Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code, (2) the Bid constitutes a *bona fide* offer to consummate the proposed Sale Transaction embodied therein, and (3) the Potential Bidder agrees to be bound by these Bidding Procedures.

T. **Consent to Jurisdiction**. Each Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, the Auction (if held), the construction and enforcement of these Bidding Procedures or any sale documents, and the consummation of a Sale Transaction.

By submitting a Bid, each Potential Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of these Bidding Procedures and to refrain from (a) submitting a Bid after conclusion of the Auction (if any) or (b) seeking to reopen the Auction (if any) once closed. **The submission of a Bid shall constitute a binding and irrevocable offer (a) for the Successful Bidder, until consummation of the proposed Sale Transaction, (b) for the Alternate Bidder (if any), as provided herein, including section VIII herein, and (c) for any Bidder other than the Successful Bidder and Alternate Bidder, until two business days after entry of the Sale Order approving the Successful Bid and (if applicable) the Alternate Bid for the applicable Assets, and each Bid must include a written acknowledgement and representation to such effect.**

## VI.   NO COMMUNICATIONS AMONG BIDDERS WITHOUT CONSENT.

There shall be no communications between or among Potential Bidders and/or Acceptable Bidders unless the Debtors' advisors have authorized such communication in writing. The Debtors reserve the right, in their reasonable business judgment and upon consultation with the Consultation Parties, to disqualify any Potential Bidders or Acceptable Bidders that have communications between or amongst themselves without the prior authorization of the Debtors' advisors. For the avoidance of doubt, the joining of Bids between Potential Bidders or Acceptable Bidders may be permitted by the Debtors, after consultation with the Consultation Parties; *provided* that, the Debtors will be authorized to approve joint Bids in their reasonable discretion on a case-by-case basis.

## VII.    STALKING HORSE BIDDER(S).

On November 11, 2024, the Debtors and RS Purchaser LLC (the "Recovery Solutions Stalking Horse Bidder" and, together with the Corrections Asset(s) Stalking Horse Bidder, the "Stalking Horse Bidders") have entered into that certain asset purchase agreement (the "Recovery Solutions Stalking Horse Agreement" and, the Bid contemplated thereby, the "Recovery Solutions Stalking Horse Bid") for the sale of substantially all of the Recovery Solutions Assets.  Pursuant to the Recovery Solutions Stalking Horse Agreement, and subject to the terms and conditions thereof, the Recovery Solutions Stalking Horse Bidder has agreed to acquire all of the Recovery Solutions Assets and assume certain liabilities from the Debtors, free and clear of all claims or encumbrances (other than Assumed Liabilities and Permitted Encumbrances, each as defined in the Recovery Solutions Stalking Horse Agreement).  In the event that the Recovery Solutions Stalking Horse Agreement is terminated, pursuant to the provisions thereof (other than for breach thereof by the Recovery Solutions Stalking Horse Bidder), or in the event that the purchase of the Assets is ultimately consummated by any person other than the Recovery Solutions Stalking Horse Bidder, the Debtors will reimburse the Recovery Solutions Stalking Horse Bidder (at the time required under the Recovery Solutions Stalking Horse Agreement) for its reasonable and documented out-of-pocket expenses in conjunction with the Recovery Solutions Stalking Horse Bid up to a maximum amount of $2,000,000 (the "Recovery Solutions Expense Reimbursement").

The Debtors are authorized, but not obligated, in an exercise of their reasonable business judgment, and following consultation with the Consultation Parties, to (a) select one or more Acceptable Bidders to act as the Corrections Asset(s) Stalking Horse Bidder (such Acceptable Bidder's Bid, the "Corrections Asset(s) Stalking Horse Bid" and, together with the Recovery Solutions Stalking Horse Bid, the "Stalking Horse Bids") and enter into a purchase agreement or chapter 11 plan of reorganization with respect to such proposed Corrections Asset(s) Sale Transaction with such Corrections Asset(s) Stalking Horse Bidder (each such agreement, a "Corrections Asset(s) Stalking Horse Agreement" and, together with the Recovery Solutions Stalking Horse Agreement, the "Stalking Horse Agreements"), and (b) in connection with any Corrections Asset(s) Stalking Horse Agreement with a Corrections Asset(s) Stalking Horse Bidder, agree to (i) provide a breakup fee (other than a Corrections Asset(s) Stalking Horse Bidder that is a Secured Party (as defined herein)) in an amount not to exceed three percent of the cash portion of the applicable Purchase Price (the "Corrections Asset(s) Breakup Fee") and (ii) reimburse the Corrections Asset(s) Stalking Horse Bidder's reasonable and documented out-of-pocket fees and expenses incurred in connection with preparation and negotiation of the Corrections Asset(s) Stalking Horse Bid in an amount up to $1,000,000 (the "Corrections Asset(s) Expense Reimbursement" and, together with the Corrections Asset(s) Breakup Fee, the "Corrections Asset(s) Bid Protections"); *provided* that (y) the payment of any Corrections Asset(s) Bid Protections shall be subject to the terms and conditions of the definitive agreement(s) executed between the Debtors and such Corrections Asset(s) Stalking Horse Bidder(s), and (ii) any Corrections Asset(s) Bid Protections will not be binding on the Debtors until the approval of such Corrections Asset(s) Bid Protections in accordance with these Bidding Procedures.  To the extent payable, any Corrections Asset(s) Bid Protections would be paid out of the proceeds of the sale to which they relate.  To the extent that the Bid Protections do not otherwise comply with these Bidding Procedures, the Debtors reserve the right to seek Court approval of such Bid Protections.

No later than two business days after selecting a Corrections Asset(s) Stalking Horse Bidder, the Debtors shall file with the Court a notice (a "Corrections Asset(s) Stalking Horse Notice") that (a) sets forth the identity of the Corrections Asset(s) Stalking Horse Bidder, (b) sets forth the amount of the Corrections Asset(s) Stalking Horse Bid and what portion of the Corrections Asset(s) Stalking Horse Bid (if any) would be in the form of cash, (c) identifies the Corrections Assets (or Auction Lot thereof) to be purchased and the contracts and leases to be assumed, (d) states whether the Corrections Asset(s) Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Corrections Asset(s) Stalking Horse Bid, (e) specifies any proposed Corrections Asset(s) Bid Protections, and (f) attaches a copy of the Corrections Asset(s) Stalking Horse Agreement (or chapter 11 plan of reorganization), including all exhibits, schedules, and attachments thereto, and serve such Corrections Asset(s) Stalking Horse Notice on the U.S. Trustee, counsel to each of the Consultation Parties, and those parties who have filed the appropriate notice pursuant to Bankruptcy Rule 2002 requesting notice of all pleadings filed in the Chapter 11 Cases (collectively, the "Corrections Asset(s) Stalking Horse Notice Parties"), with no further notice being required.

The Corrections Asset(s) Stalking Horse Notice shall also specify the deadline to file objections (the "Corrections Asset(s) Stalking Horse Objections") to the designation of the Corrections Asset(s) Stalking Horse Bidder, the terms of the Corrections Asset(s) Stalking Horse Bid, or the Corrections Asset(s) Bid Protections set forth therein, which deadline (the "Corrections Asset(s) Stalking Horse Objection Deadline") shall be no earlier than three business days after service of the Stalking Horse Notice on the Stalking Horse Notice Parties.  The Corrections Asset(s) Stalking Horse Objections must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules, and Complex Procedures, (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Court and served on the Debtors and the Corrections Asset(s) Stalking Horse Notice Parties by the Corrections Asset(s) Stalking Horse Objection Deadline.

If a timely Corrections Asset(s) Stalking Horse Objection is filed and served, to the extent not resolved consensually, the Debtors may schedule a hearing before the Court to be held on an expedited basis (on not less than three-days' notice) seeking authorization to enter into the Corrections Asset(s) Stalking Horse Agreement (including the Corrections Asset(s)  Bid Protections contained therein) (a "Corrections Asset(s) Stalking Horse Hearing").  If no timely Corrections Asset(s) Stalking Horse Objection is filed and served, upon the expiration of the Corrections Asset(s) Stalking Horse Objection Deadline, the Debtors shall file with the Court a certificate of no objection (a "CNO") and, upon such filing, (a) the Debtors' designation of the Corrections Asset(s) Stalking Horse Bidder and agreement respecting the Corrections Asset(s) Bid Protections shall be deemed approved and (b) the Debtors may enter into the Corrections Asset(s) Stalking Horse Agreement (including a chapter 11 plan of reorganization), in each case without further notice or opportunity to be heard.  Upon the approval by the Court at a Corrections Asset(s) Stalking Horse Hearing for the Debtors to enter into the Corrections Asset(s) Stalking Horse Agreement (including the Corrections Asset(s) Bid Protections contained therein), or upon the Debtors' filing a CNO, the Corrections Asset(s) Stalking Horse Bidder shall be the "Corrections Asset(s) Approved Stalking Horse Bidder," its Corrections Asset(s) Stalking Horse Bid shall be the "Corrections Asset(s) Approved Stalking Horse Bid," and the Corrections Asset(s) Bid Protections contained therein (if any) shall be the "Corrections Asset(s) Approved Bid Protections."

## VIII.   DESIGNATION OF AN ALTERNATE BIDDER.

If for any reason a Successful Bidder fails to consummate its Successful Bid within the time permitted after the entry of the Sale Order approving the Sale to such Successful Bidder, then the Qualified Bidder or Qualified Bidders with the next-highest or otherwise second-best Bid (each, an "Alternate Bidder"), as determined by the Debtors after consultation with their advisors and the Consultation Parties, at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein, will automatically be deemed to have submitted the highest or otherwise best Bid or Bids (each, an "Alternate Bid"), and the Alternate Bidder will be required to consummate the transaction pursuant to the Alternate Bid as soon as is commercially reasonable without further order of the Court upon at least 24 hours' advance notice, which notice will be filed with the Court; *provided* that the foregoing shall not apply to any Qualified Bidder that (a) both (i) qualifies as a Secured Party and (ii) submits a Bid that contemplates providing consideration pursuant to section 363(k) of the Bankruptcy Code or (b) is expressly exempted from such requirement pursuant to an applicable Stalking Horse Agreement.

Upon designation of the Alternate Bidder at the Auction, the Alternate Bid must remain open, notwithstanding any outside date set forth in such Alternate Bidder's proposed purchase agreement or a chapter 11 plan, until the earlier of (a) the Closing of the Successful Bid or (b) the date that is 60 days following the conclusion of the Auction.  Each Alternate Bidder's Deposit will be held in escrow until the closing of the Sale Transaction with the applicable Successful Bidder.

## IX.   BID DEADLINES.

Any Recovery Solutions / Consolidated Bid must be transmitted via email (in .pdf or similar format) to the Debtors and their advisors as specified herein so as to be **actually received** on or before **December 13, 2024 at 4:00 p.m. (prevailing Central Time)** (the "Recovery Solutions / Consolidated Bid Deadline").  Any Corrections Asset(s) Bid must be transmitted via email (in .pdf or similar format) to the Debtors and their advisors as specified herein so as to be **actually received** on or before **January 20, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Corrections Asset(s) Bid Deadline" and, together with the Recovery Solutions / Consolidated Bid Deadline, the "Bid Deadline").

## X.   QUALIFIED BIDS & QUALIFIED BIDDERS.

A Bid is deemed a "Qualified Bid" if the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, determine that such Bid (a) satisfies the Bid Requirements set forth above and (b) is reasonably likely to be consummated if selected as the Successful Bid (or Alternate Bid, as applicable) for the applicable Assets no later than the Applicable Outside Date (as defined below); *provided* that any Stalking Horse Bid shall constitute and be deemed a Qualified Bid, and the Stalking Horse Bidders may participate in the Auctions.

The "Applicable Outside Date" is, (a) in the case of any Recovery Solutions / Consolidated Bid, January 9, 2025 and (b) in the case of any Corrections Asset(s) Bid, March 31, 2025.

An Acceptable Bidder that submits a Qualified Bid is a "Qualified Bidder" with respect to the Assets to which such Qualified Bid relates.  A Qualified Bid for the Recovery Solutions Assets, or sale of all or substantially all of the Assets, shall constitute a "Recovery Solutions / Consolidated

Qualified Bid." A Qualified Bid for all or substantially all of the Corrections Assets, or sale of non-overlapping SF Assets and LG Assets, shall constitute a "Corrections Asset(s) Qualified Bid."

As soon as reasonably practicable after the applicable Bid Deadline, the Debtors will notify each Acceptable Bidder whether such party is a Qualified Bidder and shall provide the Consultation Parties' counsel with a copy of each Qualified Bid. If an Acceptable Bidder's Bid is determined not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit (if any) on the date that is three business days after the applicable Bid Deadline. The Debtors shall have the right (upon consultation with the Consultation Parties) to deem a Bid a Qualified Bid even if such Bid does not conform to one or more of the Bid Requirements.

Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the date set for the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtors following consultation with the Consultation Parties, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the Purchase Price, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified herein; *provided* that any Qualified Bid may be improved at the Auction (if any) as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth herein.

Notwithstanding anything herein to the contrary, the Debtors, in consultation with the Consultation Parties, reserve the right to work with (a) Potential Bidders and Acceptable Bidders to aggregate two or more Bids into a single consolidated Bid prior to the applicable Bid Deadline and (b) Qualified Bidders to aggregate two or more Qualified Bids into a single Qualified Bid prior to the conclusion of the Auction (if any). The Debtors, in consultation with the Consultation Parties, reserve the right to cooperate with any Acceptable Bidder to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid. The Debtors reserve the right to accept a single Qualified Bid or multiple Bids that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple bidders shall be treated as a single Qualified Bidder and their Bid a single Qualified Bid for purposes of the Auction (if any)).

## XI.   RIGHT TO CREDIT BID.

Any Qualified Bidder that has a valid and perfected lien on any of the Assets of the Debtors' estates (a "Secured Party") shall be entitled to credit bid all or a portion of the face value of such Secured Party's remaining claims against the Debtors toward the Purchase Price specified in such Qualified Bidder's Bid; *provided* that (a) a Secured Party shall be entitled to credit bid its claim(s) only with respect to those Assets that are subject to a valid and perfected lien in favor of such Secured Party as to such claim(s) and (b) any such credit bid must be submitted on or before the applicable Bid Deadline and include cash consideration sufficient to satisfy the Carve-Out (as defined in the DIP Orders) any senior liens on the collateral that is subject to the credit bid, except to the extent otherwise agreed by the holders of such senior liens in their sole and absolute discretion. Notwithstanding anything to the contrary herein, the DIP Lenders and the First Lien Lenders (if applicable), subject to section 363(k) of the Bankruptcy Code, may submit a credit bid of all or any portion of the aggregate amount of their respective remaining secured claims. Any credit bid submitted by any DIP Lender or any Prepetition First Lien Secured Party, subject to

section 363(k) of the Bankruptcy Code, shall be deemed a Qualified Bid (without the need for any Deposit), unless otherwise ordered by the Court.

## XII.   AUCTION.

In the event that the Debtors timely receive more than one Qualified Bid for one or more Assets, the Debtors shall conduct an auction (the "Auction") for the applicable Assets. The Auction shall be conducted in accordance with these Bidding Procedures and upon notice to all Qualified Bidders that have submitted Qualified Bids with respect to those Assets. The Auction for the Recovery Solutions / Consolidated Sale Transaction (the "Recovery Solutions / Consolidated Auction") shall be conducted at McDermott Will & Emery LLP, 444 West Lake Street, Suite 4000, Chicago, Illinois 60606 on **December 16, 2024 at 9:00 a.m. (prevailing Central Time)**, or such later time on such day or such other place as the Debtors shall notify all Participating Parties (as defined below). The Auction for the Corrections Assets (the "Corrections Asset(s) Auction") shall be conducted at McDermott Will & Emery LLP, 444 West Lake Street, Suite 4000, Chicago, Illinois 60606 on **January 28, 2025 at 9:00 a.m. (prevailing Central Time)**, or such later time on such day or such other place as the Debtors shall notify all Participating Parties. If (a) no more than one Qualified Bid is submitted by the applicable Bid Deadline (whether the Recovery Solutions Stalking Horse Bid, a Corrections Asset(s) Approved Stalking Horse Bid, or otherwise) or (b) multiple Partial Bids (as defined below) are submitted by the applicable Bid Deadline for non-overlapping SF Assets and LG Assets, the Debtors may elect to cancel the applicable Auction and seek approval of the proposed Sale Transaction(s) contemplated in the Recovery Solutions Stalking Horse Bid, such Corrections Asset(s) Approved Stalking Horse Bid, Qualified Bid that is not either a Recovery Solutions Stalking Horse Bid or Corrections Asset(s) Approved Stalking Horse Bid, or Partial Bids, as applicable, at the applicable Sale Hearing.

If any of the Qualified Bids submitted by the applicable Bid Deadline are structured as a purchase of less than all or substantially all of the Correction Assets (each, such bid a "Partial Bid"), the Debtors may, in consultation with the Consultation Parties, conduct separate auctions at the Auction for each the SF Assets and the LG Assets (each, an "Auction Lot"). The Debtors may combine Partial Bids into an Auction Lot to compete against a Corrections Asset(s) Approved Stalking Horse Bid for all or substantially all of the Corrections Assets (as applicable). The Debtors may designate such Auction Lot at any time prior to the Auction. Only representatives or agents of the Debtors, the Consultation Parties, and the Qualified Bidders (including the Recovery Solutions Stalking Horse Bidder and any Corrections Asset(s) Approved Stalking Horse Bidder, and the legal and financial advisors to each of the foregoing (collectively, the "Participating Parties"), will be entitled to attend the Auction, and only Qualified Bidders will be entitled to make any Subsequent Bids (as defined herein) at the Auction. The Participating Parties participating in the Auction must appear in person, telephonically, or through a video teleconference, as determined by the Debtors. Prior to each Auction, the Debtors will (a) notify each applicable Qualified Bidder that has timely submitted a Qualified Bid that its Bid is a Qualified Bid and (b) provide all applicable Qualified Bidders with (i) copies of the Qualified Bid or combination of Qualified Bids that the Debtors believe, in consultation with the Consultation Parties, is the highest or otherwise best offer (the "Starting Bid") for the applicable Asset Package, (ii) an explanation of how the Debtors value the Starting Bid, and (iii) a list identifying all of the applicable Qualified Bidders. For the avoidance of doubt, the Starting Bid for the Corrections Assets may be comprised of Qualified Bids for non-overlapping SF Assets and LG Assets if the aggregate consideration of

such Qualified Bids is higher and better than the Corrections Asset(s) Approved Stalking Horse Bid for all or substantially all of the Corrections Assets (as applicable).  The Debtors shall also provide copies of such Starting Bid (if applicable, marked against the Recovery Solutions Stalking Horse Bid or Corrections Asset(s) Approved Stalking Horse Bid) to all of the applicable Qualified Bidders (including the applicable Stalking Horse Bidder(s)) and the Consultation Parties.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (a) it has not engaged in any collusion with respect to the bidding process and (b) its Qualified Bid is a good faith offer and it intends to consummate the Sale Transaction contemplated by its Qualified Bid if such Qualified Bid is the Successful Bid (or Alternate Bid, as applicable) for the applicable Assets.

The Debtors may (upon consultation with the Consultation Parties) employ and announce at each Auction additional procedural rules for conducting the Auction (*e.g.,* the amount of time allotted to submit Subsequent Bids); *provided* that such rules shall (a) not be inconsistent with the Bankruptcy Code, the Bidding Procedures Order, or any other order of the Court entered in connection herewith and (b) be disclosed to all applicable Qualified Bidders.

Bidding at each Auction will begin with the applicable Starting Bid and continue, in one or more rounds of bidding in the presence of all parties at the Auction, so long as during each round at least one subsequent bid (a "Subsequent Bid") is submitted by a Qualified Bidder that (a) improves upon such Qualified Bidder's immediately prior Qualified Bid and (b) the Debtors determine, in consultation with the Consultation Parties, that such Subsequent Bid is (i) with respect to the first round, a higher or otherwise better offer than the Starting Bid and (ii) with respect to subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below), in each case respecting the Corrections Assets taking into account other Qualified Bids for non-overlapping SF Assets and LG Assets; *provided* that, with respect to the first round, any Qualified Bid must include a minimum overbid of two percent over the Starting Bid. Notwithstanding anything to the contrary herein, the Debtors, in their discretion and in consultation with the Consultation Parties, may determine appropriate minimum bid increments or requirements for each round of bidding.

After the first round of bidding and between each subsequent round of bidding, as applicable, the Debtors, in their discretion and in consultation with the Consultation Parties, will determine and announce the Bid or Bids that they believe to be the highest or otherwise best offer or combination of offers (the "Leading Bid") for each applicable Asset Package.  Additional consideration in excess of the amount set forth in the applicable Starting Bid may include cash and/or non-cash consideration; *provided* that the value for such non-cash consideration shall be determined by the Debtors, in their discretion and in consultation with the Consultation Parties.

A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge and written confirmation of the Leading Bid.

For the purpose of evaluating Subsequent Bids, the Debtors may require a Qualified Bidder submitting a Subsequent Bid to submit, as part of its Subsequent Bid, additional evidence (in the form of financial disclosure or credit-quality support information or enhancement acceptable to

the Debtors in their discretion, after consultation with the Consultation Parties) demonstrating such Qualified Bidder's ability to close the proposed transaction.

The Debtors shall maintain a transcript of all Bids made and announced at each Auction, including the Starting Bid(s), all Subsequent Bid(s), the Leading Bid(s), the Alternate Bid(s), and the Successful Bid(s).

If a Qualified Bidder increases its bid at an Auction and is the Successful Bidder or Alternate Bidder, such Qualified Bidder must increase its Deposit to an amount equal to ten percent of the proposed Purchase Price submitted at the Auction within two days after the Auction.

Prior to the conclusion of each Auction, the Debtors, in consultation with the Consultation Parties, shall (a) review and evaluate each Bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale transaction (in the case of a Chapter 11 Plan Bid, the structure, confirmability, and feasibility of any proposed chapter 11 plan (including the proposed time and costs estimated to be necessary to negotiate, document, and obtain confirmation of such proposed chapter 11 plan), (b) determine and identify the highest or otherwise best offer or collection of offers (the "Successful Bid(s)"), (c) determine and identify the Alternate Bid(s) and (d) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of (i) the identity of the party or parties that submitted the Successful Bid(s) (the "Successful Bidder(s)"), (ii) the amount and other material terms of the  Successful Bid(s), (iii) Alternate Bidders, and (iv) the amount and other material terms of the Alternate Bid(s).  As soon as reasonably practicable after the completion of the applicable Auction, the Successful Bidder(s) and the applicable Debtors shall complete and execute all agreements, instruments, and other documents necessary to consummate the applicable Sale Transaction(s) contemplated by the applicable Successful Bid(s). Promptly following the selection of the Successful Bid(s) and Alternate Bid(s), the Debtors shall file a notice of the Successful Bid(s) and Alternate Bid(s) with the Court, together with a proposed order approving the Sale Transaction(s) contemplated therein (a "Sale Order").

## XIII.   FIDUCIARY OUT.

Notwithstanding anything to the contrary in these Bidding Procedures or any document filed with or entered by the Court, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or its board of directors, board of managers, or similar governing body to take any action or to refrain from taking any action with respect to any proposed Sale Transaction or these Bidding Procedures to the extent such Debtor or governing body determines in good faith, in consultation with outside counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Further, notwithstanding anything to the contrary in the Bidding Procedures or any document filed with or entered by the Court, until the closing of the applicable Auction (if any), the Debtors and their respective directors, managers, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to (a) consider, respond to, and facilitate alternate proposals for sales or other transactions involving any or all of the Assets (each an "Alternate Proposal"), (b) provide access to non-public

18

information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity, (c) maintain or continue discussions or negotiations with respect to Alternate Proposals, (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternate Proposals, and (e) enter into or continue discussions or negotiations with any person or entity regarding any Alternate Proposals.

## XIV.   "AS IS, WHERE IS".

Consummation of any Sale Transaction will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors or their estates, except as specifically accepted or agreed to by the Debtors in the executed definitive documentation for the Sale Transaction ("Definitive Sale Documents").  Consummation of any Sale Transaction will be without any representations or warranties whatsoever by the Debtors' representatives or advisors.  Unless otherwise specifically accepted or agreed to by the Debtors in Definitive Sale Documents, and other than as contemplated by a transaction pursuant to a chapter 11 plan of reorganization with respect to the Corrections Assets, all of the Debtors' right, title, and interest in and to the Assets disposed of in a Sale Transaction will be transferred to the Successful Bidder (or Alternate Bidder, as applicable) free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests in accordance with sections 363(f) of the Bankruptcy Code.

By submitting a Bid, each Potential Bidder will be deemed to acknowledge and represent that it (a) has had an opportunity to conduct adequate due diligence regarding the Debtors and the proposed Sale Transaction prior to making its Bid, (b) has relied solely on its own independent review, investigation, and inspection of any document, including executory contracts and unexpired leases, in making its Bid, and (c) did not rely on or receive from any person or entity (including any of the Debtors or their advisors or other representatives) any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the proposed Sale Transaction or the completeness of any information provided in connection with the proposed Sale Transaction or the Auction (if any).

## XV.   COMMISSIONS.

The Debtors shall be under no obligation to pay any commissions, fees, or expenses to any Potential Bidder's agent, advisor, or broker.  All commissions, fees, or expenses for any such agents, advisors, or brokers may be paid by Potential Bidders at such Potential Bidder's discretion. In no case shall any commissions, fees, or expenses for any Potential Bidder's agent, advisor, or broker be deducted from any proceeds derived from any Sale of the Assets.  This paragraph shall not apply to any Recovery Solutions Expense Reimbursement or Corrections Asset(s) Bid Protections that become(s) payable pursuant to, respectively, the terms of the Recovery Solutions Stalking Horse Bid or any Corrections Asset(s) Stalking Horse Agreement.

## XVI.   RESERVATION OF RIGHTS.

The Debtors shall be entitled to modify these Bidding Procedures in their reasonable business judgment, in consultation with the Consultation Parties, in any manner that will best

promote the goals of these Bidding Procedures, or impose, at or prior to the Auction (if any), additional customary terms and conditions on a Sale Transaction, including (a) extending the deadlines set forth in these Bidding Procedures, (b) adjourning the Auction, (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction (if any), (d) canceling the Auction, and (e) rejecting any or all Bids or Qualified Bids. Any modification to these Bidding Procedures, or adoption of new rules, procedures, or deadlines, is without prejudice to a party in interest's right to seek relief from the Court that such modification, or adoption of new rules, procedures, or deadlines, is inconsistent with this paragraph or these Bidding Procedures.

## XVII. CONSENT TO JURISDICTION.

All Qualified Bidders shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction or the construction and enforcement of these Bidding Procedures.

## XVIII. SALE HEARING.

The Court shall hold a hearing to consider approval of the Successful Bid(s) (and Alternate Bid(s), as applicable) and the proposed Sale Transaction(s) contemplated thereby (a "Sale Hearing"). The Sale Hearing with respect to Recovery Solutions / Consolidated Sale Transaction(s) contemplated by any designated Successful Bid(s) (and the Alternate Bid(s), as applicable) shall be held on **December [23], 2024 at [ ]:[ ] [a./p.]m.** The Sale Hearing with respect to any Corrections Asset(s) Sale Transaction(s) contemplated by any designated Successful Bid(s) (and the Alternate Bid(s), as applicable) shall be held on **February [4], 2025 at [ ]:[ ] [a./p.]m.** The Sale Hearing may be adjourned by the Debtors by an announcement of the adjourned date at a hearing before the Court or by filing a notice on the Court's docket.

## XIX. WIND-DOWN BUDGET.

Notwithstanding anything contained in the Bidding Procedures, any Bid (including a credit bid) of any Corrections Asset(s) Sale Transaction(s) or a sale of substantially all of the Assets (a "Consolidated Asset Sale") shall be subject to (a) the Debtors having sufficient cash at the consummation of any such sale, as determined in consultation with the Consultation Parties, to satisfy the reasonable wind-down budget negotiated in good faith (the "Wind-Down Budget") to pay all allowed (i) post-petition claims, (ii) administrative expense claims and priority claims, and (iii) professional fees and expenses necessary to wind-down the Debtors' estates in a reasonable and appropriate timeline, subject to the consent of the Required Backstop Parties (which shall not be unreasonably withheld) and in consultation with the Consultation Parties, and (b) the requirement that the net proceeds of any Corrections Asset(s) Sale Transaction(s) or a Consolidated Asset Sale, pursuant to the Bidding Procedures, shall first satisfy the Wind-Down Budget before repayment from such proceeds of any other claims against the Debtors. At the closing of each Corrections Asset(s) Sale Transaction(s) or a Consolidated Asset Sale, the Debtors shall deposit the sale proceeds from such Corrections Asset(s) Sale Transaction or such Consolidated Asset Sale into a segregated account held by the Debtors pending the ultimate resolution (either by agreement or Court determination) and funding of the appropriate amount on account of the Wind-Down Budget; *provided, however*, that the Debtors shall be authorized to use

a portion of such sale proceeds to pay all allowed (x) post-petition claims, (y) administrative expense claims and priority claims, and (z) professional fees and expenses necessary to administer the Debtors' estates accrued through the closing of these chapter 11 cases in an amount determined by the Debtors, or as otherwise determined by the Court.  The Debtors shall not distribute any proceeds of any Corrections Asset(s) Sale Transaction or a Consolidated Asset Sale prior to the funding of the Wind-Down Budget.

## XX.   RETURN OF DEPOSIT.

Any Deposits provided by Qualified Bidders shall be held in a noninterest-bearing escrow account on terms acceptable to the Debtors.  Any such Deposits will be returned to Qualifying Bidders that are not designated Successful Bidders (or Alternate Bidders, as applicable) on the date that is four business days after the Auction (if any).  Any Deposit provided by a Successful Bidder (or Alternate Bidder, as applicable) shall be applied to the Purchase Price of the applicable Sale Transaction at closing.

If a Successful Bidder (or Alternate Bidder, as applicable) fails to consummate the proposed Sale Transaction contemplated by its Successful Bid (or Alternate Bid, as applicable) because of a breach by such Successful Bidder (or Alternate Bidder, as applicable), the Debtors will not have any obligation to return any Deposit provided by such Successful Bidder (or Alternate Bidder, as applicable), which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors and their estates.

## XXI.   DIP ORDERS

Notwithstanding anything to the contrary contained in these Bidding Procedures or otherwise, nothing in these Bidding Procedures shall amend, modify, or impair any provision of the DIP Orders or the rights of the Debtors, the DIP Agent, the First Lien Agent, the DIP Lenders, or the Consenting First Lien Lenders under any of the DIP Documents or  the Existing First Lien Documents (as applicable), including with respect to allocation of the sale proceeds of any DIP Collateral or First Lien Collateral.

## Exhibit 2

**Recovery Solutions Stalking Horse Agreement**

*Execution Version*

EQUITY INTEREST AND ASSET PURCHASE AGREEMENT

DATED AS OF NOVEMBER 11, 2024

BY AND AMONG

RS PURCHASER LLC,

WELLPATH HOLDINGS, INC.

AND

THE ADDITIONAL SELLERS

[TABLE OF CONTENTS]

Page

**ARTICLE 1 DEFINITIONS** ..................................................................................... **2**

1.1  Definitions ......................................................................................................2
1.2  Other Definitions and Interpretive Matters .............................................17

**ARTICLE 2 PURCHASE AND SALE** ....................................................................... **18**

2.1  Purchase and Sale ........................................................................................18
2.2  Excluded Assets ...........................................................................................20
2.3  Assumed Liabilities .....................................................................................22
2.4  Excluded Liabilities .....................................................................................22
2.5  Assignment and Assumption of Contracts .................................................23
2.6  Further Assurances ......................................................................................26

**ARTICLE 3 PURCHASE PRICE** ............................................................................. **27**

3.1  Consideration ...............................................................................................27
3.2  Allocation of Purchase Price .......................................................................27

**ARTICLE 4 CLOSING AND DELIVERIES** ............................................................. **28**

4.1  Closing Date .................................................................................................28
4.2  Buyer's Deliveries .......................................................................................28
4.3  Sellers' Deliveries .......................................................................................29

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF SELLERS** ................. **29**

5.1  Status ............................................................................................................29
5.2  Power and Authority ....................................................................................30
5.3  Enforceability ..............................................................................................30
5.4  Group Companies and Managed Entity; Capitalization .............................30
5.5  No Violation; Consents and Approvals ......................................................31
5.6  Financial Statements ....................................................................................31
5.7  Absence of Certain Developments ..............................................................31
5.8  Litigation ......................................................................................................33
5.9  Environmental Matters ................................................................................33
5.10  Title to Properties ........................................................................................34
5.11  Sufficiency of Assets ...................................................................................34
5.12  Leased Real Property. ..................................................................................34
5.13  Compliance with Laws. ...............................................................................35
5.14  Labor and Employment Matters. .................................................................36
5.15  Employee Benefit Plans ...............................................................................39
5.16  Tax Matters ..................................................................................................40

5.17    Insurance ....................................................................................................41
5.18    Affiliated Transactions .............................................................................41
5.19    Material Contracts .....................................................................................41
5.20    Intellectual Property ..................................................................................43
5.21    Material Customers and Suppliers ............................................................43
5.22    Regulatory Compliance .............................................................................43
5.23    Brokers ......................................................................................................45
5.24    Bank Accounts ..........................................................................................45
5.25    NO OTHER REPRESENTATIONS AND WARRANTIES ....................45

**ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF BUYER** .................................**46**

6.1    Organization and Good Standing ................................................................46
6.2    Power and Authority ...................................................................................46
6.3    Enforceability .............................................................................................46
6.4    No Violations; Consents and Approvals .....................................................46
6.5    Brokers ........................................................................................................47
6.6    Litigation .....................................................................................................47
6.7    NO OTHER REPRESENTATIONS AND WARRANTIES ......................47

**ARTICLE 7 ACTIONS PRIOR TO THE CLOSING DATE** ...................................................**48**

7.1    Access and Reports .....................................................................................48
7.2    Operations Prior to the Closing Date .........................................................49
7.3    Antitrust Filings; Cooperation. ...................................................................51
7.4    Bankruptcy Court Matters ..........................................................................54
7.5    Expense Reimbursement .............................................................................55
7.6    Disclosure Schedules; Notice of Developments .........................................55
7.7    Sale Free and Clear .....................................................................................56
7.8    Alternate Bidder .........................................................................................56
7.9    Consents ......................................................................................................56
7.10   Treatment of Shared Contracts. ..................................................................57
7.11   Transition Services Agreement Schedules .................................................58

**ARTICLE 8 ADDITIONAL AGREEMENTS** ........................................................................**58**

8.1    Taxes ...........................................................................................................58
8.2    Bulk Sales ...................................................................................................60
8.3    Wrong Pockets ............................................................................................60
8.4    Assumed Contracts: Adequate Assurance and Performance .......................60
8.5    Employee Matters .......................................................................................60
8.6    Post-Closing Books and Records and Personnel ........................................62
8.7    Satisfaction of Certain Estate Liabilities ...................................................63

**ARTICLE 9 CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE** .....................**63**

9.1    Accuracy of Representations .......................................................................63
9.2    Sellers' Performance ...................................................................................63

9.3      No Order ....................................................................................................................63
9.4      Governmental Authorizations .....................................................................................63
9.5      Sellers' Deliveries ......................................................................................................64
9.6      DIP Financing Orders .................................................................................................64
9.7      Sale Order ...................................................................................................................64
9.8      Assumed Contracts .....................................................................................................64
9.9      Consents ......................................................................................................................64
9.10     Material Adverse Effect ..............................................................................................64
9.11     No Default; No Termination Event .............................................................................64
9.12     Restructuring Support Agreement ..............................................................................64

**ARTICLE 10 CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE ........... 64**

10.1     Accuracy of Representations .......................................................................................64
10.2     Sale Order ...................................................................................................................65
10.3     Buyer's Performance ...................................................................................................65
10.4     No Order ......................................................................................................................65
10.5     Governmental Authorizations .....................................................................................65
10.6     Buyer's Deliveries .......................................................................................................65

**ARTICLE 11 TERMINATION ....................................................................................................... 65**

11.1     Termination Events .....................................................................................................65
11.2     Effect of Termination ..................................................................................................67

**ARTICLE 12 GENERAL PROVISIONS ......................................................................................... 68**

12.1     Survival .......................................................................................................................68
12.2     Confidentiality ............................................................................................................68
12.3     Public Announcements ................................................................................................68
12.4     Notices ........................................................................................................................68
12.5     Waiver .........................................................................................................................70
12.6     Entire Agreement; Amendment ..................................................................................70
12.7     Assignment .................................................................................................................70
12.8     Severability .................................................................................................................70
12.9     Expenses ......................................................................................................................71
12.10    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver......................71
12.11    Counterparts ................................................................................................................71
12.12    Parties in Interest; No Third-Party Beneficiaries; No Amendment ...............................72
12.13    Remedies .....................................................................................................................72
12.14    Specific Performance ..................................................................................................72
12.15    Sellers' Representative; Reliance ................................................................................72
12.16    Limitations on Damages ..............................................................................................73
12.17    General Release ...........................................................................................................73
12.18    Non-Recourse .............................................................................................................74
12.19    Joinder.........................................................................................................................76

**EXHIBITS**

Exhibit A          Form of Assumption Agreement
Exhibit B          Bidding Procedures
Exhibit C          Form of Bidding Procedures Order
Exhibit D          Form of Bill of Sale
Exhibit E          Form of Intellectual Property Assignment Agreement
Exhibit F          Form of Transition Services Agreement
Exhibit G          Form of Securities Transfer Agreement

EQUITY INTEREST AND ASSET PURCHASE AGREEMENT

THIS EQUITY INTEREST AND ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of November 11, 2024 (the "**Execution Date**"), is made and entered into by and among RS Purchaser LLC, a Delaware limited liability company ("**Buyer**"), Wellpath Holdings, Inc., a Delaware corporation (the "**Company**"), and the Additional Sellers (collectively with the Company, the "**Sellers**" and, each entity individually, a "**Seller**"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in Article 1.

## RECITALS

WHEREAS, on the Execution Date, the Sellers and certain of their affiliates shall file voluntary petitions (the "**Bankruptcy Cases**") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

WHEREAS, in accordance with the Bidding Procedures and subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, Sellers desire to sell to Buyer the Acquired Assets, Buyer desires to purchase from Sellers the Acquired Assets and assume the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated by this Agreement;

WHEREAS, pursuant to the direction letter, dated on or around the date hereof (the "**Instruction Letter**"), a true and correct copy of which has been provided to Sellers, the Required Lenders (as defined in the DIP Facility) and UBS AG Stamford Branch, as agent (the "**DIP Agent**") have authorized and directed that Buyer credit bid the obligations under the DIP Facility, pursuant to the terms and subject to the conditions set forth in this Agreement;

WHEREAS, upon the Closing, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Buyer pursuant to the Sale Order, free and clear of all Liens (other than Permitted Liens), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

WHEREAS, the Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court; and

WHEREAS, the board of directors, board of managers, managing member, or similar governing body of each Seller has determined that it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and each has approved the same.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

# ARTICLE 1

## DEFINITIONS

1.1     Definitions.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"***Accounts Receivable***" means, with respect to each Seller, all accounts receivable, notes receivable, purchase orders, negotiable instruments, chattel paper, notes and other rights to payment, including those consisting of all accounts receivable in respect of services rendered or products sold to customers of the RS Business by such Seller, any other miscellaneous accounts receivable of such Seller related to the RS Business, and any claim, remedy or other right of such Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto.

"***Acquired Assets***" has the meaning set forth in Section 2.1.

"***Acquired Avoidance Actions***" means all Avoidance Actions, including any proceeds thereof, that may be asserted against parties to, or otherwise are related to the Assumed Contracts.

"***Acquired Companies***" the Subsidiaries of the Sellers set forth on Schedule 2.1(f)(i), as it may be amended from time to time pursuant to the terms hereof.

"***Acquired Company Plan***" means any Plan which is maintained, sponsored or entered into solely by an Acquired Company.

"***Action***" means any legal action, suit, petition, plea, charge, claim, demand, hearing, inquiry, arbitration, complaint, grievance, summons, litigation, mediation, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, inquest, audit, examination, investigation or similar matter commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority.

"***Additional Sellers***" means: Correct Care Holdings, LLC, a Florida limited liability company, and Alpine CA Behavioral Health HoldCo, LLC, a Delaware limited liability company.

"***Ad Hoc Group***" means that certain ad hoc group of unaffiliated Consenting First Lien Lenders and Consenting Second Lien Lenders represented by Akin Gump Strauss Hauer & Feld LLP, Houlihan Lokey Capital, Inc. and Ankura Consulting Group, LLC.

"***Affiliate***" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Exchange Act.

"***Agreement***" has the meaning set forth in the introductory paragraph.

"***Allocation Statement***" has the meaning set forth in Section 3.2.

2

"***Alpine Purchase Agreement***" means that certain Equity Purchase Agreement by and between CCS-CMGC Parent Holdings, LP, Alpine CA Behavioral Health HoldCo, LLC, Wellpath Holdings, Inc., as guarantor, the sellers party thereto, and the seller representative, dated as of April 21, 2022.

"***Alternate Bidder***" has the meaning set forth in the Bidding Procedures.

"***Alternate Bid Expiration Date***" has the meaning set forth in <u>Section 7.8</u>.

"***Alternative Transaction***" means any sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, consent solicitation, exchange offer, tender offer, recapitalization, plan of reorganization or liquidation, share exchange, business combination, joint venture, debt incurrence, or similar transaction involving the Company and/or any of its Subsidiaries (including, for the avoidance of doubt, a transaction premised on a sale of assets under Section 363 of the Bankruptcy Code), or the debt, equity, or other interests in the Company and/or any of its Subsidiaries that transfers to or vests ownership of the RS Business or substantially all of its assets in any party other than Buyer.

"***Annual Financial Statements***" has the meaning set forth in <u>Section 5.6</u>.

"***Anti-Corruption Laws***" means the U.S. Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and any applicable Legal Requirements related to bribery or corruption.

"***Anti-Money Laundering Laws***" means the Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956-1957), the USA PATRIOT ACT ((Pub. L. No. 107-56), the Bank Secrecy Act (31 U.S.C. §§5311-5332)), the UK Proceeds of Crime Act 2002, the UK Terrorism Act 2000 and any applicable Legal Requirements related to terrorist financing or money laundering, including know-your-customer (KYC) and financial recordkeeping and reporting requirements.

"***Antitrust Law***" means, collectively, the HSR Act, title 15 of the United States Code §§ 1-7, as amended (the Sherman Act), Title 15 of the United States Code §§ 12-27 and Title 29 of the United States Code §§ 52-53, as amended (the Clayton Act), the Federal Trade Commission Act (15 U.S.C.§ 41 et seq.), as amended, and the rules and regulations promulgated thereunder, and all other national, state, local or foreign Legal Requirements in effect from time to time that are designed or intended to (a) prohibit, restrict or regulate actions or transactions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition; or (b) regulate transactions involving foreign investments, including any Legal Requirements that provide for review of national security matters in any jurisdiction.

"***Apportioned Taxes***" has the meaning set forth in <u>Section 8.1(b)</u>.

"***Approved Budget***" has the meaning set forth in the applicable DIP Financing Orders.

"***Assumed Contracts***" has the meaning set forth in <u>Section 2.5(a)(i)</u>.

"***Assumed Liabilities***" has the meaning set forth in <u>Section 2.3</u>.

"***Assumption Agreement***" means the Assignment and Assumption Agreement, in substantially the form attached hereto as **<u>Exhibit A</u>**.

"***Auction***" means the auction for the sale of the RS Business conducted by Sellers if, and only if, any Qualified Bid (other than this Agreement) is received pursuant to the terms and conditions of the Bidding Procedures Order.

"***Avoidance Action***" means any and all actual or potential avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Seller, its Estates, or other authorized parties in interest to avoid a transfer of property or an obligation incurred by the Seller pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through and including 553, and 724(a) of the Bankruptcy Code, or under similar or related state, federal, and non-U.S. statutes and common law, including fraudulent transfer laws or fraudulent conveyance.

"***Bankruptcy and Equity Exceptions***" has the meaning set forth in <u>Section 5.3</u>.

"***Bankruptcy Cases***" has the meaning set forth in the recitals.

"***Bankruptcy Code***" means Title 11 of the United States Code, Sections 101 *et seq*.

"***Bankruptcy Court***" has the meaning set forth in the recitals.

"***Bidding Procedures***" means bid procedures, substantially in the form attached hereto as **<u>Exhibit B</u>** (with changes approved by Buyer and Sellers in accordance with this Agreement), to be approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"***Bidding Procedures Motion***" means the motion filed by Sellers with the Bankruptcy Court seeking entry of the Bidding Procedures Order approving, among other things, the Bidding Procedures.

"***Bidding Procedures Order***" means an Order of the Bankruptcy Court, substantially in the form attached hereto as **<u>Exhibit C</u>** (with changes approved by Buyer and Sellers in accordance with this Agreement).

"***Bill of Sale***" means a Bill of Sale, in substantially the form attached hereto as **<u>Exhibit D</u>**.

"***Business Day***" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized to close.

"***Buyer***" has the meaning set forth in the introductory paragraph and shall also include any Buyer Designee.

"***Buyer 401(k) Plan***" has the meaning set forth in <u>Section 8.5(e)</u>.

"***Buyer Designee***" has the meaning set forth in <u>Section 2.1</u>.

"***Buyer Employees***" has the meaning set forth in <u>Section 8.5(b)</u>.

"***Cash Cap***" means an amount equal to $10,000,000.00, which amount is subject to adjustment by a mechanism to be mutually agreed to by the Parties in good faith no later than ten (10) Business Days following the Execution Date, which mechanism shall take into account anticipated levels of Cure Costs, accounts payable and Accounts Receivable as of the Closing.  For the avoidance of doubt, only the mechanism will be agreed upon within ten (10) Business Days following the Execution Date, the actual targets and calculations will be agreed upon prior to the Sale Hearing.

"***Causes of Action***" means any claim, interest, damage, remedy, cause of action, proceeding, demand, right, action, suit, obligation, liability, account, defense, offset, power, privilege, license, Lien, indemnity, guaranty, franchise, debt, judgment, or controversy of any kind or character whatsoever, whether known or unknown, choate or inchoate, foreseen or unforeseen, existing or hereinafter arising, contingent or noncontingent, disputed or undisputed, liquidated or unliquidated, secured or unsecured, matured or unmatured, suspected or unsuspected, assertable directly or derivatively, reduced to judgment or otherwise, whether arising before, on, or after the commencement of the Bankruptcy Cases, in contract, tort, law, equity, or otherwise pursuant to any theory of law. For the avoidance of doubt, Causes of Action include the following:  (a) any right of setoff, counterclaim, or recoupment and any claim under contracts or for breaches of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any claims or causes of action for aiding and abetting (including of breaches of fiduciary duties), knowing participation (including knowing participation in breach of fiduciary duty), and conspiracy (including conspiracy to breach fiduciary duty); (d) any claims or causes of action for illegal dividends; (e) any claims or causes of action for fraud, misrepresentations, or omissions; (f) the right to object to, subordinate, disallow, or otherwise contest Liens and Claims; (g) any claim or defense, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (h) any Avoidance Action.

"***Claim***" means a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"***Closing***" has the meaning set forth in <u>Section 4.1</u>.

"***Closing Date***" means the date and time as of which the Closing occurs as set forth in <u>Section 4.1</u>.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Company***" has the meaning set forth in the introductory paragraph.

"***Consenting First Lien Lenders***" has the meaning set forth in the Restructuring Support Agreement.

"***Consenting Second Lien Lenders***" has the meaning set forth in the Restructuring

Support Agreement.

"*Consenting Stakeholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Contract*" means any agreement, contract, obligation, promise, undertaking, lease (including any Leases), sublease, purchase order, arrangement, license, commitment, insurance policy or other binding arrangement or understanding (in each case whether written or oral), and any amendments, modifications or supplements thereto.

"*Corrections Business*" means the Company's businesses and operations other than the RS Business.

"*Cure Costs*" means all monetary liabilities, including pre-petition monetary liabilities, of Sellers that must be paid or otherwise satisfied to cure all of Sellers' monetary defaults under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court.

"*Deferred One Year Cash Payment*" means a portion of the purchase price under the Alpine Purchase Agreement in an original amount equal to $17,500,000.

"*Determination Date*" has the meaning set forth in Section 2.5(a).

"*DIP Agent*" has the meaning set forth in the recitals.

"*DIP Facility*" has the meaning set forth in the Restructuring Support Agreement.

"*DIP Financing Orders*" means, collectively, the Interim DIP Financing Order and the Final DIP Financing Order.

"*Disclosure Schedules*" means the Disclosure Schedules attached hereto, dated as of the Execution Date, delivered by Sellers to Buyer in connection with the execution of this Agreement, as the same may be supplemented and amended pursuant to Section 7.6.

"*Disputed Contract*" has the meaning set forth in Section 2.5(a)(i).

"*Disputed Contract Determination*" has the meaning set forth in Section 2.5(a)(v).

"*Documents*" means all of the documents that are used or useful in, held for use in, or intended to be used in, or that arise in any way out of, the RS Business.

"*Employees*" means all employees of the Acquired Companies as of the Closing.

"*Environmental Laws*" means any and all Legal Requirements enacted and in effect on or prior to the date of this Agreement concerning pollution, natural resources, or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing,

processing, discharge, release, control, or cleanup of any hazardous materials, substances, or wastes.

"**_Equipment_**" means all furniture, fixtures, equipment, computers, machinery, vehicles, apparatus, attachments, appliances, fittings, lighting fixtures, doors, cabinets, partitions, mantels, motors, pumps, screens, plumbing, heating, air conditioning, waste disposal and storing, wiring, telephones, televisions, monitors, security systems, carpets, floor coverings, wall coverings, office equipment, laboratory equipment, computers, registers, safes, trash containers, meters and scales, combinations, codes and keys, implements, telephone systems, signage, supplies, communications equipment, information technology assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties of the vendor applicable thereto, and all other tangible personal property of every kind and description, and Improvements used, or held for use, in connection with the operation of the RS Business, wherever located.

"**_Equity Interests_**" means any shares of any class of capital stock, membership interests, partnership interests or other equity or equity-based interests (including securities convertible or exchangeable into equity interests) in any Person, which are issued and outstanding (including all rights to receive all beneficial interest in any such items), and any outstanding warrants, options, voting agreements or other Contracts or obligations pursuant to which such Person is or may become obligated to issue, sell, purchase, return, redeem, vote or abstain from voting any shares of capital stock, membership interests, partnership interests or other equity interests.

"**_ERISA_**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**_ERISA Affiliate_**" means, with respect to any Person, trade, business or entity, any other Person, trade, business or entity that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA that includes or included the first Person, trade, business, or entity that is, or was at the relevant time, a member of the same "controlled group" as the first Person, trade, business, or entity pursuant to Section 4001(a)(14) of ERISA.

"**_Exchange Act_**" means the Securities Exchange Act of 1934, as amended.

"**_Excluded Assets_**" has the meaning set forth in <u>Section 2.2</u>.

"**_Excluded Company_**" means any direct or indirect Subsidiary of a Seller that is not an Acquired Company.

"**_Excluded Contracts_**" has the meaning set forth in <u>Section 2.5(a)(i)</u>.

"**_Excluded Liabilities_**" has the meaning set forth in <u>Section 2.4</u>.

"**_Execution Date_**" has the meaning set forth in the introductory paragraph.

"**_Exit Term Loan Facility Documents_**" means the credit agreement and related loan

documents (including the "Credit Documents" or similar term defined in such credit agreement) governing Buyer's takeback exit term loan facility, to be entered into on or substantially concurrently with the Closing.

"***Expense Reimbursement***" means an amount, not to exceed $2,000,000, for which Sellers shall be liable upon the occurrence of a Protection Event, equal to the reasonable and documented out-of-pocket costs, fees and expenses of Buyer and the Ad Hoc Group (including reasonable expenses of legal, financial advisory, accounting and other similar costs, fees and expenses and all filing fees under the HSR Act and any other Antitrust Laws, including the fees and expenses of Akin Gump Strauss Hauer & Feld LLP, any local counsel, Houlihan Lokey Capital, Inc. and Ankura Consulting Group, LLC) related to the formation and operation of the Buyer and the transactions contemplated by this Agreement and to the extent such out-of-pocket costs, fees and expenses are not otherwise paid or reimbursed by the Sellers under the DIP Facility promptly upon the terms and conditions set forth in Section 11.2(b), which amount, upon entry of the Bidding Procedures Order, shall constitute a super priority administrative expense of Sellers under section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of any kind, including those specified in sections 503(b) or 507(b) of the Bankruptcy Code and be paid as provided in Section 11.2.

"***Facility***" has the meaning set forth in Section 5.9.

"***Final DIP Financing Order***" means a Final Order of the Bankruptcy Court approving, among other things, the DIP Facility and the Sellers' entry into the definitive agreements related thereto.

"***Final Order***" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Action or Order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"***Financial Statements***" has the meaning set forth in Section 5.6.

"***GAAP***" means United States generally accepted accounting principles as in effect at the Interim Balance Sheet Date.

"***Governmental Authority***" means any United States or non-United States federal, state, provincial, or local governmental, or regulatory commission, board, bureau, agency, court,

or other tribunal of any of the foregoing.

"*Governmental Authorization*" means any approval, consent, license, Permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"*Hazardous Substance*" means (a) petroleum or petroleum products, flammable materials, explosives, radioactive materials, radon gas, lead-based paint, asbestos, and polychlorinated biphenyls (PCBs), and (b) any chemicals or other materials or substances which are defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances," "toxic pollutants," "contaminants," "pollutants," or words of similar import under any applicable Environmental Law.

"*HIPAA*" means the Health Insurance Portability and Accountability Act of 1996, (42 U.S.C. §1320d et seq.), as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, and any implementing regulations promulgated thereunder (including the Standards for Privacy of Individually Identifiable Health Information, the Security Standards for the Protection of Electronic Protected Health Information and the Standards for Electronic Transactions and Code Sets promulgated thereunder) and applicable Legal Requirements regarding patient privacy and the security, storage, disposal, transmission, use or disclosure of health care records or information protected as "personal data," "personal information," "personal identifiable information," or "personal health information" among others.

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder and any successor to such statute, rules, or regulations.

"*Improvements*" means the buildings, structures, fixtures, systems, facilities, easements, rights-of-way, privileges, improvements, parking areas, landscaped areas, PP&E, licenses, appurtenances and all other rights and benefits appurtenant or in any way related to and/or demised under any lease of, or other contract or agreement for the use of, the Real Property Leases, as applicable.

"*Indebtedness*" means, at any time and with respect to any Person: (a) all indebtedness of such Person for borrowed money or indebtedness issued or incurred in substitution or exchange for indebtedness for borrowed money; (b) all indebtedness of such Person for the deferred price of property or services, including reimbursement and other obligations for surety bonds; (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (d) non-contingent obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance or similar instrument (in each case, only to the extent drawn); (e) "earnouts", purchase price adjustments, profit sharing arrangements, deferred purchase money amounts and similar payment obligations or continuing obligations of any nature of such Person arising out of purchase and sale contracts; (f) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases, but only to the extent recorded as a capital lease in the Financial Statements; (g) unfunded or underfunded single employer defined pension plan or withdrawal liabilities currently payable to any multiemployer plan liabilities; (h) all Indebtedness of others

9

referred to in clauses (a) through (g) above guaranteed directly by such Person; (i) all Indebtedness referred to in clauses (a) through (h) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including accounts and contract rights) owned by such Person (other than Permitted Liens), even though such Person has not assumed or become liable for the payment of such Indebtedness; and (i) for clause (a) through (i) above, all accrued interest thereon, if any, and any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayments of such Indebtedness.

"**_Instruction Letter_**" has the meaning set forth in the recitals.

"**_Intellectual Property_**" means all copyrights, patents, trademarks, trade names, trade styles, logos, product designations and service marks and all applications (pending or in process) and registrations therefor and licenses thereof primarily used or held for use in the RS Business.

"**_Intellectual Property Assignment Agreement_**" means the Intellectual Property Assignment Agreement, in substantially the form attached hereto as **Exhibit E**.

"**_Interim Balance Sheet_**" has the meaning set forth in Section 5.6.

"**_Interim Balance Sheet Date_**" has the meaning set forth in Section 5.6.

"**_Interim DIP Financing Order_**" means an interim Order of the Bankruptcy Court approving, among other things, the DIP Facility on an interim basis and the Sellers' entry into the definitive agreements related thereto.

"**_Interim Financial Statements_**" has the meaning set forth in Section 5.6.

"**_Inventory_**" has the meaning set forth in Section 2.1(g).

"**_IRS_**" means the Internal Revenue Service.

"**_Key Person_**" means individuals listed on Schedule 1.1(a).

"**_Knowledge_**" means, with respect to any matter in question, in the case of Sellers, the actual knowledge of any of the individuals listed on Schedule 1.1(b) is deemed to have after due investigation and inquiry.

"**_Lease_**" and "**_Leases_**" means all leases, subleases, licenses, sublicenses, occupancy agreements, access agreements, memoranda, amendments, restatements, modifications, supplements, and assignments.

"**_Leased Real Property_**" has the meaning set forth in Section 5.12(a).

"**_Legal Requirement_**" means any federal, state, provincial, county, local, municipal, foreign, international, or multinational law (statutory, common or otherwise), constitution, treaty, convention, ordinance, equitable principle, code, rule, regulation or Order enacted, adopted,

promulgated or applied by any Governmental Authority.

"***Liability***" means Claim or Lien of any kind or nature whatsoever (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"***Lien***" means any "interest" as that term is used in Section 363(f) of the Bankruptcy Code, mortgage, deed of trust, pledge, assignment, successor liability, security interest, encumbrance, easement, condition, covenant, reservation, lien, mechanics lien, claim, charge, hypothecation, warrant, deemed trust, action, or claim of any kind or nature whatsoever in respect of any property, other than any license of Intellectual Property, including any of the foregoing created by, arising under, or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a capital lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of a financing statement naming the owner of the property as to which such lien relates as the debtor under the Uniform Commercial Code or any comparable Legal Requirement in any other jurisdiction.

"***Managed Entity***" means California Health and Recovery Solutions, P.C., a California professional corporation.

"***Material Adverse Effect***" means any fact, state of facts, change, circumstance, occurrence, effect, event, result or development that individually or in the aggregate (taking into account all other such facts, states of fact, changes, circumstances, occurrences, effects, events, results or developments) has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on (a) the RS Business, the Acquired Assets or the assets, properties, prospects, condition (financial or otherwise), liabilities or results of operations of the RS Business (excluding the Excluded Assets and the Excluded Liabilities), taken as a whole or (b) the ability of the Sellers to consummate the transactions contemplated by this Agreement or to perform any of their obligations under this Agreement, but, with respect to clause (a) only, excluding any fact, state of facts, change, circumstance, occurrence, effect, event, result or development to the extent that it results from or arises out of (i) the filing, commencement or pendency of the Bankruptcy Cases; (ii) the execution and delivery of this Agreement or the announcement thereof, including any termination of, reduction in or similar negative impact on relationships, contractual or otherwise, with any customers, suppliers, distributors, partners or employees of the Sellers or the RS Business; (iii) any adoption, implementation, modification, repeal or other changes in Legal Requirement or accounting regulations or principles, or in interpretations of any of the foregoing; (iv) any specific action required to be taken pursuant to the terms of this Agreement or any action taken or failed to be taken, by the Seller at the written request of, or with the written consent of, Buyer; (v) any change or effect of economic, business or political conditions (including outbreak, continuation or escalation of any military conflict, declared or undeclared war, armed hostilities, civil unrest, public demonstrations or acts of foreign or domestic terrorism or sabotage (including hacking, ransomware or any other electronic attack), or any escalation or worsening of any such conditions) or the securities, debt, banking, capital, credit or financial markets, or in interest or exchange rates, in each case, in any country or region; (vi) any epidemic, pandemic or outbreak of disease, or any escalation or worsening of such conditions, (vii) any natural or manmade disasters or calamities, weather conditions including hurricanes, floods, tornados, tsunamis, earthquakes and wild fires, cyber outages, or other force majeure events, or

11

any escalation or worsening of such conditions; (viii) any other regional, national or international calamity, crisis or emergency; or (ix) any failure by the Sellers or the Acquired Companies to meet any projections, estimates, or budgets of or relating to the RS Business for any period prior to, on, or after the date of this Agreement (it being understood that the underlying causes of such failure may be taken into account in determining whether a Material Adverse Effect has occurred); provided that, in the cases of immediately preceding clauses (iii), (v), (vi), (vii) and (viii), such fact, state of facts, change, circumstance, occurrence, effect, event, result or development shall be taken into account to the extent that Sellers are disproportionately affected, taken as a whole, as compared to other companies in the same industry as Sellers and solely to the extent of such disproportionate effect.

"***Material Contract***" has the meaning set forth in <u>Section 5.19(a)</u>.

"***Material Customers***" has the meaning set forth in <u>Section 5.21(a)</u>.

"***Material Suppliers***" has the meaning set forth in <u>Section 5.21(b)</u>.

"***Non-Acquired Company Plan***" means every Plan that is not an Acquired Company Plan.

"***Order***" means any order, writ, injunction, judgment, verdict, ruling, decision, subpoena, mandate, precept, command, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Authority or an arbitrator, mediator or other quasi-judicial or judicially sanctioned Person.

"***Ordinary Course of Business***" means, with respect to any Person, the ordinary and usual course of normal day to day operations of such Person and its business, consistent with its past practice (including with respect to quality, quantity and frequency).

"***Organizational Documents***" means (a) any certificate or articles of incorporation, bylaws, certificate or articles of formation, operating agreement or partnership agreement, (b) any documents comparable to those described in clause (a) as may be applicable pursuant to any Legal Requirements, and (c) any amendment or modification to any of the foregoing.

"***Other Rights and Interests***" means (i) easements, rights of way, privileges, licenses, hereditaments, appurtenances and all other rights and benefits appurtenant or in any way related to, or demised under any lease of or other context or agreement for the use of, the Leased Real Property and (ii) all strips and gores and any land lying in the bed of a public road, highway or other access way, open or proposed adjourning such Leased Real Property, in each case, to the extent any Seller has a legally recognized interest therein.

"***Outside Date***" has the meaning set forth in <u>Section 11.1(b)(i)</u>.

"***Party***" or "***Parties***" means, individually or collectively, Buyer and Sellers.

"***Permits***" has the meaning set forth in <u>Section 5.22(d)(i)</u>.

"***Permitted Liens***" means (a) statutory Liens for current Taxes or other

governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate Actions by any Acquired Company or any Seller; (b) mechanics', carriers', workers', repairers', and similar statutory Liens arising or incurred in the ordinary course of business; (c) Liens arising under worker's compensation, unemployment insurance, social security, retirement, or similar legislation; (d) Liens on goods in transit incurred pursuant to documentary letters of credit; (e) purchase money Liens and Liens securing rental payments under capital lease arrangements; (f) Liens arising under the Leases; (g) Liens that do not, individually or in the aggregate, result in a Material Adverse Effect; (h) the Liens set forth on Schedule 1.1(c), (i) Liens incurred in the ordinary course of business in connection with securing the performance of bids, tenders, public utilities or private utilities, leases and contracts in the ordinary course of business, statutory obligations, surety or appeal bonds, performance bonds and other obligations of a like nature, and obligations in respect of letters of credit or bank guaranties that have been posted to support payment of the liens described in this clause (i), (j) Liens on cash collateral (y) deposited with issuers of performance or surety bonds or performance and completion guarantees or similar instruments or issuers of letters of credit issued to an issuer of performance or surety bonds or performance and completion guarantees or similar instruments, in each case issued or created in the ordinary course of business or (z) arising in connection with letters of credit issued in the ordinary course of business, and (k) other Liens arising in the ordinary course of business and not incurred in connection with the borrowing of money.

"***Person***" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group (as defined in section 13(d)(3) of the Exchange Act) or Governmental Authority.

"***Petition Date***" means November 11, 2024.

"***Plan***" and "***Plans***" means employee benefit, welfare, supplemental unemployment benefit, employment, offer letter, individual consulting, change in control, retention, severance pay, bonus, pension, profit sharing, retirement, deferred compensation, incentive compensation, stock compensation, stock option, stock appreciation, phantom stock option, other equity or equity-based compensation, vacation, sick leave, death benefit, health or other medical, dental, life, disability, or other insurance, Code section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance, fringe benefit, or other similar plan, program, agreement, or arrangement, whether written or oral, including any (i) "employee benefit plan" within section 3(3) of ERISA or (ii) other employee benefit plans, programs, agreements or arrangements, whether or not subject to ERISA, sponsored, maintained, contributed to or required to be contributed to, or entered into, by the Sellers or the Acquired Companies, or pursuant to which the Sellers or the Acquired Companies have any Liability, in each case, for the benefit of their current or former officers, directors, employees, individual consultants their dependents or beneficiaries, other than plans established pursuant to statute

"***Post-Closing Tax Period***" has the meaning set forth in Section 8.1(b).

"***Pre-Closing Tax Period***" has the meaning set forth in Section 8.1(b).

"***Pre-Paid Expenses***" means all deposits (including customer deposits and security

deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, pre-paid or deferred charges and expenses, prepayments, rights under warranties or guarantees, vendor rebates and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent) that relate primarily to the RS Business, except professional fee retainers.

"*Previously Omitted Contract*" has the meaning set forth in Section 2.5(b)(i).

"*Previously Omitted Contract Designation*" has the meaning set forth in Section 2.5(b)(i).

"*Previously Omitted Contract Notice*" has the meaning set forth in Section 2.5(b)(ii).

"*Protection Event*" has the meaning set forth in Section 11.2(b).

"*Purchase Price*" has the meaning set forth in Section 3.1.

"*Qualified Bid*" has the meaning set forth in the Bidding Procedures.

"*Real Property Leases*" has the meaning set forth in Section 5.12(b).

"*Release*" means (a) any releasing, spilling, discharging, dumping, disposing, leaking, pumping, injecting, pouring, depositing, dispersing, emitting, emptying, escaping, leaching or migrating into the indoor or outdoor environment, including ambient air, soil, surface water, groundwater and surface or subsurface strata, and (b) the abandonment or discarding of barrels, tanks, containers or receptacles, whether or not sealed or closed, containing, or which formerly contained, Hazardous Substances.

"*Representative*" means, with respect to a particular Person, any director, manager, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of the Execution Date, among the Company and the other parties thereto.

"*RS Business*" means the business of (i) providing inpatient behavioral health services outside of correctional facilities, including inpatient and residential treatment, partial hospitalization and outpatient programs, and community-based services on behalf of Governmental Authorities, and (ii) providing behavioral health and/or substance use disorder services inside correctional facilities to the extent such services are paid by or on behalf of local or state mental health departments and result solely from an involuntary treatment order related to a behavioral health and/or substance use disorder diagnosis.

"*Sale Hearing*" means the hearing to consider the entry of the Sale Order.

"*Sale Order*" means an Order of the Bankruptcy Court, substantially in the form agreed to by Sellers and Buyer, or otherwise reasonably acceptable to Buyer, pursuant to, *inter*

14

*alia*, Sections 105, 363 and 365 of the Bankruptcy Code authorizing and approving, *inter alia*, the sale of the Acquired Assets to Buyer and/or the Buyer Designees, as applicable, on the terms and conditions set forth herein, free and clear of all Liens (other than Permitted Liens), and the assumption and assignment of the Assumed Contracts to Buyer and/or the Buyer Designees, as applicable, and containing findings of fact and conclusions of law that Buyer and/or the Buyer Designees, as applicable, has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code.

"***Sales Taxes***" has the meaning set forth in Section 8.1(a).

"***Sanctioned Country***" means any country or region (i) that is the subject or target of comprehensive Sanctions (including Cuba, Iran, North Korea, Syria, Crimea, the so-called Donetsk People's Republic and so-called Luhansk People's Republic, Kherson, Zaporizhzhia and other regions of Ukraine that are the subject or target of comprehensive Sanctions); (ii) the government of which is the subject or target of Sanctions (including Venezuela) or (iii) that is otherwise the subject or target of broad Sanctions (including Russia, Belarus and Afghanistan).

"***Sanctioned Person***" means any Person that is (a) the target of Sanctions, including any Person(s) listed on any Sanctions list, including OFAC's Specially Designated Nationals and Blocked Persons List and Sectoral Sanctions Identifications List, the EU Consolidated List and HM Treasury's Consolidated List of Persons Subject to Financial Sanctions; (b) located, organized, resident or operating in or incorporated under the laws of any Sanctioned Country; or (c) owned or controlled by or acting on behalf or at the direction of (as such terms are defined and interpreted by the relevant Sanctions) any Person(s) that are described in clause(s) (a) and/or (b) such that such Person is subject to the same restrictions or prohibitions as the Person(s) described in clause(s) (a), and/or (b).

"***Sanctions***" means any economic, financial or trade sanctions or trade embargoes administered or enforced from time to time by (a) the United States Government (including those administered by OFAC, the U.S. Department of State and the U.S. Department of Commerce), (b) the United Nations Security Council, (c) the European Union and each member state thereof (including those administered by the EU Council or EU Commission, when acting in furtherance of the EU's Common and Foreign Security Policy), and (d) the United Kingdom (including those administered by His Majesty's Treasury and the Department of Business, Innovation and Skills).

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Seller Cure Cap***" means an amount equal to (a) $10,000,000 less (b) any amounts paid by, or on behalf of, the Sellers on or after the Execution Date in connection with the payment of any pre-petition trade payables;

"***Seller 401(k) Plan***" has the meaning set forth in Section 8.5(e).

"***Sellers***" has the meaning set forth in the introductory paragraph.

"***Settlement Agreement***" means that certain Settlement Agreement by and among Alpine CA Behavioral Health HoldCo, LLC, Wellpath Holdings, Inc., Alpine Special Treatment Center, Inc., Mike Doyle, Victoria Klein and Kristen Allred, dated as of July 1, 2024.

"*Shared Contracts*" means those Contracts that relate to both the RS Business and the Corrections Business.

"*Straddle Period*" has the meaning set forth in <u>Section 8.1(b)</u>.

"*Subsidiary*" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the managers, directors or similar managing body.

"*Successful Bidder*" has the meaning set forth in the Bidding Procedures.

"*Tax*" or "*Taxes*" (and with correlative meaning, "*Taxable*" and "*Taxing*") means (i) any U.S. federal, state, provincial, local, non-U.S. or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto, whether disputed or not) and (ii) any liability for any items described in clause (i) payable by reason of contract, transferee liability or operation of law (including Treasury Regulations Section 1.1502-6) or otherwise.

"*Tax Return*" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"*Taxing Authority*" means the Internal Revenue Service and any other Governmental Authority that has the right to impose Taxes on the Sellers and the Acquired Companies.

"*Transaction Documents*" means this Agreement, the Assumption Agreement, the Bills of Sale, the Intellectual Property Assignment Agreement, the Restructuring Support Agreement, the Transition Services Agreement and any other agreements, instruments or documents entered into at the Closing pursuant to this Agreement.

"*Transfer Taxes*" has the meaning set forth in <u>Section 8.1(a)</u>.

"*Transferred Permits*" has the meaning set forth in <u>Section 2.1(o)</u>.

"*Transition Services Agreement*" means that certain transition services agreement to be entered into between the Sellers and the Buyer, in substantially the form attached hereto as **Exhibit F**.

"*Unified Program Facility Permit*" means that certain Unified Program Facility

16

Permit, issued to Alpine Special Treatment Center Inc. by the County of San Diego Department of Environmental Health and Quality.

"***WARN Act***" has the meaning set forth in <u>Section 5.14(g)</u>.

<u>1.2</u>    <u>Other Definitions and Interpretive Matters</u>.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

<u>Calculation of Time Period</u>. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

<u>Day</u>. Any reference in this Agreement to days (but not Business Days) means calendar days.

<u>Dollars</u>. Any reference in this Agreement to $ means United States dollars.

<u>Exhibits/Schedules</u>. All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

<u>Gender and Number</u>. Any reference in this Agreement to gender includes all genders, and words imparting the singular number only include the plural and vice versa.

<u>Headings</u>. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "***Section***" or "***Article***" are to the corresponding Section or Article of this Agreement unless otherwise specified.

<u>Herein</u>. Words such as "***herein***", "***hereof***" and "***hereunder***" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

<u>Including</u>. The word "***including***" or any variation thereof means "***including, without limitation,***" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

<u>Or</u>. The word "***or***" shall be disjunctive but not exclusive.

(b)    No Strict Construction. Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event

17

an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limiting the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE 2

### PURCHASE AND SALE

2.1     Purchase and Sale. Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement, on the Closing Date, Sellers shall unconditionally sell, transfer, assign, convey and deliver to Buyer and/or one or more other Persons designated by Buyer (each, a "**_Buyer Designee_**"), and Buyer shall purchase, acquire and accept from Sellers, free and clear of any and all Liens (other than Permitted Liens), all of Sellers' direct or indirect right, title and interest in, to or under the RS Business, including all of Sellers' properties, rights, Claims and assets (other than the Excluded Assets) of every kind and description (wherever situated or located, real, personal or mixed, tangible or intangible, whether identifiable or contingent, owned, leased or licensed) primarily used, held for use in, or useful in, or intended to be primarily used in, the RS Business, whether or not reflected on the books and records of Sellers, as the same shall exist on the Closing Date (collectively, the "**_Acquired Assets_**"). Without limiting the generality of the prior sentence, the Acquired Assets shall include (except where so noted in the following list or in any definition used in the following list) all of Sellers' direct or indirect right, title and interest in, to and under the following (solely to the extent that such properties, rights, Claims and assets relate to the RS Business):

(a)     all Accounts Receivable;

(b)     all Pre-Paid Expenses;

(c)     all cash and cash equivalents in an amount not to exceed the Cash Cap, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, instruments and investments of Sellers primarily involving or primarily related to the RS Business, excluding prepaid deposits related to professional fee retainers; provided, however, the Parties acknowledge and agree that the Sellers shall use reasonable best efforts to have an amount of cash and cash equivalents in an amount equal to the Cash Cap as of the Closing;

(d)     all Intellectual Property owned by the Sellers;

(e)     all Equipment, whether owned or leased (and, to the extent leased, any Contract or rights related thereto if such Contract is an Assumed Contract);

(f)     all record and beneficial ownership in Equity Interests owned by the Sellers (and all rights related thereto of the Sellers) in each Acquired Company; provided, however, that Buyer may, in its sole and absolute discretion, amend or revise Schedule 2.1(f)(i) at any time and from time to time prior to the date that is two (2) Business Days prior to the Closing Date, in

18

order to add any one or more of the direct or indirect Subsidiaries of the Sellers set forth on Schedule 2.1(f)(ii) (and such added Subsidiary shall be automatically included as an Acquired Company for purposes of this Agreement), or remove any direct or indirect Subsidiary of the Sellers from such Schedule 2.1(f)(i) (and such removed Subsidiary shall be automatically deemed an Excluded Company for purposes of this Agreement);

(g)     all inventory and products of any kind or nature, primarily involving or primarily related to the RS Business and maintained, held or stored by or for the Sellers on the Closing Date, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same ("***Inventory***");

(h)     to the extent permitted by Legal Requirements, all Documents and other books and records (including financial and accounting files (but excluding the general corporate files and records of Sellers, insofar as they primarily involve or primarily relate to the RS Business)), and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, business software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, other technical information and data, vendor lists, supplier lists, and all other business and other records solely to the extent primarily related to the RS Business;

(i)     all Assumed Contracts, and, with respect to any Plan that is an Assumed Contract and not an Acquired Company Plan, any and all assets, trust agreements, insurance policies, administrative services agreements, and other contracts, files, and records in respect thereof;

(j)     all Leased Real Property under any Lease that is an Assumed Contract (and any agreement and rights related thereto or under the applicable Lease to the extent that such agreement or Lease is an Assumed Contract) together with all interests in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof including all Other Rights and Interests in respect thereof;

(k)     all security deposits with respect to any Lease that is an Assumed Contract;

(l)     all rights under or arising out of all third-party insurance policies related to the RS Business (other than director and officer insurance policies), including third-party property and casualty insurance proceeds and other insurance proceeds (solely for the sake of clarity, this subsection (n) shall not include any self-insured policies of Sellers or any of their Affiliates);

(m)     all goodwill and customer referral relationships, other intangible property and all privileges, set-offs, indemnification rights, causes of action, actions, Claims and demands and rights of any kind as against others (whether by contract or otherwise) exclusively involving or exclusively relating to, arising from or associated with any of the Acquired Assets, the Assumed Liabilities and/or the RS Business;

(n)     all Acquired Avoidance Actions;

(o)      All Permits that primarily involve or primarily relate to the RS Business, to the extent transferable, including those designated as "Transferred Permits" on Schedule 2.1(o) (the "***Transferred Permits***");

(p)      all Causes of Actions of the Sellers of any kind relating to the RS Business against any Buyer Employee (excluding the proceeds of any insurance policies held by the Sellers or any of their Affiliates related to any such Causes of Action) arising at any time prior to the Closing, which such Causes of Actions shall be, and effective immediately upon Closing hereby are, waived and released in full by Buyer or Buyer Designee immediately upon Closing;

(q)      all claims, interests, rights, rebates, refunds, abatements, remedies, recoveries and benefits of Sellers, and all claims and causes of action (other than with respect to Taxes), arising under or relating to any of the Acquired Assets, the Assumed Liabilities or the RS Business, including those arising out of Assumed Contracts, express or implied warranties, representations, licenses and guarantees from suppliers, manufacturers, contractors or others solely to the extent relating to the operation of the RS Business or affecting the Equipment, Improvements, Inventory or other tangible Acquired Assets or ordered by the Sellers prior to the Closing Date (and in any case, any component thereof);

(r)      all rights, but not obligations, under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with former employees and agents of Sellers or with third parties with respect to the RS Business (including any non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with or in contemplation of the Auction);

(s)      all telephone, telex and telephone facsimile numbers and other directory listings; and

(t)      all assets, if any, listed on Schedule 2.1(t) (regardless of whether such assets are covered by any of the foregoing).

2.2      Excluded Assets. Notwithstanding anything to the contrary in this Agreement (including Section 2.1), nothing herein shall be deemed to sell, transfer, assign, convey or deliver any of the Excluded Assets to Buyer or any of the Buyer Designees, and Sellers shall retain all right, title and interest to, in and under, and all Liabilities with respect to, the Excluded Assets. For all purposes of and under this Agreement, the term "***Excluded Assets***" shall consist of only the following items, assets and properties:

(a)      subject to Section 2.1(h), the limited liability company, partnership and corporate books and records of internal limited liability company, partnership and corporate proceedings, minute books, organizational or governing documents, stock ledgers, Tax records, work papers and other records of Sellers as they pertain to ownership, organization, qualification to do business or existence of Sellers; provided, however, that copies of the foregoing items (including copies of Tax records and work papers of Sellers) shall be made available by Sellers to Buyer at Buyer's reasonable request, provided, however, that with respect to Tax Returns of the Seller, at the reasonable request of Buyer, Seller shall make available to Buyer all information contained in its Tax Returns relating to the Tax attributes or otherwise to the Tax matters of the

RS Business or the Acquired Assets for periods (or portions thereof) commencing after the Closing Date or of the Acquired Companies;

(b) any Contract that is not an Assumed Contract;

(c) any Excluded Company;

(d) all assets not primarily used, held for use in, or useful in, or not intended to be primarily used in the RS Business, including those primarily used, held for use in, or useful in, or intended to be used in, the Corrections Business;

(e) all current and prior director and officer insurance policies of the Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(f) all Causes of Action, including any proceeds thereof, other than any such Causes of Action that relate to, or constitute a part of, the Acquired Assets (including the Acquired Assets described in Section 2.1(n));

(g) all rights under or arising out of all (i) self-insurance policies of Sellers or any of their Affiliates related to the RS Business or otherwise and (ii) third-party insurance policies related to the Corrections Business, including third party property and casualty insurance proceeds and other insurance proceeds;

(h) any employment-related or compensation-related Contracts (including the Non-Acquired Company Plans not otherwise assumed pursuant to Section 2.1(i)), collective bargaining agreements, and books and records, in each case relating to employees who are not directly employed by an Acquired Company as of the Closing and any Contracts listed on Schedule 2.2(h) (including any personnel and employment records for such employees and former employees of the Sellers or the Acquired Companies);

(i) the general corporate files and records of Sellers, insofar as they relate to the organization, existence or capitalization of the applicable Seller, as well as any other records or materials relating to the Sellers generally and not primarily involving or primarily related to the Acquired Assets or the operations of the RS Business; provided, that copies of such files and records shall be made available to Buyer upon reasonable request to the extent permitted by applicable law and related to the RS Business;

(j) all insurance policies of the Sellers;

(k) documents (x) that Sellers are required by Legal Requirements to retain, (y) that if transferred would violate any applicable Legal Requirements (including with respect to privacy) or (z) that are subject to any attorney-client, work product or similar privilege with respect to work performed in anticipation of or in connection with the preparation or administration of the Bankruptcy Cases, this Agreement or the transactions contemplated by this Agreement;

(l) all Causes of Action, including any proceeds thereof, other than any

21

such Causes of Action that relate to, or constitute a part of, the Acquired Assets (including the Acquired Avoidance Actions described in Section 2.1(n));

(m)     all credits, deposits, prepaid amounts and other rights to refunds of (i) Taxes of the RS Business paid by or with respect to the Sellers which refunds are attributable to Pre-Closing Tax Periods, (ii) Taxes that are attributable to the Corrections Business and (iii) Taxes that are Excluded Liabilities;

(n)     all cash and cash equivalents in excess of the Cash Cap, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, instruments and investments of Sellers primarily involving or primarily related to the RS Business, excluding prepaid deposits related to professional fee retainers; and

(o)     any rights, claims or causes of action of Sellers under this Agreement or any other Transaction Document.

2.3     Assumed Liabilities. Subject to entry of the Sale Order, upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer or Buyer Designee shall, effective at the time of the Closing, assume and agree to discharge and perform when due, only the following Liabilities of Sellers (the "**Assumed Liabilities**"), and no other Liabilities:

(a)     all Liabilities under the Assumed Contracts that are required to be performed after the Closing Date (including sponsorship of any Plan that is an Assumed Contract and all Liabilities under or related thereto), solely to the extent they arise or relate to periods of time after the Closing Date; provided, however, that Buyer shall assume the obligations to pay all (i) outstanding trade payables in accordance with Section 2.3(b) and (ii) Cure Costs in excess of the Seller Cure Cap.

(b)     trade payables related to the Acquired Assets incurred in the ordinary course of the RS Business, as agreed in good faith by the Sellers and Buyer prior to the Closing;

(c)     Liabilities arising out of operation of the Acquired Assets for periods on or following the Closing Date; and

(d)     all Liabilities with respect to Taxes imposed on the RS Business or the Acquired Assets that are attributable to any Post-Closing Tax Period.

The assumption by Buyer or any of its applicable Buyer Designees of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.  For the avoidance of doubt, Assumed Liabilities shall not include any Liability relating to or arising out of any violation of law by, or any Action against, any Seller or any breach, default or violation by any Seller of or under any Assumed Contracts, all of which shall constitute Excluded Liabilities.

2.4     Excluded Liabilities. Notwithstanding any provision in this Agreement to the contrary, neither Buyer nor any Buyer Designee shall assume, nor shall Buyer or any of its applicable Buyer Designees be obligated to assume or be obliged to pay, perform or otherwise discharge, any Liability of, or Liability against, Sellers, Sellers' Subsidiaries, the RS Business or

22

the Acquired Assets, of any kind or nature, whether absolute, accrued, contingent or otherwise, whether due or to become due and whether or not assets, and whether or not known or unknown or currently existing or hereafter arising or matured or unmatured, direct or indirect, and however arising, other than the Assumed Liabilities, and Sellers shall be solely and exclusively liable with respect to all Liabilities of Sellers, other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "***Excluded Liabilities***").  Without limiting the generality of the foregoing, the Excluded Liabilities shall include each of the following Liabilities of Sellers and Sellers' Subsidiaries:

(a)    all Liabilities with respect to the Deferred One Year Cash Payment and any related Liabilities arising under either the Alpine Purchase Agreement or Settlement Agreement;

(b)    all Liabilities with respect to Employees, former employees, or current or former directors, officers, consultants or contractors (and, in each case, their respective representatives or beneficiaries) of the Sellers or Acquired Companies for any action or inaction of any of the Sellers or Acquired Companies occurring prior to or on the Closing Date, including payroll, vacation, sick leave, unemployment benefits, notice pay, retirement benefits, pension benefits, collective bargaining agreements, disputes, grievances, arbitrations, claims, employment agreements or arrangements, severance, WARN Act, retention or termination agreements or arrangements, employee stock option, equity compensation, equity-based compensation, employee stock purchase, employee benefits, Plans, compensation arrangements, profit sharing plans, health care and other welfare plans or benefits, or any other employee plans, agreements, policies, or arrangements or benefits or other compensation of any kind;

(c)    all Liabilities, whether arising before, on or after the Closing Date, with respect to any employee or former employee of any Seller or Acquired Company who does not become a Buyer Employee; and

(d)    all Liabilities arising out of, relating to or with respect to any Non-Acquired Company Plan that is not an Assumed Contract.

2.5    Assignment and Assumption of Contracts.

(a)    Assumed and Excluded Contracts.

(i)    Schedule 2.5(a) sets forth a list of all executory Contracts (including all Leases primarily involving or primarily related to the RS Business) to which one or more of the Sellers are party and which are to be included in the Acquired Assets (the "***Assumed Contracts***") (subject to the terms of this Section 2.5) and sets forth the Seller entity party to such Assumed Contract and Sellers' good faith estimate of the Cure Costs associated with each Assumed Contract as of the Execution Date. From and after the Execution Date but in any event not later than three (3) Business Days prior to the Closing Date, the Sellers shall make such additions or deletions to Schedule 2.5(a) as Buyer shall request in writing in Buyer's reasonable discretion.  Automatically upon the addition of any Contract to Schedule 2.5(a), on or prior to the Determination Date, such Contract shall be an Assumed Contract for all purposes of this Agreement.  Seller shall be responsible for all Cure Costs with respect to Assumed Contracts;

23

provided, however that Sellers' liability for such Cure Costs shall not exceed the Seller Cure Cap. To the extent that Buyer seeks to assume any Contract for which the payment of its Cure Costs would exceed the Seller Cure Cap, Buyer and Seller shall negotiate in good faith the Cure Costs related to such Contract and determine whether to assume such Contract; provided, however, Buyer acknowledges and agrees it shall be responsible for any Cure Costs in excess of the Seller Cure Cap.  Any deleted Contract shall be deemed to no longer be an Assumed Contract, and for the avoidance of doubt, neither Party shall be responsible for any Cure Costs related thereto. The Parties acknowledge and agree that there will be no reduction in, or increase to, the Purchase Price as a result of (x) any change in Cure Costs or (y) any addition or elimination of any Contract as an Assumed Contract. All Contracts of Sellers that are not listed on Schedule 2.5(a) shall not be considered an Assumed Contract or an Acquired Asset and shall be deemed "***Excluded Contracts***"; provided, that Buyer has the right at any time before the date that is three (3) Business Days prior to the Closing Date (such date, the "***Determination Date***") to (A) amend Schedule 2.5(a) to designate any other Contract (including all Leases) which has not been rejected by the Sellers to be an Assumed Contract, and (B) to remove from Schedule 2.5(a) an Assumed Contract that is subject to a cure dispute with the counterparty thereto or other dispute with the counterparty thereto as to the assumption or assignment of such Assumed Contract that has not been resolved to the satisfaction of Buyer (in its sole discretion) prior to the Determination Date (any such Contract, a "***Disputed Contract***").

(ii) Sellers shall take all actions reasonably required to assume and assign the Assumed Contracts to Buyer or any of its applicable Buyer Designees, including taking all actions reasonably required to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code.

(iii) If prior to the Closing Date there are Contracts or Leases that have not been designated as an Assumed Contract or an Excluded Contract which are primarily related to the RS Business, the Sellers shall not assume or reject any such Contract or Lease pursuant to Section 365 of the Bankruptcy Code and any order of the Bankruptcy Court, until the earlier of the date Buyer so directs the Sellers and the Closing Date.

(iv) At Closing, (x) Sellers shall, pursuant to the Sale Order and the Assumption Agreement, assume and assign to Buyer or the applicable Buyer Designee (the consideration for which is included in the Purchase Price) each of the Assumed Contracts that is capable of being assumed and assigned in connection with such assumption and assignment (as agreed to among Buyer and Sellers or as determined by the Bankruptcy Court) and (y) Buyer shall assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Assumption Agreement.

(v) No later than three (3) Business Days prior to the Closing Date, Sellers shall provide Buyer with a list of all Disputed Contracts and the amount of Cure Costs that has been proposed by each such non-Seller counterparty for such Disputed Contracts; provided that Sellers shall agree to any Cure Costs for any Contract irrevocably designated by Buyer in writing as an Assumed Contract if instructed to do so by Buyer. If Sellers, with the consent of Buyer, and the non-Seller counterparty with respect to any Disputed Contract, are unable to agree on Cure Costs and/or the assumption and assignment of such Disputed Contract within five (5)

Business Days following the Closing Date, solely upon Buyer's reasonable written request, Sellers shall seek to have the amount of Cure Costs related to such Disputed Contract or the proposed assumption and assignment of such Disputed Contract determined by the Bankruptcy Court (a "***Disputed Contract Determination***"). Upon a Disputed Contract Determination that prohibits assumption and assignment to Buyer, such Disputed Contract will automatically be an Excluded Contract. If assumption and assignment to Buyer is not prohibited, then Buyer may elect to re-designate such Assumed Contract as an Excluded Contract. If such Assumed Contract is not so re-designated, (x) the applicable Sellers shall promptly take such steps as are reasonably necessary, including, if applicable and reasonably practicable, promptly on delivery of no less than five (5) Business Days' notice to the non-Seller counterparty to such Contract, to cause such Contract to be assumed by the applicable Seller and assigned to Buyer, including by executing and delivering to Buyer an Assignment and Assumption Agreement with respect to such Assumed Contract, and (y) (1) for Cure Costs until the Seller Cure Cap has been met, Seller shall pay the Cure Costs with respect to such Assumed Contract and (2) for Cure Costs in excess of the Seller Cure Cap, Buyer shall pay the Cure Costs with respect to such Assumed Contract, in each case, either (i) concurrently with Sellers' assumption and assignment thereof to Buyer or (ii) as agreed in writing by Buyer and the applicable counterparty to such Assumed Contract, and execute and deliver to the applicable Sellers an Assignment and Assumption Agreement with respect to such Assumed Contract.

(b)    <u>Previously Omitted Contracts</u>.

(i)    If prior to or following Closing until the date of confirmation of a plan of liquidation or any other plan is confirmed in the Bankruptcy Cases, it is discovered that a Contract should have been listed on <u>Schedule 2.5(a)</u> but was not listed on <u>Schedule 2.5(a)</u> and has not been rejected by Sellers (any such Contract, a "***Previously Omitted Contract***"), Sellers shall, immediately following the discovery thereof (but in no event later than three (3) Business Days following the discovery thereof), notify Buyer in writing of such Previously Omitted Contract and all Cure Costs (if any) for such Previously Omitted Contract. Buyer shall thereafter deliver written notice to Sellers, no later than ten (10) Business Days following notification of such Previously Omitted Contract from Sellers, but in any event prior to confirmation of any plan confirmed in the Bankruptcy Cases, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "***Previously Omitted Contract Designation***"). A Previously Omitted Contract designated in accordance with this <u>Section 2.5(b)(i)</u> as "Excluded," or with respect to which Buyer fails to deliver a Previously Omitted Contract Designation, shall be an Excluded Contract.

(ii) If Buyer designates a Previously Omitted Contract as "Assumed" in accordance with <u>Section 2.5(b)(i)</u>, Sellers shall serve a notice (the "***Previously Omitted Contract Notice***") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Costs with respect to such Previously Omitted Contract and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this <u>Section 2.5</u>. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with ten (10) Business Days to object, in writing to the Sellers and Buyer, to the Cure Costs or the assumption of its Contract. If the counterparties, Sellers and Buyer are unable to reach a consensual resolution with respect to the objection, the Sellers will seek an expedited hearing before Bankruptcy Court to determine the Cure Costs and approve the assumption. If no objection is served on the Sellers and Buyer, Sellers shall obtain an order of the Bankruptcy Court, which

may be the Sale Order, fixing the Cure Costs and approving the assumption of the Previously Omitted Contract.

(c)     Non-Assignment of Contracts and Permits.  Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Contract or any Permit, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a breach thereof or in any way adversely affect any of the rights of Buyer, as the assignee or transferee of such Contract or Permit (as the case may be) thereunder. If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code and the reasonable best efforts of Sellers, such consent or approval is required but not obtained with respect to an Assumed Contract or a Permit, neither Sellers nor Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted nor (but subject to the satisfaction of the conditions set forth in Section 9.4 (unless waived by Buyer in its sole and absolute discretion)) shall the Closing be delayed in respect of the Assumed Contracts or the Permits; provided, however, if the Closing occurs, then, with respect to any Assumed Contract or Permit for which consent or approval is required but not obtained, from and after the Closing, Sellers shall cooperate, without further consideration, with Buyer in any reasonable arrangement Buyer may request to provide Buyer with all of the benefits of, or under, the applicable Assumed Contract or applicable Permit, including enforcement for the benefit of Buyer of any and all rights of Sellers against any party to the applicable Assumed Contract or applicable Permit arising out of the breach or cancellation thereof by such party; provided, however, to the extent that any such arrangement has been made to provide Buyer with the benefits of, or under, the applicable Assumed Contract or applicable Permit, from and after Closing, Buyer shall be responsible for, and shall promptly pay all payment and other obligations under such Assumed Contract or Permit (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Assumed Contract or Permit had been assigned or transferred at Closing with respect to Assumed Contracts and Permits, and at such applicable later date specified in this Section 2.5(c) with respect to any additional Assumed Contracts. Any assignment to Buyer of any Assumed Contract or Permit that shall, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any Person for such assignment as aforesaid shall be made subject to such consent or approval being obtained.

2.6     Further Assurances. At and after the Closing, and without further consideration therefor, the Parties shall execute and deliver such further instruments and certificates as shall be necessary or desirable (i) to vest, perfect or confirm ownership (of record or otherwise) in Buyer and/or one or more Buyer Designees, Sellers' right, title or interest in, to or under any or all of the Acquired Assets free and clear of all Liens (other than Permitted Liens), (ii) to confirm assumption by Buyer and/or one or more Buyer Designees of all obligations related to the Assumed Liabilities, or (iii) to otherwise effectuate the purposes and intent of this Agreement and the other Transaction Documents or for aiding, assisting, collecting and reducing to possession any of the Acquired Assets or the Assumed Liabilities and exercising rights with respect thereto. Each of the Parties shall take, or cause to be taken, all actions, do or cause to be done all things as may be reasonably requested by the other Parties in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Buyer or one of more Buyer Designees or otherwise to carry out this Agreement, and shall execute and deliver all deeds,

bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances, and as may be required to consummate the transactions contemplated by this Agreement.

## **ARTICLE 3**

### **PURCHASE PRICE**

3.1     Consideration.

The aggregate consideration (the "***Purchase Price***") for the purchase, sale, assignment and conveyance of Sellers' right, title and interest in, to and under the Acquired Assets shall consist of:

(a)     the full release of Sellers that are obligors or guarantors under the DIP Facility of all Liabilities arising under, or otherwise relating to, the DIP Facility, in an aggregate amount equal to $375,000,000 under Section 363(k) of the Bankruptcy Code, as the same may be increased by Buyer at the direction of the Required Lenders with respect to the DIP Facility; and

(b)     the assumption by Buyer or any of its applicable Buyer Designees, as applicable, of the Assumed Liabilities from Sellers.

3.2     Allocation of Purchase Price. Within sixty (60) days after the Closing Date, Buyer shall prepare and deliver to Sellers a statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items that are treated as purchase price for Tax purposes among the Acquired Assets in accordance with section 1060 of the Code and the Treasury Regulations promulgated thereunder (such statement, the "***Allocation Statement***"). Within thirty (30) calendar days of delivery of the Allocation Statement, Seller shall notify Buyer of any proposed changes. The Parties shall consult with each other and attempt in good faith to resolve any issues arising as a result of the Allocation Statement. If the Parties cannot agree on the Allocation Statement, the dispute shall be resolved by a nationally recognized accounting firm mutually acceptable to Buyer and Sellers (the "***Independent Accounting Firm***"). The expenses and fees of the Independent Accounting Firm shall be borne equally by Buyer and Sellers. "Final Allocation Statement" shall mean, as the case may be, the final Allocation Statement agreed to by the Parties or resolved by the Independent Accounting Firm. Unless otherwise required by law, the IRS or any other Taxing Authority, the allocation of the Purchase Price pursuant to the Final Allocation Statement shall be final and binding on the Parties, and the Parties shall file all relevant U.S. federal, state, local and non-U.S. Tax Returns (including IRS Form 8594 and any supplements to such form) in accordance with the Final Allocation Statement, and shall not take any position inconsistent therewith. If the IRS or any other taxation authority proposes a different allocation, Sellers or Buyer, as the case may be, shall promptly notify the other party of such proposed allocation. Sellers or Buyer, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this Section 3.2. Except as otherwise required by any Legal Requirement or pursuant to a "determination" under section 1313(a) of the Code (or any comparable provision of United

27

States state, local, or non-United States law), (i) the transactions contemplated by Article 2 of this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this Section 3.2; and (ii) neither Party (nor any of their Affiliates) will take any position for Tax purposes inconsistent with this Section 3.2 in any Tax Return, in any refund claim, in any litigation or otherwise. Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Acquired Assets or the allocation of the value of the Acquired Assets in any plan or reorganization or liquidation that may be proposed.

## ARTICLE 4

### CLOSING AND DELIVERIES

4.1     Closing Date. Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities (other than those pertaining to Previously Omitted Contracts pursuant to Section 2.5(b) and Disputed Contracts pursuant to Section 2.5(a)(i)) contemplated hereby (the "**Closing**") shall take place remotely by electronic mail or other electronic exchange of documents, among and between the Parties and/or their respective counsel, no later than three (3) Business Days following the date on which all the conditions set forth in Article 9 and Article 10 have been satisfied or (if permissible) waived by the Party entitled to waive such condition (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or on such other date and time as Sellers and Buyer may mutually agree in writing. The date and time at which the Closing actually occurs is hereinafter referred to as the "**Closing Date**". Upon consummation of the Closing, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities hereunder, and the Closing, shall be deemed to have occurred as of 12:01 a.m. (New York time) on the Closing Date.

4.2     Buyer's Deliveries. At the Closing, Buyer shall deliver (or cause one or more of its Affiliates or Buyer Designees to deliver) to Sellers:

(a)     the Assumption Agreement, duly executed by Buyer or the applicable Buyer Designee;

(b)     the Bills of Sale;

(c)     the Intellectual Property Assignment Agreement, duly executed by Buyer or the applicable Buyer Designee;

(d)     the Transition Services Agreement, duly executed by Buyer;

(e)     each other Transaction Document to which Buyer is a party, duly executed by Buyer;

(f)     the certificates of Buyer to be received by Sellers pursuant to Sections 10.1 and 10.3; and

(g)      such other documents as Sellers may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

4.3      Sellers' Deliveries. At the Closing, Sellers shall deliver to Buyer:

(a)      the Bills of Sale, the Assumption Agreement, the Intellectual Property Assignment Agreement, the Transition Services Agreement, and each other Transaction Document to which any Seller is a party, duly executed by the applicable Sellers;

(b)      a copy of the Sale Order;

(c)      the certificates of Sellers to be received by Buyer pursuant to Sections 9.1 and 9.2;

(d)      a valid IRS Form W-9 from each Seller or other certification of non-foreign status for Sellers in a form and manner which complies with the requirements of Section 1445 of the Code and the Treasury Regulations promulgated thereunder;

(e)      a certificate of good standing from each Acquired Company, certified by the appropriate Governmental Authority in its jurisdiction of incorporation or formation;

(f)      the stock books, stock ledgers, minute books, corporate seals, certificates of incorporation (or other organizational documents), check books and statutory books of the Acquired Companies, in each case, to the extent in the possession of the Sellers;

(g)      a securities transfer agreement in substantially the form attached hereto as **Exhibit G** in respect of the Equity Interests of the Acquired Companies, duly executed by the applicable Sellers, together with any required registrations thereof under applicable law; and

(h)      such other documents as Buyer may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement, including the documents and instruments described in Article 9 of this Agreement.

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Disclosure Schedule, Sellers hereby jointly and severally represent and warrant to Buyer that, as of the date hereof:

5.1      Status. Each Seller and each Acquired Company is duly organized, validly existing, and in good standing (to the extent the concept is recognized by the applicable jurisdiction) under the Legal Requirements of the jurisdiction in which it is organized. Each Acquired Company, each Seller and the Managed Entity have all requisite corporate or similar organizational power

and authority to own, operate, or lease its properties and assets and to carry on the RS Business as now being conducted. Each Acquired Company, each Seller and the Managed Entity are legally qualified to transact business as a foreign corporation in all jurisdictions where the nature of its properties and the conduct of its business as now conducted require such qualification, except where the failure to be so qualified would not have a Material Adverse Effect.

       5.2    <u>Power and Authority</u>. Each Seller and each Acquired Company have all requisite corporate or similar organizational power and authority to execute and deliver each of the Transaction Documents to which such Seller or Acquired Company is a party, to perform its obligations hereunder or thereunder, and to consummate the transactions contemplated hereby and thereby, subject to obtaining Bankruptcy Court approval pursuant to the Sale Order. All acts or proceedings required to be taken by the Sellers or the Acquired Companies to authorize the execution and delivery of this Agreement and the performance of the Seller's or the Acquired Companies' obligations hereunder and thereunder have been properly taken.

       5.3    <u>Enforceability</u>. Each Transaction Document to which a Seller or an Acquired Company is a party has been duly authorized, executed, and delivered by such Seller or Acquired Company, and, assuming the due and valid authorization, execution, and delivery of such Transaction Document by the other parties thereto, such Transaction Document constitutes the legal, valid, and binding obligation of such Seller or such Acquired Company, enforceable against it in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Legal Requirements affecting or relating to creditors' rights generally and general equitable principles (the "***Bankruptcy and Equity Exceptions***").

       5.4    <u>Group Companies and Managed Entity; Capitalization</u>.

       (a)    <u>Section 5.4(a)</u> of the Disclosure Schedule lists (i) each Acquired Company, (ii) the entire authorized equity interests of each such Acquired Company, and (iii) the holders of record of all issued and outstanding shares of such equity interests, all of which are owned by the Persons set forth on <u>Section 5.4(a)</u> of the Disclosure Schedule free and clear of all Liens other than Permitted Liens. No Acquired Company owns, holds, or has the right to acquire any equity interest in any other Person (other than certain other Acquired Companies). All of the equity interests of the Acquired Companies have been duly authorized and validly issued, are fully paid and non-assessable, and were issued in compliance with all applicable state and federal securities Legal Requirements. Except as set forth in the Organizational Documents of the Acquired Companies, there are no outstanding options, warrants, convertible securities, subscription rights, conversion rights, exchange rights, or other agreements that require any of the Acquired Companies to issue or sell any equity interests (or securities convertible into or exchangeable for equity interests of such Acquired Company), and no equity securities or other Equity Interests of any Acquired Company are reserved for issuance for any purpose. Neither the Sellers nor any Acquired Company is obligated to redeem or otherwise acquire any outstanding equity interests of the Acquired Companies. Upon completion of the Closing, Buyer will own all right, title, and interest in the equity interests of the Acquired Companies.

       (b)    <u>Section 5.4(b)</u> of the Disclosure Schedule lists (i) the entire authorized equity interests of the Managed Entity, and (ii) the holders of record of all issued and

outstanding shares of such equity interests, all of which are owned by the Persons set forth on Section 5.4(b) of the Disclosure Schedule free and clear of all Liens other than Permitted Liens. The Managed Entity does not own, hold, or have the right to acquire any equity interest in any other Person. All of the equity interests of the Managed Entity have been duly authorized and validly issued, are fully paid and non-assessable, and were issued in compliance with all applicable state and federal securities Legal Requirements.

5.5     No Violation; Consents and Approvals. Except as set forth on Section 5.5 of the Disclosure Schedule, the execution and delivery by the Sellers and the Acquired Companies of each of the Transaction Documents to which a Seller or Acquired Company is a party and the consummation by it of the transactions contemplated hereby or thereby will not (a) violate any provision of the Organizational Documents of such Seller or Acquired Company, (b) violate any material Legal Requirement applicable to, binding upon, or enforceable against such Seller or Acquired Company, (c) result in any material breach of, or constitute a material default (or an event which would, with the passage of time or the giving of notice or both, constitute a material default) under, or give rise to a right of payment under or the right to terminate, any note, bond, mortgage, indenture, deed of trust, contract, commitment, arrangement, license, agreement, lease or other instrument or obligation to which such Seller or Acquired Company is a party, or (d) result in the creation or imposition of any Lien upon any of the material property or material assets of such Seller or Acquired Company. Other than Bankruptcy Court approval pursuant to the Sale Order, no approval, consent, waiver, authorization, or other order of, and no declaration, filing, registration, qualification, recording, or other action or filing with, any Governmental Authority or any other Person is required to be obtained or made by or on behalf of such Seller or Acquired Company in connection with the execution, delivery, or performance of the Transaction Documents to which it is a party in accordance with the terms and conditions thereof, except where failure to obtain such approval, consent, waiver, authorization, or other order, or to make such declaration, filing, registration, qualification, recording, or other action, would not be material to such Seller or Acquired Company.

5.6     Financial Statements. Attached as Section 5.6 of the Disclosure Schedule are copies of (a) the internally prepared unaudited balance sheet of the Sellers and the Acquired Companies and the related statement of profit and loss as of and for the fiscal year ended December 31, 2023 (the "**Annual Financial Statements**") and (b) the internally prepared unaudited balance sheet of the Sellers and the Acquired Companies as of May 31, 2024 (such date, the "**Interim Balance Sheet Date**", and such balance sheet, the "**Interim Balance Sheet**") and the related statement of profit and loss for the five (5) months then ended (collectively, with the Interim Balance Sheet, the "**Interim Financial Statements**," and, collectively with the Annual Financial Statements, the "**Financial Statements**"). The Financial Statements fairly present, in all material respects, taken as a whole, the financial position of the Sellers and the Acquired Companies at each of the balance sheet dates and the results of operations for each of the periods covered thereby, in each case, in accordance with GAAP, except that the Interim Financial Statements do not reflect year-end adjustments and do not contain footnote disclosures and other presentation items. Buyer acknowledges that the balance sheets included in the Financial Statements were created for the purposes of the transactions contemplated by this Agreement and have not been audited.

5.7     Absence of Certain Developments. Except as contemplated or permitted by this Agreement, as set forth on Section 5.7 of the Disclosure Schedule, the DIP Financing Orders

or in connection with matters arising from preparation for the Bankruptcy Cases or as authorized by the Bankruptcy Court since the Interim Balance Sheet Date:

        (a)      the RS Business, the Acquired Companies and the Managed Entity have been conducted in all material respects in the ordinary course of business;

        (b)      there has not occurred any change or event that has resulted in a Material Adverse Effect;

        (c)      the Sellers, the Acquired Companies and the Managed Entity have not sold, transferred, leased, mortgaged, pledged, or otherwise subjected to any Lien (other than Permitted Liens) any material portion of the Acquired Assets or the RS Business, taken as a whole;

        (d)      the Sellers, the Acquired Companies and the Managed Entity have not entered into any Contract to make an acquisition (whether by merger, acquisition of stock or assets, or otherwise) of any business or line of business;

        (e)      the Sellers, the Acquired Companies and the Managed Entity have not sold, leased, transferred or otherwise disposed of any Acquired Assets, except for sales of Inventory in the Ordinary Course of Business;

        (f)      the Sellers, the Acquired Companies and the Managed Entity have not waived or released any claim or rights included in or related to the Acquired Assets or the RS Business with a value individually or in the aggregate in excess of $500,000 or revalued any of the Acquired Assets, except for adjustments to the value of Inventory in the Ordinary Course of Business;

        (g)      the Sellers, the Acquired Companies and the Managed Entity have not entered into any Material Contracts with any third-party related to the Acquired Assets or the RS Business, other than in the Ordinary Course of Business;

        (h)      there has not been any change in the Organizational Documents of the Sellers, the Acquired Companies and the Managed Entity;

        (i)      the Sellers have not made with respect to the RS Business, the Acquired Companies and the Managed Entity, and the Acquired Companies and the Managed Entity have not, (i) made or revoked any material Tax election, (ii) adopted or changed any material Tax accounting method, (iii) filed an amended Tax Return, (iv) settled or compromised any material Tax audit, (v) entered into any closing agreement with any Taxing Authority that relates to Taxes or Tax Returns of any Acquired Company or the Managed Entity, or (vi) extended or waived the statute of limitations applicable to any Taxes or Tax Returns of the Acquired Companies and the Managed Entity;

        (j)      there has not been any damage, destruction, or loss (other than ordinary course repair and maintenance), whether or not covered by insurance, with respect to the property related to the RS Business and the Acquired Assets of the Sellers, the Acquired Companies and the Managed Entity having a replacement cost of more than $5,000,000;

(k)      Except as set forth on <u>Section 5.7(k)</u> of the Disclosure Schedule, or as required by Legal Requirement or any Contract or Plan, neither the Sellers, the Acquired Companies nor the Managed Entity have materially increased the salary payable or to become payable by it to any of their Employees whose base salary is in excess of $150,000, or materially increased the coverage or benefits available under any severance pay, termination pay, deferred compensation, bonus, or other incentive compensation plan or arrangement, except for bonuses payable to certain officers and Employees of the Sellers or the Acquired Companies in connection with the consummation of the transactions contemplated by this Agreement;

(l)      there has not been any material change by the Sellers, the Acquired Companies and the Managed Entity in their material accounting or methods, principles or policies;

(m)      there has not been an incurrence of any Indebtedness other than pursuant to the DIP Facility;

(n)      none of the Permits held by any Seller, the Acquired Companies or the Managed Entity have terminated, expired or lapsed; and

(o)      none of the Sellers, the Acquired Companies nor the Managed Entity have committed to do any of the foregoing.

5.8     <u>Litigation</u>.  Other than the Bankruptcy Cases or as set forth on <u>Section 5.8</u> of the Disclosure Schedule, there are no Actions or Orders pending or, to the Knowledge of the Sellers, expressly threatened in writing against the Sellers or the Acquired Companies or the Managed Entity, at law or in equity, before or by any Governmental Authority, which would reasonably be expected to be material to the RS Business, taken as a whole.  None of the Sellers, the Acquired Companies nor the Managed Entity are subject to any outstanding judgment, order or decree of any Governmental Authority that relates specifically to such Seller, Acquired Company or the Managed Entity.

5.9     <u>Environmental Matters</u>. Each Seller, Acquired Company and the Managed Entity are in material compliance with all Environmental Laws.  Each Seller, Acquired Company and the Managed Entity have obtained and is in material compliance with all Permits that are required pursuant to Environmental Laws for the occupation of the facilities of the Acquired Companies and the Managed Entity (each, a "***Facility***," and collectively, the "***Facilities***") and the operation of the business of the Seller, the Acquired Companies and the Managed Entity.  Since January 1, 2022, none of the Sellers, the Acquired Companies nor the Managed Entity have received any written notice of a material violation of Environmental Laws or any material liability arising under Environmental Laws, or any investigation, remediation, or corrective obligation relating to the Sellers, the Acquired Companies or the Facilities, the subject of which is unresolved. As of the date hereof, there is no Action or Order pending against any Seller, Acquired Company or the Managed Entity related to an actual or alleged material violation of Environmental Laws or a material liability arising under Environmental Laws.  None of the Sellers, the Acquired Companies nor the Managed Entity have treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, or released any Hazardous Substance in a manner that would give rise to material liabilities pursuant to any Environmental Law.

5.10    Title to Properties . Immediately prior to Closing, Sellers and the Acquired Companies will have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.3, and upon entry of the Sale Order, Sellers will thereby transfer to Buyer or the applicable Buyer Designee, and Buyer or the applicable Buyer Designee will (subject to Section 2.5(c)) be vested, to the maximum extent permitted by sections 105, 363 and 365 of the Bankruptcy Code, with good, valid, exclusive and marketable title to, or, in the case of property leased or licensed by Sellers, a valid, binding and enforceable leasehold or licensed interest in, all of the Acquired Assets, free and clear of all Liens, except (a) for the Assumed Liabilities and (b) for Permitted Liens. The Acquired Assets consisting of personal property are in good operating condition and repair (ordinary wear and tear excepted) and are suitable for the purposes for which they are presently used. No Acquired Asset is subject to any agreement, written or oral, for its sale or use by any Person other than Sellers.

5.11    Sufficiency of Assets. (a) Taking into account the services proposed to be provided by Sellers pursuant to the Transition Services Agreement schedules delivered to Buyer prior to the date hereof (including those that Buyer elects not to include in the Transition Services Agreement) and the Shared Contracts, the Acquired Assets will, as of the Closing Date, constitute all of the assets, properties and rights necessary for Buyer to conduct the RS Business in substantially the same manner operated by the Sellers and the Acquired Companies during the twelve (12) month period immediately prior to the Execution Date and (b) none of the Acquired Assets are owned by any Person other than Sellers or the Acquired Companies.

5.12    Leased Real Property.

(a)    Section 5.12 of the Disclosure Schedule sets forth a summary of all leases for leased assets that have annual rental payments in excess of $500,000 and all real property leases, regardless of annual rental payment amount, describing the name of the lessor and the address for the premises leased under each applicable real property lease (the "***Leased Real Property***").

(b)    All of the Sellers and the Acquired Companies' real property leases related to the RS Business (the "***Real Property Leases***") are in full force and effect, and valid and enforceable in accordance with their respective terms.  No Seller or Acquired Company has received any written notice of any event of default or event which constitutes (with notice or lapse of time or both) a material default by such Seller or Acquired Company under any Real Property Lease and which has not been cured.  No Seller or Acquired Company has received written notice that the landlord with respect to any Real Property Leases would refuse to renew such Real Property Lease upon expiration of the period thereof upon substantially the same terms, except for rent increases consistent with past experience or market rentals.  The Sellers and the Acquired Companies have made available to Buyer a true, correct, and complete copy of each Real Property Lease and all amendments and modifications thereto, and such Real Property Leases have not been modified or amended, in each case, in any material respect, since the Interim Balance Sheet Date.

(c)    The Leased Real Property set forth in Section 5.12 of the Disclosure Schedule constitutes all of the real property used or occupied by the Sellers and the Acquired Companies in the operation of the RS Business by the Sellers and the Acquired Companies.  With respect to the Real Property Leases, (i) the Sellers and the Acquired Companies' possession and

quiet enjoyment of such Leased Real Property has never been disturbed, and there are no current disputes with respect to any such Real Property Lease; (ii) no security deposit or portion thereof deposited with respect to such Real Property Lease has been applied in respect of a breach or default under such Real Property Lease which has not been redeposited in full; and (iii) none of the Real Property Leases is subject to any sublease, license, or other right of another party to use or occupy such Leased Real Property.

(d)     The Sellers and the Acquired Companies do not own any parcels of real property.

5.13     Compliance with Laws.

(a)     Each Seller, Acquired Company and the Managed Entity are in compliance with all applicable Legal Requirements, except where the failure to so comply would not reasonably be expected to have a material impact on the Sellers, Acquired Companies, the Managed Entity and the RS Business, taken as a whole.  Since January 1, 2022, to the Knowledge of the Sellers, the Sellers, Acquired Companies and the Managed Entity have not been cited, fined or otherwise notified in writing of any material failure to comply with any material Legal Requirements that has not been paid or cured.

(b)     None of the Sellers nor any of their respective Subsidiaries (including the Acquired Companies), nor any of directors, officers, employees or, to the Knowledge of the Sellers, agents of the Sellers or any of their respective Subsidiaries (including the Acquired Companies) (i) has offered, promised, given or authorized the giving or will offer, promise, give or authorize the giving of money or anything else of value, whether directly or through another Person, to (A) any governmental official, employee or agent or (B) any other Person with the knowledge that all or any portion of the money or thing of value will be offered or given to a governmental official, employee or agent, in each of clauses (A) and (B) for the purpose of influencing any action or decision thereof in his or her official capacity, including a decision to fail to perform his or her official duties, or inducing such governmental official, employee or agent to use his or her influence with any Governmental Authority to affect or influence any official act; (ii) has or will make or authorize any other Person to make any payments or transfers of value which have the purpose or effect of commercial bribery, or acceptance or acquiescence in kickbacks or other unlawful or improper means of obtaining or retaining business; (iii) has or will use any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (iv) has made or will make any direct or indirect unlawful payment to any government official, employee or agent from corporate funds; (v) has made or will make any bribe, rebate, payoff, influence payment, kickback or other unlawful payment; (vi) has or will either establish or maintain any unrecorded fund or asset for any purpose, or has or will make any intentionally false or artificial entries on its books or records for any reason; or (vii) created or used any "off-book" bank or cash account or "slush fund"; or (viii) otherwise violate any Anti-Corruption Laws.

(c)     Each of the Sellers and their respective Subsidiaries (including the Acquired Companies), and the directors, officers, employees and, to the Knowledge of the Sellers, agents of the Sellers and their respective Subsidiaries (including the Acquired Companies) have been and are in compliance with Anti-Corruption Laws, Anti-Money Laundering Laws, and

Sanctions.  Neither any Seller nor any of their respective Subsidiaries (including the Acquired Companies), nor any directors, officers, employees or, to the Knowledge of the Sellers, agents of any Seller or any of their respective Subsidiaries (including the Acquired Companies) is a Sanctioned Person.  Neither any Seller nor any of their respective Subsidiaries (including the Acquired Companies) (i) has or has had assets located in, or otherwise directly or indirectly derives or derived revenues from or engages or engaged in investments, dealings, activities, or transactions involving any Sanctioned Country; or (ii) directly or indirectly derives or derived revenues from or engages or engaged in investments, dealings, activities, or transactions with, any Sanctioned Person.  Neither any Seller nor any of their respective Subsidiaries (including the Acquired Companies) has received written notice alleging any non-compliance with Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions.  At no time has any Seller or any of their respective Subsidiaries (including the Acquired Companies), or any directors, officers, employees or, to the Knowledge of the Sellers, agents of any Seller or any of their respective Subsidiaries (including the Acquired Companies) made a voluntary, directed, or involuntary disclosure to any Governmental Authority with respect to any actual or potential violation under any Anti-Corruption Law, Anti-Money Laundering Laws or Sanctions. There has not been, and there is no, pending or threatened action, suit, proceeding, investigation or inquiry before any court or other Governmental Authority against any Seller, any of their respective Subsidiaries (including the Acquired Companies), or any of their respective directors, officers, employees or, to the Knowledge of the Sellers, agents, or any informal or formal investigation by any Seller or any of their respective Subsidiaries (including the Acquired Companies), or their respective legal representatives or a Governmental Authority involving the foregoing, that relates to a potential or actual violation of Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions. The Sellers and each Acquired Company have implemented and maintained policies and procedures designed to ensure compliance by the Sellers, their respective Subsidiaries (including the Acquired Companies) and directors, officers, employees and, to the Knowledge of the Sellers, agents of the Sellers and their respective Subsidiaries (including the Acquired Companies), with Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(d)    No part of the Purchase Price will be, directly or indirectly, used or otherwise lent, contributed, or otherwise made available, to any Person, (i) to fund any activity, business, or transaction of, with, or involving any Sanctioned Person or Sanctioned Country, or (ii) in any manner that would result in a violation of Sanctions, Anti-Money Laundering Laws or Anti-Corruption Laws by any Person (including any Party or any of their Affiliates).

5.14    Labor and Employment Matters.

(a)    Section 5.14(a) of the Disclosure Schedule sets forth a complete and correct list of Employees as of October 30, 2024, showing for each Employee:  (i) name or unique employee identifier, (ii) hire date or seniority or service credit date if different from hire date, (iii) current job title, (iv) whether such Employee is on leave and if on leave, the reason for and period of leave, including anticipated return to work date, (v) annual base salary or hourly wage, (vi) any actual bonus, commission, or other remuneration paid during 2023, (vii) exempt/non-exempt status, (viii) any increase in compensation, bonus, incentive, or service award, or any grant of any severance or termination pay, or any other increase in benefits, or any commitment to do any of the foregoing, since January 1, 2024, (ix) full-time/part-time status, (x) location, (xi) accrued but unused paid time off (including the dollar value of such hours), and (xii) union/non-union status

(and which union, if applicable).  Section 5.14(a) of the Disclosure Schedule also sets forth a complete and correct list of all individual independent contractors currently performing services or under contract to perform future services related to the RS Business for any Seller or Acquired Company and for each: (A) start date, (B) description of services provided, (C) estimated completion date, (D) hourly or per diem rate or other form and amount of pay of such contractor, (E) what Seller or Acquired Company engages the individual independent contractor, and (F) location of engagement.

(b)      The Company has provided Buyer with complete and correct copies of (i) all existing severance, accrued vacation, or other leave agreements, policies, or retiree benefits applicable to any officer, Employee, or consultant of the Sellers or the Acquired Companies, (ii) all employee trade secret, non-compete, non-disclosure, and invention assignment agreements with officers, Employees, or consultants of the Sellers or the Acquired Companies, and (iii) all manuals and handbooks applicable to any current or former director, manager, officer, employee, or consultant of any Seller or Acquired Company (in each case, to the extent still in effect and relating to the RS Business).  Except as set forth on Section 5.14(b) of the Disclosure Schedule, the employment or consulting arrangement of each officer, Employee, or consultant of any Seller or Acquired Company is, subject to applicable Legal Requirements involving the wrongful termination of employees, terminable at will (without the imposition of penalties or damages) by the Sellers or the Acquired Companies as the case may be, and the Sellers and the Acquired Companies do not have any severance obligations if any such officer, Employee, or consultant is terminated.   To the Knowledge of the Sellers, no executive Employee or key Employee of any Seller or Acquired Company or any group of Employees of any Seller or Acquired Company has any plans to terminate employment with the applicable Seller or Acquired Company.

(c)      Except as set forth on Section 5.14(c) of the Disclosure Schedule, no Seller or Acquired Company is party to, or bound by, any collective bargaining agreement or other agreement with a labor organization representing any Employees.  No collective bargaining agreement is being negotiated by any of the Sellers or Acquired Companies.  The Sellers and Acquired Companies have not experienced (nor, to the Knowledge of the Sellers, have they been threatened with) any strike, lockout, slow down, work stoppage, boycott, handbilling, picketing, walkout, demonstration, leafleting, sit-in, sick-out, or other form of organized labor disruption. Within the past three (3) years, no Seller or Acquired Company has committed any unfair labor practice, as defined in the National Labor Relations Act or other applicable labor laws.  No labor organization or group of Employees has to the Knowledge of the Sellers, sought to organize any Employees for purposes of collective bargaining, made a demand for recognition or certification, sought to bargain collectively with the Sellers or any of the Acquired Companies, or filed a petition for recognition with any Governmental Authority.  The Sellers and the Acquired Companies have paid all Employees all wages, salaries, commissions, bonuses, benefits, and other compensation due and payable to such Employees in the Ordinary Course of Business.

(d)      Within the past three (3) years, each individual who has performed services for the Sellers and the Acquired Companies or who otherwise has claims for compensation from the Sellers and the Acquired Companies has been properly classified as an employee or an independent contractor and as exempt or non-exempt pursuant to all applicable Legal

Requirements, including the Fair Labor Standards Act of 1938 (and any similar state or local Legal Requirements), the Code and ERISA.

(e)        The Sellers and the Acquired Companies are in compliance in all material respects with all applicable Legal Requirements pertaining to employment and employment practices, including all Legal Requirements relating to the hiring, promotion, assignment, and termination of employees, discrimination, harassment, retaliation, equal employment opportunities, disability, labor relations, wages and hours, hours of work, overtime, payment of wages, temporary or leased employees, employee classification, immigration, workers' compensation, background checks, employee benefits, working conditions, occupational safety and health, family and medical leave, employee terminations and data privacy and data protection to the extent they relate to Employees of the Sellers and the Acquired Companies.  There are no, and in the past three (3) years, there have not been any complaints, actions, suits, claims, investigations, or other Actions or Orders against a Seller or Acquired Company pending with, or, to the Knowledge of the Sellers, threatened to be filed by or with, any Governmental Authority in connection with the employment or engagement of any current or former employee, independent contractor, applicant for employment, volunteer, or worker provided by any temporary employment agency or third party workforce provider of any Seller or Acquired Company, including any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay, plant closures and layoffs, wage and hour issues, compliance with immigration laws, and any other employment related matter.

(f)        Each Employee has all work permits, immigration permits, visas, or other authorization required by any applicable Legal Requirement for such Employee given the duties and nature of such Employee's employment, and the Sellers and/or Acquired Companies have on file for each such Employee a Form I-9 (or equivalent form required by any other applicable jurisdiction) that is validly and properly completed in accordance with applicable law for each Employee or independent contractor with respect to whom such form is required under applicable law.

(g)        (i) Within the past three (3) years, the Sellers and Acquired Companies have not failed to provide advance notice of layoffs or termination as required by the Worker Adjustment and Retraining Notification Act of 1988 or any similar state or local law, statute, rule, act, code, ordinance or regulation, or any similar applicable Legal Requirement for employees outside of the United States regarding the termination or layoff of employees (collectively, the "***WARN Act***"), nor have the Sellers or any Acquired Companies incurred any material liability or material obligation under the WARN Act; (ii) to the Knowledge of the Sellers, no Employee has been within the past three (3) years or is being investigated in connection with any misconduct, nor subject to any disciplinary action in connection with such misconduct, that could reasonably be expected to cause any material damage to the reputation or business of the Sellers, Acquired Companies, or Employees; and (iii) to the Knowledge of the Sellers, within the past three (3) years, no Employee has engaged in any conduct or cover-up of such conduct, or aided or assisted any other person or entity to engage in any conduct that could cause or has caused any material damage to the reputation or business of the Sellers, Acquired Companies, or Employees, including but not limited to any conduct constituting sexual misconduct, harassment (including sexual harassment), discrimination, or retaliation.

(h)      Except as set forth on <u>Section 5.14(h)</u> of the Disclosure Schedule, to the Knowledge of the Sellers, there have been no material workplace accidents, injuries, or exposures in the last three (3) years involving any Employee or former employee of the Sellers or any Acquired Companies.

      5.15    <u>Employee Benefit Plans</u>.

(a)      <u>Section 5.15</u> of the Disclosure Schedule sets forth a list of all Acquired Company Plans (excluding offer letters that provide for at-will employment and can be terminated without any liability) and each material Non-Acquired Company Plan (excluding offer letters). The Sellers have separately identified in <u>Schedule 5.15(a)</u> (i) each Plan that contains a change in control provision and (ii) the sponsor or contracting entity with respect to each Plan. No Plan is subject to the Legal Requirements of relevant jurisdictions other than the United States.

(b)      Each of the Plans that is intended to be qualified under Section 401(a) of the Code either has received a favorable determination letter from the IRS or is a prototype plan that has received a notification letter from the IRS.  Nothing has occurred, and, to the Knowledge of the Sellers, there are no facts and circumstances that reasonably could be expected, to cause the loss of such qualification. The Plans comply in form and in operation, in all material respects, with the requirements of the Code, ERISA and all applicable Legal Requirements.

(c)      With respect to each Acquired Company Plan and, except as would not reasonably be expected to result in material liability to the Buyer, each Non-Acquired Company Plan, all required contributions or premium payments required to have been made under the terms of the Plan or in accordance with Legal Requirements have been made or properly accrued, in all material respects.

(d)      With respect to each Acquired Company Plan and each material Non-Acquired Company Plan, the Acquired Companies or Sellers have made available to Buyer true and complete copies (or, to the extent such plan is unwritten, an accurate written description) of (i) plan documents, amendments, and related trust agreements, (ii) the most recent IRS determination letter and/or opinion letter, if applicable, (iii) all material filings with all Governmental Authorities with respect to each Plan for the past year, (iv) the most recent Form 5500 and schedules thereto and nondiscrimination testing for the most recent plan year and (v) the latest financial statements for the Plans.

(e)      No Plan is, and neither the Sellers nor any of the Acquired Companies nor any of their respective ERISA Affiliates maintain, sponsor, contribute to or have any obligation to contribute to, or any Liability with respect to, or have in the past six (6) years maintained, sponsored, contributed to, or had any obligation to contribute to, or had any Liability with respect to, any (i) "defined benefit plan" (as defined in Section 3(35) of ERISA) or any other plan subject to the funding requirements of Sections 412 or 430 of the Code or Section 302 or Title IV of ERISA (including any "multiemployer plan" (as defined in Section 3(37) of ERISA)), (ii) "multiple employer plan" (as defined in Section 413(c) of the Code or Section 210 of ERISA), (iii) "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA, or (iv) or plan that provides for post-retirement or post-termination medical, life insurance or other similar benefits (other than health continuation coverage required by Part 6 of Subtitle B of Title I of

ERISA, Section 4980B of the Code and any similar applicable state Legal Requirement, for which the covered individual pays the full cost of coverage).

(f)     With respect to each Acquired Company Plan, and, except as would not reasonably be expected to result in material liability to the Buyer, each Non-Acquired Company Plan, all required reports, returns, notices and descriptions and other documentation that are required to have been filed with or furnished to the IRS, the United States Department of Labor or any other Governmental Authority, or to the participants or beneficiaries of such Plan (including Form 5500 Annual Reports, Summary Annual Reports, and Summary Plan Descriptions) have been filed or distributed in material compliance with the applicable requirements of ERISA, the Code, Legal Requirements, and the terms of each Plan.

(g)     No Action or Order or other claim, suit or proceeding to or by any Person or Governmental Authority with respect to any such Acquired Company Plan and, except as would not reasonably be expected to result in material liability to the Buyer, each Non-Acquired Company Plan, (other than routine claims for benefits) has been made, commenced, filed, is pending or, to the Knowledge of the Sellers, threatened in writing.

(h)     Except as set forth on Schedule 5.15(h), neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event) (i) result in any material payment becoming due, or materially increase the amount of any compensation due, to any current or former officer, director, employee or individual consultant (or their respective representatives or beneficiaries) of Sellers or the Acquired Companies; (ii) materially increase any benefits otherwise payable under any Plan; (iii) result in the acceleration of the time of payment or vesting of any such compensation or benefits; or (iv) result in the payment of any amount that could, individually or in combination with any other such payment, constitute an "excess parachute payment", as defined in Section 280G(b)(1) of the Code and the regulations promulgated thereunder.  To the Knowledge of the Sellers, no Seller nor any Acquired Company has any obligation to "gross-up" or reimburse any Person for taxes or related interest or penalties incurred by such Person, including under Section 4999, 409A, or 105(h) of the Code.

5.16    Tax Matters. Each of the Sellers (with respect to the RS Business) and the Acquired Companies has filed (or has had filed on its behalf) all federal income Tax Returns and other material Tax Returns that are required to be filed by it (taking into account any extensions of time to file that have been duly perfected).  All Taxes shown as owing by each of the Sellers (with respect to the RS Business) and the Acquired Companies on all such Tax Returns have been fully paid or properly accrued, and all such Tax Returns are true and correct in all material respects. The provision for Taxes on the Interim Financial Statements is sufficient for all accrued and unpaid Taxes of the Sellers (with respect to the RS Business) and the Acquired Companies as of the date thereof.  All material Taxes that the Sellers (with respect to the RS Business) and the Acquired Companies are obligated to withhold from amounts owing to any employee, creditor, or third party have been fully paid or properly accrued.  No Seller (with respect to the RS Business) or Acquired Company is currently and has not been a party to any Tax allocation, Tax sharing, Tax indemnity, Tax reimbursement agreement or other Tax arrangement (other than credit agreements, lease agreements, or other commercial agreements entered into in the ordinary course of business containing customary Tax allocation or gross-up provisions).  Within the past three (3) years, no

40

Seller (with respect to the RS Business) or Acquired Company has been the subject of any audit or other examination of Taxes by the Taxing Authorities of any nation, state, or locality with respect to any open Tax years, and, to the Knowledge of the Sellers, no such audit or other examination is contemplated or pending.  No written claim has been made within the past three (3) years by any Governmental Authority in a jurisdiction where a Seller (with respect to the RS Business) or Acquired Company does not file Tax Returns that it is or could be subject to taxation by that jurisdiction where a material Tax liability would result.  Within the past three (3) years, no Seller (with respect to the RS Business) or Acquired Company has been a member of any affiliated group of corporations which has filed a combined, consolidated, or unitary income Tax Return with any Governmental Authority (other than a combined, consolidated, or unitary group of which Seller or any of its Affiliates is the common parent).  No Seller (with respect to the RS Business) or Acquired Company has waived in writing any statute of limitations in respect of Taxes payable by it, which waiver is currently in effect.  There are no liens for Taxes (other than Permitted Liens) upon any of the assets of the Sellers (with respect to the RS Business) or the Acquired Companies.  No Seller (with respect to the RS Business) or Acquired Company has been a party to any "listed transaction" as defined in Section 6707A(c)(2) of the Code and Treasury Regulation Section 1.6011-4(b).  No Seller (with respect to the RS Business) or Acquired Company has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or Section 361 of the Code.  Insurance. Section 5.17 of the Disclosure Schedule lists each material insurance policy currently in effect that is maintained by the Sellers, the Acquired Companies and the Managed Entity that relates to the RS Business, the Acquired Companies and the Managed Entity, including the name of the insurer and policy number (collectively, the "***Insurance Policies***").  The Insurance Policies are in full force and effect, all premiums due thereon have been paid, and neither the Sellers, the Acquired Companies, or the Managed Entity, as applicable, are in material breach or material default thereunder.

   5.18 Affiliated Transactions. Except for this Agreement and the other Transaction Documents, Section 5.18 of the Disclosure Schedule sets forth a true and complete list of all (a) Contracts between (i) Seller or any of its Affiliates (excluding the Sellers and the Acquired Companies), on the one hand, and (ii) any Seller or Acquired Company, on the other hand, and (b) powers of attorney granted by any Acquired Company in favor of Seller, any of its Affiliates (excluding the Acquired Companies), or any of their respective representatives.

   5.19 Material Contracts.

   (a) Section 5.19 of the Disclosure Schedule sets forth a list of all Contracts in effect as of the date hereof, including all amendments and supplements thereto, to which a Seller, Acquired Company or the Managed Entity is a party or by which a Seller, Acquired Company or the Managed Entity is bound, meeting any of the descriptions set forth below (collectively referred to herein as the "***Material Contracts***"):

   (i) all Contracts relating to any completed material business acquisition by a Seller, Acquired Company or the Managed Entity within the last two (2) years;

   (ii) all collective bargaining agreements and other Contracts with a labor union, works council, or other labor organization;

(iii) Contracts relating to the acquisition or disposition by any Seller or Acquired Company outside the Ordinary Course of Business of any material assets or any material business (whether by merger, sale or purchase of stock, sale or purchase of assets or otherwise) to the extent any actual or contingent material obligations of any Seller or Acquired Company thereunder remain in effect;

(iv) any settlement or similar agreement which imposes any payment or other material obligations of any Acquired Company after the Closing Date;

(v) all written Contracts for the employment of any current officer, individual employee or other person on a full-time or consulting basis with an annual base salary or consulting fee in excess of $250,000 (excluding, in each case, healthcare providers);

(vi) all guaranties of any obligation for Indebtedness;

(vii)    all Contracts under which a Seller, Acquired Company or the Managed Entity is lessee of, or holds or operates, any personal property owned by any other party, for which the annual rental exceeds $500,000;

(viii)   all Contracts under which a Seller, Acquired Company or the Managed Entity is lessor of or permits any third party to hold or operate any personal property for which the annual rental payments exceed $500,000;

(ix) all software licenses that are material to the operation of the business of the Sellers, Acquired Companies and the Managed Entity taken as a whole (other than "off the shelf" software);

(x) all Contracts that prohibit the Sellers, Acquired Companies or the Managed Entity from freely engaging in business anywhere in the world (other than customer Contracts and non-disclosure Contracts entered into in the ordinary course of business that contain non-solicitation obligations);

(xi) all Contracts currently in effect (other than purchase orders providing for sales of products or services in the ordinary course of business) with any Material Customer or Material Supplier; and

(xii)    all Contracts currently in effect between a Seller, Acquired Company and the Managed Entity.

(b)     The Sellers, Acquired Companies and the Managed Entity have made available to Buyer a true and correct copy of all written Material Contracts.  Except as set forth on Section 5.19(b) of the Disclosure Schedule, as of the date hereof, neither the Sellers, Acquired Companies, the Managed Entity, nor, to the Knowledge of the Sellers, any other party to any Material Contract is in breach of, or in default under, any Material Contract, except where such breach or default would not reasonably be expected to be material to the Sellers, Acquired Companies and the Managed Entity, taken as a whole.  To the Knowledge of the Sellers, each Material Contract is valid, binding and in full force and effect, except for such failures to be valid,

binding or in full force and effect that would not reasonably be expected to be material to the Seller or the Acquired Companies, taken as a whole.

5.20     Intellectual Property. Section 5.20 of the Disclosure Schedule sets forth a list of all registered Intellectual Property and applications therefor owned by a Seller or Acquired Company and a list of all of the corporate names and material brand names owned by the Sellers and Acquired Companies used in the conduct of the Sellers and the Acquired Companies' RS Business as currently conducted.  Except as set forth in Section 5.20 of the Disclosure Schedule or as would not reasonably be expected to have a material impact on the Sellers and the Acquired Companies, taken as a whole, (a) a Seller or Acquired Company owns and possesses all right, title, and interest in and to, or possesses the valid and enforceable right to use, all material Intellectual Property and applications therefor used in the operation of the RS Business of the Sellers and the Acquired Companies as currently conducted; (b) during the two (2)-year period prior to the date of this Agreement, no Seller or Acquired Company has received any written notices of material infringement or misappropriation from any third party with respect to such Seller or Acquired Company's use of any Intellectual Property; (c) to the Knowledge of the Sellers, as of the date hereof, no third party is materially infringing or misappropriating any registered Intellectual Property owned by the Sellers or the Acquired Companies; and (d) to the Knowledge of the Sellers, none of the Intellectual Property or products or methods of doing business of the Sellers or the Acquired Companies as currently conducted materially infringes upon any other Person's Intellectual Property.

5.21     Material Customers and Suppliers.

(a)     Section 5.21(a) of the Disclosure Schedule sets forth a complete and accurate list of the ten (10) largest customers (by dollar volume) of the RS Business (taken as a whole in the aggregate) during fiscal year 2023 (each, a "***Material Customer***").

(b)     Section 5.21(b) of the Disclosure Schedule sets forth a complete and accurate list of the ten (10) largest suppliers (by dollar volume) of the RS Business (taken as a whole in the aggregate) during fiscal year 2023 (each, a "***Material Supplier***").

(c)     Except as set forth on Section 5.21(c) of the Disclosure Schedule, during the twelve (12) month period prior to the date hereof, none of the Sellers, the Acquired Companies nor the Managed Entity have received any written notice from any Material Customer or Material Supplier stating that such Material Customer or Material Supplier will stop its business with the Sellers, the Acquired Companies and the Managed Entity or otherwise materially change the terms of its relationship with the RS Business (other than pricing changes in the ordinary course of business).

5.22     Regulatory Compliance.

(a)     Each Seller, Acquired Company, the Managed Entity and each Facility presently is, and for the last three (3) years has been, in compliance in all material respects with all Legal Requirements of any Governmental Authority having jurisdiction over the Facilities or the assets of the Sellers or the Acquired Companies, including but not limited to, the false claims, false representations, anti-kickback, and all other provisions of the Medicare/Medicaid fraud and

abuse laws (42 U.S.C. Section 1320a-7 et seq.) and the physician self-referral and all other provisions of the federal Ethics in Patient Referrals Act, 42 U.S.C. § 1395nn, and all regulations promulgated thereunder and the corresponding state fraud and abuse, false claims, and anti-self-referral statutes and any regulations promulgated pursuant to any of the foregoing referenced statutes.

(b)      Except as would not be expected to be material to the Acquired Companies, taken as a whole, for the last three (3) years, none of the Sellers, Acquired Companies, the Managed Entity, the Facilities, or any of the Sellers', Acquired Companies' or the Managed Entity's respective officers, directors, or managing employees has engaged in any activities that are prohibited under 42 U.S.C. Section 1320a-7 et seq., or the regulations promulgated thereunder, including, but not limited to, the following:

(i)  knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment;

(ii) knowingly and willfully making or causing to be made a false statement or representation of a material fact for use in determining rights to any benefit or payment;

(iii) knowingly and willfully offering, paying, soliciting, or receiving any remuneration (including any kickback, bribe, or rebate), directly or indirectly, overtly or covertly, in cash or in kind, (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare, Medicaid, or other state healthcare program, or (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part by Medicare, Medicaid, or other state healthcare program; or

(iv) knowingly making a payment, directly or indirectly, to a physician as an inducement to reduce or limit necessary services to individuals who are under the direct care of the physician and who are entitled to benefits under Medicare, Medicaid, or other state healthcare program.

(c)      the Sellers, Acquired Companies, the Managed Entity, and the Facilities are in compliance in all material respects with the administrative simplification provisions required under HIPAA, as well as applicable state laws having similar subject matter to HIPAA, as of the applicable effective dates for such requirements.

(d)      Permits & Approvals.

(i)  Section 5.22(d) of the Disclosure Schedule sets forth each of the governmental licenses, approvals, permits or authorizations that are issued or granted to the Sellers, the Acquired Companies and the Managed Entity by a Governmental Authority and that are material to the operation of the RS Business as currently conducted (collectively, the "*Permits*"). Such Permits constitute all material governmental licenses, approvals, permits or authorizations that are necessary for the operation of the Facilities as currently conducted.  Except as set forth on Section 5.22(d) of the Disclosure Schedule, a Seller, Acquired Company or the Managed Entity is

the duly authorized holder of all such Permits that relate to the Facilities operated by the Sellers, Acquired Companies and the Managed Entity.  The Sellers, Acquired Companies, Managed Entity, and Facilities are in compliance in all material respects with all Permits held by the Sellers, Acquired Companies and the Managed Entity.

(ii) There are no provisions in, or agreements relating to, any such Permits which preclude or limit in any material respect the Sellers, Acquired Companies from operating any of the Facilities as they are currently operated.  There is not now any pending or, to the Knowledge of the Sellers, threatened action by or before any Governmental Authority to revoke, cancel, rescind, modify or refuse to renew any of the Permits, and all of the Permits are in good standing.

(iii)    Subject to entry of the Sale Order, each Permit, except as listed in Schedule 5.22(d) may be transferred or reissued to Buyer in accordance with this Agreement and without the approval of any Person.

(e)    Government Program Participation; Compliance Program.  Each of the Facilities that participates in the Medicare, Medicaid, and TriCare/CHAMPUS programs has a current and valid provider contract with such programs and is in compliance in all material respects with the conditions of participation in such programs.  The Sellers, Acquired Companies and the Managed Entity have not been excluded from participation in the Medicare, Medicaid, or TriCare/CHAMPUS programs, nor, to the Knowledge of the Sellers, is any such exclusion threatened.  The Sellers, Acquired Companies and the Managed Entity have adopted a compliance program applicable to the Facilities.  The Sellers, Acquired Companies and the Managed Entity have operated in material compliance with such compliance program and its policies.  For purposes of this Agreement, the term "compliance program" refers to provider programs of the type described in the compliance guidance published by the OIG.  None of the Sellers, Acquired Companies nor the Managed Entity (i) are a party to a Corporate Integrity Agreement with the OIG, (ii) have any reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority, (iii) have been, to the Knowledge of the Sellers, within the past three (3) years the subject of any material governmental payer program investigation conducted by any Governmental Authority, or (iv) are or have been, to the Knowledge of the Sellers, within the past three (3) years a defendant in any qui tam/False Claims Act litigation.

5.23    Brokers. Except with respect to the brokers representing Seller in this transaction, Lazard Frères & Co. LLC and MTS Health Partners, L.P., the Sellers and Acquired Companies have not incurred any obligation for any finder's or broker's or agent's fees or commissions or similar compensation in connection with the transactions contemplated hereby.

5.24    Bank Accounts.  Section 5.24 of the Disclosure Schedules set forth a true, complete and correct list of each bank, deposit, securities, lock box or cash collection, management or other account or sub-account of the RS Business or any Acquired Company, including the title and number of the account and the financial or other institution at which such account is located (designating each authorized signatory).

5.25    NO OTHER REPRESENTATIONS AND WARRANTIES.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS ARTICLE V

45

AND THE REPRESENTATIONS AND WARRANTIES OF SELLER SET FORTH IN ARTICLE VI, NONE OF THE SELLERS, ACQUIRED COMPANIES, THE MANAGED ENTITY, NOR ANY OTHER PERSON MAKES ANY REPRESENTATION OR WARRANTY, WRITTEN OR ORAL, STATUTORY, OR EXPRESS OR IMPLIED, WITH RESPECT TO ANY OF THE SELLERS, ACQUIRED COMPANIES, THE MANAGED ENTITY, OR ANY OF THEIR RESPECTIVE BUSINESSES, OPERATIONS, ASSETS, STOCK, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE), OR PROSPECTS.   BUYER HEREBY EXPRESSLY WAIVES ANY CLAIMS AND CAUSES OF ACTION AND ANY OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, IN EACH CASE, RELATING TO THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA, OR OTHER MATERIALS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO BUYER AND ITS REPRESENTATIVES BY OR ON BEHALF OF THE SELLERS, ACQUIRED COMPANIES, OR THE MANAGED ENTITY.  WITHOUT LIMITING THE FOREGOING, NONE OF THE SELLERS, ACQUIRED COMPANIES, THE MANAGED ENTITY, NOR ANY OTHER PERSON IS MAKING ANY REPRESENTATION OR WARRANTY TO BUYER WITH RESPECT TO ANY FINANCIAL PROJECTION OR FORECAST RELATING TO THE RS BUSINESS, OPERATIONS, ASSETS, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE), OR PROSPECTS OF THE SELLERS, ACQUIRED COMPANIES AND THE MANAGED ENTITY.

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers and the Acquired Companies as of the date hereof:

6.1     Organization and Good Standing. Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

6.2     Power and Authority.  Buyer has all requisite power and authority to execute and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.  All acts or proceedings required to be taken by Buyer to authorize the execution and delivery of this Agreement and the performance of Buyer's obligations hereunder have been properly taken.

6.3     Enforceability.  This Agreement has been duly authorized, executed, and delivered by Buyer, and, assuming the due and valid authorization, execution, and delivery of this Agreement by the Sellers, this Agreement constitutes the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as the same may be limited by the Bankruptcy and Equity Exceptions.

6.4     No Violations; Consents and Approvals.  The execution and delivery of this Agreement by Buyer, and the consummation by it of the transactions contemplated hereby, will

not (i) violate any provision of the Organizational Documents of Buyer, (ii) violate any material Legal Requirement applicable to, binding upon, or enforceable against Buyer, (iii) result in any material breach of, or constitute a material default (or an event which would, with the passage of time or the giving of notice or both, constitute a material default) under, or give rise to a right of payment under or the right to terminate, any Contract to which Buyer is a party or bound, or (iv) result in the creation or imposition of any Lien upon any of the material property or material assets of Buyer.  No approval, consent, waiver, authorization, or other order of, and no declaration, filing, registration, qualification, recording, or other action or filing with, any Governmental Authority or any other Person is required to be obtained or made by or on behalf of Buyer in connection with the execution, delivery, or performance of this Agreement and the consummation of the Closing hereunder in accordance with the terms and conditions of this Agreement, except where failure to obtain such approval, consent, waiver, authorization, or other order, or to make such declaration, filing, registration, qualification, recording, or other action, would not be material to Buyer taken as whole.

       6.5    <u>Brokers</u>.  Except with respect to Houlihan Lokey Capital, Inc. and Ankura Consulting Group, LLC, Buyer has not incurred any obligation for any finder's or broker's or agent's fees or commissions or similar compensation in connection with the transactions contemplated hereby for which the Sellers or the Acquired Companies may be liable.

       6.6    <u>Litigation</u>.  There are no Actions or Orders pending or, to the Knowledge of the Buyer, expressly threatened in writing against Buyer, at law or in equity, before or by any Governmental Authority which would reasonably be expected to affect the legality, validity or enforceability of this Agreement or the consummation of the transactions contemplated by this Agreement.

       6.7    <u>NO OTHER REPRESENTATIONS AND WARRANTIES</u>.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE V, BUYER ACKNOWLEDGES AND AGREES THAT NEITHER THE SELLERS, THE ACQUIRED COMPANIES, NOR ANY OTHER PERSON, MAKES ANY REPRESENTATION OR WARRANTY, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, WITH RESPECT TO ANY OF THE SELLERS, THE ACQUIRED COMPANIES OR ANY OF THEIR RESPECTIVE BUSINESSES, OPERATIONS, ASSETS, STOCK, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE), OR PROSPECTS.  BUYER HEREBY EXPRESSLY WAIVES ANY CLAIMS AND CAUSES OF ACTION AND ANY OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, IN EACH CASE, RELATING TO THE ACCURACY, COMPLETENESS, OR MATERIALITY OF ANY INFORMATION, DATA, OR OTHER MATERIALS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO BUYER AND ITS REPRESENTATIVES BY OR ON BEHALF OF THE SELLERS OR THE ACQUIRED COMPANIES.  WITHOUT LIMITING THE FOREGOING, NEITHER THE SELLERS NOR THE ACQUIRED COMPANIES, NOR ANY OTHER PERSON IS MAKING ANY REPRESENTATION OR WARRANTY TO BUYER WITH RESPECT TO ANY FINANCIAL PROJECTION OR FORECAST RELATING TO THE RS BUSINESS, OPERATIONS, ASSETS, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE), OR PROSPECTS OF ANY OF THE SELLERS OR THE ACQUIRED COMPANIES.

**ARTICLE 7**

**ACTIONS PRIOR TO THE CLOSING DATE**

7.1     Access and Reports.

(a)     During the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of Article 11, Sellers shall afford Buyer and its Representatives reasonable access, upon reasonable notice during normal business hours, to the senior executive officers of the Acquired Companies and to the books and records of the Acquired Companies and all records concerning the RS Business and Acquired Assets, and Sellers shall instruct such senior executive officers to reasonably cooperate with Buyer and its Representatives regarding the same; provided, that (i) such access does not unreasonably interfere with the operation of the Sellers' or the Acquired Companies' businesses and shall be subject to the Sellers' reasonable security measures and insurance requirements; and (ii) Buyer and its authorized agents and representatives shall not contact or otherwise communicate with the employees (other than executive employees), customers, or suppliers of the Sellers or the Acquired Companies, unless, in each instance, approved in writing in advance by the Sellers, which approval shall not be unreasonably withheld. No investigation pursuant to this Section 7.1 or by Buyer or its Representatives at any time prior to or following the Execution Date shall affect or be deemed to modify any representation or warranty made by the Sellers herein. Notwithstanding anything contained in this Agreement to the contrary, none of Buyer or its Representatives or any Buyer Designees shall have any right to perform or conduct, or cause to be performed or conducted, any environmental sampling or testing at, in, on or underneath any of Sellers' properties without written consent from the Company, which consent shall not be unreasonably withheld.

(b)     This Section 7.1 shall not require Sellers to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of the Company, is reasonably likely to result in any violation of any Legal Requirement or any Contract to which the Company or any Seller is a party or cause any privilege (including attorney-client privilege) that Sellers would be entitled to assert to be undermined with respect to such information and such undermining of such privilege could in the Company's good faith judgment (after consultation with counsel, which may be in-house counsel) adversely affect in any material respect Sellers' position in any pending or, what the Company believes in good faith (after consultation with counsel, which may be in-house counsel) could be, future litigation, (ii) personnel files, workers' compensation files, employee medical files (including employee "protected health information" (as defined in the HIPAA Standards for Privacy of Individually Identifiable Health Information, 45 CFR Part 146)), and other employee books and records, or (iii) if the Company or any Seller, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto; provided, that, in the case of clause (i), the Parties hereto shall cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be reasonably likely to result in the violation of any such Legal Requirement or Contract or be reasonably likely to cause such privilege to be undermined with respect to such information or (B) could reasonably (in the good faith belief of the Company (after consultation with counsel,

which may be in-house counsel)) be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives of Buyer could be provided access to such information.

    7.2  Operations Prior to the Closing Date. Sellers covenant and agree that, except (w) as expressly contemplated by this Agreement, (x) as disclosed in Schedule 7.2, (y) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed) or (z) as otherwise required by Legal Requirements (including any matters arising from the Bankruptcy Cases or authorized by the Bankruptcy Court), after the Execution Date and prior to the Closing Date:

    (a)  Sellers shall (and shall cause the Acquired Companies to):

    (i) use reasonable best efforts to carry on the RS Business in the Ordinary Course of Business;

    (ii) use reasonable best efforts to maintain, preserve and protect the RS Business (including with respect to the operations, organization and goodwill of the RS Business and the making of capital expenditures with respect to the RS Business, substantially consistent with current operations, forecasts and schedules that have been made available to Buyer and its Affiliates and Representatives), the Acquired Assets and the assets of the Acquired Companies in the condition in which they exist on the Execution Date in all material respects;

    (iii) manage Inventory, the timing of collection of accounts receivable and the payment accounts payable in the Ordinary Course of Business;

    (iv) maintain their books, accounts and records in accordance with past custom and practice;

    (v) use reasonable best efforts to pay all trade payables related to the Acquired Assets incurred on or after the Petition Date in the ordinary course of the RS Business and collect all Accounts Receivable due to Sellers after the Petition Date in the Ordinary Course of Business;

    (vi) use reasonable best efforts to (A) retain Employees who are in good standing and (B) maintain their relationships with and preserve for the RS Business the goodwill of their suppliers, customers, Governmental Authorities, lessors, directors, managers, officers, Key Persons and other Persons with whom they have material business relationships;

    (vii) (A) comply in all material respects with all Legal Requirements applicable to them or having jurisdiction over the RS Business or any Acquired Asset, (B) comply in all respects with all Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions, (C) use reasonable best efforts to comply in all respects with contractual obligations applicable to or binding upon them pursuant to Assumed Contracts and (D) use reasonable best efforts to maintain in full force and effect all Permits and comply with the terms of each such Permit;

    (viii) use reasonable best efforts to cause any of their current

49

insurance policies with respect to the RS Business or any of the other Acquired Assets or assets of the Acquired Companies (including the Leased Real Properties) not to be canceled or terminated or any of the coverage thereunder to lapse unless, simultaneously with such termination, cancellation or lapse, replacement, policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect;

(ix) use reasonable best efforts to maintain, preserve and protect in full force and effect the existence of all Intellectual Property owned by Sellers;

(x) use reasonable best efforts not to take or agree to or commit to assist any other Person in taking any action that would reasonably be expected to (i) result in a failure of any of the conditions to the Closing or (ii) impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation; and

(xi) file all Tax Returns and pay or deposit all Taxes on a timely basis in the Ordinary Course of Business.

(b)        Sellers shall not (and shall cause the Acquired Companies not to):

(i)  sell, assign, transfer, lease, license or allow to lapse any rights in the Intellectual Property owned by the Sellers for the RS Business (other than non-exclusive licenses to Intellectual Property granted in the Ordinary Course of Business);

(ii)  make, change or revoke any material election relating to Taxes, change any annual accounting period for applicable Tax purposes, adopt or change any material Tax accounting method, file any amended Tax Return (other than an amended Tax Return to obtain any U.S. federal, state, or local income Tax refund), enter into any closing agreement, settle any material claim or assessment with respect to Taxes, knowingly surrender any right to claim a material refund, offset or other reduction in Tax liability, or request or consent to any extension or waiver of the limitation periods applicable to any claim or assessment with respect to Taxes (other than an extension granted in the ordinary course of business in connection with an extension for the filing of Tax Returns), in each case that adversely affects Taxes of the RS Business, the Acquired Assets or the Assumed Liabilities (other than Taxes that constitute Excluded Liabilities); or

(iii) authorize, commit or agree to take, or commit to assist any other Person in taking, any of the actions set forth in this Section 7.2(b).

(iv) make any material alterations or improvements to the Leased Real Property other than in the Ordinary Course of Business;

(v)  amend, modify, restate, supplement or terminate any Lease or enter into any new Lease without obtaining such approval from Buyer;

(vi) enter into, materially amend, waive, modify, or voluntarily terminate any Material Contract or any Contract that would have been a Material Contract if entered into prior to the date hereof, except, in each case, as required by any applicable Legal

Requirement, provided, that for purposes of this Section 7.2(b)(vi), Buyer shall be deemed to have consented if Buyer does not respond to Sellers in writing within three (3) Business Days of Sellers' request for such consent;

(vii)    acquire any material properties or assets or sell, assign, license, transfer, convey, lease, sublease or otherwise dispose of any material assets of Sellers or any Acquired Company related to the RS Business, including any assets that but for such sale, assignment, license, transfer, conveyance, lease, sublease or other disposition would constitute Acquired Assets, in each case;

(viii)    subject to any Lien or otherwise encumber or, except for Permitted Liens, permit, allow or suffer to be encumbered, any of the Acquired Assets or assets of the Acquired Companies; or

(ix)enter into any settlement agreement with regard to Claims related to the RS Business or the Acquired Assets without the prior written consent of Buyer (in its sole discretion).

(c)    Nothing in this Section 7.2 is intended to result in Sellers or any of the Acquired Companies ceding control to Buyer of the Acquired Companies' basic ordinary course of business and commercial decisions prior to the Closing Date.

(d)    Notwithstanding anything contained in this Agreement to the contrary, any action taken or omitted to be taken by the Acquired Companies that otherwise could represent a failure by the Acquired Companies to operate in the Ordinary Course of Business, in response to, in connection with, or as a result of, any of the following, shall not be deemed a breach of this Section 7.2: any earthquakes, hurricanes, floods or other natural disasters, epidemics, pandemics, disease outbreaks or public health emergencies, acts of God, or force majeure events, or any escalation or worsening of any of the foregoing.

7.3    Antitrust Filings; Cooperation.

(a)    As soon as reasonably practicable (and, in any event, in the case of notifications under the HSR Act, within ten (10) Business Days, or a later date as agreed by the Parties) following entry of the Bidding Procedures Order, Sellers, on the one hand, and Buyer, on the other hand, shall each prepare and file, or cause to be prepared and filed, any notifications advisable or required to be filed under (i) the HSR Act with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice, and request early termination of the waiting period under the HSR Act and (ii) any other applicable Antitrust Laws. Buyer, on the one hand, and Sellers, on the other hand, shall use reasonable best efforts to: (i) respond as promptly as practicable to the appropriate Governmental Authorities to any requests for additional information and documentary material in connection with such filings and (ii) take all other actions necessary to cause the waiting periods under the HSR Act and waiting or review periods under any other applicable Antitrust Laws to terminate or expire at the earliest practicable date after the date of filing including using reasonable best efforts to avoid or eliminate impediments under any Antitrust Law that may be asserted by any Governmental Authority with respect to the transactions contemplated hereby so as to enable the Closing to occur as soon as

reasonably possible. Buyer shall be responsible for payment of the applicable filing fee under the HSR Act and any other applicable Antitrust Laws, and each Party shall be responsible for payment of its own respective costs and expenses (including attorneys' fees and other legal fees and expenses) associated with the preparation of its portion of any antitrust filings.

(b)     Sellers shall use reasonable best efforts to do, or cause to be done, all things necessary under the applicable Legal Requirements with the appropriate Governmental Authorities to put in place, to transfer, to amend, or to acquire all Transferred Permits that are necessary for the operation and conduct of the RS Business or Acquired Assets by or on the Closing Date, unless the applicable Legal Requirements regarding such a Permit require certain actions to be taken upon or after Closing, and, in that event, Sellers shall use reasonable best efforts to do, or cause to be done, all things necessary or desirable under the applicable Legal Requirements with the appropriate Governmental Authorities which can only be taken or done after Closing to put in place, to transfer, to amend, or to acquire such remaining Permits as promptly as reasonably practicable after the Closing.

(c)     In addition to the actions to be taken under <u>Section 7.3(a)</u> and <u>Section 7.3(b)</u>, Sellers, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using reasonable best efforts to accomplish the following: (i) taking all reasonable acts necessary to cause the conditions precedent set forth in <u>Article 9</u> and <u>Article 10</u> to be satisfied, (ii) obtaining, at the earliest practicable date, of all necessary Governmental Authorizations and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to avoid any Action by any Governmental Authority, (iii) defending of any Actions challenging this Agreement or the consummation of the transaction contemplated by this Agreement, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed, and (iv) executing and delivering any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

(d)     Sellers, on the one hand, and Buyer, on the other hand shall consult and cooperate with one another and consider in good faith the view of one another and, (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) as far as reasonably practicable, shall permit the other to review in advance any proposed written or non-ministerial oral communication or information submitted to any such Governmental Authority in response thereto, subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine. In addition, none of Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated by this Agreement, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate threat, in each case to the maximum extent practicable. Subject to restrictions under any Legal Requirements, each of Buyer, on the one hand, and Sellers, on the other hand, shall promptly

furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the RS Business) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

(e)     In the event any Action by any Governmental Authority or other Person is commenced which questions the validity or legality of the transactions contemplated hereby, seeks damages in connection therewith, or would delay, restrain, prevent, enjoin or otherwise prohibit consummation of the transactions contemplated hereby, the Parties agree to cooperate and use their reasonable best efforts to resist and defend against such Action and, if an Order is entered or issued, or becomes reasonably foreseeable to be entered or issued, in any such Action, to use their reasonable best efforts to have such Order vacated, modified, reversed, suspended, prevented, eliminated or removed so as to permit such consummation on a schedule as close to possible to that contemplated by this Agreement, and to cooperate reasonably regarding any other impediment to the consummation of the transactions contemplated hereby.

(f)     Notwithstanding anything herein to the contrary:

(i)  none of Buyer's Affiliates or equity holders shall be required to, or be required to agree to: (A) sell, divest or dispose of, any assets, products, businesses, equity or interests; (B) any conditions relating to, or changes or restrictions in, any such assets, products, businesses, equity or interests; (C) any modification or waiver of the terms and conditions of this Agreement; or (D) any other condition that requires Buyer or Buyer's Affiliates or equity holders to take any action or that limits the freedom of action with respect to any assets, products, businesses, equity or interests of the Buyer's Affiliates or equity holders; and

(ii) and in furtherance of its efforts under this Section 7.3, Buyer agrees to take any and all action necessary to eliminate each and every impediment under any antitrust law that is asserted by any Governmental Authority so as to enable the Parties hereto to close transactions contemplated by this Agreement prior to the Outside Date, including negotiating, committing to, and effecting by consent decree or otherwise: (A) the sale, divestiture or disposition of, any assets, products, businesses, equity or interests of Buyer or the RS Business (after it is acquired); (B) any conditions relating to, or changes or restrictions in, any of the RS Business's assets, products, businesses or interests; (C) any modification or waiver of the terms and conditions of this Agreement; or (D) any other condition that requires Buyer to take any action or that limits the freedom of action with respect to any assets, products, businesses or interests of Buyer or the RS Business (after it is acquired); provided, however, that Buyer shall not be required to propose, execute, carry out or agree or submit to any action or remedy that individually or in the aggregate would reasonably be expected to have a material adverse effect on the business, operations, financial condition or results of operations of the RS Business (taken as a whole); and

(iii) Neither any Seller nor any Affiliate thereof shall agree to any sale, divestiture or disposal of, any assets, products, businesses or interests of any Person or the RS Business or any material restriction on any Person or the RS Business without the prior written consent of Buyer (which shall not be unreasonably withheld, conditioned or delayed) and provided further that any such action may, at the discretion of the Sellers, be conditioned upon the Closing.

7.4     Bankruptcy Court Matters.

(a)     Bidding Procedures Motion. In connection with the transactions contemplated by this Agreement, Sellers shall have filed with the Bankruptcy Court after the execution of this Agreement by each of the Parties, but in any event, within one (1) day following the Petition Date, the Bidding Procedures Motion, including the Bidding Procedures Order and appropriate supporting declarations, in each case, in form and substance acceptable to Buyer, and which identifies Buyer as the "stalking horse" for the Acquired Assets.

(b)     Bankruptcy Procedures Hearing and Bidding Procedures Order. The Bankruptcy Court shall have entered the Bidding Procedures Order, in form and substance acceptable to Buyer and Sellers, no later than November 19, 2024.

(c)     Qualified Bids.  Pursuant to the Bidding Procedures Order, any and all Qualified Bids respecting the Acquired Assets shall have been submitted on or prior to December 13, 2024 (the "**_Bid Deadline_**").  If any Qualified Bid (other than this Agreement) is submitted prior to the Bid Deadline, the Sellers shall have commenced the Auction on or prior to December 16, 2024.

(d)     Sale Order. The Bankruptcy Court shall have entered the Sale Order on or prior to December 23, 2024, which shall be in form and substance acceptable to Buyer and Sellers and consistent with Section 7.7 hereof.

(e)     Contracts. Sellers shall serve on all non-Seller counterparties to all of their Contracts a notice specifically stating that Sellers are or may be seeking the assumption and assignment of such Contracts and shall notify such non-Seller counterparties of the deadline for objecting to the Cure Costs, if any, which deadline shall as set forth in the Bidding Procedures Order.

(f)     Bankruptcy Filings. From and after the Execution Date and until the Closing Date, Sellers shall provide draft copies of all material (i) motions, (ii) documents, and (iii) other pleadings to be filed in the Chapter 11 Cases (excluding any retention applications) to the Ad Hoc Group Advisors (as defined in the Restructuring Support Agreement) as soon as reasonably practicable, but in no event less than two (2) Business Days prior to the date when the Company intends to file such documents, and, without limiting any approval rights set forth herein, consult in good faith with the Ad Hoc Group Advisors regarding the form and substance of any such proposed filing; provided, however, that in the event that not less than two (2) Business Days' notice is impossible or impracticable under the circumstances, the Company shall provide draft copies of any motions or other pleadings (excluding any retention applications) to the Ad Hoc Group Advisors as soon as otherwise practicable before the date when the Company Parties intends to file any such motion or other pleading. In the event the entry of the Bidding Procedures Order

or the Sale Order shall be appealed, Sellers shall use their reasonable best efforts to defend such appeal. Sellers shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure or (ii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith. Sellers shall use their reasonable best efforts to cause the Bidding Procedures Order and the Sale Order to be entered and become Final Orders as soon as practicable after entry. Notwithstanding the foregoing, nothing in this Agreement precludes the Parties from consummating the transactions contemplated by this Agreement if the Sale Order has been entered and has not been stayed and Buyer, in its sole discretion, waives in writing the condition set forth in <u>Section 9.7</u> that the Sale Order be a Final Order.

        7.5    <u>Expense Reimbursement</u>. Notwithstanding anything in this Agreement to the contrary, from and after entry of the Bidding Procedures Order, Sellers agree to pay Buyer the Expense Reimbursement in the event this Agreement is terminated if and to the extent provided in <u>Section 11.2</u>. The Parties acknowledge and agree that the terms and conditions set forth in <u>Section 11.2</u> with respect to the payment of the Expense Reimbursement shall become operative only if and to the extent that the Bankruptcy Court enters the Bidding Procedures Order approving, among other things, such Expense Reimbursement.

        7.6    <u>Disclosure Schedules; Notice of Developments</u>.

        (a)    <u>Completion of Schedules</u>.  The Parties acknowledge that the Disclosure Schedules may not be complete as of the execution of this Agreement, and the Parties hereby covenant that they each will use commercially reasonable efforts to complete and deliver the Disclosure Schedule as soon as practical (but in any event prior to the date of the approval of the Bidding Procedures Order) following the execution of this Agreement.  Disclosure Schedules not included as attachments to this Agreement on the Execution Date shall be delivered by the Party responsible therefor as soon as possible after the Execution Date, and shall thereupon, if mutually acceptable to the Parties, be deemed included in this Agreement as if such Disclosure Schedules were attached to this Agreement as of the Execution Date.  Buyer may assert a good faith dispute or objection with regard to any Disclosure Schedule, and the Parties shall thereafter negotiate such disputed Disclosure Schedule in good faith until the approval of the Bidding Procedures Order; <u>provided</u>, that Sellers' disclosure shall control in the event that Buyer does not terminate this Agreement prior to the approval of the Bidding Procedures Order.  If, following such good faith negotiation, such dispute is not resolved and the disputed Disclosure Schedule has or would reasonably be expected to have a material and adverse impact on Buyer's ability to conduct the RS Business or operate the Acquired Assets in the Ordinary Course of Business consistent with past practices over the six (6) months preceding the Execution Date, then Buyer may terminate this Agreement in accordance with <u>Section 11.1(c)(vii)</u>.

        (b)    <u>Notice of Developments</u>. Sellers shall promptly notify Buyer of, and furnish Buyer any information it may reasonably request with respect to, (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Acquired Assets or the transactions contemplated by this Agreement, (ii) subject to the terms of <u>Section 7.3</u>, any notice or other communication received from any Governmental Authority in connection with the transactions contemplated by this Agreement or relating to the RS Business, the Acquired Assets or the Assumed Liabilities, (iii) any material

breach discovered by the Sellers, or of which the Sellers become aware, of its representations, warranties or covenants contained in this Agreement or any of the other Transaction Documents which material breach or material failure to perform would result in Sellers being unable to satisfy a condition set forth in <u>Section 9.1</u> or <u>Section 9.2</u>, or (iv) any Actions commenced relating to the Acquired Assets, the Assumed Liabilities or the RS Business of which it receives notice or any other fact, circumstance or event, the existence or occurrence of which Sellers acquire knowledge, (A) which in any manner challenges or seeks to prevent, enjoin, materially alter or materially delay the transactions contemplated by this Agreement, (B) has resulted in, or would reasonably be expected to result in, a material breach of a representation or warranty made by the Sellers under this Agreement or (C) has resulted in, or would be reasonably expected to result in, the failure of any condition set forth in <u>Article 9</u> to be satisfied by the Outside Date.

        7.7    <u>Sale Free and Clear</u>. Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Liens (including, for the avoidance of doubt, all successor liability, including any successorship obligations with respect to any Plan) of, against or created by Sellers or their bankruptcy estate, shall be fully released from and with respect to the Acquired Assets. On the Closing Date, the Acquired Assets shall be transferred to Buyer and/or one or more Buyer Designees, as applicable, free and clear of all obligations, Liabilities and Liens (including, for the avoidance of doubt, all successor liability, including any successorship obligations with respect to any Plan or Contract), other than the Permitted Liens and the Assumed Liabilities.

        7.8    <u>Alternate Bidder</u>. If an Auction is conducted, and Buyer is not the Successful Bidder at the Auction but is the next highest bidder after the Successful Bidder at the Auction, Buyer shall serve as an Alternate Bidder and keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable (subject to the terms and conditions of this Agreement), notwithstanding any right of Buyer to otherwise terminate this Agreement pursuant to <u>Article 11</u> hereof, until the earlier of (i) thirty (30) days after the date of the Sale Hearing or (ii) the first Business Day after the closing of a transaction with a Successful Bidder for the Acquired Assets that is not Buyer (the "***Alternate Bid Expiration Date***"); <u>provided</u>, <u>however</u>, that if prior to the Alternate Bid Expiration Date, a Successful Bidder for the Acquired Assets that is not Buyer fails to consummate its transaction as a result of a breach or failure to perform on the part of such Successful Bidder, or because a condition in such Successful Bidder's purchase agreement cannot otherwise be met, and the purchase agreement with such Successful Bidder is terminated, Buyer (as the Alternate Bidder) will be deemed to have the new prevailing bid, and Sellers will be authorized, without further order of the Bankruptcy Court, to, and Buyer (as the Alternate Bidder) shall, subject to the terms and conditions of this Agreement, consummate the transactions contemplated by this Agreement by the later of (x) ten (10) days of becoming the Successful Bidder and (y) sixty (60) days after the date of the Sale Hearing, on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction).

        7.9    <u>Consents</u>. Sellers shall use reasonable best efforts to obtain or provide, and shall cause each Acquired Company to use reasonable best efforts to obtain or provide, at the earliest practicable date, each consent, waiver, approval, order, Permit (including obtaining a replacement Unified Program Facility Permit) or authorization of, or declaration or filing with, or

notification to, any Person or Governmental Authority required or necessary to consummate the transactions contemplated by this Agreement, including each consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification listed on Schedule 7.9 (including consents from each landlord party to the Leases requiring the consent of such landlord party in connection with the consummation of the transaction contemplated herein). All such consents, waivers, approvals, orders, Permits, authorizations, declarations, filings, or notifications shall be in writing and in form and substance reasonably satisfactory to Buyer, and executed counterparts thereof shall be delivered to Buyer promptly after the receipt thereof or making thereof. Notwithstanding anything to the contrary in this Agreement, none of the Sellers, Buyer nor any of their respective Affiliates shall be required to pay any amounts in connection with obtaining any such consents, waivers, approvals, orders, Permits, authorizations, declarations, filings, or notifications.

        7.10    Treatment of Shared Contracts.

        (a)    From the date hereof until the date that is six (6) months following the Closing Date, Seller and Buyer shall, and shall cause their respective Affiliates to, use their reasonable best efforts to work together (and, if necessary and desirable, to work with the third party to any Shared Contract) to divide, partially assign, modify, or replicate (in whole or in part) the respective rights and obligations under and in respect of any Shared Contract, such that, following the Closing, (i) Buyer, an Affiliate of Buyer or an Acquired Company is the beneficiary of the rights and is responsible for the obligations related to the portion of such Shared Contract that primarily involves or primarily relates to the RS Business (the "Buyer Portion"), which rights shall be an asset of and which obligations shall be a liability of Buyer, an Affiliate of Buyer or an Acquired Company, and (ii) Seller or an Affiliate of Seller (other than an Acquired Company) is the beneficiary of the rights and is responsible for the obligations related to such Shared Contract relating to the Corrections Business (the "Seller Portion"), which rights shall be an asset of and which obligations shall be a liability of Seller or an Affiliate of Seller (other than an Acquired Company). Nothing in this Agreement shall require the division, partial assignment, modification, or replication of a Shared Contract unless and until any necessary consents are obtained or made, as applicable. If Seller and Buyer or their respective Affiliates, as applicable, are not able to enter into an arrangement to divide, partially assign, modify, or replicate (in whole or in part) the rights and obligations under and in respect of any such Shared Contract prior to the Closing, the Closing shall, subject to the satisfaction (or, to the extent permitted by applicable Legal Requirements, the waiver by the parties entitled to the benefit thereof) of the conditions set forth in Article 9 and Article 10 (other than those conditions which by their terms are to be satisfied at the Closing but subject to the satisfaction at the Closing or waiver of such conditions), nonetheless take place on the terms set forth herein and, thereafter and until the earlier of (x) the date that is six (6) months following the Closing and (y) the date on which the division, partial assignment, modification or replication of such Shared Contract is effected, Seller and Buyer shall, and shall cause their respective Affiliates to, cooperate in any commercially reasonable arrangement to provide that (1) Buyer, an Affiliate of Buyer or an Acquired Company shall receive the interest in the benefits and obligations of the Buyer Portion under and in respect of such Shared Contract and (2) Seller or an Affiliate of Seller (other than an Acquired Company) shall receive the interest in the benefits and obligations of the Seller Portion under and in respect of such Shared Contract.

(b)     Each of the Buyer and the Sellers shall, and shall cause each of their Affiliates to, (i) treat for all tax purposes the portion of each Shared Contract inuring to its respective businesses as assets owned by, and/or Liabilities of, as applicable, such party, not later than the Closing Date, and (ii) neither report nor take any Tax position (on a Tax Return or otherwise) inconsistent with such treatment (unless required by applicable Legal Requirements). Nothing herein is intended to create a partnership, joint venture, agency, or other relationship creating fiduciary or quasi-fiduciary duties or similar duties and obligations or to subject the Parties to joint and several or vicarious liability or to impose any duty, obligation, or liability that would arise therefrom.

(c)     Nothing in this <u>Section 7.10</u> shall (i) require either Party hereto to contribute capital, incur any obligation, make any payment or grant any consideration or concession in any form (including providing any letter of credit, guaranty or other financial accommodation) to any Person (other than reasonable and documented out-of-pocket expenses, attorneys' fees and recording or similar fees, all of which shall be reimbursed as promptly as reasonably practicable by the party on whose behalf such expenses and fees are incurred) or (ii) prevent each of the Buyer and Sellers from mutually agreeing to exclude certain Contracts from the provisions of this <u>Section 7.10</u>.

7.11     <u>Transition Services Agreement Schedules</u>.  The Parties acknowledge that the schedules to the Transition Services Agreement may not be complete as of the execution of this Agreement, and the Parties hereby covenant that they each will use commercially reasonable efforts to complete and deliver such schedules as soon as practical following the execution of this Agreement (but in any event no later than five (5) Business Days prior to the Auction date).  The Parties shall negotiate in good faith to finalize such schedules.

# ARTICLE 8

## ADDITIONAL AGREEMENTS

8.1     <u>Taxes</u>.

(a)     Any sales Tax, use Tax or similar Tax attributable to the sale or transfer of the Acquired Assets and not exempted under the Sale Order or by Section 1146(c) of the Bankruptcy Code ("***Sales Taxes***") and any real property transfer Tax, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Acquired Assets and not exempted under the Sale Order or by Section 1146(c) of the Bankruptcy Code ("***Transfer Taxes***") shall be borne by Sellers. Sellers and Buyer shall reasonably cooperate to (i) mitigate and/or eliminate the amount of Sales Taxes and/or Transfer Taxes resulting from the transactions contemplated herein and (ii) timely prepare and file any Tax Returns relating to such Sales Taxes and/or Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Sales Taxes and/or Transfer Taxes. Buyer shall be responsible for preparing and filing all necessary Tax Returns or other documents with respect to Sales Taxes and Transfer Taxes, provided, however, that in the event any such Tax Return requires execution by Sellers, the Party responsible for preparing the Tax Return shall deliver it to Sellers not less than ten (10) days before the due date thereof, and Sellers shall promptly execute such Tax Return and return it to the Party responsible for filing it.

(b)     All Liability for any ad valorem Taxes (including, for the avoidance of doubt, real or personal property Taxes, together with all assessments (special or general) or any similar changes or impositions) (the "***Apportioned Taxes***") with respect to the Acquired Assets for the portion of the Straddle Period that ends on the Closing Date (a "***Pre-Closing Tax Period***") shall be borne by Sellers. All Liability for any Apportioned Taxes with respect to the Acquired Assets for a Tax period or year, or portion thereof that begins after the Closing Date (a "***Post-Closing Tax Period***") shall be borne by Buyer. The total amount of Apportioned Taxes allocable to the Pre-Closing Tax Period shall be the product of (i) such Tax for the entirety of such Straddle Period, multiplied by (ii) a fraction, the numerator of which is the number of days for such Straddle Period included in the Pre-Closing Tax Period and the denominator of which is the total number of days in such Straddle Period, and the balance of Apportioned Taxes shall be allocable to the to the Post-Closing Tax Period. At the Closing, Apportioned Taxes with respect to each Acquired Asset for the applicable Straddle Period shall be prorated in accordance with the foregoing provisions based on the Tax assessment for such Acquired Asset for such Straddle Period, if available, or if otherwise, based on the Apportioned Taxes paid with respect to such Acquired Asset during the preceding Tax year. With respect to any not yet delinquent Apportioned Taxes relating to a Straddle Period or Pre-Closing Tax Period, Buyer will be required to remit payment of all such Taxes to the applicable Governmental Authority. With respect to any Apportioned Taxes relating to a Straddle Period or Pre-Closing Tax Period that are delinquent as of the Closing Date, the amount of which is known and not subject to dispute, Buyer shall either pay the delinquent amount of such Taxes directly to the applicable Governmental Authority at the Closing or, at Buyer's option, to such title company as designated by Buyer at the Closing, for further payment by it to the applicable Governmental Authority.  Notwithstanding anything to the contrary in this agreement, Taxes referred to in this <u>Section 8.1(b)</u> shall not include any Taxes of the Acquired Companies. "***Straddle Period***" shall mean any Tax period or year commencing on or before, and ending after, the Closing Date.

(c)     Notwithstanding anything in this Agreement to the contrary, the amount of income Taxes of any Subsidiary of the Sellers the Equity Interests of which are Acquired Assets for any Straddle Period that is allocable to a Pre-Closing Tax Period shall be determined based on a closing of the books, assuming that the taxable year of each such Subsidiary ends as of the end of the Closing Date.

(d)     Buyer and Sellers shall, and shall cause their respective Affiliates to, cooperate and agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and assistance relating to the RS Business and the Acquired Assets (including access to books and records and Tax Returns and related working papers dated before Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any U.S. federal, state, local or non-U.S. business Tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Acquired Assets are located; <u>provided</u>, <u>however</u>, that neither Buyer nor any Seller shall be required to disclose the contents of its income Tax Returns to any Person. Any expenses incurred in furnishing such information or assistance pursuant to this <u>Section 8.1(d)</u> shall be borne by the Party requesting it.

8.2     Bulk Sales. The Parties intend that the Sale Order shall provide that compliance with the Legal Requirements relating to bulk sales and transfers is not necessary or appropriate under the circumstances. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with "bulk sales," "bulk transfers" or similar Legal Requirements in respect of the transactions contemplated by this Agreement.

8.3     Wrong Pockets. Following the Closing, without effect on the Purchase Price, (i) Sellers shall promptly transfer to Buyer (A) any payment or funds which, per the terms of this Agreement, belongs to Buyer and is received by Sellers (directly or indirectly) after the Closing and (B) copies of any substantive communications received by Sellers after the Closing, including from a Governmental Authority or customer, supplier, distributor, landlord, licensee, service provider or other business partner, to the extent related to the RS Business, and (ii) Buyer shall promptly transfer to Sellers (A) any payment or funds which, per the terms of this Agreement, belongs to Sellers and is received by Buyer (directly or indirectly) after the Closing and (B) copies of any substantive communications received by Buyer after the Closing, including from a Governmental Authority or customer, supplier, distributor, landlord, licensee, service provider or other business partner, to the extent related to the Corrections Business.

8.4     Assumed Contracts: Adequate Assurance and Performance. Buyer shall provide adequate assurance of the future performance by Buyer of each Assumed Contract as required under Section 365 of the Bankruptcy Code. Buyer and Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's and Sellers' employees and representatives available to testify before the Bankruptcy Court.

8.5     Employee Matters.

(a)     Pre-Closing Transfer of Employees.  Prior to the Closing, the Sellers will transfer the employment of all employees included on Schedule 8.5(a) to one of the Acquired Companies, such that an Acquired Company will be such employee's direct employer as of the Closing.

(b)     Employees.  Upon the Closing, Employees will remain employees of the Acquired Companies on the same terms and conditions of employment (the Employees following the Closing, the "***Buyer Employees***").  As of the Closing, Buyer shall assume and continue to adhere to any and all collective bargaining agreements and all obligations related thereto governing the employment of the Buyer Employees.  Notwithstanding the foregoing, nothing herein will, after the Closing Date, except as otherwise provided in any collective bargaining agreement, Acquired Company Plan or Plan that is an Assumed Contract, in each case, that covers any Buyer Employees following the Closing Date, impose on Buyer any obligation to retain any Buyer Employee in its employment for any amount of time or on any terms and conditions of employment.

60

(c)    <u>Service Crediting</u>. From and after the Closing Date, Buyer shall, or shall cause Buyer's Designees to, recognize, for all purposes of under any and all plans, programs, and/or arrangements established or maintained by Buyer or any Buyer Designees, each Buyer Employee's service with Sellers and their controlled Affiliates and any of their respective predecessors prior to the Closing Date, as if such service were with Buyer or any Buyer Designee, to the same extent such service was recognized by Sellers and their controlled Affiliates prior to the Closing Date; <u>provided</u>, <u>however</u>, the foregoing shall not apply (i) with respect to benefit accrual, vesting, service credits, participation eligibility and benefits entitlements under any defined benefit pension, equity or equity-based, change in control, transaction, retention, nonqualified deferred compensation, or post-termination or retiree health or welfare benefits, or (ii) to the extent that its application would result in a duplication of benefits.

(d)    <u>Health and Welfare</u>. Buyer or Buyer's Designee shall (i) use its reasonable best efforts to cause each Buyer Employee (and his or her "eligible dependents") to be covered immediately upon the Closing or, if later, the end date of benefits coverage pursuant to the Transition Services Agreement, by a group health plan or plan of the Buyer or its Affiliates, (ii) use its reasonable best efforts such that the benefit plans do not limit or exclude coverage on the basis of any pre-existing condition of such Buyer Employee or dependent or on the basis of any other exclusion or waiting period not in effect under the applicable group health plan, and (iii) use its commercially reasonable efforts to provide each Buyer Employee full credit, for the plan year in which the Closing Date occurs, for any deductible or co-payment already incurred by the Buyer Employee under the applicable group health plan and for any other out-of-pocket expenses that count against any maximum out-of-pocket expense provision of the applicable group health plan or Buyer or any Buyer Designee's group health plans.

(e)    <u>Retirement</u>. Effective at the Closing, Buyer or any Buyer Designee shall use its reasonable best efforts to cause each Buyer Employee who, as of immediately prior to the Closing, was eligible to participate in a Plan that is a tax-qualified defined contribution plan (collectively, the "***Seller 401(k) Plan***") to be eligible to participate in Buyer or any Buyer Designee's tax-qualified defined contribution plan (the "***Buyer 401(k) Plan***").  Buyer or any Buyer Designee shall cause the Buyer 401(k) Plan to accept "eligible rollover distributions" (as such term is defined under Section 402 of the Code), including in-kind rollover of outstanding loan notes, of Buyer Employees from the Seller 401(k) Plan.

(f)    <u>Access to Information</u>. After the Execution Date, Sellers shall provide Buyer and its Affiliates with access to the Employees and with information, including employee records and data, including Plan data, reasonably requested by Buyer and such Affiliates, except as otherwise prohibited by any Legal Requirement.

(g)    <u>Payment of Compensation and Liabilities</u>. At or prior to Closing, or as soon as reasonably practicable thereafter in accordance with Sellers' or the Acquired Companies' payroll practices and pursuant to the terms of the applicable Plan, but in all events in accordance with applicable Legal Requirements, Sellers or the Acquired Companies will pay, or cause to be paid, to all Employees all compensation to which such Employees are entitled to receive prior to and on the Closing Date, and satisfy all payroll taxes related thereto.

(h)  <u>Change in Control or Similar Benefits</u>. Prior to the Closing Date and in accordance with the terms of such Plan, applicable Legal Requirements and any collective bargaining agreements, Sellers shall amend, or cause to be amended, all Plans and take all actions as may be required or necessary to provide that the transactions contemplated hereunder shall not constitute a "change in control" or similar transaction for purposes of providing or accelerating benefits or payments under any such Plans.

(i)  <u>Payroll Taxes</u>. For purposes of payroll Taxes with respect to Buyer Employees, Sellers shall treat the transaction contemplated by this Agreement as a transaction described in Treasury Regulations Sections 31.3121(a)(1)-1(b)(2) and 31.3306(b)(1)-(b)(2) (*i.e.*, Buyer shall be treated as a successor for payroll Tax purposes).

(j)  <u>No Third-Party Beneficiaries; Employment Status</u>. All provisions contained in this Agreement with respect to employee benefit plans or compensation of Buyer Employees are included for the sole benefit of the respective parties hereto. Nothing contained herein (i) shall confer upon any former, current or future employee of Sellers, any Acquired Company or Buyer or any legal representative or beneficiary thereof or any union, any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (ii) shall cause the employment status of any former, present or future employee of Sellers, any Acquired Company or Buyer to be other than terminable at will, (iii) shall confer any third party beneficiary rights upon any Buyer Employee or any dependent or beneficiary thereof or any heirs or assigns thereof, (iv) shall be construed to establish or be treated as an amendment or modification of any employee benefit plan, program, agreement, arrangement, or policy, or (v) shall be construed to limit the ability of Buyer or any of its Affiliates to amend, modify, terminate, or adopt any employee benefit plan, program, agreement, arrangement, or policy.

(k)  <u>WARN Act</u>. With respect to the Buyer Employees, Buyer will have full responsibility under the WARN Act relating to any act or omission of Buyer after the Closing Date. With respect to the Employees, Sellers will have full responsibility under the WARN Act relating to any act or omission of Sellers prior to or on the Closing Date. Sellers will have full responsibility under the WARN Act relating to any act or omission of Sellers after the Closing Date.

(l)  <u>Additional Employee Matters</u>. Buyer is not and shall not be obligated to, and does not, accept or adopt any wage rates, employee benefits, employee policies, or any other terms and conditions of employment except as required by the terms of any collective bargaining agreement covering the Buyer Employees or as expressly agreed to herein.

(m)  For the avoidance of doubt, this <u>Section 8.5</u> is subject to <u>Sections 2.3</u> and <u>2.4</u>.

8.6  <u>Post-Closing Books and Records and Personnel</u>. For a period of six (6) years after the Closing Date, each Party hereto shall provide the other Parties hereto (and their respective Representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, solely to the books and records acquired pursuant to this Agreement as of the Closing Date so as to enable Buyer and Sellers to prepare Tax, financial or

court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, and to prosecute and defend legal Actions or for other like purposes, including Claims, objections and resolutions. If any Party desires to dispose of any such records, such Party shall, thirty (30) days prior to such disposal, provide the other Party with a reasonable opportunity to remove such records to be disposed of at the removing Party's expense.

8.7     Satisfaction of Certain Estate Liabilities.  At or prior to Closing, Sellers or the Acquired Companies, as applicable, will pay and satisfy, or cause to be paid or satisfied, all Liabilities, contingent or otherwise, set forth on Schedule 8.7 in accordance with the DIP Financing Orders and the Approved Budget.

## ARTICLE 9

### CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Buyer, in its sole and absolute discretion:

9.1     Accuracy of Representations. The representations and warranties of Sellers set forth in this Agreement shall be true and correct as of the Closing Date, with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date), in each case, unless the effect of all such breaches of representations and warranties taken together would not have, or be reasonably likely to have, in the aggregate, a Material Adverse Effect; provided, that the representations and warranties of Sellers set forth in Sections 5.1, 5.2, 5.4, 5.18 and 5.23 shall be true and correct in all material respects as of the Closing Date as though such representations and warranties had been made on and as of the Closing Date (provided that any such representations and warranties which are confined to a specified date shall speak only as of such date). Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof.

9.2     Sellers' Performance. The covenants and agreements that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects; provided, the covenants and agreements set forth in Section 8.7 shall have been performed and complied with in all respects. Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof.

9.3     No Order. No Governmental Authority shall have enacted, issued, promulgated, decreed or entered any Order, which is in effect and has the effect of restraining or preventing (or delaying beyond the Outside Date) the consummation of or imposing material modifications on the transactions contemplated by this Agreement.

9.4     Governmental Authorizations. To the extent that consent under the HSR Act or any other applicable Antitrust Law is required or at the discretion of the Buyer deemed

63

advisable, any waiting period (and any extension thereof) under the HSR Act shall have expired or shall have been terminated.

9.5     Sellers' Deliveries. Each of the deliveries required to be made to Buyer pursuant to Section 4.3 shall have been so delivered.

9.6     DIP Financing Orders. The Bankruptcy Court shall have entered the Interim DIP Financing Order and the Final DIP Financing Order, and the Interim DIP Financing Order and the Final DIP Financing Order shall have become Final Orders.

9.7     Sale Order. The Bankruptcy Court shall have entered the Sale Order in form and substance, including with respect to all findings of fact and conclusions of law, reasonably acceptable to Buyer, and the Sale Order shall have become a Final Order.

9.8     Assumed Contracts. The Bankruptcy Court shall have approved and authorized the assumption and assignment of each Assumed Contract, except as would not have a material effect on the RS Business from and after the Closing, including the assignment and assumption of the Assumed Contracts set forth on Schedule 9.8 on the terms set forth on such Schedule.

9.9     Consents. Buyer shall have received each consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority listed on Schedule 9.9, in each case, in a form reasonably satisfactory to Buyer.

9.10    Material Adverse Effect. Since the Execution Date, no Material Adverse Effect shall have occurred.

9.11    No Default; No Termination Event. No Termination Event and No Event of Default (as defined in the DIP Facility and DIP Financing Orders, as applicable) shall have occurred.

9.12    Restructuring Support Agreement. The Restructuring Support Agreement shall not have been terminated and shall be in full force and effect.

## ARTICLE 10

### CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE

The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Sellers, in their sole and absolute discretion:

10.1    Accuracy of Representations. The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects (except that those representations and warranties which are qualified as to materiality or Material Adverse Effect or similar expressions shall be true and correct in all respects) as of the Closing Date with the same

effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified shall speak only as of such date) in each case, unless the effect of all such breaches of representations and warranties taken together would not have, or be reasonably likely to have, in the aggregate, a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement. Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

       10.2    Sale Order. The Bankruptcy Court shall have entered the Sale Order in form and substance, including with respect to all findings of fact and conclusions of law, reasonably acceptable to the Sellers, and the Sale Order shall have become a Final Order.

       10.3    Buyer's Performance. The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects, and Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

       10.4    No Order. No Governmental Authority shall have enacted, issued, promulgated, decreed, or entered any Order, which is in effect and has the effect of preventing (or delaying beyond the Outside Date) the consummation of or imposing material modifications on the transactions contemplated by this Agreement.

       10.5    Governmental Authorizations. To the extent that consent under the HSR Act or any other applicable Antitrust Law is required or at the discretion of the Buyer deemed advisable, any waiting period (and any extension thereof) under the HSR Act shall have expired or shall have been terminated.

       10.6    Buyer's Deliveries. Each of the deliveries required to be made to Sellers pursuant to Section 4.2 shall have been so delivered.

## ARTICLE 11

### TERMINATION

       11.1    Termination Events. Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing only as follows:

       (a)      by mutual written consent of Sellers and Buyer;

       (b)      by written notice of either Sellers or Buyer:

       (i) if the Closing shall not have occurred on or prior to January 9, 2025 (the "**Outside Date**"); provided, however, that the Outside Date may be extended by Buyer in its sole discretion an additional 30 days if all conditions contained in Article 9 have been satisfied other than the conditions contained in Sections 9.4 and 10.5; provided, further, that the right to terminate this Agreement under this Section 11.1(b)(i) shall not be available to any Party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Outside Date;

(ii) if a Governmental Authority issues a final, non-appealable ruling or Order permanently restraining, enjoining or otherwise prohibiting the transactions contemplated hereby where such ruling or Order was not requested, encouraged or supported by any of Sellers or Buyer; provided, that the right to terminate this Agreement under this Section 11.1(b)(ii) shall not be available to any Party whose willful failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Outside Date;

(iii) if at the end of the Auction, Buyer is not determined by Sellers to be the Successful Bidder or Alternate Bidder;

(iv) upon the termination of the Restructuring Support Agreement as to the Consenting Stakeholders; or

(v) if the Bankruptcy Court shall have entered an Order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the Bankruptcy Cases;

(c)     by written notice of Buyer, if Buyer is not then in material breach of its obligations under this Agreement:

(i)  in the event of any material breach by any Seller of, or material failure to perform, any agreements, covenants, representations or warranties contained in this Agreement or in the Sale Order, which material breach or material failure to perform would result in Sellers being unable to satisfy a condition set forth in Section 9.1 or Section 9.2 by the then-applicable Outside Date or shall not have been cured during the fifteen (15) day period following delivery by Buyer of notice to Sellers of such material breach or material failure to perform;

(ii) other than as contemplated by the Bidding Procedures Motion or Bidding Procedures Order, if any Seller consummates an Alternative Transaction or seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the Bankruptcy Cases, or appointing a trustee in any of the Bankruptcy Cases or appointing a responsible officer or an examiner with enlarged powers (other than a fee examiner) relating to the operation of Sellers' businesses pursuant to Section 1104 of the Bankruptcy Code in any of the Bankruptcy Cases;

(iii) if any of the events set forth in clauses (a) through (c) of Section 7.4 shall not have occurred by the respective dates set forth therein;

(iv) upon the occurrence of any Termination Event (as defined in the DIP Financing Orders);

(v) if, for any reason, Buyer (other than as a result of its own breach of this Agreement) is unable, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid all or a majority of the Purchase Price as set forth in Section 3.1;

(vi) a Material Adverse Effect occurs; or

(vii)    if the Disclosure Schedules fail to be finalized in accordance

66

with Section 7.6(a); provided, however, Buyer may only terminate this Agreement pursuant to this Section 11.1(c)(vii) if Buyer delivers notice of such termination within five (5) Business Days of the date of the approval of the Bidding Procedures Order;

(d)    by written notice of Sellers, if each Seller is not then in material breach of its obligations under this Agreement in the event of any material breach by Buyer of, or material failure to perform, any agreements, covenants, representations or warranties contained in this Agreement or in the Sale Order, which material breach or material failure to perform would result in Buyer being unable to satisfy a condition set forth in Section 10.1 or Section 10.3 by the then-applicable Outside Date or shall not have been cured during the fifteen (15) day period following delivery by Sellers of notice to Buyer of such material breach or material failure to perform.

Each condition set forth in this Section 11.1, pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in Section 11.1 are applicable, the applicable party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated. The Parties acknowledge and agree that no notice of termination or extension of the Outside Date provided pursuant to this Section 11.1 shall become effective until two (2) Business Days after the delivery of such notice to the other Parties, and only if such notice shall not have been withdrawn during such two (2) Business Day period or otherwise become invalid.

11.2    Effect of Termination.

(a)    In the event of termination of this Agreement by Buyer or Sellers pursuant to this Article 11, this Agreement shall become null and void *ab initio* and have no effect and all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party except (i) nothing herein shall relieve any Party from Liability for any breach of this Agreement occurring prior to such termination and (ii) this Section 11.2 (and, to the extent applicable to the interpretation or enforcement of such provision, Article 1 and Article 12), shall expressly survive the termination of this Agreement.

(b)    Sellers shall pay to Buyer the Expense Reimbursement by wire transfer of immediately available funds immediately upon the earlier to occur of (i) Bankruptcy Court approval of a Qualified Bid other than Buyer's offer to purchase the Acquired Assets, or (ii) termination of this Agreement (other than as a result of Buyer's breach of any of its representations, warranties, covenants or other agreements under this Agreement) (any such event, a "***Protection Event***"). Each Seller acknowledges and agrees that such Seller shall be jointly and severally liable for the Expense Reimbursement payable by Sellers pursuant to this Agreement.

(c)    Each Party acknowledges that the agreements contained in this Section 11.2 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement, and that any amounts payable pursuant to this Section 11.2 do not constitute a penalty.  The Expense Reimbursement shall be carved out from and not be subject to the liens and claims granted in connection with the DIP Facility and any documents related thereto (including the DIP Financing Orders) and the Exit Term Loan Facility Documents.

## ARTICLE 12

### GENERAL PROVISIONS

12.1     Survival. All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach thereof.

12.2     Confidentiality. Following the Closing, each Seller agrees to, and to cause its Affiliates to, treat and hold as confidential, and not use or disclose all or any of the information concerning the RS Business, the Acquired Assets, the negotiation or existence and terms of this Agreement or the business affairs of Buyer except disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto.

12.3     Public Announcements. Unless otherwise required by applicable Legal Requirement or by obligations of Buyer or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Buyer, on the one hand, and Sellers, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated by this Agreement or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed).  Notwithstanding the foregoing, Buyer shall not be restricted from making any public announcements or issuing any press releases regarding the RS Business after the Closing, provided that such public announcements or press releases do not reference the Sellers or their Affiliates without Sellers' prior written consent.

12.4     Notices.

All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or sent by overnight courier or electronic mail:

(i)      If to Sellers, then to:

Wellpath Holdings, Inc.
3340 Perimeter Hill Drive
Nashville, Tennessee 37211
Attn:   Ben Slocum, Chief Executive Officer
        Timothy J. Dragelin, Interim Chief Financial Officer
        Marc Goldstone, Executive Vice President and Chief Legal Officer
Email: bslocum@wellpath.us
        tdragelin@wellpath.us

mgoldstone@wellpath.us

with a copy (which shall not constitute notice) to:

McDermott Will & Emery LLP
444 West Lake Street, Suite 4000
Chicago, IL 60606
Attn:   Felicia Gerber Perlman
        Bradley Thomas Giordano
        Harris Siskind
        Eric Gilbert
        Taylor Berman
Email:  fperlman@mwe.com
        bgiordano@mwe.com
        hsiskind@mwe.com
        egilbert@mwe.com
        tberman@mwe.com


(ii)    If to Buyer:

RS Purchaser LLC
c/o Akin Gump Strauss Hauer & Feld LLP
2001 K Street N.W.
Washington, D.C. 20006
Attn:   Scott L. Alberino
        Kate Doorley
        Alan J. Feld
Email:  salberino@akingump.com
        kdoorley@akingump.com
        ajfeld@akingump.com

with a copy (which shall not constitute notice) to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn:   Daniel I. Fisher
Email:  dfisher@akingump.com

and

Akin Gump Strauss Hauer & Feld LLP
2001 K Street N.W.
Washington, D.C. 20006
Attn:   Scott L. Alberino
        Kate Doorley

Alan J. Feld
Email: salberino@akingump.com
kdoorley@akingump.com
ajfeld@akingump.com

or to such other person or address as any party shall specify by notice in writing to the other party. All such notices, requests, demands, waivers and communications shall be deemed to have been received on the date on which so personally-delivered or faxed or delivered by overnight courier or electronic mail.

12.5    Waiver. Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by Legal Requirements, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

12.6    Entire Agreement; Amendment. This Agreement (including the Disclosure Schedules and the Exhibits) and the other Transaction Documents supersede all prior agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to their subject matter. This Agreement may not be amended, modified or supplements except by a written agreement executed by each of the Parties hereto.

12.7    Assignment. This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party); provided, however, that Buyer shall be permitted to assign all or part of its rights or obligations hereunder to one or more Buyer Designees without the prior consent of Sellers so long as Buyer stands behind the performance by such Buyer Designee of this Agreement.

12.8    Severability. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

12.9    Expenses. Except as otherwise expressly provided in this Agreement, including Section 11.2, whether or not the transactions contemplated by this Agreement are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby. Any and all fees required by (i) any Governmental Authority or any Person to obtain or for the transfer of a Permit or (ii) incurred in connection with complying with any Antitrust Law, shall be the sole responsibility of Sellers.

12.10    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action; provided, however, that, if the Bankruptcy Case is closed, all Actions arising out of or relating to this Agreement shall be heard and determined in a New York state court or a federal court sitting in the State and County of New York, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action. The Parties consent to service of process by mail (in accordance with Section 12.4 or any other manner permitted by law).

(c)    THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLERS, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

12.11    Counterparts. This Agreement and any amendment hereto may be executed in two or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument. Notwithstanding anything to the contrary in Section 12.4, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

12.12   Parties in Interest; No Third-Party Beneficiaries; No Amendment. This Agreement and the other Transaction Documents shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This Agreement and the other Transaction Documents are for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind. Notwithstanding anything to the contrary, nothing in this Agreement shall constitute an amendment to any Plan.

12.13   Remedies. Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit Sellers or Buyer in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

12.14   Specific Performance. With respect to the Parties' respective covenants under this Agreement, (a) each Party recognizes that if such Party breaches or refuses to perform any such covenant, monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries, (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of the terms of such covenants, (c) if any Action is brought by the non-breaching Party or Parties to enforce such covenants, the Party in breach shall waive the defense that there is an adequate remedy at law, (d) each Party agrees to waive any requirement for the security or posting of any bond in connection with any Action seeking specific performance of such covenants and (e) each Party agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

12.15   Sellers' Representative; Reliance. Sellers, jointly and severally, hereby represent and warrant that the statements in this Section 12.15 are correct and complete as of the Execution Date:

(a)   The Company has been appointed, and is authorized, and empowered to act, in connection with, and to facilitate the consummation of, the transactions contemplated by this Agreement and the Transaction Documents and in connection with any activities to be performed by the Sellers under this Agreement and the Transaction Documents, for the purposes and with the powers, and authority set forth in this Agreement, which will include the sole power and authority:

(i)  to receive notices on behalf of Sellers hereunder pursuant to Section 12.4;

(ii) to receive and distribute the Purchase Price or any other amount paid in connection with this Agreement or the Transaction Documents to Sellers;

(iii) to enforce and protect the rights and interests of Sellers arising out of or under or in any manner relating to this Agreement and the Transaction Documents (including in connection with any claims related to the transactions contemplated hereby and thereby) and, in connection therewith, to (A) assert any claim or institute any action, (B)

72

investigate, defend, contest or litigate any action initiated by Buyer or any other Person pursuant to this Agreement and the Transaction Documents and receive process on behalf of each Seller in any such action and compromise or settle on such terms as the Company will determine to be appropriate, give receipts, releases and discharges on behalf of all or any Seller with respect to any such action, (C) file any proofs, debts, claims and petitions as the Company may deem advisable or necessary, (D) settle or compromise any claims related to the transactions contemplated by this Agreement and the Transaction Documents, (E) assume, on each Sellers' behalf, the defense of any claims related to the transactions contemplated by this Agreement and the Transaction Documents, and (F) file and prosecute appeals from any decision, judgment or award rendered in any of the foregoing actions;

(iv) to enforce or refrain from enforcing any right of any Seller (prior to the Closing) and/or of the Company arising out of or under or in any manner relating to this Agreement or the Transaction Documents;

(v) to take any action to be taken by one or more Sellers under or in connection with this Agreement or any Transaction Document; or

(vi) to make, execute, acknowledge and deliver all such other Contracts, guarantees, orders, receipts, endorsements, notices, requests, instructions, certificates, stock powers, letters and other writings, and, in general, to do any and all things and to take any and all action that the Company, in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the activities described in Section 12.15(a)(i) through Section 12.15(a)(iv) and the transactions contemplated by this Agreement and the Transaction Documents.

(b)   The Company's power and grant of authority is (i) coupled with an interest and is irrevocable and survives the bankruptcy or liquidation of any Seller and will be binding on any successor thereto; and (ii) may be exercised by the Company acting by signing as the representative of any Seller.

(c)   Buyer and its Affiliates and representatives may conclusively and absolutely rely, without inquiry, upon the action of the Company as the action of each Seller (and may ignore any action taken or notice given by any Seller other than the Company) in all matters relating to this Agreement, the Transaction Documents or the transactions contemplated hereby and thereby. Any document delivered or notice delivered by or on behalf of Buyer or its Affiliates to, or action taken by or on behalf of Buyer or its Affiliates with respect to, the Company shall be deemed to have been delivered to, or taken with respect to, all Sellers. Any amounts to be paid by Buyer to Sellers pursuant to this Agreement shall be divided by Sellers among themselves, but may be paid by Buyer to the Company. Sellers shall be jointly and severally liable for any amounts due to be paid or owed by Sellers to Buyer pursuant to this Agreement.

12.16   Limitations on Damages. WITHOUT LIMITING ANY RIGHTS OF BUYER TO RECEIVE THE EXPENSE REIMBURSEMENT IN ACCORDANCE WITH SECTION 7.5 OR SECTION 11.2 OF THIS AGREEMENT, NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY EXEMPLARY

OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT; PROVIDED, HOWEVER, THAT THE FOREGOING LIMITATION SHALL NOT APPLY TO THE EXTENT SUCH DAMAGES ARE PAYABLE TO A THIRD PARTY.

12.17   General Release.

(a)     Effective immediately following the Closing, each Seller for itself and for its successors and assigns hereby fully and forever releases, Buyer and its directors, officers, control persons (as defined in Section 15 of the Securities Act, or Section 20 of the Exchange Act), members, employees, agents, attorneys, financial advisors, consultants, legal representatives, shareholders, partners, estates, successors and assigns solely in their capacity as such (collectively referred to as the "*Buyer Group*" and each is individually a member of the Buyer Group), from any liability whatsoever on or otherwise in relation to all Seller Released Claims.  For purposes of this Section 12.17(a), the term "*Seller Released Claims*" means any claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever and other similar rights, demands, lawsuits and complaints, debts, losses, obligations, liabilities, rights, rights of recovery and damages of every kind or nature whatsoever, whether known or unknown, asserted or un-asserted, and whether for general, special, statutory, punitive or other damages, sanctions, costs, or attorney's fees, or for equitable, declaratory, injunctive, reimbursement, or other relief, in each case including all derivative claims and whether currently pending or in process and whether arising in the past, present or future and in respect of any period of time (each a "*Released Claim*") that Seller has or is entitled to make or assert, file or bring against the Buyer Group or any Person who is a member of the Buyer Group, including but not limited to any Released Claim that directly or indirectly arises out of, or is based upon, or in any manner connected with, or is in any way related to, (1) any loan, security, or forbearance or related agreement to Buyer and/or Sellers are or were parties, (2) any act or omission by any Person that is or was a member of the Buyer Group, including in their capacity as a member on, or arising from their involvement with the activities of, the board of directors or similar governing body of any Seller or any Affiliate thereof (including pursuant to board observer rights), (3) any involvement of any Person that is or was a member of the Buyer Group with the Sellers or any business, litigation, or other activities of Sellers, (4) any oral or written statement made by any Person that is or was a member of the Buyer Group to any other Person regarding Sellers or any business, litigation, or other activities of Sellers, (5) any action taken by any Person that is or was a member of the Buyer Group regarding or relating to Sellers or any business, litigation, or other activities of Sellers, or (6) any personal, contractual, employment, business, or professional relationship, contact or communication between any Person that is or was a member of the Buyer Group and Sellers occurring at any time prior to the Closing Date.  Notwithstanding anything set forth herein to the contrary, the releases set forth herein do not extend to (A) any obligations that are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the willful misconduct or gross negligence of such Person or (B) any obligations of the Parties under this Agreement (and any ancillary agreements or instruments delivered pursuant hereto), the DIP Facility, the First Lien Credit Agreement, and the transactions contemplated hereby and thereby.

(b)     Effective immediately following the Closing, Buyer, for itself and its successors and assigns, hereby fully and forever releases and discharges each Seller and its Affiliates and each of their respective former, current or future, direct or indirect, equity holders,

officers, employees, directors, agents, advisory board members, representatives, owners, members, partners, employees, management companies, direct and indirect parent entities, "controlling persons" (within the meaning of federal securities law), heirs, administrators and executors, financial advisors, legal advisors, shareholders, managers, principals, consultants, accountants, attorneys, actuaries, investment bankers and other professionals in each case acting in such capacity whether current or former, including in their capacity as directors of the Seller, as applicable (all such Persons collectively referred to as the "**Sellers Group**" and each is individually a member of the Seller Group), from any liability whatsoever on or otherwise in relation to all Buyer Released Claims.  For purposes of this Section 12.17(b), the term "**Buyer Released Claims**" means any Released Claim that Buyer has or is entitled to make or assert, file or bring against any Person who is a member of the Seller Group based on or relating to, or in any manner arising from, in whole or in part, the business operations of the RS Business, including but not limited to (i) any Released Claim that directly or indirectly arise out of, are based upon, or in any manner connected with any Prior Event and (ii) any Causes of Actions included in the Acquired Assets pursuant to Section 2.1(p).   For purposes of this Section 12.17(b), the term "**Prior Event**" means any transaction, event, circumstances, action, failure to act or occurrence of any sort or type based on or relating to, or in any manner arising from, in whole or in part, the business operations of the RS Business, including without limitation any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken, permitted or begun prior to the consummation of the transactions contemplated hereunder. For the avoidance of doubt, "Prior Event" shall include but is not limited to any transaction, event, circumstances, action, failure to act or occurrence of any sort or type which occurred, existed, was taken, permitted or begun in accordance with, pursuant to or by virtue of: (i) any terms of this Agreement, (ii) the transactions referred to herein, or (iii) any oral or written agreement relating to the foregoing (i) and (ii) of this sentence.

(c)     Without limiting in any way the scope of the release contained in subparagraph (a) or (b) of this Section 12.17 and effective upon the Closing Date, each Seller and Buyer, to the fullest extent allowed under applicable law, hereby waives and relinquishes for itself and the other members of the Sellers Group and Buyer Group, as applicable, all statutory and common law protections purporting to limit the scope or effect of a general release, whether due to lack of knowledge of any claim or otherwise, including, waiving and relinquishing the terms of any law which provides that a release may not apply to material unknown claims. Each Seller and Buyer hereby affirm its intent to waive and relinquish such unknown Claims and to waive and relinquish any statutory or common law protection available in any applicable jurisdiction with respect thereto.

12.18   Non-Recourse. No past, present or future director, officer, employee, incorporator, member, partner or equity holder of the Parties will have any liability for any obligations or liabilities of any Seller or Buyer, as applicable, under this Agreement, or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby; provided that the foregoing shall not limit the rights of Buyer with respect to Acquired Assets. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated by this Agreement may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the Parties hereto, no Person shall have any liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any party under

this Agreement or the agreements, documents or instruments contemplated hereby or of or for any action or proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Legal Requirements or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a party hereto or another Person or otherwise.

12.19 <u>Joinder</u>. At the Closing, any Person to whom Buyer assigns the right to receive any of the Acquired Assets at Closing shall execute a joinder in customary form, pursuant to which each such other Person will assume, and will be obligated with Buyer on a joint and several basis, to perform and satisfy each of Buyer's obligations under this Agreement.

[*Signature pages follow.*]

**IN WITNESS WHEREOF,** the Parties have caused this Equity Interest and Asset Purchase Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

RS PURCHASER LLC

By: _____
Name: Nicholas Heilbut
Title: Authorized Person

WELLPATH HOLDINGS, INC.

By: _Marc Goldstone_____

Name: Marc Goldstone

Title: Secretary

CORRECT CARE HOLDINGS, LLC

By: _Marc Goldstone_____
Name: Marc Goldstone
Title: Secretary

ALPINE CA BEHAVIORAL HEALTH HOLDCO, LLC

By: *Marc Goldstone*

Signed by:
C08C265345C8432

Name: Marc Goldstone
Title: Secretary

**<u>Exhibit A</u>**
**Form of Assignment and Assumption Agreement**

[to be attached]

Exhibit A to Equity Interest and Asset Purchase Agreement

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement, dated as of [●], 2025 (this "*Agreement*"), is made and entered into by and among Wellpath Holdings, Inc., a Delaware Corporation (the "*Company*") and each of its Affiliates listed on Exhibit A hereto (together with the Company, the "*Assignors*") and RS Purchaser LLC, a Delaware limited liability company ("*Assignee*").

## RECITALS

A.      Assignors and Assignee are parties to that certain Equity Interest and Asset Purchase Agreement, dated as of November 11,  2024  (as the same may be amended, supplemented or otherwise modified from time to time in accordance with its terms, the "*Purchase Agreement*").

B.      In accordance with Section 2.1 of the Purchase Agreement, upon the terms and subject to the conditions of the Purchase Agreement, Assignee has agreed to purchase from Assignors and each Assignor has agreed to unconditionally sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Assignee at the Closing, free and clear of any and all Liens (other than Assumed Liabilities and Permitted Liens), all of each Assignor's direct or indirect right, title and interest in, to and under the Acquired Assets.

C.      In accordance with Section 2.3 of the Purchase Agreement, Assignee has agreed to assume the Assumed Liabilities.

D.      Pursuant to the Sale Order, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignors have agreed to assign all of Assignors' right, title and interest, legal or equitable, in, to and under the Acquired Assets, including the Assumed Contracts, free and clear of all Liens, other than Assumed Liabilities and Permitted Liens, and Assignee has agreed to assume and promptly discharge and perform when due, in accordance with their respective terms, the Assumed Liabilities.

E.      The execution and delivery of this Agreement is contemplated by Section 4.2(a) and Section 4.3(a) of the Purchase Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained and set forth in the Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound hereby, agree as follows:

1.      **Definitions**. Capitalized terms used in this Agreement, but not otherwise defined herein, have the meanings ascribed thereto in the Purchase Agreement.

2.      **Assignment**. Effective as of Closing, for true and lawful consideration paid by Assignee, the receipt and sufficiency of which are hereby acknowledged (including as set forth in the Purchase Agreement), pursuant to the Sale Order and on the terms and subject to the conditions set forth in the Purchase Agreement, Assignors hereby sell, transfer, assign, convey and deliver to Assignee, and Assignee hereby purchases, acquires and accepts from Assignors, all of Assignors' legal, , and other right, title, benefit, privileges, and interest in, to and under the Assumed Contracts unto Assignee and its successors and assigns forever, free and clear of all Liens, other than the Assumed Liabilities and Permitted Liens, but in all events excluding the Excluded Assets.

3. **Acceptance and Assumption**. Effective as of Closing, pursuant to the Sale Order and on the terms and subject to the conditions set forth in the Purchase Agreement, Assignors hereby assign and Assignee hereby assumes and agrees to perform, pay, discharge in full or otherwise satisfy when due all Assumed Liabilities, including all of Assignors' obligations and liabilities whatsoever with respect to the Assumed Contracts in accordance with their respective terms to the extent constituting the Assumed Liabilities, but in all events excluding the Excluded Liabilities.  For the avoidance of doubt, Assignee will not assume, agree to pay, discharge, satisfy or perform, or have any responsibility or liability whatsoever with respect to any Excluded Contract or any Excluded Liability and Assignors hereby acknowledge that each Assignor is retaining the Excluded Contracts and Excluded Liabilities.

4. **Terms of Purchase Agreement**. This Agreement is entered into pursuant to the terms of Purchase Agreement. The scope, nature, and extent of the Assumed Contracts and the Assumed Liabilities and the rights and obligations of Assignee and Assignors with respect thereto are expressly set forth in the Purchase Agreement. Nothing contained herein will itself change, amend, extend, expand, alter or waive (nor should it be deemed or construed as changing, amending, extending, expanding, altering or waiving) the terms or conditions of the Purchase Agreement in any manner whatsoever. This instrument does not create or establish rights, liabilities or obligations not otherwise created or existing under or pursuant to the Purchase Agreement. The Purchase Agreement will not be superseded hereby but will remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Agreement, the terms of the Purchase Agreement will govern and control.

5. **Further Assurances**. Subject to the terms and conditions of the Purchase Agreement, the Assignee and Assignors agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be reasonably necessary or desirable in order to implement expeditiously the transactions contemplated by this Agreement; provided, however, that the Assignors are not obligated to incur any cost or expense or initiate or join in any litigation in order to meet the obligations under this Section 5.   Notwithstanding anything contained herein to the contrary, nothing in this Agreement shall (a) prevent Assignors from, or require Assignors to, delay the winding down of their bankruptcy estates, (b) require Assignors to pay or incur any monetary amount not paid by or escrowed for payment by Assignee, (c) impose on any party any burdens not expressly imposed on such party pursuant to the provisions of the Purchase Agreement or (d) require Assignors to become involved in any suit, action or proceeding.

6. **Governing Law; Jurisdiction**.

(a)     Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law rules that would apply the law of any state other than the State of New York.

(b)     Prior to the closing of the Bankruptcy Cases, except as otherwise expressly provided herein, the parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court, and each of the parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.  Without limiting the foregoing, each party agrees that service of process on such party as provided

2

in Sections 12.4 and 12.10(b) of the Purchase Agreement shall be deemed effective service of process on such party.

(c)     Upon the closing of the Bankruptcy Cases, except as otherwise expressly provided herein, the parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the United States District Court for the Southern District of New York, sitting in the borough of Manhattan or any New York State court sitting in the state and County of New York, so long as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of New York, and each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each party agrees that service of process on such party as provided in Sections 12.4 and 12.10(b) of the Purchase Agreement shall be deemed effective service of process on such party.

(d)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7.     **Legal Enforceability**. In case any provision of this Agreement is fully or in part invalid or unenforceable, the validity and enforceability of the other provisions of this Agreement shall not be affected thereby.

8.     **Counterparts**. This Agreement and any amendments hereto may be executed in two or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement or any amendments hereto by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Agreement.

9.     **No Third Party Beneficiaries**. This Agreement does not and is not intended to confer upon any person other than the parties hereto (and their respective successors and assigns) any rights or remedies hereunder.

10.     **Entire Agreement**.  This Agreement, the Purchase Agreement and the other Transaction Documents constitute the entire agreement between the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both oral and written.

11.     **Successors and Assigns.** All of the terms, agreements, covenants, and conditions of this Agreement will be binding upon, and inure to the benefit of and are enforceable by, the parties hereto and their respective successors and assigns.

12.     **Amendment, Modification and Waiver**. No amendment of any provision of this Agreement shall be effective, unless the same shall be in writing and signed by Assignors and Assignee. No course of dealing between or among any persons having any interest in this Agreement will be deemed effective to modify or amend any part of this Agreement or any rights or obligations of any person under or by reason

3

of this Agreement. Any failure of a party hereto to comply with any obligation or agreement hereunder may only be waived in writing by the other parties hereto, but such waiver shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure. No failure by a party hereto to take any action with respect to any breach of this Agreement or default by any other party hereto shall constitute a waiver of such party's right to enforce any provision hereof or to take any such action.

[*Signature Page Follows*]

4

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

**ASSIGNORS:**

WELLPATH HOLDINGS, INC.

By: _____
Name:
Title:

[_____]

By: _____
Name:
Title:

[_____]

By: _____
Name:
Title:

**ASSIGNEE:**

RS PURCHASER LLC

By: _____
Name:
Title:

**<u>Exhibit A</u>**
Assignors

1.   [_____]

**<u>Exhibit B</u>**
**Bidding Procedures**

[to be attached]

**<u>Exhibit C</u>**
**Form of Bidding Procedures Order**

[to be attached]

**<u>Exhibit D</u>**
**Form of Bill of Sale**

[to be attached]

Exhibit D to Equity Interest and Asset Purchase Agreement

## BILL OF SALE

This Bill of Sale, dated as of [●], 2025 (this "***Bill of Sale***"), is made and entered into by and among Wellpath Holdings, Inc., a Delaware corporation (the "***Company***") and each of its Affiliates listed on Exhibit A to this Agreement (together with the Company, the "***Sellers***") and RS Purchaser LLC, a Delaware limited liability company ("***Buyer***").

## RECITALS

A.   Buyer and Sellers are parties to that certain Equity Interest and Asset Purchase Agreement, dated as of November 11 , 2024 (as the same may be amended, supplemented or otherwise modified from time to time in accordance with its terms, the "***Purchase Agreement***").

B.   In accordance with Section 2.1 of the Purchase Agreement, upon the terms and subject to the conditions of the Purchase Agreement, Buyer has agreed to purchase from Sellers and each Seller has agreed to unconditionally sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer at the Closing, free and clear of all Liens, other than Assumed Liabilities and Permitted Liens, all of each Seller's direct or indirect right, title and interest in, to and under the Acquired Assets.

C.   Pursuant to the terms of the Purchase Agreement and by this Bill of Sale, Sellers are selling, transferring, assigning, conveying and delivering all of Sellers' right, title, and interest, legal or equitable, in, to and under the Acquired Assets to Buyer, free and clear of all Liens, other than Assumed Liabilities and Permitted Liens.

D.   In accordance with Section 2.3 of the Purchase Agreement, Buyer has agreed to assume the Assumed Liabilities from Sellers.

E.   The execution and delivery of this Bill of Sale is contemplated by Section 4.2(b) and Section 4.3(a) of the Purchase Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained and set forth in the Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound hereby, agree as follows:

1.      **Definitions**. Capitalized terms used herein, but not otherwise defined herein, have the meanings ascribed thereto in the Purchase Agreement.

2.      **Sale of Acquired Assets**. Effective as of the Closing, for true and lawful consideration paid by Buyer, the receipt and sufficiency of which are hereby acknowledged (including as set forth in the Purchase Agreement), pursuant to the Sale Order and on the terms and subject to the conditions set forth in the Purchase Agreement, Sellers hereby sell, transfer, assign, convey and deliver to Buyer, and Buyer hereby purchases, acquires and accepts from Sellers, all of Sellers' legal right, title, benefit, privileges, and interest in, to and under the Acquired Assets, free and clear of all Liens, other than the Assumed Liabilities and Permitted Liens, to have and to hold the Acquired Assets unto Buyer and its successors and assigns forever.  For the avoidance of doubt, Buyer will not assume, agree to pay, discharge, satisfy or perform, or have any responsibility or liability whatsoever with respect to any Excluded Asset or Excluded Liability

and Sellers hereby acknowledge that each Seller is retaining its respective Excluded Assets and Excluded Liabilities.

3.  **Terms of Purchase Agreement**. This Bill of Sale is entered into pursuant to the terms of the Purchase Agreement. The scope, nature, and extent of the Acquired Assets and the rights and obligations of Buyer and Sellers with respect thereto are expressly set forth in the Purchase Agreement. Nothing contained herein will itself change, amend, extend, expand, alter or waive (nor should it be deemed or construed as changing, amending, extending, expanding, altering or waiving) the terms or conditions of the Purchase Agreement in any manner whatsoever. This instrument does not create or establish rights, liabilities or obligations not otherwise created or existing under or pursuant to the Purchase Agreement. The Purchase Agreement will not be superseded hereby but will remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Bill of Sale, the terms of the Purchase Agreement will govern and control.

4.  **Further Assurances**. Subject to the terms and conditions of the Purchase Agreement, the Buyer and the Sellers agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be reasonably necessary or desirable in order to implement expeditiously the transactions contemplated by this Bill of Sale and to vest in the Buyer good title to the Acquired Assets; *provided*, *however*, that the Sellers are not obligated to incur any cost or expense or initiate or join in any litigation in order to meet the obligations under this <u>Section 4</u>.  Notwithstanding anything contained herein to the contrary, nothing in this Bill of Sale shall (a) prevent Sellers from, or require Sellers to, delay the winding down of their bankruptcy estates, (b) require Sellers to pay or incur any monetary amount not paid by or escrowed for payment by Buyer, (c) impose on any party any burdens not expressly imposed on such party pursuant to the provisions of the Purchase Agreement or (d) require Sellers to become involved in any suit, action or proceeding.

5.  **Governing Law; Jurisdiction**.

(a)  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Bill of Sale shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law rules that would apply the law of any state other than the State of New York.

(b)  Prior to the closing of the Bankruptcy Cases, except as otherwise expressly provided herein, the parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Bill of Sale or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court, and each of the parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.  Without limiting the foregoing, each party agrees that service of process on such party as provided in <u>Sections 12.4</u> and <u>12.10(b)</u> of the Purchase Agreement shall be deemed effective service of process on such party.

(c)  Upon the closing of the Bankruptcy Cases, except as otherwise expressly provided herein, the parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Bill of Sale or the transactions contemplated hereby shall be brought in the United States District Court for the Southern District of New York, sitting in the borough of Manhattan  or any New York State court sitting in the state and County of New York, so long

2

as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Bill of Sale shall be deemed to have arisen from a transaction of business in the State of New York, and each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each party agrees that service of process on such party as provided in <u>Sections 12.4</u> and <u>12.10(b)</u> of the Purchase Agreement shall be deemed effective service of process on such party.

(d)  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS BILL OF SALE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

6.  **Legal Enforceability**. In case any provision of this Bill of Sale is fully or in part invalid or unenforceable, the validity and enforceability of the other provisions of this Bill of Sale shall not be affected thereby.

7.  **Counterparts**. This Bill of Sale and any amendment hereto may be executed in two or more counterparts, each of which shall be deemed to be an original of this Bill of Sale or such amendment and all of which, when taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Bill of Sale or any amendment hereto by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Bill of Sale.

8.  **No Third Party Beneficiaries**. This Bill of Sale does not and is not intended to confer upon any person other than the parties hereto (and their respective successors and assigns) any rights or remedies hereunder.

9.  **Successors and Assigns**. All of the terms, agreements, covenants, and conditions of this Bill of Sale will be binding upon, and inure to the benefit of and are enforceable by, the parties hereto and their respective successors and assigns.

10.  **Entire Agreement**.  This Bill of Sale, the Purchase Agreement and the other  Transaction Documents constitute the entire agreement between the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both oral and written.

11.  **Amendment, Modification and Waiver**. No amendment of any provision of this Bill of Sale shall be effective, unless the same shall be in writing and signed by Sellers and Buyer. No course of dealing between or among any persons having any interest in this Bill of Sale will be deemed effective to modify or amend any part of this Bill of Sale or any rights or obligations of any person under or by reason of this Bill of Sale. Any failure of a party hereto to comply with any obligation or agreement hereunder may only be waived in writing by the other parties hereto, but such waiver shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure. No failure by a party hereto to take any action with respect to any breach of this Bill of Sale or default by any other party hereto shall constitute a waiver of such party's right to enforce any provision hereof or to take any such action**.**

*[Signature Pages Follow]*

3

IN WITNESS WHEREOF, the undersigned have executed this Bill of Sale as of the date first set forth above.

**SELLERS:**

**WELLPATH HOLDINGS, INC.**

By: _____
Name:
Title:

**[•]**

By: _____
Name:
Title:

**[•]**

By: _____
Name:
Title:

**BUYER:**

**RS PURCHASER LLC**

By: _____
Name:
Title:

[Signature Page to Bill of Sale]

**Exhibit A**

**Sellers**

1. [•].

**<u>Exhibit E</u>**
**Form of Intellectual Property Assignment Agreement**

[to be attached]

Exhibit E to Equity Interest and Asset Purchase Agreement

## INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

This Intellectual Property Assignment Agreement (the "***Assignment***") is made and entered into as of [●], 2025 (the "***Effective Date***"), by and among Wellpath Holdings, Inc., a Delaware corporation (the "***Company***"), and each of its Affiliates listed on <u>Exhibit A</u> hereto (together with the Company, the "***Assignors***") and RS Purchaser LLC, a Delaware limited liability company ("***Assignee***") pursuant to that certain Equity Interest and Asset Purchase Agreement, dated as of November [●], 2024 (as amended, amended and restated, supplemented or modified, the "***Purchase Agreement***"), by and among Assignors and Assignee.  Capitalized terms used herein, but not otherwise defined herein, have the meanings ascribed thereto in the Purchase Agreement.

WHEREAS, under the terms of the Purchase Agreement, Assignors have agreed to sell, transfer, assign, convey and deliver to Assignee the Acquired Assets, including the Intellectual Property, and have agreed to execute and deliver this Assignment, for recording with the United States Patent and Trademark Office, the United States Copyright Office, and corresponding entities or agencies in any applicable jurisdictions.

1.      <u>Assignment</u>.   Effective as of Closing, for good and valuable consideration paid by Assignee, the receipt and sufficiency of which is hereby acknowledged (including as set forth in the Purchase Agreement), pursuant to the Sale Order and on the terms and subject to the conditions of the Purchase Agreement, Assignors hereby sell, transfer, assign, convey and deliver to Assignee and its successors and assigns, and Assignee hereby purchases, acquires and accepts from Assignors, all of Assignors' respective legal and beneficial rights, titles, and interests in, to and under the following:

a.      patents and patent applications, including those set forth on <u>Schedule 1</u> hereto, and all reissues, continuations, continuations-in-part, revisions, divisionals, extensions, and reexaminations thereof;

b.      all registered trademarks and pending trademark applications, and all goodwill associated therewith, including those set forth in <u>Schedule 2</u> hereto; and

c.      all registrations of copyrights and all applications for registrations of copyright, including those set forth in <u>Schedule 3</u> hereto;

with the items in this Paragraph 1, collectively the "***Assigned Registered IP***."

2.      <u>Terms of the Purchase Agreement</u>. This Assignment is entered into pursuant to the Purchase Agreement. The scope, nature, and extent of the Assigned Registered IP, and the rights and obligations of Assignee and Assignors with respect thereto are expressly set forth in the Purchase Agreement. Nothing contained herein will itself change, amend, extend, expand, alter or waive (nor should it be deemed or construed as changing, amending, extending, expanding, altering or waiving) the terms or conditions of the Purchase Agreement in any manner whatsoever. This instrument does not create or establish rights, liabilities or obligations not otherwise created or existing under or pursuant to the Purchase Agreement. The Purchase Agreement will not be superseded hereby but will remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Assignment, the terms of the Purchase Agreement will govern and control.

3.        <u>Further Assurances</u>. Subject to the terms and conditions of the Purchase Agreement, the Assignee and the Assignors agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to implement expeditiously the transactions contemplated by this Assignment; *provided*, *however*, that the Assignors are not obligated to incur any material cost or expense or initiate or join in any litigation in order to meet the obligations under this <u>Section 3</u>. Notwithstanding anything contained herein to the contrary, nothing in this Assignment shall (a) prevent Assignors from, or require Assignors to, delay the winding down of their bankruptcy estates (if applicable), (b) require Assignors to pay or incur any monetary amount not paid by Assignee, (c) impose on any party any burdens not expressly imposed on such party pursuant to the provisions of the Purchase Agreement or (d) require Assignors to become involved in any suit, action or proceeding.

4.        <u>Governing Law; Jurisdiction</u>.

a.        Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law rules that would apply the law of any state other than the State of New York.

b.        Prior to the closing of the Bankruptcy Cases, except as otherwise expressly provided herein, the parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Assignment or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court, and each of the parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.  Without limiting the foregoing, each party agrees that service of process on such party as provided in <u>Sections 12.4</u> and <u>12.10(b)</u> of the Purchase Agreement shall be deemed effective service of process on such party.

c.        Upon the closing of the Bankruptcy Cases, except as otherwise expressly provided herein, the parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Assignment or the transactions contemplated hereby shall be brought in the United States District Court for the Southern District of New York, sitting in the borough of Manhattan or any New York State court sitting in the state and County of New York, so long as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Assignment shall be deemed to have arisen from a transaction of business in the State of New York, and each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.  Process

2

in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each party agrees that service of process on such party as provided in <u>Sections 12.4</u> and <u>12.10(b)</u> of the Purchase Agreement shall be deemed effective service of process on such party.

       d.      EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS ASSIGNMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

5.      <u>Binding Effect</u>.  This Assignment is and shall be binding upon the parties hereto, their heirs, executors, administrators, representatives, agents, employees, affiliates, officers, and principals of the parties and their successors and assigns.

6.      <u>Legal Enforceability</u>. In case any provision of this Assignment is fully or in part invalid or unenforceable, the validity and enforceability of the other provisions of this Assignment shall not be affected thereby.

7.      <u>No Third Party Beneficiaries</u>. This Assignment does not and is not intended to confer upon any person other than the parties hereto (and their respective successors and assigns) any rights or remedies hereunder.

8.      <u>Entire Agreement</u>.  This Assignment, the Purchase Agreement and the other Transaction Documents constitute the entire agreement between the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both oral and written.

9.      <u>Successors and Assigns</u>. All of the terms, agreements, covenants, and conditions of this Agreement will be binding upon, and inure to the benefit of and are enforceable by, the parties hereto and their respective successors and assigns.

10.      <u>Amendment, Modification and Waiver</u>. No amendment of any provision of this Assignment shall be effective, unless the same shall be in writing and signed by Assignors and Assignee. No course of dealing between or among any persons having any interest in this Assignment will be deemed effective to modify or amend any part of this Assignment or any rights or obligations of any person under or by reason of this Assignment. Any failure of a party hereto to comply with any obligation or agreement hereunder may only be waived in writing by the other parties hereto, but such waiver shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure. No failure by a party hereto to take any action with respect to any breach of this Assignment default by any other party hereto shall constitute a waiver of such party's right to enforce any provision hereof or to take any such action

11.      <u>Counterparts</u>.  This Assignment and any amendments hereto may be executed in two or more counterparts, each of which shall be deemed to be an original of this Assignment or such amendment and all of which, when taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Assignment or any amendments hereto by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Assignment.

3

[*Remainder of This Page Intentionally Left Blank*]

DM_US 209045593-2.066497.0811

IN WITNESS WHEREOF, the parties have executed this Assignment to be effective as of the date first written above.

**ASSIGNORS:**

WELLPATH HOLDINGS, INC.

By: _____
Name:
Title:


[•]

By: _____
Name:
Title:


[•]

By: _____
Name:
Title:


**ASSIGNEE:**


**RS PURCHASER LLC**

By: _____
Name:
Title:


[Signature Page to Intellectual Property Assignment]

**<u>Exhibit A</u>**
Assignors

1.      [•]

**SCHEDULE 1**

**ASSIGNED PATENTS AND PATENT APPLICATIONS**

**SCHEDULE 2**

**ASSIGNED TRADEMARK REGISTRATIONS AND APPLICATIONS**

**SCHEDULE 3**

**ASSIGNED COPYRIGHTS**

**<u>Exhibit F</u>**
**Form of Transition Services Agreement**

[to be attached]

**<u>Exhibit G</u>**
**Form of Securities Transfer Agreement**

[to be attached]

Exhibit G to Equity Interest and Asset Purchase Agreement

# SECURITIES TRANSFER AGREEMENT

## [●], 2025

**FOR VALUE RECEIVED**, in connection with the consummation of the transactions contemplated by that certain Equity Interest and Asset Purchase Agreement, dated as of November 11, 2024, the undersigned parties (collectively, the "***Sellers***") hereby (A) assign, transfer and otherwise convey unto RS Purchaser LLC, a Delaware limited liability company, one hundred percent (100%) of the membership interests (the "***Purchased Interests***") in each of (i) Wellpath Recovery Solutions, LLC, (ii) Correct Care of South Carolina, LLC, (iii) Harborview Center, LLC and (iv) Behavioral Health Management Systems, LLC (collectively, the "***Acquired Companies***"), which Purchased Interests are (a) all of the issued and outstanding equity interests of the Acquired Companies held (directly or indirectly) by the Sellers and (b) held in the applicable Seller's name on the books of each Acquired Company, and (B) irrevocably constitute and appoint the secretary or other responsible officer of each Acquired Company, as applicable, as attorney to transfer the applicable Purchased Interests on the books of such Acquired Company with full power of substitution in the premises.

*[Signature Page Follows]*

**DATED** effective as of the date first set forth above.

**SELLERS:**

**[•]**

By: _____
Name: [•]
Title: [•]

**<u>Exhibit 3</u>**

**Form of Sale Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
| Debtors. | (Joint Administration Requested) |

## NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court") on November 11, 2024.

**PLEASE TAKE FURTHER NOTICE** that, on November 12, 2024, the Debtors filed a motion (the "Motion")[2] with the Court seeking entry of orders, among other things, approving (a) procedures for the solicitation of Bids in connection with the Sale Transactions and the Auctions (the "Bidding Procedures"), (b) the proposed sale of substantially all of the Recovery Solutions Assets to the Recovery Solutions Stalking Horse Bidder, subject to the submission of higher or otherwise better offers, (c) the form and manner of notice related to the Sale Transactions, and (d) procedures for the assumption and assignment of contracts and leases in connection with the Sale Transactions.

**PLEASE TAKE FURTHER NOTICE** that, on [●], 2024, the Court entered an order (the "Bidding Procedures Order") approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale Transactions and the Auctions.  All parties interested in bidding should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.[3]

### Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Assets (or any lot thereof) must comply strictly

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Wellpath.  The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

[3]   To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.

with the Bidding Procedures.  Only Qualified Bids will be considered by the Debtors, in accordance with the Bidding Procedures.

**Any interested bidder should contact, as soon as practicable:**
**project.starburst.2024@lazard.com and raikin@mtspartners.com**.

**Obtaining Additional Information**

Copies of the Motion and the Bidding Procedures Order, as well as all related exhibits (including the Bidding Procedures) and all other documents filed with the Court, are available free of charge on the Debtors' case information website located at *https://dm.epiq11.com/Wellpath* or can be requested by email at WellpathInfo@epiqglobal.com.

**Important Dates and Deadlines[4]**

(1) **Bid Deadlines.**  The deadline to submit a Qualified Bid for the Recovery Solutions / Consolidated Sale Transaction is **December 13, 2024 at 4:00 p.m. (prevailing Central Time)**.  The deadline to submit a Qualified Bid for any Corrections Asset(s) Sale Transaction is **January 20, 2025 at 4:00 p.m. (prevailing Central Time)**.

(2) **Auctions.**  In the event that the Debtors timely receive more than one Qualified Bid for the Assets, and subject to the satisfaction of any further conditions set forth in the Bidding Procedures, the Debtors intend to conduct Auctions for the applicable Assets.  An Auction, if held, shall be conducted at McDermott Will & Emery LLP, 444 West Lake Street, Suite 4000, Chicago, Illinois 60606 on (a) **December 16, 2024 at 9:00 a.m. (prevailing Central Time)** for the Recovery Solutions / Consolidated Sale Transactions and (b) **January 28, 2025 at 9:00 a.m. (prevailing Central Time)** for any Corrections Asset(s) Sale Transaction

(3) **Sale Objections Deadlines**.  The deadline to file an objection with the Court to the Sale Orders, the conduct of the Auctions, or the Sale Transactions (collectively, the "Sale Objections") is (a) **December 18, 2024 at 4:00 p.m. (prevailing Central Time)** for the Recovery Solutions / Consolidated Sale Transaction and (b) **January 31, 2025 at 4:00 p.m. (prevailing Central Time)** for the Corrections Asset(s) Sale Transaction (each a "Sale Objection Deadline").

(4) **Sale Hearings**.  The Court shall hold a hearing to consider approval of the Successful Bid(s) (and Alternate Bid(s), as applicable) and the proposed Sale Transaction(s) contemplated thereby (a "Sale Hearing").  The Sale Hearing with respect to any Recovery Solutions / Consolidated Sale Transaction(s) contemplated by any designated Successful Bid(s) (and the Alternate Bid(s), as applicable) shall be held on **December [23], 2024 at [_]:[_] [a./p.]m. (prevailing Central Time).**  The Sale Hearing with respect to any Corrections Asset(s) Sale Transaction(s) contemplated by any designated Successful

---

[4]    The following dates and deadlines may be extended by the Debtors or the Court pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order.

Bid(s) (and the Alternate Bid(s), as applicable) shall be held on **February [4], 2025 at [_]:[_] [a./p.]m. (prevailing Central Time)**.

### Filing Objections

Sale Objections, if any, must (a) be in writing, (b) state, with specificity, the legal and factual bases thereof, (c) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and Complex Procedures, (d) be filed with the Court no later than the Sale Objection Deadline, and (e) no later than the Sale Objection deadline, be served on , (i) proposed counsel to the Debtors, McDermott Will & Emery, LLP, 444 West Lake Street, Suite 4000 Chicago, Illinois 60606-0029, Attn: Felicia Gerber Perlman, Bradley Thomas Giordano, Jake Jumbeck, Carole Wurzelbacher, and Carmen Dingman, and One Vanderbilt Avenue New York, New York 10017, Attn: Steven Z. Szanzer, (ii) counsel to the DIP Lenders and the Ad Hoc Group, Akin Gump Strauss Hauer & Feld, LLP, 2001 K Street N.W. Washington, DC 20006, Attn.: Scott L. Alberino and Kate Doorley, (iii) counsel to the Prepetition First Lien Administrative Agent and Prepetition Second Lien Administrative Agent, Cahill Gordon & Reindel LLP, 32 Old Slip, New York, NY 10005, Attn: Joel H. Levitin (jlevitin@cahill.com) and Jordan A. Wishnew (jwishnew@cahill.com) and Norton Rose Fulbright US LLP, 1550 Lamar Street, Suite 2000, Houston, TX 77010, Attn: Bob Bruner (bob.bruner@nortonrosefulbright.com); (iv) counsel to the Committee, and (v) the U.S. Trustee, 515 Rusk Street, Suite 3516, Houston, Texas 77002, Attn: Susan Hersch and Ha Nguyen (collectively, the "Objection Notice Parties").

### CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

*Any party or entity who fails to timely make an objection to a Sale Transaction on or before the Sale Objection Deadline in accordance with the Bidding Procedures Order and this Notice shall be forever barred from asserting any objection to any Sale Transaction, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances, and other interests.*

### NO SUCCESSOR LIABILITY

*For more information on the Debtors' businesses or their products, refer to the Declaration of Timothy J. Dragelin as Chief Restructuring Officer and Chief Financial Officer of Wellpath Holdings, Inc. and Certain of its Affiliates and Subsidiaries in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings [Docket No. 20]. The Assets sold in a Sale Transaction will be free and clear of, among other things, any claim arising from any conduct of the Debtors prior to the closing of a Sale Transaction, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent, or otherwise, so long as such claim arises out of or relates to events occurring prior to the closing of a Sale Transaction. Accordingly, as a result of any Sale Transaction, the Successful Bidder will not be a successor to any of the Debtors by reason of any theory of law or equity, and the Successful Bidder will have no liability, except as expressly provided in a definitive agreement reached between the Debtors and the Successful Bidder, for any liens, claims, encumbrances, and other interests against or in any of the Debtors under any theory of law, including successor liability theories.*

Dated:  [·], 2024
Dallas, Texas

/s/
_____

Marcus A. Helt (Texas Bar #24052187)
MCDERMOTT WILL & EMERY LLP
2501 N. Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone:     (214) 295-8000
Facsimile:     (972) 232-3098
Email:          mhelt@mwe.com

-and-

Felicia Gerber Perlman (*pro hac vice* admission pending)
Bradley Thomas Giordano (*pro hac vice* admission pending)
Jake Jumbeck (*pro hac vice* admission pending)
Carole Wurzelbacher (*pro hac vice* admission pending)
Carmen Dingman (*pro hac vice* admission pending)
MCDERMOTT WILL & EMERY LLP
444 West Lake Street, Suite 4000
Chicago, Illinois 60606-0029
Telephone:     (312) 372-2000
Facsimile:     (312) 984-7700
Email:          fperlman@mwe.com
                bgiordano@mwe.com
                jjumbeck@mwe.com
                cwurzelbacher@mwe.com
                cdingman@mwe.com

-and-

Steven Z. Szanzer (*pro hac vice* admission pending)
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, New York 10017
Telephone:     (212) 547-5400
Facsimile:     (212) 547-5444
Email:          sszanzer@mwe.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## **Exhibit 4**

**Form of Potential Assumption and Assignment Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
| | (Joint Administration Requested) |
| Debtors. | |

## NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND CURE AMOUNT

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court") on November 11, 2024.

**PLEASE TAKE FURTHER NOTICE** that, on November 12, 2024, the Debtors filed a motion (the "Motion")[2] with the Court seeking entry of orders, among other things, approving (a) procedures for the solicitation of bids in connection with the Sale Transactions and the Auctions (the "Bidding Procedures"), (b) the proposed sale of substantially all of the Recovery Solutions Assets to the Recovery Solutions Stalking Horse Bidder, subject to the submission of higher or otherwise better offers, (c) the form and manner of notice related to the Sale Transactions, and (d) procedures for the assumption and assignment of contracts and leases in connection with the Sale Transactions (the "Assumption and Assignment Procedures").

**PLEASE TAKE FURTHER NOTICE** that, on [●], 2024, the Court entered an order (the "Bidding Procedures Order") approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale Transactions, the Auctions, and the Assumption and Assignment Procedures.

**PLEASE TAKE FURTHER NOTICE** that, upon the closing of a Sale Transaction, the Debtors intend to assume and assign to the Successful Bidder(s) (whether or not a Stalking Horse Bidder) the Potential Assumed Contracts. A schedule listing the Potential Assumed Contracts (the "Potential Assumed Contracts Schedule") is attached hereto and may also be accessed free of charge on the Debtors' case information website located at *https://dm.epiq11.com/Wellpath* or can be requested by email at WellpathInfo@epiqglobal.com. In addition, the "Cure Costs," if any, necessary for the assumption and assignment of the Potential Assumed Contracts are set forth on

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Wellpath. The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

the Potential Assumed Contracts Schedule. *Each Cure Cost listed on the Potential Assumed Contracts Schedule represents all liabilities of any nature of the Debtors arising under an Assumed Contract prior to the Petition Date, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent, or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the Petition Date.*

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO A POTENTIAL ASSUMED CONTRACT**. Under the terms of the Assumption and Assignment Procedures, (a) at or prior to the closing of a Sale Transaction, a Successful Bidder may elect, in its sole and absolute discretion, (i) to exclude any contract or lease on the Potential Assumed Contracts Schedule as an Assumed Contract, as applicable (in which case it shall become an Excluded Contract), or (ii) to include on the Proposed Assumed Contracts Schedule any contract or lease listed on the Potential Assumed Contracts Schedule, by providing to the Debtors written notice of its election to exclude or include such contract or lease, as applicable, (b) if the Debtors or any Successful Bidder identify during the pendency of these chapter 11 cases (before or after the closing of a Sale Transaction) any contract or lease that is not listed on the Proposed Assumed Contracts Schedule, and such contract or lease has not been rejected by the Debtors, the Successful Bidder may in its sole and absolute discretion elect by written notice to the Debtors to treat such contract or lease as an Assumed Contract and the Debtors shall seek to assume and assign such Assumed Contract in accordance with the Assumption and Assignment Procedures, and (c) following an Auction, the Debtors may, in accordance with the applicable purchase agreement, or as otherwise agreed by the Debtors and the Successful Bidder(s), at any time before the closing of the Sale Transactions, modify the previously stated Cure Costs associated with any Proposed Assumed Contract. The Assumption and Assignment Procedures further provide that any Counterparty whose previously-stated Cure Cost is modified will receive notice thereof and an opportunity to file a Supplemental Assumption and Assignment Objection. **The assumption and assignment of the Contracts on the Potential Assumed Contracts Schedule is not guaranteed and is subject to approval by the Court and the Debtors' or Successful Bidder's right to remove an Assumed Contract from the Potential Assumed Contracts Schedule and Proposed Assumed Contracts Schedule.**

### Obtaining Additional Information

Copies of the Motion and the Bidding Procedures Order, as well as all related exhibits (including the Bidding Procedures) and all other documents filed with the Court, are available free of charge on the Debtors' case information website located at *https://dm.epiq11.com/Wellpath* or can be requested by email at WellpathInfo@epiqglobal.com.

### Filing Assumption and Assignment Objections

Pursuant to the Assumption and Assignment Procedures, objections to the potential assumption and assignment of an Assumed Contract (an "Assumption and Assignment Objection") with respect to the ability of a Successful Bidder to provide adequate assurance of future performance must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and Complex Procedures, (c) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Cost that the Counterparty believes are required to cure defaults under the relevant Assumed Contract, (d) by no later than (x) **December 18, 2024 at 4:00**

**p.m. (prevailing Central Time)** for the Recovery Solutions / Consolidated Sale Transaction, and (y) **January 31, 2025 at 4:00 p.m. (prevailing Central Time)** for any Corrections Asset(s) Sale Transaction (each an "<u>Assumption and Assignment Objection Deadline</u>"), (i) be filed with the Court and (ii) be served on , (1) proposed counsel to the Debtors, McDermott Will & Emery, LLP, 444 West Lake Street, Suite 4000 Chicago, Illinois 60606-0029, Attn: Felicia Gerber Perlman, Bradley Thomas Giordano, Jake Jumbeck, Carole Wurzelbacher, and Carmen Dingman, and One Vanderbilt Avenue New York, New York 10017, Attn: Steven Z. Szanzer, (2) counsel to the DIP Lenders and the Ad Hoc Group, Akin Gump Strauss Hauer & Feld, LLP, 2001 K Street N.W. Washington, DC 20006, Attn.: Scott L. Alberino and Kate Doorley, (3) counsel to the Prepetition First Lien Administrative Agent and Prepetition Second Lien Administrative Agent, Cahill Gordon & Reindel LLP, 32 Old Slip, New York, NY 10005, Attn: Joel H. Levitin (jlevitin@cahill.com) and Jordan A. Wishnew (jwishnew@cahill.com) and Norton Rose Fulbright US LLP, 1550 Lamar Street, Suite 2000, Houston, TX 77010, Attn: Bob Bruner (bob.bruner@nortonrosefulbright.com), (4) counsel to the Committee, and (5) the U.S. Trustee, 515 Rusk Street, Suite 3516, Houston, Texas 77002, Attn: Susan Hersch and Ha Nguyen (collectively, the "<u>Objection Notice Parties</u>").

Pursuant to the Assumption and Assignment Procedures, an Assumption and Assignment Objection relating to a proposed Cure Cost (a "<u>Cure Objection</u>") must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and Complex Procedures, (c) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Cost that the Counterparty believes are required to cure defaults under the relevant Assumed Contract, and (d) by no later than **December 11, 2024 at 4:00 p.m. (prevailing Central Time)** (the "<u>Cure Objection Deadline</u>"), (i) be filed with the Court and (ii) be served on the Objection Notice Parties.

Pursuant to the Assumption and Assignment Procedures, objections to the potential assumption and assignment of an Assumed Contract or Assumed Lease by a party whose contract or lease is listed on a Supplemental Assumed Contracts Schedule (a "<u>Supplemental Assumption and Assignment Objection</u>") with respect to the ability of a Successful Bidder to provide adequate assurance of future performance or relating to the Cure Costs (to the extent modified form the previously-stated amount) must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and Complex Procedures, (c) state, with specificity, the legal and factual bases thereof, and (d) by no later than **14 days from the date of service of such Supplemental Assumption and Assignment Notice,** (i) be filed with the Court and (ii) be served on the Objection Notice Parties.

Objections to the Sale Orders, the conduct of the Auctions, or the Sale Transactions (collectively, the "<u>Sale Objections</u>") must (a) be in writing, (b) state, with specificity, the legal and factual bases thereof, (c) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and Complex Procedures, and (d) by no later than (i) **December 18, 2024 at 4:00 p.m. (prevailing Central Time)** for the Recovery Solutions / Consolidated Sale Transaction or (ii) **January 31, 2025 at 4:00 p.m. (prevailing Central Time)** for the Corrections Asset(s) Sale Transaction (each a "<u>Sale Objection Deadline</u>").

## CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

*Any Counterparty to a contract or lease who fails to timely make an objection to the potential assumption and assignment of such contract or lease on or before the Assumption and Assignment Objection Deadline in accordance with the Assumption and Assignment Procedures, the Bidding Procedures Order, and this Notice (or in the case of a Supplemental Assumption and Assignment Objection, by 14 days from the date of service of such Supplemental Assumption and Assignment Notice) shall be deemed to have consented to the assumption and assignment of such contract or lease, including the Cure Costs (if any), set forth on a Potential Assumed Contracts Schedule or a Supplemental Assumed Contracts Schedule, and shall be forever barred from asserting any objection or claims against the Debtors, the Successful Bidder, or the property of any such parties relating to the assumption and assignment of such contract or lease, including asserting additional Cure Costs with respect to such contract or lease. Notwithstanding anything to the contrary in such contract or lease, or any other document, the Cure Costs set forth on a Potential Assumed Contracts Schedule or a Supplemental Assumed Contracts Schedule shall be controlling and will be the only amount necessary to cure outstanding defaults under the applicable Assumed Contract under section 365(b) of the Bankruptcy Code arising out of or related to any events occurring prior to the closing of a Sale Transaction or other applicable date upon which such assumption and assignment will become effective, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent, or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the closing of a Sale Transaction or other applicable date upon which such assumption and assignment will become effective.*

### Other Important Dates and Deadlines[3]

In addition to the dates and deadlines described above with respect to filing Assumption and Assignment Objections, Cure Objections, and Supplemental Assumption and Assignment Objections, note the following important dates and deadlines:

(1) **Auctions.** In the event that the Debtors timely receive more than one Qualified Bid for the Assets, and subject to the satisfaction of any further conditions set forth in the Bidding Procedures, the Debtors intend to conduct an Auction for the applicable Assets. An Auction, if held, shall be conducted at McDermott Will & Emery LLP, 444 West Lake Street, Suite 4000, Chicago, Illinois 60606 on (a) **December 16, 2024 at 9:00 a.m. (prevailing Central Time)** for the Recovery Solutions / Consolidated Sale Transactions, (b) **January 28, 2025 at 9:00 a.m. (prevailing Central Time)** for any Corrections Asset(s) Sale Transaction

(2) **Sale Hearings**. The Court shall hold a hearing to consider approval of the Successful Bid(s) (and Alternate Bid(s), as applicable) and the proposed Sale Transaction(s) contemplated thereby (a "Sale Hearing"). The Sale Hearing with respect to any Recovery Solutions / Consolidated Sale Transaction(s) contemplated by any designated Successful Bid(s) (and the Alternate Bid(s), as applicable) shall be held on **December [23], 2024 at**

---

[3] The following dates and deadlines may be extended by the Debtors or the Court pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order.

4

**[_]:[_] [a./p.]m. (prevailing Central Time).** The Sale Hearing with respect to any Corrections Asset(s) Sale Transaction(s) contemplated by any designated Successful Bid(s) (and the Alternate Bid(s), as applicable) shall be held on **February [4], 2025 at [_]:[_] [a./p.]m. (prevailing Central Time)**.

Dated: [·], 2024
Dallas, Texas

/s/
_____

Marcus A. Helt (Texas Bar #24052187)
MCDERMOTT WILL & EMERY LLP
2501 N. Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone:    (214) 295-8000
Facsimile:    (972) 232-3098
Email:        mhelt@mwe.com

-and-

Felicia Gerber Perlman (*pro hac vice* admission pending)
Bradley Thomas Giordano (*pro hac vice* admission pending)
Jake Jumbeck (*pro hac vice* admission pending)
Carole Wurzelbacher (*pro hac vice* admission pending)
Carmen Dingman (*pro hac vice* admission pending)
MCDERMOTT WILL & EMERY LLP
444 West Lake Street, Suite 4000
Chicago, Illinois 60606-0029
Telephone:    (312) 372-2000
Facsimile:    (312) 984-7700
Email:        fperlman@mwe.com
              bgiordano@mwe.com
              jjumbeck@mwe.com
              cwurzelbacher@mwe.com
              cdingman@mwe.com

-and-

Steven Z. Szanzer (*pro hac vice* admission pending)
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, New York 10017
Telephone:    (212) 547-5400
Facsimile:    (212) 547-5444
Email:        sszanzer@mwe.com

*Proposed Counsel to the Debtors and Debtors in Possession*

5

**<u>Exhibit 5</u>**

**Form of Proposed Assumption and Assignment Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
|  | (Joint Administration Requested) |
| Debtors. |  |

**NOTICE OF PROPOSED ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS OR UNEXPIRED LEASES AND CURE AMOUNT**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court") on November 11, 2024.

**PLEASE TAKE FURTHER NOTICE** that, on November 12, 2024, the Debtors filed a motion (the "Motion")[2] with the Court seeking entry of orders, among other things, approving (a) procedures for the solicitation of bids in connection with the Sale Transactions and the Auctions (the "Bidding Procedures"), (b) the proposed sale of substantially all of the Recovery Solutions Assets to the Recovery Solutions Stalking Horse Bidder, subject to the submission of higher or otherwise better offers, (c) the form and manner of notice related to the Sale Transactions, and (d) procedures for the assumption and assignment of contracts and leases in connection with the Sale Transactions (the "Assumption and Assignment Procedures").

**PLEASE TAKE FURTHER NOTICE** that, on [●], 2024, the Court entered an order (the "Bidding Procedures Order") approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale Transactions and the Auctions. All parties interested in bidding should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.[3]

**PLEASE TAKE FURTHER NOTICE that, on [December [16], 2024 at 9:00 a.m.
(prevailing Central Time) // January [28], 2025 at 9:00 a.m. (prevailing Central Time)],** the

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Wellpath. The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[3]   To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.

Debtors held an Auction at the offices of McDermott Will & Emery LLP, 444 West Lake Street, Suite 4000, Chicago, Illinois 60606.

**PLEASE TAKE FURTHER NOTICE** that, upon the closing of the Sale Transaction, the Debtors intend to assume and assign to the Successful Bidder(s) (whether or not a Stalking Horse Bidder) the Proposed Assumed Contracts. A schedule listing the Proposed Assumed Contracts (the "Proposed Assumed Contracts Schedule") is attached hereto and may also be accessed free of charge on the Debtors' case information website located at *https://dm.epiq11.com/Wellpath* or can be requested by e-mail at WellpathInfo@epiqglobal.com. In addition, the "Cure Costs," if any, necessary for the assumption and assignment of the Proposed Assumed Contracts are set forth on the Proposed Assumed Contracts Schedule. ***Each Cure Cost listed on the Potential Assumed Contracts Schedule represents all liabilities of any nature of the Debtors arising under an Assumed Contract prior to the Petition Date, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent, or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the Petition Date.***

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO A PROPOSED ASSUMED CONTRACT.** Under the terms of the Assumption and Assignment Procedures, (a) at or prior to the closing of the Sale Transaction, the Successful Bidder(s) may elect, in its sole and absolute discretion, (i) to exclude any contract or lease on the Proposed Assumed Contracts Schedule as an Assumed Contract (in which case it shall become an Excluded Contract), or (ii) to include on the Proposed Assumed Contracts Schedule any contract or lease listed on the Potential Assumed Contracts Schedule by providing to the Debtors written notice of its election to exclude or include such contract or lease, as applicable, (b) if the Debtors or any Successful Bidder identify during the pendency of these chapter 11 cases before or after the closing of the Sale Transaction) any contract that is not listed on the Proposed Assumed Contracts Schedule, and such contract or lease has not been rejected by the Debtors, the Successful Bidder may in its sole and absolute discretion elect by written notice to the Debtors to treat such contract or lease as an Assumed Contract and the Debtors shall seek to assume and assign such Assumed Contract in accordance with the Assumption and Assignment Procedures, and (c) following the Auction, the Debtors may, in accordance with the applicable purchase agreement, or as otherwise agreed by the Debtors and the Successful Bidder(s), at any time before the closing of the Sale Transaction, modify the previously-stated Cure Costs associated with any Proposed Assumed Contract. The Assumption and Assignment Procedures further provide that any Counterparty whose previously-stated Cure Cost is modified will receive notice thereof and an opportunity to file a Supplemental Assumption and Assignment Objection. **The assumption and assignment of the Contracts on the Proposed Assumed Contracts Schedule is not guaranteed and is subject to approval by the Court and the Debtors' or Successful Bidder's right to remove an Assumed Contract from the Proposed Assumed Contracts Schedule.**

### Obtaining Additional Information

Copies of the Motion and the Bidding Procedures Order, as well as all related exhibits (including the Bidding Procedures) and all other documents filed with the Court, are available free of charge on the Debtors' case information website located at *https://dm.epiq11.com/Wellpath* or can be requested by e-mail at WellpathInfo@epiqglobal.com.

## Filing Assumption and Assignment Objections

Pursuant to the Assumption and Assignment Procedures, objections to the proposed assumption and assignment of an Assumed Contract (an "Assumption and Assignment Objection") with respect to the ability of the Successful Bidder to provide adequate assurance of future performance must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and Complex Procedures, (c) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs that the Counterparty believes are required to cure defaults under the relevant Assumed Contract or Assumed Lease, (d) by no later than **[December [18], 2024 at 4:00 p.m. (prevailing Central Time) // January [31], 2025 at 4:00 p.m. (prevailing Central Time)]** (the "Assumption and Assignment Objection Deadline"), (i) be filed with the Court and (ii) be served on (1) [proposed] counsel to the Debtors, McDermott Will & Emery, LLP, 444 West Lake Street, Suite 4000 Chicago, Illinois 60606-0029, Attn: Felicia Gerber Perlman, Bradley Thomas Giordano, Jake Jumbeck, Carole Wurzelbacher, and Carmen Dingman, and One Vanderbilt Avenue New York, New York 10017, Attn: Steven Z. Szanzer, (2) counsel to the DIP Lenders and the Ad Hoc Group, Akin Gump Strauss Hauer & Feld, LLP, 2001 K Street N.W. Washington, DC 20006, Attn.: Scott L. Alberino and Kate Doorley, (3) counsel to the Prepetition First Lien Administrative Agent and Prepetition Second Lien Administrative Agent, Cahill Gordon & Reindel LLP, 32 Old Slip, New York, NY 10005, Attn: Joel H. Levitin (jlevitin@cahill.com) and Jordan A. Wishnew (jwishnew@cahill.com) and Norton Rose Fulbright US LLP, 1550 Lamar Street, Suite 2000, Houston, TX 77010, Attn: Bob Bruner (bob.bruner@nortonrosefulbright.com) (4) counsel to the Committee, and (5) the U.S. Trustee, 515 Rusk Street, Suite 3516, Houston, Texas 77002, Attn: Susan Hersch and Ha Nguyen (collectively, the "Objection Notice Parties").

**Sale Objections** (as defined below), if any, must (a) be in writing, (b) state, with specificity, the legal and factual bases thereof, (c) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and Complex Procedures, and (d) by **[December [18], 2024 at 4:00 p.m. (prevailing Central Time) // January [31], 2025 at 4:00 p.m. (prevailing Central Time)]** (the "Sale Objection Deadline") (i) be filed with the Court and (ii) be served on the Objection Notice Parties.

## CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

*Any Counterparty to an Assumed Contract who fails to timely make an objection to the proposed assumption and assignment of such contract or lease on or before the Assumption and Assignment Objection Deadline in accordance with the Assumption and Assignment Procedures, the Bidding Procedures Order, and this Notice shall be deemed to have consented with respect to the ability of a Successful Bidder to provide adequate assurance of future performance (and the Debtors' proposed Cure Costs, to the extent modified from the previously-stated amount) and shall be forever barred from asserting any objection or claims against the Debtors, the Successful Bidder, or the property of any such parties relating to the assumption and assignment of such contract or lease (including asserting additional Cure Costs with respect to such contract or lease). Notwithstanding anything to the contrary in such contract or lease, or any other document, the Cure Costs set forth on a Potential Assumed Contracts Schedule, a Proposed Assumed Contracts Schedule, or a Supplemental Assumed Contracts Schedule (as*

*applicable) shall be controlling and will be the only amount necessary to cure outstanding defaults under the applicable Assumed Contract under section 365(b) of the Bankruptcy Code arising out of or related to any events occurring prior to the closing of the Sale Transaction or other applicable date upon which such assumption and assignment will become effective, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent, or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the closing of the Sale Transaction or other applicable date upon which such assumption and assignment will become effective.*

### Other Important Dates and Deadlines[4]

In addition to the dates and deadlines described above with respect to filing Assumption and Assignment Objections, note the following important dates and deadlines:

1) **Sale Hearing**.  A hearing (the "**Sale Hearing**") to consider the proposed Sale Transaction will be held before the Court on **December [23], 2024 at [_]:[_] [a./p.]m. (prevailing Central Time) // February [4], 2025 at [_]:[_] [a./p.]m. (prevailing Central Time)** or such other date as determined by the Court.

*[Remainder of page intentionally left blank]*

---

[4]   The following dates and deadlines may be extended by the Debtors or the Court pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order.

Dated:  [·], 2024  
Dallas, Texas

/s/ _____

Marcus A. Helt (Texas Bar #24052187)  
MCDERMOTT WILL & EMERY LLP  
2501 N. Harwood Street, Suite 1900  
Dallas, Texas 75201-1664  
Telephone:      (214) 295-8000  
Facsimile:      (972) 232-3098  
Email:           mhelt@mwe.com

-and-

Felicia Gerber Perlman (*pro hac vice* admission pending)  
Bradley Thomas Giordano (*pro hac vice* admission pending)  
Jake Jumbeck (*pro hac vice* admission pending)  
Carole Wurzelbacher (*pro hac vice* admission pending)  
Carmen Dingman (*pro hac vice* admission pending)  
MCDERMOTT WILL & EMERY LLP  
444 West Lake Street, Suite 4000  
Chicago, Illinois 60606-0029  
Telephone:      (312) 372-2000  
Facsimile:      (312) 984-7700  
Email:           fperlman@mwe.com  
                 bgiordano@mwe.com  
                 jjumbeck@mwe.com  
                 cwurzelbacher@mwe.com  
                 cdingman@mwe.com

-and-

Steven Z. Szanzer (*pro hac vice* admission pending)  
MCDERMOTT WILL & EMERY LLP  
One Vanderbilt Avenue  
New York, New York 10017  
Telephone:      (212) 547-5400  
Facsimile:      (212) 547-5444  
Email:           sszanzer@mwe.com

*Proposed Counsel to the Debtors and Debtors in Possession*