## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*, | Case No. 24-90533 (ARP) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 181, 258, 265, 281, 294, 302, 372, 382, 412, 433, and 435** |

### DEBTORS' OMNIBUS OBJECTION TO
### MOTIONS FOR RELIEF FROM THE AUTOMATIC STAY

The debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors") hereby submit this omnibus objection (this "Objection") to the Lift Stay Motions[1] filed by the Movants.[2] As of the filing of this Objection, the Debtors have

---

[1] The "Lift Stay Motions" mean, collectively, (a) *Claimants Gracienne Myers And Daniel Myers Motion for Relief from Automatic Stay to Allow Insurance Covered Liability Action to Proceed* [Docket No. 181] (the "Myers Motion"); (b) *Response to Debtor's Emergency Motion for Entry of Interim and Final Orders to Enforce the Automatic Stay or in the Alternative Extend the Automatic Stay to Non-Debtor Defendants, (D.E. #17), or in the Alternative, Motion For Relief From The Automatic Stay* [Docket No. 258] (the "Deputies Motion"); (c) *Plaintiff Kyse Monk, a Minor, Through a Guardian Kandi Stewart's Motion for Relief from the Automatic Stay to Allow the Pending Personal Injury and Wrongful Death Claims Against the Debtor to Proceed* [Docket No. 265] (the Monk Motion"); (d) *Motion to Lift Automatic Stay to Proceed with § 1983 Case in State Court* [Docket No. 281] (the "Harris Motion"); (e) *Motion for Relief from Automatic Stay to Proceed with Litigation and Request for Adequate Protection Regarding Insurance Proceeds* [Docket No. 294] (the "Evans Motion"); (f) *Motion for Relief from the Automatic* [Docket No. 302] (the "Slater Motion"); (g) *Motion to Lift Stay of Civil Rights Action and Permission to Freeze Debtor(s) Assets* [Docket No 372] (the "Henderson Motion"); (h) *Plaintiff Dawn Crawford, in Her Capacity as Administratrix for the Estate of Marc Crawford's Motion for Relief from the Automatic Stay to Allow the Pending Claims Brough Against the Debtor Pursuant to 42 U.S.C. § 1983 to Proceed* [Docket No. 382] (the "Crawford Motion"); (i) *Movants Brandon Lamboy's Motion for Relief from Automatic Stay to Allow United States District Court for the District Massachusetts Case No. 1:24-cv-12572-IT to Proceed* [Docket No. 412] (the "Lamboy Motion"); (j) *Motion to Lift Automatic Stay* [Docket No. 433] (the "Strickland Motion"); and (k) *Motion to Lift Automatic Stay* [Docket No. 435] (the "Peterson Motion").

[2] The "Movants" mean, collectively, collectively, (a) Gracienne Myers and Danielle Myers (collectively, the "Myers Movants"); (b) Sheriff's Deputy Andelson Maximin and Sheriff's Deputy Dodou Jones (collectively, the "Deputies Movants"); (c) Plaintiff, Kyse Monk, a minor, through a guardian Kandi Stewart (the "Monk Movant"); (d) Tangela Harris, as special administrator of the estate of Kevin Shelton (the "Harris Movant"); (e) Kenneth Evans and Kenya Evans, as Independent Administrators of the Estate of Khayla J. Evans (the "Evans Movants"); (f) Corey A. Slater, pro se plaintiff (the "Slater Movant"), (g) Arthur Lamont Henderson, pro se

consensually resolved the Deputies Motion.[3]  In support of the Objection, the Debtors rely on the *Declaration of Timothy J. Dragelin as Chief Restructuring Officer and Chief Financial Officer of Wellpath Holdings, Inc. and Certain of its Affiliates and Subsidiaries in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 20] (the "First Day Declaration") and the *Declaration of James Seitz as Director of Insurance of Wellpath Holdings, Inc. and Certain of its Affiliates and Subsidiaries in Support of the Debtors' Omnibus Objections to Motions for Relief from the Automatic Stay and Stay Enforcement Motion* (the "Seitz Declaration")[4] filed contemporaneously herewith and state as follows:

## PRELIMINARY STATEMENT

1.      The Movants all primarily want the same thing—prompt access to allegedly available insurance proceeds.  The Movants assert that the existence of such alleged insurance will substantially mitigate, if not eliminate entirely, any hardship to the Debtors and their estates should this Court allow the Movants relief from the automatic stay to proceed with their various lawsuits against the Debtors in numerous courts across the country.

2.      As described herein, however, all of the Debtors' primary insurance policies covering the lawsuits underlying **all** of the Lift Stay Motions are fronting policies that establish no

---

plaintiff (the "Henderson Movant"); (h) Dawn Crawford, in Her Capacity as Administratrix for the Estate of Marc Crawford (the "Crawford Movant"); (i) Brandon Lamboy, pro se plaintiff (the "Lamboy Movant"); (j) the Estate of Gabriel Strickland, N.S., and Shawna Alexander (the "Strickland Movant"); and (k) John David Peterson (the "Peterson Movant").

[3]     On January 2, 2025, the Court entered an order [Docket No. 769] (the "Deputies Order") approving a stipulation as to the Deputies Objection (the "Deputies Stipulation") which, in part, provides that the relief sought in the Motion does not extend the automatic stay to the Deputies' continuation of the underlying litigation for the sole purpose of litigating whether the doctrine of official immunity under Georgia state law requires dismissal of such claims against the Deputies.  Furthermore, the Deputies Stipulation provides that entry of the Deputies Order resolves the Deputies Objection, and any other relief sought in the Deputies Objection shall be deemed denied and any other objections to the Motion shall be deemed overruled.

[4]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Seitz Declaration.

true transfer of risk.  Accordingly, all damages and defense costs related to the underlying lawsuits are borne solely by the Debtors under such fronting policies.  The next layer of the Debtors' third-party insurance coverage (the umbrella coverage described herein) requires the Debtors to expend millions of dollars per claim before transferring any liability to third-party insurers. Moreover, as described herein, all third-party umbrella insurance coverage has been exhausted for the 2018-2020 period and the Debtors are solely responsible for paying for **all** claims made during this period that have not already been liquidated.

3.      As a result, this Court's approval of the Lift Stay Motions will necessitate the immediate expenditure by the Debtors of significant estate resources to defend against a slew of lawsuits. Such expenditure is compounded when realizing that the Debtors' defense costs also extend to various other non-debtor defendants, such as employees and professional corporations, implicated by the lawsuits underlying the Lift Stay Motions.  The Debtors suspect that this Court's approval of the Lift Stay Motions would only lead to more plaintiffs filing similar motions for stay relief, which if also granted, will only further compound the cost to the Debtors' estates.  Indeed, numerous other motions requesting relief from the automatic stay have already been filed with this Court and are scheduled for hearing at subsequent dates.  The Debtors' in-house litigation team has already been stretched thin by the numerous requests for modification of the automatic stay currently pending before this Court, particularly given the other demands placed upon such employees from these chapter 11 cases.

4.      The Debtors recognize the stress and uncertainty that Movants endure due to the imposition of the automatic stay and the resulting postponement of litigation of their claims.  Such postponement, however, will be limited in light of the fact that the Debtors are seeking to accomplish their reorganization expeditiously.  The delay of financial relief, cited by many of the

3

Movants, does not constitute an "extraordinary circumstance" necessary to justify relief from the automatic stay. Indeed, similar delay is present in nearly every chapter 11 case. Ultimately, the Debtors contend that any hardship endured by the Movants is far outweighed by the prejudice and detriment to the Debtors' estates.

5.     The Debtors believe that a comprehensive restructuring is in the best interests of the Debtors' creditors, including tort claimants such as the Movants. The automatic stay is designed to provide the debtors the time and space they need to negotiate, solicit, confirm, and consummate a plan, while also protecting creditors from the proverbial "race to the courthouse" by similarly situated claimants. Without the automatic stay, the Debtors' ability to efficiently conduct their businesses and operations during the pendency of the chapter 11 cases would be threatened, and the creditors losing the "race to the courthouse" would be materially impaired. Terminating the automatic stay's breathing spell and forcing the Debtors to fund substantial litigation defense costs would be value-destructive and could jeopardize and unnecessarily delay the Debtors' restructuring efforts.

6.     For such reasons and the reasons set forth herein, the Lift Stay Motions should be denied.

## **BACKGROUND**

### I.     **The Chapter 11 Cases**

7.     On November 11, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court"). The Debtors are operating their businesses and managing their property as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

4

8.      On November 12, 2024, the Debtors filed with this Court an *Emergency Motion for Entry of Interim and Final Orders to Enforce the Automatic Stay or in the Alternative Extend the Automatic Stay to Non-Debtor Defendants* [Docket No. 17] (the "Stay Extension Motion").  As set forth in the Stay Extension Motion, the Debtors and various non-debtor defendants had approximately 1,500 lawsuits and pre-suit demands outstanding against them as of the Petition Date, the vast majority of which concern the quality of medical care provided to incarcerated individuals.  *See* Stay Extension Motion, ¶ 1.  In part, the Stay Extension Motion sought to extend the Automatic Stay to lawsuits involving certain Non-Debtor Defendants (as defined in the Stay Extension Motion) with a substantial identity of interest with the Debtors.  *Id*. at ¶ 2.

9.      On November 12, 2024, the Court entered the *Amended Interim Order Enforcing the Automatic Stay* [Docket No. 69] (the "Interim Stay Extension Order") pursuant to which the Lawsuits (as defined in the Stay Extension Motion) were stayed in their entirety, including Plaintiff's claims against the Non-Debtor Defendants (as defined in the Stay Extension Motion) on an interim basis pursuant to section 362 of the Bankruptcy Code.

10.     On November 14, 2024, the Court entered the *Amended Order (I) Authorizing the Debtors to (A) Honor and Incur Obligations to Professional Corporations and (B) Obtain New Professional Corporation Contracts, (II) Extending Statutory Protections to Professional Corporations, and (III) Granting Related Relief* [Docket No. 91] (the "PC Order").

11.     On November 25, 2024, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed an official committee in the chapter 11 cases (the "Committee"). *See Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 169].  To date, no trustee or examiner has been appointed in the chapter 11 cases.

II.     **The Debtors' Insurance**

12.     In the ordinary course of business, the Debtors have obtained fronting policies from third-party insurers (each a "<u>Fronting Policy</u>," and collectively, the "<u>Fronting Policies</u>"), which renew annually and do not establish any true risk transfer.  The third-party insurers make no payments on account of the Fronting Policies.  Instead, the Debtors utilize these fronting arrangements to meet their customers' evidence of coverage requirements.  For example, the Debtors frequently contract with various state and local governments, many of which require proof of insurance from a licensed or authorized non-admitted insurer.  While the Fronting Policies allow the Debtors to meet the requirements to provide healthcare services to their customers, such policies do not transfer any risk to the insurance companies underwriting the policies.

13.     The Debtors also enter into various umbrella policies, which provide coverage for claims in excess of the Debtors' self-insured retention ("<u>SIR</u>").[5]  Accordingly, with respect to general liability and professional liability, the Debtors retain risk for claims made in each coverage period.

A.     **The 2018-2020 Insurance Policies**

14.     From 2018-2020, the Debtors obtained various general liability and medical professional liability insurance policies, including those described herein.  During this coverage period, the Debtors reported, litigated, and settled various claims made under these policies.  As of the time of the filing of this Objection, all umbrella insurance coverage has been exhausted for

---

[5]     This Objection outlines only the first layers of insurance coverage relevant to the Lift Stay Motions.  A summary of the full coverage towers for each policy period is outlined in the Seitz Declaration.  *See* Seitz Decl., ¶ 11–29; Ex. A.  In all circumstances, however, such umbrella policies have not been triggered or, in the case of the 2018-2020 Umbrella Policy (as defined herein), have been completely exhausted with no remaining available proceeds.

the 2018-2020 period.  *See* Seitz Decl., ¶ 11.  Accordingly, the Debtors must self-fund for **all** claims made during this period that have not already been liquidated.  *Id.*

15.    Debtor CCS-CMGC Parent Holdings, LP holds a claims-made fronting policy that was in effect from December 15, 2018, through March 15, 2020, and was issued by ProAssurance Specialty Insurance Company, Inc. ("ProAssurance," and such policy, the "2018-2020 Fronting Policy").[6]  The Debtors and their employees, as well as the non-debtor professional corporations and their employees, were covered by the 2018-2020 Fronting Policy.  *See* 2018-2020 Fronting Policy, Health Care Facility Liability Policy Reimbursement Form General Liability Coverage Part § I (listing employees acting in the scope of their employment by the policyholder or a covered subsidiary as an insured); *see also* Seitz Decl., ¶ 6.

16.    The 2018-2020 Fronting Policy read in its entirety shows that no liability is transferred to ProAssurance; rather, the Debtors are first required to pay $2 million for each and every claim under the 2018-2020 Fronting Policy.  *See* 2018-2020 Fronting Policy, ¶ 5–6 (listing per claim SIR coverage of up to $2,000,000 and "Condition Precedent to Policy Benefits" as $23,500,000); Health Care Facility Liability Policy Reimbursement Form General Conditions § I ("If a Condition Precedent to Policy Benefits is shown in the Coverage Summary, our liability arises only after the policyholder has paid damages and defense costs in an amount equal to the Condition Precedent to Policy Benefits."); *see also* Seitz Decl., ¶ 12.  In other words, the Debtors fully retain the risk to pay claims made under the 2018-2020 Fronting Policy, and ProAssurance is not liable for, and does not pay, any claims made pursuant to this policy.  *See* 2018-2020 Fronting Policy, ¶ 5–6; *see also* Seitz Decl., ¶ 11.  Accordingly, damage and defense costs accrued

---

[6]    Due to various confidentiality concerns, the insurance agreements referenced herein have been designated as confidential and are not attached hereto.  The Debtors, however, have provided copies of all insurance policies referenced herein to the Committee's advisors on December 30, 2024.  Moreover, the Debtors will provide copies of such policies to the Court upon request for the Court's review.

in connection with the underlying actions covered by the 2018-2020 Fronting Policy are borne solely by the Debtors.

17.     Debtor CCS-CMGC Parent Holdings, LP also holds a claims-made umbrella policy that was in effect from December 15, 2018, through March 15, 2020, and underwritten by ProAssurance (the "2018-2020 Umbrella Policy," and together with the 2018-2020 Fronting Policy, the "2018-2020 Insurance Policies").   The 2018-2020 Umbrella Policy provides that ProAssurance's liability for defense costs, damages, judgments, and settlements arising from any single claim applies only in excess of the Debtors' $2 million SIR paid pursuant to the 2018-2020 Fronting Policy for each and every claim.  *See* 2018-2020 Umbrella Policy, Health Care Facility Excess Umbrella Liability Policy General Conditions, ¶ 1; Schedule of Primary Coverage; *see also* Seitz Decl., ¶ 12.[7]  As a result, the Debtors' third-party coverage only applies after $2 million is paid by the Debtors on account of each claim and is exhausted after $10 million in the aggregate. The 2018-2020 Umbrella Policy, however, has been exhausted, meaning there are no insurance proceeds remaining under this policy, and the Debtors are solely responsible for, and fully fund, any open claims made during this period.  *See* Seitz Decl., ¶ 11.

**B.     The 2020-2021 Insurance Policies**

18.     Debtor CCS-CMGC Parent Holdings, LP holds a claims-made fronting policy that was in effect from March 15, 2020, through March 15, 2021, and was issued by ProAssurance (the "2020-2021 Fronting Policy").   The Debtors and their employees, as well as non-debtor professional corporations and their employees, were covered by the 2020-2021 Fronting Policy. *See* 2020-2021 Fronting Policy, Health Care Facility Liability Policy Reimbursement Form

---

[7]     Moreover, the 2018-2020 Umbrella Policy only covers $10 million per occurrence and $10 million in the aggregate.  *See* 2018-2020 Umbrella Policy, Health Care Facility Excess Umbrella Liability Policy Coverage Summary, ¶ 5; *see also* Seitz Decl., ¶ 12.

General Liability Coverage Part § I (listing employees acting in the scope of their employment by the policyholder or a covered subsidiary as an insured); *see also* Seitz Decl., ¶ 6.

19.     The 2020-2021 Fronting Policy read in its entirety shows that no liability is transferred to ProAssurance; rather, the Debtors are first required to pay $3 million for each and every claim under the 2020-2021 Fronting Policy. *See* 2020-2021 Fronting Policy, ¶ 5–6 (listing per claim SIR of up to $3,000,000 and "Condition Precedent to Policy Benefits" is $23,500,000); Health Care Facility Liability Policy Reimbursement Form General Conditions § I ("If a Condition Precedent to Policy Benefits is shown in the Coverage Summary, our liability arises only after the policyholder has paid damages and defense costs in an amount equal to the Condition Precedent to Policy Benefits."); *see also* Seitz Decl., ¶ 14. Again, the Debtors fully retain the risk to pay claims made under the 2020-2021 Fronting Policy, and ProAssurance is not liable for, and does not pay, any claims made pursuant to this policy. *See* 2020-2021 Fronting Policy, ¶ 5–6; *see also* Seitz Decl., ¶ 15. Accordingly, damage and defense costs accrued in connection with the underlying actions covered by the 2020-2021 Fronting Policy are borne solely by the Debtors.

20.     Debtor CCS-CMGC Parent Holdings, LP also holds a claims-made umbrella policy that was in effect from March 15, 2020, through March 15, 2021, and underwritten by ProAssurance (the "2020-2021 Umbrella Policy," and together with the 2020-2021 Fronting Policy, the "2020-2021 Insurance Policies"). The 2020-2021 Umbrella Policy provides that ProAssurance's liability for defense costs, damages, judgments, and settlements arising from any single claim applies only in excess of the Debtors' $3 million SIR paid pursuant to the 2020-2021 Fronting Policy for each and every claim. *See* 2020-2021 Umbrella Policy, Health Care Facility Excess Umbrella Liability Policy General Conditions, ¶ 1; Schedule of Primary Coverage; *see also*

Seitz Decl., ¶ 14.[8]  Accordingly, the Debtors' third-party coverage only applies after $3 million is paid by the Debtors on account of each claim and is exhausted after $5 million in aggregate payments are made.

### C.    The 2021-2022 Insurance

21.    Debtor CCS-CMGC Parent Holdings, LP holds a claims-made fronting policy that was in effect from March 15, 2021, through March 15, 2022, and was issued by Texas Insurance Company (the "2021-2022 Fronting Policy").  The Debtors and their employees, as well as non-debtor professional corporations and their employees, were covered by the 2021-2022 Fronting Policy.  *See* 2021-2022 Fronting Policy, Health Care Facility Liability Policy General Liability Coverage Part § I (listing employees acting in the scope of their employment by the policyholder or a covered subsidiary as an insured); *see also* Seitz Decl., ¶ 6.

22.    The 2021-2022 Fronting Policy read in its entirety shows that no liability is transferred to Texas Insurance Company; rather, the Debtors are first required to pay $3 million for each and every claim under the 2021-2022 Fronting Policy.  *See* 2021-2022 Fronting Policy, ¶ 5–6 (listing per claim SIR coverage of up to $3,000,000 and "Condition Precedent to Policy Benefits" as $10,000,000); Health Care Facility Liability Policy Reimbursement Form General Conditions § I ("If a Condition Precedent to Policy Benefits is shown in the Coverage Summary, our liability arises only after the policyholder has paid damages and defense costs in an amount equal to the Condition Precedent to Policy Benefits."); *see also* Seitz Decl., ¶ 17.  As a result, the Debtors fully retain the risk to pay claims made under the 2021-2022 Fronting Policy, and Texas Insurance Company is not liable for, and does not pay, any claims made pursuant to this policy.

---

[8]    The 2020-2021 Umbrella Policy covers $5 million per occurrence and $5 million in the aggregate.  *See* 2020-2021 Umbrella Policy, Health Care Facility Excess Umbrella Liability Policy Coverage Summary, ¶ 5.

*See* 2021-2022 Fronting Policy, ¶ 5–6; *see also* Seitz Decl., ¶ 18.  Accordingly, damage and defense costs accrued in connection with the underlying actions covered by the 2021-2022 Fronting Policy are borne solely by the Debtors.

23.     The Debtors' next layer of insurance coverage is a layer of $5 million per claim pure SIR (the "2021-2022 Buffer SIR").  *See* Seitz Decl., ¶ 7, 17.  Pursuant to the 2021-2022 Buffer SIR, the Debtors are responsible for covering the next $5 million for each and every claim. *Id.* at ¶ 17.

24.     Debtor CCS-CMGC Parent Holdings, LP also holds a claims-made umbrella policy that was in effect from March 15, 2021, through March 15, 2022, and underwritten by Scottsdale Insurance Company ("Scottsdale," and such policy, the "2021-2022 Umbrella Policy," and together with the 2021-2022 Fronting Policy and the 2021-2022 Buffer SIR, the "2021-2022 Insurance Policies").  The 2021-2022 Umbrella Policy provides that Scottsdale's liability for defense costs, damages, judgments, and settlements arising from any single claim applies only in excess of the Debtors' $8 million SIR for each and every claim.[9]  *See* 2021-2022 Umbrella Policy, Endorsement No. 1.[10]  Accordingly, the Debtors' third-party coverage only applies after $8 million is paid by the Debtors on account of each claim and is exhausted after $3 million is paid in the aggregate.

**D.     The 2022-2023 Insurance Policies**

25.     Debtor CCS-CMGC Parent Holdings, LP holds a claims-made fronting policy that was in effect from March 15, 2022 through March 15, 2023, and was issued by Texas Insurance

---

[9]     The $8 million SIR is comprised of the Debtors' responsibility to self-fund (i) $3 million per claim pursuant to the 2021-2022 Fronting Policy and (ii) $5 million per claim pursuant to the 2021-2021 Buffer SIR.  *See* Seitz Decl., ¶ 17.

[10]    The 2021-2022 Umbrella Policy covers $3 million per claim and $3 million in the aggregate.  *See* 2021-2022 Umbrella Policy, Health Care Facility Excess Umbrella Liability Policy Coverage Summary, Item 4; *see also* Seitz Decl., ¶ 17.

Company (the "<u>2022-2023 Fronting Policy</u>").  The Debtors and their employees, as well as non-debtor professional corporations and their employees, were covered by the 2022-2023 Fronting Policy.  *See* 2022-2023 Fronting Policy, Health Care Facility Liability Policy General Liability Coverage Part § I (listing employees acting in the scope of their employment by the policyholder or a covered subsidiary as an insured); *see also* Seitz Decl., ¶ 6.

26.     The 2022-2023 Fronting Policy read in its entirety shows that no liability is transferred to Texas Insurance Company; rather, the Debtors are first required to pay $3 million for each and every claim under the 2022-2023 Fronting Policy.  *See* 2022-2023 Fronting Policy, ¶ 5–6 (listing per claim coverage of up to $3,000,000 and "Condition Precedent to Policy Benefits" as $6,000,000); Health Care Facility Liability Policy Reimbursement Form General Conditions § I ("If a Condition Precedent to Policy Benefits is shown in the Coverage Summary, our liability arises only after the policyholder has paid damages and defense costs in an amount equal to the Condition Precedent to Policy Benefits."); *see also* Seitz Decl., ¶ 20.  In other words, the Debtors fully retain the risk to pay claims made under the 2022-2023 Fronting Policy, and Texas Insurance Company is not liable for, and does not pay, any claims made pursuant to this policy. *See* 2022-2023 Fronting Policy, ¶ 5–6; *see also* Seitz Decl., ¶ 20.  Accordingly, damage and defense costs accrued in connection with the underlying actions covered by the 2022-2023 Fronting Policy are borne solely by the Debtors.

27.     The Debtors' next layer of insurance coverage is a layer of $5 million per claim pure SIR (the "<u>2022-2023 Buffer SIR</u>").  *See* Seitz Decl., ¶ 7, 20.  Pursuant to the 2022-2023 Buffer SIR, the Debtors are responsible for covering the next $5 million per each and every claim. *Id.* at ¶ 20.

28.     Debtor CCS-CMGC Parent Holdings, LP also holds a claims-made umbrella policy that was in effect from March 15, 2022, through March 15, 2023, and underwritten by Scottsdale (the "2022-2023 Umbrella Policy," and together with the 2022-2023 Fronting Policy and the 2022-2023 Buffer SIR, the "2022-2023 Insurance Policies").  The 2022-2023 Umbrella Policy clearly states that Scottsdale's liability for defense costs, damages, judgments, and settlements arising from any single claim applies only in excess of the Debtors' $8 million SIR for each and every claim.[11]  *See* 2022-2023 Umbrella Policy, Endorsement No. 1.[12]  Accordingly, the Debtors' third-party coverage only applies after $8 million is paid by the Debtors on account of each claim and is exhausted after $3 million is paid in the aggregate.

### E.     The 2023-2024 Insurance Policies

29.     Debtor CCS-CMGC Parent Holdings, LP holds a claims-made fronting policy that was in effect from March 15, 2023, through March 15, 2024, and was issued by Texas Insurance Company (the "2023-2024 Fronting Policy").  The Debtors and their employees, as well as non-debtor professional corporations and their employees, were covered by the 2023-2024 Fronting Policy.  *See* 2023-2024 Fronting Policy, Health Care Facility Liability Policy General Liability Coverage Part § I (listing employees acting in the scope of their employment by the policyholder or a covered subsidiary as an insured); *see also* Seitz Decl., ¶ 6.

30.     The 2023-2024 Fronting Policy read in its entirety shows that no liability is transferred to Texas Insurance Company; rather, the Debtors are first required to pay $3 million for each and every claim under the 2023-2024 Fronting Policy.  *See* 2023-2024 Fronting Policy,

---

[11]   The $8 million SIR is comprised of the Debtors' responsibility to self-fund (i) $3 million per claim pursuant to the 2022-2023 Fronting Policy and (ii) $5 million per claim pursuant to the Debtors' $5 million 2022-2023 Buffer SIR layer.  *See* Seitz Decl., ¶ 20.

[12]   The 2022-2023 Umbrella Policy covers $3 million per claim and $3 million in the aggregate.  *See* 2022-2023 Umbrella Policy, Health Care Facility Excess Umbrella Liability Policy Coverage Summary, Item 4; *see also* Seitz Decl., ¶ 20.

¶ 5–6 (listing per claim coverage of up to $3,000,000 SIR and "Condition Precedent to Policy Benefits" as $6,000,000); Health Care Facility Liability Policy Reimbursement Form General Conditions § I ("If a Condition Precedent to Policy Benefits is shown in the Coverage Summary, our liability arises only after the policyholder has paid damages and defense costs in an amount equal to the Condition Precedent to Policy Benefits."); *see also* Seitz Decl., ¶ 24.  As a result, the Debtors fully retain the risk to pay claims made under the 2023-2024 Fronting Policy, and Texas Insurance Company is not liable for, and does not pay, any claims made pursuant to this policy. *See* 2023-2024 Fronting Policy, ¶ 5–6; *see also* Seitz Decl., ¶ 25.  Accordingly, damage and defense costs accrued in connection with the underlying actions covered by the 2023-2024 Fronting Policy are borne solely by the Debtors.

31.     The Debtors' next layers of insurance coverage are a layer of $5 million per claim pure SIR (the "2023-2024 Buffer SIR") and a captive policy covering $7 million per claim (the "2023-2024 Captive Policy").  *See* Seitz Decl., ¶ 24.  Pursuant to the 2023-2024 Buffer SIR, the Debtors are responsible for covering the next $5 million for each and every claim.  *Id.*  Under the 2023-2024 Captive Policy, the Debtors are responsible for covering the next $7 million per claim.  Therefore, the Debtors' 2023-2024 Fronting Policy, 2023-2024 Buffer SIR, and 2023-2024 Captive Policy constitute $15 million of SIR coverage.

32.     Debtor CCS-CMGC Parent Holdings, LP also holds a claims-made umbrella policy that was in effect from March 15, 2023, through March 15, 2024, and underwritten by AXA XL Insurance Company Ltd ("AXA," and such policy, the "2023-2024 Umbrella Policy," and together with the 2023-2024 Fronting Policy, the 2023-2024 Buffer SIR, and the 2023-2024 Captive Policy, the "2023-2024 Insurance Policies").  The 2023-2024 Umbrella Policy clearly states that AXA's liability for defense costs, damages, judgments, and settlements arising from any single claim

14

applies only in excess of the Debtors' $15 million SIR for each and every claim.[13] *See* 2023-2024 Umbrella Policy, at Item 4, § 2.3.[14] Accordingly, the Debtors' third-party coverage only applies after $15 million is paid by the Debtors on account of each claim and is exhausted after $5 million is paid in the aggregate.

**F. The 2024-2025 Insurance Policies**

33. Debtor CCS-CMGC Parent Holdings, LP holds a claims-made fronting policy that is in effect from February 28, 2024, through February 28, 2025, and was issued by Texas Insurance Company (the "2024-2025 Fronting Policy"). The Debtors and their employees, as well as non-debtor professional corporations and their employees, are covered by the 2024-2025 Fronting Policy. *See* 2024-2025 Fronting Policy, Health Care Facility Liability Policy General Liability Coverage Part § I (listing employees acting in the scope of their employment by the policyholder or a covered subsidiary as an insured); *see also* Seitz Decl., ¶ 6.

34. The 2024-2025 Fronting Policy read in its entirety shows that no liability is transferred to Texas Insurance Company; rather, the Debtors are first required to pay $3 million for each and every claim under the 2024-2025 Fronting Policy. *See* 2024-2025 Fronting Policy, ¶ 5–6 (listing per claim coverage of up to $3,000,000 and "Condition Precedent to Policy Benefits" as $6,000,000); Health Care Facility Liability Policy Reimbursement Form General Conditions § I ("If a Condition Precedent to Policy Benefits is shown in the Coverage Summary, our liability arises only after the policyholder has paid damages and defense costs in an amount equal to the Condition Precedent to Policy Benefits."); *see also* Seitz Decl., ¶ 27. Thus, the Debtors fully retain

[13] The $15 million SIR is comprised of the Debtors' responsibility to self-fund (i) $3 million per claim pursuant to the 2023-2024 Fronting Policy, (ii) $5 million per claim pursuant to the Debtors' $5 million 2023-2024 SIR Buffer layer, and (iii) $7 million per claim pursuant to the Debtors' 2023-2024 Captive Policy. *See* Seitz Decl., ¶ 24.

[14] The 2023-2024 Umbrella Policy covers $5 million per claim and $5 million in the aggregate. *See* 2023-2024 Umbrella Policy, Risk Details, Limit of Liability; *see also* Seitz Decl., ¶ 24.

the risk to pay claims made under the 2024-2025 Fronting Policy, and Texas Insurance Company is not liable for, and does not pay, any claims made pursuant to this policy. *See* 2024-2025 Fronting Policy, ¶ 5–6; *see also* Seitz Decl., ¶ 28. Accordingly, damage and defense costs accrued in connection with the underlying actions covered by the 2024-2025 Fronting Policy are borne solely by the Debtors.

35.     The Debtors' next layers of insurance coverage are a layer of $5 million per claim pure SIR (the "2024-2025 Buffer SIR") and a captive policy covering $7 million per claim (the "2024-2025 Captive Policy"). *See* Seitz Decl., ¶ 27. Pursuant to the 2024-2025 Buffer SIR, the Debtors are responsible for covering the next $5 million for each and every claim. *Id.* Under the 2024-2025 Captive Policy, the Debtors are responsible for covering the next $7 million per claim. *Id.* Therefore, the Debtors' 2024-2025 Fronting Policy, 2024-2025 Buffer SIR, and 2024-2025 Captive Policy essentially constitute $15 million of SIR coverage.

36.     Debtor CCS-CMGC Parent Holdings, LP also holds a claims-made umbrella policy that is in effect from February 28, 2024, through February 28, 2025, and underwritten by AXA (the "2024-2025 AXA Umbrella Policy," and together with the 2024-2025 Fronting Policy, the 2024-2025 Buffer SIR, and the 2024-2025 Captive Policy, the "2024-2025 Insurance Policies"). The 2024-2025 AXA Umbrella Policy clearly states that AXA's liability for defense costs, damages, judgments, and settlements arising from any single claim applies only in excess of the Debtors' $15 million SIR for each and every claim.[15] *See* 2024-2025 AXA Umbrella Policy, at Item 5, § 2.3.[16] Accordingly, the Debtors' third-party coverage only applies after $15 million is

---

[15]     The $15 million SIR is comprised of the Debtors' responsibility to self-fund (i) $3 million per claim pursuant to the 2024-2025 Fronting Policy, (ii) $5 million per claim pursuant to the Debtors' $5 million 2024-2025 SIR Buffer layer, and (iii) $7 million per claim pursuant to the Debtors' 2024-2025 Captive Policy. *See* Seitz Decl., ¶ 27.

[16]     The 2024-2025 Umbrella Policy covers $7 million per claim and $7 million in the aggregate. *See* 2024-2025 Umbrella Policy, Risk Details, Limit of Liability; *see also* Seitz Decl., ¶ 27.

paid by the Debtors on account of each claim and is exhausted after $7 million is paid in the aggregate.

### III.    The Lift Stay Motions

#### A.    The Myers Motion

37.    The Myers Motion was filed on November 26, 2024.  The Myers Movant seeks to lift the automatic stay to prosecute a state court action pending in Circuit Court of the 11th Judicial Circuit, in and for Miami-Dade County, Florida, in the case styled *Gracienne Myers and Daniel Myers vs TB Isle Resort LP*, Case No.: 2023-24472 CA 01 (the "Myers State Court Action"), that arose on or around April 27, 2023, against non-Debtor TB Isle Resort LP (the "Resort"), Debtor 901 45th Street West Palm Beach Florida Behavioral Health Hospital Company, LLC ("901 45th Street"), and the Debtor's employee, Tarika Wynds ("Wynds").  The Movants initiated the Myers State Court Action against the Resort on October 16, 2023, and amended their complaint to join Debtor 901 45th Street and Wynds on October 1, 2024.

38.    On December 16, 2024, this Court entered an order [Docket No. 460] (the "Myers Order") approving a stipulation (the "Myers Stipulation") as to the *Claimants' Gracienne Myers' and Daniel Myers Objection to Entry of a Final Order on Debtors' Emergency Motion for Entry of Interim and Final Orders to Enforce the Automatic Stay or in the Alternative Extend the Automatic Stay to Non-Debtor Defendants* [Docket No. 220] (the "Myers Objection") which, in part, provides that the automatic stay does not extend to claims or causes of action against the Resort.

39.    The insurance policies relevant to the Myers Motion covering Debtor 901 45th Street and Wynds during the relevant period are the 2023-2024 Insurance Policies, described in paragraphs 29 through 32 of this Objection.  *See* Seitz Decl., ¶ 26.  As the Debtors fully retain the risk with respect to claims under the 2023-2024 Fronting Policy, the 2023-2024 SIR Buffer, and

the 2023-2024 Captive Policy, the Debtors are responsible for damages and defense costs for both the Debtor and Wynds until reaching the required $15 million SIR. Wynds is a Non-Debtor Defendant protected by the Interim Stay Extension Order and the Myers Motion should be denied both to the Debtor and employee Wynds.

**B.      The Monk Motion**

40.      The Monk Motion was filed on December 3, 2024. The Monk Movant seeks to lift the automatic stay so that he may prosecute an action pending in the United States District Court for the Northern District of California, in the case styled *Estate of Monk v. Alameda County, et al.*, Case No. 22-cv-04037-TSH (the "Monk District Court Action"), asserting claims pursuant to 42 U.S.C. § 1983 ("1983 Claims") against Debtor Wellpath LLC ("Wellpath").[17] The Monk Movant initiated the Monk District Court Action on July 11, 2022.

41.      The insurance policies held by the Debtors relevant to the Monk Motion are the 2021-2022 Insurance Policies, described in paragraphs 21 through 24 of this Objection. *See* Seitz Decl., ¶ 19. As the Debtors fully retain risk with respect to claims under the 2021-2022 Fronting Policy and 2021-2022 Buffer SIR, the Debtors are responsible for damages and defense costs until reaching the required $8 million SIR.

42.      The Monk District Court Action should also be stayed as to California Forensic Medical Group, Inc. ("CFMG") and its employees. CFMG is a professional corporation to which the Debtors provide managerial services pursuant to that certain Assignment of Management Services Agreement (the "CFMG MSA") dated January 2019 and attached hereto as **Exhibit A**. Under the CFMG MSA, the Debtors are required to:

> [I]ndemnify, defend and hold harmless the Management Company,

---

[17]      Although the Monk Motion requests relief from the automatic stay as to Debtor Wellpath CFMG, Debtor Wellpath LLC is a defendant and is listed on the docket in the Monk District Court Action. Regardless, the Debtors' position is that the automatic stay should not be modified with respect to either Debtor.

its Affiliates and their respective directors, managers, officers, equity holders, employees, agents (including the Management Company Representative), successors and permitted assigns (collectively, the "Management Company Indemnified Parties") from and against all losses, liabilities, demands, claims, actions or causes of action, regulatory, legislative or judicial proceedings or investigations, assessments, levies, fines, penalties, damages, costs and expenses (including reasonable attorneys', accountants', investigators' and experts' fees and expenses) incurred in connection with the defense or investigation of any claim ("Damages") sustained or incurred by any Management Company Indemnified Party arising from or related to illegal activity, intentional misconduct, negligence or breach of this Agreement by the Company and its directors, managers, officers, equity holders, employees, agents, successors and permitted assigns (the "Company Indemnified Parties").

CFMG Management Services Agreement, § 7.1.   As a result, CFMG could assert an indemnification claim against the Debtors for any expenses incurred and damages ordered in connection with the Monk District Court Action.   Accordingly, CFMG and its employees are Non-Debtor Defendants protected by the Interim Stay Extension Order (as well as the PC Order) and the Monk Motion should be denied as to the Debtor, CFMG, and CFMG's employees.

### C.   The Harris Motion

43.   The Harris Motion was filed on December 4, 2024.[18]  The Harris Movant seeks to lift the automatic stay so that she may prosecute a state court action pending in the Pulaski County Circuit Court in Arkansas, in the case styled *Tangela Harris, Special Administrator of the Estate of Kevin Shelton, Deceased v. James Gibson, et al.*, Case No. 60CV-23-3195 (the "Harris State Court Action"), alleging state law claims against Debtor Wellpath LLC and certain of its employees.  The Harris Movant initiated the Harris State Court Action on May 4, 2023.

44.   The insurance policies held by Wellpath, covering itself and its employees, relevant

---

[18]   The Harris Motion is scheduled to be heard before this Court on January 21, 2024, at 9:00 a.m. (prevailing Central Time).  *See* Docket No. 431.

to the Harris Motion are the 2023-2024 Insurance Policies described in paragraphs 29 through 32 of this Objection.  *See* Seitz Decl., ¶ 26.  As the Debtors fully retain the risk with respect to such claims under the 2023-2024 Fronting Policy, the 2023-2024 the SIR Buffer, and the 2023-2024 the Captive Policy, the Debtors are responsible for damages and defense costs until reaching the required $15 million SIR.

45.     The Debtors' employees named as defendants in the Harris State Court Action are Non-Debtor Defendants protected by the Interim Stay Extension Order and the Harris Motion should be denied as to both the Debtor and such employees.

### D.     The Evans Motion

46.     The Evans Motion was filed on December 5, 2024.  The Evans Movants seeks to lift the automatic stay so that they may prosecute an action pending in the United States District Court for the Northern District of Illinois, in the case styled *Evans of Wellpath, LLC, et al.*, Case No. 23-cv-04248 (the "Evans District Court Action"), asserting 1983 Claims against Debtor Wellpath LLC and its employees.[19]  The Evans Movants filed the Evans District Court Action on June 30, 2023.

47.     The insurance policies covering Wellpath and its employees relevant to the Evans Motion are the 2022-2023 Insurance Policies described in paragraphs 25 through 28 of this Objection.  *See* Seitz Decl., ¶ 23.  As the Debtors fully retain the risk with respect to such claims under the 2022-2023 Fronting Policy and the 2022-2023 Buffer SIR, the Debtors are responsible for damages and defense costs until reaching the required $8 million SIR.

---

[19]   For the avoidance of doubt, the Debtors submit that the automatic stay applies to Wellpath's employees, Taryn Weiler, RN, Nicholas Papanos, MD, Kerry Ehlert-Donovan, LPN, and Consuelo Reyes, RN, pursuant to the Interim Stay Enforcement Order.  The Debtors do not seek to stay the Evans District Court Action as to any of the remaining defendants (Armor Correctional Health Service, Inc., Waukegan Illinois Hospital Company, LLC, Jared Baker, MD, Sara Ferrera, MD, Shahrukh Malghani, MD, Neil Puller, MD, American Physician Partners LLC, Tzvetan Naydenov, MD, Kenji Oyasu, MD, and Fiaz Amhed), as they are unrelated to the Debtors.

48.     Additionally, Wellpath is party to an agreement with Lake County, attached hereto as **Exhibit B** (the "Lake County Agreement"), whereby Wellpath has agreed to serve as the county's comprehensive health care and mental health services provider.  Pursuant to the Lake County Agreement, Wellpath is also required to:

> Indemnify, save harmless, and defend Lake County, its agents, servants, and employees, and each of them against and hold it and them harmless from any and all lawsuits, claims, demands, liabilities, losses and expenses, including court costs and attorney's fees, for or on account of any injury to any person, or any death at any time resulting from such injury, or any damage to property, which may arise or which may be alleged to have arisen out of or in connection with the work covered by this contract.

*See* Lake County Agreement, § 10.2.

49.     Accordingly, Wellpath's indemnification obligations to Lake County effectively render the Debtors the primary defendant for all claims relating to the provision of healthcare services in these disputes, making a judgment against Lake County a judgment against the Debtors on such claims.  As a result, Lake County, as well as the Debtor's employees, Taryn Weiler, Nicholas Papanos, Kerry Ehlert-Donovan, and Consuelo Reyes, are Non-Debtor Defendants protected by the Interim Stay Extension Order and the Evans Motion should be denied as to the Debtor, the Debtors' employees, and Lake County.

**E.     The Slater Motion**

50.     The Slater Motion was filed on December 5, 2024.  The Slater Movant seeks to lift the automatic stay so that she may prosecute an action pending in the United States District Court for the District of Colorado, in the case styled *Corey Slater v. Arapahoe County Detention Facility, et al.*, Case No. 24-cv-1681 (the "Slater District Court Action"), alleging various claims, including 1983 Claims and violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., against Debtor Wellpath LLC and its employee.  The Slater Movant initiated the Slater District

Court Action on June 17, 2024.

51.     The insurance policies held by Wellpath relevant to the Slater Motion are the 2024-2025 Insurance Policies described in paragraphs 33 through 36 of this Objection.  *See* Seitz Decl., ¶ 30.  As the Debtors fully retain the risk with respect to such claims under the 2024-2025 Fronting Policy, 2024-2025 SIR Buffer, and the 2024-2025 Captive Policy, the Debtors are responsible for damages and defense costs until reaching the required $15 million SIR.

52.     Additionally, Wellpath is party to an agreement with the Board of County Commissioners of the County of Arapahoe, State of Colorado, attached hereto as **Exhibit C** (the "Arapahoe County Agreement"), whereby Wellpath has agreed to administer healthcare services at the Arapahoe County Sheriff's Office Detention Facility.  Pursuant to the Arapahoe County Agreement, Wellpath is also required to:

> [I]ndemnify and hold harmless the County and its elected and appointed officials, officers, employees and agents, including but not limited to the Arapahoe County Sheriff and all employees of the Arapahoe County Sheriff's Office, from any and all losses. damages, liabilities, claims. suits, actions, or awards, including costs, expenses. and attorney's fees, incurred or occasioned, in whole or in part, as a result or the acts or omissions of [Wellpath], or its principals, employees, agents or subcontractors that arise out of, or are alleged to arise out of, [Wellpath's] performance of service under [the Arapahoe County Agreement]."

*See* Arapahoe County Agreement, Ex. A, § 7.H.1.

53.     Accordingly, Wellpath's indemnification obligations to Arapahoe County effectively render the Debtors the primary defendant for all claims relating to the provision of health care services in these disputes, making a judgment against the Arapahoe County a judgment against the Debtors on such claims. As a result, Arapahoe County is a Non-Debtor Defendant protected by the Interim Stay Extension Order and the Slater Motion should be denied both to the Debtor and to Arapahoe County.

22

### F.      The Henderson Motion

54.      The Henderson Motion was filed on December 10, 2024.[20]  The Henderson Movant seeks to lift the automatic stay so that it may prosecute an action pending in the United States District Court for the Western District of Pennsylvania, in the case styled *Henderson v. Correct Care Solutions, Inc et al.*, Case No. 2:23-cv-01224 (the "Henderson District Court Action"), asserting 1983 Claims against Debtor Wellpath LLC (f/k/a Correct Care Solutions) and its employee, Dr. Michael Herbik.  The Henderson Movant initiated the Henderson District Court Action on July 6, 2022.

55.      The insurance policies held by Wellpath relevant to the Henderson Motion are the 2023-2024 Insurance Policies described in paragraphs 29 through 32 of this Objection.  *See* Seitz Decl., ¶ 26.  As the Debtors fully retain the risk with respect to such claims under the 2023-2024 Fronting Policy, the 2023-2024 Buffer SIR, and the 2023-2024 Captive Policy, the Debtors are responsible for damages and defense costs until reaching the required $15 million SIR.

56.      Additionally, Dr. Herbik is covered by a claims-made medical professional liability insurance policy issued by the Pennsylvania Professional Liability Joint Underwriting Association ("PAJUA") that was in effect from March 15, 2022, through March 15, 2023 attached hereto as **Exhibit D** (the "Herbik PAJUA Policy").  The Debtors purchased this policy and split the defense costs, and any settlement or judgment costs, with PAJUA for suits involving Dr. Herbik that are covered by the Herbik PAJUA Policy.  *See* Seitz Decl., ¶ 22.  Accordingly, the Debtors incur legal expenses in connection with Dr. Herbik's defense.  As a result, Dr. Herbik is a Non-Debtor Defendant protected by the Interim Stay Extension Order and the Henderson Motion should be

---

[20]   The Henderson Motion alleges that the Henderson Movant was not served notice of the Court's *Amended Interim Order Enforcing the Automatic Stay* [Docket No. 17] (the "Interim Stay Enforcement Order").  Henderson Motion, ¶ 7.  The Debtors' claims and noticing agent has confirmed, however, that the Henderson Movant was timely served the Interim Stay Enforcement Order on November 18, 2024.

denied both to the Debtor and to Dr. Herbik.[21]

### G.   The Crawford Motion

57.     The Crawford Motion was filed on December 11, 2024.  The Crawford Movant seeks to lift the automatic stay so that it may prosecute an action pending in the United States District Court for the Eastern District of Kentucky, in the case styled *Dawn Crawford, in her capacity as Administratrix of the Estate of Marc Crawford v. John Tilley, et al.*, Case No. 5:18-cv-00623 (the "Crawford District Court Action"), asserting 1983 Claims against Debtor Wellpath LLC (f/k/a Correct Care Solutions, LLC), four of its employees, and Kentucky State Reformatory.[22]   The Crawford Movant initiated the Crawford District Court Action on July 6, 2022.

58.     The insurance policies covering Wellpath and its employees relevant to the Crawford Motion are the 2018-2020 Insurance Policies, described in paragraphs 14 through 17 of this Objection.  *See* Seitz Decl., ¶ 13.  Because the 2018-2020 Umbrella Policy has been exhausted and there are no insurance proceeds remaining under this policy, the Debtors are solely responsible for, and must fully fund, any open claims made pursuant to the Crawford Motion, which were made during the 2018-2020 period.

59.     Additionally, Wellpath is party to an agreement with the Commonwealth of Kentucky Department of Corrections, attached hereto as **Exhibit E** (the "Kentucky Agreement"),

---

[21]   The Henderson Motion further alleges that the Henderson Movant "may be prejudiced by the Chapter 11 restructuring plan between debtor(s) and trustee."  Henderson Motion, ¶ 12.  While such allegations are not relevant to this Court's consideration of the Henderson Motion's request to modify the automatic stay, the Henderson Movant is not prevented from objecting to the Debtors' plan of reorganization at the appropriate time.

[22]   The Crawford Movant also asserts separate claims against Madison County Detention Center, and employees thereof.  For the avoidance of doubt, the Debtors submit that they owe no indemnification obligations to these defendants and that separate and distinct causes of action have been asserted against them by the Crawford Movant.  As a result, the automatic stay does not apply to Madison County Detention Center and their employees, and such defendants are not Non-Debtor Defendants protected by the Interim Stay Extension Order.

whereby Wellpath has agreed to serve as the Department of Corrections' comprehensive health care and mental health services provider. Pursuant to the Kentucky Agreement, Wellpath is also required to "indemnify, defend and hold KYDOC harmless from and against any and all claims against KYDOC based on [Wellpath's] performance of its obligations hereunder." *See* Kentucky Agreement, at 7–8.

60.     Accordingly, Wellpath's indemnification obligations to the Commonwealth of Kentucky Department of Corrections effectively render the Debtors the primary defendant for all claims relating to the provision of healthcare services in these disputes, making a judgment against the Commonwealth of Kentucky Department of Corrections a judgment against the Debtors for such claims. As a result, the Commonwealth of Kentucky Department of Corrections and its employees, as well as the Debtors employees, are Non-Debtor Defendants protected by the Interim Stay Extension Order and the Crawford Motion should be denied as to the Debtor, the Debtors' employees and the Commonwealth of Kentucky Department of Corrections and the employees thereof.

**H.     The Lamboy Motion**

61.     The Lamboy Motion was filed on December 9, 2024. The Lamboy Movant seeks to lift the automatic stay so that it may prosecute an action pending in the United States District Court for the District of Massachusetts, in the case styled *Brandon Lamboy v. Wellpath LLC*, Case No. 1:24-cv-12572 (the "Lamboy District Court Action"), asserting defamation, wrongful termination, and negligence against Debtor Wellpath LLC. The Lamboy Movant initiated the Lamboy District Court Action on October 7, 2024.

62.     The insurance policies held by Wellpath that are relevant to the Lamboy Motion are the 2021-2022 Insurance Policies, described in paragraphs 21 through 24 of this Objection. *See* Seitz Decl., ¶ 19. As the Debtors fully retain the risk with respect to such claims under the

2021-2022 Fronting Policy, the Debtors are responsible for damages and defense costs until reaching the required $8 million SIR.  As a result, the Lamboy Motion should be denied as to Debtor Wellpath.

### I.      The Strickland Motion

63.     The Strickland Motion was filed on December 12, 2024.  The Strickland Movant seeks to lift the automatic stay so that it may prosecute an action pending in the United States District Court for the Eastern District of California, in the case styled *Estate of Gabriel Strickland et al. v. Nevada County et al.*, Case No. 2:21-cv-00175 (the "Strickland District Court Action"), asserting 1983 Claims against Debtor Wellpath Management, Inc.,[23] two of its employees, Nevada County, California, and one of its officers.  The Strickland Movant initiated the Strickland District Court Action on January 28, 2021.

64.     The insurance policies covering Wellpath Management, Inc. and its employees relevant to the Strickland Motion are the 2020-2021 Insurance Policies described in paragraphs 18 through 20 of this Objection.  *See* Seitz Decl., ¶ 16.  As the Debtors fully retain the risk with respect to such claims under the 2020-2021 Fronting Policy, the Debtors are responsible for damages and defense costs for both the Debtor and the Debtors' employees until reaching the required $3 million SIR.

65.     Additionally, CFMG provides health care services to the County of Nevada pursuant to that certain Professional Services Agreement by and between the County of Nevada and California Forensic Medical Group, Inc. (the "2021 Nevada County Services Contract") dated January 1, 2021, and attached hereto as **Exhibit F**.  Pursuant to the Nevada County Services

---

[23]    Upon information and belief, the proper party to the Strickland District Court Action is California Forensic Medical Group, Inc. (or "CFMG"), one of the professional corporations, pursuant to which the Debtors contract with and provide various management and administrative services to professional entities (collectively, the "Professional Corporations").

Contract, CFMG is obligated to indemnify the County of Nevada and its employees:

> To the fullest extent permitted by law, each Party (the "Indemnifying Party") hereby agrees to protect, defend, indemnify, and hold the other Party (the "Indemnified Party"), its officers, agents, employees, and volunteers, free and harmless from any and all losses, claims, liens, demands, and causes of action of every kind and character resulting from the Indemnifying Party's negligent act, willful misconduct, or error or omission, including, but not limited to, the amounts of judgments, penalties, interest, court costs, legal fees, and all other expenses incurred by the Indemnified Party arising in favor of any party, including claims, liens, debts, personal injuries, death, or damages to property (including employees or property of the Indemnified Party) and without limitation, all other claims or demands of every character occurring or in any way incident to, in connection with or arising directly or indirectly out of, the Contract.  The Indemnifying Party agrees to investigate, handle, respond to, provide defense for, and defend any such claims, demand, or suit at the sole expense of the Indemnifying Party, using legal counsel approved in writing by Indemnified Party. . . . Indemnifying Party also agrees to bear all other costs and expenses related thereto, even if the claim or claims alleged are groundless, false, or fraudulent.

2021 Nevada County Services Contract, § 13.  Indeed, the County of Nevada tendered its defense in the Strickland District Court Action to CFMG, and CFMG accepted the tender as the claims relate to the provision of medical care at the County of Nevada facility.

66.     The Debtors provide managerial services to CFMG pursuant to the CFMG MSA, as described in paragraph 42 of this Objection.  As a result, the Debtors have indemnification obligations to CFMG and CFMG may assert an indemnification claim against the Debtors for any expenses incurred and damages ordered in connection with the Strickland District Court Action.

67.     Debtor Wellpath LLC, by and through the CFMG MSA, is obligated to indemnify CFMG for legal expenses it may incur as a result of providing services pursuant to the CFMG MSA.  CFMG, by and through the 2021 Nevada County Services Contract, is obligated to indemnify the County of Nevada and its employees for legal expenses it may incur as a result of providing services pursuant to the 2021 Nevada County Services Contract.  By virtue of the CFMG

27

MSA and the 2021 Nevada County Services Contract, the Debtors may ultimately be liable for the legal expenses incurred in connection with County of Nevada and its employee's defense.

68.     As a result, the County of Nevada, the County of Nevada's employee, California Forensic Medical Group, Inc., as well as the Debtors' employees, are Non-Debtor Defendants protected by the Interim Stay Extension Order and the Strickland Motion should be denied as to the Debtor, the Debtors' employees, the County of Nevada, the County of Nevada's employee, and California Forensic Medical Group, Inc.

**J.     The Peterson Motion**

69.     The Peterson Motion was filed on December 12, 2024.  The Peterson Movant seeks to lift the automatic stay so that it may proceed with its appeal pending in the Ninth Circuit Court of Appeals, in the case styled *John Peterson v. Nevada County, et al.*, Case No. 23-16146 (the "Peterson Appeal"), appealing the United States District Court for the Eastern District of California's decision to grant summary judgment to Nevada County, California and Nevada County Sheriff's Department and partial summary judgment to Debtor Wellpath Management, Inc. The Peterson Movant initiated the Peterson Appeal on August 28, 2023.

70.     The insurance policies covering Wellpath Management, Inc. relevant to the Peterson Motion are the 2018-2020 Insurance Policies described in paragraphs 14 through 17 of this Objection.  *See* Seitz Decl., ¶ 13.  As the Debtors' coverage for the period from 2018-2020 is exhausted, the Debtors are fully responsible for damages and defense costs on account of the Peterson Motion.

71.     Additionally, CFMG provided health care services to the County of Nevada pursuant to that certain Professional Services Contract by and between the County of Nevada and California Forensic Medical Group, Inc. (the "2016 Nevada County Services Contract") dated January 1, 2016, and attached hereto as **Exhibit G**.  Pursuant to the Nevada County Services

Contract, CFMG is obligated to indemnify the County of Nevada:

> Nothing herein shall be construed as a limitation of [Wellpath's] liability, and [Wellpath] shall indemnify, defend and hold harmless the County and its officers, officials, employees, agents and volunteers from any and all liabilities, claims, demands, damages, losses and expenses (including, without limitation, defense costs and attorney fees of litigation) which result from the negligent act, willful misconduct, or error or omission of [Wellpath], except such loss or damage which was caused by the sole negligence or willful misconduct of County or its officers, officials, employees, agents and volunteers.

2016 Nevada County Services Contract, § 13.  Indeed, the County of Nevada tendered its defense in the Strickland District Court Action to CFMG, and CFMG accepted the tender as the claims relate to the provision of medical care at the County of Nevada facility.

72.     The Debtors provide managerial services to CFMG pursuant to the CFMG MSA, as described in paragraph 42 of this Objection.  As a result, the Debtors have indemnification obligations to CFMG and CFMG may assert an indemnification claim against the Debtors for any expenses incurred and damages ordered in connection with the Peterson District Court Action.

73.     Debtor Wellpath LLC, by and through the CFMG MSA, is obligated to indemnify CFMG for legal expenses it may incur as a result of providing services pursuant to the CFMG MSA.  CFMG, by and through the 2016 Nevada County Services Contract, is obligated to indemnify the County of Nevada for legal expenses it may incur as a result of providing services pursuant to the 2016 Nevada County Services Contract.  By virtue of the CFMG MSA and the 2016 Nevada County Services Contract, the Debtors may ultimately be liable for the legal expenses incurred in connection with the County of Nevada's defense.

74.     As a result, the County of Nevada and California Forensic Medical Group, Inc are Non-Debtor Defendants protected by the Interim Stay Extension Order and the Peterson Motion

should be denied as to the Debtor, the County of Nevada, and California Forensic Medical Group, Inc.

<u>**OBJECTION**</u>

**I.      The Movants Have Failed to Demonstrate Cause for Relief from the Automatic Stay.**

75.      "The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws." *In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1409 (5th Cir. 1986), *on reh'g,* 808 F.2d 363 (5th Cir. 1987), *aff'd sub nom. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988) (quoting H.R. REP. NO. 95-595, at 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6296).  Its purpose is "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982).  In short, it "give[s] the debtor a 'breathing spell' from [its] creditors, and also, [] protect[s] creditors by preventing a race for the debtor's assets." *In re Commonwealth Oil Ref. Co., Inc.*, 805 F.2d 1175, 1182 (5th Cir. 1986) (quoting H.R. REP. NO. 95-595, at 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6296–97). In light of the purpose of the automatic stay, its scope is interpreted very broadly and exceptions are interpreted narrowly.  *In re Gasprom, Inc.*, 500 B.R. 598, 606 (B.A.P. 9th Cir. 2013).

76.      Section 362(d)(1) of the Bankruptcy Code provides that a court shall grant relief from the automatic stay only "for cause." 11 U.S.C. § 362(d)(1).  To meet the heavy burden an unsecured creditor like the Movants face, each Movant must make a showing of "extraordinary circumstances." *See In re Scalera*, 521 B.R. 513, 516 (Bankr. W.D. Pa. 2014); *In re Keene Corp.*, 171 B.R. 180, 185 (Bankr. S.D.N.Y. 1994) ("[A] court will not grant relief from the stay, absent 'extraordinary circumstances,' simply to liquidate an unsecured claim.").  Courts in this district

look at the totality of the circumstances in the case, but may be guided by several factors when determining whether "good cause" exists to lift the stay, including the factors known as the *Sonnax* factors.[24]  *In re Xenon Anesthesia of Tex., PLLC*, 510 B.R. 106, 112 (Bankr. S.D. Tex. 2014) (applying *Sonnax* factors).

77.     Here, the Movants do not establish extraordinary circumstances, nor have they carried their initial burden of demonstrating a prima facie showing of cause to lift the stay.  The following relevant factors weigh against lifting the stay:

      a.     the harm to the Debtors' reorganization by lifting the stay outweighs any harm the stay imposes on the Movants.

      b.     litigating the Movants' claims in other forums would interfere with the chapter 11 cases and the Debtors' sale process;

      c.     the Debtors' estates would bear financial responsibility for defending the majority of the Movant's claims;

      d.     lifting the stay will not promote judicial economy;

      e.     lifting the stay would prejudice other creditors; and

      f.     the Debtors have not acted in bad faith.

78.     As set forth in additional detail below, the balance of these factors fails to establish the "extraordinary circumstances" necessary to justify lifting the stay.  It is dispositive that each

---

[24]   The *Sonnax* factors are: (1) whether relief would result in a partial or complete resolution of the issues, (2) the lack of any connection with or interference with the bankruptcy case, (3) whether the other proceeding involves the debtor as a fiduciary, (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action, (5) whether the debtor's insurer has assumed full responsibility for defending the action, (6) whether the action primarily involves third parties, (7) whether litigation in another forum would prejudice the interests of other creditors, (8) whether the judgment claim arising from the other action is subject to equitable subordination, (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor, (10) the interests of judicial economy and the expeditious and economical resolution of litigation, (11) whether the parties are ready for trial in the other proceeding, and (12) the impact of the stay on the parties and the balance of harms.  *See In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285–87 (2d Cir. 1990).

of the Movants' have failed to show cause why the automatic stay should be lifted in these chapter 11 cases.

### A.   The Balance of Harms Weighs Against Lifting the Automatic Stay.

79.    Unsecured creditors bear a heavy burden in proving that the balance of hardships favors lifting the stay.  *See In re Residential Capital, LLC*, 508 B.R. 838, 848 (Bankr. S.D.N.Y. 2014) ("If the movant is an unsecured creditor, the policies of the automatic stay weigh against granting the relief requested.") (internal citation omitted); *In re W.R. Grace & Co.*, Case No. 01 01139 JFK, 2007 WL 1129170, at *3 (Bankr. D. Del. Apr. 13, 2007) (stating that creditors bear "the heavy and possibly insurmountable burden of proving that the balance of hardships tips significantly in favor of granting relief") (quoting *In re Micro Design, Inc.*, 120 B.R. 363, 369 (E.D. Pa. 1990)).

80.    If the automatic stay is lifted for each of the Movants' claims, the harm to the Debtors would be substantial.  Forcing the Debtors to litigate each of the Movants' underlying state and district court actions would distract and hinder the Debtors from their reorganization efforts and would take away the breathing space necessary for the Debtors to restructure and preserve the value of their assets for the benefit of **all** of their creditors.  In particular, the Debtors' legal department is already strained handling the slew of stay-related requests currently pending before this Court in addition to their core business responsibilities and the other demands of these chapter 11 cases.  *See* Seitz Decl., ¶ 4.  These key individuals must be able to focus on the Debtors' restructuring efforts to successfully navigate and exit these chapter 11 cases.

81.    The Debtors entered these cases with an RSA and a path to exit these cases on an expedited timeline.  As a result, the Movant's various actions will only be stayed for a limited period of time.  In the span of years long litigation, a stay of a few months will hardly prejudice the Movants.  Furthermore, the Myers State Court Action, the Slater District Court Action, and the

32

Lamboy District Court Action were each initiated just months before these chapter 11 cases. Allowing such cases that are in their infancy to proceed will necessarily distract the Debtors at this critical time in the chapter 11 cases as the Debtors conduct their marketing process.

82.   Additionally, as discussed further below, if any of the Lift Stay Motions are granted, it will "invite other lift stay motions that will be filed by similarly situated claimants," leading to "an unnecessary drain on the Debtors'—and the Court's—resources."  *See In re Celsius Network LLC*, 642 B.R. 497, 503 (Bankr. S.D.N.Y. 2022).  Indeed, over twenty lift stay motions have been filed as of the time of filing this Objection.

83.   On the other hand, the Movants fail to show they would sustain more significant harm than other similarly situated claimants if the Lift Stay Motions are denied.  For example, the Slater Movant states he is seeking redress for personal injury claims that occurred prepetition.  Slater Motion, § 3.  The Slater Movant fails to address how he would sustain more harm than any of the other Movants, which seek to prosecute similar claims.  The Henderson Movant objects to the automatic stay as an infringement of his constitutional rights to due process and equal protection under the law.  Henderson Motion, ¶ 9.  Such arguments are unfounded given that section 362 of the Bankruptcy Code specifically provides the right to seek relief from the automatic stay, which functions to protect a movant's due process rights by allowing for an appeal of the automatic stay.  Furthermore, the Debtors' Interim Stay Enforcement Order specifically provides that it does not prejudice the right of any creditor to seek relief from the automatic stay pursuant to section 362 of the Bankruptcy Code, which rights the Henderson Movant has asserted through the Henderson Motion.

84.   There are scores of unsecured creditors similarly situated to the Movants.  The Movants have not demonstrated that they will be more prejudiced than any other potential creditor

by a short-term delay until the Debtors exit these chapter 11 cases, based on the expedited reorganization timeline the Debtors aim to meet. *See, e.g.*, *W.R. Grace & Co*., 2007 WL 1129170, at *3 ("There is no indication that the state court claims are in any way unique, or that, if proven, Debtors' liability to the [movant], if any, will be distinguishable from liability for any of the other hundreds of thousands of asbestos claims asserted against Debtors.").

85.     To be clear, the Debtors recognize the importance of liquidating the tort claims involved in these chapter 11 cases. The Debtors' primary goal over the course of these proceedings is to move forward on maximizing value for all stakeholders as soon and as fairly as possible. In the context of these chapter 11 cases and against the backdrop of running a marketing process for the sale of the Debtors' assets, the Court should hold that the Movants have not established good cause to lift the stay.

**B.     The Debtors' Restructuring Will Be Disrupted By Lifting the Stay.**

86.     Granting the Lift Stay Motions would be extremely disruptive to the Debtors' sale and restructuring efforts. As the Debtors explained in the First Day Declaration, an increase in professional liability insurance expenses arising from the healthcare services provided pursuant to the Debtors' contracts with their government partners was one of the reasons that led to the Debtors filing these chapter 11 cases. *See* First Day Decl., ¶¶ 48–49.

87.     Courts are sensitive to granting relief from the automatic stay where the result will unleash a wave of such requests. *See In re Bally Total Fitness of Greater N.Y., Inc*., 402 B.R. 616, 623 (Bankr. S.D.N.Y. 2009) (denying motion to lift stay and noting that granting relief from stay "could open the floodgates to a multitude of similar motions causing further interference with the bankruptcy case" which weighed heavily against lifting the stay). The quantity of motions before the Court at this initial stage of these chapter 11 cases makes it clear that granting relief from the stay for each of the Movants may result in a multitude of similar requests that will expend the

34

Debtors' limited resources, and divert the attention of the Debtors from their efforts administering these chapter 11 cases.

88.     "A principal purpose of the automatic stay" is to allow the Debtors to "focus [their] energies on reorganizing and managing [their] business affairs without facing diversions and litigation. . . ."  *See In re Nw. Airlines Corp.,* Case No. 05-17930ALG, 2006 WL 694727, at *1 (Bankr. S.D.N.Y. Mar. 13, 2006).  Mindful of the strain on in-house resources, courts have declined to lift the automatic stay in similar circumstances.  *See In re Residential Cap., LLC,* Case No. 12-12020 MG, 2012 WL 3249641, at *5 (Bankr. S.D.N.Y. Aug. 7, 2012) (holding that diversion of debtors' legal team alone is sufficient to find for debtors on this factor); *In re Bally*, 402 B.R. at 623 ("[A]llowing the actions to proceed would distract the Debtors' management from the bankruptcy proceeding . . . thereby affecting the interests of other creditors."), *aff'd*, 411 B.R. 142 (S.D.N.Y. 2009).

89.     The Debtors understand and do not diminish the seriousness of the issues that the Movants have raised through the Lift Stay Motions.  Their claims should be addressed through the centralized bankruptcy process, however, not through individual lawsuits litigated on an *ad hoc* basis, as the latter would inevitably delay and interfere with these chapter 11 cases.

90.     The law is clear that even slight interference with the bankruptcy process is sufficient to deny lift-stay motions.  *See In re Penn-Dixie Indus., Inc*., 6 B.R. 832, 836–37 (Bankr. S.D.N.Y. 1980) (denying stay relief where plaintiff sought only to proceed with limited discovery of customer lists; finding such requests "cannot be shrugged off as de minimis" because "[i]nterference by creditors in the administration of the estate, no matter how small, through the continuance of a preliminary skirmish in a suit outside the Bankruptcy Court is prohibited"); *see also BDA Design Grp., Inc. v. Off. Unsecured Creditors' Comm.,* Case No. 3:13-CV-01568-O,

2013 WL 12100467, at *5 (N.D. Tex. Sept. 2, 2013), *aff'd sub nom. In re Hearthwood N. I Ass'n*, 576 F. App'x 369 (5th Cir. 2014) ("[E]ven slight interference with the administration may be enough to preclude relief.") (citation omitted); *In re Curtis*, 40 B.R. 795, 806 (Bankr. D. Utah 1984) ("The most important factor in determining whether to grant relief from the automatic stay to permit litigation against the debtor in another forum is the effect of such litigation on the administration of the estate.  Even slight interference with the administration may be enough to preclude relief in the absence of a commensurate benefit.").

91.     Rather than divert attention to defending against piecemeal litigation all across the country, the Debtors' focus should remain on the various transactions contemplated by the RSA, including the sale of all of the Debtors' assets.  Accordingly, this factor weighs against granting the Lift Stay Motions.

### C.     The Debtors Bear the Financial Burden of Defending Against the Movants' Claims.

92.     The Myers Movants, the Monk Movant, the Harris Movant, the Evans Movants, and the Crawford Movant all contend that the Debtors have liability insurance to cover the claims brought in the various underlying actions.  The Lamboy Movant,[25] the Strickland Movant, and the Peterson Movant also cite insurance coverage as a basis for lifting the stay.  Strickland Motion, at 7–9, 11; Peterson Motion, at 7–9, 11.  All argue that the existence of such alleged insurance diminishes, if not eliminates, any prejudice to the Debtors' estates.  As established herein, however, the Debtors insurance policies require the Debtors to incur the initial damage and defense costs per claim and failure to apply the automatic stay would result in a significant expenditure of finite estate assets to get through these chapter 11 cases.  Large expenditures for defense costs

---

[25]    The Lamboy Movant asserts that H.I.G. Capital, LLC ("HIG") has "substantial assets . . . to address potential liabilities."  Lamboy Motion, at 5.  HIG is not a defendant in the Lamboy District Court Action, however, and has no obligation to cover any expenses or judgments related to such litigation.

related to stayed actions were not sized into, or anticipated by, the Debtors' debtor-in-possession financing budget, and the Debtors lack sufficient liquidity to pay such expenses.

93.     Except for the Herbik PAJUA Policy, the relevant insurance policies related to the Lift Stay Motions are Fronting Policies that establish no risk transfer and umbrella policies that provide coverage only after the Debtors have expended millions of dollars on each claim (collectively, the "Umbrella Policies").  The Fronting Policies and the Umbrella Policies read together establish that the Debtors bear the cost to defend and settle claims, and the Debtors are only entitled to reimbursements from the applicable umbrella insurers after millions in SIRs have been expended.  Bankruptcy courts have held that this weighs against lifting the stay.  *See In re Residential Cap., LLC*, Case No. 12-12020 MG, 2012 WL 3423285, at *7 (Bankr. S.D.N.Y. Aug. 14, 2012) (holding that a debtor needing to pay all expenses in litigating an action with out-of-pocket funds from the estate weighs against granting relief from the stay).[26]

94.     Here, the Debtors are not seeking an indefinite stay as to the Movants.  Instead, the Debtors are seeking to uphold an even and fair process for all such similarly situated tort claimants to ensure efficient and equal treatment for all such claimants.  As such, this factor similarly weighs against granting the Lift Stay Motions.

**D.     Lifting the Stay Would Compromise the Interests of Other Creditors.**

95.     The automatic stay protects not only the Debtors but also their creditors.  It levels the playing field and ensures that creditors need not rush to other forums to preserve their rights.

---

[26]   The Evans Movants' reliance on *In re Edgeworth*, 993 F.2d 51 (5th Cir. 1993) arguing that estate property is not at issue is misplaced.  Evans Motion, ¶ 8.  The case makes it clear that the typical liability policy is distinguished from other types of insurance policies because the insurance proceeds are normally payable for the benefit of those harmed.  However, the *Edgeworth* court elaborated on this point further, stating that "***typical*** liability polic[ies]" are distinguished from other types of insurance policies because the "proceeds of such insurance policies, ***if made payable to the debtor rather than a third party*** such as a creditor, ***are property of the estate*** and may inure to all bankruptcy creditors." *Id.* at 56 (emphasis added).  As such, the proceeds of the relevant insurance policies at issue here are never paid to those "harmed by the debtor," but are "payable to the debtor rather than a third party," and therefore are property of Debtors' estates, contrary to the Evans Movants' assertions.

As a result, granting the Lift Stay Motions at this juncture in the chapter 11 cases would be inconsistent with two key tenets of chapter 11:  equal treatment among similarly situated creditors and an orderly process.  The Strickland Movant and Peterson Movant argue that there is no prejudice to other creditors if the stay is lifted as to their underlying actions.  *See* Strickland Motion, at 9; Peterson Motion, at 9.  To the contrary, it is clear that only the Movants stand to benefit if the automatic stay is lifted, while the automatic stay would continue to prohibit other parties from pursuing their claims outside of this Court.  This is especially problematic here where there are Fronting Policies that require the Debtors to expend millions of dollars per claim before the Umbrella Policies are triggered or, in the case of the Herbik PAJUA Policy, the Debtors remain on the hook for sharing defense costs.  Accordingly, other litigants may be prejudiced by not seeking to lift the automatic stay to pursue the limited insurance coverage.

96.     Courts have held that depleting a pool of available insurance funds at the expense of other potential claimants may warrant denying a request for relief from the stay.  *See In re Davis*, 730 F.2d 176, 185 (5th Cir. 1984) (affirming the bankruptcy court's decision to keep stay in place because "intact insurance coverage [i]s a bulwark against erosion of the estate"); *see also In re Sunland, Inc*., 508 B.R. 739, 744 (Bankr. D.N.M. 2014) (denying motion to lift stay because the litigation could deplete the pool of available insurance funds at the expense of other claimants, among other reasons); *In re Titan Energy, Inc*., 837 F.2d 325, 330 (8th Cir. 1988) (in many cases, "[a]llowing one claimant to collect the policy proceeds in a state court judgment would deplete the insurance pool to the detriment of all remaining creditors").  As one court noted, if an insurance policy "is too small to satisfy several potential plaintiffs[,]" then lifting the stay

> could start a race to the courthouse.... Such a race could mean unfair results as between potential plaintiffs; it could also prevent a bankruptcy court from marshalling the insurance proceeds, and, along with other assets, arranging for their distribution so as to

> maximize their ability both to satisfy legitimate creditor claims and
> to preserve the debtor's estate.

*Tringali v. Hathaway Machinery Co*., 796 F.2d 553, 560 (1st Cir. 1986).

97.     If granted, the Lift Stay Motions would invite others to seek similar relief.  Opening the "floodgates" to allow similar stay relief motions would harm other similarly situated creditors due to the potential depletion of insurance, or in this case, the Debtors' cash/property. Accordingly, this factor weighs against granting the Lift Stay Motions.

**E.     Maintaining the Automatic Stay Will Better Serve Judicial Economy.**

98.     As described above, there are scores of tort claims currently pending against the Debtors in courts across the country.  Lifting the automatic stay as to the Movants would lead to unnecessary duplication of efforts for both the Debtors and the Court and has the potential of leading to inconsistent judgments for similarly situated tort claimants.  Accordingly, judicial economy favors denial of the Motion.  *See In re Conejo Enters., Inc*., 96 F.3d 346, 353 (9th Cir. 1996) ("By staying the state action, the bankruptcy court promoted judicial economy and efficiency by minimizing the duplication of litigation in two separate forums and preventing litigation of a claim that may have been discharged in bankruptcy proceedings."); *see also In re Balco Equities Ltd., Inc*., 323 B.R. 85, 94 (Bankr. S.D.N.Y. 2005) (denying motion to lift the stay in part because "proceeding concurrently in state court would result in inconsistent or conflicting judicial decisions and would not be conducive to judicial economy") (internal citation omitted). Moreover, judicial economy will be achieved through this Court's claims submission process before allowing the automatic stay to be lifted.  Accordingly, this factor also weighs against granting the Lift Stay Motions.

F.     **The Debtors Have Not Acted in Bad Faith.**

99.    The Debtors filed these chapter 11 cases in good faith with the goal of reorganizing and maximizing value for all of their creditors, including tort plaintiffs like the Movants.[27]   The Debtors have been working diligently with all of their constituents to market their assets in a value-maximizing transaction.   Accordingly, this factor weighs against granting the Lift Stay Motions.

G.     **A Merit Analysis Does Not Weigh in Favor of Granting Relief from the Stay.**

100.   Courts have recognized that requiring a merit analysis in every case would in large part defeat the objective of economizing judicial resources.  *See In re Peterson*, 116 B.R. 247, 250 (D. Colo. 1990) (holding that the bankruptcy court did not err in not considering the probability of success on the merits of the action because it would frustrate expeditious resolution of section 362 motions and defeat the objective of economizing judicial resources).   The weight of the other factors discussed above, including the prejudice to the Debtors if the Lift Stay Motions are granted at this time, outweigh this factor.   Additionally, the majority of the Movants fail to even attempt to provide sufficient facts necessary to establish a likelihood of prevailing on the merits of their claims.   Accordingly, this factor should weigh against granting the Lift Stay Motions.

101.   As a result of all the reasons set forth herein, the Movants have failed to satisfy their heavy burden of establishing cause to modify the automatic stay.   Therefore, the Debtors request that the Court deny the Lift Stay Motions.

*[Remainder of Page Intentionally Left Blank]*

---

[27]   The Henderson Movant alleges that the "Chapter 11 Bankruptcy filing by debtors may be in bad faith to discharge debt or possible debt."  Henderson Motion, ¶ 13.  Such allegation, however, is completely unsubstantiated and there is no evidence before the Court seriously questioning the Debtors' good faith in filing these chapter 11 cases and pursuing a timely reorganization.

**WHEREFORE**, for the foregoing reasons, the Debtors respectfully request that this Court deny the Lift Stay Motions as to the Debtors and various Non-Debtor Defendants identified herein and grant such other and further relief as this Court deems just and proper.

Dated: January 7, 2025
Dallas, Texas

/s/ Marcus A. Helt
Marcus A. Helt (Texas Bar #24052187)
MCDERMOTT WILL & EMERY LLP
2501 N. Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone:     (214) 295-8000
Facsimile:     (972) 232-3098
Email:         mhelt@mwe.com

-and-

Felicia Gerber Perlman (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
James Kapp (admitted *pro hac vice*)
Jake Jumbeck (admitted *pro hac vice*)
Carole Wurzelbacher (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
444 West Lake Street, Suite 4000
Chicago, Illinois 60606-0029
Telephone:     (312) 372-2000
Facsimile:     (312) 984-7700
Email:         fperlman@mwe.com
               bgiordano@mwe.com
               jkapp@mwe.com
               jjumbeck@mwe.com
               cwurzelbacher@mwe.com

*Counsel to the Debtors and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that, on January 7, 2025, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Marcus A. Helt*
Marcus A. Helt