**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | ) Case No. 24-90533 (ARP) |
| | ) |
| Debtor. | ) |
| | ) |

## THE STATUTORY UNSECURED CLAIMHOLDERS' COMMITTEE'S LIMITED OBJECTION TO DEBTORS' SALE OF RECOVERY SOLUTIONS ASSETS PURSUANT TO STALKING HORSE AGREEMENT

The Statutory Unsecured Claimholders' Committee (the "Committee") of Wellpath Holdings, Inc., *et al.* (the "Debtors"), by and through its undersigned counsel, hereby objects to the proposed sale of the Recovery Solutions Assets[2] to RS Purchaser LLC (the "Stalking Horse Buyer") (such proposed sale, the "RS Sale"), as set forth in the *Notice of Cancellation of Auction Relating to the Recovery Solutions Assets Sale* [ECF No. 817] (the "Notice of Auction Cancellation"). In support of this objection, the Committee states as follows.[3]

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Wellpath. The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Amended Bid Procedures Order, including the Recovery Solutions Stalking Horse Agreement attached thereto (each term, as defined below), as applicable.

[3] In further support of this objection, the Committee is submitting the *Declaration of Daniel S. Desatnik in Support of the Statutory Unsecured Claimholders' Committee's Limited Objection to Debtors' Sale of Recovery Solutions Assets Pursuant to Stalking Horse Agreement* (the "Desatnik Declaration") concurrently herewith.

## PRELIMINARY STATEMENT[4]

1.      While the Committee is not opposed to the RS Sale in principle, it has grave concerns that the terms of the Recovery Solutions Stalking Horse Agreement the Debtors seek to approve will handicap the marketability of the Debtors' Corrections Assets, siphon cash out of the Corrections Business, and potentially disrupt the ability of the Debtors to continue to operate the Corrections Business.  The Committee raised its concerns with the Debtors and the Stalking Horse Buyer, but was ultimately unable to reach an acceptable resolution or otherwise obtain information from the Debtors necessary for the Committee to assess whether the terms of the proposed RS Sale are in the best interest of the Debtors' estates.  In fact, the Committee's requests for information have been repeatedly ignored.  Accordingly, the Committee objects to the terms of the RS Sale, which should not be approved in its current form for the following reasons.[5]

2.      ***First***, the Recovery Solutions Stalking Horse Agreement fails to properly delineate the assets being sold and the assets remaining with the Corrections Business.  A bidder for the Corrections Business will be unable to determine what is left for them to bid on.  Furthermore, this lack of precision creates a risk of disruptions and unforeseen costs for the Corrections Business if assets critical to its operations are inadvertently or intentionally transferred to the Stalking Horse Buyer as part of the RS Sale.  The Recovery Solutions Stalking Horse Agreement provides no mechanism to ensure precise delineation of the assets being transferred or to ensure the return of property to the Debtors' estates that properly belongs to the Corrections Business or is otherwise

---

[4]   Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings given to them elsewhere in the objection.

[5]   Moments before the Committee filed this objection, the Debtors provided revised versions of various key documents to the Committee, including the Recovery Solutions Stalking Horse Agreement and the Transition Services Agreement. The Committee will review these updated documents and continue to attempt to resolve its outstanding issues consensually. The Committee nonetheless objects to the RS Sale based on the terms stated herein and reserves the right to supplement this objection upon completion of its review of the Debtors' revisions.

material to its operation. These issues, compounded by the accelerated (albeit comparatively less so) marketing process for the Corrections Business create a self-fulfilling prophecy where the Stalking Horse Buyer is positioned to acquire a Corrections Business whose value was impaired by the RS Sale.

3.      **Second**, the Recovery Solutions Stalking Horse Agreement is deficient and incomplete as to the other essential economic terms of the transaction, in particular, the amount of cash and cash equivalents that will be delivered as part of the RS Sale. While the Recovery Solutions Stalking Horse Agreement refers to a "Cash Cap," the term is fundamentally a misnomer. In reality, the "Cash Cap" simply inserts a placeholder amount of $10 million in cash to be potentially transferred with the RS Business, subject to a net working capital adjustment to be agreed upon, supposedly by November 25, 2024. Despite repeated requests from the Committee for information regarding this adjustment mechanism and its application, the Debtors have failed to provide the requested information in a timely manner. Only yesterday, and in a deposition, did the Debtors disclose that they may ultimately deliver the RS Business with █████ in cash, a ████ increase over the so-called "Cash Cap." And only on the eve of the Sale Hearing did the Debtors share any documentation purporting to explain the adjustment mechanism, which the Committee is still reviewing. To make matters worse, this is in essence money the Debtors are returning to the DIP Lenders (through the Stalking Horse Buyer) for no additional consideration, just weeks after the Debtors told the Court that their $105 million DIP Facility was indispensable, and the Debtors incurred significant fees and roll-ups on account of such financing.

4.      **Third**, the Recovery Solutions Stalking Horse Agreement provides for the transfer of potentially valuable avoidance actions even though the Debtors have not conducted any investigation or valuation regarding the avoidance actions, depriving unsecured creditors of what

should be unencumbered property for their benefit.  These avoidance actions may be one of the only sources of recovery to general unsecured creditors, but are being given away for no additional consideration.  Indeed, the Debtors have made clear through the Restructuring Support Agreement, and now the Plan, that it is their position (and one that the Committee disputes) that the only value remaining for general unsecured creditors will be unspecified litigation causes of action to be pursued by a liquidating trust under the Plan, absent a third-party topping bid for the Corrections Business.

5.      ***Fourth***, the Recovery Solutions Stalking Horse Agreement provides for the Debtors to enter into an onerous Transition Services Agreement, pursuant to which the Debtors (in reality, the Corrections Business) will support the Stalking Horse Buyer and the RS Business during a post-closing transition period.  The Transition Services Agreement, as currently structured, features below market pricing and undermines the marketability of the Corrections Business for the following reasons, as well as others outlined below.  █████████████████████

████████████████████████████████████████████████████████████████

█████████████████ [6] Not only is the Transition Services Agreement unprofitable and will require the diversion of the equivalent of ██ Corrections Business full-time employees to service the RS Business, but it may not even cover the costs associated the services at issue, requiring the Corrections Business to effectively subsidize the RS Business.  The Transition Services Agreement also fails to account for the scenario in which a strategic buyer—and therefore a potential competitor of the RS Business—may wish to bid for the Corrections Business.  Such a buyer would understandably not want to provide support services to a competitor (much less at unfavorable rates) or risk exposing its confidential information to that competitor.  The Transition Services

---

[6]    Desatnik Declaration, Ex. 2 ( "<u>Dragelin Dep. Tr.</u>") at Tr. at 106:2–13.

Agreement must account for this and allow the Corrections Business to terminate and/or renegotiate the Transition Services Agreement under such circumstances.

6.      ***Fifth***, the Recovery Solutions Stalking Horse Agreement contemplates a sale of both assets and equity in certain operating entities (defined as the "Acquired Companies" in the Recovery Solutions Stalking Horse Agreement).  Thus, the Stalking Horse Buyer will be indirectly taking *all* liabilities of the Acquired Companies.  However, the Recovery Solutions Stalking Horse Agreement permits the Stalking Horse Buyer, in its sole discretion, to (a) add certain additional entities as Acquired Companies without providing any additional consideration and/or (b) remove an entity as an Acquired Company (thereby leaving certain liabilities with the Debtors' estates).  This optionality permits the Stalking Horse Buyer to fundamentally alter the economics of the RS Sale, *without notice to parties in interest and outside the view of the Court.*

7.      Given the above deficiencies, the Debtors cannot meet even the permissive business judgment standard to approve the RS Sale on the terms of the Recovery Solutions Stalking Horse Agreement.  The Debtors are, in essence, asking the Court to approve the sale of assets and assumption of liabilities that even the Debtors cannot identify and that no party will know until after the sale is approved (and even then, could be subject to further modifications without notice).  The Debtors cannot be deemed to have reasonably exercised business judgment where they cannot even delineate the fundamentals of the sale.  Moreover, the Debtors cannot demonstrate that the transaction is in the best interests of the estates when it handicaps the sale of the Corrections Business and provides an open-ended ability for the Stalking Horse Buyer to cannibalize assets of the Corrections Business, while stripping potentially valuable unencumbered assets.  These deficiencies in the Recovery Solutions Stalking Horse Agreement improperly position the Stalking

Horse Buyer to acquire the Corrections Business by depressing its value and frustrating interest by other bidders.

8.     As filed, the Recovery Solutions Stalking Horse Agreement was riddled with inconsistencies and ambiguities. The Committee has attempted to work closely with the Debtors and the Stalking Horse Buyer to resolve as many of the issues as possible. However, it seems that the warp speed at which the Debtors set the schedule for the RS Sale was too fast even for the Debtors themselves.  The Debtors were unable to provide the Committee with basic information typically expected for any deal—let alone one of this complexity—such as the balance sheets for certain of the entities to be potentially acquired, and the quantum of liabilities to be assumed through the equity purchase, despite repeated requests for over a month.  Absent transparency and complete information, courts have refused to approve a Bankruptcy Code § 363 sale.  *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 424 (Bankr. S.D. Tex. 2009) ("Proposals for quick sales, understood only by a few parties who would benefit from the sale, are inherently suspect").  Thus, the substantial lack of essential information and disclosure alone is sufficient to condition approval of the RS Sale on incorporating the revisions requested by the Committee.

9.     Despite these grave concerns, the Committee is willing to support the RS Sale if (a) the Recovery Solutions Stalking Horse Agreement incorporates the revisions set forth in **Exhibit A** attached hereto, (b) the Proposed Sale Order incorporates the revisions set forth in **Exhibit B** attached hereto, and (c) the Transition Services Agreement incorporates the revisions set forth in Exhibit 3 to the Desatnik Declaration.  These revisions resolve the uncertainties that currently plague the transaction documents and protect the Corrections Business' interests more fully.

10.     In summary, the proposed revisions to the Recovery Solutions Stalking Horse Agreement provide for the following:

- **Corrections Assets versus Recovery Solutions Assets**:  Provisions for the transfer of any assets primarily of the Corrections Business or otherwise material to the Corrections Business at the Acquired Companies to be transferred to the Corrections Business prior to closing of the RS Sale and ensuring no Seller transfers any such assets to the Stalking Horse Buyer, and to the extent the Corrections Business requires services or assets that, prior to the closing, were provided by the RS Business or otherwise belonging to the RS Business but are not immaterial to the conduct of the Corrections Business, the ability to enter into a "reverse" transition services arrangement with the Stalking Horse Buyer to obtain such services.  The terms of any "reverse" transition services agreement should, as a default and unless otherwise agreed by the parties, parallel those (both as to cost and duration) of any corollary service being provided to the RS Business by the Corrections Business under the Transition Services Agreement.  If there is not a correlative service, the duration should have a default minimum period of three months and should be provided at cost to the RS Business.

- **Wrong Pockets**: A mechanism to enable any asset that is property of or material to the Corrections Business that is transferred to the Stalking Horse Buyer (whether directly by a Seller or indirectly by virtue of the transfer of ownership of the Acquired Companies) be returned to the Debtors' estates.

- **Avoidance Actions**:  Clarifying language that any "Acquired Avoidance Actions" must relate solely to the RS Business, and the transfer of any Acquired Avoidance Actions shall not prejudice the Debtors' ability to pursue any retained Avoidances Actions (*e.g.* avoidance actions that may be shared between the Corrections Business and the RS Business, and actions in which the Stalking Horse Buyer may be an indispensable party.)

- **Causes of Action:**  To the extent Causes of Action constitute counterclaims or similar claims with respect to liabilities that the Debtors will retain, the Debtors should retain such Causes of Action to allow them to offset against such retained liabilities.

- **Acquired Companies:**  The loophole whereby the Stalking Horse Buyer is permitted to add or remove any entity from the list of Acquired Companies must be closed.  The Recovery Solutions Stalking Horse Agreement must provide for (i) an express representation that the sole asset of each potential additional Acquired Company is the equity interest of its direct subsidiary and that its sole liabilities are those arising under the prepetition secured debt and the DIP Facility and, in the case of Alpine CA Behavioral Health HoldCo, the liabilities under the Settlement Agreement, and (ii) an increase to the purchase price to the extent there is

incremental asset value attributable to any entity that is subsequently added as an Acquired Company.

11.     The proposed revisions to the Transition Services Agreement generally provide for the following:

- **Duration**: The RS Business shall use commercially reasonable efforts to reduce or eliminate its dependency on the services being received from the Corrections Business to the extent and as soon as is reasonably practicable following the effectiveness of the Transition Services Agreement.

- **Sale to a Competitor**: In the event that there is a sale of the Corrections Business to a competitor of the RS Business, (i) provision must be made for the prompt termination of the Transition Services Agreement and the RS Business to promptly obtain replacement services at its own cost, (ii) the RS Business shall implement appropriate policies and procedures to safeguard confidential information of the Corrections Business and the competitor, and (iii) to the extent that the provision by the Corrections Business of any additional services is required for the RS Business on a temporary basis, the remaining service period will automatically be reduced to a maximum of 75 days from the closing of such sale.

- **Pre-Funding of Costs Not Embedded in Fees**: For costs incurred by the Corrections Business that are not embedded within a fee, the Transition Services Agreement should require the RS Business to pre-fund the costs.

- **Fees Disputes**: An acquirer of the Corrections Business may dispute the fees being paid for services that are set below fair market value.

- **Termination and Changes in Services**: Clarification that the Corrections Business may decline to provide additional or expanded services requested by the RS Business and that certain services may be terminated if the performance of such services is rendered impracticable due to vendor unavailability, key employee departures or adverse modifications to underlying shared contracts.

12.     Finally, the Committee's proposed revisions to the Proposed Sale Order generally provide for the following:[7]

- **Cash Cap**:  The revised sale order would provide that no more than $10 million of cash or cash equivalents shall be transferred from the Debtors to the Stalking Horse Buyer, the Acquired Companies, or any account established by the Stalking Horse Buyer or the Acquired Companies in connection with Section 2.1(c) of the

---

[7]   The Committee continues to review the Proposed Sale Order and reserves all rights to supplement this objection and provide addition proposed revisions.

Recovery Solutions Stalking Horse Agreement, and the Debtors shall not be required to convey to the Stalking Horse Buyer or the Acquired Companies any cash or cash equivalents of or resulting from revenues generated by the Corrections Business.

- **Seller Cure Cap**:  The order should reaffirm the agreement between the Stalking Horse Buyer and the Sellers with respect to cure costs, pursuant to which the Stalking Horse Buyer shall be responsible for any cure costs for (i) Assumed Contracts and (ii) contracts of Acquired Companies, in excess of the "Seller Cure Cap" (a $10 million cap that is reduced by any amounts paid by the Sellers on or after November 11, 2024 in connection with any pre-petition trade payables). Furthermore, the order should acknowledge that the Debtors have satisfied the Seller Cure Cap based on payments made to date on account of claims paid to critical vendors.

- **Return of Estate Assets**:  To the extent that an asset that primarily relates to the Corrections Business is discovered to be held by the RS Business post-closing, the RS Business will promptly remit such asset to Debtors' estates for no consideration. Moreover, if it is determined at any time within the 12-month period following the closing that any asset of or service provided by the RS Business prior to the closing to the Corrections Business is reasonably necessary for the conduct of any portion of the Corrections Business following the closing, provision shall be made for the Corrections Business to have access to such assets or to receive such service at no cost and for a period of time that is reasonably sufficient for the Corrections Business to implement a replacement asset or service.

- **Debtors' and Stalking Horse Buyer's Representations**:  The Debtors and the Stalking Horse Buyer must represent that:

  o None of the Acquired Assets or assets held by any Acquired Company primarily relate, or are otherwise utilized by (other than in any immaterial respect), or are material to the Corrections Business.

  o Since the commencement of these chapter 11 cases, (i) no assets of any Seller or Affiliate of a Seller (other than an Acquired Company) have been transferred, assigned or contributed to an Acquired Company that do not solely relate to the RS Business, and (ii) no liabilities of any Acquired Company have been assumed by any Seller or any Affiliate of any Acquired Company (other than another Acquired Company).

13.     If the proposed changes are not made, however, the RS Sale should not be approved.

## BACKGROUND

### A. The Bankruptcy Cases

14. The Debtors are privately owned by H.I.G. Capital, LLC and are one of the largest providers of healthcare services to correctional and custodial behavioral health settings across the United States.

15. On November 11, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the Southern District of Texas (the "Court"), thereby commencing the above-captioned bankruptcy cases. The Debtors filed these chapter 11 cases with the Restructuring Support Agreement with their prepetition lenders in hand, contemplating an expedited sale process for the Recovery Solutions Assets, with a later sale of the Corrections Assets to a third-party or the Debtors' prepetition lenders. No value was contemplated for general unsecured creditors other than an unspecified share of an unknown subset of potential causes of action in a liquidating trust.

16. On November 25, 2024, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed the Committee pursuant to section 1102 of the Bankruptcy Code [ECF No. 169].

### B. The Sale Process

17. On November 19, 2024, before the Committee was appointed, the Court entered the Bid Procedures Order on a final basis,[8] which approved procedures for the marketing and sale

---

[8] *See Order (I) Approving the Bidding Procedures for the Sale of the Debtors' Assets, (II) Approving Entry into a Stalking Horse Purchase Agreement for the Recovery Solutions Assets, (III) Authorizing the Recovery Solutions Expense Reimbursement, (IV) Authorizing Potential Selection of Stalking Horse Bidders for the Corrections Assets and Approving Related Corrections Asset(s) Bid Protections, (V) Establishing Related Dates and Deadlines, (VI) Approving the Form and Manner of Notice Thereof, (VII) Approving the Assumption and Assignment Procedures, and (VIII) Granting Related Relief* [ECF No. 111] (the "Bid Procedures Order"),

of some or all of the Debtors' assets, including the Recovery Solutions Assets and the Corrections Assets. *See id.* The Bid Procedures Order authorized the terms of and the Debtors' entry into that certain *Equity Interest and Asset Purchase Agreement*, dated as of November 11, 2024 [Bid Procedures Order, Ex. 2] (the "Recovery Solutions Stalking Horse Agreement"), pursuant to which Debtors Wellpath Holdings, Inc., Correct Care Holdings, LL, and Alpine CA Behavioral Health HoldCo (collectively, the "Sellers" and each, a "Seller") agreed to effectuate the RS Sale by transferring the business associated with the Recovery Solutions Assets (the "RS Business") to the Stalking Horse Buyer, subject to higher or otherwise better offers. *Id.* The Bid Procedures Order also created two separate sales processes, placing the sale of the Recovery Solutions Assets on an accelerated six-week timeline over the holiday season, while the Corrections Assets (the business associated therewith, the "Corrections Business") would be sold on a 12-week timeline. *See* Bid Procedures Order.

18.     Following formation of the Committee, on December 3, 2024, the Committee filed *The Statutory Unsecured Claimholders' Committee's Emergency Motion for Relief from or, in the Alternative, for Alteration or Amendment of the Court's Order Approving Bidding Procedures for the Sale of the Debtors' Assets* [ECF No. 275] (the "Reconsideration Motion") in connection with the Bid Procedures Order. The Committee argued, among other things, that the sale of the Recovery Solutions Assets was (i) too fast, (ii) not justified by the evidence, and (iii) not designed to maximize value since key deadlines took place over the holiday season. It requested, among other things, that the sale of the Recovery Solutions Assets be aligned with the 12-week sale timeline of the Corrections Assets to allow appropriate diligence and encourage consolidated bids.

19.     On December 11, 2024, the Court entered the *Stipulated and Agreed Amended Order (I) Approving the Bidding Procedures for the Sale of the Debtors' Assets, (II) Approving*

*Entry into a Stalking Horse Purchase Agreement for the Recovery Solutions Assets, (III) Authorizing the Recovery Solutions Expense Reimbursement, (IV) Authorizing Potential Selection of Stalking Horse Bidders for the Corrections Assets and Approving Related Corrections Asset(s) Bid Protections, (V) Establishing Related Dates and Deadlines, (VI) Approving the Form and Manner of Notice Thereof, (VII) Approving the Assumption and Assignment Procedures, and (VIII) Granting Related Relief* [ECF No. 384] (the "Amended Bid Procedures Order"), which incorporates, *inter alia*, certain revisions to the bid procedures to address concerns raised by the Committee in the Reconsideration Motion and retains the Committee's rights to object to the Recovery Solutions Stalking Horse Agreement. *Id*.

20.     Notably, the Amended Bid Procedures Order extended key deadlines for the sale of RS Business, including an 8-day extension of the bid deadline. *Id.* at 9. It also stated that the deadlines would be further extended if an "Extension Event" occurred, which was defined to mean that if the request for proposal ("RFP") deadline for a specific governmental contract was extended beyond January 21, 2025, then the bid deadlines would be correspondingly extended on a day-to-day basis. *Id.*

21.     On December 2, 2024, the Extension Event occurred and the deadline for the governmental contract was extended by 28 days, from January 21, 2025 to February 18, 2025. However, because shortly after this extension, a January 31, 2025 request for proposal deadline for a different governmental contract was announced, and despite the provisions of the Amended Bid Procedures Order, the Debtors did not agree to extend the Recovery Solutions Assets deadlines by 28 days, which would have effectively aligned the deadlines of the RS Sale with those associated with the sale of the Corrections Business.

22.     Instead, on December 20, 2024, the Debtors filed the *Notice of Amended Timeline for Recovery Solutions/Consolidated Sale Transaction* [ECF No. 563], providing notice that certain timelines related to the sale of the Recovery Solutions Assets had been extended by approximately 16 days.  *See id*.

23.     Having received no other Qualified Bids by the Bid Deadline, the Debtors now seek approval of the RS Sale pursuant to the terms of the Recovery Solutions Stalking Horse Agreement.  *See* Notice of Auction Cancellation.  On January 6, 2025, the Debtors filed the *Notice of Filing of Proposed Sale Order Relating to the Recovery Solutions Assets Sale* [ECF No. 818], which contains the proposed order (the "Proposed Sale Order") regarding approval of the RS Sale. *Id*., Ex. A.

**C.  Other Relevant Developments**

24.     On December 20, 2024 the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and Certain of Its Debtor Affiliates* [ECF No. 564] (the "Plan") and an accompanying *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and Certain of Its Debtor Affiliates* [ECF No. 566] (the "Disclosure Statement").

25.     In the Plan, the only likely source of recovery proposed for unsecured creditors is an unspecified share of a liquidating trust containing a subset of unidentified causes of action that are not otherwise released by the Debtors, sold as part of the sales processes, or retained by the reorganized Debtors.  *See* Plan, Art. III.B.7.  While effectively offering its nearly half a billion dollars in unsecured claims, including thousands of innocent tort victims, nothing, the Plan also contains broad releases and exculpation provisions that would insulate the Debtors' sponsor, management, prepetition lenders, and restructuring support parties, as well as their "Related

Parties," from any liability.  Unless the sales of the Recovery Solutions Assets and the Corrections Assets exceed the approximately $770 million of prepetition funded debt and loans under the DIP Facility, unsecured claimholders will receive a *de minimis* recovery.

26.     The Section 341 Meeting of Creditors held on December 18, 2024 could not proceed in full because the Debtors had not yet filed their Schedules and Statements, and was continued to January 7, 2025.  The Debtors subsequently filed their Schedules and Statements on December 27, 2024.

## OBJECTION

### I.     Legal Standard

27.     The RS Sale is subject to approval pursuant to Bankruptcy Code § 363(b)(1) ("[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate").  Implicit in the statute are requirements that the RS Sale must represent a reasonable exercise of the Debtors' business judgment and be in the best interests of their estates.  *See In re Cont'l Air Lines, Inc*., 780 F.2d 1223, 1226 (5th Cir. 1986) ("for the debtor-in-possession … to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"); *In re St. Petersburg Hotel Assoc. Ltd*., 37 Bankr. 341, 343 (Bankr. M.D. Fla. 1983) (Section 363 "also impliedly requires the Court to find that it is good business judgment for the Debtor to enter into" the transaction); *In re GSC, Inc*., 453 B.R. 132, 174 (Bankr. S.D.N.Y. 2011) (citation omitted) ("The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company'").

28.     More specifically, the Bankruptcy Court for the Southern District of Texas has previously identified several factors to evaluate when determining whether to approve a sale under Bankruptcy Code § 363(b).  Where the debtor has secured a prospective buyer or stalking horse bidder, the purchase agreement governing the proposed transaction should be "sufficiently straightforward to facilitate competitive bids."  *In re Gulf Coast Oil Corp.*, 404 B.R. at 424.

29.     For the reasons below, the RS Sale as currently proposed fails these basic tests.  The Recovery Solutions Stalking Horse Agreement is the opposite of "straightforward," and, while additional bids for the Recovery Solutions Assets could not be made at this point, this deficiency improperly discourages bids for the Debtors' remaining assets and cannibalizes the remaining operations.  The RS Sale should not be approved unless the concerns raised by the Committee are adequately addressed.

## II.     The Scope of the Assets Sold is Ambiguous.

30.     The business judgment standard presumes the Debtors are acting on an informed basis.  *In re GSC, Inc.*, 453 B.R. at 174.  But, no one can be properly informed of the consequences of a sale when the very structure of the proposed transaction creates material ambiguity.  *See also In re Gulf Coast Oil Corp.*, 404 B.R. at 424 (suggesting a proposed purchase agreement should be "sufficiently straightforward" to be approved under Bankruptcy Code § 363(b)).

31.     In particular, the Recovery Solutions Stalking Horse Agreement fails to properly delineate the assets and liabilities being sold and those being left behind.  Currently, the Acquired Assets being transferred in connection with the RS Sale are defined to include those assets "primarily" related to the RS Business.  Recovery Solutions Stalking Horse Agreement § 2.1.[9]

---

[9]     More specifically, the Acquired Assets include "all of Sellers' direct or indirect right, title and interest in, to or under the RS Business, including all of Sellers' properties, rights, Claims and assets (other than the Excluded Assets) of every kind and description (wherever situated or located, real, personal or mixed, tangible or intangible, whether identifiable or contingent, owned, leased or licensed) **primarily** used, held for use in, or useful in, or

This creates uncertainty due to the significant overlap between the RS Business and the Corrections Business. Certain assets deemed Acquired Assets under the "primarily related to" threshold may be important, or even critical, to the continued operation of the Corrections Business. Yet, under the Recovery Solutions Stalking Horse Agreement, such assets would be transferred to the Stalking Horse Buyer, and the Corrections Business would have no right to any further benefit from or use of them.

32.     As an example of the intertwined nature of the RS Business and Corrections Business, the Recovery Solutions Stalking Horse Agreement acknowledges the existence of contracts that are shared between the RS Business and the Corrections Business (the "Shared Contracts"). *See* Recovery Solutions Stalking Horse Agreement § 7.10. Despite the Committee's repeated requests for more information regarding whether there are any assets shared between the Corrections Business and the RS Business, the Debtors have been unable to confirm the precise extent to which assets are shared. More clarity on the scope of the RS Sale is critical. If the Debtors themselves are unable to identify what assets will remain at the Corrections Business following the RS Sale, then no potential bidder for the Corrections Business will know what is available to be purchased.

---

intended to be **primarily** used in, the RS Business, whether or not reflected on the books and records of Sellers, as the same shall exist on the Closing Date." *Id.* (emphasis added). *See also id.* § 2.1(c) (defining Acquired Assets to include "all cash and cash equivalents in an amount not to exceed the Cash Cap, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, instruments and investments of Sellers primarily involving or **primarily related** to the RS Business, excluding prepaid deposits related to professional fee retainers; provided, however, the Parties acknowledge and agree that the Sellers shall use reasonable best efforts to have an amount of cash and cash equivalents in an amount equal to the Cash Cap as of the Closing") (emphasis added). The "causes of action" category of Acquired Assets is defined by reference to an "associated with" threshold (which is even lower than "primarily related"). *Id.* § 2.1(m) (defining Acquired Assets to include "all goodwill and customer referral relationships, other intangible property and all privileges, set-offs, indemnification rights, Causes of Action, actions, Claims and demands and rights of any kind as against others (whether by contract or otherwise) exclusively involving or exclusively relating to, arising from or **associated with** any of the Acquired Assets, the Assumed Liabilities and/or the RS Business") (emphasis added).

33.     Notwithstanding the ambiguity in the Recovery Solutions Stalking Horse Agreement relating to the scope of the assets being transferred, more concerning to the Committee is that it contains no mechanism guaranteeing that the Corrections Business can use or access assets that "primarily" relate to the RS Business but are nonetheless critical to the Corrections Business after the RS Sale.  The RS Sale should not be approved unless, among other things, the Debtors have the right to obtain a "reverse" transition services arrangement from the Stalking Horse Buyer to support the Corrections Business to the extent necessary in connection with the use of overlapping assets post-closing of the RS Sale.

34.     Moreover, to the extent any Corrections Assets that do not qualify as Acquired Assets are inadvertently transferred to the Stalking Horse Buyer as part of the RS Sale, a contractual mechanism should exist to ensure their prompt return to the Debtors' estates.  The Recovery Solutions Stalking Horse Agreement only provides a "wrong pockets" mechanism with respect to "payments," "funds," and "communications" received by the Stalking Horse Buyer that belong to the Sellers.  *Id*. § 8.3.[10]  Yet, many other assets that may be shared between the two businesses, including accounts receivable, cash and cash equivalents, and contracts, are currently part of the RS Sale.[11]  The absence of such a mechanism risks improperly depleting the Corrections

---

[10]    *Id*.  ("Wrong Pockets. Following the Closing, without effect on the Purchase Price, (i) Sellers shall promptly transfer to Buyer (A) any payment or funds which, per the terms of this Agreement, belongs to Buyer and is received by Sellers (directly or indirectly) after the Closing and (B) copies of any substantive communications received by Sellers after the Closing, including from a Governmental Authority or customer, supplier, distributor, landlord, licensee, service provider or other business partner, to the extent related to the RS Business, and (ii) Buyer shall promptly transfer to Sellers (A) any payment or funds which, per the terms of this Agreement, belongs to Sellers and is received by Buyer (directly or indirectly) after the Closing and (B) copies of any substantive communications received by Buyer after the Closing, including from a Governmental Authority or customer, supplier, distributor, landlord, licensee, service provider or other business partner, to the extent related to the Corrections Business").

[11]    *See id.* §§ 2.1(a) (defining Acquired Assets to include "all Accounts Receivable"), 2.1(c) (defining Acquired Assets to include "all cash and cash equivalents in an amount not to exceed the Cash Cap, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, instruments and investments of Sellers primarily involving or primarily related to the RS Business, excluding prepaid deposits

Business under the pretense of the RS Sale. *See In re Gulf Coast Oil Corp.*, 404 B.R. at 428 (denying approval of Bankruptcy Code § 363(b) sale because it involved not only the debtors' "crown jewels," but also "all of the other jewelry and assets").

35.     These vague and overreaching sale provisions that benefit the Stalking Horse Buyer at the expense of the sale of the Corrections Business demonstrate the Debtors have failed to properly exercise their business judgment or fulfill their fiduciary duties to the estates.   The Debtors have established a "win-win" situation for the Stalking Horse Buyer: if the RS Sale chills interest in the Corrections Business, the Plan provides that the Restructuring Support Agreement parties comprising the Stalking Horse Buyer will acquire the equity in the Corrections Business by default for an "amount to be determined between $20,000,000 and $55,000,000." Plan at 9.  In other words, the Stalking Horse Buyer stands to gain a windfall.  If a sale of the Corrections Business instead succeeds—even at a depressed price—the Stalking Horse Buyer will still unduly benefit by grabbing assets beyond the RS Business and securing itself a one-sided Transition Services Agreement (as further detailed below).

36.     These scenarios also benefit the Debtors' existing management, who are expected to be retained by the Corrections Business (to be controlled by the same parties comprising the Stalking Horse Buyer) with a forthcoming management incentive plan. *See* Plan, Art. IV.B.4.  If the RS Business or the Corrections Business were to be sold to a third-party strategic buyer, there would be no guarantee—indeed, it would be unlikely—that all or some of the Debtors' existing management would remain on board.  Through this structure, the incumbent management and lenders have set up a process to benefit themselves at the expense of the estates' unsecured

related to professional fee retainers"), 1.1 (defining Shared Contracts as "those Contracts that relate to both the RS Business and the Corrections Business").

claimholders. ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████     ███████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████[12]   The guardrails that the Committee is

proposing are necessary to mitigate this procedural imbalance.

### III.   The RS Sale Should Not Be Exploited to Divert Cash from the Debtors' Estates

37.     The Recovery Solutions Stalking Horse Agreement provides that the Sellers shall

maintain or otherwise transfer cash and cash equivalents in amount equal to the "Cash Cap" to the

RS Business as of the closing.   Despite its misleading name, the "Cash Cap" simply inserts a

placeholder amount of $10 million in cash to be transferred with the RS Business, subject to a net

working capital adjustment to be agreed upon, supposedly by November 25, 2024.   *Id.* § 1.1

(definition of Cash Cap).[13]   The Debtors and the Stalking Horse Buyer missed this key deadline

by over seven weeks, and only yesterday (after the Bid Deadline had elapsed) did the Debtors

disclose that they may ultimately deliver the RS Business with ████████ in cash, though neither

they nor anyone else can say for certain.   Dragelin Dep. Tr. at 44:2–16 ██████████████████

████████████████████████████████████████████████████████████████████████

---

[12]   Desatnik Declaration, Ex. 1 ("Schoenholtz Dep. Tr.").

[13]   Specifically, the definition provides:

> "Cash Cap" means an amount equal to $10,000,000.00, which amount is subject to adjustment by a mechanism to be mutually agreed to by the Parties in good faith no later than ten (10) Business Days following the Execution Date, which mechanism shall take into account anticipated levels of Cure Costs, accounts payable and Accounts Receivable as of the Closing. For the avoidance of doubt, only the mechanism will be agreed upon within ten (10) Business Days following the Execution Date [November 11, 2024], the actual targets and calculations will be agreed upon prior to the Sale Hearing.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███ [14]

38.     Moreover, despite repeated requests from the Committee regarding the workings of the Cash Cap adjustment mechanism, the Debtors did not share any responsive supporting documentation until the eve of the Sale Hearing, which the Committee is reviewing.  A meaningful opportunity to review and raise concerns is critical, particularly given the significant amounts at issue.  Anyone would be skeptical of a situation where cash leaving the Debtors' estates exceeds a contractually agreed "cap" by █████ and without any additional consideration in return.  *See In re Gulf Coast Oil Corp.*, 404 B.R. at 424 (criticizing quick sales that are "understood only by a few parties who would benefit from the sale").

39.     To be clear, the Committee does not take issue with the Sellers delivering $10 million of working capital to fund immediate-term operations, subject to the Debtors carrying their burden of demonstrating such amount is necessary for working capital.  Moreover, the amount of cash delivered with the RS Business should be right-sized for its needs and in any event not exceed $10 million.  The balance of any available cash should be the property of the Corrections Business and support asset value in its sale or restructuring.

## IV.    The Recovery Solutions Stalking Horse Agreement Cannot be Used to Acquire Avoidance Actions That May Be the Only Source of Recovery for General Unsecured Claims

40.     The Debtors have also failed to discharge their legal burden with respect to the transfer of certain avoidance actions embedded in the RS Sale.  The Sellers are attempting to

---

[14]     *See also* Dragelin Dep. Tr. at 58:10–21 ████████████████████████████████
████████████████████████████████████████████

transfer avoidance actions relating to assumed contracts and leases (the "<u>Acquired Avoidance Actions</u>") to the Stalking Horse Buyer before the Debtors or the Committee have conducted any investigation into their value, and without ascribing any value to the Acquired Avoidance Actions in the Recovery Solutions Stalking Horse Agreement or elsewhere.  Recovery Solutions Stalking Horse Agreement §§ 2.1(n), 1.1.[15]  Moreover, the Debtors' special committee has not even completed its limited investigation, indicating even the Debtors do not attribute much relevance to this investigation.  The Stalking Horse Buyer's credit bid does not assign any dollar amount to the Acquired Avoidance Actions, ███████████████████████████████████████

████████████████████████████████████ Dragelin Dep. Tr. at 73:24–76:19 ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

41.     Under the Plan proposed by the Debtors, the only likely source of compensation for general unsecured creditors will be an unspecified share of a liquidating trust (the "<u>Liquidating Trust</u>"), heavily diluted by deficiency claims of first and second lien lenders, that gives a trustee

---

[15]  *Id*.  § 2.1(n) (defining Acquired Assets to include "all Acquired Avoidance Actions").  *Id*.  § 1.1 (defining Acquired Avoidance Actions as "all Avoidance Actions, including any proceeds thereof, that may be asserted against parties to, or otherwise are related to the Assumed Contracts").  *Id*.  (defining Avoidance Actions as "any and all actual or potential avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Seller, its Estates, or other authorized parties in interest to avoid a transfer of property or an obligation incurred by the Seller pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through and including 553, and 724(a) of the Bankruptcy Code, or under similar or related state, federal, and non-U.S. statutes and common law, including fraudulent transfer laws or fraudulent conveyance").

power to pursue unspecified causes of action that are not otherwise released or retained by the reorganized Debtors, and then distribute proceeds to general unsecured creditors. *See* Plan, Art. III.B.7. In these circumstances, it is imperative that the Acquired Avoidance Actions are preserved for the benefit of general unsecured creditors.

42.     The Court should not allow the Acquired Avoidance Actions to be sold because the Debtors have failed to specify what Acquired Avoidance Actions are being acquired, provide a valuation for them, demonstrate that consideration is being provided for them commensurate to that value, and that the proceeds of that sale will go to fund general unsecured claimholder recoveries. Moreover, the Recovery Solutions Stalking Horse Agreement must provide that none of the Acquired Avoidance Actions being transferred are associated with the Corrections Business and/or the Corrections Assets.

43.     The RS Sale also fails for the legal reason that the Stalking Horse Buyer's credit bid cannot be used to acquire the Avoidance Actions. Section 363(k) only permits a secured creditor to credit bid its claim against "property that is subject to a lien that secures [its] claim." Bankruptcy Code § 363(k). Pursuant to the Final DIP Order (as defined in the Plan), the Stalking Horse Buyer's lien on avoidance actions is limited to the ***proceeds*** of avoidance actions, and does not include the avoidance actions themselves. Final DIP Order at 27; *see also* ECF No. 58 ("The Interim DIP Order provides that, subject to entry of the Final DIP Order, the DIP Secured Parties will be granted liens on proceeds of Avoidance Actions."). The Recovery Solutions Stalking Horse Agreement purports to sell the Acquired Avoidance Actions, not just their proceeds, through a credit bid. If the Stalking Horse Buyer seeks to acquire assets not included in its collateral, separate consideration must be provided, and that consideration should be held for the benefit of

unsecured claimholders because the Acquired Avoidance Actions are unencumbered property.  As it currently stands, the Acquired Avoidance Actions are being sold for no consideration.[16]

44.     The United States Court of Appeals for the Fifth Circuit has long recognized that avoidance actions are unencumbered and should be reserved for the benefit of unsecured creditors. *See e.g. McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*, 52 F.3d 1330, 1335-36 (5th Cir. 1995) ("[T]he proceeds recovered in an avoidance action satisfy the claims of priority and general unsecured creditors before the debtor benefits . . . The proceeds recovered in avoidance actions should not benefit the reorganized debtor; rather, the proceeds should benefit the unsecured creditors."); *ASARCO LLC v. Am. Mining Corp.*, 404 B.R. 150, 161 (S.D. Tex. 2009) ("[T]he ultimate purpose of most fraudulent-transfer laws, and in particular [section] 550 [of the Bankruptcy Code], is to protect unsecured creditors and, as far as possible, to make them whole."). The intent behind avoidance powers and a debtor's power to bring causes of action is to allow the debtor in possession to gain recoveries for the benefit of, and provide for the equitable treatment of, all unsecured creditors. *See e.g. Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors").

45.     Even under the business judgment standard, the Acquired Avoidance Actions cannot be transferred for no consideration.  The standard requires the proponent of a sale under section 363(b) of the Bankruptcy Code to demonstrate that the sale is "supported by an articulated business justification, good business judgment, or sound business reasons." *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010); *see also Gluckstadt Holdings, L.L.C. v. VCR I, L.L.C.*

---

[16]    Even if the Stalking Horse Buyer could obtain the proceeds of the Acquired Avoidance Actions through a credit bid, the action itself has separate value, as the owner of the action controls whether and when to investigate and pursue such action, among other benefits.

*(In re VCR I, L.L.C.)*, 922 F.3d 323, 326–27 (5th Cir. 2019); *In re Gulf Coast Oil Corp.*, 404 B.R. at 422–28.   When making this assessment, courts consider a variety of factors, "including: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether a transaction has been proposed and negotiated in good faith; (iv) the proportionate value of the asset to the estate as a whole; (v) the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property; and (vi) whether the asset is increasing or decreasing in value." *In re Rosbottom*, Case No. 09-11674, 2010 Bankr. LEXIS 4305, at \*12 (Bankr. W.D. La. Dec. 1, 2010) (citing *In re Cont'l Air Lines*, *Inc.*, 780 F.2d at 1226; *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)).

46.    In particular, a proposed sale of claims arising under chapter 5 of the Bankruptcy Code and not otherwise subject to a secured lender's prepetition lien must "undergo careful judicial scrutiny pursuant to existing § 363(b) requirements" before such a proposed sale can be approved. *In re Moore*, 608 F.3d at 262.   Plainly, letting the Acquired Avoidance Actions go for no specified consideration fails this test.

47.    Moreover, to the extent the Acquired Avoidance Actions are transferred pursuant to the RS Sale, the transfer should not prejudice the Debtors' rights to pursue any avoidance actions they retain, particularly with respect to avoidance actions that may be shared between the Corrections Business and the RS Business (*e.g.* where the underlying factual bases for the avoidance actions are the same, or where the Stalking Horse Buyer is a necessary party).

**V.     The Debtors Have Failed to Demonstrate That the Economic Terms of the Transition Services Agreement are Fair and the Transition Services Agreement Must Be Modified to Avoid Chilling Bidding for the Corrections Assets**

48.     Unrelated to the "reverse" transition services arrangement proposed by the Committee in § II *supra*, the Sellers and the Stalking Horse Buyer negotiated a forward Transition Services Agreement (the "TSA") in connection with the Recovery Solutions Stalking Horse Agreement, requiring the Corrections Business to service the RS Business during a temporary transition period following consummation of the RS Sale.[17]  Based on drafts of the TSA provided to the Committee, the Committee is concerned that the TSA, as currently structured, would impair the Corrections Business and therefore chill a fulsome bidding process for it.

49.     

50.     Second, the TSA's economic terms are unduly burdensome for the Corrections Business.  The fees that the Corrections Business would receive for providing services do not represent fair market value, as the Debtors have represented that no ███████ or ███████ was built into the fees.[20]  But, it is unclear whether the fees would even cover costs on a net basis.  While the Debtors have characterized the compensation structure at issue as ███████,"[21] that

---

17   Recovery Solutions Stalking Horse Agreement § 1.1 (defining Transition Services Agreement as "that certain transition services agreement to be entered into between the Sellers and the Buyer, in substantially the form attached hereto as **Exhibit F**") (emphasis in original).

18   Dragelin Dep. Tr. at 25:12–16.

19   Dragelin Dep. Tr. at 106:2–13.

20   Dragelin Dep. Tr. at 99:19–100:3.

21   Dragelin Dep. Tr. at 97:5–19.

claim remains uncertain, and several factors heighten the risk that services will be provided at a loss to the Corrections Business.  Specifically, the TSA lacks provisions to account for cost increases incurred by the Corrections Business in delivering the services and provides no mechanism for the RS Business to prepay necessary expenses.  Effectively, the TSA will subsidize the RS Business rather than contribute positively to the Corrections Business on a go-forward basis.

51.      The Debtors have been unable to answer basic questions from the Committee to get further clarity on these issues, including: (1) which contracts are necessary to provide the services under the TSA; (2) what the usage rates for contracts not structured on a per-user basis would be; (3) what the defined costs associated with the services are; and (4) how the involvement of Corrections Business personnel in the TSA would impact a go-forward Corrections Business. Without answers to these basic questions, neither the Committee nor the Court can understand whether the terms of the TSA are in the best interest of the Debtors' estates.  The Debtors cannot satisfy the business judgment standard if they themselves are not properly informed of the consequences of entering into the TSA.

52.      Third, assuming any strategic bidder for the Corrections Business could potentially be a competitor of the RS Business, the TSA must be modified to provide flexibility for such a bidder to terminate and/or renegotiate the TSA and allow for an accelerated timeline for the RS Business to find replacement services at its own expense.  A strategic buyer would understandably be reluctant to provide services to a competitor, let alone at burdensome rates that were pre-negotiated by the Sellers and the Stalking Horse Buyer.  Furthermore, a strategic buyer would understandably need assurances that its confidential information would be adequately protected from its competitor and in no way compromised through the TSA.  The TSA's failure to address

these issues, as well as others detailed in Exhibit 3 to the Desatnik Declaration, discourages bidding on the Corrections Business and therefore jeopardizes the Debtors' ability to maximize value in these chapter 11 cases.

## VI. The Stalking Horse Buyer Should Not Have the Unilateral Right to Add or Remove Acquired Entities

53.     The Recovery Solutions Stalking Horse Agreement grants the Stalking Horse Buyer the unilateral right to redefine which entities are Acquired Companies (entities that the Stalking Horse Buyer will acquire through an equity sale, in turn indirectly acquiring all their assets and inheriting all their liabilities).  In particular, the Stalking Horse Buyer has the ability to remove some or all entities from this category up to two days before closing (*i.e.* after the Court's approval of the transaction, and without notice to any parties in interest or with an opportunity for them to object).  Recovery Solutions Stalking Horse Agreement § 2.1(f).[22]  Should the Stalking Horse Buyer exercise this right and ultimately decide not to purchase any equity interests in the Acquired Companies while still acquiring the RS Business, the RS Sale could effectively be transformed into a "free and clear" asset deal, potentially saddling the Debtors' estates with unanticipated liabilities without receiving any incremental consideration in return.  In these circumstances, the Committee and its constituents could be denied the opportunity to be heard on or even evaluate the potential harm to the estates resulting from a material modification in the transaction structure.

---

[22]   More specifically, Acquired Assets are defined to include "all record and beneficial ownership in Equity Interests owned by the Sellers (and all rights related thereto of the Sellers) in each Acquired Company; <u>provided</u>, <u>however</u>, that Buyer may, in its sole and absolute discretion, amend or revise Schedule 2.1(f)(i) at any time and from time to time prior to the date that is two (2) Business Days prior to the Closing Date, in order to add any one or more of the direct or indirect Subsidiaries of the Sellers set forth on Schedule 2.1(f)(ii) (and such added Subsidiary shall be automatically included as an Acquired Company for purposes of this Agreement), or remove any direct or indirect Subsidiary of the Sellers from such Schedule 2.1(f)(i) (and such removed Subsidiary shall be automatically deemed an Excluded Company for purposes of this Agreement)."  *Id.*

54. While the Committee has requested, repeatedly, from the time of its appointment that the Debtors provide a quantification of the liabilities to be assumed under the RS Sale, they have not provided such information. ███████████████████████████████████ ███████████████████████ Schoenholtz Dep. Tr. at 81:3–82:9 ███████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████ The Debtors cannot exercise their business judgment in determining whether the consideration for the transaction is appropriate if, among other things, (1) the benefit to the estates through the assumption of liabilities is not quantified, and (2) the Stalking Horse Buyer can remove its assumption of those liabilities *after* the RS Sale has been approved and without any corresponding change in the consideration provided.

55. Since the Stalking Horse Buyer has now had sufficient time to conduct diligence in connection with the RS Sale, the Court should condition approval of the transaction on the Stalking Horse Buyer's commitment to acquire the equity interests in all entities currently designated as Acquired Companies.

56. On the flip side, the Stalking Horse Buyer also has the right to designate certain Debtor entities, which are not currently Acquired Companies, as such (collectively, the "Additional Acquired Companies"), allowing the Stalking Horse Buyer to purchase the equity interests in these entities as well.  Recovery Solutions Stalking Horse Agreement § 2.1(f).[23]

---

[23] More specifically, Acquired Assets are defined to include "all record and beneficial ownership in Equity Interests owned by the Sellers (and all rights related thereto of the Sellers) in each Acquired Company; provided, however, that Buyer may, in its sole and absolute discretion, amend or revise Schedule 2.1(f)(i) at any time and from time to time prior to the date that is two (2) Business Days prior to the Closing Date, in order to add any one or more of the direct or indirect Subsidiaries of the Sellers set forth on Schedule 2.1(f)(ii) (and such added Subsidiary shall be automatically included as an Acquired Company for purposes of this Agreement), or remove any direct or

Although this component of the RS Sale is structured as a stock deal, in turn minimizing concerns about burdening the estates with unanticipated liabilities, it raises other issues. First, the Stalking Horse Buyer will not provide any additional consideration in exchange for the Additional Acquired Companies. *See In re GSC, Inc.*, 453 B.R. at 145 & n.16 (noting buyer increased initial purchase price to account for assets not subject to auction that were later added to sale). Absent robust disclosure regarding the Additional Acquired Companies, which the Committee has not received, there is no way to evaluate whether the consideration provided by Stalking Horse Buyer fairly accounts for the value of these incremental entities. The Committee submits that it should receive, at a minimum, a balance sheet detailing the assets and liabilities of any of the Additional Acquired Companies before they can be added to the RS Sale, and sufficient notice and opportunity to object to their inclusion, especially if no additional consideration is being provided.

57.   Moreover, it is unclear why it would be necessary to add new entities to the RS Sale, when the transaction was designed to encompass the entirety of the RS Business from the beginning. The Debtors have represented that Additional Acquired Companies will only be added to the RS Sale if failure to do so would create regulatory and licensing issues for the go-forward RS Business. To the extent that is accurate, it is unclear whether adding the Additional Acquired Companies to the RS Sale would not create similar problems for the go-forward Corrections Business, which would not be in the best interests of the estates.

58.   The uncertainty surrounding which entities may be excluded from or added to the RS Sale is a product of a rushed sales process forced on the estates by the Debtors. The Debtors must not make unsecured claimholders bear the costs of their failure to specify the assets and

---

indirect Subsidiary of the Sellers from such Schedule 2.1(f)(i) (and such removed Subsidiary shall be automatically deemed an Excluded Company for purposes of this Agreement)." *Id*.

liabilities being acquired and assumed, while the incumbent lenders stand to benefit directly from the RS Sale and the Corrections Restructuring (as defined in the Plan).  The RS Sale, as currently constituted, is therefore not in the best interests of the estates.

**VII. Additional Revisions Are Needed to the Recovery Solutions Stalking Horse Agreement to Ensure Creditors of the Remaining Estates Are Sufficiently Protected**

       *a. Cure Costs Cap*

59.    The Recovery Solutions Stalking Horse Agreement provides that the Sellers shall be responsible for all cure costs with respect to assumed executory contracts and unexpired leases (collectively, the "<u>Assumed Contracts</u>"), subject to a $10 million cap that is reduced by any amounts paid by the Sellers on or after November 11, 2024 in connection with any pre-petition trade payables (the "<u>Seller Cure Cap</u>").  Recovery Solutions Stalking Horse Agreement § 2.5(a)(i).[24]  Based on information provided by the Debtors, the Committee understands that the Seller Cure Cap has been satisfied pursuant to various critical vendor payments, which the Debtors should confirm on the record and in the Proposed Sale Order.

       *b. Reimbursements*

60.    The Stalking Horse Buyer must increase its credit bid in connection with certain reimbursements the Debtors have received since entry of the Final DIP Financing Order.

61.    Prior to entry of that order, the Committee had expressed several concerns regarding the DIP Facility.  To address some of those concerns, the Stalking Horse Buyer agreed to increase its credit bid for the RS Business in an amount equal to reimbursements the Debtors were expecting to receive for vendor payments that the Stalking Horse Buyer (through the DIP

---

[24] For the avoidance of doubt, the Seller Cure Cap includes amounts necessary to satisfy cure costs of executory contracts and unexpired leases held by the Acquired Companies and any Additional Acquired Companies.

Lenders) was initially funding pursuant to the DIP Facility and the Critical Vendors Order.[25] Counsel for the Stalking Horse Buyer acknowledged this agreement to the Court.  Hr'g Tr. 31:11– 22, *In re* Wellpath Holdings, Inc., *et al*., No. 24-90533, (Bankr. S.D. Tex. Dec. 11, 2024) ("what we have agreed … with respect to … reimbursements on the RS side of the business, [is] if those reimbursements … come in, it will result in … an increase in the credit bid amount that … will result in a corresponding kind of reduction at the end of the day of … our first lien indebtedness … as part of the sale").

62.    The Committee understands that the Debtors have now received the reimbursements at issue.  A corresponding increase in the credit bid amount is in order, but has not been made yet.  Approval of the RS Sale should be conditioned on the Stalking Horse Buyer holding its end of the bargain with respect to these reimbursements.

    *c.  Non-Mutual Releases*

63.    The Recovery Solutions Stalking Horse Agreement contains non-mutual releases that disproportionately favor the Stalking Horse Buyer (collectively with certain entities and individuals listed therein, the "Buyer Group").  *See* Recovery Solutions Stalking Horse Agreement § 12.17.  While the Buyer Group is granted a full release, the Sellers are not.  *Id.*[26]  The Sellers are primarily released from claims relating to the operation of the RS Business, whereas the Buyer Group is released from virtually all actual and potential claims and causes of action, going well beyond their capacity as purchasers of the Recovery Solutions Assets.  *Id.*  Notably, the Buyer Group is released from claims arising out of or in any way related to loans, security, or forbearance

---

[25]    *See* Final Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Lien Claimants, (B) 503(b)(9) Claimants, (C) PACA/PASA Claimants, and (D) Critical Vendors, (II) Confirming Administrative Expense Priority for Outstanding Claims, and (III) Granting Related Relief entered by the Bankruptcy Court [ECF No. 392] (the "Critical Vendors Order").

[26]    Paragraph 43 of the Proposed Sale Order similarly contains overly broad releases in favor of the Buyer Group, which, for the avoidance of doubt, the Committee also objects to.

agreements to which the Stalking Horse Buyer or the Sellers were parties. *Id*. This is particularly inappropriate as the Buyer Group includes the Debtors' prepetition lenders and DIP Lenders, which should certainly not be released in those capacities through a sale process (to the extent they should be released at all). *Id*.[27]

64.     The Debtors have not made any showing as to whether they have investigated any actions against the prepetition lenders and, if so, what those actions may be worth and whether the consideration being received is appropriate for such releases. Moreover, the limited nature of the release granted to the Sellers exposes them to administrative expense liability for a potential post-petition breach of the Recovery Solutions Stalking Horse Agreement. No justification has been provided for this disparity, which fails to withstand scrutiny.

## RESERVATION OF RIGHTS

The Committee hereby reserves the right to supplement this objection prior to or at the hearing on the RS Sale, and to introduce evidence, and offer testimony concerning the RS Sale.

## CONCLUSION

Given the material deficiencies highlighted above, the Debtors cannot satisfy the business judgment standard for approval of the RS Sale and closing of the Recovery Solutions Stalking Horse Agreement. Rather, the plain terms of the Recovery Solutions Stalking Horse Agreement suggest that it was designed to strip the Debtors of most of their assets and saddle the remaining Debtors with liabilities that should have been picked up by the Stalking Horse Buyer based on the form of the RS Sale. Further, the Recovery Solutions Stalking Horse Agreement and the TSA make it impossible for a bidder on the remaining Corrections Business to know what assets they

---

[27]   The Buyer Group includes the Stalking Horse Buyer and "its directors, officers, control persons (as defined in Section 15 of the Securities Act, or Section 20 of the Exchange Act), members, employees, agents, attorneys, financial advisors, consultants, legal representatives, shareholders, partners, estates, successors and assigns." *Id*.

can bid on and force them to be term takers in a TSA that they had no hand in negotiating.  The Court should condition approval of the RS Sale on the revisions proposed by the Committee to (a) the Recovery Solutions Stalking Horse Agreement (*see* **Exhibit A** attached hereto), (b) the Proposed Sale Order (*see* **Exhibit B** attached hereto), and (c) the TSA (*see* Exhibit 3 attached to the Desatnik Declaration), and grant such other relief as may be just and proper.  Alternatively, the Court should deny approval of the RS Sale.

**STINSON LLP**

*/s/ Nicholas Zluticky*
Nicholas Zluticky (SDTX Bar No. 3845893)
Zachary Hemenway (SDTX Bar No. 3856801)
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone: (816) 842-8600
nicholas.zluticky@stinson.com
zachary.hemenway@stinson.com

- and -

Lucas Schneider (admitted *pro hac vice*)
1144 Fifteenth St., Suite 2400
Denver, Colorado 80202
Telephone: (303) 376-8400
Facsimile: (303) 376-8439
lucas.schneider@stinson.com

- and -

**PROSKAUER ROSE LLP**

Brian S. Rosen (admitted *pro hac vice*)
Ehud Barak (admitted *pro hac vice*)
Daniel Desatnik (admitted *pro hac vice*)
Eleven Times Square
New York, New York 10036-8299
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
brosen@proskauer.com
ebarak@proskauer.com

ddesatnik@proskauer.com

- and -

Paul V. Possinger (admitted *pro hac vice*)
PROSKAUER ROSE LLP
Three First National Plaza
70 West Madison, Suite 3800
Chicago, IL 60602-4342
Telephone: (312) 962-3570
Email: ppossinger@proskauer.com


*Proposed Counsel to the Statutory Unsecured
Claimholders' Committee to Wellpath Holdings,
Inc., et al.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on January 7, 2025 the foregoing document was electronically filed with the court using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF System.

*/s/ Nicholas Zluticky*
Nicholas Zluticky
Counsel for the Committee

## **Exhibit A**

### **Recovery Solutions Stalking Horse Agreement Redline**

**AMENDED AND RESTATED**

**EQUITY INTEREST AND ASSET PURCHASE AGREEMENT**

**DATED AS OF NOVEMBER 11, 2024JANUARY [●], 2025**

**BY AND AMONG**

**RS PURCHASER LLC,**

**WELLPATH HOLDINGS, INC.**

**AND**

**THE ADDITIONAL SELLERS**

[TABLE OF CONTENTS]

**Page**

**ARTICLE 1 DEFINITIONS**     **2**

1.1     Definitions     2
1.2     Other Definitions and Interpretive Matters     ~~17~~16

**ARTICLE 2 PURCHASE AND SALE**     ~~18~~17

2.1     Purchase and Sale     ~~18~~17
2.2     Excluded Assets     20
2.3     Assumed Liabilities     ~~22~~21
2.4     Excluded Liabilities     22
2.5     Assignment and Assumption of Contracts     23
2.6     No Excluded Assets or Liabilities of Acquired Companies     26
~~2.6~~2.7     Further Assurances     26
2.8     Additional Acquired Companies     27
2.9     Cash Cap     28

**ARTICLE 3 PURCHASE PRICE**     ~~27~~28

3.1     Consideration     ~~27~~28
3.2     Allocation of Purchase Price     ~~27~~28
3.3     DIP Payoff     29
3.4     Post-Closing Reimbursement Adjustment     29
3.5     Additional Acquired Companies     29

**ARTICLE 4 CLOSING AND DELIVERIES**     ~~28~~30

4.1     Closing Date     ~~28~~30
4.2     Buyer's Deliveries     ~~28~~30
4.3     Sellers' Deliveries     ~~29~~30
4.4     Separation     31

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF THE SELLERS**     ~~29~~31

5.1     Status     ~~29~~     31
5.2     Power and Authority     ~~30~~31
5.3     Enforceability     ~~30~~32
5.4     Group Companies and Managed Entity; Capitalization     ~~30~~32
5.5     No Violation; Consents and Approvals     ~~31~~32
5.6     Financial Statements     ~~31~~33
5.7     Absence of Certain Developments     ~~31~~33
5.8     Litigation     ~~33~~34
5.9     Environmental Matters     ~~33~~34
5.10     Title to Properties     ~~34~~35

i

2

5.11    Sufficiency of Assets                                                              3435
5.12    Leased Real Property.                                                              3435
5.13    Compliance with Laws.                                                             3536
5.14    Labor and Employment Matters.                                                     3637
5.15    Employee Benefit Plans                                                             39
5.16    Tax Matters                                                                       4041
5.17    Insurance                                                                          41
5.18    Affiliated Transactions                                                            41
5.19    Material Contracts.                                                                41
5.20    Intellectual Property                                                              43
5.21    Material Customers and Suppliers                                                   43
5.22    Regulatory Compliance                                                              43
5.23    Brokers                                                                            45
5.24    Bank Accounts                                                                      45
5.25    NO OTHER REPRESENTATIONS AND WARRANTIES                                            45

**ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF BUYER**                                      **46**

6.1     Organization and Good Standing                                                     46
6.2     Power and Authority                                                                46
6.3     Enforceability                                                                     46
6.4     No Violations; Consents and Approvals                                              46
6.5     Brokers                                                                           4746
6.6     Litigation                                                                         47
6.7     NO OTHER REPRESENTATIONS AND WARRANTIES                                            47

**ARTICLE 7 ACTIONS PRIOR TO THE CLOSING DATE**                                            **4847**

7.1     Access and Reports                                                                4847
7.2     Operations Prior to the Closing Date                                              4948
7.3     Antitrust Filings; Cooperation.                                                   5150
7.4     Bankruptcy Court Matters.                                                         5452
7.5     Expense Reimbursement                                                             5553
7.6     Disclosure Schedules; Notice of Developments                                      5553
7.7     Sale Free and Clear                                                               5654
7.8     Alternate Bidder                                                                  5654
7.9     Consents                                                                          5655
7.10    Treatment of Shared Contracts.                                                    5755
7.11    Transition Services Agreement Schedules                                            58

**ARTICLE 8 ADDITIONAL AGREEMENTS**                                                        **5857**

8.1     Taxes58                                                                            57
8.2     Bulk Sales                                                                        6058
8.3     Wrong Pockets                                                                     6058
8.4     Assumed Contracts: Adequate Assurance and Performance                             6058
8.5     Employee Matters                                                                  6058
8.6     Post-Closing Books and Records and Personnel                                      6360
8.7     Satisfaction of Certain Estate Liabilities                                        6360

ii

**ARTICLE 9 CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE** **63**61

9.1     Accuracy of Representations     **63**61
9.2     Sellers' Performance     **63**61
9.3     No Order     **64**61
9.4     Governmental Authorizations     **64**61
9.5     Sellers' Deliveries     **64**61
9.6     ~~DIP Financing Orders~~     **64**
~~9.7~~9.6     Sale Order     **64**61
~~9.8~~9.7     Assumed Contracts     **64**61
~~9.9~~9.8     Consents     **64**61
~~9.10~~9.9     Material Adverse Effect     **64**62
~~9.11~~9.10     No Default; No Termination Event     **64**62
~~9.12~~9.11     Restructuring Support Agreement     **64**62

**ARTICLE 10 CONDITIONS PRECEDENT TO THE OBLIGATION OF THE SELLERS TO CLOSE** **65**62

10.1     Accuracy of Representations     **65**62
10.2     Sale Order     **65**62
10.3     Buyer's Performance     **65**62
10.4     No Order     **65**62
10.5     Governmental Authorizations     **65**62
10.6     Buyer's Deliveries     **65**62

**ARTICLE 11 TERMINATION** **65**63

11.1     Termination Events     **65**63
11.2     Effect of Termination     **67**64

**ARTICLE 12 GENERAL PROVISIONS** **68**65

12.1     Survival     **68**65
12.2     Confidentiality     **68**65
12.3     Public Announcements     **68**65
12.4     Notices     **68**65
12.5     Waiver     **70**68
12.6     Entire Agreement; Amendment     **70**68
12.7     Assignment     **70**68
12.8     Severability     **71**68
12.9     Expenses     **71**68
12.10     Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver     **71**68
12.11     Counterparts     **72**69
12.12     Parties in Interest; No Third-Party Beneficiaries; No Amendment     **72**69
12.13     Remedies     **72**69
12.14     Specific Performance     **72**69
12.15     Sellers' Representative; Reliance     **72**70

2

| 12.16 | Limitations on Damages | 7471 |
| 12.17 | General Release | 7471 |
| 12.18 | Non-Recourse | 7672 |
| 12.19 | Joinder | 7672 |

2

**EXHIBITS**

Exhibit A                      Form of Assumption Agreement
~~Exhibit B~~                  ~~Bidding Procedures~~
~~Exhibit C~~                  ~~Form of Bidding Procedures Order~~
Exhibit ~~D~~B                 Form of Bill of Sale
Exhibit ~~E~~C                 Form of Intellectual Property Assignment Agreement
Exhibit ~~F~~D                 Form of Transition Services Agreement
Exhibit ~~G~~E                 Form of Securities Transfer Agreement

2

**AMENDED AND RESTATED EQUITY INTEREST AND ASSET PURCHASE AGREEMENT**

THIS **AMENDED AND RESTATED EQUITY INTEREST ~~AND~~AND ASSET PURCHASE AGREEMENT** (this "***Agreement***"), dated as of ~~November 11, 2024~~January [___], 2025 (the "***~~Execution~~Effective* Date***"), is made and entered into by and among RS Purchaser LLC, a Delaware limited liability company ("***Buyer***"), Wellpath Holdings, Inc., a Delaware corporation (the "***Company***"), and the Additional Sellers (collectively with the Company, the "***Sellers***" and, each entity individually, a "***Seller***"), as debtors and debtors-in-possession. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in Article 1.

**RECITALS**

WHEREAS, on ~~the~~November 11, 2024 (the "***Original* Execution Date**"), the Sellers and certain of their affiliates ~~shall file~~filed voluntary petitions (the "***Bankruptcy Cases***") for relief under ~~Chapter~~chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***");

WHEREAS, on the Original Execution Date, Buyer and the Sellers entered into that certain Equity Interest and Asset Purchase Agreement (the "***Original Purchase Agreement***");

WHEREAS, Buyer and the Sellers now desire, and have agreed, to amend and restate the Original Purchase Agreement in its entirety as set forth in this Agreement;

WHEREAS, in accordance with the Bidding Procedures attached to the Bidding Procedures Order entered by the Bankruptcy Court, and subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, the Sellers desire to sell to Buyer the Acquired Assets, Buyer desires to purchase from the Sellers the Acquired Assets and assume the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated by this Agreement;

WHEREAS, pursuant to ~~the~~that certain direction letter, dated on or around the ~~date hereof~~Original Execution Date (the "***Instruction Letter***"), a true and correct copy of which has been provided to the Sellers, the Required Lenders (as defined in the DIP Facility) and UBS AG Stamford Branch, as agent (the "***DIP Agent***") have authorized and directed that Buyer credit bid the obligations under the DIP Facility, pursuant to the terms and subject to the conditions set forth in this Agreement;

WHEREAS, upon the Closing, the Acquired Assets and the Assumed Liabilities shall be purchased and assumed by Buyer pursuant to the Sale Order, free and clear of all Liens (other than Permitted Liens), pursuant to ~~Sections~~sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

WHEREAS, the Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court; and

WHEREAS, the board of directors, board of managers, managing member, or similar governing body of each Seller has determined that it is advisable and in the best interests of such Seller and its constituencies ~~to~~, including its creditors, to amend and restate the Original Purchase Agreement and enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and each has approved the same.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein

made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE 1

### DEFINITIONS

1.1    Definitions.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"*Accounts Receivable*" means, with respect to each Seller, all accounts receivable, notes receivable, purchase orders, negotiable instruments, chattel paper, notes and other rights to payment, primarily related to the RS Business, including those consisting of all accounts receivable in respect of services rendered or products sold to customers of the RS Business by such Seller, any other miscellaneous accounts receivable of such Seller primarily related to the RS Business, and any claim, remedy or other right of such Seller primarily related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto.

"*Acquired Assets*" has the meaning set forth in Section 2.1.

"*Acquired Avoidance Actions*" means all Avoidance Actions, including any proceeds thereof, that may be asserted against parties to, or otherwise are ~~related~~with respect to the Assumed Contracts. and solely to the extent such Avoidance Actions relate to RS Business; provided, however, that all Avoidance Actions that may be asserted against any insiders of the Sellers, as that term is defined under section 101(31) of the Bankruptcy Code (excluding, for the avoidance of doubt, any Buyer Employees), or against any affiliates, as that term is defined under section 101(2) of the Bankruptcy Code, are specifically excluded from the Acquired Avoidance Actions, shall not be transferred or assigned to Buyer and shall remain property of the Sellers' chapter 11 estates ; provided, further, that nothing in this Agreement shall prejudice Seller's ability to pursue any Avoidance Actions that are not Acquired Avoidance Actions and Buyer shall take all reasonable steps to cooperate with Sellers in connection with any Avoidance Actions that are not Acquired Avoidance Actions.

"*Acquired Companies*" means the Subsidiaries of the Sellers set forth on Schedule ~~2.1~~2.7(f)(ia), as it may be amended from time to time pursuant to the terms hereof.

"*Acquired Company Plan*" means any Plan which is maintained, sponsored or entered into solely by an Acquired Company.

"*Acquired Interests*" has the meaning set forth in Section 2.1.

"*Acquired Seller Assets*" has the meaning set forth in Section 2.1.

"*Action*" means any legal action, suit, petition, plea, charge, claim, demand, hearing, inquiry, arbitration, complaint, grievance, summons, litigation, mediation, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, inquest, audit, examination, investigation or similar matter commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority.

"***Additional Acquired Company***" has the meaning set forth in Section 2.8.

"***Additional Acquired Company Disclosure***" has the meaning set forth in Section 7.6.

"***Additional Sellers***" means: (a) Correct Care Holdings, LLC, a Florida limited liability company, and ("***Correct Care***"), (b) Alpine CA Behavioral Health HoldCo, LLC, a Delaware limited liability company. ("***Alpine***"), and (c) subject to and solely upon satisfaction of the conditions set forth in Section 2.7, Wellpath Group Holdings, LLC (f/k/a Correct Care Solutions Group Holdings, LLC), a Delaware limited liability company ("***Wellpath Group Holdings***"), and Wellpath Hospital Holding Company, LLC, a Delaware limited liability company ("***Wellpath Hospital***").

"***Ad Hoc Group***" means that certain ad hoc group of unaffiliated Consenting First Lien Lenders and Consenting Second Lien Lenders represented by Akin Gump Strauss Hauer & Feld LLP, Houlihan Lokey Capital, Inc. and Ankura Consulting Group, LLC.

"***Affiliate***" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Exchange Act.

"***Agreement***" has the meaning set forth in the introductory paragraph.

"***Allocation Statement***" has the meaning set forth in Section 3.2.

"***Alpine Purchase Agreement***" means that certain Equity Purchase Agreement, dated as of April 21, 2022, by and between CCS-CMGC Parent Holdings, LP, Alpine CA Behavioral Health HoldCo, LLC, Wellpath Holdings, Inc., as guarantor, the sellers party thereto, and the seller representative, dated as of April 21, 2022.

"***Alternate Bidder***" has the meaning set forth in the Bidding Procedures.

"***Alternate Bid Expiration Date***" has the meaning set forth in Section 7.8.

"***Alternative Transaction***" means any sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, consent solicitation, exchange offer, tender offer, recapitalization, plan of reorganization or liquidation, share exchange, business combination, joint venture, debt incurrence, or similar transaction involving the Company and/or any of its Subsidiaries (including, for the avoidance of doubt, a transaction premised on a sale of assets under Sectionsection 363 of the Bankruptcy Code), or the debt, equity, or other interests in the Company and/or any of its Subsidiaries that transfers to or vests ownership of the RS Business or substantially all of itsthe RS Business assets in any party other than Buyer.

"***Annual Financial Statements***" has the meaning set forth in Section 5.6.

"***Anti-Corruption Laws***" means the U.S. Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and any applicable Legal Requirements related to bribery or corruption.

"***Anti-Money Laundering Laws***" means the Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956-1957), the USA PATRIOT ACT ((Pub. L. No. 107-56), the Bank Secrecy Act (31 U.S.C. §§5311-5332)), the UK Proceeds of Crime Act 2002, the UK Terrorism Act 2000 and any applicable Legal Requirements related to terrorist financing or money laundering, including know-your-customer

(KYC) and financial recordkeeping and reporting requirements.

"***Antitrust Law***" means, collectively, the HSR Act, title 15 of the United States Code §§ 1-7, as amended (the Sherman Act), Title 15 of the United States Code §§ 12-27 and Title 29 of the United States Code §§ 52-53, as amended (the Clayton Act), the Federal Trade Commission Act (15 U.S.C.§ 41 et seq.), as amended, and the rules and regulations promulgated thereunder, and all other national, state, local or foreign Legal Requirements in effect from time to time that are designed or intended to (a) prohibit, restrict or regulate actions or transactions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition; or (b) regulate transactions involving foreign investments, including any Legal Requirements that provide for review of national security matters in any jurisdiction.

"***Apportioned Taxes***" has the meaning set forth in <u>Section 8.1(b)</u>.

"***Approved Budget***" has the meaning set forth in the applicable DIP Financing Orders.

"***Assumed Contracts***" has the meaning set forth in <u>Section 2.5(a)(i)</u>.

"***Assumed Liabilities***" has the meaning set forth in <u>Section 2.3</u>.

"***Assumption Agreement***" means the Assignment and Assumption Agreement, in substantially the form attached hereto as **Exhibit A**.

"***Auction***" means the auction for the sale of the RS Business conducted by the Sellers if, and only if, any Qualified Bid (other than this Agreement) is received pursuant to the terms and conditions of the Bidding Procedures Order.

"***Avoidance Action***" means any and all actual or potential avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the ~~Seller, its~~Sellers, their Estates, or other authorized parties in interest to avoid a transfer of property or an obligation ~~or disallow a claim~~ incurred by the Seller pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through and including 553, and 724(a) of the Bankruptcy Code, or under similar or related state, federal, and non-U.S. statutes and common law, including fraudulent transfer laws or fraudulent conveyance.

"***Bankruptcy and Equity Exceptions***" has the meaning set forth in <u>Section 5.3</u>.

"***Bankruptcy Cases***" has the meaning set forth in the ~~recitals~~<u>Recitals</u>.

"***Bankruptcy Code***" means Title 11 of the United States Code, Sections 101 *et seq.*

"***Bankruptcy Court***" has the meaning set forth in the ~~recitals~~<u>Recitals</u>.

~~"***Bidding Procedures***" means bid procedures, substantially in the form attached hereto as **Exhibit B** (with changes approved by Buyer and Sellers in accordance with this Agreement), to be approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.~~

"***Bid Deadline***" has the meaning set forth in Section 7.4(a).

"***Bidding Procedures*** ~~*Motion*~~" means ~~the motion filed by Sellers with the Bankruptcy Court seeking entry of~~ the Bidding Procedures ~~Order approving, among other~~

things, approved by the Bidding Procedures Order.

"**Bidding Procedures Order**" means ~~an Order of the~~the *Stipulated and Agreed Amended Order (I) Approving the Bidding Procedures for the Sale of the Debtors' Assets, (II) Approving Entry into a Stalking Horse Purchase Agreement for the Recovery Solutions assets, (III) Authorizing the Recovery Solutions Expense Reimbursement, (IV) Authorizing Potential Selection of Stalking Horse Bidders for the Corrections Assets an Approving Related Corrections Asset(s) Bid Protections, (V) Establishing Related Dates and Deadlines, (VI) Approving the Form and manner of Notice Thereof, (VII) Approving the Assumption and Assignment Procedures, and (VIII) Granting Related Relief* entered by the Bankruptcy Court, ~~substantially in the form attached hereto as **Exhibit C** (with changes approved by Buyer and Sellers in accordance with this Agreement)~~ [Docket No. 384].

"**Bill of Sale**" means a Bill of Sale, in substantially the form attached hereto as **Exhibit ~~D~~B**.

"**Business Day**" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized to close.

"**Buyer**" has the meaning set forth in the introductory paragraph and shall also include any Buyer Designee.

"**Buyer 401(k) Plan**" has the meaning set forth in Section 8.5(e).

"**Buyer Designee**" has the meaning set forth in Section 2.1.

"**Buyer Employees**" has the meaning set forth in Section 8.5(b).

"**Cash Cap**" means an amount equal to $10,000,000.00~~, which amount is subject to adjustment by a mechanism to be mutually agreed to by the Parties in good faith no later than ten (10) Business Days following the Execution Date, which mechanism shall take into account anticipated levels of Cure Costs, accounts payable and Accounts Receivable as of the Closing. For the avoidance of doubt, only the mechanism will be agreed upon within ten (10) Business Days following the Execution Date, the actual targets and calculations will be agreed upon prior to the Sale Hearing.~~.

"**Causes of Action**" means any claim, interest, damage, remedy, cause of action, proceeding, demand, right, action, suit, obligation, liability, account, defense, offset, power, privilege, license, Lien, indemnity, guaranty, franchise, debt, judgment, or controversy of any kind or character whatsoever, whether known or unknown, choate or inchoate, foreseen or unforeseen, existing or hereinafter arising, contingent or noncontingent, disputed or undisputed, liquidated or unliquidated, secured or unsecured, matured or unmatured, suspected or unsuspected, assertable directly or derivatively, reduced to judgment or otherwise, whether arising before, on, or after the commencement of the Bankruptcy Cases, in contract, tort, law, equity, or otherwise pursuant to any theory of law. For the avoidance of doubt, Causes of Action include the following:  (a) any right of setoff, counterclaim, or recoupment and any claim under contracts or for breaches of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any claims or causes of action for aiding and abetting (including of breaches of fiduciary duties), knowing participation (including knowing

participation in breach of fiduciary duty), and conspiracy (including conspiracy to breach fiduciary duty); (d) any claims or causes of action for illegal dividends; (e) any claims or causes of action for fraud, misrepresentations, or omissions; (f) the right to object to, subordinate, disallow, or otherwise contest Liens and Claims; (g) any claim or defense, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (h) any Avoidance Action.

"***Claim***" means a "claim" as defined in ~~Section~~section 101(5) of the Bankruptcy Code.

"***Closing***" has the meaning set forth in Section 4.1.

"***Closing Date***" means the date and time as of which the Closing occurs as set forth in Section 4.1.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Company***" has the meaning set forth in the introductory paragraph.

"***Committee***" has the meaning set forth in Section 12.4.

"***Consenting First Lien Lenders***" has the meaning set forth in the Restructuring Support Agreement.

"***Consenting Second Lien Lenders***" has the meaning set forth in the Restructuring Support Agreement.

"***Consenting Stakeholders***" has the meaning set forth in the Restructuring Support Agreement.

"***Contract***" means any agreement, contract, obligation, promise, undertaking, lease (including any Leases), sublease, purchase order, arrangement, license, commitment, insurance policy or other binding arrangement or understanding (in each case whether written or oral), and any amendments, modifications or supplements thereto.

"***Corrections Acquiror***" has the meaning set forth in Section 2.7(c).

"***Corrections Business***" means the Company's businesses and operations other than the RS Business.

"***Corrections Transition Service***" has the meaning set forth in Section 2.7(c).

"***Corrections TSA***" has the meaning set forth in Section 2.7(c).

"***Critical Vendors Order***" means that certain *Final Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Lien Claimants, (B) 503(b)(9) Claimants, (C) PACA/PASA Claimants, and (D) Critical Vendors, (II) Confirming Administrative Expense Priority for Outstanding Claims, and (III) Granting Related Relief* entered by the Bankruptcy Court [Docket No. 392].

"***Cure Costs***" means all monetary liabilities, including pre-petition monetary liabilities, of the Sellers that must be paid or otherwise satisfied to cure all of the Sellers' monetary defaults under the Assumed Contracts pursuant to ~~Section~~section 365 of the Bankruptcy Code at the time of the

assumption thereof and assignment to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court.

"**Deferred One Year Cash Payment**" means a portion of the purchase price under the Alpine Purchase Agreement in an original amount equal to $17,500,000.

"**Determination Date**" has the meaning set forth in Section 2.5(a).

"**DIP Agent**" has the meaning set forth in the ~~recitals~~Recitals.

"**DIP Facility**" has the meaning set forth in the Restructuring Support Agreement.

"**DIP Financing Orders**" means, collectively, the Interim DIP Financing Order and the Final DIP Financing Order.

"**DIP Obligations**" has the meaning set forth in the DIP Financing Orders.

"**DIP Release Amount**" has the meaning set forth in Section 3.1(a).

"**Disclosure Schedules**" means the Disclosure Schedules attached hereto, ~~dated as of the Execution Date,~~ delivered by the Sellers to Buyer ~~in connection with the execution of this Agreement~~as of November 27, 2024, as the same may be modified, supplemented and amended pursuant to Section 7.6.

"**Disputed Contract**" has the meaning set forth in Section 2.5(a)(i).

"**Disputed Contract Determination**" has the meaning set forth in Section 2.5(a)(v).

"**Documents**" means all of the documents that are used or useful in, held for use in, or intended to be used in, or that arise in any way out of, the RS Business.

"**Effective Date**" has the meaning set forth in the introductory paragraph.

"**Employees**" means all employees of the Acquired Companies as of the Closing.

"**Environmental Laws**" means any and all Legal Requirements enacted and in effect on or prior to the date of this Agreement concerning pollution, natural resources, or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, control, or cleanup of any hazardous materials, substances, or wastes.

"**Equipment**" means all furniture, fixtures, equipment, computers, machinery, vehicles, apparatus, attachments, appliances, fittings, lighting fixtures, doors, cabinets, partitions, mantels, motors, pumps, screens, plumbing, heating, air conditioning, waste disposal and storing, wiring, telephones, televisions, monitors, security systems, carpets, floor coverings, wall coverings, office equipment, laboratory equipment, computers, registers, safes, trash containers, meters and scales, combinations, codes and keys, implements, telephone systems, signage, supplies, communications equipment, information technology assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties of the vendor applicable thereto, and all other tangible personal property of every kind and description, and Improvements, in each case, primarily used, or primarily held for use, in connection with the operation of

7

the RS Business, wherever located.

"*Equity Interests*" means any shares of any class of capital stock, membership interests, partnership interests or other equity or equity-based interests (including securities convertible or exchangeable into equity interests) in any Person, which are issued and outstanding (including all rights to receive all beneficial interest in any such items), and any outstanding warrants, options, voting agreements or other Contracts or obligations pursuant to which such Person is or may become obligated to issue, sell, purchase, return, redeem, vote or abstain from voting any shares of capital stock, membership interests, partnership interests or other equity interests.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"*ERISA Affiliate*" means, with respect to any Person, trade, business or entity, any other Person, trade, business or entity that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA that includes or included the first Person, trade, business, or entity that is, or was at the relevant time, a member of the same "controlled group" as the first Person, trade, business, or entity pursuant to Section 4001(a)(14) of ERISA.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Excluded Assets*" has the meaning set forth in Section 2.2.

"*Excluded Company*" means any direct or indirect Subsidiary of a Seller that is not an Acquired Company.

"*Excluded Contracts*" has the meaning set forth in Section 2.5(a)(i).

"*Excluded Liabilities*" has the meaning set forth in Section 2.4.

"~~*Execution Date*~~*Existing First Lien Credit Agreement*" has the meaning set forth in the ~~introductory paragraph~~Restructuring Support Agreement.

"*Existing Second Lien Credit Agreement*" has the meaning set forth in the Restructuring Support Agreement.

"*Exit Term Loan Facility Documents*" means the credit agreement and related loan documents (including the "Credit Documents" or similar term defined in such credit agreement) governing Buyer's takeback exit term loan facility, to be entered into on or substantially concurrently with the Closing.

"*Expense Reimbursement*" means an amount, not to exceed Two Million Dollars (\$2,000,000), for which the Sellers shall be liable upon the occurrence of a Protection Event, equal to the reasonable and documented out-of-pocket costs, fees and expenses of Buyer and the Ad Hoc Group (including reasonable expenses of legal, financial advisory, accounting and other similar costs, fees and expenses and all filing fees under the HSR Act and any other Antitrust Laws, including the fees and expenses of Akin Gump Strauss Hauer & Feld LLP, any local counsel, Houlihan Lokey Capital, Inc. and Ankura Consulting Group, LLC) related to the formation and operation of the Buyer and the transactions contemplated by this Agreement ~~and to the extent such out-of-pocket costs, fees and expenses are not otherwise paid or reimbursed by the Sellers under the DIP Facility promptly upon the terms and conditions set forth in Section 11.2(b)~~, which amount, ~~upon entry of~~in accordance with the

8

Bidding Procedures Order, shall ~~constitute a super priority administrative expense of Sellers under section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of any kind, including those specified in sections 503(b) or 507(b) of the Bankruptcy Code and~~ be paid as provided in Section 11.2.

"*Facility*" has the meaning set forth in Section 5.9.

"*Final DIP Financing Order*" means ~~a~~the *Final Order* ~~of~~*(I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Use Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* entered by the Bankruptcy Court ~~approving, among other things, the DIP Facility and the Sellers' entry into the definitive agreements related thereto~~[Docket No. 388].

"*Final Order*" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Action or Order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"*Financial Statements*" has the meaning set forth in Section 5.6.

"*GAAP*" means United States generally accepted accounting principles as in effect at the Interim Balance Sheet Date.

"*Governmental Authority*" means any United States or non-United States federal, state, provincial, or local governmental, or regulatory commission, board, bureau, agency, court, or other tribunal of any of the foregoing.

"*Governmental Authorization*" means any approval, consent, license, Permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"*Hazardous Substance*" means (a) petroleum or petroleum products, flammable materials, explosives, radioactive materials, radon gas, lead-based paint, asbestos, and polychlorinated biphenyls (PCBs), and (b) any chemicals or other materials or substances which are defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances," "toxic pollutants," "contaminants," "pollutants," or words of similar import under any applicable Environmental Law.

"*HIPAA*" means the Health Insurance Portability and Accountability Act of 1996, (42 U.S.C. §1320d et seq.), as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, and any implementing regulations promulgated thereunder (including the Standards

2

for Privacy of Individually Identifiable Health Information, the Security Standards for the Protection of Electronic Protected Health Information and the Standards for Electronic Transactions and Code Sets promulgated thereunder) and applicable Legal Requirements regarding patient privacy and the security, storage, disposal, transmission, use or disclosure of health care records or information protected as "personal data," "personal information," "personal identifiable information," or "personal health information" among others.

"***HSR Act***" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder and any successor to such statute, rules, or regulations.

"***Improvements***" means the buildings, structures, fixtures, systems, facilities, easements, rights-of-way, privileges, improvements, parking areas, landscaped areas, PP&E, licenses, appurtenances and all other rights and benefits appurtenant or in any way related to and/or demised under any lease of, or other contract or agreement for the use of, the Real Property Leases, as applicable.

"***Indebtedness***" means, at any time and with respect to any Person: (a) all indebtedness of such Person for borrowed money or indebtedness issued or incurred in substitution or exchange for indebtedness for borrowed money; (b) all indebtedness of such Person for the deferred price of property or services, including reimbursement and other obligations for surety bonds; (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (d) non-contingent obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance or similar instrument (in each case, only to the extent drawn); (e) "earnouts", purchase price adjustments, profit sharing arrangements, deferred purchase money amounts and similar payment obligations or continuing obligations of any nature of such Person arising out of purchase and sale contracts; (f) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases, but only to the extent recorded as a capital lease in the Financial Statements; (g) unfunded or underfunded single employer defined pension plan or withdrawal liabilities currently payable to any multiemployer plan liabilities; (h) all Indebtedness of others referred to in clauses (a) through (g) above guaranteed directly by such Person; (i) all Indebtedness referred to in clauses (a) through (h) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including accounts and contract rights) owned by such Person (other than Permitted Liens), even though such Person has not assumed or become liable for the payment of such Indebtedness; and (i) for clause (a) through (i) above, all accrued interest thereon, if any, and any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayments of such Indebtedness.

"***Instruction Letter***" has the meaning set forth in the ~~recitals~~Recitals.

"***Intellectual Property***" means all copyrights, patents, trademarks, trade names, trade styles, logos, product designations and service marks and all applications (pending or in process) and registrations therefor and licenses thereof primarily used or held for use in the RS Business.

"***Intellectual Property Assignment Agreement***" means the Intellectual Property Assignment Agreement, in substantially the form attached hereto as **Exhibit ~~E~~C**.

"***Interim Balance Sheet***" has the meaning set forth in <u>Section 5.6</u>.

"***Interim Balance Sheet Date***" has the meaning set forth in <u>Section 5.6</u>.

"***Interim DIP Financing Order***" means ~~an interim Order of~~<u>the Interim Order (I)</u>

*Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Use Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; (V) Scheduling Final Hearing; and (VI) Granting Related Relief* entered by the Bankruptcy Court ~~approving, among other things, the DIP Facility on an interim basis and the Sellers' entry into the definitive agreements related thereto~~[Docket No. 81].

"***Interim Financial Statements***" has the meaning set forth in Section 5.6.

"***Inventory***" has the meaning set forth in Section 2.1(~~e~~f).

"***IRS***" means the Internal Revenue Service.

"***Key Person***" means individuals listed on Schedule 1.1(a).

"***Knowledge***" means, with respect to any matter in question, in the case of the Sellers, the actual knowledge of any of the individuals listed on Schedule 1.1(b) is deemed to have after due investigation and inquiry.

"***Lease***" and "***Leases***" means all leases, subleases, licenses, sublicenses, occupancy agreements, access agreements, memoranda, amendments, restatements, modifications, supplements, and assignments.

"***Leased Real Property***" has the meaning set forth in Section 5.12(a).

"***Legal Requirement***" means any federal, state, provincial, county, local, municipal, foreign, international, or multinational law (statutory, common or otherwise), constitution, treaty, convention, ordinance, equitable principle, code, rule, regulation or Order enacted, adopted, promulgated or applied by any Governmental Authority.

"***Liability***" means a Claim or Lien of any kind or nature whatsoever (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"***Lien***" means any "interest" as that term is used in ~~Section~~section 363(f) of the Bankruptcy Code, mortgage, deed of trust, pledge, assignment, successor liability, security interest, encumbrance, easement, condition, covenant, reservation, lien, mechanics lien, claim, charge, hypothecation, warrant, deemed trust, action, or claim of any kind or nature whatsoever in respect of any property, other than any license of Intellectual Property, including any of the foregoing created by, arising under, or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a capital lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of a financing statement naming the owner of the property as to which such lien relates as the debtor under the Uniform Commercial Code or any comparable Legal Requirement in any other jurisdiction.

"***Managed Entity***" means California Health and Recovery Solutions, P.C., a California professional corporation.

"***Material Adverse Effect***" means any fact, state of facts, change, circumstance, occurrence, effect, event, result or development that individually or in the aggregate (taking into account all other such facts, states of fact, changes, circumstances, occurrences, effects, events, results or

11

2

developments) has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on (a) the RS Business, the Acquired Assets or the assets, properties, prospects, condition (financial or otherwise), liabilities or results of operations of the RS Business (excluding the Excluded Assets and the Excluded Liabilities), taken as a whole or (b) the ability of the Sellers to consummate the transactions contemplated by this Agreement or to perform any of their obligations under this Agreement, but, with respect to clause (a) only, excluding any fact, state of facts, change, circumstance, occurrence, effect, event, result or development to the extent that it results from or arises out of (i) the filing, commencement or pendency of the Bankruptcy Cases; (ii) the execution and delivery of this Agreement or the announcement thereof, including any termination of, reduction in or similar negative impact on relationships, contractual or otherwise, with any customers, suppliers, distributors, partners or employees of the Sellers or the RS Business; (iii) any adoption, implementation, modification, repeal or other changes in Legal Requirement or accounting regulations or principles, or in interpretations of any of the foregoing; (iv) any specific action required to be taken pursuant to the terms of this Agreement or any action taken or failed to be taken, by the Seller at the written request of, or with the written consent of, Buyer; (v) any change or effect of economic, business or political conditions (including outbreak, continuation or escalation of any military conflict, declared or undeclared war, armed hostilities, civil unrest, public demonstrations or acts of foreign or domestic terrorism or sabotage (including hacking, ransomware or any other electronic attack), or any escalation or worsening of any such conditions) or the securities, debt, banking, capital, credit or financial markets, or in interest or exchange rates, in each case, in any country or region; (vi) any epidemic, pandemic or outbreak of disease, or any escalation or worsening of such conditions, (vii) any natural or manmade disasters or calamities, weather conditions including hurricanes, floods, tornados, tsunamis, earthquakes and wild fires, cyber outages, or other force majeure events, or any escalation or worsening of such conditions; (viii) any other regional, national or international calamity, crisis or emergency; or (ix) any failure by the Sellers or the Acquired Companies to meet any projections, estimates, or budgets of or relating to the RS Business for any period prior to, on, or after the date of this Agreement (it being understood that the underlying causes of such failure may be taken into account in determining whether a Material Adverse Effect has occurred); provided that, in the cases of immediately preceding clauses (iii), (v), (vi), (vii) and (viii), such fact, state of facts, change, circumstance, occurrence, effect, event, result or development shall be taken into account to the extent that the Sellers are disproportionately affected, taken as a whole, as compared to other companies in the same industry as the Sellers and solely to the extent of such disproportionate effect.

"*Material Contract*" has the meaning set forth in <u>Section 5.19(a)</u>.

"*Material Customers*" has the meaning set forth in <u>Section 5.21(a)</u>.

"*Material Suppliers*" has the meaning set forth in <u>Section 5.21(b)</u>.

"*Non-Acquired Company Plan*" means every Plan that is not an Acquired Company Plan.

"*Order*" means any order, writ, injunction, judgment, verdict, ruling, decision, subpoena, mandate, precept, command, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Authority or an arbitrator, mediator or other quasi-judicial or judicially sanctioned Person.

"*Ordinary Course of Business*" means, with respect to any Person, the ordinary and usual course of normal day to day operations of such Person and its business, consistent with its past practice (including with respect to quality, quantity and frequency); provided, however, that, except as otherwise expressly specified herein, all references to the "Ordinary Course of Business" shall refer to

the Ordinary Course of Business of the RS Business.

"**Organizational Documents**" means (a) any certificate or articles of incorporation, bylaws, certificate or articles of formation, operating agreement or partnership agreement, (b) any documents comparable to those described in clause (a) as may be applicable pursuant to any Legal Requirements, and (c) any amendment or modification to any of the foregoing.

"**Original Execution Date**" has the meaning set forth in the Recitals.

"**Original Purchase Agreement**" has the meaning set forth in the Recitals.

"**Other Rights and Interests**" means (i) easements, rights of way, privileges, licenses, hereditaments, appurtenances and all other rights and benefits appurtenant or in any way related to, or demised under any lease of or other context or agreement for the use of, the Leased Real Property and (ii) all strips and gores and any land lying in the bed of a public road, highway or other access way, open or proposed adjourning such Leased Real Property, in each case, to the extent any Seller has a legally recognized interest therein.

"**Outside Date**" has the meaning set forth in Section 11.1(b)(i).

"**Parallel Cause of Action**" has the meaning set forth in Section 2.2.

"**Party**" or "**Parties**" means, individually or collectively, Buyer and the Sellers.

"**Permits**" has the meaning set forth in Section 5.22(d)(i).

"**Permitted Liens**" means (a) statutory Liens for current Taxes or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate Actions by any Acquired Company or any Seller; (b) mechanics', carriers', workers', repairers', and similar statutory Liens arising or incurred in the ordinary course of business; (c) Liens arising under worker's compensation, unemployment insurance, social security, retirement, or similar legislation; (d) Liens on goods in transit incurred pursuant to documentary letters of credit; (e) purchase money Liens and Liens securing rental payments under capital lease arrangements; (f) Liens arising under the Leases; (g) Liens that do not, individually or in the aggregate, result in a Material Adverse Effect; (h) the Liens set forth on Schedule 1.1(c), (i) Liens incurred in the ordinary course of business in connection with securing the performance of bids, tenders, public utilities or private utilities, leases and contracts in the ordinary course of business, statutory obligations, surety or appeal bonds, performance bonds and other obligations of a like nature, and obligations in respect of letters of credit or bank guaranties that have been posted to support payment of the liens described in this clause (i), (j) Liens on cash collateral (y) deposited with issuers of performance or surety bonds or performance and completion guarantees or similar instruments or issuers of letters of credit issued to an issuer of performance or surety bonds or performance and completion guarantees or similar instruments, in each case issued or created in the ordinary course of business or (z) arising in connection with letters of credit issued in the ordinary course of business, and (k) other Liens arising in the ordinary course of business and not incurred in connection with the borrowing of money.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group (as defined in section 13(d)(3) of the Exchange Act) or Governmental Authority.

"*Petition Date*" means November 11, 2024.

"*Plan*" and "*Plans*" means employee benefit, welfare, supplemental unemployment benefit, employment, offer letter, individual consulting, change in control, retention, severance pay, bonus, pension, profit sharing, retirement, deferred compensation, incentive compensation, stock compensation, stock option, stock appreciation, phantom stock option, other equity or equity-based compensation, vacation, sick leave, death benefit, health or other medical, dental, life, disability, or other insurance, Code section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance, fringe benefit, or other similar plan, program, agreement, or arrangement, whether written or oral, including any (i) "employee benefit plan" within section 3(3) of ERISA or (ii) other employee benefit plans, programs, agreements or arrangements, whether or not subject to ERISA, sponsored, maintained, contributed to or required to be contributed to, or entered into, by the Sellers or the Acquired Companies, or pursuant to which the Sellers or the Acquired Companies have any Liability, in each case, for the benefit of their current or former officers, directors, employees, individual consultants their dependents or beneficiaries, other than plans established pursuant to statute

"*Post-Closing Tax Period*" has the meaning set forth in Section 8.1(b).

"*Pre-Closing Tax Period*" has the meaning set forth in Section 8.1(b).

"*Pre-Paid Expenses*" means all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, pre-paid or deferred charges and expenses, prepayments, rights under warranties or guarantees, vendor rebates and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent) that relate primarily to the RS Business, except professional fee retainers.

"*Previously Omitted Contract*" has the meaning set forth in Section 2.5(b)(i).

"*Previously Omitted Contract Designation*" has the meaning set forth in Section 2.5(b)(i).

"*Previously Omitted Contract Notice*" has the meaning set forth in Section 2.5(b)(ii).

"*Protection Event*" has the meaning set forth in Section 11.2(b).

"*Purchase Price*" has the meaning set forth in Section 3.1.

"*Qualified Bid*" has the meaning set forth in the Bidding Procedures.

"*Real Property Leases*" has the meaning set forth in Section 5.12(b).

"*Release*" means (a) any releasing, spilling, discharging, dumping, disposing, leaking, pumping, injecting, pouring, depositing, dispersing, emitting, emptying, escaping, leaching or migrating into the indoor or outdoor environment, including ambient air, soil, surface water, groundwater and surface or subsurface strata, and (b) the abandonment or discarding of barrels, tanks, containers or receptacles, whether or not sealed or closed, containing, or which formerly contained, Hazardous Substances.

"*Representative*" means, with respect to a particular Person, any director, manager, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

14

2

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of the Original Execution Date, by and among the Company and the other parties thereto.

"**RS Business**" means, collectively, the business of (i) providing inpatient behavioral health services outside of correctional facilities, including inpatient and residential treatment, partial hospitalization and outpatient programs, and community-based services on behalf of Governmental Authorities, and (ii) providing behavioral health and/or substance use disorder services inside correctional facilities to the extent such services are paid by or on behalf of local or state mental health departments and result solely from an involuntary treatment order related to a behavioral health and/or substance use disorder diagnosis.

"**Sale Hearing**" means the hearing to consider the motion or motions of the Sellers filed with the Bankruptcy Court seeking approval and entry of the Sale Order and the relief requested therein.

"**Sale Order**" means an Order of the Bankruptcy Court, substantially in the form agreed to by the Sellers and Buyer, or otherwise reasonably acceptable to Buyer, pursuant to, *inter alia*, Sectionssections 105, 363 and 365 of the Bankruptcy Code authorizing and approving, *inter alia*, the sale of the Acquired Assets to Buyer and/or the Buyer Designees, as applicable, on the terms and conditions set forth herein, free and clear of all Liens (other than Permitted Liens), and the assumption and assignment of the Assumed Contracts to Buyer and/or the Buyer Designees, as applicable, and containing findings of fact and conclusions of law that Buyer and/or the Buyer Designees, as applicable, has acted in "good faith" within the meaning of Sectionsection 363(m) of the Bankruptcy Code.

"**Sales Taxes**" has the meaning set forth in Section 8.1(a).

"**Sanctioned Country**" means any country or region (i) that is the subject or target of comprehensive Sanctions (including Cuba, Iran, North Korea, Syria, Crimea, the so-called Donetsk People's Republic and so-called Luhansk People's Republic, Kherson, Zaporizhzhia and other regions of Ukraine that are the subject or target of comprehensive Sanctions); (ii) the government of which is the subject or target of Sanctions (including Venezuela) or (iii) that is otherwise the subject or target of broad Sanctions (including Russia, Belarus and Afghanistan).

"**Sanctioned Person**" means any Person that is (a) the target of Sanctions, including any Person(s) listed on any Sanctions list, including OFAC's Specially Designated Nationals and Blocked Persons List and Sectoral Sanctions Identifications List, the EU Consolidated List and HM Treasury's Consolidated List of Persons Subject to Financial Sanctions; (b) located, organized, resident or operating in or incorporated under the laws of any Sanctioned Country; or (c) owned or controlled by or acting on behalf or at the direction of (as such terms are defined and interpreted by the relevant Sanctions) any Person(s) that are described in clause(s) (a) and/or (b) such that such Person is subject to the same restrictions or prohibitions as the Person(s) described in clause(s) (a), and/or (b).

"**Sanctions**" means any economic, financial or trade sanctions or trade embargoes administered or enforced from time to time by (a) the United States Government (including those administered by OFAC, the U.S. Department of State and the U.S. Department of Commerce), (b) the United Nations Security Council, (c) the European Union and each member state thereof (including those administered by the EU Council or EU Commission, when acting in furtherance of the EU's Common and Foreign Security Policy), and (d) the United Kingdom (including those administered by His Majesty's Treasury and the Department of Business, Innovation and Skills).

2

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Seller Cure Cap**" means an aggregate amount equal to (a) $[10,000,000][1] less (b) anythe sum of all amounts paid by, or on behalf of, the Sellers on or after the Original Execution Date in connection with the payment of any pre-petition trade payables;, including any payments made in connection with the Critical Vendor Order.

"**Seller 401(k) Plan**" has the meaning set forth in Section 8.5(e).

"**Sellers**" has the meaning set forth in the introductory paragraph.

"**Settlement Agreement**" means that certain Settlement Agreement dated as of July 1, 2024 by and among Alpine CA Behavioral Health HoldCo, LLC, Wellpath Holdings, Inc., Mdoyle Holdings, Inc. (f/k/a Alpine Special Treatment Center, Inc.), Mike Doyle, Victoria Klein and Kristen Allred, dated as of July 1, 2024.

"**Shared Contracts**" means those Contracts that relate to both the RS Business and the Corrections Business set forth on Schedule 7.10.

"**Sharing Period**" has the meaning set forth in Section 7.10(b).

"**Straddle Period**" has the meaning set forth in Section 8.1(b).

"**Subsidiary**" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the managers, directors or similar managing body.

"**Successful Bidder**" has the meaning set forth in the Bidding Procedures.

"**Tax**" or "**Taxes**" (and with correlative meaning, "**Taxable**" and "**Taxing**") means (i) any U.S. federal, state, provincial, local, non-U.S. or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto, whether disputed or not) and (ii) any liability for any items described in clause (i) payable by reason of contract, transferee liability or operation of law (including Treasury Regulations Section 1.1502-6) or otherwise.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any

---

[1] Seller Cure Cost Cap subject to reduction pending confirmation of anticipated Cure Costs with respect to transferred contracts.

2

Tax.

"***Taxing Authority***" means the Internal Revenue Service and any other Governmental Authority that has the right to impose Taxes on the Sellers and the Acquired Companies.

"***Transaction Documents***" means this Agreement, the Assumption Agreement, the Bills of Sale, the Intellectual Property Assignment Agreement, the Restructuring Support Agreement, the Transition Services Agreement and any other agreements, instruments or documents entered into at the Closing pursuant to this Agreement.

"***Transfer Taxes***" has the meaning set forth in <u>Section 8.1(a)</u>.

"***Transferred Permits***" has the meaning set forth in <u>Section 2.1(on)</u>.

"***Transition Services Agreement***" means that certain transition services agreement to be entered into between the Sellers and the Buyer, in substantially the form attached hereto as **Exhibit FD**.

"***Unified Program Facility Permit***" means that certain Unified Program Facility Permit, issued to Alpine Special Treatment Center Inc. by the County of San Diego Department of Environmental Health and Quality.

"***WARN Act***" has the meaning set forth in <u>Section 5.14(g)</u>.

<u>1.2</u>    <u>Other Definitions and Interpretive Matters</u>.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

<u>Calculation of Time Period</u>. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

<u>Day</u>. Any reference in this Agreement to days (but not Business Days) means calendar days.

<u>Dollars</u>. Any reference in this Agreement to $ means United States dollars.

<u>Exhibits/Schedules</u>. All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

<u>Gender and Number</u>. Any reference in this Agreement to gender includes all genders, and words imparting the singular number only include the plural and vice versa.

<u>Headings</u>. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "***Section***" or "***Article***" are to the corresponding Section or Article of this Agreement unless otherwise specified.

17

Herein. Words such as "*herein*", "*hereof*" and "*hereunder*" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

Including. The word "*including*" or any variation thereof means "*including, without limitation,*" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Or. The word "*or*" shall be disjunctive but not exclusive.

(b)　No Strict Construction. Buyer, on the one hand, and the Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and the Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limiting the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE 2

### PURCHASE AND SALE

2.1　Purchase and Sale. Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement, on the Closing Date, the Sellers shall unconditionally sell, transfer, assign, convey and deliver to Buyer and/or one or more other Persons designated by Buyer (each, a "*Buyer Designee*"), and Buyer shall purchase, acquire and accept from the Sellers, free and clear of any and all Liens (other than Permitted Liens), all of the Sellers' direct or indirect right, title and interest in, to or under the RS Business, including all of (i) all record and beneficial ownership of the Equity Interests owned by the Sellers (and all rights related thereto of the Sellers) in each Acquired Company (collectively, the "*Acquired Interests*") and (ii) all of the Sellers' properties, rights, Claims and assets (other than the Excluded Assets) of every kind and description (wherever situated or located, real, personal or mixed, tangible or intangible, whether identifiable or contingent, owned, leased or licensed) primarily used, held for use in, or useful in, or intended to be primarily used in, the RS Business, whether or not reflected on the books and records of the Sellers, as the same shall exist on the Closing Date (collectively, the "*Acquired ~~Assets~~*"). Without limiting the generality of the prior sentence,*Seller Assets*" and, together with the Acquired Interests, the "*Acquired Assets*") and which are set forth with reasonable specificity on Schedule 2.1 in a schedule in the applicable asset category identified in clauses (a) through (o); provided that the Acquired Assets shall include (except where so noted in the following list or in any definition used in the following list) all of Sellers' direct or indirect right, title and interest in, to and under the following (solely to the extent that such properties, rights, Claims and assetsassets having a value, individually or in the aggregate, of less than $[300,000], which primarily relate to the RS Business): and are not otherwise material or reasonably expected to be material following the Closing to the Corrections Business notwithstanding any failure to expressly identify such assets on Schedule 2.1; provided, further, that (I) no express disclosure shall be required for the Acquired Assets contemplated pursuant to clauses (g), (l) and (q) and (II) all assets of the nature contemplated therein shall be Acquired Assets:

(a)　all Accounts Receivable;

(b)　all Pre-Paid Expenses;

2

(c)      all cash and cash equivalents in an amount not to exceed the Cash Cap, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, instruments and investments of the Sellers primarily involving or primarily related to the RS Business, excluding prepaid deposits related to professional fee retainers; provided, however, the Parties acknowledge and agree that the Sellers shall use reasonable best efforts to have an amount of cash and cash equivalents in an amount equal to the Cash Cap as of the Closing; provided, further, that the use of "reasonable best efforts" as required pursuant to this Section 2.1(c) shall not require any Seller or any Affiliate thereof to contribute, deposit, transfer or otherwise convey to the Buyer any cash or cash equivalents of or resulting from revenues generated by the Corrections Business; provided, further, that this Section 2.1(c) is subject in all respects to Section 2.8;

(d)      all Intellectual Property owned by the Sellers set forth on Schedule 2.1(d);

(e)      all Equipment, whether owned or leased (and, to the extent leased, any Contract or rights related thereto if such Contract is an Assumed Contract);

(f) all record and beneficial ownership in Equity Interests owned by the Sellers (and all rights related thereto of the Sellers) in each Acquired Company; provided, however, that Buyer may, in its sole and absolute discretion, amend or revise Schedule 2.1(f)(i) at any time and from time to time prior to the date that is two (2) Business Days prior to the Closing Date, in order to add any one or more of the direct or indirect Subsidiaries of the Sellers set forth on Schedule 2.1(f)(ii) (and such added Subsidiary shall be automatically included as an Acquired Company for purposes of this Agreement), or remove any direct or indirect Subsidiary of the Sellers from such Schedule 2.1(f)(i) (and such removed Subsidiary shall be automatically deemed an Excluded Company for purposes of this Agreement);

(f)      (g) all inventory and products of any kind or nature, primarily involving or primarily related to the RS Business and maintained, held or stored by or for the Sellers on the Closing Date, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same ("**Inventory**");

(g)      (h) to the extent permitted by Legal Requirements, all Documents and other books and records (including financial and accounting files (but excluding the general corporate files and records of the Sellers, or their Affiliates (other than the Acquired Companies), insofar as they primarily involve or primarily relate to the RS Business)), and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, business software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, other technical information and data, vendor lists, supplier lists, and all other business and other records solely to the extent primarily related to the RS Business;

(h)      (i) all Assumed Contracts, and, with respect to any Plan that is an Assumed Contract and not an Acquired Company Plan, any and all assets, trust agreements, insurance policies, administrative services agreements, and other contracts, files, and records in respect thereof;

(i)      (j) all rights with respect to any Leased Real Property under any Lease that is an Assumed Contract (and any agreement and rights related thereto or under the applicable Lease to the extent that such agreement or Lease is an Assumed Contract) together with all interests in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in

19

respect thereof including all Other Rights and Interests in respect thereof;

(j)   ~~(k)~~ all security deposits with respect to any Lease that is an Assumed Contract;

(k)   ~~(l) all rights~~ subject to compliance with Section 2.8, all rights of recovery in respect of eligible claims arising from or relating to the period prior to the Closing that are solely related to the RS Business (or if partially related to the RS Business and partially related to the Corrections Business, in respect of such partial portion of the RS Business) under or arising out of all third-party insurance policies ~~related to the RS Business~~ (other than director and officer insurance policies), including third-party property and casualty insurance proceeds and other insurance proceeds (solely for the sake of clarity, this subsection (n) shall not include any self-insured policies of the Sellers or any of their Affiliates);

(l)   ~~(m)~~ all goodwill and customer referral relationships, other intangible property and all privileges, set-offs, indemnification rights, ~~causes~~Causes of ~~action~~Action, actions, Claims and demands and rights of any kind as against others (whether by contract or otherwise) exclusively involving or exclusively relating to, arising from or associated with any of the Acquired Assets, the Assumed Liabilities and/or the RS Business;

(m)   ~~(n)~~ all Acquired Avoidance Actions;

(n)   ~~(o)~~ all Permits that primarily involve or primarily relate to the RS Business, to the extent transferable by their terms and in accordance with applicable Law, including those designated as "Transferred Permits" on Schedule 2.1(~~o~~n) (the "***Transferred Permits***");

(o)   ~~(p)~~ all Causes of Actions of the Sellers of any kind primarily relating to the RS Business against any Buyer Employee (excluding the proceeds of any insurance policies held by the Sellers or any of their Affiliates related to such Causes of Action) arising at any time prior to the Closing, which such Causes of Actions shall be, and effective immediately upon Closing hereby are, waived and released in full by Buyer or Buyer Designee immediately upon Closing; provided, however, that all Causes of Action that may be asserted against any insiders of the Sellers, as that term is defined under section 101(31) of the Bankruptcy Code (excluding, for the avoidance of doubt, any Buyer Employees), or against any affiliates, as that term is defined under section 101(2) of the Bankruptcy Code, are specifically excluded from the Acquired Assets, shall not be transferred or assigned to Buyer, and shall remain property of the Sellers' bankruptcy estates; provided further, that all Causes of Action constituting counterclaims or similar claims in respect of any Liability that is an Excluded Liability arising from or relating to any Assumed Contract shall not constitute an Acquired Asset and shall for all purposes be an Excluded Asset pursuant to Section 2.2(e);

(p)   ~~(q)~~ all claims, interests, rights, rebates, refunds, abatements, remedies, recoveries and benefits of the Sellers, and all claims and ~~causes~~Causes of ~~action~~Action (other than with respect to Taxes), arising under or primarily relating to any of the Acquired Assets, the Assumed Liabilities or the RS Business, including those arising out of Assumed Contracts, express or implied warranties, representations, licenses and guarantees from suppliers, manufacturers, contractors or others solely to the extent relating to the operation of the RS Business or affecting the Equipment, Improvements, Inventory or other tangible Acquired Assets or ordered by the Sellers prior to the Closing Date (and in any case, any component thereof);

(q)   ~~(r)~~ all rights, but not obligations, under non-disclosure or confidentiality,

2

non-compete, or non-solicitation agreements with former employees and agents of the Sellers or with third parties primarily with respect to the RS Business (including any non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with or in contemplation of the Auction);

(r)      (s) all telephone, telex and telephone facsimile numbers and other directory listings; and

(s)      (t) all assets, if any, listed on Schedule 2.1(ts) (regardless of whether such assets are covered by any of the foregoing).

Notwithstanding anything herein to the contrary, the Parties covenant and agree that: (a) between the Original Execution Date and the Closing, (i) neither the Company nor any of its Affiliates (other than any Acquired Company, but excluding for such purposes, an Additional Acquired Company) shall transfer, assign, convey or contribute (nor have transferred, assigned, conveyed or contributed) any asset to any Acquired Company that does not solely relate to the RS Business and (ii) no Acquired Company (including any potential Additional Acquired Company) shall transfer or assign, nor shall the Company or any of its Affiliates assume, a Liability of any Acquired Company (or any potential Additional Acquired Company), and (b) no asset that is material (or reasonably expected to be material following the Closing) to the Corrections Business shall be transferred pursuant to this Agreement or constitute an Acquired Asset.

2.2      Excluded Assets. Notwithstanding anything to the contrary in this Agreement (including Section 2.1), nothing herein shall be deemed to sell, transfer, assign, convey or deliver any of the Excluded Assets to Buyer or any of the Buyer Designees, and the Sellers shall retain all right, title and interest to, in and under, and all Liabilities with respect to, the Excluded Assets. For all purposes of and under this Agreement, the term "*Excluded Assets*" shall consist of only (i) all of the Sellers' properties, rights, Claims and assets of every kind and description (wherever situated or located, real, personal or mixed, tangible or intangible, whether identifiable or contingent, owned, leased or licensed) that are not primarily used, held for use in, or useful in, or intended to be primarily used in, the RS Business, and (ii) without limitation of clause (i), the following items, assets and properties:

(a)      subject to Section 2.1(hg), the limited liability company, partnership and corporate books and records of internal limited liability company, partnership and corporate proceedings, minute books, organizational or governing documents, stock ledgers, Tax records, work papers and other records of the Sellers as they pertain to ownership, organization, qualification to do business or existence of the Sellers; provided, however, that, to the extent related to the RS Business, copies of the foregoing items (including copies of Tax records and work papers of the Sellers) shall be made available by the Sellers to Buyer at Buyer's reasonable request, provided, however, that with respect to Tax Returns of the Seller, at the reasonable request of Buyer, the Seller shall make available to Buyer all information contained in its Tax Returns relating to the Tax attributes or otherwise to the Tax matters of the RS Business or the Acquired Assets for periods (or portions thereof) commencing after the Closing Date or of the Acquired Companies;

(b)      any Contract that is not an Assumed Contract;

(c)      any Excluded Company (including all record and beneficial ownership of the Equity Interests of any Excluded Company and all assets of any Excluded Company);

(d) all assets not primarily used, held for use in, or useful in, or not intended to be primarily used in the RS Business, including those primarily used, held for use in, or useful in, or intended to be used in, the Corrections Business;

(d) (e) all current and prior director and officer insurance policies of the Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(e) (f) all Causes of Action, including any proceeds thereof, other than any suchthe Causes of Action that relate to, or constitute a part of, the Acquired Assets (including the Acquired Assets described in Section 2.1(no)) and the Acquired Avoidance Actions;

(f) (g) all rights under or arising out of all (i) self-insurance policies of the Sellers or any of their Affiliates primarily related to the RS Business or otherwise and (ii) third-party insurance policies related to the Corrections Business, including third party property and casualty insurance proceeds and other insurance proceeds;

(g) (h) any employment-related or compensation-related Contracts (including the Non-Acquired Company Plans not otherwise assumed pursuant to Section 2.1(ih)), collective bargaining agreements, and books and records, in each case relating to employees who are not directly employed by an Acquired Company as of the Closing and any Contracts listed on Schedule 2.2(hg) (including any personnel and employment records for such employees and former employees of the Sellers or the Acquired Companies);

(h) (i) the general corporate files and records of the Sellers, insofar as they relate to the organization, existence or capitalization of the applicable Seller, as well as any other records or materials relating to the Sellers generally and not primarily involving or primarily related to the Acquired Assets or the operations of the RS Business; provided, that copies of such files and records shall be made available to Buyer upon reasonable request to the extent permitted by applicable law and for purposes primarily related to the RS Business;

(i) (j) all insurance policies of the Sellers;

(j) (k) documents (x) that the Sellers are required by Legal Requirements to retain, (y) that if transferred would violate any applicable Legal Requirements (including with respect to privacy) or (z) that are subject to any attorney-client, work product or similar privilege with respect to work performed in anticipation of or in connection with the preparation or administration of the Bankruptcy Cases, this Agreement or the transactions contemplated by this Agreement;

(l) all Causes of Action, including any proceeds thereof, other than any such Causes of Action that relate to, or constitute a part of, the Acquired Assets (including the Acquired Avoidance Actions described in Section 2.1(n));

(k) (m) all credits, deposits, prepaid amounts and other rights to refunds of (i) Taxes of the RS Business paid by or with respect to the Sellers which refunds are attributable to Pre-Closing Tax Periods, (ii) Taxes that are attributable to the Corrections Business and (iii) Taxes that are Excluded Liabilities;

(l) (n) all cash and cash equivalents in excess of the Cash Cap, including

22

checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, instruments and investments of the Sellers (whether primarily involving or primarily related to the RS Business or otherwise), excluding prepaid deposits related to professional fee retainers; and

(o) any rights, claims or causes of action of Sellers under this Agreement or any other Transaction Document.

(m)    any (i) rights, claims or Causes of Action of the Sellers under this Agreement or any other Transaction Document and (ii) Causes of Action of a Seller or any Affiliate of a Seller arising from or relating to any Excluded Liability in respect of any Assumed Contract.

Notwithstanding the acquisition of any Acquired Avoidance Action or Cause of Action pursuant to Section 2.1 or anything else in this Agreement to the contrary, if an Acquired Avoidance Action or Cause of Action acquired pursuant to Section 2.1 arises from the same facts or circumstances giving rise to a Cause of Action by the Company or any of its Affiliates other than the Acquired Companies (a "*Parallel Cause of Action*"), including on the basis that prior to the Closing the Acquired Companies and the Company and its other Subsidiaries constituted as single enterprise, nothing in this Agreement shall be construed to limit or restrict the right of the Company or such of its Affiliates to pursue any Parallel Cause of Action and Buyer shall not (and shall cause its Affiliates, including the Acquired Companies following the Closing to not) take or omit to take any action that would interfere or preclude such pursuit of a Parallel Cause of Action. If any Cause of Action relates partially to the RS Business (even if primarily related to the RS Business) and partially to the Corrections Business, the portion of such Cause of Action allocable to the Corrections Business shall constitute an Excluded Asset.

2.3    Assumed Liabilities. Subject to entry of the Sale Order, upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer or Buyer Designee shall, effective at the time of the Closing, assume and agree to discharge and perform when due, only the following Liabilities of the Sellers (the "*Assumed Liabilities*"), and no other Liabilities:

(a)    all Liabilities under the Assumed Contracts that are required to be performed from and after the Closing Date (including sponsorship of any Plan that is an Assumed Contract and all Liabilities under or related thereto), solely to the extent they arise or relate to periods of time from and after the Closing Date; provided, however, that Buyer shall assume the obligations to pay all (i) outstanding trade payables in accordance with Section 2.3(ba) and (ii) Cure Costs in excess of the Seller Cure Cap.;

(b)    trade payables related to the Acquired Assets incurred in the ordinary course of the RS Business, as agreed in good faith by the Sellers and Buyer prior to the Closing;

(c)    Liabilities arising out of operation of the Acquired Assets for periods on or following the Closing Date; and

(d)    all Liabilities with respect to Taxes imposed on the RS Business or the Acquired Assets that are attributable to any Post-Closing Tax Period.;

(e)    subject to Section 7.10 hereof, the Buyer Portion of all Liabilities under any Shared Contract (including the Buyer Portion of any Cure Costs with respect to a Shared Contract, none of which portion shall be borne by the Sellers); and

(f)    all Liabilities of the Sellers pursuant to the Settlement Agreement, including accrued and outstanding payments thereunder (and, for the avoidance of doubt, all Liabilities

23

for any remaining deferred purchase price, earnout or any other payment obligation under the Alpine Purchase Agreement, if any).

The assumption by Buyer or any of its applicable Buyer Designees of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.  For the avoidance of doubt, Assumed Liabilities shall not include any Liability relating to or arising out of any violation of law by, or any Action against, any Seller or any breach, default or violation by any Seller of or under any Assumed Contracts, all of which shall constitute Excluded Liabilities.

2.4     Excluded Liabilities. Notwithstanding any provision in this Agreement to the contrary, neither Buyer nor any Buyer Designee shall assume, nor shall Buyer or any of its applicable Buyer Designees be obligated to assume or be obliged to pay, perform or otherwise discharge, any Liability of, or Liability against, the Sellers, the Sellers' Subsidiaries (other than the Acquired Companies), the RS Business or the Acquired Assets, of any kind or nature, whether absolute, accrued, contingent or otherwise, whether due or to become due and whether or not assets, and whether or not known or unknown or currently existing or hereafter arising or matured or unmatured, direct or indirect, and however arising, other than the Assumed Liabilities, and the Sellers shall be solely and exclusively liable with respect to all Liabilities of the Sellers, other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "***Excluded Liabilities***").  Without limiting the generality of the foregoing, the Excluded Liabilities shall include each of the following Liabilities of the Sellers and the Sellers' Subsidiaries: (other than the Liabilities of the Acquired Companies, which, solely for the sake of clarity, (i) shall remain Liabilities of the Acquired Companies following the Closing, (ii) are not amended, modified, waived, released, or excluded in any way under this Agreement and (iii) shall not be included in the definition of "Excluded Liabilities"):

(a)    all Liabilities with respect to the Deferred One Year Cash Payment and any related Liabilities arising under either the Alpine Purchase Agreement or Settlement Agreement;

(b)    all Liabilities with respect to Employees, former employees, or current or former directors, officers, consultants or contractors (and, in each case, their respective representatives or beneficiaries) of the Sellers or Acquired Companies for any action or inaction of any of the Sellers or Acquired Companies occurring prior to or on the Closing Date, including payroll, vacation, sick leave, unemployment benefits, notice pay, retirement benefits, pension benefits, collective bargaining agreements, disputes, grievances, arbitrations, claims, employment agreements or arrangements, severance, WARN Act, retention or termination agreements or arrangements, employee stock option, equity compensation, equity-based compensation, employee stock purchase, employee benefits, Plans, compensation arrangements, profit sharing plans, health care and other welfare plans or benefits, or any other employee plans, agreements, policies, or arrangements or benefits or other compensation of any kind;

(c)    all Liabilities, whether arising before, on or after the Closing Date, with respect to any employee or former employee of any Seller or Acquired Company who does not become a Buyer Employee; and

(d)    all Liabilities arising out of, relating to or with respect to any Non-Acquired Company Plan that is not an Assumed Contract.

2.5     Assignment and Assumption of Contracts.

(a)     Assumed and Excluded Contracts.

2

(i)    Schedule 2.5(a) sets forth a list of all executory Contracts (including all Leases primarily involving or primarily related to the RS Business) to which one or more of the Sellers are party and which are to be included in the Acquired Seller Assets (the "***Assumed Contracts***") (subject to the terms of this Section 2.5) and sets forth the Seller entity party to such Assumed Contract and the Sellers' good faith estimate of the Cure Costs associated with each Assumed Contract as of the Original Execution Date. From and after the Original Execution Date but in any event not later than three (3) Business Days prior to the Closing Date, the Sellers shall make such additions or deletions to Schedule 2.5(a) as Buyer shall request in writing in Buyer's reasonable discretion.  Automatically upon the addition of any Contract to Schedule 2.5(a), on or prior to the Determination Date, such Contract shall be an Assumed Contract for all purposes of this Agreement.  ~~Seller~~The Sellers shall be responsible for all Cure Costs with respect to Assumed Contracts; provided, however that the Sellers' liability for such Cure Costs shall not exceed the Seller Cure Cap.  To the extent that Buyer seeks to assume any Contract for which the payment of its Cure Costs would (when taken together with all other Cure Costs for contracts Buyer seeks to assume) exceed the Seller Cure Cap, Buyer and the Seller shall negotiate in good faith the Cure Costs related to such Contract and determine whether to assume such Contract; provided, however, that Buyer acknowledges and agrees it shall be responsible for any Cure Costs in excess of the Seller Cure Cap.  Any deleted Contract shall be deemed to no longer be an Assumed Contract, and for the avoidance of doubt, neither Party shall be responsible for any Cure Costs related thereto. The Parties acknowledge and agree that there will be no reduction in, or increase to, the Purchase Price as a result of (x) any change in Cure Costs or (y) any addition or elimination of any Contract as an Assumed Contract. All Contracts of the Sellers that are not listed on Schedule 2.5(a) shall not be considered an Assumed Contract or an Acquired Asset and shall be deemed "***Excluded Contracts***"; provided, that Buyer has the right at any time before the date that is three (3) Business Days prior to the Closing Date (such date, the "***Determination Date***") to (A) amend Schedule 2.5(a) to designate any other Contract (including all Leases) which has not been rejected by the Sellers to be an Assumed Contract, and (B) to remove from Schedule 2.5(a) an Assumed Contract that is subject to a cure dispute with the counterparty thereto or other dispute with the counterparty thereto as to the assumption or assignment of such Assumed Contract that has not been resolved to the satisfaction of Buyer (in its sole discretion) prior to the Determination Date (any such Contract, a "***Disputed Contract***").

(ii)    The Sellers shall take all actions reasonably required to assume and assign the Assumed Contracts to Buyer or any of its applicable Buyer Designees and Buyer shall take all actions reasonably required to assume (or to cause its applicable Buyer Designees to assume) the Assumed Contracts, including taking all actions reasonably required to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of ~~Section~~section 365 of the Bankruptcy Code.

(iii)    If prior to the Closing Date there are Contracts or Leases that have not been designated as an Assumed Contract or an Excluded Contract which are primarily related to the RS Business, the Sellers shall not assume or reject any such Contract or Lease pursuant to ~~Section~~section 365 of the Bankruptcy Code and any order of the Bankruptcy Court, until the earlier of the date Buyer so directs the Sellers and the Closing Date.

(iv)    At Closing, (x) the Sellers shall, pursuant to the Sale Order and the Assumption Agreement, assume and assign to Buyer or the applicable Buyer Designee (the consideration for which is included in the Purchase Price) each of the Assumed Contracts that is capable of being assumed and assigned in connection with such assumption and assignment (as agreed to among Buyer and the Sellers or as determined by the Bankruptcy Court) and (y) Buyer or the applicable Buyer Designee shall assume each of the Assumed Contracts and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Assumption Agreement.

2

Notwithstanding anything to the herein to the contrary, upon the assignment to and assumption by Buyer or the applicable Buyer Designee of any Assumed Contract, the Sellers and each other debtor in the Bankruptcy Cases shall cease to have any liability obligation in respect of such Assumed Contract in accordance with section 365(k) of the Bankruptcy Code.

(v)   No later than ~~three~~seven (~~3~~7) Business Days prior to the Closing Date, the Sellers shall provide Buyer with a list of all Disputed Contracts and the amount of Cure Costs that has been proposed by each such non-Seller counterparty for such Disputed Contracts; provided that the Sellers shall agree to any Cure Costs for any Contract irrevocably designated by Buyer in writing as an Assumed Contract if instructed to do so by Buyer. If the Sellers, with the consent of Buyer, and the non-Seller counterparty with respect to any Disputed Contract, are unable to agree on Cure Costs and/or the assumption and assignment of such Disputed Contract by the date that is within ~~five~~three (~~5~~3) Business Days ~~following~~prior to the Closing Date, solely upon Buyer's reasonable written request, the Sellers shall seek to have the amount of Cure Costs related to such Disputed Contract or the proposed assumption and assignment of such Disputed Contract determined by the Bankruptcy Court (a "***Disputed Contract Determination***"). Upon a Disputed Contract Determination that prohibits assumption and assignment to Buyer, such Disputed Contract will automatically be an Excluded Contract. If assumption and assignment to Buyer is not prohibited, then Buyer may elect to re-designate such Assumed Contract as an Excluded Contract. If such Assumed Contract is not so re-designated, (x) the applicable Sellers shall promptly take such steps as are reasonably necessary, including, if applicable and reasonably practicable, promptly on delivery of no less than five (5) Business Days' notice to the non-Seller counterparty to such Contract, to cause such Contract to be assumed by the applicable Seller and assigned to Buyer, including by executing and delivering to Buyer an Assignment and Assumption Agreement with respect to such Assumed Contract, and (y) (1) for Cure Costs until the Seller Cure Cap has been met, the Seller shall pay the Cure Costs with respect to such Assumed Contract and (2) for Cure Costs in excess of the Seller Cure Cap, Buyer shall pay the Cure Costs with respect to such Assumed Contract, in each case, either (i) concurrently with the Sellers' assumption and assignment thereof to Buyer or (ii) as agreed in writing by Buyer and the applicable counterparty to such Assumed Contract, and execute and deliver to the applicable Sellers an Assignment and Assumption Agreement with respect to such Assumed Contract.

(vi) For the avoidance of doubt, the Parties acknowledge and agree that all Contracts to which an Acquired Company is a party shall remain Contracts of such Acquired Company and shall not be subject to this Section 2.5(a). Such Acquired Company (together with, following the Closing, the Buyer and its Affiliates) shall be solely responsible for any Cure Costs or other monetary liabilities associated with such Contracts (including to cure any breaches or deferences thereunder) and the Sellers and their Affiliates have no liability or obligation in respect of such Cure Costs or other monetary liabilities following the Closing.

(b)   Previously Omitted Contracts.

(i)   If prior to or following Closing until the date of confirmation of a plan of liquidation or any other plan is confirmed in the Bankruptcy Cases, it is discovered that a Contract should have been listed on Schedule 2.5(a) but was not listed on Schedule 2.5(a) and has not been rejected by the Sellers (any such Contract, a "***Previously Omitted Contract***"), the Sellers shall, immediately following the discovery thereof (but in no event later than three (3) Business Days following the discovery thereof), notify Buyer in writing of such Previously Omitted Contract and all Cure Costs (if any) for such Previously Omitted Contract. Buyer shall thereafter deliver written notice to the Sellers, no later than ten (10) Business Days following notification of such Previously Omitted Contract from the Sellers, but in any event prior to confirmation of any plan confirmed in the Bankruptcy Cases, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "***Previously Omitted***

2

Contract Designation"). A Previously Omitted Contract designated in accordance with this Section 2.5(b)(i) as "Excluded," or with respect to which Buyer fails to deliver a Previously Omitted Contract Designation, shall be an Excluded Contract.

(ii) If Buyer designates a Previously Omitted Contract as "Assumed" in accordance with Section 2.5(b)(i), the Sellers shall serve a notice (the "**Previously Omitted Contract Notice**") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Costs with respect to such Previously Omitted Contract and the Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this Section 2.5. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with ten (10) Business Days to object, in writing to the Sellers and Buyer, to the Cure Costs or the assumption of its Contract. If the counterparties, the Sellers and Buyer are unable to reach a consensual resolution with respect to the objection, the Sellers will seek an expedited hearing before Bankruptcy Court to determine the Cure Costs and approve the assumption. If no objection is served on the Sellers and Buyer, the Sellers shall obtain an order of the Bankruptcy Court, which may be the Sale Order, fixing the Cure Costs and approving the assumption of the Previously Omitted Contract.

(c) Non-Assignment of Contracts and Permits. Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Contract or any Permit, if, notwithstanding the provisions of ~~Sections~~sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a breach thereof or in any way adversely affect any of the rights of Buyer, as the assignee or transferee of such Contract or Permit (as the case may be) thereunder. If, notwithstanding the provisions of ~~Sections~~sections 363 and 365 of the Bankruptcy Code and the reasonable best efforts of the Sellers, such consent or approval is required but not obtained with respect to an Assumed Contract or a Permit, neither the Sellers nor Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted nor (but subject to the satisfaction of the conditions set forth in Section 9.4 (unless waived by Buyer in its sole and absolute discretion)) shall the Closing be delayed in respect of the Assumed Contracts or the Permits; provided, however, if the Closing occurs, then, with respect to any Assumed Contract or Permit for which consent or approval is required but not obtained, from and after the Closing, the Sellers shall cooperate, without further consideration, with Buyer in any reasonable arrangement Buyer may request to provide Buyer with all of the benefits of, or under, the applicable Assumed Contract or applicable Permit, including enforcement for the benefit of Buyer of any and all rights of the Sellers against any party to the applicable Assumed Contract or applicable Permit arising out of the breach or cancellation thereof by such party; provided, ~~however~~further, that, to the extent that any such arrangement has been made to provide Buyer with the benefits of, or under, the applicable Assumed Contract or applicable Permit, from and after Closing, Buyer shall be responsible for, and shall promptly pay all payment and other obligations under such Assumed Contract or Permit (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Assumed Contract or Permit had been assigned or transferred at Closing with respect to Assumed Contracts and Permits, and at such applicable later date specified in this Section 2.5(c) with respect to any additional Assumed Contracts. Any assignment to Buyer of any Assumed Contract or Permit that shall, notwithstanding the provisions of ~~Sections~~sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any Person for such assignment as aforesaid shall be made subject to such consent or approval being obtained.

2.6 No Excluded Assets or Liabilities of Acquired Companies. For the avoidance of doubt and notwithstanding anything to the contrary in this Agreement, including Sections 2.1, 2.2, 2.3 and 2.4, no assets of any Acquired Company nor any Liabilities of any Acquired Company (including, for the avoidance of doubt, any Additional Acquired Company), shall be deemed to be Excluded Assets or Excluded Liabilities under the terms of this Agreement. The Parties acknowledge and agree that (A)

2

no Acquired Company shall hold, as of the Closing, assets that do not relate solely to the RS Business, (B) except for the disposition of assets to the Seller or any of its designated Affiliates in furtherance of the preceding clause (A), all assets of an Acquired Company (including, for the avoidance of doubt, any Additional Acquired Company) shall remain assets of such Acquired Company and such Acquired Company shall continue to own all right, title and interest in and to such assets following the Closing and (C) all Liabilities of an Acquired Company (including, for the avoidance of doubt, any Additional Acquired Company) shall remain Liabilities of such Acquired Company following the Closing and are not amended, modified, waived, released or excluded in any way under this Agreement. Buyer acknowledges and agrees that, if Buyer elects to add any Additional Acquired Company, Buyer waives and releases any rights Buyer may otherwise claim to designate any Liabilities of such Acquired Company as an Excluded Liability and such Additional Acquired Company shall be subject in all respects to this Section 2.6.

2.7    2.6 Further Assurances.

(a)    The Parties acknowledge and agree that prior to the Closing the Sellers shall cause the Acquired Companies to assign, transfer and convey to the Company or a Subsidiary thereof that is not an Acquired Company (or a potential Additional Acquired Company) any asset held thereby that either (i) primarily relates to the Corrections Business, or (ii) is otherwise material or reasonably expected to be material following the Closing to the Corrections Business.  Written notice of any such assignment, transfer or conveyance shall be provided in accordance with Section 12.4.

(b)    . AtFrom and after the Closing, and without further consideration therefor, the Parties shall execute and deliver such further instruments and certificates as shall be necessary or desirable (i) to vest, perfect or confirm ownership (of record or otherwise) in Buyer and/or one or more Buyer Designees, the Sellers' right, title or interest in, to or under any or all of the Acquired Assets free and clear of all Liens (other than Permitted Liens), (ii) to confirm assumption by Buyer and/or one or more Buyer Designees of all obligations related to the Assumed Liabilities, or(iii) to cause to be assigned, transferred and conveyed for no consideration to the Company (or its designated Affiliate) any assets held by any Acquired Company or any Additional Acquired Company which (i) primarily relate to the Corrections Business, or (ii) otherwise are material to the Corrections Business, or (iv) to otherwise effectuate the purposes and intent of this Agreement and the other Transaction Documents or for aiding, assisting, collecting and reducing to possession any of the Acquired Assets or the Assumed Liabilities and exercising rights with respect thereto. Each of the Parties shall take, or cause to be taken, all actions, do or cause to be done all things as may be reasonably requested by the other Parties in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Buyer or one or more Buyer Designees or otherwise to carry out this Agreement, and shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances, and as may be required to consummate the transactions contemplated by this Agreement.

(c)    Corrections TSA. Notwithstanding anything in this Agreement to the contrary, if following the Closing, the Company or any acquiror of all or a material portion of entities or assets constituting the Corrections Business (a "**Corrections Acquiror**" and such a transaction, a "**Corrections Sale**") determines in good faith that any Acquired Asset or any asset, service, function, or operation of any Acquired Company or the RS Business (including under any Contract thereof) is reasonably necessary for the conduct of the Corrections Business following the Closing (including following the consummation of such acquisition by a Corrections Acquiror) (each, a "**Corrections Transition Service**"), the Parties shall enter into a transition services agreement (a "**Corrections TSA**") that is substantially similar to the Transition Services Agreement (as modified to reflect the reversing of parties and such other modifications as are necessary given such context) and is otherwise reasonably

28

2

acceptable to the Company or a Corrections Acquiror, as applicable, for the provision by the Buyer and the Acquired Companies of such Corrections Transition Service (i) for such period as the Company or the Corrections Acquiror, as applicable, determines in good faith to be reasonably sufficient for the Corrections Business (or the applicable portion thereof) to develop its own internal resources and capacities (or to arrange for its own third-party providers) in respect of such Corrections Transition Service, and (ii) for no fees.  Without limitation of the foregoing, the Buyer shall (and shall cause its Affiliates, including the Acquired Companies following the Closing) cooperate reasonably and in good faith with the Sellers and a Corrections Acquiror in connection with a Corrections Acquirors due diligence of the Corrections Business as concerns the need for any Corrections Transition Service and the negotiation and finalization of a Corrections TSA prior to the consummation of a Corrections Sale.

2.8     Additional Acquired Companies. The Buyer may, in its sole and absolute discretion, amend or revise Schedule 2.8(a) at any time and from time to time upon written notice to the Sellers not later than the date that is two (2) Business Days prior to the Closing Date, in order to add to Schedule 2.8(a) any one or more of the direct or indirect Subsidiaries of the Company set forth on Schedule 2.8(b) hereto and such added Subsidiary shall be automatically included as an Acquired Company for purposes of this Agreement (each, an "***Additional Acquired Company***"); provided, however, that:

(a)     the Buyer may only designate an Additional Acquired Company if all of the assets of such Additional Acquired Company (if any) which primarily relate to the Corrections Business or otherwise are or would reasonably be expected to be material to the conduct of the Corrections Business following the Closing are transferred or assigned at or prior to the Closing to the Company or any of its direct or indirect Subsidiaries other than any Acquired Company (including an Additional Acquired Company) and, notwithstanding anything in this Agreement to the contrary, no such transferred or assigned asset shall constitute an Acquired Asset;

(b)     if Correct Care becomes an Additional Acquired Company, then automatically and without the requirement of any further action by any Party, Wellpath Group Holdings shall become a Seller hereunder and Correct Care shall cease to be a Seller hereunder;

(c)     if Alpine becomes an Additional Acquired Company, then automatically and without the requirement of any further action by any Party, Wellpath Hospital shall become a Seller hereunder and Alpine shall cease to be a Seller hereunder;

(d)     if Wellpath Hospital becomes an Additional Acquired Company, then automatically and without the requirement of any further action by any Party, Wellpath Group Holdings shall become a Seller hereunder, Alpine shall cease to be a Seller hereunder, and Alpine shall also become an Additional Acquired Company; and

(e)     if Wellpath Group Holdings becomes an Additional Acquired Company, then automatically and without the requirement of any further action by any Party, each of Correct Care and Alpine shall cease to be Sellers hereunder, each of Correct Care, Alpine and Wellpath Hospital shall also become Additional Acquired Companies and the Company shall be the sole Seller hereunder (and all references herein to the Sellers shall be deemed to refer solely to the Company).

2.9     Cash Cap. Notwithstanding anything in this Agreement to the contrary, and without limiting the Sellers' efforts obligations pursuant to Section 2.1(c), the Parties acknowledge and agree that the aggregate amount of cash of the RS Business immediately following the Closing shall in no event exceed the Cash Cap.  The Parties shall not be permitted to amend or waive the limitations set forth

29

in this Section 2.8 or otherwise amend or increase the Cash Cap absent the prior approval of the Bankruptcy Court.

## ARTICLE 3

### PURCHASE PRICE

3.1     Consideration.

The aggregate consideration (the "**Purchase Price**") for the purchase, sale, assignment and conveyance of the Sellers' right, title and interest in, to and under the Acquired Assets shall consist of:

(a)     the full release of the Sellers that are obligors or guarantors under the DIP Facility of all Liabilities arising under, or otherwise relating to, the DIP Facility, in an aggregate amount equal to the sum of (I) $375,000,000 under Section*plus* (II) the aggregate amount of reimbursements received (whether from a Governmental Authority or otherwise) by the Sellers and their Affiliates (including the Acquired Companies) prior to the Closing in respect of payments made to critical vendors in accordance with the Critical Vendors Order under section 363(k) of the Bankruptcy Code (the sum of (I) and (II), the "**DIP Release Amount**"), as the same may be increased by Buyer at the direction of the Required Lenders with respect to the DIP Facility; and

(b)     the assumption by Buyer or any of its applicable Buyer Designees, as applicable, of the Assumed Liabilities from the Sellers.

3.2     Allocation of Purchase Price. Within sixty (60) days after the Closing Date, Buyer shall prepare and deliver to the Sellers a statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items that are treated as purchase price for Tax purposes among the Acquired Assets in accordance with section 1060 of the Code and the Treasury Regulations promulgated thereunder (such statement, the "**Allocation Statement**"). Within thirty (30) calendar days of delivery of the Allocation Statement, the Seller shall notify Buyer of any proposed changes. The Parties shall consult with each other and attempt in good faith to resolve any issues arising as a result of the Allocation Statement. If the Parties cannot agree on the Allocation Statement, the dispute shall be resolved by a nationally recognized accounting firm mutually acceptable to Buyer and the Sellers (the "**Independent Accounting Firm**"). The expenses and fees of the Independent Accounting Firm shall be borne equally by Buyer and the Sellers. "Final Allocation Statement" shall mean, as the case may be, the final Allocation Statement agreed to by the Parties or resolved by the Independent Accounting Firm. Unless otherwise required by law, the IRS or any other Taxing Authority, the allocation of the Purchase Price pursuant to the Final Allocation Statement shall be final and binding on the Parties, and the Parties shall file all relevant U.S. federal, state, local and non-U.S. Tax Returns (including IRS Form 8594 and any supplements to such form) in accordance with the Final Allocation Statement, and shall not take any position inconsistent therewith. If the IRS or any other taxation authority proposes a different allocation, the Sellers or Buyer, as the case may be, shall promptly notify the other party of such proposed allocation. The Sellers or Buyer, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this Section 3.2. Except as otherwise required by any Legal Requirement or pursuant to a "determination" under section 1313(a) of the Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by Article 2 of this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this Section 3.2; and (ii) neither Party (nor any of their Affiliates) will take any position for Tax purposes inconsistent with this Section 3.2 in any

2

Tax Return, in any refund claim, in any litigation or otherwise. Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Acquired Assets or the allocation of the value of the Acquired Assets in any plan or reorganization or liquidation that may be proposed.

3.3    DIP Payoff.   Upon the Closing, in accordance with the Final DIP Financing Order, all DIP Obligations, including the DIP Facility, shall automatically be deemed satisfied in full and irrevocably and forever released and any Liens or Claims of any kind and nature whatsoever that the DIP Agent and the DIP Lenders (as defined in the Final DIP Financing Order) may have in or to the DIP Collateral (as defined in the Final DIP Financing Order) shall be deemed irrevocably and forever released.  The Buyer shall take, and shall cause the DIP Agent and the DIP Lenders to take, all such action as are necessary to give effect to this Section 3.3 upon the Closing.

3.4    Post-Closing Reimbursement Adjustment.   Buyer on behalf of itself, its Affiliates and direct and indirect equityholders (including the Consenting First Lien Lenders and Consenting Second Lien Lenders) hereby agrees that the aggregate amount of reimbursements received (whether from a Governmental Authority or otherwise) by [Buyer and its Affiliates (including the Acquired Companies)] following the Closing in respect of payments made by the Sellers or their Affiliates (including the Acquired Companies) prior to the Closing to critical vendors in accordance with the Critical Vendors Order shall reduce on a dollar-for-dollar basis the outstanding Indebtedness of the Sellers under the [Existing First Lien Credit Agreement and Existing Second Lien Credit Agreement], with such amounts being applied in the following manner: (i) first, to reduce the principal balance under the Existing First Lien Credit Agreement, (ii) second, to reduce any accrued and unpaid interest under the Existing First Lien Credit Agreement, (iii) third, to reduce the principal balance under the Existing Second Lien Credit Agreement, and (iv) fourth, to reduce the accrued and unpaid interest under the Existing Second Lien Credit Agreement.

3.5    Additional Acquired Companies.  The Sellers hereby represent and warrant, and the Parties acknowledge and agree, that as of the date of this Agreement and as of the Closing: (i) the sole asset of each potential Additional Acquired Company are the equity interests held thereby in a direct subsidiary of such entity; and (ii) the only liabilities of such potential additional Acquired Companies are their liabilities as borrowers [or guarantors] under the First Lien Credit Agreement and Second Lien Credit Agreement, except, with respect to the Company and Alpine CA Behavioral Health HoldCo, LLC, who are each liable for the obligations under the Settlement Agreement. Without limitation of the foregoing, if as of the Closing any Additional Acquired Company has any assets other than as described in clause (i) of the preceding sentence, the Buyer shall be required to deliver additional consideration equal to the fair market value of such additional assets as determined by the Bankruptcy Court by either an increase of the DIP Release Amount or in cash by wire transfer of immediately available funds to an account specified in writing by the Company. The Parties shall not be permitted to amend, modify or waive, directly or indirectly, this Section 3.5 without the prior approval of the Bankruptcy Court.

## ARTICLE 4

### CLOSING AND DELIVERIES

4.1    Closing Date. Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities (other than those pertaining to Previously Omitted Contracts pursuant to Section 2.5(b) and Disputed Contracts pursuant to Section 2.5(a)(i)) contemplated hereby (the "*Closing*") shall take place remotely by electronic mail or other electronic exchange of documents, among and between the Parties and/or their respective counsel,

2

no later than three (3) Business Days following the date on which all the conditions set forth in Article 9 and Article 10 have been satisfied or (if permissible) waived by the Party entitled to waive such condition (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or on such other date and time as the Sellers and Buyer may mutually agree in writing. The date and time at which the Closing actually occurs is hereinafter referred to as the "***Closing Date***". Upon consummation of the Closing, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities hereunder, and the Closing, shall be deemed to have occurred as of 12:01 a.m. (New York time) on the Closing Date.

        4.2     <u>Buyer's Deliveries</u>. At the Closing, Buyer shall deliver (or cause one or more of its Affiliates or Buyer Designees to deliver) to the Sellers:

        (a)     the Assumption Agreement, duly executed by Buyer or the applicable Buyer Designee;

        (b)     the Bills of Sale;

        (c)     the Intellectual Property Assignment Agreement, duly executed by Buyer or the applicable Buyer Designee;

        (d)     the Transition Services Agreement, duly executed by Buyer;

        (e)     each other Transaction Document to which Buyer is a party, duly executed by Buyer;

        (f)     the certificates of Buyer to be received by the Sellers pursuant to Sections 10.1 and 10.3; and

        (g)     such other documents as the Sellers may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

        4.3     <u>Sellers' Deliveries</u>. At the Closing, the Sellers shall deliver to Buyer:

        (a)     the Bills of Sale, the Assumption Agreement, the Intellectual Property Assignment Agreement, the Transition Services Agreement, and each other Transaction Document to which any Seller is a party, duly executed by the applicable Sellers;

        (b)     a copy of the Sale Order;

        (c)     the certificates of the Sellers to be received by Buyer pursuant to Sections 9.1 and 9.2;

        (d)     a valid IRS Form W-9 from each Seller or other certification of non-foreign status for the Sellers in a form and manner which complies with the requirements of Section 1445 of the Code and the Treasury Regulations promulgated thereunder;

        (e)     a certificate of good standing from each Acquired Company, certified by the appropriate Governmental Authority in its jurisdiction of incorporation or formation;

(f)    the stock books, stock ledgers, minute books, corporate seals, certificates of incorporation (or other organizational documents), check books and statutory books of the Acquired Companies, in each case, to the extent in the possession of the Sellers;

(g)    a securities transfer agreement in substantially the form attached hereto as **Exhibit  GE** in respect of the Equity Interests of the Acquired Companies, duly executed by the applicable Sellers, together with any required registrations thereof under applicable law; and

(h)    such other documents as Buyer may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement, including the documents and instruments described in Article 9 of this Agreement.

4.4    Separation.  Immediately upon the Closing, (a) the Acquired Companies shall be automatically and irrevocably separated from the Sellers and the other debtors in the Bankruptcy Cases and shall cease to be party to any administratively consolidated chapter 11 cases or cases with the Sellers or such debtors (and, to the extent such separation is not effectuated automatically, Buyer and its Affiliates (including the Acquired Companies) shall take all such actions as are necessary to effectuate such separation) and (b) Buyer shall be solely responsible for the further administration and prosecution of the Acquired Companies' chapter 11 cases.

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as set forth in the Disclosure Schedule, the Sellers hereby jointly and severally represent and warrant to Buyer that, as of the ~~date hereof~~Original Execution Date:

5.1    Status. Each Seller and each Acquired Company is duly organized, validly existing, and in good standing (to the extent the concept is recognized by the applicable jurisdiction) under the Legal Requirements of the jurisdiction in which it is organized.  Each Acquired Company, each Seller and the Managed Entity have all requisite corporate or similar organizational power and authority to own, operate, or lease its properties and assets and to carry on the RS Business as now being conducted.  Each Acquired Company, each Seller and the Managed Entity are legally qualified to transact business as a foreign corporation in all jurisdictions where the nature of its properties and the conduct of its business as now conducted require such qualification, except where the failure to be so qualified would not have a Material Adverse Effect.

5.2    Power and Authority. Each Seller and each Acquired Company have all requisite corporate or similar organizational power and authority to execute and deliver each of the Transaction Documents to which such Seller or Acquired Company is a party, to perform its obligations hereunder or thereunder, and to consummate the transactions contemplated hereby and thereby, subject to obtaining Bankruptcy Court approval pursuant to the Sale Order.  All acts or proceedings required to be taken by the Sellers or the Acquired Companies to authorize the execution and delivery of this Agreement and the performance of the Seller's or the Acquired Companies' obligations hereunder and thereunder have been properly taken.

5.3    Enforceability.  Each Transaction Document to which a Seller or an Acquired Company is a party has been duly authorized, executed, and delivered by such Seller or Acquired Company, and, assuming the due and valid authorization, execution, and delivery of such Transaction

2

Document by the other parties thereto, such Transaction Document constitutes the legal, valid, and binding obligation of such Seller or such Acquired Company, enforceable against it in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Legal Requirements affecting or relating to creditors' rights generally and general equitable principles (the "***Bankruptcy and Equity Exceptions***").

5.4     Group Companies and Managed Entity; Capitalization.

(a)     Section 5.4(a) of the Disclosure Schedule lists (i) each Acquired Company, (ii) the entire authorized ~~equity interests~~Equity Interests of each such Acquired Company, and (iii) the holders of record of all issued and outstanding shares of such ~~equity interests~~Equity Interests, all of which are owned by the Persons set forth on Section 5.4(a) of the Disclosure Schedule free and clear of all Liens other than Permitted Liens.  No Acquired Company owns, holds, or has the right to acquire any ~~equity interest~~Equity Interest in any other Person (other than certain other Acquired Companies).  All of the ~~equity interests~~Equity Interests of the Acquired Companies have been duly authorized and validly issued, are fully paid and non-assessable, and were issued in compliance with all applicable state and federal securities Legal Requirements.  Except as set forth in the Organizational Documents of the Acquired Companies, there are no outstanding options, warrants, convertible securities, subscription rights, conversion rights, exchange rights, or other agreements that require any of the Acquired Companies to issue or sell any ~~equity interests~~Equity Interests (or securities convertible into or exchangeable for ~~equity interests of~~Equity Interests of such Acquired Company), and no equity securities or other Equity Interests of any Acquired Company are reserved for issuance for any purpose.  Neither the Sellers nor any Acquired Company is obligated to redeem or otherwise acquire any outstanding ~~equity interests~~Equity Interests of the Acquired Companies.  Upon completion of the Closing, Buyer will own all right, title, and interest in the ~~equity interests~~Equity Interests of the Acquired Companies.

(b)     Section 5.4(b) of the Disclosure Schedule lists (i) the entire authorized ~~equity interests~~Equity Interests of the Managed Entity, and (ii) the holders of record of all issued and outstanding shares of such ~~equity interests~~Equity Interests, all of which are owned by the Persons set forth on Section 5.4(b) of the Disclosure Schedule free and clear of all Liens other than Permitted Liens.  The Managed Entity does not own, hold, or have the right to acquire any ~~equity interest~~Equity Interest in any other Person.  All of the ~~equity interests~~Equity Interests of the Managed Entity have been duly authorized and validly issued, are fully paid and non-assessable, and were issued in compliance with all applicable state and federal securities Legal Requirements.

5.5     No Violation; Consents and Approvals.  Except as set forth on Section 5.5 of the Disclosure Schedule, the execution and delivery by the Sellers and the Acquired Companies of each of the Transaction Documents to which a Seller or Acquired Company is a party and the consummation by it of the transactions contemplated hereby or thereby will not (a) violate any provision of the Organizational Documents of such Seller or Acquired Company, (b) violate any material Legal Requirement applicable to, binding upon, or enforceable against such Seller or Acquired Company, (c) result in any material breach of, or constitute a material default (or an event which would, with the passage of time or the giving of notice or both, constitute a material default) under, or give rise to a right of payment under or the right to terminate, any note, bond, mortgage, indenture, deed of trust, contract, commitment, arrangement, license, agreement, lease or other instrument or obligation to which such Seller or Acquired Company is a party, or (d) result in the creation or imposition of any Lien upon any of the material property or material assets of such Seller or Acquired Company.  Other than Bankruptcy Court approval pursuant to the Sale Order, no approval, consent, waiver, authorization, or other order of, and no declaration, filing, registration, qualification, recording, or other action or filing with, any

Governmental Authority or any other Person is required to be obtained or made by or on behalf of such Seller or Acquired Company in connection with the execution, delivery, or performance of the Transaction Documents to which it is a party in accordance with the terms and conditions thereof, except where failure to obtain such approval, consent, waiver, authorization, or other order, or to make such declaration, filing, registration, qualification, recording, or other action, would not be material to such Seller or Acquired Company.

      5.6    Financial Statements.  Attached as <u>Section 5.6</u> of the Disclosure Schedule are copies of (a) the internally prepared unaudited balance sheet of the Sellers and the Acquired Companies and the related statement of profit and loss as of and for the fiscal year ended December 31, 2023 (the "***Annual Financial Statements***") and (b) the internally prepared unaudited balance sheet of the Sellers and the Acquired Companies as of May 31, 2024 (such date, the "***Interim Balance Sheet Date***", and such balance sheet, the "***Interim Balance Sheet***") and the related statement of profit and loss for the five (5) months then ended (collectively, with the Interim Balance Sheet, the "***Interim Financial Statements***," and, collectively with the Annual Financial Statements, the "***Financial Statements***").  The Financial Statements fairly present, in all material respects, taken as a whole, the financial position of the Sellers and the Acquired Companies at each of the balance sheet dates and the results of operations for each of the periods covered thereby, in each case, in accordance with GAAP, except that the Interim Financial Statements do not reflect year-end adjustments and do not contain footnote disclosures and other presentation items.   Buyer acknowledges that the balance sheets included in the Financial Statements were created for the purposes of the transactions contemplated by this Agreement and have not been audited.

      5.7    Absence of Certain Developments.  Except as contemplated or permitted by this Agreement, as set forth on <u>Section 5.7</u> of the Disclosure Schedule, the DIP Financing Orders or in connection with matters arising from preparation for the Bankruptcy Cases or as authorized by the Bankruptcy Court since the Interim Balance Sheet Date:

      (a)    the RS Business, the Acquired Companies and the Managed Entity have been conducted in all material respects in the ordinary course of business;

      (b)    there has not occurred any change or event that has resulted in a Material Adverse Effect;

      (c)    the Sellers, the Acquired Companies and the Managed Entity have not sold, transferred, leased, mortgaged, pledged, or otherwise subjected to any Lien (other than Permitted Liens) any material portion of the Acquired Assets or the RS Business, taken as a whole;

      (d)    the Sellers, the Acquired Companies and the Managed Entity have not entered into any Contract to make an acquisition (whether by merger, acquisition of stock or assets, or otherwise) of any business or line of business;

      (e)    the Sellers, the Acquired Companies and the Managed Entity have not sold, leased, transferred or otherwise disposed of any Acquired Assets, except for sales of Inventory in the Ordinary Course of Business;

      (f)    the Sellers, the Acquired Companies and the Managed Entity have not waived or released any claim or rights included in or related to the Acquired Assets or the RS Business with a value individually or in the aggregate in excess of $500,000 or revalued any of the Acquired Assets, except for adjustments to the value of Inventory in the Ordinary Course of Business;

(g)      the Sellers, the Acquired Companies and the Managed Entity have not entered into any Material Contracts with any third-party related to the Acquired Assets or the RS Business, other than in the Ordinary Course of Business;

(h)      there has not been any change in the Organizational Documents of the Sellers, the Acquired Companies and the Managed Entity;

(i)      the Sellers have not made with respect to the RS Business, the Acquired Companies and the Managed Entity, and the Acquired Companies and the Managed Entity have not, (i) made or revoked any material Tax election, (ii) adopted or changed any material Tax accounting method, (iii) filed an amended Tax Return, (iv) settled or compromised any material Tax audit, (v) entered into any closing agreement with any Taxing Authority that relates to Taxes or Tax Returns of any Acquired Company or the Managed Entity, or (vi) extended or waived the statute of limitations applicable to any Taxes or Tax Returns of the Acquired Companies and the Managed Entity;

(j)      there has not been any damage, destruction, or loss (other than ordinary course repair and maintenance), whether or not covered by insurance, with respect to the property related to the RS Business and the Acquired Assets of the Sellers, the Acquired Companies and the Managed Entity having a replacement cost of more than $5,000,000;

(k)      Except as set forth on Section 5.7(k) of the Disclosure Schedule, or as required by Legal Requirement or any Contract or Plan, neither the Sellers, the Acquired Companies nor the Managed Entity have materially increased the salary payable or to become payable by it to any of their Employees whose base salary is in excess of $150,000, or materially increased the coverage or benefits available under any severance pay, termination pay, deferred compensation, bonus, or other incentive compensation plan or arrangement, except for bonuses payable to certain officers and Employees of the Sellers or the Acquired Companies in connection with the consummation of the transactions contemplated by this Agreement;

(l)      there has not been any material change by the Sellers, the Acquired Companies and the Managed Entity in their material accounting or methods, principles or policies;

(m)      there has not been an incurrence of any Indebtedness other than pursuant to the DIP Facility;

(n)      none of the Permits held by any Seller, the Acquired Companies or the Managed Entity have terminated, expired or lapsed; and

(o)      none of the Sellers, the Acquired Companies nor the Managed Entity have committed to do any of the foregoing.

5.8    Litigation.  Other than the Bankruptcy Cases or as set forth on Section 5.8 of the Disclosure Schedule, there are no Actions or Orders pending or, to the Knowledge of the Sellers, expressly threatened in writing against the Sellers or the Acquired Companies or the Managed Entity, at law or in equity, before or by any Governmental Authority, which would reasonably be expected to be material to the RS Business, taken as a whole.  None of the Sellers, the Acquired Companies nor the Managed Entity are subject to any outstanding judgment, order or decree of any Governmental Authority that relates specifically to such Seller, Acquired Company or the Managed Entity.

2

5.9     Environmental Matters. Each Seller, Acquired Company and the Managed Entity are in material compliance with all Environmental Laws.  Each Seller, Acquired Company and the Managed Entity have obtained and is in material compliance with all Permits that are required pursuant to Environmental Laws for the occupation of the facilities of the Acquired Companies and the Managed Entity (each, a "**Facility**," and collectively, the "**Facilities**") and the operation of the business of the Seller, the Acquired Companies and the Managed Entity.  Since January 1, 2022, none of the Sellers, the Acquired Companies nor the Managed Entity have received any written notice of a material violation of Environmental Laws or any material liability arising under Environmental Laws, or any investigation, remediation, or corrective obligation relating to the Sellers, the Acquired Companies or the Facilities, the subject of which is unresolved.  As of the ~~date hereof~~Original Execution Date, there is no Action or Order pending against any Seller, Acquired Company or the Managed Entity related to an actual or alleged material violation of Environmental Laws or a material liability arising under Environmental Laws.  None of the Sellers, the Acquired Companies nor the Managed Entity have treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, or released any Hazardous Substance in a manner that would give rise to material liabilities pursuant to any Environmental Law.

5.10     Title to Properties . Immediately prior to Closing, the Sellers and the Acquired Companies will have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.3, and upon entry of the Sale Order, the Sellers will thereby transfer to Buyer or the applicable Buyer Designee, and Buyer or the applicable Buyer Designee will (subject to Section 2.5(c)) be vested, to the maximum extent permitted by sections 105, 363 and 365 of the Bankruptcy Code, with good, valid, exclusive and marketable title to, or, in the case of property leased or licensed by the Sellers, a valid, binding and enforceable leasehold or licensed interest in, all of the Acquired Assets, free and clear of all Liens, except (a) for the Assumed Liabilities and (b) for Permitted Liens. The Acquired Assets consisting of personal property are in good operating condition and repair (ordinary wear and tear excepted) and are suitable for the purposes for which they are presently used. No Acquired Asset is subject to any agreement, written or oral, for its sale or use by any Person other than the Sellers.

5.11     Sufficiency of Assets. (a) Taking into account the services proposed to be provided by the Sellers pursuant to the Transition Services Agreement schedules delivered to Buyer prior to the ~~date hereof~~Original Execution Date (including those that Buyer elects not to include in the Transition Services Agreement) and the Shared Contracts, the Acquired Assets will, as of the Closing Date, constitute all of the assets, properties and rights necessary for Buyer to conduct the RS Business in substantially the same manner operated by the Sellers and the Acquired Companies during the twelve (12) month period immediately prior to the Original Execution Date and (b) none of the Acquired Assets are owned by any Person other than the Sellers or the Acquired Companies.

5.12     Leased Real Property.

(a)     Section 5.12 of the Disclosure Schedule sets forth a summary of all leases for leased assets that have annual rental payments in excess of $500,000 and all real property leases, regardless of annual rental payment amount, describing the name of the lessor and the address for the premises leased under each applicable real property lease (the "**Leased Real Property**").

(b)     All of the Sellers and the Acquired Companies' real property leases related to the RS Business (the "**Real Property Leases**") are in full force and effect, and valid and enforceable in accordance with their respective terms.  No Seller or Acquired Company has received any written notice of any event of default or event which constitutes (with notice or lapse of time or both) a material default by such Seller or Acquired Company under any Real Property Lease and which has not been cured.  No Seller or Acquired Company has received written notice that the landlord with respect to

2

any Real Property Leases would refuse to renew such Real Property Lease upon expiration of the period thereof upon substantially the same terms, except for rent increases consistent with past experience or market rentals.  The Sellers and the Acquired Companies have made available to Buyer a true, correct, and complete copy of each Real Property Lease and all amendments and modifications thereto, and such Real Property Leases have not been modified or amended, in each case, in any material respect, since the Interim Balance Sheet Date.

(c)     The Leased Real Property set forth in <u>Section 5.12</u> of the Disclosure Schedule constitutes all of the real property used or occupied by the Sellers and the Acquired Companies in the operation of the RS Business by the Sellers and the Acquired Companies.  With respect to the Real Property Leases, (i) the Sellers and the Acquired Companies' possession and quiet enjoyment of such Leased Real Property has never been disturbed, and there are no current disputes with respect to any such Real Property Lease; (ii) no security deposit or portion thereof deposited with respect to such Real Property Lease has been applied in respect of a breach or default under such Real Property Lease which has not been redeposited in full; and (iii) none of the Real Property Leases is subject to any sublease, license, or other right of another party to use or occupy such Leased Real Property.

(d)     The Sellers and the Acquired Companies do not own any parcels of real property.

      5.13     <u>Compliance with Laws</u>.

(a)     Each Seller, Acquired Company and the Managed Entity are in compliance with all applicable Legal Requirements, except where the failure to so comply would not reasonably be expected to have a material impact on the Sellers, Acquired Companies, the Managed Entity and the RS Business, taken as a whole.  Since January 1, 2022, to the Knowledge of the Sellers, the Sellers, Acquired Companies and the Managed Entity have not been cited, fined or otherwise notified in writing of any material failure to comply with any material Legal Requirements that has not been paid or cured.

(b)     None of the Sellers nor any of their respective Subsidiaries (including the Acquired Companies), nor any of directors, officers, employees or, to the Knowledge of the Sellers, agents of the Sellers or any of their respective Subsidiaries (including the Acquired Companies) (i) has offered, promised, given or authorized the giving or will offer, promise, give or authorize the giving of money or anything else of value, whether directly or through another Person, to (A) any governmental official, employee or agent or (B) any other Person with the knowledge that all or any portion of the money or thing of value will be offered or given to a governmental official, employee or agent, in each of clauses (A) and (B) for the purpose of influencing any action or decision thereof in his or her official capacity, including a decision to fail to perform his or her official duties, or inducing such governmental official, employee or agent to use his or her influence with any Governmental Authority to affect or influence any official act; (ii) has or will make or authorize any other Person to make any payments or transfers of value which have the purpose or effect of commercial bribery, or acceptance or acquiescence in kickbacks or other unlawful or improper means of obtaining or retaining business; (iii) has or will use any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (iv) has made or will make any direct or indirect unlawful payment to any government official, employee or agent from corporate funds; (v) has made or will make any bribe, rebate, payoff, influence payment, kickback or other unlawful payment; (vi) has or will either establish or maintain any unrecorded fund or asset for any purpose, or has or will make any intentionally false or artificial entries on its books or records for any reason; or (vii) created or used any "off-book" bank or cash account or "slush fund"; or (viii) otherwise violate any Anti-Corruption Laws.

(c)      Each of the Sellers and their respective Subsidiaries (including the Acquired Companies), and the directors, officers, employees and, to the Knowledge of the Sellers, agents of the Sellers and their respective Subsidiaries (including the Acquired Companies) have been and are in compliance with Anti-Corruption Laws, Anti-Money Laundering Laws, and Sanctions.   Neither any Seller nor any of their respective Subsidiaries (including the Acquired Companies), nor any directors, officers, employees or, to the Knowledge of the Sellers, agents of any Seller or any of their respective Subsidiaries (including the Acquired Companies) is a Sanctioned Person.   Neither any Seller nor any of their respective Subsidiaries (including the Acquired Companies) (i) has or has had assets located in, or otherwise directly or indirectly derives or derived revenues from or engages or engaged in investments, dealings, activities, or transactions involving any Sanctioned Country; or (ii) directly or indirectly derives or derived revenues from or engages or engaged in investments, dealings, activities, or transactions with, any Sanctioned Person.   Neither any Seller nor any of their respective Subsidiaries (including the Acquired Companies) has received written notice alleging any non-compliance with Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions.   At no time has any Seller or any of their respective Subsidiaries (including the Acquired Companies), or any directors, officers, employees or, to the Knowledge of the Sellers, agents of any Seller or any of their respective Subsidiaries (including the Acquired Companies) made a voluntary, directed, or involuntary disclosure to any Governmental Authority with respect to any actual or potential violation under any Anti-Corruption Law, Anti-Money Laundering Laws or Sanctions. There has not been, and there is no, pending or threatened action, suit, proceeding, investigation or inquiry before any court or other Governmental Authority against any Seller, any of their respective Subsidiaries (including the Acquired Companies), or any of their respective directors, officers, employees or, to the Knowledge of the Sellers, agents, or any informal or formal investigation by any Seller or any of their respective Subsidiaries (including the Acquired Companies), or their respective legal representatives or a Governmental Authority involving the foregoing, that relates to a potential or actual violation of Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions. The Sellers and each Acquired Company have implemented and maintained policies and procedures designed to ensure compliance by the Sellers, their respective Subsidiaries (including the Acquired Companies) and directors, officers, employees and, to the Knowledge of the Sellers, agents of the Sellers and their respective Subsidiaries (including the Acquired Companies), with Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(d)      No part of the Purchase Price will be, directly or indirectly, used or otherwise lent, contributed, or otherwise made available, to any Person, (i) to fund any activity, business, or transaction of, with, or involving any Sanctioned Person or Sanctioned Country, or (ii) in any manner that would result in a violation of Sanctions, Anti-Money Laundering Laws or Anti-Corruption Laws by any Person (including any Party or any of their Affiliates).

39

2

5.14    Labor and Employment Matters.

(a)    Section 5.14(a) of the Disclosure Schedule sets forth a complete and correct list of Employees as of October 30, 2024, showing for each Employee: (i) name or unique employee identifier, (ii) hire date or seniority or service credit date if different from hire date, (iii) current job title, (iv) whether such Employee is on leave and if on leave, the reason for and period of leave, including anticipated return to work date, (v) annual base salary or hourly wage, (vi) any actual bonus, commission, or other remuneration paid during 2023, (vii) exempt/non-exempt status, (viii) any increase in compensation, bonus, incentive, or service award, or any grant of any severance or termination pay, or any other increase in benefits, or any commitment to do any of the foregoing, since January 1, 2024, (ix) full-time/part-time status, (x) location, (xi) accrued but unused paid time off (including the dollar value of such hours), and (xii) union/non-union status (and which union, if applicable). Section 5.14(a) of the Disclosure Schedule also sets forth a complete and correct list of all individual independent contractors currently performing services or under contract to perform future services related to the RS Business for any Seller or Acquired Company and for each: (A) start date, (B) description of services provided, (C) estimated completion date, (D) hourly or per diem rate or other form and amount of pay of such contractor, (E) what Seller or Acquired Company engages the individual independent contractor, and (F) location of engagement.

(b)    The Company has provided Buyer with complete and correct copies of (i) all existing severance, accrued vacation, or other leave agreements, policies, or retiree benefits applicable to any officer, Employee, or consultant of the Sellers or the Acquired Companies, (ii) all employee trade secret, non-compete, non-disclosure, and invention assignment agreements with officers, Employees, or consultants of the Sellers or the Acquired Companies, and (iii) all manuals and handbooks applicable to any current or former director, manager, officer, employee, or consultant of any Seller or Acquired Company (in each case, to the extent still in effect and relating to the RS Business). Except as set forth on Section 5.14(b) of the Disclosure Schedule, the employment or consulting arrangement of each officer, Employee, or consultant of any Seller or Acquired Company is, subject to applicable Legal Requirements involving the wrongful termination of employees, terminable at will (without the imposition of penalties or damages) by the Sellers or the Acquired Companies as the case may be, and the Sellers and the Acquired Companies do not have any severance obligations if any such officer, Employee, or consultant is terminated. To the Knowledge of the Sellers, no executive Employee or key Employee of any Seller or Acquired Company or any group of Employees of any Seller or Acquired Company has any plans to terminate employment with the applicable Seller or Acquired Company.

(c)    Except as set forth on Section 5.14(c) of the Disclosure Schedule, no Seller or Acquired Company is party to, or bound by, any collective bargaining agreement or other agreement with a labor organization representing any Employees. No collective bargaining agreement is being negotiated by any of the Sellers or Acquired Companies. The Sellers and Acquired Companies have not experienced (nor, to the Knowledge of the Sellers, have they been threatened with) any strike, lockout, slow down, work stoppage, boycott, handbilling, picketing, walkout, demonstration, leafleting, sit-in, sick-out, or other form of organized labor disruption. Within the past three (3) years prior to the Original Execution Date, no Seller or Acquired Company has committed any unfair labor practice, as defined in the National Labor Relations Act or other applicable labor laws. No labor organization or group of Employees has to the Knowledge of the Sellers, sought to organize any Employees for purposes of collective bargaining, made a demand for recognition or certification, sought to bargain collectively with the Sellers or any of the Acquired Companies, or filed a petition for recognition with any Governmental Authority. The Sellers and the Acquired Companies have paid all Employees all wages, salaries, commissions, bonuses, benefits, and other compensation due and payable to such Employees in the Ordinary Course of Business.

(d)     Within the past three (3) years prior to the Original Execution Date, each individual who has performed services for the Sellers and the Acquired Companies or who otherwise has claims for compensation from the Sellers and the Acquired Companies has been properly classified as an employee or an independent contractor and as exempt or non-exempt pursuant to all applicable Legal Requirements, including the Fair Labor Standards Act of 1938 (and any similar state or local Legal Requirements), the Code and ERISA.

(e)     The Sellers and the Acquired Companies are in compliance in all material respects with all applicable Legal Requirements pertaining to employment and employment practices, including all Legal Requirements relating to the hiring, promotion, assignment, and termination of employees, discrimination, harassment, retaliation, equal employment opportunities, disability, labor relations, wages and hours, hours of work, overtime, payment of wages, temporary or leased employees, employee classification, immigration, workers' compensation, background checks, employee benefits, working conditions, occupational safety and health, family and medical leave, employee terminations and data privacy and data protection to the extent they relate to Employees of the Sellers and the Acquired Companies. There are no, and in the past three (3) years prior to the Original Execution Date, there have not been any complaints, actions, suits, claims, investigations, or other Actions or Orders against a Seller or Acquired Company pending with, or, to the Knowledge of the Sellers, threatened to be filed by or with, any Governmental Authority in connection with the employment or engagement of any current or former employee, independent contractor, applicant for employment, volunteer, or worker provided by any temporary employment agency or third party workforce provider of any Seller or Acquired Company, including any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay, plant closures and layoffs, wage and hour issues, compliance with immigration laws, and any other employment related matter.

(f)     Each Employee has all work permits, immigration permits, visas, or other authorization required by any applicable Legal Requirement for such Employee given the duties and nature of such Employee's employment, and the Sellers and/or Acquired Companies have on file for each such Employee a Form I-9 (or equivalent form required by any other applicable jurisdiction) that is validly and properly completed in accordance with applicable law for each Employee or independent contractor with respect to whom such form is required under applicable law.

(g)     (i) Within the past three (3) years prior to the Original Execution Date, the Sellers and Acquired Companies have not failed to provide advance notice of layoffs or termination as required by the Worker Adjustment and Retraining Notification Act of 1988 or any similar state or local law, statute, rule, act, code, ordinance or regulation, or any similar applicable Legal Requirement for employees outside of the United States regarding the termination or layoff of employees (collectively, the "***WARN Act***"), nor have the Sellers or any Acquired Companies incurred any material liability or material obligation under the WARN Act; (ii) to the Knowledge of the Sellers, no Employee has been within the past three (3) years prior to the Original Execution Date or is being investigated in connection with any misconduct, nor subject to any disciplinary action in connection with such misconduct, that could reasonably be expected to cause any material damage to the reputation or business of the Sellers, Acquired Companies, or Employees; and (iii) to the Knowledge of the Sellers, within the past three (3) years prior to the Original Execution Date, no Employee has engaged in any conduct or cover-up of such conduct, or aided or assisted any other person or entity to engage in any conduct that could cause or has caused any material damage to the reputation or business of the Sellers, Acquired Companies, or Employees, including but not limited to any conduct constituting sexual misconduct, harassment (including sexual harassment), discrimination, or retaliation.

41

(h)     Except as set forth on Section 5.14(h) of the Disclosure Schedule, to the Knowledge of the Sellers, there have been no material workplace accidents, injuries, or exposures in the last three (3) years prior to the Original Execution Date involving any Employee or former employee of the Sellers or any Acquired Companies.

5.15     Employee Benefit Plans.

(a)     Section 5.15 of the Disclosure Schedule sets forth a list of all Acquired Company Plans (excluding offer letters that provide for at-will employment and can be terminated without any liability) and each material Non-Acquired Company Plan (excluding offer letters). The Sellers have separately identified in Schedule 5.15(a) (i) each Plan that contains a change in control provision and (ii) the sponsor or contracting entity with respect to each Plan. No Plan is subject to the Legal Requirements of relevant jurisdictions other than the United States.

(b)     Each of the Plans that is intended to be qualified under Section 401(a) of the Code either has received a favorable determination letter from the IRS or is a prototype plan that has received a notification letter from the IRS.  Nothing has occurred, and, to the Knowledge of the Sellers, there are no facts and circumstances that reasonably could be expected, to cause the loss of such qualification. The Plans comply in form and in operation, in all material respects, with the requirements of the Code, ERISA and all applicable Legal Requirements.

(c)     With respect to each Acquired Company Plan and, except as would not reasonably be expected to result in material liability to the Buyer, each Non-Acquired Company Plan, all required contributions or premium payments required to have been made under the terms of the Plan or in accordance with Legal Requirements have been made or properly accrued, in all material respects.

(d)     With respect to each Acquired Company Plan and each material Non-Acquired Company Plan, the Acquired Companies or the Sellers have made available to Buyer true and complete copies (or, to the extent such plan is unwritten, an accurate written description) of (i) plan documents, amendments, and related trust agreements, (ii) the most recent IRS determination letter and/or opinion letter, if applicable, (iii) all material filings with all Governmental Authorities with respect to each Plan for the past year prior to the Original Execution Date, (iv) the most recent Form 5500 and schedules thereto and nondiscrimination testing for the most recent plan year and (v) the latest financial statements for the Plans.

(e)     No Plan is, and neither the Sellers nor any of the Acquired Companies nor any of their respective ERISA Affiliates maintain, sponsor, contribute to or have any obligation to contribute to, or any Liability with respect to, or have in the past six (6) years prior to the Original Execution Date maintained, sponsored, contributed to, or had any obligation to contribute to, or had any Liability with respect to, any (i) "defined benefit plan" (as defined in Section 3(35) of ERISA) or any other plan subject to the funding requirements of Sections 412 or 430 of the Code or Section 302 or Title IV of ERISA (including any "multiemployer plan" (as defined in Section 3(37) of ERISA)), (ii) "multiple employer plan" (as defined in Section 413(c) of the Code or Section 210 of ERISA), (iii)  "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA, or (iv) or plan that provides for post-retirement or post-termination medical, life insurance or other similar benefits (other than health continuation coverage required by Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code and any similar applicable state Legal Requirement, for which the covered individual pays the full cost of coverage).

(f)      With respect to each Acquired Company Plan, and, except as would not reasonably be expected to result in material liability to the Buyer, each Non-Acquired Company Plan, all required reports, returns, notices and descriptions and other documentation that are required to have been filed with or furnished to the IRS, the United States Department of Labor or any other Governmental Authority, or to the participants or beneficiaries of such Plan (including Form 5500 Annual Reports, Summary Annual Reports, and Summary Plan Descriptions) have been filed or distributed in material compliance with the applicable requirements of ERISA, the Code, Legal Requirements, and the terms of each Plan.

(g)      No Action or Order or other claim, suit or proceeding to or by any Person or Governmental Authority with respect to any such Acquired Company Plan and, except as would not reasonably be expected to result in material liability to the Buyer, each Non-Acquired Company Plan, (other than routine claims for benefits) has been made, commenced, filed, is pending or, to the Knowledge of the Sellers, threatened in writing.

(h)      Except as set forth on <u>Schedule 5.15(h)</u>, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event) (i) result in any material payment becoming due, or materially increase the amount of any compensation due, to any current or former officer, director, employee or individual consultant (or their respective representatives or beneficiaries) of <u>the</u> Sellers or the Acquired Companies; (ii) materially increase any benefits otherwise payable under any Plan; (iii) result in the acceleration of the time of payment or vesting of any such compensation or benefits; or (iv) result in the payment of any amount that could, individually or in combination with any other such payment, constitute an "excess parachute payment", as defined in Section 280G(b)(1) of the Code and the regulations promulgated thereunder.  To the Knowledge of the Sellers, no Seller nor any Acquired Company has any obligation to "gross-up" or reimburse any Person for taxes or related interest or penalties incurred by such Person, including under Section 4999, 409A, or 105(h) of the Code.

5.16    <u>Tax Matters</u>.  Each of the Sellers (with respect to the RS Business) and the Acquired Companies has filed (or has had filed on its behalf) all federal income Tax Returns and other material Tax Returns that are required to be filed by it (taking into account any extensions of time to file that have been duly perfected).  All Taxes shown as owing by each of the Sellers (with respect to the RS Business) and the Acquired Companies on all such Tax Returns have been fully paid or properly accrued, and all such Tax Returns are true and correct in all material respects.  The provision for Taxes on the Interim Financial Statements is sufficient for all accrued and unpaid Taxes of the Sellers (with respect to the RS Business) and the Acquired Companies as of the date thereof.  All material Taxes that the Sellers (with respect to the RS Business) and the Acquired Companies are obligated to withhold from amounts owing to any employee, creditor, or third party have been fully paid or properly accrued.  No Seller (with respect to the RS Business) or Acquired Company is currently and has not been a party to any Tax allocation, Tax sharing, Tax indemnity, Tax reimbursement agreement or other Tax arrangement (other than credit agreements, lease agreements, or other commercial agreements entered into in the ordinary course of business containing customary Tax allocation or gross-up provisions).  Within the past three (3) years <u>prior to the Original Execution Date</u>, no Seller (with respect to the RS Business) or Acquired Company has been the subject of any audit or other examination of Taxes by the Taxing Authorities of any nation, state, or locality with respect to any open Tax years, and, to the Knowledge of the Sellers, no such audit or other examination is contemplated or pending.  No written claim has been made within the past three (3) years <u>prior to the Original Execution Date </u>by any Governmental Authority in a jurisdiction where a Seller (with respect to the RS Business) or Acquired Company does not file Tax Returns that it is or could be subject to taxation by that jurisdiction where a material Tax liability would result.  Within the past three (3) years <u>prior to the Original Execution Date</u>, no Seller (with respect to the RS Business)

43

or Acquired Company has been a member of any affiliated group of corporations which has filed a combined, consolidated, or unitary income Tax Return with any Governmental Authority (other than a combined, consolidated, or unitary group of which the Seller or any of its Affiliates is the common parent).  No Seller (with respect to the RS Business) or Acquired Company has waived in writing any statute of limitations in respect of Taxes payable by it, which waiver is currently in effect.  There are no liens for Taxes (other than Permitted Liens) upon any of the assets of the Sellers (with respect to the RS Business) or the Acquired Companies.  No Seller (with respect to the RS Business) or Acquired Company has been a party to any "listed transaction" as defined in Section 6707A(c)(2) of the Code and Treasury Regulation Section 1.6011-4(b).  No Seller (with respect to the RS Business) or Acquired Company has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or Section 361 of the Code.   Insurance.  Section 5.17 of the Disclosure Schedule lists each material insurance policy currently in effect that is maintained by the Sellers, the Acquired Companies and the Managed Entity that relates to the RS Business, the Acquired Companies and the Managed Entity, including the name of the insurer and policy number (collectively, the "***Insurance Policies***").  The Insurance Policies are in full force and effect, all premiums due thereon have been paid, and neither the Sellers, the Acquired Companies, or the Managed Entity, as applicable, are in material breach or material default thereunder.

5.18     Affiliated Transactions.  Except for this Agreement and the other Transaction Documents, Section 5.18 of the Disclosure Schedule sets forth a true and complete list of all (a) Contracts between (i) the Seller or any of its Affiliates (excluding the Sellers and the Acquired Companies), on the one hand, and (ii) any Seller or Acquired Company, on the other hand, and (b) powers of attorney granted by any Acquired Company in favor of the Seller, any of its Affiliates (excluding the Acquired Companies), or any of their respective representatives.

5.19     Material Contracts.

(a)     Section 5.19 of the Disclosure Schedule sets forth a list of all Contracts in effect as of the ~~date hereof~~Original Execution Date, including all amendments and supplements thereto, to which a Seller, Acquired Company or the Managed Entity is a party or by which a Seller, Acquired Company or the Managed Entity is bound, meeting any of the descriptions set forth below (collectively referred to herein as the "***Material Contracts***"):

(i)  all Contracts relating to any completed material business acquisition by a Seller, Acquired Company or the Managed Entity within the last two (2) years prior to the Original Execution Date;

(ii) all collective bargaining agreements and other Contracts with a labor union, works council, or other labor organization;

(iii) Contracts relating to the acquisition or disposition by any Seller or Acquired Company outside the Ordinary Course of Business of any material assets or any material business (whether by merger, sale or purchase of stock, sale or purchase of assets or otherwise) to the extent any actual or contingent material obligations of any Seller or Acquired Company thereunder remain in effect;

(iv) any settlement or similar agreement which imposes any payment or other material obligations of any Acquired Company after the Closing Date;

(v) all written Contracts for the employment of any current officer,

individual employee or other person on a full-time or consulting basis with an annual base salary or consulting fee in excess of $250,000 (excluding, in each case, healthcare providers);

(vi)  all guaranties of any obligation for Indebtedness;

(vii)  all Contracts under which a Seller, Acquired Company or the Managed Entity is lessee of, or holds or operates, any personal property owned by any other party, for which the annual rental exceeds $500,000;

(viii)  all Contracts under which a Seller, Acquired Company or the Managed Entity is lessor of or permits any third party to hold or operate any personal property for which the annual rental payments exceed $500,000;

(ix)  all software licenses that are material to the operation of the business of the Sellers, Acquired Companies and the Managed Entity taken as a whole (other than "off the shelf" software);

(x)  all Contracts that prohibit the Sellers, Acquired Companies or the Managed Entity from freely engaging in business anywhere in the world (other than customer Contracts and non-disclosure Contracts entered into in the ordinary course of business that contain non-solicitation obligations);

(xi)  all Contracts currently in effect (other than purchase orders providing for sales of products or services in the ordinary course of business) with any Material Customer or Material Supplier; and

(xii)  all Contracts currently in effect between a Seller, Acquired Company and the Managed Entity.

(b)  The Sellers, Acquired Companies and the Managed Entity have made available to Buyer a true and correct copy of all written Material Contracts.  Except as set forth on Section 5.19(b) of the Disclosure Schedule, as of the ~~date hereof~~Original Execution Date, neither the Sellers, Acquired Companies, the Managed Entity, nor, to the Knowledge of the Sellers, any other party to any Material Contract is in breach of, or in default under, any Material Contract, except where such breach or default would not reasonably be expected to be material to the Sellers, Acquired Companies and the Managed Entity, taken as a whole.  To the Knowledge of the Sellers, each Material Contract is valid, binding and in full force and effect, except for such failures to be valid, binding or in full force and effect that would not reasonably be expected to be material to the Seller or the Acquired Companies, taken as a whole.

5.20  Intellectual Property. Section 5.20 of the Disclosure Schedule sets forth a list of all registered Intellectual Property and applications therefor owned by a Seller or Acquired Company and a list of all of the corporate names and material brand names owned by the Sellers and Acquired Companies used in the conduct of the Sellers and the Acquired Companies' RS Business as currently conducted.  Except as set forth in Section 5.20 of the Disclosure Schedule or as would not reasonably be expected to have a material impact on the Sellers and the Acquired Companies, taken as a whole, (a) a Seller or Acquired Company owns and possesses all right, title, and interest in and to, or possesses the valid and enforceable right to use, all material Intellectual Property and applications therefor used in the operation of the RS Business of the Sellers and the Acquired Companies as currently conducted; (b) during the two (2)-year period prior to the date of this Agreement, no Seller or Acquired Company has received any written notices of material infringement or misappropriation from any third party with

45

respect to such Seller or Acquired Company's use of any Intellectual Property; (c) to the Knowledge of the Sellers, as of the ~~date hereof~~Original Execution Date, no third party is materially infringing or misappropriating any registered Intellectual Property owned by the Sellers or the Acquired Companies; and (d) to the Knowledge of the Sellers, none of the Intellectual Property or products or methods of doing business of the Sellers or the Acquired Companies as currently conducted materially infringes upon any other Person's Intellectual Property.

5.21     Material Customers and Suppliers.

(a)     Section 5.21(a) of the Disclosure Schedule sets forth a complete and accurate list of the ten (10) largest customers (by dollar volume) of the RS Business (taken as a whole in the aggregate) during fiscal year 2023 (each, a "**Material Customer**").

(b)     Section 5.21(b) of the Disclosure Schedule sets forth a complete and accurate list of the ten (10) largest suppliers (by dollar volume) of the RS Business (taken as a whole in the aggregate) during fiscal year 2023 (each, a "**Material Supplier**").

(c)     Except as set forth on Section 5.21(c) of the Disclosure Schedule, during the twelve (12) month period prior to the ~~date hereof~~Original Execution Date, none of the Sellers, the Acquired Companies nor the Managed Entity have received any written notice from any Material Customer or Material Supplier stating that such Material Customer or Material Supplier will stop its business with the Sellers, the Acquired Companies and the Managed Entity or otherwise materially change the terms of its relationship with the RS Business (other than pricing changes in the ordinary course of business).

5.22     Regulatory Compliance.

(a)     Each Seller, Acquired Company, the Managed Entity and each Facility presently is, and for the last three (3) years prior to the Original Execution Date has been, in compliance in all material respects with all Legal Requirements of any Governmental Authority having jurisdiction over the Facilities or the assets of the Sellers or the Acquired Companies, including but not limited to, the false claims, false representations, anti-kickback, and all other provisions of the Medicare/Medicaid fraud and abuse laws (42 U.S.C. Section 1320a-7 et seq.) and the physician self-referral and all other provisions of the federal Ethics in Patient Referrals Act, 42 U.S.C. § 1395nn, and all regulations promulgated thereunder and the corresponding state fraud and abuse, false claims, and anti-self-referral statutes and any regulations promulgated pursuant to any of the foregoing referenced statutes.

(b)     Except as would not be expected to be material to the Acquired Companies, taken as a whole, for the last three (3) years prior to the Original Execution Date, none of the Sellers, Acquired Companies, the Managed Entity, the Facilities, or any of the Sellers', Acquired Companies' or the Managed Entity's respective officers, directors, or managing employees has engaged in any activities that are prohibited under 42 U.S.C. Section 1320a-7 et seq., or the regulations promulgated thereunder, including, but not limited to, the following:

(i)  knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment;

(ii)  knowingly and willfully making or causing to be made a false statement or representation of a material fact for use in determining rights to any benefit or payment;

(iii) knowingly and willfully offering, paying, soliciting, or receiving any

46

remuneration (including any kickback, bribe, or rebate), directly or indirectly, overtly or covertly, in cash or in kind, (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare, Medicaid, or other state healthcare program, or (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part by Medicare, Medicaid, or other state healthcare program; or

(iv) knowingly making a payment, directly or indirectly, to a physician as an inducement to reduce or limit necessary services to individuals who are under the direct care of the physician and who are entitled to benefits under Medicare, Medicaid, or other state healthcare program.

(c)     the Sellers, Acquired Companies, the Managed Entity, and the Facilities are in compliance in all material respects with the administrative simplification provisions required under HIPAA, as well as applicable state laws having similar subject matter to HIPAA, as of the applicable effective dates for such requirements.

(d)     Permits & Approvals.

(i)   Section 5.22(d) of the Disclosure Schedule sets forth each of the governmental licenses, approvals, permits or authorizations that are issued or granted to the Sellers, the Acquired Companies and the Managed Entity by a Governmental Authority and that are material to the operation of the RS Business as currently conducted (collectively, the "**Permits**").   Such Permits constitute all material governmental licenses, approvals, permits or authorizations that are necessary for the operation of the Facilities as currently conducted.  Except as set forth on Section 5.22(d) of the Disclosure Schedule, a Seller, Acquired Company or the Managed Entity is the duly authorized holder of all such Permits that relate to the Facilities operated by the Sellers, Acquired Companies and the Managed Entity.  The Sellers, Acquired Companies, Managed Entity, and Facilities are in compliance in all material respects with all Permits held by the Sellers, Acquired Companies and the Managed Entity.

(ii) There are no provisions in, or agreements relating to, any such Permits which preclude or limit in any material respect the Sellers, Acquired Companies from operating any of the Facilities as they are currently operated.  There is not now any pending or, to the Knowledge of the Sellers, threatened action by or before any Governmental Authority to revoke, cancel, rescind, modify or refuse to renew any of the Permits, and all of the Permits are in good standing.

(iii)    Subject to entry of the Sale Order, each Permit, except as listed in Schedule 5.22(d) may be transferred or reissued to Buyer in accordance with this Agreement and without the approval of any Person.

(e)     Government Program Participation; Compliance Program.  Each of the Facilities that participates in the Medicare, Medicaid, and TriCare/CHAMPUS programs has a current and valid provider contract with such programs and is in compliance in all material respects with the conditions of participation in such programs.  The Sellers, Acquired Companies and the Managed Entity have not been excluded from participation in the Medicare, Medicaid, or TriCare/CHAMPUS programs, nor, to the Knowledge of the Sellers, is any such exclusion threatened.  The Sellers, Acquired Companies and the Managed Entity have adopted a compliance program applicable to the Facilities.  The Sellers, Acquired Companies and the Managed Entity have operated in material compliance with such compliance program and its policies.  For purposes of this Agreement, the term "compliance program" refers to provider programs of the type described in the compliance guidance published by the OIG.  None of the Sellers, Acquired Companies nor the Managed Entity (i) are a party to a Corporate Integrity

47

2

Agreement with the OIG, (ii) have any reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority, (iii) have been, to the Knowledge of the Sellers, within the past three (3) years prior to the Original Execution Date the subject of any material governmental payer program investigation conducted by any Governmental Authority, or (iv) are or have been, to the Knowledge of the Sellers, within the past three (3) years prior to the Original Execution Date a defendant in any qui tam/False Claims Act litigation.

5.23     Brokers. Except with respect to the brokers representing the Seller in this transaction, Lazard Frères & Co. LLC and MTS Health Partners, L.P., the Sellers and Acquired Companies have not incurred any obligation for any finder's or broker's or agent's fees or commissions or similar compensation in connection with the transactions contemplated hereby.

5.24     Bank Accounts.   Section 5.24 of the Disclosure Schedules set forth a true, complete and correct list of each bank, deposit, securities, lock box or cash collection, management or other account or sub-account of the RS Business or any Acquired Company, including the Person that is the holder of such account, title and number of the account and the financial or other institution at which such account is located (designating each authorized signatory).

5.25     NO OTHER REPRESENTATIONS AND WARRANTIES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS ARTICLE V AND THE REPRESENTATIONS AND WARRANTIES OF THE SELLER SET FORTH IN ARTICLE VI, NONE OF THE SELLERS, ACQUIRED COMPANIES, THE MANAGED ENTITY, NOR ANY OTHER PERSON MAKES ANY REPRESENTATION OR WARRANTY, WRITTEN OR ORAL, STATUTORY, OR EXPRESS OR IMPLIED, WITH RESPECT TO ANY OF THE SELLERS, ACQUIRED COMPANIES, THE MANAGED ENTITY, OR ANY OF THEIR RESPECTIVE BUSINESSES, OPERATIONS, ASSETS, STOCK, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE), OR PROSPECTS.  BUYER HEREBY EXPRESSLY WAIVES ANY CLAIMS AND CAUSES OF ACTION AND ANY OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, IN EACH CASE, RELATING TO THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA, OR OTHER MATERIALS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO BUYER AND ITS REPRESENTATIVES BY OR ON BEHALF OF THE SELLERS, ACQUIRED COMPANIES, OR THE MANAGED ENTITY.  WITHOUT LIMITING THE FOREGOING, NONE OF THE SELLERS, ACQUIRED COMPANIES, THE MANAGED ENTITY, NOR ANY OTHER PERSON IS MAKING ANY REPRESENTATION OR WARRANTY TO BUYER WITH RESPECT TO ANY FINANCIAL PROJECTION OR FORECAST RELATING TO THE RS BUSINESS, OPERATIONS, ASSETS, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE), OR PROSPECTS OF THE SELLERS, ACQUIRED COMPANIES AND THE MANAGED ENTITY.

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Sellers and the Acquired Companies as of the date hereofOriginal Execution Date:

6.1     Organization and Good Standing. Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

6.2     Power and Authority.  Buyer has all requisite power and authority to execute and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.  All acts or proceedings required to be taken by Buyer to authorize the execution and delivery of this Agreement and the performance of Buyer's obligations hereunder have been properly taken.

6.3     Enforceability.  This Agreement has been duly authorized, executed, and delivered by Buyer, and, assuming the due and valid authorization, execution, and delivery of this Agreement by the Sellers, this Agreement constitutes the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as the same may be limited by the Bankruptcy and Equity Exceptions.

6.4     No Violations; Consents and Approvals.  The execution and delivery of this Agreement by Buyer, and the consummation by it of the transactions contemplated hereby, will not (i) violate any provision of the Organizational Documents of Buyer, (ii) violate any material Legal Requirement applicable to, binding upon, or enforceable against Buyer, (iii) result in any material breach of, or constitute a material default (or an event which would, with the passage of time or the giving of notice or both, constitute a material default) under, or give rise to a right of payment under or the right to terminate, any Contract to which Buyer is a party or bound, or (iv) result in the creation or imposition of any Lien upon any of the material property or material assets of Buyer.  No approval, consent, waiver, authorization, or other order of, and no declaration, filing, registration, qualification, recording, or other action or filing with, any Governmental Authority or any other Person is required to be obtained or made by or on behalf of Buyer in connection with the execution, delivery, or performance of this Agreement and the consummation of the Closing hereunder in accordance with the terms and conditions of this Agreement, except where failure to obtain such approval, consent, waiver, authorization, or other order, or to make such declaration, filing, registration, qualification, recording, or other action, would not be material to Buyer taken as whole.

6.5     Brokers.  Except with respect to Houlihan Lokey Capital, Inc. and Ankura Consulting Group, LLC, Buyer has not incurred any obligation for any finder's or broker's or agent's fees or commissions or similar compensation in connection with the transactions contemplated hereby for which the Sellers, any of the Sellers' Affiliates or the Acquired Companies may be liable.

6.6     Litigation.  There are no Actions or Orders pending or, to the Knowledge of the Buyer, expressly threatened in writing against Buyer, at law or in equity, before or by any Governmental Authority which would reasonably be expected to affect the legality, validity or enforceability of this Agreement or the consummation of the transactions contemplated by this Agreement.

6.7     NO OTHER REPRESENTATIONS AND WARRANTIES.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE V, BUYER ACKNOWLEDGES AND AGREES THAT NEITHER THE SELLERS, THE ACQUIRED COMPANIES, NOR ANY OTHER PERSON, MAKES ANY REPRESENTATION OR WARRANTY, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, WITH RESPECT TO ANY OF THE SELLERS, THE ACQUIRED COMPANIES OR ANY OF THEIR RESPECTIVE BUSINESSES, OPERATIONS, ASSETS, STOCK, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE), OR PROSPECTS.  BUYER HEREBY EXPRESSLY WAIVES ANY CLAIMS AND CAUSES OF ACTION AND ANY OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, IN EACH CASE, RELATING TO THE ACCURACY, COMPLETENESS, OR MATERIALITY OF ANY INFORMATION, DATA, OR OTHER MATERIALS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO BUYER AND ITS

REPRESENTATIVES BY OR ON BEHALF OF THE SELLERS OR THE ACQUIRED COMPANIES. WITHOUT LIMITING THE FOREGOING, NEITHER THE SELLERS NOR THE ACQUIRED COMPANIES, NOR ANY OTHER PERSON IS MAKING ANY REPRESENTATION OR WARRANTY TO BUYER WITH RESPECT TO ANY FINANCIAL PROJECTION OR FORECAST RELATING TO THE RS BUSINESS, OPERATIONS, ASSETS, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE), OR PROSPECTS OF ANY OF THE SELLERS OR THE ACQUIRED COMPANIES.

## ARTICLE 7

### ACTIONS PRIOR TO THE CLOSING DATE

7.1     Access and Reports.

(a)     During the period from and including the Original Execution Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of Article 11, the Sellers shall afford Buyer and its Representatives reasonable access, upon reasonable notice during normal business hours, to the senior executive officers of the Acquired Companies and to the books and records of the Acquired Companies and all records concerning the RS Business and Acquired Assets, and the Sellers shall instruct such senior executive officers to reasonably cooperate with Buyer and its Representatives regarding the same; provided, that (i) such access does not unreasonably interfere with the operation of the Sellers' or the Acquired Companies' businesses and shall be subject to the Sellers' reasonable security measures and insurance requirements; and (ii) Buyer and its authorized agents and representatives shall not contact or otherwise communicate with the employees (other than executive employees), customers, or suppliers of the Sellers or the Acquired Companies, unless, in each instance, approved in writing in advance by the Sellers, which approval shall not be unreasonably withheld.   No investigation pursuant to this Section 7.1 or by Buyer or its Representatives at any time prior to or following the Original Execution Date shall affect or be deemed to modify any representation or warranty made by the Sellers herein. Notwithstanding anything contained in this Agreement to the contrary, none of Buyer or its Representatives or any Buyer Designees shall have any right to perform or conduct, or cause to be performed or conducted, any environmental sampling or testing at, in, on or underneath any of the Sellers' properties without written consent from the Company, which consent shall not be unreasonably withheld.

(b)     This Section 7.1 shall not require the Sellers to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of the Company, is reasonably likely to result in any violation of any Legal Requirement or any Contract to which the Company or any Seller is a party or cause any privilege (including attorney-client privilege) that the Sellers would be entitled to assert to be undermined with respect to such information and such undermining of such privilege could in the Company's good faith judgment (after consultation with counsel, which may be in-house counsel) adversely affect in any material respect the Sellers' position in any pending or, what the Company believes in good faith (after consultation with counsel, which may be in-house counsel) could be, future litigation, (ii) personnel files, workers' compensation files, employee medical files (including employee "protected health information" (as defined in the HIPAA Standards for Privacy of Individually Identifiable Health Information, 45 CFR Part 146)), and other employee books and records, or (iii) if the Company or any Seller, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto; provided, that, in the case of clause (i), the Parties hereto shall cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be reasonably likely to result in the violation

2

of any such Legal Requirement or Contract or be reasonably likely to cause such privilege to be undermined with respect to such information or (B) could reasonably (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives of Buyer could be provided access to such information.

7.2    Operations Prior to the Closing Date. The Sellers covenant and agree that, except (w) as expressly contemplated by this Agreement, (x) as disclosed in Schedule 7.2, (y) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed) or (z) as otherwise required by Legal Requirements (including any matters arising from the Bankruptcy Cases or authorized by the Bankruptcy Court), after the Original Execution Date and prior to the Closing Date:

(a)    the Sellers shall (and shall cause the Acquired Companies to):

(i)    use reasonable best efforts to carry on the RS Business in the Ordinary Course of Business;

(ii)    use reasonable best efforts to maintain, preserve and protect the RS Business (including with respect to the operations, organization and goodwill of the RS Business and the making of capital expenditures with respect to the RS Business, substantially consistent with current operations, forecasts and schedules that have been made available to Buyer and its Affiliates and Representatives), the Acquired Assets and the assets of the Acquired Companies in the condition in which they exist on the Original Execution Date in all material respects;

(iii)    manage Inventory, the timing of collection of accounts receivable and the payment accounts payable of the RS Business in the Ordinary Course of Business;

(iv)    maintain their books, accounts and records of the RS Business in accordance with past custom and practice;

(v)    use reasonable best efforts to pay all trade payables related to the Acquired Assets incurred on or after the Petition Date in the ordinary course of the RS Business and collect all Accounts Receivable due to the Sellers after the Petition Date in the Ordinary Course of Business;

(vi)    use reasonable best efforts to (A) retain Employees who are in good standing and (B) maintain their relationships with and preserve for the RS Business the goodwill of their suppliers, customers, Governmental Authorities, lessors, directors, managers, officers, Key Persons and other Persons with whom they have material business relationships with the Sellers or the Acquired Companies in respect of the RS Business;

(vii)    (A) comply in all material respects with all Legal Requirements applicable to them or having jurisdiction over the RS Business or any Acquired Asset, (B) comply in all respects with all Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions, (C) use reasonable best efforts to comply in all respects with contractual obligations applicable to or binding upon them pursuant to Assumed Contracts and (D) use reasonable best efforts to maintain in full force and effect all Permits and comply with the terms of each such Permit;

(viii)    use reasonable best efforts to cause any of their current insurance policies with respect to the RS Business or any of the other Acquired Assets or assets of the

51

Acquired Companies (including the Leased Real Properties) not to be canceled or terminated or any of the coverage thereunder to lapse unless, simultaneously with such termination, cancellation or lapse, replacement, policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect;

(ix)  use reasonable best efforts to maintain, preserve and protect in full force and effect the existence of all Intellectual Property owned by the Sellers that constitutes an Acquired Asset;

(x)  use reasonable best efforts not to take or agree to or commit to assist any other Person in taking any action that would reasonably be expected to (i) result in a failure of any of the conditions to the Closing or (ii) impair the ability of the Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation; and

(xi) file all Tax Returns and pay or deposit all Taxes on a timely basis in the Ordinary Course of Business.

(b)      the Sellers shall not (and shall cause the Acquired Companies not to):

(i)  sell, assign, transfer, lease, license or allow to lapse any rights in the Intellectual Property owned by the Sellers for that primarily relates to the RS Business (other than non-exclusive licenses to Intellectual Property granted in the Ordinary Course of Business);

(ii)  make, change or revoke any material election relating to Taxes, change any annual accounting period for applicable Tax purposes, adopt or change any material Tax accounting method, file any amended Tax Return (other than an amended Tax Return to obtain any U.S. federal, state, or local income Tax refund), enter into any closing agreement, settle any material claim or assessment with respect to Taxes, knowingly surrender any right to claim a material refund, offset or other reduction in Tax liability, or request or consent to any extension or waiver of the limitation periods applicable to any claim or assessment with respect to Taxes (other than an extension granted in the ordinary course of business in connection with an extension for the filing of Tax Returns), in each case that adversely affects Taxes of the RS Business, the Acquired Assets or the Assumed Liabilities (other than Taxes that constitute Excluded Liabilities); or

(iii)  authorize, commit or agree to take, or commit to assist any other Person in taking, any of the actions set forth in this Section 7.2(b).

(iv)  make any material alterations or improvements to the Leased Real Property other than in the Ordinary Course of Business;

(v)  amend, modify, restate, supplement or terminate any Lease for any Leased Real Property or enter into any new Lease by any Acquired Company or by any Seller with respect to the RS Business without obtaining such approval from Buyer;

(vi) enter into, materially amend, waive, modify, or voluntarily terminate any Material Contract or any Contract that would have been a Material Contract if entered into prior to the date hereofOriginal Execution Date, except, in each case, as required by any applicable Legal Requirement, provided, that for purposes of this Section 7.2(b)(vi), Buyer shall be deemed to have consented if Buyer does not respond to the Sellers in writing within three (3) Business Days of the Sellers' request for such consent;

52

2

(vii)   acquire any material properties or assets or sell, assign, license, transfer, convey, lease, sublease or otherwise dispose of any material assets of the Sellers or any Acquired Company primarily related to the RS Business, including any assets that but for such sale, assignment, license, transfer, conveyance, lease, sublease or other disposition would constitute Acquired Assets, in each case;

(viii)   subject to any Lien or otherwise encumber or, except for Permitted Liens, permit, allow or suffer to be encumbered, any of the Acquired Assets or assets of the Acquired Companies; or

(ix) enter into any settlement agreement with regard to Claims related to the RS Business or the Acquired Assets without the prior written consent of Buyer (in its sole discretion).

(c)   Nothing in this <u>Section 7.2</u> is intended to result in the Sellers or any of the Acquired Companies ceding control to Buyer of the Acquired Companies' basic ordinary course of business and commercial decisions prior to the Closing Date.

(d)   Notwithstanding anything contained in this Agreement to the contrary, any action taken or omitted to be taken by the Acquired Companies that otherwise could represent a failure by the Acquired Companies to operate in the Ordinary Course of Business, in response to, in connection with, or as a result of, any of the following, shall not be deemed a breach of this <u>Section 7.2</u>: any earthquakes, hurricanes, floods or other natural disasters, epidemics, pandemics, disease outbreaks or public health emergencies, acts of God, or force majeure events, or any escalation or worsening of any of the foregoing.

7.3   <u>Antitrust Filings; Cooperation</u>.

(a)   As soon as reasonably practicable (and, in any event, in the case of notifications under the HSR Act, within ~~ten~~one (~~10~~1) Business ~~Days~~<u>Day of the earliest to occur of (x) the Auction, or (y) the Bid Deadline if, and only if, the Sellers do not receive any Qualified Bids for the Acquired Assets (other than this Agreement) by the Bid Deadline</u>, or a later date as agreed by the Parties)~~ following entry of the Bidding Procedures Order~~, the Sellers, on the one hand, and Buyer, on the other hand, shall each prepare and file, or cause to be prepared and filed, any notifications advisable or required to be filed under (i) the HSR Act with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice, and request early termination of the waiting period under the HSR Act and (ii) any other applicable Antitrust Laws. Buyer, on the one hand, and the Sellers, on the other hand, shall use reasonable best efforts to: (i) respond as promptly as practicable to the appropriate Governmental Authorities to any requests for additional information and documentary material in connection with such filings and (ii)  take all other actions necessary to cause the waiting periods under the HSR Act and waiting or review periods under any other applicable Antitrust Laws to terminate or expire at the earliest practicable date after the date of filing including using reasonable best efforts to avoid or eliminate impediments under any Antitrust Law that may be asserted by any Governmental Authority with respect to the transactions contemplated hereby so as to enable the Closing to occur as soon as reasonably possible. Buyer shall be responsible for payment of the applicable filing fee under the HSR Act and any other applicable Antitrust Laws, and each Party shall be responsible for payment of its own respective costs and expenses (including attorneys' fees and other legal fees and expenses) associated with the preparation of its portion of any antitrust filings.

(b)   The Sellers shall use reasonable best efforts to do, or cause to be done, all things necessary under the applicable Legal Requirements with the appropriate Governmental

Authorities to put in place, to transfer, to amend, or to acquire all Transferred Permits that are necessary for the operation and conduct of the RS Business or Acquired Assets by or on the Closing Date, unless the applicable Legal Requirements regarding such a Permit require certain actions to be taken upon or after Closing, and, in that event, the Sellers shall use reasonable best efforts to do, or cause to be done, all things necessary or desirable under the applicable Legal Requirements with the appropriate Governmental Authorities which can only be taken or done after Closing to put in place, to transfer, to amend, or to acquire such remaining Permits as promptly as reasonably practicable after the Closing.

(c)     In addition to the actions to be taken under Section 7.3(a) and Section 7.3(b), the Sellers, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using reasonable best efforts to accomplish the following: (i) taking all reasonable acts necessary to cause the conditions precedent set forth in Article 9 and Article 10 to be satisfied, (ii) obtaining, at the earliest practicable date, of all necessary Governmental Authorizations and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to avoid any Action by any Governmental Authority, (iii) defending of any Actions challenging this Agreement or the consummation of the transaction contemplated by this Agreement, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed, and (iv) executing and delivering any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

(d)     The Sellers, on the one hand, and Buyer, on the other hand shall consult and cooperate with one another and consider in good faith the view of one another and, (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) as far as reasonably practicable, shall permit the other to review in advance any proposed written or non-ministerial oral communication or information submitted to any such Governmental Authority in response thereto, subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine. In addition, none of Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated by this Agreement, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to restrictions under any Legal Requirements, each of Buyer, on the one hand, and the Sellers, on the other hand, shall promptly furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the RS Business) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

(e)     In the event any Action by any Governmental Authority or other Person is commenced which questions the validity or legality of the transactions contemplated hereby, seeks

damages in connection therewith, or would delay, restrain, prevent, enjoin or otherwise prohibit consummation of the transactions contemplated hereby, the Parties agree to cooperate and use their reasonable best efforts to resist and defend against such Action and, if an Order is entered or issued, or becomes reasonably foreseeable to be entered or issued, in any such Action, to use their reasonable best efforts to have such Order vacated, modified, reversed, suspended, prevented, eliminated or removed so as to permit such consummation on a schedule as close to possible to that contemplated by this Agreement, and to cooperate reasonably regarding any other impediment to the consummation of the transactions contemplated hereby.

(f)     Notwithstanding anything herein to the contrary:

(i)  none of Buyer's Affiliates or equity holders shall be required to, or be required to agree to: (A) sell, divest or dispose of, any assets, products, businesses, equity or interests; (B) any conditions relating to, or changes or restrictions in, any such assets, products, businesses, equity or interests; (C) any modification or waiver of the terms and conditions of this Agreement; or (D) any other condition that requires Buyer or Buyer's Affiliates or equity holders to take any action or that limits the freedom of action with respect to any assets, products, businesses, equity or interests of the Buyer's Affiliates or equity holders; and

(ii)  and in furtherance of its efforts under this <u>Section 7.3</u>, Buyer agrees to take any and all action necessary to eliminate each and every impediment under any antitrust law that is asserted by any Governmental Authority so as to enable the Parties hereto to close transactions contemplated by this Agreement prior to the Outside Date, including negotiating, committing to, and effecting by consent decree or otherwise: (A) the sale, divestiture or disposition of, any assets, products, businesses, equity or interests of Buyer or the RS Business (after it is acquired); (B) any conditions relating to, or changes or restrictions in, any of the RS Business's assets, products, businesses or interests; (C) any modification or waiver of the terms and conditions of this Agreement; or (D) any other condition that requires Buyer to take any action or that limits the freedom of action with respect to any assets, products, businesses or interests of Buyer or the RS Business (after it is acquired); <u>provided</u>, <u>however</u>, that Buyer shall not be required to propose, execute, carry out or agree or submit to any action or remedy that individually or in the aggregate would reasonably be expected to have a material adverse effect on the business, operations, financial condition or results of operations of the RS Business (taken as a whole); and

(iii)  Neither any Seller nor any Affiliate thereof shall agree to any sale, divestiture or disposal of, any assets, products, businesses or interests of any Person or the RS Business or any material restriction on any Person or the RS Business without the prior written consent of Buyer (which shall not be unreasonably withheld, conditioned or delayed) and provided further that any such action may, at the discretion of the Sellers, be conditioned upon the Closing.

7.4     <u>Bankruptcy Court Matters</u>.

~~(a)  Bidding Procedures Motion. In connection with the transactions contemplated by this Agreement, Sellers shall have filed with the Bankruptcy Court after the execution of this Agreement by each of the Parties, but in any event, within one (1) day following the Petition Date, the Bidding Procedures Motion, including the Bidding Procedures Order and appropriate supporting declarations, in each case, in form and substance acceptable to Buyer, and which identifies Buyer as the "stalking horse" for the Acquired Assets.~~

~~(b)  Bankruptcy Procedures Hearing and Bidding Procedures Order.  The Bankruptcy Court shall have entered the Bidding Procedures Order, in form and substance reasonably acceptable to Buyer and Sellers, no later than November 19, 2024.~~

(a)      ~~(c)~~ Qualified Bids.  Pursuant to the Bidding Procedures Order, and as modified by that certain *Notice of Amended Timeline for Recovery Solutions / Consolidated Sale Transaction* [Docket No. 563], any and all Qualified Bids ~~respecting~~in respect of the Acquired Assets shall have been submitted on or prior to ~~December 13~~January 6, ~~2024~~2025 (the "**Bid Deadline**").  If any Qualified Bid (other than this Agreement) is submitted prior to the Bid Deadline, the Sellers shall have commenced the Auction on or prior to ~~December 16~~January 7, ~~2024~~2025.

(b)      ~~(d)~~ Sale Order. The Bankruptcy Court shall have entered the Sale Order on or prior to ~~December 23~~January 8, ~~2024~~2025, which shall be in form and substance ~~reasonably~~ acceptable to Buyer and the Sellers and consistent with Section 7.7 ~~hereof~~.

(c)      ~~(e)~~ Contracts. To the extent applicable, the Sellers shall serve on all non-Seller counterparties to all of their Contracts a notice specifically stating that the Sellers are or may be seeking the assumption and assignment of such Contracts and shall notify such non-Seller counterparties of the deadline for objecting to the Cure Costs, if any, which deadline shall as set forth in the Bidding Procedures Order.

(d)      ~~(f)~~ Bankruptcy Filings. From and after the Original Execution Date and until the Closing Date, the Sellers shall provide draft copies of all material (i) motions, (ii) documents, and (iii) other pleadings to be filed in the ~~Chapter 11~~Bankruptcy Cases (excluding any retention applications) to the Ad Hoc Group Advisors (as defined in the Restructuring Support Agreement) as soon as reasonably practicable, but in no event less than two (2) Business Days prior to the date when the Company intends to file such documents, and, without limiting any approval rights set forth herein, consult in good faith with the Ad Hoc Group Advisors regarding the form and substance of any such proposed filing; provided, however, that in the event that not less than two (2) Business Days' notice is impossible or impracticable under the circumstances, the Company shall provide draft copies of any motions or other pleadings (excluding any retention applications) to the Ad Hoc Group Advisors as soon as otherwise practicable before the date when the Company Parties intends to file any such motion or other pleading. In the event the entry of the ~~Bidding Procedures Order or the~~ Sale Order shall be appealed, the Sellers shall use their reasonable best efforts to defend such appeal. The Sellers shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure or (ii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith. The Sellers shall use their reasonable best efforts to cause the ~~Bidding Procedures Order and the~~ Sale Order to be entered and become a Final ~~Orders~~Order as soon as practicable after entry. Notwithstanding the foregoing, nothing in this Agreement precludes the Parties from consummating the transactions contemplated by this Agreement if the Sale Order has been entered and has not been stayed and Buyer, in its sole discretion, waives in writing the condition set forth in Section ~~9.7~~9.6 that the Sale Order be a Final Order.

7.5      Expense Reimbursement. Notwithstanding anything in this Agreement to the contrary, ~~from and after entry of~~in accordance with the Bidding Procedures Order, the Sellers agree to pay Buyer the Expense Reimbursement in the event this Agreement is terminated if and to the extent provided in Section 11.2. ~~The Parties acknowledge and agree that the terms and conditions set forth in Section 11.2 with respect to the payment of the Expense Reimbursement shall become~~

56

~~operative only if and to the extent that the Bankruptcy Court enters the Bidding Procedures Order approving, among other things, such Expense Reimbursement.~~

    7.6  Disclosure Schedules; Notice of Developments.

      (a)  Completion of Schedules. ~~The Parties acknowledge that the Disclosure Schedules may not be complete as of~~ If Buyer determines to include as an Acquired Company one or more Additional Acquired Companies pursuant to Section 2.7, then, following receipt of such determination by Buyer, the Sellers shall be permitted until the date that is three (3) Business Days prior to the Closing to amend the Disclosure Schedules to disclose any additional matters required to be disclosed in respect of the representations and warranties set forth in Article 5 as a result of the addition of any Additional Acquired Company (each such additional disclosure, an "***Additional Acquired Company Disclosure***"). Each Additional Acquired Company Disclosure shall for all purposes of this Agreement be deemed to have been made as of the Effective Date and included in the Disclosure Schedule as of the execution of this Agreement, and, for the ~~Parties hereby covenant that they each will use commercially reasonable efforts to complete and deliver the Disclosure Schedule as soon as practical (but in any event prior to the date of the approval of the Bidding Procedures Order) following the execution of this Agreement. Disclosure Schedules not included as attachments to this Agreement on the Execution Date shall be delivered by the Party responsible therefor as soon as possible after the Execution Date, and shall thereupon, if mutually acceptable to the Parties, be deemed included in this Agreement as if such Disclosure Schedules were attached to this Agreement as of the Execution Date. Buyer may assert a good faith dispute or objection with regard to any Disclosure Schedule, and the Parties shall thereafter negotiate such disputed Disclosure Schedule in good faith until the approval of the Bidding Procedures Order; provided, that Sellers' disclosure shall control in the event that Buyer does not terminate this Agreement prior to the approval of the Bidding Procedures Order. If, following such good faith negotiation, such dispute is not resolved and the disputed Disclosure Schedule has~~ or would reasonably be expected to ~~have a material and adverse impact on Buyer's ability to conduct the RS Business or operate the Acquired Assets in~~ the Ordinary Course of Business consistent with ~~past practices over the six (6) months preceding the Execution Date, then Buyer may terminate this Agreement in accordance with Section 11.1(e)(vii).~~ avoidance of doubt, Buyer may not assert any failure of the condition to Closing set forth in Section 9.1 as a result of any Additional Acquired Company Disclosure. A copy of the Disclosure Schedules as modified to reflect the Additional Acquired Company Disclosure shall be furnished to the Committee contemporaneously with the delivery thereof to Buyer.

      (b)  Notice of Developments. The Sellers shall promptly notify Buyer of, and furnish Buyer any information it may reasonably request with respect to, (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Acquired Assets or the transactions contemplated by this Agreement, (ii) subject to the terms of Section 7.3, any notice or other communication received from any Governmental Authority in connection with the transactions contemplated by this Agreement or relating to the RS Business, the Acquired Assets or the Assumed Liabilities, (iii) any material breach discovered by the Sellers, or of which the Sellers become aware, of its representations, warranties or covenants contained in this Agreement or any of the other Transaction Documents which material breach or material failure to perform would result in the Sellers being unable to satisfy a condition set forth in Section 9.1 or Section 9.2, or (iv) any Actions commenced relating to the Acquired Assets, the Assumed Liabilities or the RS Business of which it receives notice or any other fact, circumstance or event, the existence or occurrence of which the Sellers acquire knowledge, (A) which in any manner challenges or seeks to prevent, enjoin,

materially alter or materially delay the transactions contemplated by this Agreement, (B) has resulted in, or would reasonably be expected to result in, a material breach of a representation or warranty made by the Sellers under this Agreement or (C) has resulted in, or would be reasonably expected to result in, the failure of any condition set forth in <u>Article 9</u> to be satisfied by the Outside Date.

7.7 <u>Sale Free and Clear</u>. <u>The</u> Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Liens (including, for the avoidance of doubt, all successor liability, including any successorship obligations with respect to any Plan) of, against or created by <u>the</u> Sellers or their bankruptcy estate, shall be fully released from and with respect to the Acquired Assets. On the Closing Date, the Acquired Assets shall be transferred to Buyer and/or one or more Buyer Designees, as applicable, free and clear of all obligations, Liabilities and Liens (including, for the avoidance of doubt, all successor liability, including any successorship obligations with respect to any Plan or Contract), other than the Permitted Liens and the Assumed Liabilities.

7.8 <u>Alternate Bidder</u>. If an Auction is conducted, and Buyer is not the Successful Bidder at the Auction but is the next highest bidder after the Successful Bidder at the Auction, Buyer shall serve as an Alternate Bidder and keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable (subject to the terms and conditions of this Agreement), notwithstanding any right of Buyer to otherwise terminate this Agreement pursuant to <u>Article 11</u> ~~hereof~~, until the earlier of (i) thirty (30) days after the date of the Sale Hearing or (ii) the first Business Day after the closing of a transaction with a Successful Bidder for the Acquired Assets that is not Buyer (the "***Alternate Bid Expiration Date***"); <u>provided</u>, <u>however</u>, that if prior to the Alternate Bid Expiration Date, a Successful Bidder for the Acquired Assets that is not Buyer fails to consummate its transaction as a result of a breach or failure to perform on the part of such Successful Bidder, or because a condition in such Successful Bidder's purchase agreement cannot otherwise be met, and the purchase agreement with such Successful Bidder is terminated, Buyer (as the Alternate Bidder) will be deemed to have the new prevailing bid, and <u>the</u> Sellers will be authorized, without further order of the Bankruptcy Court, to, and Buyer (as the Alternate Bidder) shall, subject to the terms and conditions of this Agreement, consummate the transactions contemplated by this Agreement by the later of (x) ten (10) days of becoming the Successful Bidder and (y) sixty (60) days after the date of the Sale Hearing, on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction).

7.9 <u>Consents</u>. <u>The</u> Sellers shall use reasonable best efforts to obtain or provide, and shall cause each Acquired Company to use reasonable best efforts to obtain or provide, at the earliest practicable date, each consent, waiver, approval, order, Permit (including obtaining a replacement Unified Program Facility Permit)  or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority required or necessary to consummate the transactions contemplated by this Agreement, including each consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification listed on <u>Schedule 7.9</u> (including consents from each landlord party to the Leases requiring the consent of such landlord party in connection with the consummation of the transaction contemplated herein). All such consents, waivers, approvals, orders, Permits, authorizations, declarations, filings, or notifications shall be in writing and in form and substance reasonably satisfactory to Buyer, and executed counterparts thereof shall be delivered to Buyer promptly after the receipt thereof or making thereof. Notwithstanding anything to the contrary in this Agreement, none of the Sellers, Buyer nor any of their respective Affiliates shall be required to pay any amounts in connection with obtaining any such consents, waivers, approvals, orders, Permits, authorizations, declarations, filings, or notifications.

7.10 <u>Treatment of Shared Contracts</u>.

<u>2</u>

(a)     From the ~~date hereof~~Original Execution Date until the date that is six (6) months following the Closing Date, ~~Seller~~the Sellers and Buyer shall, and shall cause their respective Affiliates to, use their reasonable best efforts to work together (and, if necessary and desirable, to work with the third party to any Shared Contract) to divide, partially assign, modify, or replicate (in whole or in part) the respective rights and obligations of the RS Business and the Corrections Business under and in respect of any Shared Contract, such that, following the Closing, (i) Buyer, an Affiliate of Buyer or an Acquired Company is the beneficiary of the rights and is responsible for the obligations related to the portion of such Shared Contract that primarily involves or primarily relates to the RS Business (the "Buyer Portion"), which rights shall be an asset of and which obligations shall be a liability of Buyer, an Affiliate of Buyer or an Acquired Company, and (ii) the Seller or an Affiliate of the Seller (other than an Acquired Company) is the beneficiary of the rights and is responsible for the obligations related to such Shared Contract relating to the Corrections Business (the "Seller Portion"), which rights shall be an asset of and which obligations shall be a liability of the Seller or an Affiliate of the Seller (other than an Acquired Company).  The Parties acknowledge and agree that each Shared Contract shall remain with the Seller or an Affiliate thereof (other than an Acquired Company) and no Shared Contract is an asset of an Acquired Company or an Acquired Asset.

(b)     Nothing in this Agreement shall require the division, partial assignment, modification, or replication of a Shared Contract unless and until any necessary consents are obtained or made, as applicable. If the Seller and Buyer or their respective Affiliates, as applicable, are not able to enter into an arrangement to divide, partially assign, modify, or replicate (in whole or in part) the rights and obligations (such that the Buyer Portion and the Seller Portion of such Shared Contract are fully segmented or separated) under and in respect of any such Shared Contract prior to the Closing, the Closing shall, subject to the satisfaction (or, to the extent permitted by applicable Legal Requirements, the waiver by the parties entitled to the benefit thereof) of the conditions set forth in Article 9 and Article 10 (other than those conditions which by their terms are to be satisfied at the Closing but subject to the satisfaction at the Closing or waiver of such conditions), nonetheless take place on the terms set forth herein and, thereafter until the earlier of (x) the date that is six (6) months following the Closing and (y) the date on which the division, partial assignment, modification or replication of such Shared Contract is effected~~,~~ (the period ending on the date that is the earlier of (x) and (y), the "Sharing Period"), the Seller and Buyer shall, and shall cause their respective Affiliates to, cooperate in any commercially reasonable arrangement to provide that (1) Buyer, an Affiliate of Buyer or an Acquired Company shall receive the interest in the benefits and obligations of the Buyer Portion under and in respect of such Shared Contract and (2) the applicable Seller or an Affiliate of such Seller (other than an Acquired Company) shall receive the interest in the benefits and obligations of the Seller Portion under and in respect of such Shared Contract~~.~~; provided however, that, except as otherwise agreed in a written commercial arrangement between the Buyer and the applicable Seller (or Affiliate thereof), (A) all fees, costs and expenses incurred by the Party who retains the applicable Shared Contract during the Sharing Period to deliver to the other Party the Buyer Portion or Seller Portion, as applicable (including in respect of all amounts required to be paid to the counterparty to such Shared Contract in order to receive any goods or services constituting the Buyer Portion or Seller Portion, as applicable) shall be promptly reimbursed by such other Party, and (B) the Party who retains the applicable Shared Contract shall have no liability the obligations in respect of the Buyer Portion or Seller Portion, as applicable, of such other Party and shall be indemnified by such other Party for any losses suffered as a result of such obligations.

(c)     The expiration of the Sharing Period for a Shared Contract shall constitute a completed "transaction" of any service provided by means of such Shared Contract under the Transition Services Agreement, such that the Service Period for such service shall expire. From and after the expiration of the Sharing Period, the Party that retains the applicable Shared Contract shall cease (including under the Transition Services Agreement) to have any further obligation to provide the Buyer

Portion or the Seller Portion, as applicable, to any other Party and such other Party shall cease to have any further right, entitlement or interest in respect of the Buyer Portion or the Seller Portion, as appliable, of such Shared Contract.

(d)    (b) Each of the Buyer and the Sellers shall, and shall cause each of their Affiliates to, (i) treat for all tax purposes the portion of each Shared Contract inuring to its respective businesses as assets owned by, and/or Liabilities of, as applicable, such party, not later than the Closing Date, and (ii) neither report nor take any Tax position (on a Tax Return or otherwise) inconsistent with such treatment (unless required by applicable Legal Requirements). Nothing herein is intended to create a partnership, joint venture, agency, or other relationship creating fiduciary or quasi-fiduciary duties or similar duties and obligations or to subject the Parties to joint and several or vicarious liability or to impose any duty, obligation, or liability that would arise therefrom.

(e)    (c) Nothing in this Section 7.10 shall (i) require either Party hereto to contribute capital, incur any obligation, make any payment or grant any consideration or concession in any form (including providing any letter of credit, guaranty or other financial accommodation) to any Person (other than reasonable and documented out-of-pocket expenses, attorneys' fees and recording or similar fees, all of which shall be reimbursed as promptly as reasonably practicable by the party on whose behalf such expenses and fees are incurred) or (ii) prevent each of the Buyer and the Sellers from mutually agreeing to exclude certain Contracts from the provisions of this Section 7.10.

(f)    Except as otherwise agreed in writing between the Buyer and the applicable Seller (or Affiliate thereof), in the event that the Parties successfully divided, partially assign, modify or replicate (in whole or in party) a Shared Contract or the terms thereof to separate the Buyer Portion and the Seller Portion, (i) the Sellers (and their respective Affiliates) shall have no further obligations or liabilities in respect of such Buyer Portion (including under the Transition Services Agreement) and the Buyer shall indemnify and hold harmless the Sellers (and their respective Affiliates) for any losses suffered thereby from and after the Closing in respect of such Buyer Portion and (ii) Buyer (and its Affiliates) shall have no further obligations or liabilities in respect of such Seller Portion and the Sellers shall indemnify and hold harmless the Buyer (and its Affiliates) for any losses suffered thereby from and after the Closing in respect of such Seller Portion. To the extent there is any conflict between this Section 7.10 and the Transition Services Agreement, this Section 7.10 shall control.

7.11 Transition Services Agreement Schedules. The Parties acknowledge that the schedules to the Transition Services Agreement may not be complete as of the execution of this Agreement, and the Parties hereby covenant that they each will use commercially reasonable efforts to complete and deliver such schedules as soon as practical following the execution of this Agreement (but in any event no later than five (5) Business Days prior to the Auction date). The Parties shall negotiate in good faith to finalize such schedules.

## ARTICLE 8

### ADDITIONAL AGREEMENTS

8.1    Taxes.

(a)    Any sales Tax, use Tax or similar Tax attributable to the sale or transfer of the Acquired Assets and not exempted under the Sale Order or by Section section 1146(c) of the Bankruptcy Code ("*Sales Taxes*") and any real property transfer Tax, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Acquired Assets and not exempted under the Sale Order or

60

by ~~Section~~section 1146(c) of the Bankruptcy Code ("**_Transfer Taxes_**") shall be borne by the Sellers. The Sellers and Buyer shall reasonably cooperate to (i) mitigate and/or eliminate the amount of Sales Taxes and/or Transfer Taxes resulting from the transactions contemplated herein and (ii) timely prepare and file any Tax Returns relating to such Sales Taxes and/or Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Sales Taxes and/or Transfer Taxes. Buyer shall be responsible for preparing and filing all necessary Tax Returns or other documents with respect to Sales Taxes and Transfer Taxes, provided, however, that in the event any such Tax Return requires execution by the Sellers, the Party responsible for preparing the Tax Return shall deliver it to the Sellers not less than ten (10) days before the due date thereof, and the Sellers shall promptly execute such Tax Return and return it to the Party responsible for filing it.

(b)      All Liability for any ad valorem Taxes (including, for the avoidance of doubt, real or personal property Taxes, together with all assessments (special or general) or any similar changes or impositions) (the "**_Apportioned Taxes_**") with respect to the Acquired Assets for the portion of the Straddle Period that ends on the Closing Date (a "**_Pre-Closing Tax Period_**") shall be borne by the Sellers. All Liability for any Apportioned Taxes with respect to the Acquired Assets for a Tax period or year, or portion thereof that begins after the Closing Date (a "**_Post-Closing Tax Period_**") shall be borne by Buyer. The total amount of Apportioned Taxes allocable to the Pre-Closing Tax Period shall be the product of (i) such Tax for the entirety of such Straddle Period, multiplied by (ii) a fraction, the numerator of which is the number of days for such Straddle Period included in the Pre-Closing Tax Period and the denominator of which is the total number of days in such Straddle Period, and the balance of Apportioned Taxes shall be allocable to the to the Post-Closing Tax Period. At the Closing, Apportioned Taxes with respect to each Acquired Asset for the applicable Straddle Period shall be prorated in accordance with the foregoing provisions based on the Tax assessment for such Acquired Asset for such Straddle Period, if available, or if otherwise, based on the Apportioned Taxes paid with respect to such Acquired Asset during the preceding Tax year. With respect to any not yet delinquent Apportioned Taxes relating to a Straddle Period or Pre-Closing Tax Period, Buyer will be required to remit payment of all such Taxes to the applicable Governmental Authority. With respect to any Apportioned Taxes relating to a Straddle Period or Pre-Closing Tax Period that are delinquent as of the Closing Date, the amount of which is known and not subject to dispute, Buyer shall either pay the delinquent amount of such Taxes directly to the applicable Governmental Authority at the Closing or, at Buyer's option, to such title company as designated by Buyer at the Closing, for further payment by it to the applicable Governmental Authority.  Notwithstanding anything to the contrary in this agreement, Taxes referred to in this <u>Section 8.1(b)</u> shall not include any Taxes of the Acquired Companies. "**_Straddle Period_**" shall mean any Tax period or year commencing on or before, and ending after, the Closing Date.

(c)      Notwithstanding anything in this Agreement to the contrary, the amount of income Taxes of any Subsidiary of the Sellers the Equity Interests of which are Acquired Assets for any Straddle Period that is allocable to a Pre-Closing Tax Period shall be determined based on a closing of the books, assuming that the taxable year of each such Subsidiary ends as of the end of the Closing Date.

(d)      Buyer and the Sellers shall, and shall cause their respective Affiliates to, cooperate and agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and assistance relating to the RS Business and the Acquired Assets (including access to books and records and Tax Returns and related working papers dated before Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any U.S. federal, state, local or non-U.S. business Tax credits or incentives that Buyer may qualify for in any of the jurisdictions in

which any of the Acquired Assets are located; provided, however, that neither Buyer nor any Seller shall be required to disclose the contents of its income Tax Returns to any Person. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(d) shall be borne by the Party requesting it.

8.2    Bulk Sales. The Parties intend that the Sale Order shall provide that compliance with the Legal Requirements relating to bulk sales and transfers is not necessary or appropriate under the circumstances. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with "bulk sales," "bulk transfers" or similar Legal Requirements in respect of the transactions contemplated by this Agreement.

8.3    Wrong Pockets. Following the Closing, without effect on the Purchase Price, (i) the Sellers shall promptly transfer to Buyer (A) any payment or funds which, per the terms of this Agreement, belongs to Buyer and is received by the Sellers (directly or indirectly) after the Closing and (B) copies of any substantive communications received by the Sellers after the Closing, including from a Governmental Authority or customer, supplier, distributor, landlord, licensee, service provider or other business partner, to the extent related to the RS Business, and (ii) Buyer shall promptly transfer to the Sellers (A) any payment or funds which, per the terms of this Agreement, belongs to the Sellers and is received by Buyer (directly or indirectly) after the Closing and (B) copies of any substantive communications received by Buyer after the Closing, including from a Governmental Authority or customer, supplier, distributor, landlord, licensee, service provider or other business partner, to the extent related to the Corrections Business or any other business conducted by or matter pertaining to the Sellers and their Affiliates that is not related to the RS Business.

8.4    Assumed Contracts: Adequate Assurance and Performance. Buyer shall provide adequate assurance of the future performance by Buyer of each Assumed Contract as required under Section section 365 of the Bankruptcy Code. Buyer and the Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts pursuant to Section section 365 of the Bankruptcy Code, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's and the Sellers' employees and representatives available to testify before the Bankruptcy Court.

8.5    Employee Matters.

(a)    Pre-Closing Transfer of Employees.  Prior to the Closing, the Sellers will transfer the employment of all employees included on Schedule 8.5(a) to one of the Acquired Companies, such that an Acquired Company will be each employee's direct employer as of the Closing.

(b)    Employees.  Upon the Closing, Employees will remain employees of the Acquired Companies on the same terms and conditions of employment (the Employees following the Closing, the "**Buyer Employees**"). As of the Closing, Buyer shall assume and continue to adhere to any and all collective bargaining agreements and all obligations related thereto governing the employment of the Buyer Employees.  Notwithstanding the foregoing, nothing herein will, after the Closing Date, except as otherwise provided in any collective bargaining agreement, Acquired Company Plan or Plan that is an Assumed Contract, in each case, that covers any Buyer Employees following the Closing Date, impose on Buyer any obligation to retain any Buyer Employee in its employment for any amount of time or on any terms and conditions of employment.

(c)     Service Crediting. From and after the Closing Date, Buyer shall, or shall cause Buyer's Designees to, recognize, for all purposes of under any and all plans, programs, and/or arrangements established or maintained by Buyer or any Buyer Designees, each Buyer Employee's service with the Sellers and their controlled Affiliates and any of their respective predecessors prior to the Closing Date, as if such service were with Buyer or any Buyer Designee, to the same extent such service was recognized by the Sellers and their controlled Affiliates prior to the Closing Date; provided, however, the foregoing shall not apply (i) with respect to benefit accrual, vesting, service credits, participation eligibility and benefits entitlements under any defined benefit pension, equity or equity-based, change in control, transaction, retention, nonqualified deferred compensation, or post-termination or retiree health or welfare benefits, or (ii) to the extent that its application would result in a duplication of benefits.

(d)     Health and Welfare. Buyer or Buyer's Designee shall (i) use its reasonable best efforts to cause each Buyer Employee (and his or her "eligible dependents") to be covered immediately upon the Closing or, if later, the end date of benefits coverage pursuant to the Transition Services Agreement, by a group health plan or plan of the Buyer or its Affiliates, (ii) use its reasonable best efforts such that the benefit plans do not limit or exclude coverage on the basis of any pre-existing condition of such Buyer Employee or dependent or on the basis of any other exclusion or waiting period not in effect under the applicable group health plan, and (iii) use its commercially reasonable efforts to provide each Buyer Employee full credit, for the plan year in which the Closing Date occurs, for any deductible or co-payment already incurred by the Buyer Employee under the applicable group health plan and for any other out-of-pocket expenses that count against any maximum out-of-pocket expense provision of the applicable group health plan or Buyer or any Buyer Designee's group health plans.

(e)     Retirement. Effective at the Closing, Buyer or any Buyer Designee shall use its reasonable best efforts to cause each Buyer Employee who, as of immediately prior to the Closing, was eligible to participate in a Plan that is a tax-qualified defined contribution plan (collectively, the "**Seller 401(k) Plan**") to be eligible to participate in Buyer or any Buyer Designee's tax-qualified defined contribution plan (the "**Buyer 401(k) Plan**"). Buyer or any Buyer Designee shall cause the Buyer 401(k) Plan to accept "eligible rollover distributions" (as such term is defined under Section 402 of the Code), including in-kind rollover of outstanding loan notes, of Buyer Employees from the Seller 401(k) Plan.

(f)     Access to Information. After the Original Execution Date, the Sellers shall provide Buyer and its Affiliates with access to the Employees and with information, including employee records and data, including Plan data, reasonably requested by Buyer and such Affiliates, except as otherwise prohibited by any Legal Requirement.

(g)     Payment of Compensation and Liabilities. At or prior to Closing, or as soon as reasonably practicable thereafter in accordance with the Sellers' or the Acquired Companies' payroll practices and pursuant to the terms of the applicable Plan, but in all events in accordance with applicable Legal Requirements, the Sellers or the Acquired Companies will pay, or cause to be paid, to all Employees all compensation to which such Employees are entitled to receive prior to and on the Closing Date, and satisfy all payroll taxes related thereto.

(h)     Change in Control or Similar Benefits. Prior to the Closing Date and in accordance with the terms of such Plan, applicable Legal Requirements and any collective bargaining agreements, the Sellers shall amend, or cause to be amended, all Plans and take all actions as may be required or necessary to provide that the transactions contemplated hereunder shall not constitute a

63

2

"change in control" or similar transaction for purposes of providing or accelerating benefits or payments under any such Plans.

(i)     <u>Payroll Taxes</u>. For purposes of payroll Taxes with respect to Buyer Employees, the Sellers shall treat the transaction contemplated by this Agreement as a transaction described in Treasury Regulations Sections 31.3121(a)(1)-1(b)(2) and 31.3306(b)(1)-(b)(2) (*i.e.*, Buyer shall be treated as a successor for payroll Tax purposes).

(j)     <u>No Third-Party Beneficiaries; Employment Status</u>. All provisions contained in this Agreement with respect to employee benefit plans or compensation of Buyer Employees are included for the sole benefit of the respective parties hereto. Nothing contained herein (i) shall confer upon any former, current or future employee of the Sellers, any Acquired Company or Buyer or any legal representative or beneficiary thereof or any union, any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (ii) shall cause the employment status of any former, present or future employee of the Sellers, any Acquired Company or Buyer to be other than terminable at will, (iii) shall confer any third party beneficiary rights upon any Buyer Employee or any dependent or beneficiary thereof or any heirs or assigns thereof, (iv) shall be construed to establish or be treated as an amendment or modification of any employee benefit plan, program, agreement, arrangement, or policy, or (v) shall be construed to limit the ability of Buyer or any of its Affiliates to amend, modify, terminate, or adopt any employee benefit plan, program, agreement, arrangement, or policy.

(k)     <u>WARN Act</u>. With respect to the Buyer Employees, Buyer will have full responsibility under the WARN Act relating to any act or omission of Buyer after the Closing Date. With respect to the Employees, the Sellers will have full responsibility under the WARN Act relating to any act or omission of the Sellers prior to or on the Closing Date. The Sellers will have full responsibility under the WARN Act relating to any act or omission of the Sellers after the Closing Date.

(l)     <u>Additional Employee Matters</u>. Buyer is not and shall not be obligated to, and does not, accept or adopt any wage rates, employee benefits, employee policies, or any other terms and conditions of employment except as required by the terms of any collective bargaining agreement covering the Buyer Employees or as expressly agreed to herein.

(m)     For the avoidance of doubt, this <u>Section 8.5</u> is subject to <u>Sections 2.3</u> and <u>2.4</u>.

8.6     <u>Post-Closing Books and Records and Personnel</u>. For a period of six (6) years after the Closing Date, each Party hereto shall provide the other Parties hereto (and their respective Representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, solely to the books and records acquired pursuant to this Agreement as of the Closing Date so as to enable Buyer and the Sellers to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, and to prosecute and defend legal Actions or for other like purposes, including Claims, objections and resolutions. If any Party desires to dispose of any such records, such Party shall, thirty (30) days prior to such disposal, provide the other Party with a reasonable opportunity to remove such records to be disposed of at the removing Party's expense.

8.7     <u>Satisfaction of Certain Estate Liabilities</u>.  At or prior to Closing, the Sellers or the Acquired Companies, as applicable, will pay and satisfy, or cause to be paid or satisfied, all Liabilities, contingent or otherwise, set forth on <u>Schedule 8.7</u> in accordance with the DIP Financing Orders and the Approved Budget.

## ARTICLE 9

### CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Buyer, in its sole and absolute discretion:

9.1     Accuracy of Representations. The representations and warranties of the Sellers set forth in this Agreement shall be true and correct as of the Closing Date, with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date), in each case, unless the effect of all such breaches of representations and warranties taken together would not have, or be reasonably likely to have, in the aggregate, a Material Adverse Effect; provided, that the representations and warranties of the Sellers set forth in Sections 5.1, 5.2, 5.4, 5.18 and 5.23 shall be true and correct in all material respects as of the Closing Date as though such representations and warranties had been made on and as of the Closing Date (provided that any such representations and warranties which are confined to a specified date shall speak only as of such date). Buyer shall have received a certificate of the Sellers to such effect signed by a duly authorized officer thereof.

9.2     Sellers' Performance. The covenants and agreements that the Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects; provided, the covenants and agreements set forth in Section 8.7 shall have been performed and complied with in all respects.  Buyer shall have received a certificate of the Sellers to such effect signed by a duly authorized officer thereof.

9.3     No Order. No Governmental Authority shall have enacted, issued, promulgated, decreed or entered any Order, which is in effect and has the effect of restraining or preventing (or delaying beyond the Outside Date) the consummation of or imposing material modifications on the transactions contemplated by this Agreement.

9.4     Governmental Authorizations. To the extent that consent under the HSR Act or any other applicable Antitrust Law is required or at the discretion of the Buyer deemed advisable, any waiting period (and any extension thereof) under the HSR Act shall have expired or shall have been terminated.

9.5     Sellers' Deliveries. Each of the deliveries required to be made to Buyer pursuant to Section 4.3 shall have been so delivered.

~~9.6 DIP Financing Orders. The Bankruptcy Court shall have entered the Interim DIP Financing Order and the Final DIP Financing Order, and the Interim DIP Financing Order and the Final DIP Financing Order shall have become Final Orders.~~

9.6     ~~9.7~~ Sale Order. The Bankruptcy Court shall have entered the Sale Order in form and substance, including with respect to all findings of fact and conclusions of law, reasonably acceptable to Buyer, and the Sale Order shall have become a Final Order.

9.7     ~~9.8~~ Assumed Contracts. The Bankruptcy Court shall have approved and authorized the assumption and assignment of each Assumed Contract, except as would not have a

65

2

material effect on the RS Business from and after the Closing, including the assignment and assumption of the Assumed Contracts set forth on Schedule ~~9.8~~9.7 on the terms set forth on such Schedule.

8.8       ~~9.9~~ Consents. Buyer shall have received each consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority listed on Schedule ~~9.9~~9.8, in each case, in a form reasonably satisfactory to Buyer.

9.9       ~~9.10~~ Material Adverse Effect. Since the Original Execution Date, no Material Adverse Effect shall have occurred.

9.10     ~~9.11~~ No Default; No Termination Event. No Termination Event and No Event of Default (as defined in the DIP Facility and DIP Financing Orders, as applicable) shall have occurred.

9.11     ~~9.12~~ Restructuring Support Agreement. The Restructuring Support Agreement shall not have been terminated and shall be in full force and effect.

## ARTICLE 10

### CONDITIONS PRECEDENT TO THE OBLIGATION OF THE SELLERS TO CLOSE

The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by the Sellers, in their sole and absolute discretion:

10.1     Accuracy of Representations. The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects (except that those representations and warranties which are qualified as to materiality or Material Adverse Effect or similar expressions shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date) in each case, unless the effect of all such breaches of representations and warranties taken together would not have, or be reasonably likely to have, in the aggregate, a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement. The Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

10.2     Sale Order. The Bankruptcy Court shall have entered the Sale Order in form and substance, including with respect to all findings of fact and conclusions of law, reasonably acceptable to the Sellers, and the Sale Order shall have become a Final Order.

10.3     Buyer's Performance. The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects, and the Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

10.4     No Order. No Governmental Authority shall have enacted, issued, promulgated, decreed, or entered any Order, which is in effect and has the effect of preventing (or delaying beyond the Outside Date) the consummation of or imposing material modifications on the transactions contemplated by this Agreement.

2

10.5    Governmental Authorizations. To the extent that consent under the HSR Act or any other applicable Antitrust Law is required or at the discretion of the Buyer deemed advisable, any waiting period (and any extension thereof) under the HSR Act shall have expired or shall have been terminated.

10.6    Buyer's Deliveries. Each of the deliveries required to be made to the Sellers pursuant to Section 4.2 shall have been so delivered.

## ARTICLE 11

### TERMINATION

11.1    Termination Events. ~~Anything~~Notwithstanding anything contained in this Agreement to the contrary ~~notwithstanding~~, this Agreement may be terminated at any time prior to the Closing only as follows:

(a)    by mutual written consent of the Sellers and Buyer;

(b)    by written notice of either the Sellers or Buyer:

(i) if the Closing shall not have occurred on or prior to January ~~9~~24, 2025 (the "**Outside Date**"); provided, however, that the Outside Date may be extended by Buyer in its sole discretion an additional thirty (30) days if all conditions contained in Article 9 have been satisfied other than the conditions contained in Sections 9.4 and 10.5; provided, further, that the right to terminate this Agreement under this Section 11.1(b)(i) shall not be available to (A) any Party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Outside Date or (B) Buyer at any time when Buyer could not terminate this Agreement pursuant to Section 11.1(b)(iii);

(ii) if a Governmental Authority issues a final, non-appealable ruling or Order permanently restraining, enjoining or otherwise prohibiting the transactions contemplated hereby where such ruling or Order was not requested, encouraged or supported by any of the Sellers or Buyer; provided, that the right to terminate this Agreement under this Section 11.1(b)(ii) shall not be available to any Party whose willful failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Outside Date;

(iii) if at the end of the Auction, Buyer is not determined by the Sellers to be the Successful Bidder or, in accordance with Section 7.8, Alternate Bidder;

(iv) upon the termination of the Restructuring Support Agreement as to the Consenting Stakeholders; or

(v) if the Bankruptcy Court shall have entered an Order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the Bankruptcy Cases;

(c)    by written notice of Buyer, if Buyer is not then in material breach of its obligations under this Agreement:

(i) in the event of any material breach by any Seller of, or material failure to perform, any agreements, covenants, representations or warranties contained in this Agreement

or in the Sale Order, which material breach or material failure to perform would result in the Sellers being unable to satisfy a condition set forth in Section 9.1 or Section 9.2 by the then-applicable Outside Date or shall not have been cured during the fifteen (15) day period following delivery by Buyer of notice to the Sellers of such material breach or material failure to perform;

(ii) other than as contemplated by the ~~Bidding Procedures Motion or~~ Bidding Procedures Order, if any Seller consummates an Alternative Transaction or seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the Bankruptcy Cases, or appointing a trustee in any of the Bankruptcy Cases or appointing a responsible officer or an examiner with enlarged powers (other than a fee examiner) relating to the operation of the Sellers' businesses pursuant to ~~Section~~section 1104 of the Bankruptcy Code in any of the Bankruptcy Cases;

(iii) if any of the events set forth in clauses (a) through (c) of Section 7.4 shall not have occurred by the respective dates set forth therein;

(iv) upon the occurrence of any Termination Event (as defined in the DIP Financing Orders);

(v) if, for any reason, Buyer (other than as a result of its own breach of this Agreement) is unable, pursuant to ~~Section~~section 363(k) of the Bankruptcy Code, to credit bid all or a majority of the Purchase Price as set forth in Section 3.1; or

(vi) a Material Adverse Effect occurs; ~~or~~

~~(vii) if the Disclosure Schedules fail to be finalized in accordance with Section 7.6(a); provided, however, Buyer may only terminate this Agreement pursuant to this Section 11.1(c)(vii) if Buyer delivers notice of such termination within five (5) Business Days of the date of the approval of the Bidding Procedures Order;~~

(d) by written notice of the Sellers, if each Seller is not then in material breach of its obligations under this Agreement in the event of any material breach by Buyer of, or material failure to perform, any agreements, covenants, representations or warranties contained in this Agreement or in the Sale Order, which material breach or material failure to perform would result in Buyer being unable to satisfy a condition set forth in Section 10.1 or Section 10.3 by the then-applicable Outside Date or shall not have been cured during the fifteen (15) day period following delivery by the Sellers of notice to Buyer of such material breach or material failure to perform.

Each condition set forth in this Section 11.1, pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in Section 11.1 are applicable, the applicable party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated. The Parties acknowledge and agree that no notice of termination or extension of the Outside Date provided pursuant to this Section 11.1 shall become effective until two (2) Business Days after the delivery of such notice to the other Parties, and only if such notice shall not have been withdrawn during such two (2) Business Day period or otherwise become invalid.

11.2    Effect of Termination.

(a) In the event of termination of this Agreement by Buyer or the Sellers pursuant to this Article 11, this Agreement shall become null and void *ab initio* and have no effect and all

2

rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party except (i) nothing herein shall relieve any Party from Liability for any breach of this Agreement occurring prior to such termination and (ii) this <u>Section 11.2</u> (and, to the extent applicable to the interpretation or enforcement of such provision, <u>Article 1</u> and <u>Article 12</u>), shall expressly survive the termination of this Agreement.

(b)     <u>The </u>Sellers shall pay to Buyer the Expense Reimbursement by wire transfer of immediately available funds immediately upon the earlier to occur of (i) Bankruptcy Court approval of a Qualified Bid other than Buyer's offer to purchase the Acquired Assets, or (ii) termination of this Agreement (other than as a result of Buyer's breach of any of its representations, warranties, covenants or other agreements under this Agreement) (any such event, a "***Protection Event***"); <u>provided, however, (i) that, in the event that Buyer is the Alternate Bidder in accordance with Section 7.8 and consummates the purchase and sale of the Acquired Assets, then the Sellers shall have no obligation to Buyer for such Expense Reimbursement and (ii) that, if at the end of the Auction, Buyer is not determined by the Sellers to be the Successful Bidder, the Sellers shall not be required to pay to Buyer the Expense Reimbursement until the Alternate Bid Expiration Date</u>.   Each Seller acknowledges and agrees that such Seller shall be jointly and severally liable for the Expense Reimbursement payable by <u>the </u>Sellers pursuant to this Agreement.

(c)     Each Party acknowledges that the agreements contained in this <u>Section 11.2</u> are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement, and that any amounts payable pursuant to this <u>Section 11.2</u> do not constitute a penalty.  The Expense Reimbursement shall be carved out from and not be subject to the liens and claims granted in connection with the DIP Facility and any documents related thereto (including the DIP Financing Orders) and the Exit Term Loan Facility Documents.

## **ARTICLE 12**

### **GENERAL PROVISIONS**

12.1     <u>Survival</u>. All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach thereof.

12.2     <u>Confidentiality</u>. Following the Closing, each Seller agrees to, and to cause its Affiliates to, treat and hold as confidential, and not use or disclose all or any of the information concerning the RS Business, the Acquired Assets, the negotiation or existence and terms of this Agreement or the business affairs of Buyer except disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto.

12.3     <u>Public Announcements</u>. Unless otherwise required by applicable Legal Requirement or by obligations of Buyer or <u>the </u>Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Buyer, on the one hand, and <u>the </u>Sellers, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated by this Agreement or the activities and operations of the other and shall not issue any such release or make any such statement

69

without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed).  Notwithstanding the foregoing, Buyer shall not be restricted from making any public announcements or issuing any press releases regarding the RS Business after the Closing, <u>provided</u> that such public announcements or press releases do not reference the Sellers or their Affiliates without the Sellers' prior written consent.

      12.4   <u>Notices</u>.

All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or sent by overnight courier or electronic mail:

    (i)    If    to    the    Sellers,    then    to:

~~Wellpath                       Holdings,               Inc.~~
~~3340 Perimeter Hill Drive~~

    <u>Wellpath Holdings, Inc.</u>
    <u>3340 Perimeter Hill Drive</u>
Nashville, Tennessee 37211
Attn:   Ben Slocum, Chief Executive Officer
         Timothy J. Dragelin, Interim Chief Financial Officer
         Marc Goldstone, Executive Vice President and Chief Legal Officer
Email:  bslocum@wellpath.us
         tdragelin@wellpath.us
         mgoldstone@wellpath.us

with a copy (which shall not constitute notice) to:

McDermott Will & Emery LLP
444 West Lake Street, Suite 4000
Chicago, IL 60606
Attn:   Felicia Gerber Perlman
         Bradley Thomas Giordano
         Harris Siskind
         Eric Gilbert
         Taylor Berman
Email:  fperlman@mwe.com
         bgiordano@mwe.com
         hsiskind@mwe.com
         egilbert@mwe.com
         tberman@mwe.com

    <u>(ii)  If to Buyer:</u>

~~(ii) If to Buyer:~~

RS Purchaser LLC
c/o Akin Gump Strauss Hauer & Feld LLP
2001 K Street N.W.

70

Washington, D.C. 20006
Attn:   Scott L. Alberino
Kate Doorley
Alan J. Feld
Email:  salberino@akingump.com
kdoorley@akingump.com
ajfeld@akingump.com

with a copy (which shall not constitute notice) to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn:    Daniel I. Fisher
Email:  dfisher@akingump.com

and

Akin Gump Strauss Hauer & Feld LLP
2001 K Street N.W.
Washington, D.C. 20006
Attn:    Scott L. Alberino
Kate Doorley
Alan J. Feld
Email:  salberino@akingump.com
kdoorley@akingump.com
ajfeld@akingump.com

(iii) if to either Buyer or the Sellers, then a copy (which shall not constitute notice) also to the unsecured claimholders committee (the "***Committee***"):

Stinson LLP
1201 Walnut Street
Suite 2900
Kansas City, MO 64106
Attn:    Nicholas J. Zluticky
Lucas L. Schneider
Zachary H. Hemenway

Email:  nicholas.zluticky@stinson.com
lucas.schneider@stinson.com
zachary.hemenway@stinson.com

and

Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
Attn:    Ehud Barak
Brian Rosen
Paul Possinger

71

_____  Daniel Desatnik
          Grant R. Darwin
_____
Email: ebarak@proskauer.com
       brosen@proskauer.com
       ppossinger@proskauer.com
       ddesatnik@proskauer.com
       gdarwin@proskauer.com

or to such other person or address as any party shall specify by notice in writing to the other party. All such notices, requests, demands, waivers and communications shall be deemed to have been received on the date on which so personally-delivered or faxed or delivered by overnight courier or electronic mail. Notwithstanding anything in this Agreement to the contrary, a copy of all documents and materials furnished by or on behalf of the Sellers to the Buyer (or any representative thereof) or by or on behalf of the Buyer to the Sellers (or any representative thereof) pursuant to this Agreement shall be contemporaneously provided to the Committee and its counsel in the manner set forth in clause (iii) above. The Committee shall only be entitled to notice pursuant to this Section 12.4 for so long as the Committee remains in existence. It is expressly understood that the Committee shall not be a third-party beneficiary of this Agreement except solely with respect to its notice rights provided in this Section 12.4.

12.5    Waiver. Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by Legal Requirements, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

12.6    Entire Agreement; Amendment. This Agreement (including the Disclosure Schedules and the Exhibits) and the other Transaction Documents supersede all prior agreements (including the Original Purchase Agreement) between Buyer, on the one hand, and the Sellers, on the other hand, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and the Sellers, on the other hand, with respect to their subject matter. This Agreement may not be amended, modified or supplements except by a written agreement executed by each of the Parties hereto.

12.7    Assignment. This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party); provided, however, that Buyer shall be permitted to assign all or part of its rights or obligations hereunder to one or more Buyer Designees without the prior consent of the Sellers so long as Buyer stands behind the performance by such Buyer Designee of this Agreement.

12.8    Severability. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

72

2

12.9    Expenses. Except as otherwise expressly provided in this Agreement, including Section 11.2, whether or not the transactions contemplated by this Agreement are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby. Any and all fees required by (i) any Governmental Authority or any Person to obtain or for the transfer of a Permit or (ii) incurred in connection with complying with any Antitrust Law, shall be the sole responsibility of the Sellers.

12.10    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action; provided, however, that, if the Bankruptcy Case is closed, all Actions arising out of or relating to this Agreement shall be heard and determined in a New York state court or a federal court sitting in the State and County of New York, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action. The Parties consent to service of process by mail (in accordance with Section 12.4 or any other manner permitted by law).

(c)    THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF THE SELLERS, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

12.11    Counterparts. This Agreement and any amendment hereto may be executed in two or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument. Notwithstanding anything to the contrary in Section 12.4, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

12.12    Parties in Interest; No Third-Party Beneficiaries; No Amendment. This Agreement and the other Transaction Documents shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This Agreement and the other Transaction Documents are for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim,

cause of action, remedy or right of any kind. Notwithstanding anything to the contrary, nothing in this Agreement shall constitute an amendment to any Plan.

12.13    Remedies. Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit the Sellers or Buyer in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

12.14    Specific Performance. With respect to the Parties' respective covenants under this Agreement, (a) each Party recognizes that if such Party breaches or refuses to perform any such covenant, monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries, (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of the terms of such covenants, (c) if any Action is brought by the non-breaching Party or Parties to enforce such covenants, the Party in breach shall waive the defense that there is an adequate remedy at law, (d) each Party agrees to waive any requirement for the security or posting of any bond in connection with any Action seeking specific performance of such covenants and (e) each Party agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

12.15    Sellers' Representative; Reliance. The Sellers, jointly and severally, hereby represent and warrant that the statements in this Section 12.15 are correct and complete as of the Original Execution Date:

(a)    The Company has been appointed, and is authorized, and empowered to act, in connection with, and to facilitate the consummation of, the transactions contemplated by this Agreement and the Transaction Documents and in connection with any activities to be performed by the Sellers under this Agreement and the Transaction Documents, for the purposes and with the powers, and authority set forth in this Agreement, which will include the sole power and authority:

(i)    to receive notices on behalf of the Sellers hereunder pursuant to Section 12.4;

(ii)    to receive and distribute the Purchase Price or any other amount paid in connection with this Agreement or the Transaction Documents to the Sellers;

(iii)    to enforce and protect the rights and interests of the Sellers arising out of or under or in any manner relating to this Agreement and the Transaction Documents (including in connection with any claims related to the transactions contemplated hereby and thereby) and, in connection therewith, to (A) assert any claim or institute any action, (B) investigate, defend, contest or litigate any action initiated by Buyer or any other Person pursuant to this Agreement and the Transaction Documents and receive process on behalf of each Seller in any such action and compromise or settle on such terms as the Company will determine to be appropriate, give receipts, releases and discharges on behalf of all or any Seller with respect to any such action, (C) file any proofs, debts, claims and petitions as the Company may deem advisable or necessary, (D) settle or compromise any claims related to the transactions contemplated by this Agreement and the Transaction Documents, (E) assume, on each Sellers' behalf, the defense of any claims related to the transactions contemplated by this Agreement and the Transaction Documents, and (F) file and prosecute appeals from any decision, judgment or award rendered in any of the foregoing actions;

(iv)    to enforce or refrain from enforcing any right of any Seller (prior to

the Closing) and/or of the Company arising out of or under or in any manner relating to this Agreement or the Transaction Documents;

(v) to take any action to be taken by one or more Sellers under or in connection with this Agreement or any Transaction Document; or

(vi) to make, execute, acknowledge and deliver all such other Contracts, guarantees, orders, receipts, endorsements, notices, requests, instructions, certificates, stock powers, letters and other writings, and, in general, to do any and all things and to take any and all action that the Company, in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the activities described in Section 12.15(a)(i) through Section 12.15(a)(iv) and the transactions contemplated by this Agreement and the Transaction Documents.

(b)     The Company's power and grant of authority is (i) coupled with an interest and is irrevocable and survives the bankruptcy or liquidation of any Seller and will be binding on any successor thereto; and (ii) may be exercised by the Company acting by signing as the representative of any Seller.

(c)     Buyer and its Affiliates and representatives may conclusively and absolutely rely, without inquiry, upon the action of the Company as the action of each Seller (and may ignore any action taken or notice given by any Seller other than the Company) in all matters relating to this Agreement, the Transaction Documents or the transactions contemplated hereby and thereby. Any document delivered or notice delivered by or on behalf of Buyer or its Affiliates to, or action taken by or on behalf of Buyer or its Affiliates with respect to, the Company shall be deemed to have been delivered to, or taken with respect to, all Sellers. Any amounts to be paid by Buyer to the Sellers pursuant to this Agreement shall be divided by the Sellers among themselves, but may be paid by Buyer to the Company. The Sellers shall be jointly and severally liable for any amounts due to be paid or owed by the Sellers to Buyer pursuant to this Agreement.

12.16   Limitations on Damages. WITHOUT LIMITING ANY RIGHTS OF BUYER TO RECEIVE THE EXPENSE REIMBURSEMENT IN ACCORDANCE WITH SECTION 7.5 OR SECTION 11.2 OF THIS AGREEMENT, NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY EXEMPLARY OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT; PROVIDED, HOWEVER, THAT THE FOREGOING LIMITATION SHALL NOT APPLY TO THE EXTENT SUCH DAMAGES ARE PAYABLE TO A THIRD PARTY.

12.17   General Release.

(a)     Effective immediately following the Closing, each Seller for itself and for its successors and assigns hereby fully and forever releases, Buyer and its directors, officers, control persons (as defined in Section 15 of the Securities Act, or Section 20 of the Exchange Act), members, employees, agents, attorneys, financial advisors, consultants, legal representatives, shareholders, partners, estates, successors and assigns solely in their capacity as such (collectively referred to as the "**Buyer Group**" and each is individually a member of the Buyer Group), from any liability whatsoever on or otherwise in relation to all Seller Released Claims.  For purposes of this Section 12.17(a), the term "**Seller Released Claims**" means any claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever and other similar rights, demands, lawsuits and complaints, debts, losses, obligations, liabilities, rights, rights of recovery and damages of every kind or nature whatsoever,

2

whether known or unknown, asserted or un-asserted, and whether for general, special, statutory, punitive or other damages, sanctions, costs, or attorney's fees, or for equitable, declaratory, injunctive, reimbursement, or other relief, in each case including all derivative claims and whether currently pending or in process and whether arising in the past, present or future and in respect of any period of time (each a "***Released Claim***") that ~~the~~ Seller has or is entitled to make or assert, file or bring against the Buyer Group or any Person who is a member of the Buyer Group~~, including but not limited to any Released Claim~~ that directly or indirectly arises out of, or is based upon, or in any manner connected with, or is in any way related to~~, (1) any loan, security, or forbearance or related agreement to Buyer and/or Sellers are or were parties, (2) any act or omission by any Person that is or was a~~ this Agreement and the Buyer Group's act, omissions, performance or involvement in this Agreement.  For the avoidance of doubt, each member of the Buyer Group~~, including~~ is released under this provision solely in their capacity as ~~a member on, or arising from their involvement with the activities of, the board of directors or similar governing body of any Seller or any Affiliate thereof (including pursuant to board observer rights), (3) any involvement of any Person that is or was a member of the Buyer Group with the Sellers or any business, litigation, or other activities of Sellers, (4) any oral or written statement made by any Person that is or was a member of the Buyer Group to any other Person regarding Sellers or any business, litigation, or other activities of Sellers, (5) any action taken by any Person that is or was a member of the Buyer Group regarding or relating to Sellers or any business, litigation, or other activities of Sellers, or (6) any personal, contractual, employment, business, or professional relationship, contact or communication between any Person that is or was a member of the Buyer Group and Sellers occurring at any time prior to the Closing Date~~ member of the Buyer Group and not in any other capacity, including as an insider of the Sellers as that term is defined under section 101(31) of the Bankruptcy Code or as an affiliate as that term is defined under section 101(2) of the Bankruptcy Code.  Notwithstanding anything set forth herein to the contrary, the releases set forth herein do not extend to (A) any obligations that are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the willful misconduct or gross negligence of such Person ~~or,~~ (B) any obligations of the Parties under this Agreement (and any ancillary agreements or instruments delivered pursuant hereto, including the Transition Services Agreement), the DIP Facility, the Existing First Lien Credit Agreement, and the transactions contemplated hereby and thereby, or (C) any obligations relating to the Corrections Business.

(b)     Effective immediately following the Closing, Buyer, for itself and its successors and assigns, hereby fully and forever releases and discharges each Seller and its Affiliates and each of their respective former, current or future, direct or indirect, equity holders, officers, employees, directors, agents, advisory board members, representatives, owners, members, partners, employees, management companies, direct and indirect parent entities, "controlling persons" (within the meaning of federal securities law), heirs, administrators and executors, financial advisors, legal advisors, shareholders, managers, principals, consultants, accountants, attorneys, actuaries, investment bankers and other professionals in each case acting in such capacity whether current or former, including in their capacity as directors of the Seller, as applicable (all such Persons collectively referred to as the "***Sellers Group***" and each is individually a member of the Seller Group), from any liability whatsoever on or otherwise in relation to all Buyer Released Claims.  For purposes of this Section 12.17(b), the term "***Buyer Released Claims***" means any Released Claim that Buyer or any Affiliate thereof (including, following the Closing, the Acquired Companies) has or is entitled to make or assert, file or bring against any Person who is a member of the Seller Group based on or relating to, or in any manner arising from, in whole or in part, the business, conduct or operations of the RS Business or the Acquired Assets, including but not limited to (i) any Released Claim that directly or indirectly arise out of, are based upon, or in any manner connected with any Prior Event and (ii) any Causes of Actions included in the Acquired

Assets pursuant to Section 2.1(~~p~~o).  For purposes of this Section 12.17(b), the term "***Prior Event***" means any transaction, event, circumstances, action, failure to act or occurrence of any sort or type based on or relating to, or in any manner arising from, in whole or in part, the business operations of the RS Business or the Acquired Assets, including ~~without limitation~~ any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken, permitted or begun prior to the consummation of the transactions contemplated hereunder. For the avoidance of doubt, "Prior Event" shall include but is not limited to any transaction, event, circumstances, action, failure to act or occurrence of any sort or type which occurred, existed, was taken, permitted or begun in accordance with, pursuant to or by virtue of: (i) any terms of this Agreement, (ii) the transactions referred to herein, or (iii) any oral or written agreement relating to the foregoing (i) and (ii) of this sentence.

(c)      Without limiting in any way the scope of the release contained in subparagraph (a) or (b) of this Section 12.17 and effective upon the Closing Date, each Seller and Buyer, to the fullest extent allowed under applicable law, hereby waives and relinquishes for itself and the other members of the Sellers Group and Buyer Group, as applicable, all statutory and common law protections purporting to limit the scope or effect of a general release, whether due to lack of knowledge of any claim or otherwise, including, waiving and relinquishing the terms of any law which provides that a release may not apply to material unknown claims. Each Seller and Buyer hereby affirm its intent to waive and relinquish such unknown Claims and to waive and relinquish any statutory or common law protection available in any applicable jurisdiction with respect thereto.

12.18   Non-Recourse. No past, present or future director, officer, employee, incorporator, member, partner or equity holder of the Parties will have any liability for any obligations or liabilities of any Seller or Buyer, as applicable, under this Agreement, or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby; provided that the foregoing shall not limit the rights of Buyer with respect to Acquired Assets. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated by this Agreement may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the Parties hereto, no Person shall have any liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any action or proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Legal Requirements or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a party hereto or another Person or otherwise.

12.19   Joinder. At the Closing, any Person to whom Buyer assigns the right to receive any of the Acquired Assets at Closing shall execute a joinder in customary form, pursuant to which each such other Person will assume, and will be obligated with Buyer on a joint and several basis, to perform and satisfy each of Buyer's obligations under this Agreement.

*[Signature pages follow.]*

2

**IN WITNESS WHEREOF,** the Parties have caused this Amended and Restated Equity Interest and Asset Purchase Agreement to be executed and delivered by their duly authorized representatives, all as of the ~~Execution~~Effective Date.

RS PURCHASER LLC


By: _____
Name:
Title:


WELLPATH HOLDINGS, INC.


By: _____
Name:
Title:


CORRECT CARE HOLDINGS, LLC


By: _____
Name:
Title:


ALPINE CA BEHAVIORAL HEALTH HOLDCO, LLC


By: _____
Name:
Title:

**<u>Exhibit A</u>**
**Form of Assignment and Assumption Agreement**

[to be attached]

**Exhibit B**

**Bidding Procedures**

[to be attached]

**Exhibit C**
**Form of Bidding Procedures Order**
[to be attached]

**Exhibit D**
**Form of Bill of Sale**

[to be attached]

**<u>Exhibit ~~E~~C</u>**
**Form of Intellectual Property Assignment Agreement**

[to be attached]

**<u>Exhibit FD</u>**
**Form of Transition Services Agreement**

[to be attached]

**Exhibit ~~G~~E**
**Form of Securities Transfer Agreement**

[to be attached]

| Summary report: Litera Compare for Word 11.8.0.56 Document comparison done on 1/7/2025 6:36:47 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Wellpath - 363 SH Asset Purchase Agreement 4886-7540-8625, 13 (4).docx | |
| **Modified DMS:** iw://filesitex.proskauer.com/CURRENT/149846069/2 | |
| **Changes:** | |
| Add | 774 |
| Delete | 380 |
| Move From | 21 |
| Move To | 21 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1196 |

**Exhibit B**

**Proposed Sale Order Redline**

PR Comments to MWE Comments on 1/6/25
PRIVILEGED & CONFIDENTIAL – SUBJECT TO FRE 408

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
| Debtors. | (Jointly Administered) |
|  | **Re: Docket No. 21, 384** |

**ORDER (A) APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS AND CERTAIN EQUITY INTERESTS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (C) DISMISSING THE CHAPTER 11 CASES OF THE ACQUIRED RECOVERY SOLUTIONS DEBTORS, AND (D) GRANTING RELATED RELIEF**

Upon the *Debtors' Emergency Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of the Debtors' Assets, (B) Approving Entry into a Stalking Horse Purchase Agreement for the Recovery Solutions Assets, (C) Authorizing the Recovery Solutions Expense Reimbursement, (D) Authorizing Potential Selection of Stalking Horse Bidders for the Corrections Assets and Approving Related Corrections Assets(s) Bid Protections, (E) Establishing Related Dates and Deadlines, (F) Approving the Form and Manner of Notice Thereof, And (G) Approving the Assumption and Assignment Procedures, (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances (B) Authorizing the Assumption and assignment of Executory Contracts and Unexpired Leases, and*

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Wellpath.  The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

*(III) Granting Related Relief* [Docket No. 21] (the "Motion"),[2] seeking entry of an order (this "Order") authorizing and approving (a) a sale of the Acquired Assets, including 100% of the equity interests in each of (i) Wellpath Recovery Solutions, LLC, (ii) Correct Care of South Carolina, LLC, (iii) Harborview Center, LLC, and (iv) Behavioral Health Management Systems, LLC (collectively, the "Acquired Recovery Solutions Debtors" and, the equity interests therein, the "Acquired Equity Interests") to RS Purchaser LLC (the "Recovery Solutions Stalking Horse Bidder" or the "Buyer"), in accordance with the terms and conditions contained in the Equity Interest and Asset Purchase Agreement by and among the Debtors and the Buyer (as amended, supplemented, or otherwise modified by the parties thereto, and including the disclosure schedules and exhibits attached thereto, the "Recovery Solutions Stalking Horse Agreement") free and clear of all liens, claims, and encumbrances to the fullest extent permitted by law, except for any assumed liabilities ("Assumed Liabilities") and certain permitted encumbrances as determined by the Debtors and the Buyer (solely to the extent expressly set forth and defined in the Recovery Solutions Stalking Horse Agreement, the "Permitted Liens"), (b) authorizing the assumption and assignment of the Assumed Contracts, and (c) granting related relief; and this Court having entered the *Stipulated and Agreed Amended Order (I) Approving the Bidding Procedures for the Sale of the Debtors' Assets, (II) Approving Entry Into a Stalking Horse Purchase Agreement for the Recovery Solutions Assets, (III) Authorizing the Recovery Solutions Expense Reimbursement, (IV) Authorizing the Potential Selection of Stalking Horse Bidders for the Corrections Assets and Approving Related Corrections Asset(s) Bid Protections, (V) Establishing Related Dates and Deadlines, (VI) Approving the Form and Manner of Notice*

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion, the Bidding Procedures Order, or the Recovery Solutions Stalking Horse Agreement, as applicable as in effect on January 6, 2025.

*Thereof, (VII) Approving the Assumption and Assignment Procedures, and (VIII) Granting Related Relief* [Docket No. 384] (the "Bidding Procedures Order"), that, among other things, (a) authorized and approved the terms of and the Debtors' entry into the Recovery Solutions Stalking Horse Agreement (subject to the rights of the Committee to object to such agreement and the transactions contemplated thereby), (b) approved the Recovery Solutions Expense Reimbursement, and (c) approved the Bidding Procedures for the sale of the Debtors' Assets, including the process, timeline, and notice thereof; and the Debtors having determined after an extensive marketing and sale process [and the Auction held on [●], 2024]/[and the Debtors having received no Qualified Bids other than the Recovery Solutions Stalking Horse Bid by the Bid Deadline], that the Buyer has submitted the highest or otherwise best bid to purchase the Acquired Assets (including the Acquired Equity Interests); and the Debtors having selected the Buyer as the Successful Bidder in accordance with the Bidding Procedures; and upon due, adequate, and sufficient notice of the Motion, the Recovery Solutions Stalking Horse Agreement, and all other related transactions contemplated thereunder and in this Order (such transactions collectively, the "Sale"); and this Court having held a hearing to consider the relief requested in the Motion on a final basis (the "Sale Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion, the Tempke Declaration, the Schoenholtz Declaration, the First Day Declaration; [the *Supplemental Declaration of Christian Tempke in Support of Order (A) Approving the Sale of Certain of the Debtors' Assets and Certain Equity Interests Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, (C) Dismissing the Chapter 11 Cases of the Acquired Recovery Solutions Debtors and (D) Granting Related Relief* [Docket No. [●]], and the *Supplemental Declaration of Jason Schoenholtz in Support of Order*

3

*(A) Approving the Sale of Certain of the Debtors' Assets and Certain Equity Interests Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, (C) Dismissing the Chapter 11 Cases of the Acquired Recovery Solutions Debtors and (D) Granting Related Relief* [Docket No. [●]] (together, the "Supplemental Declarations"[3] and, together with the Tempke Declaration, the Schoenholtz Declaration, the First Day Declaration, the "Declarations")] and at the Sale Hearing establish just cause for the relief granted herein; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and all objections and reservations of rights filed or asserted in respect of the Motion, if any, having been withdrawn, resolved, or overruled; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**[4]

**I.      Jurisdiction, Final Order, and Statutory Predicates.**

A.      This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges,* General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.).  Venue of these chapter 11 cases and the Motion is proper in the United States District Court for the Southern District of Texas and in this

---

[3]  **NTD**:  To be determined whether more than one supplemental declaration is needed.

[4]   These findings and conclusions constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  Where appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact.  All findings of fact and conclusions of law announced by this Court at the Sale Hearing in relation to the Motion are hereby incorporated herein to the extent not inconsistent herewith.

Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b).

B.      This Court having found that it may enter a final order consistent with Article III of the United States Constitution.

C.      The statutory predicates for the relief requested in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014.

## II.    Notice.

D.      As evidenced by the certificates of service and publication filed with this Court [Docket Nos. 230, 278, 341, 345, 495, 511, 579, 612, 712], and as demonstrated by the evidence presented at the Sale Hearing, proper, timely, adequate, and sufficient notice of the Motion, the contracts to be potentially assumed and assigned in connection with the Sale, including the Assumed Contracts, the Sale Hearing, the Sale, and the deadlines related thereto were provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and the Bidding Procedures Order, to each Sale Notice Party.  With respect to entities whose identities are not reasonably ascertained by the Debtors after reasonable diligence, publication of the Sale Notice (i) in the national edition of *USA Today* on November 25, 2024 and November 26, 2024, (ii) in *The New York Times* on November 26, 2024, (iii) in *Prison Legal Notice* on December 5, 2024, and (iv) on the website maintained by Epiq Corporate Restructuring LLC, the Debtors' claims and noticing agent in these chapter 11 cases, located at https://dm.epiq11.com/case/wellpath on November 12, 2024, was, and is deemed, sufficient and reasonably calculated under the circumstances to reach such entities.  The notices described above and in the Motion and Bidding Procedures Order were good, sufficient, and appropriate under the circumstances and reasonably calculated to reach and apprise all known and unknown

holders of the Liens, Claims, and Interests (each as defined below), and no other or further notice of the Motion, the Sale, the Sale Hearing, the potential assumption and assignment of the Assumed Contracts, or the related Cure Costs is, or shall be, required.

E.      A reasonable opportunity to object and be heard with respect to the Sale, the Motion, and the relief requested therein has been afforded to all interested parties.

F.      The disclosures made by the Debtors concerning the Motion, the Recovery Solutions Stalking Horse Agreement, the Bidding Procedures, [the Auction,] and the Sale Hearing were good, complete, and adequate.

### III.   Business Justification

G.      The Debtors have demonstrated compelling circumstances and a good, sufficient, and reasonable business purpose and justification for entering into the Recovery Solutions Stalking Horse Agreement, which provides for, among other things, the sale of the Recovery Solutions Assets (including, for the avoidance of doubt, the Acquired Equity Interests) to the Buyer.  The Acquired Recovery Solutions Debtors are set forth on Schedule 2.1(f)(i) to the Recovery Solutions Stalking Horse Agreement, which ~~may~~shall not be amended or revised ~~in accordance with~~notwithstanding anything to the contrary in the Recovery Solutions Stalking Horse Agreement ~~from time to time in accordance with the terms thereof~~.  The Debtors have, among other things, determined in their business judgment that, under the circumstances, the benefits of consummating the Sale on the terms and conditions embodied in the Recovery Solutions Stalking Horse Agreement are in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

W.     The Buyer would not have entered into the Recovery Solutions Stalking Horse Agreement, and would not consummate the transactions contemplated thereby, if (i) the Sale of the Acquired Assets (including the Acquired Equity Interests) to the Buyer was not free and clear of all Interests (other than the Permitted Liens ~~and~~, the Assumed Liabilities, and any Interests in or against the Acquired Recovery Solutions Debtors or their assets) of any kind or nature whatsoever or (ii) if the Buyer would, or in the future could, be liable for any of the Interests (other than the Permitted Liens and the Assumed Liabilities).  The Buyer will not consummate the transactions contemplated by the Recovery Solutions Stalking Horse Agreement unless this Court expressly orders that none of the Buyer, any of the Buyer's Affiliates or Subsidiaries, or any of their respective officers, directors, partners, principals, direct and indirect equityholders (including any equity sponsor), professionals, or representatives, successors, or assigns (collectively referred to as the "Buyer Group"), or their respective assets or properties, including, without limitation, the Acquired Assets (including the Acquired Equity Interests), will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, or by payment, setoff, recoupment, or otherwise, directly or indirectly, any Interests (other than the Permitted Liens and the Assumed Liabilities), including rights or claims based on any Successor or Other Liabilities.  The total consideration to be provided under the Recovery Solutions Stalking Horse Agreement reflects the Buyer's reliance on this Order to provide it, pursuant to sections 105(a) and 363 of the Bankruptcy Code, with title to and possession of the Acquired Assets (including the Acquired Equity Interests) free and clear of all Interests (other than the Permitted Liens and the Assumed Liabilities) of any kind or nature whatsoever (including, without limitation, any potential Successor or Other Liabilities).  For the avoidance of

15

doubt, nothing herein shall prejudice or impair in any way rights of any party in interest, including, without limitation, the Committee, under Paragraph 26(a) of the DIP Order.

X.      Not transferring the Acquired Assets free and clear of all Interests (other than the Permitted Liens and the Assumed Liabilities), including rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state, federal, foreign law, or otherwise, would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Acquired Assets other than pursuant to a transfer that is free and clear of all Interests (other than the Permitted Liens and the Assumed Liabilities) of any kind or nature whatsoever would be of substantially less benefit to the Debtors' estates.

Y.      The Debtors may sell the Acquired Assets (including the Acquired Equity Interests) free and clear of all Interests (other than the Permitted Liens and, the Assumed Liabilities, and any Interests in or against the Acquired Recovery Solutions Debtors or their assets) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  Those holders of Interests that did not timely object to the Sale or the Motion, or withdrew objections to the Sale or the Motion, are deemed to have consented to the Sale and the Motion pursuant to section 363(f)(2) of the Bankruptcy Code.  All Interests (except to the extent that such encumbrances are Permitted Liens or, Assumed Liabilities, or Interests in or against the Acquired Recovery Solutions Debtors or their assets) fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and, therefore, all holders of Interests are adequately protected.

## XII.   Cure Costs and Adequate Assurance of Future Performance

Z.      The assumption and assignment of the Assumed Contracts pursuant to the terms of this Order (i) is integral to the Recovery Solutions Stalking Horse Agreement, (ii) is in the

Assumed Contracts thereafter, shall constitute adequate assurance of their future performance of and under the Assumed Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code. The Debtors have satisfied the Seller Cure Cap, and the Buyer shall be responsible for any Cure Costs in excess of the Seller Cure Cap in accordance with Section 2.5(a)(i) of the Recovery Solutions Stalking Horse Agreement. Pursuant to the Bidding Procedures Order, all counterparties to Assumed Contracts that failed to file with this Court and serve on the Objection Notice Parties a timely objection are forever barred from asserting any such objection with regard to the assumption or assignment of their Assumed Contract. This Court finds that, with respect to all such Assumed Contracts, the payment of Cure Costs is appropriate and is deemed to fully satisfy the Debtors' obligations under section 365(b) of the Bankruptcy Code. Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption and the assignment by the applicable Debtor to the Buyer of each of the Assumed Contracts. To the extent any Assumed Contract is not an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Buyer in accordance with the terms of this Order that are applicable to the Acquired Assets.

## XIII.   Not a *Sub Rosa* Plan

CC.      The Sale does not constitute a *sub rosa* chapter 11 plan or an element of such plan for which approval has been sought without the protection that a disclosure statement would afford. The Sale neither impermissibly restructures the rights of any Debtor's creditors nor impermissibly dictates a liquidating plan for any Debtor.

### III.     Transfer of the Acquired Assets

8.      Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the Debtors shall transfer the Acquired Assets, including, but not limited to, the Acquired Equity Interests and the Assumed Contracts, to the Buyer in accordance with the terms of the Recovery Solutions Stalking Horse Agreement; such transfer shall constitute a legal, valid, binding, and effective transfer of such Acquired Assets; and the Buyer shall take title to and possession of such Acquired Assets free and clear of all Interests (other than the Permitted Liens and, the Assumed Liabilities, and any Interests in or against the Acquired Recovery Solutions Debtors or their assets) in such assets and equity interests that comprise the Acquired Assets (including the Acquired Equity Interests).  Any and all valid and perfected Interests in the Acquired Assets (including the Acquired Equity Interests) shall attach to the net proceeds (if any) of the Sale with the same validity, force, and effect, if any, and in the same order of priority, that they have now as against the assets and equity interests comprising the Acquired Assets (including the Acquired Equity Interests), subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

9.      The transfer of the Acquired Assets to the Buyer in accordance with the terms of the Recovery Solutions Stalking Horse Agreement will be a legal, valid, enforceable, and effective sale and transfer of the Acquired Assets and the Assumed Liabilities and will render the Buyer fully liable for any and all Assumed Liabilities, and assumption of any Assumed Liabilities by the Buyer shall constitute a legal, valid, and effective delegation of any Assumed Liabilities to the Buyer and shall divest the Debtors of all liability with respect to any Assumed Liabilities.

interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or the Buyer's interests in the Acquired Assets (including the Acquired Equity Interests), or any similar rights, if any, or (ii) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attribute of ownership) (collectively, as defined in this clause (iib), the "Claims" and, together with the Liens and any other interests of any kind or nature whatsoever, the "Interests"), relating to, accruing, or arising any time prior to the Closing Date, with the exception of the Permitted Liens and, the Assumed Liabilities.  For the avoidance of doubt, (a) transfer of the Acquired Equity Interests shall be free and clear of Interests in such Acquired Equity Interests, but not free and clear of Interests in the assets heldor against the Acquired Recovery Solutions Debtors or their assets, and (b) anything to the contrary notwithstanding, the Acquired Recovery Solutions Debtors shall remain liable for any Interests, liabilities, or any other obligations owed by the Acquired Recovery Solutions Debtors.

11. Except as expressly assumed by the Buyer under the Recovery Solutions Stalking Horse Agreement, the transfer of the Acquired Assets to the Buyer and the assignment to the Buyer of the Assumed Contracts will not subject the Buyer to any liability whatsoever that may become due or owing under the Assumed Contracts prior to the Closing Date, or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or foreign jurisdiction, based, in whole or in part, directly or indirectly, on any theory of law or equity, including any Successor or Other Liabilities.

12. The Recovery Solutions Stalking Horse Agreement (and any ancillary agreements or instruments delivered pursuant thereto) are valid and binding contracts between the Debtors

and the Buyer and shall be enforceable pursuant to their terms.  The Recovery Solutions Stalking Horse Agreement (and any ancillary agreements or instruments delivered pursuant thereto), the Sale, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed in these chapter 11 cases, or any converted or successor cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.  The Recovery Solutions Stalking Horse Agreement (and any ancillary agreements or instruments delivered pursuant thereto) was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia, or foreign jurisdiction.   As demonstrated by the Declarations, the consideration provided by the Buyer for the Acquired Assets pursuant to the Recovery Solutions Stalking Horse Agreement (a) is fair and reasonable, (b) is the highest or otherwise best offer for the Acquired Assets, (c) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (d) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia, and any foreign jurisdiction (including the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, and similar laws and acts).  Neither the Debtors nor the Buyer ~~is~~are entering into the transactions contemplated by the Recovery Solutions Stalking Horse Agreement with any fraudulent or otherwise improper purpose, including for the purpose of statutory and common-law fraudulent conveyance and fraudulent transfer.

13.    Each and every federal, state, local, and other governmental agency, governmental department, filing agent, filing officer, title agent, recording agency, secretary of state, federal,

and the DIP Orders shall be automatically released and terminated, and each Acquired Recovery Solutions Debtor shall be automatically released from its obligations (including, for the avoidance of doubt, its obligation to guarantee the obligations with respect to the First Lien Claims, the Second Lien Claims, and the Adequate Protection Claims (as defined in the DIP Orders)) fromunder each of the First Lien Documents, the Second Lien Documents, and the DIP Orders, including for the avoidance of doubt, the Adequate Protection Liens (as defined in the DIP Orders) (the "Prepetition Release").  The First Lien Agent and the Second Lien Agent and/or the Debtors are hereby authorized to file, record, execute, and/or deliver UCC termination statements and any further instruments, releases, terminations, and documents evidencing the Prepetition Release.

22.     Notwithstanding anything to the contrary herein, effective immediately upon the Closing of the Sale, all security interests, pledges and liens of any kind, nature or description on all equity interests in, and assets and property of, each Acquired Recovery Solutions Debtor granted in favor of the DIP Collateral Agent (as defined in the Final DIP Order) under the DIP Documents shall be automatically released and terminated, and each Acquired Recovery Solutions Debtor shall be automatically released from its obligations (including, for the avoidance of doubt, its obligation to guarantee the obligations with respect to the DIP Obligations) from the DIP Documents (the "DIP Release").  The DIP Collateral Agent and/or the Debtors are hereby authorized to file record, execute and/or deliver the UCC termination statements and any further instruments, releases, terminations and documents evidencing the DIP Release.

Solutions Stalking Horse Agreement and the Buyer's agreement to perform the obligations under the Assumed Contracts in accordance with the terms of the Recovery Solutions Stalking Horse Agreement shall constitute adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the Counterparties.

30. To the furthest extent permitted by law, any party that may have had the right to consent to the assumption or assignment of a Assumed Contract is deemed to have consented to such assumption and assignment or assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code if such party failed to timely object to the assumption or assignment of such Assumed Contract in accordance with the Bidding Procedures Order, and the Buyer shall be deemed to have demonstrated adequate assurance of future performance with respect to such Assumed Contract pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. Any Counterparty to an applicable Assumed Contract that may be assumed and assigned to the Buyer who has not timely filed and served an objection shall be barred from objecting, or asserting monetary or non-monetary defaults, with respect to any such applicable Assumed Contract, and such applicable Assumed Contract, if designated as a~~a~~an Assumed Contract in accordance with the terms of the Recovery Solutions Stalking Horse Agreement, shall be deemed assumed by the Debtors and assigned to the Buyer on the Closing Date pursuant to this Order.

31. To the extent a Counterparty to an Assumed Contract failed to timely object to the Cure Costs for any applicable Assumed Contract in accordance with the Bidding Procedures Order, such Cure Costs shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Costs at any time.

32.     The requirements of Bankruptcy Rule 6006(f)(6) are hereby waived, for cause shown, with respect to the Motion and the relief requested therein.

33.     Upon and as of the Closing Date, the Buyer shall be deemed to be substituted for the applicable Debtor as a party to the applicable Assumed Contracts and the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assumed Contracts.

34.     The Counterparties shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyer, any instruments, applications, consents, or other documents that may be required or requested by any public authority or other party or entity to effectuate the applicable transfers in connection with the Sale of the Acquired Assets.

35.     From the date of the entry of this Order, the Debtors may, with the consent of the Buyer, settle objections to assumption and assignment of any applicable Assumed Contract or contracts of the Acquired Companies, including to proposed Cure Costs, without any further notice to or action by any party or order of this Court (including by paying any agreed Cure Cost); *provided* that notice to and consent of the Buyer shall be required to the extent that the Buyer is liable for such Cure Costs pursuant to the Recovery Solutions Stalking Horse Agreement or the Buyer's rights and remedies are otherwise altered in any way by the resolution. Unless this Court orders otherwise, contemporaneously with the resolution of any such objection, the executory contract or unexpired lease underlying such objection shall be deemed an Assumed Contract without the necessity of obtaining any further order of this Court.

36.     Notwithstanding anything to the contrary herein, no executory contract or unexpired lease as to which a Counterparty to an Assumed Contract timely files and serves an objection shall be considered an Assumed Contract under this Order unless and until any timely

kind against any obligation due any member of the Buyer Group or their respective assets or properties, including the Acquired Assets; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof; or (f) to the extent prohibited by section 525 of the Bankruptcy Code, revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with the Acquired Assets. For the avoidance of doubt, (a) each member of the Buyer Group is released under this Order solely in ~~their capacity as a member of the Buyer Group~~connection with this Sale and not in any other capacity, and (b) nothing herein shall prejudice or impair in any way rights of any party in interest, including, without limitation, the Committee, under Paragraph 26(a) of the DIP Order.

41.     Except with respect to Permitted Liens, Assumed Liabilities, liabilities of the Acquired Recovery Solutions Debtors, or as provided in the Recovery Solutions Stalking Horse Agreement, and without limiting other applicable provisions of this Order, the Buyer is not, by virtue of the consummation of the Sale, assuming, nor shall it be liable or responsible for any liabilities, debts, commitments, or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed, or otherwise) in any way whatsoever relating to or arising from the Debtors, the Acquired Assets, or the Debtors' operation of their businesses or use of the Acquired Assets on or prior to the Closing Date or any such liabilities, debts, commitments, or obligations that in any way whatsoever relate to periods on or prior to the Closing Date or are to be observed, paid, discharged, or performed on or prior to the Closing Date (in each case, including, without limitation, Successor or Other Liabilities and any liabilities that result from, relate to, or arise out of tort or product liability claims), or any

liabilities calculable by reference to the Debtors or their assets or operations (including by reference to the Debtors' experience or similar ratings), or relating to continuing conditions existing on or prior to the Closing Date, including with respect to any of the Debtors' predecessors or Affiliates, which liabilities, debts, commitments, and obligations are hereby extinguished insofar as they may give rise to Successor or Other Liability.

42.     None of the Buyer nor any of its affiliates, equityholders, successors, and assigns, nor any of their professionals shall have, incur any liability to, or be subject to any action by, the Debtors or any of their predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the Recovery Solutions Stalking Horse Agreement (and any ancillary agreements or instruments delivered pursuant thereto) and the entry into and consummation of the Sale, except as expressly provided in the Recovery Solutions Stalking Horse Agreement and this Order.  Neither the Debtors nor any of their affiliates, successors, and assigns, nor any of their professionals shall have, incur any liability to, or be subject to any action by, the Buyer arising out of the negotiation, investigation, preparation, execution, or delivery of the Recovery Solutions Stalking Horse Agreement (and any ancillary agreements or instruments delivered pursuant thereto) and the entry into and consummation of the Sale, except as expressly provided in the Recovery Solutions Stalking Horse Agreement and this Order.

43.     To the fullest extent permissible under applicable law, each of the Debtors and their Estates, for itself and for its successors and assigns, shall be deemed to fully and forever release each Acquired Recovery Solutions Debtor, the Buyer Group, and each member of the Buyer Group from any liability whatsoever on or otherwise in relation to all Interests (including any and all avoidance, recovery, subordination, or other claims and causes of action that may be

~~brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code, or other similar or related state, federal, or foreign statutes, common law, or other applicable law)~~ against or in any of the Acquired Recovery Solutions Debtors, the Buyer Group, or any member of the Buyer Group, or any portion of their assets or properties, that each Debtor has or is entitled to make or assert, file, or bring against any Acquired Recovery Solutions Debtor, the Buyer Group, or a member of the Buyer Group that directly or indirectly arises out of, in connection with, or in any way relating to, the ~~Acquired Recovery Solutions Debtors, the Buyer Group, or any member of the Buyer Group, their assets or properties, or the operation of the Acquired Recovery Solutions Debtors' business prior to the Closing~~<u>Stalking Horse Purchase Agreement and the Buyer Group's act, omission, performance or involvement in the Stalking Horse Agreement</u>, other than any obligations of any Acquired Recovery Solutions Debtor, the Buyer Group, or any member of the Buyer Group arising under the Recovery Solutions Stalking Horse Agreement <u>(and any ancillary agreements or instruments delivered pursuant thereto)</u> or this Order.  All Debtors shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing against any Acquired Recovery Solutions Debtor, the Buyer Group~~,~~ or any member of the Buyer Group, or their respective assets or properties, the Interests of any kind or nature whatsoever such Debtor had, has, or may have against or in the Acquired Recovery Solutions Debtor, the Buyer Group, or any member of the Buyer Group, their estates, officers, directors, shareholders, or their assets or properties <u>solely in connection with the foregoing sentence</u>.  For the avoidance of doubt, each member of the Buyer Group is released under this Order solely in ~~their capacity as a member of the Buyer~~

43

~~Group~~connection with this Sale and not in any other capacity; *provided that* nothing in this Section V shall release any party from any claim arising out of or relating to any act or omission that constitutes fraud, gross negligence, or willful misconduct, as determined by a Final Order.

**VI.   Dismissal of the Chapter 11 Cases of the Acquired Recovery Solutions Debtors**

44.    The chapter 11 cases of the Acquired Recovery Solutions Debtors (Case No. 24-90538 (ARP), Case No. 24-90545 (ARP), Case No. 24-90548 (ARP), and Case No. 24-90565 (ARP)) are hereby dismissed, effective on the Closing Date.  In each case, such dismissal is without prejudice to the Acquired Recovery Solutions Debtors' rights to file future cases under any applicable chapter of the Bankruptcy Code.

45.    The Clerk of this Court shall enter this Order on the dockets of each of the Acquired Recovery Solutions Debtors and such dockets shall be marked as closed.

46.    This Order is without prejudice to any parties' right to seek to reopen any of the Acquired Recovery Solutions Debtors' closed chapter 11 cases for good cause shown.

47.    The Debtors are authorized to take such actions as are necessary to effectuate the dismissal of the chapter 11 cases of the Acquired Recovery Solutions Debtors.  No later than two business days following the Closing Date, the Acquired Recovery Solutions Debtors shall file a notice of dismissal of the Acquired Recovery Solutions Debtors' chapter 11 cases (the "Dismissal Notice") on the docket of the above-captioned chapter 11 cases and serve the Dismissal Notice on (a) the U.S. Trustee, (b) the Committee, (c) any federal, state, or local governmental agency to the extent required by the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, or order of this Court, and(d) any party identified in section E of the *Procedures for Complex Cases in the Southern District of Texas.*

of Executory Contracts or Unexpired Leases and Cure Amount [Docket No. 194], without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order shall (a) be interpreted to set cure amounts with respect to Governmental Interests or require any Governmental Unit to novate, approve or otherwise consent to the assumption, sale, assignment or transfer of any Governmental Interests, (b) relieve any entity from any obligation to address or comply with information requests or inquiries from any Governmental Unit, (c) affect any setoff or recoupment rights of any Governmental Unit, (d) divest any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order, or (e) expand the scope of section 525 of the Bankruptcy Code.

54.     For the avoidance of doubt, notwithstanding any other provision of this Order or any other order of this Court, no sale, transfer, or assignment of any rights and interests of the Debtors in any federal license or authorization issued by the Federal Communications Commission ("FCC") shall take place prior to the issuance of FCC regulatory approval for such sale, transfer, or assignment pursuant to the Communications Act of 1934, as amended, and the rules and regulations promulgated under such statutes.  The FCC's rights and powers to take any action pursuant to its regulatory authority, including, imposing any regulatory conditions on such sales, transfers, and assignments, and setting any regulatory fines or forfeitures, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law.

55.     **Cash Cap.**  No more than $10,000,000.00 of cash or cash equivalents shall be transferred from the Debtors to the Buyer, the Acquired Recovery Solutions Debtors, or any account established by the Buyer or the Acquired Recovery Solutions Debtors in connection with

Section 2.1(c) of the Recovery Solutions Stalking Horse Agreement.  The Debtors may not convey any cash or cash equivalents resulting from revenues generated by the Corrections Business to the Buyer or the Acquired Recovery Solutions Debtors.

56. **Return of Estate Assets.**  To the extent that an asset that primarily relates to the Corrections Business is discovered to be held by the RS Business after the Closing Date, upon written notice from the Debtors or the Committee, the Buyer will promptly remit such asset to the Debtors' estates for no consideration, subject to the Buyer's right to seek relief from this Court to resolve any dispute relating to such notice.

57. **Stipulations**.  The Debtors and the Buyer represent, admit, stipulate and agree that none of the Acquired Assets or assets held by any of the Acquired Recovery Solutions Debtors that primarily relate, are material to, or are otherwise utilized (other than in an immaterial respect) by the Corrections Business.  The Debtors and the Buyer further represent, admit, stipulate and agree that since the commencement of these chapter 11 cases, (i) no assets of any of the Sellers or Affiliates of a Seller (other than any of the Acquired Recovery Solutions Debtors) that do not solely relate to the RS Business have been transferred, assigned or contributed to any of the Acquired Recovery Solutions Debtors, and (ii) no liabilities of any of the Acquired Recovery Solutions Debtors have been assumed by any of the Sellers or any Affiliates of a Seller (other than the Acquired Recovery Solutions Debtors, to the extent they represent a liability).

58. 55. In the event of an inconsistency or conflict between any provision of the Recovery Solution Stalking Horse Agreement, any other asset purchase agreements, and any provision of this Order, as to the United States, the provisions of this Order and federal law shall govern.

59. ~~56.~~ The transactions contemplated by the Recovery Solutions Stalking Horse Agreement and this Order are undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not alter, affect, limit, or otherwise impair the validity of the Sale (including the assumption, assignment, and/or transfer of the Assumed Contracts), unless such authorization and consummation of the Sale are duly stayed pending such appeal.  The Buyer is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and hereby granted, the full rights, benefits, privileges, and protections of section 363(m) of the Bankruptcy Code.  As a good-faith purchaser of the Acquired Assets, the Buyer has not entered into any agreement with any other potential bidders and has not colluded with any potential or actual bidders, and therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action against the Buyer, and the Sale may not be avoided, pursuant to section 363(n) of the Bankruptcy Code.

60. ~~57.~~ No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated under the Recovery Solutions Stalking Horse Agreement.

61. ~~58.~~ For cause shown, pursuant to Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the stays provided in Bankruptcy Rules 6004(h) and 6004(d) are hereby expressly waived and shall not apply.  Accordingly, the Debtors and Buyer are authorized and empowered to close the Sale immediately upon entry of this Order.

62.    59. The failure to include or specifically reference any particular provision of the Recovery Solutions Stalking Horse Agreement (and any ancillary agreements or instruments delivered pursuant thereto) in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Recovery Solutions Stalking Horse Agreement (and any ancillary agreements or instruments delivered pursuant thereto) be authorized and approved in its entirety.

63.    60. To the extent that this Order is inconsistent with the Motion, the terms of this Order shall control and govern.  To the extent that there are any inconsistencies between the terms of this Order, on the one hand, and the Recovery Solutions Stalking Horse Agreement (and any ancillary agreements or instruments delivered pursuant thereto), on the other hand, the terms of this Order shall control and govern.  To the extent that any plan of reorganization or liquidation, or any order of any type or kind entered in these chapter 11 cases or any subsequent chapter 7 case into which these chapter 11 cases may be converted, conflicts with or derogates from the terms of the Recovery Solutions Stalking Horse Agreement (or any ancillary agreements or instruments delivered pursuant thereto) or this Order, the terms of the Recovery Solutions Stalking Horse Agreement (or any ancillary agreements or instruments delivered pursuant thereto) and this Order shall control and govern to the extent of any such conflict or derogation.  Unless otherwise provided herein, to the extent this Order is inconsistent with the Bidding Procedures Order or any other prior order or pleading in these chapter 11 cases, or the terms of the Recovery Solutions Stalking Horse Agreement, this Order shall govern.

64.    61. The Recovery Solutions Stalking Horse Agreement may be modified, amended, or supplemented in a writing signed by the parties thereto and in accordance with the terms thereof, in consultation with the Committee, without further notice to or order of this

Court, so long as any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates and does not otherwise conflict with this Order. and subject to this paragraph.  For the avoidance of doubt, the following modifications shall be subject to the Committee's prior written consent: (1) any increase of the Seller Cure Cap, (2) any modification of the Buyer's responsibility for any Cure Costs in excess of the Seller Cure Cap, (3) any provision having the effect of increasing to the Cash Cap beyond $10,000,000.00, (4) any modifications to Schedule 2.1(f)(i) to the Recovery Solutions Stalking Horse Agreement.

65.    62.  The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted to the extent necessary, without the need for further order of this Court, to allow the Buyer and the Debtors to deliver any notice provided for in the Recovery Solutions Stalking Horse Agreement and to allow the Buyer and the Debtors to take any and all actions permitted under the Recovery Solutions Stalking Horse Agreement (and any ancillary agreements or instruments delivered pursuant thereto).

66.    63.  From time to time, as and when requested by the other, the Debtors and the Buyer, as the case may be, shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Sale, including, such actions as may be necessary to vest, perfect or confirm, record, or otherwise, in the Buyer its right, title, and interest in and to the Acquired Assets and the Assumed Contracts, subject to the provisions of the applicable Agreement.

67.    64.  This Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order, the Recovery Solutions Stalking Horse Agreement (and any ancillary agreements or instruments delivered pursuant thereto), and