**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>WELLPATH HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-90533 (ARP)<br><br>(Jointly Administered)<br>Re: Docket Nos. 21, 111, 384, 818 |

**DECLARATION OF
TIMOTHY J. DRAGELIN AS
CHIEF RESTRUCTURING OFFICER AND
CHIEF FINANCIAL OFFICER OF WELLPATH
HOLDINGS, INC. AND CERTAIN OF ITS AFFILIATES
IN SUPPORT OF ORDER (A) APPROVING THE SALE
OF CERTAIN OF THE DEBTORS' ASSETS AND CERTAIN EQUITY
INTERESTS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS,
AND ENCUMBRANCES, (B) APPROVING THE ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES, (C) DISMISSING THE CHAPTER 11 CASES OF THE ACQUIRED
RECOVERY SOLUTIONS DEBTORS, AND (D) GRANTING RELATED RELIEF**

I, Timothy J. Dragelin, declare as follows:

1. I am a Senior Managing Director with FTI Consulting, Inc. ("FTI"), which has a place of business at 1166 Avenue of the Americas, New York, New York 10036, among other locations. Since October 2024, I have served in a dual role of Chief Restructuring Officer and Chief Financial Officer of Wellpath Holdings, Inc. ("WHI" and, collectively with its debtor affiliates, the "Debtors" and, together with their non-Debtor affiliates, collectively, "Wellpath").

2. I joined FTI in August 2002 and specialize in providing financial advisory services to the various corporate stakeholders, including borrowers, creditors, and equity holders. I have

---

[1] A complete list of the Debtors (as defined below) in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Wellpath. The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

more than 30 years of experience across multiple industries, most notably healthcare, real estate, structured finance, and government contracting. I lead FTI's Healthcare Interim Management group and co-lead FTI's Healthcare Restructuring practice. My experience ranges from advising not-for-profit entities to privately held companies to multinational publicly traded corporations. I am regularly involved in interim management, bankruptcy planning and management, turnaround consultation, lender advisory, buy-side due diligence, sell-side mandates, valuation, and performance improvement engagements.

3. Prior to joining FTI, I was employed by PricewaterhouseCoopers in various capacities within the financial advisory services practice. I have been proffered and appeared as an expert witness relative to restructuring, accounting, financial, and valuation topics in several venues. I earned a B.B.A. in accounting from the College of William & Mary in Virginia, and previously held both certified public accountant and certified valuation analyst designations.

4. As a result of my tenure with Wellpath, I am generally familiar with the Debtors' capital structure, day-to-day operations, business and financial affairs, financial records, and events that have occurred during the Debtors' chapter 11 cases. I am also familiar with the Debtors' corporate structure and the status of the Debtors' relationships with various vendors and service providers.

5. I submit this declaration (this "Declaration") in support of the *Debtors' Emergency Motion for Entry of Orders (I)(A) Approving the Bidding Procedures for the Sale of the Debtors' Assets, (B) Approving Entry into a Stalking Horse Purchase Agreement for the Recovery Solutions Assets, (C) Authorizing the Recovery Solutions Expense Reimbursement, (D) Authorizing Potential Selection of Stalking Horse Bidders for the Corrections Assets and Approving Related Corrections Asset(s) Bid Protections, (E) Establishing Related Dates and Deadlines, (F) Approving the Form*

2

*and Manner of Notice Thereof, and (G) Approving the Assumption and Assignment Procedures, (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 21] (the "<u>Motion</u>").[2]

6.  Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents of the Debtors, other information prepared or collected by the Debtors' employees, my conversations with the Debtors' advisors, information supplied to me by other members of the Debtors' management and third-party advisors, or my opinion based on my experience with the Debtors' operations and financial condition. In making my statements based on documents and other information prepared or collected by the Debtors' employees or my conversations with the Debtors' counsel or other advisors, I have relied upon the accuracy of such documentation and other information. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## The Recovery Solutions Sale Transaction and the Realities of the Debtors' Business Operations

7.  Generally, I understand that the Recovery Solutions Stalking Horse Agreement provides for the purchase and sale to the Recovery Solutions Stalking Horse Bidder of the Acquired Assets, including the Acquired Equity Interests (the "<u>Recovery Solutions Sale Transaction</u>"). My understanding is that upon the consummation of the Recovery Solutions Sale

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion, the Bidding Procedures, the Recovery Solutions Stalking Horse Agreement (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof), or the *Supplemental Declaration of Jason Schoenholtz in Support of Order (A) Approving the Sale of Certain of the Debtors' Assets and Certain Equity Interests Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, (C) Dismissing the Chapter 11 Cases of the Acquired Recovery Solutions Debtors, and (D) Granting Related Relief* filed contemporaneously herewith, as applicable.

Transaction pursuant to the Recovery Solutions Stalking Horse Agreement, the Debtors' RS Business and related operations (such business and operations, the "Recovery Solutions Business") will be severed from the Debtors' broader businesses and operations comprised of the LG Division and the SF Division (such businesses and operations, collectively, the "Corrections Business"). In other words, upon consummation of the Recovery Solutions Sale Transaction, the Recovery Solutions Business will constitute a separate, standalone business under new ownership and will be unaffiliated with the Debtors' Corrections Business.

8. The business separation described above recognizes the realities of the differences between the Recovery Solutions Business and the Corrections Business. The Recovery Solutions Business addresses behavioral health needs, focuses on patients underserved by traditional mental health services, and offers a variety of services, including inpatient psychiatric hospitals, residential treatment centers, mental health rehabilitation centers, and community-based services. In contrast, the Corrections Business provides on-site medical services to incarcerated individuals either (a) with respect to the SF Division, in state and federal prisons, or (b) with respect to the LG Division, in local jails or juvenile detention facilities. Given those distinctions, the Recovery Solutions Business's operations significantly differ from the operations of the Corrections Business – *e.g.,* the nature and structure of contracts with government counterparties, the provision of services, and employment and staffing models.

9. Despite those differences, certain aspects of the businesses overlap for two primary reasons. *First*, the Debtors generally have uniform processes and services with respect to, among other things, accounting, preparation of financial statements, IT infrastructure, human resources, supply chain and procurement, legal compliance and risk, and corporate branding and marketing. Because the legal entities associated with the Recovery Solutions Business and the Corrections

4

Business, respectively, are wholly-owned direct and indirect subsidiaries of WHI, those processes and systems are hardwired into the operations of the Recovery Solutions Business and the Corrections Business, respectively. Furthermore, Wellpath has historically prepared its financial statements on a consolidated basis – *i.e.,* the Recovery Solutions Business did not have standalone financial statements.

10. *Second*, both the Recovery Solutions Business and the Corrections Business operate in the correctional healthcare arena. Because of stringent federal, local, and state regulations associated with providing healthcare in that environment, the universe of potential vendors and service providers is limited. That reality sometimes necessitates entering into a single contract with a counterparty to provide goods and/or services to both the Recovery Solutions Business and the Corrections Business.

## Efforts to Separate the Businesses and their Financial Affairs

11. Any separation of the Recovery Solutions Business from the Corrections Business needs to thoughtfully address two things: (a) the shared services described above; and (b) a mechanism to reflect the financial position of the Recovery Solutions Business on a standalone basis relative to the Corrections Business. Thus, in the months preceding the Petition Date and through and including the date of this Declaration, the Recovery Solutions Stalking Horse Bidder, the Debtors, and their respective advisors have taken painstaking efforts to address both issues.

### A. Transition of Shared Services

12. Notwithstanding the parties' efforts to separate the two businesses, overlap in certain operations will remain after the Recovery Solutions Sale Transaction closes. To address the overlap, and to provide for a seamless separation of the businesses, the parties extensively

negotiated the terms of that certain Transition Services Agreement in substantially the form of Exhibit D (the "TSA") attached to the Recovery Solutions Stalking Horse Agreement. The TSA has two primary functions.

13. *First*, the agreement outlines the process and terms pursuant to which the Sellers under the Recovery Solutions Stalking Horse Agreement and the Recovery Solutions Stalking Horse Bidder will transition services from the Corrections Business to the Recovery Solutions Business. The goal is to provide the Recovery Solutions Stalking Horse Bidder access to the information and services needed to operate the Recovery Solutions Business and to ensure uninterrupted patient care. Importantly, the TSA is not for an indefinite period. Rather, the length of the Service Time depends on the Service (each as defined in the TSA) being rendered. For example, Services that involve patient management have a Service Period of 12 months, whereas Services that are more administrative in nature (*e.g.,* IT contract management, obtaining and renewing licenses, and vendor contract management) have a duration of 2 months.[3]

14. *Second*, the TSA provides that the remaining Debtors' estates will be no worse off financially by performing their obligations under the TSA. Schedule A to the TSA outlines the fees that the Recovery Solutions Stalking Horse Bidder will pay the Corrections Business in connection with providing the applicable Service (as defined in the TSA). In addition, in the event that the remaining Debtors incur necessary, reasonable, and documented out-of-pocket expenses in connection with performing any of the Services, the Recovery Solutions Stalking Horse Bidder will reimburse the applicable Debtors for those costs; provided, the Debtors shall not incur any

---

[3] The duration of the Service Period for each Service is reflected on Schedule A to the TSA. If no date is specified for a particular service, the Service Period will end on the last day of the third full calendar month following the Effective Time (as defined in the TSA), subject to applicable extensions.

expenses that exceed $25,000 individually without first receiving the written consent of the Recovery Solutions Stalking Horse Bidder.

### B. The Recovery Solutions Business's Financial Position

15. To address the Recovery Solutions Business's working capital needs, the parties engaged in extensive negotiations over the amount of cash that the Acquired Recovery Solutions Debtors would have on their balance sheets post-closing.  At the time the parties executed the Recovery Solutions Stalking Horse Agreement, a "net working capital adjustment" mechanism typically seen in transactions of this type was contemplated, which was to be mutually agreed to by the parties in good faith following the signing.  At the time of signing, however, because the Recovery Solutions Business did not historically maintain separate financial statements from the Corrections Business, the information necessary to finalize the working capital adjustment mechanism for the Recovery Solutions Business was not available.

16. Since the Petition Date and through and including the date of this Declaration, the parties have worked together to prepare the information necessary to finalize the working capital adjustment mechanism and related provisions reflected in the Recovery Solutions Stalking Horse Agreement.  The intent of those provisions—which were extensively negotiated—is to attempt to accurately reflect the changes in working capital that are attributable to the Recovery Solutions Business.

**The TSA and Working Capital Adjustment Provisions are Necessary,
were Negotiated in Good Faith and at Arms's-length, and are Fair and Reasonable**

17. The TSA and working capital adjustment provisions in the Recovery Solutions Stalking Horse Agreement are necessary to accomplish a successful and seamless separation of the Recovery Solutions Business and the Corrections Business.

A. The TSA

18. In my experience, a transition services agreement like the TSA is an industry-standard contractual arrangement executed when a company divests one or more of its business lines. Indeed, I understand that a transition services agreement was always contemplated as a necessary component of any sale of the Recovery Solutions Business to a third party, as evidenced by the fact that during the prepetition, out-of-court sale process, a form of transition services agreement was made available to prospective bidders.

19. As for the TSA's terms, I believe the terms are fair and reasonable and were negotiated at arm's-length and in good faith. For example, each Service Period (as defined in the TSA) provides sufficient time for the parties to have access to the information and processes they need to allow for a seamless separation of the Recovery Solutions Business from the Corrections Business.

20. Further, I believe that the financial aspects of the TSA are fair and reasonable. The Debtors, the Recovery Solutions Stalking Horse Bidder, and their respective advisors engaged in extensive negotiations over the terms governing the payment of fees and reimbursement of expenses. The final terms reflected in the TSA both (a) ensure the remaining Debtors' estates are not financially worse off by performing their obligations under the TSA and (b) allow the Recovery Solutions Stalking Horse Bidder to focus on continuing to provide critical care to patients by preserving relationships with existing vendors and service providers.

### B. The Working Capital Adjustment Mechanism

21. The working capital adjustment mechanism in the Recovery Solutions Stalking Horse Agreement is also fair and reasonable. Those provisions were extensively negotiated by the Recovery Solutions Stalking Horse Bidder, the Debtors, and their respective advisors. They also reflect the parties' intent to position the Recovery Solutions Business to function as a standalone business by accurately reflecting the changes in working capital that are attributable to the Recovery Solutions Business.

22. For these reasons, I believe that the TSA and working capital adjustment provisions are necessary, were negotiated at arm's-length and in good faith, and are fair and reasonable.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: January 8, 2025        */s/ Timothy J. Dragelin*
                              Name: Timothy J. Dragelin
                              Title: Chief Restructuring Officer and
                                     Chief Financial Officer