

# EXHIBIT A
## (Second Amended Complaint)

MAJ000001

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD LEON MAJOR,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. EDWARDS, JAMES OCHS, PAUL ENNIS, MICHAEL CLARK, ADAM SHADE, SETH ERICKSON, WILLIAM NICHOLSON, NICHOLAS OHRMAN, MICHAEL HERBIK, JAMES BRIGHT, KEITH MATIYASIC, DANIEL CARNS, LAUREL R. HARRY,<br><br>Defendants. | Case No. 1:21-CV-00068-SPB-RAL<br><br>Hon. Susan Paradise Baxter<br><br>Hon. Richard A. Lanzillo<br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Edward Leon Major ("Plaintiff" or "Major"), by and through his undersigned counsel, respectfully files the following Second Amended Complaint and states as follows:

## INTRODUCTION

1.      This action, brought under 42 U.S.C. § 1983, arises out of the continuing violation of Major's Eighth Amendment right to receive adequate medical care and be free from the excessive use of force, as well as unlawful retaliation in violation of Major's First Amendment right to file grievances, committed by various individuals employed by the Pennsylvania Department of Corrections ("PA DOC").

2.      Defendants' actions have caused, and continue to cause, Major to suffer severe physical harm, including heart attacks, debilitating chest pains, permanent kidney damage, and internal bleeding.

1

MAJ000002

## PARTIES

3.      **Plaintiff, Edward Leon Major**, is, and has been at all relevant times, a PA DOC inmate. Major is currently incarcerated at the State Correctional Institute at Frackville ("SCI-Frackville"), located at 111 Altamont Blvd., Frackville, PA 17931.

4.      Upon information and belief, at all relevant times, **Defendant Michael J. Edwards** ("Edwards") was employed by PA DOC as a Registered Nurse Supervisor at SCI-Albion.

5.      Upon information and belief, at all relevant times, **Defendant James Ochs** ("Ochs") was employed by PA DOC as a Lieutenant at SCI-Albion.

6.      Upon information and belief, at all relevant times, **Defendant Paul Ennis** ("Ennis") was employed by PA DOC as a Deputy Superintendent at SCI-Albion.

7.      Upon information and belief, at all relevant times, **Defendant Michael Clark** ("Clark") was employed by PA DOC as a Superintendent at SCI-Albion.

8.      Upon information and belief, at all relevant times, **Defendant Adam Shade** was employed by the PA DOC as a Corrections Officer at SCI-Albion.

9.      Defendants Edwards, Ochs, Ennis, Clark, and Shade are collectively referred to hereafter as the "SCI-Albion Defendants."

10.     Upon information and belief, at all relevant times, **Defendant Seth Erickson** ("Erickson") was employed by PA DOC as a Unit Manager at the State Correctional Institute at Fayette ("SCI-Fayette"), located at 50 Overlook Dr., La Belle, PA 15450.

11.     Upon information and belief, at all relevant times, **Defendant William Nicholson** ("Nicholson") was employed by PA DOC as a Health Care Administrator at the State Correctional Institute at Greene ("SCI-Greene"), located at 169 Progress Dr., Waynesburg, PA 15370.

MAJ000003

12.     Upon information and belief, at all relevant times, **Defendant Nicholas Ohrman** was employed by PA DOC at SCI-Fayette.

13.     Upon information and belief, at all relevant times, **Defendant Michael Herbik** was employed by PA DOC as the Director of Healthcare at SCI-Fayette.

14.     Upon information and belief, at all relevant times, **Defendant James Bright** was employed by PA DOC as a Healthcare Administrator at SCI-Fayette.

15.     Upon information and belief, at all relevant times, **Defendant Keith Matiyasic** was employed by PA DOC as a Corrections Officer at SCI-Fayette.

16.     Upon information and belief, at all relevant times, **Defendant Corrections Officer Carns** was employed by the PA DOC as a Corrections Officer at SCI-Fayette.

17.     Defendants Erickson, Ohrman, Herbik, Bright, Matiyasic, and Carns are collectively referred to hereafter as the "SCI-Fayette Defendants."

18.     Upon information and belief, **Defendant Laurel R. Harry** is the acting Secretary of the PA DOC.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Major alleges violations of his constitutional rights under 42 U.S.C. § 1983.

20.     Venue is proper under 28 U.S.C. § 1391(b), as the events giving rise to Major's claims occurred at SCI-Albion, SCI-Fayette, and SCI-Greene, which are all PA DOC facilities located in the Western District of Pennsylvania.

## FACTS

21.     Since at least 2017, Major has been continuously deprived of his constitutional rights while housed as an inmate at SCI-Albion, SCI-Greene, and SCI-Fayette.

3

22.     Major has been deprived of adequate medical care, subjected to excessive use of force that exacerbated his chronic medical conditions, and targeted by retaliation for exercising his right to freely express grievances related to the unconstitutional treatment he has received.

*DOC Personnel Misdiagnose Major's Heart Attack and Fail to Provide Proper Treatment*

23.     On May 7, 2017, while housed at SCI-Albion, Major began to experience severe chest pains while in his cell.

24.     Major immediately notified prison staff and requested medical attention.

25.     Major received permission to go to the prison infirmary, but he did not receive any assistance from prison officials in getting there. As a result, Major struggled to walk to the infirmary, often needing to stop to catch his breath and crawl on his hands and knees due to the intense pain he was experiencing.

26.     Upon arriving at the infirmary, Major was treated by Dr. Rekha Halligan, a physician employed by the PA DOC. Major reported to Dr. Halligan that he was experiencing severe chest pains, lockjaw, and nausea, and that he felt cold while still profusely sweating.

27.     Dr. Halligan performed a cursory, inadequate examination of Major and, despite Major's complaints of crippling chest pain, concluded that his only ailment was severe dehydration. Dr. Halligan ordered that he receive an intravenous drip recovery.

28.     Dr. Halligan did not perform any tests to assess the condition of Major's heart.

29.     Dr. Halligan also did not perform any blood tests on Major at the time of his examination. Upon information and belief, however, Dr. Halligan later modified her examination report to indicate elevated calcium levels in Major's blood, which can impair both kidney and heart functions, despite having failed to perform any blood tests while Major was in the infirmary.

MAJ000005

30.     Major remained in the infirmary for three days after Dr. Halligan's examination. He continually reported experiencing severe chest pains, but his pleas for further assistance went unanswered.

31.     On May 10, 2017, the day Major was scheduled to be released from the infirmary, Dr. Halligan followed up with Major. Although Major again complained of significant pain in his chest, Dr. Halligan merely responded with words to the effect of "well at least you look better" and told Major to "drink lots of water."

32.     After Dr. Halligan left, a nurse in the infirmary approached Major and responded to his complaints by taking him to receive an electrocardiogram test (commonly known as an EKG test), which confirmed that Major was having a heart attack. Upon information and belief, Major had been experiencing repeated heart attacks over the course of his three days in the infirmary, while receiving no tests, diagnosis, or treatment from Dr. Halligan or any other infirmary personnel.

33.     Major was then immediately taken by ambulance to UPMC Hamot in Erie, PA, where he underwent emergency surgery to place a stent in his right coronary artery, which was 100 percent blocked. A true and correct copy of Major's UPMC Hamot medical report is attached hereto as Exhibit 1.

34.     On or about May 12, 2017, while bedridden at UPMC Hamot, Major's treating surgeon, Dr. Quentin Orlando, expressed surprise that a heart condition as severe as Major's was not diagnosed prior to his admission to the hospital.

35.     According to Dr. Orlando, Major also had severe kidney damage that was likely caused by years of taking prescribed medications for acid reflux such as omeprazole, ranitidine, and famotidine without health checks from prison physicians.

MAJ000006

36.    To address Major's serious heart condition, Dr. Orlando recommended that Major be prescribed aspirin, atorvastatin, nitroglycerin pills, and a heart-healthy diet.

37.    Because nitroglycerin pills, which primarily are used to relieve chest pain, are taken at the onset of symptoms, they are typically taken as needed, rather than at a specific time of day.

38.    Dr. Orlando also recommended a one-year prescription of blood thinners to prevent clotting.

39.    On May 12, 2017, Major returned to SCI-Albion. A true and correct copy of the discharge instructions received by Major is attached hereto as Exhibit 2.

40.    Upon his return to SCI-Albion, Major requested access to his nitroglycerin pills, but Dr. Halligan refused to provide the pills until she consulted with a PA DOC cardiologist.

41.    The PA DOC cardiologist, who did not see Major until May 23, 2017, reaffirmed Dr. Orlando's recommended prescription for nitroglycerin pills and a heart-healthy diet.

42.    However, Major *still* did not receive his prescribed heart medication until SCI-Albion's medical director approved of the recommendations on May 31, 2017 – more than *two weeks* after Dr. Orlando ordered that Major be provided with the medication.

43.    The PA DOC cardiologist also recommended that Major be issued an oleoresin capsicum ("O/C") spray alert medical card. These cards typically are issued to inmates to alert prison staff that they suffer from an underlying health condition that would be exacerbated by exposure to O/C spray, also known as pepper spray.

44.    Exposure to O/C spray is extremely dangerous for those, like Major, who suffer from chronic heart conditions. Exposure to O/C spray has been shown to cause sudden spikes in blood pressure that significantly increase a person's risk for stroke or heart attack.

MAJ000007

45.     Even once the nitroglycerin pills received final approval, Major did not actually receive them for another several weeks.

46.     On May 23, 2017, Major filed a grievance related to the prison's failure to provide him with his prescribed medication.

47.     Defendant Edwards reviewed and rejected Major's grievance on grounds that the medical director, by that time, had ordered Major's prescriptions, but this ignored the fact that Major's access to his prescription medication had been delayed by several weeks. A true and correct copy of Defendant Edwards' response to Major's grievance is attached hereto as Exhibit 3.

48.     Around this same timeframe, Major wrote at least seven inmate request slips to Defendant Clark relating to the prison's failure to provide Major with heart-healthy meal accommodations.

49.     Defendant Edwards, again, dismissed Major's grievance, stating that the Department of Corrections' dietitian "listed [the] standard diet as heart healthy" and that Major's request was denied. *See* Ex. 3.

50.     Upon information and belief, the standard inmate diet provided by PA DOC is wholly inadequate for inmates requiring heart-healthy meals, and largely consists of unhealthy, highly processed foods with little nutritional value.

*Inadequate PA DOC O/C Spray Policies*

51.     The PA DOC maintains a written use-of-force policy that requires PA DOC personnel to use the least amount of force reasonably believed to be necessary. *See* DC-ADM 201, Use of Force Policy, attached hereto as Exhibit 13, at III.B.

MAJ000008

52.     The PA DOC use-of-force policy explicitly states that "[d]eadly force against an inmate is authorized only when the acting staff member reasonably believes such force is necessary, and that a lesser degree of force would be ineffective or insufficient. . ." *Id*. at III.E.

53.     For inmates who are not medically vulnerable, O/C spray is classified as the second lowest amount of force on the PA DOC "Force Continuum," which ranks various uses of force on a continuum from non-deadly to deadly force. *Id*. at p.10.

54.     However, exposure to O/C spray can be especially harmful, even fatal to inmates with chronic medical conditions.

55.     Therefore, when a medically vulnerable inmate is exposed to O/C spray, the use of O/C spray intensifies from a lesser, non-deadly force to a potentially deadly force in situations where deadly force is not permissible under PA DOC policy.

56.     The PA DOC recognizes the potentially harmful effects of O/C spray and requires that correctional officers contact the Medical Department to determine if there are any medical reasons that preclude the use of OC prior to a planned use of force.

57.     The PA DOC does not have a policy or procedure in place to determine if an inmate is medically cleared for exposure to O/C spray prior to an unplanned use of force.

58.     The PA DOC does not have a policy or procedure in place to determine if nearby inmates, who will likely come into contact with residual O/C spray, are medically cleared for exposure to O/C spray prior to a planned or unplanned use of force on another inmate.

59.     The PA DOC does not have a policy or procedure in place to ensure that an inmate who is not medically cleared for exposure to O/C spray, but is nevertheless exposed to O/C spray, receives adequate medical examination, observation, and care following O/C spray exposure.

MAJ000009

60.     As a result, an inmate who has not been cleared by the Medical Department for exposure to O/C spray is effectively cleared for any unplanned use of O/C spray or secondhand exposure to O/C spray despite their chronic medical condition.

61.     Upon information and belief, the PA DOC pledged to reform its trainings and protocols for the use of O/C spray following the O/C spray-related death of an inmate in 2019.

Upon information and belief, the PA DOC has not significantly updated the policies, procedures and trainings related to the use of O/C spray since 2017. *Major Subjected to Excessive Use of Force*

62.     On February 24, 2019, after nearly two years of taking medication for a known, severe heart condition, Major became involved in an altercation with a PA DOC officer while waiting in the medication line. After the altercation had ended, and while Major was already restrained in handcuffs and lying face-down on the ground in the lobby for the medication line, Defendant Shade was ordered to spray Major in the face with O/C spray. *See* true and correct copies of Major's grievances dated March 10 and March 15, 2019, attached hereto as Exhibits 4 and 5.

63.     Major immediately notified Defendant Shade of his severe, chronic heart condition, that O/C spray would be detrimental to his health, and that he was not supposed to receive O/C spray according to the PA DOC cardiologist.

64.     Defendant Shade, however, ignored Major's pleas and sprayed Major directly in the face with O/C spray.

65.     After being sprayed, Major had trouble breathing and was transferred to the infirmary, where he received a basic eye rinse.

MAJ000010

66.    Upon information and belief, infirmary staff confiscated Major's nitroglycerin pills, and/or would not provide Major with his pills, at the direction of Defendant Shade.

67.    When Major pleaded for his nitroglycerin pills, Defendant Shade callously refused, saying words to the effect of "stop bitching, fuck your nitro, if you die then it's on you, not me. I don't give a damn about your medication."

68.    By directing infirmary staff to confiscate and deprive Major of his medically needed pills, Defendant Shade knew or should have known that prison medical staff were not providing Major with adequate medical care.

69.    The infirmary staff did not immediately check Major's medical records for O/C spray contraindication, despite Major's constant complaints of chest pain and shortness of breath, and did not provide Major with his prescribed nitroglycerin pills.

70.    After leaving the infirmary, Major was then turned over to Defendant Ochs for transfer to the Restricted Housing Unit ("RHU").

71.    Despite Major's repeated statements that he suffers from a severe, chronic heart condition that is exacerbated by the presence of O/C spray, Defendant Ochs placed Major on a shower restriction that forced Major to suffer with O/C spray on his face for more than 24 hours. *See* a true and correct copy of Major's grievances dated March 15 and 25, 2019, attached hereto as Exhibit 6.

72.    Over the next several days, after he was sprayed, Major again experienced chest pain; discomfort in both arms; numbness in his left hand; pain in his back, neck and jaw; shortness of breath; and nausea.

73.    On March 6, 2019, a nurse performed an examination through Major's cell door, at which time he again listed his symptoms.

10

74.     At the time of the examination, Major still had not received his nitroglycerin pills, which he expressed to the nurse.

75.     In spite of his severe symptoms, which were reminiscent of the symptoms he experienced when he suffered a heart attack nearly two years earlier, Major did not receive his nitroglycerin pills.

76.     Major repeatedly complained in grievances about not having his nitroglycerin pills, despite experiencing increased chest pains, and about his requests medical assistance being ignored. *See* Exhibits 4 and 5.

77.     Major filed additional grievances on March 15 and 25, 2019, related to the fact that he was sprayed and denied an opportunity to wash the O/C spray off his face for more than 24 hours. *See* Exhibit 6.

78.     In light of the obviously deliberate indifference to Major's severe, chronic condition, Major requested that he be seen by an outside physician.

79.     On March 29, 2019, Defendant Edwards rejected Major's request, indicating that Major would receive his nitroglycerin pills "[i]f the nurse feels you need [them]," even though Major had *not* received any nitroglycerin pills to alleviate the severe symptoms he repeatedly complained of. A true and correct copy of Defendant Edwards' response is attached hereto as Exhibit 7.

80.     Between March 2019 and December 2019, Major began a letter-writing campaign seeking the assistance of counsel, and even Governor Tom Wolf, to address the deliberate indifference the SCI-Albion Defendants demonstrated toward Major's chronic heart condition, and sought help in filing a civil rights action against both the SCI-Albion Defendants and Dr. Halligan

MAJ000012

for their blatant deprivation of Major's constitutional rights. True and correct copies of those letters are attached hereto as Exhibit 8.

81.     Upon information and belief, the SCI-Albion Defendants were each aware of Major's heart condition, grievances related to the inadequate medical attention he received, and his efforts to bring a civil rights action against them.

82.     In fact, in March 2019, Major's first draft of a civil rights complaint had been confiscated and sent back as "contraband." Major was informed that he was not allowed to bring his legal action unless he received permission from Defendant Clark.

83.     Upon information and belief, Defendant Clark instructed another corrections officer to destroy the complaint to avoid its filing.

*SCI-Albion Transfers Major to SCI-Fayette*

84.     In or around August 2019, in the midst of Major's efforts to pursue his grievances against the SCI-Albion Defendants in the courts, SCI-Albion transferred Major to SCI-Fayette, which was deemed, without explanation, a "disciplinary transfer."

85.     Defendants Ennis and Erickson placed Major in the SCI-Fayette RHU, purportedly for unspecified "problematic behavior," although Major had not exhibited any behavior that could be characterized as problematic—whatever that phrase means—during his time in SCI-Albion's RHU.

86.     Additionally, Defendant Ennis arbitrarily placed Major into a "step-down unit," over which Defendant Erickson served as Program Unit Manager at SCI-Fayette.

87.     While Major was housed in the step-down unit, Defendant Erickson routinely denied Major adequate medical care despite Major's multiple requests for assistance.

MAJ000013

88.     While at SCI-Fayette, corrections officers frequently and arbitrarily harassed Major, including Defendant Ohrman.

89.     On August 27, 2019, two corrections officers, including Defendant Ohrman, frivolously called Major out of the shower line, placed him back into his cell, ordered him to strip down, and handcuffed him. By the time the officers released Major and returned him, the permitted shower time was over. A true and correct copy of the grievance Major submitted related to this incident is attached hereto as Exhibit 9.

90.     Major filed a Prison Rape Elimination Act ("PREA") Complaint against Defendant Ohrman based on this incident. A true and correct report showing the prison's receipt of that PREA Complaint is attached hereto as Exhibit 10.

91.     Ultimately, Major agreed to the dismissal of his PREA Complaint after receiving assurance from another officer, Lt. Fisher, that Lt. Fisher would keep Ohrman away from Major. Ohrman, however, continued to harass Major after Major was transferred out of, and back into, SCI-Fayette.

*SCI-Fayette Transfers Major to SCI-Greene*

92.     In June 2020, Major was transferred, again without adequate explanation, to SCI-Greene.

93.     With each transfer, Major's attempts to pursue his legal actions against the SCI-Albion Defendants and SCI-Fayette Defendants were disrupted and Major would be forced to suffer through lengthy delays in obtaining his prescription medication and O/C spray alert card.

94.     By the time Major was housed at SCI-Greene, he had a well-documented, three-year history of suffering from a severe, chronic heart condition that required ongoing care, ready

MAJ000014

access to nitroglycerin pills, at least two EKG tests, and protection from O/C spray through an alert card.

95.     Failure to provide Major with this needed and medically approved care necessarily placed Major in extreme risk of suffering another heart attack.

96.     Upon information and belief, Defendant Nicholson, the healthcare administrator at SCI-Greene, was fully aware of Major's medical condition and history, and the proper and adequate care that Major required, and that had been approved for Major for more than three years.

97.     Yet despite his knowledge, Defendant Nicholson continued the ongoing deliberate indifference to Major's medical needs that had been continuously demonstrated at SCI-Albion and SCI-Fayette.

98.     Upon information and belief, Defendant Nicholson is responsible for approving prescription orders.

99.     Major made repeated requests to nurses at SCI-Greene for his nitroglycerin pills to alleviate his chest pain.

100.     Defendant Nicholson, however, refused to approve the prescription and deprived Major of his nitroglycerin pills for *an entire year*, causing Major to suffer severe chest pains without relief and putting him at risk for another heart attack.

101.     In fact, Defendant Nicholson only approved Major's prescription and allowed Major to receive his prescription medication after Major sought the assistance of the Court and Defendants' counsel.

102.     Further, while Major did, eventually, receive his nitroglycerin pills, Defendant Nicholson never granted Major an O/C spray alert card.

14

103.    Upon information and belief, Defendant Nicholson was fully aware of the necessity of granting Major an O/C spray alert card, as a crucial measure to prevent a potentially serious medical reaction to O/C spray.

104.    Regardless, Defendant Nicholson remained deliberately indifferent to the heightened risk that Major faced without an alert card and refused to issue one. While Major was fortunate not to have been sprayed while at SCI-Greene, the harm and deprivation of Major's constitutional rights had already been done.

105.    On or around December 28, 2020, Major again drafted and filed a civil rights action against Dr. Halligan, the SCI-Albion Defendants, the SCI-Fayette Defendants, and Defendant Nicholson, which eventually served to initiate this action on January 28, 2021. *See* ECF No. 6.

106.    In September 2021, in connection with his efforts to prosecute his civil rights action, Major sought to have his medical booklet and exhibits copied.

107.    On the day that Major was scheduled to pick up his copies, he received only his request slip and cash slip back, but no copies, and no originals.

108.    The librarian told Major that there were no documents attached to his request slip, despite the fact that Major clearly had provided the documents for copying.

109.    In response to his medical booklet and the exhibits to his civil rights action suddenly disappearing, Major filed grievances on September 17 and September 20, 2021. True and correct copies of Major's September 17 and 20, 2021, grievances are attached hereto as Exhibit 11.

*SCI-Greene Transfers Major Back to SCI-Fayette*

110.    Within a week of Major's second grievance, and before even receiving a response to his grievances, SCI-Greene transferred Major back to SCI-Fayette, and assigned him to the gang unit without incident, further placing his life in danger.

15

MAJ000016

*Major Again Exposed to O/C Spray Despite His Medical Condition*

111.    By late 2021, the SCI-Fayette Defendants were fully aware of Major's medical condition and his prevention measures—nitroglycerin pills, a heart-healthy diet, and an O/C spray alert card—that had been approved more than four years earlier.

112.    Despite their knowledge, however, the SCI-Fayette Defendants continued to show deliberate indifference toward Major's medical needs.

113.    Defendants Herbik and Bright refused to provide Major with his nitroglycerin pills until after Major, once again, sought the assistance of the Court and counsel for Defendants. *See* ECF No. 50.

114.    The SCI-Fayette Defendants, in other words, were fully aware and knew that Major required his medication, but deliberately refused to provide them until required to do so through legal channels.

115.    On November 4, 2021, an inmate in the cell next to Major was reprimanded for covering a light in his cell.

116.    After the inmate refused to obey orders, the officers, including Defendant Matiyasic, threatened to spray the inmate with O/C spray.

117.    Major immediately communicated to Defendant Matiyasic that he could not be exposed to O/C spray due to his heart condition.

118.    Despite Major's pleas, Defendant Matiyasic sprayed O/C spray into the neighboring cell, which ultimately flowed into Major's cell through the vents. True and correct copies of Major's grievances dated November 4 and 5, 2021, are attached hereto as Exhibit 12.

119.    Major immediately began to experience worsening symptoms, starting with a cough, runny nose, and watery eyes, and progressing until Major began vomiting blood, feeling

MAJ000017

light-headed, and experiencing chest constrictions. He took two nitroglycerin pills to alleviate the pain in his chest and pressed the cell call button for assistance.

120.    In responding to Major's pleas for help, the officer on duty mocked Major and denied him medical assistance.

121.    Major continued to seek assistance by pressing the cell call button multiple times and by pleading with a chaplain and officers, including Defendant Carns, who passed by his cell, informing them that he was vomiting blood and needed help. Defendant Carns represented to Major that a nurse would be around to check on his condition, but no nurse arrived and Major received no medical assistance until the following day.

122.    The next day, a nurse arrived at Major's cell to check on his condition.

123.    Upon information and belief, the nurse performed a cursory check on Major, only checking his blood pressure before determining that he was "alright" despite his complaints of bloody vomit.

124.    During that check, the nurse represented to Major that nobody—including Defendant Carns—had ever told medical staff about his request for assistance the previous day.

125.    In March 2022, Major again experienced bloody vomit, but this time his symptoms worsened to include blood in his stool, shortness of breath, and painful coughing.

126.    Major continually sought medical assistance to address these serious symptoms, but prison officials routinely ignored his requests for assistance, including Defendant Ohrman, against whom Major had filed the PREA Complaint in 2019, and who had harassed and retaliated against Major in the past.

127.    After constantly seeking assistance, Major finally was provided a hematoma test, which confirmed that Major was suffering from internal bleeding.

17

128.     On April 16, 2022, Major sent a letter to the Pennsylvania Department of Corrections about the inadequate medical care he was receiving at SCI-Fayette.

129.     Four days later, and after weeks of internal bleeding, Major was taken to UPMC Hamot.

130.     Major's physician at UPMC Hamot determined that his internal bleeding likely resulted from the prison dispensing blood thinners to Major for four years longer than was recommended.

131.     Despite the mounting evidence of medically inadequate care, including hospitalization for internal bleeding caused by years of the deliberately indifferent administration of prescription medication, Defendants Herbik and Bright determined Major's medical care at SCI-Fayette was medically appropriate.

## COUNT ONE
## EXCESSIVE USE OF FORCE
## IN VIOLATION OF THE EIGHTH AMENDMENT
## OF THE UNITED STATES CONSTITUTION UNDER 42 U.S.C. § 1983
### Defendant Shade

132.     Major repeats and realleges the allegations set forth in paragraphs 1 through 131 as if fully set forth and restated herein.

133.     42 U.S.C. § 1983 provides an action in law and equity against anyone who under color of state law deprives another of rights secured by the Constitution and laws.

134.     Major has a constitutional right to be free from cruel and unusual punishment, which includes the right to be free from the use of excessive force.

135.     While Major was in the custody and care of PA DOC, Defendant Shade caused Major to be sprayed with O/C spray, despite the fact that Major was already handcuffed and lying face-down on the ground, thereby posing no threat to officers.

MAJ000019

136.   Major informed Defendant Shade that he suffered from a chronic heart condition that would be exacerbated by exposure to O/C spray.

137.   Defendant Shade, however, caused Major to be sprayed with O/C spray directly in the face while Major was still subdued, thereby inflicting unnecessary and wanton pain.

138.   Defendant Shade then arbitrarily directed infirmary staff to deprive Major of his nitroglycerin pills.

139.   As a result of Defendant Shade's malicious and sadistic actions, Major suffered burning skin, excruciating chest pains, and an inability to breathe.

140.   Major is entitled to compensation for such injuries pursuant to 42 U.S.C. § 1983 in an amount to be proven at trial.

### COUNT TWO
### DELIBERATE INDIFFERENCE TO MAJOR'S SERIOUS MEDICAL NEEDS IN VIOLATION OF THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION UNDER 42 U.S.C. § 1983
#### Defendants Edwards, Nicholson, Herbik, and Bright

141.   Major repeats and realleges the allegations set forth in paragraphs 1 through 140 as if fully set forth and restated herein.

142.   42 U.S.C. § 1983 provides an action in law and equity against anyone who under color of state law deprives another of rights secured by the Constitution and laws.

143.   Major has a constitutional right to be free from cruel and unusual punishment, which includes the right to be free from deliberate indifference to his serious medical needs, and the unnecessary and wanton infliction of pain while incarcerated in a facility operated by PA DOC.

144.   Defendants Edwards, Nicholson, Herbik, and Bright all were, at all relevant times, medical professionals employed by PA DOC.

MAJ000020

145.     While he was in the custody and care of PA DOC, Major routinely informed Defendants Edwards, Nicholson, Herbik, and Bright, or they were otherwise fully aware, that Major had a medical condition requiring ongoing access to medication, a heart-healthy diet, and protection from O/C spray.

146.     Despite this knowledge, Defendants Edwards, Nicholson, Herbik, and Bright showed deliberate indifference to Major's medical needs that put him at severe risk of additional injury.

147.     Defendants Edwards, Nicholson, Herbik, and Bright regularly deprived Major of his constitutional rights under the Eighth Amendment through conduct including, but not limited to:

     a.     Failing to adequately examine Major and attend to his complaints of chest pain;

     b.     Failing to timely diagnose that Major was having a massive heart attack;

     c.     Failing to provide timely access to medically required medication; and

     d.     Failing to ensure that Major received an O/C spray alert cart to protect him from the medical consequences of being exposed to O/C spray.

148.     Defendants, as a direct and proximate result of their deliberate indifference to Major's medical needs, caused Major to suffer heart attacks, severe chronic chest pain, permanent kidney damage, and internal bleeding while in their custody and care.

149.     Major is entitled to compensation for such injuries pursuant to 42 U.S.C. § 1983 in an amount to be proven at trial.

MAJ000021

**COUNT THREE**
**DELIBERATE INDIFFERENCE TO MAJOR'S SERIOUS MEDICAL NEEDS**
**IN VIOLATION OF THE EIGHTH AMENDMENT**
**OF THE UNITED STATES CONSTITUTION UNDER 42 U.S.C. § 1983**
**Defendants Ochs, Clark, Matiyasic, Shade, and Carns**

150.   Major repeats and realleges the allegations set forth in paragraphs 1 through 149 as if fully set forth and restated herein.

151.   42 U.S.C. § 1983 provides an action in law and equity against anyone who under color of state law deprives another of rights secured by the Constitution and laws.

152.   Major has a constitutional right to be free from cruel and unusual punishment, which includes the right to be free from deliberate indifference to his serious medical needs, and the unnecessary and wanton infliction of pain while incarcerated in a facility operated by PA DOC.

153.   Defendants Ochs, Clark, Matiyasic, Shade, and Carns all were, at all relevant times, correctional employees of PA DOC.

154.   While he was in the custody and care of PA DOC, Major routinely informed Defendants Ochs, Clark, Matiyasic, Shade, and Carns, or they were otherwise fully aware, that Major had a medical condition requiring ongoing access to medication, a heart-healthy diet, and protection from O/C spray.

155.   Despite this knowledge, Defendants Ochs, Clark, Matiyasic, Shade, and Carns showed deliberate indifference to Major's medical needs and put him at severe risk of additional injury.

156.   Defendants Ochs, Clark, Matiyasic, Shade, and Carns regularly deprived Major of his constitutional rights under the Eighth Amendment through conduct including, but not limited to:

MAJ000022

a.      Failing to notify medical personnel of Major's complaints about physical pain and requests to see a nurse;

b.      Refusing to provide Major with medically necessary medications;

c.      Ordering medical personnel to confiscate and refusing to provide Major's medication;

d.      Repeatedly exposing Major, directly or indirectly, to O/C spray; and

e.      Depriving Major of an opportunity to adequately clean O/C spray off his face, despite the severe medical consequences that O/C spray causes him.

157.    Defendants, as a direct and proximate result of their deliberate indifference to Major's medical needs, caused Major to suffer heart attacks, severe chronic chest pain, permanent kidney damage, and internal bleeding while in their custody and care.

158.    Major is entitled to compensation for such injuries pursuant to 42 U.S.C. § 1983 in an amount to be proven at trial.

**COUNT FOUR**
**RETALIATION**
**IN VIOLATION OF THE FIRST AMENDMENT**
**OF THE UNITED STATES CONSTITUTION UNDER 42 U.S.C. § 1983**
**Defendants Clark, Ennis, Erickson, and Ohrman**

159.    Major repeats and realleges the allegations set forth in paragraphs 1 through 158 as if fully set forth and restated herein.

160.    42 U.S.C. § 1983 provides an action in law and equity against anyone who under color of state law deprives another of rights secured by the Constitution and laws.

161.    Major has a constitutional right under the First Amendment to freely speak and seek redress of his grievances concerning misconduct of PA DOC employees.

MAJ000023

162.    Major is free to express and seek redress for his grievances through the grievance procedure established by PA DOC, as well as through legal action in the courts.

163.    Defendants Clark, Ennis, Erickson, and Ohrman harassed and retaliated against Major when he filed grievances and pursued legal action through conduct including, but not limited to:

  a.    Obstructing Major's ability to contact counsel regarding Major's civil rights action;

  b.    Ordering the destruction of Major's draft civil rights complaint and telling Major he could not file a complaint "without permission";

  c.    Destroying, or otherwise confiscating, Major's medical booklet and exhibits to Major's civil rights complaint;

  d.    Repeatedly and suddenly transferring Major between prisons, further disrupting Major's ability to seek redress for his grievances and hindering his ability to obtain his medication; and

  e.    Placing Major in restricting housing without justification and while grievances were pending investigation.

164.    The adverse actions inflicted upon Major by Defendants Clark, Ennis, Erickson, and Ohrman are sufficiently close in temporal proximity to Major's filing of grievances and a civil rights action to give a strong inference of causal connection.

165.    Defendants, as a direct and proximate result of their wrongful conduct, have prevented Major from participating in a constitutionally protected activity.

166.    Major is entitled to compensation for such injuries pursuant to 42 U.S.C. § 1983 in an amount to be proven at trial.

MAJ000024

**COUNT FIVE**
**DELIBERATE INDIFFERENCE TO MAJOR'S SERIOUS MEDICAL NEEDS**
**IN VIOLATION OF THE EIGHTH AMENDMENT**
**OF THE UNITED STATES CONSTITUTION UNDER 42 U.S.C. § 1983**
**Defendant Harry**

167. Major repeats and realleges the allegations set forth in paragraphs 1 through 166 as if fully set forth and restated herein.

168. 42 U.S.C. § 1983 provides an action in law and equity against anyone who under color of state law deprives another of rights secured by the Constitution and laws.

169. Inmates in PA DOC custody, including Major, have a constitutional right to be free from cruel and unusual punishment, which includes the right to be free from deliberate indifference to serious medical needs, and the unnecessary and wanton infliction of pain while incarcerated in a facility operated by PA DOC.

170. Defendant Harry is the current Secretary of the PA DOC.

171. The PA DOC policies recognize the need to protect certain medically vulnerable inmates like Major from exposure to O/C spray.

172. The PA DOC policies also recognize the need to limit the use of deadly force to situations where deadly force is absolutely necessary.

173. Major is a medically vulnerable inmate who has been contraindicated to O/C spray since 2017 because of his chronic heart condition.

174. Upon information and belief, on at least one occasion, a medically vulnerable inmate died from exposure to O/C spray.

175. Yet, despite this, Defendant Harry has remained deliberately indifferent to the potentially fatal effects O/C spray may have on a number of inmates in her care in situations that do not necessitate deadly uses of force and has not implemented policies, trainings or procedures

24

to adequately protect medically vulnerable inmates like Major from the unnecessary and wanton infliction of pain that results from their exposure to O/C spray.

176.    As a direct and proximate result of Defendant Harry's deliberate indifference to the medical needs of medically vulnerable inmates like Major, Major is at continuous risk of O/C spray exposure that could cause irreparable injury such as heart attack, severe chronic chest pain, permanent kidney damage, and even death.

177.    As acting Secretary of the PA DOC, Defendant Harry can implement and enforce policies to protect medically vulnerable inmates like Major from potentially fatal O/C exposure.

178.    Without an injunction requiring the PA DOC and Defendant Harry to implement appropriate policies, medically vulnerable inmates, like Major, will continue to be at risk of potentially deadly exposure to O/C spray.

179.    Major is entitled to an injunction pursuant to 42 U.S.C. § 1983 requiring Defendant Harry to implement and enforce appropriate policies that protect inmates who are not medically cleared for O/C spray exposure from direct, unplanned use of O/C spray, as well as indirect exposure to the nearby planned or unplanned use of O/C spray.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Edward Leon Major, requests that this Court enter judgment in his favor and against Defendants as follows:

1.    Adjudge and declare that the aforementioned conduct described in this Amended Complaint are in violation of Major's rights under the First and Eighth Amendments to the United States Constitution.

2.    Enjoin Defendants from subjecting Major to the unlawful conduct described herein.

MAJ000026

3.      Order injunctive relief requiring Defendant Harry to enact PA DOC policies and procedures that protect medically vulnerable inmates from dangerous, fatal O/C spray exposure.

4.      Order further injunctive relief necessary to address the ongoing violations suffered by Major.

5.      Retain jurisdiction of this case until such time as Defendants have fully complied with all orders of the Court, and there is reasonable assurance that the Defendants will continue to comply in the future with these orders.

6.      Award Major compensatory and punitive damages.

7.      Award Major reasonable costs and expenses pursuant to 42 U.S.C. § 1988.

8.      Award Major any such other and further relief as this Court may deem appropriate and just.

MAJ000027

**JURY TRIAL DEMANDED**

Dated: September 20, 2024

Respectfully,

By: ___*/s/ Mary E. Davis*_____
David R. Osipovich (PA ID #306687)
Nicholas N. Chan (PA ID #332046)
Mary E. Davis (PA ID #334440)
**K&L GATES LLP**
210 Sixth Ave.
Pittsburgh, PA 15222
Phone: (412) 355-6578
Fax: (412) 355-6501

david.osipovich@klgates.com
nick.chan@klgates.com
mary.davis@klgates.com

Jonathan R. Vaitl (PA ID #324164)
**K&L GATES LLP**
17th North Second Street, 18th Floor
Harrisburg, PA 17101
Phone: (717) 231-5830
Fax: (717) 231-4501
jon.vaitl@klgates.com

***Attorneys for Plaintiff Edward Major***

27

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies and states that true and correct copies of the Second Amended Complaint were served upon all counsel of record via the Court's electronic filing system on September 20, 2024.

_/s/ Mary E. Davis__

David R. Osipovich (PA ID #306687)
Nicholas N. Chan (PA ID #332046)
Mary E. Davis (PA ID #334440)
**K&L GATES LLP**
210 Sixth Ave.
Pittsburgh, PA 15222
Phone: (412) 355-6578
Fax: (412) 355-6501

david.osipovich@klgates.com
nick.chan@klgates.com
mary.davis@klgates.com

Jonathan R. Vaitl (PA ID #324164)
**K&L GATES LLP**
17th North Second Street, 18th Floor
Harrisburg, PA 17101
Phone: (717) 231-5830
Fax: (717) 231-4501
jon.vaitl@klgates.com

***Attorneys for Plaintiff Edward Major***

28

MAJ000029