**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Case |
| | ) | |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | ) | Case No. 24-90533 (ARP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| _____ | ) | **Hearing: February 18, 2025, 2:00 P.M.** |

**OBJECTION OF COBB COUNTY, GEORGIA, AND COBB**
**COUNTY SHERIFF TO MOTION OF SCOTT ALLEN AND**
**KAREN ALLEN FOR RELIEF FROM AUTOMATIC STAY**
*(Relates to Docket No. 990)*

TO THE HONORABLE ALFREDO R. PÉREZ,
UNITED STATES BANKRUPTCY JUDGE:

Cobb County, Georgia, including the employees thereof (the "County"), and the Cobb County Sheriff, including the employees thereof (the "Sheriff") (collectively, the "Cobb County Parties") file this Objection to the *Motion for Relief From Automatic Stay to Proceed With Litigation* (Docket No. 990) (the "Allen Motion") filed by Scott Allen as Administrator of the Estate of Brady Allen and individually as father of Brady Allen, and Karen Allen individually as mother of Brady Allen (collectively, the "Allen Movants" or the "Allen Plaintiffs"). In support of this Objection, the Cobb County Parties would respectfully show the Court as follows:

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at *https://dm.epiq11.com/Wellpath*. The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

## I. **PRELIMINARY STATEMENT**[2]

1.       The Allen Movants seek to lift the automatic stay in order to proceed with pre-bankruptcy litigation filed in the United States District Court for the Northern District of Georgia ("District Court") against Wellpath, Wellpath employees, and employees of the Sheriff ("Sheriff Defendants"). The Cobb County Parties oppose this relief. Prior to the Debtors' bankruptcy filing, the Allen Movants initiated a lawsuit to assert claims and causes of action in connection with the death of Brady Allen on May 23, 2021, while he was incarcerated in the Cobb County Adult Detention Center. The litigation has been stayed as to all defendants since the commencement of these chapter 11 cases, and the case was administratively closed by the District Court on November 18, 2024.

2.       The Cobb County Parties seek to keep the stay in place, including as to them. In the alternative, if the stay is lifted as to the Cobb County Parties, it should be lifted as to all other co-defendants in the lawsuit, including Wellpath and its employees. The Cobb County Parties should not have to defend the state court lawsuit without the other co-defendants, who would be necessary parties to the action.

3.       As of the filing of this Objection, the Debtors have not filed a response or objection to the Allen Motion. If and when such a response or objection is filed, the Cobb County Parties reserve the right to supplement this Objection in writing or orally at the hearing.

4.       The Sheriff and Wellpath are parties to the Medical Care Agreement, pursuant to which Wellpath and its employees have provided medical and mental health services to persons incarcerated in the Sheriff's custody. The Medical Care Agreement

---

[2] Certain capitalized terms used in this Preliminary Statement are defined below.

grants the County, the Sheriff, and their respective employees a broad right of indemnity against Wellpath for expenses and losses incurred as a result of acts or omissions by Wellpath's employees in the course of providing services under the Medical Care Agreement. The Medical Care Agreement also requires Wellpath to maintain insurance policies protecting against claims arising from Wellpath's performance under the agreement, and requires that such policies include the County, the Sheriff, and their respective employees as additional insureds.

5.      Generally, the automatic stay under § 362 of the Bankruptcy Code does not apply to actions against non-debtors. *See In re Divine Ripe LLC*, 538 B.R. 300, 302 (S.D. Tex. 2015) (citing *In re TXNB Internal Case*, 483 F.3d 292, 301 (5th Cir. 2007)). However, an exception does exist in which extending the stay to non-debtors is appropriate: "[A] bankruptcy court may invoke § 362 to stay proceedings against nonbankrupt co-defendants where 'there is such *identity* between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.'" *Reliant Energy Servs., Inc, v. Enron Canada Corp.*, 349 F.3d 816, 825 (5th Cir. 2003) (italics added) (quoting *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)). A "party seeking to extend the stay will bear the burden to show that '*unusual circumstances'* exist warranting such an extension of the stay to a non-debtor'." *Divine Ripe,* 538 B.R. at 302 (italics added) (quoting William L. Norton Jr., Norton Bankruptcy Law & Practice § 43:4 (3d ed. Supp. 2010)).

6.      Courts in this Circuit recognize the "*unusual circumstance*" exception, in which the automatic stay under § 362 could extend to non-debtor defendants. The exception exists when there is "an actual, as opposed to an alleged or potential *identity of interests,* such that a judgment against the non-bankrupt party would in fact be a judgment against the

bankrupt party." *Divine Ripe,* 538 B.R. at 312 (italics added). Courts, recognizing the exception, have extended the stay when "a formal tie or a contractual indemnification … create an *identity of interests* between the debtor and non-debtor." *Reliant Energy,* 349 F.3d at 825 (italics added) (citing *Arnold v. Garlock, Inc.*, 278 F.3d 426, 436 (5th Cir. 2001)).

7.      In the instant case, an indemnity agreement exists between the Debtor and the Cobb County Parties by virtue of the Medical Care Agreement. Such indemnity creates an identity of interest between the Debtor and the Cobb County Parties, and as such, the exception extending the stay to the Cobb County Parties should apply. A judgment against an indemnitee (i.e., any Cobb County Party) is effectively a judgment against the indemnitor (i.e., Debtor). Where, like here, the indemnitor is a debtor in bankruptcy, not extending the automatic stay to the indemnitee can negate much of the stay's benefit. Recognizing this, the Debtors filed a Motion, on the second day of these cases, requesting that the automatic stay be extended to certain non-debtor parties to whom or to which the Debtors owe a duty of indemnification. The Debtors owe a duty of indemnification to the Cobb County Parties, and as such, the automatic stay is properly extended to the Cobb County Parties and should remain so.

8.      The Court granted the Debtors' motion on an interim basis and, in a subsequent Order, continued the interim extension of the automatic stay through February 18, 2025.

9.      Of course, it is the role of the Debtors, as debtors-in-possession, to assert the interests of the estates, and the Cobb County Parties do not purport to speak for the Debtors or their estates. The limited purpose of this Objection is to underscore for the Court the existence, scope, and effect of the indemnification and insurance requirements in the Medical Care Agreement which are obligations of the Debtors, and the negative impact upon the Debtors' estates that would result if the Court were to lift the automatic stay to

permit the Allen Lawsuit to go forward with respect to the Sheriff Defendants because a judgment against the Sheriff Defendants would in effect be a judgment or finding against the Debtors.

## II. BACKGROUND

**A.     The Medical Care Agreement**

10.     The Sheriff and Wellpath, LLC ("Wellpath"), a debtor and debtor-in-possession in these chapter 11 cases, are parties to an *Agreement for Inmate Medical Care at the Cobb County Adult Detention Center* (as amended and renewed, the "Medical Care Agreement") dated as of April 23, 2020.[3] [4] The Medical Care Agreement has been renewed periodically, most recently in December 2024 to remain in effect through June 30, 2025, as set forth therein.

11.     Pursuant to the Medical Care Agreement, Wellpath contracted to provide medical services at the Cobb County Adult Detention Center (the "CCADC"), including medical treatment, staffing, supplies and pharmaceuticals to inmates at the on-site infirmary at the CCADC. In November 2021, the parties amended the Medical Care Agreement to add comprehensive mental health services to the scope of services provided by Wellpath.

12.     The Medical Care Agreement gives the County, the Sheriff, and their employees, agents, and other representatives a contractual right of indemnity against Wellpath for any losses resulting from the acts or omissions of Wellpath or its employees, agents, contractors or other representatives. Wellpath's indemnity obligation is required to

---

[3] The original Medical Care Agreement was executed by Neil Warren in his official capacity as then-Sheriff of Cobb County, Georgia. The amendments and renewals were executed by Craig Owens in his official capacity as current Sheriff of Cobb County, Georgia.

[4] A true and correct excerpt of the Medical Care Agreement showing the relevant provisions is attached hereto as **Exhibit A**.

be covered by a General Commercial Liability Insurance Policy to be procured by Wellpath.

(Med. Care Agreement § VI.B.i at p. 28.) The Medical Care Agreement provides the

following indemnification provision

> [Wellpath] shall defend, indemnify and hold harmless the
> Sheriff, the County, and the Sheriff and the County's elected
> and appointed officials, officers, boards, commissions,
> employees, representatives, contractors, servants, agents and
> volunteers … from and against any and all claims, suits,
> actions, judgments, injuries, damages, losses, expenses, and
> liability of any kind whatsoever, including but not limited to
> attorneys' fees and other legal expenses, … to the extent
> caused by or resulting from negligence, recklessness, or
> intentionally wrongful conduct by [Wellpath], or any employee,
> servant, agent, subcontractor, or volunteer of [Wellpath] or any
> of its subcontractors.

(Med. Care Agreement § 6.3 at p. 31.) This contractual right of indemnity does not "negate,

abridge or otherwise reduce" any statutory, common law, or other right of contribution or

indemnity that any party may also have. (Med. Care Agreement § 6.3 at p. 31.) Further, the

contractual right of indemnity survives expiration or termination of the Medical Care

Agreement. (Med. Care Agreement § 6.3 at p. 31.)

13.     In addition, the Medical Care Agreement includes specific obligations

regarding insurance that Wellpath is required to maintain. Wellpath is obligated to

> procure and maintain in full force and effect for the duration of
> this Agreement, insurance protecting against claims for injuries
> to persons or damages to property which may arise from or in
> connection with performance of the services hereunder by
> [Wellpath], its agents, representatives, employees, or
> subcontractors.

(Med. Care Agreement art. VI.A. at p. 28.) Further, the County, the Sheriff, and their

employees, agents, and other representatives must be covered as additional insureds for,

among other things, "liability arising out of activities performed by or on behalf of [Wellpath]"

on general liability insurance policies. (Med. Care Agreement art. VI.D. i) at p. 29.)

14.     The indemnification and insurance provisions referenced above have remained in effect and unchanged through all amendments and renewals of the Medical Care Agreement.

**B.     The Allen Lawsuit**

15.     In May 2021, inmate Allen died in the Cobb County Detention Center. On May 17, 2023, the Allen Movants filed a Complaint[5] (the "Complaint") commencing a civil action (the "Allen Lawsuit") in the United States District Court for the Northern District of Georgia, Atlanta Division, Case No. 1:23-cv-02240-AT, against Wellpath, five Wellpath employees, and the Sheriff Defendants as follows:

- Sheriff Craig Owens
- Colonel Temetris Atkins
- Chief Deputy Rhonda Anderson
- Sergeant Lolita Mosely
- Sergeant Kent Vann
- Deputy Gregory Juedes
- Deputy William Gooch
- Deputy Demetrius Jones
- Deputy Deandre Brittingham
- Deputy Jennifer Williams
- Deputy Jessica Vega-Velez
- Calamati Eyvette Long
- Susan Warren
- Ashley Dickson
- Diamond Nyree Perez
- Dania Wilson

(Complaint at p. 1.)

16.     On June 9, 2023, the Sheriff Defendants filed motions to dismiss the Complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) and under the doctrines of qualified immunity and official immunity. (Docket

---

[5] A true and correct copy of the Complaint is attached hereto as **Exhibit B**.

Sheet[6] at p. 14.)

17.     On June 14, 2023, the District Court ordered all discovery stayed pending resolution of the Sheriff Defendants' motions to dismiss. (Docket Sheet at p. 15.)

18.     On February 8, 2024, the District Court granted the parties' joint motion to dismiss the claims against Diamond Nyree Perez and Ashley Dickson without prejudice. (Docket Sheet at p. 17.)

19.     On November 12, 2024, the District Court granted the parties' joint motion to dismiss the claims against Sheriff Owens, Colonel Atkins, and Chief Deputy Anderson without prejudice. (Docket Sheet at p. 20.)

20.     On November 15, 2024, Wellpath filed a Suggestion of Bankruptcy, advising the District Court of the commencement of these chapter 11 cases. (Docket Sheet at p. 20.)

21.     On November 18, 2024, the District Court stayed all pending motions in the Allen Lawsuit and administratively closed the case. (Docket Sheet at p. 20.)

22.     As of February 2, 2025, the docket sheet reflects that the District Court has not ruled on the pending motions to dismiss, discovery continues to be stayed, and no entries have been made on the docket sheet since November 2024. (Docket Sheet at p. 20.)

**C.     The Chapter 11 Cases**

23.     On November 11, 2024, the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.

24.     On November 12, 2024, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders to Enforce the Automatic Stay or in the Alternative Extend the Automatic Stay to Non-Debtor Defendants* (Docket No. 17) (the "Stay Extension

---

[6] A true and copy of the docket sheet in the Allen Lawsuit, retrieved via PACER Systems on February 2, 2025 (the "Docket Sheet"), is attached hereto as **Exhibit C**.

Motion"). In the motion, the Debtors asserted that the Court should extend the automatic stay to certain non-Debtor defendants on the grounds that these parties hold indemnity rights against the Debtors. The indemnity rights create an identity of interest with the Debtors, such that a judgment against one of the non-Debtor defendants is effectively a judgment against the Debtors. (Stay Extension Motion at pp. 12-15.)

25.     On November 12, 2024, the Court entered the *Amended Interim Order Enforcing the Automatic Stay* (Docket No. 69), granting the Stay Extension Motion on an interim basis, with a final hearing set for December 5, 2024.

26.     The December 5 hearing was later reset for December 11, 2024 (Docket No. 261), and again reset for January 14, 2025. (Docket No. 310.)

27.     On January 7, 2025, the Debtors filed the *Debtors' Omnibus Objection to Motions for Relief From the Automatic Stay* (Docket No. 827) (the "Omnibus Objection"). The Debtors were responding to eleven motions for relief from the automatic stay (the "Lift Stay Motions"), in most instances filed by tort claimants who wished to proceed in pre-bankruptcy litigation against the Debtors and non-debtor co-defendants.

28.     In the Omnibus Objection, the Debtors set forth a detailed explanation of their liability insurance structure in the relevant time periods. (Omnibus Obj. at pp. 6-17.) The Debtors summarized the first (primary) layer of coverage as follows:

> [A]ll of the Debtors' primary insurance policies covering the lawsuits underlying **all** of the Lift Stay Motions are fronting policies that establish no true transfer of risk. Accordingly, all damages and defense costs related to the underlying lawsuits are borne solely by the Debtors under such fronting policies.

(Omnibus Obj. at pp. 2-3.) (emphasis in original). The second layer of coverage, described as umbrella coverage, "requires the Debtors to expend millions of dollars per claim before transferring any liability to third-party insurers." (Omnibus Obj. at p. 3.) For the 2021-2022 period, during which the Allen Plaintiffs' claims arose, the Debtors maintained a $3 million

primary fronting policy and a $5 million self-insured retention, essentially leaving the Debtors self-insured to the extent of $8 million per claim.[7]

29.     On January 10, 2025, the Debtors filed the *Debtors' Omnibus Reply in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders to Enforce the Automatic Stay or in the Alternative Extend the Automatic Stay to Non-Debtor Defendants* (Docket No. 897) (the "Omnibus Reply"). In the Omnibus Reply, as in the Stay Extension Motion, the Debtors pointed out that an indemnity obligation by the Debtors to a non-debtor co-defendant creates an identity of interest that justifies extending the automatic stay to the non-debtor co-defendant. (*See* Omnibus Reply at pp. 14-17.)

30.     On January 14, 2025, the Court held a lengthy hearing on the Lift Stay Motions and the Stay Extension Motion. After the hearing, the Court entered the *Stipulated and Agreed Amended Order (I) Enforcing the Automatic Stay on a Final Basis With Respect to Certain Actions, (II) Enforcing the Automatic Stay on an Interim Basis With Respect to Certain Actions, (III) Extending the Automatic Stay on an Interim Basis to Certain Actions Against Non-Debtors, (IV) Setting a Final Hearing for the Interim Relief Granted Herein, and (V) Granting Related Relief* (Docket No. 962) (the "January 14 Order"). Among other relief, the January 14 Order continued the automatic stay on an interim basis to and including February 18, 2025, with respect to "[a]ny claims or causes of action that have been or may be asserted against any of the Debtors' current clients or customers or their current or former employees." (Jan. 14 Order at p. 4.)

31.     The Sheriff is a current client and customer of Wellpath, as evidenced by the

---

[7] *See Declaration of James Seitz as Director of Insurance of Wellpath Holdings, Inc. and Certain of Its Affiliates and Subsidiaries In Support of the Debtors' Omnibus Objection to Motions for Relief From the Automatic Stay and Stay Extension Reply* at pp. 5-6 & Exh. A (Docket No. 828.)

Medical Care Agreement, and as such, the Sheriff and the employees thereof benefit from the stay currently in place. More specifically, by operation of the January 14 Order, the automatic stay, currently in place through February 18, 2025, bars claims and causes of action against the Cobb County Parties in litigation where any Cobb County Parties are co-defendants with any of the Debtors, as is the case in the Allen Lawsuit. Failure to continue the stay as to the Debtors' current clients or customers or their current or former employees negatively impacts the Cobb County Parties, which includes the Sheriff and his employees, as well as the taxpayers of Cobb County. Pursuant to the January 14 Order, "[a]ny claims or causes of action that have been or may be asserted against any of the Debtors' current clients or customer or their current or former employees are stayed on an interim basis to and including February 18, 2025." (Jan. 14 Order at p. 4.) This stay should remain in place beyond February 18, 2025.

32.     On January 16, 2025, the Allen Movants filed the Allen Motion. (Docket No. 990.)

### III. <u>OBJECTION TO THE ALLEN MOTION</u>

**A.     Standard of Law**

33.     Section 362(d)(1) of the Bankruptcy Code provides that a court shall grant relief from the automatic stay only "for cause." 11 U.S.C. § 362(d)(1). "Cause" is not defined in the Bankruptcy Code. However, in deciding whether cause exists for granting relief from the automatic stay to allow prepetition litigation to proceed, courts in this district look at the totality of the circumstances in the case, but may be guided by several factors, including the factors known as the *Sonnax* factors.[8] *In re Xenon Anesthesia of Tex., PLLC*, 510 B.R. 106,

---

[8] The *Sonnax* factors are: (1) whether relief would result in a partial or complete resolution of the issues, (2) the lack of any connection with or interference with the bankruptcy case, (3) whether the other proceeding involves the debtor as a fiduciary, (4) whether a specialized

112 (Bankr. S.D. Tex. 2014) (applying *Sonnax* factors).

34.    The Debtors extensively discussed the *Sonnax* factors in the Omnibus Objection with regard to the Lift Stay Motions. (*See* Omnibus Obj. at pp. 30-40.) The Debtors assert that Movants have not "carried their initial burden of demonstrating a prima facie showing of cause to lift the stay" and that several *Sonnax* factors "weigh against lifting the stay." (Omnibus Obj. at p. 31.) The Cobb County Parties submit that most if not all of the Debtors' analysis of the *Sonnax* factors is equally applicable to the Allen Motion, and thus, weigh against lifting of the automatic stay against the Debtors or against the Cobb County Parties.

35.    A few such *Sonnax* factors are worth highlighting. First, *whether the debtors' insurer has assumed full responsibility for defending the action* weighs against modifying the stay. The Debtors' use of fronting insurance policies and self-insured retentions has left the Debtors, rather than its insurers, as the parties primarily responsible for the expenses and exposed to the risk of loss in any litigation. Second, *whether litigation in another forum would prejudice the interests of other creditors* certainly weighs against modifying the stay. Lifting the stay against the Debtors' current clients or customers or their current or former employees, which would include the Cobb County Parties, would certainly prejudice their

_____

tribunal with the necessary expertise has been established to hear the cause of action, (5) whether the debtor's insurer has assumed full responsibility for defending the action, (6) whether the action primarily involves third parties, (7) whether litigation in another forum would prejudice the interests of other creditors, (8) whether the judgment claim arising from the other action is subject to equitable subordination, (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor, (10) the interests of judicial economy and the expeditious and economical resolution of litigation, (11) whether the parties are ready for trial in the other proceeding, and (12) the impact of the stay on the parties and the balance of harms. *See Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990) (citing *In re Curtis*, 40 B.R. 795, 799-800 (Bankr. D. Utah 1984)).

interests by leaving them alone to litigate without a necessary party. Third and fourth, *the interests of judicial economy and the expeditious and economical resolution of litigation* also weigh against modifying the stay, as does *whether the parties are ready for trial*. As discussed above, the Allen Lawsuit is still in the stage of pretrial motions, and no discovery has been taken. At the time of the Debtors' chapter 11 filing, the District Court had not ruled on the remaining Sheriff Defendants' motions to dismiss. The Allen Lawsuit is nowhere near ready for trial. Accordingly, the factors of judicial economy and trial readiness also weigh against granting the Allen Motion at this time.

**B.    The Debtors Owe a Duty To Indemnify the Sheriff Defendants in the Allen Lawsuit.**

36.    Additionally, Wellpath's indemnity obligation to the Cobb County Parties is a substantial factor weighing against granting the Allen Motion with regard to the Sheriff Defendants. The clear language of the indemnity, quoted above, requires Wellpath to "defend, indemnify and hold harmless the Sheriff, the County, and the Sheriff and the County's … employees … [from harm] to the extent caused by or resulting from negligence, recklessness, or intentionally wrongful conduct by [Wellpath], or any employee, servant, agent, subcontractor, or volunteer of [Wellpath] or any of its subcontractors." (Med. Care Agreement § 6.3 at p. 31.)

37.    In the Complaint, the Plaintiffs allege numerous instances of wrongful conduct on the part of Wellpath or its employees, including the following:

- Wellpath and its employees were contractually obligated to perform a sally port triage (an initial evaluation of an arrestee's medical condition) on Mr. Allen, and they failed to do so. (Complaint at pp. 65-66.)

- A Wellpath employee improperly documented that Mr. Allen refused a medical assessment, when in fact she did not attempt to perform a medical assessment on Mr. Allen. (Complaint at p. 73.)

- A Wellpath employee either failed to review Mr. Allen's preliminary health assessment screening or ignored Mr. Allen's responses to the screening. (Complaint at p. 74.)

- Wellpath failed to provide adequate training and supervision of its employees working in the CCADC.

If any of the above allegations proves true, the Sheriff Defendants would be entitled to indemnification for the Allen Lawsuit, and they would be entitled to assert a claim against Wellpath based on the company's contractual insurance obligation. At the heart of the Allen Lawsuit is the assertion that Mr. Allen died as a result of inadequate medical care while in the CCADC, and Wellpath was contractually obligated to provide medical care at the CCADC.

38.     This Court need not identify the specific fact scenarios in the Allen Lawsuit that would give rise to indemnification claims by the Sheriff Defendants. In assessing the risk to the Debtors' estates, the critical fact is that an indemnity claim *may* be asserted. As the Debtors have pointed out,

> the Fourth Circuit clarified it had "found that a stay was authorized under 11 U.S.C. § 362(a)(3) because [the third-party defendant] **might** seek indemnification from [the debtor] for any damages it had to pay, thus implicating the debtor's property." *See In re A.H. Robins Co. Inc.*, 828 F.2d 1023, 1025 (4th Cir. 1987); *see also In re LTL MANAGEMENT, LLC*, 638 B.R. 291, 312 (Bankr. D.N.J. 2022) ("The Fourth Circuit's use of the word "might" suggests that conditional indemnification is sufficient to trigger extension of automatic stay").

(Omnibus Reply at pp. 15-16) (emphasis in original). The contractual right of indemnity set forth in the Medical Care Agreement is plainly applicable by its terms to losses or expenses incurred by the Sheriff Defendants in connection with the Allen Lawsuit on account of acts or omissions by Wellpath or its employees. As discussed above, the Allen Plaintiffs have alleged that Wellpath and its employees engaged in numerous wrongful acts and omissions that allegedly caused or contributed to Mr. Allen's death. Accordingly, granting the Allen

Motion as to the Sheriff Defendants would subject the Debtors' estates to a substantial risk of loss through indemnity claims.

## IV. <u>CONCLUSION</u>

39.     Application of the *Sonnax* factors shows that the Allen Motion should not be granted at this time. Wellpath's indemnity obligation to the Cobb County Parties creates an identity of interest between the two, and the Debtors' effectively self-insured status leaves the Debtors' estates fully exposed to any loss or expense incurred by the Sheriff Defendants. The Allen Lawsuit is not remotely ready for trial, and no judicial economy would result if the Allen Lawsuit were allowed to proceed in the District Court. These factors necessitate leaving the stay in place. In short, no cause has been shown for granting relief from the automatic stay to permit the Allen Lawsuit to go forward at this time. *See* 11 U.S.C. § 362(d)(1).

40.     For the foregoing reasons, the Cobb County Parties request that the Court deny the Allen Motion in its entirety and keep the stay in place, continue the stay currently in place as to any claims or causes of action that have been or may be asserted against any of the Debtors' current clients or customers or their current or former employees beyond February 18, 2025, and grant the Cobb County Parties such other and further relief to which they may be justly entitled.

[*Remainder of Page Intentionally Left Blank*]

Dated: February 11, 2025

Respectfully submitted,

*/s/ Jeff P. Prostok*
Jeff P. Prostok
State Bar No. 16352500
Vartabedian Hester & Haynes, LLP
301 Commerce Street, Suite 3635
Fort Worth, TX  76102
Telephone: (817) 214-4990
Email: jeff.prostok@vhh.law

ATTORNEYS FOR COBB COUNTY,
GEORGIA, AND THE COBB COUNTY
SHERIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via the Court's ECF system to all parties authorized to receive electronic notice in this case on this 11th day of February, 2025.

*/s/ Jeff P. Prostok*
Jeff P. Prostok

# EXHIBIT A

# MEDICAL CARE AGREEMENT EXCERPT

## AGREEMENT FOR INMATE MEDICAL CARE AT THE
## COBB COUNTY ADULT DETENTION CENTER

This Agreement for Inmate Medical Care at the Cobb County Adult Detention Center ("Agreement") made by and between Neil Warren, in his official capacity as Sheriff of Cobb County and his predecessor (hereinafter referred to as "Sheriff"), funding approval having been granted by the Cobb County Board of Commissioners as part of the Sheriff's annual budget, and Wellpath, LLC, a limited liability company hereinafter referred to as the "Provider." The Sheriff and Provider may be referred to individually as "Party," or collectively, as "Parties." The Effective Date of this Contract shall be as defined in Section 2.0.

## WITNESSETH:

WHEREAS, the duly-elected Sheriff, by virtue of their office, is the official designated to have charge of the Cobb County Adult Detention Center ("CCADC" or "Jail");

WHEREAS, the Sheriff is required by law to ensure that inmates confined at the CCADC are provided reasonable access to medical care and, accordingly, is authorized to enter into contracts for medical and mental health services;

WHEREAS, in order to fulfill that obligations, the Sheriff maintains space known as the Infirmary Services Main Medical Clinic (the "Infirmary") at the CCADC, at which on-site medical treatment is provided to inmates;

WHEREAS, the Sheriff seeks to fulfill that legal obligation by contracting with Provider to provide medical services at the Jail, including medical treatment, staffing, supplies and pharmaceuticals to inmates and at the on-site Infirmary at the CCADC ("Medical Services"), to manage and administer the operations of said Infirmary, and to cooperate with and assist the Mental Health Service Provider (as defined below), including through mental health screenings and referrals as further explained herein;

WHEREAS, the Sheriff also desires for Provider to coordinate access to any necessary medical or healthcare services for inmates that are not available at the on-site Infirmary;

NOW, THEREFORE, in consideration of the promises and the agreements and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, do hereby agree as follows:

## I.        Definitions

The following terms shall have the meanings set forth below:

1.1     "Infirmary" means those certain sites at the CCADC where medical or clinical services are made available to CCADC and/or jail inmates, and which may include areas within or outside of the area known as the Infirmary Services Main Medical

1



EXHIBIT
A

## V. Access and Confidentiality

5.1 <u>Jail Access and Security</u>.  Provider agrees to exercise security measures in compliance with Sheriff's Policies and Procedures.  Employees of Provider shall be subject to a security clearance in order to obtain a building pass that allows for unescorted access into the Jail.  Cobb County Sheriff and/or his designees reserve(s) the right to restrict access to any of Provider' employees to the Jail or any other Sheriff-controlled facilities.

5.2 <u>Confidentiality</u>.  Provider acknowledges that it may receive confidential information of the County or inmate in Provider's care, and that it will protect the confidentiality of any such confidential information and will require any of its subcontractors, contractors, and/or staff to likewise protect such confidential information.  The Provider agrees that confidential information it receives or such reports, information, opinions, or conclusions that Provider creates under this Contract shall not be made available to, or discussed with, any individual or organization, including the news media, without prior written approval of the Sheriff.  Provider shall exercise reasonable precautions to prevent the unauthorized disclosure and use of information whether specifically deemed confidential or not.  Provider acknowledges that the Sheriff's and County's disclosure of documentation is governed by Georgia's Open Records Act (the "Act"), and Provider will obtain the Sheriff's authorization prior to releasing any information pursuant to the Act. Provider further acknowledges that, if Provider submits records containing trade secret information and if Provider wishes to keep such records confidential, Provider must submit and attach to such records an affidavit affirmatively declaring that specific information in the records constitutes trade secrets pursuant to Article 27 of Chapter 1 of Title 10, and the Parties shall follow the requirements of O.C.G.A. § 50-18-72(a)(34) related thereto.

## VI. Insurance and Indemnification

A. <u>Requirement</u>:

Provider shall procure and maintain in full force and effect for the duration of this Agreement, insurance protecting against claims for injuries to persons or damages to property which may arise from or in connection with performance of the services hereunder by the Provider, its agents, representatives, employees, or subcontractors.

B. <u>Minimum Limits of Insurance</u>:

Provider shall maintain insurance policies with coverage and limits no less than:

i) Commercial General Liability:  $1,000,000 combined single limit per occurrence for comprehensive coverage including bodily and personal injury, sickness, disease or death, injury to or destruction of property, including loss of use resulting therefrom, damage for premises/operations, products/completed operations, independent contractors and contractual liability (specifically covering the indemnity).  This coverage may be achieved by using an excess or umbrella policy. The policy or policies must be on "an occurrence" basis ("claims made" coverage is not acceptable).

    ii) Commercial Automobile Liability (owned, non-owned and hired): $1,000,000 combined single limit per occurrence and for bodily and personal injury, sickness, disease or death, injury to or destruction of property, including loss of use resulting therefrom.

    iii) Workers' Compensation and Employers Liability: Workers' Compensation limits as required by the State of Georgia and Employers Liability of $1,000,000 per occurrence or disease.

    iv) Commercial Umbrella or Excess Liability Coverage: $2,000,000 in liability excess coverage per occurrence above the contracts stated minimum coverage limits for Commercial General Liability, Commercial Automobile Liability, and the Workers' Compensation and Employers Liability policies of insurance. This may be satisfied by having the underlying liability limits that equal or exceed the combined amount of the underlying liability limits and umbrella coverage.

    v) Professional Liability (Errors and Omissions) Coverage: $1,000,000 per claim and in the aggregate.

    vi) The making of progress payments to the Provider shall not be construed as relieving the Provider or its subcontractors or insurance carriers from providing the coverage described herein for responsibility for loss or direct physical loss, damage or destruction occurring prior to final acceptance of the services.

C.    <u>Deductibles and Self-Insured Retention</u>

    Any deductibles or self-insurance retentions must be declared to the Sheriff to ensure the financial solvency of the Provider. Provider shall pay all deductibles and be liable for all claims, losses and damages for which it self-insures.

D.    <u>General Liability, Automobile Liability, and Umbrella/Excess Insurance</u>

The policies are to contain, or be endorsed to contain, the following provisions:

    i) Additional Insured Requirement. The Sheriff and Cobb County, its elected and appointed officials, officers, boards, commissions, officers, employees, representatives, servants, volunteers and agents (hereinafter referred to as "Insured Party" or "Insured Parties") are to be covered as additional insureds as respects: liability arising out of activities performed by or on behalf of the Provider; products and completed operations of the Provider, premises owned, leased, or used by the Provider; and automobiles owned, leased, hired, or borrowed by the Provider. The coverage shall contain no special limitations on the scope of protection afforded to the Insured Parties. Nothing contained in this section shall be construed to require the Provider to provide liability insurance coverage to the any Insured Party for claims asserted against such Insured Party for its sole negligence. The general liability policy or endorsement regarding additional insured shall apply to ongoing and completed operations.

ii) Primary Insurance Requirement.  The Provider's insurance coverage shall be primary and noncontributing insurance as respects to any other insurance or self-insurance available to the Insured Parties.  Any insurance or self-insurance maintained by the Insured Parties shall be in excess of the Provider's insurance and shall not contribute with it.

iii) Reporting Requirement. Any failure to comply with reporting provisions of the policies shall not affect coverage provided to the Insured Parties.

E.    Workers' Compensation and Employers Liability Coverage

The Provider shall have and maintain in full force and effect for the duration of this Agreement, insurance protecting against claims for injuries to persons or damages to property which may arise from or in connection with the performance of the services by the Provider, its agents, representatives, employees or subcontractors. The insurer shall agree to waive all rights of subrogation against the Sheriff or County and its officers, officials, employees and volunteers for losses arising from the work performed by the Provider for the Sheriff

F.    Waiver of Subrogation

The insurers shall agree under each policy of insurance required by this Agreement to waive all rights of subrogation against the Insured Parties for losses arising from work performed by the Provider for the Sheriff or County.

G.    All Coverages

i) Notice Requirement. Each insurance policy required by this Contract shall be endorsed to state that coverage shall not be canceled except after thirty (30) days' (10 day's for nonpayment of premium) prior written notice by certified mail, return receipt requested, has been given to the Sheriff.  Sheriff reserves the right to accept alternate notice terms and provisions provided they meet the minimum requirements under Georgia law.  In the event a policy is suspended, voided, or reduced in coverage or in limits, Provider shall provide the County with 30 days' written notice.

ii) Acceptability. The insurance to be maintained by Provider must be issued by a company licensed or approved by the Insurance Commissioner to transact business in the State of Georgia. Such insurance shall be placed with insurers with a minimum AM Best's Policyholder's Rating of "A" or better and with a financial rating of Class VIII or greater.

iii) Failure of Insurers.  The Provider shall be responsible for any delay resulting from the failure of any insurer to furnish proof of coverage in the prescribed form.

H.    Verification of Coverage

Provider shall furnish the Sheriff with certificates of insurance evidencing all coverages required by this Agreement.  The certificates for each insurance policy are to be signed by a person

authorized by that insurer to bind coverage on its behalf. The certificates shall be furnished at or prior to the time the time this Agreement is submitted to the Sheriff for execution, and must be received and approved by the Sheriff before any work commences. The Sheriff reserves the right to require complete, certified copies of all required insurance policies at any time. The Provider shall provide proof that any expiring coverage has been renewed or replaced prior to the expiration of the coverage.

I.    Subcontractors

Provider shall include all subcontractors as insureds under its policies or shall furnish separate certificates for each subcontractor. All coverage for subcontractors shall be subject to all of the requirements stated in this Agreement, including, but not limited to, naming the Insured Parties as additional insureds. Provider shall be responsible for the work products and actions of all subcontractors. All subcontractors are subject to approval by the Sheriff. Subcontractors must comply with the same insurance requirements as the Provider. Subcontractors must comply with the requirements of the Georgia Security and immigration compliance Act as set forth in this Agreement.

6.1    <u>Verification</u>. Provider shall require and verify from any independent contractor with which it contracts in order to carry out and fulfill all or any part of its duties herein the same insurance coverage as set out in this Section as applicable.

6.2    <u>Property Insurance</u>. Sheriff, through County, will maintain insurance on CCADC and all County-owned property contained therein for fire and casualties. Provider will be responsible for insuring or retaining any losses to any of its personal property.

6.3    <u>Indemnification</u>. Provider covenants and agrees to take and assume all responsibility for the Work rendered in connection with this Agreement. To the fullest extent permitted by law, the Provider shall defend, indemnify and hold harmless the Sheriff, the County, and the Sheriff and the County's elected and appointed officials, officers, boards, commissions, employees, representatives, contractors, servants, agents and volunteers (individually an "Indemnified Party" and collectively the "Indemnified Parties") from and against any and all claims, suits, actions, judgments, injuries, damages, losses, expenses, and liability of any kind whatsoever, including but not limited to attorneys' fees and other legal expenses, ("Liabilities") to the extent caused by or resulting from negligence, recklessness, or intentionally wrongful conduct by Provider, or any employee, servant, agent, subcontractor, or volunteer of Provider or any of its subcontractors. This indemnity obligation does not include Liabilities caused by or resulting from the acts or omissions of an Indemnified Parties, or any of them. Such obligation shall not be construed to negate, abridge or otherwise reduce other rights or obligations of indemnity which would otherwise exist as to the party or person described in this Section. In any and all claims against the Indemnified Parties, or any of them, by an employee of the Provider or its subcontractors, the indemnification obligation under this Section shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Provider, or its subcontractors, under workers' or workmen's compensation acts, disability benefit acts or other employee benefit acts. This obligation to indemnify, defend and hold harmless the and Indemnified Parties shall survive the expiration or termination of this Agreement provided that the claims are based upon or arise out of acts or omissions that occurred during the performance of this Agreement.

31

6.4   Notice of Claims.  Each party shall notify the other if any Inmate brings a claim against it arising out of matters related to this Agreement.

**VII.   Independent Contractor Relationship**

7.1   Independent Contractors.  This Agreement is not intended to create nor shall be construed to create any relationship between Sheriff and Provider other than that of independent contractor entities contracting for the purpose of effecting this Agreement. Neither party nor any of their representatives shall be construed to be the agent, employer, employee or representative of the other.

7.2   No Interference.  Nothing in this Agreement shall be construed to interfere with or in any way affect any Provider's obligation to exercise independent medical judgment in rendering health care services to Inmates (including, but not limited to, medical management decisions and protocols).

**VIII.   Termination**

8.1   Generally.

Provider or Sheriff may terminate this Agreement pursuant to the following provisions:

(a)   Provider may terminate this Agreement if Sheriff fails to make a non-disputed payment required under this Agreement within ninety (90) days after written notice from Provider to Sheriff that payment was not made when due.

(b)   Except for payment disputes or late payment, either party may terminate this Agreement upon a non-monetary material breach of this Agreement by the other party which is not cured within thirty (30) days after the non-breaching party shall have given the breaching party written notice of such breach.

(c)   The Sheriff may terminate this Agreement at any time for convenience or due to lack of funding, upon one-hundred and eighty (180) days' written notice to Provider. Provider may terminate this Agreement without cause upon one hundred eighty (180) days' prior written notice to Sheriff.

(d)   Either party may immediately terminate this Agreement upon initiation of bankruptcy proceedings by or against the other party.

(e)   In accordance with O.C.G.A. 36-60-13(b), this Agreement will terminate immediately and absolutely at such time as funds are no longer available to satisfy the obligations of Sheriff or County.

(f)   Upon termination for any reason, Provider shall cooperate and assist with the transition to a new medical services provider so as to avoid any reasonable

# EXHIBIT B

# COMPLAINT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

SCOTT ALLEN as Administrator of the
Estate of BRADY ALLEN and
individually as father of BRADY
ALLEN, and KAREN ALLEN,
individually as mother of BRADY
ALLEN,

        Plaintiffs,

v.

COBB COUNTY SHERIFF CRAIG
OWENS, in his individual capacity,
WELLPATH, LLC, FORMER COBB
COUNTY SHERIFF OFFICE
COLONEL TEMETRIS ATKINS, in
his individual capacity, COBB
COUNTY SHERIFF CHIEF DEPUTY
RHONDA ANDERSON, in her
individual capacity, COBB COUNTY
SHERIFF SERGEANT LOLITA
MOSLEY, in her individual capacity,
COBB COUNTY SHERIFF
SERGEANT KENT VANN, in his
individual capacity, COBB COUNTY
SHERIFF DEPUTY GREGORY
JUEDES in his individual capacity,
COBB COUNTY SHERIFF DEPUTY
WILLIAM GOOCH, in his individual
capacity, COBB COUNTY SHERIFF
DEPUTY DEMETRIUS JONES, in his
individual capacity, COBB COUNTY
SHERIFF DEPUTY DEANDRE
BRITTINGHAM, in his individual
capacity, COBB COUNTY SHERIFF
DEPUTY JENNIFER WILLIAMS, in
her individual capacity, COBB

CIVIL ACTION FILE NO:


**JURY TRIAL DEMANDED**

1

COUNTY SHERIFF DEPUTY
JESSICA VEGA-VELEZ, in her
individual capacity, CALAMATI
EYVETTE LONG, in her individual
capacity, SUSAN WARREN, in her
individual capacity, ASHLEY
DICKSON, in her individual capacity,
DIAMOND NYREE PEREZ, in her
individual capacity, DANIA WILSON,
in her individual capacity,
PARAMEDIC JONATHAN WATSON,
NURSE VICKY NGETHE, R.N.,
NURSE JESICA REYNOLDS, R.N.,
PARAMEDIC BROOKE STEVIC,
NURSE DONNETTE DUGGAN-
PIERRE, R.N., ABC CORP 1-20, and
JOHN DOES 1-20,

       Defendants.

## PLAINTIFFS' COMPLAINT

Plaintiffs, Scott Allen as Administrator of the Estate of Brady Allen and individually as father of Brady Allen, and Karen Allen individually as mother of Brady Allen, (hereinafter collectively referred to as "Plaintiffs") files this Complaint against Defendants Cobb County Sheriff Craig Owens, in his individual capacity, Wellpath, LLC, Former Cobb County Sheriff Colonel Temetris Atkins, in his individual capacity, Cobb County Sheriff Chief Deputy Rhonda Anderson, in her individual capacity, Cobb County Sheriff Sergeant Lolita Mosley, in her individual capacity, Cobb County Sheriff Sergeant Kent Vann, in his individual capacity, Cobb

County Sheriff Deputy Gregory Juedes, in his individual capacity, Cobb County Sheriff Deputy William Gooch, in his individual capacity, Cobb County Sheriff Deputy Demetrius Jones, in his individual capacity, Cobb County Sheriff Deputy Deandre Brittingham, in his individual capacity, Cobb County Sheriff Deputy Jennifer Williams, in her individual capacity, Cobb County Sheriff Deputy Jessica Vega-Velez, in her individual capacity, Calamati Eyvette Long, in her individual capacity, Susan Warren, in her individual capacity, Ashley Dickson, in her individual capacity, Diamond Nyree Perez, in her individual capacity, Dania Wilson, in her individual capacity, Paramedic Jonathan Watson, Nurse Vicky Ngethe, R.N., Nurse Jessica Reynolds, R.N., Paramedic Brooke Stevic, Nurse Donnette Duggan-Pierre, R.N., ABC CORP 1-20, JOHN DOES 1-20 and state as follows:

## **PARTIES**

1.

Plaintiffs are the parents of Brady Allen and the Administrator of his estate, and both reside within the Northern District of Georgia and are subject to the jurisdiction of this Court.

2.

On May 22-23, 2021, Defendant Craig Owens was the Cobb County Sheriff and oversaw the Cobb County Adult Detention Center (hereinafter referred to as the "CCADC") located at 1825 County Services Pkwy, Marietta, GA 30008, where

3

Brady Allen died. It was Sheriff Owen's responsibility to ensure that inmates and detainees at the CCADC receive adequate medical care under O.C.G.A. § 42-4-4 and O.C.G.A. § 42-5-2. Sheriff Owens may be served at his residence in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

3.

On May 22-23, 2021, Cobb County Sheriff Owens was acting under the color of law and within the course and scope of his employment with the CCADC.

4.

On May 22-23, 2021, Defendant Temetris Atkins was a Colonel at the Cobb County Sheriff's Office (hereinafter referred to as the "CCSO") tasked in part with managing the CCADC. It was former Colonel Atkins' responsibility, in part, to ensure that inmates and detainees received adequate medical care at the CCADC. Former Colonel Atkins may be served at his residence address in DeKalb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

5.

On May 22-23, 2021, former Colonel Temetris Atkins was acting under the color of law and within the course and scope of his employment with the CCADC.

6.

On May 22-23, 2021, Defendant Rhonda Anderson was Chief Deputy at the Cobb County Sheriff's Office and tasked, in part, with managing the CCADC. It was

4

Chief Deputy Anderson's responsibility, in part, to ensure that inmates and detainees received adequate medical care at the CCADC. Chief Deputy Anderson may be served at her residence address in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

<div align="center">7.</div>

On May 22-23, 2021, Chief Deputy Rhonda Anderson was acting under the color of law and within the course and scope of his employment with the CCADC.

<div align="center">8.</div>

Defendant Wellpath, LLC. (hereinafter referred to as "Wellpath") is a foreign non-profit corporation existing under the laws of Delaware with its principal place of business at 3340 Perimeter Hill Drive, Nashville, Tennessee 37211 and may be served with a copy of the Summons and Complaint through its registered agent, Corporate Creations Network, Inc. at 2985 Gordy Parkway, 1st Floor, Marietta, Georgia 30066 and is subject to the jurisdiction of this court.

<div align="center">9.</div>

At all times material hereto, Wellpath managed the day-to-day medical operations at the CCADC.

<div align="center">10.</div>

On May 22-23, 2021, Defendant Cobb County Sheriff's Office Sergeant Lolita Mosley was employed by the Cobb County Sheriff's Office and worked at the

<div align="center">5</div>

CCADC.  Sergeant Mosley may be served with a copy of the Summons and Complaint at her residence address in Douglas County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

11.

On May 22-23, 2021, Sergeant Mosley was acting under the color of law and within the course and scope of his employment with CCADC.

12.

On May 22-23, 2021, Defendant Cobb County Sheriff's Office Sergeant Kent Vann was employed by the Cobb County Sheriff's Office and worked at the CCADC.  Sergeant Vann may be served with a copy of the Summons and Complaint at his residence address in Bartow County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

13.

On May 22-23, 2021, Sergeant Vann was acting under the color of law and within the course and scope of his employment with CCADC.

14.

On May 22-23, 2021, Defendant Cobb County Sheriff's Office Deputy Gregory Juedes was employed by the Cobb County Sheriff's Office and worked at the CCADC.  Deputy Juedes may be served with a copy of the Summons and

Complaint at his residence address in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

15.

On May 22-23, 2021, Deputy Juedes was acting under the color of law and within the course and scope of his employment with CCADC.

16.

On May 22-23, 2021, Defendant Cobb County Sheriff's Office Deputy William Gooch was employed by the Cobb County Sheriff's Office and worked at the CCADC. Deputy Gooch may be served with a copy of the Summons and Complaint at his residence address in Gilmer County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

17.

On May 22-23, 2021, Deputy Gooch was acting under the color of law and within the course and scope of his employment with CCADC.

18.

On May 22-23, 2021, Defendant Cobb County Sheriff's Office Deputy Demetrius Jones was employed by the Cobb County Sheriff's Office and worked at the CCADC. Deputy Jones may be served with a copy of the Summons and Complaint at his residence address in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

19.

On May 22-23, 2021, Deputy Jones was acting under the color of law and within the course and scope of his employment with CCADC.

20.

On May 22-23, 2021, Defendant Cobb County Sheriff's Office Deputy Deandre Brittingham was employed by the Cobb County Sheriff's Office and worked at the CCADC. Deputy Brittingham may be served with a copy of the Summons and Complaint at his residence address in Fulton County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

21.

On May 22-23, 2021, Deputy Brittingham was acting under the color of law and within the course and scope of his employment with CCADC.

22.

On May 22-23, 2021, Defendant Cobb County Sheriff's Office Deputy Jennifer Williams was employed by the Cobb County Sheriff's Office and worked at the CCADC. Deputy Williams may be served with a copy of the Summons and Complaint at her residence address in Coweta County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

23.

On May 22-23, 2021, Deputy Williams was acting under the color of law and within the course and scope of her employment with CCADC.

24.

On May 22-23, 2021, Defendant Cobb County Sheriff's Office Deputy Jessica Vega-Velez was employed by the Cobb County Sheriff's Office and worked at the CCADC. Deputy Vega-Velez may be served with a copy of the Summons and Complaint at her residence address in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

25.

On May 22-23, 2021, Deputy Vega-Velez was acting under the color of law and within the course and scope of her employment with CCADC.

26.

On May 22-23, 2021, Defendant Calamati "Eyvette" Long was employed by the Cobb County Sheriff's Office as a Criminal Justice Specialist and worked at the CCADC. Ms. Long may be served with a copy of the Summons and Complaint at her residence address in Cobb County. This Defendant is subject to the jurisdiction and venue of this Court.

27.

On May 22-23, 2021, Ms. Long was acting under the color of law and within the course and scope of her employment with CCADC.

28.

On May 22-23, 2021, Defendant Susan Warren was employed by the Cobb County Sheriff's Office as a Criminal Justice Specialist and worked at the CCADC. Ms. Warren may be served with a copy of the Summons and Complaint at her residence address in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

29.

On May 22-23, 2021, Ms. Warren was acting under the color of law and within the course and scope of her employment with CCADC.

30.

On May 22-23, 2021, Defendant Ashley Dickson was employed by the Cobb County Sheriff's Office as a Criminal Justice Specialist and worked at the CCADC. Ms. Dickson may be served with a copy of the Summons and Complaint at her residence address in Fulton County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

31.

On May 22-23, 2021, Ms. Dickson was acting under the color of law and within the course and scope of her employment with CCADC.

32.

On May 22-23, 2021, Defendant Diamond Nyree Perez was employed by the Cobb County Sheriff's Office as a Criminal Justice Specialist and worked at the CCADC. Ms. Nyree Perez may be served with a copy of the Summons and Complaint at her residence address in Fulton County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

33.

On May 22-23, 2021, Ms. Nyree Perez was acting under the color of law and within the course and scope of her employment with CCADC.

34.

On May 22-23, 2021, Defendant Dania Wilson was employed by the Cobb County Sheriff's Office as a Criminal Justice Specialist and worked at the CCADC. Ms. Wilson may be served with a copy of the Summons and Complaint at her residence address in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

35.

Defendant Jonathan Watson is a paramedic that was employed by Wellpath on May 22-23, 2021, and worked at the CCADC. Mr. Watson may be served with a copy of the Summons and Complaint at his residence address in Gwinnett County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

36.

On May 22-23, 2021, Paramedic Watson worked for Wellpath and was responsible for providing care, monitoring, and observing Brady Allen while he was housed in Intake at the CCADC.

37.

On May 22-23, 2021, Jonathan Watson was acting under the color of law pursuant to Wellpath's contract with the CCADC and within the course and scope of his employment with Wellpath.

38.

Defendant Vicky Ngethe is a registered nurse that was employed by Wellpath on May 22-23, 2021, and worked at the CCADC. Ms. Ngethe may be served with a copy of the Summons and Complaint at her residence address in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

39.

On May 22-23, 2021, Nurse Vicky Ngethe worked for Wellpath and was responsible for providing care, monitoring, and observing Brady Allen while he was housed in Intake at the CCADC.

40.

On May 22-23, 2021, Vicky Ngethe was acting under the color of law pursuant to Wellpath's contract with the CCADC and within the course and scope of her employment with Wellpath.

41.

Defendant Jesica Reynolds is a registered nurse that was employed by Wellpath on May 22-23, 2021, and worked at the CCADC. Ms. Reynolds may be served with a copy of the Summons and Complaint at her residence address in Fulton County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

42.

On May 22-23, 2021, Nurse Jesica Reynolds worked for Wellpath and was responsible for providing care, monitoring, and observing Brady Allen while he was housed in Intake at the CCADC.

43.

On May 22-23, 2021, Nurse Reynolds was acting under the color of law pursuant to Wellpath's contract with the CCADC and within the course and scope of her employment with Wellpath.

44.

Defendant Donnette Duggan Pierre is a registered nurse that was employed by Wellpath on May 22-23, 2021, and worked at the CCADC. Ms. Duggan Pierre may be served with a copy of the Summons and Complaint at her residence address in DeKalb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

45.

On May 22-23, 2021, Nurse Duggan Pierre worked for Wellpath and was responsible for providing care, monitoring, and observing Brady Allen while he was housed in Intake at the CCADC.

46.

On May 22-23, 2021, Nurse Duggan Pierre was acting under the color of law pursuant to Wellpath's contract with the CCADC and within the course and scope of her employment with Wellpath.

47.

Defendant Brooke Stevic is a paramedic that was employed by Wellpath on May 22-23, 2021, and worked at the CCADC. Ms. Stevic may be served with a copy of the Summons and Complaint at her address in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

48.

On May 22-23, 2021, Ms. Stevic worked for Wellpath and was responsible for providing care, monitoring, and observing Brady Allen while he was housed in Intake at the CCADC.

49.

On May 22-23, 2021, Ms. Stevic was acting under the color of law pursuant to Wellpath's contract with the CCADC and within the course and scope of her employment with Wellpath.

50.

ABC Corp 1-20 are unidentified corporations that were responsible for providing medical care to detainees/inmates at CCADC on May 22-23, 2021 and/or had a constitutional responsibility to provide inmates and detainees at the CCADC adequate medical care.

51.

John Does 1-20 are unidentified employees of Wellpath and/or the Cobb County Sheriff's Office who were responsible for Brady Allen's death and had a constitutional responsibility to provide detainees/inmates at the CCADC adequate medical care and/or violated the Cobb County Sheriff's Office policies and procedures for its employees with respect to providing adequate medical care.

52.

The conduct of all the Defendants was within the exercise of State authority within the meaning of 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

53.

This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, as well as the Eighth and Fourteenth Amendments of the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and the aforementioned constitutional and statutory provisions.

54.

This Court has jurisdiction over Plaintiffs' state tort claims pursuant to its ancillary and pendent jurisdiction under 28 U.S.C. § 1367.

16

55.

Venue is proper in the Northern District of Georgia, Atlanta Division pursuant to 28 U.S.C. § 1391 (b) and N.D.L.R. 3.1B(3) because the event giving rise to this claim occurred in Cobb County, Georgia, which is situated within the district and divisional boundaries of the Atlanta Division of the Northern District of Georgia.

56.

Defendants all reside within the Northern District of Georgia and are subject to the jurisdiction of this Court.

57.

The matter in controversy exceeds this court's $75,000.00 jurisdictional limit, exclusive of interest and costs.

58.

Plaintiffs timely submitted an ante-litem notice and a copy of that ante litem notice is attached as Exhibit A.

## I.      FACTUAL BACKGROUND

59.

On May 22, 2021, Cobb County Police Department arrested Brady Allen ("Mr. Allen") for Criminal Trespass (no damage to property).

60.

Brady Allen was arrested after being found at a stranger's home on the front porch and had been suspected of swimming in the property owner's swimming pool.

61.

Arresting Officer Jeremey Drennan of the Cobb County Police Department took Mr. Allen to the Cobb County Adult Detention Center ("CCADC") to be detained in relation to his alleged criminal trespass to property charge.

62.

The CCADC is managed and controlled by the Cobb County Sheriff's Office ("CCSO") and its officers.

63.

Mr. Allen was detained at the CCADC from May 22, 2021, until his death the next day on May 23, 2021 (hereinafter referred to as "the relevant time period").

64.

Upon arrival at the CCADC on May 22, 2021, Mr. Allen was shirtless, only wearing wet shorts and flip flops and was showing signs of either mental illness, drug intoxication or some form of illness.

## A.    PRE-BOOKING EVALUATION

65.

18

On May 22, 2021, Cobb County Police Officer Drennan took Mr. Allen to the CCADC so that he could be processed as a detainee at the CCADC.

66.

Upon arrival in the CCADC Prebooking Area, Officer Drennan met Cobb County Sheriff Office Deputies Gregory Juedes and William Gooch.

67.

Deputy Juedes conducted a Preliminary Health Screening Assessment ("PHSA") on Mr. Allen.

68.

The purpose of the PHSA is to determine if an inmate is mentally and medically fit to be booked at the CCADC or needs medical clearance and/or medical care prior to admission.

69.

Mr. Allen's PHSA indicated that he responded "**YES**" to the following questions:

- "Hearing voices or seeing visions?";

- "Have you ever thought of hurting yourself in the past?";

- "Have you ingested any legal/illegal drugs within the last 24 to 72 hours?;

- "Do you take prescription medication?";

- "Have you had a head injury in the last 24 to 72 hours?";

- Do you have flu-like symptoms such as fever, nausea, vomiting, diarrhea or body aches?".

<center>70.</center>

The PSHA indicates that a "supervisor/nurse" should be contacted if a "**YES**" response was indicated for the questions:

- "Have you ever thought of hurting yourself in the past?";

- "Have you ingested any legal/illegal drugs within the last 24 to 72 hours?;

- "Do you take prescription medication?"

<center>71.</center>

The PHSA indicates that a nurse should be contacted if a "**YES**" response was indicated for the questions:

- "Have you had a head injury in the last 24 to 72 hours?";

- Do you have flu-like symptoms such as fever, nausea, vomiting, diarrhea or body aches?"

<center>72.</center>

Mr. Allen's PHSA indicates that Deputy Juedes observed Mr. Allen with "Strange behavior, hallucinating" and "Appears confused, disoriented, difficulty communicating".

<center>20</center>

73.

The PHSA indicates that if CCSO staff observes an arrestee with "strange behavior, hallucinating" that a nurse **and** supervisor should be contacted.

74.

In Mr. Allen's PHSA Deputy Juedes also indicated that Mr. Allen had consumed Meth and heroine three days ago.

75.

Mr. Allen's PHSA also indicated that the arresting or transporting officer believed that Mr. Allen was currently in need of medical or mental health services.

76.

As Deputy Juedes spoke to Mr. Allen to get responses for the PHSA, Mr. Allen exhibited strange behaviors and talked to an unknown stimuli or persons that were not present.

77.

Deputy Juedes communicated Mr. Allen's PHSA responses and evaluation to Deputy William Gooch.

78.

Deputy Juedes and Deputy Gooch were assigned to Intake at the CCADC on May 22, 2021, and their 12-hour dayshift had ended, was ending, or approaching the end when Mr. Allen's PHSA was done.

79.

On May 22, 2021, Sergeant Vann was the dayshift Intake Supervisor, and his shift had ended, was ending or approaching the end when Mr. Allen's PHSA was conducted and/or completed.

80.

At the time that Mr. Allen's PHSA was conducted and/or completed the CCADC Intake night shift had reported to duty.

81.

The CCADC Intake night shift included, but was not limited to, Deputy Deandre Brittingham, Deputy Jennifer Williams, Deputy Jessica Vega-Velez and Sergeant Lolita Mosley.

82.

Deputy Juedes and/or Deputy Gooch did not communicate Mr. Allen's PHSA evaluation to Sergeant Vann, but Sergeant Vann was aware that Mr. Allen had come to the CCADC and was medically screened.

83.

Deputy Juedes and/or Deputy Gooch did not communicate Mr. Allen's PHSA evaluation to Sergeant Lolita Mosley.

84.

While Mr. Allen was detained Sergeant Lolita Mosley did become aware that a PHSA was done on Mr. Allen and she signed the PHSA.

85.

On May 22, 2021, Paramedic Jonathan Watson, Nurse Jesica Reynolds, and Nurse Vicky Ngethe were all employed by Wellpath and working at the CCADC in the Intake Area.

86.

In response to Mr. Allen's PHSA evaluation, Deputy Juedes went to the CCADC Nurse Triage Area and had contact with Paramedic Jonathan Watson who came to the Prebooking Area to evaluate Mr. Allen.

87.

On May 22, 2021, Paramedic Watson came to the Prebooking Area and/or sallyport area of the CCADC to evaluate Mr. Allen.

88.

Paramedic Watson arrived in the Prebooking Area and approached Mr. Allen with a machine that could check one or more of Mr. Allen's vital signs.

89.

Prior to approaching Mr. Allen, Paramedic Watson retrieved Mr. Allen's completed PHSA from a counter in the Prebooking Area.

90.

Paramedic Watson spoke to Mr. Allen but did not take any of his vitals or physically examine Mr. Allen.

91.

Mr. Allen also had several prescription bottles with him when he entered the Prebooking Area of the CCADC including prescriptions for:

- Bupropion HCL (two prescriptions);

- Trazodone;

- Sertraline;

- Escitalopram; and

- Hydroxytine HCL.

92.

Bupropion is an antidepressant medication used to treat a variety of conditions, including depression and other mental/mood disorders.

93.

Trazodone is a medication used to treat anxiety, depression, and restore the balance of a certain natural chemical (serotonin) in the brain.

94.

Sertraline is a medication used to manage and treat social anxiety disorder, major depressive disorder, obsessive-compulsive disorder, panic disorder and/or post-traumatic stress disorder.

95.

Escitalopram is a medication used to treat anxiety and depression and works by helping to restore the balance of a certain natural substance (serotonin) in the brain.

96.

Hydroxyzine is a medication used to relieve anxiety and tension.

97.

Mr. Allen also had two other prescription bottles, but the labels were damaged and not readable and an over-the-counter medication, Omeprazole.

98.

After speaking with Mr. Allen, Paramedic Watson looked at some of his prescriptions, but not all of them.

99.

Paramedic Watson did not speak to Mr. Allen about any of his medications.

100.

Mr. Allen's prescriptions were logged in a Prescription Drug Inventory Record by Wellpath Nurse Jesica Reynolds at 7:39 p.m. about 45 minutes after Mr. Allen was accepted at the CCADC.

101.

Sergeant Mosley signed Mr. Allen's Prescription Drug Inventory Record as Intake Supervisor indicating she was aware that Mr. Allen came into the CCADC with several medications.

102.

After speaking with Mr. Allen and looking at some of Mr. Allen's prescriptions, Paramedic Watson had a conversation with Officer Jeremy Drennan and indicated that Mr. Allen's prescriptions were for mental health and that Mr. Allen was a "druggy".

103.

After speaking to Mr. Allen, Paramedic Watson did not get the nurse or any other medical staff to evaluate Mr. Allen. Paramedic Watson also did not call the physician on call to explain Mr. Allen's responses to the PHSA or his observation of Mr. Allen.

104.

After speaking with Mr. Allen in the Prebooking Area, Paramedic Watson did not suggest that Mr. Allen should go to the hospital to be medically cleared for admission to the CCADC.

105.

Paramedic Watson cleared Mr. Allen for admission to the CCADC despite Mr. Allen's responses to the PHSA, strange behaviors, hallucinations, and obvious mental health issues.

## B.    INTAKE EVALUATION

## 1.    DESCRIPTION OF INTAKE AREA

### 106.

Mr. Allen was accepted into the CCADC and entered the Intake Area around 6:49 p.m.

### 107.

Cobb County Sheriff Office employees Deputy Brittingham, Deputy Williams, Deputy Vega-Velez and Sergeant Mosley were all assigned to Intake at that time.

### 108.

Paramedic Watson, Nurse Vicky Ngethe and Nurse Jesica Reynolds were also assigned to Intake at that time.

### 109.

In May 2021, CCSO employed Criminal Justice Specialists ("CSJ") to work at the jail and assist with tasks including, but not limited to, monitoring alert and/or distress buttons inside Intake holding cells.

### 110.

On May 22, 2021, Calamati Eyvette Long worked as a CJS at the CCADC in the Intake Area.

## 111.

On May 22, 2021, Calamati Eyvette Long worked in the CCADC Intake Area and one of her responsibilities included monitoring the alert and/or distress buttons inside Intake Holding Cells.

## 112.

On May 22, 2021, Susan Warren worked as a CJS at the CCADC in the Intake Area.

## 113.

On May 22, 2021, Susan Warren worked in the CCADC Intake Area and one of her responsibilities included monitoring the alert and/or distress buttons inside Intake Holding Cells.

## 114.

On May 22, 2021, Ashley Dickson worked at the CCADC as a CJS in the Intake Area as a CJS.

## 115.

On May 22, 2021, Ashley Dickson worked in the CCADC Intake Area and one of her responsibilities included monitoring the alert and/or distress buttons inside Intake Holding Cells.

116.

On May 22, 2021, Diamond Nyree Perez worked at the CCADC as a CJS in the Intake Area.

117.

On May 22, 2021, Diamond Nyree Perez worked in the CCADC Intake Area and one of her responsibilities included monitoring the alert and/or distress buttons inside Intake Holding Cells.

118.

On May 22, 2021, Dania Wilson worked at the CCADC as a CJS in the Intake Area.

119.

On May 22, 2021, Dania Wilson worked in the CCADC Intake Area and one of her responsibilities included monitoring the alert and/or distress buttons inside Intake Holding Cells.

120.

Calamati Eyvette Long, Susan Warren, Ashley Dickson, Diamond Nyree Perez, and Dania Wilson were all Criminal Justice Specialists at the CCADC.

121.

The CCADC Intake Area consisted of an Intake desk; fingerprinting area; "Pit" for waiting inmates to sit while awaiting processing; a telephone area with

several telephones; at least 10 holding and/or close observation cells identified by numbers H1 through H10; and a nurse and/or medical area(s) for medical evaluations/assessments.

## 122.

The Intake holding cells and/or close observation cells were identified as Holding Cells H1 through H10.

## 123.

Holding Cell H8 was a single person cell and the CCSO was able to record video and audio inside the cell.

## 124.

The Intake holding cells H9 and H10 were larger than the other holding and/or close observation cells and held multiple inmates during shift changes, cleaning periods or different times when CCADC staff determined that the inmates needed to be housed in those cells.

## 125.

On May 22, 2021, Holding Cell H9 would at times hold the male inmates/detainees.

## 126.

The CCSO was able to record audio and video inside cell H9.

## 127.

There were cameras in the Intake Area that were able to record the outside or part of the outside areas of cells H8 and H9.

128.

CCSO maintained video and audio of cells H8 and H9 for the time periods that Brady Allen was in those cells on May 22, 2021 and/or May 23, 2021.

129.

CCSO did not maintain video of CCADC Intake Area that shows and/or partially shows the outside of cells H8 and/or H9 for May 22, 2021 to May 23, 2021 from 6:49 p.m. through 8:45 a.m. which are during the times that Brady Allen was held in those respective cells.

130.

On May 22, 2021, at or around 6:49 p.m or shortly thereafter Brady Allen was directed to go inside Holding Cell H9 upon entering the CCADC Intake Area.

**2.** **BRADY ALLEN EVENING/EARLY MORNING INTAKE CONFINEMENT MAY 22, 2021 THROUGH MAY 23, 2021**

131.

On May 22, 2021, Brady Allen entered Holding Cell H9 between the hours of 6:49 p.m. and 7:10 p.m.  At that time there were at least 10 other inmates/detainees inside that cell.

132.

On May 22, 2021, between the hours of 7:00 p.m. and 7:30 p.m. Deputy Deandre Brittingham let the inmates in Holding Cell H9 out of the cell.

133.

On May 22, 2021, between the hours of 7:00 p.m. and 7:23 p.m. Brady Allen came out of holding cell H9 and sat by the intake desk where Paramedic Watson saw him briefly but did not do a full Intake Medical Assessment of him.

134.

On May 22, 2021, between the hours of 7:00 p.m. and 7:23 p.m. at some time while Brady Allen was outside H9 Deputy Jennifer Williams saw Brady Allen and noticed that he had a medical and/or mental health issue occurring with him.

135.

At that time, Deputy Williams did not have Brady Allen seen by a medical provider for a full intake assessment or report his behavior to a supervisor.

136.

At that time, Deputy Brittingham also saw that Brady Allen was exhibiting behavior consistent with medical and/or mental health issues occurring with him and did not have a full medial assessment done or report his behavior to a supervisor.

137.

Mental health illness is a medical condition that can lead to serious medical issues and/or death.

138.

Brady Allen returned to Holding Cell H9 at some time between 7:10 p.m. and 7:24 p.m.

139.

Brady Allen stayed in Holding Cell H9 from 7:24 p.m. until at or around 10:48 p.m.

140.

During the time that Mr. Allen was in Holding Cell H9, he paced in the cell a lot, talked to himself, and showed anxious behavior.

141.

During the time that Mr. Allen was in Holding Cell H9, he is seen many times in the front of the cell banging the door and heard asking to get out of the cell. No officers or medical providers let him out of the cell during these times.

142.

There is a button inside Holding Cell H9 by the door near the front of H9 that allows inmates and/or detainees to alert security personnel that the inmate wanted to communicate or was having an issue that he wanted addressed. (This button is hereafter referred to as "Alert button".)

143.

During the time that Brady Allen was in Holding Cell H9 he is seen on video pressing the alert button over a hundred times.

144.

During the time that Brady Allen was in Holding Cell H9, neither security personnel nor medical personnel responded to Mr. Allen's attempts to contact them through the Alert button.

145.

The Alert button in Holding Cell H9 is monitored by the Criminal Justice Specialists.

146.

The Criminal Justice Specialists are supposed to communicate when someone presses the Alert button to the security personnel so that they can then address the inmates concern, issue, or attempt to communicate.

147.

The Criminal Justice Specialists including Calamati Eyvette Long, Susan Warren, Ashley Dickson, Diamond Nyree Perez and Dania Wilson either did not communicate that Mr. Allen was pressing the Alert button or ignored Mr. Allen's attempts to communicate by using the Alert button.

148.

In the alternative, the Criminal Justice Specialists including Calamati Eyvette Long, Susan Warren, Ashley Dickson, Diamond Nyree Perez and Dania Wilson communicated to Deputy Brittingham, Deputy Williams, Deputy Vega-Velez and/or Sergeant Mosely that Mr. Allen was pressing the Alert button and they ignored it.

<div align="center">149.</div>

The Criminal Justice Specialists were told by CCSO staff to ignore Mr. Allen's attempts to communicate by pressing the Alert button.

<div align="center">150.</div>

The Criminal Justice Specialists including Calamati Eyvette Long, Susan Warren, Ashley Dickson, Diamond Nyreee Perez and/or Dania Wilson ignored Mr. Allen's attempts to communicate by pressing the Alert button.

<div align="center">151.</div>

During that time that Mr. Allen was in Holding Cell H9, he asked repeatedly to be let out of the cell. After 7:24: p.m. Mr. Allen was not allowed out of Holding Cell H9 until he was moved to another holding cell.

<div align="center">152.</div>

At or around 10:48 p.m., Deputy Brittingham moved Mr. Allen to Holding Cell H8 which is a smaller holding cell than Holding Cell H9.

<div align="center">153.</div>

<div align="center">35</div>

Despite Mr. Allen constantly pressing the Alert button and showing signs of a serious mental/medical health breakdown and repeatedly asking to be let out of cell H9, Deputy Brittingham moved Mr. Allen to Holding cell H8 because he thought that Mr. Allen was not complying with instructions.

### 154.

Sergeant Mosley was aware that Mr. Allen was in Holding Cell H9 and told her deputies that he could not be in there and to move Mr. Allen to another holding cell.

### 155.

Neither Sergeant Mosley nor Deputy Brittingham had Mr. Allen medically assessed prior to moving him to Holding Cell H8.

### 156.

On May 22, 2021, at or around 10:49 p.m. Mr. Allen was put in CCADC Intake Holding Cell H8. He remained in that cell for over nine and a half hours until at or about 8:41 a.m.

### 157.

While Mr. Allen was in holding cells H8 and H9 for over 13 hours he was never allowed to make a phone call so that he could reach out to someone to help him and/or bond him out.

### 158.

While Mr. Allen was in Holding Cell H8 he is seen throughout the night, pacing, making loud sounds, speaking to himself, speaking to unknown stimuli, experiencing hallucinations, pouring water on himself and cell floor, screaming and pulling his hair out of his head.

159.

Mr. Allen had long hair when he was accepted at the CCADC.

160.

During the time Mr. Allen was in Holding Cell H8 he had pulled out most of his hair on his head and put it on the floor over a nine and a half hour time span.

161.

Despite CCSO policies and procedures and the medical standards of care, Mr. Allen was not seen by a medical provider and an intake assessment was not done since the time he was in Holding Cell H9 at 7:24 p.m.

162.

Paramedic Jonathan Watson and/or Nurse Vicky Ngethe and/or Nurse Jesica Reynolds did not do an Intake Medical Assessment on Mr. Allen as required by Wellpath's contract with CCSO, Wellpath's policies and procedures, CCSO policies and procedures and/or the Standards of the National Commission on Correctional Health Care.

163.

Deputy Williams stated in her interview with CCSO Internal Affairs Officers that Wellpath medical providers Paramedic Jonathan Watson and/or Nurse Vicky Ngethe refused to do an Intake Medical Assessment on Mr. Allen.

164.

Deputy Vega-Velez stated in her interview with CCSO Internal Affairs Officers that the medical providers refused to do an Intake Medical Assessment on Mr. Allen.

165.

Deputy Brittingham and Sergeant Mosley stated in their interviews with CCSO Internal Affairs Officers that Wellpath medical providers did not do an Intake Medical Assessment on Mr. Allen "just" because they just didn't want to do the assessment.

166.

Deputy Brittingham and Sergeant Mosley both stated that Deputy Brittingham asked Wellpath medical providers Paramedic Jonathan Watson and/or Nurse Vicky Ngethe to do an Intake Medical Assessment but they refused.

167.

Nurse Vicky Ngethe stated in an interview with CCSO Officers that she did not do an Intake Medical Assessment on Mr. Allen because Sergeant Mosley and

Deputy Brittingham would not allow her to do the assessment because they claimed Mr. Allen was combative and disorderly.

### 168.

Throughout the times that Mr. Allen was in Holding Cells H8 and H9 there were no attempts to do an Intake Medical Assessment of Mr. Allen.

### 169.

Although there was no attempt to do an Intake Medical Assessment of Mr. Allen throughout the night and early morning hours of May 22, 2021 and May 23, 2021, Nurse Vicky Ngethe documented that Mr. Allen refused medial treatment and that he was having behavioral issues and was in a side cell.

### 170.

Nurse Ngethe did not follow any of the other polices of Wellpath and/or the National Commission on Correctional Healthcare if an intake assessment was unable to be completed and/or a detainee/inmate refused medical treatment.

### 171.

CCSO has policies and procedures in place for conducting medical intake assessments. Neither Deputy Brittingham, Deputy Williams, Deputy Vega-Velez nor Sergeant Mosley followed those procedures to ensure that Mr. Allen received an Intake Medical Assessment/Receiving Screening.

### 172.

Security rounds are to be conducted on all holding cells in the Intake Area including the holding cells H8 and H9 that Mr. Allen was housed in.

173.

Security rounds were not done on Mr. Allen's holding cells throughout the night or early morning hours.

174.

The security rounds would have shown that Mr. Allen's serious mental health medical situation was escalating and that he was in immediate need of medical care.

175.

The security rounds would have shown that Mr. Allen was physically hurting himself by pulling out his hair and putting it on the floor.

176.

Deputy Williams has stated that she cannot do proper security rounds on holding cells because they are covered with opaque paper that she cannot see through and thus cannot properly check on the health and safety of detainees in holding cells.

177.

Deputy Williams, Deputy Brittingham, Deputy Vega-Velz, Sergeant Mosley all failed to do proper security rounds on Mr. Allen because they were deliberately indifferent to his escalating medical condition.

178.

Deputy Williams, Deputy Brittingham, Deputy Vega-Velez, and Sergeant Mosley's shifts all ended at or around 6:00 a.m. on May 23, 2021.

## 3. BRADY ALLEN MORNING INTAKE CONFINEMENT – MAY 23, 2021

179.

Deputy Demetrius Jones, Deputy Gregory Juedes, Deputy William Gooch and Sergeant Kent Vann worked in the CCADC Intake Area beginning at or around 6:00 a.m. on May 23, 2021.

180.

When Deputy Jones, Deputy Juedes, Deputy Gooch arrived at the CCADC on May 23, 2021, they received a "pass-on" from the night shift and learned that Mr. Allen was in Holding Cell H8 because he was disorderly.

181.

Deputy Jones, Deputy Juedes and Deputy Gooch also learned that Mr. Allen did not have an Intake Medical Assessment. Deputy Juedes and Deputy Gooch were the deputies that brought Mr. Allen into the booking area the prior evening on May 22, 2021.

182.

Sergeant Vann was also made aware during pass-on that Mr. Allen was in Holding Cell H8 because he was disorderly.

183.

41

Sergeant Vann also knew that Mr. Allen did not receive an Intake Medical Assessment.

### 184.

Sergeant Vann was the Sergeant on the prior day's shift when Mr. Allen came to the CCADC and was screened by Sergeant Vann's Intake Deputies Juedes and Gooch.

### 185.

Sergeant Vann, Deputy Gooch, Deputy Juedes and Deputy Jones were all aware that Mr. Allen was suffering from a serious mental health medical condition that required immediate medical attention.

### 186.

Deputy Jones, Deputy Gooch, Deputy Juedes and Sergeant Vann were all required to do security rounds on Mr. Allen throughout the morning of May 23, 2021.

### 187.

Neither Deputy Jones, Deputy Gooch, Deputy Juedes nor Sergeant Vann did proper security rounds on Mr. Allen while he was housed in Holding Cell H8 to make sure that he was alive and not experiencing any medical issues.

### 188.

Deputy Jones has stated that at one point when he did look in Mr. Allen's cell, he saw that Mr. Allen had pulled out his hair.

189.

Deputy Jones stated that he communicated that Mr. Allen was pulling out his hair to Deputy Gooch and Deputy Juedes and neither of them contacted medical to see Mr. Allen.

190.

Deputy Jones stated that it was normal for detainees/inmates in holding cells to pull out their hair.

191.

Sergeant Vann had a video monitor at his station, and he could see that Mr. Allen was panicking and experiencing a medical emergency.

192.

Nurse Donnette Duggan Pierre is a registered nurse that worked for Wellpath in the Intake Area in the morning on May 23, 2021, beginning at or around 6:00 a.m.

193.

Paramedic Brooke Stevic is a paramedic who worked for Wellpath in the Intake Area in the morning on May 23, 2021, beginning at or around 6:00 a.m.

194.

Both Nurse Duggan Pierre and Paramedic Stevic were aware that Mr. Allen did not have an Intake Medical Assessment since the time he had been admitted to the CCADC- over 11 hours before their shift started.

195.

Nurse Duggan Pierre and Paramedic Stevic, like their night shift counterparts, were responsible for doing Intake Medical Assessments of detainees within four hours of admission to the CCADC.

196.

Neither Nurse Duggan Pierre and/or Paramedic Stevic did an Intake Medical Assessment on Mr. Allen despite his deteriorating condition, obvious medical needs, and failure of Wellpath staff to complete a medical assessment of Mr. Allen within the time required by the standard of care, Wellpath policies and procedures and the Standards of the National Commission on Correctional Healthcare.

197.

Mr. Allen's condition continued to deteriorate throughout the morning hours of May 23, 2021.

198.

Mr. Allen's screams in Holding Cell H8 became louder throughout the early morning hours of May 23, 2021, and his behavior became more anxious, panicked and erratic throughout the morning.

44

199.

Mr. Allen continued to press the Alert button as he was housed in Holding Cell H8.

200.

Mr. Allen pressed the Alert button in Holding Cell H8 at least 100 times and no medical providers and/or security responded to his attempts at communication.

201.

Again, the CJS did not communicate Mr. Allen's issues to security personnel and/or ignored his attempts at communication.

202.

Mr. Allen also continued to yell that he wanted to be let out Holding Cell H8.

203.

At or around 8:40 a.m. Mr. Allen began to pull the fire alarm in Holding Cell H8.

204.

In response to Mr. Allen pulling the firearm, Sergeant Vann, Deputy Gooch, Deputy Jones, and others approached Mr. Allen's cell armed with a pepper ball gun and tasers.

205.

Sergeant Vann had the door to Mr. Allen's holding cell opened and instructed Mr. Allen to turn around and face the wall. Instead, Mr. Allen flailed his arms contacting Sergeant Vann and ran out of the cell.

206.

When Mr. Allen ran out of holding cell H8, another Sergeant struck Mr. Allen with the pepper ball gun and Sergeant Vann, Deputy Gooch, Deputy Jones and others tackled Mr. Allen to subdue him.

207.

The Sergeant that shot Mr. Allen repeatedly with the pepper ball gun then tased Mr. Allen.

208.

Mr. Allen became nonresponsive during the subdual as the gang of officers forcefully and physically subdued Mr. Allen while he was experiencing a serious mental health/medical emergency that escalated throughout the time that Mr. Allen had been detained at CCADC without adequate medical care or his necessary medications.

209.

Mr. Allen died by homicide the morning of May 23, 2021, due to CCSO staff's and Wellpath's medical provider's failure to address his escalating serious

mental health medical issues and CCSO staff forcefully subduing him until he was non-responsive.

## COUNT I
## VIOLATION OF SECTION 42 U.S.C. SECTION 1983
## SELECT DEFENDANTS – DELIBERATE INDIFFERENCE TO MEDICAL NEEDS

### 210.

Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1 through 209 as if fully stated herein.

### 211.

This count is asserted against Paramedic Jonathan Watson, Nurse Vicky Ngethe, Deputy Deandre Brittingham, Deputy Jennifer Williams, Deputy Jessica Vega-Velez, Sergeant Lolita Mosley, Deputy William Gooch, Deputy Gregory Juedes, Deputy Demetrius Jones, Sergeant Kent Vann, Calamati Eyvette Long, Susan Warren, Ashley Dickson, Diamond Nyreee Perez and Dania Wilson in their individual capacities only.

### 212.

The conditions in which a pre-convicted detainee is confined is subject to scrutiny under the Fourteenth Amendment of the United States Constitution and subject to actions under Section 1983.

### 213.

The acts of Sheriffs, deputies, nurses, and jail staff members in a detention facility in addressing an inmates' medical care are acts under color of state law.

### 214.

At all relevant times, Defendant Wellpath had a contract with CCADC to provide medical services to inmates/detainees. Accordingly, all medical personnel acting pursuant to that contract acted under the color of state law.

### 215.

Defendants acted under the color of State law under the circumstances of this case as detailed above.

### 216.

The Sheriff is required by law to ensure that inmates confined at the CCADC are provided reasonable access to medical care and, accordingly, is authorized to enter contracts for medical and mental health services.

### 217.

Defendants deprived Mr. Allen of rights and privileges afforded to him under the Fourteenth Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

### 218.

Defendants, individually and collectively, had an obligation to make sure that detainees/inmates at CCADC received reasonable medical care when needed.

219.

Defendants, individually and collectively, had an obligation to ensure that the serious medical needs of detainees/inmates detained at CCADC were timely and adequately addressed.

220.

Defendants failed to attend to Mr. Allen's serious medical condition and did not provide him with medical care when he was in obvious physical distress and needed medical care.

221.

Defendants' failure to adequately attend to Mr. Allen's serious medical condition caused his death.

222.

Defendants' failure to adequately attend to Mr. Allen's serious medical condition was in violation of the Fourteenth Amendment of the United States Constitution.

223.

Defendants' conduct evinced a deliberate indifference to the serious medical needs and safety of Mr. Allen.

224.

Defendants Paramedic Jonathan Watson and Nurse Vicky Ngethe violated Mr. Allen's constitutional right to receive medical care by admitting him into the CCADC without further medical screening and/or addressing his serious medical needs during screening and/or throughout the evening and early morning hours of May 22, 2021 through May 23, 2021.

225.

Paramedic Watson and Nurse Ngethe allowed Mr. Allen's condition to seriously deteriorate by not addressing his mental health and medical issues and consequently leading to his foreseeable subdual that caused his death.

226.

Defendants Deputy Deandre Brittingham, Deputy Jennifer Williams, Deputy Jessica Vega-Velez, Sergeant Lolita Mosley, Deputy William Gooch, Deputy Gregory Juedes, Deputy Demetrius Jones, Sergeant Kent Vann, Calamati Eyvette Long, Susan Warren, Ashley Dickson, Diamond Nyreee Perez and Dania Wilson violated Mr. Allen's constitutional right to receive medical care by not ensuring that his serious mental health and medical issues were addressed by medical staff; by failing to properly do security rounds and detect that Mr. Allen was not well and in need of immediate medical attention; by ignoring Mr. Allen's repeated attempts to communicate his medical concerns by pressing the Alert button that was ignored by CCSO staff.

227.

Defendants knew or should have known that their failure to provide Mr. Allen medical care could result in him suffering permanent injury or harm.

228.

Defendants' acts showed a deliberate indifference to Mr. Allen's medical condition and need for medical attention in violation of the Fourteenth Amendment of the United States Constitution.

229.

Defendants' failure to provide Mr. Allen adequate medical care caused his death.

**COUNT II**
**VIOLATION OF SECTION 42 U.S.C. SECTION 1983**
**COMMAND STAFF DEFENDANTS – CUSTOM AND PRACTICE**
**VIOLATIONS AND FAILURE TO TRAIN**

230.

Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1 through 229 as if fully stated herein.

231.

This count is asserted against Cobb County Sheriff Craig Owens, Cobb County Chief Deputy Sheriff Rhonda Anderson and Former Cobb County Sheriff Colonel Temetris Atkins, in their individual capacities only (hereinafter referred to "Command Staff").

232.

Cobb County Sheriff Owens establishes the official policy at the CCSO and/or CCADC to be followed by all CCSO staff and medical providers. These policies are authoritative for all questions concerning policies, procedures, rules and regulations.

233.

Cobb County Sheriff Owens is also responsible for ensuring sure that all CCSO staff are properly trained.

234.

Cobb County Chief Deputy Sheriff Rhonda Anderson is responsible, with the Cobb County Sheriff, for developing policies and procedures, enforcement of same and training of all CCSO staff.

235.

In May 2021, Former Cobb County Sheriff Colonel Temetris Atkins was responsible for the day-to-day operation and management of the CCADC including facility operation security objectives, inmate management, supervision of staff, CCADC training and enforcement of CCSO policies and procedures at the CCADC.

236.

In May 2021, the Command staff were aware that arrestees would enter their facility with mental health issues and detoxing from drugs.

237.

The Command Staff was aware that many of the arrestees that entered the CCADC needed mental health care and/or medical treatment to address drug detoxification.

238.

Drug detoxification may require medical treatment and may lead to serious medical and/or mental health emergencies including death.

239.

The Command Staff knew that many arrestees entering the CCADC needed to be evaluated for mental health and/or medical issues prior to entering the CCADC.

240.

In May 2021, the Command Staff knew that a substantial percentage of the CCADC detainees entering the CCADC had mental health and/or medical issues.

241.

The Command Staff had a responsibility to ensure that all CCADC detainees received adequate medical care.

242.

In May 2021, the Command staff was aware of a history of CCADC detainees receiving inadequate medical care for mental health and drug addiction and/or detoxification.

243.

In May 2021, the Command staff knew that there was a history of CCADC detainees dying or suffering severe illness at the CCADC because the detainees were not receiving adequate mental health and/or medical care.

244.

Since 2010, over twenty-five (25) people have died while in the custody of the CCADC.

245.

Many of the people that people that have died since 2010 while in the custody of the CCADC suffered medical emergencies that were not properly addressed.

246.

From 2018 through 2021 at least ten (10) people died from mental health and/or medical emergencies that were likely not properly addressed while in the custody of the CCADC.

247.

Many of the in-custody deaths at the CCADC during this time were avoidable with adequate mental health and/or medical care and if the detainees/inmates were either provided adequate medical treatment or sent to a hospital to receive adequate medical care.

248.

CCSO had a written policy that all arrestees entering the CCADC were to receive a Preliminary Health Screening Assessment prior to being admitted to the jail.

249.

CCSO had a written policy that all arrestees showing signs of serious detoxification and/or mental health issues should not be admitted to jail and should be sent to a hospital for medical clearance.

250.

CCSO had a written policy that all detainees were to receive a full Intake Medial Assessment/Receiving Screening prior to being admitted to the jail.

251.

The CCSO written policy was that all detainees should receive a full Intake Medical Assessment within four hours of being admitted to jail except for exceptional circumstances.

252.

CCSO Command Staff staffed the CCADC with officers who should have been familiar with CCADC policies and procedures including making sure that inmates receive adequate medical care.

253.

CCSO Command Staff knew that CCSO officers that staffed the CCADC Intake Area should be familiar with CCSO policies and procedures with respect to arrestee Preliminary Health Screening Assessments and Intake Medical Assessments.

254.

The Preliminary Health Screening Assessment should assist the CCADC in identifying detainees who need further medical evaluation and/or need to be sent out to a hospital to be medically cleared.

255.

The Intake Medical Assessment/Receiving Screening was used to evaluate whether detainees have medical needs that needed to be addressed.

256.

The PHSA and the Intake Medical Assessment are important assessments in processing arrestees at the CCADC.

257.

In May 2021, the Command Staff staffed the CCADC Intake Area with officers who were not properly trained on PHSA and/or Intake Medical Assessment.

258.

In May 2021, the Command Staff staffed the CCADC Intake Area with officers who were not trained on how to identify detainees in need of immediate mental health and/or medical attention.

259.

In May 2021, the Command Staff was aware that the officers that staffed the CCADC Intake Area were not properly trained to identify mental health and medical emergencies, especially as it relates to drug addiction and detoxification.

260.

In May 2021, the Command Staff was aware of CCSO policy that all Intake Medical Assessments be completed in four hours unless an exceptional circumstance arose.

261.

In May 2021, the Command Staff allowed for its medical providers to control when detainees would receive their Intake Medical Assessment.

262.

In May 2021, the Command Staff did not require the medical providers to complete an Intake Medical Assessment within the time dictated by CCSO policies and procedures.

263.

In May 2021, the Command Staff was aware that the medical providers were not doing Intake Medical Assessments within the time outlined in CCSO policies and procedures.

264.

In May 2021, the Command Staff had a custom and/or policy that allowed its medical providers to not complete the Intake Medical Assessment in accordance with CCSO policies and procedures and the Standards of the National Commission on Correctional Healthcare.

265.

In May 2021, the Command Staff had a custom and/or policy that allowed for its medical providers to ignore detainee medical concerns even if the deputies brought the medical concerns to the medical provider's attention.

266.

In May 2021, the Command Staff had a custom and/or policy that deputies did not challenge any of the medical treatment detainees received and/or failed to receive in contradiction to their constitutional responsibility to ensure that detainees received adequate medical care.

267.

In May 2021 and prior to that time, the Command Staff did not properly train CCSO officers on making sure that detainees receive an Intake Medical Assessment to ensure that CCADC detainees' potential medical issues were addressed.

268.

In May 2021, The Command Staff was aware that officers assigned to the CCADC Intake Area were responsible for doing security rounds of all detainees in holding cells within the Intake Area.

269.

CCSO had a written policy that all detainees housed in holding cells in the Intake Area of the CCADC should have hourly security rounds performed by CCSO officers.

270.

CCSO had a written policy that all detainees housed in Close Observation holding cells in the Intake Area of the CCADC should have security rounds performed by CCSO officers every 12-15 minutes but never more than every 15 minutes.

271.

CCSO policies and procedures provide that monitoring of inmates during a security round shall include an unobstructed visual check to ensure the inmate's presence and physical well-being.

272.

The security rounds are to ensure that the detainees are alive, well and not in need of any immediate medical attention.

273.

The security rounds should be conducted by the CCSO officers approaching the Intake holding cells, stopping in front of the cell, looking inside the cell, and assessing the detainee's condition.

274.

CCSO policies and procedures required the CCSO officers to note that the security round had been performed by either using an electronic scanning device or writing the time of the security round on a handwritten log.

275.

The notation of the security round indicates that the security round was completed, and that the detainee was alive, well and not in need of medical attention.

276.

CCSO officers should not note that a security round was done without issue if the detainee in which the security round was performed was experiencing a medical emergency or in need of immediate medical attention.

277.

CCSO Command Staff was aware that CCSO officers had not conducted proper security rounds in the past and that their failure to properly conduct a security round could impose a great danger to CCADC detainees.

278.

CCSO Command Staff was aware and had a custom and practice that its holding cells had an opaque paper on its windows and did not allow for its officers to conduct proper security rounds to make sure that a detainee was alive and well.

279.

CCSO Command Staff did not properly train CCADC officers on how to properly conduct security rounds even though they were aware that the security rounds were not being performed properly.

280.

CCSO Command Staff were aware that its written policies were not being followed.

281.

CCSO Command Staff's custom and practice as indicated above subjected detainees, like Brady Allen, to serious risk of harm and/or death.

282.

CCSO Command Staff's failure to provide adequate training to its officers as indicated above subjected detainees, like Brady Allen, to serious harm and or death and were deliberately indifferent to detainees, like Brady Allen, medical needs.

283.

CCSO Command Staff's customs and practices and failure to train CCSO officers as indicated above caused Brady Allen to be forcefully subdued and killed at the CCADC on May 23, 2021.

## COUNT III – NEGLIGENCE
## WELLPATH, LLC, PARAMEDIC JONATHAN WATSON, NURSE VICKY NEGETHE, NURSE JESICA REYNOLDS, PARAMEDIC BROOKE STEVIC AND NURSE DONNETTE DUGGAN-PIERRRE

284.

Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1 through 283 above as if fully stated herein.

285.

Plaintiff asserts this Count against Wellpath, LLC, Paramedic Jonathan Watson, Nurse Vicky Negethe, Nurse Jesica Reynolds, Paramedic Brooke Stevic and Nurse Donnette Duggan-Pierrre (hereinafter collectively referred to as the "Wellpath Defendants").

286.

Attached to this Complaint as Exhibit B is the Affidavit of Claire Teske, a licensed registered nurse, setting forth the standard of care and the breach of the standard of care for treatment of patients, including detainees, under these same or similar circumstances.  Nurse Teske's Affidavit is incorporated herein by reference as if the same was set forth herein verbatim.

287.

At all material times hereto, Wellpath Defendants were charged with the duty of using due and proper care in treating, caring for, and attending to Mr. Brady Allen's medical needs.

288.

Wellpath contracted with the CCSO to provide medical services at the CCADC including medical treatment, staffing, supplies and pharmaceuticals to inmates throughout the CCADC.

289.

Wellpath is a national corporation that employs nearly 15,000 clinicians and professionals in 36 states across the U.S. and Australia and provides medical, mental, and behavioral healthcare services to nearly 300,000 patients located in inpatient and residential treatment facilities, civil commitment centers, and local, state, and federal correctional facilities.

290.

Wellpath's contract with CCSO was from April 15, 2020, through December 31, 2024, where Wellpath would receive at minimum over Forty-Four Million Two Hundred Eighty-Seven Thousand Ninety-Seven Dollars and Fifty cents ($44,287,097.50) for its medical services at the CCADC.

291.

Wellpath contracted with the CCSO to receive at minimum Nine Million One Hundred Seventy Thousand Three Hundred Eighty-Nine Dollars and Forty-Seven cents ($9,170,389.47) for a one-year period beginning January 1, 2021 through December 31, 2021 – the year Brady Allen died.

292.

Wellpath contracted with CCADC to provide medical care to all detainees at the CCADC including detainees suffering from an emergency medical condition.

293.

Wellpath's contract with CCADC defines "Emergency" as any medical condition of a recent onset and severity, including but not limited to severe pain that would lead a prudent layperson, possessing average knowledge of medicine and health, to believe that his or her condition, sickness, or injury is of such a nature that failure to obtain medical care could result in:

A. placing the patient's heath in serious jeopardy

B. serious impairment to bodily functions;

C. serious dysfunction of any bodily organ or body part; or

D. when ambulance or EMS services may be necessary.

294.

Wellpath, its employees, contractors and sub-contractors all had a duty to meet all applicable standards of health care. The standards that Wellpath and its medical

providers were to follow collectively and individually refer to and include the standards issued by the Medical Association of Georgia ("MAG"), the National Commission on Correctional Health Care ("NCCHC"), the American Correctional Association ("ACA"), and all other applicable medical standards.

<div align="center">295.</div>

Wellpath and its medical providers had a duty to provide detainees access to medical care in a timely manner, meaning, a detainee can be seen by a clinician, given a clinical judgment and receive the care that is ordered to meet their medical needs in accordance with all applicable Standards.

<div align="center">296.</div>

Wellpath had responsibility to staff the CCADC Intake/Receiving Area with medical providers to do Pre-admittance and Intake Medical Assessments/Receiving Screenings.

<div align="center">297.</div>

Wellpath understaffed the CCADC Intake/Receiving Area in violation of its contract with the CCSO.

<div align="center">298.</div>

Wellpath and its medical providers were contractually obligated to perform an initial medical evaluation known as the as Sally Port Triage to determine if an

arrestees' medical condition is such that the medical provider recommends a potential detainee be accepted into the jail.

299.

There is no rule that Wellpath's responsibility to assess an arrestees' fitness to be booked at jail shall or is intended to impact the Sheriff or his deputies' authority to transfer, accept, reject, or condition the acceptance of an inmate or potential inmate for any reason.

300.

Wellpath's policies and procedures as they relate to the CCADC provide that if the initial evaluation concludes that an arrestee brought to the jail requires additional medical attention/treatment or diagnostic evaluation which cannot be afforded at the jail, the arrestee may be transported by the arresting agency that presented the arrestee to an appropriate medical facility away from the Jail, except in the case of emergency.

301.

Wellpath and its medical providers had a duty to perform receiving screening/intake on all Inmates and arrestees brought to the jail in compliance with NCCHC and ACA Standards.

302.

Wellpath and its medical providers had a duty to ensure that all Intake Medical Assessments and/or Receiving Medical Screenings take place within four (4) hours of an arrestee's arrival at the jail and before an inmate is admitted to general population.

303.

Wellpath's policy provides that where an inmate screening is not performed due to the inmate's condition (i.e. combative, severely intoxicated or for other reasons relating to the correctional facility), the reason for such lack of screening shall be immediately and fully documented in the inmate's medical records.

304.

Wellpath's policy was for its medical providers to, at a minimum, make and document observations of inmates that cannot be immediately screened a minimum of every two (2) hours and must screen the inmate within eight (8) hours of their admission to the CCADC or otherwise required by NCCHC and/or ACA Standards.

305.

Wellpath and its providers' Intake Medical Assessment and/or Receiving Screening shall, at minimal, comply with all applicable NCCHC and ACA Standards and shall include, but not be limited to:

a. an individual and confidential interview using the Intake/Receiving Screening form.

b. Documentation of current illness, medical and health problems, including medications taken, special health requirements, diseases, and any potential or identified mental health illness.

c. Notation of body deformities, trauma markings, bruises and ease of movement.

d. Check the conditions of skin and body orifices, including rashes, infestations, needle marks or other indications of drug abuse.

e. Medication, special housing, and emergency health services shall be addressed immediately, when appropriate.

f. Vital signs, including, but not limited to temperature, blood pressure, pulse respiration, height, weight, chronic care needs, i.e. pulmonary diabetes, HIV/AIDS, cardiac/HTN, seizures and TB.

g. Emergency services. The provider shall refer inmates for emergency or additional health services at the time of the Receiving Screening as clinically indicated. Treatment shall be initiated where appropriate.

h. Medication. As it relates to all screenings, all medications must be verified, ordered and administered. An evaluation of urgent medications required by the inmate for chronic disease maintenance and infectious disease care and provide those medications required for health maintenance during the intake/receiving screening process.

i.  Mental Health Screening.  Provider shall require all inmates to complete the Sheriff's "safety contract" or other form or verbal or written questions regarding an inmates claimed mental state; however, provider shall not be required to execute the safety contract.  If an inmate refused to complete a "safety contract" form or other form, or refuse to answer verbal or written questions regarding an inmates' claimed mental state during the receiving Screening, the Provider shall screen and promptly refer an inmate to an appropriate Mental Health Service Provider or other medical professional as determined by Provider as having a current mental illness, or whose screening indicates the possibility of a mental illness, suicide ideation and/or unstable mental health condition.   In all other cases where deemed medically appropriate as determined by a reasonably prudent health care professional with no training, education or expertise in mental health, behavioral health, psychiatry, psychology, or similar areas of mental health, the Provider shall refer an inmate to an appropriate mental health service provider for a mental health assessment of any inmate identified as having a current mental illness or whose screening indicates the possibility of a mental illness, suicide ideation and/or unstable mental health condition.  Other than the screening and referral processes outlined herein, the Provider shall have no responsibility whatsoever to perform any Mental Health Services. Provider shall coordinate

with the Sheriff and Mental Health Service Provider to ensure reasonable access to inmates referred for Mental Health Services.

306.

Paramedic Jonathan Watson, Nurse Vicky Ngethe, Nurse Jesica Reynolds, Paramedic Brooke Stevic and Nurse Donnette Duggan-Pierre were all assigned to CCADC Intake Area on either May 22, 2021 or May 23, 2021. These medical providers were responsible for ensuring that CCADC detainees received adequate medical care and/or assessments while housed in the CCADC Intake Area.

307.

The standard of care for a registered nurse is the reasonable degree of care and skill which, under similar conditions and like circumstances, is ordinarily employed by the profession generally.

308.

The standard of care for registered nurses treating patients in general and in confinement includes:

a. Assess the patient/client in a systematic, organized manner;

b. Formulate a nursing diagnosis based on accessible, communicable, and recorded data (which is collected in a systematic and continuous manner);

c. Plan care which includes goals and prioritized nursing approaches or measures derived from the nursing diagnoses;

d.  Implement strategies to provide for patient/client participation in health promotion, maintenance, and restoration;

e.  Initiate nursing actions to assist the patient/client to maximize his/her health capabilities;

f.  Evaluate with the patient/client the status of goal achievement as a basis for reassessment, reordering of priorities, new goal-setting and revision of the plan of nursing care;

g.  Communicate, collaborate, and function with other members of the health team to provide optimum care;

h.  Respect the dignity and rights of the patient/client regardless of socioeconomic status, personal attributes, or nature of health problems; and

i.  Provide nursing care without discrimination on the basis of diagnosis, age, sex, race, creed, or color.

<div align="center">309.</div>

The standard of care for a paramedic treating patients in general and in confinement includes:

a.  Provide first-aid treatment or life support care to sick or injured patients;

b.  Transfer patients to the emergency department of a hospital or other healthcare facility; and

<div align="center">71</div>

    c. Report their observations and treatment to physicians, nurses, or other healthcare facility staff.

<div align="center">310.</div>

Nurse Vicky Ngethe, Nurse Jesica Reynolds, Nurse Donnette Duggan-Pierre had a duty to Mr. Allen to practice nursing within the standard of care and violated the standard of care for registered nurses by failing to care for Mr. Allen by not doing a Receiving Screening/Intake Medical Assessment on Mr. Allen and ensuring that his medical needs were addressed.

<div align="center">311.</div>

Nurse Jesica Reynolds logged all of Mr. Allen's nine (9) medications when he came into the jail and did not alert and/or inform any of the other medical staff regarding his medications and possible mental/medical issues.

<div align="center">312.</div>

Nurse Reynolds was aware or should have been aware of Mr. Allen's Preliminary Health Assessment Screening and was aware or should have been aware of his medical/mental health status.

<div align="center">313.</div>

Despite Nurse Reynolds knowledge of Mr. Allen's mental/medical issues, Nurse Reynolds did not do an Intake Medical Assessment on Mr. Allen to determine his appropriateness to be housed at CCADC and/or his immediate medical needs.

<div align="center">72</div>

314.

Nurse Vicky Ngethe was aware or should have been aware of Mr. Allen's Preliminary Health Screening Assessment and his responses thereto.

315.

Nurse Ngethe was also aware or should have been aware of Mr. Allen's erratic behavior at the jail and that he was being housed in a small and isolated confinement cell.

316.

Despite Nurse Ngethe's knowledge of Mr. Allen's serious medical condition, Nurse Ngethe failed to do an Intake Medical Assessment on Mr. Allen.

317.

Nurse Ngethe improperly documented that Mr. Allen refused a medical assessment despite the fact that she did not attempt to do a medical assessment on Mr. Allen. Nurse Ngethe also did not observe Mr. Allen throughout the evening even if he had refused the assessment.

318.

Nurse Donnette Duggan-Pierre was the morning nurse assigned to Intake on May 23, 2021. She was aware or should have been aware that Mr. Allen was in a small confinement cell because he displayed mental health/medical issues.

319.

Nurse Duggan Pierre failed to do an Intake Medical Assessment on Mr. Allen knowing that he had been at the CCADC since her previous shift but at minimum for over twelve (12) hours.

320.

Paramedic Watson did not perform Mr. Allen's Pre-booking Screening when he entered the jail in compliance with the standard of care; Wellpath's policies and procedures; and/or the NCCHC and/or ACA Standards.

321.

Paramedic Watson either failed to review Mr. Allen's Preliminary Health Assessment Screening or ignored Mr. Allen's responses to the PHSA.

322.

Paramedic Watson should have at minimum taken Mr. Allen's vitals during his initial assessment with Mr. Allen and contacted the Nurse or another medical provider to make them aware of Mr. Allen's condition in the Prebooking Area.

323.

Paramedic Watson also saw Mr. Allen in the Intake Area of the jail and again failed to take his vitals and/or contact another medical provider and make them aware of Mr. Allen's condition.

324.

74

Paramedic Watson also saw Mr. Allen in the holding cell(s) acting strangely and erratically and did not notify another medical provider of Mr. Allen's behavior or make sure that an Intake Medical Assessment was done on Mr. Allen.

325.

Paramedic Brooke Stevic was the morning paramedic assigned to Intake on May 23, 2021. She was aware or should have been aware that Mr. Allen was in a small confinement cell because he displayed mental health/medical issues.

326.

Paramedic Stevic failed to do an Intake Medical Assessment on Mr. Allen knowing that he had been at the CCADC since her previous shift but at minimum for over twelve (12) hours.

327.

The Wellpath medical providers failure to properly care for Mr. Allen caused his death on May 23, 2021.

328.

At all times pertinent hereto, Paramedic Jonathan Watson, Paramedic Brooke Stevic, Nurse Vicky Ngethe, Nurse Jesica Reynolds, and Nurse Donnette Duggan-Pierre were acting within the course and scope of their employment with Wellpath.

329.

Wellpath is liable for acts and omissions of its medical providers under the doctrine of respondeat superior, agency or apparent agency.

330.

Wellpath is also liable for failing to train and supervise its employees working at the CCADC on how to properly do pre-booking screenings and Intake Medical Assessments/Receiving Screenings.

### COUNT IV – NEGLIGENCE
### SERGEANT LOLITA MOSLEY, SERGEANT KENT VANN, DEPUTY DEANDRE BRITTINGHAM, DEPUTY JENNIFER WILLIAMS, DEPUTY JESSICA VEGA-VELEZ, DEPUTY DEMETRIUS JONES, DEPUTY WILLIAM GOOCH, DEPUTY GREGORY JUEDES, CALAMATI EYVETTE LONG, SUSAN WARREN, ASHLEY DICKSON, DIAMOND NYREE PEREZ, and DANIA WILSON

331.

Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1 through 330 above as if fully stated herein.

332.

Plaintiff asserts this count against Sergeant Lolita Mosley, Sergeant Kent Vann, Deputy Deandre Brittingham, Deputy Jennifer Williams, Deputy Jessica Vega-Velez, Deputy Demetrius Jones, Deputy William Gooch, Deputy Gregory Juedes, Calamati Eyvette Long, Susan Warren, Ashley Dickson, Diamond Nyree Perez, and Dania Wilson in their individual capacities only. (hereinafter collectively referred to as "CCADC Defendants")

76

333.

The CCADC Defendants must follow the written policies and procedures of the Cobb County Sheriff's Office ("CCSO").

334.

Following the CCSO's policies and procedures is a ministerial duty.

335.

Providing medical care for inmates, including but not limited to Intake Medical Assessments, are ministerial duties.

336.

The PHSA and the responsibilities associated therewith, including but not limited to contacting medical providers and supervisors, are ministerial duties.

337.

The performance of security rounds at the CCADC is a ministerial duty.

338.

Monitoring holding cells and responding to Alert button requests at the CCADC are ministerial duties.

339.

CCSO policies and procedures provide that upon incarceration arrestees shall undergo a PHSA to identify and address any medical or mental health issues/concerns conveyed by the inmate or as observed by staff.

340.

CCSO Staff shall notify the Intake Supervisor of any "yes" responses from the arrestee as indicated on the PHSA or if staff reasonably believes the arrestee is in need of medical or mental health intervention.

341.

The Intake Supervisor shall promptly notify the Intake Nurse of any "yes" responses or observations that would indicate further assessment.

342.

The Intake Supervisor shall sign the PHSA form after completion and forward it to an Intake Specialist for further processing.

343.

The Intake Supervisor's signature indicates that the document has been reviewed for critical information and information that dictates the need for immediate medical attention.

344.

The Intake Supervisor and Intake Nurse shall be immediately notified if staff observes any of the following conditions or if the arrestee exhibits signs or symptoms of medical or mental issues:

- Arrestee appears intoxicated whereas his speech and motor skills are obviously affected.

- Staff suspects the arrestee is at risk of self-harm or poses a threat of harm to others based on the arrestee's comments, observed injuries that the inmate states are self-inflicted, arresting/transporting officer comments and/or observations.
- Arrestee admits to having recently ingested drugs.
- Arrestee verbally communicates the need to see a medical or mental health provider.

345.

Intake Staff shall immediately notify the Intake Supervisor any time an arrestee has prescription medication in their possession. (Policy 2-06-03.00)

346.

The Intake Supervisor shall inspect the medication to ensure that:

- the medication is in its original container;
- there is only one type of medication in each container;
- the name on the prescription is that of the arrestee.

347.

The Intake Supervisor shall call upon the Intake Nurse to verify the identity of the medication to determine if it is critical to the health of the inmate and to verify the number of pills/tablets located in the container. (Policy 2-06-08.00)

348.

No arrestee shall be admitted to CCADC without medical/mental health intervention if he/she presents symptoms of a serious illness, injury, unusual behavior or are in an unconscious state.  (Policy 2-02-03.01)

349.

Prior to accepting custody of an arrestee, personnel shall bring the following conditions to the attention of an Intake Nurse:

- Any suspected or obvious signs of illness, injury or evidence that the arrestee is under the influence of alcohol or drugs.

- The arrestee responds yes to specific questions asked when completing the PHSA.

350.

Employees assigned to the Intake Area are responsible for monitoring and supervising the activities of all inmates located in Intake. (Policy 2-02-15.00)

351.

If an arrestee is accepted into custody and requires frequent or subsequent medical attention, the arrestee shall be placed in a close observation area as directed by medical staff or the Intake Supervisor. (Policy 2-02-03.01)

## 352.

CCSO policies and procedures provide that inmates shall have adequate and proper access to emergency medical care. Medical staff shall ensure that prompt medical attention (response) is provided in situations deemed a medical emergency. (Policy 2-06-04.00)

## 353.

CCSO policies and procedures provide that staff shall be observant and responsive to signs of an emergency medical situation within the facility. (Policy 2-06-04.01)

## 354.

CCSO policies and procedures provide that the delivery of emergency medical services shall be a top priority, taking precedence over routine duties and responsibilities. (Policy 2-06-04.01)

## 355.

CCSO policies and procedures provide that inmates requiring emergency treatment beyond the facility's resources and capabilities shall be transported to a designated treatment facility or the nearest emergency room. Inmates requiring

increased monitoring or close observation may be placed in Close Observation Cells. (Policy 2-3-07.01)

### 356.

CCSO policies and procedures provide that Medical or security personnel may request placement of an inmate into Close Observation for reasons that include but are not limited to:

a. Inmate exhibits signs of abnormal behavior (e.g. hearing voices);

b. Inmate is displaying marked change in behavior occurring over an extended period of time (e.g. refusal of means or shower);

c. Inmate refused to take medication; and

d. Inmate speaks of or acts on threats of self-harm or threatens to harm others. (Policy 2-03-07.01)

### 357.

CCSO policies and procedures provide that CCSO staff should conduct observation security rounds every hour for inmates placed in an Intake holding cell, but is not on Close Observations. (Policy 2-02-15.00)

### 358.

The Intake Supervisor shall conduct a security round at least twice during each twelve-hour shift. (Policy 2-02-15.00)

### 359.

Observation (security) rounds shall be recorded by means of a Personal Digital Assistant (PDA), Guard I Pipe, or other security device that produces a written/digital record of observation (security) rounds conducted.

360.

CCSO Intake staff shall address and respond to any reasonable need, question or other request from an inmate (i.e. request to use the telephone or restroom, inquiries of charge(s) or bond information, request for food or water, indication of self-harm).

361.

CCSO Intake staff shall notify the Intake Supervisor of any disruptive or non-compliant behavior by any inmate that results in their placement in a holding cell. (Policy 2-02-15.00)

362.

Medical staff shall perform assessment rounds for all inmates housed in any level of segregation or medical housing units. (Policy 2-06-05.02)

363.

CCSO policies and procedures provide that the placement of inmates in a Close Observation Cell requires staff to conduct frequent and random observation/security rounds that shall not be more than 15 minutes apart.

364.

CCSO policies and procedures provide that monitoring of inmates during a security round shall include an unobstructed visual check to ensure the inmate's presence and physical well-being.

<div align="center">365.</div>

Criminal Justice Specialists ensure the safety of inmates. Ensure that inmates are not injured by themselves or by other inmates; respond to alarms; and provide inmates with information regarding charges, bonding, attorneys and personal interactions. Staff and operates security control rooms, providing monitoring of both inmates and security/fire control systems; control all movement within monitored area and ensure that inmates are safely and securely maintained. Operate security electronics system, intercom, radio equipment, computer terminal, telephone and key control systems.

<div align="center">366.</div>

The CCADC Defendants violated one or more of the aforementioned CCSO policies and procedures.

<div align="center">367.</div>

CCADC Defendants negligently performed or failed to perform their ministerial functions by:

- failing to provide Mr. Allen adequate medical assessments as outlined above;

- failing to contact appropriate personnel to respond to Mr. Allen's PHSA;

<div align="center">84</div>

- failing to ensure that Mr. Allen received an adequate Intake Medical Assessment/Receiving Screening;

- failing to provide Mr. Allen medical care to address deteriorating mental health and medical issues;

- failing to place Mr. Allen in Close Observations so that he could be frequently monitored for his mental health/medical issues;

- failing to properly conduct security rounds on Mr. Allen's cells to ensure that he was alive and well and not in need of medical attention; and

- failing to respond to Mr. Allen's numerous attempts to communicate by pressing the Alert button within the cells hundreds of times.

<p align="center">368.</p>

Mr. Allen's death was proximately caused by the CCADC Defendants as alleged herein.

<p align="center"><strong><u>COUNT V</u></strong><br><strong>PUNTIVE DAMAGES AND ATTORNEYS' FEES</strong></p>

<p align="center">369.</p>

Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1 through 368 above as if fully stated herein.

<p align="center">370.</p>

The acts and omissions of defendants as alleged show intent, willful misconduct, malice, fraud, wantonness, oppression and/or that entire want of care

<p align="center">85</p>

which raised the presumption of conscious indifference to the consequences entitling Plaintiffs to an award of punitive damages in an amount sufficient to deter Defendants from the same or similar actions in the future in accordance with 42 U.S.C. Section 1983.

371.

Defendants were malicious towards Mr. Allen because he was a detainee at the CCADC and did not believe he was entitled to the right to adequate medical care as secured by the United States Constitution.

372.

Defendants' conduct was done with reckless disregard of Mr. Allen's rights and all CCADC detainees and inmates similarly situated to Mr. Allen.

373.

The acts and omissions of Defendants justify an award of punitive damages to Plaintiffs.

374.

Per 42 U.S.C. Section 1983 Plaintiffs are entitled to attorney fees for bringing this action.

## COUNT VI
## BAD FAITH AND STUBBORN LITIGIOUSNESS

375.

Plaintiff re-alleges and incorporates herein the allegations contained in Paragraphs 1-374 of Plaintiffs' Complaint as though fully stated herein.

376.

There is no bona fide controversy as to liability, and as a result Defendants have been stubbornly litigious, have acted in bad faith, and have caused Plaintiffs unnecessary expenses under O.C.G.A. § 13-6-11.

377.

Defendants' actions entitle Plaintiffs to recover attorney's fees and expenses of litigation.

## DAMAGES

378.

Plaintiffs are entitled to recover as Administrator of Brady Allen's Estate and as Mr. Allen's parents for both Survivorship and Wrongful Death Claims including but not limited to Mr. Allen's pain and suffering, medical, funeral, and other expenses, the full value of Mr. Allen's life, mental anguish, loss of society, companionship, care, and guidance that was proximately caused by all Defendants for its Section 1983 violations and negligence. Plaintiffs are also entitled to punitive damages and attorneys' fees under 42 U.S.C. Section 1983 and O.C.G.A. § 13-6-11.

## JURY TRIAL DEMANDED

379.

Plaintiffs demand a trial by a jury on all matters that can be so tried.

WHEREFORE, Plaintiffs respectfully requests this Court enter Judgment against Defendants for actual and compensatory damages, punitive damages, attorney fees, costs, and all other relief the Court deems just and equitable.

This  18th  day of May, 2023.

<div style="margin-left: 40%;">

Respectfully submitted,

s/ Timothy J. Gardner
**TIMOTHY J. GARDNER**
Georgia Bar No. 115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547

***Attorneys for Plaintiffs***

</div>

Gardner Trial Attorneys, LLC
3100 Cumberland Blvd.
Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1(D), the undersigned hereby certifies that the foregoing document has been prepared in Times New Roman 14, a font and type selection approved by the Northern District of Georgia in LR 5.1(B) and LR 5.1(C).

This  18th  day of May, 2023.


GARDNER TRIAL ATTORNEYS, LLC


/s/ Timothy J. Gardner
**TIMOTHY J. GARDNER**
Georgia Bar No. 115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547

***Attorneys for Plaintiffs***


3100 Cumberland Blvd.
Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

# EXHIBIT C

# DOCKET SHEET

4months,CLOSED

# U.S. District Court
## Northern District of Georgia (Atlanta)
## CIVIL DOCKET FOR CASE #: 1:23-cv-02240-AT

Allen et al v. Owens et al

Assigned to: Judge Amy Totenberg

Cause: 42:1983 Civil Rights Act

Date Filed: 05/17/2023

Date Terminated: 11/18/2024

Jury Demand: Both

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: Federal Question

**Plaintiff**

**Scott Allen**
*individually as father of Brady Allen*
*as administrator of the estate of*
the Estate of Brady Allen

represented by **Henrietta G. Brown**
Gardner Trial Attorneys, LLC
Suite 1470
3100 Cumberland Blvd.
Atlanta, GA 30339
770-693-8202
Fax: 404-393-9838
Email: hgb@gardnertrialattorneys.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Timothy J. Gardner**
Gardner Trial Attorneys, LLC
Suite 1470
3100 Cumberland Blvd.
Atlanta, GA 30339
770-693-8202
Fax: 404-393-9838
Email: tjg@gardnertrialattorneys.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Karen Allen**
*individually as mother of Brady Allen*

represented by **Henrietta G. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Timothy J. Gardner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Cobb County Sheriff Craig Owens**
*in his individual capacity*
*TERMINATED: 11/12/2024*

represented by **Thomas M. Mitchell**
Carothers & Mitchell, LLC
1809 Buford Highway
Buford, GA 30518
770-932-3552
Fax: 770-932-6348
Email: thomas.mitchell@carmitch.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian R. Dempsey**
Gwinnett County Law Department
75 Langley Drive
Lawrenceville, GA 30046
770-822-8707
Email:
brian.dempsey@gwinnettcounty.com
*TERMINATED: 06/22/2024*

**Cullen Barrett Threlkeld**
Carothers & Mitchell, LLC
1809 Buford Highway
Buford, GA 30518
770-932-3552
Email: cullen.threlkeld@carmitch.com
*ATTORNEY TO BE NOTICED*

**Hugh William Rowling , Jr.**
Office of Cobb County Attorney
Law Department
100 Cherokee Street
Suite 350
Marietta, GA 30090-7003
770-528-4000
Email:
H.William.Rowling@cobbcounty.org
*ATTORNEY TO BE NOTICED*

**Lauren S. Bruce**
Cobb County Attorney's Office
Suite 350
100 Cherokee Street
Marietta, GA 30090
770-528-4000
Email: Lauren.Bruce@cobbcounty.org
*ATTORNEY TO BE NOTICED*

**Defendant**

**Temetris Atkins**
*Former Cobb County Sheriff Office*
*Colonel, in his individual capacity*
*TERMINATED: 11/12/2024*

represented by **Thomas M. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian R. Dempsey**
(See above for address)
*TERMINATED: 06/22/2024*

**Cullen Barrett Threlkeld**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hugh William Rowling , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren S. Bruce**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Wellpath, LLC**

represented by **Beth Boone**
Hall Booth Smith
3528 Darien Highway
Ste 300
Brunswick, GA 31525
912-554-0093
Email: bboone@hallboothsmith.com
*TERMINATED: 09/30/2024*
*LEAD ATTORNEY*

**Richard Wells Littlefield , III**
Hall Booth Smith - Brunswick
3528 Darien Highway
Ste 300
Brunswick, GA 31525
912-554-0093
Fax: 912-554-1973
Email: rlittlefield@hallboothsmith.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tiffiny Montenegro**
Hall Booth Smith - Brunswick
3528 Darien Highway
Ste 300
Brunswick, GA 31525
912-554-0093

Email: tmontenegro@hallboothsmith.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cobb County Sheriff Chief Deputy
Rhonda Anderson**
*in her individual capacity*
*TERMINATED: 11/12/2024*

represented by **Thomas M. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian R. Dempsey**
(See above for address)
*TERMINATED: 06/22/2024*

**Cullen Barrett Threlkeld**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hugh William Rowling , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren S. Bruce**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cobb County Sheriff Sergeant Lolita
Mosley**
*in her individual capacity*

represented by **Thomas M. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian R. Dempsey**
(See above for address)
*TERMINATED: 06/22/2024*

**Cullen Barrett Threlkeld**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hugh William Rowling , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren S. Bruce**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cobb County Sheriff Sergeant Kent Vann**

*in his individual capacity*

represented by **Thomas M. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian R. Dempsey**
(See above for address)
*TERMINATED: 06/22/2024*

**Cullen Barrett Threlkeld**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hugh William Rowling , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren S. Bruce**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cobb County Sheriff Deputy Gregory Juedes**

*in his individual capacity*

represented by **Thomas M. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian R. Dempsey**
(See above for address)
*TERMINATED: 06/22/2024*

**Cullen Barrett Threlkeld**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hugh William Rowling , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren S. Bruce**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cobb County Sheriff Deputy William Gooch**

*in his individual capacity*

represented by **Thomas M. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian R. Dempsey**

5

(See above for address)
*TERMINATED: 06/22/2024*

**Cullen Barrett Threlkeld**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hugh William Rowling , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren S. Bruce**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cobb County Sheriff Deputy Demetrius Jones**
*in his individual capacity*

represented by **Thomas M. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian R. Dempsey**
(See above for address)
*TERMINATED: 06/22/2024*

**Cullen Barrett Threlkeld**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hugh William Rowling , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren S. Bruce**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cobb County Sheriff Deputy Deandre Brittingham**
*in his individual capacity*

represented by **Thomas M. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian R. Dempsey**
(See above for address)
*TERMINATED: 06/22/2024*

**Cullen Barrett Threlkeld**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hugh William Rowling , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren S. Bruce**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cobb County Sheriff Deputy Jennifer Williams**
*in her individual capacity*

represented by   **Thomas M. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian R. Dempsey**
(See above for address)
*TERMINATED: 06/22/2024*

**Cullen Barrett Threlkeld**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hugh William Rowling , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren S. Bruce**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cobb County Sheriff Deputy Jessica Vega-Velez**
*in her individual capacity*

represented by   **Thomas M. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian R. Dempsey**
(See above for address)
*TERMINATED: 06/22/2024*

**Cullen Barrett Threlkeld**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hugh William Rowling , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren S. Bruce**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Calamati Eyvette Long**                    represented by   **Thomas M. Mitchell**
*in her individual capacity*                                  (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Brian R. Dempsey**
                                                              (See above for address)
                                                              *TERMINATED: 06/22/2024*

                                                              **Cullen Barrett Threlkeld**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Hugh William Rowling , Jr.**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Lauren S. Bruce**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Susan Warren**                             represented by   **Thomas M. Mitchell**
*in her individual capacity*                                  (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Brian R. Dempsey**
                                                              (See above for address)
                                                              *TERMINATED: 06/22/2024*

                                                              **Cullen Barrett Threlkeld**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Hugh William Rowling , Jr.**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Lauren S. Bruce**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Ashley Dickson**                           represented by   **Brian R. Dempsey**
*in her individual capacity*                                  (See above for address)

8

**Defendant**

**Diamond Nyree Perez**           represented by   **Brian R. Dempsey**
*in her individual capacity*                                 (See above for address)
*TERMINATED: 02/08/2024*                          *TERMINATED: 06/22/2024*

**Defendant**

**Dania Wilson**                        represented by   **Thomas M. Mitchell**
*in her individual capacity*                                 (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Brian R. Dempsey**
                                                     (See above for address)
                                                     *TERMINATED: 06/22/2024*

                                                     **Cullen Barrett Threlkeld**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Hugh William Rowling , Jr.**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Lauren S. Bruce**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**Paramedic Jonathan Watson**       represented by   **Beth Boone**
                                                     (See above for address)
                                                     *TERMINATED: 09/30/2024*
                                                     *LEAD ATTORNEY*

                                                     **Richard Wells Littlefield , III**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Tiffiny Montenegro**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**Nurse Vicky Ngethe**                   represented by   **Beth Boone**
*R.N.*                                               (See above for address)
                                                     *TERMINATED: 09/30/2024*
                                                     *LEAD ATTORNEY*

**Richard Wells Littlefield , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tiffiny Montenegro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Nurse Jessica Reynolds**              represented by    **Beth Boone**
*R.N.*                                                    (See above for address)
                                                          *TERMINATED: 09/30/2024*
                                                          *LEAD ATTORNEY*

**Richard Wells Littlefield , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas M. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tiffiny Montenegro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Paramedic Brooke Stevic**           represented by    **Beth Boone**
                                                        (See above for address)
                                                        *TERMINATED: 09/30/2024*
                                                        *LEAD ATTORNEY*

**Richard Wells Littlefield , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tiffiny Montenegro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Nurse Donnette Duggan-Pierre**      represented by    **Beth Boone**

(See above for address)
*TERMINATED: 09/30/2024*
*LEAD ATTORNEY*

**Richard Wells Littlefield , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tiffiny Montenegro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ABC CORP 1-20**

**Defendant**

**John Does 1-20**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/17/2023 | 1 | COMPLAINT with Jury Demand filed by Scott Allen & Karen Allen. (Filing fee $402, receipt number AGANDC-12605607) (Attachments: # 1 Exhibit B - Expert Affidavit, # 2 Exhibit A - Ante Litem Notice, # 3 Civil Cover Sheet)(jra) Please visit our website at http://www.gand.uscourts.gov/commonly-used-forms to obtain Pretrial Instructions and Pretrial Associated Forms which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 05/19/2023) |
| 05/18/2023 | 2 | Electronic Summons Issued as to ABC CORP 1-20, Chief Deputy Rhonda Anderson, Deputy Deandre Brittingham, Ashley Dickson, Donnette Duggan-Pierre, Deputy William Gooch, John Does 1-20, Deputy Demetrius Jones, Deputy Gregory Juedes, Calamati Eyvette Long, Sergeant Lolita Mosley, Vicky Ngethe, Craig Owens, Diamond Nyree Perez, Jessica Reynolds, Sheriff Colonel Temetris Atkins, Brooke Stevic, Sergeant Kent Vann, Deputy Jessica Vega-Velez, Susan Warren, Jonathan Watson, Wellpath, LLC, Deputy Jennifer Williams, Dania Wilson. (jra) (Entered: 05/19/2023) |
| 05/22/2023 | 3 | PROPOSED SUMMONS filed by Scott Allen *for Donnette Duggan Pierre* (Gardner, Timothy) (Entered: 05/22/2023) |
| 05/22/2023 | 4 | Electronic Summons Issued as to Donnette Duggan-Pierre. (dob) (Entered: 05/22/2023) |
| 05/22/2023 | 5 | Return of Service Executed by Scott Allen. Deputy Jennifer Williams served on 5/22/2023, answer due 6/12/2023. (Attachments: # 1 Affidavit of Service)(Gardner, Timothy) (Entered: 05/22/2023) |
| 05/22/2023 | 6 | PROPOSED SUMMONS filed by Scott Allen *for Donnette Duggan Pierre* (Gardner, Timothy) (Entered: 05/22/2023) |
| 05/23/2023 | 7 | Summons Issued as to Donnette Duggan-Pierre. (dob) (Entered: 05/23/2023) |

| 05/23/2023 | 8 | Return of Service Executed by Scott Allen. Brooke Stevic served on 5/19/2023, answer due 6/9/2023. (Gardner, Timothy) (Entered: 05/23/2023) |
|---|---|---|
| 05/23/2023 | 9 | Return of Service Unexecuted by Scott Allen as to Donnette Duggan-Pierre. (Attachments: # 1 Affidavit of Non-Service)(Gardner, Timothy) (Entered: 05/23/2023) |
| 05/23/2023 | 10 | Return of Service Unexecuted by Scott Allen as to Deputy Demetrius Jones. (Attachments: # 1 Affidavit of Non-Service)(Gardner, Timothy) (Entered: 05/23/2023) |
| 05/23/2023 | 11 | AFFIDAVIT re 8 Return of Service Executed *on Brooke Stevic* by Scott Allen. (Gardner, Timothy) (Entered: 05/23/2023) |
| 05/23/2023 | 12 | PROPOSED SUMMONS filed by Scott Allen *for Dania Wilson* (Gardner, Timothy) (Entered: 05/23/2023) |
| 05/23/2023 | 13 | Return of Service Executed by Scott Allen. Calamati Eyvette Long served on 5/20/2023, answer due 6/12/2023. (Attachments: # 1 Affidavit of Service)(Gardner, Timothy) (Entered: 05/23/2023) |
| 05/24/2023 | 14 | Electronic Summons Issued as to Dania Wilson. (dob) (Entered: 05/24/2023) |
| 05/24/2023 | 15 | Return of Service Executed by Scott Allen. Deputy Jessica Vega-Velez served on 5/23/2023, answer due 6/13/2023. (Attachments: # 1 Affidavit of Service)(Gardner, Timothy) (Entered: 05/24/2023) |
| 05/24/2023 | 16 | Return of Service Executed by Scott Allen. Deputy William Gooch served on 5/23/2023, answer due 6/13/2023. (Attachments: # 1 Affidavit of Service)(Gardner, Timothy) (Entered: 05/24/2023) |
| 05/24/2023 | 17 | PROPOSED SUMMONS filed by Scott Allen *for Demetrius Jones* (Gardner, Timothy) (Entered: 05/24/2023) |
| 05/24/2023 | 18 | PROPOSED SUMMONS filed by Scott Allen *for Diamond Nyree Perez* (Gardner, Timothy) (Entered: 05/24/2023) |
| 05/25/2023 | 19 | Electronic Summons Issued as to Deputy Demetrius Jones. (dob) (Entered: 05/25/2023) |
| 05/25/2023 | 20 | Electronic Summons Issued as to Diamond Nyree Perez. (dob) (Entered: 05/25/2023) |
| 05/25/2023 | 21 | PROPOSED SUMMONS filed by Scott Allen *for Craig Owens* (Gardner, Timothy) (Entered: 05/25/2023) |
| 05/25/2023 | 22 | PROPOSED SUMMONS filed by Scott Allen *for Rhonda Anderson* (Gardner, Timothy) (Entered: 05/25/2023) |
| 05/25/2023 | 23 | PROPOSED SUMMONS filed by Scott Allen *for Lolita Mosley* (Gardner, Timothy) (Entered: 05/25/2023) |
| 05/25/2023 | 24 | PROPOSED SUMMONS filed by Scott Allen *for Jesica Reynolds* (Gardner, Timothy) (Entered: 05/25/2023) |
| 05/25/2023 | 25 | Return of Service Executed by Scott Allen. Wellpath, LLC served on 5/19/2023, answer due 6/9/2023. (Attachments: # 1 Affidavit of Service)(Gardner, Timothy) (Entered: 05/25/2023) |
| 05/25/2023 | 26 | Return of Service Executed by Scott Allen. Sergeant Kent Vann served on 5/21/2023, |

| | | answer due 6/12/2023. (Attachments: # 1 Affidavit of Service)(Gardner, Timothy) (Entered: 05/25/2023) |
|---|---|---|
| 05/25/2023 | 27 | Return of Service Executed by Scott Allen. Donnette Duggan-Pierre served on 5/23/2023, answer due 6/13/2023. (Attachments: # 1 Affidavit of Service)(Gardner, Timothy) (Entered: 05/25/2023) |
| 05/26/2023 | 28 | Electronic Summons Issued as to Jessica Reynolds. (dob) (Entered: 05/26/2023) |
| 05/26/2023 | 29 | Electronic Summons Issued as to Craig Owens. (dob) (Entered: 05/26/2023) |
| 05/26/2023 | 30 | Electronic Summons Issued as to Sergeant Lolita Mosley. (dob) (Entered: 05/26/2023) |
| 05/26/2023 | 31 | Electronic Summons Issued as to Chief Deputy Rhonda Anderson. (dob) (Entered: 05/26/2023) |
| 05/26/2023 | 32 | Return of Service Executed by Scott Allen. Deputy Deandre Brittingham served on 5/19/2023, answer due 6/9/2023. (Attachments: # 1 Affidavit of Service)(Gardner, Timothy) (Entered: 05/26/2023) |
| 05/30/2023 | 33 | Return of Service Executed by Scott Allen. Susan Warren served on 5/20/2023, answer due 6/12/2023. (Attachments: # 1 Affidavit of Service)(Gardner, Timothy) (Entered: 05/30/2023) |
| 05/31/2023 | 34 | Return of Service Executed by Scott Allen. Temetris Atkins served on 5/20/2023, answer due 6/12/2023. (Attachments: # 1 Affidavit of Service)(Gardner, Timothy) (Entered: 05/31/2023) |
| 05/31/2023 | 35 | Return of Service Executed by Scott Allen. Dania Wilson served on 5/25/2023, answer due 6/15/2023. (Attachments: # 1 Affidavit of Service)(Gardner, Timothy) (Entered: 05/31/2023) |
| 05/31/2023 | 36 | Return of Service Executed by Scott Allen. Chief Deputy Rhonda Anderson served on 5/25/2023, answer due 6/15/2023. (Gardner, Timothy) (Entered: 05/31/2023) |
| 05/31/2023 | 37 | Return of Service Executed by Scott Allen. Jonathan Watson served on 5/19/2023, answer due 6/9/2023. (Attachments: # 1 Affidavit of Service)(Gardner, Timothy) (Entered: 05/31/2023) |
| 06/01/2023 | 38 | Return of Service Executed by Scott Allen. Deputy Demetrius Jones served on 5/30/2023, answer due 6/20/2023. (Gardner, Timothy) (Entered: 06/01/2023) |
| 06/01/2023 | 39 | Return of Service Executed by Scott Allen. Sergeant Lolita Mosley served on 5/31/2023, answer due 6/21/2023. (Gardner, Timothy) (Entered: 06/01/2023) |
| 06/01/2023 | 40 | Return of Service Executed by Scott Allen. Deputy Gregory Juedes served on 5/20/2023, answer due 6/12/2023. (Attachments: # 1 Affidavit of Service)(Gardner, Timothy) (Entered: 06/01/2023) |
| 06/01/2023 | 41 | Return of Service Unexecuted by Scott Allen as to Sergeant Lolita Mosley. (Attachments: # 1 Affidavit of Non-Service)(Gardner, Timothy) (Entered: 06/01/2023) |
| 06/01/2023 | 42 | Return of Service Executed by Scott Allen. Vicky Ngethe served on 5/28/2023, answer due 6/20/2023. (Gardner, Timothy) (Entered: 06/01/2023) |
| 06/01/2023 | 43 | Return of Service Executed by Scott Allen. Craig Owens served on 5/26/2023, answer due 6/16/2023. (Gardner, Timothy) (Entered: 06/01/2023) |

| 06/01/2023 | 44 | Return of Service Unexecuted by Scott Allen as to Sergeant Lolita Mosley. (Gardner, Timothy) (Entered: 06/01/2023) |
|---|---|---|
| 06/02/2023 | 45 | STANDING ORDER: Guidelines to Parties and Counsel. Signed by Judge Amy Totenberg on 6/2/2023. (dob) (Entered: 06/02/2023) |
| 06/06/2023 | 46 | Return of Service Executed by Scott Allen. Jessica Reynolds served on 6/1/2023, answer due 6/22/2023. (Gardner, Timothy) (Entered: 06/06/2023) |
| 06/09/2023 | 47 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM with Brief In Support by Deputy Deandre Brittingham, Deputy William Gooch, Deputy Demetrius Jones, Deputy Gregory Juedes, Sergeant Lolita Mosley, Sergeant Kent Vann, Deputy Jessica Vega-Velez, Deputy Jennifer Williams. (Attachments: # 1 Brief)(Dempsey, Brian) (Entered: 06/09/2023) |
| 06/09/2023 | 48 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM with Brief In Support by Calamati Eyvette Long, Susan Warren, Dania Wilson. (Attachments: # 1 Brief) (Dempsey, Brian) (Entered: 06/09/2023) |
| 06/09/2023 | 49 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM with Brief In Support by Chief Deputy Rhonda Anderson, Temetris Atkins, Craig Owens. (Attachments: # 1 Brief)(Dempsey, Brian) (Entered: 06/09/2023) |
| 06/09/2023 | 50 | NOTICE of Appearance by Lauren S. Bruce on behalf of Chief Deputy Rhonda Anderson, Temetris Atkins, Deputy Deandre Brittingham, Deputy William Gooch, Deputy Demetrius Jones, Deputy Gregory Juedes, Calamati Eyvette Long, Sergeant Lolita Mosley, Craig Owens, Sergeant Kent Vann, Deputy Jessica Vega-Velez, Susan Warren, Deputy Jennifer Williams, Dania Wilson (Bruce, Lauren) (Entered: 06/09/2023) |
| 06/09/2023 | 51 | NOTICE of Appearance by Hugh William Rowling, Jr on behalf of Chief Deputy Rhonda Anderson, Temetris Atkins, Deputy Deandre Brittingham, Deputy William Gooch, Deputy Demetrius Jones, Deputy Gregory Juedes, Calamati Eyvette Long, Sergeant Lolita Mosley, Craig Owens, Sergeant Kent Vann, Deputy Jessica Vega-Velez, Susan Warren, Deputy Jennifer Williams, Dania Wilson (Rowling, Hugh) (Entered: 06/09/2023) |
| 06/09/2023 | 52 | CERTIFICATE of Compliance (Boone, Beth) (Entered: 06/09/2023) |
| 06/09/2023 | 53 | CERTIFICATE of Compliance (Littlefield, Richard) (Entered: 06/09/2023) |
| 06/09/2023 | 54 | ANSWER to 1 COMPLAINT with Jury Demand by Wellpath, LLC. Discovery ends on 11/6/2023.(Littlefield, Richard) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions. (Entered: 06/09/2023) |
| 06/09/2023 | 55 | ANSWER to 1 COMPLAINT with Jury Demand by Jonathan Watson.(Littlefield, Richard) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions. (Entered: 06/09/2023) |
| 06/09/2023 | 56 | ANSWER to 1 COMPLAINT with Jury Demand by Brooke Stevic.(Littlefield, Richard) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions. (Entered: 06/09/2023) |
| 06/09/2023 | 57 | Certificate of Interested Persons and Corporate Disclosure Statement by Wellpath, LLC. (Littlefield, Richard) (Entered: 06/09/2023) |

| 06/12/2023 | 58 | CERTIFICATE of Compliance *for Timothy Gardner* (Gardner, Timothy) (Entered: 06/12/2023) |
|---|---|---|
| 06/12/2023 | 59 | CERTIFICATE of Compliance *for Henrietta Brown* (Brown, Henrietta) (Entered: 06/12/2023) |
| 06/12/2023 | 60 | Certificate of Interested Persons and Corporate Disclosure Statement by Scott Allen. (Gardner, Timothy) (Entered: 06/12/2023) |
| 06/12/2023 | 61 | CERTIFICATE of Compliance *for Lauren S. Bruce* (Bruce, Lauren) (Entered: 06/12/2023) |
| 06/12/2023 | 62 | CERTIFICATE of Compliance *for H. William Rowling, Jr.* (Rowling, Hugh) (Entered: 06/12/2023) |
| 06/13/2023 | 63 | CERTIFICATE of Compliance re 45 Order (Dempsey, Brian) (Entered: 06/13/2023) |
| 06/13/2023 | 64 | ANSWER to 1 COMPLAINT with Jury Demand by Donnette Duggan-Pierre. (Littlefield, Richard) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions. (Entered: 06/13/2023) |
| 06/13/2023 | 65 | MOTION to Stay *All Discovery and Rule 26 Requirements* with Brief In Support by Chief Deputy Rhonda Anderson, Temetris Atkins, Deputy Deandre Brittingham, Deputy William Gooch, Deputy Demetrius Jones, Deputy Gregory Juedes, Calamati Eyvette Long, Sergeant Lolita Mosley, Craig Owens, Sergeant Kent Vann, Deputy Jessica Vega-Velez, Susan Warren, Deputy Jennifer Williams, Dania Wilson. (Dempsey, Brian) (Entered: 06/13/2023) |
| 06/14/2023 | | ORDER, by docket entry only, granting 65 Motion to Stay all discovery (including disclosures and planning conferences pursuant to Fed. R. Civ. P. 26, L.R. 16.2, and L.R. 26.1), until the Court has ruled on their motions to dismiss. Ordered by Judge Amy Totenberg on 6/14/23. (hfm) (Entered: 06/14/2023) |
| 06/15/2023 | 66 | ANSWER to 1 COMPLAINT with Jury Demand by Jessica Reynolds.(Littlefield, Richard) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions. (Entered: 06/15/2023) |
| 06/15/2023 | 67 | ANSWER to 1 COMPLAINT with Jury Demand by Vicky Ngethe.(Littlefield, Richard) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions. (Entered: 06/15/2023) |
| 06/21/2023 | 68 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM with Brief In Support by Ashley Dickson. (Attachments: # 1 Brief)(Dempsey, Brian) (Entered: 06/21/2023) |
| 06/22/2023 | 69 | RESPONSE in Opposition re 49 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Scott Allen. (Gardner, Timothy) (Entered: 06/22/2023) |
| 06/22/2023 | 70 | RESPONSE in Opposition re 68 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 48 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Scott Allen. (Gardner, Timothy) (Entered: 06/22/2023) |
| 06/23/2023 | 71 | RESPONSE in Opposition re 47 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Scott Allen. (Gardner, Timothy) (Entered: 06/23/2023) |
| 06/29/2023 | 72 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM with Brief In Support |

| | | |
|---|---|---|
| | | by Diamond Nyree Perez. (Attachments: # 1 Brief)(Dempsey, Brian) (Entered: 06/29/2023) |
| 07/05/2023 | 73 | REPLY BRIEF re 47 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Deputy Deandre Brittingham, Deputy William Gooch, Deputy Demetrius Jones, Deputy Gregory Juedes, Sergeant Lolita Mosley, Sergeant Kent Vann, Deputy Jessica Vega-Velez, Deputy Jennifer Williams. (Dempsey, Brian) (Entered: 07/05/2023) |
| 07/05/2023 | 74 | REPLY BRIEF re 68 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 48 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Ashley Dickson, Calamati Eyvette Long, Susan Warren, Dania Wilson. (Dempsey, Brian) (Entered: 07/05/2023) |
| 07/05/2023 | 75 | REPLY BRIEF re 49 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Chief Deputy Rhonda Anderson, Temetris Atkins, Craig Owens. (Dempsey, Brian) (Entered: 07/05/2023) |
| 07/07/2023 | 76 | Joint MOTION to Dismiss *Less Than All Parties (Defendant Diamond Nyree Perez, In Her Individual Capacity and Ashley Dickson, In Her Individual Capacity)* by Scott Allen. (Attachments: # 1 Text of Proposed Order)(Gardner, Timothy) (Entered: 07/07/2023) |
| 07/10/2023 | | Submission of 47 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 49 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 68 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 48 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , to District Judge Amy Totenberg. (hfm) (Entered: 07/10/2023) |
| 07/12/2023 | 77 | RESPONSE re 72 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Karen Allen, Scott Allen. (Gardner, Timothy) Modified on 7/13/2023 to edit event selected (dob). (Entered: 07/12/2023) |
| 07/25/2023 | | Submission of 76 Joint MOTION to Dismiss *Less Than All Parties (Defendant Diamond Nyree Perez, In Her Individual Capacity and Ashley Dickson, In Her Individual Capacity)*, to District Judge Amy Totenberg. (hfm) (Entered: 07/25/2023) |
| 07/27/2023 | | Submission of 72 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , to District Judge Amy Totenberg. (hfm) (Entered: 07/27/2023) |
| 08/24/2023 | 78 | Application for Leave of Absence for the following date(s): November 2, 2023 - November 9, 2023 and December 7, 2023 - December 13, 3023, by Beth Boone. (Attachments: # 1 Text of Proposed Order)(Boone, Beth) (Entered: 08/24/2023) |
| 09/18/2023 | 79 | Notice for Leave of Absence for the following date(s): Sept 27-Oct 3, 2023, Oct 13-18, 2023, November 20-24, 2023, December 14-22, 2023, by Brian R. Dempsey. (Dempsey, Brian) (Entered: 09/18/2023) |
| 10/18/2023 | 80 | MOTION for Leave to File Supplemental Brief 68 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 48 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 47 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 76 Joint MOTION to Dismiss *Less Than All Parties (Defendant Diamond Nyree Perez, In Her Individual Capacity and Ashley Dickson, In Her Individual Capacity)*, 49 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 72 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM with Brief In Support by Chief |

| | | |
|---|---|---|
| | | Deputy Rhonda Anderson, Temetris Atkins, Deputy Deandre Brittingham, Ashley Dickson, Deputy William Gooch, Deputy Demetrius Jones, Deputy Gregory Juedes, Calamati Eyvette Long, Sergeant Lolita Mosley, Craig Owens, Diamond Nyree Perez, Sergeant Kent Vann, Deputy Jessica Vega-Velez, Susan Warren, Deputy Jennifer Williams, Dania Wilson. (Dempsey, Brian) Modified on 10/19/2023 to edit relief and text(tmf). (Entered: 10/18/2023) |
| 10/19/2023 | | Notification of Docket Correction re 80 MOTION for Leave to File Supplemental Brief 68 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 48 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 47 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 76 Joint MOTION to Dismiss *Less Than All Parties (Defendant Diamond Nyree Perez, In Her Individual Capacity and Ashley Dickson, In Her Individual Capacity)*, 49 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 72 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM with Brief In Support by Chief Deputy Rhonda Anderson, Temetris Atkins, Deputy Deandre Brittingham, Ashley Dickson, Deputy William Gooch, Deputy Demetrius Jones, Deputy Gregory Juedes, Calamati Eyvette Long, Sergeant Lolita Mosley, Craig Owens, Diamond Nyree Perez, Sergeant Kent Vann, Deputy Jessica Vega-Velez, Susan Warren, Deputy Jennifer Williams, Dania Wilson. (Dempsey, Brian) Modified on 10/19/2023 to edit relief and text(tmf). (Entered: 10/19/2023) |
| 11/01/2023 | 81 | RESPONSE in Opposition re 80 Motion for Leave to File filed by Karen Allen, Scott Allen. (Gardner, Timothy) (Entered: 11/01/2023) |
| 11/16/2023 | | Submission of 80 Motion for Leave to File, to District Judge Amy Totenberg. (hfm) (Entered: 11/16/2023) |
| 11/17/2023 | | ORDER, by docket entry only, denying 80 Motion for Leave to File Supplemental Briefs. Ordered by Judge Amy Totenberg on 11/17/23. (hfm) (Entered: 11/17/2023) |
| 11/30/2023 | 82 | Certification of Consent to Substitution of Counsel. Tiffiny Montenegro replacing attorney Richard Wells Littlefield, III. (Montenegro, Tiffiny) (Entered: 11/30/2023) |
| 02/08/2024 | 83 | ORDER dismissing as moot 68 Motion to Dismiss for Failure to State a Claim; dismissing as moot 72 Motion to Dismiss for Failure to State a Claim. Plaintiffs' claims against Defendant Diamond Nyree Perez, in her individual capacity, and Defendant Ashley Dickson, in her individual capacity, are DISMISSED WITHOUT PREJUDICE. Signed by Judge Amy Totenberg on 2/8/2023. (dob) (Entered: 02/08/2024) |
| 02/22/2024 | | ORDER by docket entry only. Defendants pending Motions to Dismiss (Docs. 47, 48, 49) are STAYED pending the issuance of the United States Court of Appeals for the Eleventh Circuits en banc decision in Betty Wade v. Georgia Correctional Health, LLC, et al. (N.D. Ga. Case Number: 4:18-cv-00192-AT; Eleventh Circuit Case Number 21-14275), which will address the question: What is the standard for establishing liability on an Eighth Amendment deliberate-indifference claim? (USCA11 Case 21-14275, Doc. 57). Defendants are DIRECTED to file either supplemental briefs (not to exceed 10 pages) OR amended motions to dismiss within 60 days of the issuance of the Eleventh Circuits en banc decision. Ordered by Judge Amy Totenberg on 2/22/24. (hfm) (Entered: 02/22/2024) |
| 02/28/2024 | 84 | Notice for Leave of Absence for the following date(s): March 29-April 5, 2024, May |

| | | |
|---|---|---|
| | | 21-28, 2024, July 22-26, 2024, September 16-18, 2024, October 11-16, 2024, November 25-29, 2024, and December 20-27, 2024, by Brian R. Dempsey. (Dempsey, Brian) (Entered: 02/28/2024) |
| 03/21/2024 | 85 | Request for Leave of Absence for the following date(s): June 12, 2024 - June 14, 2024; July 24, 2024 - August 2, 2024; December 5, 2024 - December 13, 2024, by Beth Boone. (Boone, Beth) (Entered: 03/21/2024) |
| 06/22/2024 | 86 | Certification of Consent to Substitution of Counsel. Thomas M. Mitchell replacing attorney Brian R. Dempsey. (Mitchell, Thomas) (Entered: 06/22/2024) |
| 06/22/2024 | 87 | Notice for Leave of Absence for the following date(s): June 19 through June 26, 2024, August 23 through August 27, 2024, November 15 through November 25, 2024, by Thomas M. Mitchell. (Mitchell, Thomas) (Entered: 06/22/2024) |
| 06/27/2024 | 88 | ORDER AND NOTICE. This Order provides notice to all parties with active cases before the Court that, as of July 1, 2024, the marvelous and extraordinarily capable Harry Martin will no longer be the Courtroom Deputy for the undersigned. Mr. Martin has ascended to a leadership position in the Clerk's Office where he will continue his superb service to the Court, and the public, at large. Please direct all future communications regarding court matters to the undersigned's new Courtroom Deputy, Keri Gardner, at keri_gardner@gand.uscourts.gov and 404-215-1437. Signed by Judge Amy Totenberg on 6/27/2024. (bgt) (Entered: 06/27/2024) |
| 09/09/2024 | 89 | CERTIFICATE of Compliance (Mitchell, Thomas) (Entered: 09/09/2024) |
| 09/09/2024 | 90 | Amended MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM with Brief In Support by Chief Deputy Rhonda Anderson, Temetris Atkins, Craig Owens. (Attachments: # 1 Brief in support of Amended Motion to Dismiss)(Mitchell, Thomas) (Entered: 09/09/2024) |
| 09/09/2024 | 91 | Amended MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM with Brief In Support by Calamati Eyvette Long, Susan Warren, Dania Wilson. (Attachments: # 1 Brief in support of Amended Motion to Dismiss)(Mitchell, Thomas) (Entered: 09/09/2024) |
| 09/09/2024 | 92 | Amended MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM with Brief In Support by Deputy Deandre Brittingham, Deputy William Gooch, Deputy Demetrius Jones, Deputy Gregory Juedes, Sergeant Lolita Mosley, Sergeant Kent Vann, Deputy Jessica Vega-Velez, Deputy Jennifer Williams. (Attachments: # 1 Brief in support of Amended Motion to Dismiss)(Mitchell, Thomas) (Entered: 09/09/2024) |
| 09/18/2024 | 93 | Consent MOTION for Extension of Time Respond to Cobb County Defendants' Amended Motions to Dismiss re: 91 Amended MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 90 Amended MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 92 Amended MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Karen Allen, Scott Allen. (Attachments: # 1 Text of Proposed Order)(Gardner, Timothy) (Entered: 09/18/2024) |
| 09/18/2024 | 94 | ORDER granting 93 Consent MOTION for Extension of Time Respond to Cobb County Defendants' Amended Motions to Dismiss re: 91 , 90 , 92 through and including 10/23/2024. Signed by Judge Amy Totenberg on 9/18/2024. (dob) (Entered: 09/18/2024) |
| 09/30/2024 | 95 | Certification of Consent to Substitution of Counsel. Richard Wells Littlefield, III |

| | | replacing attorney Beth Boone. (Littlefield, Richard) (Entered: 09/30/2024) |
|---|---|---|
| 10/23/2024 | 96 | Joint MOTION to Dismiss *Less Than All Parties* by Karen Allen, Scott Allen. (Attachments: # 1 Text of Proposed Order)(Gardner, Timothy) (Entered: 10/23/2024) |
| 10/23/2024 | 97 | RESPONSE in Opposition re 90 Amended MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Karen Allen, Scott Allen. (Gardner, Timothy) (Entered: 10/23/2024) |
| 10/23/2024 | 98 | NOTICE of Appearance by Richard Wells Littlefield, III on behalf of Donnette Duggan-Pierre, Vicky Ngethe, Jessica Reynolds, Brooke Stevic, Jonathan Watson, Wellpath, LLC (Littlefield, Richard) (Entered: 10/23/2024) |
| 10/23/2024 | 99 | RESPONSE in Opposition re 91 Amended MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Karen Allen, Scott Allen. (Gardner, Timothy) (Entered: 10/23/2024) |
| 10/23/2024 | 100 | RESPONSE in Opposition re 92 Amended MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Karen Allen, Scott Allen. (Gardner, Timothy) (Entered: 10/23/2024) |
| 10/23/2024 | 101 | MOTION for Leave to File Amended Complaint *to Eliminate All Federal Claims Against All Defendants* by Karen Allen, Scott Allen. (Attachments: # 1 Exhibit A) (Gardner, Timothy) (Entered: 10/23/2024) |
| 10/25/2024 | 102 | NOTICE of Appearance by Cullen Barrett Threlkeld on behalf of Chief Deputy Rhonda Anderson, Temetris Atkins, Deputy Deandre Brittingham, Deputy William Gooch, Deputy Demetrius Jones, Deputy Gregory Juedes, Calamati Eyvette Long, Sergeant Lolita Mosley, Craig Owens, Sergeant Kent Vann, Deputy Jessica Vega-Velez, Susan Warren, Deputy Jennifer Williams, Dania Wilson (Threlkeld, Cullen) (Entered: 10/25/2024) |
| 11/06/2024 | 103 | REPLY to Response to Motion re 91 Amended MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Ashley Dickson, Calamati Eyvette Long, Susan Warren, Dania Wilson. (Threlkeld, Cullen) (Entered: 11/06/2024) |
| 11/06/2024 | 104 | RESPONSE in Opposition re 101 MOTION for Leave to File Amended Complaint *to Eliminate All Federal Claims Against All Defendants* filed by Deputy Deandre Brittingham, Ashley Dickson, Deputy William Gooch, Deputy Demetrius Jones, Deputy Gregory Juedes, Calamati Eyvette Long, Sergeant Lolita Mosley, Sergeant Kent Vann, Deputy Jessica Vega-Velez, Susan Warren, Deputy Jennifer Williams, Dania Wilson. (Threlkeld, Cullen) (Entered: 11/06/2024) |
| 11/06/2024 | 105 | REPLY to Response to Motion re 92 Amended MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Deputy Deandre Brittingham, Deputy William Gooch, Deputy Demetrius Jones, Deputy Gregory Juedes, Sergeant Lolita Mosley, Sergeant Kent Vann, Deputy Jessica Vega-Velez, Deputy Jennifer Williams. (Threlkeld, Cullen) (Entered: 11/06/2024) |
| 11/06/2024 | 106 | NOTICE of Non-Opposition re 96 Joint MOTION to Dismiss *Less Than All Parties* filed by Chief Deputy Rhonda Anderson, Temetris Atkins, Craig Owens. (Threlkeld, Cullen) Modified on 11/7/2024 to edit event (tmf). (Entered: 11/06/2024) |
| 11/07/2024 | | NOTICE of Non-Opposition re 96 Joint MOTION to Dismiss *Less Than All Parties* filed by Chief Deputy Rhonda Anderson, Temetris Atkins, Craig Owens. (Threlkeld, |

| | | |
|---|---|---|
| | | Cullen) Modified on 11/7/2024 to edit event (tmf). (Entered: 11/07/2024) |
| 11/07/2024 | | Submission of 90 , 91 , 92 Amended MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM to District Judge Amy Totenberg. (kng) (Entered: 11/07/2024) |
| 11/12/2024 | 107 | ORDER denying as moot 90 Motion to Dismiss for Failure to State a Claim; granting 96 Motion to Dismiss terminating Craig Owens (in his individual capacity), Chief Deputy Rhonda Anderson (in her individual capacity) and Temetris Atkins (Former Cobb County Sheriff Office Colonel, in his individual capacity). Signed by Judge Amy Totenberg on 11/12/2024. (dob) (Entered: 11/13/2024) |
| 11/15/2024 | 108 | SUGGESTION OF BANKRUPTCY Upon the Record *and Notice of Stay* by Wellpath, LLC. (Attachments: # 1 Exhibit Voluntary Petition of Wellpath, # 2 Exhibit Stay Order)(Littlefield, Richard) (Entered: 11/15/2024) |
| 11/18/2024 | 109 | ORDER staying all pending motions in this action. The Court Administratively Closes this case. In the event the U.S. Bankruptcy Court of the Southern District of Texas dismisses the Petitions or lifts the stays, or if there is some other changein the proceedings before the Bankruptcy Court, Plaintiff may move to reopen the case at that time. Wellpath is ORDERED to keep the other parties to this litigation informed as to the status of its bankruptcy proceedings. Signed by Judge Amy Totenberg on 11/18/2024. (dob) (Entered: 11/18/2024) |
| 11/18/2024 | | Civil Case Terminated. (dob) (Entered: 11/18/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/02/2025 10:39:26 | | |
| **PACER Login:** | BlakeBerryman | **Client Code:** | Cobb_County |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-02240-AT |
| **Billable Pages:** | 20 | **Cost:** | 2.00 |