**EXHIBIT**

Allen Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| SCOTT ALLEN as Administrator of the Estate of BRADY ALLEN and individually as father of BRADY ALLEN, and KAREN ALLEN, individually as mother of BRADY ALLEN, | |
| Plaintiffs, | |
| v. | |
| COBB COUNTY SHERIFF CRAIG OWENS, in his individual capacity, WELLPATH, LLC, FORMER COBB COUNTY SHERIFF OFFICE COLONEL TEMETRIS ATKINS, in his individual capacity, COBB COUNTY SHERIFF CHIEF DEPUTY RHONDA ANDERSON, in her individual capacity, COBB COUNTY SHERIFF SERGEANT LOLITA MOSLEY, in her individual capacity, COBB COUNTY SHERIFF SERGEANT KENT VANN, in his individual capacity, COBB COUNTY SHERIFF DEPUTY GREGORY JUEDES in his individual capacity, COBB COUNTY SHERIFF DEPUTY WILLIAM GOOCH, in his individual capacity, COBB COUNTY SHERIFF DEPUTY DEMETRIUS JONES, in his individual capacity, COBB COUNTY SHERIFF DEPUTY DEANDRE BRITTINGHAM, in his individual capacity, COBB COUNTY SHERIFF DEPUTY JENNIFER WILLIAMS, in her individual capacity, COBB | CIVIL ACTION FILE NO:<br><br>**JURY TRIAL DEMANDED** |

1

COUNTY SHERIFF DEPUTY
JESSICA VEGA-VELEZ, in her
individual capacity, CALAMATI
EYVETTE LONG, in her individual
capacity, SUSAN WARREN, in her
individual capacity, ASHLEY
DICKSON, in her individual capacity,
DIAMOND NYREE PEREZ, in her
individual capacity, DANIA WILSON,
in her individual capacity,
PARAMEDIC JONATHAN WATSON,
NURSE VICKY NGETHE, R.N.,
NURSE JESICA REYNOLDS, R.N.,
PARAMEDIC BROOKE STEVIC,
NURSE DONNETTE DUGGAN-
PIERRE, R.N., ABC CORP 1-20, and
JOHN DOES 1-20,

          Defendants.

## PLAINTIFFS' COMPLAINT

Plaintiffs, Scott Allen as Administrator of the Estate of Brady Allen and individually as father of Brady Allen, and Karen Allen individually as mother of Brady Allen, (hereinafter collectively referred to as "Plaintiffs") files this Complaint against Defendants Cobb County Sheriff Craig Owens, in his individual capacity, Wellpath, LLC, Former Cobb County Sheriff Colonel Temetris Atkins, in his individual capacity, Cobb County Sheriff Chief Deputy Rhonda Anderson, in her individual capacity, Cobb County Sheriff Sergeant Lolita Mosley, in her individual capacity, Cobb County Sheriff Sergeant Kent Vann, in his individual capacity, Cobb

2

County Sheriff Deputy Gregory Juedes, in his individual capacity, Cobb County Sheriff Deputy William Gooch, in his individual capacity, Cobb County Sheriff Deputy Demetrius Jones, in his individual capacity, Cobb County Sheriff Deputy Deandre Brittingham, in his individual capacity, Cobb County Sheriff Deputy Jennifer Williams, in her individual capacity, Cobb County Sheriff Deputy Jessica Vega-Velez, in her individual capacity, Calamati Eyvette Long, in her individual capacity, Susan Warren, in her individual capacity, Ashley Dickson, in her individual capacity, Diamond Nyree Perez, in her individual capacity, Dania Wilson, in her individual capacity, Paramedic Jonathan Watson, Nurse Vicky Ngethe, R.N., Nurse Jessica Reynolds, R.N., Paramedic Brooke Stevic, Nurse Donnette Duggan-Pierre, R.N., ABC CORP 1-20, JOHN DOES 1-20 and state as follows:

## **PARTIES**

1.

Plaintiffs are the parents of Brady Allen and the Administrator of his estate, and both reside within the Northern District of Georgia and are subject to the jurisdiction of this Court.

2.

On May 22-23, 2021, Defendant Craig Owens was the Cobb County Sheriff and oversaw the Cobb County Adult Detention Center (hereinafter referred to as the "CCADC") located at 1825 County Services Pkwy, Marietta, GA 30008, where

Brady Allen died. It was Sheriff Owen's responsibility to ensure that inmates and detainees at the CCADC receive adequate medical care under O.C.G.A. § 42-4-4 and O.C.G.A. § 42-5-2. Sheriff Owens may be served at his residence in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

3.

On May 22-23, 2021, Cobb County Sheriff Owens was acting under the color of law and within the course and scope of his employment with the CCADC.

4.

On May 22-23, 2021, Defendant Temetris Atkins was a Colonel at the Cobb County Sheriff's Office (hereinafter referred to as the "CCSO") tasked in part with managing the CCADC. It was former Colonel Atkins' responsibility, in part, to ensure that inmates and detainees received adequate medical care at the CCADC. Former Colonel Atkins may be served at his residence address in DeKalb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

5.

On May 22-23, 2021, former Colonel Temetris Atkins was acting under the color of law and within the course and scope of his employment with the CCADC.

6.

On May 22-23, 2021, Defendant Rhonda Anderson was Chief Deputy at the Cobb County Sheriff's Office and tasked, in part, with managing the CCADC. It was

Chief Deputy Anderson's responsibility, in part, to ensure that inmates and detainees received adequate medical care at the CCADC. Chief Deputy Anderson may be served at her residence address in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

7.

On May 22-23, 2021, Chief Deputy Rhonda Anderson was acting under the color of law and within the course and scope of his employment with the CCADC.

8.

Defendant Wellpath, LLC. (hereinafter referred to as "Wellpath") is a foreign non-profit corporation existing under the laws of Delaware with its principal place of business at 3340 Perimeter Hill Drive, Nashville, Tennessee 37211 and may be served with a copy of the Summons and Complaint through its registered agent, Corporate Creations Network, Inc. at 2985 Gordy Parkway, 1st Floor, Marietta, Georgia 30066 and is subject to the jurisdiction of this court.

9.

At all times material hereto, Wellpath managed the day-to-day medical operations at the CCADC.

10.

On May 22-23, 2021, Defendant Cobb County Sheriff's Office Sergeant Lolita Mosley was employed by the Cobb County Sheriff's Office and worked at the

5

CCADC. Sergeant Mosley may be served with a copy of the Summons and Complaint at her residence address in Douglas County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

11.

On May 22-23, 2021, Sergeant Mosley was acting under the color of law and within the course and scope of his employment with CCADC.

12.

On May 22-23, 2021, Defendant Cobb County Sheriff's Office Sergeant Kent Vann was employed by the Cobb County Sheriff's Office and worked at the CCADC. Sergeant Vann may be served with a copy of the Summons and Complaint at his residence address in Bartow County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

13.

On May 22-23, 2021, Sergeant Vann was acting under the color of law and within the course and scope of his employment with CCADC.

14.

On May 22-23, 2021, Defendant Cobb County Sheriff's Office Deputy Gregory Juedes was employed by the Cobb County Sheriff's Office and worked at the CCADC. Deputy Juedes may be served with a copy of the Summons and

Complaint at his residence address in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

15.

On May 22-23, 2021, Deputy Juedes was acting under the color of law and within the course and scope of his employment with CCADC.

16.

On May 22-23, 2021, Defendant Cobb County Sheriff's Office Deputy William Gooch was employed by the Cobb County Sheriff's Office and worked at the CCADC. Deputy Gooch may be served with a copy of the Summons and Complaint at his residence address in Gilmer County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

17.

On May 22-23, 2021, Deputy Gooch was acting under the color of law and within the course and scope of his employment with CCADC.

18.

On May 22-23, 2021, Defendant Cobb County Sheriff's Office Deputy Demetrius Jones was employed by the Cobb County Sheriff's Office and worked at the CCADC. Deputy Jones may be served with a copy of the Summons and Complaint at his residence address in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

19.

On May 22-23, 2021, Deputy Jones was acting under the color of law and within the course and scope of his employment with CCADC.

20.

On May 22-23, 2021, Defendant Cobb County Sheriff's Office Deputy Deandre Brittingham was employed by the Cobb County Sheriff's Office and worked at the CCADC. Deputy Brittingham may be served with a copy of the Summons and Complaint at his residence address in Fulton County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

21.

On May 22-23, 2021, Deputy Brittingham was acting under the color of law and within the course and scope of his employment with CCADC.

22.

On May 22-23, 2021, Defendant Cobb County Sheriff's Office Deputy Jennifer Williams was employed by the Cobb County Sheriff's Office and worked at the CCADC. Deputy Williams may be served with a copy of the Summons and Complaint at her residence address in Coweta County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

23.

On May 22-23, 2021, Deputy Williams was acting under the color of law and within the course and scope of her employment with CCADC.

24.

On May 22-23, 2021, Defendant Cobb County Sheriff's Office Deputy Jessica Vega-Velez was employed by the Cobb County Sheriff's Office and worked at the CCADC. Deputy Vega-Velez may be served with a copy of the Summons and Complaint at her residence address in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

25.

On May 22-23, 2021, Deputy Vega-Velez was acting under the color of law and within the course and scope of her employment with CCADC.

26.

On May 22-23, 2021, Defendant Calamati "Eyvette" Long was employed by the Cobb County Sheriff's Office as a Criminal Justice Specialist and worked at the CCADC. Ms. Long may be served with a copy of the Summons and Complaint at her residence address in Cobb County. This Defendant is subject to the jurisdiction and venue of this Court.

27.

On May 22-23, 2021, Ms. Long was acting under the color of law and within the course and scope of her employment with CCADC.

28.

On May 22-23, 2021, Defendant Susan Warren was employed by the Cobb County Sheriff's Office as a Criminal Justice Specialist and worked at the CCADC. Ms. Warren may be served with a copy of the Summons and Complaint at her residence address in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

29.

On May 22-23, 2021, Ms. Warren was acting under the color of law and within the course and scope of her employment with CCADC.

30.

On May 22-23, 2021, Defendant Ashley Dickson was employed by the Cobb County Sheriff's Office as a Criminal Justice Specialist and worked at the CCADC. Ms. Dickson may be served with a copy of the Summons and Complaint at her residence address in Fulton County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

31.

On May 22-23, 2021, Ms. Dickson was acting under the color of law and within the course and scope of her employment with CCADC.

32.

On May 22-23, 2021, Defendant Diamond Nyree Perez was employed by the Cobb County Sheriff's Office as a Criminal Justice Specialist and worked at the CCADC. Ms. Nyree Perez may be served with a copy of the Summons and Complaint at her residence address in Fulton County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

33.

On May 22-23, 2021, Ms. Nyree Perez was acting under the color of law and within the course and scope of her employment with CCADC.

34.

On May 22-23, 2021, Defendant Dania Wilson was employed by the Cobb County Sheriff's Office as a Criminal Justice Specialist and worked at the CCADC. Ms. Wilson may be served with a copy of the Summons and Complaint at her residence address in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

35.

Defendant Jonathan Watson is a paramedic that was employed by Wellpath on May 22-23, 2021, and worked at the CCADC. Mr. Watson may be served with a copy of the Summons and Complaint at his residence address in Gwinnett County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

36.

On May 22-23, 2021, Paramedic Watson worked for Wellpath and was responsible for providing care, monitoring, and observing Brady Allen while he was housed in Intake at the CCADC.

37.

On May 22-23, 2021, Jonathan Watson was acting under the color of law pursuant to Wellpath's contract with the CCADC and within the course and scope of his employment with Wellpath.

38.

Defendant Vicky Ngethe is a registered nurse that was employed by Wellpath on May 22-23, 2021, and worked at the CCADC. Ms. Ngethe may be served with a copy of the Summons and Complaint at her residence address in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

39.

On May 22-23, 2021, Nurse Vicky Ngethe worked for Wellpath and was responsible for providing care, monitoring, and observing Brady Allen while he was housed in Intake at the CCADC.

40.

On May 22-23, 2021, Vicky Ngethe was acting under the color of law pursuant to Wellpath's contract with the CCADC and within the course and scope of her employment with Wellpath.

41.

Defendant Jesica Reynolds is a registered nurse that was employed by Wellpath on May 22-23, 2021, and worked at the CCADC. Ms. Reynolds may be served with a copy of the Summons and Complaint at her residence address in Fulton County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

42.

On May 22-23, 2021, Nurse Jesica Reynolds worked for Wellpath and was responsible for providing care, monitoring, and observing Brady Allen while he was housed in Intake at the CCADC.

43.

On May 22-23, 2021, Nurse Reynolds was acting under the color of law pursuant to Wellpath's contract with the CCADC and within the course and scope of her employment with Wellpath.

44.

Defendant Donnette Duggan Pierre is a registered nurse that was employed by Wellpath on May 22-23, 2021, and worked at the CCADC. Ms. Duggan Pierre may be served with a copy of the Summons and Complaint at her residence address in DeKalb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

45.

On May 22-23, 2021, Nurse Duggan Pierre worked for Wellpath and was responsible for providing care, monitoring, and observing Brady Allen while he was housed in Intake at the CCADC.

46.

On May 22-23, 2021, Nurse Duggan Pierre was acting under the color of law pursuant to Wellpath's contract with the CCADC and within the course and scope of her employment with Wellpath.

47.

Defendant Brooke Stevic is a paramedic that was employed by Wellpath on May 22-23, 2021, and worked at the CCADC. Ms. Stevic may be served with a copy of the Summons and Complaint at her address in Cobb County, Georgia. This Defendant is subject to the jurisdiction and venue of this Court.

48.

On May 22-23, 2021, Ms. Stevic worked for Wellpath and was responsible for providing care, monitoring, and observing Brady Allen while he was housed in Intake at the CCADC.

49.

On May 22-23, 2021, Ms. Stevic was acting under the color of law pursuant to Wellpath's contract with the CCADC and within the course and scope of her employment with Wellpath.

50.

ABC Corp 1-20 are unidentified corporations that were responsible for providing medical care to detainees/inmates at CCADC on May 22-23, 2021 and/or had a constitutional responsibility to provide inmates and detainees at the CCADC adequate medical care.

51.

John Does 1-20 are unidentified employees of Wellpath and/or the Cobb County Sheriff's Office who were responsible for Brady Allen's death and had a constitutional responsibility to provide detainees/inmates at the CCADC adequate medical care and/or violated the Cobb County Sheriff's Office policies and procedures for its employees with respect to providing adequate medical care.

52.

The conduct of all the Defendants was within the exercise of State authority within the meaning of 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

53.

This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, as well as the Eighth and Fourteenth Amendments of the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and the aforementioned constitutional and statutory provisions.

54.

This Court has jurisdiction over Plaintiffs' state tort claims pursuant to its ancillary and pendent jurisdiction under 28 U.S.C. § 1367.

55.

Venue is proper in the Northern District of Georgia, Atlanta Division pursuant to 28 U.S.C. § 1391 (b) and N.D.L.R. 3.1B(3) because the event giving rise to this claim occurred in Cobb County, Georgia, which is situated within the district and divisional boundaries of the Atlanta Division of the Northern District of Georgia.

56.

Defendants all reside within the Northern District of Georgia and are subject to the jurisdiction of this Court.

57.

The matter in controversy exceeds this court's $75,000.00 jurisdictional limit, exclusive of interest and costs.

58.

Plaintiffs timely submitted an ante-litem notice and a copy of that ante litem notice is attached as Exhibit A.

## I.     FACTUAL BACKGROUND

59.

On May 22, 2021, Cobb County Police Department arrested Brady Allen ("Mr. Allen") for Criminal Trespass (no damage to property).

17

60.

Brady Allen was arrested after being found at a stranger's home on the front porch and had been suspected of swimming in the property owner's swimming pool.

61.

Arresting Officer Jeremey Drennan of the Cobb County Police Department took Mr. Allen to the Cobb County Adult Detention Center ("CCADC") to be detained in relation to his alleged criminal trespass to property charge.

62.

The CCADC is managed and controlled by the Cobb County Sheriff's Office ("CCSO") and its officers.

63.

Mr. Allen was detained at the CCADC from May 22, 2021, until his death the next day on May 23, 2021 (hereinafter referred to as "the relevant time period").

64.

Upon arrival at the CCADC on May 22, 2021, Mr. Allen was shirtless, only wearing wet shorts and flip flops and was showing signs of either mental illness, drug intoxication or some form of illness.

## A.   PRE-BOOKING EVALUATION

65.

On May 22, 2021, Cobb County Police Officer Drennan took Mr. Allen to the CCADC so that he could be processed as a detainee at the CCADC.

66.

Upon arrival in the CCADC Prebooking Area, Officer Drennan met Cobb County Sheriff Office Deputies Gregory Juedes and William Gooch.

67.

Deputy Juedes conducted a Preliminary Health Screening Assessment ("PHSA") on Mr. Allen.

68.

The purpose of the PHSA is to determine if an inmate is mentally and medically fit to be booked at the CCADC or needs medical clearance and/or medical care prior to admission.

69.

Mr. Allen's PHSA indicated that he responded "**YES**" to the following questions:

- "Hearing voices or seeing visions?";

- "Have you ever thought of hurting yourself in the past?";

- "Have you ingested any legal/illegal drugs within the last 24 to 72 hours?";

- "Do you take prescription medication?";

- "Have you had a head injury in the last 24 to 72 hours?";

- Do you have flu-like symptoms such as fever, nausea, vomiting, diarrhea or body aches?".

70.

The PSHA indicates that a "supervisor/nurse" should be contacted if a "**YES**" response was indicated for the questions:

- "Have you ever thought of hurting yourself in the past?";

- "Have you ingested any legal/illegal drugs within the last 24 to 72 hours?;

- "Do you take prescription medication?"

71.

The PHSA indicates that a nurse should be contacted if a "**YES**" response was indicated for the questions:

- "Have you had a head injury in the last 24 to 72 hours?";

- Do you have flu-like symptoms such as fever, nausea, vomiting, diarrhea or body aches?"

72.

Mr. Allen's PHSA indicates that Deputy Juedes observed Mr. Allen with "Strange behavior, hallucinating" and "Appears confused, disoriented, difficulty communicating".

73.

The PHSA indicates that if CCSO staff observes an arrestee with "strange behavior, hallucinating" that a nurse **and** supervisor should be contacted.

74.

In Mr. Allen's PHSA Deputy Juedes also indicated that Mr. Allen had consumed Meth and heroine three days ago.

75.

Mr. Allen's PHSA also indicated that the arresting or transporting officer believed that Mr. Allen was currently in need of medical or mental health services.

76.

As Deputy Juedes spoke to Mr. Allen to get responses for the PHSA, Mr. Allen exhibited strange behaviors and talked to an unknown stimuli or persons that were not present.

77.

Deputy Juedes communicated Mr. Allen's PHSA responses and evaluation to Deputy William Gooch.

78.

Deputy Juedes and Deputy Gooch were assigned to Intake at the CCADC on May 22, 2021, and their 12-hour dayshift had ended, was ending, or approaching the end when Mr. Allen's PHSA was done.

79.

On May 22, 2021, Sergeant Vann was the dayshift Intake Supervisor, and his shift had ended, was ending or approaching the end when Mr. Allen's PHSA was conducted and/or completed.

80.

At the time that Mr. Allen's PHSA was conducted and/or completed the CCADC Intake night shift had reported to duty.

81.

The CCADC Intake night shift included, but was not limited to, Deputy Deandre Brittingham, Deputy Jennifer Williams, Deputy Jessica Vega-Velez and Sergeant Lolita Mosley.

82.

Deputy Juedes and/or Deputy Gooch did not communicate Mr. Allen's PHSA evaluation to Sergeant Vann, but Sergeant Vann was aware that Mr. Allen had come to the CCADC and was medically screened.

83.

Deputy Juedes and/or Deputy Gooch did not communicate Mr. Allen's PHSA evaluation to Sergeant Lolita Mosley.

84.

While Mr. Allen was detained Sergeant Lolita Mosley did become aware that a PHSA was done on Mr. Allen and she signed the PHSA.

### 85.

On May 22, 2021, Paramedic Jonathan Watson, Nurse Jesica Reynolds, and Nurse Vicky Ngethe were all employed by Wellpath and working at the CCADC in the Intake Area.

### 86.

In response to Mr. Allen's PHSA evaluation, Deputy Juedes went to the CCADC Nurse Triage Area and had contact with Paramedic Jonathan Watson who came to the Prebooking Area to evaluate Mr. Allen.

### 87.

On May 22, 2021, Paramedic Watson came to the Prebooking Area and/or sallyport area of the CCADC to evaluate Mr. Allen.

### 88.

Paramedic Watson arrived in the Prebooking Area and approached Mr. Allen with a machine that could check one or more of Mr. Allen's vital signs.

### 89.

Prior to approaching Mr. Allen, Paramedic Watson retrieved Mr. Allen's completed PHSA from a counter in the Prebooking Area.

### 90.

Paramedic Watson spoke to Mr. Allen but did not take any of his vitals or physically examine Mr. Allen.

91.

Mr. Allen also had several prescription bottles with him when he entered the Prebooking Area of the CCADC including prescriptions for:

- Bupropion HCL (two prescriptions);

- Trazodone;

- Sertraline;

- Escitalopram; and

- Hydroxytine HCL.

92.

Bupropion is an antidepressant medication used to treat a variety of conditions, including depression and other mental/mood disorders.

93.

Trazodone is a medication used to treat anxiety, depression, and restore the balance of a certain natural chemical (serotonin) in the brain.

94.

Sertraline is a medication used to manage and treat social anxiety disorder, major depressive disorder, obsessive-compulsive disorder, panic disorder and/or post-traumatic stress disorder.

95.

Escitalopram is a medication used to treat anxiety and depression and works by helping to restore the balance of a certain natural substance (serotonin) in the brain.

96.

Hydroxyzine is a medication used to relieve anxiety and tension.

97.

Mr. Allen also had two other prescription bottles, but the labels were damaged and not readable and an over-the-counter medication, Omeprazole.

98.

After speaking with Mr. Allen, Paramedic Watson looked at some of his prescriptions, but not all of them.

99.

Paramedic Watson did not speak to Mr. Allen about any of his medications.

100.

Mr. Allen's prescriptions were logged in a Prescription Drug Inventory Record by Wellpath Nurse Jesica Reynolds at 7:39 p.m. about 45 minutes after Mr. Allen was accepted at the CCADC.

101.

Sergeant Mosley signed Mr. Allen's Prescription Drug Inventory Record as Intake Supervisor indicating she was aware that Mr. Allen came into the CCADC with several medications.

102.

After speaking with Mr. Allen and looking at some of Mr. Allen's prescriptions, Paramedic Watson had a conversation with Officer Jeremy Drennan and indicated that Mr. Allen's prescriptions were for mental health and that Mr. Allen was a "druggy".

103.

After speaking to Mr. Allen, Paramedic Watson did not get the nurse or any other medical staff to evaluate Mr. Allen. Paramedic Watson also did not call the physician on call to explain Mr. Allen's responses to the PHSA or his observation of Mr. Allen.

104.

After speaking with Mr. Allen in the Prebooking Area, Paramedic Watson did not suggest that Mr. Allen should go to the hospital to be medically cleared for admission to the CCADC.

105.

Paramedic Watson cleared Mr. Allen for admission to the CCADC despite Mr. Allen's responses to the PHSA, strange behaviors, hallucinations, and obvious mental health issues.

## B.    INTAKE EVALUATION

## 1.    DESCRIPTION OF INTAKE AREA

### 106.

Mr. Allen was accepted into the CCADC and entered the Intake Area around 6:49 p.m.

### 107.

Cobb County Sheriff Office employees Deputy Brittingham, Deputy Williams, Deputy Vega-Velez and Sergeant Mosley were all assigned to Intake at that time.

### 108.

Paramedic Watson, Nurse Vicky Ngethe and Nurse Jesica Reynolds were also assigned to Intake at that time.

### 109.

In May 2021, CCSO employed Criminal Justice Specialists ("CSJ") to work at the jail and assist with tasks including, but not limited to, monitoring alert and/or distress buttons inside Intake holding cells.

### 110.

On May 22, 2021, Calamati Eyvette Long worked as a CJS at the CCADC in the Intake Area.

111.

On May 22, 2021, Calamati Eyvette Long worked in the CCADC Intake Area and one of her responsibilities included monitoring the alert and/or distress buttons inside Intake Holding Cells.

112.

On May 22, 2021, Susan Warren worked as a CJS at the CCADC in the Intake Area.

113.

On May 22, 2021, Susan Warren worked in the CCADC Intake Area and one of her responsibilities included monitoring the alert and/or distress buttons inside Intake Holding Cells.

114.

On May 22, 2021, Ashley Dickson worked at the CCADC as a CJS in the Intake Area as a CJS.

115.

On May 22, 2021, Ashley Dickson worked in the CCADC Intake Area and one of her responsibilities included monitoring the alert and/or distress buttons inside Intake Holding Cells.

116.

On May 22, 2021, Diamond Nyree Perez worked at the CCADC as a CJS in the Intake Area.

117.

On May 22, 2021, Diamond Nyree Perez worked in the CCADC Intake Area and one of her responsibilities included monitoring the alert and/or distress buttons inside Intake Holding Cells.

118.

On May 22, 2021, Dania Wilson worked at the CCADC as a CJS in the Intake Area.

119.

On May 22, 2021, Dania Wilson worked in the CCADC Intake Area and one of her responsibilities included monitoring the alert and/or distress buttons inside Intake Holding Cells.

120.

Calamati Eyvette Long, Susan Warren, Ashley Dickson, Diamond Nyree Perez, and Dania Wilson were all Criminal Justice Specialists at the CCADC.

121.

The CCADC Intake Area consisted of an Intake desk; fingerprinting area; "Pit" for waiting inmates to sit while awaiting processing; a telephone area with

several telephones; at least 10 holding and/or close observation cells identified by numbers H1 through H10; and a nurse and/or medical area(s) for medical evaluations/assessments.

122.

The Intake holding cells and/or close observation cells were identified as Holding Cells H1 through H10.

123.

Holding Cell H8 was a single person cell and the CCSO was able to record video and audio inside the cell.

124.

The Intake holding cells H9 and H10 were larger than the other holding and/or close observation cells and held multiple inmates during shift changes, cleaning periods or different times when CCADC staff determined that the inmates needed to be housed in those cells.

125.

On May 22, 2021, Holding Cell H9 would at times hold the male inmates/detainees.

126.

The CCSO was able to record audio and video inside cell H9.

127.

There were cameras in the Intake Area that were able to record the outside or part of the outside areas of cells H8 and H9.

128.

CCSO maintained video and audio of cells H8 and H9 for the time periods that Brady Allen was in those cells on May 22, 2021 and/or May 23, 2021.

129.

CCSO did not maintain video of CCADC Intake Area that shows and/or partially shows the outside of cells H8 and/or H9 for May 22, 2021 to May 23, 2021 from 6:49 p.m. through 8:45 a.m. which are during the times that Brady Allen was held in those respective cells.

130.

On May 22, 2021, at or around 6:49 p.m or shortly thereafter Brady Allen was directed to go inside Holding Cell H9 upon entering the CCADC Intake Area.

2.   **BRADY ALLEN EVENING/EARLY MORNING INTAKE CONFINEMENT MAY 22, 2021 THROUGH MAY 23, 2021**

131.

On May 22, 2021, Brady Allen entered Holding Cell H9 between the hours of 6:49 p.m. and 7:10 p.m.  At that time there were at least 10 other inmates/detainees inside that cell.

132.

On May 22, 2021, between the hours of 7:00 p.m. and 7:30 p.m. Deputy Deandre Brittingham let the inmates in Holding Cell H9 out of the cell.

### 133.

On May 22, 2021, between the hours of 7:00 p.m. and 7:23 p.m. Brady Allen came out of holding cell H9 and sat by the intake desk where Paramedic Watson saw him briefly but did not do a full Intake Medical Assessment of him.

### 134.

On May 22, 2021, between the hours of 7:00 p.m. and 7:23 p.m. at some time while Brady Allen was outside H9 Deputy Jennifer Williams saw Brady Allen and noticed that he had a medical and/or mental health issue occurring with him.

### 135.

At that time, Deputy Williams did not have Brady Allen seen by a medical provider for a full intake assessment or report his behavior to a supervisor.

### 136.

At that time, Deputy Brittingham also saw that Brady Allen was exhibiting behavior consistent with medical and/or mental health issues occurring with him and did not have a full medial assessment done or report his behavior to a supervisor.

### 137.

Mental health illness is a medical condition that can lead to serious medical issues and/or death.

138.

Brady Allen returned to Holding Cell H9 at some time between 7:10 p.m. and 7:24 p.m.

139.

Brady Allen stayed in Holding Cell H9 from 7:24 p.m. until at or around 10:48 p.m.

140.

During the time that Mr. Allen was in Holding Cell H9, he paced in the cell a lot, talked to himself, and showed anxious behavior.

141.

During the time that Mr. Allen was in Holding Cell H9, he is seen many times in the front of the cell banging the door and heard asking to get out of the cell. No officers or medical providers let him out of the cell during these times.

142.

There is a button inside Holding Cell H9 by the door near the front of H9 that allows inmates and/or detainees to alert security personnel that the inmate wanted to communicate or was having an issue that he wanted addressed. (This button is hereafter referred to as "Alert button".)

143.

During the time that Brady Allen was in Holding Cell H9 he is seen on video pressing the alert button over a hundred times.

144.

During the time that Brady Allen was in Holding Cell H9, neither security personnel nor medical personnel responded to Mr. Allen's attempts to contact them through the Alert button.

145.

The Alert button in Holding Cell H9 is monitored by the Criminal Justice Specialists.

146.

The Criminal Justice Specialists are supposed to communicate when someone presses the Alert button to the security personnel so that they can then address the inmates concern, issue, or attempt to communicate.

147.

The Criminal Justice Specialists including Calamati Eyvette Long, Susan Warren, Ashley Dickson, Diamond Nyree Perez and Dania Wilson either did not communicate that Mr. Allen was pressing the Alert button or ignored Mr. Allen's attempts to communicate by using the Alert button.

148.

In the alternative, the Criminal Justice Specialists including Calamati Eyvette Long, Susan Warren, Ashley Dickson, Diamond Nyree Perez and Dania Wilson communicated to Deputy Brittingham, Deputy Williams, Deputy Vega-Velez and/or Sergeant Mosely that Mr. Allen was pressing the Alert button and they ignored it.

149.

The Criminal Justice Specialists were told by CCSO staff to ignore Mr. Allen's attempts to communicate by pressing the Alert button.

150.

The Criminal Justice Specialists including Calamati Eyvette Long, Susan Warren, Ashley Dickson, Diamond Nyreee Perez and/or Dania Wilson ignored Mr. Allen's attempts to communicate by pressing the Alert button.

151.

During that time that Mr. Allen was in Holding Cell H9, he asked repeatedly to be let out of the cell. After 7:24: p.m. Mr. Allen was not allowed out of Holding Cell H9 until he was moved to another holding cell.

152.

At or around 10:48 p.m., Deputy Brittingham moved Mr. Allen to Holding Cell H8 which is a smaller holding cell than Holding Cell H9.

153.

Despite Mr. Allen constantly pressing the Alert button and showing signs of a serious mental/medical health breakdown and repeatedly asking to be let out of cell H9, Deputy Brittingham moved Mr. Allen to Holding cell H8 because he thought that Mr. Allen was not complying with instructions.

154.

Sergeant Mosley was aware that Mr. Allen was in Holding Cell H9 and told her deputies that he could not be in there and to move Mr. Allen to another holding cell.

155.

Neither Sergeant Mosley nor Deputy Brittingham had Mr. Allen medically assessed prior to moving him to Holding Cell H8.

156.

On May 22, 2021, at or around 10:49 p.m. Mr. Allen was put in CCADC Intake Holding Cell H8. He remained in that cell for over nine and a half hours until at or about 8:41 a.m.

157.

While Mr. Allen was in holding cells H8 and H9 for over 13 hours he was never allowed to make a phone call so that he could reach out to someone to help him and/or bond him out.

158.

While Mr. Allen was in Holding Cell H8 he is seen throughout the night, pacing, making loud sounds, speaking to himself, speaking to unknown stimuli, experiencing hallucinations, pouring water on himself and cell floor, screaming and pulling his hair out of his head.

### 159.

Mr. Allen had long hair when he was accepted at the CCADC.

### 160.

During the time Mr. Allen was in Holding Cell H8 he had pulled out most of his hair on his head and put it on the floor over a nine and a half hour time span.

### 161.

Despite CCSO policies and procedures and the medical standards of care, Mr. Allen was not seen by a medical provider and an intake assessment was not done since the time he was in Holding Cell H9 at 7:24 p.m.

### 162.

Paramedic Jonathan Watson and/or Nurse Vicky Ngethe and/or Nurse Jesica Reynolds did not do an Intake Medical Assessment on Mr. Allen as required by Wellpath's contract with CCSO, Wellpath's policies and procedures, CCSO policies and procedures and/or the Standards of the National Commission on Correctional Health Care.

### 163.

Deputy Williams stated in her interview with CCSO Internal Affairs Officers that Wellpath medical providers Paramedic Jonathan Watson and/or Nurse Vicky Ngethe refused to do an Intake Medical Assessment on Mr. Allen.

164.

Deputy Vega-Velez stated in her interview with CCSO Internal Affairs Officers that the medical providers refused to do an Intake Medical Assessment on Mr. Allen.

165.

Deputy Brittingham and Sergeant Mosley stated in their interviews with CCSO Internal Affairs Officers that Wellpath medical providers did not do an Intake Medical Assessment on Mr. Allen "just" because they just didn't want to do the assessment.

166.

Deputy Brittingham and Sergeant Mosley both stated that Deputy Brittingham asked Wellpath medical providers Paramedic Jonathan Watson and/or Nurse Vicky Ngethe to do an Intake Medical Assessment but they refused.

167.

Nurse Vicky Ngethe stated in an interview with CCSO Officers that she did not do an Intake Medical Assessment on Mr. Allen because Sergeant Mosley and

Deputy Brittingham would not allow her to do the assessment because they claimed Mr. Allen was combative and disorderly.

168.

Throughout the times that Mr. Allen was in Holding Cells H8 and H9 there were no attempts to do an Intake Medical Assessment of Mr. Allen.

169.

Although there was no attempt to do an Intake Medical Assessment of Mr. Allen throughout the night and early morning hours of May 22, 2021 and May 23, 2021, Nurse Vicky Ngethe documented that Mr. Allen refused medial treatment and that he was having behavioral issues and was in a side cell.

170.

Nurse Ngethe did not follow any of the other polices of Wellpath and/or the National Commission on Correctional Healthcare if an intake assessment was unable to be completed and/or a detainee/inmate refused medical treatment.

171.

CCSO has policies and procedures in place for conducting medical intake assessments. Neither Deputy Brittingham, Deputy Williams, Deputy Vega-Velez nor Sergeant Mosley followed those procedures to ensure that Mr. Allen received an Intake Medical Assessment/Receiving Screening.

172.

Security rounds are to be conducted on all holding cells in the Intake Area including the holding cells H8 and H9 that Mr. Allen was housed in.

173.

Security rounds were not done on Mr. Allen's holding cells throughout the night or early morning hours.

174.

The security rounds would have shown that Mr. Allen's serious mental health medical situation was escalating and that he was in immediate need of medical care.

175.

The security rounds would have shown that Mr. Allen was physically hurting himself by pulling out his hair and putting it on the floor.

176.

Deputy Williams has stated that she cannot do proper security rounds on holding cells because they are covered with opaque paper that she cannot see through and thus cannot properly check on the health and safety of detainees in holding cells.

177.

Deputy Williams, Deputy Brittingham, Deputy Vega-Velz, Sergeant Mosley all failed to do proper security rounds on Mr. Allen because they were deliberately indifferent to his escalating medical condition.

178.

Deputy Williams, Deputy Brittingham, Deputy Vega-Velez, and Sergeant Mosley's shifts all ended at or around 6:00 a.m. on May 23, 2021.

**3.** **BRADY ALLEN MORNING INTAKE CONFINEMENT – MAY 23, 2021**

179.

Deputy Demetrius Jones, Deputy Gregory Juedes, Deputy William Gooch and Sergeant Kent Vann worked in the CCADC Intake Area beginning at or around 6:00 a.m. on May 23, 2021.

180.

When Deputy Jones, Deputy Juedes, Deputy Gooch arrived at the CCADC on May 23, 2021, they received a "pass-on" from the night shift and learned that Mr. Allen was in Holding Cell H8 because he was disorderly.

181.

Deputy Jones, Deputy Juedes and Deputy Gooch also learned that Mr. Allen did not have an Intake Medical Assessment. Deputy Juedes and Deputy Gooch were the deputies that brought Mr. Allen into the booking area the prior evening on May 22, 2021.

182.

Sergeant Vann was also made aware during pass-on that Mr. Allen was in Holding Cell H8 because he was disorderly.

183.

41

Sergeant Vann also knew that Mr. Allen did not receive an Intake Medical Assessment.

184.

Sergeant Vann was the Sergeant on the prior day's shift when Mr. Allen came to the CCADC and was screened by Sergeant Vann's Intake Deputies Juedes and Gooch.

185.

Sergeant Vann, Deputy Gooch, Deputy Juedes and Deputy Jones were all aware that Mr. Allen was suffering from a serious mental health medical condition that required immediate medical attention.

186.

Deputy Jones, Deputy Gooch, Deputy Juedes and Sergeant Vann were all required to do security rounds on Mr. Allen throughout the morning of May 23, 2021.

187.

Neither Deputy Jones, Deputy Gooch, Deputy Juedes nor Sergeant Vann did proper security rounds on Mr. Allen while he was housed in Holding Cell H8 to make sure that he was alive and not experiencing any medical issues.

188.

Deputy Jones has stated that at one point when he did look in Mr. Allen's cell, he saw that Mr. Allen had pulled out his hair.

189.

Deputy Jones stated that he communicated that Mr. Allen was pulling out his hair to Deputy Gooch and Deputy Juedes and neither of them contacted medical to see Mr. Allen.

190.

Deputy Jones stated that it was normal for detainees/inmates in holding cells to pull out their hair.

191.

Sergeant Vann had a video monitor at his station, and he could see that Mr. Allen was panicking and experiencing a medical emergency.

192.

Nurse Donnette Duggan Pierre is a registered nurse that worked for Wellpath in the Intake Area in the morning on May 23, 2021, beginning at or around 6:00 a.m.

193.

Paramedic Brooke Stevic is a paramedic who worked for Wellpath in the Intake Area in the morning on May 23, 2021, beginning at or around 6:00 a.m.

194.

Both Nurse Duggan Pierre and Paramedic Stevic were aware that Mr. Allen did not have an Intake Medical Assessment since the time he had been admitted to the CCADC- over 11 hours before their shift started.

195.

Nurse Duggan Pierre and Paramedic Stevic, like their night shift counterparts, were responsible for doing Intake Medical Assessments of detainees within four hours of admission to the CCADC.

196.

Neither Nurse Duggan Pierre and/or Paramedic Stevic did an Intake Medical Assessment on Mr. Allen despite his deteriorating condition, obvious medical needs, and failure of Wellpath staff to complete a medical assessment of Mr. Allen within the time required by the standard of care, Wellpath policies and procedures and the Standards of the National Commission on Correctional Healthcare.

197.

Mr. Allen's condition continued to deteriorate throughout the morning hours of May 23, 2021.

198.

Mr. Allen's screams in Holding Cell H8 became louder throughout the early morning hours of May 23, 2021, and his behavior became more anxious, panicked and erratic throughout the morning.

44

199.

Mr. Allen continued to press the Alert button as he was housed in Holding Cell H8.

200.

Mr. Allen pressed the Alert button in Holding Cell H8 at least 100 times and no medical providers and/or security responded to his attempts at communication.

201.

Again, the CJS did not communicate Mr. Allen's issues to security personnel and/or ignored his attempts at communication.

202.

Mr. Allen also continued to yell that he wanted to be let out Holding Cell H8.

203.

At or around 8:40 a.m. Mr. Allen began to pull the fire alarm in Holding Cell H8.

204.

In response to Mr. Allen pulling the firearm, Sergeant Vann, Deputy Gooch, Deputy Jones, and others approached Mr. Allen's cell armed with a pepper ball gun and tasers.

205.

Sergeant Vann had the door to Mr. Allen's holding cell opened and instructed Mr. Allen to turn around and face the wall. Instead, Mr. Allen flailed his arms contacting Sergeant Vann and ran out of the cell.

206.

When Mr. Allen ran out of holding cell H8, another Sergeant struck Mr. Allen with the pepper ball gun and Sergeant Vann, Deputy Gooch, Deputy Jones and others tackled Mr. Allen to subdue him.

207.

The Sergeant that shot Mr. Allen repeatedly with the pepper ball gun then tased Mr. Allen.

208.

Mr. Allen became nonresponsive during the subdual as the gang of officers forcefully and physically subdued Mr. Allen while he was experiencing a serious mental health/medical emergency that escalated throughout the time that Mr. Allen had been detained at CCADC without adequate medical care or his necessary medications.

209.

Mr. Allen died by homicide the morning of May 23, 2021, due to CCSO staff's and Wellpath's medical provider's failure to address his escalating serious

mental health medical issues and CCSO staff forcefully subduing him until he was non-responsive.

## COUNT I
## VIOLATION OF SECTION 42 U.S.C. SECTION 1983
## SELECT DEFENDANTS – DELIBERATE INDIFFERENCE TO MEDICAL NEEDS

### 210.

Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1 through 209 as if fully stated herein.

### 211.

This count is asserted against Paramedic Jonathan Watson, Nurse Vicky Ngethe, Deputy Deandre Brittingham, Deputy Jennifer Williams, Deputy Jessica Vega-Velez, Sergeant Lolita Mosley, Deputy William Gooch, Deputy Gregory Juedes, Deputy Demetrius Jones, Sergeant Kent Vann, Calamati Eyvette Long, Susan Warren, Ashley Dickson, Diamond Nyreee Perez and Dania Wilson in their individual capacities only.

### 212.

The conditions in which a pre-convicted detainee is confined is subject to scrutiny under the Fourteenth Amendment of the United States Constitution and subject to actions under Section 1983.

### 213.

The acts of Sheriffs, deputies, nurses, and jail staff members in a detention facility in addressing an inmates' medical care are acts under color of state law.

214.

At all relevant times, Defendant Wellpath had a contract with CCADC to provide medical services to inmates/detainees. Accordingly, all medical personnel acting pursuant to that contract acted under the color of state law.

215.

Defendants acted under the color of State law under the circumstances of this case as detailed above.

216.

The Sheriff is required by law to ensure that inmates confined at the CCADC are provided reasonable access to medical care and, accordingly, is authorized to enter contracts for medical and mental health services.

217.

Defendants deprived Mr. Allen of rights and privileges afforded to him under the Fourteenth Amendment of the United States Constitution in violation of 42 U.S.C. § 1983.

218.

Defendants, individually and collectively, had an obligation to make sure that detainees/inmates at CCADC received reasonable medical care when needed.

48

219.

Defendants, individually and collectively, had an obligation to ensure that the serious medical needs of detainees/inmates detained at CCADC were timely and adequately addressed.

220.

Defendants failed to attend to Mr. Allen's serious medical condition and did not provide him with medical care when he was in obvious physical distress and needed medical care.

221.

Defendants' failure to adequately attend to Mr. Allen's serious medical condition caused his death.

222.

Defendants' failure to adequately attend to Mr. Allen's serious medical condition was in violation of the Fourteenth Amendment of the United States Constitution.

223.

Defendants' conduct evinced a deliberate indifference to the serious medical needs and safety of Mr. Allen.

224.

Defendants Paramedic Jonathan Watson and Nurse Vicky Ngethe violated Mr. Allen's constitutional right to receive medical care by admitting him into the CCADC without further medical screening and/or addressing his serious medical needs during screening and/or throughout the evening and early morning hours of May 22, 2021 through May 23, 2021.

### 225.

Paramedic Watson and Nurse Ngethe allowed Mr. Allen's condition to seriously deteriorate by not addressing his mental health and medical issues and consequently leading to his foreseeable subdual that caused his death.

### 226.

Defendants Deputy Deandre Brittingham, Deputy Jennifer Williams, Deputy Jessica Vega-Velez, Sergeant Lolita Mosley, Deputy William Gooch, Deputy Gregory Juedes, Deputy Demetrius Jones, Sergeant Kent Vann, Calamati Eyvette Long, Susan Warren, Ashley Dickson, Diamond Nyreee Perez and Dania Wilson violated Mr. Allen's constitutional right to receive medical care by not ensuring that his serious mental health and medical issues were addressed by medical staff; by failing to properly do security rounds and detect that Mr. Allen was not well and in need of immediate medical attention; by ignoring Mr. Allen's repeated attempts to communicate his medical concerns by pressing the Alert button that was ignored by CCSO staff.

227.

Defendants knew or should have known that their failure to provide Mr. Allen medical care could result in him suffering permanent injury or harm.

228.

Defendants' acts showed a deliberate indifference to Mr. Allen's medical condition and need for medical attention in violation of the Fourteenth Amendment of the United States Constitution.

229.

Defendants' failure to provide Mr. Allen adequate medical care caused his death.

## COUNT II
## VIOLATION OF SECTION 42 U.S.C. SECTION 1983
## COMMAND STAFF DEFENDANTS – CUSTOM AND PRACTICE
## VIOLATIONS AND FAILURE TO TRAIN

230.

Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1 through 229 as if fully stated herein.

231.

This count is asserted against Cobb County Sheriff Craig Owens, Cobb County Chief Deputy Sheriff Rhonda Anderson and Former Cobb County Sheriff Colonel Temetris Atkins, in their individual capacities only (hereinafter referred to "Command Staff").

232.

Cobb County Sheriff Owens establishes the official policy at the CCSO and/or CCADC to be followed by all CCSO staff and medical providers. These policies are authoritative for all questions concerning policies, procedures, rules and regulations.

233.

Cobb County Sheriff Owens is also responsible for ensuring sure that all CCSO staff are properly trained.

234.

Cobb County Chief Deputy Sheriff Rhonda Anderson is responsible, with the Cobb County Sheriff, for developing policies and procedures, enforcement of same and training of all CCSO staff.

235.

In May 2021, Former Cobb County Sheriff Colonel Temetris Atkins was responsible for the day-to-day operation and management of the CCADC including facility operation security objectives, inmate management, supervision of staff, CCADC training and enforcement of CCSO policies and procedures at the CCADC.

236.

In May 2021, the Command staff were aware that arrestees would enter their facility with mental health issues and detoxing from drugs.

237.

The Command Staff was aware that many of the arrestees that entered the CCADC needed mental health care and/or medical treatment to address drug detoxification.

238.

Drug detoxification may require medical treatment and may lead to serious medical and/or mental health emergencies including death.

239.

The Command Staff knew that many arrestees entering the CCADC needed to be evaluated for mental health and/or medical issues prior to entering the CCADC.

240.

In May 2021, the Command Staff knew that a substantial percentage of the CCADC detainees entering the CCADC had mental health and/or medical issues.

241.

The Command Staff had a responsibility to ensure that all CCADC detainees received adequate medical care.

242.

In May 2021, the Command staff was aware of a history of CCADC detainees receiving inadequate medical care for mental health and drug addiction and/or detoxification.

243.

In May 2021, the Command staff knew that there was a history of CCADC detainees dying or suffering severe illness at the CCADC because the detainees were not receiving adequate mental health and/or medical care.

244.

Since 2010, over twenty-five (25) people have died while in the custody of the CCADC.

245.

Many of the people that people that have died since 2010 while in the custody of the CCADC suffered medical emergencies that were not properly addressed.

246.

From 2018 through 2021 at least ten (10) people died from mental health and/or medical emergencies that were likely not properly addressed while in the custody of the CCADC.

247.

Many of the in-custody deaths at the CCADC during this time were avoidable with adequate mental health and/or medical care and if the detainees/inmates were either provided adequate medical treatment or sent to a hospital to receive adequate medical care.

248.

CCSO had a written policy that all arrestees entering the CCADC were to receive a Preliminary Health Screening Assessment prior to being admitted to the jail.

249.

CCSO had a written policy that all arrestees showing signs of serious detoxification and/or mental health issues should not be admitted to jail and should be sent to a hospital for medical clearance.

250.

CCSO had a written policy that all detainees were to receive a full Intake Medial Assessment/Receiving Screening prior to being admitted to the jail.

251.

The CCSO written policy was that all detainees should receive a full Intake Medical Assessment within four hours of being admitted to jail except for exceptional circumstances.

252.

CCSO Command Staff staffed the CCADC with officers who should have been familiar with CCADC policies and procedures including making sure that inmates receive adequate medical care.

253.

CCSO Command Staff knew that CCSO officers that staffed the CCADC Intake Area should be familiar with CCSO policies and procedures with respect to arrestee Preliminary Health Screening Assessments and Intake Medical Assessments.

254.

The Preliminary Health Screening Assessment should assist the CCADC in identifying detainees who need further medical evaluation and/or need to be sent out to a hospital to be medically cleared.

255.

The Intake Medical Assessment/Receiving Screening was used to evaluate whether detainees have medical needs that needed to be addressed.

256.

The PHSA and the Intake Medical Assessment are important assessments in processing arrestees at the CCADC.

257.

In May 2021, the Command Staff staffed the CCADC Intake Area with officers who were not properly trained on PHSA and/or Intake Medical Assessment.

258.

In May 2021, the Command Staff staffed the CCADC Intake Area with officers who were not trained on how to identify detainees in need of immediate mental health and/or medical attention.

259.

In May 2021, the Command Staff was aware that the officers that staffed the CCADC Intake Area were not properly trained to identify mental health and medical emergencies, especially as it relates to drug addiction and detoxification.

260.

In May 2021, the Command Staff was aware of CCSO policy that all Intake Medical Assessments be completed in four hours unless an exceptional circumstance arose.

261.

In May 2021, the Command Staff allowed for its medical providers to control when detainees would receive their Intake Medical Assessment.

262.

In May 2021, the Command Staff did not require the medical providers to complete an Intake Medical Assessment within the time dictated by CCSO policies and procedures.

263.

In May 2021, the Command Staff was aware that the medical providers were not doing Intake Medical Assessments within the time outlined in CCSO policies and procedures.

264.

In May 2021, the Command Staff had a custom and/or policy that allowed its medical providers to not complete the Intake Medical Assessment in accordance with CCSO policies and procedures and the Standards of the National Commission on Correctional Healthcare.

265.

In May 2021, the Command Staff had a custom and/or policy that allowed for its medical providers to ignore detainee medical concerns even if the deputies brought the medical concerns to the medical provider's attention.

266.

In May 2021, the Command Staff had a custom and/or policy that deputies did not challenge any of the medical treatment detainees received and/or failed to receive in contradiction to their constitutional responsibility to ensure that detainees received adequate medical care.

267.

In May 2021 and prior to that time, the Command Staff did not properly train CCSO officers on making sure that detainees receive an Intake Medical Assessment to ensure that CCADC detainees' potential medical issues were addressed.

268.

In May 2021, The Command Staff was aware that officers assigned to the CCADC Intake Area were responsible for doing security rounds of all detainees in holding cells within the Intake Area.

269.

CCSO had a written policy that all detainees housed in holding cells in the Intake Area of the CCADC should have hourly security rounds performed by CCSO officers.

270.

CCSO had a written policy that all detainees housed in Close Observation holding cells in the Intake Area of the CCADC should have security rounds performed by CCSO officers every 12-15 minutes but never more than every 15 minutes.

271.

CCSO policies and procedures provide that monitoring of inmates during a security round shall include an unobstructed visual check to ensure the inmate's presence and physical well-being.

272.

The security rounds are to ensure that the detainees are alive, well and not in need of any immediate medical attention.

273.

The security rounds should be conducted by the CCSO officers approaching the Intake holding cells, stopping in front of the cell, looking inside the cell, and assessing the detainee's condition.

274.

CCSO policies and procedures required the CCSO officers to note that the security round had been performed by either using an electronic scanning device or writing the time of the security round on a handwritten log.

275.

The notation of the security round indicates that the security round was completed, and that the detainee was alive, well and not in need of medical attention.

276.

CCSO officers should not note that a security round was done without issue if the detainee in which the security round was performed was experiencing a medical emergency or in need of immediate medical attention.

277.

CCSO Command Staff was aware that CCSO officers had not conducted proper security rounds in the past and that their failure to properly conduct a security round could impose a great danger to CCADC detainees.

278.

CCSO Command Staff was aware and had a custom and practice that its holding cells had an opaque paper on its windows and did not allow for its officers to conduct proper security rounds to make sure that a detainee was alive and well.

279.

CCSO Command Staff did not properly train CCADC officers on how to properly conduct security rounds even though they were aware that the security rounds were not being performed properly.

280.

CCSO Command Staff were aware that its written policies were not being followed.

281.

CCSO Command Staff's custom and practice as indicated above subjected detainees, like Brady Allen, to serious risk of harm and/or death.

282.

CCSO Command Staff's failure to provide adequate training to its officers as indicated above subjected detainees, like Brady Allen, to serious harm and or death and were deliberately indifferent to detainees, like Brady Allen, medical needs.

283.

CCSO Command Staff's customs and practices and failure to train CCSO officers as indicated above caused Brady Allen to be forcefully subdued and killed at the CCADC on May 23, 2021.

## COUNT III – NEGLIGENCE
## WELLPATH, LLC, PARAMEDIC JONATHAN WATSON, NURSE VICKY NEGETHE, NURSE JESICA REYNOLDS, PARAMEDIC BROOKE STEVIC AND NURSE DONNETTE DUGGAN-PIERRRE

284.

Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1 through 283 above as if fully stated herein.

285.

Plaintiff asserts this Count against Wellpath, LLC, Paramedic Jonathan Watson, Nurse Vicky Negethe, Nurse Jesica Reynolds, Paramedic Brooke Stevic and Nurse Donnette Duggan-Pierrre (hereinafter collectively referred to as the "Wellpath Defendants").

286.

Attached to this Complaint as Exhibit B is the Affidavit of Claire Teske, a licensed registered nurse, setting forth the standard of care and the breach of the standard of care for treatment of patients, including detainees, under these same or similar circumstances. Nurse Teske's Affidavit is incorporated herein by reference as if the same was set forth herein verbatim.

287.

At all material times hereto, Wellpath Defendants were charged with the duty of using due and proper care in treating, caring for, and attending to Mr. Brady Allen's medical needs.

288.

Wellpath contracted with the CCSO to provide medical services at the CCADC including medical treatment, staffing, supplies and pharmaceuticals to inmates throughout the CCADC.

289.

Wellpath is a national corporation that employs nearly 15,000 clinicians and professionals in 36 states across the U.S. and Australia and provides medical, mental, and behavioral healthcare services to nearly 300,000 patients located in inpatient and residential treatment facilities, civil commitment centers, and local, state, and federal correctional facilities.

290.

Wellpath's contract with CCSO was from April 15, 2020, through December 31, 2024, where Wellpath would receive at minimum over Forty-Four Million Two Hundred Eighty-Seven Thousand Ninety-Seven Dollars and Fifty cents ($44,287,097.50) for its medical services at the CCADC.

291.

Wellpath contracted with the CCSO to receive at minimum Nine Million One Hundred Seventy Thousand Three Hundred Eighty-Nine Dollars and Forty-Seven cents ($9,170,389.47) for a one-year period beginning January 1, 2021 through December 31, 2021 – the year Brady Allen died.

292.

Wellpath contracted with CCADC to provide medical care to all detainees at the CCADC including detainees suffering from an emergency medical condition.

293.

Wellpath's contract with CCADC defines "Emergency" as any medical condition of a recent onset and severity, including but not limited to severe pain that would lead a prudent layperson, possessing average knowledge of medicine and health, to believe that his or her condition, sickness, or injury is of such a nature that failure to obtain medical care could result in:

A. placing the patient's heath in serious jeopardy

B. serious impairment to bodily functions;

C. serious dysfunction of any bodily organ or body part; or

D. when ambulance or EMS services may be necessary.

294.

Wellpath, its employees, contractors and sub-contractors all had a duty to meet all applicable standards of health care. The standards that Wellpath and its medical

providers were to follow collectively and individually refer to and include the standards issued by the Medical Association of Georgia ("MAG"), the National Commission on Correctional Health Care ("NCCHC"), the American Correctional Association ("ACA"), and all other applicable medical standards.

295.

Wellpath and its medical providers had a duty to provide detainees access to medical care in a timely manner, meaning, a detainee can be seen by a clinician, given a clinical judgment and receive the care that is ordered to meet their medical needs in accordance with all applicable Standards.

296.

Wellpath had responsibility to staff the CCADC Intake/Receiving Area with medical providers to do Pre-admittance and Intake Medical Assessments/Receiving Screenings.

297.

Wellpath understaffed the CCADC Intake/Receiving Area in violation of its contract with the CCSO.

298.

Wellpath and its medical providers were contractually obligated to perform an initial medical evaluation known as the as Sally Port Triage to determine if an

arrestees' medical condition is such that the medical provider recommends a potential detainee be accepted into the jail.

299.

There is no rule that Wellpath's responsibility to assess an arrestees' fitness to be booked at jail shall or is intended to impact the Sheriff or his deputies' authority to transfer, accept, reject, or condition the acceptance of an inmate or potential inmate for any reason.

300.

Wellpath's policies and procedures as they relate to the CCADC provide that if the initial evaluation concludes that an arrestee brought to the jail requires additional medical attention/treatment or diagnostic evaluation which cannot be afforded at the jail, the arrestee may be transported by the arresting agency that presented the arrestee to an appropriate medical facility away from the Jail, except in the case of emergency.

301.

Wellpath and its medical providers had a duty to perform receiving screening/intake on all Inmates and arrestees brought to the jail in compliance with NCCHC and ACA Standards.

302.

Wellpath and its medical providers had a duty to ensure that all Intake Medical Assessments and/or Receiving Medical Screenings take place within four (4) hours of an arrestee's arrival at the jail and before an inmate is admitted to general population.

303.

Wellpath's policy provides that where an inmate screening is not performed due to the inmate's condition (i.e. combative, severely intoxicated or for other reasons relating to the correctional facility), the reason for such lack of screening shall be immediately and fully documented in the inmate's medical records.

304.

Wellpath's policy was for its medical providers to, at a minimum, make and document observations of inmates that cannot be immediately screened a minimum of every two (2) hours and must screen the inmate within eight (8) hours of their admission to the CCADC or otherwise required by NCCHC and/or ACA Standards.

305.

Wellpath and its providers' Intake Medical Assessment and/or Receiving Screening shall, at minimal, comply with all applicable NCCHC and ACA Standards and shall include, but not be limited to:

a. an individual and confidential interview using the Intake/Receiving Screening form.

b. Documentation of current illness, medical and health problems, including medications taken, special health requirements, diseases, and any potential or identified mental health illness.

c. Notation of body deformities, trauma markings, bruises and ease of movement.

d. Check the conditions of skin and body orifices, including rashes, infestations, needle marks or other indications of drug abuse.

e. Medication, special housing, and emergency health services shall be addressed immediately, when appropriate.

f. Vital signs, including, but not limited to temperature, blood pressure, pulse respiration, height, weight, chronic care needs, i.e. pulmonary diabetes, HIV/AIDS, cardiac/HTN, seizures and TB.

g. Emergency services. The provider shall refer inmates for emergency or additional health services at the time of the Receiving Screening as clinically indicated. Treatment shall be initiated where appropriate.

h. Medication. As it relates to all screenings, all medications must be verified, ordered and administered. An evaluation of urgent medications required by the inmate for chronic disease maintenance and infectious disease care and provide those medications required for health maintenance during the intake/receiving screening process.

68

i. Mental Health Screening. Provider shall require all inmates to complete the Sheriff's "safety contract" or other form or verbal or written questions regarding an inmates claimed mental state; however, provider shall not be required to execute the safety contract. If an inmate refused to complete a "safety contract" form or other form, or refuse to answer verbal or written questions regarding an inmates' claimed mental state during the receiving Screening, the Provider shall screen and promptly refer an inmate to an appropriate Mental Health Service Provider or other medical professional as determined by Provider as having a current mental illness, or whose screening indicates the possibility of a mental illness, suicide ideation and/or unstable mental health condition. In all other cases where deemed medically appropriate as determined by a reasonably prudent health care professional with no training, education or expertise in mental health, behavioral health, psychiatry, psychology, or similar areas of mental health, the Provider shall refer an inmate to an appropriate mental health service provider for a mental health assessment of any inmate identified as having a current mental illness or whose screening indicates the possibility of a mental illness, suicide ideation and/or unstable mental health condition. Other than the screening and referral processes outlined herein, the Provider shall have no responsibility whatsoever to perform any Mental Health Services. Provider shall coordinate

with the Sheriff and Mental Health Service Provider to ensure reasonable access to inmates referred for Mental Health Services.

306.

Paramedic Jonathan Watson, Nurse Vicky Ngethe, Nurse Jesica Reynolds, Paramedic Brooke Stevic and Nurse Donnette Duggan-Pierre were all assigned to CCADC Intake Area on either May 22, 2021 or May 23, 2021. These medical providers were responsible for ensuring that CCADC detainees received adequate medical care and/or assessments while housed in the CCADC Intake Area.

307.

The standard of care for a registered nurse is the reasonable degree of care and skill which, under similar conditions and like circumstances, is ordinarily employed by the profession generally.

308.

The standard of care for registered nurses treating patients in general and in confinement includes:

a. Assess the patient/client in a systematic, organized manner;

b. Formulate a nursing diagnosis based on accessible, communicable, and recorded data (which is collected in a systematic and continuous manner);

c. Plan care which includes goals and prioritized nursing approaches or measures derived from the nursing diagnoses;

70

d.   Implement strategies to provide for patient/client participation in health promotion, maintenance, and restoration;

e.  Initiate nursing actions to assist the patient/client to maximize his/her health capabilities;

f.  Evaluate with the patient/client the status of goal achievement as a basis for reassessment, reordering of priorities, new goal-setting and revision of the plan of nursing care;

g.  Communicate, collaborate, and function with other members of the health team to provide optimum care;

h.   Respect the dignity and rights of the patient/client regardless of socioeconomic status, personal attributes, or nature of health problems; and

i.  Provide nursing care without discrimination on the basis of diagnosis, age, sex, race, creed, or color.

309.

The standard of care for a paramedic treating patients in general and in confinement includes:

a.  Provide first-aid treatment or life support care to sick or injured patients;

b.  Transfer patients to the emergency department of a hospital or other healthcare facility; and

71

c. Report their observations and treatment to physicians, nurses, or other healthcare facility staff.

### 310.

Nurse Vicky Ngethe, Nurse Jesica Reynolds, Nurse Donnette Duggan-Pierre had a duty to Mr. Allen to practice nursing within the standard of care and violated the standard of care for registered nurses by failing to care for Mr. Allen by not doing a Receiving Screening/Intake Medical Assessment on Mr. Allen and ensuring that his medical needs were addressed.

### 311.

Nurse Jesica Reynolds logged all of Mr. Allen's nine (9) medications when he came into the jail and did not alert and/or inform any of the other medical staff regarding his medications and possible mental/medical issues.

### 312.

Nurse Reynolds was aware or should have been aware of Mr. Allen's Preliminary Health Assessment Screening and was aware or should have been aware of his medical/mental health status.

### 313.

Despite Nurse Reynolds knowledge of Mr. Allen's mental/medical issues, Nurse Reynolds did not do an Intake Medical Assessment on Mr. Allen to determine his appropriateness to be housed at CCADC and/or his immediate medical needs.

314.

Nurse Vicky Ngethe was aware or should have been aware of Mr. Allen's Preliminary Health Screening Assessment and his responses thereto.

315.

Nurse Ngethe was also aware or should have been aware of Mr. Allen's erratic behavior at the jail and that he was being housed in a small and isolated confinement cell.

316.

Despite Nurse Ngethe's knowledge of Mr. Allen's serious medical condition, Nurse Ngethe failed to do an Intake Medical Assessment on Mr. Allen.

317.

Nurse Ngethe improperly documented that Mr. Allen refused a medical assessment despite the fact that she did not attempt to do a medical assessment on Mr. Allen. Nurse Ngethe also did not observe Mr. Allen throughout the evening even if he had refused the assessment.

318.

Nurse Donnette Duggan-Pierre was the morning nurse assigned to Intake on May 23, 2021. She was aware or should have been aware that Mr. Allen was in a small confinement cell because he displayed mental health/medical issues.

319.

Nurse Duggan Pierre failed to do an Intake Medical Assessment on Mr. Allen knowing that he had been at the CCADC since her previous shift but at minimum for over twelve (12) hours.

### 320.

Paramedic Watson did not perform Mr. Allen's Pre-booking Screening when he entered the jail in compliance with the standard of care; Wellpath's policies and procedures; and/or the NCCHC and/or ACA Standards.

### 321.

Paramedic Watson either failed to review Mr. Allen's Preliminary Health Assessment Screening or ignored Mr. Allen's responses to the PHSA.

### 322.

Paramedic Watson should have at minimum taken Mr. Allen's vitals during his initial assessment with Mr. Allen and contacted the Nurse or another medical provider to make them aware of Mr. Allen's condition in the Prebooking Area.

### 323.

Paramedic Watson also saw Mr. Allen in the Intake Area of the jail and again failed to take his vitals and/or contact another medical provider and make them aware of Mr. Allen's condition.

### 324.

Paramedic Watson also saw Mr. Allen in the holding cell(s) acting strangely and erratically and did not notify another medical provider of Mr. Allen's behavior or make sure that an Intake Medical Assessment was done on Mr. Allen.

325.

Paramedic Brooke Stevic was the morning paramedic assigned to Intake on May 23, 2021. She was aware or should have been aware that Mr. Allen was in a small confinement cell because he displayed mental health/medical issues.

326.

Paramedic Stevic failed to do an Intake Medical Assessment on Mr. Allen knowing that he had been at the CCADC since her previous shift but at minimum for over twelve (12) hours.

327.

The Wellpath medical providers failure to properly care for Mr. Allen caused his death on May 23, 2021.

328.

At all times pertinent hereto, Paramedic Jonathan Watson, Paramedic Brooke Stevic, Nurse Vicky Ngethe, Nurse Jesica Reynolds, and Nurse Donnette Duggan-Pierre were acting within the course and scope of their employment with Wellpath.

329.

Wellpath is liable for acts and omissions of its medical providers under the doctrine of respondeat superior, agency or apparent agency.

330.

Wellpath is also liable for failing to train and supervise its employees working at the CCADC on how to properly do pre-booking screenings and Intake Medical Assessments/Receiving Screenings.

## COUNT IV – NEGLIGENCE
**SERGEANT LOLITA MOSLEY, SERGEANT KENT VANN, DEPUTY DEANDRE BRITTINGHAM, DEPUTY JENNIFER WILLIAMS, DEPUTY JESSICA VEGA-VELEZ, DEPUTY DEMETRIUS JONES, DEPUTY WILLIAM GOOCH, DEPUTY GREGORY JUEDES, CALAMATI EYVETTE LONG, SUSAN WARREN, ASHLEY DICKSON, DIAMOND NYREE PEREZ, and DANIA WILSON**

331.

Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1 through 330 above as if fully stated herein.

332.

Plaintiff asserts this count against Sergeant Lolita Mosley, Sergeant Kent Vann, Deputy Deandre Brittingham, Deputy Jennifer Williams, Deputy Jessica Vega-Velez, Deputy Demetrius Jones, Deputy William Gooch, Deputy Gregory Juedes, Calamati Eyvette Long, Susan Warren, Ashley Dickson, Diamond Nyree Perez, and Dania Wilson in their individual capacities only. (hereinafter collectively referred to as "CCADC Defendants")

333.

The CCADC Defendants must follow the written policies and procedures of the Cobb County Sheriff's Office ("CCSO").

334.

Following the CCSO's policies and procedures is a ministerial duty.

335.

Providing medical care for inmates, including but not limited to Intake Medical Assessments, are ministerial duties.

336.

The PHSA and the responsibilities associated therewith, including but not limited to contacting medical providers and supervisors, are ministerial duties.

337.

The performance of security rounds at the CCADC is a ministerial duty.

338.

Monitoring holding cells and responding to Alert button requests at the CCADC are ministerial duties.

339.

CCSO policies and procedures provide that upon incarceration arrestees shall undergo a PHSA to identify and address any medical or mental health issues/concerns conveyed by the inmate or as observed by staff.

340.

CCSO Staff shall notify the Intake Supervisor of any "yes" responses from the arrestee as indicated on the PHSA or if staff reasonably believes the arrestee is in need of medical or mental health intervention.

341.

The Intake Supervisor shall promptly notify the Intake Nurse of any "yes" responses or observations that would indicate further assessment.

342.

The Intake Supervisor shall sign the PHSA form after completion and forward it to an Intake Specialist for further processing.

343.

The Intake Supervisor's signature indicates that the document has been reviewed for critical information and information that dictates the need for immediate medical attention.

344.

The Intake Supervisor and Intake Nurse shall be immediately notified if staff observes any of the following conditions or if the arrestee exhibits signs or symptoms of medical or mental issues:

- Arrestee appears intoxicated whereas his speech and motor skills are obviously affected.

- Staff suspects the arrestee is at risk of self-harm or poses a threat of harm to others based on the arrestee's comments, observed injuries that the inmate states are self-inflicted, arresting/transporting officer comments and/or observations.

- Arrestee admits to having recently ingested drugs.

- Arrestee verbally communicates the need to see a medical or mental health provider.

345.

Intake Staff shall immediately notify the Intake Supervisor any time an arrestee has prescription medication in their possession. (Policy 2-06-03.00)

346.

The Intake Supervisor shall inspect the medication to ensure that:

- the medication is in its original container;

- there is only one type of medication in each container;

- the name on the prescription is that of the arrestee.

347.

The Intake Supervisor shall call upon the Intake Nurse to verify the identity of the medication to determine if it is critical to the health of the inmate and to verify the number of pills/tablets located in the container. (Policy 2-06-08.00)

348.

No arrestee shall be admitted to CCADC without medical/mental health intervention if he/she presents symptoms of a serious illness, injury, unusual behavior or are in an unconscious state.  (Policy 2-02-03.01)

349.

Prior to accepting custody of an arrestee, personnel shall bring the following conditions to the attention of an Intake Nurse:

• Any suspected or obvious signs of illness, injury or evidence that the arrestee is under the influence of alcohol or drugs.

• The arrestee responds yes to specific questions asked when completing the PHSA.

350.

Employees assigned to the Intake Area are responsible for monitoring and supervising the activities of all inmates located in Intake. (Policy 2-02-15.00)

351.

If an arrestee is accepted into custody and requires frequent or subsequent medical attention, the arrestee shall be placed in a close observation area as directed by medical staff or the Intake Supervisor. (Policy 2-02-03.01)

352.

CCSO policies and procedures provide that inmates shall have adequate and proper access to emergency medical care. Medical staff shall ensure that prompt medical attention (response) is provided in situations deemed a medical emergency. (Policy 2-06-04.00)

353.

CCSO policies and procedures provide that staff shall be observant and responsive to signs of an emergency medical situation within the facility. (Policy 2-06-04.01)

354.

CCSO policies and procedures provide that the delivery of emergency medical services shall be a top priority, taking precedence over routine duties and responsibilities. (Policy 2-06-04.01)

355.

CCSO policies and procedures provide that inmates requiring emergency treatment beyond the facility's resources and capabilities shall be transported to a designated treatment facility or the nearest emergency room. Inmates requiring

increased monitoring or close observation may be placed in Close Observation Cells. (Policy 2-3-07.01)

356.

CCSO policies and procedures provide that Medical or security personnel may request placement of an inmate into Close Observation for reasons that include but are not limited to:

a. Inmate exhibits signs of abnormal behavior (e.g. hearing voices);

b. Inmate is displaying marked change in behavior occurring over an extended period of time (e.g. refusal of means or shower);

c. Inmate refused to take medication; and

d. Inmate speaks of or acts on threats of self-harm or threatens to harm others. (Policy 2-03-07.01)

357.

CCSO policies and procedures provide that CCSO staff should conduct observation security rounds every hour for inmates placed in an Intake holding cell, but is not on Close Observations. (Policy 2-02-15.00)

358.

The Intake Supervisor shall conduct a security round at least twice during each twelve-hour shift. (Policy 2-02-15.00)

359.

Observation (security) rounds shall be recorded by means of a Personal Digital Assistant (PDA), Guard I Pipe, or other security device that produces a written/digital record of observation (security) rounds conducted.

360.

CCSO Intake staff shall address and respond to any reasonable need, question or other request from an inmate (i.e. request to use the telephone or restroom, inquiries of charge(s) or bond information, request for food or water, indication of self-harm).

361.

CCSO Intake staff shall notify the Intake Supervisor of any disruptive or non-compliant behavior by any inmate that results in their placement in a holding cell. (Policy 2-02-15.00)

362.

Medical staff shall perform assessment rounds for all inmates housed in any level of segregation or medical housing units. (Policy 2-06-05.02)

363.

CCSO policies and procedures provide that the placement of inmates in a Close Observation Cell requires staff to conduct frequent and random observation/security rounds that shall not be more than 15 minutes apart.

364.

CCSO policies and procedures provide that monitoring of inmates during a security round shall include an unobstructed visual check to ensure the inmate's presence and physical well-being.

365.

Criminal Justice Specialists ensure the safety of inmates. Ensure that inmates are not injured by themselves or by other inmates; respond to alarms; and provide inmates with information regarding charges, bonding, attorneys and personal interactions. Staff and operates security control rooms, providing monitoring of both inmates and security/fire control systems; control all movement within monitored area and ensure that inmates are safely and securely maintained. Operate security electronics system, intercom, radio equipment, computer terminal, telephone and key control systems.

366.

The CCADC Defendants violated one or more of the aforementioned CCSO policies and procedures.

367.

CCADC Defendants negligently performed or failed to perform their ministerial functions by:

- failing to provide Mr. Allen adequate medical assessments as outlined above;

- failing to contact appropriate personnel to respond to Mr. Allen's PHSA;

- failing to ensure that Mr. Allen received an adequate Intake Medical Assessment/Receiving Screening;

- failing to provide Mr. Allen medical care to address deteriorating mental health and medical issues;

- failing to place Mr. Allen in Close Observations so that he could be frequently monitored for his mental health/medical issues;

- failing to properly conduct security rounds on Mr. Allen's cells to ensure that he was alive and well and not in need of medical attention; and

- failing to respond to Mr. Allen's numerous attempts to communicate by pressing the Alert button within the cells hundreds of times.

368.

Mr. Allen's death was proximately caused by the CCADC Defendants as alleged herein.

## COUNT V
## PUNTIVE DAMAGES AND ATTORNEYS' FEES

369.

Plaintiffs re-allege and incorporate herein the allegations contained in Paragraphs 1 through 368 above as if fully stated herein.

370.

The acts and omissions of defendants as alleged show intent, willful misconduct, malice, fraud, wantonness, oppression and/or that entire want of care

85

which raised the presumption of conscious indifference to the consequences entitling Plaintiffs to an award of punitive damages in an amount sufficient to deter Defendants from the same or similar actions in the future in accordance with 42 U.S.C. Section 1983.

### 371.

Defendants were malicious towards Mr. Allen because he was a detainee at the CCADC and did not believe he was entitled to the right to adequate medical care as secured by the United States Constitution.

### 372.

Defendants' conduct was done with reckless disregard of Mr. Allen's rights and all CCADC detainees and inmates similarly situated to Mr. Allen.

### 373.

The acts and omissions of Defendants justify an award of punitive damages to Plaintiffs.

### 374.

Per 42 U.S.C. Section 1983 Plaintiffs are entitled to attorney fees for bringing this action.

## COUNT VI
## BAD FAITH AND STUBBORN LITIGIOUSNESS

### 375.

Plaintiff re-alleges and incorporates herein the allegations contained in Paragraphs 1-374 of Plaintiffs' Complaint as though fully stated herein.

376.

There is no bona fide controversy as to liability, and as a result Defendants have been stubbornly litigious, have acted in bad faith, and have caused Plaintiffs unnecessary expenses under O.C.G.A. § 13-6-11.

377.

Defendants' actions entitle Plaintiffs to recover attorney's fees and expenses of litigation.

## **DAMAGES**

378.

Plaintiffs are entitled to recover as Administrator of Brady Allen's Estate and as Mr. Allen's parents for both Survivorship and Wrongful Death Claims including but not limited to Mr. Allen's pain and suffering, medical, funeral, and other expenses, the full value of Mr. Allen's life, mental anguish, loss of society, companionship, care, and guidance that was proximately caused by all Defendants for its Section 1983 violations and negligence. Plaintiffs are also entitled to punitive damages and attorneys' fees under 42 U.S.C. Section 1983 and O.C.G.A. § 13-6-11.

## **JURY TRIAL DEMANDED**

379.

87

Plaintiffs demand a trial by a jury on all matters that can be so tried.

WHEREFORE, Plaintiffs respectfully requests this Court enter Judgment against Defendants for actual and compensatory damages, punitive damages, attorney fees, costs, and all other relief the Court deems just and equitable.

This  18th  day of May, 2023.

Respectfully submitted,

s/ Timothy J. Gardner
**TIMOTHY J. GARDNER**
Georgia Bar No. 115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547

***Attorneys for Plaintiffs***

Gardner Trial Attorneys, LLC
3100 Cumberland Blvd.
Suite 1470
Atlanta, GA 30339
Phone:  770.693.8202
Fax:  404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

## **CERTIFICATE OF COMPLIANCE**

Pursuant to LR 7.1(D), the undersigned hereby certifies that the foregoing document has been prepared in Times New Roman 14, a font and type selection approved by the Northern District of Georgia in LR 5.1(B) and LR 5.1(C).

This 18th day of May, 2023.

**GARDNER TRIAL ATTORNEYS, LLC**

/s/ Timothy J. Gardner

**TIMOTHY J. GARDNER**
Georgia Bar No. 115430
**HENRIETTA G. BROWN**
Georgia Bar No. 253547

*Attorneys for Plaintiffs*

3100 Cumberland Blvd.
Suite 1470
Atlanta, GA 30339
Phone: 770.693.8202
Fax: 404.393.9838
tjg@gardnertrialattorneys.com
hgb@gardnertrialattorneys.com

89



May 12, 2022

**VIA OVERNIGHT MAIL**
**& EMAIL lisa.cupid@cobbcounty.org**
Cobb County Board of Commissioners
C/O Lisa Cupid, Chairwoman
100 Cherokee Street
Marietta, Georgia 30090

**VIA OVERNIGHT MAIL**
Cobb County Attorney
H. William Rowling, Jr., Esq.
100 Cherokee Street, Suite 350
Marietta, GA 30090

**VIA OVERNIGHT MAIL**
**& EMAIL craig.owens@cobbcounty.org**
Cobb County Sheriff's Office
C/O Craig D. Owens Sr., Sheriff
185 Roswell Street, NE
Marietta, GA 30060

**VIA OVERNIGHT MAIL**
**& EMAIL Risk.Management@doas.ga.gov**
State of Georgia
Department of Administrative Services
Risk Management Division
200 Piedmont Avenue, S.E.
Suite 1804 West Tower
Atlanta, GA 30334

> *Re:* ***ANTE LITEM NOTICE AND PRESENTATION OF CLAIM***
> ***AGAINST COBB COUNTY, COBB COUNTY SHERIFF'S OFFICE***
> ***AND ITS FORMER AND CURRENT OFFICERS, DEPUTIES AND***
> ***MEDICAL STAFF***

|  |  |
|---|---|
| *Our Client:* | Brady Allen |
| *Matter Number:* | ALLE-21-05-01638 |
| *Dates of Injury:* | May 23, 2021 |
| *Case Number:* | 21-05303 |

Dear Sirs/Madams:

Please be advised that our law firm represents Scott and Karen Allen, as surviving parents of Brady Allen and the Estate of Brady Allen (hereinafter collectively referred to as the "Estate") against the Cobb County Sheriff's Office, Cobb County Sheriff Craig Owens, Former Cobb County Sheriff Neil Warren, Former and Current Cobb County Sheriff's Officers/Deputies including, but not limited to Lieutenant Beasley and Deputy Ferguson, and Cobb County Sheriff's Office medical staff. Our claims relate to the injuries and death of Brady Allen (D.O.B. 5/4/1980 and SOID #000803302) while an inmate at the Cobb County Adult Detention Center (hereinafter referred to as "CCADC") at 1825 County Services Parkway, SW, Marietta, GA, 30008, from May 22, 2021, through May 23, 2021. You are hereby put on notice of our intent to file a lawsuit based on the following:



May 12, 2022
Page **2** of **4**

A)  Mr. Allen died at CCADC on May 23, 2021. The cause of Mr. Allen's death was "sudden death associated with acute methamphetamine intoxication and law enforcement subdual." His death could have been avoided had Cobb County Sheriff Deputies provided Mr. Allen with the necessary medical care he needed and not excessively subdued and deployed an electric device (taser) and launched multiple pepper balls at Mr. Allen causing a premature death. Mr. Allen was experiencing a medical emergency and instead of immediately providing him necessary medical treatment, Cobb County Sheriff Officers unnecessarily and inappropriately subdued and tasered him in violation of his civil rights and Cobb County Sheriff's Office policies and procedures.

On May 22, 2021, Mr. Allen was arrested by Cobb County Police Department and transported for booking to Cobb County Adult Detention Center. On or around 6:01 p.m., Cobb County Sheriff's Office staff completed a preliminary health screening assessment where it indicated Mr. Allen ingested methamphetamine and heroine prior to his detention. It was also known by Cobb County Sheriff's Office that Mr. Allen had a history of drug issues and was arrested for trespass because he was swimming in a pool that did not belong to him.

Based on Cobb County Sheriff's Office arrest/booking report, Mr. Allen was booked on or around 6:51 p.m. and at around 10:48 p.m. placed in a single person cell. While in the single person cell, surveillance videos show Mr. Allen exhibited signs of being restless, lying down, sitting down, pacing the cell floor, pulling most his hair from his head, drinking from the sink faucet, undressing and re-dressing several times, delusional, hallucinating, vocalizing in words and sounds, banging his head and pressing the emergency medical call button several times. Mr. Allen exhibited these behaviors for almost ten hours. Despite being monitored constantly, none of the Cobb County Sheriff Office officers/deputies responded to Mr. Allen's calls of distress or provided him with any medical assistance.

During Intake at CCADC, Mr. Allen communicated to Cobb County Sheriff's Office that he had thoughts of hurting himself in the past. In fact, the inventory of prescription pills obtained from Mr. Allen well documented that he struggled with anxiety and depression. Despite the signs of a possible medical and mental health episode and multiple prescription pills for anxiety and depression, Cobb County Sheriff Deputies never sent Mr. Allen to be evaluated by a medical and/or mental health professional. Cobb County Sheriff Deputies also did not give Mr. Allen any of his necessary prescriptions.

While housed in the single person cell, Mr. Allen was observed responding to unseen stimuli and later attempted to remove a fire detector from the wall of his cell. At around 8:41 a.m. Cobb County Sheriff Deputies entered his cell. Cobb County Sheriff's

3100 Cumberland Blvd., Suite 1470 | Atlanta, Georgia 30339
(770) 693-8202 | inquiries@gardnertrialattorneys.com | gardnertrialattorneys.com

May 12, 2022
Page **3** of **4**

Deputies then forcefully subdued Mr. Allen, tased and pepper balled him, placed him in a prone position on the ground and restrained Mr. Allen using a waist chain with one of his hands secured in a handcuff. Several deputies used their significant body weight and pain compliance measures, including mandibular angle technique and knee strikes, in subduing Mr. Allen. Mr. Allen stated "I can't breathe" multiple times but deputies continued to improperly subdue him. On or around 8:45 a.m., Mr. Allen was unresponsive, and deputies began CPR. Mr. Allen was then transported to Wellstar Kennestone hospital where he was pronounced dead.

With knowledge of possible drug use prior to detainment, Sheriff Deputies should have never subdued or deployed multiple pepper balls and an electrical device (taser) at Mr. Allen. Due to his apparent medical condition, Mr. Allen should have been under the care of medical and/or mental health professionals. Prior to subduing Mr. Allen and with evidence that he was experiencing a serious mental health and medical emergency that needed immediate treatment, Cobb County Sheriff Deputies should have contacted a medical and/or mental health professional to immediately evaluate and treat Mr. Allen. Upon information and belief Cobb County Sheriff's Office had a custom and policy of not providing necessary mental health medical attention to detainees and inmates at the CCADC.

An Estate, Survivorship and Wrongful Death Claim will be brought arising out of the death of Brady Allen. The basis for the claim will be violation of State laws including negligence, cruelty to a pretrial detainee, excessive use of force, failure to comply with policy and procedures for use of an electronic device against detainees, violation of Cobb County Sheriff's Office ministerial duties and policies and procedures related to providing pretrial detainees necessary mental health and medical treatment and observation of detainees, and Federal Claims pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of Mr. Allen's Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment and to receive adequate medical care.

B)    The nature of the losses our clients have and/or continue to suffer include, but are not limited to, wrongful death, conscious pain and suffering, survivorship claims, personal physical injury, pain and suffering, mental anguish including the apprehension of imminent death, lost wages, medical related expenses, funeral expenses, punitive damages, cost of litigation, attorneys' fees plus additional estate and wrongful death claims.

C)    The amount of the loss claimed is fifty million dollars ($50,000,000.00) and if paid in 30 days a suit will not be brought.

May 12, 2022
Page **4** of **4**

     Please accept this as Scott and Karen Allen's and the Estate's notice of claim and legal ante litem notice pursuant to O.C.G.A. § 36-11.1, et seq and O.C.G.A. § 50-21-26 et. Seq. with regard to all claims against Cobb County, the Cobb County Sheriff's Department, State of Georgia, and Cobb County Sheriff Craig Owens and his officers/deputies. Please review this notice and contact me so that we may determine if this matter can be amicably resolved or if we need to file suit.

     Thank you for your time and attention to this matter.

       Very truly,

       **GARDNER TRIAL ATTORNEYS, LLC**

       Timothy J. Gardner

cc: Scott and Karen Allen




(https://www.
loc=en_US&re

Your shipment
**1Z32E70E0108271891**

✔ Delivered On
Friday, May 13 at **10:05 A.M.**

**Delivered To**
MARIETTA, GA US

**Received By:**
HARP
Proof of Delivery

Get Updates  ❯

View Details

Track Another Package

Track

UPS Freight Less-than-Truckload ("LTL") transportation services are offered by TFI International Inc., its affiliates or divisions (including without limitation TForce Freight), which are not affiliated with United Parcel Service, Inc. or any of its affiliates, subsidiaries or related entities ("UPS"). UPS assumes no liability in connection with UPS Freight LTL transportation services or any other services offered or provided by TFI International Inc. or its affiliates, divisions, subsidiaries or related entities.

(?) **This Site**                                                                          +

**Other UPS Sites**                                                                 +

**Connect With Us**                                                                +

**Legal**                                                                                   +

Copyright ©1994- 2022 United Parcel Service of America, Inc. All rights reserved.

**Ask UPS**



| | | |
|---|---|---|
| **Shipment Receipt** | May 12, 2022 | 1Z32E70E0108271891 |

## Where

**Ship From**
GARDNER TRIAL ATTORNEYS, TIMOTHY GARDNER, ESQ.
3100 CUMBERLAND BLVD, SUITE 1470, ATL, GA 30339
7706938202 105

**Ship To**
COBB COUNTY BOARD OF COMMISSIONERS, C/O LISA CUPID, CHAIRWOMAN
100 CHEROKEE STREET, MARIETTA, GA 30090

## What

**Package 1 - 1Z32E70E0108271891**

| Weight | Dimensions | Reference Numbers |
|---|---|---|
| 1 lbs | UPS Letter | ALLE-21-05-01638 |

# Service Details - UPS Next Day Air

## Additional Options

Email Notifications: nn@gardnertrialattorneys.com

## Payment

Bill Shipping Charges To: Shipper - 32E70E

## Shipping Total

**Shipping Fees**

| | |
|---|---|
| UPS Next Day Air | $34.50 |
| **Package 1** | |
| Fuel Surcharge | $8.97 |

Transportation Charges: for services listed as guaranteed, refunds apply to transportation charges only. See Terms and Conditions in the Service Guide for details. Certain commodities and high value shipments may require additional transit time for customs clearance.

**Subtotals**

| | |
|---|---|
| Shipping Fees | $43.47 |
| Combined Charges | $43.47 |
| Contract Rate | $23.90 |
| Published Charges: $43.47 | |
| **Total (with taxes and discount)** | $0.00 |

Rate excludes VAT. Rate includes a fuel Surcharge, but excludes taxes, duties and other charges that may apply to the shipment.
Your invoice may vary from the displayed reference rates

Note: This document is not an invoice.

All shipments are subject to the UPS Tariff/Terms and Conditions of Service ("UPS terms") in effect on the date of shipment, which are available at www.ups.com/terms. Pursuant to the UPS Terms, UPS's maximum liability for loss or damage to each domestic package or international shipment is limited to $100, unless the shipper declares a greater value in the declared value field of the UPS shipping system used and pays the applicable charge (in which case UPS's maximum liability is the declared value). Special terms apply to some services and articles. Please review the UPS Terms for liability limits, exclusions from liability, maximum declared values, prohibited items, and other important terms of service. The shipper agrees that in the absence of a greater declared value, $100 value is a reasonable limitation under the circumstances of the transportation. Claims not timely made (generally noticed within sixty days and filed within nine months, but filed within sixty days for international shipments) are deemed waived and will not be paid. See the UPS Terms for details. Under no circumstances will UPS be liable for any special, incidental, or consequential damages.



**Shipment Receipt**                    May 12, 2022                    1Z32E70E0126848547

## Where

**Ship From**
GARDNER TRIAL ATTORNEYS, TIMOTHY GARDNER, ESQ.
3100 CUMBERLAND BLVD, SUITE 1470, ATL, GA 30339
7706938202 105

**Ship To**
COBB COUNTY ATTORNEY, H. WILLIAM ROWLING, JR., ESQ.
100 CHEROKEE STREET, SUITE 350, MARIETTA, GA 30090

## What

**Package 1 - 1Z32E70E0126848547**

| Weight | Dimensions | Reference Numbers |
|---|---|---|
| 1 lbs | UPS Letter | ALLE-21-05-01638 |

# Service Details - UPS Next Day Air

## Additional Options

Email Notifications: nn@gardnertrialattorneys.com

## Payment

Bill Shipping Charges To: Shipper - 32E70E

## Shipping Total

**Shipping Fees**

| | |
|---|---|
| UPS Next Day Air | $34.50 |
| **Package 1** | |
| Fuel Surcharge | $8.97 |

Transportation Charges: for services listed as guaranteed, refunds apply to transportation charges only. See Terms and Conditions in the Service Guide for details. Certain commodities and high value shipments may require additional transit time for customs clearance.

**Subtotals**

| | |
|---|---|
| Shipping Fees | $43.47 |
| **Combined Charges** | $43.47 |
| **Contract Rate** | $23.90 |
| Published Charges: $43.47 | |
| **Total (with taxes and discount)** | $0.00 |

Rate excludes VAT. Rate includes a fuel Surcharge, but excludes taxes, duties and other charges that may apply to the shipment.
Your invoice may vary from the displayed reference rates

Note: This document is not an invoice.

All shipments are subject to the UPS Tariff/Terms and Conditions of Service ("UPS terms") in effect on the date of shipment, which are available at www.ups.com/terms. Pursuant to the UPS Terms, UPS's maximum liability for loss or damage to each domestic package or international shipment is limited to $100, unless the shipper declares a greater value in the declared value field of the UPS shipping system used and pays the applicable charge (in which case UPS's maximum liability is the declared value). Special terms apply to some services and articles. Please review the UPS Terms for liability limits, exclusions from liability, maximum declared values, prohibited items, and other important terms of service. The shipper agrees that in the absence of a greater declared value, $100 value is a reasonable limitation under the circumstances of the transportation. Claims not timely made (generally noticed within sixty days and filed within nine months, but filed within sixty days for international shipments) are deemed waived and will not be paid. See the UPS Terms for details. Under no circumstances will UPS be liable for any special, incidental, or consequential damages.




(https://www.
loc=en_US&re

Your shipment
1Z32E70E0126848547

✓ Delivered On
Friday, May 13 at **10:06 A.M.**

**Delivered To**
MARIETTA, GA US

**Received By:**
GUINN
<u>Proof of Delivery</u>

Get Updates ❯

<u>View Details</u>

**Track Another Package**

| |
|---|

| Track |
|---|

UPS Freight Less-than-Truckload ("LTL") transportation services are offered by TFI International Inc., its affiliates or divisions (including without limitation TForce Freight), which are not affiliated with United Parcel Service, Inc. or any of its affiliates, subsidiaries or related entities ("UPS"). UPS assumes no liability in connection with UPS Freight LTL transportation services or any other services offered or provided by TFI International Inc. or its affiliates, divisions, subsidiaries or related entities.

❓ **This Site**                                                                 ✛

**Other UPS Sites**                                                              ✛

**Connect With Us**                                                              ✛

**Legal**                                                                        ✛

Copyright ©1994- 2022 United Parcel Service of America, Inc. All rights reserved.

**Ask UPS**




(https://www.
loc=en_US&re

Your shipment
1Z32E70E0126270554

✔ Delivered On
Friday, May 13 at 11:48 A.M.

**Delivered To**
ATLANTA, GA US

**Received By:**
FRNT DESK
<u>Proof of Delivery</u>

Get Updates  ❯

<u>View Details</u>

### Track Another Package

[                                                                              ]

[                                    Track                                     ]

UPS Freight Less-than-Truckload ("LTL") transportation services are offered by TFI International Inc., its affiliates or divisions (including without limitation TForce Freight),
which are not affiliated with United Parcel Service, Inc. or any of its affiliates, subsidiaries or related entities ("UPS"). UPS assumes no liability in connection with UPS Freight
LTL transportation services or any other services offered or provided by TFI International Inc. or its affiliates, divisions, subsidiaries or related entities.

❓ **This Site**                                                                  ＋

**Other UPS Sites**                                                               ＋

**Connect With Us**                                                               ＋

**Legal**                                                                         ＋

Copyright ©1994- 2022 United Parcel Service of America, Inc. All rights reserved.

**Ask UPS**

 **Shipment Receipt**          May 12, 2022          1Z32E70E0126270554

## Where

**Ship From**
GARDNER TRIAL ATTORNEYS, TIMOTHY GARDNER, ESQ.
3100 CUMBERLAND BLVD, SUITE 1470, ATL, GA 30339
7706938202 105

**Ship To**
DEPARTMENT OF ADMIN. SERVICES, RISK MANAGEMENT DIVISION
200 PIEDMONT AVENUE, S.E., ATLANTA, GA 30334

## What

**Package 1 - 1Z32E70E0126270554**

| Weight | Dimensions | Reference Numbers |
|---|---|---|
| 1 lbs | UPS Letter | ALLE-21-05-01638 |

# Service Details - UPS Next Day Air

## Additional Options

Email Notifications: nn@gardnertrialattorneys.com

## Payment

Bill Shipping Charges To: Shipper - 32E70E

## Shipping Total

| Shipping Fees | | | Subtotals | |
|---|---|---|---|---|
| UPS Next Day Air | $34.50 | | Shipping Fees | $43.47 |
| **Package 1** | | | **Combined Charges** | $43.47 |
| Fuel Surcharge | $8.97 | | **Contract Rate** | $23.90 |
| | | | Published Charges: $43.47 | |
| | | | **Total (with taxes and discount)** | $0.00 |

Transportation Charges: for services listed as guaranteed, refunds apply to transportation charges only. See Terms and Conditions in the Service Guide for details. Certain commodities and high value shipments may require additional transit time for customs clearance.

Rate excludes VAT. Rate includes a fuel Surcharge, but excludes taxes, duties and other charges that may apply to the shipment.
Your invoice may vary from the displayed reference rates

Note: This document is not an invoice.

All shipments are subject to the UPS Tariff/Terms and Conditions of Service ("UPS terms") in effect on the date of shipment, which are available at www.ups.com/terms. Pursuant to the UPS Terms, UPS's maximum liability for loss or damage to each domestic package or international shipment is limited to $100, unless the shipper declares a greater value in the declared value field of the UPS shipping system used and pays the applicable charge (in which case UPS's maximum liability is the declared value). Special terms apply to some services and articles. Please review the UPS Terms for liability limits, exclusions from liability, maximum declared values, prohibited items, and other important terms of service. The shipper agrees that in the absence of a greater declared value, $100 value is a reasonable limitation under the circumstances of the transportation. Claims not timely made (generally noticed within sixty days and filed within nine months, but filed within sixty days for international shipments) are deemed waived and will not be paid. See the UPS Terms for details. Under no circumstances will UPS be liable for any special, incidental, or consequential damages.





Your shipment
1Z32E70E0118605501

✔ Delivered On
Friday, May 13 at 10:21 A.M.

**Delivered To**
MARIETTA, GA US

**Received By:**
FARBER
<u>Proof of Delivery</u>

Get Updates  ❯

<u>View Details</u>

**Track Another Package**

[                                                                    ]

[                            Track                            ]

UPS Freight Less-than-Truckload ("LTL") transportation services are offered by TFI International Inc., its affiliates or divisions (including without limitation TForce Freight), which are not affiliated with United Parcel Service, Inc. or any of its affiliates, subsidiaries or related entities ("UPS"). UPS assumes no liability in connection with UPS Freight LTL transportation services or any other services offered or provided by TFI International Inc. or its affiliates, divisions, subsidiaries or related entities.

(?) **This Site**                                                                 +

**Other UPS Sites**                                                          +

**Connect With Us**                                                          +

**Legal**                                                                           +

Copyright ©1994- 2022 United Parcel Service of America, Inc. All rights reserved.

**Ask UPS**



| | | |
|---|---|---|
| Shipment Receipt | May 12, 2022 | 1Z32E70E0118605501 |

## Where

**Ship From**
GARDNER TRIAL ATTORNEYS, TIMOTHY GARDNER, ESQ.
3100 CUMBERLAND BLVD, SUITE 1470, ATL, GA 30339
7706938202 105

**Ship To**
COBB COUNTY SHERIFF, C/O CRAIG D. OWENS SR., SHERIFF
185 ROSWELL STREET NORTHEAST, MARIETTA, GA 30060

## What

**Package 1 - 1Z32E70E0118605501**

**Weight**
1 lbs

**Dimensions**
UPS Letter

**Reference Numbers**
ALLE-21-05-01638

# Service Details - UPS Next Day Air

## Additional Options

Email Notifications: nn@gardnertrialattorneys.com

## Payment

Bill Shipping Charges To: Shipper - 32E70E

## Shipping Total

| Shipping Fees | | Subtotals | |
|---|---|---|---|
| UPS Next Day Air | $34.50 | Shipping Fees | $43.47 |
| **Package 1** | | Combined Charges | $43.47 |
| Fuel Surcharge | $8.97 | Contract Rate | $23.90 |
| | | Published Charges: $43.47 | |
| | | **Total (with taxes and discount)** | $0.00 |

Transportation Charges: for services listed as guaranteed, refunds apply to transportation charges only. See Terms and Conditions in the Service Guide for details. Certain commodities and high value shipments may require additional transit time for customs clearance.

Rate includes a fuel Surcharge, but excludes taxes, duties and other charges that may apply to the shipment.
Your invoice may vary from the displayed reference rates

Note: This document is not an invoice.

All shipments are subject to the UPS Tariff/Terms and Conditions of Service ("UPS terms") in effect on the date of shipment, which are available at www.ups.com/terms. Pursuant to the UPS Terms, UPS's maximum liability for loss or damage to each domestic package or international shipment is limited to $100, unless the shipper declares a greater value in the declared value field of the UPS shipping system used and pays the applicable charge (in which case UPS's maximum liability is the declared value). Special terms apply to some services and articles. Please review the UPS Terms for liability limits, exclusions from liability, maximum declared values, prohibited items, and other important terms of service. The shipper agrees that in the absence of a greater declared value, $100 value is a reasonable limitation under the circumstances of the transportation. Claims not timely made (generally noticed within sixty days and filed within nine months, but filed within sixty days for international shipments) are deemed waived and will not be paid. See the UPS Terms for details. Under no circumstances will UPS be liable for any special, incidental, or consequential damages.

AFFIDAVIT:     CLAIRE E. TESKE, RN, BA, PMH-BC, LNC

I, Claire E. Teske, being duly sworn, make the following statements:

1.  I am over 18 years of age, of sound mind, and otherwise competent to make this Affidavit. The evidence set out in the forgoing Affidavit is based on my personal knowledge.

2.  I am a registered nurse and licensed in California.  I am also competent to offer opinions as an expert on the matters at issue in this case in that I have education, training, and experience in these areas and the credentials outlined in my Curriculum Vitae, a copy of which is attached hereto and incorporated herein by reference as Exhibit "A".

3.  I have been practicing nursing since 1974.  For at least three of the five years preceding May 22, 2021, I have been actively involved in nursing.

4.  Based upon my education, training and experience, I am familiar with that degree of care and skill ordinarily exercised by nurses under the same or similar circumstances and like surrounding conditions as the facts of this case.  Specifically, I am familiar with that degree of care and skill ordinarily exercised by nurses and medical staff including paramedics when treating patients with behavioral issues/changes during the intake/booking process.  Within the 5 years preceding May 22, 2021, I have also supervised, taught, and instructed medical support staff in their care and assessment of patients with drug abuse, mental health, and behavioral issues and I am familiar with the degree of care and skill ordinarily employed by these professionals.

5.  At the time of the acts or omissions addressed in my standard of care opinions set forth herein below, I had actual knowledge and experience in the areas of practice or specialty in which these opinions are given.

6.  In connection with the giving of this Affidavit, I have reviewed the medical records of Brady Barret Allen pertaining to his incarceration on May 22, 2021.  I have also reviewed the Autopsy Report of Brady Barret Allen.

7.  Each of the opinions that I have expressed herein are given to and based upon a reasonable degree of medical probability.

8.  As the factual basis for my opinions herein, I have assumed the following facts to be true and, in my opinion, the following is an accurate summary of pertinent events and conditions that occurred in this matter:



a. Mr. Allen was arrested on May 22, 2021, and held at the Cobb County Jail. Due to his unpredictable behavior, he was never processed/booked.

b. The Preliminary Health Screening Assessment was completed May 22, 2021, at 1801 hours by officer #19013. There were 8 positive responses: One response was unclear.

- Does the arresting or transport officer believe the Arrestee is currently in need of medical or mental health services? YES
- Strange behavior, hallucinating (Contact nurse and supervisor).
- Appears confused, disoriented, difficulty communicating.
- Hearing voices or seeing visions? Unclear answer but probably a YES.
- Have you ever thought of hurting yourself in the past? YES (If yes explain below/contact supervisor/nurse). No comment noted.
- Have you ingested any legal/illegal drugs within the last 24 – 72 hours? YES- (If yes, explain below and contact nurse/supervisor). Comment: Meth, Heroin 3 days ago.
- Do you take prescription medication? YES
- Have you had a head injury in the last 24 – 72 hours? YES (If yes, explain below and contact nurse/supervisor). No comment noted.
- Do you have flu-like symptoms such as fever, nausea, vomiting, diarrhea, or body aches? YES (If yes, contact the nurse).

c. The above positive responses along with his unusual behavior should have triggered a medical/mental health assessment by the medical staff. This information indicates that there may be a serious medical/mental health issue and warrants further assessment, a call to the medical provider, possible treatment and/or an evaluation at the emergency room.

d. There is no indication in the medical record that any assessment was done. There are no vital signs, documented calls to the medical provider or communication between the on-site medical staff regarding Mr. Allen.

e. In reviewing the interviews of several of the custody and medical staff that were present at the time Mr. Allen was in the Sallyport, it is documented that Paramedic Watson was in the Sallyport and spoke with Mr. Allen, but he did not do vital signs, or a documented assessment. He states he did not review the Screening form. The video shows him with a piece of paper in his hand, but he states, "I was never given this sheet, I didn't know it had been filled out". When asked what was the sheet in your hand that you were looking at in the video, Watson stated, "I was looking at, uh, I don't recall". When asked by Internal Affairs if he thought it would have been important to look at the sheet that described what was wrong with Inmate Allen, Paramedic Watson replied, "Yes sir, I do".

2

f.  Mr. Watson cleared Mr. Allen for booking and did not provide any further care or discuss him with the nurse on duty. There is no documentation that any information regarding Mr. Allen was passed on to the next shift.

g.  On May 22, 2021 @ 1939 hours, Jesica Reynold, RN completed a Prescription Drug Inventory Record.  The medications on this record were currently being prescribed by a community provider and were for depression and anxiety.  Mr. Allen brought these medications to the jail at the time of his arrest.  It is unknown what happened to this list after its completion, but it would have been important to notify the on-call provider and have the medications continued. It is apparent that Mr. Allen was taking these medications judging by the date of refills and number of pills left in the bottles. Nurse Reynolds should have known that these medications would have helped to calm Mr. Allen and she should have notified the jail medical provider for orders.  She also should have reviewed his records at this time.  Discovering that he had not been assessed and no vital signs had been done may have changed the outcome of this situation if she would have completed an assessment.

h.  Mr. Allen was placed in a holding cell pending further processing/booking.  Over the next 8 hours his behavior continued to be abnormal.  He was seen taking his shirt on/off, pacing, banging on the cell door.  His level of agitation was escalating.

i.  Later in the evening, (May 23, 2021 @ 0109) Nurse Ngethe stated she attempted to see Mr. Allen but was told by custody staff that he too agitated, and she could not see him at that time.

j.  The Internal Affairs Investigative Interviews of the custody staff on duty at the time Mr. Allen was present at the jail expressed the following:
Deputy J. Williams:  Mr. Allen appeared to be "under the influence of something". "He needed to see a nurse".  Medical did not call for him/see him.  They felt he was too combative at the time.
Deputy Brittingham:  Asked medical to see Mr. Allen.  Was told, "not until he calms down". Second request to medical to see Mr. Allen.   "Exception Form already completed.  Will refer to next shift for evaluation".
Deputy Velez:  Assigned to intake/evening shift.  He was seen by medical in sallyport (Watson).  Watson stated, "He's fine".  Mr. Allen appeared anxious (detoxing?).

The correctional staff were all in agreement that Mr. Allen was not acting normally. Multiple requests were made to medical to assess/evaluate him, but this was not done.

k.  The fact that Mr. Allen was "too agitated" should have been an indication to the nurse that there may be a problem and further assessment should be pursued.
Mr. Allen remained in a holding cell for the next 8 hours, his condition deteriorating.

3

l. At the end of the shift, Officer Brittingham made 2 requests to medical (Watson) that Mr. Allen be seen by medical. The response was that a Refusal Exception Form had been completed and that the day shift would follow up. Mr. Allen was never assessed by the medical staff. The night shift referred him to the day shift. The day shift did not see him. On May 23, 2021 @ 0911 hours, 3 hours after the change of shift, Mr. Allen was transported to the hospital, unresponsive and pronounced dead at 0938.

9. Paramedic Watson failed to render appropriate care to Mr. Allen. He knew his behavior was not normal but did not do an assessment to evaluate him for a serious medical condition. He did not take the basic vital signs required for all new intakes. He did not discuss the patient with the nurse on duty. The on-call medical provider was not notified of Mr. Allen's situation. No treatment was initiated. Mr. Allen's current mental health prescriptions were not verified and continued. Mr. Allen was never assessed and asked questions regarding hospitalizations, current medications/treatments. The fact that he was just an inpatient for serious medical issues and left hospital AMA is information that would have prompted a call to the medical provider and a trip to the emergency room.

10. Paramedic Watson failed to follow up assessing Mr. Allen, after his initial contact with him. In fact, he did not see Mr. Allen at all for the remainder of the shift.

11. Nurse Ngethe failed to do an assessment on Mr. Allen. She stated she was told he was too agitated, but this should have been a red flag and she should have insisted that she be able to evaluate him, or he would have to go to the emergency room for evaluation.

12. There is no documentation of a change of shift report for the medical staff. The day shift staff for intake was Paramedic Brooke Stevic and Nurse Donnette Duggan-Pierre. During an interview between Georgia Bureau of Investigation and Paramedic Stevic, she stated she had no interaction with Inmate Allen prior to the incident. Also, during Nurse Duggan-Pierre's interview with Georgia Bureau of Investigation, she stated she had no interaction with Inmate Allen prior to the incident. On May 23, 2021 @ 0942 hours a telephone call was made from the Charge Nurse Desk (7072) to intake triage (4349) – One member of the medical staff asks another what was on the back of Allen's Preliminary medical form. The nurse states, "Strange behavior, appears confused and disoriented, hearing voices, have you ever thought of hurting yourself, there's a yes on that, have you ingested anything illegal, yes, have you had a head injury in the last 24 – 72 hours, that's a yes too. The other nurse replies, "Oh God".

13. It is my opinion, with a reasonable degree of medical certainty based on my education, training, and experience, and the facts contained in the records that I reviewed, that Nurse Ngethe, Nurse Reynolds, and Paramedic Watson were charged with the care and treatment of Mr. Allen, and that they failed to exercise that degree of care and skill ordinarily exercised by nurses and paramedics under the same or similar circumstances and like surrounding conditions ( the standard of care).

4

14. In my opinion, with a reasonable degree of medical certainty based upon my education, training, experience, and my review of the medical records, that Nurse Ngethe, Nurse Reynolds, and Paramedic Watson breached the standard of care by:

    a. Failing to appropriately assess/evaluate Mr. Allen who was presenting with signs/symptoms of potential serious medical issues. His behavioral changes could have indicated several possibilities such as dehydration, drug withdrawals, hyperglycemia, toxicity, electrolyte imbalance, brain injury.

    b. Failing to send Mr. Allen to the emergency room for evaluation of a recent head injury as stated on his screening form, as well as several other "YES" answers to medical questions.

    c. Failing to follow the procedure for continuing current medications. If Mr. Allen had been given his anti-anxiety medication it may have calmed him down, circumventing the disastrous outcome.

15. There is no documentation of a medical assessment or any medical care being provided from Paramedic Stevic or Nurse Duggan-Pierre to Mr. Allen, prior to him becoming unresponsive. It is apparent that nothing was done for Mr. Allen. A telephone call (May 23. 2021 @ 1005 hours) from the Watch Commander (4212) to Intake Triage (4349) – Lieutenant Garrett asks the nurse if her notes indicate if Mr. Allen was ever talked to by medical. The nurse explained there was nothing in Inmate Allen's chart other than an Exception and he was in a side cell due to behavior. No documentation of care exists because Paramedic Stevic and Nurse Duggan-Pierre did not provide any medical care to Mr. Allen prior to his unresponsiveness incident. It is my opinion, with a reasonable degree of medical certainty based on my education, training, and experience, that this is a breach of the standard of care and the day shift staff, Paramedic Stevic and Nurse Duggan-Pierre, who was assigned to the care of Mr. Allen should be accountable for their actions, or lack of action.

16. This Affidavit is not intended to provide an exhaustive listing of all the opinions which I may have concerning the matters at issue in this case, and I reserve the right to express additional opinions based on any additional information which may come to my attention as this case proceeds through the discovery and litigation process.

5

17. To a reasonable degree of medical certainty, it is my professional opinion that the above-mentioned medical staff's failure to properly care for Mr. Allen contributed to his death.


Claire E. Teske, RN, BA, PMH-BC, LNC


Sworn and subscribed
Before me this 21st day
Of April, 2023 .


Notary Public

My Commission Expires: 11/21/2024

JENNIFER LYNN HILSTAD
COMM. # 2338047
NOTARY PUBLIC - CALIFORNIA
PLACER COUNTY
COMM. EXPIRES NOV. 21, 2024