IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
| Debtors. | (Jointly Administered) |
| | Re Docket No.: 384, 567, 1022 |

**DEBTORS' OBJECTION TO THE STATUTORY
UNSECURED CLAIMHOLDERS' COMMITTEE'S EMERGENCY
MOTION TO EXTEND THE DEADLINES FOR (I) THE BID
PROCEDURES ORDER AND (II) SOLICITATION PROCEDURES MOTION**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this objection (the "Objection") in response to *The Statutory Unsecured Claimholders' Committee's Emergency Motion To Extend The Deadlines for (I) the Bid Procedures Order and (II) Solicitation Procedures Motion* [Docket No. 1022] (the "Extension Motion") filed by Statutory Unsecured Claimholders' Committee (the "Committee") to extend the deadlines in the *Stipulated and Agreed Amended Order (I) Approving the Bidding Procedures for the Sale of the Debtors' Assets, (II) Approving Entry Into a Stalking Horse Purchase Agreement for the Recovery Solutions Assets, (III) Authorizing the Recovery Solutions Expense Reimbursement, (IV) Authorizing Potential Selection of Stalking Horse Bidders for the Corrections Assets and Approving Related Correction Asset(s) Bid Protections, (V) Establishing Related Dates and Deadlines, (VI) Approving the Form and Manner of Notice Thereof, (VII) Approving the Assumption and Assignment of Procedures, and (VIII) Granting Related Relief* [Docket No. 384] (the "Bidding

---

[1] A complete list of the Debtors (as defined below) in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Wellpath. The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

Procedures Order"),[2] the Bidding Procedures, and the *Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 567] *(*the "Solicitation Motion").[3]  In support of this Objection, the Debtors respectfully state as follows:[4]

**Preliminary Statement**

1.  At the inception of these chapter 11 cases, the Debtors proposed an expeditious process that appropriately balanced the Debtors' restructuring goals, the health and safety of their patients, and notice and due process considerations affecting their patients.  Prolonged delays put the well-being of the Debtors' patients at risk and increases the likelihood of irreparable harm to the Debtors' businesses.

2.  To ensure the Debtors' businesses would remain intact during these chapter 11 cases and instill confidence in their customer base, shortly after the Petition Date, the Debtors communicated the timeline to their customers and vendors, providing comfort that they would expeditiously emerge from these chapter 11 cases as a stronger, well-capitalized enterprise.  This

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order or the Extension Motion, as applicable.

[3] The Debtors understand from the Committee that the Committee considers resolved the portion of the Extension Motion relating to the Corrections Business sale timeline under the Bidding Procedures and the Bidding Procedures Order.

[4] In further support of this Objection the Debtors submit the *Declaration of Timothy J. Dragelin as Chief Restructuring Officer and Chief Financial Officer of Wellpath Holdings, Inc. and Certain of its Affiliates and Subsidiaries in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 20], which is incorporated herein by reference.

2

comfort was necessary as the Debtors' customer base is made up of state and local government entities with significant discretion and ability to transition contracts to the Debtors' competitors. The Confirmation Schedule is critical to preserving the Debtors' ongoing business and to limiting any destruction of value to the Debtors' estates. Indeed, there are a number of customer contracts that require rebidding and renewing in the second quarter of 2025 and customers may move up their rebid processes on any particular contract if they believe it is necessary to ensure the safety of the Debtors' vulnerable patient population.

3. The Debtors are committed to working collaboratively with their stakeholders, including the Committee, through these chapter 11 cases in an efficient, structured manner. For example, shortly after the appointment of the Committee, the Debtors, the Committee, the DIP Lenders, and the Ad Hoc Group entered into good faith arm's-length negotiations over the Bidding Procedures and the appropriate timelines for the Debtors' sale processes. Despite the Debtors' efforts to collaborate with the Committee, the Committee has chosen to take a "scorched earth approach" by using delay in connection with the Debtors' proposed confirmation timeline to exert process leverage and extort value for one constituency at the expense of the Debtors' overall business operations and value.

4. Since the outset of these chapter 11 cases, the Debtors openly described in their papers and in Court the interplay between the Restructuring Support Agreement, the sale processes, and the confirmation of a chapter 11 plan. The dual-track process originally memorialized in a chapter 11 plan filed on December 20, 2024,[5] and as detailed in the disclosure

---

[5] *See Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and Certain of Its Debtor Affiliates* [Docket No. 564].

statement filed contemporaneously therewith,[6] provided the Debtors optionality and flexibility to ensure a value-maximizing transaction for the benefit of the Debtors' estates and stakeholders. The Debtors, however, did not receive a Qualified Bid for the Corrections Assets by the Corrections Asset(s) Bid Deadline (each as defined in the Bidding Procedures Order). As a result, on January 28, 2025, the Debtors, after consulting with the Consultation Parties, cancelled the Corrections Asset(s) Auction and Sale Hearing as to the Corrections Business. Accordingly, on February 10, 2025 and February 15, 2025, the Debtors filed updated versions of the chapter 11 plan[7] and disclosure statement[8] contemplating restructuring transactions relating to the Corrections Business and are seeking to solicit, confirm, and consummate the Plan (and the restructuring transactions contemplated therein).

5. Critically, the Confirmation Schedule[9] (as defined in the Solicitation Motion) is guided by the Debtors' need to emerge from chapter 11 shortly after the end of the first quarter of 2025 given the number of customer contracts that start the renewal/rebidding process in

---

[6] *See Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and Certain of its Debtor Affiliates* [Docket No. 566].

[7] *See Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and Certain of Its Debtor Affiliates* [Docket Nos. 1307, 1408] (as amended, supplemented, or modified from time to time, the "Plan").

[8] *See Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and Certain of its Debtor Affiliates* [Docket Nos. 1308, 1410] (as amended, supplemented, or modified from time to time, the "Disclosure Statement").

[9] Since the filing of the Extension Motion, the Debtors agreed to extend the Confirmation Timeline whereby the Confirmation Hearing is currently scheduled for March 31, 2025. The revised Confirmation Schedule was memorialized in the *Stipulation and Agreed Order Regarding (A) the Schedule Set Forth in Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief and (B) the Statutory Unsecured Claimholders' Committees Emergency Motion to Extend the Deadlines for (I) the Bid Procedures Order and (II) the Solicitation Procedures Motion* [Docket No. 1195] (the "Confirmation Schedule Stipulation"). In the Confirmation Schedule Stipulation, the Committee explicitly reserved the "right to object to the [Confirmation Schedule] set forth above and the Solicitation Procedures Motion, [and is] expressly preserved and will be taken up at the hearing scheduled for February 18, 2025 at 9:00 a.m. (prevailing Central Time)." Confirmation Schedule Stipulation, ¶ 3.

April of 2025.  Indeed, failure to close the restructuring transactions for the Corrections Business contemplated by the Plan shortly after the first quarter of 2025 would jeopardize approximately $57 million of gross profits (*e.g.*, customers may move up their rebid processes on any particular contract if they believe that doing so is necessary to ensure the safety of the Debtors' vulnerable patient population), thereby eroding substantial value of the Corrections Business.  If the Debtors experience significant value degradation to the Corrections Business, it will put at risk the new money exit financing (*i.e.*, up to $55 million) contemplated by, and the viability of, the Plan.

6.     Finally, the current case financing budget does not contemplate an elongated timeline and, as such, the Debtors would not have sufficient liquidity to operate (including funding the collateralization of upcoming surety bond requirements).

7.     The Extension Motion underscores the Committee's intent to extract value from stakeholders without regard to the risk of value-degradation, particularly since over half of the members of the Committee would have no vested interest in the Debtors' business upon emergence.  Accordingly, the Committee proposed an untenable confirmation timeline that contemplates a confirmation hearing more than seven weeks after the Debtors' originally proposed timeline (a month after the updated scheduled confirmation hearing set forth in the Confirmation Schedule Stipulation) and a full month into the critical second quarter of 2025.  The Committee timeline would hinder the Debtors' ability to renew or rebid on many significant customer contracts, increase the likelihood of irreparable harm to the Debtors' businesses, and decrease potential recoveries for all stakeholders – including many of the Committee's direct constituents.

8.     Contrary to the Committee's agenda, the Debtors goals are simple:  minimize administrative expenses; maximize value for their stakeholders; and ensure the Debtors' business can continue on a going-forward basis.  Languishing in bankruptcy would only maximize

administrative expenses, decrease distributable value, and cause irreparable harm to the Debtors' business. The Court should not countenance the Committee's efforts to usurp the Debtors' business judgement (relating to confirmation process) or the Debtors' exclusive right to solicit votes on, and seek confirmation of, a chapter 11 plan. Accordingly, for the reasons set forth herein, the Extension Motion should be denied.

## Reply

**I.     The Confirmation Schedule is Reasonable and Appropriate and the Committee Proposing a Timeline is Inappropriate.**

9.     The Committee argues that the Debtors should extend these chapter 11 cases for *at least an additional month* from the Confirmation Timeline set forth in the Confirmation Schedule Stipulation (*i.e.,* an additional 51 days from the originally proposed timeline set forth in the Solicitation Motion), disregarding the ramifications to the Debtors' business and their customers, vendors, and stakeholders. In accordance with Bankruptcy Rule 3017(d), 3018(a), and 2002(b), the Debtors' proposed Confirmation Schedule is more than appropriate and sufficient. *See* Solicitation Motion.

10.    The Committee ignores the harmful ramifications a delayed Confirmation Schedule could have on the Debtors' business and, consequently, the Debtors' stakeholders. *First*, the Confirmation Schedule is guided by the Debtors' need to emerge from chapter 11 shortly after the first quarter of 2025 given the number of customer contracts that require renewal/rebidding in the second quarter of 2025. Indeed, failure to close the restructuring transaction for the Corrections Business shortly after the end of the first quarter of 2025 would put at risk approximately $57

million of gross profits,[10] thereby potentially eroding substantial value from the Corrections Business to the detriment of the Debtors and all their stakeholders.[11]

11. The Debtors were hopeful that they would be able to collaborate with the Committee and discuss the interplay between the Confirmation Timeline and achieving a value-maximizing transaction that preserves the Debtors' estates for the benefit of all stakeholders, including numerous trade creditors and claimants who could benefit from the Debtors maintaining ongoing business operations and indemnification obligations. Despite the Debtors' repeated offers to explain the business risk of the Committee's proposed timeline to the Committee's advisors, the Committee filed the Extension Motion and declined to even respond to the Debtors' offers for several days. When the Committee's advisors finally responded to the Debtors' offers, the Debtors' key business personnel provided the Committee's advisors with commercially sensitive information during a lengthy video conference to explain the ramifications of an elongated chapter 11 process. However, instead of taking the time to analyze and evaluate the information and data provided by the Debtors, the Committee's advisors inundated Debtors' counsel with overly broad and burdensome discovery requests,[12] overwhelming a management team that had gone above and beyond to satisfy the Committee's expansive diligence requests.[13] Among other requests, the Committee sought to depose the very management team members that carved out time to

---

[10] The approximate $57 million in potential gross profit loss takes into account those contracts that initiate the renewal/rebidding process in April 2025 and does **not** take into account any contracts that may move up from their anticipated rebid date.

[11] Attached as **Exhibit A** is a summary of the renewals and rebids at risk if the Debtors were to remain in bankruptcy during the second quarter of 2025.

[12] The Committee has since served subpoenas to depose such individuals.

[13] Attached as **Exhibit B** is the half of dozen emails Debtors' counsel received shortly after the video conference among the Committee's advisors and the Debtors' key business personnel.

voluntarily answer the Committee's questions. Simply put, the Committee's aggressive litigation and business disruption tactics are not the actions of a party interested in responsibly evaluating the business risk of the Committee's proposed schedule.

12. ***Second***, the current case financing budget does not contemplate an elongated timeline and, as such, the Debtors would not have sufficient liquidity to collateralize upcoming surety bond requirements or to pay professional fees during this extended period. The Debtors are currently negotiating approximately $15 million in surety bonds that require 50% collateralization. Further delays in these chapter 11 cases could also require the collateralization of upwards of $14 million related to Workers Compensation. The Debtors had expected that the negotiated amounts required for collateralization would be available from the equity financing contemplated under the Plan; absent such financing, the Debtors would not have the wherewithal to take such actions. In addition, when formulating the case financing budget, the parties expected the Debtors' emergence from bankruptcy to occur mid-March 2025; as such, extending the originally proposed Confirmation Schedule by nearly two months would result in millions of dollars of unaccounted fees and expenses (*e.g.*, professional fees).

13. ***Third***, the Confirmation Schedule comports with the milestones set forth in the Restructuring Support Agreement, without which the Debtors would not have a confirmable plan and would risk up to $55 million in committed new money financing. The Debtors filed for bankruptcy after entering into a Restructuring Support Agreement that would provide for an efficient and effective restructuring process that would culminate in a confirmable chapter 11 plan. The Restructuring Support Agreement contains various milestones that provide the Debtors' constituents, including customers and vendors, with confidence that the Debtors' business will continue on a go-forward basis following these chapter 11 cases. Indeed, the Debtors maintained

8

strong relationships with their customers and vendors due to the belief that the Debtors would emerge from these chapter 11 cases shortly after the end of the first quarter of 2025 as a stronger, well-capitalized enterprise.  A one month delay in the Confirmation Timeline set forth in the Confirmation Schedule Stipulation (*i.e.,* a nearly two-month delay in the originally proposed timeline set forth in the Solicitation Motion) would inevitably undermine the Debtors' credibility and erode the Debtors' relationships with their customers and vendors, which, in turn, would irreparably harm the Debtors' business and hinder the Debtors' ability to provide high quality, compassionate care to their patients.

14. The Committee has not asserted a rational justification for an extension that would inevitably harm the business and the recoveries of their constituents; rather it relies on a case that is distinguishable from these chapter 11 cases – *In re Tehum Care Services, Inc.*, Case No. 23-90086 (CML) (Bankr. S.D. Tex.).  Unlike *Tehum*, these chapter 11 cases are not a "Texas Two-Step".  In other words, prior to the filing for bankruptcy, Tehum's affiliate transferred all of its tort liability and a relatively small portion of its assets into a new subsidiary "Tehum" to shield the debtor's parent company and affiliates.  These chapter 11 cases are quite different.  Tehum is not an operating business.  The Debtors are operating a business, and any disruption can have critical consequences not just to the Debtors' estates, but also to its vulnerable patient population.  While the Debtors have tort liability claims similar to Tehum, hundreds of these claims are not anticipated to be impaired by these chapter 11 cases.  As previously explained in the Stay Extension Motion,[14] the Debtors have indemnification obligations with, among others, Professional Corporations,

---

[14] The "Stay Extension Motion" shall mean, collectively, the *Debtors' Emergency Motion for Entry of Interim and Final Orders to Enforce the Automatic Stay or in the Alternative Extend the Automatic Stay to Non-Debtor Defendants* [Docket No. 17] and the *Debtors' Omnibus Reply in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders to Enforce the Automatic Stay or in the Alternative Extend the Automatic Stay to Non-Debtor Defendants* [Docket No. 897].

customers, and its directors and officers. Many of these indemnification obligations will likely be assumed under the Plan as they are part of contracts that are critical to the Debtors' business. Therefore, such claims, to the extent liability is found, will likely be paid after the Debtors emerge from chapter 11. The tort claims that are primarily at issue are those where (a) the only defendant is a Debtor, (b) there is a separate/distinct cause of action against a Debtor from the indemnified parties, or (c) a Debtor is a defendant and is not assuming the underlying agreement to the indemnification obligation with the other defendant.

15. The Debtors do not dispute that both these chapter 11 cases and *Tehum* deal with the challenges of noticing incarcerated individuals; however, under the Plan in these cases, incarcerated individuals entitled to vote comprise only a subset of claimants in **one** Voting Class – Class 6 General Unsecured Claims. As such, there are **three** other impaired Voting Classes that do not include incarcerated individuals. Of the four Voting Classes under the Plan **only one** must vote to accept the Plan. *See* 11 U.S.C § 1129(a)(10) (to the extent there is an impaired class of claims, at least one impaired class of claims must vote accept the plan). Accordingly, delaying these chapter 11 cases to the detriment of the Debtors' business and all key stakeholders is unjustified and inappropriate.

16. The Debtors do, however, understand the importance of properly noticing incarcerated individuals and have collaborated with this Court, the U.S. Trustee, and the Committee to ensure due process remains preserved notwithstanding the challenges presented given the facts and circumstances of these chapter 11 cases. Throughout these chapter 11 cases, the Debtors have tirelessly worked in collaboration with these various constituents to ensure that the Debtors are constructively noticing its patients. As part of the Debtors' efforts to properly notice their patients, the Debtors have, among other things, published notices in various

publications and posted notices on information bulletins accessible to the Debtors' patients. Following conversations with the U.S. Trustee, the Debtors agreed that it would be appropriate to continue its constructive noticing efforts during the Debtors' solicitation process and provide incarcerated individuals with an extended deadline to opt out of the release provisions in the Plan (*i.e.,* approximately 30 days after the Confirmation Hearing and 23 days after the General Bar Date).

17. Based on the foregoing, the Debtors submit that the Debtors' proposed Confirmation Schedule is reasonable and appropriate and respectfully request that the Court deny the relief requested in the Extension Motion.

## II. The Committee's Attempt to Usurp the Debtors' Confirmation Schedule is Inappropriate.

18. The Bankruptcy Code provides for an initial period of 120 days after the commencement of a chapter 11 case during which the debtor has the exclusive right to file a chapter 11 plan. 11 U.S.C. § 1121(b). If the debtor files a plan within that 120-day period, it has the exclusive right to solicit acceptance of a plan for a period of 180 days after commencement of the chapter 11 case. 11 U.S.C. § 1121(c)(3). "The exclusivity period gives the debtor the ability to stabilize its operations and the opportunity to retain control over the reorganization process." *In re Clamp-All Corp.,* 233 B.R. 198, 207 (Bankr. D. Mass. 1999). It was intended that the exclusivity period provide debtors with a clear advantage early on in the case – "an unqualified opportunity to negotiate a settlement and propose a plan of reorganization without interference from creditors and other interests." *In re Texaco, Inc.*, 81 B.R. 806, 809 (Bankr.S.D.N.Y.1988) (citing H.R. Rep. No. 95–595, at 231–32 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6191). While collaborating with creditors is imperative, those negotiations must be conducted in a in a manner consistent with these policy goals. *See In re Clamp-All Corp.,* 233 B.R. 198 at 206.

11

19.     Given that the Debtors timely filed the Plan and Disclosure Statement within their exclusive period to do so, the Debtors need only ensure that the Confirmation Schedule comports with the applicable Bankruptcy Code sections, Bankruptcy Rules, Bankruptcy Local Rules, and the Complex Cases Procedures.  As detailed in the Solicitation Motion, the Confirmation Schedule satisfies all of the applicable requirements.  Accordingly, the Court should not allow the Committee to infringe on the Debtors' exclusive right to solicit votes on, and seek confirmation of, the Plan by usurping the Debtors' business judgement with the Committee's self-interested views, which are jaded by a strategy of using delay as a means to extort value at the expense of the Debtors' estates and key stakeholders.

**III.    The Disclosure Statement will Provide Sufficient Information for Creditors to Evaluate a Plan by the Disclosure Statement Hearing.**

20.     The Committee maintains that the Disclosure Statement fails to provide sufficient information for creditors to evaluate the Plan – a claim that is best suited for the Committee's objections to the Disclosure Statement.  The crux of the Committee's concerns is that the anticipated recoveries of the unsecured creditors remains unclear.  Indeed, the Committee has not even provided the Debtors with comments to the Plan and Disclosure Statement.  As detailed above, the Debtors filed revised versions of the Disclosure Statement and Plan following the Corrections Asset(s) Bid Deadline sufficiently prior to the Disclosure Statement Hearing to clarify the Debtors' intended path forward.  Further the Debtors filed a liquidation analysis and financial projections supporting the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code and clearly show that the Plan is the best value-maximizing transaction for the benefit of all creditors.  At the Disclosure Statement Hearing, the Debtors intend to make their case in chief that the Disclosure Statement is comprehensive and provides clear, accurate, fair,

reasonable, and therefore, adequate information as required under section 1125 of the Bankruptcy Code.

### **<u>Conclusion</u>**

21. For the foregoing reasons, the Debtors respectfully request that the Court deny the Committee's relief requested in the Extension Motion.

*[Remainder of page intentionally left blank]*

| | |
|---|---|
| Dated: February 17, 2025<br>Dallas, Texas | /s/ Marcus A. Helt |

Marcus A. Helt (Texas Bar #24052187)
MCDERMOTT WILL & EMERY LLP
2501 N. Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone:     (214) 295-8000
Facsimile:      (972) 232-3098
Email:            mhelt@mwe.com

-and-

Felicia Gerber Perlman (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
Jake Jumbeck (admitted *pro hac vice*)
Carole Wurzelbacher (admitted *pro hac vice*)
Carmen Dingman (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
444 West Lake Street, Suite 4000
Chicago, Illinois 60606-0029
Telephone:     (312) 372-2000
Facsimile:      (312) 984-7700
Email:            fperlman@mwe.com
                     bgiordano@mwe.com
                     jjumbeck@mwe.com
                     cwurzelbacher@mwe.com
                     cdingman@mwe.com

-and-

Steven Z. Szanzer (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, New York 10017
Telephone:     (212) 547-5400
Facsimile:      (212) 547-5444
Email:            sszanzer@mwe.com

*Counsel to the Debtors and Debtors in Possession*

14

**Certificate of Service**

      I certify that, on February 17, 2025 I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                          */s/ Marcus A. Helt*
                                          Marcus A. Helt