**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. 1380, 1384, 1386, 1389, 1393 – 1394, & 1397 – 1398** |

<u>**CERTIFICATE OF SERVICE**</u>

I, GEOFF ZAHM, hereby certify that:

1.  I am employed as a Senior Case Manager by Epiq Corporate Restructuring, LLC, with its principal office located at 777 Third Avenue, New York, New York 10017. I am over the age of eighteen years and am not a party to the above-captioned action.

2.  On February 14, 2025, I caused to be served the:

    a.  *slipsheet* "Debtors and Debtors in Possession Witness and Exhibit List for February 18, 2025 Hearing at 9:00 a.m (Prevailing Central Time)," dated February 14, 2025, *related to Docket No. 1380,* a copy of which is annexed hereto as <u>Exhibit A</u>, (the "1st Witness & Exhibit List),

    b.  "Declaration of Timothy J. Dragelin in Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Key Employee Incentive Plan and (B) Non-Insider Key Employee Retention Plan and (II) Granting Related Relief," dated February 14, 2025 [Docket No. 1384], (the "Dragelin Declaration"),

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Wellpath. The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

c.  "Supplemental Declaration of Gilbert Jones in Support of, and in Response to Objections to, Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors'(A) Key Employee Incentive Plan and (B) Non-Insider Key Employee Retention Plan and (II) Granting Related Relief," dated February 14, 2025 [Docket No. 1386], the (the "Jones Declaration"),

d.  *slipsheet* "Debtors and Debtors in Possession Witness and Exhibit List for February 18, 2025 Hearing at 4:00 p.m. (Prevailing Central Time)," dated February 14, 2025, *related to Docket No. 1389,* a copy of which is annexed hereto as Exhibit B, (the "2nd Witness & Exhibit List"),

e.  "Agenda of Matters Set for Hearing on February 18, 2025 at 9:00 a.m. (Prevailing Central Time)," dated February 14, 2025 [Docket No. 1393], the (the "Morning Agenda"),

f.  "Agenda of Matters Set for Hearing on February 18, 2025 at 4:00 p.m. (Prevailing Central Time)," dated February 14, 2025 [Docket No. 1394], the (the "Afternoon Agenda"),

g.  "Amended Agenda of Matters Set for Hearing on February 18, 2025 at 2:00 p.m. (Prevailing Central Time)," dated February 14, 2025 [Docket No. 1397], the (the "Amended Agenda"), and

h.  "Debtors' Response to Colorado Tort Plaintiffs' Objection to Debtors' Emergency Motion for Entry of Interim and Final Orders to Enforce the Automatic Stay or in the Alternative to Extend the Automatic Stay to Non-Debtor Defendants," dated February 14, 2025 [Docket No. 1398], the (the "Objection Response"),

by causing true and correct copies of the:

i.  1st Witness & Exhibit List, Dragelin Declaration, Jones Declaration, 2nd Witness & Exhibit List, Morning Agenda, Afternoon Agenda, Amended Agenda, and Objection Response to be enclosed securely in separate postage pre-paid envelopes and delivered via first class mail to those parties listed on the annexed Exhibit C and to 54 parties whose names and addresses are confidential and therefore not included,

ii.  1st Witness & Exhibit List, Dragelin Declaration, Jones Declaration, 2nd Witness & Exhibit List, Morning Agenda, Afternoon Agenda, Amended Agenda, and Objection Response to be delivered via electronic mail to those parties listed on the annexed Exhibit D, and

      iii.   Objection Response to be delivered via electronic mail to: *jcornwell@munsch.com* and *jvasek@munsch.com.*

3.  All envelopes utilized in the service of the foregoing contained the following legend: "LEGAL DOCUMENTS ENCLOSED. PLEASE DIRECT TO THE ATTENTION OF ADDRESSEE, PRESIDENT OR LEGAL DEPARTMENT."

*/s/ Geoff Zahm*
Geoff Zahm

# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
| Debtors. | (Jointly Administered) |

## DEBTORS AND DEBTORS IN POSSESSION
## WITNESS AND EXHIBIT LIST FOR FEBRUARY 18, 2025 HEARING
## AT 9:00 A.M (PREVAILING CENTRAL TIME)

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby submit this witness and exhibit list (the "Witness and Exhibit List") with respect to the hearings scheduled for February 18, 2025, at 9:00 a.m. (prevailing Central Time) (the "Hearing") before the Honorable Alfredo R. Pérez, United States Bankruptcy Judge, 515 Rusk Street, Courtroom 400, Houston, Texas 77002.

### **WITNESSES**

The Debtors may call any of the following witnesses at the Hearing:

1. Timothy J. Dragelin, Chief Restructuring Officer and Chief Financial Officer;

2. Daniel Raikin, Vice President, MTS Health Partners, L.P., as expert witness to the sale process;

3. Christian Tempke, Managing Director, Lazard Frères & Co. LLC, as expert witness to sale process and value of plan consideration;

4. Ben Slocum, Chief Executive Officer, Wellpath Group Holdings, Inc.;

---

[1] A complete list of the Debtors (as defined below) in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Wellpath. The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

5.      Any witness listed, offered, or called by any other party;

6.      Any witness necessary to authenticate a document; and

7.      Any witness required for rebuttal or impeachment.

The Debtors reserve the right to cross examine witnesses called by any other party.

## **EXHIBITS**

The Debtors may offer any one or more of the following exhibits at the Hearing:

| Exhibit No. | Description | Offered | Objection | Admitted | Disposition After Hearing |
|---|---|---|---|---|---|
| 1. | *Declaration of Timothy J. Dragelin as Chief Restructuring Officer and Chief Financial Officer of Wellpath Holdings, Inc. and Certain of its Affiliates and Subsidiaries in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 20] | | | | |
| 2. | *Declaration of Christian Tempke in Support of Debtors' Emergency Motion for Entry of Orders (I)(A) Approving the Bidding Procedures for the Sale of the Debtors' Assets, (B) Approving Entry Into a Stalking Horse Purchase Agreement for the Recovery Solutions Assets, (C) Authorizing the Recovery Solutions Expense Reimbursement, (D) Authorizing Potential Selection of Stalking Horse Bidders for the Corrections Assets and Approving Related Corrections Asset(s) Bid Protections, (E) Establishing Related Dates and Deadlines, (F) Approving the Form and Manner of Notice Thereof, and (G) Approving the Assumption and Assignment Procedures, (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 21-1] | | | | |
| 3. | *Declaration of Jason Schoenholtz in Support of Debtors' Emergency Motion for Entry of Orders (I)(A) Approving the Bidding Procedures for the Sale of the Debtors' Assets, (B) Approving Entry Into a Stalking Horse Purchase Agreement for the Recovery Solutions Assets, (C) Authorizing the Recovery Solutions Expense Reimbursement, (D) Authorizing Potential Selection of Stalking Horse Bidders for the Corrections Assets and Approving Related Corrections Asset(s) Bid Protections, (E) Establishing Related Dates and Deadlines, (F)* | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | *Approving the Form and Manner of Notice Thereof, and (G) Approving the Assumption and Assignment Procedures, (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 21-2] | | | | |
| 4. | *The Statutory Unsecured Claimholders' Committee's Emergency Motion for Relief From or, in the Alternative, for Alteration or Amendment of the Court's Order Approving Bidding Procedures* [Docket No. 275] | | | | |
| 5. | *Declaration of William Wicker in Support of the Statutory Unsecured Claimholders' Committee's Emergency Motion for Relief From or, in the Alternative, for Alteration or Amendment of the Court's Order Approving Bidding Procedures for the Sale of Debtors' Assets* [Docket No. 275-1] | | | | |
| 6. | *Stipulated and Agreed Amended Order (I) Approving the Bidding Procedures for the Sale of the Debtors' Assets, (II) Approving Entry Into a Stalking Horse Purchase Agreement for the Recovery Solutions Assets, (III) Authorizing the Recovery Solutions Expense Reimbursement, (IV) Authorizing the Potential Selection of Stalking Horse Bidders for the Corrections Assets and Approving Related Corrections Asset(s) Bid Protections, (V) Establishing Related Dates and Deadlines, (VI) Approving the Form and Manner of Notice Thereof, (VII) Approving the Assumption and Assignment Procedures, and (VIII) Granting Related Relief* [Docket No. 384] | | | | |
| 7. | *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures With Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates With Respect Thereto, and (V) Granting Related Relief* [Docket No. 567] | | | | |
| 8. | *Notice of Amended Timeline for Corrections Asset(s) Sale Transactions* [Docket No. 1020] | | | | |
| 9. | *The Statutory Unsecured Claimholders' Committee's <u>Emergency</u> Motion to Extend the Deadlines for (I) the Bid Procedures Order and (II) the Solicitation Procedures Motion* [Docket No. 1022] | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 10. | *Declaration of William Wicker in Support of the Statutory Unsecured Claimholders' Committee's <u>Emergency</u> Motion to Extend the Deadlines for (I) the Bid Procedures Order and (II) the Solicitation Procedures Motion* [Docket No. 1023] | | | | |
| 11. | *Stipulation and Agreed Order Regarding (A) the Schedule Set Forth in Debtors' Motion for Entry of Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief and (B) the Statutory Unsecured Claimholders' Committee's Emergency Motion to Extend the Deadlines for (I) the Bid Procedures Order and (II) the Solicitation Procedures Motion* [Docket No. 1195] | | | | |
| 12. | *Notice of Filing of Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and Certain of its Debtor Affiliates* [Docket No. 1307] | | | | |
| 13. | *Notice of Filing of Disclosure Statement for the Joint Chapter 11 Plan of Wellpath Holdings, Inc. and Certain of its Debtor Affiliates* [Docket No. 1308] | | | | |
| 14. | *Notice of Filing of Revised Disclosure Statement Order* [Docket No. 1310] | | | | |
| 15. | Any pleading (or exhibit thereto) on file in these cases | | | | |
| 16. | Any exhibits listed, designated, or offered by any other party | | | | |
| 17. | Any exhibits necessary for rebuttal | | | | |

The Debtors reserve the right to modify, amend, or supplement this Witness and Exhibit List at any time prior to the Hearing. The Debtors reserve the right to ask the Court to take judicial notice of pleadings, orders, transcripts, and/or other documents filed in or in connection with these chapter 11 cases, and to offer rebuttal exhibits. Designation of any exhibit above does not waive any objection the Debtors may have to any exhibit listed on any other party's exhibit list.

*[Remainder of page intentionally left blank]*

Dated: February 14, 2025       Respectfully submitted,

*/s/ Marcus A. Helt*

Marcus A. Helt (Texas Bar #24052187)
MCDERMOTT WILL & EMERY LLP
2501 N. Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone:    (214) 295-8000
Facsimile:    (972) 232-3098
Email:       mhelt@mwe.com

-and-

Felicia Gerber Perlman (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
Jake Jumbeck (admitted *pro hac vice*)
Carole Wurzelbacher (admitted *pro hac vice*)
Carmen Dingman (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
444 West Lake Street, Suite 4000
Chicago, Illinois 60606-0029
Telephone:    (312) 372-2000
Facsimile:    (312) 984-7700
Email:       fperlman@mwe.com
            bgiordano@mwe.com
            jjumbeck@mwe.com
            cwurzelbacher@mwe.com
            cdingman@mwe.com

-and-

Steven Z. Szanzer (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, New York 10017
Telephone:    (212) 547-5400
Facsimile:    (212) 547-5444
Email:       sszanzer@mwe.com

*Counsel to the Debtors and Debtors in Possession*

## **CERTIFICATE OF SERVICE**

I certify that on February 14, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Marcus A. Helt*
Marcus A. Helt

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF
## TIMOTHY J. DRAGELIN AS
## CHIEF RESTRUCTURING OFFICER AND
## CHIEF FINANCIAL OFFICER OF WELLPATH HOLDINGS, INC.
## AND CERTAIN OF ITS AFFILIATES AND SUBSIDIARIES IN SUPPORT
## OF THE DEBTORS' CHAPTER 11 PROCEEDINGS AND FIRST DAY PLEADINGS

I, Timothy J. Dragelin, hereby declare under penalty of perjury:

1.       I am a Senior Managing Director with FTI Consulting, Inc. ("FTI") and, since June 2024, I have served as the Interim Chief Financial Officer of Wellpath Holdings, Inc. ("WHI" and, collectively with its debtor affiliates, the "Debtors" and, collectively with their non-Debtor affiliates, "Wellpath") and, since October 2024, I have served in a dual role of Chief Restructuring Officer and Chief Financial Officer. In addition, from December 2022 through April 2023 I served as Wellpath's Chief Transformation Officer.

2.       I joined FTI in August 2002 and specialize in providing financial advisory services to the various corporate stakeholders, including borrowers, creditors, and equityholders.  I have more than 30 years of experience across multiple industries, most notably healthcare, real estate, structured finance, and government contracting.  I lead FTI's Healthcare Interim Management

---

[1]       A complete list of the Debtors (as defined below) in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Wellpath.  The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

Debtors' Exhibit 001

group and co-lead FTI's Healthcare Restructuring practice. My experience ranges from advising not-for-profit entities to privately held companies to multinational publicly traded corporations. I am regularly involved in interim management, bankruptcy planning and management, turnaround consultation, lender advisory, buy-side due diligence, sell-side mandates, valuation, and performance improvement engagements.

3.      Prior to joining FTI, I was employed by PricewaterhouseCoopers in various capacities within the financial advisory services practice. I have been proffered and appeared as an expert witness relative to restructuring, accounting, financial, and valuation topics in several venues. I earned a B.B.A. in accounting from the College of William & Mary in Virginia, and previously held both certified public accountant and certified valuation analyst designations.

4.      In connection with the filing of this declaration (this "Declaration"), each of the Debtors filed a voluntary petition (collectively, the "Petitions") in the United States Bankruptcy Court for the Southern District of Texas (the "Court") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). To minimize the potential adverse impact of the commencement of these chapter 11 cases, the Debtors have requested certain "first day" relief in various applications and motions filed with the Court, each of which is listed in Section V.A below (collectively, the "First Day Pleadings"). I have reviewed the First Day Pleadings or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' businesses and to the success of these chapter 11 cases. The First Day Pleadings seek relief intended to preserve the value of the Debtors by, among other things, satisfying certain prepetition claims and granting certain administrative and procedural relief to facilitate an orderly transition into and out of these chapter 11 cases. This relief is critical to the Debtors' restructuring and reorganization efforts.

5.      As a result of my tenure with Wellpath, I am generally familiar with the Debtors'
capital structure, day-to-day operations, business and financial affairs, and financial records.  I am
also familiar with the Debtors' corporate structure and the status of the Debtors' relationships with
various vendors and service providers.  I submit this Declaration in support of the Petitions and
the First Day Pleadings and to assist the Court and other parties in interest in understanding
Wellpath's corporate history, business operations, and prepetition capital structure and the
circumstances that compelled the commencement of these chapter 11 cases as of
November 11, 2024 (the "Petition Date").

6.      Except as otherwise indicated herein, all facts set forth in this Declaration are based
upon my personal knowledge, my review of relevant documents of the Debtors, other information
prepared or collected by the Debtors' employees, my conversations with the Debtors' advisors,
information supplied to me by other members of the Debtors' management and third-party
advisors, or my opinion based on my experience with the Debtors' operations and financial
condition.  In making my statements based on documents and other information prepared or
collected by the Debtors' employees or my conversations with the Debtors' counsel or other
advisors, I have relied upon the accuracy of such documentation and other information.  If called
upon to testify, I would testify competently to the facts set forth in this Declaration. Unless
otherwise indicated, the financial information contained herein is unaudited and provided on a
consolidated basis.

**Preliminary Statement**

7.      Wellpath is the premier provider of localized, high quality, compassionate care to
vulnerable patients in challenging clinical environments. Wellpath is the leading medical and
mental health services provider in correctional facilities, inpatient and residential treatment

3

facilities, forensic treatment facilities, and civil commitment centers. Headquartered in Nashville, Tennessee with operations in approximately 420 facilities across 39 states, Wellpath provides outsourced solutions to the correctional healthcare and behavioral healthcare industries. Wellpath offers an array of healthcare services to its federal, state, and local government partners, including on-site medical services, telehealth and mental health programs, and pharmacy management. Wellpath employs more than 13,000 people and serves nearly 200,000 patients daily.

8. Despite Wellpath's historical and continued market leading position and its critical role in addressing the healthcare needs of its clients, Wellpath faced significant financial challenges in recent years. Those issues stemmed from, among other things, escalating operating and labor costs, a transitory increase in professional liability insurance expenses, and underperformance on several significant contracts. These financial challenges, combined with a high-rate interest environment, led to increasing liabilities, deferred payables, and liquidity shortfalls. Compounding matters, the maturity date of the Debtors' Prepetition Revolving Credit Facility (as defined below) would occur in October 2024.

9. Starting in January 2024, to address the Debtors' significant maturity wall, Lazard Frères & Co. LLC ("Lazard"), as the Debtors' restructuring investment banker, worked closely with the Debtors' legal counsel, McDermott Will & Emery LLP ("McDermott"), to pursue an out-of-court recapitalization transaction involving a sale of the Debtors' behavioral health division, Recovery Solutions (the "RS Division"). The Debtors sought to use proceeds from a potential sale of the RS Division to pay down a significant portion of the Prepetition First Lien Credit Facility to facilitate an extension of the remaining debt amounts. As such, between January and March of 2024, Lazard prepared for the marketing process of the RS Division.

10.     The sale process of the RS Division was launched in April 2024. Lazard, together with the Debtors' healthcare investment banker, MTS Health Partners L.P. ("MTS"), contacted over 140 parties, including financial sponsors and strategic parties, to solicit proposals to acquire the RS Division. In connection with the solicitation, Lazard and MTS prepared, among other things, a confidential information presentation and an electronic data room to which prospective bidders that executed confidentiality agreements received access. In total, more than 70 prospective bidders executed confidentiality agreements and received access to private-side information. By the end of June 2024, the Debtors received six preliminary indications of interest as part of a first-round process. The Debtors continued and further advanced the marketing process during July and August of 2024.

11.     During that time, the Debtors and Lazard began engaging with an ad hoc group of lenders (the "Ad Hoc Group") represented by Akin Gump Strauss Hauer & Field LLP, as counsel, Houlihan Lokey Capital, Inc., as investment banker, and Ankura Consulting Group LLC, as financial advisor, to begin discussions about potential out-of-court balance sheet solutions. On August 30, 2024 (as later amended on September 30, 2024 and October 31, 2024), the Debtors and the Ad Hoc Group executed the Forbearance Agreements (as defined below) to forbear from taking enforcement actions relating to the events of default in connection with the cash interest and amortization payments on the prepetition credit facilities as well as maturity of the Prepetition Revolving Credit Facility, with the goal to preserve liquidity and extend the runway to continue working toward an amicable solution.

12.     However, despite the Debtors' robust marketing process, after several weeks of further diligence and management presentations, the Debtors only received one formal second-round check-in bid, which was at a reduced valuation from the preliminary indication of interest.

While Wellpath and its advisors tried to keep the bidder engaged, the Debtors also attempted to reengage with other bidders between August and September of 2024. The Debtors did not receive any acceptable bids at the conclusion of the Debtors' bidding process. Consequently, the Debtors temporarily put the marketing process on hold and pivoted to negotiating the terms of an in-court restructuring with the Ad Hoc Group. These negotiations ultimately led to the execution of the Restructuring Support Agreement, dated November 11, 2024 (the "RSA"), attached hereto as **Exhibit B**.

13.     The RSA provides a flexible structure that will enable the parties to explore the most value-maximizing restructuring alternative available. Under the RSA, the Debtors' proposed restructuring has several components.

14.     ***First***, to fund these chapter 11 cases and the processes and transactions contemplated by the RSA, subject to Court approval, the Debtors secured access to a debtor-in-possession financing facility in the aggregate principal amount of $522,375,000 consisting of up to (a) $105,000,000 in new money term loans and (b) $417,375,000 in "rolled up" prepetition secured loans (the "DIP Term Facility"). All Prepetition Lenders (as defined below) will have the opportunity to participate in the $105,000,000 new money term loan financing, which will be syndicated following the "first day" hearing in these chapter 11 cases. The Prepetition Lenders party to the RSA have agreed to backstop the new money term loan financing. All Prepetition Lenders that participate in the new money financing will have certain of their prepetition debt holdings rolled up into the DIP Term Facility.

15.     ***Second***, the RSA contemplates an active, open marketing process for a value-maximizing sale for substantially all or one or more subsets of the Debtors' assets. To that end, on the Petition Date, the Debtors have filed a motion asking the Court to approve the proposed

Bidding Procedures (as defined in the Bidding Procedures Motion)[2] for such a sale and certain related dates and deadlines.  The Bidding Procedures provide for a dual track process that will allow the Debtors flexibility to market assets associated with the RS Division, the LG Division, and the SF Division.  Although the proposed Bidding Procedures and the RSA provide for a longer runway for the LG Division assets and SF Division assets, the Debtors propose a faster timeline— approximately six weeks after the Petition Date—to market and consummate the sale of the RS Division assets.  As further explained below and in the Bidding Procedures Motion, given both (a) the extensive marketing process the occurred prepetition, (b) upcoming contract renewals, and (c) the vulnerable patients the RS Division serves, this expeditious timeline is warranted under the circumstances.

16.     ***Third***, the Debtors' proposed lenders under the DIP Term Facility (the "DIP Lenders") and the Prepetition Lenders party to the RSA have agreed that they will cap any credit bid of the loans outstanding under the DIP Term Facility for the Debtors' RS Division assets and related business lines.  Although the credit bid cap does not prevent the DIP Lenders from including cash as part of any overbid, this structure assures interested bidders that they are not competing against "credit bid currency" up to the full amount of the Debtors' post-petition debt.  The Debtors believe that the credit bid cap will increase the likelihood of a robust auction process for the Debtors' assets.  Indeed, the Debtors and their prepetition secured lenders are eager

---

[2]     "Bidding Procedures Motion" means the *Debtors' Emergency Motion for Entry of Orders (I)(A) Approving the Bidding Procedures for the Sale of the Debtors' Assets, (B) Approving Entry into a Stalking Horse Purchase Agreement for the Recovery Solutions Assets, (C) Authorizing the Recovery Solutions Expense Reimbursement, (D) Authorizing Potential Selection of Stalking Horse Bidders for the Corrections Assets and Approving Related Corrections Asset(s) Bid Protections, (E) Establishing Related Dates and Deadlines, (F) Approving the Form and Manner of Notice Thereof, and (G) Approving the Assumption and Assignment Procedures, (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* filed contemporaneously herewith.

to (a) ensure a true market test on the value for the Debtors and their assets and (b) maximize the value of the Debtors' estates for the benefit of all stakeholders.

17.     *Fourth*, with respect to the Debtors' LG Division and SF Division, under the RSA, the DIP Lenders have committed to purchase in a direct private placement new equity interests in Reorganized Wellpath pursuant to a chapter 11 plan of reorganization, subject to a post-petition marketing process for a sale of these assets under section 363.  The DIP Lenders party to the RSA as of the Petition Date have agreed to backstop the Debtors' proposed equity financing in respect of Reorganized Wellpath.

18.     *Finally*, the Debtors propose an expeditious chapter 11 process that appropriately balances the Debtors' restructuring goals, the health and safety of their patients, and notice and due process considerations.  It is critical that the Debtors emerge from these chapter 11 cases as soon as reasonably practicable due to the nature of their business and their vulnerable patient population.  The Debtors believe that consummation of the transactions contemplated in the RSA will ensure continued operations of their healthcare services, employment of their physicians, and safety of their patients.  Any delay puts the well-being of the Debtors' patients at risk and increases the likelihood of irreparable harm to the Debtors' businesses.

19.     The Debtors expect to continue operations normally throughout these chapter 11 cases and remain focused on providing the quality healthcare services that their patients require. The Debtors are committed to working collaboratively with their stakeholders, including creditors, employees, and clients, to move through these chapter 11 cases in an efficient, structured manner.

20.     To familiarize the Court with the Debtors, their businesses, the circumstances leading up to these chapter 11 cases, and the relief that the Debtors are seeking in the First Day Pleadings, this Declaration is organized into five parts.  *Part I* provides a general overview of the

Debtors' corporate history and business operations. ***Part II*** provides an overview of the Debtors' prepetition capital structure. ***Part III*** describes the circumstances leading to the filing of these chapter 11 cases. ***Part IV*** provides an overview of the RSA and the proposed path for these chapter 11 cases. ***Part V*** discusses the First Day Pleadings.

## I.  Wellpath's History and Operations.

### A.  Corporate History.

21.      Wellpath's roots trace back to two legacy businesses that offered out-sourced healthcare services to the corrections industry:  (a) Correctional Medical Group Companies ("CMGC"); and  (b) Correct Care Solutions ("CCS").  CMGC was a healthcare provider specializing in medical services for correctional facilities.  Founded in 1983, CMGC focused on delivering comprehensive healthcare solutions to inmates in jails and prisons across the United States.  CMGC offered a range of services, including primary care, dental care, mental health services, and chronic disease management.  In 2012, funds affiliated with H.I.G. Capital, LLC (collectively, "HIG") acquired CMGC.

22.      CCS was founded in 2003 and quickly grew to become one of the largest providers of healthcare services to correctional facilities across the United States.  CCS specialized in offering comprehensive medical and mental health services to inmates, including primary care, dental care, chronic disease management, and mental health treatment.

23.      In 2018, CCS merged with CMG through a transaction led by HIG.  The combined entity rebranded under the banner "Wellpath" to reflect its broader focus on integrated healthcare solutions, including behavioral health, medical, and dental care.  Since the merger, Wellpath has

9

become the leading and largest provider of healthcare services in correctional and custodial behavioral health settings in the United States.

**B.      Wellpath's Revenue Model and Business Operations.**

24.      Wellpath's revenue model is largely based on long-term contracts with government entities, which provide stable, recurring revenue.  Most contracts contain built-in cost escalators tied to inflation, particularly in the LG Division, helping to protect margins from rising operational costs.  Wellpath also benefits from strong client satisfaction, as illustrated by its long-standing relationships—*e.g.*, approximately 50 of Wellpath's customers have partnered with the company for at least 20 years.

25.      Because Wellpath contracts directly with government entities, it must often go through a request for proposal ("RFP") process when, for example, a contract expires or when Wellpath seeks to enter a new area.  Although the RFP process varies depending on the governmental entity, the process essentially involves a competitive bidding process among similar service providers.

26.      Wellpath's business operations are structured into three key divisions: (a) State & Federal (the "SF Division"); (b) Local Government (the "LG Division"); and (c) the RS Division.

**1.      SF Division.**

27.      The SF Division delivers medical services to a total patient population of approximately 135,000 individuals in approximately 131 state and federal prisons across 10 states. With a staff of approximately 1,600 healthcare professionals, the SF Division's operations focus on chronic care and disease management for incarcerated individuals (with an average sentence of approximately three years).  Patients require ongoing care with more targeted treatment fulfilled by a large in-house, on-site staff equipped to offer extensive medical treatment.  The SF Division

offers a comprehensive on-site suite of medical services, including recruiting and staffing, dental, lab, and x-ray services, behavioral healthcare programs, off-site emergency services coordination, and pharmacy services.

28.     The SF Division generally negotiates its contracts directly with state government entities and the Federal Bureau of Prisons for five-to-ten-year terms (subject to extensions).  The contracts provide a stable revenue stream on a monthly basis and contain prenegotiated terms to account for off-site and on-site services and pharmacy costs during the RFP bidding process. In 2023, the SF Division generated approximately $775,000,000 in revenue, which accounted for approximately 35% of Wellpath's total 2023 revenue.[3]

       **2.**     **LG Division.**

29.     With a staff of approximately 1,600 healthcare professionals, the LG Division delivers medical, dental, and mental healthcare services to a total patient population of approximately 138,000 adult and juvenile patients in more than 240 local detention facilities across 29 states.  The LG Division's patients require care in the most efficient manner possible because of the short duration of their stay (approximately two weeks on average) in local correctional facilities.

30.     Like the SF Division, the LG Division offers a comprehensive on-site suite of medical services in accordance with client requirements and applicable accrediting body rules. Such services include, among others, comprehensive medical and behavioral healthcare programs, off-site hospital contracting, and dental care.

31.     To operate successfully, the LG Division must overcome challenges not found in other healthcare settings.  The LG Division's patients move frequently and are in-and-out of

---

[3]     These figures include revenue from three contracts that were terminated in 2024.  Excluding the revenue from those contracts, the SF Division generated revenue of approximately $332,000,000 in 2023.

facilities in a short amount of time, making patient care management difficult.  To address those obstacles, the LG Division built its own provider networks that can provide care off-site if Wellpath is unable to provide healthcare services within the facility.

32.     The LG Division's client base primarily consists of municipal and county government entities, such as county sheriffs, county health departments, and other various local government officials.  The LG Division negotiates its contracts directly with local governmental entities, which may require going through an RFP process for contracts that typically span three-to-five years (plus possible extension terms).  The LG Division contracts provide stable, recurring revenue on a monthly basis with annual revenue escalators, and many include structured spending caps to mitigate risks associated with off-site treatment (*e.g.*, hospitalization) and pharmacy costs.

33.     In 2023, the LG Division generated approximately $1,000,000,000 in revenue, which accounted for approximately 45% of Wellpath's total 2023 revenue.[4]

### 3.     RS Division.

34.     Founded in 1997, the RS Division is the largest U.S. provider of behavioral health, residential treatment, and community-based services for public entities.  Recognized as a pioneer in the development of evidence-based, patient-centered models of therapeutic intervention for individuals with serious mental illness, the RS Division's business model addresses behavioral health needs, focusing on patients underserved by traditional mental health services, and provides a broad range of outsourced behavioral health services.  Since its founding, the RS Division has grown to become the largest player in an underserved, high barrier-to-entry market for acute patient populations suffering from long-term conditions that reside in public facilities has been.

---

[4]     These figures include revenue from contracts the Debtors rationalized in 2024.  Excluding the revenue from those contracts, the LG Division generated revenue of approximately $918,000,000 in 2023.

12

With a staff of approximately 3,700 healthcare professionals, the RS Division provides health services to approximately 3,000 patients and operates approximately 70 facilities across 10 states.

35.     The RS Division differentiates itself from private behavioral health facilities by focusing on higher-acuity patients that require longer treatment durations.  Indeed, the RS Division's services fill an underserved need in the correction healthcare space.  States and counties struggle to meet needs of specialized patients due to complex health diagnoses, bed shortages, and a lack of specialized mental health staff.  The RS Division fills this need by offering comprehensive, "one-stop-shop" service offerings that allow public entities to efficiently outsource all their complex behavioral health populations needs to a single provider.

36.     The RS Division benefits from a "capex-light" model, as state and county entities typically fund facility construction and improvements.  Many of the RS Division's contracts contain price escalators tied to the Consumer Price Index to protect margins.  In addition, the RS Division's contracted revenue model, which is based on beds rather than occupancy, provides stable revenue streams (unlike private facilities that are subject to patient volume fluctuations).

37.     The RS Division has demonstrated strong financial growth, with a 14% annual growth rate in revenue since 2021.  In 2023, the RS Division generated approximately $425,000,000 in revenue, which accounted for approximately 20% of Wellpath's total 2023 revenue.

**II.     Wellpath's Prepetition Corporate and Capital Structure.**

38.     Wellpath's corporate structure chart is attached hereto as **Exhibit A**.

39.     As of the Petition Date, the Debtors' prepetition capital structure includes approximately $644,096,041 of outstanding principal funded debt obligations, as summarized below:

Case 24-90533 Document 1324 Filed in TXSB on 02/19/25 Page 24 of 262

Case 24-90533   Document 20   Filed in TXSB on 11/12/24   Page 14 of 30

| Funded Debt | Maturity | Approx. Principal Amount Drawn/Outstanding |
|---|---|---|
| Prepetition Revolving Credit Facility | October 1, 2024 | $61,596,041 |
| Prepetition First Lien Term Loan Facility | October 1, 2025 | $472,500,000 |
| Prepetition Second Lien Term Loan Facility | October 1, 2026 | $110,000,000 |
| **Total Funded Debt Obligations** | **$644,096,041** | |

A.       **Prepetition First Lien Obligations.**

40.       Certain of the Debtors are party to that certain First Lien Credit Agreement (as amended, amended and restated, supplemented, and otherwise modified from time to time prior to the date hereof, the "Prepetition First Lien Credit Agreement"), by and among WHI, as borrower ("Borrower"), CCS-CMGC Intermediate Holdings, Inc. ("Holdings"), and each of Borrower's direct or indirect subsidiaries that is a party thereto as a guarantor (collectively, with Borrower and Holdings, the "Prepetition First Lien Loan Parties"), the lenders party thereto, and UBS AG, Stamford Branch, as the administrative agent (the "Prepetition First Lien Administrative Agent") and as collateral agent (the "Prepetition First Lien Collateral Agent") for such lenders.   The Prepetition First Lien Credit Agreement provides for two credit facilities:   (a) a $65,000,000 revolving loan credit facility (the "Prepetition Revolving Credit Facility" and, the loans provided thereunder, the "Prepetition Revolving Loans") provided by certain lenders party to the Prepetition First Lien Credit Agreement (the "Prepetition Revolving Lenders"); and (b) a $500,000,000 term loan credit facility (the "Prepetition First Lien Term Loan Facility," and, together with the Prepetition Revolving Credit Facility, the "Prepetition First Lien Credit Facility"; and the loans provided under the Prepetition First Lien Term Loan Facility, the "Prepetition First Lien Term Loans," and, together with the Prepetition Revolving Loans, the "Prepetition First Lien Loans") provided by certain lenders party to the Prepetition First Lien Credit Agreement (the "Prepetition

14

First Lien Term Lenders" and, together with the Prepetition Revolving Lenders, the "Prepetition First Lien Lenders" and, together with the Prepetition First Lien Administrative Agent and the Prepetition First Lien Collateral Agent, the "Prepetition First Lien Secured Parties").

41.    As of the Petition Date, the aggregate principal amount outstanding under the Prepetition First Lien Loans is approximately $534,096,041, consisting of approximately $61,596,041 on account of the Prepetition Revolving Loans and approximately $472,500,000 on account of the Prepetition First Lien Term Loans (such amounts, collectively with all other amounts incurred or accrued but unpaid prior to the Petition Date pursuant to the Prepetition First Lien Credit Agreement, the "Prepetition First Lien Obligations").

**B.    Prepetition Second Lien Obligations.**

42.    Certain of the Debtors are party to that certain Second Lien Credit Agreement (as amended, amended and restated, supplemented and otherwise modified from time to time prior to the date hereof, the "Prepetition Second Lien Credit Agreement"), by and among Borrower, Holdings, and each of Borrower's direct or indirect subsidiaries that is a party thereto as a guarantor (collectively, with Borrower and Holdings, the "Prepetition Second Lien Loan Parties"), the lenders party thereto, and UBS AG, Stamford Branch, as the administrative agent (the "Prepetition Second Lien Administrative Agent") and as the collateral agent (the "Prepetition Second Lien Collateral Agent") for such lenders.  The Prepetition Second Lien Credit Agreement provides for a $110,000,000 term loan credit facility (the "Prepetition Second Lien Term Loan Facility" and, the loans provided thereunder, the "Prepetition Second Lien Term Loans") provided by certain lenders party to the Prepetition Second Lien Credit Agreement (the "Prepetition Second Lien Term Lenders" and, together with the Prepetition Second Lien Administrative Agent and the

Prepetition Second Lien Collateral Agent, the "Prepetition Second Lien Secured Parties") and, together with the Prepetition First Lien Secured Parties, the "Prepetition Secured Parties").

43.     As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Second Lien Term Loan Facility is approximately $110,000,000 on account of the Prepetition Second Lien Term Loans (such amounts, collectively with all other amounts incurred or accrued but unpaid prior to the Petition Date pursuant to the Prepetition Second Lien Credit Agreement, the "Prepetition Second Lien Obligations" and, together with the Prepetition First Lien Obligations, the "Prepetition Secured Obligations").

III.    **Circumstances Leading to These Chapter 11 Cases.**

A.      **Rising Cost Pressures and Effect on Financial Performance.**

44.     Over the past three years, Wellpath's year-over-year financial performance experienced fluctuations driven by both external and internal challenges.  In 2022, Wellpath reported total revenue of approximately $2.059 billion, an 18% annual growth rate since 2006. Wellpath attributed its revenue growth to strong performances across state and local government contracts, as well as contributions from the RS Division.

45.     In 2023, however, the foregoing trend did not continue.  This reversal was due to, among other things, escalating operating and labor costs, rising professional liability expenses, and underperforming contracts.

1.      **Operating and Labor Costs.**

46.     The COVID-19 pandemic altered the healthcare landscape and imposed substantial costs on providers of medical and mental health services driven by increased demand for medical supplies (*e.g.*, PPE and vaccines) and service professionals (including bonuses and retention programs aimed at addressing labor shortages).  Although Wellpath was not unique in

16

experiencing labor shortages and wage increases during the COVID-19 pandemic, Wellpath felt their impacts more acutely than other healthcare providers.  Wellpath was not eligible to directly receive funding from the American Rescue Plan Act or Coronavirus Aid, Relief, and Economic Security Act, despite the purpose of such funds being to cover COVID-related medical expenses of public medical facilities and support public health expenditures, respectively.  Thus, to attract and retain healthcare professionals and employees, Wellpath had to offer higher salaries and wages—but without the benefit of the federal stimulus programs available to other healthcare providers.

47.     These pandemic-driven material and labor costs amounted to over approximately $30,000,000 and $50,000,000, respectively, between fiscal years 2020 and 2022.  Although these costs were short-lived in nature, the overall healthcare industry experienced a structural shift in labor costs due to inflation, minimum wage hikes, and other macroeconomic factors.  As a result, post-pandemic, Wellpath's labor expenses continued to rise, particularly for the LG Division.

### 2.     Professional Liability Expenses.

48.     Wellpath also faced a short-term increase in professional liability insurance expenses, primarily driven by case settlements associated with terminated contracts and the lack of available third-party liability insurance.  For example, in 2023, approximately 70% of all executed settlements related to incidents that allegedly occurred prior to 2018.  The settlements generally arose from claims against the Debtors associated with healthcare services provided pursuant to the contracts with their government partners.  The short-term spike in legal costs further

17

strained Wellpath's financials, with cash settlements totaling approximately $110,000,000 between 2019 and 2023.

49.     In response, Wellpath undertook a series of mitigation efforts that the Debtors believe will result in reduced professional liability expense exposure. For example, as part of Wellpath's contract rationalization efforts discussed below, Wellpath terminated approximately 65 underperforming contracts that carried outsized risk and for which it was difficult to obtain insurance coverage. In addition, Wellpath increased provider training and awareness. Because of these efforts, Wellpath anticipates a meaningful decline in professional liability expenses and expense exposure.

### 3.     Underperforming Contracts.

50.     A number of Wellpath's contracts underperformed in 2023. In particular, two material contracts for facilities located in Michigan and Georgia failed to meet projected financial performance because (a) Wellpath priced the economic terms for such contracts utilizing historical pre-COVID data provided by the clients, which did not reflect the post-pandemic operational challenges and increased costs borne by the healthcare industry and (b) medically necessary off-site care and pharmacy costs for the impacted facilities exceeded projections which were based on the information provided by the clients. In addition, high levels of turnover necessitated temporary retention bonuses to retain staff, further straining Wellpath's budget. In other words, Wellpath's labor and other operating costs increased, but Wellpath could not reprice the contracts to adjust for the higher costs.

51.     Further, in Michigan, a large backlog of care from the prior vendor resulted in higher patient acuity and increased utilization, whereas in Georgia, wage inflation and other incidents exacerbated the losses. As a result, Wellpath experienced a combined negative gross

profit of approximately $40,000,000 from 2022 through the first half of 2024 from these two contracts alone.

52.     In response to these financial pressures, Wellpath implemented a dual track strategy to address unprofitable customer contracts.  *First*, Wellpath employed a contract rationalization strategy to exit from unprofitable or high-risk contracts, especially in connection with local government healthcare services.  In doing so, from 2022 through the first half of 2024, Wellpath rationalized approximately 65 underperforming contracts.

53.     *Second*, Wellpath embarked on a repricing initiative across its portfolio, particularly with respect to contracts with local governments, to account for increased professional liability expenses and labor costs.  As part of this strategy, Wellpath institutionalized the negotiation process to accelerate execution and focused on leveraging its differentiated service offerings compared to its competitors.

54.     While these repricing initiatives were effective, they did not provide material near-term financial relief.  On June 25, 2024, Wellpath retained me as its Interim Chief Financial Officer to replace the former Chief Financial Officer and to assist Wellpath in its restructuring efforts.

**B.      The Debtors' Prepetition Efforts to Address Declining Liquidity.**

55.     By July 2023, rising costs began to strain Wellpath's cash flow and liquidity.  Compounding matters, the Debtors' Prepetition Revolving Credit Facility matured only three months later.  To preserve liquidity, Wellpath approached the Prepetition Revolving Lenders and negotiated an extension of the maturity date (the "Prepetition Revolving Facility Maturity Date") to October 1, 2024.  In exchange for securing this extension, Wellpath agreed to maintain minimum liquidity of at least $20,000,000.

56.     Wellpath's management and board of directors recognized that the cost pressures would continue, so they began to evaluate strategic alternatives.  Starting in January 2024, to

19

address the Debtors' significant maturity wall, Lazard worked closely with the Debtors' legal counsel, McDermott, to pursue an out-of-court recapitalization transaction involving a sale of the RS Division.  The Debtors sought to use proceeds from a potential sale of the RS Division to pay down a significant portion of the Prepetition First Lien Credit Facility to facilitate an extension of the remaining debt amounts.  As such, between January and March of 2024, Lazard prepared for the marketing process of the RS Division.

57.     The sale process of the RS Division was launched in April of 2024.  Lazard, together with MTS, contacted over 140 parties, including financial sponsors and strategic parties, to solicit proposals to acquire the RS Division.  In connection with this solicitation, Lazard and MTS prepared, among other things, a confidential information presentation and an electronic data room to which prospective bidders that executed confidentiality agreements received access.  In total, more than 70 prospective bidders executed confidentiality agreements and received access to private-side information.  By the end of June 2024, the Debtors received six preliminary indications of interest as part of a first-round process.  The Debtors continued and further advanced the marketing process during July and August of 2024.  During that time, the Debtors and Lazard began engaging with the Ad Hoc Group to discuss the preliminary framework of a potential amend-and-extend transaction.

58.     However, despite the Debtors' robust marketing process, after several weeks of further diligence and management presentations, the Debtors only received one formal second-round check-in bid, which was at a reduced valuation from the preliminary indication of interest. While Wellpath and its advisors tried to keep the bidder engaged, the Debtors also attempted to reengage with other bidders between August and September of 2024.  The Debtors did not receive any acceptable bids at the conclusion of the Debtors' bidding process.

**C.     Engagement with Stakeholders to Address Wellpath's Capital Structure.**

59.     The inability to secure an acceptable and committed third-party bid for the RS Division, ongoing liquidity challenges, growing vendor payables, and the approaching Prepetition Revolving Facility Maturity Date (*i.e.*, October 1, 2024) prompted the Debtors to temporarily put the marketing process on hold and to pivot to negotiating the terms of an in-court restructuring with the Ad Hoc Group.

60.     As the parties negotiated the terms of a potential restructuring, the Debtors' declining liquidity, upcoming interest and amortization payments, and pending debt maturity made it clear a from forbearance from the lenders would be necessary to extend the Debtors' liquidity runway so the parties could continue negotiations.  Accordingly, on August 30, 2024, the Debtors, the Ad Hoc Group, the Prepetition First Lien Administrative Agent, and the Prepetition Second Lien Administrative Agent, as applicable, executed both the Forbearance Agreement to First Lien Credit Agreement (as amended, the "First Lien Forbearance Agreement") and the Forbearance Agreement to Second Lien Credit Agreement (as amended, the "Second Lien Forbearance Agreement" and, together with the First Lien Forbearance Agreement, the "Forbearance Agreements").  Under the Forbearance Agreements, the Prepetition Secured Parties agreed to forbear until September 30, 2024 from exercising certain rights and remedies available to them under the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement, as applicable.  That deadline was later extended to November 15, 2024. The Forbearance Agreements provided the Debtors with much needed breathing room and liquidity relief to negotiate a comprehensive restructuring with the Ad Hoc Group and explore strategic alternatives.

61.     On November 11, 2024, in connection with the board's ongoing review of strategic alternatives, Wellpath's board appointed two independent and disinterested directors, Patrick J. Bartels and Carol Flaton, who together comprise a special committee of disinterested directors. Wellpath's board of directors delegated to the new directors the authority to, among other things, review and act upon strategic transactions, including authorizing the filing of these chapter 11 cases.

## IV.     The Restructuring Support Agreement and Path for the Chapter 11 Cases.

62.     Following the execution of the Forbearance Agreements, Wellpath and the Ad Hoc Group continued discussions about the terms of an in-court or out of court restructuring.   On November 11, 2024, those discussions culminated in the execution of the RSA between the Debtors and the Consenting Stakeholders (as defined in the RSA).   In conjunction therewith, the Debtors entered into a purchase agreement with RS Purchaser LLC (the "Recovery Solutions Stalking Horse") to serve as stalking horse bidder for the Debtors' RS Division assets.

63.     The RSA establishes a clear and value-maximizing framework—with the necessary financing—for these chapter 11 cases and provides for the continuation of the RS Division sale process and the initiation of a sale process for the LG Division assets and the SF Division assets. The sales may be consummated pursuant to one or more of (a) an asset purchase agreement, (b) a share purchase agreement, or (c) a plan of reorganization.   As set forth above, the Recovery Solutions Stalking Horse will serve as the stalking horse bidder for the Debtors' RS Division assets.

64.     Concurrently with the contemplated sale process, the Debtors will file and seek confirmation of a chapter 11 plan (the "Plan").   Among other things, the Plan will provide for the sale of 97% of the equity interests in Reorganized Wellpath to the DIP Lenders (subject to dilution

in connection with any management incentive plan or post-effective date issuances) pursuant to a private placement issuance, in addition to a distribution of 3% of the equity interests in Reorganized Wellpath under the Plan to holders of claims under the Prepetition First Lien Credit Agreement. The Plan will be withdrawn or modified and prosecuted based on the results of the Debtors' sale process.

65.     A key aspect of the RSA is the Debtors' ability to move through chapter 11 in an efficient and timely manner. Although the proposed Bidding Procedures and the RSA provide for a longer runway for the LG Division assets and SF Division assets, the Debtors propose a faster timeline—approximately six weeks—to market and close the sale of the RS Division's assets. The timeline for the post-petition marketing process, though expeditious, proposes a reasonable schedule that is appropriate under the circumstances when considering both the (a) extensive prepetition marketing process the occurred prepetition and (b) vulnerable patients the RS Division serves.

66.     In short, the RSA provides Wellpath with the flexibility it needs to pursue value-maximizing transactions and reorganize for continued operation on a quick timeframe. Indeed, minimizing time in chapter 11 is crucial to both Wellpath's stakeholders and its patients. Wellpath intends to proceed with a fair and efficient process to preserve and maximize value for all stakeholders, which ultimately will inure to the substantial benefit of all parties in interest.

V.      **First Day Pleadings and Related Relief Requested.**

    A.      **The Debtors' Need for DIP Financing and Access to Cash Collateral.[5]**

    67.      Pursuant to the DIP Motion, the Debtors seek authority to enter into the DIP Term Facility, use Cash Collateral, and obtain related relief.  The DIP Term Facility, if approved, would provide the Debtors with access to $105,000,000 of desperately needed new money capital.

    68.      As of the Petition Date, the Debtors will have approximately $47,000,000 of unrestricted cash on hand, which is insufficient to operate their enterprise and continue paying their obligations as they come due.  Indeed, in the weeks prior to the Petition Date, the Debtors were unable to make any payments due to inventory vendors in the ordinary course and were forced to forego all such payments.  Although the Debtors attempted to manage relationships with suppliers, vendors, and surety providers near-term payment demands and supply chain disruptions indicated that this stopgap measure was not sustainable.

    69.      Facing a liquidity crisis and the risk of jeopardizing key relationships with their vendor partners, the Debtors, with the assistance of their advisors, determined that they required obtaining incremental and immediate liquidity to address their post-petition financing needs. Absent the ability to access the funds available under the DIP Term Facility and Cash Collateral, the Debtors would likely face a value-destructive and immediate interruption to their operations and lose support from key stakeholders on which the Debtors' business depends, including vendors, suppliers, and employees.

---

[5]    Evidentiary support for the DIP Motion is included in the *Declaration of Christian Tempke in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* filed contemporaneously herewith.

70.     The Debtors will require immediate access to the DIP Term Facility and use of Cash Collateral to ensure they have sufficient liquidity during the interim period to fund essential costs and expenses and avoid irreparable harm to the Debtors' operations.  In addition, the Debtors will require full access to the DIP Term Facility after a final hearing to continue providing uninterrupted patient care, fund working capital needs, and consummate the transactions contemplated in the RSA.  The Debtors, with the assistance of their advisors, have concluded that the proposed DIP Term Facility will be sufficient to support operations and maintain necessary liquidity on the currently contemplated schedule for these chapter 11 cases.

71.     The Debtors, in consultation with their advisors, have also determined that the proposed DIP Term Facility is necessary to ensure a positive message to the market that these chapter 11 cases are sufficiently funded, which is critical to address the concerns raised by the Debtors' patients, customers, employees, and vendors.  Thus, immediate access to the DIP Term Facility and Cash Collateral is crucial to the Debtors' efforts to preserve value for their stakeholders during these chapter 11 cases.

72.     Based upon my personal knowledge and participation in the development and review of the proposed budget (the "Initial DIP Budget"), without the DIP Term Facility and authorized use of Cash Collateral, the Debtors will not have sufficient sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business throughout these chapter 11 cases.

### B.     Other First Day Pleadings.

73.     In connection with the filing of the Petitions, the Debtors filed the below-listed First Day Pleadings, which are explained in greater detail in **Exhibit C**, requesting relief that the Debtors believe is necessary to enable them to administer their estates with minimal disruption

and loss of value during these chapter 11 cases. The facts set forth in each of the First Day Pleadings are incorporated herein in their entirety.[6]

1.       **Administrative Motions.**

(a)      Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>").

(b)      Debtors' <u>Emergency</u> *Ex Parte* Application for Entry of an Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent (the "<u>Claims and Noticing Agent Retention Application</u>").

(c)      Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Redact Personally Identifiable Information, (II) Approving the Form and Manner of Notifying Creditors of Commencement of These Chapter 11 Cases and Other Information and (III) Granting Related Relief (the "<u>Creditor Matrix Motion</u>").

(d)      Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Implementation of Procedures to Maintain and Protect Confidential Health Information and (II) Granting Related Relief (the <u>Patient Confidentiality Motion</u>").

(e)      Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (B) Bankruptcy Rule 2015.3 Financial Reports, and (II) Granting Related Relief (the "<u>SOFA Extension Motion</u>").

---

[6]   Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Pleadings.

**2.      Operational Motions Requiring Immediate Relief.**

(a)      Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders
(I) Authorizing the Debtors to (A) Continue to Operate Their Cash
Management System and Maintain Existing Bank Accounts, and
(B) Maintain Existing Business Forms and Books and Records,
(II) Waiving Deposit Requirements, (III) Allowing Intercompany
Transactions and Affording Administrative Expense Priority to Post-
Petition Intercompany Claims, and (IV) Granting Related Relief
(the "<u>Cash Management Motion</u>").

(b)      Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders
(I) Authorizing the Debtors to Pay Certain Prepetition Claims of
(A) Lien Claimants, (B) 503(B)(9) Claimants, (C) PACA/PASA
Claimants, and (D) Critical Vendors, (II) Confirming Administrative
Expense Priority for Outstanding Orders, and (III) Granting Related
Relief (the "<u>Critical Vendors Motion</u>").

(c)      Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the
Debtors to (A) Honor and Incur Obligations to Professional
Corporations and (B) Obtain New Professional Corporation Contracts,
(II) Extending Statutory Protections to Professional Corporations, and
(III) Granting Related Relief (the "<u>PC Motion</u>").

(d)      Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders
(I) Authorizing the Debtors to (A) Continue Insurance Coverage
Entered into Prepetition and Satisfy Prepetition Obligations Related
Thereto, (B) Honor and Renew the Premium Financing Agreements
Entered into Prepetition and Satisfy Obligations Related Thereto,
(C) Renew, Amend, Supplement, Extend, or Purchase Insurance
Policies, (D) Continue to Pay Brokerage Fees, and (E) Maintain
the Surety Bond Program and Letters Of Credit, and (II) Granting
Related Relief (the "<u>Insurance Motion</u>").

(e)      Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving
Notification and Hearing Procedures for Certain Transfers of and
Declarations of Worthlessness with Respect to Equity of the Debtors
and (II) Granting Related Relief (the "<u>NOL Motion</u>").

(f)      Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing
Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting
Related Relief (the "<u>Taxes Motion</u>").

(g)     Debtors' **Emergency** Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "Utilities Motion").

(h)     Debtors' **Emergency** Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, (B) Continue Employee Benefits Programs, and (II) Authorizing Current and Former Employees to Proceed with Outstanding Workers' Compensation Claims, and (III) Granting Related Relief (the "Wages Motion").

(i)     Debtors' **Emergency** Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief (the "Customer Programs Motion").

(j)     Debtors' **Emergency** Motion for Entry of Interim and Final Order to Enforce the Automatic Stay or in the Alternative Extend the Automatic Stay to Non-Debtor Defendants (the "Stay Extension Motion").

74.     The First Day Pleadings request authority to, among other things, enter into the DIP Term Facility and continue use of the Debtors' Cash Collateral, honor workforce-related compensation and benefits obligations, pay claims of prepetition critical vendors, continue to honor certain customer programs, and continue the Debtors' cash management system and other operations in the ordinary course of business to ensure minimal disruption of the Debtors' business operations during these chapter 11 cases.   For the avoidance of doubt, the Debtors request authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Pleadings.

75.     The Debtors have tailored their requests for immediate relief to those circumstances when the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates.   An orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief described below could hinder the Debtors'

operations and cause irreparable harm.  Other requests for relief will be deferred for consideration at a later hearing.

76.     I have reviewed each of the First Day Pleadings and am familiar with the content and substance contained therein.  The facts set forth in each First Day Pleading are true and correct to the best of my knowledge and belief with appropriate reliance on other corporate officers and advisors and I can attest to such facts.  The relief requested in each of the First Day Pleadings (a) is necessary to allow the Debtors to operate with minimal disruption and productivity losses during these chapter 11 cases, (b) is critical to ensure the maximization of value of the Debtors' estates through preserving customer, supplier and other partner relationships, among other things, (c) is essential to achieving a successful reorganization and ultimately emerging as a sustainable enterprise, and (d) serves the best interests of the Debtors' stakeholders.

## **Conclusion**

77.     The Debtors' ultimate goal in these chapter 11 cases is to achieve an orderly, efficient, consensual, and successful reorganization to maximize the value of the Debtors' estates for their stakeholders.  To minimize any loss of value, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the course of these chapter 11 cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and completing a successful reorganization of the Debtors' businesses will be substantially enhanced.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: November 12, 2024

/s/    *Timothy J. Dragelin*
Name: Timothy J. Dragelin
Title:   Chief Restructuring Officer and
        Chief Financial Officer.

The exhibits to this document have been omitted due to their length. Copies of this document with the exhibits included may be obtained free of charge on the docket report maintained on the website of the Debtors' noticing agent at https//dm.epiq11.com/case/wellpath/dockets. A copy of the Notice with this exhibit included may also be requested by emailing the Debtors' noticing agent at Wellpath@epiqglobal.com

# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
| Debtors. | (Jointly Administered) |

## DEBTORS AND DEBTORS IN POSSESSION
## WITNESS AND EXHIBIT LIST FOR FEBRUARY 18, 2025 HEARING
## AT 4:00 P.M. (PREVAILING CENTRAL TIME)

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby submit this witness and exhibit list (the "Witness and Exhibit List") with respect to the hearing scheduled for February 18, 2025 at 4:00 p.m. (prevailing Central Time) (the "Hearing") before the Honorable Alfredo R. Pérez, United States Bankruptcy Judge, 515 Rusk Street, Courtroom 400, Houston, Texas 77002.

## WITNESSES

The Debtors may call any of the following witnesses at the Hearing:

1. Timothy J. Dragelin, Chief Restructuring Officer and Chief Financial Officer;

2. Gilbert Jones, Senior Managing Director – Human Capital, FTI Consulting, Inc.

3. Any witness listed, offered, or called by any other party;

4. Any witness necessary to authenticate a document; and

5. Any witness required for rebuttal or impeachment.

The Debtors reserve the right to cross examine witnesses called by any other party.

---

[1] A complete list of the Debtors (as defined below) in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Wellpath. The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

## **EXHIBITS**

The Debtors may offer any one or more of the following exhibits at the Hearing:

| Exhibit No. | Description | Offered | Objection | Admitted | Disposition After Hearing |
|---|---|---|---|---|---|
| 1. | *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Key Employee Incentive Plan and (B) Non-Insider Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1010] | | | | |
| 2. | *Declaration of Gilbert Jones in Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Key Employee Incentive Plan and (B) Non-Insider Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1010] | | | | |
| 3. | *Objection of the United States Trustee to Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Key Employee Incentive Plan and (B) Non-Insider Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1286] | | | | |
| 4. | *The Statutory Unsecured Claimholders' Committee's Objection to Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Key Employee Incentive Plan and (B) Non-Insider Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1291] | | | | |
| 5. | *Declaration of Heather L. Barlow in Support of the Statutory Unsecured Claimholders' Committee's Objection to Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Key Employee Incentive Plan and (B) Non-Insider Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1292] | | | | |
| 6. | *Declaration of Timothy J. Dragelin as Chief Restructuring Officer and Chief Financial Officer of Wellpath Holdings, Inc. and Certain of its Affiliates in Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Key Employee Incentive Plan and (B) Non-Insider Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1384] | | | | |
| 7. | *Supplemental Declaration of Gilbert Jones in Support of, and in Response to Objections to, Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A)* | | | | |

2

| | | | | | |
|---|---|---|---|---|---|
| | *Key Employee Incentive Plan and (B) Non-Insider Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1386] | | | | |
| 8. | Any pleading on file in these cases | | | | |
| 9. | Any exhibits listed, designated, or offered by any other party | | | | |
| 10. | Any exhibits necessary for rebuttal | | | | |

The Debtors reserve the right to modify, amend, or supplement this Witness and Exhibit List at any time prior to the Hearing. The Debtors reserve the right to ask the Court to take judicial notice of pleadings, orders, transcripts, and/or other documents filed in or in connection with these chapter 11 cases, and to offer rebuttal exhibits. Designation of any exhibit above does not waive any objection the Debtors may have to any exhibit listed on any other party's exhibit list.

*[Remainder of page intentionally left blank]*

Dated: February 14, 2025       Respectfully submitted,

*/s/ Marcus A. Helt*

Marcus A. Helt (Texas Bar #24052187)
MCDERMOTT WILL & EMERY LLP
2501 N. Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone:    (214) 295-8000
Facsimile:    (972) 232-3098
Email:    mhelt@mwe.com

-and-

Felicia Gerber Perlman (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
Jake Jumbeck (admitted *pro hac vice*)
Carole Wurzelbacher (admitted *pro hac vice*)
Carmen Dingman (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
444 West Lake Street, Suite 4000
Chicago, Illinois 60606-0029
Telephone:    (312) 372-2000
Facsimile:    (312) 984-7700
Email:    fperlman@mwe.com
        bgiordano@mwe.com
        jjumbeck@mwe.com
        cwurzelbacher@mwe.com
        cdingman@mwe.com

-and-

Steven Z. Szanzer (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, New York 10017
Telephone:    (212) 547-5400
Facsimile:    (212) 547-5444
Email:    sszanzer@mwe.com

*Counsel to the Debtors and Debtors in Possession*

## CERTIFICATE OF SERVICE

I certify that, on February 14, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Marcus A. Helt*
Marcus A. Helt

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
| Debtors. | (Jointly Administered) |

### DEBTORS' MOTION FOR ENTRY OF AN ORDER
### (I) AUTHORIZING AND APPROVING THE DEBTORS'
### (A) KEY EMPLOYEE INCENTIVE PLAN AND (B) NON-INSIDER
### KEY EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF

**If you object to the relief requested, you must respond in writing. Unless otherwise directed by the court, you must file your response electronically at https://ecf.txsb.uscourts.gov within 21 days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within 21 days from the date this motion was filed. Otherwise, the court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on February 10, 2025 at 11:30 a.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002. You may participate in the hearing either in person or by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Perez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Perez's homepage. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Perez's homepage. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1]    A complete list of the Debtors (as defined below) in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Wellpath. The Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

The above-captioned debtors and debtors in possession (collectively, the "Debtors")
respectfully state as follows in support of this motion (the "Motion"):

**Preliminary Statement**

1.      Wellpath is the premier provider of localized, high quality, compassionate care to
vulnerable patients in challenging clinical environments.  To provide this high quality of care to
the vulnerable populations that Wellpath serves, the Debtors rely on their greatest asset: their
highly skilled and dedicated workforce of approximately 13,700 employees (the "Employees").[2]
The Employees perform a variety of critical functions to manage their cash flows and adapt to
current market trends so that the Debtors can continue their tradition of providing industry-leading
care to their patients.  The skills and experience of the Employees are essential to the Debtors'
ongoing operations and key to the Debtors' ability to pursue the sale and reorganization
transactions contemplated by the Restructuring Support Agreement, dated November 11, 2024, a
copy of which is attached to the First Day Declaration (as amended, the "RSA").  In many
instances, the Employees are distinctly familiar with the Debtors' services, clinical practices,
processes, and systems and possess specialized knowledge, skills, or experience that cannot be
easily replaced.  Due to the high demand for individuals with these skill sets, if such an Employee
were to leave, it would be extremely difficult to replace them with someone with similar expertise.

2.      It is equally important to properly incentivize the Debtors' management team in
light of the ongoing sale and restructuring processes contemplated by the RSA.  Not only are
the Employees tasked with executing a chapter 11 transition and turnaround plan, but they are also

---

[2]     Additional information about the Debtors' businesses and affairs, capital structure, and prepetition indebtedness,
and the events leading up to the filing of these chapter 11 cases, can be found in the *Declaration of Timothy J.
Dragelin as Chief Restructuring Officer and Chief Financial Officer of Wellpath Holdings, Inc. and Certain of
its Affiliates and Subsidiaries in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings*
[Docket No. 20] (the "First Day Declaration").  Capitalized terms used herein but not otherwise defined shall
have the meanings ascribed to them in the First Day Declaration.

required to devote a significant amount of time and attention to ongoing marketing and sale efforts—in addition to fulfilling their daily duties.

3.      Furthermore, maintaining a properly incentivized senior management team throughout the Debtors' organization is critical to the efficient and effective completion of the great deal of work necessary to consummate the transactions contemplated by the RSA and emerge from chapter 11.  At the same time, senior management must maintain a high level of business performance to minimize disruption to patients, vendors, and Employees.  To properly incentivize the Debtors' senior leadership team, and thereby facilitate a value-maximizing resolution of these chapter 11 cases, the Debtors seek approval of an incentive-based plan (the "KEIP") for certain members of the Debtors' senior leadership team (each a "KEIP Participant" and, collectively, the "KEIP Participants").

4.      In addition, for the Debtors to maintain ordinary course operations and continue providing quality patient care during these chapter 11 cases, it is essential that the Debtors retain a core group of non-insider Employees who are key to the Debtors' realization of these goals.  To that end, the Debtors developed a cash-based retention plan (the "Non-Insider KERP" and, together with the KEIP, the "Compensation Plans") for these non-insider Employees (each a "KERP Participant" and, collectively, the "KERP Participants" and, together with the KEIP Participants, the "Participants").  Because the KERP Participants are essential to the Debtors' ability to maintain ordinary course operations and continue providing quality patient care during these chapter 11 cases, approval of the Non-Insider KERP is critically important to the success of the Debtors' chapter 11 process.

5.      This motion seeks approval of the (a) KEIP, which includes 12 members of the Debtors' senior management team and (b) Non-Insider KERP, which includes 32 KERP

Participants.[3]  The Compensation Plans are market-based compensation programs.  The Debtors, with input from their advisors, including FTI Consulting, Inc. ("FTI"), developed the Compensation Plans based on a practical assessment of the Debtors' organizational and operational structure, their historical employee retention and incentive programs, and with reference to prevailing terms of market-based compensation programs.  Both the KEIP and the Non-Insider KERP contemplate cash payments and are contingent on the waiver by the applicable Participants of any 2024 annual bonus in its entirety.  The anticipated aggregate cost for the KEIP and Non-Insider KERP is approximately $4,588,000 and $3,022,000, respectively.  The average cost per participant for the KEIP is approximately $380,000 and is in the 50th percentile compared to the KEIP Peer Group (as defined below), while the maximum cost of the program is in the 36th percentile.

6.    The Non-Insider KERP contemplates cash retention payments to 32 non-insider Employees, in addition to the Discretionary KERP Participants, in the aggregate amount of approximately $3,022,000.    The average per participant retention payment is equal to approximately 31% of a KERP Participant's base salary (the "Retention Payment Amount"). The Debtors' advisors assisted the Debtors in ensuring that the Compensation Plans were designed to achieve the desired operational performance, within the market range of compensation offered at comparable companies, and reasonable in terms of size and scope.  For the Non-Insider KERP, the aggregate payments would approximate the 62nd percentile compared to the KERP Peer Group.

---

[3]    In addition, the Non-Insider KERP contemplates that the Debtors' Chief Restructuring Office (the "CRO") may designate, in his sole discretion, additional non-insider Employees as KERP Participants (collectively, the "Discretionary KERP Participants") and award such Employees discretionary amounts totaling $675,000 in the aggregate the "Discretionary Pool").   The CRO may also utilize the Discretionary Pool, in his sole discretion, to increase Retention Payment Amounts (as defined below) to certain KERP Participants whose roles and workload increased due to departures by other Employees.

7.     Importantly, no retention payments shall be made to insiders, and the Compensation Plans otherwise comply with the Bankruptcy Code.  Payments under the KEIP are incentive-based and will be paid only if KEIP Participants achieve objective performance goals.  These goals represent a mix of difficult-to-reach targets and challenging, incentive-based benchmarks, which were developed to align incentives with positive outcomes for all of the Debtors' stakeholders.  Accordingly, the Debtors respectfully request that the Court authorize the Debtors to implement the Compensation Plans.

## Relief Requested

8.     By this Motion, and pursuant to sections 105(a), 363(b), 363(c), and 503(c) of title 11 of the United States Code (the "Bankruptcy Code") and rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors seek entry of an order, substantially in the form annexed hereto (the "Order"), (a) authorizing and approving the KEIP and the Non-Insider KERP and (b) granting related relief.  In support of this Motion, the Debtors submit the *Declaration of Gilbert Jones in Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Key Employee Incentive Plan and (B) Non-Insider Key Employee Retention Plan and (II) Granting Related Relief*, attached hereto as **Exhibit A** (the "Jones Declaration").

## Jurisdiction and Venue

9.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.).

10.     This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  In addition, the Debtors confirm their consent to the entry of a final order by the Court in connection with

5

this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

11.     Venue of these chapter 11 cases and related proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

12.     On November 11, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

13.     The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

14.     The chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 27] entered by the Court, on November 12, 2024, in each of these chapter 11 cases.

15.     On November 25, 2024, the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code.  *See Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 169].  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

## Key Employee Incentive Plan

### I.     Overview of KEIP.

16.     The KEIP Participants are comprised of 12 members of the Debtors' senior management team.  The KEIP Participants have played, and will continue to play, a central role in the overall strategy and direction of the Debtors' business enterprise, as well as the Debtors'

restructuring.  The KEIP Participants include the (a) Chief Executive Officer, (b) Chief Operating Officer, (c) Chief Compliance Officer, (d) Chief Legal Officer, (e) Division President, State and Federal, (f) Chief Information Officer, (g) Senior Vice President of Operations, Local Government, (h) Chief Human Resources Officer, (i) Senior Vice President of Operations, Local Government, (j) Chief Accounting Officer, (k) Interim Chief Medical Officer, and (l) Senior Vice President of Finance and Treasurer.  The KEIP Participants may be considered "insiders" under the Bankruptcy Code.

17.     In addition to their substantial day-to-day responsibilities running a highly complex enterprise, these individuals have seen their workloads expand significantly as the Debtors have transitioned their operations into chapter 11.  The additional challenges these responsibilities pose should be factored into consideration of the KEIP Participants' ability to achieve targeted business performance.

18.     The Debtors are sensitive to concerns about executive compensation, but the Debtors believe that appropriate, incentive-based compensation opportunities for their senior management team—goals that, if achieved, would ensure that the KEIP Participants are paid within the ballpark of the market—remain an important tool to drive performance and would inure to the benefit of the Debtors' stakeholders.  Thus, the Debtors have evaluated the need for a KEIP with the benefit of independent oversight and guidance from their advisors.  The proposed award opportunities reflect FTI's benchmarking analysis versus the Debtors' industry peers (the "Industry Market Peer Group" or "Industry Market"),[4] which consists of five healthcare services companies with (a) revenues between approximately $135,000,000 and $3,200,000,000

---

[4]     The 14 companies comprising the Industry Market Peer Group include the following:  Mallinckrodt plc (2021 & 2022); Genesis Care Pty Ltd.; 24 Hour Fitness Worldwide, Inc.; Amyris Inc.; LSC Communications; Inc.; NPC International, Inc.; Exide Holdings, Inc.; Clovis Oncology Inc.; Ebix Inc.; Instant Brands Inc.; Stage Stores, Inc.; Basic Energy Services, Inc.; Endologix, Inc.

and (b) funded debt between $226,000,000 and $5,300,000,000, as well as a review of incentive-based compensation plans approved in other chapter 11 cases (the "KEIP Peer Group" or "KEIP Market").  FTI also evaluated the KEIP Participants' compensation against the Mercer U.S. Executive Remunerations Survey for healthcare services companies with revenues between approximately $1,000,000,000 and $5,000,000,000 (the "Mercer Survey Data").

19.     The proposed KEIP contains the following primary design features:

- ***KEIP Awards***.  Each KEIP award will be a cash amount provided (to the extent earned based on actual performance) upon the conclusion of the applicable performance period described below; *provided, however,* that the KEIP awards are subject to clawback in the event that a KEIP Participant's employment terminates for "cause" or voluntarily without "good reason" (each as defined below) prior to December 31, 2025.  Potential payments are tied to achieving specified performance metrics for each performance period and subject to the KEIP Participant's continued employment through the end of that performance period (except as provided below).

- ***Performance Targets***.  KEIP payouts to KEIP Participants will be based on four performance metrics:  (a) the closing of a sale transaction for the Recovery Solution Assets (the "Recovery Solutions Sale Transaction"); (b) the closing of a Corrections Asset(s) Sale Transaction or the consummation of a chapter 11 plan of reorganization involving the Corrections Assets (each as defined in the Bidding Procedures Motion);[5] (c) certain financial metrics, including meeting or outperforming the Initial DIP Budget[6] (as defined in the Interim DIP Order[7]),

---

[5]   *See Debtors'* Emergency *Motion for Entry of Orders  (I)(A) Approving the Bidding Procedures for the Sale of the Debtors' Assets, (B) Approving Entry into a Stalking Horse Purchase Agreement for The Recovery Solutions Assets, (C) Authorizing the Recovery Solutions Expense Reimbursement, (D) Authorizing Potential Selection of Stalking Horse Bidders for the Corrections Assets and Approving Related Corrections Asset(s) Bid Protections, (E) Establishing Related Dates and Deadlines, (F) Approving the Form and Manner of Notice Thereof, and (G) Approving the Assumption and Assignment Procedures, (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 21] (the "Bidding Procedures Motion").

[6]   In the event of satisfaction in full of the DIP Obligations (as defined in the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Use Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 388] (the "Final DIP Order")), references to the Interim DIP Budget shall mean the Cash Collateral (as defined in the Final DIP Order) budget agreed between the Debtors and the Ad Hoc Group.

[7]   *See Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Use Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; (V) Scheduling Final Hearing;*

achieving minimum liquidity of no less than $35 million upon consummation of the chapter 11 plan (if applicable), and achieving performance levels such that the business will require an Equity Financing Amount (if applicable) of no greater than $55 million; and (d) meeting or exceeding a threshold for the retention or renewal of certain contracts, such that the aggregate gross profit of such contracts that are terminated, or at risk of termination, does not exceed $40 million.

- *KEIP Payout Ranges*.  The KEIP will provide for potential payments for achieving the performance targets set forth in the KEIP.

- *Performance Periods*.  Performance related to a Recovery Solutions Sale Transaction would be measured as of the date of a successful closing of such transaction, including pursuant to a Credit Bid.  Performance related to the Corrections Assets would be measured as of the date of a successful closing of a Corrections Asset(s) Sale Transaction or consummation of a chapter 11 plan of reorganization involving the Corrections Assets.  Performance related to the financial metrics and the retention or renewal of the Debtors' contracts will be measured as of the date of a Corrections Asset(s) Sale Transaction or consummation of a chapter 11 plan of reorganization involving the Corrections Assets.

- *KEIP Payment Timing*.  Payments to KEIP Participants, to the extent earned, would occur as soon as reasonably practicable after the conclusion of the applicable performance period.

- *Termination of Employment*.  If (a) the Debtors terminate a KEIP Participant's employment without "cause"[8] or due to disability, (b) a KEIP Participant's employment terminates due to their death, or (c) the KEIP Participant resigns for "good reason,"[9] in each case, during the applicable performance period, subject to the KEIP Participant's timely execution, delivery, and

---

*and (VI) Granting Related Relief* [Docket No. 81] (the "Interim DIP Order").

[8]  "Cause" shall mean (a) the commission of a felony or other crime involving moral turpitude or the commission of any other act or omission involving embezzlement, theft, misappropriation, dishonesty, unethical business conduct, disloyalty, fraud, or breach of fiduciary duty, (b) reporting to work under the influence of alcohol, (c) the use of illegal drugs (whether or not at the workplace) or other conduct, even if not in conjunction with his or her duties to the Debtors, which could reasonably be expected to, or which does, cause the Debtors public disgrace or disrepute or economic harm, (d) repeated failure to perform duties as reasonably directed in good faith by the Board (as defined below), (e) gross negligence or willful misconduct with respect to any Debtors or in the performance of your duties as an employee, (f) obtaining any personal profit not thoroughly disclosed to and approved by the Debtors in connection with any transaction entered into by, or on behalf of, or in relation to, any Debtor, (g) violating any of the terms of a Debtor's established rules or policies, or (h) any breach of any agreement between you and any Debtor, including the violation of any restrictive covenants.

[9]  "Good Reason" shall mean the occurrence of any of the following conditions, without the Participant's consent, (a) a material diminution in their duties, authority, or responsibilities, (b) the Debtors requiring the Participant to be principally based at any office more than 25 miles from Nashville, Tennessee (solely for the sake of clarity, excluding ordinary travel consistent with their duties and responsibilities), or (c) any material breach of the Participant's offer letter by the Debtors.

9

Case 24-90533   Document 1010   Filed in TXSB on 01/17/25   Page 10 of 54

non-revocation of a release of claims in favor of the Debtors and such KEIP Participant's compliance with their obligations to the Debtors, the KEIP Participant would be entitled to its *pro rata* share of the KEIP award that would otherwise have been earned for such performance period based on (y) actual performance during the performance period and (z) the percentage of the performance period that the KEIP Participant was employed by the Debtors measured from the Petition Date to the date of termination of such KEIP Participant's employment, which will be paid at such time payments are paid to other KEIP Participants.  If a KEIP Participant's employment is terminated by the KEIP Participant due to a voluntary resignation without "good reason", any remaining unpaid portion of the KEIP payment would be forfeited.  If the Debtors terminate a KEIP Participant's employment for "cause", the KEIP Participants entire KEIP award, whether or not earned, would be forfeited.

- *No Reallocation.*  Any portion of the KEIP that is forfeited and/or not earned, shall not be reallocated to any other KEIP Participant or otherwise.

20.     If approved, the KEIP would provide aggregate (for all KEIP Participants) target opportunities of approximately $4,588,000 respectively.   The individual award opportunities available to each KEIP Participant are summarized as follows:

| Participant's Title | Target Award Opportunity |
| --- | --- |
| Chief Executive Officer | $1,607,000 |
| Chief Operating Officer | $450,000 |
| Chief Compliance Officer | $250,000 |
| Chief Legal Officer | $300,000 |
| Division President, State and Federal | $271,000 |
| Chief Information Officer | $250,000 |
| Senior Vice President of Operations, Local Government | $300,000 |
| Chief Human Resources Officer | $250,000 |
| Senior Vice President of Operations, Local Government | $300,000 |
| Chief Accounting Officer | $180,000 |
| Interim Chief Medical Officer | $250,000 |

| Senior Vice President of Finance and Treasurer | $180,000 |
|---|---|
| **Total Award Values** | $4,588,000 |

21.     As set forth in the Jones Declaration, the proposed target total direct compensation for the KEIP Participants in the aggregate would approximate the 50th percentile of the Mercer Survey Data.  The target cost per participant is at the 50th percentile of the KEIP Market, while the target total cost of the KEIP would be at the 79th percentile.

**II.     The Performance Targets.**

22.     Under the KEIP, awards are payable only upon the Debtors' achievement of certain sale, reorganization, and operational performance targets, all as set forth in more detail in the Jones Declaration.  Achievement of these performance targets have required and will require substantial efforts from the KEIP Participants.  Indeed, the KEIP Participants worked tirelessly to support the sale process relating to the Recovery Solutions Assets, including negotiating and finalizing the transactions contemplated by the Recovery Solutions Stalking Horse Agreement and related agreements and documents and preparing for the closing of such transactions.  Absent the KEIP Participants' herculean efforts, the parties could not finalize the Recovery Solutions Sale Transaction.  The performance targets – including (a) the closing of a Corrections Asset(s) Sale Transaction or the consummation of a chapter 11 plan of reorganization involving the Corrections Assets, (b) (i) meeting or outperforming the Initial DIP Budget, (ii) achieving minimum liquidity of no less than $35 million upon consummation of the chapter 11 plan (if applicable), (iii) achieving performance levels such that the business will require an Equity Financing Amount (if applicable) of no greater than $55 million, and (c) meeting or exceeding a threshold for the retention or renewal of certain contracts, such that the aggregate gross profit of such contracts that are terminated, or at risk of termination, does not exceed $40 million – were approved by the

Special Committee (as defined below), with the support of the DIP Lenders and the Ad Hoc Group, and developed carefully to ensure that they are an appropriate "reach" to drive performance, on the one hand, but will not present unrealistic or unattainable goals, on the other hand—which would thwart the incentivizing nature of the KEIP. The Debtors developed the performance targets in consultation with the Debtors' restructuring advisors and coupled with an independent review of the total compensation award levels by FTI.

**III.    The Need for a KEIP.**

23.    The Debtors face severe business pressures due to recent challenges in the market, including market headwinds, inflated operating expenses due to increased costs for labor and medical supplies, and certain underperforming contracts. In light of these pressures and the additional challenges of these chapter 11 cases, it is critical that the Debtors implement the KEIP immediately to ensure that the key employees remain with the Debtors during the pendency of these chapter 11 cases and are properly incentivized to consummate the transactions contemplated by the RSA and to maximize value for all stakeholders.

24.    In recent months, the KEIP Participants have seen a substantial increase in their workloads without any concomitant increase in their compensation, including facilitating the Recovery Solutions Sale Transaction. In fact, even if the KEIP is approved and the Debtors achieve the target KEIP metrics, the fiscal year 2025 total direct compensation of the Debtors' Chief Executive Officer at target would approximate the 50th percentile of the Mercer Survey Data. The Debtors' senior executives have continued to perform their preexisting job functions and have taken on more responsibilities as a result of the chapter 11 process. The KEIP Participants' responsibilities now also include developing and implementing the Debtors' reorganization strategy, participating in Court hearings, continuing to negotiate with stakeholders and other parties, reviewing Court filings, assisting in the ongoing sale process for all of the Debtors' assets,

and responding to creditor inquiries and requests from the U.S. Trustee. The dedication of the Debtors' senior management team would help communicate stability throughout all facets of the Debtors' operations, as well as to customers, vendors, suppliers, and other parties who work alongside the Debtors. In addition, providing incentive opportunities through the KEIP would enable the Debtors to (a) not only achieve, but possibly exceed, their near-term operational goals and (b) consummate the transactions contemplated by the RSA, in both cases for the benefit of the Debtors, the Debtors' estates, and all parties in interest.

### Key Employee Retention Plan

**IV. Overview of the Non-Insider KERP.**

25. The Debtors employ approximately 13,700 Employees. The KERP Participants include 32 key non-insider Employees and additional key Employees to be identified by the CRO in his sole discretion (*i.e.*, the Discretionary KERP Participants), all of whom are non-Insiders and whose knowledge and experience are essential to preserving operational stability and maximizing the value of the Debtors' estates. These Employees include highly trained and knowledgeable personnel that would be extremely difficult to replace without a negative effect on the Debtors' business. Indeed, since the beginning of 2024, several key employees at the senior manager level and above have resigned from the Debtors (including nine vice presidents)[10]. Given the increasing demands placed upon the potential KERP Participants during these chapter 11 cases, providing compensation designed to motivate key Employees to remain with the Debtors throughout the restructuring process is essential.

---

[10] The nine senior level non-insider Employees include a Vice President of Business Development, a Vice President of Financial Planning & Analysis, a Vice President of Business Development, a Senior Vice President of Procurement and Accounts Payable, a Division Vice President of Financial Planning & Analysis, a Vice President of Mental Health Innovations, two Division Presidents, and a Senior Vice President of AGC Risk Management and Litigation.

26.     Due to the importance of the KERP Participants to the success of the Debtors'

businesses and their restructuring, the Debtors, along with their advisors, developed a

compensation plan designed to offer competitive, fair compensation that motivates the KERP

Participants to remain with the Debtors through these chapter 11 cases.  The key terms of the

Non-Insider KERP are summarized as follows:

- *Eligible Participants*.  The Non-Insider KERP awards will be provided to approximately 32 non-insider Employees who were eligible under the Company's prepetition incentive plans based on grade level and position, as well as certain Discretionary KERP Participants.  Specifically, the KERP Participants do not include any Employee who (a) is appointed or hired directly by the board of directors of CCS-CMGC Parent GP, LLC (the "Board"), (b) reports directly to the Board or the Debtors' Chief Executive Officer, (c) regularly attends Board meetings, (d) exercises managerial control over, or has responsibility for, the Debtors' operations as a whole, or (e) dictates the Debtors' overall corporate policy, governance, or disposition of corporate assets.  Grants to Discretionary KERP Participants will be capped at $675,000 in the aggregate and shall only be made prior to the conclusion of the KERP Retention Period.

- *Non-Insider KERP Awards*.  The Non-Insider KERP awards represent fixed cash amounts payable based on continued employment through the closing of a Corrections Asset(s) Sale Transaction or the consummation of a chapter 11 plan of reorganization involving the Corrections Assets (the "KERP Retention Period").

- *Maximum Amount of Non-Insider KERP*.  The total amount of the Non-Insider KERP would not exceed $3,022,000.

- *Payment Dates*.  Each KERP Participant would be paid 100% of the KERP award upon the effective date of a chapter 11 plan confirmed in these chapter 11 cases (the "Plan Effective Date"); *provided, however,* that the Non-Insider KERP awards are subject to clawback in the event that a KERP Participant's employment terminates for "cause" or voluntarily without "good reason" prior to December 31, 2025.

- *Performance Criteria*.  The Non-Insider KERP has no performance criteria.

- *Termination of Employment*.  If (a) the Debtors terminate a KERP Participant's employment prior to the end of the applicable KERP Retention Period without "cause" or due to disability or (b) a KERP Participant's employment terminates due to their death, in each case, during the applicable KERP Retention Period, subject to the KERP Participant's timely execution,

delivery, and non-revocation of a release of claims in favor of the Debtors and such KERP Participant's compliance with his or her obligations to the Debtors, the KERP Participant would be entitled to the full KERP award.  If a KERP Participant's employment is terminated prior to the end of the applicable KERP Retention Period due to a voluntary resignation, the KERP award payment would be forfeited.  If the Debtors terminate a KERP Participant's employment for "cause" prior to the KERP award payment, the KERP award, whether or not vested, would be forfeited.

- • ***Reallocation.***  The CRO may reallocate any portion of the Non-Insider KERP that is forfeited by a KERP Participant or Discretionary KERP Participants to any other non-insider employee; *provided*, that in no event shall more than $50,000 in the aggregate be reallocated to any one KERP Participant or Discretionary KERP Participant.

## V.   Reasonableness of the Non-Insider KERP.

27.     The Debtors and their advisors evaluated whether the Non-Insider KERP's design, structure, and cost are reasonable and consistent with market practice—keeping in mind their financial and operational restructuring goals and the Debtors' commitment to continue providing quality patient care throughout these chapter 11 cases and into the future.  In particular, FTI analyzed 13 comparable non-insider plans approved in recent chapter 11 cases of companies with (a) revenues between approximately $135,000,000 and $3,200,000,000 and (b) funded debt between $226,000,000 and $1,800,000,000 (collectively, the "KERP Peer Group" or "KERP Market").[11]  For the Non-Insider KERP, the aggregate payments would approximate the 62nd percentile compared to the KERP Peer Group.  Based on this review of comparable retention plans, the Debtors believe that the total cost of the Non-Insider KERP is reasonable relative to the KERP Market.

---

[11]    The 13 companies comprising the KERP Peer Group include the following:  Genesis Care Pty Ltd.; 24 Hour Fitness Worldwide, Inc.; Amyris Inc.; LSC Communications, Inc.; NPC International, Inc.; Exide Holdings, Inc.; Clovis Oncology Inc.; Ebix Inc.; Stage Stores, Inc.; Basic Energy Services, Inc.; Invacare Corp.; Gulf Coast Health Care, LLC; Endologix, Inc.

## Basis for Relief

**I.     The Compensation Plans are Ordinary Course Transactions Under Section 363(c) of The Bankruptcy Code.**

28.     Under section 363(c)(1) of the Bankruptcy Code, a debtor in possession "may enter into transactions . . . in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  Courts in the Fifth Circuit and elsewhere apply a two-prong test to determine if a transaction is in the ordinary course of a debtor's business.  *See, e.g., In re Cowin,* 2014 WL 1168714, at *40 (Bankr. S.D. Tex. Mar. 21, 2014); *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013) (applying the "horizontal" and "vertical" tests); *In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006);  *In re Johns-Manville Corp.*, 60 B.R. 612, 616, 618 (Bankr. S.D.N.Y. 1986).  Under the horizontal dimension test, the Court analyzes if "the transaction was of the sort commonly undertaken by companies in the industry." *Patriot Place*, 486 B.R. at 793;  *Cowin*, 2014 WL 1168714, at *40 n.55 (noting the "horizontal dimension test" is also known as the "comparable businesses test").  Under the vertical dimension test, the court analyzes whether a hypothetical creditor would view the transaction as an ordinary or unusual business practice.  *Cowin*, 2014 WL 1168714, at *41.  If the transaction was ordinary, such hypothetical creditor would not expect notice and a hearing with the opportunity to object.  *Id*.

29.     First, the Compensation Plans satisfy the horizontal dimension test because they are consistent with such plans within the Debtors' industry.  *See In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012) (approving incentive bonus plans under section 363(c)(1) of the Bankruptcy Code where the debtor sought to continue prepetition plans that were common in the industry).  To establish a reference point for the competitiveness of the Compensation Plans, FTI examined the KEIP Peer Group's and KERP Peer Group's compensation practices.  The KEIP

would result in the KEIP Participants receiving total direct compensation in the aggregate would approximate the 50th percentile of the Industry Market.  The average total cost per participant for the KEIP correspond to the 50th percentile of the KEIP Market.  For the Non-Insider KERP, the aggregate payments would approximate the 62nd percentile compared to the KERP Peer Group. Based on the comparisons of the Compensation Plans to other compensation plans in the KEIP Market and KERP Market, the Compensation Plans are consistent with compensation practices within the Debtors' industry.

30.     Second, the Compensation Plans meet the vertical dimension test because they represent a substantial continuation of the Debtors' prepetition compensation practices.  *See Dana Corp.*, 358 B.R. at 579, 581 (finding that the debtor's post-petition compensation program was a "refinement" of historical practices and therefore within the ordinary course of debtor's business). The Debtors have historically offered cash bonus plans to supplement the Employees' salary compensation.  The Compensation Plan awards are entirely cash-based and do not include stock awards.  Moreover, the Compensation Plan target awards are generally in line with an Employee's prepetition target annual awards.

31.     Because the Compensation Plans are consistent with both the Debtors' prepetition practice and industry practice for companies in and out of chapter 11, the Debtors respectfully request that the Court approve the Compensation Plans as an ordinary course transaction pursuant to section 363(c) of the Bankruptcy Code.

**II.     Even if the Compensation Plans are Not an Ordinary Course Transaction, Implementing the Compensation Plans is a Proper Exercise of the Debtors' Sound Business Judgment Under Section 363(b) of the Bankruptcy Code.**

32.     Even assuming the Compensation Plans are not an ordinary course transaction, the Compensation Plans constitute a sound exercise of the Debtors' business judgment. Section 363(b)(1) of the Bankruptcy Code empowers a court to allow a debtor to "use, sell, or

lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A debtor's decision to use, sell, or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor. *See In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"). Courts emphasize that the business judgment standard is not an onerous standard; rather it "is flexible and encourages discretion." *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011); *In re Perez*, 339 B.R. 385, 399 n. 14 (Bankr. S.D. Tex. 2006), *aff'd sub nom. Perez v. Peake*, 373 B.R. 468 (S.D. Tex. 2007) ("Section 363(b) should be interpreted liberally to provide a bankruptcy judge with substantial freedom to tailor his orders to meet differing circumstances and to avoid shackling the judge with unnecessary rigid rules." (cleaned up)). As such, courts exhibit "[g]reat judicial deference . . . to [a debtor's] exercise of business judgment." *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005). Indeed, as long as a transaction "appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to [enter into the transaction] should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the Bankruptcy Code." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (cleaned up).

33. There is no question that the Debtors possess an articulable business purpose to implement the Compensation Plans. The Participants are integral to the day-to-day operations of the Debtors' businesses and are experiencing increasing demands as a result of this challenging market, the Debtors' filing for chapter 11, and the transactions contemplated by the RSA. The

Debtors also cannot easily replace the Participants or without adversely affecting the Debtors' operations or restructuring efforts.

34.     Moreover, the cost of the Compensation Plans is reasonable for the size and earnings potential of the Debtors.  To measure the reasonableness of the KEIP, FTI analyzed incentive plans approved in chapter 11 cases involving companies with (a) revenues between approximately $135,000,000 and $3,200,000,000 and (b) funded debt between $226,000,000 and $5,300,000,000 that had filed for chapter 11 since 2020 and sought approval of sale-based or dual-track incentive plans.  FTI also evaluated the KEIP Participants' compensation against the Mercer Survey Data.  Finally, FTI examined non-insider compensation plans approved in the chapter 11 cases since 2020 for companies outside the healthcare sector with (a) revenues between approximately $260,000,000 and $3,200,000,000 and (b) funded debt between $226,000,000 and $1,500,000,000.  Against these different measures, both the KEIP and the KERP fall within the norm of the industry practice.  Indeed, the target cost per participant of the KEIP is $382,000, which ranks in the 50th percentile of companies in the KEIP Peer Group, and the target cost per participant of the Non-Insider KERP as a percentage of base-salary is 31%, which ranks in the 80th percentile of the KERP Market (based on those in the KERP Peer Group that disclosed such information).  The Compensation Programs apply to only a fraction of the Debtors' Employees. Finally, the Debtors developed the Compensation Plans in reliance on their advisors and they were reviewed and approved by the members of the Special Committee, whose members are not current Employees of the Debtors nor Participants.  For these reasons, the Debtors' decision to implement the Compensation Plans is a valid exercise of the Debtors' sound business judgment and, therefore, should be approved.

19

III.     **The Compensation Plans are Justified by the Facts and Circumstances of These Chapter 11 Cases.**

35.     Section 503(c)(3) of the Bankruptcy Code prohibits certain transfers made to managers, consultants, and others that are not justified by the facts and circumstances of a bankruptcy case. *See* 11 U.S.C. § 503(c)(3). Certain courts have held that section 503(c)(3) of the Bankruptcy Code's "facts and circumstances" justification test "creates a standard no different that the business judgment standard under section 363(b) of the Bankruptcy Code." *In re Velo Holdings, Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012); *In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) (finding that "a majority of courts . . . agree that the 'facts and circumstances' test of 503(c)(3) is identical to the business judgment standard under 363(b)(1)"); *In re Patriot Coal Corp.*, 492 B.R. 518, 530–31 (Bankr. E.D. Mo. 2013) (using the business judgment test to analyze an incentive plan under section 503(c)(3) of the Bankruptcy Code); *Dana Corp.*, 358 B.R. at 576–77 (describing six factors to evaluate if a compensation plan meets the "sound business judgment test" under section 503(c)(3) of the Bankruptcy Code). Other courts have determined that section 503(c)(3) of the Bankruptcy Code requires a court to "make its own determination that the transaction will serve the interests of creditors and the debtor's estate." *In re Pilgrim's Pride Corp.*, 401 B.R. 229, 237 (Bankr. N.D. Tex. 2009). A court should make this determination based on whether the proposed compensation plan is justified on the facts of a particular case. A court should make this determination based on whether the proposed compensation plan is justified on the facts of a particular case. *See id.; In re Country Fresh Holding Co. Inc.*, No. 21-30574, 2021 WL 2932680, at *12 (MI) (Bankr. S.D. Tex. July 12, 2021) ("Section 503(c)(3)'s language makes clear that courts must consider all relevant facts and circumstances surrounding a proposed KEIP.").

20

36.     Under either the business judgment standard or the facts and circumstances analysis proposed by *Pilgrim's Pride*, courts have analyzed compensation plans using the six factors identified in *Dana Corporation* to determine whether a compensation proposal is permitted by 503(c)(3). *See, e.g., In re FirstEnergy Sol. Corp.*, 591 B.R. 688, 697698 (Bankr. N.D. Ohio 2018) (analyzing a proposed KERP using the *Dana Corp.* factors without deciding whether section 503(c)(3) modifies the business judgment standard); *Patriot Coal*, 492 B.R. at 531 (applying the business judgment standard and analyzing an insider incentive plan and a non-insider retention plan using the *Dana Corp.* factors).  In order to determine whether a compensation proposal meets the "sound business judgment test" courts consider the following six factors: (a) whether the plan is calculated to achieve the desired performance; (b) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities, and earning potential; (c) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (d) whether the plan is consistent with industry standards; (e) whether the debtor performed due diligence in investigating the need for the plan; and (f) whether the debtor received independent advice in performing due diligence, creating, and authorizing the plan.  *See Dana Corp.*, 358 B.R. at 576–77; *see also In re Residential Capital, LLC*, 491 B.R. 73, 85−86 (Bankr. S.D.N.Y. 2013) (applying the *Dana Corp.* factors to the debtors' retention plan for non-insiders and approving the plan as an exercise of sound business judgment).

37.     No single factor is dispositive, and a court has discretion to weigh each factor based on the specific facts and circumstances before it.  *See, e.g., FirstEnergy Sol. Corp.*, 591 B.R. at 697 (*Dana Corp.* "factors are neither exhaustive nor of inherently equal weight.").  Even the total absence of a factor may be permissible, so long as the Debtors' interests are sufficiently protected. *See In re Borders Grp. Inc.*, 453 B.R. 459, 477 (Bankr. S.D.N.Y. 2011) (finding that the lack of

Case 24-90533   Document 1010   Filed in TXSB on 01/17/25   Page 22 of 54

independent counsel was "not fatal" where the presence of other factors ensured "that the [d]ebtors' interests were sufficiently protected"); *In re Glob. Aviation Holdings Inc.*, 478 B.R. 142, 154 (Bankr. E.D.N.Y. 2012) (noting "the relatively modest size of the proposed bonus payouts made the retention of independent legal counsel economically inefficient"). The Debtors respectfully submit that the KEIP satisfies the standards set forth above.

### A.     The KEIP is Justified by The Facts and Circumstances of These Chapter 11 Cases.

38.     The KEIP is a sound exercise of the Debtors' business judgment and is justified by the facts and circumstances of these chapter 11 cases.

- **The KEIP is Calculated to Achieve the Desired Performance**. The KEIP is tied to the Debtors' ability to meet and exceed certain threshold metrics, each of which are tied to the stability and future success of the Debtors' businesses, as well as the transactions contemplated by the RSA. KEIP awards for the KEIP Participants are tied to both the sale or equitization of certain of the Debtors' assets and achieving certain operational performance targets. These metrics help ensure that the Debtors maintain access to essential post-petition financing while also achieving certain operational goals that would likely be challenging to achieve while implementing a sale and reorganization process. Indeed, the KEIP Participants worked tirelessly to support the sale process relating to the Recovery Solutions Assets, including negotiating and finalizing the transactions contemplated by the Recovery Solutions Stalking Horse Agreement and related agreements and documents and preparing for the closing of such transactions. Absent the KEIP Participants' herculean efforts, the parties could not finalize the Recovery Solutions Sale Transaction.

- **The Cost of the KEIP is Reasonable**. The estimated aggregate payout at target performance levels under the KEIP is $4,588,000. Compared to court-approved incentive plans of the Debtors' chapter 11 peers, the target cost of the KEIP would be at the 79th percentile of the KEIP Market (primarily driven by the KEIP's large number of participants), with the target cost per participant at the 50th percentile of the KEIP Market. The proposed target total direct compensation for the KEIP Participants in the aggregate would approximate the 50th percentile of the Mercer Survey Data.

- **The Scope of the KEIP is Reasonable**. The KEIP is reasonably limited to senior management whose efforts are critical to the Debtors' restructuring and maximizing the value of the Debtors' estates. The scope of the KEIP is fair, reasonable, and does not discriminate unfairly among the KEIP Participants.

- **The KEIP is Consistent with Industry Practices**.  FTI gathered external market compensation data from data sources, encompassing a representative database of compensation information for comparable executives, including from the Mercer Survey Data.  Absent the KEIP, FTI determined that the KEIP Participants would be compensated below industry standards for their positions.  The KEIP Participants' total direct compensation (including potential KEIP payouts) in the aggregate would approximate the 50th percentile of the Mercer Survey Data.

- **The Debtors Performed Due Diligence in Developing the KEIP**.  The Debtors retained and relied on FTI in developing the KEIP.  This process involved a review of the market and peer group data, including data regarding the structure and specific performance metrics ultimately included in the KEIP.

- **The Debtors Received Independent Counsel in Developing the KEIP**.  The Debtors actively sought input from their legal and financial consultants during the KEIP development process and hired and consulted with FTI for its specific compensation-related expertise.  In addition, the special committee of the Board of Directors of CCS-CMGS Intermediate Holdings 2, Inc. (the "Special Committee"), comprised solely of disinterested directors, evaluated and approved the KEIP.

39.     Because the KEIP will incentivize the KEIP Participants to meet specific objective performance goals, the achievement of which would facilitate a value-maximizing resolution of these chapter 11 cases, the KEIP reflects a sound exercise of the Debtors' business judgment and is justified by the facts and circumstances of these chapter 11 cases.  Accordingly, the KEIP satisfies section 503(c)(3) of the Bankruptcy Code.

B.      **The KERP Is Justified by the Facts and Circumstances of these Chapter 11 Cases.**

40.     The Debtors' Non-Insider KERP is a sound exercise of the Debtors' business judgment and is justified by the facts and circumstances of these chapter 11 cases.

- **The Non-Insider KERP is Calculated to Achieve the Desired Performance**.  The Non-Insider KERP was carefully designed by the Debtors and their advisors to ensure that key, non-insider Employees are fairly compensated and remain with the Debtors through the Plan Effective Date.  Through the Non-Insider KERP, these Employees' total direct compensation would be relatively flat year-over-year, whereas any significant reduction in that compensation might prompt those Non-Insider KERP Participants' voluntary departure during

the chapter 11 cases. Accordingly, the Non-Insider KERP and the desired retention outcome are strongly correlated.

- **The Cost of the Non-Insider KERP is Reasonable**. The Non-Insider KERP's total cost will not exceed $3,022,000. The Non-Insider KERP awards correspond to the 80th percentile of the KERP Market based on the target cost as a percent of the KERP Participants' base salaries and the aggregate payments would approximate the 62nd percentile compared to the KERP Peer Group. The KERP Participant pool includes many highly skilled, highly trained Employees necessary to the Debtors' success while in chapter 11, reinforcing the reasonableness of these costs.

- **The Scope of the Non-Insider KERP is Fair and Reasonable**. The 32 KERP Participants represent a small portion of the Debtors' total Employee base. The scope of the Non-Insider KERP is fair and reasonable because the KERP Participants' retention is necessary to the Debtors' restructuring process.

- **The Non-Insider KERP is Consistent with Industry Standards**. The Debtors and their advisors undertook a benchmarking analysis examining non-insider compensation plans of 13 companies that filed petitions since 2020, with (a) revenues between approximately $135,000,000 and $3,200,000,000 and (b) funded debt between $226,000,000 and $1,800,000,000. FTI's comparison of the Non-Insider KERP's structure and terms with this peer groups' plans confirmed that the Non-Insider KERP is consistent with market practices.

- **The Debtors Performed Due Diligence in Developing the Non-Insider KERP**. The Debtors actively sought the advice of FTI and their other advisors in designing an appropriate retention plan for their non-insider Employees. The Debtors also engaged their advisors in the selection process to ensure that no KERP Participant was an "insider" and that each KERP Participant was essential to the Debtors' ongoing business and restructuring processes.

- **The Debtors Received Independent Counsel in Developing the Non-Insider KERP**. FTI and the Debtors' legal advisors counseled the Debtors regarding the development and implementation of the Non-Insider KERP. The Special Committee also reviewed and approved the Non-Insider KERP.

41.     Because implementing the Non-Insider KERP would motivate the Debtors' Employees for the benefit of all parties in interest, the Non-Insider KERP reflects a sound exercise of the Debtors' business judgment and is justified by the facts and circumstances of these chapter 11 cases. Accordingly, the Non-Insider KERP satisfies section 503(c)(3) of the Bankruptcy Code.

#### IV.    Section 503(c)(1) is Inapplicable to the Compensation Plans.

42.    Section 503(c)(1) of the Bankruptcy Code generally prohibits payments to "insiders" made for the sole or primary purpose of inducing the "insider" to remain with a debtor's business—*i.e.*, those insider plans that are essentially "pay to stay" plans. *See, e.g., Borders Grp.*, 453 B.R. at 471. The Compensation Plans are not barred under section 503(c)(1) of the Bankruptcy Code.

##### A.    Section 503(C)(1) Is Inapplicable to the KEIP.

43.    Section 503(c)(1) of the Bankruptcy Code does not apply to performance-based incentive plans. *See, e.g., Velo Holdings*, 472 B.R. at 209 (finding an incentive-based plan alleviated the need for analysis under section 503(c)(1) of the Bankruptcy Code); *Borders Grp.*, 453 B.R. at 471 (finding that "the Debtors [had] met their burden of establishing that the [compensation program was] incentivizing, thereby alleviating the need for a section 503(c)(1) analysis").

44.    In determining if a compensation plan is primarily incentivizing, courts consider whether the plan is "designed to motivate insiders to rise to a challenge or merely report to work." *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012). "[I]ncentivizing plans with some components that arguably have a retentive effect do not necessarily violate section 503(c)." *Dana Corp.*, 358 B.R. at 572; *see also Glob. Home Prod.*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) ("The fact . . . that all compensation has a retention element does not reduce the Court's conviction that [the] Debtors' primary goal [is] to create value by motivating performance."). Rather, the focus remains on whether the plan is, on the whole, incentivizing in nature by demanding a "reach" before an award opportunity is achieved. *Dana Corp.*, 358 B.R. at 581.

45.    Because the KEIP is incentive-based, section 503(c)(1) of the Bankruptcy Code does not apply. The KEIP provides award opportunities only if the KEIP Participants satisfy

Case 24-90533 Document 1010 Filed in TXSB on 01/17/25 Page 26 of 54

threshold levels of performance tagged to metrics that are subject to considerable challenges in these chapter 11 cases. While the KEIP Participants are integral to the Debtors' restructuring process, they cannot obtain an award simply as a result of "showing up." *Cf. Hawker Beechcraft*, 479 B.R. at 315 (denying KEIP approval where lower threshold was attainable so long as debtor did not encounter "any 'whoopsies.'"). Instead, the KEIP Participants must achieve results for the benefit of all of the Debtors' stakeholders to be compensated. Accordingly, the Debtors submit that the KEIP should be approved.

**B.      Section 503(c)(1) is Inapplicable to the KERP.**

46.      Section 101(31) of the Bankruptcy Code provides that where a debtor is a corporation, insiders include any "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor . . . or (iv) relative of a . . . director, officer or person in control of the debtor." 11 U.S.C. § 101(31)(B). An employee may be an "insider" if such employee has "at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *Velo Holdings*, 472 B.R. at 208 (citations omitted). An employee's job title, alone, does not make that employee an "insider." *See Borders Grp.*, 453 B.R. at 469 (noting that "[c]ompanies often give employees the title 'director' or 'director-level,' but do not give them decision-making authority akin to an executive" and concluding that certain "director level" employees in that case were not insiders).

47.      Here, none of the KERP Participants are "insiders" under section 101(31) of the Bankruptcy Code. The KERP Participants lack discretionary control over substantial budgetary amounts as well as significant control with respect to the Debtors' corporate policies or governance. None of these Employees was hired or appointed by the Board or reports directly to the Board. Thus, although certain KERP Participants hold titles like "director," "vice president," or "chief," none is an "insider" of the Debtors, which renders section 503(c)(1) of the Bankruptcy

26

Code inapplicable to the Non-Insider KERP.  Accordingly, the Debtors submit that the Non-Insider

KERP should be approved.

**Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)**

48.     To implement successfully the relief sought herein, the Debtors request that

the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the

circumstances.  The Debtors also request that, to the extent applicable to the relief requested in

this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that

"[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until

the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr.

P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary to

achieve the transactions contemplated by the RSA and to preserve and maximize value for the

Debtors' estates and economic stakeholders.  Accordingly, the Debtors respectfully submit that

ample cause exists to justify the (a) finding that the notice requirements under Bankruptcy Rule

6004(a) have been satisfied and (b) waiving of the 14-day stay imposed by Bankruptcy Rule

6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

**Notice**

49.     Notice of this Motion will be provided to the following parties or their respective

counsel:   (a) the U.S. Trustee; (b) Stinson LLP and Proskauer Rose LLP, as counsel to

the Committee; (c) counsel to the DIP Lenders; (d) counsel to the Ad Hoc Group; (e) counsel to

the Prepetition First Lien Administrative Agent; (f) counsel to the Prepetition Second Lien

Administrative Agent; (g) the U.S. Trustee; (h) the state attorneys general for states in which the

Debtors conduct business; and (i) any party identified in section E of the *Procedures for Complex*

*Cases in the Southern District of Texas* (collectively, the "Notice Parties").  A copy of this Motion

and the Order approving it will also be made available on the Debtors' case information website

located at https://dm.epiq11.com/Wellpath.  Based on the circumstances surrounding this Motion and the nature of the relief requested, the Debtors respectfully submit that no other or further notice is required.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form annexed hereto, granting the relief requested herein and such other and further relief as the Court deems appropriate under the circumstances.

Dated: January 17, 2025
Dallas, Texas

/s/ Marcus A. Helt

Marcus A. Helt (Texas Bar #24052187)
MCDERMOTT WILL & EMERY LLP
2501 N. Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone:     (214) 295-8000
Facsimile:     (972) 232-3098
Email:         mhelt@mwe.com

-and-

Felicia Gerber Perlman (*pro hac vice* admission pending)
Bradley Thomas Giordano (*pro hac vice* admission pending)
Jake Jumbeck (*pro hac vice* admission pending)
Carole Wurzelbacher (*pro hac vice* admission pending)
Carmen Dingman (*pro hac vice* admission pending)
MCDERMOTT WILL & EMERY LLP
444 West Lake Street, Suite 4000
Chicago, Illinois 60606-0029
Telephone:     (312) 372-2000
Facsimile:     (312) 984-7700
Email:         fperlman@mwe.com
               bgiordano@mwe.com
               jjumbeck@mwe.com
               cwurzelbacher@mwe.com
               cdingman@mwe.com

-and-

Steven Z. Szanzer (*pro hac vice* admission pending)
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, New York 10017
Telephone:     (212) 547-5400
Facsimile:     (212) 547-5444
Email:         sszanzer@mwe.com

*Counsel to the Debtors and Debtors in Possession*

29

Case 24-90533   Document 1010   Filed in TXSB on 01/17/25   Page 30 of 54

## **Certificate of Service**

I certify that, on January 17, 2025, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Marcus A. Helt*

Marcus A. Helt

The exhibits to this document have been omitted due to their length. Copies of this document with the exhibits included may be obtained free of charge on the docket report maintained on the website of the Debtors' noticing agent at https//dm.epiq11.com/case/wellpath/dockets. A copy of the Notice with this exhibit included may also be requested by emailing the Debtors' noticing agent at Wellpath@epiqglobal.com

# EXHIBIT C

| Claim Name | Address Information |
|---|---|
| ALPINE CA BEHAVIORAL HOLDCO, LLC | 2120 ALPINE BLVD ALPINE CA 91901 |
| AU MEDICAL CENTER INC. | 1120 15TH STREET BA-2612 AUGUSTA GA 30912 |
| BROWARD HEALTH | MANAGED CARE DEPARTMENT 1608 S.E. 3RD AVENUE, SUITE 508 FORT LAUDERDALE FL 33316 |
| BROWARD HEALTH MEDICAL CENTER | ATTN: PRESIDENT/CEO/GENERAL COUNSEL 1800 NW 49TH STREET, SUITE 100 FORT LAUDERDALE FL 33309 |
| CRISP REGIONAL HOSPITAL | 902 7TH ST N CORDELE GA 31015 |
| FLORIDA HOSPITAL WATERMAN | 1000 WATERMAN WAY TAVARES FL 32778-5266 |
| FRESNO COMMUNITY HOSPITAL AND MEDICAL | 2823 FRESNO ST FRESNO CA 93721-1324 |
| HCA FLORIDA NORTHWEST HOSPITAL | 2801 N STATE RD 7 MARGATE FL 33063-5596 |
| MEDICAL CENTER OF CENTRAL GEORGIA, INC. | 777 HEMLOCK ST MACON GA 31201 |
| MEMORIAL UNIVERSITY MEDICAL CENTER – SAVANNAH | 4700 WATERS AVE SAVANNAH GA 31404-6220 |
| NORTHERN MARIANA ISLANDS ATTORNEY GENERAL | ATTN: EDWARD MANIBUSAN CALLER BOX 10007 SAIPAN MP 96950-8907 |
| OFFICE OF THE UNITED STATES ATTORNEY FOR THE | SOUTHERN DISTRICT OF TEXAS, WELLS FARGO PLAZA, 1000 LOUISIANA ST #2300 HOUSTON TX 77002 |
| PIEDMONT AUGUSTA HOSPITAL | 1350 WALTON WAY AUGUSTA GA 30901-2612 |
| SELECT SPECIALTY HOSPITAL – AUGUSTA INC. | 1537 WALTON WAY AUGUSTA GA 30904-3764 |
| SHAWN KITCHEN | 116 BOULEVARD OF THE ALLIES O'BRIEN COLEMAN & WRIGHT LLC PITTSBURGH PA 15222 |
| SPALDING REGIONAL HOSPITAL, INC. | 601 S 8TH ST GRIFFIN GA 30224-4213 |
| ST. JOSEPH MERCY HOSPITAL | 5301 E HURON RIVER DR ANN ARBOR MI 48106-0993 |
| STATE OF ALABAMA ATTORNEY GENERAL | ATTN: STEVE MARSHALL 501 WASHINGTON AVE MONTGOMERY AL 36104 |
| STATE OF ALABAMA ATTORNEY GENERAL | ATTN: STEVE MARSHALL PO BOX 300152 MONTGOMERY AL 36130-0152 |
| STATE OF AMERICAN SAMOA ATTORNEY GENERAL | ATTN: FAINU'ULELEI FALEFATU ALA'ILIMA-UTU AMERICAN SAMOA GOV'T, EXEC OFC BLDG UTULEI, TERRITORY OF AMERICAN SAMOA PAGO PAGO AS 96799 |
| STATE OF CALIFORNIA ATTORNEY GENERAL | CONSUMER PROTECTION SECTION ATTN: BANKRUPTCY NOTICES 455 GOLDEN GATE AVE., STE. 11000 SAN FRANCISCO CA 94102-7004 |
| STATE OF CALIFORNIA ATTORNEY GENERAL | ATTN: ROB BONTA 1300 'I' ST SACRAMENTO CA 95814-2919 |
| STATE OF FLORIDA ATTORNEY GENERAL | ATTN: ASHLEY MOODY PL 01 THE CAPITOL TALLAHASSEE FL 32399-1050 |
| STATE OF ILLINOIS ATTORNEY GENERAL | ATTN: KWAME RAOUL 100 W RANDOLPH ST CHICAGO IL 60601 |
| STATE OF INDIANA ATTORNEY GENERAL | ATTN: TODD ROKITA INDIANA GOVERNMENT CENTER SOUTH 302 W WASHINGTON ST, 5TH FL INDIANAPOLIS IN 46204 |
| STATE OF KANSAS ATTORNEY GENERAL | ATTN: KRIS W. KOBACH 120 SW 10TH AVE, 2ND FL TOPEKA KS 66612 |
| STATE OF KENTUCKY ATTORNEY GENERAL | ATTN: DANIEL CAMERON 700 CAPITOL AVE, STE 118 FRANKFORT KY 40601-3449 |
| STATE OF MASSACHUSETTS ATTORNEY GENERAL | ATTN: ANDREA JOY CAMPBELL 1 ASHBURTON PLACE, 20TH FL BOSTON MA 02108-1518 |
| STATE OF MINNESOTA ATTORNEY GENERAL | ATTN: KEITH ELLISON 445 MINNESOTA ST STE 1400 ST. PAUL MN 55101-2131 |
| STATE OF MISSISSIPPI ATTORNEY GENERAL | ATTN: LYNN FITCH PO BOX 220 JACKSON MS 39205 |
| STATE OF MONTANA ATTORNEY GENERAL | ATTN: AUSTIN KNUDSEN JUSTICE BLDG 215 N SANDERS ST HELENA MT 59601 |
| STATE OF NEW JERSEY ATTORNEY GENERAL | ATTN: MATTHEW J. PLATKIN RJ HUGHES JUSTICE COMPLEX 25 MARKET ST – PO BOX 080 TRENTON NJ 08625-0080 |
| STATE OF NEW MEXICO ATTORNEY GENERAL | ATTN: RAUL TORREZ 408 GALISTEO ST VILLAGRA BLDG SANTA FE NM 87501 |
| STATE OF NEW YORK ATTORNEY GENERAL | ATTN: LETITIA A. JAMES DEPT. OF LAW THE CAPITOL, 2ND FL ALBANY NY 12224-0341 |
| STATE OF NORTH CAROLINA ATTORNEY GENERAL | ATTN: JOSH STEIN PO BOX 629 RALEIGH NC 27602-0629 |
| STATE OF NORTH CAROLINA ATTORNEY GENERAL | ATTN: JOSH STEIN 9001 MAIL SERVICE CTR RALEIGH NC 27699-9001 |
| STATE OF TEXAS ATTORNEY GENERAL | ATTN: KEN PAXTON PO BOX 12548 AUSTIN TX 78711-2548 |
| STATE OF VIRGINIA ATTORNEY GENERAL | ATTN: JASON MIYARES 202 N NINTH ST RICHMOND VA 23219 |

WELLPATH
SERVICE LIST

| Claim Name | Address Information |
|---|---|
| STATE OF WYOMING ATTORNEY GENERAL | ATTN: BRIDGET HILL 109 STATE CAPITAL 200 W. 24TH ST CHEYENNE WY 82002 |
| THE MEDICAL CENTER | 710 CENTER ST COLUMBUS GA 31901-1527 |

**Total Creditor count  40**

**EXHIBIT D**

WELLPATH HOLDINGS, INC., *et al.,*  Case No. 24-90533 (ARP)

Electronic Mail Core/2002/Top 30 Service List

| Creditor Name | Email Address |
|---|---|
| AKERMAN LLP | michael.napoli@akerman.com |
| AKIN GUMP STRAUSS HAUER & FELD LLP | salberino@akingump.com; mbrimmage@akingump.com; kdoorley@akingump.com; taylorb@akingump.com |
| ANTONINO BILLANTE | jamie@aswtlawyers.com |
| BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP | nathan.rugg@bfkn.com; alexander.berk@bfkn.com |
| BENESCH FRIEDLANDER, COPLAN & ARONOFF LLP | jgentile@beneschlaw.com |
| BONDS ELLIS EPPICH SCHAFER JONES LLP | aaron.guerrero@bondsellis.com; bryan.prentice@bondsellis.com |
| Broward County Attorney | sandron@broward.org |
| BROWARD HEALTH MEDICAL CENTER | credentials@browardhealth.org |
| BROWARD HEALTH NORTH | credentials@browardhealth.org |
| BRYAN CAVE LEIGHTON PAISNER LLP | kyle.hirsch@bclplaw.com; jarret.hitchings@bclplaw.com |
| Buchalter, A Professional Corporation | jgarfinkle@buchalter.com |
| CAHILL GORDON & REINDEL LLP | jwishnew@cahill.com; jlevitin@cahill.com |
| CARDINALE FAYARD, APLC | paul.cardinale@cardinalefayardlaw.com; greg.fayard@cardinalefayardlaw.com; vloumber@gavrilovlaw.com; bnettels@gavrilovlaw.com |
| CLARK HILL PLC | Dbrescia@clarkhill.com |
| COKINOS \| YOUNG | cpower@cokinoslaw.com; tgibbs@cokinoslaw.com; emyles@cokinoslaw.com |
| CORRECT RX PHARMACY SERVICES, INC. | accountsreceivable@correctrxpharmacy.com |
| CROWE & DUNLEVY | mark.craige@crowedunlevy.com |
| DIAMOND DRUGS, INC. | mshawley@diamondpharmacy.com; gsleis@diamondpharmacy.com |
| DISTRICT OF COLUMBIA ATTORNEY GENERAL | oag@dc.gov |
| FAEGRE DRINKER BIDDLE & REATH LLP | kristen.perry@faegredrinker.com; joseph.argentina@faegredrinker.com |
| VARTABEDIAN HESTER & HAYNES LLP | jeff.prostok@vhh.law; blake.berryman@vhh.law |
| FROST BROWN TODD LLP | rmatthews@fbtlaw.com; pburgess@fbtlaw.com |
| GOLAN CHRISTIE TAGLIA LLP | ddloving@gct.law; sjrosenberg@gct.law; skdunkley@gct.law; ddsamz@gct.law |
| Gordon Rees Scully Mansukhani, LLP | madeyemo@grsm.com |
| HINSHAW & CULBERTSON, LLP | bzeeck@hinshawlaw.com; jshadid@hinshawlaw.com |

WELLPATH HOLDINGS, INC., *et al.,* Case No. 24-90533 (ARP)

Electronic Mail Core/2002/Top 30 Service List

| Creditor Name | Email Address |
|---|---|
| JANELLE BUTTERFIELD | john@johndevlinlaw.com |
| KATTEN MUCHIN ROSENMAN LLP | Yelena.archiyan@katten.com |
| KESSLER COLLINS, PC | Hrubin@kesslercollins.com |
| LABORATORY CORPORATION OF AMERICA | cashposters@labcorp.com |
| Law Offices of Greg W. Garrotto | jjggarrotto@msn.com; greggarrotto@msn.com |
| LINEBARGER GOGGAN BLAIR & SAMPSON LLP | dallas.bankruptcy@lgbs.com; austin.bankruptcy@lgbs.com; houston_bankruptcy@lgbs.com |
| MANIER & HEROD, PC | mcollinstrustee@manierherod.com; mbuchman@manierherod.com |
| MCCREARY, VESELKA, BRAGG & ALLEN, P.C. | jparsons@mvbalaw.com |
| MCKESSON MEDICAL - SURGICAL INC. | mms.eft@mckesson.com |
| MCLAREN GREATER LANSING | contact@mclaren.org |
| MehaffyWeber | HollyHamm@mehaffyweber.com; BlakeHamm@mehaffyweber.com |
| Munsch Hardt Kopf & Harr, P.C. | jcornwell@munsch.com; bfunk@munsch.com; arperez@munsch.com |
| NORTON ROSE FULBRIGHT US LLP | bob.bruner@nortonrosefulbright.com; maria.mokrzycka@nortonrosefulbright.com |
| OFFICE OF THE ATTORNEY GENERAL OF GUAM | administration@oagguam.org |
| Office of the Attorney General of Texas | roma.desai@oag.texas.gov; stephanie.eberhardt@oag.texas.gov |
| OFFICE OF THE UNITED STATES TRUSTEE | ha.nguyen@usdoj.gov |
| PADFIELD & STOUT LLP | carisco@padfieldstout.com |
| PARMET PC | matt@parmet.law |
| PHARMACORR, LLC | rachel.irving@pharmacorr.com |
| PHOEBE PUTNEY MEMORIAL HOSPITAL | himroi@phoebehealth.com |
| PIVOT HEALTH LAW, LLC | sgoodman@pivothealthaz.com; pivothealthaz@gmail.com |
| PRIME HEALTHCARE FOUNDATION, INC. | info@primehealthcare.com |
| PROSKAUER ROSE LLP | brosen@proskauer.com; ebarak@proskauer.com; ddesatnik@proskauer.com; ppossinger@proskauer.com |
| PUBLIC JUSTICE | jaosorno@publicjustice.net |
| Ross, Smith & Binford, PC | casey.roy@rsbfirm.com |
| SHELBY CO HEALTHCARE CORP DBA REGIONAL ONE HEALTH | kericksen@regionalonehealth.org |
| SHER GARNER CAHILL RICHTER KLEIN & HILBERT, L.L.C. | tmadigan@shergarner.com |
| SONATA SOFTWARE NORTH AMERICA, INC. | dipannita.s@sonata-software.com |
| STATE OF ALASKA ATTORNEY GENERAL | attorney.general@alaska.gov |
| STATE OF AMERICAN SAMOA ATTORNEY GENERAL | ag@la.as.gov |

WELLPATH HOLDINGS, INC., *et al.,*  Case No. 24-90533 (ARP)

Electronic Mail Core/2002/Top 30 Service List

| Creditor Name | Email Address |
| --- | --- |
| STATE OF ARIZONA ATTORNEY GENERAL | aginfo@azag.gov |
| STATE OF ARKANSAS ATTORNEY GENERAL | oag@arkansasag.gov |
| STATE OF COLORADO ATTORNEY GENERAL | attorney.general@coag.gov |
| STATE OF CONNECTICUT ATTORNEY GENERAL | attorney.general@ct.gov |
| STATE OF DELAWARE ATTORNEY GENERAL | attorney.general@delaware.gov |
| STATE OF GEORGIA ATTORNEY GENERAL | agcarr@law.ga.gov |
| STATE OF HAWAII ATTORNEY GENERAL | hawaiiag@hawaii.gov |
| STATE OF IDAHO ATTORNEY GENERAL | bankruptcy@ag.idaho.gov |
| STATE OF IOWA ATTORNEY GENERAL | webteam@ag.iowa.gov |
| STATE OF LOUISIANA ATTORNEY GENERAL | constituentservices@ag.louisiana.gov |
| STATE OF MAINE ATTORNEY GENERAL | attorney.general@maine.gov |
| STATE OF MARYLAND ATTORNEY GENERAL | oag@oag.state.md.us |
| STATE OF MICHIGAN ATTORNEY GENERAL | miag@michigan.gov |
| STATE OF MISSOURI ATTORNEY GENERAL | attorney.general@ago.mo.gov |
| STATE OF NEBRASKA ATTORNEY GENERAL | ago.info.help@nebraska.gov |
| STATE OF NEVADA ATTORNEY GENERAL | aginfo@ag.nv.gov |
| STATE OF NEW HAMPSHIRE ATTORNEY GENERAL | attorneygeneral@doj.nh.gov |
| STATE OF NORTH DAKOTA ATTORNEY GENERAL | ndag@nd.gov |
| STATE OF OHIO ATTORNEY GENERAL | trish.lazich@ohioattorneygeneral.gov |
| STATE OF OKLAHOMA ATTORNEY GENERAL | donna.hope@oag.ok.gov |
| STATE OF OREGON ATTORNEY GENERAL | attorneygeneral@doj.state.or.us |
| STATE OF PENNSYLVANIA ATTORNEY GENERAL | consumers@attorneygeneral.gov |
| STATE OF RHODE ISLAND ATTORNEY GENERAL | ag@riag.ri.gov |
| STATE OF SOUTH CAROLINA ATTORNEY GENERAL | odcmail@sccourts.org |
| STATE OF SOUTH DAKOTA ATTORNEY GENERAL | consumerhelp@state.sd.us |
| STATE OF TENNESSEE ATTORNEY GENERAL | agbankcal@ag.tn.gov |
| STATE OF UTAH ATTORNEY GENERAL | bankruptcy@agutah.gov |
| STATE OF VERMONT ATTORNEY GENERAL | ago.info@vermont.gov |
| STATE OF WASHINGTON ATTORNEY GENERAL | serviceatg@atg.wa.gov |
| STATE OF WEST VIRGINIA ATTORNEY GENERAL | communications@wvago.gov |
| STATE OF WISCONSIN ATTORNEY GENERAL | dojbankruptcynoticegroup@doj.state.wi.us |
| STINSON LLP | nicholas.zluticky@stinson.com; zachary.hemenway@stinson.com; lucas.schneider@stinson.com |
| THE WINTERS LAW GROUP LLC | jessica@thewinterslawgroup.com |
| TOGUT, SEGAL & SEGAL LLP | frankoswald@teamtogut.com |
| Troutman Pepper Hamilton Sanders LLP | evelyn.meltzer@troutman.com; dabney.carr@troutman.com; sarah.bures@troutman.com; chelsey.noble@troutman.com |
| U.S VIRGIN ISLANDS ATTORNEY GENERAL | info@usvidoj.com |
| UP HEALTH SYSTEM - MARQUETTE | upmarquette@verisma.com |
| WICK PHILLIPS GOULD & MARTIN, LLP | catherine.curtis@wickphillips.com; jason.rudd@wickphillips.com |
| Texas Attorney General's Office | kimberly.walsh@oag.texas.gov |
| MEYERS, RODBELL & ROSENBAUM, P.A. | BDEPT@MRRLAW.NET |

WELLPATH HOLDINGS, INC., *et al.,* Case No. 24-90533 (ARP)

Electronic Mail Core/2002/Top 30 Service List

| Creditor Name | Email Address |
|---|---|
| Bass, Berry & Sims PLC | pjennings@bassberry.com; eal-nimri@bassberry.com; sara.morgan@bassberry.com |
| Waldron & Schneider, PLLC | kbartley@ws-law.com |
| MADDIN HAUSER ROTH & HELLER, P.C. | jteicher@maddinhauser.com |
| LIECHTY, MCGINNIS, BERRYMAN & BOWEN, LLP | DDenny@lmlawyers.com |
| U.S. Department of Justice | cortney.robinson@usdoj.gov |
| WARNER NORCROSS & JUDD, LLP | rgiunta@wnj.com; jlauderbach@wnj.com |
| CAVAZOS HENDRICKS POIROT, P.C. | aburns@chfirm.com |
| Andrews Myers, P.C. | jjudd@andrewsmyers.com |
| OLIVER MANER LLP | jmassee@olivermaner.com; mhoss@olivermaner.com |
| John Paul DeVerna ESQ PC | jpd@mynylawyer.com |
| LANDWEHR LAW FIRM, LLC | dtlandwehr@att.net |
| MCDERMOTT WILL & EMERY LLP | dgenender@mwe.com; mkelly@mwe.com |
| CLARK HILL PLC | bfranke@clarkhill.com; ahornisher@clarkhill.com |
| BROWN NIMEROFF LLC | jnimeroff@brownnimeroff.com |
| ATTORNEY GENERAL FOR THE STATE OF MICHIGAN | damichs@michigan.gov |
| Kenneth R. Beams | kennethbeams@gmail.com |
| McBRYAN, LLC | lmcbryan@mcbryanlaw.com |
| Drew Willey | Drew@Law-DW.com |
| TYRONE GLOVER LAW | helen@tyroneglover.com |
| Tran Singh LLP | stran@ts-llp.com |
| Carlton Fields, P.A. | aweiss@carltonfields.com |
| Fishman Jackson PLLC | mralston@fishmanjackson.com |
| Bass, Berry & Sims PLC | pjennings@bassberry.com |
| STEVENSON & BULLOCK, P.L.C. | cbullock@sbplclaw.com; ecrowder@sbplclaw.com; kbedigian@sbplclaw.com |
| Thomas, Thomas & Hafer, LLP | jlucy@tthlaw.com |
| William D. Schroeder, Jr. | schroeder@jrlaw.org |
| Katers & Granitz, LLC | kraasch@katersgranitz.com |
| FAEGRE DRINKER BIDDLE & REATH, LLP | Andrew.koehler@faegredrinker.com |
| Downey Brand LLP | jdreher@downeybrand.com |