1          IN THE UNITED STATES BANKRUPTCY COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3                  HOUSTON DIVISION

4    IN RE:                        §    CASE NO. 24-90533-11
                                   §    HOUSTON, TEXAS
5    WELLPATH HOLDINGS, INC.,      §    TUESDAY,
     ET AL,                        §    FEBRUARY 18, 2025
6         DEBTORS.                 §    8:57 A.M. TO 7:57 P.M.

7
               **DISCLOSURE STATEMENT AND MOTION HEARING**

8
             BEFORE THE HONORABLE ALFREDO R. PEREZ
9               UNITED STATES BANKRUPTCY JUDGE

10

11

12      APPEARANCES:                   SEE NEXT PAGE

13      CASE MANAGER:                  TYLER LAWS

14      ELECTRONIC RECORDING OFFICER: AKEITA HOUSE

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                 935 Eldridge Road, #144
22               Sugar Land, TX 77478
                    281-277-5325
23           www.judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25         transcript produced by transcription service.

1                              **APPEARANCES:**

2

3    FOR DEBTOR:                    MCDERMOTT WILL & EMERY LLP
                                    Brad Giordano, Esq.
4                                   Felicia Perlman, Esq.
                                    444 West Lake St., Ste. 4000
5                                   Chicago, IL 60606
                                    312-372-2000
6
                                    MCDERMOTT WILL & EMERY LLP
7                                   David Genender, Esq.
                                    2501 N. Harwood St., Ste. 1900
8                                   Dallas, TX 75201
                                    214-295-8000
9
                                    MCDERMOTT WILL & EMERY LLP
10                                  Steven Z. Szanzer, Esq.
                                    Nathan Bull, Esq.
11                                  One Vanderbilt Ave.
                                    New York, NY 10017
12                                  212-547-5400

13   FOR DIAMOND DRUGS, INC.:       BONDS ELLIS EPPICH SCHAFER
                                    Aaron Guerrero, Esq.
14                                  950 Echo Lane, Ste. 120
                                    Houston, TX 77024
15                                  713-335-4838

16                                  LEECH TISHMAN
                                    John Steiner, Esq.
17                                  525 William Penn Pl., 28th Fl.
                                    Pittsburgh, PA 15219
18                                  412-261-1600

19   FOR THE UNSECURED CREDITORS    PROSKAUER ROSE
     COMMITTEE:                     Brian Rosen, Esq.
20                                  Daniel Desatnik, Esq.
                                    Ehud Barak, Esq.
21                                  Adam Farbiarz, Esq.
                                    Eleven Times Square
22                                  New York, NY 10036
                                    212-969-3000
23

24

25

```
 1                        APPEARANCES (CONT'D)

 2


 3    FOR AD HOC LENDER GROUP:          AKIN GUMP STRAUSS HAUER & FELD
                                        Scott Alberino, Esq.
 4                                      Marty Brimmage, Jr., Esq.
                                        Kate Doorley, Esq.
 5                                      Benjamin Taylor, Esq.
                                        2300 N. Field St., Ste. 1800
 6                                      Dallas, TX 75201
                                        214-969-2885
 7

 8    FOR THE STATUTORY UNSECURED       STINSON LLP
      CLAIMHOLDERS' COMMITTEE OF        Nicholas Zluticky, Esq.
 9    WELLPATH HOLDINGS, INC.,          Zachary Hemenway, Esq.
      et al:                            1201 Walnut, Ste. 2700
10                                      Kansas City, MO 64106
                                        816-842-8600
11

12    FOR THE U.S. TRUSTEE:            OFFICE OF THE U.S. TRUSTEE
                                        Susan Hersh, Esq.
13                                      515 Rusk St., Ste. 3516
                                        Houston, TX 77002
14                                      202-590-7962

15    FOR LAYLA CAPACI,                 DREW WILLEY LAW
      TEESHA GRAHAM, AND                Andrew Willey, Esq.
16    CARY MOONE:                       P.O. Box 30317
                                        Houston, TX 77249
17                                      713-739-9455

18    FOR CREDITOR MARZAN WILLIAMS:     HINSHAW & CULBERTSON, LLP
                                        John Shadid, Esq.
19                                      151 N. Franklin St., Ste. 2500
                                        Chicago, IL 60606
20                                      309-253-5896

21    FOR COBB COUNTY, GEORGIA:         VARTABEDIAN HESTER & HAYNES
                                        Jeffrey Prostok, Esq.
22                                      301 Commerce St., Ste. 3635
                                        Fort Worth, TX 76102
23                                      817-214-4990

24

25
```

1                    **APPEARANCES (CONT'D)**

2

3  FOR KRISTEN ALLRED,           HERRON LAW, APC
   VICTORIA KLEIN, AND           Matthew Herron, Esq.
4  MICHAEL DOYLE:                406 Ninth Ave., Ste. 313
                                 San Diego, CA 92101
5                                619-233-4122

6  FOR DANIEL AND GRACIENNE      MANDINA & GINSBERG, LLP
   MYERS:                        Marc Ginsberg, Esq.
7                                15500 New Barn Rd., Ste. 107
                                 Miami Lakes, FL 33014
8                                305-358-1181

9

10

11  (Please also see Electronic Appearances.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **INDEX**

2

|                      | Direct | Cross | Redirect | Recross | Further Redirect |
|----------------------|--------|-------|----------|---------|------------------|
| WITNESS:             |        |       |          |         |                  |
| BENJAMIN SLOCUM       |        |       |          |         |                  |
| By Mr. Genender      | 38     | .     | 57       | .       | 64               |
| By Mr. Hemenway      | .      | 42    | .        | 60      | .                |
| By Mr. Ginsberg      | .      | 53    | .        | .       | .                |
| By Mr. Herron        | .      | 62    | .        | .       | .                |
| TIMOTHY DRAGELIN      |        |       |          |         |                  |
| By Mr. Hemenway      | 172    | .     | 187      | .       | .                |
| By Mr. Genender      | .      | 183   | .        | .       | .                |
| By Mr. Ginsberg      | .      | 189   | .        | .       | .                |
| JACK SHADID           |        |       |          |         |                  |
| By Mr. Hemenway      | 194    | .     | .        | .       | .                |
| By Mr. Genender      | .      | 202   | .        | .       | .                |
| JAMES RICHARD SEITZ   |        |       |          |         |                  |
| By Mr. Kapp          | 228    | .     | .        | .       | .                |
| by Mr. Ellis         | .      | 229   | .        | .       | .                |
| TIMOTHY DRAGELIN      |        |       |          |         |                  |
| By Mr. Bull          | 381    | .     | 435      | .       | .                |
| By Mr. Farbiarz      | .      | 403   | .        | .       | .                |
| By Ms. Hersh         | .      | 430   | .        | .       | .                |

| EXHIBITS:              | Received |
|------------------------|----------|
| EXHIBITS 19 AND 20     | 379      |
| ECF 137-1, -2, -3      | 323      |
| ECF 1292 & 1429        | 372      |
| ECF 1386 & 1422        | 361      |

                                ***

1    **HOUSTON, TEXAS; TUESDAY, FEBRUARY 18, 2025; 8:57 A.M.**

2         THE COURT:  Please be seated.  Give me a minute

3    here.  All right.  Everyone, make sure to keep your phones

4    on mute; otherwise, I'll activate the hand-raising feature.

5         All right.  Good morning, everyone.  It is

6    Tuesday, February 18th, 2025.  We're here for the 9:00 a.m.

7    Docket.  First matter on the agenda, the only matter on the

8    agenda at 9:00 o'clock Docket is Case Number 24-90533,

9    Wellpath Holdings, Inc.

10        We have the Disclosure Statement, as well as the

11   emergency motion to extend deadlines on the Docket for

12   today.

13        So why don't we get appearances of counsel in the

14   courtroom, and then we'll get appearances of counsel on the

15   line.

16        MR. GIORDANO:  Good morning, Your Honor.  Brad

17   Giordano from McDermott Will & Emery.  I'm joined by my

18   colleagues, Felicia Perlman, David Genender, Nathan Bull,

19   and Steven Szanzer.

20        MR. ROSEN:  Good morning, Your Honor.  Brian

21   Rosen, Proskauer Rose, on behalf of the Unsecured Creditors

22   Committee.  And I'm here with my colleagues, Danny Desatnik

23   and Ehud Barak.

24        MR. ALBERINO:  Good morning, Your Honor.  Scott

25   Alberino here from Akin on behalf of the Ad Hoc Lender

1  Group.  And I'm joined in the courtroom today by my

2  colleagues, Kate Doorley, Marty Brimmage, and Ben Taylor.

3  Thank you.

4          MR. ZLUTICKY:  Good morning, Your Honor.  Nicholas

5  Zluticky of Stinson for the Statutory Committee of Unsecured

6  Claimholders.  I'm here with my colleague Zachary Hemenway.

7          THE COURT:  Nice to see you, Ms. Hersh, --

8          MS. HERSH:  Thank you, Your Honor.

9          THE COURT:  -- in person.

10          MS. HERSH:  Good morning.  Susan Hersh, United

11  States Trustee.  It's a pleasure to be here with you.  Thank

12  you.

13          MR. WILLEY:  Good morning, Your Honor.  Andrew

14  Willey on behalf of Layla Capaci, Teesha Graham, and Cary

15  Moone, the claimants referred to in the Disclosure

16  Statements as the personal injury claimants.

17          MR. GUERRERO:  Good morning, Your Honor.  Aaron

18  Guerrero on behalf of creditor Diamond Drugs, Inc.  Also

19  appearing remotely with me is my cocounsel, John Steiner,

20  with Leech Tishman.

21          THE COURT:  All right.  Does anyone on the

22  Line wish to make an appearance?

23          MR. SHADID:  Jack Shadid on behalf of creditor

24  Marzan Williams.

25          MS. NANDGAONKAR:  Good morning, Your Honor.

1    Rujuta Nandgaonkar of Mitchell Leeds.

2              THE COURT:  I'm sorry.  Would you say your name

3    again.  We're getting a little background.

4              MS. NANDGAONKAR:  Sure.  Rujuta Nandgaonkar of

5    Mitchell --

6              THE COURT:  All right.  One more time, please.

7              MS. NANDGAONKAR:  Sure.  Rujuta Nandgaonkar of

8    Mitchell Leeds.

9              THE COURT:  Anyone else?

10             Mr. Prostok, I think you might be muted.

11             MR. PROSTOK:  Good morning, Your Honor.

12             MR. HERRON:  Good morning, Your Honor.  Matthew

13   Herron appearing on behalf of Allred, Klein, and Doyle.

14   Thank you.

15             THE COURT:  Thank you, Mr. Herron.

16             MR. PROSTOK:  Your Honor, can you hear me?

17             THE COURT:  I can hear you now.

18             MR. PROSTOK:  Thank you, Your Honor.  Jeff Prostok

19   on behalf of Cobb County.

20             THE COURT:  All right.

21             Mr. Ginsberg?

22             MR. GINSBERG:  (No audible response.)

23             THE COURT:  All right.  I am going to mute the

24   lines because we're getting some background.  There's a lot

25   of people on.  So if you would, please hit five star, and I

1    will -- I'll let you back in to the call.

2            Also, would everyone please make sure to go to my

3    website and make an appearance because that's the way we

4    keep track of official appearances, through the website.

5            All right.  So I'm going to mute the lines.  And

6    then if you hit five start, I will unmute you.

7            So Mr. Ginsberg, if you want to make an

8    appearance?

9            MR. GINSBERG:  Yes, Your Honor.  Yes, Your Honor.

10   Marc Ginsberg.

11           THE COURT:  All right.  Thank you, sir.

12           All right.  So I'm going to go ahead and mute the

13   lines, and just hit five star.  All right.  Okay.

14           Mr. Giordano?

15           MR. GIORDANO:  Good morning, Your Honor.

16           THE COURT:  Good morning.

17           MR. GIORDANO:  And Brad Giordano of McDermott Will

18   & Emery on behalf of the Debtors.

19           Your Honor, I know we have a large agenda for

20   today.  I'll be handling the Disclosure Statement, which is

21   at item one on the agenda, and I expect that that will

22   dovetail or subsume to some extent the Committee's emergency

23   extension motion at item number two.

24           As I mentioned, I'm joined by a number of my

25   colleagues in the courtroom today, but we also have Tim

1  Dragelin at FTI, who's the company's CFO, and Christian

2  Tempke at Lazard, the company's investment banker, both of

3  whom are available to testify to the extent Your Honor deems

4  it necessary for various aspects of the Disclosure

5  Statement.

6          And finally, we have Ben Slocum, Wellpath CEO, in

7  the courtroom.  And Mr. Slocum will testify to the reasons

8  for the Debtors' solicitation schedule.

9          Your Honor, as you are aware, we commenced these

10  Chapter 11 cases on November 11th, 2024, with an RSA

11  supported by the company's first lien and second lien

12  lenders.

13          The company is a large, complex organization at

14  the time of filing, having over 1,300 employees and seeing

15  approximately 200,000 patients on a daily basis.  Ensuring

16  that that company, with those operations -- and again, over

17  a million patients are seen by this company a year -- was

18  able to enter Chapter 11 with a clear Line of sight to a

19  restructuring and a path out of Chapter 11 so that that

20  critical care that the company provides is not interrupted

21  and the value of the company is not degraded was not easily

22  achieved.

23          The process that we put in place involved two

24  primary initiatives, the first of which was accomplished on

25  January 27th with the closing of the Debtors' Recovery

1    Solutions sale.

2         The second part of that process was a marketing

3    initiative for the Debtors' corrections business, which was

4    backstopped by a plan of reorganization supported again by

5    the first and second lien holders.

6         Our solicitation motion was filed at Docket

7    Number 567 on December 20th, 2024.  And the Disclosure

8    Statement that we initially filed with that motion included

9    toggle features because at the time, there was uncertainty

10   as to whether we would be proceeding with a sale of assets

11   under 363 for the corrections assets, or if we would be

12   proceeding with a plan of reorganization, or subsequent to

13   that initial filing, the bid deadline for the correction

14   sale passed on January 27th without the Debtors receiving a

15   qualified bid.

16        Given the lack of a qualified bid, after

17   consultation with the various consultation parties and

18   notably the Committee as part of that, the Debtors canceled

19   the auction for the corrections business and pivoted to the

20   current plan process.

21        After we filed the initial versions of the plan

22   and Disclosure Statement again on December 20th, the Debtors

23   received formal and informal comments from various

24   constituents to the plan.  And we also received several

25   formal objections to the solicitation motion and the

1  Disclosure Statement.

2       Those are found -- I won't list all of the titles,

3  but those are found at Dockets number 993, 1004, 1392, 1007,

4  1012, 1048, 1418, 1271, and 1411.

5       Responding to those objections and those comments,

6  we filed an amended plan and Disclosure Statement on

7  February 10th that included a number of substantive

8  revisions, most notably taking out the toggle features that

9  were present in the first drafts, thereby giving and

10  clarifying the treatment for various stakeholders.

11       Additionally, the revised versions included

12  numerous comments from the Office of the United States

13  Trustee, who we consulted with on a number of occasions to

14  narrow and limit the issues that office has with our

15  solicitation materials and the plan.

16       And I would be remiss if I didn't take the time to

17  thank Ms. Hersh for her efforts there.  We talked with her

18  quite a bit, and I think, you know, the documents are in

19  much better shape because of her engagement with the

20  Debtors.

21       Unfortunately, despite inviting comments on

22  numerous occasions, the Committee declined to provide

23  comments on the Disclosure Statement in the plan except for

24  their objections until approximately 24 hours before this

25  hearing -- so two months without helping us resolve their

1    issues.

2            And the reason for that is because the Committee

3    wants to delay the process to gain negotiation leverage.

4    But for all the discussion you're going to hear today about

5    the need for delay from the Committee, the company currently

6    has one path to exit bankruptcy as a going concern.

7            And that path includes an up to $55 million exit

8    facility of committed capital that was sized to support the

9    business on our current schedule.  Getting that amount of

10   capital was hard won.

11           And the Committee's delay at any cost strategy

12   does nothing but increase the size of capital necessary to

13   stand up the go-forward business without providing any

14   incremental dollars to do so.

15           The Committee schedule, importantly, would also

16   endanger the RSA and critical health care operations of the

17   business, not to mention would endanger the recovery to a

18   large number of their own constituents who stand to have

19   contracts cured and paid in full and go-forward trade

20   relationships with the Debtors.

21           And, Your Honor, that group is not as vocal as the

22   personal injury claimants in this case because they have no

23   reason to be as vocal.  They do well under our plan, but

24   that doesn't mean that we should just discount their

25   interests because they're not standing up and objecting.

```
1              Your Honor, despite the lack of help, we did try
2    to narrow the field of issues.  The most recent drafts of
3    the plan and Disclosure Statement and solicitation materials
4    were filed early this morning at Docket 1430 through 1432.
5              And the collective revised drafts include a number
6    of substantive revisions that the Debtors believe clarify
7    the recovery for the various constituencies under the plan.
8              Some of the more salient features is that there is
9    now a liquidating trust initial funding of $3 million that,
10   you know, the liquidating trustee can determine whether to
11   use to fund causes of action or to distribute to unsecured
12   claimants.
13             THE COURT:  I thought it was pretty clear that it
14   was only to fund the administrative cost of the liquidating
15   trust.  There's no provision in there to fund any creditor
16   recovery.
17             MR. GIORDANO:  For the 3 million?
18             THE COURT:  Yes.
19             MR. GIORDANO:  Okay.  I think that -- right.  I
20   think that we can --
21             THE COURT:  I mean, is that correct?
22             MR. GIORDANO:  -- I think we can clarify that.  I
23   believe --
24             THE COURT:  No, I think they're saying correct,
25   that there's no funding for unsecured creditors.
```

1        MR. GIORDANO:  Okay.  Understood.  The liquidating

2   trust causes of action comprise potential claims and causes

3   of action among other things that against non-go-forward

4   trade and certain of the Debtors' former contractual

5   counterparties with a headLine number of $10 million.

6        And that's going into trust, and that's at least

7   $10 million.  We actually think it's likely higher than

8   that.

9        It also includes a contingent value right, CBR,

10  which is the right to have a cash distribution in the event

11  of the emerging business generates cash flow above certain

12  thresholds and there's -- or there's a whole company

13  liquidity event for reorganized Wellpath, provided again

14  that it exceeds a certain threshold amount.

15        THE COURT:  Is the cash flow consideration in the

16  plan?  Because I only saw the sale above two times the

17  investment.  That's the only thing that --

18        MR. GIORDANO:  There will be additional disclosure

19  of the CVR through the plan supplement document.

20        THE COURT:  Okay.  But that's not in the plan

21  that's going out for solicitation.

22        MR. GIORDANO:  Correct.  Additionally, the Debtors

23  have modified the solicitation packages to ensure they are

24  easy to read and understand.

25        And acknowledging the issues the Debtors have

1  faced in ensuring incarcerated individuals receive notice

2  and can exercise their rights, the Debtors made a number of

3  changes to the solicitation materials again with the benefit

4  of United States Trustee's comments.

5          Among other things, we have agreed to accept as a

6  proof of an election opt out to the third-party release any

7  written communication provided by an incarcerated individual

8  until April 30th, 2025, approximately 30 days after the

9  confirmation hearing.

10         THE COURT:  Including anything that's already been

11  filed by any incarcerated individual?

12         MR. GIORDANO:  Yes.  That's a new indication of

13  their intent to opt out.  But we also are carving out of the

14  releasing parties anybody who has filed a lift stay motion

15  or an automatic stay objection.

16         THE COURT:  Okay.  But there were a lot of letters

17  that were filed that had to determine how to classify, and

18  they could have been a lift stay, they could have been

19  approved claim, they could have been one thing, they could

20  have been the other.

21         So we'll -- I guess we'll have to go revisit all

22  of those letters because some of them were not classified as

23  motions to lift stay.

24         MR. GIORDANO:  That's fair.  And the intention

25  though is to make sure that if somebody has indicated that

1  they don't want to be a releasing party, that they are not a

2  releasing party.

3           THE COURT:  Okay.

4           MR. GIORDANO:  So --

5           THE COURT:  What about minors?

6           MR. GIORDANO:  Say it again.

7           THE COURT:  What about minors?

8           MR. GIORDANO:  I don't believe there's any

9  distinction between minors and other individuals in the way

10 we've drafted these documents.

11          THE COURT:  Yeah.  I'm going to have a really

12 difficult time approving anything with respect to minors or

13 anybody who's incompetent.  So I've done that in other

14 cases.

15          MR. GIORDANO:  Understood, Your Honor.  And we'll

16 discuss that, and I imagine that's a fairly easy

17 clarification that we can make to the documents.

18          In addition to those changes, we also included a

19 number of frequently asked questions to help people on the

20 ballot, you know, navigate through what the ballot means and

21 how to fill it out.

22          We changed and I believe made it much more easily

23 identifiable where the opt-out mechanic is and how to fill

24 that portion of the ballot out.  And we have much more

25 comprehensible voting instructions that again, we worked to

1    develop with the United States Trustee's Office.

2          In response to the party's various feedback, the

3    Debtors have also supplemented their Disclosure Statement to

4    include additional information regarding a number of other

5    things.

6          I'll list a few of them, but the sale

7    transactions, the restructuring transactions, expected

8    recoveries under the plan, value ranges for the liquidating

9    trust, the appointment of independent directors, the Special

10   Committee investigation, risk factors related to the

11   liquidating trust, and the CVR risk factors related to

12   retained causes of action in general, and tax consequences

13   for the restructuring transactions.

14          And as described in greater detail in the omnibus

15   reply that we filed at 1425 last night, the Debtors believe

16   these changes resolve many of the open objectors' issues.

17          But regardless, the revised documents meet the

18   standard for adequate disclosure under 1125.  Indeed, the

19   revised Disclosure Statement contains approximately 150

20   pages of information, and we think that it appropriately

21   balances the need for substantial disclosure with the

22   comments from many of the objecting parties that we make the

23   disclosure simple to understand.

24          And there's a natural tension between adding pages

25   and pages of disclosure on, you know, everything that the

1   company has ever done in the lead up to the Chapter 11 and

2   having parties take that information, digest it, and

3   understand it.

4          All of that adds up to information sufficient for

5   the members of the various voting classes to make an

6   informed decision on whether to support the plan or not.

7   And I think that's the most important thing to remember

8   today.

9          There's going to be a lot of discussion, but we

10  are not here today seeking confirmation of a plan.  While we

11  expect that the plan process might be contested, although

12  I'm still hopeful that we might not, we submit that the vast

13  majority of the objections to the Disclosure Statement

14  brought forward today are actually plan confirmation

15  objections and are more appropriately heard at the plan

16  confirmation hearing.

17         Moreover, those objections do not render the plan

18  patently unconfirmable on its face.  That is a low bar to

19  clear based on impossibility of that plan being confirmed.

20  And the plan that we have on file, I submit, clears that

21  bar.

22         And additionally, I believe the Debtors will be

23  able to meet the requirements for confirmation at the

24  appropriate time.

25         With that, at the end of today's hearing, Your

1   Honor, we're seeking that you approve the Disclosure

2   Statement, the solicitation materials, the ballots, and the

3   requisite notices, and that we schedule a March 31st, 2025,

4   confirmation hearing on the plan, and establish March 26th

5   as the deadline for objections to confirmation to the plan.

6           Your Honor, I do not believe testimony is

7   necessary to determine whether Disclosure Statement meets

8   the adequate information standard, as that's a legal

9   determination.

10          But given that we know that the Committee has had

11  issues with our solicitation schedule, we would like to call

12  Ben Slocum, Wellpath's CEO, to the stand to describe why the

13  timeline for solicitation and consideration of a plan is

14  critical to maximizing value for these Debtors.

15          THE COURT:  Okay.  Why don't I let other people

16  make opening statement and then we'll call Mr. Slocum.

17          MR. GIORDANO:  Thank you, Your Honor.

18          THE COURT:  Thank you.

19          MR. ALBERINO:  Good morning, Your Honor.  Scott

20  Alberino again.  I try not to put my reading glasses on.  I

21  also recognize the Debtors don't seem to have a lot of

22  friends in the courtroom, and I thought maybe I could say a

23  few words from my perspective representing the ad hoc

24  lender.

25          So we filed a short statement last night in

1  support of approval of the Disclosure Statement and in

2  opposition to the Committee's request/objection to the

3  proposed solicitation timetable.

4          Now, Your Honor, I think the Committee has filed a

5  lot of paper here in an attempt to slow down the Debtors'

6  march to exit Chapter 11.  The Debtors said on day one that

7  they intended to move with speed, and they have.  And in

8  many instances, with the approval of this Court and with the

9  Committee.

10         And while there's always a balancing act, you

11  know, in Chapter 11 cases about finding the right mixture of

12  speed and process, we believe the Debtors here are trying to

13  walk that tightrope with the best interests of the estate in

14  mind.

15         And it's for good reason, and I know you'll hear

16  from Mr. Slocum soon through testimony, but the Debtors

17  operate in an unforgiving business environment.  They have

18  local, state, federal customers, all of whom have the

19  ability to put our contracts out for rebid and not renew our

20  contracts and to not award us new contracts, all because the

21  Debtors are in bankruptcy right now.

22         The fact that we've gotten this far holding this

23  together, I think is a testament to the remarkable job being

24  done by the Debtors' management team, who I personally know

25  have been crisscrossing the country since the company filed,

1  you know, to reassure customers that we're on track to

2  emerge with the plan the company entered Chapter 11 with.

3        The other reason why speed is important, Your

4  Honor, is because, as Mr. Giordano said, the Debtors' size,

5  the DIP financing, and the exit financing to meet the RSA

6  milestones.

7        Delay in these cases increases administrative

8  expenses, the likelihood of the Debtors being asked to

9  provide more cash collateral to sureties and insurers, and

10 the risk of the Debtors losing contracts.

11       And all these factors contribute to the risk that

12 the 55 million of equity financing that we've committed to

13 just may not be enough when the dust settles here.  And

14 there could be no assurance that my clients, the ad hoc

15 lenders, will be willing to entertain putting in more

16 capital, much less doing so with the Committee serving

17 subpoenas this weekend on every member of my ad hoc group as

18 part of a discovery fishing expedition.

19       Mr. Brimmage may address that later, Your Honor.

20 This is not a threat that we're going to pull financing.

21 It's just an underwriting reality.  It's a tough business.

22 The negotiation on the equity financing was very difficult,

23 and we're committed to it, but we agreed to it based upon a

24 certain timetable given the underwriting risk associated

25 with the business.

1    Now Your Honor, as representatives of the Debtors'
2  first and second lien lenders in these cases, you know, we
3  did negotiate a plan, an RSA, and a DIP financing, equity
4  financing that we thought would maximize value for all
5  stakeholders.
6    The RSA milestones are designed to allow the
7  company to exit by the spring to maximize our chances of not
8  losing contracts heading into the second quarter, you know,
9  later on in this year.
10    While we recognize the Committee is not satisfied
11  with the plan's proposed treatment of unsecured creditors,
12  at the same time, the Committee must recognize that the
13  Debtors cannot reorganize without a massive capital
14  infusion.
15    And the parties that often write the check will
16  require terms and conditions, and we have been thoughtful
17  about what those terms and conditions should be.  And as
18  Mr. Giordano pointed out as well, we believe many of the
19  Committee's constituencies are beneficiaries that stand to
20  benefit under the plan through contract cures, an assumption
21  of practice group identification obligations, in addition
22  to, you know, keeping a massive player in the market in
23  business, continuing to do business with our service
24  providers, as well as, you know, goods providers.
25    Now just a few more remarks, Your Honor, but I was

1   hoping that we would not be sitting here today asking you to

2   rule on a contested Disclosure Statement.

3          As you know, the ad hoc lender group has a track

4   record in this case of working hard to reach consensual

5   resolutions.  We did it on the DIP.  We did it with the

6   Recovery Solution sale.

7          And when you move fast, everyone has to be willing

8   to compromise.  My clients have held up their end of the

9   bargain in these cases, and the Committee did, too.  We did

10  reach deals with them.

11         Unfortunately, it appears our luck has run out,

12  you know, despite efforts to reach agreement, and efforts

13  which I assure you will continue even if the Disclosure

14  Statement is approved today.

15         But one final point, Your Honor, it struck me that

16  while we're sitting here today kind of stuck in the weeds

17  with motions, objections, subpoenas, discovery, let's not

18  forget this exercise here is not academic.

19         The Debtors are a huge business.  I'm going to

20  correct Mr. Giordano, but they actually employ nearly 10,000

21  full-time and part-time employees.  And their workers serve

22  over 200,000 patients per day across the country in hundreds

23  of facilities.

24         There are jobs at risk.  There are patients at

25  risk.  The Debtors did not come into these cases unprepared.

1   They came in with a plan, with the money, and with the

2   process designed to reorganize the Debtors in accordance

3   with the requirements of the Bankruptcy Code.

4          I think having submitted a Disclosure Statement,

5   which, you know, we submit, Your Honor, easily meets the

6   standards under Section 1125 of the Bankruptcy Code, is not

7   even close to patently unconfirmable, and which respects the

8   rights of impaired classes, we would urge the Court to

9   approve the Disclosure Statement and the proposed schedule.

10  Thank you, Your Honor.

11         MR. ZLUTICKY:  Good morning, Your Honor.  It's

12  been called a lot of names in the last ten minutes, but I'm

13  Nick Zluticky here for the Statutory Committee of Unsecured

14  Claimholders.

15         We represent a varied group of unsecured

16  claimholders.  It includes contract claimholders, some of

17  the customers that the Debtor refers to.  It also includes

18  tort claimants that have suffered serious injuries.  Some

19  have lost loved ones.

20         And they contend, and the Debtors may dispute, but

21  they contend that the Debtors are responsible for that or

22  the professional corporations that have relationships with

23  the Debtors.

24         And one of the things that I think we've heard

25  this morning is a bunch of discussion about the business and

1  how the business needs to survive and we need to move

2  forward because the business and the people that they

3  employ.

4         But I didn't hear a single word about the people

5  who were harmed and what's going to happen to them if we

6  move along this timeline.  And we are not here to create

7  leverage.  We are not here to slow down the process for the

8  sake of slowing down the process.

9         We are here to make sure that all of our

10 constituents, a large majority of which are incarcerated

11 individuals, have appropriate due process in this case.

12        This solicitation procedure does not contain the

13 requisite due process that our constituents need in order to

14 be able to evaluate a plan, vote on that plan, and have

15 their ballot submitted.  That is completely different from

16 the opt out.

17        They -- I realize they pushed the opt-out date,

18 which we'll get to later.  We're talking right now about

19 soliciting a claim.  On a fast track, they want a hearing on

20 March 31st with the vast majority of the claim pool here

21 being incarcerated individuals.

22        They want a hearing before the claims bar date.

23 How is that due process?  I want to be clear that we are

24 willing -- and this Committee has shown we are willing -- to

25 negotiate with the Debtors and the ad hoc lender group where

1  we can to come to consensual resolution.

2         But when we are faced with the choice of agreeing

3  to a timeline that we know will hurt the vast majority of

4  our creditors, I'm sorry, it's not leverage.  It's our

5  fiduciary duty to our clients.

6         And it's because our sincere belief that they

7  deserve due process and day in court.  And we'll get into

8  all the issues with the Disclosure Statement throughout the

9  presentation of the evidence, and then we'll certainly have

10  argument at closing.

11         But I did want to state that while we do

12  appreciate the work that has been done on the solicitation

13  procedures, supplements of the Disclosure Statement, we're

14  not here for leverage.  We're here to protect our clients.

15  And I think it's important that everybody in this courtroom

16  today remember the people, the human element of this.

17         There are thousands of people who've been hurt,

18  and they deserve their day in court.  We're going to hear a

19  lot this afternoon about that on the motion for stay

20  extension.  And so I want us to just all be careful that we

21  don't just completely separate the two.

22         They're not both in separate vacuums.  It all fits

23  together.  And we'll get into the releases.  Happy to talk

24  about that at a later time this morning.  I think that from

25  the Committee's perspective, we believe that this Disclosure

1    Statement is inadequate.

2           We do believe that this plan is patently

3    unconfirmable.  The releases are not proper.  The -- this

4    does not meet the best interest test.  It's not even close.

5    There's a great number of assets that simply do not go to

6    the liquidating trust that are unencumbered that would be

7    available in a Chapter 7.  And these creditors deserve

8    better, and that's what we're here to make sure they get.

9           THE COURT:  All right.  Does anyone else wish to

10   make an opening statement?

11          Ms. Hersh?

12          MS. HERSH:  Thank you, Your Honor.  I'll just make

13   a couple observations briefly.  Just a couple of things with

14   respect to the disclosure and the issues before the Court to

15   kind of frame them for the Judge.

16          With respect to disclosure, as I mentioned in my

17   papers, I do believe there's not adequate information for

18   unsecured creditors to believe -- to understand the value of

19   what they're receiving, although I think the Debtor has

20   actually said that they might get zero.

21          So that does -- will come into other issues as

22   that will parlay into when we get into the consent issues

23   about opt-out releases.  But there's that issue.

24          With respect to solicitation, a couple things.  I

25   want to tell -- two things.  One is I appreciate very much

1  the Debtors' counsel working with me to try to make these

2  documents more readable.

3          Way back even in the bar date order and

4  procedures, we were trying to find language that real people

5  could understand.  We know what third-party release is, but

6  nobody else knows what that terms of if it's just sitting in

7  pages of bold type.

8          So we tried a little bit to try to clarify some of

9  that.  And I appreciate that it does not necessarily solve

10  all of the United States Trustee's problems about

11  solicitation, but wanted to let the Judge know that we

12  reserve our rights at confirmation time.

13          But I do think that many of those improvements are

14  huge improvements to the process, and I hope that they

15  continue in ballots in many more cases going forward.

16          So the challenge with solicitation really are two.

17  One is that -- and it's hard to figure out, but here's the

18  story.  You have known creditors.  They're scheduled.

19  They're scheduled as contingent, unliquidated, or disputed.

20          So the Debtor has determined they're not entitled

21  to vote until they file a proof of claim.  So they're not

22  getting plan station packages; they're getting a notice of

23  hearing and an opt-out form.  They might be creditors.

24          I believe that they're creditors that are entitled

25  to notice and an opportunity to vote because they could file

1   their proof of claim at any time.  The challenge here is

2   that we have a bar date of April the 9th.

3           I don't think they can be disregarded.  And I

4   think that when you look at solicitation and to be conscious

5   of the fact that you have this group of known creditors that

6   the Debtors scheduled that are not given an opportunity to

7   vote on the plan, okay, in order to understand everything

8   that's going further.

9           They're just getting that opt-out form which is a

10  little bit in the notice of hearing in the abstract as

11  opposed to in context.  The -- so there's that issue.

12          And then there's certainly an issue with respect

13  to time.  And I know we got here because we were

14  accommodating various people.  But you do have the issue of

15  time.  This is a complicated case.  It is a fat package

16  that's coming or a very thin package that's coming.

17          But I don't know logistically that it's going to

18  be -- it's going to be an issue about whether or not people

19  can get it back on time in order to actually exercise their

20  rights in accordance with due process with information that

21  they need.

22          Lastly, we can go -- I'll go through this at the

23  end, but we obviously think that on a policy matter, the opt

24  outs don't work particularly in this case, that the silence

25  will not be considered as consent.  It's confusing.

1          It's not clear.  You've got the time issues, and

2    you've got people who've got not the packages.  So we can go

3    through that at the end.  But I just wanted to tell the

4    Judge that I do appreciate the improvements in solicitation,

5    but the failure to return even those forms we don't believe

6    would be consent.  And I'll reserve my rights at the end.

7    Thank you.

8          THE COURT:  Thank you.  All right.

9          Does anyone on the phone wish to make an opening?

10          Oh, come on.  Come on forward.  Hold on.  One more

11   person in the courtroom.

12          MR. WILLEY:  Thank you, Your Honor.  Andrew Willey

13   for the personal injury claimants.  And I just want to

14   second what the counselor for the UCC stated that remind the

15   Court that this case involves 1,500 pending lawsuits of

16   people in jail who have said that the medical care that they

17   received was inadequate.

18          This is not a business that operates in the free

19   market.  Their customers, the incarcerated, do not get to

20   choose.  They don't get to walk into a clinic and say, I

21   want a minimum standard of care, and the free-market

22   pressures that we enjoy in America are going to guide them

23   to making the right choices.

24          The people that are receiving the care are forced

25   to do it.  And the reality is they can't get care that any

1   of us would want for any of ourselves, our grandparents, our

2   children.  And they're standing up and saying, we want to be

3   heard.

4          We stand here ready to work.  We've been in

5   communication with Wellpath's counsel asking for feasibility

6   and confirmability through the financial projections that

7   they sent that has grossly underestimated how much they're

8   going to have to pay in these settlements, not to mention

9   the liability insurance that there's been testimony in this

10  case previously that they're not acquiring.

11         What has been put in this Disclosure Statement for

12  their actual capability to get that insurance and how much

13  they're going to have to pay in those settlements has been

14  grossly underestimated, which means their financial

15  projections need to be looked at.

16         We're going to be digging in and getting financial

17  economists, if we have the time, into their -- we've

18  requested their financial statements, their models, and we

19  are going to -- we are prepared to figure out their

20  feasibility and confirmability of those financial

21  projections once the details are given.

22         And we don't have that, so we join to ask that the

23  Disclosure Statement not be granted today.  Thank you.

24         THE COURT:  All right.  Anyone else in the

25  courtroom?

1          All right.  How about on the line?  Anyone else

2    wish to make an opening?

3          MR. GINSBERG:  Yes, Marc Ginsberg if you can hear

4    me.

5          THE COURT:  I can hear you.

6          MR. GINSBERG:  Yes, Your Honor.  Marc Ginsberg on

7    behalf of Gracienne and Daniel Myers.  Your Honor, it

8    appears that my clients are the only private-paying

9    psychiatric patients who are at the -- one of the Debtors'

10   private hospitals.

11          And there is no consideration in this plan, in

12   this Disclosure Statement as to their type of claim.  I'm

13   referring to Page 1431-1, Page 27.  The Debtor is proposing

14   approximately of relief of $10 million for all possible

15   claims.

16          I just -- that's point number one I wish to make,

17   which is wholly inadequate given the number of claims that

18   there are and to disclose it that way.  I've been a lawyer

19   for 44 years, although I don't practice in bankruptcy.

20          I've been in Bankruptcy Court when I'm trying to

21   get a bankruptcy stay vacated for a case.  I have read this

22   Disclosure Statement multiple times, and I don't know what

23   an opt-out form means.  And I've been a lawyer for 44 years.

24          What would my clients be opting out of?  I don't

25   see where that's described in this Disclosure Statement.

1   And if I don't understand it, I don't believe that laypeople

2   will understand what that form entails.  So I think at least

3   as to that, there needs to be clarification.

4          And the other point I wish to make, Your Honor, is

5   that given the Debtors' tactical decision in years past to

6   purchase what I'm going to call deceptive liability

7   insurance so as to procure these contracts they got around

8   the country from these corrections departments as well as at

9   private facilities, I think at a minimum the Disclosure

10  Statement should include that the available insurance limit

11  that should have been available should be included in the

12  amount that will be expected in the plan upon its

13  presentation for confirmation.  Thank you for your time.

14          THE COURT:  Thank you, sir.

15          Anyone else on the line?  All right.

16          Mr. Giordano?

17          MR. HERRON:  Yes, Your Honor.

18          THE COURT:  Oh, I'm sorry.  Go ahead, Mr. Herron.

19          MR. HERRON:  Yes, Your Honor.  Matthew Herron

20  again.  Your Honor, I did receive and look through what the

21  Debtors filed yesterday in terms of the response, and I can

22  say that we don't need to add anything with regard to the

23  release with the other presentations that have been made,

24  but we've been directed toward a plan article 18127 sort of

25  saying we're going to tell you about your contract being

1   rejected or accepted later.

2           Our request is that that be included now.  It's a

3   substantial claim.  It's -- and we're not sure what the

4   Debtors' position is.  And having this at the last minute,

5   it's going to be kind of impossible for us to understand

6   where we fit going through the process.  So that's our

7   request.

8           THE COURT:  Thank you.  My understanding is that

9   the plan supplement will address this, and that the plan

10  supplement will be filed five business days before the

11  voting deadline is my understanding.

12          Is that the state of play currently?

13          MR. GIORDANO:  Yes, Your Honor.

14          THE COURT:  Okay.

15          All right.  Anyone else wish to be heard?

16          All right, Mr. Giordano.

17          MR. GIORDANO:  Your Honor, I'm just rising to cede

18  the podium to my colleague, David Genender, who --

19          THE COURT:  Okay.

20          MR. GIORDANO:  -- will put on the witness.

21          THE COURT:  Before -- Mr. Genender, before you get

22  on, let me ask Mr. Giordano one or two questions because --

23  they raised.

24          So, my -- and this addresses Ms. Hersh's point --

25  so my understanding is in order to vote, you have to be a

1   claimholder on March 13th.

2          MR. GIORDANO:  That's correct.

3          THE COURT:  Okay.

4          MR. GIORDANO:  And Your Honor --

5          THE COURT:  So that's, you know, assuming this --

6   so and then you have a week after the Disclosure Statement

7   order is entered to get it out.  So if you get it out

8   sometime next week, that's basically -- they have to have an

9   allowed claim on that date.

10          MR. GIORDANO:  That's correct, for them to receive

11   the solicitation package.  Yeah.  I'm happy to address more

12   of this.

13          THE COURT:  No, no, no, no.  I just want to make

14   sure that I have it correct.  So it's really not the 26th;

15   it's really the 13th.

16          MR. GIORDANO:  There is a -- it takes time to --

17   this particular solicitation process takes quite a bit of

18   time so --

19          THE COURT:  But that's -- I think we're talking

20   two different things.  Getting out the solicitation process

21   is to five, you know, five business days after I enter the

22   order.

23          MR. GIORDANO:  Right.

24          THE COURT:  But in order to vote, you have to have

25   an allowed claim as of the 13th.

1          MR. GIORDANO:  Yes, yes.

2          THE COURT:  Okay.  Because otherwise, you won't be

3   allowed to vote.

4          MR. GIORDANO:  Understood.

5          THE COURT:  Okay.

6          MR. GIORDANO:  Yes.

7          THE COURT:  Do you know, does somebody know as of

8   today how many allowed claims there are from any prisoners?

9          MR. GIORDANO:  I do not have that figure with me.

10  I'm sure we can, you know, look, and get you an estimate

11  obviously.

12         THE COURT:  Okay.

13         MR. GIORDANO:  Most of the --

14         THE COURT:  I would imagine --

15         MR. GIORDANO:  -- medical malpractice claims --

16         THE COURT:  Very little.

17         MR. GIORDANO:  -- are contingent, unliquidated,

18  and disputed.

19         THE COURT:  Oh, okay.  All right.

20         MR. GENENDER:  Good morning, Your Honor.  The

21  Debtors would call Ben Slocum -- not would call; we do call.

22         THE WITNESS:  Good morning, Judge.

23         THE COURT:  Good morning.

24         THE WITNESS:  Thank you, Your Honor.

25         THE COURT:  Could you raise your right hand,

1   please.

2              THE WITNESS:  Yes.

3              THE COURT:  Do you solemnly swear or affirm to

4   tell the truth, the whole truth, and nothing but the truth?

5              THE WITNESS:  Yes.

6              THE COURT:  Thank you.

7              Go ahead, Mr. Genender.

8              MR. GENENDER:  Thank you, Your Honor.

9              THE COURT:  It's very weird to have a different

10  Mr. Genender.

11             MR. GENENDER:  I hear that a lot.

12                     DIRECT EXAMINATION

13  BY MR. GENENDER:

14  Q    Can you tell us your name, sir?

15  A    My name is Ben Reese Slocum.

16  Q    And what's your background, Mr. Slocum, with Wellpath?

17  A    I am the current chief executive officer of Wellpath.

18  Q    And how long have you been in the industry or at

19  Wellpath?

20  A    I've been at Wellpath since July 15th of 2020.

21  Q    And the court's aware, but could you give us just at a

22  very high level what the corrections business is at

23  Wellpath?

24  A    Certainly.  Currently at Wellpath, on the corrections

25  side of our business -- because as we know, Recovery

1   Solutions has been -- has moved on -- we are the leading

2   provider of health care and mental health care services to

3   people that are incarcerated at the federal level, which

4   would include the Federal Bureau of Prisons, the U.S.

5   Marshal Service, as well as for state contracts and for

6   local government contracts, which is the largest portion of

7   our business just by -- by footprint.

8   Q    And just to cut to the heart of it, what is the goal,

9   what is Wellpath's goal for emerging from bankruptcy?

10  A    Our goal emerging from bankruptcy is to be able to

11  continue to operate our business and provide the quality

12  care that we've been providing since the existence of the

13  business in many iterations for the past 30 years.

14  Q    And as far as a date, when does Wellpath want to be

15  able to get out of bankruptcy to preserve its business?

16  A    March 31st.

17  Q    And how was that date or that goal selected?

18  A    We selected that goal because there's a preponderance

19  of our contracts that are up for renewal and rebid effective

20  July 1 of 2025.

21  Q    And can you give us a little color?  Why does that

22  matter?

23  A    Traditionally in our business, and almost in every

24  instance, decisions are made about a renewal or a rebid on a

25  vendor to provide these services by a local government or

1  state or federal entity which, by the way, are very rare

2  risk-adverse entities by design.

3       And they make that decision because if they were to

4  make a change, generally 90 days is the timeframe

5  historically required to make a change that doesn't put the

6  system in jeopardy or people's care in jeopardy, et cetera,

7  et cetera.

8  Q    And you mentioned the term risk averse.  Why would

9  Wellpath not emerging from bankruptcy by March 31st cause

10 any of these government entities to trigger that risk-averse

11 nature?

12 A    They would have to seek an additional or a new provider

13 to provide those services or to attempt to find a way to

14 provide them themselves, which they currently don't do

15 today.

16      And I think as most know, this is a very niche market.

17 There's not a ton of vendors that provide the services we

18 provide.  If they're not otherwise provided by us, they're

19 provided by the entity as a self-operated environment.

20 Q    The company Wellpath has been able to get at least one

21 new contract and have a couple renew.  How were you able to

22 do that while you're in bankruptcy and these entities are

23 still risk averse?

24 A    I believe that in the instance of the one entity, it's

25 a very small entity up in the upper Midwest.  And they were

1  in emergency procurement situation.  They didn't have any

2  other vendor options, and they asked us if we would please

3  take the contract for them so that they didn't run into

4  their ability to provide care.

5  Q    And how about the renewals that you've been able to

6  obtain?

7  A    Well, we've been able to renew our customers based on

8  us telling them that we expected to be out by March 31st and

9  that they felt comfortable with us at our word, and we're

10 really trading on our goodwill and our historical delivery

11 of quality of care for our customer base and doing what we

12 say we're going to do.

13 Q    Is it just the contracts that are coming up for renewal

14 that you believe are at risk if the company doesn't come out

15 of bankruptcy by early April?

16 A    Well, I wish that was actually the case, but no; it's

17 the entire block of business that we have.  It's 1.6, you

18 know, billion of revenue.

19       Every customer we have has a term for convenience

20 clause.  And what that means is they have no reason -- there

21 doesn't have to be a breach of contract or anything like

22 that for them to get out.

23       They simply have the ability under their own decision

24 making to leave the contract with notice.  And that notice

25 is usually 30 -- between 30 and 90 days for the

1    preponderance of our business.

2        So if our customer base were to be nervous that we were

3    not successfully coming out when we said we could, and they

4    had to look for an alternative, they have the ability to

5    give us immediate notice that they were going to leave and

6    go elsewhere.

7                MR. GENENDER:  Pass the witness.

8                        CROSS-EXAMINATION

9    BY MR. HEMENWAY:

10   Q    Good morning, Mr. Slocum.  My name is Zach Hemenway,

11   counsel for the Committee.

12   A    Hi, Zach.

13   Q    Now Mr. Slocum, you haven't had a single customer who

14   declined to renew during the pendency of this case, have

15   you?

16   A    At this point we have not.

17   Q    And you mentioned those termination for convenience

18   clauses.  No one's exercised those, have they?

19   A    At this point they have not.

20   Q    So you said they might if they're nervous.  So can we

21   assume they weren't nervous when you guys filed this

22   bankruptcy and called them and told them about it?

23   A    We told them that we expected that we'd be through this

24   process by the 31st, and based on that, they haven't acted

25   on it.

1  Q    So you -- every customer you called when you filed

2  bankruptcy, you told them, we're exiting on March 31st?

3  A    For the most part.

4  Q    For the most part.  Okay.  Who's the chief

5  restructuring officer, Mr. Slocum?

6  A    Tim Dragelin.

7  Q    And do you speak to Mr. Dragelin regularly about your

8  communications with customers?

9  A    I do.

10  Q    Would it surprise you to know that in his deposition,

11  he didn't mention any of those conversations about exiting

12  March 31st?

13  A    I can't speak to that.

14  Q    You mentioned July 1st being kind of a magic date and

15  that you were working back 90 days before that.  That's not

16  based on a contractual term, is it?

17  A    Yes.

18  Q    All your contracts have 90 days' notice for

19  termination?

20  A    No, all of our -- a significant portion of our

21  contracts have a 7/1 date that triggers a renewal or a rebid

22  for them -- 7/1 and other in October and November and

23  January 1 are traditionally the key dates for (inaudible).

24  Q    Thank you for clarifying, Mr. Slocum.  My question was

25  about the 90 days backwards.  That's just a date that you

1   came up with, right, 90 days?

2   A    It's a date -- yes.  It's a date based on our

3   historical experience on when our customers will make a

4   decision to move to a new vendor if they feel they need to.

5   Q    And none of those customers have made that decision

6   thus far, even though they could, correct?

7   A    It's not time for them yet to do that.

8   Q    They can't -- I thought you testified that they could

9   terminate earlier if they like.

10  A    They can terminate when they want, but they would

11  normally historically make their decisions on or around the

12  end of March.

13  Q    Have customers made decisions that put things out for

14  rebid before the 90 days?

15  A    Customers will go out to rebid if they feel they need

16  to if they're receiving poor service as an example.

17  Q    How many of your customers have done that?

18  A    We have had no customers pivot outside of the normal

19  process as of yet.

20  Q    Okay.  Now as a company, do you just wait and see if

21  the customer puts it out for rebid, or do you work with them

22  to try to negotiate a renewal?

23  A    If it's a renewal, we work to negotiate a renewal.  If

24  it's a rebid, they have to by policy go out for a rebid.

25  Q    Understand.  And you would prefer the renewal, correct?

1  A    If it's in a renewal period.  But customers will have

2  to rebid at a -- based on their local procurement laws.

3  Q    And you already successfully negotiated terms on at

4  least nine of those renewals, haven't you?

5  A    I can't speak to the exact number, but we have

6  successfully renewed those that were in the renewal window

7  so far.

8  Q    If Mr. Dragelin represented that it was nine, would you

9  disagree with that number?

10 A    Not at this point.  I wouldn't be in a position to do

11 that.

12 Q    And you negotiated all those renewals while this case

13 was pending, correct?

14 A    I believe so.

15 Q    And in terms of negotiating a renewal, that involves

16 negotiating terms, agreeing on terms?

17 A    Yes.

18 Q    What about contracts where it could be up for renewal,

19 but you negotiate to amend or extend or something else?

20 Have you had any of those?

21 A    There are normally instances where that will happen,

22 particularly if additional services are required.

23 Q    And you would do that because you'd want to avoid an

24 RFP and keep the customer?

25 A    Let me differentiate for you the difference between a

1  renewal and a rebid.  A renewal is just the annual

2  anniversary of a contract within a rebid cycle for a

3  customer.

4       So, as I said earlier, a rebid is when a customer is

5  contractually obligated to put an RFP out on the street and

6  solicit updated proposals from interested parties, and

7  they're following procurement laws of the state, the county,

8  or the federal government, if that makes sense.

9  Q    Thank you, Mr. Slocum.  So on at least three contracts,

10  you've negotiated an amendment rather than a renewal; is

11  that right?

12  A    Yes.

13  Q    And on all of those, you were able to negotiate more

14  favorable terms than you had before the bankruptcy?

15  A    Generally, I can't speak to them in particular, but

16  generally amendments occur when a service change needs to

17  happen.  They may want less of a service, they may want more

18  of a service, and they come to us and ask us if they can

19  negotiate those adjustments.

20  Q    If your chief restructuring officer, Mr. Dragelin, told

21  me that all three of those had more favorable terms than

22  your pre-bankruptcy, would you disagree with that?

23  A    I wouldn't disagree with that necessarily.

24  Q    So you've had nine contracts that you've already been

25  able to renew, and those negotiations occurred during

1  bankruptcy, correct?

2  A    Yes.

3  Q    And you've had three where you negotiated a better

4  deal, correct?

5  A    Per Mr. Dragelin.

6  Q    And the pleading that your counsel filed this week

7  included an exhibit about the contracts that you were

8  calling at risk?

9  A    Yes.

10  Q    And it had some calculations as to the value of those?

11  A    Yes.

12  Q    Isn't it true that all 12 of those contracts that I

13  just referenced are included in that number?

14  A    I'd have to look at the documents.

15  Q    Did you work on that number?

16  A    Did I work on that, on which number?

17  Q    Did you work on the exhibit?  Are you familiar with the

18  exhibit?

19  A    I did not work on that exhibit.

20  Q    Okay.  But you're here testifying that you have 50-plus

21  contracts that are up for renewal on July 1st, --

22  A    Yes.

23  Q    -- correct?

24  A    Yes.

25  Q    And that --

1   A     These -- there should be 56, 57 of them.

2   Q     And you can't tell me whether that number includes the

3   12 that I just talked about?

4   A     Yes, that includes the 12.

5   Q     It does include the 12.

6   A     Yes.

7   Q     Okay.

8   A     I'm sorry.  I didn't understand your question.

9   Q     So even though you've already negotiated renewals and,

10  in some cases, negotiated a better deal than you have, you

11  view those contracts as at risk?

12  A     Yes.

13  Q     Okay.  And at the same time, you haven't had a single

14  customer terminate?

15  A     No.

16  Q     You've talked in the pleadings about some RFPs that are

17  out that you want to get out of bankruptcy in time for?

18  A     Yes.

19  Q     Can you tell me the due dates of any of those RFPs?

20  A     Due dates as when the response from us has to be

21  submitted by --

22  Q     Yeah.

23  A     -- or when they're going to make their decisions by?

24  Q     When the response from you has to be submitted by.

25  A     The one state contract we have is already past due, and

1    it's been submitted and is being assessed.  Actually, the

2    other state contract has also been in that exact same

3    situation.

4         And those are the two largest customers that we were

5    concerned about having ourselves out for because of the

6    nature of the contracts.

7    Q    I understand.  My question is, can you tell me the due

8    date of any RFP you're currently preparing a response to?

9    A    That I'm currently preparing a response to.  Not any --

10   I can't give you the specific dates for each one because

11   there's a large list of them.

12   Q    Can you give me the specific dates for any?

13   A    Yeah, the two that I just discussed have already come

14   past due.  They've -- they had to be in, in January and were

15   submitted already.

16   Q    Okay.  What about any of the others?  Can you give me a

17   date that they're due?

18   A    Generally due somewhere between January and, I would

19   say, March 1st at the latest.

20   Q    So which ones are due?  It's February 17th, February

21   18th.  Which ones are due March 1st?

22   A    I don't have a list of the actual due dates for each

23   one of the RFPs in front of me at the moment.

24   Q    So Mr. Dragelin wasn't aware of any that were due March

25   1st or between now and July.  Was he mistaken?

1  A    I don't believe he was mistaken.

2  Q    And so you're not aware of any either?

3  A    I don't have the specific dates.  If you'd like to show

4  a document to me to refresh my memory, I'm happy to address

5  it.

6  Q    You're -- Mr. Slocum, you're here testifying that you

7  have these RFPs that you have to be prepared to respond to.

8  A    Yes.

9  Q    I'm asking which ones and when do you have to respond?

10 Can you tell me any?

11 A    I can tell you that we have filed our responses already

12 on two of them --

13 Q    I understand that.

14 A    -- two contracts.  And that we are in the process of

15 releasing the other ones that we are working toward right

16 now and several of the processes have not yet started --

17 Q    Okay.

18 A    -- which I believe --

19 Q    So you can't tell me --

20 A    -- contracts.

21 Q    Oh, I didn't mean to talk over you.  I apologize.

22 A    No, you're quite all right.  You can talk --

23 Q    So you can't tell me any specific RFP or when it's due?

24 A    I don't have the list in front of me.  I apologize for

25 that.

1  Q    Okay.  Well, I mean, --

2  A    I know the general -- I know the numbers, and I know

3  the aggregated facts around those numbers.

4  Q    And you don't know if any of them are due between now

5  and July 1st?

6  A    Oh, they're all due between now and July 1st.  Anything

7  that would be effective July 1 would have to be submitted

8  prior to July 1.

9  Q    I'm asking about RFPs, not renewals, Mr. Slocum.  You

10  testified earlier that the renewals are due July 1.

11  A    RFPs would be due -- there is -- okay.  I'm going to --

12  just to refresh.  A renewal is negotiation we do with the

13  customer in between the rebid windows.  A rebid is an RFP.

14      And a rebid would have an RFP submitted by a customer

15  to us and our competitors for response with a due date for

16  that RFP response.

17      That RFP response will have varied dates, but will

18  always be or should always be before the July 1 effective

19  date.

20  Q    And yet you can't point me to any that has those dates?

21  A    Well, they should all have a date before July 1 if

22  they're going to move on July 1.

23  Q    I'm not asking what they should have.  I'm saying are

24  there any you're aware of?  Mr. Dragelin wasn't aware of

25  any.

1  A    I can't speak to what Mr. Dragelin said.

2  Q    Are there any you're aware of?

3  A    We should have all of our RFPs or renewals resolved

4  before July 1.

5  Q    I'm not asking what you should have.  We're talking

6  about an RFP.  That's a public process, correct?  They're

7  generally publicly available?

8  A    Generally public.

9  Q    We could look them up online?

10  A    Could look them up online.

11  Q    And you can't point me to any that have a

12  deadline between now and July 1?

13  A    I can't give you the specific deadlines --

14  Q    Okay.

15  A    -- but they would all have a deadline.

16  Q    Thank you.

17            MR. HEMENWAY:  No further questions.

18            THE COURT:  All right.

19            Anyone else wish to cross-examine?

20            MR. GENENDER:  Brief redirect, Your Honor?

21            THE COURT:  Yes.

22            Anyone on the Line wish to cross-examine?

23            MR. GINSBERG:  Yes, Your Honor.  Marc Ginsberg has

24  just a couple of questions.

25            THE COURT:  All right.  Mr. Ginsberg, go ahead.

1         MR. GINSBERG:  Yes.

2                         CROSS-EXAMINATION

3   BY MR. GINSBERG:

4   Q    Sir, when you bid for and contract for these correction

5   jobs, do the certificates of insurance you provide specify

6   on the certificate that there is no true risk transfer to

7   insurance in the event of a claim?

8   A    I'm not sure I understand your question, Mr. Ginsberg.

9   Q    Well, are you aware that the insurance that Wellpath

10  has disclosed in this bankruptcy is that there are no true

11  risks of transfer of liability for payment to the insurance

12  company, that they are essentially self-insured plans with

13  Wellpath's money responsible for paying legal expense and

14  claim amounts for any claim that's submitted whether it be

15  by a prisoner or by a private hospital patient?

16        MR. GENENDER:  Your Honor, I'm going to object.

17  This is argumentative and it's not relevant to the issue

18  before the Court, which is the scheduling and the timing of

19  the solicitation.

20        THE COURT:  I think it does go a little bit to the

21  feasibility issue, and that's a timing issue.  So I'm going

22  to allow it.

23        THE WITNESS:  Would you mind repeating your

24  question, Mr. Ginsberg?

25  BY MR. GINSBERG:

1  Q    Sure.  I'm just trying to find out as CEO, do you know

2  that the insurance that Wellpath has had in effect had no

3  true risk transfer of payment responsibility for legal

4  expense for defense costs or payment of claims to an

5  insurance company?

6  A    We have an insurance stack, and we have self-funded

7  components of our insurance, Mr. Ginsberg.  So it'd be a

8  combination of those two that would be addressing any

9  claims.

10  Q    Well, are you aware that your insurance executive

11  provided a Declaration and testified here that there is no

12  true risk transfer of payment for legal expense or for

13  payment of claims for any of the claims submitted in this

14  bankruptcy?

15             MR. GENENDER:  Your Honor, this is argumentative.

16             THE COURT:  Sustained.

17  BY MR. GINSBERG:

18  Q    Are you aware that there is no true risk transfer of

19  insurance with respect to Wellpath's business?

20  A    I am aware, Mr. Ginsberg, that there is a risk

21  insurance stack for a portion of our coverage and a self-

22  funded portion of our coverage as well.  I think it depends

23  upon which particular stack that the claim is getting pushed

24  against.

25  Q    Now if the 1,500 claims that have been submitted by

1  prisoners and however many private lawsuits and claims that

2  have been submitted to Wellpath, would Wellpath have had the

3  need to seek this reorganization?

4  A    I can't speak to the specific number and how it works

5  against the stack, Mr. Ginsberg.

6  Q    Would you agree that the presence of these claims and

7  lawsuits by prisoners and private-paying patients was a

8  substantial factor in Wellpath's Declaration of Chapter 11

9  bankruptcy?

10 A    I would agree that the concern about the total

11 liability from a financial perspective for Wellpath in

12 aggregate drove Wellpath to make the decisions to file for

13 the bankruptcy.

14 Q    And when you say in aggregate, you're speaking of the

15 aggregate of the tort claims that have been brought, made,

16 or filed against Wellpath or one of its subsidiary

17 companies?

18 A    I would say that it is based on the aggregated

19 liability of the enterprise across all creditors.

20 Q    Well, I'm speaking now with specific to the tort

21 claims.  If these tort claims did not exist, would Wellpath

22 have had a need to seek reorganization?

23 A    I believe the aggregate concern, Mr. Ginsberg, was that

24 with the tort claims and with the rest of the business that

25 we knew existed from a liability perspective, Wellpath had

1  to file, and that we had to look at it in totality.

2  Q    All right.  So if the tort claims were eliminated from

3  the debt portfolio, would Wellpath have been able to conduct

4  its business without seeking reorganization?

5           MR. GENENDER:  Objection, Your Honor.  This is a

6  hypothetical.  He's asking for an opinion.  It's not

7  relevant.

8           THE COURT:  Sustained.

9           MR. GUERRERO:  I have nothing further.  Thank you

10 for your time.

11          THE COURT:  All right.  All right.

12          I have one question.

13          THE WITNESS:  Yes, sir.

14          THE COURT:  Mr. Slocum, you said that the recovery

15 service business had been eliminated from the plan because

16 it was sold.  Is Alpine Behavioral Health Holdco, is that --

17 that's still a Debtor in this case?  Is that a behavior --

18 is that part of --

19          THE WITNESS:  Part of Recovery Solutions.

20          THE COURT:  Okay.  So that's still in the plan?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Okay.  So it's not correct that

23 Recovery Systems has been sold if that's still retained in

24 the plan, right?

25          THE WITNESS:  Recovery Solutions has been sold and

1    the Alpine unit is within the Recovery Solutions family.

2              THE COURT:  And that's been sold?

3              THE WITNESS:  That -- Alpine and Recovery

4    Solutions has been sold.

5              THE COURT:  Okay.  But Alpine --

6              THE WITNESS:  Asking the question --

7              THE COURT:  -- has not been sold?

8              THE WITNESS:  (No audible response.)

9              THE COURT:  Well, all right.  I'll just ask your

10   client.

11             THE WITNESS:  What my lawyer is telling me, it's a

12   holding company; it's not an operating company.

13             THE COURT:  Okay.

14             MR. GENENDER:  May I redirect, Your Honor?

15             THE COURT:  Yes.

16                      REDIRECT EXAMINATION

17   BY MR. GENENDER:

18   Q    Let's go backwards, Mr. Slocum.  Were there funded debt

19   maturity dates that played a role in the filing of the

20   bankruptcy?

21   A    I apologize.  Could you repeat?

22   Q    Were there debt maturity dates coming up?

23   A    Yes.

24   Q    And can you tell us what role that had in the decision

25   to file for bankruptcy?

1   A     Has a significant role.

2   Q     Mr. Hemenway asked you about two sets of contracts --

3   some renewals and some rebids.

4   A     Yes.

5   Q     I believe there were 12 of them.  Are any of those

6   finalized?

7   A     At this point, the ones that are at risk are not

8   finalized that we spoke of.

9   Q     So is that why they're at risk?

10  A     Yeah.  They're at risk.

11          MR. HEMENWAY:  Objection.  Leading.

12          THE WITNESS:  They are at risk.

13          THE COURT:  Wait.  Hold on a second.

14          I'm going to let him answer.  I think it's just --

15          THE WITNESS:  They're at risk for a number of

16  different reasons.  And we are just working through those

17  with those customers now to see if we can alleviate

18  concerns.

19  BY MR. GENENDER:

20  Q     Mr. Hemenway also asked you about some communications

21  you had with your customers, the government entities that

22  you contract with, about the bankruptcy.  Can you tell us

23  about the effort that went into reaching out and talking

24  with those customers?

25  A     Absolutely.  Great question.  So significant effort

1    went across our entire customer base.  We operate in 36

2    states.

3         And to probably correct everybody, we have about 13,000

4    employees right now when you add in our 1099 and our PRN

5    contracting staff.

6         We met with every customer on our books, either

7    telephonically or in person, preferably in person because we

8    thought it was incredibly important to calm any concerns or

9    fears that they had about the future of Wellpath and where

10   we were going to go.

11        As part of that process, they wanted to understand when

12   Wellpath would potentially be coming out of bankruptcy.  And

13   I can understand that, particularly given the sensitive

14   nature of July 1 dates for them to make decisions by.

15        And I think it's also important probably to understand

16   that most of our customers are either sheriffs, which are

17   elected officials, you know, in law enforce enforcement, or

18   we have appointed officials at the state level from the

19   governor.

20        And of course, you have the Federal Bureau of Prisons,

21   and ICE, and the U.S. Marshals Service.  So it was all those

22   constituencies look slightly different, but they all look at

23   it from the same lens, which is a very risk-averse lens

24   because, as I think everybody in the room knows, this

25   population of patients are protected under the U.S.

1  Constitution to receive care appropriately when they're

2  detained.

3       Because as I think was alluded earlier, they don't make

4  those decisions for themselves.  So our concern is always to

5  do the right thing and make sure that we have our customers'

6  concerns secured.

7       Now that was a very difficult process.  If I can add,

8  in fact, that during this process, I lost two division

9  presidents, a chief medical officer, a chief human resource

10 officer, a CFO, and a divisional CFO while we were trying to

11 accomplish this communication process amongst other things.

12 Q    Did you participate in a conference with counsel for

13 the UCC to go over some of the pending contracts?

14 A    Yes, I did.

15 Q    On that call, was there a document that had been

16 provided to the Committee listing out all the contracts?

17 A    There was.

18 Q    If you'd had that list, could you have answered some of

19 Mr. Hemenway's questions?

20 A    Yes.

21           MR. GENENDER:  Nothing further, Your Honor.

22           THE COURT:  All right.  Anything further?

23           Go ahead.

24           MR. HEMENWAY:  Just a couple.

25                     RECROSS-EXAMINATION

1   BY MR. HEMENWAY:

2   Q    Mr. Slocum, you talked about that was a difficult

3   process going out to your customers and talking to them

4   about the bankruptcy.  And you were losing people that whole

5   time, it sounds like.

6   A    That it was, yeah.

7   Q    And each of those customers could have terminated their

8   contract with you, couldn't they?

9   A    They could have.

10  Q    And none of them did?

11  A    They did not.

12  Q    And you, I believe you testified earlier that you told

13  customers that you were going to be out of bankruptcy by

14  March 31st; is that right?

15  A    They asked us specifically when we thought would be

16  finished with the process, and we told them we had planned

17  on being through the process God willing by the 31st.

18  Q    Okay.  So you only told the customers that asked you;

19  is that what you're saying?

20  A    We told the -- I -- I can't -- I wasn't involved in

21  every conversation, Mr. Hemenway.  But the conversations

22  that I was involved with, I advised them of when I thought

23  we would be if they didn't ask so that we got in front of

24  that question.

25  Q    Okay.  So it's something you told customers.  You've

1  got 50, I think the document that Mr. Genender referenced

2  and the exhibit to your objection lists about 55 contracts

3  that are at risk?

4  A    57.

5  Q    57?

6  A    57 in the process right now for 7/1-ish day.  Yes.

7  Q    How many of those customers told you they were going to

8  terminate if you weren't out by March 31st?

9  A    Nobody has told me personally.

10 Q    Okay.

11           MR. HEMENWAY:  No further questions.

12           THE COURT:  Anything further?

13           MR. GENENDER:  No, Your Honor.

14           MR. HERRON:  Your Honor, I had a question.

15           THE COURT:  Yes, go ahead.

16                        RECROSS-EXAMINATION

17 BY MR. HERRON:

18 Q    Yes.  To follow up on the Court's question, we

19 understand that Behavioral Health Management Systems, LLC is

20 the operator of the Alpine facility; is that correct?

21 A    I'd have to -- I apologize, Mr. Herron.  I would have

22 to look at the corporate structure in terms of the operating

23 structure for that.  But Alpine is in the control of

24 Recovery Solutions at this point.

25 Q    So our understanding is that that operating entity

1   bankruptcy has been dismissed; is that correct?

2   A    I cannot respond to that question, Mr. Herron.  I

3   apologize.  I don't have that document in front of me.  We

4   have a very complex structure right now for our operating

5   group.

6          THE COURT:  I probably should have directed my

7   question to the lawyer.

8          So why don't we get Mr. Giordano to explain it

9   because I was confused as a result of the fact that Recovery

10  Solutions has been interspersed throughout the Disclosure

11  Statement, and we refer to Alpine as being one of them so --

12         MR. GIORDANO:  Thank you, Your Honor.  Yes, the

13  operating businesses were sold through the Recovery

14  Solutions sale.  And those were stock transfers, so the

15  entities themselves were dismissed.

16         THE COURT:  Right.  But the actual Alpine unit is

17  housed in Behavioral Health Management System.  It's like a

18  d/b/a, whereas Alpine CA Behavioral Health, Holdco LC is a

19  holding company that only had the stock of the Harborview

20  Center and --

21         MR. GIORDANO:  And some contractual liabilities,

22  but that did not -- those did not leave the estate at this

23  point.

24         THE COURT:  Got it.  Okay.

25         MR. GIORDANO:  Okay.

1          THE COURT:  All right.

2          All right.  Mr. Herron.  Any other questions?

3          MR. HERRON:  No, Your Honor.

4          THE COURT:  Okay.  Anyone comment?

5    One question.

6                    FURTHER REDIRECT EXAMINATION

7    BY MR. GENENDER:

8    Q    Do you think it's relevant to the feasibility of the

9    future of your company to improve the quality of medical

10   care so that the lawsuits that the company faces isn't to

11   the magnitude that it currently faces?

12   A    I think it's incumbent upon Wellpath and anybody in our

13   business to continuously improve the quality of care we

14   provide to all of our patients on a daily basis, regardless

15   of any situation.

16          THE COURT:  All right.  Thank you, sir.  You may

17   step down.

18          THE WITNESS:  Thank you, Your Honor.  Appreciate

19   you.

20      (Witness steps down.)

21          MR. GIORDANO:  Brad Jordan of McDermott Will &

22   Emery, on behalf of the Debtors, again for the Record.  Your

23   Honor, that's all the testimony that we think is necessary

24   for determining whether adequate information exists to

25   approve the Disclosure Statement under 1125.

1          Again, that's a legal determination.  We've heard

2    from a number of objecting parties about a number of issues

3    including feasibility and projections, et cetera, all of

4    which they will have their day to contest, and we will have

5    to put on our proof as part of the confirmation process.

6          The solicitation timeline is critical to the

7    reorganization of this business, as Mr. Slocum just

8    testified to.  And while we are sensitive to the issues

9    facing incarcerated individuals, it's important to remember

10   that of -- there are 1,500 pending lawsuits.

11         And again, we see 200,000 patients in a given day,

12   and less than 5 percent of the general unsecured class is

13   currently incarcerated.  So we again submit that it's

14   important -- all of these issues are very important, but

15   they cannot be the only thing that's important.

16         We have to balance them against the business and

17   maximizing its value, which frankly, if we do properly

18   inures to the benefit of the substantial -- of the general

19   unsecured population.

20         I don't have anything else to add unless Your

21   Honor has any questions for me.

22         THE COURT:  I do have some questions.  How do you

23   get to the 5 percent?

24         MR. GIORDANO:  We looked at the universe of

25   potential claimants in terms of who we think is incarcerated

1  based on the noticing procedures and --

2          THE COURT:  So of the 1,500, you're saying only 5

3  percent is incarcerated?

4          MR. GIORDANO:  No, Your Honor.  I'm saying 5

5  percent of the overall general unsecured claim population.

6          THE COURT:  Okay.  So you have 20,000 creditors?

7          MR. GIORDANO:  I'm saying based on what we believe

8  the -- I believe that that calculation is based on the

9  number of claims, the value of the claims.

10          THE COURT:  The value or the number?

11          MR. GIORDANO:  I would need to check, Your Honor.

12          THE COURT:  Okay.  Because --

13          MR. GIORDANO:  I don't want to speculate, but I

14  believe it's based on taking the overall claims population,

15  including both -- sorry -- litigation claimants and trade

16  claimants.

17          UNIDENTIFIED MALE:  Your Honor, may I ask a

18  question?

19          THE COURT:  Yes.

20          UNIDENTIFIED MALE:  Is that based upon your

21  schedules, Brad, or what you project because the bar date

22  hasn't occurred yet?  How would you know?

23          MR. GIORDANO:  Based on what we do -- what we

24  think we know under discovery.

25          THE COURT:  Okay.  All right.  So I do --

1           MR. GIORDANO:  And we have -- I understand.

2           THE COURT:  -- I do have some questions.

3           MR. GIORDANO:  Sure.

4           THE COURT:  And if you could get clarification on

5  that, that would be --

6           MR. GIORDANO:  Happy to.

7           THE COURT:  -- good because I didn't see that

8  anywhere in the Disclosure Statement or anyplace else.

9           So one fundamental question is, what's going to

10  happen to these 1,500 claims once the plan goes effective?

11          MR. GIORDANO:  They'll receive their treatment

12  under the plan.  How are they going to get liquidated?

13          MR. GIORDANO:  Through -- well, there's a number

14  of potential ways that they could get liquidated, but --

15          THE COURT:  But where does it say how they're

16  going to get liquidated in the plan?

17          MR. GIORDANO:  The individual --

18          THE COURT:  Yes.

19          MR. GIORDANO:  -- tort claimants?  I'm not sure

20  that I can opine on exactly how they choose to go about

21  liquidating their claims.  They could settle.  They could

22  proceed to --

23          THE COURT:  Okay.  So --

24          MR. GIORDANO:  -- conduct litigation until the

25  claim is determined.

1          THE COURT:  Right.  So once the plan becomes

2   effective, basically, there's not any more stay, so they can

3   proceed to liquidate their claims wherever they are there?

4          MR. GIORDANO:  There -- I believe there's a

5   gatekeeping function for certain types of claims if they

6   were bringing them against released parties, but otherwise,

7   yes.

8          THE COURT:  Okay.  All right.  So there is a

9   gatekeeping function.  Okay.  I want to get to that because

10  -- okay.  So anyone who has a claim that goes after November

11  11th, they're treated in the ordinary course, so they don't

12  have to do anything, correct?

13         MR. GIORDANO:  Yes, Your Honor.

14         THE COURT:  Okay.  So then let's take a look at

15  that.  In my mind, there's three different ways to look at

16  when the claim arose.

17         If the claim arises and the damage occurs before

18  November 11th, that's a prepetition claim that will be

19  treated under the plan.

20         If the treatment occurred before November 11th,

21  but the injury, the damage doesn't arise after November

22  11th, under Butner and state law, it would be a postpetition

23  claim because even though the treatment occurred

24  prepetition, they didn't have a claim until there was

25  damage.  That's the way I understand it under Butner.

1          MR. GIORDANO:  Yeah.

2          THE COURT:  So if they manifest after that -- and

3     I'm asking you whether you agree or not.  I'm not --

4          MR. GIORDANO:  If the claim -- I just want to make

5     sure I understand.  So if the claim -- if there was an

6     individual who was harmed theoretically before the Chapter

7     11, but the injury arose after?

8          THE COURT:  Right.  So if somebody went in, got

9     medication, it was the wrong medication, and a month later,

10    they have consequences.  They don't have a claim until

11    there's the consequences.

12          And under state law, under Butner that I have to

13    follow, that would be a postpetition claim.

14          MR. GIORDANO:  I'm probably -- I would probably

15    need to look at the case, but I have no reason to doubt Your

16    Honor's recitation.

17          THE COURT:  Okay.  And then the third is if there

18    is, you know, a denial of medical coverage or a denial of

19    services, that in the way that I see the case law, that

20    accrues every day that there's a denial.  So if there's a

21    denial prepetition, that's, you know, but if there's a

22    denial postpetition, then that's a postpetition claim.

23          MR. GIORDANO:  Certainly, if the action giving

24    rise to the cause of action occurred postpetition, that is a

25    postpetition.

1          THE COURT:  Well, it's -- there's no action.  It's

2  a denial or some other continuing.

3          MR. GIORDANO:  Understood.

4          THE COURT:  They give the wrong injection

5  prepetition.  They give it postpetition.  There's a

6  postpetition claim.

7          MR. GIORDANO:  Yes.

8          THE COURT:  All right.  So we don't have to worry

9  about anything that occurred post January -- November 11th

10  through the -- all right.  So that's -- just want to make

11  that clear.  Okay.

12          MR. GIORDANO:  And Your Honor, I just wanted to

13  also -- I'm sure you have more questions, but I did want to

14  just clarify specifically that March 14th was the date for

15  the plan supplement, because I know you asked me about that

16  earlier.

17          THE COURT:  March 14th is the date.

18          MR. GIORDANO:  Assuming, you know, --

19          THE COURT:  Yeah.

20          MR. GIORDANO:  -- we stick with the schedule.

21  Yes.

22          THE COURT:  Got it.  Okay.  Unfortunately, I went

23  through the plan that was filed on the 10th, so I don't know

24  if you have a copy of that because -- you -- okay.

25          MR. GIORDANO:  If you'd give me one minute?

1          THE COURT:  Yeah, great.

2          MR. GIORDANO:  Okay.

3       (Brief pause.)

4          MR. GIORDANO:  Okay.  I have it in front of me,

5  Your Honor.

6          THE COURT:  All right.  So on Page 1, in the

7  introduction, the very top, the fourth line, it says dated

8  December 20th.  Is that still there?  That has to be

9  updated?

10          MR. GIORDANO:  We'll update it.

11          THE COURT:  Okay.

12          MR. GIORDANO:  And just to say it, we did file

13  some changes this morning.

14          THE COURT:  And I saw the changes.  So a lot of

15  the stuff that I had has been picked up.  And I do commend

16  the Debtors for significantly improving the plan and

17  Disclosure Statement.  I agree with that.

18          MR. GIORDANO:  Thank you, Your Honor.

19          THE COURT:  All right.  So one of the questions

20  that I have is pursuant to the Recovery, you know, Solutions

21  sale order, the purchaser was given certain protections,

22  including releases and everything else.

23          How does that -- and I know in here I reaffirm all

24  of the releases and basically say nothing herein affects it.

25  Is there anything different or more in here than the

1  Recovery Solutions purchasers got pursuant to the Recovery

2  Solutions order?

3          MR. GIORDANO:  Is there anything in the plan that

4  delivers the Recovery Solution purchasers additional value?

5          THE COURT:  Yes.

6          MR. GIORDANO:  I don't believe -- I don't believe

7  there is.  I'm not sure what that would be.

8          THE COURT:  Well, okay.  So then maybe you can go

9  through and basically, as it relates to Recovery Solutions,

10 just say, you know, as it relates to Recovery Solutions,

11 nothing herein affects all of the -- everything, you know,

12 all of the --

13         MR. GIORDANO:  I think that we can certainly add

14 some clarifying language.  I would just want to be clear,

15 however, that some of the same parties that are purchasing

16 Recovery Solutions are also parties that have a stake in the

17 go-forward corrections business.

18         THE COURT:  Absolutely.  And I'm just saying, just

19 as a purchaser of Recovery Solutions versus as a purchaser

20 of --

21         MR. GIORDANO:  In their capacity.

22         THE COURT:  In their capacity.

23         MR. GIORDANO:  Understood.

24         THE COURT:  Correct.  Okay.

25         MR. GIORDANO:  I'm sure we can add some language

1   to that effect.

2          THE COURT:  All right.  So I don't -- it wasn't

3   clear to me exactly how the equity financing worked.  And

4   maybe we need someone to help you with that.

5          MR. GIORDANO:  I think that that's fair.  We can

6   certainly put on some testimony to that effect.

7          THE COURT:  Well, I mean, at some point you need

8   to put up testimony, but this is just I want to kind of

9   understand what was intended.

10         So the equity financing is going to be anywhere

11  between 20 million and 55 million for 97 percent of the

12  company.

13         MR. GIORDANO:  That's correct.

14         THE COURT:  Okay.  And there's no valuation in

15  here, so depending on -- I don't understand how that

16  actually works.

17         MR. GIORDANO:  Well, it works with a stipulated

18  plan value that was tested to see whether we could get value

19  over and above it.

20         THE COURT:  Okay.  And where is that in the

21  Disclosure Statement?

22         MR. GIORDANO:  On the plan of reorganization or

23  sorry -- on the --

24         THE COURT:  The Disclosure Statement that you have

25  a stipulated plan value.  I didn't see it.

1          MR. GIORDANO:  I'd need to see if it's in the

2  exhibits or not, but I --

3          THE COURT:  Well, it's not in the Disclosure

4  Statement that there's a stipulated plan value.

5          MR. GIORDANO:  Okay.

6          THE COURT:  Okay.  So I think we need to fix that.

7  And then -- and so the way I understand it is that you have

8  to have $35 million of liquidity, and then the additional

9  amount, at least based on what was in the Disclosure

10  Statement, is going to -- is what you need in order to cure

11  all of the amounts.

12          MR. GIORDANO:  Provide -- yes, to provide cures.

13  That's correct.

14          THE COURT:  Okay.  So how do you calculate the 35

15  million?  Where is that in here?

16          MR. GIORDANO:  In terms of how we -- like how we

17  arrive at what's needed under the 55?

18          THE COURT:  Yes, yes, exactly.  There's no

19  calculation in here and what, who determines it, who

20  calculates it, how it's calculated, and is it like, for

21  instance, you know, obviously professional fees are being

22  escrowed, but there's going to be success fees.

23          So how do -- where does that go in here?  There's,

24  you know, there's other large numbers that are out there

25  that potentially would have to pay up.  Who calculates that

1  number and how is it calculated?

2        MR. GIORDANO:  Right.  I mean, it will be

3  calculated with the help of our CRO and our investment

4  banker at the time of emergence.  Because again, it's based

5  on a minimum liquidity threshold.  So we're going to have to

6  figure out what --

7        THE COURT:  I mean, I --

8        MR. GIORDANO:  -- the uses are and then have to

9  figure out how much is actually.  But we expect that the

10  full 55 is what will be required.  But you're right; there

11  is a range.

12        THE COURT:  Okay.  All right.  So and I understand

13  that.  I just want to understand how -- what are the

14  variables to the minimum liquidity because that is obviously

15  an important number to reach.

16        MR. GIORDANO:  Okay.

17        THE COURT:  All right.  In terms of you have a

18  range of 335 to 405 for the general unsecured claims, is

19  there a build up to that range on Page 10?

20        MR. GIORDANO:  Yeah.  Let me grab that.  Sorry.

21  On Page 10 of the?

22        THE COURT:  Disclosure statement.

23        MR. GIORDANO:  I'm looking at the plan.

24        THE COURT:  No, no.  I'm just -- I'm only looking

25  at the Disclosure Statement.

1          MR. GIORDANO:  Yeah.  Okay.  The answer to your

2   question, Your Honor, is that it is based on the Debtors'

3   books and records.  It --

4          THE COURT:  Okay.  All right.

5          MR. GIORDANO:  It's based on the Debtors' books

6   and records.

7          THE COURT:  All right.  So I think we need to have

8   some disclosure as to how you got to that build up and, you

9   know, to test it.

10          MR. GIORDANO:  That's fine.

11          THE COURT:  So as it relates to administrative

12   claims, I think that -- and I think you confirmed this -- is

13   that the administrative claim that the Debtors incur in the

14   ordinary course of business are just going to be paid in

15   accordance with their terms.  And that would include any

16   personal injury claims as they arise postpetition.

17          MR. GIORDANO:  And are liquidated.

18          THE COURT:  And are liquidated.  Well, yes,

19   exactly, obviously.  And are liquidated.  Okay.

20          MR. GIORDANO:  Right.

21          THE COURT:  All right.  And there's no need for an

22   administrative -- with respect to those, there's no need for

23   an administrative claim bargaining?

24          MR. GIORDANO:  For postpetition administrative

25   claims?

1          THE COURT:  Incurred in the ordinary course of

2    business.

3          MR. GIORDANO:  I'm -- I don't believe so.

4          THE COURT:  Okay.  Well, that's the way I'm

5    reading this so --

6          MR. GIORDANO:  Yeah, I understand the question.

7    And if it's not clear, I'm happy to make that clear.

8          THE COURT:  Okay.  All right.  Is the professional

9    fee escrow included in the $35 million of liquidity?

10         UNIDENTIFIED MALE:  I'm sorry, Your Honor.  Could

11   you repeat that?

12         THE COURT:  Is the $35 million -- is the

13   professional fiasco included in the 35 million of liquidity?

14         MR. GIORDANO:  No, I believe that's already been

15   accounted for.

16         THE COURT:  So it's not.  It's excluded.  Okay.

17   All right.  So I was a little confused on Page 14 on C and

18   D, and I think -- so on the professional fee amount, they

19   have to give you an estimate through the effective date.

20   That's in C.

21         But in D, after the confirmation hearing, then the

22   Debtor can pay without regard to the escrowed amount.  So I

23   think it's a -- I don't care which way you do it, but I

24   think it's inconsistent.

25         MR. GIORDANO:  Okay.

1          THE COURT:  So if you want to do both confirmation

2    and then everything else after confirmation is outside of

3    it, I'm fine with that.  If you want to go to the effective

4    date --

5          MR. GIORDANO:  Understood.  I think probably the

6    disconnect has to do more with success fees, but I

7    understand.

8          THE COURT:  Okay.  Well, then if that's the case,

9    then you probably want to go both effective date.

10         MR. GIORDANO:  Yeah.

11         THE COURT:  All right.  One of the things that I

12   was a little confused about, you go to N on the next page,

13   Page 15.  It says what are the sources of cash and other

14   consideration required to fund the plan.

15         So my understanding is that -- and this is a

16   couple of places -- that it looks like the take-back debt is

17   a cash funding source.  But my understanding is that the

18   take-back debt is simply, you know, new debt that's being

19   issued but in return -- in exchange for the old debt and the

20   3 percent, but there's no cash coming in.  Is that -- so I

21   think you need -- it comes up several times.  I think you

22   need to make that clear.

23         MR. GIORDANO:  Okay.  Thank you.

24         THE COURT:  Okay.  So at the bottom of Page 16 --

25   and again, this comes up several times -- the Debtors retain

1    the right to list the causes of action that they're going to

2    retain.

3            And then there is -- and then it says, unless

4    otherwise agreed in writing by the parties to the applicable

5    causes of action, all objections to the schedule of retained

6    causes of action must be filed with the Bankruptcy Court on

7    or before 30 days after the effective date.

8            I guess I've never seen a plan where -- to what

9    the Debtor determines to retain.  What's the purpose of

10   that?  And it's in here about ten times.

11           MR. GIORDANO:  Retaining the ability to object to

12   the causes of action being retained by the reorganized

13   Debtors?

14           THE COURT:  Yeah.  What is that intended to do?  I

15   mean, the Debtor has the business judgment discretion to

16   retain causes of action.  So why is -- why can somebody

17   object to that?  I don't understand.  What's the purpose of

18   it?

19           MR. GIORDANO:  I would have to see whether that

20   was a comment that we got or not.  But I'd need to consult

21   with my --

22           MR. GENENDER:  Your Honor, if I may?

23           MR. GIORDANO:  Please.

24           MR. GENENDER:  I believe it's because the schedule

25   retains cause of action, that you're allowed to amend it

1   until the effective date.  So no one would have seen it

2   until the effective date.

3          THE COURT:  All right.  So don't you -- I think

4   that we need to have the retained causes of action filed

5   before the voting deadline, you know, in the plan

6   supplement.  But if -- and I don't think you can --

7          MR. GIORDANO:  It would be a plan supplement

8   document.

9          THE COURT:  Right.  But then it would be fixed --

10          MR. GIORDANO:  You're saying to finalize it and

11   not be able to move things?

12          THE COURT:  Yeah, yeah.  Because otherwise, if

13   people are voting, they got -- they have to have some time

14   to see that.

15          MR. GIORDANO:  Okay.  And that would solve the

16   need for the objection beyond the effective date.

17          THE COURT:  Right.  All right.  So in terms of

18   releasing parties, you're going to exclude minors and anyone

19   who's incompetent.  So this is the first third-party release

20   that I've seen that's not reciprocal.  So how does that

21   work?

22          MR. GIORDANO:  In the sense that every releasing

23   party should be in your view a released party?

24          THE COURT:  Well, no, no.  That's not in my view.

25   I'm saying this is the first third-party release that I've

1    seen that is not reciprocal.

2          MR. GIORDANO:  We can discuss whether to make it

3    reciprocal, Your Honor.

4          THE COURT:  Okay.  All right.  So then I guess in

5    terms of -- I have a concern about the definition of related

6    parties, and I want to understand.  I understand employees,

7    but who are your agents?  Would that be the professional

8    corporations?

9          MR. GIORDANO:  I think it could be.  You're

10   talking about -- sorry.  I was just talking to my colleague.

11         THE COURT:  I'm sorry.  I'm sorry.

12         MR. GIORDANO:  Because I understand that the

13   answer to your previous question is somewhat based on

14   comments that we got from the United States Trustee, but

15   understood.  We're --

16         THE COURT:  I'm sorry.  I had moved on.  So what

17   --

18         MR. GIORDANO:  Okay.

19         THE COURT:  -- what was the answer to the which

20   question?

21         MR. GIORDANO:  I think it has to do with what

22   you're about to address with the related parties.  So we can

23   probably get into that.

24         THE COURT:  Okay.  Yeah.  Because I -- it doesn't

25   really tell anybody who they're actually releasing on the

1    related parties.  So I mean, I understand the definition of

2    the released parties.

3              MR. GIORDANO:  Uh-huh.

4              THE COURT:  And but the related party definition,

5    I'm --

6              MR. GIORDANO:  I think the related -- I mean, the

7    related parties' definition are, you know, various, you

8    know, individuals and perhaps, in certain cases, service

9    providers, right, that are all affiliated with the company.

10             So the related parties' definition, I think folks

11   should assume that it releases most of the types of folks

12   that have been involved in, you know, certainly this

13   restructuring.  And that includes, you know, this list

14   which, you know, agents, I suppose is more of a catch-all

15   term.

16             THE COURT:  Okay.  I'm not concerned about their

17   liability for this restructuring.  I'm really concerned

18   about their -- the issues related to the personal injury

19   claimants.  So -- and who the related parties are and who

20   the agents are because I don't, you know, let me just --

21             MR. GIORDANO:  I think you're asking whether we're

22   trying to release.  I think I understand Your Honor's

23   question now.

24             THE COURT:  Okay.

25             MR. GIORDANO:  You're concerned about our

1  potential to release claims as they relate to, say, the PC

2  entities.

3          THE COURT:  The PC entities and, you know, a

4  doctor who provided service that may be, you know, an

5  employee or, you know, their professional corporation is an

6  employee of Wellpath.

7          MR. GIORDANO:  I think it would encompass

8  employees of Wellpath.  I do not think it would encompass

9  individuals for entities that did not file for Chapter 11.

10 That -- so in other words, the PCs would not -- the claims

11 against the PCs would not be extinguished through this.

12         THE COURT:  Okay.  So --

13         MR. GIORDANO:  Because remember, there's a part of

14 -- and this is frankly something that we probably should

15 clarify -- part of the way that this company is set up,

16 because of the corporate practice of medicine doctrine, is

17 that there are a number of states which require friendly PC

18 entities to set up that actually provide the care, right.

19         And then we have managed services agreements with

20 those PC entities.  And we provide, you know, for example,

21 funding to them for their operations.

22         And this has, I think, come up in some of the

23 state proceeding matters.  But there's also as part of those

24 MSAs indemnification obligations, right.

25         So, you know, this is partly why we think the go-

1    forward business is valuable even to a large number of

2    personal injury claimants where they have separate causes of

3    action against nonDebtor parties that are then going to be

4    indemnified through the assumption of those MSAs.

5              So just to kind of say it out loud, that is --

6    that's an important feature that, you know, I think is

7    getting lost in the mix here.  And that is certainly not

8    what we're trying to extinguish through the plan because

9    it's got to be based on the Debtors that are actually in

10   Chapter.

11             THE COURT:  Yes, sir.

12             MR. HEMENWAY:  Your Honor, I don't want to

13   necessarily interrupt all the Q and A with Mr. Giordano.

14   There are a couple of things that Your Honor's asked about

15   that I do feel like I need to clarify if I could have a

16   moment, please.

17             THE COURT:  Sure.  Unfortunately, I have a few

18   questions.

19             MR. HEMENWAY:  And I'm not going to get into other

20   argument about --

21             THE COURT:  No, no.

22             MR. HEMENWAY:  -- other issues.  I just want to

23   address this point.

24             THE COURT:  These are really in my mind

25   clarification because I think there's a big tradeoff between

1  going fast and what's getting released.

2          MR. HEMENWAY:  Understood.  Understood.

3          THE COURT:  Yeah.  And so, you know, at some

4  point, --

5          MR. HEMENWAY:  Well, --

6          THE COURT:  -- I'm just trying to understand.

7          MR. HEMENWAY:  Understood.  I will cede the

8  podium.

9          MR. ZLUTICKY:  Yeah, I think these are

10 existential.  The first is, Your Honor asked about what

11 happens for prepetition claims and postpetition claims and

12 when do they arise.

13          The way that the Debtors have structured the

14 releases, that's not relevant because they are making sure

15 that everything gets released that arose on or before the

16 effective date.

17          THE COURT:  Well, that's going to have to change.

18          MR. ZLUTICKY:  Yeah.  But that's -- and they're

19 also releasing future claims.  It says existing or

20 hereinafter existing.  So there are future claims releases

21 here.  That's another piece that I believe they need to be

22 very clear with Your Honor on, that that's what they're

23 asking you to approve is a Disclosure Statement that

24 releases future claims, and it releases any claims that

25 arose on or before the effective date.

1                On the PCs issue, the PCs are related entities.

2   The definition of released parties does not, may not include

3   all of the PCs.  I think it does include some of them.  It

4   may not include all of them, but they are related entities.

5                And then if you look at the definition of related

6   parties, it says at the very end, and for the avoidance of

7   doubt, it also means the related parties of the related

8   parties.

9                We are going to have a hearing this afternoon

10  where you're going to hear that there is such an identity of

11  interest between the professional corporations and the

12  Debtors that any claim that goes forward against the

13  professional corporations is essentially a claim against the

14  Debtor.

15               How can they say that there's a sufficient

16  identity of interest, yet they are not even a released

17  party, a related party to a released party, or a related

18  party to a related party to a related party to a related

19  party of a released party.  Because that's where this is

20  going.

21               THE COURT:  Yeah.  And these are the questions

22  that I'm trying to understand.  And so I don't think there's

23  -- I mean, this is not the time for argument.

24               MR. ZLUTICKY:  No, I --

25               THE COURT:  I'm really just trying to understand.

1          MR. ZLUTICKY:  Right.  And but -- and I'm not

2  trying to argue the issue.  I'm just explaining my

3  understanding of what this release does.

4          THE COURT:  But we're --

5          MR. ZLUTICKY:  And I think it's important to get

6  that clarification --

7          THE COURT:  -- we're going to get --

8          MR. ZLUTICKY:  -- and I promise I'm not going to -

9  -

10         THE COURT:  -- a revised draft.  And then people

11  will --

12         MR. ZLUTICKY:  Yeah.

13         THE COURT:  -- be able to -- it off.

14         MR. ZLUTICKY:  But just in --

15         THE COURT:  But for right now, --

16         MR. ZLUTICKY:  -- I do think it does include the

17  PCs, Your Honor.  And so this indemnification issue, it's

18  important because I think it includes the PCs as currently

19  written.

20         MR. GIORDANO:  We've explained that it does not to

21  the Committee multiple times.

22         THE COURT:  Okay.

23         MR. GIORDANO:  And it would have been nice -- we

24  would have been happy to work through language with them to

25  clarify that prior to the Disclosure Statement hearing.

1          THE COURT:   Yeah.   In the last related -- in the
2    last -- so --

3          MR. GIORDANO:   By the way, the reciprocal point is
4    again, a United States Trustee comment because I do not
5    believe she wanted the related parties to automatically be
6    granting third-party releases.

7          THE COURT:   Correct.   And but I do think that to
8    the extent you're not a related party, then you -- the issue
9    is that the way it works right now, the way I understand it
10   is if you are a creditor, you give a release, but you don't
11   get a release.   You're an unsecured creditor.

12         MR. GIORDANO:   Again, I think we're perfectly
13   happy to make it reciprocal.   We were trying to respond to
14   objections received.

15         THE COURT:   Okay.   That may have.   I mean, there
16   may be a valid business reason to have it that way.   I don't
17   know.   But I'm just saying this is just the first time I've
18   seen it without being reciprocal.

19         MR. GIORDANO:   And I'm trying to clarify where it
20   came from.

21         THE COURT:   And then also I think we need to limit
22   -- well, I think I have the most concern about the related
23   party definition, and in particular, the related, you know,
24   related parties, particularly to the Debtor, is the one that
25   gives me the most concern.

1          I'm not as concerned with the related parties to

2     the lenders or to other entities that are being granted

3     release.  But I think -- but I do think that -- and I think

4     it's a tradeoff between wanting to go fast and what's

5     getting released.  So we can talk about that later.

6          And then in the last one that I approved in terms

7     of the releasing party -- and this may have been language

8     from the U.S. Trustee, frankly -- it limited releasing party

9     as it related to a related entity solely to the extent such

10    related party would, one, would be obligated to grant a

11    release under the principles of the agent if they were

12    directed to do so by the entity in the foregoing clause A

13    through whatever above to whom they are related; or two, may

14    assert causes of actions on behalf of or in a derivative

15    capacity through the entity above.

16         So that limits it to -- and I can provide you that

17    language as well.

18         MR. GIORDANO:  Thank you, Your Honor.

19         THE COURT:  All right.  So we already went through

20    what comment I had at the top of Page 18, the very bottom of

21    the first paragraph.

22         You've expanded that to mean just anybody who

23    filed a lift stay to just basically anybody who filed

24    anything --

25         MR. GIORDANO:  For who's counted as or who were --

1    we're considering to have opted out.

2          THE COURT:  Right.

3          MR. GIORDANO:  Correct.

4          THE COURT:  Yeah.

5          MR. GIORDANO:  And if Your Honor would like us to,

6    you know, deal with the letters, obviously we're happy to do

7    that as well.

8          THE COURT:  Yeah, no, no.  I am going to want you

9    to do that.

10         MR. GIORDANO:  Okay.

11         THE COURT:  All right.  So you know, as I said, it

12   comes up a couple of places, but for instance, at the top of

13   Page 21, you talk about the releases contemplated by the

14   Recovery Solutions order.

15         And I think that's perfectly appropriate.  I just

16   want to make sure that we're consistent as to what they're

17   getting under that order.

18         MR. GIORDANO:  Again, we're happy to add some

19   clarification that that release for that purpose and in that

20   capacity is what they're getting.

21         THE COURT:  And then there's a lot of -- on

22   Page 22 in the releases by the releasing party, there's

23   pretty broad language that they're releasing any other act

24   or omission, transaction, agreement, or event, occurrence

25   taking place before the effective date.

1          I think we need to make clear that that doesn't

2    include, you know, the liquidation of the claims, and it

3    doesn't include anything that happened post-effective date,

4    at least as it relates to the personal injury claims Chapter

5    --

6          MR. GIORDANO:  To the underlying cause of action.

7          THE COURT:  Right.  Exactly.  Yeah.

8          MR. GIORDANO:  Yeah.  Understood.

9          THE COURT:  That comes up also on 24 in the middle

10   of the Paragraph where it says except otherwise provided,

11   you -- you know, one is commencing or continuing any manner,

12   any action, or proceeding that arose prepetition the

13   injunction.  We need to carve that out.

14         MR. GIORDANO:  From the injunction.  Sorry, Your

15   Honor.

16         THE COURT:  Of the injunction.

17         MR. GIORDANO:  You're on the injunction?

18         THE COURT:  Yes.  I'm just going through the

19   Disclosure Statement.

20         MR. GIORDANO:  Yeah.  I'm --

21         THE COURT:  Obviously these --

22         MR. GIORDANO:  -- looking at the redline, but I

23   probably just need to look at the clean with you.

24         THE COURT:  Yeah.

25         MR. GIORDANO:  All right.

 1           THE COURT:  You guys were too fast for me.

 2           MR. GIORDANO:  Okay.  Thank you.

 3           THE COURT:  So do I understand correctly that the

 4  liquidation trust would have to stay open for seven years or

 5  as long as the CBR was open?  CBR has a seven-year term.

 6  And so with the -- I mean, unless after --

 7           MR. GIORDANO:  Some shorter period of time.

 8           THE COURT:  -- time, it's determined that it's

 9  valueless.  But then that would be --

10           MR. GIORDANO:  I think that it, you know, the

11  exact mechanics of the liquidating trust will be a plan

12  supplement document.  But yes, I mean that intuitively would

13  need to be open in order to deal with any CBR interests at

14  that time.

15           THE COURT:  So in the -- I'm not sure if it's -- I

16  think it's in the plan.  You say that the liquidating trust

17  is responsible for the U.S. Trustee fees going forward; is

18  that correct?

19           MR. GIORDANO:  (No audible response.)

20           THE COURT:  Okay.  All right.

21           MR. GIORDANO:  I'd need to check, Your Honor.  I'm

22  happy to.  Give me one second.

23           THE COURT:  I'm sure it says that.

24           MR. GIORDANO:  If you're asking, I'm sure it says

25  it too.

1           I -- thank you.  Yeah.  Okay.  Thank you.

2           THE COURT:  All right.  So --

3           MR. GIORDANO:  Yes.

4           THE COURT:  -- when you transfer the assets to the

5    liquidating trust -- and so this is a more general question.

6    I was a little confused as to the way you structured the

7    plan.

8           Normally, I would see a situation where you say we

9    have one plan, and then each individual Debtor has -- will

10   be, you know, you will count each individual Debtor in their

11   plan.

12          And we're not affecting a substantive

13   consolidation.  But here's the way the recoveries would

14   work.  Normally, then you would see in the liquidation

15   analysis that there would be a combined, like we have here,

16   but there would be separate liquidation analysis for each of

17   the Debtors.

18          I didn't see that, and I didn't see any language.

19   There is some language, like for instance, in the ballot, it

20   says, you know, you vote your amount and we'll allocate it

21   to the appropriate Debtor.

22          But is this a subcon plan or is it individual

23   plans?  Nowhere does it say that in there.

24          MR. GIORDANO:  It's individual plans, Your Honor.

25          THE COURT:  Okay.  Can we specify that?  And then

1   if that's the case, then I think we need to do -- the

2   liquidation analysis needs to be, you know, each individual

3   has to meet the best interest test.  Also, and I think we do

4   need --

5           MR. GIORDANO:  Your Honor, I assume that we could

6   supplement.  Given the solicitation time, I'm assuming we

7   could supplement the record with the --

8           THE COURT:  Yeah, yeah.

9           MR. GIORDANO:  -- liquidation analysis.

10          THE COURT:  I'm going to, you know, I'm going to

11  need to see the amended Disclosure Statement.  So hopefully,

12  you can get it done tomorrow or the next day.  And then --

13          MR. GIORDANO:  I do think I probably would -- in

14  terms of the liquidation analysis, I'll need to have a

15  conversation with our financial advisor about kind of the

16  process for that and what and how easy that's going to be

17  under the circumstances.

18          THE COURT:  Okay.  But how do I confirm a plan

19  saying that it meets the best interest test if I don't have

20  a liquidation analysis for any given Debtor?

21          MR. GIORDANO:  I understand the concern, Your

22  Honor.  I need to --

23          THE COURT:  I mean, --

24          MR. GIORDANO:  -- I may need a moment to talk to

25  --

1            THE COURT:  Okay.  All right.  That's fine.

2            MR. GIORDANO:  -- my counterpart at FTI.

3            THE COURT:  I'm not -- I'm just -- I'm asking the

4   question.

5            MR. GIORDANO:  Understood.

6            MR. GINSBERG:  May I ask a follow-up question to

7   that, Your Honor?  Mark Ginsberg speaking.

8            THE COURT:  Yes, sir.

9            MR. GINSBERG:  I believe there are two claimants

10  who have claims against what we call Neurobehavioral

11  Hospital, which is the entity 901 -- I forgot the rest of

12  the address --

13           THE COURT:  Right.

14           MR. GINSBERG:  -- on West 45th Street.  I've read

15  an article that that hospital is in the process of closing.

16  I think its primary asset is real estate, and I don't know

17  what the status of that is.

18           And if there is going to be a liquidation

19  analysis, I would hope that would include the two claims vis

20  a vis that particular Debtor.  Thank you.

21           UNIDENTIFIED MALE:  Your Honor, I appreciate that

22  you're stealing a lot of our thunder.  It's good.  And

23  you're getting a lot of our questions out of the way, but we

24  do have a case to present --

25           THE COURT:  Understood, understood.  But let me --

1  let's --

2           UNIDENTIFIED MALE:  -- including evidence.

3           THE COURT:  Understand.  And I just want to go

4  through this just -- well, actually why don't you go ahead

5  and present your evidence and then we can go back --

6           UNIDENTIFIED MALE:  I just want to make sure --

7           THE COURT:  -- because I do have more questions.

8           UNIDENTIFIED MALE:  -- that Mr. Giordano's case is

9  closed at this time.

10          MR. GIORDANO:  Well, I assume we would be able to

11 do -- sorry.  I assume that we -- if we're going to have

12 testimony, we may, especially given Your Honor's comments,

13 we may want to put our financial adviser on the stand.

14          THE COURT:  That's fine.

15          MR. GIORDANO:  But I would want a quick minute to

16 recess and make sure if that's okay.

17          THE COURT:  Should we go ahead?  It's almost 11:00

18 o'clock, and we've been going for two hours.  Why don't we

19 take a ten-minute break?

20          MR. GIORDANO:  That would be good.  Thank you.

21          UNIDENTIFIED MALE:  Sure.

22          THE COURT:  Okay.

23          UNIDENTIFIED MALE:  Thank you, Your Honor.

24          THE COURT:  All right.

25      (Recess taken from 10:56 a.m. to 11:07 a.m.)

1          THE COURT:  Please be seated.  Folks?

2       (Court and court personnel confer.)

3          MR. GIORDANO:  Your Honor, I think, from our

4   perspective, we're happy to save our witnesses for

5   rebuttal --

6          THE COURT:  Okay.

7          MR. GIORDANO:  -- if necessary.  You know, again,

8   I think we were making good progress.  I think, to limit,

9   potentially, the amount of testimony and issues that we

10  actually have, it might be good to go through the rest of

11  Your Honor's comments and then the Committee can certainly

12  put on their witnesses, if it's necessary.

13         MR. ROSEN:  It's fine, Your Honor.

14         THE COURT:  Okay.  Then we can do that.

15         MR. GIORDANO:  Okay.  And Your Honor, I did get

16  you, on the break, some clarification on the five percent

17  piece, which is, you know, when I said the five percent of

18  incarcerated individuals earlier, that it's less than five

19  percent based on the number of claims filed by prisoners

20  balanced against the total population of scheduled and filed

21  claims, so that's the amount.

22         MR. ROSEN:  I'm sorry.  Brad?

23         THE COURT:  So --

24         MR. ROSEN:  Excuse me.  That -- was that filed as

25  of today?  When you say "claims filed by prisoners"?

1          MR. GIORDANO:  Yes, I believe the -- we got the

2   information from --

3          MR. ROSEN:  Okay.

4          THE COURT:  All right.  Say it again.

5          MR. GIORDANO:  The amount of claims filed by

6   prisoners, as compared to the total amount of scheduled and

7   filed claims by other individuals as of --

8          THE COURT:  So do you know how many claims have

9   been filed by prisoners?

10          MR. GIORDANO:  I do not.  I --

11          THE COURT:  It's not the 1,500, obviously.

12          MR. GIORDANO:  Correct.

13          THE COURT:  Okay.

14          MR. GIORDANO:  Correct.

15          THE COURT:  So -- all right.  All right.  That

16   makes sense.  I'm not sure it's very helpful, but it makes

17   sense.

18       (Laughter)

19          THE COURT:  Because it could be three claims.

20       (Laughter)

21          MR. GIORDANO:  I'd hate to be -- I'd hate to be

22   accused of being helpful, Your Honor, so.

23          THE COURT:  All right.

24          MR. GIORDANO:  Right.

25          THE COURT:  All right.  What I thought you were

1  saying was that you had 20 times the number --

2          MR. GIORDANO:  No, I under --

3          THE COURT:  -- above the fifteen --

4          MR. GIORDANO:  I understand, which is why we

5  wanted to get clarification on the record.

6          THE COURT:  Okay.  Okay.  All right.  And I think

7  we're clear that the liquidating trust funding amount is

8  strictly for admin expenses --

9          MR. GIORDANO:  Correct.

10          THE COURT:  -- not for creditor --

11          MR. GIORDANO:  That is --

12          THE COURT:  -- payouts.

13          MR. GIORDANO:  That is correct.  That was my

14  mistake.

15          THE COURT:  Okay.  So, in connection with the

16  equity financing, the commitment premium and the various

17  other amounts, they're all payable in stock; they're not

18  payable in cash.  Okay.  Because there's -- it's a little

19  confusing on the bottom of Page 30, but I think --

20          UNIDENTIFIED:  How you going to sell stocks --

21          THE COURT:  Okay.

22          UNIDENTIFIED:  -- in a bankruptcy organization?

23  Unlawful enrichment.  My objection continues, sir.

24          THE COURT:  Okay.  Thank you.  We'll come back to

25  you.  Just raise your hand again, after we get done with

1   this.

2           MR. GIORDANO:  Where are you now, Your Honor?

3           THE COURT:  I'm on Page 32.

4       (Pause in the proceedings.)

5           THE COURT:  Okay.  And Page 34, you get this thing

6   about -- again, and it's many places, about they have 30

7   days to object to the schedules of retained assets.  But I

8   guess that's been cleared up.

9           MR. GIORDANO:  We're going to make that change and

10  we'll carry it through.

11          THE COURT:  All right.  So I don't understand the

12  vesting of the liquidating trust assets.  So it says that

13  the initial funding, as well as the causes of action that

14  are transferred to the trust, those are the liquidating.

15  Then it says:

16          "-- provided that, after the funding of the

17  professional" --

18          It's kind of in the middle of the Paragraph --

19          MR. GIORDANO:  Yes.

20          THE COURT:  -- that says "provided."

21          MR. GIORDANO:  I'm following.

22          THE COURT:  "-- after the funding of professional

23  fee escrows, the collateral or proceeds of the sale of such

24  collateral that's post-restructuring that are securing the

25  first liens shall remain subject to the liens and claims of

1    the first lien lenders, as applicable."

2              I don't understand that at all because my

3    understanding is, is that, on the effective date, all liens

4    will be released and the only liens that exist will be the

5    liens that the take-back debt will have.  So why are we

6    talking about the first lien claims and the second lien

7    claims, that they'll keep their liens?

8         (Participants confer.)

9              MR. GIORDANO:  That needs to be corrected.

10             THE COURT:  Okay.  That's a bust?

11             MR. GIORDANO:  That is a bust.

12             THE COURT:  Okay.  All right.  In terms of, at the

13   very bottom of that, what do you mean by "reconciling

14   general unsecured claims"?  I understand how -- what that

15   does with respect to proofs of claim that are filed by non

16   personal injury claimants.  But does the liquidating trust

17   have any role in liquidating the personal injury claims?

18             MR. GIORDANO:  I would imagine only to the extent,

19   you know, there's a settlement or some other agreement to

20   liquidate those claims, those -- we're not seeking to

21   invalidate the ability of those claimants to have their day

22   in court, if they determine that that's the best thing for

23   them.

24             THE COURT:  And at this point, there are no

25   undisputed personal injury claims.

1          MR. GIORDANO:  I don't know whether the answer is
2     no.  I assume that the vast majority are disputed.
3          THE COURT:  Okay.
4          MR. GINSBERG:  Your Honor, Marc Ginsberg speaking.
5          May I ask a question about the liquidating trust
6     and the priority of payments?
7          THE COURT:  Sure.  But I think the answer is, is
8     that they're going to need to reserve and only make a
9     distribution based on the whole universe.  And then it will
10    go -- it's going to be up to the liquidating trustee, based
11    on the evidence, to determine how much to liquidate.
12         But the other thing, Mr. Ginsberg, is there isn't
13    going to be anything to liquidate, until and unless the
14    liquidating trust prevails on one of the causes of action,
15    and so I don't anticipate that there's going to be anything
16    to distribute for a while.  Just, in fact, based on the new
17    plan, it basically says that there's no distributions, you
18    know, that there may be no distributions from the
19    liquidating trust.
20         MR. GINSBERG:  I understand that.  But I assume
21    that the liquidating trust is going to wait until all claims
22    have an established amount before it begins paying
23    everybody, so it could do it all on a pro rata basis.
24         THE COURT:  Well, I think what they'll do is --
25    generally speaking, what they'll do is they will -- and I'm

1   just doing it based on experience.  Generally speaking, what

2   they'll do is they'll say -- they'll take everybody's demand

3   and use that as the denominator and so pay only, you know,

4   whatever pro rata amount based on everybody's demand until

5   they're all liquidated.

6          MR. GINSBERG:  All right.  I -- so I just think

7   that should be in the plan, what they expect to do, I think

8   -- in the Disclosure Statement, so people like me have an

9   understanding of how it's going to work.

10          THE COURT:  Yeah, and --

11          MR. GINSBERG:  I mean, that's my --

12          THE COURT:  I think that will be in the

13   liquidating trust document, so --

14          MR. GINSBERG:  Okay.

15          THE COURT:  And that will be available before the

16   plan.

17          MR. GINSBERG:  Thank you.

18      (Pause in the proceedings.)

19          THE COURT:  So, in terms of the -- I think we need

20   someplace in here -- there's a description in Page 42 and 43

21   of the SF Division and the LG Division, and that -- how much

22   revenue they did for 2023, and the fact that they had it.

23          I think we should also have -- so they talk about

24   -- each one talks about "health care professionals."  Is

25   that different than employees?  Because the numbers just

1   didn't quite add up for me.  So I can -- state and federal

2   has 1,600 health care, and in the LG Division, it has 1,600

3   health care professionals; whereas, you know, we're talking

4   about 10,000 employees.

5        MR. GIORDANO:  Right.  But not all employees are

6   health care professionals.  I think of --

7        THE COURT:  But they --

8        MR. GIORDANO:  -- "health care professionals" --

9        THE COURT:  Okay.  So --

10        MR. GIORDANO:  -- more applying to --

11        THE COURT:  Okay.  Got it.

12        MR. GIORDANO:  -- doctors, nurses, et cetera.

13        THE COURT:  All right.  I had a comment at the top

14   of Page 44, where you were talking about the Recovery

15   Solutions business.  You know, why don't you say it was sold

16   during the bankruptcy?  But you say that on the next page,

17   so I think that's fine.

18        MR. GIORDANO:  Okay.

19        THE COURT:  All right.  One thing, at the bottom

20   of Page 46, you indicate that, between 2019 and 2023, that

21   settlements totaled $110 million, but there's no -- any --

22   nowhere else is there a projection of what you anticipate

23   the level of expense will be going forward.  I don't know if

24   that's in the projections, but if it is, it's not detailed.

25        MR. GIORDANO:  So is Your Honor -- would Your

1   Honor want us to kind of have a sentence explaining exactly

2   how we're projecting that out --

3           THE COURT:  Yes.

4           MR. GIORDANO:  -- going forward?

5           THE COURT:  Yeah, exactly --

6           MR. GIORDANO:  Okay.

7           THE COURT:  -- because, you know, if I just do the

8   straight math, you're talking about -- and if this

9   continues, it's about 2 million a month.

10          MR. GIORDANO:  I think --

11          THE COURT:  And I --

12          MR. GIORDANO:  I think --

13          THE COURT:  -- don't know --

14          MR. GIORDANO:  -- we can --

15          THE COURT:  -- whether that includes defense costs

16  or just settlements.

17          MR. GIORDANO:  Understood.  I be -- we can

18  certainly add some language that explains that.

19          THE COURT:  With respect to the exculpation on the

20  independent directors, can we specify who they are?

21          MR. GIORDANO:  The independent directors?

22          THE COURT:  Yes.

23          MR. GIORDANO:  Patrick Bartels and Carol --

24          THE COURT:  Those are the independent directors.

25  The -- it says "independent board members."  So is that

1  different than Carol Flaton and Patrick Bartels?  That's my

2  question because it doesn't talk about independent --

3          MR. GIORDANO:  "Independent board members"?

4          THE COURT:  Yeah.  And that -- if you're talking

5  about the SEC definition of "independent board members,"

6  that's different, in my mind, than --

7          MR. GIORDANO:  We can --

8          THE COURT:  -- than Ms. Flaton --

9          MR. GIORDANO:  We can clarify the --

10          THE COURT:  But what the --

11          MR. GIORDANO:  -- the --

12          THE COURT:  -- intent was?

13          MR. GIORDANO:  I -- anybody that's independent, I

14  think that was the intent.

15          THE COURT:  Okay.  Well --

16          MR. GIORDANO:  And the question -- I don't know,

17  standing here, you know, in terms of the exact individual

18  and whether they qualify under that standard because I do

19  understanding that, you know, holdings in the entity and

20  things like that matter, so --

21          THE COURT:  Okay.

22          MR. GIORDANO:  But certainly, those two is -- are

23  incorporated and there may be others.

24          THE COURT:  Yeah.  So I just think we need to

25  specify it.  And obviously, that's a plan issue, that's not

1  a --

2          MR. GIORDANO:  Yep.

3          THE COURT:  -- an issue for today.

4          MR. GIORDANO:  I think we do have a couple of

5  other, I think, board members that qualify, but we'll

6  specify.

7      (Pause in the proceedings.)

8          THE COURT:  You know, one thing that I think we

9  need to put in here are what the deadlines in the

10  restructuring support agreement are because it's not -- it's

11  nowhere in here.

12          MR. GIORDANO:  We can do that.

13          Your Honor, if you can help me out and tell me

14  what Page you're on at this point.

15          THE COURT:  Yeah, I'm on -- right now, I'm on Page

16  74 --

17          MR. GIORDANO:  Okay.

18          THE COURT:  -- which is the -- where you describe:

19          "The Debtors could be subject to substantial

20  uninsured liabilities or increased insurance costs."

21          MR. GIORDANO:  Okay.

22          THE COURT:  I think we need a more fulsome

23  description of the insurance because, you know, the initial

24  Declaration, which basically said that the fronting policy,

25  there was no transfer of risk, I think the question that

1  Mr. Ginsberg was asking.  I think that we need to have some

2  disclosure of that because this seems to indicate, you know,

3  the Debtors will maintain a claims way -- professional and

4  general liability insurance coverage in excess of those

5  amounts, that they are self-insured.  But the testimony in

6  some of these cases says that's $15 million that you're

7  self-insured.  As a practical matter, you know, is that any

8  insurance at all for most of these claims?

9          So it -- I think we need to have some disclosure

10 on that because that is -- I don't think we need to get into

11 the specifics of any particular -- you know, I mean --

12         MR. GIORDANO:  There is some complexity to that

13 based on the claims, but I understand.

14         THE COURT:  I understand.  But I'm talking about

15 going forward.  Okay?

16         MR. GIORDANO:  Yes.

17         THE COURT:  Not going -- not looking back.

18         MR. GIORDANO:  The current --

19         THE COURT:  I'm going --

20         MR. GIORDANO:  The go forward --

21         THE COURT:  Yeah.

22         MR. GIORDANO:  -- policy stack as it --

23         THE COURT:  Yeah, because that --

24         MR. GIORDANO:  -- is today.

25         THE COURT:  That --

1          MR. GIORDANO:  Yep.

2          THE COURT:  That obviously impacts feasibility.

3  But I think -- I do think that the response to the -- those

4  objections that you made I think is well taken.  This is not

5  kind of looking back; this is looking forward.  But we need

6  to understand that.

7          MR. GIORDANO:  Understood.

8          THE COURT:  And then, you know, my experience with

9  self -- what would happen if you did a Chapter 7

10 liquidation; what would happen to those fronting policies?

11 I think we're going to need some analysis because, under

12 some state laws, they're required to step in if the -- if,

13 you know, it's a Chapter 7 and there's nothing to pay.  So,

14 you know, that goes to the best interests test.

15         MR. GIORDANO:  Understood.

16         THE COURT:  Okay.

17     (Pause in the proceedings.)

18         THE COURT:  You know, obviously, the best

19 interests and the liquidation analysis is -- I mean, it's a

20 confirmation issue, so I'm not -- that's not going to hold

21 up approval of the Disclosure Statement.  But I do think

22 that there is, in my mind, significant concern that, if

23 you're wiping out causes of action that other -- that third

24 parties may have, that they're actually worse off in a

25 Chapter 11 than they are in a liquidation.

1          MR. GIORDANO:  Your Honor, I'm not sure that we

2   agree that that's the case, but --

3          THE COURT:  I mean, it's going to be subject to

4   evidence.

5          MR. GIORDANO:  Understood.  And --

6          THE COURT:  Yeah.

7          MR. GIORDANO:  But I think that --

8          THE COURT:  But it --

9          MR. GIORDANO:  -- we're going to have to, you

10  know, show Your Honor that that's not the case, if we want

11  the plan confirmed.

12         THE COURT:  All right.  Page 81, the second full

13  paragraph.  So here's where there's the kind of back-and-

14  forth.  So you -- nowhere do you say that you're going to

15  solicit for each individual plan.  But then, here, it says:

16         "Pursuant to Article 3(e) of the plan, if a class

17  contains claims eligible to vote and no holders of claims

18  eligible to vote in such class vote to accept or reject the

19  plan, the holders of such claims are deemed to have accepted

20  the plan."

21         I don't know any authority to do that.  And this

22  would indicate to me that you're voting separately by plan,

23  by Debtor.  But there's -- nowhere does it say that and

24  there's no liquidation analysis --

25         MR. GIORDANO:  Under --

1          THE COURT:  -- per Debtor.

2          MR. GIORDANO:  Understood.

3          And Your Honor, I probably should have started

4 that we understand the -- Your Honor's concern on the

5 liquidation and best interests test and we are going to put

6 together a revised liquidation --

7          THE COURT:  Yeah, but --

8          MR. GIORDANO:  -- as part of --

9          THE COURT:  -- I need to think about that because

10 I don't think that I can deem accept -- if they're -- I

11 mean, the statute is pretty clear that you have to have, you

12 know, 66 in two halves, 66 in one half, and more than 50

13 percent of voting claims; and, if there's no voting claims,

14 then the class doesn't care.

15          MR. GIORDANO:  I've certainly seen this approved

16 in other plans.  But perhaps, you know, we'd need to carry

17 our --

18          THE COURT:  Uh-huh.

19          MR. GIORDANO:  We'd need to show you some

20 authority for that.

21          THE COURT:  Yeah.  And show me where it says I can

22 do that in the statute --

23          MR. GIORDANO:  Understood.

24          THE COURT:  -- more importantly.

25          MR. GIORDANO:  I understand.

1          THE COURT:  Or give me a Fifth Circuit case.

2          MR. GIORDANO:  We will look for one, Your Honor.

3      (Pause in the proceedings.)

4          THE COURT:  So one of the questions -- and I think

5   I -- we were talking about this before we broke -- was I

6   understand the concept of that this will be a grantor --

7   liquidating grantor trust, and so the creditors are deemed

8   to have received the assets first and then donated it to the

9   liquidating trust.  So the question I have is:  At some

10  point in here, you need to have -- we need to have a

11  disclosure as to what you think the value is.  And if you

12  want to say we don't know and it might be zero, that's fine,

13  but we need to do that.

14          MR. GIORDANO:  The disclosure -- sorry -- of --

15  value of what?

16          THE COURT:  Of what is being transferred to the

17  holders, which then, in turn, is being contributed to the

18  liquidating trust.

19          And that also would impact your monthly operating

20  report because that would be deemed a distribution; and, to

21  the extent there's a value, you pay monthly fees.  And I'm

22  sure Ms. Hersh wants them done on a Debtor-by-Debtor basis,

23  so --

24          MR. GIORDANO:  We haven't asked, but I assume so,

25  as well.

1          THE COURT:  She's nodding her head.

2          MR. GIORDANO:  Is she?  Okay.

3          THE COURT:  Yeah.

4      (Laughter)

5          THE COURT:  So that's nowhere -- that's --

6          MR. GIORDANO:  Understood.

7          THE COURT:  Okay.

8      (Pause in the proceedings.)

9          THE COURT:  All right.  I gave you my comments on

10  the liquidation statement and I gave you my comments on the

11  projections.

12          And so, as of today, based on -- you know, in the

13  projections, the only two leases that you sought rejection

14  are the 901 45 Street, West Palm Beach, and the Boynton

15  Beach Florida Behavioral.  That's -- I think that's what it

16  says.

17          MR. GIORDANO:  Yeah.  I do believe we'll have some

18  additional things to add, but that will be --

19          THE COURT:  Those are the only ones, that's what's

20  disclosed in here, that's what the projections are based on.

21          MR. GIORDANO:  Correct.

22          UNIDENTIFIED:  May I ask what Page that's on?  I

23  didn't see --

24          THE COURT:  It's not --

25          UNIDENTIFIED:  -- where -- that they were basing

1   on --

2         THE COURT:  Unfortunately, the financial

3   projections at Exhibit E are not -- there's no Page numbers.

4   So it's on the -- it's on the second full Page of text,

5   "operating impacts."

6         MR. GIORDANO:  If you're looking at it on a -- I

7   think a PDF, it's Page 137.

8         UNIDENTIFIED:  On which document number, please?

9         MR. GIORDANO:  Let's see.  1431.

10        UNIDENTIFIED:  Great.  Thank you.

11        MR. GIORDANO:  You're welcome.

12        UNIDENTIFIED:  Your Honor?

13        THE COURT:  Yes.

14        UNIDENTIFIED:  On this subject, is -- would it be

15  possible to move up the date for the acceptance or rejection

16  of the executory contracts and leases?  I don't see how a

17  liquidation analysis could be done without that first.

18        And secondly, we have this sort of hybrid

19  situation with regard to the Alpine property and operation.

20        THE COURT:  All right.  We'll consider that when

21  we listen to argument.  I'm just -- here, I'm just really

22  trying to understand what's in here, as opposed to --

23        UNIDENTIFIED:  Okay.  Thank you.

24     (Pause in the proceedings.)

25        THE COURT:  All right.  Now I'm going to go to the

1   order approving the Disclosure Statement.

2        (Participants confer.)

3        MR. GIORDANO:  If you'll give me one second to

4   grab it.

5        (Pause in the proceedings.)

6        MR. GIORDANO:  Okay.  I have a redLine in front of

7   me, so I'll do my best to follow along.

8        THE COURT:  Okay.  All right.  So there are

9   several findings in here that you're asking me to make that

10  I don't have evidence and I think will be the subject of

11  testimony at the confirmation hearing, so -- and we -- I can

12  circle back to them.  But we can either conditionally

13  approve this to send it out for solicitation, or we can take

14  out those findings.

15        Like I -- I'm not sure that I can make a finding

16  that the way you've structured the solicitation, where the

17  Epiq only has to look at the books and records that you gave

18  them, where you say that, you know, most of the population

19  is only in the facility for two weeks and then moves on,

20  that that's adequate -- that that's adequate information.

21        I would -- you know, with respect to your

22  commercial creditors who you're doing business with, with

23  respect to any shareholder that, you know, a share -- I

24  don't have a problem with that.  But I don't know that I can

25  make a finding that the service is adequate, especially

1    when, on the other side, you say that the person -- the

2    creditor takes the risk of their ballot not being returned

3    or their opt-out not being returned, whereas the claims

4    agent has no obligation to do any work, other than whatever

5    you gave them.

6           MR. GIORDANO:  Well, I think -- Your Honor, I --

7    if you can -- when you say "conditionally approve," you're

8    saying we could put on additional testimony to that effect?

9           THE COURT:  No, no, no, no.  I mean, it would --

10   you -- I would approve it and then -- but to the extent

11   you're asking me to say that there was good service, we

12   would have -- we would -- and somebody challenged whether

13   there was good service, then that would be the subject of a

14   confirmation hearing, in the confirmation hearing, it would

15   not be --

16          MR. GIORDANO:  That makes sense to me.

17          THE COURT:  Yeah.

18          MR. GIORDANO:  I understand that.

19          THE COURT:  Okay.  All right.  So this comes up a

20   couple of places.

21          All right.  I think that Ms. Hersh raised the

22   issue of, you know, the proof of claim deadline is after the

23   voting deadline and what -- how do we -- how do we

24   disenfranchise those creditors.

25          MR. GIORDANO:  Your Honor, the reason that the --

1    I mean, just to kind of start back from when we started

2    these cases, we moved the claims bar date at the request of

3    the Committee and the United States Trustee.  But it wasn't

4    -- you know, we never did that with the intention that that

5    would then be bootstrapped into a reason to delay the

6    process overall.

7              I think that, you know, to the extent we're

8    talking about individuals, a certain subset of individuals,

9    you could, could they vote at a dollar, I suppose we'd be

10   open to that.

11             THE COURT:  And that is -- that's confusion

12   because, at one place, you do say that they're voting at a

13   dollar.

14             MR. GIORDANO:  Okay.  So -- and I'm just trying to

15   understand which --

16             THE COURT:  Where is it?  I saw that.  I'll come

17   to it, but -- so that -- it's confusing as to whether they

18   vote at a dollar or they have to do it.

19             But it seems to me that, you know -- you know,

20   obviously, with respect to that, I have a real concern

21   whether that is, you know, authorized by the Bankruptcy

22   Code, to disenfranchise somebody because the proof of claim

23   date is after the voting date.

24             MR. GIORDANO:  I'm not sure that it's

25   disenfranchising them.  We are allowing for delays for

1  certain things because we acknowledge the difficulty with

2  getting information to a certain subclass of the general

3  unsecured claimants, and that applies to both the proof of

4  claim and it applies to the opt-out form.

5         You know, just to say it, you know, the Committee

6  has made their intention very clear that they are going to

7  encourage general unsecured claims -- claimants to vote

8  against the plan.  And we are not expecting to go to

9  confirmation without having to, you know, essentially meet

10  the cramdown standards there.

11         We -- the solicitation time line, in other

12  contexts, would -- is normal course and appropriate.  And we

13  understand the -- we understand the sensitive issue that we

14  have an incarcerated population, but this is one where it's

15  a balancing test.  And in our view, we are still calculating

16  our solicitation to get them the ability to vote, but there

17  -- we cannot have it indefinitely delayed.  And so --

18         THE COURT:  And --

19         MR. GIORDANO:  And there's challenges in every --

20  in other contexts, there's challenges, too, of getting

21  information to people, you know, for various reasons.

22         THE COURT:  Well, okay.  This -- again, this is a

23  confirmation issue, as to whether I can approve a plan that

24  does this.  Now, obviously, if a class rejects, then

25  probably not an issue.  But if the class doesn't reject,

1   then I think it could be a huge issue.

2          MR. GIORDANO:  Understood.  And perhaps, at that -

3   - if -- at that point in time, you know, if that remains a

4   concern or it's an issue, then, you know, we can -- we may

5   still need to go through the standards to deem them to

6   reject.

7          THE COURT:  Right.  And then -- that's one

8   concern.

9          The other concern is the fact that they won't have

10  gotten anything other than a few pages.  And so I kind of

11  would like to see like a front Page in twenty-four-point

12  letters that says, unless you vote -- unless you check this

13  box, you may not get any recovery from the Debtor and waive

14  all your rights against other parties because that's, in

15  essence, the gist of it.

16         MR. GIORDANO:  More than happy to tweak, again,

17  some of these materials.  We've been trying to do that for

18  that exact reason, frankly, to make sure that they're clear

19  and easy to understand.

20         I would also add that the Committee has proposed

21  sending in a letter that, you know, urges their constituents

22  to vote against the plan, which includes -- I mean, I don't

23  know what font you used; it was much bigger than 24, I think

24  -- that says to reject the plan.  So I think that we're more

25  than happy to do that.  And I think that there's going to be

1    other things that those individuals are getting that are

2    going to help them understand what the Committee thinks they

3    should do.  And just to say, I mean, we're happy to include

4    that Committee letter --

5              THE COURT:  Okay.

6              MR. GIORDANO:  -- if it --

7              THE COURT:  So --

8              MR. GIORDANO:  -- wasn't clear.

9              THE COURT:  So the voting record date was February

10   13th.  It wasn't -- I thought it was March 13, but it was

11   February 13.  I'm sorry.  So, as of five days ago, who could

12   vote on the plan was fixed, and that just can't be right.

13             MR. GIORDANO:  It is February 13th, but that was

14   also by stipulation with the Committee.

15             THE COURT:  Okay.  All right.  So then --

16             UNIDENTIFIED:  No, no, no.

17             MR. ROSEN:  That's not accurate, Your Honor.

18             UNIDENTIFIED:  No.

19             MR. GIORDANO:  Well --

20             MR. ROSEN:  We pushed for the later date and they

21   rejected our later date.

22        (Participants confer.)

23             MR. ROSEN:  We may have stipulated at one point.

24   We filed a motion to change that.  We've had a number of

25   conversations where we asked for it to be later.  We said it

1   should be the bar date.  So the fact that there was a

2   stipulation --

3           THE COURT:  Okay.

4           MR. ROSEN:  -- at one point --

5           THE COURT:  All right.

6           MR. ROSEN:  -- (indiscernible).

7           MR. GIORDANO:  I think, for purposes of the voting

8   record date, if Your Honor thinks that that should be pushed

9   back to some date, I mean, we're happy to consider that.

10  But that was -- this has been --

11          THE COURT:  I'm not --

12          MR. GIORDANO:  -- the clear date that's been on

13  file --

14          THE COURT:  I'm not --

15          MR. GIORDANO:  -- for a while.

16          THE COURT:  I am not -- I'm not going to make you

17  change it.  But obviously, this is a -- this will be a

18  confirmation issue as to whether, you know, you had an

19  appropriate record -- voting record date under the

20  circumstances.

21          MR. GIORDANO:  Okay.  Well, we will take that

22  under advisement.

23          THE COURT:  Yeah.  So, if you look at -- on Page 3

24  of the solicitation and voting procedures and the second

25  full paragraph, the second sentence says:

1          "The Debtors and the claims agent are not required
2    to conduct any additional research to" -- "for updated
3    addresses based on undeliverable solicitation package or
4    ballots or non-voting status."
5          It says:
6          "For purposes of serving solicitation packages,
7    the Debtors may rely on the address information for voting
8    classes, as compiled, updated, and maintained by the claims
9    agent as of the voting record date."
10          Which was five days ago.  So I don't know where
11    they got their information, but obviously, that's going to
12    be a confirmation issue as to whether that gave appropriate
13    notice.
14          MR. GIORDANO:  Yep.
15          THE COURT:  All right.  So, in Page 5 of the
16    solicitation procedures, which is Exhibit 2 to the --
17          MR. GIORDANO:  I'm just trying to find it.
18        (Pause in the proceedings.)
19          THE COURT:  Paragraph F.
20          MR. GIORDANO:  Sorry.  Pardon me, Your Honor.
21    Just give me one second to find it.
22          THE COURT:  No problem.
23          MR. GIORDANO:  Okay.  Okay.  I'm there.
24          THE COURT:  So this one here, it says that, if
25    there's a proof of claim for an unliquidated amount, they

1  will get a ballot for one dollar?  I don't understand.  If

2  it's elsewhere, you say that, if it's unliquidated or

3  contingent, then it's disputed.

4         MR. GIORDANO:  Right.  This is if we receive a

5  proof of claim.

6         THE COURT:  Okay.  So, if some -- if you list

7  somebody's claim as liquidated and disputed, they don't get

8  a ballot, but if they file a proof of claim that is

9  contingent and unliquidated, they get a ballot.

10        MR. GIORDANO:  That's my understanding.

11        I think we could -- we would be open to, you know,

12  providing a proof of claim to others, as well.  I --

13        THE COURT:  I --

14        MR. ROSEN:  A ballot.

15        MR. GIORDANO:  Sorry.  Yes, a ballot.

16        THE COURT:  Huh?  I'm sorry.

17        MR. GIORDANO:  I was corrected by Committee -- we

18  would be open to providing a ballot to others, as well.

19        THE COURT:  Okay.  Well, whatever it is, I think

20  we just need to put it --

21        MR. GIORDANO:  Make it clearer, yeah, I

22  understand.

23        THE COURT:  -- on it, on what it is.  And you

24  know, obviously.

25        (Pause in the proceedings.)

1           THE COURT:  Yeah, Paragraph 22 on Page 8, where it

2   says that delivery of the opt-out ballot is at the risk of

3   the holder.  I'm just -- I'm not -- I'm just not prepared to

4   accept that.  I think we need -- we would need -- if they

5   don't have it, I think we'd need to understand the facts and

6   circumstances.

7           MR. GIORDANO:  So -- sorry, Your Honor.  I just

8   want to make sure I understand the concern.  It -- the

9   concern is, is that, if somebody mails a ballot to Epiq and,

10  for whatever reason, it doesn't --

11          THE COURT:  They mail it and it doesn't get out of

12  the prison.

13          MR. GIORDANO:  Okay.  So this would seem to be the

14  type of provision that should be modified for currently

15  incarcerated individuals, potentially.  But I mean, I think

16  that, typically speaking, folks are responsible for mailing

17  their ballots in and we can't --

18          THE COURT:  Understood.  But you have to couple

19  that with the fact that, in the local government, people are

20  only in for two weeks, so I don't know what addresses you're

21  sending them to.  So, if they didn't get it because they've

22  moved and you sent it to a prior address or you sent it to

23  the, you know, detention facility when they're no longer in

24  the detention facility, you know, and then they file a claim

25  later on -- and obviously, they're going to file a claim and

1   you're going to say no, it's barred --

2          MR. GIORDANO:  But it --

3          THE COURT:  And they're going --

4          MR. GIORDANO:  At that time --

5          THE COURT:  -- to have to come --

6          MR. GIORDANO:  -- they could raise notice, their

7   notice issues.

8          THE COURT:  Well, understood.  But this would seem

9   to bar their ability to raise it.  That's my only point.  I

10  don't want to bar anybody's ability to raise it.

11         MR. GIORDANO:  Understood.

12         Your Honor, a clarification though.  I understand

13  that, for, again, purposes of certain of the -- certain of

14  the types of claimants that we have here.  But I do think

15  that relying on the Debtors' books and records --

16         THE COURT:  Yeah, I --

17         MR. GIORDANO:  -- generally is --

18         THE COURT:  I agree.  I mean, we're -- you know,

19  I've approved opt-out forms when I am satisfied that service

20  is good, and facts matter.  And here, you've got, you know,

21  your normal commercial creditors and your normal bank

22  creditors, and they can certainly -- and here, you only have

23  one equity holder, so -- but in a -- in your clients, that's

24  a -- kind of a different issue, in my mind.

25         MR. GIORDANO:  I understand.  I think we can make

1    -- I think we can make an accommodation here.

2           THE COURT:  All right.  So, if you go -- again,

3    for some reason, the ballots aren't -- the pages aren't

4    numbered.  If you go to --

5           MR. GIORDANO:  They are in the redline, Your

6    Honor, you'll be happy to know.

7           THE COURT:  All right.  If you go to Item 1,

8    "Voting, complete this section."

9           MR. GIORDANO:  Item -- yes.

10          THE COURT:  So, right under the box, it says:

11          "The vote cast above will be applied in the same

12   manner against each applicable Debtor."

13          I mean, that just kind of comes out of the blue.

14   It -- and it doesn't say who the applicable Debtor is, how

15   that's determined, or anything like that.  That goes to my

16   question about joint plans, several plans.

17          MR. GIORDANO:  Correct.  I mean, I think that

18   there are going to be claimants who have, you know, their --

19   where their claim is potentially at multiple Debtors.  I

20   think this is what we're trying to accomplish, is to make

21   sure that we're sorting them properly.

22          THE COURT:  Yeah.  But how would somebody actually

23   know -- I mean, if you have a contract, understood.  But how

24   would, actually -- somebody actually know who their creditor

25   is?  I mean, and how is -- are you going to tabulate votes

1     per Debtor?

2              MR. GIORDANO:  I think, as Your Honor mentioned,

3     we're going to have to.

4              THE COURT:  Okay.  All right.  Well, I think this

5     needs to be further explained and then some reference to it

6     in the Disclosure Statement --

7              MR. GIORDANO:  Okay.

8              THE COURT:  -- because it just kind of comes out

9     of the blue there.

10             MR. GIORDANO:  Understood.  Thank you.

11             MR. ROSEN:  Excuse me, Your Honor.  If it's based

12    upon the schedules, will each ballot be reflective of

13    against which Debtor the claim exists?

14             THE COURT:  I don't know.  Usually, that's what

15    happens, but I don't know.

16             MR. GIORDANO:  I would assume so.  I'd need to

17    check with our noticing agent, but we should have that in

18    our books and records, again.

19         (Participants confer.)

20             THE COURT:  All right.  I think you've heard my

21    concerns about the definition of "related parties."

22             MR. GIORDANO:  Yes, Your Honor.

23         (Pause in the proceedings.)

24             THE COURT:  And then I go to the notice of non-

25    voting status.

1          All right.  So let's assume somebody doesn't file

2     a proof of claim by 4/7.  Under Edgeworth, they can still

3     proceed against insurance coverage because it's not property

4     of the estate.

5          (Participants confer.)

6          THE COURT:  Presumably, they can proceed against

7     anything that isn't property of the estate.  But that isn't

8     really -- it isn't really disclosed anywhere.  Now I'm not

9     sure it has to be, but as a practical matter, that's --

10          MR. GIORDANO:  That -- you -- that -- sorry.  That

11     you're able to go after non-estate property --

12          THE COURT:  Right.

13          MR. GIORDANO:  -- to the extent you have a claim

14     against it?

15          THE COURT:  Yes.  And insurance proceeds,

16     traditionally, are non-estate property under Edgeworth.

17          MR. GIORDANO:  And you would like that to be --

18          THE COURT:  Well, it came up when I was reading

19     the opt-out form --

20          MR. GIORDANO:  Right.

21          THE COURT:  -- because everything is tied to a

22     proof of claim.

23          But yeah, the -- well, another concern that I have

24     about the opt-out form is that it doesn't really say

25     anywhere that, if you're just receiving the opt-out form and

1  not receiving the Disclosure Statement or the plan, it

2  doesn't say anywhere that unsecured creditors may receive

3  zero under the plan.

4          MR. GIORDANO:  Okay.

5          THE COURT:  I mean, that's -- that was --

6          MR. GIORDANO:  Understood.  We can add that to the

7  opt-out form for unsecured creditors.

8      (Pause in the proceedings.)

9          THE COURT:  Okay.  So Page 5 of the opt-out form.

10         MR. GIORDANO:  Sorry.  Let me get there.

11     (Pause in the proceedings.)

12         MR. GIORDANO:  All right.  I think I'm with you,

13 Your Honor.

14         THE COURT:  Okay.  So it says, in the second --

15 the first full Paragraph -- or the second full paragraph:

16         "You will receive the same treatment on account of

17 your claims under the plan, regardless of whether you elect

18 not to grant the release contained in Article 10(d)" -- or

19 "9(d) of the plan; however, by opting out of the release, as

20 set forth in 10(d), you will forego the benefit of obtaining

21 the release."

22         That's the Debtor release, right?

23         MR. GIORDANO:  In 9(c)?

24         THE COURT:  In 9(c).

25         MR. GIORDANO:  I believe --

1           THE COURT:  Okay.

2           MR. GIORDANO:  I believe so.

3           THE COURT:  All right.

4      (Participants confer.)

5           MR. GIORDANO:  Sorry.  Let me just -- let me just

6  confirm that.

7      (Participants confer.)

8           MR. GIORDANO:  Sorry.  There's a lot of paper up

9  here, Your Honor.  I just want to make sure I'm saying it

10  correctly.

11           Correct.  So it's the Debtor release.  That's

12  right.

13           THE COURT:  Okay.  All right.  Now I'm on the plan

14  and I have a few comments.

15      (Participants confer.)

16           MR. ROSEN:  Excuse me, Your Honor.

17           THE COURT:  Okay.

18      (Participants confer.)

19           MR. ROSEN:  In connection with that, if they're

20  not getting a Debtor release, is it possible to include also

21  in there what types of claim they would have against that

22  person not giving that release, they're not receiving that

23  release.  I mean, what would you be going after,

24  hypothetically, a prisoner who is not giving you the

25  release?

1          MR. GIORDANO:  I -- we're talking in

2     hypotheticals.  I am sure that there are potential claims.

3     I don't know any specific ones related to a hypothetical

4     prisoner.

5          MR. ROSEN:  Could -- is it possible just do

6     something "such as" blank, blank, and blank, I mean, so that

7     they know what they're talking about, so they know it goes

8     into their decision-making?

9          MR. GIORDANO:  I think that the risk there is that

10    we're talking about claims and -- we would have to have

11    individual opt-out forms for every single individual.  I

12    don't think that we can --

13         MR. ROSEN:  Well, I'm just --

14         MR. GIORDANO:  -- necessarily --

15         MR. ROSEN:  -- asking generally speaking.  It

16    might be helpful for them.

17         MR. GIORDANO:  I understand.  But they can

18    reference the plan.

19         THE COURT:  No.  But these people aren't getting

20    the plan.

21         MR. ROSEN:  Right.  Nor the Disclosure Statement -

22    -

23         THE COURT:  Yeah.

24         MR. ROSEN:  -- Brad.  They're not getting the plan

25    or the Disclosure Statement.

1         (Participants confer.)

2             UNIDENTIFIED:  And they can't go onLine because

3   they don't have internet access.

4         (Participants confer.)

5             MR. GIORDANO:  Okay.  Well, I suppose we could put

6   the release provision --

7             THE COURT:  No, no.

8             MR. GIORDANO:  -- into the --

9             THE COURT:  I mean --

10            MR. GIORDANO:  -- into the opt-out form.

11            THE COURT:  You --

12            MR. GIORDANO:  But there is -- there's a -- you

13  know, there is a limit on the clarification we can provide

14  for individuals.  And I think that it has the risk of

15  potentially being misleading if we put a laundry list and

16  it's not what their particular claim may be.

17            THE COURT:  Okay.  On the plan, I think you --

18            MR. ROSEN:  Your Honor, I just think it's

19  important for someone to know what consideration they might

20  be getting in exchange for giving a release.  The Debtors

21  have said they're not getting any consideration; yet, they

22  want an opt-out release -- they want a release of third-

23  party claims.  I think these people need to know that.

24  Other than your point, where it says you're getting zero

25  from the estate, they should know what other possible

1   consideration might be coming to them, which might be zero.

2          THE COURT:  I think that's a confirmation issue

3   that we're preserving, but yeah, I mean, that --

4          MR. GIORDANO:  Let us see if there's a way to make

5   it --

6          THE COURT:  Yeah.

7          MR. GIORDANO:  -- clearer for them.  I -- again, I

8   have no problem trying to make things clearer.  I'm

9   concerned when we are listing things on a hypothetical basis

10  that could become unclear in their own right.

11         THE COURT:  Okay.

12     (Pause in the proceedings.)

13         THE COURT:  So, in the plan, Paragraph -- Page 30

14  -- E, "elimination of vacant classes."

15         MR. GIORDANO:  I'm just going to it, Your Honor.

16     (Participants confer.)

17         MR. GIORDANO:  Yes.

18         THE COURT:  That would seem to be consistent with

19  having multiple plans, as opposed to one plan, which you

20  would typically see this type of provision in.  You know,

21  that's why it kind of raised my --

22         MR. GIORDANO:  Understood.

23         THE COURT:  -- concern.

24         MR. GIORDANO:  Understood.

25         THE COURT:  Okay.  On Page -- it is, again, in the

1   plan, Page 33, C, you're talking about the consideration for

2   plan distributions.  Then you talk in B, "the issuance of or

3   borrowings under take-back debt."  It's my understanding

4   there's no borrowings under the take-back debt, there's --

5   it's just going to be issued.

6          MR. GIORDANO:  We can clarify.

7          THE COURT:  Okay.  All right.  Several places in

8   the plan -- and I'm looking at Page 39, the last paragraph.

9   You say:

10          "Post-restructuring Debtors reserve and retain all

11   such causes of action of the Debtors, notwithstanding the

12   rejection or repudiation of any executory contracts."

13          And I understand that sentence perfectly well and

14   I think that's appropriate, but I don't understand what

15   "repudiation" is, and it's several places in here.

16          MR. GIORDANO:  We can talk about --

17          THE COURT:  No.  I mean what did you intend --

18   what did you mean?

19          MR. GIORDANO:  I think it was probably -- it is

20   not meant to be different than what we're doing, which would

21   be rejection, so -- and I -- we can clarify that.

22          THE COURT:  Okay.  Because I mean, under Mission

23   Products, it's a pre-petition breach; it's not a

24   repudiation.

25          MR. GIORDANO:  Understood.

1            THE COURT:  And here, on Page 40, again, in the

2    liquidating trust assets vesting, you have the same thing

3    about the first lien claims and the first lien collateral

4    and the second lien collateral, so it's got to be cleaned

5    up, as well.

6            MR. GIORDANO:  Thank you.

7            THE COURT:  Okay.  So I'm going to Page 47, the

8    last sentence, right above B.  So, at the beginning you say,

9    unless you've rejected it or moved to reject or it's in the

10   list of rejected contracts, that the -- all other executory

11   contracts and unexpired leases will be deemed assumed by the

12   applicable Debtor on the effective date.

13            But then, on the top of 47, it says:

14            "Notwithstanding anything to the contrary in the

15   plan, the Debtors" -- "the post-restructuring Debtors, as

16   applicable, reserve the right to alter, amend, modify, or

17   supplement the rejected contracts and unexpired leases

18   schedule at any time up to 45 days after the effective

19   date."

20            So I understand that if you put something on the

21   rejection list -- or on the -- something gets assumed and

22   you have a cure dispute and the cure dispute is rule against

23   you, that then you can reject the contract because you went

24   to assume it.  Somewhere in here it says that there are no

25   cure disputes because everybody's already deemed to have

1  agreed to the cure amounts.  I don't know if that's true or

2  not.

3          UNIDENTIFIED SPEAKER:  Well, I think unless they

4  objected.

5          THE COURT:  So as of today you've set cure amounts

6  to every single executory contract and unexpired lease that

7  you intend to assume?

8          UNIDENTIFIED SPEAKER:  I believe we have.

9          THE COURT:  Okay.  All right.  So then if that's

10 the case, then first of all I don't know how I can -- you

11 know, you can make a determination as to assumption or

12 rejection of any executory contract after the confirmation

13 hearing, number 1, because that's what 365 says, you have to

14 assume or reject.

15         UNIDENTIFIED SPEAKER:  In the even that we -- as

16 you pointed out, we have --

17         THE COURT:  Right, right.

18         UNIDENTIFIED SPEAKER:   -- a cure dispute.

19         THE COURT:  If there's a cure dispute.

20         UNIDENTIFIED SPEAKER:  Right.

21         THE COURT:  Okay.  Then --

22         UNIDENTIFIED SPEAKER:  I think it's mostly what

23 we're trying to capture here is --

24         THE COURT:  Okay.  Well, then I think you need to

25 say that because this basically says that -- this just

1  doesn't really tie into a cure dispute, it basically says

2  that, that you can just alter, modify or supplement, you

3  know, move a -- you know, if you move a contract from one to

4  the other.

5          UNIDENTIFIED SPEAKER:  Understood.

6          THE COURT:  All right.  So that needs to be

7  changed.

8      (Pause in the proceedings.)

9          THE COURT:  So on Page 59D, what was this -- what

10  was this intended to cover?

11          UNIDENTIFIED SPEAKER:  We're talking about the

12  header estimation of plan?

13          THE COURT:  Yes.

14      (Pause in the proceedings.)

15          UNIDENTIFIED SPEAKER:  I'm just making sure I'm

16  reading the whole section.

17      (Pause in the proceedings.)

18          UNIDENTIFIED SPEAKER:  I think that -- I think

19  that this is a section dealing with bringing claims

20  estimation proceeding in front of Your Honor, and the

21  process by which we could do that.

22          THE COURT:  Okay.  But what types of claims?

23          UNIDENTIFIED SPEAKER:  I guess theoretically any

24  sort of claim that's currently disputed or contingent or

25  unliquidated.  However, given that the provision includes

1  estimation for purposes of distribution, I think they would

2  have to agree to that, as I understand the law.

3           THE COURT:  Well, under, you know, 157(b)(2)(B) I

4  can't estimate personal injury claims.

5           UNIDENTIFIED SPEAKER:  We can certainly say that

6  you're not estimating personal injury claims, I don't think

7  that that --

8           THE COURT:  Okay.  Or wrongful death --

9           UNIDENTIFIED SPEAKER:  -- was the type --

10          THE COURT:  -- yeah, it's --

11          UNIDENTIFIED SPEAKER:  -- of claim that we're

12  mostly --

13          THE COURT:  Okay.

14          UNIDENTIFIED SPEAKER:  -- concerned about.

15          THE COURT:  All right.  I just -- I didn't think

16  that's what you meant, but I want to make sure that --

17          UNIDENTIFIED SPEAKER:  No, personal injury claims

18  we do differently and that's the province of the liquidating

19  trustee and the individual claimants.  We're not -- I mean

20  just to say it on the Record, we're not planning on bringing

21  a bunch of -- the personal injury claims --

22          THE COURT:  No, no, I mean --

23          UNIDENTIFIED SPEAKER:  -- exist in their own --

24          THE COURT:  My understanding --

25          UNIDENTIFIED SPEAKER:  -- universe.

1          THE COURT:   -- is they'll just go back to State

2     Court.

3          UNIDENTIFIED SPEAKER:  Correct.

4          THE COURT:  And then --

5          UNIDENTIFIED SPEAKER:  Yes, I think this is more

6     to do with contractual disputes or something to that effect,

7     but we can -- we can clarify that personal injury claims are

8     not implicated here.

9          THE COURT:  All right.  Obviously one of the -- on

10    the bottom of Page 61 one of the issues that will be the

11    subject of confirmation is whether it's in the best

12    interest, and we've discussed that already.

13         UNIDENTIFIED SPEAKER:  Sorry, can you -- where --

14         THE COURT:  It's at the bottom -- you basically --

15    you're saying that it's in the best interest of creditors --

16         UNIDENTIFIED SPEAKER:  Right.

17         THE COURT:   -- and --

18         UNIDENTIFIED SPEAKER:  And we'll have to put on

19    our proof of that.

20         THE COURT:  Yeah.

21       (Pause in the proceedings.)

22         THE COURT:  Let me -- so the top of Page 62, kind

23    of in the middle of the Paragraph --

24         UNIDENTIFIED SPEAKER:  Which paragraph, Your

25    Honor?

1          THE COURT:  The very top Paragraph at the top of

2   Page 62, the release of liens.  There's a specific reference

3   to, Any liability to the extent such claim or interest

4   relate to services that the employees of the Debtors have

5   performed by or to the effective date.  I'm not sure I

6   understand what you mean by that.  And then it goes on, That

7   arise from the termination of employment or refs and

8   warranties.

9          UNIDENTIFIED SPEAKER:  I apologize, Your Honor,

10  I'm having trouble finding where you're at.

11         THE COURT:  Okay.  So on Page 62 in the plan above

12  release of liens.

13         UNIDENTIFIED SPEAKER:  Ah, okay.  Page 63 is what

14  I'm looking at.  Apologies.

15         THE COURT:  No problem.  So there's a reference in

16  here I just -- I don't understand what -- what it means,

17  this whole -- I mean this is talking about the discharge.

18  And I think it -- basically what it says is that to the

19  extent any -- this is the actual discharge.

20         UNIDENTIFIED SPEAKER:  And which -- sorry, Your

21  Honor, I just want to make sure --

22         THE COURT:  And so --

23         UNIDENTIFIED SPEAKER:   -- I understand what the

24  question is.

25         THE COURT:   -- so this would seem to discharge

1  everything through the effective date.  And it's not

2  consistent with what we talked about with respect to

3  administrative expense claims.  So I think it's -- I mean it

4  can be written so it's consistent, but it doesn't -- just

5  read that -- read that language because I don't think it's

6  consistent with --

7          UNIDENTIFIED SPEAKER:  I understand.  I see -- I

8  see what you're saying.  We can clarify it slightly.  Pardon

9  me, one second, Your Honor.

10      (Pause in the proceedings.)

11          UNIDENTIFIED SPEAKER:  Your Honor, I -- okay, so

12  my colleague is correcting me.  I think that we're looking

13  at this kind of from a personal injury standpoint, but

14  this --

15          THE COURT:  Right.

16          UNIDENTIFIED SPEAKER:   -- does make sense

17  actually when you think about administrative claims bar

18  dates or other --

19          THE COURT:  Right.

20          UNIDENTIFIED SPEAKER:   -- non-personal so --

21          THE COURT:  Right.  But it's broad enough that

22  it's --

23          UNIDENTIFIED SPEAKER:  So we need to clarify it

24  for personal injury.

25          THE COURT:  And that was my only point, I said --

1          UNIDENTIFIED SPEAKER:  Right.

2          THE COURT:   -- it was going to be -- it makes

3    sense otherwise.

4          UNIDENTIFIED SPEAKER:  Yes.

5          THE COURT:  Okay.  So the injunction provision --

6       (Pause in the proceedings.)

7          THE COURT:   -- the -- I have a comment here that

8    so to the extent somebody opts out they preserve all their

9    defenses, it's not like they give up some of their defenses.

10          UNIDENTIFIED SPEAKER:  Correct.

11          THE COURT:  Okay.

12       (Pause in the proceedings.)

13          THE COURT:  All right.  So Page 77, it says, After

14   the effective date the post-restructuring Debtors, or the

15   liquidating trustee as applicable, are authorized to limit

16   the entities receiving documents pursuant to 2002 to those

17   entities who filed a renewed request.  I mean what, you

18   know, what authority do I have to do that, to waive 2002?

19          UNIDENTIFIED SPEAKER:  I think this was more for

20   housekeeping, but I --

21          THE COURT:  I mean I understand, I think it would

22   be good, but I just don't understand that somebody isn't

23   going to receive notice that there's something that might

24   impact them unless they do a renewed request, and there's no

25   provision in the Bankruptcy Code.

1          UNIDENTIFIED SPEAKER:  There is -- I understand

2    Your Honor's concern.  Just to say what the practical

3    concern here was was the expense of noticing and --

4          THE COURT:  Totally -- totally --

5          UNIDENTIFIED SPEAKER:   -- trying to limit --

6          THE COURT:    -- totally understand, but again,

7    it's the balancing test.

8          UNIDENTIFIED SPEAKER:  Agreed.  I understand, and

9    I think we can remove that provision.

10          THE COURT:  So you should re-read the non-

11   severability of the plan provision on 78 to make sure that

12   it's internally consistent.  I read it a couple of times and

13   I thought that it might not be, but in my opinion, and

14   again, once I -- a couple of other times I read it and it

15   was.  So those are all my comments.

16          UNIDENTIFIED SPEAKER:  Okay.  Well, we very much

17   appreciate you walking us through it.  I think there are a

18   number of changes that we can make to address these comments

19   and make the documents clearer for all parties involved, and

20   we're going to endeavor to do that hopefully starting right

21   now.  I know we've got a long day ahead of us.

22          Your Honor, I think, you know, we'll obviously

23   need to file revised forms of all of these materials that

24   incorporate --

25          THE COURT:  Right.

144

1           UNIDENTIFIED SPEAKER:   -- these issues.  And as I

2  said to Committee counsel before the hearing, to the extent

3  that Your Honor approves our solicitation time line, you

4  know, our door is still open for any other clarifications

5  that they would like to -- us to consider.

6           However, again, I'm not sure, you know, given --

7  given the amount of things we have to get through today, I'm

8  not sure how much testimony is necessary on whether the

9  Disclosure Statement contains adequate information.  I'll

10  let the Committee counsel speak to it.

11           But we would -- we would hope that given the

12  number of changes that we're going to be making to the

13  document we'll have closed out a number of issues and hope

14  as well that we can at least avoid testimony that go to plan

15  confirmation issues since we're going to probably be here

16  again doing that anyway.

17           THE COURT:  All right.  And if you would, when you

18  filed the revised Disclosure Statement if you could do a

19  redLine to the one that you filed on the 10th.

20           UNIDENTIFIED SPEAKER:  On the 10th, yes.

21           THE COURT:  Because that's the one that I --

22           UNIDENTIFIED SPEAKER:  We had a healthy debate

23  about what the right redLine was to run on the last version

24  so thank you for making that clear.

25           THE COURT:  Thank you.

1           UNIDENTIFIED SPEAKER:  Okay.  With that, unless

2    you --

3           THE COURT:  Okay.

4           UNIDENTIFIED SPEAKER:   -- have any more

5    questions, I'm happy to cede the podium.

6       (Pause in the proceedings.)

7           THE COURT:  Mr. Rosen?

8           UNIDENTIFIED SPEAKER:  Peering over -- peering

9    over the screen.  Your Honor, I don't know if this is the

10   right time if you wanted to take a break?

11          THE COURT:  No, no, let's go forward --

12          UNIDENTIFIED SPEAKER:  Okay.

13          THE COURT:   -- because we've got stuff starting

14   at 2:00, so let's --

15          UNIDENTIFIED SPEAKER:  Okay.  You want to go

16   first?

17          THE COURT:  We'll take a -- we'll take a break

18   before the 2:00 o'clock.

19      (Pause in the proceedings.)

20          MR. ROSEN:  Well, I was going to start with good

21   morning, but that's no longer applicable, Your Honor.  Your

22   Honor, and I do, as I said before, I appreciate that you

23   stole somewhat of my -- some of my thunder here because you

24   did take a lot of things out of our, or at least my comments

25   that I was going to make, and have everybody try to address

1   today.

2           As a preliminary matter, Your Honor, there is

3   another motion on with respect to this and that obviously

4   goes to the timing of everything.  And I know that the

5   Debtors put on Mr. Slocum already to try and address that,

6   so I would assume, Your Honor, that rather than doing

7   multiple items on the agenda we're just going to be

8   compressing that, or at least those motions together with --

9           THE COURT:  Correct.

10          MR. ROSEN:   -- the approval of the Disclosure

11  Statement.

12          THE COURT:  I took Mr. Slocum's testimony to be on

13  both motions.

14          MR. ROSEN:  Okay.  And we will be presenting

15  something with respect to that as well, Your Honor.

16      THE COURT:  Okay.

17          MR. ROSEN:  With respect to the presentation

18  itself, Your Honor, we will be providing the Committee's

19  position in 3 different stages with 3 different persons.  I

20  will be addressing the overall in the Debtors' failure to

21  submit a Disclosure Statement that satisfies the adequate

22  information requisites of Section 1129 -- excuse me, 1125 of

23  the Bankruptcy Code.

24          Mr. Zluticky will be addressing the patent

25  unconfirmability aspects of the plan, and in doing so will

1   be discussing the releases being foisted upon persons and

2   the total lack of information being provided with respect to

3   the claims and causes of action being wholesale abandoned or

4   intended to -- we ultimately expect them to be abandoned

5   based upon testimony that we've already heard by the Debtors

6   and the lenders, and the incomplete -- the incomplete

7   investigation done by the Debtors and the Special Committee

8   appointed to do the sponsor's bidding in this case.

9         The Mr. Hemenway will address aspects of the

10  solicitation and procedures, the timing and the affect upon

11  the creditors and he may also address some of the prior

12  items as discussed with Mr. Dragelin last Friday at his

13  deposition, and as we will be bringing them out again today,

14  Your Honor.

15        Your Honor, I don't want to specifically quote

16  Howard Beale from *Network* and run to the window and tell

17  everybody what -- how mad I am about this, but I am

18  frustrated by this Chapter 11 case, and I really am

19  surprised at the way that it's been going on.

20        This case has been run by the lenders in

21  accordance with the terms of the restructuring support

22  agreement, an agreement that is actually no longer

23  applicable or viable.  Nevertheless, the Debtors and their

24  advisors are being led around and acting solely at the

25  behest of these lenders in developing an unconfirmable

1   Chapter 11 plan, and attempting to ram it through at

2   breakneck speed.

3            By that, Your Honor, we have counsel standing here

4   every time in response to the odd objections, doing their

5   best -- and I guess Mr. Slocum as well -- earlier today a

6   Chicken Little imitation and screaming that the sky is

7   falling, we have to do things by a certain date and time,

8   and if we don't, the Chapter 11 plan is going to fall apart.

9            Well, as you heard from Mr. Slocum, not 1 piece of

10  the sky has fallen.  Not 1 piece of Sky Lab even fell to the

11  earth.  On the contrary what has happened, Your Honor, is

12  that the Debtors and their advisors have provided the most

13  conservative approach to the Debtors' businesses.

14           They have produced financial projections that have

15  dramatically been overwhelmed by receivables, and in doing

16  so -- I'm sorry -- have led this Court and creditors to a

17  pace that's truly not even warranted.  The only thing we

18  heard today, Your Honor, and the only evidence that's before

19  the Court is that April 1 isn't even a real date.  It's not

20  one that people need to abide by.

21           Now the problem is that the Disclosure Statement

22  is just another step along the way, and I appreciate how the

23  Court went through with counsel some of its concerns about

24  the Disclosure Statement and how you would like things to

25  change.  But it doesn't really tell creditors what the

1   Debtors and the lenders truly concocted, it doesn't tell

2   creditors that the liquidation trust that they present as a

3   gift recovery is truly an empty vessel.

4          Instead, throughout the recent -- their recent

5   pleadings the Debtors and the Committee are standing here --

6   excuse me, are standing here and -- are -- excuse me, the

7   Debtors are casting the Committee as standing in the way of

8   a great recovery for the creditors.  But as the Court knows,

9   the Committee is just standing up for the rights of the

10  general unsecured creditors and pointing out the infirmities

11  that exist in trying to generate the greatest recovery to

12  which they are entitled.

13         And if that means we point out that the Debtors

14  have not done their job as fiduciaries for the entire

15  creditor body, then the Committee will be that voice, Your

16  Honor.

17         So where have the Debtors fallen down and how have

18  they attempted to mask it?  Well, let's take a look at the

19  chart that the Debtors developed to address the numerous

20  objections filed, and specifically, Your Honor, the piece of

21  the chart with respect to the Creditors Committee's

22  objections.

23         So, Your Honor, if we go to Page 1, so there the

24  chart parrots what has been said multiple times before, that

25  the liquidating trust will have a liquidating trust causes

1    of action and now a CVR.  But no one knows what the causes

2    of action are because, Your Honor, because they do not

3    disclose them at all.  They say that they will be doing them

4    now in the plan supplement and that plan supplement, as you

5    said, Your Honor, will not be able to change the retained

6    causes of action.

7           But that will be done very, very close to the

8    voting deadline, Your Honor, and that's just something that

9    won't work because, Your Honor, it's my understanding, and I

10   think you said it before, the Debtors have said that they

11   will be doing it 5 days sooner than they originally

12   projected.  I think that's what it was, Your Honor.  Or was

13   it 5 days prior to the voting deadline, that's a bit unclear

14   and I hope that the Court gets an answer with respect to

15   that one.

16          But Mr. Dragelin has stated in his deposition that

17   there are real claims and causes of action that exist, over

18   $10 million at a minimum, and they do not intend to pursue

19   them.  That was his testimony.  So in the Debtors' schedules

20   it talks about serious litigation against the states of

21   Georgia and Michigan and that they value in the tens of

22   millions of dollars.

23          So how can the Debtors not show these as assets

24   that will be providing recovery to creditors, why won't they

25   list it in the projected recovery, why is it zero to

1   unknown?  Are the schedules inaccurate, Your Honor, is the

2   disclosure inaccurate?  We just don't know.

3          And we would love to see some information with

4   respect to the testimony that Mr. Dragelin talked about as

5   the claims that exist and with respect to these claims and

6   causes of action that are contained in their schedules,

7   which they now say will not yield any recovery, although

8   they were provided a significant amount in their schedules

9   themselves.

10          With respect to Page 2, Your Honor, and moving to

11   the claims pool, the UCC noted the failure to identify the

12   pool.  And, yes, in subsequent turns of the Disclosure

13   Statement there's been attempt to do this.  And I believe,

14   Your Honor, you focused on a number, I believe it was in the

15   300 --

16          THE COURT:  330 to 405.

17          MR. ROSEN:  Thank you, 330 to 405.  Your Honor, we

18   would love to know how that was derived.  I think what we

19   heard today --

20          THE COURT:  Books and records.

21          MR. ROSEN:  The books and records.  That is

22   correct.  I don't think it takes into account any of the

23   1500 claims or loses which are out there that may be

24   certainly a different number.  300 to 405 maybe that's just

25   the number of the deficiency claims that they are saying now

1   goes into the general unsecured pool, not counting anyone

2   else, not counting any of the 1500 claims that are out

3   there, the lawsuits that are out there, because when you add

4   up the first and second deficiency numbers, oh, my goodness,

5   it comes very, very close to those numbers.

6          So what is it that they're including?  We think,

7   Your Honor, it would be a much greater number, a much

8   greater denominator.  Of course that may lessen it to below

9   zero, the recovery, I don't know.  But we think that there

10  needs to be some basis for what they're talking about

11  because as far as we can tell, there hasn't been anything so

12  far.

13          Also on Page 2, Your Honor, there is a value of

14  the assets in the trust, and it is as if there was a chant,

15  a mantra, the trust includes all the causes of action and a

16  sprinkling of cash and a valueless VCR -- or, CVR, excuse

17  me.  There is no disclosure other than the $3 million

18  funding, there is no there there.  What was interesting,

19  what came out today, Your Honor, was that the $3 million

20  won't even be distributable to creditors.

21          It is solely for the purposes of administrative

22  functions of this trust that they, of course, want to run

23  because they are saying they're the sole people who can

24  nominate people and nominate the liquidating trustee.  But

25  now we also understand that it's their intention for all the

1    United States Trustee fees to come out of this liquidating

2    trust as well.  I'm not sure why that is, Your Honor, and

3    I'm sure that there's an explanation that someday they'll

4    make.

5          Your Honor, with respect to H.I.G., and that is at

6    the bottom of Page 2 I believe it is, they say there are no

7    material claims.  What they do not disclose is what they

8    didn't do.  They do not say that the level of investigation

9    was 50,000 feet above land.  They do not disclose that the

10   mandate was limited to a few payments or dividends or fees

11   extracted that yielded up to $10 million.  They do not

12   disclose that they never inquired about the level of review

13   and involvement of H.I.G. and the actions of Wellpath that

14   gave rise to the scores of medical mishaps and resultant

15   litigation.

16         Here, Your Honor, the UCC investigation is

17   ongoing.  Excuse me --

18         THE COURT:  The Debtors' investigation is ongoing.

19         MR. ROSEN:  No, actually the Debtors maintain that

20   it's pretty much done, that the Special Committee has

21   already done what it is doing.  But the Debtors seek to push

22   all of these actions under the carpet and provide a release,

23   even before the UCC investigation is completed.       The

24   Disclosure Statement needs to talk about these things, Your

25   Honor, and what actually was investigated and what was not

1   investigated.  We believe that's important, we believe that

2   if people are looking -- or being asked to provide releases

3   and the Debtors are looking to provide a wholesale release

4   to H.I.G., that needs to be disclosed.

5           Page 3, Your Honor, talks about the liquidation

6   analysis, but I think you've already worn that one out, Your

7   Honor, so I'm going to skip that.  It's obviously vastly

8   incomplete, doesn't really talk about the best interest test

9   in a sufficient way, and I believe that once the Debtors try

10  to do it on a Debtor-by-Debtor basis, we'll have an

11  opportunity to look at it again.

12          I don't know, Your Honor, and we can get to this

13  in the closing also about the conditional approval of the

14  Disclosure Statement today if, in fact, that occurs, but we

15  want an opportunity to look at this best interest test, or

16  at least liquidation analyses and be able to tell the Court

17  whether or not we think they're valid or complete,

18  sufficient for somebody to be able to express their opinion

19  whether to accept or reject the plan.

20          With respect to the equity financing, Your Honor,

21  we appreciate that more information was provided, but the

22  documents have not been completed, they are to come in the

23  plan supplement like every other document that they

24  promised, and that will not be for several weeks to come.

25  This of course would affect the CVR that is proposed to be

1  given and of course the CVR agreement is to come as well.

2  So how can creditors know whether to support or oppose the

3  plan without perhaps the one piece of consideration which

4  may flow their way in 7 years, or up to 7 years.

5           And I will bring 1 other point, Your Honor, it's a

6  complete aside, a liquidating trust is for 3 years by IRS

7  rules.  You can get a 1-time 3-year extension of that to 6

8  years.  I don't know what we do for that other year, Your

9  Honor.  And I'm sure someone on that side of the table will

10  tell at one point.

11           The Debtors try to pawn all of this off by saying

12  that contingencies do not mean that a Disclosure Statement

13  is inadequate.  While that may be so, Your Honor, one needs

14  to know what goes into the contingencies in order to develop

15  a decision whether to accept or reject a plan.  And this --

16  this Disclosure Statement is devoid of any of those

17  contingencies.

18           On Page 4, Your Honor, the insurance information,

19  and you addressed it at one point, Your Honor, and I

20  appreciate that.  And the Committee pointed out that the

21  Disclosure Statement needed to discuss insurance policies,

22  the self-insured program of the Debtors and the recent

23  decision to change its mode of operation in that regard.

24           The Debtors gave back -- the back of its hand to

25  this one, Your Honor, and said it does not need to address

1  "specialized issues" I think it was on the bottom of Page 4

2  of their -- their chart.  Specialized issues that may affect

3  a particular creditor.  I think, Your Honor, they missed the

4  boat completely on this one.

5          It's very important for people to understand what

6  might exist for the benefit of people who they are asking to

7  opt in or opt out with respect to releases.  It's very

8  important to understand what is property of the estate,

9  what's not.  I think Your Honor said insurance policies are

10 not usually property of the estate, they are for the benefit

11 of these people who might be claimants.

12         We would like to know what it is exactly is being

13 done.  The insurance policies and the ability of creditors

14 to recover for the numerous tort claims that exist is

15 critical, Your Honor.  It does not affect a particular

16 creditor, it affects hundreds of creditors that have

17 commenced litigation.

18         The Debtors valuation of its businesses and the

19 cash needs going forward are being modified, however, Your

20 Honor, in light of the insurance issues.  And I know you

21 talked about feasibility before.

22         That will go absolutely to the feasibility of the

23 Debtors on a reorganized basis with respect to the takeback

24 debt if, in fact, they're now using money for what was once

25 a self-insured program.  Are they now diverting that

1  information?  There are just more questions that need to be

2  answered, Your Honor, as part of the Disclosure Statement.

3  It needs to explain this rather than merely taking value

4  away from the general unsecured creditors.

5          Page 5, Your Honor, talks about the releases and

6  exculpation, and I know that you've talked about this for a

7  while already with Mr. Giordano, and I'm going to allow

8  Mr. Zluticky to address this point because it goes to some

9  of the items that he was talking about in the opening

10 earlier today.

11         Your Honor, indemnification obligations are also

12 out there on Page 5.  The UCC asked for information

13 regarding the indemnification obligations to not only the

14 directors and officers but also other entities as well, such

15 as the PCs.  We've heard different things already today

16 about the PCs.  Are they related persons, are they not

17 related persons, are they getting the benefit of a release

18 from the Debtors, are they getting the benefit of a release

19 of third-party release.

20         This is important because one of the things that

21 has been touted repeatedly to the Committee as well as to

22 the Court by counsel for the Debtors is that everyone

23 benefits by the indemnification obligations to the PCs,

24 because if, in fact, the Debtors are assuming these

25 obligations to the PCs, then litigation can commence, go

1   forward against the PCs and people who are bringing those

2   actions against the PCs will be covered.

3            How can that be, Your Honor?  If, in fact, they,

4   by the opt outs, were giving these PCs great releases?  It

5   doesn't make sense.  It's -- maybe it's just a Pyrrhic

6   victory on the part of somebody.  But if, in fact, there is

7   a release that is going, a third-party release, this

8   indemnification obligation doesn't make any sense.  We don't

9   get it, and we would love to make sure, and maybe it's a

10  straightforward answer, the PCs are not getting a third-

11  party release.  That --

12           THE COURT:  That's what he said.

13           MR. ROSEN:  I don't think it did.  And if it has

14  come out that way, we're happy because that solves one

15  mystery.

16           THE COURT:  I understood it that way.

17           MR. ROSEN:  Okay.  Your Honor, there's been a lot

18  here about the Debtors are claiming that we are just trying

19  to delay the process for purposes of leverage.  That really

20  is not true, Your Honor.  What we have really tried to do is

21  talk to the Debtors.  We've talked a lot with the lenders

22  honestly, Your Honor, to try and resolve these things.  As

23  Mr. Alberino has even said, we've done some things on a

24  consensual basis so far, we've been unsuccessful with

25  respect to the plan aspect of it though.

1        But we're not here to try and slow down the

2   process other than we want people an opportunity to have

3   their due process rights.  What we heard today, that doesn't

4   do it.  I mean there is no true answer there, Your Honor,

5   because April 1 was not a true deadline as we heard.

6        We want people to have the opportunity, we want

7   them to file their proofs of claim and we know that that

8   date is out there.  We appreciate that they moved the opt

9   out date to April 30.  I don't know if that's still a valid

10  time period, Your Honor.

11       But what we really are trying to do is understand

12  what it is that they've been trying to do, what it is the

13  true effect on the general unsecured creditors is and we

14  believe that the Debtors and the lenders in their haste to

15  try and get to where they want to go have lost track of the

16  general unsecured creditors and what they need to do for the

17  general unsecured creditors.

18       This case cannot be just about the lenders and

19  their desire to take the RS business and the corrections

20  business and generate as much value as they can.  This has

21  to be about the people who we are representing as well, the

22  general unsecured creditors, and providing them with zero to

23  unknown zero doesn't really do it, Your Honor.  There needs

24  to be a benefit for the general unsecured creditors.

25       And we've been trying to figure that out from Day

1  1, and we've been unsuccessful because the information that

2  people have in their hands, meaning the Debtors have in

3  their hands, they claim that we are -- we haven't given

4  comments on the Disclosure Statement, Your Honor.  We did

5  try to give comments on the Disclosure Statement but a lot

6  of the information that we've asked for is solely in their

7  hands.

8       We can't give word-for-word comments.  We've

9  provided them with a laundry list of things that we wanted

10 them to include.  They chose to include but a few, Your

11 Honor.  We can provide those again to Mr. Giordano and

12 hopefully he'll have a change of heart and decide to provide

13 it.  I don't care, Your Honor, how he does it.

14      As you know, there's been a lot of representation,

15 I've done a lot of representation of Debtors, and a

16 Disclosure Statement, it's easy to say the unsecured claim -

17 - the Unsecured Committee asserts, and put that in, Your

18 Honor.  It doesn't have to be what the Debtors say.  But if

19 we believe that something should be included, we should have

20 the benefit of being able to put that in there for the

21 benefit of everybody, with a disclaimer that it is solely

22 the Committee's assertion and not theirs, Your Honor.

23      With that what I would like to do, Your Honor, is

24 pass the podium over to Mr. Zluticky so that he can address

25 the next piece.

1           THE COURT:  Okay.  Thank you.

2      (Pause in the proceedings.)

3           THE COURT:  Before you do that, did I

4  misunderstand the -- the PCs?

5           MR. ROSEN:  No.

6           THE COURT:  Okay.

7           MR. ZLUTICKY:  Would it be possible to get some

8  clarifying language in the Disclosure Statement that makes

9  it clear because --

10           THE COURT:  I think all of that is coming so I

11  mean --

12           UNIDENTIFIED SPEAKER:  I think I offered that.

13           THE COURT:   -- we're going to wait for a turn

14  compared to the one filed on the 10th.

15           MR. ZLUTICKY:  Thank you.  Your Honor, I'm not

16  going to spend a ton of time talking about patently

17  unconfirmable issues.  I understand that typically these

18  would be taken up at confirmation, however, I do think there

19  are 2 things that I want to highlight for Your Honor that I

20  do think we need to consider now as we're going forward with

21  approving potentially a Disclosure Statement that's going to

22  be sent out to thousands of people.

23           The first is I'm a little frustrated with the

24  notion that only 5 percent of the claimants are incarcerated

25  individuals.  They know that's not true.  They listed 1500

1  lawsuits in their statement of financial affairs.  They know

2  that there are hundreds of incarcerated individuals, it's

3  way more than 5 percent.  And I just -- I can't get past the

4  fact that that would actually be something that the Debtors

5  would believe despite their own filings.

6            THE COURT:  Well, I think after they clarified it,

7  it's really 5 percent of the people who filed proofs of

8  claim --

9            UNIDENTIFIED SPEAKER:  And just to clarify

10 further, of the 1500 claims -- claimants for personal injury

11 not all of those people are currently incarcerated.  There's

12 many that -- before becoming incarcerated.

13           MR. ZLUTICKY:  That's correct, but it's more than

14 5 percent.  And it's far more than 5 percent.  And the

15 problem is here, and we'll get to this, but the bar date

16 hasn't run, there's still a lot of time left for people to

17 get these proofs of claim, to process them and send them

18 back and have the -- have the correctional facilities

19 actually transmit them to EPIQ.

20           And so I don't think we can just make blanket

21 statements about what the creditor body is or is not.  I

22 think we just have to look at their schedules and their

23 statement of financial affairs and that alone shows this is

24 way more than 5 percent.

25           So moving on from that, on the -- there's really 2

1    issues on patently unconfirmable that I think we should

2    address now.  The first is the best interest test, and Your

3    Honor was very focused on that earlier.  We do not believe

4    that the Debtors should be permitted to solicit acceptance

5    of a plan that on its face and by the Debtors' own admission

6    is going to fail the best interest test under 1129(a)(7).

7           The Debtors argue that the Committee's objection

8    ignores that certain potential general Unsecured

9    Claimholders would fare better under a plan because their

10   contracts would be assumed and all defaults would be cured

11   under 365(b)(1).  But that argument ignores the actual text

12   of 1129(a)(7) in 2 important respects.

13          First, that section applies to impaired classes of

14   claims in interest.  If they're going to assume and cure all

15   defaults, that contract counterparty is not impaired.  So

16   that doesn't actually factor in here as we're talking about

17   best interest test.

18          Second, this section applies to each holder for an

19   impaired class of claims.  And so you have to do a holder-

20   by-holder analysis and make sure that each holder that

21   doesn't accept the plan is getting as much or more than they

22   would get in a Chapter 7.  They have not done that.  They

23   have not even come close to doing that.  They just say some

24   people are going to get assumed, and that'll be good for

25   them.

1          We have a Committee of 10, and I can tell you

2    right now that there are a lot of people in our Committee

3    that are very upset with this plan, or otherwise I wouldn't

4    be standing up here.  I wouldn't be standing up here without

5    authority from my Committee to do so.  We are vehemently

6    opposed to this plan.  It is not in the best interest of all

7    creditors.

8          And while it certainly may be true that some

9    creditors could fare better, the reality is that there are

10   many who will not.  It's unfortunate that these provisions

11   were not focused on, but I do think that the focus really

12   here has been on following the RSA and simply just going

13   through it by the letter and making sure that all the value

14   goes to the lenders or goes to the people who are receiving

15   incentive packages on the back end.  It's not going to

16   general unsecured creditors.

17          I cannot believe that all of the avoidance actions

18   that are against the release parties that the Debtors may

19   have are being released for not consideration.  There's

20   nothing in the Disclosure Statement that says that there's

21   any consideration, so I have to take the Debtors at their

22   word.          There's no consideration given for those

23   releases.  There's -- as, you know, Mr. Rosen said earlier,

24   there's no evidence the Debtors even investigated all of the

25   release parties and the related parties that are all getting

1  this release by the Debtors of the estate causes of action.

2  What are they, what are they worth, why are you giving them

3  away for nothing?

4       They cite to *Robert Shaw*, remember, in *Robert*

5  *Shaw*, the Special Committee in that case investigated all

6  claims against the -- not just the sponsor but all the

7  directors and officers including breach of fiduciary duty

8  claims.  The Special Committee didn't do that here.  Didn't.

9  And they only looked at H.I.G. and they only looked at the 2

10 directors for H.I.G.  And in *Robert Shaw* the Committee did

11 an investigation and reached the same conclusion.

12      So here we have a situation where no investigation

13 was done by the Debtors, there was a limited investigation

14 by the Special Committee, the UCC's doing our investigation,

15 and right now there's a Disclosure Statement out there that

16 has absolutely nothing about what these claims are and what

17 the Debtors are releasing.  We do know they're not getting

18 any consideration for them though.  And so I think that we

19 are all owed an explanation for what these causes of action

20 are and why they're giving them a release for nothing.

21      And in addition there are other claims out there,

22 commercial tort claims, post-petition contracts the Debtors

23 have entered into where 552(a) cuts off a lender's post-

24 petition rights.  Remember the DIP has been fully paid, but

25 the lenders filed a statement yesterday that said that in

1  the first paragraph.

2          We're not in -- we're not in the world of a DIP

3  anymore, this is cash collateral.  And they do not, I

4  believe, have a lien on post-petition contracts under

5  552(a).  We'll have to take that up at another time, I don't

6  think that's an issue for today.  But I do think it's worthy

7  to get the Debtors' view on that in the Disclosure

8  Statement.

9          There's other potential unencumbered assets,

10 there's rights to insurance, and there's other potential

11 causes of action that we don't know anything about, all of

12 which, if there were a Chapter 7 liquidation, the Chapter 7

13 Trustee would hold, would pursue all of it, liquidate it

14 into cash and distribute the cash.  None of those things are

15 being distributed to creditors.  We're told that there's

16 going to be a schedule of retained causes of action that

17 we're going to get.  And Your Honor's been talking about

18 when we're going to get that and when they're going to

19 provide it.

20         What they have told us though is here's what's not

21 going to be on the list.  What's not going to be on the

22 list, any claims we have against the release parties

23 including avoidance actions.  We know that.  Liquidating

24 trust won't get it.  We know that any claims against parties

25 they deem critical to their ongoing business in their sole

1   discretion, they aren't going to the liquidating trust,

2   they're going to stay with the reorganized Debtors.

3        We know the claims that exist against directors

4   and officers aren't going to the liquidating trust, they're

5   going to stay with the Debtors.  All this despite the fact

6   that there are D&O policies out there where there's a

7   deadline of March 1 to make claims.  And how is it that they

8   haven't even done an investigation when they have a

9   fiduciary duty to, in 2 weeks, in less than 2 weeks make

10  claims on an D&O policy.        It's simply unacceptable

11  at this stage that we don't know all of this information,

12  and what we do know is that this fails the best interest

13  test every single day.  And what they're going to tell you

14  is, Your Honor, give us time to fix it, we'll fix it between

15  now and plan confirmation.  You'll see, we'll come up with

16  the evidence and show you.

17        The problem though is we already know, based on

18  the statements that they're making in the Disclosure

19  Statement that creditors are going to be worse off.  Why

20  should we waste estate time and resources confusing all of

21  these individual creditors by sending out a plan that we

22  know is DLA.  We should just have the Debtors go back, redo

23  the plan in a way that actually meets the best interest

24  test, come back, do a new hearing on a Disclosure Statement

25  seeking additional approval and move on from there.

1          But that brings me to the second point, which is

2     not the best interest test, that has to do with the

3     releases.  And, Your Honor, we're not up here to argue here

4     *Purdue*, we're not up here to say that opts out are

5     inappropriate, we understand the United States Trustee's

6     position, we respectfully disagree with it.

7          I do think that in the 5th Circuit non-consensual

8     third-party releases have not been permitted for a long

9     time.  And so the discussion in the 5th Circuit for a long

10    time has been what is consent.  And essentially what we're

11    doing is we're creating a settlement agreement, a contract

12    with these parties saying, If you do not opt out, you are

13    giving consideration, you are giving a release.

14          And if done correctly, I think that's okay, that's

15    allowed.  It's under *Robert Shaw*, it's under prior 5th

16    Circuit precedent, it's -- but you have to do it the right

17    way, which is 2 things.  Number 1, in order to have a

18    contract it's like -- it's like Contracts 1 in law school,

19    you have to consideration.  What is the consideration that

20    any of these release parties are giving for those releases?

21          And the other courtroom right now they're

22    litigating confirmation of a plan where Red River Talc's

23    giving billions of dollars in cash in exchange for third-

24    party releases.  In 2 weeks we're going forward on

25    confirmation of a plan in *Tehum Care Services* where the

1  released parties are going to bring $75 million in exchange

2  for releases.

3         Here, zero.  Nothing.  We're not even getting

4  reciprocal releases.  Now they're saying the will socialize

5  that and get back to us, but we're not even getting -- we're

6  not even getting mutual releases.  So how in the world can

7  this plan go forward with third-party releases that do not

8  on their face meet the test for approval.  There has to be

9  consideration on both sides.  There's none.  I've read the

10  Disclosure Statement, I haven't seen it.

11         Second, this time period is not sufficient to get

12  consent.  Now I understand that they're saying, Well, we're

13  going to extend that deadline for people who are currently

14  incarcerated.  And I appreciate that, but that's just the

15  deadline for the opt out, that's not the deadline to vote on

16  the plan.

17         And not to rehash what I just argued, but under

18  1129(a)(7) if you don't accept the plan, you have to show

19  that you're going to do as well or better than you would in

20  a 7 liquidation.  So it's important that everybody have a

21  full and fair opportunity to vote on the plan.  This is not

22  a full and fair opportunity to do that.

23         Most of the creditor body here, if they're not

24  incarcerated, they were formally incarcerated, they're

25  difficult to locate.  Their attorneys will tell you that it

1   is difficult to locate them, it is difficult to get in touch

2   with them to explain to them their rights.  Not to mention

3   the number of them that are unrepresented.  And we have to

4   be able to give them time to evaluate this plan and

5   determine whether to vote on it and to accept or reject.

6           Sending them the plan in the ballot and saying,

7   You have more time to send the ballot back, I can understand

8   that, Your Honor.  You're not giving them for example 2

9   separate envelopes, pre-paid stamps, that say, Here's the

10  envelope for the ballot, here's the envelope for the opt out

11  form.  And how is anyone, based on a review of what they've

12  done, be able to delineate between the 2.

13          It's simply just not sufficient to obtain contain

14  consent under the law when you're dealing with this

15  particular creditor body on this short notice.  And so for

16  those reasons as this plan is currently constructed it is

17  patently unconfirmable.  And we believe that for those

18  reasons the Court should simply deny approval of the

19  Disclosure Statement on these bases alone and move forward

20  with having them come back with a different plan that at

21  least meets the best interest test.

22          Like at least give the -- at least give the

23  creditors something more, or something that they would at

24  least get in a 7 liquidation.  Don't give us $3 million just

25  for the administrative costs and a CVR that we have to hold

1   for 7 years by the way, that we can't transfer.  You can't

2   actually -- a CVR is a marketable security, except we're not

3   allowed to market it or sell it or liquidate it.  The

4   liquidating trustee has to sit there and hold it for up to 7

5   years.

6            I just do not understand how that can ever meet

7   the best interest test, despite what the Debtors are saying

8   they're going to be able to do in the next 30 days.  And so

9   for those reasons I think the plan should -- the Disclosure

10  Statement should be denied, and they should go back and come

11  up with a plan that meets the best interest test, that has

12  releases where there's actually consideration, or where

13  there is no consideration get rid of the release.  It's

14  really that simple, if you're not going to give

15  consideration, you do not get a release.  And so we think

16  that that should be the mandate going forward and that's

17  what we would ask the Court to do.

18            THE COURT:  Thank you.

19            MR. HEMENWAY:  Your Honor, before I get started

20  just some housekeeping.  Well, I appreciated Mr. Giordano's

21  suggestion that we may not need testimony before he hears

22  it, we do feel obligated to create a note entry record for

23  you and for our constituents as to the points we're arguing.

24  So I do have two witnesses I'd like to put on, both of them

25  will be fairly brief, and then some remarks on solicitation

1    procedures.

2            So I'm happy to keep going --

3            THE COURT:  Yeah, please do.  We'll go to -- we'll

4    go to about 1:30 --

5            MR. HEMENWAY:  Okay.

6            THE COURT:   -- and then we'll break and then

7    we'll do the lift stays, and if we have time we'll come back

8    to this, and then at 4:00 -- and then we'll continue to lift

9    stays and then we'll come back.

10           MR. HEMENWAY:  Okay.

11           THE COURT:  So, okay.

12           MR. HEMENWAY:  Thank you, Your Honor.  And I think

13   that 1:30 would probably give me just about enough time to

14   get through all of it, so if we are close to 1:30 I'll do my

15   best to wrap up.

16           THE COURT:  Okay.

17           MR. HEMENWAY:  We'd like to call the Chief

18   Restructuring Officer, Mr. Dragelin.

19       (Pause in the proceedings.)

20           THE COURT:  Good afternoon.

21           MR. DRAGELIN:  Good afternoon.

22       (Witness sworn.)

23           THE COURT:  Please be seated.

24                        DIRECT EXAMINATION

25   BY MR. HEMENWAY:

1  Q     Good afternoon, Mr. Dragelin.  Good to see you again.

2  A     Good to see you.

3  Q     We spoke on Friday at your deposition do you recall?

4  A     Yes.

5  Q     Mr. Dragelin, how much cash does the Debtor have on

6  hand as of the last DIP reporting period?

7  A     I think we have about 140 million maybe.

8  Q     Okay.  And only 3 million of that goes to the

9  liquidating trust.  Correct?

10  A     Well, under the current construct, yes, we would fund 3

11  million.

12  Q     About 2 percent give or take?

13  A     Roughly.

14  Q     Let's talk about the estate assets and where the

15  Debtors are proposing they'd go in this plan.  We spoke on

16  Friday about estate causes of action.  Now the plan still

17  doesn't say which estate causes of action are going to

18  unsecured creditors, does it?

19  A     It talks about retained and then those that go into the

20  liquidating trust.

21  Q     Yeah, and it doesn't say which are which.  Correct?

22  A     It does not specifically identify which are which.

23  Q     And, but you've identified a bunch of estate causes of

24  action that are not going to the trust.  Correct?

25  A     I think on Friday I likely misspoke when I said things

1  were not going into the trust.

2  Q    Okay.  So you told me on Friday the Debtor is keeping

3  avoidance actions against any of the vendors it wants to

4  keep working with.  Is that no longer the case?

5  A    No, that is true.

6  Q    Okay.  And the reorganized Debtors isn't keeping those

7  so it can pursue a recovery, is it?

8  A    It's keeping those in order to maintain business

9  operations.

10  Q    So those will go away as you keep working with those

11  companies?

12  A    Yes.

13  Q    And what about the litigation claims the Debtor listed

14  in the schedules, the -- you told me the liquidating trust

15  definitely isn't getting those either.

16  A    No, I believe I misspoke on that.  They actually are

17  going into the liquidating trust.

18  Q    I see.  And you also told me you don't believe those

19  have any value.  Did you misspeak on that as well?

20  A    No, not necessarily.

21  Q    Okay.  And of course there are other estate claims and

22  causes of action no one's getting.  Right?  Because you

23  decided to release them.

24  A    That's not true.

25  Q    There aren't estate causes of action being released in

1  the plan?

2  A    No.

3  Q    So the -- does the estate maintain claims against the

4  company's directors and officers?

5  A    There are no claims against the directors and officers

6  that have been identified.

7  Q    So you're not aware of any, but if there were, would

8  they be released in the plan?

9  A    If there were, but we had an investigation done and

10 there were not any identified.

11 Q    Okay.  Well, if there aren't any claims, then why are

12 you bothering to release them?

13 A    I think it's part and parcel of the belt and

14 suspenders, if there are, you know, certain contingency

15 items that people could raise --

16 Q    I see.

17 A    -- those are released.

18 Q    And the same with claims against the parent company,

19 H.I.G., any claims that may exist are being released?

20 A    Same answer as before, verification was done and there

21 aren't any at that time.

22 Q    Okay.  When you say the same answer as before, before I

23 asked you about the directors and officers.  That

24 investigation isn't done, is it?

25 A    My understanding is that it is.

1  Q    You told me on Friday that it was ongoing.  Did it get

2  done over the weekend?

3  A    I misspoke.

4  Q    Okay.  The Disclosure Statement says it's ongoing as

5  well.  Was that incorrect?

6  A    My understanding is that none have been identified and

7  I believe it is substantially complete.

8  Q    Okay.  The disclosure -- just to be -- just so you're

9  aware, Mr. Dragelin, I don't want to talk you into making a

10  misstatement, the Disclosure Statement identifies those as

11  company targets and says that investigation is ongoing?

12  A    Can we look at it just to --

13  Q    I'm just -- I'm just -- we don't need to get into it,

14  I'm working with limited time.  You told me on Friday that

15  you believe that that investigation of company targets began

16  in the last 30 days.  Is that right?

17  A    Roughly, it was the second phase of the initial

18  investigation.

19  Q    Okay.  So it began in the last 30 days and was

20  completed between Friday and today?  Okay.

21  A    I've been told there are none.

22  Q    Okay.  I don't think that's what I asked, but let's

23  just keep moving.  Now Wellpath, they have insurance for

24  those directors and officers claims, don't they?

25  A    We do have D&O insurance.

1  Q    Millions in insurance.  Fair?

2  A    I don't recall the exact --

3  Q    Does 20 million plus sound right?

4  A    I don't recall the actual --

5  Q    And that's not self-insurance, is it?

6  A    No, it's not.

7  Q    That's not fronting insurance where it's supposed to

8  look like insurance but it's not there?

9  A    I don't believe it's self-insured.

10  Q    Okay.  And if those claims are released, no one will

11  collection on that insurance, will there?

12  A    If there were claims and they were released,

13  presumably --

14  Q    Sure.

15  A     -- collection.

16  Q    And those directors and officers, they're not giving

17  the estate anything in return for those releases, are they?

18  A    I would disagree with that.

19  Q    What are they giving?

20  A    It's been sweat equity, our directors and officers

21  continue to work with the company currently, through the

22  restructuring, leading up to the restructuring and even now.

23  Q    I see.  So they're getting releases because they do a

24  good job for the company?

25  A    All the efforts they're putting in to help the Debtors

TIMOTHY DRAGELIN - DIRECT BY MR. HEMENWAY                178

1  reorganize.

2  Q    I see.  And this afternoon you're also going to come

3  and talk about approximately $4 million that they're also

4  getting for those efforts?

5  A    Part and parcel of there is a key employee incentive

6  plan --

7  Q    Sure.

8  A     -- that we are seeking approval for.

9  Q    Okay.  You also told me on Friday there's very little

10 assets in this estate.  Do you recall that testimony,

11 Mr. Dragelin?

12 A    In the -- what would be remaining, that's what you're

13 talking about, is going to the liquidating trust.

14 Q    I see.  I just asked -- you said there was little

15 assets that's in the estate, and I appreciate the

16 clarification.  Now at the start of the case there weren't

17 little assets in the estate, were there?

18 A    (No audible response.)

19 Q    At the beginning of the case the estate assets were not

20 as minuscule as they are -- as they will be post the

21 corrections restructuring?

22 A    Yeah, I'm not following your question, I'm sorry.

23 Q    So when the Debtors filed this case they had half a

24 billion dollars of assets or more, fair to say?

25 A    We'd have to look at a balance sheet, I know we had,

TIMOTHY DRAGELIN - DIRECT BY MR. HEMENWAY                179

1  you know, accounts receivable, we had a little bit of cash,

2  we had some pre-paid assets if that's what you're talking

3  about.

4  Q    Mr. Dragelin, you were a key part of the sale process

5  pre- and post-petition, weren't you?

6  A    Yes.

7  Q    And you would agree with me, wouldn't you, that the

8  sales process for the RS and corrections business

9  contemplated those assets being worth half a billion dollars

10  or more?

11  A    We weren't sure what value we were going to get for it,

12  that's what the sale process was for.

13  Q    Okay.  And those RS assets aspect of that, all those

14  went to the lenders after you had the expedited sales

15  process.  Right?

16  A    It was actually a pretty extensive sales process.

17  Q    Okay.  But after the sale process, I don't mean to

18  quibble about terminology.

19  A    Ultimately they ended up with the assets.

20  Q    And that was after the sale process that resulted in

21  zero bids?

22  A    We did not have any qualified bids, that's true.

23  Q    And the other part of those assets, other than causes

24  of action we've already talked about, that's the corrections

25  business?

1  A    If you want to define a business as an asset, yes, you

2  could say that.

3  Q    You don't define an ongoing --

4  A    It's a --

5  Q    -- business as a -- okay.  And that's going to the

6  lenders too.  Right?

7  A    Ultimately, yes.

8  Q    So when you talked about there being little assets

9  available, you mean to anyone other than the lenders.  Is

10 that fair to say?

11 A    I would not -- I would disagree with that

12 characterization.

13 Q    Okay.  But what is the liquidating trust getting again?

14 A    It's getting various causes of action, it's getting

15 litigation that we talked about.

16 Q    And you told me on Friday you value that at zero, or

17 close to it?

18         UNIDENTIFIED SPEAKER:  Your Honor, I think it's

19 unintentional but he's cutting the witness off before he's

20 done with his answer.  I'd ask him just to be able to finish

21 his answer.

22         MR. HEMENWAY:  I apologize, Mr. Dragelin.

23         THE WITNESS:  No problem.

24         UNIDENTIFIED SPEAKER:  The question didn't get an

25 answer was what's going into the trust.

1        MR. HEMENWAY:  I heard him answer it.  Yeah --

2        THE COURT:  Yeah.

3        MR. HEMENWAY:   -- I'll slow down.

4        THE COURT:  Take your time.

5        THE WITNESS:  Sure.  We valued in the Disclosure

6   Statement those assets of being anywhere between zero and

7   unknown.

8   BY MR. HEMENWAY:

9   Q    Zero and unknown.  Okay.

10  A    And the reason --

11  Q    And I don't mean to cut you off before you're done, I'm

12  trying to get to -- do what Mr. Giordano asked, to get

13  through this quickly.  So the remaining assets that go to

14  the lenders is that regardless of whether they're

15  encumbered, Mr. Dragelin?

16  A    Now what do you mean, sir?

17  Q    Well, you understand the term collateral.  Correct?

18  A    I do.

19  Q    So when I say the word encumbered I mean something

20  that's collateral for a loan, which here would be the

21  lender's loan to Wellpath.  So in terms of what the lenders

22  get under the plan it's everything except for those things

23  you just described going to the liquidating trust.  Right?

24  A    Yes, that's fair.

25  Q    And that's regardless of whether they were collateral

1  for the lender's loan or not.  Correct?

2  A    I don't believe they are collateral for the lender's

3  loan.

4  Q    Okay.  But that's -- did you do that analysis?

5  A    It's my understanding to be the case, yeah.

6  Q    Okay.  So if something is not going to the liquidating

7  trust, and it turns out that your understanding is incorrect

8  and it's, in fact, not collateral for the loan, it would

9  still go to the lenders.  Correct?

10  A    I mean I'd have to see if that's the fact.

11  Q    Isn't that how the plan is set up?

12  A    Well, it --

13  Q    It's not going to the liquidating trust, is it?

14  A    I presume --

15         MR. BRIMMAGE:  Your Honor, I'll object --

16         THE WITNESS:   -- there's no collateral.

17         MR. BRIMMAGE:   -- because that's a compound

18  question.  He asked him a question, he didn't let him

19  answer, he asked another question.  I'd ask that he slow

20  down and let the witness answer.

21         THE COURT:  Just take your time.

22         MR. HEMENWAY:  Sure.

23         THE COURT:  I mean if we have to come back later,

24  we'll come back later.

25         MR. HEMENWAY:  I appreciate it.  Is Mr. Brimmage

1  representing the witness?

2          THE COURT:  No, Mr. Brimmage is objecting.

3  BY MR. HEMENWAY:

4  Q    And you understand that the avoidance actions here are

5  not collateral for the loan.  Correct?

6  Q    Yes.

7  Q    Okay.  And all of those that don't go to the

8  liquidating trust, those are going to the lenders?

9  A    Yes.

10 Q    Okay.

11         MR. HEMENWAY:  I think that's all I have.

12         MR. GENENDER:  Very briefly, Your Honor.

13                    CROSS-EXAMINATION

14 BY MR. GENENDER:

15 Q    Why is it, Mr. Dragelin, that the litigation that's

16 going into -- the causes of action that are going into the

17 litigation trust are valued between zero and unknown?

18 A    Because they're unknown.

19 Q    Does that mean they have no value?

20 A    Not necessarily.

21 Q    You were asked about some litigation that wasn't going

22 to the trust in your deposition, yet I think it is going

23 into your -- into the trust.  I don't want to get into the

24 details, but are those the same types of claims, they may

25 have value, we just don't know?

1  A    Okay.  I'm sorry, the last sentence didn't make sense.

2  Can you --

3  Q    The non-critical avoidance actions are going into the

4  trust?

5  A    Yes.

6  Q    Are there additional claims that are going to into the

7  trust that you're aware of?

8  A    Yeah, certain litigation claims.

9  Q    And are those -- they fall into the same bucket, you

10 don't know what the value is but there may well be value

11 there?

12 A    Correct.

13 Q    You were asked about the cash balance of the company.

14 Of that you said $3 million is going into the trust?

15 A    Yes.

16 Q    If there was no plan, would there be $3 million going

17 to support pursuit of claims?

18         MR. HEMENWAY:  Objection, Your Honor, calls for

19 speculation.

20         THE COURT:  Sustained.

21 BY MR. GENENDER:

22 Q    Are you aware of any plans to -- for the company to

23 provide any support to pursue claims outside of the plan

24 structure?

25 A    No.

1  Q     You were also asked about some avoidance actions that

2  were not going to go into the trust because they're with

3  current vendors.  Are those current vendors critical

4  vendors?

5  A    They are vendors that we would use on a go-forward

6  basis, some which would include our critical vendors, yes.

7  Q    And if those avoidance -- if those -- let me ask you

8  this, was there account payable out to those vendors?

9  A    There is.

10 Q    And to what extent roughly?

11 A    Our current projection is that we will emerge, we use

12 the March 31 date, roughly $50 million.

13 Q    And --

14         THE COURT:  I'm sorry, $50 million of what?

15         THE WITNESS:  Accounts payable to -- on a pre-

16 petition and post-petition accounts payable.

17         THE COURT:  So these were for vendors who were

18 not -- because my understanding was that critical vendors

19 were paid and in essence their avoidance actions were waived

20 at the time.

21         THE WITNESS:  So if you remember, Your Honor,

22 there's $45 million that was approved on --

23         THE COURT:  Right.

24         THE WITNESS:   -- on the first day.

25         THE COURT:  Exactly.

 1          THE WITNESS:  I believe we have approximately $15

 2  million left of that 45 million --

 3          THE COURT:  Okay.

 4          THE WITNESS:   -- because we've been negotiating

 5  with those -- those counterparties.  And then on a post-

 6  petition basis those same vendors, as well as others we'll

 7  have accumulated --

 8          THE COURT:  35 million to get you to the 50.

 9          THE WITNESS:  Roughly, sir, yes.

10  BY MR. GENENDER:

11  Q    And who ultimately is going to pay that AP, is that

12  going to be current Wellpath or emerged Wellpath under the

13  plan?

14  A    Emerged Wellpath.

15          MR. GENENDER:  Pass the witness.

16          THE COURT:  Okay.  But, Mr. Dragelin, the 35 that

17  they've accumulated post-petition pursuant to the

18  administrative expense, that would get paid in the ordinary

19  course of business.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  It's only the 15 million that would be

22  pre-petition.

23          THE WITNESS:  That's right.  And that will be paid

24  as well.

25          THE COURT:  Yes.  Okay.  So, all right.  I

TIMOTHY DRAGELIN - CROSS BY MR. GENENDER                    187

1    understand.  So it's not really 50 that would otherwise not

2    be paid because 35 is an admin expense.

3              THE WITNESS:  If there wasn't a plan I think was

4    his question, Your Honor.  Those would not be paid.

5              THE COURT:  What, the 35?

6              THE WITNESS:  The 35, because I need a reorganized

7    Debtor to pay those.

8              THE COURT:  Well, a Chapter 7 Trustee may pay

9    those.  We don't know.  It could be an administrative

10   expense that would come after the 7 expenses.

11             THE WITNESS:  Correct.  And under the current

12   liquidation analysis pretty much all the cash is used up in

13   wind down expenses, operational.

14             MR. GENENDER:  Pass the witness, Your Honor.

15             THE COURT:  Okay.

16                       REDIRECT EXAMINATION

17   BY MR. HEMENWAY:

18   Q    Just two questions, Mr. Dragelin, I believe.  You

19   talked about causes of action against third parties and that

20   you misspoke and those are going to the liquidating trust

21   now?

22   A    Yes.

23   Q    You told me on Friday that you believe the likely

24   recovery on those was zero.  Have you changed your mind

25   since Friday?

1   A    No, I think it's very hard to determine, that's why we

2   disclosed it as zero and unknown.

3   Q    I mean I can call up your testimony, you said, I

4   believe the likely recovery is zero.

5   A    At the moment it's very difficult to know exactly what

6   that recovery is going to be.

7   Q    And specifically one of the claims is the claim against

8   the Georgia Department of Corrections?

9   A    That -- there is a claim for that, yes.

10  Q    And you said that that -- there had been an arbitration

11  on that claim?

12  A    I think it was attempted arbitration.

13  Q    And based on that you believe that that claim has no

14  value?

15  A    The claim, roughly it's over 10 million, maybe $15

16  million.

17  Q    So you -- since Friday --

18          UNIDENTIFIED SPEAKER:  He --

19          MR. HEMENWAY:  Oh, I'm sorry.  I'm sorry.

20  BY MR. HEMENWAY:

21  Q    But there are defenses that the estate has of Georgia,

22  many of those dollars are also for pass through and so those

23  are dollars that may not have been paid but would be owed,

24  so the estate -- we hadn't paid those claims, there may be a

25  defense against the estate having to pay those claims.

TIMOTHY DRAGELIN - CROSS BY MR. GINSBERG                    189

1  Those are all things that need to be investigated and

2  whether or not there's any actual real value there from the

3  claim.

4  Q    Okay.

5          MR. HEMENWAY:  No further questions.

6          MR. GINSBERG:  Your Honor, may I ask a single

7  question of the witness?

8          THE COURT:  Yes. Sir.

9                    CROSS-EXAMINATION

10 BY MR. GINSBERG:

11 Q    Sir, can you just describe for me what are the --

12 describe what are these unknown claims, could you describe

13 what they are?  Are they accounts -- are they accounts

14 receivables you're trying to collect that have a known value

15 or are they claims that arose because Wellpath paid claims

16 and now you're trying to get money back from somebody else

17 on indemnification?  I'm just very unsure what you mean by

18 claims that are going to the liquidating trust.

19 A    Mr. Ginsberg, there's two sets of claims that are

20 going, avoidance actions which I previously estimated in my

21 deposition.  There was also then litigation claims against a

22 couple of customers and it was the value of those that are

23 identified in the Disclosure Statement as zero and unknown,

24 not that the claim itself was unknown.

25 Q    So it was -- yeah.  That's my question, I understand

1  you describe that litigation claim.  Can you just give me an

2  example of what the litigation in any one of these cases

3  involves?

4  A    It's amounts owed under the contracts from the customer

5  to Wellpath.

6  Q    Okay.  So if there's an accounts -- so that's

7  essentially an accounts receivable action, a collection of a

8  debt.  Wouldn't that be a known amount that you can collect

9  from an entity that is a governmental entity for example?

10 You should know the amount of the -- that you're seeking,

11 wouldn't you?

12 A    Not specifically in a way that some of these claims

13 work.  These are risk share claims so there's an amount that

14 we have paid on -- for care and there's a risk sharing

15 between customers and Wellpath and so there's calculations

16 that need to be done in order to determine exactly how much

17 that risk share is and whether or not all those claims were

18 paid or not paid.  So those were some of the reasons why

19 those amounts are unknown as well.  But I'm not aware --

20 Q    Is there any --

21 A     -- so you have a layman's claims explanation at this

22 point of it.

23 Q    There's intention you determine what the amount that's

24 going to be sought in any one of these cases, that's in --

25 at least in the works so we'll know that before confirmation

1  that for example the case against Georgia was seeking X

2  dollars and this is the basis, or are we just -- we just sit

3  and wait and just have no idea what might -- what might have

4  happened.

5  A    I believe that we filed them in our schedules, but we

6  didn't put an amount in there.  I'll have to talk to counsel

7  as to whether or not we put amounts in there or not so.

8  Q    And the other type of claims described, as you say, are

9  avoidance actions.  In other words you're trying to avoid a

10  debt or a debt that someone is taking against you, is that

11  what you mean by avoidance actions?

12  A    They would be preference actions, sir.

13  Q    Sorry?

14  A    Preference actions.  Amounts paid --

15  Q    Okay.

16  A    -- leading up to the bankruptcy case in the last 90

17  days.

18  Q    And so then on your side you're trying to recover those

19  amounts?

20  A    The idea would -- that a portion of amounts that were

21  paid leading up to the case would be put into -- would be

22  potential preference actions and put in the liquidating

23  trust.

24  Q    But what's the estimate of that amount?  How much --

25  how much is going to be seeking -- or the cause is seeking

1    in these avoidance actions, or preference actions as you

2    style it?

3    A    The current estimate is $10 million.

4    Q    Thank you.  That was all I had.

5              MR. GINSBERG:  Thank you, Your Honor.

6              MR. HEMENWAY:  Yeah, nothing further from me.

7              And I apologize for being -- for talking over you,

8    Mr. Dragelin.

9              I was a journalism major, Your Honor, and when I

10   get a deadline, I'm pushing -- pushing to meet it.

11             THE WITNESS:  Okay.

12             THE COURT:  All right.  Mr. Genender, any recross?

13             MR. GENENDER:  No, Your Honor.

14             THE COURT:  Okay.  You may step down.  Thank you,

15   sir.

16        (Witness steps down.)

17             MR. HEMENWAY:  Briefly we'd like to call Jack

18   Shadid.  Mr. Shadid is on the WebEx.

19             UNIDENTIFIED SPEAKER:  Your Honor, could we -- I

20   hate to do this, we don't know what his connection is to the

21   case.  He's a lawyer in Chicago.  Could we ask for an offer

22   of proof, if we don't dispute it, just do it that way?

23             MR. HEMENWAY:  Mr. Shadid has filed a proof of

24   claim on behalf of his client in this case.

25             UNIDENTIFIED SPEAKER:  Okay.  That wasn't clear

1   from your witness list.

2           THE COURT:  Okay.

3           UNIDENTIFIED SPEAKER:  Proceed.

4           THE COURT:  Mr. Shadid, would you raise your hand?

5   Oh, can you hit five star?  Hit five star first.

6       (Pause in the proceedings.)

7           THE COURT:  All right.  Can you hear me?  Why

8   don't you speak up?

9           MR. SHADID:  It says I'm un-muted.  Can you hear

10  me?

11          THE COURT:  Yep, I can hear you.  Okay.  Raise

12  your right hand, sir.

13      (Witness sworn.)

14          THE COURT:  All right.

15          MR. BRIMMAGE:  Your Honor, just real quick, Marty

16  Brimmage here on behalf of the lenders.  I looked and didn't

17  find a 7-day notice that this witness will be testifying

18  remotely.  Is there any particular reason he's not in the

19  courtroom?

20          MR. HEMENWAY:  Well, Mr. Shadid is representing

21  his client pro bono and we didn't want to ask him or client

22  to incur the travel expense to come here, Your Honor.

23          MR. BRIMMAGE:  Okay, Your Honor.

24          THE COURT:  Okay.

25          MR. BRIMMAGE:  I just wanted to know.

1        THE COURT:  All right.

2                    DIRECT EXAMINATION

3   BY MR. HEMENWAY:

4   Q    Mr. Shadid, can you state your name and profession for

5   the Record?

6   A    Yep, my name is Jack Shadid, I'm an attorney, I work

7   with the law firm Hinshaw & Culbertson.

8   Q    Thank you.  And what's your connection to this

9   bankruptcy case?

10  A    I represent a creditor in a civil rights case alleging

11  claims against the government as well as Wellpath.

12  Q    And what's your client's name, Mr. Shadid?

13  A    My client's name is Marzan Williams.

14  Q    How did you come to represent Mr. Williams?

15  A    My law firm was appointed to represent him on a pro

16  bono basis through the Northern District of Illinois.

17  Q    Can you tell me generally how you communicate with

18  Mr. Williams?

19  A    Phone calls, emails, I try and talk to him as much as I

20  can, you know, usually about once a month maybe.

21  Q    Is Mr. Williams incarcerated?

22  A    Yes, he's currently incarcerated.

23  Q    How does the process work to have a phone call with

24  Mr. Williams?

25  A    So we have to schedule and send an email to a

1  counselor, the counselor has to respond to my email, agree

2  to set up the call.  We have to find a time that works for

3  the counselor's schedule as well as my schedule and then we

4  put it on the calendar and then I receive a call from the

5  prison ideally at the scheduled time.

6  Q    Approximately how long does that process take, days,

7  weeks?

8  A    It can take weeks, it can take a month, it just -- it

9  depends on the counselor you're working with, the facility

10 he's at, things like that.

11 Q    Okay.  How did you find out about the bankruptcy case

12 of Wellpath, Mr. Shadid?

13 A    I actually saw it in a Law 360 email that I get every

14 morning with news headlines.

15 Q    Do you know if Mr. Williams received a notice of the

16 bankruptcy?

17 A    I believe he did not.

18 Q    Do you know why?

19 A    The address that the Debtor had on file was his prior

20 address.  He had since been moved to a different facility.

21 Q    Did you work to prepare a proof of claim form for your

22 client?

23 A    Yes, I did.

24 Q    Approximately when did you send Mr. Williams that form?

25 A    I put it in the mail I think it was December 10.

1  Q    And did you do anything special in terms of postage or

2  contacting the facility?

3  A    Yes, I overnighted with UPS and then in my package I

4  put a, you know, pre-postage paid envelope trying to get him

5  to return it.  I called the prison -- or emailed the prison

6  and just asked if there was, you know, ways I could make

7  sure that this process goes quickly.  I didn't get much

8  help.

9  Q    Now, Mr. Shadid, I think you mentioned that you do

10 sometimes have the ability to email Mr. Williams.  Why

11 wouldn't you just email him that proof of claim form?

12 A    Well, I can't use my Outlook, you have to use what's

13 called Corrlinks, sometimes it's called Trulincs, which is

14 like an email platform on the internet.  It doesn't allow

15 attachments to be sent.

16 Q    I see.

17 A    Just text and email.

18 Q    So you sent the proof of claim form you said December

19 10.  Do you know about when Mr. Williams received it?

20         MR. GENENDER:  Objection, Your Honor --

21         THE WITNESS:  I know it was delivered to the

22 prison on December 11.

23         THE COURT:  Hold on a second.  Hold on.

24         MR. GENENDER:  There's --

25         MR. HEMENWAY:  I asked if he knew, Your Honor.

1          MR. GENENDER:  Well, I think he was about to say

2   something other than answering that.

3          THE COURT:  Yeah, I think it's -- just do you know

4   when he got it.

5          MR. HEMENWAY:  Do you need --

6          THE COURT:  Yes, sir.

7          THE WITNESS:  I don't know the precise date he

8   received it, no.

9   BY MR. HEMENWAY:

10  Q    Did you get a chance to talk to Mr. Williams about the

11  proof of claim form?

12  A    Yes.

13  Q    Had he received it at that point?

14  A    No, he had not.

15  Q    Approximately when was that, Mr. Shadid?

16         MR. GENENDER:  Objection, Your Honor, this is --

17  it's hearsay --

18         THE WITNESS:  I talked to him around January 15.

19         THE COURT:  Hold on again, hold on.

20         MR. GENENDER:  I think it's hearsay and I don't

21  know if he's intending to waive attorney-client privilege

22  about his communications with his client, but I don't think

23  there's -- this is all hearsay about whether or not he got

24  something.  It's from the client, not from him.  He doesn't

25  know if he got it or not.  He's just relaying hearsay.

1              THE COURT:  All right.  Mr. Shadid, did you get

2   the proof of claim back from your client?

3              THE WITNESS:  I'm still waiting for it.

4              THE COURT:  Okay.  I think that's the relevant --

5              MR. HEMENWAY:  That's fine.

6              THE COURT:   -- issue.

7              MR. HEMENWAY:  Yeah, Your Honor, and I understand

8   where Mr. Genender's coming from.  The one thing I would

9   like to state on the Record, because there was a suggestion

10  of privilege waiver, I don't believe the fact that an

11  attorney talked to a client is privileged, and so I'm trying

12  to be very careful about that and I don't want to -- I'm not

13  going to ask Mr. Shadid about the substance of any

14  conversation or anything involving his advice to his client.

15             Also, I would appreciate a little leeway given

16  that we can't have Mr. Williams testify because his

17  correctional facility won't let him participate in these

18  proceedings.

19  BY MR. HEMENWAY:

20  Q    Mr. Shadid, do you understand that part of this hearing

21  is to evaluate the solicitation procedures proposed by the

22  Debtors?

23  A    Yes, I do.

24  Q    And have you reviewed those procedures, the plan, or

25  the proposed ballot?

1  A    Very limited but, yes.

2  Q    Are you aware the plan includes something called an opt

3  out?

4  A    I'm vaguely aware, yes.

5  Q    You understand that Mr. Williams will be releasing some

6  of the Defendants in his case if he doesn't elect opt out?

7  A    Again, very limited understanding, but I guess I could

8  say yes.

9  Q    Do you know what Mr. Williams and other creditors are

10  getting in return for those releases?

11  A    That is something I'm still trying to figure out, so,

12  you know, it's just not clear to me through what review I've

13  done of the documents in the court Docket and whatnot.

14  Q    And you understand that some of that information is

15  being revealed in the plan supplement?

16  A    Yes.

17  Q    Now what we've heard today is Debtors' plan to mail

18  that document out about 12 days before the voting deadline.

19  In your experience do you believe that's enough time for

20  Mr. Williams to receive and review before casting his vote

21  on the plan?

22          MR. GENENDER:  Objection --

23          THE COURT:  Hold on a second, let me --

24          MR. GENENDER:   -- objection, Your Honor, this

25  calls for an expert opinion, it's not -- he's not competent

1  to make that.  Maybe it's not relevant to what we're doing -

2  - his opinion is not relevant to what we're doing.

3          THE COURT:  No, I think he asked him whether in

4  his experience he thought 12 days was sufficient.  And it's

5  a question of in his experience whether its sufficient or

6  not.  I don't --

7          MR. HEMENWAY:  I'm not suggesting --

8          THE COURT:  I don't see him asking for an opinion.

9          MR. HEMENWAY:  Yeah, I'm asking Mr. Shadid about

10 his client, I'm not suggesting he's an expert on --

11         MR. GENENDER:  In his experience whether something

12 is sufficient, again, I think it's elevating him to --

13 essentially to an expert on the mail and delivery at a

14 hospital at a prison, which he's not qualified to do.  He's

15 got very limited exposure.

16         MR. HEMENWAY:  But I believe Mr. -- I mean I think

17 the topic is Mr. Shadid's ability to communicate with his

18 own client and I think he -- to the extent that we're going

19 to call that expert testimony, he's certainly qualified on

20 that topic.

21         THE COURT:  Yeah, I don't think it's expert

22 testimony, and I think he can talk about what his experience

23 is based on this particular client.  So go ahead, you can --

24 BY MR. HEMENWAY:

25 Q   Mr. Shadid, I'll restate the question.  Do you believe

1  12 days -- in your experience is 12 days enough time for

2  Mr. Williams to receive and review that document before

3  casting his vote on the plan?

4  A    No, no, I don't know, in my experience I don't know

5  that he would receive it in that time let alone return it to

6  me seeing as how I sent him a claim form almost 70 days ago

7  and haven't received it in return.

8  Q    And do you have concerns about being able to advise

9  Mr. Williams on the ballot, the plan or the opt out?

10  A    Yes, I do.  You know, it's kind of like of trying to

11  thread a needle creating a situation where I can speak to

12  him and he can have possession of the documents that I need

13  him to posses, let alone have -- have read them in advance.

14  He did at some point receive the claim form I sent, I did

15  not get to talk to him about it.  Yeah.

16  Q    If you're not able to address those questions in time,

17  what does that mean for your client?

18  A    I mean I guess he's shooting in the blind.  Right?

19  Just here you go, good luck.

20  Q    All right.  Thank you, Mr. Shadid.

21          THE COURT:  All right.

22          THE WITNESS:  Thank you.

23          THE COURT:  Mr. Genender?

24          MR. GENENDER:  Real briefly.

25                      CROSS-EXAMINATION

1    BY MR. GENENDER:

2    Q    Mr. Shadid, appreciate you answering just a few

3    questions for me.  You said you are in touch with your

4    client, Mr. Williams, about once a month?

5    A    I try for once a month.

6    Q    Phone calls?  You said they take --

7    A    Well, I mean if I can, yes.

8    Q    And so you schedule those months in advance?  If it

9    takes a month to get a --

10   A    I usually schedule about a month in advance.

11   Q    So you --

12   A    I get off a call and then start working to schedule

13   another one.

14   Q    And the emails on top of that, you can do that from

15   your end from one of these special apps or systems.  Right?

16   A    Yes.

17   Q    You called it Trulincs.  When did you -- when did you

18   learn that Mr. Williams had received the proof of claim you

19   sent him?  When did he get it, when did you learn he --

20   A    He sent me --

21   Q    Go ahead.

22   A     -- on January 22 he sent me an email and said, I have

23   a claim form, I'm looking at this form.

24   Q    Okay.  And he chose in the almost month since then not

25   to return it to you.  As far as you know.

1   A    He put it in the mail.  No, he put it in the mail.

2   Q    So you do have it.

3   A    No.

4   Q    Do you know when he put it in the mail?

5   A    On January 22 is my understanding.

6   Q    That's what he told you.  I assume that's what he told

7   you.  You didn't --

8   A    Yes.

9   Q    -- you didn't see him put it in the mail.

10  A    No.

11  Q    Is Mr. Williams the only individual you know who has a

12  claim in this bankruptcy?

13  A    Yes.

14          MR. GENENDER:  Pass the witness.

15          MR. HEMENWAY:  No further questions, Your Honor.

16          THE COURT:  All right.  Thank you, Mr. Shadid.

17  You may be excused.

18          THE WITNESS:  Thank you, Your Honor.

19          MR. HEMENWAY:  Thank you, Mr. Shadid.

20      (Witness excused.)

21          MR. HEMENWAY:  So, Your Honor, we don't have any

22  more witnesses to present, but I'd like to talk a little bit

23  about the solicitation procedures.  Oh, one second, let me

24  confer.

25      (Pause in the proceedings.)

1          MR. ROSEN:  Your Honor, I apologize for

2    interrupting my colleague.  While we do not have a witness

3    to put forth evidence, we do have an exhibit, it's

4    Exhibit 23 to our Witness and Exhibit List on the Disclosure

5    Statement.  It's the transcript of Jason Schoenholtz'

6    deposition.  We move for the admission of Exhibit 23 under

7    Rule 32(a)(3).

8          UNIDENTIFIED SPEAKER:  Your Honor, I don't think

9    the entire deposition should come in.  We asked them for

10   pages and lines and they didn't give them to us.  If there's

11   a Page and Line --

12         THE COURT:  So we're going to need to break now

13   till 2:00 o'clock when we're going to start.  So we're going

14   to have to continue this.  So if you could give them

15   page and line, that would be -- if you can do that, then you

16   can --

17         UNIDENTIFIED SPEAKER:  We'll --

18         THE COURT:  Yeah, we'll have scouters and so when

19   we --so when we come back to this, I'll let you finish up

20   and then, Mr. Giordano, you'll go at that point.

21         MR. GIORDANO:  Thank you, Your Honor.

22         MR. HEMENWAY:  Thank you.

23         THE COURT:  All right.  And anyone else who wishes

24   to be heard.  All right.  So let's -- let's come back at

25   2:00 o'clock and then we'll start at that point with the

1    motions to lift stay.

2           UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

3           UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

4       (Recess taken from 1:31 p.m. to 2:01 p.m.)

5           THE COURT:  All right.  This is this is Judge

6    Perez, and we're here for the 2:00 hearings in the Wellpath

7    matter, and I'll call the Docket as set forth.

8           So, if you would please, mute your lines until I

9    call your case, because otherwise, I'm going to have to

10   activate the hand raising feature.

11          MALE SPEAKER:  Okay, apologies.  I just wanted to

12   check in and let you guys know I was here.

13          THE COURT:  Thank you.

14          MALE SPEAKER:  Your Honor?

15          THE COURT:  Yes.

16          MALE SPEAKER:  Before you called the Docket for

17   the stay, you had asked that when we come back, we do the

18   designation of Mr. Schoenholtz.  Is it -- due to technical

19   difficulties, meaning I can't create a PDF in 30 minutes,

20   but I'm having somebody else who's smarter than me do it, is

21   it okay if we just take that up at the back end of stay --

22          THE COURT:  Sure.

23          MALE SPEAKER:  -- and just start with the stay?

24          THE COURT:  Yeah, that's fine.

25          MALE SPEAKER:  Thank you very much, Your Honor.

1          THE COURT:  Yeah, and I'm sorry if I gave you the

2    impression that I wanted to be done right away.

3          MALE SPEAKER:  Oh, no.  No, not a problem at all.

4    It's my fault for not having it done.

5          And Your Honor, I just wanted to make sure I

6    understood on the Disclosure Statement, did you want us to

7    wrap that up before starting the stay or come back to it?

8          THE COURT:  No, no.  No, we're going to we're

9    going to continue it till the end --

10         MALE SPEAKER:  Okay, thank you.

11         THE COURT:  -- of the stay.  I don't want --

12   there's a lot of people here waiting.

13         MALE SPEAKER:  Understood, Your Honor.  I just

14   want to make sure I heard you right.

15      (Background noise heard over the conference line.)

16         THE COURT:  All right, I'm going to have to

17   activate the Hand-raising feature.  So, if you want to

18   speak, please press five star.

19      (Conference muted.)

20         MALE SPEAKER:  Hello?

21         THE COURT:  Yes.

22         MALE SPEAKER:  Hey, this is Oliver.

23      (Unknown male overheard in the background.)

24         THE COURT:  All right, please mute your lines.

25         All right, I need to print out the agenda.  For

1   some reason, I had it, but I can't find it right now.

2           MALE SPEAKER:  And Your Honor, we filed an

3   amended agenda about an hour ago.

4           THE COURT:  Oh, okay.

5           MALE SPEAKER:  And we have a copy of that if

6   you'd like us --

7           THE COURT:  Perfect, perfect.

8           MALE SPEAKER:  I had a feeling, Your Honor.

9   There's a lot of paper.

10          THE COURT:  Yes.

11          MALE SPEAKER:  And it reflects the most recent

12  stipulations --

13          THE COURT:  Okay.

14          MALE SPEAKER:  -- and continuances.

15          THE COURT:  All right.  So, this is Judge Perez.

16  We're here for the 2:00 Docket in the Wellpath case, 24-

17  90533, and we have various matters that are set forth to go

18  forward at this time.

19          So, we will -- all right.  So, I guess the

20  motions that are going forward, A is Samuel Randolph at

21  Docket No. 504.

22          Is anyone here representing Samuel Randolph?

23      (No audible response.)

24          THE COURT:  All right.  If you haven't hit five

25  star, I can't hear you.  So, you need to hit five star.

1          (No audible response.)

2              THE COURT:  Okay, it doesn't appear that anyone

3     is here for Mr. Randolph.  All right, I'll call that at the

4     end of the Docket.

5              The next matter is the letter requesting the stay

6     not be lifted by Paul McPherson.

7              Mr. McPherson, did you hit five star?

8          (No audible response.)

9              THE COURT:  All right.

10             MR. MCPHERSON:  Good --

11             THE COURT:  All right.

12             MR. MCPHERSON:  Good afternoon, Your Honor.

13             THE COURT:  Good afternoon.

14             All right, why don't you go ahead?

15             MR. MCPHERSON:  Yes, sir.

16             I'm requesting a leave of stay.  I filed a

17    disability and employment discrimination complaint against

18    Wellpath Recovery Solutions, their CEO, and their Director

19    of Human Resources with the New Hampshire Estate FEPA, New

20    Hampshire Human Rights Commission, and my complaint was

21    accepted.  In my letter to you, I provided both my FEPA ID

22    number and EEOC number.  And as I mentioned in my letter,

23    when Wellpath served with the discrimination charges, I was

24    notified they wanted to negotiate, mediate, but I went ahead

25    and informed DHHS of the discrimination charges against my

1   employer.  The State of New Hampshire DHHS removed the CEO

2   from the hospital, and shortly thereafter that, I got

3   notified that Wellpath rescinded mediation.  So, now, I'm

4   waiting for the investigation to take place.

5          THE COURT:  Okay.  So -- go ahead.

6          MR. KAPP:  Your Honor, Jay Kapp on behalf of the

7   Debtors.

8          Your Honor, this is a case, as Mr. McPherson just

9   stated, against Wellpath Recovery Solutions.  As discussed

10  this morning, RS has been acquired by a buyer, its Debtor is

11  assumed, and RS is no longer a Debtor and notice of the

12  discharge has been filed.  As a result, the motion is moot

13  and should be denied as there's nothing -- that RS is no

14  longer a Debtor in this bankruptcy case.

15         THE COURT:  So, Mr. McPherson, do you understand

16  that?  There is no automatic stay preventing you from going

17  forward.  So, what we will -- what I will do is I will deny

18  the motion as moot and state in there that there is no

19  automatic stay preventing you from going forward with your

20  claims.

21         MR. MCPHERSON:  Okay, sir.  Thank you, sir.  I

22  appreciate it.

23         THE COURT:  Okay.

24         All right, the next matter is the Motion to Lift

25  Stay filed that Docket 589 by Deborah Wagner.

1            All right, I just opened somebody's line.  Is

2  anyone here representing Mr. Wagner?

3            MS. GOODMAN:  Yes, Karen Goodman on behalf of

4  Deborah Wagner.

5            THE COURT:  Okay.  All right, hold on a second.

6  I need to read my notes.

7            MS. GOODMAN:  Sure.

8        (Pause in proceedings.)

9            THE COURT:  Okay, go ahead.  Ms. Goodman,

10 proceed.

11           MS. GOODMAN:  Thank you very much.

12           So, I have read the objections, and I also went

13 back because of the citation to the insurance policy by

14 Ironshore, as well as the management agreement between

15 Wellpath and CFMG.  Here's the critical part I think that's

16 kind of missing in the analysis by Debtors' counsel, and

17 that is that under the terms of the Ironshore policy, it

18 specifically provides that the insurer, Ironshore, shall

19 advance the cost of defense.

20           And then it goes on to say the retention is not a

21 condition, satisfaction in the million dollar retention is

22 not a condition of that requirement so long as the company's

23 financially insolvent.  So, that is, of course, the

24 condition we're in right now.

25           So, the Wellpath insurance policy appears to be

1    an applicable target and would be appropriate to pursue

2    under the plain language of the insurance policy.

3              The second part is -- and just as a reminder,

4    this is a state court claim which we're alleging against

5    both CFMG, as the employer of Ms. Wagner, as well as

6    Wellpath claims of discrimination, harassment, and

7    retaliation.  When I reviewed the management agreement

8    between Wellpath and CFMG, and that was previously filed in

9    your court on January 7th of 2025, expressly provides that

10   the relationship between CFMG and Wellpath is of an

11   independent nature.  And it specifically provides that they

12   are independent economically.  It goes on to provide the

13   indemnification -- and this is, of course, the claim the

14   Debtor relies upon.  The indemnification provisions are

15   limited.  So, the only way that CFMG could seek indemnity

16   from Wellpath is if there's a finding of intentional

17   misconduct, illegal conduct, or negligence, or breach of

18   contract by Wellpath.

19             So, those claims, we don't have to pursue those

20   claims.  We have a standing, a viable claim against

21   Ms. Wagner's employer, and that is CFMG.  We have a viable

22   claim against her supervisor for harassment, Mr. McKnight.

23   It's clear by the terms of the management agreement, they

24   are independent and we should be able to proceed those

25   against those claims, just like we can proceed based on the

1    representations of Debtor against Nevada County and the

2    deputy sheriff.  So, on that, I submit.

3            MR. KAPP:  Your Honor, Jay Kapp on behalf of the

4    Debtors.

5            A couple preliminary matters before I address

6    this objection directly.  At the January 14th hearing, this

7    Court entered into evidence Mr. Seitz's original

8    Declaration, his first supplemental, and his second

9    supplemental.  He's like Oprah, but instead of cars, he

10   gives out Declarations, Your Honor.  If to the extent we

11   need to, we'll enter those into evidence again.

12           We also have Mr. Seitz's third supplemental

13   Declaration, which goes to, as in this Wagner motion,

14   describing various insurance policies covering employment

15   practices, liability, and certain carveout policies to

16   provide coverage for individual providers.  The particular

17   motions that that's relevant to today are, well, the

18   Randolph, which was pushed, Wagner, Brown, Perkinson, and

19   Lamboy.  So, at this point, we would ask that those

20   Declarations be entered or reentered into evidence.

21           THE COURT:  So, the first, second, and third --

22   the first and second have already been entered into

23   evidence.

24           MR. KAPP:  To make it even easier, Dockets 828,

25   898, and 912 have already been entered into evidence, and I

1   am requesting that Docket No. 1337, the third supplemental,

2   also be entered.

3            THE COURT:  All right.

4            Ms. Goodman, have you seen the third supplemental

5   Declaration?

6            MS. GOODMAN:  Let me just see if I have that

7   handy.  Give me one moment.  Yes, I have, Your Honor.  I

8   have it.

9            THE COURT:  All right, any objection to that

10  being admitted?

11           MS. GOODMAN:  No.

12           THE COURT:  All right.  So, we will admit the --

13  give me the numbers again.  828 --

14           MR. KAPP:  828, 898 is the first supplemental,

15  the second supplemental is 912, and the third supplemental

16  is 1337.

17           THE COURT:  All right.  So, I will admit, for

18  purposes of this hearing, Mr. Seitz's Declaration at 828,

19  898, 912, and 1337.

20           MR. KAPP:  Thank you, Your Honor.

21           And Your Honor, I also would just note, also

22  following up on a comment you made at the January 14th

23  hearing, we went out to all the movants today and offered

24  their counsel the applicable insurance policies and

25  agreements to the extent relevant if they would sign a

1  proper confidentiality agreement.  Most did, and as you can

2  tell by the Wagner response, she is in possession of the

3  relevant documents.

4          And then finally, Your Honor, just so I say it

5  once so I don't have to say it all day, we will incorporate

6  all of the arguments that are set forth in our first

7  omnibus, our second omnibus, and to the extent relevant, the

8  Debtors' reply to the stay extension objections.

9          With respect to this particular motion, the

10  applicable insurance policy here, covering not only the

11  Debtor but professional corporation CFMG and its employee is

12  the 2024-2025 EPL policy, which has been provided to

13  Movant's counsel.  Under such policy, the Debtor must incur

14  $1 million in defense costs and damages before third party

15  insurance is implicated.  And we do have Mr. Seitz here.

16  The professional corporation here is a named entity on that

17  insurance policy.

18          So, therefore, in addition to any insurance

19  implications, the Debtors (indiscernible) CFMG, and its

20  employee's indemnification obligations under that MSA.  So,

21  they're potential of indemnification here as well.  And

22  that's also provided to Movant's counsel.  So, the Debtors'

23  estates are prejudiced by such expenses and potential

24  indemnification obligations which outweigh any harm incurred

25  by the Movant, and we would request the motion be denied.

1           THE COURT:  Okay, what do you respond to her

2   comment about the Ironshore policy?

3           MR. KAPP:  One second, Your Honor.

4       (Pause in the proceedings.)

5           MR. KAPP:  Your Honor, I am told by Mr. Seitz,

6   and he is free to testify, that we have not met the

7   deductible.  And therefore, what Ms. Wagner is referring to

8   -- I'm sorry -- counsel for Wagner is referring to is not

9   applicable here, and that the insurance costs are still

10  borne by the Debtors.

11          THE COURT:  Ms. Goodman?

12          MS. GOODMAN:  Yes.  Well, let me just read the

13  language, Your Honor, so there's no dispute, and it's that

14  in the insurance policy that we were provided, Section VI,

15  Roman numeral VIF, it says the insurer shall pay costs of

16  defense prior to the final disposition of any claims

17  provided such claim is covered by the policy.  Then Item 1,

18  which is the pertinent provision, "the appropriate retention

19  has been satisfied. However, this condition shall not apply

20  in the event of the financial" --

21      (Multiple people speaking at once.)

22          MS. GOODMAN:  That, Your Honor, has not yet been

23  addressed in any Declaration by Mr. Seitz.  So, I think that

24  that is very pertinent as it relates to what's going on

25  here.  And I think we're in this condition of financial

1   insolvency and it appears to, based on a plain reading of

2   this insurance policy, to excuse the company's obligation to

3   incur the million dollars of self-insured retention.

4            THE COURT:  If the policy has an insolvency

5   clause, then, I mean, that's what it seems like it has.

6            MR. KAPP:  Your Honor, we are checking to make

7   sure that even though there is an insolvency clause, there

8   isn't another out.  Some of these policies have outs for if

9   the company has filed for bankruptcy, the insurance doesn't

10  kick in.  So, before I say that Ms. Goodman is right or

11  wrong, we're checking that.  I don't know how -- as we burst

12  this, I don't know if we want to go to another motion and

13  come back, but we are checking back.

14           THE COURT:  All right, why don't we take a minute

15  and figure this out?  Because most of these self-insured

16  retention, or many of them have insurance clauses.

17       (Pause in the proceedings.)

18           MR. SHANNON:  Your Honor, R.J. Shannon, Shannon

19  Lee, LLP.

20           While we have a minute, while that's going on, I

21  didn't jump up and do this before, but again, with respect

22  to my clients whose issues are coming up later, again, I'd

23  just like to reserve all rights, because some of my

24  arguments are based on the idea that there is a self-

25  insurance retention.  So, I would just like to reserve

1    rights for all the other matters that come before --

2              THE COURT:  Absolutely.

3        (Pause in the proceedings.)

4              MR. KAPP:  Your Honor, we actually agree with

5    that interpretation.

6              THE COURT:  Okay.

7              MR. KAPP:  On this one policy, and I will note

8    this policy is only relevant to this motion.  But on that

9    one, there is a carveout for insolvency, which includes the

10   definition of Debtor in Possession.

11             THE COURT:  All right.  So, I'm going to lift the

12   stay to allow you to proceed against the insurance policy.

13             Would you, Ms. Goodman, send a proposed form of

14   order to counsel for the Debtor, and then as soon as I get

15   that, I will enter it.

16             So, thank you for --

17             MS. GOODMAN:  Absolutely.

18             Thank you very much, Your Honor.

19             THE COURT:  All right, the next matter is the

20   motion for lift for stay filed by Diane Harris Willie at

21   598.

22             Is anyone here representing Ms. Willie?

23        (No audible response.)

24             THE COURT:  So, my understanding is that with

25   respect -- is anyone here for Ms. Willie?  And if you --

1    okay, I'm sorry.  Somebody from the 412 number.

2              MR. MEGREY:  Yes, Your Honor, can you hear me?

3              THE COURT:  Yes, I can.

4              MR. MEGREY:  Hi, Your Honor, this is Mike Megrey

5    on behalf of the -- on behalf of Diane Harris Willie.

6              THE COURT:  Okay.  And this is a wrongful death

7    action, correct?

8              MR. MEGREY:  Wrongful death?  Yes, negligent

9    wrongful death, Your Honor.

10             THE COURT:  Okay, and are there any Defendants

11   other than the Debtors?

12             MR. MEGREY:  Yes, Your Honor.  Aside from the

13   Debtors themselves and their individual employees identified

14   -- and I apologize.  This case was stayed almost before we

15   could get any meaningful discovery.  So, there are one, two,

16   three, four individuals who I assume were employed through

17   Wellpath or by a similar entity.  But there are also, in

18   addition to that, state correctional institutions and the

19   Pennsylvania Department of Corrections named as well.

20         (Loud chiming heard in the background.)

21             THE COURT:  All right, I don't know where that's

22   coming from.

23             All right.  Go ahead, Mr. Megrey.

24             MR. MEGREY:  Yes, Your Honor.

25             So, we filed this Motion for Relief from the

1 automatic stay to proceed in the action filed in the United

2 States District Court in the Western District of

3 Pennsylvania that as you alluded to stems from medical

4 negligence, and we also allege a civil rights violation in

5 the lawsuit itself against Wellpath, some various employees,

6 and some other parties.

7          And I've had the opportunity to look through the

8 insurance policies that Debtors' counsel sent over to you

9 me, and they mention specific phrases of deductibles

10 reserved in the coverage summary, but I don't see any

11 specific language that reserves any deductibles in the

12 coverage summary provided if I'm looking at the document

13 itself correctly.  There's condition precedent, policy

14 benefits, but it doesn't mention anything about the

15 deductible itself.

16          THE COURT:  Okay.

17          Mr. Kapp?

18          MR. KAPP:  Your Honor, the insurance policies

19 here covering Wellpath and its employees are the 2023-2024

20 insurance policies described in the Seitz's Declaration.  As

21 a result, the Debtors are responsible for the first

22 $50 million in defense costs and damages before third party

23 insurance is implicated.  The underlying lawsuit should also

24 remain stayed as to the Pennsylvania Department of

25 Corrections and its employees.  There, the contract has an

1  indemnification obligation relating to all medical care we

2  would note.  So, there is the possibility of an indemnity

3  claims here.  The Willie complaint all relates to medical

4  care.

5            And so, as a result, we would -- the expenses

6  incurred in addition to potential indemnification

7  obligations, we request the motion be denied.

8            THE COURT:  Okay.

9            Mr. Megrey?

10           MR. MEGREY:  No, Your Honor, I'm not going to --

11  I won't rebut that.  I understand their position.  I just

12  disagree.

13           THE COURT:  So, pursuant to the plan, the stay

14  will lift on the effective date.

15           So, Mr. Kapp, what I'd like to do is, you know,

16  deny them, well, continue to stay both as to the Debtors,

17  their employees, Pennsylvania Corrections, and everything,

18  but I want to have an outside date.  I don't want to have

19  continuing counsel continuing to having to expend time.

20           So, obviously the effective date is one, but I'd

21  like to have another date and do the earlier of the

22  effective date or the other date.

23           MR. KAPP:  Thank you, Your Honor.  We're going to

24  address that.

25           First of all, your order of January 14th extended

221

1  the stay as to Debtors and its employees.

2         THE COURT:  April 27th.

3         MR. KAPP:  April 30th.

4         THE COURT:  April 30th.

5         MR. KAPP:  Or I said 31st last time and there is

6  no April 31st.  So, you're closer than I am.  Price is right

7  rules.

8         But -- or the earlier of that plan effective date

9  or dismissal of Chapter 11 cases.  We have also file later

10 on today the stay extension order, and we submitted a draft,

11 which we'll get to here later.  But that also now

12 contemplates, if approved by the Court, that customers and

13 PCs would be extended to the same period.  Now, we still

14 have to argue that, but if contemplated, we would have an

15 order that would extend all of that to a drop dead of April

16 30th, or the planned effective date, or dismissal, whichever

17 comes first.

18        THE COURT:  All right.  So, I'm going to rule and

19 we will -- Mr. Megrey, if you could work on an order with

20 Mr. Kapp, and it's a form of order.

21        So, I'm going to continue to stay in effect until

22 the earlier of, one, effective date of the plan, two,

23 dismissal of the case, three, conversion to a Chapter 7, or,

24 four, April 30th.  So, after -- if none of the three other

25 ones have occurred before April 30th, then you'll be free to

1   proceed at that time.  And I'm not -- so, there's only going

2   to be two exceptions to that continuation of the state.

3   One, to the extent someone is seeking medical care as

4   opposed to -- obviously, in your situation, that's not the

5   case -- someone is seeking medical care, which would not be.

6           And the other one is if there are some changed

7   circumstances that weren't anticipated right now, such as

8   perhaps the need to add an additional party because there's

9   limitations running or something like that, but it has to be

10  something that you could, that wouldn't be foreseeable

11  today.

12          MR. KAPP:  And Your Honor, we'd like to also

13  reserve, as that April 30th deadline, the right to file a

14  Motion to Continue those dates if --

15          THE COURT:  You can, you can certainly reserve

16  the right and they can reserve the right to --

17          MR. KAPP:  Well, I'll reserve our right.

18          THE COURT:  Everybody's reserving rights, but

19  that's my ruling.

20          MR. KAPP:  All right.

21          THE COURT:  All right.  So, Mr. Megrey, so, that

22  that's going to be my ruling so that we'll enter an order

23  and that you'll have certainty as to the outside date that

24  you can go forward.

25          MR. MEGREY:  Okay.  Just to clarify, Your Honor,

223

1    am I to work on with Debtors' counsel coming up with an

2    order?

3              THE COURT:  Yeah, I think he can draft the order

4    and have you comment on it, because --

5              MR. KAPP:  Your Honor, we'll draft the order.

6              THE COURT:  Yeah, they can draft the order and

7    send it to you for comment, okay?

8              MR. MEGREY:  Thank you, Your Honor.

9              Have a good day.

10             THE COURT:  Thank you.

11             All right, next matter is -- the Plaintiff is

12   Joseph Mrozek filed at Docket 613.

13             Is anyone here representing Joseph Mrozek?  Could

14   you hit five star if you want to speak?

15             All right, somebody from the 412 area code.

16             MR. ELLIS:  Yes.  Good afternoon, Your Honor.

17   This is Paul Ellis.

18             Can you hear me okay?

19             THE COURT:  I can hear you fine, sir.

20             MR. ELLIS:  Okay, thank you.

21             THE COURT:  All right, give me a minute.  Let me

22   read my notes.

23             MR. ELLIS:  Okay.

24             THE COURT:  So, was this case filed in 2000 or

25   2022?

1          MR. ELLIS:  One second, Your Honor.  I took over

2   for another attorney.  So, I -- I think the state court

3   action was in 2020, Your Honor.

4          THE COURT:  Okay.

5          All right.  Go ahead, Mr. Ellis.

6          MR. ELLIS:  Yes, Your Honor.

7          We're asking for, our motion is asking for relief

8   based on the fact that this is a state claim, Your Honor.

9   It is premised in medical negligence.  We also think that it

10  meets the burden of the extraordinary circumstances test

11  outlined in Scalera at the Western District bankruptcy

12  Docket.

13         Your Honor, our client was being treated for a

14  minor leg infection and was subject to a level of neglect

15  that goes to the outcome of an amputation, and then

16  subsequent serious medical complications as a result.  So,

17  it's a very serious case, Your Honor.  There's no entities

18  that are Defendants.  It's the, you know, it's the

19  employees.  So, based on that and the, you know, and the

20  language in the policy (indiscernible) for us to

21  (indiscernible) stay.

22         THE COURT:  Okay, all right.  Thank you, sir.

23         Is there any allegation in your complaint with

24  respect to ongoing medical care, or is this just a damage

25  claim for injuries that were occurred in 2020?

1          MR. ELLIS:  It's not it's not ongoing, Your

2     Honor.  These are based on prior damages.

3          THE COURT:  Okay, thank you.  All right.

4          MR. KAPP:  Jay Kapp again for the Debtor, Your

5     Honor.

6          As noted by Counsel, this lawsuit is against the

7     Debtors' employees.  The Debtor is not a named Defendant

8     here.  However, the Debtor is paying for the cost of the

9     employees' defense pursuant to the insurance policies which

10    we have as being the '22-2023 as that is when the claim was

11    raised.

12         THE COURT:  Well, if the lawsuit was filed in

13    2020, how can that be?

14         MR. KAPP:  I don't know, Your Honor.  If it's

15    covered by the 2018 to 2020 policy, then in the Seitz

16    Declaration, there is no third party coverage, if you

17    remember.  That is exhausted.  If it's in the 2020 to 2021

18    policy coverage period, the Debtors must incur the first $3

19    million of defense costs and damages, whereas under 2023, it

20    would be 8 million.  So, even if it is under the 2020 to

21    2021 policy, the Debtors do incur substantial costs in

22    defense costs and damages before third party insurance is

23    available.

24         THE COURT:  So, why did -- what is the basis for

25    you to say this is the 2022-2023?

1          MR. KAPP:  Your Honor, that is the information in

2  the Debtors' files.

3          THE COURT:  That is the information in the

4  Debtors' files?

5          MR. KAPP:  Yes, and their system.

6          THE COURT:  Well, how do we know it's correct?

7          MR. KAPP:  Well --

8          MR. ELLIS:  Your Honor, I would just note that

9  even in their objection, they state that the Mrozek movant

10 initiated the state court action on March 23rd, 2020.  So --

11         THE COURT:  That's why I asked, because I was a

12 little confused.

13         MR. KAPP:  And we'll also note, Your Honor, the

14 insurance policies have a retroactive function.  So, it just

15 -- when the claim arises to the policy, they don't all occur

16 in that time frame.  They could have occurred before.  What

17 we note is when the claim went to the insurer.  I don't know

18 much more than that.

19         THE COURT:  Okay.

20         MR. KAPP:  But I do know that regardless, as I

21 said -- and then we're tracking that down, because that is -

22 - but I would say regardless, the Debtors incurred costs.

23 And if it is the 2018(m) there's no third party insurance

24 still available.  So, there is costs here.

25              In addition, we also have -- the underlying

1   lawsuit also has Pennsylvania Defendants, which implicate

2   the indemnification obligations under Pennsylvania's MSA.

3   Movement was given a copy of that.  The sole cause of action

4   in this underlying complaint relates to medical care.

5              So, there are possible indemnification

6   obligations here.  And therefore, due to insurance

7   obligations and possible indemnification obligations, we

8   believe the stay should be denied.  We would agree to a

9   similar stipulation as was just entered into if I'm reading

10  your mind, Your Honor, but --

11             THE COURT:  Well --

12             MR. KAPP:  Otherwise, we'd say the motion be

13  denied.

14             THE COURT:  I don't think we're there yet.  I

15  really need more precision in this stuff.  And I don't want

16  to say, well, you know, they were correct.  So, we really

17  need more precision.

18             So, Mr. Ellis, what I'm going to do is I'm going

19  to continue this hearing for a week.  Let me find a date.

20             MR. KAPP:  Your Honor?

21             THE COURT:  Yes, sir.

22             MR. KAPP:  Mr. Seitz says he has the answer.  And

23  Mr. Seitz, if we can put him up, Mr. Seitz does have the

24  answer.

25             THE COURT:  Okay.  Well, go ahead.

1          Got to go around the other side.

2      (Witness sworn.)

3          THE COURT:  Okay, please be seated.

4                    DIRECT EXAMINATION

5  BY MR. KAPP:

6  Q    Can you tell us your name, please?

7  A    James Richard Seitz.

8  Q    Mr. Seitz, you've been sitting here.  You saw your

9  prior Declarations have been admitted into evidence.  One of

10  those references the Mrozek motion and cites the 2022 to

11  2023 fronting policy, buffer SAR, and umbrella policy.

12  We've just heard that that lawsuit may have been filed in

13  2020.

14          Can you explain how it would be under those policies?

15  A    The policies are claims made policies with a

16  retroactive date back to 2013.  So, any claim that would

17  have occurred from 2013 to present would be covered under

18  the policy that's in place on the date the claim is reported

19  to Wellpath, which would have been in '22 to '23.

20          MR. KAPP:  That's all, Your Honor.

21          THE COURT:  Okay.

22          So, the lawsuit was filed in 2020.  You didn't

23  know about it until 2022 or 2023?

24          THE WITNESS:  It could have been filed to our

25  client.

1          THE COURT:  No, it included your employees.

2          THE WITNESS:  All I can tell you is that it did

3  not get registered in the corporate office and our claims

4  system until '22.

5          THE COURT:  All right.

6          MR. ELLIS:  Let me -- may I continue, Your Honor?

7          THE COURT:  Sure.

8                    CROSS-EXAMINATION

9  BY MR. ELLIS:

10 Q     If it was under an earlier policy, would it change

11 whether or not Wellpath would be responsible for paying for

12 defense costs?

13 A     The level of SIR would be reduced under a previous

14 policy, but we would still be responsible.

15 Q     Are there -- and maybe I'll just do it this way so

16 we'll have it in the record for all of these hearings.

17        Are there any cases that are currently being brought

18 against Wellpath, or its employees, or anyone we're

19 providing defense under these policies where the next dollar

20 of expense isn't incurred by Wellpath or the policies are

21 exhausted?

22 A     Absolutely not.  So, Wellpath is responsible for the

23 next dollar.

24          THE COURT:  So, none of these policies have

25 insolvency clauses?  Is that your testimony?

1              THE WITNESS:  The insolvency clause only applied

2    to the D&O EPL policy.  There is an exclusion in the GLPL

3    policy that says that if the company goes bankrupt or has a

4    failure to pay, the coverage is excluded entirely,

5    because --

6              THE COURT:  All right.

7              THE WITNESS:  That policy is a reimbursement

8    policy.  If we weren't bankrupt, it would respond.

9              THE COURT:  If you were bankrupt?

10             THE WITNESS:  If we were not bankrupt and we

11   failed to pay, the policy would pay.  That bankruptcy

12   exclusion voids that coverage.

13             THE COURT:  Okay.

14             MR. ELLIS:  I can clear that up if --

15             THE COURT:  Yeah, this is not --

16   BY MR. ELLIS:

17   Q    Okay.  Mr. Seitz, in a world in which Wellpath is not

18   in bankruptcy, if Wellpath doesn't pay its self-insured

19   retention under some of these policies, do the insurance

20   companies step in and pay?

21   A    Yes, it would.

22   Q    And what would be the next step that would happen

23   outside of bankruptcy?

24   A    The primary funding policy would pay, and then

25   Wellpath would incur the self-insured retention if there was

1  one beyond that to the next level of insurance.

2  Q     But if the insurance company paid when Wellpath didn't

3  pay its retention, where would the insurance company get its

4  money from?

5  A     It would seek reimbursement from Wellpath.

6  Q     And if Wellpath is in bankruptcy, does that system

7  change if Wellpath doesn't pay its self-insured retention?

8  A     The insurer refuses to make any payment on our behalf

9  if we are in bankruptcy.

10 Q     And that's just in the policies?

11 A     That's an exclusion in the policy, all fronting

12 policies.

13        THE COURT:  Okay.  So, that's really different

14 than the testimony that I understood last time.  The

15 testimony that I understood last time was that if there was,

16 that the risk of the fronting policy completely shifted,

17 outside of bankruptcy and inside of bankruptcy, completely

18 shifted to Wellpath.

19        And I understand -- and I think what he's saying

20 now is that the fronting policy steps up if they're outside

21 of bankruptcy and then would seek reimbursement.  Whether or

22 not Wellpath could pay or not, that's a different issue, but

23 that if they're in bankruptcy, the fronting policy doesn't

24 pay.  That's what I understand the testimony.

25        Is that correct?

 1              MR. ELLIS:  What I understood was -- and Jim,

 2    tell me if I got this wrong -- if Wellpath doesn't pay its

 3    retention and breaches, basically, its agreement to pay its

 4    retention, then in circumstances, the insurers will pay, but

 5    they have a -- is there a fund or there's some money that

 6    they pull it out of and then they can terminate the

 7    policies?

 8              THE WITNESS:  Wellpath has posted a cash and

 9    surety bond to cover the aggregate of the fronting policy in

10    the event that we would not pay.

11              MR. ELLIS:  And --

12              THE COURT:  I'm going to need to see the

13    policies, because this is just not consistent with what I

14    heard last time.  What I heard last time was that the entire

15    risk shifted on the fronting policy, and I think what he's

16    saying now is that they pay, but then the risk shifts back

17    for Wellpath to pay.

18    BY MR. ELLIS:

19    Q.    In the ordinary course, Mr. Seitz, who pays that

20    retention?

21    A     Wellpath does.  There's a clause in the policy where

22    we must pay the retention up to the $3 million limit for

23    each and every claim, and we're responsible for defense

24    costs and to handle that claim.

25              THE COURT:  Okay.  So, then the fronting policy

1  never pays?  When does the fronting policy pay?

2              THE WITNESS:  The fronting policy would only pay

3  if Wellpath refused to pay a claim that was settled in

4  court.

5  BY MR. ELLIS:

6  Q     And has that ever happened?

7  A     It's never happened.

8              THE COURT:  All right, I'm going to need to see

9  the policies because this is just more confusing.

10             Anyone else wish to cross-examine?

11             MR. JUDD:  Your Honor, very briefly -- Josh Judd

12 here on Docket 920 -- because of the way the question was

13 couched as to all these motions.  You know, I've never seen

14 the policies despite request, and I don't want to be bound

15 by testimony, although I'm liking the testimony that I'm

16 hearing now compared to January.  But I just want to reserve

17 rights if -- not be bound by his testimony, but instead the

18 actual policies.

19             THE COURT:  Okay, all right.

20             You may step down, unless anyone has any

21 questions.

22             MR. GINSBERG:  Your Honor, may I be heard, Marc

23 Ginsberg?

24             THE COURT:  Yes, sir.

25             MR. GINSBERG:  I have received the policies.  I

1  signed the nondisclosure with Wellpath counsel.  I've seen

2  most of these policies, and I think Your Honor's thought is

3  correct.  This is not a matter of testimony, quite frankly.

4  This is a matter of insurance policy interpretation, and I

5  think the Court needs to review the policy for itself to

6  determine what it provides.  I do not see the provision that

7  Mr. Seitz is extending under oath this day, that if Wellpath

8  doesn't pay, that the company will then step up and pay, and

9  it'll seek the money back from Wellpath.  I don't see that.

10         But what is new today is he says that there is a

11  bond that Wellpath has posted with the insurance carriers to

12  cover the self-retention or the conditions.  If that's the

13  case, then we have money to -- it's available for these

14  claims.  That is that bond if it truly exists.  So, I think

15  that's where it needs to go at this point.

16         Thank you for your time.

17         MR. ELLIS:  Your Honor, I had essentially the

18  same question.  Is it okay if I asked Mr. Seitz about that?

19  BY MR. ELLIS:

20  Q    Mr. Seitz, earlier you testified about there being

21  collateral for those policies?

22  A    We have to collateralize the aggregate on those

23  fronting policies.

24  Q    So the $3 million?

25  A    $6 million.

1  Q     $6 million.  What's the status of that collateral?

2  A     That collateral covers the insurer's financial

3  liability if Wellpath were to fail to pay a claim and the

4  Courts found the insurance liable.

5  Q     So, the insurer has the $6 million for those policies?

6  A     When Wellpath filed bankruptcy, then a clause kicks in

7  that that's no longer applicable.  It excludes all coverage.

8  The insurer will not pay a dime.  Because of Wellpath filing

9  bankruptcy, they're not going to get paid back.

10 Q     My question, Mr. Seitz, is what happened to the $6

11 million?

12 A     Insurance company -- each fronting policy holds the $6

13 million.  So, but it rolls year to year.

14 Q     So, because of the bankruptcy, they won't ever have to

15 pay anything, but they have the $6 million?  Is that what

16 you're saying?

17 A     That's correct.

18 Q     And that's pursuant to your contract with them?

19 A     That's correct.

20 Q     Did they keep it forever?

21 A     Until the policy terminates the policy period, and

22 then we will renew with a new fronting policy and apply

23 those funds to a new fronting policy.

24 Q     So, you're planning to use those as reserves for a

25 post restructuring Wellpath?

1   A     That's the way it works every year.

2   Q     Okay.

3   A     The fronting policy is commuted every year.

4           BY THE COURT:  And how many of these reserved

5   amounts are there?  How many fronting policies do you have?

6           THE WITNESS:  Ever since 2018.

7           THE COURT:  So, 6 million for '18, '19, '20?

8           THE WITNESS:  No.  Well, no, each year that 6

9   million goes to the new fronting policy, and the old policy

10  is terminated.

11          THE COURT:  So, how many 6 millions are out

12  there?

13          THE WITNESS:  One.  One 6 million for the '24-'25

14  policy.

15  BY MR. ELLIS:

16  Q     So, Mr. Seitz, just help me understand this.  And I'm

17  not an insurance lawyer.  I'm just trying to ask the same

18  question that the attorney on the phone asked.  You

19  explained to me that the insurance company gets $6 million

20  as collateral in case they have the obligation to pay,

21  right?

22  A     Correct.

23  Q     And you also said that because Wellpath filed

24  bankruptcy, the insurance company will never have the

25  obligation to pay, right?

1   A      That's correct.

2   Q      So, why do they need the $6 million?

3   A      I can't respond to that.  I'm not an underwriter.

4           BY MR. ELLIS:  That's all, Your Honor.

5           THE COURT:  Thank you.

6           All right.  You may step down, sir.

7           THE WITNESS:  All right, thank you.

8       (Witness steps down.)

9           THE COURT:  So, this is not very clear.

10          MR. KAPP:  Your Honor, we have -- I can get you

11  insurance policies one of two ways.  I've got the hard

12  copies here, or we can send it electronically to you today

13  or tomorrow.

14          THE COURT:  No, you can give the hard, you can

15  give Mr. Slocum the hard copies, but I still want to

16  continue this hearing until -- and we'll take the time --

17          MR. KAPP:  We'll need to make sure we have

18  Mr. Seitz available.

19          THE COURT:  Yes, and we can do it remotely.  So,

20  nobody needs to come.

21          MR. KAPP:  And Your Honor, except for Item 3,

22  miscellaneous matters, really everything else on the agenda

23  deals with the insurance issue.

24          THE COURT:  All right, how about -- Mr. Ellis,

25  are you available on Monday afternoon?

1          MR. ELLIS:  Is that the 24th, Your Honor?

2          THE COURT:  Yes, sir.

3          MR. ELLIS:  Yes, I am, Your Honor.

4          THE COURT:  Mr. Kapp, are you available?

5          MR. KAPP:  Yes, sir.

6          THE COURT:  Mr. Seitz, are you available?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  Okay.  So, why don't we do it at 2:00

9   Central?

10         MR. KAPP:  I'm checking on my litigator, sir,

11  Your Honor.  2:00 p.m. Central on Monday the 24th.

12         THE COURT:  Okay, all right.  So, we will

13  continue ECF No. 613 to 2:00 p.m. Central on the 24th with

14  the stay to remain in effect.

15         All right.

16         MALE SPEAKER:  All right.  Thank you, Your Honor.

17  I'm just going to remain on because I have one other matter

18  before the Court today.

19         THE COURT:  No problem.

20         Okay, the next matter is Docket No. 767, which is

21  Omar Rivera.

22         Again, if you want to speak, please press five

23  star one time.

24         I just unmuted a couple of people.

25         MR. HUGHES:  Yeah, maybe me, David Hughes.

1          I was actually trying to get in on the last

2  conversation just to reserve rights (indiscernible) policy,

3  but my case has not come up yet.  So, I'll just wait

4  (indiscernible).

5          THE COURT:  All right, Mr. Hughes.  Thank you.

6          MR. HUGHES:  Thank you.

7          THE COURT:  All right, is anyone here

8  representing Omar Rivera?

9

10         MR. ELLIS:  Your Honor?

11         THE COURT:  Yes.

12         MR. ELLIS:  One request as to that hearing on

13  Monday.  We were just talking amongst ourselves and asked

14  counsel, and neither of us was sure, but to the extent that

15  that collateral arrangement is governed by any contract that

16  hasn't been produced, we would ask that you order it to be

17  produced.

18         THE COURT:  Yeah, I want to see kind of the

19  insurance policy and all of the contracts related to that.

20  Yeah.

21         MR. ELLIS:  My concern is I know that insurance

22  policies have been produced, but to the extent that there

23  are different agreements that go to collateral for insurance

24  policies, we would ask that those be produced if they

25  haven't already been.

1          MR. KAPP:  Your Honor, as counsel knows, we've

2   been giving them everything.  He knows that.  So, to the

3   extent that something new hasn't been provided, we will, of

4   course, provide it.

5          MR. ELLIS:  And if I didn't make it clear, I said

6   I wasn't sure.  I just asked counsel if it had been.  We

7   weren't sure.  So, I just wanted to state it for the record

8   and make sure we were on the same page.

9          THE COURT:  Mr. Madurski, are you -- can you hear

10  me?  Why don't you say something?  Are you on mute yourself?

11      (No audible response.)

12         THE COURT:  All right, just hit five star one

13  time.

14         All right, can you hear me now?

15         MR. MADURSKI:  I can hear you, your Honor.  Thank

16  you.

17         Good afternoon.

18         THE COURT:  Good afternoon.

19         Are you here -- do ahead.

20         MR. MADURSKI:  Sorry, Judge.

21         Yes, I'm here on behalf of Mr. Rivera, and it's

22  also a state civil medical malpractice claim that may invoke

23  some of the issues that were being discussed previously.

24         I do apologize.  I don't think I saw the

25  objection.  I've been out on paternity leave, but I just

1    reviewed that right now, Debtors' objection.  And I did

2    respond to the consent order while I was out that they could

3    E-sign my name and send the policy.  But the policy we had

4    from our state civil matter, which is what I proceeded based

5    off of, I didn't see any mentions of the SIR or, you know,

6    these bankruptcy contingencies, and that's not the case.

7    They might not exist.  I suppose we'd need to review the

8    policy Debtor is the referencing here.  But the general

9    concept of our application request was (indiscernible) to

10   proceed to the extent of insurance coverage.  And also, we

11   feel that this claim will be well within any premium or

12   primary coverage without reaching any excess.

13           THE COURT:  All right.

14           Mr. Kapp?

15           MR. KAPP:  Your Honor, here the relevant

16   insurance policies are the 2021-'22 policies, where the

17   Debtor would be responsible for the first $8 million in

18   damages and defense costs.

19           In addition, the Riviera litigation also concerns

20   the Hudson County Correctional Center.  The professional

21   service agreement with the county provides that the Debtor

22   is required to indemnify Hudson County for costs arising

23   from Debtors' performance.  Each of these causes of action

24   in the underlying complaint reference medical care, and as a

25   result, the Debtors may owe indemnification to Hudson

1    County, which effectively renders the Debtors the primary

2    Defendants.  And so, we would ask that the stay be denied as

3    to the Debtor, its employees, and Hudson County.

4              THE COURT:  All right.

5              Mr. Madurski?

6              MR. MADURSKI:  Yeah, I suppose one of the reasons

7    I would need to see the policy is because the policy that we

8    have from discovery in the state case doesn't seem to

9    reference any contingencies or self-insurance --

10             MR. KAPP:  Your Honor -- sorry.

11             MR. MADURSKI:  No, go ahead.

12             MR. KAPP:  I was just going to comment we did

13   send an email to counsel and it was never responded to.  So,

14   if he would like to still enter into an NDA, we have

15   extended the invitation.

16             THE COURT:  All right.  So, Mr. Madurski, why

17   don't you review the policy and then we'll continue this

18   till next Monday at 2:00?  Are you available then?  Central.

19             MR. MADURSKI:  I'll be available, Your Honor.

20             And just for the record, I did respond to over a

21   week ago on the 10th.

22             THE COURT:  Okay, all right.

23             And then would you please send them the policy

24   that you got in discovery because that I want to understand

25   why the disconnect?

1              MR. KAPP:  And Your Honor, just to make clear,

2    we'll provide the policy once a confidentiality agreement is

3    executed.

4              THE COURT:  Sure, understood.

5              MR. KAPP:  All right.  Thank you, Your Honor.

6              THE COURT:  Thank you.

7              All right.  So, I'm going to continue this to

8    02/24.

9              The next matter is Maria Vendrell, Hurtado.

10   Vendrell as co-guardians, Docket No. 782.

11             MR. KAPP:  Your Honor, that's been withdrawn.

12             THE COURT:  You're right, you're right.

13             MR. KAPP:  I know you want to do extra, Your

14   Honor, but we got a lot.

15             THE COURT:  Next matter is Vernon McGinnis,

16   Docket No. 785.

17             And so, we granted partial relief from stay on

18   the injunctive relief?

19             MR. KAPP:  Yes, with respect to medical care,

20   Your Honor.

21             THE COURT:  Right.

22             MR. KAPP:  That was granted.  This would apply to

23   his other claims.

24             THE COURT:  All right, anyone here for

25   Mr. McGinnis?  Anyone here for Mr. McGinnis?

244

1          (No audible response.)

2               THE COURT:  I can't tell whether Mr. McGinnis is

3     represented by counsel.

4               MR. KAPP:  I don't believe so.

5               THE COURT:  Okay.  All right, we'll continue this

6     to the March 18th Docket.

7               All right, the next matter is --

8               MR. KAPP:  Your Honor, this is one where we

9     entered into a stipulation, and then you put it on the

10    calendar.  So, I can't -- I'm prepared to address it, but I

11    can't particularly say why it went on the agenda.  But when

12    you're ready, Your Honor, I'm prepared to address it.

13              THE COURT:  The only reason I put it on the

14    agenda is because I wanted to make sure that there were no

15    objections like we received from Cobb County with respect to

16    the stipulation.  So, I don't think there have been any.

17    So, I'm prepared to --

18              MR. KAPP:  And Your Honor, I would note that we

19    did file an amended stipulation as to this this morning

20    because I was trying to predict what you were putting the

21    agenda on for, and we clarified that this is a situation

22    where there's obvious pre-transfer claims and then post-

23    transfer.  Pre transfer before he went to Hudson County

24    Correctional Facility where none of that involves the

25    Debtor.  And we have made it -- the amended stipulation just

1  makes clear as to post-transfer claims.  They can go forward

2  as to Hudson County for discovery but not for trial.

3           THE COURT:  I don't -- again, the only reason I

4  did it was because I didn't want somebody objecting saying

5  that they otherwise would be entitled to it.

6           MR. KAPP:  Right.

7           MALE SPEAKER:  I object.

8           Am I unmuted?

9           THE COURT:  No, you're unmuted, sir.

10           MALE SPEAKER:  Yes, sir.  Good afternoon.

11           Sorry for the turmoil, but I strongly object.

12  This is 3:05 Violations of federal consent judgment.  I

13  object about your ruling on that being irrelevant.  It is

14  irrelevant.  And I object about how this is concentrating on

15  violations of US (indiscernible) when it comes to life and

16  liberty issues, first, foremost.

17           THE COURT:  Understood, sir.  I've noted your

18  objection.

19           MALE SPEAKER:  With the documents filed with the

20  Court that we're talking about, that were mailed last week.

21           THE COURT:  All right.

22           MALE SPEAKER:  And the $4 million 48 hour fees

23  compensation mutually beneficial plan redress agreements,

24  Judge.

25           THE COURT:  All right.  Thank you, sir.

1          MALE SPEAKER:  Judge, please.  Judge Perez, those

2   are evidence about the derelictions of Wellpath.

3   (Indiscernible) evidence.  The grievances at the jail, over

4   400 of them.  Torture, fight for right. Torture as a marine

5   because of my oath about domestic enemies.  Torture.

6          THE COURT:  All right, sir.  Let me come back to

7   you.

8          All right. I'll go ahead and enter that order.

9          MR. KAPP:  Thank you, Your Honor.

10          THE COURT:  All right.  So --

11          MR. KAPP:  And then, we have another stipulation,

12   Your Honor, up next the with respect to O'Neal.  And that

13   prior, Your Honor, we -- back in December, there was a

14   stipulation to allow Cobb County to go forward with

15   indemnity issues only, and this stipulation clarified that

16   O'Neal had -- it was never our intent to say they couldn't

17   defend against that action.  And so, that clarified that.

18   Although Cobb County was not a party to that, they didn't

19   sign on, it was run by them, and they agreed to that

20   stipulation.  So, that's what Item J here seeks to

21   accomplish.

22          THE COURT:  Right, but there's still the Smith

23   case, right?

24          MR. KAPP:  Yes, that's covered.

25          THE COURT:  So, Mr. Prostok, no objection to my

1     entry of the stipulation at 1314.

2               MR. PROSTOK:  No objection, Your Honor.

3               THE COURT:  Okay, I will enter it.

4               MR. KAPP:  Thank you, Your Honor.

5               THE COURT:  And just for the Record, that is

6     Docket No. 809, the Jennifer O'Neal.  And again, just for

7     the record, with respect to the Motion of Relief Stay filed

8     at 795, Hassan Alluwi (phonetic), we'll enter the

9     stipulation filed at 1440.

10              Okay, next matter is the Motion of Relief from

11    Stay filed by Ariel Hill.

12              MR. KAPP:  Your Honor, that --

13              THE COURT:  That's been continued to -- all

14    right, next one -- it's been continued to March 18.

15              Next one is Marzan Williams.  It's been partially

16    resolved by Docket 1085.

17              Is anyone here representing Marzan Williams?

18         (No audible response.)

19              THE COURT:  Mr. Kapp?

20              MR. KAPP:  Would like me to address that one?

21              THE COURT:  Yes.

22              MR. KAPP:  Your Honor, first of all, we do set

23    forth in the second omnibus objection that we also -- in

24    addition to the stipulation we entered into to the US

25    government, which you referred to, we also enter into a

1   stipulation with respect to Metropolitan Correctional Center

2   in Chicago.  We do not believe the stay applies to them.

3   The insurance policies covering the Debtor -- this is

4   against the Debtor -- are the 2023-2024 policies which were

5   provided to Movant's counsel.  Under those policies, the

6   Debtors are responsible for the first $15 million in defense

7   costs and damages before third party insurance is available,

8   and thus, the stays would be impacted if the lawsuit

9   continues and we would ask that the motion be denied in that

10  part as to the Debtors, Your Honor.

11          THE COURT:  All right, has there been a motion --

12  has there been a stipulation with respect to the

13  Metropolitan Correctional Center?

14          MR. KAPP:  There has not, Your Honor.  We put it

15  in the brief, and if they -- we would enter into it if folks

16  wanted to.  Sometimes folks don't seem to want to enter into

17  partly stip and not allow it all to go forward.  So, if

18  there is folks that want to, we would.

19          THE COURT:  Okay, all right.

20          Again, anyone here representing Marzan Williams?

21          MALE SPEAKER:  (Indiscernible) 3:10 that was

22  Mr. Shadid earlier, so I'm not sure if he missed the timing,

23  but I asked that we put it to the back of the Docket, and

24  I'll let him know that it got called.

25          THE COURT:  All right.  All right, we'll move

1  Mr. Shadid to the back of the Docket.  Somebody can call

2  him.

3            MALE SPEAKER:  Thank you, Your Honor.

4            THE COURT:  So, the other question I had here.

5  Mr. Kapp, is that the filing initially said that this was

6  the '21 year, the 2021 year and you're saying it's the 2022-

7  2023 year?

8            MR. KAPP:  Yes, Your Honor, I'm saying it is

9  2023-2024.

10            THE COURT:  Okay.  All right, the case was

11  originally filed in 2021 --

12            MR. KAPP:  And Your Honor, some of these also get

13  -- I don't have the whole procedural history, but some of

14  them get moved from state to federal.  I don't know if

15  that's applicable here, but some of these things bounce

16  around.

17            THE COURT:  Okay.  Well, that's -- we will move

18  that to the back of the Docket.

19            Okay, next matter is Docket No. 827.  That's your

20  objection, and the --

21            MR. KAPP:  And then, Your Honor, I think the next

22  one is --

23            THE COURT:  Okay.  So, I guess -- that's not all

24  the motions, right?

25            MR. KAPP:  No, no.  I think the next one is O.

1          THE COURT:  O, okay.  All right, Nora Perkinson,

2   Docket No. 846.

3          Is anyone here representing Nora Perkinson?

4          MR. CHILDERS:  Yes, Your Honor, can you hear me

5   now?

6          THE COURT:  I can hear you now, sir.

7          MR. CHILDERS:  This is Joe Childers representing

8   the creditor, Nora Perkinson, Your Honor.

9          I'd first like to direct the Court's attention to

10   the omnibus response at Page 24, and I think that there will

11   be a stipulation that this stay can be lifted as it applies

12   to the Kentucky Department of Corrections.  That's as is

13   stated in the Debtors' response, Page 24, Footnote 31.

14          Out of an abundance of caution, I filed an

15   objection to the proposed order that was proposed this

16   morning, which didn't seem to get into (indiscernible).  So,

17   I want confirmation from the Debtors' counsel.

18          MR. KAPP:  Your Honor, this is the same policy as

19   the Wagner policy.  So not only do we not contest with

20   respect to Kentucky and we would enter into a stipulation,

21   we also believe that this lawsuit can proceed.

22          THE COURT:  Okay, Mr. Perkinsson -- and

23   Mr. Childers, sorry.

24          MR. CHILDERS:  That's okay, Your Honor.

25          THE COURT:  Mr. Childers, did you hear that from

1   Mr. Kapp?

2          MR. CHILDERS:  Yes, and that's great news, Your

3   Honor.  I'll -- so, I assume the Debtors' counsel will send

4   me a proposed order or a stipulation?

5          MR. KAPP:  Which would you like?  Well --

6          THE COURT:  Yeah, either one.  Either one is

7   fine.  Proposed order is -- that way they can make it --

8          MR. KAPP:  I think an order makes sense.

9          THE COURT:  An order would be better.  So, in

10  essence, we will grant your Motion to Lift Stay as to all

11  parties limited to insurance.

12         MR. KAPP:  Yes.

13         MR. CHILDERS:  Thank you, Your Honor.

14         THE COURT:  All right, next matter is Docket No.

15  869, Faith Salinas.

16         Elkhart County is in Indiana?  Yeah, it's the

17  Northern District of Indiana, okay.

18         All right, is anyone here representing Faith

19  Salinas?

20      (No audible response.)

21         THE COURT:  Okay.  All right, I think I just

22  unmuted you.

23         MR. VETNE:  Thank you, Judge.

24         THE COURT:  Okay.  Go ahead, sir.

25         MR. VETNE:  Judge, I don't really have anything

1   to add to our motion.

2           THE COURT:  So, this is the 2024-2025 policy

3   year.

4           MR. KAPP:  Yes, sir.

5           THE COURT:  Okay.  So, we will lift the stay for

6   you to proceed against insurance proceeds.

7           MR. KAPP:  No, Your Honor, this is tort.

8           THE COURT:   This is tort?

9           MR. KAPP:  This is not -- so, this is where the

10  Debtor -- this is not the EPL or the policy we were dealing

11  with before the EPL.  This is the tort policy by which the

12  Debtors incur the first $50 million of damages and defense

13  costs.  So, we do believe that the stay applies as to the

14  Debtor, and we also believe Elkhart County -- and there's a

15  contract here, and Wellpath is required to indemnify the

16  county and its employees for claims related to medical care,

17  and therefore, the causes of action in the Salinas complaint

18  are identical for all Defendants.  And so, therefore, there

19  are identification obligations and a clear identity of

20  interest with the county's employees.  And thus, we believe

21  this stay should, the motion should be denied.

22          THE COURT:  So, this is not for medical care?

23          MR. KAPP:  No, this is not an employee -- this is

24  not one of the employee policies or related to one of the

25  medical emergency issues, which, by the way, all of those we

1   have agreed to, we have filed notice of.

2           THE COURT:  All right.  Mr. VETNE, what is the

3   nature of the claim here?  I know it says tort, but I don't

4   know --

5           MR. VETNE:  Judge, it's a 1983 claim.  Judge,

6   Ms. Salinas is a paraplegic who was for some reason

7   incarcerated and the jail facility was unable to meet her

8   critical health care needs during the term of her

9   incarceration, which lasted several months beginning in

10  October of '23.

11          THE COURT:  Okay, and who are the Wellpath

12  Defendants in the case?

13          MR. VETNE:  Wellpath, Incorporated -- I'm sorry.

14  Wellpath, LLC, I think.

15          THE COURT:  All right.  So, with respect --

16          MR. VETNE:  Yeah, Wellpath, LLC, Judge.

17          THE COURT:  All right.  So, with respect to this

18  one, we'll do the --

19          MR. KAPP:  Continue until April, the first, the

20  earlier of the three, the four.  You added the conversion to

21  a 7.

22          THE COURT:  Correct.

23          MR. KAPP:  Okay.

24          THE COURT:  All right.  So, Mr. Vetne, I'm going

25  to enter an order that they'll send you a copy of that

1    basically continues to stay in effect with respect to all

2    Defendants until the earlier of the effective date of the

3    plan, the dismissal of the case, conversion to a 7, or April

4    30th of this year.  So, you have a firm date.

5                MR. VETNE:  Got it.  Thank you, Judge.

6                THE COURT:  Thank you.

7                MR. KAPP:  Your Honor, now we jump to S.

8                THE COURT:  Okay.  All right.  So, we have --

9    this is Sonya Cypress, Docket No. 920.

10               Is anyone hear for Ms. Cypress?

11               MR. JUDD:  Yes, Your Honor, Josh Judd with

12   Andrews Myers on behalf of Movant Sonya Cypress on behalf of

13   the estate of Aaron Cypress.

14               THE COURT:  Okay.

15               MR. JUDD:  Your Honor, this is a motion related

16   to relief from stay for a wrongful death.  We filed the

17   motion on January 13th.  I believe things changed on January

18   14th when the Court issued an order related to certain non-

19   Debtor stay.  So, that's not addressed in our motion.  Based

20   upon -- we also filed an exhibit list for this hearing at

21   ECF 1363, 1 through 4.

22               Before the hearing, I submitted a proposed form

23   of order that actually tracked some of your statements

24   earlier based upon the Debtors' response of saying, "Here's

25   the insurance stack."  We have not received the copies of

1  the insurance policies.  I think we'll be able to get those

2  by agreement with the Debtors after this hearing.

3  Considering some of the testimony today, I'd rather not have

4  that order -- and it tracked and said stay would be modified

5  as the Debtor April 30th.  That's (indiscernible) or plan

6  confirmation, or dismissal, or the outside date of

7  April 30th.

8          So, it tracked what you already discussed here.

9  It also proposed that the Debtor, the stay be terminated as

10 to non-Debtors prior to that date, depending on what the

11 Court rules this afternoon as to the extension of the non-

12 Debtor stay.  Reading the tea leaves, I see that you're

13 going to extend that non-Debtor stay.  So, as an initial

14 matter, I just ask -- we're going to have a couple of these

15 set March 18th.  I just ask that we could come back on this

16 case on March 18th.  My expectation is if the policies say

17 what they, what they're supposed, what I've been led to

18 believe they say, we'll probably have an agreed order along

19 the lines of what you've already talked about in a couple

20 other cases today.  If they don't, we'll probably conduct

21 some discovery before that hearing and then have a contested

22 hearing on the 18th, if acceptable to the Court, on several

23 matters.  But that's how I'd like to proceed.

24          THE COURT:  That's fine with me.

25          Mr. Kapp?

1          MR. KAPP:  I don't want to be the -- no, Your

2    Honor.  We agree to continue this and we also will discuss

3    an NDA so we can provide the applicable information.

4          THE COURT:  Thank you, sir.  Thank you.

5          MR. JUDD:  Thank you.

6          May I be excused?

7          THE COURT:  Absolutely, yes.

8          Okay.  So, then the next matter is the Motion for

9    Relief from Stay at Docket 946, Tony Walker.

10         MR. HUGHES:  Your Honor, can you hear me?

11         THE COURT:  Yes, I can hear you, sir.

12         MR. HUGHES:  All right.  David Hughes, Your

13   Honor, for Toni Walker, and this is a death case as well.

14   My client's son froze to death in the jail.

15         I just have two points.  One is I have not seen

16   the insurance policies either.  I had communicated with the

17   Debtors' his counsel, and I thought I had the policies

18   because we'd gotten policies in the underlying suit.  From

19   the discussion today, I don't think I have all the policies,

20   and I would like a chance to look at that.  I'm happy to

21   sign the NDA today and (indiscernible) counsel.

22         The other issues, however, are twofold.  One is

23   we have in the case Centurion, another Defendant that's not

24   a Debtor that there's no reason we shouldn't proceed against

25   them in the case.  The other issue is there's a 1983 aspect

1  to the case with several things that do not involve medical

2  care.  They do involve detention officers from DeKalb

3  County.  I see in the response that Debtors' counsel is

4  requesting that (indiscernible) stay continue

5  (indiscernible), but I really don't see any indication that

6  there will be indemnification because those claims are

7  separate and did not involve medical care.  They involve not

8  checking on the detainee based on the policies of the jail

9  itself, and therefore, he froze.

10        And so, that really isn't a medical issue as it

11  relates to the detention officer.  Now, there are medical

12  claims, obviously against the medical personnel, but the

13  Centurion medical personnel should able to go forward

14  (indiscernible) of course, I would want to look at policy

15  before we address that, Your Honor.

16        THE COURT:  Mr. Kapp?

17        MR. KAPP:  Well, as to the Debtor, I don't know

18  if we would want to continue.  We would have -- we've been

19  in contact about an NDA.  We didn't get one reached.  We're

20  happy to continue that discussion.

21        As to DeKalb County, Wellpath does have a

22  contract pursuant to which it agrees to indemnify the county

23  and its employees for claims related to medical care.  As we

24  do say in our objection, there are some allegations based on

25  separate conduct of the county and its employees.  And each

1   of those causes of action in the underlying complaint,

2   however, appear to reference the Debtor or medical care.

3   It's very hard to separate them.  And so thus, because we

4   can't separate them, it doesn't mean that the potential for

5   indemnification doesn't exist, because this complaint it --

6   and so, as a result of that potential and the insurance

7   obligations, we would ask that the stay -- we're happy to

8   continue this to March and enter into an, so we can enter an

9   NDA and get him the insurance agreements, or with Dekalb

10  County, we continue to have this be denied and continued

11  until April 30th, or had the stakes ended April 30th.

12  However you want to proceed here.

13          THE COURT:  Mr. Hughes?

14          MR. HUGHES:  Well, I guess, Your Honor, if those

15  are the options, I'd rather have it in March as opposed to

16  April.  If the Court is inclined to continue the stay as to

17  non-Debtors out of an abundance of caution, which I

18  certainly understand, then I say (indiscernible) March and

19  let us (indiscernible).  Otherwise, I'm happy to look at the

20  policies before Monday if that's in the Court's inclination.

21  But I'd rather have a stay -- I'd rather have a continuance

22  till Monday or March 18th as opposed to waiting till April,

23  obviously.

24          MR. KAPP:  Your Honor, I do want to be very

25  clear.  With DeKalb County, we believe that that should

259

1    still be stayed.  So, we're prepared for that answer now.

2    It's just with respect to the Debtors, we've had evidence

3    here.  I don't think that this is a Monday issue.  I think

4    this is a March 18th issue.

5            THE COURT:  Okay, I'm going to go ahead and

6    continue the stay on the case with respect to both the

7    Debtors and the non-Debtors until the March 18th date.

8            And then, Mr. Hughes, just worked with the

9    Debtors' counsel to get the insurance policies and whatever

10   other documents are needed to see whether there is, in fact,

11   an indemnification of the county that -- you know, I

12   understand that there is some potential conduct that is not

13   medical care, but -- and we're going to err on the side of

14   not making a mistake with respect to whether there is an

15   indemnity or not, at least until the plan goes effective.

16           So, we'll continue this one to March 18th.

17           MR. HUGHES:  Okay.

18           THE COURT:  Thank you, sir.

19           MR. HUGHES:  And I'm assuming I have another case

20   on that.

21           Thank you.

22           THE COURT:  All right, next one is Docket

23   Number 955, John Elwyn Herndon.

24           Anyone here representing Mr. Herndon?

25           MR. KAPP:  This is a pro se matter, Your Honor.

1            THE COURT:  Yeah.  So, he's in custody in
2  Arkansas?
3            MR. KAPP:  Yes, Your Honor.
4            As I'm sure you have a note -- we're both reading
5  from our notes, Your Honor, but we did a grant partial
6  relief as to medical care.
7            THE COURT:  Yeah, right.
8            MR. KAPP:  And he does have two cases here, one
9  against the Debtors' employees, and -- both are against the
10 Debtor and their employees.
11           THE COURT:  All right.  Well, in this case, let's
12 go ahead and enter the order to April 30th, and that way
13 we'll have certainty on that one.  And if Mr. Herndon is
14 able to come back, we'll reconsider that, but for now --
15           MR. KAPP:  We'll file that with you, Your Honor.
16           THE COURT:  Okay, next one is Docket No. 986,
17 Terri Lamb.
18           Is anyone here representing Ms. Lamb?
19           MR. KAPP:  Your Honor, that's been continued.
20           THE COURT:  You're right.
21           MR. KAPP:  And I'm going to beat you to it.  The
22 next one has been, too.
23           THE COURT:  The next one has been continued.
24           The next one there's a stipulation?
25           MR. KAPP:  Yes, Your Honor, and that was similar

1  to -- I was allowed Cobb County.  This allows Plaintiff to

2  go forward on a couple of motions to dismiss Cobb County and

3  the Plaintiff.  Everyone signed off to that stipulation,

4  although there -- yes.

5          THE COURT:  This is Allen?

6          MR. KAPP:  This is Allen, not Smith.

7          THE COURT:  Mr. Prostok?

8          MR. PROSTOK:  That is correct, Your Honor.

9          THE COURT:  All right.  So, in connection with

10  the Motion for Relief from Stay at Docket No. 990, Scott

11  Allen, I will enter the stipulation at 1423.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Randi 3:30 to 5:00

2         THE COURT:  Next one is Docket Number 986, Terri

3  Lamb.  Is anyone here representing Ms. Lamb?

4         MR. KAPP:  Your Honor, that's been continued.

5         THE COURT:  You're right.

6         MR. KAPP:  And I'm going to beat you to it, --

7         THE COURT:  Next one's been --

8         MR. KAPP:  -- next one has been, too.

9         THE COURT:  -- continued.  The next one, there's a

10  stipulation.

11         MR. KAPP:  Yes, Your Honor.

12         THE COURT:  And that was similar to that.  I was

13  allowed Cobb County -- this allows Plaintiff to go forward

14  on a couple of motions to dismiss.  Cobb County and the

15  Plaintiff, everyone signed off to that stipulation.  And all

16  though there -- yes.

17         THE COURT:  This is Allen.

18         MR. KAPP:  This is Allen, not Smith.

19         THE COURT:  Okay.  Mr. Prostok.

20         MR. PROSTOK:  That is correct, Your Honor.

21         THE COURT:  All right.  So in connection with the

22  motion for relief from stay at Docket Number 990, Scott

23  Allen, I will enter the stipulation at 1423.

24         All right.  Next matter is the motion at Docket

25  1000, Oliver King.

1          MR. KING:  Yes, hello?

2          THE COURT:  Yes.

3          MR. KING:  Yeah, I'm here.

4          THE COURT:  All right, Mr. King.

5          MR. KING:  Pro se litigant and filed this motion

6   for relief from stay concerning my State case, a medical

7   case, medical negligence in the Northern District.

8          It's been over a year.  I believe if the stay is

9   lifted, I could reach some type of settlement or agreement

10  instead of, you know, prolonging the case.  It is medical

11  negligence, cruel and unusual punishment, civil rights act.

12         It's already difficult, forced to litigate myself,

13  wasn't appointed free representation, just want to get the

14  case over with.  I'm praying that the Court grant my motion.

15         THE COURT:  All right.  Mr. Kapp.

16         MR. KAPP:  Your Honor, the underlying lawsuit here

17  is against two of the Debtors' employees.  The relevant

18  insurance policies covering those employees are the 2024,

19  2025 tort policy, which under that one the Debtors are

20  responsible for defense costs and damages for the first 15

21  million before third-party insurance is available.  And,

22  therefore, we would request that this stay motion be denied.

23         THE COURT:  Well, he filed a 1983 action but it's

24  for his medical care.

25         MR. KAPP:  I do not believe he -- I -- maybe

1   that's a question for the -- the complaint seems to suggest

2   that it is a KERP, and I don't -- so if he is currently

3   incarceration, which I don't believe, --

4           MR. KING:  No.

5           MR. KAPP:  -- I believe this is a past act, Your

6   Honor.

7           THE COURT:  No, no, but it's for medical

8   malpractice, not tort.

9           MR. KAPP:  Oh.

10          THE COURT:  I mean, this is a pro se litigant

11  complaining about medical malpractice.

12          MR. KING:  And I was denied a serious medicine

13  that I needed.

14          MR. KAPP:  They -- I'm sorry.  I am told by my

15  boss that this is covered by the normal policy, normal tort

16  policy, which has --

17          MR. KING:  That's --

18          MR. KAPP:  -- the 15 million deductible.  So the

19  current malpractice is under the tort claim policy; is that

20  correct?

21          THE COURT:  Okay.  But then how is this different

22  from --

23          MR. KAPP:  The other one is an -- the other one

24  was an EPL policy.  This is the general tort policy.  And so

25  the EPL policy had the language that this policy does not.

1          And we will have one more here in a minute that

2     covers that other policy.

3          THE COURT:  All right.  So, Mr. King, here's going

4     to be my ruling.

5          We'll enter an order that the stay will remain in

6     effect and it will lift so that you can pursue your claims

7     on the earlier to occur of the confirmation, the effective

8     date of the plan, the conversion of this case to a Chapter 7

9     or a dismissal, or April 30th.

10          So by April 30th, which is the outside date, you

11     will be able to proceed with respect to this case.  So we'll

12     enter an order to that effect.

13          And if there are changed circumstances that were

14     not foreseeable now, then you can come back.  But that's

15     going to be my ruling.

16          MR. KING:  All right.  Thank you, Your Honor.

17          THE COURT:  Thank you, sir.  You may be excused if

18     you want.

19          All right.  Next matter is the motion for relief

20     from stay filed by Vicki Ann Assevero, Docket Number 1003.

21          MALE SPEAKER:  Your Honor, can you hear me?

22          THE COURT:  Yes, I can hear you, sir.

23          MALE SPEAKER:  Okay, Your Honor.  This is a

24     similar case to the one I just argued on.  It's a wrongful

25     death as to two (glitch in the audio).  I understand the

1   Debtors' not objecting to lifting the stay as to Centurion,

2   which is a non-Debtor Defendant, but apparently wants to

3   continue the stay as to the detention officers in the case.

4         But Your Honor's smart, it's in Your Honor's -- if

5   (glitch in the audio) continue this in the case, as well,

6   because lifting the stay as to one Defendant is not going to

7   move the case law (glitch in the audio) we're going to get

8   them lifted -- the stay lifted as to the detention officers.

9         But I do think they should be lifted in this case.

10  There's absolutely nothing medical about the allegations

11  made against the detention officers in this case.  And I

12  think we could work something out with Debtors' counsel on

13  that issue.

14         THE COURT:  Any objection to moving it to the

15  18th?

16         MR. KAPP:  We can move it to the 18th, Your Honor.

17         We do note that as to Cobb County, Count Two is

18  unrelated to medical care.  We believe Count One, which

19  deals with the Debtors, and Count Three, which we have

20  identification obligations, the stay should apply.  But we

21  can consult with counsel and see if we can reach an

22  agreement.

23         THE COURT:  Okay.  Thank you.  All right.  So I

24  will continue Docket Number 1003 to the March 18th date.

25         The next matter is the letter from Christopher

1  Buchanan at Docket Number 1005.  And does this one involve

2  medical care?

3          MR. KAPP:  Your Honor.  I do not believe so.  This

4  is a 1983; although he does say he seeks access to medical

5  care.

6          THE COURT:  Right.

7          All right.  Is -- Mr. Buchanan, is he -- are you

8  on the line?  If so, you need to press five, star.

9          MR. BUCHANAN:  (No audible response.)

10          MR. KAPP:  And, Your Honor, it was unclear and so

11  we did put in our objection to the extent that this does

12  relate to the pursuit and receipt of current medical care,

13  we have no issue with that.  It just was unclear by the

14  pleading whether that was the case.

15          THE COURT:  And so this is the 2024, 2025 --

16          MR. KAPP:  Yes, the $15 million deductible.

17          THE COURT:  All right.  Obviously I don't think

18  he's been able to get on so we'll continue this until March

19  18 with the stay to remain in effect as to all parties.

20          All right.  The next matter is -- so I see

21  Mr. Shandig's here.  Mr. Shandig, we'll go back to your

22  case.

23          MALE SPEAKER:  Mr. Shadid, Your Honor.

24          THE COURT:  Shadid, yes.  Okay.  So let -- before

25  we -- before Mr. Shadid, so you need to hit five, star.

1          But before we go back to that, in Buchanan there

2    is a -- you know, he does say he needs medical attention

3    immediately.  So is there an issue about medical care here?

4          MR. KAPP:  Your Honor, we don't -- Your Honor,

5    we're not -- as we said, we're -- we just don't know.

6          THE COURT:  All right.  Well, --

7          MR. KAPP:  And so if you would like us to enter

8    what we've normally been entering, to the extent -- we could

9    phrase it to the extent there is the need for immediate

10   medical care, including procedures and appointments, we can

11   file that.

12         THE COURT:  Yeah, why don't we do that just in

13   case, and then continue the rest of it to the 18th to the

14   extent --

15         MR. KAPP:  Your --

16         THE COURT:  -- for damage, because he keeps -- he

17   talks about his ring finger, ringer finger injury.

18         All right.  So let's go back to Williams.  All

19   right.  So we're going back to Case Number ECF 814 and 1085,

20   Marshawn [sic] is it?  It's not Marshawn.  Marzan Williams.

21   Okay.  You should be on.

22         MR. SHADID:  (No audible response.)

23         THE COURT:  All right.  Just hit it one time,

24   five, star one time.

25         MR. SHADID:  Testing.  It says I'm unmuted now.

1          THE COURT:  Yeah, you're unmuted.

2          MR. SHADID:  Okay.  Great.  Thank you.

3          THE COURT:  Go ahead, Mr. Shadid.

4          MR. SHADID:  So we did enter a stipulation and

5   agreed order as to the non-Debtor Defendants.  I guess I'm

6   just curious like what my options are regarding the

7   potential to continue my case against Wellpath.

8          I know there's a lot of insurance questions going

9   around.  I don't really understand what a fronting policy

10  is.  I'm working on it.  So I was hoping to just get a

11  little clarification, if possible.

12         THE COURT:  Mr. Kapp.

13         MR. KAPP:  I don't know where to begin, Your

14  Honor.  We would notice -- note that we have sent them the

15  applicable policies.

16         THE COURT:  Okay.

17         MR. KAPP:  But we do believe from what we show

18  that the applicable insurance policies here are the 2023,

19  2024 policies which -- under which the Debtors are

20  responsible for the first $15 million in defense costs and

21  damages before third-party insurance is available.

22         And, therefore, we believe that the motion should

23  be -- and this is just as to the Debtor, Your Honor.  So we

24  believe the motion should be denied.

25         Although we do state as to the Debtor we have --

1    as stated we have sent -- signed a stipulation with respect

2    to the United States.  And we also would enter into a

3    stipulation with respect to Metropolitan Correctional Center

4    in Chicago.

5         But as to the Debtor, we believe due to those

6    insurance issues, that the stay should not -- that the

7    motion should not be granted as to the Debtor.

8         THE COURT:  All right.  So, Mr. Shadid, I think

9    that as it relates to the Metropolitan Correction Center and

10   the United States, you can go forward.

11        And then to the extent that we can also include in

12   the order that as it relate to the Wellpath Debtors, it'll

13   be the earlier of effective date of the plan, dismissal,

14   conversion, or April 30th, you know.

15        MR. SHADID:  Okay.  Understood.

16        THE COURT:  All right.

17        MR. SHADID:  And then so as to both valuing my

18   claim and certain allegations to the other Defendants in my

19   case, I'm trying to acquire copies of my client's HIPAA

20   information.

21        And both through the civil counsel in my civil

22   case and Debtors' counsel here in the bankruptcy, they're

23   not willing to give that information to me.  Is that

24   something that can be addressed through this Court?

25        THE COURT:  I don't know the answer to that

1  question.  I think you just -- you know, you would need to

2  file a motion, and then we could take it up.  But I --

3          MR. SHADID:  Okay.

4          THE COURT:  -- nobody's ever asked me to provide

5  HIPAA information.

6          MR. SHADID:  Okay.  Thank you, Your Honor.

7          THE COURT:  All right.  So would you work with

8  Mr. Kapp to get a form of order that does those two things?

9          MR. KAPP:  Your Honor, we'll --

10          MR. SHADID:  Yes.  And can you just -- go ahead.

11          MR. KAPP:  Thank you.  We'll put together a draft

12  and we'll get it to counsel.

13          THE COURT:  Okay.  All right.  So --

14          MR. SHADID:  Thank you, sir.

15          THE COURT:  -- Mr. Kapp will do that.  Okay.

16          MR. SHADID:  Great.  Have a great day.

17          THE COURT:  Thank you.

18          All right.  So the motions at 814 will be resolved

19  and then will enter the Docket.  All right.

20          Next matter is Maria Elena Garcia, Docket

21  Number 1014.  Anyone here representing Ms. Garcia?

22          MS. HENRIKS:  This is Yana Henriks, Your Honor.

23  Can you hear me?

24          THE COURT:  I can hear you fine, Ms. Henriks.

25          MS. HENRIKS:  I am appearing on behalf of the

1    Garcia estate.

2         (Pause in the proceedings.)

3              THE COURT:  Okay.  Give me one minute, let me just

4    read my notes.  Okay.  So have you seen the -- Mr. Kapp, you

5    produced your agreement with Tulare County because I think I

6    reviewed that.  Is that --

7              MR. KAPP:  Yes, Your Honor.

8              THE COURT:  Ms. Henicks [sic], have you --

9    Henriks, have you seen that agreement with Tulare County?

10             MS. HENRIKS:  I believe I've seen it.  I have not

11   seen the carveout policy, although I have signed a NDA

12   agreement.  But I am aware.

13             However, I just wanted to argue about the

14   underlying case, Your Honor.  There's some information the

15   Court needs to know it affects both --

16             THE COURT:  All right.  Go ahead.

17             MS. HENRIKS:  -- this particular case.

18             THE COURT:  All right.

19             MS. HENRIKS:  The claims are brought under main --

20   the gravamen of the claims under 1983 alluded in deliberate

21   indifference for serious medical needs by nurses, Tracy

22   Anderson and Terry -- whatever his last name is.  Those are

23   -- Erickin (phonetic).

24             And those claims are kind of separate and apart

25   from a claim that ultimately kind of resulted in a wrongful

1   death.

2         And what resulted in a wrongful death was actions

3   taken place in a patrol car by Defendant Carrillo basically

4   putting the decedent in -- facedown, handcuffed, without

5   basically putting seatbelt or any kind of securing him,

6   which eventually led to asphyxiation type of injury.  And

7   that was the cause of death as it was determined.

8         The case was in a very advanced stage where all

9   the expert discovery was concluded, forensic pathologist,

10  and all of that was done when the bankruptcy was filed.

11        So the claims against Tulare County, and even

12  Debtors concedes, really should not be stayed.

13        I don't think that there is any indemnification of

14  Tulare County for actions of the deputies which is not even

15  -- Tulare County can't even indemnify them because, as the

16  Court is well aware, under 1983, there is no indemnity

17  (glitch in the audio) that was the claim.  It's not even --

18  it's not each individual -- I'm mean the deputy.

19        So that's the one thing.  There is no basis.  They

20  even concede that (glitch in the audio) the stay (glitch in

21  the audio) completely independent claim of any medical needs

22  as the (glitch in the audio) pretty much did that by putting

23  decedent facedown, handcuffed, and (glitch in the audio)

24  strapping him in a patrol car.

25        That's one aspect why the stay has to be lifted

1    immediately.  We're pretty much almost going to trial

2    against -- I mean on those claims when the bankruptcy was

3    filed.

4            Second is this carveout policy.  I haven't seen

5    it, but at this stage everything was exhausted.  And we

6    agreed to limit our claims against employees of CMGS or

7    whatever the company -- they have so many entities, but

8    Wellpath.

9            (Glitch in the audio) the policy limits.  So --

10   and whatever (glitch in the audio) several experts retained

11   by all of them jointly.

12           So there is no really -- just on this individual

13   case there's no basis to continue this stay as the case was

14   in very advanced stages.

15           Whatever fees are already expended, there is a

16   summary judgment motion that the Court has to rule upon

17   whether those claims will survive or not.

18           So the Court should just (glitch in the audio)

19   piecemealing this.  And also the fact that there's

20   controversy about the carveout which my understanding the

21   Court needs to review this policy terms.  And I watching the

22   testimony, I think it's (glitch in the audio) the Court and

23   (glitch in the audio).

24           I can answer the questions if the Court has about

25   the case.  But our position is the stay has to lifted -- has

1  to be lifted completely as to Debtor and non-Debtor

2  entities.

3          THE COURT:  All right.

4          MR. KAPP:  Your Honor, --

5          THE COURT:  Mr. Kapp.

6          MR. KAPP:  -- Jay Kapp.  Couple of things here.

7          First of all, we have been in lots of contact with

8  counsel here and lots of correspondence.  She ultimately did

9  send an NDA.

10          And we did send her all the insurance policies on

11  February 7th to her email.  We can resend those, but we have

12  sent them to her.

13          There's a lot going on in this case.  This is --

14  deals with a professional corporation so we have both

15  insurance obligations as well as an indemnification

16  obligations.

17          And then with respect to CFMG, not only to we

18  indemnify them but they have obligations to indemnify

19  Tulare, which we have accepted tender and have been paying

20  for Tulare's defense costs as to claims one and three.

21          THE COURT:  So claim two is the claim for

22  excessive force that resulted in the affixiation [sic] and

23  death.

24          MR. KAPP:  And as we set forth in our objection,

25  with respect to that claim and several other claims we do

1  not believe the stay applies as we do not believe the

2  indemnification obligations are triggered.

3          However, we do believe it applies with one and

4  three.

5          And as we have stated with respect to four, six,

6  seven, and ten, the allegations are so muddled there that we

7  do believe that because they're so interrelated to our

8  facts, that we would need to defend and pay attention or

9  risk collateral estoppel and res judicata concerns.

10          However, with -- and that's with respect to claims

11  four, six, seven, and ten.

12          But as to claims two, five, eight, and nine, we do

13  believe, and would enter into a stipulation, that the stay

14  does not apply to Tulare County or CFMG with respect to

15  those four claims -- counts, again, two, five, eight, and

16  nine.

17          But as with respect to all the other counts, we do

18  believe that the stay should stay in place.

19          MS. HENRIKS:  Your Honor, I disagree with the

20  counsel's characterization or a practice of really

21  determining the merits of the case based on a pleading only.

22          For example, you don't plead all the little facts

23  or even the old detail facts in a short formal federal

24  pleading.  You just pleading out to put them under notice.

25          And counsel should have known from underlying case

1  that there is expert discovery that was completed, and that

2  was to the -- due to the actions of the officer or (glitch

3  in the audio) from jail.  So that's already been

4  established.

5          And if he is looking at only pleadings, that's

6  improper way.  He could have gotten the counsel to give him

7  an update, or the experts testify, facts that were conceded.

8          So a lot took place since filing of the complaint.

9  So you can't just go back and look (glitch in the audio) oh,

10  well, it's muddled.  It's not muddled.  Now everything is

11  clear.  We have expert testimony.

12          And it's --

13          THE COURT:  I'm sorry, I just lost you.  Can you

14  say that again?

15          MS. HENRIKS:  I think it's improper to claim that

16  there is a duty to defend just or they have -- they are on

17  the hook just because allegations are muddled because of the

18  fact that we have concluded all the expert testimony and

19  it's clear that the wrongful death claim is mainly to the

20  actions of Defendant -- individual Defendant Carrillo.

21          It's not even Tulare County that's liable for this

22  and there is no vicarious liability or (glitch in the audio)

23  of the agency.

24          My argument there is we can't piecemeal this case

25  and just stay certain actions against Tulare County and lift

1    the stay on the rest.

2            As far as the 2021 carveout policy, I'll go -- I

3    mean, that's what I'm particular interested in.  I still

4    don't understand, Your Honor, the hundred thousand dollar

5    where they claim for the claim, this has all been satisfied.

6    All the defense being cost is paid, this was enormously

7    expensive case.

8            We have agreed to limit our claims to the

9    insurance coverage.  What else do they want at this point?

10   Everything that's been already paid is paid.  All the

11   experts testified, they been retained.

12           We are at the phase that all we have to do is let

13   the court hear the summary judgment motion.  Perhaps they'll

14   lose some claims.  And because of the stay, the court, the

15   federal judge doesn't want to hear the summary judgment

16   motion.

17           This is nothing but a stalling tactic.  Even for

18   Debtors' own benefit it should be better for them to lift

19   the stay so they can see what claims are in, what claims are

20   out given we have pending summary motion that's fully

21   briefed, doesn't require any attorney time anymore, and they

22   can know if some claims are going to get dismissed and some

23   claims are going to survive.

24           So I would ask the Court to lift the stay in

25   entirety because there is (glitch in the audio) that minimal

1   burden counsel didn't make.  He's basically saying claims

2   are muddled up.  That's not true.

3            Well, at this stage of the litigation we have a

4   clear position on the expert testimony and all the

5   stipulations we've made, what claims that we're asserting,

6   what's the causation there, and what's at issue.

7            So the Court -- I would respectfully ask the Court

8   to lift the stay.

9            THE COURT:  All right.  Mr. Kapp, what about the

10  statement that the hundred thousand has been paid?

11           MR. KAPP:  Your Honor, that insurance policy does

12  not apply.  Counsel is referring to other policies that do

13  not apply to her policy -- her case.

14           What applies to her case are the 2021, 2022

15  policies which, you know -- hold on -- which has the $8

16  million responsibility before third-party insurance kicks

17  in.

18           Your Honor, I would also state the burden to show

19  extraordinary circumstances here is on movant.  And there

20  was nothing in her motion that goes into these counts and

21  says any of what we have just heard, so that is all brand

22  new and not in evidence.

23           THE COURT:  All right.  So I'm going to continue

24  this hearing until next Monday, the 24th, at 2:00 p.m.  And

25  at that time I want to hear, number one, the issue on the

1    policy and, number two, whether in fact medical care is

2    implicated.

3           To the extent medical care is implicated, then I

4    will continue the stay until the earlier of April 30th and

5    the other -- the effective date of the plan and the other

6    two conditions.

7           MR. KAPP:  And, Your Honor, to the extent that

8    there is medical care implicated, then we need to have

9    something sent to us to show that.  If we're going to send

10   insurance, we need counsel to send us what shows that

11   because what we have seen does not show that.

12          THE COURT:  But it -- okay.  All right.  Well,

13   counsel, can you work with Mr. Kapp to give him the

14   information showing that in connection specifically with the

15   wrongful death claim, count number six, there's no medical

16   care issue?

17          MR. KAPP:  And we would ask counsel to -- Ms. Lee

18   does all the real work so the email's probably coming from

19   Catherine Lee.

20          THE COURT:  Okay.  All right.

21          MS. HENRIKS:  Your Honor, I would provide all the

22   expert reports by Plaintiffs and Defendants also so counsel

23   can read the experts' report and see the opinion as to the

24   causation and what's implicated.

25          And so this is continued until --

1          THE COURT:  next Monday.

2          MS. HENRIKS:  -- Monday basically.  Okay.

3          THE COURT:  At 2:00 p.m. Central --

4          MS. HENRIKS:  And would be 12:00 o'clock.

5          THE COURT:  Yeah, 12:00 o'clock your time.

6          MS. HENRIKS:  Thank you.

7          THE COURT:  All right.  Next matter is Steve

8  Pinder.  We did enter a motion.  He's -- I think he's in --

9  well, where is he, Arkansas?

10          MR. KAPP:  Yeah.  He's pro se, I believe he is.

11          THE COURT:  Mr. Pinder, are you on the Line by any

12  chance?

13          MR. PINDER:  (No audible response.)

14          THE COURT:  Probably not.  Okay.

15          MR. KAPP:  And we did address the medical issues

16  on February 5th.  Otherwise he's asserting 1983 claims

17  against two Wellpath employees.

18          THE COURT:  All right.  So why don't we go ahead

19  and enter the order on the April 30th with respect to this

20  one?

21          MALE SPEAKER:  Yes, Your Honor.

22          THE COURT:  All right.  Next matter is Docket

23  Number 1145, Alton Brown.  We did enter an order with

24  respect to medical care at 1249.

25      (Pause in the proceedings.)

1           MR. KAPP:  Your Honor, this is pro se counsel.

2           THE COURT:  All right.

3           MR. KAPP:  This does involve -- he has two cases

4   here.  Both are under the 2018, 2020 policies which have

5   been fully exhausted.

6           THE COURT:  Okay.  And is Wexford Health Sources,

7   is that a Wellpath entity?

8           MR. KAPP:  No, Your Honor.

9           THE COURT:  Do you know who they are?

10      (Mr. Kapp/co-counsel confer.)

11          MR. KAPP:  Oh, I am told that they are a

12   competitor to whom the stay can be lifted, does not apply

13   to, doesn't have to be lifted, doesn't apply.

14          But there are cases -- there's two separate cases.

15   One is against the -- we call them the Weckford (phonetic)

16   and the Wolf case.  Wexford applies to numerous -- to

17   Wellpath and numerous employees.  And then the Wellpath --

18   that's Wexford.

19          And Wolf asserts claims against Wellpath, 11 of

20   Wellpath's employees, and over 40 employees of the

21   Pennsylvania Department of Corrections.  And we do have

22   indemnification obligations to Pennsylvania Department of

23   Corrections.

24          THE COURT:  Okay.  So one case is 101680, the

25   other case is 01081.  Okay.

1          MR. KAPP:  Yes.

2          THE COURT:  So which is which?

3          MR. KAPP:  Your Honor, 01680 is Wexford.

4          THE COURT:  Okay.  And does the stay apply to that

5    one?

6          MR. KAPP:  Yes, Your Honor.  Hold on, got lost in

7    my notes.

8          THE COURT:  Okay.  Yes.  Okay.  So mine says it

9    does include Correct Care Solutions.

10          All right.  Let's enter the April 30th order here.

11          MR. KAPP:  All right.  Your Honor, I believe that

12   is it for this.

13          I would note Mr. Lamboy, who is pro se, was a

14   continued motion.  And he deals with the insurance policy

15   that we dealt with of Warren.  And so on that one we would

16   agree and enter an order that his underlying case can go

17   forward.

18          THE COURT:  All right.  Mr. Lamboy -- and I'll get

19   to you, Ms. Winters.  Mr. Lamboy, did you hit five, star?

20          MR. LAMBOY:  (No audible response.)

21          THE COURT:  All right.  Can you hear me?

22          MR. LAMBOY:  Yes, Your Honor, thank you.

23          THE COURT:  All right.  Did you hear that they're

24   going to enter an order that will allow you to proceed

25   against, you know, in your case, to the extent of insurance

1  policy, and that there is an insurance policy that covers

2  your claims?

3  　　　　　MR. LAMBOY:  Thank you, Your Honor, thank you.  I

4  appreciate that, thank you.

5  　　　　　THE COURT:  All right.  So that one be -- okay.

6  　　　　　Ms. Winters, did you hit five, star?

7  　　　　　MS. WINTERS:  Can you hear me now?

8  　　　　　THE COURT:  I can hear you.

9  　　　　　MS. WINTERS:  Oh, okay.  Good afternoon.  Thank

10  you.

11  　　　　　I was on the original agenda on Page 6-H on the

12  matters that were continued from the January 14th hearing.

13  I represent Dawn Crawford, a creditor.

14  　　　　　And on the amended agenda, it indicated that this

15  matter, our motion, was being passed to March.  But I wanted

16  to get on the record here and say that I had signed the

17  nondisclosure agreement.

18  　　　　　I have not yet been provided with the insurance

19  policy or the contracts that were labeled as confidential on

20  the omnibus objection that was filed to my motion.

21  　　　　　I think we do have an agreement that the stay will

22  be lifted as to a different detention center and different

23  medical provider also at issue in my case.

24  　　　　　But we haven't -- I haven't received a copy of a

25  proposed stipulation.  That agreement came kind of late

1    relative to this hearing, so I understand it might take a

2    day or two to get that resolved.

3         But I do believe that there is still going to be a

4    dispute about whether the stay should be lifted as to the

5    correctional Defendants in my case.  All the claims against

6    them are separate and apart from the claims relating to

7    medical treatment.

8         And so for many of the same reasons you heard

9    other counsel articulate here today, we believe that the

10   stay against the correctional Defendants in my case should

11   be lifted as well.

12        We are fine with passing that to March.  And then

13   hopefully I'll get additional information relating to the

14   insurance policies and how -- and other policies that might

15   provide coverage for the -- my situation with Correct Care,

16   the Correct Care employees who provided treatment for my

17   client.  So --

18        THE COURT:  All right.  Thank you, Ms. Winters.

19        Ms. Bethel, you've been on the whole time.  Did

20   you have a matter set?

21        MS. WINTERS:  May I be excused, Your Honor?

22        THE COURT:  Yes, you may.

23        Ms. Bethel, can you hit --

24        MS. WINTERS:  Thank you.

25        THE COURT:  -- five, star one time.  All right.

1  Go ahead, Ms. Bethel.

2           MS. BETHEL:  Good afternoon, Your Honor.  I am

3  here for Michael Seng on behalf of Deandre (indiscernible).

4  Professor Michael Seng is Court-appointed counsel.

5           This matter is -- was filed pro se against

6  Wellpath and King County and several employees there.

7  Honestly, I'm not entirely sure of this insurance discussion

8  as it might relate to the claim that we are representing

9  Mr. Bradley on.

10           It does involve issues with regard to poor medical

11  care but also tort issues with regard to his treatment.

12           I will say that since we filed that claim, as of

13  last week Mr. Bradley has moved facilities, so to some

14  extent our injunctive relief claim in there is mooted.

15           I'm also a little unclear as to what these rulings

16  have to do with the county Defendants in King County.  And

17  so if it is possible for relief from stay to pursue those

18  Defendants, we would request that.

19           MR. KAPP:  Your Honor, this is not a stay motion.

20  This was an objection to stay extension.

21           Pursuant to your comments on the January 14th --

22  and what you've heard here, this is really a stay motion.

23  And we would -- to the extent we -- they are entitled to use

24  the stay determination process and have us take a look and

25  see if there's an agreement we can reach; otherwise, we

1   would encourage them to file a stay motion.

2        THE COURT:  Okay.  Did you understand that,

3   Ms. Bethel?

4        MS. BETHEL:  I think if we could file a motion for

5   relief from stay.

6        THE COURT:  Right.  Exactly.  And if you get it on

7   file quickly, we'll set that for hearing on March 18th,

8   which is the next hearing date.

9        MS. BETHEL:  Thank you, Your Honor.

10       THE COURT:  All right.  Thank you, Ms. Bethel.

11       MR. KAPP:  And, Your Honor, the one other one I

12   would mention, even though we have it under continued, it

13   was not heard, it was pushed because of mis-scheduling with

14   pro se Mr. Slater.  And I did hear him so we might want to

15   address that one.  That has not been heard by you yet.

16       THE COURT:  All right.  Mr. Slater, are you on?

17       MR. SLATER:  (No audible response.)

18       THE COURT:  Please hit five, star one time.  All

19   right.

20       MR. SLATER:  Yes.  You can hear me?

21       THE COURT:  Yes, I can hear you.

22       MR. SLATER:  Okay.  Sir, I am approaching the

23   Court today to testify for my motion from stay.  Wellpath --

24   as well as medical negligence and harm.  Also, I have 1983

25   and Chapter 8 and 11.

1          My main reason for being here is because Wellpath

2   is not going to -- no one from Wellpath's going to appear in

3   a criminal court because of the wrongdoing.  The only way

4   for me to get justice is through a civil lawsuit.

5          So I gave Wellpath two months' advance notice of

6   my cancer and diabetes diagnosis in case I lost my trial.  I

7   ended up losing my trial.

8          The entirety of my stay I did not receive any

9   treatment.  Tumor, cancer metastasized to my back.  Now I

10  can no longer use my left leg or control my bowel or

11  bladder.

12         The only way for me to get any justice is to be

13  able to sue them.

14         THE COURT:  Understand, Mr. Slater.

15         Mr. Kapp.

16         MR. KAPP:  Well, Your Honor, first of all, we are

17  sympathetic to Mr. Slater's plight.

18         He asserts various claims against the Debtor, the

19  Debtors' employees, as well as Arapahoe County.

20         The relevant insurance policies with respect to

21  the Debtor itself and its employees are the 2024, 2025

22  policies with -- which where the Debtors retain the first

23  $15 million in defense and damages before third-party

24  insurance is applicable.

25         The Debtor also has a contract with Arapahoe

1    whereby the Debtors indemnify the county and all of its

2    officers and employees for any lawsuits, damages, costs,

3    attorneys' fees arising out of Wellpath's performances under

4    the agreement.

5            So there is potential indemnification obligations

6    with the effect of rendering the Debtor as the primary

7    Defendant and, therefore, the stay should remain in place as

8    to the Debtors and its employees and Arapahoe County, and

9    the motion denied.

10           THE COURT:  All right.  So, Mr. Slater, because of

11   the fact that these are claims against the Debtor and the

12   Debtor has indemnified the county, I will agree to continue

13   the stay until the earlier of April 30th, which is about 75

14   days from now, or the effective date of the plan, or

15   dismissal or conversion of the case.

16           And I understand that this is very frustrating for

17   you.  But I think in the context of this case, unfortunately

18   we need to see the plan process through.  And to the extent

19   that the plan isn't confirmed on April 30th, you'll be able

20   to continue to proceed.

21           So this is about a 75-day period.  And,

22   unfortunately, I think that's the best we can do at this

23   point.

24           MR. SLATER:  Okay.  Will there be something put on

25   the Docket on PACER that I can print to give the status

1    report to the judge handling my lawsuits here in Colorado?

2             THE COURT:  Absolutely.  There'll be an order

3    entered.  And then once that order is entered, it will say

4    that your -- that stay will lift as of that date, unless

5    there are some extenuating circumstances that come about.

6             But I think the intent today is that those -- the

7    -- that the stay would lift no later than April 30th so that

8    you could proceed with your case.

9             MR. SLATER:  Okay.  And just to be aware, I am

10   getting pretty darned close to death due to this so --

11            THE COURT:  No, --

12            MR. SLATER:  -- just a little side note, I guess.

13            THE COURT:  No, I -- look, I'm very, very

14   sympathetic.  And, you know, hopefully this will get done

15   quicker rather than later.  Unfortunately it's a tough

16   decision.  But I need to treat the stay motions accordingly,

17   unfortunately.

18            MR. SLATER:  Okay.

19            THE COURT:  Those are the facts.

20            MR. SLATER:  Okay.

21            THE COURT:  All right.

22            MR. SLATER:  Well, thank you very much for your

23   help then.  And I will send that over to the judge here --

24            THE COURT:  All right.  Thank you.

25            MR. SLATER:  -- when I get it.

1          THE COURT:  All right.

2          MR. SLATER:  Thank you.

3          MR. KAPP:  Your Honor, a couple things here.

4          MR. GINSBERG:  I been (glitch in the audio) for

5  Marc Ginsberg on the Myers case.  Are we going to deal with

6  that today?  It's number -- "A" on number two.

7          MR. KAPP:  Yes, sir.  I'm getting to that next.  A

8  couple of things.

9          MR. GINSBERG:  Okay.

10          MR. KAPP:  First of all, I want to note -- and we

11  -- this happened right before and it did not get on the

12  agenda.

13          But we -- with respect to item "J" of continued

14  motions, we had an agreement with counsel to continue the

15  Strickland motion until March 18th.  I believe your -- I

16  believe the Court was notified but it did not make the

17  agenda.

18          With respect to the other six motions here, Your

19  Honor, all of these have been heard before.  After the

20  January 14th hearing we did take up the Court's directive

21  and offered all of Plaintiff's -- all movants' counsels, I

22  should say, the right to view the applicable documents if

23  they entered into an NDA.  Your Honor, all but Harris agreed

24  to that.

25          So the documents, none of them took up your offer

1  on the January 14th transcript to file any additional

2  pleadings contesting the accuracy of the Debtors' arguments

3  as to the applicable insurance policies, the Debtors'

4  retention of risk with respect to same, or the

5  indemnification obligations contained in the pertinent

6  customer agreements.

7        So I will defer to you on how you would like to

8  handle those.  But that's just kind of a summary of where we

9  are.

10       THE COURT:  All right.  So let's just call the

11  Docket.  So the first matter is the Myers case, Docket

12  Number 181.

13       MR. GINSBERG:  Yes, Your Honor, thank you.  Marc

14  Ginsberg on behalf of Gracienne and Daniel Myers.

15       I received two of the five policies, Your Honor,

16  first off.  Neither here nor there but there are three other

17  policies that are referenced in Mr. Seitz's Declarations

18  that were not produced.

19       I received the AFA policy and I received

20  (indiscernible) policy.

21       Counsel's characterization of how those policies

22  work is not a hundred percent accurate, but I don't think it

23  makes any difference in terms of your ruling on this motion.

24       Essentially, under the Texas Instrument policy,

25  the Wellpath is required to expend $6 million at which time

1    the underlying policy will then pay $3 million published.

2         I am not sure what the second layer policy is

3    because that wasn't provided, but that's just a starting

4    point.

5         I essentially agree to the order that you are

6    proposing with respect to the other ones, the four dates.

7         I will, though -- I do have a question though.  If

8    it is converted to a Chapter 7, does that mean there'll be a

9    new stay under Chapter 7?

10         THE COURT:  That's not my intent that there would

11    be a new stay under Chapter 7.  But we can work through the

12    order on that.  My -- I wanted --

13         MR. GINSBERG:  Okay.

14         THE COURT:  -- to give a firm date.

15         MR. KAPP:  Your Honor, --

16         MR. GINSBERG:  Okay.  I appreciate that.

17         THE COURT:  And I don't think this case is going

18    to get converted to a Chapter 7 but --

19         MR. GINSBERG:  All right.  Well, I --

20         MR. KAPP:  You brought it up, Your Honor.

21         MR. GINSBERG:  -- want to make a point, if I

22    could, regarding us getting to the bottom of the $6 million

23    of collateral, because if nothing else that should certainly

24    go into the liquidating trust, be some type of money towards

25    these claims at a minimum.

1          And then so that's neither here nor there for

2    today but I wanted to make that point, which is why I stayed

3    on the line so long today, Your Honor.

4          I want to thank you for your patience.  You have

5    tremendous stamina and (glitch in the audio).

6          So if that's going to be the order, I'm okay with

7    it.  And if counsel for the Debtor agrees, I'll wait to see

8    that order on the four dates.

9          And it can be in an omnibus order.  You don't need

10   one specific for my case unless you feel it's necessary.

11   You can just list my case in an omnibus order for all those

12   other ones, save the Court some signatures, if that helps.

13          THE COURT:  All right.  Thank you, sir.

14          Mr. Kapp.

15          MR. KAPP:  Your Honor, I would just note we

16   provided the fronting and the umbrella policy which we were

17   asked to do by the Court.  Those are the applicable

18   policies.

19          The six million, that's just not reading this

20   correctly.  The 2023, 2024 policies apply here with $15

21   million per claim.

22          But if the offer is to enter an order extending

23   all those until April pursuant to the four conditions, we'll

24   agree to that.

25          THE COURT:  Okay.  Thank you, sir.

1          All right.  Mr. Ellis, you've had your hand.

2          MALE SPEAKER:  (Indiscernible).

3          THE COURT:  Thank you, Mr. Ginsberg.

4          Mr. Ellis, you've had your hand up.  Was there a

5  matter that we passed over?

6          MR. ELLIS:  Yes, Your Honor.  Can you hear me

7  okay?

8          THE COURT:  I can hear you fine.

9          MR. ELLIS:  Okay.  Thank you.  I just wanted to --

10 I just want to -- failed to mention we -- I'm on the

11 Commonwealth of Pennsylvania -- I'm on the Randolph, the

12 Samuel Randolph matter.

13         And I know it was scheduled, I just don't know

14 where it's at in the queue.  And I -- you know, I think

15 we're getting -- we're winding down and I just wanted to at

16 least mention it.

17         MR. KAPP:  That was the very first one we did,

18 Your Honor.

19         THE COURT:  Okay.  All right.  So, yes.  So I

20 called that I think before you got on, and that was the very

21 first matter, Samuel Randolph, Docket Number 504.

22         MR. ELLIS:  Okay.  I wasn't aware that it was

23 called, Your Honor.  But I understand.  I was still -- I

24 think I was still figuring out how to work the audio, Your

25 Honor.  It's my first time, and I apologize.

1           THE COURT:  No, no problem.

2           So is there anything different from this case that

3   the April 30th order shouldn't apply?

4           MR. KAPP:  No, Your Honor.  Oh, there is one

5   employee we note that we are not defending as he has opted

6   out of taking our --

7           THE COURT:  Right.

8           MR. KAPP:  -- defense.  But other than that, it

9   falls in the same category.

10       (Pause in the proceedings.)

11          THE COURT:  Mr. Ellis, are you okay with the April

12  30th order with respect to this case?

13          MR. ELLIS:  Your Honor, if you -- can you just

14  remind me what that order is, --

15          THE COURT:  Yeah.  So --

16          MR. ELLIS:  -- Your Honor?  I'm sorry.  I --

17          THE COURT:  -- the stay will lift on the earlier

18  of the confirmation, the effective date of the plan,

19  conversion, dismissal, or April 30th.

20          MR. ELLIS:  Yes, Your Honor.

21          THE COURT:  Okay.  So we'll go back to Docket

22  Number 504 and we'll enter the April 30th order.  All right.

23          Next matter on the agenda is Kyse Monk, a minor,

24  and the guardian, Kandi Stewart, Docket Number 265.  Could

25  you hit five, star?

1          Mr. Spearman, is that your client?  No, you're

2    294.

3          Mr. Lucy, is that your client?

4          MR. LUCY:  (No audible response.)

5          THE COURT:  No.  All right, Mr. Kapp.

6          MR. KAPP:  Your Honor, we heard this on January

7    14th.  This is a suit against Debtor Wellpath and implicates

8    the '21, '22 policies which require us to cover the first

9    million in defense and damages.

10          CFMG is also a Defendant, and we have an

11    obligation to indemnify under Section 7.1 of that agreement.

12    So we -- this is another candidate if we wanted to enter an

13    order extending the -- through those four conditions through

14    April 30th.

15          THE COURT:  All right.  So with respect to Docket

16    Number 265, I'll go ahead and extend it to 4/30.

17          Next matter is Tangela Harris, special

18    administrator of the Estate of Kevin Shelton, Docket

19    Number 281.

20          MS. VIRDEN MALLET:  Yes, Your Honor.  This is

21    Jessica Virden Mallett for the Plaintiff Tangela Harris.

22          THE COURT:  All right.

23          MS. VIRDEN MALLETT:  Sorry.

24          THE COURT:  Go ahead.

25          MS. VIRDEN MALLET:  Yes.  I think Debtors'

1  counsel's representation that all these matters were heard

2  on the 14th is a bit inaccurate.  I was out of the country

3  and it was set to be heard on the 21st and got moved to

4  today, so I have not been heard yet.

5          I've been listening and reading all this stuff.

6  But basically under -- I did not sign an NDA so I do not

7  have copies of the policy because, as I pointed out, under

8  Arkansas law, we were entitled to any insurance contracts

9  that cover our claim.

10          This case was filed long before the bankruptcy

11  case was filed.  I should have been given these documents

12  then.

13          What I received was a Declarations Page from

14  ProAssurance stating there was $3 million in coverage.  As

15  I'm reading the pleadings and listening to counsel, it

16  appears that this is not the case.

17          However, I would request the insurance documents

18  just be provided to me not pursuant to an NDA as I should

19  have gotten them years ago anyway under Arkansas Rule of

20  Civil Procedure 26.  So that was my first request.

21          And then I also wanted to clarify that since I

22  don't have these, that the $3 million dec Page I received is

23  not a real Declarations page.  There is not actually $3

24  million in coverage.

25          THE COURT:  All right.  Thank you.

1          MR. KAPP:  Your Honor, a couple things.

2          First of all, counsel's absolutely correct.  We

3     did agree to continue this.  That was my mistake, so I

4     apologize.

5          We -- you heard it, Your Honor.  We were directed

6     to provide those -- the applicable documents under an NDA.

7     I can't speak to what happened in the underlying litigation.

8     I know what I've been asked to do here, and that's what we

9     offered.  It was declined.

10         I would note that this case is against Debtor

11    Wellpath, six of Debtor -- the Debtors' employees, as well

12    as Arkansas Department of Correction, of whom we have an

13    obligation to indemnify.

14         So we're happy to enter into an NDA and provide

15    the insurance.  But if there is not an agreement to do that

16    we would say that that motion should be denied or we should

17    extend the stay under the April 30th order.

18         THE COURT:  All right.  So I think you need to

19    have a discussion with counsel as to the contours of the

20    Arkansas Rule of Civil Procedure, if that provides

21    sufficient protection for the Debtors in terms of the

22    confidentiality of the orders.

23         So what I'm going to do is I'm going to go ahead

24    and continue this until the March 18th date.  And I want to

25    make sure that before we have a full-blown hearing on this

1    that this is not a situation where everyone does not have

2    the same level of information.

3           And if I need to decide whether, you know, the

4    insurance policy should be produced without an NDA, I can

5    hear that.

6           But I understand the position that the parties

7    have taken that -- I mean, we're in Bankruptcy Court now so

8    generally speaking you would have an NDA, regardless of what

9    the underlying case may have brought.

10          But to the extent that, you know, Arkansas Rule

11   Civil Procedure 26 provides sufficient protections, I don't

12   have a real problem using that in lieu of an NDA.  So I'm

13   going to go ahead and continue Docket Number 281 to the

14   March 18th date.

15          MS. VIRDEN MALLETT:  And, Your Honor, I guess --

16   may I ask a question?

17          THE COURT:  Yes.

18          MS. VIRDEN MALLETT:  I guess what I'm having

19   trouble understanding is why they're entitled to an NDA.  I

20   mean, I understand that we're in Bankruptcy Court now.  But

21   the only reason I found out that I did not have the correct

22   policy is because of their filings in this case.

23          And so it's the same person, it's the same entity

24   that should have provided it in 2021, and they failed to do

25   so.  The Arkansas Rules of Civil Procedures don't have

1  confidentiality protections.

2         It says the contents of a policy shall be

3  provided.  And that didn't happen.  And I know we can have a

4  -- move it to the 18th, and that's fine.  I'm just trying to

5  get clarification as to the need for protection seeing as,

6  you know, --

7         THE COURT:  Yeah.

8         MS. VIRDEN MALLETT:  -- essentially my -- mine is

9  also a wrongful death case for failure to provide medical

10 care, which it appears that there are many, many claimants

11 that have the same issue, except that my issue is I'm not

12 getting the policy to review because they didn't give it to

13 me when they were supposed to.  Now they're trying to hide

14 behind the confidentiality bankruptcy provision.

15        THE COURT:  Well, I mean, there is -- the person

16 you were dealing with prepetition was the Debtor, and now

17 you're dealing with the Debtor-in-possession.

18        And there is case law which says that the Debtor-

19 in-possession is different than the Debtor, and the Debtor-

20 in-possession has to protect all of its interests.

21        To the extent the stay is lifted in the future,

22 then, you know, and you go back to State Court, then

23 obviously the State Court rules would apply.

24        But to the extent that we're talking about the

25 Debtor-in-possession in this Court, it's not just the

1    Debtors, the prepetition Debtors' interest that I'm

2    protecting but I'm protecting the interest of all the other

3    creditors.  So that's part of the reason why we look at

4    these confidentiality provisions.

5            But obviously have a discussion with counsel and

6    see if you can agree on it.  And maybe you could do

7    something temporal where -- that the -- once the stay is

8    lifted, the NDA goes away, if in fact you're required to --

9    they're required to produce it under Arkansas law.

10           But I'm not -- I -- the Debtor-in-possession is a

11   different entity than the prepetition Debtor that you were

12   dealing with in the case before.

13           MS. VIRDEN MALLETT:  Okay.  I mean, the -- yeah,

14   and I guess that's the problem with your stay in place that

15   I can't file it to actually get it in State Court.  But I

16   guess I'll work with them and we'll continue it to the 18th.

17           THE COURT:  All right.  Thank you, ma'am.

18           All right.  Next matter is --

19           MS. VIRDEN MALLETT:  All right.  Thank you.

20           THE COURT:  -- 294, Kenneth Evans and Kenya Evans.

21   Mr. Spearman, could you hit five, star?  Okay, there you go.

22           MR. SPEARMAN:  Can you hear me?

23           THE COURT:  I can hear you, sir.

24           MR. SPEARMAN:  All right.  Good afternoon.

25           Yes, sir, I know we're here from the continued

1    January 14th.  I've supplied the movants' personal injury

2    counsel with the insurance policies.  They've reviewed them.

3          I haven't -- they haven't given me anything new to

4    follow up with about them.  I guess they wanted something

5    definitive probably from I guess your Court first before

6    they have me do anything else.

7          But it was a wrongful death claim as well as a

8    1983 claim for inadequate medical care against not only the

9    Debtors but a few other probably medical facilities, and

10   other people as well.

11         THE COURT:  Mr. Kapp.

12         MR. KAPP:  Well, Your Honor, first of all, we're

13   worried -- the NDA provided that this should not be shared

14   with Plaintiff's counsel and only used for bankruptcy

15   purposes.  So I'm worried that right there we have a

16   violation of the NDA.

17         But moving on, arguments still apply.  This is a

18   case against the Debtor and its employees.  The 2022, 2023

19   policies are impacted, which is $8 million before third-

20   party insurance is available.

21         There is also an agreement with Lake County to

22   indemnify.

23         As before, we did state that there's another -- a

24   couple other parties, Armor Correctional Health and a

25   hospital in Illinois that we do not believe the stay applies

1    to.

2            But with respect to the Debtors, the Debtors'

3    employees, and Lake County, we believe that this motion

4    should be denied.

5            THE COURT:  Mr. Spearman.

6            MR. SPEARMAN:  Yes, Your Honor.

7            Hearing the, you know, discussions about the

8    insurance policy today and, you know, not only was there the

9    umbrella policy here but the -- I believe the frontloading

10   policy as well, just from what we're hearing today, if there

11   is any type of update to that as far as like a bond or

12   collateralized agreements regarding that, we initially

13   sought adequate protection in our motion, and we just want

14   to make sure that we are adequately protected on that end

15   to, you know, if anything be continued or just can go set,

16   you know, order with April 30th, whichever the Court

17   presumes is the proper course of action to employ.

18           THE COURT:  All right.  So, you know, I'm happy to

19   do either one, move this to March 18th if you're going to

20   have new arguments or --

21           MR. SPEARMAN:  I'd rather not.

22           THE COURT:  Okay.

23           MR. SPEARMAN:  Yeah, I mean, you know, we've been

24   here two hours or so --

25           THE COURT:  April 30th.

1          MR. KAPP:  I don't think there's anything new,

2   Your Honor.

3          THE COURT:  Okay.  So we'll do the April 30th

4   order.

5          MR. SPEARMAN:  All right.  Thank you, Your Honor.

6          THE COURT:  All right.  Thank you, sir.

7          So that's on Docket Number 294.

8          All right.  Next matter is --

9          MR. KAPP:  We -- now we've done a couple.  We did

10  Slater, --

11         THE COURT:  Right.

12         MR. KAPP:  -- and we did Bradley.  So by my notes,

13  Your Honor, we go to "G," Henderson.

14         THE COURT:  Okay.  What did we do with Bradley?

15         MR. KAPP:  What did we do with Bradley?

16         THE COURT:  Because Mr. Bradley was on the phone

17  at the corrections hearing.

18         MR. KAPP:  It was his Court-appointed counsel.  We

19  already argued them in -- oh, she said she's going to file a

20  lift stay motion.  So --

21         THE COURT:  So we have --

22         MR. KAPP:  So I don't know if there's something

23  that --

24         THE COURT:  Okay.  So we did Crawford also?

25         MR. KAPP:  Yes.  Crawford is continued.  So I

1  believe it's just Henderson.

2          THE COURT:  All right.  So next matter is motion

3  to lift stay by Arthur Lamont Henderson, Docket Number 372.

4  Anyone here on Docket 372?

5      (No audible response.)

6          MR. KAPP:  I show that this was carried to

7  February 18, so I'm not sure we've had movant appear.

8          But this is -- it's a case against the Debtor.

9  It's the 2023, '24 policies are implicated with the $15

10  million obligation before third-party insurance is

11  applicable.

12          There is also the -- this is the issue, if you

13  remember, Your Honor, with Dr. Hrbek and 50 -- being

14  responsible for 50 percent of his legal expenses.

15          THE COURT:  Right.

16          MR. KAPP:  And as the policy was issued under

17  Pennsylvania Professional Liability.  And he had a service

18  issue and the claim agent confirmed that he had -- was on

19  the service list.  I don't know if -- so that's all I know

20  here.

21          THE COURT:  All right.  So let's go ahead and

22  continue it to March 18 --

23          MALE SPEAKER:  Your Honor, I can clarify --

24          THE COURT:  Yes.

25          MALE SPEAKER:  -- from last time, it was continued

1   on my request just because I had spoken to Mr. Henderson

2   once and confirmed that he was a pro se incarcerated

3   individual.  So --

4           THE COURT:  All right.

5           MALE SPEAKER:  -- it wasn't taken up --

6           THE COURT:  All right.  So let's continue it to

7   March 18th, and then we'll enter the -- if need be, we'll

8   enter the order.

9           MR. KAPP:  All right, Your Honor.  And I believe

10  that is it for continued.  And then that would take us to

11  miscellaneous.

12          THE COURT:  Okay.

13          MR. KAPP:  And, Your Honor, just to move it --

14  I'll read through this in order.

15          First one is Mr. Leonard, emergency motion to

16  continue.  He asked to delay the final hearing on the lift

17  stay motions for three months because he's missed hearing

18  dates due to delayed notice, and he's not allowed access to

19  videoconferencing.

20          On January 15th, Mr. Leonard was added to the

21  master service list.  He's also been sent a proof of claim

22  form.

23          And then on January 22nd, he was sent -- he

24  requested a financial affidavit of indigency form to waive

25  filing fees, and the Debtors sent him that form.  And

1    there'll be -- he has some other things he's filed later on

2    here.

3              With respect to the next on the Docket, Christina

4    -- I'll let you pronounce it before I do.

5              THE COURT:  De Rossitte.

6              MR. KAPP:  See, I would slaughter it.

7              She sought injunctive relief to permit herself and

8    other incarcerated people to attend the January 14th

9    hearing, which has already passed.  Another claim that they

10   are not being permitted at their facility to

11   videoconferencing.

12             On January 15th the movant's new address was added

13   to the master service list and she was sent a proof of

14   claim.

15             She also made a claim that pro se individuals may

16   be seeking relief for medical-related issues and not

17   monetary damages.  As this Court knows, the Debtor will

18   continue to evaluate those claims and file notices that the

19   stay does not apply to immediate medical treatment being

20   sought as those situation arise.

21             Next is Sylvester Barbee motion for default

22   judgment, seeks entry of a default judgment against

23   Wellpath.

24             On January 17th, Mr. Barbee was added to the

25   master service list and he was sent a proof of claim.

1          With respect to Billy Culbertson's affidavit re
2    lawsuits, the affidavit states that CCS, now Wellpath, has
3    engaged in cruel and unusual punishment and failed to
4    provide medical services.  He seeks to file a proof of
5    claim.
6          On January 17th, Mr. Culbertson was added to the
7    master service list.  And a lot of these, Your Honor, have
8    addresses different than what we originally had.  So this
9    address has been added and he was sent a proof of claim
10   form.
11         Then we have additional letters filed by
12   Mr. Leonard and a letter, Docket 1006, and then a motion --
13   another objection and motion and request for Debtors to pay,
14   compensate creditor, Docket 1146.
15         Again he asserts he's not been able to access the
16   hearings and he has requested representation.  He seeks
17   compensation for medical care denied to him while he was
18   incarcerated.  He has not filed suit.
19         And he further objects to the Debtors having their
20   debt discharged through the bankruptcy.
21         As I mentioned before, on January 15th Mr. Leonard
22   was added to the master service list and sent a proof of
23   claim.  And we also sent him the indigency form that he
24   requested.
25         Docket 1149 -- I think I'm still -- yeah, Byron

1  Wallace letter.  He has not been permitted to attend

2  hearings by audio/video, and he has received late notices.

3         We have confirmed that he has been added to the

4  master service list, and he was sent a proof of claim on

5  January 24.

6         All right.  And now we go to the objection of Cobb

7  County to the Henrietta Smith stay stipulation.  The Debtors

8  -- we -- Cobb County objected at Docket 1215.  Smith filed a

9  reply in support of the stipulation in Docket 1371.

10         Your Honor, the Debtors assert that they owe no

11  indemnification to the Cobb County Defendants with respect

12  to this matter.

13         And one confusion we've had, Your Honor, is you've

14  heard a lot of the same Defendants over and over.  And so a

15  lot of confusion is one Defendant say Cobb County is

16  mentioned with respect to something and we enter into

17  something in one matter but not in another.

18         And it's a fact-by-fact analysis.  And as we've

19  gone through this, the facts are different in every one of

20  these cases.  And we've done our best to try to figure out

21  what the stay applies to and what doesn't.

22         Here, we believe the indemnity obligations does

23  not include -- the indemnity here to Cobb County

24  specifically provides that the obligation does not include

25  liabilities caused by or resulting from the acts or

1  omissions of the indemnified parties, which would be Cobb

2  County.

3           And, therefore, we believe that the claims based

4  on the acts and omissions of Cobb County Defendants did not

5  implicate the Debtors' indemnification obligations, and that

6  is why we agreed to enter into the stipulation.

7           I know that both Cobb County and Smith are

8  represented here, and I will cede the podium.

9           MR. PROSTOK:  Thank you, Your Honor.  May I

10 proceed?

11          THE COURT:  Yes, go ahead.

12          MR. SHANNON:  Okay.

13          THE COURT:  All right.  Yeah.

14          MR. SHANNON:  You know, Judge I am here on behalf

15 of Henrietta Smith and Nickeil Bethea-Smith.  Those are the

16 actual claimants.

17          One thing I think at this point it makes sense to

18 dispute really clear, these Plaintiffs objected to the

19 extension of the stay in total.

20          What this stipulation and agreed order, what it

21 really is, is an agreement that resolves their objection.

22 It resolved a lot of other objections as well.  This is one

23 of them.

24          So at least in my view, at least to start off

25 with, Judge -- and we'll get into -- I would like the

1  opportunity to talk about why I agree with the Debtor that

2  the stipulation -- or that the -- that there is no indemnity

3  obligation and address some of the arguments that I believe

4  Cobb County are going to raise.

5         But it's important to remember what this is, that

6  it's not a request for new relief.  It is a limitation on

7  the relief that the Debtors are otherwise seeking.

8         Unless Cobb County can come in here and say, no,

9  Judge, you have to extend the stay to these Cobb County

10  Defendants -- it's actually not Cobb County and it's not the

11  sheriff's office, it's employees of them.

12         But unless you have no discretion to do anything

13  else, then Cobb County doesn't have a basis to come in and

14  say, no, Judge, you have to extend that to them.  And not

15  only do you have to do it, you have to do it without a

16  motion by someone who's seeking that.

17         Cobb County has not filed the motion for this.

18  They have not filed an adversary proceeding.  They've not

19  done any of that.

20         And so we can get into, you know, the actual

21  factual basis, the arguments raised by Cobb County.  But I

22  don't think we need to.

23         If we do, I have Mr. Wingo Smith here.  He is one

24  of the attorneys in the underlying lawsuit.  He can give you

25  some insight into what those allegations are.  But, again,

1    Judge, I don't think we even need to get there.

2            THE COURT:  All right.  Mr. Prostok.

3            MR. PROSTOK:  Thank you, Your Honor.

4            This is an objection to a proposed stipulation

5    that would have modified the automatic stay as to our

6    client, Cobb County.

7            The Court's January 14th order continued the stay

8    for claims and causes of action against the Debtors' current

9    clients and customers or their current or former employees.

10           The Cobb County Sheriff is a current client,

11   customer of the Debtors because of an agreement for inmate

12   medical care at the Cobb County Adult Detention Center.

13           And, Your Honor, our Exhibit 1 is an excerpt of

14   the agreement showing the provisions that are relevant to

15   today's hearing.  I'd move to admit that exhibit, Your

16   Honor.

17           THE COURT:  All right.  Does anyone object to the

18   admission of Exhibit Number 1, which is the Cobb County --

19           MR. SHANNON:  Your Honor, if we are going to get

20   into evidence, then I'd like to present evidence as well.

21   But no objection on that.

22           THE COURT:  Okay.

23           MR. PROSTOK:  Thank you, Your Honor.

24           So the January order that continued the stay in

25   place for claims against the sheriff where the employees in

314

1  litigation where they're Co-Defendants with the DIP, the

2  stipulation would have changed that.

3         And the proposed stipulation would have modified

4  the stay to allow the litigation to go forward against non-

5  Debtor Co-Defendant in 28 lawsuits where the Plaintiffs were

6  represented by Mr. Shannon's firm.

7         One of those lawsuits is the *Smith v. Bains, et*

8  *al*, which is the lawsuit in the U.S. District Court,

9  Northern District of Georgia, against Wellpath, three

10 Wellpath employees, and six employees of the Cobb County

11 Sheriff.

12        The stipulation would have allowed the Plaintiff

13 to proceed against the sheriff's employees but keep the stay

14 in place as to Wellpath employees.  And we filed a limited

15 objection to the stipulation only as it relates to the Smith

16 lawsuit.

17        Your Honor, the crux of our objection is this.

18 The Debtors' decision to enter into the stipulation at least

19 as to Smith litigation is not in the best interest of this

20 estate.

21        And by agreeing to let the Smith Plaintiffs

22 proceed against the sheriff and his employees, the Debtors

23 are exposing their estates to risk and liability for

24 indemnity claims.

25        In the medical agreement, Exhibit 1, Wellpath is

1   under a duty to indemnify the county, the sheriff, and their

2   employees from losses due to negligence, recklessness, or

3   intentionally wrongful conduct by Wellpath or its employees.

4           And, Your Honor, I'd like to move to admit three

5   more exhibits.  It's Cobb County Exhibit 2, which is a copy

6   of the Docket in the Smith lawsuit retrieved through PACER

7   system on January 30th, '25.

8           Exhibit 3 is a copy of the complaint filed in the

9   Smith lawsuit.

10          And Exhibit 4 is a copy of the District Court's

11  order staying discovery pending resolution of the

12  Defendants' motion to dismiss.  And I'd move to admit those

13  three exhibits.

14          THE COURT:  Any objection?

15          MR. SHANNON:  No objection, Your Honor.  I still

16  think it is a little odd that Cobb County is presenting

17  evidence first on this, then -- unless they're now saying

18  they're movant.  But no objection to the admission.

19          THE COURT:  Well, --

20          MR. PROSTOK:  Your Honor, as the Court can see

21  from the complaint, the Smith Plaintiffs have alleged quite

22  a number of instances of wrongful conduct by Wellpath's

23  employees.

24          It includes Wellpath abruptly stopped Ms. Smith's

25  psychiatric medications and failed to prescribe her new,

1 appropriate medication; Wellpath neglected to place her on

2 constant watch, though she was alleged to be acutely

3 suicidal; and Wellpath failed to issue a medical order that

4 she could not have mesh underwear.

5          The Smith Plaintiffs have alleged that these acts

6 or omissions by Wellpath employees caused or contributed to

7 the death of Ms. Smith.

8          THE COURT:  Mr. Prostok, let me -- Mr. Genender

9 wants to make an objection.

10         MR. GENENDER:  Not an objection to the admission

11 but the complaint is being offered I understand from notice

12 of what the claims are not for the truth, and that's how

13 it's being received.

14         THE COURT:  All right.

15         MR. PROSTOK:  Absolutely.  That's --

16         THE COURT:  But I think if we're going to have an

17 evidentiary hearing on this then we need to move it to a

18 different point.

19         I understand kind of what the issue is here.  And

20 in my mind, the real question is, is there an indemnity or

21 not.  And, you know, that's what we should determine because

22 if there isn't an indemnity, then I think that --

23         MR. KAPP:  Your Honor, with all due respect,

24 counsel is complicating this issue.  A couple of things.

25         Number one, there is an order.  But, as you know,

1  the stay applies to the Debtors and the Debtors can seek the

2  relief.  So that's what we've done here and we -- what we've

3  filed.  So that's a complete red herring.

4         Number two, the stipulation he's talking about as

5  to the Debtor, the stipulation does not allow any litigation

6  to go forward as to the Debtor.  So all of that is a

7  distraction.  The stipulation has that objection go away and

8  the stay applies as to the Debtor and Debtors' employees.

9         The stipulation applied as to Cobb County.  We do

10  not dispute that there is an indemnification agreement.

11  We've set that forth.

12         However, as I said, and I'll repeat again, claims

13  based on the acts and omission of Cobb County Defendants do

14  not implicate the Debtors' indemnification obligations.

15         For an example -- and this is not evidence, it's

16  just Count One -- and I was hoping not to go into Count One.

17  But Count One alleges the county Defendants Kelly and

18  another employee were informed during shift changes that

19  Ms. Smith had attempted to commit suicide by using mesh

20  underwear, and that under no circumstances should Ms. Smith

21  be allowed to possess mesh underwear.

22         That does not involve the Debtor, Your Honor.

23         Claim two, Count Two alleges Defendants Kelly and

24  Keith's failure to follow these directives constituted a

25  negligent breach of administerial duty imposed upon them in

1    violation of Georgia state law.

2          Again, that does not impact medical care.

3          Three, Defendant county failed to perform the

4    required wellness check which constituted a negligent breach

5    of administerial duty imposed upon them in violation of

6    Georgia state law.

7          It does not -- so we don't do this willy-nilly,

8    Your Honor.

9          So we did agree to the stipulation, if we have to

10   go into this.  But the complaint is the complaint.

11         MR. PROSTOK:  Your Honor, may I --

12         THE COURT:  Yeah.

13         MR. PROSTOK:  -- proceed, Your Honor?  And I'll

14   try to get to your concern, Your Honor, because that -- I

15   think I know where the Court's going.

16         But, I mean, the directives with respect to

17   whether or not mesh underwear should have been provided was

18   under the direct control of Wellpath.

19         They were the ones that filled out the forms to

20   determine whether or not the Plaintiff should have had mesh

21   underwear or not, and they failed to do so.  So, I mean,

22   it's interrelated.

23         But let's talk about this indemnity, Your Honor,

24   if that's what the Court's concerned about.  And I think

25   that's really what turns our position and why our position

1   is correct.  If the Debtors had made their own assessment of

2   the indemnity risk in connection with the Smith, I mean,

3   they owe it to the creditors and this Court to show them the

4   work.

5          I mean, and let me explain.  Debtors haven't

6   provided any fact-based analysis.

7          They've offered in a conclusory statement in their

8   omnibus reply to our objection to the stay motions that the

9   Debtors owe no indemnification obligations to Cobb County or

10  its employees in connection with the Henrietta Smith case,

11  and that the case should not be stayed as to such Defendant.

12         Well, their statement is really confusing, Your

13  Honor, because it conflicts with their conclusion on a

14  different lawsuit involving the exact same indemnity

15  provision.

16         I mean, two other sheriff's deputies are

17  Co-Defendants with Wellpath in a lawsuit by Jennifer O'Neal

18  and Adel Tillman Capes.  And the O'Neal lawsuit involves the

19  exact same indemnity language and the same medical care

20  agreement.

21         However, the Debtors reached an opposite

22  conclusion on those two lawsuits.  So, Your Honor, the

23  Debtors conclude there is an indemnity duty in O'Neal but

24  not in Smith, it makes no sense.

25         And Your Honor's words are -- you know, have

1  meaning.  And you said today, let's err on the side of not

2  making a mistake if there is an indemnity claim.

3            And, Your Honor, they -- there's nothing that the

4  Debtor could show that there is not a chance that indemnity

5  applies.  If it applies in these other cases, it has to

6  apply here, or at least there's a chance that it applies

7  here.

8            And if it does, you know, we've got two months,

9  you know, the April date which, you know, it basically puts

10 my clients on the same footing as every -- as, you know, as

11 the other Defendants.

12           I mean, it's just -- they're asking us to get

13 started with one arm tied behind our back, Your Honor.  It's

14 not fair, it's not going to be prejudicial to anybody to

15 start out at the same place, especially when there's an

16 indemnity issue.

17           And Your Honor has seen the insurance issues that

18 exist in this case and the problems, you know, that are out

19 there with respect to insurance.

20           So, Your Honor, we don't think that the Debtor has

21 met its burden to show that the settlement is a valid

22 exercise of its valid -- of its Debtors' business judgment.

23           Come up here and say, oh, there's no indemnity,

24 even though it's the same provision that they've been

25 relying on, seeking indemnity and stay protection throughout

1    this case.  That's not evidence -- or the fact that they've

2    shown the best business judgment with respect to these

3    issues.

4            And so, Your Honor, I have more but I realize the

5    time's late and that you've heard a lot today.

6            But I would say that they certainly -- at the very

7    least, if the Court's inclined to modify the -- to stay the

8    sheriff's employees, we'd ask the Court to modify the stay

9    to allow the sheriff's employees to take discovery of

10   Wellpath and its employees as well, Your Honor, because

11   these facts are interrelated.

12           These allegations are with respect to the Wellpath

13   employees are also the same allegations that are with

14   respect to our employees.

15           And I ask the Court to look at the complaint and

16   look at what's been alleged with respect to Wellpath versus

17   what's been alleged as to the Cobb deputies.

18           And I think the Court will come to the same

19   conclusion that we did, that they're intertwined

20   allegations.  They're not distinct in any manner.

21           And that the stay for another couple months to

22   avoid the unfairness and allow for a level playing field

23   makes sense under these circumstances, and is completely

24   consistent with all of the relief that this Debtor has

25   sought before this Court in these other cases.  Thank you,

1  Your Honor.

2          THE COURT:  All right.  Before you -- Mr. Shannon.

3          Mr. Kapp, are you okay with allowing them to

4  proceed?  I thought I read someplace that you said you were

5  okay with allowing them to proceed with discovery to the

6  extent that they need it in connection if I --

7          MR. KAPP:  Well, yes, Your Honor.

8          THE COURT:  All right.  Mr. Shannon.

9          MR. SHANNON:  Your Honor, if that resolves it,

10  it's fine with me obviously, right?  We would love to have

11  relief from stay against the Debtors if they would agree to

12  it.  They won't.

13          I want to go back to what I said.  And I'll -- if

14  this isn't the time for an evidentiary hearing, then I won't

15  have Mr. Smith testify.

16          But what he would testify to is that there --

17  these are different claims.  I break it down in the reply.

18  It is filed at Docket Number 1371.  And I break it down

19  claim-by-claim what the allegations are, who it's against.

20  There is no overlap.  If you read the complaint, that is the

21  case.

22          As far as my Witness and Exhibit List, we did have

23  agreements that our exhibits could be admitted.  I think

24  there's going to be some overlap.  They're at Docket 1376.

25  Judge, right now I would just move for the admission of

1  1376-1 through three; only three documents, and two of them

2  are overlapping.

3          THE COURT:  All right.  Any objection to the

4  admission of documents 137-1 through three?

5          MALE SPEAKER:  Is one of them the complaint?

6          MR. SHANNON:  And one of them is the complaint,

7  and same understanding.

8          THE COURT:  All right.  They'll be admitted.

9      (ECF 137-1, 137-2, and 137-3 received in evidence.)

10         MR. SHANNON:  There is one thing that -- well,

11 again, I want to reiterate this -- the idea that, again, if

12 this stipulation was not entered, then I could -- we could

13 agree with the Debtors in a couple minutes, that as we get

14 into this stay extension motion, which the Smith Plaintiffs

15 oppose and which I'm going to have to drastically expand my

16 arguments about if this stipulation is not agreed, we could

17 agree in that order granting it this exact relief in the

18 stipulation agreed order.  And it would be the exact same

19 thing.

20         And so that reality is what we are here about,

21 whether there can be a limitation on the relief sought by

22 the Debtors with that stay extension motion.

23         As I've talked about before, that is an extreme

24 relief, right.  It is exceptional relief to extend the

25 automatic stay beyond what it says in the Bankruptcy Code.

1          You can only do that if it's the Debtors asking

2    because the Debtors are the ones protected by the automatic

3    stay.

4          It's not other creditors, it's not other, you

5    know, customers of the Debtor.  Maybe you can extend it to

6    them but only if the Debtors ask, only if it's to protect

7    the Debtors, only if it's to protect the estate.

8          And they are the parties with standing to ask you

9    for that.  It's not the Co-Defendants who get the lucky

10   break by having the stay extended to them.  They just get

11   lucky there.

12         Compound he's asking you to not do what the

13   Debtors want and basically force them to request relief they

14   no longer are asking for.  And they don't have standing to

15   do that.  They're not the parties protected by the automatic

16   stay.

17         As far as the indemnity, Judge, the indemnity

18   language, it is very clear what is not included in that

19   indemnity language.  I've quoted it in the reply and -- on

20   pages 14 and 15, and I've bolded what was not put in by Cobb

21   County.

22         The language that was not put in by Cobb County

23   is, this indemnity obligation does not include liabilities

24   caused by or resulting from the acts or omissions of an --

25   of indemnified parties or any of them.  So acts or omissions

1   of Cobb County are not covered under the indemnity.

2           What's going to be happening under the stipulation

3   and agreed order is that the Smith Plaintiffs can pursue

4   their causes of action against the Cobb County Defendants.

5           Again, not Cobb County because they're not

6   actually a Defendant in the case, it's their employees.  But

7   they can pursue those claims.  And each of those claims are

8   based on the acts and omissions of those particular people.

9   There is an expressed -- there is expressed language in the

10  indemnity saying this is not indemnified.  These allegations

11  are not indemnified.

12          You know, I don't want to get into it more than I

13  have to, Judge, because it's one of those arguments that I

14  won't have to make if this stipulation and agreed order is

15  approved.

16          But look, I disagree with the Debtors' position

17  and maybe her position and Cobb County's position about what

18  needs to be shown to extend the automatic stay with respect

19  to indemnity.  You know, I don't think age robins over is

20  the law in the Fifth Circuit.  It's never been cited by the

21  Fifth Circuit.

22          But we can disagree on that, but part of the

23  stipulation and agreed order is taking that out of the

24  equation, at least as far as the Smith Plaintiffs go.

25          Same thing with the insurance that was brought up

1   by Cobb County.  And I think we heard it today -- earlier

2   today.  When I listened to them on January 14th, my

3   understanding of what was said was that, hey, if there's a

4   claim against the insurance, no one paid it.

5            The Debtors' don't -- you know, only the Debtors

6   would pay it.  And I asked if the Debtors don't pay it what

7   happens?  Nobody.

8            The Debtors don't have to pay insurance claims

9   made by co-insurers.  The automatic stay already stops that.

10  Again, not any basis, I don't think to extend the stay at

11  all.  But even if that's disputed and the Debtors do not

12  agree with me on that, we'd have to argue it out.  We won't

13  have to argue it out based on the stipulation and agreed

14  order.

15           The last thing, Judge, Cobb County -- one of their

16  exhibits shows that there was already an administrative stay

17  pending -- a stay of discovery pending a resolution of a

18  motion to dismiss.

19           You lift the stay here, what you're doing is

20  letting that -- things get started in Cobb County.  They

21  can -- or in the Northern District of Georgia.  The District

22  Court can decide that issue.  But it's not just going to all

23  of a sudden discovery is now due by Cobb County.  It's going

24  to allow the, you know, that district court judge to get the

25  ball moving on it.

1          And that matters to my client because they're

2    worried about information being lost, all that.  But it is

3    not an immediate, you know, Cobb County is going to have to

4    start responding to discovery.

5          So I don't think there's any prejudice at Cobb

6    County, right.  If there is, they're free to seek relief

7    from the automatic stay themselves.  They can come in --

8    they can probably get in here on March 18th if they want.

9    Or they can just wait another one.  But again there's no

10   reason to not grant the stipulation and agreed order.  Thank

11   you, Your Honor.

12          THE COURT:  All right, anything further?

13          MR. PROSTOK:  May I just offer briefly, Your

14   Honor?

15          THE COURT:  Yes.

16          MR. PROSTOK:  Thank you.  We're asking for a stay

17   of claims until April 30th.   A little over two months.  The

18   Court has a discretion to extend the stay to non-Debtors.

19          The Court exercised that discretion most recently

20   in your January 14th order.  And we think the Court was

21   right to do so in an instances where there's an indemnity

22   right with Cobb County Sheriff and its employees.

23          The Debtors made a showing at that January 14th

24   hearing that it was in the best interest of the estate to do

25   so.  When the Debtors revealed that they're essentially self

1  insured up to high dollar threshold for claims, that the

2  impact that the indemnity claim could have on the Debtors'

3  estates can be, obviously, significant.

4        But both stipulations will be objected to the

5  Debtors fifth Plaintiff, we're asking the Court to reverse

6  the exercise of that discretion without any showing that

7  reversed the exercise of discretion is in the best interest

8  of the estate.

9        Error on the side of not making a mistake if there

10  is an indemnity claim.  And that's where we are here, Your

11  Honor.

12        Fifth Plaintiff say that Cobb County is only

13  entitlement to an extension -- from a stay is a job the

14  Debtors speak to the estate.  That's true as far as it goes.

15  But the cases make it clear the fairness to other parties is

16  an important consideration in deciding whether to modify the

17  automatic stay to let litigation proceed or not.

18        It would be profoundly unfair, Your Honor, to

19  leave the Sheriff's employees to face litigation alone

20  without participation of Wellpath and its employees who are

21  clearly necessary parties in the litigation.

22        If the Court decides to reverse its discretion,

23  decide to allow litigation to proceed, then the Court should

24  also modify the stay as to the Debtors employees.  At a very

25  minimum modify the stay to allow the employees -- Sheriff's

1   employees to take discovery of Wellpath.

2          But Your Honor the Smith parties dispute to

3   sheriff's indemnity rights.  The truth is, there may be

4   indemnity rights with respect to some causes of action and

5   not have it or some fact pattern and not others.

6          But we don't know.  The litigation is in the very

7   early stage.  If there's no discovery, is all that clear

8   where responsibility falls.  If any of the Defendants are

9   responsible between the sheriff's employees on one side,

10  Wellpath and its employees on the other side.

11         And that's why the sheriff's employees have to be

12  able to conduct discovery if the litigation proceeds.  But,

13  Your Honor, we're talking two months.  You got it right the

14  first time.  It's in the best interest of the estate to be

15  cautious and because of the indemnity exposure, this estate

16  is best served by keeping the stay in place until all the

17  (indiscernible) in the litigation, especially under these

18  circumstances for such a short period of time.

19         Thank you, Your Honor.

20         THE COURT:  Thank you.  Mr. --

21         MR. KAPP:  Your Honor, Jay Kapp, on behalf of the

22  Debtors.  Both counsel got a little bit off track on the

23  stay extension arguments.  And I think Your Honor actually

24  summed up the issue about 15 minutes ago with the -- the

25  question is whether the indemnification obligations apply to

1    Cobb County in this situation and whether the Court has the

2    appetite to entertain that analogy.

3              So if the Court does not want to do that, it

4    should probably be stayed.  If the Court does, then we

5    should go and take a look at it.

6              We looked at it.  And we've tried to be, out of an

7    abundance of caution, as this court knows -- but if that is

8    the court's concern, then that is the action the court

9    should take.

10             THE COURT:  Well, I do have that concern.  But,

11   the Debtor has made a business judgment that they don't want

12   to extend the stay with respect to this lawsuit.  I'm not

13   sure that I can substitute my judgment for the Debtors'

14   business judgment.

15             And Mr. Prostok can file a motion to lift stay and

16   I may very well grant it, but we're really talking about

17   a -- the Debtors' exercised its business judgment to bring

18   the matter the first time.

19             The issue seem to be hang on whether there is an

20   indemnity or there isn't an indemnity.  I don't know whether

21   there is or there isn't.  The Debtor thinks that there's not

22   and that's the exercise of their business judgment.

23             So I do think that to the extent that the Cobb

24   County needs to take discovery, that we should allow them to

25   do that and to the extent that Mr. Prostok wants to file a

1    motion to lift stay to have -- it be allowed to go forward

2    against the Debtor, then we'll hear that as well.

3           But I'm inclined to approve the stipulation with

4    the change to allow them to take discovery against the

5    Debtor.  And then Mr. Prostok if you file your motion to

6    lift stay, we'll hear it on the -- on March 18th and we'll

7    deal with it at that time.

8           MR. PROSTOK:  Thank you, Your Honor.

9           THE COURT:  All right, Mr. Lucy, you've been

10   waiting around for awhile.  Does that even matter?

11      (Pause in the proceedings.)

12          MR. LUCY:  No, Your Honor.  He drew the short

13   straw.

14          THE COURT:  Okay.  And I see Ms. Goodman is on the

15   line.

16          MR. LUCY:  I have a feeling they may still be

17   objectors to the stay extension.

18          THE COURT:  Oh, okay.  All right.

19          MR. LUCY:  And we're almost there, Your Honor.

20   Following up on miscellaneous.  There is Charles Talbert

21   document -- Docket 1266.

22          Notices related to the bankruptcy were mailed to

23   him in prison and have been returned to the Sender.  He sent

24   us a new address which we have added to the MSL and the

25   Debtors have also sent him a proof of claim.

1          We've also revised the master service list

2    information to add Court coding and service at the mailing

3    address.

4          THE COURT:  He's complained three or four times

5    that they haven't got the coding correct and that's a

6    concern of mine.

7          MR. LUCY:  We reached out to the noticing agent

8    and we think we've got it right, Your Honor.

9          THE COURT:  Ms. Goodman, do you want to be heard

10   on that?  Let me let you -- go ahead Ms. Goodman.

11         I think you maybe muted on your side.  Did you hit

12   five star?

13       (No audible response.)

14         THE COURT:  Here we go.  All right, you should be

15   unmuted.

16         MS. GOODMAN:  Thank you, Your Honor.  I know it's

17   hard this late in the day, but I did want to make sure I

18   called attention to 1266.

19         While I don't advocate for any individual in this

20   case, when I did note that mail had been returned from Epiq,

21   from DNC and from Mr. Helt, I reached out to the operations

22   team.  And the Debtor is in engaged on this and so I think

23   we need more time and Epiq is engaged.

24         But there is a policy -- policy statement 803 from

25   the Pennsylvania Department of Corrections that has been

1    provided to Epiq so the Debtors do have that.

2          If I read that policy, there are some problematic

3    things relative to how normal noticing procedures occur.

4    Just as an example, in the policy statement, they talk about

5    non-privileged mail being rejected if it's sent from a P.O.

6    box.

7          And if you notice on 1266, you know, Page 6, you

8    know, Epiq is sending things from a mail box.  It's also not

9    entirely clear to someone who doesn't function in this state

10   that BMC is coming from the Court.

11         So I just want you to know I'm engaged with the

12   ops team and the with the Debtors.  The Debtors have been

13   engaged.  I don't want to derail anything here since I'm

14   sure they don't want me to raise anything this late in the

15   day.

16         But maybe we can put a pin in, in trying to get

17   this resolved.  But it's raised a bigger issue to me making

18   sure that the policies don't exist in other institutions.  I

19   mean, I'm grateful that this gentleman sent copies of what

20   was going on.

21         But there's sort of a larger issue just to try to

22   make sure hearing notices and proof of claims, et cetera are

23   getting there through no fault of the Debtors.  This case

24   has been very different from me for sure as an ombudsman and

25   trying to chase down some of these issues.

1           But I just wanted you to know I'm engaged and I do

2    think there are some opportunities to make some changes.

3    But in fairness to Mr. Zander and everybody else who's

4    engaged with me, that has been done.

5           THE COURT:  Thank you.  Ms. Goodman.

6           MR. KAPP:  All right, Your Honor.  Then the

7    last -- then we move to Docket 1279.  Appointment for

8    counsel.  Mr. Magnus alleges to be a creditor Wellpath and

9    has received bankruptcy notice, which is (indiscernible)

10   counsel appointed to protect his rights.

11          On February 4th, we added Mr. Magnus to the master

12   service list and he was sent the proof of claim.

13          THE COURT:  I don't think I can appoint counsel.

14   I mean, there is a Committee that's functioning -- although

15   they don't represent any individual.  I think that's the

16   only power that I have.

17          MR. KAPP:  And then, Your Honor, the final three

18   items have all been addressed.  We've addressed the

19   (indiscernible) stipulation, the O'Neil stipulation has been

20   addressed and the Smith goes to the Cobb County stipulation.

21          Which would move us into stay extension motion, if

22   you would like to proceed.

23          THE COURT:  Yep, let's do that.

24          MR. KAPP:  Your Honor, after the January 14th unit

25   hearing, we reached out to counsel for objectors to the stay

1    extension and offered to apply (indiscernible) insurance to

2    customer agreements subject to confidentiality agreements.

3            Pursuant to the terms of the January 14th Stay

4    Extension order, which was agreed to consensually with the

5    creditor's Committee.  Any objections to entry of the final

6    order would be filed by 4:00 p.m. on February 7th.

7            Only one objection was filed by that deadline and

8    that was the objection of the Colorado Tort Plaintiffs

9    representing four separate lawsuits.  And we replied

10   separately to that.

11           But as we stated in our reply, to that objection

12   and consistent with comments made by this Court on the 14th,

13   this again really addresses the underlying merits of the

14   four individual cases as to what -- and really should be

15   addressed as motions for stay of relief.

16           If we need to get into the details, we've set it

17   forth in our reply and I can do so if I have to.  While we

18   incorporate -- so we believe that objection should be

19   overruled as it's an inappropriate stay motion.

20           There were no other objections that were filed by

21   the February 7th deadline.  Indeed, Your Honor, the Debtors

22   have made progress with resolving many of these objections

23   and stipulating the stay relief as to underlying lawsuits

24   where we could.

25           For example, although we just had Mr. Shannon up

1   here, the tort claimants objection represented 34 individual

2   all suits.  The Debtors are pleased to report that

3   stipulations have been entered or objections otherwise

4   resolved with respect to 32.  Not including the one we just

5   talked about.

6          So progress has been made.  In the January 14th

7   order, the Court extended the say as we've discussed as to

8   Debtors' -- the Debtors' current and former employees.  To

9   the extent the Debtors' are named Defendants in the lawsuit,

10  to the Debtors' directors and officers and to HIG, it's

11  directors, officers and employees.

12         And that stay was extended to the earlier of

13  effective date of the plan, dismissal of the cases or April

14  30th, 2025.

15         This morning, Your Honor, the Debtors' filed a

16  proposed order extending the stay for the remaining

17  categories of non-Debtor Defendants set forth in that

18  January 14th order, extending them to the same timeline.

19         Earlier plan effective date, the Smith's hold

20  their cases are April 30th.  These clearly defined

21  categories of non-Debtor Defendants are, category one,

22  professional corporations and their current or former

23  employees.

24         Your Honor, as demonstrated, the Debtors have both

25  insurance as well as indemnification obligations as to the

1  professional corporations creating the sufficient identity

2  of interest necessary to extend the stay to the professional

3  corporations under Fifth Circuit law.

4        And we know the professional corporations are a

5  material source of the Debtors operating revenue.

6        Category two is Debtors current or former

7  employees where the Debtors are not named in the underlying

8  lawsuit.

9        Again here it has been demonstrated these

10 employees are covered by the Debtors' insurance and the

11 Debtors cover these expenses when the underlying claims

12 relate to their performance of their duties.

13        This is a clear identity of interest where the

14 Debtors are the ultimate Defendant.  Moreover, Your Honor,

15 the mere fact the Debtor isn't a named Defendant doesn't

16 change these obligations in any way.

17        And it would leave a gapping hole in the stay

18 protection if folks could just sue employees, not name the

19 Debtors, avoid the stay and the Debtors estate incur the

20 cost of defense and the detriment of the estate to

21 stakeholders.

22        That can't be the correct result.  So we'd ask

23 that the stay be extended there as well.

24        Category three is current clients and customers.

25 As demonstrated, indemnification and tender obligations

1   create a clear identity of interest such that extending the

2   stay to such customers is justified.

3            In such situations, the Debtor is bound by

4   contract to honor these indemnity obligations -- which is

5   what was required by H. Robbins and it was adopted by

6   Reliance in the Fifth Circuit.

7            The Debtors have an absolute obligation to

8   indemnify within the parameter of such agreements.  There

9   are no outs.  The idea that the indemnity has to have no

10  conditions what so ever in order to constitute an

11  enforceable obligation is not supported by the case law as

12  we have set forth in our reply.

13           And it would also render the standard completely

14  meaningless as all indemnities almost have conditions and

15  qualifications.  And indeed, blanket indemnities are

16  prohibited in many states, including Texas.

17           These are real obligations as demonstrated in the

18  various tender offers and acceptances.  The Debtors

19  indemnify as to claims related to provisions of medical

20  services.

21           Just because those indemnifications are limited to

22  the provision of medical services, in no way makes it any

23  less an obligation.  And we believe that is the requirement

24  of A.H. Robbins.  There is a bound contractual obligation.

25           Finally, Your Honor, the fourth category is

1   Debtors' former clients and customers.

2           And, Your Honor, many of these agreements -- we

3   dealt with Orange County and York today, which we address in

4   the stay motions -- the indemnification obligation survived

5   termination of the contract.

6           And so for the same reason as current customers,

7   such indemnification obligations create an identity of

8   interest sufficient to extend the stay.  We would note, Your

9   Honor, that there is an example with respect to Josephine

10  County where the indemnification obligations did not survive

11  termination of the contract.

12          The contract had been terminated.  And there

13  pursuant to the stay determination process, the Debtors did

14  agree to allow that stay to go -- that case to go forward.

15          So again, Your Honor, the Debtors are seeking that

16  the stay be extended to all four of those specific

17  non-Debtor Defendant category until plan effective date,

18  dismissal of the cases or April 30th, which ever comes

19  first.

20          I also note, the proposed final order that we sent

21  over today does continue the stay determination process that

22  was incorporated in the January 14th order and agreed upon

23  with the creditors Committee.

24          And the Debtors have been able to resolve some

25  issues consensually with respect to that process.  And that

1   process will continue whereby filing a stay motion may

2   possibly be avoided if we can reach agreement.

3           So therefore, Your Honor, we request that the

4   Court enter the proposed order and extend the stay to

5   those -- to April 30th dismissal of the case or plan

6   effective date, whichever comes first.

7           THE COURT:  All right --

8           MR. UNKNOWN:  Your Honor.

9           THE COURT:  Yes.

10          MR. UNKNOWN:  The Committee's objection, you will

11  recall, was taken up on the 14th amendment, moved to the

12  18th.  So that objection is still active.

13          I think that a lot of what Debtors counsel said,

14  we can agree with.  There are a couple issues we have.  So,

15  I think to start, you know, when we were here last month, we

16  heard that going and determining whether the stay would

17  apply would be a Herculean task and would be something the

18  Debtors couldn't handle.

19          So it was a little frustrating here today hear

20  instances where like the Wagoner case where Plaintiff's

21  counsel appeared to know Debtors insurance policy better

22  than they did.  That was a case filed December 24th.

23          So we were told last month that there was going to

24  be attention applied to these and stipulations would be

25  granted.  That clearly didn't happen for the Waggoner

1   Childress Plaintiff.

2           Similarly we heard about the insurance and we

3   heard a different story than we heard last month when

4   Mr. Seitz filed his four or five Declarations, he didn't

5   mention there were any policies with bankruptcy solution,

6   for example.  And we also heard about collateral.

7           So I think that, you know, it just really goes to

8   the frustration that my colleague, Mr. Rosen, outlined that

9   when something benefits the lenders, in this case you're

10  seeing huge teams of lawyers do whatever it takes.

11          Rounds and rounds of Declarations, filings in the

12  middle of the night, for things that mattered individual

13  creditors.  They're not getting the attention they deserved.

14          And when we ask for that to happen, we're being

15  told it's a herculean task and you're asked to excuse them

16  from sometimes even complying with the letter of the spirit

17  of the bankruptcy code.

18          So it's frustrating for us to hear those and the

19  two areas -- I think everything that was outlined in order

20  Debtors' proposed -- then we did submit -- send them some

21  comments before they submitted to you.

22          The two main things that we have an issue with is

23  on the former contracts, it may be that there was an

24  indemnity and that there's contractual, you know, right.

25  But that's just an unsecured claim -- if those people have

1   to incur expenses.

2           That's not something the Debtors are going to have

3   to pay out of the estate expenses.  It's just somebody else

4   that's going to have to get in Line with the other unsecured

5   creditors who are receiving very little recovery.

6           So we're not sure -- we don't understand why those

7   contract parties would be treated any differently than

8   general unsecured creditors who are trade creditors or

9   general unsecured creditors who have a settlement agreement

10  contract.

11          The other area is that on the professional

12  corporations, I think we did oppose that.  We can agree with

13  that as long as it's clear that those parties are getting

14  released.  Because the objection we had, we didn't want it

15  to be something where the claims against those parties can't

16  go forward.  And then they're going to go away as part of

17  the Plan in this case.

18          So it sounded like we had that confirmation

19  orally.  Once we had that in writing, we just had --

20          THE COURT:  We crossed that bridge.

21          MR. UNKNOWN:  Yep.  The last thing is --

22          MR. UNKNOWN 2:  Your Honor, can he repeat that?  I

23  missed all that.  Committee -- would you repeat what I

24  confirmed?

25          MR. UNKNOWN:  On the professional corporations,

1   what Mr. Drew Dina (phonetic) said earlier about them not

2   being released from the plan.  We don't have an issue with

3   the stay extending to them, assuming they're not going to

4   get a release.  Thank you.

5          The last thing is just, you know, we heard about

6   that policy that applied to Mr. Childress or I apologize.  I

7   don't know gender of the Childress Plaintiff.  But Childress

8   and Wagoner Plaintiffs.  It seems like there's been a clear

9   conclusion that the Debtors don't have an ongoing duty to

10  defend.

11         I think that the order can exclude claims arising

12  under that policy rather than requiring people to come

13  forward and secretly because it's clear that once they do,

14  the Debtors are just going to tell them that they can go for

15  it.  Thank you, Your Honor.

16         THE COURT:  All right.  Mr. Lucy?

17         MR. LUCY:  Yes, Your Honor.

18         MR. UNKNOWN 3:  I can go after Mr. Lucy.

19         THE COURT:  Let's let Mr. Lucy.  He's been waiting

20  a long time and hasn't talked yet.

21         MR. LUCY:  Yes, Your Honor.  Can you hear me?

22         THE COURT:  I can hear you fine, sir.

23         MR LUCY:  Your Honor, I'm here on looks like

24  subsection F, Docket Number 1231.  And this was essentially

25  a response to a request by the one of the Defendants in the

1   case, Wellpath, to lift stay (indiscernible) Thacker Cole.

2   I understand that we're late in the day.  So I'll just some

3   brief background.

4          The Thacker Cole is a co-Defendant with Wellpath

5   and two other employees in a case.  He's there on a

6   essentially a low agreement, by a placement agency.  So he

7   was working for Wellpath as a physician in that facility.

8          Our concern is, and while we filed the response,

9   Your Honor, is that because the allegations for medical mal

10   practice is against all Defendants and essentially Dr. Cole

11   was an agent of Well path at the time and vicarious claims

12   in that complaint that this would be difficult to lift stay

13   as Thacker Cole only and continue with that litigation.  But

14   continue the stay as to Wellpath.

15          So we had some concerns and I know we put it in

16   our brief, Your Honor.  It's rather concise, identity of

17   interest relative to the vicarious claims.  So essentially

18   the actions of Dr. Cole, Wellpath would be vicarious liable

19   for that.

20          So we were just concerned and would present some

21   issues move forward with that cloud over Dr. Cole.  So

22   essentially we want to at least file something of record to

23   make the Court aware because I understand there was a foot

24   note relative to Thacker Cole by the Debtor, I think, in one

25   of their proposed orders or memos that he was not an

1    employee and not subject to indemnification agreement.

2         And while I have no doubt that is accurate, I am

3    not privy to any contract between the placement agency and

4    Wellpath at this point.  I'm assuming that there was no

5    indemnity provisions, but putting that aside we do think

6    (glitch in the audio) with this agency agreement between the

7    placement agency and Wellpath.

8         THE COURT:  All right, thank you, sir.

9         MR. LUCY:  Thank you.

10        THE COURT:  All right, Mr. Vasek.

11        MR. VASEK:  Thank you, Your Honor.  Can you hear

12   me?

13        THE COURT:  I can hear you, sir.

14        MR. VASEK:  Thank you.  Your Honor, I represent

15   the Colorado Tort Plaintiffs that were mentioned earlier and

16   you can find the full width within our objection filed at

17   Docket 1283.

18        I know the Court has already heard arguments on

19   this stay extension motion during previous hearings.  And so

20   I'm not going to rehash all that typically given the late

21   hour in the day.  And really we just filed a joinder.

22        But I did want to push back a little bit on the

23   Debtors' characterization that this was really just a motion

24   for relief from the stay.

25        For example, there is discussion in the response

1    the Debtors filed about insurance that's in place to protect

2    the Debtors and their employees.  Really all we were trying

3    to do here was object to the extension of the stay as it

4    relates to non-Debtor Defendants who are Governmental

5    entities.  That's the limited relief we were seeking, Your

6    Honor, that stay.

7            As I read your January 14th order expires today

8    unless the Court extends it. And so with that, Your Honor, I

9    really have nothing else to add.  I just wanted to make that

10   clarification.  Thank you.

11           THE COURT:  Mr. Freeman?  Do you want to hit five

12   star?

13      (Pause in the proceedings.)

14           THE COURT:  There you go.

15           MR. FREEMAN:  Can you hear me?

16           THE COURT:  Yes, sir.

17           MR. FREEMAN:  Okay, my name is Elissa Freeman

18   (phonetic).  I am (indiscernible) on behalf of our client

19   Richard Reichart.  And we just want to clarify that the

20   extension of the stay to non-Debtors should be limited to

21   only to those instances where the client is being held

22   liable for the Debtors actions.

23           And the stay should certainly apply to cases where

24   the Debtor has indemnification obligations.  We know from

25   your order or from the stipulated agreement on January 14th,

1    it does have language similar to that, but we just want,

2    kind of clarity on that point.  And to just ask going

3    forward that it's made clear that if there's no -- you know,

4    in claims if there are no allegations or claims relating to

5    the Debtor at all then, you know, obviously even if it's

6    under the same count than the stay should not extend to

7    parties that are also being sued.  And that's really all I

8    anted to add.  It's like everything else I had listed has

9    kind of been addressed.

10          THE COURT:  Thank you, sir.  Mr. Lucy did you want

11   to speak again or let Mr. Shannon go?

12          MR. LUCY:  You must has sensed me squirming in my

13   seat.

14          I just wanted to be clear on what relief we are

15   seeking and  I think it would be appropriate in our case --

16   especially given the agency issue, which I think is a little

17   bit different than some other instances where you have other

18   entities involved in various parts of (indiscernible) is to

19   extend until April 30th for that hybrid order I think you

20   were talking about earlier.

21          I think especially under the circumstances, you

22   know, any verdict against Dr. Cole could essentially be

23   imputed to Wellpath and vice versa.

24          So I think it's a bit convoluted mess and we just

25   want to avoid any issues moving forward with this

1    litigation.  Essentially, I don't want my client holding the

2    bag from it.

3           THE COURT:  Thank you.

4           MR. LUCY:  Thank you.

5           MR. KAPP:  Yes, Your Honor.  Just to be clear, we

6    did not file a separate objection.  However in the

7    stipulation and agreed order, there were four lawsuits that

8    were not resolved but in that it said those objections are

9    now continued to this day.  Right, so we are still here.

10          There were four lawsuits.  Judge, I have a very

11   narrow issue for you today.  Given actually I kind of agree

12   with the Committee for a change.  I actually agree that, you

13   know, I had an issue with the professional corporations.

14   The stay extension to them based on what I've seen about the

15   indemnities.

16          I disagree with the idea that you should error on

17   the side of the indemnity.  Right.  The Debtors have the

18   burden of proof to ask for this crazy relief to add stuff to

19   the bankruptcy code.

20          But actually if they're not getting a release then

21   I kind of agree with the Committee, that's less of a

22   problem.  Where I do run into an issue, Your Honor, is with

23   respect to one of those four that are left over.

24          Just to make it clear, Capaci, Brazelton

25   (phonetic), -- Capaci and Brazelton we actually agree with

1   the Debtors that those probably should be stayed.

2           With respect to McCullough, the litigation counsel

3   is talking with the Debtors directly.  It is with McGonna

4   (phonetic) -- the estate of McGonna versus Elemated

5   (phonetic) County -- that I still have an issue with.

6           The issue is this.  In that lawsuit, there is no

7   customer of the Debtor involved.  There is a professional

8   corporation, employees of the professional corporation and

9   then the county. Right.

10          And then opposite of that is how they are named.

11  They are actually named county and the county employees,

12  they're the real number one Defendants listed first.  That's

13  who the lawsuit is mainly about.

14          And then the professional corporation, CFMG as

15  well.  No problem with the stay extending to them and their

16  employees.  No issue.

17          Where we run into the issue though is with the

18  county.  Because they are not a customer of the Debtor.

19  There is no contractual relationship between the Debtor and

20  the county.

21          Now what the Debtor is going to say is there was a

22  chain there, right.  But we haven't seen any evidence of

23  that.  And I'm actually going to -- what is in evidence

24  though is a copy of this particular agreement between the

25  Debtors and CFMG.

1          And what that says is the indemnity is only for

2   actions of -- like CFMG has to indemnify the Debtor for

3   actions of CFMG.  The Debtors have to indemnify CFMG for

4   actions of the Debtor.

5          And if the Debtor is not a Defendant in the

6   lawsuit -- that's the other aspect of this.  The Debtor is

7   not a Defendant in the lawsuit.  There are no allegations

8   that the Debtors did anything.  Right, so there's no cause

9   for indemnity there.

10          As I read the order right now, it just says

11   customers and clients of the Debtors.  That's fine. What I

12   don't want is for the Debtors to then come in and then say

13   what we really mean is customers of the Debtors and also of

14   the professional corporation.

15          That has not been requested.  It was not requested

16   originally.  It wasn't in the January 14th order that was

17   entered.  I don't want it to be what happens when I say look

18   it doesn't apply here.  Read the order.

19          The Debtors come back and seek to enforce the

20   order here, to seek sanctions against -- not me, I guess,

21   but probably litigation counsel.

22          I want to be very clear what the order does on

23   that point.  I don't think it's should cover customers of

24   the professional corporation because there's no direct

25   contractual obligation.  They're not customers, they're not

1  clients.  The indemnity takes multiple steps.

2        And we at the very least, Judge, we haven't been

3  demonstrated that there's an indemnity there.  I don't think

4  there's been much evidence of indemnity -- any indemnities

5  at all.  There is some.  But certainly not in that

6  situation.  I don't think you should error on the side of

7  that they're asking for exceptional relief here, Your Honor.

8  Thank you.

9        THE COURT:  All right, anyone else wish to be

10  heard?  Mr. Kapp?

11        MR. KAPP:   Just a couple of things, Your Honor.

12  Your Honor it has been a herculean task.  There were 1500

13  lawsuits.  The idea that we would have knowledge of all

14  these when this case began, is -- we have been taxed to be

15  where we are and we have moved mountains.

16        I will tell you the processes worked.  The idea of

17  the stay was to bring every thing and if the people had an

18  issue then we were able to deal with it.  And Your Honor, we

19  have.

20        So I would argue the stay is working.  I am

21  frustrated by and Mr. Hemmingway's frustration because they

22  know what we have done and what we have provided them in

23  diligence and the stay determination process.

24        And they know we are trying.  It may not be

25  perfect, but we are trying and they know that.  Your Honor,

1    I do agree with Mr. Hemmingway of the four categories I set

2    forth.

3          The final category with respect to PC contracts

4    that have been terminated.  There are only eight of those,

5    Your Honor -- ten of those, sorry.  One we've already

6    allowed the stipulation to go.

7          We'll agree that that is an unsecured claim as the

8    contract has been terminated.  The stay does not apply to

9    that, you know, category.  We do believe it should apply to

10   all three.

11         I don't -- we can also confirm that PCs will not

12   be released in the plan, so that addresses that.  And then

13   finally, Your Honor, we set forth the three categories that

14   are in the order.  I don't know what Mr. Shannon was talking

15   about because it does not apply to the relief that we have

16   sought.

17         THE COURT:  All right and what about Mr. Lucy's

18   concern?

19         MR. KAPP:  Umm.

20         THE COURT:  I mean, think his concern is at a

21   minimum he was an agent and or working for somebody who had

22   been hired by Wellpath.  So at least during this interim

23   period.

24         MR. KAPP:  Your Honor, we have no problem with

25   staying as to him pursuant to the terms we have already

1    agreed to.

2           THE COURT:  Okay  All right.

3           MR. KAPP0:  We do have a form of order, but we

4    would need to take out the one paragraph.  If you'd like for

5    us to resubmit it, we can.

6           THE COURT:  Yeah, please do that. And then -- and

7    send it to you know, counsel for the Committee and the

8    various other objectors.  But I'll get that on file.

9           So just to make clear.  I have considered the

10   motion to extend the stay that was filed on -- by Docket

11   Number 17.  And based on the representation of counsel and

12   the arguments and the evidence that was taken during the

13   first stay extension motion, I am going to -- subject to the

14   various caveats that we hard today -- to extend that to the

15   April 30th date and the other conditions, the effective date

16   of the Plan, et cetera.

17          And with that, I think it's in the best interest

18   of the estate I do think that this is an imperfect process

19   but I think its worked.

20          It's worked well and, you know, the personal

21   injury claimants will have certainty as to when they would

22   be able to go forward with respect to these items on a go

23   forward basis in approximately 75 days.

24          MR. KAPP:  Thank you, Your Honor.  One question,

25   would you like us to add the fourth condition of the

1  conversion to a Chapter 7?

2         THE COURT:  I think as a practical matter that's

3  the case anyway.  So I don't necessarily think you need to

4  do that.

5         MR. KAPP: And then, Your Honor, we do have the PC

6  motion as a separate agenda.  We did have separate orders

7  and then we had duplicate on January 14th.  We had two

8  orders that said the same thing.

9         We submitted another order for the PC which does

10  extend it.  I don't know if we want to enter that order.

11  That order would work. So that's up to you, Your Honor.

12         THE COURT:  All right, I'll review the form.

13         MR. KAPP:  And all that does is extend it as to PC

14  and their employees through April 30th and the other

15  conditions.

16         THE COURT:  Okay.

17         MR. KAPP:  Thank you, Your Honor.

18         THE COURT:  All right, any thing further on the

19  2:00 o'clock Docket?

20      (No audible response.)

21         MR. UNKNOWN:  So, Your Honor, with that I'd like

22  to be excused.  Because I don't have anything to do the rest

23  of the day.

24         THE COURT:  We're only getting started.  All

25  right.  So it's 5:40, so we can take a 20 minute break.  And

1   then do you want -- how do we want to proceed?

2           Do we want to go to the KEIP first or do we want

3   to go to the -- so we're going to have to come back for the

4   Disclosure Statement hearing in any event because I'm going

5   to want to see all the changes.

6           So what do you want to do first?

7           MR. KAPP:  Sorry, Your Honor.  Your suggestion you

8   need to see all the changes at a continued hearing on the

9   Disclosure Statement?

10          THE COURT:  Yeah.  Yes.  I think -- I need to see

11  the changes and to the extent I have questions, I need to

12  ask the questions before I'm going to be able to do that.

13          MR. KAPP:  Okay.

14          THE COURT:  For instances I need to look at the

15  new liquidation analysis.  And I suspect I'll have

16  questions.

17          MR. KAPP:  Okay. Well, Your Honor, if that's the

18  case then I would suggest that we pick up the KEIP and the

19  next while we continue to progress those documents in the

20  back room.

21          THE COURT:  All right, Mr. Rosen?

22          MR. ROSEN:  Your Honor, that is fine with us with

23  respect to having a little chance to review what these guys

24  put together and obviously we might want to run with

25  (indiscernible) if there could be a little leeway

1   (indiscernible) but actually that would be fine with us.

2          THE COURT:  Yeah I'm mean, we'll have the

3   hearing -- video hearing, you know, late tomorrow afternoon,

4   Wednesday afternoon.  I mean, I'm not trying to delay this

5   and we can have something --

6          MR. KAPP:  Your Honor, I think that for most of

7   these changes they can be done fairly quickly.  I do think

8   that for purposes of, you know, box by box liquidation

9   analysis, you know, that was one of the clarifying questions

10  I asked earlier whether that needed to be done as part of

11  the Disclosure Statement approval.

12         THE COURT:  I think that if I send -- if you're

13  sending something a Disclosure Statement out it has to show

14  the best interest.  And how do you show the best interest

15  unless you have a -- I mean, there's -- obviously there's

16  going to be a --

17         MR. KAPP:  Well there is -- well, and just to say

18  I understand the point.  I think there's also there is case

19  law in this district that has a per plan rather than a per

20  box of --

21         THE COURT:  Well okay so then if you want to do a

22  per plan, then you got to meet consolidation, right?

23         MR. KAPP;  Well, I'm not sure that that's what the

24  case law suggests.  But I think it -- I understand Your

25  Honor's point.

1          THE COURT:  But the problem was that the

2    Disclosure Statement wasn't clear as to what you were doing.

3          MR. KAPP:  Understand.  We are -- and we are going

4    to make that -- we certainly are going to make that clear.

5    I am merely suggesting that in order to, you know, ensure

6    that the liquidation analysis on a per entity basis is, you

7    know, clear and correct.

8          That could take longer and I -- you know, as we've

9    said, I think that that is a -- that comes at a great risk

10   for the company if that takes longer to put together.

11         THE COURT:  Understood.  But I mean, I think you

12   have to -- which way you're going to go or per Debtor or per

13   plan.  If it's per plan, then we've got other issues.

14         MR. KAPP:  Understood, understood.  Okay.  Again,

15   obviously anything that we're changing  we will be sharing

16   with the Committee.  We're hopeful that they'll give us

17   input.

18         The -- but I do think that per given Your Honor's

19   comments, then for purposes of the rest of the evening, we

20   should probably spend it on the KEIP.

21         THE COURT:  Okay, all right so it's 5:44, we

22   should come back at 6:00 o'clock and then we'll start with

23   that.

24         MR. KAPP:  Thank you, Your Honor.

25      (Recess taken from 5:44 p.m. to 6:01 p.m.)

1          THE COURT:  Please be seated.  All right, so just

2     for planning purposes, we can go to 8:00 tonight.  And if

3     we're not done and with respect to the Disclosure Statement,

4     you can come back at 1:00 o'clock on Thursday.

5          So, tomorrow we'll get the papers, look at them

6     and then we'll be back Thursday at 1:00.  Is that?

7          MS. PEARLMAN:  Is this back to the Disclosure

8     Statement, Your Honor.  Is that they do it telephonic?

9          THE COURT:  Yes, yes.

10         MS. PEARLMAN:  You said that.  I just wanted to

11    make sure people were making travel plans and the break so.

12         THE COURT:  Yeah, yeah.  No, no that will be soon

13    telephonic.  Yes.  It's really literally will be argument

14    and the form of order.

15         MS. PEARLMAN:  Perfect.  And hopefully with

16    respect to the remaining motions, we will (indiscernible).

17         THE COURT:  I'm happy to stay as long as it takes.

18    But there's other people that --

19         MS. PEARLMAN:  Understood.  Appreciate that.  And

20    we appreciate your staying this late already.

21         Shall we get started?

22         THE COURT:  Yeah.

23         MS. PEARLMAN:  Perfect.

24         THE COURT:  Let me just call the Docket.  So this

25    is the 4:00 o'clock Docket on Case Number 24-90533.  It's

1  the Debtors KEIP Kirk motion that is found at Docket

2  Number 1386.

3  　　　　　MS. PEARLMAN:  Your Honor, Felicia Pearlman on

4  behalf of the Debtors here today on our motion with respect

5  to the KEIP incurred.

6  　　　　　We very much appreciate Your Honor's extra time

7  today and letting us go forward even though our 4:00 o'clock

8  hearing is starting a little bit later than that.

9  　　　　　We have received one objection with respect to the

10  KERP and that's from the Committee.  And two with respect to

11  the KEIP from the Committee and the U.S. Trustee.

12  　　　　　I will address each program separately and why

13  these programs should be approved and the objections

14  overruled.

15  　　　　　As an initial matter, the Debtors filed several

16  Declarations in support of the motion.  These are the

17  Declarations of Gilbert Jones in support of the motion,

18  which is Exhibit A to the original KEIP, KERP motion at

19  Docket Number 1010.

20  　　　　　The Declaration of Timothy Dragelin in support of

21  the motion at Docket Number 1284.  And the amended

22  supplemental Declaration of Gilbert Jones in support of the

23  Debtors' motion at Docket Number 1422.

24  　　　　　Both Mr. Jones and Mr. Dragelin are in the

25  courtroom today.  Mr. Dragelin will have some additional

1    direct testimony.  And both are available for cross

2    examination to the extent necessary.

3         I would like to move these Declarations into

4    evidence.

5         THE COURT:  Okay, so there's the initial

6    Declaration of Mr. Gilbert Jones at 1010 and then the

7    Declaration of Mr. Dragelin and I think it's at 1384, not

8    1284.

9         MS. PEARLMAN:  Thank you, Your Honor.

10        THE COURT:  Is that right.

11        MS. PEARLMAN:  My notes say 1284,  but I am not

12   looking at the Docket so I will --

13        THE COURT:  Well I'm looking at your Witness and

14   Exhibit List.

15        MS. PEARLMAN:  I would assume that is more correct

16   than my own typing.

17        THE COURT:  Yes, 1384.

18        MS. PEARLMAN:  Thank you, Your Honor.

19        THE COURT:  And then the last Declaration is of

20   Mr. Gilbert Jones at 1386.

21        MS. PEARLMAN:  So there was a supplemental

22   Declaration filed that had a stake in it.  And we filed an

23   amended supplemental.

24        THE COURT:  Okay.

25        MS. PEARLMAN: Which I understand is at 1422.  I

1    just want to make sure we admit the correct since the other

2    one had an error.

3         THE COURT:  Yes, correct.  So you don't want to

4    admit 1386, but 1422?

5         MS. PEARLMAN:  Correct.

6         THE COURT:  All right.  Any objection to the

7    admission of the Declaration -- the two Declarations of

8    Mr. Jones and the Declaration of Mr. Dragelin?

9         MS. UNKNOWN:  No, Your Honor.

10         MR. UNKNOWN:  No, Your Honor.

11         THE COURT:  All right they will be admitted and

12    then to the extent that counsel wants to call them on cross

13    then we'll do that at the appropriate time.

14         (ECF 1422 and 1386 received in evidence.)

15         MS. PEARLMAN:  Thank you, Your Honor.  Your Honor,

16    some background before we turn to each of the programs.

17         In the months leading up to the filing of these

18    cases and since the filing, the Debtors have lost a

19    significant number of critical employees.  Leading up to the

20    filing we lost 15 key management and senior level employees.

21         Since the filing of this motion, just over a month

22    ago, we have lost over 300 additional employees.  These

23    losses stem in large part from the significant uncertainty

24    regarding the go forward business and the perceived lack of

25    job security.  Along with the incredible increase in work

1   load that all are basic.

2         Going back to before the filing, the Debtors tried

3   to increase retention by putting new bonus programs in place

4   tied to transactions.  Recognizing that these programs would

5   not be paid, there was a filing.  The Debtors began

6   discussions with the DIP lender regarding the KEIP and KERP.

7         Given the need to focus on the business and the

8   sale efforts, these discussions did not conclude until after

9   the holidays.  And on January 17th we filed our motion

10  seeking approval of these programs.

11         I'd like to start with the KERP.  Your Honor, the

12  KERP initially covered 32 key non-insider with non-insider

13  employees.  One of these employees has since left the

14  Debtors so it now covers 31.

15         These individuals were selected by the Debtors

16  senior management team based on functions they performed and

17  the difficulty in replacing them.  In addition, the KERP

18  contains a discretionary pool that can be allocated if

19  needed to retain employees.

20         While the Committee asserts that some of these

21  employees are insiders, this is not correct.  While some do

22  have titles that include director, chief, or vice president,

23  case law is clear that an individuals title does not

24  determine whether they are an insider.  Their

25  responsibilities and legal rights do.

1          None of these individuals exercise control of the

2     Debtors or have authority to dictate corporate policy.  They

3     do not sit on the board or report to the board or regularly

4     attend board meetings.

5          The fact that they have a title where in some

6     instances other individuals with that title are insiders

7     does not make them an insider under the bankruptcy code.

8          The Committee also objects to the KERP as not

9     being justified by the fact and circumstances of the case.

10    As the Declarations of Gilbert Jones show, the KERP payments

11    are in Line with other retention programs for similar

12    companies.

13         Even not taking into account the value of the 2024

14    bonus that KERP participants must wait in order to

15    participate in the program.

16         Further, while the Committee argues that the claw

17    back feature in the KERP suggest that the KERP include

18    additional payment amounts to retain participants post

19    effective date and that does not benefit the estate.

20         This is incorrect.  Requiring employees to remain

21    post effective date in order to retain their KERP payments

22    adds stability to the business now, protecting contract and

23    patient care, increasing the current value of the business

24    for the benefit of all.

25         With respect to the discretionary component of the

1  KERP, this is not unusual in KERP programs.  It has been

2  approved by this court in other cases.

3          Importantly, the discretionary component was

4  formulated in significant part to address concerns that were

5  raised by the patient care ombudsman regarding our ability

6  to retain key employees directly related to the provision of

7  medical care.

8          There are currently 23 additionally individuals

9  who directly effect patient care, that the Debtors believe

10 will likely need to receive payments from this pool in order

11 to keep them from leaving WellPath.  The Debtors provided

12 this information to the Committee's advisors.

13         With respect to the Committee's contention that we

14 have not provided them enough information to evaluate the

15 KERP, this is without merit as we set forth in our papers.

16 And I will not belabor that point here.

17         Now, Your Honor, I'd like to turn to the KEIP.

18 Your Honor, the KEIP provides indentiface bonuses to 12 key

19 senior level management members who are and have been

20 critical to the Debtors ability to protect and maximize the

21 value of the Debtors estate and who's work load as a result

22 has increased tremendously as a result of these cases.

23         The KEIP has four incentive based metrics.  Each

24 with an award if the metric is met.  Unlike some other

25 plans, there's no range of a word for metric of a lower

 1   target is met. Each metric is either met or not.

 2           From the time these metrics were put in place,

 3   they were and are challenging metrics to meet.  I will

 4   address each of the metrics.  But before I do I think it's

 5   important to note as Judge Isgur held *in re: Country Fresh*,

 6   2021 West Law 293, 2680.

 7           These metrics should be evaluated from the time

 8   the KEIP was formulated and whether they incentivize

 9   prospectively.

10           The first metric is the closing of the recovery

11   solution sale.  The closing of the RSA sale was a

12   significant challenge for the KEIP participants as it

13   required not only the time consuming marketing process but

14   also the challenging work of the establishing separate

15   management offices as well as the negotiations and

16   implementation of the transition services agreement.

17           All in an exceedingly quick time frame to preserve

18   the value of the business and ensure the ability to close in

19   the time frame required by the RSA.

20           The objectors argue that because the sale has

21   closed, it cannot be part of the KEIP.  This is not correct

22   as *Country Fresh* states, the metric must be looked at

23   prospectively.

24           The Debtors began discussions with lenders prior

25   to the petition date.  The RSA sale metric was in place at

1   this time as the Debtors pre-petition had a sale related

2   bonus in place.

3          The discussions were continued to after the filing

4   to allow the Debtors and all parties to focus on preparing

5   for the filing in the most value protected manner.  They

6   began again with this metric in place immediately

7   thereafter.

8          The KEIP participants were aware from before the

9   petition date that a metric in the KEIP would be the

10  successful closing the RSA sale in the request time frame.

11         This was done to incentivize them to commit all

12  the extra time and effort that was needed to reach this mile

13  stone.  Even though the Debtors knew, they would be unable

14  to seek court approval of the program at that time as they

15  were still in discussions with the DIP lenders and as was

16  rightly focusing on all the other critical and more pressing

17  matters that were necessary to protect value of the business

18  and the provision of health care early in the cases.

19         The fact that the Debtors were not able to file

20  the motion until later does not in any way negate that this

21  metric was intended and did, in fact, incentivize the KEIP

22  participants to meet this critical goal.

23         To quote Judge Isgur, "Here the proof is in the

24  pudding.  The fact that the Debtors were able to close this

25  sale on such a short time frame is proof that this metric

1  was, in fact, incentivized."

2        The second factors of the sale of a consumption of

3  a Chapter 11 plan for the pressions business.  I think it's

4  clear by this mornings hearing that this is not a simple

5  prop up.

6        The Committee itself has stated its clear intent

7  to object and request the inclusion of a letter in the

8  solicitation materials urging creditors to vote against the

9  plan.

10        Not even focusing on the amount of work the KEIP

11  participants will need to do in the coming weeks to attain

12  confirmation.  As well as the extensive amount of work they

13  will need to do to ensure customers that they can continue

14  to provide health care services and that their customers

15  should not seek to terminate or start early rebid processes

16  in light of the Committee's action.

17        The work the KEIP participants have done since the

18  filing of these cases to run the correction sale process and

19  work with vendors and customers to retain their support

20  shows the incentivizing nature of the KEIP and the value of

21  the KEIP participants have added to the estate.

22        While the committer argues that the lack of bids

23  for the correction business implies that the KEIP

24  participant have not provided value.  This argument is

25  baseless.

1          The absences of bid does not in any way diminish

2    their efforts not only in supporting the sales process but

3    also in addressing the challenges of operating a business

4    such as this during a restructuring process in maintaining

5    value.

6          In fact, given the market message and lack of

7    interest, it is clear how valuable the senior management

8    efforts were in negotiating the RSA to ensure the viability

9    of the go-forward business and how critical their efforts

10   are to maintaining the business.

11          With respect to the third metric, the financial

12   metric.  Financial targets are a common feature of incentive

13   plans.  The metrics tied in meeting or exceeding the DIP

14   budget, maintaining a minimum level of liquidity and

15   achieving certain performance levels such as the financing

16   needed on the effective date will be no greater than $55

17   million.

18          These metrics require to KEIP participants to

19   carefully manage costs during the case as well as to

20   actively negotiate with vendors to receive favorable terms

21   and focus on collecting accounts receivable including agent

22   accounts receivable.  All during a time of operational

23   uncertainty and challenge.

24          The level set to meet this metric as the

25   Declaration show are not lay ups but are difficult targets

1    to meet.  And the fact the Debtors look now like they will

2    hopefully meet them as we head towards confirmation although

3    there is still substantial risk, is a reflection of the hard

4    work of the KEIP participants and the incentivizing nature

5    of the KEIP itself.

6           The last metric is the retention of contract.

7    This ties to a corresponding provision the RSA that if the

8    Debtors do not meet, will result in a breach of the RSA and

9    could lead to a need to liquidate.

10          To this end, the KEIP participants -- as

11   Mr. Slocum testified -- spent significant time meeting with

12   customers, reassuring them of the Debtors ability to

13   continue to provide high quality care and demonstrating

14   their long term stability despite the Chapter 11 cases.

15          Remember, their customers are unique from other

16   situations.  They are governmental entities with the

17   constitutional requirement to provide health care.

18          As soon as these customers question the Debtors'

19   ability to continue to provide these services, they will

20   likely look to replace the Debtors to protect their own

21   ability to meet these obligations.

22          These KEIP participants have also been actively

23   involved in working with many of the same customers and

24   helping to get their support to find way to improve noticing

25   and the provision of information to incarcerated patients.

1          As Your Honor is aware, the Debtors do not have

2    their own facilities but operate out of their customer's

3    facilities.  So our senior management team has been actively

4    engaged with our customers to help effectuate them putting

5    up posters and adding burdens on their customers during this

6    time.

7          All while trying to show these customers that it

8    is nothing more than business as usual and the restructuring

9    has not impacted their ability to operate and do the best

10   that they customers will not look elsewhere for these

11   services.

12          Your Honor, the KEIP and the metric it is based on

13   a reasonable and justified given the facts of these case.

14   It is designed to incentivize the participants to serve the

15   best interest to the Debtors' estate to protect and maximize

16   value as well as to protect the ability to provide health

17   care to the communities it serves.

18          Failure to achieve any of these metrics could

19   result in termination of the RSA and the liquidation of the

20   estate which would have a devastating effect on the value of

21   the Debtors and leave patients without care.

22          The KEIP satisfies the standard set forth in Dana

23   and referenced by this Country in *Country Fresh*.  There is

24   reasonable relationship between KEIP and the performance

25   result desired as stated today and as is shown in the

1    Declarations.

2          Further, these goals are not easy to achieve but

3    challenging goals that take significant effort and come with

4    significant risks.  The cost is reasonable as shown by the

5    market data presented in the Jones Declaration.

6          The KEIP is limited to the 12 members of the

7    Debtors' senior management team that drive the strategy for

8    the Debtors business and their restructuring efforts.  All

9    of whom have direct influence as whether the metrics are

10   achieved and must work hard well above and beyond their

11   regular job to achieve these metrics.

12         The KEIP was developed with reliance on outside

13   advisors.  As set forth in both the Dragelin Declaration and

14   the original Jones Declaration, the Debtors received

15   independent advise regarding the KEIP and incorporated the

16   fact limited advisors and the Debtors largest economic

17   stakeholder.

18         And the KEIP was approved by the independent

19   Special Committee of the board.  Your Honor, with that I

20   would like to turn the podium to my partner Nathan Bull to

21   present Mr. Dragelin for some direct.

22         THE COURT:  Let's have anyone who also wants to

23   make an opening statement.

24         MS. PEARLMAN:  Thank you, Your Honor.

25         MR. DESATNIK:  Good evening, Your Honor.  Daniel

1    Desatnik from Proskauer Rose LLP the Statutory Unsecured

2    Claimholders Committee.

3          The Committee opposes both the KEIP and KERP as

4    they are currently proposed.  In support of our opposition,

5    we submitted the Declaration of Heather Barlow at Docket

6    Number 1294 and a supplemental Barlow Declaration at 1429

7    and as the Debtors did, we would ask to move those into

8    evidence.

9        (Pause in the proceedings.)

10         THE COURT:  All right does anyone object to the

11   admission of the Declaration of Heather Barlow at 1292 and

12   what's the other numbers?  I don't see it on the list.

13         MR. DESATNIK:  So the redacted version is 1292,

14   the unredacted is 1294 and then the supplemental Declaration

15   is 1429.

16         MR. KAPP:  We have no objection.

17         THE COURT:  Okay, so does any one object to the --

18   I guess I hear no objections to the admission of the

19   Declaration of Heather Barlow at 1292, and what's the other

20   one, 14?

21         MR. DESATNIK:  1429, Your Honor.

22         THE COURT:  1429.  Okay.  They will be admitted

23   subject to cross-examination.

24       (ECF 1292 and 1429 received in evidence.)

25         MR. DESATNIK:  Thank you, Your Honor.  To be

1   clear, the Committee would not have opposed a KEIP that was

2   truly incentivizing and rewarding insiders for obtaining

3   meaningful value that benefited all creditors.

4        Nor would we oppose the retention of awards for

5   rank and file employees that the patient care ombudsman

6   identifies as directly responsible for the health and well

7   being of patients.

8        As you know, several of our Committee members were

9   impacted by substandard health care and we are highly

10  sensitive to the needs of the patient population.

11       Unfortunately, the Debtors did not propose a KEIP

12  or a KERP that fit these descriptions.  I'll begin with the

13  KEIP.

14       The Debtors have the evidentiary burden to show

15  that the insider KEIP is primarily incentivizing rather than

16  a disguised retention program.

17       At the end of the evidence, we will show you that

18  they have not and cannot meet this burden.  On its face, the

19  KEIP is merely a vehicle to pay $4.6 million and above

20  market bonuses to insiders for merely carrying out their day

21  to day duties.

22       Before these cases were filed, the Debtors entered

23  into a pre-petition restructuring agreement with their

24  lenders that contemplate a sale of Recovery Solutions and

25  the corrections business.

374

1            If the sales failed -- which they did -- the

2    lenders would get a recovery solution business through a

3    stalking horse bid and for the corrections through a

4    restructuring financing.

5            What is presented as four discrete performance

6    target under the KEIP are actually merely components of

7    complying with the pre-petition RSA.  They would pay insider

8    management not for benefiting the estate but carrying out an

9    agreement for the benefit of the lenders.

10           None of the four metrics are incentivizing or

11   require insiders to provide any incremental value to the

12   estates.  The first target is the sale of the RS division.

13   That sale already closed stalking horse bidder after the

14   Debtors failed to achieve any bids through the sales

15   process.

16           The second target is the completion of the

17   correction restructuring.  This was fully negotiated in a

18   pre-petition RSA and is again a consequence of the Debtors

19   failure to get any bids through the sales process.  Despite

20   the Committee coming before Your Honor several times to

21   sound the alarm and seek more time for the sale.

22           Courts have consistently rejected KEIP metrics

23   when they are based solely on preordained sales or

24   restructuring events.  And the case for that is *in re:*

25   *ResCap* 478er.

1         The third target is dressed up as a financial

2    metric, but again it is simply the criteria needed to

3    complete the correction of the restructuring as negotiated

4    in the RSA.  It's therefore duplicative of the second

5    metric.

6         And the fourth metric regarding preventing $40

7    million in gross profits at risk is also a term of the RSA

8    and is thus duplicative of the metrics two and three.  You

9    will hear evidence that meeting this metric is not only a

10   lay up it is a foregone conclusion.

11        The current amount of at risk contracts pursuant

12   to the formula and the RSA they are implementing is zero

13   dollars as the chief restructuring officer confirmed at his

14   deposition.

15        The KEIP fails for this reason alone.  The KEIP is

16   not a matter of right.  And management does not get one

17   simply for taking a company through bankruptcy.  Even if the

18   KEIP were incentivizing, it would further not be justified

19   because this one is significantly above market.

20        This includes giving the CEO a bonus that alone is

21   three times more than his current salary and five times

22   mores than his bonus in prior years when the company was

23   solvent.

24        As you will hear from the Committee's expert,

25   Heather Barlow, who has three decades of experience with

1   KEIPs and KERPs, the insider KEIP is more than double the

2   industry median.

3           The Debtors believe their KEIP is authorized under

4   Judge Isgur's decision in *Country Fresh*.  But Country Fresh

5   actually shows why this KEIP is not justified by the facts

6   and circumstances of this case.  And does not serve the best

7   interest of all creditors.

8           Unlike in Country Fresh, where the KEIP

9   participants only received awards for each $1 million

10  increase in sales price that got above the stalking horse

11  bid.  Here the KEIP participants are actually awarded for

12  not achieving any incremental value.

13          As you'll hear from the evidence, they actually

14  only need to achieve the worst possible outcome the minimum

15  required outcome under the RSA in order to get their awards.

16          And the proof is in the pudding.  Management did

17  not achieve a single bid above the stalking horse bid and we

18  are on a fast track to close the corrections restructuring

19  at the behest of the lenders.

20          As Judge Isgur observed in *Country Fresh*, the cost

21  of the incentives to the estate must be compared to the

22  impact of the estate.  The evidence will show they failed

23  this test.

24          The Debtors do not need to pay above market

25  bonuses when they are seeking to confirm a plan and be out

1    of bankruptcy in one and a half months that will already

2    contain a management incentive plan.

3           The unfairness of paying insiders outside bonuses

4    is magnified because the plan would pay Unsecured

5    Claimholders with nothing on account of over half a billion

6    dollars in claims.

7           The Debtors want to look at this metric

8    prospectively but the evidence will show that the KEIP was

9    not actually completed until after January, which was after

10   the RS sale had already been concluded and therefore could

11   not have incentivized the insiders that would receive it.

12          I'll now talk about the KERP.  As a threshold

13   matter the Debtors have not demonstrated the 32 KERP, now 31

14   KERP participants are not insiders.

15          And as an aside I'll say that even though it's not

16   31 KERP participants, the Debtors did not amend their

17   motions seeking to reduce the amount of KERP payments

18   they're looking to award based on that employee leaving,

19   they're still seeking the same amount.

20          Several of the KERP participants hold titles such

21   as President, Chief and Director.  The Debtors argue that

22   because these individuals do not report to the board of the

23   parent company or the CEO of the parent -- except for one of

24   them -- they are not insiders

25          But they failed to show that they are not --

1    insiders or officers of the individual Debtor entities and

2    as we heard earlier this is not a substantive consolidation.

3    They need to show that these are not officers of the

4    individual Debtor entities not of just TOPCO.

5         Even if they were not insiders, the evidence will

6    show that the proposed KERP is over 3.25 times the median

7    KERP based on the Debtors own comparables.

8         If the Debtors are only seeking to retain these

9    employees for another one and half months, these amounts are

10   not appropriate.  If these awards are to retain the

11   employees until the year end, the cost should not be born by

12   the estates where unsecured creditors are getting nothing.

13        Rather, they should be born by the Debtors soon to

14   be new owners.

15        Your Honor, these are not the facts and

16   circumstances where we should be moving the goal post of

17   what is market.  This is not the type of case that justifies

18   awards that are 3.25 times above the median.

19        And I'll repeat what I said at the outset.  The

20   Committee would not have been opposed to a truly

21   incentivized KEIP that actually generated incremental value

22   that actually was able to get unsecured creditors recoveries

23   and we would not oppose a KERP that goes to employees that

24   are directly responsible for the health and well being of

25   the patient population.  That's not what's here.

1          And so we respectfully request that you deny both

2   the KEIP and the KERP.  Thank you.

3          THE COURT:  Ms. Hersh?

4          MS. HERSH:  Thank you, Your Honor.  I'll be brief.

5   I'll refer the court to my briefing of our objection filed

6   at 1286.  And my Witness and Exhibit List filed at 1264.

7          And just for the record, I move to admit my two

8   exhibits, UST one and two.  They are Declarations filed by

9   the Debtors 19 and 20 at the inception of the case.  That is

10  the --

11         THE COURT:  Mr. Dragelin's Declaration.

12         MS. HERSH -- and Mr. Tempkies (phonetic.)

13         THE COURT:  Any objection to the admission of the

14  Declarations at 19 and 20 that were filed at the beginning?

15      (No audible response.)

16         MS. HERSH:  Thank you, Your Honor.

17         THE COURT:  Those are admitted.

18      (Debtors' 19 and 20 received in evidence.)

19         MS. HERSH:  Appreciate that.  So, --

20         THE COURT:  Is he even here for cross-examination.

21         MS. HERSH:  Thank you very much.  So the U.S.

22  Trustee's objection is not to the philosophical idea of

23  whether or not individuals should get a KEIP under certain

24  circumstances.

25         But in this particular circumstances, the case law

1  does provide that if you have an insider, in order for them

2  to have a KEIP payment, it has to be inspirational.  It has

3  to have them do something above what they are required to

4  do.

5          It is our contention -- and I won't repeat what's

6  been said and I can have a closing at the end.  But

7  essentially all of these four charges are things that this

8  Debtor was obligated to do under the RSA on the first day.

9  And I'm presuming they didn't enter an RSA that they knew

10  that they were going to default on so that default

11  herculean.

12          So assuming that they entered it in good faith,

13  that this is what they were going to do.  That that was what

14  was expected of them and it's not above and beyond.  As the

15  Patriot Cole Corporation case says a plan does not require

16  additional work or effort beyond what is contemplated -- I'm

17  sorry.

18          A plan that does not require additional work or

19  effort beyond what is contemplated pre-petition is not an

20  incentive plan but is retention and cannot be approved under

21  the more lenient standard for accepted plans.

22          Because what's proposed in t he KERP does not

23  provide them to do any extra work other than what was

24  contemplated pre-petition.  It does not satisfy the

25  requirement so we're going to ask that it not be approved.

1          But also make a note, that the size of the KEIP

2   seems to be quite extensive.  It seems like that even

3   combined that they're getting 75 percent of their salary for

4   these 60 days or 90 days for the case.

5          So, thank you, Your Honor.

6          THE COURT:  Anyone else wish to make an opening?

7      (No audible response.)

8          THE COURT:  All right.  Counsel?

9          MR. BULL:  Good evening, Your Honor.

10          THE COURT:  Good evening.

11          MR. BULL:  Nathan Bull for the Debtors and we call

12  Mr. Tim Dragelin.

13          THE COURT:  Take a seat, Mr. Dragelin.  You're

14  still under oath.

15      (Witness previously sworn.)

16          THE WITNESS:  Thank you.

17                      DIRECT EXAMINATION

18  BY MR. BULL:

19  Q    Good evening, Mr. Dragelin.

20  A    Evening, Mr. Bull.

21  Q    And what is your role at the Debtors?

22  A    I'm currently the Chief Restructuring Officer and the

23  interim Chief Financial Officer.

24  Q    And when did you become the CRO and CFO?

25  A    CFO, I was appointed the CFO at the end of June of this

TIMOTHY DRAGELIN - DIRECT BY MR. BULL                    382

1  2024 and the CRO, October of 2024.

2  Q    And at a high level, what are your responsibilities in

3  those roles?

4  A    Well, relative to the CFO role, I run the finance and

5  accounting department.  That includes all the reporting out

6  to the various constituents, making sure that we are

7  fiscally responsible for funds.  And relative to the CRO,

8  and it comes with all the bankruptcy reporting, as well as

9  interacting with Counsel and our investment bankers on the

10  restructuring.

11  Q    Did you also have a role at FTI?

12  A    I do.  I am Senior Managing Director at FTI Consulting.

13  I lead -- co-lead the health care restructuring practice and

14  lead health care in the managing group.

15  Q    Okay.  Well, what is a KEIP?

16  A    It's the Key Incentive -- Key Employee Incentive Plan,

17  which is designed to incentivize insider employees, key

18  employees, during the pendency of the case to achieve

19  objectives of the case.

20  Q    And what is a KERP?

21  A    Key Employee Retention Plan, it's designed for

22  non-insiders.  In order to retain them throughout the

23  pendency of the case that otherwise they were subject to

24  departure.

25  Q    And prior to Wellpath, did you have any experience with

1  KEIPs or KERPs?

2  A    I have.  Obviously the current construct, I think, came

3  around in 2005-or-so.  Prior to that, right there was

4  certainly retention plans that existed.  I've been

5  restructuring work since 1989, so I've certainly been around

6  that.

7       I've been Chief Executive Officer multiple times where

8  I've had to design incentive plans or retention plans for

9  employees across thousands of employees.

10 Q    When did Wellpath start considering a KEIP and a KERP?

11 A    I believe the first time we thought about it was when

12 we started to contingency plan to potentially prepare for

13 bankruptcy.  That's the first time that it came up in

14 earnest, though, when it was October timeframe that we

15 started digging into it.

16 Q    October of 2024?

17 A    2024.

18 Q    And why was Wellpath considering a KEIP and a KERP?

19 A    Well, leading up to that period of time, we had lost a

20 significant number of executives.  We lost the Chief

21 Financial Officer.  That's why I was there to begin with.

22      The Chief Medical Officer, the CHRO had given notice --

23 the Chief Hearing Officer, two additional presidents also

24 departed.

25 Q     And did you consider these departures to be potential

1    KEIP and KERP participants?

2    A    They were.  I mean, when we looked at the initial ideas

3    as to who would be included in the KEIPs and KERPs, that was

4    for the individuals or at least the positions that would

5    have been in the KEIP and KERP.  We had told a couple of

6    those people that had left, that the Chief Medical Officer

7    and one of the division presidents, when they knew that the

8    potential bankruptcy was going to happen, I did talk to them

9    about -- even though we hadn't formulated yet -- that we

10   would be seeking approval for one ultimately because they

11   were going to be losing significant compensation due to the

12   bankruptcy.

13   Q    And when was that conversation?

14   A    They left in -- they left just before the bankruptcy,

15   so that would have been in October timeframe.

16   Q    Okay.  And since the filing, have employees continued

17   to leave?

18   A    They have.

19   Q    How many?

20   A    So since the filing, I think we've lost with the recent

21   departure that was mentioned earlier in counsel's comments,

22   I think we've lost an additional three people that would

23   have been included in the KERP and then we've lost multiple

24   hundreds in turnover since the bankruptcy.

25   Q    And what do you think is driving that turnover?

1  A     Turnover picked up in January, for sure.  I think part

2  of it has been the unsure elements of the bankruptcy and it

3  is a competitive environment still for health care workers

4  and so that has just exasperated the problem with retention.

5  Q     Okay.  And were you involved in Wellpath's process

6  creating the KEIP and KERP?

7  A     I was.

8  Q     And what's your role?

9  A     Initially it was knowing that we were going to be --

10 the executives were going to be losing significant

11 compensation and we can certainly talk about it, but there

12 were certain bonus programs that have been put in place.  We

13 believed that those were going to be subject to forfeiture

14 and not be allowed in the bankruptcy, offering the insiders,

15 so we developed a plan to analyze and put together a KEIP

16 and a KERP for those people.

17 Q     Who else was involved in that process?

18 A     The independent Committee of the board, counsel, FTI,

19 executive compensation consultants were also involved.

20 Q     And can you describe the process to build the KEIP and

21 KERP?

22 A     Yes.  So the first thing we did is looked at people's

23 current compensation, what amounts, what levels would be

24 incentivizing in terms of dollar amounts.  We analyzed that

25 in terms of market compensation for individuals.  We looked

1  at it from a market comparables for other KEIPs and KERPs.

2      We then looked at what metrics or targets would be

3  appropriate and then negotiated that with the lenders who

4  were providing through the DIP financing body amounts to be

5  paid, hopefully to arrive at where we are today.

6  Q    And what was FTI's role in that process?

7  A    In addition to me, I hired Bill Jones, one of my

8  partners who is in the executive compensation group who

9  helped analyze compensation, as well as KEIPs and KERPs in

10 the marketplace.

11 Q    And why did you discuss the KEIPs and KERPs with the

12 lenders?

13 A    Well, ultimately they were providing the funding.  The

14 initial DIP budget included a placeholder for $12 million

15 for KEIP and KERP, and ultimately we knew that we would have

16 to seek their approval to pay it, relative to the DIP budget

17 and so we were going to seek their approval in terms of the

18 structure.

19 Q    And you mentioned the independent Committee, is that

20 the Special Committee?

21 A    It is.

22 Q    And what was their role in the process?

23 A    As CRO I actually report to them and so as part of

24 their process, I had to run the concept by them, you know,

25 whether or not we could include a KEIP and a KERP, and

1  ultimately it was their approval that I needed to get from

2  the Debtors' side.

3  Q    Okay.  And can you describe the proposed KEIP?

4  A    Yes.  The KEIP is $4.6 million for 12 individuals.  It

5  is -- has four components to it.  We've heard a little bit

6  already, but the recovery solution sale, the correction sale

7  were planned.  Certain financial metrics and then retention

8  of customers.

9  Q    And those components are the metrics that have to be

10  achieved, correct?

11  A    Yes.

12  Q    And can you describe the proposed KERP?

13  A    The KERP is $3 million for 50 -- I guess now 54-55

14  individuals as constructed.  A portion of that, 675,000 was

15  earmarked "discretionary," but tagged for 23 individuals

16  that the patient care ombudsman had said were important to

17  incentivize them to stay around.

18  Q    Can additional participants be added to that

19  discretionary pool?

20  A    They can.

21  Q    And who decides that?

22  A    That would be myself in consultation with the Special

23  Committee.

24  Q    And what parameters are there on adding additional

25  participants?

1  A     Ultimately it's the retention program.  So the

2  criticality of those employees will be the primary driver,

3  as well as whether or not they're at risk of returning.

4  Q     Did those plans change over time, the KEIP and the

5  KERP?

6  A     They did relative to the negotiations, as I mentioned

7  earlier.  Our initial placeholder was 12 million.  Our

8  initial ask, I think ultimately -- I don't remember what the

9  actual ask was, and then came down to the current level that

10 it is now.

11 Q     And it came down in discussions with the lenders,

12 right?

13 A     That's correct.

14 Q     Okay.  And at some point was a clawback and a retention

15 period added?

16 A     It was, yes.

17 Q     And why was that added?

18 A     Part of the idea, in terms of negotiations with the

19 lenders, was that the dollars that went out the door and if

20 everybody walked immediately upon payment, that would hurt

21 the overall enterprise.  And so a clawback was instituted

22 for those amounts.

23          THE COURT:  Post-effective date?

24          THE WITNESS:  The clawback goes through

25 December 31st of '25.

1  BY MR. BULL:

2  Q    And just to be clear, was the clawback requested by the

3  lenders?

4  A    It was.

5  Q    Did the addition of the clawback have an effect on the

6  size of the KEIP or the KERP?

7  A    It was part and parcel of the negotiations in terms of

8  the amount that we negotiated.

9  Q    Who selected the KEIP participants?

10 A    That was initially myself, as well as the Special

11 Committee and then in consultation with Mr. Slocum, the CEO.

12 Q    Okay.  And how were they selected?

13 A    Ultimately it looked at the criticality of those people

14 in driving the overall restructuring and strategy of the

15 company.

16 Q    And generally speaking, who are the 12 participants?

17 A    It is primarily the C Suite, if I can name them, I

18 think, off memory, if you want, is the Chief Executive

19 Officer, Chief Operating Officer, Chief Medical Officer,

20 Chief Human Resource Officer, Chief Compliance Officer,

21 Chief Information Officer, Chief Legal Officer, Chief

22 Accounting Officer, Senior Vice President of Finance, I

23 mentioned Chief Operating Officer -- yeah, I did already.

24 President of the State and Federal Division and two presence

25 of the local government division.  That's 12.

1  Q     Thank you.

2        When did the KEIP participants learn about the

3  possibility of a KEIP?

4  A     That was prior to filing, October/November timeframe.

5  Q     And how was that done?

6  A     So we have executive leadership team meetings that

7  Mr. Slocum runs.  They knew that -- I had to inform them

8  that they were not going to get their incentive payments,

9  whether it was incentive bonus payments or their

10 transactional bonuses, I think those added up to, for that

11 group, over $8 million worth of compensation that they would

12 not be receiving.

13       And that instead, to continue to incentivize them, we

14 would seek approval -- well, first, seek the design of a

15 KEIP and a KERP to keep those individuals and then seek

16 approval of the Court to do so.

17 Q     Why did you tell them about the KEIP and KERP at that

18 time?

19 A     Well, we lost a significant number of key employees

20 already, and then given the fact that they were going to be

21 losing that level of compensation to the bankruptcy, it was

22 important to figure a new way to incentivize people.

23 Q     Did you discuss the KEIP metrics?

24 A     We did generally at the time because the RSA was under

25 development.  They were fully briefed on the RSA and what

1   they were going to be doing with respect to it.  And that we

2   would likely be tying components of a successful

3   restructuring into their KEIP.

4        Ultimate the exact numbers were negotiated over the

5   next six weeks or so with the lender.

6   Q    Do you believe the potential KEIP played a role in

7   retaining the key participants?

8   A    It has heretofore because I talk to them almost every

9   week about it.

10  Q    What are the metrics to be achieved under the KEIP?

11  A    The first was the Recovery Solutions.  If successful,

12  the Recovery Solutions sale to whoever party that was going

13  to be.  Correction sale or plan confirmation.  There were

14  financial metrics that were put in place which included

15  meeting the DIP budget, a minimal liquidity at the end of

16  the case and achieving an amount that did that exceed the

17  need for $55 million of equity infusion to get us out the

18  case.  I think that was the three components.

19       And then the last was customer retention.

20  Q    Is that the contract retention?

21  A    Contract retention, yes.

22  Q    And who picked those metrics?

23  A    So it was partly me, relative to knowing that we had to

24  have a successful restructuring and then also in concert

25  with the lenders, negotiating with the lenders.

1  Q    Now we've heard criticisms that the metrics are layups

2  or *fait accompli* or foregone conclusions.  Do you agree with

3  those characterizations?

4  A    I do.

5  Q    At a high level, can you describe the additional work

6  that's required by the management team for those metrics,

7  starting with the Recovery Solutions sale?

8  A    Yes.  So the Recovery Solutions sale -- so even though

9  it was a separate business, we did have certain and separate

10 contracts with customers.  We did have overlapping

11 customers.

12      So the first piece was just dealing with customer

13 relationships that you're separating out.

14      The other part of the separation is that for the most

15 part it was intertwined from a back-office standpoint in all

16 the functions that the KEIP participants actually run.  We

17 had to stand up a separation management office and then

18 ultimately a TSA, Transition Services Agreement.

19      That for any buyer, whether it was a new private equity

20 firm or a strategic would need because of the inner workings

21 of the back-office of the Recovery Solutions Group, as well

22 as the corrections business.

23      The standing up of that in a very short order was an

24 extremely difficult task.  It's everything from -- it's new

25 bank accounts to new bonding relationships to new systems,

1  new policies and procedures, new HR functions, et cetera.

2       But ultimately Recovery Solutions will have to hire

3  their own, but in the meantime it's Wellpath.  And so you're

4  doubling the duties because before, it was one, now you're

5  having to do it twice.

6       So standing that up was a significant amount of work.

7  Q    And the Recovery Solutions sale has occurred, right?

8  A    It has.

9  Q    So why do you think the participants should receive an

10 award for it?

11 A    Well, it was a critical part of the overall

12 restructuring.  They were told that we would seek this and

13 we wanted them to come to achieve a sale of Recovery

14 Solutions.  So it was prospective in terms of the beginning

15 of the case.  There was a significant amount of work put in

16 place.

17      The amount of diligence from third parties that were

18 looking at Recovery Solutions took away from their day jobs

19 and ultimately they lost significant compensation that was

20 there before for Recovery Solutions transaction.

21 Q    Do you think there would be an impact on the

22 participants if they're not awarded the first metric?

23 A    Yes.  I think -- I will have a hard time keeping them.

24 Q    Okay.  And can you describe the additional work

25 required for the second metric, the correction

1    sale/Chapter 11 Plan of Reorganization?

2    A    So yes.  There was diligence that had to be done for --

3    we had several interested parties along the way that did

4    diligence on the corrections business.  That took away from

5    management time.

6         You'd think a lot of the times your advisors would do

7    that, but there was questions really for all people that are

8    in that KEIP, relative to whether it was compliance, or

9    clinical elements, or accounting issues, so there was the

10   added burden of them being interviewed and having to prepare

11   Schedules and information for diligent parties, including

12   the lenders, quite frankly, who were the backstop parties,

13   who were 24/7 on our people's tails essentially asking for

14   information.

15        So a significant amount of information and work went

16   into the diligence.

17        The other thing that I think is important to note is

18   we're operating a business now in Chapter 11 that has caused

19   disruption to our vendors, obviously our employees, as you

20   can see from the turnover.  Any extra work that's gone into

21   trying to keep the waters calm, so to speak, has been

22   significant extra work over and above their day-to-day

23   duties.

24   Q    And how about the third metric, the financial metrics?

25   A    Well, financial metrics -- first of all, I'm limited in

1    terms of how much money I was able to borrow under the DIP.

2    There is no more DIP, so there's a timing element of that,

3    but I need to be able to get out of bankruptcy in a certain

4    amount of time.

5        There's also the fact that we -- while the Court did

6    approve certain First Day relief for critical vendors,

7    et cetera, which was extremely helpful in continuity care.

8    There was nonetheless a number of vendors who decided not to

9    show up and not provide goods and services.

10           Those negotiations continue to this day to keep

11   the operations going.  We've looked for and continue to look

12   for post authorization strategies to keep our costs down, as

13   well as, you know, push counsel to get this case, you know,

14   through, to keep the professional fees down, and the overall

15   stability of the business in terms of cash flow.

16           One of the biggest drains right now is our surety.

17   A program which continues to require collateralization,

18   which we didn't have fully budgeted, so we've had to manage

19   our operations in order to stay within our DIP budget, which

20   at the moment we are still managing to do that.

21   Q    Okay.  And then the fourth metric, contract retention.

22   What additional work was required to achieve that?

23   A    So you know, the contractor -- and there's been some

24   talk today about the contract retention.  Our clients have

25   termination for convenience rights under their contracts.

1  They're government contractors.  They have keep or see

2  abilities.

3       Part of this restructuring plan there was significant

4  concern because we had lost some contracts prior to

5  bankruptcy because of our financial wherewithal, or lack

6  thereof at the time, and rumors in the marketplace that we

7  believed that we were going to have, as well as the DIP

8  Lenders.  We were worried that we were going to have

9  contract losses.  We were essentially going to have contract

10 attrition.

11      We already had called on our own accord 65 contracts in

12 18 months, and so there was still some, you know, issues out

13 there that whether or not, you know, customers need to go

14 someplace else.

15      With the pendency of the bankruptcy, you had the *Tehum*

16 case.  There was going to be worry about whether or not our

17 customers would pull a T for C notwithstanding sort of

18 bankruptcy automatic stay because of the T for C rights.

19 Q    And what's a T for C?

20 A    Termination for convenience, essentially the unilateral

21 ability to terminate a contract.

22 Q    And is that true for all your contracts?

23 A    Yes.

24 Q    And what work was the management team doing to keep

25 these contracts?

TIMOTHY DRAGELIN - DIRECT BY MR. BULL                397

1   A     So they have been -- we kind of joke a little bit,

2   calling it crisscrossing the country working with our

3   customers.  They were on a day-to-day basis that's been, you

4   know, the CEO, the COO, and the various presidents,

5   including myself, who have had to constantly reassure our

6   customers.  We had a whole communication program that we put

7   in place, a lot of face-to-face meetings.

8         And it's not just our customers.  It's not just the

9   contracting entity, but it's City Council members, it's the

10  contracting entities, not just necessarily your local

11  sheriff.  It's the people who essentially the sheriff

12  reports to that you have to spend time reassuring that we

13  are going to come through this so that they don't exercise

14  their right and move on to another vendor.

15  Q     And what's the amount of contracts up for renewal or

16  (indiscernible)?

17  A     So in the current window that we're sitting in, there

18  is $57 million of gross profit that essentially would drop

19  to the bottom line.  That is in the re-bid renewal window.

20  Q     Okay.  And is that the universe of at-risk contracts?

21  A     No.  The way that the at-risk calculation was done was

22  really around all contracts because of the termination for

23  convenience ability and the concern around those contracts,

24  and that would be the full $1.5 billion.

25  Q     That's because they're --

1  A     Of revenue.  You know, call it a 150, 160 million of

2  gross profit.

3  Q    Do you consider those at risk because they're freely

4  terminable?

5  A    Yes.

6  Q    And as we get into April what's your view of that risk?

7  A    So right now there is -- as I just mentioned, there is

8  $57 million of gross profit that is in a renewal re-bid

9  window.  And there's been testimony already about that.

10       What was missed was the fact that while the date of

11  those contracts is estimated to be July 1 for the renewal

12  re-bid, the notice period, as Mr. Slocum talked about, is

13  really sort of that April 1 date where they're going to make

14  a decision whether or not they allow us to go forward with

15  the renewal, or if they're going to go out or actually

16  re-bid or do a -- what's called an emergency procurement.

17       It's interesting about that whole list that was talked

18  about before.  They're all in various stages, but none of

19  the clients have actually signed the document, even though

20  we may have negotiated terms already and we've signed, the

21  customer has not agreed yet.  And so those are all been at

22  risk.

23  Q    Okay.  And at a high level, can you describe the roles

24  that each of the key participants have played and are

25  playing in achieving these metrics?  And can you start with

1    Mr. Slocum?

2    A    So Mr. Slocum really has -- first and foremost, because

3    of my dual role, Mr. Slocum has actually taken on more

4    responsibilities, as well.  So yes, I'm the CFO and Chief

5    Restructuring Officer -- those are kind of two full-time

6    jobs.  So Mr. Slocum has stepped in to drive a lot of

7    restructuring elements, dealing with lenders, reporting.

8         As the Chief Architect of the communication strategy

9    with our customers, he was the chief force behind standing

10   up the Transition Services Agreement on a very fast pace in

11   order to achieve the Recovery Solutions sale.

12        And so those were some of the areas that he has been

13   responsible for.

14        Cindy Watson, as Chief Operating Officer, Cindy has

15   deep customer relationships, many of which overlap with the

16   Recovery Solutions and managing that carveout.  And that

17   transition was important.  She's driving cost reduction

18   strategies through the operating down to the gross profit,

19   as well as some SG&A, selling general and administration.

20   So those are her -- and some vendor negotiations, as well.

21        Reporting to her, David Thompson, State Federal Eric

22   Hamness (phonetic), local government and Cole Casey

23   (phonetic), local government.  The three of them are

24   responsible for the day-to-day operations of those

25   divisions.  They have been dealing with vendor negotiations,

1   the customer retentions, meeting with those customers, and

2   cost reduction strategies within their divisions.

3        Chief Compliance Offer and the Chief Medical Officer,

4   I'll sort of kind of put them together partly driving our

5   improvement in the care of our patients, not only on a

6   compliance, but also on a clinical level, which helps

7   mitigate costs, but also just improves the quality of care

8   for our patients.

9        They also oversaw their direct reports relative to

10  Recovery Solutions and helped them do the transition into

11  sort of a elevator roles and continue to oversee those

12  elements for compliance and the Chief Medical Officer.

13       The Chief Information Officer, Joel Jenson (phonetic),

14  he was really sort of the arms and legs of the TSA and the

15  SMOs, Separation Management Office, and drove significant

16  cost reductions during this period of time, outsourcing

17  pretty much the whole IT group.

18       Chief Human Resource Officer, Debbie Chan, she was

19  previously the head of talent acquisitions, everything about

20  recruiting, and the fact that we have 20 percent turnover

21  in, you know, year-out yield, that's a very significant

22  role.

23            She replaced the former CHRO just prior to filing,

24  who left because they didn't believe that there was going to

25  be KEIP or any kind of an incentive.  And so Debbie took on

1   that role.  She's been a CHRO before.

2         She's helped with Recovery Solutions in terms of

3   keeping that, the talent acquisition there and keeping those

4   people in place, and then also looking for cost reduction

5   strategies in the employee base.

6         Who am I missing?

7   Q    Mr. Tussi (phonetic).

8   A    Mr. Tussi, Chief Accounting Officer.  So all things

9   accounting, the carveout of Recovery Solutions, vendor

10  management, accounts payable management.

11        Jennifer Desvario, SPV of Finance.  She's also our

12  treasurer, and so the whole treasury management, standing up

13  Recovery Solutions treasury, as well as really the day-to-

14  day management of our cash flow and keeping us in check

15  relative to our DIP financing.  And she also works on our

16  bonding program, our surety program.

17        And the Mark Goldstone, Chief Legal Officer, has been

18  instrumental in the Recovery Solutions spin-off and the

19  diligence leading up to it, especially around licenses and

20  liabilities.  He is in charge of the overall insurance

21  programs and has been instrumental in the negotiations with

22  a lot of our vendors.

23        Is that everybody?

24  Q    That's all 12.

25  A    Okay.  All right.  So.

1  Q    When did Wellpath file its motion seeking approval of

2  the KEIP and KERP?

3  A    Mid-January, 13th, 17th, something in that range.

4  Q    Why didn't it file it sooner?

5  A    Partly in negotiations that were going on with the

6  lenders who were funding it and we did have a lot of other

7  things going on, like the Recovery Solutions sale, as well

8  as diligence from the lenders, the UCC, et cetera, that

9  those were sort of the two issues that drove this to be a

10  little bit later.

11  Q    Okay.  And if the KEIP and KERP are not approved, do

12  you think people will leave?

13  A    I do.

14  Q    Who do you think will leave?

15  A    I think there are members of the C Suite that are at

16  significant risk of leaving.  I think the KERP members.

17  I've already lost a number of people that would have been in

18  the KERP, including my staff and the finance and accounting.

19  We've lost our entire financial planning and analysis team,

20  so -- and I lost some of our pricing team.

21       So I think those will continue to occur unless we lock

22  them down.

23  Q    And if members of the C Suite left, what would be the

24  impact be on the Debtors?

25  A    Well, we actually don't have backups because we had

 1  lost so many C Suite members before and promoted from

 2  within.  We don't really have a bench at this point.  I

 3  actually think it does damage to our operations and

 4  ultimately our value.

 5          MR. BULL:  Thank you, Mr. Dragelin.

 6              I'll pass the witness.

 7          (Pause in the proceedings.)

 8          MR. FARBIARZ:  Good evening.  I'm Adam Farbiarz

 9  from the Proskauer Rose Law Firm for the UCC.

10          THE WITNESS:  Thank you.

11                      CROSS-EXAMINATION

12  BY MR. FARBIARZ:

13  Q    Good evening, Mr. Dragelin.  Nice to see you again.

14  A    Same.

15          MR. FARBIARZ:  Is Ms. Swift, Ms. Miranda Swift on

16  the line?  I think she's going to be calling up some

17  exhibits.  Great.

18          Ms. Swift, could you pull up Docket 1384, which is

19  Mr. Dragelin's Declaration that was admitted into evidence?

20          THE COURT:  Have her turn on her camera and then

21  I'll give her presenter rights.

22          (Pause in the proceedings.)

23          MR. FARBIARZ:  Ms. Swift, did you hear the Judge's

24  instruction?

25          (No audible response.)

1          MR. FARBIARZ:  Great.

2      (Pause in the proceedings.)

3          MR. FARBIARZ:  Were you able to present Docket

4  1384, Ms. Swift, Mr. Dragelin's Declaration?

5          MS. SWIFT:  (No audible response.)

6          MR. FARBIARZ:  I'll proceed while Ms. Swift works

7  that out.

8          THE COURT:  Let me -- I think she just --

9          MALE SPEAKER:  There she is.

10          MR. FARBIARZ:  Oh, beautiful, okay, great.

11          THE COURT:  Okay.  Is that you, Mr. Dragelin, at

12  402?

13          THE WITNESS:  I'm sorry?  1384?

14          THE COURT:  No, no, there's somebody just raised

15  their hand.

16          MS. SWIFT:  That was me, Miranda, sorry.

17          THE COURT:  Okay, good.

18          MR. FARBIARZ:  Okay, great.

19          And Ms. Swift, could you go to Page 7, Paragraph

20  15?  Thank you.

21  BY MR. FARBIARZ:

22  Q    So Mr. Dragelin, Mr. Bull was just asking about you

23  testified that there were four performance targets or

24  performance metrics under the KEIP; is that correct?

25  A    That's correct.

TIMOTHY DRAGELIN - CROSS BY MR. FARBIARZ                405

1   Q     And if we look at Paragraph 15, the second sentence, it

2   says, "These performance targets include the following," and

3   then it has list.  Do you see that?

4   A     I do.

5   Q     And the first performance target is (a) the closing of

6   the Recovery Solutions sale transaction; is that right?

7   A     Yes.

8   Q     The Recovery Solutions sale has already taken place,

9   correct?

10  A     It has.

11  Q     And because the Recovery Solutions sale has already

12  taken place, if the Court were to approve the KEIP, the

13  Wellpath employees who are part of the proposed KEIP will at

14  that very moment be entitled to the amounts associated with

15  the Recovery Solutions performance target, correct?

16  A     That's correct.

17  Q     And more specifically, if the Court were to approve the

18  KEIP at that very moment the Wellpath employees who are

19  subject to the participate in the KEIP will be entitled to

20  an aggregate $1.77 million; is that right?

21  A     That's correct.

22          THE COURT:  Okay.  I have a question because in

23  Mr. Gilbert's Declaration, he says, "Critically if any of

24  the Debtors' KEIP metrics are not achieve, then the KEIP

25  participants will not receive any awards."

1          So the way I read his Declaration is you have to

2    meet all four before you get any of the awards.  Is that not

3    correct?

4          THE WITNESS:  That's not correct, sir.

5          MR. FARBIARZ:  If I may, Your Honor.  I think

6    actually it was either this morning or yesterday, Mr. Jones

7    amended yet again his Declaration to change those very words

8    to make clear that it's an à la carte kind of award system.

9          THE COURT:  Okay.  Well --

10          MR. FARBIARZ:  So I don't know if you've seen the

11   latest and greatest?

12          THE COURT:  No, I didn't see the latest and

13   greatest, but they did point out that you had filed an

14   amended one, but.

15          MR. FARBIARZ:  Yeah, and I had actually --

16   Ms. Swift, could you pull up 1422-1, which is the exhibit to

17   the Jones Declaration?  I just want to be clear about this.

18          MALE SPEAKER:  And if I may, Your Honor, that is

19   correct.  Mr. Jones filed the Amended Supplemental

20   Declaration and he clarified that, Your Honor.

21          THE COURT:  All right.  Well then, okay.  'Cause I

22   thought that addressed a lot of the issues that were raised

23   about the allocation and what did what and who got what

24   percentage for what, but okay, I'm going to have to re-think

25   it then.

1          MR. FARBIARZ:  Yeah, it's à la carte and if I may,

2    1422-1 is an exhibit to Mr. Jones' latest and greatest and

3    if we go to Page 4, please, Ms. Swift.  If we can zoom in a

4    little bit?

5    BY MR. FARBIARZ:

6    Q    And Mr. Dragelin, we've reviewed this document at your

7    deposition on Friday, so I think you're familiar with it,

8    correct?

9    A    I am.

10   Q    And the document shows that if Metric One, the RS sale,

11   the Recovery Solutions sale metric is achieved, which of

12   course, it already has been, as you just testified, the 12

13   would-be KEIP participants would get an aggregate

14   $1.77 million as reflected on this exhibit, correct?

15   A    That's how we discussed it, yes.

16   Q    A million dollars would go toward the CEO, Mr. Slocum,

17   and then $70,000 to each of the other 11 KEIP participants,

18   right?

19   A    Correct.

20   Q    And the same would apply to each of the other three

21   metrics there.  It would be rewarded à la carte as each of

22   them was -- as each of those metrics is achieved, right?

23   A    That's what we designed it for.

24          MR. FARBIARZ:  Okay.  And Ms. Swift, could you

25   just go back to the witness's -- Mr. Dragelin's Declaration,

1    Page 7, if you don't mind?

2    BY MR. FARBIARZ:

3    Q    And as of today, Mr. Dragelin, because the Recovery

4    Solutions sale has already taken place, the 12 would-be

5    participants in the KEIP, they don't have to be incentivized

6    to do anything to complete the Recovery Solutions sale,

7    correct?

8    A    Well, the sale is complete.

9    Q    As a matter of logic, they do not have to do anything.

10   They don't have to be incentivized to do anything for the

11   sale to be completed because the sale has already occurred,

12   correct?

13   A    On a go-forward basis as of today, that's correct.

14   Q    They don't have to do anything to earn that

15   $1.77 million, right?

16   A    It was already earned.

17   Q    Okay.  Mr. -- on your direct examination, you said --

18   Mr. Bull asked you what would happen if the RS metric --

19   sorry, if these participants weren't given their award under

20   the RS metric, and you testified, quote, "I will have a hard

21   time keeping them," unquote.

22        Did you testify to that?

23   A    That's a fair representation of what I said.

24   Q    So the purpose of the RS metric is to ensure that you

25   keep -- K-E-E-P -- those 12 would-be KEIP participants,

1    right?

2    A    I disagree.

3    Q    But you will have a hard time keeping them if that

4    metric is not blessed by the Court, correct?

5    A    Yes.

6              MR. FARBIARZ:  And let's look at the second

7    metric.  And that's B on the screen in front of you.

8    BY MR. FARBIARZ:

9    Q    The metric B is the closing of a corrections asset sale

10   transaction or consummation of a Chapter 11 Plan of

11   Reorganization involving the corrections assets.  That's the

12   second metric, correct?

13   A    It is.

14   Q    And the corrections asset sale, as contemplated in the

15   Debtors' KEIP motion, that never took place, right?

16   A    It did not.

17   Q    And because the corrections asset sale did not occur,

18   this second metric, which is B on your screen, is intended

19   to incentivize, not the sale, which never occurred, but only

20   the reorganization of Wellpath, including the corrections

21   assets, correct?

22   A    That is correct.

23   Q    The Wellpath team, the C Suite, as we sit here today

24   has already developed the Plan of Reorganization involving

25   the corrections assets, correct?

1    A    It's not achieved it, no.

2    Q    They've developed that plan, though, right?

3    A    The plan, yes.

4    Q    The Plan of Reorganization for the corrections asset or

5    involving the corrections assets is set forth in the RSA

6    that was included in Wellpath's First Day papers, right?

7    A    Correct, but it's not that cheap.

8    Q    And to state the obvious, the RSA was negotiated

9    pre-petition, correct?

10    A    It was.

11    Q    In other words, the Wellpath team has already

12    negotiated the terms of the sale of the corrections assets,

13    right?

14    A    The terms are.

15    Q    Okay.

16    A    But we've not actually achieved that metric yet.

17          MR. FARBIARZ:  Let's look at the third metric, and

18    Ms. Swift, if you could scroll down so we can see all of C

19    on one page, please?  Thank you.

20    BY MR. FARBIARZ:

21    Q    C, the third metric is certain financial metrics,

22    including meeting or outperforming the initial DIP budget,

23    achieving minimum liquidity of no less than $35 million upon

24    consummation of a Chapter 11 Plan and achieving performance

25    levels, such that the business will require an equity

1    financing amount of no greater than $55 million.  That's the

2    third metric under the proposed KEIP, correct?

3    A    It is.

4    Q    And to be clear, this refers -- this third metric, of

5    course, starts out with meeting or outperforming the initial

6    DIP budget -- and to be clear, the initial DIP budget

7    contemplates that Wellpath as minimum liquidity of no less

8    than $35 million, right?

9    A    That forecast that we used for the sizing of the DIP

10   including an ending cash balance of 35 million and for about

11   ongoing minimum liquidity of 35 million.

12   Q    There's an ongoing minimum liquidity, every week added

13   the minimum liquidity of $35 million under the initial DIP

14   budget, right?

15   A    That's the way we sized it, sized the DIP financing.

16           MR. FARBIARZ:  Okay.  And we don't have to go into

17   -- I don't have to pull it up 'cause the hour is late, but

18   the initial DIP budget for the Court's record is at

19   Docket 81, pages 243 and 244, and you'll see the $35 million

20   that are sized every week at minimum liquidity.

21   BY MR. FARBIARZ:

22   Q    And for purposes of this Metric 3, to the extent it

23   requires Wellpath to meet or out-perform the initial DIP

24   budget, for the purpose of Metric 3, outperforming the

25   initial DIP budget simply means not running out of money,

1    correct?

2    A      I mean, that's fair because we were limited in terms

3    of our amount of DIP financing we had and we had a minimum

4    liquidity, so we couldn't go borrow more money.

5    Q      I'm just trying to keep it simple.

6          On Friday, when I deposed you, I said, "What does this

7    mean, this third metric when we say not meeting the initial

8    DIP budget, you said it means not running out of money, and

9    you said, yeah, that's what it means, not running out of

10   money.  Okay.

11         And by the way, you testified earlier today, your

12   earlier session, that today's Debtors have a $140 million

13   cash on hand?

14   A      Roughly, 130, 140, somewhere in there.

15   Q      And still on this third metric, the RSA, the

16   pre-petition negotiated RSA, contemplates that the parties

17   that will take equity in the reorganized Wellpath will put

18   in no more than $55 million in exchange for their equity and

19   doing so will ensure that the Reorganized Wellpath has at

20   least $35 million liquidity.  That's in the RSA, right?

21   A      The mechanism there in the RSA is such that if I am

22   sitting on, let's say $40 million of cash, they can provide

23   50 million in equity financing.  So there's an interplay

24   between liquidity and how much they need to provide.

25               THE COURT:  So if you have 140, they don't have to

1  provide the 20?

2          THE WITNESS:  That's a good question, but I won't

3  have 140.

4          THE COURT:  Well, but if you did?

5          THE WITNESS:  If I did, I would -- I could cure --

6  I could cure the contracts that are currently contemplated

7  to be cured and pay the amounts with my cash on hand.

8          THE COURT:  And so they would not put in any money

9  for their 97 percent stake?  Is that?  I mean --

10          THE WITNESS:  Yeah, I think -- I guess that is --

11  I have to actually check with counsel, but operationally, I

12  will not have that level of cash, so I will need between --

13  and if you -- I mean, I can stand upon it, Your Honor.

14          THE COURT:  No, that's okay.  I mean.

15          THE WITNESS:  I'm going to have 70 million or so

16  of professional fees coming up, plus some of the other just

17  ongoing expenses that will wipe that number down to 35.

18          THE COURT:  I thought we heard that the

19  professional fees were separately escrowed and were not

20  included in part of the 35.

21          THE WITNESS:  They are.  It deducts from my

22  current cash balance to get down to the 35.  In order to

23  actually sitting on $100 million cash today, I will be

24  continuing to pay professional fees, as well as ongoing

25  operating expenses, and collateralization of shorty bonds,

1    et cetera.  And I will end up at emergence with $35 million

2    in cash.  So the professional fees, including -- I think

3    Your Honor said, the contingent fees or the --

4              THE COURT:  The success fees.

5              THE WITNESS:  -- success fees, thank you.  Those

6    are out of the 35, meaning I don't need to dip into the 35

7    for those.

8              THE COURT:  Okay.  Well, obviously during the

9    Plan, somebody is going to have to explain this to me

10   because I didn't quite understand.

11             THE WITNESS:  Okay.

12             THE COURT:  Thank you.

13             MR. FARBIARZ:  May I proceed, Your Honor?

14             THE COURT:  Sure.  I'm sorry.

15             MR. FARBIARZ:  Oh, please.

16   BY MR. FARBIARZ:

17   Q    I just wanted to bring us back to the screen, which is

18   Metric C and I just wanted to -- I was trying to draw out

19   the connection between Metric C, the financial metrics, and

20   the RSA.  So if we could --

21             MR. FARBIARZ:  Actually let's look at the RSA.  I

22   think that will ground us a little bit.

23             Ms. Swift, could you pull up Docket 20-2, which is

24   the RSA?

25        (Pause in the proceedings.)

1          MR. FARBIARZ:  There you go.  And if you could

2  jump to Page 99, please?

3  BY MR. FARBIARZ:

4  Q    And do you recognize this -- perfect.

5       Do you recognize this, Mr. Dragelin, as the refinancing

6  term sheet that's a part of the RSA?

7  A    Yes.

8  Q    And let's talk about the heart of the matter, which is

9  that the equity financing term --

10         MR. FARBIARZ:  Could you zoom in a little bit

11  more, Ms. Swift, on the equity financing term in the chart?

12         There you go.

13  BY MR. FARBIARZ:

14  Q    Okay.  And I'm just reading in the middle where it

15  says, "collectively the participants."  Are you with me,

16  Mr. Dragelin?

17  A    Yes.

18  Q    It says, "Collectively the participants, a defined

19  term, will commit to subscribe to purchase the common equity

20  of Reorganized Wellpath being issued in the equity financing

21  in an aggregate amount to be determined between $20 million

22  and $55 million, which is defined as the equity financing in

23  that."

24       Do you see that?

25  A    Yes.

1  Q    And I'm just going to skip to the next sentence.  It

2  says, "The equity," you with me, the equity financing?

3  A    Yes.

4  Q    "The equity financing amount shall be determined by the

5  required backstop parties and shall be reasonably acceptable

6  to the Debtors, it being understood that it shall be

7  acceptable to the Debtors to the extent the equity financing

8  amount is sufficient to ensure that there will be at least

9  $35 million unrestricted cash on the balance sheet of

10 Reorganized Wellpath on the Plan effective date."

11       Did I read that correctly and do you agree --

12 A    Yes.  Yep, yep, yep.

13 Q    -- 35 million.

14 A    35 million, yes.

15       MR. FARBIARZ:  And let's -- Ms. Swift, just go

16 back to 1384, Mr. Dragelin's Declaration, pages 7 and 8.

17 BY MR. FARBIARZ:

18 Q    So just to be clear, Mr. Dragelin, if the RSA deal goes

19 through as contemplated in the equity financing term sheet

20 we just read, which of course if part of the RSA that was

21 pre-negotiated, where according to that equity financing

22 term sheet, Wellpath takes equity financing of no more than

23 $55 million and as per the equity financing term sheet, that

24 achieves minimum liquidity for the Reorganized Wellpath, of

25 $35 million.  And of course, if Wellpath has not run out of

1   money by this point -- which you said is part of the -- what

2   it means to adhere to the DIP budget, then the third

3   performance metric under the KEIP will have been achieved,

4   correct?

5   A    So if we have 35 million of cash, I haven't had to

6   borrow any more, and I get to have an equity infusion of

7   55 million, that's how I achieve that metric.

8   Q    If the Reorganized Wellpath takes in 55 million -- no

9   more than $55 million, as contemplated by the equity

10  financing term sheet in the RSA, and Wellpath has

11  $35 million of liquidity, and Wellpath hasn't run out of

12  money by that date, the third performance metric under the

13  KEIP will have been achieved, correct?

14  A    Not completely.

15  Q    Do you recall testifying on Friday that it would be

16  achieved if those metrics -- if that scenario I just

17  presented was achieved and realized, and you testified on

18  Friday that, in fact, the third metric would be achieved?

19       Do you recall testifying to that?

20  A    A nuance.

21  Q    Please?

22  A    So if you go back actually -- or I'll just read it

23  here.  "Achieving performance levels such that the business

24  will require an equity financing amount of no greater than

25  55 million."

1        So if all of those elements happen, I would agree with

2    you, okay?  But those performance metrics are such that we

3    have negotiated our exit or our cures to be no more than the

4    55 million, or 55 million, but we get, you know, some extra

5    -- we have some extra cash on the balance sheet, so we maybe

6    only -- as I mentioned, we only get 50 million from the

7    lenders, but I have 40 million -- and I use 5 million of my

8    own cash, right?

9        The point is if I have cures that are greater than the

10   55 million -- that I need to cure more than 55 million --

11   Q    Yeah.

12   A    -- and I don't have capital to do that, --

13   Q    Yeah.

14   A    -- this metric is not achieved.  But if I hit that

15   number and I get 55 million and I'm sitting on 35 million of

16   cash, and I haven't had to borrow anymore, then you're

17   absolutely right and my testimony is consistent.

18       However, you missed the nuance that we have to

19   negotiate that 55 million because it's not just 55 million

20   that goes onto the balance sheet.  It's 55 million that

21   actually goes to unsecured creditors in the form of cures.

22       And the bucket that that 55 million goes against is

23   greater than $55 million.  So I actually have to negotiate

24   down from the actual balances down to the 55 million.

25       That's how -- that's how that metric is achieved.

1  Q    I get it, but my point is simply that if the RSA is

2  consummated as contemplated in the equity financing term

3  sheet, this third metric will be achieved; isn't that

4  correct?

5  A    But I have to achieve the individual elements in order

6  for that to be true.

7  Q    Okay.  But if those individual elements are achieved,

8  as contemplated in the equity financing term sheet, KEIP

9  Metric Number 3, or C in your Declaration will have been

10 achieved, correct?

11 A    Yes.  If I achieve it, I achieved it, yes, correct.

12 Q    Mr. Dragelin, isn't it true -- and didn't you testify

13 on Friday at your deposition that really the third KEIP

14 metric is saying if the equity financing, as already

15 contemplated in the RSA, gets consummated, then the third

16 KEIP metric will have been met.  Isn't that what you

17 testified to?

18         MR. BULL:  Your Honor?  Your Honor, I'm going to

19 object.  It's a compound question.  Is it true what you

20 testified to and it's also improper impeachment.  He's asked

21 him three questions in one and it's not fair to the witness.

22         THE COURT:  Yeah, just ask him the question, as

23 opposed to overlaying it.

24         MR. FARBIARZ:  Understood.

25 BY MR. FARBIARZ:

1   Q    Isn't it true that the third KEIP metric is saying if

2   the equity financing, as already contemplated in the RSA,

3   gets consummated, then the third KEIP metric will have been

4   met?

5   A    Yes, because there's a pre-condition to that

6   55 million.

7   Q    Let's look at the fourth metric and that's D on the

8   screen.

9        The fourth metric is meeting or exceeding -- are you

10  with me?  I'm sorry.

11  A    I am.

12  Q    Okay.  The fourth metric is D, meeting or exceeding a

13  threshold for the retention or renewal of certain contracts

14  such that the aggregate gross profit of such contracts that

15  are terminated or quote/unquote at risk for termination, as

16  that term is defined in the RSA, does not exceed

17  $40 million.  And that's the fourth metric, correct?

18  A    Correct.

19  Q    And to evaluate whether this fourth metric has been

20  achieved, Wellpath, as Ms. Pearlman said in the opening,

21  "Wellpath intends to use a formula to assess whether the

22  Debtors have lost or contracts are at risk of losing gross

23  profits -- strike that, excuse me.

24       Wellpath intends to use a formula to assess whether the

25  company has lost or is at risk of losing gross profits of up

TIMOTHY DRAGELIN - CROSS BY MR. FARBIARZ                421

1   to $40 million and intends to use a formula, correct?

2   A    That is correct.

3   Q    And as Ms. Pearlman was saying in opening, that formula

4   is set forth in the RSA, correct?

5   A    That's correct.

6            MR. FARBIARZ:  Okay.  If we could look at the RSA

7   again, Ms. Swift?  That's Docket 20-2.  Then we go to

8   Page 33.  It says termination events, Section 13, and if we

9   could scroll down to Page 35 now and look at termination

10  event T, as in Thomas?

11           Zoom in on T.  Thank you very much.

12  BY MR. FARBIARZ:

13  Q    And there's a formula here.  And the formula says if

14  the aggregate gross profit of X, the sum of Romanette (i),

15  100 percent of terminated contracts, Romanette (ii),

16  50 percent of at risk terminated contracts, Romanette (iii),

17  16.66 percent of at risk RFP contracts, and four,

18  33.33 percent of our fee contracts, less Y, 100 percent of

19  new contract wins, et cetera, I'll leave it at that.

20       If under this formula the loss contracts -- the gross

21  profits of the loss contracts or the at-risk contracts

22  exceed $40 million, then the metric will not have been met,

23  and under this formula if the gross profits, at-risk profits

24  are less than $40 million, the metric will have been met; is

25  that right?

1        Sorry, that was a little long-winded.

2   A    Yes.

3   Q    Suffice to say that this is the formula that governs

4   the metric?

5   A    Yes.

6   Q    Thank you.

7        And to get in the weeds only a little bit, the formula

8   counts 100 percent of -- actually the dollar amounts of

9   100 percent are actually terminated the contracts toward the

10  40 million of lost gross profits, right?

11  A    Okay.

12  Q    Okay.  And the formula counts 50 percent -- 50 cents on

13  the dollar of what the formula calls at-risk terminated the

14  contracts?

15  A    That's correct.

16  Q    And the formula counts 16-odd percent and 33-odd

17  percent of what the formula calls at-risk or fee contracts

18  are fee contracts, right?

19  A    That's correct.

20  Q    And putting aside the niceties of the formula, you

21  know, the 50 cents on the dollar, et cetera, in fact today

22  -- as of today, there have been zero at-risk or terminated

23  contracts that would count toward this $40 million

24  threshold, correct?

25  A    That's correct because the ones that have been

1  terminated have not counted against this formula.

2  Q    Okay.  So just to be clear, today under Metric 4, not a

3  single dollar would count toward the $40 million threshold,

4  right?

5  A    That's correct.

6  Q    Okay.  And you testified on Direct that there are about

7  $57 million in customer contracts that are currently in the

8  process of renewal or rebidding, correct?

9  A    That is correct.

10 Q    Isn't it also true that in communicating with the

11 unsecured claimholder's Committee, Wellpath has identified a

12 slightly different number of $45.8 million in contracts that

13 Wellpath believes are the contracts that are coming up for

14 renewal or rebid shortly?

15 A    No.

16 Q    You don't recall that?  That number $45.8 million?

17 A    That is the local government piece only, not including

18 statements at all.

19 Q    $57 million is the local government plus --

20 A    And plus the state and federal, that's right.

21 Q    Okay.  Isn't it true, Mr. Dragelin, that the overall

22 goal of the KEIP is to achieve the objectives of the

23 restructuring as set forth in the RSA?

24 A    Consistent with our goals as in overall restructuring,

25 yes.

1  Q    Pre-petition, you verbally -- and only verbally, never

2  in writing, told the 12 KEIP participants, or who we're

3  calling the 12 KEIP participants today, that Wellpath would

4  seek approval for the KEIP; isn't that correct?

5  A    That's correct.

6  Q    And Wellpath waited until January to apply for the KEIP

7  because negotiations with the RSA parties had not been

8  finalized, correct?

9  A    That, as well as the other activities of the case, as I

10 testified to earlier.

11 Q    Okay.  But the negotiations with the lenders did not

12 conclude until around Christmas, correct?

13 A    That is correct.

14        MR. FARBIARZ:  Ms. Winston, can we look at --

15 sorry, Ms. Swift, excuse me.  Can we look at Exhibit 1422-1

16 again, please?

17        And go to Page 2, this is the exhibit to the Jones

18 Declaration, again, that just came into evidence?  Thank

19 you.

20        1422-1, Page 2, please.  Thank you.

21        Okay.  Let's zoom into the annual salary column,

22 which is the third column after the names, excuse me, yeah.

23 Thank you.

24 BY MR. FARBIARZ:

25 Q    This shows that the 12 would be KEIP participants'

1   current salary in aggregate is $4.3 million, correct?

2          THE WITNESS:  Could you do me a favor?  Could

3   Ms. Swift, could she just give me a quick pan by this

4   document so I can see the whole document?

5          MR. FARBIARZ:  Ms. Swift, please listen to the

6   witness and do what he says.  Thank you.

7          THE WITNESS:  She can go a little faster.  I just

8   want to --

9          MR. FARBIARZ:  You know what?  If we have it

10  paper, we could actually -- do we have 1422 in paper,

11  1422-1?

12         MALE SPEAKER:  It was filed yesterday.

13         MR. FARBIARZ:  It was filed yesterday.

14         THE WITNESS:  Thank you.

15  BY MR. FARBIARZ:

16  Q    And we reviewed this document on Friday?

17  A    We did.  I just -- I just wanted to make sure it was

18  the whole document.

19  Q    Sure.  The question was this shows that the 12 KEIP

20  participants' current salary in aggregate is $4.3 million,

21  right?

22  A    Yes, sir.

23  Q    Okay.  And it also shows STI, or Short Term Incentive

24  for those 12 KEIP participants, correct?

25  A    Yes.

1  Q    But to be clear, these 12 KEIP participants are not

2  getting any STI, correct?

3  A    That's correct.  And the reason is because of the

4  bankruptcy filing.

5  Q    And under the KEIP, the Debtors are proposing to pay

6  these individuals an additional $4.6 million, correct?

7  A    That's correct.

8  Q    And if the Court were to approve Wellpath's application

9  for a KEIP, and Wellpath emerges from bankruptcy in April,

10 there will have been approximately two months from the time

11 the KEIP will have been in effect until the emergence of

12 bankruptcy and the 12 KEIP participants get their

13 $4.6 million, which will be approximately equal to their

14 annual salary, correct?

15 A    I'm sorry, that was a long -- that was a long question.

16 Q    Let's move on.  It wasn't one question.  Let's move on.

17      You testified on Direct -- or I should say, Mr. Bull

18 asked you what would happen if the KEIP is not approved?  Do

19 you remember he asked you that question?

20 A    I do.

21 Q    And do you remember you answered, "The members of the

22 C Suite are at significant risk of leaving."  You said that,

23 right?

24 A    That sounds pretty accurate.

25 Q    Is it accurate to say that the purpose of the KEIP is

1  to help retain these members of the C Suite?

2  A    All KEIPs have retentive value.

3  Q    I want to ask you about the KERP.  The KERP is for

4  non-insiders, correct?

5  A    Correct.

6              MR. FARBIARZ:  Ms. Swift, could you go to

7  Mr. Dragelin's Declaration again, 1384?  Let's go to Page 13

8  now.  Page 13, Paragraph 23, the second sentence.

9  BY MR. FARBIARZ:

10  Q    You write there, "While certain KEIP" -- I'm sorry,

11  excuse me.

12      "While certain KERP participants have titles that

13  include the words 'director' and 'chief,' these participants

14  (a) are not part of the C Suite, (b) are not appointed or

15  hired directly by the board of directors of CCS-CMGC parent

16  GP, LLC, (c) do not report directly to the board or the

17  Debtors' Chief Executive Officer, other than John Longfield

18  Smith, who recently received a promotion and now reports to

19  the Debtors' Chief Executive Officer, but has not managerial

20  control or influence over the Debtors' operations as a

21  whole, nor dictates corporate policy."

22              Did I read that correctly?

23  A    Yes.

24  Q    Now Mr. John Longfield Smith is, in fact, the president

25  of Zenova, correct?

1  A     That's correct.

2  Q     Mr. John Longfield Smith is the highest ranking

3  employee at Zenova, right?

4  A     He is.

5  Q     Zenova Management, LLC, and Zenova Telehealth, LLC, are

6  Debtors in this bankruptcy, right?

7  A     I believe that's correct.

8  Q     And are you aware that the Debtors filed a reply brief

9  last night in further support of the KEIP motion?

10 A     Yes.

11 Q     And are you aware that in that reply brief, they

12 acknowledge that an officer is a person elected or appointed

13 by the board of director to manage the daily operations of a

14 corporation, such as the CEO, president, secretary or

15 treasurer?  Are you aware that they put that in their reply

16 brief yesterday?

17 A     I don't recall those exact words.  You can show them to

18 me.

19 Q     Again, these words describe Mr. Longfield Smith as not

20 having managerial control or influence over Debtor

21 operations as a whole, right?

22       Strike that.

23       In fact, isn't it true that Mr. Longfield Smith, the

24 president of Zenova, under the proposed KERP is slated to

25 receive the largest payment of any Wellpath employee who

1  will participate in the KERP?

2  A    He does have the larges balance under the KERP; that's

3  correct.

4  Q    He will receive the most money under the KERP of any

5  KERP recipients.

6        According to the Declaration you submitted --

7            MR. FARBIARZ:  And we can look at -- sorry,

8  Page 12, Paragraph 21.  Scroll up a little bit, Ms. Swift,

9  if you don't mind?  Thank you.

10  BY MR. FARBIARZ:

11  Q    According to the Declaration the KERP provides for cash

12  incentives to 32 key non-insider employees in addition to

13  the discretionary KEIP participants, correct?

14  A    That's correct.

15            MR. FARBIARZ:  And I believe there's a footnote,

16  Ms. Swift, can you just drop down a little bit?

17  BY MR. FARBIARZ:

18  Q    Yeah, Footnote 11 says, "The current number of proposed

19  discretionary KERP participants is 23 employees."  See,

20  that's what you wrote in your Declaration?

21  A    That's correct.

22  Q    The 23 discretionary KERP participants would receive a

23  portion of the $675,000 discretionary KERP pool, right?

24  A    That's correct.

25  Q    But the 32 are now 31 originally identified KERP

1  participants are the individuals among whom the $2.3 million

2  non-discretionary portion of the KERP would be divided,

3  correct?

4  A    That's correct.

5           MR. FARBIARZ:  Thank you.

6           I don't have any more questions.

7           THE COURT:  Anyone else wish to cross-examine?

8       (No audible response.)

9           THE COURT:  All right.  Do you have Redirect?

10          Oh, Ms. Hersh?

11                    CROSS-EXAMINATION

12  BY MS. HERSH:

13  Q    Mr. Dragelin, can I ask a couple of questions on the

14  RSA?  Section 13 of the termination events and --

15          MS. HERSH:  And maybe Ms. Swift will put that back

16  up, 22-2?

17          MR. FARBIARZ:  She's not here.

18          MS. HERSH:  Oh, that's fine.  It was fine.

19  BY MS. HERSH:

20  Q    This lists in the RSA various events of default, is it

21  an event of default of the RSA if the RS recovery sale

22  doesn't close?

23  A    We'd have to look at the actual document to refresh my

24  memory.

25          MS. HERSH:  She's so good.  There it is.

1          Okay.  Can we scroll up to -- let's see.  Oh, L as

2   in Larry?

3   BY MS. HERSH:

4   Q    The closing of the RS sale is a milestone under

5   Section 4, is that correct?

6   A    Can you point me to the section?

7   Q    Sure.

8   A    I'm not trying to be difficult.

9   Q    No, that's fine.

10         Are you aware that the closing of the RS sale is a

11   milestone under Section 4?  Does that sound familiar to you?

12   A    It sounds familiar, but --

13   Q    Okay.  So if I said to you that Section 4.01 little (j)

14   says, "As a milestone no later than January 9th, 2025, the

15   recovery sales solutions shall have been consummated."  It's

16   out in front of you, I'm reading the milestone.

17   A    Oh, okay.

18   Q    Okay.  The milestone -- does that sound like a

19   milestone?

20   A    What was the date, ma'am.

21   Q    It says no later than January 9, 2025 in the milestone.

22   A    In the milestone.  That was amended, I know, so.

23   Q    Okay.  Separate from the date.

24   A    Okay.

25   Q    If the RS -- the Recovery Solutions sale doesn't close,

TIMOTHY DRAGELIN - CROSS BY MS. HERSH                    432

1  is that an event of default as you understand it under the

2  RSA?

3  A    Sounds familiar.

4  Q    Okay.  And that would be under 13.01(l), which is the

5  failure to achieve a milestone and that nothing is in front

6  of you, the failure to achieve any milestone would be an

7  event of default under the RSA; is that correct?

8  A    There's a proviso here, right under Section 4.01(j), as

9  a direct result of a purchaser of Recovery Solutions, but

10  you said it correctly.

11  Q    Okay.  And was the Debtors' compliance with the initial

12  DIP budget -- let me say the other way.

13      If the Debtor did not perform in connection with the

14  initial DIP budget, would the Debtor have been in default

15  under the DIP facility?

16  A    So if we defaulted under the DIP, we'd be in default on

17  the DIP.

18  Q    Right.  And if you're in default under the DIP under

19  Section I, you'd be in default of the RSA; is that correct?

20  A    That's what it says.

21  Q    Okay.  And if you didn't confirm a plan -- let me go

22  back.  Let me try again.

23      Is one of the milestones under Section 4 that you

24  confirm a Plan?

25  A    I believe so, yes.

1  Q    Okay.  So if you don't confirm a Plan, which is a

2  milestone, you'd be in default under the RSA; is that

3  correct?

4  A    Yes.

5  Q    Okay.  And we were talking about the $40 million or

6  less of loss of profit from termination of contracts --

7  there's so many negatives, I can't say the sentence.  But

8  you know I'm talking about Metric Number 4?

9  A    Yes, ma'am.

10  Q    Okay.  And isn't it an event of default under the RSA

11  if the Debtor doesn't achieve that, i.e., lose less than

12  $40 million of contracts?

13  A    Stated another way, if we lose more than 40, that's

14  right.

15  Q    Then you're in default of the RSA?

16  A    Correct.

17           MS. HERSH:  Okay.  Thank you, Your Honor.

18           No more questions.

19           THE COURT:  All right.  I did have one question

20  before I let you do that.

21           So this morning you testified that at 3:31 you

22  would have 50 million of AP, which included the 15 million

23  of critical vendor payments that have not been paid.

24           Is that -- how does that relate to the cure

25  amounts?  I thought these were the cure amounts?

1          THE WITNESS:  No, sir.  So, if I -- can I speak in

2   rough number?

3          THE COURT:  Yes.

4          THE WITNESS:  Just, okay.

5          So coming into bankruptcy, we had roughly

6   $270 million of accounts payable and liabilities.  A hundred

7   million, roughly -- 45 million from Your Honor's First Day,

8   you know, approved motions, and up to 55, which I believe

9   I'll use all 55, equals the 100 million, which will go to

10  the unsecured creditors through the First Day Motion,

11  critical vendors, and also cures.

12         At exit, at March 31, there will be, I believe,

13  10-to-$15 million, roughly, as we talked about this morning,

14  that will be in accounts payable because we've negotiated

15  with those vendors 'cause their amounts, like 503(b) amounts

16  were much greater than we originally estimated, and so -- as

17  well as some cure costs, that we're putting those actually

18  as accounts payable versus having a stroke check on Day One

19  and paying those.

20         Actually, stretching out when we have to actually

21  pay those.

22         THE COURT:  So you were paying them in the

23  ordinary course?

24         THE WITNESS:  Yes.

25         THE COURT:  So the cures --

1          THE WITNESS:  We're paying some right now, sir.

2    We're paying some now and it's stretched out over time, so.

3          THE COURT:  All right.  Go ahead, counsel.

4          MR. BULL:  Thank you.

5                    REDIRECT EXAMINATION

6    BY MR. BULL:

7    Q    Mr. Dragelin, is Mr. Longfield Smith an insider for

8    purposes of the KERP?

9    A    He is not.

10   Q    Does he regularly report to the board?

11   A    He does not.  Zenova is a start-up division.  It's a

12   division that we believe is going to have significant growth

13   as a way for us to actually increase value and increase

14   EBITDA on a go-forward basis.  And that's why he was

15   appointed to that position -- newly created position during

16   this case in an effort to drive additional revenue in the

17   future.

18   Q    And is he part of the C Suite?

19   A    He is not.

20   Q    And in constructing the KERP, did you take any steps to

21   ensure that no insiders were part of the KERP?

22   A    We did.

23   Q    Do you recall what those steps were?

24   A    We consulted with counsel, outside counsel, as well as

25   inside counsel on definitions and the way people -- their

1 | positions and how they interacted, et cetera, to make sure

2 | that we did not run afoul of those rules.

3 | Q    And to your knowledge, are there any insiders in the

4 | KERP?

5 | A    There are not.

6 |          MR. BULL:  And if I could ask Ms. Swift, if she'll

7 | bear with me, to put back up 1422?

8 |          Then I'll ask a question.  There we go.  Thank

9 | you.  Appreciate that.

10 |          Would you be able to scroll to the right, please?

11 |          Could we go further to the right?

12 |          Okay.  That's perfect.  Oop, sorry, could we go to

13 | -- how about the middle of the page?

14 |          That's perfect.  Thank you.

15 | BY MR. BULL:

16 | Q    Mr. Dragelin, do you see the column titled "RS

17 | transaction incentive?"

18 | A    I do.

19 | Q    And do you know what that column represents?

20 | A    Yes.  Those were previous bonuses tied to a Recovery

21 | Solutions transaction.

22 | Q    And what's the total of those bonuses on the bottom of

23 | the page?

24 | A    7.8 million.

25 | Q    Okay.  And will the executives receive those bonuses?

1   A      No.

2   Q      And why is that?

3   A      Due to the filing of the bankruptcy and their insider

4   nature, it was determined through advice of counsel that

5   those would not be able to be paid.

6   Q      Okay.  And how about the next column, "Corrections

7   Transaction Incentive"?  Do you know what that represents?

8   A      Yes.  That was a contemplated corrections transaction

9   sale, similarly that will not be paid because of the nature

10  of it, and the nature of the participants.

11  Q      Okay.  And what's the total amount of that bonus on the

12  bottom of the page?

13  A      Approximately 3.1 million.

14  Q      Okay.  And then the next column, "Previously Guaranteed

15  Bonus 2024 Compensation," do you know what that represents?

16  A      Yes.  So these members, as well as some members in the

17  KERP actually had guaranteed bonuses from 2024.  So they

18  were 2024 bonuses that are paid in 2025.  That's the cycle

19  of the bonuses at Wellpath.

20         These were guaranteed previously to be paid at those

21  levels.

22  Q      And you said members of the KERP.  Did you mean the

23  KEIP?

24  A      Actually there is a handful of member -- yes, they're

25  members of the KEIP, but they're similarly members of the

1  KERP that had guaranteed bonuses that are going away.

2  Q    Yeah, these were guaranteed, but were these paid?

3  A    They were not.

4  Q    Okay.  And what's the total of that column?

5  A    1.7 million.

6  Q    And in constructing the KEIP awards, did you take into

7  account these lost transaction bonuses and the 2024 bonus?

8  A    Yes, because total compensation included these amounts

9  and those amounts are being forfeited.

10 Q    Okay.  When you testified earlier that people will

11 leave if the first metric for the RS sale is not paid, why

12 do you think they will leave?

13 A    Due to the efforts that they put forward to-date in

14 achieving that milestone, that metric and not getting any

15 kind of compensation for it.

16      Given my conversations with people, they'll be sorely

17 disappointed and worry about their future.

18 Q    You were asked questions about whether the RSA had

19 already been negotiated.  Do you recall that?

20 A    Yes.

21 Q    Does that mean all the work is done?

22 A    No.

23 Q    Are there ongoing milestones under the RSA?

24 A    There are ongoing milestones, including hearings like

25 today that we're having to achieve and an exit date that we

1    have to achieve, as well.

2    Q    And you were also asked questions about whether

3    portions of the RSA coincide with the metrics under the

4    KEIP, right?

5    A    That's correct.

6    Q    But does the existence of terms in the RSA reduce the

7    amount of work required to achieve the metric?

8    A    No, as I think I testified to, that they aren't

9    achieved yet, other than the RSL.  Everything else is still

10   open and has significant risk.

11   Q    And you still have to do the work, right?

12   A    It's also do the work.

13   Q    Okay.  Thank you.

14          MR. BULL:  Nothing further.

15          UNIDENTIFIED SPEAKER:  I have nothing.

16          THE COURT:  All right.  You may step down.

17          THE WITNESS:  Appreciate it.

18      (Witness steps down.)

19          THE COURT:  All right.  Ms. Pearlman?

20          MS. PEARLMAN:  Your Honor, with respect to

21   Mr. Jones, we're relying on the Declaration, but he's in

22   Florida if anybody wants to cross-examine him.

23          And then I believe that the Committee said they

24   had a witness that they wanted to present, as well.

25          THE COURT:  All right.  So it's -- unlike

1    Mr. Ginsberg who had 18 questions that were only one

2    question, you did say we'd get through both witnesses.

3              So with respect to Mr. Jones, we'll admit the --

4    the two Declarations have been admitted, and obviously I

5    didn't read the right Declaration because I came in thinking

6    that was the state of play.

7              So should we try to conclude his cross-examination

8    today, or -- 'cause obviously we're not going to get to

9    their witness until Thursday.  But should we go ahead and

10   conclude that today?

11             How long is it going to take?  I really don't want

12   people here much more than --

13             MALE SPEAKER:  Your Honor, I think I'll need about

14   a half an hour.

15             THE COURT:  All right.  So why don't we just start

16   with him on --

17             MS. PEARLMAN:  On Thursday?

18             THE COURT:  -- on Thursday and then we can talk

19   about whether we do one or the other first.  I'd like to

20   conclude this hearing 'cause this does have testimony that

21   needs to come in.

22             MS. PEARLMAN:  Understand, Your Honor.  We talked

23   about the Disclosure Statement continuation hearing on

24   Thursday.  It was a Zoom hearing.

25             THE COURT:  Yes.

1          MS. PEARLMAN:  Can we put this off --

2          THE COURT:  Oh, absolutely.  Yes, yes, yes.

3          MS. PEARLMAN:  Okay.  I know with witnesses, I

4   just wanted to make sure that that was -- okay.

5          THE COURT:  No, no, no.  There's no need for

6   either Mr. Gilbert or Ms. Barlow to come back -- to come

7   back to Houston in the rain, but.

8          MS. PEARLMAN:  Instead, we'll all be in our

9   respective places with snow.

10      (Laughter)

11         THE COURT:  All right.

12         MS. PEARLMAN:  We appreciate that, Your Honor.

13  Thank you.

14         THE COURT:  Okay.  Unless there's anything

15  further, we will stand in recess until Tuesday at 1:00.

16         I'm going to take a minute here, so you can all be

17  seated.

18         MALE SPEAKER:  Tuesday?  Thursday or Tuesday?

19      (Cross talk.)

20         THE COURT:  I meant to say Thursday.

21         MALE SPEAKER:  Long day.

22       (Proceedings concluded at 7:57 p.m.)

23

24

25                    *  *  *  *  *

1          I certify that the foregoing is a correct

2    transcript to the best of my ability produced from the

3    electronic sound recording of the proceedings in the above-

4    entitled matter.

5    /S/  MARY  D.  HENRY

6    CERTIFIED BY THE AMERICAN ASSOCIATION OF

7    ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9    JTT TRANSCRIPT #69615

10   DATE FILED:  FEBRUARY 20, 2025

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25