**<u>Exhibit A</u>**

**Fifth Amended Plan**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
| Debtors. | Jointly Administered |

**JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF WELLPATH HOLDINGS, INC. AND CERTAIN OF ITS DEBTOR AFFILIATES**

**MCDERMOTT WILL & EMERY LLP**
Felicia Gerber Perlman (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
Jake Jumbeck (admitted *pro hac vice*)
Carole Wurzelbacher (admitted *pro hac vice*)
Carmen Dingman (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606-0029
Telephone:  (312) 372-2000
Facsimile:  (312) 984-7700
Email:       fperlman@mwe.com
               bgiordano@mwe.com
               jjumbeck@mwe.com
               cwurzelbacher@mwe.com
               cdingman@mwe.com

- and -

**MCDERMOTT WILL & EMERY LLP**
Steven Z. Szanzer (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone:  (212) 547-5400
Facsimile:  (212) 547-5444
Email:       sszanzer@mwe.com

**MCDERMOTT WILL & EMERY LLP**
Marcus A. Helt (Texas Bar #24052187)
2501 N. Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone:  (214) 295-8000
Facsimile:  (972) 232-3098
Email:       mhelt@mwe.com

*Counsel to the Debtors and Debtors-in-Possession*

Dated: March 17, 2025

---

[1]  A complete list of the debtors in these chapter 11 cases may be obtained on the website of the debtors' claims and noticing agent at https://dm.epiq11.com/Wellpath.  The debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

## <u>TABLE OF CONTENTS</u>

**ARTICLE I.** DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF
TIME, AND GOVERNING LAW ........................................................................5
A. Defined Terms. ...........................................................................5
B. Rules of Interpretation. ............................................................26
C. Computation of Time. ..............................................................27
D. Governing Law. ........................................................................27
E. Reference to Monetary Figures. ...............................................28
F. Reference to the Debtors or the Post-Restructuring Debtors. ...28
G. Controlling Document. .............................................................28

**ARTICLE II.** ADMINISTRATIVE CLAIMS, DIP CLAIMS, PROFESSIONAL FEE CLAIMS,
AND PRIORITY CLAIMS, ..............................................................................28
A. Administrative Claims. .............................................................28
B. DIP Claims. ..............................................................................29
C. Professional Fee Claims. ..........................................................30
D. Priority Tax Claims. .................................................................31
E. Restructuring Expenses & Agent Fees. ....................................31

**ARTICLE III.** CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....31
A. Classification of Claims and Interests. .....................................31
B. Treatment of Claims and Interests. ..........................................32
C. Special Provision Governing Unimpaired Claims. ...................36
D. Elimination of Vacant Classes. ................................................36
E. Intercompany Interests. ............................................................37
F. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
Code. .........................................................................................37
G. Controversy Concerning Impairment. ......................................37
H. Subordinated Claims. ...............................................................37

**ARTICLE IV.** MEANS FOR IMPLEMENTATION OF THE PLAN ......................................37
A. General Settlement of Claims and Interests. .............................37
B. Restructuring Transactions. ......................................................38
C. Administrative Consolidation for Voting and Distribution Purposes Only. 39
D. Sources of Consideration for Plan Distributions ......................40
E. Equity Financing ......................................................................42
F. Management Incentive Plan .......................................................43
G. Employee Matters .....................................................................43
H. Corporate Existence ..................................................................43
I. New Organizational Documents ................................................44
J. Directors and Officers of the Post-Restructuring Debtors. ........44
K. Vesting of Assets in the Post-Restructuring Debtors ................45
L. Preservation of Causes of Action. .............................................45
M. Effectuating Documents; Further Transactions. .......................46
N. The Liquidating Trust. ..............................................................46

| | | |
|---|---|---|
| O. | Tax Matters. | 50 |
| P. | Cancellation of Existing Securities and Agreements. | 51 |
| Q. | Corporate Action. | 51 |
| R. | Indemnification Obligations. | 52 |
| S. | Section 1146 Exemption. | 52 |
| T. | Director and Officer Liability Insurance | 53 |

**ARTICLE V.** TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............53

| | | |
|---|---|---|
| A. | Assumption and Rejection of Executory Contracts and Unexpired Leases. | 53 |
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 54 |
| C. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. | 55 |
| D. | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. | 56 |
| E. | Insurance Policies. | 56 |
| F. | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 56 |
| G. | Reservation of Rights. | 57 |
| H. | Nonoccurrence of Effective Date. | 57 |
| I. | Contracts and Leases Entered Into After the Petition Date. | 57 |

**ARTICLE VI.** PROVISIONS GOVERNING DISTRIBUTIONS ............57

| | | |
|---|---|---|
| A. | Distributions on Account of Claims Allowed as of the Effective Date. | 57 |
| B. | Distribution Agent. | 58 |
| C. | Rights and Powers of the Distribution Agent. | 58 |
| D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 59 |
| E. | Manner of Payment. | 60 |
| F. | Compliance with Tax Requirements. | 61 |
| G. | Allocations. | 61 |
| H. | Foreign Currency Exchange Rate. | 61 |
| I. | Setoffs and Recoupment. | 61 |
| J. | Claims Paid or Payable by Third Parties. | 62 |

**ARTICLE VII.** THE LIQUIDATING TRUSTEE ............63

| | | |
|---|---|---|
| A. | Creation and Governance of the Liquidating Trust. | 63 |
| B. | Liquidating Trustee and Liquidating Trust Agreement. | 64 |
| C. | Tax Treatment. | 64 |
| D. | Dissolution of Liquidating Trust. | 64 |

**ARTICLE VIII.** PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ............65

| | | |
|---|---|---|
| A. | Allowance of Claims. | 65 |
| B. | Claims Administration Responsibilities. | 65 |
| C. | Disputed Claims Process. | 66 |
| D. | Estimation of Claims. | 66 |
| E. | Adjustment to Claims or Interests without Objection. | 67 |
| F. | Disallowance of Claims. | 67 |

G.      No Distributions Pending Allowance. ......................................67
H.      Distributions After Allowance. ...............................................68
I.      No Post-Petition Interest on Claims........................................68
J.      Accrual of Dividends and Other Rights.................................68

**ARTICLE IX.** SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS 68
A.      Discharge of Claims and Termination of Interests. ..................68
B.      **Release of Liens.** ...................................................................69
C.      **Releases by the Debtors.** .......................................................70
D.      **Releases by the Releasing Parties.** .......................................72
E.      **Exculpation**. ...........................................................................73
F.      **Injunction**. ..............................................................................74
G.      Gatekeeper Provision. .............................................................74
H.      Protections Against Discriminatory Treatment. ......................75
I.      Document Retention. ...............................................................75
J.      Reimbursement or Contribution. ............................................75
K.      Government Carve Out. ...........................................................75

**ARTICLE X.** CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ............76
A.      Conditions Precedent to the Effective Date. ...........................76
B.      Waiver of Conditions................................................................78
C.      Effect of Failure of Conditions. ..............................................78
D.      Substantial Consummation .....................................................78

**ARTICLE XI.** MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN......78
A.      Modification and Amendments.................................................78
B.      Effect of Confirmation on Modifications. ................................79
C.      Revocation or Withdrawal of Plan...........................................79

**ARTICLE XII.** RETENTION OF JURISDICTION .............................................79
**ARTICLE XIII.** MISCELLANEOUS PROVISIONS ............................................81
A.      Immediate Binding Effect.........................................................81
B.      Additional Documents. ............................................................82
C.      Payment of Statutory Fees.......................................................82
D.      Statutory Committee and Cessation of Fee and Expense Payment. ..........82
E.      Reservation of Rights................................................................82
F.      Successors and Assigns.............................................................83
G.      Notices. ....................................................................................83
H.      Term of Injunctions or Stays....................................................84
I.      Entire Agreement......................................................................84
J.      Plan Supplement. .....................................................................85
K.      Nonseverability of Plan Provisions..........................................85
L.      Votes Solicited in Good Faith...................................................85
M.      Closing of Chapter 11 Cases.....................................................85
N.      Waiver or Estoppel. .................................................................86
O.      Creditor Default. ......................................................................86

## INTRODUCTION

Wellpath Holdings, Inc. and certain of the above-captioned debtors and debtors in possession (collectively, the "Debtors"),[2] propose this joint chapter 11 plan of reorganization for the resolution of the outstanding claims against, and equity interests in, the Debtors. Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, the Restructuring Transactions, and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan provides for the administrative consolidation of all of the Debtors solely for the purposes of voting on the Plan, tabulating the votes to determine which Class or Classes have accepted the Plan, confirming the Plan, and the resulting treatment of all Claims and Interests and Plan Distributions.

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*Ad Hoc Group*" means the informal ad hoc group of unaffiliated Consenting First Lien Lenders and Consenting Second Lien Lenders represented by the Ad Hoc Group Advisors.

2.    "*Ad Hoc Group Advisors*" means, collectively, Akin Gump Strauss Hauer & Feld LLP, as counsel to the Ad Hoc Group, Ankura Consulting Group, LLC, as financial advisor to the Ad Hoc Group, and Houlihan Lokey Capital, Inc., as investment banker to the Ad Hoc Group.

3.    "*Adequate Protection Claims*" means all adequate protection Claims arising in favor of the Prepetition Secured Parties (as defined in the Financing Orders) under applicable law or pursuant to the Financing Orders.

4.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through and including the Effective Date; (b) Allowed Professional Fee Claims; (c) Adequate

---

[2]    As used herein, the term Debtors shall not include CCS-CMGC Parent GP, LLC, CCS-CMGC Parent Holdings, LP, Wellpath Recovery Solutions, LLC, Correct Care of South Carolina, LLC, Harborview Center, LLC, and Behavioral Health Management Systems, LLC.

Protection Claims; (d) Restructuring Expenses; (e) Agent Fees; and (f) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code.

5.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which (a) with respect to Administrative Claims other than Professional Fee Claims, Adequate Protection Claims, Restructuring Expenses, or Agent Fees, shall be 30 days after the Effective Date and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.  For the avoidance of doubt, there shall not be a Bar Date for the assertion of any Claim for alleged personal injury, wrongful death, or other similar Claim or Cause of Action against any Debtor arising out of, relating to, or in connection with, an injury or death that occurred on or after the Petition Date, but prior to the Effective Date.

6.      "*Affiliate*" means, with respect to any Person, any other Person controlled by, controlling or under common control with such Person and shall also include any Related Fund of such Person.  As used in this definition, "control" (including, with its correlative meanings, "controlling," "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by contract or otherwise).

7.      "*Agent Fees*" means the Adequate Protection Fees, the DIP Professional Fees, the Agency Fee, and the Fronting Fee (all as defined in the Financing Order) relating to the Prepetition Agents, the DIP Agent, and/or the Fronting Lender that are required to be paid by the Debtors pursuant to the terms of the Financing Order, and, for the avoidance of doubt, which, without further order of, or application to, the Bankruptcy Court by such professionals, including the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, shall be Allowed as an Administrative Claim upon occurrence and shall not be subject to any offset, defense, counter-claim, reduction, or credit.

8.      "*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim Filed by the applicable Claims Bar Date or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or for which Claim a Proof of Claim is not required under the Plan, the Bankruptcy Code, or a Final Order, including the Financing Order); (b) a Claim that is scheduled by the Debtors as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed pursuant to the Plan or a Final Order, including the Financing Order; *provided*, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order.  Any Claim that has been or is hereafter listed on the Schedules as contingent, unliquidated, or disputed, and for which no contrary or superseding Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent

applicable. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor or Post-Restructuring Debtor, as applicable. For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow" and "Allowing" shall have correlative meanings.

9.      "*Assumption Notice*" means that certain Notice of Potential Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amount [Docket No. 194].

10.      "*Automatic Stay Objection*" means any objection to the *Debtors' Emergency Motion for the Entry of Interim and Final Orders to Enforce the Automatic Stay or in the Alternative Extend the Automatic Stay to Non-Debtor Defendants* [Docket No. 17] Filed on or prior to the Plan Objection Deadline.

11.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims and Causes of Action that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code, or other similar or related state, federal, or foreign statutes, common law, or other applicable Law.

12.      "*Backstop Commitments*" means the several but not joint commitments by the Backstop Parties to backstop the DIP Facility and commit to the Equity Financing pursuant to the Commitment Letter.

13.      "*Backstop Parties*" means the parties that, severally and not jointly, backstopped the DIP Facility and committed to the Equity Financing pursuant to the Commitment Letter.

14.      "*Backstop Premium*" means the premium payable to (a) the Backstop Parties as consideration for the Backstop Parties providing the Backstop Commitment, in an amount equal to 10% of the principal amount of the New Money Term Loan Commitments (as defined in the DIP Credit Agreement), which was earned and paid in kind upon entry by the Bankruptcy Court of the Interim DIP Order and (b) all DIP Lenders as consideration for the DIP Lenders committing to the Equity Financing, in an amount equal to 10% of the Equity Financing Amount, which amounts shall be fully earned and nonrefundable upon entry by the Bankruptcy Court of the Final DIP Order and to be paid in New Common Equity on the Effective Date.

15.      "*Ballot*" means a ballot accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote to the Plan shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

16.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended, and as applicable to the Chapter 11 Cases.

17.　　　"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

18.　　　"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time, and as applicable to the Chapter 11 Cases.

19.　　　"*Bar Date(s)*" means the applicable date(s) designated by the Bankruptcy Court (or pursuant to the Bankruptcy Rules) as the last date for filing Proofs of Claims or Interests in the Chapter 11 Cases of the respective Debtors, including the Claims Bar Date, the Governmental Unit Bar Date, and the Administrative Claims Bar Date.

20.　　　"*Bar Date Order*" means the order of the Bankruptcy Court establishing the Bar Dates [Docket No. 491].

21.　　　"*Bidding Procedures*" means the *Bidding Procedures for the Sale of the Debtors' Assets*, attached as <u>Exhibit 1</u> to the *Stipulated and Agreed Amended Order (I) Approving the Bidding Procedures for the Sale of the Debtors' Assets, (II) Approving Entry Into a Stalking Horse Purchase Agreement for the Recovery Solutions Assets, (III) Authorizing the Recovery Solutions Expense Reimbursement, (IV) Authorizing Potential Selection of Stalking Horse Bidders for the Corrections Assets and Approving Related Corrections Asset(s) Bid Protections, (V) Establishing Related Dates and Deadline, (VI) Approving the Form and Manner of Notice Thereof, (VII) Approving the Assumption and Assignment Procedures, and (VIII) Granting Related Relief* [Docket No. 384].

22.　　　"*Business Day*" means any day other than a Saturday, Sunday, a "legal holiday" (as defined in section 9006(a) of the Bankruptcy Code), or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

23.　　　"*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

24.　　　"*Cash Collateral*" has the meaning ascribed to such term in section 363(a) of the Bankruptcy Code.

25.　　　"*Causes of Action*" means any claims, cross-claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, judgments, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and

gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any other Avoidance Action.

26.      "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

27.      "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors or any of the Estates.

28.      "*Claims and Solicitation Agent*" means Epiq Corporate Restructuring LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

29.      "*Claims Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be Filed with respect to Claims, other than Administrative Claims, Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered an order excluding the Holders of such Claims or Interests from the requirement of Filing Proofs of Claim.

30.      "*Claims Register*" means the official register of Claims maintained by the Claims and Solicitation Agent.

31.      "*Class*" means a class of Claims or Interests as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

32.      "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

33.      "*Commitment Letter*" means that certain *Amended and Restated Senior Secured Superpriority Debtor in Possession Credit Facility and Equity Financing Backstop Commitment Letter*, dated as of January 27, 2025, as may be amended or modified pursuant to its terms.

34.      "*Commitment Premium*" means the premium payable to the Equity Financing Participants in an amount equal to 5% of the committed Equity Financing Amount, to be paid in New Common Equity on the Effective Date.

35.      "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

36.      "*Compensation and Benefit Programs*" means all employment, offer letter and severance agreements and policies, and all employment, wages, compensation, restrictive covenant, and benefit plans and policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and retention plans, programs, and payments, life and accidental death and dismemberment insurance plans and programs, for all

employees of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and managers, in each case existing with the Debtors immediately prior to the Effective Date.

37. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

38. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

39. "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Debtors and the Required Consenting First Lien Lenders.

41. "*Consenting First Lien Lenders*" means Holders of First Lien Claims that are or become parties to the Restructuring Support Agreement.

42. "*Consenting Second Lien Lenders*" means Holders of Second Lien Claims that are or become parties to the Restructuring Support Agreement.

43. "*Consenting Stakeholders*" means any party (other than the Debtors and the TopCo Debtors) to the Restructuring Support Agreement, including: (a) the Backstop Parties, (b) the Consenting First Lien Lenders, and (c) the Consenting Second Lien Lenders.

44. "*Consummation*" means the occurrence of the Effective Date as to the applicable Debtor.

45. "*Corrections Business*" means the Debtors' business and operations of providing health services to patients in state and federal correction facilities and local jail facilities and juvenile detention facilities.

46. "*Covered Claims*" means any claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing of the Restructuring Support Agreement (including the Term Sheets) and related prepetition transactions, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement or any contract, instrument, release or other agreement or document created or entered into in connection with the Restructuring Support Agreement (including the Term Sheets), the Bidding Procedures, the DIP Facility, the DIP Documents, the Disclosure Statement, the Plan, the Plan Supplement, the Equity Financing Documents, the Definitive Documents, the Chapter 11 Cases, the commencement of the Chapter 11 Cases, the marketing process for the sale of any of the Debtors' assets, the Recovery Solutions Stalking Horse Agreement (as defined in the Recovery Solutions Sale Order), the Recovery Solutions Sale Order, the solicitation of votes on the Plan, the prepetition negotiation and settlement of claims, the pursuit

of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or after the Petition Date and on or before the Effective Date.

47.     "*Cure Costs*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or, if applicable, such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

48.     "*CVR*" means that certain uncertificated, non-transferrable contractual contingent value right, which right shall be governed by the CVR Agreement entered into by Reorganized Wellpath and the Liquidating Trust.

49.     "*CVR Agreement*" means that certain agreement setting forth the full terms and conditions of the CVR, a substantially final form of which shall be filed with the Plan Supplement.

50.     "*CVR Termination Date*" means the date occurring on the seven-year anniversary of the Effective Date.

51.     "*CVR Trigger Transaction*" means the first to occur of the consummation of any transaction that results in one of the following: (a) the sale or exchange of at least a majority of all of the voting equity interests of Reorganized Wellpath to one or more third parties (whether by merger, sale, recapitalization, consolidation, combination or otherwise), (b) the sale, directly or indirectly, by Reorganized Wellpath, of at least a majority of all of the assets of Reorganized Wellpath and its subsidiaries, taken as a whole, to one or more third parties, or (c) an initial public offering of securities of Reorganized Wellpath. Notwithstanding the foregoing, no transaction shall constitute a CVR Trigger Transaction if the equityholders of Reorganized Wellpath prior to any such transaction continue to own or control, directly or indirectly, at least a majority of the issued and outstanding voting equity interests of Reorganized Wellpath or the acquirer, as applicable, following such transaction.

52.     "*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

53.     "*Debtor Release*" means the release set forth in Article IX.C of the Plan.

54.     "*Definitive Documents*" shall have the meaning set forth in the Restructuring Support Agreement.

55.     "*DIP Agent*" means UBS, in its capacity as the administrative agent and collateral agent under the DIP Documents, and any successor agent thereunder.

56.     "*DIP Claim*" means any and all Claims arising under, derived from, or based upon the DIP Documents, including claims for principal amounts outstanding, interest, fees, indemnification, expenses, costs and any other charges of the DIP Agent and the DIP Lenders

arising under or related to the DIP Facility, including the DIP Roll-Up Claims and the DIP Fees (as defined in the Financing Order), in each case payable under and in accordance with the DIP Documents and the Financing Order.

57. "*DIP Credit Agreement*" means the definitive superpriority senior secured debtor-in-possession credit agreement, dated as of November 13, 2024, by and among the Debtors party thereto, the DIP Agent and the DIP Lenders, as amended, amended and restated, supplemented, or otherwise modified in accordance with its terms.

58. "*DIP Documents*" means the DIP Credit Agreement, the "Credit Documents" (as defined in and under the DIP Credit Agreement), and any other documentation governing the DIP Facility, including the Financing Orders, which shall be in form and substance acceptable to the Required Consenting First Lien Lenders.

59. "*DIP Facility*" means the credit facility provided for under the DIP Credit Agreement.

60. "*DIP Lenders*" means the lenders party to the DIP Credit Agreement from time to time.

61. "*DIP Loans*" means the loans under the DIP Facility.

62. "*DIP Roll-Up Claim*" means any Claim arising under, or related to, the DIP Roll-Up Loans.

63. "*DIP Roll-Up Loans*" means, collectively, the DIP Loans resulting from the "roll up" of First Lien Claims and Second Lien Claims into the DIP Facility pursuant to the Financing Order.

64. "*Disclosure Statement*" means the related disclosure statement with respect to this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan, as may be amended, supplemented, or modified from time to time, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

65. "*Disclosure Statement Order*" means the *Order (I) Approving the Adequacy of the Disclosure Statement on a Conditional Basis, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No [·]].

66. "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest: (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which an objection or request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

67.     "*Distribution Agent*" means the Liquidating Trust, or the Entity or Entities selected by the Debtors, the Post-Restructuring Debtors, or the Liquidating Trust, as applicable, to make or facilitate distributions pursuant to the Plan.

68.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Post-Restructuring Debtors, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

69.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims are eligible to receive distributions under the Plan on account of Allowed Claims, which date shall be on or as soon as is reasonably practicable after the Effective Date.

70.     "*Effective Date*" means, as to the applicable Debtor, the date that is the first Business Day on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article X.A of the Plan have been satisfied or waived in accordance with Article X.B of the Plan and (b) no stay of the Confirmation Order is in effect.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

71.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

72.     "*Equity Financing*" means the sale of the Equity Financing Securities for the Equity Financing Amount, upon the terms and conditions set forth in the Commitment Letter.

73.     "*Equity Financing Amount*" means an amount to be determined between $20,000,000 and $55,000,000, which shall be determined by the Required Consenting First Lien Lenders and shall be reasonably acceptable to the Debtors, it being understood that it shall be acceptable to the Debtors to the extent that the Equity Financing Amount is sufficient to ensure that there will be at least $35,000,000 of unrestricted cash on the balance sheet of Reorganized Wellpath on the first Business Day following the Effective Date, which $35,000,000 does not include an additional $4,600,000 that separately shall be available to Reorganized Wellpath for the payment to certain employees of the Post-Restructuring Debtors pursuant to the Post-Restructuring Debtors' key employee incentive plan.

74.     "*Equity Financing Documents*" means any agreements and documents executed and delivered in connection with the Equity Financing, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, which shall be in form and substance acceptable to the Required Consenting First Lien Lenders and the Debtors.

75.     "*Equity Financing Participants*" means the Backstop Parties and any party that has executed and delivered a subscription form to the Debtors in connection with the Equity Financing that either are (a) a qualified institutional buyer, as such term is defined in Rule 144A under the Securities Act, or (b) an institutional "accredited investor" ("*IAI*") within the meaning of Rule 501(a)(1), (2), (3), or (7) under the Securities Act or an entity in which all of the equity investors are IAIs (which, in the case of (a) and (b), for the avoidance of doubt, may not include any natural person) who committed to purchase New Common Equity being issued in the Equity Financing.

76.        "*Equity Financing Securities*" means New Common Equity offered in the Equity Financing in the form of shares of common equity in Reorganized Wellpath representing 97% of the issued and outstanding New Common Equity, subject to dilution on account of the Commitment Premium, the Backstop Premium, and any MIP Interests.

77.        "*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case and all property (as defined in section 541 of the Bankruptcy Code) acquired by such Debtor after the Petition Date and before the Effective Date.

78.        "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the TopCo Debtors; (c) the Committee; and (d) with respect to each of the foregoing Entities in clauses (a) and (b), the Independent Directors.

79.        "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

80.        "*Existing Parent Interests*" means, collectively, all Interests in Wellpath Parent outstanding immediately prior to the Effective Date.

81.        "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

82.        "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

83.        "*Final DIP Order*" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Use Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 388].

84.        "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any other court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order.

85.        "*Financing Order*" means any order entered in the Chapter 11 Cases approving the DIP Facility or the use of cash collateral, including the Interim DIP Order and the Final DIP Order.

86.      "*First Lien Agent*" means UBS, in its capacity as the administrative agent and the collateral agent for the First Lien Lenders under the First Lien Documents and any successor agents thereunder.

87.      "*First Lien Claim*" means any Claims on account of the First Lien Loans or related to, arising out of, or arising under or in connection with the First Lien Documents, including approximately $534,096,041 in principal amount, which consists of (a) approximately $472,500,000 in principal amount of term loans advanced under the First Lien Credit Agreement and (b) approximately $61,596,041 in principal amount of revolving loans advanced under the First Lien Credit Agreement, plus accrued and unpaid interest and all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, additional interest, any other Obligations (as defined in the First Lien Credit Agreement), and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the First Lien Documents.

88.      "*First Lien Collateral*" means collateral securing the First Lien Claims pursuant to the First Lien Documents.

89.      "*First Lien Credit Agreement*" means that certain First Lien Credit Agreement, dated as of October 1, 2018 (as may be amended, restated, amended and restated, modified or supplemented from time to time), by and among Wellpath Holdings, Inc. (f/k/a CCS-CMGC Holdings, Inc.), as borrower, CCS-CMGC Intermediate Holdings, Inc., as holdings, the other Credit Parties (as defined in the First Lien Credit Agreement) from time to time party thereto, UBS (as successor to UBS AG, Cayman Islands Branch and Credit Suisse AG, Cayman Islands Branch), as the administrative agent and UBS (as successor to Credit Suisse AG, Cayman Islands Branch) as collateral agent, and the lenders from time to time party thereto.

90.      "*First Lien Deficiency Claim*" means any First Lien Claim that is not a Secured Claim.

91.      "*First Lien Documents*" means the First Lien Credit Agreement, collectively with any other agreements, documents, instruments, and amendments related thereto, including any guaranty agreements, pledge and collateral agreements, UCC financing statements, or other perfection documents, subordination agreements, fee letters, and any other security agreements executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

92.      "*First Lien Lenders*" means the Holders of First Lien Loans.

93.      "*First Lien Secured Claim*" means any First Lien Claim that is a Secured Claim.

94.      "*First Lien Loans*" means the loans made pursuant to the First Lien Credit Agreement.

95.      "*Fronting Lender*" means UBS, in its capacity as fronting lender pursuant to the Commitment Letter.

96.　　　"*General Unsecured Claim*" means any Claim against any of the Debtors that is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) an Other Secured Claim; (d) an Other Priority Claim; (e) a First Lien Claim; (f) a DIP Claim; (g) a Second Lien Claim; (h) a First Lien Deficiency Claim; (i) a Second Lien Deficiency Claim; (j) an Intercompany Claim; or (k) a Section 510(b) Claim.

97.　　　"*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, general partner, special committee, or such similar governing body of any of the Debtors or the Post-Restructuring Debtors, as applicable.

98.　　　"*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

99.　　　"*Governmental Unit Bar Date*" means the date by which Proofs of Claim must be Filed with respect to Claims held by Governmental Units.

100.　　　"*Holder*" means an Entity holding a Claim against or an Interest in a Debtor, as applicable.

101.　　　"*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

102.　　　"*Independent Directors*" means, solely in their capacities as independent directors on the applicable board of directors or board of managers of the Debtors or TopCo Debtors, (a) Carol Flaton and (b) Patrick Bartels.

103.　　　"*Intercompany Claim*" means any Claim held by a Debtor against another Debtor arising before the Petition Date.

104.　　　"*Intercompany Interest*" means any Interest held by a Debtor in another Debtor.

105.　　　"*Interests*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, and including all common stock, preferred stock, limited partner interests, general partner interests, limited liability company interests, and any other equity, ownership, beneficial or profits interests in any of the Debtors, whether or not transferable, and options, warrants, rights, or other securities, agreements or interests to acquire or subscribe for, or which are exercisable, convertible or exchangeable into or for the shares (or any class thereof) of, common stock, preferred stock, limited partner interests, general partner interests, limited liability company interests, or other equity, ownership, beneficial or profits interests in or of any Debtor, contractual or otherwise, including equity or equity-based incentives, grants or other instruments issued, granted or promised to be granted to current or former employees, directors, officers or contractors of the Debtors (in each case whether or not arising under or in connection with any employment agreement).

106.　　　"*Interim DIP Order*" means the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Use Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to*

*the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; (V) Scheduling Final Hearing; and (VI) Granting Related Relief* [Docket No. 244].

107.    "*Internal Revenue Service*" means the United States Internal Revenue Service.

108.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time, and as applicable to the Chapter 11 Cases.

109.    "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

110.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

111.    "*Lift Stay Motion*" means any motion seeking to lift or seeking relief from the automatic stay with respect to any of the Debtors or the TopCo Debtors to prosecute professional liability claims against a Debtor or TopCo Debtor Filed on or prior to the Plan Objection Deadline.

112.    "*Liquidating Trust*" means the trust established on the Effective Date, which shall be funded with the Liquidating Trust Assets, the Liquidating Trust Initial Funding, and the Liquidating Trust Subsequent Funding to, among other things, hold the Liquidating Trust Assets and make Plan Distributions to Holders of Allowed Claims as set forth in this Plan.

113.    "*Liquidating Trust Agreement*" means that certain trust agreement establishing the Liquidating Trust, by and among the Debtors and the Liquidating Trustee, in form and substance reasonably acceptable to the Required Consenting First Lien Lenders and the Committee, setting forth, among other things, the Liquidating Trustee's rights, powers, and obligations with respect to the administration of the Liquidating Trust Assets and making Plan Distributions, all of which shall be consistent with the applicable provisions of the Plan.

114.    "*Liquidating Trust Assets*" means all assets of the Estates to be distributed to Holders of Allowed Claims by the Liquidating Trustee as set forth in this Plan, which shall consist of the Liquidating Trust Causes of Action, the CVR, the Liquidating Trust Initial Funding, the Liquidating Trust Subsequent Funding (solely as of the time that such Liquidating Trust Initial Funding and Liquidating Trust Subsequent Funding are contributed to the Liquidating Trust), and any other assets transferred to the Liquidating Trust (solely as of the time that such assets are transferred to the Liquidating Trust).

115.    "*Liquidating Trust Causes of Action*" means any of the Debtors' or the Estates' Causes of Action to be transferred to, and vest in, the Liquidating Trust that are identified on the Schedule of Liquidating Trust Causes of Action.  For the avoidance of doubt, the Liquidating Trust Causes of Action shall not include (a) any Cause of Action against an Exculpated Party or a Released Party, (b) any Cause of Action against a Person or Entity related to the go-forward operation of the Corrections Business as determined by the Required Consenting First Lien Lenders, or (c) any Cause of Action that has been acquired by the Recovery Solutions Purchaser pursuant to the Recovery Solutions Stalking Horse Agreement.

116.     "*Liquidating Trust Initial Funding*" means Cash in the amount of $3,000,000 to be contributed by the Post-Restructuring Debtors to the Liquidating Trust on the Effective Date, which shall be allocated for any purpose determined by the Liquidating Trustee in accordance with the Liquidating Trust Agreement, including distributions to Holders of Allowed Claims.

117.     "*Liquidating Trust Subsequent Funding*" means Cash in the amount of $2,000,000, of which (a) $1,000,000 shall be contributed by the Post-Restructuring Debtors to the Liquidating Trust on or as soon as reasonably practicable after the first anniversary of the Effective Date, and (b) $1,000,000 shall be contributed by the Post-Restructuring Debtors to the Liquidating Trust on or as soon as reasonably practicable after the second anniversary of the Effective Date, which shall be allocated for any purpose determined by the Liquidating Trustee in accordance with the Liquidating Trust Agreement, including distributions to Holders of Allowed Claims.

118.     "*Liquidating Trustee*" means the Person or Persons selected by the Required Consenting First Lien Lenders, in consultation with the Committee, that is identified in the Plan Supplement to serve as the trustee(s) of the Liquidating Trust, and any successor thereto.

119.     "*Management Incentive Plan*" means a management incentive plan to be adopted by the New Board as soon as reasonably practicable following the Effective Date with the terms and conditions (including any and all awards granted thereunder) determined by the New Board, including, without limitation, with respect to the participants, allocation, timing, and the form, structure, and extent of issuance and vesting.

120.     "*MIP Interests*" means a pool of the New Common Equity, as of the Effective Date, reserved for issuance to participants under the Management Incentive Plan in accordance with the terms thereof.

121.     "*New Board*" means the initial board of directors, board of managers, or comparable governing body of Reorganized Wellpath, on and after the Effective Date.

122.     "*New Common Equity*" means the common equity interests in Reorganized Wellpath.

123.     "*New Organizational Documents*" means the governance documents for each of the Post-Restructuring Debtors, which documents shall be acceptable to the Required Consenting First Lien Lenders and reasonably acceptable to the Debtors.

124.     "*Opt Out Form*" means the form by which all Holders of Claims against the Debtors or Interests may voluntarily opt out from becoming a Releasing Party by checking the applicable box on such form.

125.     "*Other Priority Claim*" means any Claim against any of the Debtors other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

126.     "*Other Secured Claims*" means any Secured Claim other than a Secured Tax Claim, a First Lien Claim, or a Second Lien Claim.

127.    "*Per Share Purchase Price*" means a price per share based on the number of units of New Common Equity to be issued on the Effective Date divided by the Equity Financing Amount, which shall be determined by the Required Consenting First Lien Lenders and the Debtors prior to the Effective Date.

128.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

129.    "*Petition Date*" means November 11, 2024.

130.    "*Plan*" means this joint chapter 11 plan of reorganization, the Plan Supplement, and all exhibits and schedules annexed hereto or referenced herein, in each case, as may be amended, supplemented, or otherwise modified from time to time in accordance with the Bankruptcy Code, the Restructuring Support Agreement, and the terms hereof.

131.    "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims under this Plan.

132.    "*Plan Objection Deadline*" means the date established by the Bankruptcy Court for the deadline to File objections to the Confirmation of the Plan.

133.    "*Plan Supplement*" means the compilation of documents and forms of documents, term sheets, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed prior to the Confirmation Hearing to the extent available, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the New Organizational Documents; (b) to the extent known, the identities of the members of the New Board; (c) the Equity Financing Documents; (d) the Takeback Facility Credit Agreement; (e) the Rejected Executory Contracts and Unexpired Leases Schedule; (f) the Schedule of Retained Causes of Action; (g) the Schedule of Liquidating Trust Causes of Action; (h) the Restructuring Transactions Memorandum; (i) the Liquidating Trust Agreement, and (j) the CVR Agreement.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement up to the Effective Date as set forth in this Plan, subject to the approval rights of the Required Consenting First Lien Lenders set forth in the Restructuring Support Agreement.  Notwithstanding the foregoing, final versions of the Schedule of Retained Causes of Action and the Schedule of Liquidating Trust Causes of Action shall be Filed ten Business Days prior to the Confirmation Hearing; *provided, however*, that the Debtors shall have the right to alter, amend, modify, or supplement the Schedule of Retained Causes of Action or the Schedule of Liquidating Trust Causes of Action up to the Effective Date with the consent of the Required Consenting First Lien Lenders and, solely with respect to the Schedule of Liquidating Trust Causes of Action, the Committee (with such consent not to be unreasonably withheld).

134.    "*Post-Restructuring Debtor*" means any Debtor, or any successor thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Wellpath.

135.        "*Prepetition Agents*" means the First Lien Agent and the Second Lien Agent.

136.        "*Prepetition Debt Documents*" means the First Lien Debt Documents and the Second Lien Debt Documents.

137.        "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

138.        "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated.

139.        "*Pro Se Objection*" means any letter or other document Filed by a *pro se* Person objecting to any aspect of the Chapter 11 Cases on or prior to the Plan Objection Deadline.

140.        "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.  For the avoidance of doubt, "Professionals" does not include the Ad Hoc Group Advisors.

141.        "*Professional Corporation*" shall have the meaning ascribed to such term in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor and Incur Obligations to Professional Corporations and (B) Obtain New Professional Corporation Contracts, (II) Extending Statutory Protections to Professional Corporations, and (III) Granting Related Relief* [Docket No. 15].

142.        "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.C of this Plan.

143.        "*Professional Fee Claim*" any Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional on or after the Petition Date through and including the Confirmation Date under sections 328, 330, 331, 503(b)(2), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (including transaction and success fees) to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

144.        "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

145.        "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the Claims Bar Date, the Governmental Unit Bar Date, or the Administrative Claims Bar Date, as applicable.

146.      "*Recovery Solutions Business*" means the Debtors' business of (a) providing inpatient behavioral health services outside of correctional facilities, including inpatient and residential treatment, partial hospitalization and outpatient programs, and community-based services on behalf of Governmental Authorities, and (b) providing behavioral health and/or substance use disorder services inside correctional facilities to the extent such services are paid by or on behalf of local or state mental health departments and result solely from an involuntary treatment order related to a behavioral health and/or substance use disorder diagnosis.

147.      "*Recovery Solutions Debtors*" means, collectively, (a) Wellpath Recovery Solutions, LLC, (b) Correct Care of South Carolina, LLC, (c) Harborview Center, LLC, and (d) Behavioral Health Management Systems, LLC.

148.      "*Recovery Solutions Purchaser*" means the purchaser of the Recovery Solutions Business pursuant to the Recovery Solutions Sale Order.

149.      "*Recovery Solutions Sale Order*" means the *Order (A) Approving the Sale of Certain of the Debtors' Assets and Certain Equity Interests Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, (C) Dismissing the Chapter 11 Cases of the Acquired Recovery Solutions Debtors, and (D) Granting Related Relief* [Docket No. 1040].

150.      "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

151.      "*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

152.      "*Related Fund*" means, with respect to any Person, any fund, account or investment vehicle that is controlled, advised or managed by (a) such Person, (b) an Affiliate of such Person or (c) the same investment manager, advisor or subadvisor that controls, advises or manages such Person or an Affiliate of such investment manager, advisor or subadvisor.

153.      "*Related Party*" means to the fullest extent permitted by law, with respect to any Entity, such Entity's predecessors, successors, assigns, and Affiliates (whether by operation of Law or otherwise) and subsidiaries, and each of their respective Related Funds, managed accounts or funds or investment vehicles, and each of their respective current and former equity holders (regardless of whether such Interests are held directly or indirectly), officers, directors, managers, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, equity sponsors, investment managers, fund advisors, direct and indirect parent Entities, direct and indirect investors, direct and indirect equity participants, "controlling persons" (within the meaning of the federal securities law), heirs, administrators and executors, and other professionals, in each case acting in such capacity whether current or former, including in their capacity as directors, as applicable; *provided*, that, for the

avoidance of doubt, (a) the Professional Corporations and their respective owners and employees shall not be deemed Related Parties and (b) the term "Related Parties" includes a Related Party's Related Parties.

154.     "*Release Objectors*" means the Objectors, as defined in the *Objection of Kristin Allred, Victoria Klein, and Mike Doyle to Approval of the Disclosure Statement for the Joint Chapter 11 Plan of Wellpath Holdings, Inc. and Certain of its Debtor Affiliates* [Docket No. 1411].

155.     "*Released Parties*" means, each of, and in each case in its capacity as such: (a) each Debtor, (b) the TopCo Debtors, (c) each Post-Restructuring Debtor, (d) the Recovery Solutions Debtors, (e) the Consenting Stakeholders, (f) Reorganized Wellpath, (g) the DIP Lenders, (h) the DIP Agent, (i) the First Lien Agent, (j) the Second Lien Agent, (k) the Fronting Lender, (l) each Holder of Interests, (m) each Holder of Interests in the Post-Restructuring Debtors, (n) each First Lien Lender that is not a Consenting First Lien Lender and that does not elect to opt out of the releases in the Plan, (o) each Second Lien Lender that is not a Consenting Second Lien Lender and that does not elect to opt out of the releases in the Plan, and (p) the Related Parties of each of the foregoing Entities in clauses (a) through (o) of this definition to the fullest extent permitted by law other than any such Related Party that elects to opt out of the Releases in the Plan; *provided*, the Release Objectors and any other Person that either elects to opt out of or objects to the releases in Article IX hereof shall not be deemed Released Parties.

156.     "*Releasing Parties*" means, each of, and in each case in its capacity as such: (a) each Debtor, (b) the TopCo Debtors, (c) each Post-Restructuring Debtor, (d) the Recovery Solutions Debtors, (e) the Consenting Stakeholders, (f) Reorganized Wellpath, (g) the DIP Lenders, (h) the DIP Agent, (i) the First Lien Agent, (j) the Second Lien Agent, (k) the Fronting Lender, (l) each Holder of Interests, (m) each Holder of Interests in the Post-Restructuring Debtors, (n) each First Lien Lender that is not a Consenting First Lien Lender and that does not elect to opt out of the releases in the Plan, (o) each Second Lien Lender that is not a Consenting Second Lien Lender and that does not elect to opt out of the releases in the Plan, (p) each Holder of a Claim entitled to vote to accept or reject the Plan that does not affirmatively elect to opt out of being a Releasing Party by (i) checking the appropriate box on such Holder's timely and properly submitted Ballot to indicate that such Holder elects to opt out of the Plan's release provisions or (ii) timely filing an objection to the Plan's release provisions, (q)  each Holder of a Claim that is an incarcerated individual that does not affirmatively elect to opt out of being a Releasing Party by delivering such election (by checking the appropriate box on such incarcerated individual's Ballot, or by another means of written communication, to indicate that such incarcerated individual elects to opt out of the Plan's release provisions) to the Debtors, the Claims and Solicitation Agent, or the Bankruptcy Court by no later than 60 days after the Confirmation Date, (r) each Holder of a Claim or Interest in a nonvoting Class, or is otherwise not entitled to vote on the Plan, that does not affirmatively elect to opt out of being a Releasing Party by (i) checking the appropriate box on such Holder's timely and properly submitted Opt-Out Form to indicate that such Holder elects to opt out of the Plan's release provision or (ii) timely filing an objection to the Plan's release provisions, and (s) the Related Parties of each of the foregoing Entities in clauses (a) through (r) of this definition to the fullest extent permitted by law and solely to the extent that such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an entity in clauses (a) through (r); *provided, however*, that the Release Objectors and any Holder of a Claim or Interest that Filed a Lift Stay Motion, an

Automatic Stay Objection, or a Pro Se Objection in these Chapter 11 Cases shall not be deemed a Releasing Party; *provided*, *further*, that, for the avoidance of doubt, in no case shall a minor or an incompetent Person (each as defined under applicable state law) be deemed a Releasing Party.

157.     "*Reorganized Wellpath*" means (a) Wellpath Parent, as reorganized on the Effective Date pursuant to the Definitive Documents or (b) a newly formed entity that will, directly or indirectly, own 100% of the Interests in the Post-Restructuring Debtors upon the Effective Date.  For the avoidance of doubt, Reorganized Wellpath shall not include the Recovery Solutions Business.

158.     "*Required Consenting First Lien Lenders*" shall have the meaning set forth in the Restructuring Support Agreement.

159.     "*Restructuring Expenses*" means the reasonable and documented prepetition and post-petition fees and out-of-pocket expenses incurred by the Ad Hoc Group Advisors in accordance with the Financing Order, the Restructuring Support Agreement, and the Recovery Solutions Sale Order, which, without further order of, or application to, the Bankruptcy Court by such professionals, including the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, shall be Allowed as an Administrative Claim upon occurrence and shall not be subject to any offset, defense, counter-claim, reduction, or credit.

160.     "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of November 11, 2024, by and among the Debtors, the Backstop Parties, the Consenting First Lien Lenders, and the Consenting Second Lien Lenders (as may be amended, supplemented, or modified from time to time in accordance with the terms thereof).

161.     "*Restructuring Transactions*" means any transaction, reorganizations, restructurings, and actions as may be necessary or appropriate to effect a restructuring of the Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in this Plan and in accordance with the Restructuring Transactions Memorandum, the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued or executed pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in Article IV.

162.     "*Restructuring Transactions Memorandum*" means the summary of transaction steps to complete the Restructuring Transactions, which shall be included in the Plan Supplement.

163.     "*Schedule of Liquidating Trust Causes of Action*" means the schedule, which shall be in form and substance acceptable to the Required Consenting First Lien Lenders and the Debtors, of certain Causes of Action of the Debtors that (a) are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time, and (b) shall be transferred to, and vest in, the Liquidating Trust on the Effective Date.

164.     "*Schedule of Retained Causes of Action*" means the schedule, which shall be in form and substance acceptable to the Required Consenting First Lien Lenders and the Debtors, of

certain Causes of Action of the Debtors, including the Liquidating Trust Causes of Action, that (a) are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time, and (b) shall be transferred to, and vest in, the Post-Restructuring Debtors on the Effective Date.

165.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, including any amendments or supplements thereto.

166.    "*SEC*" means the U.S. Securities and Exchange Commission.

167.    "*Second Lien Agent*" means UBS, in its capacity as the administrative agent and the collateral agent for the Second Lien Lenders under the Second Lien Documents and any successor agents thereunder.

168.    "*Second Lien Claim*" means any Claims on account of the Second Lien Loans or related to, arising out of, or arising under or in connection with, the Second Lien Documents, including approximately $110,000,000 in principal amount, plus accrued and unpaid interest and all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, additional interest, any other Obligations (as defined in the Second Lien Credit Agreement), and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Second Lien Documents.

169.    "*Second Lien Credit Agreement*" means that certain Second Lien Credit Agreement, dated as of October 1, 2018 (as may be amended, restated, amended and restated, modified or supplemented from time to time), by and among Wellpath Holdings, Inc. (f/k/a CCS-CMGC Holdings, Inc.), as borrower, CCS-CMGC Intermediate Holdings, Inc., as holdings, the other Credit Parties (as defined in the Second Lien Credit Agreement) party thereto, UBS (as successor to UBS AG, Cayman Islands Branch and Credit Suisse AG, Cayman Islands Branch), as the administrative agent and UBS (as successor to Credit Suisse AG, Cayman Islands Branch) as collateral agent, and the lenders from time to time party thereto.

170.    "*Second Lien Deficiency Claim*" means any Second Lien Claim that is not a Secured Claim.

171.    "*Second Lien Documents*" means the Second Lien Credit Agreement, collectively with any other agreements, documents, instruments, and amendments related thereto, including any guaranty agreements, pledge and collateral agreements, UCC financing statements, or other perfection documents, subordination agreements, fee letters, and any other security agreements executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

172.    "*Second Lien Lenders*" means the Holders of Second Lien Loans.

173.    "*Second Lien Loans*" means the loans made pursuant to the Second Lien Credit Agreement.

174.     "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

175.     "*Secured Claim*" means a Claim: (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code to the extent of the amount subject to setoff.

176.     "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

177.     "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

178.     "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

179.     "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax, privilege taxes, and other similar taxes imposed or assessed by any Governmental Unit.

180.     "*Takeback Facility*" means the credit facility provided for under the Takeback Facility Credit Agreement.

181.     "*Takeback Facility Credit Agreement*" means the definitive credit agreement governing the Takeback Facility.

182.     "*Takeback Facility Documents*" means the Takeback Facility Credit Agreement and any and all security documents or other documents related thereto.

183.     "*Term Sheets*" means the term sheets attached as exhibits to the Restructuring Support Agreement.

184.     "*Third-Party Release*" means the release set forth in Article IX.D of the Plan.

185.     "*Threshold Amount*" means an amount equal to 1.75 times the total equity value implied by the maximum Equity Financing Amount (inclusive of fees), measured upon the first (if any) CVR Trigger Transaction to occur prior to the automatic termination on the CVR Termination Date, subject to any adjustments necessary to account for any capital infusion following the Effective Date or other similar transactions.

186.     "*TopCo Debtors*" means CCS-CMGC Parent GP, LLC and CCS-CMGC Parent Holdings, LP.

187.     "*UBS*" means UBS AG, Stamford Branch.

188.      "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

189.      "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

190.      "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

191.      "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

192.      "*Wellpath Parent*" means CCS-CMGC Intermediate Holdings 2, Inc., prior to the Effective Date.

B.      *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan, Restructuring Support Agreement, or Confirmation Order, as applicable; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the

words "without limitation"; (15) references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Post-Restructuring Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (18) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws.

Notwithstanding anything herein to the contrary, any and all information, notice, and consent rights of the Consenting Stakeholders set forth in the Restructuring Support Agreement (including the exhibits thereto) and the Financing Orders with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, are incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.  For the avoidance of doubt, and notwithstanding anything to the contrary set forth herein or in the Restructuring Support Agreement, such consent rights shall not apply following Consummation of this Plan.

The absence in this Plan of references to any and all information, notice, and consent rights of the Consenting Stakeholders set forth in the Restructuring Support Agreement (including the exhibits thereto) with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair, modify, or negate such rights.

Solely with respect to any information, notice, or consent rights in the Plan, in the event of any inconsistency between the Plan and the Restructuring Support Agreement, the terms of the Restructuring Support Agreement shall control.

C.    *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.    *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and

section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that governance matters relating to the Debtors or the Post-Restructuring Debtors, as applicable, not incorporated or formed under New York law shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Post-Restructuring Debtor, as applicable.

E.    *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.    *Reference to the Debtors or the Post-Restructuring Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Post-Restructuring Debtors shall mean the Debtors and the Post-Restructuring Debtors, as applicable, to the extent the context requires.

G.    *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, including the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS,
## PROFESSIONAL FEE CLAIMS, AND PRIORITY CLAIMS,

In accordance with section 1123(a)(1) of the Bankruptcy Code, Allowed Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.    *Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Post-Restructuring Debtors, as applicable, and with respect to any non-ordinary course Allowed Administrative Claims, or as otherwise provided for under the Plan, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than holders of Professional Fee Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to

the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Post-Restructuring Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in this Article II.A of the Plan, and except with respect to Administrative Claims that are Professional Fee Claims, Restructuring Expenses, or Agent Fees, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors pursuant to the procedures specified in the Confirmation Order and/or the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates or their property and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Debtors or Post-Restructuring Debtors or any notice to or action, order or approval of the Bankruptcy Court or any other Entity.** Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors and the requesting party no later than 60 days after the Effective Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

B.     *DIP Claims.*

In accordance with the Recovery Solutions Sale Order, (1) effective immediately upon the closing of the sale of the Recovery Solutions Business to the Recovery Solutions Purchaser, (a) the DIP Obligations (as defined in the Final DIP Order) (other than any accrued and unpaid DIP Obligations constituting amounts payable to the DIP Agent (or its advisors) solely for their account in their capacity as such, which were paid to the DIP Agent (or its advisors) in cash upon the closing of the sale of the Recovery Solutions Business or in the ordinary course pursuant to the terms of the Final DIP Order) were deemed satisfied by the consummation of the sale of the Recovery Solutions Business to the Recovery Solutions Purchaser, and (b) all security interests, pledges, and liens of any kind, nature, or description on all equity interests in, and assets and property of, each Debtor granted in favor of the DIP Agent under the DIP Documents were released and terminated, and each Debtor was released from its obligations from the DIP Documents (the "DIP Release"), (2) the DIP Agent and/or the Debtors were authorized, without any further notice to or action, order, or approval of the Court, to file record, execute and/or deliver UCC termination statements and any further instruments, releases, terminations and documents evidencing the DIP Release, and (3) the Debtors were further authorized to cooperate with and provide general assistance to the DIP Agent, as reasonably requested by the DIP Agent, prior to and after the consummation of the sale of the Recovery Solutions Business with respect to any

issues related to effectuating the transactions contemplated by the sale of the Recovery Solutions Business and the Recovery Solutions Sale Order.

C.     *Professional Fee Claims.*

      1.     <u>Final Fee Applications and Payment of Professional Claims.</u>

All final requests for payment of Professional Fee Claims must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing (if necessary) in accordance with the procedures established by the Bankruptcy Court. The Post-Restructuring Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account. The Post-Restructuring Debtors will establish the Professional Fee Escrow Account in trust for the Professionals and fund such account with Cash equal to the Professional Fee Amount on the Effective Date.

      2.     <u>Professional Fee Escrow Account.</u>

On the Effective Date, the Post-Restructuring Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Post-Restructuring Debtors using Cash on hand. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Post-Restructuring Debtors. The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Post-Restructuring Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When such Allowed Professional Fee Claims have been paid in full, any remaining amount held in the Professional Fee Escrow Account shall promptly be paid to the Post-Restructuring Debtors without any further action or order of the Bankruptcy Court.

      3.     <u>Professional Fee Amount.</u>

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors as soon as reasonably practicable before the anticipated Effective Date, but in no event later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors, Post-Restructuring Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

      4.     <u>Post-Effective Date Fees and Expenses.</u>

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Effective Date, any requirement that Professionals comply with

sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.      *Restructuring Expenses & Agent Fees.*

On the Effective Date, the Debtors or the Post-Restructuring Debtors shall pay in full in Cash any outstanding Restructuring Expenses and Agent Fees without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases and without any requirement for further notice or Bankruptcy Court review or approval.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan and making distributions in accordance with the Plan in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal Person, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Persons, or cause the transfer of any assets.  Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Persons after the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below.  The Debtors shall be administratively consolidated solely for the purposes of voting on the Plan, tabulating the votes to determine which Class or Classes have accepted the Plan,

confirming the Plan, and the resulting treatment of all Claims and Interests and Plan Distributions. All of the potential Classes for the Debtors are set forth herein.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | First Lien Secured Claims | Impaired | Entitled to Vote |
| Class 4 | First Lien Deficiency Claims | Impaired | Entitled to Vote |
| Class 5 | Second Lien Deficiency Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 9 | Existing Parent Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.     *Treatment of Claims and Interests.*

Except to the extent that a Holder of an Allowed Claim or Allowed Interest agrees in writing to less favorable treatment, in exchange for the full and final satisfaction, settlement, release, and discharge of its Claim or Interest, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Claim or Interest becomes an Allowed Claim or an Allowed Interest, as applicable, or as soon as reasonably practicable thereafter.

1.     <u>Class 1 – Other Secured Claims</u>

(a)     *Classification*:  Class 1 consists of all Other Secured Claims.

(b)     *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Post-Restructuring Debtor (and in consultation with the Required Consenting First Lien Lenders): (i) payment

in full in Cash; (ii) Reinstatement of such Claim; or (iii) such other treatment rendering such Claim Unimpaired.

(c)     *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.     Class 2 – Other Priority Claims

(a)     *Classification*:  Class 2 consists of all Other Priority Claims.

(b)     *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor or Post-Restructuring Debtor, with the consent of the Required Consenting First Lien Lenders, (i) payment in full in Cash; or (ii) such other treatment rendering such Claim Unimpaired.

(c)     *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.     Class 3 – First Lien Secured Claims

(a)     *Classification*:  Class 3 consists of all First Lien Secured Claims.

(b)     *Allowance*:  The First Lien Secured Claims shall be Allowed in full, in the amount of $276,105,278 plus accrued interest and all other fees, costs, expenses, premiums, and other amounts provided for under the First Lien Credit Agreement, *less* the First Lien Deficiency Claims, without the need to file any Proofs of Claims against the Debtors, and will not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person or Entity.

(c)     *Treatment*:  Each Holder of an Allowed First Lien Secured Claim shall receive its Pro Rata share of (i) 3% of the New Common Equity, subject to dilution on account of the MIP Interests and (ii) $124,213,836.00 of the Takeback Facility.

(d)     *Voting*:  Class 3 is Impaired under the Plan.  Holders of First Lien Secured Claims are entitled to vote to accept or reject the Plan.

4. <u>Class 4 – First Lien Deficiency Claims</u>

   (a) *Classification*:  Class 4 consists of all First Lien Deficiency Claims.

   (b) *Allowance*: The First Lien Deficiency Claims shall be Allowed in full, in an amount equal to the difference of (i) the First Lien Secured Claims of $276,105,278 and (ii) the value of projected recovery received by the First Lien Secured Claims, which is comprised of (A) 3% of New Common Equity, subject to dilution on account of the MIP Interests, and (B) $124,213,836 of the Takeback Facility.

   (c) *Treatment:*  Each Holder of an Allowed First Lien Deficiency Claim shall receive its Pro Rata share of the beneficial interests in the Liquidating Trust along with the Holders of Allowed Second Lien Deficiency Claims in Class 5 and Holders of Allowed General Unsecured Claims in Class 6. Thereafter, each such Holder shall be paid from the Liquidating Trust as set forth in the Liquidating Trust Agreement.

   (d) *Voting*:  Class 4 is Impaired under the Plan.  Holders of First Lien Deficiency Claims are entitled to vote to accept or reject the Plan.

5. <u>Class 5 – Second Lien Deficiency Claims</u>

   (a) *Classification*:  Class 5 consists of all Second Lien Deficiency Claims.

   (b) *Allowance*:  The Second Lien Deficiency Claims shall be Allowed in full, in the amount of $115,901,041 plus accrued interest and all other fees, costs, expenses, premiums, and other amounts provided for under the Second Lien Credit Agreement, without the need to file any Proofs of Claim against the Debtors, and will not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person or Entity.

   (c) Treatment: Each Holder of an Allowed Second Lien Deficiency Claim shall receive its Pro Rata share of the beneficial interests in the Liquidating Trust along with the Holders of Allowed First Lien Deficiency Claims in Class 4 and Holders of Allowed General Unsecured Claims in Class 6.  Thereafter, each such Holder shall be paid from the Liquidating Trust as set forth in the Liquidating Trust Agreement.

   (d) *Voting*:  Class 5 is Impaired under the Plan.  Holders of Second Lien Deficiency Claims are entitled to vote to accept or reject the Plan

6.     Class 6 – General Unsecured Claims

    (a)    *Classification*:  Class 6 consists of all General Unsecured Claims.

    (b)    *Treatment*:  Each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the beneficial interests in the Liquidating Trust along with the Holders of Allowed First Lien Deficiency Claims in Class 4 and Holders of Allowed Second Lien Deficiency Claims in Class 5.  As of the Effective Date, the Debtors' liability for all General Unsecured Claims shall be (i) assumed by the Liquidating Trust without further act, deed, or Court order and (ii) administered and paid from the Liquidating Trust as set forth in the Liquidating Trust Agreement.

    (c)    *Voting*:  Class 6 is Impaired under the Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

7.     Class 7 – Intercompany Claims

    (a)    *Classification*:  Class 7 consists of all Intercompany Claims.

    (b)    *Treatment*:  Subject to the Restructuring Transactions Memorandum, each Allowed Intercompany Claim shall be Reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Post-Restructuring Debtors or Liquidating Trust, as applicable (with the consent of Required Consenting First Lien Lenders); *provided* that no distributions shall be made on account of any Intercompany Claims.

    (c)    *Voting*:  Class 7 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

8.     Class 8 – Intercompany Interests

    (a)    *Classification*:  Class 8 consists of all Intercompany Interests.

    (b)    *Treatment*:  Subject to the Restructuring Transactions Memorandum, each Intercompany Interest shall be Reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Post-Restructuring Debtors or Liquidating Trust, as applicable (with the consent of Required Consenting First Lien Lenders); *provided*, that no distributions shall be made on account of any Intercompany Interests.

    (c)    *Voting*:  Class 8 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

9.      <u>Class 9 – Existing Parent Interests</u>

(a)     *Classification*:  Class 9 consists of all Existing Parent Interests.

(b)     *Treatment*:  Without the need for any further corporate or limited liability company action or approval of any board of directors, board of managers, members, shareholders or officers of any Debtor or Post-Restructuring Debtor, as applicable, all Existing Parent Interests shall be cancelled, released, and extinguished without any distribution, and will be of no further force or effect, and each Holder of an Existing Parent Interest shall not receive or retain any distribution, property, or other value on account of such Existing Parent Interest.

(c)     *Voting*:  Class 9 is Impaired under the Plan and is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Existing Parent Interests are not entitled to vote to accept or reject the Plan.

10.     <u>Class 10 – Section 510(b) Claims</u>

(a)     *Classification*:  Class 10 consists of all Section 510(b) Claims.

(b)     *Treatment*:  All Section 510(b) Claims shall be discharged and released, and each Holder of a Section 510(b) Claim shall not receive or retain any distribution, property, or other value on account of its Section 510(b) Claim.

(c)     *Voting*:  Class 10 is Impaired under the Plan and is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing herein shall affect the Debtors', the Post-Restructuring Debtors', or the Liquidating Trust's, as applicable, rights regarding any Unimpaired Claim, including, all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D.     *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining

acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.      *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the holders of New Common Equity, and in exchange for the Debtors', Post-Restructuring Debtors', and Liquidating Trust's, as applicable, agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

F.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more Classes of Impaired Claims. The Debtors may seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XI hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

G.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

H.      *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to the Plan.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall

constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI hereof, all Plan Distributions made to Holders of Allowed Claims (as applicable) in any Class are intended to be and shall be final.

B.     *Restructuring Transactions.*

On or before the Effective Date, the Debtors or the Post-Restructuring Debtors, as applicable, shall take all applicable actions set forth in the Restructuring Transactions Memorandum and may take any additional action as may be necessary or appropriate to effectuate the Restructuring Transactions, and any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions that are consistent with and pursuant to the terms and conditions of the Plan, the Restructuring Support Agreement, and the Restructuring Transactions Memorandum, which transactions may include, as applicable: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, the Restructuring Support Agreement, and the Restructuring Transactions Memorandum and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Restructuring Support Agreement, and the Restructuring Transactions Memorandum and having other terms to which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other certificates or documentation pursuant to applicable law; (4) the issuance of the New Common Equity, including pursuant to the Equity Financing; (5) the execution and delivery of the Takeback Facility Documents and any filing related thereto; (f) the execution and delivery of the New Organizational Documents of each Post-Restructuring Debtor; (6) the execution and delivery of the Liquidating Trust Agreement and any filing related thereto; (7) the execution and delivery of the CVR Agreement and any filing related thereto, and distribution of the CVR to the Liquidating Trust, and (8) all other actions that the applicable Post-Restructuring Debtors determine to be necessary or advisable, including making filings or recordings that may be required by applicable law in connection with the Plan. All Holders of Claims receiving distributions pursuant to the Plan and all other necessary parties in interest, including any and all agents thereof, shall prepare, execute, and deliver any agreements or

documents, including any subscription agreements, and take any other actions as the Debtors determine are necessary or advisable to effectuate the provisions and intent of the Plan.

The Confirmation Order shall and shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions, including, for the avoidance of doubt, any and all actions required to be taken under applicable non-bankruptcy law.

On the Effective Date, (1) Reorganized Wellpath and the Liquidating Trustee shall enter into the CVR Agreement and (2) the Liquidating Trustee, on behalf of the Liquidating Trust, shall receive the CVR. The CVR Agreement shall be duly authorized without the need for any further corporate action and without any further action by Holders of Claims, equityholders, members, directors, or officers of the Debtors or the Post-Restructuring Debtors, as applicable.

The CVR shall provide for a cash payment in the amount of ten percent of the equity proceeds generated in connection with a CVR Trigger Transaction in excess of the Threshold Amount based on the implied equity value in connection with a CVR Trigger Transaction. The CVR shall only be payable in cash to the extent that the Threshold Amount is achieved in connection with a CVR Trigger Transaction occurring prior to the CVR Termination Date. For the avoidance of doubt, if the Threshold Amount is not achieved prior to the CVR Termination Date, then no payment will be owed to the Liquidating Trust on account of the CVR.

The CVR shall not include any events of default or covenants except for the obligation to make the cash payment to the Liquidating Trust, if applicable, in accordance with the terms set forth in the CVR Agreement. The CVR shall not include monitoring, reporting, information or similar rights and shall not provide the Liquidating Trust any rights to vote on any matter at Reorganized Wellpath or otherwise entitle the Liquidating Trust (or any holder of beneficial interests therein) to any dividends with respect to any equity of Reorganized Wellpath.

The CVR shall be non-certificated and non-transferable. The CVR is structured so as to not be considered a security under applicable securities laws and shall not be subject to registration under securities laws or any other applicable law.

The provisions of this Article IV.B with respect to the CVR are subject to, and qualified in all respects, by the specific terms and conditions set forth in the CVR Agreement. In the event of an inconsistency between this Plan and the CVR Agreement, the terms and conditions of the CVR Agreement shall govern.

C.      *Administrative Consolidation for Voting and Distribution Purposes Only.*

The Plan is premised on the administrative consolidation of the Debtors solely for the purposes of voting on the Plan, tabulating the votes to determine which Class or Classes have accepted the Plan, confirming the Plan, and the resulting treatment of all Claims and Interests and Plan Distributions, but shall not constitute a transfer of assets or liabilities between Debtors for any other purpose. Each Debtors shall continue to maintain its separate corporate existence for all purposes other than the treatment of Claims and Interests under the Plan. On the Effective Date, and except as otherwise expressly provided in the Plan, solely for voting, tabulation, confirmation,

and distribution purposes with respect to each Class of Claims or Interests, (1) all Claims or Interests in each respective Class shall be deemed merged or consolidated and treated as Claims or Interests against the Debtors on a consolidated basis, (2) each Claim or Interest in each respective Class shall be deemed a single Claim against, or Interest in, the consolidated Debtors, (3) any Claim in a given Class based on a guaranty by any Debtors of the obligations of any other Debtors shall be deemed eliminated and extinguished, so that any Claim against any Debtor and any guarantee thereof by any other Debtor, and any joint or several liability of any of the Debtors, shall be deemed to be one obligation of the consolidated Debtors, and (4) each Holder of any Allowed Claim or Interest in a given Class shall be entitled to a single recovery on account of such Claim or Interest, in accordance with the treatment provided under the Plan for such Class, regardless of whether such Holder filed Proofs of Claims against multiple Debtors or has Claims against multiple Debtors based on the same or similar debt.

The Plan's treatment shall not affect (1) any subordination provisions set forth in any agreement relating to any Claim or Interest, (2) the ability of the Post-Restructuring Debtors or the Liquidating Trustee, as applicable, to seek to have any Claim subordinated in accordance with section 510 of the Bankruptcy Code or other applicable law, (3) any aspects, rights, benefits, privileges, liens, security interests, or claims under the New Organizational Documents, Takeback Facility, New Common Equity, or the legal and entity structure of the Debtors or Post-Restructuring Debtors, (4) any obligations under any contracts, licenses, or leases that were entered into during the Chapter 11 Cases or executory contracts or unexpired leases that have been or will be assumed pursuant to this Plan, (5) the vesting of assets in separate Post-Restructuring Debtors pursuant to Article IV.K of this Plan, or (6) guarantees that are required to be maintained after the Effective Date, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any of the Debtors' assets.

D.    *Sources of Consideration for Plan Distributions*

The Debtors shall fund Plan Distributions pursuant to the Restructuring Transactions, as applicable, with (1) the issuance of the New Common Equity, including through the Equity Financing, (2) the issuance of the Takeback Facility, (3) the Liquidating Trust Assets, and (4) Cash on hand. Each distribution and issuance referred to in this Article IV shall be governed by the terms and conditions set forth in the Plan or the Liquidating Trust Agreement applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, Reorganized Wellpath shall issue the New Common Equity pursuant to the Equity Financing and the Plan. The issuance of the New Common Equity, including equity on account of the Commitment Premium and Backstop Premium by the Post-Restructuring Debtors shall be authorized without (1) the need for any further corporate, limited liability company, partnership, or other governance action and without any action by the Holders of Claims, members, managers, directors, or officers of the Debtors or Post-Restructuring Debtors, as applicable, or other parties in interest, (2) notice to or order or other approval of the Bankruptcy Court, (3) act or omission under applicable law, regulation, order, or rule, or (4) vote, consent, authorization, or approval of any Person.

All of the shares (or comparable units) of New Common Equity, including in connection with the Commitment Premium and the Backstop Premium, issued pursuant to the Equity Financing and the Plan shall be duly authorized, validly issued, fully paid, and non-assessable and deemed not to have been issued in violation of any preemptive rights, rights of first refusal or similar rights or any applicable law. Each distribution and issuance of New Common Equity shall be governed by the terms and conditions set forth in the Equity Financing Documents or the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Post-Restructuring Debtor(s). Any Entity's acceptance of New Common Equity shall be deemed to constitute its agreement to enter into, and the New Common Equity shall be subject to, the applicable New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms. The New Common Equity will not be registered under the Securities Act or listed on any exchange as of the Effective Date and will not meet the eligibility requirements of the Depository Trust Company.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Equity (other than the Equity Financing Securities, the Commitment Premium, and Backstop Premium) on account of Allowed First Lien Secured Claims in accordance with the terms of the Plan shall be exempt from the registration and prospectus delivery requirements of the Securities Act and any other applicable federal, state, or local law requiring registration and/or delivery of prospectuses prior to the offering, issuance, distribution, and sale of a security. In addition, pursuant to section 4(a)(2) of the Securities Act, the offering, issuance, and distribution of Equity Financing Securities, the Commitment Premium, and the Backstop Premium pursuant to the Equity Financing is exempt from the registration and prospectus delivery requirements of the Securities Act and any applicable federal, state, or local law requiring registration and/or delivery of prospectuses prior to the offering, issuance, distribution, and sale of a security. Such securities issued under section 4(a)(2) of the Securities Act will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

Confirmation of the Plan shall be deemed approval of (1) the Equity Financing and the Equity Financing Documents and (2) all transactions contemplated thereby, and all actions to be taken and undertakings to be made, and obligations to be incurred by the Post-Restructuring Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Post-Restructuring Debtors to enter into and execute the Equity Financing Documents, and such other documents as may be required to effectuate the Equity Financing.

On the Effective Date, the Post-Restructuring Debtors shall be authorized to execute, deliver, and enter into the Takeback Facility Documents without further (1) notice to or order or other approval of the Bankruptcy Court, (2) act or omission under applicable law, regulation, order, or rule, (3) vote, consent, authorization, or approval of any Person, or (4) action by the Holders of Claims.

Confirmation of the Plan shall be deemed approval of (1) the Takeback Facility and the Takeback Facility Documents and (2) all transactions contemplated thereby, and all actions to be taken and undertakings to be made, and obligations to be incurred by the Post-Restructuring Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Post-Restructuring Debtors to enter into and execute the Takeback Facility Documents, and such other documents as may be required to effectuate the Takeback Facility.

On the Effective Date, all of the liens and security interests to be granted in accordance with the Takeback Facility Documents, (1) shall be deemed to be granted, (2) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Takeback Facility Documents, (3) shall be deemed automatically perfected on the Effective Date, subject only to such prior liens and security interests as may be permitted under the Takeback Facility Documents, and (4) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

E.     *Equity Financing*

On the Effective Date, the Debtors shall consummate the Equity Financing, through which each Equity Financing Participant, subject to the terms and conditions set forth in the Plan and the Commitment Letter, shall be obligated to purchase Equity Financing Securities at the Per Share Purchase Price.  Pursuant to the Commitment Letter, certain Equity Financing Participants shall receive their Pro Rata share of $786,164.00 of the Takeback Facility, in addition to the allocation of Equity Financing Securities, as consideration for such Backstop Party's payment of the Per Share Purchase Price.  Each Equity Financing Participant shall receive the Commitment Premium as consideration for providing its allocable share of the Equity Financing Amount.  The Per Share Purchase Price shall be payable in Cash.  On or prior to the Effective Date, the Equity Financing Participants will be required to fund into escrow with a bank, trust company or other agent approved by the Debtors and the Required Consenting First Lien Lenders an amount equal to the Price Per Share for such Equity Financing Participant's allocation of the Equity Financing Securities.

For the avoidance of doubt, the percentage ownership attributable to the Equity Financing Securities (subject to dilution by the Backstop Premium, Commitment Premium, and any MIP Interests) will be equal to 97% of the New Common Equity.

The Equity Financing shall be backstopped by the Backstop Parties in accordance with the terms and subject to the conditions of the Commitment Letter.  Subject to, and in accordance with the Commitment Letter, as consideration for the commitments of the Backstop Parties under the Commitment Letter, the Backstop Parties shall receive the Backstop Premium, which was fully earned upon entry by the Bankruptcy Court of the Final DIP Order, and the Commitment Premium. The commitments of the Backstop Parties under the Commitment Letter are several, not joint, obligations of the Backstop Parties, such that no Backstop Party shall be liable or otherwise responsible for the commitments of any other Backstop Party under the Commitment Letter. Any Backstop Party's rights, obligations or interests under the Commitment Letter may be freely

assigned, delegated or transferred, in whole or in part, by such Backstop Party to (1) any other Backstop Party, (2) any Affiliate (as defined in the Restructuring Support Agreement) of a Backstop Party, or (3) any other Person that is approved in writing in accordance with the terms of the Commitment Letter prior to such assignment, delegation or transfer, and such approval shall be deemed to be provided if (a) the transferee has the financial wherewithal to fulfill its obligations with respect to the Backstop Commitments to be transferred, as determined in the Debtors' reasonable opinion after request by the Debtors to the transferee, and prompt delivery to the Debtors by the transferee, of proof of such financial wherewithal and (b) such transferee provides a written agreement to the Debtors under which it confirms the accuracy of the representations set forth on Exhibit C of the Commitment Letter as applied to the transferee.

On the Effective Date, the proceeds of the Equity Financing shall be used by the Post-Restructuring Debtors for working capital and general corporate purposes.

F.    *Management Incentive Plan*

As soon as reasonably practicable following the Effective Date, the New Board shall adopt and implement the Management Incentive Plan, which will provide for the grants of equity and equity-based awards (*i.e.*, the MIP Interests) to employees, directors, consultants, and other service providers of the Post-Restructuring Debtors, as determined at the discretion of the New Board.

G.    *Employee Matters*

Unless otherwise provided herein, and subject to Article V of the Plan, the Post-Restructuring Debtors, with the prior written consent (which consent may be given via email) of the Required Consenting First Lien Lenders, shall:  (1) assume all Compensation and Benefit Programs; or (2) amend current or enter into new agreements with such Persons on terms and conditions acceptable to the Post-Restructuring Debtors, the Required Consenting First Lien Lenders, and such Person.  All collective bargaining agreements that the Debtors are party to that are in place as of the Effective Date shall be assumed by the Post-Restructuring Debtors and shall remain in place as of the Effective Date.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

A counterparty to any Compensation and Benefit Programs assumed pursuant to this Plan shall have the same rights under such Compensation and Benefit Programs as such counterparty had thereunder immediately prior to such assumption (unless otherwise agreed by such counterparty and the applicable Post-Restructuring Debtors); *provided, however,* that any assumption of Compensation and Benefit Programs pursuant to this Plan or any of the Restructuring Transactions shall not trigger or be deemed to trigger any change of control, change in control, immediate vesting, or similar provisions therein.

H.    *Corporate Existence*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Restructuring Transactions Memorandum), each Debtor, as Post-Restructuring Debtors, shall continue to exist on and after

the Effective Date as a separate legal Entity with all the powers available to such Entity pursuant to the applicable Law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other organizational documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other organizational documents) are amended, amended and restated, or replaced under the Plan or otherwise, including pursuant to the New Organizational Documents, in each case, consistent with the Plan, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended, amended and restated, or replaced pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).   On or after the Effective Date, the respective certificate of incorporation and bylaws (or other organizational documents) of one or more of the Post-Restructuring Debtors may be amended or modified in accordance with the terms thereof without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.   On or after the Effective Date, one or more of the Post-Restructuring Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

I.      *New Organizational Documents*

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Post-Restructuring Debtors without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person (other than as may be expressly required by the New Organizational Documents).   To the extent required under the Plan or applicable non-bankruptcy law, each of the Post-Restructuring Debtors will file its New Organizational Documents with the applicable authorities in its respective jurisdiction of organization. The New Organizational Documents will prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.

On or after the Effective Date, the Post-Restructuring Debtors may amend and restate their respective New Organizational Documents in accordance with the terms thereof, and the Post-Restructuring Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of their respective jurisdictions of incorporation or formation and the New Organizational Documents.

J.      *Directors and Officers of the Post-Restructuring Debtors.*

As of the Effective Date, the terms of the current members of the board of directors of Wellpath Parent shall expire, and the new directors and officers of the Post-Restructuring Debtors shall be appointed.  Except to the extent that a current member of the board of directors of Wellpath Parent is designated to serve as a director, manager, or sole manager of a Post-Restructuring Debtor, as applicable, the current members of the board of directors of Wellpath Parent prior to the Effective Date, in their capacities as such, shall have no continuing obligations to Wellpath Parent on or after the Effective Date, and each such director shall be deemed to have resigned or shall otherwise cease to be a director of Wellpath Parent on the Effective Date.   Each of the

directors, managers, sole managers, and officers of each of the Post-Restructuring Debtors shall serve pursuant to the terms of the applicable New Organizational Documents of such Post-Restructuring Debtor and may be designated, replaced, or removed in accordance with such New Organizational Documents.

K.      *Vesting of Assets in the Post-Restructuring Debtors*

Except as otherwise provided in the Confirmation Order or in the Plan (including the Restructuring Transactions Memorandum and Article IX hereof), on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan, except the Liquidating Trust Assets (other than the Liquidating Trust Subsequent Funding), shall vest in each respective Post-Restructuring Debtor, free and clear of all Liens, Claims, charges, other encumbrances, and interests. On and after the Effective Date, except as otherwise provided in the Plan, including Article IX hereof, each Post-Restructuring Debtor may operate its business and may use, acquire, or dispose of property, enter into transactions, agreements, understandings or arrangements, whether in or other than in the ordinary course of business and execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects.

L.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX hereof or pursuant to a Final Order (including the Financing Order), each Post-Restructuring Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated on the Schedule of Retained Causes of Action, except the Liquidating Trust Causes of Action or any Cause of Action that has been acquired by the Recovery Solutions Purchaser pursuant to the Recovery Solutions Stalking Horse Agreement, and the Post-Restructuring Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX hereof or pursuant to a Final Order (including the Financing Order), or any Cause of Action that has been acquired by the Recovery Solutions Purchaser pursuant to the Recovery Solutions Stalking Horse Agreement, which, in each case, shall be deemed released and waived by the Debtors and the Post-Restructuring Debtors as of the Effective Date.

The Post-Restructuring Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Post-Restructuring Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Post-Restructuring Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. Except as specifically released or as assigned or transferred under the Plan or pursuant to a Final Order (including**

**the Financing Order), the Debtors and the Post-Restructuring Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IX hereof or pursuant to a Final Order (including the Financing Order).** Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order (including the Financing Order), the Post-Restructuring Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Post-Restructuring Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, and except as expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order (including the Financing Order), any Causes of Action, except any Cause of Action that has been acquired by the Recovery Solutions Purchaser pursuant to the Recovery Solutions Stalking Horse Agreement, that a Debtor may hold against any Entity shall vest in the Post-Restructuring Debtors, except as otherwise expressly provided in the Plan, including Article IX hereof. The applicable Post-Restructuring Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, except any Cause of Action that has been acquired by the Recovery Solutions Purchaser pursuant to the Recovery Solutions Stalking Horse Agreement. The Post-Restructuring Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

M.   *Effectuating Documents; Further Transactions.*

Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Post-Restructuring Debtors, and their respective officers, directors, members, and managers (as applicable), are authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of this Plan such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Post-Restructuring Debtors, without the need for any approvals, authorizations, actions, notices or consents except for those expressly required pursuant to the Plan.

N.   *The Liquidating Trust.*

In accordance with the Plan, including Article VII hereof, and the Liquidating Trust Agreement, on and after the Effective Date, the Liquidating Trustee shall be the exclusive administrator of the Liquidating Trust Assets and shall make Plan Distributions to Holders of Allowed Claims to the extent provided herein.

1.      Vesting of the Liquidating Trust Assets in the Liquidating Trust.

Except as otherwise provided in the Plan (including the Restructuring Transactions Memorandum and Article IX hereof), the Confirmation Order, the Liquidating Trust Agreement, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, the Debtors shall transfer the Liquidating Trust Assets and the Liquidating Trust Initial Funding to the Liquidating Trust, and all such assets shall vest in the Liquidating Trust on such date, to be administered by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement.   On or as soon as reasonably practicable after the first anniversary of the Effective Date, the Post-Restructuring Debtors shall transfer $1,000,000 of the Liquidating Trust Subsequent Funding to the Liquidating Trust, and all such funding shall vest in the Liquidating Trust on such date, to be administered by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement.  On or as soon as reasonably practicable after the second anniversary of the Effective Date, the Post-Restructuring Debtors shall transfer the remaining $1,000,000 of the Liquidating Trust Subsequent Funding to the Liquidating Trust, and all such funding shall vest in the Liquidating Trust on such date, to be administered by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement.  On and after the Effective Date, except as otherwise provided for in the Plan or the Confirmation Order, with respect to the Liquidating Trust Assets, the Liquidating Trust may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action that constitute Liquidating Trust Assets.  The act of transferring the Liquidating Trust Assets, as authorized by this Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidating Trust as if the asset or right was still held by the applicable Debtor.

2.      Assumption of General Unsecured Claims by the Liquidating Trust.

On the Effective Date, and without further action of any Person, the Liquidating Trust shall assume the liabilities, obligations, and responsibilities of the Debtors for all General Unsecured Claims as set forth in the Plan and the Liquidating Trust Agreement.  The Liquidating Trustee shall implement procedures in accordance with the Liquidating Trust Agreement to reach resolution of General Unsecured Claims and determine the Liquidating Trust's liability for such Claims. Distributions in accordance with the Liquidating Trust Agreement and in accordance with the procedures contemplated therein shall be the sole source of recovery, if any, against the Debtors, their Estates, or the Post-Restructuring Debtors in respect of such General Unsecured Claims, and the Holders of such General Unsecured Claims shall have no other or further recourse to the Debtors, their Estates, or the Post-Restructuring Debtors.  In furtherance of the foregoing, the Liquidating Trust, subject to and only to the extent provided in the Liquidating Trust Agreement, shall have all defenses, cross-claims, offsets, and recoupments regarding General Unsecured Claims that the Debtors, as applicable have, or would have had, under applicable law, but solely to the extent consistent with the Liquidating Trust Agreement and the Plan.  For the avoidance of doubt, the foregoing shall not impair any person's or party's ability to pursue claims or causes of action against non-Debtors in the event such person or party opts out of the Third-Party Release; *provided*, that such claims or causes of action do not constitute property of the Debtors' Estates.

3. <u>Liquidating Trustee.</u>

On or prior to the Effective Date, the Liquidating Trust shall be established in accordance with the Liquidating Trust Agreement for the purpose of being vested with and liquidating the Liquidating Trust Assets, reconciling General Unsecured Claims, and making certain Plan Distributions to Holders of Allowed Claims to the extent set forth in this Plan and the Liquidating Trust Agreement. The Liquidating Trustee shall have the authority to administer, amend, modify, or supplement the Liquidating Trust Agreement and the procedures set forth therein in accordance with the Liquidating Trust Agreement and the terms of this Plan. Subject to and to the extent set forth in this Plan, the Confirmation Order, the Liquidating Trust Agreement or any other order of the Bankruptcy Court entered in connection therewith, the Liquidating Trust and the Liquidating Trustee shall be empowered, without the need for Bankruptcy Court approval, to:

(a) perform all actions and execute all agreements, instruments, and other documents necessary to effectuate the purpose of the Liquidating Trust;

(b) establish, maintain, and administer trust accounts, which shall be segregated to the extent appropriate in accordance with this Plan;

(c) accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle and protect, as applicable, the Liquidating Trust Assets in accordance with this Plan;

(d) except to the extent any other Claims have already been Allowed, control and effectuate the General Unsecured Claims allowance and reconciliation process with respect to General Unsecured Claims, including to object to, seek to subordinate, recharacterize, compromise or settle any and all such General Unsecured Claims against the Debtors, including the Disputed General Unsecured Claims, pursuant to the procedures prescribed in this Plan and the Liquidating Trust Agreement;

(e) pursue the Liquidating Trust Causes of Action, elect not to pursue any such Liquidating Trust Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Liquidating Trust Causes of Action, as is in the best interests of the beneficiaries of the Liquidating Trust;

(f) calculate and make Plan Distributions of the proceeds of the Liquidating Trust Assets to Holders of Allowed Claims, in accordance with the Plan and the Liquidating Trust Agreement;

(g) prepare and file appropriate tax returns and other reports on behalf of the Liquidating Trust and pay taxes or other obligations owed by the Liquidating Trust;

(h) retain, compensate, and employ professionals to represent the Liquidating Trust;

(i)   exercise such other powers as may be vested in the Liquidating Trust under the Liquidating Trust Agreement and this Plan, or as are deemed by the Debtors or the Liquidating Trustee to be necessary and proper to implement the provisions of the Liquidating Trust Agreement and effectuate the purpose of the Liquidating Trust; and

(j)   dissolve the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement.

Notwithstanding anything to the contrary in this Article IV.N.3, the Liquidating Trust's primary purpose is liquidating the Liquidating Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Liquidating Trust's liquidating purpose and reasonably necessary to conserve and protect the Liquidating Trust Assets and provide for the orderly liquidation thereof.

4.   <u>Preservation of Liquidating Trust Causes of Action.</u>

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX hereof, any applicable Final Order (including the Financing Order), the Liquidating Trust shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Liquidating Trust Causes of Action, whether arising before or after the Petition Date, including any actions specifically identified on the Schedule of Liquidating Trust Causes of Action, and the Liquidating Trust's rights to commence, prosecute, or settle such Liquidating Trust Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than pursuant to a Final Order (including the Financing Order), which, in each case, shall be deemed released and waived by the Debtors, the Liquidating Trust, and the Post-Restructuring Debtors as of the Effective Date. For the avoidance of doubt, the Liquidating Trust Causes of Action shall be specified on the Schedule of Liquidating Trust Causes of Action and, notwithstanding anything to the contrary in Article IX of this Plan, the Debtors, the Post-Restructuring Debtors, Reorganized Wellpath, and their Estates shall not release the Liquidating Trust Causes of Action. For the further avoidance of doubt, the Liquidating Trust Causes of Action shall not include (a) any Cause of Action against an Exculpated Party or a Released Party, (b) any Cause of Action against a Person or Entity related to the go-forward operation of the Corrections Business as determined by the Required Consenting First Lien Lenders, or (c) any Cause of Action that has been acquired by the Recovery Solutions Purchaser pursuant to the Recovery Solutions Stalking Horse Agreement.

The Liquidating Trust may pursue such retained Liquidating Trust Causes of Action, as appropriate, in accordance with the best interests of the Liquidating Trust. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Liquidating Trust Causes of Action against it as any indication that the Liquidating Trust will not pursue any and all available Liquidating Trust Causes of Action of the Debtors against it. Except as specifically released under the Plan or pursuant to a Final Order (including the Financing Order), the Liquidating Trust expressly reserves all rights to prosecute any and all Liquidating Trust Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IX hereof, the Liquidating Trust Agreement, or pursuant to a Final Order (including the Financing Order).** Unless any Liquidating Trust Causes of Action held against

an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order (including the Financing Order), the Liquidating Trust expressly reserves all Liquidating Trust Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Liquidating Trust Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Liquidating Trust reserves and shall retain such Liquidating Trust Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, and except as expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order (including the Financing Order), any Liquidating Trust Causes of Action held against any Entity shall vest in the Liquidating Trust, except as otherwise expressly provided in the Plan, including Article IX hereof. The Liquidating Trust, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Liquidating Trust Causes of Action. The Liquidating Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Liquidating Trust Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

5.    Securities Exempt; Transferability.

The Liquidating Trust shall be structured so as not to be subject to the Securities Act, the Securities Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended. The interests in the Liquidating Trust, and any right to receive a distribution from the Liquidating Trust, shall not be evidenced by any certificate, security, receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the Liquidating Trust by the Liquidating Trustee. The interests in the Liquidating Trust, and any rights to receive distributions from the Liquidating Trust, shall not constitute "securities" and shall not be registered pursuant to the Securities Act. If it is determined that such interests in the Liquidating Trust or rights constitute "securities," the exemption provisions of section 1145(a)(1) of the Bankruptcy Code would be satisfied and such securities would be exempt from registration. The interests in the Liquidating Trust may not be transferred at any time and shall be totally passive.

O.    *Tax Matters.*

The terms of the Plan and the Restructuring Transactions shall be structured in accordance with the Restructuring Transactions Memorandum to minimize, to the extent practicable, the aggregate tax impact of the Restructuring Transactions on the Debtors and the Post-Restructuring Debtors, taking into account both the cash tax impact of the Restructuring Transactions on the Debtors in the tax year of the Restructuring Transactions and the tax liability of the Post-Restructuring Debtors in subsequent tax years.

The Debtors and the Required Consenting First Lien Lenders shall cooperate in good faith (and/or cause their Affiliates to cooperate in good faith) to structure the Restructuring Transactions

in a tax efficient manner reasonably acceptable to the Required Consenting First Lien Lenders and as set forth in the Restructuring Transactions Memorandum.

P.      *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise provided in this Plan and the Confirmation Order, all notes, instruments, certificates, credit agreements, indentures, Securities and other documents evidencing or governing Claims or Interests (other than those Claims or Interests Reinstated under the Plan) shall be cancelled and the rights of the Holders thereof and obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.   Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to this Plan or the Confirmation Order.   Nothing contained herein shall be deemed to cancel, terminate, release or discharge the obligations of the Debtors or any of their counterparts under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order or hereunder.   Notwithstanding the releases set forth in Article IX.D of the Plan, Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights, claims, or remedies of the Holder of a Claim or Interest shall continue in effect solely for purposes of (1) enabling Holders of Allowed Claims to receive Plan Distributions as provided herein and subject to the terms and conditions of the applicable governing document or instrument as set forth therein, (2) allowing and preserving the rights of each of the applicable agents to (a) make or direct the Plan Distributions as provided herein and (b) assert or maintain any rights for indemnification or contribution the applicable agent may have against the Debtors or the applicable Lenders solely to the extent arising under, and due pursuant to the terms of, the applicable governing document or instrument, (3) preserving the Prepetition Agents' exercise of their rights, claims, causes of action, and interests as against any money or property distributable to the holders of Allowed Claims, (4) permitting the Prepetition Agents to enforce any obligation (if any) owed to them under the Plan, (5) permitting the Prepetition Agents to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court relating to the Prepetition Debt Documents in furtherance of the foregoing, and (6) permitting the Prepetition Agents to perform any functions that are necessary to effectuate the foregoing.

Q.      *Corporate Action.*

On the Effective Date, all actions contemplated under the Plan (including the Restructuring Transactions Memorandum) shall be deemed authorized and approved in all respects, including implementation of the Restructuring Transactions and all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).   All matters provided for in the Plan involving the corporate or organizational structure of the Debtors or the Post-Restructuring Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Post-Restructuring Debtors, as applicable, in connection with the Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further notice to or order

51

of the Bankruptcy Court or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the Holders of Claims, equityholders, members, directors, or officers of the Debtors or the Post-Restructuring Debtors, as applicable. Before, on, or after the Effective Date, as applicable, the appropriate officers of the Debtors or the Post-Restructuring Debtors, as applicable, shall be authorized and, as applicable, directed, to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Restructuring Debtors without the need for any approvals, authorizations, actions, or consents of or from any Person or Entity. The authorizations and approvals contemplated by this Article IV.Q shall be effective notwithstanding any requirements under non-bankruptcy Law.

R.      *Indemnification Obligations.*

Unless otherwise determined by the Debtors, in consultation with the Required Consenting First Lien Lenders, consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, agents, and other professionals of the Debtors, as applicable, shall (1) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (2) remain intact, in full force and effect, and irrevocable, (3) not be limited, reduced or terminated after the Effective Date, and (4) survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on, or after the Petition Date. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors (to the extent assumable) under the Plan and shall continue as obligations of the Post-Restructuring Debtors. Any Claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, for any reason. For the avoidance of doubt, the Post-Restructuring Debtors shall not assume any indemnification provisions or obligations related to any Holder of Interests in the Debtors.

S.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code and applicable law, any transfers (whether from a Debtor to a Post-Restructuring Debtor or to any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Post-Restructuring Debtors, including distribution of the CVR to the Liquidating Trust; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument

of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the imposition or collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

T.      *Director and Officer Liability Insurance.*

After the Effective Date, none of the Post-Restructuring Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors and officers of the Debtors who serviced in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, including in Article IV.G, all Executory Contracts or Unexpired Leases will be deemed assumed by the applicable Post-Restructuring Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that:  (1) are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (3) is the subject of a motion to reject filed on or before the Confirmation Date; (4) are to be rejected by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with any sale transaction; or (5) are a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Rejected Executory Contracts and Unexpired Leases Schedule, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory

Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Post-Restructuring Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Post-Restructuring Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan conditions, restricts or prevents, or purports to condition, restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease or allows the counterparty thereto to terminate, recapture, impose any penalty, declare a default, condition a renewal or extension, or modify any term or condition upon any assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Post-Restructuring Debtors, as applicable, reserve the right to, at any time up to 45 days after the Effective Date, supplement the Rejected Executory Contracts and Unexpired Leases Schedule with any Executory Contract or Unexpired Lease subject to a dispute relating to the amount of a Cure Cost.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, and (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Post-Restructuring Debtors, the Estates, or their property without the need for any objection by the Post-Restructuring Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with

Article III.B.6 of the Plan and may be objected to in accordance with the provisions of Article VIII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

During the course of the Chapter 11 Cases, as part of the sale process conducted by the Debtors in accordance with the Bidding Procedures, the Debtors Filed the Assumption Notice listing proposed Cure Costs with respect to their Executory Contracts and Unexpired Leases that may be assumed or assumed and assigned. In accordance therewith, the deadline to object to the proposed Cure Costs of each Executory Contract and Unexpired Lease listed on the Assumption Notice have expired. Only the rights of those parties who submitted an objection to the proposed Cure Costs of or in connection with their Executory Contract or Unexpired Lease prior to the objection deadline set forth in the Assumption Notice have been reserved (any objection timely submitted, an "*Assumption Dispute*"). No other party may dispute or object to the proposed Cure Costs of or in connection with their Executory Contract or Unexpired Lease. To the extent an Assumption Dispute relates solely to proposed Cure Costs, the applicable Post-Restructuring Debtor may assume or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of the Assumption Dispute; *provided*, that such Post-Restructuring Debtor reserves Cash in an amount sufficient to pay the full amount asserted as the required cure payment by the non-Debtor party to such Executory Contract or Unexpired Lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court). To the extent an Assumption Dispute is resolved or determined against the applicable Post-Restructuring Debtor, such Post-Restructuring Debtor may reject the applicable Executory Contract or Unexpired Lease after such determination, and the counterparty may thereafter File a Proof of Claim for any purported Rejection Damages in accordance with the Plan. Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption or assumption and assignment of such Executory Contract or Unexpired Lease (excluding objections to the proposed Cure Costs) must be asserted by the Plan Objection Deadline.

As soon as reasonably practicable after the Effective Date (unless otherwise agreed by and between the Post-Restructuring Debtors and the counterparty to an Executory Contract or Unexpired Lease), the Post-Restructuring Debtors shall pay all outstanding and undisputed Cure Costs set forth in the Assumption Notice other than those relating to Executory Contracts or Unexpired Leases listed on the Rejected Executory Contracts and Unexpired Leases Schedule. Any Cure Cost shall be deemed fully satisfied and released upon payment by the Post-Restructuring Debtors of such Cure Cost; *provided, however*, that nothing herein shall prevent the Post-Restructuring Debtors from paying any Cure Cost despite the failure of the relevant counterparty to File such request for payment of such Cure Cost. The Post-Restructuring Debtors also may settle any Cure Cost without any further notice to or action, order, or approval of the Bankruptcy Court and Claims associated with such Cure Costs can be expunged from the Claims Register (including by the Claims and Solicitation Agent).

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure Cost pursuant to this Article V.C, shall result in the full release and satisfaction of any Cure Costs, other Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory

Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim, or Claims set forth on the Schedules, based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Cost has been fully paid, shall be deemed Disallowed upon the later of entry of the Confirmation Order or such payment in full without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court and can be expunged from the Claims Register (including by the Claims and Solicitation Agent)**.**

D.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Post-Restructuring Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Post-Restructuring Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, shall be treated as Executory Contracts hereunder. Unless otherwise provided in the Plan, on the Effective Date solely to the extent not provided in the Rejected Executory Contracts and Unexpired Leases Schedule, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Post-Restructuring Debtors.

Nothing in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other Final Order (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors or draw on any collateral or security therefor. For the avoidance of doubt, insurers and third-party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all

Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Post-Restructuring Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Post-Restructuring Debtors, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

H.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Post-Restructuring Debtors in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### ARTICLE VI.
### PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distributions on Account of Claims Allowed as of the Effective Date.*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors or the Post-Restructuring Debtors, as the case may be, and the Holder of the applicable Allowed Claim on the first Distribution Date, the Post-Restructuring Debtors or the Liquidating Trust, as applicable, shall make initial distributions under the Plan on account of Claims Allowed as of the Effective Date, subject to the Post-Restructuring Debtors' or the Liquidating Trust's, as applicable, right to object to Claims; *provided* that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements,

course of dealing, course of business, or industry practice, (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of the Plan, and (3) Allowed General Unsecured Claims shall be paid (if entitled to payment) in accordance with Article III.B.6 of the Plan.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  Distribution Dates shall occur no less frequently than once in every ninety-day period, as necessary, in the Post-Restructuring Debtors' or Liquidating Trust's, as applicable, sole discretion.

B.      *Distribution Agent.*

All distributions under the Plan shall be made by the Distribution Agent.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Post-Restructuring Debtors or Liquidating Trust, as applicable.

C.      *Rights and Powers of the Distribution Agent.*

1.      <u>Powers of the Distribution Agent.</u>

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      <u>Expenses Incurred on or After the Effective Date.</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent or the Prepetition Agents on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Distribution Agent or the Prepetition Agents, in each case directly related to distributions under the Plan, shall be paid in Cash by the Post-Restructuring Debtors or Liquidating Trust, as applicable, in the ordinary course of business.  In the event that the Post-Restructuring Debtors object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Post-Restructuring Debtors and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Post-Restructuring Debtors and Distribution Agent are unable to resolve any differences

regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security, is transferred twenty or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.      Delivery of Plan Distributions in General.

Except as otherwise provided herein, the Distribution Agent shall make Plan Distributions to Holders of Allowed Claims as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such Plan Distributions shall be determined at the discretion of the Post-Restructuring Debtors or Liquidating Trust, as applicable.

All Plan Distributions to Holders of Allowed First Lien Secured Claims, Allowed First Lien Deficiency Claims, and Allowed Second Lien Deficiency Claims, as applicable, shall be deemed completed when made directly to the Holders of Allowed First Lien Secured Claims, Allowed First Lien Deficiency Claims, and Allowed Second Lien Deficiency Claims (in cooperation with the relevant Prepetition Agent).  The Prepetition Agents shall not incur any liability whatsoever on account of any Plan Distributions except for gross negligence or willful misconduct.  For the avoidance of doubt, all distributions referenced in this paragraph shall be subject to any exercise of the Prepetition Agents' rights, claims, causes of action, and interests as against any money or property distributable to the Holders of Allowed First Lien Secured Claims, Allowed First Lien Deficiency Claims, and Allowed Second Lien Deficiency Claims, as applicable.

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, or credit card, or as otherwise required or provided in the applicable agreements.

3.      Minimum Distributions.

No fractional shares of New Common Equity shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan (including the issuance of New Common Equity pursuant to Article III.B.3(c)(i) of this Plan) on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Equity that is not a whole number, the actual distribution of shares of New Common Equity shall be calculated to three decimal places and rounded up or down to the closest whole

number of shares of New Common Equity (with a half-share of New Common Equity or greater rounded up and less than a half-share of New Common Equity rounded down). The total number of authorized shares of New Common Equity to be distributed to Holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding. Neither the Post-Restructuring Debtors, Liquidating Trust, nor the Distribution Agent shall have any obligation to make a distribution that consists of less than one share of New Common Equity or is less than $100 to any Holder of an Allowed Claim.

4.      Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no further distribution to such Holder shall be made unless and until the Distribution Agent is notified in writing of the then-current address of such Holder, at which time all currently-due, missed distributions shall be made to such Holder as soon as reasonably practicable thereafter without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Post-Restructuring Debtors or Liquidating Trust, as applicable, automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims to such property or interest in property shall be discharged and forever barred.

5.      Surrender of Cancelled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.P hereof shall be deemed to have surrendered such certificate or instrument to the Distribution Agent. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Reinstated under this Plan.

E.      *Manner of Payment.*

1.      Except as otherwise set forth herein, all distributions of New Common Equity to Holders of the applicable Allowed Claims under the Plan, in addition to all issuances of New Common Equity pursuant to the Equity Financing or in connection with the Commitment Premium and Backstop Premium, shall be made by the Debtors on the Effective Date.

2.      All distributions of Cash to the Holders of the applicable Allowed Claims under the Plan shall be made by the Distribution Agent on behalf of the applicable Debtor or Post-Restructuring Debtor.

3.      At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

F.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, Post-Restructuring Debtors, Distribution Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information or forms necessary to facilitate such distributions (including the determination of any withholding in connection therewith), or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors, Post-Restructuring Debtors, and Liquidating Trust, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

Any person entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the applicable Distribution Agent an appropriate IRS Form W-9 or (if the payee is a foreign Person) an appropriate IRS Form W-8.

G.      *Allocations.*

Plan Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Final Order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

I.      *Setoffs and Recoupment.*

Except as expressly provided in the Financing Order and this Plan, including pursuant to Article IX hereof, each Post-Restructuring Debtor or the Liquidating Trust, as applicable, may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Post-Restructuring Debtor or the Liquidating Trust, as applicable, may hold

against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Post-Restructuring Debtor(s) or the Liquidating Trust, as applicable, and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Post-Restructuring Debtor or its successor of any and all claims, rights, and Causes of Action that such Post-Restructuring Debtor or its successor may possess against the applicable Holder.  In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Causes of Action of the Debtors, the Post-Restructuring Debtors, or the Liquidating Trust, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XIII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.      *Claims Paid or Payable by Third Parties.*

      1.      <u>Claims Paid by Third Parties.</u>

The Debtors, the Post-Restructuring Debtors, or the Liquidating Trust, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Post-Restructuring Debtor, or the Liquidating Trust.  To the extent a Holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a party that is not a Debtor, a Post-Restructuring Debtor, or the Liquidating Trust, as applicable, on account of such Claim, such Holder shall, within fourteen days of receipt thereof, repay or return the distribution to the applicable Post-Restructuring Debtor or the Liquidating Trust, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Post-Restructuring Debtor or the Liquidating Trust, as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

      2.      <u>Claims Payable by Third Parties.</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Causes of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.
## THE LIQUIDATING TRUSTEE

The rights, powers, privileges, obligations, and compensation of the Liquidating Trustee shall be set forth in the Liquidating Trust Agreement, which shall be filed as part of the Plan Supplement.

A.      *Creation and Governance of the Liquidating Trust.*

On the Effective Date, (1) the Debtors shall irrevocably transfer all of their rights, title, and interests in all of the Liquidating Trust Assets and the Liquidating Trust Initial Funding to the Liquidating Trust and (2) the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and take all steps necessary to establish the Liquidating Trust in accordance with the Plan and the beneficial interests therein.  In accordance with section 1141 of the Bankruptcy Code, the Liquidating Trust Assets, the Liquidating Trust Initial Funding, and the Liquidating Trust Subsequent Funding (at the applicable time of transfer of such funding) shall automatically vest in the Liquidating Trust without further action by any Person or Entity, free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other Stamp or Similar Tax.  In the event of any conflict between the terms of the Plan and the terms of the Liquidating Trust Agreement, the terms of the Plan shall govern. Upon completion of the transfer of the Liquidating Trust Assets, the Liquidating Trust Initial Funding, and the Liquidating Trust Subsequent Funding (at the applicable time of transfer of such funding) to the Liquidating Trust, neither the Debtors nor the Post-Restructuring Debtors shall have any further interest in the Liquidating Trust Assets, the Liquidating Trust Initial Funding, the Liquidating Trust Subsequent Funding, or the Liquidating Trust.  The Liquidating Trustee shall be the exclusive administrator of the Liquidating Trust Assets.  The Liquidating Trust shall be governed by the Liquidating Trust Agreement and administered by the Liquidating Trustee. The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Article VII.A.  The Liquidating Trustee shall hold and distribute the Liquidating Trust Assets and any proceeds thereof in accordance with the provisions of the Plan and the Liquidating Trust Agreement. Other rights and duties of the Liquidating Trustee shall be as set forth in the Liquidating Trust Agreement.

B.     *Liquidating Trustee and Liquidating Trust Agreement.*

The Liquidating Trust Agreement generally will provide for, among other things: (1) the irrevocable transfer of all of the Debtors' rights, title and interest in all of the Liquidating Trust Assets to the Liquidating Trust; (2) the payment of all expenses of the Liquidating Trust solely from the Liquidating Trust Assets, (for the avoidance of doubt, the Post-Restructuring Debtors shall not be obligated to pay any fees, costs, or expenses of the Liquidating Trust or the Liquidating Trustee); (3) procedures for the reconciliation and allowance of General Unsecured Claims as set forth in the Liquidating Trust Agreement; and (4) distributions under the Plan to Holders of Allowed Claims to the extent set forth herein and in the Liquidating Trust Agreement and pursuant to the procedures set forth therein.  The Liquidating Trust Agreement may include reasonable and customary provisions that allow for the limitation of liability of the Liquidating Trustee and its professionals, agents, and advisors, among others, and for indemnification of such Persons by the Liquidating Trust. Any such indemnification shall be the sole responsibility of the Liquidating Trust and payable solely from the Liquidating Trust Assets. The Liquidating Trustee shall be responsible for all decisions and duties with respect to the Liquidating Trust and the Liquidating Trust Assets, except as otherwise provided in the Liquidating Trust Agreement.

C.     *Tax Treatment.*

In furtherance of this Article VII.C, other than with respect to Liquidating Trust Assets that are subject to potential disputed claims of ownership or uncertain distributions (if any), (1) the Liquidating Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4(d) and in compliance with Rev. Proc. 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code with the beneficiaries of the Liquidating Trust treated as the grantors and owners of the Liquidating Trust; (2) the sole purpose of the Liquidating Trust shall be the liquidation and distribution of the Liquidating Trust Assets in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business; (3) all parties (including the Debtors, the Post-Restructuring Debtors, the Liquidating Trust Beneficiaries, and the Liquidating Trustee) shall report consistently with such treatment (including the deemed receipt of the underlying assets, subject to applicable liabilities and obligations, by the Holders of Allowed Claims, as applicable, followed by the deemed transfer of such assets to the Liquidating Trust); (4) all parties shall report consistently with the valuation of the Liquidating Trust Assets transferred to the Liquidating Trust as determined by the Liquidating Trustee (or its designee); (5) the Liquidating Trustee shall be responsible for filing returns for the Liquidating Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a); and (6) the Liquidating Trustee shall annually send to each holder of an interest in the Liquidating Trust a separate statement regarding the receipts and expenditures of the trust as relevant for United States federal income tax purposes.

D.     *Dissolution of Liquidating Trust.*

The Liquidating Trustee and the Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as all distributions required to be made by the Liquidating Trustee under the Plan have been made.  Upon dissolution of the Liquidating Trust, any remaining Liquidating Trust Assets shall be distributed to the Liquidating Trust Beneficiaries in accordance with the Liquidating Trust Agreement; *provided, however,* in no event shall the Liquidating Trust be

dissolved later than five years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

**ARTICLE VIII.**
**PROCEDURES FOR RESOLVING**
**CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**

This Article VIII shall not apply to the First Lien Claims and Second Lien Claims, which Claims shall be Allowed in full, without the need to file any Proofs of Claims against the Debtors, and will not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person or Entity.

A.      *Allowance of Claims.*

The Debtors, the Post-Restructuring Debtors, or the Liquidating Trustee (to the extent set forth in the Liquidating Trust Agreement with respect to General Unsecured Claims) as applicable, shall have the exclusive authority to determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed.  Upon such determination, the Debtors, Post-Restructuring Debtors, or the Liquidating Trustee, as applicable, may update the Claims Register to reflect such Proofs of Claim as Allowed and, upon delivery of the applicable treatment for such Unimpaired Claims under Article III.B (including, for the avoidance of doubt, Reinstatement), to mark such Proofs of Claims as satisfied. The Debtors may determine, in consultation with the Required Consenting First Lien Lenders, to Reinstate a claim that would be an Unimpaired Claim under the Plan, even if no timely Proof of Claim is filed therefor.

B.      *Claims Administration Responsibilities.*

The Debtors, the Post-Restructuring Debtors, or the Liquidating Trustee (to the extent set forth in the Liquidating Trust Agreement with respect to General Unsecured Claims), as applicable, shall have the exclusive authority to (1) File, withdraw, or litigate to judgment any objections to Claims, (2) settle or compromise any such objections to Claims without further notice to or action, order, or approval of the Bankruptcy Court, and (3) administer and adjust the Claims Register to reflect such settlements or compromises without further notice to or action, order, or approval of the Bankruptcy Court.  Except as otherwise provided herein, from and after the Effective Date, each Post-Restructuring Debtor or the Liquidating Trustee (to the extent set forth in the Liquidating Trust Agreement with respect to General Unsecured Claims), shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date, and the Post-Restructuring Debtors have after the Effective Date, with respect to any Claim (including

any Disputed Claim), including the Causes of Action retained pursuant to Articles IV.L and IV.N.3 of the Plan.

Any objections to Proofs of Claims (other than Administrative Claims) shall be served and Filed (1) on or before the date that is one hundred and eighty days following the later of (a) the Effective Date and (b) the date that a Proof of Claim is Filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of a Claim or (2) such later date as ordered by the Bankruptcy Court.

C.    *Disputed Claims Process.*

If the Debtors, Post-Restructuring Debtors, or the Liquidating Trustee (to the extent set forth in the Liquidating Trust Agreement with respect to General Unsecured Claims) dispute any Proof of Claim that is Filed on account of an Unimpaired Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that the Debtors, Post-Restructuring Debtors, or the Liquidating Trustee (to the extent set forth in the Liquidating Trust Agreement with respect to General Unsecured Claims), as applicable, or the Holder of such Claim may elect to have the validity or amount of any Claim adjudicated by the Bankruptcy Court instead.  If a Holder makes such an election, the Bankruptcy Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been filed.

If the Debtors, Post-Restructuring Debtors, or the Liquidating Trustee (to the extent set forth in the Liquidating Trust Agreement with respect to General Unsecured Claims), as applicable, dispute any Impaired Claim that is not Allowed as of the Effective Date pursuant to Article III.B or a Final Order entered by the Bankruptcy Court (which may include the Confirmation Order), the Debtors, Post-Restructuring Debtors, or the Liquidating Trustee (to the extent set forth in the Liquidating Trust Agreement with respect to General Unsecured Claims), as applicable, shall File an objection with, and the dispute shall be determined, resolved, or adjudicated before, the Bankruptcy Court.

D.    *Estimation of Claims.*

Before, on, or after the Effective Date, the Debtors, the Post-Restructuring Debtors, or the Liquidating Trustee (to the extent set forth in the Liquidating Trust Agreement with respect to General Unsecured Claims), as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under

the Plan (including for purposes of distributions), and the relevant Post-Restructuring Debtor or the Liquidating Trustee, to the extent set forth in the Liquidating Trust Agreement with respect to General Unsecured Claims, may elect to pursue any supplemental proceedings to object to the allowance of, or any ultimate distribution on, such Claim; *provided*, that, in accordance with 28 U.S.C. § 157(b)(2)(B), this Article VIII.D shall not apply to any contingent or unliquidated personal injury tort or wrongful death Claim against an Estate for purposes of distribution under the Plan.

E.     *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Post-Restructuring Debtors or the Liquidating Trustee, to the extent set forth in the Liquidating Trust Agreement with respect to General Unsecured Claims without the Post-Restructuring Debtors or the Liquidating Trustee having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.     *Disallowance of Claims.*

Except as otherwise expressly set forth herein or the Bar Date Order, and subject to the terms hereof, including Article IX, and the Financing Order, all Claims of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors, the Post-Restructuring Debtors, or the Liquidating Trustee, to the extent set forth in the Liquidating Trust Agreement (including acting on behalf of the Post-Restructuring Debtors) allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed disallowed if:  (1) the Entity, on the one hand, and the Debtors, the Post-Restructuring Debtors, or the Liquidating Trustee, to the extent set forth in the Liquidating Trust Agreement (including acting on behalf of the Post-Restructuring Debtors), as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**Except as otherwise provided herein, the Bar Date Order, or as agreed to by the Post-Restructuring Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order**.

G.     *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim

shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

H.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim or Interest the distributions (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

I.      *No Post-Petition Interest on Claims.*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, including the Financing Order, post-petition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

J.      *Accrual of Dividends and Other Rights.*

For purposes of determining the accrual of distributions or other rights after the Effective Date, the applicable New Common Equity shall be deemed distributed as of the Effective Date regardless of the date on which it is actually distributed; *provided*, *however*, that the Post-Restructuring Debtors shall not pay any such distributions or distribute such other rights, if any, until after distribution of the applicable New Common Equity actually takes place.

## ARTICLE IX.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

The releases and discharges of Claims, Interests, and Causes of Action described in the Plan, including releases by the Debtors and by Holders, constitute good-faith compromises and settlements of the matters covered thereby and such releases are consensual.  Such compromises and settlements are made in exchange for consideration, are in the best interest of Holders, are fair, equitable, and reasonable, and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan.

Each of the release, indemnification, discharge, and exculpation provisions set forth in the Plan or in the Confirmation Order (1) is within the jurisdiction of the Bankruptcy Court under sections 1334(a), 1334(b), and 1334(e) of title 28 of the United States Code, (2) is an essential means of implementing the Plan, (3) is an integral and non-severable element of the transactions incorporated into the Plan, (4) confers a material benefit on, and is in the best interests of, the

Debtors, their Estates, and their creditors, (5) is important to the overall objectives of the Plan to finally resolve all claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors, (6) is fair, equitable, and reasonable and in exchange for good and valuable consideration, and (7) is consistent with sections 105, 1123, 1129, 1141, and other applicable provisions of the Bankruptcy Code. Notwithstanding anything to the contrary herein, the releases, stipulations, and exculpation provisions hereof are in addition to and do not replace, the release, stipulations, and other provisions of any Final Order of the Bankruptcy Court (including the Final DIP Order).

Pursuant to, and to the maximum extent provided by, section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services that employees of the Debtors have performed prior to the Effective Date, and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the holder of such a Claim or Interest has accepted the Plan. The Confirmation Order, if applicable, shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

B.     *Release of Liens.*

**Except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Restructuring Debtors and their successors and assigns, in each case without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Post-Restructuring Debtors. Any Holder of such Secured Claim (and the applicable agents for such Holder (including the First Lien Agent or Second Lien Agent)) shall be authorized and directed, at the sole cost and**

expense of the Post-Restructuring Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder (including the First Lien Agent or Second Lien Agent)), and to take such actions as may be reasonably requested by the Post-Restructuring Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Post-Restructuring Debtors, at the sole cost and expense of the Post-Restructuring Debtors, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Post-Restructuring Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

C.     ***Releases by the Debtors.***

To the fullest extent permissible under applicable law, other than in the case of willful misconduct, gross negligence, or actual fraud (but not, for the avoidance of doubt, Avoidance Actions), each of the Debtors, the Post-Restructuring Debtors, Reorganized Wellpath, and their Estates, in each case in behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any cause of action, directly or derivatively by, through, for, of because of the foregoing entities shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party from any and all claims, interests, damages, remedies, causes of action, demands, rights, debts, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter existing, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted or assertable, direct or derivative, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, Post-Restructuring Debtors, Reorganized Wellpath, or their Estates, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the debtors, the company (including the capital structure, management, ownership, equity sponsorship, or operation thereof), the business operations of the Debtors, actions taken by the Debtors' board of directors or board of managers, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the Post-Restructuring Debtors or Reorganized Wellpath, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan or the Recovery Solutions Sale Order, the business or contractual arrangements between or

70

among any of the Debtors and any Released Party, the Debtors' restructuring efforts, the ownership or operation of the Debtors by any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to claims asserted against the debtors), intercompany transactions (other than any intercompany claims that have been reinstated as contemplated above), the Restructuring Transactions, the Sale Transactions, entry into the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the orders approving the Sale Transactions, the Term Sheets, the Bidding Procedures, the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Equity Financing Documents, the DIP Documents, the Definitive Documents, or any other documents (including any legal opinion requested by any entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Recovery Solutions Sale Order, the Confirmation Order, or the Plan or the reliance by any Released Party on the Recovery Solutions Sale Order, the Plan, or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the orders approving the Sale Transactions, the Term Sheets, the Bidding Procedures, the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Equity Financing Documents, or the DIP Documents, the administration and implementation of the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than any obligations of any Released Party arising under the Plan, any Definitive Documents, or any other document, instrument, or agreement executed to implement the Chapter 11 Cases.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Post-Restructuring Debtors, or the Debtors' Estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including any Claim or obligation arising under the Plan, or (2) any individual from any Claim or Cause of Action related to an act or omission that constitutes actual fraud, willful misconduct, or gross negligence.

D.    ***Releases by the Releasing Parties.***

      **To the fullest extent permissible under applicable law, other than in the case of willful misconduct, gross negligence, or actual fraud (but not, for the avoidance of doubt, Avoidance Actions), each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party from any and all claims, interests, damages, remedies, causes of action, demands, rights, debts, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter existing, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted or assertable, direct or derivative, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Releasing Parties or their Estates, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors and the TopCo Debtors  (including the capital structure, management, ownership, equity sponsorship, or operation thereof), the business operations of the Debtors, actions taken by the Debtors' Board of Directors or Board of Managers, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the Post-Restructuring Debtors or Reorganized Wellpath, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan or the Recovery Solutions Sale Order, the business or contractual arrangements between or among any of the Debtors and any Released Party, the Debtors' restructuring efforts, the ownership or operation of the Debtors by any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to claims asserted against the debtors), intercompany transactions (other than any intercompany claims that have been reinstated as contemplated above), the Restructuring Transactions, the Sale Transactions, entry into the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the orders approving the sale transactions, the Term Sheets, the Bidding Procedures, the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Equity Financing Documents, the DIP Documents, the Definitive Documents, or any other documents (including any legal opinion requested by any entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Recovery Solutions Sale Order, the Confirmation Order, or the Plan or the reliance by any Released Party on the Recovery Solutions Sale Order, the Plan, or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the orders approving the sale transactions, the Term Sheets, the Bidding Procedures, the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Equity Financing Documents, or the DIP Documents, the administration and implementation of the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than any obligations of any released party arising under the Plan, any Definitive Documents, or any other document, instrument, or agreement executed to implement the Chapter 11 Cases.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Article IX.D do not**

release any lender under either the First Lien Credit Agreement or the Second Lien Credit Agreement from any indemnification or contribution claims of the applicable Prepetition Agent specifically provided for in the First Lien Credit Agreement or the Second Lien Credit Agreement, as applicable.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Third-Party Release.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including any Claim or obligation arising under the Plan, or (2) any individual from any Claim or Cause of Action related to an act or omission that constitutes actual fraud, willful misconduct, or gross negligence.

E.      *Exculpation*.

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action or any claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the Chapter 11 Cases, the Disclosure Statement, the Plan (including the Plan Supplement), the DIP Documents (including with respect to the DIP Facility and DIP Roll-Up Loans), the Restructuring Support Agreement, the Equity Financing Documents, the Takeback Facility Documents, the Liquidating Trust Agreement, the Bidding Procedures, the Purchase Agreement(s), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the marketing of the Corrections Business, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (excluding, for the avoidance of doubt, providing any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other

agreement contemplated by the Plan), except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity for any post-Effective Date obligation under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

F.      ***Injunction***.

        **Except as otherwise expressly provided in the Plan, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Post-Restructuring Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan; *provided*, that, for the avoidance of doubt, this Article IX.F shall not apply to parties that timely opt out of the Third-Party Release to preserve their claims against the Released Parties.**

G.      *Gatekeeper Provision.*

        No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Claim or Cause of Action of any kind against any of the Released Parties that arose or arises from or is related to any Covered Claim without first (1) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim against a Released

Party and is not a Claim that was released under the Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (2) obtaining from the Bankruptcy Court, in the form of a Final Order, specific authorization for such party to bring such Claim or Cause of Action against a Released Party; *provided that*, nothing in this Article IX.G shall apply to claims of Holders that have opted out of the Third-Party Release.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Claims or Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.

H.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Post-Restructuring Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Post-Restructuring Debtors, or another Entity with whom the Post-Restructuring Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.      *Document Retention.*

On and after the Effective Date, the Post-Restructuring Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Post-Restructuring Debtors.

J.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

K.      *Government Carve Out.*

Nothing in the Confirmation Order or the Plan shall effect a release of any Claim by the United States Government or any of its agencies or any state and local authority whatsoever, including any claims arising under the Internal Revenue Code, the environmental laws, regulatory laws, or any criminal laws of the United States or any state and local authority against any party

or person, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws, regulatory laws, or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in the Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person.

## ARTICLE X.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.B hereof:

1.    the Bankruptcy Court shall have entered the Confirmation Order, Filed in a manner consistent in all material respects with the Plan (including finding that (a) section 1145 of the Bankruptcy Code fully applies to the New Common Equity offered, issued, and distributed on account of the Allowed First Lien Secured Claims and (b) section 4(a)(2) of the Securities Act fully applies, as applicable, to the New Common Equity offered, issued, and distributed pursuant to the Equity Financing), and such order shall have become a Final Order;

2.    the Plan and all documentation with respect to the Plan and Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, shall be materially consistent with the terms and conditions described in the Restructuring Support Agreement;

3.    the New Organizational Documents, which shall be acceptable to the Required Consenting First Lien Lenders and reasonably acceptable to the Debtors, shall have become effective (or shall become effective concurrently with the effectiveness of the Plan);

4.    the Restructuring Support Agreement shall not have been terminated (and no event shall have occurred that purports to terminate the Restructuring Support Agreement (even if such termination does not occur as a result of the automatic stay of section 362 of the Bankruptcy Code or otherwise)), and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit any of the Required Consenting First Lien Lenders or the Debtors or TopCo Debtors to terminate the Restructuring Support Agreement in accordance with its terms upon the expiration of such time;

5.    the Bankruptcy Court shall have entered the Interim DIP Order, the Final DIP Order, the Recovery Solutions Sale Order, the Disclosure Statement Order, and the Confirmation Order, each of which (a) shall be consistent with the Restructuring

Support Agreement and otherwise be in form and substance acceptable to the Required Consenting First Lien Lenders and the Debtors and (b) shall not have been stayed, reversed, dismissed, or vacated; for the avoidance of doubt, no Cash Collateral Termination Event (as defined in the Final DIP Order) shall have occurred;

6. the Debtors shall have paid in full in Cash (or the Debtors shall pay in full in Cash substantially contemporaneously with consummation of the Restructuring Transactions) all Restructuring Expenses and Agent Fees;

7. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

8. the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the Plan;

9. all Professional Fee Amounts that require the approval of the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been funded into the Professional Fee Escrow Account pending the approval of such fees and expenses by the Bankruptcy Court;

10. no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Plan;

11. the Liquidating Trust shall be established and funded with the Liquidating Trust Initial Funding, and the Liquidating Trustee shall have been appointed in accordance with the provisions of the Plan and the terms of the Liquidating Trust Agreement;

12. the New Common Equity shall have been issued by Post-Restructuring Wellpath;

13. the following documents shall be in full force and effect substantially contemporaneous with the consummation of the Restructuring Transactions (including shall not be stayed, modified, revised, or vacated, or subject to any pending appeal), and shall not have been terminated prior to the Effective Date:  (a) the New Organizational Documents; (b) such other motions, orders, agreements, and documentation necessary or desirable to consummate and document the transactions contemplated by this Plan; (c) the Equity Financing Documents; (d) the Takeback Facility Documents; (e) to the extent not included in the foregoing, all financing documents needed to effectuate the Restructuring Transactions, and (f) all other material customary documents delivered in connection with transactions of this type (including any and all other documents implementing, achieving, contemplated by or relating to the Restructuring Transactions);

14. the closing and funding of the Equity Financing and the Takeback Facility shall have occurred;

15. the Debtors shall have otherwise substantially consummated the applicable Restructuring Transactions in a manner consistent in all respects with the Plan; and

16. as of the Effective Date, no temporary restraining order, preliminary or permanent injunction, judgment, or other order preventing the Restructuring Transactions or any of the transactions contemplated by any of the Definitive Documents shall have been entered, issued, rendered, or made, nor shall any proceeding seeking any of the foregoing be commenced or pending; nor shall any proceeding seeking any of the foregoing be threatened by a governmental body; nor shall there be any law promulgated, enacted, entered, enforced, or deemed applicable to any of the parties which makes the consummation of the Restructuring Transactions or any of the transactions contemplated by any of the Definitive Documents illegal, void, or rescinded.

B.    *Waiver of Conditions.*

Except as otherwise specified in this Plan, any one or more of the conditions to Consummation (or any component thereof) set forth in this Article X may be waived by the Debtors with the prior written consent of the Required Consenting First Lien Lenders (not to be withheld unreasonably), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.    *Effect of Failure of Conditions.*

If Consummation does not occur as to any Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims or Liens by the Debtors, any Holders of Claims or Interests, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

D.    *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments.*

Except as otherwise specifically provided in this Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan; *provided*, that any material modification to the Plan shall be subject to the consent of the Required Consenting First Lien Lenders. Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of

the Bankruptcy Code, the Debtors expressly reserve their right, in consultation with the Required Consenting First Lien Lenders, to revoke or withdraw, or to alter, amend, or modify the Plan, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.    *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan.*

The Debtors reserve the right, in consultation with the Required Consenting First Lien Lenders, to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization or liquidation. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.  allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.  decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.  resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or secured or unsecured status, or amount of any Claim or Interest, including with respect

to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Post-Restructuring Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7. enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement;

8. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10. issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article IX hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.J hereof;

13. enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14. determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15. enter an order concluding or closing the Chapter 11 Cases;

16. adjudicate any and all disputes arising from or relating to distributions under the Plan;

17. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article IX hereof;

22. enforce all orders previously entered by the Bankruptcy Court; and

23. hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XII to the contrary, the New Organizational Documents and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect.*

Subject to Article X.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Post-Restructuring Debtors, any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests (1) are Impaired or Unimpaired, (2) have, or are deemed to have accepted the Plan, or (3) failed to vote to accept or reject the Plan),

All Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.   *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Post-Restructuring Debtors, the Liquidating Trust, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.   *Payment of Statutory Fees.*

The Debtors shall file all monthly reports and pay all fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code or as agreed by the U.S. Trustee, for each quarter (including any fraction thereof) until the Effective Date.

On and after the Effective Date, the Post-Restructuring Debtors shall file all quarterly reports and pay all fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code or as agreed by the U.S. Trustee, for each quarter (including any fraction thereof) until the earlier of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  The Liquidating Trust Assets disbursed to the Liquidating Trust will be included in the calculation of the statutory fees payable to the U.S. Trustee by the Debtors and the Post-Restructuring Debtors for the quarter in which such disbursement occurs, and neither the Debtors nor the Post-Restructuring Debtors will be responsible for any statutory fees, if any, based on the Liquidating Trust's subsequent distributions.

D.   *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, the Committee and any other statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Post-Restructuring Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

E.   *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an

admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Wellpath Holdings, Inc.<br>3340 Perimeter Hill Drive<br>Nashville, TN 37211<br>Attention:  Chief Executive Officer<br>              Interim Chief Financial Officer<br>              Chief Legal Officer | McDermott Will & Emery LLP<br>444 West Lake Street, Suite 4000<br>Chicago, IL 60606<br>Attention:  Felicia Perlman,<br>              Bradley Thomas Giordano,<br>              Jake Jumbeck,<br>              Carole Wurzelbacher, and<br>              Carmen Dingman<br>Email:      fperlman@mwe.com<br>              bgiordano@mwe.com<br>              jjumbeck@mwe.com<br>              cwurzelbacher@mwe.com<br>              cdingman@mwe.com<br><br>    and<br><br>McDermott Will & Emery LLP<br>One Vanderbilt Avenue<br>New York, NY 10017-3852<br>Attention:  Steven Z. Szanzer<br>Email:       sszanzer@mwe.com<br><br><br>    and<br><br>McDermott Will & Emery LLP<br>2501 North Harwood Street, Suite 1900<br>Dallas, TX 75201-1664<br>Attention:  Marcus A. Helt<br>Email:       mhelt@mwe.com |

| United States Trustee | Counsel to the DIP Lenders and Ad Hoc Group |
|---|---|
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 | Akin Gump Strauss Hauer & Feld LLP<br>2001 K Street, N.W.<br>Washington, D.C. 20006<br>Attention: Scott Alberino<br>         Kate Doorley<br>Email:     salberino@akingump.com<br>           kdoorley@akingump.com |
| **Counsel to the Unsecured Creditors' Committee** | |
| Stinson LLP<br>1201 Walnut, Suite 2900<br>Kansas City, MO 64106<br>Attention: Nicholas Zluticky<br>         Zachary Hemenway<br>Email:     nicholas.zluticky@stinson.com<br>           zachary.hemenway@stinson.com<br>    and<br><br>Stinson LLP<br>1144 Fifteenth St., Suite 2400<br>Denver, Colorado 80202<br>Attention: Lucas Schneider<br>Email:     lucas.schneider@stinson.com | Proskauer Rose LLP<br>Eleven Times Square<br>New York, NY 10036-8299<br>Attention: Brian S. Rosen<br>         Ehud Barak<br>         Daniel Desatnik<br>Email:     brosen@proskauer.com<br>           ebarak@proskauer.com<br>           ddesatnik@proksauer.com<br><br>    and<br><br>Proskauer Rose LLP<br>70 West Madison, Suite 3800<br>Chicago, IL 60602-4342<br>Attention:  Paul V. Possinger<br>Email:     ppossinger@proskauer.com |

H.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous

negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://dm.epiq11.com/Wellpath or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Post-Restructuring Debtors' consent, as applicable; and (3) except as otherwise provided in this Article XIII.K, nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Post-Restructuring Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Post-Restructuring Debtors or the Liquidating Trustee, as applicable, shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents

required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.      *Creditor Default.*

An act or omission by a Holder of a Claim or an Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan.  Upon an event of default, the Post-Restructuring Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Post-Restructuring Debtors in remedying such default.  Upon the finding of such a default by a creditor, the Bankruptcy Court may:  (1) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (2) enforce the Plan by order of specific performance; (3) award judgment against such defaulting creditor in favor of the Post-Restructuring Debtors in an amount, including interest, to compensate the Post-Restructuring Debtors for the damages caused by such default; and (4) make such other order as may be equitable that does not materially alter the terms of the Plan.

Dated:  March 17, 2025

_/s/ Timothy J. Dragelin_
Wellpath Holdings, Inc.
CCS-CMGC Intermediate Holdings, Inc.
CCS-CMGC Intermediate Holdings 2, Inc.
Wellpath CFMG, Inc.
WHC, LLC
Wellpath Community Care Centers of Virginia, LLC
CHC Companies, LLC
Conmed Healthcare Management, LLC
WPMed, LLC
Correct Care Holdings, LLC
Wellpath Group Holdings, LLC
Wellpath, LLC
Correctional Healthcare Companies, LLC
Correctional Healthcare Holding Company, LLC
Wellpath Management, Inc.
Wellpath Education, LLC
HCS Correctional Management, LLC
Jessamine Healthcare, LLC
Wellpath Community Care Management, LLC
Alpine CA Behavioral Health HoldCo, LLC
Wellpath Hospital Holding Company, LLC
Wellpath Community Care Holdings, LLC
Justice Served Health Holdings, LLC
Physicians Network Association, Inc.
Healthcare Professionals, LLC
Missouri JSH HoldCo, LLC
Missouri JSH Manager, Inc.
Wellpath SF HoldCo, LLC
Perimeter Hill RPA, LLC
Zenova Telehealth, LLC
Zenova Management, LLC
901 45th Street West Palm Beach Florida Behavioral
Health Hospital Company, LLC
Boynton Beach Florida Behavioral Health Hospital
Company, LLC