# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION

In re:

**WELLPATH HOLDINGS, INC., et al.,**
Debtors.

§
§ **Chapter 11**
§ **Case No. 24-90533 (ARP)**
§ **(Jointly Administered)**

*United States Courts*
*Southern District of Texas*
*F I L E D*
*APR 2 1 2025*
*Nathan Ochsner, Clerk of Court*

## FIRST DECLARATION OF DR. KANWAR PARTAP SINGH GILL IN SUPPORT OF SUPPLEMENTAL BRIEF FILED IN SUPPORT OF DKTS. 1897, 2049, AND 2075

### NOTICE TO THE COURT AND ALL PARTIES

This declaration has been carefully for organized, tabulated, and indexed. Each section is clearly labeled and referenced to ensure absolute clarity. This declaration and attached exhibits are being submitted physically and in compliance with all applicable Federal Rules and Local Bankruptcy Rules.

# TABLE OF CONTENTS – SECTION INDEX

| # | Section/Subsection Title | Page Range |
|---|---|---|
| 1 | DECLARATION OF DR. KANWAR PARTAP SINGH GILL IN SUPPORT OF SUPPLEMENTAL BRIEF FILED IN SUPPORT OF DKTS. 1897, 2049, AND 2075 | 1–45 |
| 2 | Face Sheet for All Exhibits related to Declaration | 46 |
| 3 | Exhibit 1 – HR and Retaliation Timeline | 47–73 |
| 4 | Exhibit 2 – CPOM Violations | 74–147 |
| 5 | Exhibit 3 – 409A Tax Impact Documentation | 148–179 |
| 6 | Exhibit 4 – Legal Memoranda to MWE and Coercion Evidence | 180–261 |
| 7 | Exhibit 5 – April 14 Supplemental Brief supporting Motions 1897, 2049, and 2075 | 262–351 |

## CERTIFICATION OF ACCURACY

I, Dr. Kanwar Partap Singh Gill, personally verified each Declaration page referenced above. The sections and pages are exact and accurate, fully resolving previous procedural concerns.

Filed by:

**Dr. Kanwar Partap Singh Gill**

Pro Se Statutory Creditor | ADA-Protected Physician | Federal Whistleblower

Date: April 19, 2025

Place of Execution: Fresno County, California

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

In re:
**WELLPATH HOLDINGS, INC., et al.,**
**Debtors.**
§ Chapter 11
§ Case No. 24-90533 (ARP)
§ (Jointly Administered)

**DECLARATION OF DR. KANWAR PARTAP SINGH GILL IN SUPPORT OF SUPPLEMENTAL**
**BRIEF FILED IN SUPPORT OF DKTS. 1897, 2049, AND 2075**

Pursuant to 28 U.S.C. § 1746, I, Dr. Kanwar Partap Singh Gill, do hereby submit this
Declaration as a formal evidentiary statement under penalty of perjury, in support of the
legal and factual positions set forth in my Supplemental Brief filed April 14, 2025, and in
further support of the following motions presently before this Court:

1. Dkt. No. 1897 – Motion for Relief from the Automatic Stay;
2. Dkt. No. 2049 – Emergency Motion to Stay Plan Solicitation and Voting;
3. Dkt. No. 2075 – Motion to Strike Improper Third-Party Releases.

This Declaration is not submitted as a mere factual affidavit but as a jurisdictional and
statutory record for the purposes of judicial determination, regulatory scrutiny, and
evidentiary preservation. It is anchored in firsthand, contemporaneously documented
experience as a California-licensed physician, a pro se movant, a statutory creditor under
11 U.S.C. § 101(10), and a whistleblower-employee of California Forensic Medical Group,
Inc. ("CFMG"), a physician-owned, state-regulated professional medical corporation.

The factual assertions contained herein derive from my direct professional observations,
preserved internal correspondence, payroll and fiduciary records, and protected
disclosures made to relevant oversight bodies and legal counsel. Each statement is
grounded in verifiable evidence, forming the foundation of the statutory and constitutional
violations described in the Supplemental Brief and accompanying Exhibits 1 through 5.

This Declaration is submitted for consideration by the United States Bankruptcy Court for
the Southern District of Texas, with the understanding that it may be subject to appellate

review, regulatory investigation, and disciplinary referral pursuant to the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and applicable federal and state law. It is respectfully tendered in service of the Court's duty to adjudicate only those plans proposed in good faith and in accordance with law, as required by 11 U.S.C. § 1129(a)(3) and relevant constitutional doctrine.

## TABLE OF CONTENTS

**I. Professional Background and Legal Standing**
– Physician Licensure and Employment with CFMG
– Clinical History at Fresno County Detention Facility
– Creditor Status and Standing as NQDCP Participant
– Pro Se Representation and Scope of Filings

**II. Summary of Economic and Structural Claims**
– Deferred Compensation Misappropriation and Constructive Trust Violations
– CPOM Governance Violations and Professional Corporation Statutory Conflict
– Coercive and Unlawful Plan Structure and Solicitation Design
– Procedural and Legal Consequences: Tax, Regulatory, and Constitutional Harms

**III. Corporate Practice of Medicine (CPOM) Violations**
– Lay Control over Physician Governance in Violation of Cal. Bus. & Prof. Code §§ 2400–2417
– Evidentiary Examples of Clinical Interference by Wellpath Personnel
– Absence of Governance Carve-Outs or Corrective Structure in the Fifth Amended Plan
– Preemption Risks and Legal Consequences under § 1129(a)(1)–(3)

**IV. Improper HR Oversight and Retaliation**
– Unauthorized HR Investigations by Non-Physicians, Including Angie Baldwin
– Breaches of CPOM Doctrine in Employment Governance and Medical Judgment Delegation
– Retaliation Against ADA- and FEHA-Protected Disclosures
– Constructive Termination and Exclusion from Clinical and Professional Governance

**V. Deferred Compensation Misclassification and Tax Exposure**
– Wrongful Reclassification of NQDCP Assets as Estate Property in Violation of § 541(d)
– Violations of California Labor Code §§ 200–223 and ERISA § 1104 Fiduciary Duties
– Triggering of Constructive Distribution under IRC § 409A and Related Penalties
– Failure to Disclose, Indemnify, or Remedy Ongoing Tax Harm

## VI. Procedural Defects in Third-Party Releases and Plan Solicitation
– Coercive Nature of Article IX Opt-Out Release Mechanisms
– Constitutional Violations of Due Process Under Mullane v. Central Hanover Bank
– Non-Compliance with Fifth Circuit Precedent (Zale, Pacific Lumber, Highland Capital)
– Deceptive Disclosure Design and Obfuscation of Material Legal Consequences

## VII. Internal Ethics and Professional Misconduct by McDermott Will & Emery LLP (MWE)
– Advance Legal Memoranda Provided to MWE Prior to April 14 Supplemental Brief
– Violations of ABA Model Rules 1.2(d), 3.3(a), 4.1, 5.1, 5.2, and 8.4(c)
– Individualized Conduct of Attorneys Perlman, Helt, Szanzer, and Wurzelbacher
– Use of Withheld Deferred Compensation as Leverage to Suppress Protected Filings

## VIII. Substantive Federal and State Statutory Violations
– CPOM Governance Conflicts Under Cal. Bus. & Prof. Code §§ 2400–2417
– Whistleblower Protections Violated Under Cal. Labor Code § 1102.5
– Disability and Retaliation Claims Under ADA and FEHA
– Fiduciary and Anti-Retaliation Breaches Under ERISA §§ 1104 and 1140
– Constructive Distribution, Excise Taxes, and Non-Compliance Under IRC §§ 409A and 6662
– Bankruptcy Code Violations of §§ 524(e), 541(d), and 1129(a)(1)–(3)

## IX. Exhibits Incorporated by Reference
– Exhibit 1 – HR and Retaliation Timeline
– Exhibit 2 – Internal CPOM Violation Evidence
– Exhibit 3 – 409A Tax Impact Documentation
– Exhibit 4 – Legal Memoranda to MWE and Coercion Evidence
– Exhibit 5 – Supplemental Brief Filed April 14, 2025

## X. Judicial Oversight and Ethical Considerations
## XI. Closing Affirmation and Reservation of Rights

## I. PROFESSIONAL BACKGROUND AND LEGAL STANDING

### 1. Physician Licensure and Employment with CFMG

**1.** I am a duly licensed physician in the State of California, in good standing with the Medical Board of California (License No. A109884), with no history of disciplinary action, suspension, or professional censure. My license is active and unrestricted. I remain bound by, and in full compliance with, the regulatory framework set forth in the California Medical Practice Act, codified at Cal. Bus. & Prof. Code § 2000 et seq.

**2.** I am employed full-time as a Senior Staff Physician by California Forensic Medical Group, Inc. ("CFMG"), a California professional medical corporation lawfully registered under Cal. Corp. Code § 13400 et seq., and governed by the statutory requirements of physician ownership, control, and governance as imposed by Cal. Bus. & Prof. Code § 2400 et seq.

**3.** CFMG, by legal structure and operational practice, is distinct and independent from Wellpath Holdings, Inc. and its debtor-affiliated entities. It exists and operates as a physician-controlled, state-licensed medical entity, and is not subject to the corporate governance of any lay-owned or private equity-controlled MSO. I have no contractual, fiduciary, or employment relationship with Wellpath Holdings, Inc.

---

## 2. Clinical History at Fresno County Detention Facility

**4.** Since September 2019, I have continuously served as a licensed physician assigned to the Fresno County Adult Detention Facility, a state-sanctioned correctional medical site providing care to one of California's highest-acuity, highest-liability patient populations. My responsibilities encompass intake evaluations, chronic care management, acute illness intervention, suicide risk assessments, and emergency stabilization—delivered under conditions of operational constraint, legal scrutiny, and institutional vulnerability.

**5.** My role is one of record. I am recognized within the facility by custody command staff, including the ranking officers of the Fresno County Sheriff's Office, as a consistent, ethical, and evidence-based clinical provider. This recognition is corroborated by internal CFMG performance records and by the absence of any adverse peer review or disciplinary referral. I remain in good standing with both my employer and the state correctional healthcare system.

**6.** My professional conduct, medical decision-making, and scope of care are governed not only by the California Business and Professions Code but also by Title 15, California Code of Regulations §§ 1200–1230, which regulate healthcare in correctional institutions. I remain in full compliance with those provisions.

---

## 3. Creditor Status and Standing as NQDCP Participant

**7.** I assert standing in this matter as a non-contingent, liquidated, and statutorily protected creditor of the Debtors' estate. My claim arises from the wrongful classification and withholding of deferred compensation earned exclusively through my W-2 employment at CFMG.

**8.** These earnings, accumulated under the terms of a Non-Qualified Deferred Compensation Plan (NQDCP), constitute earned, vested wages held in trust, not discretionary bonuses or employer contributions. The source of the funds is CFMG—a non-debtor under this Court's jurisdiction—and all amounts are reported on tax documents issued under CFMG's Employer Identification Number (77-0005793).

**9.** My deferred compensation account, as reflected in my Fidelity NetBenefits statement dated November 12, 2024, contains a vested balance of $162,597.08, accumulated solely from wages earned through licensed medical labor. These funds are not, and have never been, part of Wellpath's equitable estate. The Debtors' administrative custody over the NQDCP does not confer beneficial ownership and falls squarely within the exclusionary language of 11 U.S.C. § 541(d).

**10.** The improper freeze and reclassification of these funds constitute a breach of fiduciary duty under ERISA § 404, 29 U.S.C. § 1104, as well as a retaliatory interference with protected plan rights under ERISA § 510, 29 U.S.C. § 1140. Further, the Plan's triggering of a constructive distribution under IRC § 409A imposes upon me immediate income inclusion, a 20% excise tax penalty, and exposure to accuracy-related assessments under IRC § 6662, all of which are documented in Exhibit 3 and incorporated herein by reference.

**11.** As a plan participant, whistleblower, and non-debtor employee, I am entitled to independent statutory protection under federal and state law, none of which have been acknowledged or preserved by the Fifth Amended Plan.

---

## 4. Pro Se Representation and Scope of Filings

**12.** I appear in these proceedings pro se, having submitted all pleadings, declarations, and supporting exhibits independently and without retained counsel. I have done so not as an act of protest, but in defense of my professional, statutory, and constitutional rights.

**13.** My filings include the following motions:

- Dkt. No. 1897 – Motion for Relief from the Automatic Stay, seeking to adjudicate non-estate claims, including deferred compensation, CPOM violations, and employment retaliation;
- Dkt. No. 2049 – Emergency Motion to Stay Plan Solicitation and Voting, challenging the use of opt-out third-party releases, deceptive disclosure language, and structurally coercive solicitation practices;
- Dkt. No. 2075 – Motion to Strike Improper Third-Party Releases, seeking invalidation of non-consensual discharge provisions that violate 11 U.S.C. § 524(e), Fifth Circuit precedent, and constitutional due process.

**14.** These motions are not isolated grievances. They form a single, unified legal record supported by:

- The April 14, 2025 Supplemental Brief,
- Exhibits 1 through 5, and
- The statutory and evidentiary foundation presented in this Declaration.

**15.** The legal rights at stake span multiple jurisdictions and legal regimes, including:

- Employment governance and licensure rights under California's CPOM doctrine;
- Fiduciary protections and anti-retaliation provisions under ERISA;
- Asset classification and tax timing under the Bankruptcy Code and IRC § 409A;
- Procedural protections under the Due Process Clause of the Fifth Amendment, as interpreted in Mullane v. Central Hanover Bank, and by the Fifth Circuit in Zale Corp. and Pacific Lumber.

**16.** I invoke these rights not in resistance to the reorganization process, but to ensure that it proceeds in accordance with law, equity, and the constitutional guarantees that apply to every person and professional appearing before this Court.

## II. SUMMARY OF ECONOMIC AND STRUCTURAL CLAIMS

### Introduction

**17.** The injuries asserted herein are not theoretical or speculative, but instead are verifiable, traceable, and statutorily redressable harms—economic, structural, regulatory, and constitutional in nature. These harms stem directly from the design, operation, and legal defects of the Fifth Amended Plan of Reorganization (Dkt. 1835), and implicate foundational doctrines governing trust law, tax administration, fiduciary integrity, employment licensure, and procedural due process. The evidentiary record before this Court—including W-2s, IRS filings, ERISA-covered documents, internal HR emails, and legal

memoranda—renders these harms not only established, but incapable of lawful ratification under the Bankruptcy Code or federal constitutional norms.

---

### 1. Deferred Compensation Misappropriation and Constructive Distribution

**18.** My first and most immediate injury arises from the misappropriation and functional termination of earned, vested deferred compensation—contractual wages held in trust under a Non-Qualified Deferred Compensation Plan (NQDCP). While the Debtors acted as ministerial administrators of the plan, the funds were earned solely through W-2 employment with California Forensic Medical Group, Inc. (CFMG)—a non-debtor, physician-governed professional medical corporation.

**19.** As of November 12, 2024, my Fidelity NetBenefits account reflected a fully vested balance of $162,597.08, derived entirely from base wages I affirmatively elected to defer. These funds are not bonuses, equity, or employer-contributed assets. They are earned wages, documented on CFMG W-2s, and held in constructive trust for my exclusive benefit. The Debtors' administrative custody conveyed no equitable interest, and under 11 U.S.C. § 541(d), such property is excluded from the bankruptcy estate.

**20.** The Debtors' unilateral freeze and reclassification of these trust-held wages violated multiple statutes, including:

- ERISA § 404 (29 U.S.C. § 1104) – by breaching fiduciary duties of loyalty and exclusive purpose;
- ERISA § 510 (29 U.S.C. § 1140) – by retaliating against a plan participant for asserting protected rights;
- California Labor Code §§ 200–223 – by unlawfully withholding earned wages;
- IRC § 409A(a) – by triggering constructive distribution, with immediate income inclusion, a 20% excise tax, and exposure to further penalties under IRC § 6662;
- Treas. Reg. § 1.409A-3(j)(4)(ix) – by failing to satisfy the regulatory conditions for plan termination and liquidation.

**21.** The Plan termination failed every element of the regulatory safe harbor under § 1.409A-3(j)(4)(ix):

- It was not part of a plan-wide termination;
- No 12-month deferral was observed;
- No 24-month liquidation window was honored;
- No representation was made that no new NQDC plan would be adopted within three years;

- And the termination was triggered within the context of financial distress and bankruptcy—an explicit disqualifier under the regulation.

**22.** As a result, I suffered a constructive distribution of the entire deferred balance, even though I received no funds. The IRS treated the termination as an acceleration of deferred income, resulting in:

- Immediate gross income inclusion under IRC § 409A(a)(1)(A);
- A 20% excise tax under § 409A(a)(1)(B);
- Exposure to accuracy-related penalties and audit risk under § 6662, as substantiated in Exhibit 3, including my IRS Form 8275.

**23.** These tax consequences are tangible, irreversible, and legally attributable to the Debtors' misconduct. The Plan provides no indemnification, no disclosure of the 409A risk, and no mechanism for tax relief. It thus transforms a statutory fiduciary obligation into a litigation weapon—using trust-backed wages to suppress protected legal activity, as documented in Exhibit 4.

---

## 2. CPOM Governance Violations and Professional Corporation Statutory Conflict

**24.** Parallel to the financial injury is the structural violation of California's Corporate Practice of Medicine (CPOM) doctrine, codified in Cal. Bus. & Prof. Code §§ 2400–2417, which prohibits lay entities from controlling physician employment or clinical judgment.

**25.** As reaffirmed by People v. Cole, 38 Cal. 2d 99 (1951), Conway v. State Bd. of Med. Examiners, 47 Cal. App. 2d 105 (1941), and 76 Ops. Cal. Atty. Gen. 133 (1993), such governance arrangements are not merely voidable—they are void ab initio as a matter of public policy.

**26.** The Fifth Amended Plan (Dkt. 1835) codifies a structure in which Wellpath—a lay-owned, private equity-controlled MSO—exercises de facto control over CFMG's licensed physicians. This includes scheduling, disciplinary actions, compensation decisions, and HR investigations, all documented in Exhibit 2.

**27.** The Plan contains no governance carve-out, no transition mechanism, and no compliance clause to restore lawful physician-led oversight. Confirmation of this Plan would amount to federal ratification of an illegal employment structure, in violation of § 1129(a)(1) and § 1129(a)(3).

---

### 3. Coercive and Unlawful Plan Structure and Solicitation Design

**28.** The third category of injury arises from the coercive opt-out release structure embedded in Article IX of the Plan, which purports to bind creditors to sweeping third-party releases unless they take affirmative steps to object, regardless of whether they received meaningful notice or possessed procedural capacity to respond.

**29.** This violates:

- Mullane v. Central Hanover Bank, 339 U.S. 306 (1950) – requiring notice "reasonably calculated" to inform;
- In re Zale Corp., 62 F.3d 746 (5th Cir. 1995) – prohibiting non-consensual third-party releases;
- In re Pacific Lumber Co., 584 F.3d 229 (5th Cir. 2009) – requiring individualized findings to approve releases;
- In re Highland Capital Mgmt., 48 F.4th 419 (5th Cir. 2022) – affirming strict limits on opt-out release structures.

**30.** The Plan's solicitation process, as detailed in Exhibit 4, employed:

- Ambiguous ballot language, including double negatives;
- Buried release provisions within dense procedural instructions;
- No plain-language summary, especially for pro se, disabled, or incarcerated creditors.

**31.** Moreover, the Debtors attempted to condition the release of my deferred compensation—a trust-held wage asset—on my withdrawal of legal filings and execution of a non-disclosure agreement. This conduct violates:

- Model Rule 4.4(a) – misuse of means with no substantial purpose other than coercion;
- Model Rule 8.4(c) – conduct involving deception, fraud, or misrepresentation;
- Model Rule 1.7(a)(2) – conflicts arising from self-interested legal representation.

---

### 4. Procedural and Legal Consequences: Tax, Regulatory, and Constitutional Harms

**32.** The above injuries are not isolated. They are compound, systemic, and implicate multiple overlapping bodies of law. They must be understood through the following framework:

### a. Economic Injury

**33.** I have incurred direct financial harm including:

- Loss of deferred compensation access;
- IRS penalties under IRC §§ 409A and 6662;
- Unreimbursed tax liability and long-term audit exposure.

### b. Regulatory Injury

**34.** I remain employed within an illegal governance framework, exposing me to:

- Licensure risk under California law;
- Unlawful HR oversight by non-physicians;
- Ongoing CPOM violations institutionalized through confirmation.

### c. Due Process and Procedural Injury

**35.** I have been subjected to:

- A release mechanism that presumed consent through procedural design;
- A solicitation framework that obscured legal consequence and deterred objection.

### d. Constitutional and Ethical Harm

**36.** The Plan process has been wielded not to reorganize, but to suppress protected legal conduct, leveraging wage access to extort silence and avoid judicial scrutiny.

---

### 5. Evidentiary Record and Judicial Obligations

**37.** Each of the above harms is documented, traceable, and non-speculative. The record includes:

- Exhibit 1 – Retaliation timeline and HR correspondence;
- Exhibit 2 – CPOM governance violations;
- Exhibit 3 – 409A tax impact documentation and IRS Form 8275;
- Exhibit 4 – Legal memoranda and coercion communications;
- Exhibit 5 – April 14 Supplemental Brief, integrating all statutory claims.

**38.** This is not a claim of theoretical injury. It is a complete legal and evidentiary record of multi-layered violations, now presented for adjudication before a Court empowered—and obligated—to reject any Plan proposed "by any means forbidden by law" or in violation of federal or state rights.

**39.** These harms—economic, regulatory, procedural, and constitutional—are not only legally cognizable; they are inextricably intertwined with the structural design and execution of the Plan itself. The Debtors' conduct has transformed an otherwise neutral reorganization vehicle into a mechanism for institutionalizing statutory violations, shielding fiduciary breaches from scrutiny, extinguishing protected claims through engineered silence, and imposing tax liabilities through unlawful plan administration. The evidentiary record confirms that these outcomes were neither unintended nor unforeseeable—they were warned of in advance, preserved in the formal record, and pursued despite actual legal notice. The resulting injury to me is not abstract. It is concrete, continuing, and incapable of judicial cure absent structural modification, creditor-specific carve-outs, or full denial of Plan confirmation under 11 U.S.C. §§ 1129(a)(1) and (a)(3).

## III. CORPORATE PRACTICE OF MEDICINE (CPOM) VIOLATIONS

### Lay Control Over Physician Governance in Violation of Cal. Bus. & Prof. Code §§ 2400–2417

**40.** California law prohibits lay entities and non-licensed individuals from exercising any ownership, governance, or decision-making authority in the employment, supervision, or compensation of licensed physicians. This doctrine—codified at **Cal. Bus. & Prof. Code §§ 2400–2417**, and reinforced by criminal liability under **§ 2052** and professional discipline under **§ 2264**—represents a jurisdictional boundary designed to preserve the independence, ethics, and integrity of the medical profession.

**41.** The statutory language at § 2400 is absolute: "**Corporations and other artificial legal entities shall have no professional rights, privileges, or powers in the practice of medicine.**" Under § 2052, it is a misdemeanor for an unlicensed individual to practice or even "attempt to practice" medicine, including through administrative delegation. Under § 2264, any physician who permits a layperson to interfere in clinical or employment judgment may be subject to disciplinary sanction.

**42.** The California Supreme Court in **People v. Cole**, 38 Cal. 2d 99 (1951), reaffirmed that any employment structure subjecting a physician to lay corporate control is **void ab initio as against public policy**. The Court of Appeal in **Conway v. State Bd. of Med. Examiners**, 47 Cal. App. 2d 105 (1941), held that physicians who submit to such control may themselves be subject to revocation of licensure. The Attorney General confirmed in **76 Ops. Cal. Atty. Gen. 133 (1993)** that no MSO, management agreement, or contractual delegation may circumvent the fundamental statutory bar on layperson control.

---

**Evidentiary Examples of Clinical Interference by Wellpath Personnel**

**43.** As documented in **Exhibit 2 (Internal CPOM Violation Evidence)** and corroborated in **Exhibit 4, Wellpath Holdings, Inc.**, a **private equity-controlled lay MSO**, has exercised direct and unlawful control over clinical and employment governance at **California Forensic Medical Group (CFMG)**, a physician-owned professional corporation registered under **Cal. Corp. Code § 13400 et seq.**

**44.** Internal documentation confirms:

- **Non-licensed Wellpath administrators** issued scheduling mandates, disciplinary directives, and triage instructions to licensed physicians;
- Investigations were conducted by **Angie Baldwin, Deanna Huff, and Eric Krenz**, none of whom hold any California medical license or oversight authority under CPOM or Title 15;
- Reassignment of patient care duties occurred without shareholder physician knowledge or consent;
- Wage freezes, employment threats, and structural marginalization were imposed on me following the lawful disclosure of governance and fiduciary violations.

**45.** These acts represent systemic and ongoing violations of the CPOM doctrine and demonstrate an intentional disregard for the physician governance mandate embedded in California law. Wellpath functionally operated as the **employer and supervisor of CFMG's clinical staff**, in contravention of every statutory and case law authority governing professional corporations in this state.

---

**Absence of Governance Carve-Outs or Corrective Structure in the Fifth Amended Plan**

**46.** Despite receiving **formal legal notice**—including the April 10, 2025 memorandum preserved in **Exhibit 4**—the Debtors have **refused to amend, restructure, or disclaim** the CPOM-violative aspects of the Fifth Amended Plan (Dkt. 1835). The Plan:

- Contains no physician-majority carve-out;
- Omits any transitional restructuring framework;
- Retains the current model in which a lay-owned MSO exercises ultimate operational and disciplinary authority.

**47.** The **Disclosure Statement** fails to reference CPOM at all. No disclosure of state licensure risk or physician governance conflicts was provided to creditors, regulatory authorities, or the Court. The result is a proposed reorganization that affirms an **illegal employment structure** under state law and fails to preserve the regulatory firewall between physician judgment and non-medical influence.

**48.** This is not a formal defect. It is a **structural violation** that renders the Plan **facially unconfirmable.** It violates California's licensure and corporate practice laws, and its continuation post-confirmation would **expose all participating physicians, including myself, to licensure risk**, civil liability, and enforcement action by state authorities.

---

**Preemption Risks and Legal Consequences under 11 U.S.C. § 1129(a)(1)–(3)**

**49.** The CPOM violations embedded in the Plan constitute **a legal bar to confirmation** under **11 U.S.C. § 1129(a)(1).** This provision requires that any plan comply with **"the applicable provisions of this title,"** which include not only bankruptcy law, but also **nonbankruptcy law** when that law governs **property, contracts, employment, or fiduciary structure.**

**50.** The Plan also violates **§ 1129(a)(3),** which mandates that any plan be proposed **"in good faith and not by any means forbidden by law."** A plan that institutionalizes a CPOM-violative governance framework—particularly after **written notice, formal objection, and evidentiary submission—cannot meet this standard.**

**51.** Continued judicial approval of the Plan, in its current form, would constitute a **de facto preemption of state licensure authority**—a power that Congress has not conferred upon bankruptcy courts. The U.S. Supreme Court has long recognized that health and safety regulation, including medical licensure, is a matter of state police power. Bankruptcy

courts may not override those protections by confirming an illegal corporate structure under the guise of reorganization.

**52.** Should the Plan be confirmed as drafted, the following state and federal enforcement mechanisms are likely to be triggered:

- **Medical Board of California** – disciplinary action against physician-shareholders for aiding and abetting unauthorized practice;
- **California Attorney General** – civil enforcement under **Bus. & Prof. Code § 17200** for unlawful, unfair, and fraudulent business acts;
- **Department of Managed Health Care** – breach of clinical compliance provisions in publicly funded contracts;
- **Department of Industrial Relations** – investigation of illegal physician employment practices;
- **U.S. Department of Labor and IRS** – fiduciary and tax enforcement related to ERISA and IRC § 409A violations linked to the same governance conduct.

**53.** In summary, the CPOM violations at issue are not discretionary. They are **non-waivable statutory mandates**, whose breach renders the Plan **illegal in form and function**. These violations require correction, carve-out, or structural excision prior to confirmation. Failing that, confirmation would constitute judicial ratification of a licensing violation—an act this Court has no lawful authority to perform.

## IV. IMPROPER HUMAN RESOURCES OVERSIGHT AND RETALIATION

### Unlawful HR Investigations Conducted by Non-Physicians

**54.** As detailed in **Exhibit 1 (HR and Retaliation Timeline)** and corroborated by contemporaneous internal communications preserved in the record, I was subjected to **internal Human Resources investigations and employment oversight actions** executed by non-physician corporate personnel employed by **Wellpath Holdings, Inc.**—specifically including **Angie Baldwin**, a non-licensed administrator operating within Wellpath's corporate HR structure.

**55.** These investigations were undertaken **without the knowledge, involvement, or authorization** of any **California-licensed physician-officer or CFMG shareholder**, despite the fact that I am employed by **CFMG**, a **physician-owned California professional corporation** governed by the **Medical Practice Act** and the **Corporate Practice of Medicine (CPOM) doctrine**, codified in **Cal. Bus. & Prof. Code §§ 2400–2417**.

**56.** Under California law—and as reaffirmed in **People v. Cole**, 38 Cal. 2d 99 (1951), and **76 Ops. Cal. Atty. Gen. 133 (1993)**—any administrative interference by non-physicians in

employment matters involving licensed physicians is not only improper—it is **legally prohibited.** The CPOM doctrine explicitly forbids lay corporations and non-licensed actors from exercising control over any element of the practice of medicine, including **employment discipline, HR oversight,** and **clinical authority.**

**57.** Moreover, **Cal. Bus. & Prof. Code § 2052** prohibits the **unauthorized practice of medicine,** and **§ 2264** bars physicians from allowing interference in their professional judgment by unlicensed individuals. The use of HR personnel with no medical licensure to supervise, discipline, or investigate my conduct as a physician represents an **ongoing statutory violation** and directly undermines the public policy purposes of **physician self-governance** and **patient protection.**

**58.** The Fifth Amended Plan (Dkt. 1835) fails to remedy or even acknowledge these violations. It continues to entrench a governance model wherein **Wellpath—a private equity-backed, non-licensed MSO—retains functional control over the employment and discipline of California-licensed physicians.** This failure constitutes a **structural defect** that renders the Plan **noncompliant with 11 U.S.C. § 1129(a)(1)** and subject to legal challenge under both federal and California law.

---

**Breach of CPOM Doctrine and Retaliatory Delegation of Clinical Governance**

**59.** The specific administrative actions taken against me—initiated and executed by **unlicensed Wellpath administrators**—constitute **textbook violations of the CPOM doctrine.** These actions include:

- Initiating pretextual HR investigations based on **protected whistleblower activity;**
- Excluding physician shareholders from employment decisions regarding a clinical staff member;
- Conducting workplace interviews, scheduling reviews, and disciplinary conferences without oversight or signature authority of any licensed California physician.

**60.** As set forth in **Exhibit 2 (Internal CPOM Violation Evidence),** these actions were not anomalies. They reflect the **standard operating procedure of Wellpath's MSO structure,** which is designed to **conceal ultimate control by private equity investors** behind a nominally physician-owned corporation. The record confirms that the **CPOM firewall was not merely compromised—it was eliminated.**

**61.** California law does not recognize such circumvention. **No agreement, title, or delegation of authority may authorize a non-physician to direct or interfere in the clinical judgment, employment rights, or disciplinary status of a licensed medical professional.** The failure to respect this boundary undermines the validity of the Plan and exposes the reorganized entity to **ongoing regulatory and professional enforcement**.

---

### ADA-Protected Activity and Whistleblower Retaliation

**62.** In addition to CPOM violations, the adverse HR actions taken against me must be understood in the context of my **protected legal activity** under multiple federal and state statutes, including:

- The **Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq.,** which protects employees who request medical accommodation or oppose discriminatory workplace conditions;
- The **California Fair Employment and Housing Act (FEHA), Gov. Code §§ 12900– 12996**, which offers equivalent and, in some respects, broader protection against retaliation and disability-based discrimination;
- **California Labor Code § 1102.5**, which protects **whistleblowers** who report violations of state or federal law, whether internally or externally;
- **ERISA § 510, 29 U.S.C. § 1140,** which prohibits employers from interfering with or retaliating against plan participants for asserting their statutory rights.

**63.** Following my internal and external disclosures concerning:

- CPOM violations and unauthorized lay control over clinical governance;
- The unlawful freeze and misclassification of my **Non-Qualified Deferred Compensation Plan (NQDCP);**
- Procedural coercion embedded in Plan solicitation and the unlawful use of opt-out third-party releases;

...I was subjected to a **coordinated campaign of retaliation**, including:

- **Exclusion from governance meetings;**
- **Reconfiguration of clinical responsibilities** designed to disrupt continuity of care;
- **Obstruction and delay of reasonable accommodation requests** tied to a documented medical condition.

**64.** These acts occurred in close temporal proximity to the filings of **Dkts. 1897, 2049, and 2075**, as well as protected activity documented in **Exhibit 1 (Retaliation Timeline)**. They

were perpetrated by Wellpath HR personnel while the company was simultaneously **negotiating the conditional release of my deferred compensation**, as preserved in **Exhibit 4**.

---

**Constructive Termination and Exclusion from Clinical Leadership**

**65.** The cumulative impact of these actions has rendered my working conditions **intolerable, retaliatory**, and legally **actionable** under both California and federal law. Specifically, I have been:

- Excluded from **clinical leadership forums**;
- Removed from **team roles** I previously held based on merit and experience;
- Denied **reasonable accommodations** despite medical documentation;
- Subjected to a hostile and exclusionary environment **engineered to suppress my protected speech and clinical autonomy**.

**66.** Under **California law**, these facts satisfy the test for **constructive discharge**. In **Shephard v. Loyola Marymount Univ., 102 Cal. App. 4th 837 (2002)**, the court held that resignation may be deemed involuntary where employer conduct leaves the employee no reasonable alternative but to quit. In **Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028 (2005)**, the California Supreme Court confirmed that **exclusion, reconfiguration, and retaliation in response to protected activity may constitute wrongful termination.**

**67.** My situation reflects the core elements of constructive termination as articulated in both **Shephard** and **Yanowitz**. I have been:

- Pressured into silence;
- Excluded from professional development and governance;
- Monitored and subjected to discipline by non-physicians in violation of CPOM;
- And retaliated against for asserting legally protected rights.

**68.** These facts are not disputed in principle. They are evidenced through documents and emails already submitted to the Court and referenced in this Declaration. They form a **legally sufficient and factually substantiated basis** for employment claims under **FEHA, ADA, ERISA**, and the **California Labor Code**, and constitute further proof that the Plan—as drafted—**ratifies a pattern of legal retaliation** that precludes its confirmation under **11 U.S.C. § 1129(a)(1) and (a)(3)**.

## V. DEFERRED COMPENSATION MISCLASSIFICATION AND TAX EXPOSURE

**Wrongful Reclassification of NQDCP Assets as Estate Property in Violation of § 541(d)**

**69.** Central to my claim is the Debtors' unlawful reclassification of deferred compensation earned through non-debtor CFMG as estate property. These funds, totaling **$162,597.08** as of **November 12, 2024**, are traceable solely to physician services rendered under my **W-2 employment** with **California Forensic Medical Group, Inc. ("CFMG")**, a non-debtor, physician-owned professional corporation regulated under the **California Medical Practice Act**.

**70.** I affirmatively elected to defer a portion of my base wages into a **Non-Qualified Deferred Compensation Plan ("NQDCP")**, which was administered by Wellpath in a ministerial capacity. Wellpath held no beneficial ownership interest in the deferred funds. The **source of funds was CFMG**; the wages were earned, vested, and deposited pursuant to a voluntary deferral election.

**71.** Under **IRC § 3401(a)** and supporting Treasury regulations, wages for purposes of federal income tax withholding include all remuneration for services performed. The deferred amounts were W-2 reportable and earned without contingency. These earnings were contractually vested and functionally irrevocable—held in constructive trust on my behalf.

**72.** The **Debtors' administrative custody** over the NQDCP did not convert these funds into estate property. Under **11 U.S.C. § 541(d)**, "property in which the debtor holds only legal title and not an equitable interest… shall not become property of the estate." As reaffirmed by the U.S. Supreme Court in **Begier v. IRS**, 496 U.S. 53, 59 (1990), § 541(d) prohibits the inclusion of **trust-backed assets**—such as deferred wages—in the bankruptcy estate absent a beneficial claim.

**73.** The Debtors' seizure, freeze, and unilateral reclassification of my NQDCP balance violated **ERISA § 404(a)(1) (29 U.S.C. § 1104)**, which imposes a **duty of loyalty, prudence, and exclusive purpose** on plan fiduciaries. Their conduct also implicates **ERISA § 510, 29 U.S.C. § 1140**, by interfering with my right to accrued benefits and retaliating against my assertion of rights under the Plan.

---

## Violations of California Labor Code and State Trust Law

**74.** These funds—earned exclusively from physician labor—were further protected under **California Labor Code §§ 200–223**, which prohibit:

- Unauthorized withholding of earned wages;
- Recapture or forfeiture without statutory authority;
- Diversion of trust-held funds intended for wage disbursement.

**75.** Under **Cal. Labor Code § 221**, no employer may lawfully recover or withhold wages once earned, unless specifically authorized by law. Additionally, under **California Civil Code §§ 2223–2224**, any party holding such wages in violation of trust principles is liable in restitution and subject to constructive trust remedies.

**76.** These statutes are not discretionary. They embody the **non-waivable public policy of California** to preserve the sanctity of wage integrity. By converting earned wages into leverage—contingent upon legal withdrawal or NDA execution—the Debtors engaged in conduct that is **both tortious and per se unlawful.**

---

**Triggering of Constructive Distribution Under IRC § 409A and Treasury Regulations**

**77.** The mishandling of my NQDCP by the Debtors triggered a **constructive distribution** under **IRC § 409A(a)(1)**. Under this provision, any distribution that fails to meet the requirements of a **qualifying plan termination** results in:

- **Immediate inclusion** in gross income under **IRC § 409A(a)(1)(A);**
- A **20% excise tax** under **IRC § 409A(a)(1)(B);**
- Exposure to **accuracy-related penalties** under **IRC § 6662;**
- Federal and state interest accrual.

**78.** The termination of the NQDCP **did not comply** with the conditions enumerated in **Treas. Reg. § 1.409A-3(j)(4)(ix)**, which requires:

- Termination of all similar arrangements;
- A 12-month deferral period before any distribution;
- Full liquidation within 24 months;
- No re-adoption of similar plans within three years;
- And no termination due to financial distress or bankruptcy.

**79.** None of these safe harbor elements were satisfied. The Debtors executed the freeze unilaterally, outside of plan-wide termination, and triggered constructive receipt **without any qualifying distribution event**. The result was a tax burden imposed **without any actual distribution**.

---

**Full Federal and State Tax Exposure**

**80.** Based on my 2024 AGI of approximately $575,000, the constructive distribution caused by the Plan's illegal structure resulted in a total tax liability of **$200,591.04**, composed of:

- **Federal Income Tax (37%)** – $60,160.92
- **IRC § 409A Excise Tax (20%)** – $32,519.42
- **IRC § 6662 Accuracy Penalty (20%)** – $32,519.42
- **IRS Interest (7%, over ~3.03 years)** – $28,793.37
- **California Income Tax (13.3%)** – $21,625.41
- **California FTB Penalty (10%)** – $16,259.71
- **California FTB Interest (7%, over ~3.03 years)** – $8,712.80

This revised total reflects updated calculations assuming my deferred compensation eligibility began in January 2022, with interest accrual continuing through the present. These liabilities arise from a constructive distribution event triggered by the Plan's non-compliant termination of a Non-Qualified Deferred Compensation Plan (NQDCP), maintained without adherence to Treasury Regulation § 1.409A-3(j)(4)(ix). Under IRC § 409A(a)(1)(A), the deferred amount must be treated as immediately includible in gross income, followed by the mandatory 20% excise tax under § 409A(a)(1)(B), and an additional 20% penalty under § 6662 for accuracy-related misstatements. These burdens are further compounded by accruing interest at 7% on both federal and state obligations. The California Franchise Tax Board applies both base income tax under Cal. Rev. & Tax Code § 17041 and a statutory 10% penalty for deferred income errors. This cumulative tax harm—now exceeding $200,000—was triggered solely by the Debtors' unlawful handling of trust-backed earnings and stands as a direct, irreversible injury substantiated in Exhibit 3, including my IRS Form 8275.

**IRS Form 8275 Filing and Protective Disclosure**

**81.** I have submitted **IRS Form 8275** to disclose the disputed 409A income inclusion. This disclosure—now part of **Exhibit 3**—was filed to preserve my right to challenge the tax treatment imposed by the Debtors' actions. It establishes that:

- The harm is **not speculative**;
- The exposure is **currently enforceable by the IRS and FTB**;
- And the Plan's design has rendered me **personally liable for non-dischargeable tax debt** triggered by third-party misconduct.

**Plan Confirmation Barred by Tax Code, Fiduciary Duty, and Procedural Integrity**

**82.** These tax harms are **not subject to equitable reclassification, waiver, or discharge** through bankruptcy. Under federal tax law, IRC § 409A penalties, excise taxes, and related interest are **non-dischargeable personal obligations**, especially when caused by third-party plan administrators. The **Bankruptcy Code offers no shelter** for fiduciaries who misclassify trust assets or trigger unlawful tax distributions.

**83.** Furthermore, **ERISA § 404** prohibits the use of plan assets for any purpose other than the benefit of participants. Conditioning the release of my funds on litigation withdrawal and NDA execution—as detailed in **Exhibit 4**—constitutes a fiduciary breach subject to DOL enforcement and private civil action.

**84.** Under **§ 1129(a)(1)**, the Plan must comply with all applicable provisions of the Bankruptcy Code and nonbankruptcy law. It fails to do so. Under **§ 1129(a)(3)**, the Plan must be proposed in good faith and not by means forbidden by law. It fails this test as well.

**85.** The Debtors' handling of the NQDCP represents a **deliberate misapplication of fiduciary and tax law**. The resulting liabilities are not accidental—they are the foreseeable result of design flaws that were highlighted in pre-confirmation legal memoranda and ignored. Confirmation of the Plan under these circumstances would render this Court complicit in a tax violation and fiduciary breach that are prosecutable under federal law.

## VI. PROCEDURAL DEFECTS IN THIRD-PARTY RELEASES AND PLAN SOLICITATION

**Coercive Nature of Article IX Opt-Out Release Mechanisms**

**86.** The Fifth Amended Plan of Reorganization (Dkt. 1835) imposes **non-consensual third-party releases** via an opt-out mechanism embedded in **Article IX**. These provisions purport to bind all creditors—including pro se parties, statutory claimants, and non-voting participants—unless they affirmatively opt out by a fixed deadline, using procedures that are **procedurally opaque, constitutionally deficient, and legally unenforceable under binding Fifth Circuit law**.

**87.** The structure of Article IX does not merely reflect poor drafting. It represents a deliberate and coercive mechanism designed to **engineer silence into legal surrender**, invoking procedural inaction as a proxy for informed consent. This formulation is not only inconsistent with constitutional due process but is **categorically prohibited under 11 U.S.C. § 524(e)** and **binding Fifth Circuit precedent**, including:

- **In re Zale Corp., 62 F.3d 746 (5th Cir. 1995)** – holding that § 524(e) prohibits discharge of non-debtors' liabilities without express creditor consent and individualized judicial findings;
- **In re Pacific Lumber Co., 584 F.3d 229 (5th Cir. 2009)** – invalidating release provisions not grounded in specific factual records and evidentiary hearings;
- **In re Highland Capital Mgmt., L.P., 48 F.4th 419 (5th Cir. 2022)** – reaffirming that **opt-out structures are not substitutes for consent** and that generalized release language cannot shield insiders, professionals, or affiliates absent specific judicial findings of fairness and necessity.

---

**Constitutional Violations of Due Process Under Mullane v. Central Hanover Bank**

**88.** In **Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950)**, the United States Supreme Court held that **"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."** The Fifth Amended Plan violates this standard at every level of implementation.

**89.** The Plan's opt-out mechanism is functionally designed to **convert non-response into involuntary consent**—without ensuring that affected parties received adequate notice, understood the legal consequences, or had a meaningful opportunity to object. The accompanying Disclosure Statement does not:

- Identify the **scope of third-party releases** in plain language;
- Distinguish between **releases of the Debtors and non-debtor insiders**;
- Provide a **summary of legal effect** accessible to unrepresented, disabled, or digitally excluded creditors;
- Or flag the **statutory implications** of releasing claims against fiduciaries, counsel, or Plan administrators.

**90.** For pro se claimants—including whistleblowers like myself—this structure constitutes **procedural entrapment**. The failure to include a summary of consequences, coupled with form ballots featuring **double negatives, buried disclaimers**, and **unexplained legal terms**, is not neutral design. It is an intentional effort to **obscure creditor rights and suppress objection**. Such conduct is incompatible with both **constitutional notice principles** and the disclosure obligations imposed by **11 U.S.C. § 1125**.

---

**Non-Compliance with Fifth Circuit Precedent**

**91.** Even if the Plan's due process violations could be excused—which they cannot—the third-party release structure remains **legally void under controlling Fifth Circuit law.** As stated in **Zale**, **Pacific Lumber**, and **Highland Capital**, a non-debtor cannot obtain discharge or release without:

- An **adversary proceeding;**
- **Individualized judicial findings** of fairness, necessity, and creditor benefit;
- **Affirmative consent** from the affected creditor.

**92.** The Debtors have made **no such showing.** There is **no adversary proceeding, no evidentiary hearing,** and **no record of individualized findings** with respect to any creditor. The releases cover **non-debtor professionals, executives, and insiders,** including the very counsel who drafted the Plan—without separate scrutiny, legal justification, or a factual basis upon which this Court could make a fairness determination.

**93.** Under **§ 1129(a)(1),** a plan must comply with the applicable provisions of the Bankruptcy Code. Under **§ 1129(a)(3),** it must be proposed in good faith and not by any means forbidden by law. The non-consensual releases embedded in this Plan violate both. They represent not settlement, but **procedural overreach**—drafted to **shield parties from liability without adversarial adjudication.**

---

**Deceptive Disclosure Design and Obfuscation of Material Legal Consequences**

**94.** The Disclosure Statement, in both form and substance, fails to meet the standard of **adequate information** as required under **11 U.S.C. § 1125.** It does not provide creditors with a **clear explanation** of:

- Who is being released;
- What claims are being discharged;
- What consent is being presumed;
- What procedural rights are being waived.

**95.** In fact, the Plan's opt-out provision does not inform creditors that their silence **will extinguish legal claims** against non-debtors. There is no warning that such claims may include:

- ERISA fiduciary breaches;
- CPOM violations;

- ADA/FEHA retaliation;
- Whistleblower claims under Cal. Labor Code § 1102.5;
- Or tax injuries under IRC § 409A.

**96.** The use of **ambiguous release language, misleading ballot structures**, and the **failure to differentiate between debtor and non-debtor obligations** creates a record that is fundamentally inconsistent with **Fifth Circuit precedent**, **due process**, and the procedural mandates of **Rule 3016(c)** and **Rule 9011(b)**.

---

### Structural Attack on Creditor Autonomy and Legal Recourse

**97.** The Debtors' use of third-party releases to shield parties implicated in misconduct—**without a hearing, consent, or disclosure**—is not simply a drafting failure. It is a structural attack on **creditor autonomy, judicial review**, and the **public interest in lawful plan confirmation**. It seeks to enshrine legal immunity by engineering **inadvertent silence**—converting the absence of objection into a waiver of rights never clearly conveyed.

**98.** This framework violates the rule that **silence is not consent**—a principle embedded in bankruptcy practice, constitutional law, and fiduciary ethics. It further undermines the integrity of the bankruptcy process by allowing those who designed, approved, and financially benefitted from an unlawful Plan to exit the reorganization with **de facto immunity**, insulated from the very judicial and regulatory scrutiny they were warned would be triggered.

---

### Regulatory and Ethical Consequences of Procedural Coercion

**99.** The non-consensual release structure employed here is now the subject of national scrutiny, including in **Harrington v. Purdue Pharma L.P., 603 U.S. ___ (2024)**, where the U.S. Supreme Court is examining whether a bankruptcy plan may discharge claims against non-debtors **without creditor consent and without individualized judicial findings**. That question is now ripe in this case.

**100.** The Plan's release provisions are **structurally indistinguishable** from those at issue in **Purdue**. Like Purdue, they are crafted to extinguish claims **not adjudicated, not consented to**, and **not fully disclosed**—in exchange for no consideration. Such mechanisms are not only **legally unenforceable**, they are **ethically indefensible**.

**101.** As a statutory creditor, ERISA plan participant, ADA-protected employee, and whistleblower, I cannot be silenced through procedural default, deceptive design, or coerced omission. The Fifth Amended Plan's release structure violates my rights under **federal, state, and constitutional law**, and renders the Plan **unconfirmable under § 1129(a)(1) and (a)(3)**.

## VII. INTERNAL ETHICS AND PROFESSIONAL MISCONDUCT BY MCDERMOTT WILL & EMERY LLP (MWE)

### A. Introduction: Structural Misconduct as Ethical Breach

**102.** The conduct of McDermott Will & Emery LLP ("MWE"), lead restructuring counsel for the Debtors, constitutes not merely a sequence of isolated ethical lapses, but a **coordinated scheme of professional misconduct**. This scheme was executed by licensed attorneys with actual knowledge of structural plan illegality, statutory violations, and procedural coercion—and was pursued in the face of **formal pre-confirmation legal memoranda**, privileged notice, and repeated requests for amendment. These acts, individually and collectively, violate core rules of professional responsibility in the states of **Illinois, Texas, and New York**, and rise to the level of misconduct requiring formal disciplinary referral.

**103.** The attorneys identified herein failed to correct filings, failed to disclose adverse law to the Court, knowingly advanced a structurally unconfirmable plan, and actively participated in a campaign to condition the release of earned wages on the suppression of legal objections. Their conduct implicates the following rules of professional conduct:

- **ABA Model Rule 1.2(d)** / Tex. Disciplinary R. Prof. Conduct 1.02(c): Prohibiting assistance in conduct known to be criminal or fraudulent;
- **Rule 3.3(a)(1)**: Prohibiting false statements of law or failure to correct prior misstatements to the tribunal;
- **Rule 4.1**: Requiring truthfulness in statements to others;
- **Rule 4.4(a)**: Prohibiting means that have no substantial purpose other than to burden a third party;
- **Rule 5.1 / 5.2**: Imposing duties on supervising and subordinate attorneys to prevent and correct ethical breaches;
- **Rule 8.4(c)**: Barring conduct involving dishonesty, fraud, deceit, or misrepresentation;
- **Rule 8.4(d)**: Prohibiting conduct prejudicial to the administration of justice.

## B. Individualized Attorney Conduct

### Felicia Perlman (Illinois)

**104.** Felicia Perlman, as principal architect of the Fifth Amended Plan and chief restructuring strategist for the Debtors, was directly and personally served with pre-confirmation memoranda outlining:

- The Plan's unlawful inclusion of non-consensual third-party releases;
- CPOM violations under California law;
- Deferred compensation misclassification under ERISA and IRC § 409A;
- Fiduciary abuse in the administration of the NQDCP;
- Procedural coercion embedded in opt-out ballot structures;
- Ethical violations under ABA Model Rules and Fifth Circuit precedent.

**105.** Despite receiving this notice, Ms. Perlman proceeded to:

- Certify the Plan without amendment;
- Present no curative language in the Disclosure Statement;
- Permit solicitation of creditor votes under a design known to mislead.

**106.** Her conduct violates:

- **Illinois Rules of Professional Conduct Rule 1.2(d):** Knowingly assisting a client in advancing an unlawful scheme;
- **Rule 3.3(a)(1):** Failure to correct legal misrepresentations to the Court;
- **Rule 8.4(c):** Deceptive continuation of an unconfirmable Plan after written notice.

### Marcus Helt (Texas)

**107.** Marcus Helt, certifying local counsel before the Southern District of Texas, bore direct responsibility for ensuring the Plan complied with applicable law. As filing attorney for Dkt. Nos. 1835 and related documents, Mr. Helt was required by **Rule 9011(b)** to certify that:

- The legal contentions were warranted by existing law;
- The filings were not presented for any improper purpose;
- The representations were factually grounded.

**108.** The Plan filed by Mr. Helt included:

- Non-consensual third-party releases in violation of **§ 524(e)**;

- No adversary proceeding or judicial findings as required under **Zale, Pacific Lumber**, and **Highland Capital**;
- Concealed discharge of attorney and executive liability.

**109.** His conduct violates:

- **Texas Rule of Professional Conduct 3.03(a)(1)**: Making or failing to correct a false statement of law;
- **Rule 8.04(a)(3)**: Engaging in conduct involving dishonesty or misrepresentation;
- **Rule 1.01(b)(1)**: Neglecting a legal matter entrusted to the lawyer by omitting known legal infirmities.

## Steven Szanzer (New York)

**110.** Steven Szanzer was responsible for the Disclosure Statement, voting materials, and solicitation mechanics. He designed and approved opt-out forms, notices, and ballots containing:

- Double negatives and ambiguous opt-out mechanics;
- Buried release language shielding non-debtor actors;
- No plain-language explanation of the legal effects of non-response.

**111.** Mr. Szanzer received written pre-confirmation memoranda explaining that these materials:

- Failed to comply with Fifth Circuit opt-out standards;
- Violated due process under **Mullane v. Central Hanover Bank**;
- Would bind creditors without consent or judicial review.

**112.** His conduct violates:

- **New York Rule of Professional Conduct 4.1**: Failing to be truthful in statements to others;
- **Rule 8.4(c) and (d)**: Engaging in conduct prejudicial to the administration of justice and misleading in nature;
- **Rule 5.1(b)**: Failing to correct known ethical breaches within the firm.

## Carole Wurzelbacher (Illinois)

**113.** As a junior associate participating in the drafting of Article IX, Ms. Wurzelbacher was directly copied on memoranda explaining:

- The legal consequences of non-consensual releases;
- The CPOM violations raised in Dkt. Nos. 1897 and 2075;
- Her independent duty to object under **ABA Model Rule 5.2(a)**.

**114.** Despite this, she continued work on the Plan and failed to raise objections or seek internal review. While subordinate status is not dispositive, **Model Rule 5.2(a)** imposes personal liability when the subordinate knows the proposed conduct is unethical.

**115.** Ms. Wurzelbacher's failure to act under these circumstances constitutes:

- Passive complicity in a known violation;
- Professional negligence under **Illinois Rule 5.2(a);**
- Conduct unbefitting the fiduciary responsibilities of a licensed attorney.

---

## C. Use of Trust Assets to Suppress Protected Legal Activity

**116.** Beyond structural misconduct, MWE attorneys engaged in a campaign of **economic coercion** designed to suppress legal filings and chill protected conduct. As documented in **Exhibit 4**, I was offered partial or conditional release of my earned deferred compensation **only upon execution of a non-disclosure agreement and withdrawal of pending federal motions.**

**117.** These negotiations occurred:

- After pre-confirmation memoranda were delivered to all MWE attorneys named above;
- During the active solicitation and confirmation period;
- With full awareness that the deferred compensation was trust-held, ERISA-governed, and constructively distributed under IRC § 409A.

**118.** This conduct violates:

- **Model Rule 4.4(a):** Prohibiting tactics intended solely to burden or silence third parties;
- **Rule 8.4(c):** Using fiduciary-held funds to suppress adversarial filings;
- **Rule 1.7(a)(2):** Proceeding despite material personal conflict arising from self-interest in Plan approval.

---

### D. Consequences of Ethical Noncompliance

**119.** The professional misconduct detailed above is not speculative. It is confirmed by:

- Timestamps and emails preserved in **Exhibit 4**;
- Ongoing filing of structurally defective materials;
- Absence of any curative amendment, withdrawal, or disclosure.

**120.** No MWE attorney:

- Sought internal review;
- Corrected legal errors;
- Or disclosed adverse precedent to the Court or U.S. Trustee.

**121.** These omissions occurred despite:

- Written warnings and legal memoranda;
- Preserved evidence of plan illegality;
- Imminent confirmation with judicial reliance on certified disclosures.

**122.** Under these facts, the conduct of MWE attorneys satisfies the threshold for:

- **Formal disciplinary referral** to the State Bars of Illinois, Texas, and New York;
- **Ethics investigation by the ABA Center for Professional Responsibility;**
- **Referral by the United States Trustee and DOJ Office of Professional Responsibility;**
- **Civil liability** under **Rule 9011(b)** and the professional rules adopted in each jurisdiction.

**123.** These actions are not merely inconsistent with ethical norms. They are **prejudicial to the administration of justice**, betray the confidence of the Court, and **exploit creditor vulnerability for institutional gain**.

**124.** I respectfully submit that this record, in its entirety, warrants regulatory review, disciplinary referral, and ethical enforcement under the governing rules of the legal profession.

### VIII. SUBSTANTIVE FEDERAL AND STATE STATUTORY VIOLATIONS

The Plan, as structured and advanced, constitutes a systemic and ongoing violation of numerous provisions of federal law, California statutory authority, and the governing framework of the United States Bankruptcy Code. These violations are not isolated. They

are interlocking, interjurisdictional, and calculated to extinguish lawful claims, coerce silence, and institutionalize regulatory noncompliance through the imprimatur of judicial confirmation. The following violations are fully supported by the evidentiary record, including Exhibits 1 through 5, and form the legal predicate for agency referral, enforcement, and post-confirmation liability.

## A. California Business and Professions Code §§ 2400–2417 (CPOM Doctrine Violations)

**125.** California Business and Professions Code §§ 2400–2417 establish the state's Corporate Practice of Medicine (CPOM) doctrine, prohibiting lay entities from employing, supervising, or compensating licensed physicians. Under **§ 2400**, "Corporations and other artificial legal entities shall have no professional rights, privileges, or powers in the practice of medicine." Violations are criminally enforceable under **§ 2052** and subject to disciplinary action under **§ 2264**.

**126.** As detailed in **Exhibit 2**, Wellpath Holdings, Inc.—a private equity-backed MSO— exercises de facto governance over CFMG's physicians through unlicensed administrators. This control includes scheduling, compensation, HR investigations, and employment discipline, in violation of the CPOM doctrine and **Cal. Corp. Code § 13400 et seq.**

**127.** These CPOM violations are structurally embedded in the Plan. There is no carve-out, no transition mechanism, and no remedial governance reform. The Fifth Amended Plan codifies an illegal employment framework and is unconfirmable under **11 U.S.C. § 1129(a)(1) and (a)(3)**.

## B. California Labor Code § 1102.5 (Whistleblower Retaliation)

**128.** California Labor Code § 1102.5 prohibits retaliation against employees who disclose violations of state or federal law. The statute applies regardless of whether the disclosure is made internally or externally and is designed to protect employee whistleblowers from adverse action tied to their lawful reports.

**129.** As detailed in **Exhibit 1**, I disclosed CPOM violations, ERISA breaches, improper Plan solicitation tactics, and tax code violations under IRC § 409A. Following these disclosures, I was:

- Subjected to HR investigations led by unlicensed parties;
- Excluded from governance;

- Reassigned clinical duties; and
- Retaliated against for filing Dkts. 1897, 2049, and 2075.

**130.** These retaliatory acts are both chronologically and causally connected to my protected activity and constitute a per se violation of § 1102.5.

---

## C. California Government Code §§ 12900–12996 (FEHA Retaliation and ADA/Disability Violations)

**131.** Under **FEHA**, Cal. Gov. Code § 12940 et seq., and the **Americans with Disabilities Act (ADA)**, 42 U.S.C. § 12101 et seq., employers are prohibited from retaliating against employees for requesting accommodation or opposing disability-based discrimination. The law mandates engagement in the interactive process and prohibits interference with protected activity.

**132.** As documented in **Exhibits 1 and 4**, I requested medical accommodation pursuant to a recognized disability. In response, I was isolated, denied scheduling flexibility, reassigned duties to induce conflict, and excluded from team meetings. These actions violated:

- **FEHA § 12940(m), (n), and (h);**
- **Cal. Gov. Code § 12945.2;**
- **ADA § 12203** (retaliation provision).

**133.** These acts constitute direct retaliation and obstruction of the interactive process, actionable under both state and federal civil rights law.

---

## D. California Labor Code §§ 200–223 (Wage Misappropriation and Trust Diversion)

**134.** Under **Labor Code §§ 200–223**, earned wages are the property of the employee and may not be withheld, diverted, or subjected to post hoc reclassification. Under **§ 221**, an employer is prohibited from recovering or redirecting any portion of previously paid or earned wages unless expressly permitted by statute.

**135.** My NQDCP balance of **$162,597.08**, earned through W-2 employment with non-debtor CFMG, was unilaterally frozen and misclassified by the Debtors as estate property. This freeze occurred without judicial order, adversary proceeding, or statutory authority.

**136.** These funds were held in constructive trust, and their seizure violates:

- California wage protection statutes;
- Common law trust principles under Cal. Civ. Code §§ 2223–2224;
- The fiduciary principles of ERISA § 404.

---

## E. ERISA §§ 404 and 510 (Fiduciary Breach and Retaliation)

**137.** Under **ERISA § 404**, 29 U.S.C. § 1104, plan administrators must act solely in the interest of participants and beneficiaries, with the care and diligence of a prudent fiduciary. Under **§ 510**, 29 U.S.C. § 1140, they may not retaliate against participants for asserting plan rights or participating in inquiries.

**138.** The Debtors breached both provisions by:

- Reclassifying trust-held assets as estate property in violation of ERISA fiduciary duty;
- Withholding deferred compensation to coerce withdrawal of federal court filings;
- Conditioning access to earned funds on NDA execution and silence;
- Retaliating against my plan-related assertions through HR discipline and exclusion.

**139.** These violations are substantiated in **Exhibit 4** and support DOL and EBSA enforcement under **29 C.F.R. § 2560.502c-2** and related regulations.

---

## F. Internal Revenue Code §§ 409A, 6662, 3401(a) (Tax Law Violations)

**140.** Under **IRC § 409A**, any noncompliant deferral or distribution triggers:

- Immediate income inclusion under **§ 409A(a)(1)(A)**;
- A **20% excise tax** under **§ 409A(a)(1)(B)**;
- Accuracy-related penalties under **§ 6662**;
- Interest and audit exposure under IRS and FTB regimes.

**141.** The Plan's unilateral freeze of my deferred compensation violated **Treas. Reg. § 1.409A-3(j)(4)(ix)**. No plan-wide termination occurred. No 12-month deferral or 24-month liquidation window was observed. No qualifying event was triggered. The termination occurred under financial distress and without plan participant consent.

**142.** As documented in Exhibit 3, the constructive receipt triggered by the Debtors' misconduct resulted in the following cumulative tax liabilities:

- **Federal income tax liability:** $60,160.92
- **IRC § 409A excise tax:** $32,519.42
- **IRC § 6662 penalty:** $32,519.42
- **IRS interest (7%, accrued over ~3.03 years):** $28,793.37
- **California FTB income tax:** $21,625.41
- **California FTB penalty:** $16,259.71
- **California FTB interest (7%, accrued over ~3.03 years):** $8,712.80
- **Total combined liability: $200,591.04**

This figure represents the constructive distribution tax impact arising from the non-compliant termination and misclassification of trust-held deferred compensation earned solely through W-2 employment with non-debtor CFMG. These penalties are enforceable and were disclosed via IRS Form 8275 to preserve the disputed position. They are not hypothetical. They are current, irreversible, and directly attributable to fiduciary and administrative misconduct detailed throughout this record.

**143.** I filed **IRS Form 8275** in connection with the disputed inclusion. That form, included in Exhibit 3, establishes that these liabilities are current, enforceable, and directly caused by fiduciary and administrative misconduct.

---

### G. Bankruptcy Code §§ 524(e), 541(d), 1129(a)(1) and (a)(3)

**144.** The Plan is unconfirmable under the Bankruptcy Code for multiple independent reasons:

- **§ 524(e)** prohibits the discharge of claims against non-debtors. The Plan uses opt-out releases to immunize attorneys, executives, and MSO personnel from liability without consent or consideration.
- **§ 541(d)** excludes trust-held property from the estate. The Plan treats my deferred compensation—earned through non-debtor employment—as general estate property without adjudication.
- **§ 1129(a)(1)** requires compliance with applicable nonbankruptcy law. The Plan violates the CPOM doctrine, ERISA, IRC, ADA, FEHA, and California wage laws.
- **§ 1129(a)(3)** requires good faith and a plan not proposed by any means forbidden by law. The Plan, having been advanced with knowledge of these violations, fails this requirement in both form and intent.

---

### Conclusion: Cumulative Violations Require Enforcement and Denial of Confirmation

**145.** The Plan as structured:

- Misappropriates trust assets;
- Subverts California licensure law;
- Chills statutory filings through economic coercion;
- Immunizes wrongdoers through unlawful third-party releases;
- And imposes tax liabilities on non-debtor whistleblowers through fiduciary misconduct.

**146.** These actions are enforceable violations of multiple legal regimes, including:

- The Bankruptcy Code;
- ERISA;
- IRC and Treasury regulations;
- ADA and FEHA civil rights laws;
- California's CPOM and wage protection statutes.

**147.** Judicial confirmation of this Plan would constitute federal ratification of violations that state and federal agencies are duty-bound to prevent. These harms are **not subject to waiver**, and the Plan may not be confirmed under any standard consistent with law, equity, or the institutional legitimacy of this Court.

## IX. EXHIBITS INCORPORATED BY REFERENCE

**148.** In support of the factual assertions and legal conclusions set forth in this Declaration and in the Supplemental Brief filed April 14, 2025, I hereby incorporate by reference the following five exhibits. Each exhibit has been independently authenticated, contemporaneously preserved, and submitted in accordance with the **Federal Rules of Evidence**, including **Rule 901(b)(4)** (authentication by distinctive characteristics), and may be properly reviewed as part of the unified record in support of **Dkts. 1897, 2049, and 2075**. These materials are not supplementary—they are central evidentiary artifacts that substantiate the statutory violations, structural defects, and ethical breaches necessitating judicial relief and regulatory response.

---

### Exhibit 1 – HR and Retaliation Timeline

**149.** Exhibit 1 provides a detailed chronological account of **retaliatory workplace conduct** executed by Wellpath Holdings, Inc. following my **protected disclosures** regarding unlawful Plan provisions, governance misconduct, and fiduciary breach. This timeline includes:

- Internal Human Resources communications initiated and directed by **Angie Baldwin**, a non-licensed administrative employee of Wellpath;
- Evidence of **exclusion from governance meetings**, clinical marginalization, and targeted reconfiguration of duties intended to destabilize protected employment;
- **Obstruction of ADA accommodation requests**, including failure to engage in the interactive process and interference with disability-related scheduling.

**150.** This exhibit substantiates the claims made in **Section IV** of this Declaration, and supports causes of action and enforcement under:

- **ADA – 42 U.S.C. § 12112 and § 12203** (retaliation and accommodation failure),
- **FEHA – Cal. Gov. Code §§ 12940(h), (m), (n), 12945.2,**
- **California Labor Code § 1102.5** (whistleblower retaliation),
- **ERISA § 510 – 29 U.S.C. § 1140** (retaliation for plan-based activity).

---

**Exhibit 2 – Internal CPOM Violation Evidence**

**151.** Exhibit 2 includes internal emails, schedules, triage directives, and policy documents confirming that **Wellpath—a private equity-controlled MSO—exercised unlawful control** over core clinical functions at CFMG. The record reflects:

- Non-physician administrators at Wellpath issuing **staffing and triage directives**;
- Unauthorized reassignment of **physician-patient responsibilities**;
- Exclusion of physician-shareholders from compensation, employment, and disciplinary decisions.

**152.** These documents confirm systemic and sustained **CPOM doctrine violations**, as described in **Sections III and VIII**, and establish statutory breaches of:

- **Cal. Bus. & Prof. Code §§ 2400–2417** (prohibiting lay control of medical practice),
- **Cal. Bus. & Prof. Code § 2052 and § 2264** (unauthorized practice and delegation of judgment),
- **Cal. Corp. Code §§ 13400 et seq.** (professional corporation governance requirements).

These acts render the Plan **unconfirmable** under **11 U.S.C. §§ 1129(a)(1) and (a)(3)**, and subject the governance model to **licensure enforcement by the Medical Board of California.**

---

**Exhibit 3 – 409A Tax Impact Documentation**

**153.** Exhibit 3 documents the **constructive distribution, excise tax penalties, and audit exposure** resulting from the Debtors' unlawful handling and reclassification of the Non-Qualified Deferred Compensation Plan (NQDCP). It includes:

- A certified **Fidelity NetBenefits account statement** showing a **vested balance of $162,597.08,** earned exclusively through W-2 employment with **non-debtor CFMG;**
- **IRS Form 8275,** filed to disclose the disputed tax position resulting from **forced income inclusion under IRC § 409A(a)(1);**
- A comprehensive tax analysis demonstrating **federal and California liabilities totaling $200,591.04,** consisting of:

| Tax Category | Amount (USD) |
|---|---|
| Federal Income Tax (37%) | $60,160.92 |
| IRC § 409A Excise Tax (20%) | $32,519.42 |
| IRC § 6662 Accuracy Penalty (20%) | $32,519.42 |
| IRS Interest (7%, accrued over ~3.03 years) | $28,793.37 |
| California Income Tax (13.3%) | $21,625.41 |
| California FTB Penalty (10%) | $16,259.71 |
| California FTB Interest (7%, ~3.03 years) | $8,712.80 |
| ⬛ **Total Combined Tax Liability** | **$200,591.04** |

**154.** This exhibit substantiates the claims presented in **Sections V and VIII** of the Declaration and supports multiple causes of action and regulatory enforcement under:

- **IRC §§ 409A(a)(1)(A), 409A(a)(1)(B), and 6662** (constructive receipt, 20% excise tax, and accuracy-related penalties);
- **Treas. Reg. § 1.409A-3(j)(4)(ix)** (termination without required liquidation and compliance timeline);
- **Cal. Rev. & Tax Code § 17041,** FTB penalty rules, and interest accrual regimes;
- **11 U.S.C. § 541(d)** (exclusion of trust property from the bankruptcy estate);
- **ERISA § 404** (fiduciary breach due to misuse of plan assets held for the exclusive benefit of the participant).

This tax liability is not speculative. It is real, enforceable, and has been directly triggered by noncompliant Plan conduct and the Debtors' failure to adhere to the mandatory requirements of IRC § 409A and its accompanying Treasury regulations.

---

**Exhibit 4 – Legal Memoranda and Coercion Evidence**

**155.** Exhibit 4 contains:

- Formal, confidential memoranda sent to MWE attorneys **Felicia Perlman, Marcus Helt, Steven Szanzer, and Carole Wurzelbacher**, warning of CPOM violations, ERISA breaches, tax penalties, and ethical violations;
- Emails from Wellpath executives and MWE counsel **conditioning the release of trust-backed deferred compensation** on the withdrawal of pending motions and the execution of NDAs;
- Screenshots and transcripts evidencing explicit efforts to **suppress whistleblower claims** through economic leverage.

**156.** This exhibit forms the factual core of **Section VII**, and supports disciplinary proceedings and regulatory action under:

- **ABA Model Rules 1.2(d), 3.3(a)(1), 4.4(a), 5.1, 5.2, 8.4(c) and (d);**
- **Rule 9011(b)** (misrepresentations to the Court),
- **11 U.S.C. § 1129(a)(3)** (good faith and lawful proposal requirement).

These communications demonstrate that the Plan was advanced with actual knowledge of its legal defects and that attorneys knowingly used fiduciary assets to silence dissent.

---

**Exhibit 5 – April 14, 2025 Supplemental Brief**

**157.** Exhibit 5 contains my **April 14, 2025 Supplemental Brief**, filed in support of Dkts. 1897, 2049, and 2075. This brief:

- Consolidates legal arguments regarding structural illegality of the Plan;
- Applies binding Fifth Circuit authority including **Zale**, **Pacific Lumber**, and **Highland Capital**;
- Analyzes tax harm under **IRC § 409A**, ERISA fiduciary breaches, CPOM violations, and due process failures.

**158.** The Supplemental Brief is cross-referenced throughout this Declaration and functions as its legal counterpart. It satisfies the **analytical and statutory burden required under 11 U.S.C. § 1129** and Rule 9011, and should be considered part of the formal evidentiary record for all motions on file.

---

**Final Integration Statement**

**159.** The above exhibits are **not illustrative**. They are the evidentiary basis for:

- Judicial denial of confirmation under **§§ 524(e), 541(d), 1129(a)(1) and (a)(3)**;
- State and federal enforcement actions under CPOM, ERISA, and the Internal Revenue Code;
- Disciplinary proceedings under **state bar codes and the ABA Model Rules**.

Each exhibit is individually authenticated and jointly incorporated by reference under **penalty of perjury pursuant to 28 U.S.C. § 1746**.

## X. JUDICIAL OVERSIGHT AND ETHICAL CONSIDERATIONS

### A. Supervisory Duties of the Court Under § 1129(a)(3) and Rule 9011(b)

**160.** The confirmation of a plan under Chapter 11 is not a ministerial act. It is the exercise of a **core Article I judicial function** that must be executed **in fidelity to law, in defense of constitutional rights, and with full awareness of the ethical obligations of officers of the court**. Under **11 U.S.C. § 1129(a)(3)**, the Court bears a **non-delegable duty** to determine whether the Plan **"has been proposed in good faith and not by any means forbidden by law."** This determination requires more than a mechanical checklist. It demands a substantive inquiry into the integrity of the Plan, the conduct of its proponents, and the nature of the process by which it was advanced.

**161.** Under **Federal Rule of Bankruptcy Procedure 9011(b)**, attorneys appearing before this Court are required to certify that their submissions are **legally warranted, factually grounded**, and **not interposed for an improper purpose**. The certification is not symbolic. It is a **legal representation to the Court** that every element of the filing is consistent with statutory, regulatory, and ethical mandates.

**162.** In this case, the record is unambiguous. The Plan was:

- Advanced with actual notice of CPOM violations under **California law**;
- Structured to obscure **ERISA fiduciary breaches, IRC § 409A penalties**, and **Section 541(d) misclassifications**;
- Used to condition the release of trust-held deferred compensation on **silence**, **withdrawal of objections**, and **execution of NDAs**;
- Solicited using ballots and disclosures designed to **mislead**, **coerce**, and **procedurally entrap**.

**163.** A plan built on such foundations cannot be confirmed in good faith. A confirmation proceeding cannot become a **shield for ethical misconduct,** nor may the bankruptcy process be transformed into a **vessel for immunizing fiduciaries from the consequences of their statutory violations.**

---

## B. Disclosure Failures and Structural Concealment of Legal Defects

**164.** The Court's responsibility under **§ 1125 of the Bankruptcy Code** is to ensure that the Disclosure Statement provides "**adequate information**" to permit creditors to make informed decisions. In this case, the Disclosure Statement failed to disclose—intentionally and with material consequence—the following structural violations:

- The existence of **409A excise tax exposure** and constructive distribution liabilities;
- **ERISA § 404 and § 510 fiduciary violations** and their DOL-enforceable consequences;
- The unlawful control exercised by Wellpath in violation of the **CPOM doctrine** and **Cal. Bus. & Prof. Code §§ 2400–2417;**
- The existence of **protected ADA/FEHA accommodation requests**, and subsequent retaliation;
- The Plan's reliance on **non-consensual third-party releases** to extinguish **statutory, regulatory, and constitutional claims.**

**165.** These omissions are not errors. They are deliberate. They constitute a pattern of structural concealment designed to:

- Facilitate creditor silence through **uninformed consent;**
- Shield non-debtor professionals—including MWE attorneys—from liability;
- Subvert judicial review by depriving the Court of a full evidentiary record at the time of confirmation.

**166.** The result is a **constructive fraud on the Court.** This term is not used lightly. It reflects the systemic suppression of material facts known to be essential to judicial review and required under statute, rule, and ethical obligation.

---

## C. Institutional Referral Pathways for Professional Review and Regulatory Oversight

**167.** Based on the foregoing, I respectfully request that this Court refer the conduct of counsel and Plan proponents to the following oversight and enforcement bodies:

- **The State Bars of Illinois, Texas, and New York**, for ethics review of:
  - o Felicia Perlman (IL);
  - o Marcus Helt (TX);
  - o Steven Szanzer (NY);
  - o Carole Wurzelbacher (IL).

Each of these attorneys has violated, inter alia:

- **ABA Model Rules 1.2(d), 3.3(a), 4.4(a), 5.1, 5.2, 8.4(c), and 8.4(d)**.
- **The United States Trustee Program**, pursuant to **28 U.S.C. § 586(a)(3)**, for:
  - o Monitoring attorney conduct;
  - o Referring matters for disciplinary action under **Rule 9011**;
  - o Objecting to confirmation under **§ 1129(a)(3).**
- **The DOJ Office of Professional Responsibility**, for:
  - o Investigating whether the Debtors' attorneys engaged in conduct prejudicial to federal court proceedings.
- **The IRS Office of Chief Counsel**, for:
  - o Reviewing the Plan's creation of constructive tax events under **IRC § 409A, § 6662, and § 3401(a);**
  - o Investigating tax harm and enforcement jurisdiction over trust-held deferred compensation.
- **The California Attorney General – Health Quality Enforcement Section**, for:
  - o Enforcement of the CPOM doctrine under **Cal. Bus. & Prof. Code § 17200**;
  - o Investigation of the MSO control structure and disciplinary referral to the **Medical Board of California.**
- **The California Department of Industrial Relations**, and **California Civil Rights Department**, for:
  - o Enforcement of wage, whistleblower, and accommodation rights under:
    - ▪ **Cal. Labor Code §§ 1102.5, 200–223;**
    - ▪ **Cal. Gov. Code §§ 12940, 12945.2, 12965.**

## D. Recommendation for Record Preservation and Conditional Referral

**168.** This Court now possesses a complete evidentiary record documenting structural illegality, ethical violation, and professional misconduct. If the Plan proceeds to confirmation **without structural correction**, the Court will have:

- Endorsed the use of economic coercion to silence objectors;
- Ratified the concealment of nonbankruptcy statutory violations;

- Validated a solicitation and disclosure process that fails under both **constitutional** and **statutory** standards.

**169.** The Court must act.

If confirmation is granted, I request that the Court **sua sponte refer the evidentiary record**—including this Declaration, Dkts. 1897, 2049, and 2075, and Exhibits 1 through 5—to the aforementioned oversight bodies.

If confirmation is denied, I respectfully request that the Court condition any future confirmation on:

- The removal of illegal third-party releases;
- A restructuring of the Plan to comply with CPOM, ERISA, and IRC § 409A;
- And certification to the U.S. Trustee that all disclosure failures have been corrected under penalty of Rule 9011.

**170.** The judicial power conferred under Chapter 11 does not include the power to ratify illegality, institutionalize coercion, or ignore misconduct presented in the evidentiary record. The law, and the legitimacy of this Court, demand better.

## XI. CLOSING AFFIRMATION AND RESERVATION OF RIGHTS

### 1. Declaration Under Penalty of Perjury

**171.** I, Dr. Kanwar Partap Singh Gill, hereby declare under penalty of perjury, pursuant to **28 U.S.C. § 1746**, that the foregoing Declaration is true and correct to the best of my knowledge, information, and belief. The facts recited herein are based on my direct experience, contemporaneous records, and good-faith legal understanding. The legal assertions contained herein reflect my independent analysis, supported by cited authority and attached exhibits.

**172.** This Declaration is submitted not as a complete catalog of all legal or regulatory remedies available to me, but as a verified evidentiary statement responsive to the procedural posture of the present case. It does not purport to identify all potential harms, violations, or liabilities that may arise from the conduct described herein, nor does it exhaustively document all statutory, administrative, or equitable grounds for redress.

## 2. Reservation of Legal, Administrative, and Regulatory Remedies

**173.** I expressly reserve all rights and remedies available to me:

- **Under federal and state law**, including but not limited to:
    - ◦ **Labor, licensure, fiduciary, disability, tax**, and **anti-retaliation statutes**;
    - ◦ The **Bankruptcy Code, Internal Revenue Code, ERISA, ADA, FEHA**, and the **California Business and Professions Code**;
    - ◦ The **U.S. Constitution**, including **First, Fifth**, and **Fourteenth Amendment protections**;
- In any tribunal or proceeding, whether judicial, administrative, or investigatory;
- Whether now known or arising hereafter;
- Whether sounding in law, equity, or administrative function;
- And without prejudice to any statutory or constitutional defense or privilege.

**174.** Nothing in this Declaration shall be construed as a waiver, limitation, or disclosure of confidential legal strategy, future litigation posture, or enforcement pathway—whether in this proceeding or any parallel forum. All rights are reserved **without limitation** and **without prejudice**.

---

## 3. Request for Judicial Relief and/or Referral

**175.** The purpose of this Declaration is singular: to present a **truthful, factually supported, and legally anchored record** in support of judicial and regulatory oversight. I seek **no punitive remedy**, only **lawful adjudication consistent with governing statutes, constitutional obligations, and the institutional integrity of the bankruptcy process**.

**176.** To the extent this Declaration compels **judicial notice**, **regulatory referral**, or **post-confirmation inquiry**, such measures are requested not as instruments of reprisal, but as procedural safeguards—designed to preserve the legitimacy of this Court, to protect the public's interest in lawful plan confirmation, and to ensure that no legal or ethical violation is inadvertently ratified through silence or oversight.

**177.** If the Court determines that the conduct described herein falls outside its jurisdiction to remedy directly, I respectfully request that the full evidentiary record be preserved and transmitted to the appropriate **disciplinary, regulatory**, or **enforcement bodies** for independent review.

---

## 4. Formal Execution & Non-Waiver Clause

**178.** Executed this 14th day of April, 2025, in **Fresno, California**, under the laws of the United States of America.

**179.** No part of this Declaration shall be construed to waive any objection, defense, right, or remedy—**procedural or substantive**, **statutory or constitutional**—that may otherwise be available to me, individually or in conjunction with similarly situated claimants. Any omission or ambiguity shall be construed liberally in favor of the preservation of such rights.

---

**Respectfully submitted,**

*[signature]*

**/s/ Dr. Kanwar Partap Singh Gill**
**Dr. Kanwar Partap Singh Gill**

**April 19th 2025**

Pro Se Movant and Creditor
Senior Staff Physician
California Forensic Medical Group
Fresno County Adult Detention Facility
Email: kpsgill@kpsgill.com
Phone: (559) 447-8490
Address: 8408 N. Ann Ave, Fresno, CA 93720

---

## CERTIFICATE OF SERVICE

I hereby certify that on **April 19, 2025**, I caused a true and correct copy of the:

**Declaration of Dr. Kanwar Partap Singh Gill in Support of Supplemental Brief Filed in Support of Dkts. 1897, 2049, and 2075**

together with all referenced exhibits, to be served via **First-Class U.S. Mail** upon the following parties:

**Counsel for Debtors – McDermott Will & Emery LLP**

1. Felicia Perlman
2. Marcus Helt
3. Steven Szanzer
4. Carole Wurzelbacher
5. Darren Azman –

**Office of the U.S. Trustee (Region 7 – SDTX)**

6. Susan Her – susan.her@usdoj.gov
7. Ha Nguyen – ha.nguyen@usdoj.gov
8. 515 Rusk Street, Suite 3516, Houston, TX 77002

**Official Committee of Unsecured Creditors – Stinson LLP**

9. Zachary Hemenway
10. Nicholas Zluticky
11. Lucas Schneider

**Wellpath & CFMG Officers**

12. Marc Goldstone – Chief Legal Officer
13. Dr. Dheeraj Taranath – Interim Chief Clinical Officer
14. Grady J. Bazzel – CEO, CFMG
15. Scott Kennedy – CFO, CFMG
16. Richard Medrano – Secretary, CFMG

**Regulatory and Oversight Agencies**

18. Medical Board of California
19. California Attorney General – Health Quality Enforcement
20. California Labor Commissioner – Lilia García-Brower
21. IRS Office of Professional Responsibility
22. U.S. Department of Labor – EBSA
23. Department of Justice – Office of Professional Responsibility
24. Daniel C. Cederborg – dcederborg@fresnocountyca.gov (Fresno County Counsel)

I certify under penalty of perjury that the foregoing is true and correct.

Executed on April 19, 2025, in Fresno, California.

/s/ Dr. Kanwar Partap Singh Gill
Dr. Kanwar Partap Singh Gill

---

## EXHIBIT SUMMARY

1. **Exhibit 1 – HR and Retaliation Timeline**
   Chronology and internal correspondence showing retaliation after ADA and whistleblower disclosures.
2. **Exhibit 2 – Internal CPOM Violation Evidence**
   Emails and documents evidencing Wellpath's lay control over CFMG physician functions.
3. **Exhibit 3 – 409A Tax Impact Documentation**
   Fidelity NetBenefits statement, IRS Form 8275, and full tax penalty breakdown.
4. **Exhibit 4 – Legal Memoranda and Coercion Evidence**
   Memoranda to MWE and emails conditioning wage release on litigation silence.
5. **Exhibit 5 – April 14 Supplemental Brief**
   Procedural and legal foundation for motions and this Declaration.

**Exhibit Cover Sheets – Dr. Kanwar Partap Singh Gill**

## EXHIBIT 1 – HR and Retaliation Timeline

Filed in Support of Dkts. 1897, 2049, 2075

Declarant: Dr. Kanwar Partap Singh Gill

Case: In re Wellpath Holdings, Inc., Case No. 24-90533 (S.D. Tex.)

### Declaration Cross-Reference

Referenced in Sections: IV, VIII

Cited in Paragraphs: ¶¶ 54–67, 120–130, 149–150

### Description of Contents

This exhibit contains contemporaneous communications and timeline documentation demonstrating retaliatory actions against Dr. Gill following protected ADA and whistleblower disclosures.

Included Documents:

- - HR emails from Angie Baldwin
- - Accommodation requests and denials
- - Governance exclusion notices
- - Retaliation chronology

### Legal Basis and Relevance

Statutes, regulations, and ethical rules implicated:

- - ADA (42 U.S.C. §§ 12101 et seq.)
- - FEHA (Cal. Gov. Code §§ 12940, 12945.2)
- - ERISA § 510 (29 U.S.C. § 1140)
- - Cal. Labor Code § 1102.5

### Authentication Status

Authenticated under Rule 901(b)(4) through contemporaneous email records, internal HR correspondence, and declaration-backed documentation. Preserved March–April 2025.

### Evidentiary Purpose

Supports employment retaliation claims and whistleblower protections.

KPSGILL.COM

Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

## Request to Reschedule HR Meeting Due to Active Litigation and Oversight Requirements Under California Law
1 message

---

**Kanwar Partap Singh Gill** <kpsgill@kpsgill.com>                                     Wed, Apr 9, 2025 at 11:11 AM
To: Angie Baldwin <ARBaldwin@wellpath.us>, Marc Goldstone <MGoldstone@wellpath.us>
Bcc: Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

**Subject:** Request to Reschedule HR Meeting Due to Active Litigation and Oversight Requirements Under California Law

Dear Ms. Baldwin,

Thank you for your message and the ongoing communication regarding the HR/ER meeting originally scheduled for April 15, 2025.

As you may be aware, I am currently an active litigant in *In re Wellpath Holdings, Inc.*, Case No. 24-90533 (Bankr. S.D. Tex.), where I have raised substantial legal claims involving physician compensation, corporate practice of medicine violations, ERISA noncompliance, and improper wage deferral involving California Forensic Medical Group (CFMG). These claims are legally and factually supported in Docket Nos. 1897 and 2049. The deadline for opposition filings in this matter is April 15, 2025, and I am presently preparing and finalizing legal pleadings in that context.

The amount at stake exceeds **$375,000**, and includes not only unpaid deferred compensation but also tax liabilities, penalty exposure, accrued interest, and the substantial opportunity cost associated with legal drafting, research, and case management since March 4, 2025. These losses arise **entirely from the mishandling of my deferred compensation by CFMG**, which permitted Wellpath—its management services contractor—to assume control over funds that constituted my earned wages and were never intended to be subject to corporate commingling or bankruptcy risk. The reckless failure to safeguard these wages in a separate trust or protected account—as required under ERISA principles and California compensation law—has resulted in extraordinary financial harm. It is this harm that I am seeking to remedy through the ongoing bankruptcy proceedings.

Given this context, I must respectfully request that **our HR meeting be rescheduled until after April 22, 2025**, the date of the bankruptcy court's scheduled hearing. This is not a refusal to engage—it is a legally necessary measure to:

- Prevent any **procedural or substantive prejudice** to my pending federal litigation;

- Avoid **crossover risks** between an internal HR fact-finding process and external judicial proceedings;

- Maintain compliance with the **Americans with Disabilities Act (ADA)** and California's Fair Employment and Housing Act (FEHA), including protections related to workplace accommodations and clinical scheduling;

- Ensure that **California's Corporate Practice of Medicine (CPOM) doctrine**, as codified in Business & Professions Code §§ 2400 et seq., is fully respected, including with respect to physician oversight of disciplinary or employment matters.

---

In light of my current role as a salaried physician employed by CFMG—a California professional medical corporation—any employment-related investigation involving my conduct must be **directly authorized or supervised by a California-licensed physician-officer of CFMG**. I have not received such confirmation, and as raised in prior correspondence, I respectfully request that the following be clarified in writing:

1. Whether this investigation is being carried out under the formal delegation or supervision of any CFMG physician-officer, such as Dr. Grady Bazzel;

2. Whether any findings made through this process will be used to support, justify, or inform CFMG employment actions, including discipline, remediation, or termination;

3. Whether any emergent employment issue presently exists that cannot be deferred until after April 22;

4. Whether Wellpath is asserting that this HR review satisfies the standards applicable to California professional medical corporations regarding physician employment governance.

This request is submitted out of an abundance of caution, and with a view toward avoiding any perception of interference, delay, or noncooperation. If a critical matter arises before April 22 requiring urgent discussion, I remain available for timely coordination—as long as the meeting is convened under appropriate physician-led oversight and legal safeguards.

To reiterate, this limited postponement is necessary to avoid undue hardship, protect procedural rights, and preserve a clean record in ongoing federal and regulatory proceedings. I appreciate your continued professionalism, and I remain committed to resolving all outstanding issues through lawful, cooperative, and structured channels.

Sincerely,
**Dr. Kanwar P. Gill**
Senior Physician – Fresno County Adult Detention Facility
Email: kpsgill@kpsgill.com | Sent from personal account for independence and documentation purposes

On Wed, Apr 9, 2025 at 8:39 AM Angie Baldwin <ARBaldwin@wellpath.us> wrote:

Dr. Gill,

You have raised concerns that fall under different disciplines. CFMG has received your email alleging a number of serious matters. Compliance will be reaching out to you to separately investigate your compliance-related concerns. As you know, I have been tasked with conducting an investigation of your workplace discrimination and retaliation allegations. Wellpath is contracted to perform this function on behalf of CFMG, and I am the designated investigator for these concerns. As it relates to the HR/ER investigation, I ask that you refrain from including others on communications related to this investigation, as that could adversely impact the integrity of the investigation.

We are still scheduled to meet on the 15th to discuss issues you've raised within the scope of this investigation. The main purpose of this initial meeting is to gather information from you. Please direct any additional concerns or questions about the investigation into your allegations of workplace discrimination and retaliation solely to my attention. After we meet, I will identify witnesses or other appropriate people to interview and plan the next steps in the investigation. If you are aware of additional facts or evidence relevant to your allegations, please send them to me. It goes without saying that interference with the investigation is not permitted and will

only serve to will slow the process down and potentially damage the integrity of the investigation.  Thank you for your cooperation, and I hope to speak with you soon.

**ANGIE BALDWIN, PHR, SPHR**

Sr. Employee Relations Manager



3340 Perimeter Hill Dr., Nashville, TN 37211
**PH 615-312-7272// CELL 615-636-7045**

**WellpathCare.com**

**From:** Kanwar Partap Singh Gill <kpsgill@kpsgill.com>
**Sent:** Tuesday, April 8, 2025 4:09 PM
**To:** Dheeraj Taranath <DTaranath@wellpath.us>; Angie Baldwin <ARBaldwin@wellpath.us>
**Cc:** webmaster@mbc.ca.gov
**Subject:** [EXT] Re: Urgent Request for CFMG-Led HR Oversight:

CAUTION: This Email is from an EXTERNAL source. Do not click links or open attachments unless you recognize the sender and know the content is safe.  Report suspicious messages to SPAM@Wellpath.us

**Subject:** Clarification of HR Jurisdiction and Demand for Physician-Led Oversight of CFMG Employment Matters

• Dr. Grady Judson Bazzel – California P&S License No. C 53908, Chief Executive Officer, CFMG

• Dr. Richard M. Medrano – California P&S License No. A 103477, Secretary, CFMG

• Dr. Scott Herbert Kennedy – California P&S License No. C 171808, Chief Financial Officer, CFMG

**In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.)**

Dear Ms. Baldwin,

Thank you for acknowledging receipt of my recent emails and for including them in your investigative file.

Let me respectfully and unequivocally state that it is my continuing intent to communicate with California Forensic Medical Group (CFMG) leadership and request that any human resources investigation into my employment as a CFMG-employed physician be conducted either:

1. By an HR representative employed and directly supervised by a California-licensed physician within CFMG, or
2. Under the exclusive oversight of a physician-led panel consistent with the mandates of the California Medical Practice Act and the corporate practice of medicine (CPOM) doctrine.

I must also ask you to clearly identify your role in this matter:

- Are you conducting this HR investigation under the direction of CFMG or Wellpath?
- Do any of CFMG's physician-officers (such as Dr. Bazzel) formally supervise or approve your actions?
- Will your findings be considered binding for purposes of CFMG employment discipline, remediation, or termination?

These are critical threshold questions, particularly given your recent statement that I do not need to include Dr. Grady Bazzel—CFMG's CEO—in these communications. With respect, I must request a written confirmation of that assertion, as this statement will need to be forwarded to the Medical Board of California in connection with the active investigation into CFMG's HR governance structure and its compliance with California law.

As you are aware, I have made extensive disclosures concerning the misclassification of my wages, interference with patient care, retaliatory administrative behavior, and race- and national origin-based discrimination—all of which occurred under CFMG's direct authority. To that end, I am compelled to reiterate that these are not Wellpath matters. These are physician employment grievances governed under California law, requiring physician-led adjudication.

Your role as a Wellpath-employed HR professional may create an inherent conflict of interest when reviewing concerns that implicate CFMG's legal structure and California-specific employment protections. Without a clear delegation of investigatory authority from a CFMG physician-officer, any HR process led exclusively by you may be legally insufficient and procedurally invalid under California Business & Professions Code §§2400 et seq.

As a reminder, I previously addressed these issues in my April 3, 2025 letter to Wellpath's Chief Legal Officer Marc Goldstone, which was copied to Kerrie Webb, Staff Counsel for the Medical Board of California. That letter outlines how Wellpath's HR and corporate structure continue to violate CPOM restrictions, ERISA standards, and IRC §409A deferred compensation laws—all of which are now under regulatory scrutiny.

Additionally, I have communicated the urgency of these concerns to Dr. Dheeraj Taranath and CFMG leadership, including in my April 3 email regarding the April 11 meeting. I have clearly laid out the binding physician-led resolution terms that must be finalized in that meeting to avoid external escalation. These terms include employment protections, compensation parity, deferred compensation recovery, and full whistleblower safeguards—all of which are grounded in California's statutory protections for physicians and employees.

In light of the above, please confirm the following:

1. Whether your investigation is authorized by any of the California-licensed physician-officers of CFMG.
2. Whether your findings will be used to support or justify any future CFMG disciplinary actions.
3. Whether you have any direct reporting obligations to CFMG leadership.
4. Whether CFMG's physician-shareholders have delegated their non-delegable duties (under California law) to Wellpath's HR.
5. Whether Wellpath is asserting that your investigation satisfies California HR standards for professional medical corporations.

Absent affirmative and documented answers to these questions, I must regard the current HR review process as procedurally flawed and noncompliant with state law.

For the record, I am still fully open to an internal resolution—as emphasized in my prior correspondence. However, if this process continues without physician oversight, or if Dr. Bazzel is excluded from further communication, I will be

obligated to report this as further evidence of CFMG's failure to retain legally required physician control over employment matters.

I respectfully await your clarification and look forward to a transparent discussion that complies with both California labor protections and our ethical duty to uphold physician autonomy in correctional healthcare.

Best regards,
**Dr. Kanwar P. Singh Gill**
Senior Physician
Fresno County Adult Detention Facility
Email: kpsgill@kpsgill.com
Sent from my personal email account for documentation and independence purposes

---

On Tue, Apr 8, 2025 at 12:04 PM Kanwar Partap Singh Gill <kpsgill@kpsgill.com> wrote:

**Subject:** Urgent Request for CFMG-Led HR Oversight: Wellpath's Interference with CFMG Physician Employment Matters

• Dr. Grady Judson Bazzel – California P&S License No. C 53908, Chief Executive Officer, CFMG

• Dr. Richard M. Medrano – California P&S License No. A 103477, Secretary, CFMG

• Dr. Scott Herbert Kennedy – California P&S License No. C 171808, Chief Financial Officer, CFMG

Dear Dr. Bazzel, Dr. Medrano, and Dr. Kennedy,

I write to you today not just as a colleague and long-standing CFMG physician, but as a party directly affected by what I must assert is an unlawful and inappropriate delegation of human resources oversight to Wellpath—a non-California management services organization. This matter demands urgent attention by CFMG's licensed physician leadership.

As you are aware, I am employed by **California Forensic Medical Group (CFMG)**. Yet, all current internal HR investigations into my employment-related grievances are being handled solely by **Angie Baldwin**, a **human resources officer of a Management Services Organization (Wellpath)** based in Tennessee. While Ms. Baldwin has been communicative, she is not employed by CFMG and is not licensed to oversee or adjudicate employment matters involving California-licensed physicians governed under the Medical Practice Act and associated state labor protections.

Let me be clear: **these are not Wellpath matters.** These are employment-related grievances between a physician and CFMG—**a California professional medical corporation**. The decision to delegate this process to Wellpath, which is not licensed to engage in the practice of medicine or employ physicians under California law, amounts to a **violation of the corporate practice of medicine (CPOM) doctrine,** California Business & Professions Code §§ 2400 et seq., and likely exposes CFMG to civil and criminal liability.

**Summary of Concerns Raised (HR in Nature and CFMG-Specific):**

    1. **Race-Based Discrimination in Leadership**

        ◦ I am the only brown physician remaining in senior leadership at our site.
        ◦ Despite more than five years of dedicated service with CFMG and having been licensed to practice medicine since 2009, I was passed over for the Medical Director position at the juvenile facility in favor of a physician who obtained their license in 2018. This decision raises significant concerns, particularly given the substantial difference in clinical experience and leadership tenure. I had formally expressed my interest in the role and engaged in direct dialogue with the Regional Director of Operations regarding this opportunity. However, after several discussions and assurances, the role was ultimately awarded to someone with markedly less experience. Based on this and several prior interactions, I must express—in the most professional but clear terms—that I do not have confidence in the Regional Director's judgment or impartiality. Her track record of unfulfilled commitments and lack of transparency remains one of my greatest concerns moving forward.

- The ongoing pattern of replacing physicians of color—particularly those of South Asian descent—with less experienced individuals raises serious concerns under the California Fair Employment and Housing Act (FEHA), particularly regarding discriminatory practices in leadership appointments based on both race and national origin.

## 2. Constructive Termination and Retaliation

- I received credible reports that the RDO, HSA, and DON have discussed "getting rid of me."
- My repeated whistleblower reports (on deferred compensation, administrative interference, and discrimination) have been met with hostility and coercive tactics.

## 3. Misclassification and Mishandling of Deferred Compensation

- My CFMG-earned deferred compensation has been wrongfully absorbed into the Wellpath bankruptcy estate.
- Wellpath HR staff (e.g., Donald White) have conflated CFMG and Wellpath wages, which undermines legal distinctions that must be maintained between the two entities.

## 4. Clinical Interference by Nonphysicians

- I was removed from control of a weekly patient care meeting (which I chair), which was rescheduled by non-physician staff to conflict with high-volume patient activity.
- These decisions have compromised patient care and violated my obligations under the Medical Practice Act.

## 5. Lack of CFMG-Led HR Grievance Process

- Since November 2024, I have raised concerns internally without any action by a CFMG-based HR or physician-leader.
- The current investigation led by Wellpath HR—without CFMG physician oversight—invalidates the entire process, particularly given the scope and substance of the allegations.

## My Formal Request to CFMG Shareholders

I am now formally requesting that **a human resources representative employed by CFMG—and reporting to a California-licensed physician-officer of CFMG**—be assigned to oversee and adjudicate the investigation of my grievances. This includes the alleged:

- Racial discrimination;
- Constructive and retaliatory conduct;
- Compensation misappropriation; and
- Workplace interference that affects patient care and my medical license.

Any continued reliance on a Wellpath investigator for this matter will be viewed as a continued violation of CPOM and a dereliction of CFMG's non-delegable duties as a professional medical corporation under California law.

## Legal Exposure if Not Addressed

Should any adverse action—up to and including termination—be taken against me while Wellpath is improperly handling what are clearly CFMG physician HR issues, I would have no option but to assert my rights under:

- **California Labor Code §1102.5 (whistleblower retaliation);**
- **California Fair Employment and Housing Act (FEHA);**
- **California Medical Practice Act (Business & Professions Code §§2052 et seq.);**
- **Federal ERISA and bankruptcy whistleblower provisions.**

Such a termination, under the present circumstances and timeline of protected activity, would appear overtly **retaliatory and discriminatory** on its face.

## Closing

I have dedicated over five years of service to CFMG, consistently delivering exceptional clinical outcomes, financial savings, and professional leadership. I have made every effort to resolve these concerns internally and

respectfully. It is now incumbent on you—as CFMG's licensed shareholders and physician leaders—to reclaim your statutory responsibilities and immediately assign a proper, physician-governed HR process for this matter.

Please confirm that this request is being escalated appropriately within CFMG, and that a CFMG-based HR professional—answering to physician leadership—will be assigned immediately to review and address my concerns.

Sincerely,
**Dr. Kanwar P. Gill**
Senior Physician, Fresno County Adult Detention Facility
*Sent from my personal account to preserve independence and documentation*

**KPSGILL.COM**

Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

## Request for Clarification – Schedule, Pre-Shift Huddles, After-Hours Expectations, and Reasonable Accommodation

1 message

---

**Kanwar Gill** <KaGill@wellpath.us>
To: Eric Krenz <EKrenz@wellpath.us>, Deanna Huff <Deanna.Huff@wellpath.us>, Alla Liberstein <Alla.Liberstein@wellpath.us>
Cc: Linda Matlock <LMatlock@wellpath.us>, Jacob Lieder <JLieder@wellpath.us>, Angie Baldwin <ARBaldwin@wellpath.us>

Wed, Apr 9, 2025 at 9:45 AM

Dear Mr. Krenz,

Thank you for your April 9, 2025, message regarding the implementation of mandatory pre-shift huddles beginning Monday, April 14, 2025. I appreciate the facility's effort to align with NCCHC requirements. In light of the new operational directive and in the context of ongoing workplace matters, I respectfully request clarification on several points that intersect with existing contractual, legal, and accommodation frameworks.

For over five and a half years, I have adhered to a consistent clinical schedule approved at the local level. My schedule incorporates a reasonable accommodation granted due to a documented and certified medical condition, which is formally recorded and acknowledged by both corporate and local HR. This accommodation was granted under the ADA and the California Fair Employment and Housing Act (FEHA), and has functioned successfully in balancing clinical responsibilities and health needs without undue burden to the facility.

As such, I request clarification on the following areas:

## 1. Schedule Change Confirmation

- Does the pre-shift huddle requirement constitute a modification of my established schedule?
- If so, has this change been reviewed and authorized by a California-licensed physician-officer of CFMG, as required under the California Medical Practice Act?
- Does this new requirement override or alter the current ADA/FEHA accommodation on file?

## 2. After-Hours Expectations

Please clarify:

- Am I expected to remain accessible for work-related phone calls, texts, or emails after completion of my shift?
- Am I required to review or complete patient charts or other documentation beyond my scheduled work hours?
- If after-hours availability is expected, will this be accompanied by compensation or formal schedule adjustment in accordance with applicable labor standards?

## 3. Timekeeping and Staffing Standards

As a salaried physician, I have consistently complied with clock-in/clock-out protocols to maintain transparency. However, I have noted that other salaried leadership roles (e.g., DON, HSA) may not uniformly adhere to the same standard.

Per the *Hall v. County of Fresno Remedial Plan*, staffing requirements are explicitly defined for:

- Health Services Administrator: 40 hours/week
- Director of Nursing: 40 hours/week
- Medical Director: 20 hours/week (minimum)
- Staff Physician: 40 hours/week

Please confirm:

- Whether clock-in/out expectations apply equally to all salaried staff at this facility.
- Whether flexible work arrangements or ADA accommodations for other salaried employees are acknowledged similarly.

## 4. Retaliation and Oversight Concerns

Given the timing and unilateral nature of recent changes, I am compelled to raise concern regarding the appearance of retaliatory behavior, especially given the absence of physician input or clinical governance. As noted in prior correspondence, I have raised protected concerns under California labor laws, whistleblower provisions, and the Medical Practice Act.

In coordination with ongoing HR/ER and compliance reviews now being conducted at the request of corporate HR, I respectfully request that changes to work duties, structure, or workflow be closely reviewed for compliance with applicable ADA, FEHA, and retaliation prevention guidelines.

## Additional Clarification Requested by April 11, 2025:

Please confirm by this date so that I may take appropriate steps, including:

- Coordinating with my medical provider regarding possible changes to my treatment schedule and medication timing, which may be affected by an earlier required start time.
- Making necessary adjustments to my children's school transportation schedule.
- Planning for consistent provider coverage in the outpatient housing unit, which will be impacted if I must leave after eight hours of service.

If longer than 8-hour shifts are expected of me moving forward, I request a written explanation and justification so I may provide it to my medical provider. Again, I reiterate that the accommodation granted has been effective in meeting clinical care demands and must be maintained unless formally reassessed through the required interactive process.

## HR Oversight and Coordination

In response to the April 9, 2025 communication from Ms. Angie Baldwin, I am aware that Wellpath is currently tasked with conducting the HR/ER investigation on behalf of CFMG, and that corporate Compliance will separately review other matters I have raised. Ms. Baldwin requested to remain copied on pertinent communications, and I am doing so here in that spirit and for documentation.

While I will follow her instruction not to broadly circulate investigation-related material, I believe this message falls squarely within operational clarification and protected accommodation territory. I will continue to cooperate in good faith and within the legal framework provided.

Thank you again for your time and attention.


Best Regards,

Kanwar Gill MD

Wellpath

Fresno County Adult Detention Facility

1225 M Street, Fresno, CA 93721

Office: (559) 600-9365

Email: KaGill@wellpath.us


IMPORTANT CONFIDENTIALITY NOTICE:

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

**From:** Eric Krenz <EKrenz@Wellpath.us>
**Sent:** Wednesday, April 9, 2025 8:36 AM
**To:** Deanna Huff <Deanna.Huff@Wellpath.us>; Marlene A Bazan <MBazan@Wellpath.us>; Alla Liberstein <Alla.Liberstein@Wellpath.us>; Eric Krenz <EKrenz@Wellpath.us>
**Cc:** Linda Matlock <LMatlock@Wellpath.us>
**Subject:** Pre-Shift Huddle **PLEASE READ**
**Importance:** High

Good Morning,

Starting Monday morning, 4/14/2025, there will be a Sign In sheet for both Day shift & NOC Pre-Shift Team Huddles. Pre-shift huddles are an NCCHC requirement, and as such require minutes and attendance tracking.  I also would like to remind everyone that per Deanna's email, dated 3/13/2025, attendance to pre-shift huddles are mandatory unless specifically given reprieve ;) from Deanna, Marlene, Dr. Liberstein, or myself.

Thank you,

## Eric Krenz II, RN

Director of Nursing



**Fresno County Adult Detention Facility**

1225 M St., Fresno, CA, 93721

Office: (559) 600-9351

Cell: (559) 909-8025

EKrenz@wellpath.us

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

KPSGILL.COM

Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

**Follow-Up: Clarification Requested Regarding Applicability of Wellpath Handbook Policies to CFMG-Employed Physicians in California**
1 message

Kanwar Gill <KsGill@wellpath.us>
To: Angie Baldwin <ARBaldwin@wellpath.us>
Cc: Jacob Lieder <JLieder@wellpath.us>, Linda Matlock <LMatlock@wellpath.us>

Subject: Follow-Up: Clarification Requested Regarding Applicability of Wellpath Handbook Policies to CFMG-Employed Physicians in California

Dear Ms. Baldwin,

I am forwarding below my March 31, 2025, request for written clarification regarding several policies outlined in the **Wellpath Team Member Handbook (effective March 2025)** and their applicab **California Forensic Medical Group (CFMG)**. Despite the submission of that request to Mr. Massie, Ms. Matlock and Mr. Lieder, I have yet to receive a substantive response.

In light of recent developments—including the deferral of our HR/ER meeting to a date after the April 22, 2025 bankruptcy hearing—I respectfully request that this outstanding inquiry be escal review. The questions outlined are foundational to determining whether the procedural standards outlined in the Wellpath Handbook apply to CFMG-employed physicians governed by the Cal statutes.

**Summary of Core Questions Requiring Written Clarification**

1. Applicability of Handbook to CFMG Employees

- Does Wellpath consider the March 2025 **Team Member Handbook** binding and enforceable with respect to CFMG-employed physicians in California?
- If the Handbook applies, does that include all complaint procedures (Sections 1.5, 1.9, 5.9), retaliation protections (1.6), and the accommodation process under the ADA/FEHA (1.7, 1.8)?
- If it does not apply, what alternative HR policy framework governs CFMG physician complaints, grievances, and accommodations?

2. Governance and Oversight

- As raised in multiple prior communications, including my April 9, 2025 email to you and CFMG leadership, please confirm whether a **California-licensed CFMG physician-officer** has form investigation into my workplace concerns.
- Given that Wellpath explicitly states (p. 2) that "[n]o contrary statement by any Wellpath team member...shall have any force or effect, unless...signed by the Chief Human Resources O **employment implications for a CFMG-employed physician absent direct physician-officer oversight under California law?**

3. Timekeeping Disparities and Retaliation Risk

The Handbook's section 3.7.2 mandates clock-in/out for "Exempt Salary and Contract Team Members... at a client site location"—specifically for contract compliance and safety tracking, not pay

However, salaried counterparts in senior leadership positions—namely the Medical Director, Director of Nursing, and Health Services Administrator—have not clocked in or out during that time

- Whether timekeeping enforcement applies equally across all exempt roles at this site;
- Whether selective enforcement of this provision—particularly after protected complaints have been raised—may be construed as discriminatory or retaliatory, particularly given the leg
- Whether my clock-in/out data is used in any disciplinary or investigatory analysis distinct from what is done for other exempt staff.

4. Accommodation Integrity and Workflow Changes

Per Handbook Sections 1.7 (Disabilities) and 3.9 (Attendance Policy), accommodations must be protected and adjusted only through the interactive process. The introduction of mandatory pre-

- ADA/FEHA accommodation due to timing and medical treatment schedule;
- Parental obligations for minor dependents;
- Capacity to maintain 40 hours of clinical work without exceeding a standard shift.

Please confirm whether this change has been:

- Reviewed by HR for ADA/FEHA implications;
- Submitted for physician-level governance review per **California Business & Professions Code §§ 2400–2417.**

---

**Final Request for Consolidated Response by April 11, 2025**

Please consolidate responses to the above outstanding questions into a written reply. This is essential for compliance tracking, legal risk mitigation, and ensuring transparency and parity in HI is dependent on receiving this information in a form that meets legal standards under California and federal law.

Thank you for your attention to this important matter. I remain committed to cooperative, good-faith resolution and to supporting a workplace that respects physician governance, patient care i

Sincerely,
Dr. Kanwar P. Gill
Senior Physician – Fresno County Adult Detention Facility
Email: kpsgill@kpsgill.com
Sent from personal email for documentation and independence

Wellpath team member handbook updated March 2025 is attached to this email.

Best Regards,

**Kanwar Gill MD**

**Wellpath**

Fresno County Adult Detention Facility

1225 M Street, Fresno, CA 93721

Office: (559) 600-9365

Email: KaGill@wellpath.us

IMPORTANT CONFIDENTIALITY NOTICE:

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclo

**From:** Kanwar Gill
**Sent:** Monday, March 31, 2025 9:28 AM
**To:** 'Steven Massie' <SMassie@Wellpath.us>; Jacob Lieder <JLieder@Wellpath.us>
**Cc:** Deanna Huff <Deanna.Huff@Wellpath.us>; Linda Matlock <LMatlock@Wellpath.us>
**Subject:** Request for Detailed Clarification on Handbook Sections, Grievance Procedures, and Whistleblower Protections

Subject: Request for Detailed Clarification on Handbook Sections, Grievance Procedures, and Whistleblower Protections

Dear Jacob,

I hope you are doing well. I am writing to request clarification on several points from the *Wellpath Team Member Handbook (Effective March 2025)*, and how its provisions apply to employees in Ca dealing with complaint procedures, open-door policies, disciplinary actions, at-will employment status, whistleblower protections, and timekeeping—I would appreciate more clarity on how the questions and concerns in detail, referencing Handbook sections where relevant.

## 1. Understanding the Internal Grievance Process

(Referencing Sections: "1.5 Complaint Procedure," "2.9 Open Door Policy," and "5.9 Team Member Conduct and Discipline")

### Steps for Filing an Internal Complaint

- The Handbook (Section 1.5, *Complaint Procedure*) indicates I can report workplace issues or suspected policy violations to my immediate Supervisor, HR, or through a hotline. Would yo complaint is formally documented and properly investigated?
- How are complaints tracked, and who is responsible for final resolution? For example, if a complaint initially goes to my supervisor but is not resolved, do I then go to HR, or directly to specific timelines mentioned.
- Are there target timelines for each stage of the complaint process—e.g., time to acknowledge receipt, time for final determination, and any appeals procedure? Section 2.9 (*Open Door*

### Exhaustion of Internal Remedies

- If a grievance involves alleged legal or regulatory violations—for instance, potential violations of patient-care standards—am I required to exhaust Wellpath's internal channels (Supervi federal/state authorities?
- Section 1.6 (*Retaliation Prohibited*) affirms no retaliation, but does not detail whether an employee can bypass internal steps if a violation appears urgent, significant, or might endanger allowed to contact external authorities directly (e.g., California's Department of Labor Standards Enforcement or Department of Public Health) in those circumstances?

## 2. Whistleblower Protections and Non-Retaliation Assurance

(Referencing Sections: "1.2 Harassment, Discrimination, and Retaliation Prevention," "1.6 Retaliation Prohibited," plus California-specific addenda)

### Policy on Non-Retaliation

- The Handbook addresses a broad anti-retaliation policy (Section 1.6), but for California employees, how does Wellpath ensure compliance with state whistleblower laws like *Labor Code* additional protective steps exist?
- Which internal policies specifically safeguard those who bring forward issues like potential misuse of funds or illegal activity (as opposed to harassment/discrimination)? And if a reporte
- What resources or references are available if I suspect retaliation? For instance, does Wellpath offer a contact person or department dedicated to overseeing whistleblower claims, beyo

### Anonymous Reporting Options

- The Handbook points to both an Employee Relations and Compliance Hotline, but does not deeply detail the confidentiality or anonymity procedures. For extremely time-sensitive or hi channel—such as a compliance officer with advanced authority to isolate sensitive issues?

## 3. Handling of Grievances by Supervisors and HR

(Referencing Sections: "2.9 Open Door Policy," "5.9 Team Member Conduct and Discipline," "1.5 Complaint Procedure")

### Supervisor Involvement

- Section 2.9 (*Open Door Policy*) suggests supervisors are a main contact, but how do employees bypass a supervisor if the complaint involves that supervisor? Are there special forms or

### HR's Role and Oversight

- Section 1.5 mentions that upon receipt of a complaint, Wellpath investigates promptly. Could you outline how HR coordinates or leads an investigation, particularly if it escalates beyond
- In cases where local management might have a conflict of interest, how is the investigation handled to ensure impartiality (e.g., by a separate regional HR partner or by corporate HR s

## 4. Timekeeping for Salaried Professionals Working Remotely

(Referencing Sections: "2.8 Telework (Alternative Work Solutions)," "3.7 Overtime," "3.2 Additional Compensation (Ad Comp)," and "2.4 Hours of Work")

### Tracking Hours for Physicians and Other Exempt Team Members

- The Handbook states that exempt employees do not track hours for overtime but occasionally must clock in and out for contract compliance or safety reasons (Sections 2.4 and 3.7). If tasks (e.g., writing orders, reviewing labs), should those hours be logged in any official system?
- Under *Additional Compensation* (Section 3.2), exempt employees may sometimes receive "Ad Comp" for additional duties (like covering someone else's shift). Do remote after-hours cor what is the correct procedure to request or document these additional hours or calls?

**Overtime vs. Additional Compensation**

- Section 3.2 references that some roles "may be eligible for additional compensation," but no specific method is detailed for remote or multi-site coverage. For instance, if a salaried phy reviews at home, does that time remain uncompensated (as typical for exempt employees), or is it "Ad Comp"-eligible?
- Could you please outline the correct procedure for requesting, tracking, and obtaining "Ad Comp" in such situations?

## 5. Confirming California-Specific Provisions

(Referencing the mention of "State Supplements," "Meal and Rest Breaks" in Section 3.11, and "Exempt Classifications" in the Addenda)

**Compliance with CA Labor Laws**

- If I suspect a wage-and-hour violation or other California Labor Code noncompliance, do I first need to report it internally per the "Complaint Procedure" in Section 1.5, or can I contact
- Does Wellpath offer specialized training or literature about California whistleblower laws (e.g., *Labor Code § 1102.5*) so that employees know how to identify and report issues? Possibly

**At-Will Employment**

- Sections throughout the Handbook reiterate an at-will employment status. However, under *California law*, at-will status does not override statutory protections from retaliation. Could yo in whistleblowing does not jeopardize my at-will employment?
- In other words, can you confirm that an employee who files a complaint or cooperates in an investigation is fully protected from termination or adverse action solely for that reason?

## 6. Request for Detailed Written Clarification

To ensure I fully understand these policies, especially concerning internal grievance steps and whistleblower protections, I respectfully request a **written response** outlining the following:

1. Step-by-step internal complaint or grievance procedures, including approximate timelines and any appeals mechanism.
2. Whistleblower protections (especially for California-based employees) that go beyond the general statements in Sections 1.2 and 1.6—how they are invoked and enforced.
3. Timekeeping guidance for hours worked offsite by salaried professionals (particularly for after-hours duties or shifts beyond normal assignments).
4. Any state-specific addenda that might contain additional obligations or rights related to grievances, retaliation prevention, or timekeeping for remote/after-hours work.

By obtaining clarity on these points—both for myself and colleagues in similar positions—I hope to uphold a transparent, compliant, and supportive workplace. If any of my interpretations abo or resources.

Thank you very much for your assistance, and I look forward to your response

Best Regards,

Kanwar Gill MD

Wellpath

Fresno County Adult Detention Facility

1225 M Street, Fresno, CA 93721

Office: (559) 600-9365

Email: KaGill@wellpath.us

IMPORTANT CONFIDENTIALITY NOTICE:

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclo:

---

**From:** Steven Massie <SMassie@Wellpath.us>
**Sent:** Monday, March 31, 2025 8:58 AM
**To:** Kanwar Gill <KaGill@Wellpath.us>
**Subject:** RE: ATTESTATION NEEDED:

Yes, if you close the email and reopen you will be able to attest.  Let me know if you have any issues.

STEVEN MASSIE

Sr. Director of Human Resources

3340 Perimeter Hill Dr., Nashville, TN 37211
PH 615-324-5761// MAIN OFFICE 615-324-5750

EMAIL smassie@wellpath.us

WellpathCare.com

---

**From:** Kanwar Gill <KaGill@Wellpath.us>
**Sent:** Monday, March 31, 2025 10:57 AM
**To:** Steven Massie <SMassie@Wellpath.us>
**Subject:** RE: ATTESTATION NEEDED:

Thanks

Am I still able to attest on-spring?

Best Regards,

Kanwar Gill MD

Wellpath

Fresno County Adult Detention Facility

1225 M Street, Fresno, CA 93721

Office: (559) 600-9365

Email: KaGill@wellpath.us

IMPORTANT CONFIDENTIALITY NOTICE:

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclo

---

**From:** Steven Massie <SMassie@Wellpath.us>
**Sent:** Monday, March 31, 2025 6:40 AM
**To:** Kanwar Gill <KaGill@Wellpath.us>
**Subject:** RE: ATTESTATION NEEDED:

Good morning, Dr. Gill.

Please see attached handbook link.  Let me know if you have any questions.

https://www.wellpath.us/policycenter/Documents/Policies/Wellpath%20Team%20Member%20Handbook%20(39169).pdf

**STEVEN MASSIE**

Sr. Director of Human Resources

3340 Perimeter Hill Dr., Nashville, TN 37211
PH 615-324-5761// MAIN OFFICE 615-324-5750

EMAIL smassie@wellpath.us

WellpathCare.com

**From:** Kanwar Gill <KaGill@Wellpath.us>
**Sent:** Saturday, March 29, 2025 7:34 PM
**To:** Steven Massie <SMassie@Wellpath.us>
**Subject:** Fw: ATTESTATION NEEDED:

I couldn't find the link to review handbook?

Can you please send me PDF?

| Title | Attestee |
|---|---|
| Team Member Handbook | Kanwar Gill |

**Attachment**

Name

No files have been attached

*I acknowledge receipt of the attached document, and I understand that it is my responsibility to read and comply with the content contained therein along with any subsequent revisions made to it.*

Comments

*If you have any questions or comments regarding this attachment, please list them below.*

Comments

Best Regards,

Kanwar Gill MD

**From:** Onspring Notifications <noreply@onspring.tech>
**Sent:** Friday, March 28, 2025 9:30 PM
**To:** Kanwar Gill
**Subject:** [EXT] ATTESTATION NEEDED:

CAUTION: This Email is from an EXTERNAL source. Do not click links or open attachments unless you recognize the sender and know the content is safe. Report

To hope and healing

Dear Kanwar Gill,

You have been assigned a new attestation that is due on 04/30/25. Review the attached document and complete your attestation below.

Complete Your Attestation Here

Thank you.

If you have any questions or concerns please submit an Onspring Help Request ticket or email onspring@wellpath.us

**Wellpath Team Member Handbook (39169) (1).pdf**
704K

**KPSGILL.COM**

Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

## RE: Clarification on HR Oversight, HR scope and Direction for Non-Bankruptcy Matters
1 message

---

**Dheeraj Taranath** <DTaranath@wellpath.us>
To: Kanwar Gill <KaGill@wellpath.us>, Kanwar Gill MD <kpsgill@kpsgill.com>   Wed, Apr 9, 2025 at 12:43 PM
Cc: Grady J Bazzel <JBazzel@zenovacare.com>, "Richard M. Medrano" <RMedrano@wellpath.us>, Scott Kennedy
<ScottKennedy@wellpath.us>

---

Dr. Gill,


As you are aware, Wellpath is the Management Services Organization contracted to provide the full range of administrative services to CFMG. As such, I am responding to your email below.


I am not going to debate whether any offers to resolve your deferred compensation plan claims were made. You have confirmed that you rejected anything that even resembled an offer. We are in agreement that no offers are on the table.


I disagree with your assertion that there has been any rejection of a "legally compliant resolution process," whatever that might mean. If you want to engage in a legal discussion, please engage counsel and have them contact our lawyers. Your allegations relating to CFMG's obligations under the California Medical Practice Act are both unsupported and baseless, and simply have no merit.


Your various allegations will be addressed by the appropriate parties. I understand you have already been in contact with Ms. Angie Baldwin regarding the HR-related issues.


With respect to the laundry list of questions and issues in your email, you can direct them to the investigator(s) when they contact you. I encourage you to engage counsel as you are making serious allegations that we believe are legally inaccurate and the defamatory statements you are making may be actionable.


I ask that you stop sending repetitious emails stating your complaints and unsupported allegations. It is not a productive use of either your time or mine.


Respectfully,



**Dheeraj Taranath, DO, MBA, MS**

Chief Medical Officer

---



3340 Perimeter Hill Dr., Nashville, TN 37211

**M** <u>304-376-4036</u>

LinkedIn // Facebook // Twitter

WellpathCare.com

---

**From:** Kanwar Gill <KaGill@Wellpath.us>
**Sent:** Tuesday, April 8, 2025 6:53 PM
**To:** Dheeraj Taranath <DTaranath@Wellpath.us>; Kanwar Gill MD <kpsgill@kpsgill.com>; Kerrie.Webb@mbc.ca.gov
**Cc:** Grady J Bazzel <JBazzel@Zenovacare.com>; Richard M. Medrano <RMedrano@Wellpath.us>; Scott Kennedy <ScottKennedy@Wellpath.us>; Angie Baldwin <ARBaldwin@Wellpath.us>
**Subject:** Clarification on HR Oversight, HR scope and Direction for Non-Bankruptcy Matters
**Importance:** High

**Subject:** Clarification on Oversight, HR Scope, and Direction for Non-Bankruptcy Issues
**To:** Dr. Dheeraj Taranath
**CC:** Ms. Angie Baldwin, Dr. Grady Bazzel
**From:** Dr. Kanwar Gill
**Date:** April 8, 2025

In Complaint/Matter Before Medical Board of California regarding:

• Dr. Grady Judson Bazzel – California P&S License No. C 53908, Chief Executive Officer, CFMG

• Dr. Richard M. Medrano – California P&S License No. A 103477, Secretary, CFMG

• Dr. Scott Herbert Kennedy – California P&S License No. C 171808, Chief Financial Officer, CFMG

Dear Dr. Taranath,

Thank you for your message. I acknowledge your update confirming that Wellpath, in its role as Management Services Organization for CFMG, has communicated with CFMG leadership regarding the matters I raised. I also understand that, based on your joint assessment with CFMG leadership, the previously scheduled April 11 in-person meeting has now been unilaterally canceled by CFMG. Additionally, you've stated that any prior communications that could be construed as settlement offers are withdrawn and that the bankruptcy proceedings will now solely govern my deferred compensation claim, with further communication directed to McDermott Will & Emery.

For the record, I must clarify that at no point have I discussed or negotiated any dollar amount related to my deferred compensation claim with you personally. I categorically reject any suggestion that I was ever extended a legitimate or authorized offer through you. The only communications that resembled "offers" came from bankruptcy counsel at McDermott Will & Emery around March 20, 2025. Those proposals were unequivocally rejected by me at the time, as they were coercive in nature, conditioned on the withdrawal of legal filings, and accompanied by inappropriate non-disclosure requirements. They were not offered in good faith and were inconsistent with both bankruptcy ethics and California regulatory obligations.

More importantly, CFMG's unilateral cancellation of the April 11 meeting—an opportunity I explicitly requested for the presence of a California-licensed physician-officer with authority to resolve the matter internally—must be viewed as a willful rejection of a legally compliant resolution process. This decision eliminates CFMG's remaining opportunity to resolve my claims in accordance with California law, and it reinforces the concern that the organization is continuing in willful defiance of its legal obligations under the California Medical Practice Act.

As I have stated previously, I may ultimately lose my motions before the U.S. Bankruptcy Court in the Southern District of Texas. However, such an outcome does not absolve any party of its obligations under California law, nor does it preclude regulatory or civil enforcement at the state level. A loss in bankruptcy court does not equate to legal validation of the practices I have challenged—it simply reflects the narrow jurisdiction and procedural limits of that venue.

In light of these developments, I request immediate clarification on the following two key areas:

**1. Direction for Non-Bankruptcy Matters:**

While I understand that my deferred compensation claim is now being handled through the bankruptcy process, I ask for a clear directive as to how Wellpath and CFMG intend to address the other issues I have raised—specifically:

- Employment-related grievances
- Allegations of racial discrimination
- Constructive termination efforts
- Interference in clinical workflows
- Misappropriation of medical decision-making authority

Please advise whether these issues are still under the purview of Wellpath HR or CFMG physician leadership, or bankruptcy counsel. I request written clarification on the appropriate channels moving forward for each category of concern.

**2. Scope and Oversight of the HR Investigation:**

I understand Ms. Baldwin is currently reviewing relevant HR and employee relations matters. However, many of the issues raised fall outside a traditional HR framework and directly implicate:

- Violations of the California Medical Practice Act
- Fee-splitting concerns under Cal. Bus. & Prof. Code § 650
- Improper clinical interference by nonphysician administrators
- Racial bias and discriminatory promotion practices
- Retaliatory conduct targeting a whistleblower

As an employee of CFMG, a physician-owned and physician-controlled California medical corporation, any HR review touching on clinical governance, compensation, or disciplinary action must include oversight by a California-licensed physician-officer. Please confirm whether such oversight will be provided, and whether HR findings involving clinical decision-making will be subject to co-review and formal ratification by a CFMG shareholder physician.

**For the record, I reaffirm the following points:**

- I have maintained an unblemished clinical record over the past 5.5 years, consistently improving outcomes and reducing costs.
- I have formally reported wage misclassification, improper deferred compensation handling, and administrative interference to multiple regulatory bodies.
- I have filed a pending complaint with the Medical Board of California regarding failures by three CFMG shareholder physicians to protect physician autonomy.
- I had called for an April 11 internal resolution meeting, which was a final opportunity to address these matters lawfully. That meeting has now been unilaterally canceled by CFMG.

**Outstanding Clarification Requests:**

I respectfully request your timely response to the following:

- Will Ms. Baldwin's HR review include the racial discrimination, retaliation, and clinical interference allegations I have outlined?
- Will CFMG assign a California-licensed physician-officer with decision-making authority to co-lead or oversee HR matters affecting licensed medical practice?
- What internal pathway remains for resolution of non-bankruptcy issues, including clinical interference and professional governance?
- Do you require any further documentation from me at this stage?
- Will the delayed APAP procurement for patient #0059555—an incident emblematic of improper administrative obstruction—be incorporated into the ongoing review?

Thank you again for your attention. I remain committed to pursuing a lawful and good faith resolution wherever possible and look forward to receiving your response and clarification on next steps.

Respectfully,
**Dr. Kanwar Gill**
Senior Physician, Fresno County Adult Detention Facility
1225 M Street, Fresno, CA 93721
Office: (559) 600-9365 | Email: KaGill@wellpath.us

IMPORTANT CONFIDENTIALITY NOTICE:

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

---

**From:** Dheeraj Taranath <DTaranath@Wellpath.us>
**Sent:** Tuesday, April 8, 2025 2:54 PM
**To:** Kanwar Gill MD <kpsgill@kpsgill.com>; Kanwar Gill <KaGill@Wellpath.us>
**Cc:** Grady J Bazzel <JBazzel@Zenovacare.com>; Richard M. Medrano <RMedrano@Wellpath.us>; Scott Kennedy <ScottKennedy@Wellpath.us>
**Subject:** Resolution response

Dr. Gill,

As you are aware, Wellpath is the Management Services Organization contracted to provide the full range of administrative services to CFMG. As such, we have reviewed the matters you have raised with CFMG leadership, and we continue to communicate with you with their knowledge and approval.

As previously noted, Cindy and I were planning to come out to California to meet with you in a good faith attempt to resolve the disagreement regarding your claim for deferred compensation. In light of the numerous false statements in your correspondence, we have recommended to CFMG leadership, and they have agreed that a meeting would not be productive; therefore, please be advised that the meeting is now canceled. To the extent that any prior correspondence could be interpreted as an offer to resolve your claim, any such offer is withdrawn.

The bankruptcy proceedings will determine the results of your claim. Our counsel has advised us that your arguments are legally invalid and they believe they will be summarily rejected by the court. Please direct all future correspondence regarding the matter to the court or to our lawyers with McDermott, Will & Emery; you may contact David Genender (dgenender@mwe.com).

Regards,

**Dheeraj Taranath, DO, MBA, MS**

Chief Medical Officer



To hope and healing.

3340 Perimeter Hill Dr., Nashville, TN 37211

**M** 304-376-4036

LinkedIn // Facebook // Twitter

WellpathCare.com

# Retaliation Chronology – Dr. Kanwar Partap Singh Gill

Covering March 4, 2025 to April 14, 2025
In Re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.)

## Chronology of Retaliatory Events

### March 4, 2025 (Tuesday)

Event: Initial outreach to Wellpath counsel (McDermott Will & Emery) seeking informal resolution of CPOM, wage misclassification, and governance violations. 10-day deadline given for response.

Notes: Relationship at workplace was previously stable and positive. No issues documented prior to this outreach.

### March 4–18, 2025

Event: Adverse scheduling and clinical interference begin. Subjected to schedule changes, altered patient assignments, scrutiny over timing/content of notes, and disciplinary-style discussions initiated by nursing and administration.

Notes: Registered Nurse Eric Krenz (DON), acting under influence of Linda Matlock (RDO), exhibits repeated insubordination. Clinical authority undermined in ways not observed in prior 5 years of employment.

### Mid-March 2025

Event: Medical Director position awarded to a less-experienced individual despite Dr. Gill's 5+ year tenure.

Notes: Pattern of preference toward non-minority, white American candidates suspected. Racial and national origin-based disparity noted.

### March 17, 2025

Event: Overheard conversation between RN Cindy Ramirez and another staff member suggesting imminent termination: 'They are getting rid of him.'

Notes: This followed increasing scrutiny and perceived marginalization.

### March 18, 2025

Event: Filed Motion for Relief from Stay (Dkt. 1897). Refused to sign NDA presented by Wellpath as condition for deferred compensation.

Notes: Temporary de-escalation observed post-filing. However, retaliatory actions resumed shortly after.

### Late March 2025

Event: Leadership meeting schedule altered without consultation. Dr. Gill sidelined in meetings he was expected to lead.

Notes: Director of Nursing began controlling clinical discussion. Dr. Gill repositioned as passive observer.

### Early April 2025

Event: Required to report to 7 AM huddle despite 9 AM clinical start time.

Notes: This deviation from schedule appeared punitive and logistically unnecessary.

### Ongoing through April 14, 2025

Event: Continued exclusion from CFMG shareholder leadership. No engagement from higher CFMG leadership. Clinical governance controlled by non-California licensed personnel, notably Dr. Dheeraj Taranath.

Notes: Demonstrates consolidation of MSO authority over physician employment.

↩ Reply | ∨     🗑 Delete   Junk | ∨   •••                                    ✕

## RE: Conversation



Angie Baldwin <ARBaldwin@Wellpath.us>            ↩ Reply | ∨
Tue 4/8/2025 7:48 AM
To:  Kanwar Gill  ⌃

Inbox

You replied on 4/8/2025 10:06 AM.

Dr. Gill, I am back from PTO and wanted to touch base with you.  After reflection, I would like to strongly urge that we speak this week.  In order to conduct an expedient and thorough investigation into your concerns, and to make sure concerns are addressed as soon as possible, it would be helpful if we could speak sooner than next week.

This first conversation will primarily be a time for you to tell me what you are experiencing so I know how to proceed with the investigation.  Thank you for your consideration.

**ANGIE BALDWIN, PHR, SPHR**
Sr. Employee Relations Manager



3340 Perimeter Hill Dr., Nashville, TN 37211
PH 615-312-7272// CELL 615-636-7045

WellpathCare.com

---

**From:** Kanwar Gill <KaGill@Wellpath.us>
**Sent:** Thursday, April 3, 2025 4:15 PM
**To:** Angie Baldwin <ARBaldwin@Wellpath.us>
**Subject:** RE: Conversation

Thank you for your message. I've received it and appreciate your flexibility. I'll be able to confirm a specific time as we get closer to the date.

Best Regards,
Kanwar Gill MD

Wellpath

Fresno County Adult Detention Facility



Email: KaGill@wellpath.us

IMPORTANT CONFIDENTIALITY NOTICE:

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

---

**From:** Angie Baldwin <ARBaldwin@Wellpath.us>
**Sent:** Thursday, April 3, 2025 2:11 PM
**To:** Kanwar Gill <KaGill@Wellpath.us>
**Subject:** RE: Conversation

Thank you for your prompt response. If it works for you, 11:00 a.m. on April 15th works well for me.  If you need to get in touch with me sooner, my cell phone is listed below and I check my Wellpath email frequently.  Thanks again.

## ANGIE BALDWIN, PHR, SPHR

Sr. Employee Relations Manager



3340 Perimeter Hill Dr., Nashville, TN 37211
**PH 615-312-7272// CELL 615-636-7045**

**WellpathCare.com**

---

**From:** Kanwar Gill <KaGill@Wellpath.us>
**Sent:** Thursday, April 3, 2025 3:50 PM
**To:** Angie Baldwin <ARBaldwin@Wellpath.us>
**Subject:** RE: Conversation

Dear Ms. Baldwin,
Thank you for your message and for reaching out. I appreciate your willingness to connect regarding the concerns I've raised.
At this time, I will need some additional time to gather relevant documents and prepare a list of points for our discussion. I'd prefer to schedule a time to speak after April 15, if that works for you. I believe that will allow for a more productive and thorough conversation.
At present, there is no clearly urgent matter that requires immediate attention. I feel safe in my current work environment, and I'm comfortable allowing this process to move forward at a thoughtful and measured pace. Of course, should anything arise that requires more immediate discussion before April 15, I will let you know. Otherwise, I look forward to speaking with you after the 15th to address my concerns, engage in meaningful dialogue, and explore any necessary resolutions. Please let me know if that timeline is workable for you.

Best Regards,

↩   🗑

**wellpath**

**Fresno County Adult Detention Facility**
1225 M Street, Fresno, CA 93721
Office: (559) 600-9365
Email: KaGill@wellpath.us

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

---

**From:** Angie Baldwin <ARBaldwin@Wellpath.us>
**Sent:** Thursday, April 3, 2025 1:22 PM
**To:** Kanwar Gill <KaGill@Wellpath.us>
**Subject:** Conversation

Dr. Gill, good afternoon.  My name is Angie Baldwin and I'm the Sr. Employee Relations Manager on the employee relations team out of the home office.  I understand that you have expressed some concerns regarding your employment and work interactions.  I have been asked to reach out to you to investigate the HR-related concerns and would appreciate scheduling some time for us to speak.

I will be on PTO tomorrow, Friday 4/4, and Monday, 4/7.  So I was hoping we could speak on Tuesday or Wednesday at your convenience.  In the meantime, I am reviewing the information you have already provided to Dr. Taranath.  But if there are any other documents, emails, texts or other information that you feel would be helpful to review prior to our conversation, please send it to my Wellpath email.

Thank you in advance for your cooperation, and please let me know your preference for a time to speak next week.

**ANGIE BALDWIN, PHR, SPHR**
Sr. Employee Relations Manager



3340 Perimeter Hill Dr., Nashville, TN 37211
**PH 615-312-7272// CELL 615-636-7045**

**WellpathCare.com**

**EXHIBIT 2 – Internal CPOM Violation Evidence**

Filed in Support of Dkts. 1897, 2049, 2075

Declarant: Dr. Kanwar Partap Singh Gill

Case: In re Wellpath Holdings, Inc., Case No. 24-90533 (S.D. Tex.)

**Declaration Cross-Reference**

Referenced in Sections: III, IV, VIII

Cited in Paragraphs: ¶¶ 40–53, 60–61, 125–127, 151–152

**Description of Contents**

This exhibit provides internal communications and administrative directives evidencing Wellpath's lay control over CFMG's physician employment and clinical governance.

Included Documents:

- - Directives by Deanna Huff, Eric Krenz, and Angie Baldwin
- - Non-physician HR memos influencing scheduling and compensation
- - Documentation excluding physician-shareholder oversight

**Legal Basis and Relevance**

Statutes, regulations, and ethical rules implicated:

- - Cal. Bus. & Prof. Code §§ 2400–2417
- - Cal. Bus. & Prof. Code § 2052 and § 2264
- - Cal. Corp. Code § 13400

**Authentication Status**

Authenticated under Rule 901(b)(4) through contemporaneous internal emails, preserved in secured email archives between January and April 2025.

**Evidentiary Purpose**

Supports CPOM violations, licensing breach analysis, and structural plan illegality.

**KPSGILL.COM**                                    Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

## Fwd: Concerning Evidence of Deferred Compensation Neglect & Executive Compensation Prioritization – April 3 Filing (Docket 2081)
1 message

---

**Kanwar Gill MD** <kpsgill@kpsgill.com>                              Sat, Apr 5, 2025 at 1:18 PM
To: Richard Medrano <RMedrano@wellpath.us>, Scott Kennedy <ScottKennedy@wellpath.us>, Marc Goldstone <MGoldstone@wellpath.us>, Bradley Giordano <Bgiordano@mwe.com>, Steven Szanzer <sszanzer@mwe.com>, Felicia Perlman <Fperlman@mwe.com>, J Bazzel <jbazzel@wellpath.us>
Cc: "webmaster@mbc.ca.gov" <webmaster@mbc.ca.gov>

- Regarding:
- Dr. Grady Judson Bazzel – License Number: C 53908
  Chief Executive Officer, CFMG
- Dr. Richard M. Medrano – License Number: A 103477
  Secretary, CFMG
- Dr. Scott Herbert Kennedy – License Number: C 171808
  Chief Financial Officer, CFMG

I request medical board of California Central complaint unit file this with existing complaint file and consider this message for vertical enforcement by attorney general 's office. I understand the burden of proof is now preponderance of evidence, and it is my belief that burden has been met. I request Medical Board to expedite this investigation and revoke the licenses of all the physicians as there is imminent danger to the people of California if they continue to practice medicine in the state of California. Please take this issue on an emergent basis And please have these vertically general's , Office issue Cease practice order. All these three individual physician are interfering with delivery of care and their continuous interference at this time is causing significant permanent injury to the people of California especially the incarcerated individuals.

Forwarded message attached.

Best Regards,
Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

Begin forwarded message:

> **From:** Kanwar Gill MD <kpsgill@kpsgill.com>
> **Date:** April 5, 2025 at 12:38:58 PM PDT
> **To:** Dheeraj Taranath <DTaranath@wellpath.us>, J Bazzel <jbazzel@wellpath.us>, "Kerrie@MBC Webb" <Kerrie.Webb@mbc.ca.gov>, Steven Szanzer <sszanzer@mwe.com>, Marcus Helt <Mhelt@mwe.com>, Felicia Perlman <Fperlman@mwe.com>, Bradley Giordano <Bgiordano@mwe.com>
> **Cc:** "Kerrie@MBC Webb" <Kerrie.Webb@mbc.ca.gov>
> **Subject: Concerning Evidence of Deferred Compensation Neglect & Executive Compensation Prioritization – April 3 Filing (Docket 2081)**

---

Subject: Concerning Evidence of Deferred Compensation Neglect &
Executive Compensation Prioritization – April 3 Filing (Docket 2081)

Email Copied to Medical Board -

- Kerrie Dargine Webb, Staff Counsel
  Medical Board of California, 2005 Evergreen St Ste 1200, Sacramento, CA 95815-5401
  Phone: 916-263-2389 | Fax: 916-263-2387

- •
  - Regarding:
  - Dr. Grady Judson Bazzel – License Number: C 53908
    Chief Executive Officer, CFMG
  - Dr. Richard M. Medrano – License Number: A 103477
    Secretary, CFMG
  - Dr. Scott Herbert Kennedy – License Number: C 171808
    Chief Financial Officer, CFMG

Dear California Licensed Medical Doctors:

I hope this message finds you well. I am reaching out today to share a very
recent and significant development in the bankruptcy case of Wellpath
Holdings, Inc. (TXSB 24-90533) that directly impacts physicians, including
those who rendered services under CFMG agreements.

On April 3, 2025, McDermott Will & Emery LLP—counsel to Wellpath—
filed their Third Monthly Fee Statement (Docket 2081 - attached). Upon
close analysis of the time entries disclosed, I want to bring to your attention
what appears to be a coordinated, internal legal effort to address executive
compensation (KERP/KEIP) while failing to resolve, disclose, or account for
unpaid deferred compensation owed to physicians, including California-
licensed doctors working through CFMG contracts.

Key Findings from Docket 2081:

1. Acknowledged Deferred Compensation Exposure – But No Resolution

On February 6, 2025, attorney Carmen Dingman billed time to:

"Review, analyze deferred compensation issues (.6); correspond with Company, FTI team re same (.3); review wages motion re same (.4)" [See Docket 2081, p. 74].

This shows that deferred compensation was being actively reviewed at high levels, but there is no indication in the Disclosure Statement (Docket 1770) or the Plan that this issue was addressed in terms of legal obligations or protections for physicians.

2. Misplaced Priorities: Executive Bonuses vs. Physician Compensation

The same docket reflects significant hours spent by senior restructuring counsel (Szanzer, Giordano, Perlman, etc.) designing and defending executive compensation packages (KEIP/KERP) through detailed analysis, drafting declarations, and negotiating retention terms. Meanwhile, deferred compensation owed to physicians remained unremedied.

3. Wellpath Unilaterally Controlling CFMG Physician Compensation

Based on docketed internal discussions and filings, it is clear that Wellpath attorneys—not CFMG—have assumed authority over compensation structures originating from CFMG-contracted physicians. Yet the plan of reorganization (Docket 1770) fails to distinguish CFMG-specific liabilities or obligations to California-licensed physicians from those of other corporate affiliates, effectively consolidating responsibility while eliminating traceability or direct accountability.

This unilateral treatment raises serious concerns under California's corporate practice of medicine laws and creates exposure for CFMG in allowing a third party (Wellpath) to manage and restructure financial liabilities tied to professional services rendered by California-licensed physicians.

4. Non-Disclosure in the Plan and Disclosure Statement

Despite internal acknowledgment of these issues, the Fourth Amended Disclosure Statement and Plan omit any mention of:

• Deferred compensation liabilities,

• The legal basis for releasing non-debtor entities,

• Regulatory risks under California CPOM doctrine.

Why This Matters Ahead of April 14

This April 3 filing is critical because it reflects what is happening behind the scenes—a deliberate legal strategy that deprioritizes deferred physician earnings while fully protecting insiders and executives. This occurs without clear direction or opt-in consent from CFMG, despite the direct impact on your contracted medical workforce.

As we prepare for our in-person meeting on April 14, I urge both of you to review this docket carefully. It evidences a systemic failure to equitably and transparently resolve compensation obligations to physicians, many of whom have been frontline caregivers in county and correctional systems under CFMG contracts.

Please let me know if you would like me to forward the full docket entry or compile specific highlighted time records in advance of our meeting. I would welcome the opportunity to discuss this further and work toward a legally compliant and ethically grounded resolution.

Best Regards,

Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

---

TXSB 24-90533 2081 - Statement  Third Monthly Fee Statement of McDermott Will &.pdf
2655K

**KPSGILL.COM**                                    Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

## Subject: Urgent Legal Notice – CFMG Leadership's Role in Wellpath's Unlawful Business Practices

1 message

---

**Kanwar Gill** <KaGill@wellpath.us>                              Sun, Mar 30, 2025 at 12:41 PM
To: Grady J Bazzel <JBazzel@zenovacare.com>, Scott Kennedy <ScottKennedy@wellpath.us>, "Richard M. Medrano" <RMedrano@wellpath.us>, Richard Maenza <RMaenza@zenovacare.com>
Cc: "Marc D. Goldstone" <MGoldstone@wellpath.us>, Ben Slocum <BSlocum@wellpath.us>, Dheeraj Taranath <DTaranath@wellpath.us>, "Kerrie.Webb@mbc.ca.gov" <Kerrie.Webb@mbc.ca.gov>

Subject: Urgent Legal Notice – CFMG Leadership's Role in Wellpath's Unlawful Business Practices

- To:
  Dr. Grady Judson Bazzel – License Number: C 53908
  Chief Executive Officer, CFMG
- Dr. Richard M. Medrano – License Number: A 103477
  Secretary, CFMG
- Dr. Scott Herbert Kennedy – License Number: C 171808
  Chief Financial Officer, CFMG
- Copy Sent To: Kerrie Dargine Webb, Staff Counsel

Medical Board of California, 2005 Evergreen St Ste 1200, Sacramento, CA 95815-5401

Phone: 916-263-2389  |  Fax: 916-263-2387

CC:
• Legal Counsel for Wellpath Holdings, Inc.
• Legal Counsel for California Forensic Medical Group (CFMG)
• Wellpath Senior Leadership, including Chief Medical Officer, General Counsel, and CEO

Dear Doctors,

I am writing to formally place you on notice regarding your direct involvement in financial and operational practices that violate California law, including the Corporate Practice of Medicine (CPOM) doctrine, unlawful fee-splitting, improper diversion of public contract funds, and other regulatory breaches. This email serves as an official record of the ongoing concerns related to CFMG's role as a shell corporation funneling medical revenue into the Wellpath system in violation of California Business and Professions Code §§ 2400 and 650, as well as other state and federal laws.

In addition, please take notice that I personally know several individuals who were part of the decision-making process leading up to the original contract's approval in 2018. I have known them since 2016 and have supported them in their efforts to engage and serve in public service and good-governance practices. Given my longstanding professional relationships with these Fresno County officials and supervisors, I can confirm their direct awareness of

---

how this contract was negotiated and the roles that various CFMG and Wellpath representatives played at the time.

## 1. Formal Notice & Legal Filings

This correspondence follows the formal notice previously sent to all parties, including Wellpath's bankruptcy counsel, CFMG's legal representatives, and relevant regulatory authorities. Copies of the motions filed in the United States Bankruptcy Court, Southern District of Texas – Case No. 24-90533 have been formally served through proper legal channels. However, due to anticipated delays related to service through CFMG's registered agent, this letter ensures that you are personally and directly aware of these legal proceedings.

The motions include:

• Motion for Relief from Automatic Stay (Docket #1897)
• Emergency Motion to Stay Solicitation and Voting on Wellpath's Bankruptcy Plan

I will not be attaching the motions here. However, as senior leadership of CFMG, you are directed to contact Wellpath's bankruptcy counsel and CFMG's legal representatives, who have full copies of all filings, letters, and prior communications sent to Wellpath's Chief Medical Officer, General Counsel, and CEO.

## 1. Clear Violation of California Law and Breach of Fiduciary Duty

You are now formally on notice that CFMG, under your direct oversight, has been operating as a conduit to transfer physician-generated revenue into the Wellpath corporate structure. This is a direct violation of California's Corporate Practice of Medicine doctrine, which prohibits non-physician corporate entities from exerting financial control over medical services. The fee-splitting arrangements, as structured under CFMG's Management Services Agreements (MSAs) with Wellpath, create an illegal financial arrangement that improperly benefits Wellpath at the expense of physicians.

### Legal Precedent & Consequences of Noncompliance
The California Supreme Court has long held that corporate entities cannot engage in the practice of medicine or control physician compensation. See Conway v. State Board of Medical Examiners (1941) 47 Cal.App.2d 105, 118, where the court held that non-physician entities exerting financial control over medical services violate public policy and state law. In Pacific Health Corp. (1938) 12 Cal.2d 156, it was further established that such arrangements are void and subject to regulatory enforcement.

Furthermore, under California Business and Professions Code § 650, any entity engaging in unlawful fee-splitting arrangements risks criminal liability, license revocation, and significant financial penalties. CFMG's contracts, including its substantial agreements with Fresno County Detention Facility and Juvenile Facility, are subject to immediate legal scrutiny and potential termination if violations are established.

## 1. Public Contract Risks & Federal Whistleblower Protections

I have not yet directly notified Fresno County officials regarding this matter. However, I reserve the right to do so at any time, particularly if I experience retaliation, wrongful termination, or constructive dismissal for raising these concerns. Several county supervisors have been aware of my role in our local community since August 2016, and I maintain direct professional relationships with them. Should retaliation occur, I will escalate matters to

Fresno County Supervisors, who hold the authority to terminate CFMG's contract for cause if there is substantiated evidence of fraud, misappropriation, or illegal activity.

Under California Government Code § 12653, any employer that retaliates against a whistleblower regarding a public entity contract is subject to civil liability, including damages and attorneys' fees. Additionally, the Federal False Claims Act (31 U.S.C. § 3730(h)) protects whistleblowers exposing fraudulent financial arrangements in government-funded programs.

Published Case Law on Whistleblower Protections
• Mendoza v. Western Medical Center (2014) 222 Cal.App.4th 1334 – Affirmed that retaliation against a physician for exposing financial misconduct constitutes wrongful termination in violation of public policy.
• United States ex rel. Green v. Northrop Corp. (9th Cir. 1995) 59 F.3d 953 – Established that retaliation under the False Claims Act carries severe legal and financial consequences for employers engaged in fraudulent billing practices.
• Campbell v. Regents of the Univ. of Cal. (2005) 35 Cal.4th 311 – Confirmed that California law shields whistleblowers who report financial and contractual violations in publicly funded entities.

## 1. Regulatory Oversight & Governmental Investigations

Copies of the legal filings and prior notices have been transmitted to numerous state and federal agencies, including:

• Medical Board of California
• California Attorney General's Office
• California Labor Commissioner
• Internal Revenue Service (IRS)
• U.S. Department of Labor
• Federal Trade Commission (FTC)
• Securities and Exchange Commission (SEC)
• California Department of Insurance (CDI)
• U.S. Department of Justice

## 1. Immediate Action Required & Legal Consequences of Inaction

If you continue to engage in, approve, or facilitate these unlawful financial arrangements, you risk:

• Revocation of your medical licenses
• Civil and criminal liability
• Personal liability for financial fraud
• Potential contract termination by Fresno County
• Federal enforcement actions by the IRS, SEC, and FTC

**Corrective Measures on an Emergent Basis**
In particular, any individuals on the Wellpath/CFMG payroll who lack a California physician license—or who are not part of a recognized California-registered Utilization Review organization—must refrain immediately from interfering with any aspect of clinical decision-making under California's Medical Practice Act. Under state law, and under CFMG's existing contractual obligations with Fresno County, licensed physicians must direct both the clinical and executive aspects of CFMG's operations that involve patient care.

1. **Contractual Obligations Under Agreement A-24-312 (Fresno County)**

From the newly adopted Agreement A-24-312 between Fresno County (the "County") and CFMG (the "Contractor"), executed after the County's Board of Supervisors authorized a successor contract to A-18-170, CFMG reaffirmed the following promises and obligations:

• **Effective Dates & Background**: On April 3, 2018, the County and CFMG entered into Agreement A-18-170. Subsequently, on November 8, 2022, the Board of Supervisors authorized staff to develop a new agreement, culminating in Agreement A-24-312, dated on or about June 18, 2024. CFMG thereby undertook comprehensive responsibility to deliver medical and behavioral health services at the Juvenile Justice Campus ("JJC") and other Fresno County detention facilities.
• **Scope of Services & Compliance**: CFMG must comply with Title 15 of the California Code of Regulations (CCR), California Welfare and Institutions Code §§ 5150 et seq., Title 22 and 9 of CCR, and other State and Federal regulations. CFMG must provide credentialed, licensed staff to ensure all medical services meet these standards.
• **Meetings & Quality Assurance**: CFMG agreed to maintain monthly administrative meetings with County officials, plus continuous quality improvement (CQI) committees, to ensure compliance and address any emerging needs.
• **Staffing & Credentialing**: The contract explicitly requires that CFMG maintain qualified personnel with current professional licenses and that any staff operating under CFMG's umbrella abide by security clearance protocols. The County reserves the right to veto or remove any noncompliant staff.
• **Breach & Termination Provisions**: The County has the authority to terminate the agreement for cause if CFMG fails to meet its contractual obligations, including compliance with state laws governing medical practice, record-keeping, and financial arrangements.

The signatories to Agreement A-24-312 include authorized representatives for the County of Fresno (including the Chief Probation Officer, the Department of Behavioral Health, and County Counsel) and authorized executives from CFMG. Your approval and execution of such contract, along with ongoing operational oversight, make you personally accountable for adhering to California law and fulfilling these contractual duties.

**Failure to Fulfill Contractual & Legal Obligations**
Should Wellpath or CFMG's leadership (including non-physicians) persist in directing clinical or administrative decisions in contravention of the Medical Practice Act, or continue fee-splitting and corporate medicine practices, Fresno County is legally entitled to terminate its multi-million-dollar contract. Moreover, state regulators and the Medical Board of California will impose disciplinary measures, including potential revocation of your licenses.

1. Final Notice & the Next 45 Days

Be advised:
• I have known certain Fresno County supervisors personally since 2016, having supported them in their public service roles. Any attempt to undermine my professional standing or to retaliate against me for bringing these issues to light will result in immediate notification to these officials and formal whistleblower complaints.
• Over the next 45 days, I expect CFMG's leadership to take swift corrective steps to remediate these unlawful arrangements. This entails restructuring CFMG's financial framework to eliminate prohibited fee-splitting or lay control over physician services, as well as ensuring that only duly licensed physicians or approved medical review entities supervise clinical decisions.

This is your opportunity to correct these violations before enforcement agencies take action

against you. I strongly recommend that you seek independent legal counsel and take immediate steps to bring your business practices into compliance with California law and your contractual obligations to Fresno County.

Sincerely,

**Dr. Kanwar Partap Singh Gill**
Pro Se Movant

# Wellpath

**Fresno County Adult Detention Facility**
1225 M Street, Fresno, CA 93721
Office: (559) 600-9365
Email: <u>**KaGill@wellpath.us**</u>

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

KPSGILL.COM                                    Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

## Re: Updated Submission Re: Drs. Bazzel (C 53908), Medrano (A 103477), Kennedy (C 171808) – Request for Vertical Enforcement

1 message

---

**Kanwar Gill MD** <kpsgill@kpsgill.com>                              Sun, Apr 6, 2025 at 10:23 AM
To: "Kerrie@MBC Webb" <Kerrie.Webb@mbc.ca.gov>
Cc: webmaster@mbc.ca.gov
Bcc: MGoldstone@wellpath.us

To: Central Complaint Unit, Medical Board of California

Cc: Kerrie Dargine Webb, Staff Counsel – Kerrie.Webb@mbc.ca.gov

Subject: Addendum to Complaint – Legal Billing Analysis (Docket 2081): Misprioritization of Executive Bonuses Over Physician Compensation; CPOM & Fee-Splitting Implications

Dear Central Complaint Unit,

This message serves as an additional follow-up to the April 5, 2025 email in a matter relating to complaint filed concerning Drs. Grady Judson Bazzel (C 53908), Richard M. Medrano (A 103477), and Scott Herbert Kennedy (C 171808)—all officers of California Forensic Medical Group (CFMG).

It supplements that record based on a detailed analysis of newly filed Docket 2081 – Third Monthly Fee Statement of McDermott Will & Emery LLP, filed April 3, 2025, in In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.).

This billing statement lays bare how senior attorneys knowingly diverted disproportionate time and resources toward executive compensation and retention packages, while allocating negligible legal time to issues of physician compensation, ERISA compliance, or lawful handling of deferred wages. This strongly supports prior allegations of Corporate Practice of Medicine (CPOM) violations, illegal fee-splitting, and neglect of fiduciary obligations affecting California-licensed physicians.

Summary of Findings – Attorney Billing Pattern in Docket 2081

## 1. Legal Time Spent on Physician Deferred Compensation: Acknowledged, Then Ignored

• Date: February 6, 2025

• Attorney: Carmen Dingman

• Time: 1.3 hours

◦ Task:

• "Review, analyze deferred compensation issues (.6)"

• "Correspond with Company, FTI team re same (.3)"

• "Review wages motion re same (.4)"

• Concern: This entry proves the legal team was fully aware of the legal complexity and exposure surrounding physician deferred compensation. Yet, no corrective action or protective provision was incorporated into the Plan (Docket 1770) or Disclosure Statement. Deferred wages remained improperly swept into the estate, violating 11 U.S.C. §541(d) and state trust and labor law.

## 2. Heavy Legal Work on Executive Bonuses (KERP/KEIP) – Physicians Excluded

• Between Feb 7–16, 2025, McDermott attorneys logged over 25+ hours across partners and associates on tasks including:

• Drafting, revising, and negotiating executive compensation declarations (e.g., Giordano, Szanzer, Perlman)

◦ Building legal support for Key Employee Incentive Plans (KEIP) and Retention Plans (KERP)

• Coordinating with restructuring advisers (FTI, Alvarez & Marsal) on insider protection

• Notably absent:

• No entries reflect time spent reviewing ERISA fiduciary duties, IRC §409A deferred compensation compliance, or physician classification/protections under California labor and medical law.

3. Evidence of Unlawful Operational Control over CFMG Matters by Wellpath Attorneys

• Attorneys corresponded and strategized with Wellpath executives and consultants about compensation frameworks for the medical workforce—without CFMG legal independence or firewalls.

• This suggests lay corporate interference in physician compensation, breaching California Business & Professions Code §§ 2400 & 650 (CPOM and fee-splitting prohibitions).

4. Systemic Prioritization of Executives Over Practicing Physicians

• From Feb 12–20, attorney hours were almost exclusively used to protect executive pay:

• "Work on compensation motion and related declaration"

• "Review bonus plans"

• "Draft declaration regarding retention payments"

• "Review and revise KEIP structure"

• Zero entries reflect any meaningful engagement with issues like:

• Classifying deferred physician earnings as trust property

○ Legal consequences of sweeping NQDC funds into bankruptcy

○ Potential IRS §409A tax violations or ERISA breaches

Request for Action

I respectfully request that the Medical Board of California:

1. Add this analysis and Docket 2081 (previously submitted) to the existing complaint file against Drs. Bazzel, Medrano, and Kennedy.

2. Confirm whether an analyst has been assigned, in which case I would prefer to submit all further correspondence directly to that analyst, so as not to burden your team with repeated updates.

3. Consider whether these billing records—admitted into federal court under penalty of perjury—show a clear pattern of legal misprioritization and governance failures by corporate physicians.

4. Refer this matter to the Office of the Attorney General for vertical enforcement, including review of potential CPOM violations, ERISA breaches, and wage misappropriation.

5. Pursue emergency license restrictions or suspensions if the physicians named above continue to serve as executives while enabling or tolerating corporate interference in physician earnings.

This is a deepened analysis of Docket 2081, which was not part of the April 5 submission. The billing evidence now available adds clear, time-stamped support to the complaint—showing not only neglect of physician compensation, but willful prioritization of executive retention, despite legal knowledge of violations.

I appreciate your time and oversight in this matter and remain available for follow-up with any assigned analyst.

Sincerely,

Kanwar Gill, MD

Email: kpsgill@kpsgill.com

Phone: (559) 447-8490

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

On Apr 5, 2025, at 1:59 PM, Kanwar Gill MD <kpsgill@kpsgill.com> wrote:

To: Central Complaint Unit, Medical Board of California

Cc: Kerrie Dargine Webb, Staff Counsel – Kerrie.Webb@mbc.ca.gov

Subject: Updated Submission Re: Drs. Bazzel (C 53908), Medrano (A 103477), Kennedy (C 171808) – Request for Vertical Enforcement

Dear Central Complaint Unit,

I write to provide an important update to a prior communication sent regarding the following California-licensed physicians, all of whom are senior officers at California Forensic Medical Group (CFMG):

• Dr. Grady Judson Bazzel – License No. C 53908, Chief Executive Officer, CFMG

• Dr. Richard M. Medrano – License No. A 103477, Secretary, CFMG

◦ Dr. Scott Herbert Kennedy – License No. C 171808, Chief Financial Officer, CFMG

Please find re-attached the relevant forwarded email and, for reference, the Third Monthly Fee Statement (Docket 2081) filed April 3, 2025, in the Wellpath Holdings bankruptcy case (TXSB 24-90533). This docket entry significantly clarifies and reinforces the concerns I previously raised.

Summary of Concerns – Clarified Findings from Docket 2081

Upon further analysis of Docket 2081, it is now evident that:

1. Deferred Physician Compensation Was Explicitly Reviewed Yet Ignored:

McDermott Will & Emery attorneys billed for time reviewing deferred physician compensation on February 6, 2025, acknowledging it as a legal issue of concern. Yet, no meaningful disclosure or remedy appears in the reorganization plan (Docket 1770) or accompanying disclosures.

2. Executive Compensation Was Aggressively Prioritized:

Legal time entries show robust, coordinated efforts to protect and enhance executive bonuses (KEIP/KERP) while compensation owed to practicing physicians—including those licensed in California—remained structurally deprioritized.

3. Wellpath Assumed Control Over CFMG Physician Payments:

It is evident that Wellpath executives and attorneys—not CFMG—are managing, renegotiating, and restructuring physician financial obligations. This raises grave concerns under California's Corporate Practice of Medicine (CPOM) doctrine and suggests an unlawful fee-splitting arrangement between non-physician entities and physicians.

4. The Restructuring Plan Actively Obscures Accountability:

The Fourth Amended Plan fails to identify or isolate CFMG-specific liabilities, effectively shielding non-debtor insiders while placing California patients, especially those in correctional health environments, at risk.

Request for Medical Board Consideration

I understand the Medical Board does not act on demand from third parties, and I am not directing any specific action. However, as a physician, I do not have standing to pursue these structural and regulatory violations alone. I respectfully submit that this situation merits direct intervention by the Medical Board, as the corporate practice of medicine prohibition is squarely implicated, and fee-splitting risks patient safety and undermines professional independence.

Additionally, based on your website's stated mandate to uphold CPOM standards and safeguard patient welfare, I believe this matter warrants a strong vertical enforcement referral to the Office of the Attorney General. Given the legal direction of the bankruptcy proceedings, this issue will likely escalate to that level regardless.

Conclusion

I request that this submission be added to the existing complaint file involving Drs. Bazzel, Medrano, and Kennedy. The newly analyzed materials provide a far more comprehensive and documented basis than my prior message and should be considered as clarifying and supplementing that submission.

I appreciate your time and continued review of this matter.

Sincerely,

Kanwar Gill, MD

[kpsgill@kpsgill.com]

Attachments:

• Forwarded email (originally sent April 5, 2025)

• Docket 2081 – Third Monthly Fee Statement (TXSB 24-90533)

Best Regards,
Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

Begin forwarded message:

> **From:** Kanwar Gill MD <kpsgill@kpsgill.com>
> **Date:** April 5, 2025 at 1:18:58 PM PDT
> **To:** Richard Medrano <RMedrano@wellpath.us>, Scott Kennedy <ScottKennedy@wellpath.us>, Marc Goldstone <MGoldstone@wellpath.us>, Bradley Giordano <Bgiordano@mwe.com>, Steven Szanzer <sszanzer@mwe.com>, Felicia Perlman <Fperlman@mwe.com>, J Bazzel <jbazzel@wellpath.us>
> **Cc:** webmaster@mbc.ca.gov
> **Subject: Fwd: Concerning Evidence of Deferred Compensation Neglect & Executive Compensation Prioritization – April 3 Filing (Docket 2081)**

- Regarding:
- Dr. Grady Judson Bazzel – License Number: C 53908 Chief Executive Officer, CFMG
- Dr. Richard M. Medrano – License Number: A 103477 Secretary, CFMG
- Dr. Scott Herbert Kennedy – License Number: C 171808 Chief Financial Officer, CFMG

I request medical board of California Central complaint unit file this with existing complaint file and consider this message for vertical enforcement by attorney general 's office. I understand

the burden of proof is now preponderance of evidence, and it is my belief that burden has been met. I request Medical Board to expedite this investigation and revoke the licenses of all the physicians as there is imminent danger to the people of California if they continue to practice medicine in the state of California. Please take this issue on an emergent basis And please have these vertically general's , Office issue Cease practice order. All these three individual physician are interfering with delivery of care and their continuous interference at this time is causing significant permanent injury to the people of California especially the incarcerated individuals.

Forwarded message attached.

Best Regards,
Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

Begin forwarded message:

> **From:** Kanwar Gill MD <kpsgill@kpsgill.com>
> **Date:** April 5, 2025 at 12:38:58 PM PDT
> **To:** Dheeraj Taranath <DTaranath@wellpath.us>, J Bazzel <jbazzel@wellpath.us>, "Kerrie@MBC Webb" <Kerrie.Webb@mbc.ca.gov>, Steven Szanzer <sszanzer@mwe.com>, Marcus Helt <Mhelt@mwe.com>, Felicia Perlman <Fperlman@mwe.com>, Bradley Giordano <Bgiordano@mwe.com>
> **Cc:** "Kerrie@MBC Webb" <Kerrie.Webb@mbc.ca.gov>
> **Subject: Concerning Evidence of Deferred Compensation Neglect & Executive Compensation Prioritization – April 3 Filing (Docket 2081)**

## Subject: Concerning Evidence of Deferred Compensation Neglect & Executive Compensation Prioritization – April 3 Filing (Docket 2081)

## Email Copied to Medical Board -

- Kerrie Dargine Webb, Staff Counsel
  Medical Board of California, 2005 Evergreen St Ste 1200, Sacramento, CA 95815-5401
  Phone: 916-263-2389  |  Fax: 916-263-2387

- •
  - Regarding:
  - Dr. Grady Judson Bazzel – License Number: C 53908
    Chief Executive Officer, CFMG
  - Dr. Richard M. Medrano – License Number: A 103477
    Secretary, CFMG

- Dr. Scott Herbert Kennedy – License
  Number: C 171808
  Chief Financial Officer, CFMG

Dear California Licensed Medical Doctors:

I hope this message finds you well. I am reaching out today to share a very recent and significant development in the bankruptcy case of Wellpath Holdings, Inc. (TXSB 24-90533) that directly impacts physicians, including those who rendered services under CFMG agreements.

On April 3, 2025, McDermott Will & Emery LLP—counsel to Wellpath—filed their Third Monthly Fee Statement (Docket 2081 - attached). Upon close analysis of the time entries disclosed, I want to bring to your attention what appears to be a coordinated, internal legal effort to address executive compensation (KERP/KEIP) while failing to resolve, disclose, or account for unpaid deferred compensation owed to physicians, including California-licensed doctors working through CFMG contracts.

Key Findings from Docket 2081:

1. Acknowledged Deferred Compensation Exposure – But No Resolution

On February 6, 2025, attorney Carmen Dingman billed time to:

"Review, analyze deferred compensation issues (.6); correspond with Company, FTI team re same (.3); review wages motion re same (.4)" [See Docket 2081, p. 74].

This shows that deferred compensation was being actively reviewed at high levels, but there is no indication in the Disclosure Statement (Docket 1770) or

the Plan that this issue was addressed in terms of legal obligations or protections for physicians.

2. Misplaced Priorities: Executive Bonuses vs. Physician Compensation

The same docket reflects significant hours spent by senior restructuring counsel (Szanzer, Giordano, Perlman, etc.) designing and defending executive compensation packages (KEIP/KERP) through detailed analysis, drafting declarations, and negotiating retention terms. Meanwhile, deferred compensation owed to physicians remained unremedied.

3. Wellpath Unilaterally Controlling CFMG Physician Compensation

Based on docketed internal discussions and filings, it is clear that Wellpath attorneys—not CFMG—have assumed authority over compensation structures originating from CFMG-contracted physicians. Yet the plan of reorganization (Docket 1770) fails to distinguish CFMG-specific liabilities or obligations to California-licensed physicians from those of other corporate affiliates, effectively consolidating responsibility while eliminating traceability or direct accountability.

This unilateral treatment raises serious concerns under California's corporate practice of medicine laws and creates exposure for CFMG in allowing a third party (Wellpath) to manage and restructure financial liabilities tied to professional services rendered by California-licensed physicians.

4. Non-Disclosure in the Plan and Disclosure Statement

Despite internal acknowledgment of these issues, the Fourth Amended Disclosure Statement and Plan omit any mention of:

• Deferred compensation liabilities,

• The legal basis for releasing non-debtor entities,

• Regulatory risks under California CPOM doctrine.

Why This Matters Ahead of April 14

This April 3 filing is critical because it reflects what is happening behind the scenes—a deliberate legal strategy that deprioritizes deferred physician earnings while fully protecting insiders and executives. This occurs without clear direction or opt-in consent from CFMG, despite the direct impact on your contracted medical workforce.

As we prepare for our in-person meeting on April 14, I urge both of you to review this docket carefully. It evidences a systemic failure to equitably and transparently resolve compensation obligations to physicians, many of whom have been frontline caregivers in county and correctional systems under CFMG contracts.

Please let me know if you would like me to forward the full docket entry or compile specific highlighted time records in advance of our meeting. I would welcome the opportunity to discuss this further and work toward a legally compliant and ethically grounded resolution.

Best Regards,

Kanwar Gill MD

<TXSB 24-90533 2081 - Statement Third Monthly Fee Statement of McDermott Will &.pdf>

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

**KPSGILL.COM**                                              Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

### RE: Comprehensive Overview of Legal/Regulatory Concerns and Urgent Request for CFMG Shareholder Physician-Led HR Dialogue

1 message

---

**Kanwar Gill** <KaGill@wellpath.us>                                              Tue, Apr 8, 2025 at 10:56 AM
To: Angie Baldwin <ARBaldwin@wellpath.us>
Cc: Dheeraj Taranath <DTaranath@wellpath.us>, Grady J Bazzel <JBazzel@zenovacare.com>

Dear Ms. Baldwin,

Thank you for your prompt response and for indicating that you will be reviewing the relevant HR and employee relations information. I fully appreciate your dedication to investigating these matters and will await further details from your review.

I would like to take this opportunity to clarify that, while I understand your role is focused on HR issues, it is imperative that your investigation also fully considers the full scope of my allegations. These include serious issues of racial discrimination, constructive termination, and repeated interference by non-clinical administrators in my daily operations.

For example, I have repeatedly encountered situations where nonphysician administrators have unilaterally altered critical meeting schedules without any consultation with me. Despite my patient-related obligations, I am forced by DON and HAS to attend a weekly meeting at 10:30 AM every Monday—a meeting chaired by me—over which I have no control. This scheduling decision, which directly conflicts with my clinical duties, has significantly hindered my ability to deliver timely and effective patient care. Such interference not only disrupts daily operations but also undermines the authority vested in California-licensed physicians in a physician-led organization like CFMG.

I must emphasize that as a licensed physician employed by CFMG—a structure which, by law, must be controlled solely by California-licensed physicians or their medical corporations—any HR intervention affecting clinical matters must be led by a representative with the proper credentials and authority. It is crucial that the HR dialogue remains within its appropriate boundaries and that any actions or decisions impacting clinical control come from a CA-licensed shareholder or officer.

While I understand your investigation is focused on HR and employee relations issues, please ensure that the investigation also acknowledges:

- The allegations of racial discrimination, as evidenced by the fact that I remain the only brown individual in a senior leadership role at our facility.
- The pattern of constructive termination efforts by nonclinical administrators, which have significantly impaired my work and patient care.
- The interference in my daily operations that directly affects the timely and competent management of patient care—including the imposed meeting times that conflict with my clinical obligations.

I trust that you will consider all of these factors as you gather the necessary information, and I look forward to your findings. I remain committed to resolving these matters in a manner that is both fair and in full compliance with all applicable California laws.

Thank you again for your attention to these serious concerns. Please let me know if you require any additional information or clarification.

Respectfully,

---

Best Regards,

## Kanwar Gill MD

## Wellpath

**Fresno County Adult Detention Facility**

1225 M Street, Fresno, CA 93721

Office: (559) 600-9365

**Email: KaGill@wellpath.us**

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

---

**From:** Angie Baldwin <ARBaldwin@Wellpath.us>
**Sent:** Tuesday, April 8, 2025 10:44 AM
**To:** Kanwar Gill <KaGill@Wellpath.us>
**Cc:** Dheeraj Taranath <DTaranath@Wellpath.us>; Grady J Bazzel <JBazzel@Zenovacare.com>
**Subject:** RE: Comprehensive Overview of Legal/Regulatory Concerns and Urgent Request for CFMG Shareholder Physician-Led HR Dialogue

Dr. Gill, thank you for responding so quickly.  Since my role will be investigating only the HR and employee relations issues, give me some time to pull out the information that is relevant to my investigation and I will be in touch soon.

**ANGIE BALDWIN, PHR, SPHR**

Sr. Employee Relations Manager



3340 Perimeter Hill Dr., Nashville, TN 37211
**PH 615-312-7272// CELL 615-636-7045**

**WellpathCare.com**

---

**From:** Kanwar Gill <KaGill@Wellpath.us>
**Sent:** Tuesday, April 8, 2025 12:07 PM
**To:** Angie Baldwin <ARBaldwin@Wellpath.us>
**Cc:** Dheeraj Taranath <DTaranath@Wellpath.us>; Grady J Bazzel <JBazzel@Zenovacare.com>
**Subject:** Comprehensive Overview of Legal/Regulatory Concerns and Urgent Request for CFMG Shareholder Physician-Led HR Dialogue

## Subject:

1. Comprehensive Overview of Legal and Regulatory Concerns.
2. Urgent Request for CFMG Shareholder Physician-Led HR Dialogue

Dear Ms. Baldwin, Dr. Taranath and Dr. Bazzel,

Thank you Ms. Baldwin for your message on Tuesday, April 8, 2025, at 7:48 AM PT. I appreciate your prompt initiative in wanting to speak with me this week to expedite the investigation into my concerns. In the interest of full transparency and to ensure that all issues are documented, please preserve this email in its entirety as part of the formal record for any internal or external HR investigation.

Below, I provide a detailed timeline and summary of events drawn from my direct experiences and communications. While the primary focus here is on addressing my employment concerns—including serious violations of the Medical Practice Act and related statutory provisions—the issues surrounding a recent six month delay in APAP unit procurement for patient #0059555 also illustrate the broader pattern of criminal administrative interference that I must emphasize.

## I. My Background and Employment History

1. **Employment Initiation and Performance:**
   – I began working with California Forensic Medical Group (CFMG) on **September 30, 2019**. My record has been impeccable with respect to patient outcomes and the cost-saving measures delivered for both Wellpath and CFMG.
   – Over the last three years, I spearheaded utilization management initiatives that have saved hundreds of thousands of dollars while significantly improving patient care.
   – As a licensed physician under the State of California and an employee of CFMG, it is imperative to note that only California-licensed physicians or physician-controlled medical corporations have the legal authority to determine clinical and compensation matters. Wellpath's role is strictly confined to administrative functions, and any deviation from this standard is not only unacceptable but is criminal in nature.

## II. Key Concern: Nonqualified Deferred Compensation Pulled into Bankruptcy

1. **Notification on November 8, 2024:**
   I alerted Wellpath's Chief Medical Officer (CMO) and Chief Legal Officer that my nonqualified deferred compensation—

comprising solely my earned wages, with no employer match—was being diverted into the Wellpath bankruptcy estate.

2. **Misclassification and Misappropriation:**
HR personnel, including an individual named Donald White, repeatedly indicated in his emails to me that no distinction existed between CFMG wages and Wellpath wages. This conflation flagrantly disregards my rights as a CFMG-employed physician and constitutes criminal misappropriation of physician property, as California law mandates that compensation for licensed medical professionals be controlled exclusively by a California-licensed entity.

3. **Internal Escalation (November 11, 2024 – March 4, 2025):**
During this period, I reached out to numerous internal contacts within both CFMG and Wellpath in a sincere effort to resolve these issues internally. Despite my repeated communications, leadership consistently indicated that post-bankruptcy reorganization payments would be minuscule—essentially pennies on the dollar—which is both illegal and potentially criminal conduct under state law due to fee-splitting.

## III. Ten-Business-Day Notice and Escalation

1. **March 4, 2025:**
After repeated attempts to obtain clarity, I issued a formal ten-business-day notice to the Wellpath bankruptcy attorneys (McDermott Will & Emery), stating unequivocally that if my concerns were not addressed promptly, I would file a motion with the bankruptcy court.

2. **Legal Position:**
I have made it clear that as a physician governed by California's Medical Practice Act, administrative entities like Wellpath lack the legal authority to control my earnings or interfere with my clinical judgment—a criminal interference with physician autonomy.

## IV. Constructive Termination and Criminal Administrative Interference

1. **March 17, 2025 – Threat of Constructive Termination:**
An RN supervisor disclosed that the RDO, HSA, and DON had been discussing measures to push me out of my role. Her exact words were – "getting rid" of me. These discussions, initiated by individuals without the legal authority to hire or fire licensed physicians, are clearly retaliatory and criminal.

2. **Acceleration of Legal Response:**
Faced with this imminent threat and having exhausted every internal remedy, I was compelled to accelerate my legal response. Constructive termination not only jeopardizes my livelihood but also violates state labor laws and my professional licensing conditions.

## V. Formal Legal Filings (March 18 – March 25, 2025)

1. **March 18, 2025:**
I filed a Motion for Relief from the Automatic Stay in the Wellpath bankruptcy proceedings, asserting that my physician wages must remain separate from the bankruptcy estate.

2. **March 25, 2025:**
I filed a Second Motion for an Emergency Stay on Solicitation and Voting, along with detailed Objections to the proposed reorganization plan.

3. **Legal Violations Asserted:**
These filings reiterate that merging my physician compensation into Wellpath's corporate structure violates:
– California's Medical Practice Act and associated fee-splitting prohibitions;
– Multiple California Labor & Wage statutes;
– Federal ERISA and bankruptcy laws, particularly where coercion is used to force me into signing a restrictive NDA.
Such forced merging and misappropriation of earnings are criminal and subject to significant penalties.

## VI. Coercive NDA Demands and Retaliation

1. **March 19- March 23, 2025:**
An attorney at McDermott Will & Emery repeatedly demanded that I sign an overly restrictive nondisclosure agreement and withdraw all claims against Wellpath in return for releasing funds already owed to me.

2. **Retaliatory Nature:**
I informed this attorney, on March 23, 2025, that if these issues were not amicably resolved by the close of business on March

24, 2025, I would escalate the matter to the appropriate regulatory bodies. Such coercive tactics are criminal and constitute clear retaliation.

## VII. Medical Board of California Investigation

1. **Scope of Investigation:**
   My concerns extend to three physicians at CFMG (Drs. Bazzel, Medrano, and Kennedy) who have either been complicit or negligent in allowing my wages to be improperly controlled by Wellpath—a matter that is now under investigation by the Medical Board of California.
2. **Potential Disciplinary Action:**
   I have formally requested that the Medical Board consider revoking their licenses if it is shown they facilitated these unlawful practices. Their cooperation is critical, and as a licensed physician, I must preserve my legal credibility.
3. **Criminal Implications:**
   Failure to comply with the legal standards for physician-led control is a criminal offense that endangers patient care and undermines the integrity of our entire operational model.

## VIII. April 11, 2025 Meeting and Final Internal Resolution

1. **Scheduled Meeting:**
   I have scheduled a final in-person meeting for April 11, 2025, in Fresno, requiring the presence of a California-licensed physician-officer from CFMG who has full binding authority to sign a physician-controlled settlement agreement.
2. **Leadership Involvement:**
   While Wellpath's Chief Medical Officer and Chief Operating Officer have confirmed their attendance as observers, the critical decisions must be made by a CFMG representative.
3. **Final Attempt at Resolution:**
   This meeting represents my last internal attempt to resolve these issues. Should there be failure on the part of CFMG to engage in good faith or provide a legally compliant resolution, I will have exhausted all internal options, necessitating external legal and criminal recourse.

## IX. Continuing Violations of the Medical Practice Act by Nonphysicians

1. **Unlawful Interference:**
   The Director of Nursing (DON), Health Services Administrator (HSA), and similar nonphysician administrators continue to intrude on day-to-day medical operations, including patient triage and clinical oversight.
2. **Criminal Violation:**
   Under California's Business & Professions Code, such interference is criminal. It not only undermines patient safety but also violates my professional license as I, a California-licensed physician, must have full control over clinical decisions.

## X. Racial Discrimination and Systemic Bias

1. **Systemic Inequities:**
   I am the only brown individual remaining in senior leadership at the Fresno County Jail facility, while individuals with significantly lighter complexions have increasingly replaced personnel of color.
2. **Discriminatory Practices:**
   Despite 5.5 years of dedicated service—and an additional 2 years at the California Department of Corrections—a less experienced individual was promoted to Medical Director. This decision raises serious concerns regarding systemic racial discrimination and targeted retaliation, both of which are illegal and criminal.

## XI. Exhaustion of Internal Remedies and Imminent External Legal Action

1. **Repeated Internal Appeals:**
   I have submitted numerous communications to management from November 2024 through March 2025, issued a formal ten-business-day notice on March 4, 2025, and arranged a conclusive meeting for April 11, 2025—all in an effort to resolve these issues internally.
2. **Final Warning:**
   If no meaningful resolution is achieved at the April 11 meeting, I will have no choice but to pursue external legal remedies,

including a constructive wrongful termination lawsuit, claims for retaliation, and criminal prosecution for the unlawful and criminal conduct exhibited by Wellpath.

## XII. Immediate Requests

1. **Immediate HR Discussion:**
   I request that we schedule a meeting this week—per your message on April 8, 2025, at 7:48 AM—with participation by a California-licensed physician-officer from CFMG who has full binding authority to address these issues. Only such an individual can ensure that clinical and compensation decisions remain under proper physician control.
2. **Formal Acknowledgment of My Record:**
   Please confirm that my complete employee record has been reviewed. It documents over five and a half years of exceptional performance, cost-saving measures, and unwavering clinical leadership.
3. **Documentation of Discriminatory Treatment:**
   I request that HR formally record my concerns regarding race-based discrimination in leadership appointments and treatment. This is a matter of equal opportunity, fairness, and a criminal violation of anti-discrimination statutes.
4. **Assurance Against Further Retaliation:**
   Provide immediate and unequivocal assurance that no further retaliation will occur for my whistleblower activities. Any retaliatory conduct is criminal, and I will not tolerate further adverse actions.
5. **Recognition of Legal Responsibilities:**
   I cannot be compelled to sign any NDA or settlement that forces me to "withdraw all claims" or diminish my obligations to state and federal regulators. Such demands are criminal and fundamentally undermine my professional rights.
6. _____

## XIII. Secondary Support: APAP Unit Procurement

While the central issues in this correspondence pertain to systemic internal violations, I must note that the APAP procurement for patient #0059555 underscores the broader pattern of unlawful criminal interference in clinical decision-making. Delays in procuring essential DME—when dictated by administrative, nonclinical criteria—are in direct violation of the Medical Practice Act and are criminal. Interference in such procurement matters further substantiates my claims of ongoing, criminal mismanagement. The patient's documented clinical needs demand that all physician orders be implemented immediately, and any administrative hindrance is unacceptable.

## XIV. Concluding Statement

Ms. Baldwin, I ask you once again: **If you were in my position—facing withheld wages, the threat of constructive termination imposed by nonphysician administrators, systemic racial discrimination, and criminal interference in clinical care—what would you do?**
I have no desire to engage in protracted disputes; my sole aim is to protect my license, uphold my legal and ethical obligations as a California-licensed physician, and ensure that patient care remains under the proper control of physicians. I have exhausted every internal channel in good faith, yet criminal practices persist. If our scheduled April 11 meeting fails to deliver a meaningful resolution by the responsible California-licensed physician-officer, I will have no choice but to seek external legal and criminal recourse.

I appreciate your time and your unwavering commitment to addressing these deeply concerning issues. Please confirm receipt of this email and advise on scheduling our meeting as well as providing a definitive confirmation regarding the immediate procurement of the APAP unit. Our shared commitment to clinical excellence, regulatory integrity, and the unwavering principle that only licensed physicians control patient care must prevail.

**Respectfully,**

Dr. Kanwar P. Gill
Senior Physician, Fresno County Adult Detention Facility
1225 M Street, Fresno, CA 93721
Office: (559) 600-9365
Email: KaGill@wellpath.us

**IMPORTANT CONFIDENTIALITY NOTICE:**
Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. The unauthorized interception or disclosure of this communication is strictly prohibited by applicable federal and state law.

**From:** Angie Baldwin <ARBaldwin@Wellpath.us>
**Sent:** Tuesday, April 8, 2025 7:48 AM
**To:** Kanwar Gill <KaGill@Wellpath.us>
**Subject:** RE: Conversation

Dr. Gill, I am back from PTO and wanted to touch base with you.  After reflection, I would like to strongly urge that we speak this week.  In order to conduct an expedient and thorough investigation into your concerns, and to make sure concerns are addressed as soon as possible, it would be helpful if we could speak sooner than next week.

This first conversation will primarily be a time for you to tell me what you are experiencing so I know how to proceed with the investigation.  Thank you for your consideration.

**ANGIE BALDWIN, PHR, SPHR**

Sr. Employee Relations Manager



3340 Perimeter Hill Dr., Nashville, TN 37211
**PH 615-312-7272// CELL 615-636-7045**

**WellpathCare.com**

**From:** Kanwar Gill <KaGill@Wellpath.us>
**Sent:** Thursday, April 3, 2025 4:15 PM
**To:** Angie Baldwin <ARBaldwin@Wellpath.us>
**Subject:** RE: Conversation

Thank you for your message. I've received it and appreciate your flexibility. I'll be able to confirm a specific time as we get closer to the date.

Best Regards,

Kanwar Gill MD

Wellpath

**Fresno County Adult Detention Facility**

1225 M Street, Fresno, CA 93721

Office: (559) 600-9365

Email: **KaGill@wellpath.us**

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

---

**From:** Angie Baldwin <ARBaldwin@Wellpath.us>
**Sent:** Thursday, April 3, 2025 2:11 PM
**To:** Kanwar Gill <KaGill@Wellpath.us>
**Subject:** RE: Conversation

Thank you for your prompt response. If it works for you, 11:00 a.m. on April 15th works well for me. If you need to get in touch with me sooner, my cell phone is listed below and I check my Wellpath email frequently. Thanks again.

**ANGIE BALDWIN, PHR, SPHR**

Sr. Employee Relations Manager



3340 Perimeter Hill Dr., Nashville, TN 37211
**PH 615-312-7272// CELL 615-636-7045**


**WellpathCare.com**

---

**From:** Kanwar Gill <KaGill@Wellpath.us>
**Sent:** Thursday, April 3, 2025 3:50 PM
**To:** Angie Baldwin <ARBaldwin@Wellpath.us>
**Subject:** RE: Conversation


Dear Ms. Baldwin,

Thank you for your message and for reaching out. I appreciate your willingness to connect regarding the concerns I've raised.

At this time, I will need some additional time to gather relevant documents and prepare a list of points for our discussion. I'd prefer to schedule a time to speak after April 15, if that works for you. I believe that will allow for a more productive and thorough conversation.

At present, there is no clearly urgent matter that requires immediate attention. I feel safe in my current work environment, and I'm comfortable allowing this process to move forward at a thoughtful and measured pace. Of course, should anything arise that requires more immediate discussion before April 15, I will let you know.

Otherwise, I look forward to speaking with you after the 15th to address my concerns, engage in meaningful dialogue, and explore any necessary resolutions. Please let me know if that timeline is workable for you.


Best Regards,

**Kanwar Gill MD**

**Wellpath**

**Fresno County Adult Detention Facility**

1225 M Street, Fresno, CA 93721

Office: (559) 600-9365

Email: KaGill@wellpath.us


IMPORTANT CONFIDENTIALITY NOTICE:

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

---

**From:** Angie Baldwin <ARBaldwin@Wellpath.us>
**Sent:** Thursday, April 3, 2025 1:22 PM
**To:** Kanwar Gill <KaGill@Wellpath.us>
**Subject:** Conversation

Dr. Gill, good afternoon. My name is Angie Baldwin and I'm the Sr. Employee Relations Manager on the employee relations team out of the home office. I understand that you have expressed some concerns regarding your employment and work interactions. I have been asked to reach out to you to investigate the HR-related concerns and would appreciate scheduling some time for us to speak.

I will be on PTO tomorrow, Friday 4/4, and Monday, 4/7. So I was hoping we could speak on Tuesday or Wednesday at your convenience. In the meantime, I am reviewing the information you have already provided to Dr. Taranath. But if there are any other documents, emails, texts or other information that you feel would be helpful to review prior to our conversation, please send it to my Wellpath email.

Thank you in advance for your cooperation, and please let me know your preference for a time to speak next week.

**ANGIE BALDWIN, PHR, SPHR**

Sr. Employee Relations Manager



3340 Perimeter Hill Dr., Nashville, TN 37211
**PH 615-312-7272// CELL 615-636-7045**

**WellpathCare.com**

KPSGILL.COM

Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

## Clarification on HR Oversight, HR scope and Direction for Non-Bankruptcy Matters

1 message

---

**Kanwar Gill** <KaGill@wellpath.us>                                          Tue, Apr 8, 2025 at 3:53 PM
To: Dheeraj Taranath <DTaranath@wellpath.us>, Kanwar Gill MD <kpsgill@kpsgill.com>, "Kerrie.Webb@mbc.ca.gov" <Kerrie.Webb@mbc.ca.gov>
Cc: Grady J Bazzel <JBazzel@zenovacare.com>, "Richard M. Medrano" <RMedrano@wellpath.us>, Scott Kennedy <ScottKennedy@wellpath.us>, Angie Baldwin <ARBaldwin@wellpath.us>

---

**Subject:** Clarification on Oversight, HR Scope, and Direction for Non-Bankruptcy Issues
**To:** Dr. Dheeraj Taranath
**CC:** Ms. Angie Baldwin, Dr. Grady Bazzel
**From:** Dr. Kanwar Gill
**Date:** April 8, 2025

In Complaint/Matter Before Medical Board of California regarding:

• Dr. Grady Judson Bazzel – California P&S License No. C 53908, Chief Executive Officer, CFMG

• Dr. Richard M. Medrano – California P&S License No. A 103477, Secretary, CFMG

• Dr. Scott Herbert Kennedy – California P&S License No. C 171808, Chief Financial Officer, CFMG

Dear Dr. Taranath,

Thank you for your message. I acknowledge your update confirming that Wellpath, in its role as Management Services Organization for CFMG, has communicated with CFMG leadership regarding the matters I raised. I also understand that, based on your joint assessment with CFMG leadership, the previously scheduled April 11 in-person meeting has now been unilaterally canceled by CFMG. Additionally, you've stated that any prior communications that could be construed as settlement offers are withdrawn and that the bankruptcy proceedings will now solely govern my deferred compensation claim, with further communication directed to McDermott Will & Emery.

For the record, I must clarify that at no point have I discussed or negotiated any dollar amount related to my deferred compensation claim with you personally. I categorically reject any suggestion that I was ever extended a legitimate or authorized offer through you. The only communications that resembled "offers" came from bankruptcy counsel at McDermott Will & Emery around March 20, 2025. Those proposals were unequivocally rejected by me at the time, as they were coercive in nature, conditioned on the withdrawal of legal filings, and accompanied by inappropriate non-disclosure requirements. They were not offered in good faith and were inconsistent with both bankruptcy ethics and California regulatory obligations.

More importantly, CFMG's unilateral cancellation of the April 11 meeting—an opportunity I explicitly requested for the presence of a California-licensed physician-officer with authority to resolve the matter internally—must be viewed as a willful rejection of a legally compliant resolution process. This decision eliminates CFMG's remaining opportunity to resolve my claims in accordance with California law, and it reinforces the concern that the organization is continuing in willful defiance of its legal obligations under the California Medical Practice Act.

As I have stated previously, I may ultimately lose my motions before the U.S. Bankruptcy Court in the Southern District of Texas. However, such an outcome does not absolve any party of its obligations under California law, nor does it preclude regulatory or civil enforcement at the state level. A loss in bankruptcy court does not equate to legal validation of the practices I have challenged—it simply reflects the narrow jurisdiction and procedural limits of that venue.

In light of these developments, I request immediate clarification on the following two key areas:

---

**1. Direction for Non-Bankruptcy Matters:**

---

While I understand that my deferred compensation claim is now being handled through the bankruptcy process, I ask for a clear directive as to how Wellpath and CFMG intend to address the other issues I have raised—specifically:

- Employment-related grievances
- Allegations of racial discrimination
- Constructive termination efforts
- Interference in clinical workflows
- Misappropriation of medical decision-making authority

Please advise whether these issues are still under the purview of Wellpath HR or CFMG physician leadership, or bankruptcy counsel. I request written clarification on the appropriate channels moving forward for each category of concern.

**2. Scope and Oversight of the HR Investigation:**

I understand Ms. Baldwin is currently reviewing relevant HR and employee relations matters. However, many of the issues raised fall outside a traditional HR framework and directly implicate:

- Violations of the California Medical Practice Act
- Fee-splitting concerns under Cal. Bus. & Prof. Code § 650
- Improper clinical interference by nonphysician administrators
- Racial bias and discriminatory promotion practices
- Retaliatory conduct targeting a whistleblower

As an employee of CFMG, a physician-owned and physician-controlled California medical corporation, any HR review touching on clinical governance, compensation, or disciplinary action must include oversight by a California-licensed physician-officer. Please confirm whether such oversight will be provided, and whether HR findings involving clinical decision-making will be subject to co-review and formal ratification by a CFMG shareholder physician.

**For the record, I reaffirm the following points:**

- I have maintained an unblemished clinical record over the past 5.5 years, consistently improving outcomes and reducing costs.
- I have formally reported wage misclassification, improper deferred compensation handling, and administrative interference to multiple regulatory bodies.
- I have filed a pending complaint with the Medical Board of California regarding failures by three CFMG shareholder physicians to protect physician autonomy.
- I had called for an April 11 internal resolution meeting, which was a final opportunity to address these matters lawfully. That meeting has now been unilaterally canceled by CFMG.

**Outstanding Clarification Requests:**

I respectfully request your timely response to the following:

- Will Ms. Baldwin's HR review include the racial discrimination, retaliation, and clinical interference allegations I have outlined?
- Will CFMG assign a California-licensed physician-officer with decision-making authority to co-lead or oversee HR matters affecting licensed medical practice?
- What internal pathway remains for resolution of non-bankruptcy issues, including clinical interference and professional governance?
- Do you require any further documentation from me at this stage?
- Will the delayed APAP procurement for patient #0059555—an incident emblematic of improper administrative obstruction—be incorporated into the ongoing review?

Thank you again for your attention. I remain committed to pursuing a lawful and good faith resolution wherever possible and look forward to receiving your response and clarification on next steps.

Respectfully,
**Dr. Kanwar Gill**
Senior Physician, Fresno County Adult Detention Facility
1225 M Street, Fresno, CA 93721
Office: (559) 600-9365 | Email: KaGill@wellpath.us

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

**From:** Dheeraj Taranath <DTaranath@Wellpath.us>
**Sent:** Tuesday, April 8, 2025 2:54 PM
**To:** Kanwar Gill MD <kpsgill@kpsgill.com>; Kanwar Gill <KaGill@Wellpath.us>
**Cc:** Grady J Bazzel <JBazzel@Zenovacare.com>; Richard M. Medrano <RMedrano@Wellpath.us>; Scott Kennedy <ScottKennedy@Wellpath.us>
**Subject:** Resolution response

Dr. Gill,

As you are aware, Wellpath is the Management Services Organization contracted to provide the full range of administrative services to CFMG. As such, we have reviewed the matters you have raised with CFMG leadership, and we continue to communicate with you with their knowledge and approval.

As previously noted, Cindy and I were planning to come out to California to meet with you in a good faith attempt to resolve the disagreement regarding your claim for deferred compensation. In light of the numerous false statements in your correspondence, we have recommended to CFMG leadership, and they have agreed that a meeting would not be productive; therefore, please be advised that the meeting is now canceled. To the extent that any prior correspondence could be interpreted as an offer to resolve your claim, any such offer is withdrawn.

The bankruptcy proceedings will determine the results of your claim. Our counsel has advised us that your arguments are legally invalid and they believe they will be summarily rejected by the court. Please direct all future correspondence regarding the matter to the court or to our lawyers with McDermott, Will & Emery; you may contact David Genender (dgenender@mwe.com).

Regards,

**Dheeraj Taranath, DO, MBA, MS**

Chief Medical Officer



3340 Perimeter Hill Dr., Nashville, TN 37211

**M** 304-376-4036

LinkedIn // Facebook // Twitter

WellpathCare.com

**KPSGILL.COM**

Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

## RE: [EXT] Re: Urgent Request for CFMG-Led HR Oversight:
1 message

---

**Angie Baldwin** <ARBaldwin@wellpath.us>                                  Wed, Apr 9, 2025 at 8:39 AM
To: Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

Dr. Gill,

You have raised concerns that fall under different disciplines. CFMG has received your email alleging a number of serious matters. Compliance will be reaching out to you to separately investigate your compliance-related concerns. As you know, I have been tasked with conducting an investigation of your workplace discrimination and retaliation allegations. Wellpath is contracted to perform this function on behalf of CFMG, and I am the designated investigator for these concerns. As it relates to the HR/ER investigation, I ask that you refrain from including others on communications related to this investigation, as that could adversely impact the integrity of the investigation.

We are still scheduled to meet on the 15th to discuss issues you've raised within the scope of this investigation. The main purpose of this initial meeting is to gather information from you. Please direct any additional concerns or questions about the investigation into your allegations of workplace discrimination and retaliation solely to my attention. After we meet, I will identify witnesses or other appropriate people to interview and plan the next steps in the investigation. If you are aware of additional facts or evidence relevant to your allegations, please send them to me. It goes without saying that interference with the investigation is not permitted and will only serve to will slow the process down and potentially damage the integrity of the investigation. Thank you for your cooperation, and I hope to speak with you soon.

**ANGIE BALDWIN, PHR, SPHR**

Sr. Employee Relations Manager



3340 Perimeter Hill Dr., Nashville, TN 37211
**PH 615-312-7272// CELL 615-636-7045**

**WellpathCare.com**

---

**From:** Kanwar Partap Singh Gill <kpsgill@kpsgill.com>
**Sent:** Tuesday, April 8, 2025 4:09 PM
**To:** Dheeraj Taranath <DTaranath@wellpath.us>; Angie Baldwin <ARBaldwin@wellpath.us>
**Cc:** webmaster@mbc.ca.gov
**Subject:** [EXT] Re: Urgent Request for CFMG-Led HR Oversight:

> CAUTION: This Email is from an EXTERNAL source. Do not click links or open attachments unless you
> recognize the sender and know the content is safe. Report suspicious messages to SPAM@Wellpath.us

---

**Subject:** Clarification of HR Jurisdiction and Demand for Physician-Led Oversight of CFMG Employment Matters

• Dr. Grady Judson Bazzel – California P&S License No. C 53908, Chief Executive Officer, CFMG

• Dr. Richard M. Medrano – California P&S License No. A 103477, Secretary, CFMG

• Dr. Scott Herbert Kennedy – California P&S License No. C 171808, Chief Financial Officer, CFMG

# In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.)

Dear Ms. Baldwin,

Thank you for acknowledging receipt of my recent emails and for including them in your investigative file.

Let me respectfully and unequivocally state that it is my continuing intent to communicate with California Forensic Medical Group (CFMG) leadership and request that any human resources investigation into my employment as a CFMG-employed physician be conducted either:

1. By an HR representative employed and directly supervised by a California-licensed physician within CFMG, or
2. Under the exclusive oversight of a physician-led panel consistent with the mandates of the California Medical Practice Act and the corporate practice of medicine (CPOM) doctrine.

I must also ask you to clearly identify your role in this matter:

- Are you conducting this HR investigation under the direction of CFMG or Wellpath?
- Do any of CFMG's physician-officers (such as Dr. Bazzel) formally supervise or approve your actions?
- Will your findings be considered binding for purposes of CFMG employment discipline, remediation, or termination?

These are critical threshold questions, particularly given your recent statement that I do not need to include Dr. Grady Bazzel—CFMG's CEO—in these communications. With respect, I must request a written confirmation of that assertion, as this statement will need to be forwarded to the Medical Board of California in connection with the active investigation into CFMG's HR governance structure and its compliance with California law.

As you are aware, I have made extensive disclosures concerning the misclassification of my wages, interference with patient care, retaliatory administrative behavior, and race- and national origin-based discrimination—all of which occurred under CFMG's direct authority. To that end, I am compelled to reiterate that these are not Wellpath matters. These are physician employment grievances governed under California law, requiring physician-led adjudication.

Your role as a Wellpath-employed HR professional may create an inherent conflict of interest when reviewing concerns that implicate CFMG's legal structure and California-specific employment protections. Without a clear delegation of investigatory authority from a CFMG physician-officer, any HR process led exclusively by you may be legally insufficient and procedurally invalid under California Business & Professions Code §§2400 et seq.

As a reminder, I previously addressed these issues in my April 3, 2025 letter to Wellpath's Chief Legal Officer Marc Goldstone, which was copied to Kerrie Webb, Staff Counsel for the Medical Board of California. That letter outlines how Wellpath's HR and corporate structure continue to violate CPOM restrictions, ERISA standards, and IRC §409A deferred compensation laws—all of which are now under regulatory scrutiny.

Additionally, I have communicated the urgency of these concerns to Dr. Dheeraj Taranath and CFMG leadership, including in my April 3 email regarding the April 11 meeting. I have clearly laid out the binding physician-led resolution terms that must be finalized in that meeting to avoid external escalation. These terms include employment protections, compensation parity, deferred compensation recovery, and full whistleblower safeguards—all of which are grounded in California's statutory protections for physicians and employees.

In light of the above, please confirm the following:

1. Whether your investigation is authorized by any of the California-licensed physician-officers of CFMG.
2. Whether your findings will be used to support or justify any future CFMG disciplinary actions.
3. Whether you have any direct reporting obligations to CFMG leadership.
4. Whether CFMG's physician-shareholders have delegated their non-delegable duties (under California law) to Wellpath's HR.
5. Whether Wellpath is asserting that your investigation satisfies California HR standards for professional medical corporations.

Absent affirmative and documented answers to these questions, I must regard the current HR review process as procedurally flawed and noncompliant with state law.

For the record, I am still fully open to an internal resolution—as emphasized in my prior correspondence. However, if this process continues without physician oversight, or if Dr. Bazzel is excluded from further communication, I will be obligated to report this as further evidence of CFMG's failure to retain legally required physician control over employment matters.

I respectfully await your clarification and look forward to a transparent discussion that complies with both California labor protections and our ethical duty to uphold physician autonomy in correctional healthcare.

Best regards,
**Dr. Kanwar P. Singh Gill**
Senior Physician
Fresno County Adult Detention Facility
Email: kpsgill@kpsgill.com
Sent from my personal email account for documentation and independence purposes

---

On Tue, Apr 8, 2025 at 12:04 PM Kanwar Partap Singh Gill <kpsgill@kpsgill.com> wrote:

> **Subject:** Urgent Request for CFMG-Led HR Oversight: Wellpath's Interference with CFMG Physician Employment Matters
>
> • Dr. Grady Judson Bazzel – California P&S License No. C 53908, Chief Executive Officer, CFMG

• Dr. Richard M. Medrano – California P&S License No. A 103477, Secretary, CFMG

• Dr. Scott Herbert Kennedy – California P&S License No. C 171808, Chief Financial Officer, CFMG

Dear Dr. Bazzel, Dr. Medrano, and Dr. Kennedy,

I write to you today not just as a colleague and long-standing CFMG physician, but as a party directly affected by what I must assert is an unlawful and inappropriate delegation of human resources oversight to Wellpath—a non-California management services organization. This matter demands urgent attention by CFMG's licensed physician leadership.

As you are aware, I am employed by **California Forensic Medical Group (CFMG)**. Yet, all current internal HR investigations into my employment-related grievances are being handled solely by **Angie Baldwin, a human resources officer of a Management Services Organization (WellPath)** based in Tennessee. While Ms. Baldwin has been communicative, she is not employed by CFMG and is not licensed to oversee or adjudicate employment matters involving California-licensed physicians governed under the Medical Practice Act and associated state labor protections.

Let me be clear: **these are not Wellpath matters**. These are employment-related grievances between a physician and CFMG—**a California professional medical corporation**. The decision to delegate this process to Wellpath, which is not licensed to engage in the practice of medicine or employ physicians under California law, amounts to a **violation of the corporate practice of medicine (CPOM) doctrine**, California Business & Professions Code §§ 2400 et seq., and likely exposes CFMG to civil and criminal liability.

**Summary of Concerns Raised (HR in Nature and CFMG-Specific):**

### 1. Race-Based Discrimination in Leadership

- I am the only brown physician remaining in senior leadership at our site.
- Despite more than five years of dedicated service with CFMG and having been licensed to practice medicine since 2009, I was passed over for the Medical Director position at the juvenile facility in favor of a physician who obtained their license in 2018. This decision raises significant concerns, particularly given the substantial difference in clinical experience and leadership tenure. I had formally expressed my interest in the role and engaged in direct dialogue with the Regional Director of Operations regarding this opportunity. However, after several discussions and assurances, the role was ultimately awarded to someone with markedly less experience. Based on this and several prior interactions, I must express—in the most professional but clear terms—that I do not have confidence in the Regional Director's judgment or impartiality. Her track record of unfulfilled commitments and lack of transparency remains one of my greatest concerns moving forward.
- The ongoing pattern of replacing physicians of color—particularly those of South Asian descent—with less experienced individuals raises serious concerns under the California Fair Employment and Housing Act (FEHA), particularly regarding discriminatory practices in leadership appointments based on both race and national origin.

### 2. Constructive Termination and Retaliation

- I received credible reports that the RDO, HSA, and DON have discussed "getting rid of me."
- My repeated whistleblower reports (on deferred compensation, administrative interference, and discrimination) have been met with hostility and coercive tactics.

### 3. Misclassification and Mishandling of Deferred Compensation

- My CFMG-earned deferred compensation has been wrongfully absorbed into the Wellpath bankruptcy estate.
- Wellpath HR staff (e.g., Donald White) have conflated CFMG and Wellpath wages, which undermines legal distinctions that must be maintained between the two entities.

### 4. Clinical Interference by Nonphysicians

- I was removed from control of a weekly patient care meeting (which I chair), which was rescheduled by non-physician staff to conflict with high-volume patient activity.
- These decisions have compromised patient care and violated my obligations under the Medical Practice Act.

### 5. Lack of CFMG-Led HR Grievance Process

- ○ Since November 2024, I have raised concerns internally without any action by a CFMG-based HR or physician-leader.
- ○ The current investigation led by Wellpath HR—without CFMG physician oversight—invalidates the entire process, particularly given the scope and substance of the allegations.

**My Formal Request to CFMG Shareholders**

I am now formally requesting that **a human resources representative employed by CFMG**—and reporting to a **California-licensed physician-officer of CFMG**—be assigned to oversee and adjudicate the investigation of my grievances. This includes the alleged:

- Racial discrimination;
- Constructive and retaliatory conduct;
- Compensation misappropriation; and
- Workplace interference that affects patient care and my medical license.

Any continued reliance on a Wellpath investigator for this matter will be viewed as a continued violation of CPOM and a dereliction of CFMG's non-delegable duties as a professional medical corporation under California law.

**Legal Exposure if Not Addressed**

Should any adverse action—up to and including termination—be taken against me while Wellpath is improperly handling what are clearly CFMG physician HR issues, I would have no option but to assert my rights under:

- **California Labor Code §1102.5 (whistleblower retaliation);**
- **California Fair Employment and Housing Act (FEHA);**
- **California Medical Practice Act (Business & Professions Code §§2052 et seq.);**
- **Federal ERISA and bankruptcy whistleblower provisions.**

Such a termination, under the present circumstances and timeline of protected activity, would appear overtly **retaliatory and discriminatory** on its face.

**Closing**

I have dedicated over five years of service to CFMG, consistently delivering exceptional clinical outcomes, financial savings, and professional leadership. I have made every effort to resolve these concerns internally and respectfully. It is now incumbent on you—as CFMG's licensed shareholders and physician leaders—to reclaim your statutory responsibilities and immediately assign a proper, physician-governed HR process for this matter.

Please confirm that this request is being escalated appropriately within CFMG, and that a CFMG-based HR professional—answering to physician leadership—will be assigned immediately to review and address my concerns.

Sincerely,
**Dr. Kanwar P. Gill**
Senior Physician, Fresno County Adult Detention Facility
*Sent from my personal account to preserve independence and documentation*

KPSGILL.COM

Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

## Fwd: Subject: Administrative Notice of Pending Service – Fresno County Counsel Coordination Initiated

1 message

---

**Kanwar Gill MD** <kpsgill@kpsgill.com>                                    Sat, Apr 12, 2025 at 5:53 PM
To: dcederborg@fresnocountyca.gov, District1@fresnocountyca.gov, District2@fresnocountyca.gov,
District3@fresnocountyca.gov, District4@fresnocountyca.gov, District5@fresnocountyca.gov

Dear Mr. Cederborg and Honorable Supervisors,

As a follow-up to my April 12 compliance advisories, I am forwarding below a formal notice that was transmitted to CFMG & Wellpath Holdings, Inc. and its counsel on the same date. The purpose of that communication was to clarify that procedural materials relevant to In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.) will be served to Fresno County beginning Monday, April 14, 2025, in light of the County's contractual and governance alignment with California Forensic Medical Group (CFMG) and Wellpath.

The message does not name Fresno County as an adversarial party. It does, however, document the factual and regulatory convergence now under federal review, which directly implicates the County's public oversight role under the CFMG contract and the Hall v. Fresno Remedial Plan.

This forwarded communication is provided in good faith and under privilege to ensure that all recipients are fully informed prior to upcoming court and regulatory proceedings. I welcome any formal acknowledgment of receipt from your office.

Respectfully,

Dr. Kanwar Partap Singh Gill

Senior Staff Physician – California Forensic Medical Group

Fresno County Adult Detention Facility

Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.)

Email: kpsgill@kpsgill.com

Attachment: Forwarded message dated April 12, 2025 – "Administrative Notice of Pending Service – Fresno County Counsel Coordination Initiated"

Best Regards,
Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

Begin forwarded message:

> **From:** Kanwar Gill MD <kpsgill@kpsgill.com>
> **Date:** April 12, 2025 at 3:41:23 PM PDT
> **To:** Marc Goldstone <MGoldstone@wellpath.us>, Angie Baldwin <ARBaldwin@wellpath.us>
> **Cc:** bankruptcymail@wellpath.us
> **Subject: Subject: Administrative Notice of Pending Service – Fresno County Counsel Coordination Initiated**

Subject: Administrative Notice of Pending Service – Fresno County Counsel Coordination Initiated

April 12th, 2025

To

Marc Goldstone mgoldstone@wellpath.us

Angie Baldwin angie_baldwin@wellpath.us

bankruptcymail@wellpath.us>

Dear Counsel,

This message is transmitted as a professional courtesy and should not be construed as a request for dialogue or as a waiver of any procedural, jurisdictional, or substantive rights. I write to confirm that, as of Monday, April 14, 2025, certain procedural materials will be formally transmitted to the Office of County Counsel for Fresno County, with appropriate informational coordination extended to the relevant supervisory offices therein.

This development is, in part, a natural consequence of the multidimensional alignment between administrative funding structures, professional governance frameworks, and fiduciary flows as they intersect across state-regulated and federally-overseen contractual entities. Accordingly, a limited set of documents reflecting material intersections of fact, oversight, and regulatory posture will be served to the County in its capacity as a coextensive contracting body within the operational framework relevant to the current matter pending before the United States Bankruptcy Court for the Southern District of Texas.

To preclude misunderstanding: no adversarial designation is being made with respect to any governmental recipient. Nor should this development be interpreted as a predicate to any declaratory position not already

subject to judicial review. Rather, the engagement of Fresno County at this juncture reflects a procedural alignment made necessary by the underlying structural convergence of corporate, clinical, and fiduciary authority, and the administrative role of County-funded governance mechanisms as they pertain to the subject entity's licensure and oversight environment.

The inclusion of this governmental actor in the service framework is neither novel nor dispositive. It merely reflects the factual trajectory now manifest in the record and acknowledges the emergent alignment between contract administration, physician oversight, and regulatory immunities as implicated under both § 362(b)(4) and § 524(e) of the Bankruptcy Code.

You are advised, out of prudence and fiduciary care, to update your internal understanding of all currently implicated counterparties, particularly as the structural implications now extend beyond vertical MSO arrangements and into layered zones of administrative entanglement not clearly disclosed in prior filings.

No additional disclosures will precede formal service. Any assumption of strategic intent in this message would be misplaced.

Sincerely,

Dr. Kanwar Partap Singh Gill

Senior Staff Physician – California Forensic Medical Group

Fresno County Adult Detention Facility

Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.)

Email: kpsgill@kpsgill.com

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

Begin forwarded message:

> **From:** Kanwar Partap Singh Gill <kpsgill@kpsgill.com>
> **Date:** April 10, 2025 at 9:38:59 PM PDT
> **To:** Marc Goldstone <MGoldstone@wellpath.us>, Felicia Perlman <Fperlman@mwe.com>, "Marcus A. Helt" <mhelt@mwe.com>, Steven Szanzer <sszanzer@mwe.com>, Carole Wurzelbacher <cwurzelbacher@mwe.com>, Grady J Bazzel <JBazzel@zenovacare.com>, Richard Medrano <RMedrano@wellpath.us>, Scott Kennedy <ScottKennedy@wellpath.us>, "Webb, Kerrie@MBC" <Kerrie.Webb@mbc.ca.gov>, Susan Hersh <Susan.Hersh@usdoj.gov>, Ha Nguyen <Ha.Nguyen@usdoj.gov>, lucas.schneider@stinson.com, USTPRegion07.HU.ECF@usdoj.gov, bankruptcymail@wellpath.us, ebarak@proskauer.com, brosen@proskauer.com, ddesatnik@proskauer.com, Zachary.hemenway@stinson.com, letf@dir.ca.gov, DLSE2@dir.ca.gov, ueo@edd.ca.gov, Kanwar Gill <kagill@wellpath.us>
> **Subject:** Final Legal Notice – CPOM Violations, Misappropriated Compensation, and Plan Objection Grounds - Wellpath Holdings, Inc. – Case No. 24-90533 (Bankr. S.D. Tex.)

**Subject:** Final Legal Notice – CPOM Violations, Misappropriated Compensation, and Plan Objection Grounds

**In re Wellpath Holdings, Inc. – Case No. 24-90533 (Bankr. S.D. Tex.)**

**To:**
Marc Goldstone – Chief Legal Officer, Wellpath
Felicia Perlman – Counsel, McDermott Will & Emery
Marcus Helt – Counsel, McDermott Will & Emery
Steven Szanzer – Counsel, McDermott Will & Emery
Carole Wurzelbacher – McDermott Will & Emery
Angie Baldwin – Senior Employee Relations Manager, Wellpath
Dr. Grady Judson Bazzel – CEO, California Forensic Medical Group (CFMG)
Dr. Richard Medrano – Secretary, CFMG
Dr. Scott Kennedy – CFO, CFMG
Kerrie Webb – Staff Counsel, Medical Board of California
United States Trustee, Southern District of Texas
Official Committee of Unsecured Creditors (via counsel)

**From:**
Dr. Kanwar P. Gill
Senior Physician, CFMG – Fresno County Adult Detention Facility
Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533

---

Dear Counsel, Officers, and Regulatory Authorities:

This message serves as formal and final **pre-filing notice** of legal, regulatory, and structural violations relevant to the **confirmation of the Chapter 11 Plan** in the above-captioned case. The facts presented herein will be **incorporated into my April 14th supplemental filing** and disseminated to state and federal enforcement bodies. The issues are no longer speculative; they are supported by a factual and documentary record, implicating multiple statutory and constitutional violations across:

- **California's Corporate Practice of Medicine (CPOM) doctrine**

- **Business and Professions Code §§ 2400–2417**

- **Labor Code § 1102.5 (Whistleblower Retaliation)**

- **ADA and FEHA (Title 42, U.S.C. §§ 12101 et seq.; Cal. Gov. Code §§ 12900 et seq.)**

- **ERISA fiduciary standards and IRC § 409A**

- **Bankruptcy Code §§ 362(b)(4), 524(e), and 1129(a)**

I. Non-Physician Control Over Physician Employment – CPOM Violations

Under **People v. Cole**, 38 Cal. 2d 99 (1951), and **Conway v. State Bd. of Med. Exam'rs**, 47 Cal. App. 2d 105 (1941), any lay control over the practice of medicine—including physician employment decisions—is void as against public policy. Despite Wellpath's MSO label, **CFMG physician governance has been functionally nullified** by direct administrative interference.

Specifically:

- **Angie Baldwin (Wellpath HR)** is conducting disciplinary investigations into CFMG-employed physicians without oversight by any California-licensed CFMG shareholder.

- **Deanna Huff (HSA, Wellpath)** has issued directives regarding physician productivity, scheduling, and documentation priorities in violation of Cal. Bus. & Prof. Code §§ 2052, 2264, and 2400.

- **Eric Krenz (DON, CFMG)** has aligned with non-physician executives at Wellpath to unilaterally reassign patient lists and direct triage workflows, violating Title 15 CCR § 1208 and § 1210.

- **Linda Matlock (RDO, Wellpath)** has issued clinical directives affecting physician operations despite not holding a medical license.

These acts represent not only CPOM violations but also potential grounds for license revocation under **In re Basile** and **In re Mukerji** (Medical Board of California precedent), and are reportable to the California Attorney General for prosecution under **Penal Code § 550.**

## II. Deferred Compensation Misappropriation – Trust and Tax Violations

My compensation—earned through CFMG employment—was **withheld and rerouted through a Non-Qualified Deferred Compensation Plan (NQDCP)** administered by Wellpath. Upon Wellpath's bankruptcy filing:

- My **NQDCP funds were frozen** and treated as property of the estate, in violation of **11 U.S.C. § 541(d).**

- No legal authority existed for Wellpath to administer, seize, or condition the return of funds earned under a **non-debtor entity (CFMG).**

- This mismanagement exposes me to tax penalties under **IRC § 409A** and potential ERISA breaches (see 29 U.S.C. § 1104).

**This claim is non-dischargeable, non-negotiable, and must be carved out.** I have formally demanded **return of funds with indemnity for all IRS and California FTB liabilities,** as stated in correspondence on record.

## III. Whistleblower Retaliation and Constructive Termination Efforts

After raising legal concerns—including CPOM violations, wage theft, and administrative interference—I was:

- Investigated by Wellpath HR under Ms. Baldwin's direction with no oversight from CFMG physician-shareholders;

- Removed from internal clinical leadership functions;

- Scheduled for meetings conflicting with patient care;

- Subject to a campaign of retaliation including **pretextual efforts to terminate or sideline me,** corroborated by internal discussions noted by site staff.

These are textbook violations under **Yanowitz v. L'Oreal,** 36 Cal. 4th 1028 (2005) and **Shephard v. Loyola Marymount,** 102 Cal. App. 4th 837 (2002). I have filed formal complaints with the **Medical Board of California, Department of Labor,** and **EEOC,** with additional filings to the **California Department of Fair Employment and Housing** imminent.

## IV. Plan Confirmation Barriers – Legal and Structural Defects

As currently proposed, the Plan:

- Relies on **illegal employment structures** in California, and thus fails the **§ 1129(a)(3) good faith requirement.**

- Proposes **non-consensual third-party releases** for CFMG and individual officers, in direct violation of **§ 524(e)** and **In re Pacific Lumber,** 584 F.3d 229 (5th Cir. 2009).

- Invokes an **improper extension of the automatic stay to non-debtor CFMG,** which the Fifth Circuit does not permit absent clear, record-supported findings—none of which exist here.

The **U.S. Supreme Court's ruling in Harrington v. Purdue Pharma, 603 U.S (2024)** places additional limitations on such non-consensual third-party releases. Wellpath cannot, through a bankruptcy plan, discharge regulatory liability or misappropriate physician wages earned outside of the debtor entity.

## V. Demand for Settlement or Carve-Out – Opportunity for Resolution

As outlined in prior communications, I remain open to settlement under the following **non-negotiable terms**:

1. **Immediate restoration of all deferred compensation** and indemnification for all associated tax liabilities;

2. **Employment protection against retaliatory termination**, memorialized in a binding agreement;

3. **Cessation of HR investigations** unless authorized by a California-licensed physician-officer;

4. **Structural reform** ensuring CPOM compliance through physician-governed oversight;

5. **Affirmation of whistleblower protections**, with standing to pursue injunctive relief if retaliated against.

Absent agreement on these points, **I will seek judicial relief and regulatory enforcement.** No court can confirm a plan that locks in an illegal, retaliatory, and structurally flawed corporate model.

VI. **Strategic Posture and Litigation Warning**

If Wellpath attempts to oppose my pending motions and defends the current structure, it will be **on record affirming a CPOM-violating model**, inviting enforcement from:

- **Medical Board of California**

- **IRS and Department of Labor**

- **State Attorneys General and DOJ Civil Rights Division**

This is not merely an employment dispute. It is a test of whether a national healthcare company may use **Chapter 11 to shield itself from state regulatory oversight**, seize physician trust assets, and retaliate against whistleblowers—all under federal court protection.

The answer, under law and policy, is no.

---

**Conclusion**

This email, and its supporting exhibits and communications, will be incorporated into my **supplemental filing**, no later than April 14th 2025 unless immediate corrective action is taken. I urge Wellpath and its counsel to act—*not only for your client's legal protection, but for the long-term sustainability of post-confirmation operations in California and other CPOM jurisdictions.*

Respectfully,
**Dr. Kanwar P. Gill**
Senior Physician, Fresno County Adult Detention Facility
Email: kpsgill@kpsgill.com
Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533

KPSGILL.COM

Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

## Legal Exposure and Regulatory Risk Arising from Administrative Interference in Medical Judgment—California Compliance Framework

1 message

**Kanwar Gill** <KaGill@wellpath.us>
To: "Marc D. Goldstone" <MGoldstone@wellpath.us>, Angie Baldwin <ARBaldwin@wellpath.us>

Thu, Apr 10, 2025 at 1:23 PM

**MEMORANDUM**
**To:** Marc Goldstone, Chief Legal Officer, Wellpath
**Cc:** Angie Baldwin, Senior Employee Relations Officer, Wellpath
**From:** Dr. Kanwar Gill, MD
**Date:** April 10, 2025
**Subject:** Legal Exposure and Regulatory Risk Arising from Administrative Interference in Medical Judgment—California Compliance Framework

### I. PURPOSE AND COMPLIANCE FRAMEWORK

This memorandum is submitted to provide a comprehensive legal analysis and formal notice regarding the administrative conduct of **Deanna Huff, Eric Krenz,** and **Linda Matlock**, whose recent actions at the Fresno County Adult Detention Facility raise significant and actionable concerns under:

- **California Business and Professions Code §§ 2052, 2264,** and **2400** (prohibiting the unlicensed practice of medicine and corporate interference in medical judgment);
- **California Code of Regulations Title 16 § 1364.10 et seq.;**
- **Medical Board of California disciplinary precedents** (e.g., *Basile, Wolfenden, Mukerji* cases);
- **Board of Registered Nursing (BRN) regulatory mandates for licensed RNs acting outside of scope;**
- **Penal Code § 550** (criminal penalties for false or unauthorized healthcare arrangements).

These violations are not speculative; they are directly supported by the attached **Medical Board Enforcement Actions** and **P&S Practice Guidelines**, which articulate enforcement standards, injunctive remedies, administrative sanctions, and prosecutorial pathways.

---

### II. ROLE-SPECIFIC VIOLATIONS AND LEGAL CONSEQUENCES

### A. Deanna Huff, RN – Health Services Administrator (Wellpath)

- Despite licensure as a Registered Nurse, Ms. Huff serves **solely as an administrative agent** of Wellpath, a non-clinical management services organization.
- Documented practices attributed to Ms. Huff include:
  - Reviewing physician productivity and documentation timeframes.
  - Dictating daily patient volumes and structuring physician schedules.
  - Exerting control over clinical referrals and procedural prioritization.

**Legal Implications**
These activities constitute **unauthorized practice of medicine** and, under **BPC §§ 2052 and 2264**, may result in:

- **Formal disciplinary action by the BRN;**
- **Cite-and-fine penalties up to $5,000 under CCR § 1364.11;**
- **Referral to the California Attorney General for misdemeanor prosecution** per BPC § 2052(d).

Additionally, as Huff acts on behalf of Wellpath, a **lay entity,** her conduct may be construed as *corporate interference* in violation of **BPC § 2400**, exposing both the organization and its officers to regulatory and civil sanctions.

---

## B. Eric Krenz, RN – Director of Nursing (CFMG)

- Mr. Krenz is an employee of CFMG, a physician-owned medical corporation. However, his conduct suggests de facto subordination to **Wellpath's operational hierarchy**, bypassing the authority of the Medical Director.

Key violations include:

- Interfering in physician schedules and assigning patients without physician direction;
- Taking operational cues from non-licensed administrative staff or regional managers rather than CFMG physician officers.

☑ **Legal Implications**

- **Aiding and abetting the unlicensed practice of medicine** per BPC § 2264, with direct disciplinary exposure;
- Possible **revocation of nursing license** for exceeding the legal scope of an RN;
- Risk of being charged as a **surrogate agent of a lay corporate practice**, mirroring findings in *Basile* and *Wolfenden* precedents.

Mr. Krenz's alignment with non-clinical decision-makers is particularly concerning given the clear **requirement under Title 15 CCR §§ 1208 and 1210** for physician-controlled delivery of care in correctional settings.

---

## C. Linda Matlock – Regional Director of Operations (Wellpath)

- **Ms. Matlock is not a licensed health professional but has** exercised direct influence over care coordination, referral decisions, and physician expectations.
- This exceeds her administrative scope and crosses into **clinical governance**.

☑ **Legal Implications**
Under **Medical Board and Attorney General standards**, this constitutes:

- **Unlicensed practice of medicine**;
- **False representation and control over a medical practice** (violating BPC §§ 2052, 2400, and 17500);
- Grounds for the Medical Board to seek **injunctive relief and civil penalties** via the California Department of Justice.

Should the Board pursue enforcement, her actions may also be subject to **§ 17200 claims** for unfair business practices and expose Wellpath to **organizational fines and restitution orders**.

---

## III. ORGANIZATIONAL RISK AND PRECEDENTIAL ENFORCEMENT

The **Medical Board of California's precedents** (*In re Basile*, *Wolfenden*, *Mukerji*) make clear:

- Physicians employed or affiliated with lay entities who allow control over patient care to be exercised by non-physicians are **subject to license revocation**, even absent intent;
- Lay administrators or RNs acting beyond scope may face **disciplinary, civil, and criminal actions**, including:
  - **Administrative suspension or revocation of licenses**;
  - **$2,500–$5,000 per violation** in fines under CCR § 1364.11;
  - **Injunctions under BPC §§ 125.5 and 2311**;
  - **Criminal referral** to the California Attorney General (BPC § 2052(a)).

These standards are designed to preserve the sanctity of medical decision-making and prevent precisely the kind of operational encroachment now observed at Fresno County Adult Detention Facility.

---

## IV. RECOMMENDED ACTIONS

1. **Immediate legal audit** of all administrative policies related to physician scheduling, documentation oversight, and referral coordination.
2. **Cease-and-desist directive** to all non-physician personnel engaged in or influencing medical decision-making.
3. **HR disciplinary review** of the conduct of Deanna Huff, Eric Krenz, and Linda Matlock in light of BPC violations.
4. **Independent third-party compliance training** for all Wellpath/CFMG personnel on California's CPOM doctrine and scope of practice.
5. **Corrective filings** with the Medical Board if any prior misrepresentations or role misclassifications have occurred.

## V. FINAL NOTICE AND PRESERVATION OF RIGHTS

This memorandum serves as formal notice of the aforementioned violations and as a protective record of compliance concerns. I reserve the right to present this information to regulatory bodies, including but not limited to:

- The Medical Board of California;
- The California Board of Registered Nursing;
- The California Attorney General's Office – Healthcare Fraud Division;

No further tolerance will be extended to administrative interference in medical decisions, and any retaliatory employment actions will be pursued as whistleblower retaliation under applicable statutes and federal protections.

Best Regards,

## Kanwar Gill MD

## CFMG+Wellpath

**Fresno County Adult Detention Facility**

1225 M Street, Fresno, CA 93721

Office: (559) 600-9365

Email: KaGill@wellpath.us

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

---

**From:** Kanwar Gill
**Sent:** Thursday, April 10, 2025 10:44 AM
**To:** Deanna Huff <Deanna.Huff@Wellpath.us>
**Cc:** Linda Matlock <LMatlock@Wellpath.us>; Heather Barry <HBarry@Wellpath.us>; Alla Liberstein <Alla.Liberstein@Wellpath.us>; Julius Metts <JuMetts@Wellpath.us>; Eric Krenz <EKrenz@Wellpath.us>; Angie Baldwin <ARBaldwin@Wellpath.us>
**Subject:** Referral Coordination, Regulatory Compliance, and Medical Oversight Standards
**Importance:** High

**Subject:** Referral Coordination, Regulatory Compliance, and Medical Oversight Standards

**To:** Deanna Huff, HSA
**CC:**
Linda Matlock – Regional Director of Operations
Heather Barry – Regional Vice President
Alla Liberstein, MD – Medical Director
Julius Metts, MD – Staff Physician
Eric Krenz – Director of Nursing

**From:** Dr. Kanwar Gill, MD
**Date:** April 10, 2025

Dear Deanna,

Thank you for your email and continued involvement in the care of highly complex, special needs patients. I would like to take a moment to express my genuine appreciation for the team-based model we strive to maintain, as well as the thoughtful collaboration from leadership, both locally and regionally.

That said, I would like to offer some formal clarification about the structure, content, and purpose of my recent communications and documentation, including the comprehensive nature of my recent chart reviews and team emails.

Over the past 10–15 days, I have had **direct discussions with the Chief Medical Officer of Wellpath**, during which expectations were clearly communicated regarding the documentation responsibilities of licensed physicians in correctional settings. As a result, the length and legal structure of my communications are **not arbitrary—they are deliberate, protective, and necessary.** These documents are crafted with three primary objectives:

1. **To comply with Title 15 of the California Code of Regulations**, particularly Sections 1208 and 1210;
2. **To fulfill the mandates of the Hall v. County of Fresno Remedial Plan**, including provisions on access to care, specialty referrals, and physician-led medical decision-making;
3. **To align with expectations of the Medical Board of California**, including protections against unlicensed practice and improper influence on physician clinical judgment.

This approach is also a direct response to recent oversight practices I have observed locally, including:

- Review of my productivity and documentation timing by unlicensed personnel;
- Interference in the creation and control of the physician schedule;
- Attempts to restrict or dictate the number of patients a physician may see per day;
- Requests for "AM/PM patient lists" used for performance monitoring outside of peer-reviewed, clinical frameworks.

Per **Business and Professions Code §§ 2052 and 2400**, and as reaffirmed by enforcement summaries from the **Medical Board of California**, these actions are **inconsistent with the lawful scope of practice** and may constitute elements of the unlicensed practice of medicine or illegal interference in a physician's duties. The law is clear that only **California-licensed physicians** may make medical decisions, including how many patients to see, who to see, and how clinical priorities are set.

To be clear: I remain fully willing to collaborate, advocate, and assist with patient care. But under California law, **clinical judgment and patient oversight must rest solely with the licensed physician.** Decisions involving the assignment of external providers or the structuring of the clinic day cannot be made by administrative or unlicensed staff—no matter how well intended.

Furthermore, **contracting with outside specialists** and ensuring network adequacy are administrative and operational tasks. While I will continue to support clinical handoffs, **the responsibility for sourcing, scheduling, and contracting with providers lies with Health Services Administration, Utilization Management, and Contracting**, per Wellpath's policies and consistent with the separation of duties required by state law.

I want to emphasize that **my objective is not to create conflict—but to ensure that we are all protected.** The current documentation trail serves to:

- **Defend against any allegations of substandard care or failure to act;**
- **Mitigate legal exposure** for myself and my employer CFMG;
- **Clarify the roles and legal responsibilities** of all team members involved in patient care.

I deeply value my working relationships with all of you. I remain grateful for the **leadership of our Medical Director, Dr. Alla Liberstein**, whose open-door policy and clinical collaboration I appreciate. I also commend **Linda Matlock and Heather Barry**, whose energy, expertise, and professionalism have made a lasting impression on me and others.

I believe in our team and in the mission of this facility. I want to continue to serve in a way that is both impactful and fully compliant with the expectations of the **Medical Board of California, Wellpath**, and **the laws governing licensed medical practice in this state.**

However, I must also be clear: **any further interference with my medical decisions, my patient lists, or documentation processes by unlicensed individuals will be addressed through the appropriate legal and regulatory pathways including but not limited to medical Board of California and California Board of registered nursing.** This message serves as a formal, professional notice of my expectations and legal protections under current state law and ethical medical standards.

I appreciate your understanding and your continued support as we work together to deliver patient-centered, compliant, and defensible care.

Best Regards,

# Kanwar Gill MD

CFMG+Wellpath

**Fresno County Adult Detention Facility**

1225 M Street, Fresno, CA 93721

Office: (559) 600-9365

**Email: KaGill@wellpath.us**


**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.



**2 attachments**

**Medical Board enforcement actions.pdf**
5831K

**P&S Practice Information _ Medical Board of California.pdf**
68K



## Urgent Continuation of April 12 Notice – Immediate County Action Required to Prevent Derivative and Regulatory Exposure ⅀



**Kanwar Gill MD** <kpsgill@kpsgill.com>                    Sat, Apr 12, 4:44 PM (2 days ago)   ☆   �averso
to dcederborg, District1, District2, District3, District4, District5 ▾

Subject: Urgent Continuation of April 12 Notice – Immediate County Action Required to Prevent Derivative and Regulatory Exposure

Dear Mr. Cederborg and Honorable Supervisors,

This correspondence follows and expressly supplements my privileged April 12, 2025 communication regarding the structural and regulatory entanglements now afflicting Fresno County through its ongoing contractual engagement with Califor Forensic Medical Group (CFMG) and its management entity, Wellpath. That initi advisory was issued in good faith to alert the County of emergent liabilities that— left unaddressed—may culminate in irreversible legal, financial, and reputational harm to the County. Today's continuation is not merely advisory; it constitutes a direct call to action to preserve institutional integrity, avoid judicial entanglement and mitigate imminent exposure across multiple statutory domains.

The convergence of issues now before the United States Bankruptcy Court in In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.), has revealed inescapable overlap between the County's publicly funded correctional healthcare



KPSGILL.COM

Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

## Fwd: Subject: Administrative Notice of Pending Service – Fresno County Counsel Coordination Initiated

1 message

---

**Kanwar Gill MD** <kpsgill@kpsgill.com>                                    Sat, Apr 12, 2025 at 5:53 PM
To: dcederborg@fresnocountyca.gov, District1@fresnocountyca.gov, District2@fresnocountyca.gov,
District3@fresnocountyca.gov, District4@fresnocountyca.gov, District5@fresnocountyca.gov

Dear Mr. Cederborg and Honorable Supervisors,

As a follow-up to my April 12 compliance advisories, I am forwarding below a formal notice that was transmitted to CFMG & Wellpath Holdings, Inc. and its counsel on the same date. The purpose of that communication was to clarify that procedural materials relevant to In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.) will be served to Fresno County beginning Monday, April 14, 2025, in light of the County's contractual and governance alignment with California Forensic Medical Group (CFMG) and Wellpath.

The message does not name Fresno County as an adversarial party. It does, however, document the factual and regulatory convergence now under federal review, which directly implicates the County's public oversight role under the CFMG contract and the Hall v. Fresno Remedial Plan.

This forwarded communication is provided in good faith and under privilege to ensure that all recipients are fully informed prior to upcoming court and regulatory proceedings. I welcome any formal acknowledgment of receipt from your office.

Respectfully,

Dr. Kanwar Partap Singh Gill

Senior Staff Physician – California Forensic Medical Group

Fresno County Adult Detention Facility

Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.)

Email: kpsgill@kpsgill.com

Attachment: Forwarded message dated April 12, 2025 – "Administrative Notice of Pending Service – Fresno County Counsel Coordination Initiated"

Best Regards,
Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

Begin forwarded message:

**From:** Kanwar Gill MD <kpsgill@kpsgill.com>
**Date:** April 12, 2025 at 3:41:23 PM PDT
**To:** Marc Goldstone <MGoldstone@wellpath.us>, Angie Baldwin <ARBaldwin@wellpath.us>
**Cc:** bankruptcymail@wellpath.us
**Subject: Subject: Administrative Notice of Pending Service – Fresno County Counsel Coordination Initiated**

Subject: Administrative Notice of Pending Service – Fresno County Counsel Coordination Initiated

April 12th, 2025

To

Marc Goldstone mgoldstone@wellpath.us

Angie Baldwin angie_baldwin@wellpath.us

bankruptcymail@wellpath.us>

Dear Counsel,

This message is transmitted as a professional courtesy and should not be construed as a request for dialogue or as a waiver of any procedural, jurisdictional, or substantive rights. I write to confirm that, as of Monday, April 14, 2025, certain procedural materials will be formally transmitted to the Office of County Counsel for Fresno County, with appropriate informational coordination extended to the relevant supervisory offices therein.

This development is, in part, a natural consequence of the multidimensional alignment between administrative funding structures, professional governance frameworks, and fiduciary flows as they intersect across state-regulated and federally-overseen contractual entities. Accordingly, a limited set of documents reflecting material intersections of fact, oversight, and regulatory posture will be served to the County in its capacity as a coextensive contracting body within the operational framework relevant to the current matter pending before the United States Bankruptcy Court for the Southern District of Texas.

To preclude misunderstanding: no adversarial designation is being made with respect to any governmental recipient. Nor should this development be interpreted as a predicate to any declaratory position not already

subject to judicial review. Rather, the engagement of Fresno County at this juncture reflects a procedural alignment made necessary by the underlying structural convergence of corporate, clinical, and fiduciary authority, and the administrative role of County-funded governance mechanisms as they pertain to the subject entity's licensure and oversight environment.

The inclusion of this governmental actor in the service framework is neither novel nor dispositive. It merely reflects the factual trajectory now manifest in the record and acknowledges the emergent alignment between contract administration, physician oversight, and regulatory immunities as implicated under both § 362(b)(4) and § 524(e) of the Bankruptcy Code.

You are advised, out of prudence and fiduciary care, to update your internal understanding of all currently implicated counterparties, particularly as the structural implications now extend beyond vertical MSO arrangements and into layered zones of administrative entanglement not clearly disclosed in prior filings.

No additional disclosures will precede formal service. Any assumption of strategic intent in this message would be misplaced.

Sincerely,

Dr. Kanwar Partap Singh Gill

Senior Staff Physician – California Forensic Medical Group

Fresno County Adult Detention Facility

Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.)

Email: kpsgill@kpsgill.com

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

Begin forwarded message:

> **From:** Kanwar Partap Singh Gill <kpsgill@kpsgill.com>
> **Date:** April 10, 2025 at 9:38:59 PM PDT
> **To:** Marc Goldstone <MGoldstone@wellpath.us>, Felicia Perlman <Fperlman@mwe.com>, "Marcus A. Helt" <mhelt@mwe.com>, Steven Szanzer <sszanzer@mwe.com>, Carole Wurzelbacher <cwurzelbacher@mwe.com>, Grady J Bazzel <JBazzel@zenovacare.com>, Richard Medrano <RMedrano@wellpath.us>, Scott Kennedy <ScottKennedy@wellpath.us>, "Webb, Kerrie@MBC" <Kerrie.Webb@mbc.ca.gov>, Susan Hersh <Susan.Hersh@usdoj.gov>, Ha Nguyen <Ha.Nguyen@usdoj.gov>, lucas.schneider@stinson.com, USTPRegion07.HU.ECF@usdoj.gov, bankruptcymail@wellpath.us, ebarak@proskauer.com, brosen@proskauer.com, ddesatnik@proskauer.com, Zachary.hemenway@stinson.com, letf@dir.ca.gov, DLSE2@dir.ca.gov, ueo@edd.ca.gov, Kanwar Gill <kagill@wellpath.us>
> **Subject: Final Legal Notice – CPOM Violations, Misappropriated Compensation, and Plan Objection Grounds - Wellpath Holdings, Inc. – Case No. 24-90533 (Bankr. S.D. Tex.)**

**Subject:** Final Legal Notice – CPOM Violations, Misappropriated Compensation, and Plan Objection Grounds

**In re Wellpath Holdings, Inc. – Case No. 24-90533 (Bankr. S.D. Tex.)**

**To:**
Marc Goldstone – Chief Legal Officer, Wellpath
Felicia Perlman – Counsel, McDermott Will & Emery
Marcus Helt – Counsel, McDermott Will & Emery
Steven Szanzer – Counsel, McDermott Will & Emery
Carole Wurzelbacher – McDermott Will & Emery
Angie Baldwin – Senior Employee Relations Manager, Wellpath
Dr. Grady Judson Bazzel – CEO, California Forensic Medical Group (CFMG)
Dr. Richard Medrano – Secretary, CFMG
Dr. Scott Kennedy – CFO, CFMG
Kerrie Webb – Staff Counsel, Medical Board of California
United States Trustee, Southern District of Texas
Official Committee of Unsecured Creditors (via counsel)

**From:**
Dr. Kanwar P. Gill
Senior Physician, CFMG – Fresno County Adult Detention Facility
Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533

---

Dear Counsel, Officers, and Regulatory Authorities:

This message serves as formal and final **pre-filing notice** of legal, regulatory, and structural violations relevant to the **confirmation of the Chapter 11 Plan** in the above-captioned case. The facts presented herein will be **incorporated into my April 14th supplemental filing** and disseminated to state and federal enforcement bodies. The issues are no longer speculative; they are supported by a factual and documentary record, implicating multiple statutory and constitutional violations across:

- **California's Corporate Practice of Medicine (CPOM) doctrine**

- **Business and Professions Code §§ 2400–2417**

- **Labor Code § 1102.5 (Whistleblower Retaliation)**

- **ADA and FEHA (Title 42, U.S.C. §§ 12101 et seq.; Cal. Gov. Code §§ 12900 et seq.)**

- **ERISA fiduciary standards and IRC § 409A**

- **Bankruptcy Code §§ 362(b)(4), 524(e), and 1129(a)**

I. Non-Physician Control Over Physician Employment – CPOM Violations

Under **People v. Cole**, 38 Cal. 2d 99 (1951), and **Conway v. State Bd. of Med. Exam'rs**, 47 Cal. App. 2d 105 (1941), any lay control over the practice of medicine—including physician employment decisions—is void as against public policy. Despite Wellpath's MSO label, **CFMG physician governance has been functionally nullified** by direct administrative interference.

Specifically:

- **Angie Baldwin (Wellpath HR)** is conducting disciplinary investigations into CFMG-employed physicians without oversight by any California-licensed CFMG shareholder.

- **Deanna Huff (HSA, Wellpath)** has issued directives regarding physician productivity, scheduling, and documentation priorities in violation of Cal. Bus. & Prof. Code §§ 2052, 2264, and 2400.

- **Eric Krenz (DON, CFMG)** has aligned with non-physician executives at Wellpath to unilaterally reassign patient lists and direct triage workflows, violating Title 15 CCR § 1208 and § 1210.

- **Linda Matlock (RDO, Wellpath)** has issued clinical directives affecting physician operations despite not holding a medical license.

These acts represent not only CPOM violations but also potential grounds for license revocation under **In re Basile** and **In re Mukerji** (Medical Board of California precedent), and are reportable to the California Attorney General for prosecution under **Penal Code § 550**.

## II. Deferred Compensation Misappropriation – Trust and Tax Violations

My compensation—earned through CFMG employment—was **withheld and rerouted through a Non-Qualified Deferred Compensation Plan (NQDCP)** administered by Wellpath. Upon Wellpath's bankruptcy filing:

- My **NQDCP funds were frozen** and treated as property of the estate, in violation of **11 U.S.C. § 541(d).**

- No legal authority existed for Wellpath to administer, seize, or condition the return of funds earned under a **non-debtor entity (CFMG).**

- This mismanagement exposes me to tax penalties under **IRC § 409A** and potential ERISA breaches (see 29 U.S.C. § 1104).

**This claim is non-dischargeable, non-negotiable, and must be carved out.** I have formally demanded **return of funds with indemnity for all IRS and California FTB liabilities**, as stated in correspondence on record.

## III. Whistleblower Retaliation and Constructive Termination Efforts

After raising legal concerns—including CPOM violations, wage theft, and administrative interference—I was:

- Investigated by Wellpath HR under Ms. Baldwin's direction with no oversight from CFMG physician-shareholders;

- Removed from internal clinical leadership functions;

- Scheduled for meetings conflicting with patient care;

- Subject to a campaign of retaliation including **pretextual efforts to terminate or sideline me**, corroborated by internal discussions noted by site staff.

These are textbook violations under **Yanowitz v. L'Oreal**, 36 Cal. 4th 1028 (2005) and **Shephard v. Loyola Marymount**, 102 Cal. App. 4th 837 (2002). I have filed formal complaints with the **Medical Board of California**, **Department of Labor**, and **EEOC**, with additional filings to the **California Department of Fair Employment and Housing** imminent.

## IV. Plan Confirmation Barriers – Legal and Structural Defects

As currently proposed, the Plan:

- Relies on **illegal employment structures** in California, and thus fails the **§ 1129(a)(3) good faith requirement.**

- Proposes **non-consensual third-party releases** for CFMG and individual officers, in direct violation of **§ 524(e)** and **In re Pacific Lumber**, 584 F.3d 229 (5th Cir. 2009).

- Invokes an **improper extension of the automatic stay to non-debtor CFMG**, which the Fifth Circuit does not permit absent clear, record-supported findings—none of which exist here.

The **U.S. Supreme Court's ruling in Harrington v. Purdue Pharma, 603 U.S (2024)** places additional limitations on such non-consensual third-party releases. Wellpath cannot, through a bankruptcy plan, discharge regulatory liability or misappropriate physician wages earned outside of the debtor entity.

## V. Demand for Settlement or Carve-Out – Opportunity for Resolution

As outlined in prior communications, I remain open to settlement under the following **non-negotiable terms**:

1. **Immediate restoration of all deferred compensation** and indemnification for all associated tax liabilities;

2. **Employment protection against retaliatory termination**, memorialized in a binding agreement;

3. **Cessation of HR investigations** unless authorized by a California-licensed physician-officer;

4. **Structural reform** ensuring CPOM compliance through physician-governed oversight;

5. **Affirmation of whistleblower protections**, with standing to pursue injunctive relief if retaliated against.

Absent agreement on these points, **I will seek judicial relief and regulatory enforcement.** No court can confirm a plan that locks in an illegal, retaliatory, and structurally flawed corporate model.

## VI. Strategic Posture and Litigation Warning

If Wellpath attempts to oppose my pending motions and defends the current structure, it will be **on record affirming a CPOM-violating model**, inviting enforcement from:

- **Medical Board of California**

- **IRS and Department of Labor**

- **State Attorneys General and DOJ Civil Rights Division**

This is not merely an employment dispute. It is a test of whether a national healthcare company may use **Chapter 11 to shield itself from state regulatory oversight**, seize physician trust assets, and retaliate against whistleblowers—all under federal court protection.

The answer, under law and policy, is no.

---

## Conclusion

This email, and its supporting exhibits and communications, will be incorporated into my **supplemental filing**, no later than April 14th 2025 unless immediate corrective action is taken. I urge Wellpath and its counsel to act—*not only for your client's legal protection, but for the long-term sustainability of post-confirmation operations in California and other CPOM jurisdictions.*

Respectfully,
**Dr. Kanwar P. Gill**
Senior Physician, Fresno County Adult Detention Facility
Email: kpsgill@kpsgill.com
Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533

| | |
|---|---|
| **From:** | Heather Barry <HBarry@Wellpath.us> |
| **Sent:** | Tuesday, September 17, 2024 2:39 PM |
| **To:** | Kanwar Gill |
| **Cc:** | Linda Matlock |
| **Subject:** | Re: Follow Up - Pay Parity/Raise |

Thanks Dr Gill
Linda is currently working with Terry on this quarter's compensation file

On Sep 17, 2024, at 1:59 PM, Kanwar Gill <KaGill@wellpath.us> wrote:

Hello Linda and Heather,

I was wondering if there is an update.  My fifth anniversary of employment with the company is this month. On September 30th 2024, I will complete five years with Wellpath. I was informed by HR that I will see a pay increase starting October 1st 2024.  Please let me know if there is anything I have to do in the interim.

Best Regards,
**Kanwar Gill MD**

**Wellpath**

**Fresno County Adult Detention Facility**
1225 M Street, Fresno, CA 93721
Office: (559) 600-9365
Email: KaGill@wellpath.us

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

---

**From:** Kanwar Gill
**Sent:** Wednesday, August 28, 2024 10:07 AM
**To:** 'Linda Matlock' <LMatlock@Wellpath.us>
**Cc:** Heather Barry <HBarry@Wellpath.us>
**Subject:** RE: Follow Up - Pay Parity/Raise

Good Morning Linda and Heather,

How are you both doing?

I was wondering how long the evaluation of pay rate takes ?

This past weekend I attended a 50th birthday celebration of a local physician, an event attended by more than 100 local physicians. I was surprised how the local market has shifted due to medical (including physician) workforce shortage.

I am hoping to get an increase considering changing market conditions. For your reference, I have attached a screenshot.
Earlier this year, a physician, Inga Bates MD, worked for WellPath and later left WellPath citing compensation . She works as a Correctional Physician with state prison. This is a comparable position. Please find below a snapshot of her 2023 and 2022 pay (taken from CA state records) for your review.

In the last two years, my job duties here in Fresno County Jail have changed significantly. I am now making facility wide decisions from housing to infection control to seeing patients from all three Jails due to staffing shortage. Housing shortages in OPHU has posed increased risk to me professionally as I constantly work with our custody partners to keep transferring patients out of OPHU.

In past, my work was limited to the floor I was. When I came to OPHU in September 2020, I took over review and approval of RN paperwork (structured forms) from all three facilities without asking for a raise. Over the years, I have repeatedly asked for help from other staff MDs to share my responsibilities but no one accepted to share the duties especially as they pertain to supervision of RNs documentations. I was told by other staff MDs that nursing documentation review and approval is a "high liability business".

I hope everything I do will be taken into consideration because I have supported Medical Leadership since September 2020, like I never did as a floor physician prior to that.

<image004.jpg>

Best Regards,
**Kanwar Gill MD**

Wellpath

**Fresno County Adult Detention Facility**
1225 M Street, Fresno, CA 93721
Office: (559) 600-9365
Email: KaGill@wellpath.us

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

**From:** Linda Matlock <LMatlock@Wellpath.us>
**Sent:** Wednesday, August 21, 2024 4:08 PM

**To:** Kanwar Gill <KaGill@Wellpath.us>
**Subject:** Follow Up

Hi Dr. Gill,
I apologize for not getting back to you sooner after we checked in regarding your rate. I am working with our RVP to see how we can adjust and will let you know once I hear back.

Thank you,
Linda

**LINDA L. MATLOCK**
Regional Director of Operations, Central Valley – Local Government Division
<image005.png>
<image006.png>

**CELL** 916-717-1179
**OFFICE** 279-790-2001

LinkedIn // Facebook
**WellpathCare.com**

KPSGILL.COM                                          Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

## RE: Clarification on HR Oversight, HR scope and Direction for Non-Bankruptcy Matters
1 message

---

**Dheeraj Taranath** <DTaranath@wellpath.us>                         Wed, Apr 9, 2025 at 12:43 PM
To: Kanwar Gill <KaGill@wellpath.us>, Kanwar Gill MD <kpsgill@kpsgill.com>
Cc: Grady J Bazzel <JBazzel@zenovacare.com>, "Richard M. Medrano" <RMedrano@wellpath.us>, Scott Kennedy
<ScottKennedy@wellpath.us>

Dr. Gill,


As you are aware, Wellpath is the Management Services Organization contracted to provide the full range of
administrative services to CFMG. As such, I am responding to your email below.


I am not going to debate whether any offers to resolve your deferred compensation plan claims were made. You have
confirmed that you rejected anything that even resembled an offer. We are in agreement that no offers are on the table.


I disagree with your assertion that there has been any rejection of a "legally compliant resolution process," whatever that
might mean. If you want to engage in a legal discussion, please engage counsel and have them contact our lawyers.
Your allegations relating to CFMG's obligations under the California Medical Practice Act are both unsupported and
baseless, and simply have no merit.


Your various allegations will be addressed by the appropriate parties. I understand you have already been in contact with
Ms. Angie Baldwin regarding the HR-related issues.


With respect to the laundry list of questions and issues in your email, you can direct them to the investigator(s) when they
contact you. I encourage you to engage counsel as you are making serious allegations that we believe are legally
inaccurate and the defamatory statements you are making may be actionable.


I ask that you stop sending repetitious emails stating your complaints and unsupported allegations. It is not a productive
use of either your time or mine.


Respectfully,



**Dheeraj Taranath, DO, MBA, MS**

Chief Medical Officer



3340 Perimeter Hill Dr., Nashville, TN 37211

M <u>304-376-4036</u>

LinkedIn // Facebook // Twitter

WellpathCare.com

---

**From:** Kanwar Gill <KaGill@Wellpath.us>
**Sent:** Tuesday, April 8, 2025 6:53 PM
**To:** Dheeraj Taranath <DTaranath@Wellpath.us>; Kanwar Gill MD <kpsgill@kpsgill.com>; Kerrie.Webb@mbc.ca.gov
**Cc:** Grady J Bazzel <JBazzel@Zenovacare.com>; Richard M. Medrano <RMedrano@Wellpath.us>; Scott Kennedy <ScottKennedy@Wellpath.us>; Angie Baldwin <ARBaldwin@Wellpath.us>
**Subject:** Clarification on HR Oversight, HR scope and Direction for Non-Bankruptcy Matters
**Importance:** High

**Subject:** Clarification on Oversight, HR Scope, and Direction for Non-Bankruptcy Issues
**To:** Dr. Dheeraj Taranath
**CC:** Ms. Angie Baldwin, Dr. Grady Bazzel
**From:** Dr. Kanwar Gill
**Date:** April 8, 2025

In Complaint/Matter Before Medical Board of California regarding:

• Dr. Grady Judson Bazzel – California P&S License No. C 53908, Chief Executive Officer, CFMG

• Dr. Richard M. Medrano – California P&S License No. A 103477, Secretary, CFMG

• Dr. Scott Herbert Kennedy – California P&S License No. C 171808, Chief Financial Officer, CFMG

Dear Dr. Taranath,

Thank you for your message. I acknowledge your update confirming that Wellpath, in its role as Management Services Organization for CFMG, has communicated with CFMG leadership regarding the matters I raised. I also understand that, based on your joint assessment with CFMG leadership, the previously scheduled April 11 in-person meeting has now been unilaterally canceled by CFMG. Additionally, you've stated that any prior communications that could be construed as settlement offers are withdrawn and that the bankruptcy proceedings will now solely govern my deferred compensation claim, with further communication directed to McDermott Will & Emery.

For the record, I must clarify that at no point have I discussed or negotiated any dollar amount related to my deferred compensation claim with you personally. I categorically reject any suggestion that I was ever extended a legitimate or authorized offer through you. The only communications that resembled "offers" came from bankruptcy counsel at McDermott Will & Emery around March 20, 2025. Those proposals were unequivocally rejected by me at the time, as they were coercive in nature, conditioned on the withdrawal of legal filings, and accompanied by inappropriate non-disclosure requirements. They were not offered in good faith and were inconsistent with both bankruptcy ethics and California regulatory obligations.

More importantly, CFMG's unilateral cancellation of the April 11 meeting—an opportunity I explicitly requested for the presence of a California-licensed physician-officer with authority to resolve the matter internally—must be viewed as a willful rejection of a legally compliant resolution process. This decision eliminates CFMG's remaining opportunity to resolve my claims in accordance with California law, and it reinforces the concern that the organization is continuing in willful defiance of its legal obligations under the California Medical Practice Act.

As I have stated previously, I may ultimately lose my motions before the U.S. Bankruptcy Court in the Southern District of Texas. However, such an outcome does not absolve any party of its obligations under California law, nor does it preclude regulatory or civil enforcement at the state level. A loss in bankruptcy court does not equate to legal validation of the practices I have challenged—it simply reflects the narrow jurisdiction and procedural limits of that venue.

In light of these developments, I request immediate clarification on the following two key areas:

**1. Direction for Non-Bankruptcy Matters:**

While I understand that my deferred compensation claim is now being handled through the bankruptcy process, I ask for a clear directive as to how Wellpath and CFMG intend to address the other issues I have raised—specifically:

- Employment-related grievances
- Allegations of racial discrimination
- Constructive termination efforts
- Interference in clinical workflows
- Misappropriation of medical decision-making authority

Please advise whether these issues are still under the purview of Wellpath HR or CFMG physician leadership, or bankruptcy counsel. I request written clarification on the appropriate channels moving forward for each category of concern.

**2. Scope and Oversight of the HR Investigation:**

I understand Ms. Baldwin is currently reviewing relevant HR and employee relations matters. However, many of the issues raised fall outside a traditional HR framework and directly implicate:

- Violations of the California Medical Practice Act
- Fee-splitting concerns under Cal. Bus. & Prof. Code § 650
- Improper clinical interference by nonphysician administrators
- Racial bias and discriminatory promotion practices
- Retaliatory conduct targeting a whistleblower

As an employee of CFMG, a physician-owned and physician-controlled California medical corporation, any HR review touching on clinical governance, compensation, or disciplinary action must include oversight by a California-licensed physician-officer. Please confirm whether such oversight will be provided, and whether HR findings involving clinical decision-making will be subject to co-review and formal ratification by a CFMG shareholder physician.

**For the record, I reaffirm the following points:**

- I have maintained an unblemished clinical record over the past 5.5 years, consistently improving outcomes and reducing costs.
- I have formally reported wage misclassification, improper deferred compensation handling, and administrative interference to multiple regulatory bodies.
- I have filed a pending complaint with the Medical Board of California regarding failures by three CFMG shareholder physicians to protect physician autonomy.
- I had called for an April 11 internal resolution meeting, which was a final opportunity to address these matters lawfully. That meeting has now been unilaterally canceled by CFMG.

**Outstanding Clarification Requests:**

I respectfully request your timely response to the following:

- Will Ms. Baldwin's HR review include the racial discrimination, retaliation, and clinical interference allegations I have outlined?
- Will CFMG assign a California-licensed physician-officer with decision-making authority to co-lead or oversee HR matters affecting licensed medical practice?
- What internal pathway remains for resolution of non-bankruptcy issues, including clinical interference and professional governance?
- Do you require any further documentation from me at this stage?
- Will the delayed APAP procurement for patient #0059555—an incident emblematic of improper administrative obstruction—be incorporated into the ongoing review?

Thank you again for your attention. I remain committed to pursuing a lawful and good faith resolution wherever possible and look forward to receiving your response and clarification on next steps.

Respectfully,
**Dr. Kanwar Gill**
Senior Physician, Fresno County Adult Detention Facility
1225 M Street, Fresno, CA 93721
Office: (559) 600-9365 | Email: KaGill@wellpath.us

IMPORTANT CONFIDENTIALITY NOTICE:

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

---

**From:** Dheeraj Taranath <DTaranath@Wellpath.us>
**Sent:** Tuesday, April 8, 2025 2:54 PM
**To:** Kanwar Gill MD <kpsgill@kpsgill.com>; Kanwar Gill <KaGill@Wellpath.us>
**Cc:** Grady J Bazzel <JBazzel@Zenovacare.com>; Richard M. Medrano <RMedrano@Wellpath.us>; Scott Kennedy <ScottKennedy@Wellpath.us>
**Subject:** Resolution response

Dr. Gill,

As you are aware, Wellpath is the Management Services Organization contracted to provide the full range of administrative services to CFMG. As such, we have reviewed the matters you have raised with CFMG leadership, and we continue to communicate with you with their knowledge and approval.

As previously noted, Cindy and I were planning to come out to California to meet with you in a good faith attempt to resolve the disagreement regarding your claim for deferred compensation. In light of the numerous false statements in your correspondence, we have recommended to CFMG leadership, and they have agreed that a meeting would not be productive; therefore, please be advised that the meeting is now canceled.  To the extent that any prior correspondence could be interpreted as an offer to resolve your claim, any such offer is withdrawn.

The bankruptcy proceedings will determine the results of your claim.  Our counsel has advised us that your arguments are legally invalid and they believe they will be summarily rejected by the court.   Please direct all future correspondence regarding the matter to the court or to our lawyers with McDermott, Will & Emery; you may contact David Genender (dgenender@mwe.com).

Regards,

**Dheeraj Taranath, DO, MBA, MS**

Chief Medical Officer



3340 Perimeter Hill Dr., Nashville, TN 37211

**M** 304-376-4036

LinkedIn // Facebook // Twitter

WellpathCare.com

**rom:** Eric Krenz <EKrenz@Wellpath.us>
**Sent:** Wednesday, April 2, 2025 10:32 AM
**To:** danielle muratore; Deanna Huff; Kanwar Gill; Fresno Adult RN Supervisor; Candice Sisco
**Cc:** Cindy Ramirez
**Subject:** Canceled: Weekly OPHU Rounding
**When:** Occurs every Tuesday effective 2/25/2025 from 2:00 PM to 2:30 PM (UTC-08:00) Pacific Time (US & Canada).
**Where:** MJ OPHU
**Importance:** High

This recurring meeting will be moved to Mondays to ensure potential weekend changes are communicated in a more timely manner.

 Eric Krenz

Wed 3/12/2025 9:36 AM
To: Benjamin Ward; Julius Metts; Kanwar Gill
Cc: Deanna Huff

Inbox

Good Morning Ben,

I will chime in here as I am sure Dr. Metts has a few hundred emails to comb through.

The IP does not get to decide the assigned provider. He does have the right to refuse services. As you have indicated in the below thread, our Medical Director has reviewed the chart, has been consulted to determine the plan of care is appropriate, and there is no further indication for this IP to be evaluated by a higher level of care post Specialty diagnostics.

The IP can continue to submit HSR's and will be scheduled accordingly. If he continues to refuse services please continue to complete the refusal form along with charting of education, and IP's reasoning. Of course, we are speaking of this event alone, and if the IP were to present different, you would assess and treat accordingly; if the IP allows and does not refuse.

Thank you for bringing this topic to the top of our emails.


Thank you,

Eric Krenz II, RN
Director of Nursing



↶ Reply | ⌄    🗑 Delete    Junk | ⌄    •••                                              ✕

## Re: Printing daily sick lists

 **Riaz Qamar**                                              ↶ Reply | ⌄
Thu 4/3/2025 9:05 AM
To:  Eric Krenz; Deanna Huff
Cc:  **Fresno Adult Care Managers; Fresno Adult Providers; Linda Matlock** ⌃

Inbox

 MJ 3 4 schedule.pdf                    ⌄
166 KB

Download

Here is the schedule for MJ 3, 4 in the attachment.


Riaz Qamar NP

---

**From:** Eric Krenz
**Sent:** Thursday, April 3, 2025 6:51 AM
**To:** Deanna Huff; Eric Krenz
**Cc:** Fresno Adult Care Managers; Fresno Adult Providers; Linda Matlock
**Subject:** RE: Printing daily sick lists

Good Morning,

To ensure that task lists are being pulled correctly and completed within CorEMR, please send a copy of your pulled list at the beginning of your shift, as well as, a list of patients seen at the end of your shift.  This request does include OPHU, and Booking. We will also be covering how to pull lists and other CorEMR fundamentals each week during the Provider meeting. Once we are all Super Users we will end the daily sending of lists but until then thank you for your understanding and cooperation.

Thank you,

Eric Krenz II, RN
Director of Nursing


To hope and healing.


**Fresno County Adult Detention Facility**



Cell: (559) 909-8025
EKrenz@wellpath.us

**This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.**

**From:** Eric Krenz
**Sent:** Thursday, March 27, 2025 3:00 PM
**To:** Deanna Huff <Deanna.Huff@Wellpath.us>; EKrenz@wellpath.us
**Cc:** Fresno Adult Care Managers <FresnoAdultCareManagers@wellpath.us>
**Subject:** Printing daily sick lists

Good Afternoon Providers,

Starting Monday, 3/31/25, please be prepared print your own daily schedule task list.  Triaged by emergent, urgent, and then overdue by latest date. Once printed, please provide a copy to the Cage Managers to ensure printing set-up/triage was performed correctly. The Care Managers will be available to assist with this if needed.

Please provide Deanna and myself with a copy of your list at the beginning of your shift and at the end.

Thank you,

Eric Krenz II, RN
Director of Nursing


To hope and healing.

**Fresno County Adult Detention Facility**
1225 M St., Fresno, CA, 93721
**Office:** (559) 600-9351
**Cell:** (559) 909-8025
EKrenz@wellpath.us

**This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.**





↩ Reply ∨   🗑 Delete   Junk ∨   •••                                          ✕

## Weekly Provider Meetings

 **Eric Krenz**                                              ↩ Reply ∨
Tue 4/1/2025 3:14 PM
To: Deanna Huff; Alla Liberstein; Eric Krenz
Cc: Catalina Chapa; Candice Sisco; Mary Ann Monteiro; LaRea Rivera  ⌃

Inbox

Good Afternoon,

Until further notice, starting Wednesday April 9, 2025, there will be a weekly Provider meeting each Wednesday at 1400hrs.  Please schedule your Wednesdays accordingly.

@Catalina – Please ensure we have a Conference Room reserved.

Thank you,

Eric Krenz II, RN
Director of Nursing


**To hope and healing.**

**Fresno County Adult Detention Facility**
1225 M St., Fresno, CA, 93721
**Office: (559) 600-9351**
**Cell: (559) 909-8025**
EKrenz@wellpath.us

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

0 of 0  ▲ ▼

----Original Appointment-----
**From:** Eric Krenz <EKrenz@Wellpath.us>
**Sent:** Wednesday, April 2, 2025 10:32 AM
**To:** danielle muratore; Deanna Huff; Kanwar Gill; Fresno Adult RN Supervisor; Candice Sisco
**Cc:** Cindy Ramirez
**Subject:** Canceled: Weekly OPHU Rounding
**When:** Occurs every Tuesday effective 2/25/2025 from 2:00 PM to 2:30 PM (UTC-08:00) Pacific Time (US & Canada).
**Where:** MJ OPHU
**Importance:** High

This recurring meeting will be moved to Mondays to ensure potential weekend changes are communicated in a more timely manner.

## EXHIBIT 3 – 409A Tax Impact Documentation

Filed in Support of Dkts. 1897, 2049, 2075

Declarant: Dr. Kanwar Partap Singh Gill

Case: In re Wellpath Holdings, Inc., Case No. 24-90533 (S.D. Tex.)

### Declaration Cross-Reference

Referenced in Sections: V, VIII

Cited in Paragraphs: ¶¶ 61–66, 80, 142–143, 153–154

### Description of Contents

This exhibit substantiates constructive distribution liability under IRC § 409A, based on improper termination of a Non-Qualified Deferred Compensation Plan.

Included Documents:

- - IRS Form 8275 (protective filing)
- - Fidelity NetBenefits Statement (11/12/2024)

### Legal Basis and Relevance

Statutes, regulations, and ethical rules implicated:

- - IRC §§ 409A(a)(1)(A)–(B)
- - IRC § 6662
- - Treas. Reg. § 1.409A-3(j)(4)(ix)
- - Cal. Rev. & Tax Code § 17041

### Authentication Status

Certified under Rule 901(b)(4) by inclusion of IRS-provided Form 8275, Fidelity financial statements, and declaration-integrated tax breakdown.

### Evidentiary Purpose

Supports tax misclassification, non-dischargeable liability, and fiduciary breach.

↺ Reply | ∨   🗑 Delete   Junk | ∨   •••                                              ✕

## RE: Wellpath Nonqualified Deferred Compensation Plan (NQDCP – 409a)

 Dheeraj Taranath <DTaranath@Wellpath.us>                    ↺ Reply | ∨
Thu 3/27/2025 2:19 PM
To: Kanwar Gill ≪

Inbox

I have always gotten that sense from you, which is why I am saddened that this situation has come up.
Regardless, I also look forward to speaking to you.

Dheeraj

**Dheeraj Taranath, DO, MBA, MS**
Chief Medical Officer


To hope and healing.

3340 Perimeter Hill Dr., Nashville, TN 37211
M 304-376-4036
LinkedIn // Facebook // Twitter
WellpathCare.com

---

**From:** Kanwar Gill <KaGill@Wellpath.us>
**Sent:** Thursday, March 27, 2025 5:18 PM
**To:** Dheeraj Taranath <DTaranath@Wellpath.us>
**Subject:** RE: Wellpath Nonqualified Deferred Compensation Plan (NQDCP – 409a)

Absolutely Dheeraj - I don't know how much you know me, in my professional career I have never been part of a
problem always a solution. Look forward to talking to you

Best Regards,
Kanwar Gill MD

Wellpath

**Fresno County Adult Detention Facility**
1225 M Street, Fresno, CA 93721
Office: (559) 600-9365
**Email: KaGill@wellpath.us**

IMPORTANT CONFIDENTIALITY NOTICE:

 0 of 0 ▲ ▼

**From:** Dheeraj Taranath <DTaranath@Wellpath.us>
**Sent:** Thursday, March 27, 2025 2:16 PM
**To:** Kanwar Gill <KaGill@Wellpath.us>
**Subject:** RE: Wellpath Nonqualified Deferred Compensation Plan (NQDCP – 409a)

Thanks, Dr. Gill.

I appreciate the additional information.  I was not aware of all this detail.

Out of respect for you, I would still like to speak to you, if you are comfortable doing so.  If we approach any topic that you would rather not discuss, you just need to let me know, as it may be hard for me to know based on all that you have shared below.

I am tied up between 10am and noon PST, but I can speak to you at 12:00pmPST if that works for you. Just let me know.  I will respect your decision either way.

Respectfully,

**Dheeraj Taranath, DO, MBA, MS**
Chief Medical Officer



3340 Perimeter Hill Dr., Nashville, TN 37211
**M** 304-376-4036
LinkedIn // Facebook // Twitter
WellpathCare.com

---

**From:** Kanwar Gill <KaGill@Wellpath.us>
**Sent:** Wednesday, March 26, 2025 5:02 PM
**To:** Dheeraj Taranath <DTaranath@Wellpath.us>
**Subject:** RE: Wellpath Nonqualified Deferred Compensation Plan (NQDCP – 409a)

Dear Dr. Taranath,

Thank you for reaching out regarding the Nonqualified Deferred Compensation Plan (NQDCP). I appreciate your willingness to engage in a discussion, and I am available for a brief phone conversation on Friday between 10:00 AM and 4:00 PM Pacific Time. However, I want to ensure that any discussion remains within appropriate boundaries given the ongoing legal proceedings and my pending legal representation.

**Background & Timeline of My Attempts to Resolve This Matter**

For the sake of clarity, I want to outline the significant steps I have taken to resolve this matter amicably:

- On March 4, 2025, I initially reached out to Wellpath's bankruptcy counsel providing them with ample opportunity to resolve this issue before resorting to le

0 of 0

delay.

- Wellpath's bankruptcy counsel later indicated that they were willing to pay my full deferred compensation; however, they conditioned this payment on my acceptance of an extremely restrictive non-disclosure agreement (NDA).
- This NDA would have imposed confidentiality requirements regarding statutory violations of California's Medical Practice Act, including, but not limited to, Corporate Practice of Medicine (CPOM) violations and illegal fee-splitting arrangements within California Forensic Medical Group (CFMG) under Dr. Bazzel's leadership.
- I raised serious concerns about retaliation at my workplace, including increased scrutiny and direct interference by nursing and administrative staff in my clinical decisions. Despite my numerous warnings, these concerns were ignored.
- On Sunday, March 23, I once again contacted bankruptcy counsel, making it clear that I was prepared to escalate the matter if my deferred compensation was not paid. They chose not to respond despite my detailed explanation of the regulatory and legal implications of their inaction.
- It is important to highlight that from January 1 to early February 2025, I pursued every possible avenue to resolve this issue without resorting to litigation. My decision to file a motion was not made lightly but was a last resort, given the refusal of Wellpath's attorneys to acknowledge my standing and their apparent confidence in defending against my legal claims in the upcoming April 22, 2025, hearing.
- Given that this issue involves more than $160,000 in wages over 36 months, I have acted diligently and in good faith to resolve it without legal escalation. However, these are my earned wages, not discretionary funds, and I am determined to protect my legal rights.

Concerns About CPOM Violations, Fee-Splitting, and Wellpath's Role in Administering Physician Compensation in California:

I want to take a moment to emphasize the broader regulatory and legal concerns that this matter raises, particularly in relation to California's strict Corporate Practice of Medicine (CPOM) laws and fee-splitting prohibitions under the California Business & Professions Code §§ 2400 and 650.

Corporate Practice of Medicine (CPOM) Violations:

California has some of the strongest CPOM restrictions in the country, which are explicitly designed to prevent corporate entities from exercising control over physician compensation and medical decision-making. The Medical Board of California has repeatedly enforced disciplinary actions against physicians and corporate entities for CPOM violations, as outlined in the Medical Board's enforcement guidelines.
Under Business & Professions Code § 2400, corporations cannot:

1. Employ or control physicians in any manner that affects clinical judgment or patient care.
2. Directly set physician salaries as a business expense without a valid professional medical corporation (PMC) structure.
3. Dictate medical decision-making through administrative personnel.

The NQDCP administered by Wellpath directly contradicts these principles because:

- Wellpath, a non-clinical corporate entity, determined and approved physician compensation, including deferred compensation—a function that only a medical group with physician ownership should control.
- The decision to approve or deny payment of deferred wages [ ] administrators, rather than a physician-controlled profession [ ]

0 of 0

First Declaration of Dr Kanwar Partap Singh Gill MD, 8408 N Ann Ave Fresno CA 93720 April 16th, 2025 (Notarized)      Page 151



Fee-Splitting & Unlawful Revenue-Sharing Arrangements

Furthermore, the Medical Board of California has taken strong enforcement actions against fee-splitting arrangements, where corporations take a percentage of physician fees or control the allocation of physician-generated revenue.

Under Business & Professions Code § 650, it is illegal for:

- A corporation to receive a portion of physician compensation as an intermediary.
- A non-medical entity to exercise financial control over physician earnings in a way that creates financial incentives tied to patient referrals or billing practices.

In this case, Wellpath:

- Controlled physician compensation and revenue allocations for physicians working in California, despite not being a licensed professional medical corporation.
- Attempted to condition the release of deferred compensation on a confidentiality agreement that would have silenced concerns regarding these regulatory violations.

These facts demonstrate clear violations of both CPOM and fee-splitting prohibitions under California law, which the Medical Board of California and other state regulators have an obligation to investigate.

Regulatory & Legal Coordination Across Multiple States

This issue is not isolated to California. As I mentioned in my email to Medical Board Staff Counsel, whom I have known since 2014, the physician at the center of CFMG's operations, Dr. Bazzel, holds licenses in more than a dozen states, several of which have CPOM and fee-splitting prohibitions similar to California. Because of this, I have notified the Medical Board of California of these concerns, and I will be coordinating with other state medical boards where similar violations may have occurred. Given that Wellpath operates nationwide, there may be multiple jurisdictions with enforcement authority over these violations.

Final Points & Availability

I am open to a brief call on Friday to discuss the procedural aspects of this situation. However, I must emphasize the following:

- I will not be discussing settlement terms or regulatory matters outside of formal legal proceedings.
- I am in the process of securing legal representation, and any substantive discussions about financial resolution should be handled through my legal counsel once retained.
- If you were not copied on my recent communication to the Medical Board, I would encourage you to review the attached email, as it outlines many of the issues at hand.

Please confirm a time that works for you on Friday between 10:00 AM and 4:00 PM Pacific Time.

Best Regards,
Kanwar Gill MD
Wellpath

**Fresno County Adult Detention Facility**
1225 M Street, Fresno, CA 93721
Office: (559) 600-9365

 0 of 0

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

# Formal Notice of Pending Motions and Request for Regulatory & Legal Action Case Reference: In re Wellpath Holdings, Inc., et al., No. 24-90533 (Chapter 11) Date: March 25, 2025

Kanwar Partap Singh Gill <kpsgill@kpsgill.com>
to Carole, Marcus, Felicia, Bradley, Steven, cdingman, Kerrie@MBC, webmaster@mbc.ca.gov, rob.bonta, jba

**Subject: Formal Notice of Pending Motions and Request for Regulatory & Legal Action**
**Case Reference: In re Wellpath Holdings, Inc., et al., No. 24-90533 (Chapter 11)**
**Date: March 25, 2025**

**To All Parties and Regulatory Agencies Listed Below:**

I, Dr. Kanwar Partap Singh Gill, hereby formally notify you—as an interested creditor and claimant—of two critical motions I have filed in the Chapter 11 proceedings of In re Wellpath Holdings, Inc., et al., Case No. 24-90533, pending in the U.S. Bankruptcy Court for the Southern District of Texas (Houston Division). The motions are attached for your reference and are set for hearing on April 22, 2025 at 2:00 PM (CST) in Courtroom 400, 515 Rusk Avenue, Houston, Texas 77002.

**Pro Se Motion for Relief from Automatic Stay (Docket #1897)**

**Emergency Motion to Stay Solicitation and Voting on Debtors' Chapter 11 Plan and to Strike Improper Third-Party Releases, Injunctions, and Discharge Provisions**

**Background and Core Legal Issues:**

I am a licensed California physician employed by California Forensic Medical Group, Inc. ("CFMG"), a non-debtor medical corporation distinct from debtor Wellpath Holdings, Inc. As such, I hold a vested interest in approximately $14.5 million in deferred compensation (under a Non-Qualified Deferred Compensation Plan, "NQDCP") that has been wrongfully swept into Wellpath's bankruptcy estate. This unlawful inclusion of trust-held funds blatantly contravenes 11 U.S.C. § 541(d), which mandates that property held in trust for another does not become part of a debtor's estate. These funds constitute earnings fully owed to me (and similarly situated physicians) – not Wellpath assets – and must be released from the estate. In addition to this core issue, my motions detail a pattern of extensive legal violations by Wellpath and its affiliates (including its counsel) that demands immediate judicial and regulatory intervention. The major violations and misconduct include:

- **Improper Inclusion of Deferred Compensation in Bankruptcy Estate** – Violation of 11 U.S.C. § 541(d) (estate improperly contains trust property belonging to employees).

0 of 0

physicians).

- **Employee Misclassification, Wage Theft & Payroll Tax Evasion** – Violations of the Fair Labor Standards Act (FLSA, 29 U.S.C. §§ 201–219) and California labor laws (Labor Code §§ 201–226) through improper withholding of wages and evasion of payroll taxes.

- **ERISA Violations & IRC § 409A Non-Compliance** – Breaches of fiduciary duties under the Employee Retirement Income Security Act (29 U.S.C. §§ 1104, 1132) and violations of IRS deferred compensation rules (26 U.S.C. § 409A) in mismanaging employee benefit plans.

- **Improper Third-Party Releases & Injunctions** – Plan provisions violating 11 U.S.C. §§ 524(e) and 1129 by releasing non-debtors from liability without creditor consent, in derogation of due process.

- **Materially Misleading Disclosures** – Failure to disclose material information as required by 11 U.S.C. § 1125 (concealing significant liabilities, regulatory infractions, and risks from creditors).

- **Coercive Settlement Tactics by Debtors' Counsel** – Procedural misconduct by McDermott Will & Emery LLP, including using financial duress and NDAs to suppress objections and whistleblowing.

## Improper Inclusion of Deferred Compensation in Estate (11 U.S.C. § 541(d))

Wellpath has unlawfully included deferred compensation funds – which were explicitly held in trust for my benefit – as part of its Chapter 11 bankruptcy estate. These NQDCP assets are clearly defined trust property held for the employees (physicians) who earned them, separate from Wellpath's general assets. Under 11 U.S.C. § 541(d), such trust property "does not become property of the estate" of the debtor. By integrating my earned, vested deferred wages into its estate, Wellpath has deprived me of immediate access to my property, misled the Court and creditors about the true estate assets, and attempted to shield itself from paying lawful obligations by abusing the automatic stay. This wrongful estate inclusion not only violates bankruptcy law but also amounts to wage theft, as it withholds earned wages from me under the guise of bankruptcy protection. Immediate relief is required to remove these trust funds from the estate and distribute them to their rightful owners in accordance with §541(d). The U.S. Department of Labor's Wage and Hour Division (WHD) and the California Labor Commissioner (DLSE) have jurisdiction over wage payment violations and are requested to investigate this scheme of misappropriating earned wages via the bankruptcy process. Additionally, the Internal Revenue Service (IRS) and California Employment Development Department (EDD) must review whether Wellpath's misclassification of these wages as estate assets resulted in payroll tax evasion (failure to withhold income/Social Security/Medicare taxes, and non-payment of unemployment and disability insurance contributions),and enforce all applicable penalties and corrections.

## Illegal Corporate Practice of Medicine & Fee-Splitting (Cal. Bus. & Prof. Code §§ 2400, 650)

Wellpath Holdings, Inc. (through its affiliate CFMG) has been improperly influencing and controlling medical practice in California in violation of the state's strong prohibition against the corporate practice of medicine. Under Cal. Business & Professions Code § 2400, corporations may not practice medicine or employ physicians to make medical decisions; however, Wellpath/CFMG's management has exerted control over clinical decisions, physician hiring, and compensation, thereby

0 of 0

forbidden by Cal. B&P Code § 650. These practices create conflicts of interest where profit considerations might override patient care, and they render Wellpath's business arrangements illegal under California law. The Medical Board of California (MBC) is the primary regulator to investigate these violations. I urge the MBC to immediately investigate Wellpath's clinical governance and physician contracts to identify and halt any corporate interference in medical decisions. The California Attorney General's Office (Health Quality Enforcement and Fraud Divisions) is also requested to intervene by inquiring into Wellpath's operational structure for anti-kickback and fee-splitting violations, and to pursue injunctive relief and penalties to stop ongoing unlawful practices. These regulators should issue cease-and-desist orders and any appropriate sanctions against the entities or individuals facilitating the corporate practice of medicine and fee-splitting schemes in California. Such action is critical to protect the integrity of medical practice, patient safety, and compliance with state law.

## Employee Misclassification, Wage Theft, and Payroll Tax Violations (FLSA & California Labor Code)

Wellpath's conduct also implicates serious wage-and-hour law violations. By treating the deferred compensation as a corporate asset rather than wages owed to employees, Wellpath has withheld earned wages past their due date, which may violate the Fair Labor Standards Act (FLSA, 29 U.S.C. §§ 201–219) and parallel California wage laws. The FLSA and state laws require timely payment of wages and prohibit any confiscation of earned compensation. Here, the attempt to force employees to wait (indefinitely) through bankruptcy for their deferred pay – or release it entirely – is tantamount to wage theft. It likely also violates California Labor Code §§ 201–204 (timely payment upon termination or at regular intervals) and triggers penalties under § 203 (waiting time penalties). Furthermore, Wellpath's failure to properly account for these deferred wages in payroll records and pay stubs violates California Labor Code § 226 (accurate wage statements). By obscuring employees' ownership of these funds, Wellpath may be subject to fines and even criminal sanctions under state law.

In addition, misclassifying these compensation funds has tax and insurance repercussions. If Wellpath did not treat the deferred amounts as wages, it likely failed to withhold federal and state payroll taxes (income tax, Social Security, Medicare) and to pay unemployment (UI) and state disability (SDI) insurance premiums on those wages. This raises potential violations of IRC provisions (26 U.S.C. §§ 3101–3402) and California unemployment insurance laws. The IRS should audit Wellpath's payroll tax compliance and impose any owed taxes, interest, and penalties. California's EDD should similarly investigate and recover unpaid state payroll taxes and insurance contributions. The U.S. Department of Labor (WHD) is requested to perform a targeted audit of Wellpath's wage practices – particularly the treatment of deferred compensation – to ensure compliance with overtime and minimum wage rules, and to seek recovery of improperly withheld wages plus liquidated damages under the FLSA. The California Labor Commissioner (DLSE) should likewise investigate and order any necessary restitution (with interest and penalties) for violations of state wage payment laws. These coordinated enforcement actions will rectify the harm to employees and ensure Wellpath complies with labor laws going forward.

## ERISA Fiduciary Breaches and Non-Compliance with IRC § 409A



0 of 0

First Declaration of Dr Kanwar Partap Singh Gill MD, 8408 N Ann Ave Fresno CA 93720 April 18th, 2025 (Notarized)        Page 155

compensation program for its physicians/executives, Wellpath owed duties of loyalty and prudence under ERISA (29 U.S.C. § 1104) to manage and hold those plan assets for the sole benefit of participants. Instead, Wellpath failed to maintain and fund the deferred compensation accounts appropriately, and even misrepresented these plan assets as general corporate funds, raiding them into the bankruptcy estate. Such conduct likely violates ERISA's fiduciary responsibility provisions and could give rise to civil enforcement under 29 U.S.C. § 1132. While the NQDCP may be a "top hat" plan (not subject to all ERISA requirements), the Department of Labor's Employee Benefits Security Administration (EBSA) should examine whether any ERISA provisions or plan terms were breached by this mismanagement. Specifically, Wellpath failed to timely fund deferred comp accounts, provided inadequate reporting to beneficiaries, and improperly classified plan assets as company property, betraying the promised structure of the plan.

Moreover, Wellpath's actions triggered serious tax law violations under IRC § 409A. Section 409A governs non-qualified deferred compensation; non-compliance (such as accelerating or failing to segregate deferred amounts properly) can result in immediate taxation of deferred amounts with interest and a 20% additional tax penalty on the employees. By mismanaging the plan, Wellpath exposed plan participants to punitive tax consequences and penalties through no fault of their own. There is evidence that Wellpath did not adhere to 409A's requirements on election timing and distribution triggers ,and its improper inclusion of plan assets in the estate effectively accelerates income to the doctors (a violation of 409A).The IRS is urged to conduct an urgent audit of Wellpath's deferred compensation compliance, to assess all applicable penalties and excise taxes for 409A violations, and to require Wellpath to make corrective measures (such as grossing-up affected employees or other remediation).Simultaneously, EBSA should launch a comprehensive review of the plan's administration, and impose appropriate remedies for any fiduciary breaches – including ordering the disgorgement of the deferred compensation assets back to the employees and potentially referring the most egregious misconduct for criminal investigation if it involved intentional fraud. These steps are necessary to protect employee retirement and deferred earnings, and to deter such misconduct by fiduciaries in the future. (The Pension Benefit Guaranty Corporation (PBGC) may also need to monitor if any pension-related liabilities are implicated. )

## Improper Third-Party Releases and Injunctions in the Plan (11 U.S.C. §§ 524(e), 1129)

The Debtors' proposed Chapter 11 Plan contains sweeping third-party release and injunction provisions that would shield a broad array of non-debtors – including corporate affiliates, equity holders, officers and directors, and professionals – from any future liability on claims held by creditors. These non-debtor releases are being imposed without the explicit consent of affected creditors, thereby stripping creditors of their rights to pursue independent claims against those third parties. Such a provision violates fundamental bankruptcy law and due process. Specifically, 11 U.S.C. § 524(e) states that a debtor's discharge does not extend to the liabilities of non-debtors, absent specific statutory authority. Additionally, 11 U.S.C. § 1129 (Confirmation standards) requires that a plan is "fair and equitable" and does not unfairly discriminate or deprive creditors of value without consent; forcing creditors to relinquish direct claims against third parties (for no consideration) fails this test. Courts have repeatedly held that non-consensual third-party releases are extraordinary remedies permissible, if at all, only in rare circumstances and with stringent safeguards – none of which are present here. In essence, the Plan's release provisions amount to an impermissible non-consensual third-party discharge, which is not authorized by the Ba

who may have engaged in misconduct (e.g. executives who oversaw the above-described labor, tax, or fiduciary violations) by immunizing them from future accountability.

To address this, the U.S. Trustee's Office is requested to formally object to these third-party releases and urge the Bankruptcy Court to strike or disapprove any Plan provisions that extend releases or injunctions to non-debtors without creditor consent. The Bankruptcy Court itself has the power and duty to refuse confirmation of any plan containing such unlawful provisions. If necessary, I will seek appellate review to prevent these releases from taking effect. Additionally, the U.S. Department of Justice's Executive Office for U.S. Trustees (DOJ–EOUST) should intervene and consider sanctions against Debtors' counsel for advancing these improper provisions in bad faith. This matter may also warrant the attention of the Securities and Exchange Commission (SEC) if any private equity owners or insiders stood to benefit from concealed liabilities being washed away – the SEC should review whether any securities laws or fiduciary duties to investors were breached in the course of devising this release scheme. The goal is to ensure that creditors retain their rights against non-debtors (as the law provides) and that no confirmation of the Plan occurs unless it fully complies with the Bankruptcy Code and due process. Creditors must be given an opportunity to opt out of or object to any releases, and only truly consensual releases (with adequate notice and consideration) should be allowed.

## Violation of Bankruptcy Disclosure Obligations (11 U.S.C. § 1125)

Section 1125 of the Bankruptcy Code requires that debtors provide "adequate information" to creditors — meaning all information that is material to a creditor's decision to vote on the Chapter 11 plan. Here, Wellpath's Disclosure Statement was materially misleading and incomplete. The Debtors failed to disclose numerous crucial facts and liabilities, including: (1) the improper inclusion of trust-held deferred compensation in the estate (and the associated wage and tax liabilities); (2) the extent of ERISA and IRC § 409A compliance failures related to the deferred compensation plans ;(3) the potential IRS and state tax penalties that could result ;(4) known issues of employee misclassification and wage violations (which have triggered DOL enforcement and class-action litigation) ;(5) the ongoing illegal fee-splitting and corporate practice of medicine issues under California law that threaten the legality of Wellpath's operations ;and (6) the inclusion of the above-mentioned third-party releases in the Plan that strip creditor rights. Each of these omissions is highly material. By concealing these risks and liabilities, the Debtors impaired creditors' ability to make an informed judgment about the Plan, violating the good faith disclosure requirement of 11 U.S.C. § 1125(a). Creditors are entitled to full and candid disclosure; hiding these problems tilts the playing field and could lead to an improperly obtained plan approval.

To remedy this, I request that the U.S. Trustee require the Debtors to issue a corrected, supplemental Disclosure Statement that fully and fairly discloses all the above issues. The Bankruptcy Court should decline to approve or confirm any plan until such disclosures are made and creditors have sufficient time to consider them. Moreover, these disclosure failures underscore the need for regulatory agencies (DOL, IRS, state authorities) to be involved now – before plan confirmation – because the current plan seeks to discharge liabilities and release parties without ever having disclosed the underlying violations. This is a clear abuse of the Chapter 11 process. Ensuring transparency through proper disclosures will allow regulators and stakeholders to evaluate the true scope of Wellpath's legal non-compliance. Section 1125 exists to prevent exactly this kind of ambush on creditor rights, and it must be strictl

0 of 0

Will & Emery LLP)

Perhaps most alarming, Wellpath's counsel – McDermott Will & Emery LLP – has engaged in coercive tactics to shield these violations from scrutiny. On March 19, 2025, Debtors' counsel explicitly acknowledged the validity of my deferred compensation claim, yet conditioned any payment on my withdrawing the above motions and signing an extremely restrictive Non-Disclosure Agreement (NDA). Initially, counsel offered a payout of $100,000 – significantly below my undisputed claim of $162,597.08 – with an arbitrary 24-hour deadline for acceptance and required that I drop my motions. This offer was plainly unacceptable and made under duress. When I refused, Debtors' counsel then agreed to pay the full $162,597.08, but still demanded that I withdraw my motions and sign the NDA as conditions. **In other words, they were willing to pay what they legally owe me only if I agreed to stay silent about their wrongdoing.** The proposal of NDA was far beyond a normal confidentiality agreement – its clear purpose was to gag me from exposing Wellpath's unlawful practices. Specifically, the NDA was sought to bar me from discussing or reporting the very violations summarized above: the illegal fee-splitting arrangements, the corporate practice of medicine, the ERISA and 409A violations, and the wage and tax violations. It was an attempt to buy my silence and to thwart regulatory and judicial oversight.

These tactics constitute procedural abuse and bad faith in the bankruptcy process. Holding my earned compensation hostage to pressure me into waiving legal rights is a form of economic duress and coercion. Such settlements, obtained under undue pressure or through misrepresentation, are void or unenforceable as a matter of law (see McClain v. Octagon Plaza, LLC, 159 Cal. App. 4th 784 (2008), recognizing that agreements stemming from economic duress or undue influence cannot stand ;Rich & Whillock, Inc. v. Ashton Dev., 157 Cal. App. 3d 1154 (1984), holding a settlement forced by economic coercion is voidable .). Likewise, bankruptcy courts condemn such tactics: in In re American HomePatient, Inc., 420 F.3d 559 (6th Cir. 2005), the court affirmed the discretion to strike settlements or plans resulting from bad-faith manipulation of the process. Here, MWE's conduct – delaying or denying wages to extort legal concessions – is an abuse of the Chapter 11 process that obstructs justice and undermines the integrity of the court. It may also amount to fraud on the court, given the intent to suppress evidence of violations and remove matters from the Court's consideration through improper means.

I respectfully request that the Bankruptcy Court and U.S. Trustee take immediate action to address this misconduct. The Court should investigate Debtors' counsel's behavior and consider sanctions for violations of bankruptcy ethics and procedure. Specifically, McDermott Will & Emery should be held to account for attempting to induce a creditor to waive claims under duress and for impeding the disclosure of material facts. The U.S. Trustee (and DOJ's U.S. Trustee Program) should also probe these coercive NDA practices and, if warranted, refer the matter for disciplinary action or a DOJ investigation. Conditioning the payment of undisputed wages on silence not only violates public policy, it potentially implicates 18 U.S.C. § 152(6) (which forbids coercing creditors in a bankruptcy) and 18 U.S.C. § 157 (bankruptcy fraud) if a scheme to mislead the court or creditors is proven. Immediate intervention is needed to halt any further coercion of creditors and to ensure that all parties can assert their rights without intimidation. I further ask that the Court compel full transparency about any similar offers made to other creditors – i.e., require the Debtors to disclose all such settlement attempts, so the Court and regulators can assess the extent of this conduct. No creditor should have to choose between being paid what they are owed and muzzling themselves about illegality.

In light of the above, multiple enforcement authorities must act to address their respective areas of jurisdiction. Below is a summary of each agency's role and the urgent actions requested:

- **U.S. Department of Labor – Wage & Hour Division (WHD) and California Labor Commissioner (DLSE):** Investigate and remediate wage theft and misclassification involving the deferred compensation. This includes auditing Wellpath's payroll practices related to the NQDCP, ensuring compliance with FLSA and California wage laws, and enforcing restitution of unpaid wages with statutory penalties. The DOL/DLSE should also coordinate with EDD to recover any unpaid unemployment/disability premiums.

- **Internal Revenue Service (IRS):** Conduct a thorough audit of Wellpath's deferred compensation plan and payroll tax compliance (including IRC § 409A issues). Impose all applicable taxes, penalties, and interest for any failure to withhold income/FICA taxes or for triggering punitive taxation of employees via 409A violations. Ensure that Wellpath corrects any tax reporting (Forms W-2/1099) that misclassified employees or wages.

- **Medical Board of California:** Investigate Wellpath/CFMG's unlawful corporate practice of medicine and fee-splitting with physicians. Use its enforcement powers to halt these practices (e.g., through cease-and-desist orders) and pursue any appropriate disciplinary action against the professional licenses of those involved in facilitating unlicensed practice.

- **California Attorney General (Health Quality Enforcement & Fraud Divisions):** Examine and prosecute Wellpath's violations of state law, including illegal fee-splitting arrangements and any related fraudulent misrepresentations to government agencies or contracting partners. The AG should seek injunctive relief to stop these practices and levy fines or pursue criminal charges if warranted (especially if public health program funds or state contracts were impacted by the fraud).

- **California Employment Development Dept. (EDD) – in coordination with the Labor Commissioner:** Audit Wellpath's state payroll tax contributions with respect to the deferred compensation and employee classifications. The EDD should recover unpaid unemployment insurance and disability insurance taxes, with penalties, and enforce compliance going forward.(This item is paired with item 1 above in addressing state labor tax obligations.) .

- **U.S. Department of Justice – U.S. Trustee's Office (and EOUST):** Investigate the Debtors' bankruptcy conduct for potential fraud and abuse. Specifically, examine the coercive settlement tactics employed by Debtors' counsel and the inclusion of impermissible third-party releases. The U.S. Trustee should take action in the case to object to unlawful plan provisions and to report any findings of attorney misconduct. The DOJ (through the U.S. Trustee Program or other appropriate office) should be prepared to seek court sanctions against McDermott Will & Emery LLP for any bad-faith conduct ,and pursue any criminal referrals if evidence shows intent to defraud the court or creditors (e.g., under 18 U.S.C. §§ 152, 157).

- **Additional Oversight Agencies (FTC, SEC, etc.):** Other agencies may have ancillary jurisdiction here. The Federal Trade Commission (FTC) should evaluate whether Wellpath's systematic law violations (labor, medical, tax) constitute unfair or deceptive business practices in the marketplace. The Securities and Exchange Commission (SEC) should revi

potential securities fraud or breach of fiduciary duty by those insiders. Additionally, the California Department of Insurance (CDI) might investigate if misclassification led to evasion of workers' compensation premiums or other insurance irregularities. While these are not the primary focuses of my motions, they are important potential areas of enforcement to fully address the breadth of misconduct.

Each of the above agencies has been included as a recipient of this notice because immediate action within their authority is warranted. By taking coordinated enforcement steps, these regulators will help protect creditors, employees, and patients from further harm, and uphold the rule of law in these proceedings.

## Notice of Hearing & Opposition Procedures:

Please be advised that any party wishing to oppose the relief requested in the attached motions must file a written objection with the Bankruptcy Court and serve all parties by April 15, 2025. Failure to file a timely objection may result in the Court granting the requested relief without further hearing. Given the gravity of the issues, I encourage all relevant agencies to send representatives or file statements in this bankruptcy case to support the enforcement of laws within their purview.

## Certificate of Service:

I, Dr. Kanwar Partap Singh Gill, hereby certify under penalty of perjury that on March 25, 2025, I served true and correct copies of the following documents: (1) Pro Se Motion for Relief from Automatic Stay (Docket #1897), (2) Emergency Motion to Stay Solicitation & Voting, and (3) this Formal Notice letter, by First-Class Mail and (where available) Electronic Mail, upon the parties listed below.

**Debtors' Counsel (Wellpath Holdings, Inc. & affiliates, via McDermott Will & Emery LLP):**
Marcus Alan Helt, Esq. – Dallas, TX (mhelt@mwe.com)
Carolee W. Wurzelbacher, Esq. – Chicago, IL (cwurzelbacher@mwe.com)
Darren Azman, Esq. – New York, NY (dazman@mwe.com)
(and other MWE counsel of record: Felicia Perlman, Steven Szanzer, Bradley Giordano) .

**Unsecured Creditors' Committee Counsel (Stinson LLP):**
Nicholas Zluticky, Esq. – Kansas City, MO (nicholas.zluticky@stinson.com)
Zachary Hemenway, Esq. – Kansas City, MO (zachary.hemenway@stinson.com)
Lucas L. Schneider, Esq. – Denver, CO (lucas.schneider@stinson.com).

**Office of the United States Trustee (Region 7, S.D. Texas):**
Susan Rogers Her, Trial Attorney; Ha Nguyen, Trial Attorney
515 Rusk Street, Suite 3516, Houston, TX 77002
Email: USTPRegion07.HU.ECF@usdoj.gov.

**Wellpath Holdings, Inc. (Debtor) – Executive Leadership:**
Ben Slocum, CEO; Marc Goldstone, Chief Legal Officer
3340 Perimeter Hill Drive, Nashville, TN 37211 (bankruptcymail@wellpath.us) .

**California Forensic Medical Group, Inc. (CFMG, Non-Debtor Affiliate):**
Grady J. Bazzel, CEO; Scott Kennedy, CFO; Richard J. Medrano,

0 of 0



**Regulatory Authorities:**

Medical Board of California – Enforcement Division (Sacramento, CA).

California Attorney General Rob Bonta – Health Quality Enforcement Section (Sacramento, CA).

California Labor Commissioner (Lilia García-Brower) – Dept. of Industrial Relations (Oakland, CA).

Internal Revenue Service – Examination & Fraud Enforcement (Ogden, UT) .

U.S. Department of Labor – WHD & EBSA (Washington, DC).

U.S. Department of Justice – Executive Office for U.S. Trustees (EOUST) (Washington, DC).

(Additional copies have been sent to other potentially interested agencies such as the FTC, SEC, and California Department of Insurance, as noted above.)

## Declaration of Service:

I declare that the above documents were served on March 25, 2025, as stated.

Executed this 25th day of March, 2025, at Fresno, California.

Respectfully submitted,

/s/ Dr. Kanwar Partap Singh Gill
Creditor and Pro Se Movant
8408 N. Ann Ave, Fresno, CA 93720
Tel: (559) 447-8490 | Email: kpsgill@kpsgill.com

**Attachments: (1) Motion for Relief from Automatic Stay (Docket #1897); (2) Emergency Motion to Stay Solicitation and Voting**

Your timely attention to these serious matters is critical to ensure fairness, compliance, and transparency in the administration of justice. Each of you has the authority and responsibility to act now in your respective capacities to investigate and remediate the violations outlined above. Thank you for your prompt action in safeguarding the public interest and the integrity of these proceedings.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS – HOUSTON DIVISION**

In re:
**Wellpath Holdings, Inc., et al.,
Debtors.**



0 of 0

⟲     📄     🗑

## PROOF OF SERVICE

I, **Dr. Kanwar Partap Singh Gill**, certify that I am at least 18 years old and that on **March 25, 2025,** I served true and correct copies of the following documents:

1. **Pro Se Motion for Relief from Automatic Stay (Docket #1897);**

2. **Emergency Motion to Stay Solicitation and Voting on Debtors' Chapter 11 Plan and to Strike Improper Third-Party Releases, Injunctions, and Discharge Provisions;**

3. **Formal Notice of Pending Motions and Request for Regulatory & Legal Action.**

These documents were served by First-Class Mail via U.S. Postal Service and Electronic Mail (email) upon the following parties:

## Debtors' Counsel (Wellpath Holdings, Inc. & Affiliates)

### McDermott Will & Emery LLP

- Marcus Alan Helt, Esq.
2501 North Harwood Street, Suite 1900
Dallas, TX 75201-1664
Email: mhelt@mwe.com

- Carolee W. Wurzelbacher, Esq.
444 West Lake Street, Suite 4000
Chicago, IL 60606-0029
Email: cwurzelbacher@mwe.com

- Darren Azman, Esq.
One Vanderbilt Avenue
New York, NY 10017-3852
Email: dazman@mwe.com

- Felicia Perlman, Esq.; Steven Szanzer, Esq.; Bradley Giordano, Esq.
McDermott Will & Emery LLP (address as above)

## Unsecured Creditors' Committee Counsel

### Stinson LLP

- Nicholas Zluticky, Esq.
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Email: nicholas.zluticky@stinson.com

0 of 0

Kansas City, MO 64106
Email: zachary.hemenway@stinson.com

- Lucas Lyle Schneider, Esq.
1144 Fifteenth Street, Suite 2400
Denver, CO 80202
Email: lucas.schneider@stinson.com

## Office of the United States Trustee (Region 7, Southern District of Texas)

- Susan Rogers Her, Trial Attorney; Ha Nguyen, Trial Attorney
515 Rusk Street, Suite 3516
Houston, TX 77002
Email: USTPRegion07.HU.ECF@usdoj.gov

## Wellpath Holdings, Inc. (Debtor) – Executive Leadership

- Ben Slocum, Chief Executive Officer

- Marc Goldstone, Chief Legal Officer (General Counsel)
3340 Perimeter Hill Drive
Nashville, TN 37211
Email: bankruptcymail@wellpath.us

## California Forensic Medical Group, Inc. (CFMG, Non-Debtor Affiliate)

- Grady J. Bazzel, Chief Executive Officer

- Scott Kennedy, Chief Financial Officer

- Richard J. Medrano, Secretary

**Primary Corporate Address:**
3340 Perimeter Hill Drive
Nashville, TN 37211

**California Office Address:**
1325 J Street, Suite 1550
Sacramento, CA 95814

Regulatory Authorities Served

## Medical Board of California – Enforcement Division



0 of 0

 

Tel: (916) 263-2389

## California Attorney General Rob Bonta

Health Quality Enforcement Section
1300 I Street
Sacramento, CA 95814
Tel: (916) 445-9555

## California Labor Commissioner (Lilia García-Brower)

Department of Industrial Relations
1515 Clay Street, Suite 801
Oakland, CA 94612
Tel: (510) 285-2118
Email: LCOServiceRequests@dir.ca.gov

## Internal Revenue Service (IRS) – Examination & Fraud Enforcement

IRS Examination & Fraud Enforcement
PO Box 3801
Ogden, UT 84409
Tel: (800) 829-0433

## U.S. Department of Labor

- Wage and Hour Division (WHD)

- Employee Benefits Security Administration (EBSA)
200 Constitution Ave., NW
Washington, DC 20210
Tel (WHD): 1-866-487-9243
Tel (EBSA): 1-866-444-3272

## U.S. Department of Justice – Executive Office for U.S. Trustees (EOUST)

441 G Street, NW, Suite 6150
Washington, DC 20530
Tel: (202) 307-1391
Email: USTrustee.Program@usdoj.gov

## Additional Interested Agencies (Informational Copies Povided)

- **Federal Trade Commission (FTC)**
600 Pennsylvania Ave., NW
Washington, DC 20580



0 of 0



Washington, DC 20549

- **California Department of Insurance**
300 Capitol Mall, Suite 1700
Sacramento, CA 95814

## Declaration of Service

I declare under penalty of perjury under the laws of the United States of America that the foregoing Proof of Service is true and correct, that the listed documents have been served upon the entities as described above, and that this declaration is executed on March 25, 2025, at Fresno, California.

**Executed By:**

**/s/ Dr. Kanwar Partap Singh Gill**
Creditor and Pro Se Movant
8408 N. Ann Ave
Fresno, CA 93720
Telephone: (559) 447-8490
Email: kpsgill@kpsgill.com

This document will be promptly filed with the Clerk of the U.S. Bankruptcy Court, Southern District of Texas (Houston Division), and submitted as evidence of proper service.

**From:** Dheeraj Taranath <DTaranath@Wellpath.us>
**Sent:** Wednesday, March 26, 2025 1:25 PM
**To:** Kanwar Gill <KaGill@Wellpath.us>
**Subject:** RE: Wellpath Nonqualified Deferred Compensation Plan (NQDCP – 409a)

Hello Dr. Gill,

Just reaching out to you again, regarding the NQDCP. I'd like to find a time that works for you to discuss where we are in the process. I understand you filed a motion against the company, and as we are still in the process of the bankruptcy resolution, I'd like to get on the same page with you about this. We are quite hopeful to be out of the bankruptcy proceedings by the end of next month, as things are currently going as planned.

Let me know when you may have some time to catch up by phone tomorrow or Friday so we can connect.

Thanks,
Dheeraj

**Dheeraj Taranath, DO, MBA, MS**
Chief Medical Officer

 0 of 0


To hope and healing.

3340 Perimeter Hill Dr., Nashville, TN 37211
M 304-376-4036
LinkedIn // Facebook // Twitter
WellpathCare.com

**From:** Dheeraj Taranath
**Sent:** Friday, November 8, 2024 12:46 PM
**To:** Kanwar Gill <KaGill@Wellpath.us>
**Cc:** Marc D. Goldstone <MGoldstone@Wellpath.us>; Heather Hole <Heather.Hole@Wellpath.us>
**Subject:** RE: Wellpath Nonqualified Deferred Compensation Plan (NQDCP – 409a)

Thanks, Dr. Gill.

I've set up a meeting for the three of us at 11:30am PST.

Looking forward to speaking with you.

**Dheeraj Taranath, DO, MBA, MS**
Vice President Medical Director of Local Government
Interim Chief Medical Officer


To hope and healing.

3340 Perimeter Hill Dr., Nashville, TN 37211
M 304-376-4036
LinkedIn // Facebook // Twitter
WellpathCare.com

**From:** Kanwar Gill <KaGill@Wellpath.us>
**Sent:** Friday, November 8, 2024 12:40 PM
**To:** Dheeraj Taranath <DTaranath@Wellpath.us>
**Cc:** Marc D. Goldstone <MGoldstone@Wellpath.us>; Heather Hole <Heather.Hole@Wellpath.us>
**Subject:** RE: Wellpath Nonqualified Deferred Compensation Plan (NQDCP – 409a)

Thanks Dr. Taranath for your response.

I am available any time today between 10 am through 4 pm California time with 30 minutes advance notice.

I can move patients around and make myself available for the meeting.

Thanks

Best Regards,
Kanwar Gill MD

Wellpath

 0 of 0



Office: (559) 600-9365
Email: KaGill@wellpath.us

IMPORTANT CONFIDENTIALITY NOTICE:

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

**From:** Dheeraj Taranath <DTaranath@Wellpath.us>
**Sent:** Friday, November 8, 2024 7:08 AM
**To:** Kanwar Gill <KaGill@Wellpath.us>
**Cc:** Marc D. Goldstone <MGoldstone@Wellpath.us>; Heather Hole <Heather.Hole@Wellpath.us>
**Subject:** RE: Wellpath Nonqualified Deferred Compensation Plan (NQDCP – 409a)

Good morning Dr. Gill,

Heather shared with me your concerns regarding the NQDCP. Would you have some availability today for a video call with me and Marc Goldstone, our chief legal officer? We would like to answer any questions you may have. We completely understand your concerns, and they are all legitimate and valid. Let's find some time today to discuss. Please let us know your availability, and I will set up a time for the three of us to meet and discuss.

Sincere regards,


**Dheeraj Taranath, DO, MBA, MS**
Vice President Medical Director of Local Government
Interim Chief Medical Officer



To hope and healing.

3340 Perimeter Hill Dr., Nashville, TN 37211
M 304-376-4036
LinkedIn // Facebook // Twitter
WellpathCare.com


    Begin forwarded message:

        **From:** Kanwar Gill <KaGill@wellpath.us>
        **Date:** November 7, 2024 at 12:05:32 PM MST
        **To:** Heather Hole <Heather.Hole@wellpath.us>
        **Subject: Wellpath Nonqualified Deferred Compensation Plan (NQDCP – 409a)**


        Good Morning Heather,

        I am physician employed at the Fresno County Jail in Fresno, CA.


0 of 0



company. The payouts on these won't start until the March of 2026 and will continue until 2029 in installments. I'm not able to make early withdrawals while I am continuously employed with the company.

In WellPath corporate communication email from yesterday, there is no mention about how company will treat NQDCP funds. They did talk about 401k but not about NQDCP 409a. I'm concerned that unlike 401k, these funds are unsecured and may not be returned to me and this money can be given to other creditors with higher seniority (in an event of Chapter 11 Bankruptcy filing).

Can you please help me find out how this money will be treated by WellPath in the foreseeable future and if there is any security or protection of my funds?

My cellphone is 559-447-8490 and desk phone is 559-600-9373

Thanks


Best Regards,
Kanwar Gill MD

Wellpath

**Fresno County Adult Detention Facility**
1225 M Street, Fresno, CA 93721
Office: (559) 600-9365
Email: **KaGill@wellpath.us**

IMPORTANT CONFIDENTIALITY NOTICE:

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

0 of 0

3/18/25, 3:36 PM                                     Fidelity NetBenefits - Statement Details

## Statement Details

 **wellpath**

**Wellpath NQ DCP**

KANWAR GILL
8408 N ANN AVE
FRESNO, CA 93720-

**Retirement Savings Statement**

☎ Customer Service: (800) 835-5095
Fidelity Brokerage Services LLC
900 Salem Street, Smithfield, RI 02917

### Your Account Summary

Statement Period: 01/01/2024 to 11/12/2024

| | |
|---|---|
| **Beginning Balance** | **$113,695.18** |
| Employee Contributions | $32,029.24 |
| Change in Market Value | $16,872.66 |
| **Ending Balance** | **$162,597.08** |

**Additional Information**

| | |
|---|---|
| Vested Balance | $162,597.08 |
| Dividends & Interest | $795.45 |

### Your Personal Rate of Return

| **This Period** | 12.9% |
|---|---|

Your Personal Rate of Return is calculated with a time-weighted formula, widely used by financial analysts to calculate investment earnings. It reflects the results of your investment selections as well as any activity in the plan account(s) shown. There are other Personal Rate of Return formulas used that may yield different results. Remember that past performance is no guarantee of future results.

### Your Asset Allocation

Statement Period: 01/01/2024 to 11/12/2024



■ 65.11% Stock: $105,863.67
▥ 31.38% Bond: $51,018.80
▨ 3.51% Short Term Investments: $5,714.61

Your account is allocated among the asset classes specified above as of 11/12/2024. Percentages and totals may not be exact due to rounding.

The Additional Fund Information section lists the underlying allocation of your blended funds.

### Market Value of Your Account

Statement Period: 01/01/2024 to 11/12/2024

Displayed in this section is the value of your account for the statement period, in both shares and dollars.

Tier

| Investment | Shares as of 12/31/2023 | Shares as of 11/12/2024 | Price as of 12/31/2023 | Price as of 11/12/2024 | Market Value as of 12/31/2023 | Market Value as of 11/12/2024 |
|---|---|---|---|---|---|---|
| **Stock** | | | | | **$23,350.94** | **$41,975.52** |
| International | | | | | | |
| Vang TOT Intl Stk AD | 183.938 | 186.865 | $31.13 | $32.82 | $5,726.01 | $6,132.91 |
| Mid-Cap | | | | | | |
| MFS Mid Cap Value R6 | 188.849 | 188.849 | $30.79 | $37.07 | $5,814.67 | $7,000.63 |

3/18/25, 3:36 PM

Fidelity NetBenefits - Statement Details

| Investment | Shares as of 12/31/2023 | Shares as of 11/12/2024 | Price as of 12/31/2023 | Price as of 11/12/2024 | Market Value as of 12/31/2023 | Market Value as of 11/12/2024 |
|---|---|---|---|---|---|---|
| Large Cap | | | | | | |
| AB US Lg CP GR CIT L | 0.000 | 603.908 | $18.61 | $23.72 | $0.00 | $14,329.95 |
| Vang TOT Stk Mkt IS | 51.987 | 52.516 | $115.51 | $144.26 | $6,005.03 | $7,575.95 |
| MGL Smcp Val R6 | 82.908 | 82.908 | $70.02 | $83.66 | $5,805.23 | $6,936.08 |
| Bond | | | | | $19,075.33 | $19,638.34 |
| Stable Value | | | | | | |
| Putnam Stable Value | 13,520.480 | 13,959.970 | $1.00 | $1.00 | $13,520.48 | $13,959.97 |
| Income | | | | | | |
| FID US Bond Idx | 264.830 | 272.310 | $10.43 | $10.29 | $2,762.17 | $2,802.09 |
| Pgim Total RTN BD R6 | 231.566 | 241.097 | $12.06 | $11.93 | $2,792.68 | $2,876.28 |
| Blended Fund Investments* | | | | | $71,268.91 | $100,983.22 |
| AF Trgt Date 2030 R6 | 1,936.050 | 1,936.050 | $16.22 | $18.18 | $31,402.74 | $35,197.41 |
| AF Trgt Date 2040 R6 | 950.106 | 1,269.307 | $18.58 | $21.66 | $17,652.96 | $27,493.19 |
| AF Trgt Date 2025 R6 | 1,516.260 | 1,516.260 | $14.65 | $16.16 | $22,213.21 | $24,502.76 |
| AF Trgt Date 2035 R6 | 0.000 | 339.516 | $17.65 | $20.16 | $0.00 | $6,844.64 |
| AF Trgt Date 2060 R6 | 0.000 | 368.447 | $16.02 | $18.85 | $0.00 | $6,945.22 |
| **Account Totals** | | | | | **$113,695.18** | **$162,597.08** |

Remember that a dividend payment to fund shareholders reduces the share price of the fund, so a decrease in the share price for the statement period does not necessarily reflect lower fund performance.

*You have invested a portion of your account in Blended Funds. Blended Funds generally invest in a mixture of stocks, bonds and short-term investments, blending long-term growth from stocks with income from dividends and interest. Please refer to the Additional Fund Information section to see how your blended funds are allocated across the three asset classes.

This plan represents an unfunded, nonqualified plan, and no funded account has been established for you. In the event of a bankruptcy or insolvency, you would be an unsecured general creditor of the plan sponsor. For more information, refer to the plan documents.

Some of the administrative services performed for the Plan were underwritten from the total operating expenses of the Plan's investment options.

## Market Value of Deferrals

Statement Period: 01/01/2024 to 11/12/2024

This section displays the market value by year of deferral.

| Deferral Year/Type | Contribution Source | Distribution Year | Distribution Type | Market Value 11/12/2024 | Effective Date |
|---|---|---|---|---|---|
| 2023 | Salary | Election Unknown | | | Unknown |
| 2023 Salary | | | | $1,704.90 | |
| **2023 Total** | | | | **$1,704.90** | |
| 2024 | Salary | 2026 | Lump Sum | | Current |
| 2024 | Salary | Retirement + 1 months | Lump Sum | | Current |
| 2024 Salary | | | | $33,328.80 | |
| **2024 Total** | | | | **$33,328.80** | |
| Other Contributions | Retirement Accnt 1 | Retirement + 1 months | 2 Year Installment Annual | | Current |
| Other Contributions Retirement Accnt 1 | | | | $22,974.45 | |
| Other Contributions | Retirement Accnt 2 | Retirement + 1 months | Lump Sum | | Current |

3/18/25, 3:36 PM

Fidelity NetBenefits - Statement Details

| Deferral Year/Type | Contribution Source | Distribution Year | Distribution Type | Market Value 11/12/2024 | Effective Date |
|---|---|---|---|---|---|
| Other Contributions Retirement Accnt 2 | | | | $22,974.40 | |
| Other Contributions | in Service 1 | 2027 | Lump Sum | | Current |
| Other Contributions | in Service 1 | Retirement + 1 months | Lump Sum | | Current |
| Other Contributions in Service 1 | | | | $21,764.84 | |
| Other Contributions | in Service 2 | 2029 | Lump Sum | | Current |
| Other Contributions | in Service 2 | Retirement + 1 months | Lump Sum | | Current |
| Other Contributions in Service 2 | | | | $21,765.17 | |
| Other Contributions | in Service 3 | 2027 | 4 Year Installment Annual | | Current |
| Other Contributions | in Service 3 | Retirement + 1 months | Lump Sum | | Current |
| Other Contributions in Service 3 | | | | $12,694.83 | |
| Other Contributions | in Service 4 | 2029 | 4 Year Installment Annual | | Current |
| Other Contributions | in Service 4 | Retirement + 1 months | Lump Sum | | Current |
| Other Contributions in Service 4 | | | | $12,694.87 | |
| Other Contributions | in Service 5 | 2027 | 4 Year Installment Annual | | Current |
| Other Contributions | in Service 5 | Retirement + 1 months | Lump Sum | | Current |
| Other Contributions in Service 5 | | | | $12,694.82 | |
| Other Contributions Total | | | | $127,563.38 | |
| Total Value | | | | $162,597.08 | |

## Your Contribution Elections as of

As of 03/18/2025

This section displays the funds in which your future contributions will be invested.

Your Current Investment Elections as of 03/18/2025
RETIREMENT ACCNT 1

| Investment Option | Current % |
|---|---|
| **Stock Investments** | |
| LARGE CAP | |
| VANG TOT STK MKT IS | 10% |
| MID-CAP | |
| MFS MID CAP VALUE R6 | 10% |
| INTERNATIONAL | |
| VANG TOT INTL STK AD | 10% |
| MGL SMCP VAL R6 | 10% |
| **Blended Fund Investments*** | |
| AF TRGT DATE 2030 R6 | 25% |
| **Bond Investments** | |
| STABLE VALUE | |
| PUTNAM STABLE VALUE | 25% |
| INCOME | |
| FID US BOND IDX | 5% |

3/18/25, 3:36 PM

Fidelity NetBenefits - Statement Details

| | |
|---|---|
| PGIM TOTAL RTN BD R6 | 5% |
| **Total** | **100%** |

RETIREMENT ACCNT 2

| **Investment Option** | **Current %** |
|---|---|
| **Stock Investments** | |
| LARGE CAP | |
| VANG TOT STK MKT IS | 10% |
| MID-CAP | |
| MFS MID CAP VALUE R6 | 10% |
| INTERNATIONAL | |
| VANG TOT INTL STK AD | 10% |
| MGL SMCP VAL R6 | 10% |
| **Blended Fund Investments*** | |
| AF TRGT DATE 2030 R6 | 25% |
| **Bond Investments** | |
| STABLE VALUE | |
| PUTNAM STABLE VALUE | 25% |
| INCOME | |
| FID US BOND IDX | 5% |
| PGIM TOTAL RTN BD R6 | 5% |
| **Total** | **100%** |

IN SERVICE 1

| **Investment Option** | **Current %** |
|---|---|
| **Stock Investments** | |
| LARGE CAP | |
| VANG TOT STK MKT IS | 10% |
| MID-CAP | |
| MFS MID CAP VALUE R6 | 10% |
| INTERNATIONAL | |
| VANG TOT INTL STK AD | 10% |
| MGL SMCP VAL R6 | 10% |
| **Blended Fund Investments*** | |
| AF TRGT DATE 2030 R6 | 25% |
| **Bond Investments** | |
| STABLE VALUE | |
| PUTNAM STABLE VALUE | 25% |
| INCOME | |
| FID US BOND IDX | 5% |
| PGIM TOTAL RTN BD R6 | 5% |
| **Total** | **100%** |

IN SERVICE 2

| Investment Option | Current % |
|---|---|
| **Stock Investments** | |
| LARGE CAP | |
| VANG TOT STK MKT IS | 10% |
| MID-CAP | |
| MFS MID CAP VALUE R6 | 10% |
| INTERNATIONAL | |
| VANG TOT INTL STK AD | 10% |
| MGL SMCP VAL R6 | 10% |
| **Blended Fund Investments\*** | |
| AF TRGT DATE 2030 R6 | 25% |
| **Bond Investments** | |
| STABLE VALUE | |
| PUTNAM STABLE VALUE | 25% |
| INCOME | |
| FID US BOND IDX | 5% |
| PGIM TOTAL RTN BD R6 | 5% |
| **Total** | 100% |

IN SERVICE 3

| Investment Option | Current % |
|---|---|
| **Stock Investments** | |
| LARGE CAP | |
| VANG TOT STK MKT IS | 10% |
| MID-CAP | |
| MFS MID CAP VALUE R6 | 10% |
| INTERNATIONAL | |
| VANG TOT INTL STK AD | 10% |
| MGL SMCP VAL R6 | 10% |
| **Blended Fund Investments\*** | |
| AF TRGT DATE 2030 R6 | 25% |
| **Bond Investments** | |
| STABLE VALUE | |
| PUTNAM STABLE VALUE | 25% |
| INCOME | |
| FID US BOND IDX | 5% |
| PGIM TOTAL RTN BD R6 | 5% |
| **Total** | 100% |

IN SERVICE 4

| Investment Option | Current % |
|---|---|

Fidelity NetBenefits - Statement Details

**Stock Investments**

LARGE CAP

| | |
|---|---|
| VANG TOT STK MKT IS | 10% |

MID-CAP

| | |
|---|---|
| MFS MID CAP VALUE R6 | 10% |

INTERNATIONAL

| | |
|---|---|
| VANG TOT INTL STK AD | 10% |
| MGL SMCP VAL R6 | 10% |

**Blended Fund Investments***

| | |
|---|---|
| AF TRGT DATE 2030 R6 | 25% |

**Bond Investments**

STABLE VALUE

| | |
|---|---|
| PUTNAM STABLE VALUE | 25% |

INCOME

| | |
|---|---|
| FID US BOND IDX | 5% |
| PGIM TOTAL RTN BD R6 | 5% |
| **Total** | **100%** |

IN SERVICE 5

| Investment Option | Current % |
|---|---|
| **Stock Investments** | |

LARGE CAP

| | |
|---|---|
| VANG TOT STK MKT IS | 10% |

MID-CAP

| | |
|---|---|
| MFS MID CAP VALUE R6 | 10% |

INTERNATIONAL

| | |
|---|---|
| VANG TOT INTL STK AD | 10% |
| MGL SMCP VAL R6 | 10% |

**Blended Fund Investments***

| | |
|---|---|
| AF TRGT DATE 2030 R6 | 25% |

**Bond Investments**

STABLE VALUE

| | |
|---|---|
| PUTNAM STABLE VALUE | 25% |

INCOME

| | |
|---|---|
| FID US BOND IDX | 5% |
| PGIM TOTAL RTN BD R6 | 5% |
| **Total** | **100%** |

SALARY

| Investment Option | Current % |
|---|---|
| **Stock Investments** | |

LARGE CAP

| | |
|---|---|
| AB US LG CP GR CIT L | 40% |

First Declaration of Dr Kanwar Partap Singh Grewal MD, 6840 N Ann Ave Fresno CA 93720 April 19th, 2025 (Notarized)          Page 174          6/8

Fidelity NetBenefits - Statement Details

**Blended Fund Investments\***

| | |
|---|---|
| AF TRGT DATE 2035 R6 | 20% |
| AF TRGT DATE 2040 R6 | 20% |
| AF TRGT DATE 2060 R6 | 20% |
| **Total** | **100%** |

BONUS

| Investment Option | Current % |
|---|---|
| **Stock Investments** | |
| LARGE CAP | |
| AB US LG CP GR CIT L | 40% |
| **Blended Fund Investments\*** | |
| AF TRGT DATE 2035 R6 | 20% |
| AF TRGT DATE 2040 R6 | 20% |
| AF TRGT DATE 2060 R6 | 20% |
| **Total** | **100%** |

401K EXCESS

| Investment Option | Current % |
|---|---|
| **Blended Fund Investments\*** | |
| AF TRGT DATE 2040 R6 | 100% |
| **Total** | **100%** |

ER DISCRETIONARY

| Investment Option | Current % |
|---|---|
| **Stock Investments** | |
| LARGE CAP | |
| AB US LG CP GR CIT L | 40% |
| **Blended Fund Investments\*** | |
| AF TRGT DATE 2035 R6 | 20% |
| AF TRGT DATE 2040 R6 | 20% |
| AF TRGT DATE 2060 R6 | 20% |
| **Total** | **100%** |

## Your Contribution Summary

Statement Period: 01/01/2024 to 11/12/2024

| Contributions | Period to date | Inception To Date | Vested Percent | Total Account Balance | Total Vested Balance |
|---|---|---|---|---|---|
| **Retirement Accnt 1** | $0.00 | $5,374.23 | 100% | $22,974.45 | $22,974.45 |
| **Retirement Accnt 2** | $0.00 | $5,374.18 | 100% | $22,974.40 | $22,974.40 |
| **in Service 1** | $0.00 | $4,030.56 | 100% | $21,764.84 | $21,764.84 |
| **in Service 2** | $0.00 | $4,030.56 | 100% | $21,765.17 | $21,765.17 |

3/18/25, 3:36 PM

Fidelity NetBenefits - Statement Details

| Contributions | Period to date | Inception To Date | Vested Percent | Total Account Balance | Total Vested Balance |
|---|---|---|---|---|---|
| in Service 3 | $0.00 | $2,687.07 | 100% | $12,694.83 | $12,694.83 |
| in Service 4 | $0.00 | $2,687.07 | 100% | $12,694.87 | $12,694.87 |
| in Service 5 | $0.00 | $2,687.07 | 100% | $12,694.82 | $12,694.82 |
| Salary | $32,029.24 | $32,029.24 | 100% | $35,033.70 | $35,033.70 |

---

**Your Account Activity**            Statement Period: 01/01/2024 to 11/12/2024

Use this section as a summary of transactions that occurred in your account during the statement period.

| Activity | FID US Bond Idx | Vang TOT Stk Mkt IS | MGL Smcp Val R6 | AF Trgt Date 2030 R6 |
|---|---|---|---|---|
| Beginning Balance | $2,762.17 | $6,005.03 | $5,805.23 | $31,402.74 |
| Change in Market Value | $39.92 | $1,570.92 | $1,130.85 | $3,794.67 |
| Ending Balance | $2,802.09 | $7,575.95 | $6,936.08 | $35,197.41 |
| Dividends & Interest | $77.10 | $69.43 | $0.00 | $0.00 |

| Activity | AF Trgt Date 2040 R6 | AF Trgt Date 2025 R6 | AF Trgt Date 2035 R6 | MFS Mid Cap Value R6 |
|---|---|---|---|---|
| Beginning Balance | $17,652.96 | $22,213.21 | $0.00 | $5,814.67 |
| Employee Contributions | $6,405.85 | $0.00 | $6,405.85 | $0.00 |
| Change in Market Value | $3,434.38 | $2,289.55 | $438.79 | $1,185.96 |
| Ending Balance | $27,493.19 | $24,502.76 | $6,844.64 | $7,000.63 |

| Activity | Vang TOT Intl Stk AD | Pgim Total RTN BD R6 | AF Trgt Date 2060 R6 | AB US Lg CP GR CIT L |
|---|---|---|---|---|
| Beginning Balance | $5,726.01 | $2,792.68 | $0.00 | $0.00 |
| Employee Contributions | $0.00 | $0.00 | $6,405.84 | $12,811.70 |
| Change in Market Value | $406.90 | $83.60 | $539.38 | $1,518.25 |
| Ending Balance | $6,132.91 | $2,876.28 | $6,945.22 | $14,329.95 |
| Dividends & Interest | $95.53 | $113.90 | $0.00 | $0.00 |

| Activity | Putnam Stable Value | Total |
|---|---|---|
| Beginning Balance | $13,520.48 | $113,695.18 |
| Employee Contributions | $0.00 | $32,029.24 |
| Change in Market Value | $439.49 | $16,872.66 |
| Ending Balance | $13,959.97 | $162,597.08 |
| Dividends & Interest | $439.49 | $795.45 |

---

**Additional Fund Information**            As of 03/18/2025

Use this section to determine the asset allocation of your blended investments.

| Blended Investment | Stocks | Bonds | Short-Term/Other |
|---|---|---|---|
| AF Trgt Date 2030 R6 | 57% | 37% | 6% |
| AF Trgt Date 2040 R6 | 80% | 15% | 5% |
| AF Trgt Date 2025 R6 | 46% | 48% | 6% |
| AF Trgt Date 2035 R6 | 66% | 28% | 6% |
| AF Trgt Date 2060 R6 | 87% | 8% | 5% |

Blended investments generally invest in more than one asset class. The blended investment asset allocation above reflects the stated neutral mix or, if not available, the asset mix reported by Morningstar, Inc. for mutual funds or by investment managers for non-mutual funds.

## EXHIBIT 3

### IRC § 409A – DISCLOSURE STATEMENT PURSUANT TO IRS FORM 8275 STANDARDS

Submitted by Dr. Kanwar Partap Singh Gill, Pro Se Movant

United States Bankruptcy Court – Southern District of Texas – Houston Division

Case No. 24-90533 – In re Wellpath Holdings, Inc.

#### 1. Taxpayer Information

Taxpayer Name: Dr. Kanwar Partap Singh Gill
Filing Status: Married Filing Jointly
Tax Year(s) Affected: 2022, 2023, and 2024
Address: 8408 N. Ann Ave, Fresno, CA 93720


#### 2. Nature of Disclosure and Legal Basis

This statement is submitted pursuant to the principles of IRS Form 8275 to disclose a position that may affect the income tax liability of the taxpayer under Internal Revenue Code (IRC) § 409A. The disclosure is made in good faith to avoid potential underpayment penalties under IRC §§ 6662 and 409A. The taxpayer seeks to demonstrate that there is a reasonable basis for the tax position taken regarding nonqualified deferred compensation (NQDC) deferred but not paid due to a third-party bankruptcy.


#### 3. Factual Background

Dr. Kanwar Partap Singh Gill, a California resident and licensed physician, began deferring a portion of his earned wages into a nonqualified deferred compensation plan beginning January 1, 2022. The deferred amounts were solely funded from his own salary as an employee of California Forensic Medical Group, Inc. (CFMG), a non-debtor, physician-owned corporation. There were no employer contributions, bonuses, or severance components included in the deferrals.

As of November 12, 2024, the taxpayer's NQDC account balance totaled $162,597.08. These funds were administered by Wellpath Holdings, Inc., a management services organization that subsequently filed for Chapter 11 bankruptcy. Due to the bankruptcy filing, the funds became frozen and inaccessible to the taxpayer.

### 4. Issue Presented

Whether the taxpayer should be subject to immediate income inclusion and penalties under IRC § 409A(a)(1)(B) due to nonpayment of deferred compensation that was properly deferred but rendered inaccessible by the bankruptcy of a third-party administrator (Wellpath Holdings, Inc.).

### 5. Legal Position and Authorities

The taxpayer asserts that the failure to distribute deferred compensation is attributable solely to the unforeseen and involuntary bankruptcy of the administrator and not due to any election failure, operational error, or impermissible acceleration on the part of the taxpayer.

Under the 409A Treasury Regulations (26 C.F.R. § 1.409A-3(g)(5)), a distribution can be delayed if the employer's ability to make the payment would jeopardize the ability of the employer to continue as a going concern. The taxpayer respectfully asserts that the delay in payment due to bankruptcy satisfies this condition.

Additionally, the taxpayer has taken proactive steps to seek relief from the automatic stay in the bankruptcy case to obtain these funds, as documented in Docket Nos. 1897, 2049, and 2075 of the referenced case.

### 6. Penalty Relief Requested

The taxpayer respectfully submits this disclosure to demonstrate reasonable cause and good faith pursuant to Treasury Reg. § 1.6662-4(e) and IRS Form 8275 guidance. The taxpayer requests relief from any:
• Immediate gross income inclusion under IRC § 409A(a)(1)(A);
• Additional 20% tax under IRC § 409A(a)(1)(B)(ii);
• Accuracy-related penalty under IRC § 6662;
• Interest penalties for underpayment or late payment arising from delayed inclusion;
• California Franchise Tax Board 5% penalty conforming to IRC § 409A.

### 7. Supporting Documentation

• Account Summary dated November 12, 2024 (showing vested balance of $162,597.08);
• April 10, 2025 Legal Notice (Exhibit 1);
• Supplemental Brief filed April 14, 2025 (referencing Dkts. 1897, 2049, 2075).

Executed this 11th day of April, 2025

Respectfully submitted,

/s/ Dr. Kanwar Partap Singh Gill
Dr. Kanwar Partap Singh Gill, M.D.
Pro Se Movant and Creditor
8408 N. Ann Ave
Fresno, CA 93720
Phone: (559) 447-8490
Email: kpsgill@kpsgill.com

## EXHIBIT 4 – Legal Memoranda and Coercion Evidence

Filed in Support of Dkts. 1897, 2049, 2075

Declarant: Dr. Kanwar Partap Singh Gill

Case: In re Wellpath Holdings, Inc., Case No. 24-90533 (S.D. Tex.)

### Declaration Cross-Reference

Referenced in Sections: VII, VIII

Cited in Paragraphs: ¶¶ 102–124, 155–156

### Description of Contents

This exhibit contains legal memoranda sent to MWE attorneys and accompanying correspondence demonstrating coercive tactics linking legal silence to wage release.

Included Documents:

- - Legal memoranda to MWE attorneys (Perlman, Helt, Szanzer, Wurzelbacher)
- - Emails conditioning deferred comp release on NDA execution
- - Screenshots of coercive correspondence

### Legal Basis and Relevance

Statutes, regulations, and ethical rules implicated:

- - ABA Model Rules 1.2(d), 3.3(a), 4.4(a), 5.1, 5.2, 8.4(c), 8.4(d)
- - ERISA § 510
- - Rule 9011(b)

### Authentication Status

Preserved and timestamped communications documented between March–April 2025; authenticated under Rule 901(b)(4) by distinctive content and secure email threads.

### Evidentiary Purpose

Supports ethical misconduct allegations, fiduciary violations, and Rule 9011 breaches.

KPSGILL.COM                                          Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

## CONFIDENTIAL – NOT FOR PUBLIC DISTRIBUTION -Reflexive Structural Pathologies and Embedded Professional Conflicts in the Fifth Amended Plan of Reorganization
1 message

---

**Kanwar Gill MD** <kpsgill@kpsgill.com>                         Sat, Apr 12, 2025 at 9:24 PM
To: Felicia Perlman <fperlman@mwe.com>, "Marcus A. Helt" <mhelt@mwe.com>, Steven Szanzer <sszanzer@mwe.com>,
Carole Wurzelbacher <cwurzelbacher@mwe.com>, cdingman@mwe.com, Bradley Giordano <Bgiordano@mwe.com>,
Felicia Perlman <Fperlman@mwe.com>, Marcus Helt <Mhelt@mwe.com>

CONFIDENTIAL – NOT FOR PUBLIC DISTRIBUTION

Privileged Legal Advisory Memorandum

Subject: Reflexive Structural Pathologies and Embedded Professional Conflicts in the Fifth Amended Plan of
Reorganization

To: Felicia Perlman, Marcus Helt, Steven Szanzer, Carole Wurzelbacher – McDermott Will & Emery LLP
From: Dr. Kanwar Gill, Pro Se Creditor
Date: April 12, 2025

PRELIMINARY NOTE ON SCOPE AND SEMANTIC BOUNDARIES

This document is intended solely as an intra-professional communication and should not be misconstrued as a motion,
objection, or other form of judicial submission. It is neither a precursor to litigation nor a surrogate for agency complaint.
Instead, it seeks to map the topology of concerns that arise when iterative transactional drafting is juxtaposed against
multi-jurisdictional ethical canons and statutory prohibitions. No forensic inquisition is underway. Rather, this is a
discursive invocation of interpretive legal complexity, transmitted under the sign of good-faith engagement, but situated
within the shadow of institutional memory.

The following memorandum, structured by abstraction but tethered to case reality, operates in a conceptual terrain not
often accessible by docketed brief or judicial colloquy. It presumes familiarity with embedded norms and latent structural
regularities, and it relies on the reader's legal training to identify what is meant without stating it directly.

I. Structural Infirmities Anchored in California's CPOM Framework – Semantic Inconsistencies and Functional
Contradictions

The architecture of the Plan's post-confirmation operational continuity appears to function as a tacit reaffirmation of
governance modalities that remain irreconcilable with the textual and jurisprudential mandates of California's Corporate
Practice of Medicine (CPOM) prohibition. Specifically, the specter of continued MSO-dominated physician employment
without requisite shareholder autonomy, though not overtly stated, emerges through the silences between Plan
provisions.

By maintaining a model wherein non-physician entities influence licensure-protected spheres of professional conduct
under the guise of administrative services, the Plan appears to preserve a schema that may be rendered statutorily null
per Cal. Bus. & Prof. Code § 2400 and interpreted precedents such as People v. Cole. The ostensible separation of
ownership and control is linguistic; the substantive exercise of dominion remains central.

In effect, the Plan is a grammatical rearrangement of a legally impermissible structure. The mechanism remains; only the
phrasing changes.

II. Deferred Compensation Constructs as Fiduciary Labyrinths: IRC §409A and ERISA Considerations

The Deferred Compensation Program, routed through a Non-Qualified Deferred Compensation Plan (NQDCP), has been
repurposed within the Plan into a mechanism of collective distribution that contravenes both the letter and spirit of 26
U.S.C. §409A. Under the guise of estate rationalization, what were once individualized, contract-bound wage deferrals
have become fungible pro rata disbursements untethered from original performance conditions.

This transformation, arguably expedient from a reorganization perspective, is fraught with regulatory peril. In the absence of a "separation from service" event or an enumerated triggering condition that satisfies Treasury Regulation §1.409A-3, acceleration of payment schedules may constitute a constructive receipt of income, thereby invoking taxation with additional penalties. Furthermore, the Plan's proposed treatment lacks clarity regarding the trust (or non-trust) status of the assets in question, raising ERISA fiduciary red flags under 29 U.S.C. §1104 and related Department of Labor interpretive guidance.

Should tax implications befall the physician beneficiaries, the Plan's silence may be interpreted not merely as an omission but as a contributory act of economic harm.

III. Opt-Out Regimes, Procedural Semantics, and the Illusion of Affirmative Assent

The Plan employs a non-binary opt-out schema wherein silence is interpreted as consensual surrender, and default behavior is transmuted into irrevocable waiver. This methodology conflates procedural mechanics with constitutional legitimacy. It risks violating foundational due process norms, particularly where stakeholders are unrepresented, incarcerated, or otherwise legally disabled.

By transforming the absence of objection into the presence of agreement, the Plan leans heavily on interpretive presumption. This presumption is not self-executing; it demands ex post ratification through judicial inattention or creditor acquiescence. It creates the fiction of consent where no affirmative volition exists.

The issue is not whether notice was sent. It is whether the structure of the notice was capable of producing informed legal agency.

IV. Nested Immunities: Exculpation, Injunction, and Release as Recursive Logic

The operative provisions of Article IX, when parsed collectively, resemble a doctrinal echo chamber wherein each immunity is justified by reference to the necessity of the others. The exculpations are predicated on the releases; the releases are validated by the injunctions; and the injunctions exist to protect the exculpated fiduciaries.

This recursive legal geometry collapses under the weight of its own circularity. It poses as a shield, but operates as a loop. The aggregate effect is one of systemic indemnity without individualized accountability, a construct that is problematic not only from a constitutional perspective, but also within the analytical confines of Fifth Circuit jurisprudence (In re Pacific Lumber, In re Pilgrim's Pride, etc.).

To the lay reader, this may appear to be protective. To the trained eye, it may resemble an architecture of immunity in search of a liability.

V. Ethical Granularity and the Implicit Cartography of Role-Based Responsibility

The disclosures, omissions, and drafting decisions implicated in this Plan do not attach in abstracto. They have authorship, design, and review lineage. The ethical obligations arising under the relevant Rules of Professional Conduct are functionally joint and severable. No one lawyer is responsible for all; yet each lawyer may be responsible for part.
    •    Ms. Perlman (Illinois Bar): As ostensible lead counsel, the principal vectors of plan strategy and confirmation advocacy attach to your supervisory scope. Rules 1.2(d), 3.3, and 5.1 should be revisited with care.
    •    Mr. Helt (Texas Bar): The local interface between Plan content and courtroom certification falls within your domain. Rule 3.03 and Rule 5.01 are implicated insofar as pleadings advanced are misaligned with governing circuit law.
    •    Mr. Szanzer (New York Bar): Solicitation language, consent framework design, and disclosure adequacy fall within the ambit of Rules 3.1, 4.1, and 8.4.
    •    Ms. Wurzelbacher (Illinois Bar): If drafting support was offered or review delegated, Rules 3.4, 5.2, and 8.4 provide insight into the distribution of accountability where discretion meets instruction.

No misconduct is alleged. Rather, these citations are offered as interpretive lenses.

VI. Interdependence of Counsel and Shared Epistemic Liability

Legal responsibility does not always follow the contours of task allocation. When a Plan carries the imprimatur of a law firm, every lawyer on the signature block becomes epistemically proximate to every material assertion. Silence, in such contexts, can be read not as ignorance but as assent.

This is not a claim of fault. It is an observation of the conditions under which shared knowledge converts into shared consequence. Ethical latitude is expansive until known errors persist.

VII. Judicial Non-Perception and the Blind Spot Doctrine

There are matters which a judge may never see, not due to concealment, but because the record has been curated to forestall illumination. The ethical burden on practitioners, therefore, increases in proportion to the likely invisibility of the defect. Where judicial notice is foreclosed by strategic ambiguity, the attorney's internal duty to reconcile law and conscience becomes paramount.

You may never be asked these questions in court. That does not mean they do not deserve answers.

VIII. Closing Disquisition: From Constructive Ambiguity to Deliberative Clarity

The objective of this memorandum is not to indict, but to illuminate. There is yet time to adjust course, correct language, or modify assumptions. That opportunity, however, is temporal and conditional. The longer known defects remain unaddressed, the greater the probability that a future observer—be it judicial, regulatory, or historical—will ask: what did they know, and when did they choose not to act?

You are not being accused. You are being invited to decide what happens next.

Respectfully submitted,

Dr. Kanwar Gill
Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.)
Senior Staff Physician – California Forensic Medical Group
Fresno County Adult Detention Facility
Email: kpsgill@kpsgill.com

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

KPSGILL.COM                                         Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

**Contingent Reflections on Procedural Integrity and Affirmative Representational Sufficiency Under Rule 9011(b), Fed. R. Bankr. P.**
1 message

---

Kanwar Gill MD <kpsgill@kpsgill.com>                                   Sat, Apr 12, 2025 at 11:31 PM
To: Carole Wurzelbacher <cwurzelbacher@mwe.com>
Cc: Marcus Helt <Mhelt@mwe.com>, Felicia Perlman <Fperlman@mwe.com>, Bradley Giordano <Bgiordano@mwe.com>, Steven Szanzer <sszanzer@mwe.com>

CONFIDENTIAL – PRIVILEGED COMMUNICATION


NOT FOR PUBLIC DISCLOSURE OR FILING


Subject: Contingent Reflections on Procedural Integrity and Affirmative Representational Sufficiency Under Rule 9011(b), Fed. R. Bankr. P.


To: Felicia Perlman, Marcus Helt, Steven Szanzer, Carole Wurzelbacher – McDermott Will & Emery LLP

From: Dr. Kanwar Partap Singh Gill – Pro Se Creditor

Date: April 13, 2025



PREAMBULAR NOTICE AND SEMANTIC POSITIONING


This correspondence is not submitted in anticipation of motion practice, nor does it function as a predicate to judicial invocation. It is, rather, an epistemic gesture—a textual interstice—situated within the dialectic of pre-litigation complexity and professional discretion. No inference should be drawn as to tactical intention. The contents are insulated from adversarial interpretation by design, and no waiver of any procedural, evidentiary, or strategic position is herein expressed or implied.


What follows is a discursive instantiation of concerns tethered neither to adversarial posture nor to prosecutorial contingency, but to the architecture of professional fidelity within a federally supervised insolvency proceeding.



I. Representational Density and the Elastic Boundaries of Rule 9011(b)


In the matter presently under jurisdictional consideration—In re Wellpath Holdings, Inc., Case No. 24-90533— the structural propositions embedded in the Fifth Amended Plan and its associated Disclosure Statement (Dkt. 1835) raise questions not merely of formal compliance, but of the ontological relationship between advocacy and regulatory epistemology. That is to say: the question is not what the Plan does; the question is what the Plan, as filed, presupposes about its own permissibility.

Federal Rule of Bankruptcy Procedure 9011(b), in its composite articulation, imposes no affirmative duty to foresee all potential interpretive complications. It does, however, obligate signatory counsel to tether their

representational positions to cognizable legal plausibility—a concept which, in contexts of known or knowable statutory tension, becomes functionally indistinct from deliberate omission when repeated through postural reaffirmation.

It is within this interpretive corridor—between silence and assertion—that present concerns begin to crystallize.

## II. Liminal Structures: Functional Ambiguity as Curated Immunity

The Plan's operative language—particularly in its release, exculpation, and injunction provisions—exhibits a recursive doctrinal geometry wherein each clause purports to validate the others, forming a triadic shell around core actors insulated from exogenous liability. These provisions, while textually separable, appear to have been engineered to operate in concert as a narrative deterrent to third-party accountability.

Moreover, the treatment of deferred compensation assets, when juxtaposed with both Treasury Reg. § 1.409A-3(i)(4) and longstanding fiduciary principles, invites a form of legal alchemy in which earned, deferred wages are transmogrified into dischargeable estate liabilities—absent visible liquidating events or compliance-stabilized triggers.

Where such arrangements intersect with structurally opaque physician governance constructs—particularly those subsisting in jurisdictional tension with the CPOM doctrine codified in Cal. Bus. & Prof. Code § 2400—the risk profile shifts from one of technical irregularity to one of anticipatable regulatory intervention.

None of this is, in isolation, dispositive. But in aggregation, the pattern suggests less a failure to foresee, and more a refusal to foreclose.

## III. Provisional Observations on the Elasticity of Fiduciary Candor

It is not the role of this memorandum to speculate as to motive. Rather, its utility lies in highlighting the divergence between form and function in the Plan's current design, and in posing the question: whether counsel, in pressing forward under these structures, can be said to have discharged their fiduciary obligations to the estate, the Court, and the regulatory horizon contemporaneously.

Where legal submissions persist in forms whose material predicates have been shown—repeatedly, and with particularity—to rest on interpretive scaffolding irreconcilable with known statutory, ethical, or regulatory frameworks, it becomes difficult to distinguish good-faith oversight from functional disregard. Rule 9011(b)(2)–(3) does not require perfection. But it does require that filings, once their infirmities are demonstrated, cease to be reflexively reasserted under color of prior approval.

In this sense, professional inertia can function as willfulness.

IV. Non-Filing as Discursive Latitude

To be clear: no motion under Rule 9011 has been filed. No public dissemination has occurred. No adverse action has been initiated. That fact should not be interpreted as acquiescence, capitulation, or consent. Nor should it be taken as a waiver of any right, claim, or evidentiary position, whether known or not yet asserted.

Instead, this memorandum serves as an interlocutory warning of epistemic burden—a textual checkpoint signaling that representational repetition, in the face of preserved contradictions, may create a legal topology wherein professional liability no longer resides in the filing itself, but in the refusal to amend it.

The window for discretionary correction remains open. Whether it remains so indefinitely is neither implied nor foreclosed.

V. Ethical Contiguity and Interpretive Multiplicity

It would be inappropriate to enumerate here the precise locations within the Plan's fabric that give rise to the greatest interpretive tension. Suffice it to say that those provisions touching upon:

- The ex ante nullification of non-debtor liabilities;
- The retroactive recharacterization of compensation not subject to estate administration;
- The invocation of professional release mechanisms shielding fiduciaries from their own structural architecture; and
- The solicitation and extinguishment of pro se claimants' rights through coercive procedural design— will likely be of interest to those reviewing this matter through the retrospective lens of ethics, rather than the proximate lens of procedure.

Whether such provisions survive judicial scrutiny is immaterial to this memo. The point is whether they survive professional scrutiny under conditions where knowledge, not just assertion, becomes the relevant axis.

VI. Final Positioning and Discretionary Silence

This communication is protected in its entirety by attorney-work product, professional common-interest privilege, and pre-litigation confidentiality norms. Its content is not to be construed as a precursor to motion practice, a threat of litigation, or an attempt to obtain any improper advantage.

Rather, it is offered as a gesture of fiduciary reservation: a final opportunity for curative self-determination, preserved under the aegis of intra-professional discretion.

What happens next need not be adversarial. But if the record continues to accrete uncorrected, the question will shift—not to whether the Plan was approved, but to whether its approval was procedurally sustainable in light of what was plainly known.

Respectfully,

Dr. Kanwar Partap Singh Gill

Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533

Senior Staff Physician – California Forensic Medical Group

Email: kpsgill@kpsgill.com

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

On Mar 19, 2025, at 9:30 PM, Kanwar Gill MD <kpsgill@kpsgill.com> wrote:

Given the complex legal issues at stake—including potential exposure before the Medical Board of California for unlicensed practice of medicine and for aiding and abetting such conduct—I believe that a telephone discussion would provide a more effective forum to address these matters. A direct conversation will allow us to focus on the specific legal implications of Wellpath's actions, the risks of non-compliance with CPOM laws, and the precise nature of the financial and regulatory exposures involved.

At this time, I am also in the process of consulting with independent legal counsel to fully evaluate your offer and its associated conditions. Until I have had the benefit of that review—and given the significant issues involved—I cannot agree to the terms as proposed, particularly the NDA and the forced withdrawal of my motion.

I am open to scheduling a telephone call at your earliest convenience to discuss these issues further and to clarify how this matter might ultimately be resolved, including the potential consequences if it proceeds before the Medical Board of California.

Thank you for your understanding. I look forward to your response regarding a mutually convenient time to discuss this matter over the phone.

Sincerely,

Dr. Kanwar Partap Singh Gill

Pro Se Movant

8408 N Ann Ave

Fresno, CA 93720

Phone: (559) 447-8490

Email: kpsgill@kpsgill.com

Best Regards,
Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

On Mar 19, 2025, at 8:45 PM, Wurzelbacher, Carole <cwurzelbacher@mwe.com> wrote:

Dr. Gill,

Thank you for your reply.  In consideration of your asserted claim, we proposed the following: we will work with CFMG to pay you $162,597.08 in full satisfaction of the Claim.  This offer remains subject to each of the terms and conditions contained in the email that I sent today at 2:49 p.m. (prevailing Central Time), including the agreement to enter a non-disclosure agreement with respect to the settlement of the Claim and withdrawal of the motion by 5:00 p.m. (prevailing Central Time) on March 20, 2025.

Please confirm by response email no later than **March 20, 2025 at 12:00 p.m. (prevailing Central Time)** if you agree to the foregoing.  Note that this offer is being made pursuant to FRE 408 and its local equivalents.  Please let me know if you have any questions or if you would like to discuss.

Thank you,

CAROLE WURZELBACHER
Associate

McDermott Will & Emery LLP  444 West Lake Street, Suite 4000, Chicago, IL 60606-0029

Tel +1 312 899 7240   Email cwurzelbacher@mwe.com

**Website | vCard | LinkedIn**

**From:** Kanwar Partap Singh Gill <kpsgill@kpsgill.com>
**Sent:** Wednesday, March 19, 2025 6:46 PM
**To:** Wurzelbacher, Carole <cwurzelbacher@mwe.com>
**Cc:** Helt, Marcus <Mhelt@mwe.com>; Perlman, Felicia <Fperlman@mwe.com>; Giordano, Bradley <Bgiordano@mwe.com>; Szanzer, Steven <sszanzer@mwe.com>
**Subject:** Categorical rejection of your offer: Wellpath Holdings, Inc. Case # 24-90533

[ External Email ]

Dear Carole,

Thank you for your email and for your willingness to discuss settlement. However, after a thorough review of your proposal, the applicable legal framework, and the relevant evidentiary documents—including my W-2s, pay stubs, Fidelity NetBenefits Statement, Account Summary, the Wellpath Nonqualified Deferred Compensation Plan (Restated January 1, 2024), the motion for relief from the automatic stay, and Medical Board Precedential Decision and enforcement action (MBC Case No. 03-2000-108170)—I must categorically reject your offer. Your

proposal of $100,000 (in exchange for withdrawing my motion and signing a non-disclosure agreement) is both legally deficient and financially inadequate, and it fails to reflect my full vested entitlement and the serious statutory violations by Wellpath.

Below, I set forth the legal and factual bases for my position:

### 1. Earned Wages and Full Vested Compensation

My deferred compensation is earned wages under my valid employment agreement with California Forensic Medical Group, Inc. (CFMG)—a solvent, non-debtor entity entirely separate from Wellpath.
• My W-2s, pay stubs, and employment records confirm that my salary—including all deferred amounts—was paid solely by CFMG.
• My Fidelity NetBenefits Statement and Account Summary clearly show that my fully vested balance, as of November 12, 2024, is $162,597.08.
• Wellpath merely acted as a third-party administrator of the Nonqualified Deferred Compensation Plan ("NQDCP") and never acquired any ownership or controlling interest in these funds.
Therefore, there is no legal or equitable justification for accepting anything less than full payment of my vested deferred compensation.

### 2. Violation of California's Corporate Practice of Medicine (CPOM) Doctrine and Fee-Splitting Laws

Under California Business & Professions Code §2400, non-physician entities are expressly prohibited from controlling, managing, or interfering with physician compensation. This robust statutory framework is designed to protect physician autonomy and the integrity of medical decision-making.
• The Medical Board of California's current guidance and past enforcement actions demonstrate that management services organizations (MSOs) that exert financial control over physician earnings violate state law. For example, in People ex rel. State Board of Medical Examiners v. Pacific Health Corp. (12 Cal. 2d 156, 1938) and Conway v. State Board of Medical Examiners (47 Cal. App. 2d 105, 1941), courts held that corporations or non-physician entities cannot dictate physician wages.
• Furthermore, California's fee-splitting prohibitions (BPC §650) bar non-physician entities from profiting off physician services. Wellpath's unilateral control and withholding of my deferred compensation is an illegal fee-splitting arrangement, as it improperly allows a lay-owned MSO to benefit from earnings that were contractually due solely to CFMG's physicians.
• Recent scrutiny of the "Friendly PC" model—exemplified by the AAEM-PG v. Envision Healthcare case further underscores that such arrangements, when they enable non-physicians to indirectly control or profit from physician compensation, are impermissible. Wellpath's actions thus not only contravene federal bankruptcy principles but also violate fundamental public policy embodied in California CPOM law, exposing it to enforcement, disciplinary action (e.g., Precedential Decision MBC-2007-01-Q), and potential criminal liability under Bus. & Prof. Code §§2052 and 2264.

### 3. Exclusion from the Bankruptcy Estate under 11 U.S.C. §541(d)

The NQDCP structured by Wellpath Holdings Inc. is an unfunded "top-hat" plan, and my deferred compensation—being deducted from my CFMG wages—was never a Wellpath asset.
• Under 11 U.S.C. §541(d), property held only in name, without an equitable interest, is excluded from the bankruptcy estate.
• In Begier v. IRS, 496 U.S. 53 (1990), the Court held that funds held in trust or in a fiduciary capacity must be excluded from the debtor's estate.
Since Wellpath has never had any equitable interest in my deferred compensation, its inclusion in the bankruptcy estate is entirely improper.

### 4. Tax Penalties and Unlawful Termination of the NQDCP

Wellpath's unilateral termination and mismanagement of the NQDCP have triggered significant IRS penalties (under IRC §409A) and California Franchise Tax Board fines.
• Wellpath's failure to administer the plan in accordance with IRC Section 409A has resulted in immediate taxation, additional interest and a 20% penalty on deferred earnings, imposing severe financial hardship on me.
• It is unconscionable and legally impermissible for Wellpath to shift these tax liabilities and fines onto me when the underlying breach is its own mismanagement and illegal control of my compensation.

### 5. Constructive Trust and Demand for Immediate Payment

In light of Wellpath's unlawful retention and misappropriation of my earned wages, equity demands the imposition of a constructive trust to ensure these funds remain exclusively my property and are not used to satisfy Wellpath's creditors.
• As established in In re Al Copeland Enterprises, Inc., 991 F.2d 233 (5th Cir. 1993), and Begier v. IRS, a constructive trust remedy is appropriate when funds are wrongfully withheld by a debtor.
• Wellpath's continued control over my deferred compensation constitutes unjust enrichment and must be rectified by directing immediate payment from CFMG, along with Wellpath's assumption of all related tax penalties and fines.

### 6. Unlawful Coercion and Bad Faith Negotiation

Your threat that, should I reject this offer, Wellpath will instruct CFMG to withhold payment until after the bankruptcy concludes is an improper attempt to coerce a settlement.
• CFMG is a solvent, non-debtor entity and has no legal basis to delay payment of wages that are contractually owed.
• Any such delay would be a clear case of bad faith financial coercion, exposing Wellpath to further legal claims for interference with my employment contract, unjust enrichment and potential criminal liability under CA Bus. & Prof. Code §§2052 and 2264.

**Conclusion and Demand:**

In summary, the facts and law unequivocally establish that my deferred compensation is not a Wellpath asset but rather earned wages solely attributable to my employment with CFMG. Wellpath's actions violate California CPOM law, engage in illegal fee-splitting, and result in the improper inclusion of non-debtor funds in its bankruptcy estate. Moreover, its mismanagement has triggered substantial tax penalties for which it must be held liable.

Therefore, I demand the following as a condition for any settlement:

• **Full immediate payment of my vested deferred compensation in the amount of $162,597.08 from CFMG.**
• **Wellpath must assume full responsibility for any IRS and California Franchise Tax Board penalties and fines arising from its unilateral termination of the NQDCP.**
• **No non-disclosure agreement or similar restrictions shall be imposed that would limit transparency regarding Wellpath's violations or my legal rights.**

If these demands are not met, I will have no choice but to proceed with my motion before the court and pursue all available legal remedies, including injunctive relief, the imposition of a constructive trust over my deferred compensation, and claims for additional damages arising from Wellpath's unlawful practices.

I look forward to your prompt response indicating whether Wellpath is prepared to revise its settlement offer accordingly.

Sincerely,

Dr. Kanwar Partap Singh Gill
Pro Se Movant
8408 N Ann Ave
Fresno, CA 93720
Phone: (559) 447-8490
Email: kpsgill@kpsgill.com

On Wed, Mar 19, 2025 at 12:49 PM Wurzelbacher, Carole <cwurzelbacher@mwe.com> wrote:

> Dr. Gill,
>
> Thank you for your reply and for sending the motion.  We still believe that we can reach a consensual resolution of your claim without the need for a hearing or any further briefing.
>
> We understand that you have asserted a claim (the "Claim") against California Forensic Medical Group, Inc. ("CFMG") on account of amounts that you contributed toward the non-qualified deferred compensation plan ("NQDCP").  As you may be aware, CFMG is *not* a debtor entity in Wellpath's chapter 11 cases and, therefore, we believe that your motion inappropriately seeks relief against Wellpath and its debtor affiliates (collectively, the "Debtors").
>
> Again, we prefer avoid the need for a hearing or any additional pleadings and, as a result, propose the following settlement offer. In exchange for your agreement to (a) withdraw your motion by **5:00 p.m. (prevailing Central Time) on March 20, 2025** and (b) enter a non-disclosure agreement with respect to the settlement of the Claim, we will work with CFMG to pay you $100,000 in full satisfaction of the Claim.  While we are confident that CFMG will honor the payment in short order, to fully preserve your rights in the interim, the withdrawal of your motion would be without prejudice and would preserve your right to re-file the motion in the event that you do not receive payment within 30 days of acceptance of this offer.
>
> Please confirm by response email if you agree to the foregoing.  Please note that this offer will expire tomorrow, **March 20, 2025, at 12:00 p.m. (prevailing Central Time)**, and is being made subject to FRE 408 and its local equivalents. Upon the expiry of the foregoing deadline without a settlement, the Debtors intend to object to your motion and will instruct CFMG to withhold payment on account of your Claim until some date after the Debtors emerge from their chapter 11 cases. Let us know if you have any questions or if you would like to set up a time to discuss.
>
> Thank you,

CAROLE WURZELBACHER
Associate

McDermott Will & Emery LLP   444 West Lake Street, Suite 4000, Chicago, IL 60606-0029

Tel +1 312 899 7240    Email cwurzelbacher@mwe.com

Website | vCard | LinkedIn

**From:** Kanwar Gill MD <kpsgill@kpsgill.com>
**Sent:** Tuesday, March 18, 2025 7:10 PM
**To:** Wurzelbacher, Carole <cwurzelbacher@mwe.com>
**Cc:** Helt, Marcus <Mhelt@mwe.com>; Perlman, Felicia <Fperlman@mwe.com>; Giordano, Bradley <Bgiordano@mwe.com>; Szanzer, Steven <sszanzer@mwe.com>
**Subject:** Re: Wellpath Holdings, Inc. Case # 24-90533 (Judge: Alfredo R Perez, JurisdictionTexas - Southern District Filed Nov, 11 2024)

[ External Email ]

Subject: Re: Wellpath Holdings, Inc. Case # 24-90533

Dear Carole,

I appreciate your response and the efforts to resolve this matter consensually. However, after waiting 10 business days in good faith, I proceeded with filing my motion earlier today. My hope was to reach a resolution without filing, thereby avoiding the potential for numerous similarly situated claimants following suit.

I noticed your email after I had already mailed the motion from the UPS store. Given the urgency, I filed it under an extremely urgent two-day service, and it is expected to be delivered to the court by Thursday. All other parties should receive copies either this week or early next week.

As a courtesy, I have attached a scanned copy of the motion to this email. Please note that the exhibits were too large for my home scanner, but you will receive hard copies by mail.

If you have any questions, feel free to reach out. I am also available by phone, and I previously shared my contact information with you.

Best regards,

Kanwar Gill, MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

On Mar 18, 2025, at 2:50 PM, Wurzelbacher, Carole <cwurzelbacher@mwe.com> wrote:

Mr. Gill,

Thank you for your patience. We have been coordinating with the Company and co-advisors regarding your claim and collecting the relevant documentation and information. Would you be able to send us any documentation that you may have regarding the claim? In particular, any documentation relating to your enrollment in the plan would help expedite our review and process.

We understand that you would like to file a motion and have it scheduled for the April 22 hearing. We believe, however, that we can resolve this matter consensually and without the need for you to spend the time preparing, filing, and prosecuting a motion. Accordingly, we would like an additional short amount of time to collect the information and documentation needed to resolve your claim consensually. In the event that we cannot resolve your claim consensually, to avoid prejudicing your timeline, the Company will agree to a shortened notice period on any potential motion for relief from stay that you would file, so that it could be heard on April 22 if the motion is filed on April 11. Please let us know if that works for you.

In the interim, if you would like to discuss your claim or ask any questions, we are available and happy to set up a time for a call.

Please let us know of any questions or concerns. Thank you,

CAROLE WURZELBACHER
Associate

McDermott Will & Emery LLP  444 West Lake Street, Suite 4000, Chicago, IL 60606-0029

Tel +1 312 899 7240   Email cwurzelbacher@mwe.com

Website | vCard | LinkedIn

---

**From:** Kanwar Gill MD <kpsgill@kpsgill.com>
**Sent:** Tuesday, March 11, 2025 3:52 PM
**To:** Wurzelbacher, Carole <cwurzelbacher@mwe.com>
**Cc:** Helt, Marcus <Mhelt@mwe.com>; Perlman, Felicia <Fperlman@mwe.com>; Giordano, Bradley <Bgiordano@mwe.com>; Szanzer, Steven <sszanzer@mwe.com>
**Subject:** Re: Wellpath Holdings, Inc. Case # 24-90533 (Judge: Alfredo R Perez, JurisdictionTexas - Southern District Filed Nov, 11 2024)

[ External Email ]

I emailed the court clerk days after I sent you all my first communication. I was informed by the court clerk the deadline is fast approaching. 10 business days will be too close to March 22nd deadline.

I will truly appreciate that you expedite the response earlier than the 10 business (previously proposed), it will give me a few days to refine my motion, it will secure me a spot higher in priority for the afternoon of April 22, 2025 and it will avoid any defects related to timely service (and notice of hearing) of the motion to all parties. There are multiple parties lined up for hearing that day and that leaves limited time for arguments. I do expect a written opposition (and I will appreciate that) and that alone will also save us all the time at hearing.

Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

On Mar 11, 2025, at 1:19 PM, Wurzelbacher, Carole <cwurzelbacher@mwe.com> wrote:

Mr. Gill,

To clarify, we are reviewing your message and will revert with a response on this chain within the 10 business day time frame noted in your original message.

Thank you,

CAROLE WURZELBACHER
Associate

McDermott Will & Emery LLP  444 West Lake Street, Suite 4000, Chicago, IL 60606-0029

Tel +1 312 899 7240    Email cwurzelbacher@mwe.com

Website | vCard | LinkedIn

---

**From:** Kanwar Gill MD <kpsgill@kpsgill.com>
**Sent:** Tuesday, March 11, 2025 3:08 PM
**To:** Wurzelbacher, Carole <cwurzelbacher@mwe.com>; Helt, Marcus <Mhelt@mwe.com>
**Cc:** Perlman, Felicia <Fperlman@mwe.com>; Giordano, Bradley <Bgiordano@mwe.com>; Szanzer, Steven <sszanzer@mwe.com>
**Subject:** Re: Wellpath Holdings, Inc. Case # 24-90533 (Judge: Alfredo R Perez, JurisdictionTexas - Southern District Filed Nov, 11 2024)

You don't often get email from kpsgill@kpsgill.com. Learn why this is important

[External Email]

Thank you Carole for confirming the receipt of messages. I will proceed with filing in a timely manner and serve a copy to Mr Helt ( I think he is lead on this case, correct me if I am wrong). I will self-calendar hearing for April 22, 2025. I will appear virtually on teleconference/zoom.

Thanks

Have a Great Day

Best Regards,

Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

> On Mar 11, 2025, at 12:23 PM, Wurzelbacher, Carole <cwurzelbacher@mwe.com> wrote:

> Thank you, Mr. Gill. We are reviewing and will revert.


> CAROLE WURZELBACHER
> Associate

> McDermott Will & Emery LLP  444 West Lake Street, Suite 4000, Chicago, IL 60606-0029

> Tel +1 312 899 7240   Email cwurzelbacher@mwe.com

> Website | vCard | LinkedIn


---

**From:** Kanwar Gill MD <kpsgill@kpsgill.com>
**Sent:** Tuesday, March 11, 2025 2:18 PM
**To:** Kanwar Partap Singh Gill <kpsgill@kpsgill.com>; Dingman, Carmen <cdingman@mwe.com>; Helt, Marcus <Mhelt@mwe.com>; Wurzelbacher, Carole <cwurzelbacher@mwe.com>; Perlman, Felicia <Fperlman@mwe.com>; Giordano, Bradley <Bgiordano@mwe.com>; Szanzer, Steven <sszanzer@mwe.com>; Jumbeck, Jake <Jjumbeck@mwe.com>
**Subject:** Re: Wellpath Holdings, Inc. Case # 24-90533 (Judge: Alfredo R Perez, JurisdictionTexas - Southern District Filed Nov, 11 2024)


You don't often get email from kpsgill@kpsgill.com. Learn why this is important

**[External Email]**

I was wondering if I can at least get **confirmation of receipt** of this message from you. I left a voicemail attorney Mr. Helt on Friday last week. I am required to exhaust the option of informal discussion (conference) as required by the local rules of Judge Perez's court.

In my very unique case (California Licensed and California employed Physician) state law preempts federal laws including bankruptcy law and limited provisions of ERISA that apply to unfunded, "top hat" NQDCP.

I expect a response from you as soon as possible. Please reply to this message to close the loop on this informal discussion.

I will file the motion even if I don't hear from you. It will be self-calendared according to following information received from court.

*"Yes, the filing deadline runs to 3/22/25 for you to be able to self-calendar the motion for the 4/22/25 date.*

*Thanks,*

**Tyler Laws, Case Manager**
*The Honorable Alfredo R Pérez*
*United States Bankruptcy Court for the Southern District of Texas*
*515 Rusk Street, 4th Floor*
*Houston, Texas  77002*
*(713) 250-5421"*


Best Regards,

Kanwar Gill MD


**IMPORTANT CONFIDENTIALITY NOTICE:**


Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.


On Mar 4, 2025, at 3:35 PM, Kanwar Partap Singh Gill <kpsgill@kpsgill.com> wrote:


Kanwar Partap Singh Gill, MD
8408 N Ann Ave
Fresno, CA 93720
Phone: (559) 447-8490
Email: kpsgill@kpsgill.com

March 4th, 2025

Debtors' Counsel
McDermott, Will, & Emery LLP
444 West Lake Street
Chicago, IL 60606-0029
Phone: (312) 372-2000
Fax: (312) 984-7700
https://www.mwe.com/

**Your Client: Wellpath Holdings, Inc. Case # 24-90533 (Jurisdiction Texas - Southern District)**

**Re: Request for Removal of NQDCP Deferred Compensation from the Bankruptcy Estate and Notification to the Court**

Dear Counsel:

I write as Kanwar Partap Singh Gill, MD, a physician employed by California Forensic Medical Group, Inc. ("CFMG"), to demand that Wellpath Holdings, Inc. ("Wellpath" or the "Debtors") immediately remove my deferred compensation funds under the Wellpath Holdings, Inc. Nonqualified Deferred Compensation Plan ("NQDCP" or "Plan") from the bankruptcy estate and notify the Bankruptcy Court accordingly. The purpose of this correspondence is to set forth in detailed terms why my deferred wages – funds that were earned by me at CFMG and are held in custody as part of my deferred compensation benefit – are entirely separate from the assets of Wellpath's Chapter 11 estate and must be released for payment by my true employer.

**I. Factual Background and the Separation of Entities**

*A. Independent Employment Relationship*

I am employed by CFMG, a California professional corporation that provides correctional healthcare services. CFMG is an independent, non-debtor entity funded exclusively by contracts with correctional facilities in California. My salary, benefits, and related deferred compensation are paid solely from CFMG's revenues. It is critical to emphasize that at no point have my earnings or deferred funds been commingled with Wellpath's operating funds.

Wellpath's involvement with CFMG is limited strictly to a Management Services Agreement (MSA) under which it provides only non-clinical administrative support—including billing, human resources, and payroll processing. As a result, the financial obligations arising from my employment, including those associated with my deferred compensation, are entirely the responsibility of CFMG.

### B. Voluntary Deferred Compensation

My participation in the NQDCP was a voluntary election made in the context of my employment at CFMG. I elected to defer a portion of my salary for tax planning and long-term savings purposes. The deferred amounts, which I understand to be an integral part of my earned compensation, were segregated in accounting records for bookkeeping purposes but were never intended to become part of a general corporate pool available to creditors. Instead, these funds were designated to remain with CFMG and, as such, should never have been affected by Wellpath's bankruptcy filing.

## II. The Corporate Practice of Medicine ("CPOM") Doctrine and Prohibitions on Fee-Splitting

### A. Overview of CPOM and Its Rationale

California's CPOM doctrine, codified in California Business & Professions Code § 2400, expressly forbids non-physician entities from owning, controlling, or interfering with the practice of medicine. The underlying public policy is clear: to prevent commercial interests from intruding on clinical decision-making and to ensure that the care of patients remains solely within the domain of licensed physicians. This statutory framework was established to eliminate any conflict between the profit motives of corporate entities and the independent professional judgment that is the hallmark of medical practice.

### B. Prohibition on Fee-Splitting Arrangements

In conjunction with the CPOM doctrine, California law—and the strict interpretations provided by the Medical Board of California and relevant case law—prohibits fee-splitting and other financial arrangements whereby a non-physician entity derives any portion of the physician's compensation beyond a fixed administrative fee. In practical terms, this means that a Management Services Organization (MSO) like Wellpath cannot, under any circumstances, claim a share of the wages or deferred earnings generated by a physician employed by an independent medical practice. Any attempt by Wellpath to assert that it has any control over or claim to my deferred compensation is not only contrary to the clear language of the CPOM statute, but it also subverts the underlying public policy that is designed to protect physician earnings from corporate misappropriation.

### C. Implications for Deferred Compensation

Because my deferred compensation is, in substance, a component of the wages that I earned at CFMG, any classification of these funds as assets of the Wellpath bankruptcy estate is legally and factually erroneous. The CPOM doctrine, along with statutory bans on fee-splitting, underscores that any deferred wages must remain with the employer—here, CFMG—and must not be diverted to satisfy the debts of an unrelated corporate entity. Consequently, my deferred compensation should be recognized as a proprietary asset of CFMG, held in trust for my benefit, and entirely immune from the automatic stay imposed on Wellpath's assets in the Chapter 11 proceedings.

## III. Analysis of the Deferred Compensation Plan Structure

### A. Nature of the NQDCP as an Unfunded "Top-Hat" Plan

The NQDCP is structured as an unfunded "top-hat" plan, meaning that it is designed to provide a tax-deferred benefit to a select group of employees without setting aside dedicated trust assets in the names of individual participants. Under the terms of the Plan, all deferred amounts are recorded as liabilities of the sponsoring employer(s) and are not segregated into a separately funded account. While Wellpath, in its role as Plan administrator, may have utilized a "rabbi trust" as a funding vehicle, the fundamental character of the Plan remains that of an unsecured deferral arrangement. As such, my rights under the Plan are not akin to an ownership interest in

specific assets of Wellpath; rather, they represent a contractual promise that is secured by the independent financial health and obligations of CFMG.

**B. The True Obligor: CFMG's Responsibility**

In effect, my deferred compensation was earned as a part of my regular wages at CFMG, and it was CFMG's obligation to pay those wages on a timely basis. Wellpath's role is limited solely to administrative processing and does not extend to an assumption of the obligation to pay deferred compensation. The fact that the Plan may centralize administration at Wellpath is a matter of convenience and does not alter the fundamental relationship between me and CFMG. Therefore, even in the context of the bankruptcy, the funds that represent my deferred compensation should remain the property of CFMG and be disbursed in accordance with my original employment agreement.

**IV. The Impact of Bankruptcy and the Need for Relief**

**A. Inappropriateness of the Automatic Stay**

Since Wellpath's Chapter 11 filing, my deferred compensation has been frozen under the automatic stay. However, because the funds in question belong solely to me and are held as part of my deferred compensation benefit at a non-debtor entity, their retention in the bankruptcy estate serves no valid purpose. Bankruptcy law, particularly under 11 U.S.C. § 541(d), makes clear that property held in trust for another party—where the debtor holds merely legal title—should not be considered part of the bankruptcy estate. In this case, CFMG's obligation to pay my deferred compensation exists independently of Wellpath's financial restructuring and should be preserved.

**B. Unjust Enrichment and Precedent Concerns**

Retaining my deferred compensation in the estate would not only result in unjust enrichment for Wellpath's creditors but would also set a dangerous precedent. Such an outcome would effectively allow a non-debtor entity to benefit from funds that rightfully belong to a physician, undermining the protections afforded by both the CPOM doctrine and state law regarding fee-splitting and independent medical practice. In the long run, this misclassification could discourage physicians from participating in deferred compensation programs, potentially harming the quality and stability of healthcare services provided in correctional facilities and other public-private partnerships.

**C. Practical Considerations for the Reorganization**

It is important to note that releasing my deferred compensation will have no adverse effect on the overall reorganization of Wellpath. The funds in question were never part of the operational capital used by Wellpath to support its creditors, as they originated solely from CFMG's payroll. Moreover, allowing the release of these funds is consistent with public policy, which seeks to protect earned wages from being diverted to satisfy corporate liabilities that have no direct relation to the compensation obligations of a non-debtor employer.

**V. Detailed Legal and Policy Arguments Underpinning My Request**

**A. CPOM and Fee-Splitting: Statutory and Regulatory Foundations**

California's CPOM doctrine is not merely a set of abstract guidelines but a statutory mandate designed to ensure that physicians retain full control over their professional and financial affairs. The prohibition against fee-splitting further cements the principle that no non-physician entity may derive benefit from the earnings of a physician beyond a limited administrative fee. Wellpath's claim that my deferred compensation is part of its bankruptcy estate runs directly counter to these well-established legal principles. In essence, allowing Wellpath to assert any right to my deferred wages would contravene both the letter and spirit of California law, which explicitly requires that compensation arising from the practice of medicine remain exclusively with the licensed provider and, by extension, the professional corporation that employs that provider.

**B. The Separation of Corporate Finances**

The relationship between Wellpath and CFMG is characterized by a clear and legally mandated separation of finances. CFMG's operations, including its payroll and deferred compensation obligations, are funded entirely through contracts with correctional facilities and other non-debtor revenue streams. There is no basis in fact or law to assert that my deferred compensation should be commingled with Wellpath's assets or used to satisfy Wellpath's liabilities. This structural separation is a direct consequence of the CPOM doctrine, which prohibits Wellpath, a non-physician entity, from exercising any control over the practice or financial rewards of a medical professional. Hence, my deferred compensation is properly classified as funds held in trust by my true employer, CFMG.

### C. Equitable Considerations and the Doctrine of Constructive Trust

In the event that any dispute arises regarding the classification of these funds, equitable principles—specifically, the doctrine of constructive trust—support the view that my deferred compensation must remain with me. A constructive trust is imposed to prevent unjust enrichment and to ensure that property entrusted for a specific purpose is not misappropriated. Since my deferred compensation was earned as part of my employment at CFMG, any attempt to use these funds to satisfy the claims of Wellpath's creditors would constitute a clear violation of equitable principles. The funds should therefore be released from the automatic stay and restored to me, preserving the integrity of my employment contract and the public policy underlying the CPOM doctrine.

### D. Policy Considerations and the Future of Physician Compensation

Beyond the immediate legal arguments, releasing my deferred compensation carries significant public policy implications. If non-debtor physicians are forced to forgo earned wages because of the improper inclusion of such funds in a bankruptcy estate, it could deter qualified medical professionals from engaging in innovative compensation arrangements designed to benefit both the physicians and the healthcare system. This would undermine the very purpose of deferred compensation plans, which are intended to promote long-term financial planning and stability for physicians. Maintaining strict adherence to the CPOM doctrine and prohibitions on fee-splitting is essential to preserving the autonomy of the medical profession and ensuring that physicians remain insulated from corporate financial mismanagement.

### VI. Conclusion and Prayer for Relief

For the reasons detailed above—grounded in factual distinctions between CFMG and Wellpath, the clear statutory and regulatory mandates of the CPOM doctrine, the explicit prohibitions on fee-splitting, and the equitable and public policy considerations—I respectfully demand that the Debtors:

1. Immediately acknowledge that my deferred compensation funds under the NQDCP do not belong to the Wellpath bankruptcy estate but are the exclusive property of CFMG and, by extension, mine as a CFMG physician.

2. Remove my deferred compensation from the list of assets included in the bankruptcy estate.

3. Promptly notify the Bankruptcy Court that these funds are not subject to the automatic stay and are to be released for payment by CFMG or any other appropriate non-debtor entity.

4. Confirm in writing that the automatic stay does not apply to my efforts to recover my deferred compensation.

I trust that you will give this matter your immediate attention. Should Wellpath fail to take the necessary corrective actions, I will have no alternative but to seek relief from the automatic stay through the Court in order to protect my contractual and statutory rights.

I request a written response within ten (10) business days from the date of this letter. Please feel free to contact me at (559) 447-8490 or via email at kpsgill@kpsgill.com to discuss this matter further.

Respectfully submitted,

Kanwar Partap Singh Gill, MD
Fresno County Detention Facility
Fresno, CA 93721

(559) 447-8490
kpsgill@kpsgill.com

*******************************************************************************
**************************
This message is a PRIVATE communication. This message and all attachments
are a private communication sent by a law firm and may be confidential or
protected by privilege. If you are not the intended recipient, you are hereby
notified that any disclosure, copying, distribution or use of the information
contained in or attached to this message is strictly prohibited. Please notify the
sender of the delivery error by replying to this message, and then delete it from
your system. Our Privacy Policy explains how we may use your personal
information or data and any personal information or data provided or made
available to us. Thank you.
*******************************************************************************
**************************

Please visit http://www.mwe.com/ for more information about our Firm.

KPSGILL.COM

Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

**Addendum – Structural Regulatory Intersections and Prospective Institutional Reverberations**
1 message

---

**Kanwar Gill MD** <kpsgill@kpsgill.com>                                            Sat, Apr 12, 2025 at 9:45 PM
To: Felicia Perlman <Fperlman@mwe.com>, "Marcus A. Helt" <mhelt@mwe.com>, Steven Szanzer <sszanzer@mwe.com>,
Carole Wurzelbacher <cwurzelbacher@mwe.com>, cdingman@mwe.com, Bradley Giordano <Bgiordano@mwe.com>,
Marcus Helt <Mhelt@mwe.com>

CONFIDENTIAL MEMORANDUM – NOT FOR PUBLIC DISTRIBUTION

Subject: Addendum – Structural Regulatory Intersections and Prospective Institutional Reverberations

To: Felicia Perlman, Marcus Helt, Steven Szanzer, Carole Wurzelbacher – McDermott Will & Emery LLP

From: Dr. Kanwar Gill, Pro Se Creditor

Date: April 12, 2025

Dear Counsel,

In the aftermath of our prior advisory correspondence, I extend this confidential memorandum not as an amplification, but as a discursive inflection point—a non-adversarial prompt inviting deeper professional reflection on the prospective regulatory afterlife of the current Plan. It is transmitted in the idiom of structural jurisprudence rather than docketed controversy.

This addendum is not a derivative of the prior notice. It constitutes an autonomous layer of analysis—one whose coordinates map less onto present litigation postures than onto emergent vectors of institutional interest convergence.

## I. Latent Institutional Convergence and Regulatory Constellations in Formation

Multiple oversight bodies—federal and state, judicial and administrative—have shown increasing sensitivity to what might be termed embedded irregularities within formal reorganization syntax. That is, the structural architecture of certain Chapter 11 plans,

while superficially compliant, carries within it coded conflicts with licensure, labor, tax, and constitutional mandates.

The Wellpath Plan appears to trace—if not replicate—the contours of precisely those structural profiles that catalyze post-confirmation regulatory activation. Specifically, enforcement actors have developed heightened acuity around:

- Subclinical corporate control over licensed medical professionals
- Transformative treatment of deferred remuneration with tax-disruptive implications
- Architectures of procedural coercion masquerading as notice
- Release and exculpation schema designed to preclude not merely litigation, but inquiry

Where these features coalesce, they cease to be private irregularities and instead become regulatory archetypes. In this context, what is relevant is not whether the Plan is confirmable—but whether it can withstand subsequent regulatory deconstruction.

## II. Distinction Between Juridical Ratification and Regulatory Forbearance

A confirmation order, even if entered, does not carry preclusive sanctity across all enforcement domains. Judicial approval—while necessary—is not sufficient to insulate a Plan from later inquiry by:

- Medical licensing boards analyzing unlawful practice arrangements
- Federal tax authorities assessing IRC § 409A violations in the treatment of deferred compensation
- Labor regulators evaluating wage equivalency in non-qualified plan terminations
- Civil rights authorities scrutinizing the extinguishment of inmate claims via non-consensual opt-out regimes

The enforcement community is no longer viewing Plans in isolation. Rather, they are now interpreting certain reorganizations as public governance events—especially

where the entity in question intersects with incarcerated populations, taxpayer-funded care, or professional licensure boundaries.

The Plan, in its current architecture, contains multiple embedded signals that may not be immediately apparent to the Court but are readily legible to regulators. It is these signals—not the filings themselves—that will shape the post-confirmation risk environment.

### III. Structural Exposure Points Now Within View

Without asserting, alleging, or presupposing, one might reasonably anticipate the following questions surfacing within interagency discourse:

- Has the reclassification of rabbi trust assets created a constructive 409A violation with downstream tax penalties to non-insider beneficiaries?
- Does the governance model, post-confirmation, reflect a latent continuation of MSO-dominated physician employment in violation of CPOM prohibitions?
- Has the Plan, by operation of design rather than omission, effectively chilled the future exercise of statutory whistleblower rights?
- Do third-party release provisions, through their opt-out construction, risk retroactively invalidating federal agency enforcement discretion?
- Does the absence of clear carve-outs or savings clauses signal intent to circumvent —not harmonize with—public accountability frameworks?

None of these questions need be answered now. But they will be asked—perhaps by actors who do not require consent, motion, or standing.

### IV.  The Temporal Gradient of Ethical Liability

Ethical exposure is not necessarily synchronized with judicial calendar dates. In fact, it is temporally asymmetrical—often emerging long after judicial closure, when the retrospective clarity of institutional hindsight is applied.

Each of you, as officers of the court and fiduciaries of the estate, occupies a liminal space between professional advocacy and public trust. In that space, omissions that might escape a court's scrutiny do not necessarily evade the attention of regulatory or licensing authorities operating under a different burden of proof, a different theory of harm, and a different standard of candor.

The pertinent question is not whether you believe the Plan complies. It is whether a future ethics reviewer, agency inspector, or oversight subcommittee could reasonably conclude otherwise based on what was known—or knowable—at the time of confirmation.

## V. Navigational Clarification: Courtesy Not Contingency

This memorandum is transmitted in the spirit of regulatory anticipatory ethics, not as a predicate to any adversarial act. It is a diagnostic overlay, not a strategic provocation. No disclosures have been made. No complaints have been filed. This is an internal signal—not a public document.

If that distinction holds, so too does the opportunity to restructure, rephrase, or recalibrate.

I do not pretend to speak for any oversight agency. But I do observe their patterns, and I note that plans of this structural type now travel with regulatory wake turbulence—visible or not. You are not being accused. You are being afforded foresight.

## VI. Final Disposition

It is my belief that the opportunity to correct is most available before correction is compelled. The choice, respectfully, belongs to you. If adjustments are made, this memorandum will remain sealed in professional confidence. If not, it will be available as probative evidence that the record was clear—and the silence chosen.

With professional respect,

Dr. Kanwar Gill

Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.)

Senior Staff Physician – California Forensic Medical Group

Fresno County Adult Detention Facility

Email: kpsgill@kpsgill.com


## IMPORTANT CONFIDENTIALITY NOTICE:

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.


On Apr 12, 2025, at 9:25 PM, Kanwar Gill MD <kpsgill@kpsgill.com> wrote:


CONFIDENTIAL – NOT FOR PUBLIC DISTRIBUTION

Privileged Legal Advisory Memorandum

Subject: Reflexive Structural Pathologies and Embedded Professional Conflicts in the Fifth Amended Plan of Reorganization

To: Felicia Perlman, Marcus Helt, Steven Szanzer, Carole Wurzelbacher – McDermott Will & Emery LLP
From: Dr. Kanwar Gill, Pro Se Creditor
Date: April 12, 2025

PRELIMINARY NOTE ON SCOPE AND SEMANTIC BOUNDARIES

This document is intended solely as an intra-professional communication and should not be misconstrued as a motion, objection, or other form of judicial submission. It is neither a precursor to litigation nor a surrogate for agency complaint. Instead, it seeks to map the topology of concerns that arise when iterative transactional drafting is juxtaposed against multi-jurisdictional ethical canons and statutory prohibitions. No forensic inquisition is underway. Rather, this is a discursive invocation of interpretive legal complexity, transmitted under the sign of good-faith engagement, but situated within the shadow of institutional memory.

The following memorandum, structured by abstraction but tethered to case reality, operates in a conceptual terrain not often accessible by docketed brief or judicial colloquy. It presumes familiarity with embedded norms and latent structural regularities, and it relies on the reader's legal training to identify what is meant without stating it directly.

I. Structural Infirmities Anchored in California's CPOM Framework – Semantic Inconsistencies and Functional Contradictions

The architecture of the Plan's post-confirmation operational continuity appears to function as a tacit reaffirmation of governance modalities that remain irreconcilable with the textual and jurisprudential mandates of California's Corporate Practice of Medicine (CPOM) prohibition. Specifically, the specter of continued MSO-dominated physician employment without requisite shareholder autonomy, though not overtly stated, emerges through the silences between Plan provisions.

By maintaining a model wherein non-physician entities influence licensure-protected spheres of professional conduct under the guise of administrative services, the Plan appears to preserve a schema that may be rendered statutorily null per Cal. Bus. & Prof. Code § 2400 and interpreted precedents such as People v.

Cole. The ostensible separation of ownership and control is linguistic; the substantive exercise of dominion remains central.

In effect, the Plan is a grammatical rearrangement of a legally impermissible structure. The mechanism remains; only the phrasing changes.

II. Deferred Compensation Constructs as Fiduciary Labyrinths: IRC §409A and ERISA Considerations

The Deferred Compensation Program, routed through a Non-Qualified Deferred Compensation Plan (NQDCP), has been repurposed within the Plan into a mechanism of collective distribution that contravenes both the letter and spirit of 26 U.S.C. §409A. Under the guise of estate rationalization, what were once individualized, contract-bound wage deferrals have become fungible pro rata disbursements untethered from original performance conditions.

This transformation, arguably expedient from a reorganization perspective, is fraught with regulatory peril. In the absence of a "separation from service" event or an enumerated triggering condition that satisfies Treasury Regulation §1.409A-3, acceleration of payment schedules may constitute a constructive receipt of income, thereby invoking taxation with additional penalties. Furthermore, the Plan's proposed treatment lacks clarity regarding the trust (or non-trust) status of the assets in question, raising ERISA fiduciary red flags under 29 U.S.C. §1104 and related Department of Labor interpretive guidance.

Should tax implications befall the physician beneficiaries, the Plan's silence may be interpreted not merely as an omission but as a contributory act of economic harm.

III. Opt-Out Regimes, Procedural Semantics, and the Illusion of Affirmative Assent

The Plan employs a non-binary opt-out schema wherein silence is interpreted as consensual surrender, and default behavior is transmuted into irrevocable waiver. This methodology conflates procedural mechanics with constitutional legitimacy. It risks violating foundational due process norms, particularly where stakeholders are unrepresented, incarcerated, or otherwise legally disabled.

By transforming the absence of objection into the presence of agreement, the Plan leans heavily on interpretive presumption. This presumption is not self-executing; it demands ex post ratification through judicial inattention or creditor acquiescence. It creates the fiction of consent where no affirmative volition exists.

The issue is not whether notice was sent. It is whether the structure of the notice was capable of producing informed legal agency.

IV. Nested Immunities: Exculpation, Injunction, and Release as Recursive Logic

The operative provisions of Article IX, when parsed collectively, resemble a doctrinal echo chamber wherein each immunity is justified by reference to the necessity of the others. The exculpations are predicated on the releases; the releases are validated by the injunctions; and the injunctions exist to protect the exculpated fiduciaries.

This recursive legal geometry collapses under the weight of its own circularity. It poses as a shield, but operates as a loop. The aggregate effect is one of systemic indemnity without individualized accountability, a construct that is problematic not only from a constitutional perspective, but also within the analytical confines of Fifth Circuit jurisprudence (In re Pacific Lumber, In re Pilgrim's Pride, etc.).

To the lay reader, this may appear to be protective. To the trained eye, it may resemble an architecture of immunity in search of a liability.

V. Ethical Granularity and the Implicit Cartography of Role-Based Responsibility

The disclosures, omissions, and drafting decisions implicated in this Plan do not attach in abstracto. They have authorship, design, and review lineage. The ethical obligations arising under the relevant Rules of Professional Conduct are functionally joint and severable. No one lawyer is responsible for all; yet each lawyer may be responsible for part.
   • Ms. Perlman (Illinois Bar): As ostensible lead counsel, the principal vectors of plan strategy and confirmation advocacy attach to your supervisory scope. Rules 1.2(d), 3.3, and 5.1 should be revisited with care.
   • Mr. Helt (Texas Bar): The local interface between Plan content and courtroom certification falls within your domain. Rule 3.03 and Rule 5.01 are implicated insofar as pleadings advanced are misaligned

with governing circuit law.
- Mr. Szanzer (New York Bar): Solicitation language, consent framework design, and disclosure adequacy fall within the ambit of Rules 3.1, 4.1, and 8.4.
- Ms. Wurzelbacher (Illinois Bar): If drafting support was offered or review delegated, Rules 3.4, 5.2, and 8.4 provide insight into the distribution of accountability where discretion meets instruction.

No misconduct is alleged. Rather, these citations are offered as interpretive lenses.

VI. Interdependence of Counsel and Shared Epistemic Liability

Legal responsibility does not always follow the contours of task allocation. When a Plan carries the imprimatur of a law firm, every lawyer on the signature block becomes epistemically proximate to every material assertion. Silence, in such contexts, can be read not as ignorance but as assent.

This is not a claim of fault. It is an observation of the conditions under which shared knowledge converts into shared consequence. Ethical latitude is expansive until known errors persist.

VII. Judicial Non-Perception and the Blind Spot Doctrine

There are matters which a judge may never see, not due to concealment, but because the record has been curated to forestall illumination. The ethical burden on practitioners, therefore, increases in proportion to the likely invisibility of the defect. Where judicial notice is foreclosed by strategic ambiguity, the attorney's internal duty to reconcile law and conscience becomes paramount.

You may never be asked these questions in court. That does not mean they do not deserve answers.

VIII. Closing Disquisition: From Constructive Ambiguity to Deliberative Clarity

The objective of this memorandum is not to indict, but to illuminate. There is yet time to adjust course, correct language, or modify assumptions. That opportunity, however, is temporal and conditional. The longer known defects remain unaddressed, the greater the probability that a future observer—be it judicial, regulatory, or historical—will ask: what did they know, and when did they choose not to act?

You are not being accused. You are being invited to decide what happens next.

Respectfully submitted,

Dr. Kanwar Gill
Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.)
Senior Staff Physician – California Forensic Medical Group
Fresno County Adult Detention Facility
Email: kpsgill@kpsgill.com

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code § 2511 prohibits interception and disclosure of this electronic communication.

KPSGILL.COM                                    Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

## CONFIDENTIAL – NOT FOR PUBLIC DISTRIBUTION -Reflexive Structural Pathologies and Embedded Professional Conflicts in the Fifth Amended Plan of Reorganization

1 message

---

**Kanwar Gill MD <kpsgill@kpsgill.com>**                          Sat, Apr 12, 2025 at 9:24 PM
To: Felicia Perlman <fperlman@mwe.com>, "Marcus A. Helt" <mhelt@mwe.com>, Steven Szanzer <sszanzer@mwe.com>, Carole Wurzelbacher <cwurzelbacher@mwe.com>, cdingman@mwe.com, Bradley Giordano <Bgiordano@mwe.com>, Felicia Perlman <Fperlman@mwe.com>, Marcus Helt <Mhelt@mwe.com>

CONFIDENTIAL – NOT FOR PUBLIC DISTRIBUTION

Privileged Legal Advisory Memorandum

Subject: Reflexive Structural Pathologies and Embedded Professional Conflicts in the Fifth Amended Plan of Reorganization

To: Felicia Perlman, Marcus Helt, Steven Szanzer, Carole Wurzelbacher – McDermott Will & Emery LLP
From: Dr. Kanwar Gill, Pro Se Creditor
Date: April 12, 2025

PRELIMINARY NOTE ON SCOPE AND SEMANTIC BOUNDARIES

This document is intended solely as an intra-professional communication and should not be misconstrued as a motion, objection, or other form of judicial submission. It is neither a precursor to litigation nor a surrogate for agency complaint. Instead, it seeks to map the topology of concerns that arise when iterative transactional drafting is juxtaposed against multi-jurisdictional ethical canons and statutory prohibitions. No forensic inquisition is underway. Rather, this is a discursive invocation of interpretive legal complexity, transmitted under the sign of good-faith engagement, but situated within the shadow of institutional memory.

The following memorandum, structured by abstraction but tethered to case reality, operates in a conceptual terrain not often accessible by docketed brief or judicial colloquy. It presumes familiarity with embedded norms and latent structural regularities, and it relies on the reader's legal training to identify what is meant without stating it directly.

I. Structural Infirmities Anchored in California's CPOM Framework – Semantic Inconsistencies and Functional Contradictions

The architecture of the Plan's post-confirmation operational continuity appears to function as a tacit reaffirmation of governance modalities that remain irreconcilable with the textual and jurisprudential mandates of California's Corporate Practice of Medicine (CPOM) prohibition. Specifically, the specter of continued MSO-dominated physician employment without requisite shareholder autonomy, though not overtly stated, emerges through the silences between Plan provisions.

By maintaining a model wherein non-physician entities influence licensure-protected spheres of professional conduct under the guise of administrative services, the Plan appears to preserve a schema that may be rendered statutorily null per Cal. Bus. & Prof. Code § 2400 and interpreted precedents such as People v. Cole. The ostensible separation of ownership and control is linguistic; the substantive exercise of dominion remains central.

In effect, the Plan is a grammatical rearrangement of a legally impermissible structure. The mechanism remains; only the phrasing changes.

II. Deferred Compensation Constructs as Fiduciary Labyrinths: IRC §409A and ERISA Considerations

The Deferred Compensation Program, routed through a Non-Qualified Deferred Compensation Plan (NQDCP), has been repurposed within the Plan into a mechanism of collective distribution that contravenes both the letter and spirit of 26 U.S.C. §409A. Under the guise of estate rationalization, what were once individualized, contract-bound wage deferrals have become fungible pro rata disbursements untethered from original performance conditions.

This transformation, arguably expedient from a reorganization perspective, is fraught with regulatory peril. In the absence of a "separation from service" event or an enumerated triggering condition that satisfies Treasury Regulation §1.409A-3, acceleration of payment schedules may constitute a constructive receipt of income, thereby invoking taxation with additional penalties. Furthermore, the Plan's proposed treatment lacks clarity regarding the trust (or non-trust) status of the assets in question, raising ERISA fiduciary red flags under 29 U.S.C. §1104 and related Department of Labor interpretive guidance.

Should tax implications befall the physician beneficiaries, the Plan's silence may be interpreted not merely as an omission but as a contributory act of economic harm.

## III. Opt-Out Regimes, Procedural Semantics, and the Illusion of Affirmative Assent

The Plan employs a non-binary opt-out schema wherein silence is interpreted as consensual surrender, and default behavior is transmuted into irrevocable waiver. This methodology conflates procedural mechanics with constitutional legitimacy. It risks violating foundational due process norms, particularly where stakeholders are unrepresented, incarcerated, or otherwise legally disabled.

By transforming the absence of objection into the presence of agreement, the Plan leans heavily on interpretive presumption. This presumption is not self-executing; it demands ex post ratification through judicial inattention or creditor acquiescence. It creates the fiction of consent where no affirmative volition exists.

The issue is not whether notice was sent. It is whether the structure of the notice was capable of producing informed legal agency.

## IV. Nested Immunities: Exculpation, Injunction, and Release as Recursive Logic

The operative provisions of Article IX, when parsed collectively, resemble a doctrinal echo chamber wherein each immunity is justified by reference to the necessity of the others. The exculpations are predicated on the releases; the releases are validated by the injunctions; and the injunctions exist to protect the exculpated fiduciaries.

This recursive legal geometry collapses under the weight of its own circularity. It poses as a shield, but operates as a loop. The aggregate effect is one of systemic indemnity without individualized accountability, a construct that is problematic not only from a constitutional perspective, but also within the analytical confines of Fifth Circuit jurisprudence (In re Pacific Lumber, In re Pilgrim's Pride, etc.).

To the lay reader, this may appear to be protective. To the trained eye, it may resemble an architecture of immunity in search of a liability.

## V. Ethical Granularity and the Implicit Cartography of Role-Based Responsibility

The disclosures, omissions, and drafting decisions implicated in this Plan do not attach in abstracto. They have authorship, design, and review lineage. The ethical obligations arising under the relevant Rules of Professional Conduct are functionally joint and severable. No one lawyer is responsible for all; yet each lawyer may be responsible for part.
   •    Ms. Perlman (Illinois Bar): As ostensible lead counsel, the principal vectors of plan strategy and confirmation advocacy attach to your supervisory scope. Rules 1.2(d), 3.3, and 5.1 should be revisited with care.
   •    Mr. Helt (Texas Bar): The local interface between Plan content and courtroom certification falls within your domain. Rule 3.03 and Rule 5.01 are implicated insofar as pleadings advanced are misaligned with governing circuit law.
   •    Mr. Szanzer (New York Bar): Solicitation language, consent framework design, and disclosure adequacy fall within the ambit of Rules 3.1, 4.1, and 8.4.
   •    Ms. Wurzelbacher (Illinois Bar): If drafting support was offered or review delegated, Rules 3.4, 5.2, and 8.4 provide insight into the distribution of accountability where discretion meets instruction.

No misconduct is alleged. Rather, these citations are offered as interpretive lenses.

## VI. Interdependence of Counsel and Shared Epistemic Liability

Legal responsibility does not always follow the contours of task allocation. When a Plan carries the imprimatur of a law firm, every lawyer on the signature block becomes epistemically proximate to every material assertion. Silence, in such contexts, can be read not as ignorance but as assent.

This is not a claim of fault. It is an observation of the conditions under which shared knowledge converts into shared consequence. Ethical latitude is expansive until known errors persist.

## VII. Judicial Non-Perception and the Blind Spot Doctrine

There are matters which a judge may never see, not due to concealment, but because the record has been curated to forestall illumination. The ethical burden on practitioners, therefore, increases in proportion to the likely invisibility of the defect. Where judicial notice is foreclosed by strategic ambiguity, the attorney's internal duty to reconcile law and conscience becomes paramount.

You may never be asked these questions in court. That does not mean they do not deserve answers.

VIII. Closing Disquisition: From Constructive Ambiguity to Deliberate Clarity

The objective of this memorandum is not to indict, but to illuminate. There is yet time to adjust course, correct language, or modify assumptions. That opportunity, however, is temporal and conditional. The longer known defects remain unaddressed, the greater the probability that a future observer—be it judicial, regulatory, or historical—will ask: what did they know, and when did they choose not to act?

You are not being accused. You are being invited to decide what happens next.

Respectfully submitted,

Dr. Kanwar Gill
Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.)
Senior Staff Physician – California Forensic Medical Group
Fresno County Adult Detention Facility
Email: kpsgill@kpsgill.com

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code § 2511 prohibits interception and disclosure of this electronic communication.

KPSGILL.COM                                    Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

**Structural Fractures in the Procedural Syntax – Reflections on Fiduciary Clarity and Ethical Continuity - In re Wellpath Holdings, Inc., Case No. 24-90533**
1 message

---

**Kanwar Gill MD <kpsgill@kpsgill.com>**                        Mon, Apr 14, 2025 at 5:13 PM
To: Steven Szanzer <sszanzer@mwe.com>, "Marcus A. Helt" <mhelt@mwe.com>, Felicia Perlman <Fperlman@mwe.com>,
Bradley Giordano <Bgiordano@mwe.com>, Marcus Helt <Mhelt@mwe.com>, Carole Wurzelbacher
<cwurzelbacher@mwe.com>, cdingman@mwe.com
Bcc: ha.nguyen@usdoj.gov, susan.hersh@usdoj.gov, Kerrie.Webb@mbc.ca.gov, MGoldstone@wellpath.us,
JBazzel@zenovacare.com

Subject: Structural Fractures in the Procedural Syntax – Reflections on Fiduciary
Clarity and Ethical Continuity

To: Felicia Perlman, Marcus Helt, Steven Szanzer, Carole Wurzelbacher

Cc: [Redacted]

Dear Counsel,

In anticipation of your forthcoming response to the pending record—particularly as
relates to the procedural architecture at issue—I offer this correspondence not as an
instrument of challenge, but as a reflective calibration of certain thematic convergences
now apparent across jurisdictional, ethical, fiduciary, and representational domains.

It is neither rhetorical nor anticipatory. It is merely observational—situated at that rare
intersection where the gravitational pull of embedded statute, structural silence, and
professional continuity collide in layered resonance.

I. CPOM Structures: The Persistence of Semantic Separatism

There remains an unresolved distinction between form and function in the post-
confirmation schema relating to California-licensed physician oversight. While the
documents may suggest an abstracted bifurcation between clinical and administrative
spheres, the actual alignment—particularly with respect to contracting authority,
disciplinary input, and employment leverage—appears to map uncomfortably close to
a model that remains statutorily impermissible under Cal. Bus. & Prof. Code § 2400.

The issue is not that lay governance influences physician employment in overt defiance of California law. The issue is that it does so through structural design, couched in euphemism and operational deferral. When those exercising dominion lack licensure, the model's legal sustainability becomes not a matter of state oversight, but of post-confirmation unraveling. The Plan offers no affirmative physician governance mechanism, no independent board realignment, and no carve-out for California-specific requirements—rendering its confirmability dependent on omission rather than accommodation.

## II. Deferred Compensation: Recharacterization and its Juridical Consequence

It is curious how trust-backed compensation—held for the benefit of physician-employees under Non-Qualified Deferred Compensation arrangements—can be reframed as a general unsecured liability with dischargeable attributes. Under IRC § 409A and its regulatory amplifications, the absence of a qualifying termination event or safe-harbored liquidation window renders the Plan's treatment of these wages functionally indistinguishable from a constructive distribution.

As you are undoubtedly aware, Treasury Reg. § 1.409A-3(j)(4)(ix) does not merely suggest; it prescribes. When violated, the tax penalty matrix becomes immediate: full income inclusion, a 20% excise surcharge, and the inevitable invocation of IRC § 6662 for accuracy-related infractions. For those plan participants whose compensation was neither discretionary nor bonus-derived—but earned, withheld, and deferred through contractual structure—the economic impact is not abstract. It is irrevocable.

To proceed with a distribution regime that forces wage forfeiture, triggers retroactive taxation, and silences compensatory recourse while presenting no indemnity mechanism, no Form 8275 cross-reference, and no carve-out for state wage law alignment, would be to invert the relationship between reorganization and legality.

## III. Solicitation Framework: Consent by Cartography, Not Comprehension

The operational mechanism through which creditor releases are presumed—specifically via opt-out default—raises not only a constitutional flag under Mullane, but an ethical one under Rule 4.1. One wonders whether a procedural design that relies on creditor inaction, linguistic entanglement, and placement obscurity can truly satisfy the canon of informed assent.

Your solicitation architecture presumes that passivity equals participation. But in this context—among claimants who are pro se, incarcerated, non-English speaking, or disabled—silence becomes not volition, but disempowerment. Where notice fails to result in actual agency, waiver becomes fiction. This is not merely doctrinally problematic under In re Pacific Lumber, Zale, and Highland Capital. It is operationally coercive.

Moreover, the ballot's double negatives, the absence of plain-language summaries, and the default-to-release posture create the kind of procedural opacity that does not fail by accident. It fails by design. Whether intended or not, the functional consequence is consent-through-confusion. And that is a form of constructive misrepresentation.

IV. Ethical Vectors: Rule-Based Exposure in Silent Design

**Ms. Perlman, your supervisory role implicates ABA Model Rules 1.2(d), 3.3, and 5.1. Mr. Helt, your Texas licensure and courtroom presence render you uniquely accountable under TDRPC Rules 3.03 and 5.01. Mr. Szanzer, the solicitation instruments bearing your logistical imprimatur invoke scrutiny under NY Rule 4.1 and 8.4. Ms. Wurzelbacher, Rule 5.2's subordinate liability framework—as well as your drafting footprint—may yet define how your participation is interpreted.**

This is not an allegation. It is a procedural phenomenon: when the document is defective, the signature block is not silent. The ethics do not arise from your intentions. They arise from the record. And as that record now includes a reorganization blueprint that threatens to override CPOM, reclassify fiduciary wage structures in violation of IRC § 409A, extinguish whistleblower rights through silent waivers, and distribute legal immunity through procedural disorientation, the inquiry becomes not "if" but "when."

## V. Strategic Nonalignment and Prospective Hindsight

It is immaterial whether the Plan is confirmed. What matters is whether it was advocated with knowledge of the tensions it perpetuates. Courts are not the only venue of inquiry. And time is not always aligned with procedural calendars. The epistemic burden is shifting. What is known now will be read as what was "clearly known" then.

The absence of objection by regulatory bodies today does not equate to post-confirmation exoneration tomorrow. And if this Plan becomes the object of a disciplinary lens—bar review, agency oversight, or public scrutiny—the question will not be whether you intended harm. It will be whether you chose to proceed amid predictable consequence.

## VI. Final Reflection: Between Syntax and Consequence

In closing, I do not write this email to solicit engagement, nor to articulate a procedural threat. I write because the record is accreting, and in that accumulation, signatures matter. The choices made today—particularly the choice to re-assert structural constructs that have already been challenged—may one day be interpreted not as advocacy, but as abandonment of interpretive ethics.

Your response to Dkt. 1897 is due tomorrow. I anticipate that it will reflect not only your position, but your awareness. The record speaks regardless. Whether you amplify it, modify it, or preserve it as-is, the weight of what follows will not be measured by this reply—but by what is already visible.

Respectfully,

Dr. Kanwar Partap Singh Gill

Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533

Senior Staff Physician – California Forensic Medical Group

Fresno County Adult Detention Facility

Email: kpsgill@kpsgill.com

This message is not a filing, demand, or adversarial threat. It does not disclose legal strategy, and it shall not be interpreted as waiver, concession, or limitation of any right, claim, or legal position. Its purpose is purely preservational.

Best Regards,
Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

KPSGILL.COM                                    Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

## Professional Reflections on Strategic Integrity and Supervisory Ethics in Reorganization Drafting

1 message

**Kanwar Gill MD** <kpsgill@kpsgill.com>                            Sun, Apr 13, 2025 at 9:20 AM
To: Felicia Perlman <fperlman@mwe.com>

[Confidential Memorandum – Not for Circulation or Filing]

Subject: Professional Reflections on Strategic Integrity and Supervisory Ethics in Reorganization Drafting

To: Felicia Perlman, Esq. – Lead Plan Architect

Email: fperlman@mwe.com

From: Dr. Kanwar Partap Singh Gill

Date: April 13, 2025

Privileged and Confidential – Internal Attorney Communication Only


Dear Ms. Perlman,


Please accept this correspondence as a privileged and collegially transmitted reflection —one governed by the high threshold of intra-professional discretion, and transmitted with no strategic posture, adversarial agenda, or prejudicial signaling of future intent. Its function is neither anticipatory nor accusatory, but rather prophylactic in nature: a precautionary gesture in anticipation of potential ethical and structural reverberations that may materialize irrespective of confirmation outcomes.


You occupy a unique position—at the doctrinal and supervisory apex of a multi-jurisdictional confirmation effort. Within that role, your duties under the Illinois Rules of Professional Conduct, particularly Rules 1.2(d) (Scope of Representation and Allocation of Authority), 3.3 (Candor Toward the Tribunal), and 5.1 (Responsibilities of Partners and Supervisory Lawyers), engage not merely formalist compliance, but interpretive foresight. It is under this umbrella that I raise three foundational concerns, each implicating the structural core of the Plan you have put forward.

# I. Functional Obfuscation of CPOM Violations – Cal. Bus. & Prof. Code § 2400

The Plan, as currently structured, appears to tacitly preserve a governance framework in which non-physician-controlled MSO entities exercise de facto control over licensed physician services in California. The syntactic separation between "administrative services" and "clinical governance" dissolves under substantive scrutiny—particularly when operational command, personnel oversight, and remuneration structuring remain under the MSO's dominion. This silence in the Plan—particularly given your acknowledged leadership role—may be perceived not as omission, but as constructive circumvention of California's long-standing Corporate Practice of Medicine doctrine.

From the perspective of regulatory latency, such omissions become problematic not upon filing, but upon retrospective examination—especially if downstream harm arises and fiduciary awareness is presumed. The bar does not demand prescience; it demands cautious reckoning with foreseeable incongruities.

# II. Transformational Recharacterization of Deferred Compensation – IRC § 409A and Fiduciary Misalignment

The proposed treatment of Non-Qualified Deferred Compensation Plans (NQDCPs), as refracted through the Plan's pro rata distribution model, effectively recasts individualized deferred earnings as estate-bound general liabilities—a move that introduces not only tax-triggering events under Treas. Reg. § 1.409A-3(i)(4), but a serious divergence from the fiduciary obligations prescribed under 29 U.S.C. § 1104 and relevant ERISA interpretive guidance.

The absence of a statutorily compliant separation event or liquidation trigger—combined with the obfuscation of trust structures—creates a paradigm wherein silent conversion of earnings into estate debt becomes a species of fiduciary dilution. Insofar

as you have stewarded the Plan's strategic direction, the doctrinal burden rests at your desk.

## III. Circular Legal Shielding via Recursive Release Constructs – Ethical and Jurisprudential Risks

Article IX's interlocking exculpation, release, and injunction clauses form a self-reinforcing doctrinal lattice—one that, when evaluated collectively, insulates insiders, directors, and private equity stakeholders from post-confirmation scrutiny. This triadic immunity apparatus may be viewed as facially impermissible under Fifth Circuit precedent (see In re Pacific Lumber Co., 584 F.3d 229 (5th Cir. 2009)), and structurally corrosive to the Rule 9011(b)(2)–(3) expectation of legal plausibility and factual grounding.

In the context of Illinois Rule 8.4(d) (conduct prejudicial to the administration of justice), one must ask: does the Plan shield fiduciaries from future exposure in ways that cannot be squared with either circuit law or evolving regulatory expectations? And if so, what supervisory obligations attach to those who drafted and endorsed such instruments?

## IV. Supervisory Exposure and the Principle of Constructive Knowledge

It is not merely what one knew, but what one could not reasonably have failed to know that defines the modern boundary of Rule 5.1 and Rule 8.3 (Reporting Professional Misconduct) exposure. Even if each provision, standing alone, occupies a permissible boundary, the composite effect of strategic silence, syntactic obfuscation, and procedural insulation suggests a blueprint of professional evasion—not on its face, but in its architectural logic.

The relevant question is not whether the Plan will survive confirmation. It is whether the structure, once operationalized, will endure ethical retrojection—that is, a backward-looking reconstruction of what was materially knowable, ethically consequential, and legally avoidable at the time of its ratification.

# V. Opportunity for Curative Stewardship

This message is neither a threat nor a precursor to filing. It is a privileged advisory, designed to afford you the latitude to reflect, reassess, and if needed, recalibrate. Whether you choose to correct course internally or proceed on your present path, this memorandum will remain preserved, not as an evidentiary weapon, but as a professional time-stamp—a marker that ethical clarity was offered prior to procedural closure.

Should you choose to act, I trust the record will reflect not merely your professional brilliance, but your institutional humility and supervisory care. That, more than legal ingenuity, is what distinguishes great counsel from merely effective counsel.

With respect,

Dr. Kanwar Partap Singh Gill

Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.)

Senior Staff Physician – California Forensic Medical Group

Email: kpsgill@kpsgill.com

PRIVILEGED & CONFIDENTIAL

This communication is submitted in a private, protected, and intra-professional context. It is not a motion, complaint, public disclosure, or admission. Nothing herein shall be construed as waiver of any rights, defenses, or privileges. This correspondence is shielded by applicable work product, common interest, and pre-litigation confidentiality doctrines.

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

KPSGILL.COM

Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

**Jurisdictional Certification, Ethical Signatures, and Fiduciary Reflection on Procedural Design**
1 message

---

**Kanwar Gill MD** <kpsgill@kpsgill.com>                                         Sun, Apr 13, 2025 at 9:24 AM
To: "Marcus A. Helt" <mhelt@mwe.com>

[Confidential Memorandum – Not for Circulation or Filing]

Subject: Jurisdictional Certification, Ethical Signatures, and Fiduciary Reflection on Procedural Design

To: Marcus A. Helt, Esq. – Texas Lead and Local Certifying Counsel

Email: mhelt@mwe.com

From: Dr. Kanwar Partap Singh Gill

Date: April 13, 2025

Privileged and Confidential – Intra-Professional Advisory Only


Dear Mr. Helt,


This message is conveyed not as a procedural objection, strategic overture, or precursor to adversarial engagement, but as a calibrated expression of intra-professional concern —governed entirely by standards of fiduciary discretion, and addressed to you in your capacity as certifying counsel in a jurisdiction with stringent jurisprudential and ethical contours.


Your status as lead Texas counsel places you at a unique junction—both a conduit and gatekeeper—between the structural contents of the Plan and the affirmative representations made to a court of record under Rules 3.03 and 5.01 of the Texas Disciplinary Rules of Professional Conduct. Those duties extend not merely to the veracity of factual assertions, but to the broader procedural legitimacy of the mechanisms advanced.


It is within this precise intersection that several items warrant quiet but unambiguous reflection.

## I. Article IX and the Fifth Circuit's Clear Doctrine Against Non-Consensual Third-Party Releases

The Plan's deployment of an opt-out-based third-party release mechanism, embedded within Article IX, stands in direct tension with binding Fifth Circuit precedent, including In re Pacific Lumber Co., 584 F.3d 229 (5th Cir. 2009). That decision, and its progeny, reject precisely this construct: a release regime wherein silence is transmuted into consent and procedural default into irrevocable forfeiture.

As certifying local counsel, your imprimatur was affixed to a document whose foundational provisions contradict circuit-level doctrine—a contradiction not merely of argument, but of binding legal threshold. In affirming the adequacy of such a mechanism before the United States Bankruptcy Court for the Southern District of Texas, you may have, however inadvertently, created a jurisprudential anomaly whose reverberations may only emerge after institutional hindsight is fully engaged.

One must therefore ask: if opt-out silence is the basis for extinguishing rights of the incarcerated, the unrepresented, or the procedurally disadvantaged, how does this comport with your own duties under Rule 3.03(a)(1) (prohibiting the presentation of legal contentions contrary to controlling law) and Rule 5.01(a) (supervisory responsibility for firm conduct presented under your name)?

## II. Procedural Architecture and the Incarcerated Creditor Class

The creditor class most directly impacted by this opt-out schema—unrepresented incarcerated individuals—presents a troubling context. These claimants are:

- Often deprived of full legal literacy,

- Structurally disabled from electronic participation,
- And uniquely vulnerable to procedural devices that camouflage substantive waiver beneath the guise of notice.

In this context, reliance on general service to custody facilities as "notice" becomes ethically untenable under Rule 8.04(a)(3) (prohibition against conduct involving dishonesty, fraud, deceit, or misrepresentation), even absent intent to deceive. The ethical challenge lies in designing a system that defaults to waiver without meaningful legal agency, and in certifying it as procedurally and constitutionally adequate.

You were in a singular position to either halt or condition that mechanism's certification under Texas law. The decision to proceed places your professional judgment at the center of any future inquiry into procedural coercion or due process erosion.

## III. The Ethics of Silence and the Doctrine of Constructive Consent

The Fifth Circuit has repeatedly emphasized that non-consensual third-party releases must meet the highest standard of explicit creditor participation. The Plan's reliance on silence—as a proxy for volitional surrender—may be facially ineffective under circuit law, but its submission to the Court under your signature renders the issue ethically fraught, not merely procedurally defective.

Your duty, under Rule 1.02(c) (prohibiting assistance in conduct the lawyer knows to be criminal or fraudulent), is not merely passive. It includes an affirmative obligation to withhold certification where operative provisions lack legal merit or foundational consent.

The difference between arguable ambiguity and foreseeable illegality is the difference between advocacy and complicity.

## IV.  The Role of Local Counsel as Jurisdictional Safeguard

Local counsel does not merely localize the pleading; he lends jurisdictional legitimacy to its contents. That is the function of your name and license in this proceeding.

The question, therefore, is not whether others drafted the Plan's architecture, but whether you validated it for judicial reliance, knowing or having reason to know that certain provisions could not survive controlling scrutiny in this forum.

That signature is not benign. It is a declaration to the Court that the document, as presented, is legally permissible, factually coherent, and ethically supportable under the rules of the jurisdiction.

## V. Opportunity for Discretionary Reassessment

No motion is pending. No complaint has been filed. No public accusation will be made. But the convergence of legal doctrine, procedural design, and ethical responsibility is not a matter that can be left to silence.

This correspondence is intended as a private signal: that what may appear procedurally durable today may, under different eyes, seem ethically indefensible tomorrow. Should future oversight or enforcement scrutiny emerge, the record will reflect that an opportunity for reconsideration was offered—not publicly, but collegially.

You retain the power to lead that internal course correction. That power may not last indefinitely.

Respectfully,

Dr. Kanwar Partap Singh Gill

Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.)

Senior Staff Physician – California Forensic Medical Group

Email: kpsgill@kpsgill.com

## PRIVILEGED & CONFIDENTIAL

This communication is submitted for private professional consideration. It does not constitute an adversarial act, motion, complaint, or request for relief. No part of this memorandum may be construed as a waiver of rights, a concession of claims, or a disclosure of strategy. This document is protected by work product privilege, common interest doctrine, and all applicable confidentiality safeguards.

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code § 2511 prohibits interception and disclosure of this electronic communication.

KPSGILL.COM

Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

**Solicitation Architecture, Constructive Waiver, and the Ethics of Procedural Design**
1 message

---

**Kanwar Gill MD** <kpsgill@kpsgill.com>
To: Steven Szanzer <sszanzer@mwe.com>

Sun, Apr 13, 2025 at 9:28 AM

[Confidential Memorandum – Not for Circulation or Filing]

Subject: Solicitation Architecture, Constructive Waiver, and the Ethics of Procedural Design

To: Steven Z. Szanzer, Esq. – Solicitation Counsel and Disclosure Architect

Email: sszanzer@mwe.com

From: Dr. Kanwar Partap Singh Gill

Date: April 13, 2025

Privileged and Confidential – Internal Counsel Communication Only


Dear Mr. Szanzer,


This correspondence is submitted with full recognition of your professional standing and the formidable complexity of your role in the orchestration of solicitation materials and procedural consent frameworks associated with the Fifth Amended Plan. What follows is not a litigation overture, nor a predicate to complaint. It is, rather, an internal signal—a reflective advisory offered in the idiom of jurisprudential stewardship.


In your capacity as principal architect of the solicitation and notice architecture now before the Court, your work engages not only the precision of drafting but the ethics of consent construction—particularly when applied to pro se, incarcerated, or otherwise structurally disenfranchised classes of creditors. It is in this jurisdictional and ethical terrain that several observations warrant careful, perhaps urgent, consideration.

## I. The Use of Silence as Affirmative Waiver – Structural Misalignment with Informed Consent Doctrine

The solicitation materials circulated under your imprimatur rely heavily upon a construct whereby inaction is converted into legal consent, and failure to opt out is transfigured into irrevocable release. This is not merely a matter of procedural design —it is a substantive redefinition of agency, and one that conflicts with well-settled expectations of consent in bankruptcy jurisprudence and beyond.

Under New York Rules of Professional Conduct 4.1 (Truthfulness in Statements to Others) and 8.4(c)–(d) (Misrepresentation and Conduct Prejudicial to the Administration of Justice), the ethical fault line is not defined by disclosure in form, but by comprehension in fact. When a solicitation scheme uses formality to substitute for actual volition—particularly when the impacted class includes individuals with no legal counsel, no digital access, and no meaningful ability to interpret multi-layered opt-out constructs—the bar of ethical sufficiency is simply not met.

## II. The Architecture of Coercive Procedure – Misuse of Structural Presumption

The current structure relies upon a presumption of agency where no actual agency is possible, and a presumption of legal understanding where the documentation itself obfuscates more than it reveals. It is not merely that the Plan seeks releases; it is that the pathway to withholding them is operationally inaccessible to large swaths of impacted parties.

In this regard, the solicitation regime fails not only legally, but ethically, in a manner that is detectable under Rule 3.1 (Meritorious Claims and Contentions) and Rule 1.4 (Communication with Clients/Counterparties), especially when mapped onto a known class of unsophisticated creditors.

The reliance on constructive waiver within a structurally rigged environment may pass unnoticed by a time-constrained tribunal, but it will not escape regulatory hindsight—or the interpretive reach of post-confirmation inquiry.

## III. Disclosure Materials as Ethical Instruments – The Risk of Curated Misunderstanding

A document may be technically accurate yet ethically misleading. When a disclosure statement relies on linguistic overcomplexity, lack of plain-language summaries, and ambiguity of opt-out procedure, it becomes less a disclosure and more a mechanism of procedural foreclosure.

The solicitation documents associated with the Plan appear to shift the burden of comprehension to parties least equipped to bear it. This design is not neutral. It is structurally coercive. Whether intentional or not, the effect is to embed a procedural trapdoor beneath unrepresented or impaired creditors.

The ethical danger lies not in the formal approval of the solicitation materials, but in the future question of whether those who designed them anticipated, or should have anticipated, their coercive impact. That question will not be asked by the Court. It will be asked by bar authorities, oversight bodies, or appellate reviewers in a different moment and with a different lens.

## IV. Interpretive Burden and the Professional Ethics of Foreseeability

When legal structures are deployed in environments of known vulnerability, the ethical burden on the drafter increases, not decreases. The solicitation framework, as designed, creates an illusion of informed assent through the architecture of ambiguity. Under

Rule 8.4(c), such ambiguity, when foreseeably harmful, becomes indistinguishable from misrepresentation.

It is not merely a question of what the materials state; it is a question of what they are likely to produce—in silence, in inaction, and in involuntary waiver.

That burden attaches to you. Not as a matter of litigation, but as a matter of record.

## V. An Invitation to Preempt Ethical Degeneration

You are still in a position to recalibrate. To strengthen disclosure. To clarify language. To create default settings that favor agency over suppression, and clarity over contrivance. None of this requires public revision. It requires only private ethical imagination.

This message is not a warning. It is an opportunity—an open door through which curative reform may still pass without reputational consequence. Whether that opportunity is accepted or ignored will not affect your current standing. But it may materially define how that standing is remembered when retrospective inquiry is applied.

With professional regard,

Dr. Kanwar Partap Singh Gill

Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.)

Senior Staff Physician – California Forensic Medical Group

Email: kpsgill@kpsgill.com

PRIVILEGED & CONFIDENTIAL

This advisory memorandum is protected by all applicable legal privileges, including work product doctrine, common-interest communications, and intra-professional discretion. It contains no litigation strategy, no threats of action, and no external disclosure. Its purpose is reflective, not adversarial.

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

KPSGILL.COM

Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

## Drafting Responsibility, Subordinate Ethics, and Structural Clarity in Procedural Architecture

1 message

Kanwar Gill MD <kpsgill@kpsgill.com>                    Sun, Apr 13, 2025 at 9:32 AM
To: Carole Wurzelbacher <cwurzelbacher@mwe.com>

[Confidential Memorandum – Not for Circulation or Filing]

Subject: Drafting Responsibility, Subordinate Ethics, and Structural Clarity in Procedural Architecture

To: Carole Wurzelbacher, Esq. – Drafting and Review Counsel

Email: cwurzelbacher@mwe.com

From: Dr. Kanwar Partap Singh Gill

Date: April 13, 2025

Privileged and Confidential – Not for Team Circulation

Dear Ms. Wurzelbacher,

Please receive this memorandum not as confrontation, nor as warning, but as a private reflection transmitted under the protections of intra-professional confidentiality. Its intent is neither adversarial nor strategic, but rather restorative—focused on the ethical positioning of your role as drafting counsel in the development and internal review of the Fifth Amended Plan.

In complex proceedings such as this, junior attorneys are often relied upon to perform the linguistic, structural, and organizational labor that animates core filings. But it is precisely within this labor that critical professional decisions are made—ones that may later come to define the ethical topography of the case.

You are, by title and function, a lawyer licensed in Illinois, operating within the framework of Rules 5.2 (Responsibilities of a Subordinate Lawyer), 3.4 (Fairness to Opposing Party and Counsel), and 1.0(h) (Knowledge inferred from circumstances). These rules do not expect omniscience, but they do expect cognizance—an awareness

of irregularities when they are apparent on the face of what is being drafted, and a willingness to escalate, question, or qualify what may later be scrutinized.

# I. Drafting Apparatus and the Role of Recursive Exculpation

The structural logic of Article IX, and its recursive entanglement of releases, exculpations, and injunctions, presents a professional hazard disguised as doctrinal design. These provisions, as written, operate not in isolation but as self-reinforcing immunities—a doctrinal "loop" in which each shield justifies the next, rendering the overall framework resistant to external inquiry.

If you were involved in drafting, editing, or supporting this article—or similar language elsewhere—then your professional imprimatur, however latent, is functionally affixed. Under Rule 5.2(a), subordination to a supervising attorney does not absolve responsibility where the ethical or legal impropriety is apparent or inferable. And in this instance, the appearance is not faint.

The releases extend not merely to estate fiduciaries, but to private equity entities whose involvement in the underlying control architecture has never been substantively disclosed, nor their immunity explained. That design choice is not ethically neutral.

# II. Structural Ambiguity and CPOM-Adjacent Drafting Risks

The Plan's treatment of post-confirmation governance—particularly in relation to California's prohibition on the corporate practice of medicine (Cal. Bus. & Prof. Code § 2400)—is characterized by conspicuous vagueness. There is no express reference to compliance carve-outs, nor to structural reforms that would remediate known CPOM violations. If you participated in drafting or reviewing any provisions relating to operational continuity, MSO-physician relationships, or deferred compensation

redistribution, then your silence may be read as acquiescence to structural noncompliance.

The ethical issue is not whether the CPOM violation is explicit—it is whether the drafting was structured to obscure it.

Should subsequent inquiries arise—whether from the Medical Board, the IRS, or fiduciary oversight bodies—the relevant question will not be what was assigned to you, but what became apparent to you in the course of your work.

## III. Deferred Compensation, IRC § 409A, and the Transformation of Earnings

The proposed recharacterization of NQDCP funds—turning individualized deferred compensation into fungible, dischargeable estate liabilities—raises serious concerns under Treas. Reg. § 1.409A-3(i)(4) and ERISA fiduciary principles. These are not abstract tax questions. They are issues of economic harm to physicians who earned these funds under specific contracts, now reclassified under a collective liquidation model absent any separation or forfeiture event.

If you were involved in the treatment or redrafting of these sections, the drafting itself may implicate you in constructive erosion of earned benefits, particularly if the design strips protections without due process or acknowledgment of statutory risk.

## IV. Rule 5.2, Ethical Agency, and the Threshold of Inferred Knowledge

It bears emphasizing that Illinois Rule 5.2 does not provide a blanket immunity for junior attorneys. Instead, it holds that where the ethical risk is "apparent or reasonably known," the subordinate has a duty not only to decline to participate in problematic conduct, but to seek clarification or correction.

The standard is not fault. It is epistemic proximity. What did you know, or—more importantly—what does the record demonstrate you had reason to know?

In complex Chapter 11 matters, where junior counsel are frequently embedded in structural drafting, the evidentiary footprint often speaks louder than hierarchy. Emails, markup iterations, and silent approvals become the measure of professional complicity.

## V. Discretionary Reflection and the Ethics of Internal Course Correction

This memorandum is extended to you with full respect for your talent, position, and future. No complaint is pending. No escalation is intended. But there remains an opportunity to intervene quietly—to raise the concerns internally that may later define how your professional judgment is remembered, both within the firm and beyond it.

Such intervention does not require insubordination. It requires integrity—the kind that recognizes when silence begins to resemble assent, and when contribution to a drafting defect is no longer neutral.

Should you choose to act, you may yet become a stabilizing force in a process increasingly under ethical and regulatory pressure.

Respectfully,

Dr. Kanwar Partap Singh Gill

Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.)

Senior Staff Physician – California Forensic Medical Group

Email: kpsgill@kpsgill.com

PRIVILEGED & CONFIDENTIAL

This document is shared solely for the purposes of intra-professional ethical reflection. It is not a threat, notice, or declaration of any procedural intention. It does not disclose litigation strategy, and it may not be used as an admission, waiver, or foundation for future motion practice. All applicable privileges—attorney work product, professional discretion, and common interest protections—are expressly preserved.

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

**KPSGILL.COM**

Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

Re: Categorical rejection of your offer: Wellpath Holdings, Inc. Case # 24-90533
1 message

---

**Kanwar Gill MD** <kpsgill@kpsgill.com>                                              Thu, Mar 20, 2025 at 7:31 AM
To: Carole Wurzelbacher <cwurzelbacher@mwe.com>
Cc: Marcus Helt <Mhelt@mwe.com>, Felicia Perlman <Fperlman@mwe.com>, Bradley Giordano <Bgiordano@mwe.com>, Steven Szanzer
<sszanzer@mwe.com>

Thank you for your prompt reply. I note your insistence that your offer expire at noon CT today and your suggestion that I withdraw my motion without prejudice if additional time is needed. However, I must reiterate that this claim concerns my earned wages and inherent property rights as an independent, licensed physician, and it is not merely an ordinary unsecured creditor claim.

Given the complexity of the legal issues at stake—including Wellpath's interference with physician compensation in clear violation of California's Corporate Practice of Medicine (CPOM) doctrine and its unlawful fee-splitting practices—I have no option but to consult with independent legal counsel to fully evaluate your proposed terms. Justice demands that I be afforded adequate time to secure appropriate representation before agreeing to any conditions that would require me to sign a non-disclosure agreement or withdraw my motion.

I respectfully decline any pressure to accept your offer under the abbreviated deadline. While I remain open to discussing these issues by phone, any settlement must fully reflect my vested deferred compensation without requiring me to relinquish my claim or consent to confidentiality provisions that would obscure your client's statutory violations.

I look forward to a meaningful discussion that addresses the substantive issues before this matter potentially comes before the Medical Board of California.

Thank you for your understanding.

Sincerely,

Dr. Kanwar Partap Singh Gill

Pro Se Movant

8408 N Ann Ave

Fresno, CA 93720

Phone: (559) 447-8490

Email: kpsgill@kpsgill.com

Best Regards,
Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S.
Code§ 2511 prohibits interception and disclosure of this electronic communication.

On Mar 20, 2025, at 6:02 AM, Wurzelbacher, Carole <cwurzelbacher@mwe.com> wrote:

Dr. Gill,

We are happy to schedule a call, but the expiration of our offer at noon CT today still applies.  If you would like more time to discuss, you may withdraw your motion without prejudice to re-file in the event that we do not reach an agreement.  As previously noted, CFMG is not a debtor in Wellpath's chapter 11 cases and we would oppose your motion on those grounds, among others.  We have made the offer to avoid additional legal fees and we will withdraw it if an agreement cannot be reached.

If you would still like to discuss, please let us know your availability for a short call.

Thank you,

CAROLE WURZELBACHER
Associate

McDermott Will & Emery LLP  444 West Lake Street, Suite 4000, Chicago, IL 60606-0029

Tel +1 312 899 7240   Email cwurzelbacher@mwe.com

Website | vCard | LinkedIn

---

**From:** Kanwar Gill MD <kpsgill@kpsgill.com>
**Sent:** Wednesday, March 19, 2025 11:31 PM
**To:** Wurzelbacher, Carole <cwurzelbacher@mwe.com>
**Cc:** Helt, Marcus <Mhelt@mwe.com>; Perlman, Felicia <Fperlman@mwe.com>; Giordano, Bradley <Bgiordano@mwe.com>; Szanzer, Steven <sszanzer@mwe.com>
**Subject:** Re: Categorical rejection of your offer: Wellpath Holdings, Inc. Case # 24-90533

[ External Email ]

Given the complex legal issues at stake—including potential exposure before the Medical Board of California for unlicensed practice of medicine and for aiding and abetting such conduct—I believe that a telephone discussion would provide a more effective forum to address these matters. A direct conversation will allow us to focus on the specific legal implications of Wellpath's actions, the risks of non-compliance with CPOM laws, and the precise nature of the financial and regulatory exposures involved.

At this time, I am also in the process of consulting with independent legal counsel to fully evaluate your offer and its associated conditions. Until I have had the benefit of that review—and given the significant issues involved—I cannot agree to the terms as proposed, particularly the NDA and the forced withdrawal of my motion.

I am open to scheduling a telephone call at your earliest convenience to discuss these issues further and to clarify how this matter might ultimately be resolved, including the potential consequences if it

proceeds before the Medical Board of California.

Thank you for your understanding. I look forward to your response regarding a mutually convenient time to discuss this matter over the phone.

Sincerely,

Dr. Kanwar Partap Singh Gill

Pro Se Movant

8408 N Ann Ave

Fresno, CA 93720

Phone: (559) 447-8490

Email: kpsgill@kpsgill.com

Best Regards,
Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

On Mar 19, 2025, at 8:45 PM, Wurzelbacher, Carole <cwurzelbacher@mwe.com> wrote:

Dr. Gill,

Thank you for your reply.  In consideration of your asserted claim, we proposed the following: we will work with CFMG to pay you $162,597.08 in full satisfaction of the Claim.  This offer remains subject to each of the terms and conditions contained in the email that I sent today at 2:49 p.m. (prevailing Central Time), including the agreement to enter a non-disclosure agreement with respect to the settlement of the Claim and withdrawal of the motion by 5:00 p.m. (prevailing Central Time) on March 20, 2025.

Please confirm by response email no later than **March 20, 2025 at 12:00 p.m. (prevailing Central Time)** if you agree to the foregoing.  Note that this offer is being made pursuant to FRE 408 and its local equivalents.  Please let me know if you have any questions or if you would like to discuss.

Thank you,

CAROLE WURZELBACHER
Associate

McDermott Will & Emery LLP  444 West Lake Street, Suite 4000, Chicago, IL 60606-0029

Tel +1 312 899 7240   Email cwurzelbacher@mwe.com

Website | vCard | LinkedIn

---

**From:** Kanwar Partap Singh Gill <kpsgill@kpsgill.com>
**Sent:** Wednesday, March 19, 2025 6:46 PM
**To:** Wurzelbacher, Carole <cwurzelbacher@mwe.com>
**Cc:** Helt, Marcus <Mhelt@mwe.com>; Perlman, Felicia <Fperlman@mwe.com>; Giordano, Bradley <Bgiordano@mwe.com>; Szanzer, Steven <sszanzer@mwe.com>
**Subject:** Categorical rejection of your offer: Wellpath Holdings, Inc. Case # 24-90533

[ External Email ]

Dear Carole,

Thank you for your email and for your willingness to discuss settlement. However, after a thorough review of your proposal, the applicable legal framework, and the relevant evidentiary documents—including my W-2s, pay stubs, Fidelity NetBenefits Statement, Account Summary, the Wellpath Nonqualified Deferred Compensation Plan (Restated January 1, 2024), the motion for relief from the automatic stay, and Medical Board Precedential Decision and enforcement action (MBC Case No. 03-2000-108170)—I must categorically reject your offer. Your proposal of $100,000 (in exchange for withdrawing my motion and signing a non-disclosure agreement) is both legally deficient and financially inadequate, and it fails to reflect my full vested entitlement and the serious statutory violations by Wellpath.

Below, I set forth the legal and factual bases for my position:

1. **Earned Wages and Full Vested Compensation**
My deferred compensation is earned wages under my valid employment agreement with California Forensic Medical Group, Inc. (CFMG)—a solvent, non-debtor entity entirely separate from Wellpath.
• My W-2s, pay stubs, and employment records confirm that my salary—including all deferred amounts—was paid solely by CFMG.
• My Fidelity NetBenefits Statement and Account Summary clearly show that my fully vested balance, as of November 12, 2024, is $162,597.08.
• Wellpath merely acted as a third-party administrator of the Nonqualified Deferred Compensation Plan ("NQDCP") and never acquired any ownership or controlling interest in these funds.
Therefore, there is no legal or equitable justification for accepting anything less than full payment of my vested deferred compensation.

2. **Violation of California's Corporate Practice of Medicine (CPOM) Doctrine and Fee-Splitting Laws**
Under California Business & Professions Code §2400, non-physician entities are expressly prohibited from controlling, managing, or interfering with physician compensation. This robust statutory framework is designed to protect physician autonomy and the integrity of medical decision-making.
• The Medical Board of California's current guidance and past enforcement actions demonstrate that management services organizations (MSOs) that exert financial control over physician earnings violate state law. For example, in People ex rel. State Board of Medical Examiners v. Pacific Health Corp. (12 Cal. 2d 156, 1938) and Conway v. State Board of Medical Examiners (47 Cal. App. 2d 105, 1941), courts held that corporations or non-physician entities cannot dictate physician wages.
• Furthermore, California's fee-splitting prohibitions (BPC §650) bar non-physician entities from profiting off physician services. Wellpath's unilateral control and withholding of my deferred compensation is an illegal fee-splitting arrangement, as it improperly allows a lay-owned MSO to benefit from earnings that were contractually due solely to CFMG's physicians.
• Recent scrutiny of the "Friendly PC" model—exemplified by the AAEM-PG v. Envision Healthcare case further underscores that such arrangements, when they enable non-physicians to indirectly control or profit from physician compensation, are impermissible. Wellpath's actions thus not only contravene federal bankruptcy principles but also violate fundamental public policy embodied in California CPOM law, exposing it to enforcement, disciplinary action (e.g., Precedential Decision MBC-2007-01-Q), and potential criminal liability under Bus. & Prof. Code §§2052 and 2264.

3. **Exclusion from the Bankruptcy Estate under 11 U.S.C. §541(d)**
The NQDCP structured by Wellpath Holdings Inc. is an unfunded "top-hat" plan, and my deferred compensation—being deducted from my CFMG wages—was never a Wellpath asset.
• Under 11 U.S.C. §541(d), property held only in name, without an equitable interest, is excluded from the bankruptcy estate.
• In Begier v. IRS, 496 U.S. 53 (1990), the Court held that funds held in trust or in a fiduciary capacity must be excluded from the

debtor's estate.

Since Wellpath has never had any equitable interest in my deferred compensation, its inclusion in the bankruptcy estate is entirely improper.

**4.  Tax Penalties and Unlawful Termination of the NQDCP**

Wellpath's unilateral termination and mismanagement of the NQDCP have triggered significant IRS penalties (under IRC §409A) and California Franchise Tax Board fines.

• Wellpath's failure to administer the plan in accordance with IRC Section 409A has resulted in immediate taxation, additional interest and a 20% penalty on deferred earnings, imposing severe financial hardship on me.

• It is unconscionable and legally impermissible for Wellpath to shift these tax liabilities and fines onto me when the underlying breach is its own mismanagement and illegal control of my compensation.

**5.  Constructive Trust and Demand for Immediate Payment**

In light of Wellpath's unlawful retention and misappropriation of my earned wages, equity demands the imposition of a constructive trust to ensure these funds remain exclusively my property and are not used to satisfy Wellpath's creditors.

• As established in In re AI Copeland Enterprises, Inc., 991 F.2d 233 (5th Cir. 1993), and Begier v. IRS, a constructive trust remedy is appropriate when funds are wrongfully withheld by a debtor.

• Wellpath's continued control over my deferred compensation constitutes unjust enrichment and must be rectified by directing immediate payment from CFMG, along with Wellpath's assumption of all related tax penalties and fines.

**6.  Unlawful Coercion and Bad Faith Negotiation**

Your threat that, should I reject this offer, Wellpath will instruct CFMG to withhold payment until after the bankruptcy concludes is an improper attempt to coerce a settlement.

• CFMG is a solvent, non-debtor entity and has no legal basis to delay payment of wages that are contractually owed.

• Any such delay would be a clear case of bad faith financial coercion, exposing Wellpath to further legal claims for interference with my employment contract, unjust enrichment and potential criminal liability under CA Bus. & Prof. Code §§2052 and 2264.

**Conclusion and Demand:**

In summary, the facts and law unequivocally establish that my deferred compensation is not a Wellpath asset but rather earned wages solely attributable to my employment with CFMG. Wellpath's actions violate California CPOM law, engage in illegal fee-splitting, and result in the improper inclusion of non-debtor funds in its bankruptcy estate. Moreover, its mismanagement has triggered substantial tax penalties for which it must be held liable.

Therefore, I demand the following as a condition for any settlement:

• **Full immediate payment of my vested deferred compensation in the amount of $162,597.08 from CFMG.**

• **Wellpath must assume full responsibility for any IRS and California Franchise Tax Board penalties and fines arising from its unilateral termination of the NQDCP.**

• **No non-disclosure agreement or similar restrictions shall be imposed that would limit transparency regarding Wellpath's violations or my legal rights.**

If these demands are not met, I will have no choice but to proceed with my motion before the court and pursue all available legal remedies, including injunctive relief, the imposition of a constructive trust over my deferred compensation, and claims for additional damages arising from Wellpath's unlawful practices.

I look forward to your prompt response indicating whether Wellpath is prepared to revise its settlement offer accordingly.

Sincerely,

Dr. Kanwar Partap Singh Gill
Pro Se Movant
8408 N Ann Ave
Fresno, CA 93720
Phone: (559) 447-8490
Email: kpsgill@kpsgill.com

On Wed, Mar 19, 2025 at 12:49 PM Wurzelbacher, Carole <cwurzelbacher@mwe.com> wrote:

> Dr. Gill,
>
> Thank you for your reply and for sending the motion.  We still believe that we can reach a consensual resolution of your claim without the need for a hearing or any further briefing.

We understand that you have asserted a claim (the "Claim") against California Forensic Medical Group, Inc. ("CFMG") on account of amounts that you contributed toward the non-qualified deferred compensation plan ("NQDCP"). As you may be aware, CFMG is _not_ a debtor entity in Wellpath's chapter 11 cases and, therefore, we believe that your motion inappropriately seeks relief against Wellpath and its debtor affiliates (collectively, the "Debtors").

Again, we prefer avoid the need for a hearing or any additional pleadings and, as a result, propose the following settlement offer. In exchange for your agreement to (a) withdraw your motion by **5:00 p.m. (prevailing Central Time) on March 20, 2025** and (b) enter a non-disclosure agreement with respect to the settlement of the Claim, we will work with CFMG to pay you $100,000 in full satisfaction of the Claim.  While we are confident that CFMG will honor the payment in short order, to fully preserve your rights in the interim, the withdrawal of your motion would be without prejudice and would preserve your right to re-file the motion in the event that you do not receive payment within 30 days of acceptance of this offer.

Please confirm by response email if you agree to the foregoing.  Please note that this offer will expire tomorrow, **March 20, 2025, at 12:00 p.m. (prevailing Central Time)**, and is being made subject to FRE 408 and its local equivalents.  Upon the expiry of the foregoing deadline without a settlement, the Debtors intend to object to your motion and will instruct CFMG to withhold payment on account of your Claim until some date after the Debtors emerge from their chapter 11 cases.  Let us know if you have any questions or if you would like to set up a time to discuss.

Thank you,


CAROLE WURZELBACHER
Associate

McDermott Will & Emery LLP   444 West Lake Street, Suite 4000, Chicago, IL 60606-0029

Tel +1 312 899 7240   Email cwurzelbacher@mwe.com

Website | vCard | LinkedIn

---

**From:** Kanwar Gill MD <kpsgill@kpsgill.com>
**Sent:** Tuesday, March 18, 2025 7:10 PM
**To:** Wurzelbacher, Carole <cwurzelbacher@mwe.com>
**Cc:** Helt, Marcus <Mhelt@mwe.com>; Perlman, Felicia <Fperlman@mwe.com>; Giordano, Bradley <Bgiordano@mwe.com>; Szanzer, Steven <sszanzer@mwe.com>
**Subject:** Re: Wellpath Holdings, Inc. Case # 24-90533 (Judge: Alfredo R Perez, JurisdictionTexas - Southern District Filed Nov, 11 2024)


[ External Email ]


Subject: Re: Wellpath Holdings, Inc. Case # 24-90533


Dear Carole,


I appreciate your response and the efforts to resolve this matter consensually. However, after waiting 10 business days in good faith, I proceeded with filing my motion earlier today. My hope was to reach a resolution without filing, thereby avoiding the potential for numerous similarly situated claimants following suit.

I noticed your email after I had already mailed the motion from the UPS store. Given the urgency, I filed it under an extremely urgent two-day service, and it is expected to be delivered to the court by Thursday. All other parties should receive copies either this week or early next week.

As a courtesy, I have attached a scanned copy of the motion to this email. Please note that the exhibits were too large for my home scanner, but you will receive hard copies by mail.

If you have any questions, feel free to reach out. I am also available by phone, and I previously shared my contact information with you.

Best regards,

Kanwar Gill, MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

On Mar 18, 2025, at 2:50 PM, Wurzelbacher, Carole <cwurzelbacher@mwe.com> wrote:

Mr. Gill,

Thank you for your patience. We have been coordinating with the Company and co-advisors regarding your claim and collecting the relevant documentation and information. Would you be able to send us any documentation that you may have regarding the claim? In particular, any documentation relating to your enrollment in the plan would help expedite our review and process.

We understand that you would like to file a motion and have it scheduled for the April 22 hearing. We believe, however, that we can resolve this matter consensually and without the need for you to spend the time preparing, filing, and prosecuting a motion. Accordingly, we would like an additional short amount of time to collect the information and documentation needed to resolve your claim consensually. In the event that we cannot resolve your claim consensually, to avoid prejudicing your timeline, the Company will agree to a shortened notice period on any potential motion for relief from stay that you would file, so that it could be heard on April 22 if the motion is filed on April 11. Please let us know if that works for you.

In the interim, if you would like to discuss your claim or ask any questions, we are available and happy to set up a time for a call.

Please let us know of any questions or concerns. Thank you,

CAROLE WURZELBACHER
Associate

McDermott Will & Emery LLP  444 West Lake Street, Suite 4000, Chicago, IL 60606-0029

Tel +1 312 899 7240    Email cwurzelbacher@mwe.com

Website | vCard | LinkedIn

---

**From:** Kanwar Gill MD <kpsgill@kpsgill.com>
**Sent:** Tuesday, March 11, 2025 3:52 PM
**To:** Wurzelbacher, Carole <cwurzelbacher@mwe.com>
**Cc:** Helt, Marcus <Mhelt@mwe.com>; Perlman, Felicia <Fperlman@mwe.com>; Giordano, Bradley <Bgiordano@mwe.com>; Szanzer, Steven <sszanzer@mwe.com>
**Subject:** Re: Wellpath Holdings, Inc. Case # 24-90533 (Judge: Alfredo R Perez, JurisdictionTexas - Southern District Filed Nov, 11 2024)

[ External Email ]

I emailed the court clerk days after I sent you all my first communication. I was informed by the court clerk the deadline is fast approaching. 10 business days will be  too close to March 22nd deadline.

I will truly appreciate that you expedite the response earlier than the 10 business (previously proposed), it will give me a few days to refine my motion, it will secure me a spot higher in priority for the afternoon of April 22, 2025 and it will avoid any defects related to timely service (and notice of hearing) of the motion to all parties. There are multiple parties lined up for hearing that day and that leaves limited time for arguments. I do expect a written opposition (and I will appreciate that) and that alone will also save us all the time at hearing.

Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

On Mar 11, 2025, at 1:19 PM, Wurzelbacher, Carole <cwurzelbacher@mwe.com> wrote:

Mr. Gill,

To clarify, we are reviewing your message and will revert with a response on this chain within the 10 business day time frame noted in your original message.

Thank you,

CAROLE WURZELBACHER
Associate

McDermott Will & Emery LLP  444 West Lake Street, Suite 4000, Chicago, IL 60606-0029

Tel +1 312 899 7240    Email cwurzelbacher@mwe.com

Website | vCard | LinkedIn

---

**From:** Kanwar Gill MD <kpsgill@kpsgill.com>
**Sent:** Tuesday, March 11, 2025 3:08 PM
**To:** Wurzelbacher, Carole <cwurzelbacher@mwe.com>; Helt, Marcus <Mhelt@mwe.com>
**Cc:** Perlman, Felicia <Fperlman@mwe.com>; Giordano, Bradley <Bgiordano@mwe.com>;
Szanzer, Steven <sszanzer@mwe.com>
**Subject:** Re: Wellpath Holdings, Inc. Case # 24-90533 (Judge: Alfredo R Perez, JurisdictionTexas
- Southern District Filed Nov, 11 2024)

You don't often get email from kpsgill@kpsgill.com. Learn why this is important

[ External Email ]

Thank you Carole for confirming the receipt of messages. I will proceed with filing in a timely
manner and serve a copy to Mr Helt ( I think he is lead on this case, correct me if I am wrong). I
will self-calendar hearing for April 22, 2025. I will appear virtually on teleconference/zoom.


Thanks

Have a Great Day


Best Regards,

Kanwar Gill MD


**IMPORTANT CONFIDENTIALITY NOTICE:**


Transmission of this message does not waive doctor-patient, attorney-client, work product, or
intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of
this electronic communication.


> On Mar 11, 2025, at 12:23 PM, Wurzelbacher, Carole <cwurzelbacher@mwe.com>
> wrote:


> Thank you, Mr. Gill.  We are reviewing and will revert.


> CAROLE WURZELBACHER
> Associate

> McDermott Will & Emery LLP  444 West Lake Street, Suite 4000, Chicago, IL 60606-0029

> Tel +1 312 899 7240    Email cwurzelbacher@mwe.com

> Website | vCard | LinkedIn


**From:** Kanwar Gill MD <kpsgill@kpsgill.com>
**Sent:** Tuesday, March 11, 2025 2:18 PM
**To:** Kanwar Partap Singh Gill <kpsgill@kpsgill.com>; Dingman, Carmen
<cdingman@mwe.com>; Helt, Marcus <Mhelt@mwe.com>; Wurzelbacher,
Carole <cwurzelbacher@mwe.com>; Perlman, Felicia
<Fperlman@mwe.com>; Giordano, Bradley <Bgiordano@mwe.com>; Szanzer,
Steven <sszanzer@mwe.com>; Jumbeck, Jake <jjumbeck@mwe.com>
**Subject:** Re: Wellpath Holdings, Inc. Case # 24-90533 (Judge: Alfredo R Perez,
JurisdictionTexas - Southern District Filed Nov, 11 2024)

You don't often get email from kpsgill@kpsgill.com. Learn why this is important

[ External Email ]

I was wondering if I can at least get **confirmation of receipt** of this message from you. I left a voicemail attorney Mr. Helt on Friday last week. I am required to exhaust the option of informal discussion (conference) as required by the local rules of Judge Perez's court.

In my very unique case (California Licensed and California employed Physician) state law preempts federal laws including bankruptcy law and limited provisions of ERISA that apply to unfunded, "top hat" NQDCP.

I expect a response from you as soon as possible. Please reply to this message to close the loop on this informal discussion.

I will file the motion even if I don't hear from you. It will be self-calendared according to following information received from court.

*"Yes, the filing deadline runs to 3/22/25 for you to be able to self-calendar the motion for the 4/22/25 date.*

*Thanks,*

**Tyler Laws, Case Manager**
*The Honorable Alfredo R Pérez*
*United States Bankruptcy Court for the Southern District of Texas*
*515 Rusk Street, 4th Floor*
*Houston, Texas  77002*
*(713) 250-5421"*

Best Regards,

Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

On Mar 4, 2025, at 3:35 PM, Kanwar Partap Singh Gill <kpsgill@kpsgill.com> wrote:

Kanwar Partap Singh Gill, MD
8408 N Ann Ave
Fresno, CA 93720
Phone: (559) 447-8490
Email: kpsgill@kpsgill.com

March 4th, 2025

Debtors' Counsel
McDermott, Will, & Emery LLP
444 West Lake Street
Chicago, IL 60606-0029
Phone: (312) 372-2000

Fax: (312) 984-7700
https://www.mwe.com/

**Your Client: Wellpath Holdings, Inc. Case # 24-90533 (Jurisdiction Texas – Southern District)**

**Re: Request for Removal of NQDCP Deferred Compensation from the Bankruptcy Estate and Notification to the Court**

Dear Counsel:

I write as Kanwar Partap Singh Gill, MD, a physician employed by California Forensic Medical Group, Inc. ("CFMG"), to demand that Wellpath Holdings, Inc. ("Wellpath" or the "Debtors") immediately remove my deferred compensation funds under the Wellpath Holdings, Inc. Nonqualified Deferred Compensation Plan ("NQDCP" or "Plan") from the bankruptcy estate and notify the Bankruptcy Court accordingly. The purpose of this correspondence is to set forth in detailed terms why my deferred wages – funds that were earned by me at CFMG and are held in custody as part of my deferred compensation benefit – are entirely separate from the assets of Wellpath's Chapter 11 estate and must be released for payment by my true employer.

**I. Factual Background and the Separation of Entities**

*A. Independent Employment Relationship*

I am employed by CFMG, a California professional corporation that provides correctional healthcare services. CFMG is an independent, non-debtor entity funded exclusively by contracts with correctional facilities in California. My salary, benefits, and related deferred compensation are paid solely from CFMG's revenues. It is critical to emphasize that at no point have my earnings or deferred funds been commingled with Wellpath's operating funds. Wellpath's involvement with CFMG is limited strictly to a Management Services Agreement (MSA) under which it provides only non-clinical administrative support—including billing, human resources, and payroll processing. As a result, the financial obligations arising from my employment, including those associated with my deferred compensation, are entirely the responsibility of CFMG.

*B. Voluntary Deferred Compensation*

My participation in the NQDCP was a voluntary election made in the context of my employment at CFMG. I elected to defer a portion of my salary for tax planning and long-term savings purposes. The deferred amounts, which I understand to be an integral part of my earned compensation, were segregated in accounting records for bookkeeping purposes but were never intended to become part of a general corporate pool available to creditors. Instead, these funds were designated to remain with CFMG and, as such, should never have been affected by Wellpath's bankruptcy filing.

**II. The Corporate Practice of Medicine ("CPOM") Doctrine and Prohibitions on Fee-Splitting**

*A. Overview of CPOM and Its Rationale*

California's CPOM doctrine, codified in California Business & Professions Code § 2400, expressly forbids non-physician entities from owning, controlling, or interfering with the practice of medicine. The underlying public policy is clear: to prevent commercial interests from intruding on clinical decision-making and to ensure that the care of patients remains solely within the domain of licensed physicians. This statutory framework was established to eliminate any conflict between the profit motives of corporate entities and the independent professional judgment that is the hallmark of medical practice.

*B. Prohibition on Fee-Splitting Arrangements*

In conjunction with the CPOM doctrine, California law—and the strict interpretations provided by the Medical Board of California and relevant case law—prohibits fee-splitting and other financial arrangements whereby a non-physician entity derives any portion of the physician's compensation beyond a fixed administrative fee. In practical terms, this means that a Management Services Organization (MSO) like Wellpath cannot, under any circumstances, claim a share of the wages or deferred earnings generated by a physician employed by an independent medical practice. Any attempt by Wellpath to

assert that it has any control over or claim to my deferred compensation is not only contrary to the clear language of the CPOM statute, but it also subverts the underlying public policy that is designed to protect physician earnings from corporate misappropriation.

### C. Implications for Deferred Compensation

Because my deferred compensation is, in substance, a component of the wages that I earned at CFMG, any classification of these funds as assets of the Wellpath bankruptcy estate is legally and factually erroneous. The CPOM doctrine, along with statutory bans on fee-splitting, underscores that any deferred wages must remain with the employer—here, CFMG—and must not be diverted to satisfy the debts of an unrelated corporate entity. Consequently, my deferred compensation should be recognized as a proprietary asset of CFMG, held in trust for my benefit, and entirely immune from the automatic stay imposed on Wellpath's assets in the Chapter 11 proceedings.

### III. Analysis of the Deferred Compensation Plan Structure

### A. Nature of the NQDCP as an Unfunded "Top-Hat" Plan

The NQDCP is structured as an unfunded "top-hat" plan, meaning that it is designed to provide a tax-deferred benefit to a select group of employees without setting aside dedicated trust assets in the names of individual participants. Under the terms of the Plan, all deferred amounts are recorded as liabilities of the sponsoring employer(s) and are not segregated into a separately funded account. While Wellpath, in its role as Plan administrator, may have utilized a "rabbi trust" as a funding vehicle, the fundamental character of the Plan remains that of an unsecured deferral arrangement. As such, my rights under the Plan are not akin to an ownership interest in specific assets of Wellpath; rather, they represent a contractual promise that is secured by the independent financial health and obligations of CFMG.

### B. The True Obligor: CFMG's Responsibility

In effect, my deferred compensation was earned as a part of my regular wages at CFMG, and it was CFMG's obligation to pay those wages on a timely basis. Wellpath's role is limited solely to administrative processing and does not extend to an assumption of the obligation to pay deferred compensation. The fact that the Plan may centralize administration at Wellpath is a matter of convenience and does not alter the fundamental relationship between me and CFMG. Therefore, even in the context of the bankruptcy, the funds that represent my deferred compensation should remain the property of CFMG and be disbursed in accordance with my original employment agreement.

### IV. The Impact of Bankruptcy and the Need for Relief

### A. Inappropriateness of the Automatic Stay

Since Wellpath's Chapter 11 filing, my deferred compensation has been frozen under the automatic stay. However, because the funds in question belong solely to me and are held as part of my deferred compensation benefit at a non-debtor entity, their retention in the bankruptcy estate serves no valid purpose. Bankruptcy law, particularly under 11 U.S.C. § 541(d), makes clear that property held in trust for another party—where the debtor holds merely legal title—should not be considered part of the bankruptcy estate. In this case, CFMG's obligation to pay my deferred compensation exists independently of Wellpath's financial restructuring and should be preserved.

### B. Unjust Enrichment and Precedent Concerns

Retaining my deferred compensation in the estate would not only result in unjust enrichment for Wellpath's creditors but would also set a dangerous precedent. Such an outcome would effectively allow a non-debtor entity to benefit from funds that rightfully belong to a physician, undermining the protections afforded by both the CPOM doctrine and state law regarding fee-splitting and independent medical practice. In the long run, this misclassification could discourage physicians from participating in deferred compensation programs, potentially harming the quality and stability of healthcare services provided in correctional facilities and other public-private partnerships.

### C. Practical Considerations for the Reorganization

It is important to note that releasing my deferred compensation will have no adverse effect on the overall reorganization of Wellpath. The funds in question were never part of the operational capital used by Wellpath to support its creditors, as they originated solely from CFMG's payroll. Moreover, allowing the release of these funds is consistent with public policy, which seeks to protect earned wages from being diverted to satisfy corporate liabilities that have no direct relation to the compensation obligations of a non-debtor employer.

## V. Detailed Legal and Policy Arguments Underpinning My Request

### A. CPOM and Fee-Splitting: Statutory and Regulatory Foundations

California's CPOM doctrine is not merely a set of abstract guidelines but a statutory mandate designed to ensure that physicians retain full control over their professional and financial affairs. The prohibition against fee-splitting further cements the principle that no non-physician entity may derive benefit from the earnings of a physician beyond a limited administrative fee. Wellpath's claim that my deferred compensation is part of its bankruptcy estate runs directly counter to these well-established legal principles. In essence, allowing Wellpath to assert any right to my deferred wages would contravene both the letter and spirit of California law, which explicitly requires that compensation arising from the practice of medicine remain exclusively with the licensed provider and, by extension, the professional corporation that employs that provider.

### B. The Separation of Corporate Finances

The relationship between Wellpath and CFMG is characterized by a clear and legally mandated separation of finances. CFMG's operations, including its payroll and deferred compensation obligations, are funded entirely through contracts with correctional facilities and other non-debtor revenue streams. There is no basis in fact or law to assert that my deferred compensation should be commingled with Wellpath's assets or used to satisfy Wellpath's liabilities. This structural separation is a direct consequence of the CPOM doctrine, which prohibits Wellpath, a non-physician entity, from exercising any control over the practice or financial rewards of a medical professional. Hence, my deferred compensation is properly classified as funds held in trust by my true employer, CFMG.

### C. Equitable Considerations and the Doctrine of Constructive Trust

In the event that any dispute arises regarding the classification of these funds, equitable principles—specifically, the doctrine of constructive trust—support the view that my deferred compensation must remain with me. A constructive trust is imposed to prevent unjust enrichment and to ensure that property entrusted for a specific purpose is not misappropriated. Since my deferred compensation was earned as part of my employment at CFMG, any attempt to use these funds to satisfy the claims of Wellpath's creditors would constitute a clear violation of equitable principles. The funds should therefore be released from the automatic stay and restored to me, preserving the integrity of my employment contract and the public policy underlying the CPOM doctrine.

### D. Policy Considerations and the Future of Physician Compensation

Beyond the immediate legal arguments, releasing my deferred compensation carries significant public policy implications. If non-debtor physicians are forced to forgo earned wages because of the improper inclusion of such funds in a bankruptcy estate, it could deter qualified medical professionals from engaging in innovative compensation arrangements designed to benefit both the physicians and the healthcare system. This would undermine the very purpose of deferred compensation plans, which are intended to promote long-term financial planning and stability for physicians. Maintaining strict adherence to the CPOM doctrine and prohibitions on fee-splitting is essential to preserving the autonomy of the medical profession and ensuring that physicians remain insulated from corporate financial mismanagement.

## VI. Conclusion and Prayer for Relief

For the reasons detailed above—grounded in factual distinctions between CFMG and Wellpath, the clear statutory and regulatory mandates of the CPOM doctrine, the explicit prohibitions on fee-splitting, and the equitable and public policy considerations—I respectfully demand that the Debtors:

1. Immediately acknowledge that my deferred compensation funds under the NQDCP do not belong to the Wellpath bankruptcy estate but are the exclusive property of CFMG and, by extension, mine as a CFMG physician.

2. Remove my deferred compensation from the list of assets included in the bankruptcy estate.

3. Promptly notify the Bankruptcy Court that these funds are not subject to the automatic stay and are to be released for payment by CFMG or any other appropriate non-debtor entity.

4. Confirm in writing that the automatic stay does not apply to my efforts to recover my deferred compensation.

I trust that you will give this matter your immediate attention. Should Wellpath fail to take the necessary corrective actions, I will have no alternative but to seek relief from the automatic stay through the Court in order to protect my contractual and statutory rights.

I request a written response within ten (10) business days from the date of this letter. Please feel free to contact me at (559) 447-8490 or via email at kpsgill@kpsgill.com to discuss this matter further.

Respectfully submitted,

Kanwar Partap Singh Gill, MD
Fresno County Detention Facility
Fresno, CA 93721
(559) 447-8490
kpsgill@kpsgill.com

*********************************************************************************************************
*************************
This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Our Privacy Policy explains how we may use your personal information or data and any personal information or data provided or made available to us. Thank you.
*********************************************************************************************************
*************************

Please visit http://www.mwe.com/ for more information about our Firm.

KPSGILL.COM                     Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

## Courtesy Notice – Supplemental Brief Filed and Under Review
1 message

**Kanwar Gill MD <kpsgill@kpsgill.com>**                     Fri, Apr 11, 2025 at 7:45 PM
To: Marc Goldstone <MGoldstone@wellpath.us>, Felicia Perlman <Fperlman@mwe.com>, "Marcus A. Helt" <mhelt@mwe.com>, Steven Szanzer <sszanzer@mwe.com>, Carole Wurzelbacher <cwurzelbacher@mwe.com>, Grady J Bazzel <JBazzel@zenovacare.com>, Richard Medrano <RMedrano@wellpath.us>, Scott Kennedy <ScottKennedy@wellpath.us>, "Kerrie@MBC Webb" <Kerrie.Webb@mbc.ca.gov>, Susan Hersh <Susan.Hersh@usdoj.gov>, Ha Nguyen <Ha.Nguyen@usdoj.gov>, lucas.schneider@stinson.com, USTPRegion07.HU.ECF@usdoj.gov, bankruptcymail@wellpath.us, ebarak@proskauer.com, brosen@proskauer.com, ddesatnik@proskauer.com, Zachary.hemenway@stinson.com, letf@dir.ca.gov, DLSE2@dir.ca.gov, ueo@edd.ca.gov, Kanwar Gill <kagill@wellpath.us>

Subject: Courtesy Notice – Supplemental Brief Filed and Under Review

To:

Marc Goldstone – Chief Legal Officer, Wellpath

Felicia Perlman – McDermott Will & Emery

Marcus Helt – McDermott Will & Emery

Steven Szanzer – McDermott Will & Emery

Carole Wurzelbacher – McDermott Will & Emery

Angie Baldwin – Wellpath Employee Relations

Dr. Grady Judson Bazzel – CEO, CFMG

Dr. Richard Medrano – Secretary, CFMG

Dr. Scott Kennedy – CFO, CFMG

Kerrie Webb – Medical Board of California

U.S. Trustee – Southern District of Texas

Official Committee of Unsecured Creditors (via counsel)

From:

Dr. Kanwar P. Gill

Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533

Senior Physician – CFMG, Fresno County Adult Detention Facility

This is to notify you that the Supplemental Brief in support of my previously filed motions has been completed and express mailed to the U.S. Bankruptcy Court for the Southern District of Texas, with guaranteed delivery no later than 9:00 AM Central Time, Monday, April 14, 2025.

Due to technical limitations, I have not yet been able to scan and transmit the full brief and its supporting materials electronically. That said, the content is consistent with, but not limited to, the pre-filing legal notices previously provided to all counsel, parties, and regulators. Additional disclosures, analyses, and declarations have been incorporated where appropriate.

The document includes—but is not limited to—detailed structural observations, employment governance anomalies, oversight mechanisms, and non-dischargeable claim frameworks, as well as treatment pathways for certain categories of professional services arrangements and compensation instruments. To the extent these issues intersect with plan confirmation standards or post-confirmation oversight obligations, they are addressed in a format tailored to the current procedural phase and framed to preserve the legal and factual record.

It would be inappropriate at this stage to summarize the submission's impact on confirmation feasibility, voting mechanics, claim classifications, or stay-related relief, though all of those areas were considered with reference to material facts now of record. I will refrain from commenting further except to confirm that the brief does not adopt a segmented or motion-by-motion structure, and instead presents an integrated assessment of all plan-level and non-debtor enforcement issues raised to date.

You are advised to allocate sufficient internal and external resources for immediate review upon filing, as time-sensitive decisions will likely follow—particularly where jurisdictional clarity, professional licensure status, and administrative hierarchy alignment are concerned. This will be especially important where estate asset treatment intersects with operational governance models not fully disclosed in the Plan or Disclosure Statement.

Given prior missed opportunities for direct resolution and internal misunderstanding of jurisdictional triggers, I have taken the liberty of consolidating all outstanding matters for judicial review. If any clarification is needed, the docketed version of the filing will speak for itself.

There will be no further advance disclosures.

Dr. Kanwar P. Gill

Pro Se Creditor – In re Wellpath Holdings, Inc.

Senior Physician – CFMG

Email: kpsgill@kpsgill.com

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

On Apr 10, 2025, at 9:38 PM, Kanwar Partap Singh Gill <kpsgill@kpsgill.com> wrote:

**Subject:** Final Legal Notice – CPOM Violations, Misappropriated Compensation, and Plan Objection Grounds

**In re Wellpath Holdings, Inc. – Case No. 24-90533 (Bankr. S.D. Tex.)**

**To:**
Marc Goldstone – Chief Legal Officer, Wellpath
Felicia Perlman – Counsel, McDermott Will & Emery
Marcus Helt – Counsel, McDermott Will & Emery
Steven Szanzer – Counsel, McDermott Will & Emery
Carole Wurzelbacher – McDermott Will & Emery
Angie Baldwin – Senior Employee Relations Manager, Wellpath
Dr. Grady Judson Bazzel – CEO, California Forensic Medical Group (CFMG)
Dr. Richard Medrano – Secretary, CFMG
Dr. Scott Kennedy – CFO, CFMG
Kerrie Webb – Staff Counsel, Medical Board of California
United States Trustee, Southern District of Texas
Official Committee of Unsecured Creditors (via counsel)

**From:**
Dr. Kanwar P. Gill
Senior Physician, CFMG – Fresno County Adult Detention Facility
Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533

Dear Counsel, Officers, and Regulatory Authorities:

This message serves as formal and final **pre-filing notice** of legal, regulatory, and structural violations relevant to the **confirmation of the Chapter 11 Plan** in the above-captioned case. The facts presented herein will be **incorporated into my April 14th supplemental filing** and disseminated to state and federal enforcement bodies. The issues are no longer speculative; they are supported by a factual and documentary record, implicating multiple statutory and constitutional violations across:

- **California's Corporate Practice of Medicine (CPOM) doctrine**

- **Business and Professions Code §§ 2400–2417**

- **Labor Code § 1102.5 (Whistleblower Retaliation)**
- **ADA and FEHA (Title 42, U.S.C. §§ 12101 et seq.; Cal. Gov. Code §§ 12900 et seq.)**
- **ERISA fiduciary standards and IRC § 409A**
- **Bankruptcy Code §§ 362(b)(4), 524(e), and 1129(a)**

I. **Non-Physician Control Over Physician Employment – CPOM Violations**

Under **People v. Cole**, 38 Cal. 2d 99 (1951), and **Conway v. State Bd. of Med. Exam'rs**, 47 Cal. App. 2d 105 (1941), any lay control over the practice of medicine—including physician employment decisions—is void as against public policy. Despite Wellpath's MSO label, **CFMG physician governance has been functionally nullified** by direct administrative interference.

Specifically:

- **Angie Baldwin (Wellpath HR)** is conducting disciplinary investigations into CFMG-employed physicians without oversight by any California-licensed CFMG director.
- **Deanna Huff (HSA, Wellpath)** has issued directives regarding physician productivity, scheduling, and documentation priorities in violation of Cal. Bus. & Prof. Code §§ 2052, 2264, and 2400.
- **Eric Krenz (DON, CFMG)** has aligned with non-physician executives at Wellpath to unilaterally reassign patient lists and direct triage workflows, violating Title 15 CCR § 1208 and § 1210.
- **Linda Matlock (RDO, Wellpath)** has issued clinical directives affecting physician operations despite not holding a medical license.

These acts represent not only CPOM violations but also potential grounds for license revocation under **In re Basile** and **In re Mukerji** (Medical Board of California precedent), and are reportable to the California Attorney General for prosecution under **Penal Code § 550**.

II. **Deferred Compensation Misappropriation – Trust and Tax Violations**

My compensation—earned through CFMG employment—was **withheld and rerouted through a Non-Qualified Deferred Compensation Plan (NQDCP)** administered by Wellpath. Upon Wellpath's bankruptcy filing:

- My **NQDCP funds were frozen** and treated as property of the estate, in violation of **11 U.S.C. § 541(d).**
- No legal authority existed for Wellpath to administer, seize, or condition the return of funds earned under a **non-debtor entity (CFMG).**
- This mismanagement exposes me to tax penalties under **IRC § 409A** and potential ERISA breaches (see 29 U.S.C. § 1104).

**This claim is non-dischargeable, non-negotiable, and must be carved out.** I have formally demanded **return of funds with indemnity for all IRS and California FTB liabilities**, as stated in correspondence on record.

III. **Whistleblower Retaliation and Constructive Termination Efforts**

After raising legal concerns—including CPOM violations, wage theft, and administrative interference—I was:

- Investigated by Wellpath HR under Ms. Baldwin's direction with no oversight from CFMG physician-shareholders;
- Removed from internal clinical leadership functions;
- Scheduled for meetings conflicting with patient care;
- Subject to a campaign of retaliation including **pretextual efforts to terminate or sideline me**, corroborated by internal discussions noted by site staff.

These are textbook violations under **Yanowitz v. L'Oreal**, 36 Cal. 4th 1028 (2005) and **Shephard v. Loyola Marymount**, 102 Cal. App. 4th 837 (2002). I have filed formal complaints with the **Medical Board of**

**California**, **Department of Labor**, and **EEOC**, with additional filings to the **California Department of Fair Employment and Housing** imminent.

IV. **Plan Confirmation Barriers – Legal and Structural Defects**

As currently proposed, the Plan:

- Relies on **illegal employment structures** in California, and thus fails the **§ 1129(a)(3) good faith requirement**.

- Proposes **non-consensual third-party releases** for CFMG and individual officers, in direct violation of **§ 524(e)** and **In re Pacific Lumber**, 584 F.3d 229 (5th Cir. 2009).

- Invokes an **improper extension of the automatic stay to non-debtor CFMG**, which the Fifth Circuit does not permit absent clear, record-supported findings—none of which exist here.

The **U.S. Supreme Court's ruling in Harrington v. Purdue Pharma, 603 U.S (2024)** places additional limitations on such non-consensual third-party releases. Wellpath cannot, through a bankruptcy plan, discharge regulatory liability or misappropriate physician wages earned outside of the debtor entity.

V. **Demand for Settlement or Carve-Out – Opportunity for Resolution**

As outlined in prior communications, I remain open to settlement under the following **non-negotiable terms**:

1. **Immediate restoration of all deferred compensation** and indemnification for all associated tax liabilities;

2. **Employment protection against retaliatory termination**, memorialized in a binding agreement;

3. **Cessation of HR investigations** unless authorized by a California-licensed physician-officer;

4. **Structural reform** ensuring CPOM compliance through physician-governed oversight;

5. **Affirmation of whistleblower protections**, with standing to pursue injunctive relief if retaliated against.

Absent agreement on these points, **I will seek judicial relief and regulatory enforcement.** No court can confirm a plan that locks in an illegal, retaliatory, and structurally flawed corporate model.

VI. **Strategic Posture and Litigation Warning**

If Wellpath attempts to oppose my pending motions and defends the current structure, it will be **on record affirming a CPOM-violating model**, inviting enforcement from:

- **Medical Board of California**

- **IRS and Department of Labor**

- **State Attorneys General and DOJ Civil Rights Division**

This is not merely an employment dispute. It is a test of whether a national healthcare company may use **Chapter 11 to shield itself from state regulatory oversight**, seize physician trust assets, and retaliate against whistleblowers—all under federal court protection.

The answer, under law and policy, is no.

---

**Conclusion**

This email, and its supporting exhibits and communications, will be incorporated into my **supplemental filing**, no later than April 14th 2025 unless immediate corrective action is taken. I urge Wellpath and its counsel to act—*not only for your client's legal protection, but for the long-term sustainability of post-confirmation operations in California and other CPOM jurisdictions.*

Respectfully,
**Dr. Kanwar P. Gill**
Senior Physician, Fresno County Adult Detention Facility

Email: kpsgill@kpsgill.com
Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533

KPSGILL.COM                                         Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

**Subject: Concerns Regarding Retaliatory Actions & Increased Scrutiny – Request for Immediate Resolution**

1 message

---

**Kanwar Gill MD** <kpsgill@kpsgill.com>                      Fri, Mar 21, 2025 at 10:11 AM
To: Carole Wurzelbacher <cwurzelbacher@mwe.com>, "Marcus A. Helt" <mhelt@mwe.com>, Bradley Giordano
<Bgiordano@mwe.com>, Felicia Perlman <Fperlman@mwe.com>, Marcus Helt <Mhelt@mwe.com>

Carole, I appreciate your prompt responses and the willingness to discuss settlement. However, I must express my deep concern over recent developments at my workplace that go beyond our prior discussions about my deferred compensation claim.

Over the past two to three weeks, I have observed unprecedented scrutiny of my work by nursing and administrative staff—individuals who, by law, do not have the authority to supervise or direct a licensed physician's clinical decisions. I have overheard discussions suggesting an intent to find fault in my performance and even to terminate my employment. Such behavior not only constitutes harassment and workplace embarrassment but also appears designed to build a case for wrongful termination.

I want to make it clear that I am a licensed physician, and only fellow physicians may supervise clinical practice. I am scheduled to meet with regional and local leadership next week to address these issues directly. I take these matters extremely seriously; any retaliatory action or wrongful termination will compel me to pursue every available legal and regulatory remedy. This includes, but is not limited to, notifying the Medical Board of California, the California Attorney General's office, and the California Labor Commissioner. I understand that the Medical Board's burden of proof has been modified since 2024 to "more likely than not," and that investigations now carry significant financial implications for the respondent. It is my firm belief that any such investigation could result in severe penalties—including potential actions against the licensed shareholders of CFMG—which would have far-reaching consequences on Wellpath's operations in California.

I want to reiterate that my claim concerns my earned wages and property rights as a physician employed by CFMG, not an ordinary creditor claim. While I remain open to discussing a fair resolution for my deferred compensation, any settlement must not force me to relinquish my claim or agree to restrictive confidentiality provisions.

I stress, again and strongly, that any attempt to retaliate—either by increasing scrutiny, engaging in wrongful termination, or any other adverse action—will leave me no choice but to seek intervention from state regulatory agencies. I fully understand the implications of Medical Board, Attorney General, and Labor Commissioner involvement, and I am prepared to pursue those avenues if necessary.

I trust that you appreciate the gravity of these concerns. Please note that, moving forward, I will respond solely via email regarding this matter. I will also provide a Notice of Hearing within 24 hours of receiving the necessary court forms, as required under the applicable federal and local rules (details are on the first two pages of my motion).

I look forward to your prompt written response, confirming that you understand my position and will take immediate steps to ensure that my rights are not compromised.

Sincerely,

Dr. Kanwar Partap Singh Gill

Pro Se Movant

8408 N Ann Ave

Fresno, CA 93720

Phone: (559) 447-8490

Email: kpsgill@kpsgill.com

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

KPSGILL.COM                                          Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

**Formal Request for Oversight Review – Structural and Fiduciary Irregularities in Fifth Amended Plan of Reorganization (In re Wellpath Holdings, Inc., Case No. 24-90533)**
1 message

---

**Kanwar Gill MD** <kpsgill@kpsgill.com>                          Sat, Apr 12, 2025 at 10:15 PM
To: Ha Nguyen <Ha.Nguyen@usdoj.gov>, Susan Hersh <susan.hersh@usdoj.gov>, Carole Wurzelbacher <cwurzelbacher@mwe.com>, Felicia Perlman <Fperlman@mwe.com>, Bradley Giordano <Bgiordano@mwe.com>, Marcus Helt <Mhelt@mwe.com>, "Kerrie@MBC Webb" <Kerrie.Webb@mbc.ca.gov>, Marc Goldstone <MGoldstone@wellpath.us>, Steven Szanzer <sszanzer@mwe.com>
Cc: Susan Hersh <Susan.Hersh@usdoj.gov>

Subject: Formal Request for Oversight Review – Structural and Fiduciary Irregularities in Fifth Amended Plan of Reorganization (In re Wellpath Holdings, Inc., Case No. 24-90533)

To:

Susan Rogers Her, Trial Attorney

Ha Nguyen, Trial Attorney

Office of the United States Trustee – Region 7

Southern District of Texas – Houston Division

Email: USTPRegion07.HU.ECF@usdoj.gov

From:

Dr. Kanwar Partap Singh Gill

Pro Se Creditor – In re Wellpath Holdings, Inc. (Case No. 24-90533)

Senior Staff Physician – California Forensic Medical Group

Fresno County Adult Detention Facility

Email: kpsgill@kpsgill.com

Date: April 12,  2025

---

Dear Ms. Her and Ms. Nguyen,

I submit this memorandum in my capacity as a physician-creditor in the above-referenced Chapter 11 matter, and in furtherance of the public interest functions entrusted to your office under 28 U.S.C. § 586(a)(3) and Bankruptcy Code § 307. The issues identified below merit prompt scrutiny and potential oversight intervention, as they bear directly on the integrity of the plan confirmation process and the statutory predicates of 11 U.S.C. §§ 1125 and 1129.

This correspondence arises from independent legal analysis and publicly docketed materials, including the Fifth Amended Plan of Reorganization and associated Disclosure Statement (Dkt. 1835). It is submitted in good faith and with full respect for the procedural posture of the case.

I. Indicators of Regulatory Conflict Embedded in the Plan Structure

The Plan, as drafted, appears to entrench a governance model in which licensed physicians remain under indirect control of non-physician holding companies. This construct—while facially couched in "MSO" terminology—may operate in tension with California's corporate practice of medicine doctrine (Cal. Bus. & Prof. Code § 2400). No divestiture or professional corporation realignment has been disclosed. If the Plan enables continued unlicensed control over medical practice, it risks post-confirmation regulatory nullification and may render the Plan unconfirmable under § 1129(a)(3) as inconsistent with state law.

II. Deferred Compensation Reversion and IRC § 409A Exposure

Court-authorized termination of the Debtors' non-qualified Deferred Compensation Plan (NQDCP) has yielded a proposed treatment under which rabbi trust assets revert to the estate and participants receive pro rata unsecured creditor distributions. There is no indication of structured compliance with IRC § 409A or Treasury Reg § 1.409A-3(i)(4), raising significant risk of adverse tax consequences to physicians and fiduciary noncompliance. Such treatment may also offend ERISA-equivalent state wage statutes, inviting downstream IRS or DOL review.

III. Procedural Opt-Out Mechanics and Due Process Concerns

The Plan's opt-out framework for third-party releases—particularly in the context of unrepresented incarcerated creditors—raises substantial due process concerns. Article IX.D purports to deem silence as consent to release, notwithstanding the reality that many affected claimants lack legal counsel, mail access, or comprehension of the underlying documents. Under Mullane v. Central Hanover Bank, 339 U.S. 306 (1950), notice must be "reasonably calculated" to inform. Where procedural structures convert inaction into permanent legal forfeiture, constitutional adequacy is imperiled.

IV. Solicitation Ambiguity and Risk to Institutional Credibility

Beyond technical defects, the aggregate architecture of the Plan may be perceived as structured opacity. Broad releases, self-referential exculpation, and undisclosed post-confirmation ownership arrangements pose concerns under § 1125's adequate information standard. If solicitation was conducted on the basis of ambiguity, it may have compromised creditor agency. The Office of the United States Trustee has standing under § 307 to object where the process itself undermines the legitimacy of the reorganization.

Requested Oversight Considerations:

In light of these factors, I respectfully request that the U.S. Trustee's Office consider the following:

- Formal inquiry into whether the current Plan construct adheres to the confirmability requirements of §§ 1125 and 1129(a)(1)–(3);

- Engagement with Debtors' counsel to address whether affirmative carve-outs will be made for: (1) whistleblower protections, (2) regulatory enforcement actions, and (3) claims of constitutional magnitude;

- Assessment of solicitation fairness and sufficiency, particularly as it pertains to non-consensual third-party releases and the rights of pro se, medically vulnerable, and incarcerated creditors;

- Advisory intervention under § 307 should confirmation be pursued without appropriate structural recalibration.

I remain available to provide non-public documentation, statutory analyses, or declarations upon request. My interest is not adversarial but fiduciary—ensuring that the reorganization proceeds in a manner consonant with federal oversight obligations, state regulatory integrity, and public confidence.

Thank you for your consideration and continued stewardship of the bankruptcy system.

With professional respect,

Dr. Kanwar Partap Singh Gill

Pro Se Creditor – In re Wellpath Holdings, Inc. (Case No. 24-90533)

Senior Staff Physician – California Forensic Medical Group

Fresno County Adult Detention Facility

Email: kpsgill@kpsgill.com

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

On Apr 10, 2025, at 1:09 PM, Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov> wrote:

Thank you Dr. Gill. I am confirming that the UST received this email.

**From:** Kanwar Partap Singh Gill <kpsgill@kpsgill.com>
**Sent:** Thursday, April 10, 2025 2:06 PM
**To:** Hersh, Susan (USTP) <Susan.Hersh@usdoj.gov>; Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>
**Subject:** [EXTERNAL] In re Wellpath Holdings, Inc., et al., No. 24-90533 (Chapter 11)

**Case Reference: In re Wellpath Holdings, Inc., et al., No. 24-90533 (Chapter 11)**

**Subject:** Request for Oversight and Intervention Regarding Conflict and Regulatory Violations - In re Wellpath Holdings, Inc., Case No. 24-90533

**To:** U.S. Trustee's Office - Southern District of Texas

Dear US Trustee.

I write in my capacity as a pro se physician-creditor in *In re Wellpath Holdings, Inc.*, Case No. 24-90533 (Bankr. S.D. Tex.), to respectfully request that your office closely review certain structural issues that have surfaced in connection with the Debtor's plan, solicitation practices, and internal governance model that implicates both bankruptcy and state law violations.

My claim arises from unpaid deferred compensation and related fiduciary breaches exceeding $375,000. However, the broader concern now emerging involves:

1. **Improper extension of the automatic stay to a non-debtor entity (California Forensic Medical Group, Inc. or CFMG),** which is simultaneously being held out as independent in state regulatory contexts while being subsumed into the Debtor's operational structure through an aggressive management services agreement.
2. **Violations of California's Corporate Practice of Medicine doctrine,** which prohibit non-physician control over medical employment and decision-making. The current governance model, as reflected in the Debtor's communications and actions, raises significant concerns under state and public contract law.
3. **Retaliatory employment behavior and internal investigations being conducted by the Debtor (Wellpath) against physicians employed by CFMG,** including myself, while active litigation is ongoing. This creates an active conflict of interest that is procedurally incompatible with the Bankruptcy Code's fiduciary principles and may give rise to whistleblower retaliation under both ERISA and California Labor Code §1102.5.
4. **Inclusion of trust property or misclassified deferred compensation in the estate in violation of 11 U.S.C. §541(d),** which jeopardizes the integrity of the claims resolution process.

Given that these concerns intersect directly with public policy, regulatory integrity, and the fair administration of this case, I respectfully request that your office:

- Review the Debtor's filings and plan representations regarding CFMG's independence versus control;
- Consider filing a statement or limited objection to ensure the Court is fully informed on the implications of physician-employment conflicts and state law governance restrictions;
- Scrutinize the procedural fairness of current solicitation and classification structures under Docket Nos. 1897 and 2049, which I filed;
- Engage, if necessary, with the California Medical Board or relevant regulatory bodies to evaluate the Debtor's operational compliance posture.

I remain available to provide any supporting documentation, including HR-related communications, regulatory complaints, and plan language that demonstrates the concerns outlined above.

Thank you for your time and your role in protecting the integrity of the bankruptcy process.

Sincerely,
**Dr. Kanwar P. Gill**
Senior Physician - Fresno County Adult Detention Facility
Email: kpsgill@kpsgill.com
Pro Se Creditor
Case No. 24-90533 (Bankr. S.D. Tex.)

## EXHIBIT 5 – April 14 Supplemental Brief

Filed in Support of Dkts. 1897, 2049, 2075

Declarant: Dr. Kanwar Partap Singh Gill

Case: In re Wellpath Holdings, Inc., Case No. 24-90533 (S.D. Tex.)

## Declaration Cross-Reference

Referenced in Sections: II, VI, IX

Cited in Paragraphs: ¶¶ 14, 157–158

## Description of Contents

This exhibit presents the April 14, 2025 Supplemental Brief, formally filed with the Court, detailing structural Plan defects, non-consensual third-party releases, and embedded legal violations.

Included Documents:

- - Final April 14 Supplemental Brief (PDF/Word)
- - Service confirmation emails or filing receipt

## Legal Basis and Relevance

Statutes, regulations, and ethical rules implicated:

- - 11 U.S.C. §§ 1129(a)(1), (a)(3), 524(e)
- - Fifth Circuit case law: Zale, Pacific Lumber, Highland Capital

## Authentication Status

Filed and docketed with the U.S. Bankruptcy Court for the S.D. of Texas. Preserved as part of court record and internal legal files.

## Evidentiary Purpose

Supports plan challenge, due process violations, and legal roadmap for Dkts. 1897, 2049, 2075.

24·90533

# SUPPLEMENTAL MOTION FOR RELIEF FROM THE AUTOMATIC STAY, EMERGENCY MOTION TO STAY PLAN SOLICITATION AND VOTING, AND MOTION TO STRIKE IMPROPER THIRD-PARTY RELEASES

United States Courts
Southern District of Texas
FILED

APR 1 4 2025

Nathan Ochsner, Clerk of Court

## Introduction and Preliminary Statement

Dr. Kanwar Partap Singh Gill ("Movant"), a physician employed by California forensic medical group ("CFMG"), an independent California professional medical corporation. CFMG contracts with Wellpath ("Debtors"), a Tennessee based management services organization ("MSO"). Movant submits this Supplemental Brief in support of his (1) Motion for Relief from the Automatic Stay (the "Stay Motion") and (2) Emergency Motion to Stay Plan Solicitation and Voting and to Strike Improper Third-Party Releases (the "Plan Motion"). This filing updates and reinforces the Motions in light of recent legal developments and in anticipation of arguments by Debtors' counsel (McDermott Will & Emery) opposing the relief. Movant's aim is to preserve all judicial and regulatory rights and to present an unassailable legal position prior to the confirmation hearing set for April 30, 2025, in these Chapter 11 cases.

The core issues before the Court are straightforward:

- **Impermissible Non-Debtor Releases:** The Debtors' proposed Plan contains broad third-party release provisions that violate binding precedent and fundamental bankruptcy law. In *Harrington v. Purdue Pharma L.P., 144 S. Ct. 105 (2024)* the U.S. Supreme Court **held that the Bankruptcy Code does not authorize non-consensual third-party releases in Chapter 11**

---

5 | P a g e

**plans.** This landmark decision settles any doubt that a plan may **not** extinguish claims against non-debtors without the affected claimants' genuine consent. The Fifth Circuit has long taken the same position (*In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009); *In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995)), prohibiting non-consensual releases of third-party liability. Accordingly, the Plan's third-party release provisions are **unenforceable and must be stricken** as a matter of law.

- **Plan Proposed by "Means Forbidden by Law" (11 U.S.C. § 1129(a)(3)):** The Plan, as structured, would sanction ongoing violations of law and public policy, rendering it unconfirmable for lack of good faith and legality. Specifically, the Debtors' business model raises red-flag compliance issues under state **corporate practice of medicine ("CPOM") laws,** which prohibit corporations from unlawfully employing physicians or controlling medical practice. Confirmation of a plan that perpetuates such violations would contravene the requirement that a plan not be proposed by any means forbidden by law. Furthermore, the Plan appears to shield insiders and executives from accountability (through releases and otherwise) despite credible allegations of **whistleblower retaliation** and potential breaches of fiduciary duties (including under ERISA) and tax compliance failures (26 U.S.C. § 409A). Using Chapter 11 to cleanse or immunize such misconduct is fundamentally inconsistent with the good faith requirement of § 1129(a)(3). The Plan, in its current form, is thus **unconfirmable** as a matter of law and public policy.

- **Relief from Stay for Cause:** Given the above, Movant seeks relief from the automatic stay to pursue and preserve his rights and to allow appropriate regulatory and legal processes to proceed. "Cause" exists to lift the stay under 11 U.S.C. § 362(d)(1) because the automatic stay is being used by the Debtors as a sword to halt Movant's protected whistleblower activities

and to impede enforcement of laws (such as state medical regulations and federal benefit protections) that are **not suspended by bankruptcy**. The Bankruptcy Code's purpose is to give an honest debtor a fresh start *within the confines of law*, not to act as a safe harbor for unlawful conduct or to preempt valid police power enforcement. Allowing Movant (and relevant regulators) to proceed will not prejudice the estate—indeed, it will ensure the reorganization, if any, occurs on a lawful foundation—while continued imposition of the stay gravely harms Movant and the public interest by delaying or denying resolution of vital compliance issues.

Movant files this Supplemental Brief to assist the Court and parties by marshalling the most pertinent legal authorities and factual context. The goal is to preempt foreseeable opposition arguments and to demonstrate, in a professional and fact-focused manner, why the relief sought is not only warranted but necessary to uphold the integrity of the Chapter 11 process. Movant respectfully submits that granting the Motions will preserve important rights and set appropriate boundaries in advance of confirmation, thereby streamlining the issues for the April 22, 2025 hearing and avoiding later reversals or interventions by appellate courts and regulators.

**Factual and Procedural Background**

**1. The Chapter 11 Case and Movant's Involvement:** Wellpath Holdings, Inc. and its affiliates ("Wellpath" or "Debtors") filed these Chapter 11 cases in late 2024 amid financial and legal distress in their healthcare operations. Wellpath does business in medical and behavioral health services in correctional and institutional settings across multiple states. **Dr. Kanwar Partap Singh Gill** ("Dr. Gill") is a licensed California physician who currently serves as a senior staff physician with California Forensic Medical Group (CFMG), a professional medical corporation. In this role, Dr. Gill identified and formally reported systemic legal and regulatory

7 | P a g e

First Declaration of Dr Kanwar Partap Singh Gill MD, 8408 N Ann Ave Fresno CA 93720 April 19th, 2025 (Notarized)        Page 265

violations within the Debtors' operational model, including: the unlawful delegation of clinical oversight to non-physicians; interference in medical decision-making; and widespread breaches of California's Corporate Practice of Medicine (CPOM) doctrine, as codified in Business and Professions Code §§ 2400–2417. He raised these concerns through internal channels, corporate leadership, and external agencies, including the Medical Board of California. His reports alleged that Wellpath—a management services organization without lawful physician ownership in California—was exerting de facto control over physician employment, disciplinary procedures, and clinical operations in direct violation of California law and binding precedent (e.g., *People v. Cole*, 38 Cal. 2d 99 (1951); *Conway v. State Bd. of Med. Exam'rs*, 47 Cal. App. 2d 105 (1941)).

Rather than investigate or address these concerns, the Debtors and their affiliates engaged in escalating retaliation. This included HR investigations conducted by non-physicians lacking California licensure or legal authority; removal from clinical leadership responsibilities; exclusion from medical meetings; and scheduling disruptions that interfered with patient care. These actions were part of a sustained pattern of constructive termination. Nonetheless, Dr. Gill **remains employed** in his role at the Fresno County Adult Detention Facility and has thoroughly documented his protected activity in anticipation of regulatory and judicial proceedings. His disclosures—concerning CPOM violations, misappropriated deferred compensation, ERISA noncompliance, and administrative interference in patient care—are the subject of ongoing complaints before the Medical Board of California, the U.S. Department of Labor, and the Equal Employment Opportunity Commission. These facts constitute clear violations of California Labor Code § 1102.5 and applicable federal anti-retaliation laws and are central to Dr. Gill's claims in this Chapter 11 case, as set forth in Docket Nos. 1897, 2049, and 2075.

**2. Dr. Gill's Claims and Standing:** As a result of these events, Dr. Gill holds significant claims and rights in this case. While he remains employed by CFMG, he has been subjected to ongoing retaliation and constructive termination efforts, giving rise to an unsecured claim for damages related to retaliatory conduct, including reputational harm, interference with employment conditions, and legal expenses. He may also hold (or represent) claims based on breaches of fiduciary duty—such as potential ERISA violations in the administration of deferred compensation—and statutory protections, including whistleblower and regulatory enforcement provisions. As a physician with firsthand knowledge of ongoing legal violations, Dr. Gill has standing as a party-in-interest to object to any Chapter 11 plan that would perpetuate unlawful practices or release liable parties. His standing is reinforced by the concurrent interest of the United States Trustee and state regulators in these issues (including the U.S. Trustee's lead role in *Harrington v. Purdue Pharma*). Dr. Gill's position as both a creditor and whistleblower uniquely qualifies him to raise the objections asserted herein.

**3. The Debtors' Plan and Disclosure Statement:** The Debtors have proposed a Chapter 11 Plan (the "Plan") which, according to the Disclosure Statement conditionally approved on or about March 14, 2025, contemplates a reorganization sponsored by the Debtors' private-equity owners and management. The Plan, as currently on file, contains *extremely broad* **third-party release** provisions. In substance, it proposes to **release and permanently enjoin** any claims or causes of action that third parties (such as Dr. Gill or other creditors, and potentially governmental entities) might have against a host of non-debtor parties – including the Debtors' officers, directors, managers, investors, and affiliated entities – for any acts or omissions occurring before the Plan's effective date. These releases are to be imposed on creditors *regardless of whether a creditor affirmatively agrees*. The Plan's mechanism is effectively an "opt-out" release: if a claimant does not object or

return a form to opt out (or in some cases even if they do, per the breadth of the injunction language), that claimant is deemed to **consent** to waiving all such claims. Dr. Gill, along with certain other parties, objected strenuously to these provisions at the disclosure stage. In response, the Debtors insisted on moving forward with solicitation, effectively deferring the dispute to confirmation.

Additionally, the Plan does not appear to address or cure the **CPOM issues** identified by Dr. Gill. The Debtors intend to continue their operations post-confirmation in substantially the same corporate form, which would mean continuing to employ physicians and other providers in states that prohibit such arrangements absent specific exceptions. Nowhere do the Plan or Disclosure Statement describe any restructuring of corporate entities or compliance measures to resolve these known legal problems. The Plan similarly provides no dedicated treatment or carve-out for potential liabilities under **ERISA** or **Section 409A of the Internal Revenue Code** related to the Debtors' executive compensation and benefit programs. Dr. Gill is aware of, for example, certain deferred compensation, if not timely honored or exempted, could trigger Section 409A penalties for Dr. Gill and all similarly situated individuals. The Plan's current treatment would effectively cancel or indefinitely delay some of these payouts, an outcome that carries significant tax consequences.

Finally, context is critical: **internal communications** (attached as part of Exhibit 2) demonstrate that prior to bankruptcy, Dr. Gill and others internally raised alarms about compliance problems – including formal reports to human resources and management about the CPOM concerns and possibly unsafe or unethical practices. Rather than act on these reports, the Debtors' leadership (some of whom remain in control during the Chapter 11) sought to suppress them. This pattern of behavior sets the backdrop for Dr. Gill's Motions. It shows that the Debtors entered bankruptcy

with the intent to use the process to *silence whistleblowers* and shield insiders, rather than to transparently address the company's issues.

**4. The Pending Motions:** In light of the above, Dr. Gill filed the two Motions now before the Court:

- **The Stay Motion (Dkt. 1897)** seeks relief from the automatic stay to allow Dr. Gill to take actions that should not be stayed i and n the first place or that constitute "cause" for lifting the stay. This includes permitting Dr. Gill to (a) continue to pursue any pending whistleblower or retaliation litigation against the Debtors (to liquidate his claim or obtain injunctive remedies), (b) make necessary reports to regulatory and licensing authorities regarding Debtors' ongoing CPOM violations or other public safety concerns, and (c) if appropriate, commence actions against individual wrongdoers (such as suits against officers for ultra vires or willfully unlawful conduct) which the Debtors' Plan would otherwise improperly enjoin. The Stay Motion provided notice of the *police and regulatory powers* exception under 11 U.S.C. § 362(b)(4), arguing that to whatever extent Dr. Gill's efforts align with enforcement of health and safety laws, they are outside the stay. In an abundance of caution, however, the Stay Motion asks for an explicit order confirming that Dr. Gill may proceed.

- **The Plan Motion (Dkts. 2049 & 2075)** seeks emergent relief to halt the Plan solicitation/voting process and to strike the impermissible third-party release provisions before votes are counted or the confirmation process proceeds on a false premise. Dr. Gill filed this Motion because the inclusion of unlawful releases in the Plan materials is highly prejudicial: it puts creditors to a Hobson's choice (needing to opt out or object individually to avoid losing rights) and creates confusion about creditors' rights. Moreover, moving forward with a plan that, on its face, contains provisions contrary to

Supreme Court and Fifth Circuit law wastes estate resources and court time. The Plan Motion thus urged the Court to **pause** solicitation until the offending provisions are removed or, alternatively, to formally notify creditors that those provisions will not be approved, thereby ensuring an informed and lawful voting process. The Plan Motion also reiterates that the Plan as proposed cannot be confirmed under § 1129(a)(3) due to its unlawful aspects (releases, CPOM, etc.), and that proceeding with solicitation without curing these defects undermines the integrity of the process.

**5. Subsequent Developments:** The United States Supreme Court's decision in *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 105 (2024), issued in June 2024—well before the filing of these Motions in March 2025—resoundingly confirms Dr. Gill's position regarding the impermissibility of non-consensual third-party releases under the Bankruptcy Code. That decision is discussed in detail below and provides binding authority relevant to the relief requested here.

On April 10, 2025, Dr. Gill (acting pro se) sent a comprehensive Legal Notice Email (attached as Exhibit 1) to the Debtors, their counsel, the U.S. Trustee, and several regulatory agencies. The notice outlined the structural and statutory violations embedded in the proposed Plan and formally put all parties on notice of Dr. Gill's intent to assert and preserve these objections. Among other issues, the notice emphasized that confirming the Plan in its current form could violate bankruptcy law and trigger oversight or enforcement actions by agencies such as the Medical Board of California, the U.S. Department of Labor, and the Internal Revenue Service.

With the confirmation hearing imminent (April 30, 2025), and the U.S. Trustee and other creditors having also raised objections to the Plan's non-debtor releases, the issues are now fully joined. Rather than risk delay or reversal on appeal, Dr. Gill respectfully urges the Court to grant the requested relief now: lift the stay for cause,

strike the unlawful third-party releases, and ensure the Plan complies with governing law before proceeding to confirmation. Doing so will conserve judicial resources and uphold the integrity of the confirmation process.

**Argument and Authorities**

## I. Relief from the Automatic Stay Should Be Granted for Cause to Allow Enforcement of Important Rights and Laws

Under 11 U.S.C. § 362(d)(1), the Court *"shall"* grant relief from the automatic stay "for cause." Cause is not rigidly defined in the Code; it is a flexible standard, left to the Court's discretion on the facts of each case. Here, ample cause exists to lift or modify the stay so that Dr. Gill and pertinent regulatory authorities may proceed with actions that are outside the proper scope of the bankruptcy stay and essential to protect public interests.

### A. The Stay Was Not Meant to Shield Ongoing Legal Violations or Suppress Regulatory Oversight

The automatic stay is a shield intended to protect the debtor's estate from a chaotic scramble by creditors for assets, thereby giving the debtor a breathing spell to reorganize. It was **never intended to be used as a sword to violate the law with impunity.** Bankruptcy does not grant a debtor a license to ignore non-bankruptcy law. In fact, the Bankruptcy Code expressly excepts governmental police and regulatory actions from the stay (11 U.S.C. § 362(b)(4)), recognizing that a debtor's operations must remain subject to the rule of law and public safety regulation even during reorganization.

Here, the Debtors operate in a heavily regulated industry – healthcare – where compliance with state medical licensing laws is paramount. Dr. Gill's whistleblower

reports (see Exhibits) include allegations that Wellpath's corporate structure and practices violate state CPOM doctrines. For example, **California's CPOM prohibition "prevents corporations and other artificial entities from practicing medicine"** and from employing physicians directly to provide patient care. Many other states have similar laws or regulations to ensure medical decisions remain in the hands of licensed professionals, free of commercial conflicts. If Wellpath's pre-petition structure indeed ran afoul of such laws (a matter which Dr. Gill's evidence supports), then every day that it continues business-as-usual in bankruptcy is another day of legal violation. The automatic stay **should not be twisted into an injunction that bars state authorities or whistleblowers from addressing these ongoing violations.** Cause exists to lift the stay to allow notification and involvement of the appropriate regulators (e.g., state Medical Boards, state Attorneys General, or Departments of Health) so that they may investigate and, if warranted, take action to enforce their laws. To the extent regulators themselves choose to act, § 362(b)(4) already permits it; to the extent Dr. Gill needs to assist or initiate the process by providing information or even filing complaints, the stay should be modified to permit that.

Likewise, any effort by the Debtors to use the stay to stymie federal oversight must be rejected. If there are potential ERISA violations (for instance, if the Debtors mishandled employee health plan funds or pension contributions), the U.S. Department of Labor could have an interest. If there are § 409A deferred compensation implications, the IRS could be involved—notably, severe tax consequences fall on employees if deferred compensation is not handled properly. Under 26 U.S.C. § 409A, this includes immediate income inclusion of the deferred amount, an additional 20% federal tax penalty, and penalties on interest for late tax payments. In addition, the California Franchise Tax Board imposes a separate 5% state tax penalty on nonqualified deferred compensation that violates § 409A. These

cumulative federal and state penalties can result in substantial and unjust financial harm to affected individuals. Dr. Gill seeks stay relief to ensure that informing and coordinating with such agencies is allowed. The estate should not be hermetically sealed off from lawful oversight.

## B. Cause Exists to Allow Whistleblower Claims and Related Litigation to Proceed in a Competent Forum

Dr. Gill's personal claim for whistleblower retaliation is a core element of his rights. While liquidating that claim could occur in this Court, the nature of the claim (involving factual issues of employment law, possibly discrimination or retaliation statutes, and medical industry standards) may be more appropriately handled in a specialized forum (for example, a federal district court or through an administrative process if it implicates laws like the False Claims Act or state whistleblower statutes). Courts often consider a variety of factors ("Curtis factors," from *In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984), and adopted by many courts) when deciding whether to lift the stay to allow pending litigation to continue: these include judicial economy, whether specialized expertise is needed, whether insurance or third parties are available to satisfy a judgment, and whether resolving the outside litigation would aid the bankruptcy case by liquidating claims.

Here, those factors favor lifting the stay:

- **Prejudice to the Estate if Stayed vs. Lifted:** Keeping the stay in place prejudices Dr. Gill severely — it delays his day in court and potentially muzzles his claims until after plan confirmation (by which time Debtors hope to extinguish them via releases). In contrast, allowing the litigation to proceed would not materially prejudice the estate; if anything, it may expedite a resolution (the claim could be liquidated to a judgment or settled, clarifying Dr. Gill's creditor status). The Debtors have been aware of his claims and can

budget or insure for that contingency. There is no serious risk to reorganization from litigating a single claimant's lawsuit, particularly if tailored stay relief is granted (e.g., allowing proceeding through judgment but requiring enforcement actions to come back to this Court).

• A retaliation or whistleblower case brought by a California resident— particularly under the **California Whistleblower Protection Act, California Labor Code §§ 1102.5 et seq.,** or relevant **FEHA provisions**—may invoke statutory frameworks that are distinct from those typically addressed under the Bankruptcy Code. Additionally, federal statutes such as **Title VII, Sarbanes-Oxley,** or **Dodd-Frank** may apply depending on the nature of the protected activity (e.g., reporting of fraud, discrimination, or unsafe conditions). These claims often provide for **jury trial rights**, statutory damages, and non-bankruptcy remedies, and are usually handled in **state superior courts** or **federal district courts** with jurisdiction over civil rights and labor matters.

• While the bankruptcy court has jurisdiction to address claims against the estate, where a whistleblower retaliation claim involves **non-bankruptcy federal or state law**, and requires **factual development beyond the bankruptcy record,** cause exists to allow the matter to proceed in its **natural forum.** Doing so protects due process, avoids procedural prejudice, and ensures full and fair adjudication of rights under **state public policy protections** for healthcare whistleblowers—especially where protected activity relates to **patient safety, medical licensing, or state corporate practice of medicine (CPOM) violations.**

• **Overlapping Parties and Non-Debtor Interests:** Dr. Gill's allegations likely involve not just Debtor entities but also individuals (e.g. specific executives who retaliated, or the Debtors' private equity owners if they directed unlawful acts). Some of those individuals are *not* debtors in this

16 | P a g e

Court. The automatic stay does not protect non-debtor third parties by default. (Any extension of the stay or injunction to them would be an extraordinary measure – effectively akin to the non-debtor releases that, as discussed below, are not authorized under law except in narrow circumstances.) Thus, absent the Plan's attempted third-party injunction, Dr. Gill could sue those individuals now. Judicial efficiency would counsel that all defendants (Debtor and non-Debtor) be tried together. Continuing the stay only as to the Debtor might result in duplicative proceedings – something that stay relief can cure by allowing the entire case to move forward as one.

- **Public Policy Favoring Whistleblowers:** Both Congress and the courts have repeatedly emphasized strong public policy in favor of protecting whistleblowers and allowing retaliation claims to be heard. In the context of a bankruptcy, this policy translates to recognizing that silencing a whistleblower by use of the automatic stay is an abuse of the stay's purpose. Dr. Gill's role in highlighting healthcare compliance issues potentially benefited patients and the integrity of the Debtors' business. Courts should be wary of any scenario in which a debtor might attempt to use the bankruptcy stay as a tool to *avoid accountability for retaliatory conduct.* Granting stay relief aligns with the broader statutory schemes that protect such employees. (For example, Sarbanes-Oxley's whistleblower provisions, while perhaps not directly applicable to this private company, reflect a national policy that whistleblowers should be able to report and, if retaliation occurs, to seek redress swiftly.)

In sum, continuing to stay Dr. Gill's ability to litigate his claims or pursue related rights does not meaningfully advance the Debtors' reorganization – it only serves to postpone an inevitable reckoning and to give the Debtors procedural leverage to try to eliminate those claims through a plan. That is not "breathing spell"; that is

procedural warfare. **Cause exists to lift the stay now** so that Dr. Gill can proceed to protect his interests and the public interest, while this Court retains oversight to ensure no prejudice to the estate's orderly administration.

## C. The Debtors' Anticipated Objections to Stay Relief Lack Merit

Movant anticipates that the Debtors (through counsel, McDermott Will & Emery) will oppose stay relief, perhaps arguing that Dr. Gill's issues can or should be addressed at confirmation or that the stay should remain in place to avoid interference with the bankruptcy. Those arguments should be rejected:

○    **"Confirmation, not Stay Relief, is the Proper Stage"**: Debtors may say that Dr. Gill's complaints about releases or plan provisions should be dealt with at confirmation, not via a lift-stay motion. This misses the mark. The Stay Motion is not asking the Court to decide plan confirmation now; it is asking the Court to permit certain external processes to continue in parallel. That is a distinct question. Indeed, even if the Court were to ultimately deny confirmation (or if the Debtors withdraw the offending releases), Dr. Gill still needs relief from stay to pursue claims that will survive or exist outside of bankruptcy. Conversely, if the Plan were somehow confirmed with releases intact, Dr. Gill would have lost his chance to press his rights. So, waiting until confirmation effectively denies him any relief under § 362(d) when he is entitled to it now.

•    **"Distraction and Cost to the Estate"**: Debtors might argue that allowing litigation or regulatory actions will distract management or impose costs, harming the reorganization. The reality is, the *greater distraction and cost will come from not addressing these issues*. If regulators are kept in the dark now, they could come in post-confirmation and impose far more draconian measures (including potentially revoking licenses or imposing

fines) that could scuttle the reorganized company. If Dr. Gill's claims are not addressed now, they will result in appeals and collateral attacks later (for example, a challenge to the confirmation order's releases, which could embroil the estate in protracted appellate litigation). By contrast, granting stay relief and confronting the issues in the proper fora can *reduce* long-term costs. The management is already spending estate resources to resist Dr. Gill (through legal fees fighting these motions); those resources would be better spent resolving his claims in earnest.

- **"No Showing of Likely Success":** In some contexts, debtors argue that a movant should show a likelihood of success on the merits of the litigation to justify stay relief. To be clear, § 362(d)(1) does not explicitly require such a showing – "cause" can exist for many reasons. Regardless, Dr. Gill's underlying claims are substantiated by documents and testimony (as will be shown in the other forum). More importantly, the legal issues he raises (CPOM, releases, etc.) are not speculative; they are concrete violations. The Supreme Court's decision in *Purdue Pharma* alone vindicates his stance that third-party releases are illegal. The Court need not prejudge the entire whistleblower case to see that there are serious questions deserving to be tried. It suffices that Dr. Gill's position is far from frivolous; it is meritorious enough that multiple public authorities are interested (the U.S. Trustee's involvement in *Purdue* shows the gravity of release issues, and state regulators have expressed concerns in similar cases of corporate medicine). In any event, even if success were uncertain, the balancing of harms (immediate irreparable harm to Dr. Gill vs. minimal harm to Debtors) supports lifting the stay.

In conclusion on this point, **Dr. Gill respectfully requests that the Court grant relief from the automatic stay** to the extent necessary to allow: (a) the

commencement or continuation of any legal proceedings by Dr. Gill related to his whistleblower retaliation claims or related causes of action against non-debtor parties; (b) the reporting of, and cooperation with, any government or regulatory entity in investigations of the Debtors' conduct (including CPOM issues and any other health/safety compliance matter); and (c) any actions by governmental units in respect of the foregoing. By granting such relief, the Court will ensure that it is not inadvertently sheltering wrongdoing under the umbrella of the stay and that any reorganization will proceed in tandem with, not in contravention of, applicable law and justice.

## II. The Debtors' Chapter 11 Plan Contains Impermissible Provisions – Including Third-Party Releases – that Render it Unconfirmable under 11 U.S.C. § 1129(a)(1) and (a)(3) and Must Be Removed or Stricken

Perhaps the most urgent issue prompting this Supplemental Brief is the Debtors' insistence on Plan provisions that are flatly inconsistent with the law. Chief among these is the Plan's broad **non-debtor release** (and related injunction) that would force Dr. Gill and other stakeholders to relinquish claims against a host of third parties without their affirmative consent. This section of the brief addresses why those release provisions cannot stand (Part II.A) and then turns to other Plan infirmities – specifically, violations of law such as CPOM (Part II.B), potential ERISA/409A problems (Part II.C), and the overall lack of good faith given the context of whistleblower retaliation (Part II.D) – all of which compel a conclusion that the Plan as proposed violates § 1129(a)(3)'s mandate that a plan be proposed in good faith and not by any means forbidden by law. In short, **the Plan is unconfirmable in its present form**. Consequently, solicitation of votes on such a Plan is improper, and the Court should require the Debtors to amend or strike the offending provisions before moving forward. If the Debtors refuse, the only legally correct outcome would be to deny confirmation on these grounds.

## A. The Plan's Non-Consensual Third-Party Releases Are Prohibited by Supreme Court and Fifth Circuit Precedent

The Plan's release provisions seek to discharge non-debtor parties (insiders, owners, and others) from liability for a wide array of claims, even if a creditor does not consent. This is exactly the kind of overreach that courts at all levels have condemned:

- **Supreme Court (2024) – Harrington v. Purdue Pharma:** In June 2024, the Supreme Court emphatically held that **"the Bankruptcy Code does not allow for the inclusion of non-consensual third-party releases in chapter 11 plans."** The Court in *Purdue Pharma* reversed a confirmation order that had granted releases to the Sackler family (non-debtor owners of Purdue) as part of a settlement. It found no statutory authority in Chapter 11 for such releases outside the specific asbestos context in § 524(g). The Supreme Court clarified that a plan cannot "provide for the release of claims against non-debtors without the consent of the claimants." This decision resolved a long-standing split among circuits. It aligned squarely with the Fifth Circuit's approach (more on Fifth Circuit law below) and rejected the more lenient approach of other circuits (Second, Third, etc.). The Supreme Court further underscored that plan proponents cannot do an "end-run" around the Bankruptcy Code's limits by simply labeling a discharge as a "release." In a particularly apt passage, the Court noted that in the Purdue plan, the Sacklers were obtaining a benefit far beyond what the Code permits: they "[sought] an order discharging a broad sweep of present and future claims against them" even including fraud and willful misconduct claims, all while not being debtors themselves and not surrendering all their assets. **"Plan proponents cannot evade [the Code's] limitations simply by rebranding**

their discharge a 'release.'" {supremecourt.gov} That is precisely what the Debtors here attempt with their third-party release.

The Supreme Court's ruling leaves no doubt that **non-consensual releases are not allowed**. It did, however, make a point to say the decision was "narrow" in that it does not prohibit truly consensual releases or certain forms of settlement where creditors *affirmatively* agree {supremecourt.gov}. The Court expressly did **not** opine on what counts as "consent" in this context (for example, it did not decide whether an "opt-out" mechanism can constitute consent). This means that in situations like the present case, where the Debtors will likely argue that silence or failure to opt-out equals consent, there is a live legal question. But one thing is beyond dispute: any creditor like Dr. Gill who **objects** to the release or opts out cannot be deemed to have consented. For such a non-consenting creditor, a third-party release is forbidden, full stop. And the Plan here would bind even those who object — making it squarely a non-consensual release as to at least some creditors.

- **Fifth Circuit – Longstanding Prohibition on Non-Debtor Releases:** Even before the Supreme Court spoke, the Fifth Circuit's jurisprudence barred what the Debtors attempt in their Plan. In *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009), the Fifth Circuit struck down a plan's non-debtor release and exculpation provisions, except as to a narrow class of estate fiduciaries. The Court noted that, outside of the specific asbestos provision in § 524(g), nothing in the Code permits a bankruptcy court to **absolve non-debtors of liability to third parties**. It cited Bankruptcy Code § 524(e), which states that the discharge of a debtor **"does not affect the liability of any other entity on, or the property of any other entity for, such debt."** 11 U.S.C. § 524(e). The Fifth Circuit has repeatedly interpreted § 524(e) to **mean exactly what it says: a debtor's bankruptcy cannot discharge the liabilities of third**

parties. As the Fifth Circuit explained in *Pacific Lumber*, **"In a variety of contexts, this court has held that Section 524(e) only releases the debtor, not co-liable third parties.".** The court emphasized that the fresh start provided to the debtor by bankruptcy law "is not intended to serve [the] purpose" of wiping away the liabilities of others. *Consequently, the Fifth Circuit ordered that "the non-debtor releases must be struck"* (except as to the official Creditors' Committee, which was given a limited exculpation for its role in the case).

Even earlier, in *In re Zale Corp.*, the Fifth Circuit warned that a bankruptcy court cannot approve a release that effectively discharges the liability of a non-debtor. In *Zale*, an injunction was proposed to protect a settling third-party, and the Fifth Circuit held that was beyond the bankruptcy court's power absent specific authorization. The court observed that **"§ 524 prohibits the discharge of debts of nondebtors"** and that allowing such releases would improperly extend bankruptcy benefits to entities who had not themselves filed for relief.

The upshot is that **within the Fifth Circuit, non-consensual third-party releases have been generally impermissible for decades.** Debtors' counsel, McDermott Will & Emery, is surely aware of this; yet the Plan they drafted for Wellpath contains exactly such a release. The only arguable wiggle room they might claim is that a creditor can opt out of the release. But an "opt-out" scheme effectively binds everyone who doesn't take affirmative action. Many courts (including the Fifth Circuit in other cases) have expressed skepticism that failing to opt out is true "consent." After *Purdue*, that skepticism is even stronger. The Supreme Court explicitly flagged the open question of **whether passive "deemed consent" via silence is valid.** Given the constitutional due process concerns and contractual nature of a release, consent should mean an

affirmative agreement – a creditor's *express* willingness to release claims in exchange for negotiated consideration. The Debtors here did not negotiate releases individually with Dr. Gill (or most creditors); they just inserted a blanket release in the Plan. Dr. Gill, for his part, has *not consented* – he has formally opted out and objected. Therefore, as to Dr. Gill (and others similarly situated), the Plan is unquestionably proposing a non-consensual release, which is illegal.

- **No Extraordinary Circumstances Exist to Justify a Non-Debtor Release:** Historically, even circuits that allowed some non-debtor releases did so only in "extraordinary" cases, such as mass tort situations where the injunction was integral to a global settlement (and even those are now called into doubt by *Purdue*). Here, there is nothing extraordinary to justify third-party releases. This is not an asbestos case with a channeling trust authorized by Congress. This is not a situation where, say, a third-party is contributing an astronomical sum *in exchange* for a release that is the linchpin of a victim compensation fund (as was argued in *Purdue* – and even there the Supreme Court said that policy argument cannot override the statute {supremecourt.gov}). To the contrary, here the releases seem designed to simply protect the Debtors' shareholders, executives, and affiliated management companies from any accountability – essentially to launder away potential state law fraud, breach of duty, or malpractice claims that creditors or government agencies might have. **There is no consideration to creditors for these releases**; they are one-sided gifts. They are not essential to the reorganization – indeed, the Debtors have not articulated any scenario where, for example, a particular insider will refuse to perform under the Plan absent a release. Even if they had, that kind of coercion was rejected in *Purdue*: the Sacklers had said they wouldn't contribute billions without a release, but the

Supreme Court held that such policy leverage cannot overcome the lack of legal authority {supremecourt.gov}. The same logic applies: an unwilling funder cannot force an illegal term into a plan.

Given the clear law, the conclusion is inescapable: **the Court should refuse to approve the Plan's third-party releases**. At a minimum, the Court should strike those provisions or obtain the Debtors' agreement to amend the Plan to remove them. If the Debtors will not remove them, then the Plan cannot be confirmed under 11 U.S.C. § 1129(a)(1) (which requires the Plan to comply with the applicable provisions of the Bankruptcy Code – here, the releases violate § 524(e) and the confirmation standards) and § 1129(a)(3) (a plan proposing relief forbidden by law is not proposed "in good faith").

**Anticipated Debtor Argument (and Rebuttal):** Debtors may try to salvage the releases by arguing: (1) they are consensual because creditors could opt out; (2) they are fair or customary; or (3) the Court could confirm the Plan but simply not enforce the releases as to objectors (i.e., sever the clause as to Dr. Gill but still bind others). None of these hold water:

1.   **"Deemed Consent via Opt-Out"** – Deeming consent from inaction is highly dubious, especially post-*Purdue*. Many creditors might not understand the need to opt out (or might not even receive the solicitation package due to outdated addresses, etc.), and treating them as if they signed a release is arguably a violation of due process. The Supreme Court's reservation of this issue suggests caution: the safe approach for the Court is to require affirmative consent (such as a vote **and** a checked box agreeing to the release). Dr. Gill and others have not affirmatively consented – indeed, they vehemently object – so as to them, the releases are non-consensual. The Plan does not even provide a mechanism to exclude specific objectors from the

release; it's an all-or-nothing proposition. Thus, it is non-consensual in design and effect.

2.    **"Releases are Customary/Harmless"** – While some debtors have included boilerplate third-party releases in plans in recent years, that was a risky practice even before *Purdue* and is now a largely defunct one. In the Fifth Circuit, the custom was always constrained by *Pacific Lumber*: typically, debtors here either did not include third-party releases or, if they did, they limited them to parties who voted yes on the plan (affirmative consent) or they provided an opt-in. The Debtors' counsel coming from outside jurisdictions might have been tempted to copy-paste a broader provision, but *custom* is not law. Moreover, releasing claims against non-debtors is far from harmless – it could extinguish legitimate rights. For instance, if Dr. Gill has a tort claim against an executive for fraudulent inducement (hypothetically), the release would nullify it. If a patient's family had an independent claim against an executive for a healthcare decision (outside the bankruptcy claim against the corporate Debtor), the release might cut that off too. Those are significant substantive rights being taken without compensation. There is nothing equitable or benign about that.

3.    **"Sever or don't enforce as to objector"** – Debtors might fall back and say, well, if Dr. Gill doesn't consent, then he's not released, but that shouldn't stop confirming the Plan for everyone else. But then one must ask: how is the Plan in the best interests of creditors or fair and equitable if some get bound and some don't? More critically, if the Court fashions an opt-out for Dr. Gill by judicial fiat, that is effectively re-writing the Plan's terms on the fly. Other creditors who maybe missed the opt-out might also deserve the same treatment. It becomes unworkable and creates disparate outcomes. The cleaner approach is to excise the non-debtor release provision entirely (or require the Debtors to modify it to an opt-IN release where only those who knowingly

and voluntarily sign on are bound). The Court has authority under § 105(a) to strike improper provisions and under § 1127 to order modifications before confirmation if necessary to comply with the law.

In summary, **the Plan's third-party release and injunction provisions violate the Bankruptcy Code and binding precedent.** Dr. Gill requests that the Court rule, prior to or at confirmation, that such provisions will not be approved. This relief is sought in the Plan Motion and is necessary to avoid tainting the solicitation and confirmation process with unlawful terms. It will also preserve the rights of Dr. Gill and similarly situated parties to pursue claims against non-debtors after confirmation, which, as shown, they are entitled to do.

**B. The Plan Would Facilitate the Debtors' Violation of State Corporate Practice of Medicine (CPOM) Laws, Thus Being Proposed "By Means Forbidden By Law" and Not in Good Faith**

A bankruptcy reorganization plan cannot require participants to break the law, nor can it legalize a debtor's unlawful conduct. Section 1129(a)(3) explicitly conditions confirmation on the plan being *"proposed in good faith and not by any means forbidden by law."* (Emphasis added.) This imposes a duty on the plan proponent to ensure that implementation of the plan will not involve illegal acts. In this case, the Debtors' Plan fails that test because it does nothing to address – and indeed implicitly condones – the Debtors' ongoing **CPOM violations.**

To recap, "Corporate Practice of Medicine" doctrines are state laws that bar corporations (especially non-professional corporations owned by laypersons or private equity firms) from employing physicians or practicing medicine. The idea, as codified for example in California, is that **medical decisions should be made by licensed professionals, not driven by corporate profit motives,** and that lay entities should not profit from providing physicians' services except through

27 | P a g e

statutorily authorized structures. California's Business & Professions Code § 2400, for instance, states that **"corporations and other artificial entities shall have no professional rights, privileges, or powers" in the practice of medicine,** effectively preventing them from employing doctors to treat patients (with only narrow exceptions for certain clinic models or HMOs). Other states have similar statutes or regulations, and some states' medical boards actively enforce these rules. Violation of CPOM can result in fines, injunctions, or loss of license for the physicians involved.

Wellpath's business – providing healthcare in correctional facilities – often involves employing or contracting with doctors, nurses, and other health professionals to deliver care inside jails, prisons, and psychiatric hospitals. If Wellpath operates in a state with a strict CPOM doctrine (like California, Texas (which has CPOM for certain practices), Illinois, etc.), it typically must use a physician-owned professional corporation or association to employ the doctors, or otherwise be structured to comply (such as management services agreements that leave clinical control to physicians). **Dr. Gill's contention, supported by internal documents (Exhibit 2) and his firsthand experience, is that Wellpath was not fully compliant with these requirements pre-petition.** For example, Wellpath Holdings, Inc. (a lay corporation) directly employed many clinical staff in certain states, and decisions about hiring/firing medical personnel or approving treatments were made by non-physician executives beholden to the corporate parent. These arrangements arguably violated state law, meaning the Debtors were regularly engaging in "means forbidden by law."

Now, turning to the Plan: The Plan proposes to reorganize the Debtors and allow them to continue operating the business going forward with a reduced debt load. However, nowhere do the Debtors propose to alter the corporate form or structure of their operations to come into CPOM compliance. One would expect, for instance, a

plan provision that says: *"On the Effective Date, the Reorganized Debtor shall ensure that all physician services in CPOM-prohibited states are provided through appropriately licensed physician entities, and the Debtors shall not employ physicians in those states except through such entities."* There is no such provision. There is not even an acknowledgment of the issue. This indicates that the Debtors either (a) intend to keep violating those laws after emerging from bankruptcy, or (b) have not taken the issue seriously, perhaps assuming (wrongly) that bankruptcy shields them.

**This is a critical problem under § 1129(a)(3).** A plan that contemplates the continuation of illegal conduct is a plan proposed by means forbidden by law. Courts have refused to confirm plans on such grounds in analogous situations – for example, plans involving marijuana-related businesses (which, though legal under state law, violate federal law, thus flunking § 1129(a)(3)) have been denied confirmation because the plan's implementation required ongoing violation of the Controlled Substances Act. By the same token, if Wellpath's plan means it will simply pick up where it left off, employing doctors illegally in some states, then the plan is essentially a blueprint for continuing to break state law. The bankruptcy court should not bless that.

**The Debtors might argue** that § 1129(a)(3) refers to the proposal of the plan, not the content (some courts have parsed "good faith" to focus on the plan process). However, the Fifth Circuit and others have held that a plan which on its face or as a matter of law violates non-bankruptcy law fails § 1129(a)(3). It's not just about the debtor's subjective intent; it's also about what the plan is setting in motion. Here, knowing what they know (because Dr. Gill has amply put them on notice), if the Debtors proceed without addressing CPOM, that is a lack of good faith and a use of forbidden means. The Debtors would effectively be asking this Court to assist them in evading state law, which the Court should decline.

To remedy this, the Debtors would need to amend the Plan to ensure compliance – possibly by restructuring their provider arrangements or including language that voids any plan provision or release that would purport to excuse compliance with medical practice laws. Absent such changes, confirmation must be denied. Dr. Gill has no desire to see the Debtors fail to reorganize; indeed, as a physician who cares about patient care continuity, he would prefer the Debtors succeed legally. But a legal reorganization must involve coming into compliance, not sweeping issues under the rug.

It is also worth noting that this Court's confirmation of a plan that ignores CPOM could inadvertently entangle the Court in those violations. For instance, if post-confirmation an issue arises, the Debtors might try to argue that the confirmation order (a federal court order) somehow preempts or protects them from state enforcement (they might assert concepts like conflict preemption). That would put this Court's order at odds with state law, raising federalism concerns. Far better to avoid that by ensuring the plan itself is lawful and respects state law.

In summary on this point: **The Plan in its current form cannot be confirmed because it is inconsistent with fundamental state health care laws.** The Court should insist that the Debtors either cure this issue or face denial of confirmation under § 1129(a)(3). Good faith in Chapter 11 inherently requires that the reorganized business will be operated within the bounds of the law, especially where a concerned party has brought the violation to light. Dr. Gill stands ready to provide detailed evidence of the CPOM issues at a hearing (including, if necessary, testimony and documents showing how physicians were controlled or influenced by the corporate parent). But even on a prima facie basis, the Debtors' silence on this topic speaks volumes: one cannot propose a plan in good faith while ignoring a known illegality.

## C. The Plan Fails to Adequately Address Potential ERISA and Section 409A Liabilities, Exposing Participants to Penalties and the Estate to Continuing Fiduciary Breach Claims

Another respect in which the Plan appears to be proposed by "means forbidden by law" and in bad faith is its treatment (or lack of treatment) of the Debtors' obligations under **ERISA (Employee Retirement Income Security Act)** and **IRC § 409A** relating to deferred compensation. These are highly technical areas, but the bottom line is simple: the Debtors cannot use the Plan to wash away duties to employees that federal law says cannot be washed away.

**ERISA Issues:** If the Debtors have any qualified retirement plans (e.g., a 401(k) plan) or health plans, ERISA imposes fiduciary duties on the plan administrators and sponsors. While claims for monetary benefits under such plans can be handled in a bankruptcy (they'd be claims against the estate, possibly priority if they are wage-related contributions), what bankruptcy cannot do is allow a plan fiduciary to be absolved of liability for breaching their duties in managing the plan's assets. For instance, if an officer of the Debtors misused employee 401(k) contributions, that officer can't get a release from ERISA liability via a plan. ERISA § 410(a) explicitly states that any provision purporting to relieve a fiduciary of liability is void as against public policy. Yet the Plan's third-party release potentially covers "any claim" including breach of fiduciary duty. This means confirmation of the Plan could conflict with ERISA's anti-exculpation rule.

Furthermore, the Plan contemplates reorganizing and continuing operations. If there were any underfunded pension or benefits issues, the reorganized Debtor must comply going forward. ERISA and the IRS impose excise taxes and penalties for failure to make required contributions to retirement plans. The Plan should provide for cure of any delinquent contributions (to avoid 26 U.S.C. § 4971 taxes or DOL

First Declaration of Dr Kanwar Partap Singh Gill MD, 8408 N Ann Ave Fresno CA 93720 April 19th, 2025 (Notarized)     Page 289

enforcement). Dr. Gill is concerned that some physicians (including himself) had nonqualified deferred compensation agreements that also implicate ERISA (some severance or top-hat plans are subject to ERISA's vesting and funding rules, albeit more loosely). If those are simply wiped out, the individuals may claim breach of contract (which becomes a claim in bankruptcy), but also potentially breach of fiduciary duty if those plans were maintained improperly. The Plan provides no clarity on this, which suggests the Debtors did not fully account for those obligations. Ignoring them could mean post-confirmation lawsuits or regulatory actions – again indicating a lack of comprehensive good faith planning.

**409A Issues:** Section 409A of the Internal Revenue Code governs nonqualified deferred compensation (generally, compensation that an employee earns in one year but that is payable in a future year). It imposes strict timing rules on when elections are made and when payments can be paid. If a payment that was promised at a certain time is delayed beyond a short grace period, or if it is eliminated, the employee faces harsh tax consequences. Specifically, the deferred amount becomes **immediately taxable as ordinary income, an additional 20% federal tax penalty** is imposed under 26 U.S.C. § 409A, and **interest accrues at a premium rate** on the underpaid taxes. Moreover, for California residents, the **Franchise Tax Board** imposes an additional 5% state tax penalty on the deferred compensation, further compounding the financial harm. These consequences are not discretionary—they are automatically triggered by a violation and result in significant, multi-layered tax liabilities even though the employee has not received the promised compensation. Dr. Gill's.

In a bankruptcy context, section 409A often comes into play if a company has deferred salary or bonuses it cannot pay. The IRS does recognize a "going concern" exception that allows delaying a payment if paying it would jeopardize the company's going concernproskauer.com (which often applies in bankruptcy), but

that rule requires that the payment be made as soon as it no longer jeopardizes the business (i.e., effectively, by the time the company is healthy post-reorg). If the Plan simply cancels the obligation or never pays it even when able, then a 409A violation occurs.

Dr. Gill's personal situation illustrates the serious legal and tax implications caused by the Debtors' failure to account for lawful deferred compensation obligations. Dr. Gill is employed by California Forensic Medical Group, Inc. (CFMG), an independent physician-owned professional medical corporation based in California and not a debtor in these proceedings. CFMG contracts with Wellpath Holdings, Inc. and/or its subsidiaries through a Management Services Agreement (MSA), pursuant to which Wellpath—acting as a Management Services Organization (MSO)— provides only non-clinical administrative support. Under California law, such MSOs are strictly limited to non-clinical functions (e.g., billing, HR, IT, office management) and are expressly prohibited from influencing clinical decision-making, hiring or firing medical personnel based on clinical performance, determining treatment plans, or controlling patient medical records. These restrictions are codified to enforce the Corporate Practice of Medicine (CPOM) doctrine, ensuring that only licensed physicians within the PMC control medical judgment and patient care.

Dr. Gill's claim involves unpaid nonqualified deferred compensation that was lawfully deducted from his regular earned salary pursuant to an executed compensation deferral arrangement. The funds were not a severance, bonus, or employer-contributed amount, but represented his own earned income—deferred for legitimate planning purposes. The bankruptcy filing halted these scheduled payments. Under Section 409A of the Internal Revenue Code, if such deferred amounts are not paid within the statutory window—generally by the end of the tax year in which the employer becomes able to pay, or within 2.5 months thereafter—

they become immediately taxable as income, regardless of whether any funds are actually received by the employee. This also triggers a mandatory 20% additional federal tax penalty, interest on late taxes, and for California residents like Dr. Gill, a further 5% penalty assessed by the California Franchise Tax Board. In short, Dr. Gill may be penalized with tens of thousands of dollars in taxes and penalties on compensation he never received—creating a disastrous and inequitable financial outcome. The Plan, as currently drafted, fails to address or remedy this issue and appears to treat Dr. Gill's deferred salary as a general unsecured claim subject to partial or zero recovery. Other physicians and executives with similar deferred compensation arrangements may face identical consequences unless corrective action is taken.

**Why is this a confirmation issue?** Because proposing a plan that causes these outcomes could be considered not in good faith. The Debtors know or should know about their compensation arrangements. To cavalierly cancel them without addressing 409A is to flout tax law and harm individuals beyond normal bankruptcy consequences. A good faith plan proponent would, at minimum, disclose this and possibly structure settlements to mitigate it (for example, paying those deferred amounts upon emergence, or negotiating releases of claims in exchange for something of value that offsets the tax). Doing nothing suggests the Debtors either overlooked it or didn't care because they assume people like Dr. Gill won't have the clout to object effectively.

Moreover, **if any of the released parties in the Plan are fiduciaries or persons who participated in making or breaking these compensation promises, releasing them might itself violate law.** The IRS could still pursue the employer or responsible persons for withholding tax issues etc., but releasing them from creditor claims might cut off employees' ability to seek recompense.

---

**34 | P a g e**

In sum, the Plan's failure to address these employee compensation compliance matters is another facet of it being "by means forbidden by law." It is not that the Plan document explicitly says "we violate 409A"; it's that the result of confirmation would be to ratify actions that trigger those legal penalties. The Court should insist on clarity and compliance. Possibly, the Debtors could resolve this by carving out from the releases any liability related to ERISA/409A breaches and by providing in the Plan that any deferred comp will either be paid or not be deemed discharged such that affected individuals can pursue the reorganized debtor for it when it's able to pay (consistent with 409A's timing rules). Without such modifications, the Plan as is runs afoul of federal tax law policies.

## D. The Circumstances of Whistleblower Retaliation and Concealment of Misconduct Indicate the Plan Was Not Proposed in Good Faith (11 U.S.C. § 1129(a)(3))

Good faith in proposing a plan generally means the plan is intended to achieve a result consistent with the objectives and purposes of the Bankruptcy Code – which are to rehabilitate the debtor while fairly treating creditors, not to be a vehicle for fraud or illegitimate ends. When the architects of a plan have a personal stake in using the plan to shield themselves from wrongdoing or to silence dissent, that calls into question the plan's good faith.

Here, Dr. Gill's experience strongly suggests that one of the driving motives behind the Debtors' plan is to **prevent exposure of, and accountability for, misconduct by current or former insiders.** Dr. Gill was a whistleblower – he internally reported issues (CPOM problems, possibly patient care concerns, maybe financial improprieties – details can be provided under seal if needed, as some involve patient information). Instead of addressing these, the Debtors' top management (who are now shepherding this Chapter 11) retaliated against him, terminating his

35 | P a g e

employment. When the Debtors later filed bankruptcy, they sought to cut off his pending legal claims and, through this Plan, permanently bar him from ever suing the people who wronged him. At the same time, they have not corrected the underlying issues he raised (e.g., CPOM compliance), indicating the bankruptcy process is being used as a cover – to discharge debts and also to wipe the slate clean on their questionable practices without actually correcting them.

This pattern can be viewed as a lack of good faith in the bankruptcy sense. *Chapter 11 is intended as a shield for honest but unfortunate debtors – it is not intended as a haven for wrongdoers to escape the consequences of their non-bankruptcy wrongs.* Courts have dismissed Chapter 11 cases or denied plan confirmation where the debtor's primary goal was to dodge a single big lawsuit or where there was evidence of "new debtor syndrome" (creating an entity to dump liabilities). While this case is a bit different (Wellpath is an ongoing business that truly was in financial distress), the *intent* behind the plan is relevant. If the evidence shows (as Dr. Gill asserts) that significant energy in plan negotiations was devoted to ensuring management and owners get releases and protection, even more than to maximizing creditor recoveries, that is a telltale sign of misplaced priorities – indicative of a plan proposed not *solely* for reorganization but *additionally* for personal protection of insiders.

The inclusion of such broad releases that extend to claims of "willful misconduct" or "gross negligence" (the Plan's definition likely attempts to carve out actual fraud from release, but often not clearly) is evidence of that intent. Contrast: a prototypical good-faith plan might include a limited exculpation covering estate fiduciaries for acts in the bankruptcy (to encourage participation), but wouldn't release pre-petition malfeasance of management.

Additionally, **Dr. Gill's internal communications and emails (Exhibit 2)** demonstrate that there were concerns raised up the chain that were suppressed. For example, an email from Dr. Gill to the then-Chief Clinical Officer outlines specific regulatory violations and warns of consequences. The lack of any action on those shows a mindset of sweeping problems under the rug. Now, that same management team comes to this Court and effectively asks for trust and leniency in confirming a plan that would insulate them. The Court is entitled to weigh this history when evaluating § 1129(a)(3). Good faith is a fact-intensive standard. Here, the facts smell of self-dealing and an attempt to subvert the fairness of the process.

To be clear, Dr. Gill is not making a personal attack for the sake of it; he is highlighting that *from a structural perspective*, the Plan is designed to benefit a select few at the potential expense of law compliance and creditor rights. That is inconsistent with the Code's purpose of equitable distribution and fresh start for the *debtor* (not a liability shield for non-debtors).

In a recent example of judicial skepticism: the confirmation of a plan for a company called Highland Capital Management (in the Fifth Circuit) was affirmed except for an overbroad exculpation clause that protected non-debtor insiders, which the Fifth Circuit struck down in 2022, noting it went beyond what was necessary or permissible. The courts are on guard against abuses of third-party protections. Dr. Gill urges this Court to exercise similar vigilance.

### E. Remedy: Denial of Confirmation or Required Modification

Given the multiple issues above, the Court has essentially two choices:

(1) **Deny confirmation** of the Plan if it remains unmodified, because it fails to meet § 1129(a)(1) (compliance with Code) and § 1129(a)(3) (good faith and legality). This would be the outcome if Debtors insist on pressing forward without change. Such

37 | P a g e

denial would preserve everyone's rights – the Debtors could go back to the drawing board and propose a lawful plan (or convert the case to Chapter 7 if reorganization fails), and Dr. Gill (and others) would not have improperly lost any rights in the interim.

(2) **Condition confirmation on specific modifications** to cure these defects. The Court could, for example, state that it will confirm only if:

- All third-party release and injunction provisions (except perhaps a narrow exculpation for estate fiduciaries for post-petition acts) are removed. Creditors who voted for the Plan can separately execute releases if they choose, but non-consenting parties will not be bound.
- The Plan or Confirmation Order is amended to explicitly require the Reorganized Debtor to comply with all applicable healthcare laws (including CPOM restrictions) and not to utilize the confirmation order as a defense against enforcement of those laws. Possibly require the Debtors to file, within a certain time, a compliance report or plan for restructuring their doctor staffing arrangements in each state.
- The releases are narrowed to exclude any claims related to ERISA plan fiduciary breaches or 409A violations, and to clarify that nothing in the Plan discharges any liability that by law cannot be discharged (e.g., any governmental fines or penalties that are non-dischargeable under § 523 if this were Chapter 7, because although corporate debtors don't get a discharge per se, the plan's injunction shouldn't bar government from enforcing police powers).
- Provide that any deferred compensation or similar obligations to employees that were delayed due to the bankruptcy will be paid as soon as the Reorganized Debtor is able to do so without jeopardizing its operations, consistent with the "going concern" exception under Section 409A of the

Internal Revenue Code. In the alternative, the Plan must expressly preserve the affected employees' rights to seek appropriate relief if the Debtors fail to pay such amounts when able. This provision is necessary to avoid subjecting employees to severe adverse tax consequences—including immediate federal income inclusion, an additional 20% federal tax penalty under 26 U.S.C. § 409A, accrued interest on unpaid taxes, and potential penalties imposed by state taxing authorities such as the California Franchise Tax Board—arising solely from the Debtors' failure to timely fulfill deferred compensation obligations.

- Remove any language that could be construed as retaliation against Dr. Gill or others (for instance, if the Plan had any gag order or non-disparagement clause buried in it – we did not see one, but just to cover bases).

If the Debtors accept such conditions, the plan can potentially be salvaged in a lawful form. If they resist, that itself speaks to priorities (why would a Debtor push so hard for releases unless to protect individuals? If they truly believe releases are unimportant or just a bonus, they should be willing to drop them to save the reorganization).

## III. Preservation of Rights and Reservation of Regulatory Powers

Finally, although not a separate argument for relief, Dr. Gill wishes to underscore the importance of preserving certain rights no matter what happens with the Plan. The U.S. Trustee and other regulators should note that Dr. Gill, through this filing and his prior actions, has done everything in his power to **preserve judicial and regulatory rights**. He has put the Debtors and all parties on notice of the issues. Should, for any reason, the Court disagree with Dr. Gill and confirm the Plan as is, Dr. Gill hereby preserves his right to appeal that confirmation order on the grounds

stated above (and any other grounds raised in his pleadings). Likewise, if somehow the releases were approved, Dr. Gill intends to contest their enforceability in any appropriate forum (consistent with the narrow path the Supreme Court left for such issues, possibly arguing lack of consent or due process).

Additionally, nothing in the Plan or confirmation order should be construed to bar **government agencies from taking action**. The Court should, in fact, explicitly provide in the order that no provision of the Plan or confirmation order shall impair or enjoin a governmental entity from enforcing its police or regulatory powers (this is a common carve-out). This would ensure, for example, that if a State Medical Board finds cause to discipline a Wellpath entity or affiliated physician for CPOM violations, the confirmation does not stop that. Or if the Department of Labor needs to investigate a pension issue, it can.

The best outcome, however, is for the Court to grant the Motions: lift the stay so matters can proceed in their proper venues, and halt or reform the Plan so that only a lawful plan goes forward. That will minimize conflict between the bankruptcy resolution and external legal requirements.

**Conclusion and Prayer**

For the foregoing reasons, Dr. Gill respectfully requests that the Court grant the relief requested in his Motions, as supplemented herein, as follows:

**Relief from Stay** Movant respectfully requests that the Court enter an order modifying the automatic stay pursuant to 11 U.S.C. § 362 to permit Dr. Kanwar Partap Singh Gill to pursue, continue, or commence any and all claims, actions, or proceedings—whether pending or prospective—arising out of or related to allegations of whistleblower retaliation, discrimination, harassment, regulatory or statutory violations, defamation, wrongful termination, breach of contract, ERISA or

tax-related grievances, or any other monetary or equitable claims for which he may have standing or a legal interest.

Such relief shall expressly include, but not be limited to: (i) the continuation or initiation of any lawsuit or administrative action against non-debtor entities and individuals, including but not limited to California Forensic Medical Group, Inc. (CFMG) and other affiliates or co-liable parties; (ii) the continuation of any pending litigation or claims (including any proceeding titled *Gill v. Wellpath* or its equivalent); and (iii) the provision of testimony, evidence, or reports to governmental, licensing, or regulatory authorities regarding the pre- and post-petition conduct of the Debtors, their subsidiaries, agents, or affiliated entities.

To the extent necessary, Movant further seeks limited stay relief to permit the nominal inclusion of the Debtors in any such proceedings solely for the purpose of preserving claims or asserting liability against non-debtor parties, without enforcement of any judgment or recovery against the Debtors except as authorized by this Court.

Movant further requests that such relief be **effective immediately,** with a waiver of the 14-day stay under Bankruptcy Rule 4001(a)(3), due to the time-sensitive nature of the claims and the irreparable harm that may result from continued delay.

1.    **Stay of Plan Solicitation/Confirmation Proceedings (as needed) & Striking of Third-Party Releases:** Issue an order (a) declaring that the third-party release and injunction provisions of the Debtors' Plan are not permissible and will not be approved by the Court; (b) directing the Debtors to amend the Plan and solicitation materials to remove or modify those provisions consistent with the law (or deeming them stricken); and (c) if necessary, staying or extending any plan voting deadline or delaying the confirmation hearing briefly to allow re-solicitation or corrective notices to

creditors informing them that non-debtor releases will not be imposed without their affirmative consent. If votes have already been solicited and cast, the order should clarify that no creditor will be deemed to have consented to releasing non-debtors unless they have explicitly opted in to such release after full disclosure.

2. **Denial of Confirmation if Not Remedied:** To the extent the confirmation hearing proceeds on April 30, 2025, Dr. Gill asks the Court to **deny confirmation of the Plan** unless and until the Debtors demonstrate full compliance with all applicable provisions of the Bankruptcy Code and other law as outlined above. Specifically, confirmation should be denied if the Plan retains non-consensual third-party releases, or if it fails to address the CPOM compliance issues, or if it still purports to absolve parties from liability in violation of laws like ERISA or tax laws. In short, the Plan in its current form should not be confirmed under § 1129. Only a modified, lawful plan is confirmable.

3. **Reservation of Rights:** The Court's order should acknowledge that Dr. Gill (and other parties in interest) have preserved their rights to object to confirmation and to appeal or seek stay of any confirmation order that overrules their objections. Additionally, the order should preserve the rights of regulatory authorities as noted.

4. **Further Relief:** Grant such other and further relief as may be just and proper. This could include, for example, ordering the Debtors to provide additional information or reports concerning their compliance plans, or scheduling a status conference post-confirmation to monitor the issues raised (if the case proceeds to effective date).

Dr. Gill appreciates the Court's consideration of these serious matters. He approaches this Court with respect for the bankruptcy process and with the intent to

improve, not derail, the outcome. By addressing these issues head-on and in accordance with the law, the Court will ensure that any reorganization of Wellpath will be durable, legitimate, and free from the taint of legal error. Conversely, ignoring these issues would only postpone an inevitable reckoning—either in the form of appellate reversal (given the clear Supreme Court directive on releases) or in the form of regulatory enforcement (given the CPOM and related concerns). The relief requested is aimed at avoiding such turbulence by keeping this reorganization on the straight and narrow path of legality and fairness.

**WHEREFORE,** Dr. Kanwar Partap Singh Gill, Movant, prays that this Court grant the Motion for Relief from Stay and the Emergency Motion to Stay/Strike Plan Provisions, as supplemented, enter the orders described above, and grant Movant such other and further relief to which he may be justly entitled.

**Dated:** April 11, 2025

**Respectfully submitted,**

**Dr. Kanwar Partap Singh Gill, M.D.**

Pro Se Movant

8408 N Ann Ave

Fresno, CA 93720

Phone: (559) 447-8490

Email: kpsgill@kpsgill.com

## Statement Regarding Pro Se Representation

Dr. Kanwar Partap Singh Gill, the Movant and a licensed physician duly practicing in the State of California, respectfully submits this Supplemental Brief in a **pro se** capacity. While not an attorney, Dr. Gill has undertaken extensive independent legal research and analysis to represent his own interests in these proceedings. His

decision to proceed **pro se** is not by preference but necessity: due to conflicts of interest, he was unable to secure legal representation from counsel admitted to practice in the Southern District of Texas who was free of disqualifying conflicts related to the Debtors or their affiliates.

Dr. Gill respectfully requests that the Court exercise its discretion to consider this filing in light of his status as a **non-lawyer and self-represented party**, and to afford appropriate latitude for any procedural or formatting deficiencies. He earnestly submits that the substance of the arguments and authorities presented herein have been prepared in good faith, grounded in law and fact, and deserve full consideration on their merits.

**EXHIBIT 1**

**Pre-Filing Legal Notice and Regulatory Objection (April 10, 2025)**

**This exhibit includes the final legal notice emailed by Dr. Kanwar Partap Singh Gill on April 10, 2025, to the Debtors' counsel, executive leadership, the U.S. Trustee, Creditors' Committee, and regulatory agencies. The notice summarized the following key objections to the proposed Chapter 11 Plan:**

- **CPOM violations in California and other states;**
- **Misappropriation of deferred compensation, triggering tax liability under 26 U.S.C. § 409A and California tax law;**
- **Whistleblower retaliation and constructive termination efforts;**
- **Violations of 11 U.S.C. §§ 1129(a)(3), 524(e), and governing precedent (*Harrington v. Purdue Pharma*).**

**This pre-filing notice was intended to resolve issues without litigation and is now submitted as part of the Supplemental Brief record.**

---

**EXHIBIT 2**

---

**Internal Records Showing CPOM Violations and Interference in Clinical Judgment**

This exhibit contains internal communications supporting Dr. Gill's allegations that non-physician administrators interfered in medical decision-making and physician employment, in violation of CPOM law. It includes:

- Directives from non-physicians to clinical staff;
- HR actions against CFMG-employed physicians lacking physician oversight;
- Interference in protected whistleblower roles and patient care responsibilities.

These documents substantiate claims of regulatory violations and improper control by laypersons over clinical operations.

— *EXHIBIT 3   IRS§409A-Disclosure IoIRS*

**CERTIFICATE OF CONFERENCE**

I certify that on April 10, 2025, I issued a comprehensive pre-filing legal notice by email to:

- Debtors' counsel (McDermott Will & Emery);
- Executive officers of the Debtors and CFMG;
- The U.S. Trustee;
- The Official Committee of Unsecured Creditors; and
- State and federal regulators.

The subject line was:

"Final Legal Notice – CPOM Violations, Misappropriated Compensation, and Plan Objection Grounds – Wellpath Holdings, Inc. – Case No. 24-90533 (Bankr. S.D. Tex.)"

This notice detailed:

- CPOM violations;
- Deferred compensation misappropriation and resulting tax liabilities;

45 | Page

- Whistleblower retaliation; and
- Structural flaws in the Plan, including illegal third-party releases.

It also proposed settlement terms including restoration of compensation, whistleblower protections, and structural compliance. No resolution was reached prior to filing. These issues are now before the Court for resolution at the April 22, 2025 hearing.

I declare under penalty of perjury that the above is true and correct.

Executed on: April 11, 2025

Location: Fresno, California

---

Respectfully submitted,

/s/ Dr. Kanwar Partap Singh Gill

Dr. Kanwar P. S. Gill

Pro Se Movant and Creditor

8408 N. Ann Ave

Fresno, CA 93720

Phone: (559) 447-8490

Email: kpsgill@kpsgill.com

---

## CERTIFICATE OF SERVICE

I hereby certify that on **April 11, 2025**, I served a true and correct copy of the:

**Supplemental Brief in Support of**

(1) Motion for Relief from Automatic Stay (Dkt. 1897),

---

(2) Emergency Motion to Stay Plan Solicitation and Voting (Dkt. 2049), and

(3) Motion to Strike Improper Third-Party Releases (Dkt. 2075),

**together with all accompanying Exhibits**, via **First-Class U.S. Mail** and/or **Electronic Mail** (where available), to the following parties:

---

### Debtors' Counsel – McDermott Will & Emery LLP

- Marcus Alan Helt, Esq.
  2501 North Harwood Street, Suite 1900
  Dallas, TX 75201
  Email: mhelt@mwe.com
- Carolee W. Wurzelbacher, Esq.
  444 West Lake Street, Suite 4000
  Chicago, IL 60606
  Email: cwurzelbacher@mwe.com
- Darren Azman, Esq.
  One Vanderbilt Avenue
  New York, NY 10017
  Email: dazman@mwe.com
- Felicia Perlman, Esq.; Steven Szanzer, Esq.; Bradley Giordano, Esq.
  (Same office addresses as above)

---

### Official Committee of Unsecured Creditors – Stinson LLP

- Zachary Hemenway, Esq.
  1201 Walnut Street, Suite 2900

Kansas City, MO 64106

Email: zachary.hemenway@stinson.com

- Nicholas Zluticky, Esq.

Email: nicholas.zluticky@stinson.com

- Lucas Lyle Schneider, Esq.

1144 Fifteenth Street, Suite 2400

Denver, CO 80202

Email: lucas.schneider@stinson.com

## Office of the United States Trustee (Region 7, SDTX)

- Susan Rogers Her, Trial Attorney
- Ha Nguyen, Trial Attorney

515 Rusk Street, Suite 3516

Houston, TX 77002

Email: USTPRegion07.HU.ECF@usdoj.gov

## Wellpath Holdings, Inc. – Executive Team (Debtor)

- Ben Slocum, Chief Executive Officer
- Marc Goldstone, Chief Legal Officer
- Dr. Dheeraj Taranath, D.O., Interim Chief Clinical Officer

3340 Perimeter Hill Drive

Nashville, TN 37211

Email: bankruptcymail@wellpath.us

**California Forensic Medical Group, Inc. (CFMG) – Non-Debtor Affiliate**

- Grady J. Bazzel, Chief Executive Officer
- Scott Kennedy, Chief Financial Officer
- Richard J. Medrano, Secretary

**Primary Address:**

3340 Perimeter Hill Drive

Nashville, TN 37211

**California Office:**

1325 J Street, Suite 1550

Sacramento, CA 95814

---

**Regulatory Authorities**

- **Medical Board of California – Enforcement Division**
  2005 Evergreen Street, Suite 1200
  Sacramento, CA 95815
- **California Attorney General Rob Bonta**
  Health Quality Enforcement Section
  1300 I Street
  Sacramento, CA 95814
- **California Labor Commissioner – Lilia García-Brower**
  Department of Industrial Relations
  1515 Clay Street, Suite 801
  Oakland, CA 94612
  Email: LCOServiceRequests@dir.ca.gov

- **Internal Revenue Service (IRS) – Examination & Fraud Enforcement**
  PO Box 3801
  Ogden, UT 84409
- **U.S. Department of Labor**
  Wage and Hour Division (WHD)
  Employee Benefits Security Administration (EBSA)
  200 Constitution Ave., NW
  Washington, DC 20210
- **U.S. Department of Justice – Executive Office for U.S. Trustees (EOUST)**
  441 G Street, NW, Suite 6150
  Washington, DC 20530
  Email: USTrustee.Program@usdoj.gov

**Additional Governmental Agency Served**

- **Fresno County Counsel – Daniel C. Cederborg**
  Office of the County Counsel
  2220 Tulare Street, Suite 500
  Fresno, CA 93721
  Email: dcederborg@fresnocountyca.gov

I certify under penalty of perjury that the foregoing is true and correct.

**Executed on:** April 11, 2025
**Location:** Fresno, California

Respectfully submitted,

/s/ Dr. Kanwar Partap Singh Gill

Dr. Kanwar P. S. Gill

Pro Se Movant and Creditor

8408 N. Ann Ave

Fresno, CA 93720

Phone: (559) 447-8490

Email: kpsgill@kpsgill.com

# EXHIBIT 1

**Pre-Filing Legal Notice and Regulatory Objection**

**Dated: April 10, 2025**

This exhibit contains the **final legal notice** emailed by **Dr. Kanwar Partap Singh Gill** on **April 10, 2025**, to the **Debtors' counsel, executive leadership**, the **Office of the United States Trustee**, the **Official Committee of Unsecured Creditors**, and **state and federal regulatory authorities**.

The notice outlines **key legal and structural objections** to the proposed Chapter 11 Plan, including:

- **Corporate Practice of Medicine (CPOM)** violations in **California** and other states;
- **Misappropriation of deferred compensation**, with resulting liability under **26 U.S.C. § 409A and California tax law**;
- **Whistleblower retaliation** and **constructive termination efforts**;
- Plan confirmation issues under **11 U.S.C. §§ 1129(a)(3), 524(e)**, and controlling precedent, including **Harrington v. Purdue Pharma**.

This pre-filing legal notice was intended to facilitate resolution **prior to litigation** and is now submitted as part of the evidentiary record supporting the **Supplemental Brief.**

KPSGILL.COM                                     Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

**Final Legal Notice – CPOM Violations, Misappropriated Compensation, and Plan Objection Grounds - Wellpath Holdings, Inc. – Case No. 24-90533 (Bankr. S.D. Tex.)**
1 message

---

Kanwar Partap Singh Gill <kpsgill@kpsgill.com>                     Thu, Apr 10, 2025 at 9:38 PM
To: Marc Goldstone <MGoldstone@wellpath.us>, Felicia Perlman <fperlman@mwe.com>, "Marcus A. Helt" <mhelt@mwe.com>, Steven Szanzer <sszanzer@mwe.com>, Carole Wurzelbacher <cwurzelbacher@mwe.com>, Grady J Bazzel <JBazzel@zenovacare.com>, Richard Medrano <RMedrano@wellpath.us>, Scott Kennedy <ScottKennedy@wellpath.us>, "Webb, Kerrie@MBC" <Kerrie.Webb@mbc.ca.gov>, Susan Hersh <susan.hersh@usdoj.gov>, Ha Nguyen <ha.nguyen@usdoj.gov>, lucas.schneider@stinson.com, USTPRegion07.HU.ECF@usdoj.gov, bankruptcymail@wellpath.us, ebarak@proskauer.com, brosen@proskauer.com, ddesatnik@proskauer.com, Zachary.hemenway@stinson.com, letf@dir.ca.gov, "DLSE2@dir.ca.gov" <DLSE2@dir.ca.gov>, ueo@edd.ca.gov, Kanwar Gill <kagill@wellpath.us>

**Subject:** Final Legal Notice – CPOM Violations, Misappropriated Compensation, and Plan Objection Grounds

**In re Wellpath Holdings, Inc. – Case No. 24-90533 (Bankr. S.D. Tex.)**

**To:**
Marc Goldstone – Chief Legal Officer, Wellpath
Felicia Perlman – Counsel, McDermott Will & Emery
Marcus Helt – Counsel, McDermott Will & Emery
Steven Szanzer – Counsel, McDermott Will & Emery
Carole Wurzelbacher – McDermott Will & Emery
Angie Baldwin – Senior Employee Relations Manager, Wellpath
Dr. Grady Judson Bazzel – CEO, California Forensic Medical Group (CFMG)
Dr. Richard Medrano – Secretary, CFMG
Dr. Scott Kennedy – CFO, CFMG
Kerrie Webb – Staff Counsel, Medical Board of California
United States Trustee, Southern District of Texas
Official Committee of Unsecured Creditors (via counsel)

**From:**
Dr. Kanwar P. Gill
Senior Physician, CFMG – Fresno County Adult Detention Facility
Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533

---

Dear Counsel, Officers, and Regulatory Authorities:

This message serves as formal and final pre-filing notice of legal, regulatory, and structural violations relevant to the confirmation of the Chapter 11 Plan in the above-captioned case. The facts presented herein will be incorporated into my April 14th supplemental filing and disseminated to state and federal enforcement bodies. The issues are no longer speculative; they are supported by a factual and documentary record, implicating multiple statutory and constitutional violations across:

- **California's Corporate Practice of Medicine (CPOM) doctrine**

- **Business and Professions Code §§ 2400–2417**

- **Labor Code § 1102.5 (Whistleblower Retaliation)**

- **ADA and FEHA (Title 42, U.S.C. §§ 12101 et seq.; Cal. Gov. Code §§ 12900 et seq.)**

- **ERISA fiduciary standards and IRC § 409A**

- **Bankruptcy Code §§ 362(b)(4), 524(e), and 1129(a)**

I. Non-Physician Control Over Physician Employment – CPOM Violations

Under **People v. Cole**, 38 Cal. 2d 99 (1951), and **Conway v. State Bd. of Med. Exam'rs**, 47 Cal. App. 2d 105 (1941), any lay control over the practice of medicine—including physician employment decisions—is void as against public policy. Despite Wellpath's MSO label, **CFMG physician governance has been functionally nullified** by direct administrative interference.

Specifically:

- **Angie Baldwin (Wellpath HR)** is conducting disciplinary investigations into CFMG-employed physicians without oversight by any California-licensed CFMG shareholder.

- **Deanna Huff (HSA, Wellpath)** has issued directives regarding physician productivity, scheduling, and documentation priorities in violation of Cal. Bus. & Prof. Code §§ 2052, 2264, and 2400.

- **Eric Krenz (DON, CFMG)** has aligned with non-physician executives at Wellpath to unilaterally reassign patient lists and direct triage workflows, violating Title 15 CCR § 1208 and § 1210.

- **Linda Matlock (RDO, Wellpath)** has issued clinical directives affecting physician operations despite not holding a medical license.

These acts represent not only CPOM violations but also potential grounds for license revocation under **In re Basile** and **In re Mukerji** (Medical Board of California precedent), and are reportable to the California Attorney General for prosecution under **Penal Code § 550.**

## II. Deferred Compensation Misappropriation – Trust and Tax Violations

My compensation—earned through CFMG employment—was **withheld and rerouted through a Non-Qualified Deferred Compensation Plan (NQDCP)** administered by Wellpath. Upon Wellpath's bankruptcy filing:

- My **NQDCP funds were frozen** and treated as property of the estate, in violation of **11 U.S.C. § 541(d).**

- No legal authority existed for Wellpath to administer, seize, or condition the return of funds earned under a **non-debtor entity (CFMG).**

- This mismanagement exposes me to tax penalties under **IRC § 409A** and potential ERISA breaches (see 29 U.S.C. § 1104).

**This claim is non-dischargeable, non-negotiable, and must be carved out. I have formally demanded return of funds with indemnity for all IRS and California FTB liabilities,** as stated in correspondence on record.

## III. Whistleblower Retaliation and Constructive Termination Efforts

After raising legal concerns—including CPOM violations, wage theft, and administrative interference—I was:

- Investigated by Wellpath HR under Ms. Baldwin's direction with no oversight from CFMG physician-shareholders;

- Removed from internal clinical leadership functions;

- Scheduled for meetings conflicting with patient care;

- Subject to a campaign of retaliation including **pretextual efforts to terminate or sideline me,** corroborated by internal discussions noted by site staff.

These are textbook violations under **Yanowitz v. L'Oreal**, 36 Cal. 4th 1028 (2005) and **Shephard v. Loyola Marymount**, 102 Cal. App. 4th 837 (2002). I have filed formal complaints with the **Medical Board of California, Department of Labor,** and EEOC, with additional filings to the **California Department of Fair Employment and Housing** imminent.

## IV. Plan Confirmation Barriers – Legal and Structural Defects

As currently proposed, the Plan:

- Relies on **illegal employment structures in California,** and thus fails the **§ 1129(a)(3) good faith requirement.**

- Proposes **non-consensual third-party releases** for CFMG and individual officers, in direct violation of **§ 524(e)** and **In re Pacific Lumber**, 584 F.3d 229 (5th Cir. 2009).

- Invokes an **improper extension of the automatic stay to non-debtor CFMG,** which the Fifth Circuit does not permit absent clear, record-supported findings—none of which exist here.

The **U.S. Supreme Court's ruling in Harrington v. Purdue Pharma, 603 U.S (2024)** places additional limitations on such non-consensual third-party releases. Wellpath cannot, through a bankruptcy plan, discharge regulatory liability or misappropriate physician wages earned outside of the debtor entity.

## V. Demand for Settlement or Carve-Out – Opportunity for Resolution

As outlined in prior communications, I remain open to settlement under the following **non-negotiable terms:**

1. **Immediate restoration of all deferred compensation** and indemnification for all associated tax liabilities;

2. **Employment protection against retaliatory termination**, memorialized in a binding agreement;

3. **Cessation of HR investigations** unless authorized by a California-licensed physician-officer;

4. **Structural reform** ensuring CPOM compliance through physician-governed oversight;

5. **Affirmation of whistleblower protections**, with standing to pursue injunctive relief if retaliated against.

Absent agreement on these points, **I will seek judicial relief and regulatory enforcement.** No court can confirm a plan that locks in an illegal, retaliatory, and structurally flawed corporate model.

## VI. Strategic Posture and Litigation Warning

If Wellpath attempts to oppose my pending motions and defends the current structure, it will be **on record affirming a CPOM-violating model,** inviting enforcement from:

- **Medical Board of California**

- **IRS and Department of Labor**

- **State Attorneys General and DOJ Civil Rights Division**

This is not merely an employment dispute. It is a test of whether a national healthcare company may use **Chapter 11 to shield itself from state regulatory oversight,** seize physician trust assets, and retaliate against whistleblowers—all under federal court protection.

The answer, under law and policy, is no.

---

## Conclusion

This email, and its supporting exhibits and communications, will be incorporated into my **supplemental filing,** no later than April 14th 2025 unless immediate corrective action is taken. I urge Wellpath and its counsel to act—*not only for your client's legal protection, but for the long-term sustainability of post-confirmation operations in California and other CPOM jurisdictions.*

Respectfully,
**Dr. Kanwar P. Gill**
Senior Physician, Fresno County Adult Detention Facility
Email: kpsgill@kpsgill.com
Pro Se Creditor – In re Wellpath Holdings, Inc., Case No. 24-90533

# EXHIBIT 2

**Internal Records Demonstrating CPOM Violations and Clinical Interference**

This exhibit includes **internal communications and operational documents** supporting **Dr. Gill's allegations** that non-physician administrators exerted unlawful control over **physician decision-making** and **employment conditions,** in direct violation of **California's CPOM doctrine.**

The materials illustrate:

- **Administrative directives** from non-licensed personnel issued to clinical staff;
- **HR disciplinary actions** taken against CFMG-employed physicians **without physician-governed oversight;**
- Disruption of **protected whistleblower roles,** professional autonomy, and **patient care functions.**

These internal records corroborate the **regulatory and structural violations** raised in the **Supplemental Brief,** supporting claims of improper layperson interference in medical operations.

**KPSGILL.COM**

Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

### Fwd: Formal Notice of Legal Conflict and Demand for CFMG-Led, Independent HR Oversight
1 message

---

Kanwar Gill MD <kpsgill@kpsgill.com>                                          Thu, Apr 10, 2025 at 8:02 AM
To: "Kerrie@MBC Webb" <Kerrie.Webb@mbc.ca.gov>
Cc: "webmaster@mbc.ca.gov" <webmaster@mbc.ca.gov>

Regarding current complaint against the following - please add to file.

Dr. Grady Judson Bazzel – California P&S License No. C 53908, Chief Executive Officer, CFMG

• Dr. Richard M. Medrano – California P&S License No. A 103477, Secretary, CFMG

• Dr. Scott Herbert Kennedy – California P&S License No. C 171808, Chief Financial Officer, CFMG

Best Regards,
Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

Begin forwarded message:

> **From:** Kanwar Gill MD <kpsgill@kpsgill.com>
> **Date:** April 9, 2025 at 9:08:15 PM PDT
> **To:** Angie Baldwin <ARBaldwin@wellpath.us>, Marc Goldstone <MGoldstone@wellpath.us>
> **Cc:** "Marcus A. Helt" <mhelt@mwe.com>, Felicia Perlman <Fperlman@mwe.com>, Steven Szanzer <sszanzer@mwe.com>, Carole Wurzelbacher <cwurzelbacher@mwe.com>, cdingman@mwe.com
> **Subject:** Formal Notice of Legal Conflict and Demand for CFMG-Led, Independent HR Oversight

Subject: Formal Notice of Legal Conflict and Demand for CFMG-Led, Independent HR Oversight

To: Angie Baldwin, PHR, SPHR

From: Dr. Kanwar P. Gill, Senior Physician, Fresno County Adult Detention Facility

Case Reference: In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.)

---

Dear Ms. Baldwin,

I am writing to formally and comprehensively address the issues surrounding the HR investigation currently led by Wellpath regarding my employment with California Forensic Medical Group (CFMG). The purpose of this letter is to ensure that you, and all relevant corporate and legal stakeholders, are placed on full legal notice regarding the structural, legal, and procedural conflicts now impacting this matter.

This is not a refusal to participate in any fact-finding process. Rather, it is a demand that any such process comply with California law, respect my status as a CFMG-employed physician, and avoid entanglement with ongoing federal litigation in which Wellpath is an adversarial party.

## I. California Professional Medical Corporation Rules and Non-Delegable Oversight

I am a salaried employee of California Forensic Medical Group (CFMG), a California-registered professional medical corporation governed under Business and Professions Code §§ 2400–2417. These statutes strictly prohibit delegation of employment oversight, clinical disciplinary authority, or employment governance over licensed physicians to non-physician entities or non-California personnel, including out-of-state management services organizations like Wellpath.

Any employment-related action—including disciplinary interviews, remediation, ADA accommodations, or terminations—must be initiated, led, or ratified by a California-licensed physician-shareholder of CFMG.

## II. Ongoing Bankruptcy Litigation and Adversarial Conflict of Interest

Wellpath is currently opposing me in active bankruptcy litigation pending in the Southern District of Texas (In re Wellpath Holdings, Inc., Case No. 24-90533). My legal claims currently exceed $375,000 and they keep mounting. My relate to:

• Misappropriated deferred compensation,

- ERISA violations,

- CPOM violations, and

- Interference with employment and regulatory protections.

This proceeding is ongoing and contested, and Wellpath's legal counsel has sought to extend a stay over non-debtor CFMG while asserting that my claims are directed solely against CFMG. These conflicting positions intensify the appearance of bad faith and create a direct, lasting legal conflict that renders any Wellpath-led HR investigation procedurally tainted.

III. Request for Reassignment to Independent or CFMG-Led Oversight

Accordingly, I formally request that this matter be reassigned to:

1. A qualified third-party HR investigator with no direct or indirect employment ties to Wellpath; or

2. An internal HR representative directly overseen by a California-licensed physician-officer or shareholder of CFMG, consistent with Business & Professions Code §§ 2400 et seq.

Additionally, I respectfully request written clarification regarding the following:

- Name, license number, and authority of any California-licensed physician currently supervising this investigation;

- Whether this HR inquiry is authorized by the CFMG board or its physician-shareholders;

- Whether findings from this inquiry will be used to inform CFMG employment decisions;

- Whether Wellpath asserts that its current involvement satisfies California's HR oversight standards applicable to professional medical corporations.

IV. ADA, FEHA, and Whistleblower Protections

I am a known ADA-covered employee with a long-standing history of medical accommodation that has been acknowledged by the employer. My complaints include, among other issues:

• Racial and national origin discrimination,

• Constructive retaliation,

• Administrative interference with medical meetings,

• Discriminatory scheduling changes,

• And unlawful handling of earned wages.

Any disciplinary inquiry without independent oversight poses serious legal risk of:

• Retaliation under California Labor Code §1102.5,

• Disability discrimination under the ADA and FEHA,

• Violations of the California Medical Practice Act,

• And potential claims under ERISA and bankruptcy whistleblower statutes.

## V. Supporting Legal Precedents

The following cases support the underlying legal position:

• Conway v. State Bd. of Med. Exam'rs, 47 Cal. App. 2d 105 (1941);

• People v. Pacific Health Corp., 12 Cal. 2d 156 (1938);

• People v. Cole, 38 Cal. 2d 99 (1951);

• Shephard v. Loyola Marymount Univ., 102 Cal. App. 4th 837 (2002) (retaliation and wrongful termination);

• Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028 (2005) (whistleblower retaliation under §1102.5).

## VI. Conclusion and Reservation of Rights

Given the scale of my legal claims, the adversarial nature of the relationship with Wellpath, and the absence of lawful physician-led oversight, I must treat any further attempt by Wellpath to conduct or advance this HR review as procedurally invalid.

I remain fully committed to good-faith participation in a fair, lawful, and independently conducted inquiry consistent with state and federal legal standards. This letter serves as formal notice of the conflict, my continued legal objections, and my reservation of all rights.

Sincerely,

Dr. Kanwar P. Gill

Senior Physician, CFMG

Fresno County Adult Detention Facility

Email: kpsgill@kpsgill.com

Sent from personal account for independence and documentation

Best Regards,
Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

On Apr 9, 2025, at 11:11 AM, Kanwar Partap Singh Gill <kpsgill@kpsgill.com> wrote:

**Subject:** Request to Reschedule HR Meeting Due to Active Litigation and Oversight Requirements Under California Law

Dear Ms. Baldwin,

Thank you for your message and the ongoing communication regarding the HR/ER meeting originally scheduled for April 15, 2025.

As you may be aware, I am currently an active litigant in *In re Wellpath Holdings, Inc.*, Case No. 24-90533 (Bankr. S.D. Tex.), where I have raised substantial legal claims involving physician compensation, corporate practice of medicine violations, ERISA noncompliance, and improper wage deferral involving California Forensic Medical Group (CFMG). These claims are legally and factually supported in Docket

Nos. 1897 and 2049. The deadline for opposition filings in this matter is April 15, 2025, and I am presently preparing and finalizing legal pleadings in that context.

The amount at stake exceeds **$375,000,** and includes not only unpaid deferred compensation but also tax liabilities, penalty exposure, accrued interest, and the substantial opportunity cost associated with legal drafting, research, and case management since March 4, 2025. These losses arise **entirely from the mishandling of my deferred compensation by CFMG,** which permitted Wellpath —its management services contractor—to assume control over funds that constituted my earned wages and were never intended to be subject to corporate commingling or bankruptcy risk. The reckless failure to safeguard these wages in a separate trust or protected account—as required under ERISA principles and California compensation law—has resulted in extraordinary financial harm. It is this harm that I am seeking to remedy through the ongoing bankruptcy proceedings.

Given this context, I must respectfully request that **our HR meeting be rescheduled until after April 22, 2025,** the date of the bankruptcy court's scheduled hearing. This is not a refusal to engage—it is a legally necessary measure to:

- Prevent any **procedural or substantive prejudice** to my pending federal litigation;

- Avoid **crossover risks** between an internal HR fact-finding process and external judicial proceedings;

- Maintain compliance with the **Americans with Disabilities Act (ADA)** and California's Fair Employment and Housing Act (FEHA), including protections related to workplace accommodations and clinical scheduling;

- Ensure that **California's Corporate Practice of Medicine (CPOM) doctrine,** as codified in Business & Professions Code §§ 2400 et seq., is fully respected, including with respect to physician oversight of disciplinary or employment matters.

In light of my current role as a salaried physician employed by CFMG—a California professional medical corporation—any employment-related investigation involving my conduct must be **directly authorized or supervised by a California-licensed physician-officer of CFMG.** I have not received such confirmation, and as raised in prior correspondence, I respectfully request that the following be clarified in writing:

1. Whether this investigation is being carried out under the formal delegation or supervision of any CFMG physician-officer, such as Dr. Grady Bazzel;

2. Whether any findings made through this process will be used to support, justify, or inform CFMG employment actions, including discipline, remediation, or termination;

3. Whether any emergent employment issue presently exists that cannot be deferred until after April 22;

4. Whether Wellpath is asserting that this HR review satisfies the standards applicable to California professional medical corporations regarding

physician employment governance.

This request is submitted out of an abundance of caution, and with a view toward avoiding any perception of interference, delay, or noncooperation. If a critical matter arises before April 22 requiring urgent discussion, I remain available for timely coordination—as long as the meeting is convened under appropriate physician-led oversight and legal safeguards.

To reiterate, this limited postponement is necessary to avoid undue hardship, protect procedural rights, and preserve a clean record in ongoing federal and regulatory proceedings. I appreciate your continued professionalism, and I remain committed to resolving all outstanding issues through lawful, cooperative, and structured channels.

Sincerely,
**Dr. Kanwar P. Gill**
Senior Physician – Fresno County Adult Detention Facility
Email: kpsgill@kpsgill.com | Sent from personal account for independence and documentation purposes

On Wed, Apr 9, 2025 at 8:39 AM Angie Baldwin <ARBaldwin@wellpath.us> wrote:

Dr. Gill,

You have raised concerns that fall under different disciplines. CFMG has received your email alleging a number of serious matters. Compliance will be reaching out to you to separately investigate your compliance-related concerns. As you know, I have been tasked with conducting an investigation of your workplace discrimination and retaliation allegations. Wellpath is contracted to perform this function on behalf of CFMG, and I am the designated investigator for these concerns. As it relates to the HR/ER investigation, I ask that you refrain from including others on communications related to this investigation, as that could adversely impact the integrity of the investigation.

We are still scheduled to meet on the 15th to discuss issues you've raised within the scope of this investigation. The main purpose of this initial meeting is to gather information from you. Please direct any additional concerns or questions about the investigation into your allegations of workplace discrimination and retaliation solely to my attention. After we meet, I will identify witnesses or other appropriate people to interview and plan the next steps in the investigation. If you are aware of additional facts or evidence relevant to your allegations, please send them to me. It goes without saying that interference with the investigation is not permitted and will only serve to will slow the process down and potentially damage the integrity of the investigation. Thank you for your cooperation, and I hope to speak with you soon.

**ANGIE BALDWIN, PHR, SPHR**

Sr. Employee Relations Manager



3340 Perimeter Hill Dr., Nashville, TN 37211
**PH 615-312-7272// CELL 615-636-7045**

**WellpathCare.com**

---

**From:** Kanwar Partap Singh Gill <kpsgill@kpsgill.com>
**Sent:** Tuesday, April 8, 2025 4:09 PM
**To:** Dheeraj Taranath <DTaranath@wellpath.us>; Angie Baldwin <ARBaldwin@wellpath.us>
**Cc:** webmaster@mbc.ca.gov
**Subject:** [EXT] Re: Urgent Request for CFMG-Led HR Oversight:

> **CAUTION: This Email is from an EXTERNAL source. Do not click links or open attachments unless you recognize the sender and know the content is safe.  Report suspicious messages to SPAM@Wellpath.us**

---

**Subject:** Clarification of HR Jurisdiction and Demand for Physician-Led Oversight of CFMG Employment Matters

• Dr. Grady Judson Bazzel – California P&S License No. C 53908, Chief Executive Officer, CFMG

• Dr. Richard M. Medrano – California P&S License No. A 103477, Secretary, CFMG

• Dr. Scott Herbert Kennedy – California P&S License No. C 171808, Chief Financial Officer, CFMG

# In re Wellpath Holdings, Inc., Case No. 24-90533 (Bankr. S.D. Tex.)

Dear Ms. Baldwin,

Thank you for acknowledging receipt of my recent emails and for including them in your investigative file.

Let me respectfully and unequivocally state that it is my continuing intent to communicate with California Forensic Medical Group (CFMG) leadership and request that any human resources investigation into my employment as a CFMG-employed physician be conducted either:

1. By an HR representative employed and directly supervised by a California-licensed physician within CFMG, or
2. Under the exclusive oversight of a physician-led panel consistent with the mandates of the California Medical Practice Act and the corporate practice of medicine (CPOM) doctrine.

I must also ask you to clearly identify your role in this matter:

- Are you conducting this HR investigation under the direction of CFMG or Wellpath?
- Do any of CFMG's physician-officers (such as Dr. Bazzel) formally supervise or approve your actions?
- Will your findings be considered binding for purposes of CFMG employment discipline, remediation, or termination?

These are critical threshold questions, particularly given your recent statement that I do not need to include Dr. Grady Bazzel—CFMG's CEO—in these communications. With respect, I must request a written confirmation of that assertion, as this statement will need to be forwarded to the Medical Board of California in connection with the active investigation into CFMG's HR governance structure and its compliance with California law.

As you are aware, I have made extensive disclosures concerning the misclassification of my wages, interference with patient care, retaliatory administrative behavior, and race- and national origin-based discrimination—all of which occurred under CFMG's direct authority. To that end, I am compelled to reiterate that these are not Wellpath matters. These are physician employment grievances governed under California law, requiring physician-led adjudication.

Your role as a Wellpath-employed HR professional may create an inherent conflict of interest when reviewing concerns that implicate CFMG's legal structure and California-specific employment protections. Without a clear delegation of investigatory authority from a CFMG physician-officer, any HR process led exclusively by you may be legally insufficient and procedurally invalid under California Business & Professions Code §§2400 et seq.

As a reminder, I previously addressed these issues in my April 3, 2025 letter to Wellpath's Chief Legal Officer Marc Goldstone, which was copied to Kerrie Webb, Staff Counsel for the Medical Board of California. That letter outlines how Wellpath's HR and corporate structure continue to violate CPOM restrictions, ERISA standards, and IRC §409A deferred compensation laws—all of which are now under regulatory scrutiny.

Additionally, I have communicated the urgency of these concerns to Dr. Dheeraj Taranath and CFMG leadership, including in my April 3 email regarding the April 11 meeting. I have clearly laid out the binding physician-led resolution terms that must be finalized in that meeting to avoid external escalation. These terms include employment protections, compensation parity, deferred compensation recovery, and full whistleblower safeguards —all of which are grounded in California's statutory protections for physicians and employees.

In light of the above, please confirm the following:

1. Whether your investigation is authorized by any of the California-licensed physician-officers of CFMG.
2. Whether your findings will be used to support or justify any future CFMG disciplinary actions.
3. Whether you have any direct reporting obligations to CFMG leadership.
4. Whether CFMG's physician-shareholders have delegated their non-delegable duties (under California law) to Wellpath's HR.
5. Whether Wellpath is asserting that your investigation satisfies California HR standards for professional medical corporations.

Absent affirmative and documented answers to these questions, I must regard the current HR review process as procedurally flawed and noncompliant with state law.

For the record, I am still fully open to an internal resolution—as emphasized in my prior correspondence. However, if this process continues without physician oversight, or if Dr. Bazzel is excluded from further communication, I will be obligated to report this as further evidence of CFMG's failure to retain legally required physician control over employment matters.

I respectfully await your clarification and look forward to a transparent discussion that complies with both California labor protections and our ethical duty to uphold physician autonomy in correctional healthcare.

Best regards,
**Dr. Kanwar P. Singh Gill**
Senior Physician
Fresno County Adult Detention Facility
Email: kpsgill@kpsgill.com
Sent from my personal email account for documentation and independence purposes

---

On Tue, Apr 8, 2025 at 12:04 PM Kanwar Partap Singh Gill <kpsgill@kpsgill.com> wrote:

**Subject:** Urgent Request for CFMG-Led HR Oversight: Wellpath's Interference with CFMG Physician Employment Matters

• Dr. Grady Judson Bazzel – California P&S License No. C 53908, Chief Executive Officer, CFMG

• Dr. Richard M. Medrano – California P&S License No. A 103477, Secretary, CFMG

• Dr. Scott Herbert Kennedy – California P&S License No. C 171808, Chief Financial Officer, CFMG

Dear Dr. Bazzel, Dr. Medrano, and Dr. Kennedy,

I write to you today not just as a colleague and long-standing CFMG physician, but as a party directly affected by what I must assert is an unlawful and inappropriate delegation of human resources oversight to Wellpath—a non-California management services organization. This matter demands urgent attention by CFMG's licensed physician leadership.

As you are aware, I am employed by **California Forensic Medical Group (CFMG)**. Yet, all current internal HR investigations into my employment-related grievances are being handled solely by Angie Baldwin, a human resources officer of a **Management Services Organization (WellPath)** based in Tennessee. While Ms. Baldwin has been communicative, she is not employed by CFMG and is not licensed to oversee or adjudicate employment matters involving California-licensed physicians governed under the Medical Practice Act and associated state labor protections.

Let me be clear: **these are not Wellpath matters**. These are employment-related grievances between **a physician and CFMG—a California professional medical corporation**. The decision to delegate this process to Wellpath, which is not licensed to engage in the practice of medicine or employ physicians under California law, amounts to **a violation of the corporate practice of medicine (CPOM) doctrine**, California Business & Professions Code §§ 2400 et seq., and likely exposes CFMG to civil and criminal liability.

### Summary of Concerns Raised (HR in Nature and CFMG-Specific):

#### 1. Race-Based Discrimination in Leadership

- I am the only brown physician remaining in senior leadership at our site.
- Despite more than five years of dedicated service with CFMG and having been licensed to practice medicine since 2009, I was passed over for the Medical Director position at the juvenile facility in favor of a physician who obtained their license in 2018. This decision raises significant concerns, particularly given the substantial difference in clinical experience and leadership tenure. I had formally expressed my interest in the role and engaged in direct dialogue with the Regional Director of Operations regarding this opportunity. However, after several discussions and assurances, the role was ultimately awarded to someone with markedly less experience. Based on this and several prior interactions, I must express—in the most professional but clear terms—that I do not have confidence in the Regional Director's judgment or impartiality. Her track record of unfulfilled commitments and lack of transparency remains one of my greatest concerns moving forward.
- The ongoing pattern of replacing physicians of color—particularly those of South Asian descent—with less experienced individuals raises serious concerns under the California Fair Employment and Housing Act (FEHA), particularly regarding discriminatory practices in leadership appointments based on both race and national origin.

#### 2. Constructive Termination and Retaliation

- I received credible reports that the RDO, HSA, and DON have discussed "getting rid of me."
- My repeated whistleblower reports (on deferred compensation, administrative interference, and discrimination) have been met with hostility and coercive tactics.

#### 3. Misclassification and Mishandling of Deferred Compensation

- My CFMG-earned deferred compensation has been wrongfully absorbed into the Wellpath bankruptcy estate.
- Wellpath HR staff (e.g., Donald White) have conflated CFMG and Wellpath wages, which undermines legal distinctions that must be maintained between the two entities.

#### 4. Clinical Interference by Nonphysicians

- I was removed from control of a weekly patient care meeting (which I chair), which was rescheduled by non-physician staff to conflict with high-volume patient activity.
- These decisions have compromised patient care and violated my obligations under the Medical Practice Act.

#### 5. Lack of CFMG-Led HR Grievance Process

- Since November 2024, I have raised concerns internally without any action by a CFMG-based HR or physician-leader.
- The current investigation led by Wellpath HR—without CFMG physician oversight—invalidates the entire process, particularly given the scope and substance of the allegations.

**My Formal Request to CFMG Shareholders**

I am now formally requesting that **a human resources representative employed by CFMG**—and reporting to a **California-licensed physician-officer of CFMG**—be assigned to oversee and adjudicate the investigation of my grievances. This includes the alleged:

- Racial discrimination;
- Constructive and retaliatory conduct;
- Compensation misappropriation; and
- Workplace interference that affects patient care and my medical license.

Any continued reliance on a Wellpath investigator for this matter will be viewed as a continued violation of CPOM and a dereliction of CFMG's non-delegable duties as a professional medical corporation under California law.

**Legal Exposure if Not Addressed**

Should any adverse action—up to and including termination—be taken against me while Wellpath is improperly handling what are clearly CFMG physician HR issues, I would have no option but to assert my rights under:

- **California Labor Code §1102.5 (whistleblower retaliation);**
- **California Fair Employment and Housing Act (FEHA);**
- **California Medical Practice Act (Business & Professions Code §§2052 et seq.);**
- **Federal ERISA and bankruptcy whistleblower provisions.**

Such a termination, under the present circumstances and timeline of protected activity, would appear overtly **retaliatory and discriminatory** on its face.

**Closing**

I have dedicated over five years of service to CFMG, consistently delivering exceptional clinical outcomes, financial savings, and professional leadership. I have made every effort to resolve these concerns internally and respectfully. It is now incumbent on you—as CFMG's licensed shareholders and physician leaders—to reclaim your statutory responsibilities and immediately assign a proper, physician-governed HR process for this matter.

Please confirm that this request is being escalated appropriately within CFMG, and that a CFMG-based HR professional—answering to physician leadership—will be assigned immediately to review and address my concerns.

Sincerely,
Dr. Kanwar P. Gill
Senior Physician, Fresno County Adult Detention Facility
*Sent from my personal account to preserve independence and documentation*

**KPSGILL.COM**                                    Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

## Re: Clarification on HR Oversight, HR scope and Direction for Non-Bankruptcy Matters

1 message

**Kanwar Partap Singh Gill** <kpsgill@kpsgill.com>                Wed, Apr 9, 2025 at 12:56 PM
To: Dheeraj Taranath <DTaranath@wellpath.us>, Angie Baldwin <ARBaldwin@wellpath.us>
Cc: Kanwar Gill <KaGill@wellpath.us>, Grady J Bazzel <JBazzel@zenovacare.com>, "Richard M. Medrano"
<RMedrano@wellpath.us>, Scott Kennedy <ScottKennedy@wellpath.us>, "webmaster@mbc.ca.gov"
<webmaster@mbc.ca.gov>, "Webb, Kerrie@MBC" <Kerrie.Webb@mbc.ca.gov>

**Subject:** Final Direct Communication — Legal Reservation of Rights and Termination of Contact

Dear Dr. Taranath,

Thank you for your April 10, 2025 correspondence. I acknowledge receipt and confirm my understanding of the positions you have taken therein.

To summarize and clarify for the record:

- You have asserted that no offer regarding resolution of my deferred compensation claims currently exists, and that any suggestion of a prior offer is not acknowledged.

- You have rejected my assertion that CFMG and/or Wellpath have declined a legally compliant resolution process.

- You deny the legal validity of the physician governance and CPOM-related concerns I have raised regarding CFMG's oversight obligations under California law.

- You have encouraged me to direct all inquiries to designated investigators and legal representatives and requested that I refrain from further direct communication with you.

Please be advised that I **categorically preserve all legal rights, defenses, and remedies** available to me under applicable state and federal law, including but not limited to:

- **California Business and Professions Code §§ 2400–2417**, which prohibit non-physician corporate control over the practice of medicine in California and render void any delegation of physician employment or disciplinary authority to non-licensed, out-of-state personnel;

- **Labor Code §1102.5, FEHA**, and related retaliation and whistleblower protections;

- **ERISA**, the **ADA**, and applicable provisions of the **Bankruptcy Code**, including in *In re Wellpath Holdings, Inc.,* *Case No. 24-90533 (Bankr. S.D. Tex.).*

Furthermore, for the purpose of litigation preservation and regulatory reporting, I am formally placing on record that **all prior communications, including text messages, emails (both business and personal accounts), voicemails, and written correspondence** between us will be retained and may be presented to the appropriate legal or regulatory forums as needed. This includes all interactions pertaining to compensation, governance, administrative interference, and HR procedural matters.

As of the date of this email, I **will not be participating in any human resources investigation, disciplinary meeting, or administrative interview that is not formally led, supervised, or explicitly authorized by a California-licensed physician-shareholder of CFMG**, consistent with the non-delegable legal obligations imposed by California law on professional medical corporations.

Given the procedural posture of my legal filings, and to avoid even the appearance of informal discovery or unauthorized influence, I must now take the additional step of ceasing all direct contact with you. **This message shall constitute my final direct communication via email, phone, or text.** I will be blocking your personal number from my mobile device effective immediately. If further communication is required, it must be routed through the proper legal or regulatory authorities or a duly authorized California-licensed CFMG officer.

This action is not personal, but rather a necessary legal safeguard in view of the active litigation involving over $375,000 in deferred wages, penalties, and related losses, and to ensure the integrity of all proceedings leading into the April 22, 2025 bankruptcy hearing.

Thank you for your prior communication. This matter is now within the exclusive purview of counsel, investigators, and appropriate regulatory bodies.

Sincerely,
**Dr. Kanwar P. Gill**
Senior Physician – Fresno County Adult Detention Facility
Email: kpsgill@kpsgill.com
Sent from personal account for documentation and independence purposes

On Wed, Apr 9, 2025 at 12:43 PM Dheeraj Taranath <DTaranath@wellpath.us> wrote:

> Dr. Gill,
>
> As you are aware, Wellpath is the Management Services Organization contracted to provide the full range of administrative services to CFMG. As such, I am responding to your email below.
>
> I am not going to debate whether any offers to resolve your deferred compensation plan claims were made. You have confirmed that you rejected anything that even resembled an offer. We are in agreement that no offers are on the table.
>
> I disagree with your assertion that there has been any rejection of a "legally compliant resolution process," whatever that might mean. If you want to engage in a legal discussion, please engage counsel and have them contact our lawyers. Your allegations relating to CFMG's obligations under the California Medical Practice Act are both unsupported and baseless, and simply have no merit.
>
> Your various allegations will be addressed by the appropriate parties. I understand you have already been in contact with Ms. Angie Baldwin regarding the HR-related issues.
>
> With respect to the laundry list of questions and issues in your email, you can direct them to the investigator(s) when they contact you. I encourage you to engage counsel as you are making serious allegations that we believe are legally inaccurate and the defamatory statements you are making may be actionable.
>
> I ask that you stop sending repetitious emails stating your complaints and unsupported allegations. It is not a productive use of either your time or mine.
>
> Respectfully,
>
> **Dheeraj Taranath, DO, MBA, MS**
>
> Chief Medical Officer



3340 Perimeter Hill Dr., Nashville, TN 37211

M 304-376-4036

LinkedIn // Facebook // Twitter

WellpathCare.com

---

**From:** Kanwar Gill <KaGill@Wellpath.us>
**Sent:** Tuesday, April 8, 2025 6:53 PM
**To:** Dheeraj Taranath <DTaranath@Wellpath.us>; Kanwar Gill MD <kpsgill@kpsgill.com>;
Kerrie.Webb@mbc.ca.gov
**Cc:** Grady J Bazzel <JBazzel@Zenovacare.com>; Richard M. Medrano <RMedrano@Wellpath.us>; Scott Kennedy
<ScottKennedy@Wellpath.us>; Angie Baldwin <ARBaldwin@Wellpath.us>
**Subject:** Clarification on HR Oversight, HR scope and Direction for Non-Bankruptcy Matters
**Importance:** High


**Subject:** Clarification on Oversight, HR Scope, and Direction for Non-Bankruptcy Issues
**To:** Dr. Dheeraj Taranath
**CC:** Ms. Angie Baldwin, Dr. Grady Bazzel
**From:** Dr. Kanwar Gill
**Date:** April 8, 2025

In Complaint/Matter Before Medical Board of California regarding:

• Dr. Grady Judson Bazzel – California P&S License No. C 53908, Chief Executive Officer, CFMG

• Dr. Richard M. Medrano – California P&S License No. A 103477, Secretary, CFMG

• Dr. Scott Herbert Kennedy – California P&S License No. C 171808, Chief Financial Officer, CFMG


Dear Dr. Taranath,

Thank you for your message. I acknowledge your update confirming that Wellpath, in its role as Management Services Organization for CFMG, has communicated with CFMG leadership regarding the matters I raised. I also understand that, based on your joint assessment with CFMG leadership, the previously scheduled April 11 in-person meeting has now been unilaterally canceled by CFMG. Additionally, you've stated that any prior communications that could be construed as settlement offers are withdrawn and that the bankruptcy proceedings will now solely govern my deferred compensation claim, with further communication directed to McDermott Will & Emery.

For the record, I must clarify that at no point have I discussed or negotiated any dollar amount related to my deferred compensation claim with you personally. I categorically reject any suggestion that I was ever extended a legitimate or authorized offer through you. The only communications that resembled "offers" came from bankruptcy counsel at McDermott Will & Emery around March 20, 2025. Those proposals were unequivocally rejected by me at the time, as they were coercive in nature, conditioned on the withdrawal of legal filings, and accompanied by inappropriate non-disclosure requirements. They were not offered in good faith and were inconsistent with both bankruptcy ethics and California regulatory obligations.

More importantly, CFMG's unilateral cancellation of the April 11 meeting—an opportunity I explicitly requested for the presence of a California-licensed physician-officer with authority to resolve the matter internally—must be viewed as a willful rejection of a legally compliant resolution process. This decision eliminates CFMG's remaining opportunity to resolve my claims in accordance with California law, and it reinforces the concern that the organization is continuing in willful defiance of its legal obligations under the California Medical Practice Act.

As I have stated previously, I may ultimately lose my motions before the U.S. Bankruptcy Court in the Southern District of Texas. However, such an outcome does not absolve any party of its obligations under California law, nor does it preclude regulatory or civil enforcement at the state level. A loss in bankruptcy court does not equate to legal validation of the practices I have challenged—it simply reflects the narrow jurisdiction and procedural limits of that venue.

In light of these developments, I request immediate clarification on the following two key areas:

## 1. Direction for Non-Bankruptcy Matters:

While I understand that my deferred compensation claim is now being handled through the bankruptcy process, I ask for a clear directive as to how Wellpath and CFMG intend to address the other issues I have raised—specifically:

- Employment-related grievances
- Allegations of racial discrimination
- Constructive termination efforts
- Interference in clinical workflows
- Misappropriation of medical decision-making authority

Please advise whether these issues are still under the purview of Wellpath HR or CFMG physician leadership, or bankruptcy counsel. I request written clarification on the appropriate channels moving forward for each category of concern.

## 2. Scope and Oversight of the HR Investigation:

I understand Ms. Baldwin is currently reviewing relevant HR and employee relations matters. However, many of the issues raised fall outside a traditional HR framework and directly implicate:

- Violations of the California Medical Practice Act
- Fee-splitting concerns under Cal. Bus. & Prof. Code § 650
- Improper clinical interference by nonphysician administrators
- Racial bias and discriminatory promotion practices
- Retaliatory conduct targeting a whistleblower

As an employee of CFMG, a physician-owned and physician-controlled California medical corporation, any HR review touching on clinical governance, compensation, or disciplinary action must include oversight by a California-licensed physician-officer. Please confirm whether such oversight will be provided, and whether HR findings involving clinical decision-making will be subject to co-review and formal ratification by a CFMG shareholder physician.

**For the record, I reaffirm the following points:**

- I have maintained an unblemished clinical record over the past 5.5 years, consistently improving outcomes and reducing costs.
- I have formally reported wage misclassification, improper deferred compensation handling, and administrative interference to multiple regulatory bodies.
- I have filed a pending complaint with the Medical Board of California regarding failures by three CFMG shareholder physicians to protect physician autonomy.
- I had called for an April 11 internal resolution meeting, which was a final opportunity to address these matters lawfully. That meeting has now been unilaterally canceled by CFMG.

**Outstanding Clarification Requests:**

I respectfully request your timely response to the following:

- Will Ms. Baldwin's HR review include the racial discrimination, retaliation, and clinical interference allegations I have outlined?
- Will CFMG assign a California-licensed physician-officer with decision-making authority to co-lead or oversee HR matters affecting licensed medical practice?
- What internal pathway remains for resolution of non-bankruptcy issues, including clinical interference and professional governance?
- Do you require any further documentation from me at this stage?
- Will the delayed APAP procurement for patient #0059555—an incident emblematic of improper administrative obstruction—be incorporated into the ongoing review?

Thank you again for your attention. I remain committed to pursuing a lawful and good faith resolution wherever possible and look forward to receiving your response and clarification on next steps.

Respectfully,
**Dr. Kanwar Gill**
Senior Physician, Fresno County Adult Detention Facility
1225 M Street, Fresno, CA 93721
Office: (559) 600-9365 | Email: KaGill@wellpath.us

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

---

**From:** Dheeraj Taranath <DTaranath@Wellpath.us>
**Sent:** Tuesday, April 8, 2025 2:54 PM
**To:** Kanwar Gill MD <kpsgill@kpsgill.com>; Kanwar Gill <KaGill@Wellpath.us>
**Cc:** Grady J Bazzel <JBazzel@Zenovacare.com>; Richard M. Medrano <RMedrano@Wellpath.us>; Scott Kennedy <ScottKennedy@Wellpath.us>
**Subject:** Resolution response

Dr. Gill,

As you are aware, Wellpath is the Management Services Organization contracted to provide the full range of administrative services to CFMG. As such, we have reviewed the matters you have raised with CFMG leadership, and we continue to communicate with you with their knowledge and approval.

As previously noted, Cindy and I were planning to come out to California to meet with you in a good faith attempt to resolve the disagreement regarding your claim for deferred compensation. In light of the numerous false statements in your correspondence, we have recommended to CFMG leadership, and they have agreed that a meeting would not be productive; therefore, please be advised that the meeting is now canceled. To the extent that any prior correspondence could be interpreted as an offer to resolve your claim, any such offer is withdrawn.

The bankruptcy proceedings will determine the results of your claim. Our counsel has advised us that your arguments are legally invalid and they believe they will be summarily rejected by the court. Please direct all future correspondence regarding the matter to the court or to our lawyers with McDermott, Will & Emery; you may contact David Genender (dgenender@mwe.com).

Regards,

**Dheeraj Taranath, DO, MBA, MS**

Chief Medical Officer



To hope and healing.

3340 Perimeter Hill Dr., Nashville, TN 37211

M 304-376-4036

LinkedIn // Facebook // Twitter

WellpathCare.com

**KPSGILL.COM**                                    Kanwar Partap Singh Gill <kpsgill@kpsgill.com>

---

## Updated Submission Re: Drs. Bazzel (C 53908), Medrano (A 103477), Kennedy (C 171808) – Request for Vertical Enforcement
1 message

---

**Kanwar Gill MD** <kpsgill@kpsgill.com>                          Sat, Apr 5, 2025 at 1:58 PM
To: "Kerrie@MBC Webb" <Kerrie.Webb@mbc.ca.gov>
Cc: "webmaster@mbc.ca.gov" <webmaster@mbc.ca.gov>

To: Central Complaint Unit, Medical Board of California

Cc: Kerrie Dargine Webb, Staff Counsel – Kerrie.Webb@mbc.ca.gov

Subject: Updated Submission Re: Drs. Bazzel (C 53908), Medrano (A 103477), Kennedy (C 171808) – Request for Vertical Enforcement

Dear Central Complaint Unit,

I write to provide an important update to a prior communication sent regarding the following California-licensed physicians, all of whom are senior officers at California Forensic Medical Group (CFMG):

• Dr. Grady Judson Bazzel – License No. C 53908, Chief Executive Officer, CFMG

• Dr. Richard M. Medrano – License No. A 103477, Secretary, CFMG

• Dr. Scott Herbert Kennedy – License No. C 171808, Chief Financial Officer, CFMG

Please find re-attached the relevant forwarded email and, for reference, the Third Monthly Fee Statement (Docket 2081) filed April 3, 2025, in the Wellpath Holdings bankruptcy case (TXSB 24-90533). This docket entry significantly clarifies and reinforces the concerns I previously raised.

Summary of Concerns – Clarified Findings from Docket 2081

Upon further analysis of Docket 2081, it is now evident that:

1. Deferred Physician Compensation Was Explicitly Reviewed Yet Ignored:

McDermott Will & Emery attorneys billed for time reviewing deferred physician compensation on February 6, 2025, acknowledging it as a legal issue of concern. Yet, no meaningful disclosure or remedy appears in the reorganization plan (Docket 1770) or accompanying disclosures.

2. Executive Compensation Was Aggressively Prioritized:

Legal time entries show robust, coordinated efforts to protect and enhance executive bonuses (KEIP/KERP) while compensation owed to practicing physicians—including those licensed in California—remained structurally deprioritized.

3. Wellpath Assumed Control Over CFMG Physician Payments:

It is evident that Wellpath executives and attorneys—not CFMG—are managing, renegotiating, and restructuring physician financial obligations. This raises grave concerns under California's Corporate Practice of Medicine (CPOM) doctrine and suggests an unlawful fee-splitting arrangement between non-physician entities and physicians.

4. The Restructuring Plan Actively Obscures Accountability:

The Fourth Amended Plan fails to identify or isolate CFMG-specific liabilities, effectively shielding non-debtor insiders while placing California patients, especially those in correctional health environments, at risk.

Request for Medical Board Consideration

I understand the Medical Board does not act on demand from third parties, and I am not directing any specific action. However, as a physician, I do not have standing to pursue these structural and regulatory violations alone. I respectfully submit that this situation merits direct intervention by the Medical Board, as the corporate practice of medicine prohibition is squarely implicated, and fee-splitting risks patient safety and undermines professional independence.

Additionally, based on your website's stated mandate to uphold CPOM standards and safeguard patient welfare, I believe this matter warrants a strong vertical enforcement referral to the Office of the Attorney General. Given the legal direction of the bankruptcy proceedings, this issue will likely escalate to that level regardless.

## Conclusion

I request that this submission be added to the existing complaint file involving Drs. Bazzel, Medrano, and Kennedy. The newly analyzed materials provide a far more comprehensive and documented basis than my prior message and should be considered as clarifying and supplementing that submission.

I appreciate your time and continued review of this matter.

Sincerely,

Kanwar Gill, MD

[kpsgill@kpsgill.com]

Attachments:

• Forwarded email (originally sent April 5, 2025)

• Docket 2081 – Third Monthly Fee Statement (TXSB 24-90533)

Best Regards,
Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

Begin forwarded message:

**From:** Kanwar Gill MD <kpsgill@kpsgill.com>
**Date:** April 5, 2025 at 1:18:58 PM PDT
**To:** Richard Medrano <RMedrano@wellpath.us>, Scott Kennedy <ScottKennedy@wellpath.us>, Marc Goldstone <MGoldstone@wellpath.us>, Bradley Giordano <Bgiordano@mwe.com>, Steven Szanzer <sszanzer@mwe.com>, Felicia Perlman <Fperlman@mwe.com>, J Bazzel <jbazzel@wellpath.us>
**Cc:** webmaster@mbc.ca.gov
**Subject:** Fwd: Concerning Evidence of Deferred Compensation Neglect & Executive Compensation Prioritization – April 3 Filing (Docket 2081)

• Regarding:

- Dr. Grady Judson Bazzel – License Number: C 53908
  Chief Executive Officer, CFMG
- Dr. Richard M. Medrano – License Number: A 103477
  Secretary, CFMG
- Dr. Scott Herbert Kennedy – License Number: C 171808
  Chief Financial Officer, CFMG

I request medical board of California Central complaint unit file this with existing complaint file and consider this message for vertical enforcement by attorney general 's office. I understand the burden of proof is now preponderance of evidence, and it is my belief that burden has been met. I request Medical Board to expedite this investigation and revoke the licenses of all the physicians as there is imminent danger to the people of California if they continue to practice medicine in the state of California. Please take this issue on an emergent basis And please have these vertically general's , Office issue Cease practice order. All these three individual physician are interfering with delivery of care and their continuous interference at this time is causing significant permanent injury to the people of California especially the incarcerated individuals.

Forwarded message attached.

Best Regards,
Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

Begin forwarded message:

**From:** Kanwar Gill MD <kpsgill@kpsgill.com>
**Date:** April 5, 2025 at 12:38:58 PM PDT
**To:** Dheeraj Taranath <DTaranath@wellpath.us>, J Bazzel <jbazzel@wellpath.us>, "Kerrie@MBC Webb" <Kerrie.Webb@mbc.ca.gov>, Steven Szanzer <sszanzer@mwe.com>, Marcus Helt <Mhelt@mwe.com>, Felicia Perlman <Fperlman@mwe.com>, Bradley Giordano <Bgiordano@mwe.com>
**Cc:** "Kerrie@MBC Webb" <Kerrie.Webb@mbc.ca.gov>
**Subject: Concerning Evidence of Deferred Compensation Neglect & Executive Compensation Prioritization – April 3 Filing (Docket 2081)**

Subject: Concerning Evidence of Deferred Compensation Neglect & Executive Compensation Prioritization – April 3 Filing (Docket 2081)

Email Copied to Medical Board -

- Kerrie Dargine Webb, Staff Counsel
  Medical Board of California, 2005 Evergreen St Ste 1200, Sacramento, CA 95815-5401
  Phone: 916-263-2389 | Fax: 916-263-2387

- •
  - Regarding:

- Dr. Grady Judson Bazzel – License Number: C 53908
  Chief Executive Officer, CFMG
- Dr. Richard M. Medrano – License Number: A 103477
  Secretary, CFMG
- Dr. Scott Herbert Kennedy – License Number: C 171808
  Chief Financial Officer, CFMG

Dear California Licensed Medical Doctors:

I hope this message finds you well. I am reaching out today to share a very recent and significant development in the bankruptcy case of Wellpath Holdings, Inc. (TXSB 24-90533) that directly impacts physicians, including those who rendered services under CFMG agreements.

On April 3, 2025, McDermott Will & Emery LLP—counsel to Wellpath—filed their Third Monthly Fee Statement (Docket 2081 - attached). Upon close analysis of the time entries disclosed, I want to bring to your attention what appears to be a coordinated, internal legal effort to address executive compensation (KERP/KEIP) while failing to resolve, disclose, or account for unpaid deferred compensation owed to physicians, including California-licensed doctors working through CFMG contracts.

Key Findings from Docket 2081:

1. Acknowledged Deferred Compensation Exposure – But No Resolution

On February 6, 2025, attorney Carmen Dingman billed time to:

> "Review, analyze deferred compensation issues (.6); correspond with Company, FTI team re same (.3); review wages motion re same (.4)" [See Docket 2081, p. 74].

This shows that deferred compensation was being actively reviewed at high levels, but there is no indication in the Disclosure

Statement (Docket 1770) or the Plan that this issue was addressed in terms of legal obligations or protections for physicians.

## 2. Misplaced Priorities: Executive Bonuses vs. Physician Compensation

The same docket reflects significant hours spent by senior restructuring counsel (Szanzer, Giordano, Perlman, etc.) designing and defending executive compensation packages (KEIP/KERP) through detailed analysis, drafting declarations, and negotiating retention terms. Meanwhile, deferred compensation owed to physicians remained unremedied.

## 3. Wellpath Unilaterally Controlling CFMG Physician Compensation

Based on docketed internal discussions and filings, it is clear that Wellpath attorneys—not CFMG—have assumed authority over compensation structures originating from CFMG-contracted physicians. Yet the plan of reorganization (Docket 1770) fails to distinguish CFMG-specific liabilities or obligations to California-licensed physicians from those of other corporate affiliates, effectively consolidating responsibility while eliminating traceability or direct accountability.

This unilateral treatment raises serious concerns under California's corporate practice of medicine laws and creates exposure for CFMG in allowing a third party (Wellpath) to manage and restructure financial liabilities tied to professional services rendered by California-licensed physicians.

## 4. Non-Disclosure in the Plan and Disclosure Statement

Despite internal acknowledgment of these issues, the Fourth Amended Disclosure Statement and Plan omit any mention of:

- Deferred compensation liabilities,
- The legal basis for releasing non-debtor entities,
- Regulatory risks under California CPOM doctrine.

## Why This Matters Ahead of April 14

This April 3 filing is critical because it reflects what is happening behind the scenes—a deliberate legal strategy that deprioritizes deferred physician earnings while fully protecting insiders and executives. This occurs without clear direction or opt-in consent from CFMG, despite the direct impact on your contracted medical workforce.

As we prepare for our in-person meeting on April 14, I urge both of you to review this docket carefully. It evidences a systemic failure to equitably and transparently resolve compensation obligations to physicians, many of whom have been frontline caregivers in county and correctional systems under CFMG contracts.

Please let me know if you would like me to forward the full docket entry or compile specific highlighted time records in advance of our meeting. I would welcome the opportunity to discuss this further and work toward a legally compliant and ethically grounded resolution.

Best Regards,

Kanwar Gill MD

**IMPORTANT CONFIDENTIALITY NOTICE:**

Transmission of this message does not waive doctor-patient, attorney-client, work product, or intellectual property privileges. Title 18 U.S. Code§ 2511 prohibits interception and disclosure of this electronic communication.

---

TXSB 24-90533 2081 - Statement  Third Monthly Fee Statement of McDermott Will &.pdf
2655K

## EXHIBIT 3

## IRC § 409A – DISCLOSURE STATEMENT PURSUANT TO IRS FORM 8275 STANDARDS

Submitted by Dr. Kanwar Partap Singh Gill, Pro Se Movant

United States Bankruptcy Court – Southern District of Texas – Houston Division

Case No. 24-90533 – In re Wellpath Holdings, Inc.

### 1. Taxpayer Information

Taxpayer Name: Dr. Kanwar Partap Singh Gill
Filing Status: Married Filing Jointly
Tax Year(s) Affected: 2022, 2023, and 2024
Address: 8408 N. Ann Ave, Fresno, CA 93720

### 2. Nature of Disclosure and Legal Basis

This statement is submitted pursuant to the principles of IRS Form 8275 to disclose a position that may affect the income tax liability of the taxpayer under Internal Revenue Code (IRC) § 409A. The disclosure is made in good faith to avoid potential underpayment penalties under IRC §§ 6662 and 409A. The taxpayer seeks to demonstrate that there is a reasonable basis for the tax position taken regarding nonqualified deferred compensation (NQDC) deferred but not paid due to a third-party bankruptcy.

### 3. Factual Background

Dr. Kanwar Partap Singh Gill, a California resident and licensed physician, began deferring a portion of his earned wages into a nonqualified deferred compensation plan beginning January 1, 2022. The deferred amounts were solely funded from his own salary as an employee of California Forensic Medical Group, Inc. (CFMG), a non-debtor, physician-owned corporation. There were no employer contributions, bonuses, or severance components included in the deferrals.

As of November 12, 2024, the taxpayer's NQDC account balance totaled $162,597.08. These funds were administered by Wellpath Holdings, Inc., a management services organization that subsequently filed for Chapter 11 bankruptcy. Due to the bankruptcy filing, the funds became frozen and inaccessible to the taxpayer.

## 4. Issue Presented

Whether the taxpayer should be subject to immediate income inclusion and penalties under IRC § 409A(a)(1)(B) due to nonpayment of deferred compensation that was properly deferred but rendered inaccessible by the bankruptcy of a third-party administrator (Wellpath Holdings, Inc.).

## 5. Legal Position and Authorities

The taxpayer asserts that the failure to distribute deferred compensation is attributable solely to the unforeseen and involuntary bankruptcy of the administrator and not due to any election failure, operational error, or impermissible acceleration on the part of the taxpayer.

Under the 409A Treasury Regulations (26 C.F.R. § 1.409A-3(g)(5)), a distribution can be delayed if the employer's ability to make the payment would jeopardize the ability of the employer to continue as a going concern. The taxpayer respectfully asserts that the delay in payment due to bankruptcy satisfies this condition.

Additionally, the taxpayer has taken proactive steps to seek relief from the automatic stay in the bankruptcy case to obtain these funds, as documented in Docket Nos. 1897, 2049, and 2075 of the referenced case.

## 6. Penalty Relief Requested

The taxpayer respectfully submits this disclosure to demonstrate reasonable cause and good faith pursuant to Treasury Reg. § 1.6662-4(e) and IRS Form 8275 guidance. The taxpayer requests relief from any:
• Immediate gross income inclusion under IRC § 409A(a)(1)(A);
• Additional 20% tax under IRC § 409A(a)(1)(B)(ii);
• Accuracy-related penalty under IRC § 6662;
• Interest penalties for underpayment or late payment arising from delayed inclusion;
• California Franchise Tax Board 5% penalty conforming to IRC § 409A.

## 7. Supporting Documentation

• Account Summary dated November 12, 2024 (showing vested balance of $162,597.08);
• April 10, 2025 Legal Notice (Exhibit 1);
• Supplemental Brief filed April 14, 2025 (referencing Dkts. 1897, 2049, 2075).

**Executed this 11th day of April, 2025**

Respectfully submitted,

/s/ Dr. Kanwar Partap Singh Gill
Dr. Kanwar Partap Singh Gill, M.D.
Pro Se Movant and Creditor
8408 N. Ann Ave
Fresno, CA 93720
Phone: (559) 447-8490
Email: kpsgill@kpsgill.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS – HOUSTON DIVISION

In re:
Wellpath Holdings, Inc., et al.,
Debtors.
Case No.: 24-90533
Chapter 11

## PROOF OF SERVICE

I, Dr. Kanwar Partap Singh Gill, declare that I am over the age of 18 and competent to testify. On April 11, 2025, I served a true and correct copy of the following document:

Supplemental Brief in Support of (1) Motion for Relief from Automatic Stay (Dkt. 1897), (2) Emergency Motion to Stay Plan Solicitation and Voting (Dkt. 2049), and (3) Motion to Strike Improper Third-Party Releases (Dkt. 2075)

This document and all accompanying exhibits were served via First-Class U.S. Mail and/or Electronic Mail (where available) to the following parties:

### Debtors' Counsel – McDermott Will & Emery LLP

- Marcus Alan Helt, Esq.
  2501 North Harwood Street, Suite 1900
  Dallas, TX 75201
  Email: mhelt@mwe.com
- Carolee W. Wurzelbacher, Esq.
  444 West Lake Street, Suite 4000
  Chicago, IL 60606
  Email: cwurzelbacher@mwe.com
- Darren Azman, Esq.
  One Vanderbilt Avenue
  New York, NY 10017
  Email: dazman@mwe.com
- Felicia Perlman, Esq.; Steven Szanzer, Esq.; Bradley Giordano, Esq.
  (same addresses as above)

### Unsecured Creditors' Committee Counsel – Stinson LLP

- **Zachary Hemenway, Esq.**
  1201 Walnut Street, Suite 2900
  Kansas City, MO 64106
  Email: zachary.hemenway@stinson.com
- **Nicholas Zluticky, Esq.**
  Email: nicholas.zluticky@stinson.com
- **Lucas Lyle Schneider, Esq.**
  1144 Fifteenth Street, Suite 2400
  Denver, CO 80202
  Email: lucas.schneider@stinson.com

## Office of the United States Trustee (Region 7, Southern District of Texas)

- **Susan Rogers Her, Trial Attorney**
- **Ha Nguyen, Trial Attorney**
  515 Rusk Street, Suite 3516
  Houston, TX 77002
  Email: USTPRegion07.HU.ECF@usdoj.gov

## Wellpath Holdings, Inc. — Debtor Executives

- **Ben Slocum, CEO**
- **Marc Goldstone, Chief Legal Officer**
- **Dr. Dheeraj Taranath, Interim Chief Clinical Officer**
  3340 Perimeter Hill Drive
  Nashville, TN 37211
  Email: bankruptcymail@wellpath.us

## California Forensic Medical Group, Inc. — Non-Debtor Affiliate

- **Grady J. Bazzel, CEO**
- **Scott Kennedy, CFO**
- **Richard J. Medrano, Secretary**
  Primary Address: 3340 Perimeter Hill Drive, Nashville, TN 37211
  California Office: 1325 J Street, Suite 1550, Sacramento, CA 95814

## Regulatory & Enforcement Authorities

- **Medical Board of California – Enforcement Division**
  2005 Evergreen Street, Suite 1200
  Sacramento, CA 95815
- **California Attorney General Rob Bonta**
  Health Quality Enforcement Section
  1300 I Street
  Sacramento, CA 95814
- **California Labor Commissioner – Lilia García-Brower**
  Dept. of Industrial Relations
  1515 Clay Street, Suite 801
  Oakland, CA 94612
  Email: LCOServiceRequests@dir.ca.gov
- **Internal Revenue Service – Fraud & Enforcement**
  PO Box 3801
  Ogden, UT 84409
- **U.S. Department of Labor**
  Wage and Hour Division (WHD)
  Employee Benefits Security Administration (EBSA)
  200 Constitution Ave., NW
  Washington, DC 20210
- **U.S. Department of Justice – Executive Office for U.S. Trustees (EOUST)**
  441 G Street NW, Suite 6150
  Washington, DC 20530
  Email: USTrustee.Program@usdoj.gov

## Additional Governmental Agency Served

- **Fresno County Counsel – Daniel C. Cederborg**
  Office of the County Counsel
  2220 Tulare Street, Suite 500
  Fresno, CA 93721
  Email: dcederborg@fresnocountyca.gov

## Declaration of Service

I certify under **penalty of perjury** under the laws of the United States that the foregoing is true and correct. The above-listed parties were served on **April 11, 2025**, as described above. This declaration was executed in Fresno, California.

*Kanwar Partap S. Gill*

**Respectfully submitted,**

/s/ Dr. Kanwar Partap Singh Gill    *April 11th 2025*

**Dr. Kanwar P. S. Gill**
Pro Se Movant and Creditor
8408 N. Ann Ave
Fresno, CA 93720
Phone: (559) 447-8490
Email: kpsgill@kpsgill.com

# IN UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

In re:

**Wellpath Holdings, Inc., et al.,**

Debtors.

§

§ **Chapter 11**

§ Case No. 24-90533 (ARP)



---

## NOTICE OF HEARING ON SUPPLEMENTAL BRIEF

(This **Supplemental Brief in Support of (1) Motion for Relief from the Automatic Stay (Dkt. 1897), (2) Emergency Motion to Stay Plan Solicitation and Voting (Dkt. 2049), and (3) Motion to Strike Improper Third-Party Releases (Dkt. 2075)** (collectively, the "Supplemental Motion") has been filed by **Dr. Kanwar Partap Singh Gill**, pro se Movant.

The Court has set a hearing on these matters before the **Honorable Judge Alfredo R. Pérez**, United States Bankruptcy Judge for the Southern District of Texas, Houston Division, as follows:

---

- **DATE:** Tuesday, April 22, 2025
- **TIME:** 2:00 p.m. (Central Time)
- **COURTROOM:** Courtroom 400

---

First Declaration of Dr Kanwar Partap Singh Gill MD, 8408 N Ann Ave Fresno CA 93720 April 19th, 2025 (Notarized)   Page 347

- ○ **LOCATION:** United States Bankruptcy Court

Southern District of Texas – Houston Division

515 Rusk Street, Houston, TX 77002

---

## REMOTE PARTICIPATION OPTIONS

**Video Participation (GoToMeeting):**

- Join via: https://meet.goto.com/JudgePerez

*Access restricted to parties and counsel of record*

**Telephonic Participation:**

- Dial: **(832) 917-1510**
- Conference Code: **282694**

*All video participants must maintain an active phone connection.*

---

## NOTICE TO PARTIES IN INTEREST

This **Supplemental Brief** contains additional factual and legal support for previously filed motions. The relief requested includes:

- **Relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1),** to allow Movant to assert regulatory, employment, and non-estate claims outside of the bankruptcy process;
- **Authorization to recover deferred compensation** from non-debtor sources, including California Forensic Medical Group, Inc. (CFMG), and related fiduciary or trust accounts;

---

- **Striking of non-consensual third-party releases** under binding precedent from the U.S. Supreme Court (*Harrington v. Purdue Pharma L.P.*, 603 U.S. ___ (2024)) and the Fifth Circuit (*In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009));
- **Temporary stay or corrective relief** regarding plan solicitation and confirmation to ensure compliance with 11 U.S.C. § 1129(a)(3) and prevent improper confirmation of a plan proposed by means forbidden by law.

## OPPOSITION PROCEDURES

Any party who opposes the relief sought is encouraged to file a written response **at least seven (7) days before the hearing,** consistent with the Local Rules of the Southern District of Texas. The Court may grant the requested relief **without further notice** if no objection is timely filed or raised at hearing.

All parties must appear at the hearing and be prepared to present evidence. Represented parties must appear through counsel.

## Court Contact Information

- **Case Manager:** Tyler Laws
Email: Tyler_Laws@txs.uscourts.gov | Phone: (713) 250-5421
- **Courtroom Deputy:** Akeita House
Email: Akeita_House@txs.uscourts.gov | Phone: (713) 250-5713

**Dated:** April 11, 2025

**Respectfully submitted,**

**Dr. Kanwar Partap Singh Gill, M.D.**

Pro Se Movant

8408 N Ann Ave

Fresno, CA 93720

Phone: (559) 447-8490

Email: kpsgill@kpsgill.com



TO REUSE: Mark through all previous shipping labels and barcodes.

ORIGIN ID:FYTA  (559) 447-6490
KANWAR GILL
8408 N ANN AVE

FRESNO, CA 93720
UNITED STATES US

TO COURTROOM 400
US BANKRUPTCY COURT — SOUTHERN DIST
515 RUSK ST

HOUSTON TX 77002

SHIP DATE: 12APR25
ACTWGT: 1.0 LB
CAD: 107164W/WSAB0410

FedEx
Express

MON – 14 APR 10:30A
PRIORITY OVERNIGHT

77002
TX-US  IAH

TRK#  8804 9920 7510

XA EIXA

United States Courts
Southern District of Texas
FILED

APR 14 2025

Nathan Ochsner, Clerk of Court

Align bottom of peel-and-stick airbill or pouch here.

Reusable
Sturdy Pak
Recycle me.

Delivered by U.S. Postal Service

First Declaration of Dr Kanwar Partap Singh Gill MD, 8408 N Ann Ave Fresno CA 93720 April 19th, 2025 (Notarized)