UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>WELLPATH HOLDINGS, INC., et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-90533 (ARP) |

# OBJECTIONS OF CLAIMANTS TO CONFIRMATION OF THE DEBTORS' PROPOSED PLAN OF REORGANIZATION

TO THE HONORABLE JUDGE OF THE UNITED STATES BANKRUPTCY COURT SITTING IN THE SOUTHERN DISTRICT OF TEXAS:

Claimants Layla Capaci, as administrator of the Estate of Niki Capaci, Teesha (Ontiveros) Graham, as personal representative (under the New Mexico Wrongful Death Act) for Frankie Jacquez, and Cary Moone, as power of attorney for her father, Jerry Moone, by and through undersigned counsel, respectfully object to confirmation of the Debtors' Proposed Plan of Reorganization (the "Plan"). The Plan is unconfirmable because the Debtors have not shown that it is feasible, as required by 11 U.S.C. § 1129(a)(11) and was not proposed in good faith, as required by 11 U.S.C. § 1129(a)(3). While bankruptcy courts typically give broad latitude to plan proponents on feasibility grounds, this case provides the rare scenario where the Plan fails to clear even a low hurdle. The Plan fails to sufficiently address the Debtors' high professional liability costs, one of the three primary stated reasons for its bankruptcy. Without a detailed plan to

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Wellpath.

address these costs, Claimants' experts project that, under the Plan, the Reorganized Wellpath can expect to incur far more in professional liability costs than the Debtor's financial projections claim — and can expect insufficient cash flow to pay them, rendering the Debtors inadequately capitalized on the effective date of the Plan.

## I. PRELIMINARY STATEMENT

Wellpath, Inc., one of the nation's largest correctional healthcare providers, filed for Chapter 11 bankruptcy in November 2024, citing a recent downturn in its financial stability. Among the three primary reasons Wellpath provided for its bankruptcy is rising professional liability expenses driven by a broad self-insurance program, developed in response to a lack of access to affordable third-party insurance, and excessive lawsuit settlements.

Per its filings, Wellpath paid $110 million in professional liability claims between 2019 and 2023 and faced roughly 1,500 outstanding lawsuits at the time of filing, the vast majority related to medical malpractice.[2] *See* Dkt. 17 par. 1. These lawsuits allege systemic deficiencies in the provision of medical care, including cases of gross negligence and preventable deaths among incarcerated people. The large volume of past and pending lawsuits stem from operational failures, including chronic understaffing, inadequate training, harmful policies, and systemic neglect.

Underscoring the Debtors' dire and worsening state of operations, there were more than 1,250 media articles about lawsuits against Wellpath in 2024 alone, compared

---

[2] Wellpath notes that 70 percent of its settlements in 2023 stem from incidents prior to 2018, when the Debtor was formed by HIG Capital through the merger of Correct Care Solutions and Correctional Medical Group Companies. The Debtor appears to be suggesting that the operational failures that led to these lawsuits are not a present issue. However, lawsuits typically take years to go through the courts and thus it is expected that those that have already been settled stem from incidents that date further back. Most of Wellpath's roughly 1,500 pending lawsuits allege medical malpractice claims from much more recent incidents, illustrating its continued operational failures.

to 575 articles in 2017 about its predecessors Correct Care Solutions and Correctional Medical Group Companies combined.[3] One article covered the case of a present Claimant's decedent, Niki Capaci, a mother of seven, who died in 2023 in a New York county jail after a Wellpath employee gave her medication she was intolerant to while going through severe opioid withdrawal. In 2024, a report by the New York State Commission of Correction confirmed that Ms. Capaci received inadequate care.[4]

Government audits routinely confirm Wellpath's operational failures. A June 2024 audit by the Alameda County Sheriff's Office reported that Wellpath was ***zero percent compliant*** with the essential "access to care" standard, which requires that "the patient is seen by a qualified health care professional, is rendered an appropriate clinical judgment, and receives care that is ordered." In fact, Wellpath was at least fifty percent compliant in just one out of ten audit standards.[5]

Wellpath has a history of attempting to evade responsibility, going so far as to destroy or fabricate evidence. In Oregon, for example, a judge found that Wellpath executives intentionally deleted emails connected to wrongful death allegations.[6] In Monterey County, California, Wellpath failed to meet 43 out of 44 care standards after a court order, despite initially claiming compliance through a private auditor. Wellpath admitted to its noncompliance only after it was revealed that its auditors never even visited the jail.[7]

---

[3] *Meltwater.com* media search. Conducted 13 Jan. 2025.
[4] Diaz, Jaclyn. *A Health Care Provider That Faced Dozens of Prisoner Lawsuits Is Filing for Bankruptcy*. *NPR*, 27 Dec. 2024.
[5] *Medical Quality Assurance Monthly Results Report*. Forvis Mazars, Alameda County Sheriff's Office, June 2024.
[6] Wilson, Conrad. *Oregon Jail Health Care Provider Destroyed Evidence and Tried to Cover It Up, Judge Finds*. *OPB*, 3 Oct. 2024.
[7] Calkins, Royal. *Wellpath Admits Failures at Monterey County Jail*. *Voices of Monterey Bay*, 14 Nov. 2024.

Further, Wellpath staff has given numerous accounts of ways in which the Debtors' policies and practices have hindered an ability to provide quality care. For example, one unionized Wellpath employee described waiting for their supervisor to leave before calling an ambulance because doing so was discouraged by the Debtors due to its high cost.[8] Indeed, the state of Michigan sued Wellpath for breach of contract after failing to pay $6 million that it owed to an ambulance service provider.[9] And Michigan is not the only state left holding millions in unpaid vendor bills: subcontractors in Georgia are claiming $75 million in unpaid bills.[10] Similar accounts can be found in the previously mentioned media coverage.

These operational and managerial failures have caused Wellpath to garner scrutiny all the way from Congress. In 2023, a group of Congressmembers led by Senator Elizabeth Warren launched an investigation into Wellpath concerned about chronic understaffing and cost-cutting that put the lives of incarcerated people at risk.[11] These concerns have been echoed in recent years across the country's courts, government agencies, media, and impacted communities. Their salience and prevalence undoubtedly have rightfully threatened Wellpath's ability to secure third-party professional liability insurance and created substantial professional liability costs for the Debtors, and there is no indication that these circumstances will change following the proposed restructuring.

---

[8] Account provided by a Wellpath union member represented by the National Union of Healthcare Workers.
[9] LeBlanc, Beth. *Michigan Sues Prison Health Care Provider, Alleges It Shorted Subcontractors $35M*. *The Detroit News*, 18 Sept. 2024.
[10] Robbins, Danny, and Carrie Teegardin. *Health Care Provider Bankruptcy May Stick Rural Georgia with State Prisoners' Medical Bills*. *The Atlanta Journal-Constitution*, 13 Feb. 2025.
[11] Ellis, Blake, and Melanie Hicken. *Senators Raise Alarm About Nation's Largest Prison Health Care Provider*. *CNN*, 19 Dec. 2023.

A feasible reorganization plan would tackle these challenges head-on. Yet in its Plan and motion to confirm, the Debtors have not offered details that they will make ***any improvements*** to Wellpath's healthcare provision, but have instead lauded its service quality. As such, one of the primary reasons the Debtors filed for bankruptcy remains a critical financial risk, one that the Debtor's financial projections appear to misrepresent and account for.

Claimants' experts, whose analysis focused narrowly on professional liability costs, estimate that these costs will be roughly double what the Debtors' financial projections assert, or 5.1 percent of revenue versus 2.7 percent of revenue. Based on these corrected estimates that more accurately assess professional liability costs using actual historical payouts from Wellpath, the Reorganized Wellpath would have insufficient cash flow and be inadequately capitalized, rendering the Plan unconfirmable under 11 U.S.C. § 1129(a)(11). And there are still other likely events that could negatively impact the reorganized business, such as the loss of contracts, that could worsen its financial stability. To establish feasibility and render the Plan confirmable, ***the Debtors must include a detailed plan for how they will improve Wellpath's healthcare services***, or provide a pathway for the Claimants' influence over such services, such that it will be able to secure affordable third-party insurance and mitigate future professional liability costs.

## II.     ARGUMENTS AND AUTHORITIES

**A.  The Debtors' Reorganization Plan is not feasible as it fails to demonstrate adequate capitalization and ability to pay debts as they come due.**

Under 11 U.S.C. § 1129(a)(11), a plan must be "not likely to be followed by liquidation, or the need for further reorganization, of the debtor or any successor." Courts

have consistently held that feasibility requires a showing of "a reasonable assurance of commercial viability."[12] The Plan fails this standard as it is based on unsupported financial projections that woefully underestimate the Debtors' post-confirmation professional liability costs and ignore other downside financial risks, namely the potential loss of contracts. Adjusting the Debtors' financial projections with just the corrected professional liability costs indicates that post-confirmation, the Debtors will be inadequately capitalized and have limited ability to pay debts as they come due, before even considering other potential downside risks. They will have no choice but to beat a hasty path back to insolvency proceedings, whether in this court or under state law. To present a feasible Plan, the Debtors must present operational improvements that would lower Wellpath's professional liability costs and increase the likelihood they can retain contracts.

1. ***The Debtors' projected professional liability costs are nearly double what the Plan projects.***

A debtor's solvency is judged by whether they are able to pay debts as they come due.[13] Further, a debtor's solvency, and it's chances of success of its reorganization, may be demonstrated under any of three tests: (1) the balance sheet test; (2) the cash flow test; and (3) the unreasonably small capital test.[14] Under the balance sheet test, solvency is determined by whether the fair value of the Debtors' assets exceeds their liabilities. Under the cash flow test, also referred to as the ability to pay debts test, solvency is

---

[12] *In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1165 (5th Cir. 1993); *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997).
[13] *In re Heritage Org., L.L.C.*, 413 B.R. 438, 464 (Bankr. N.D. Tex. 2009); see also 11 U.S.C. § 101(32)(A) (defining insolvency as the inability to pay debts as they become due); 11 U.S.C. § 1112(b)(4)(A) (listing as cause for dismissal or conversion the "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation").
[14]*In re Brentwood Lexford Partners, LLC*, 292 B.R. 255, 265 (Bankr. N.D. Tex. 2003); see also *In re Trinsum Grp., Inc.*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011).

determined by whether the Debtors have sufficient cash flow such that it is able to meet its capital obligations as they come due. Finally, under the unreasonably small capital test, also referred to as the adequate capital test, solvency is determined by whether the Debtors have sufficient capital to operate the business. If the Debtors fail any of these tests, the Plan would leave the Debtors insolvent on the effective date of the Plan. That outcome violates the statutory requirement that the Plan proponents show that the Plan is feasible under 11 U.S.C. § 1129(a)(11), and thus the Plan cannot be confirmed. In particular, bankruptcy courts deny confirmation on feasibility grounds when an emerging debtor will face serious cash flow or insufficient capital problems.[15]

The Claimants' experts, economists from the Brattle Group, find that, at a minimum, the Debtors' Plan fails the unreasonably small capital test. More specifically, Claimant's experts confirm that Reorganized Wellpath will use available cash to payoff financial stakeholders while building liabilities to future malpractice claimants with a limited ability to pay such debts when due, assuming no operational improvements after restructuring. That assumption is based on debtor's plan not addressing operational improvements in any way.

Using two widely accepted methods, the paid loss development method ("PLDM") and the Frequency-Severity method, Mr. McKnight's report estimates that the Debtors' professional liability costs are, in fact, double what is included in the Debtors' reports, at 5.1 percent of revenue rather than 2.7 percent of revenue. Appendix 1, pg. 22. While the Debtors have not provided support for the professional liability costs in their financial projections, actuarial estimates developed by KPMG in January 2024 were

---

[15] *See, e.g., Pookrum v. Bank of America, N.A.*, 512 B.R. 781, 789 (D. Md. 2014); *In re P.J. Keating Co.*, 168 B.R. 464, 472 (Bankr. D. Mass. 1994).

based on a variety of different metrics including claims paid, incurred losses, prior reserve estimates, and industry trends. In contrast to the prior actuarial estimates, Mr. McKnight bases his estimates on ***actual*** payments that Wellpath made for professional liability claims prior to bankruptcy.

Using this figure, Mr. Esses' report projects that the adjusted cash flow leaves the Reorganized Wellpath undercapitalized from adverse developments, is unsustainable, and likely unfinanceable. Appendix 2, pg. 3. By 2029, the debt, including the accrued insurance claims reserves, of the Reorganized Wellpath entity will be roughly 21 times unlevered free cash flow and unlevered free cash flow will be approximately 0.7 percent of revenue, leaving the Reorganized Wellpath unable to pay their debts as they come due and unable to access further capital on commercially reasonable terms. *Id*. Mr. Esses further explains that the enterprise value included in the Debtors' Plan confirms the fallacy of their projections, as the enterprise value depends on an implied and unsubstantiated Weighted Average Cost of Capital ("WACC") of approximately 32 percent and an unrealistic expectation of a cost of equity capital of 76 percent — figures that confirm the debtor's financial projections in their plan are too optimistic. *Id*. at pg. 20.

2. ***Additional downside risks may worsen the already stressed financial projections.***

While already inadequately capitalized, the chances of the Debtors' post-confirmation success could worsen further if the Debtors lose contracts. The lower end of the Plan's projections fails to incorporate such potential downside risks, which are not unlikely.

First, the Debtors' projections assume a rather steady state of business. However, multiple government agencies are actively considering cancelling their contracts with Wellpath, in large part ***due to the substandard care provided by Wellpath***. Some may also choose to part ways upon learning of the Debtors' multi-tiered fictional insurance scheme that was exposed during these bankruptcy proceedings. Most notably, advocates, supported by local elected officials, are leading a campaign in Alameda County, California to oust Wellpath, which began in June 2024[16] after a comprehensive audit found that Wellpath was ***zero percent compliant*** with the county's access-to-care standard and deficient in 90 percent of core categories.[17]

The deficiencies in Alameda were not an outlier. Similar failures have been documented in other places like Monterey County, California, where a federal monitor found that Wellpath met only one (1) of fort-four (44) performance standards.[18] The county recently opened bids for a new contract.[19] Just this month, Loudoun County, Virginia delayed renewing its contract with Wellpath after the county's Board of Supervisors shared ethical and financial concerns about the Debtors.[20] The list of potential contract losses is long and, losing any will make the the Debtors' Plan even less feasible.

---

[16] Lyman, Jeanita. *Advocates Call for Change to Santa Rita Jail's Medical Provider*. Pleasanton Weekly, 7 Apr. 2025.
[17] *Medical Quality Assurance Monthly Results Report*. Forvis Mazars, Alameda County Sheriff's Office, June 2024.
[18] Calkins, Royal. *Wellpath Admits Failures at Monterey County Jail*. Voices of Monterey Bay, 14 Nov. 2024.
[19] Rodriguez, Katie. *With Wellpath's Contract Set to Expire, County Opens Bids for Jail Health Care Providers*. Monterey County Now, 27 Feb. 2025.
[20] Raja, Bethany, and Evan Goodenow. *Supervisors Delay Renewing Wellpath Contract for Detention Center Medical Services*. Loudoun Times, 10 Apr. 2025.

3. ***The Plan has not proposed operational improvements to Wellpath's healthcare services.***

The Debtors claim they have taken mitigation steps but offer only two minor and insufficient examples: (1) the cancellation of 65 underperforming contracts for which it struggled to secure third-party professional liability insurance, and (2) increased provider training and awareness.

Cancelling underperforming contracts does not address the Debtors' broad operational failures in providing adequate healthcare that have led to thousands of lawsuits across the country, which it explicitly notes are undermining its ability to secure reasonably-priced third-party professional liability insurance. As the Claimants' experts state, the premiums for any third-party professional liability insurance the Debtors could currently secure would likely be as costly as the liability settlements themselves. The reality is that any contract can become underperforming at the moment a major lawsuit is filed, and the Debtors cannot sustainability cancel contracts every time such an event happens, especially since they happen so often. Further, once the lawsuits have been filed, Wellpath carries the liability cost whether or not the contract is later cancelled, unless it files for bankruptcy again.

While increasing provider training may be a promising start, the statement in the Plan is far too general to inspire confidence without specific details of the type of training and how it will be implemented and followed by staff to ensure that the quality of care improves. No dollar amount has been offered towards these efforts and now accountability plan to ensure compliance with improvements has been offered. And improvements in training are far from sufficient to broadly improve healthcare across

Wellpath's facilities. Accordingly, it is inconceivable that these efforts will reduce the Debtors' professional liability costs to the extent necessary for the Plan to succeed.

This is not to say that the Debtors have no options for a successful reorganization. On the contrary, the Claimants have provided the Debtors with a template for Wellpath to propose improvements in a comprehensive list of areas. Appendix 3. We urge the court to require Wellpath to submit a detailed list of improvements such that creditors can be sure that the Debtors will sufficiently improve operations to pull Wellpath out of insolvency and — along the way — not unnecessarily harm or kill more people through neglect and malpractice.

If the Court decides not to require the Debtors to include such operational improvements in their Plan, then it should consider not discharging the active tort claims against the Debtors, as doing so merely condone abuse of the bankruptcy system. Earlier this year, in *In re Tehum Care Services, Inc.*,[21] the court declined to dismiss post-confirmation litigation against the Debtors' successor entity, citing the "strong indicia of continuity and control." This case involved the divisional merger of another major prison healthcare provider, Corizon, into YesCare and Tehum Care Services, which received more than a billion dollars in liabilities, primarily medical malpractice settlements, and went on to file bankruptcy. Wellpath is similarly purporting to retain its existing contracts, operational footprint, corporate leadership, and most importantly, business model, as it pertains to its correctional healthcare business, which is at issue in the Plan. Allowing the Debtors to skirt liability for the tort harms Wellpath has caused with no

---

[21] *In re Tehum Care Services, Inc.* (Corizon), No. 23-90086 (Bankr. S.D. Tex. 2024); *United States v. Carolina Transformer Co.*, 978 F.2d 832, 838 (4th Cir. 1992).

plans to stop doing such harm would be a grave injustice that makes a mockery and misapplication of bankruptcy law.

B. **The plan was not proposed in good faith**

Finally, the Plan must be denied because it was not proposed in good faith, as required by 11 U.S.C. § 1129(a)(3). Good faith requires a "legitimate and honest purpose to reorganize" and "a reasonable hope of success."[22] The Code thus bars debtors from using Chapter 11 as a tool to escape liability while continuing harmful practices. Most debtors, of course, implicitly recognize this fact. From asbestos to oxycontin, when a debtor's goods or services cause harms that send the business careening into bankruptcy, the reorganized entity commits to mitigating that harm in the future.

Here, the Debtors' conduct prior to and during this bankruptcy case strongly suggests an effort to insulate Wellpath from responsibility for harm caused by inadequate medical care, rather than a desire to reform their business model. Such conduct undercuts any assertion that the Debtors are committed to sustainability or fulfilling their obligations to creditors. Rather, the Plan appears designed to preserve executive control and profit margins while limiting legal exposure through bankruptcy's discharge provisions that will eliminate, or cap claims brought by harmed individuals and their families.

A plan proposed under these conditions cannot satisfy the good faith requirement of § 1129(a)(3). Bankruptcy can preserve go-forward value, reduce debt overhang, and offer a needed "fresh start" — but without some commitment to reformation, that "fresh start" turns into "rinse and repeat."

---

[22] *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).

### III. CONCLUSION

The Plan should not be confirmed as it is not feasible under § 1129(a)(11) and was not proposed in good faith under § 1129(a)(3), as shown by the issues in this objection, our expert reports, and further testimonial evidence to be provided at the confirmation hearing. The Plan is based on faulty projections that falsely suggest adequate capitalization and the ability to pay debts as they come due post-confirmation, while also downplaying additional risks that the Debtors face. Accordingly, the Claimants respectfully request that the Court deny confirmation of the Debtors' Plan.

Respectfully submitted,

By: */s/ Drew Willey*
Drew Willey
Fed ID: 2513935
SBN: 24093371
Willey Law Firm, PLLC
P.O. Box 30317
Houston, Texas 77249
713-739-9455 (p)
713-510-1950 (f)
Drew@Law-DW.com
ATTORNEY FOR CLAIMANTS FOR THE LIMITED PURPOSE OF OBJECTING TO CONFIRMATION OF THE PLAN

### CERTIFICATE OF SERVICE

I, Drew Willey, certify by my signature below that the foregoing document was electronically filed with this Court on April 22, 2025, which constitutes service on Filing Users.

*/s/ Drew Willey*