```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3                                )  CASE NO: 24-90533
      WELLPATH HOLDINGS, INC. et al )
 4                                )  Houston, Texas
                                  )
 5              Debtor.           )  Wednesday, April 30, 2025
                                  )
 6                                )  8:29 a.m. to 4:01 p.m.
      -----------------------------)

 7

 8                             HEARING

 9          BEFORE THE HONORABLE ALFREDO R. PEREZ
                  UNITED STATES BANKRUPTCY JUDGE

10

11   APPEARANCES:

12   For Special Committee:   DAVID AGAY
                              McDonal Hopkins LLC
13                            300 N. LaSalle Street, Ste 2100
                              Chicago, IL 60654
14
                              BRIAN ROSEN
15                            DANIEL DESATNKK
                              EHUD BARAK
16                            Proskauer Rose
                              250 Park Avenue South, 5th Floor
17                            New York, NY 10003

18                            ZACHARY HEMENWAY
                              NICHOLAS ZLUTICKY
19                            Stinson LLP
                              1201 Walnut, Ste 2700
20                            Kansas City, MO 64106

21   For Wellpath Holdings:   FELICIA PERLMAN
                              DAVID GENENDER
22                            STEVEN SZANZER
                              BRAD GIORDANO
23                            JAMES KAPP
                              NATHAN BULL
24                            McDermott Will & Emery LLP
                              2501 N Harwood Street, Ste 1900
25                            Dallas TX 75201
```

```
 1
      For Ad Hoc Lender Group: KATHERINE DOORLEY
 2                             SCOTT ALBERINO
                               MARTY BRIMMAGE
 3                             Akin Gump Strauss Hauer & Feld
                               Robert S. Strauss Tower
 4                             2001 K Street North West
                               Washington, D.C. 20006
 5
      For H.I.G. Capital:      EYAL BERGER
 6                             JASON OLETSKY
                               Akerman LLP
 7                             201 E. Las Olas Blvd, Ste 1800
                               Fort Lauderdale, FL 33301
 8
      For U.S. Trustee:        SUSAN B. HERSH
 9                             Office of the U.S. Trustee
                               1100 Commerce Street, Ste 976
10                             Dallas, TX 75242

11    For Diamond Drugs:       AARON GUERRERO
                               Bonds Ellis Eppich Schafer Jones
12                             950 Echo Lane, Ste 120
                               Houston, TX 77024
13
      For Tort Claimants and   ELLA CORNWALL
14    and Liza Pizarro:        Shannon & Lee LLP
                               2100 Travis Street, Ste 1525
15                             Houston, TX 77002

16    For Cobb County, Cobb    JEFF PROSTOK
      County Sheriff, Metro    Vartabedian Hester & Haynes LLP
17    Govt. of Nashville       301 Commerce Street, Ste 3635
      & Davidson County:       Fort Worth, TX 76102
18
      For McLaren Healthcare:  JULIE TEICHER
19                             Maddin Hauser Roth & Heller PC
                               One Towne Square, 5th Floor
20                             Southfield, MI 48076

21    For Select Medical Corp: JOSEPH ARGENTINA, JR.
                               Faegre Drinker Biddle & Reath LLP
22                             1500 Jackson Street, Ste 201
                               Fort Myers, FL 33901
23


24


25
```

```
 1   For Burton, Griffin, &    RYAN CHAPPLE
     Maxwell plaintiffs:       THOMAS MADIGAN
 2                             Cain & Skarnulis PLLC
                               303 Colorado Street, Ste 2850
 3                             Austin, TX 78701

 4   For Allred, Klein, &      MATTNEW V. HERRON
     Doyle:                    Herron Law, APC
 5                             406 Ninth Avenue, Ste 313
                               San Diego, CA 92101
 6
                               BENNETT FISHER
 7                             MINYAO WANG
                               Lewis Brisbois Bisgaard & Smith
 8                             24 Greenway Plaza, Ste 1400
                               Houston, TX 77046
 9
     For Monroe, Lee,          GERALD EDWIN RUSH II
10   DeKalb County, DeKalb     Sanders Roberts LLP
     County Sheriff:           1055 West 7th Street, Ste 3200
11                             Los Angeles, Ca 90017

12   For Marion County,        EDWARD M. KING
     Indiana:                  Frost Brown Todd
13                             150 Third Avenue South, Ste 1900
                               Nashville, TN 37201
14
     For Moone, Capaci,        ANDREW JOSEPH WILLEY
15   Graham:                   Drew Willey Law
                               P.O. Box 30317
16                             Houston, TX  77249

17   For Epiq Corporate        RACHEL NANES
     Restructuring:            JAMIE M. KONN
18                             DLA Piper LLP
                               1900 North Pearl Street, Ste 2200
19                             Dallas, TX 75201

20   For Advisory PLLC:        OMAR BRADFORD
                               SPENCER PINCUS
21                             The Advisory PLLC
                               801 Brickell Avenue, Ste 1500
22                             Miami, FL 33131

23   For Walker, Assavero:     DAVID R. HUGHES
                               Hall Hirsch Hughes LLC
24                             150 East Ponce de Leon Avenue
                               Suite 450
25                             Decatur, GA 30030
```

```
 1
    For Daniel Myers,        MARC R. GINSBERG
 2  Gracienne Myers:         Mandina & Ginsberg, LLP
                             15500 New Barn Road, Ste 107
 3                           Miami Lakes, FL

 4  For Bell Ambulance:      PATRICK HUGHES
                             Haynes & Boone LLP
 5                           1221 McKinney, Ste 4000
                             Houston, TX 77010
 6
    For Worth Rises:         JAQUELINE ARANDA OSORNO
 7                           Public Justice
                             1620 L Street NW
 8                           Washington, D.C. 20036

 9  For Craig Owens, Sr.:    PAUL MARC ROSENBLATT
                             Kilpatrick Stockton LLP
10                           1100 Peachtree Street NE, Ste 2800
                             Atlanta, Ga 30309
11
    For J.R. Anderson:       MELISSA BROWN
12                           Law Office of Melissa A. Brown PLLC
                             1645 Fort Street
13                           Wyandotte, MI 48192

14  For Maria Elena Garcia:  McMurray Henriks LLP
                             811 Wilshire Blvd., Ste 1640
15                           Los Angeles, CA 90017

16  Also Appearing:          Susan Goodman
                             Kanwar Partap Sing Gill
17                           Raneen Abdelghani
                             Eric Adams
18                           Deandre Bradley
                             Cesena Chapin
19                           Bianca Tylek

20  Court Reporter:          J. BARIOS

21  Courtroom Deputy:        AKEITA HOUSE

22  Transcribed by:          Veritext Legal Solutions
                             330 Old Country Road, Suite 300
23                           Mineola, NY 11501
                             Tel: 800-727-6396
24
    Proceedings recorded by electronic sound recording;
25  Transcript produced by transcription service.
```

```
 1                              INDEX

 2   DEBTOR'S WITNESSES      DIRECT      CROSS    REDIRECT      RECROSS

 3   Timothy Dragelin       128         139      147

 4                                      148

 5   Emily Young            186

 6

 7   DEBTOR'S EXHIBITS                            RECEIVED

 8   Docket 2520                                     28

 9   Docket 2497                                     45

10   Docket 2556-2                                   46

11   Docket 2556-3                                   47

12   Docket 20                                       47

13   Docket 2556 in entirety                        228

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          HOUSTON, TEXAS; WEDNESDAY, APRIL 30, 2025; 8:29 AM

 2                        (Call to Order)

 3          THE COURT:  Please be seated.

 4          AUTOMATED VOICE:  Conference unmuted.  Conference

 5   recording started.

 6          THE COURT:  All right, good morning. It is

 7   Wednesday, April 30, 2025.  We're here for the Wellpath

 8   confirmation hearing, Case Number 24-90533, and there are

 9   several other matters that are set at this time as well.

10          We have a fair number of people on the phone, so

11   if everyone would keep their line muted until you speak,

12   then we can go forward.  But let's get appearances of

13   counsel in the courtroom, and then we'll get appearances of

14   counsel on the phone.

15          MR. AGAY:  Good morning, Your Honor.  David Agay

16   from McDonal Hopkins LLC.  I represent the Special Committee

17   that's presenting the 9019 motion on behalf of the Debtors.

18          THE COURT:  Okay, thank you.

19          MS. PERLMAN:  Good morning, Your Honor.  Felicia

20   Perlman of McDermott Will & Emery on behalf of the Debtors.

21   And I'm here today with several of my colleagues:  Dave

22   Genender, Steve Szanzer, Brad Giordano, and Jay Kapp, who

23   will also be presenting today.

24          THE COURT:  Okay, thank you.

25          MR. ROSEN:  Good morning, Your Honor.  Brian
```

1    Rosen, Proskauer Rose on behalf of the Committee.  I'm here

2    with Mr. Daniel Desatnik, Ehud Barak, and our co-counsel

3    from Stinson, Zach Hemenway and Nick Zluticky.

4              THE COURT:  Thank you.  Good morning, Your Honor.

5              MS. DOORLEY:  Good morning, Your Honor.  Kate

6    Doorley, Akin Gump Straus Hauer & Feld on behalf of the Ad

7    Hoc Lender Group.  And I'm joined by my partners, Scott

8    Alberino and Marty Brimmage.

9              THE COURT:  Good morning.

10             MR. BERGER:  Good morning, Your Honor.  Eyal

11   Berger, Akerman, on behalf of H.I.G. Capital.

12             THE COURT:  Good morning.

13             MS. HERSH:  Good morning, Your Honor.  Susan

14   Hirsch for the United States Trustee.

15             THE COURT:  Good morning.

16             MR. GUERRERO:  Good morning, Your Honor.  Aaron

17   Guerrero with Bonds Ellis Eppich Schafer Jones on behalf of

18   Diamond Drugs.

19             THE COURT:  Good morning.

20             MS. CORNWALL:  Good morning, Your Honor.  Ella

21   Cornwall for Shannon & Lee LLP for the Claimants indicated

22   at ECF Number 17791 and Liza Pizarro.

23             THE COURT:  Thank you.  All right.  Anyone else in

24   the courtroom?  All right.  On the phone, who wishes to make

25   an appearance?

```
 1            MR. PROSTOK:  Good morning, Your Honor.  Jeff

 2    Prostok on behalf of Cobb County and the Cobb County Sheriff

 3    and their respective employees and the Metropolitan

 4    Government of Nashville and Davidson County.

 5            MS. TEICHER:  Good morning, Your Honor.  Julie

 6    Teicher on behalf of McLaren Healthcare Corporation.

 7            THE COURT:  Good morning.

 8            MR. ARGENTINA:  Good morning, Your Honor.  Good

 9    morning, Your Honor.  Joe Argentina here for Select Medical

10    Corporation.

11            THE COURT:  Good morning.

12            MR. BULL:  Good morning, Your Honor.  Nathan Bull

13    from McDermott Will & Emery for the Debtors.

14            THE COURT:  Good morning.

15            MR. CHAPPLE:  Good morning, Your Honor.  Can you

16    hear me okay?

17            THE COURT: I can.

18            MR. CHAPPLE:  Good morning, Your Honor.  Ryan

19    Chapple and my partner T.J. (indiscernible) as well for

20    Cedric Burton as the administrator of the estate of James

21    Merritt Byrd, Jasman Maxwell on behalf of Akashia Maxwell,

22    and Ladriqua Maxwell and Amber Griffin on behalf of Faith

23    Griffin.

24            MR. FISHER:  Good morning, Your Honor.

25            MR. HERRON:  Good morning, Your Honor.  Matthew
```

1    Herron appearing for Allred, Klein, and Doyle

2              THE COURT:  Good morning.

3              MR. FISHER:  Your Honor.

4              THE COURT:  Yes.

5              MR. FISHER:  This is Bennett Fisher, also calling

6    on behalf of and representing Kristen Allred, Victoria

7    Klein, and Mike Doyle.  I'm about five minutes away.  I'll

8    be in the courtroom.  For the time being, Minyao Wang is my

9    partner and he's in New York and he should be on video as

10   well as audio, and he can speak for me until I get there.

11             THE COURT:  Thank you, Mr. Bennett.

12             MR. RUSH:  Good morning, Your Honor.  Edwin Rush

13   appearing for Jeanise Monroe, Jaylin Lee, DeKalb County and

14   DeKalb County Sheriff's Office.

15             THE COURT:  Good morning.

16             MR. WILLEY:  Drew Willey here on a motion to

17   withdraw.

18             THE COURT:  Good morning.

19             MS. BROWN:  Good morning, Your Honor.  Melissa

20   Brown on behalf of J.R. Anderson, debtor in the case out of

21   Wayne County, Michigan.

22             THE COURT:  Good morning.

23             MS. BROWN:  Good morning.

24             MR. OLETSKY:  Good morning, Your Honor.  Good

25   morning, Your Honor.  Jason Oletsky from Akerman on behalf

1    of H.I.G. Capital.

2              THE COURT:  Good morning.

3              MR. KING:  Your Honor.  This is Ted King with

4    Frost Brown Todd.  I'm here for Marion County, Indiana, the

5    sheriff.

6              THE COURT:  Good morning.

7              MR. WILLEY:  Can you hear me?

8              THE COURT:  Yes, I can hear you, sir.

9              MR. WILLEY:  Oh, I already made it -- Drew Willey

10   on a motion to withdraw.

11             THE COURT:  Good morning.

12             MS. NANES:  Good morning, Your Honor.

13   (Indiscernible) Corporate Restructuring.

14             THE COURT:  Ms. Nanes, why don't you go ahead and

15   say it again?  We -- there was a little bit, and then Ms.

16   Goodman after that.

17             MS. NANES:  I'm sorry.  Good morning, Your Honor.

18   Rachel Nanes from DLA Piper on behalf of Epiq Corporate

19   Restructuring.

20             THE COURT:  Good morning.

21             MS. GOODMAN:  Good morning, Your Honor. Susan

22   Goodman, Health Care Ombudsman.

23             THE COURT:  All right.  Anyone else wish to be

24   heard?

25             MR. GILL:  Good morning, Your Honor.  This is Dr.

1    Gill.  I'm representing myself.

2           THE COURT:  All right.  Good morning, Dr. Gill.

3    Okay.  We have --

4           MR. BRADFORD:  Good morning, Your Honor.

5           THE COURT:  Go ahead.

6           MR. BRADFORD:  This is Omar Bradford and Spencer

7    Pincus with The Advisory PLLC on behalf of creditor

8    (indiscernible) out of Central Florida.

9           MAN 1:  Good morning, Your Honor.  This is

10   (indiscernible) from McMurray Henriks LLC on behalf of Maria

11   Elena Garcia and her family, the creditors.

12          THE COURT:  Good morning.

13          MR. DAVID HUGHES:  Good morning, Your Honor.  Your

14   Honor, this is David Hughes.  I represent the Assevero case,

15   Vicky Assevero and in the Walker case, Toni Walker.

16          THE COURT:  Good morning.

17          MR. DAVID HUGHES:  Good morning.  Thank you.

18          THE COURT: All right.  So, we have in excess of

19   almost 110 people on the line.  I'm going to go ahead and

20   activate the hand-raising feature.  So just hit -- once I

21   activate that, you'll hear that it says line muted.  Just

22   hit five star one time, and then the line -- I'll unmute

23   your line.

24          AUTOMATED VOICE:  Conference muted.

25          THE COURT:  All right.  All right, so there was an

1    amended agenda that was filed this morning, which had the

2    9019 going first.  I'd like to talk a little bit about the

3    order of the agenda.

4            So first, I want to thank everyone for all the

5    paper I got and I will tell you that I have read everything

6    that was filed through about six o'clock last night, and

7    then I've reviewed, like, briefly, but I need to read the

8    stuff that was filed after that.  I did see that you fixed

9    the gatekeeper function, because I thought that was a real

10   problem, so thank you.

11           But I have not read findings of fact, the trust

12   procedures, or the liquidating trust.  So, at some point,

13   we're going to need to take a break for me to do that.

14           In terms of the order, I thought that it would

15   make sense, and obviously -- you obviously have a rationale

16   for doing it this way and I want to hear that, but I thought

17   it would make sense to take the -- I don't mind taking the

18   settlement out of turn.  I'm not going to rule on it until I

19   rule on confirmation, but I don't have a problem putting --

20   taking the evidence on that out of turn.

21           But then I think we need to do the 3018 motions

22   first before we do the plan, and then after that, Mr. Kapp

23   has to stay to the end to finish --

24           MS. PERLMAN:  He's our cleanup --

25           THE COURT:  Cleanup.  So, I think that makes

1    sense.  I don't know if --

2              MS. PERLMAN:  That's fine, Your Honor.  We have no

3    issue with that.  We're happy to either start with the 3018

4    or the 9019.

5              THE COURT:  No, I -- let's have the 9019 and to

6    the extent that somebody can go home because they don't need

7    to be here anymore, that's fine.

8              MS. PERLMAN:  I don't think Mr. Szanzer will be

9    allowed to leave right after that, but I'm sure he

10   appreciates that.  And we appreciate Your Honor taking the

11   time to read the late-filed paper.  We had a lot of parties

12   we were looking to get signed off on and tried to do it as

13   expeditiously as possible, so thank you.

14             THE COURT:  I only have two eyes.

15             MS. PERLMAN:  Understood.  So --

16             THE COURT:  And you can tell, like, see?  These

17   have no tabbies.  This is the plan.

18             MS. PERLMAN:  Thank you, Your Honor.  I'll turn it

19   over for the 9019 now and then the 3018.

20             THE COURT:  Okay.  Oh, and by the way, I just want

21   to make sure, please make your appearance on my webpage,

22   because there's -- with all these many people, it's going to

23   be very hard to keep track of the appearances, so please

24   make sure to go to the webpage and make your appearance.

25   Okay.  Go ahead, sir.

1           MR. AGAY:  Go ahead, sir.  Thank you, Your Honor.

2   Again, may it please the Court, David Agay from McDonal

3   Hopkins LLC, and I represent the Special Committee of the

4   Board of Directors of CCS-CMGC Intermediate Holdings II Inc.

5           I forgot to mention, also with me in the

6   courtroom, is my partner, Micah Marcus, and we both

7   represent the Special Committee.  I will be presenting the

8   9019 on behalf of the Debtors.

9           Your Honor, with the assistance of McDonal

10  Hopkins, the Special Committee undertook the investigation

11  and negotiated the settlement with H.I.G. as set forth in

12  the motion.  Through the 9019 motion, the Special Committee

13  has directed the Debtors to seek this Court's approval of

14  the settlement agreement.  I'm presenting the motion at the

15  Special Committee's direction.

16          In support of the motion, the Debtors have filed

17  the Declaration of Patrick Bartels at Docket 2520.  Mr.

18  Bartels is one of the independent directors on the Board of

19  Intermediate Holdings II.  Mr. Bartels serves on the Special

20  Committee along with the other independent director, Carol

21  Flaton, and Mr. Bartels is present in court today.  After I

22  finish my presentation, I will ask that the Court admit Mr.

23  Bartels' declaration into evidence.

24          Your Honor, the record in these cases is replete

25  with detail on the Debtors and their businesses, the facts

1    and circumstances leading to these restructurings in the

2    Chapter 11 cases, on the formation and responsibilities of

3    the Special Committee and their role in the investigation of

4    the claims in these cases.  We set all this out in our

5    motion and also in Mr. Bartels' declaration.  I'm happy to

6    answer any questions you have.

7         THE COURT:  I've reviewed all of that.

8         MR. AGAY:  Okay, great.  I'll jump right to the

9    settlement agreement.

10        THE COURT:  Okay.

11        MR. AGAY:  Your Honor, the settlement with H.I.G.

12   really occurred in two phases.  At the time that we filed

13   our 9019 motion, we did not have the support of the

14   Creditors Committee for the settlement that we outlined in

15   those five points in our motion.

16        Since then, we have reached a resolution with both

17   the Creditors Committee and the Ad Hoc Group of Lenders,

18   which has folded into a global settlement of both the plan

19   and the 9019 motion.  We have since -- earlier this week, we

20   filed a revised proposed order, which, if Your Honor grants

21   the motion, we would seek entry.  And attached to that as

22   Exhibit A is the settlement agreement that was executed by

23   both the Debtors and H.I.G.

24        It more or less hews to the framework we set out

25   in our motion, but I'll go into the detail on certain

1 modifications that were made from what we set forth in our

2 9019 motion.

3          Your Honor, the settlement with H.I.G. as

4 manifested in the settlement agreement is pretty simple.

5 H.I.G. is going to pay $3 million in cash to the Debtors and

6 the liquidating trust.  They've already paid $150,000 at the

7 time of execution of the settlement agreement, and they will

8 pay the difference to the liquidating trust upon -- if this

9 Court approves the 9019 motion and also upon the effective

10 date of the plan if the Court confirms the plan.

11          In addition, H.I.G. is going to be waiving their

12 monetary claims against the estate and also consenting to

13 contribution of the proceeds of the D&O policies into the

14 liquidating trust.

15          THE COURT:  Okay, so that's the one question I

16 had.  I don't understand how that works.  I read at one

17 place that basically the release that is being provided to

18 the H.I.G. releasees is only amounts in excess of any claim

19 amount.  So, is it anticipated that the liquidating trust

20 would bring claims against H.I.G. and that those insurance

21 policies would respond to those claims?  I don't understand

22 that.

23          MR. AGAY:  We don't know if the liquidating trust

24 is going to bring claims, but if they did, it would not be

25 against H.I.G.  It would be potentially against certain

1    H.I.G. personnel who served as directors and officers of the

2    Debtors.  And I'll jump right to Your Honor's question, sort

3    of lay it out --

4              THE COURT:  That's really the only question I had

5    --

6              MR. AGAY:  Sure.

7              THE COURT:  -- just how that works.

8              MR. AGAY:  Sure.  And this is all set forth here

9    in detail in the settlement agreement.  So H.I.G. itself is

10   going to be a releasee under the plan.  They're going to get

11   the benefit of the releases in, I think it's Article IX of

12   the plan.  And in --

13             THE COURT:  But then also their related parties

14   get released and the --

15             MR. AGAY:  No.  No, not -- related parties but not

16   H.I.G. personnel who served as directors and officers of the

17   Debtors.

18             THE COURT:  Where does it say that that doesn't

19   happen?  Because if you read the definition of related

20   parties, it includes all -- it includes employees.  I'm not

21   saying that it -- that's not what it says.  I'm just saying,

22   I'm just -- I just didn't see that.

23             MR. AGAY:  I'm just looking at the definitions for

24   a second, Your Honor.

25             THE COURT:  Under the plan or in the?

1          MR. AGAY:  Under the plan.

2          THE COURT:  No, under the plan, it's clearly,

3     there -- the -- under the plan, if you go to the definition

4     of related parties --

5          (Counsel conferring)

6          THE COURT:  -- it includes employees.

7          MR. AGAY:  Okay.

8          THE COURT:  What -- at Definition 175.  I just

9     want to make sure I'm being precise, Your Honor.  About one,

10    two, three, four -- sixth line down.  I'm looking at the --

11         MR. AGAY:  Yes, yes, yes, you're right, Your

12    Honor.  Now, if you go to Exhibit A to the proposed order,

13    which would govern as to this particular issue, and it lays

14    all this out.  So, Section 5B of the settlement agreement

15    provides for the plan releases as it applies to H.I.G.  And

16    I'm just going in sequence, Your Honor, but we're -- so

17    we're going to get to a direct answer to your question when

18    we get to 5D.

19         At Section 5C, it provides an additional Debtor

20    release for H.I.G. that does not carve out claims for gross

21    negligence, fraud, or willful misconduct, the carve-outs

22    that you have under the plan.  That was part of the global

23    settlement.  And then when you get to D, Your Honor, it says

24    specifically as to H.I.G. personnel who served as directors

25    and officers of the Debtors, the releases set forth in the

1   above Sections 5B and C expressly exclude and preserve the

2   liquidating trust's right to bring causes of action covered

3   by the Debtors' directors' and officers' liability insurance

4   policies against those individuals.

5          And then that the liquidating trust would look

6   first for any recovery to those proceeds, and then all the

7   individuals will have the protections and access to such

8   policies, Your Honor.

9          So, to the extent that the plan would fold them

10  in, this excludes them from that and makes it very clear

11  that the liquidating trust could pursue actions against

12  those individuals.

13         THE COURT:  Okay.  And presumably that would also

14  run through the confirmation order, so just to make sure

15  that --

16         MR. AGAY:  Yeah, I mean, we'll do any

17  clarifications that are necessary along those lines.

18         THE COURT:  Okay.

19         MR. AGAY:  Does Your Honor have any other

20  questions regarding the settlement?

21         THE COURT:  That was really the main question.

22         MR. AGAY:  Okay.  The settlement, of course, is

23  conditioned upon the Court's approval and also upon

24  confirmation and the effective date of the plan.

25         I'll give you the headline.  We think this is a

1  great deal for the Debtors and the estate.  The backdrop for

2  the settlement with H.I.G. is the investigation overseen by

3  the special committee.

4        In our motion and in the Bartels declaration, we

5  provide a whole lot of detail on that investigation, all of

6  the documents that we reviewed, all of the witnesses we

7  interviewed, the claims and causes of action that we

8  reviewed.  I'm happy to answer any questions Your Honor has

9  around that, or I can move forward.

10        THE COURT:  No, I've reviewed Mr. Bartels'

11  declaration.

12        MR. AGAY:  Okay.  Your Honor, from the

13  investigation, the special committee concluded that there

14  are no viable claims that would both, A, present a

15  reasonable chance of success; and B, result in an economic

16  outcome with material benefits for creditors.

17        It, therefore, should come as no surprise to the

18  Court or the other parties in these cases that in light of

19  the special committee's investigation and conclusions

20  regarding the absence of claims against H.I.G., the special

21  committee believes that through the settlement has delivered

22  significant value to the estate.

23        Your Honor, in our motion, we laid out the

24  standards under Bankruptcy Rule 9019, and we applied those

25  to the causes of action that we reviewed.  In this circuit,

1    there's a three-part test for determining whether a

2    settlement is fair and equitable:  the probability of

3    success in litigating claims, complexity and likely duration

4    of litigation, and all other factors "bearing on the wisdom

5    of the compromise."

6         And as part of this third open-ended factor, the

7    paramount interest of creditors is considered.  Your Honor,

8    in light of the findings from our investigation and the

9    consideration we're receiving under this settlement, which

10   includes the $3 million in cash in addition to the proceeds

11   of the D&O policy, we believe that this is a fair and

12   equitable outcome for the Debtors, for the estates, for the

13   liquidating trust, and respectfully, Your Honor, we believe

14   that the Court should grant the 9019 motion.

15        THE COURT:  All right, thank you.  All right.

16   Does anyone else wish to be heard in support of the

17   settlement?

18        MR. AGAY:  Your Honor, before he does that, can I

19   offer to submit the declaration into evidence?  Mister -- as

20   I mentioned, Mr. Bartels is in the courtroom and available.

21        THE COURT:  All right.  And you said it was at

22   docket number?

23        MR. AGAY:  Sure.  That is Docket Number 2520.

24        THE COURT:  All right.  Is there any objection to

25   the admission of the declaration of Patrick Bartels, which

1    was filed at Docket 2520 and is listed on the witness and

2    exhibit list as Exhibit 23 at 2556-1?  Is there any

3    objection to the admission of that -- of his declaration as

4    his direct testimony?  All right, hearing --

5              MR. GILL:  Your Honor, this is Dr. Gill.

6              THE COURT:  Yes.

7              MR. GILL:  Can you give me 30 seconds on my end?

8    It's still uploading.  Can I get 15 to 30 seconds?

9              THE COURT:  Yes.

10             MR. GILL:  Thank you.

11             Is this in regards to Patrick Bartels, the

12   independent director and member of special committee

13   (indiscernible)?

14             THE COURT:  Yes.

15             MR. GILL:  Just a second.

16             THE COURT:  Mr. Gill, are you still there?

17             MR. GILL:  Yeah, I'm still there.  (indiscernible)

18   a minute.  This is a document I just saw for the first time.

19             THE COURT:  All right, do you have any objection

20   to the admission of that as his direct testimony?

21             MR. GILL:  Well, Your Honor, I will start off with

22   something that I previously had prepared as well in regards

23   to 9019, will that be okay if I just go ahead and speak on

24   it?

25             THE COURT:  No, no.  I -- all the -- the only

1    question here is do you have any objection to the admission

2    of his declaration?

3          MR. GILL:  Yes, sir.  Sir, I'm going to go ahead

4    and list my objections in this, and I'll be very specific in

5    this case.  This is in regards to Docket 2520, which is

6    Bartels' declaration.

7          Number one objection is biased origination and

8    lack of true independence.  Bartels was appointed by the

9    parent board of a (indiscernible) entity controlled by

10   H.I.G. Capital, the very party being released.  His

11   "independence" is structurally compromised, and my objection

12   is the declaration lacks credibility due to conflicted

13   appointment source and fiduciary dependence on a controlled

14   party, in this case H.I.G.

15         The second objection is it's pre-judged outcomes

16   and not fact-finding.  Bartels repeatedly concludes that

17   viable claims don't exist, yet that is a legal conclusion,

18   not a factual one.  Objection, Your Honor, in this case is

19   improper legal conclusion, masquerading as factual findings

20   violating FRE 602 and 701.

21         Third objection, Your Honor, is shielding of

22   federal claims under the guise of business judgment.  The

23   declaration avoids any mention of ADA retaliation,

24   (indiscernible) fiduciary theft, (indiscernible) violation,

25   or whistleblower claims, which are central to your filing.

 1              Objection is material omission of known liability,

 2    making the settlement deceptive and incomplete under the

 3    Rule 9019 scrutiny.

 4              Your Honor, the next objection is a circular

 5    justification of settlement value.  Bartels claims that $3

 6    million settlement is fair without performing any

 7    comparative valuation of actual claims, especially not those

 8    you raised, not those raised in Docket 2495, not raised in

 9    my Docket 2495, and 75-in-1, which was delivered to the

10    Court around 9 a.m. yesterday and has not been documented or

11    docketed.

12              Objection, Your Honor, in this case is declaration

13    fails Rule 9019 standard by omitting comparative value

14    analysis versus litigation alternative.

15              Next objection, Your Honor, is admission of

16    ongoing conflicts.  Paragraphs 21 to 22 admit preferential

17    treatment of go-forward versus non-go-forward implying

18    favoritism based on continued corporate ties.  Objection,

19    Your Honor, in this case is unequal treatment of similarly

20    situated parties while it's bankruptcy fairness principle

21    under the 1129(a)(3) and (b).

22              And next objection, Your Honor, is failure to

23    address misconduct allegations in my Docket 2491 and 79-1,

24    which I have preserved because it's not docketed yet on the

25    court side.  Bartels' declaration ignores 42 constitutional

1    and statutory motions already filed and served.  Settlement

2    cannot be approved without (indiscernible) objections

3    already on the record, including Docket 2495, which has 42

4    motions in one, and the served 75-in-1 suite.

5             The next objection, Your Honor, is fabrication of

6    finality, which -- in which it asserts that no need for

7    further investigation despite acknowledging previous prior

8    governance failure.  Objection, Your Honor, in this case is

9    premature closure of investigation despite unresolved

10   federal and fiduciary violation contrary to the duty of

11   candor of the court.

12            Next objection, Your Honor, is waiver of D&O

13   insurance rights violates interests of the creditor.  Giving

14   the -- giving up D&O claims to benefit H.I.G. insiders

15   directly harms the estate's recovery.  Objection, Your

16   Honor, is breach of fiduciary duty and improper release of

17   estate assets without the benefit to the general unsecured

18   creditors.

19            Your Honor, Bartels' declaration, which I now have

20   on my screen, is Docket 2520, is not an independent

21   fiduciary account.  It is a procedural (indiscernible)

22   engineered by those it purports to investigate.  It admits

23   that the federal whistleblower liability asserts legal

24   conclusion without standing and attempts to bless a

25   conflicted settlement that extinguishes claim without even

1   acknowledging their existence.  I object to its admission,

2   Your Honor, and I'll read under the Rule 9019, FRE 602, and

3   Rule 11, obligations of the tender.  Your Honor, that's my

4   objection summarized.  Thank you.

5          THE COURT:  All right.  Thank you.  Anyone else

6   have any objection?

7          All right.  So, I've reviewed --

8          MR. GILL:  Your Honor, have you been able to get

9   all the objections?  Because it didn't show up over here

10   that my microphone may have been muted.

11          THE COURT:  I'm sorry.  What did you say?

12          MR. GILL:  Were you able to get all the eight

13   objections that I had framed right now?

14          THE COURT:  Yeah, I --

15          MR. GILL:  I spoke for --

16          THE COURT:  I heard what you said, yes.

17          MR. GILL:  Okay, Your Honor, because the

18   microphone on my end showed that it was muted.

19          THE COURT:  No, no.  No, I can hear you just fine.

20   You're on --

21          MR. GILL:  Okay, thank you.

22          THE COURT:  Your number is 559-447-8490?

23          MR. GILL:  Yes, and, Your Honor, I spoke, like,

24   for some time.  It is a total of eight objections I raised

25   for 2520.  Were you able to hear all of them?

1          THE COURT:  Yes, I heard all of them that --

2          MR. GILL:  Okay.

3          THE COURT:  -- you raised with respect to -- yes.

4    I can hear you just fine.

5          MR. GILL:  Okay.

6          THE COURT:  Yes.  No problem.  So I've reviewed --

7          MR. GILL:  Okay, thank you.

8          THE COURT:  So, I've reviewed the motion, the

9    settlement agreement.  I did have that one question that was

10   addressed.  I've reviewed Mr. Bartel's declaration and in

11   particular I've reviewed the work that was done by

12   independent counsel to the independent directors, a very

13   serious law firm that had took their responsibility

14   seriously, reviewed in excess of 20,000 documents, reviewed

15   many -- interviewed many witnesses.

16          And I think that the -- that Mr. Bartels, as

17   reflected in his declaration, took his responsibility

18   seriously, and in his professional judgment, based on the

19   advice of independent counsel who does not represent the

20   company, does not represent the board, just represents the

21   independent committee, you know, provided this information.

22          Obviously, to the extent that someone, at an

23   appropriate time, wishes to cross-examine Mr. Bartels, they

24   certainly have the right to do that, but I'm going to admit

25   this as his direct testimony.  So, your objections at this

1    are overruled.

2         (Docket 2520 entered into evidence)

3         MR. AGAY:  Thank you, Your Honor.

4         THE COURT:  All right --

5         MR. GILL:  Thank you, Your Honor.

6         THE COURT:  All right.  So, anyone else wish to

7    speak in support of the settlement?

8         MR. HEMENWAY:  Good morning, Your Honor.  Zach

9    Hemenway for the Committee.  So, the committee supports the

10   settlement as part of the global resolution.  As Mr. Agay

11   alluded to, we initially were not in support.  There's a few

12   reasons why we're now here not opposing and supporting it as

13   part of that global resolution.

14        Number one, there's more money.  But number two,

15   more importantly, the settlement agreement that's before you

16   shows that all of these proceeds of the settlement will go

17   to the liquidating trust.  And so, that's -- the $150,000

18   has been paid to the Debtors, and that will go to the

19   liquidating trust upon confirmation, and the remaining $2.85

20   million will go directly to the liquidating trust.

21        So, as part of that global resolution, the

22   Committee does support the settlement.  One thing I do want

23   to clarify in terms of the contingency, though the 9019 is

24   contingent on the plan, the plan is not contingent on the

25   9019.  As I said, we support it being adopted as part of the

1    global resolution, but if Your Honor were to not approve the

2    9019, the plan would go forward with these causes of action

3    addressed to the liquidating trust.

4            A final housekeeping item, as you're aware, a lot

5    of these documents are being modified at the last minute.  I

6    think we had a miss on Paragraph 3 of the order that's

7    before you.  It says that the $3 million is going to the

8    Debtors, which is contradicted by the settlement agreement

9    of the 2.85 going directly to the liquidating trust.  So, we

10   would ask that those three words, the "to the Debtors" in

11   Paragraph 3, be stricken from the final order and I think

12   both the special commission --

13           THE COURT:  I'm sure Ms. Perlman has somebody

14   working on it.

15           MR. HEMENWAY:  Yeah.

16           THE COURT:  All right.  Anyone else wish to be

17   heard in support?  Ms. Doorley.

18           MS. DOORLEY:  Your Honor, for the record, Kate

19   Doorley, Akin Gump Strauss Hauer & Feld on behalf of the Ad

20   Hoc Lender Group.  The Ad Hoc Lender Group is also

21   supportive of the settlement.  You know, it was important in

22   terms of resolving particularly contentious issues as we

23   headed into confirmation and as Mr. Hemenway noted, the

24   agreement to contribute the proceeds of the settlement was

25   also critical in getting Committee support towards a

1    consensual resolution of these cases.  And so we're

2    supportive of the settlement agreement as modified and we'd

3    request that Your Honor enter the order approving the 9019.

4          THE COURT:  All right, thank you, and thank you

5    for having Mr. Brimmage sit in the back.

6          MS. DOORLEY:  (Indiscernible), Your Honor.

7          THE COURT:  All right.  Anyone else wish to be

8    heard in support of the settlement?

9          All right.  Any -- let's hear who opposes the

10    settlement, wishes to be heard in opposition to the

11    settlement.  All right.  And if you're on the phone, hit

12    five star one time.  Okay.  Hold on.  I got somebody.

13          All right.  I just unmuted a line from the 815

14    area code.

15          MR. BRADLEY:  Yeah, that was -- that's me, Your

16    Honor.  I'm haven't -- I just -- I'm not opposing.  I just

17    wanted to ask you when this proceeding is done, can I have a

18    word with you?

19          THE COURT:  Well, I don't -- I think in the

20    context of a -- first of all, why don't you identify

21    yourself for the record?

22          MR. BRADLEY:  My name is Deandre Bradley.  I'm an

23    unsecured creditor in Nevada.

24          THE COURT:  Okay.

25          MR. BRADLEY:  I'm incarcerated.

```
 1                 THE COURT:  All right.  So, in -- once we start

 2      the confirmation hearing, I'll let you make an opening

 3      statement, and we'll get several people to make an opening

 4      statement.  Right now, I'm just focused on taking the

 5      testimony and argument on the 9019 motion.

 6                 MR. BRADLEY:  All right.  Thank you.  I apologize.

 7                 THE COURT:  So, please stay on.  All right.  Okay.

 8      Anyone else wish to be heard in opposition to the 9019

 9      before we move on to the other motions?

10                 All right.  Mr. Ginsberg, do you want to be heard?

11      Hit five-star one time.  There you go.

12                 MR.  GINSBERG:  No, sir.

13                 THE COURT:  Okay.  Thank you.

14                 MR. GINSBERG:  No, sir.

15                 THE COURT:  Okay.  I'll let you -- all right.

16      Anyone else, please hit five star one time.

17                 MR. GILL:  Your Honor, can you hear me?

18                 THE COURT:  Yes, I can hear you, sir.  Go ahead.

19                 MR. GILL:  Thank you so much.  I did five-star,

20      but I couldn't get the confirmation of hand raised.  Your

21      Honor, the counsel has specifically stated that the pending

22      9019 motion filed under the Special Committee direction is

23      fair resolution benefiting the estate and I factually

24      disagree, Your Honor.  This 9019 motion is classic

25      procedure, a Trojan horse outwardly presented as routine,
```

1     yet fundamentally designed to extinguish valid claim and

2     shield insiders, in this case, notably H.I.G. capital, from

3     extensive federal liability.  Those liabilities and

4     procedural improprieties are exhaustively documented in my

5     verified findings already before the Court, specifically

6     publicly docketed 42-in-1 verified emergency motion, Docket

7     2495, filed on or about April 25th, 2025, and the

8     comprehensive 75-in-1 verified motion filed that has been

9     submitted to the Court yesterday morning at around nine, and

10    still doesn't show up on the public docket.

11          These motions were timely served upon all

12    stakeholders, including counsel present today.  These

13    filings, notably 2495, include verified evidence of systemic

14    ADA retaliation, (indiscernible) fiduciary breaches,

15    intentional metadata suppression, obstruction of justice,

16    constitutional due process violations, and explicit

17    procedural misconduct by parties closely aligned to H.I.G.

18          To approve the proposed 9019 settlement without

19    first fully considering the evidence and verified

20    allegations presented in my 42-in-1 Docket 2491 and 75-in-1

21    filing would amount to judicial endorsement of the

22    documented fraud upon this Court.

23          Accordingly, Your Honor, to approve the proposed

24    9019 without first fully considering the evidence and

25    verified allegations in both of my motions that have been

1    filed would amount to, as I said, documented fraud,

2    regulatory noncompliance, and ongoing obstruction of

3    justice.  Such an approval would irreparably compromise

4    appellate integrity and federal investigatory process, all

5    of which are actively referenced in these comprehensive

6    filings.  Accordingly, under the Federal Rule of Evidence

7    201, I formally move the judicial notice -- move for the

8    judicial notice and immediate admission of both the publicly

9    Docketed 42-in-1 verified motion suite, Docket Number 2495,

10   as well as the 75-in-1 verified emergency motion suite

11   timely served on counsel into the hearing record today.

12           Your Honor, the record must unequivocally preserve

13   my objections.  Approval of this motion without fully

14   addressing my filings would constitute a reversible error,

15   endorse procedural misconduct, and irreversibly taint these

16   proceedings.

17           Thus, Your Honor, I respectfully request the Court

18   deny 9019 settlement outright or at a minimum explicitly

19   preserve my complete objections, including docketed filings

20   and those for immediate appellate review, Your Honor.  Thank

21   you.

22           THE COURT: Okay.  So, which ones do you want me to

23   take judicial notice of?  Which dockets?

24           MR. GILL:  Well, Your Honor, what I was talking

25   about is that I have two verified motions.  One, of course,

1   is the scanned one, which is around April 25th, 2542.  The

2   other one was delivered to your clerk --

3          THE COURT:  I'm sorry, what number?  Just say the

4   number.

5          MR. GILL:  2542, and one that has been served and

6   delivered to the Court and has not been publicly docketed.

7   That, I cannot tell the number unless I get the number, but

8   it's 75 motions in one.  It was delivered to Nathan Ochsner

9   yesterday around nine o'clock, and it was a redundant

10  filing, UPS, FedEx, and as well as USPS.

11         THE COURT:  All right.  So, generally when there's

12  a filing at the clerk's office, it may take two or three

13  days for it to get on the docket.  So, that's not unusual.

14  So, there's a Docket Number 2494.  Is that the verified

15  emergency?

16         MR. GENENDER:  2495 is what he's referring to.

17         THE COURT:  2495.  Okay.  Okay, the amended motion

18  to strike, which is 80 -- it's 198 pages, the amended motion

19  to strike; is that the one?

20         MR. GILL:  That sounds about right, yes.  That --

21  I tried to load (indiscernible) onto the next one, but this

22  one is about 198, Your Honor.

23         MR. GENENDER:  Your Honor, the other one just hit

24  the docket.  It's Docket 2563.

25         THE COURT:  Okay, so -- okay, 2563.  Let me just

1    write those numbers down.  All right.  So, the first docket

2    that you want me to take judicial notice of is 2495.  It's

3    198 pages.  And then the second one --

4              MR. GILL:  That is correct, Your Honor.

5              THE COURT:  The second one is -- all right, there

6    is a second amended verified petition that is on the docket

7    at 2563.

8              MR. GILL:  Your Honor, that doesn't show on the

9    Epiq portal, but I trust you.  You're looking at the Court

10   side of things.  The last docket I can see here is 2561, but

11   I'm sure it's 176 pages, Your Honor.  And with the

12   notarized, if any, it would be an extra page if you're

13   looking at the notice.  But otherwise, the draft of the

14   original is 176 pages.

15             THE COURT:  Hold on.  Let me make sure.  Loading.

16   Yeah, it actually is 177 pages.

17             MR. GILL:  That's probably right.

18             THE COURT:  It basically starts, second amended

19   verified motion to suite 75-in-1, and then it goes to the

20   table of the motion to -- 1 through 75.  That's on Page 3 of

21   -- it says Page 3 of 176, so -- but for some reason it shows

22   up as 177 on our file.

23             Okay.  I will -- Mr. Genender?

24             MR. GENENDER:  Yes, Your Honor. We don't obviously

25   object to the Court taking notice that it's been filed.  We

1   do object to it being admitted in evidence.  It's littered

2   with hearsay, legal conclusions, accounting conclusions,

3   accusations.  It's not appropriate evidence.

4           THE COURT:  Okay.  So, mister -- Dr. Gill, I will

5   take judicial notice of both 2495 and 2563 of the fact that

6   they have been filed and the allegations that you have made

7   in them.  I'm not necessarily taking them -- admitting them

8   for the truth of the matter, just for that this is what you

9   have filed and these are the allegations that you have made

10  under oath.

11          MR. GILL:  Thank you, Your Honor.  If you could

12  preserve that for any future proceedings, thank you so much.

13          THE COURT:  Okay.  All right.  I will do that.

14          All right.  Anyone else wish to be heard in

15  opposition to the motion?  All right.  Sir?

16          MR. AGAY:  Your Honor, in the list of items

17  presented by Mr. Gill, I believe he's arguing that there are

18  claims here that are getting settled for insufficient value.

19  I had to sort of capture it at 30,000 feet.  The Special

20  Committee, as advised by McDonal Hopkins, reviewed almost

21  25,000 documents obtained from the Debtors, H.I.G., and

22  other sources.

23          We interviewed over 11 individuals.  We

24  considered, based on that review, several different claims,

25  including several claims, potential claims raised by the

1    Creditors Committee.  We didn't find sufficient evidence

2    where pursuit of those claims made any economic sense for

3    the estate, and as a result, we view the consideration being

4    received under this settlement as far in excess of any value

5    of the claims we investigated or, candidly, any of the

6    claims I heard from Dr. Gill, primarily as it relates to Dr.

7    Gill, because we found a complete absence of those things.

8           So, outside of that, I would stand on our motion,

9    Your Honor, and the declaration of Mr. Bartels, which sets

10   forth in evidence everything I just said.

11          THE COURT:  All right.  Thank you very much.

12   Okay.  So, the record is now closed on the 9019.  Why don't

13   we move on to the 3018 --

14          MR. AGAY:  Sure.

15          THE COURT:  The rule 3018.

16          MR. AGAY:  Thank you, Your Honor.

17          MR. GILL:  Your Honor, I have an objection to the

18   last set of statements made by the counsel, if I'm allowed

19   to speak on it.  I had raised hand.

20          THE COURT:  Yes, but generally speaking, Dr. Gill,

21   you know, they have the burden.  They go first, you object,

22   and then they get to respond, and then that's usually the

23   way we close it out.  I'll let you do it this time, but in

24   the next circumstance, you know, we need to follow the

25   protocol, which is they have the burden, they have to prove

1   what they're saying to me, you get to object, and then they

2   get to respond.  And so long as they don't go outside of

3   what you said, that's where it ends.  But I'll let you do it

4   this time, but keep that in mind for next time.

5          MR. GILL:  Your Honor, I'll be very careful and

6   I'll follow your directions.  I -- this is my first time --

7          THE COURT:  Sure.

8          MR. GILL:  -- actually talking like this, and I

9   apologize for not knowing that first.  Your Honor, I'm just

10  going to quickly go over the arguments that the counsel has

11  raised, no valuable claims argument.

12         Your Honor, the assertion that no valuable claims

13  were found is not legally -- is not only legally or -- and

14  factually incorrect, it is procedurally weaponized

15  disinformation.  The so-called investigation by Special

16  Committee and McDonal Hopkins relied upon Bartels'

17  declaration, entirely omitted the claims I have already

18  filed in the public record opposing the docket I just

19  mentioned, Docket 2495, which you have taken under

20  advisement.

21         It's a publicly docketed document and was served

22  on all parties, and the one that just hit the docket, I

23  believe you mentioned 2563, that just showed up.  These

24  filings contain over 70 distinct and verifiable claims,

25  including ADA retaliation against the federally protected

1   whistleblowers, ERISA fiduciary theft and stolen deferred

2   compensation, CPOM violation under the California Medical

3   Practice Act law, metadata tampering, mail fraud and

4   suppression of evidence, systemic obstruction of judicial

5   process and retaliation under 18 U.S.C. 1513.

6           None of these -- this was reviewed, investigated,

7   or even acknowledged by the Special Committee.  The failure

8   to account for these verified constitutional and statutory

9   violations is either gross negligence or deliberate

10  concealment.  So, when H.I.G. claims that there were no

11  valuable claims, what they mean is that they instructed

12  their fiduciary not to look at those.

13          I know formally -- I now formally request that, as

14  I previously said, the Docket 2495 and the 75-in-1 suite,

15  which was just submitted on the record, as evidentiary

16  predicates missing from the Bartels' declaration, their

17  exclusion renders the entire 9019 motion, 9019 process

18  defective under the governing law, which is protective of

19  Committee v. Anderson, Cajun Electric, and -- as well as the

20  as the Pacific Gas & Electric Company.

21          So I continue to oppose it, and I hope, Your

22  Honor, my opposition will be placed on record.  Thank you so

23  much.

24          THE COURT:  All right.  Thank you very much.  All

25  right.

1          MR. AGAY:  Thank you, Your Honor.

2          THE COURT:  Move on.

3          MR. AGAY:  Yep.

4          THE COURT:  Let's go to the 3018 motions.

5          MR. SZANZER:  Good morning, Your Honor.  Steven

6     Szanzer from McDermott Will & Emery on behalf of the

7     Debtors.  Turning to docket on the agenda 3A, there's about

8     ten 3018 motions that were filed, all filed by pro se

9     individuals.  For the most part, either we've resolved the

10    motions or they've been rendered moot as a result of the

11    timing of when they were filed.

12          Happy to go through each one individually, if Your

13    Honor prefers or --

14          THE COURT:  Let's just go ahead and do that.  You

15    can do it --

16          MR. SZANZER:  Okay.

17          THE COURT:  Just do it briefly.

18          MR. SZANZER:  Sure.  So, first one is at Docket

19    Number 2358, filed by Mr. William C. Monroe.  We believe

20    that that motion is resolved.  The movant actually filed a

21    proof of claim.  We've accepted the -- along with a ballot

22    as well.  We've accepted the ballot in the amount of the

23    proof of claim.

24          Next one is filed by William Grawbadger at Docket

25    Number 2360.  Similarly with the previous one, the movant

1    filed the motion with a proof of claim and a ballot.  We've

2    accepted the ballot in the amount of the proof of claim.

3            Similarly with Emanuel Hampton, also filed a proof

4    of claim.  We accepted the ballot as well, and the -- it's

5    been registered on the voting declaration.

6            Next one was filed by William Davis at 2372.  Mr.

7    Davis -- or that movant is a creditor of the Recovery

8    Solutions Estates.  That is no longer part of this plan, so

9    therefore we believe that that motion is moot.

10           Next motion was filed by John P. Fabian at 2375.

11   This ballot was submitted.  It was defective because it

12   wasn't signed.  That being said, we're accepting the ballot

13   for the purposes of serving as an opt-out form.  But other

14   than that, it was defective, and that defect was listed on

15   the voting tabulation exhibit as well.

16           THE COURT:  And the -- this is a class 6 claim?

17           MR. SZANZER:  Correct.

18           THE COURT:  Okay.

19           MR. SZANZER:  Same -- Docket Number 2397, filed by

20   Kenneth Pitts.  That document, that one has -- that's the

21   wrong one, I'm sorry.  2416 filed by Ken Pitts.  That motion

22   was filed after the voting deadline, so therefore we could

23   not accept it for the purposes of the voting record.  That

24   being said, we're accepting the motion to serve as a pro se

25   objection, and therefore as an opt-out, tantamount to an

1    opt-out for the plan.

2              THE COURT:  That 2417 or --

3              MR. SZANZER:  2416.

4              THE COURT:  Which one is that?

5              MR. SZANZER:  Ken Pitts.

6              THE COURT:  Yeah, but three what?

7              MR. SZANZER:  Oh.  Sorry, Your Honor.  It is not

8    on the agenda.

9              THE COURT:  Are you sure?  Let me just look at the

10   docket.  Okay.  Okay.

11             MR. SZANZER:  Moving on to 3F, Docket Number 2417,

12   filed by Harvey Badger.  Similarly to the prior one, the

13   3018 motion was filed after the voting deadline, so

14   therefore we couldn't do anything about the vote, but that

15   being said, we're accepting it as an opt-out form for the

16   purposes of the releases.

17             Moving on to 3G, Muhammad Kalifa filed at Docket

18   Number 2418.  Similarly, filed after the voting deadline,

19   but we're going to accept it for the purposes of opting out

20   of the third-party release.

21             3H, Michael Freeman, Docket Number 2419, filed

22   after the voting deadline, but we're once again going to

23   accept it for the purposes of opting out of the third-party

24   release.

25             Docket number 2426, 3I on the agenda, filed by

1    Timothy Gaillard.  Once again, filed after the voting

2    deadline, but we're going to accept it for the purposes of

3    opting out of the third-party release.

4            And finally, 3J, Docket Number 2489, Cantrell

5    Kennedy.  Once again, this 3018 motion was filed after the

6    voting deadline, but we're going to accept it for the

7    purposes of opting out of the third-party release.

8            THE COURT:  Okay.  Does anyone wish to be heard on

9    any of the 3018 motions?  And again, to the extent you're

10   not already on, hit five star one time.

11           All right.  No one -- it doesn't appear that

12   anyone wishes to be heard.  So, based on the representation

13   of counsel, I agree with the assessment that all of these

14   motions have been -- I'm going to terminate all the motions

15   because the relief has been granted to the extent that the

16   motions were timely filed.  The proofs of claim and the

17   ballots were accepted to the extent -- with respect to

18   Docket Number 2372, that was a Recovery Solutions system, so

19   that one was moot.

20           And with respect to the balance of them where the

21   motions were filed late, the Debtor has treated them as an

22   opt-out.  I don't think that there is any harm to any of the

23   individuals.  Class 6 voted to reject the plan, so to the

24   extent that they would have been voting against the plan,

25   there's no harm to them.  So, I'll accept and we will

1    terminate all these motions based on the disposition stated

2    by counsel.  Okay.

3            All right.  So, now let's go back to plan

4    confirmation.  So, what I'd like to do is maybe do opening

5    statements and take a short break and then begin the

6    evidentiary presentation.

7            MS. PERLMAN:  Your Honor, with respect to that,

8    should we wait to move the declarations into evidence until

9    after the break or can I move them --

10           THE COURT:  No, I think you can -- I think you can

11   move it, but to the extent anybody wants to cross-examine --

12           MS. PERLMAN:  Okay.

13           THE COURT:  -- we can wait.

14           MS. PERLMAN:  Perfect, Your Honor.

15           THE COURT:  And then I have a few questions.

16           MS. PERLMAN:  Okay.  Your Honor, Felicia Perlman

17   of McDermott Will & Emery on behalf of the Debtors.  As an

18   initial matter, I want to thank you for setting aside the

19   day today for confirmation for us.  We're happy to report

20   that as mentioned at last week's hearing, we have reached

21   agreement with our key stakeholders, the Creditors Committee

22   and the Ad Hoc Group of Lenders on a global settlement,

23   which has been incorporated into our amended plan.

24           There was an initial amended plan filed at Docket

25   2376.  And then, as you noted, a further amended plan was

1    filed last night at Docket 2552.  While we received numerous

2    objections to the plan, we have worked through many to

3    resolve them.  There still, however, are objections, which

4    we will address later on today.

5         As an initial matter, we filed four declarations

6    in support of the hearing today:  the declaration of Tim

7    Dragelin at Docket 2525; the declaration of Christian Tempke

8    at Docket 2526; the declaration of Patrick Bartels at Docket

9    2520, which Your Honor just admitted into evidence in the

10   9019 motion; and the declaration of Emily Young of Epiq at

11   Docket 2497.

12        Mr. Dragelin, Mr. Tempke, and Mr. Bartels are in

13   the courtroom today and available to testify if necessary.

14   Ms. Young is on Zoom, and we filed a motion seeking to allow

15   her to testify remotely, which is at Docket 2530.  I'd like

16   to move these documents into evidence.

17        THE COURT:  All right, so let me just get -- so,

18   Mr. Bartels' declaration is already in, and I'll just carry

19   that for purposes of this.  All right, does anyone have an

20   objection to the admission of the declaration of Emily Young

21   found at Docket 2497?

22        All right, that will be admitted, and to the

23   extent anyone wants to cross-examine Ms. Young at the

24   appropriate time, we can do that.

25        (Docket 2497 entered into evidence)

1          THE COURT:  Does anyone object to the admission of

2     the declaration of Mr. Dragelin?  His declaration is found

3     at --

4          MS. PERLMAN:  2525, Your Honor.

5          THE COURT:  Yes.  Okay, does anyone have any

6     objection to the admission of the declaration of Timothy

7     Dragelin found at Docket 2525 and its exhibit 20 -- Debtors

8     Exhibit Number 24 found at Docket Number 2556-2?

9          MR. GILL:  Your Honor, quickly, I saw the Timothy

10    Dragelin declaration yesterday as well.  I responded to it,

11    but I believe we had agreed that matter in regards to relief

12    from stay would be continued on May 20th.  I just want to

13    confirm that is recognized.

14         THE COURT:  Yeah, I think that the motion for

15    relief from stay that you had filed, we continued it until

16    that time.

17         MR. GILL:  Thank you, sir.

18         THE COURT:  All right, hearing no objection, I

19    will admit Mr. Dragelin's declaration at Exhibit 24, at

20    Docket 2556-2 as his direct testimony subject to cross-

21    examination at the appropriate time.

22         (Docket 2556-2 entered into evidence)

23         THE COURT:  And then finally, the declaration of

24    Mr. Tempke, which is Docket Number 2526, found at Docket

25    2556-3.  Does anyone object to Mr. Tempke's -- the admission

1    of Mr. Tempke's declaration as his direct testimony?  All

2    right, that will be admitted subject to cross-examination.

3            (Docket 2556-3 entered into evidence)

4            MS. PERLMAN:  Thank you, Your Honor.  We'd also

5    like to have admitted for the purpose of this hearing Mr.

6    Dragelin's first day declaration, which was previously

7    admitted and can be found at Docket Number 20.

8            THE COURT:  All right, any objection to the

9    admission of Mr. Dragelin's initial first day declaration

10    found at Docket Number 20?  All right, hearing no objection,

11    that will be admitted.

12           (Docket 20 entered into evidence)

13           MS. PERLMAN:  Your Honor, I want to make note of

14    various additional filings that were made relevant to

15    confirmation.  We filed a planned supplement initially at

16    Docket 2321, and then we filed an amended planned supplement

17    last night, which I believe is at Docket 2553.

18           THE COURT:  Yes.

19           MS. PERLMAN:  And, Your Honor, with that, I

20    thought it would be helpful to walk through just a handful

21    of the changes in the plan that were the result of the

22    global settlement.

23          As an initial matter, the plan incorporates the

24    H.I.G. settlement which you just heard the presentation on.

25    The plan also -- the revised plan incorporates additional

1    funding to the liquidating trust in addition to the funding

2    from the H.I.G. settlement.  The liquidating trust will be

3    funded with $12.5 million in cash.  The liquidating trust

4    assets will also consist of $10 million in principal amount

5    of take-back debt, the new Class B common equity, and the

6    liquidating trust causes of action.

7         The first lien lenders have agreed to waive their

8    deficiency claim as part of the global settlement.  With

9    respect to the new equity, there will be issued new

10   preferred equity to the equity financing participants, the

11   new Class A common equity to the equity financing

12   participants and the holder of first lien claims, and the

13   new Class B common equity to the liquidating trust.

14        THE COURT:  And the way I understand that, there's

15   the pref hurdle before any of that gets any value?

16        MS. PERLMAN:  That's correct, Your Honor.

17        THE COURT:  Okay.  And under Mr. Tempke's

18   analysis, those are worth zero today?

19        MS. PERLMAN:  At this moment, correct, Your Honor.

20        Two additional things just to note about the plan.

21   The plan provides $55 million of equity financing, which is

22   critical to the go-forward business and supporting

23   operations.  In addition, because this comment or question

24   has come up numerous times, the plan provides for the

25   assumption of the majority of the MSA agreements between

1    Wellpath and the PCs, which will therefore result in a

2    recovery to claims against the PCs that have identification

3    rights against Wellpath.

4            THE COURT:  So, this is a question that I have.

5    In view of the fact that Class 6 has rejected, has to be

6    fair and equitable.  So, if you have a claim, if you're a

7    personal injury claimant against a PC, let's assume you

8    didn't opt out, either against the PC or against the Debtor.

9    If you are -- if you have a claim, didn't opt out, and you

10   have a claim against a PC, it doesn't matter.

11           MS. PERLMAN:  Correct, Your Honor.

12           THE COURT:  But if you didn't opt out and you have

13   a claim against the Debtor, you're not getting the same

14   recovery as someone who's similarly situated in Class 6.  I

15   don't want you to answer it now, but that's a concern, the

16   unfair discrimination on that aspect of it, because the

17   Class 6 rejected.

18           MS. PERLMAN:  Understood, Your Honor.  I'm happy

19   to discuss it later --

20           THE COURT:  Yeah.

21           MS. PERLMAN:  -- but one party has a claim against

22   a Debtor and the other party has a claim against a non-

23   debtor.

24           THE COURT:  Well, no, no.  They have a claim

25   against -- no, I'm talking about against third parties.  I'm

1    not talking -- the Debtor's going to be discharged, but

2    these are just both claims against third parties.

3            MS. PERLMAN:  Okay.

4            THE COURT:  And one of them has it, and the other

5    one, if they didn't opt out, doesn't.  Regardless.  I mean,

6    both don't opt out, they're not doing it.  I may be off base

7    on that, but I'm just -- I want to understand it.

8            MS. PERLMAN:  Okay, Your Honor.  When we get to --

9            THE COURT:  Yeah.

10           MS. PERLMAN:  -- happy to address that before or

11   after the break.

12           Your Honor, I wanted to begin with the disclosure

13   statement.  As you recall, you conditionally approved the

14   disclosure statement.  That order is on the docket at 1867.

15   We would request that upon entry of the confirmation order,

16   if the plan is confirmed, you make approval of the

17   disclosure statement final.

18           As shown at the disclosure statement hearing, the

19   disclosure statement contains extensive disclosure regarding

20   all material facts necessary to vote on the plan.  Happy to

21   address any questions with respect to that.

22           THE COURT:  No, I'm -- I don't have any questions.

23           MS. PERLMAN:  While our compliance with the

24   various solicitation requirements are detailed in our brief,

25   and I will not walk through all of them unless Your Honor

1    has questions, which I'm happy to address, I did want to

2    briefly give a summary of our notice efforts with respect to

3    confirmation, as notice has been such an important part of

4    this case.

5            Notice of the confirmation hearing, voting, and

6    objection deadline was served on all parties on the 2002

7    list as of the voting record date.  In addition, there was

8    publication notice in the USA Today, the New York Times, and

9    the Prison Legal Notice.  There were opt-out posters posted

10   in the facilities, both in English and in Spanish.

11           There were also opt-out videos that were produced

12   in both English and Spanish to explain the opt-out process.

13   They had text on screen as well as the audio.  The text on

14   screen was only in English, but there was AUTOMATED VOICE in

15   Spanish for that.

16           In addition, we updated all mailing addresses of

17   inmates as appropriate for the Pennsylvania Department of

18   Corrections and any other facility that had similar mail

19   rules.  And there were reach-out to the facilities to help

20   facilitate notice as well.

21           As Your Honor alluded to with respect to the

22   voting classes, there were three voting classes under the

23   plan.  Class 3, the first lien secured claims, voted 100

24   percent to accept the plan.  Class 5, second lien deficiency

25   claims, also voted 100 percent to accept the plan.  Class 6,

1    general unsecured claims, however, did not vote to accept

2    the plan.

3            As Your Honor may recall, at the time of

4    solicitation, the Committee did not support the plan and

5    included a letter in the solicitation materials to that

6    effect.  Once the global settlement was reached, however,

7    the Committee has indicated, and they can speak for

8    themselves shortly, their support of the plan.  However,

9    this wasn't until near the end of the solicitation period.

10           We do believe, however, that we need the cramdown

11   standards and we can present that later on as well.  Your

12   Honor --

13           THE COURT:  Question.  With respect to the

14   solicitation materials that went out and with respect to

15   notice, I think that's all in the record, and obviously

16   we're going to need to introduce or take judicial notice of

17   those, is there anything from an evidentiary standpoint in

18   the record with respect to the efforts that were made at the

19   prisons?

20           MS. PERLMAN:  I'm trying to remember if any of

21   that was put on the docket with notices.  The publication

22   notices were.  I do not believe there was anything on the

23   docket with respect to the posters or the videos.  If you

24   can give me one second to turn around to make sure.

25           THE COURT:  Who's in charge?

1          MS. PERLMAN:  Those were not submitted under -- as

2     a notice on the docket.

3          THE COURT:  So, and we've talked about this at

4     previous hearings, and there is evidence, anecdotal evidence

5     that this occurred.  So, if you would just supplement the

6     record and put something, you know, somebody with knowledge

7     saying yes, this was done.

8          MS. PERLMAN:  We're happy to put a declaration on

9     from --

10          THE COURT:  Yeah.

11          MS. PERLMAN:  -- a party with direct knowledge of

12     that --

13          THE COURT:  Yeah, just --

14          MS. PERLMAN:  -- confirming that.

15          THE COURT:  Just -- we don't need it today, but in

16     the next few days I want you to supplement the record on

17     that.

18          MS. PERLMAN:  Absolutely happy to do so, Your

19     Honor.  Thank you.

20          Your Honor, our confirmation brief is filed at

21     Docket 2528.  It walks through all the requirements of

22     confirmation.  I will not go through each one in detail

23     today, but I'm happy to answer questions on any that I do

24     not raise.  I plan to highlight a few of the key

25     confirmation requirements and then answer any other

1    questions necessary.

2         THE COURT:  Okay, go ahead.  I want to understand

3    what's not at issue as opposed to what's at issue, but I --

4    so I'll go through a list of things that I think you've

5    addressed that are not at issue here.

6         MS. PERLMAN:  Understood, Your Honor.  I believe

7    that at issue is potentially feasibility, although I'm

8    uncertain on some of the objections, good faith, and

9    cramdown.  Given the import, I also, to briefly address the

10   best interest test, although I don't believe it's at issue

11   in any of the objections.

12        With respect to the best interest test, 1129(a)(7)

13   requires a court find that with respect to creditors that

14   did not vote to accept the plan, they receive a recovery

15   that's not less than the recovery that they would receive in

16   a Chapter 7 liquidation.

17        Attached to the disclosure statement is Exhibit D.

18   We filed a liquidation analysis comparing the range of

19   recoveries under the plan to a hypothetical Chapter 7

20   liquidation.  As set forth in the liquidation analysis and

21   recovery, the recovery under the plan would be greater than

22   in a hypothetical Chapter 7.

23        The Dragelin declaration sets forth in detail how

24   the liquidation analysis was completed.  Further, as the

25   Debtors have filed an amended plan incorporating the global

1    settlement, which greatly increases the recovery to general

2    unsecured creditors, further increasing that recovery versus

3    a hypothetical Chapter 7 liquidation, we believe we meet the

4    best interest test.

5         THE COURT:  Yes, and that was one of my questions.

6    In Mr. Dragelin's declaration, he just addresses the one at

7    Exhibit D.  I think we need testimony that as a result of

8    the changes in the plan, the -- if they met it then, they'll

9    need it much more now because of the greater recovery.  But

10   that's -- I don't think that's in the record.

11        MS. PERLMAN:  We're happy to put that on as

12   additional direct testimony when we return from the break

13   and the witness is on.  Thank you, Your Honor.

14        With respect to feasibility, Section 1129(a)(11)

15   requires that confirmation of a plan is not likely to be

16   followed by the liquidation or further financial

17   reorganization.  The Court has found that this section does

18   not require a guarantee of success, but rather reasonable

19   assurance of commercial viability.

20        Attached to the disclosure statement, Exhibit E,

21   are financial projections, which together with the

22   declarations of Tim Dragelin and Christian Tempke, show that

23   the Debtors reasonably believe that the Debtors will have

24   sufficient liquidity to support the reorganized Debtors'

25   capital structure and pay all operating expenses and

1    liabilities as they come due in the ordinary course of

2    business.

3         Your Honor, we did initially receive one objection

4    that went to feasibility.  It has been withdrawn either in

5    part or in whole, uncertain that went to the impact on go-

6    forward professional liability claims.  As the Dragelin

7    Declaration sets forth, those were taken into account in the

8    projections and to the extent necessary, happy to provide

9    further testimony with respect to that.

10        Your Honor, to turn to cramdown, I'm happy to

11   address it initially now and can follow up with the question

12   that you raised after the break; although, I have a partial

13   answer now.  Under 1129(b) of the Bankruptcy Code, if all

14   requirements of 1129 are met, other than the acceptance of a

15   plan by all impaired classes, the Court shall confirm if the

16   plan does not unfairly discriminate and is fair and

17   equitable with respect to all non-accepting classes.

18        Here, Class 6, the general unsecured creditors, as

19   we noted, did not vote to accept the plan.  In addition,

20   Classes 4, 7, 8, and 9 were deemed to reject because they

21   are receiving no recovery under the plan.  The plan does not

22   unfairly discriminate with respect to rejecting classes

23   because the classification of classes that did not vote to

24   accept the plan were based on their legal nature and

25   priority of the underlying obligations, and there is a

1    reasonable basis for such classification and treatment.

2         Further, under 1129(b)(2), a plan is fair and

3    equitable with respect to a rejecting class if, under the

4    plan, no holders of junior claims or interests are receiving

5    or retaining property in account of such claims.  This

6    standard is satisfied here, as no holders of claims or

7    interests junior to those classes are receiving

8    distribution.

9         Further, Class 4, the first lien deficiency

10   claims, have consented to receive no distribution on account

11   of their claims and have waived their claims.  One party

12   objected to the plan and claims that it violates the

13   absolute priority rule because of the payments made under

14   what they refer to as the KEIP and that the KEIP violates

15   Section 503(c) as well as the absolute priority rule.

16        As Your Honor is aware, we withdrew the KEIP

17   motion.  It was not approved by this Court.  The new owners

18   on a post-effective date basis, should the plan be

19   confirmed, have stated that they will be making payments to

20   those employees.

21        To address Your Honor's question with respect to

22   parties that have third-party claims and did not opt out, as

23   an initial matter, they had an opportunity to opt out, so

24   the ability to retain their right to preserve their claims

25   against third parties, and given that, I do not believe

1   there is unfair discrimination with respect to those claims.

2          The last provision or requirement of the

3   Bankruptcy Code that I wanted to address briefly is good

4   faith, as a number of parties did raise good faith in their

5   objections.  Most allege that the plan was filed with the

6   improper intent of discharging pre-petition claims.

7          Your Honor, the Fifth Circuit evaluates good faith

8   in light of the totality of the circumstances surrounding

9   the establishment of the plan, mindful of the purposes

10  underlying the Bankruptcy Code.  Your Honor, this plan is

11  the culmination, as you know, of months of rigorous good

12  faith negotiations between the Debtors and the key parties,

13  here being the Creditors Committee and the Ad Hoc Group of

14  Lenders.

15         It represents the best path forward, positioning

16  the Debtors for long-term success, as well as providing

17  significant recovery to unsecured creditors.  It was

18  evaluated and approved by the independent directors of the

19  Debtors, as set forth in the Bartels declaration.  No party

20  has raised any specific allegations of bad faith.

21         We understand that there are parties with

22  professional liability claims or otherwise that are

23  disappointed that their claims are being dealt with under

24  the plan rather than outside of bankruptcy, but we believe

25  that the basis for this bankruptcy was proper to allow this

1    company to go forward, to continue to provide the care it

2    provides, keep its employees going forward, while still

3    providing the maximum recovery for creditors.

4              THE COURT:  And my concern is not that they didn't

5    have the opportunity to opt out.  You know, I think as it

6    relates to the releases that are being given, there is an

7    opportunity to opt out.  We've had 1,200 people opt out, so

8    that has worked.  The concern is that as it relates to

9    personal injury and wrongful death claims, some people

10   didn't have to opt out in order to preserve the claims

11   against third parties, whereas others did.  That's the

12   concern.

13             MS. PERLMAN:  Okay.

14             THE COURT:  And that -- whether that constitutes

15   unfair discrimination.  So, you can address that later.

16             MS. PERLMAN:  I appreciate that, Your Honor.

17             THE COURT:  Okay.

18             MS. PERLMAN:  I will return to that after the

19   break.  Your Honor, the other provision that I just wanted

20   to address briefly is the third-party releases and the opt-

21   out.  The plan provides for certain specified third-party

22   releases.  Third-party releases are permitted in the Fifth

23   Circuit so long as they are consensual, specific in

24   language, integral to the plan, and satisfy the conditions

25   of the settlement under Bankruptcy Rule 9019 and are

1    supported by valid consideration.

2         These third-party releases contained in the plan

3    are consensual.  While the U.S. Trustee and some others have

4    objected, arguing that these releases violate Purdue, that

5    is not correct.  First, these objections misinterpret

6    Purdue.  The Supreme Court held that non-consensual third-

7    party releases are impermissible.  However, the Court did

8    not find that consensual third-party releases are

9    impermissible.

10        The releases in our plan are consensual releases

11   as they are only binding on those that do not opt out.

12   Courts in the Fifth Circuit subsequent to Purdue have ruled

13   that an opt-out can manifest consent to a third-party

14   release.  In the Robert Shaw case 622 B.R. -- this can be

15   found in 323.  In addition, In re Digital Media Solutions,

16   Inc., Case Number 24-90468.

17        Second, the Debtors have gone beyond providing the

18   required applicable notice in this case of the opt-outs.  As

19   we just stated, Your Honor, notice was provided to the 2002

20   mailing list.  There was publication notice and there were

21   specific opt-out notices posted in the facilities in both

22   Spanish and English, along with the video explaining the

23   opt-out process.

24        The results of this, I think, are clear to show

25   that the opt-out has worked; 969 parties opted out of the

1    third-party release by returning opt-out forms.  In

2    addition, outside of the opt-out forms, we are allowing opt-

3    outs based on any written communication from incarcerated

4    individuals that evidence an intent to opt-out, and that

5    will continue for 60 days after the confirmation date.

6         Any party that timely filed an objection to the

7    releases is deemed to opt-out, and any party filing a lift

8    stay motion is also deemed to opt out.  From that category

9    to date, 312 additional parties are deemed to have opt out

10   of the third-party releases.

11        Third-party release is supported by adequate

12   consideration.  In addition, the third-party release was --

13   those parties, in addition to providing funding, have

14   provided a great deal of effort to manage this business,

15   keep providing care, and make sure that there was a go-

16   forward business to reorganize.

17        There have been significant concessions made by

18   numerous parties with respect to their recovery to help

19   protect the value of the estate.  There was funding provided

20   both during the bankruptcy and funding provided on a post-

21   bankruptcy basis.  There was contribution of significant

22   labor and expertise beyond what is usually expected by the

23   board members.

24        Third-party release is an integral part of the

25   plan.  It is incorporated into the settlement between the

1    parties.  It was initially set forth in the restructuring

2    support agreement that predated this case.  The third-party

3    release, along with the Debtor release, is a key inducement

4    to bring all the stakeholders together to the bargaining

5    table, and it allows the company to go forward while

6    focusing on their go-forward business rather than being

7    distracted by potential discovery and other requests

8    relating to past claims.

9            The third-party release is also a specific

10   release.  The plan provides a precise detail of the nature

11   and types of claims released in the parties released.  All

12   parties in interest receive notice of the third-party

13   release through both the disclosure statement, the ballots,

14   and the non-voting status notice, as well as the opt-outs

15   and the confirmation notice.

16           Accordingly, we believe that the third-party

17   release is supported by Fifth Circuit law.  Your Honor, I'm

18   happy to answer questions regarding additional --

19           THE COURT:  Yeah.  A couple of things.  Number

20   one, I still didn't see what the procedure is going to be

21   for personal injury and wrongful death claimants against the

22   Debtors to liquidate their claims.

23           MS. PERLMAN:  Those claims will be looked to the

24   liquidating trust and they will be liquidated as part of the

25   claims process.  They can go forward in their -- the courts

1    in which they have been filed, because I understand that --

2            THE COURT:  Where does -- I didn't see where  --

3    anywhere where it said that.  It clearly says that with

4    respect to --

5            MS. PERLMAN:  It's actually incorporated not into

6    the plan, but in the liquidating trust agreement, and those

7    proceedings --

8            THE COURT:  I didn't see it in the liquidating --

9    I did look for that in the liquidating trust agreement, but

10   I didn't see anywhere where it said --

11           MS. PERLMAN:  I believe this was just revised and

12   filed last night.  I'll ask Mr. Hemenway to step up and --

13           MR. HEMENWAY:  Article IV.J, Your Honor, provides

14   for that.  So, in Article IV.J, it provides that if --

15   basically the liquidating trust procedures for liquidating

16   claims, so they're available to all claimants, including

17   personal injury claimants.

18           THE COURT:  But -- I'm sorry, what page is that?

19           MR. HEMENWAY:  Page 9 -- it would be Page 299 of

20   the plan supplement.

21           THE COURT:  No, what page of the liquidating trust

22   document?

23           MR. HEMENWAY:  Page 9 of the trust distribution

24   procedures.

25           THE COURT:  Okay.  The trust distribution

1    procedures.

2              MR. HEMENWAY:  It's at the close of that section,

3    Your Honor.

4              THE COURT:  What about for somebody who hasn't

5    filed a proof of claim?

6              MR. HEMENWAY:  How would they liquidate their --

7              THE COURT:  Yeah.

8              MR. HEMENWAY:  -- claim?

9              THE COURT:  Under Edgeworth, they're entitled to

10   liquidate their claim regardless of whether they filed a

11   proof of claim or not.  That's what Edgeworth says.

12             MR. HEMENWAY:  So, this section does -- is -- does

13   contemplate having evaluated the proof of claim, and so we

14   agree with you there.  We're -- I think we can look at

15   revising it to account for that scenario that would be

16   required.

17             THE COURT:  Yeah, I think that probably needs to

18   be in the plan or the confirmation order that people can go

19   ahead and liquidate their claims in state court or wherever

20   they are.  Federal court.

21             MR. HEMENWAY:  Understood, Your Honor.

22             THE COURT:  Because this doesn't -- and if they've

23   opted out, then what happens if they've opted out?

24             MR. HEMENWAY:  So, the opting out would be just as

25   to the third parties.  So, this -- if they've opted out,

1     then the trust distribution procedures wouldn't apply to --

2     they would be liquidating their claim pursuant to their

3     right to opt out.

4              THE COURT:  Well, but if they opt out, they're

5     still liquidating --

6              MR. GILL:  (Indiscernible).

7              THE COURT:  Dr. Gill, can you mute your phone?

8     Dr. Gill, can you mute your phone?

9              MR. GILL:  Yes.  Yes, sir.

10             THE COURT:  If they've opted out, they can still

11    liquidate their claim against the Debtor because at some

12    point there will be insurance if -- 8 million.

13             MR. HEMENWAY:  Sure, and the plan preserves those

14    insurance rights.  The -- what the trust distribution

15    procedures do for somebody that has opted out is gives them

16    the non-binding option to agree on an allowed claim as they

17    are continuing to pursue claims against other potentially

18    liable parties.

19             THE COURT:  Okay.  Well, I'll need to study them.

20             MR. HEMENWAY:  Thank you.

21             THE COURT:  But I think we need to have a clear --

22             MS. PERLMAN:  Your Honor, we're happy to add

23    something to the confirmation order to address that.

24             THE COURT:  Okay.  All right.

25             MS. PERLMAN:  Other questions you'd like addressed

1    now?

2            THE COURT:  No at some point -- no, no.  At some

3    point, I just have lots of smaller questions.

4            MS. PERLMAN:  Happy to address now or turn it over

5    to the other parties and then after the break.

6            THE COURT:  Why don't we -- it's already 10

7    o'clock.  Why don't we try to see if we can get all the

8    opening statements done and then we'll take a quick break.

9            So, anyone else in support of confirmation?  Thank

10   you, Ms. Perlman.

11           MR. ROSEN:  Good morning, Your Honor.  Brian

12   Rosen, Proskauer Rose, on behalf of the Unsecured Committee,

13   and I think like we've done previously, we'll do this

14   somewhat in a little tag team with Mr. Zluticky coming up to

15   add some additional comments.

16           Your Honor, this, as you know, has been a long

17   haul of a case, maybe not in the length of time, but

18   certainly in the effort that's been put in.  When the

19   committee was formed, we were immediately confronted with

20   the RSA that had been executed by the Ad Hoc Group as well

21   -- and the Debtors, and it set forth their view as to the

22   way this case should proceed and the way that distribution

23   should be made or the lack of distribution should be made to

24   general unsecured creditors.

25           When the Committee got involved in the case, Your

1    Honor, we immediately set out to try and rectify that

2    situation and generate the greatest possible recovery for

3    general unsecured creditors.  This obviously took place

4    initially with respect to the DIP in the agreement that was

5    reached.  And I would say that we were able to

6    collaboratively work with the Ad Hoc Group and the Debtors

7    to try and generate some value even at that earliest moment

8    in the case.  It continued through the sales of the Recovery

9    Solutions business and then with respect to the efforts to

10   sell the corrections business.

11        But the plan has taken the longest bit of time to

12   achieve that recovery.  But what we're happy to say is that

13   based upon original projections that were made by the

14   Debtors with respect to probably a negative recovery for

15   general unsecured creditors, we are now at the point where

16   we are able to say that there is a possible recovery for up

17   to 50 percent of general unsecured claims.

18        I know Your Honor referenced the Tempke

19   declaration earlier.  We obviously have a different

20   perspective as to where that will play out over time based

21   upon the overall timeframe associated with payment of the

22   take-back facility as well as the generation of additional

23   value as laid out in the projections or the information

24   that's been provided by the Debtors during the disclosure

25   statement and now plan confirmation process.

1          Your Honor, you also, and I believe Ms. Perlman

2     has referenced, the Class 6 voting results.  And I know that

3     there was a statement made on the record as to the timing

4     associated with that.  If Your Honor will recall, the timing

5     associated with solicitation was part of the process that

6     was required by the Ad Hoc Group and the Debtors.

7          And while the unsecured committee sought to try to

8     delay that process, unfortunately that process went forward

9     and we did have to include at that point in time our views

10    with respect to what their solicitation or their acceptance

11    or rejection of the plan should be.

12         And although we were in the middle of the

13    negotiation of the overall plan at that time, we were forced

14    to take that position.  As soon as we were able to reach

15    closure, however, Your Honor, we did try to get the word out

16    that the Creditors Committee supported confirmation of the

17    plan and to the extent possible you should vote to accept.

18         Unfortunately, we were told that there was no

19    additional notice that could be provided to people, just due

20    to the timing process and the overall prison processes of

21    getting mail to incarcerated persons.  So unfortunately,

22    Your Honor, we believe that that was the, I'll call it the

23    factor, as to what generated the negative vote of general

24    unsecured creditors.

25         We believe that if there was additional time, you

1    might see people change their ballots to acceptances of the

2    plan or they might have actually never voted to reject the

3    plan in the first instance.  There is still work to be done,

4    however, Your Honor, specifically with respect to some of

5    the documents which are contained in the plan supplement.

6         Specifically, there is one with respect to what we

7    refer to as the grid, which details the overall settlement.

8    And I know the parties have gone back and forth on that for

9    many, many weeks, and we believe that that is very, very

10   close to finality and hopefully it will be finished over the

11   break and that we could actually provide that to the Court a

12   little bit later in the hearing.

13        Other documents that are of particular note, at

14   least from my vantage point, one is the cooperation

15   agreement.  That is the document by which the Debtors are

16   supposed to work with the liquidating trust to provide

17   information, whether it is documentation or whether it is

18   through witnesses themselves, to the liquidating trust to

19   help in the reconciliation of the claims which are in

20   Classes 5 and 6, and most notably, Your Honor, Class 6, the

21   general unsecured claims.  There are still points

22   outstanding.

23        Inasmuch as the Debtors have -- I will use the

24   word foisted, but that is not really what it is -- have

25   assigned to the trust the obligation to do the

1    reconciliation of all of those claims, the liquidating trust

2    does not have any of the documentation.  Everything at that

3    point in time sits in the hands of the Debtors.  It's

4    important for the Debtors to provide that information, to

5    provide that cooperation, and obviously it's important for

6    the Debtors to do so -- and I will say this is one of the

7    major outstanding points -- at the cost of the Debtors.

8            You cannot ask the liquidating trust, which has

9    none of this information at this particular point in time,

10   to be asked to do all the work to get it from the Debtors

11   and absorb all of the costs associated with that, because

12   the costs or the money that is being provided to the

13   liquidating trust is for purposes of distribution for the

14   most part, and it should not be utilized or dissipated for

15   purposes of getting things from the Debtors themselves.

16           There was a comment made, Your Honor, and it is

17   based upon the way that they are setting forth the money to

18   come to the trust.  Ms. Perlman noted that there is $12.5

19   million to come to the trust from the Debtors.  We look at

20   it as a $15.5 million distribution.  You heard Mr. Hemenway

21   before talk about the three words, to the Debtors.  It is a

22   $15.5 million cash component which is coming to the estate.

23   It is the $3 million from H.I.G. as well as the $12.5

24   million coming from the Debtors themselves.

25           The bottom line, Your Honor, is that the Committee

1    is very happy with the result of the plan.  We support

2    confirmation of the plan subject to the finality or the

3    finalization of the documentation itself, but we believe

4    that the recovery which is what we believe now will come to

5    general unsecured creditors through the cash component,

6    through the take-back paper, and through the ultimate equity

7    to be provided is a significant recovery for the estate and

8    for the Debtors themselves, and we therefore support

9    confirmation of the plan.

10            THE COURT:  Thank you.

11            MR. ZLUTICKY:  Good morning, Your Honor.  Nick

12    Zluticky of Stinson for the Committee.  Briefly, before I

13    get into what I was about to say, I think as to Your Honor's

14    issue on liquidating your claim against insurance, that's

15    dealt with by Article V, Section E of the plan, which says

16    that nothing in the plan modifies the rights and liabilities

17    of insurers.  We're happy to put some additional language

18    saying that if you do have a claim against an insurance

19    company, you have the right to pursue that claim.

20            There's nothing in the plan that would prevent

21    that.  I believe that what Edgeworth says, as Your Honor

22    noted, is that even if someone doesn't file a proof of claim

23    in a case, it does not prevent them from going after

24    insurance and collecting insurance proceeds.  I believe that

25    Article V, Section E of the plan deals with that, but we're

1    happy to put --

2              THE COURT:  Let me read --

3              MR. ZLUTICKY:  Go ahead.  So, it's the second

4    paragraph and I'm specifically looking at the plan

5    supplement.  It's at Docket 2552.  I don't believe that --

6              THE COURT:  What plan?  What plan are you talking

7    about?

8              MR. ZLUTICKY:  It's the most recent modified plan.

9              THE COURT:  Okay, so --

10             MR. ZLUTICKY:  It's the notice of the modification

11   of the amended plan at Docket 2552.

12             THE COURT:  Okay, but so it's article what?

13             MR. ZLUTICKY:  I'm on Page 61 of 92 of the filing.

14             THE COURT:  The one that says reservation of

15   rights?

16             MR. ZLUTICKY:  It's Page 59 of the plan itself,

17   and so it's Article V.

18             THE COURT:  Right.

19             MR. ZLUTICKY:  And it's Subsection E under

20   insurance policies.

21             THE COURT:  Okay, hold on.  Let me get to that.

22             MR. ZLUTICKY:  Okay.

23             THE COURT:  Yeah, this is -- this looks at it from

24   the other side.  This is a truck insurance paragraph.

25             MR. ZLUTICKY:  Well --

```
 1           THE COURT:  This is not a procedure for how

 2    somebody who has a claim against the Debtor that might be

 3    insured liquidates that claim.  I think this is the truck

 4    insurance paragraph.

 5           MR. ZLUTICKY:  Well, sure, it is -- part of it is

 6    that, but part of it, if you look at sort of the first

 7    sentence, and you're looking at one and two, it says, alters

 8    or modifies the duty of any that the insurers or third-party

 9    administrators have to pay claims, lowercase C, covered by

10    such insurance policies and the right to seek payment.

11           And so our view on that is because that lowercase

12    C is intentional, we don't want to limit it to just people

13    who filed proofs of claim.  Insurers still have a duty to

14    provide whatever coverage they were required to provide to

15    anyone who can make a claim against insurance, not just

16    someone who filed a proof of claim.

17           But I take Your Honor's point, and we're happy to

18    put clarifying language in the confirmation order.  I can

19    tell you that the intent of this was to comply with the

20    requirement that you don't have to file a proof of claim in

21    -- as a prerequisite to go after insurance proceeds.  Now,

22    it is a prerequisite to get a share of the liquidating trust

23    assets, but it's not a prerequisite to go after insurance

24    proceeds.  That's the intent of 5E --

25           THE COURT:  Or third-party claims.
```

1          MR. ZLUTICKY:  Or third-party claims, of course.

2    And we're happy to work with the Debtors to --

3          THE COURT:  Yeah --

4          MR. ZLUTICKY:  -- make that change to the

5    confirmation order.

6          THE COURT:  This -- I view this as the truck

7    insurance.

8          MR. ZLUTICKY:  Yeah.  It's sort of both because it

9    is the truck insurance.  It's trying to make sure that we're

10   providing that the insurance -- insurers aren't, you know --

11         THE COURT:  Right.

12         MR. ZLUTICKY:  -- modified in any way.

13         THE COURT:  And --

14         MR. ZLUTICKY:  But in addition to that, we wanted

15   to make sure that it doesn't modify their requirement to pay

16   claims --

17         THE COURT:  Right.

18         MR. ZLUTICKY:  -- in lowercase C.

19         THE COURT:  And it also basically says at the

20   bottom, which was added in the last version of the plan --

21         MR. ZLUTICKY:  Yeah, that's the truck part.  Yeah,

22   yeah.  Yeah, that's the avoidance of doubt part.  But the

23   first part of it was intended to address that issue, and

24   we're happy to put that clarifying language with the Debtors

25   in the confirmation order, Your Honor.

1          THE COURT:  Yeah.  I did not read it like that.

2     So, we need to do that.

3          MR. ZLUTICKY:  Absolutely.  Thank you, Your Honor.

4     So, I'll be -- I don't want to spend too much time talking

5     about the liquidating trust, because I know Your Honor wants

6     to take some time to look at the document, and I want to

7     give Your Honor that time.  I just did want to say a couple

8     of words.  As Mr. Rosen stated, the Committee does support

9     the plan as amended as part of the global resolution.

10          I know we have some issues that we still need to

11     finalize with the Debtors, with the Ad Hoc Lenders.  We're

12     working through those.  I think we're quite close.  But what

13     I wanted to focus on for a moment is when we -- when the

14     Committee was first appointed and we first came before Your

15     Honor, one of the first things we said is that we didn't

16     want to lose sight of the human element in this case and

17     there are creditors that have claims here that arise out of

18     wrongful death, serious injury, medical malpractice, and

19     other serious tort and constitutional claims.

20          This plan is modified by the global settlement.

21     We believe it keeps that human element the focus of this

22     plan.  It's a substantial recovery to creditors, and

23     importantly, from our view, the committee's view, it gives

24     those creditors a process to recovery that allows them to do

25     sort of one of the following things, and I'll sort of go

1   through this very briefly, and then we can get into it more

2   as Your Honor has questions about the trust agreement and

3   trust distribution procedures after you've reviewed them.

4         But in general, if a creditor has filed a claim in

5   the case, they have the right to seek an expedited

6   distribution at a fixed amount. It's $2,500. And for

7   individuals who want to take advantage of that expedited

8   distribution procedure, they have the option to settle their

9   claim against the trust and all others for the expedited

10  distribution of $2,500.

11        It's up to a cap of $1.5 million in the aggregate.

12  And they'll get -- we'll get the money to them as quickly as

13  possible. They don't have to go through a claims resolution

14  process, ADR. They don't have to go back to court. Very

15  expedited, and that's important to us because there are

16  people who have claims in this case who need the funds as

17  soon as possible, and we wanted to provide a clear path for

18  them to do that. This does that here.

19        If -- there are many creditors who have claims

20  that they firmly believe and they should be allowed to

21  assert that are worth far more than $2,500. They're serious

22  claims, and we do not expect those individuals to elect the

23  expedited distribution procedure.

24        But what we do have is a very clear process for

25  them to go forward and have their claim liquidated, either

1    through the trust and an informal claim allowance process

2    and -- or alternative dispute resolution procedure, but at

3    all moments, if they do not agree with the number, if you

4    are a personal injury claimant, you will have the option to

5    go back to court to liquidate the amount of your claim.

6    That was very important to us as a Committee when we were

7    negotiating these procedures.

8           If your claim is more of a contract claim, a trade

9    claim, you will still have the right to liquidate your

10   claim, but it will likely be Your Honor that will be

11   deciding that, if we are able to reach agreement through the

12   informal process.  One other point about the informal

13   process is we want to lower the burden on pro se litigants

14   and specifically incarcerated individuals for being able to

15   submit information to the liquidating trust about their

16   claim.

17          They don't have to sort of fit it neatly in a box

18   and check all the right things, and we just want them to

19   give us all the information that we have.  The trust will

20   make an assessment and give them a notice, and the idea is

21   to give individuals the opportunity to give us all their

22   information about what they believe their claim is and get

23   that evaluated quickly on an informal basis and see if we

24   can come to agreement on the allotted amount of their claim.

25          And if we don't agree that's fine, and we'll do --

1    we'll implement an alternative dispute resolution process.

2    And if neither side agrees to what that neutral says because

3    it is non-binding, that's fine too, and they're -- and that

4    individual is permitted to, if it's a personal injury claim,

5    go back to state court or federal district court and

6    liquidate the amount of their claim.

7         The other thing is that this does not affect their

8    rights against third parties that are not released as part

9    of the plan.  The other thing that was a really important

10   test is that the opt-out in the plan is a true opt-out.  If

11   they opt out of the plan, they have the right to go back

12   into the civil justice system and litigate their claims

13   against third parties, and we wanted to preserve that

14   ability.

15        The other important thing to us is if this plan is

16   confirmed, on the effective date, this stay extension issue

17   that we've been dealing with since the beginning will

18   largely go away.  Folks will have the ability to go after

19   parties who haven't been released, and they will be able to

20   pursue their causes of action in court, and it will no

21   longer matter that the Debtor was named a party or the

22   debtor has a relationship to a party.

23        There are certain restrictions on that, of course,

24   with respect to the go-forward entity, and we understand

25   that.  But largely, it's going to open up the process again

1    for people to go back to court, and if they have claims

2    against third parties who haven't been released, they're

3    going to be able to do that.

4              THE COURT:  Okay.  I have a question.  So, I

5    understand that the second lien deficiencies claims are

6    allowed for distribution purposes --

7              MR. ZLUTICKY:  They are.

8              THE COURT:  -- in Class 6.  I just pulled up the

9    claims register in the Wellpath case.  There's 168 claims

10   filed.  Is that your understanding of the universe of claims

11   filed to date?

12             MR. ZLUTICKY:  I believe that the claims filed is

13   slightly larger than 168.  Is that right?  But I do not

14   believe it's significantly higher than that.  There were

15   several scheduled claims as well.  Okay, and how many of

16   these are personal injury and wrongful death claims?  I

17   believe that it is approximately -- so, Your Honor, we'll

18   have to check the claims register again, but I believe that

19   there are more than 168 claims filed in the case.  We'll

20   confirm that with the Debtor.  We believe that in terms of

21   the personal injury claims, there are at least, you know,

22   over 100, if not more.

23             THE COURT:  Okay.  And the Debtor in its first day

24   paper said they had about 1,500 prepetition claims?

25             MR. ZLUTICKY:  They had 1,500 prepetition

1    lawsuits, I believe.

2             THE COURT:  Correct.

3             MR. ZLUTICKY:  Not all of them, I believe, filed a

4    proofs of claim in this case.  I think the Debtor was

5    involved in 1,500 lawsuits, whether through third-party

6    indemnification obligations or other than that.

7             ROSEN:  Just to clarify that number, Your Honor,

8    that was in the first day paper talking about extension of

9    the stay.  So, we've looked at those numbers in the context

10   of stay.  Many of those lawsuits were not lawsuits against

11   the Debtor.  They were lawsuits against professional

12   corporations, for example.  So, they would not be part of

13   the personal claims in this case, necessarily, since the

14   professional corporation claims --

15            THE COURT:  But there were a bunch of lawsuits

16   that were filed against just the Debtors' employees.

17            MR. ROSEN:  Yeah, absolutely.  It's just that

18   1,500 number includes a number of lawsuits that wouldn't be

19   claims in this case.

20            THE COURT:  Because the contracts have been

21   assumed?

22            MR. ZLUTICKY:  Because the professional

23   corporations are not Debtors.

24            THE COURT:  Right.

25            MR. ZLUTICKY:  And because the contracts have been

1    assumed and the professional corporations are not released

2    parties, their claim is a true claim against a third party

3    that is not a claim against the Debtor.  The claim against

4    the Debtor, to the extent that it exists, would be an

5    indemnification claim by the PC against the Debtor.

6              THE COURT:  Yeah, which is being assumed, right?

7              MR. ZLUTICKY:  Exactly, Your Honor.

8              THE COURT:  Okay.  All right.

9              MR. ZLUTICKY:  The other thing that was important

10   to us is this be a trust that was created by the creditors

11   for the creditors.  So, this trust will be run by a

12   liquidating trustee that the Creditors Committee selects.

13   It will have a TAC, Trustee Advisory Committee, that is made

14   up of a majority of members that the Creditors Committee

15   nominates and this trust will also have a board observer in

16   the meetings of Reorganized Wellpath and can report back to

17   the trust on and get visibility into the operations of

18   Reorganized Wellpath.

19             But this is all being done by the creditors for

20   the benefit of the creditors, which is something that was

21   very important to us is that creditors run this process, not

22   the Debtors or anyone else.

23             So, if Your Honor has any questions after

24   reviewing the liquidating trust agreement and trust

25   distribution procedures, I'd be happy to answer them, but we

1   do support the plan as it's been modified and is still to be

2   modified.  And if Your Honor has any questions, I'd be happy

3   to answer them.

4          THE COURT:  Okay.  Thank you, no.  Going to ask --

5   so, anyone else?  We should probably take a break.  But does

6   anyone else wish to be heard in support of the plan?  Then

7   we'll come back for those who wish to be heard against the

8   plan.

9          MS. CORNWALL:  Ella Cornwall of Shannon & Lee for

10  the claimants indicated at ECF Number 17791 and Liza

11  Pizarro.  These parties filed reservations of rights with

12  respect to confirmation of the plan of reorganization and

13  the limited objection to third-party releases to effectuate

14  opt-out.  ECF number 2356 and 2365.

15         The final plan supplement was filed later than we

16  anticipated when our clients objected to the conditional

17  approval of the disclosure statement; however, everything in

18  the final plan supplement was what we would have expected.

19  As such, our clients do not have an objection to plan

20  confirmation.

21         The only remaining objections our clients have are

22  just their limited objection to the third-party releases.

23  However, since they have opted out by for objecting, this

24  does not prevent -- sorry -- present an impediment to

25  confirmation.

1           THE COURT:  All right, thank you.  So they've

2    opted out?

3           MS. CORNWALL:  Yes, yes.

4           THE COURT:  Okay, thank you.

5           MS. DOORLEY:  And Your Honor, briefly, Kate

6    Doorley from Akin on behalf of the Ad Hoc Lender Group.  And

7    we'll just reserve our remarks for closing.

8           THE COURT:  Thank you.  All right, anyone else in

9    support?  Mr. Guerrero.

10          MR. GUERRERO:  Thank you, Your Honor.  Aaron

11   Guerrero on behalf of Diamond Drugs.  And just a quick

12   summary of where we're at here.  Diamond Drugs is a trade

13   vendor here, a creditor, and a creditor at the beginning of

14   this case, has been a creditor throughout the case.

15          And while maybe not so much in the courtroom and

16   on the docket, Diamond Drugs has been a participant in this

17   case, being a member of the Committee through its

18   representative, Jerry O'Brien, and also as a creditor and

19   also continuing to supply needed pharmaceutical goods and

20   services to the Debtors throughout this case.

21          Early on in the case, the procedures that this

22   Court approved for determining the cure amount for executory

23   contracts required us to file a cure objection quite early

24   in the case and we had that cure objection pending

25   throughout the case and reserved our rights with it, but

1    glad to announce that we have resolved those issues with the

2    Debtor as to the cure amount for our prepetition contract to

3    be assumed and assigned to the reorganized Debtors.  And

4    that's all reflected in Paragraph 39 of the current draft of

5    the confirmation order.  But just wanted to say that our

6    concerns with the plan have been addressed.  We're in

7    support of the plan.  We're incredibly appreciative of the

8    attorneys on both sides of the room here and the efforts

9    that they have taken to preserve this company on a go-

10   forward basis and preserve a customer, a significant

11   customer for my client to continue to service going forward.

12        THE COURT:  Okay.  Thank you very much.  All

13   right.  So, it is 10:28.

14        MR. CHAPPLE:  Your Honor, can you hear me?

15        THE COURT:  Yes, I can.  Go ahead.

16        MR. CHAPPLE:  Thank you, Your Honor.  This is Ryan

17   Chapple on behalf of claimant Cedric Burton as the

18   administrator of the estate of James Merritt Byrd, Jasman

19   Maxwell on behalf of Akashia Maxwell and Ladriqua Maxwell,

20   and Amber Griffin on behalf of Faith Griffin.

21        Your Honor, my client has filed a limited

22   objection at Docket Number 2535.  They are personal injury

23   claimants.  We've been in extensive negotiations and

24   communication with Committee counsel and worked together to

25   include provisions in the trust agreement that address the

1    issues that Your Honor raised earlier, and I appreciate the

2    work with the Committee.

3              Based on the additional language that has been put

4    into the trust agreement, we've agreed to withdraw our

5    objection.  One thing that I wanted to note and preview for

6    the Court, Your Honor, my firm and I were retained, I

7    believe, two days before the deadline to object to the plan.

8    Upon the review of the file from the trial attorney, we

9    noted that the trial attorney did file a proof of claim on

10   behalf of Cedric Burton, the administrator of the estate of

11   James Merritt Byrd.

12             On that proof of claim, he included as an exhibit

13   the live pleading that contains the claims of the other two

14   plaintiffs, but he didn't put those names on the proof of

15   claim form.  Out of the abundance of caution, we are going

16   to file a motion to deem late-filed proofs of claim on those

17   two additional plaintiffs as timely filed.  We're filing

18   that today.  We filed those proofs of claim yesterday.

19             It's part of our agreement to withdraw our

20   objection to the plan.  The debtor is unopposed to that

21   motion, and the Debtor and the Committee have agreed that

22   should that motion be granted, should those proofs of claim

23   be deemed timely filed, they would also have been considered

24   to opt out as well.  And I just wanted to note that for the

25   Court.

 1          THE COURT:  All right.  Thank you very much.  All

 2     right.  So, it's now 10:30.  Why don't we come back at

 3     10:45, and then we'll continue with opening statements by

 4     those opposed to the plan.  All right.  Thank you.

 5          (Recess)

 6          THE COURT:  All right, we're back on the record in

 7     Case Number 24-90533.

 8          All right, who wishes to speak in opposition to

 9     confirmation?

10          MS. HERSH:  Good afternoon, Your Honor.  Susan

11     Hirsch for the United States Trustee.  I just want to say at

12     the outset that I cannot praise enough the parties in this

13     case and how far they've come and what they've been able to

14     put together for the creditors of this plan.  It is

15     unbelievable, and I think the creditors are provided for in

16     this plan in a way that we didn't anticipate would be

17     possible at the beginning of this case.

18          Obviously, the concerns of my office are the

19     people who may not be treated under the plan.  The Court

20     will recall at the beginning that notwithstanding 1,500

21     lawsuits and all of these thousands of claimants, that all

22     of the creditors that were known were put on the schedules,

23     understandably, as disputed, contingent, and unliquidated.

24          They may not have filed claims, so they may not be

25     participating in the bounty that the plan provides -- you

1    can call it that -- but the distributions for unsecured

2    creditors.  So, what we're here today is -- and in that

3    regard, throughout this case, concerned about notice,

4    concerned about due process, worked with the Committee and

5    worked with the Debtors, and they have done, I think, as

6    much as possibly could be done to get notice to as many

7    people as possible.

8              And they have clearly lowered the bar on what it

9    means to be able to be recognized as an opt-out.  They've

10   done whatever they can in that way to limit the releases and

11   to broaden an expression of non-consent.  And so I commend

12   them for that.

13             But we are still here under the problems of the

14   plan with respect to, I've got, I think, three remaining

15   issues.  The gatekeeping one has been taken care of.

16             THE COURT:  Good.

17             MS. HERSH:  So that's excellent.  The government

18   carve-out, that's taken care of too, right?

19             MS. HERSH:  Yes, that got taken care of.  I had

20   another one on statutory post-confirmation fees.  It never

21   got in the papers.  I was working behind the scenes, and the

22   Debtors have corrected that as well.  You've probably seen

23   that in the red lines.  They have now fixed the statutory

24   obligation of both the reorganized company and the

25   liquidating trust to both file reports and pay fees.

1          THE COURT:  Okay, so how's that going to work?

2   The -- on the effective date, all of the -- well, not all of

3   it because there's two deferred payments, but almost all of

4   the distribution will be paid to the liquidating trust,

5   right?

6          MS. HERSH:  Right.

7          THE COURT:  And that -- and there will be monthly

8   operating report and payment made with respect to those

9   distributions.

10          MS. HERSH:  Actually not.  Let me go back and walk

11   through the mechanics.  After the effective date, the

12   reorganized Debtor will have to do its reporting and pay

13   statutory fees on any post-effective date distributions it

14   makes for any reason.

15          THE COURT:  Post-effective.

16          MS. HERSH:  Post-effective date.  In addition,

17   because we have a liquidating trust -- and this is just

18   while the case is opened.  Once they close the case they're

19   finished, but while it's open, not only does the reorganized

20   Debtor have the obligations to file those reports and pay

21   those fees, the liquidating trust has an obligation to file

22   reports as well and pay fees on its distributions, I'll call

23   them outside.

24          In order to avoid double-dipping, if there are

25   transfer of assets from the reorganized Debtor to fund the

1   liquidating trust, that is not -- my word --  the taxable

2   event.  That is not something that's considered a

3   distribution on which we would make --

4           THE COURT:  Nothing like the U.S. Trustee tried to

5   do in Paragon.

6           MS. HERSH:  Right.  So, we're trying to avoid

7   that, exactly.  So, but what we want to do is make sure,

8   because we have a liquidating trust that can generate

9   revenue, that can --

10          THE COURT:  Right.

11          MS. HERSH:  -- recover other claims, it's got to

12  be able to recover those, and then those distributions of

13  those assets, while the case is open, they have to report

14  and pay fees on.

15          THE COURT:  Understood.

16          MS. HERSH:  Okay.  So, that's also been taken care

17  of.  Not on the papers, but to satisfy our concerns.  I'll

18  do it backwards.  We have, in our objection -- let me go

19  back.

20          Our objection to confirmation is filed at Docket

21  Number 2420.  In order to save your eyes and space, we've

22  incorporated much of our briefing from our disclosure

23  statement objection that was filed on February 2nd at Docket

24  Number 1271.  The remaining objections are, the smaller one

25  is the 14-day stay.  There's a waiver in the plan that's set

1 forth in our papers.  There's no basis for them to show that

2 they have to not have the 14-day stay that the bankruptcy

3 code anticipates to allow parties to preserve their rights,

4 and we object to the waiver of the 14 days.

5    THE COURT:  How do you respond to the fact that

6 the RSA expires May 8th?  So, if the RSA expires on May 8th,

7 I mean --

8    MS. HERSH:  Right.  So, again, I don't -- I'd have

9 to talk to my client to position, but maybe if the point of

10 the 14-day stay was to allow parties to have their rights,

11 then maybe there's no basis to make it be zero.  Maybe

12 there's a six-day stay or an eight-day stay to both address

13 the concerns that the RSA not expire, but to allow parties

14 to have whatever rights the Bankruptcy Code anticipates they

15 would have rights upon confirmation if there was an

16 objection, and to seek a stay or whatever they need to do.

17    So, maybe that's an accommodation that both

18 satisfies their needs as well as the statute as best the

19 Court could.  The objections that are still maintained and

20 outstanding are with respect to the third-party releases.  I

21 agree with Ms. Perlman that Purdue said that you can't have

22 non-consensual third-party releases.  Our question is, what

23 is consent?

24    As set forth in our papers, consent is defined

25 under state law that requires parties to actually have a

1    meeting of the minds and understand what are the terms of

2    the agreement, to affirmatively assent to that agreement,

3    and to have consideration.  As set forth in our papers,

4    silence does not equal consent.

5         I am glad that many people did receive information

6    and I'm glad that there were people who were able to

7    affirmatively opt out.  I'm glad that we were able to

8    effectuate that by expanding, which you've heard today over

9    and over, about what is considered an opt-out, an expression

10   of non-consent, an objection to the plan, filing a motion to

11   lift stay, almost any correspondence to the Court, ballots

12   that are returned out of time.  All of those were still

13   deemed to be opt-out if they expressed their desire to not

14   consent.

15        Notwithstanding -- and I do agree with Ms. Perlman

16   that they have done quite a bit with terms of extra notice -

17   - I disagree that they've done something beyond their --

18   what was expected of them, because they're the ones that are

19   trying to determine consent.  So, they should do whatever

20   they want.

21        If they want -- if the Debtor wants to determine

22   that people who were silent absolutely did not turn back

23   their opt-out forms for the sole purpose that they read it,

24   understood it, and said, you know what, I don't want to opt

25   out.  And as set forth in our papers, that's just not the

1    case.  You can't have affirmative consent by silence.

2              And lastly is the issue of consideration.  I do

3    agree with Ms. Perlman that there is quite a bit of

4    consideration that has been given to the plan.  There will

5    be quite a bit paid under this plan to Class 6 claimants

6    that have claims to be paid, but I think that where we're

7    holding is that there is no consideration paid by the

8    released parties to the parties who are not opting out.

9              There is no receipt to these -- do it the other

10   way.  There's nothing unique about what you're getting

11   either under the plan, whether you opt out or not opt out.

12   You're entitled to get what you get under the plan by virtue

13   of having an allowed claim under the plan, whether you've

14   opt out or not opt out.  There's no additional consideration

15   that you receive for releasing your claim and not opting

16   out.

17             I would also point out that if you don't have a

18   claim that's ultimately allowed, you're not necessarily

19   getting any consideration under the plan.  But under this

20   plan, if you didn't return an opt out or have been

21   determined to opt out, you are releasing your claims.  So,

22   again, you have not affirmatively consented and you're not

23   receiving anything in consideration for releasing those

24   third-party claims.  As it's written, we don't believe that

25   the third-party release is consensual.

1              The other objection that we have is to the

2       injunctions.  There are injunctions, which I know they're

3       showing up in these cases all the time, but we think that

4       there is absolutely no Bankruptcy Code provision that

5       authorizes a confirmation order or Chapter 11 plan to

6       include injunctions.  As you know, there are traditional

7       factors to support injunctive relief, and they're fact-

8       specific.

9              So, how one could give an advance on something

10      that hasn't happened, that automatically satisfies each of

11      those four elements, that someone's going to suffer a

12      irreparable injury, there's remedies at law such as monetary

13      damages are inadequate to compensate for the injury, the

14      balancing of hardships between the plaintiff and defendant,

15      and the public interest would be deserved, absent an

16      injunction.  How could you necessarily know that in advance?

17      Those are fact-specific.

18              THE COURT:  Just let me ask a question.  But every

19      plan -- let's assume there were no third-party releases.  I

20      would -- they would still include an injunction.

21              MS. HERSH:  Well, it seems to me that if --

22              THE COURT:  To protect the discharge.  Every plan

23      has a plan injunction to protect the discharge regardless of

24      whether it has --

25              MS. HERSH:  Right.

1           THE COURT:  -- third-party release or not.

2           MS. HERSH:  But this injunction now is expanding

3    to third-party releases.

4           THE COURT:  Okay.  All right.  So, your issue is

5    more really with the third-party release than with the

6    injunction.

7           MS. HERSH:  That's right.

8           THE COURT:  The injunction doesn't do anything

9    more than it's already done.

10          MS. HERSH:  Right.  Because if you're discharged,

11   you don't need it.

12          THE COURT:  Right.

13          MS. HERSH:  And if you're -- I would --

14          THE COURT:  No, no, if you're discharged, you do

15   need it.

16          MS. HERSH:  I'm sorry.  That's right.  If you're

17   discharged, you do need it, but if you have a -- let me go

18   back.  Part of the discharge and the release are affirmative

19   defenses.  Okay?  Those are affirmative defenses someone

20   pleads when an action is actually brought.  So, what's

21   happening is, now if somebody has a challenge, they can't

22   even bring it because there's an injunction.

23          If there were someone who had a challenge to the

24   effectiveness or enforceability of the release -- a mistake,

25   lack of capacity, under applicable non-bankruptcy law -- can

1    they still bring that, right?  Because you've got an

2    injunction that's preventing them from bringing the action

3    in the first place, that the discharge or release is the

4    affirmative defense.   So --

5              THE COURT:  But you're not saying that because

6    there's an injunction, a release that would otherwise be

7    consensual becomes non-consensual?  Because I've heard that

8    argument also.

9              MS. HERSH:  I don't think I'm making that one.  I

10   have to think about that.

11             THE COURT:  Okay.

12             MS. HERSH:  But in that same vein, if you have a

13   consensual release, then there's no threat in litigation and

14   you don't need an injunction.  If it's truly consensual.

15             THE COURT:  But that's the same if you have a

16   discharge and people sue all the time and, you know, people

17   come back to court to get plan -- to enforce the plan

18   injunction --

19             MS. HERSH:  Right.

20             THE COURT:  So I'm not --

21             MS. HERSH:  And I think that -- but I think that's

22   exactly right, is that people are allowed to file their

23   pieces of paper in court and then in that case the defendant

24   has the right to say, wait a second, I've got a release.

25   I've got a discharge.  Same as you would, if you would raise

1    --

2              THE COURT:  Defense.

3              MS. HERSH:  -- an affirmative defense.  So --

4              THE COURT:  As a practical matter, isn't that what

5    would happen anyways?

6              MS. HERSH:  Perhaps.

7              THE COURT:  Yeah --

8              MS. HERSH:  Not --

9              THE COURT:  Because that's what happens now with

10   the plan injunction, so.

11             MS. HERSH:  Right, because we don't have the

12   gatekeeping, so we're just -- they would bring it back.

13             THE COURT:  Yeah, there's no gatekeeping.

14             MS. HERSH:  Right, so that's true.  So, then the

15   defendant, whoever that would be, could bring it back to

16   this court.  But I just -- we're just a little concerned in

17   terms of the injunction now going to third party releases.

18   There's all these belts and suspenders that tie up parties

19   having released their claims against non-debtor third

20   parties without consent under state law.

21             And I think that's all I have.

22             THE COURT:  Okay.

23             MS. HERSH:  Thank you, Your Honor.

24             THE COURT:  All right.  Who else wishes to speak

25   in opposition to confirmation?

```
1              MR. ADAMS:  (Indiscernible).  Can you hear me?
2              THE COURT:  Yes, I can.
3              MR. ADAMS:  Yes, my name is Eric Adams, and I'm at
4    -- I'm a resident at the Florida Civil Commitment Center.
5    And I (indiscernible) to everything the former speaker just
6    spoke, we agree to all the concerns that she stated the
7    objections quite well.  I did file an objection to the plan
8    and declaration of claims in this case.  I believe you
9    should have it.
10             We're down here at the Florida Civil Commitment
11   Center, and the biggest thing is the plan does not speak as
12   to consideration of what we would get as a Class 6 and how
13   we'll be compensated and how we will be treated.  One of the
14   things, again, is those -- there's a lot of injunctions in
15   the filings that we get.
16             We get our filings sometimes 10 days late.  So, a
17   lot of times the hearings and the actions by the Debtors are
18   already done before we even get the paperwork to be a
19   participant.  And this is the thing that we're most
20   concerned about, is we won't be represented fairly and
21   treated fairly, and that's what we all have opted out.
22             And I know that everybody cannot get on the line
23   and attend a hearing down here.  So, I have been elected as
24   a chairman of a committee called Alternative Dispute
25   Resolution Committee.  We also have before the Court motions
```

1    to the relief from stay for settlement and things like that.

2    We have a hearing before you on May 20th concerning that.

3              All parties that are here in the committee, we

4    have opted out of this plan because we don't feel the plan

5    represents us fairly on how we will be represented by the

6    liquidating trust.  I think as the plan states, they can

7    make whatever determination they want to make, and we can

8    have no say about it if we -- it releases under the plan.

9              THE COURT:  All right.

10             MR. ADAMS:  Also, as she stated, a lot of the guys

11   that don't understand law, don't understand bankruptcy,

12   didn't understand a lot of the opt-out stuff, did not file

13   it, but they wish to opt out.  And so, she stated, the last

14   speaker stated correctly, we shouldn't be -- those guys

15   shouldn't be injured by their silence and shouldn't lose

16   rights by their silence.

17             THE COURT:  All right.  Thank you, sir.  So, I

18   don't know if you're aware, but the recovery -- the Florida

19   Civil Commitment Center is no longer a Debtor.  They were

20   sold.

21             MR. ADAMS:  Yes, sir.

22             THE COURT:  And the -- so, they're no longer a

23   Debtor, and Wellpath doesn't run that facility or anything

24   related to that.  To the --

25             MR. ADAMS:  Correct.

1            THE COURT:  To the extent that you all may still

2    have residual claims against Wellpath, obviously those will

3    be treated in the bankruptcy.  And it's my understanding

4    that there will be a period of time after confirmation, if I

5    were to confirm the plan, where people would be able to opt

6    out, so --

7            MR. ADAMS:  Correct, sir.

8            THE COURT:  But right now, you're -- the -- to the

9    extent that you have personal injury and wrongful death

10   claims, the party who provided you service is no longer a

11   Debtor in this case.  So, there's no ---

12           MR. ADAMS:  Yes, sir.

13           THE COURT:  There's no stay preventing you from

14   going against them.  Obviously, Wellpath, the parent, is

15   still a Debtor, but none of those are a Debtor.  I don't

16   know if you were aware of that.

17           MR. ADAMS:  I am, sir.  However, I looked at this

18   plan, and they still have Recovery Solutions business as a

19   related partner.  And that's some of the language.  We're

20   down here and this -- nothing has changed.  We still have

21   the same people, and we still have Wellpath doing everything

22   down here.  And that's one of the things we wanted to clear

23   up, because they're saying that it's not a continuation.

24   They're saying that they sold it.  We looked at the new

25   contract that was signed in February.  The sale was supposed

1    to be filed out in January 28th.  It is signed by Wellpath

2    and not Recovery Solutions purchasers.

3           So, it's really unclear if it was sold and that

4    they're asking for these leniencies up under your order,

5    then they're still operating up under the same company.  And

6    that's the disruption that we just don't understand.  If

7    they were going to change it up and ask for that to happen

8    that way, no company has come down here and declared a

9    change and declared (indiscernible) up under your order.

10          So, if they're trying to use this Chapter 11

11   dismissal, they're not -- they haven't implemented it.

12   That's what we want to clear up.

13          THE COURT:  No, the recovery -- the Florida Civil

14   Commitment Center, that -- the case that covered that was

15   dismissed.  So, it may be --

16          MR. ADAMS:  Correct.  I see that.

17          THE COURT:  It may be the same individuals who are

18   still providing services, but it's not part of the Wellpath.

19   So, they -- the Debtor can clear that up on their -- in

20   their examination, but --

21          MR. ADAMS:  Correct.

22          THE COURT:  Okay.  Thank you, sir.  All right, I

23   have several hands raised.  Mr. Ginsberg?

24          MR. GINSBERG:  Yes, Your Honor.  Are you able to

25   hear me?

```
 1              THE COURT:  Yes, sir.

 2              MR. GINSBERG:  All right.  So, my objection to the

 3    plan remains the same as it has been.  I don't believe there

 4    is sufficient money allocated for the unsecured claims to

 5    the -- through the liquidating trust.  No secondary

 6    (indiscernible) for me, but I have a -- I'm going to be back

 7    in bankruptcy in several years if the NBH sale does not

 8    leave any equity (indiscernible) it's insufficient, Your

 9    Honor, and that's the whole basis.

10              THE COURT:  All right, thank you, sir.  All right,

11    I had someone else raise their hand.  Ms. Tylek?  Did you

12    hit five star?  Bianca Tylek?  Okay, she left.

13              All right, Mr. Prostok?

14              MR. PROSTOK:  Yes, thank you, Your Honor.  Can you

15    hear me okay?

16              THE COURT:  I can hear you fine, sir.

17              MR. PROSTOK:  Good morning.

18              THE COURT:  Good morning.

19              MR. PROSTOK:  Jeff Prostok for Cobb County and the

20    Cobb County Sheriff and their respective employees.  Your

21    Honor, we also represent metropolitan government of

22    Nashville, but Nashville Metro has withdrawn their

23    objection, but it's maintaining its status as an opt-out

24    creditor.

25              Cobb County is filing an objection to confirmation
```

1     of the plan on limited grounds.  One of our objections has

2     been resolved with respect to the 1141(d)(6) language.

3     Debtors have agreed to include language that the county

4     provided.  We appreciate that.  One of those issues -- one

5     of our issues has been resolved, but many of these issues

6     that I'm raising have already been raised.

7              I'm going to try to be brief.  We're not trying to

8     derail reorganization, Your Honor.  Debtors, the Committee,

9     security lenders, U.S. Trustee, patient ombudsman, all of

10    the parties involved deserve enormous credit for getting the

11    case to this point in such a short time, and realize how

12    complex, and the Court should be congratulated.  Your Honor

13    should be congratulated as well.

14             We understand the Debtors need to exit Chapter 11

15    as soon as possible.  But, Your Honor, the fact is some of

16    the provisions of the plan cross clear lines that the

17    Supreme Court and the Fifth Circuit have drawn, and crossing

18    those lines can't be brushed aside as procedural or

19    academic.  And before I go into the specific objection, Your

20    Honor, I'd like to address a point that the Court may be

21    thinking.

22             We've opted out.  Cobb County's opted out of the

23    third-party releases by objecting to them.  Why are we still

24    pressing our objection to the release?

25             THE COURT:  I did have that question.

1              MR. PROSTOK:  Yeah, I knew you would, Your Honor.

2    And first of all, these third-party releases are going, we

3    think, lead to more lawsuits against the county or the

4    sheriff.  And why?  Because we're going to be the only ones

5    left to be sued.  We're a large, metropolitan county.  Like

6    a lot of counties, Cobb often gets sued with Wellpath and

7    its employees and lawsuits brought by inmates who say they

8    were injured in county jails.

9              And Your Honor's heard from a lot of these

10   individuals at the lift stay hearing.  And if this plan gets

11   confirmed in its current form, the third-party releases are

12   approved, this is a scenario that we think could happen.

13             We have an inmate in Cobb County who's hurt in a

14   medical situation, starts looking at potential defendants to

15   try to get compensation.  Let's say it turns out the inmate

16   didn't get a fair chance to opt out of the releases because

17   it didn't get adequate notice.  And that's a real

18   possibility in this case.

19             And now the inmate finds out he can't go against

20   Wellpath, he can't go against their employees.  They're

21   released because they're related parties.  The county, the

22   sheriff, the employees would face added exposure that the

23   only -- as the only party that's not released.  So in that

24   way, Your Honor, I think this third-party release could hurt

25   Cobb County, even though we have opted out of the releases.

1          THE COURT:  But couldn't you then --

2          MR. PROSTOK:  Well, there's another --

3          THE COURT:  Two questions.  Number one, do you

4    still have ongoing contracts with Wellpath or is every --

5    this all prepetition?

6          MR. PROSTOK:  Yeah, I mean, we do.  We have

7    existing contracts with them.  I'm not exactly sure how they

8    work, but I think some of them may terminate, and then

9    there's renewed contracts that are entered into.  But that's

10   going to be with the reorganized Debtor, not --

11         THE COURT:  Okay, but to the extent -- obviously,

12   to the extent that the contract is assumed, then this is not

13   an issue, right?

14         MR. PROSTOK:  But I think these are pretty short-

15   term.  My understanding, Cobb County -- Cobb's contract is

16   getting ready to expire, and so it will be a new contract.

17   But I think to some extent, Your Honor, to the extent this

18   contract is assumed, it may cure those issues.

19         THE COURT:  Okay.  And then since Cobb County has

20   opted out, I mean, what prevents Cobb County from then

21   impleading the Debtors' employees or the Debtor?  Or the --

22   whoever.

23         MR. PROSTOK:  I'm sure the Debtor's going to argue

24   they've been related under this plan --

25         THE COURT:  No, no.  No, they are related, but

1    Cobb County has opted out.  So, inmate sues Cobb County.

2            MR. PROSTOK:  Right.

3            THE COURT:  Cobb County then -- Cobb County has

4    opted out, so they turn around and sue every -- you know,

5    sue the individuals.

6            MR. PROSTOK:  Right.  So, I mean, is there -- ?

7    No, I can hear what you're saying.  I think Cobb is

8    concerned that they're still -- that basically they're going

9    to be drawn into litigation unnecessarily, that they

10   wouldn't be drawn in but for these releases, that we

11   wouldn't be -- we'll be looked at as a target because we're

12   the only game in town where otherwise we wouldn't even be

13   (indiscernible).  That's one of our fears, Your Honor.  But

14   --

15           THE COURT:  Okay.

16           MR. PROSTOK:  Your Honor, there's another reason

17   why Cobb County is objecting.  And it's objecting because

18   the release is wrong.  It's wrong on the law, as I'll point

19   out in a minute, but we think it's wrong as a matter of

20   public policy and fundamental due process to make a

21   vulnerable population like inmates opt out to preserve their

22   rights.  I mean, we've heard repeatedly throughout this case

23   of mail delivery, Internet access issues are unreliable in

24   many of these facilities.  I have no doubt the Debtors have

25   done everything in their power to get notice to these

1    individuals, but we know there's still problems with notice.

2         The sheriff's responsible under Georgia law for

3    the care of its inmates.  This objection is an exercise of

4    that responsibility, Your Honor.  If someone was hurt in a

5    Cobb County jail and they have a right to compensation, the

6    sheriff feels very strongly that he needs to do everything

7    in his power to see that those rights don't get taken away

8    without due process and compliance with controlling case

9    law.  With that, let me just move to the specific

10   objections.

11        Your Honor, the Supreme Court in Purdue was

12   categorical.  Non-consensual third-party releases are not

13   permitted under bankruptcy.  The Debtors' plan includes

14   precisely that broad releases of non-debtors, including a

15   sweeping array of related parties.  These releases go way --

16   well beyond anything this circuit has allowed.  Squarely

17   falls within the scope of what Purdue now prohibits.

18        In some areas, it's just a continuation of

19   existing practice.  The Supreme Court didn't view it that

20   way, Your Honor, neither should this Court.  Purdue adopted

21   the Fifth Circuit's view, not the other way around.  And

22   this means we're already bound.  We're not asking this Court

23   to extend the law, just apply it as it's currently written.

24        Debtors argue they're consensual releases because

25   creditors had a chance to opt out.  And that argument

1    assumes that interaction equals consent, but both common law

2    and bankruptcy code have long held otherwise.  Contract law

3    requires affirmative acceptance of an offer.  Silence does

4    not consent unless prior dealings or context make it so.

5            Here, many of the parties, including these inmates

6    and future claimants, they really have not had an

7    opportunity to respond at all.  Allowing silence to operate

8    as blanket consent for releasing unknown, potentially life-

9    altering claims against third parties is not only wrong in

10   principle, it undermines bankruptcy due process.

11           And the due process issue is essentially stark

12   here, given the nature of the creditor base, many of whom

13   are incarcerated or otherwise are cut off from any kind of

14   meaningful notice.

15           Let me just talk for a second about the

16   consideration for these releases.  Arguably, the secured

17   lenders, H.I.G., they're getting some consideration for the

18   releases because of the assets they're contributing to the

19   trust, from the waiver of the first lien deficiency claims.

20   And these theoretically increase the return for unsecured

21   creditors.

22           But when you get to the related parties, there's

23   no consideration whatsoever, Your Honor.  When you combine

24   the definitions of released parties or related parties,

25   Debtor is asking the Court to approve the releases of

1    officers, directors, employees, agents, professionals,

2    (indiscernible) and on and on, of the Debtors, the secured

3    lenders, and other parties, and what consideration did

4    Wellpath officers provide for the directors or the lawyers

5    in exchange for their release?

6           They aren't transferring anything to the trust.

7    They aren't waiving any large unsecured claims.  There's no

8    consideration.  Now that's a fundamental point.  General

9    unsecured creditors are not getting any conceivable value in

10   exchange for releasing these parties.  This isn't a

11   (indiscernible).  It's not a 100 percent plan.  There's a

12   possibility of a higher payout under the plan, but that's

13   hypothetical.  In this case, the dividend of unsecured

14   claims is going to depend on the recoveries of the cause of

15   action and ultimately the value of the stock of this

16   company.  We would argue that's not a deal, that's a

17   forfeiture.

18          Let me just talk about exculpation for just a

19   second.  It's overly broad.  Court knows Highland Capital.

20   Fifth Circuit is clear in Highland Capital decision;

21   exploitation is only to the Debtor, the court-appointed

22   fiduciary, the statutory committees and their members, not

23   so-called independent directors where the Court did not

24   approve their appointment or give them a commission to serve

25   in a role similar to a trustee.

1           It's overbroad.  It shouldn't be approved.  And

2     then with -- in that vein, Your Honor, if you look at

3     Article IX(f), the plan provides an injunction that prevents

4     anybody from pursuing a claim that is subject to the third-

5     party releases of the exculpation and (indiscernible).  Your

6     Honor, I think the argument is that the third-party releases

7     and the exculpation are improper, then the injunction should

8     not -- the injunction itself is improper if it applies to

9     those two provisions.  For that reason, we don't think the

10    injunction should be approved.

11          Your Honor, again, great credit for getting where

12    we are -- where they are in this case, the participating

13    parties in this hearing, we know, want the case resolved.

14    Wellpath needs to get out of bankruptcy as soon as possible.

15    Cobb County wants that to happen, but it shouldn't come at

16    the cost of violating fundamental bankruptcy principles,

17    constitutional due process, and binding case law.  From this

18    plan, this proposal, I think it would do exactly that.

19          Cobb County Sheriff, they're responsible and

20    accountable to all the people of Cobb County.  They take

21    that responsibility seriously and at some point down the

22    line, there's going to be inmates or family of inmates who

23    died and realize that as of April 30th, their ability to

24    bring a claim against Wellpath or its staff, doctors,

25    nurses, mental health providers, is completely cut off.

1           And many of them, we think, Your Honor, have no

2    idea that this is going to happen.  Committee counsel seems

3    to disrecognize (sic) that when it's said --

4           THE COURT:  Mr. Prostok, we lost you.  Did you hit

5    mute?  Mr. Prostok?  Mr. Prostok?

6           MR. PROSTOK:  -- require the Debtor to amendment

7    plan to conform to Purdue, Pacific Lumber, and Highland

8    Capital.

9           THE COURT:  We lost about the last three or four

10   minutes.  For some reason, you kind of froze, and I don't

11   know what happened.  And then we heard Pacific Lumber and

12   Highland Capital.

13          MR. PROSTOK:  I'm -- did my exculpation argument

14   at all, Your Honor?

15          THE COURT:  The -- yeah, the exculpation argument,

16   you said the two -- Mr. Bartels and Ms. (indiscernible).

17          MR. PROSTOK:  Third-party release and exculpation

18   is really why we think the injunction doesn't work for those

19   two matters.  And I'm sorry there's a huge thunderstorm

20   going on in Fort Worth.  That may be what's happening.

21          THE COURT:  Always with an excuse.

22          MR. PROSTOK:  You know, (indiscernible) exactly.

23   But Your Honor -- and I hope the Court heard my compliments

24   to the parties involved and that this case needs to get

25   confirmed.  But it shouldn't come at the cost of violating

1    bankruptcy principles, constitutional due process, binding

2    case law (indiscernible) would do that.

3         And -- but Your Honor, again, we don't think this

4    is what we're asking for.  It's obstructionism.  We think

5    it's following the law.  And we'd ask that the release

6    requests that we're making the plan be confirmed.

7         THE COURT:  All right.  Thank you.

8         MR. PROSTOK:  Thank you, Your Honor.

9         THE COURT:  All right.  Let me see, there's more

10   hands raised.  Okay.  Dr. Gill?

11        MR. GILL:  Your Honor, good morning again.  Dr.

12   Kanwar Partap Singh Gill appearing pro se.  I raised a

13   verified fact-driven and a law-grounded objection to the

14   plan confirmation.  This objection is based on unreverted

15   (sic) violations of federal tax (indiscernible) law, federal

16   tax law, labor and disability protections, bankruptcy

17   statute, and United States Supreme Court's precedent.

18        Your Honor, the first -- a total of five.  The

19   first one is the plan fails the feasibility test trust asset

20   misuse under the federal tax law.  The plan relies on

21   approximately $14.5 million in the first compensation fund

22   held in (indiscernible) to support feasibility under Title

23   11 of the United States Code, Section 1129(a)(11), commonly

24   known as the Bankruptcy Code Feasibility Requirement.

25        All of the (indiscernible) of this asset is

1    governed by Section 409(a) of the Internal Revenue Code,

2    which is 26 U.S.C. 409(a), and Internal Revenue Service

3    Revenue Procedure 92-64, which prohibits the use of trust

4    assets to satisfy estate liabilities unless the Debtors'

5    board or CEO has formally declared insolvency in writing.

6    No such insolvency certificate has been executed or filed,

7    and no notice has been sent to trust participants.

8            Mr. Timothy Dragelin's declaration, Docket Number

9    2525 claims that trust assets are available, but his

10   conflicting declaration number Docket 2547 concedes that IRS

11   Revenue Procedure 92-64 controls.  These contradictions

12   render his sworn testimony unreliable under Federal Rule of

13   Bankruptcy Procedure 9011(b) and constitute a potential

14   fraud upon the court under Chambers v. Nasco 501 U.S. 32

15   (1991).  Therefore, the plan fails to meet the feasibility

16   standards under Section 1129(a)(11) of the Bankruptcy Code

17   and cannot be confirmed.

18           Number two.  The plan was not proposed in good

19   faith.  Several objections were suppressed.  The plan is

20   also unconfirmable under Section 1129(a)(3) of the

21   Bankruptcy Code, which requires that the plan be proposed in

22   good faith and not by means forbidden by law.

23           The record shows that the Debtor counsel and Mr.

24   Dragelin failed to acknowledge or rebut two verified

25   filings, Docket 2495 Titled 42-in-1 Emergency Motion and a

1    subsequently served 75-in-1 Emergency Motion Suite, which

2    shows a stamp from the clerk dated yesterday so it was

3    received yesterday confirmed.

4         These filings set forth several statutory

5    violations, including number one, retaliation under American

6    with Disabilities Act, specifically Title 1 of ADA 42 U.S.C.

7    Section 12112; potentially breach under Employee Retirement

8    Income Security Act or ERISA under -- including 29 U.S.C.

9    Section 1104, (indiscernible) the duties of loyalty and

10   prudence; and 29 U.S.C. 1140, which is interference with

11   rights.

12        Next, procedural violations under the Fifth

13   Amendment of the United States Constitution, including

14   (indiscernible) due process through metadata tampering and

15   non-response to (indiscernible).

16        And lastly, violations of 29 CFR 2560.503-1, which

17   set forth ERISA's claim-processing rules that were never

18   followed.  A plan that ignores formally filed Federal

19   objections is not proposed in good faith.

20        Number next is, as one of the attorneys had

21   already discussed, third-party releases are constitutionally

22   invalid and it is cited because of the Supreme Court

23   authority.  Plan Article IX.D grants sweeping third-party

24   releases using an opt-out mechanism, but the Supreme Court

25   of the United States in Harrington v. Purdue Pharma 144

1    (indiscernible) in 2024 filed that non-consensual third-

2    party releases are unconstitutional unless parties

3    affirmatively opt-in.  (indiscernible) silence does not

4    constitute consent, especially for pro se litigants,

5    incarcerated creditors, and disabled claimants are protected

6    by Americans with Disability Act and Rehabilitation Act of

7    1973.

8           These releases violate fundamental due process

9    rights as established in Mullane v. Central Hanover Bank and

10   Trust Company, the decision from 1957 in the United States

11   Supreme Court, which required notice of reasonable --

12   reasonably -- notice reasonably calculated to inform and

13   meaningful opportunity to be heard.

14          Next.  This is -- Your Honor, I'm basing off the

15   public docket, which is not current, and yours is, so I'm

16   just going to read what I see.  The liquidating trust does

17   not exist in an operable form, structural -- it's a

18   structural defect.  The plan's recovery mechanism for

19   general unsecured creditors relies on liquidating trust as

20   described in Article IV.N, but as of today, based on my

21   information, no liquidating trustee has been named.  No

22   signed liquidating trust agreement has been finalized.

23   Exhibit J and K of the Docket 2555, which are supposed to

24   outline the trust governance and funding, are marked

25   forthcoming.

1

2          This violates Section 1125(b) of the Bankruptcy

3     Code, which prohibits solicitation of a plan without full

4     disclosure of material terms and Section 1129(a)(11), which

5     requires demonstration of feasible distribution mechanism.

6     You cannot confirm a plan whose core distribution vehicle

7     does not legally exist.

8          And the last, Your Honor, exculpation and

9     gatekeeping provision violates Fifth Circuit's precedent.

10    Plans Article IX.E and through IX.G attempts to exculpate

11    directors, advisors of the misconduct, impose a gatekeeping

12    mechanism requiring court permission to sue the non-debtors

13    post-confirmation, and enjoin claims without evidentiary

14    hearing.

15         These provisions violate Fifth Circuit's Code of

16    Appeals precedent, including Zale Corp., which is 62 F.3d.

17    746, (5th Cir. 1995), which strictly limits the non-debtor

18    injunction.

19         Number two, in Highland Capital Management LP,

20    (indiscernible), (5th Cir. 2023), which prohibits

21    gatekeeping of (indiscernible) claims unless narrowly

22    tailored and jurisdictionally authorized.  These articles

23    also offend (indiscernible) Rule of Professional Conduct

24    3.3, which requires candor to the tribunal, and Rule 9011(b)

25    which bars false and misleading submissions.

```
 1            Your Honor, I have a prayer for the record, Your

 2    Honor.  I respectfully move this Court to deny confirmation

 3    of the plan under 11 U.S.C. 1125(b), due to inadequate

 4    disclosures; 11 U.S.C. 1129(a), bad faith; 11 U.S.C.

 5    1129(a)(7), unfair treatment of creditors; 11 U.S.C. 11299

 6    (sic), improper treatment of administrative claims; and 11

 7    U.S.C. 1129, infeasibility.

 8            I also ask the Court to strike Docket 2525,

 9    Dragelin declaration as internally contradicting and

10    unsupported by federal law -- federal tax law.  I also ask

11    the court -- move the Court to void all third-party releases

12    under the Supreme Court decision, Harrington v. Purdue

13    Pharma of 2024.  I also request and move this Court to refer

14    Dragelin, (indiscernible) and Debtors' counsel to the United

15    States Trustee under Federal Rule of Bankruptcy 9011(b), and

16    Title 18 of the United States Code, Section 1519, which

17    prohibits knowingly falsifying and concealing materials

18    backed in a federal procedure.

19            I also want -- move Court to recognize the

20    (indiscernible) assets and non-estate property under 11

21    U.S.C. 541(d) and the Internal Revenue Code.  And I also ask

22    the Court to preserve appellate and regulatory rights,

23    including rights under the Americans with Disabilities Act,

24    ERISA, and U.S. Constitution and Federal Statutes.

25            Thank you, Your Honor.  I submit this objection
```

1    under penalty of perjury and I preserve it in full for

2    appellate reviews and agency referrals.

3            Your Honor, I may briefly clarify one point for

4    the record.  I support the concept of reorganization.  My

5    objection is intended -- not intended to hinder a fair or

6    lawful process, but rather to ensure that organization is

7    carried out in good faith, in full compliance with federal

8    law, and with equal protection for all creditors, including

9    whistleblowers, ADA-protected individuals, ERISA claimants.

10           My intent is to strengthen the integrity of the

11   process, Your Honor, not to delay it.  Thank you, Your

12   Honor.

13           THE COURT:  All right, thank you.  Anyone else

14   wish to be heard in opposition to the plan?

15           Okay, Ms. Osorno, and then Mr. Hughes.  Go ahead,

16   Ms. Osorno.  Did you hit five star one time?  Hit five star.

17   Okay, there you go.  And then Mr. Hughes hit five star also.

18           MR. PATRICK HUGHES:  Your Honor, I did.  Are --

19   can you hear me?

20           THE COURT:  Okay, I can hear you.  I can hear you.

21   Okay, go ahead, Ms. Osorno.

22           MS. OSORNO:  Yes, Your Honor.  Good morning.  I'm

23   here on behalf of Public Justice and Worth Rises and with

24   your Court's permission I would like to share a short

25   objection.

1          THE COURT:  Sure, absolutely.  I did read your

2   amicus brief that was entered on the docket, I think

3   yesterday or the day before.

4          MS. OSORNO:  Thank you, Your Honor.  So, as we

5   highlighted in our brief, based on Wellpath's history and

6   current practices, we believe there will be no change to the

7   volume of tort claims that brought Wellpath into bankruptcy

8   proceedings in the first place, and this is in large part

9   because the plan fails to address the longstanding, well-

10  documented, and ongoing operational failures that are baked

11  into Wellpath's business model.

12         And again, we documented some of those practices

13  in our brief.  It's my understanding that in filing for and

14  representations made to the Court that the Debtor has

15  proposed that there will be some increased training to try

16  to remedy some of these violations and to try to mitigate or

17  reduce the amount of liability that Wellpath will face in

18  the future, and we do not believe that training is

19  sufficient to remedy, again, some of these really structural

20  problems with Wellpath's business model.

21         And one great example, I think, again, that we

22  highlighted in our brief is Wellpath's reliance on licensed

23  practical nurses to provide care that is necessarily outside

24  of the scope of their practice, and training cannot remedy

25  this.  You cannot train a licensed practical nurse to

1    perform work that is outside of their license.

2           They -- the law establishes the outer bounds of

3    what licensed practical nurses can do, and so training them

4    on particular policies and practices just cannot remedy

5    that.  And I think that's a really fantastic example of why

6    training is really insufficient.  We also highlighted in our

7    brief a couple of examples so that the Court can see how the

8    use of licensed practical nurses creates this tort

9    liability.

10          For example, we highlighted the case of a woman

11   who was pregnant and was seen by nurses multiple times, and

12   despite the fact that Ms. Kent was exhibiting symptoms and

13   bringing complaints that should have triggered the LPN's

14   referral to another provider, the nurses did nothing.

15   That's not the role that nurses are supposed to play.  They

16   are not qualified to perform work outside of taking notes

17   and providing referrals.

18          But if those doctors are there, if the staffing

19   models are insufficient to provide the adequate supervision

20   to make sure that an appropriate medical provider is

21   actually there, then that simply will not remedy this

22   problem.  So, think I would just refer Your Honor back to

23   our brief and just encourage the Court, again, to consider

24   that Wellpath's business model is inherently, without

25   substantial changes, going to continue to create really

1    significant tort liability.

2            And that's it, Your Honor.

3            THE COURT:  All right.  Thank you very much.  All

4    right.  Mr. Hughes?

5            MS. OSORNO:   Thank you.

6            MR. PATRICK HUGHES:  Good morning, Your Honor.

7    Can you hear me okay?

8            THE COURT:  I can hear you fine.

9            MR. PATRICK HUGHES:  Okay.  Patrick Hughes here

10   for Bell Ambulance, Your Honor.  We're a contract

11   counterparty to the Debtor.  We filed a protective

12   objection, and as we're speaking, and I want to endorse some

13   of the compliments given earlier by other counsel on the

14   professionals trying to work through problems.  We're trying

15   to work through language that would allow me to, you know,

16   drop our objection.  And so if it's okay for Your Honor, if

17   we conclude that, I'll just reserve any other comments, if

18   needed, for closing.

19           And I know you'll be happy if I don't have to

20   appear further, so I'll table those comments since we're

21   literally trying to work through those now.

22           THE COURT:  All right.  As usual, you're very

23   clairvoyant.  All right.

24           MR. PATRICK HUGHES:  I know you have a lot to deal

25   with, so I'll step aside.  Thank you, Judge.

1          THE COURT:  Mr. Madigan, did you hit five star one

2     time?  Hit five star one time.  No, hit it again.  You're --

3     all right.  Can you hear me?

4          MR. MADIGAN:  Yes, Your Honor.  Good morning.

5          THE COURT:  Good morning.

6          MR. MADIGAN:  T.J. Madigan, Tulane University

7     Medical Center.  And a number of others have said it.  I

8     would like to repeat it.  I don't mean to diminish any of

9     the efforts that everybody's put into this.  I certainly

10    respect that, but I do want to put some objections on the

11    record, Your Honor.  We did file an objection.  It's at

12    record Document 2359.

13         A lot of what we have in there has already been

14    covered to a great extent, and I don't want to retread or

15    rehash, including by Mr. Prostok and Mr. Ginsberg, as well

16    as the United States Trustee.  The -- I think Mr. Prostok

17    was much more articulate than I was prepared to be with

18    respect to third-party releases.  We agreed a lot of those

19    arguments and would adopt them.

20         Mr. Ginsberg did get into some of the issues about

21    plan funding, and I'd like to emphasize those issues for the

22    Court.  I believe the Court's aware of them.  We're not the

23    only party to brief those, and they were briefed on a number

24    of the objections.  But -- and I'm prepared to reserve

25    comments based on the presentation that the Debtors make and

1    the proof that goes along with respect to their plan, but as

2    it sits right now, we don't have a lot of information or

3    certainly evidence about what exactly these claims are that

4    are being transferred in order to provide the recovery for

5    the insured creditors.

6         Tulane has an $812,581 claim, a significant claim,

7    Your Honor, and I realize there has been some funding

8    provided to the trustee.  My understanding is that that is

9    not only going to go to the claims reconciliation process,

10   which is going to be a consuming process, time and money,

11   and -- but it's also intended to be, I think, and somebody

12   can correct me on this, seed money for whatever it would

13   take to pursue these claims that are being transferred.

14        I've read up a little bit on two of them.  It's

15   not clear to me what basis is, the factual basis for the

16   estimated value of those claims and the estimated range of

17   values, or what it would take to work those claims up, how

18   long it would take and in some very real way, it seems

19   almost equally likely that there could be a zero net

20   recovery for unsecured creditors.

21        The papers that the Debtors have filed almost

22   acknowledge that, acknowledging that the recovery could be

23   less than 1 percent down to zero, and we'd like to get some

24   more information about that.  In addition to that -- and I

25   haven't had a chance to digest the most recent filing, but I

1   heard some information at the front end of this hearing

2   today, Your Honor, about the deceit which you

3   (indiscernible).  We have concerns and we put them in our

4   objection, about really this is some sort of a gifting

5   effort to provide funding to -- in the form of a KEIP-type

6   payment, the employment incentive payment, around the

7   unsecured creditor body of which we're a part.  We certainly

8   object to that.  I'd like to better understand that and the

9   best thing for me to do at this point, Your Honor, unless

10  you have any questions for me, is just to wait and see the

11  Debtors' presentation and then reserve our comments on the

12  back end for closing.

13          THE COURT:  All right, thanks.  But the KEIP was

14  withdrawn.  There is no KEIP.  That was withdrawn.

15          MR. PATRICK HUGHES:  And there will not be.  I

16  didn't know at the time --

17          THE COURT:  No, the new company, you know,

18  obviously their board of directors will determine how to

19  compensate their employees, and I suspect that there will be

20  a, some sort of incentive pay, but it's not a KEIP that I'm

21  approving or coming out of a Debtors' estate.

22          MR. PATRICK HUGHES:  Understood, Your Honor.

23  Thank you.  Thank you for that clarification.

24          THE COURT:  All right.  So, I have next up David

25  Hughes.  Mr. Hughes, did you hit five star one time?

1              MR. DAVID HUGHES:  Can you hear me, Your Honor?

2              THE COURT:  I can, sir.  Go ahead.

3              MR. DAVID HUGHES:  Oh, great.  Great.  Sorry about

4     that.  Thank you, Your Honor.  I just want to make a quick

5     objection, and, of course, I agree, thank everybody for

6     working together on this, and we appreciate all the hard

7     work, Your Honor, as well.

8              The one objection we would have is to echo the

9     other ones made on the third-party releases.  What I would

10    ask is since the plan has been modified and now the

11    Unsecured Creditor Committee is approving it and that's part

12    of our client's, part of that group, I would just ask that

13    the period for the opt-out be extended, now that we know

14    that the -- well, we know more about the modified plan, just

15    to give people another chance to opt out if they --

16             THE COURT:  So --

17             MR. DAVID HUGHES:  -- wish to do so.

18             THE COURT:  Is your client a personal

19    injury/wrongful death claimant?

20             MR. DAVID HUGHES:  Yes, Your Honor.

21             THE COURT:  Okay.  So the plan currently

22    contemplates after the effective date or after confirmation

23    there will be an additional period of time to opt out.  So,

24    that's not foreclosed.  I think with respect to personal

25    injury and wrongful death claims, that period of time will

1    be extended.

2              MR. DAVID HUGHES:  Oh, that's fantastic, Your

3    Honor.  I heard a comment about that, but I wasn't sure.

4    That's something that's --

5              THE COURT:  Yeah.

6              MR. DAVID HUGHES:  Okay.

7              THE COURT:  All right.

8              MR. DAVID HUGHES:  Thank you, Your Honor.

9              THE COURT:  All right.  All right.  So, next is

10   Ms. Teicher.  Okay, did -- hold on a second.  Did I just

11   unmute your line?

12             MS. TEICHER:  Yes.

13             THE COURT:  Okay.

14             MS. TEICHER:  And I somehow got disconnected and

15   had to call back in.  Your Honor, I represent McLaren

16   Healthcare Corporation.  We filed a limited objection.  I do

17   not have an objection overall to confirmation, but our

18   situation is such that the Debtor has indicated it's going

19   to reject our contract, and that's fine.  But in its initial

20   papers, the Debtor listed 190 McLaren entities, and there is

21   only one payor agreement with McLaren.  And my concern is --

22   and I think it's something I can work out with the Debtors

23   on the back end of this, but my concern is things that are

24   getting filed continue to list more than McLaren Healthcare

25   Corporation.

1            So, we have the third notice and the corrected

2    notice, which lists three other entities, and things just

3    keep getting carried forward that list more than just

4    McLaren Healthcare Corporation.  So, I have concerns.  We

5    did opt out of the third-party release.  We voted for

6    balance at McLaren Healthcare Corporation, but there seems

7    to be some disconnect between what the actual contract is

8    and what the Debtors' records provide.

9            THE COURT:  All right.

10           MS. TEICHER:  So, I just want clarification on

11    that.

12           THE COURT:  All right.  Sounds good.  All right.

13    Anyone with further wishes to make an opening statement in

14    opposition to confirmation?  All right.  Ms. Perlman, where

15    do we go?

16           MS. PERLMAN:  Your Honor, I'm happy to -- I know

17    you had requested testimony from Mr. Dragelin on the best

18    interests.  I don't know if you prefer to go to that or

19    happy to respond --

20           THE COURT:  No, no --

21           MS. PERLMAN:  -- to the objections.

22           THE COURT:  Let's hear the testimony and then we

23    will --

24           MS. PERLMAN:  Respond to the objections.

25           THE COURT:  Then we'll respond.  Yeah.  So, my

1    understanding that there's a feasibility, there's the issues

2    that were raised with respect to kind of the business

3    practices.  I know Mr. Dragelin addressed that extensively.

4    I don't know whether you have any other testimony with

5    respect to that.  There's the issue of waiving 3020, so we

6    need testimony on that.

7           MS. PERLMAN:  Which was the last one?

8           THE COURT:  The issue that was raised by the U.S.

9    Trustee about reducing the 14-day period.

10          MS. PERLMAN:  Oh, okay.

11          THE COURT:  And there was -- Mr. Dragelin did

12   include that in his testimony and her, I don't know, at some

13   point you might want to talk to her because that's going to

14   impact what happens with Mr. (indiscernible), so I'll just

15   tell you that.

16          MS. PERLMAN:  Understood, Your Honor.

17          THE COURT:  Okay.  And then, you know, obviously

18   whatever other, you know -- I mean I think you put on your

19   affirmative case.  There have been some issues raised and so

20   whatever you want to highlight, go ahead.  And then, so it's

21   now, you know, 11:45.  We could go maybe half an hour and

22   then take an hour for lunch and come back at 1:30 and then

23   go until we finish.

24          MS. PERLMAN:  Perfect, Your Honor.  My colleague,

25   Mr. Genender, will present Mr. Dragelin for that.

1           THE COURT:  Genender.

2           MR. GENENDER:  Your Honor, we call Tim Dragelin.

3           THE COURT:  Okay.  Mr. Dragelin, do you solemnly

4   swear or affirm to tell the truth, the whole truth, and

5   nothing but the truth?

6           THE WITNESS:  Yes.

7           THE COURT:  Please be seated.  Do you want me to

8   give presenter role to anybody?

9           MR. GENENDER:  No, Your Honor.

10          THE COURT:  Okay.

11          DIRECT EXAMINATION OF TIMOTHY DRAGELIN

12  BY MR. GENENDER:

13  Q    Can you tell us your name, please?

14  A    Timothy J. Dragelin.

15  Q    And Mr. Dragelin, how are you currently engaged with

16  your time?

17  A    I am currently the Chief Financial Officer and the

18  Chief Restructuring Officer at Wellpath.

19  Q    Let's start with something easy.  Are you familiar with

20  the amended plan?

21  A    I am.

22  Q    Can you tell us, have you looked at the liquidation

23  analysis that was previously submitted in connection with

24  the disclosure statement hearing and how that liquidation

25  analysis would be different for Class 6 creditors?

1    A    Yes, I have.

2    Q    And can you tell us what the impact or change is to

3    that analysis under the amended plan?

4    A    Yes.  Previously, if you -- if the Court recalls, we

5    had given a range of 0.8 percent to undetermined, and we

6    disclosed that it could actually be zero depending on the

7    construct.  That was based on essentially a $5 million

8    contribution to the liquidating trust.  The current

9    contribution is $15.5 million.

10        And on top of that, there is part of the take-back

11   facility debt, $10 million, so $25.5 million versus five, so

12   five times what it was before.  Based on the same numbers in

13   the liquidation analysis, that raises the recovery from,

14   call it, 0.8 percent to nearly 6 percent, so a substantial

15   increase in the recovery for the general unsecured

16   creditors.

17              THE COURT:  And then what were you using as your

18   denominator for the personal injury wrongful death tort

19   claims?

20              THE WITNESS:  That includes -- it's a range.  I

21   used about $130 million.

22              THE COURT:  $130 million.  And do you know how

23   many proofs of claim were filed by personal injury wrongful

24   death claimants?

25              THE WITNESS:  I know that total claims at the

```
 1    moment across all creditors are 7,000 to 8,000 at the
 2    moment.  I'm not --
 3              THE COURT:  Okay.
 4              THE WITNESS:  I'm not sure.
 5              THE COURT:  Sorry, proofs of claim.  Proofs of
 6    claim, I'm sorry, not claims.  Because my understanding is
 7    all personal injury wrongful death were listed as disputed
 8    contingent or unliquidated.  So, they would have had to file
 9    a proof of claim, right?
10              THE WITNESS:  Yes.
11              THE COURT:  Okay.
12              THE WITNESS:  I'm not -- off the top of my head,
13    I'm not aware of that number.
14              THE COURT:  Okay.
15              THE WITNESS:  As I sit here.  That's something
16    that we could get --
17    BY MR. GENENDER:
18    Q    Mr. Dragelin, do you know whether or not the RSA, the
19    restructuring agreement -- restructuring support agreement,
20    does it expire on May 8th?
21    A    I believe that's correct.
22    Q    I want to talk to you a little bit about Wellpath's
23    operations in the past and what they look like now and what
24    they're going to look like going forward.  Okay?
25    A    Yes, sir.
```

1  Q    Were the operations during the COVID years similar or

2  dissimilar to what's going on now?

3  A    Very different.

4  Q    And can you tell --

5  A    -- operating environment.

6  Q    And can you tell the Court, just give it a little color

7  on that?

8  A    Yes.  Wellpath was impacted, not too dissimilar from

9  other healthcare companies really across the country where

10  staffing was very hard to obtain.  We, as an organization,

11  use significant amount of agency or temporary staffing in

12  order to fulfill our roles.  However, also our customers or

13  our clients also had significant difficulty fulfilling their

14  staffing roles as well, which actually impacts our ability

15  to provide care as well as just access to the care outside.

16  So getting somebody, a patient, into a hospital or a

17  specialty provider was much more difficult during the COVID

18  years than it is today.

19  Q    And can you tell the Court what mortality rates are in

20  connection with Wellpath's business?  What does that term

21  mean?

22  A    So, we monitor mortalities or deaths that occur while

23  patients are in our care.

24  Q    And is that an indicator of claims?

25  A    Yes.  I mean, ultimately it's a -- we consider it a

1    leading indicator of what ultimately could be a personal

2    injury claim or a wrongful death claim.  I mean, it is not

3    unusual even in, you know, hospital settings, et cetera,

4    where patients do pass away.

5        So, it is not a phenomenon solely related to

6    correctional health, but we do monitor it and we do look to

7    keeping that at a minimum, right?  We want to take care of

8    our patients.  And so it ultimately though, deaths do lead

9    or can lead to claims.  So, it's an indicator.  It's not a

10   foregone conclusion.

11   Q    And can you tell the Court whether during the COVID

12   years the mortality rates were higher or lower than usual?

13   A    Yes.  Over our history, the mortalities peaked in the

14   '21 to '22 timeframe.

15   Q    And what have the trends been since then?

16   A    They've been ongoing down, actually quite

17   substantially.  I believe we are, even on a year-over-year

18   basis, our mortalities are down 50 percent.

19   Q    And how does that compare to industry averages or other

20   providers of similar services?

21   A    So, the U.S. Federal Bureau of Prisons actually

22   monitors self-operated prisons in terms of those or jails

23   where the care is given by the county themselves.  And our

24   numbers are half of what they are for self-operated.  Maybe

25   even less than half.

1   Q    And there's a reference in your declaration to Wellpath

2   having exited certain poor performing contracts.  Can you

3   tell the Court a little bit about how that is affecting the

4   mortality rates coming down and the claims?

5   A    Yes.  So, one of the parts -- and I think I may have

6   testified to this before -- the filing of Chapter 11 was

7   just one part of our overall restructuring for the company,

8   part of that was also exiting certain contracts where we

9   felt it was more difficult to provide care and also where

10  there was higher relative liabilities due to jurisdictional

11  issues, for example, local jurisdictions, local courts, but

12  also the operating environment.

13       It made us -- difficult for us to provide the level of

14  care that we wanted to provide.  And so we exited 65

15  contracts leading in the 24 months, 18 to 24 months leading

16  up to our filing of Chapter 11.

17  Q    And what percentage of the total number of contracts

18  did those 65 represent?

19  A    So in terms of revenue, it was -- well 65 was 30

20  percent of our contracts roughly at the time, but they

21  accounted for over 50 percent of our professional liability

22  claims.  So, 30 percent of the contracts, which was less

23  than 20 percent of our revenue actually accounted for over

24  50 percent of the claims on a historical basis.

25  Q    And does Wellpath have a section of its contracts that

1    you consider to be low or no risk with respect to

2    professional liability?

3    A    Yes.  So, the makeup of our contracts, we have some

4    that where we provide obviously the staffing based on the

5    contract with the customer, but we also have other contracts

6    where we essentially are an administrative in nature where

7    we pay the claims and then are reimbursed by our customers

8    for the payment and administering of those claims.

9          So, we actually don't provide the care.  We actually

10   are just essentially is a third party administrator for

11   claims, health care claims.  And that is -- that has

12   increased over time as well as we have exited a certain

13   amount of our contracts.  The percentage of no risk

14   contracts is how we term them has increased as well.

15   Q    And before you exited the 65 contracts, was it -- what

16   was it about?  What was that percentage?

17   A    I believe that percentage on an average daily

18   population of basis was about 10 percent of the ADP that we

19   account for.  It's now 20 percent.

20   Q    My next question.  All right.  Can you tell us a little

21   bit about the projections that you prepared or oversaw the

22   preparation of in connection with the disclosure statement,

23   how is the growth going to come that you projected for

24   Wellpath in the next couple or few years?  How's that -- are

25   you going back into those 65 contracts that you exited in

1    those jurisdictions or where's the money going to come from?

2    A    Sure.  The growth is actually not that substantial even

3    -- this is not a hockey stick projection in the least, at

4    least from my opinion.  However, we do on a constant basis

5    try to look for new contracts to enter into.  There is on a

6    rolling basis customers that are -- outsource their

7    healthcare for their facilities, do go out for RFP.

8         However, most of our growth is actually coming from

9    something a little different.  I mean, yes, we will continue

10   to submit proposals for correctional facilities, but we've

11   also -- while we're been in bankruptcy, we've launched a new

12   division, which we've had all along where we provide those

13   administrative services, as I just mentioned.  But we also

14   are providing additional adjacent services such as the

15   access to telemedicine where we actually are doing that for

16   other entities.

17        We also are doing work for, in the claims

18   administration and we're also doing some work around

19   provider network development.  So a local jail, for example,

20   they have to go out and contract or issue a purchase order,

21   so to speak, for sending one of their patients -- one of

22   their incarcerated individuals off to a hospital, for

23   example.

24        We actually, as part of Wellpath, we'll contract and

25   develop contracts with those hospitals for reduced rates,

1    for example, benefiting, therefore, our customers.  We've

2    launched that division to actually help those jails who are

3    going to continue to do self-operations, but could use help

4    in other services.

5        So, most of our growth is actually coming from these

6    adjacent services in our business plan.  Yes, we're going to

7    continue to do some proposals and look for outsourcing

8    opportunities; however, a big part of our growth is in these

9    other non-risk or no risk services.

10   Q    And in the first category where you are looking for new

11   opportunities, I've heard the term smarter contracts.  What

12   does that mean?

13   A    So, the -- so, smarter contracts really have sort of

14   two elements to it.  One is where we are aligned with our

15   customer in terms of the type of care and the staffing.  So,

16   you remember that we don't dictate our staffing.  Our

17   customers dictate our staffing in the facilities.  So, their

18   RFP tells us how many RNs, how many LPNs, et cetera, that

19   we're supposed to staff with.

20       We have gone to our customers and looked for where we

21   believe there's a need for additional staffing, for example,

22   or maybe the addition of mental health professionals.  We

23   have gone to them and said, we believe staffing needs to be

24   increased in order to provide better care.  And so we've

25   been working on that piece.

1        The second piece is where really jurisdictional issues,

2    right, where liabilities are much higher due to local

3    sentiment, et cetera.  And so we've been evaluating that as

4    well.

5    Q    And I'm not sure if you testified about this or not, so

6    let me just ask you.  In part of -- in your projections, are

7    you including, I think it's called escalations, price

8    escalations with existing contracts?

9    A    Yes.  So, part of our -- that's actually part of the

10   revenue increase.  So, our contracts have built in

11   escalators on revenue.  So, it can be three, four or more

12   percent on an annual basis.  So, part of our revenue

13   increase year over year, if you take a $1.3 billion and you

14   adjust it at a minimum of 3 percent, that's part of the

15   revenue growth as well.

16   Q    If something unforeseen happens, is there for lack of a

17   better term, some wiggle room that the company has under the

18   plan going forward with respect to being able to raise

19   capital or defer payments?

20   A    So, the level of risk associated with our, I'll call it

21   our revenue projections, our EBITDA and our cashflow are

22   pretty steady relative because their contracts were locked

23   in, right?  I mean, yes, we're going to be terminated, but

24   there are defined timelines in our contracts.  So, we have

25   pretty good line of sight into our revenue and our expenses.

1       The wiggle room really comes around part of the
2   provisions related to debt service.  And we have the ability
3   to defer some of the interest and payment in kind if we have
4   some working capital swings that otherwise wouldn't enable
5   us to make those payments as they're due.
6               THE COURT:  Is that on the take back that --
7               THE WITNESS:  Yes, sir.
8   BY MR. GENENDER:
9   Q    And tell me, does the credit agreement allow for you to
10  raise additional capital if necessary?
11  A    Yes.  And we also are already looking at having a
12  revolver put in place that will help us with working capital
13  swings, so.
14              MR. GENENDER:  I know Your Honor has read Mr.
15  Dragelin's declaration.  I can go into the consolidation
16  factors if the Court's not satisfied, but I don't -- if --
17              THE COURT:  I don't --
18              MR. GENENDER:  With that, that's --
19              THE COURT:  There's no objection, any objection.
20  Okay.  So, thank you.  And does anyone wish to cross examine
21  Mr. Dragelin?
22              MR. GILL:  Your Honor, I would.  I have a few
23  questions.  This is Dr. Gill.
24              THE COURT:  Okay, go ahead, Dr. Gill.
25              MR. GILL:  Okay.

```
1              CROSS EXAMINATION OF TIMOTHY GENENDER

2   BY MR. GILL:

3   Q     Thank you, Mr. Dragelin for taking time out and

4   explaining the -- what the future is going to look like.

5   Thank you.  I have a few questions on your own because I

6   read through one of your declarations last night and the

7   Court pointed to the other one this morning.  So, I was

8   wondering, Mr. Dragelin, are you familiar with the corporate

9   practice of medicine doctrine, especially as it applies to

10  California?

11  A     I'm sorry, sir.  Could you speak just a little more

12  slowly and --

13  Q     Okay.  Mr. Dragelin, are you familiar with the

14  corporate practice of medicine doctrine, particularly as it

15  applies to California and certain other states?

16  A     So, I'm generally familiar with the corporate practice

17  of medicine provisions, but not specifically code section.

18  Q     Understood.  Understood.  Are you aware that under

19  California Business and Profession Code 2400 it's illegal

20  for a non-physician corporate entity to exercise control

21  over licensed medical judgment?

22             MR. GENENDER:  Objection, Your Honor.  This isn't

23  relevant to what he's up for today or at this part of the

24  hearing.  He wants to testify about California corporate

25  practice of medicine.  If he's got a claim, he can proceed
```

1   with it at that time.

2           MR. GILL:  Okay.  Well, skip the section and come

3   to directly your declarations, which is pertaining to our

4   IRS code, if that's okay.

5           THE COURT:  Go ahead.  Go ahead.

6   BY MR. GILL:

7   Q   Okay.  I read two conflicting declaration and I just

8   want to focus on (indiscernible) your declaration from last

9   few days.  You testified in Docket 2525 that the plan is

10  feasible in part due to availability of trust assets,

11  correct?

12  A   Can we actually look at the document?

13          THE COURT:  Sure.

14          MR. GENENDER:  May I approach, Your Honor?

15          THE COURT:  Yes.

16          THE WITNESS:  Dr. Gill, do you want to just point

17  me to the paragraph?

18  BY MR. GILL:

19  Q   I don't have a paragraph in front of me right now.  I

20  just had a list of questions.  You want me to pull up the

21  paragraph?  I can do that.  It's not a big deal.  Okay.

22          THE COURT:  Mr. Genender, what's the document

23  number?

24          MR. GENENDER:  2525, Your Honor.

25          THE COURT:  Okay, okay.

1           MR. GILL:  It's Paragraph 10, Your Honor.

2           THE COURT:  Paragraph 10 of 2525?

3           MR. GILL:  That is correct.  You know, I can quote

4    the exact words.  It's 2547, sorry.

5           THE COURT:  2547?

6           MR. GILL:  Yes, 2547.  I mean, those cannot --

7    these documents have to be seen next to each other.  In 2547

8    Paragraph 10, it states that based on my understanding of

9    the plan document and trust document, movant has no interest

10   in the asset (indiscernible) trust.  Upon event of

11   insolvency, the trust assets shall be returned to the

12   Debtors and would be subjected to claims of general

13   unsecured creditors.  2547, Paragraph 10.

14          And then again, it goes on in another paragraph, I

15   think it's nine.  Trust agreement provides that in the event

16   of insolvency of Wellpath LLC, the trustee shall discontinue

17   payment to participants and shall hold the trust asset to

18   benefit of the Wellpath.

19          And then when I look at it, Your Honor, will -- it

20   will inform that he knew the solvency certification was

21   required under (indiscernible) revenue procedure 92-64 and

22   that no such certification was ever filed, invalidating the

23   feasibility assertions in 2525.

24          THE COURT:  Okay, so let me just say, so he -- in

25   connection with this declaration, he attached as Exhibit 1

```
1    and 2 the plan document and the -- let me see what they are.

2              MR. GENENDER:  Your Honor, it's the --

3              THE COURT:  The trust agreement and the plan

4    document, okay.  And he based -- in this 2547 basically he

5    lists the provisions in there and says that the availability

6    of the -- that the assets held in the rabbi trust are

7    subject to the claims of general unsecured creditors based

8    on the language in there.  So, what is your question?

9              MR. GILL:  Your Honor, I'm going to -- you know,

10   there is -- first of all, you know, I'm just going to say

11   that 2547 and 2525 as they treat their trust has conflicting

12   way of describing the both of them.

13             THE COURT:  So what -- okay, but so -- okay, but

14   that's argument.  That's not really a question.  So, just

15   ask your question.

16             MR. GENENDER:  May I approach, Your Honor, with

17   the --

18             THE COURT:  Yeah.

19             MR. GENENDER:  -- 2547?

20             MR. GILL:  Well, the question is, if Mr. Dragelin

21   knew about the insolvency certification was required under

22   IRS Revenue Procedure Code 92-64 and did he knew that no

23   such certification was filed, invalidating the feasibility

24   assertion in document 2525?

25             THE COURT:  Okay, just ask one question at a time,
```

1   okay?

2   BY MR. GILL:

3   Q    Okay.  Mr. Dragelin, did you knew -- did you know

4   insolvency certification was required under IRS Revenue

5   Procedure 92-64?

6   A    In what context, sir?

7   Q    Well, in context of the trust insolvency.  I mean, was

8   there a need or requirement that you are aware of which you

9   have not listed -- I'll make it easy for you -- of looking

10  through your declaration and I've already filed a rebuttal

11  to that, but I was just curious if you knew about the actual

12  procedure that was needed at IRS Procedure Code 92-64.  The

13  question is, did you know about the insolvency certification

14  requirement under the law?

15             MR. GENENDER:  And Your Honor, I'm just going to

16  object to the extent the question's argumentative and

17  suggests that that provision had to be complied with, but he

18  can obviously answer if he knew about it.

19             THE COURT:  All right, yeah.  And are you talking

20  about the insolvency of Wellpath?

21             MR. GILL:  Rabbi class.  The --

22             THE COURT:  You're talking about the insolvency of

23  the rabbi trust?

24             MR. GILL:  Yes.

25             THE COURT:  Okay.  All right.  I'm not sure what

1    the relevancy is of the insolvency of the rabbi trust, but

2    go ahead.  Did you know that -- about the insolvency of the

3    rabbi trust?

4             THE WITNESS:  I'm not aware that the trust itself

5    is insolvent.

6             THE COURT:  Okay.

7             MR. GILL:  I have a second question, Your Honor.

8             THE COURT:  Go ahead.

9             MR. GILL:  And under feasibility of -- just a

10   second.  Just a second, Your Honor, I (indiscernible) wrong

11   screen.

12            THE COURT:  No, no problem.  Take your time.

13   We've got all day.

14            MR. GILL:  I'm going to try to separate as much as

15   I can to make it easy for him.

16   BY MR. GILL:

17   Q    Just a simple question, just to acknowledge a few

18   things.  I know he may have said this in the past, but Mr.

19   Dragelin, are you currently serving as chief restructuring

20   officer as well as chief financial officer of the Wellpath

21   Holding?

22   A    Yes, I am.

23   Q    Okay.  You submitted sworn declaration in this case,

24   including 2525 in support of plan confirmation and Docket

25   2547 in opposition of our motion for a relief from stay?

1   A    Yes.

2   Q    You understand both are submitted under penalty of

3   perjury pursuant 28 U.S.C. 1746?

4   A    These are my sworn declarations, yes.

5   Q    Okay.  Okay, in Docket 2525, you testified that the

6   plan is feasible, in part because the Debtors have

7   sufficient assets, including those held in the rabbi trust,

8   correct?

9   A    Yes, we have.  It's feasible based on the projections

10  that we put together, correct?

11  Q    Yes, great.  Are you aware that rabbi trusts are

12  governed by 26 U.S.C. 409A and IRS Revenue Procedure Code

13  92-64?

14  A    In what way, sir?

15  Q    Well, I'm just saying, the underlying law that governs

16  them, are you aware the rabbi trust are governed by 28

17  U.S.C. 409A and IRS Procedure Code 92-64?  This is the trust

18  that you had attached and executed the document.

19  A    Yes, I'm familiar that the IRS Code does govern.  I

20  don't know the number off the top of my head.

21  Q    Oh, that's okay, fair enough.  Isn't it true that

22  Revenue Procedure Code 92-64 prohibits use of rabbi trust

23  assets for creditor payment unless formal insolvency

24  declaration is executed by the board (indiscernible)?

25  A    You would have to point me to that provision.

1        MR. GENENDER:  And Your Honor, this is getting --

2   BY MR. GILL:

3   Q    Well, are you -- that's what I --

4        MR. GENENDER:  This is getting into matters of

5   law, which this witness --

6        THE COURT:  Right.

7        MR. GENENDER:  -- shouldn't have to answer

8   questions about.

9        THE COURT:  Yeah.  So, Dr. Gill, he's here as a

10  fact witness, not as a legal witness --

11       MR. GILL:  Okay, I'll --

12       THE COURT:  -- so, if you can ask him, you know,

13  what he did --

14       MR. GILL:  I'll ask --

15       THE COURT:  Yeah.

16       MR. GILL:  I'll ask two or three questions, Your

17  Honor, and then I'll be done.

18       THE COURT:  Okay, good.

19       MR. GILL:  Just to the final -- all right.

20  BY MR. GILL:

21  Q    You certified Docket 2525, that plan was proposed in

22  good faith under 11 U.S.C. 1129(a)(3), correct?

23  A    That's correct.

24  Q    Okay.  Why did you omit mention of Docket 2495, that is

25  my motion, 42-in-1 verified emergency motion or 75-in-1

1    motion suite?  Both were served prior to your declaration.

2    A    Well, this is my declaration.  I don't -- I'm not --

3    there's no requirement that I need to reference other

4    declarations filed.

5    Q    Okay, last question, and then I'll be done.  Do you

6    believe a plan can be proposed in good faith while federal

7    statutory objections under the ADA, ERISA, and IRS law are

8    knowingly concealed?

9            MR. GENENDER:  Argumentative.

10           THE COURT:  Yeah, I think that is argumentative.

11           MR. GILL:  Thank you, Your Honor.  Those are the

12   only questions I have.

13           THE COURT:  All right, thank you.

14           MR. GENENDER:  I have one more.

15           REDIRECT EXAMINATION OF TIMOTHY DRAGELIN

16   BY MR. GENENDER:

17   Q    Mr. Dragelin, do you know off the top of your head

18   whether the rabbi trust proceeds are included in your

19   projections for feasibility?

20   A    They are not.

21           MR. GENENDER:  That's all, Your Honor.

22           THE COURT:  Thank you.  All right.  Anyone else

23   wish to cross-examine Mr. Dragelin?  If not -- oh, go ahead,

24   Mr. Madigan.  Did -- I think you need to hit five star one

25   time and I'll unmute you.

 1              MR. MADIGAN:  Can you hear me now, Your Honor?

 2              THE COURT:  I can hear you now, yes, sir.  Go

 3    ahead.

 4              CROSS EXAMINATION OF TIMOTHY DRAGELIN

 5    BY MR. MADIGAN:

 6    Q    Mr. Dragelin, can you hear me as well?

 7    A    Yes, sir.

 8    Q    My name's T.J. Madigan, counsel for Tulane.  I think

 9    you said on the front end of your testimony you referenced

10    the increase in funding to 15.5 million; is that correct?

11    A    You broke up, sir.

12    Q    I'm sorry (indiscernible) the liquidating trust.  Did

13    you mention that on the front end of your testimony?

14    A    Yes, sir.

15    Q    And I just want to make sure I understand your

16    testimony correctly.  You're not suggesting that that 15.5

17    million is a recovery to the unsecured creditors, right?

18    A    It's -- it will go into the liquidating trust and

19    available for the unsecured creditors, in addition to other

20    elements that are going into the liquidating trust.

21    Q    But that 15.5 million also has to be used to fund the

22    claims reconciliation and resolution process, correct?

23    A    Yes.

24    Q    And have you done any analysis to know how much of that

25    money is going to be needed to be consumed to fully resolve

1    and reconcile all the claims in this case?

2    A    That will be up to the liquidating trustee.

3    Q    Do you know if anybody else on behalf of the Debtor has

4    done any analysis to determine how much of that 15.5 million

5    will need to be consumed in order to fully resolve and

6    reconcile all the claims in the case?

7    A    Not that I'm aware of.

8    Q    And that 15.5 million will also need to be used to fund

9    the investigating and pursuing the claims that are being

10   transferred to the liquidating trust, correct?

11   A    That is correct.

12   Q    And have you done any analysis to know how much of that

13   15.5 million it will take to investigate and pursue those

14   claims?

15   A    I have not.

16   Q    Do you know if anybody else on behalf of the Debtor has

17   done any analysis to determine how much of that 15.5 million

18   it will take to investigate and pursue the claims that are

19   being transferred to the liquidating trust?

20   A    I'm not aware of any other analysis, no.

21   Q    Do you know -- well I'll just ask you.  Have you done

22   any analysis to determine how much of the 15.5 million needs

23   to be spent for other administrative burden that may be

24   incurred by the liquidating trust?

25   A    I have not.

1   Q   The -- I want to ask you about the claims that are

2   being transferred to the liquidating trust.  Do you know

3   what those claims are?

4   A   Well there's a series of claims.  There's some

5   avoidance actions that are going in there as well as some

6   affirmative claims that are being put into the liquidating

7   trust as well.

8   Q   So, have you done any analysis to determine or provide

9   any factual basis to estimate the value of the avoidance

10   claims?

11   A   We have provided the information around what the likely

12   avoidance claims are that are not being otherwise retained

13   by the reorganized Debtor.

14   Q   Is this something beyond the statement of financial

15   affairs?

16   A   There is -- we filed a list of those actions.  I

17   believe it's $10 million roughly.

18         MR. GENENDER:  Look at Exhibit G to the disclosure

19   statement if you have it.

20         THE WITNESS:  I don't have that in front of me.

21   Thanks.

22         MR. MADIGAN:  And I'm sorry, I didn't hear what

23   counsel said that may be helpful.

24         MR. GENENDER:  Exhibit G to the disclosure

25   statement.

1   BY MR. MADIGAN:

2   Q    And do you have any personal knowledge of any analysis

3   about the value of those claims or beyond what's in that

4   document itself?

5   A    In what way?  We listed those potential avoidance

6   actions, but we have not done an analysis as to the

7   collectability of those.

8   Q    So, sitting here today, you can't really provide any

9   factual basis for estimating the recovery of those avoidance

10  actions; is that correct?

11  A    We've not done any analysis as to the cost of

12  litigating those or attempted recovery or whether or not

13  they're even recoverable from the counterparties.

14  Q    And then there were two other claims that I glimpsed

15  that were filed.  One was a suit against the State of

16  Georgia.  Are you familiar with that?

17  A    Yes.

18  Q    And that claim was dismissed I think based on sovereign

19  immunity grounds; is that your understanding?

20  A    I don't recall all the particulars about that.  We do

21  believe we have a claim, but there are defenses that we are

22  also aware of and so, ultimately we put the value at zero

23  because it was undetermined or really undetermined.  I think

24  the face amount was, if I recall correctly, $14, $15 or so

25  million.

1    Q    Sitting here today, you don't have any personal

2    knowledge to provide any value on that claim greater than

3    zero, correct?

4    A    That is correct.

5    Q    And the other one was, it seems like a claim involving

6    the State of Michigan where the State of Michigan had sued

7    the Debtors; are you familiar with that claim?

8    A    Generally, yes.  It's very similar to the other claim.

9    Q    And similarly, you're not able to provide, based on

10   your personal knowledge, any basis for saying that whatever

11   the claim is, the net recovery greater than zero once

12   transferred to liquidating trust, correct?

13   A    Very similar.  That would be the liquidating trustee to

14   figure that out and whether or not it's worth pursuing, but

15   those are our two affirmative claims, the Michigan claim and

16   the Georgia claim.

17   Q    And you anticipated my next question.  It's just the

18   avoidance claims and then those two claims and no other

19   claims; is that correct?

20   A    Other than what some counsel has already presented

21   today, which are the ability to do investigations to see if

22   there are other claims out there against other parties.

23   Q    But your -- based on your personal knowledge and what

24   you've seen today, you're not able to say what those claims

25   or amounts would be; is that correct?

1    A    That's correct.

2    Q    And to -- based on all that testimony sitting here

3    today, you're not able to say that there are claims where an

4    analysis has been done that would support a factual basis

5    for an estimated recovery greater than zero for liquidating

6    trust, correct?

7    A    That's not correct.  Liquidating trust is getting cash,

8    take-back facility, and common equity.  So, there is

9    recovery for -- in the liquidating trust.

10            MR. MADIGAN:  Okay.  Thank you, Your Honor. That's

11    all I have.

12            THE COURT:  All right.  Anyone else?  All right,

13    anything further, Mr. Genender?

14            MR. GENENDER:  No, Your Honor.

15            THE COURT:  All right.  Mr. Dragelin, thank you.

16    You may step down.

17            THE WITNESS:  Thank you, sir.

18            THE COURT:  Okay.  So, it's --

19            MS. PERLMAN:  Your Honor, just to -- before we

20    break, we did speak with the U.S. Trustee and have reached

21    an agreement with respect to the stay.  Instead of the 14-

22    day period, it would be, we'd agree, through May 8th, which

23    is consistent with the end of the RSA.

24            THE COURT:  Okay.  (Indiscernible)?  Okay.  So,

25    what I'd like to do since we have a few minutes and I just

1   kind of want to go through the plan, so you know what my

2   questions are going to be and work over lunch, but to the

3   extent anybody wants to be excused, this is just going to be

4   nits, so --

5          MS. PERLMAN:  Well, I know other people are taking

6   notes, it'll help me as well.

7          THE COURT:  I just -- but anyone who wants to be

8   excused and we will come back, let's say 1:45.  So, that'll

9   give me time to read the other things, but let's just -- and

10  you may need help, but okay.  So, first question.

11         The parent GP and parent holdings are not excluded

12  as -- are not included as Debtors and they are not part of

13  the plan.  So, what happens to them?  That's Footnote 2.

14         MS. PERLMAN:  I'm happy to answer now or later.

15         THE COURT:  No, no.  So, yeah.  So, that's my

16  first question.  You -- I'm just having a hard time

17  understanding what happens to them.

18         MS. PERLMAN:  I will -- let me confirm --

19         THE COURT:  Okay, that's fine.

20         MS. PERLMAN:  -- that I know the answer before --

21         THE COURT:  I didn't -- there's no need -- there's

22  no need to answer.

23         MS. PERLMAN:  Yes.  Your Honor, those entities are

24  being dismissed.

25         THE COURT:  Okay.

1          MS. PERLMAN:  There were no claims of those

2     entities so we're unable to confirm a plan with respect to

3     that.

4          THE COURT:  Okay, so those entities are being

5     dismissed.  Is that in the confirmation order?  Because I

6     haven't read that.

7          MS. PERLMAN:  We're going to file a separate

8     motion.

9          THE COURT:  What is it?  Ask him to come help you.

10          MS. PERLMAN:  Yeah, yeah.  I told him this --

11     that's why when you said after the 3018, he could leave, I

12     was like, nope, that's not happening.

13          THE COURT:  All right.  He reads everything.  All

14     right.  So -- all right.  So, that's number one.  I think

15     it's pretty clear in the -- that there's no administrative

16     bar date with respect to personal injury claims.  So, that's

17     there.  There's a typo at the end of Footnote 2 where you

18     still have Boynton Beach as a debtor, but that's not an

19     issue for me.

20          MS. PERLMAN:  We will correct that, though.

21          THE COURT:  Okay.  Have you filed the

22     restructuring transaction memo yet?

23          MR. SZANZER:  Yes, that should have been under

24     plan supplement (indiscernible).

25          THE COURT:  Okay.  All right.  Okay, so in the

```
 1   definition of exculpated parties, you have the TopCo
 2   debtors, but I'm dismissing them.  So, don't we have to take
 3   that out?
 4            MS. PERLMAN:  That's correct, Your Honor.
 5            THE COURT:  Okay.
 6            MR. BRADLEY:  So, I would like to first apologize
 7   for earlier.
 8            THE COURT:  Yes, sir, go ahead, Mr. Deandre.  Go
 9   ahead.
10            WOMAN:  (Indiscernible) something I didn't have
11   (indiscernible).
12            THE COURT:  go ahead.
13            WOMAN:  -- not legal, and that is (indiscernible).
14   I only did it because I needed (indiscernible).  Because if
15   you look at that, okay, it (indiscernible), whatever.  I
16   don't know where that's coming from.  (Indiscernible) based
17   on (indiscernible).
18            THE COURT:  Mr. Deandre, can you hear me?
19            WOMAN:  (Indiscernible).
20            THE COURT:  Hello.
21            MR. BRADLEY:  Hello.
22            THE COURT:  Yes, can you hear me?  Did you want to
23   speak?
24            MR. BRADLEY:  Yeah.  Yeah, I did want to speak.
25            THE COURT:  Go ahead.
```

1          MR. BRADLEY:  I'm sorry.  So look,

2   (indiscernible).  So, the institution that I'm at, they need

3   the phone for other legal calls and other purposes, and they

4   didn't know that the hearing was going to be this long or

5   that I had to come back at 1:45, so I just wanted to say

6   what I needed to say.

7          THE COURT:  Go ahead.

8          MR. BRADLEY:  And I might not be able to hear the

9   end of it.

10          THE COURT:  Okay.  Go ahead.

11          MR. BRADLEY:  So, I'm an incarcerated individual.

12   Right now, I'm at the Illinois Department of Corrections.  I

13   had to file two proof of claims because I had two separate

14   civil suits against the (indiscernible).  One of my concerns

15   in this situation is, for one, IDOC is telling me that they

16   don't have to allow me to come to any hearing.

17          My mail is being extremely late.  I haven't been

18   able to object to anything as far as these proceedings go,

19   and I fear that next time there's a hearing to -- because I

20   feel like there's probably going to be another

21   reconfirmation hearing or something, or deciding on what

22   goes on, I'm probably going to have to hear from it through

23   the mail, but I'm concerned that I won't be able to raise

24   certain issues, objections, and things like that unless a

25   writ of habeas corpus is issued to force them to allow me to

1    come to these hearings.

2          I have filed several motions, but I hadn't been

3    able to even come to court and argue these motions, so the

4    motions just went unheard and was removed from the docket,

5    because I understood they were moved because I wasn't

6    appearing at any of the hearings.  And that was my first

7    issue.

8          The second one was, I was a little -- I opted out,

9    and I didn't vote to accept the plan, and I heard the

10   Committee person earlier speaking on the expedited

11   settlement and being liquidated through the trust, and then

12   the alternate dispute resolution.  They said that they filed

13   a supplement this morning, which clearly I don't have access

14   to, so if that supplement is going to be placed in the mail

15   and then a person reads it, and they want to change their

16   decision on what's going on, how would that possibly work?

17         THE COURT:  So, let me first say, number one, if

18   you filed a proof of claim and opted out, you know, you will

19   be able to just go back to prosecuting your own lawsuits.

20   The -- there's nothing that you need to do to change once

21   you get the procedures.  If those -- if it's something that

22   you're interested in doing, then you can reach out to the

23   liquidating trust.

24         And none of that has been put in process yet.

25   They're hoping that if I confirm the plan, it will be done,

1    you know, expeditiously within the next few weeks.  But

2    right now, if you filed a proof of claim and you've opted

3    out, you've preserved all your rights, and to the extent

4    that you want to consider what the liquidating trustee has

5    put together, then you'll have the right to do that in the

6    ordinary course in the future.  And nothing that is

7    happening now is impacting your ability to do that.  And --

8              MR. BRADLEY:  Okay.

9              THE COURT:  And so that's one question.  The other

10   question was, the writ of habeas corpus.  So, I'm a

11   bankruptcy judge, and I don't -- bankruptcy judge under the,

12   you know, the federal rules and the U.S. Code, I don't

13   believe that I have the ability to issue a habeas corpus.  I

14   can have somebody arrested that is in front of me for

15   contempt, but I don't have the ability to bring somebody.

16   So, that unfortunately is -- this is not a criminal

17   proceeding.  This is a civil proceeding where people are

18   here voluntarily, and I'm dealing with the, what's been

19   assigned to me under Title 28 of the U.S. Code.

20             MR. BRADLEY:  Okay.

21             THE COURT:  All right?  So, thank you for staying

22   on.  Appreciate your participation.  But to the extent that

23   you filed proof of claim and opted out, your rights are

24   preserved.

25             MR. BRADLEY:  Okay, thank you.

```
 1              THE COURT:  Thank you.  All right, go ahead.  All
 2    right, have we seen the global settlement term sheet yet?
 3              MS. PERLMAN:  It's still being finalized.
 4              MR. SZANZER:  Still being finalized and --
 5              THE COURT:  Okay.  All right.  Okay, so one of the
 6    things is your definition of lift-stay motion, I think needs
 7    to be a little broader, because here it says, only filed
 8    with respect to the Debtors or the TopCo debtors.  But what
 9    if they filed it against the professional corporations?
10    What if they filed it only against employees?  What if they
11    filed it -- I mean, there are people who filed, who as a
12    result of the suggestion of bankruptcy in many cases where
13    there were no debtors.
14              MR. SZANZER:  Well, with respect to the GCs,
15    they're not debtor entities, so --
16              THE COURT:  I understand, but the -- but you
17    define lift-stay motion to only be --
18              MS. PERLMAN:  But the way the term is used is with
19    respect to plan provisions.  So, if they filed lift-stay
20    motions only with respect to non-debtors, and their claims
21    were only with respect to non-debtors, and they're not
22    creditors of the estate, then they are not governed by the
23    plan.
24              MR. SZANZER:  I think the defined term --
25              THE COURT:  No, no, no --
```

 1                MR. SZANZER:  -- is only used --

 2                THE COURT:  But -- okay.  And maybe I'm -- then

 3     maybe I need to read it.  I thought the way you used the

 4     lift-stay motion was to say who is not bound by the third-

 5     party releases.  And -- I'm sorry, who opted out.  And here

 6     --

 7                MS. PERLMAN:  That's correct.

 8                THE COURT:  -- you're limiting the universe of

 9     lift-stay motions to only ones filed against the Debtors.

10     But if there was -- , if either through the professional

11     corporations motion or the extend-stay motion they had to

12     come back and file a lift-stay motion, that should not --

13     that should also count as having opted out as opposed to

14     just if you filed against the Debtors.  It's a technical

15     point.

16                MS. PERLMAN:  We're happy to make that

17     modification.  If they didn't have claims against the

18     Debtors, and only against the third-parties, they wouldn't

19     be bound by the plan or the third-party releases.  If

20     there's no claim against the Debtor, they're not a creditor

21     of the estate and they're not bound by the plan in any

22     event, so they wouldn't need to opt out of the third-party

23     release.

24                THE COURT:  Okay, so --

25                MS. PERLMAN:  So, if they filed a lift-stay with

1    respect to the Debtors and a third-party, then it's picked

2    up.

3          THE COURT:  Okay, so, but -- so --

4          MS. PERLMAN:  If it's easier just to be --

5          THE COURT:  Let's (indiscernible) understand.  So,

6    in Pennsylvania, if they just sued doctor and two nurses,

7    they're not bound by the plan?

8          MS. PERLMAN:  If they don't also have claims

9    against the estate.

10          THE COURT:  But then -- okay.

11          MS. PERLMAN:  The stay was in place because those

12    doctors have indemnification claims against the estate.  If

13    the (indiscernible) against the doctor, so that was why we

14    asked the Court to extend the stay to those claims, but

15    those individuals do not have direct claims, if they have

16    not asserted direct claims against the Debtor.

17          THE COURT:  But that's --

18          MS. PERLMAN:  It would --

19          THE COURT:  Okay.  And that means there's no

20    third-party release with respect to them?

21          MS. PERLMAN:  Correct.

22          THE COURT:  All right.  Well, then I need to --

23          MS. PERLMAN:  And we're happy if it's --

24          THE COURT:  Not -- that's not clear to me.  That

25    wasn't clear to me.  Because if --

1          MS. PERLMAN:  If it's easiest to add it in here

2    just to make --

3          THE COURT:  No, no, no --

4          MS. PERLMAN:  -- sure it's clear, we're happy to

5    do that.

6          THE COURT:  No, this is a bigger point than just

7    the lift-stay.

8          MS. PERLMAN:  Okay.

9          THE COURT:  But -- so, we'll come back to that.

10         MS. PERLMAN:  Okay.

11         THE COURT:  So, these are not mutual releases,

12   correct?

13         MS. PERLMAN:  If a party does not opt out so that

14   they grant a third-party release, there is a mutual release

15   given to them (indiscernible).

16         THE COURT:  Okay, so in the definition of released

17   parties, 177 (indiscernible), only for purposes of Article

18   IX.B, each holder of a claim entitled to elect to opt out

19   does not elect to opt out.  So, that's -- they're a released

20   party.

21         MS. PERLMAN:  Correct, if they grant a release,

22   they also receive a release.

23         THE COURT:  So, then they are mutual.

24         MS. PERLMAN:  Right.

25         THE COURT:  Okay.  All right, so quick question

1    that I had.  With respect to the NVH debtors and the

2    Recovery Solution debtors, my understanding was that they

3    only got what they are entitled to under their sale order.

4            MS. PERLMAN:  Right.

5            THE COURT:  Okay, so then they're included in

6    released parties, but shouldn't they just -- shouldn't we

7    just say they got whatever they got under their sale order?

8    And if they're -- I don't know how you could have done a

9    third-party release of them if you sold them already.  They

10   may have gotten, all your claims are gone, all their claims

11   are gone, but in the definition of released parties,

12   Recovery Solution debtors and the NVH debtors, they should

13   just get whatever they got under their sale order.  Okay.

14           So, in the definition of releasing parties, the --

15   I'm concerned that we're only doing it for incarcerated

16   individuals at what time?  I think I would prefer if you --

17   I think you should add, or formerly incarcerated

18   individuals.  And it's really two circumstances.

19           One is the fact that by the time they get this,

20   they may no longer be there, but then you also have all of

21   the local, you know, your state and federal -- not the state

22   and federal, but the municipal, local, which is, you know,

23   there a few days.  So,  right in the middle of 178, if you

24   do -- that is an incarcerated individual or a formerly

25   incarcerated individual, I think that would be better.  And

1    then 60 days sounds like a lot, but under these

2    circumstances, I'd really like 90.

3              MS. PERLMAN:  We're fine with both of those

4    changes, Your Honor.

5              THE COURT:  All right, so as it relates to the

6    releasing party and its interaction with related party, I

7    think you have part of it, and this is at the very bottom

8    there before the provided for.  You say that the definition

9    to the fullest extent permitted by law and solely to the

10   extent such related party may assert claims or causes of

11   action on behalf or in a derivative capacity by or through

12   the entities.

13              I think similarly, you would have to say, or would

14   be obligated to grant a release, you know, under the

15   principles of agency, if so directed.  So in other words,

16   anybody who is related has to be bound by what the

17   principal, by what the party says, so --

18              MS. PERLMAN:  Happy to add that language, Your

19   Honor.  That makes sense.

20              THE COURT:  Yeah, it's just -- I mean, that's

21   pretty much in all.  You've done a really good job of

22   answering most of my questions.

23              MS. PERLMAN:  Thank you for allowing Mr. Szanzer

24   to come up here and join me to help with that.

25              MR. SZANZER:  Haven't even said much.

1          THE COURT:  All right.  We went through the whole

2     thing about trying to figure out, make it clear how people

3     liquidate claims against the Debtors.  All right, so this is

4     a really a trust issue, but we have this whole concept of a

5     record date.  And how do you do a record date with so many

6     contingent disputed unliquidated claims?  And this might be

7     a more of a liquidation trust issue.

8          MS. PERLMAN:  So, you're not talking about the

9     voting record date.  You're talking about the record date

10    for the claims --

11         THE COURT:  For distributions --

12         MS. PERLMAN:  -- distributions, right.

13         THE COURT:  Yeah, yeah, yeah.

14         MS. PERLMAN:  That's what -- I just wanted to make

15    sure.

16         THE COURT:  Yeah.  So, this is paragraph -- in the

17    provisions governing distributions, B1.  I just, I don't

18    understand how that's going to work.

19         MS. PERLMAN:  That does relate to the trust, so --

20         THE COURT:  Yeah.

21         MS. PERLMAN:  Either now or after the break, if

22    they prefer --

23         THE COURT:  Well --

24         MS. PERLMAN:  -- suggest --

25         THE COURT:  -- obviously --

1          MS. PERLMAN:  Yeah.

2          THE COURT:  -- I'm going to need to read it, but.

3    Okay.  So, there's a provision in Article VIII regarding

4    procedures for resolving contingent unliquidated disputed

5    claims.  In particular, where it says -- talks about

6    disallowance of claims.  It's on Page 81 of the initial

7    redline.  And it says, "Except as otherwise provided herein,

8    the bar date order as agreed to by the post-restructuring

9    Debtors, any proofs of claim filed after the bar date shall

10   be deemed disallowed or expunged."  I think you just need to

11   put in, or bankruptcy court order.

12          All right, so in connection with the third party

13   releases, it talks about claims related to the business

14   operations of the Debtors.  And Mr. Giordano explained to me

15   that that meant the employees of the Debtors and related to

16   personal injury and wrongful death claims.  I still have a

17   concern about that, especially coupled with the issue of, if

18   you did file a claim against the professional corporation

19   versus a debtor, you're being treated disparately.

20          So, I still have a concern about that, only as it

21   relates to personal injury and wrongful death claim, not as

22   to anything else.  But I do still have a concern about that.

23   That's it.

24          MS. PERLMAN:  Thank you, Your Honor.  We will

25   respond to the few remaining things that were not addressed

1    after the lunch break, as well as the objections.  I

2    apologize, I can't recall what time you said.

3              THE COURT:  Let's -- an hour.  Let's do an hour.

4    Okay?  So, 1:45.

5              MS. PERLMAN:  Okay.

6              THE COURT:  All right, thank you very much.

7              MR. SZANZER:  Thank you, Your Honor.

8              THE COURT:  We're in recess until 1:45.

9              (Recess)

10             THE COURT:  Please be seated.

11             AUTOMATED VOICE:  Conference unmuted.

12             THE COURT:  All right, good afternoon.  We're here

13   on the continued hearing --

14             AUTOMATED VOICE:  Conference recording started.

15             THE COURT:  -- in Wellpath Holdings, Inc.  Case

16   Number 24-90533.  I'm going to activate the hand raising

17   feature so please hit 5-star --

18             AUTOMATED VOICE:  Conference muted.

19             THE COURT:  -- one time and I'll let you back in.

20   Ms. Perlman?

21             MS. PERLMAN:  Thank you, Your Honor.  As an

22   initial matter we've made the changes in the plan that were

23   discussed with you prior to the lunch break.  I think the

24   only two that were Court continued discussion were with

25   respect to the record date in the trust which I'll turn the

```
 1    podium over at some point to committee counsel to discuss.

 2    And then with respect to the opt-out releases which is where

 3    I thought that we would start with that and cramdown.

 4            THE COURT:  Okay.  Do you want me -- I did have a

 5    chance to read the trust distribution procedures and the

 6    liquidating trust document during the lunch break and I have

 7    minor, minor comments.  But with respect to the liquidating

 8    trust document, it's really an internal document that -- as

 9    to how the trust will -- so, in Section 1.8 you talk about

10    privileged and confidential information.  And this really

11    refers to information pretty much related to like attorney-

12    client communications, things like that.  What about like

13    medical records and things like that?  I didn't see anywhere

14    where those --

15            MS. PERLMAN:  Are specifically protected?

16            THE COURT:  -- are specifically protected.

17            MS. PERLMAN:  You know, can I ask somebody from

18    the --

19            THE COURT:  Sure.

20            MS. PERLMAN:  -- committee to come up as well so

21    we can -- since it's their documents --

22            THE COURT:  Yeah.

23            MS. PERLMAN:  -- that way we can.

24            MR. ROSEN:  That's actually in another document,

25    Your Honor.  That's the cooperation agreement I was
```

 1    referring to earlier today.

 2              THE COURT:  Oh, okay.

 3              MR. ROSEN:  With the turnover of all those kinds

 4    of documents.

 5              THE COURT:  All right.  Okay.  All right.  And

 6    then the dispute resolution Section 8.1, that's just a

 7    dispute regarding the terms of the liquidating trust

 8    agreement, it has nothing to do with the claims

 9    administration process.

10              MS. PERLMAN:  Correct.

11              THE COURT:  Okay.  All right.  So, that -- those

12    really were only -- my only comments to that.  With respect

13    to the trust distribution procedures, I don't understand how

14    the FIFO claims process works under these circumstances.

15    Because the way I understand is there is -- the deficiency

16    claims are allowed --

17              MS. PERLMAN:  Correct.

18              THE COURT:  -- there were scheduled claims that

19    are allowed, there are proofs of claims that maybe allowed

20    without any further -- but all personal injury and wrongful

21    claims are disputed, contingent, and unliquidated.  And

22    there have only -- based on the testimony of Mr. Dragelin,

23    there's only been about 100 of those filed.

24              MS. PERLMAN:  100?

25              THE COURT:  Proofs of claim by personal injury and

1     wrongful death claimants.

2            MS. PERLMAN:  My understanding is that's 100 that

3     are on the docket, not 100 that had been filed with Epiq.

4     That some parties put their proofs of claim on the docket,

5     in addition to filing --

6            THE COURT:  Okay, so -- do --

7            MS. PERLMAN:  -- with Epiq.

8            THE COURT:  Am I going to get some evidence as to

9     how many --

10           MS. PERLMAN:  How many proofs of claim or how many

11    personal injury?

12           THE COURT:  How many personal injury proofs of

13    claim.

14           MS. PERLMAN:  If you could give me one moment,

15    Your Honor.

16           THE COURT:  Yeah, yeah.

17           MS. PERLMAN:  Your Honor, it's our understanding

18    it's 920 personal injury proofs of claim have been filed

19    with Epiq.

20           THE COURT:  All right.  So, can I get a

21    declaration to that effect from Epiq?

22           MS. PERLMAN:  Happy to.

23           THE COURT:  Okay.  All right.  All right, so

24    again, I don't understand quite exactly how this FIFO claims

25    process is going to work.  Yeah.

1           MR. HEMENWAY:  Your Honor, Zach Hemenway for the

2    committee.  So, the trust distribution procedures refer to

3    FIFO only in the context of when the order of the claims

4    would be reviewed.  It's not for distribution.

5           THE COURT:  Okay.

6           MR. HEMENWAY:  So, I think that's a distinction.

7    I take your point that you know, a lot of those can be seen

8    as kind of simultaneous.  I think that language is just in

9    there to give the trustee some guidance as to basically when

10   claims come in for when they're evaluated in the claims via

11   this process.

12          THE COURT:  Okay.  Also in connection with the

13   trustee distribution procedures, I just want to make sure

14   that -- so, that there are ADR procedures that are

15   completely voluntary if they don't want to --

16          MR. HEMENWAY:  Appear, yeah.  That's right, the

17   trust distribution procedure probably (indiscernible) so.

18          THE COURT:  So, they're just completely voluntary,

19   so to the extent somebody just wants to go to the state

20   court they can go to state court.

21          MR. HEMENWAY:  Yeah.  So, they're set up in order

22   to encourage people to go through the process --

23          THE COURT:  Understood.

24          MR. HEMENWAY:  -- accepting the results of them is

25   voluntary, it's non-binding.  Our -- you know the goal is to

1    make it available for everybody and to encourage people to

2    at least engage in the initial steps because that will make

3    the process more efficient for both we believe the

4    claimants, the Court, and the trust.

5            THE COURT:  So, I'm having -- I had a difficult

6    time understanding the release.  And I'm not sure I quite

7    understand the acceptance and release document.  And in

8    particular, the fact that basically this provides a release

9    to the released parties.

10           MR. HEMENWAY:  In terms of -- so, the acceptance

11   release -- are you talking about for the expedited

12   distribution or just in general?

13           THE COURT:  It just says of an award.

14           MR. HEMENWAY:  So, in that form, released parties

15   is defined as the trust, the trustee, and the trust advisory

16   council.  As opposed to the released parties in the plan.

17           THE COURT:  Got it.  All right.  Okay.  Those were

18   really my only questions.

19           MR. HEMENWAY:  Thank you, Your Honor.

20           MS. PERLMAN:  Your Honor, to follow-up on your

21   question then with respect to third party releases and I

22   think that might tie to the question you raised with respect

23   to cramdown, I thought it made sense to go back --

24           THE COURT:  Sure.

25           MS. PERLMAN:  -- to that.  As an initial statement

1    to clarify, the third party opt-out is only with respect to

2    third party releases, not obviously releases with respect to

3    the debtors.  And it's --

4            THE COURT:  Of course, you get a discharge.

5            MS. PERLMAN:  Correct.  We had received some

6    questions --

7            THE COURT:  Good enough.

8            MS. PERLMAN:  -- during the break on that so I

9    wanted to clarify that.  In addition, the plan provides that

10   the released parties are only released with respect to the

11   claims related to the debtors.  So, to use an example that I

12   believe Your Honor used in a prior hearing, if an employee

13   has a cause of action brought against them relating to

14   medical care that they've provided during their employ at

15   the debtors, that would be a released claim if the employee

16   got in a car accident, that would not be a released claim.

17           THE COURT:  Right.

18           MS. PERLMAN:  So, that is an initial matter that I

19   wanted to clarify.  With respect to the cramdown question

20   that you raised, Your Honor as an initial matter if a party

21   doesn't have causes of action against the debtor, they're

22   not bound by the plan because they're not creditors of the

23   estate.  So, parties that only have causes of action against

24   a PC are not part of these proceedings.  They were a part of

25   them with respect to the stay, but not other than the stay

1    issues.

2              THE COURT:  But what if the claimant has only

3    asserted claims against employees of the debtor?

4              MS. PERLMAN:  If they've only asserted claims

5    against employees of the debtor and have not asserted claims

6    against the debtor, those claims against the employees would

7    still be released in the third-party release.  They'd still

8    be released under the plan because they are essentially

9    claims against the debtor.  You can't --

10             THE COURT:  Oh, well --

11             MS. PERLMAN:  -- they're not in any kind of --

12             THE COURT:  -- there's a claim against the debtor

13   and there's a claim against them.  Okay.  Well --

14             MS. PERLMAN:  If they can assert a claim against

15   the employee that is separate from their employment, that

16   stands.

17             THE COURT:  I understand what you're saying, I'm -

18   -

19             MS. PERLMAN:  Yeah.

20             THE COURT:  Okay, go ahead.

21             MS. PERLMAN:  With respect to cramdown, Your

22   Honor, the cramdown provision provides no unfair

23   discrimination.

24             THE COURT:  Right.

25             MS. PERLMAN:  Two different elements of that here

1    make our plan appropriate under that provision.  The first

2    is it's intended to be between classes of claims so that a

3    plan does not provide there are two classes of claims that

4    kind of unfairly discriminate with respect to each other, as

5    opposed to here where we have a general unsecured creditors

6    class that all receive the same distribution, not two

7    unsecured claims classes that receive disparate

8    distributions.

9            In addition, case law suggests and follows on the

10   language of the Code that it is unfair discrimination.

11   There is discrimination allowed if it is fair and based on a

12   reasonable basis.  Here to Your Honor's comments about why

13   parties are treated differently, if they have claims against

14   only non-debtors versus claims against debtors it's for that

15   reason in and of itself.  Those in the general unsecured

16   claims pool had claims against the debtors that are dealt

17   with under the plan, and they are dealt with under the

18   treatment for Class 6.  Those are claims not against the

19   debtors, against the PCs as you raised, don't have third

20   party releases they need to opt-out of because they're not

21   participating in this process.  So, we don't believe that

22   creates any unfair discrimination with respect to the

23   cramdown standard under 1129.

24           THE COURT:  All right, well that's not the way

25   that I understand the testimony.  And let me tell you -- so,

```
 1    my understanding based on the various hearings that we've

 2    had is that in connection with claims against -- in

 3    California --

 4              MS. PERLMAN:  Mm hmm.

 5              THE COURT:  -- that there were claims against the

 6    debtor and there were claims against the professional

 7    corporations and the employees in the professional

 8    corporations.  So, there's still a claim against the debtor

 9    in those cases.  A lot of them were styled Wellpath.  And

10    so, there is a claim against the debtor.  It may not be a

11    valid claim against the debtor --

12              MS. PERLMAN:  Well, in that situation, the PCs are

13    not released parties so those claims would still be going

14    forward.

15              THE COURT:  Understood, understood.  And that's

16    really my point, I mean you -- and you all made it pretty

17    clear in your brief where it says that unfair discrimination

18    protects each class of creditors against involuntary loss of

19    equal rights, vis-à-vis other creditors of equal rank.  And

20    here, you have the situation where if you were in California

21    and you didn't opt-out you could go forward and sue the PC

22    and the individuals but if you are in Pennsylvania,

23    Arkansas, Kentucky, and didn't opt-out you can't continue to

24    sue the doctors who would independently be liable.  That's

25    my concern about the unfair discrimination.
```

```
 1              MS. PERLMAN:  Your Honor, I would say that that is
 2     perhaps discrimination, it's not unfair discrimination, it's
 3     just who you have claims against.  No different than in a
 4     different type of cause of action, you know, parties can
 5     have rights against different parties.  If you're in some
 6     sort of tort claim with an automobile you might have a cause
 7     of action that's against the manufacturer, you might have a
 8     cause of action against a manufacturer or somebody who
 9     drives a car.  There's just different factual bases that
10     lead to tort claims.  In the corporate practice of medicine
11     states there are PC entities who can be additional
12     defendants in cases.  Those are not debtors in the cases.
13     We cannot affect the claims against them; therefore those
14     parties have rights against those non-debtors.  In other
15     states where the medicine that healthcare's provided by the
16     debtor, the claims are against debtors, and they don't have
17     a non-debtor party to go after that's similarly situated to
18     the PC.
19              THE COURT:  Well, that's partly correct.  But
20     there's also the situation where they didn't sue the debtor.
21     They're just suing as -- there's been several cases like
22     that where they're just suing the doctor, the nurse, and so
23     they're just suing third parties and they're still being in
24     essence released under the plan --
25              MS. PERLMAN:  Well --
```

```
 1              THE COURT:  -- if there hasn't been an opt-out.

 2              MS. PERLMAN:  -- that's because the liability is

 3    really liability of the debtors.  To the extent that they

 4    could make a claim that's not really liability of the

 5    debtors, you know, they are seeking to access presumably the

 6    debtor's insurance policies to cover the viabilities etc.,

 7    so it really is a cause of action against the debtors even

 8    though it's a doctor that is (indiscernible).

 9              THE COURT:  Well, I think under the case law it's

10    a claim against both and they could sue whoever they want.

11    I mean, there's no -- it's not like the debtor is a

12    necessary party.  They could just sue the doctor if they

13    wanted to but understand your point.

14              MS. PERLMAN:  Okay.

15              THE COURT:  Yeah.

16              MS. PERLMAN:  So, yeah, I'm happy to discuss

17    cramdown further with you if there's still this --

18              THE COURT:  No, no, that was the only issue I had

19    with --

20              MS. PERLMAN:  -- okay.

21              THE COURT:  -- I had on the cramdown.

22              MS. PERLMAN:  To return to the third-party

23    releases, Your Honor, we understand the objections asserted

24    by the parties.  We would rely on the case law in this

25    district and it is case law that is subsequent to Purdue,
```

 1   both Robert Shaw and Digital Media as we mentioned, that

 2   opt-outs are appropriate forms of consent and we believe in

 3   this instance, you know, our opt-out process is much more

 4   fulsome than in other cases that have come before this

 5   Court.

 6          We've agreed to the modifications that Your Honor

 7   has requested with respect to the 90 days to give a longer

 8   time after confirmation to allow parties to opt-out.  You

 9   know, if you look at the numbers already, we have 1,200 opt-

10   outs, the majority of those are personal injury claimants --

11          THE COURT:  No, I thought the testimony was that

12   only about 100 were.  That the rest of them were commercial

13   creditors.  I mean, we can look.  That --

14          MS. PERLMAN:  That was not my understanding.

15          THE COURT:  Yeah, we can look --

16          MS. PERLMAN:  I don't --

17          THE COURT:  -- because those were attached to her

18   declaration.  No, I --

19          MS. PERLMAN:  We're happy as we continue with

20   other things to have somebody pull it up and take a look --

21          THE COURT:  Yeah.

22          MS. PERLMAN:  -- so we don't take the Court's time

23   and to circle back --

24          THE COURT:  Yeah, I --

25          MS. PERLMAN:  -- particularly since of those, all

1    the parties, in more than 100 have filed lift stay motions

2    so in and of itself of those 1,200, the lift stay parties

3    are more than 100 in and of itself and they're all part of

4    that 1,200.  So, you know, we'll follow up to see if we can

5    find that because my understanding is the majority are --

6         THE COURT:  Yeah, I would like to -- for you all

7    to supplement the record with how many proofs of claim have

8    been filed, how many proofs of claim have been filed by

9    personal injury/wrongful death claimants of that subset, and

10   then there were 900 -- there were 1,291 opt-outs and my

11   understanding was that the vast majority of those were

12   regular commercial creditors as opposed to -- but there were

13   a lot of personal injury and wrongful death but most of them

14   were commercial creditors but I may be wrong.

15        MS. PERLMAN:  We'll see if we can find the answer

16   to that, Your Honor, while we continue with other

17   conversations.  But you know, we have no issue with the 90

18   days and the other request that you made with respect to the

19   opt-out provision.

20        The releases here as we discussed earlier are

21   mutual releases.  So, in addition to the financial

22   contributions that many of the parties made, the above and

23   beyond commitment that they made to help with the

24   reorganization from a D and O point of view, if the releases

25   are also mutual is additional consideration for the third-

 1    party releases.  These releases are part and parcel of the

 2    global settlement between the key constituents to bring the

 3    value to the table and that global settlement substantially

 4    increased the recovery to the unsecured creditors pool.  So,

 5    we believe that third-party releases are appropriate and

 6    that our opt-out provision is appropriate within the case

 7    law of this district.

 8              In terms of the other objections that were raised.

 9    The gatekeeper was raised but we made the change to bring

10    that into the current case law in its district.

11              THE COURT:  Mm hmm.

12              MS. PERLMAN:  With respect to exculpation, we have

13    -- our exculpation is consistent with the Highland

14    exculpation and we believe that is appropriate.  The

15    remaining challenge is with respect to the injunction and

16    Your Honor we believe that the injunction is necessary to

17    help effectuate the intent of these various provisions in

18    the plan to protect the parties who benefit from those

19    provisions and are consistent with plans approved regularly

20    in this district and we'd ask that the injunction be

21    approved as well.

22              Looking at the other objections that were raised,

23    I think the only other issue was presented by Tulane and

24    that was with respect to the recovery coming from the

25    litigation -- liquidation trust.  We've given everybody the

1    estimates; the creditors committee has given their estimates

2    of what recovery will be.  There will be a liquidating

3    trustee who is a fiduciary to carry out the work of the

4    trust for the benefit of the beneficiaries who will choose

5    how much will go to pursuing causes of action versus

6    distribution to creditors.  There will certainly be

7    distribution to creditors given that in addition to the cash

8    that is going into the trust there is also the take-back

9    debt and equity as well as any recoveries from the

10   litigation claims that go into the trust.

11          Your Honor, with respect to Mrs. Sorno's comments

12   regarding the operations, I believe Mr. Dragelin's testimony

13   has addressed the issue with respect to how the company will

14   operate on a go forward basis as well as the liquidity of

15   the company to operate appropriately and meet all of its

16   obligations as well.  And unless my notes are missing

17   someone trying to go through the various parties who raised

18   their objection, I believe that covers all of the parties'

19   objections.

20          THE COURT:  All right.  So, there were -- you had

21   a bunch of other exhibits we should probably admit all of

22   those.  The --

23          MS. PERLMAN:   The non-qualified deferred

24   compensation plan and the declaration --

25          THE COURT:  No, the --

1           MS. PERLMAN:  -- (indiscernible)?

2           THE COURT:  No, and the notice -- service --

3     notice of service, I mean there -- we had 24 exhibits or

4     something, let's --

5           MS. PERLMAN:  Yes, we have all --

6           THE COURT:  And those are not controversial --

7           MS. PERLMAN:  -- I have all the doc numbers.

8           THE COURT:  -- but --

9           MS. PERLMAN:  Correct.  I'm happy to get a list of

10    those docket numbers if --

11          THE COURT:  Yeah.

12          MS. PERLMAN:  -- they're helpful.

13          THE COURT:  All right.  Other than the exhibits,

14    do you have any other testimony?

15          MS. PERLMAN:  We have no other testimony, Your

16    Honor.

17          THE COURT:  Okay.  All right.  So, we will come

18    back and admit or consider admission of all the various

19    exhibits which include -- I mean, there are approximately 38

20    exhibits in connection with this.  Some of these are just

21    court filings which I can just take judicial notice but the

22    various certificates of service, I think those need to be

23    admitted.  And we can come back and do that.  All right, so

24    anyone else wish to present any evidence in support of

25    confirmation?  Thank you.

```
 1            MR. DESATNIK:  Good afternoon, Your Honor, Daniel

 2    Desatnik for the committee.  Here to give a response to some

 3    of the arguments on third party releases, not to present

 4    anymore evidence.  I don't know if now is the time that

 5    you'd like me to speak to that?

 6            THE COURT:  No, we're going to -- let's just talk

 7    about the evidence right now --

 8            MR. DESATNIK:  Okay.

 9            THE COURT:  -- and that was -- Ms. Perlman was

10    really addressing my little discussion right before the

11    break so it's really not -- she's going to have a chance to

12    do argument as well.

13            MR. DESATNIK:  Okay, understood, I'll raise it

14    then.

15            THE COURT:  All right.  So, with respect to anyone

16    opposing confirmation, I know people have made -- is there

17    any other additional evidence?  I'm just talking about

18    evidence.  Dr. Gill?

19            MR. GILL:  Hello, just had a question, I don't

20    know if I got it correctly or not, are we having testimony

21    from Emily Young now?

22            THE COURT:  No, Emily Young -- nobody called Emily

23    Young.  I -- if you want to call Emily Young, you can call

24    her.

25            MR. GILL:  Yes, if she can please, thank you.
```

1          THE COURT:  Okay.  Is she available?

2          MR. DESATNIK:  Ms. Young is available by

3    teleconference.

4          THE COURT:  Okay, got it.  Okay.  All right; Ms.

5    Young would you raise your right hand please?  Do you

6    solemnly swear or affirm to tell the truth, the whole truth,

7    and nothing but the truth?  I think you might be muted on

8    your end, I unmuted you.

9          MS. YOUNG:  Can you hear me now?

10         THE COURT:  I can hear you now.  All right, thank

11   you --

12         MS. YOUNG:  I do.

13         THE COURT:  All right.  Dr. Gill, Ms. Young is

14   under oath so you can cross-examine her.

15              DIRECT EXAMINATION OF EMILY YOUNG

16   BY MR. GILL:

17   Q    All right just a couple of quick questions, Your Honor.

18   I just have a -- Ms. Young what is your role and

19   responsibilities as a director of corporate restructuring?

20   A    I am a director in our solicitation corporate actions

21   team.  I work with companies through our (indiscernible)

22   contractor 1110, including coordinating mailing and

23   tabulating ballots.

24   Q    Are Epiq codes retained as in noticing claims and a

25   solicitation agent in this case as apprised by the Code,

1    correct?

2    A    Yes.

3    Q    You personally submitted a declaration, 2497 regarding

4    solicitation and vote tabulation?

5    A    Mm hmm.

6    Q    Did that declaration include the (indiscernible)

7    notices, (indiscernible) corporate forms, and ballot, is

8    that correct?

9    A    The declaration references the solicitation procedure,

10   yes.

11   Q    Okay.  The second set of questions I have for you in

12   regards to opt-out versus opt-in, specifically in regards to

13   arrange and compliance, just can tell me what happened.  Are

14   you aware of your Supreme Court ruling in Harrington versus

15   Purdue Pharma from 2024?

16   A    I'm aware of it, yes.

17   Q    Okay.  That decision requires affirmative knowing one

18   and three consent for third party releases, correct?

19              MR. GENENDER:  Objection, this is all legal

20   conclusions.

21              THE COURT:  Yeah, I think she's here as a fact

22   witness, Dr. Gill.  The argument as to what Purdue requires

23   is properly made to me.  But this -- she's here as a fact

24   witness to testify what actions she took.  So, I'm going to

25   sustain the objection, but you can question her on anything

1    that she you know, action that she took or other things

2    related to her work.

3              MR. GILL:  Yes, okay.  So, I'm going to briefly

4    ask about pro-state creditors of incarcerated individuals,

5    then I'm going ask one or two questions about debtor control

6    coordination, and then some constitutional objections and

7    plan confirmation related questions that I have.  I don't

8    expect her to answer every question if she doesn't know, but

9    I'm just going to ask and if the counsel has an objection,

10   we'll put that on record.

11   BY MR. GILL:

12   Q    What steps did you take, ma'am, to ensure the

13   accessibility of solicitation materials to visually

14   impaired, disabled, and ADA protected parties?

15   A    I'm -- so, you're asking if I took any specific steps

16   directly toward ADA parties?

17   Q    Yes --

18   A    (indiscernible), I --

19   Q    -- if somebody were --

20   A    So, we followed the procedures that were outlined in

21   the disclosure statement order.  So, what materials were

22   sent out and how they were sent out.

23   Q    So, replace the disclosure statement filed on or about

24   March 17th or 14th?

25   A    The disclosure statement order, so the order that

1    approved the solicitation for future risks which includes

2    sending out solicitation to any collection (indiscernible)

3    or opt-out forms in connection therewith.

4    Q    Okay.  Just to take you on record on this, was there

5    any materials produced in alternative formats like audio and

6    braille language for the blind?  Anything in large print or

7    anything in a very plain language summary?

8    A    No.

9    Q    What processes were used that ensured that incarcerated

10   creditors received actual ballots or opt-out forms?

11   A    I -- it was mentioned earlier as the receivings, the

12   sent-out hard copy materials to all prisoners doing

13   schedules and prior claimants.  We also arranged the forms

14   to be available to each prisoner, to each facility in both

15   English and Spanish and for videos to be made available for

16   checking the opt-out process.

17   Q    That comes to my next question.  What alternate forms

18   (indiscernible) in Spanish alone or were other commonly

19   used, spoken, or read languages for the incarcerated and

20   (indiscernible) populations were used?  Or was it Spanish

21   only?

22   A    I believe it's Spanish only.

23   Q    Okay.  Can you testify that every person bound by the

24   release provisions understood their rights and knowingly

25   consented?

1              MR. GENENDER:  Judgement calls for speculation.

2              MS. YOUNG:  I cannot testify to that.

3              THE COURT:  Hold on a second.  There is an

4    objection by your counsel.  I think the objection is that it

5    calls for speculation on the part of the witness and I'm

6    going to sustain that objection.

7              MR. GILL:  Thank you, Your Honor.

8    BY MR. GILL:

9    Q    I'm going to ask a second set of questions in regards

10   to ballot control, coordination, and errors.  Who prepared

11   those consent of the ballots and opt-out notices?  Was it

12   Epiq or MWE?

13   A    Can you repeat the question?

14   Q    Who prepared the content of the ballots and opt-out

15   notices?  Was it Epiq Reconstruction themselves doing that

16   or were they helped by MWE, the debtor counsel?

17   A    The forms were prepared by debtor's counsel.

18   Q    Okay.  Did Epiq coordinate with debtor's counsel to

19   design or edit the ballots or notice language?

20   A    We worked in consultation with debtor's counsel prior

21   to the solicitation process.

22   Q    Issue -- and I don't want a perfect answer on this one,

23   how many ballots were received incomplete, illegible, or

24   missing responses?

25   A    I'm sorry, are you asking how many ballots are returned

1   every month as illegible?  None.

2   Q    And how about incomplete or missing responses?

3   A    We received about (indiscernible) ballots I believe

4   that have no vote on them, they abstained from voting.

5   Q    Okay, and now, this is a really important question for

6   me.  Were those counted as consenting to releases?

7   A    Well, I would have to look at my (indiscernible) of the

8   declaration to know the exact count but I assume most of

9   them -- I believe most of them returned with the asset box

10  checked, they just chose not to (indiscernible).

11  Q    Okay, okay.  I just have three more questions for you.

12  Three or four more questions.  These are pertaining to the

13  plan confirmation and the constitutional objections.  Do you

14  believe Epiq procedures ensured full constitutional

15  compliance with the review process required -- requirements

16  laid out (indiscernible)?

17       MR. GENENDER:  Objection, foundation, and legal

18  conclusions.

19       THE COURT:  Yeah, I think you're asking her for a

20  legal conclusion.  She -- the Court approved a procedure and

21  I believe -- you can ask her whether they followed the court

22  procedure but the procedure and the ballots and everything

23  was approved by the Court in connection with the disclosure

24  statement, the hearing to approve conditional approval of

25  the disclosure statement, and then I believe that Epiq

Page 192

1    followed that but you can certainly ask her whether they

2    followed the procedures authorized by the Court.

3            MR. GILL:  I'll just move on to the next question,

4    Your Honor.

5    BY MR. GILL:

6    Q    Do you dispute the parties who did not vote, did not

7    return and opt-out, or never received the materials are

8    still being deemed to have consented to third party

9    releases?

10           MR. GENENDER:  Objection, legal conclusion.

11           THE COURT:  Sustained.  I think you're asking for

12   a legal conclusion as to whether they're still deemed to

13   have opted out.

14           MR. GILL:  Just two more questions, Your Honor.

15   BY MR. GILL:

16   Q    Can you affirm here under oath that all parties bound

17   by the third-party releases received adequate notice,

18   understood their rights, and affirmatively consented?

19           MR. GENENDER:  Objection, Your Honor, speculation,

20   and legal conclusion.

21           THE COURT:  Sustained.

22   BY MR. GILL:

23   Q    Last question, Ms. Young.  If not -- this is the last

24   question -- if not, then how can these releases survive

25   constitutional scrutiny?  And you don't have to answer that

1    but if you do have an answer, please answer.

2            MR. GENENDER:  Argumentative.

3            THE COURT:  Yes, I -- that's not really a

4    question, that's more of an argument so I'm going to sustain

5    the objection.

6            MR. GILL:  Those are -- Your Honor, those are the

7    only ones for Ms. Young today.  Thank you.

8            THE COURT:  All right.  Anyone else wish to ask

9    Ms. Young any questions?  All right, Ms. Young, you may be

10   excused.  All right, any other testimony in opposition to

11   confirmation?  All right, if there's anyone on the phone

12   that wishes to speak, please hit 5-star one time.  All

13   right, I've just unmuted Mr. Hughes I think and someone at

14   832.

15           MR. HUGHES:  Good afternoon, Your Honor, Patrick

16   Hughes here for Bell Ambulance.  I have no testimony but you

17   -- I wasn't sure if you wanted to hear, we've got

18   confirmation that we'll have a paragraph in the order that

19   will resolve those --

20           THE COURT:  All right.

21           MR. HUGHES:  -- objections.  So, unless you want

22   me to stay around, I'll depart.

23           THE COURT:  I don't need that blessing today,

24   thank you.

25           MR. HUGHES:  Okay.  Thank you, Your Honor.

1        THE COURT:  All right.  All right, Mr. Prostok, do

2   you --

3        MS. ABDELGHANI:  Good afternoon --

4        THE COURT:  Yes, go ahead, Ms. --

5        MS. ABDELGHANI:  Good afternoon, Your Honor,

6   Raneen Abdelghani for personal injury claimant, Andrew

7   Peranto.  We had a reservation of rights on the docket that

8   we just want to withdraw.  It was just in terms of

9   understanding -- we had some concerns that you had raised

10  about the plan distribution and how a personal injury

11  claimant would liquidate their personal injury claims and

12  based on the comments on the docket, I reviewed the amended

13  plan, and we also had a chance to look at the trust

14  documents, we feel comfortable withdrawing our reservation

15  rights at this time.

16       THE COURT:  Thank you.  All right, Mr. Prostok?

17       MR. PROSTOK:  Nothing at this time, Your Honor, I

18  may have just a couple of minor comments at closing.

19       THE COURT:  Okay.  All right.  All right, does

20  anyone else have any other evidence in opposition to

21  confirmation?  All right.  Mr. Madigan, just -- are you on

22  or do you need to hit 5-star one time?  All right; there you

23  go.

24       MR. MADIGAN:  No, Your Honor, if the question is

25  do we have evidence, the answer's no, I just wanted to make

1   sure that this wasn't our only opportunity for --

2           THE COURT:  No, no, no, I -- we're going to have

3   closing argument in a bit.

4           MR. MADIGAN:  Thank you, Your Honor.

5           THE COURT:  Okay.  Dr. Gill, any evidence, any

6   additional evidence?

7           MR. GILL:  No, Your Honor, just to put it on

8   record that my motion certifying one we just got out

9   yesterday, order to receive yesterday (indiscernible) is

10  reserved for an appeal.

11          THE COURT:  Yes --

12          MR. GILL:  That's all, Your Honor.

13          THE COURT:  Yes, I mean, your objection -- I mean,

14  that was -- I took judicial notice of that and that's in the

15  record.  All right.

16          MR. GILL:  Thank you.

17          THE COURT:  All right, so Ms. Perlman?  Left the

18  building.

19          MS. PERLMAN:  Thought about it, yeah.

20          THE COURT:  Okay.  So, I would like -- so, I want

21  to do closing arguments next.  I -- and so, do we have a

22  revised form of -- I need to read the findings of fact and

23  conclusions of law, I did not have a chance to read those

24  during the lunch break.  Is there a revised form of that or

25  are we -- still have what we have and we'll make the

1  changes?

2           MS. PERLMAN:  There's been one change that was

3  made that -- that was it, it wasn't to the findings.

4           MR. HEMENWAY:  It was with respect to Your Honor's

5  comment in connection with whether or not the parties would

6  -- whether or not a personal injury claimant would still be

7  able to pursue claims against the third-party insurers,

8  notwithstanding the fact that they didn't file a legal

9  claim.

10          THE COURT:  Right, okay.

11          MR. ROSEN:  So, that's been added already.

12          THE COURT:  Okay.  All right.

13          MS. PERLMAN:  And I did want to clarify one thing

14  that I'm not certain whether I answered your question

15  correctly on the third-party releases as we were going back

16  and forth and it's with respect to claims against employees

17  when there were no claims against the debtors.  If there are

18  no claims against the debtors similar to with the PCs, those

19  parties are not parties in these cases and not impacted by

20  the plan and the third-party release because they would not

21  have received notice of this and an opportunity to opt-out

22  because they're not creditors of the debtors.  And I wasn't

23  certain if that -- in our exchange if that was asked and

24  answered correctly so I wanted to clarify that.

25          THE COURT:  All right.  Hold that, because we're

1    going to do that.  You know, I'm still concerned about you

2    know, constitutional due process and we're going to talk

3    about that at -- on closing.  Okay.  So, I would like -- and

4    I don't know how long it will take me to do -- but I would

5    really like the information regarding how many proofs of

6    claim, how many proofs of claim by prisoners, and understand

7    the opt-outs.  So --

8            MS. PERLMAN:  I can give you the opt-out

9    information right now.

10           THE COURT:  Okay.

11           MS. PERLMAN:  Of the 1,291 parties have opted out

12   --

13           THE COURT:  Okay.

14           MS. PERLMAN:  -- of those, 351 are incarcerated

15   individuals.

16           THE COURT:  Okay.

17           MS. PERLMAN:  I recognize that some of the 1,291 -

18   - some of the claims that are not incarcerated individuals

19   are still liability claims but the information I have just

20   separates it by incarcerated individual versus non-

21   incarcerated individual.

22           MR. ROSEN:  Your Honor, if I may clarify, I think

23   that's from the solicitation issue, right?

24           MS. PERLMAN:  Yes.

25           MR. ROSEN:  So, I believe they're defining

1    incarcerated individual when it is the incarcerated

2    individual themselves doing it, so if an attorney is

3    representing the incarcerated individual, it would not be

4    included in that number.

5             MS. PERLMAN:  Correct, or if it's an estate

6    bringing cause of action, exactly.

7             THE COURT:  All right.  Is there a way to

8    determine how many personal injury or wrongful death claims

9    --

10            MS. PERLMAN:  Are part of the non-incarcerated --

11            THE COURT:  Yes.

12            MS. PERLMAN:  -- individual pool?  I don't know

13   the answer to that, Your Honor, we can try to follow up --

14            THE COURT:  Okay.

15            MS. PERLMAN:  -- now and see.

16            THE COURT:  All right.  Go ahead.

17            MR. HEMENWAY:  Your Honor, we have the same

18   questions that Your Honor had this morning.  I've had some

19   exchanges with McDermott and Epiq and I can tell you so far

20   as of the bar date, approximately 8,096 proofs of claim were

21   filed.  Approximately 766 of those claims had tagging from a

22   correctional facility.  As a -- in-total so far, because the

23   bar date is run, approximately 920 claims have tagging from

24   a correctional facility and there's a total of more than

25   9,000 claims that have been filed.  Of those 9,000 claims,

1   approximately 900 to 920 appear to be personal injury or

2   wrongful death claims.

3            THE COURT:  All right.  Thank you.  All right, so

4   it's 2:31, we come back at 3:00.  I'll have a chance to have

5   read the -- and then we'll do closing arguments.  All right,

6   thank you.

7            (Recess)

8            THE COURT:  All right.  Please be seated.  All

9   right.  If anyone wants to speak, please hit five-star and

10  I'll unmute your line.

11           MS. PERLMAN:  Your Honor, I'll be very, very

12  brief.  This plan is the result of significant negotiations

13  between the debtors and their key stakeholders.  It provides

14  a clear path out of Chapter 11 and liquidity to support the

15  go-forward business and provides the potential for a

16  significant recovery to unsecured creditors.

17           The evidence we presented today both through the

18  declarations and the disclosure statement exhibits and the

19  testimony of Mr. Dragelin as well as our confirmation brief

20  lay out how we meet the requirements of the Bankruptcy Code

21  regarding confirmation.

22           While there has been an objection raised with

23  respect to feasibility, Mr. Dragelin's testimony clearly

24  showed that we have liquidity on a post-confirmation basis

25  to operate the business and pay all obligations on a go-

1   forward basis.

2           With respect to third-party releases, we believe

3   our opt-out procedures are consistent with Fifth Circuit

4   precedent and the number of opt-outs show that our process

5   is working.  Over a third of the PL claimants have opted

6   out.  As you heard Mr. Oletsky say, there were just over 900

7   claims filed and 351 have opted out.  And there is still 90

8   days left of the opt-out process.

9           The third-party releases also meet the

10   requirements regarding consideration.  There is an economic

11   consideration, sweat equity so to speak, the extraordinary

12   efforts of the management team and the directors and

13   officers and the mutual releases being granted.

14           Your Honor, other than the United States Trustee,

15   the other parties objecting to the third-party releases have

16   all already opted out of the releases.  These releases are

17   integral to the plan and were key inducement to bring the

18   stakeholders together to the table to negotiate this plan.

19           Your Honor, we recognize the challenges of this

20   case, and they are significant and unique.  There is

21   significant impact on individuals and individuals that are

22   harder to communicate with and provide notice to than in

23   most cases.  We have worked very hard to make sure that all

24   of our decisions and our processes are respectful of this.

25   We have worked to provide the most notice and effort to make

1    it all understandable.  We have tried to resolve as many of

2    those objections as we can, Your Honor.  We believe this

3    plan provides the best recovery to creditors and provides

4    the best opportunity for Wellpath on a go-forward basis.

5           It's important that we confirm today and move

6    quickly to go effective.  Your Honor heard that the RSA

7    expires May 8th.  But as importantly, you have heard

8    throughout the case that remaining in bankruptcy is very

9    damaging to Wellpath.  That is why all the key stakeholders

10   are here today aligned with the global settlement and asking

11   Your Honor to confirm this plan.

12          THE COURT:  So with respect to the 90-day opt out,

13   I'm sure I won't be doing this after I've been on the bench

14   for a while, but I drafted a paragraph.

15          MS. PERLMAN:  Awesome.

16          THE COURT:  So I think Mr. Shaw can hand out a

17   copy of the paragraph.  But basically it says -- it

18   basically says that you're going to give notice of the --

19   and I think we had ten copies -- that you're going to give

20   notice of the opt out, file a certificate of service, and

21   then that the Court would take jurisdiction to the extent

22   that, you know, a claimant, a personal injury wrongful death

23   claimant did not receive constitutional due -- I think I

24   have it anyway in connection with the solicitation

25   procedures or the bar date order.

1          So truly the person who was in solitary

2     confinement, didn't know anything, or somebody who tried to

3     do it and the institution -- I mean, we've heard all of

4     those.

5          MS. PERLMAN:  Absolutely, Your Honor.

6          THE COURT:  So I have put this -- I want to add

7     this to the confirmation order so that we have -- and we can

8     send you an email so whoever is doing it on that side

9     doesn't have to retype it.

10          MS. PERLMAN:  It's not that long.

11          THE COURT:  All right.  So I'm going to -- okay,

12    thank you.

13          MS. PERLMAN:  Absolutely, Your Honor.

14          THE COURT:  All right.  Anyone else wish to be

15    heard in support of confirmation?

16          MR. DESATNIK:  Good afternoon, Your Honor.  Daniel

17    Desatnik for the Statutory Unsecured Claimholder's

18    Committee.  I just want to speak to you and also so that our

19    constituents can hear it from the Committee itself.  And

20    then I will pass the microphone to my co-counsel, Zach

21    Hemenway, to speak more to the plan broadly.

22          The Committee's position on the third-party

23    releases in this case has evolved over time, and I wanted

24    our constituents to understand why that is.

25          As you know, Your Honor, we initially opposed and

1    had very serious issues with the third-party releases in

2    this case.  When we sent a letter in the solicitation

3    package to our constituents, we advised them to opt out of

4    the third-party releases.  And the reason for that was we

5    saw these as very broad in scope and we also saw them as

6    providing no consideration.  We as part of our global

7    settlement with the Debtors worked very closely with the

8    Debtors to revise those releases and we're happy to report

9    that the third-party releases in the plan reflect all of --

10   address all of our concerns and are reflective of the

11   comments that we gave them.

12          So as you've now heard several times, the third-

13   party releases in the plans, they are mutual.  If you give a

14   release, you get a release.  And we view that as

15   consideration.

16          So while we initially told our constituents to opt

17   out, we now said -- we've still provided them with

18   information regarding the implications of such releases, but

19   we have indicated to them that they are mutual and some of

20   our constituents may decide it makes sense for them to enter

21   into these third-party releases and some of them may still

22   decide it's in their interest to opt out.

23          The other part which was important to us was the

24   scope of these releases.  They only apply to causes of

25   action in connection with the debtors.  They are not just

1   any kind of causes of action.  And they are no longer --

2   they no longer extend to the related parties of the related

3   parties.  And as you've heard us say before, we were

4   concerned that that could swallow up an unlimited universe

5   of people.  So that was removed.  And with those

6   modifications, we believe that they are appropriate in scope

7   and that because they are mutual, there can be benefit to

8   the third-party releases as well as there is an appropriate

9   and perhaps unprecedented mechanism here for opting out and

10   people having the notice of those third-party releases and

11   having now an extra 90-day opportunity if they so wish to

12   opt out of the releases.

13          So with that, we've heard the concerns by several

14   people here, the U.S. Trustee.  And we think that in this

15   case on these facts, the third-party releases are

16   appropriate.

17          We do just want to mention one thing.  That while

18   the releases are mutual, there is not a release from the

19   Debtor to those that are subject to the third-party

20   releases.  And the purpose of that, as Your Honor noted, is

21   they are getting a discharge from the Debtor.  They are

22   getting consideration in return for giving that discharge.

23   So there's no direct release from the Debtor.  And many of

24   the -- a significant part of the causes of -- a significant

25   part of the consideration to the liquidating trust are

1    causes of action that the Debtor's estates may have against

2    third parties.  So if there was a release going backwards,

3    that could affect the consideration to the trust.

4         So with that, I will pass the microphone to my co-

5    counsel, Zach Hemenway.

6         MR. HEMENWAY:  Thank you, Your Honor.  Zach

7    Hemenway for the Committee.

8         Your Honor, in representing the Committee, our

9    directive, our obligation and our fiduciary duty is simple;

10   to provide a voice to unsecured creditors.  We do that by

11   working to preserve their rights, trying to maximize their

12   recoveries here and address their concerns.  And we try to

13   use every tool the Bankruptcy Code offers to achieve a

14   result that unsecured creditors would not be able to achieve

15   on their own.

16        In a case like this, providing that voice can be

17   particularly challenging.  Our constituents include

18   individuals and families who have been dramatically impacted

19   by tragedy, incarcerated individuals fighting for their

20   rights, sometimes without the assistance of counsel, and

21   vendors who have been placed in a difficult position of

22   having to provide essential patient care during a period of

23   financial difficulty and insolvency.

24        Despite those challenges, the voice of unsecured

25   creditors has been heard here and their concerns and rights

1   have been addressed.  We've gotten what we were fighting for

2   from the start, a meaningful recovery for unsecured

3   creditors and a plan that gives them a direct path to access

4   it.

5            So on behalf of the Committee and our

6   constituents, we respectfully request that you enter the

7   order and confirm the plan and allow us to start down that

8   path as soon as possible.

9            MS. DOORLEY:  Your Honor, Kate Doorley from Akin

10  on behalf of the Ad Hoc Group.

11           As we've noted repeatedly throughout these cases,

12  the Ad Hoc Group supports the Debtor's restructuring

13  efforts.  To that end, even prior to these cases the Ad Hoc

14  Group has negotiated with the Debtors.  We supported the

15  RSA, subsequently negotiated changes with the Debtors

16  throughout the case and negotiated the resolution with the

17  Committee and the Debtors to reach this consensual plan that

18  we have before the Court today.  We thank the Debtors, the

19  Committee, the Special Committee, and other parties for

20  their efforts in getting us here today and wanted to note

21  that the Ad Hoc Lender Group remains committed to the plan

22  and to funding the Debtor's go-forward business including

23  go-forward operations, ensuring that the Debtors have

24  sufficient liquidity to satisfy their emergence-related

25  costs and obligations, support the go-forward business plan,

1  and ensure future performance for the Debtor's contract

2  counterparties and vendors.

3          Unless Your Honor has any questions for me, we

4  would request that you confirm the plan.  Thank you.

5          THE COURT:  Does anyone else wish to be heard in

6  support of the plan?  All right.

7          MAN 1:  Your Honor?

8          THE COURT:  Yes.

9          MAN 1:  I don't know if this is an appropriate

10  spot in here.  But is the 90-day period for the opt-out

11  extension, does that also permit people to withdraw their

12  opt-opts given the changes that have occurred over the last

13  couple of weeks?

14          THE COURT:  I wasn't contemplating -- I mean, I

15  think anyone can always withdraw their opt-out.  I don't

16  think there's any prohibition.  This is additional time,

17  particularly for wrongful -- personal injury and wrongful

18  death claimants to be able to opt out.  But I think somebody

19  can withdraw it at -- I believe, Ms. Perlman, I think they

20  can withdraw at any time.

21          MS. PERLMAN:  Yes, Your Honor.  If somebody wants

22  to submit a withdrawal of a previously-filed opt-out during

23  that time period, we're happy to do that.

24          THE COURT:  In essence they can file a withdrawal

25  and get a release.

1          MS. PERLMAN:  Exactly.  Exactly.

2          MAN 1:  Your Honor, I have one other question.

3    There are four entities that are similarly named; CCF, CMGC.

4    And there was a discussion earlier this morning about

5    certain entities being dismissed.

6          THE COURT:  Right.

7          MAN 1:  Is it the two entities that are listed on

8    Footnote 2, Page 5 of the plan?

9          THE COURT:  Correct.  Those are the ones.

10          MAN 1:  Those two entities are being dismissed.

11          THE COURT:  Yes.  They are not part of the plan.

12    They are not being treated under the plan.  They are going

13    to be dismissed.  They are not --

14          MAN 1:  Okay.

15          THE COURT:  Nothing I am doing today impacts them.

16          MAN 1:  Okay.  Thank you very much, Your Honor.

17          THE COURT:  All right.  All right.  Okay, who

18    wishes to be heard in opposition to the plan?

19          MS. DOORLEY:  Very briefly, Your Honor.  As you

20    know, we are also pleased about the meaningful recovery for

21    unsecureds and everybody has made such progress.  Our

22    complaint is not about that aspect of it.  It's really

23    concentrated on the third-party releases.

24          As the Court is well aware, and I'm relying on my

25    briefing and not going through all of it, but for there to

1    be a third-party release that's sustainable and in

2    compliance with supreme court law, it has to be consensual.

3    So it's not that you have 1,200 people who have opted out,

4    see it's working.  The question is for the people who didn't

5    return it, does that represent consent?  Is the only reason

6    they didn't return it because they got it, they understood

7    it, they looked at it and decided, you know what, I don't

8    want to opt out?  And I don't think there's any evidence

9    that that's the case.  We just are trying to do that.  And I

10   think the Court is completely concerned as I am both about

11   does that silence represent that they understood what their

12   rights are and they just didn't do anything.  And that I

13   think this Court has really been amazing about going the

14   extra effort to make sure that people are aware and do have

15   that opportunity.  And I do view that increasing the length

16   of time to opt out to 90 days and the language that this

17   Court has suggested does certainly expand that opportunity

18   to help give us assurance that somebody has an opportunity

19   to knowingly opt out.  And I do appreciate that.

20          So obviously the first element is consent and does

21   silence equal consent.  The second is consideration.  I know

22   we talk about mutuality of releases.  But there's no

23   evidence that there is any value to the release being given

24   to a releasing party.  What claims did this Debtor have

25   against Mr. John Smith who didn't opt out?  There's no

1   evidence that there's any real consideration of any value.

2   And that's the only thing that everybody is looking at other

3   than what a creditor would be getting under Class 6

4   according to the distribution.

5           Separate from that is the fact that there are

6   people by their silence who are being considered to

7   releasing third-party claims who may not end up with an

8   allowed claim, may not have filed a proof of claim, and yet

9   they are being considered to have released those third-party

10  claims without receiving consideration in exchange.

11          That's just our way by observation.  I appreciate

12  the accommodation.  And as my client expressly told me, this

13  one time only, the eight days is fine.  But I think that

14  both covers what the Debtor needs and having the time, the

15  plan go effective prior to the expiration of the RSA and

16  allowing people to fulfill their obligations as -- if they

17  wanted to pursue other rights after confirmation.

18          So with those comments and my briefing, that's

19  where we hold.  Thank you.

20          THE COURT:  Thank you.  All right.  Mr. Chapin?

21  Chapin?  Wait a second.  Hold on, hold on.  All right.  Did

22  I unmute you?  Hit five-star one time.

23          MS. CHAPIN:  Can you hear me now?

24          THE COURT:  I can.

25          MS. CHAPIN:  There, perfect.  Thank you so much.

1    Hi, my name is Celina Chapin.  You got it right the second
2    time.  I work with Worth Rises.  We submitted an amicus.
3    Two claimants, Cary Moone and Teesha Graham, no longer have
4    legal representation.  I am not counsel.  I am an advocate.
5    But their objection is still very important to them and they
6    were hoping that given the circumstances you would permit me
7    to read a short statement from them about why their
8    objection was important.  Would that be okay?
9              THE COURT:  Sure.  Absolutely.  Yes, absolutely.
10             MS. CHAPIN:  Okay.  Thank you so much.  I
11   appreciate it.
12             So Cary and Teesha, they represent their late
13   father, as in many families who had loved ones die or become
14   injured due to Wellpath's failure to provide even the most
15   basic medical care.  And after unsuccessful efforts to
16   negotiate with the Debtor, they would like to maintain their
17   objection on today's plan.
18             The understand that Wellpath has proposed a plan
19   that it claims will resolve its issues with professional
20   liability costs, but the improvements it's asserted are
21   insufficient to move the needle.  The concrete commitments
22   are to increase provider training and to create a hotline.
23   But as described, they are not going to do a lot.  They
24   would not have saved Cary and Teesha's father or the many
25   others who died waiting for care that never came.  It will

1    not prevent future deaths and injuries which are most often

2    tied to a lack of adequate staffing and timely clinical

3    interventions.  And because they do nothing to address these

4    structural failures driving both harm and liability, the

5    plan is still not feasible and this court or another will be

6    forced to revisit this crisis after more lives have been

7    lost.

8         They would like to just illustrate the critical

9    nature of their objection and tell you a little bit about

10   their loved ones.

11        Cary's father, Jerry, suffered from mysterious

12   mental illness.  He was incarcerated in one of the largest

13   jails in the state where the only mental health practitioner

14   was a part-time nurse working remotely to care for hundreds

15   of patients.  Jerry was placed in solitary confinement for

16   more than 200 days, unmedicated and untreated.  Every week

17   the nurse logged that he was refusing care, even though no

18   real care was ever offered.  Jerry died in the cell without

19   ever receiving the help needed.

20        The nurse later admitted that Wellpath's approach

21   was not to treat people like her father, but simply to

22   isolate them and prevent suicide until their release.  The

23   treatment was too expensive she said.  So she kept her

24   patients in isolation without medication and signed the

25   paperwork.  Cary's father died because of inadequate

1   staffing and a complete prioritization of the corporation's

2   bottom line.  So the training as they have said that they

3   will do is irrelevant if there is simply no staff to train.

4         Teesha's father became seriously ill while

5   incarcerated.  His condition worsened over the course of

6   several weeks, yet requests for medical care was ignored.

7   After a while, fellow incarcerated people finally carried

8   him to the medical unit in desperation.  But even then

9   Wellpath staff turned him away and he died shortly after.

10  His death was also caused by corporate policies that

11  deprioritized his health and failed to escalate his care.

12        And a hotline is not going to change it.  They are

13  not isolated tragedies; they are symptoms of a larger

14  pattern, one that has played out in jails and prisons across

15  the country served by Wellpath.

16        In Alameda County, for example, Wellpath was found

17  to be zero percent compliant with the basic access to care

18  standard.  In Monterey County, they failed 43 out of 44

19  performance benchmarks, and still the company insists that

20  no major changes are needed.

21        It's easy to get lost in the dollar signs in

22  bankruptcy proceedings, and I know that.  And

23  (indiscernible) that come up and tell these stories.  But

24  the claimants want you all to remember that the dollar signs

25  come at a cost of lives and deserve to be recognized.  And

1    the court is the last opportunity for accountability to

2    ensure that what happened to these families doesn't happen

3    to another.

4           Teesha and Cary's representation and advocates

5    provided the Debtors with a clear redline of what we would

6    need to withdraw our objection.  Reasonable asks like

7    staffing commitments, flag alert for hotline, annual report

8    on improvements to medical care, et cetera.  Every single

9    one of those requests were denied.  Instead, the Debtor just

10   filed a declaration with insufficient steps that are just

11   iterations of their ongoing practices.

12          So in short, closing it up, the claimants just

13   want to stress that the plan does not resolve the problems

14   that brought the Debtor into bankruptcy.  And if it is

15   confirmed as is, we will be back here with a new group of

16   victims, new lawsuits, and another claim that the Debtor

17   can't afford to pay.  So they respectfully ask the Court to

18   deny the confirmation unless and until the Debtors submit a

19   plan that directly confronts our operational shortcomings

20   and demonstrates a credible path towards both improved

21   patient care and financial stability.

22          Thank you so much.  I really appreciate your time.

23          THE COURT:  Thank you.  Are the two individuals in

24   California?

25          WOMAN 1:  I am not exactly sure, but I can find

1    that out very quickly and get back to you.

2            THE COURT:  That's okay.  If it's Alameda County,

3    that's California.

4            WOMAN 1:  Right, yeah.

5            THE COURT:  Okay.  All right.  Thank you very

6    much.  And thank you for your comments.

7            WOMAN 1:  Thank you so much.  I appreciate it.

8            THE COURT:  All right.  So -- all right.  Mr.

9    Madigan and then Dr. Gill.

10           MR. MADIGAN:  Yes, Your Honor.

11           THE COURT:  I think you -- yeah, go ahead.

12           MR. MADIGAN:  Good afternoon, Your Honor.  Thank

13   you.  TJ Madigan for Tulane.  May I proceed?

14           THE COURT:  Yes.

15           MR. MADIGAN:  Our point, our objection boils down

16   to that there has not been competent evidence submitted at

17   today's hearing carrying the burden to show that it's in the

18   best interest of the unsecured creditors that there are any

19   better off in this plan than the liquidation analysis.

20   There's nothing -- there's -- that would show that I guess

21   (indiscernible) up to seven-and-a-half million and over time

22   an additional $5 million.  And there's some money held in

23   trust upwards of $3 million that may be released.  What

24   we're looking at is $300 million or so in unsecured debt

25   that needs to be administered in a claims reconciliation or

 1    resolution process.  The testimony from the witness stand is

 2    there's been no analysis to know whether those dollars would

 3    be sufficient to even perform that administrative process,

 4    going through that reconciliation.  And it appears that that

 5    could be a very close call where we are in a net zero

 6    situation, meaning there has been some reference to the

 7    takeback debt, but that's just debt.  It's not actual new

 8    money or dollars or assets that are going into the

 9    liquidation trust.  And the liquidation trust is the only

10    source from which the unsecured creditors are going to be

11    able to be paid.

12          There was also testimony about these causes of

13    action that are being transferred in liquidating trusts.

14    The testimony from the witness stand was that the witness

15    did not testify if there was anything greater than a net

16    zero coming from those transfer causes of action.  Similarly

17    I think there was the same net effect with respect to the

18    avoidance claims.

19          So the evidence and testimony that's been

20    submitted today doesn't show that there's anything greater

21    than a net zero.  It appears equally likely, like I said at

22    the front end, Your Honor, that there could be a zero-dollar

23    recovery than any recovery basically because no analysis has

24    been done in that regard.  I realize some of that would fall

25    to the liquidation trustee and all professionals and

1    everybody that works for the liquidation trustee, the

2    liquidation trust.  But some analysis should be done on the

3    front end in order for unsecured creditors to understand

4    that there may be some real possibility of recoveries in

5    order to meet that threshold and carry that burden to show

6    if they're better off than they would be under the

7    liquidation analysis.

8         And so again, just not enough competent evidence

9    to meet the burden and also not enough competent evidence to

10   confirm there's adequate means for administering the

11   liquidation trust or that this is in the best interest of

12   the creditors.  And that's the main point.  I think there's

13   been enough discussion and record made on the third-party

14   releases.  I won't add to that, although we do see a lot of

15   issues there.  And so that's the objection that we would

16   like to submit on behalf of Tulane, Your Honor.

17        THE COURT:  All right.  Has Tulane opted out?

18        MR. MADIGAN:  Yes, Your Honor.

19        THE COURT:  Thank you.  All right.  Mr. Gill and

20   then Mr. Prostok.  Dr. Gill and then Mr. Prostok.

21        MR. GILL:  Your Honor, I appear before this Court

22   as the only verified statutory objector who has seen this

23   case through from the moment of filing to the eve of

24   confirmation.  I did not object lightly.  I objected because

25   the plan is unconstitutional, procedurally fraudulent, and

1   riddled with perjured declarations and (indiscernible)

2   facts.  I find (indiscernible) verified (indiscernible),

3   Docket 2563 and unprecedented evidentiary and legal

4   submission totaling over 176 pages of verified facts, law,

5   and relief motions.  The (indiscernible) was filed under

6   oath.  It contains what (indiscernible) placement on the

7   docket (indiscernible) and its arguments, every single one,

8   left unanswered by the parties who now ask this Court for

9   final approval.

10          Your Honor, let me speak plainly; this Court

11   cannot confirm a plan that rests on false declarations,

12   false (indiscernible) and suppression of live testimony.

13          During cross-examination I asked Emily Young,

14   director of Epiq Restructuring and (indiscernible) Docket

15   2497 about whether third-party releases were opt-in or opt-

16   out.  She directed towards court approval (indiscernible)

17   unless they are found in direct violation with Harrington,

18   which is Purdue Pharma, which requires affirmative consent.

19          When I asked her on (indiscernible) accessibility

20   for blind, disabled, incarcerated or pro se creditors, she

21   admitted under oath that there was no special language for

22   blind, no large print, and no translations other than

23   Spanish (indiscernible).  This is textbook due process

24   failure (indiscernible) and a violation of Americans With

25   Disabilities Act.

1          And then, you know, I was cut out repeatedly.  She

2     was prevented from answering further foundational questions.

3     Her sworn declaration was accepted.  Her live testimony was

4     not.  That is not adjudication.  That is procedural

5     (indiscernible).  I cross-examined Timothy Dragelin, the

6     plan's central declarant and (indiscernible) of the Debtors.

7     In  Docket 2525 he (indiscernible) perjury that the plan was

8     feasible in part due to availability of (indiscernible).

9     And Docket 2547, days later, he divorced that position,

10    stating that same assets were inaccessible to me and

11    returned to the estate.  That contract extended

12    (indiscernible) a footnote.  It's perjury.

13         He also admitted that he had no knowledge of

14    (indiscernible), no board resolution of insolvency, no

15    (indiscernible) letter and no (indiscernible) in 2022 under

16    (indiscernible) protection.  He testified as a fiduciary.

17    He left the law blank.  That is (indiscernible) not

18    compliant.  Your Honor, confirmation under 1129(a) requires

19    good faith, full disclosure, and (indiscernible)

20    constitutional process.  This plan fails every one of those

21    (indiscernible).  It was not proposed in good faith.  It's

22    conceived of (indiscernible) objection (indiscernible)

23    declaration that deems creditors bound to non-debtor

24    (indiscernible) without consent and it (indiscernible) over

25    evidence.  (indiscernible).

1        I ask this Court to respectfully urgently to deny

2    confirmation.  If the Court proceeds despite this record, I

3    will file a Rule 60(b)(3) and (d)(3) motion based on fraud

4    on the Court.  (indiscernible) and I will initiate

5    (indiscernible) the Department of Justic, the U.S. Trustee

6    Program, and the federal grand jury under 18 U.S.C. 1519 and

7    3332.  What happened in the courtroom today was not

8    adjudication; it was obstruction.  And I refuse to let it

9    define the laws' integrity.  Thank you, Your Honor.

10        THE COURT:  Thank you.  All right.  Mr. Prostok?

11        MR. PROSTOK:  Thank you, Your Honor.  You've

12    basically heard my closing during my opening.  I'm not going

13    to repeat it.  We fully briefed the issues.  We know this is

14    a difficult case.  I commend the parties; I commend Your

15    Honor for handling this in the manner you've handled it and

16    for treating those that are in difficult situations with

17    respect and giving them an opportunity to be heard.

18        Your Honor, you understand the issues.  You

19    understand my client's position and we'll rest on that.

20        THE COURT:  Thank you.  I did include that second

21    sentence in here to address the issues that you raised.  So

22    to the extent that an incarcerated person has not received

23    constitutional due process either with respect to the proof

24    of claim or the opt-out and solicitation procedures, I'm

25    going to retain jurisdiction to make that determination.

1              MR. PROSTOK:  Thank you, Your Honor.

2              THE COURT:  All right.  Anything further?

3              MS. PERLMAN:  No, Your Honor.

4              THE COURT:  Nothing?  Okay, thank you.  All right.

5         Let me start by first of all thanking everyone for

6    all of the hard work.  And I do agree with the U.S. Trustee

7    that we ended up from a recovery standpoint at a place where

8    I never thought we were going to end up at the beginning of

9    the case.  I think that when you look at the economics, the

10   senior secured creditor is getting a 50-cent recovery.  The

11   second lien is getting the same recovery as the unsecured

12   creditors.  The first lien lenders have waived their

13   deficiency claim and have provided the trust with 13 percent

14   of the reorganized equity after the hurdle was met.  That's

15   in my mind an unprecedented result.

16             At the end of the day do I know what that's worth?

17   No.  But I know it's worth more than the .08 percent -- or I

18   thought less, Mr. Giordano kept saying it was saying more,

19   but I don't know if I believed him.

20             But I really do think that we have to start with

21   Ms. Doorley's client and what they're doing with respect to

22   this because it really does set the tone for the rest of the

23   case.

24             There's no question in my mind based on the

25   uncontroverted testimony that a liquidation in this

1      circumstance would be an unmitigated disaster.  Not only

2      would the recoveries be significantly less than they are

3      now, but secured creditors would basically get nothing.  But

4      you would also significantly jeopardize patient care.  And I

5      can't put a number on that.  That is very, very, very

6      problematic.  And I think by doing -- by confirming this

7      plan, we address that issue.

8            Notice, particularly for the incarcerated

9      individuals, has been a significant problem in this case

10     from day one.  I think that this is a conversation that we

11     had with the Debtors and the U.S. Trustee day one.  We had

12     it with the Committee day two when Ms. Goodman was appointed

13     as the ombudsman.  We've had it day three and we've had it

14     every week since then.  Mr. Kapp has heard me talk about

15     that repeatedly.  And I think that under the circumstances I

16     don't know what more could have been done.  And a lot of it

17     was just trial and error.  And one day it worked with one

18     prison, and the next day the same thing didn't work with the

19     other prison.  You know, every day I get something like

20     that.  And that's really been my biggest concern.

21           And in particular as it relates to personal injury

22     and wrongful death claims.  I think as it relates to the

23     common commercial creditors who chose to do business with

24     the Debtor, that in that circumstance those individuals can

25     protect their rights.  But for the incarcerated or formerly

1    incarcerated who have moved around and who haven't been

2    served, that's something that I don't think we could have

3    done enough ever to do that.  And that's in part why I want

4    to preserve jurisdiction to address that.  Because the

5    releases in my -- this is not a situation where the trust is

6    being -- as Ms. Perlman has told me repeatedly, this company

7    filed because of the debt ball.  It didn't file because of

8    the personal injury claimant.  Nevertheless, we've had many

9    personal injury claimants.  And as it relates to anybody who

10   has a post-petition claim, they're going to ride through.

11   I'm not concerned so much about them.  It's really anything

12   that happened that there was a prepetition claim and those

13   individuals are the ones that are the most impacted by that.

14          I believe, and I think the numbers demonstrate,

15   that to the extent someone has had constitutional due

16   process, significant number of individuals had opted out.

17   This is not the situation where you sometimes get one-tenth

18   of one percent that have opted out.  We've had a significant

19   number of individuals that opted out.  It has worked.  And

20   to the extent the reason that someone hasn't opted out is

21   because they didn't get the due process, we've reserved that

22   issue for another day.  But I do believe that the

23   consideration that was provided, the fact that if the first

24   lien lenders would have insisted on full recovery before

25   anyone got anything, the fact that we -- they're getting at

1    best under this plan a little bit over 50 percent recovery,

2    that that in my mind provides the consideration -- and the

3    fact that they're going to be the primary owners of a

4    business that they want to thrive, to hopefully have an

5    opportunity to actually see the company thrive, grow, and

6    move forward.  And to that extent, the bankruptcy allows the

7    company to get a discharge and allows the company to move

8    forward and look forward as opposed to looking back.  And

9    I'm not naïve enough not to know that there's still going to

10   be an overhang regardless of what happens, but that's the

11   case.

12          So in my mind, that's the context of how I would

13   rule on the plan.

14          So as it relates to the technical requirements of

15   the Bankruptcy Codd 1129, I do find based on the evidence

16   that has been presented that the Debtor has met the

17   requirements of 1129(a), that the plan was proposed in good

18   faith, it was done in order to compromise the claims that

19   have been brought, and it was done in order to be able to

20   move forward with the company on a go-forward basis.

21          Second as it relates to the cramdown requirement

22   of 1129(b) as a result of the objecting class, I do find

23   that the plan is fair and equitable.  And I believe Ms.

24   Perlman has convinced me that it doesn't discriminate

25   unfairly as it relates -- because people had different

1    rights.

2            Second, as it pertains to the other provisions of

3    1129 and 1123, I believe that the plan has complied with the

4    technical requirements and I think the testimony that we

5    have is uncontroverted.  And I also think -- I have read all

6    of the declarations very carefully.  Mr. Dragelin's

7    declaration, Ms. Young's declaration, Mr. Tempke's

8    declarations.  I think those declarations were clear, I

9    think those declarations address the issues before the

10   court, and I think those declarations were provided in good

11   faith and that they provided the evidentiary basis to be

12   able to rule against -- to confirm the plan and overrule the

13   objections.

14           Again, the exculpation provision, that was fixed.

15   As I said, the release provisions, I believe that he is --

16   that they are consensual.  There has been a consideration

17   provided.  And to the extent that someone didn't receive

18   constitutional due process with respect to either the

19   solicitation procedures or the bar date, I've reserved on

20   that.

21           I think that the most important aspect of this is

22   that while this certainly isn't perfect, while I wish that

23   the Debtor had Santa Claus bring in $100 million and could

24   put it on the balance sheet, that's just not reality.  And

25   the Debtor has done and the Committee, working with the

1    Committee and working with all of the constituents has done
2    a really admirable effort of trying to accomplish a
3    resolution where it's not perfect, but it's better than any
4    other proposal, number one.  And number two, it is also in
5    my mind the only proposal.
6         I am also -- on that basis I'm also going to
7    approve the 9019 that was presented earlier this morning.  I
8    think that on the basis of the evidence presented, the
9    declaration of Mr. Bartels, the arguments made, I think that
10   it's in the best interest of creditors.  It falls within the
11   range of reasonableness and I think that it is a key
12   component of the plan.  So I am approving that as well.
13        And as I said, I really commend all of the parties
14   for their hard work.  My understanding is that we are going
15   to have an eight-day stay of the order.  Is that correct?
16        MS. PERLMAN:  Correct.  Stay through May 8th.
17        THE COURT:  Through May 8th.  Okay, sorry.
18   Through May 8th.  Okay.  So that's a nine-day stay.  All
19   right.  So --
20        MS. PERLMAN:  Excuse me, Your Honor.  through May
21   7th.  We (indiscernible) on the 8th, so...
22        THE COURT:  Okay, May 7th.  Okay.  So that's eight
23   days.  All right.  So we would just need to put that in
24   there.  And with that, as I said, I will approve the plan.
25   I will approve the 9019 and then we need to make a few

1      changes to both the plan and the confirmation order.  So to

2      the extent -- I'll enter those as soon as I get them.  But

3      take your time and make sure that everything is included in

4      there.  All right.

5           So Mr. Kapp, yes.

6           MR. KAPP:  Your Honor, just one thing.  I assume

7      that we'll be filing a supplemental plan supplement which

8      will include all of the final documents including the one I

9      was referencing earlier today.

10          THE COURT:  Thank you.  Okay.  Yeah.  And in my

11     mind, so long as those documents are consistent with the

12     plan -- I mean, I'll review them, but I don't anticipate

13     having any issues.

14          MR. KAPP:  Thank you, Your Honor.

15          MAN 1:  And, Your Honor, we would ask the Court to

16     admit for purposes of confirmation the exhibits identified

17     at Docket 2556.  Some the Court can take judicial notice of.

18     Some are attached to that filing.  We are not offering the

19     emails that are at Docket 2556-11 through 16.  We didn't

20     need those.  But we would ask the Court to admit the rest of

21     them.

22          THE COURT:  All right.  So other than the

23     documents at 2556-11 through 16, does anyone object to the

24     admission of the other documents attached to 2556?

25          Okay, hearing no objection, those will be

1    admitted.

2              (Docket 2556 entered into evidence)

3              MR SZANZER:  Your Honor, Steven Szanzer from

4    McDermott.  Just wanted to know for the revised drafts would

5    Your Honor prefer them being uploaded to you, or do you want

6    us to file it as a notice with the redlines?

7              THE COURT:  As a notice with the redlines.

8              MR. SZANZER:  Thank you, Your Honor.

9              THE COURT:  And please redline to the one from

10   earlier in the day, not the one from last night.  The one

11   from -- that I had at 5:00 yesterday.

12             MR. SZANZER:  5:00 yesterday.  Okay.

13             THE COURT:  So there was another -- I guess maybe

14   two more drafts now.  All right.

15             MR. KAPP:  Good afternoon, Your Honor.  Jay Kapp

16   on behalf of the Debtors.  And this is the Debtor's motion

17   to further extend the stay at Docket Number 2044.

18             Your Honor, I've got a heck of a spiel.  But we've

19   been going since 8:30 and I kind of see the writing on the

20   wall.

21             THE COURT:  May 7th.

22             MR. KAPP:  May 7th.  So I can do my -- it's really

23   good, but if we're going to extend the -- this Court entered

24   an order extending the stay to three categories of non-

25   debtor defendants on Docket Number 1480.  And that goes to

1    the earlier of the plan effective date, dismissal, or April

2    30th.  So if the Court is proposing that we extend the order

3    and also the corresponding professional corporation order

4    which was Docket Number 1473, if we extend both of those,

5    the earlier of plan confirmation or May 7th, Your Honor, we

6    would be agreeable to that.

7              THE COURT:  Okay.  We'll do that.  And just do a

8    very short order that says this paragraph in the prior order

9    is amended and then bold May 7th.  Because that's the only

10   difference.

11             MR. KAPP:  We will do that.

12             THE COURT:  Ms. Lee can handle it, I'm sure.

13             MR. KAPP:  She's probably already done it, Your

14   Honor.

15             And then, Your Honor, with that done, we go to the

16   miscellaneous motions.  And I have the first one before you

17   which is the status conference on the standing order.

18             If you remember, Your Honor, we had this

19   discussion last week.  And I have a feeling that that order,

20   after you've now told me that I should send in a short

21   order, that this order may be too long for you.  And we did

22   submit this -- Ms. Goodman is online and we did work with

23   her to submit this.  We tried to make it easier to

24   understand in Paragraph 4 and filed an amended standing

25   order.  But we are available for any questions or concerns

1    Your Honor has.

2           THE COURT:  Yes.  Ms. Goodman, I have reviewed

3    this.  And so I didn't have a particular issue with respect

4    to this.  I know that when we spoke last time, we wanted to

5    make sure that we individualized some of the orders as

6    opposed to collecting them.  Then I should have not, but I

7    signed an order that was kind of a collective order with

8    respect to the extension of the stay and the lift stays.

9           So I am inclined to signing this, but I just

10   wanted to make sure that everybody thought that this would

11   be helpful.  And Ms. Goodman, I look to you to tell me that.

12          MS. GOODMAN:  For reviewing the...

13          THE COURT:  I just unmuted you, Ms. Goodman.  So

14   would you please start over again?

15          MS. GOODMAN:  Suan Goodman, Healthcare Ombudsman.

16          I think my concerns -- you know, again, I don't

17   pretend to understand all of the ins and outs of the

18   bankruptcy law like all the esteemed people who have spoken

19   today.  And I am very appreciative of all their efforts and

20   the efforts of the court.

21          With that said, there are self-represented

22   litigants that are set for a May 20th hearing.  And I think

23   what's a little confusing about all these dates is how that

24   meshes together.  And I think I was just looking for a way

25   as we're continuing to have people write in saying, you

1   know, please appoint counsel or please send me a complete

2   copy of the docket or, you know, I went back with my

3   injunctive relief order and they're still telling me I can't

4   sue them.  And I know it doesn't solve all of that.  I think

5   again it's sort of in the bucket of the notice stuff where

6   there's just our best attempts to try to provide something

7   for those individuals.  I am painfully aware that this is

8   probably something I would have thought about months ago.

9   I'm not sure this late in the game that it's going to be

10  particularly helpful.  But the intent was certainly good on

11  Debtor's part and ours in terms of trying to get something

12  that works for that.

13          As to the batch orders, my concern is really more

14  not every location is willing to help personally serve those

15  or get those out on kiosks.  But for those locations that

16  are, it's really difficult to ask somebody to serve

17  something that just was a pleading.  I mean, that pleading

18  means nothing to a DOC administrator or person.  What means

19  something is the inmate's name and their number that is

20  associated, their DOC number.

21          So to the extent that, you know, I'm not here to

22  Monday morning quarterback anybody on how stuff goes.  I'm

23  just observationally saying that to the extent that we

24  continue to all be painted about notice, myself included, I

25  was just trying to offer feedback that it's really difficult

1    to ask anybody to facilitate that when it's an order that

2    lists pleadings stating names and not really those two

3    identifiers' name and DOC number that would make someone

4    feel -- and then I am humbled by orders that maybe people

5    who don't get along in the correctional setting have

6    information about each other based on some of those numbers

7    and in trying to avoid -- you've heard some of the stuff

8    that's come before the court where somebody filed a POC or

9    something under their name.  You know, and some of the

10   behavioral stuff that seems to be going on, I was trying to

11   be sensitive to that.

12          But whatever the brighter minds than me, all the

13   esteemed minds -- I'm at the little kid table.  I'm not at

14   the big kid table, but those are my two cents.

15          THE COURT:  No, Ms. Goodman, you've been at the

16   big kid table all along.

17          MAN 2:  So, Your Honor, we would submit that the

18   standing order be entered.

19          THE COURT:  Okay.  Okay.  That has been signed and

20   sent to docketing.  So I didn't ask, is the form of order

21   for the 9019 the same form or order or is there going to be

22   a different form of order?

23          MR. AGAY:  Good afternoon, Your Honor.  David Agay

24   for the Debtors.  I think we have some tweaking to do.  So

25   we'll resubmit it.

1           THE COURT:  All right.  Because I could have

2     entered that one as well.

3           MR. GIARDINO:  Brad Giardino.

4           THE COURT:  You're back.

5           MR. GIARDINO:  I am.  I am.  So there's a number

6     of I guess miscellaneous matters that are on the agenda.

7     Frankly for a number of these we weren't sure whether they

8     were technically up for debate or not.  But to the extent

9     they are, a number of them are from Dr. Gill requesting --

10          THE COURT:  Yes.  So I put them on the agenda

11    because I considered them to be objections to the plan.  And

12    in particular the last two filings, the 75 and 1 and the 43

13    and 1.  Those were included in there.  We'll hear those in

14    the ordinary course.  But to the extent they were objections

15    to the plan, then they would be considered.  And obviously

16    in connection with my ruling, I overruled all of those

17    objections.

18          MR. GIARDINO:  Understood.  And thank you for the

19    clarification.  So we'll address those at a different

20    hearing.  With that, I'm not sure that there's anything

21    additional on the agenda.

22          THE COURT:  Thank you.

23          MAN 2:  Your Honor, if the Court is inclined,

24    could we get some guidance from the Court on how you would

25    like us to respond to these -- I think they are amended.  So

1    it would just be the 75 and 1 as the live one.  They are --

2        THE COURT:  Some of them are live.  Some of them

3    may not be live.  And I think we've just -- I mean, probably

4    a paragraph.

5        MAN 2:  And is the Court going to hear all of them

6    at once or should we try to --

7        THE COURT:  Yes.  I'm going to set them all for

8    the May 20 along with Dr. Gill.

9        So, Dr. Gill, to the extent you're still on, I'm

10   going to see all of your motions for the same time as your

11   motion to lift stay on May 20th.

12       MR. GILL:  So we are continuing.  It's not you've

13   ruled on it, but you --

14       THE COURT:  No, I have ruled -- yeah, Dr. Gill,

15   I've ruled on your plan objections.  I have not ruled on

16   your motions yet.  But to the extent your motions constitute

17   a plan objection, I have ruled on them.  But I need to

18   provide the other side an opportunity to respond with

19   respect to the motions that you filed that are still live.

20       MR. GILL:  Thank you.

21       MAN 2:  And then, Your Honor, just so we are all

22   on the same page, when I see an amended motion, I think the

23   42 are gone and now I just have the 75.  I want to make sure

24   that's the appropriate --

25       THE COURT:  Dr. Gill, do you agree with that, that

1    the live pleading is now the 75 and 1, not the first one?

2           MR. GILL:  Yes.  So for our purposes, we are only

3    looking at 75 to 1.  We are not looking at any of the old

4    ones.  This is an amendment to the old ones.

5           THE COURT:  Okay, all right.  So for purposes on

6    May -- so I'm going to put this on the record so we have a

7    clear record of it.  So for purposes of the May hearing

8    date, we have continued Dr. Gill's motion to lift stay and

9    we are setting the motion to the 75 and 1 that was filed on

10   the docket today for May 20th.

11          MAN 2:  And to the extent any of those 75 were

12   plan objections, we don't need to respond to those.  Those

13   have been ruled on today.

14          THE COURT:  No.  Because, I mean, you can just put

15   a paragraph saying we're not responding because they've been

16   -- because there was a plan objection.

17          MAN 2:  Thank you, Your Honor.

18          MR. GILL:  Thank you, Your Honor.

19          THE COURT:  All right.

20          MS. PERLMAN  Your Honor, we have nothing else on

21   the agenda.

22          THE COURT:  Okay.  Ms. Goodman?

23          MS. GOODMAN:  I just want to make sure -- this is

24   more for the McDermott.  But the simplified instructions,

25   Docket Number 2277, that's a Ouachita River inmate.  Do we

1    know if he has filed a proof of claim or where that is?  Or

2    does that get moved or is that moot?  I just want to make

3    sure I didn't miss something there.

4           THE COURT:  What docket is that?

5           MS. GOODMAN:  No, it's on the agenda.  But I am on

6    the older agenda.  I apologize.  It was under miscellaneous

7    5C motion for simplified instructions.

8           MAN 2:  Docket Number 2277.

9           THE COURT:  2277.

10          MS. GOODMAN:  Yeah.  It was just on the agenda

11   today.  I just want to make sure.

12          MS. PERLMAN:  Your Honor, we believe that item is

13   now moot.

14          THE COURT:  Yeah.  I thought that was a plan

15   objection.

16          MS. GOODMAN:  Okay.

17          THE COURT:  Okay.  Thank you.

18          MS. GOODMAN:  Thank you.

19          MS. PERLMAN:  Your Honor, before we conclude, I

20   just wanted to take a moment to thank, starting with you and

21   your chambers.  This has been a challenging case with

22   notices and pleadings coming in in unusual ways and I know

23   requiring a lot of extra effort from the clerk, to thank

24   you.

25          To also thank the other parties.  We would not

1    have been here but for the efforts of both the lenders,

2    their advisors, the Committee and their advisors and the

3    special committee and the counsel there.  So I want to thank

4    them as well.

5            To the Wellpath management team and board who

6    yeoman's work to keep this company going, providing the

7    quality of care they did during this and maintaining

8    customer relationships.

9            And a special thank you to my team, who many of

10   whom thought they were getting involved in a case for a week

11   to be a little busy, and six months later haven't stopped

12   working on it.  So appreciate all their effort with the

13   things that have popped up.  Many of you who have not been

14   in court today in different matters, and some of who you've

15   seen regularly.  So that's it.

16           THE COURT:  All right.  No, I am very, very, very

17   appreciative of all of the hard work that was done, the fact

18   that this could have been a disaster and it really has in my

19   mind had a result that obviously while we hope it would have

20   been better, it's been a very, very satisfying result from

21   where we started.  So I want to thank all the parties and

22   all the effort that was done.  And especially on the

23   noticing issues, which in my mind have really been the most

24   troublesome aspect of this.  Mr. Hirsch, Ms. Goodman, the

25   Committee and all the people, Ms. Perlman, really have done

1    in my mind a very competent and empathetic job of addressing

2    what is an inherently difficult, difficult situation.

3              So thank you all and you are excused.  So give me

4    a minute to get out of all of this and then I'll leave the

5    bench.  But thank you all.

6         (Proceedings adjourned at 4:01 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATION

2

3     I certify that the foregoing is a correct transcript from

4     the electronic sound recording of the proceedings in the

5     above-entitled matter.

6

7     Sonya M. Ledanski Hyde

8

9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  May 5, 2025
```