**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| WELLPATH HOLDINGS, INC., *et al.*,[1] | Case No. 24-90533 (ARP) |
| Post-Restructuring Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 2321, 2555** |

**NOTICE OF FILING FINAL PLAN SUPPLEMENT DOCUMENTS
FOR THE DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

**PLEASE TAKE NOTICE THAT**, on May 1, 2025, the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") entered an order (the "Confirmation Order") (a) approving on a final basis the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and Certain of its Debtor Affiliates* (the "Disclosure Statement") and (b) confirming the *First Amended Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. And Certain of Its Debtor Affiliates (with Technical Modifications)* (as modified, amended, or supplemented from time to time, the "Plan") [Docket No. 2596].[2]

**PLEASE TAKE FURTHER NOTICE** that, on April 18, 2025, the Debtors filed the *Notice of Filing Plan Supplement for the Debtors' Joint Chapter 11 Plan of Reorganization* [Docket No. 2321].

**PLEASE TAKE FURTHER NOTICE** that, on April 29, 2025, the Debtors filed the *Notice of Revised Plan Supplement Documents for the Debtors' Joint Chapter 11 Plan of Reorganization* [Docket No. 2555].

**PLEASE TAKE FURTHER NOTICE** that attached hereto are the drafts of documents or forms of documents set forth below, which form the Plan Supplement:

| | |
|---|---|
| **Exhibit A** | New Organizational Documents |
| **Exhibit B** | Directors and Officers of Reorganized Wellpath |

---

[1]   A complete list of the Post-Restructuring Debtors (as defined in the Plan) in these chapter 11 cases may be obtained on the website of the Post-Restructuring Debtors' claims and solicitation agent at https://dm.epiq11.com/Wellpath.  The Post-Restructuring Debtors' service address for these chapter 11 cases is 3340 Perimeter Hill Drive, Nashville, Tennessee 37211.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Confirmation Order or the Plan, as applicable.

| | |
|---|---|
| **Exhibit C** | Equity Financing Documents |
| **Exhibit D** | Takeback Facility Documents |
| **Exhibit E** | Rejected Executory Contracts and Unexpired Leases Schedule |
| **Exhibit F** | Schedule of Retained Causes of Action |
| **Exhibit G** | Schedule of Liquidating Trust Causes of Action |
| **Exhibit H** | Restructuring Transactions Memorandum |
| **Exhibit I** | Liquidating Trust Documents |
| **Exhibit J** | Liquidating Trustee and Members of Liquidating Trust Advisory Board |
| **Exhibit K** | Liquidating Trust Cooperation Agreement |

**PLEASE TAKE FURTHER NOTICE** that the Post-Restructuring Debtors reserve all rights, in consultation with or with the consent of the Ad Hoc Group and the Committee, to the extent required under the Plan (as may be amended, supplemented, or modified), to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained herein in accordance with the terms of the Plan at any time before the Effective Date of the Plan or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court, upon notice to the Ad Hoc Group and the Committee.

**PLEASE TAKE FURTHER NOTICE** that the forms of the documents contained in the Plan Supplement are integral to—and, for the avoidance of doubt, are considered part of and incorporated by reference into—the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, or related documents, you should contact Epiq Corporate Restructuring, LLC, the Claims and Solicitation Agent retained by the Debtors in these chapter 11 cases (the "Claims and Solicitation Agent"), by (a) writing to Wellpath Holdings, Inc., c/o Epiq Ballot Processing, 10300 SW Allen Boulevard, Beaverton, OR 97005, (b) emailing WellpathInfo@epiqglobal.com, or (c) calling the Debtors' restructuring hotline at (888) 884-6182 (US toll free) or (503) 479-4073 (international). You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.txs.uscourts.gov. Copies of certain orders, notices, and pleadings, as well as other information regarding these chapter 11 cases, are also available for inspection free of charge online at https://dm.epiq11.com/Wellpath.

Dated:  May 9, 2025
Dallas, Texas

*/s/ Marcus A. Helt*

Marcus A. Helt (Texas Bar #24052187)
MCDERMOTT WILL & EMERY LLP
2501 N. Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone:     (214) 295-8000
Facsimile:     (972) 232-3098
Email:         mhelt@mwe.com

-and-

Felicia Gerber Perlman (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
Jake Jumbeck (admitted *pro hac vice*)
Carole Wurzelbacher (admitted *pro hac vice*)
Carmen Dingman (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
444 West Lake Street, Suite 4000
Chicago, Illinois 60606-0029
Telephone:     (312) 372-2000
Facsimile:     (312) 984-7700
Email:         fperlman@mwe.com
               bgiordano@mwe.com
               jjumbeck@mwe.com
               cwurzelbacher@mwe.com
               cdingman@mwe.com

-and-

Steven Z. Szanzer (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, New York 10017
Telephone:     (212) 547-5400
Facsimile:     (212) 547-5444
Email:         sszanzer@mwe.com


*Counsel to the Post-Restructuring Debtors*

## Exhibit A

**New Organizational Documents**

*Execution Version*

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**NEW WPCC PARENT, LLC**

(a Delaware limited liability company)

Effective as of

May 9, 2025

THE MEMBERSHIP INTERESTS REFERENCED IN THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES AND THEIR OFFER AND SALE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE. THE MEMBERSHIP INTERESTS THAT ARE REFERENCED HEREIN MAY NOT BE OFFERED, SOLD, PLEDGED, HYPOTHECATED, TRANSFERRED OR OTHERWISE DISPOSED OF UNTIL THE HOLDER THEREOF PROVIDES EVIDENCE SATISFACTORY TO THE COMPANY (WHICH, IN THE DISCRETION OF THE COMPANY, MAY INCLUDE AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY) THAT SUCH SALE, OFFER, TRANSFER, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION WILL NOT VIOLATE APPLICABLE FEDERAL OR STATE SECURITIES LAWS, EXCEPT IF THE OFFER OR SALE HAS BEEN REGISTERED AND/OR QUALIFIED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS OR AN EXEMPTION FROM REGISTRATION AND/OR QUALIFICATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS IS AVAILABLE. THERE IS CURRENTLY NO TRADING MARKET FOR THE MEMBERSHIP INTERESTS, AND IT IS NOT ANTICIPATED THAT ONE WILL DEVELOP. THERE ARE RESTRICTIONS UPON THE TRANSFERABILITY AND VOTING RIGHTS OF THE MEMBERSHIP INTERESTS SET FORTH HEREIN. NO SALE, TRANSFER, OR OTHER DISPOSITION BY A MEMBER OF ITS MEMBERSHIP INTERESTS MAY BE MADE EXCEPT IN ACCORDANCE WITH THE TERMS SET FORTH HEREIN. THEREFORE, MEMBERS MAY NOT BE ABLE TO READILY LIQUIDATE THEIR INVESTMENTS.

Article I DEFINITIONS ........................................................................................................... 5
    1.1    Definitions. ...................................................................................................... 5
    1.2    Construction; Usage Generally ..................................................................... 11
    1.3    Cross References to Other Defined Terms .................................................... 11

Article II THE COMPANY AND ITS BUSINESS................................................................... 14
    2.1    Formation ....................................................................................................... 14
    2.2    Company Name .............................................................................................. 14
    2.3    Effective Date ................................................................................................ 14
    2.4    Term................................................................................................................ 14
    2.5    Offices ............................................................................................................ 14
    2.6    Registered Office and Registered Agent........................................................ 14
    2.7    Filings; Authorized Persons ........................................................................... 14
    2.8    Ratification Purposes ..................................................................................... 14
    2.9    Purposes ......................................................................................................... 14
    2.10   No Partnership ............................................................................................... 14
    2.11   Non-Voting Equity Securities ........................................................................ 15

Article III CAPITAL CONTRIBUTIONS; DISTRIBUTIONS .............................................. 15
    3.1    Admission...................................................................................................... 15
    3.2    Additional Capital Contributions .................................................................. 15
    3.3    No Interest in Company Property ................................................................... 15
    3.4    Distributions. .................................................................................................. 16
    3.5    Distribution Rules .......................................................................................... 17

Article IV MEMBERSHIP INTEREST ................................................................................... 17
    4.1    Membership Interest ...................................................................................... 17
    4.2    Designation of Membership Interest .............................................................. 18
    4.3    Issuance of Membership Interests; Register; Transfer.................................... 18
    4.4    Certificates .................................................................................................... 18
    4.5    Fractional Interests ........................................................................................ 19
    4.6    Persons Bound By Membership Interests ....................................................... 19

Article V MANAGEMENT OF THE COMPANY ................................................................... 19
    5.1    Management and Control of the Company ..................................................... 19
    5.2    Members Shall Not Manage or Control ......................................................... 20
    5.3    Board of Managers......................................................................................... 20
    5.4    Meetings of the Board of Managers............................................................... 22
    5.5    Quorum and Voting ....................................................................................... 22
    5.6    Procedural Matters of the Board of Managers. .............................................. 22
    5.7    Officers .......................................................................................................... 23
    5.8    Terms of Office; Resignation; Removal ........................................................ 23
    5.9    Related Party Transactions ............................................................................ 24
    5.10   Board Observers ............................................................................................ 24
    5.11   Supermajority Board Approval Rights ........................................................... 26

Article VI MEMBERS AND MEETINGS ............................................................................... 26
    6.1    Members. ........................................................................................................ 26
    6.2    Admission of New Members ......................................................................... 26
    6.3    Resignation .................................................................................................... 27

6.4     Power of Members ........................................................................... 27
6.5     Meetings of Members ....................................................................... 27
6.6     Place of Meetings ............................................................................ 27
6.7     Notice of Members' Meetings .......................................................... 27
6.8     Waiver of Notice .............................................................................. 28
6.9     Voting Interests ............................................................................... 28
6.10    Quorum; Vote Required ................................................................... 28
6.11    Action by Written Consent of Members .......................................... 28
6.12    Voting by Ballot .............................................................................. 28
6.13    No Cumulative Voting ..................................................................... 29
6.14    Special Voting Requirements .......................................................... 29

Article VII EXCULPATION; INDEMNIFICATION; LIABILITY; OPPORTUNITY ............................ 29
7.1     Exculpation ..................................................................................... 29
7.2     Indemnification ............................................................................... 30
7.3     Liability; Duties .............................................................................. 32
7.4     Insurance ......................................................................................... 32
7.5     Limited Liability Company Opportunity ......................................... 33

Article VIII ACCOUNTING; FINANCIAL AND TAX MATTERS ......................................... 33
8.1     Books and Records; Reports............................................................. 33
8.2     Fiscal Year; Taxable Year ............................................................... 35
8.3     Bank and Investment Accounts ....................................................... 35
8.4     Tax Election .................................................................................... 35

Article IX TRANSFERS OF MEMBERSHIP INTERESTS; RIGHT OF FIRST OFFER; TAG
ALONG RIGHT; DRAG ALONG RIGHT; PREEMPTIVE RIGHTS......................................... 35
9.1     Limitation on Transfer ..................................................................... 35
9.2     Permitted Transfers.......................................................................... 36
9.3     Right of First Offer .......................................................................... 36
9.4     Tag-Along Right ............................................................................... 38
9.5     Drag-Along Right............................................................................. 40
9.6     Condition to Transfers ..................................................................... 42
9.7     Effect of Transfer ............................................................................ 42
9.8     Tolling.............................................................................................. 43
9.9     Preemptive Rights............................................................................ 43
9.10    Transfers Among Members .............................................................. 45

Article X REGISTRATION RIGHTS ............................................................................. 46
10.1    Demand Registration Right.............................................................. 46
10.2    Piggyback Registration Right........................................................... 47
10.3    Effective Demand Registration ........................................................ 48
10.4    Cutback............................................................................................ 48
10.5    Form S-3 Registration ...................................................................... 48
10.6    Holdback Agreements....................................................................... 50
10.7    Registration Procedures................................................................... 50
10.8    Seller Information............................................................................. 53
10.9    Notice to Discontinue....................................................................... 53
10.10   Registration Expenses...................................................................... 53
10.11   Indemnification; Contribution.......................................................... 53
10.12   Initial Public Offering...................................................................... 56

10.13    Registration Rights Agreement..................................................................56
10.14    Rule 144..................................................................................................56
10.15    Independent Nature of Obligations............................................................57

Article XI DISSOLUTION OF COMPANY; LIQUIDATION AND DISTRIBUTION OF
    ASSETS..........................................................................................................57
11.1    Events of Dissolution..............................................................................57
11.2    Liquidation; Winding Up.........................................................................58
11.3    Survival of Rights, Duties and Obligations................................................58
11.4    Claims of the Members............................................................................58

Article XII MISCELLANEOUS..................................................................................59
12.1    Expenses................................................................................................59
12.2    Further Assurances..................................................................................59
12.3    Notices...................................................................................................59
12.4    Amendments; Termination.......................................................................59
12.5    Severability............................................................................................60
12.6    Headings and Captions............................................................................60
12.7    Counterparts...........................................................................................60
12.8    GOVERNING LAW.................................................................................60
12.9    Jurisdiction.............................................................................................61
12.10    Entire Agreement; Non-Waiver................................................................61
12.11    No Third Party Beneficiaries....................................................................61
12.12    No Right to Partition...............................................................................61
12.13    Investment Representation.......................................................................61
12.14    Confidentiality........................................................................................62


Exhibit A        Form of Offer Notice
Exhibit B        Form of Joinder
Exhibit C        Form of Notice of Transfer
Schedule 5.3(a)    Board of Managers

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**NEW WPCC PARENT, LLC**

**THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (as may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, the "***Agreement***") of New WPCC Parent, LLC, a Delaware limited liability company (the "***Company***"), effective as of May 9, 2025 (the "***Effective Date***"), is adopted and entered into by and among the Members and the Company.

WHEREAS, the Company was formed as a limited liability company pursuant to the Act by filing a Certificate of Formation (the "***Certificate***") with the Secretary of State of the State of Delaware on April 28, 2025;

WHEREAS, on May 2, 2025, Dan Clancy (the "***Original Member***") entered into that certain Limited Liability Company Agreement of the Company (the "***Original Agreement***") as the original sole member of the Company, effective as of April 28, 2025;

WHEREAS, Wellpath Holdings, Inc ("***Wellpath***") and certain affiliated companies (the "***Debtors***") were debtors and debtors in possession in those certain jointly administered bankruptcy cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Bankruptcy Court***") filed on November 11, 2024 (the "***Petition Date***"), Case No. 24-90533 (MI) (the "***Chapter 11 Cases***");

WHEREAS, on April 30, 2025, the Debtors filed their *Further Modified First Amended Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and Certain of its Debtor Affiliates* [ECF No. 2586] (as amended, supplemented or otherwise modified from time to time, the "***Plan***" and, the restructuring transactions contemplated thereby, including the Equity Financing (as defined in the Plan), the "***Restructuring Transactions***");

WHEREAS, on the date hereof, the Company will issue the New Common Equity and New Preferred Equity (each as defined in the Plan), in connection with which the Original Member agreed to forfeit and have cancelled the Original Member's equity interests in the Company for no consideration;

WHEREAS, concurrently with the preceding step and the execution and delivery of this Agreement, and in furtherance of the Plan, which was confirmed by the Bankruptcy Court on April 30, 2025, by the *Findings of Fact, Conclusions of Law, and Order (I) Confirming the First Amended Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and Certain of its Debtor Affiliates and (II) Approving the Disclosure Statement on a Final Basis* [ECF No. 2596] filed on May 1, 2025 (the "***Confirmation Order***"), among other things, the transactions contemplated by the Restructuring Transactions Memorandum (as defined in the Plan) will be consummated, pursuant to which, among other things, the Company, through a series of contributions and exchanges, will indirectly acquire substantially all of the assets of Wellpath Holdings, Inc. (including the stock of Wellpath CFMG Inc.);

WHEREAS, in connection with the Equity Financing, Members who were lenders under the DIP Credit Agreement (as defined in the Plan) (1) committed to purchase New Common Equity in exchange for cash capital contributions to the Company and (2) received New Preferred Equity as additional consideration for such participation in the Equity Financing;

WHEREAS, this Agreement was executed and delivered for the purpose of (1) amending and restating the Original Agreement in its entirety, (2) governing the affairs of, and the conduct of the business of, the Company, pursuant to the terms set forth in the Plan, (3) memorializing the terms of the Membership Interests, authorizing the future issuance of additional Membership Interests, including the Incentive Interests, in accordance with this Agreement and the Plan, and (4) setting forth their respective rights and obligations, in each case, as of and after the Effective Date;

WHEREAS, on the Effective Date, pursuant to the Plan and the Confirmation Order (including pursuant to the Equity Financing), the Membership Interests of the Company will be distributed to the Members in the amounts set forth opposite each Member's name on the Register of Members; and

WHEREAS, as of the Effective Date, the Original Agreement is hereby amended and restated in its entirety in the form of this Agreement and each Member shall be deemed, as a result of having accepted distributions of the Membership Interests pursuant to the Plan and pursuant to the Equity Financing, to have accepted the terms of this Agreement (solely in their capacity as Members) and to be parties hereto without further action or execution of this Agreement.

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     Definitions.

As used in this Agreement, the following terms shall have the meanings set forth below:

"*1% Member*" means each Member that, together with its Affiliates, holds, as of the applicable date of determination, at least one percent (1%) of the outstanding Common Interests (excluding from the numerator and denominator of such calculation any Incentive Interests and any Common Interests issued in any Excluded Issuances).

"*10% Class A Member*" means each Member that, together with its Affiliates, holds as of the applicable date of determination, at least ten percent (10%) of the outstanding Class A Interests (in each case, excluding from the numerator and denominator of such calculation any Incentive Interests and any Class A Interests issued in any Excluded Issuances).

"*Act*" means the Delaware Limited Liability Company Act, as amended from time to time.

"*Affiliate*" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such Person. The term "<u>control</u>" (including the terms "controlled by" and "under common control with") as used in this definition means the possession, directly or indirectly (including through one or more intermediaries), of the power or authority to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting Securities, by contract or otherwise. The term "Affiliated" shall have a correlative meaning. For the avoidance of doubt, funds and/or accounts (*provided, however*, that portfolio company investments of a Member or its Affiliates shall not be considered "Affiliates" hereunder) managed, advised or sub-advised by the same Investment Manager shall be deemed "Affiliates" if the Investment Manager or an Affiliate thereof has discretionary and management authority over such funds and/or accounts. Notwithstanding the foregoing, a non-discretionary sub-advising

relationship shall not confer Affiliate status. For purposes of this Agreement, Jefferies LLC and its Affiliates shall be deemed to be Affiliates of Jefferies Finance LLC and its Affiliates.

"*Arena*" means Arena Capital Advisors, LLC, a Delaware limited liability company.

"*Arena Member*" means, collectively, Arena and/or its Affiliates listed on the Register of Members and/or such Member's Permitted Transferees.

"*Banking Regulations*" means all federal, state and foreign laws applicable to banks, bank holding companies and their Subsidiaries and Affiliates, including the Bank Holding Company Act, the Federal Reserve Act and the Dodd-Frank Wall Street Reform and Consumer Protection Act, in each case as amended, and applicable rules and regulations thereunder, and any successor to such statutes, rules or regulations.

"*Board of Managers*" means the Board of Managers of the Company provided for in Article V.

"*Business Day*" means any calendar day that is not a Saturday, Sunday or other calendar day on which banks are required or authorized to be closed in the City of New York.

"*Capital Contribution*" means the contribution made, or deemed to have been made, by a Member in accordance with Section 3.1.

"*Change of Control*" means the occurrence of any of the following: (i) the direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation or whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Company and its Subsidiaries, to any one Third Party Purchaser (or group of Affiliated Third Party Purchasers) or (ii) the consummation by the Company or a Subsidiary of the Company of any transaction or series of related transactions (including any merger, recapitalization, stock issuance, consolidation or restructuring whether by operation of law or otherwise), the result of which is that the Members of the Company or the equity holders of its Subsidiaries or their respective Affiliates, as applicable, immediately prior to such transaction (in their capacities as such) possess less than a majority of the outstanding Membership Interests or of the membership or other equity interests of any surviving entity of any such transaction immediately after the consummation of such transaction or series of related transactions (excluding from the numerator and denominator of such calculation any Incentive Interests).

"*Chief Executive Officer*" means the natural person from time to time serving as chief executive officer of the Company.

"*Class A Percentage Ownership*" means, with respect to any Member holding Class A Interests, the fraction, expressed as a percentage, the numerator of which is the total number of Class A Interests held by such Member and the denominator of which is the total number of Class A Interests issued and outstanding at the time of determination, excluding, from each of the numerator and the denominator above, any options, warrants, convertible debt obligations, Series A Preferred Interests, Incentive Interests or similar Securities.

"*Code*" means the Internal Revenue Code of 1986, as amended, including any successor provisions and transition rules.

"*Commission*" means the United States Securities and Exchange Commission.

"***Common Ownership Percentage***" means, with respect to any Member, the fraction, expressed as a percentage, the numerator of which is the total number of Common Interests held by such Member and the denominator of which is the total number of Common Interests issued and outstanding at the time of determination, excluding, from each of the numerator and the denominator above, any options, warrants, convertible debt obligations, Series A Preferred Interests, Incentive Interests or similar Securities.

"***Competitor of the Company***" means any Person and, together with its Affiliates, any controlling equityholder of such Person or Affiliate, and any holding company with respect thereto, that the Board of Managers determines in good faith is a direct or indirect competitor of the Company or any of its Subsidiaries, a copy of which list of Competitors of the Company (as determined by the Board of Managers) shall be maintained by the Company and available upon request by the Members; *provided*, *however*, after the initial determination of Competitors of the Company by the Board of Managers, such list of Competitors of the Company may be amended by the Board of Managers in good faith from time to time; *provided*, *further*, that any such list of Competitors of the Company (initial or amended) shall be effective at the time of the determination by the Board of Managers.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended, or any successor statute thereto, and the rules and regulations of the Commission promulgated thereunder.

"***Excluded Issuances***" means any issuance of any New Securities/Indebtedness (as defined herein) (i) to Persons who are, or who are becoming, employees, managers, directors or consultants of the Company or any of its Subsidiaries in connection with a bona fide option or equity participation plan or other bona fide compensation arrangement that is duly approved by the Board of Managers (each such arrangement, a "***Management Incentive Plan***"), (ii) with respect to any equity interests issued as part of or in connection with a debt financing transaction or series of transactions duly approved by the Board of Managers (*provided*, *however*, that the Preemptive Rights set forth in <u>Section 9.9</u> shall apply to any Preemptive Debt, as applicable), (iii) as consideration for or as financing for an acquisition, merger, a joint venture or joint venture partnership or similar transaction duly approved by the Board of Managers, (iv) pursuant to conversion or exchange rights included in securities or indebtedness previously issued by the Company as permitted by and consistent with the terms and conditions of this Agreement, (v) in connection with an equity interest split, division, dividend or similar transaction or reorganization duly approved by the Board of Managers, (vi) pursuant to a Public Offering, (vii) issued by a Subsidiary of the Company to the Company or another wholly-owned direct or indirect Subsidiary of the Company or (viii) in connection with the Restructuring Transactions.

"***Family Member***" means an individual's spouse, domestic partner, sibling, child, or other lineal descendant of such individual (including adoptive relationships and stepchildren) and the spouses of each such natural person.

"***FINRA***" means the Financial Industry Regulatory Authority.

"***FS Investments***" means FS Investment Solutions, LLC, a Delaware limited liability company.

"***FS Member***" means, collectively, FS Investments and/or its Affiliates listed on the Register of Members and/or such Member's Permitted Transferees.

"***GAAP***" means United States generally accepted accounting principles in effect from time to time.

"***Governmental Authority***" means the government of any nation, state, city, locality or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or

administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"***Incentive Interests***" means any Common Interests issued under a Management Incentive Plan and designated as Incentive Interests by the Board of Managers.

"***Initial Public Offering***" means (i) the initial underwritten public offering of the Membership Interests or other equity interests of the Company or any corporate successor thereto, the parent of the Company or any of their respective Subsidiaries, pursuant to an effective registration statement filed under the Securities Act, (ii) a transaction with a special purpose acquisition company (SPAC) pursuant to which the Company becomes, or merges into, a public registrant under the Securities Act, or (iii) a direct listing of the Membership Interests on national securities exchange.

"***Independent Manager***" means a Manager who is independent from the Company, the Company's Affiliates and any of the Company's major equityholders or major debtholders, including the Major Holder Members.

"***Investment Manager***" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, has the power to direct or control the investment decisions of such Person.  The term "control" as used in this definition means the possession, directly or indirectly (including through one or more intermediaries), of the power or authority to direct or cause the direction of the management, policies, or decisions of a Person, whether through the ownership of voting Securities, by contract or otherwise.

"***Major Holder Member***" means each of the FS Member, the Arena Member, and the Ripple Member (so long as such Member, as applicable, is entitled to appoint a Manager to the Board of Managers pursuant to Section 5.3(a)).

"***Manager***" means a natural person serving as a member of the Board of Managers in accordance with this Agreement.

"***Members***" means the Persons who are parties hereto as listed on the Register of Members; *provided, however*, that such term shall also include such other Persons who shall become members of the Company in accordance with the terms of this Agreement and pursuant to and in accordance with the Act; *provided further, however*, that a Person shall cease to be a Member for purposes of this Agreement at such time as such Person ceases to own any Membership Interests.  Holders of Incentive Interests shall not be treated as, and shall not have any rights of, Members other than the right to receive distributions pursuant to Section 3.4 and the obligations (but not the rights) applicable to Members in Article IX or Article X or as otherwise explicitly provided herein or by the Board of Managers.

"***Person***" means any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, estate, unincorporated organization, Governmental Authority or other entity and shall include any "group" within the meaning of the regulations promulgated by the Commission under Section 13(d) of the Exchange Act.

"***Piggyback Member***" means (i) each Major Holder Member and each Affiliate of a Major Holder Member that, in each case, holds Membership Interests at any applicable time and (ii) each other Member that, together with its Affiliates, holds, at the applicable time, at least one percent (1.0%) of the Voting Interests.

"***Preferred Liquidation Preference***" means $63,250,000 *plus* the dollar value of the aggregate Preferred Return accrued and unpaid in respect of the Series A Preferred Interests, *minus* the

aggregate amount distributed to the Members on account of the Series A Preferred Units pursuant to <u>Section 3.4</u>.

"***Preferred Ownership Percentage***" means, with respect to any Member, the fraction, expressed as a percentage, the numerator of which is the total number of Series A Preferred Interests held by such Member and the denominator of which is the total number of Series A Preferred Interests issued and outstanding at the time of determination, excluding, from each of the numerator and the denominator above, any options, warrants, convertible debt obligations, Common Interests, Incentive Interests or similar Securities.

"***Preferred Return***" means a cumulative annual return payable in cash or in-kind, at the election of the Company, accruing from and after the Effective Date at the rate of thirteen percent (13.0%) per annum, on the then-current aggregate Preferred Liquidation Preference and all previously accrued and unpaid distributions thereon, compounded semi-annually on June 30 and December 31 of each year.  The Preferred Return shall increase the Preferred Liquidation Preference with respect to each Series A Preferred Interest by the appropriate corresponding amount.

"***Public Offering***" means a public offering of the Membership Interests or other equity interests of the Company or any successor thereto pursuant to an effective registration statement under the Securities Act or any comparable statement under any comparable federal statute then in effect (other than any registration statement on Form S-8 or Form S-4 or any successor forms thereto).

"***Register of Members***" means a schedule containing the name, address, number and type of Membership Interests, which schedule is maintained by the Company or caused by the Company to be maintained (including by the Company's transfer agent, if any); *provided*, *however*, that such schedule shall be deemed Confidential Information and, unless required by applicable law, will not be publicly available or disclosed to any Person without the prior approval of the Board of Managers.

"***Registrable Securities***" means all Membership Interests held by the Members whether acquired on or after the date hereof, including (i) the Membership Interests acquired upon the exercise of preemptive rights and (ii) any and all Membership Interests or other equity interests issued or issuable with respect to Registrable Securities by way of Membership Interests, stock or other equity interest split, division, dividend or similar transaction or reorganization or in connection with any combination of Membership Interests, stock, or other equity interests, recapitalization, merger, consolidation or other reorganization; *provided*, *however*, that Registrable Securities, once issued, shall cease to be Registrable Securities (i) upon the sale or disposal thereof pursuant to an effective Registration Statement, (ii) upon the sale thereof to the public pursuant to Rule 144 (or successor rule) under the Securities Act under circumstances in which all of the applicable conditions of such Rule (then in effect) are met, (iii) upon the sale thereof in a private transaction in which the Transferor's rights under this Agreement are not validly assigned in accordance with the terms of this Agreement or when such Registrable Securities are proposed to be sold or distributed by a Person not entitled to the registration rights under this Agreement or (iv) when such Registrable Securities cease to be outstanding.

"***Registration Statement***" means any registration statement filed pursuant to the Securities Act.

"***Regulatory Concern***" means any set of facts or circumstances in which:

(i)      a Member reasonably believes, based on the advice of counsel, that such Member's ownership of Securities issued by the Company, or any organizational or governance document or agreement of the Company or any of its Subsidiaries or any agreement to which the Company or any of its Subsidiaries is a party and, in each case, is

binding on such Member, (x) is or would be (after expiration of any applicable conformance period or otherwise) in conflict with the requirements of the Banking Regulations, (y) gives rise to a limitation in law (solely with respect to and as a result of the Banking Regulations) that will materially impair the ability of such Member or any of its Affiliates to conduct its business, or (z) could otherwise present a material adverse regulatory risk for such Member or any of its Affiliates; or

(ii)      such Member or any of its Affiliates receives notice from or is otherwise informed in any manner by a Governmental Authority that such Member's ownership of Securities issued by the Company, or any organizational or governance document or agreement of the Company or any of its Subsidiaries or any agreement to which the Company or any of its Subsidiaries is a party and, in each case, is binding on such Member, (x) is or would be (after expiration of any applicable conformance period or otherwise) in conflict with the requirements of the Banking Regulations, or (y) gives rise to a limitation in law (solely with respect to and as a result of the Banking Regulations) that will materially impair the ability of such Member or any of its Affiliates to conduct its business.

"*Related Person*" means (i) any Affiliate of the Company and (ii) any other Person if such other Person and its Affiliates beneficially own (within the meaning of Rule 13d-3 under the Exchange Act) in the aggregate more than five percent (5%) of the outstanding Membership Interests.

"*Restricted Membership Interests*" means Membership Interests acquired directly or indirectly from the Company, or from an Affiliate of the Company, in a transaction or chain of transactions not involving or not deemed to involve a Public Offering, including pursuant to the Equity Financing.

"*Ripple*" means Ripple Industries LLC, a Delaware limited liability company.

"*Ripple Member*" means, collectively, Ripple and/or its Affiliates listed on the Register of Members and/or such Member's Permitted Transferees.

"*Securities*" means "securities" as defined in Section 2(a)(1) of the Securities Act and includes, with respect to any Person, such Person's capital stock or other equity interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such Person's capital stock.

"*Securities Act*" means the Securities Act of 1933, as amended, or any successor statute thereto, and the rules and regulations of the Commission promulgated thereunder.

"*Subsidiary*" means, with respect to any Person, any other Person, whether incorporated or unincorporated, in which the Company or any one or more of its other Subsidiaries, directly or indirectly, owns or controls: (i) fifty percent (50%) or more of the Securities or other ownership interests, including profits, equity or beneficial interests; or (ii) Securities or other interests having by their terms ordinary voting power to elect more than fifty percent (50%) of the board of directors or others performing similar functions with respect to such other Person that is not a corporation.

"*Transfer*" means any, direct or indirect, transfer, sale, assignment, pledge, hypothecation or other disposition of any Membership Interest, whether voluntary or involuntary, or any agreement to transfer, sell, assign, pledge, hypothecate or otherwise dispose of any Membership Interest, including any such transfer, sale, assignment, pledge, hypothecation, disposition by operation of law or otherwise to an heir, successor or assign; *provided, however*, that (i) a transaction that is a pledge in connection with a bona fide financing arrangement shall not be deemed to be a Transfer but a foreclosure pursuant thereto shall be deemed to be a Transfer; (ii) with respect to any Member that is a widely held "investment company" as

defined in the Investment Company Act of 1940, as amended, or any publicly traded company whose securities are registered under the Exchange Act, a transfer, sale, assignment, pledge, hypothecation, or other disposition of ownership interests in such investment company or publicly traded company shall not be deemed a Transfer; (iii) with respect to any Member that is a private equity fund, hedge fund or similar vehicle (including any investment fund or managed account), any Transfer of limited partnership or other similar non-control interest in any Member or entity which is a pooled investment vehicle holding other material investments and which is an equityholder (directly or indirectly) of a Member, or the change in control of any general partner, manager or similar person of such entity, will not be deemed to be a Transfer for purposes hereof; and (iv) the change of an Investment Manager of a Member that does not also result in the Transfer of the underlying beneficial interest in Membership Interests of such Member will not be deemed to be a Transfer for purposes hereof. The term "Transferred" shall have a correlative meaning.

"*UBS*" means UBS Securities LLC and its affiliates.

1.2     <u>Construction; Usage Generally</u>.  The definitions in this <u>Article I</u> or the Schedules to this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. All references herein to Articles, Sections and Schedules shall be deemed to be references to Articles and Sections of, and Schedules to, this Agreement unless the context shall otherwise require.  All Schedules attached hereto shall be deemed incorporated herein as if set forth in full herein and, unless otherwise defined therein, all terms used in any Schedule shall have the meaning ascribed to such term in this Agreement.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All accounting terms not defined in this Agreement shall have the meanings determined by GAAP.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise expressly provided herein, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.  Where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates.  The language used in this Agreement has been chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.  Any reference in this Agreement to $ shall mean U.S. dollars.  In calculating any Member's ownership of Membership Interests for the purposes of determining whether a Member shall have certain rights under this Agreement, all applicable Membership Interests held by Affiliated Members shall be aggregated for the purposes of such determination; *provided, however*, that no Membership Interests shall be attributed to more than one Person within any such group of Affiliated Members.

1.3     <u>Cross References to Other Defined Terms</u>.  Each capitalized term listed below is defined on the corresponding page of this Agreement:

| Term | Page No. |
|---|---|
| Accelerated Acquirer | 45 |
| Additional Capital Contribution | 15 |
| Agreement | 4 |
| Approved Sale | 41 |
| Arena Manager | 20 |
| Bankruptcy Code | 4 |

Bankruptcy Court.................................................................................................... 4
Base Participating Holder ...................................................................................... 37
Buyout Notice ........................................................................................................ 40
CEO Manager ........................................................................................................ 20
Certificate................................................................................................................ 4
Chapter 11 Cases .................................................................................................... 4
Class A Interests ................................................................................................... 17
Class B Interests ................................................................................................... 17
Common Interests ................................................................................................. 17
Company ................................................................................................................. 4
Confidential Information ....................................................................................... 63
Confirmation Order ................................................................................................ 4
Counterparty ......................................................................................................... 45
Counterparty Excluded Information ..................................................................... 45
Damages................................................................................................................ 30
Demand Registration ............................................................................................ 46
Drag-Along Outside Date ..................................................................................... 41
Drag-Along Sale ................................................................................................... 40
Effective Date ......................................................................................................... 4
Effective Transfer Time ........................................................................................ 42
Elected Units......................................................................................................... 29
Event of Dissolution ............................................................................................. 57
Excess ROFO Portion ........................................................................................... 37
Extra Participating Rightholder ........................................................................... 37
Final Offer Notice ................................................................................................. 37
FS Manager ........................................................................................................... 20
Fund Indemnitee ................................................................................................... 31
Fund Indemnitors ................................................................................................. 31
Holdback Period ................................................................................................... 50
Holder ................................................................................................................... 48
Holders.................................................................................................................. 48
Incidental Registration ......................................................................................... 47
Indemnified Party ................................................................................................. 54
Indemnifying Party ............................................................................................... 54
Indemnitee ............................................................................................................ 30
Initiating Members................................................................................................ 46
Liabilities .............................................................................................................. 54
Liability................................................................................................................. 54
Liquidating Trust Observer .................................................................................. 25
Major Holder Managers ....................................................................................... 20
Management Incentive Plan.................................................................................... 7
Managing Underwriter ......................................................................................... 47
Managing Underwriters ........................................................................................ 47
Members' Counsel ................................................................................................ 50
Membership Interest ............................................................................................. 17
New Equity Securities .......................................................................................... 43
New Securities/Indebtedness ............................................................................... 43
Non-Initiating Member ......................................................................................... 47
Non-Initiating Members ....................................................................................... 47
Notice of Acceptance ........................................................................................... 44
Observer................................................................................................................ 25
Offer Notice .......................................................................................................... 36

Offer Purchase Notice ................................................................................ 36
Offer Sale Price ......................................................................................... 36
Offered Interest .......................................................................................... 36
Offered Securities/Indebtedness ............................................................... 43
Original Agreement ...................................................................................... 4
Original Member .......................................................................................... 4
Participating Member ................................................................................ 47
Participating Members .............................................................................. 47
Participating Rightholders ........................................................................ 37
Permitted Amendment .............................................................................. 18
Permitted Transferees .............................................................................. 36
Petition Date ................................................................................................ 4
Plan ............................................................................................................. 4
Preemptive Offer ....................................................................................... 43
Preemptive Right ....................................................................................... 43
Principal Office .......................................................................................... 14
Proportionate Percentage ......................................................................... 43
Proposed Transfer .................................................................................... 39
Protected Person ...................................................................................... 29
Records ..................................................................................................... 52
Registration Expenses .............................................................................. 53
Regulatory Tender .................................................................................... 29
Restructuring Transactions ........................................................................ 4
Rightholders .............................................................................................. 36
Ripple Manager ......................................................................................... 20
ROFO Evaluation Period ........................................................................... 36
S-3 Initiating Member ................................................................................ 48
S-3 Initiating Members .............................................................................. 48
S-3 Non-Initiating Member ........................................................................ 48
S-3 Non-Initiating Members ...................................................................... 48
S-3 Registration ........................................................................................ 48
Selling Members ....................................................................................... 40
Selling ROFO Member .............................................................................. 36
Selling Tag Member .................................................................................. 38
Series A Payoff ......................................................................................... 17
Series A Preferred Interests ..................................................................... 17
Shelf Takedown ........................................................................................ 49
Shelf Takedown Request .......................................................................... 49
Stock ......................................................................................................... 56
Subject Purchaser ..................................................................................... 43
Successor Corporation .............................................................................. 56
Tag Along Rightholder .............................................................................. 38
Tag-Along Notice ...................................................................................... 39
Tag-Along Notice Period ........................................................................... 39
Third Party Purchaser ............................................................................... 36
Third Party Sale ........................................................................................ 37
Third Party Sale Period ............................................................................. 37
Trigger Seat .............................................................................................. 21
Valid Business Reason .............................................................................. 46
Voluntary Voting Restricted Member ........................................................ 29
Voting Interest ........................................................................................... 28
Wellpath ...................................................................................................... 4

## ARTICLE II
## THE COMPANY AND ITS BUSINESS

2.1     <u>Formation</u>.  The Members hereby agree to continue the Company, which was formed pursuant to the provisions of the Act on April 28, 2025, and hereby agree that the Company shall be governed by the terms and conditions of this Agreement and, except as otherwise provided herein, the Act. This Agreement shall constitute the "limited liability company agreement" (as that term is used in the Act) of the Company.  The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Act in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2     <u>Company Name</u>.  The name of the Company is "New WPCC Parent, LLC".  The Board of Managers may (without the consent of any Member) change the Company's name at any time and from time to time in accordance with the provisions of the Act.

2.3     <u>Effective Date</u>.  This Agreement is entered into, and is effective as of the Effective Date.

2.4     <u>Term</u>.  The Company shall continue until dissolved and its affairs wound up in accordance with the Act and the terms of this Agreement.

2.5     <u>Offices</u>.  The principal office of the Company shall be established and maintained at 3340 Perimeter Hill Drive, Nashville, Tennessee 37211, or at such other or additional place or places as the Board of Managers shall determine from time to time ("***Principal Office***"). The Company may have other offices at such place or places as the Board of Managers may from time to time designate.

2.6     <u>Registered Office and Registered Agent</u>.  The address of the Company's registered office in the State of Delaware and the name and address of the Company's registered agent in the State of Delaware shall be Cogency Global Inc., 850 New Burton Road, Suite 201, Dover, Delaware 19904.  The Board of Managers may designate another registered agent and/or registered office from time to time in accordance with the provisions of the Act and any other applicable laws.

2.7     <u>Filings; Authorized Persons</u>.  The Members shall execute and deliver such documents and perform such acts consistent with the terms of this Agreement as may be necessary to comply with the requirements of law for the formation, qualification and operation of a limited liability company, the ownership of property and the conduct of business under the laws of the State of Delaware and each other jurisdiction in which the Company shall own property or conduct business. Nikki Tsimbidis was designated as an "authorized person," within the meaning of the Act, to execute, deliver and file the Certificate and the execution, delivery and filing of the Certificate is hereby ratified.

2.8     <u>Ratification Purposes</u>.  The Members ratify any and all acts taken or caused to be taken by any "authorized person" (within the meaning of the Act) in the name of or on behalf of the Company prior to the Effective Date.

2.9     <u>Purposes</u>.  The Company is formed for the purposes of engaging in any lawful acts or activities for which limited liability companies may be organized under the Act and to engage in any and all activities necessary or incidental thereto. The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Act.

2.10    <u>No Partnership</u>.  The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture, and that no Member, Manager or officer of the Company

shall be a partner or joint venturer of any other Member, Manager or officer of the Company as a result of this Agreement.

2.11    Non-Voting Equity Securities.  The Company shall not issue any non-voting equity Securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; *provided*, *however*, that the foregoing restriction (a) shall have such force and effect only for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Company, (b) shall not have any further force or effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code; and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; DISTRIBUTIONS

3.1    Admission.

(a)    On the Effective Date and pursuant to the Plan, each of the Members has (i) exchanged, or is deemed to have exchanged, directly or indirectly, to or for the benefit of the Company, such Member's Allowed First Lien Secured Claims (as defined in the Plan) for newly authorized Class A Interests of the Company, (ii) purchased newly authorized and issued Class A Interests from the Company in connection with and pursuant to the terms of the Equity Financing, (iii) received newly authorized and issued Series A Preferred Interests from the Company as additional consideration in connection with the Equity Financing, and/or (iv) received newly authorized and issued Class B Interests pursuant to the Plan, in each case, as set forth on the Register of Members opposite such Member's name.

(b)    The Register of Members shall be amended by (or caused to be amended by) the Board of Managers following any Transfer as provided by Article IX or any issuance of additional Membership Interests in accordance with this Agreement. The Company shall provide any Member's individual holding of Membership Interests, as well as the total amount of outstanding Membership Interests of each Class of Membership Interest and on an aggregated basis, at any time to such Member upon request.

(c)    Each Person designated for admission to the Company as an additional Member in accordance with this Agreement (other than in connection with a Transfer made in accordance with Article IX) shall contribute cash, other property (including Securities) or services rendered in the amount and of the type designated by the Board of Managers and the Register of Members shall be amended at the time of such additional Members' admission as a Member by the Board of Managers or a duly authorized officer (or by any applicable transfer agent upon instruction by the Board of Managers or a duly authorized officer) to reflect such contribution.

3.2    Additional Capital Contributions.  No Member shall be obligated to make any Additional Capital Contribution to the Company.  All amounts paid to the Company by a Member as additional equity capital (other than initial Capital Contributions) shall be deemed to be an "***Additional Capital Contribution***" by such Member for the purposes of this Agreement, and the Register of Members shall be amended at the time of such Additional Capital Contribution by the Board of Managers (or by any applicable transfer agent upon instruction by the Board of Managers) to reflect such contribution.

3.3    No Interest in Company Property.  A Member's Membership Interests shall for all purposes be personal property.  A Member has no interest in specific Company property.

3.4     Distributions.

(a)     No Member shall be entitled to receive any distribution from the Company except as provided in this Agreement.  Distributions (whether interim distributions or distributions on liquidation) made after the Effective Date shall be made in amounts and at the times determined by the Board of Managers or a committee thereof, whose determination shall be conclusive, to the Members, subject to the terms of this Agreement and the restrictions set forth in the Act and the terms of any grant documents, award agreements or Management Incentive Plan related to any outstanding Incentive Interests.  Subject to the restrictions set forth in this Section 3.4 and Section 3.5, the Act and the terms of any grant documents, award agreements or Management Incentive Plan related to any outstanding Incentive Interests, all distributions (whether in cash, property or Securities, and whether interim distributions, distributions upon liquidation or distributions in the event of an Approved Sale), dividends, or redemptions shall be made to or among Members as set forth in Section 3.4(b); *provided, however*, that notwithstanding anything to the contrary contained herein, with respect to the Incentive Interests:the Incentive Interests may, by their terms, which terms must be approved by the Board of Managers or a committee thereof, provide for or result in non-pro rata distributions, dividends in respect of, or redemptions of, such Incentive Interests;

(ii)     no unvested Incentive Interests shall receive any such distributions, dividends or redemptions nor shall they be entitled to any such distributions, dividends or redemptions unless otherwise determined by the Board of Managers or a committee thereof, whose determination shall be conclusive;

(iii)     no vested Incentive Interests shall receive any such distributions, dividends or redemptions nor shall they be entitled to any such distributions, dividends or redemptions unless otherwise determined by the Board of Managers or a committee thereof, whose determination shall be conclusive, or expressly authorized by the terms of the grant documents, award agreements or Management Incentive Plan granting such vested Incentive Interest (in each case, which grant documents, award agreements or Management Incentive Plan has been approved by the Board of Managers or a committee thereof); and

(iv)     the holders of Incentive Interests shall not have any voting rights or any other rights, other than the right to receive distributions as set forth in this Section 3.4 and the obligations (but not the rights) applicable to Members in Article IX or Article X or as otherwise explicitly provided herein or by the Board of Managers.

(b)     Subject to Section 3.5, all distributions of cash and any Securities and other property to be distributed shall be made to the Members as follows:

(i)     first, if any Series A Preferred Interests are then outstanding, to the holders of Series A Preferred Interests pro rata in accordance with their respective Preferred Ownership Percentages, until the aggregate Preferred Liquidation Preference is reduced to zero; and

(ii)     second, to the extent there is available cash or other assets remaining after the distributions required by Section 3.4(b)(i) above, to all holders of Common Interests pro rata in accordance with their respective Common Ownership Percentages.

3.5     Distribution Rules.

(a)     No distribution shall be declared and paid pursuant to Section 3.4 unless, (i) such distribution is paid out of funds legally available therefor, (ii) the Liquidating Trust Initial Funding and each Liquidating Trust Subsequent Funding (each as defined in the Plan) have each been made in full and (iii) such distribution or payment would not cause the Company or any of its Subsidiaries to be in violation of any material agreement binding on the Company or any Subsidiary thereof.

(b)     A Member shall not have the status of, and is not entitled to the remedies available to, a creditor of the Company with regard to distributions that such Member becomes entitled to receive pursuant to this Agreement or the Act.

## ARTICLE IV
## MEMBERSHIP INTEREST

4.1     Membership Interest.

(a)     As of the Effective Date, the ownership interests in the Company (each, a "***Membership Interest***") are evidenced by four classes of ownership interests: (a) the Class A Common Interests (the "***Class A Interests***"), (b) the Class B Common Interests (the "***Class B Interests***" and, together with the Class A Interests, the "***Common Interests***"), (c) the Series A Preferred Interests (the "***Series A Preferred Interests***") and (d) the Incentive Interests, each in such amounts as initially set forth on the Register of Members.

(b)     The Class A Interests and the Class B Interests shall have identical rights in all respects, in each case, except as otherwise expressly specified in this Agreement, including as may be amended pursuant to Section 4.2 and/or Section 12.4.

(c)     Except as may otherwise be approved by the Board, the Liquidating Trust may not distribute or otherwise Transfer any of the Class B Interests to Liquidating Trust Beneficiaries (as defined in the Plan) until such time that the Liquidating Trust is terminated pursuant to the terms and conditions set forth in the Liquidating Trust Agreement (as defined in the Plan). Notwithstanding the foregoing, the Liquidating Trust shall be permitted to Transfer any Class B Interests to Third Party Purchasers, subject in all cases to the obligations and limitations with respect to Transfers of Membership Interests set forth in Article IX.

(d)     The Series A Preferred Interests shall have an aggregate liquidation preference equal to the Preferred Liquidation Preference, which Series A Preferred Interests, with respect to distribution rights and rights upon the Company's liquidation, winding up or dissolution, will rank senior to the Common Interests.  Distributions pursuant to Section 3.4(b)(i) in respect of the Series A Preferred Interests shall reduce on a dollar-for-dollar basis the aggregate liquidation preference in respect of all Series A Preferred Interests until the Preferred Liquidation Preference has been satisfied in full, at which time the liquidation preference shall be zero ("***Series A Payoff***"). Effective upon a Series A Payoff, the Series A Preferred Interests shall thereafter have no further rights or entitlements under this Agreement in any respect.

(e)     The holders of Incentive Interests shall not be treated as, and shall not have any voting or any other rights of, Members other than to receive distributions pursuant to Section 3.4 (but subject to the terms of such Incentive Interests) and the obligations (but not the rights) applicable to Members in Article IX or Article X or as otherwise explicitly provided herein or by the Board of Managers or in the Management Incentive Plan or applicable grant document or award agreement thereunder. In addition to the provisions set forth in this Agreement, the Incentive

Interests shall be subject to vesting, forfeiture, termination and other provisions to be set forth in the applicable grant document, award agreement or Management Incentive Plan pursuant to which such Incentive Interests were issued.

(f)     For the avoidance of doubt, and subject to the terms of any applicable grant document or award agreement, any actions taken by the Board of Managers (including amendment of this Agreement) in connection with the creation or maintenance of Incentive Interests, including (i) creating any new classes of ownership interests which may be designated as 'Incentive Interests'; (ii) modifying or canceling any existing Incentive Interests; and (iii) modifying any applicable threshold, minimum recovery or similar requirement, shall not require the consent of Members pursuant to <u>Section 12.4</u> and shall constitute and be deemed to be a Permitted Amendment (as defined below).

4.2     <u>Designation of Membership Interest</u>.  Subject to the terms of this Agreement, the Board of Managers shall have the power to designate the ownership interests in the Company into one or more additional classes and/or series of Membership Interests and to fix for such class or series such voting powers, full or limited, or no voting powers, and such distinctive designations, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions thereof, as shall be stated and expressed in the properly approved resolution or resolutions of the Board of Managers providing for such designation, and such resolution or resolutions of the Board of Managers shall set forth such amendments to this Agreement as shall be necessary or reasonable in the sole judgment of the Board of Managers to effect such resolution and subject in all respects to <u>Sections 9.9</u> and <u>12.4</u>, such amendments shall be binding upon all of the Members of the Company upon a properly adopted resolution by the Board of Managers (each such amendment to this Agreement, a "***Permitted Amendment***").

4.3     <u>Issuance of Membership Interests; Register; Transfer</u>.  Subject to <u>Sections 3.2</u> and <u>9.9</u>, the Board of Managers may issue Membership Interests from time to time in such portions of the entire interests in the Company as the Board of Managers shall properly approve, either for cash, services, Securities, property or other value, or in exchange for other Membership Interests, and at such price and upon such terms as the Board of Managers may, subject to the terms of this Agreement, determine, whose determination shall be conclusive. The Board of Managers may appoint one or more transfer agents and one or more registrars, all in accordance with such rules, regulations and procedures as the Board of Managers may determine, whose determination shall be conclusive.

4.4     <u>Certificates</u>.  The Company may, upon the direction of the Board of Managers, issue certificates of limited liability company interests evidencing the Membership Interests; *provided*, *however*, that, with respect to each Member, such Member's Membership Interests shall be uncertificated unless such Member agrees to receive a certificate evidencing its Membership Interests.

(a)     Each certificate, if any, evidencing Restricted Membership Interests shall bear (or, if uncertificated, shall be deemed to bear) a legend in substantially the following form:

NEITHER THE ISSUANCE NOR THE SALE OF THESE SECURITIES HAS BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED OR ASSIGNED IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT

TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED.

(b)     Each certificate, if any, evidencing Membership Interests held by any Member shall bear (or if uncertificated, shall be deemed to bear) a legend in substantially the following form:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNLESS SUCH TRANSFER COMPLIES WITH THE PROVISIONS OF THAT CERTAIN AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF NEW WPCC PARENT, LLC (THE "COMPANY") DATED AS OF MAY 9, 2025, AS THE SAME MAY BE AMENDED AND/OR RESTATED FROM TIME TO TIME IN ACCORDANCE WITH ITS TERMS (THE "AGREEMENT"), A COPY OF WHICH IS ON FILE AND MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE COMPANY.  THE SALE, PLEDGE, HYPOTHECATION, ASSIGNMENT OR TRANSFER IN ANY MANNER, WHETHER DIRECT OR INDIRECT, VOLUNTARY OR INVOLUNTARY, BY OPERATION OF LAW OR OTHERWISE, OF THIS CERTIFICATE AND THE SECURITIES REPRESENTED HEREBY ARE RESTRICTED AS DESCRIBED IN THE AGREEMENT.  NO REGISTRATION OR TRANSFER OF THESE SECURITIES WILL BE MADE ON THE BOOKS OF THE COMPANY UNLESS ACCOMPANIED BY EVIDENCE OF COMPLIANCE WITH THE APPLICABLE TERMS OF THE AGREEMENT.

4.5    <u>Fractional Interests</u>.  Any fraction of a Membership Interest will be issued as a corresponding fractional Membership Interest computed to five (5) decimal places.

4.6    <u>Persons Bound By Membership Interests</u>.  Any Person that acquires in any manner whatsoever any interest in any Membership Interest or any other Security of the Company, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, executed and delivered a joinder to this Agreement, including by accepting and not returning to the Company any certificate representing such Membership Interest or other Securities delivered to such Person, shall be deemed by the acceptance of such certificate and/or the benefits of the acquisition of Membership Interests or Securities, to have agreed to be subject to and bound by all of the terms, conditions and obligations of this Agreement.

## ARTICLE V
## MANAGEMENT OF THE COMPANY

5.1    <u>Management and Control of the Company</u>.  The management, operation and control of the business and affairs of the Company shall be vested exclusively in the Board of Managers, except as otherwise expressly provided for in this Agreement.  The Board of Managers shall have full and complete power, authority and discretion for, on behalf of and in the name of the Company, to enter into and perform all contracts and other undertakings that it may deem necessary or advisable to carry out any and all of the objects and purposes of the Company.  A Manager acting individually, however, will not have the power to bind the Company.  The power and authority of the Board of Managers may be delegated by the Board of Managers to a committee of Managers, to any officer of the Company or to any other Person engaged to act on behalf of the Company.

5.2     <u>Members Shall Not Manage or Control</u>. The Members, other than as they may act by and through the Board of Managers, shall take no part in the management of the business and affairs of the Company and shall transact no business for the Company, in each case, other than as specifically delegated by the Board of Managers.

5.3     <u>Board of Managers</u>.

(a)     A Board of Managers shall be established and shall initially consist of five (5) natural persons, in accordance with this <u>Section 5.3</u>.  The initial Board of Managers as of the Effective Date is set forth on <u>Schedule 5.3(a)</u>. The initial Board of Managers shall serve until their successors are elected and/or appointed, as applicable. Thereafter, the Board of Managers shall be elected and/or appointed, as applicable, at each annual meeting of the Members, which election and/or appointment, as applicable, may also be conducted through action by written consent pursuant to <u>Section 6.11</u>, and, subject to this <u>Section 5.3</u>, shall be comprised of:

(i)     so long as the FS Member holds at least fifty percent (50%) of the Class A Interests held by the FS Member on the Effective Date, one (1) individual appointed by the FS Member (the "***FS Manager***");

(ii)     so long as the Arena Member holds at least fifty percent (50%) of the Class A Interests held by the Arena Member on the Effective Date, one (1) individual appointed by the Arena Member (the "***Arena Manager***");

(iii)     so long as the Ripple Member holds at least fifty percent (50%) of the Class A Interests held by the Ripple Member on the Effective Date, one (1) individual appointed by the Ripple Member (the "***Ripple Manager***" and, collectively with the FS Manager and the Arena Manager, the "***Major Holder Managers***");

(iv)     one (1) Independent Manager appointed by Members holding a majority of the then outstanding Class A Interests not held by the Major Holder Members (calculated excluding any Incentive Interests and any Class A Interests issued in any Excluded Issuances); and

(v)     the then current Chief Executive Officer (the "***CEO Manager***"); *provided, however*, that if there is no Chief Executive Officer then in office, the CEO Manager's position shall remain vacant until such time as there is a Chief Executive Officer.

(b)     Each Manager on the Board of Managers shall serve until his or her incapacity, death, removal or resignation and until his or her successor is elected and/or appointed, as applicable, pursuant to <u>Section 5.3(c)</u>.

(c)     Subject to the designation thresholds set forth in <u>Sections 5.3(a)(i)-(a)(iii)</u>, as applicable, (i) a Manager (other than the CEO Manager) may only be removed with the prior consent of the Member entitled to appoint such Manager pursuant to this <u>Section 5.3</u>, (ii) a Member may remove and replace the Manager (other than the CEO Manager) that it is entitled to appoint pursuant to this <u>Section 5.3</u> at any time with or without cause by notice to the Company and (iii) in the event that a vacancy is created on the Board of Managers by the death, disability, incapacity, retirement, resignation or removal of a Manager (other than the CEO Manager), or if a seat with respect to such Manager (other than the CEO Manager) on the Board of Managers has not previously been filled, the Member entitled to appoint such Manager pursuant to this <u>Section 5.3</u> may designate the applicable replacement Manager or, in the case of a Manager appointed by Members holding a majority of the Class A Interests pursuant to <u>Section 5.3(d)</u> (calculated

excluding any Incentive Interests and any Class A Interests issued in any Excluded Issuances), the vacancy may be filled with a Manager appointed by a vote of the Board of Managers, to serve until the next annual meeting of the Members.  The CEO Manager will be removed automatically if such CEO Manager is no longer the chief executive officer of the Company.

(d)     In the event that any Member is no longer entitled to designate a Manager pursuant to this Section 5.3, then the applicable Manager(s) shall promptly resign or otherwise be automatically removed without any action required by the Board of Managers or any Members, and the vacant Manager position shall be appointed by the remaining Managers on the Board of Managers for the remainder of the applicable term.  Subject to the remainder of this Section 5.3(d), with respect to any Manager so appointed by the remaining Managers, at the next annual meeting of the Members thereafter, and at each annual meeting of the Members thereafter, such Manager shall be elected by Members holding a majority of the then outstanding Class A Interests (excluding any Incentive Interests and any Class A Interests issued in any Excluded Issuances) or by written consent pursuant to Section 6.11; *provided, however*, if, at any time prior to the Series A Payoff, all three Major Holder Members are no longer entitled to designate a Manager pursuant to Sections 5.3(a)(i)-(a)(iii), as applicable, then, at the annual meeting of the Members following the last occurrence of a Major Holder Member losing its right to designate a Manager (such last Manager seat of the Major Holder Members, the "***Trigger Seat***") and at each annual meeting of the Members thereafter, Members holding a majority of the then outstanding Class A Interests and Class B Interests (excluding any Incentive Interests and any Common Interests issued in any Excluded Issuances) shall elect (including by written consent pursuant to Section 6.11) a Manager to fill the Trigger Seat; *provided*, *further*, that, for the avoidance of doubt, the rights of the Class B Interests pursuant to this sentence shall only apply with respect to the Trigger Seat and shall not apply to any other vacancies on the Board of Managers prior to the Series A Payoff.  Following the Series A Payoff, Members holding Class B Interests shall be entitled to vote on all Manager elections that are submitted to the Members for approval with respect to seats that were allocated to Major Holder Members pursuant to Sections 5.3(a)(i)-(a)(iii).  Once any of the Members holds less than the applicable thresholds set forth in this Section 5.3, its applicable appointment rights with respect to such Manager(s) in this Section 5.3 shall terminate (notwithstanding any subsequent acquisition of Class A Interests that causes it to hold more than the applicable Class A Interests set forth in this Section 5.3).

(e)     All Managers shall be entitled to reimbursement of their reasonable and documented out-of-pocket expenses incurred in connection with their attendance of meetings of the Board of Managers and any committees of the Board of Managers; *provided*, *however*, that any Manager that is not an employee of any Member, the Company or any of their respective Affiliates or Subsidiaries shall be entitled to receive compensation in consideration for their services on the Board of Managers subject to approval thereof from time to time, pursuant to Section 5.9.

(f)     The Major Holder Managers shall elect a member of the Board of Managers (who shall not be the CEO Manager) to serve as Chairperson.

(g)     Any Manager may resign at any time by so notifying the Chairperson in writing; *provided* the Chairperson may resign by notifying each of the other members of the Board of Managers in writing.  Such resignation shall take effect upon receipt of such notice by the Chairperson or the other members of the Board of Managers, as applicable, or at such later time as is therein specified, and, unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective.

(h)     The designation of an individual as a Manager shall not of itself create a right to continued membership on the Board of Managers, attendance of the meetings of the Board of Managers, or employment with the Company.

(i)     The maximum number of Managers on the Board of Managers shall be initially set at five (5) Managers; *provided*, *however*, that the maximum number of Managers on the Board of Managers may be increased or decreased upon the unanimous approval of each of the Major Holder Members (to the extent that each such Major Holder Member, as applicable, has the right to appoint a Manager at such time).

5.4     Meetings of the Board of Managers.  The Board of Managers shall hold regular meetings at least once during each fiscal quarter at such time and place as shall be determined by the Board of Managers.  Special meetings of the Board of Managers may be called at any time by any Manager.  Written notice shall be required with respect to any meeting of the Board of Managers, and written notice of any special meetings shall specify the purpose of the special meeting.  Unless waived by all of the Managers then in office in writing (before, during or after a meeting) or with respect to any Manager at such meeting, prior notice of any regular or special meeting (including reconvening a meeting following any adjournments or postponements thereof) shall be given to each Manager then in office at least forty-eight (48) hours before the time of such meeting. Notice of any meeting need not be given to any Manager then in office who shall submit, either before, during or after such meeting, a signed waiver of notice.  Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except when the Manager attends the meeting for the express purpose of objecting at the beginning thereof to the transaction of any business because the meeting is not properly noticed, called or convened.

5.5     Quorum and Voting.

(a)     No action may be taken by the Board of Managers unless a quorum is present.  A quorum shall consist of the presence, in person, by electronic means or by proxy, of a majority of the Managers then in office. Except as otherwise set forth in this Agreement, the Board of Managers shall act by vote of a majority of the Managers present, in person, by electronic means or by proxy, at a meeting at which a quorum is present, and each Manager shall have one vote.

(b)     Subject to Section 5.9, no Manager shall be disqualified from acting on any matter because such Manager or the Member appointing such Manager is interested in the matter to be acted upon by the Board of Managers so long as all material aspects of such matter have been disclosed in reasonable detail to all Managers who are to act on such matter.  Each Manager may authorize in writing another natural person or natural persons to vote and act for such Manager by proxy, and such natural person or natural persons holding such proxy shall be counted towards the determination of whether a quorum of the Board of Managers is present.  One natural person may hold more than one proxy and each such proxy held by such natural person shall be counted towards the determination of whether a quorum of the Board of Managers exists. In addition to the requirements of Section 5.5(a), any action pursuant to Section 5.9 shall require the approval of a majority of the disinterested Managers.

5.6     Procedural Matters of the Board of Managers.

(a)     Any action required or permitted to be taken by the Board of Managers (or any committee thereof) may be taken without a meeting, if all the Managers or the members of a committee of the Board of Managers, as applicable, required to carry the vote at any duly convened meeting thereof, consent in writing to such action.  Such consent shall set forth the action or actions so taken and shall have the same effect as a vote of the Board of Managers or the applicable committee of the Board of Managers.

(b)     The Board of Managers (and each committee thereof) shall cause to be kept a book of minutes of all of its actions by written consent and in which there shall be recorded with respect to each meeting of the Board of Managers (or any committee thereof) the time and place of such meeting, whether regular or special (and if special, how called), the names of those present and the proceedings thereof.

(c)     Managers may attend and participate in a meeting of the Board of Managers (or any committee thereof) by conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear one another, and such participation shall constitute presence in person at such meeting; *provided*, *however*, the Board of Managers may, in its discretion, invite individuals who are not Managers to attend a meeting of the Board of Managers (or any committee thereof).

(d)     At each meeting of the Board of Managers, the Chairperson shall preside and, in his or her absence, Managers holding a majority of the votes present may appoint any member of the Board of Managers to preside at such meeting. The secretary (or such other person as shall be designated by the Board of Managers) shall act as secretary at each meeting of the Board of Managers. In case the secretary shall be absent from any meeting of the Board of Managers, an assistant secretary shall perform the duties of secretary at such meeting or the person presiding at the meeting may appoint any person to act as secretary of the meeting.

(e)     The Board of Managers may designate one or more committees to take any action that may be taken hereunder by the Board of Managers, which committees shall take actions under such procedures (not inconsistent with this Agreement) as shall be designated by it. Each committee of the Board of Managers shall be comprised of Managers (excluding the Chief Executive Officer or any other Managers that are employees of the Company or any of its Affiliates or Subsidiaries) in proportion to each Member's appointment rights to the Board of Managers unless any such Member with appointment rights pursuant to Section 5.3(a) consents in writing to less than proportionate representation on any such committee.

5.7     Officers.

(a)     All officers of the Company shall have such authority and perform such duties as may be provided in this Agreement or, to the extent not so provided, by resolution passed by the Board of Managers.  The officers of the Company shall be appointed by the Board of Managers. Each officer shall be a natural person eighteen years of age or older.  One person may hold more than one office.  In all cases where the duties of any officer, agent, or employee are not prescribed by this Agreement, such officer, agent or employee shall follow the orders and instructions of the Chief Executive Officer unless otherwise directed by the Board of Managers.  The officers, to the extent of their powers as set forth in this Agreement or as delegated to them by the Board of Managers, are agents of the Company and the actions of the officers taken in accordance with such powers shall bind the Company.

(b)     The secretary of the Company will generally perform all the duties usually appertaining to the office of secretary of a limited liability company.

5.8     Terms of Office; Resignation; Removal.

(a)     Each officer shall hold office until he or she is removed in accordance with Section 5.8(c) below or his or her earlier death, disability or resignation.  Any vacancy occurring in any of the officers of the Company, for any reason, shall be filled by action of the Board of Managers.

(b)     Any officer may resign at any time by giving written notice to the Board of Managers.  Such resignation shall take effect at the time specified in such notice or, if the time be not specified, upon receipt thereof by the Board of Managers.  Unless otherwise specified therein, acceptance of such resignation shall not be necessary to make it effective.

(c)     Each officer shall be subject to removal by the Board of Managers.

(d)     The compensation and terms of employment of all of the officers shall be fixed by the Board of Managers from time to time.

5.9     <u>Related Party Transactions</u>.

(a)     Neither the Company nor any of its Subsidiaries shall enter into, or amend or waive the material terms of any transaction, agreement or arrangement with any Related Person or any employees of any Member other than (i) customary employment (in the case of employees), indemnification or expense reimbursement arrangements with Managers, officers or employees of the Company in the ordinary course of business or awards pursuant to a Management Incentive Plan, (ii) subject to <u>Sections 5.9(b)</u> and <u>5.9(c)</u>, a transaction in which Preemptive Rights apply pursuant to <u>Section 9.9</u> hereof, or (iii) to the extent the Recovery Solutions Business (as defined in the Plan) is a Related Person of the Company at such time, any transaction, agreement or arrangement between the Company and the Recovery Solutions Business, in each case, unless such transaction, agreement or arrangement is (x) on arm's length terms and (y) approved by a majority of the disinterested Managers on the Board of Managers (in accordance with <u>Section 5.5(b)</u>).  If the Board of Managers (in its sole discretion) (1) engages a financial advisor or (2) undertakes in a bona fide market process with respect to a proposed transaction, then any such transaction pursuant thereto shall be deemed to be on arm's length terms for purposes of clause <u>(x)</u> of this <u>Section 5.9(a)</u> and <u>Section 5.9(c)</u>.

(b)     During the first twelve (12) months following the Effective Date, any issuance of Membership Interests (including any transaction in which Preemptive Rights apply pursuant to <u>Section 9.9</u> hereof) pursuant to a transaction in which any Major Holder Member actually participates shall be subject to the conditions set forth in <u>Section 5.9(a)</u>; *provided, however*, that the foregoing shall not apply to any transactions in which (i) Preemptive Rights apply and (ii) Third Party Purchasers are reasonably expected to acquire at least twenty-five percent (25%) of the Membership Interests or any other equity Securities issued by the Company in such transaction.

(c)     Any issuance of equity Securities that rank senior to the Series A Preferred Interests or are otherwise on terms which are less favorable to the Company than those of the Series A Preferred Interests (including pursuant to any transaction in which Preemptive Rights apply pursuant to <u>Section 9.9</u> hereof) shall be on arm's length terms as determined in good faith by the Board of Managers.

5.10     <u>Board Observers</u>.

(a)     So long as a Major Holder Member is entitled to appoint a Manager to Board pursuant to <u>Sections 5.3(a)(i)-5.3(a)(iii)</u>, as applicable, such Major Holder Member may, from time to time, select, and shall notify the Board of Managers in writing of its selection of, one (1) non-voting observer to attend meetings of the Board of Managers and any committees thereof.

(b)     Without duplication of the rights set forth in <u>Section 5.10(a)</u>, each 10% Class A Member shall be entitled to appoint one (1) non-voting observer so long as such 10% Class A

Member continues to hold at least ten percent (10%) of the outstanding Class A Interests (calculated excluding any Incentive Interests and any Class A Interests issued in any Excluded Issuances).

(c)     The Liquidating Trust (as defined in the Plan) will have the right to designate one (1) non-voting observer so long as the Liquidating Trust holds at least fifty percent (50%) of the Class B Interests held by the Liquidating Trust on the Effective Date (such Person designated to serve as an observer pursuant to this Section 5.10(c), the "**Liquidating Trust Observer**" and, together with any such Person so designated to serve as an observer pursuant to Section 5.10(a) or 5.10(b), an "**Observer**" and, collectively, the "**Observers**").  The Liquidating Trust Observer shall be a professional independent director or manager or otherwise qualified professional and shall be independent from the Company, the Company's Affiliates and any of the Company's major equityholders or major debtholders.  The Liquidating Trustee (as defined in the Plan) will consult in good faith with the Board of Managers as to the selection of the Liquidating Trust Observer, and the Liquidating Trust Observer will not have any conflicts of interest with respect to the Company. For the avoidance of doubt, the right to appoint a Liquidating Trust Observer is solely the right of the Liquidating Trust and does not entitle any other Member that may hold Class B Interests to such right.

(d)     Each Observer shall have the right to attend and be heard at any formal and informal meetings of the Board of Managers and any committees thereof and must also be given the opportunity to participate in any such meeting telephonically or through other virtual means of communication (e.g., by providing dial-in instructions or a hyperlink to a Zoom, Microsoft Teams or similar conference) and have full access to any materials distributed to the Board of Managers or any committee thereof; *provided, however,* that the Company reserves the right to exclude any Observer from access to any material or meeting or portion thereof if the Board of Managers determines reasonably in good faith and upon the advice of counsel, whose determination shall be conclusive, that (i) such exclusion is reasonably necessary to preserve any applicable privilege, including the attorney-client or work product privilege between the Company or any of its Affiliates and its counsel, (ii) such exclusion is reasonably necessary to avoid a bona fide conflict of interest with respect to the subject matter of such materials or meeting (or portion thereof), or (iii) such exclusion is reasonably necessary to avoid a violation of any applicable laws or regulations; provided that any such exclusion shall be narrowly tailored to ensure that any such exclusion is limited solely to the portion of any such meeting or materials as is necessary, on the advice of counsel, to (x) protect such privilege, (y) avoid a bona fide conflict of interest with respect to the subject matter of such materials or meeting, or (z) avoid a violation of applicable law.  The Observers shall be entitled to notice of all meetings of the Board of Managers or any committees thereof in the same manner and at the same time as notice is sent to, and shall be sent copies of all notices, reports, minutes, proposed or executed consents and other documents at the time and in the manner as they are provided to, members of the Board of Managers or any committees thereof, except with respect to information from which the Board of Managers has determined reasonably in good faith, whose determination shall be conclusive, to exclude from each Observer pursuant to the proviso in the foregoing sentence. Each Observer shall be required to execute a customary confidentiality agreement and an appointment agreement reasonably acceptable to the Company prior to attending such meetings or receiving any written materials to be discussed at such meetings. The Observers shall not receive any compensation or fees from the Company; *provided*, *however*, each Observer shall be entitled to reimbursement for reasonable out-of-pocket expenses incurred in connection with their attendance of meetings of the Board of Managers or any committees of the Board of Managers; *provided*, *further*, for the avoidance of doubt, the Company shall not pay any compensation, fees or other expenses to the Liquidating Trust Observer other than the reimbursement provided for in this Section 5.10(d).

5.11     Supermajority Board Approval Rights.  The Company shall not, and as applicable, shall not cause or permit any of its Subsidiaries to, take any of the following actions without the approval of a majority of the Managers excluding the CEO Manager or any other employee of the Company that may be then serving on the Board of Managers:

(a)     purchase or redeem any Membership Interests or any other equity Securities issued by the Company (other than Incentive Interests);

(b)     authorize (or otherwise reclassify) any new Securities having any preference or priority as to distributions, voting or other contractual approval rights superior to the Common Interests;

(c)     hire, terminate or otherwise demote the Chief Executive Officer or any other C-level executive;

(d)     consummate an IPO or any direct listing of any Securities of the Company or any successor thereto;

(e)     consummate a Change of Control, other than any Drag-Along Sale pursuant to Section 9.5(a);

(f)     any acquisition or disposition (whether of a sale of equity or assets, disposition of assets, merger or consolidation) of the Company or any of its Subsidiaries, in each case, in one transaction or a series of related transactions involving total consideration in excess of $25,000,000, which amount may be increased by Supermajority Board Approval to an amount of up to $50,000,000;

(g)     change any tax or accounting policy, practice or procedure (except as required by applicable law or a mandatory change in GAAP) by the Company, any of its Subsidiaries, or any of their Affiliates;

(h)     dissolve, liquidate or wind up the Company, any of its Subsidiaries or any of their Affiliates, other than as expressly required by applicable law; or

(i)     agree or commit to do any of the foregoing.

The approvals required under this Section 5.11 are in addition to any other required approval under this Agreement.

## ARTICLE VI
## MEMBERS AND MEETINGS

6.1     Members.  The name, address, number and type of Membership Interests of each Member are set forth on the Register of Members.  Such schedule shall be amended from time to time to reflect the admission of new Members, Additional Capital Contributions of the Members, and the Transfer of Membership Interests, each as permitted by the terms of this Agreement.  Absent manifest error as determined by the Board of Managers in good faith, the ownership interests recorded on the Register of Members shall be conclusive record of the outstanding Membership Interests and the record owners thereof.

6.2     Admission of New Members.  New Members may be admitted (i) by the Board of Managers or (ii) in accordance with the transfer provisions contained in Article IX.   Each new Member, prior to being admitted, shall represent and warrant to the Company that such new Member is acquiring the Membership Interests solely for its own account for investment purposes and not with a view to, or for offer

or sale in connection with, any distribution thereof, that such new Member acknowledges that the Membership Interests are not registered under the Securities Act, and that the Membership Interests may not be transferred or sold except pursuant to the registration provisions of the Securities Act, or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable, and that the new Member is not a Competitor of the Company and make such other representations as the Company shall deem necessary or appropriate.

6.3     <u>Resignation</u>.  A Member may not resign or withdraw from the Company prior to the dissolution and winding up of the Company. This <u>Section 6.3</u> shall have no effect on a Member's right to transfer Membership Interests in accordance with the terms of this Agreement.

6.4     <u>Power of Members</u>.  The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and, except as otherwise expressly set forth herein with respect to any specific powers, the Act.  The Members holding Class A Common Interests shall elect the Board of Managers in accordance with <u>Section 5.3</u>.  Except as otherwise specifically provided by this Agreement or required by the Act, no Member shall have the power to act for or on behalf of, or to bind, the Company.

6.5     <u>Meetings of Members</u>.  Meetings of the Members shall, and may only, be called by the Board of Managers.  The Members holding Common Interests may vote, approve a matter or take any action by voting their Common Interests at a meeting, in person or by proxy, or without a meeting by written consent of the Members pursuant to <u>Section 6.11</u>.

6.6     <u>Place of Meetings</u>.  The Board of Managers or a duly authorized committee thereof may designate any place, either within or outside of the State of Delaware, as the place of meeting for any annual meeting or for any special meeting of the Members; *provided*, *however*, the Board of Managers may also determine, whose determination shall be conclusive, to hold any annual meeting or special meeting of the Members in a virtual format.  If no designation is made, the place of meeting shall be the Principal Office of the Company. Members may participate in a meeting by means of a conference telephone or electronic media by means of which all persons participating in the meeting can communicate concurrently with each other, and any such participation in a meeting shall constitute presence in person of such Member at such meeting.

6.7     <u>Notice of Members' Meetings</u>.

(a)     In connection with the calling of any meeting of the Members, the Board of Managers may set a record date for determining the Members entitled to vote at such meeting.  Written notice stating the place, day, and hour of the meeting and, in case of a special meeting, the purpose for which the meeting is called shall be delivered not less than five (5) days nor more than sixty (60) days before the date of the meeting, either personally, by email or by mail, by or at the direction of any Manager calling the meeting to each Member, whether or not such Member is entitled to vote at such meeting.

(b)     Notice to Members shall be given in accordance with <u>Section 12.3</u>.

(c)     When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the Company may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting.

6.8     <u>Waiver of Notice</u>.

(a)     When any notice is required to be given to any Member of the Company under the provisions of this Agreement, a waiver thereof in writing signed by the Person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

(b)     By attending a meeting, a Member:

(i)     Waives objection to lack of notice or defective notice of such meeting unless the Member, at the beginning of the meeting, objects to the holding of the meeting or the transacting of business at the meeting; and

(ii)    Waives objection to consideration at such meeting of a particular matter not within the purpose or purposes described in the meeting notice unless the Member objects to considering the matter when it is presented.

6.9     <u>Voting Interests</u>.  Except as expressly provided otherwise in this Agreement, the "***Voting Interest***" of each holder of Membership Interests shall be equal to the Common Ownership Percentage owned by such holder. Incentive Interests (if and when issued) and Series A Preferred Interests shall not be entitled to vote, in each case, except to the extent required by the Act or <u>Section 12.4</u>.

6.10    <u>Quorum; Vote Required</u>.  The presence at a meeting, in person or by proxy, of Members owning a majority of the outstanding Voting Interests entitled to vote on the subject matter of the meeting at the time of the action taken constitutes a quorum for the transaction of business required.  When a quorum is present, the affirmative vote, in person or by proxy, of Members owning a majority of the Voting Interests entitled to vote on the subject matter shall be the act of the Members, unless the vote of a greater proportion or number or voting by classes is required by the Act or by this Agreement.  If a quorum is not represented at any meeting of the Members, such meeting may be adjourned to a period not to exceed sixty (60) days at any one adjournment.

6.11    <u>Action by Written Consent of Members</u>.  Any action required or permitted to be taken at any meeting of the Members may be taken without a meeting if Members holding not less than the minimum number of Voting Interests that would be necessary to approve the action pursuant to the terms of this Agreement, consent thereto in writing, and the writing or writings are filed with the minutes of the proceedings of the Members.  In no instance where action is authorized by written consent shall a meeting of Members be required to be called or notice required to be given prior to such action; *provided*, *however*, a copy of the action taken by written consent shall be with the Records of the Company maintained at the Principal Office.  Reasonably prompt notice, including posting to the datasite for the Members, of the taking of any action taken without a meeting by less than unanimous written consent shall be given to those Members who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of Members to take the action were obtained; *provided, however,* that the effectiveness of such action is not dependent on the giving of such notice so long as any such written consent without a meeting shall be distributed to all Members not less than twenty-four hours prior to the effectiveness of any such action.  Written consent by the Members pursuant to this <u>Section 6.11</u> shall have the same force and effect as a vote of such Members taken at a duly held meeting of the Members and may be stated as such in any document.

6.12    <u>Voting by Ballot</u>.  Voting on any question or in any election may be by voice vote unless the presiding officer shall order or any Member shall demand that voting be by ballot.

6.13   No Cumulative Voting.   No Member shall be entitled to cumulative voting in any circumstance.

6.14   Special Voting Requirements.

(a)   If at any time, including pursuant to the exercise of certain rights contained herein, a Member that is a bank, financial institution, or an Affiliate thereof or any other Member that elects to be treated as such (a "*Voluntary Voting Restricted Member*") holds more than 4.9% of any class of Membership Interests, such Member may at its sole option elect, by delivering a written notice of such election to the Company, to suspend the voting rights associated with any Membership Interests held by such Member in excess of 4.9% of any such class of Membership Interests of the Company (the "*Elected Units*") in each case, except to the extent required by the Act or Section 12.4.   Upon such election, the Company will suspend the voting rights attached to the Elected Units.   Other than with respect to voting during any period in which a Voluntary Voting Restricted Member has elected to suspend its voting rights, the Elected Units shall carry the same rights and privileges as in effect immediately prior to any such election (including in respect of distributions), in all respects.   For the avoidance of doubt, an irrevocable election by a Voluntary Voting Restricted Member will be treated as irrevocable by the Company.   Notwithstanding the foregoing, a Voluntary Voting Restricted Member, upon providing at least sixty-one (61) days' prior written notice to the Company, shall be entitled to reinstate its voting rights with respect to its Elected Units, and any such Membership Interests shall thereafter carry the same rights and privileges as all other Membership Interests, including with respect to voting.

(b)   The Company shall use commercially reasonable efforts to cooperate in good faith with each Voluntary Voting Restricted Member in order to avoid such Voluntary Voting Restricted Member being deemed to control the Company or any successor to the Company (or being required to divest all or any portion of its Membership Interests).

(c)   Notwithstanding anything contained herein to the contrary, if UBS reasonably determines that is has a Regulatory Concern, the Company shall, upon written notice by UBS, accept the tender of any and all ownership interests of the Company held by UBS as a contribution to the Company at no cost to the Company (the "*Regulatory Tender*").   The closing of any Regulatory Tender shall take place promptly following delivery of the applicable tender notice.

## ARTICLE VII
## EXCULPATION; INDEMNIFICATION; LIABILITY; OPPORTUNITY

7.1   Exculpation.

(a)   No Manager, officer or Member, in any way, guarantees or shall be liable for the return of any Members' capital contributions or a profit for the Members from the operations of the Company. To the fullest extent permitted by law, including as not prohibited by Section 18-1101 of the Act, none of (i) the officers of the Company or any of its Subsidiaries, (ii) the Managers, (iii) the Members (including each Member appointing and each Investment Manager directing the appointment of a Manager, whether in its capacity as such appointing Member, Investment Manager, or otherwise and each Fund Indemnitor related to or affiliated with such Member, Manager, and/or Investment Manager), (iv) any Person who is or was serving at the request of the Company for another corporation, partnership, limited liability company or other entity or enterprise as a director, officer, partner, member, manager or trustee thereof, (v) the Observers, or (vi) any of the Managers' or the Members' respective Affiliates, Investment Managers, or any of their respective officers, directors, employees, partners, members, managers, advisors, representatives or equityholders (each Person described in (i)-(v), a "*Protected Person*") will be

liable to the Company, any Member, any Manager or any other Person that is a party to or is otherwise bound by this Agreement for any loss or damage sustained by the Company, any Member, any Manager or any other Person that is a party to or is otherwise bound by this Agreement except as specifically provided to the contrary in the immediately following sentence. None of the Protected Persons shall be liable to the Company, its Members, its Managers or any other Persons that are a party to or are otherwise bound by this Agreement for any loss or damage resulting from any act or omission taken or suffered by such Protected Person in connection with the conduct of the affairs of the Company or otherwise in connection with this Agreement or the matters contemplated hereby, unless such loss or damage is incurred by reason of such Protected Person's acts or omissions that constitute a bad faith violation of the implied contractual covenant of good faith and fair dealing or, with respect to any Protected Person described in clauses (i) and (iv) above (in their capacity as such), any matter for which the personal liability of an officer of a Delaware corporation is not permitted to be eliminated under the General Corporation Law of the State of Delaware. Any Protected Person or officer may consult with legal counsel, accountants, advisors or other similar persons with respect to the Company's affairs and shall be fully protected and justified in any action or inaction that is taken or omitted in good faith, in reliance upon and in accord with the opinion or advice of such persons; *provided*, *however*, such legal counsel, accountants, advisors or other similar persons shall have been selected in good faith. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in Section 18-406 of the Act.

(b)     None of the Members, by reason of their execution of this Agreement or a joinder to this Agreement or their status as Members or equity holders of the Company shall be responsible or liable for any indebtedness, liability or obligation of any other Member incurred either before or after the execution of this Agreement.

7.2     <u>Indemnification</u>.

(a)     To the fullest extent permitted under the Act and applicable law, the Company shall indemnify and hold harmless each of the Protected Persons and each officer of the Company and each officer, director or manager of its Subsidiaries (each, an "***Indemnitee***") from and against any and all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim) of any nature whatsoever, known or unknown, liquidated or unliquidated (collectively, "***Damages***"), that are incurred by any Indemnitee, and arise out of, are related to, or are in connection with (i) the affairs or operations of the Company or the performance by such Indemnitee of any of the Indemnitee's responsibilities hereunder and (ii) the service at the request of the Company by such Indemnitee as a partner, member, manager, director, officer, trustee, employee or agent of any other Person; *provided, however*, that the Indemnitee (A) acted in good faith and, to the extent such Indemnitee is an officer, consultant or employee of the Company or its Subsidiaries, in a manner such Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, (B) did not violate any applicable fiduciary duties set forth in <u>Section 7.3(c)</u> and (C) with respect to any criminal action or proceeding, had no reasonable cause to believe such Indemnitee's conduct was unlawful; *provided, further, however*, that no Member shall be entitled to indemnification from the Company for any indemnification such Member may be obligated to provide pursuant to <u>Section 10.11(b)</u>. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Indemnitee did not act in good faith and in a manner which such Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such Indemnitee's conduct was unlawful. The indemnification obligations of the Company pursuant to this <u>Section</u>

7.2 shall be satisfied from and limited to the Company's assets and no Member shall have any personal liability on account thereof.

(b)    The Company shall pay reasonable, documented expenses incurred by any Indemnitee in defending any action, suit or proceeding described in subsection (a) of this Section 7.2 in advance of the final disposition of such action, suit or proceeding, as such Damages are incurred; *provided, however*, that any such advance shall only be made if such Indemnitee provides written affirmation to repay such advance if it shall ultimately be determined by a court of competent jurisdiction that such Indemnitee is not entitled to be indemnified by the Company pursuant to this Section 7.2.

(c)    Certain Indemnitees that are directors, officers, employees, stockholders, partners, limited partners, members, equityholders, managers, or advisors of any Member or any of such Member's Affiliates (each such Person, a "**Fund Indemnitee**") may have certain rights to indemnification, advancement of expenses and/or insurance provided by or on behalf of such Member and/or its Affiliates (collectively, the "**Fund Indemnitors**").  Notwithstanding anything to the contrary in this Agreement or otherwise:  (i) the Company is the indemnitor of first resort (*i.e.*, the Company's obligations to each Fund Indemnitee are primary and any obligation of the Fund Indemnitors to advance Damages or to provide indemnification for such Damages incurred by each Fund Indemnitee are secondary), (ii) the Company shall be required to advance the full amount of Damages incurred by each Fund Indemnitee and will be liable for the full amount of all such Damages paid in settlement to the extent legally permitted and as required by this Agreement, without regard to any rights each Fund Indemnitee may have against the Fund Indemnitors, and (iii) the Company irrevocably waives, relinquishes and releases the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.  Notwithstanding anything to the contrary in this Agreement or otherwise, no advancement or payment by the Fund Indemnitors on behalf of a Fund Indemnitee with respect to any claim for which such Fund Indemnitee has sought indemnification or advancement of Damages from the Company shall affect the foregoing and the Fund Indemnitors will have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Fund Indemnitee against the Company. The Fund Indemnitors are express third party beneficiaries of the terms of this Section 7.2(c).

(d)    Without limiting Section 7.2(c), the indemnification provided by this Section 7.2 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement, determination of the Board of Managers or otherwise.  The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Section 7.2 shall continue as to an Indemnitee who has ceased to be a Member, Manager or officer (or other Person indemnified hereunder) and shall inure to the benefit of the successors, executors, administrators, legatees and distributees of such Person.

(e)    The provisions of this Section 7.2 shall be a contract between the Company, on the one hand, and each Indemnitee who served at any time while this Section 7.2 is in effect in any capacity entitling such Indemnitee to indemnification hereunder, on the other hand, pursuant to which the Company and each such Indemnitee intend to be legally bound. No repeal or modification of this Section 7.2 shall affect any rights or obligations with respect to any state of facts then or theretofore existing or thereafter arising or any action, suit or proceeding theretofore or thereafter brought or threatened based in whole or in part upon such state of facts.

(f)    The Company may enter into indemnity contracts with Indemnitees and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under this Section 7.2 hereof and containing such other procedures

regarding indemnification as are appropriate.  For the avoidance of doubt, each of the Managers shall be entitled to receive indemnity contracts with the Company on terms no less favorable than any other indemnity contract entered into between the Company (or any of its Subsidiaries) and any other Manager.

7.3     Liability; Duties.

(a)     Except as otherwise expressly required by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member, officer nor any Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being an officer, Member or acting as a Manager of the Company.

(b)     To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provision of law or equity or otherwise, the parties hereto hereby agree that any duties (including fiduciary duties) of a Member or Manager (but not the duties of the officers of the Company, in their capacity as such) owed to the Company, the Members or any other Person (whether bound by this Agreement or otherwise) are hereby waived and eliminated to the fullest extent permitted under Delaware law and any other applicable law; *provided, however,* that (i) the foregoing shall not be deemed to eliminate the implied contractual covenant of good faith and fair dealing and (ii) the foregoing shall not apply to employees or officers of the Company or its Subsidiaries.  Notwithstanding any other provision of this Agreement (but subject to the provisos in the first sentence of this Section 7.3(b)) or otherwise applicable provision of law or equity, whenever in this Agreement, any Member or Manager (but not the officers of the Company, in their capacity as such) is permitted or required to take any action or make any decision, such Member or Manager shall be entitled to consider only such interests and factors as he, she or it desires, including exclusively his, her or its own interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation (fiduciary or otherwise) to give any consideration to any interest of or factors affecting the Company, the Subsidiaries, any Member or any other Person, and shall be entitled to act in a manner adverse to the Company, the Subsidiaries, the Members and any other Person.

(c)     The officers of the Company, in their capacity as such (including, for the avoidance of doubt, the CEO Manager in his or her capacity as Chief Executive Officer), shall have fiduciary duties identical to those of officers of business corporations organized under the General Corporation Law of the State of Delaware.

(d)     The provisions of this Agreement, to the extent that they restrict or eliminate the duties (including fiduciary duties) and liabilities of a Person to the Company, any Member, any Manager or any other Person that is a party to or is otherwise bound by this Agreement otherwise existing at law, in equity or otherwise, are agreed by the parties hereto to replace such other duties and liabilities of such Person.

(e)     The Members acknowledge and agree that the foregoing is intended to comply with the provisions of the Act (including Section 18-1101 of the Act) permitting members and managers of a limited liability company to eliminate fiduciary duties to the fullest extent permitted under the Act.

7.4     Insurance.  The Company shall purchase and maintain insurance, on behalf of such Indemnitees (and shall use commercially reasonable efforts to include the Observers on such insurance coverage), and may purchase and maintain insurance on behalf of the Company, against any liability that

may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such Indemnitees, and in such amounts, as the Board of Managers reasonably determines are customary for similarly-situated businesses such as the Company and its Subsidiaries, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement.

7.5     Limited Liability Company Opportunity.

(a)     Each Member and the Company acknowledges and affirms that the Members (and their owners, affiliated funds and Affiliates) and the Managers (excluding any Manager that is an officer or employee of the Company or any of its Subsidiaries) may have, and may continue to participate in, directly or indirectly, investments in assets and businesses which are, or will be, suitable for the Company or competitive with the Company's business.

(b)     Each Member, individually and on behalf of the Company, expressly (i) waives any conflicts of interest or potential conflicts of interest that exist or arise as a result of any such investments and agrees that no Member, Manager nor any of their respective Affiliates or representatives shall have liability to any Member or any Affiliate thereof, or the Company with respect to any such conflicts of interest or potential conflicts of interest, (ii) acknowledges and agrees that no Member nor any of its Affiliates or representatives (including any Manager appointed by such Member) will have any duty (A) to disclose to the Company or any other Member any such business opportunities or (B) not to pursue any such business opportunities, in each case, whether or not competitive with the Company's business and whether or not the Company might be interested in such business opportunity for itself (except to the extent that such Person is a Manager that is an officer, consultant or employee of the Company or any of its Subsidiaries, (iii) agrees that the terms of this Section 7.5 to the extent that they modify or limit a duty or other obligation (including fiduciary duties), if any, that a Member or any of its Affiliates or representatives may have to the Company or any other Member under the Act or other applicable law, rule or regulation, are reasonable in form, scope and content, and (iv) waives to the fullest extent not prohibited by the Act any duty or other obligation, if any, that a Member may have to the Company or another Member, pursuant to the Act or any other applicable law, rule or regulation, to the extent necessary to give effect to the terms of this Section 7.5.

**ARTICLE VIII**
**ACCOUNTING; FINANCIAL AND TAX MATTERS**

8.1     Books and Records; Reports.

(a)     The books and records of the Company will be maintained at the Company's Principal Office.

(b)     The Board of Managers shall maintain or cause to be maintained a system of accounting established and administered in accordance with the accrual method of accounting or as shall be required by GAAP, and shall set aside on the books of the Company or otherwise record all such proper reserves pursuant to the accrual method of accounting or as shall be required by GAAP.

(c)     As soon as reasonably practicable after the close of each fiscal year of the Company, but in any event not later than one hundred twenty (120) days after the end of each fiscal year of the Company (*provided*, *however*, that, in the case of the fiscal year ending December 31, 2025, within 150 days of such year end), the Company shall provide (including by posting to the datasite for the Members) to each Member (other than to any Member that is a Competitor of the

Company) a copy of the audited consolidated financial statements of the Company and its Subsidiaries (including a balance sheet, statement of income and statement of cash flows, together with the notes thereto) and the opinion of a recognized independent certified public accounting firm with respect to such financial statements.

(d)     As soon as reasonably practicable after the end of each of the first three (3) fiscal quarters of each fiscal year, but in any event not later than forty-five (45) days after the end of each of the first three fiscal quarters of each fiscal year of the Company (provided, however, that, in the case of the second fiscal quarter of fiscal year 2025 (for the fiscal quarter ending June 30, 2025) and the third fiscal quarter of fiscal year 2025 (for the fiscal quarter ending September 30, 2025), within 60 days of such quarter end), commencing with the fiscal quarter ending March 31, 2025, the Company shall provide (including by posting to the datasite for the Members) to each Member (other than to any Member that is a Competitor of the Company) the unaudited consolidated financial statements of the Company and its Subsidiaries (including a balance sheet, statement of income and statement of cash flows) for each such fiscal quarter, all certified by an appropriate officer of the Company.

(e)     The Company shall make the information and reports to be provided pursuant to Sections 8.1(c) and 8.1(d) available (including by posting to the datasite for the Members) to the Members and any bona fide prospective third party transferees of a Member's Membership Interests identified by a Member, in each case, subject to such potential transferee entering into a customary non-disclosure agreement with the Company (including on a click-through basis, and which will provide that such potential transferee may not share such information and reports) and confirmation by the Company that such potential transferee would be eligible to acquire Membership Interests in the Company; *provided, however*, that notwithstanding the foregoing, and, for the avoidance of doubt, no data site access or other information or reports will be made available to a Competitor of the Company.

(f)     Notwithstanding the foregoing, no financial information required to be furnished pursuant to Sections 8.1(c) and 8.1(d) shall be required to include any information required by, or to be prepared or approved in accordance with, or otherwise be subject to, any provision of Section 404 of the Sarbanes-Oxley Act of 2002 or any rules, regulations, or accounting guidance adopted pursuant to that section.

(g)     The Company shall conduct quarterly update calls with the Members, beginning with the fiscal quarter ending June 30, 2025.

(h)     So long as the Liquidating Trust is entitled to appoint the Liquidating Trust Observer pursuant to Section 5.10(c), the Officers shall, upon written request (e-mail being sufficient) from the trustee of the Liquidating Trust, make themselves available at a mutually agreed time (but, unless agreed by such trustee, a date that is not more than thirty (30) days from the date of such request) for a call or videoconference with representatives of the Liquidating Trust no more than twice per fiscal year to discuss the business of the Company and its Subsidiaries.

(i)     Upon a written request from a Member that specifies in detail the information being requested and the basis for such request (including with reference to the specific law, rule or regulation, as applicable), the Company will use commercially reasonable efforts to provide such Member with information that such Member determines, upon advice of counsel, is strictly necessary in order for such Member (or its Affiliates or any Related Person) to comply with any applicable law or applicable regulatory or tax requirements of such Member; *provided*, that any information provided by the Company pursuant to this Section 8.1(i) shall be considered Confidential Information.

(j)     For the avoidance of doubt, the information rights set forth in this <u>Section 8.1</u> for the benefit of the Class B Interests shall only apply to the Liquidating Trust, in its capacity as a holder of Class B Interests, and any third party transferee thereof that, together with its Affiliates, holds as of the applicable date of determination, at least ten percent (10%) of the outstanding Class B Interests. The information provided to the Liquidating Trust pursuant to this <u>Section 8.1</u> shall be considered Confidential Information and shall not be disseminated to or otherwise shared with any beneficiaries of the Liquidating Trust or any other Person. For the avoidance of doubt, nothing in this <u>Section 8.1(j)</u> shall affect or otherwise limit the information rights of any Member holding Class A Interests.

8.2     <u>Fiscal Year; Taxable Year</u>.  The fiscal year of the Company for financial accounting purposes shall end on December 31.  The taxable year of the Company for federal, state and local income tax purposes shall end on December 31 unless another date is required by the Code.

8.3     <u>Bank and Investment Accounts</u>.  All funds of the Company shall be deposited in its name, or in such name as may be designated by the Board of Managers, in such checking, savings or other accounts, or held in its name in the form of such other investments, as shall be designated by the Board of Managers. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such officer or officers of the Company as the Board of Managers may designate.

8.4     <u>Tax Election</u>.  The Company shall elect to be treated as a corporation for U.S. federal income and applicable state income tax purposes effective as of the date of its formation.

## ARTICLE IX
## TRANSFERS OF MEMBERSHIP INTERESTS; RIGHT OF FIRST OFFER; TAG ALONG RIGHT; DRAG ALONG RIGHT; PREEMPTIVE RIGHTS

9.1     <u>Limitation on Transfer</u>.

(a)     The Members shall not, directly or indirectly, Transfer any Membership Interests except in accordance with the provisions of this Agreement.  Any attempt to Transfer any Membership Interests in violation of the provisions of this <u>Article IX</u> shall be null and void *ab initio* and the Company shall not register or effect any such Transfer.  Any Transfer pursuant to <u>Sections 9.2</u>, <u>9.3</u>, <u>9.4</u> or <u>9.5</u> shall not be prohibited by this <u>Section 9.1</u>.  Any Transfer made in accordance with the provisions of this <u>Article IX</u> shall not require the approval of the Board of Managers.

(b)     No Transfer contemplated by this <u>Article IX</u> shall be permitted if, as a result of such Transfer, the Company (i) could be reasonably likely to be subject to reporting obligations under the Exchange Act or otherwise required to make any filing with the Commission or (ii) would be reasonably likely to violate the registration or qualification provisions of any applicable securities laws.  The Members shall not, directly or indirectly, Transfer any Membership Interests to a Competitor of the Company (except in connection with a transaction that is a Drag-Along Sale or an Approved Sale). The Company may institute legal proceedings to force rescission of a Transfer prohibited by this <u>Section 9.1</u> and to seek any other remedy available to it at law, in equity or otherwise, including an injunction prohibiting any such Transfer.

(c)     The Board of Managers shall have the power to determine all matters related to this <u>Section 9.1</u>, including matters necessary or desirable to administer or to determine compliance with this <u>Section 9.1</u> and, absent actual fraud, bad faith, manifest error, or self-dealing, the

determinations of the Board of Managers shall be final and binding on the Company and the Members and any proposed transferee.

(d)     The Members shall not, directly or indirectly, Transfer any Incentive Interests or permit any Incentive Interests to be subject to any liens, restrictions, claims, garnishments, or encumbrances, except those restrictions arising under applicable securities laws and this Agreement or with the prior written consent of the Board of Managers, and any attempt to Transfer any Incentive Interests or subject any Incentive Interests to any such liens, restrictions, claims, garnishments, or encumbrances without the prior written consent of the Board of Managers shall be null and void *ab initio* and the Company shall not register or effect any such Transfer.

9.2     <u>Permitted Transfers</u>.  Without compliance with <u>Sections 9.3</u> or <u>9.4</u> or the requirement of any consent of the Board of Managers or the Company: (i) a Member may Transfer its Membership Interests or any portion thereof to any Affiliate of such Member, and (ii) a Member may Transfer his or her Membership Interests or any portion thereof to any Family Member (or a Family Member of such Member's spouse, parent or sibling), a company, partnership or a trust established for the benefit of any of the foregoing or any personal representative, estate or executor under any will of such Member or pursuant to the laws of intestate succession, *provided, however,* that, in each case, such Transfer is made in accordance with the applicable provisions of <u>Section 9.1</u> and <u>Section 9.6</u>.  The Persons to whom Members may Transfer their Membership Interests or any portion thereof pursuant to this <u>Section 9.2</u> are referred to hereinafter as "***Permitted Transferees***"; *provided, however,* that, in each case, such Transfer is made in accordance with <u>Section 9.1</u> and <u>Section 9.6</u>.

9.3     <u>Right of First Offer</u>.

(a)     Except in a transaction pursuant to which <u>Sections 9.2</u>, <u>9.4</u> or <u>9.5</u> apply, if at any time a Member wishes to Transfer all or any portion of such Member's Membership Interests (such Member, the "***Selling ROFO Member***") to any Person other than a Permitted Transferee (such Person, a "***Third Party Purchaser***"), such Selling ROFO Member shall first offer such Membership Interests that are proposed to be Transferred by sending written notice (the "***Offer Notice***") in the form attached hereto as <u>Exhibit A</u>, to the Company for transmittal to (i) each Major Holder Member, so long as such Major Holder Member is entitled to appoint a Manager to the Board of Managers, and (ii) each 10% Class A Member at the applicable time (all such Members, "***Rightholders***"), which Offer Notice shall be an offer to sell and shall state the proposed terms of such Transfer, including (x) the number of Membership Interests such Selling ROFO Member proposes to Transfer (the "***Offered Interest***"), (y) the proposed amount and consideration (which consideration shall be exclusively cash) (the "***Offer Sale Price***") and (z) all other material terms and conditions of the proposed Transfer; *provided*, *however*, that such Rightholders shall be permitted to assign to one or more Affiliates of such Rightholder any of its rights under this <u>Section 9.3</u> (which, following such assignment, such Affiliate shall also be deemed to be a "Rightholder" for purposes of this <u>Section 9.3</u>) so long as (1) such Affiliate, if it is not a Member, executes and delivers a joinder to this Agreement, in substantially the form attached hereto as <u>Exhibit B</u>, in connection with and as a condition to the purchase of any Offered Interests by it and (2) such assignment of the rights under this <u>Section 9.3</u> complies with <u>Section 9.1(b)</u> and <u>Section 9.6(c)</u> as if such assignment were a "Transfer".  The Company will transmit the Offer Notice to each Rightholder within three (3) Business Days of receipt from the Selling ROFO Member.

(b)     Each Rightholder shall have a period of fifteen (15) days following the receipt of the Offer Notice (the "***ROFO Evaluation Period***") to accept the Selling ROFO Member's offer by delivering written notice (the "***Offer Purchase Notice***") to the Company agreeing to purchase the Offered Interests on the terms set forth in the Offer Notice (including the same price and with the same amount of consideration), which Offer Purchase Notice shall include: (i) such Rightholder's

election and agreement to purchase the number of Offered Interests up to such Rightholder's entire Class A Percentage Ownership of Offered Interests (each, a "***Base Participating Holder***"), (ii) if such Rightholder has elected to purchase its entire Class A Percentage Ownership of Offered Interests, then, in such Rightholder's sole discretion, such Rightholder's election and agreement to purchase up to its entire Class A Percentage Ownership of the Offered Interests not subscribed for by other Rightholders and (iii) if such Rightholder has elected to purchase its entire Class A Percentage Ownership of Offered Interests and its entire Class A Percentage Ownership of the Offered Interests not subscribed for by other Rightholders (each, an "***Extra Participating Rightholder***," and together with the Base Participating Holders, the "***Participating Rightholders***"), then, in such Rightholder's sole discretion, such Rightholder's election and agreement to purchase the number of remaining Offered Interests not purchased by other Rightholders (the "***Excess ROFO Portion***"); *provided*, *however*, that, upon the written request of a Counterparty for the Selling ROFO Member to enter into a confidentiality agreement pursuant to Section 9.10, the ROFO Evaluation Period shall instead be deemed to commence on such date that, following the receipt by the Selling ROFO Member of all Counterparty Excluded Information, either (x) the Selling ROFO Member has reaffirmed its intention to Transfer the Offered Interest or (y) if the Selling ROFO Member has not made such reaffirmation, is three (3) Business Days after receiving such Counterparty Excluded Information. During the ROFO Evaluation Period (but not after the end of such period), the offer to purchase by the Participating Rightholders and the offer to sell by the Selling ROFO Member shall, in each case, be revocable; *provided*, *however*, that, if the Selling ROFO Member revokes an offer to sell Membership Interests to a Third Party Purchaser, then such Selling ROFO Member may not sell any Membership Interests to the same or any other Third Party Purchaser during the thirty (30) day period following such revocation. If more than one Extra Participating Rightholder wishes to exercise its right to purchase all of the Excess ROFO Portion, each such Extra Participating Rightholder shall only have the right to purchase Offered Interests with respect to such Excess ROFO Portion equal to the ratio of (i) the number of Offered Interests then held by such Extra Participating Rightholder to (ii) the total number of Offered Interests held by all Extra Participating Rightholders wishing to so exercise.

(c)      If no Offer Purchase Notice has been timely delivered under Section 9.3(b), if the Rightholders have not agreed to purchase all of the Offered Interests pursuant to the terms and conditions in the Offer Notice, or if Rightholders have failed to purchase all of the Offered Interests pursuant to the terms and conditions in this Section 9.3, then the Selling ROFO Member shall be permitted to Transfer all of the Offered Interests or any portion of the Offered Interests not purchased by the Rightholders pursuant to Section 9.3(b) on the terms and conditions set forth in the Offer Notice for a purchase price in cash, net of commissions or similar expenses, that is no lower than the Offer Sale Price (a "***Third Party Sale***"); *provided, however*, that such Third Party Sale is consummated within forty-five (45) days after the earlier to occur of (i) the waiver by all of the Rightholders of their option to purchase some or all of the Offered Interests and (ii) the expiration of the ROFO Evaluation Period (such period, the "***Third Party Sale Period***"). If such Third Party Sale is not consummated within such Third Party Sale Period for any reason, then the restrictions provided for in this Section 9.3 shall again become effective, and no Transfer of Membership Interests may be made thereafter by the Selling ROFO Member without again offering the same to the Rightholders in accordance with this Section 9.3.

(d)      During the ROFO Evaluation Period the Company shall not provide or discuss any Offer Purchase Notice with any Member; *provided, however*, that the Company may discuss an Offer Purchase Notice with the Participating Rightholder who delivered such Offer Purchase Notice. The Company shall notify (the "***Final Offer Notice***") the Selling ROFO Member, and each Participating Rightholder within three (3) Business Days following the expiration of the ROFO Evaluation Period of the number of Offered Interests which such Participating Rightholder has agreed to purchase pursuant to this Section 9.3 (provided that if all of the Offered Interests are not

purchased by Participating Rightholders, the Selling ROFO Member shall not have an obligation to sell any Offered Interests).  Subject to the parties agreeing to a mutually acceptable definitive transfer agreement in accordance with Section 9.3(e), the Participating Rightholders and the Selling ROFO Member shall consummate the transaction contemplated by the Offer Notice within three (3) Business Days after receipt of the Final Offer Notice. At such closing, the Selling ROFO Member shall deliver to each Participating Rightholder the Offered Interests, including certificates (if any) representing the Offered Interests. Each Participating Rightholder shall, at the closing, deliver to the Selling ROFO Member payment in full in immediately available funds for the Offered Interests purchased by it; it being further agreed that no portion of the purchase price shall be subject to any escrow or holdback.  At such closing, all the parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate.

(e)     At the closing contemplated by Section 9.3(d) above, the Selling ROFO Member shall provide customary representations, warranties and covenants in its individual capacity in connection with such transaction; *provided*, *however*, that such representations, warranties and covenants shall be limited to customary fundamental representations and warranties regarding (i) its brokers and finders, (ii) title to its Offered Interests, free and clear of all liens, claims and encumbrances (other than those arising under applicable securities laws and this Agreement), (iii) its authority, power and right to enter into and consummate the transaction without violating any other material agreement or applicable law, (iv) its power and right to enter into and consummate the transaction without the consent of a Governmental Authority or Person and (v) the absence of any required consents for it to enter into and consummate the transaction and the absence of any registration requirements in connection therewith.  The Selling ROFO Member's liability under the definitive transfer agreement with respect to such transaction will not exceed the total purchase price received by the Selling ROFO Member in such transaction except for liability resulting from fraud or knowing and willful breach. In no event shall any Affiliate (other than any Affiliate of such Selling ROFO Member which Affiliate itself is Transferring Membership Interests in such transaction) of such Selling ROFO Member be liable under such transaction, in any respect.

(f)     Upon the delivery of any Offer Notice, if requested by any Rightholder, the Company shall inform such Rightholder if the Company believes such Rightholder possesses material non-public information regarding the Company (including as a result of an Affiliate of such Rightholder serving as a Manager).

9.4     Tag-Along Right.

(a)     If a Member or group of Members (the "***Selling Tag Member***") elects to Transfer Common Interests representing twenty-five percent (25%) or more of the then outstanding Common Interests of the Company on a fully diluted basis (excluding, for purposes of this calculation, any Incentive Interests) to a Third Party Purchaser, in one or a series of related transactions, then, in lieu of complying with the provisions of Section 9.3, such Selling Tag Member shall offer the other Members (excluding any Member who only holds Incentive Interests, each a "***Tag-Along Rightholder***") the right to include in such Selling Tag Member's Transfer to the Third Party Purchaser the Tag-Along Rightholder's pro rata portion (based upon the amount of outstanding Common Interests and excluding Incentive Interests) of the Common Interests proposed to be Transferred by the Selling Tag Member at the same price and on the same terms and conditions described in the Tag-Along Notice (as defined below).  For purposes of calculating whether the twenty-five percent (25%) threshold set forth above has been satisfied, any transactions with any such Third Party Purchaser, its Affiliates or any of the foregoing will be aggregated, provided such transactions are consummated within the same twelve (12)-month period or if a definitive agreement with respect thereto is entered into during such twelve (12)-month period and such transaction is consummated thereafter.  For the avoidance of doubt, any proposed Transfer

described in this Section 9.4(a) (a "**Proposed Transfer**") shall be subject to the terms and conditions of this Section 9.4 and shall not be subject to Section 9.3.

(b)     Prior to the consummation of any Proposed Transfer, the Selling Tag Member proposing to make the Proposed Transfer shall offer to the other Tag-Along Rightholders the right to be included in the Proposed Transfer by sending written notice (the "**Tag-Along Notice**") to the Company for transmittal to each of the Tag-Along Rightholders, which notice shall (i) state the name of such Selling Tag Member, (ii) state the name and address of the proposed Third Party Purchaser, (iii) state the portion of such Selling Tag Members' Common Interest to be sold, (iv) state the proposed purchase price and form of consideration of payment and all other material terms and conditions of such sale, (v) include a calculation of the consideration per Common Interest to be received by each Tag-Along Rightholder who elects to participate, (vi) include a representation that the Third Party Purchaser has been informed of the "tag-along" rights provided in this Section 9.4 and has agreed to purchase the Common Interest in accordance with the terms hereof, and (vii) be accompanied by a written offer from the Third Party Purchaser. Such right shall be exercisable by written notice to the Selling Tag Member proposing to make the Proposed Transfer (with a copy to the Company) given within ten (10) days after receipt by the Tag-Along Rightholder of the Tag-Along Notice (the "**Tag-Along Notice Period**") specifying the number of Common Interests with respect to which such Tag-Along Rightholder shall exercise its rights under this Section 9.4. If the Third Party Purchaser elects to purchase less than all of the Common Interests offered for sale as a result of the Tag-Along Rightholder's exercise of their "tag-along" rights provided in this Section 9.4, then the Selling Tag Member and each Tag-Along Rightholder shall have the right to include in such sale such number of Common Interests equal to its respective pro rata portion of the Common Interests to be Transferred to the Third Party Purchaser in exchange for its respective pro rata share of consideration to be received in the Transfer to the Third Party Purchaser based on its applicable portion of Common Interests being so Transferred. Failure by a Tag-Along Rightholder to respond within the Tag-Along Notice Period shall be regarded as a rejection of the offer made pursuant to the Tag-Along Notice and a waiver by such Tag-Along Rightholder of its rights under this Section 9.4.

(c)     Each Tag-Along Rightholder shall agree (i) to make such representations, warranties, covenants, indemnities and agreements to the Third Party Purchaser as made by the Selling Tag Member in connection with the Tag-Along Transfer (other than any noncompetition, non-solicitation or other restrictive agreements or covenants that would bind the Tag-Along Rightholder or its Affiliates), and (ii) to substantially the same terms and conditions to the Transfer as the Selling Tag Member agrees (including the same consideration the Selling Tag Member receives); *provided, however*, that (A) the representations, warranties, indemnities, covenants, conditions, escrow agreements and other provisions and agreements relating to such Tag-Along Transfer shall in no event be broader or more burdensome than those given by the Selling Tag Member, (B) all such representations, warranties, covenants, indemnities and agreements (and any and all obligations with respect thereto) shall be made by each Tag-Along Rightholder severally and not jointly and severally, (C) a Tag-Along Rightholder's liability under the definitive purchase agreement with respect to such transaction will not exceed the total purchase price actually received by such Tag-Along Rightholder in such transaction except for liability resulting from fraud or knowing and willful breach, (D) any consideration, including escrow or holdbacks, applicable to such Tag-Along Transaction shall be applied pro rata (based upon the aggregate amount of Common Interests of the Selling Tag Member and the Tag-Along Rightholders included in the Tag-Along Transfer) among the Members participating in the Tag-Along Transaction and (E) such Tag-Along Rightholder, to the extent that such Tag-Along Rightholder is not also an officer, consultant or employee of the Company or its Subsidiaries, is not required to enter into a non-competition, non-solicitation or any other restrictive covenant or agreement or to amend, extend or terminate any contractual or other relationship with the Company, the Third Party Purchaser or any of their

Affiliates other than investment-related documents of the Company in connection with such Proposed Transfer; it being further agreed that in no event shall any Affiliate (other than any Affiliate of such Tag-Along Rightholder which Affiliate itself is selling its Common Interests in such transaction) or, related Party, or direct or indirect equityholder or beneficiary of such Tag-Along Rightholder be liable under such transaction, in any respect.

(d)    Each Selling Tag Member shall have forty-five (45) days following expiration of the Tag-Along Notice Period in which to Transfer the Common Interests described in the Tag-Along Notice and the Common Interests to be sold by the Tag-Along Rightholders, on the terms set forth in the Tag-Along Notice (which such forty-five (45) day period may be extended for a reasonable time not to exceed sixty (60) days to the extent reasonably necessary to obtain any approval of a Governmental Authority). If at the end of such forty-five (45) day period (or such longer period as described above), the Selling Tag Member has not completed such transfer, the Selling Tag Member may not then effect a Transfer of Common Interests subject to this <u>Section 9.4</u> without again fully complying with the provisions of this <u>Section 9.4</u>.

9.5    <u>Drag-Along Right</u>.

(a)    If a Member or group of Members holding (x) if during the first eighteen (18) months after the Effective Date, Common Interests representing at least two-thirds (2/3) of the then outstanding Common Interests (on a fully diluted basis and excluding, for purposes of this calculation, any Incentive Interests) or (y) if following eighteen (18) months after the Effective Date, Common Interests representing at least a majority of the then outstanding Common Interests (on a fully diluted basis and excluding, for purposes of this calculation, any Incentive Interests) (such Member or group of Members, in either case, the "***Selling Members***") proposes to sell, in one or a series of related transactions, (i) if during the first eighteen (18) months after the Effective Date, at least two-thirds (2/3) of the then outstanding Common Interests (on a fully diluted basis and excluding, for purposes of this calculation, any Incentive Interests) or (ii) if following eighteen (18) months after the Effective Date, at least a majority of the then outstanding Common Interests (on a fully diluted basis and excluding, for purposes of this calculation, any Incentive Interests), in each case, to a Third Party Purchaser or group of two or more Third Party Purchasers (other than to an Affiliate of such Selling Member) (a "***Drag-Along Sale***"), then such Selling Members shall have the right, in lieu of complying with the provisions of <u>Sections 9.3</u>, <u>9.4</u>, and <u>9.6</u>, to require the other Members to sell the pro rata portion of their Common Interests (pro rata based on the Common Interests to be sold over the aggregate outstanding Common Interests) to such Third Party Purchaser in connection with such Drag-Along Sale and otherwise on the same terms as such Selling Members selling such Common Interests.  Such right shall be exercisable by written notice (a "***Buyout Notice***") given to each Member other than the Selling Members which shall state (i) that such Selling Members propose to effect the sale of the applicable percentage of the Common Interests of every Member of the Company to such Third Party Purchaser, (ii) the name and address of the Third Party Purchaser, and (iii) the purchase price the Third Party Purchaser is paying for the Common Interests and which attaches a copy of any definitive agreements between such Selling Members and the other parties to such transaction.  Each such Member agrees that, upon receipt of a Buyout Notice, each such Member shall be obligated to sell the pro rata portion of its Common Interests for the purchase price set forth in the Buyout Notice and upon the other terms and conditions of such transaction (and otherwise take all reasonably necessary action to cause consummation of the proposed transaction, including voting such Common Interests in favor of such transaction).

(b)    If either (i) during the first eighteen (18) months after the Effective Date, (A) a Member or group of Members holding Common Interests representing at least two-thirds (2/3) of the then outstanding Common Interests (on a fully diluted basis and excluding, for purposes of this

calculation, any Incentive Interests) or (B) a majority of the Board of Managers, and only after ratification by Members holding Common Interests representing at least a majority of the then outstanding Common Interests on a fully-diluted basis (excluding for purposes of this calculation, any Incentive Interests), or (ii) if following eighteen (18) months after the Effective Date, Members holding Common Interests representing at least a majority of the then outstanding Common Interests (on a fully diluted basis and excluding, for purposes of this calculation, Incentive Interests) approves any transaction that would result in a Change of Control of the Company (other than to or with a Selling Member or an Affiliate of a Selling Member) (an "**Approved Sale**"), then so long as distributions of consideration to the Members are made in accordance with the provisions of Section 3.4, each Member agrees to, at the direction of the Selling Members or the Board of Managers, as applicable, include its Common Interests (pro rata based on the Common Interests to be sold over the aggregate outstanding Common Interests) in such Approved Sale and vote in favor thereof and will use its reasonable best efforts to cooperate in the Approved Sale and will take all necessary and desirable actions in connection with the consummation of the Approved Sale as are reasonably requested by the Selling Members or the Board of Managers, as applicable, including by waiving any appraisal or similar rights with respect to the Approved Sale and executing any action by written consent of the Members; *provided*, in the event of clause (i)(A) or clause (ii), the Board of Managers shall provide customary cooperation with the Selling Members to effectuate a Change of Control of the Company proposed by such Selling Members (provided that such Selling Members constitute the requisite thresholds under clause (i)(A) or clause (ii), as applicable).

(c)     The closing with respect to any Drag-Along Sale pursuant to this Section 9.5 shall be held as soon as practicable and at the time and place specified in the Buyout Notice but in any event within nine (9) months of the date the Buyout Notice is delivered to the Members (the "**Drag-Along Outside Date**"). Consummation of the Transfer of Common Interests by any Member to the Third Party Purchaser in a Drag-Along Sale (i) shall be conditioned upon consummation of the Transfer by each Selling Member to such Third Party Purchaser of the Common Interests proposed to be Transferred by the Selling Members and (ii) may be effected by a Transfer of the Common Interests or the merger, consolidation or other combination of the Company with or into the Third Party Purchaser or its Affiliate, in one or a series of related transactions. If the proposed Transfer with respect to the applicable Common Interests subject to the Buyout Notice does not meet the requirements of Section 9.5(a) prior to the Drag-Along Outside Date, such Selling Members shall be deemed to have forfeited their rights to require the other Members to sell their Common Interests to such Third Party Purchaser in connection with such Drag-Along Sale.

(d)     The Selling Members shall arrange for the payment of cash (by bank cashier's check or certified check or by wire transfer of immediately available funds to the accounts designated by the other Members), Securities or any other form of consideration in connection with any Drag-Along Sale or Approved Sale directly by the Third Party Purchaser to each other Member, upon delivery of an appropriate assignment in form and substance reasonably satisfactory to the Third Party Purchaser, which assignment shall be made free and clear of all liens, claims and encumbrances, except as provided by this Agreement or as otherwise agreed to by such Third Party Purchaser. In connection with any Drag-Along Sale or Approved Sale, each other Member shall execute the applicable purchase agreement, if applicable, and make or provide the same representations, warranties, covenants, indemnities and agreements as the Selling Members make or provide in connection with the Drag-Along Sale or Approved Sale; *provided, however*, that each other Member shall only be obligated to make individual representations and warranties with respect to its title to and ownership of the applicable Common Interests, authorization, execution and delivery of relevant documents, enforceability of such documents against such Member, and other matters relating to such Member, but not with respect to any of the foregoing with respect to any other Members, the Selling Members or their Common Interests; *provided, further, however*, that all representations, warranties, covenants and indemnities in the applicable purchase agreement

shall be made by the Selling Members and the other Members severally and not jointly and any indemnification obligation shall be pro rata based on the consideration received by the Selling Members and each other Member, in each case, in an amount not to exceed the aggregate proceeds actually received by the Selling Members and each other Member in the Drag-Along Sale or Approved Sale; and such Member, to the extent that such Member is not also an officer or employee of the Company or its Subsidiaries, is not required to enter into a non-competition, non-solicitation or any other restrictive covenant or agreement or to amend, extend or terminate any contractual or other relationship with the Company, the acquirer or any of their Affiliates other than investment-related documents of the Company in connection with such Drag-Along Sale or Approved Sale. Any transaction costs, including transfer taxes and legal, accounting and investment banking fees incurred by the Company and the Selling Members and any other Member participating in a Transfer pursuant to a Buyout Notice shall, unless the applicable Third Party Purchaser refuses, be borne by the Company in the event of an Approved Sale and shall otherwise be borne by the Members on a pro rata basis based on the consideration received by each Member in such Transfer.

9.6    Condition to Transfers.  In addition to all other terms and conditions contained in this Agreement, no Transfers permitted under this Article IX (excluding Transfers pursuant to Section 9.5) shall be completed or effective unless each of the following has been satisfied or waived by the Board of Managers on the date of such Transfer:

(a)    Neither the proposed transferee nor any of its Affiliates shall be a direct or indirect Competitor of the Company or any of its Subsidiaries.

(b)    The Member making such Transfer shall have provided to the Company (i) at least five (5) Business Days' prior notice of such Transfer, (ii) a certificate of the Member making such Transfer, delivered with such notice, containing a statement that such Transfer is permitted under this Article IX, which notice of Transfer shall be in substantially the form attached hereto as Exhibit C, together with such information as is reasonably necessary for the Company to make such determination and (iii) such other information or documents as may be reasonably requested by the Company in order for it to make such determination.

(c)    The transferee of such Membership Interests shall have executed and delivered to the Company a joinder agreement, in substantially the form attached hereto as Exhibit B, by which it shall become a party to and be bound by the applicable terms and provisions of this Agreement.

(d)    If requested by the Board of Managers in its reasonable judgment within the five (5) Business Day period referenced in clause (a) above, the Company shall have received the opinion of counsel to the Member making such Transfer, at the expense of the Member making such Transfer, reasonably satisfactory in form and substance to the Board of Managers, to the effect that: (i) such Transfer would not violate the Securities Act or any state securities or "blue sky" laws applicable to the Company or the Membership Interests to be Transferred, (ii) such Transfer shall not impose liability or reporting obligations on the Company or any Member thereof in any jurisdiction, whether domestic or foreign, or result in the Company or any Member thereof becoming subject to the jurisdiction of any court or Governmental Authority anywhere, other than the states, courts and Governmental Authorities in which the Company is then subject to such liability, reporting obligation or jurisdiction, (iii) such Transfer would not, individually or together with other concurrently proposed Transfers, cause the Company to be regarded as an "investment company" under the Investment Company Act of 1940, as amended, and (iv) such Transfer shall not cause an Event of Dissolution.

9.7    Effect of Transfer.  Upon the close of business on the effective date of any Transfer of Membership Interests (the "**_Effective Transfer Time_**") in accordance with the provisions of this Agreement,

(a) the Transferee shall be admitted as a Member (if not already a Member) and for purposes of this Agreement such transferee shall be deemed a Member, and (b) the Transferred Membership Interests shall continue to be subject to all the provisions of this Agreement.  Unless the transferor and Transferee otherwise agree in writing, and give written notice of such agreement to the Company at least seven (7) days prior to such Effective Transfer Time, all distributions declared to be payable to the transferor at or prior to such Effective Transfer Time shall be made to the transferor.  No Transfer shall relieve the transferor (or any of its Affiliates) of any of their obligations or liabilities under this Agreement arising prior to the closing of the consummation of such Transfer.

9.8     Tolling.  All time periods specified in this Article IX are subject to reasonable extension for the purpose of complying with requirements of law or regulation as determined by the Board of Managers.

9.9     Preemptive Rights.

(a)     Between the Effective Date and the date of consummation of an Initial Public Offering, if the Company (or a Subsidiary of the Company) shall propose to issue and sell any (i) equity Securities (including Membership Interests) or any equity Security, debt Security or debt instrument, in each case, convertible into or exchangeable for any equity Securities of the Company (or a Subsidiary of the Company) (including any Membership Interests) (collectively, the "*New Equity Securities*") or (ii) debt Securities or indebtedness for borrowed money where seventy-five percent (75%) or more of such debt issuance is made to the Major Holder Members (collectively with the New Equity Securities, the "*New Securities/Indebtedness*"), or enter into any contracts relating to the issuance or sale of any New Securities/Indebtedness to any Person (the "*Subject Purchaser*"), in each case, other than with respect to Excluded Issuances, each Member who either (i) is a Major Holder Member, so long as such Major Holder Member is entitled to appoint a Manager to the Board of Managers or (ii) is (A) a 1% Member and (B) an "accredited investor" (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) as of the date of issuance of such New Securities/Indebtedness shall have the right (a "*Preemptive Right*") to purchase (or otherwise participate with respect to) such Member's pro rata portion (based on ownership of Membership Interests (for the avoidance of doubt, excluding any Incentive Interests) and determined without regard to Members not eligible for such Preemptive Right) of the New Securities/Indebtedness at the same price and on the same other terms proposed to be issued and/or sold (the "*Proportionate Percentage*"); *provided*, *however*, that such Member shall be permitted to assign to an Affiliate of such Member its Preemptive Right to purchase (or otherwise participate with respect to) such Member's Proportionate Percentage of the New Securities/Indebtedness so long as (x) such Affiliate, if it is not a Member, executes and delivers a joinder to this Agreement, in substantially the form attached hereto as Exhibit B, in connection with and as a condition to exercise of a Preemptive Right assigned to it and (y) such assignment of the Preemptive Right complies with Section 9.1(b) and Section 9.6(d) as if such assignment of the Preemptive Right were a "Transfer".  The Company shall offer to sell to any such Member (or permit any such Member to participate with respect to) its Proportionate Percentage of such New Securities/Indebtedness (the "*Offered Securities/Indebtedness*") and to sell to any such Member (or permit any such Member to participate with respect to) such of the Offered Securities/Indebtedness as shall not have been subscribed for (or participated in) by the other Members as hereinafter provided, at the price and on the terms described above, which shall be specified by the Company in a written notice delivered to any such Member which such notice shall also state (x) the number and amount of New Securities/Indebtedness proposed to be issued and (y) the portion of the New Securities/Indebtedness available for purchase (or participation in) by such Member and shall be given to such Members at least fifteen (15) days prior to any issuance giving rights under this Section 9.9 (the "*Preemptive Offer*").  The Preemptive Offer shall by its terms remain open for a period of at least fifteen (15) days from the date of receipt thereof and shall specify the date on

which the Offered Securities/Indebtedness will be sold to accepting Members (or participated in by accepting Members) (which shall be at least fifteen (15) but not more than one hundred and eighty (180) days from the date of the Preemptive Offer). The failure of any Member to respond to the Preemptive Offer during the fifteen (15) day period shall be deemed a waiver of such Members' Preemptive Right with respect to such Preemptive Offer.

(b)        Each such Member shall have the right, during the period of the Preemptive Offer, to purchase (or participate with respect to) any or all of its Proportionate Percentage of the Offered Securities/Indebtedness at the purchase price or principal amount, as applicable, and on the terms stated in the Preemptive Offer. Notice by any Member of its acceptance, in whole or in part, of a Preemptive Offer shall be in writing (a "***Notice of Acceptance***") signed by such Member and delivered to the Company prior to the end of the specified period of the Preemptive Offer, setting forth the Offered Securities/Indebtedness such Member elects to purchase (or participate in).

(c)        Each such Member shall have the additional right to offer in its Notice of Acceptance to purchase (or participate with respect to) any of the Offered Securities/Indebtedness not accepted for purchase by (or participation in by) any other Members, in which event such Offered Securities/Indebtedness not accepted by such other Members shall be deemed to have been offered to and accepted by the Members exercising such additional right under this paragraph (c) pro rata in accordance with their respective Proportionate Percentages (determined without regard to those Members not electing to purchase (or participate with respect to) their full respective Proportionate Percentages under the foregoing paragraph (a)) on the same terms and conditions as those specified in the Preemptive Offer, but in no event shall any such electing Member be allocated a number of New Securities/Indebtedness in the Company in excess of the maximum number of Offered Securities/Indebtedness such Member has elected to purchase in its Notice of Acceptance.

(d)        At the closing of the purchase, issuance or incurrence of New Securities/Indebtedness subscribed for by the Members under this Article IX, the Company shall deliver certificates (if applicable) or other evidence, to the extent applicable, representing the New Securities/Indebtedness, or shall provide or cause to be provided, upon request, confirmation of such Member's updated holdings, and such New Securities/Indebtedness shall be issued free and clear of all liens and the Company shall so represent and warrant, and further represent and warrant that such New Securities/Indebtedness shall be, upon issuance thereof to the Members that elected to purchase or lend such New Securities/Indebtedness and after payment therefor, duly authorized, validly issued and fully paid and non-assessable, as applicable. Each Member purchasing the New Securities/Indebtedness shall deliver at the closing payment in full in immediately available funds for the New Securities/Indebtedness purchased or loaned by it. At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate.

(e)        Sale to Subject Purchaser. In the case of any Preemptive Offer, if Notices of Acceptance given by the Members do not cover in the aggregate all of the Offered Securities/Indebtedness, the Company may during the period of one hundred and eighty (180) days following the date of expiration of such Preemptive Offer sell to any other Person or Persons (or permit any other Person or Persons to participate with respect to) all or any part of the New Securities/Indebtedness not covered by a Notice of Acceptance, but only on terms and conditions that are no more favorable to such Person or Persons or less favorable to the Company than those set forth in the Preemptive Offer. If such sale (or participation) is not consummated within such 180-day period for any reason, then the restrictions provided for herein shall again become effective, and no issuance and/or sale of New Securities/Indebtedness may be made thereafter by the Company without again offering the same in accordance with this Article IX. The closing of

any issuance and purchase pursuant to this Section 9.9 shall be held at a time and place as the parties to the transaction may agree.

(f)  Preemptive Rights Exception. Notwithstanding anything to the contrary herein, if the Board of Managers, acting in good faith, determines, whose determination shall be conclusive, that it would be in the best interests of the Company to issue New Securities/Indebtedness which would otherwise be required to be offered to the Members under this Section 9.9 prior to making such offer, the Company may issue such New Securities/Indebtedness to a Person (an "*Accelerated Acquirer*") without first complying with the procedures set forth in Section 9.9(a); *provided*, *however*, that within ten (10) Business Days after the occurrence of such issuance, the Company shall provide to each Member who has a Preemptive Right: (i) written notice of such issuance and the Preemptive Offer required by Section 9.9(a) and (ii) the Preemptive Right to purchase (or participate with respect to) such Member's Proportionate Percentage of the New Securities/Indebtedness that such Member would have been entitled to purchase (or participate with respect to) pursuant to the procedures set forth in Sections 9.9(a) and 9.9(b) had this Section 9.9(f) not been invoked, subject to such eligible Member's delivery of a Notice of Acceptance pursuant to Section 9.9(b) prior to the later of the end of the specified period of the Preemptive Offer and five (5) Business Days after receipt of notice of the Preemptive Offer, and which shall be on the same terms and conditions provided in the provisions of this Section 9.9 relating to the Preemptive Right, the closing of such purchase (or participation) to take place as soon as reasonably practicable. If one or more Members exercise the election to make a purchase (or participation), the Company shall give effect to each such exercise by (i) requiring that the Accelerated Acquirer (in which case the Accelerated Acquirer hereby agrees to) sell down (or allocate participation in) a portion of its New Securities/Indebtedness, (ii) issuing additional New Securities/Indebtedness to such Member or (iii) a combination of (i) and (ii), so long as such action effectively provides such Member with the same amount of New Securities/Indebtedness and the same consideration and fees, as applicable, that such Member would have been entitled to had this Section 9.9(f) not been invoked. Notwithstanding anything contained herein to the contrary, the voting and governance thresholds contained in this Agreement shall not be changed solely as a result of the purchase of New Securities/Indebtedness pursuant to this Section 9.9(f) unless and until each Member who has a Preemptive Right elects not to purchase or participate such Member's Proportionate Percentage under this Section 9.9(f).

9.10  Transfers Among Members.  Each Member acknowledges and agrees, with respect to any Transfer by or with any Member who is entitled to designate any member of the Board of Managers or any Observer or who otherwise has a representative of such Member or its Affiliates serving on the Board of Managers pursuant to Section 5.3 or as a Board of Managers observer pursuant to Section 5.10 or otherwise (any such Member, a "*Counterparty*") that (a) no Counterparty has made any representation or warranty, express or implied, regarding the Company or its Subsidiaries and any such purported representations or warranties are expressly disclaimed and waived; and (b) a Counterparty may have, or may come into possession of, information with respect to the Membership Interests, the Company or its Subsidiaries that may constitute material non-public information or information that is not known to other Members and that may be material to a decision to the purchase or sale of Membership Interests by or with such Counterparty ("*Counterparty Excluded Information*").  In connection with any such purchase or sale of Membership Interests by or with such Counterparty, such Counterparty may, in his, her or its sole discretion and upon written request, require the applicable Member purchasing or selling Membership Interests, including any Selling ROFO Member or Tag-Along Rightholder, to enter into a confidentiality agreement in form and substance satisfactory to the Counterparty (but shall not include any cleansing provision or similar provision), pursuant to which the Counterparty shall disclose to such Member, including any such Selling ROFO Member or Tag-Along Rightholder, all Counterparty Excluded Information in such Counterparty's possession.  Within three (3) Business Days of receiving such Counterparty Excluded Information, the applicable Member, including any applicable Selling ROFO Member or Tag-Along Rightholder, may

revoke its purchase or sale, including its Offer Notice, Tag-Along Notice, and Notice of Acceptance, as applicable. Each Member irrevocably and unconditionally waives and releases the Company, the Counterparty and each of their Affiliates from any and all claims (whether for Damages, rescission or any other relief), that it might have against the Company, the Counterparty or their Affiliates, whether under applicable securities laws or otherwise, with respect to any Counterparty Excluded Information in connection with such purchase or sale, and each Member has agreed not to solicit or encourage, directly or indirectly, any other Person to assert any such claim. Each Member further confirms that it understands the significance of the foregoing waiver.

## ARTICLE X
## REGISTRATION RIGHTS

10.1    Demand Registration Right.

(a)    Subject to the terms and conditions of this Article X, at any time on or after an Initial Public Offering, each Member or group of Members, which collectively hold an aggregate of twenty-five percent (25%) or more of the then outstanding Stock (as defined below) (collectively, the "***Initiating Members***"), may make a written request (specifying the intended method of disposition and the amount of Registrable Securities (as defined herein) proposed to be sold) that the Company effect, and the Company shall use its reasonable best efforts to effect, a registration of its Securities (a "***Demand Registration***") of all or any requested portion of the Registrable Securities collectively held by such Members (subject to Section 10.4); *provided*, that the Company shall not be obligated to effect a Demand Registration if the Registrable Securities requested by the Initiating Members to be registered (i) are already registered on a shelf registration statement on Form S-3 pursuant to Section 10.5, or (ii) have, at any time after an Initial Public Offering, an estimated aggregate public offering price (before deduction of any underwriting discounts and commissions) of less than twenty five million dollars ($25,000,000). If the Board of Managers (or similar governing body), in its good faith judgment, determines that any registration of the Registrable Securities should not be made or continued because it would materially interfere with any material financing, acquisition, corporate reorganization or merger or other material transaction involving the Company (a "***Valid Business Reason***"), the Company may (i) postpone filing a Registration Statement relating to a Demand Registration until such Valid Business Reason no longer exists, but in no event for more than ninety (90) days, and (ii) in case a Registration Statement has been filed relating to a Demand Registration, if the Valid Business Reason has not resulted from actions taken by the Company, the Company, upon the approval of a majority of the Board of Managers, acting in good faith, may cause such Registration Statement to be withdrawn and its effectiveness terminated; *provided*, *however*, that a new Registration Statement is filed within ninety (90) days thereafter, or may postpone amending or supplementing such Registration Statement, but in no event for more than ninety (90) days; *provided*, *however*, that if the registration of Registrable Securities is postponed pursuant to clause (i), the Company shall not be permitted to register under the Securities Act any equity Securities of the Company owned by other Members of the Company during any such postponement. The Company shall give written notice of its determination to postpone or withdraw a Registration Statement and of the fact that the Valid Business Reason for such postponement or withdrawal no longer exists, in each case, promptly after the occurrence thereof. Notwithstanding anything to the contrary contained herein, the Company may not postpone or withdraw a filing under this Section 10.1 more than once in any twelve (12) month period. For the avoidance of doubt, any postponement or withdrawal of a Registration Statement shall result in the related registration of Registrable Securities not constituting a Demand Registration for purposes of Section 10.1(c) hereof.

(b)    The Company shall use its reasonable best efforts to cause such Demand Registration to be in the form of a firm commitment underwritten offering and the managing

46

underwriter or underwriters (the "***Managing Underwriter***" or "***Managing Underwriters***") selected for such offering shall be selected by the Initiating Members or the S-3 Initiating Members (as defined herein), as the case may be, subject to the Company's approval (which shall not be unreasonably withheld, conditioned or delayed); *provided*, that each Managing Underwriter shall be a reputable nationally recognized investment bank; *provided, further,* that the Company shall select the Managing Underwriter or Managing Underwriters if such Initiating Members or S-3 Initiating Members, as the case may be, cannot so agree on the same within a reasonable time period.

(c)      Notwithstanding anything herein to the contrary, the Company shall only be required to (A) effect one (1) Demand Registration in any six (6) month period and (B) effect a total of not more than three (3) Demand Registrations.

10.2    Piggyback Registration Right.

(a)      Within five (5) Business Days following receipt by the Company of a request from the Initiating Members to effect a Demand Registration, the Company shall give written notice of such request to each Piggyback Member (each a "***Non-Initiating Member***", and collectively, the "***Non-Initiating Members***"), which shall describe, to the extent known, the anticipated filing date, the proposed registration and the proposed plan of distribution, and offer the Non-Initiating Members the opportunity to register their Registrable Securities (an "***Incidental Registration***") in such registration. Following the receipt of such notice, each Non-Initiating Member shall be entitled, by delivery of a written request to the Company delivered no later than five (5) Business Days following receipt of notice from the Company, to include all or any portion of their Registrable Securities in such Demand Registration (subject to Section 10.4).  If the Demand Registration is in the form of a firm commitment underwritten offering, the right of each Non-Initiating Member to have Registrable Securities included in a Demand Registration pursuant to this Section 10.2(a) shall be conditioned upon each Non-Initiating Member entering into (together with the Initiating Members) an underwriting agreement in customary form with the Managing Underwriter. Subject to Section 10.4, the Company shall use its reasonable best efforts to cause the Managing Underwriter to permit the Non-Initiating Members to participate in the Incidental Registration and to include their Registrable Securities in such offering on the same terms and conditions as the Registrable Securities being sold for the account of the Initiating Members.

(b)      In connection with an offering by the Company for its own account or for the benefit of any Member (other than a registration statement on Form S-4 or S-8 (or other registration solely relating to an offering or sale to employees or directors of the Company pursuant to any employee stock plan or other employee benefit arrangement) or any successor thereto), the Company shall give written notice to each Piggyback Member (each a "***Participating Member***", and collectively, the "***Participating Members***") at least ten (10) Business Days prior to the proposed offering. Following the receipt of such notice, each Participating Member (together with its Affiliates) shall be entitled, by delivery of a written request to the Company delivered no later than five (5) Business Days following receipt of notice from the Company, to include all or any portion of its Registrable Securities in such offering (subject to Section 10.4). The right of each Participating Member to have Registrable Securities included in an offering pursuant to this Section 10.2(b) shall be conditioned (if an underwritten offering) upon each Participating Member entering into (together with the Company) an underwriting agreement in customary form with the Managing Underwriter selected for such underwriting by the Company. Subject to Section 10.4, the Company shall use its reasonable best efforts (within five (5) Business Days of the notice provided for above) to cause the Managing Underwriter to permit the Participating Members to participate in a registration pursuant to this Section 10.2(b) to include their Registrable Securities in such offering

on the same terms and conditions as the Registrable Securities being sold for the account of the Company.

10.3  <u>Effective Demand Registration</u>. The Company shall use its reasonable commercial efforts to cause any Demand Registration to become effective not later than ninety (90) days after it receives a request under <u>Section 10.1(a)</u> hereof and to remain continuously effective for the lesser of (i) the period during which all Stock registered in the Demand Registration are sold and (ii) one hundred and eighty (180) days, *provided*, *however*, that a registration shall not constitute a Demand Registration if (x) after such Demand Registration has become effective, such registration or the related offer, sale or distribution of Registrable Securities thereunder is interfered with by any stop order, injunction or other order or requirement of the Commission or other Governmental Authority for any reason not solely attributable to the Initiating Members and such interference is not thereafter eliminated or (y) the conditions specified in the underwriting agreement, if any, entered into in connection with such Demand Registration are not satisfied or waived, other than by reason of a failure by any of the Initiating Members.

10.4  <u>Cutback</u>. Notwithstanding any other provision of this <u>Article X</u>, if the Managing Underwriter advises the Company that the amount of Registrable Securities requested to be included in an underwritten offering contemplated by <u>Section 10.1</u>, <u>Section 10.2</u> or <u>Section 10.5</u> exceeds the amount which can be sold in such offering without materially adversely affecting the price, timing or distribution of the Registrable Securities being offered, then the Company will reduce the Registrable Securities to be included in such offering by (A) if the offering was initiated for and on behalf of the Company: (i) first only including the Registrable Securities (or portion thereof) being sold for the account of the Company; and (ii) second including the Registrable Securities (or portion thereof) of the holders of Registrable Securities (each a "***Holder***", and collectively, the "***Holders***") pro rata among the Initiating Members or the S-3 Initiating Members, as the case may be, and the Non-Initiating Members or S-3 Non-Initiating Members, as the case may be (in each case, based for each such Holder on the percentage derived by dividing (x) the number of Registrable Securities proposed to be sold by such Holder in such offering by (y) the aggregate number of Registrable Securities proposed to be sold by all Holders in such offering), or (B) if the offering was initiated for and on behalf of the Holders: (i) first only including the Registrable Securities (or portion thereof) of the Holders pro rata among the Initiating Members or the S-3 Initiating Members, as the case may be, and the Non-Initiating Members or S-3 Non-Initiating Members, as the case may be (in each case, based for each such Holder on the percentage derived by dividing (x) the number of Registrable Securities proposed to be sold by such Holder in such offering by (y) the aggregate number of Registrable Securities proposed to be sold by all Holders in such offering) and (ii) second including the Registrable Securities (or portion thereof being sold for the account of the Company.

10.5  <u>Form S-3 Registration</u>. Following an Initial Public Offering and upon the Company becoming eligible for use of Form S-3 (or any successor form thereto) under the Securities Act in connection with a public offering of its Securities, in the event that the Company shall receive from any Member or group of Members, which collectively hold an aggregate of twenty-five percent (25%) or more of the then outstanding Membership Interests (each an "***S-3 Initiating Member***", and collectively, the "***S-3 Initiating Members***") a written request that the Company register, under the Securities Act on Form S-3 (or any successor form then in effect) (an "***S-3 Registration***"), all or a portion of the Registrable Securities owned by such S-3 Initiating Member, the Company shall give written notice of such request to each Major Holder Member and each other Piggyback Member who is not an S-3 Initiating Member (each a "***S-3 Non-Initiating Member***", and collectively the "***S-3 Non-Initiating Members***") at least ten (10) Business Days before the anticipated filing date of such Form S-3, and such notice shall describe the proposed registration and offer such S-3 Non-Initiating Members the opportunity to register the number of Registrable Securities as each S-3 Non-Initiating Member may request in writing to the Company, given within five (5) Business Days after their receipt from the Company of the written notice of such registration. If requested by the S-3 Initiating Members, such S-3 Registration shall be for an offering on a continuous basis pursuant to Rule 415 under the Securities Act. The Company shall use its reasonable best efforts to (x) cause such registration

pursuant to this Section 10.5(a) to become and remain effective as soon as practicable, but in any event not later than forty-five (45) days after it receives a request therefor, (y) include in such registration the Registrable Securities of the S-3 Non-Initiating Members who have requested in writing to participate in such S-3 Registration on the same terms and conditions as the Registrable Securities of the S-3 Initiating Member and (z) at the written request of any S-3 Initiating Members, which request shall specify the approximate number of Registrable Securities to be sold in the Shelf Takedown (as defined below) and the expected price range (net of underwriting discounts and commissions) of such Shelf Takedown (a "*Shelf Takedown Request*"), enter into an underwriting agreement in a form as is customary in firm commitment underwritten offerings of securities (a "*Shelf Takedown*") with the Managing Underwriter selected by the S-3 Initiating Members and take all such other reasonable actions as are requested by the Managing Underwriter in order to expedite or facilitate the disposition of such Registrable Securities pursuant to such Shelf Takedown; *provided*, *however*, that the Company shall have no obligation to facilitate or participate in, including entering into any underwriting agreement for more than two (2) Shelf Takedowns in any 365-day period and four (4) Shelf Takedowns in total pursuant to this Agreement. Notwithstanding the foregoing, the Company shall not be required to effect any registration pursuant to this Section 10.5(a), (i) within ninety (90) days after the effective date of any other Registration Statement of the Company pursuant to which the Holders have sold or may sell Registrable Securities or consummation of a previous Shelf Takedown, (ii) if Form S-3 (or any successor form) is not available for such offering by the S-3 Initiating Members or (iii) if the estimated aggregate public offering price for any Shelf Takedown (before deduction of any underwriting discounts and commissions) is less than twenty-five million dollars ($25,000,000).

(b)     If the Board of Managers (or similar governing board) has a Valid Business Reason, the Company may (x) postpone filing a Registration Statement relating to an S-3 Registration until such Valid Business Reason no longer exists, but in no event for more than ninety (90) days, and (y) in case a Registration Statement has been filed relating to an S-3 Registration, if the Valid Business Reason has not resulted from actions taken by the Company, the Company, upon the approval of a majority of the Board of Managers acting in good faith, may cause such Registration Statement to be withdrawn and its effectiveness terminated or may postpone amending or supplementing such Registration Statement; *provided*, *however*, that a new S-3 Registration is filed within ninety (90) days thereafter, or may postpone amending or supplementing such Registration Statement, but in no event for more than ninety (90) days; *provided*, *further*, that if the registration of Registrable Securities is postponed pursuant to clause (x), the Company shall not be permitted to register under the Securities Act any equity Securities of the Company owned by other Members of the Company during any such postponement. The Company shall give written notice to the Members of its determination to postpone or withdraw a Registration Statement and of the fact that the Valid Business Reason for such postponement or withdrawal no longer exists, in each case, promptly after the occurrence thereof. Notwithstanding anything to the contrary contained herein, the Company may not postpone or withdraw a filing due to a Valid Business Reason under this Section 10.5(b) more than once in any twelve (12) month period.

(c)     Within three (3) Business Days following receipt by the Company of a Shelf Takedown Request from the S-3 Initiating Members, the Company shall give written notice of such request to each S-3 Non-Initiating Member, which shall describe the anticipated offering launch date and offer, subject to Section 10.4, the S-3 Non-Initiating Members the opportunity to sell a portion or all of their Registrable Securities in such Shelf Takedown. Following the receipt of such notice, each S-3 Non-Initiating Member shall be entitled, by delivery of a written request to the Company delivered no later than two (2) Business Days following receipt of notice from the Company, to include its Registrable Securities in such Shelf Takedown Request (subject to Section 10.4).  The right of each S-3 Non-Initiating Member to have Registrable Securities included in a Shelf Takedown pursuant to this Section 10.5(c) shall be conditioned upon each S-3 Non-Initiating Member entering into an underwriting agreement in the form approved by the S-3 Initiating Members and reasonably acceptable to each S-3 Non-Initiating Member. Subject to Section 10.4,

49

the Company shall use its reasonable best efforts to cause the Managing Underwriter selected by the S-3 Initiating Members to permit the S-3 Non-Initiating Members to participate in the Shelf Takedown and to include their Registrable Securities in such offering on the same terms and conditions as the Registrable Securities being sold for the account of the S-3 Initiating Members.

10.6    Holdback Agreements. To the extent not inconsistent with applicable law and, if requested by the Managing Underwriter, each Member agrees, upon request of the Managing Underwriter to sign a lock-up agreement, which shall include customary carve-outs, not to effect any public sale or distribution of any Registrable Securities or of any Securities convertible into or exchangeable or exercisable for such Registrable Securities, including a sale pursuant to Rule 144 under the Securities Act, or offer to sell, contract to sell (including any short sale), grant any option to purchase or enter into any hedging or similar transaction with the same economic effect as a sale of Registrable Securities, in each case, (i) in the case of an Initial Public Offering, during the period up to one-hundred eighty (180) days (as the Managing Underwriter determines) beginning on the effective date of the registration statement (except as part of such registration) for such Initial Public Offering and (ii) in the case of any other Public Offering, during the period up to ninety (90) days (as the Managing Underwriter determines) beginning on the effective date of the registration statement (except as part of such registration) for such Public Offering (such period of time, the "**Holdback Period**"); *provided*, *however*, that the Holdback Period shall be the same with respect to all Members and shall be no longer than the duration of the shortest restriction generally imposed by the Managing Underwriter on the Company or the officers or directors of the Company.

(b)    If requested by the Managing Underwriter, the Company agrees not to effect any public sale or distribution of any of its Stock, or any Securities convertible into or exchangeable or exercisable for Stock (except pursuant to registrations on Form S-4 or S-8 or any successor thereto), during the period beginning on the effective date of any Registration Statement filed pursuant to Section 10.1 in which the Members are participating and ending on the earlier of (i) the date on which all Registrable Securities on such registration statement are sold and (ii) one hundred and eighty (180) days (or such lesser period as the Managing Underwriter may agree) after the effective date of such registration statement (except as part of such registration).

10.7    Registration Procedures.

(a)    Whenever registration of Registrable Securities has been requested pursuant to Section 10.1, Section 10.2 or Section 10.5, the Company shall use its reasonable best efforts to effect the registration and sale of such Registrable Securities in accordance with the intended method of distribution thereof and in connection with any such request, the Company shall:

(i)    prepare and file with the Commission a Registration Statement on any form for which the Company then qualifies or which counsel for the Company shall deem appropriate and which form shall be available for the sale of such Registrable Securities in accordance with the intended method of distribution thereof, and use its reasonable commercial efforts to cause such Registration Statement to become effective within the time periods specified in Section 10.3 or Section 10.5, as applicable; *provided*, *however*, that (x) before filing a Registration Statement or prospectus or any amendments or supplements thereto, the Company shall provide one legal counsel selected by holders of a majority of the Registrable Securities to be included in such Registration Statement ("**Members' Counsel**") with an adequate and appropriate opportunity to review and comment on such Registration Statement and each prospectus included therein (and each amendment or supplement thereto) to be filed with the Commission, subject to such documents being under the Company's control, and (y) the Company shall promptly notify the Members' Counsel and each seller of Registrable Securities of any stop order issued or

threatened by the Commission and promptly take all action required to prevent the entry of such stop order or to remove it if entered;

(ii) use its reasonable best efforts to, as promptly as reasonably practicable, prepare and file with the Commission such amendments and supplements to such Registration Statement and the prospectus used in connection therewith as may be necessary to keep such Registration Statement effective for the period provided for in <u>Section 10.3</u>; *provided*, *however*, that, in the case of an S-3 Registration, the Company will use its reasonable best efforts to cause such S-3 Registration to be continuously effective under the Securities Act from and after the date it is first declared or becomes effective until all Registrable Securities covered by such S-3 Registration have been distributed in the manner set forth and as contemplated in the S-3 Registration or there are no longer any Registrable Securities outstanding; and shall comply with the provisions of the Securities Act with respect to the disposition of all Registrable Securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such Registration Statement;

(iii) furnish to each seller of Registrable Securities, prior to filing a Registration Statement, a reasonable number of copies of such Registration Statement as is proposed to be filed, and thereafter such number of copies of such Registration Statement, each amendment and supplement thereto (in each case, including all exhibits thereto), and the prospectus included in such Registration Statement (including each preliminary prospectus) and any prospectus filed under Rule 424 under the Securities Act as each such seller may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such seller;

(iv) use its reasonable best efforts to register or qualify such Registrable Securities under such other securities or "blue sky" laws of such jurisdictions as any seller of Registrable Securities may reasonably request, and to continue such qualification in effect in such jurisdiction for as long as permissible pursuant to the laws of such jurisdiction, or for as long as any such seller requests or until all of such Registrable Securities are sold, whichever is shortest, and do any and all other acts and things which may be reasonably necessary or advisable to enable any such seller to consummate the disposition in such jurisdictions of the Registrable Securities owned by such seller; *provided*, *however*, that the Company shall not be required to (x) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this <u>Section 10.7(a)(iv)</u>, (y) subject itself to taxation in any such jurisdiction or (z) consent to general service of process in any such jurisdiction;

(v) notify each seller of Registrable Securities at any time when a prospectus relating thereto is required to be delivered under the Securities Act, as promptly as reasonably practicable upon discovery that, or upon the happening of any event as a result of which, the prospectus included in such Registration Statement contains an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, and the Company shall as promptly as reasonably practicable prepare a supplement or amendment to such prospectus and furnish to each seller of Registrable Securities a reasonable number of copies of such supplement to or an amendment of such prospectus as may be necessary so that, after delivery to the purchasers of such Registrable Securities, such prospectus shall not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to

make the statements therein, in light of the circumstances under which they were made, not misleading;

(vi)     enter into and perform customary agreements (including an underwriting agreement in customary form with the Managing Underwriter) and use its reasonable best efforts to take such other actions as are prudent and reasonably required in order to expedite or facilitate the disposition of such Registrable Securities, including causing its officers to participate in "road shows" and other information meetings organized by the Managing Underwriter but not in connection with more than two (2) offerings in any twelve (12) months;

(vii)     upon execution of confidentiality agreements in form and substance reasonably satisfactory to the Company, which shall be consistent with the due diligence and disclosure obligations under securities laws applicable to the Company and the Members, make available at reasonable times for inspection by the Managing Underwriter participating in any disposition of such Registrable Securities pursuant to a Registration Statement, Members' Counsel and any attorney, accountant or other agent retained by any Managing Underwriter, all financial and other records, pertinent corporate documents and properties of the Company and its Subsidiaries (collectively, the "***Records***") as shall be reasonably necessary to enable them to exercise their due diligence responsibility, and cause the Company's and its Subsidiaries' officers, directors and employees, and the independent public accountants of the Company, to supply all information reasonably requested by any such Person in connection with such Registration Statement;

(viii)     if such sale is pursuant to an underwritten offering, obtain "cold comfort" letters dated the effective date of the Registration Statement and the date of the closing under the underwriting agreement from the Company's independent public accountants in customary form and covering such matters of the type customarily covered by "cold comfort" letters as Members' Counsel or the Managing Underwriter reasonably requests;

(ix)     obtain for delivery to the Managing Underwriters an opinion, dated the most recent effective date of the Registration Statement or the date of the closing under the underwriting agreement, of counsel representing the Company , addressed to the Managing Underwriter, if any, covering such legal matters with respect to the registration in respect of which such opinion is being given as the Managing Underwriter may reasonably request and are customarily included in such opinions;

(x)     use its reasonable best efforts to comply with all applicable rules and regulations of the Commission, and make generally available to its Security holders, as soon as reasonably practicable but no later than fifteen (15) months after the effective date of the Registration Statement, an earnings statement covering a period of twelve (12) months beginning after the effective date of the Registration Statement, in a manner which satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder;

(xi)     use its reasonable best efforts to cause all such Registrable Securities to be listed on each securities exchange on which similar Securities issued by the Company are then listed provided that the applicable listing requirements are satisfied;

(xii)     keep Members' Counsel advised as to the initiation and progress of any registration under Section 10.1, Section 10.2 or Section 10.5 hereunder;

(xiii)   cooperate with each seller of Registrable Securities and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the FINRA; and

(xiv)   take all other steps reasonably necessary to effect the registration of the Registrable Securities contemplated hereby.

10.8   <u>Seller Information</u>. The Company may require each seller of Registrable Securities as to which any registration is being effected to furnish, and such seller shall furnish, to the Company such information regarding the distribution of such Registrable Securities as the Company may from time to time reasonably request in writing, as a condition to including such Registrable Securities in such Registration Statement.

10.9   <u>Notice to Discontinue</u>. Each Member agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in <u>Section 10.7(a)(v)</u>, such Member shall forthwith discontinue disposition of Registrable Securities pursuant to the Registration Statement covering such Registrable Securities until such Members' receipt of the copies of the supplemented or amended prospectus contemplated by <u>Section 10.7(a)(v)</u> and, if so directed by the Company, such Member shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Members' possession, of the prospectus covering such Registrable Securities which is current at the time of receipt of such notice. If the Company shall give any such notice, the Company shall extend the period during which such Registration Statement shall be maintained effective pursuant to this Agreement (including the period referred to in <u>Section 10.7(a)(ii)</u>) by the number of days during the period from and including the date of the giving of such notice pursuant to <u>Section 10.7(a)(v)</u> to and including the date when sellers of such Registrable Securities under such Registration Statement shall have received the copies of the supplemented or amended prospectus contemplated by and meeting the requirements of <u>Section 10.7(a)(v)</u>.

10.10   <u>Registration Expenses</u>. The Company shall pay all reasonable expenses arising from or incident to its performance of, or compliance with, this Agreement, including (i) Commission, stock exchange and FINRA registration and filing fees, (ii) all fees and expenses incurred in complying with securities or "blue sky" laws (including reasonable and documented fees, charges and disbursements of counsel to the Managing Underwriter incurred in connection with "blue sky" qualifications of the Registrable Securities as may be set forth in any underwriting agreement), (iii) all printing, messenger and delivery expenses, (iv) the fees, charges and expenses of counsel to the Company and of its independent public accountants and any other accounting fees, charges and expenses incurred by the Company (including any expenses arising from any "cold comfort" letters or any special audits incident to or required by any registration or qualification) and the reasonable and documented legal fees, charges and expenses of a single counsel to the Members incurred by such Members participating in any registration as a group, and (v) any liability insurance or other premiums for insurance, if the Company elects to purchase such insurance, obtained in connection with any Demand Registration or piggy-back registration thereon, Incidental Registration or S-3 Registration pursuant to the terms of this Agreement, regardless of whether such Registration Statement is declared effective. All of the expenses described in the preceding sentence of this <u>Section 10.10</u> are referred to herein as "***Registration Expenses***." The holder of Registrable Securities sold pursuant to a Registration Statement shall bear the expense of any broker's commission or underwriter's discount or commission relating to registration and sale of such Members' Registrable Securities and, subject to clause (iv) above, shall bear the fees and expenses of their own counsel.

10.11   <u>Indemnification; Contribution</u>.

(a)   <u>Indemnification by the Company</u>.   The Company shall indemnify and hold harmless each Member, its partners, directors, officers, Affiliates and each Person who controls

53

(within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) the Member from and against any and all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim subject to Section 10.11(c)) (each, a "*Liability*" and collectively, "*Liabilities*"), arising out of or based upon any untrue, or allegedly untrue, statement of a material fact contained in any Registration Statement under which any Registrable Securities were registered, prospectus or preliminary prospectus (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading (in the case of any prospectus or preliminary prospectus, in light of the circumstances such statements were made), except insofar as such Liability arises out of or is based upon any untrue statement or alleged untrue statement or omission or alleged omission contained in such Registration Statement, preliminary prospectus or prospectus in reliance and in conformity with information concerning any Member furnished in writing to the Company by such Member expressly for use therein, including the information furnished to the Company pursuant to Section 10.11(b). The Company shall also provide customary indemnities to any Managing Underwriters of the Registrable Securities, their officers, directors and employees and each Person who controls such Managing Underwriters (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) to the same extent as provided above with respect to the indemnification of the Members.

(b)    Indemnification by the Members.  In connection with any Registration Statement in which any Member is participating pursuant to Section 10.1, Section 10.2 or Section 10.5 hereof, each Member shall promptly furnish to the Company in writing such information with respect to such Member as the Company may reasonably request pursuant to Section 10.8 or as may be required by law for use in connection with any such Registration Statement or prospectus and all information required to be disclosed in order to make the information previously furnished to the Company by such Member not materially misleading or necessary to cause such Registration Statement not to omit a material fact with respect to such Member. Each Member agrees to indemnify and hold harmless the Company, its partners, directors, officers, Affiliates, any Managing Underwriter retained by the Company and each Person who controls the Company or such Managing Underwriter (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) from and against any and all Liabilities arising out of or based upon any untrue, or allegedly untrue, statement of a material fact contained in any Registration Statement, prospectus or preliminary prospectus (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading (in the case of any prospectus or preliminary prospectus, in light of the circumstances such statements were made), but if and only to the extent that such Liability arises out of or is based upon any untrue statement or omission or alleged untrue statement or omission contained in such Registration Statement, preliminary prospectus or prospectus in reliance and in conformity with information concerning such Member furnished in writing by such Member expressly for use therein, *provided*, *however*, that the total amount to be indemnified by each Member pursuant to this Section 10.11(b) shall be limited to such Members' *pro rata* portion of the net proceeds (after deducting the underwriters' discounts and commissions) received by such Member in the offering to which the Registration Statement or prospectus relates.

(c)    Conduct of Indemnification Proceedings.  Any Person entitled to indemnification under this Section 10.11 (the "*Indemnified Party*") agrees to give prompt written notice to the indemnifying party (the "*Indemnifying Party*") after the receipt by the Indemnified Party of any written notice of the commencement of any action, suit, proceeding or investigation or threat

thereof made in writing for which the Indemnified Party intends to claim indemnification or contribution pursuant to this Agreement; *provided*, *however*, that the failure so to notify the Indemnifying Party shall not relieve the Indemnifying Party of any Liability that it may have to the Indemnified Party hereunder (except to the extent that the Indemnifying Party is actually and materially prejudiced or otherwise forfeits substantive rights or defenses by reason of such failure). If notice of commencement of any such action is given to the Indemnifying Party as above provided, the Indemnifying Party shall be entitled to participate in and, to the extent it may wish, jointly with any other Indemnifying Party similarly notified, to assume the defense of such action at its own expense, with counsel chosen by it and reasonably satisfactory to such Indemnified Party. The Indemnified Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be paid by the Indemnified Party unless (i) the Indemnifying Party agrees in writing to pay the same, (ii) the Indemnifying Party fails to assume the defense of such action with counsel reasonably satisfactory to the Indemnified Party or (iii) the named parties to any such action (including any impleaded parties) include both the Indemnifying Party and the Indemnified Party and the Indemnified Party has been advised by such counsel that either (x) representation of such Indemnified Party and the Indemnifying Party by the same counsel would be inappropriate under applicable standards of professional conduct or (y) there may be one or more legal defenses available to the Indemnified Party which are different from or additional to those available to the Indemnifying Party. In any of such cases, the Indemnifying Party shall not have the right to assume the defense of such action on behalf of such Indemnified Party, it being understood, however, that the Indemnifying Party shall not be liable for the fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) for all Indemnified Parties. No Indemnifying Party shall be liable for any settlement entered into without its written consent (such consent not to be unreasonably withheld or delayed). No Indemnifying Party shall, without the consent of such Indemnified Party (such consent not to be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Party is a party and indemnity has been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability for claims that are the subject matter of such proceeding.

(d)  Contribution.  If the indemnification provided for in this Section 10.11 from the Indemnifying Party is held by a court of competent jurisdiction to be unavailable to an Indemnified Party hereunder in respect of any Liabilities referred to herein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and Indemnified Party on the other in connection with the statements or omissions which resulted in such Liabilities, as well as other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by such Indemnifying Party or Indemnified Party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.  The amount paid or payable by a party as a result of the Liabilities referred to above shall be deemed to include, subject to the limitations set forth in Sections 10.11(a), 10.11(b) and 10.11(c), any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding; *provided*, *however*, that the total amount to be contributed by any Member shall be limited to the net proceeds (after deducting the underwriters' discounts and commissions) received by the Member in the offering.

(e)  Fraud.  The parties hereto agree that it would not be just and equitable if contribution pursuant to Section 10.11(d) were determined by *pro rata* allocation or by any other

method of allocation which does not take account of the equitable considerations referred to in Section 10.11(d). No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

10.12   Initial Public Offering.

(a)     In connection with an Initial Public Offering of the Company, all Members shall and shall cause their Affiliates to take all necessary or desirable actions in connection with the consummation of such transaction, (A) to, as the Board of Managers may reasonably request, (x) convert the Company to a corporate form in a tax-free transaction (except to the extent of taxable income or gain required to be recognized by a Member in an amount that does not exceed the amount of cash or any property or rights (other than stock) received by such Member upon the consummation of such transaction and/or any concurrent transaction), or (y) accomplish the foregoing by effecting a transaction that is treated as the contribution of the Securities of the Company into a newly formed "shell" corporation pursuant to Section 351 of the Code, with the result that each Member shall hold capital stock of such surviving corporation or business entity (in each case, the "***Successor Corporation***", and any reference in this Article X to (i) the Company also being a reference to the Successor Corporation and (ii) Registrable Securities also being a reference to Stock, as applicable), and (B) to cause the Successor Corporation to assume all of the obligations of the Company under this Article X.   Subject to applicable law, the rights of the Members (including as to governance and approvals) will be substantially similar in all material respects for such Successor Corporation until the completion of an Initial Public Offering.

(b)     The Company and the Board of Managers will use their respective reasonable best efforts to perform any conversion or restructuring contemplated in Section 10.12 in the most tax efficient manner for the Members, including any Members that are treated as corporations for federal income tax purposes.  Upon the approval of the Board of Managers that such action is necessary to preserve the benefits of "tacking" under Rule 144 of the Securities Act, such conversion or merger may be structured to occur without any action on the part of any Member, and each Member hereby consents in advance to any action that the Board of Managers shall deem necessary to accomplish such result.

(c)     In connection with an Initial Public Offering, all of the outstanding Membership Interests of the Company shall automatically convert into shares of common stock of the Successor Corporation (the "***Stock***") immediately prior to the consummation of the Initial Public Offering or at such other time as the Board of Managers may determine.

(d)     In connection with an Initial Public Offering, all Members shall have the right to include in such offering a *pro rata* number of such Member's shares of Stock (held as a result of the automatic conversion described in Section 10.12(c)).

10.13   Registration Rights Agreement. The Company and each of the Members acknowledge and agree that in connection with and effective upon the consummation of a transaction referenced in Section 10.12, the Company or any successor and each of the Members will enter into a registration rights agreement on substantially the terms and conditions set forth in this Article X, *mutatis mutandis*.

10.14   Rule 144. At all times after the Company has filed a Registration Statement with the Commission pursuant to the requirements of either the Securities Act or the Exchange Act or has otherwise become subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act (or successor provision), the Company agrees to:

(a)　use its reasonable best efforts to make and keep public information regarding the Company available, as those terms are understood and defined in Rule 144 (or any successor rule or regulation to Rule 144 then in force) of the Securities Act, at all times;

(b)　use its reasonable best efforts to file all reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the Commission thereunder in a timely manner at all times;

(c)　so long as a holder of Registrable Securities owns any Registrable Securities, furnish to such holder forthwith upon reasonable request a copy of the most recent annual or quarterly report of the Company, and such other reports and documents so filed as such holder may reasonably request in availing itself of any rule or regulation of the Commission allowing such holder to sell any such securities without registration;

(d)　take such further action as any holder or holders of Registrable Securities may reasonably request, all to the extent required to enable such holders to sell Registrable Securities pursuant to (i) Rule 144 adopted by the Commission under the Securities Act (as such rule may be amended from time to time) or any similar rule or regulation hereafter adopted by the Commission or (ii) a Registration Statement on Form S-3 or any similar registration form hereafter adopted by the Commission; and

(e)　upon the written request of any holder of Registrable Securities, deliver to such holder of Registrable Securities a written statement as to whether it has complied with such requirements.

10.15　Independent Nature of Obligations. The obligations of each holder of Registrable Securities under this Agreement are several and not joint with the obligations of any other holder of Registrable Securities, and no holder of Registrable Securities shall be responsible in any way for the performance of the obligations of any other holder of Registrable Securities under this Agreement. Nothing contained herein, and no action taken by any holder of Registrable Securities pursuant thereto, shall be deemed to constitute such holders of Registrable Securities as a partnership, an association, a joint venture or any other kind of group or entity, or create a presumption that the holders of Registrable Securities are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by this Agreement. Each holder of Registrable Securities shall be entitled to independently protect and enforce its rights, including the rights arising out of this Agreement, and it shall not be necessary for any other holder of Registrable Securities to be joined as an additional party in any proceeding for such purpose. The failure or waiver of performance by any holder of Registrable Securities does not excuse performance by any other holder of Registrable Securities.

## ARTICLE XI
## DISSOLUTION OF COMPANY;
## LIQUIDATION AND DISTRIBUTION OF ASSETS

11.1　Events of Dissolution. This Section 11.1 sets forth the exclusive events which will cause the dissolution of the Company. The provisions of Section 18-801 of the Act that apply unless the limited liability company agreement otherwise provides shall not become operative. The Company shall be dissolved upon any of the following events (each, an "*Event of Dissolution*"):

(a)　The Board of Managers shall elect to dissolve the Company pursuant to this Agreement (including Section 5.11); or

(b)     A dissolution is required under Section 18-801(a)(4) of the Act or there is entered a decree of judicial dissolution under Section 18-802 of the Act.

11.2    <u>Liquidation; Winding Up</u>.  Upon the occurrence of an Event of Dissolution, the Board of Managers shall wind up the affairs of the Company in accordance with the Act and shall supervise the liquidation of the assets and property of the Company and, except as hereinafter provided, shall have full, complete and absolute discretion in the mode, method, manner and timing of effecting such liquidation. The Board of Managers shall have absolute discretion in determining whether to sell or otherwise dispose of Company assets or to distribute the same in kind and its determination shall be conclusive. The Board of Managers shall liquidate and wind up the affairs of the Company as follows:

(a)     The Board of Managers shall prepare (or cause to be prepared) a balance sheet of the Company in accordance with GAAP as of the date of dissolution.

(b)     The assets, properties and business of the Company shall be liquidated by the Board of Managers in an orderly and businesslike manner so as not to involve undue sacrifice. Notwithstanding the foregoing, if it is determined by the Board of Managers, whose determination shall be conclusive, not to sell all or any portion of the properties and assets of the Company, such properties and assets shall be distributed in kind in the order of priority set forth in subsection (c); *provided, however*, that the fair market value of such properties and assets (as determined by the Board of Managers in good faith, which determination shall be binding and conclusive) shall be used in determining the extent and amount of a distribution in kind of such properties and assets in lieu of actual cash proceeds of any sale or other disposition thereof.

(c)     The proceeds of the sale of all or substantially all of the properties and assets of the Company and all other properties and assets of the Company not sold, as provided in subsection (b) above, and valued at the fair market value thereof as provided in such subsection (b), shall be applied and distributed in one or more installments as follows, and in the following order of priority:

(i)    <u>First</u>, to the payment of all debts and liabilities of the Company and the expenses of liquidation not otherwise adequately provided for and the setting up of any reserves that are reasonably necessary for any contingent, conditional or unmatured liabilities or obligations of the Company or of the Members arising out of, or in connection with, the Company; and

(ii)    <u>Second</u>, the remaining proceeds to the Members in accordance with the applicable provisions of <u>Section 3.4</u>.

(d)     A certificate of cancellation, as required by the Act, shall be filed by the Board of Managers.

11.3    <u>Survival of Rights, Duties and Obligations</u>. Termination, dissolution, liquidation or winding up of the Company for any reason shall not release any party from liability which at the time of such termination, dissolution, liquidation or winding up already had accrued to any other party or which thereafter may accrue with respect to any act or omission prior to such termination, dissolution, liquidation or winding up.

11.4    <u>Claims of the Members</u>.  Members and former Members shall look solely to the Company's assets for the return of their contributions to the Company, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such contributions, the Members and former Members shall have no recourse against the Company or any other Member.

**ARTICLE XII**
**MISCELLANEOUS**

12.1    <u>Expenses</u>.  Unless otherwise provided herein, the Company shall bear all of the expenses incurred by the Company in connection with the preparation, execution and performance of this Agreement and, the transactions contemplated hereby, including all fees and expenses of agents, counsel and accountants; *provided, however*, that the Company shall have no liability for any transfer costs, taxes or related or similar expenses required to be paid by a Member in connection with a Transfer by such Member (including any costs to obtain an opinion with respect thereto).

12.2    <u>Further Assurances</u>.  Each party to this Agreement agrees to execute, acknowledge, deliver, file and record such further certificates, amendments, instruments and documents, and to do all such other acts and things, as may be required by law or as, in the opinion of the Board of Managers, may be necessary or advisable to carry out the intent and purposes of this Agreement.

12.3    <u>Notices</u>.  Any notice or other communication required or permitted to be given hereunder shall be in writing, and shall be deemed given and received (a) when transmitted by electronic mail or personally delivered on a Business Day during normal business hours, (b) on the Business Day following the date of dispatch by overnight courier, or (c) on the third Business Day following the date of mailing by registered or certified mail, return receipt requested, in each case, addressed to the Company or the Board of Managers at the address of the Principal Office of the Company set forth in <u>Section 2.5</u>, or to a Member at such Members' address shown on the Register of Members, or in any such case to such other address as the Company or any party hereto shall have last designated to the Company and the Members by notice given in accordance with this <u>Section 12.3</u>.  No notices under <u>Sections 9.3</u>, <u>9.4</u>, <u>9.5</u>, or <u>9.9</u> may be given by mail pursuant to clause (c) above.

12.4    <u>Amendments; Termination</u>.    Except as otherwise expressly provided herein, this Agreement and the Certificate may not be modified, amended or restated, and provisions hereof may not be waived without the approval of the Board of Managers and the Members holding a majority of the then outstanding Common Interests on a fully-diluted basis (excluding, for purposes of this calculation, any Incentive Interests); *provided*, *however*, that (a) any amendment, modification or waiver (including an amendment, modification or waiver to clause (a) of this <u>Section 12.4</u>) that would adversely affect in any respect the rights or obligations of any Member without similarly and proportionally affecting the rights or obligations hereunder of all other Members (for the avoidance of doubt, without giving effect to any Member's specific holdings of Membership Interests, specific tax or economic position or any other matters personal to a Member or any rights given to Members owning a certain level of Membership Interests and not to such affected Member specifically), shall not be effective as to such Member without such Member's prior written consent; (b) any amendment, modification or waiver (including an amendment, modification or waiver to clause (a) of this <u>Section 12.4</u>) that would adversely affect in any respect the rights or obligations of the Members holding Class B Interests without similarly and proportionally affecting the rights or obligations hereunder of Members holding Class A Interests (for the avoidance of doubt, without giving effect to any Member's specific holdings of Membership Interests, specific tax or economic position or any other matters personal to a Member or any rights given to Members owning a certain level of Membership Interests and not to such affected Member specifically), shall not be effective as to the Members holding Class B Interests without obtaining the prior written consent of Members holding a majority of the then outstanding Class B Interests on a fully-diluted basis (excluding, for purposes of this calculation, any Incentive Interests); (c) any amendment or modification (i) to the right of certain Members to appoint Managers pursuant to <u>Section 5.3</u> and/or observers to the Board of Managers pursuant to <u>Section 5.10</u>, (ii) to <u>Sections 3.2</u>, <u>3.4</u>, <u>3.5</u>, <u>6.14</u>, <u>7.1</u>, <u>7.2</u>, <u>7.3</u>, <u>7.5</u>, or clause (c) of this <u>Section 12.4</u> (or the defined terms utilized therein with respect thereto, including as to <u>Section 3.4</u> any amendment or change in the Preferred Return or calculation thereof), or (iii) that would require additional Capital Contributions of the then-existing Members or change the limited liability of the Members provided for herein and in the Act,

shall, in each case of (i), (ii), and (iii), require the prior written consent of each Member adversely affected by such amendment or modification; (d) any amendment, modification or waiver (including an amendment, modification or waiver to clause (d) of this Section 12.4) to any approval or consent right or any applicable threshold with respect thereto shall not be effective unless approved by Members holding Membership Interests equal to or in excess of the approval or consent right applicable thereto; (e) any amendment, modification or waiver to Section 9.1, Section 9.2, Section 9.3, Section 9.4, Section 9.5, Section 9.6, Section 9.9 or this Section 12.4 (or the defined terms used therein with respect thereto) shall require consent of Members holding seventy-five percent (75%) of the then outstanding Common Interests on a fully-diluted basis (excluding, for purposes of this calculation, any Incentive Interests); (f) any amendment, modification or waiver to Section 8.1 shall require consent of Members holding eighty-five percent (85%) of the then outstanding Common Interests on a fully-diluted basis (excluding, for purposes of this calculation, any Incentive Interests); (g) subject to compliance with Section 9.9 and the foregoing clause (c) of this proviso, the Company shall be permitted to amend and modify this Agreement pursuant to a Permitted Amendment approved by the Board of Managers as contemplated by Section 4.2 without the consent of the Members; (h) any amendment or modification to the terms or rights applicable to the Series A Preferred Interests shall require the prior written consent of each Member then holding Series A Preferred Interests; (i) no consent of any Member who only holds Incentive Interests shall be required to modify, amend, or restate this Agreement; (j) the Company shall automatically amend (or cause to be amended) the Register of Members and Schedule 5.3(a) hereto pursuant to the terms of this Agreement without the consent of the Members; and (k) upon any modification, amendment or restatement of this Agreement (other than an amendment to the Register of Members), the Company shall distribute to each of the Members a copy of such modification, amendment or restatement of this Agreement. Any approval, consent or waiver of or with respect to any provision of this Agreement requested by any party hereto must be in writing by the party granting such approval, consent or waiver; *provided*, *however*, that any such writing may be by means of an electronic writing or electronic mail. This Agreement shall terminate automatically upon the consummation of an Initial Public Offering and the entry into a registration rights agreement pursuant to Section 10.13 on substantially the same terms as set forth in Article X by the Company (or the Successor Corporation) and each Member (*mutatis mutandis*).

12.5    Severability. Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid, unenforceable or contrary to the Act or existing or future applicable law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those provisions of this Agreement which are valid, enforceable and legal. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

12.6    Headings and Captions. All headings and captions contained in this Agreement and the table of contents hereto are inserted for convenience only and shall not be deemed a part of this Agreement. The Annexes are considered a part of this Agreement.

12.7    Counterparts. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the same agreement. Facsimile counterpart signatures to this Agreement shall be binding and enforceable.

12.8    GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (WITHOUT REGARD TO THE RULES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY).

12.9     Jurisdiction. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Court of Chancery of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, (i) any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum and (ii) any and all right to trial by jury in any such suit, action or proceeding. Service of process, summons, notice or other document by registered mail to the address designated in Section 12.3 shall be effective service of process for any suit, action or other proceeding brought in any such court. For the avoidance of doubt, nothing herein shall modify or override the respective jurisdictional provisions in the Plan, Confirmation Order, or Plan Supplement documents (other than this Agreement).

12.10     Entire Agreement; Non-Waiver. This Agreement supersedes all prior agreements between the parties with respect to the subject matter hereof and contains the entire agreement between the parties with respect to such subject matter. No delay on the part of any party in exercising any right hereunder shall operate as a waiver thereof, nor shall any waiver, express or implied, by any party of any right hereunder or of any failure to perform or breach hereof by any other party constitute or be deemed a waiver of any other right hereunder or of any other failure to perform or breach hereof by the same or any other Member, whether of a similar or dissimilar nature.

12.11     No Third Party Beneficiaries. Nothing contained in this Agreement (other than the provisions of Article VII hereof, of which the Protected Persons and Indemnitees are intended third party beneficiaries who shall be entitled to enforce such provisions as if parties hereto), express or implied, is intended to or shall confer upon anyone other than the parties (and their successors and permitted assigns) and the Company any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

12.12     No Right to Partition. The Members, on behalf of themselves and their successors and assigns, if any, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Company or any asset of the Company, or any Membership Interest which is considered to be Company property, regardless of the manner in which title to such property may be held.

12.13     Investment Representation .

(a)     Each Member, by execution of this Agreement, (a) represents that it has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary action (corporate or otherwise) required for the due authorization, execution, delivery and performance by it of this Agreement, (b) represents that this Agreement has been duly and validly executed and delivered by such Member and, assuming due and valid execution and delivery hereof by the Company, does, or upon its execution by the Member will, constitute valid and legally binding obligations of such Member, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general principles of equity whether applied in a court of law or a court of equity, (c) represents to each

61

other Member and to the Company that such Member is acquiring a Membership Interest in the Company for the purpose of investment for such Member's own account, with the intent of holding such Membership Interest for investment and without the intent of participating directly or indirectly in any sale or distribution thereof in a manner that would violate the Securities Act, (d) represents it is not relying (and will not at any time rely) upon any information, representation or warranty by the Company other than as set forth in this Agreement, (e) acknowledges it has read and understands this Agreement and understands the terms and conditions herein, and (f) acknowledges that such Member must bear the economic risk of loss of such Member's capital contributions to the Company because this Agreement contains restrictions on Transfer and because the Membership Interests in the Company have not been registered under applicable United States federal and state securities laws (it being understood that the Company shall be under no obligation so to register such Membership Interests in the Company) and cannot be Transferred unless registered under such securities laws or an exemption therefrom is available.

(b)     Each Member that participated in the Equity Financing and is receiving Membership Interests hereunder further represents that it is an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) of the Securities Act or a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act.

12.14   Confidentiality.

(a)     Except as and to the extent as may be required by applicable law, taxing or regulatory authorities or audits, inquiries or examinations (including FINRA), without the prior written consent of the Board of Managers, the Members (including any Managers appointed by such Members) shall not make, and shall direct their officers, directors, agents, employees and other representatives not to make, directly or indirectly, any public comment, statement, or communication with respect to, or otherwise disclose or permit the disclosure of Confidential Information (including, for the avoidance of doubt, the Register of Members or any information included therein) or any of the terms, conditions, or other aspects of this Agreement; *provided, however*, that the Members (including any Managers appointed by such Members) and their respective equity owners may disclose Confidential Information (i) to their Affiliates and its and their officers, directors, agents, employees, trustees, and other representatives who are subject to obligations of confidentiality, (ii) as to the Liquidating Trust, to members of the Liquidating Trust Advisory Board (as such term is defined in the Plan), (iii) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with monitoring its investment in the Company and who agreed to abide by the confidentiality provisions contained herein, *provided*, the applicable Member shall be responsible for any breach of such confidentiality provisions by its or its equity owners' attorneys, accountants, consultants, and other professionals, (iv) to their respective equity owners and their respective investors, co-investors, managed accounts, limited partners or other similar Persons of the Members and their respective equity owners, as applicable, who are subject to obligations of confidentiality and in confidential materials delivered to prospective investors, limited partners or other similar Persons of the Members and their respective equity owners, as applicable, who are subject to obligations of confidentiality, in each case, in the ordinary course of business or in connection with customary marketing and reporting activities; *provided, however*, that the Members will use commercially reasonable best efforts to, or cause their respective equity owners, to, enforce their respective rights in connection with a breach of such confidentiality obligations by any Person receiving Confidential Information pursuant to this clause (iv), and (v) to a bona fide potential purchaser of Membership Interests held by such Member if such bona fide potential purchaser executes a confidentiality agreement, reasonably acceptable to the Company, with such Member containing terms at least as protective as the terms set forth in this Section 12.14 and which, among other things, provides for third-party beneficiary rights in favor of the Company to enforce the terms

thereof.  Each Member shall use, and shall cause its officers, directors, agents, employees and other representatives to whom Confidential Information is disclosed to use, the Confidential Information only in connection with its investment in the Membership Interests of the Company and not for any other purpose (including to disadvantage the Company or any other Member).  As used herein, "*Confidential Information*" means all information, knowledge, systems or data relating to the business, operations, finances, policies, strategies, intentions or inventions of the Company and its Subsidiaries and Affiliates (including any of the terms of this Agreement and any information provided pursuant to Article VIII) from whatever source obtained, except for any such information, knowledge, systems or data which at the time of disclosure (i) was in the public domain or otherwise in the possession of the disclosing Person (from a source not known by the disclosing Person to be subject to confidentiality obligations with respect thereto), unless such information, knowledge, systems or data was placed into the public domain or became known to such disclosing Person in violation of any non-disclosure obligation, including this Section 12.14, or (ii) was or is independently developed by the disclosing Person or any of its representatives without reference to the Confidential Information.  Each Member agrees that money damages would not be a sufficient remedy for any breach of this Section 12.14 by a Member, and that in addition to all other remedies, the Company shall be entitled to injunctive or other equitable relief as a remedy for any such breach.  Each Member agrees not to oppose the granting of such relief and agrees to waive any requirement for the securing or posting of any bond in connection with such remedy.

(b)     If any Member is required by applicable law to disclose any Confidential Information (other than to a regulatory or self-regulatory authority), it must, to the extent reasonably practicable under the circumstances and permitted by applicable law, first provide notice reasonably in advance to the Company with respect to the content of the proposed disclosure, the reasons that such disclosure is required by law and the time and place that the disclosure will be made.  Such Member shall cooperate, at the Company's sole cost and expense, with the Company to obtain confidentiality agreements or arrangements with respect to any legally mandated disclosure and in any event shall disclose only such information as is required by applicable law when required to do so.

(c)     Each Member shall indemnify the Company for any Damages incurred, suffered or sustained by the Company as a result of any breach by such Member of this Section 12.14.

\* \* \* \* \*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the date first above written.

**COMPANY:**

**NEW WPCC PARENT, LLC**

_Signed by:_

Marc Goldstone

C68C283343C9E52...

Name:  Marc Goldstone
Title:   Chief Legal Officer

**MEMBER SIGNATURE PAGES ON FILE WITH THE COMPANY**

**<u>Exhibit A</u>**
**Form of Offer Notice**

**Offer Notice**
Re: Transfer of Membership Interests
in New WPCC Parent, LLC


Dated as of [_____]



To:  New WPCC Parent, LLC
     3340 Perimeter Hill Drive
     Nashville, Tennessee 37211
     Attn.:  Marc Goldstone, Chief Legal Officer
     Email: mgoldstone@wellpath.us



Reference is hereby made to the Amended and Restated Limited Liability Company Agreement, dated as of May 9, 2025 (the "***LLC Agreement***") of New WPCC Parent, LLC, a Delaware limited liability company (the "***Company***").  Capitalized terms used but not otherwise defined herein have the meanings given to them in the LLC Agreement.

The undersigned Member (the "***Transferor***") wishes to transfer its Membership Interest and hereby gives this Offer Notice to the other Rightholders as required under Section 9.3(a) of the LLC Agreement.

Pursuant to Section 9.3(b) of the LLC Agreement, you have until the expiration of the ROFO Evaluation Period to deliver an Offer Purchase Notice to the Company: (i) agreeing to purchase the number of Offered Interests up to your entire Percentage Ownership of Offered Interests; (ii) if you have elected to purchase your entire Percentage Ownership of Offered Interests, agreeing to purchase up to your entire Percentage Ownership of the Offered Interests not subscribed for by other Rightholders and (iii) if you have elected to purchase your entire Percentage Ownership of Offered Interests and your entire Percentage Ownership of the Offered Interests not subscribed for by other Rightholders, agreeing to purchase the number of remaining Offered Interests not purchased by other Rightholders, in each case, upon the terms set forth below.

    (A)    <u>Offered Interests</u>: [●] Membership Interests as recorded by the Company on the Register of Members to the LLC Agreement as of the date hereof.

    (B)    <u>Price and Form of Consideration</u>:  [●]

If you elect to purchase the Offered Interests pursuant to the terms above, you and the Transferor shall enter into a definitive written transfer agreement, which shall include the terms set forth in Section 9.3(d) of the LLC Agreement.  Notwithstanding anything to the contrary herein, nothing in this Offer Notice shall be deemed to amend, modify or supersede Section 9.3 of the LLC Agreement, which shall continue in full force and effect.

EXHIBIT A

Very truly yours,


Transferor: [_____]

By:_____
      Name:
      Title:

Please send any response to this notice to
the Company at the address below:

New WPCC Parent, LLC
3340 Perimeter Hill Drive
Nashville, Tennessee 37211
Attn.:  Marc Goldstone, Chief Legal Officer
Email: mgoldstone@wellpath.us

EXHIBIT A

## Exhibit B

**Form of Joinder**

# JOINDER

The undersigned is executing and delivering this Joinder, dated as of [___], to that certain Amended and Restated Limited Liability Company Agreement of New WPCC Parent, LLC, a Delaware limited liability company (the "**Company**"), dated as of May 9, 2025 (as amended, modified, restated or supplemented from time to time, the "***LLC Agreement***"), in connection with the transfer of ownership of Membership Interests (as defined in the LLC Agreement) held by [____] to the undersigned.

By executing and delivering this Joinder to the Company, the undersigned hereby (i) agrees to become a party to, to be bound by, and to comply with all of the provisions, obligations and responsibilities of the LLC Agreement in the same manner as if the undersigned were an original signatory to the LLC Agreement; (ii) agrees that the undersigned shall be a Member of the Company, as such term is defined in the LLC Agreement; (iii) represents and warrants to the Company that the undersigned is acquiring the Membership Interests solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof; and (iv) acknowledges that the Membership Interests are not registered under the Securities Act of 1933, as amended, and that the Membership Interests may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended, or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable.

Additionally, the undersigned agrees and acknowledges that the address provided on the signature page hereto shall be included as part of the current Register of Members (as defined in the LLC Agreement) of the LLC Agreement as if originally provided therein.

[_____]

By: _____

Name: _____

Title: _____

Address:

E-mail:

Attention:

**<u>Exhibit C</u>**

**Form of Notice of Transfer**

EXHIBIT C

**Notice of Transfer**
Re: Transfer of Membership Interests
in New WPCC Parent, LLC


Dated as of [_____]



To:     New WPCC Parent, LLC
        3340 Perimeter Hill Drive
        Nashville, Tennessee 37211
        Attn.:  Marc Goldstone, Chief Legal Officer
        Email: mgoldstone@wellpath.us

To whom it may concern:

Reference is hereby made to that certain Amended and Restated Limited Liability Company Agreement, dated as of May 9, 2025 (as amended, modified, restated or supplemented from time to time, the "***LLC Agreement***"), of New WPCC Parent, LLC, a Delaware limited liability company (the "***Company***").  Capitalized terms used but not otherwise defined herein have the meanings given to them in the LLC Agreement.

The undersigned Member (the "***Transferor***") hereby certifies that effective five (5) Business Days following the Company's receipt of this Notice of Transfer (the "***Effective Date***"), the Transferor will transfer [●] Membership Interests to [●] (the "***Transferee***") for a price per Membership Interest of $[●].

The undersigned hereby certifies that (i) such transfer is permitted under Article IX of the LLC Agreement, (ii) neither the Transferee nor any of the Transferee's Affiliates is a Competitor of the Company, and (iii) for value received, effective as of the Effective Date, the undersigned Transferor hereby sells, assigns, and transfers unto the Transferee [●] Membership Interests standing in such undersigned Transferor's name on the books of the Company and hereby irrevocably constitutes and appoints the Company as attorney-in-fact of the undersigned to transfer said Membership Interests on the books of the Company with full power of substitution.


[*Signature Page Follows*]


EXHIBIT C

Very truly yours,


By   _____
Name:   _____
Title:   _____

## <u>Exhibit B</u>

**Directors and Officers of Reorganized Wellpath**

## Managers and Officers of Reorganized Wellpath

Pursuant to the *First Amended Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and Certain of its Debtor Affiliates (With Technical Modifications)* [Docket No. 2596-1] (the "Plan")[1] filed by Wellpath Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") and in accordance with section 1129(a)(5) of the Bankruptcy Code, the following individuals will serve as managers and officers of Reorganized Wellpath:

Managers

1. Dan Clancy

2. James Waldeck

3. Chris Bove

4. Ben Slocum

5. Additional Manager to be appointed by FS Investments post-Effective Date in accordance with the Amended and Restated Limited Liability Company Agreement filed with the Court on April 18, 2025.

Officers

1. Ben Slocum (Chief Executive Officer)

2. Cindy Watson (Chief Operating Officer)

3. Dheeraj Taranath (Chief Clinical Officer)

4. Carla Wallace (Chief Compliance Officer)

5. Joel Jensen (Chief Information Officer)

6. Timothy Dragelin (Interim Chief Financial Officer)

7. Marc Goldstone (Chief Legal Officer)

8. Debbie Jandt (Chief Human Resources Officer)

## Nature of Compensation

In accordance with section 1129(a)(5)(B) of the Bankruptcy Code and Article IV.G, to the extent that any Person listed in this Plan Document constitutes an "insider" (as such term is defined in section 101(31) of the Bankruptcy Code) of the Debtors, the nature of compensation for such Person shall, subject to the New Organizational Documents and any applicable employment contracts (which, for the avoidance of doubt, shall not include any contract listed on the Schedule of Rejected Contracts), continue in such form as exists

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

immediately before the Effective Date; provided, that certain officers may also participate in the Management Incentive Plan contemplated by <u>Article IV.F</u>.

**<u>Exhibit C</u>**

**Equity Financing Documents**

[*See* <u>Subscription Procedures and Subscription Form</u>]

## Exhibit D

**Takeback Facility Documents**

*Execution Version*

---

### FIRST LIEN CREDIT AGREEMENT

**among**

**NEW WPCC PARENT, LLC,**

**VARIOUS LENDERS,**

**and**

**ACQUIOM AGENCY SERVICES LLC,**

**as ADMINISTRATIVE AGENT and COLLATERAL AGENT**

_____

**Dated as of May 9, 2025**

---

# TABLE OF CONTENTS

Page

SECTION 1.        DEFINED TERMS...........................................................................................................1

1.01        Other Definitional Provisions, etc...................................................................................47
1.02        Accounting Terms.............................................................................................................48
1.03        Rounding............................................................................................................................48
1.04        Times of Day......................................................................................................................48
1.05        Timing of Payment or Performance.................................................................................48
1.06        Available Amount Transactions.......................................................................................48
1.07        Pro Forma Calculations...................................................................................................48
1.08        Currency Translation........................................................................................................50
1.09        Calculations, Computations.............................................................................................50
1.10        Interest Rate and Fee Calculations.................................................................................51
1.11        Limited Condition Transaction........................................................................................51
1.12        Practice Groups.................................................................................................................51
1.13        Rates...................................................................................................................................51

SECTION 2.        AMOUNT AND TERMS OF CREDIT..........................................................................52

2.01        The Commitments..............................................................................................................52
2.02        Minimum Amount of Each Borrowing..............................................................................52
2.03        Notice of Borrowing..........................................................................................................52
2.04        Disbursement of Funds.....................................................................................................53
2.05        Notes...................................................................................................................................54
2.06        Conversions.......................................................................................................................54
2.07        Pro Rata Borrowings........................................................................................................55
2.08        Interest................................................................................................................................55
2.09        Interest Periods.................................................................................................................56
2.10        Increased Costs, Illegality, etc........................................................................................57
2.11        Compensation....................................................................................................................58
2.12        Change of Lending Office.................................................................................................59
2.13        Replacement of Lenders....................................................................................................59
2.14        [Reserved]..........................................................................................................................61
2.15        Incremental Term Loans...................................................................................................61
2.16        Extensions of Term Loans.................................................................................................63
2.17        Refinancing Amendments..................................................................................................65
2.18        Reverse Dutch Auction Repurchases................................................................................65
2.19        Benchmark Replacement Setting......................................................................................67

SECTION 3.        [RESERVED]..................................................................................................................69

SECTION 4.        FEES; REDUCTIONS OF COMMITMENT.................................................................69

4.01        Fees.....................................................................................................................................69
4.02        Mandatory Reduction of Commitments.............................................................................69

SECTION 5.        PREPAYMENTS; PAYMENTS; TAXES.......................................................................69

5.01        Voluntary Prepayments.....................................................................................................69
5.02        Mandatory Repayments.....................................................................................................69
5.03        Method and Place of Payment..........................................................................................73
5.04        Taxes...................................................................................................................................74

Page

5.05    Presumption of the Administrative Agent as to Payments of the Borrower ............................... 77

SECTION 6.        CONDITIONS PRECEDENT TO CREDIT EVENTS ON THE CLOSING DATE.................. 78

6.01    Closing Date; Notes ....................................................................................................... 78
6.02    Officer's Certificate ....................................................................................................... 78
6.03    Opinions of Counsel ...................................................................................................... 78
6.04    Company Documents; Proceedings; etc. ........................................................................ 78
6.05    Plan of Reorganization ................................................................................................... 78
6.06    [Reserved] .................................................................................................................... 79
6.07    Material Adverse Change ............................................................................................... 79
6.08    [Reserved] .................................................................................................................... 79
6.09    [Reserved] .................................................................................................................... 79
6.10    Security Documents ....................................................................................................... 79
6.11    [Reserved] .................................................................................................................... 80
6.12    Solvency Certificate ...................................................................................................... 80
6.13    Fees, etc. ....................................................................................................................... 80
6.14    [Reserved] .................................................................................................................... 80
6.15    [Reserved] .................................................................................................................... 80
6.16    Subsidiaries Guaranty .................................................................................................... 80
6.17    KYC Information ............................................................................................................ 80

SECTION 7.        CONDITIONS PRECEDENT TO ALL CREDIT EVENTS. .................................... 81

7.01    No Default; Representations and Warranties .................................................................. 81
7.02    Notice of Borrowing ...................................................................................................... 81

SECTION 8.        REPRESENTATIONS AND WARRANTIES. ................................................... 81

8.01    Company Status ............................................................................................................. 81
8.02    Power and Authority ...................................................................................................... 82
8.03    No Violation .................................................................................................................. 82
8.04    Approvals; Governmental Authorizations ...................................................................... 82
8.05    Financial Statements; Financial Condition; Undisclosed Liabilities; No Material Adverse Effect ........... 83
8.06    Litigation ...................................................................................................................... 83
8.07    True and Complete Disclosure ....................................................................................... 83
8.08    Margin Regulations ....................................................................................................... 83
8.09    Tax Returns and Payments ............................................................................................. 84
8.10    Compliance with ERISA ................................................................................................ 84
8.11    Security Documents ....................................................................................................... 85
8.12    Properties ...................................................................................................................... 86
8.13    Subsidiaries .................................................................................................................. 86
8.14    Compliance with Statutes, etc. ...................................................................................... 86
8.15    Investment Company Act ............................................................................................... 87
8.16    Environmental Matters ................................................................................................... 87
8.17    Employment and Labor Relations .................................................................................. 87
8.18    Intellectual Property, etc. ............................................................................................... 87
8.19    USA Patriot Act; OFAC; FCPA ..................................................................................... 88
8.20    [Practice Groups ............................................................................................................ 88
8.21    Healthcare Matters ........................................................................................................ 88
8.22    Solvency ....................................................................................................................... 89
8.23    Beneficial Ownership ..................................................................................................... 89

SECTION 9.        AFFIRMATIVE COVENANTS. ................................................................... 89

Page

9.01    Information Covenants ................................................................................................ 89
9.02    Books, Records and Inspections; Quarterly Lender Calls ........................................ 93
9.03    Maintenance of Property; Insurance ........................................................................ 94
9.04    Existence; Franchises .............................................................................................. 95
9.05    Compliance with Laws, etc ..................................................................................... 95
9.06    Compliance with Environmental Laws .................................................................... 95
9.07    Business, etc. ........................................................................................................... 96
9.08    [Reserved] ............................................................................................................... 96
9.09    Payment of Obligations ........................................................................................... 96
9.10    Treatment of Restricted Cash .................................................................................. 96
9.11    Additional Security; Further Assurances; etc. ......................................................... 96
9.12    Designation of Subsidiaries .................................................................................... 99
9.13    Permitted Acquisitions ............................................................................................ 99
9.14    Ratings .................................................................................................................... 99
9.15    Compliance with PATRIOT Act, FCPA, OFAC, Anti-Terrorism and Anti-Money Laundering
         Laws ........................................................................................................................ 100

SECTION 10.      NEGATIVE COVENANTS ................................................................. 100

10.01    Liens ...................................................................................................................... 100
10.02    Consolidation, Merger or Sale of Assets, etc ....................................................... 103
10.03    Restricted Payments .............................................................................................. 107
10.04    Indebtedness .......................................................................................................... 110
10.05    Advances, Investments and Loans ........................................................................ 114
10.06    Transactions with Affiliates .................................................................................. 117
10.07    Financial Covenant ............................................................................................... 119
10.08    Certificate of Incorporation, By-Laws and Certain Other Agreements; Limitations on Voluntary
         Payments, etc. ........................................................................................................ 119
10.09    Limitation on Certain Restrictions on Restricted Subsidiaries ............................. 120
10.10    [Reserved] ............................................................................................................. 121
10.11    Accounting Changes ............................................................................................. 121

SECTION 11.      EVENTS OF DEFAULT AND REMEDIES. ...................................... 121

11.01    Payments ............................................................................................................... 121
11.02    Representations, etc. .............................................................................................. 122
11.03    Covenants .............................................................................................................. 122
11.04    Default Under Other Agreements .......................................................................... 122
11.05    Bankruptcy, etc. .................................................................................................... 122
11.06    ERISA ................................................................................................................... 123
11.07    Security Documents ............................................................................................... 123
11.08    Guaranties ............................................................................................................. 124
11.09    Judgments .............................................................................................................. 124
11.10    Change of Control ................................................................................................. 124
11.11    Invalidity of Credit Documents ............................................................................ 124
11.12    Borrower's Right to Cure ...................................................................................... 125

SECTION 12.      THE ADMINISTRATIVE AGENT ................................................... 126

12.01    Appointment ......................................................................................................... 126
12.02    Nature of Duties and Protections .......................................................................... 126
12.03    Lack of Reliance on the Administrative Agent ..................................................... 128
12.04    Certain Rights of the Administrative Agent .......................................................... 128
12.05    Reliance ................................................................................................................. 128
12.06    Erroneous Payments. ............................................................................................. 129

Page

12.07    Indemnification ...................................................................................................130
12.08    The Administrative Agent in its Individual Capacity ........................................130
12.09    [Reserved] ...........................................................................................................131
12.10    Resignation by the Administrative Agent ...........................................................131
12.11    Collateral Matters ...............................................................................................131
12.12    Right to Realize on Collateral and Enforce Guarantees......................................132
12.13    Force Majeure ......................................................................................................133
12.14    Delivery of Information .......................................................................................133
12.15    Applicable Intercreditor Arrangements ...............................................................133
12.16    [Reserved] ............................................................................................................134
12.17    Certain ERISA Matters ........................................................................................134

SECTION 13.        MISCELLANEOUS. ..................................................................................135

13.01    Payment of Expenses, etc. ...................................................................................135
13.02    Right of Setoff .....................................................................................................136
13.03    Notices .................................................................................................................137
13.04    Benefit of Agreement; Assignments; Participations ...........................................138
13.05    No Waiver; Remedies Cumulative .......................................................................142
13.06    Payments Pro Rata ...............................................................................................143
13.07    [Reserved] ............................................................................................................143
13.08    Several Obligations ..............................................................................................143
13.09    GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL .....143
13.10    Counterparts .........................................................................................................144
13.11    [Reserved] ............................................................................................................144
13.12    Headings Descriptive ...........................................................................................144
13.13    Amendment or Waiver; etc ..................................................................................145
13.14    Survival ................................................................................................................147
13.15    Domicile of Loans ...............................................................................................147
13.16    Register .................................................................................................................147
13.17    Confidentiality .....................................................................................................148
13.18    No Advisory or Fiduciary Responsibility ...........................................................149
13.19    PATRIOT ACT .....................................................................................................149
13.20    Post-Closing Actions ...........................................................................................149
13.21    Interest Rate Limitation .......................................................................................150
13.22    [Reserved] ............................................................................................................150
13.23    Lender Action ......................................................................................................150

SCHEDULE 1.01(a)    Lender Addresses
SCHEDULE 1.01(b)    Commitments
SCHEDULE 1.01(d)    Practice Groups
SCHEDULE 2.18       Reverse Dutch Auction Procedures
SCHEDULE 8.12       Real Property
SCHEDULE 8.13       Subsidiaries
SCHEDULE 8.16       Environmental Matters
SCHEDULE 10.01      Existing Liens
SCHEDULE 10.02      Dispositions
SCHEDULE 10.04      Permitted Surviving Debt
SCHEDULE 10.05      Existing Investments
SCHEDULE 10.06      Transactions with Affiliates
SCHEDULE 10.09      Contractual Obligations
SCHEDULE 13.20      Post-Closing Matters


EXHIBIT A-1    Form of Notice of Borrowing
EXHIBIT A-2    Form of Notice of Conversion/Continuation
EXHIBIT B      Form of Term Note
EXHIBIT C      [Reserved]
EXHIBIT D-1    Form of U.S. Tax Compliance Certificate for Foreign Lenders That Are Not Partnerships
EXHIBIT D-2    Form of U.S. Tax Compliance Certificate for Foreign Participants That Are Not Partnerships
EXHIBIT D-3    Form of U.S. Tax Compliance Certificate for Foreign Participants That Are Partnerships
EXHIBIT D-4    Form of U.S. Tax Compliance Certificate for Foreign Lenders That Are Partnerships
EXHIBIT E      Form of Subsidiaries Guaranty
EXHIBIT F      Form of Pledge Agreement
EXHIBIT G      Form of Security Agreement
EXHIBIT H      Form of Compliance Certificate
EXHIBIT I-1    Form of Assignment and Assumption Agreement
EXHIBIT I-2    Form of Assignment Notice
EXHIBIT J      PIK Election Notice
EXHIBIT K      Form of Solvency Certificate
EXHIBIT L      Form of Liquidity Certificate

## FIRST LIEN CREDIT AGREEMENT

This FIRST LIEN CREDIT AGREEMENT is entered into as of May 9, 2025 (as amended, amended and restated, modified and supplemented from time to time, this "Agreement"), by and among New WPCC Parent, LLC (the "Borrower"), Acquiom Agency Services LLC, as administrative agent (in such capacity, including any permitted successor thereto, the "Administrative Agent") and as collateral agent (in such capacity, including any permitted successor thereto, the "Collateral Agent") under the Credit Documents, and each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender").

## PRELIMINARY STATEMENTS

On November 11, 2024 (the "Petition Date"), Wellpath Holdings, Inc., CCS-CMGC Intermediate Holdings, Inc. and CCS-CMGC Intermediate Holdings 2, Inc. and certain of their subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (such court, together with any other court having exclusive jurisdiction over the Chapter 11 Cases from time to time and any Federal appellate court thereof, the "Bankruptcy Court") and commenced cases, jointly administered under Case No. 24-90533 (collectively, the "Chapter 11 Cases"), and have continued in the possession and operation of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Code Bankruptcy;

On May 1, 2025, the Bankruptcy Court entered the Confirmation Order (as defined below) confirming the Plan of Reorganization (as defined below) of the Debtors and the Debtors shall emerge from the Chapter 11 Cases on the date hereof, when all conditions to consummation of the Plan of Reorganization have been satisfied, or waived pursuant to the terms of the Plan of Reorganization;

The Borrower has requested, and the Lenders have agreed to make available to the Borrower, senior secured first lien term loans in the form of Initial Term Loans in an aggregate principal amount equal to $135,000,000, which amount shall be deemed to be made by the Lenders on the Closing Date subject to the terms and conditions set forth in this Agreement and the other Credit Documents; and

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

SECTION 1.      Defined Terms.

As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Acquired Entity or Business" shall mean either (x) the assets constituting a business, division or product line of any Person not already a Subsidiary of the Borrower or (y) the Equity Interests of any such Person (including by way of merger), which Person shall, as a result of the acquisition of such Equity Interests, become a Restricted Subsidiary of the Borrower (or shall be merged with and into the Borrower or a Restricted Subsidiary of the Borrower (it being understood and agreed that any such Person may have Foreign Subsidiaries as and to the extent permitted by Section 9.13 and the definition of "Permitted Acquisition," including by way of a merger of any Foreign Subsidiary with any Foreign Subsidiary of the Borrower as part of a series of related transactions which collectively constitute a Permitted Acquisition).

"Act" shall have the meaning provided in Section 8.19.

"<u>Additional Lender</u>" shall mean, at any time, any bank, other financial institution or investor that, in any case, is not an existing Lender and that agrees to provide any portion of any (a) Incremental Facility in accordance with Section 2.15 or (b) Refinancing Term Loan Commitments in accordance with Section 2.17; <u>provided</u> that each Additional Lender shall be subject to the approval of the Administrative Agent (such approval not to be unreasonably withheld, delayed or conditioned), in each case to the extent any such consent would be required from the Administrative Agent under Section 13.04(b) for an assignment of Loans to such Additional Lender.

"<u>Additional Security Documents</u>" shall have the meaning provided in Section 9.11(a).

"<u>Administrative Agent</u>" shall mean Acquiom Agency Services LLC, in its capacity as Administrative Agent for the Lenders hereunder and under the other Credit Documents, and shall include any permitted successor to the Administrative Agent appointed pursuant to Section 12.09.

"<u>Affiliate</u>" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person.  A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities or by contract; <u>provided</u>, <u>however</u>, that none of the Administrative Agent, any Lender or any of their respective Affiliates shall be considered an Affiliate of the Borrower or any Subsidiary thereof as a result of this Agreement, the extension of credit hereunder, or its actions in connection herewith or any other Credit Document.

"<u>Aggregate Consideration</u>" shall mean, with respect to any Permitted Acquisition, the sum (without duplication) of (i) the aggregate amount of all cash paid (or to be paid) by the Borrower or any of its Restricted Subsidiaries in connection with such Permitted Acquisition (excluding cash received in connection therewith from Eligible Equity Proceeds), (ii) the aggregate principal amount of all Indebtedness assumed, incurred, refinanced and/or issued in connection with such Permitted Acquisition to the extent permitted by Section 10.04 and (iii) the Fair Market Value of all other types of consideration (excluding cash received in connection therewith from Eligible Equity Proceeds and any Qualified Equity Interests of the Borrower (or any direct or indirect parent company)) payable in connection with such Permitted Acquisition; <u>provided</u>, that the "Aggregate Consideration" shall include any earn-out or other contingent purchase price obligations valued in accordance with GAAP and incurred by the Borrower or any Restricted Subsidiary after such obligation has become due and payable.

"<u>Agreement</u>" shall mean this Credit Agreement, as modified, supplemented, amended, restated (including any amendment and restatement hereof), extended, refinanced or renewed from time to time.

"<u>AHYDO Payment</u>" shall mean any mandatory prepayment or redemption pursuant to the terms of any Indebtedness that is intended or designed to cause such Indebtedness not to be treated as an "applicable high yield discount obligation" within the meaning of Section 163(i) of the Code.

"<u>Applicable Excess Cash Flow Percentage</u>" shall mean, with respect to any Excess Cash Payment Date, 75%.

"<u>Applicable Intercreditor Arrangements</u>" shall mean (i) with respect to any Indebtedness contemplated to be secured by Collateral on a pari passu basis with the Liens securing the Obligations, a customary pari passu intercreditor agreement and (ii) with respect to any Indebtedness contemplated to be secured by Collateral on a junior lien basis to the Liens securing the Obligations, a customary junior lien intercreditor agreement, (iii) with respect to any Indebtedness pursuant to a Permitted Revolving Facility that is an asset-based revolving facility, a customary "split lien" intercreditor agreement or similar

agreement providing for, among other things, lien priority of such Permitted Revolving Facility over certain categories of Collateral that are customarily considered to be priority collateral for providers of asset-based revolving facilities and lien subordination of such Permitted Revolving Facility with respect to all other Collateral and (iv) with respect to any Indebtedness pursuant to a Permitted Revolving Facility that is a cash-flow based revolving facility and contemplated to be secured by Collateral on a senior lien basis to the Liens securing the Obligations, a customary junior payment and/or lien intercreditor agreement, in each case of the foregoing (i), (ii), (iii) and (iv), in form and substance reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders).

"Applicable Margin" shall mean a percentage per annum equal to, with respect to Initial Term Loans (x) 9.50% for Term SOFR Loans and 8.50% for Base Rate Loans or (y) if the PIK Option is selected, 11.50% for Term SOFR Loans and 10.50% for Base Rate Loans (where in the case of (y), an amount of interest at 8.00% per annum for Term SOFR Loans or 7.00% per annum for Base Rate Loans, as applicable, shall be paid in kind and capitalized pursuant to Section 2.08(g) and the remainder (together with Term SOFR or the Base Rate, as applicable) shall be paid in cash).

"Approved Fund" shall mean any Fund that is administered, advised or managed by a Lender or an Affiliate of the entity that administers, advises or manages any Fund that is a Lender.

"Asset Sale" shall mean any sale, transfer or other disposition (including through division) by the Borrower or any of its Restricted Subsidiaries to any Person (including by way of redemption by such Person) other than to the Borrower or a Subsidiary Guarantor of any asset (including any Equity Interests in another Person) but excluding (i) any such sales, transfers or other dispositions that generate aggregate Net Sale Proceeds of less than $3,750,000 during any Fiscal Year, (ii) Recovery Events and (iii) any such sale, transfer or other disposition permitted by Section 10.02 (other than clauses (iii), (xviii), (xxii) and (xxvi) thereto).

"Assignee" shall have the meaning provided in Section 13.04(b)(i).

"Assignment and Assumption Agreement" shall mean an Assignment and Assumption Agreement substantially in the form of Exhibit I-1 (appropriately completed).

"Auction" shall have the meaning provided in Section 2.18(a).

"Auction Manager" shall have the meaning set forth in Section 2.18(a).

"Authorized Officer" shall mean, with respect to (i) delivering Notices of Borrowing, Notices of Conversion/Continuation and similar notices, any person or persons that has or have been authorized by the board of directors of the Borrower to deliver such notices pursuant to this Agreement, (ii) delivering financial information and officer's certificates pursuant to this Agreement, the chief executive officer, the president, the chief financial officer, the treasurer, the principal accounting officer or any other officer having substantially the same responsibilities of the Borrower, and (iii) any other matter in connection with this Agreement or any other Credit Document, any officer (or a person or persons so designated by the board of directors of the Borrower) of the Borrower.

"Available Amount" shall mean, at any time (the "Reference Date"), the sum of the following (without duplication):

    (a)    $10,000,000; plus

(b)        an amount equal to (w) the cumulative amount of Excess Cash Flow (which amount shall not be less than zero in any Fiscal Year) of the Borrower and its Restricted Subsidiaries for the Available Amount Reference Period, <u>minus</u> (x) the portion of such Excess Cash Flow that has been (or is required to be) applied to the prepayment of Loans in accordance with Section 5.02(f), <u>minus</u> (y) the aggregate amount by which the required Excess Cash Flow payment for any Excess Cash Payment Period has been reduced pursuant to the proviso to Section 5.02(f); provided that amounts available under this clause (b) shall only be available if (i) no Event of Default has occurred and is continuing or would result from the making of such Restricted Payment, Investment or the relevant payment pursuant to Section 10.03(v), 10.05(xvi) or 10.08(ii)(y)(II), respectively, and (ii) with respect to such Restricted Payment, Investment or the relevant payment pursuant to Section 10.03(v), 10.05(xvi) or 10.08(ii)(y)(II), respectively, the Total Net Leverage Ratio on a Pro Forma Basis as of the last day of the most recently ended Calculation Period is less than or equal to 2.30:1.00; <u>plus</u>

(c)        (i) Eligible Equity Proceeds other than to the extent received in connection with any Cure Right pursuant to Section 11.12, (ii) the cumulative amount of cash and Cash Equivalent proceeds from the Qualified Equity Interests of the Borrower (or any direct or indirect parent of the Borrower) issued upon conversion of Indebtedness or Disqualified Equity Interests issued after the Closing Date of the Borrower or any Restricted Subsidiary of the Borrower owed to a Person other than a Credit Party, and (iii) without duplication of amounts included under clause (i) above, the proceeds and the fair market value (as reasonably determined by the Borrower) of marketable securities or other property contributed as Qualified Equity Interests of the Borrower (or any direct or indirect parent of the Borrower) to a Credit Party or a Restricted Subsidiary thereof since the Closing Date from any Person other than a Credit Party or a Restricted Subsidiary other than to the extent received in connection with any Cure Right pursuant to Section 11.12; <u>plus</u>

(d)        to the extent not included in clause (c) above, the aggregate amount received by the Borrower or any Restricted Subsidiary from cash dividends and distributions received from any Unrestricted Subsidiaries, joint venture or minority interest and net cash proceeds in connection with the sale of its Equity Interests (other than Disqualified Equity Interests) in any Unrestricted Subsidiary, joint venture or minority interest, in each case, to any Person other than the Borrower or any Restricted Subsidiary and during the period from and including the Business Day immediately following the Closing Date through and including the Reference Date, in each case to the extent such Investments in such Unrestricted Subsidiary, joint venture or minority interest were originally made using the Available Amount pursuant to Section 10.05(xvi); <u>plus</u>

(e)        in the event any Unrestricted Subsidiary has been re-designated as a Restricted Subsidiary or has been merged, consolidated or amalgamated with or into, or transfers or conveys its assets to, or is liquidated into, the Borrower or a Restricted Subsidiary, the Fair Market Value (as determined by the board of directors of the Borrower) of the Investments of the Borrower and the Restricted Subsidiaries in such Unrestricted Subsidiary at the time of such re-designation, combination or transfer (or of the assets transferred or conveyed, as applicable), in each case to the extent such Investments correspond to the designation of a Subsidiary as an Unrestricted Subsidiary pursuant to Section 9.12 and were originally made using the Available Amount pursuant to Section 10.05(xvi); <u>plus</u>

(f)        to the extent not included in clause (c) above, the aggregate amount of cash dividends, distributions, interest, fees, premium, return of capital, repayment of principal, income, profits (from a disposition or otherwise) and other amounts received or realized in respect of such Investment (including upon sale of any such Investment), to the Borrower or any Restricted

Subsidiary in respect of Investments made using the Available Amount pursuant to Section 10.05(xvi); plus

(g)        the amount of any Declined Proceeds; minus

(h)        the aggregate amount of (1) Restricted Payments made pursuant to Section 10.03(v), (xi) and (xii) (only to the extent, in the case of Section 10.03(xii), that the Investment corresponding to the designation of the relevant Subsidiary as an Unrestricted Subsidiary or any subsequent Investment in such Unrestricted Subsidiary, was made in reliance on the Available Amount pursuant to Section 10.05(xvi)), (2) Investments made pursuant to Section 10.05(xvi), and (3) prepayments made pursuant to Section 10.08(ii)(y)(II) during the period from and including the Business Day immediately following the Closing Date through and including the Reference Date (without taking account of the intended usage of the Available Amount on such Reference Date), in each case, to the extent made using the Available Amount.

"Available Amount Reference Period" shall mean, with respect to any Reference Date, the period commencing on the Closing Date, and ending on the last day of the most recent Fiscal Year for which financial statements required to be delivered pursuant to Section 9.01(b), and the related compliance certificate required to be delivered pursuant to Section 9.01(e), have been received by the Administrative Agent and the Lenders.

"Available Tenor" shall mean, as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark or payment period for interest calculated with reference to such Benchmark, as applicable, that is or may be used for determining the length of an Interest Period or otherwise, for determining any frequency of making payments of interest calculated pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (d) of Section 2.19.

"Bail-In Action" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" shall have the meaning provided in Section 11.05.

"Base Rate" shall mean, for any day, a fluctuating rate per annum equal to the highest of (i) the Prime Lending Rate at such time, (ii) 1/2 of 1% per annum in excess of the overnight Federal Funds Rate for such day and (iii) Term SOFR for a one-month tenor in effect on such day as published two U.S. Government Securities Business Days prior to such day (or if such day is not a U.S. Government Securities Business Day, the immediately preceding U.S. Government Securities Business Day) plus 1.00% per annum; provided that, if the Base Rate as so determined shall ever be less than the Floor, then the Base Rate shall be deemed to be the Floor.  For purposes of this definition, Term SOFR shall be determined using Term SOFR as otherwise determined by the Administrative Agent in accordance with the definition of "Term SOFR," except that (x) if a given day is a Business Day, such determination shall be made on such day (rather than two (2) Business Days prior to the commencement of an Interest Period) or (y) if a given day is not a Business Day, Term SOFR for such day shall be the rate determined by the Administrative Agent pursuant to preceding clause (x) for the most recent Business Day preceding such day.  Any change in the Base Rate due to a change in the Prime Lending Rate, the Federal Funds Rate or

Term SOFR shall be effective as of the opening of business on the day of such change in the Prime Lending Rate, the Federal Funds Rate or Term SOFR, respectively.

"<u>Base Rate Loan</u>" shall mean each Loan that bears interest based on the Base Rate.

"<u>Base Rate Term SOFR Determination Day</u>" shall have the meaning specified in the definition of "<u>Term SOFR</u>".

"<u>Benchmark</u>" shall mean, initially, the Term SOFR Reference Rate; *provided* that if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.19.

"<u>Benchmark Replacement</u>" shall mean, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent (at the written direction of the Required Lenders) for the applicable Benchmark Replacement Date:

(1) the sum of: (a) Daily Simple SOFR and (b) 0.11448% (11.448 basis points);

(2) the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for syndicated credit facilities in the North American market denominated in the applicable Currency at such time and (b) the related Benchmark Replacement Adjustment;

If the Benchmark Replacement as determined pursuant to <u>clause (1)</u> or <u>(2)</u> above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Credit Documents.

"<u>Benchmark Replacement Adjustment</u>" shall mean, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent (at the written direction of the Required Lenders) and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"<u>Benchmark Replacement Conforming Changes</u>" shall mean, with respect to either the use of administration of the Term SOFR Rate or any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage

provisions, and other technical, administrative or operational matters) that the Administrative Agent (at the written direction of the Required Lenders) decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent (at the written direction of the Required Lenders) decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent (at the written direction of the Required Lenders) determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent (at the written direction of the Required Lenders) decides is reasonably necessary in connection with the administration of this Agreement and the other Credit Documents).

"Benchmark Replacement Date" shall mean the earliest to occur of the following events with respect to the then-current Benchmark:

(1)     in the case of clause (1) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof); and

(2)     in the case of clause (2) of the definition of "Benchmark Transition Event," the first date on which all Available Tenors of such Benchmark (or the published component used in the calculation thereof) has been or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) have been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that for any Loans denominated in dollars, such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (2) and even if such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, if such Benchmark is a term rate, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) above with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein solely to the extent such event applies to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" shall mean the occurrence of one or more of the following events with respect to the then-current Benchmark:

(1)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board, the Federal Reserve Bank of New York, the Term SOFR Administrator, an insolvency

official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" shall mean, with respect to any Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.19 and (y) ending at the time that a Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.19.

"Beneficial Ownership Certification" shall mean a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" shall mean 31 C.F.R. § 1010.230.

"Benefit Plan" shall mean any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Borrower" shall have the meaning provided in the first paragraph of this Agreement.

"Borrower LLCA" shall mean that certain Amended and Restated Limited Liability Company Agreement of the Borrower, effective as of the date hereof.

"Borrower Party" shall have the meaning set forth in Section 2.18(a).

"Borrowing" shall mean the borrowing of one Type of Loan of a single Class from all the Lenders having Commitments with respect to such Class on a given date (or resulting from a conversion or conversions on such date) having in the case of Term SOFR Loans the same Interest Period.

"Business Day" shall mean (i) for all purposes other than as covered by clause (ii) below, any day except Saturday, Sunday and any day which shall be in New York, New York, a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close and (ii)

if used in connection with an amount that bears interest at a rate based on SOFR or any direct or indirect calculation or determination of SOFR, any such day that is also a U.S. Government Securities Business Day.

"C Corporation Subsidiary" shall mean any Subsidiary of the Borrower treated as a corporation or association taxable as a corporation for U.S. federal income tax purposes.

"Calculation Period" shall mean, with respect to any Specified Transaction or any other event expressly required to be calculated on a Pro Forma Basis pursuant to the terms of this Agreement, the Test Period most recently ended prior to the date of such Specified Transaction or other event for which financial statements have been delivered to the Lenders pursuant to Section 9.01(a) or (b) as applicable; provided that, with respect to any event required to be calculated on a Pro Forma Basis that occurs prior to the date on which financial statements have been (or are required to be) delivered pursuant to Section 9.01(a) for the Fiscal Quarter ended June 30, 2025, the "Calculation Period" shall be the period of four consecutive Fiscal Quarters of the Borrower ended June 30, 2025 (taken as one accounting period), with Consolidated EBITDA (prior to giving pro forma effect to the applicable event required to be calculated on a Pro Forma Basis) being as set forth in the definition of "Test Period".

"Capital Expenditures" shall mean, with respect to any Person, for any period, the aggregate, without duplication, of all expenditures by such Person which should be capitalized in accordance with GAAP during such period; provided that "Capital Expenditures" shall not include (i) any capitalized interest expense reflected as additions to property, plant or equipment in the consolidated balance sheet of the Borrower and its Restricted Subsidiaries, and (ii) any non-cash compensation or other non-cash costs reflected as additions to property, plant or equipment in the consolidated balance sheet of the Borrower and its Restricted Subsidiaries.

"Capitalized Lease Obligations" shall mean, with respect to any Person, all obligations under Capitalized Leases of such Person which, under GAAP, are or will be required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with such principles; provided that for all purposes hereunder, subject to Section 1.02, the amount of obligations under any Capitalized Leases shall be the amount thereof accounted for as a liability on a balance sheet (excluding the notes thereto) in accordance with GAAP.

"Capitalized Leases" shall mean, subject to Section 1.02, all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases.

"Cash Equivalents" shall mean, as to any Person, (i) securities issued or directly and fully guaranteed or insured by the United States, or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than 12 months from the date of acquisition, (ii) marketable direct obligations issued by any state of the United States, or any political subdivision of any such state or any public instrumentality thereof maturing within 12 months from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's, (iii) Dollar denominated time deposits, certificates of deposit and bankers acceptances of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's with maturities of not more than 12 months from the date of acquisition by such Person, (iv) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (iii) above, (v) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by S&P or at least P 1 or the equivalent thereof by Moody's and in each case maturing

not more than six months after the date of acquisition by such Person (vi) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (v) above, and (vii) in the case of any Foreign Subsidiary, (x) such local currencies in those countries in which such Foreign Subsidiary transacts business from time to time in the ordinary course of business and (y) investments of comparable tenor and credit quality to those described in the foregoing clauses (i) through (vi) customarily utilized in countries in which such Foreign Subsidiary operates for short term cash management purposes.

"Cash Management Agreement" shall mean any agreement or arrangement for the provision of treasury, depository, credit card, debit card, purchase card and cash management services or any automated clearing house transfer of funds or foreign exchange facilities.

"CFC" shall mean a "controlled foreign corporation" within the meaning of Section 957(a) of the Code.

"CFC Holdco" shall mean any direct or indirect Domestic Subsidiary of the Borrower that has no material assets other than the equity (or the equity and debt) of one of more Foreign Subsidiaries that are CFCs.

"Change in Law" shall mean the occurrence, after the Closing Date, of any of the following: (a) the adoption of any law, rule, regulation or treaty (excluding the taking effect after the Closing Date of a law, rule, regulation or treaty adopted prior to the Closing Date), (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority, requiring compliance by any Lender (or lending office of such Lender). It is understood and agreed that (i) the Dodd–Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203, H.R. 4173), all Laws relating thereto and all interpretations and applications thereof and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall, for the purpose of this Agreement, be deemed to be adopted subsequent to the Closing Date.

"Change of Control" shall mean (i) prior to the occurrence of a Qualified IPO, the occurrence of a "Change of Control" (or similar defined term) under the Borrower LLCA, (ii) after the occurrence of a Qualified IPO, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) other than the Permitted Holders and any underwriters in connection with a Qualified IPO is or shall at any time become the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of 40% or more on a fully diluted basis of the voting interests (for the election of directors or other similar governing body) in the Borrower's Equity Interests and the Permitted Holders shall own, directly or indirectly, less than such person or group on a fully diluted basis of the voting interests in the Borrower's Equity Interests or (iii) a change of control or similar event shall occur as provided in any Junior Financing Documentation to the extent the aggregate principal amount of the Indebtedness evidenced thereby equals or exceeds the Threshold Amount.

"Claims" shall have the meaning provided in the definition of "Environmental Claims."

"Class" (a) when used with respect to Lenders, refers to whether such Lenders are Additional Lenders, Lenders or Extending Term Lenders, (b) when used with respect to Commitments, refers to whether such Commitments are Term Loan Commitments, Refinancing Term Loan Commitments or Extended Term Commitments and (c) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are Initial Term Loans, Incremental Term Loans,

Refinancing Term Loans, or Extended Term Loans, in each case, under this Agreement, of which such Loan, Borrowing or Commitment shall be a part.

"Closing Date" shall mean the first date that all of the conditions precedent in Section 6 are satisfied or waived in accordance with Section 6, which date is May 9, 2025.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Collateral" shall mean all property (whether real or personal) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document, including all Pledge Agreement Collateral, all Security Agreement Collateral, all Mortgaged Properties but, for the avoidance of doubt, excluding all Excluded Collateral.

"Collateral Agent" shall mean the Administrative Agent acting as collateral agent for the Secured Creditors pursuant to the Security Documents.

"Commitment" shall mean any of the commitments of any Lender to extend credit hereunder.

"Commodity Exchange Act" shall mean the Commodity Exchange Act (7 U.S.C. 1 et seq.) and any successor statute.

"Company" shall mean any corporation, limited liability company, partnership or other business entity (or the adjectival form thereof, where appropriate).

"Confirmation Order" means the Findings of Fact, Conclusions of Law, and Order (i) Confirming the First Amended Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and Certain of its Debtor Affiliates and (ii) Approving the Disclosure Statement on a Final Basis, entered by the Bankruptcy Court at Docket No. 2596 on May 1, 2025.

"Consolidated EBITDA" shall mean, for any period, Consolidated Net Income for such period (without giving effect to any gains or losses from sales of assets other than inventory sold in the ordinary course of business), adjusted by:  (A) adding thereto (in each case to the extent deducted in determining Consolidated Net Income for such period (other than with respect to clauses (vii), (viii), (xii), and (xiii) below)), without duplication, the amount of:

(i)        total interest expense (inclusive of amortization of deferred financing fees and other original issue discount and banking fees, charges and commissions (e.g., letter of credit fees and commitment fees, non-cash interest payments, the interest component of Capitalized Leases, net payments, if any, pursuant to Interest Rate Protection Agreements with respect to Indebtedness, the interest component of any pension or other post-employment benefit expense, in each case to the extent included as interest expense under GAAP)) of the Borrower and its Restricted Subsidiaries determined on a consolidated basis for such period;

(ii)        provision for taxes based on income, profits or capital and foreign withholding taxes and franchise, state single business unitary and similar taxes for the Borrower and its Restricted Subsidiaries determined on a consolidated basis for such period;

(iii)        all depreciation and amortization expense of the Borrower and its Restricted Subsidiaries determined on a consolidated basis for such period, including amortization or impairment of intangibles (including goodwill), non-cash write-offs of debt discounts and debt issuances, non-cash costs and commissions, non-cash discounts and other non-cash fees and

-11-

charges with respect to Indebtedness, Interest Rate Protection Agreements and Other Hedging Agreements;

(iv)    extraordinary, unusual or non-recurring cash charges, expenses or losses of the Borrower and its Restricted Subsidiaries during such period;

(v)    all non-cash charges, losses or expenses (including, without limitation, any non-cash asset retirement costs, non-cash compensation charges, non-cash translation (gain) loss and non-cash expense relating to the vesting of warrants) of the Borrower and its Restricted Subsidiaries determined on a consolidated basis for such period;

(vi)    restructuring costs, integration costs, costs of strategic initiatives, business optimization expenses or costs, retention, recruiting, relocation and signing and stay bonuses and expenses, including payments made to employees who are subject to non-compete agreements, facility opening, pre-opening and closing and consolidation costs, contract termination costs, stock option and other equity-based compensation expenses, severance costs, transaction fees and expenses and management, monitoring, consulting and advisory fees, indemnities and expenses, including, without limitation, any one time expense relating to enhanced accounting function or other transaction costs, including those associated with becoming a standalone entity or a public company, and public company costs; provided, the aggregate amount included pursuant to this clause (vi) with respect to any Test Period that begins on or after June 30, 2026 shall not exceed the greater of (x) $14,375,000 and (y) 25% of Consolidated EBITDA on a Pro Forma Basis for such Test Period (to be calculated before giving effect to any such amounts added back to Consolidated EBITDA pursuant to this clause (vi));

(vii)    the amount of "run-rate" cost savings, cost synergies, operating improvements and operating expense reductions related to restructurings, cost savings initiatives or other initiatives that are reasonably identifiable and factually supportable and projected by the Borrower in good faith to result from actions either taken or expected to be taken, or with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of the Borrower) in connection with the Transaction or any Specified Transaction or the implementation of an operational initiative (including the termination, abandonment or discontinuance of operations and product lines) no later than (I) in the case of any such cost savings, operating expense reductions, other operating improvements and cost synergies in connection with the Transactions, 12 months after the Closing Date and (II) in all other cases, 12 months after the consummation of the Specified Transaction or the implementation of an operational initiative, which is expected to result in such cost savings, expense reductions, other operating improvements or cost synergies (calculated on a Pro Forma Basis as though such cost savings, operating expense reductions, other operating improvements and synergies had been realized on the first day of such period and as if such cost savings, operating expense reductions, other operating improvements and synergies were realized during the entirety of such period), net of the amount of actual benefits realized during such period from such actions; provided that (A) a duly completed certificate signed by an Authorized Officer of the Borrower shall be delivered to the Administrative Agent together with the compliance certificate required to be delivered pursuant to Section 9.01(e), certifying that (x) such cost savings, operating expense reductions, other operating improvements and cost synergies are reasonably identifiable, reasonably anticipated to be realizable and factually supportable in the good faith judgment of the Borrower, and (y) such actions are to be taken within (I) in the case of any such cost savings, operating expense reductions, other operating improvements and cost synergies in connection with the Transaction, 12 months after the Closing Date and (II) in all other cases, 12 months after the consummation of the Specified Transaction or the implementation of an operational initiative,

-12-

which is expected to result in such cost savings, expense reductions, other operating improvements or synergies, (B) projected amounts (and not yet realized) may no longer be added in calculating Consolidated EBITDA pursuant to this clause (vii) to the extent occurring more than 12 months after the specified action taken in order to realize such projected cost savings, operating expense reduction, other operating improvements and synergies and (C) no cost savings, operating expense reductions and synergies shall be added pursuant to this clause (vii) to the extent duplicative of any expenses or charges otherwise added to Consolidated EBITDA, whether through a pro forma adjustment or otherwise, for such period; provided, further the aggregate amount included pursuant to this clause (vii), together with the aggregate amount included in Consolidated EBITDA pursuant to Section 1.07(d), with respect to any Test Period that begins on or after June 30, 2026 shall not exceed the greater of (x) $14,375,000 and (y) 25% of Consolidated EBITDA on a Pro Forma Basis for such Test Period (to be calculated before giving effect to any such amounts added back to Consolidated EBITDA pursuant to this clause (vii) or included in Consolidated EBITDA pursuant to Section 1.07(d));

(viii)    [reserved;]

(ix)    other accruals, up-front fees, transaction costs, commissions, expenses (including rationalization, legal, tax, structuring and other costs and expenses), premiums or charges related to any equity offering, permitted investment, acquisition (including any acquisition subject to a letter of intent or purchase agreement), dividend, restricted payment, disposition, recapitalization or incurrence, or repayment, amendment, or modification of Indebtedness, in each case, permitted by this Agreement, or related to any amendment, modification or waiver of such documentation (including this Agreement) (whether or not successful, and including costs and expenses of the Administrative Agent and Lenders that are reimbursed and up-front or financing fees, fees, costs, expenses (including fees, costs and expenses of any counsel, consultants or other advisors), transaction costs, commissions, expenses, premiums or charges related to or in connection with the Transaction (including Transaction Expenses) and any non-recurring merger or business acquisition transaction costs incurred during such period (in each case whether or not successful));

(x)    any non-cash increase in expenses (i) resulting from the revaluation of inventory (including any impact of changes to inventory valuation policy methods including changes in capitalization of variances) or other inventory adjustments, or any other acquisition or (ii) due to purchase accounting;

(xi)    charges, losses, or expenses to the extent covered by contractual indemnification, insurance or refunding provisions in favor of the Borrower or any of its Restricted Subsidiaries and actually paid by such third parties, or, so long as the Borrower has made a determination that a reasonable basis exists for payment and only to the extent that such amount is in fact paid within 365 days after such determination (with a deduction in the applicable future period for any amount so added back to the extent not so paid within such 365 days);

(xii)    to the extent not otherwise included in Consolidated Net Income and to the extent covered by business interruption insurance and actually reimbursed or otherwise paid, expenses or losses relating to business interruption or, so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is in fact indemnified or reimbursed within 365 days after such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365 days);

(xiii)     solely for purposes of determining compliance with the Financial Covenant in respect of any period which includes a Cure Quarter (but not for the determination of the First Lien Net Leverage Ratio or the Total Net Leverage Ratio for any other purposes, including calculations thereof in the definitions of "Maximum Incremental Facilities Amount" and "Permitted Ratio Debt" or in Sections 2.15, 9.13 and 10.04), the amount of proceeds from any sale or contribution of equity in connection with the exercise of a Cure Right in respect of such Cure Quarter;

(xiv)     minority interest expense, the amount of any non-controlling interest consisting of income attributable to non-controlling interests of third parties in any non-wholly owned Restricted Subsidiary, excluding cash distributions in respect thereof, and the amount of any reductions in arriving at Consolidated Net Income resulting from the application of Accounting Standards Codification Topic No. 810, *Consolidation*;

(xv)     bank fees and costs owed with respect to letters of credit, bankers acceptances and surety bonds, in each case, in connection with financing activities;

(xvi)     any costs related to the implementation of operational and reporting systems and technology initiatives, including non-recurring product compliance costs; and

(xvii)     any earnout obligations with respect to any acquisition or investment paid or accrued during such period; and

(B)     subtracting therefrom (to the extent not otherwise deducted in determining Consolidated Net Income for such period and without duplication, the amount of (i) all cash payments or cash charges made (or incurred) by the Borrower or any of its Restricted Subsidiaries for such period on account of any non-cash charges added back to Consolidated EBITDA in a previous period, (ii) income and gain items corresponding to those referred to in clauses (A)(iv) and (A)(v) above (other than the accrual of revenue in the ordinary course) and (iii) the amount of any non-controlling interest consisting of loss attributable to non-controlling interests of third parties in any non-wholly owned Restricted Subsidiary added to (and not deducted from) Consolidated Net Income in such period, and;

provided that:

(A)     to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA (x) currency translation gains and losses related to currency re-measurements of Indebtedness and (y) gains or losses on Interest Rate Protection Agreements and Other Hedging Agreements;

(B)     to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any adjustments resulting from the application of Statement of Financial Accounting Standards No. 133 and International Accounting Standard No. 39 and their respective related pronouncements and interpretations;

(C)     to the extent any Restricted Payments are declared or paid pursuant to Section 10.03(ii)(D) through 10.03(ii)(G), such amounts shall be excluded in determining Consolidated EBITDA; and

(D)     the calculation of Consolidated EBITDA shall be subject to Section 1.12.

Notwithstanding anything to the contrary contained above, for purposes of determining Consolidated EBITDA for any Test Period which ends prior to the first anniversary of the Closing Date, Consolidated EBITDA for all portions of such period occurring prior to the Closing Date shall be calculated in accordance with the definition of "Test Period" contained herein.

"Consolidated First Lien Indebtedness" shall mean, as of any date of determination, Consolidated Indebtedness that is, in each case, secured by a Lien on any asset or property of the Borrower or any Restricted Subsidiary (other than Liens that are junior or subordinate to the Liens of the Collateral Agent in the Collateral).

"Consolidated Indebtedness" shall mean, at any time all Indebtedness of the Borrower and its Restricted Subsidiaries (on a consolidated basis and subject to Section 1.12) as would be required to be reflected as debt or Capitalized Lease Obligations on the liability side of a consolidated balance sheet of the Borrower and its Restricted Subsidiaries in accordance with GAAP consisting of the outstanding principal amount of funded Indebtedness for borrowed money (including purchase money indebtedness) and the principal portion of Capitalized Lease Obligations; provided, that Consolidated Indebtedness shall not include (x) Indebtedness in respect of completion guarantees, performance bonds, surety or appeal bonds or similar instruments, letters of credit, bankers' acceptances or bank guarantees, in each case except to the extent of unreimbursed amounts thereunder; provided, that any unreimbursed amount under trade letters of credit shall not be counted as Consolidated Indebtedness until five (5) Business Days after such amount is drawn, and (y) all cash collateralized letters of credit. Unrestricted Subsidiaries shall not be included in any determination of "Consolidated Indebtedness".

"Consolidated Net Income" shall mean, for any period, the net income (or loss) of the Borrower and its Restricted Subsidiaries determined on a consolidated basis (after deduction for minority interests) for such period (taken as a single accounting period) in accordance with GAAP, provided that the following items shall be excluded in computing Consolidated Net Income (without duplication):

(i)        the net income (or loss) for such period of any Person that is not a Restricted Subsidiary of the Borrower or that is accounted for by the equity method of accounting; provided that Consolidated Net Income shall be increased by the amount of dividends or deductions that are actually paid in cash or Cash Equivalents by such Person to the Borrower or a Restricted Subsidiary during such period;

(ii)       except for determinations expressly required to be made on a Pro Forma Basis, the net income (or loss) of any Person accrued prior to the date it becomes a Restricted Subsidiary or is merged into or consolidated with the Borrower or a Restricted Subsidiary or all or substantially all of the property or assets of such Person are acquired by a Restricted Subsidiary; and

(iii)      any net income or loss attributable to the early extinguishment or cancellation of Indebtedness.

In addition, to the extent not already included in Consolidated Net Income of the Borrower and its Restricted Subsidiaries, Consolidated Net Income shall include (w) dividends or distributions that are paid in cash or Cash Equivalents by Unrestricted Subsidiaries to the Borrower or a Restricted Subsidiary during such period, (x) the amount of proceeds received from business interruption insurance in respect of expenses, charges or losses with respect to business interruption, (y) reimbursements of any expenses or charges that are actually received and covered by indemnification or other reimbursement provisions, in each case to the extent such expenses, charges or losses were deducted in the calculation of Consolidated Net Income and (z) the purchase accounting effects of adjustments (including the effects of such

-15-

adjustments pushed down to the Borrower and its Restricted Subsidiaries) in component amounts required or permitted by GAAP (including in the inventory, property and equipment, software, goodwill, intangible assets, in-process research and development, deferred revenue and debt line items thereof) and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and the Restricted Subsidiaries), as a result of the Transactions, any acquisition consummated prior to the Closing Date, any Permitted Acquisitions or other Investments, or the amortization or write-off of any amounts thereof.

"<u>Consolidated Secured Indebtedness</u>" shall mean, as of any date of determination, Consolidated Indebtedness that is secured by a Lien on any asset or property of the Borrower or any Restricted Subsidiary; provided that such Lien is granted under any Security Document or is pari passu or senior to the Liens securing the Obligations.

"<u>Consolidated Subsidiary</u>" shall mean at any date any Subsidiary which would be consolidated with those of the Borrower (or any other Person, as the context may require hereunder) in its consolidated financial statements if such statements were prepared as of such date, it being agreed that each Practice Group shall be deemed a Consolidated Subsidiary.

"<u>Consolidated Total Assets</u>" shall mean the total assets of the Borrower and its Restricted Subsidiaries on a consolidated basis, as shown on the most recent balance sheet of the Borrower delivered pursuant to Section 9.01(a) or (b) or, for the period prior to the time any such statements are so delivered pursuant to Section 9.01(a) or (b), the financial statements for the period most recently ended delivered to the Administrative Agent prior to the Closing Date (in each case adjusted to exclude assets of any Person other than the Borrower and its Restricted Subsidiaries).

"<u>Contingent Obligation</u>" shall mean, as to any Person, any obligation of such Person as a result of such Person being a general partner of any other Person, unless the underlying obligation is expressly made non-recourse as to such general partner, and any obligation of such Person guaranteeing or intended to guarantee any Indebtedness ("<u>primary obligations</u>") of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; <u>provided</u>, <u>however</u>, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary indemnity obligations in effect on the Closing Date or customary and reasonable indemnity obligations entered into in connection with any contractual arrangement, including any acquisition, capital expenditure, investment or disposition of assets permitted under this Agreement (other than any such obligations with respect to Indebtedness).  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"<u>Corporate Practice Rules</u>" shall mean any law relating to the practice of medicine, fee splitting or the sharing of revenues related to the practice of medicine, the employment of physicians or other healthcare professionals and the "corporate practice of medicine doctrine" or otherwise applicable to (i) the organization, control or ownership of entities that employ physicians or other medical or clinical

service providers or that engage individuals to provide medical or clinical services and (ii) the unauthorized or unlicensed practice of medicine or other clinical services by entities that are not wholly owned by physicians or other medical or clinical service providers.

"<u>Corresponding Tenor</u>" with respect to any Available Tenor shall mean, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding Business Day adjustment) as such Available Tenor.

"<u>Credit Documents</u>" shall mean this Agreement, the Subsidiaries Guaranty, the Pledge Agreement, the Security Agreement, the Intellectual Property Security Agreements and, after the execution and delivery thereof pursuant to the terms of this Agreement, each Note (if any), any intercreditor agreement entered into pursuant to the Applicable Intercreditor Arrangements and each other Security Document.

"<u>Credit Event</u>" shall mean the making of any Loan.

"<u>Credit Party</u>" shall mean the Borrower and each Subsidiary Guarantor.

"<u>Cure Quarter</u>" shall have the mean assigned to such term in Section 11.12.

"<u>Cure Right</u>" shall have the meaning assigned to such term in Section 11.12.

"<u>Cure Termination Date</u>" shall have the meaning assigned to such term in Section 11.12.

"<u>Daily Simple SOFR</u>" shall mean, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent  in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; *provided* that, if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion (in consultation with the Borrower).

"<u>Declined Proceeds</u>" shall have the meaning provided in Section 5.02(k).

"<u>Default</u>" shall mean any event, act or condition set forth in Section 11 which with notice or lapse of time, in each case, as set forth in such Section, or both, would (without cure or waiver hereunder) constitute an Event of Default.

"<u>Defaulting Lender</u>" shall mean any Lender that (a) has failed, within two (2) Business Days after the date required to be funded or paid, to (i) fund any portion of its Loans required to be funded by it or (ii) pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Borrower or the Administrative Agent or any other Lender in writing that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a Loan cannot be satisfied), (c) has failed, within three (3) Business Days after request by the Administrative Agent or any other Lender, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations to fund prospective Loans under this Agreement; *provided*

that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Administrative Agent's or other Lender's receipt of such certification in form and substance satisfactory to it and the Administrative Agent, or (d) after the date of this Agreement, has become the subject of a bankruptcy or insolvency event.

"Designated Non-Cash Consideration" shall mean the Fair Market Value of non-cash consideration received by the Borrower or any of its Restricted Subsidiaries in connection with an asset sale or other disposition that is so designated as Designated Non-Cash Consideration on or prior to the date received pursuant to a duly completed certificate signed by an Authorized Officer of the Borrower, setting forth the basis of such Fair Market Value, less the amount of cash or Cash Equivalents received in connection with a subsequent payment, redemption, retirement, sale or other disposition of such Designated Non-Cash Consideration within 180 days from the date of receipt. A particular item of Designated Non-Cash Consideration will no longer be considered to be outstanding when and to the extent cash or Cash Equivalents has been subsequently received in connection with a subsequent payment, redemption, retirement, sale or other disposition of such Designated Non-Cash Consideration.

"Disqualified Equity Interests" shall mean any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests or solely at the election of the issuer), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests and cash in lieu of fractional shares), in whole or in part, (c) provides for the scheduled payments of dividends in cash (other than with respect to common equity issued in connection with a Qualified IPO), or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Latest Maturity Date of the Loans at the time of issuance; provided that if such Equity Interests are issued pursuant to a plan for the benefit of employees of the Borrower (or any direct or indirect parent thereof), or its Restricted Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by the Borrower (or any direct or indirect parent thereof), or any of its Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"Disqualified Institutions" shall mean (a) those Persons that are competitors (and any such entities' Affiliates clearly identifiable solely on the basis of name) other than bona fide debt funds (other than as separately identified pursuant to clause (b) below)) of the Borrower and its Subsidiaries identified to the Administrative Agent and (b) those banks, financial institutions and other Persons, including such entities' Affiliates (to the extent clearly identifiable solely on the basis of name) other than bona fide debt funds (other than as separately identified pursuant to this clause (b)), to the extent separately identified by the Borrower to the Administrative Agent in writing prior to the Closing Date. The identification of any Person as a Disqualified Institution after the date hereof shall be effective only as of the time of such identification and any such identification shall have no retroactive effect of any kind, including to disqualify any Person that theretofore shall have become a Lender. Notwithstanding the foregoing, each Credit Party and the Lenders acknowledge and agree that the Administrative Agent will not have any responsibility or obligation to determine whether any Lender or potential Lender is a Disqualified Institution and the Administrative Agent will have no liability with respect to any assignment made to a Disqualified Institution. The Borrower shall confirm, upon the written request of the Administrative Agent or any Lender, whether a particular Person is a Disqualified Institution.

-18-

"Dollars" and the sign "$" shall each mean freely transferable lawful money of the United States.

"Domestic Subsidiary" of any Person shall mean any Subsidiary of such Person incorporated or organized in the United States or any state thereof or the District of Columbia.

"Drawing" shall have the meaning provided in Section 3.05(b).

"EEA Financial Institution" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Yield" shall mean, as to any Initial Term Loans or Incremental Term Loans of any tranche or any other Indebtedness, the effective yield on such loans as reasonably determined by the Borrower (consistent with generally accepted financial practices), taking into account the applicable interest rate margins (but not any fluctuations in SOFR), and all fees, including recurring periodic, up-front or similar fees or original issue discount (amortized over the shorter of (x) the life of such loans and (y) the four years following the date of incurrence thereof) payable generally to lenders making such loans, but excluding (i) any arrangement, commitment, structuring, underwriting, engagement or other fees payable in connection therewith that are not generally shared with the lenders thereunder and (ii) any amendment fees or customary consent fees paid generally to consenting lenders; provided, further, that, if any Incremental Terms Loans include an interest rate floor greater than the applicable interest rate floor (if any) under the Initial Term Loans, such differential between interest rate floors shall be equated to the applicable all-in-yield for purposes of determining whether an increase to the interest rate margin under the Initial Term Loans shall be required, but only to the extent an increase in the interest rate floor (if any) in the Initial Term Loans would cause an increase in the interest rate then in effect thereunder, and in such case, the interest rate floor (if any) (but not the interest rate margin) applicable to the Initial Term Loans shall be increased to the extent of such differential between interest rate floors (if applicable).

"Eligible Equity Proceeds" shall mean the net cash proceeds received by the Borrower (or any direct or indirect parent) from the sale or issuance of any Qualified Equity Interests of the Borrower (or any such parent) to any Person other than the Borrower and its Restricted Subsidiaries or from any capital contribution in respect of Qualified Equity Interests of the Borrower (or any such parent) from any Person other than the Borrower and its Restricted Subsidiaries, in each case, to the extent such net cash proceeds or capital contributions are directly or indirectly contributed to, and actually received by the Borrower after the Closing Date as cash common equity (or, if only a portion thereof is so contributed and received, to the extent of such portion).

"Eligible Transferee" shall mean and include a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act) (other than a natural person) but in any event excluding (i) except to the extent expressly provided in Sections 2.18 and 13.04(e), the Borrower and their

respective Restricted Subsidiaries and (ii) Disqualified Institutions (with respect to participations, so long as the list of Disqualified Institutions is available to the Lenders).

"Environmental Claims" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of noncompliance or violation, investigations and/or adjudicatory proceedings relating in any way to any noncompliance with, or liability arising under, Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereafter, "Claims"), including (a) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, or remedial actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief arising out of or relating to an alleged injury or threat of injury to occupational health or safety or the environment, in both cases, due to the presence or Release of Hazardous Materials.

"Environmental Law" shall mean any applicable federal, state, local or foreign law (including principles of common law), rule, regulation, ordinance, code, directive, judgment, or order, now or hereafter in effect and in each case as amended, and any enforceable or binding judicial or administrative interpretation thereof, relating to the protection of the environment, or to occupational health (as it relates to the exposure to environmental hazards) or to the presence, Release or threatened Release, or the manufacture, use, transportation, treatment, storage, disposal or recycling of Hazardous Materials, or the arrangement for any such activities.

"Equity Interests" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interest in (however designated) equity of such Person, including any common stock, preferred stock, any limited or general partnership interest and any limited liability company membership interest; provided, that any instrument evidencing Indebtedness convertible or exchangeable for Equity Interests shall not be deemed to be Equity Interests, unless and until any such instruments are so converted or exchanged.

"ERISA" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" shall mean any person that for purposes of Title I or Title IV of ERISA or Section 412 of the Code would be deemed at any relevant time to be a single employer or otherwise aggregated with the Borrower or any of its Restricted Subsidiaries under Section 414(b) or (c) of the Code or Section 4001 of ERISA.

"ERISA Event" shall mean any one or more of the following:

(a)     any Reportable Event;

(b)     the filing of a notice of intent to terminate any Plan, if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA, the filing under Section 4041(c) of ERISA of a notice of intent to terminate any Plan or the termination of any Plan under Section 4041(c) of ERISA;

(c)     the institution of proceedings, or the occurrence of an event or condition which would reasonably be expected to constitute grounds for the institution of proceedings by the PBGC under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan;

-20-

(d)  the failure to make a required contribution to any Plan that would result in the imposition of a lien or other encumbrance or the provision of security under Section 430 of the Code or Section 303 or 4068 of ERISA, or the arising of such a lien or encumbrance or the provision of such security; the failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, whether or not waived, under any Plan; the filing of any request for or receipt of a minimum funding waiver under Section 412 of the Code or Section 302 of ERISA with respect to any Plan; or a determination that any Plan is, or is reasonably expected to be, considered an at-risk plan within the meaning of Section 430 of the Code or Section 303 of ERISA;

(e)  engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA with respect to any Plan;

(f)  the failure to make any required contribution to a Multiemployer Plan; the complete or partial withdrawal of the Borrower or any of its Restricted Subsidiaries or any ERISA Affiliate from a Multiemployer Plan, the reorganization or insolvency under Title IV of ERISA of any Multiemployer Plan, or the receipt by the Borrower or any of its Restricted Subsidiaries or any ERISA Affiliate, of any notice that a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA; or

(g)  the Borrower or any of its Restricted Subsidiaries or an ERISA Affiliate incurring any liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA).

"Erroneous Payment" shall have the meaning assigned to such term in Section 12.06(a).

"EU Bail-In Legislation Schedule" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" shall have the meaning provided in Section 11.

"Excess Cash Flow" shall mean, for any period, an amount (which shall not be less than zero) equal to (a) net cash from operating activities (as determined in accordance with GAAP and as reflected in the consolidated cash flow statement) of the Borrower and its Restricted Subsidiaries for such period, minus (b) the sum, without duplication, of (i) the aggregate amount of all principal payments in cash of Term Loans (whether voluntary or mandatory) or other Indebtedness made during such period consisting of (A) the principal component of payments in respect of Capital Lease Obligations and (B) the amount of any mandatory or voluntary prepayment of Term Loans actually made and any mandatory or voluntary redemption or prepayment of Other Applicable Indebtedness, in the case of this clause (B), including revolving credit loans to the extent there is an equivalent permanent reduction in commitments thereunder, (ii) the aggregate amount actually paid by the Borrower and its Restricted Subsidiaries in cash during such period on account of capital expenditures, (iii) the amount of Investments, acquisitions and Restricted Payments permitted hereunder made in cash during such period (in each case, other than intercompany Investments, intercompany acquisitions and intercompany Restricted Payments), (iv) the aggregate amount of any cash bonuses to employees and officers that become earned and payable during such period, (v) any Taxes required to be paid in cash by the Borrower or its Restricted Subsidiaries during or with respect to such period, (vi) the aggregate amount of all interest and principal payments in cash of any Permitted Revolving Facility made during such period and (vii) at the Borrower's election, without duplication of amounts deducted from Excess Cash Flow in prior periods, the aggregate consideration required to be paid in cash by the Borrower or any Restricted Subsidiary relating to Permitted Acquisitions (or similar Investments), Restricted Payments (in each case, other than

intercompany Permitted Acquisitions (or similar Investments) and intercompany Restricted Payments) or capital expenditures that are planned to be consummated or made during the period of four consecutive fiscal quarters of the Borrower following the end of such period (the "Planned Expenditures"); provided, that to the extent that the aggregate amount of cash actually utilized to finance such Permitted Acquisitions (or similar Investments) or capital expenditures during such period of four consecutive fiscal quarters is less than the Planned Expenditures, the amount of such shortfall shall, in each case but without duplication, be added to the calculation of Excess Cash Flow, at the end of such period.

"Excess Cash Payment Date" shall mean the date occurring five (5) Business Days after the date on the Borrower's annual audited financial statements are required to be delivered pursuant to Section 9.01(b) (commencing with the Fiscal Year of the Borrower ending December 31, 2026).

"Excess Cash Payment Period" shall mean, with respect to any repayment required on any Excess Cash Payment Date, the Fiscal Year of the Borrower immediately preceding such Excess Cash Payment Date.

"Exchange Act" shall mean the Securities Exchange Act of 1934, and the rules and regulations promulgated thereunder.

"Excluded Collateral" shall have the meaning provided in the Security Agreement.

"Excluded Equity Interests" shall have the meaning provided in the Pledge Agreement.

"Excluded Information" shall have the meaning provided in Section 2.18(d).

"Excluded Subsidiary" shall mean (i)(x) any Domestic Subsidiary of a Foreign Subsidiary of the Borrower that is a CFC or (y) any CFC Holdco, (ii) Unrestricted Subsidiaries, (iii) any captive insurance Subsidiary, (iv) not-for-profit Subsidiaries, (v) any special purpose vehicle or Special Purpose Securitization Subsidiary, (vi) any Immaterial Subsidiary, (vii) any Subsidiary, to the extent a guarantee of which is prohibited or restricted by contracts binding on such Subsidiary on the Closing Date (or if acquired after the Closing Date, on the date of such acquisition) (but in each case not created in contemplation thereof) or applicable law (including any requirement to obtain governmental or regulatory authority or third party consent (other than the Borrower or its Subsidiaries), license, approval, or authorization (under applicable law or pursuant to any such contract), (viii) any Foreign Subsidiary, (ix) any Subsidiary that is not directly or indirectly a Wholly-Owned Subsidiary of the Borrower, (x) any Subsidiary for which the Administrative Agent and the Borrower determine the cost and/or burden of obtaining the guaranty outweigh the benefit to the Lenders and (xi) any Restricted Subsidiary acquired pursuant to a Permitted Acquisition that is an obligor under secured Indebtedness permitted to be assumed pursuant to this Agreement (and not incurred in contemplation of such Permitted Acquisition) and any Restricted Subsidiary thereof that guarantees such Indebtedness, in each case, to the extent that such secured Indebtedness prohibits such Subsidiary from becoming a Guarantor. For the avoidance of doubt, the Borrower shall not constitute an Excluded Subsidiary. Notwithstanding the foregoing, (i) no Subsidiary of the Borrower shall be an Excluded Subsidiary if such Subsidiary is a guarantor with respect to any Permitted Revolving Facility, any Incremental Notes, any Permitted Ratio Debt or any other Indebtedness for borrowed money or notes with an aggregate outstanding principal amount in excess of the Threshold Amount; and (ii) no Subsidiary of the Borrower shall constitute an Excluded Subsidiary pursuant to clause (ix) of this definition unless such Subsidiary becomes a non-Wholly Owned Restricted Subsidiary as a result of a transaction, (A) the primary purpose of which was not obtaining the release of its Guaranty or otherwise to evade the requirements of Sections 9.11, (B) that results in a joint venture not involving Affiliates of the Borrower (other than Persons that are Affiliates solely due to being a portfolio company of an Affiliate of the Borrower) for bona fide business purposes (as determined by the Borrower

in good faith, but in any case not for any financing) and where the other Person taking an equity interest in such Restricted Subsidiary takes such equity interest for fair market value (as determined by the Borrower in good faith) and (C) that does not result in the release of all or substantially all of the Collateral.

"Excluded Swap Obligations" shall mean with respect to any Guarantor any Swap Obligation if, and to the extent that, all or a portion of the guaranty of such Guarantor by, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the guaranty of such Guarantor or the grant of such security interest would become effective with respect to such related Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.

"Excluded Taxes" shall mean any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), and franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.13) or (ii) such Lender changes its lending office, except in each case, to the extent that, pursuant to Section 5.04, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 5.04(f) and (d) any withholding Taxes imposed under FATCA.

"Extended Term Commitment" shall have the meaning provided in Section 2.16(a).

"Extending Term Lender" shall have the meaning provided in Section 2.16(a).

"Extended Term Loans" shall have the meaning provided in Section 2.16(a).

"Extension" shall have the meaning provided in Section 2.16(a).

"Extension Offer" shall have the meaning provided in Section 2.16(a).

"Fair Market Value" shall mean, with respect to any asset (including any Equity Interests of any Person), the price at which a willing buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset, as determined in good faith by the board of directors or other governing body or, pursuant to a specific delegation of authority by such board of directors or governing body, a designated senior officer, of the Borrower, or the Subsidiary of the Borrower selling such asset.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices

adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCPA" shall mean the Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder.

"Federal Funds Rate" shall mean, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by depository institutions, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three depository institutions of recognized standing selected by the Administrative Agent (rounded upward, if necessary, to a whole multiple of 1/100 of 1.00%).

"Fee Letter" shall mean that certain agent fee letter, dated as of the date hereof, between the Borrower and the Administrative Agent.

"Fees" shall mean all amounts payable pursuant to or referred to in Sections 4.01.

"Financial Covenant" shall have the meaning assigned to such term in Section 10.07(b).

"First Lien MFN Provisions" shall have the meaning provided in Section 2.15(b)(i)(II).

"First Lien Net Leverage Ratio" shall mean, on any date of determination, the ratio of (x) Consolidated First Lien Indebtedness on such date, minus, the aggregate amount of cash and Cash Equivalents of the Borrower and the Restricted Subsidiaries on such date that would not appear as "restricted" on a consolidated balance sheet of the Borrower and the Restricted Subsidiaries to (y) Consolidated EBITDA of the Borrower and its Restricted Subsidiaries for the Test Period most recently ended on or prior to such date; provided that (i) for purposes of any calculation of the First Lien Net Leverage Ratio pursuant to this Agreement, Consolidated EBITDA shall be determined on a Pro Forma Basis in accordance with Section 1.07 and shall be determined in accordance with Section 1.12, (ii) for purposes of any calculation of the First Lien Net Leverage Ratio pursuant to this Agreement, Consolidated First Lien Indebtedness shall be determined on a Pro Forma Basis in accordance with the requirements of Section 1.07 and shall be determined in accordance with Section 1.12 and (iii) for purposes of any calculation of the Financial Covenant, "Consolidated First Lien Indebtedness" and "Consolidated Indebtedness" shall solely include Indebtedness in respect of (x) the Loans, (y) any Permitted Ratio Debt secured on a pari passu basis with the Liens securing the Obligations and (z) any Incremental Notes secured on a pari passu basis with the Liens securing the Obligations.

"Fiscal Quarter" shall mean, for any Fiscal Year, (i) the fiscal period commencing on January 1 of such Fiscal Year and ending on March 31 of such Fiscal Year, (ii) the fiscal period commencing on April 1 of such Fiscal Year and ending on June 30 of such Fiscal Year, (iii) the fiscal period commencing on July 1 of such Fiscal Year and ending on September 30 of such Fiscal Year and (iv) the fiscal period commencing on October 1 of such Fiscal Year and ending on December 31 of such Fiscal Year.

"Fiscal Year" shall mean the fiscal year of the Borrower and its Restricted Subsidiaries ending on December 31 of each calendar year.

"Flood Insurance Laws" shall mean, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973

as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Floor" shall mean a rate of interest *per annum* equal to (i) in the case of any determination of Term SOFR, 2.00% and (ii) in the case of any determination of the Base Rate, 3.00%.

"Foreign Disposition" shall have the meaning provided in Section 5.02(l).

"Foreign Lender" shall mean a Lender that is not a U.S. Person.

"Foreign Pension Plan" shall mean any plan, fund (including any superannuation fund) or other similar program established or maintained outside the United States by the Borrower or any one or more of its Restricted Subsidiaries primarily for the benefit of employees of the Borrower or such Restricted Subsidiaries residing outside the United States, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code; provided that a Foreign Pension Plan shall not include any plan, fund or other similar program exclusively sponsored or maintained by a Governmental Authority.

"Foreign Recovery Event" shall have the meaning provided in Section 5.02(l).

"Foreign Subsidiary" of any Person shall mean any Restricted Subsidiary of such Person that is not a Domestic Subsidiary.

"Fund" shall mean any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"GAAP" shall mean generally accepted accounting principles in the United States as in effect from time to time.

"Governmental Authority" shall mean the government of the United States, any other nation or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Governmental Programs" shall mean (i) the Medicare and Medicaid Programs, and (ii) other similar federal, state or local governmental health care programs.

"Granting Lender" shall have the meaning provided in Section 13.04(i).

"Guaranteed Creditors" shall mean and include each of the Administrative Agent, the Collateral Agent, each Lender and any Affiliate of the Administrative Agent, the Collateral Agent or a Lender (even if such Person ceases to be the Administrative Agent, the Collateral Agent or a Lender), in each case, party to a Cash Management Agreement, Interest Rate Protection Agreement or Other Hedging Agreement to the extent designated by the Borrower in writing to the Administrative Agent, which designation in the case of any such agreement governed by a Master Agreement shall only be required upon the Borrower entering into a Master Agreement, and not in respect of each Interest Rate Protection

-25-

Agreement or Other Hedging Agreement entered into thereunder; provided that no such designation shall be required of such Person as the Administrative Agent or an Affiliate of the Administrative Agent.

"Guaranteed Party" shall mean the Borrower and each other Guarantor party to a Cash Management Agreement, an Interest Rate Protection Agreement or Other Hedging Agreement with any Guaranteed Creditor.

"Guarantor" shall mean each Subsidiary Guarantor.

"Guaranty" shall mean the Subsidiaries Guaranty.

"Hazardous Materials" shall mean (a) any petroleum or petroleum products, radioactive materials, asbestos that is friable, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls, medical or biological wastes or materials and radon gas; and (b) any chemicals, materials, wastes, pollutants, contaminants or substances in any form that are prohibited, limited or regulated pursuant to any Environmental Law.

"Health Care Laws" shall mean all laws relating to the following, in each case applicable to or binding upon any Person or any of such Person's property or to which such Person or any of such Person's property is subject, including:  (i) federal fraud and abuse laws and regulations, including, the Ethics in Patient Referral Act (42 U.S.C. §1395nn and §1395(q)) (the "Stark Law"), the federal Anti-Kickback Statute  (42 U.S.C. § 1320a-7b(b)), the civil False Claims Act (31 U.S.C. § 3729 et seq.) and Sections 1320a-7 and 1320a-7a and 1320a-7b of Title 42 of the United States Code; (ii) the Food, Drug and Cosmetic Act (21 U.S.C. § 301 et seq.); (iii) the Anti-Inducement Law (42 U.S.C. § 1320a-7a(a)(5)); (iv) state laws similar to any of the foregoing; (v) HIPAA; (vi) the Social Security Act; (vii) laws governing the Medicare program (Title XVIII of the Social Security Act) and the regulations promulgated thereunder; (viii) laws governing the Medicaid program (Title XIX of the Social Security Act) and the regulations promulgated thereunder; (ix) the Corporate Practice Rules; (x) the licensure or regulation of physician and health care providers, healthcare professionals, facilities or payors; (xi) patient health care; (xii) quality, safety certification and accreditation standards and requirements; and (xiii) any and all other applicable federal, state or local health care laws, rules, codes, statutes, regulations, manuals, orders, ordinances, statutes, policies, professional or ethical rules, administrative guidance and requirements.

"HIPAA" shall mean the: (i) Health Insurance Portability and Accountability Act of 1996; (ii) the Health Information Technology for Economic and Clinical Health Act (Title XIII of the American Recovery and Reinvestment Act of 2009); and (iii) any state and local laws regulating the privacy and/or security of individually identifiable information, including state laws providing for notification of breach of privacy or security of individually identifiable information.

"Immaterial Subsidiary" shall mean each Restricted Subsidiary that, as of the last day of the Fiscal Quarter of the Borrower most recently ended, had net revenues and Consolidated Total Assets, in each case, for such Fiscal Quarter representing less than 3.5% of the consolidated net revenues and total assets of the Borrower and its Restricted Subsidiaries for such Fiscal Quarter; provided that in the event that the Immaterial Subsidiaries, taken together, had as of the last day of the Fiscal Quarter of the Borrower most recently ended net revenues and total assets, in each case, in excess of 7.0% of the consolidated net revenues and Consolidated Total Assets of the Borrower and its Restricted Subsidiaries for such Fiscal Quarter, the Borrower shall promptly designate one or more Immaterial Subsidiaries to cease to be an Immaterial Subsidiary as may be necessary not to exceed the foregoing 7.0% limit, and any such designated Restricted Subsidiary shall no longer be deemed to be an Immaterial Subsidiary hereunder.

"Incremental Amendment" shall have the meaning provided in Section 2.15(c).

"Incremental Facility" shall mean (i) each Incremental Term Loan and (ii) the Incremental Notes.

"Incremental Facility Closing Date" shall have the meaning provided in Section 2.15(d).

"Incremental Notes" shall have the meaning provided in Section 10.04(xix).

"Incremental Term Loans" shall have the meaning provided in Section 2.15(a).

"Indebtedness" shall mean, as to any Person, without duplication, (i) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services other than accounts payable incurred in the ordinary course of business, (ii) the maximum amount available to be drawn or paid under all letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations issued for the account of such Person and all unpaid drawings and unreimbursed payments in respect of such letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations, (iii) all indebtedness of the types described in clause (i), (ii), (iv), (v), (vi) or (vii) of this definition secured by any Lien on any property owned by such Person, whether or not such indebtedness has been assumed by such Person (provided that, if the Person has not assumed or otherwise become liable in respect of such indebtedness, such indebtedness shall be deemed to be in an amount equal to the lesser of (x) the Fair Market Value of the property to which such Lien relates or (y) the aggregate unpaid amount thereof), (iv) all Capitalized Lease Obligations of such Person, (v) all Contingent Obligations of such Person in respect of indebtedness of the types described in clauses (i), (ii), (iv), (vi) or (vii) of this definition, (vi) the Termination Value under any Interest Rate Protection Agreement or any Other Hedging Agreement and (vii) all obligations of such Person in respect of Disqualified Equity Interests.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is directly liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. Notwithstanding the foregoing, Indebtedness shall not include trade payables, accrued expenses and deferred tax and other credits incurred by any Person in accordance with customary practices and in the ordinary course of business, deferred compensation or any earn-out obligation (until such obligation is then due and owing and a non-contingent liability on the balance sheet of such Person in accordance with GAAP) of such Person or amounts owed pursuant to any contractual arrangement with, and for services to be performed by, an original equipment manufacturer incurred in the ordinary course of business.

"Indemnified Person" shall have the meaning provided in Section 13.01(a).

"Indemnified Taxes" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Credit Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Initial Term Loan Commitment" shall mean, for each Lender party to this Agreement on the Closing Date, the amount set forth opposite such Lender's name on Schedule 1.01(b) directly below the column entitled "Initial Term Loan Commitment," as the same may be terminated pursuant to the terms herein.

"Initial Term Loan Maturity Date" shall mean the date that is the fifth (5th) anniversary of the Closing Date.

"Initial Term Loans" shall have the meaning provided in Section 2.01(a).

"Information" shall mean all information received from the Borrower and related to the Borrower or their business, other than any such information that was available to the Administrative Agent, the Collateral Agent, or any Lender on a nonconfidential basis prior to its disclosure by the Borrower.

"Intellectual Property Security Agreements" shall mean any Copyright Security Agreements, Patent Security Agreements, and Trademark Security Agreements (as each such term is defined in the Security Agreement).

"Intercompany Debt" shall mean any Indebtedness, now existing or hereafter incurred, owed by the Borrower or any of its Restricted Subsidiaries to the Borrower or any of its Restricted Subsidiaries.

"Intercompany Loans" shall have the meaning provided in Section 10.05(viii).

"Intercompany Note" shall mean a promissory note evidencing Intercompany Loans, duly executed and delivered in form reasonably satisfactory to the Required Lenders, with blanks completed in conformity herewith.

"Interest Determination Date" shall mean, with respect to any Term SOFR Loan, the second Business Day prior to the commencement of any Interest Period relating to such Term SOFR Loan.

"Interest Payment Date" means, (a) as to any Term Loan other than a Base Rate Loan, the last day of each Interest Period applicable to such Term Loan and the Maturity Date of the facility under which such Term Loan was made; provided, however, that if any Interest Period for a Term SOFR Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan, each Quarterly Payment Date.

"Interest Period" shall have the meaning provided in Section 2.09.

"Interest Rate Protection Agreement" shall mean any interest rate swap agreement, interest rate cap agreement, interest collar agreement, interest rate hedging agreement or other similar agreement or arrangement, including any of the foregoing subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, as "Master Agreement").

"Investments" shall have the meaning provided in Section 10.05.

"IRS" shall mean the United States Internal Revenue Service.

"Junior Financing" shall mean, collectively, any Permitted Ratio Debt (other than Permitted Ratio Debt that is secured on a pari passu basis with the Obligations), Incremental Notes (other than Incremental Notes that rank pari passu in right of security with Initial Term Loans) and any other Indebtedness that is secured on a junior basis to the Obligations, unsecured or contractually subordinated to the Obligations or any Permitted Refinancing Indebtedness in respect thereof; provided, that Junior Financing shall not include any Intercompany Debt.

"Junior Financing Documentation" shall mean any documentation governing any Junior Financing.

"<u>KARS Receivables Facility</u>" shall mean the financing facility established pursuant to that certain Receivables Purchase Agreement, dated as of September 27, 2023, by and among Perimeter Hill RPA, LLC, Wellpath LLC, KARS Funding LLC and Katsumi Servicing LLC.

"<u>Latest Maturity Date</u>" shall mean, at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of any Incremental Term Loan, Refinancing Term Loan or any Extended Term Loan, in each case as extended in accordance with this Agreement from time to time.

"<u>LCT Election</u>" shall have the meaning provided in Section 1.11(a).

"<u>LCT Test Date</u>" shall have the meaning provided in Section 1.11(a).

"<u>Leaseholds</u>" of any Person shall mean all the right, title and interest of such Person as lessee, sublessee or licensee in, to and under leases, subleases or licenses of land, improvements and/or fixtures.

"<u>Lender</u>" shall have the meaning provided in the first paragraph of this Agreement.

"<u>Lien</u>" shall mean any mortgage, pledge, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including any conditional sale or other title retention agreement), and any lease having substantially the same effect as any of the foregoing.

"<u>Limited Condition Transaction</u>" shall mean any (1) acquisition or similar Investment by one or more of the Borrower and its Restricted Subsidiaries of any assets, business or person permitted to be acquired by this Agreement, in each case whose consummation is not conditioned on the availability of, or on obtaining, third party financing, (2) any repayment, repurchase or refinancing of Indebtedness with respect to which an irrevocable notice of repayment (or similar irrevocable notice) is required to be delivered or (3) any dividends or distributions on, or redemptions of equity interests, in each case for clauses (1), (2) and (3), to the extent not prohibited by this Agreement and the other Credit Documents.

"<u>Liquidity</u>" shall mean, at any time of determination, the sum of (i) the aggregate amount of all Unrestricted cash and Unrestricted Cash Equivalents of the Borrower and its Restricted Subsidiaries at such time, *plus* (ii) the aggregate amount of unutilized revolving loan commitments (not including any reserves) actually available to be drawn by the Borrower or its Restricted Subsidiaries under a Permitted Revolving Facility or any other revolving credit facility of the Borrower and/or its Restricted Subsidiaries incurred in compliance with this Agreement; <u>provided</u>, that, to the extent Unrestricted, Letters of Credit or cash collateral that are necessary for new or existing customer contracts and actually used for such customer contracts within ninety-five (95) days after such time of determination shall be excluded in calculating clause (i) above.

"<u>Liquidity Certificate</u>" shall have the meaning provided in Section 9.01(f).

"<u>Loan</u>" shall mean an extension of credit by a Lender to the Borrower under Section 2.

"<u>Loan Participant</u>" shall mean any Person who participates in the Loans pursuant to Section 13.04, <u>provided</u> that only Eligible Transferees may be Loan Participants.

"<u>Majority Lenders</u>" of any Class shall mean those Non-Defaulting Lenders which would constitute the Required Lenders under, and as defined in, this Agreement if all outstanding Obligations of

all other Classes under this Agreement were repaid in full and all Commitments with respect thereto were terminated.

"<u>Margin Stock</u>" shall have the meaning provided in Regulation U.

"<u>Master Agreement</u>" shall have the meaning provided in the definition of "Interest Rate Protection Agreement".

"<u>Material Adverse Effect</u>" shall mean (i) a material adverse effect on the business, assets, financial condition or results of operations of the Credit Parties and their Subsidiaries, taken as a whole or (ii) a material and adverse effect on the material rights and remedies (taken as a whole) of the Administrative Agent under the Credit Documents, taken as a whole.

"<u>Material Intellectual Property</u>" shall mean any intellectual property that is material to the business or operations of the Borrower and its Subsidiaries (when taken as a whole).

"<u>Management/Services Agreement</u>" shall mean a management agreement, service agreement or other similar agreement entered into between the Borrower or any of its Restricted Subsidiaries and a Practice Group, pursuant to which the Borrower or such Restricted Subsidiary provides management and administrative services to such Practice Group in exchange for a management fee paid to the Borrower or such Restricted Subsidiary.

"<u>Market Capitalization</u>" shall mean an amount equal to (i) the total number of issued and outstanding shares of common Equity Interests of the Borrower (or any direct or indirect parent) on the date of the declaration of a Restricted Payment multiplied by (ii) the arithmetic mean of the closing prices per share of such common Equity Interests on the principal securities exchange on which such common Equity Interests are traded for the 30 consecutive trading days immediately preceding the date of declaration of such Restricted Payment (or if such common Equity Interests have traded for less than 30 consecutive trading days, the number of days such common Equity Interests have traded preceding the date of declaration of such Restricted Payment).

"<u>Maturity Date</u>" shall mean, with respect to the Initial Term Loans, the Initial Term Loan Maturity Date; provided, that the reference to Maturity Date with respect to (x) Refinancing Term Loans shall be the final maturity date as specified in the applicable Refinancing Amendment, (y) Extended Term Loans, shall be the final maturity date as specified in the applicable Extension Offer and (z) any Incremental Facility, shall be the final maturity date as specified in the applicable Incremental Amendment; provided, further, that if any such day is not a Business Day, the applicable Maturity Date shall be the Business Day immediately succeeding such day.

"<u>Maximum Incremental Facilities Amount</u>" shall mean, at any date of determination, the sum of (a)(i) $45,000,000 minus (ii) the sum of (A) the aggregate principal amount of Incremental Term Loans made pursuant to Section 2.15(a) prior to such date in reliance on clause (a)(i) of this definition, (B) the aggregate principal amount of Incremental Notes issued or incurred pursuant to Section 10.04(xix)(I) prior to such date in reliance on clause (a)(i) of this definition, provided that the maximum amount deducted pursuant to this clause (a)(ii) shall not exceed $45,000,000; plus (b) an additional amount if, after giving effect to the incurrence of such additional amount, the First Lien Net Leverage Ratio is less than or equal to 2.30:1.00, determined on a Pro Forma Basis as of the last day of the Calculation Period most recently ended prior to the date of the incurrence of the Incremental Facility as if it had been incurred (and, if incurred to finance a Permitted Acquisition or other Specified Transaction, such transaction had been consummated) on the first day of such Calculation Period and calculated (A) in the case of any Incremental Facility that are unsecured, subordinated in right of payment to the Obligations

-30-

and/or secured by Liens that are junior to the Liens of the Collateral Agent in the Collateral, as if such Incremental Facilities rank pari passu in right of payment and security with the Initial Term Loans at the time of incurrence and at all times thereafter, (B) without netting the cash proceeds from any such Incremental Facility then proposed to be incurred, and (C) [reserved]; provided, further, for the avoidance of doubt, to the extent the proceeds of any Incremental Facility are being utilized to repay Indebtedness (including any repayment, repurchase or refinancing of any Indebtedness for which an irrevocable notice of repayment (or similar notice of repayment) has been delivered), such calculations shall give pro forma effect to such repayments (the "First Lien Incremental Leverage Test"); plus (c) the aggregate amount of all voluntary prepayments of the Term Loans and Incremental Notes, in each case, except to the extent funded with long-term Indebtedness.  The Borrower may elect, if the Borrower meets the First Lien Incremental Leverage Test at such time, to use clause (b) of the Maximum Incremental Facilities Amount regardless of whether the Borrower has capacity under clause (a) and/or clause (c) of the Maximum Incremental Facilities Amount.  Further, if the Borrower meets the First Lien Incremental Leverage Test on a Pro Forma Basis, then the Borrower may elect from time to time for any portion of any Incremental Facility incurred in reliance on clause (a) and/or clause (c) of the Maximum Incremental Facilities Amount to be reclassified as incurred under clause (b) of the Maximum Incremental Facilities Amount. Unless the Borrower otherwise elects in writing to the Administrative Agent, the Borrower shall be deemed to have used amounts under clause (b) (to the extent compliant therewith) prior to utilization of amounts under clause (a) and clause (c).

"Maximum Rate" shall have the meaning provided in Section 13.21.

"Minimum Borrowing Amount" shall mean, at any time, $5,000,000.

"Minimum Extension Condition" shall have the meaning provided in Section 2.16(b).

"Moody's" shall mean Moody's Investors Service, Inc., together with its successors.

"Mortgage" shall mean a mortgage, leasehold mortgage, deed of trust, leasehold deed of trust, deed to secure debt, leasehold deed to secure debt, debenture or similar security instrument pursuant to which the Borrower or a Guarantor grants to the Collateral Agent a Lien.

"Mortgage Policy" shall mean an ALTA Lender's title insurance policy (Form 2006).

"Mortgaged Property" shall mean any Real Property owned in fee simple by the Borrower or any of its Restricted Subsidiaries which is encumbered (or required to be encumbered) by a Mortgage pursuant to the terms hereof.

"Multiemployer Plan" shall mean any multiemployer plan as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is an obligation to contribute of) the Borrower or any of its Restricted Subsidiaries or with respect to which the Borrower or any of its Restricted Subsidiaries has any liability (including on account of an ERISA Affiliate).

"NAIC" shall mean the National Association of Insurance Commissioners.

"Net Debt Proceeds" shall mean with respect to any incurrence of Indebtedness, the gross cash proceeds (net of underwriting discounts and commissions, fees and other costs associated therewith, including those of attorneys, accountants and other professionals) received by the Borrower and its Restricted Subsidiaries from the respective incurrence of such Indebtedness.

"Net Recovery Event Proceeds" shall mean, with respect to any Recovery Event, the cash proceeds received by the Borrower and its Restricted Subsidiaries in connection with such Recovery Event, net of (i) costs, expenses and taxes incurred in connection with such Recovery Event, (ii) in the case of any Recovery Event regarding a Non-Wholly Owned Subsidiary, the pro rata portion of such proceeds that is contractually required (including pursuant to the organizational documents of such Subsidiary) to be paid to third Persons holding minority interests of such Subsidiary at the time of such Recovery Event (with such portion not to exceed such third Person's proportionate share of such proceeds based on its relative holding of Equity Interests in such Subsidiary), (iii) any funded escrow established in connection with any such Recovery Event (provided that to the extent that any amounts are released from such escrow to the Borrower or a Restricted Subsidiary thereof, such amounts, net of any related expenses, shall constitute Net Recovery Event Proceeds), (iv) any taxes paid or reasonably estimated to be payable in connection therewith, (v) the amount of such gross cash proceeds required to be used to permanently repay any Indebtedness (other than Indebtedness pursuant to this Agreement and any Incremental Notes) which is secured by a Lien (other than (i) a Lien that ranks subordinated to the Lien securing the Obligations or (ii) a Lien ranking pari passu with the Liens securing the Obligations unless such Indebtedness provides for ratable sharing of such proceeds as described in the third proviso to Section 5.02(g)) on the respective assets which were the subject of such Recovery Event and (vi) without duplication of clause (iii) above, the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (iv) above) (x) related to any of the applicable assets and (y) retained by the Borrower or any of its Restricted Subsidiaries including, without limitation, pension plan and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Recovery Event Proceeds with respect to such Recovery Event on the date of such reduction).

"Net Sale Proceeds" shall mean for any sale, transfer or other disposition of assets, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received by the Borrower and its Restricted Subsidiaries from such sale, transfer or other disposition of assets, net of (i) transaction fees, expenses and costs (including any underwriting, brokerage or other customary selling commissions, legal, advisory and other fees and expenses (including title and recording expenses), associated therewith and sales, VAT and transfer taxes arising therefrom), (ii) payments of unassumed liabilities relating to the assets sold, transferred or otherwise disposed of at the time of, or within 60 days after, the date of such sale, transfer or other disposition, (iii) the amount of such gross cash proceeds required to be used to permanently repay any Indebtedness (other than Indebtedness pursuant to this Agreement and any Incremental Notes) which is secured by a Lien (other than (i) a Lien that ranks subordinated to the Lien securing the Obligations or (ii) a Lien ranking pari passu with the Liens securing the Obligations unless such Indebtedness provides for ratable sharing of such proceeds as described in the third proviso to Section 5.02(e)) on the respective assets which were sold, transferred or otherwise disposed of, (iv) taxes paid or reasonably estimated to be payable in connection therewith, (v) any funded escrow established pursuant to the documents evidencing any such sale, transfer or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale, transfer or disposition (provided that to the extent that any amounts are released from such escrow to the Borrower or a Restricted Subsidiary thereof, such amounts, net of any related expenses, shall constitute Net Sale Proceeds) and (vi) without duplication of clause (v) above, the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (iv) above) (x) related to any of the applicable assets and (y) retained by the Borrower or any of its Restricted Subsidiaries including pension plan and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such

liability) shall be deemed to be Net Sale Proceeds of such sale, transfer or disposition of assets occurring on the date of such reduction).

"Non-Defaulting Lender" shall mean and include each Lender other than any Defaulting Lender.

"Non-Wholly Owned Subsidiary" shall mean, as to any Person, each Subsidiary of such Person which is not a Wholly-Owned Subsidiary of such Person.

"Note" shall mean any Term Note.

"Notice of Borrowing" shall have the meaning provided in Section 2.03(a).

"Notice of Conversion/Continuation" shall have the meaning provided in Section 2.06.

"Notice Office" shall mean (i) for the office of the Administrative Agent, 950 17th Street, Suite 1400, Denver, CO 80202, (ii) for the office of the Collateral Agent, 950 17th Street, Suite 1400, Denver, CO 80202, or, in either case such other office or person as the Administrative Agent or the Collateral Agent may hereafter designate in writing as such to the other parties hereto.

"Obligations" shall mean (i) all now existing or hereafter arising debts, liabilities, obligations, covenants, and duties of payment, indemnification, reimbursement or performance by the Borrower and the other Credit Parties of every kind, matured or unmatured, direct or contingent, owing, arising, due, or payable by any Credit Party arising out of this Agreement or any other Credit Document, including, without limitation, all obligations to repay principal or interest (including interest, fees and other amounts accruing during any proceeding under the Bankruptcy Code or other bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, and to pay interest, fees, costs, charges, expenses, professional fees, and all sums chargeable to any Credit Party or for which any Credit Party is liable as indemnitor under the Credit Documents, whether or not evidenced by any note or other instrument and (ii) liabilities and indebtedness of any Guaranteed Party owing to a Guaranteed Creditor under any Cash Management Agreement, Interest Protection Agreement or other Hedging Agreement, whether now in existence or hereafter arising. Notwithstanding anything to the contrary contained herein or in any other Credit Document, in no event will the Obligations include any Excluded Swap Obligations.  Notwithstanding anything to the contrary contained above or in any other Credit Document, (x) obligations of any Guaranteed Party owing to any Guaranteed Creditor under any Cash Management Agreement, Interest Protection Agreement or other Hedging Agreement shall be secured and guaranteed pursuant to the Credit Documents only to the extent that, and for so long as, the other Obligations are so secured and guaranteed and (y) any release of Collateral or Guarantors effected in the manner permitted by this Agreement shall not require the consent of holders of obligations under any Cash Management Agreement, Interest Protection Agreement or other Hedging Agreement.

"OFAC" shall have the meaning provided in Section 8.19(b).

"Other Applicable Indebtedness" shall have the meaning provided in Section 5.02(e).

"Other Connection Taxes" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

"Other Hedging Agreements" shall mean any foreign exchange contracts, currency swap agreements, commodity agreements or other similar arrangements, or arrangements designed to protect against fluctuations in currency values or commodity prices, including any of the foregoing subject to the terms and conditions of, or governed by, any form of Master Agreement.

"Other Taxes" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to a request of the Borrower under Section 2.13).

"Participant" shall have the meaning provided in Section 3.04(a).

"Participant Register" shall have the meaning provided in Section 13.04(j).

"Patriot Act" shall mean the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"Payment Office" shall mean the office of the Administrative Agent located at 950 17th Street, Suite 1400, Denver, CO 80202, or such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"Payment Recipient" shall have the meaning assigned to such term in Section 12.06(a).

"PBGC" shall mean the U.S. Pension Benefit Guaranty Corporation.

"Periodic Term SOFR Determination Day" shall have the meaning specified in the definition of "Term SOFR".

"Permitted Acquired Debt" shall have the meaning provided in Section 10.04(vii).

"Permitted Acquisition" shall mean the acquisition by the Borrower or a Restricted Subsidiary of the Borrower of an Acquired Entity or Business (including by way of merger of such Acquired Entity or Business with and into the Borrower (so long as the Borrower is the surviving Person), a Subsidiary Guarantor (so long as a Subsidiary Guarantor is the surviving Person) or a Restricted Subsidiary of the Borrower that is not the Borrower or a Subsidiary Guarantor (so long as a Restricted Subsidiary of the Borrower is the surviving Person, although if a Wholly-Owned Subsidiary of the Borrower is a party to such merger, such Wholly-Owned Subsidiary shall be the surviving Person)); provided that (in each case) (A) the Acquired Entity or Business acquired pursuant to the respective Permitted Acquisition is in a business permitted by Section 9.07, (B) all requirements of Sections 9.13 and 10.02 applicable to Permitted Acquisitions are satisfied in accordance with the terms of such Sections or waived by the Required Lenders, (C) with respect to any acquisition in which the Aggregate Consideration for the Acquired Entity or Business exceeds $15,000,000, the Borrower shall have delivered to the Administrative Agent (x) a copy of the acquisition or other purchase agreement related thereto, (y) historical financial statements of the Acquired Entity or Business for the previous fiscal year and for the most recent interim period, which are available and have been delivered to the Borrower and (z) to the extent readily available and permitted to be shared, copies of existing due diligence reports, and (D) such acquisition shall be consensual and, if applicable, shall have been approved by the board of directors (or similar governing body) of the Acquired Entity or Business. Notwithstanding anything to the contrary contained in the immediately preceding sentence, an acquisition which does not otherwise meet the

requirements set forth above in the definition of "Permitted Acquisition" shall constitute a Permitted Acquisition if, and to the extent, the Required Lenders agree in writing, prior to the consummation thereof, that such acquisition shall constitute a Permitted Acquisition for purposes of this Agreement.

"Permitted Encumbrance" shall mean, with respect to any Mortgaged Property, Permitted Liens and other such exceptions to title as are set forth in the Mortgage Policy delivered with respect thereto, all of which exceptions must be reasonably acceptable to the Collateral Agent in its reasonable discretion.

"Permitted Holders" shall mean collectively, each holder of more than 5.0% (on a fully-diluted basis) of the equity interests in the Borrower as of the Closing Date.

"Permitted Liens" shall have the meaning provided in Section 10.01.

"Permitted Ratio Debt" shall mean Indebtedness of the Borrower or any Restricted Subsidiary; provided that (a) such Indebtedness is either (w) senior unsecured, (x) subordinated in right of payment to the Obligations and unsecured,  (y) secured by the Collateral on a pari passu basis with the Obligations, or (z) secured by the Collateral on a junior basis as compared to the Obligations subject to the Applicable Intercreditor Arrangements, (b) Weighted Average Life to Maturity applicable to such Indebtedness shall be no shorter than the remaining Weighted Average Life to Maturity of any then-existing tranche of Term Loans (without giving effect to any prepayment thereof), (c) the final maturity date with respect to such Indebtedness shall be no earlier than the Latest Maturity Date on the date of the issuance or incurrence, as applicable, thereof, (d) if such Indebtedness is (i) secured on a pari passu basis with the Liens securing the Obligations, or (ii) secured on a junior basis as compared to the Obligations, then such Indebtedness shall be subject to the Applicable Intercreditor Arrangements, (e) immediately after giving effect thereto and to the use of the proceeds thereof, (i) no Event of Default shall exist or result therefrom (other than in connection with a Permitted Acquisition or other permitted Investment that is a Limited Condition Transaction, in which case the foregoing condition shall be no Specified Default  exists or would result therefrom) and (ii) on a Pro Forma Basis giving effect to the incurrence of such Indebtedness, (A) if such debt is secured by a Lien on the Collateral that is pari passu with the Lien on the Collateral securing the Obligations, the First Lien Net Leverage Ratio is less than or equal to 2.30:1.00, (B) if such debt is secured by a Lien on the Collateral that is junior to the Lien on the Collateral securing the Obligations or secured by assets that do not constitute Collateral, the Senior Secured Net Leverage Ratio is less than or equal to 3.30:1.00, or (C) if such debt is unsecured, the Total Net Leverage Ratio is less than or equal to 4.30:1.00, in each case, as of the last day of the most recently ended Calculation Period prior to the incurrence of such Indebtedness, (f) if such indebtedness is incurred by a Credit Party, no such Indebtedness shall be guaranteed by Persons other than the Credit Parties, (g) any such Indebtedness that is a Term Loan secured on a pari passu basis with Initial Term Loans shall be subject to the First Lien MFN Provisions as if such Indebtedness were Incremental Term Loans incurred pursuant to Section 2.15, and (h) such Indebtedness contains covenants and events of default that are not materially more restrictive taken as a whole to the Borrower and its Restricted Subsidiaries than those contained in this Agreement, unless (1) the Lenders under the Initial Term Loans also receive the benefit of such more restrictive terms, (2) such provisions apply after the maturity date of the Latest Maturity Date or (3) such terms are reasonably satisfactory to the Administrative Agent; provided that a certificate of the Borrower as to the satisfaction of the conditions described in clause (h) above (other than subclause (3)) delivered at least five (5) Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material covenants and events of default of such Indebtedness or drafts of documentation relating thereto, stating that the Borrower has reasonably determined in good faith that such covenants and events of default satisfy the foregoing requirements, shall be conclusive unless the Administrative Agent notifies the Borrower within such five (5) Business Day period that it disagrees with such determination (including a reasonably detailed description of the basis upon which it disagrees).

"Permitted Refinancing" shall mean, with respect to any Person, any modification, refinancing, replacement, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, replaced, refunded, renewed or extended except by an amount equal to unpaid accrued interest, fees (including original issue discount), expenses and premium thereon and by an amount equal to any existing commitments unutilized thereunder, unless the incurrence of the Indebtedness and, if applicable, Liens above such amount are otherwise permitted hereby, (b) such modification, refinancing, replacement, refunding, restructuring, renewal or extension has a final stated maturity date equal to or later than the final stated maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, replaced, refunded, renewed, or extended (other than to the extent of nominal amortization for periods where amortization has been eliminated or reduced as a result of prepayments of such Indebtedness), (c) at the time thereof, no Event of Default shall have occurred and be continuing, (d) such modification, refinancing, replacement, refunding, renewal or extension does not add guarantors or security from that which applied to such Indebtedness being modified, refinanced, replaced, refunded, renewed or extended, unless in connection with an acquisition (so long as such guarantors, or security are also added to support the Obligations to the extent required by Section 9.11), (e) to the extent such Indebtedness being modified, refinanced, replaced, refunded, renewed or extended is subordinated in right of payment to the Obligations, such modification, refinancing, replacement, refunding, renewal or extension is subordinated in right of payment to the Obligations (i) on terms (taken as a whole) at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended or (ii) on terms reasonably satisfactory to the Administrative Agent, (f) to the extent such Indebtedness being modified, refinanced, replaced, refunded, renewed or extended is secured by Liens that are subordinated to the Liens securing the Obligations, such modification, refinancing, replacement, refunding, renewal or extension is unsecured or secured by Liens that are subordinated to the Liens securing the Obligations on terms (taken as a whole) at least as favorable to the Lenders as those contained in the documentation (including any intercreditor or similar agreements) governing the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended, (g) such modification, refinancing, replacement, refunding, renewal or extension is incurred by the Person or Persons who are the obligors of the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended and (h) such modification, refinancing, replacement, refunding, renewal or extension contains terms and conditions (excluding pricing, and optional prepayment or redemption terms which shall be determined by Borrower) of any such Indebtedness that reflect market terms and conditions at the time of incurrence or issuance of such Indebtedness (as reasonably determined by Borrower).

"Permitted Refinancing Indebtedness" shall mean, with respect to any Indebtedness being modified, refinanced, replaced, refunded, renewed or extended, any Indebtedness implemented in respect thereof pursuant to, and in accordance with the requirements of, a Permitted Refinancing.

"Permitted Revolving Facility" shall mean a senior secured revolving facility (which may be asset-based, cash flow-based or otherwise) to be incurred by the Borrower and the other Credit Parties after the Closing Date pursuant to terms reasonably satisfactory to the Required Lenders and subject to the Applicable Intercreditor Arrangements.

"Permitted Securitization Financing" shall mean (A) the KARS Receivables Facility and (B) one or more transactions pursuant to which (i) Securitization Assets or interests therein are sold or transferred to or financed by one or more Special Purpose Securitization Subsidiaries, and (ii) such Special Purpose Securitization Subsidiaries finance (or refinance) their acquisition of such Securitization Assets or interests therein, or the financing thereof, by selling or borrowing against Securitization Assets (including conduit and warehouse financings) and any Hedging Agreements entered into in connection with such

Securitization Assets; provided, that recourse to the Borrower or any Subsidiary (other than the Special Purpose Securitization Subsidiaries) in connection with such transactions shall be limited to the extent customary (as determined by the Borrower in good faith) for similar transactions in the applicable jurisdictions (including, to the extent applicable and customary, in a manner consistent with the delivery of a "true sale"/"absolute transfer" opinion with respect to any transfer by the Borrower or any Subsidiary (other than a Special Purpose Securitization Subsidiary)).

"Permitted Surviving Debt" shall have the meaning provided in Section 10.04(ii).

"Person" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any Governmental Authority.

"PIK Election Notice" has the meaning assigned to such term in Section 2.08(g).

"PIK Interest" shall have the meaning provided in Section 2.08(g).

"PIK Option" shall have the meaning provided in Section 2.08(g).

"PIK Option Liquidity Trigger" shall mean, with respect to a given Interest Period, *pro forma* Liquidity would be less than $50,000,000 as of the applicable Interest Payment Date, as calculated by the Borrower in the most recently delivered Liquidity Certificate after giving *pro forma* effect to (i) the full cash payment of all interest amounts due and payable on such Interest Payment Date and (ii) if such Interest Payment Date is also a Scheduled Initial Term Loan Repayment Date, the full payment of the applicable Scheduled Interest Term Loan Repayment.

"Plan" shall mean an "employee pension benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA maintained or contributed to by the Borrower or any of its Restricted Subsidiaries or with respect to which  the Borrower or any of its Restricted Subsidiaries has any liability (including on account of an ERISA Affiliate).

"Plan of Reorganization" means the "Plan" as defined in the Confirmation Order.

"Pledge Agreement" shall have the meaning provided in Section 6.10(a).

"Pledge Agreement Collateral" shall mean all "Collateral" as defined in the Pledge Agreement, but excluding any Excluded Collateral.

"Pledgee" shall have the meaning provided in the Pledge Agreement.

"Practice Group" shall mean any Person (a) that provides medical, healthcare or related professional services; (b) the Equity Interests of which are not owned by the Borrower or any of its Restricted Subsidiaries; (c) that is party to a Management/Services Agreement pursuant to which the Borrower or any of its Restricted Subsidiaries manages, without exercising any professional medical judgment, the day-to-day non-clinical, administrative operations of such Person and (d) that pays to the Borrower or any of its Restricted Subsidiaries fees pursuant to any Management/Services Agreement to which such Person is a party. As of the Closing Date, each Person listed as a "Practice Group" on Schedule 1.01(d) shall be a Practice Group.

"Prime Lending Rate" shall mean the rate which the Administrative Agent determines from time to time as its prime lending rate in effect at its principal office in New York City and notified to the

Borrower.  The Prime Lending Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer by the Administrative Agent, which may make commercial loans or other loans at rates of interest at, above or below the Prime Lending Rate.

"Pro Forma Basis" shall mean, with respect to compliance with any test, covenant or calculation of any ratio hereunder, the determination or calculations of such test, covenant or ratio (including in connection with Specified Transaction) in accordance with Section 1.07.

"Projections" shall mean the projections prepared by or on behalf of the Borrower in connection with the Transactions and delivered to the Lenders on or around the Closing Date.

"PTE" shall mean a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Qualified Equity Interests" shall mean any Equity Interests that are not Disqualified Equity Interests.

"Qualified IPO" shall mean a bona fide underwritten sale to the public of common stock of the Borrower (or any direct or indirect parent) (i) pursuant to a registration statement (other than on Form S-8 or any other form relating to securities issuable under any benefit plan of the Borrower or any of its Restricted Subsidiaries, as the case may be) that is declared effective by the SEC or (ii) after which the common Equity Interests of the Borrower or any direct or indirect parent of the Borrower (an "IPO Entity") are listed on an internationally recognized securities exchange or dealer quotation system; provided that , solely for purposes of Section 10.03(ix), such sale of common stock shall only constitute a Qualified IPO if either (x) the IPO Entity shall have no material assets or operations other than those of the Borrower and its Restricted Subsidiaries or (y) substantially all of the net proceeds received from such sale are contributed to the Borrower.

"Quarterly Payment Date" shall mean the last Business Day of each March, June, September and December occurring after the Closing Date.

"Rabbi Trust" means the trust created by that certain Amended and Restated Trust Agreement made on March 27, 2020 by and between Wellpath LLC and Matrix Trust Company.

"Rabbi Trust Order" means a final order of the Bankruptcy Court authorizing and approving on a final basis, among other things, the turnover of assets relating to the Rabbi Trust.

"Rabbi Trust Proceeds" mean, following entry of the Rabbi Trust Order, any net cash proceeds turned over to the Borrowers pursuant to the Rabbi Trust Order.

"Real Property" of any Person shall mean all the right, title and interest of such Person in and to land, improvements and fixtures, which constitute real property, including Leaseholds, to the extent constituting an interest in real property.

"Recipient" shall mean (a) the Administrative Agent, or (b) any Lender, as applicable.

"Recovery Event" shall mean any event that gives rise to the receipt by the Borrower or any of its Restricted Subsidiaries of any cash insurance proceeds or condemnation awards payable (i) by reason of theft, loss, physical destruction, damage, taking or any other similar event with respect to any property or assets of the Borrower or any of its Restricted Subsidiaries (but not by reason of any loss of revenues or interruption of business or operations caused thereby) and (ii) under any policy of insurance required to

-38-

be maintained under Section 9.03, in each case except to the extent such proceeds or awards constitute reimbursement or compensation for amounts previously paid by the Borrower or any of its Restricted Subsidiaries in respect of any such event (as certified to the Administrative Agent by the Borrower pursuant to an officer's certificate delivered by an Authorized Officer not later than the fifth (5th) Business Day following the date of the receipt of such proceeds or awards).

"<u>Reference Date</u>" shall have the meaning provided in the definition of "Available Amount."

"<u>Refinanced Term Loans</u>" shall have the meaning provided in Section 13.13(c).

"<u>Refinancing</u>" shall mean the refinancing transactions described in Sections 6.06(a), (b) and (c).

"<u>Refinancing Amendment</u>" shall mean an amendment to this Agreement in form and substance reasonably satisfactory to the Administrative Agent (at the written direction of the Required Lenders) and the Borrower executed by each of (a) the Borrower and the Borrower, (b) the Administrative Agent, and (c) each Additional Lender and Lender that agrees to provide any portion of the Refinancing Term Loan Commitments being incurred pursuant thereto, in accordance with Section 2.17.

"<u>Refinancing Term Loan Commitments</u>" shall mean one or more Classes of term loan commitments hereunder that result from a Refinancing Amendment.

"<u>Refinancing Term Loans</u>" shall mean one or more Classes of Term Loans that result from a Refinancing Amendment.

"<u>Register</u>" shall have the meaning provided in Section 13.16.

"<u>Registered Equivalent Notes</u>" shall mean, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act, substantially identical notes (having the same guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"<u>Regulation D</u>" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"<u>Regulation T</u>" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"<u>Regulation U</u>" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"<u>Regulation X</u>" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"<u>Rejection Notice</u>" shall have the meaning provided in Section 5.02(k).

"<u>Release</u>" shall mean disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping, or migrating, into, through or upon any land or water or air, or otherwise entering into the environment.

"<u>Relevant Governmental Body</u>" shall mean the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"<u>Replaced Lender</u>" shall have the meaning provided in Section 2.13.

"<u>Replacement</u>" shall mean any modification, refinancing, refunding, renewal, replacement, redemption, repurchase, defeasance, exchange and/or extension of any Indebtedness.

"<u>Replacement Lender</u>" shall have the meaning provided in Section 2.13.

"<u>Replacement Term Loans</u>" shall have the meaning provided in Section 13.13(c).

"<u>Reportable Event</u>" shall mean an event described in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan that is subject to Title IV of ERISA other than those events as to which the 30-day notice period is waived under applicable regulations.

"<u>Required Lenders</u>" shall mean, at any time, Non-Defaulting Lenders the sum of whose outstanding Term Loans at such time represents at least a majority of the sum of all outstanding Term Loans of Non-Defaulting Lenders.

"<u>Restricted</u>" shall mean, when referring to cash or Cash Equivalents of the Borrower or any of its Restricted Subsidiaries, that such cash or Cash Equivalents appears (or would be required to appear) as "restricted" on a consolidated balance sheet of the Borrower or of any such Restricted Subsidiary (unless such appearance is related to the Credit Documents or Liens created thereunder).

"<u>Restricted Payment</u>" shall mean, with respect to any Person, that such Person has declared or paid a dividend, distribution or returned any equity capital to its stockholders, partners or members or authorized or made any other distribution, payment or delivery of property (other than Qualified Equity Interests of the Borrower (or any direct or indirect parent of the Borrower)) or cash to its stockholders, partners or members in their capacity as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for a consideration any shares any of class of its capital stock or any other Equity Interests outstanding on or after the Closing Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests), or set aside any funds for any of the foregoing purposes, other than the payment of compensation or benefits in the ordinary course of business to holders of any such Equity Interests who are employees, consultants or other service providers of the Borrower or any of its Restricted Subsidiaries, any of their respective direct or indirect parent companies or any of the Practice Groups.

"<u>Restricted Subsidiary</u>" shall mean any Subsidiary of the Borrower other than an Unrestricted Subsidiary or any Practice Group (to the extent constituting a Subsidiary).

"<u>Returns</u>" shall have the meaning provided in Section 8.09.

"<u>Sale-Leaseback Transaction</u>" shall mean an arrangement relating to property owned by the Borrower or any of its Restricted Subsidiaries whereby the Borrower or such Restricted Subsidiary sells or transfers such property to any Person in contemplation of the Borrower or any other Restricted Subsidiary leasing such property from such Person or its Affiliates.

"<u>S&P</u>" shall mean Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc., and any successor owner of such divisions.

"Scheduled Initial Term Loan Repayment" shall have the meaning provided in Section 5.02(b).

"Scheduled Initial Term Loan Repayment Date" shall have the meaning provided in Section 5.02(b).

"SEC" shall have the meaning provided in Section 9.01(h).

"Secured Creditors" shall mean and include each of (i) the Administrative Agent, (ii) the Collateral Agent, (iii) each Lender, and (iv) each Guaranteed Creditor in its capacity as a party to a Cash Management Agreement, Interest Rate Protection Agreement or Other Hedging Agreement with a Credit Party.

"Securities Act" shall mean the Securities Act of 1933 and the rules and regulations promulgated thereunder.

"Security Agreement" shall have the meaning provided in Section 6.10(b).

"Security Agreement Collateral" shall mean all "Collateral" as defined in the Security Agreement, but excluding any Excluded Collateral.

"Security Document" shall mean and include each of the Security Agreement, the Security Agreement Joinder, the Pledge Agreements, the Intellectual Property Security Agreements, any intercreditor agreement entered into pursuant to the Applicable Intercreditor Arrangements, each Mortgage and each other agreement, instrument or document that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Creditors and, after the execution and delivery thereof, each Additional Security Document and any security agreement, pledge agreement or other similar agreement delivered to the Collateral Agent pursuant to Section 9.11 or Section 13.20; provided that any cash collateral or other agreements entered into pursuant to the Letter of Credit Back-Stop Arrangements shall constitute "Security Documents" solely for purposes of (x) Sections 8.03 and 10.01(iv) and (y) the term "Credit Documents" as used in Sections 10.04(i), 10.13 and 13.01.

"Securitization Assets" shall mean accounts receivable and the proceeds thereof.

"Senior Secured Net Leverage Ratio" shall mean, on any date of determination, the ratio of (x) Consolidated Secured Indebtedness on such date, *minus,* the aggregate amount of cash and Cash Equivalents of the Borrower and the Restricted Subsidiaries on such date that would not appear as "restricted" on a consolidated balance sheet of the Borrower and the Restricted Subsidiaries to (y) Consolidated EBITDA of the Borrower and its Restricted Subsidiaries for the Test Period most recently ended on or prior to such date; provided that (i) for purposes of any calculation of the Senior Secured Net Leverage Ratio pursuant to this Agreement, Consolidated EBITDA shall be determined on a Pro Forma Basis in accordance with Section 1.07 and shall be determined in accordance with Section 1.12 and (ii) for purposes of any calculation of the Senior Secured Net Leverage Ratio pursuant to this Agreement, Consolidated Secured Indebtedness shall be determined on a Pro Forma Basis in accordance with the requirements of Section 1.07 and shall be determined in accordance with Section 1.12.

"Significant Asset Sale" shall mean each Asset Sale which generates Net Sale Proceeds of at least $5,000,000.

"SOFR" shall mean a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" shall mean the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"Solvent" and "Solvency" mean, with respect to any Person on any date of determination, that on such date (a) the sum of the debt (including contingent liabilities) of such Person does not exceed the present fair saleable value (on a going concern basis) of the assets of such Person; (b) the capital of such Person, is not unreasonably small in relation to the business of such Person, contemplated as of the date of determination; and (c) such Person does not intend to incur, or believe that it will incur, debts including current obligations or contingent obligations beyond its ability to pay such debts as they mature in the ordinary course of business.  For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"SPC" shall have the meaning provided in Section 13.04(i).

"Specified Default" shall mean an Event of Default arising under Section 11.01 or 11.05.

"Special Purpose Securitization Subsidiary" shall mean (i) a direct or indirect Subsidiary of the Borrower established in connection with a Permitted Securitization Financing for the acquisition of Securitization Assets or interests therein, and which is organized in a manner (as determined by the Borrower in good faith) intended to reduce the likelihood that it would be substantively consolidated with the Borrower or any of the Subsidiaries (other than Special Purpose Securitization Subsidiaries) in the event the Borrower or any such Subsidiary becomes subject to a proceeding under the Code (or other insolvency law) and (ii) any subsidiary of a Special Purpose Securitization Subsidiary.

"Specified Transaction" shall mean any incurrence or repayment of Indebtedness (other than for working capital purposes), including any Indebtedness incurred as an Incremental Term Loan or any Investment that results in a Person becoming a Restricted Subsidiary or an Unrestricted Subsidiary (including pursuant to Section 9.12), any Permitted Acquisition, any Significant Asset Sale or other asset sale that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower, any Investment constituting an acquisition of assets constituting a business unit, line of business or division of another Person or any asset sale of a business unit, line of business or division of the Borrower or a Restricted Subsidiary, in each case whether by merger, consolidation, amalgamation or otherwise.

"Stock Certificates" shall mean Collateral consisting of certificates representing Equity Interests held by the Borrower or any Guarantor (provided that the Borrower and the Guarantors shall not be required to deliver Stock Certificates constituting Excluded Collateral, including Stock Certificates issued by any Foreign Subsidiary that is a CFC or of a CFC Holdco representing in excess of 65% of the voting capital stock and 100% of the non-voting capital stock of such CFC or CFC Holdco) for which a security interest can be perfected by delivering such Stock Certificates, together with undated stock powers or other appropriate instruments of transfer executed in blank for each such certificate.

"Subordinated Indebtedness" shall mean, with respect to any Person, any Indebtedness of such Person if the instrument creating or evidencing such Indebtedness or pursuant to which such Indebtedness is outstanding expressly provides that such Indebtedness is (i) if incurred by the Borrower, subordinated in right of payment to the Obligations in form and substance reasonably satisfactory to the Administrative Agent or (ii) if incurred by the Borrower or a Restricted Subsidiary (other than the Borrower), subordinated in right of payment to the guarantee and other obligations made by such Person pursuant to

its Guaranty and the Obligations, as the same relate to such Person in form and substance reasonably satisfactory to the Administrative Agent.

"<u>Subsidiaries Guaranty</u>" shall have the meaning provided in Section 6.16.

"<u>Subsidiary</u>" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time.  Unless otherwise qualified, all references to a "<u>Subsidiary</u>" or to "<u>Subsidiaries</u>" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower. Notwithstanding anything contained to the contrary in this Agreement or any other Credit Document, Practice Groups shall not be deemed to be Subsidiaries of the Borrower, any other Credit Party or any Subsidiary thereof, unless the Borrower, such other Credit Party or such Subsidiary actually acquires Equity Interests of such Practice Group and such Practice Group otherwise satisfies the conditions set forth above in the first sentence above.

"<u>Subsidiary Guarantor</u>" shall mean each direct and indirect Wholly-Owned Domestic Subsidiary of the Borrower (other than any Excluded Subsidiary), in each case, whether existing on the Closing Date or established, created or acquired after the Closing Date, unless and until such time as the respective Subsidiary is released from all of its obligations under the Subsidiaries Guaranty in accordance with the terms and provisions thereof.

"<u>Swap Obligation</u>" shall mean, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"<u>Target Person</u>" shall have the meaning provided in Section 10.05.

"<u>Tax</u>" or "<u>Taxes</u>" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Tax Group</u>" shall have the meaning provided in Section 10.03(ii)(B).

"<u>Term Loan Commitment</u>" shall mean, as to each Lender, its Initial Term Loan Commitment set forth opposite such Lender's name on Schedule 1.01(b) directly below the column entitled "Initial Term Loan Commitment" or under a comparable caption in the Assignment and Assumption Agreement pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement (including Section 2.15).

"<u>Term Loans</u>" shall mean Initial Term Loans, Incremental Term Loans, Refinancing Term Loans and Extended Term Loans.

"<u>Term Note</u>" shall have the meaning provided in Section 2.05(a).

"<u>Term SOFR</u>" shall mean,

(a)      for any calculation with respect to a Term SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)      for any calculation with respect to an Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "Base Rate Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Base Rate SOFR Determination Day;

provided that, if Term SOFR as so determined shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.

"Term SOFR Administrator" shall mean CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent (at the written direction of the Required Lenders)).

"Term SOFR Loan" shall mean a Loan that bears interest at a rate based on Term SOFR, other than pursuant to clause (iii)(x) of the definition of "Base Rate".

"Term SOFR Reference Rate" shall mean the forward-looking term rate based on SOFR.

"Termination Value" shall mean, in respect of any one or more Interest Rate Protection Agreements or any Other Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Interest Rate Protection Agreement or Other Hedging Agreement, (a) for any date on or after the date such Interest Rate Protection Agreement or Other Hedging Agreement has been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the maximum aggregate amount (giving effect to any netting agreements) that would be required to be paid if such Interest Rate Protection Agreement or such Other Hedging Agreement were terminated at such time.

"Test Period" shall mean each period of four consecutive Fiscal Quarters of the Borrower then last ended, in each case taken as one accounting period; provided that in the case of any Test Period which includes any Fiscal Quarter ended on or prior to March 31, 2025, the rules set forth in the immediately succeeding sentence shall apply; provided further, that in the case of determinations of the

First Lien Net Leverage Ratio, Senior Secured Net Leverage Ratio and Total Net Leverage Ratio pursuant to this Agreement, such further adjustments (if any) as described in the proviso to the definition of "First Lien Net Leverage Ratio," "Senior Secured Net Leverage Ratio" or "Total Net Leverage Ratio", as the case may be, contained herein shall be made to the extent applicable.  If the respective Test Period (i) includes the Fiscal Quarter of the Borrower ended June 30, 2024, Consolidated EBITDA for such Fiscal Quarter shall be deemed to be $9,300,000, (ii) includes the Fiscal Quarter of the Borrower ended September 30, 2024, Consolidated EBITDA for such Fiscal Quarter shall be deemed to be $4,100,000, (iii) includes the Fiscal Quarter of the Borrower ended December 31, 2024, Consolidated EBITDA for such Fiscal Quarter shall be deemed to be $9,100,000 and (iv) includes the Fiscal Quarter of the Borrower ended March 31, 2025, Consolidated EBITDA for such Fiscal Quarter shall be deemed to be $20,200,000; provided that further adjustments may be made on a Pro Forma Basis to the amounts specified above to the extent provided herein.

"Threshold Amount" shall mean $20,000,000.

"Total Commitment" shall mean, at any time, the sum of the Commitments of each of the Lenders at such time.

"Total Initial Term Loan Commitment" shall mean, at any time, the sum of the Initial Term Loan Commitments of each of the Lenders at such time.

"Total Net Leverage Ratio" shall mean, on any date of determination, the ratio of (x) Consolidated Indebtedness on such date, minus, the aggregate amount of cash and Cash Equivalents of the Borrower and the Restricted Subsidiaries on such date that would not appear as "restricted" on a consolidated balance sheet of the Borrower and the Restricted Subsidiaries to (y) Consolidated EBITDA of the Borrower and its Restricted Subsidiaries for the Test Period most recently ended on or prior to such date; provided that (i) for purposes of any calculation of the Total Net Leverage Ratio pursuant to this Agreement, Consolidated EBITDA shall be determined on a Pro Forma Basis in accordance with Section 1.07 and shall be determined in accordance with Section 1.12 and (ii) for purposes of any calculation of the Total Net Leverage Ratio pursuant to this Agreement,  Consolidated Indebtedness shall be determined on a Pro Forma Basis in accordance with the requirements of Section 1.07 and shall be determined in accordance with Section 1.12.

"Trading with the Enemy Act" shall have the meaning provided in Section 8.19(a).

"Transactions" shall mean, collectively, (i) the execution, delivery and performance by each Credit Party of the Credit Documents to which it is a party, the incurrence of Loans on the Closing Date, (ii) the consummation of the transactions contemplated by, and in accordance with, the Plan of Reorganization and (iii) the payment of all fees and expenses in connection with the foregoing (the "Transaction Expenses").

"Transaction Expenses" shall have the meaning provided in the definition of "Transaction."

"Type" shall mean the type of Loan determined with regard to the interest option applicable thereto, i.e., whether a Base Rate Loan or a Term SOFR Loan.

"UCC" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"UCC Filing Collateral" shall mean Collateral, including Collateral constituting investment property, for which a security interest can be perfected by filing a UCC-1 financing statement.

"Unadjusted Benchmark Replacement" shall mean the Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unfunded Pension Liability" of any Plan shall mean the amount, if any, by which the value of the liabilities under the Plan, as defined in Section 4001(a)(16) of ERISA, exceeds the fair market value of all plan assets determined in accordance with the assumptions used for funding the Plan pursuant to Section 412 of the Code for the applicable Plan year.

"United States" and "U.S." shall each mean the United States of America.

"Unrestricted" shall mean, when referring to cash or Cash Equivalents of the Borrower or any of its Restricted Subsidiaries, that such cash or Cash Equivalents are not Restricted.

"Unrestricted Subsidiary" shall mean any Subsidiary of the Borrower designated by the Borrower as an Unrestricted Subsidiary pursuant to Section 9.12 as of the Closing Date or subsequent thereto, in each case, until such Person ceases to be an Unrestricted Subsidiary of the Borrower in accordance with Section 9.12 or ceases to be a Subsidiary of the Borrower.

"U.S. Government Securities Business Day" shall mean any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 5.04(f)(ii)(B)(3).

"Weighted Average Life to Maturity" shall mean, when applied to any Indebtedness, at any date, the quotient obtained by dividing (a) the sum of the products of (i) the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness multiplied by (ii) the amount of such payment; by (b) the sum of all such payments.

"Wholly-Owned Domestic Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Domestic Subsidiary.

"Wholly-Owned Subsidiary" shall mean, as to any Person, (i) any corporation 100% of whose capital stock is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time (other than, in the case of a Foreign Subsidiary of the Borrower with respect to the preceding clauses (i) and (ii), director's qualifying shares and/or other nominal amount of shares required to be held by Persons other than the Borrower and its Subsidiaries under applicable law).

"Withholding Agent" shall mean the Borrower, the Administrative Agent and any other applicable withholding agent.

"Write-Down and Conversion Powers" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

-46-

1.01    <u>Other Definitional Provisions, etc.</u>

(a)      Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Credit Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)      As used herein and in the other Credit Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (ii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iii) unless the context otherwise requires, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Equity Interests, securities, revenues, accounts, leasehold interests and contract rights, (iv) the word "will" shall be construed to have the same meaning and effect as the word "shall", (v) unless the context otherwise requires, any reference herein (A) to any Person shall be construed to include such Person's permitted successors and assigns and (B) to the Borrower or any other Credit Party shall be construed to include the Borrower or such Credit Party as debtor and debtor-in-possession and any receiver or trustee for the Borrower or any other Credit Party, as the case may be, in any insolvency or liquidation proceeding, (vi) all references to "knowledge" of any Credit Party or a Subsidiary of the Borrower means the actual knowledge of an Authorized Officer, (vii) references to "the best of an officer's knowledge" or similar phrases referring to "best knowledge" of an officer shall be interpreted to mean that such officer has made such diligent investigation or inquiry as would be customary and prudent for such officer to make in the context of the applicable circumstances and (viii) all references to any Governmental Authority, shall include any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(c)      The words "<u>hereof</u>," "<u>herein</u>" and "<u>hereunder</u>" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)      The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)      Unless otherwise expressly provided herein, (i) all references to documents, instruments and other agreements (including the Credit Documents) and all other contractual instruments shall be deemed to include all subsequent amendments, restatements, amendments and restatements, extensions, supplements, modifications, refinancings, renewals, replacements and restructurings thereto, but only to the extent that such amendments, restatements, amendments and restatements, extensions, supplements, modifications, refinancings, renewals, replacements and restructurings are permitted by the Credit Documents; and (ii) references to any law (including by succession of comparable successor laws) shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

(f)      All certifications to be made hereunder by an officer or representative of a Credit Party shall be made by such person in his or her capacity solely as an officer or a representative of such Credit Party, on such Credit Party's behalf and not in such person's individual capacity.

(g)      Any reference herein to a merger, transfer, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of

such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, Restricted Subsidiary, Unrestricted Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

1.02    Accounting Terms

All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein. Notwithstanding any other provision contained herein, any lease that is treated as an operating lease for purposes of GAAP as of December 31, 2017 shall not be treated as Indebtedness (including as a result of the implementation of ASC 842) or as a Capitalized Lease and shall continue to be treated as an operating lease (and any future lease, if it were in effect on December 31, 2017, that would be treated as an operating lease for purposes of GAAP as of December 31, 2017 shall be treated as an operating lease), in each case for purposes of this Agreement, notwithstanding any actual or proposed change in GAAP after December 31, 2017.

1.03    Rounding

Any financial ratios required to be maintained pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

1.04    Times of Day

Unless specified, all references herein to times of day shall be references to Eastern Time (daylight or standard, as applicable).

1.05    Timing of Payment or Performance

When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance (including delivery of any documents or notices) required on a day which is not a Business Day, the date of such payment (other than as specified otherwise herein) or performance shall extend to the immediately succeeding Business Day and such extension shall be reflected in the computation of interest or fees, as the case may be.

1.06    Available Amount Transactions

If more than one action occurs on any given date the permissibility of the taking of which is determined hereunder by reference to the amount of the Available Amount immediately prior to the taking of such action, the permissibility of the taking of each such action shall be determined independently and in no event may any two or more such actions be treated as occurring simultaneously.

1.07    Pro Forma Calculations

(a)    Notwithstanding anything to the contrary herein, the First Lien Net Leverage Ratio, the Senior Secured Net Leverage Ratio and the Total Net Leverage Ratio shall be calculated in the manner

prescribed by this Section 1.07; provided that notwithstanding anything to the contrary in clause (b), (c) or (d) of this Section 1.07, when calculating the First Lien Leverage Ratio for purposes of determining actual compliance (and not Pro Forma Compliance or compliance on a Pro Forma Basis) with the Financial Covenant pursuant to Section 10.07(a), the events described in this Section 1.07 that occurred subsequent to the end of the applicable Test Period shall not be given pro forma effect.

(b)     For purposes of calculating the First Lien Net Leverage Ratio, Senior Secured Net Leverage Ratio and Total Net Leverage Ratio, Specified Transactions (and the incurrence or repayment of any Indebtedness in connection therewith) that have been made (i) during the applicable Test Period or Calculation Period and (ii) subsequent to such Test Period (or Calculation Period) and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a pro forma basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period or Calculation Period, as applicable.  If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Restricted Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.07, then the First Lien Net Leverage Ratio, Senior Secured Net Leverage Ratio and Total Net Leverage Ratio shall be calculated to give pro forma effect thereto in accordance with this Section 1.07.

(c)     In the event that the Borrower or any of its Restricted Subsidiaries incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness included in the calculations of the First Lien Net Leverage Ratio, Senior Secured Net Leverage Ratio and Total Net Leverage Ratio, as the case may be, (i) during the applicable Test Period (or Calculation Period) and (ii) subsequent to the end of the applicable Test Period (or Calculation Period) and prior to or simultaneously with the event for which the calculation of any such ratio is made, then the First Lien Net Leverage Ratio, Senior Secured Net Leverage Ratio and Total Net Leverage Ratio shall be calculated giving pro forma effect to such incurrence or repayment of Indebtedness, to the extent required, as if the same had occurred on the last day of the applicable Test Period (or Calculation Period) in the case of the First Lien Net Leverage Ratio, Senior Secured Net Leverage Ratio or Total Net Leverage Ratio.

(d)     Whenever pro forma effect is to be given to a Specified Transaction or implementation of an operating initiative, the pro forma calculations shall be made in good faith by an Authorized Officer of the Borrower and include, for the avoidance of doubt, the amount of "run-rate" cost savings, operating expense reductions, other operating improvements and cost synergies that are reasonably identifiable and factually supportable and projected by the Borrower in good faith to result from actions which have been taken or with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of the Borrower) no later than 12 months following the closing date of such Specified Transaction or implementation of an operating initiative (calculated on a pro forma basis as though such "run-rate" cost savings, operating expense reductions, other operating improvements and cost synergies had been realized on the first day of such period and as if such "run-rate" cost savings, operating expense reductions, other operating improvements and cost synergies were realized during the entirety of such period and "run-rate" means the full recurring benefit for a period that is associated with any action taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken (including any savings expected to result from the elimination of a public target's compliance costs with public company requirements) net of the amount of actual benefits realized during such period from such actions, and any such adjustments shall be included in the initial pro forma calculations of such financial ratios or tests and during any subsequent Test Period in which the effects thereof are expected to be realized) relating to such Specified Transaction or implementation of an operating initiative; provided

that (a) such amounts shall be limited to those for which such cost savings, operating expense reductions, other operating improvements and cost synergies are factually supportable, reasonably identifiable and supported by an officer's certificate delivered to the Administrative Agent by an Authorized Officer of the Borrower, (b)  no amounts shall be added to the extent duplicative of any amounts that are otherwise added back in computing Consolidated EBITDA (or any other components thereof), whether through a *pro forma* adjustment or otherwise, with respect to such period and (c) the aggregate amount included in this Section 1.07(d), together with any amount under clause (vii) of the definition of "Consolidated EBITDA", with respect to any Test Period shall not exceed an amount equal to the greater of (x) $14,375,000 and (y) 25% of Consolidated EBITDA on a Pro Forma Basis for such Test Period (to be calculated before giving effect to any such amounts included in Consolidated EBITDA pursuant to this clause (d) or added back to Consolidated EBITDA pursuant to clause (vii) of the definition of "Consolidated EBITDA").

      1.08    <u>Currency Translation</u>

      For purposes of determining compliance as of any date with Section 10 or any Event of Default under Section 11 or for purposes of calculating the First Lien Net Leverage Ratio, Senior Secured Net Leverage Ratio, or Total Net Leverage Ratio or for any other specified purposes hereunder, amounts incurred or outstanding in currencies (other than Dollars) shall be translated into Dollars at the exchange rates in effect on the first Business Day of the Fiscal Quarter in which such determination occurs or in respect of which such determination is being made, as such exchange rates shall be determined in good faith by the Borrower based on commonly used financial reporting sources; <u>provided</u> that for purposes of determining compliance with the Financial Covenant, the First Lien Net Leverage Ratio, Senior Secured Net Leverage Ratio and the Total Net Leverage Ratio, amounts incurred or outstanding in currencies (other than Dollars) shall be translated in accordance with GAAP.  No Default or Event of Default shall arise as a result of any limitation or threshold set forth in Dollars in Section 10, Section 11.04 or Section 11.09 or any defined term used therein being exceeded solely as a result of changes in currency exchange rates from those applicable on the first day of the Fiscal Quarter in which such determination occurs or in respect of which such determination is made (it being understood that such changes shall nonetheless be taken into account in determining the remaining availability (if any) under any such limitation or threshold).

      1.09    <u>Calculations, Computations</u>

      The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with GAAP consistently applied throughout the periods involved (except as set forth in the notes thereto or as otherwise disclosed in writing by the Borrower to  the Lenders); <u>provided</u> that if at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Credit Document (including as a result of the effect of such change on any definition that includes accounting terms) used in calculating such ratio or determining compliance with such requirement) (the "<u>Accounting Change</u>") and the Borrower shall so request, the Lenders and the Borrower shall negotiate in good, faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders), <u>provided</u> <u>however</u>, that, until so amended, such ratio or requirement shall continue to be computed in conformity with those accounting principles and policies in effect immediately prior to such Accounting Change. Notwithstanding anything to the contrary contained herein, all such financial statements shall be prepared, and all financial covenants contained herein or in any other Credit Document shall be calculated, in each case, without giving effect to any election under FASB ASC 825 (or any similar accounting principle) permitting a Person to value its financial liabilities at the fair value thereof and to the extent expressly provided herein, certain calculations shall be made on a Pro Forma Basis.

1.10   Interest Rate and Fee Calculations

All computations of interest and other Fees hereunder shall be made on the basis of a year of 360 days (except for interest calculated by reference to the Base Rate, which shall be based on a year of 365 or 366 days, as applicable) for the actual number of days (including the first day but excluding the last day) occurring the period for which such interest or Fees are payable.

1.11   Limited Condition Transaction

(a)   For purposes of (i) determining compliance with any provision of this Agreement which requires the calculation of the First Lien Net Leverage Ratio, the Senior Secured Net Leverage Ratio, or the Total Net Leverage Ratio, (ii) determining the accuracy of representations and warranties and/or whether a Default or Event of Default shall have occurred and be continuing (or any subset of Defaults or Events of Default), or (iii) testing availability under baskets set forth in this Agreement (including baskets measured as a percentage of Consolidated EBITDA or Consolidated Total Assets or by reference to the Available Amount), in each case, in connection with a Limited Condition Transaction, at the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Transaction, an "LCT Election"), the date of determination of whether any such action is permitted hereunder, shall be deemed to be the date the definitive agreements for such Limited Condition Transaction are entered into or such notice is given (the "LCT Test Date"), and if, after giving pro forma effect to the Limited Condition Transaction and the other transactions to be entered into in connection therewith as if they had occurred at the beginning of the most recent Test Period ending prior to the LCT Test Date, the Borrower could have taken such action on the relevant LCT Test Date in compliance with such ratio or basket, such ratio or basket shall be deemed to have been complied with.

(b)   For the avoidance of doubt, if the Borrower has made an LCT Election and any of the ratios or baskets for which compliance was determined or tested as of the LCT Test Date are exceeded as a result of fluctuations in any such ratio or basket (including due to fluctuations of the target of any Limited Condition Transaction or currency exchange rates) at or prior to the consummation of the relevant transaction or action, such baskets or ratios will not be deemed to have been exceeded as a result of such fluctuations.  If the Borrower has made an LCT Election for any Limited Condition Transaction, then in connection with any subsequent calculation of any ratio or basket on or following the relevant LCT Test Date and prior to the earlier of (i) the date on which such Limited Condition Transaction is consummated or (ii) the date that the definitive agreement for such Limited Condition Transaction is terminated or expires without consummation of such Limited Condition Transaction, any such ratio or basket shall be calculated on a pro forma basis assuming such Limited Condition Transaction and other transactions in connection therewith (including any incurrence of Indebtedness or Liens and the use of proceeds thereof) had been consummated.

1.12   Practice Groups

Notwithstanding anything to the contrary contained in this Agreement or any other Credit Document, solely for the purposes of calculating Consolidated EBITDA and Consolidated Indebtedness of the Borrower and its Restricted Subsidiaries for any purpose under any Credit Document, the financial results and Indebtedness of the Practice Groups, if consolidated with those of the Borrower in its consolidated financial statements in accordance with GAAP, shall be included as if such Practice Groups were Restricted Subsidiaries.

1.13   Rates

The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, (x) the continuation of, administration of, submission of, calculation of or any other matter related to the rates referred to in the definition of "Base Rate", "Term SOFR Reference Rate" or "Term SOFR", or any component definition thereof, or any alternative, successor or replacement reference rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement reference rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, Base Rate, the Term SOFR Reference Rate, Term SOFR or any other Benchmark prior to its discontinuance or unavailability), or (y) the effect, implementation or composition of any Benchmark Replacement Conforming Changes. The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of Base Rate or a Benchmark, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower. The Administrative Agent (at the written direction of the Required Lenders) may select information sources or services in its reasonable discretion to ascertain Base Rate, the Term SOFR Reference Rate, Term SOFR or any other Benchmark, or any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and the Administrative Agent shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

SECTION 2.     Amount and Terms of Credit.

2.01     The Commitments

(a)     Subject to and upon the terms and conditions set forth herein and pursuant to the Plan of Reorganization, each Lender with an Initial Term Loan Commitment shall be deemed to have made a term loan or term loans (each, an "Initial Term Loan" and, collectively, the "Initial Term Loans") to the Borrower, which Initial Term Loans (i) shall be deemed to be incurred pursuant to a single drawing on the Closing Date, (ii) shall be denominated in Dollars, (iii) except as hereinafter provided, shall, at the option of the Borrower, be incurred and maintained as, and/or converted into, Base Rate Loans or Term SOFR Loans; provided that except as otherwise specifically provided in Section 2.10(b), all Initial Term Loans comprising the same Borrowing shall at all times be of the same Type and (iv) shall be made by each such Lender in that aggregate principal amount which does not exceed the Initial Term Loan Commitment of such Lender on the Closing Date. Once repaid, Initial Term Loans incurred hereunder may not be reborrowed.

2.02     Minimum Amount of Each Borrowing

The aggregate principal amount of each Borrowing of Loans under a respective Class shall not be less than the Minimum Borrowing Amount applicable to such Class. More than one Borrowing may occur on the same date, but at no time shall there be outstanding more than ten Borrowings of Term SOFR Loans in the aggregate for all Classes of Loans.

2.03     Notice of Borrowing

(a)     Whenever the Borrower desires to incur (x) Term SOFR Loans hereunder, the Borrower shall give the Administrative Agent at the Notice Office at least three (3) U.S. Government Securities Business Days' prior written notice of each Term SOFR Loan to be incurred hereunder (or, in the case of Term SOFR Loans deemed to be made on the Closing Date, at least one U.S. Government Securities

Business Days' prior notice) and (y) Base Rate Loans hereunder, the Borrower shall give the Administrative Agent at the Notice Office notice at least one (1) U.S. Government Securities Business Day prior to date of the proposed Borrowing of each Base Rate Loan to be incurred hereunder, provided that (in each case) any such notice shall be deemed to have been given on a certain day only if given before 12:00 noon on such day; provided further that such notice relating to the Initial Term Loans deemed to be made on the Closing Date may be delivered on the Closing Date.  Each such notice (each, a "Notice of Borrowing"), except as otherwise expressly provided in Section 2.10, shall be irrevocable and shall be in writing, substantially in the form of Exhibit A-1, appropriately completed to specify: (i) the aggregate principal amount of the Loans to be incurred (or, in the case of the Initial Term Loans, deemed incurred) pursuant to such Borrowing, (ii) the date of such Borrowing (which shall be a Business Day), (iii) whether the Loans being incurred pursuant to such Borrowing shall constitute Term Loans, and (iv) whether the Loans being incurred pursuant to such Borrowing are to be initially maintained as Base Rate Loans or, to the extent permitted hereunder, Term SOFR Loans and, if Term SOFR Loans, the initial Interest Period to be applicable thereto.  The Administrative Agent shall promptly give each Lender which is required to make Loans of the Class specified in the respective Notice of Borrowing, notice of such proposed Borrowing, of such Lender's proportionate share thereof and of the other matters required by the immediately preceding sentence to be specified in the Notice of Borrowing.

      2.04    Disbursement of Funds

      No later than 12:00 noon on the date specified in each Notice of Borrowing, other than the deemed borrowing of the Initial Term Loans on the Closing Date, each Lender with a Commitment of the respective Class will make available its pro rata portion (determined in accordance with Section 2.07) of each such Borrowing requested to be made on such date.  All such amounts will be made available in Dollars and in immediately available funds, and the Administrative Agent will, make available to the Borrower, or to such other account as the Borrower may specify in writing to the Administrative Agent, the aggregate of the amounts so made available by the Lenders.  Unless the Administrative Agent shall have been notified by any Lender prior to the date of Borrowing that such Lender does not intend to make available to the Administrative Agent such Lender's portion of any Borrowing to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the Borrower a corresponding amount. If such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to the Administrative Agent.  The Administrative Agent also shall be entitled to recover on demand from such Lender or the Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower until the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to (i) if recovered from such Lender, the overnight Federal Funds Rate for the first three days and at the interest rate otherwise applicable to such Loans for each day thereafter and (ii) if recovered from the Borrower, the rate of interest applicable to the respective Borrowing, as determined pursuant to Section 2.08. Nothing in this Section 2.04 shall be deemed to relieve any Lender from its obligation to make Loans hereunder or to prejudice any rights which the Borrower may have against any Lender as a result of any failure by such Lender to make Loans hereunder.

      The Administrative Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any

right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

2.05    Notes

(a)      The Borrower's obligation to pay the principal of, and interest on, the Loans made by each Lender shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 13.16 and shall, if requested by such Lender, also be evidenced by a promissory note duly executed and delivered by the Borrower substantially in the form of Exhibit B, with blanks appropriately completed in conformity herewith (each, a "Term Note" and, collectively, the "Term Notes").

(b)      Each Lender will note on its internal records the amount of each Loan made by it and each payment in respect thereof and prior to any transfer of any of its Notes will endorse on the reverse side thereof the outstanding principal amount of Loans evidenced thereby.  Failure to make any such notation or any error in such notation shall not affect the Borrower's obligations in respect of such Loans.

(c)      Notwithstanding anything to the contrary contained above in this Section 2.05 or elsewhere in this Agreement, the Borrower shall only be required to deliver Notes to Lenders promptly following written request for the delivery of such Notes.  No failure of any Lender to request or obtain a Note evidencing its Loans to the Borrower shall affect or in any manner impair the obligations of the Borrower to pay the Loans (and all related Obligations) incurred by the Borrower which would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties therefor provided pursuant to the various Credit Documents.  Any Lender which does not have a Note evidencing its outstanding Loans shall in any event be required to make the notations otherwise described in preceding clause (b).

2.06    Conversions

The Borrower shall have the option to convert, on any Business Day, all or a portion equal to at least the Minimum Borrowing Amount of the outstanding principal amount of Loans  made pursuant to one or more Borrowings (so long as of the same Class) of one or more Types of Loans into a Borrowing (of the same Class) of another Type of Loan, provided that, (i) except as otherwise provided in Section 2.10(b), Term SOFR Loans may be converted into Base Rate Loans only on the last day of an Interest Period applicable to the Loans being converted unless the Borrower pays any amounts due under Section 2.11 and no such partial conversion of Term SOFR Loans  shall reduce the outstanding principal amount of such Term SOFR Loans made pursuant to a single Borrowing to less than the Minimum Borrowing Amount applicable thereto, (ii) Base Rate Loans may not be converted into Term SOFR Loans in excess of one month if any Event of Default exists pursuant to Section 11.05 on the date of conversion, and (iii) if any Event of Default (other than as referred to in preceding clause (ii)) is in existence on the date of the proposed conversion of a Term SOFR Loan, (x) Base Rate Loans may not be converted into Term SOFR Loans if the Administrative Agent (at the written direction of the Required Lenders) or the Required Lenders have notified the Borrower that conversions will not be permitted during the existence of such Event of Default and (y) in the absence of the notification referred to in preceding clause (x), Base Rate Loans may only be converted into Term SOFR Loans with an Interest Period of one month, and (iv) no conversion pursuant to this Section 2.06 shall result in a greater number of Borrowings of Term SOFR Loans than is permitted under Section 2.02.

Each such conversion shall be effected by the Borrower by giving the Administrative Agent at the Notice Office prior to 12:00 noon at least (x) in the case of conversions of Base Rate Loans into Term SOFR Loans, three (3) U.S. Government Securities Business Days' prior notice and (y) in the case of conversions of Term SOFR Loans into Base Rate Loans, one (1) U.S. Government Securities Business

Day's prior notice (each, a "Notice of Conversion/Continuation"), in each case substantially in the form of Exhibit A-2, appropriately completed to specify the Loans to be so converted, the Borrowing or Borrowings pursuant to which such Loans were incurred and, if to be converted into Term SOFR Loans, the Interest Period to be initially applicable thereto. The Administrative Agent shall give each applicable Lender prompt notice of any such proposed conversion affecting any of its Loans.

2.07    Pro Rata Borrowings

All Borrowings of Initial Term Loans under this Agreement shall be incurred from the Lenders of the applicable Class pro rata on the basis of their Initial Term Loan Commitments. It is understood that no Lender shall be responsible for any default by any other Lender of its obligation to make Loans hereunder and that each Lender shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans hereunder.

2.08    Interest

(a)    The Borrower agrees to pay interest in respect of the unpaid principal amount of each Base Rate Loan from the date of Borrowing or conversion thereof until the earlier of (i) the maturity thereof (whether by acceleration or otherwise) and (ii) the conversion of such Base Rate Loan to a Term SOFR Loan pursuant to Section 2.06 or 2.09, as applicable, at a rate per annum which shall be equal to the sum of the relevant Applicable Margin plus the Base Rate, each as in effect from time to time.

(b)    The Borrower agrees to pay interest in respect of the unpaid principal amount of each Term SOFR Loan from the date of Borrowing or conversion thereof until the earlier of (i) the maturity thereof (whether by acceleration or otherwise) and (ii) the conversion of such Term SOFR Loan to a Base Rate Loan pursuant to Section 2.06, 2.09 or 2.10, as applicable, at a rate per annum which shall, during each Interest Period applicable thereto, be equal to the sum of the relevant Applicable Margin plus the Term SOFR Rate for such Interest Period.

(c)    Upon the occurrence and during the continuance of a Specified Default, including with respect to an Event of Default pursuant to Section 11.01, as a result of the acceleration of the Loans, overdue principal and, to the extent permitted by law, overdue interest in respect of each Loan (other than Loans owed to a Defaulting Lender) shall, in each case, at the election of the Required Lenders, bear interest at a rate per annum equal to the rate which is 2.00% in excess of the rate then borne by such Loans. Interest that accrues under this Section 2.08(c) shall be payable on written demand.

(d)    Accrued (and theretofore unpaid) interest shall be payable either fully in cash (if the PIK Option is not elected (or deemed not elected) pursuant to Section 2.08(g)), or partially in cash and partially in kind (if the PIK Option is elected pursuant to Section 2.08(g)) (i) in respect of each Base Rate Loan, (x) quarterly in arrears on each Quarterly Payment Date, and (y) at maturity (whether by acceleration or otherwise) and, after such maturity, on written demand, and (ii) in respect of each Term SOFR Loan, (x) on the last day of each Interest Period applicable thereto and, in the case of an Interest Period in excess of three months, on each date occurring at three month intervals after the first day of such Interest Period, and (y) on the date of any repayment or prepayment (on the amount repaid or prepaid) at maturity (whether by acceleration or otherwise) and, after such maturity, on written demand.

(e)    Upon each Interest Determination Date, the Administrative Agent shall determine the Term SOFR for each Interest Period applicable to the respective Term SOFR Loans and shall promptly notify in writing the Borrower and the applicable Lenders thereof. Each such determination shall, absent manifest error, be final and conclusive and binding on all parties hereto.

(f)        The provisions of this Section 2.08 (and the interest rates applicable to the various extensions of credit hereunder) shall be subject to modification as expressly provided in Sections 2.15, 2.16, 2.17 and 2.19.

(g)        If the Borrower determines, upon delivery of a Liquidity Certificate, that the PIK Option Liquidity Trigger will be triggered, it may elect to have the interest payment for the applicable Interest Period paid partially in cash and paid partially in kind and capitalized (the "PIK Option", and any such interest paid in kind and capitalized, "PIK Interest") by providing a notice in the form attached hereto as Exhibit J (a "PIK Election Notice") to the Administrative Agent and the Lenders no later than five (5) Business Days prior to the applicable Interest Payment Date; provided that if the Borrower fails to timely provide a PIK Election Notice, the Borrower shall be deemed to not have elected the PIK Option for the applicable Interest Period.  PIK Interest shall accrue and be capitalized and added to the outstanding principal balance of the Loans on each date on which PIK Interest is paid pursuant to Section 2.08(d), and from and after such date, the outstanding principal amount of the Initial Term Loans shall without further action by any party hereto be deemed to be increased by the aggregate amount of PIK Interest so capitalized and added to the Loans in accordance with the immediately preceding sentence, whereupon such amount of PIK Interest so capitalized and added shall also accrue interest in accordance with the terms of this Section 2.08.

2.09        Interest Periods

At the time the Borrower gives any Notice of Borrowing or Notice of Conversion/Continuation in respect of the making of, or conversion into, any Term SOFR Loan (in the case of the initial Interest Period applicable thereto) or prior to 12:00 noon on the third (3rd) U.S. Government Securities Business Day prior to the expiration of an Interest Period applicable to such Term SOFR Loan (in the case of any subsequent Interest Period applicable thereto), in each case, the Borrower shall have the right to elect the interest period (each, an "Interest Period") applicable to such Term SOFR Loan, which Interest Period shall, at the option of the Borrower, be a one, three, six or, if approved by each Lender with Loans and/or Commitments under the relevant Class, twelve month period; provided that (in each case):

(i)        all Term SOFR Loans comprising a Borrowing shall at all times have the same Interest Period;

(ii)        the initial Interest Period for any Term SOFR Loan shall commence on the date of Borrowing of such Term SOFR Loan (including the date of any conversion thereto from a Base Rate Loan) and each Interest Period occurring thereafter in respect of such Term SOFR Loan shall commence on the day on which the next preceding Interest Period applicable thereto expires; provided, further that the initial Interest Period with respect to the Initial Term Loans shall commence on the Closing Date and end on June 30, 2025;

(iii)        if any Interest Period for a Term SOFR Loan begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of such calendar month;

(iv)        if any Interest Period for a Term SOFR Loan would otherwise expire on a day which is not a Business Day, such Interest Period shall expire on the next succeeding Business Day (unless such Business Day falls in another month, in which case such Interest Period shall expire on the immediately preceding Business Day); and

(v)     no Interest Period in respect of any Borrowing of any Class of Loans shall be selected which extends beyond the Maturity Date for such Class of Loans.

If by 12:00 noon on the third (3rd) U.S. Government Securities Business Day prior to the expiration of any Interest Period applicable to a Borrowing of Term SOFR Loans, the Borrower has failed to elect, or is not permitted to elect, a new Interest Period to be applicable to such Term SOFR Loans as provided above, the Borrower shall be deemed to have elected to continue such Term SOFR Loans as Term SOFR Loans with an Interest Period of the same duration as such current Interest Period effective as of the expiration date of such current Interest Period; provided that if the Borrower is not permitted to elect a new Interest Period to be applicable to such Term SOFR Loans as provided above, the Borrower shall be deemed to have elected to convert such Term SOFR Loans into Base Rate Loans effective as of the expiration date of such current Interest Period.

2.10     Increased Costs, Illegality, etc.

(a)     In the event that any Lender shall have reasonably determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto):

(i)     on any Interest Determination Date that, by reason of any changes arising after the date of this Agreement, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of "Term SOFR" and the Administrative Agent provides notice of the same to each Lender of such Class and the Borrower; or

(ii)     at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any Term SOFR Loan because of (x) any change since the Closing Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, guideline or request, such as, but not limited to:  (A) subject any Recipient to any Taxes (other than (x) Indemnified Taxes, (y) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (z) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or (B) a change in official reserve requirements, but, in all events, excluding reserves required under Regulation D to the extent included in the computation of Term SOFR and/or (y) other circumstances arising since the Closing Date affecting such Lender, the London interbank market or the position of such Lender in such market (including that the Term SOFR Rate with respect to such Term SOFR Loan does not adequately and fairly reflect the cost to such Lender of funding (or deemed funding of) such Term SOFR Loan); or

(iii)     at any time, that the making or continuance of any Term SOFR Loan has been made (x) unlawful by any law or governmental rule, regulation or order, or (y) impossible by compliance by any Lender in good faith with any governmental request (whether or not having force of law);

then, and in any such event, such Lender shall promptly give written notice to the Borrower and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders).  Thereafter (x) in the case of clause (i) above, Term SOFR Loans shall no longer be available until such time as the Administrative Agent notifies in writing the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist, and any Notice of Borrowing or Notice of Conversion/Continuation given by the Borrower with respect to Term SOFR Loans which have not yet been incurred (including by way of conversion) shall be deemed rescinded by the Borrower (or if requested by the Borrower, deemed a request for Base Rate Loans), (y) in the case of clause (ii) above, the Borrower agrees, subject to the provisions of Section

-57-

2.11(b) (to the extent applicable), to pay to such Lender, promptly following such Lender's written request (including documentation reasonably supporting such request) therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion (in accordance with generally accepted financial practices) shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts received or receivable hereunder (a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent manifest error, be final and conclusive and binding on all the parties hereto) and (z) in the case of clause (iii) above, the Borrower shall take one of the actions specified in Section 2.10(b) as promptly as possible and, in any event, within the time period required by law.

(b)        At any time that any Term SOFR Loan is affected by the circumstances described in Section 2.10(a)(ii), the Borrower may, and in the case of a Term SOFR Loan affected by the circumstances described in Section 2.10(a)(iii), the Borrower shall, either (x) if the affected Term SOFR Loan is then being made initially or pursuant to a conversion, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed in writing) on the same date that the Borrower was notified by the affected Lender or the Administrative Agent pursuant to Section 2.10(a)(ii) (or convert such request to a Base Rate Loan) or (iii) or (y) if the affected Term SOFR Loan is then outstanding, upon at least three (3) Business Days' written notice to the Administrative Agent, require the affected Lender to convert such Term SOFR Loan into a Base Rate Loan, provided that, if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this Section 2.10(b).

(c)        If any Lender determines that after the Closing Date the introduction of or any change in any applicable law or governmental rule, regulation, order, guideline, directive or request (whether or not having the force of law) concerning capital adequacy, or any change in interpretation or administration thereof by the NAIC or any Governmental Authority, central bank or comparable agency, will have the effect of increasing the amount of capital required or expected to be maintained by such Lender or any corporation controlling such Lender based on the existence of such Lender's Commitments hereunder or its obligations hereunder, then the Borrower agrees to pay to such Lender, promptly following its written demand therefor (including the reasonable detail set forth in the last sentence of this clause (c)), such additional amounts as shall be required to compensate such Lender or such other corporation for the increased cost to such Lender or such other corporation or the reduction in the rate of return to such Lender or such other corporation as a result of such increase of capital.  In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable and customary, provided that such Lender's determination of compensation owing under this Section 2.10(c) shall, absent manifest error, be final and conclusive and binding on all the parties hereto.  Each Lender, upon determining that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice thereof to the Borrower, which notice shall show in reasonable detail the basis for calculation of such additional amounts.

(d)        Notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III shall in each case be deemed to be a change after the Closing Date in a requirement of law or government rule, regulation or order, regardless of the date enacted, adopted, issued or implemented (including for purposes of this Section 2.10 and Section 3.06).

2.11    Compensation

(a)     The Borrower agrees to compensate each Lender, promptly following its written request (which request shall set forth in reasonable detail the basis for requesting such compensation), for all losses, expenses and liabilities (including any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its Term SOFR Loans but excluding loss of anticipated profits) which such Lender may sustain:  (i) if for any reason (other than a default by such Lender) a Borrowing of, or conversion from or into, Term SOFR Loans does not occur on a date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation (whether or not withdrawn by the Borrower or deemed withdrawn pursuant to Section 2.10(a)); (ii) if any prepayment or repayment (including any prepayment or repayment made pursuant to Section 5.01, Section 5.02 or as a result of an acceleration of the Loans pursuant to Section 11) or conversion of any of its Term SOFR Loans occurs on a date which is not the last day of the Interest Period with respect thereto; (iii) if any prepayment of any of its Term SOFR Loans is not made on any date specified in a notice of prepayment given by the Borrower; or (iv) as a consequence of (x) any other default by the Borrower to repay Term SOFR Loans when required by the terms of this Agreement or any Note held by such Lender or (y) any election made pursuant to Section 2.10(b).

(b)     Notwithstanding anything to the contrary, with respect to any Lender's or any Loan Participant's claim for compensation under Section 2.10(a) or (c), 2.11, 3.06 or 5.04, the Borrower shall not be required to compensate such Person for any amount incurred more than 180 days prior to the date that such Person notifies the Borrower in writing of the event that gives rise to such claim; provided that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

2.12    Change of Lending Office

Each Lender agrees that on the occurrence of any event giving rise to the operation of Section 2.10(a)(ii) or (iii), Section 2.10(c) or (d), Section 3.06 or Section 5.04 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event, provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage in any material respect, with the object of avoiding the consequence of the event giving rise to the operation of such Section.  Nothing in this Section 2.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Sections 2.10, 3.06 and 5.04.

2.13    Replacement of Lenders

(w) If any Lender becomes a Defaulting Lender, (x) upon the occurrence of any event giving rise to the operation of Section 2.10(a)(ii) or (iii), Section 2.10(c) or (d), Section 3.06 or Section 5.04 with respect to any Lender which results in such Lender charging to the Borrower increased costs in excess of those being generally charged by the other Lenders, (y) in the case of a refusal by a Lender to consent to a proposed change, waiver, discharge or termination with respect to this Agreement as contemplated by clauses (i) through (v) of the first proviso to Section 13.13(a) or clauses (1) through (5) of the second proviso to Section 13.13(a), in each case, which has been approved by the Required Lenders, Majority Lenders or at least a majority (in dollar amount) of such directly and adversely affected Lenders, as applicable or (z) if a Lender rejects (or is deemed to reject) the Extension under Section 2.16(a) which Extension has been accepted under Section 2.16(a) by the Required Lenders, the Borrower shall have the right, in accordance with Section 13.04(b),  to (i) replace such Lender (the "Replaced Lender") with one or more other Eligible Transferees, none of whom shall constitute a Defaulting Lender at the time of such replacement (collectively, the "Replacement Lender") but in the case of a replacement where the consent of the respective Lender is required with respect to less than all Classes of its Loans or

-59-

Commitments, to replace the Commitments and/or outstanding Loans of such Lender in respect of each Class where the consent of such Lender would otherwise be individually required, with identical Commitments and/or Loans of the respective Class provided by the Replacement Lender or (ii) if no Event of Default then exists or would exist after giving effect to such termination, terminate the Commitment of such Lender, and repay all Obligations (other than contingent obligations not then due and payable and other than obligations under any Cash Management Agreement, Interest Rate Protection Agreement or Other Hedging Agreement with a Guaranteed Creditor) of the Borrower owing to such Lender relating to the Loans and participations held by such Lender as of such termination date; provided that in the case of any such termination of Commitments pursuant to this clause (ii), such termination shall be sufficient (together with all other consenting Lenders or other Commitments being terminated in connection with the adoption of the applicable proposed change, waiver, discharge or termination) to cause the adoption of the applicable proposed change, waiver, discharge or termination and such termination shall be in respect of any applicable facility only in the case of clause (x) or, with respect to a Class vote, clause (y); provided that:

(a)      at the time of any replacement pursuant to this Section 2.13, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to Section 13.04(b) (and with all fees payable pursuant to said Section 13.04(b) to be paid by the Replacement Lender and/or the Replaced Lender  (as may be agreed to at such time by and among the Borrower, the Replacement Lender and the Replaced Lender)) pursuant to which the Replacement Lender shall acquire all of the Commitments and outstanding Loans (or, in the case of the replacement of only the outstanding Term Loans, the outstanding Term Loans of the respective Lender) of, (except for the replacement of only outstanding Term Loans) the Replaced Lender and, in connection therewith, shall pay to the Replaced Lender in respect thereof an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the respective Replaced Lender under each Class with respect to which such Replaced Lender is being replaced, (B) [reserved] (C) an amount equal to all accrued, but theretofore unpaid, Fees owing to the Replaced Lender (but only with respect to the relevant Class, in the case of the replacement of less than all Classes of Loans then held by the respective Replaced Lender) pursuant to Section 4.01; and

(b)      all obligations of the Borrower then owing to the Replaced Lender (other than those (i) specifically described in clause (a) above in respect of which the assignment purchase price has been, or is concurrently being, paid, but including all amounts, if any, owing under Section 2.11(a) or (ii) relating to any Class of Loans and/or Commitments of the respective Replaced Lender which will remain outstanding after giving effect to the respective replacement) shall be paid in full to such Replaced Lender concurrently with such replacement.

Upon receipt by the Replaced Lender of all amounts required to be paid to it pursuant to this Section 2.13, the Administrative Agent is authorized (which authorization is coupled with an interest) (but not obligated) to execute an Assignment and Assumption Agreement on behalf of such Replaced Lender, and any such Assignment and Assumption Agreement so executed by the Administrative Agent and the Replacement Lender shall be effective for purposes of this Section 2.13 and Section 13.04 (it being understood that the failure of any such Replaced Lender to execute an Assignment and Assumption Agreement shall not render such assignment invalid and such assignment shall be recorded in the Register).  Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in clauses (a) and (b) above, recordation of the assignment on the Register by the Administrative Agent pursuant to Section 13.16 and, if so requested by the Replacement Lender, delivery to the Replacement Lender of the appropriate Note or Notes executed by the Borrower, the Replacement Lender shall become a Lender hereunder and, unless the respective Replaced Lender continues to have outstanding Initial Term Loans hereunder, the Replaced Lender shall cease to constitute a Lender

hereunder, except with respect to indemnification provisions under this Agreement (including Sections 2.10, 2.11, 3.06, 5.04, 12.06, 13.01 and 13.06), which shall survive as to such Replaced Lender to the extent contemplated herein.

2.14     [Reserved].

2.15     Incremental Term Loans.

(a)     The Borrower shall have the right, to request (by written notice to the Administrative Agent) at any time and from time to time after the Closing Date, additional term loans to be made pursuant to (and to constitute a part of) the existing Class of Initial Term Loans and/or one or more additional tranches of term loans under this Agreement (the "Incremental Term Loans"); provided that

(i)     no Event of Default shall have occurred and be continuing, and at the time that any such Incremental Term Loan is made, no Event of Default shall have occurred and be continuing or result therefrom;

(ii)     each tranche of Incremental Term Loans (or addition of Incremental Term Loans to the existing Class of Initial Term Loans) shall be in an aggregate principal amount that is not less than $10,000,000 and an integral multiple of $5,000,000 in excess thereof (provided that such amount may be less than $10,000,000 if such amount represents all remaining availability under the limit set forth in clause (iii) below);

(iii)     the aggregate amount of all Incremental Term Loans made available pursuant to this Section 2.15 shall not exceed the Maximum Incremental Facilities Amount as in effect at such time; and

(iv)     the Borrower shall have delivered to the Administrative Agent a certificate executed by an Authorized Officer of the Borrower certifying to the best of such officer's knowledge, compliance with the requirements of preceding clauses (i) and (iii).

(b)     all Incremental Term Loans (and all interest, fees and other amounts payable thereon) shall (x) be Obligations under this Agreement and the other applicable Credit Documents and (y) except as otherwise required below, all other terms of such Incremental Term Loans will be as agreed between the Borrower, the Administrative Agent (subject to the Administrative Agent's approval not to be unreasonably withheld, delayed or conditioned) and the Lenders and/or Additional Lenders providing such Incremental Term Loans (and to the extent not consistent with the terms of the Initial Term Loans, such terms (A) shall not be materially more restrictive to the Borrower and its Restricted Subsidiaries, when taken as a whole, than the terms of the Initial Term Loans, unless (1) the Lenders under the Initial Term Loans also receive the benefit of such more restrictive terms or (2) such provisions only apply after the maturity date of the Initial Term Loans or (B) shall be reasonably satisfactory to the Required Lenders and the Administrative Agent); provided, however, that (i) in the case of a new tranche of Incremental Term Loans, (I) the maturity and amortization of such tranche of Incremental Term Loans may differ, so long as such tranche of Incremental Term Loans shall have (a) a final stated maturity date of no earlier than the Latest Maturity Date then in effect and (b) a Weighted Average Life to Maturity of no less than the Weighted Average Life to Maturity as then in effect for the Initial Term Loans (other than to the extent of nominal amortization for periods where amortization has been eliminated or reduced as a result of prepayment of such Initial Term Loans) and (II) if such new tranche of Incremental Term Loans are secured on a pari passu basis with the Initial Term Loans, the Effective Yield for such new tranche of Incremental Term Loans may exceed the Effective Yield then applicable to the Initial Term Loans so long as the Effective Yield for the Initial Term Loans is (or are) increased (to the extent necessary) such that the Effective Yield thereof is not less than the Effective Yield of such new tranche of Incremental Term

Loans minus 0.50% (collectively, the "First Lien MFN Provisions"), (ii) Incremental Term Loans will share ratably in right of prepayment with the Term Loans pursuant to Sections 5.01 and 5.02 (unless the Lenders holding such Incremental Term Loans agree to participate on a less than ratable basis), (iii) in the case of Incremental Term Loans to be made pursuant to (and to constitute a part of) the existing Class of Initial Term Loans, (I) such new Incremental Term Loans shall have the same Scheduled Initial Term Loan Repayment Dates as then remain with respect to the Initial Term Loans (with the amount of each Scheduled Initial Term Loan Repayment applicable to such new Incremental Term Loans to be the same (on a proportionate basis) as is theretofore applicable to the Initial Term Loans, thereby increasing the amount of each then remaining Scheduled Initial Term Loan Repayment proportionately, and (II) on the date of the making of such new Incremental Term Loans, and notwithstanding anything to the contrary set forth in Section 2.09, such new Incremental Term Loans shall be added to (and form part of) each Borrowing of outstanding Initial Term Loans on a pro rata basis (based on the relative sizes of the various outstanding Borrowings), so that each Lender will participate proportionately in each then outstanding Borrowing of Initial Term Loans and (iv) all Incremental Term Loans shall be unsecured or secured by the relevant Security Documents, and guaranteed under each relevant Guaranty, on a pari passu basis with (or on a junior basis to) all other Initial Term Loans; provided, however, (A) no Incremental Term Loans (or Incremental Notes incurred in lieu thereof) shall be guaranteed by Persons other than the Credit Parties, in each case as set forth in the applicable incremental amendment, (B) any Incremental Term Loans (or Incremental Notes incurred in lieu thereof) that are secured on a pari passu basis with the Liens securing the Obligations under this Agreement shall (i) not be secured by any Lien on any asset of the Borrower or any Restricted Subsidiary other than any asset constituting Collateral, and (ii) be subject to the Applicable Intercreditor Arrangements, (C) in the case of Incremental Term Loans (or Incremental Notes incurred in lieu thereof) secured on a junior basis with the Liens securing the Obligations under this Agreement, shall (i) not be secured by any Lien on any asset of the Borrower or any Restricted Subsidiary other than any asset constituting Collateral, (ii) be subject to the Applicable Intercreditor Arrangements, and (iii) be established as a separate facility from the then existing Initial Term Loans, and (D) in the case of Incremental Term Loans (or Incremental Notes incurred in lieu thereof) that are unsecured shall be established as a separate facility from the then existing Initial Term Loans.  The Administrative Agent shall have no obligation to ascertain whether the requirements of this Section 2.15(b) have been complied with.

(c)        Each notice from the Borrower pursuant to this Section 2.15 shall set forth the requested amount and proposed terms of the relevant Incremental Term Loans.

(d)        Incremental Term Loans may be made by any existing Lender or by any Additional Lender; provided that the Administrative Agent shall have consented to such Lender's or Additional Lender's making such Incremental Term Loans if such consent would be required under Section 13.04(b) for an assignment of Loans, to such Lender or Additional Lender.  Commitments in respect of Incremental Term Loans shall become Commitments under this Agreement pursuant to an amendment (each, an "Incremental Amendment") to this Agreement and, as appropriate, the other Credit Documents, executed by the Borrower, each Lender agreeing to provide such Commitment, if any, each Additional Lender, if any, and, to the extent required hereunder, the Administrative Agent.  The Incremental Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Credit Documents as may be necessary or appropriate, in the reasonable opinion of such Lenders and Additional Lenders and the Borrower, to effect the provisions of this Section (including, in the case of Incremental Term Loans, structured as a separate Class, the incorporation of class voting rights that prevent Lenders from agreeing to modifications that would allocate (or reallocate) payments to the Lenders in a non-pro rata manner unless such modifications are agreed to by each Lender holding the Loans or Incremental Term Loans whose payment rights are being adversely affected).

(e)      The effectiveness of any Incremental Amendment shall be subject to the satisfaction (or waiver) on the date thereof (each, an "Incremental Facility Closing Date") of each of the conditions set forth in such Incremental Amendment, including (i) the delivery of an acknowledgment in form and substance reasonably satisfactory to the Required Lenders and the Administrative Agent and executed by each Guarantor acknowledging that such Incremental Term Loans shall constitute (and be included in the definition of) "Guaranteed Obligations" under each Guaranty of such Guarantor and (ii) the delivery by the Borrower and its Restricted Subsidiaries of such technical amendments, modifications and/or supplements to the respective Security Documents as are reasonably requested by the Required Lenders and the Administrative Agent to ensure that the Incremental Term Loans (and related Obligations) are secured by, and entitled to the benefits of, the relevant Security Documents (to the extent applicable), and (iii) if reasonably requested, the delivery of an opinion or opinions, in form and substance reasonably satisfactory to the Required Lenders and the Administrative Agent.

(f)      The Borrower will use the proceeds of the Incremental Term Loans for any purpose not prohibited by this Agreement and as agreed to by the Borrower and the lenders providing such Incremental Facility.

(g)      No Lender shall be obligated to provide any Incremental Term Loans, unless it so agrees in its sole discretion.

This Section 2.15 shall supersede any provisions in Section 2.07, 13.06 or 13.12 to the contrary.  Notwithstanding any other provision of any Credit Document, the Credit Documents may be amended by the Administrative Agent and the Borrower, if necessary or reasonably advisable, to provide for terms applicable to any Incremental Term Loans permitted by this Section 2.15.

2.16     Extensions of Term Loans.

(a)      Notwithstanding anything to the contrary in this Agreement, pursuant to one or more offers (each, an "Extension Offer") made from time to time by the Borrower to all Lenders of Term Loans with a like maturity date, on a pro rata basis (based on the aggregate outstanding principal amount of the respective Term Loans with a like maturity date, as the case may be) and on the same terms to each such Lender, the Borrower is hereby permitted to consummate from time to time transactions with individual Lenders that accept the terms contained in such Extension Offers to extend the maturity date of each such Lender's Term Loans and otherwise modify the terms of such Term Loans pursuant to the terms of the relevant Extension Offer (including by increasing the interest rate or fees payable in respect of such Term Loans (and related outstandings) and/or modifying the amortization schedule in respect of such Lender's Term Loans) (each, an "Extension," and each group of Term Loans, in each case as so extended, as well as the original Term Loans (in each case not so extended), being a "tranche"; any Extended Term Loans (as defined below) shall constitute a separate tranche of Term Loans from the tranche of Term Loans from which they were converted, so long as the following terms are satisfied:  (i) no Event of Default shall have occurred and be continuing at the time the offering document in respect of an Extension Offer is delivered to the Lenders, (ii) [reserved], (iii) except as to interest rates, fees, amortization, final maturity date, "AHYDO" or optional prepayments, premium, required prepayment dates and participation in prepayments (which shall, subject to immediately succeeding clauses (iv), (v) and (vi), be determined by the Borrower and the Extending Term Lenders and set forth in the relevant Extension Offer), the Term Loans of any Lender that agrees to an Extension with respect to such Term Loans (an "Extending Term Lender") extended pursuant to any Extension ("Extended Term Commitments") and any Loan made under an Extended Term Commitment, an "Extended Term Loan") shall be substantially identical to, or (taken as a whole) no more favorable to the Extending Term Lenders than those applicable to the Term Loans subject to such Extension Offer (unless (1) the Lenders under the Initial Term Loans also receive the benefit of such more favorable terms or (2) such covenants or other provisions are applicable only to

periods after the Latest Maturity Date), (iv) the final maturity date of any Extended Term Loans shall be no earlier than the then Latest Maturity Date hereunder, (v) the Weighted Average Life to Maturity of any Extended Term Loans shall be no shorter than the remaining Weighted Average Life to Maturity of the Term Loans extended thereby, (vi) any Extended Term Loans may participate on a pro rata basis or a less than pro rata basis (but not greater than a pro rata basis) in any voluntary or mandatory repayments or prepayments hereunder, in each case as specified in the respective Extension Offer, (vii) if the aggregate principal amount of Term Loans (calculated on the face amount thereof), in respect of which Lenders, shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Term Loans, as the case may be, offered to be extended by the Borrower pursuant to such Extension Offer, then the Term Loans of such Lenders, shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Lenders, have accepted such Extension Offer, (viii) all documentation in respect of such Extension shall be consistent with the foregoing, and (ix) any applicable Minimum Extension Condition shall be satisfied unless waived by the Borrower.

(b)      With respect to all Extensions consummated by the Borrower pursuant to this Section 2.16, (i) such Extensions shall not constitute voluntary or mandatory payments or prepayments for purposes of Section 5 and (ii) no Extension Offer is required to be in any minimum amount or any minimum increment, provided that the Borrower may at its election specify as a condition (a "Minimum Extension Condition") to consummating any such Extension that a minimum amount (to be determined and specified in the relevant Extension Offer in the Borrower's sole discretion and may be waived by the Borrower) of Term Loans of any or all applicable tranches be tendered.  The Administrative Agent and the Lenders hereby consent to the Extensions and the other transactions contemplated by this Section 2.16 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Term Loans on such terms as may be set forth in the relevant Extension Offer) and hereby waive the requirements of any provision of this Agreement (including Sections 5 and 13.06) or any other Credit Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section 2.16.

(c)      No consent of any Lender or the Administrative Agent shall be required to effectuate any Extensions, other than the consent of each Lender agreeing to such Extension with respect to one or more of its Term Loans (or a portion thereof).  All Extended Term Loans and all obligations in respect thereof shall be Obligations under this Agreement and the other Credit Documents that are secured by the Collateral on a pari passu basis with all other applicable Obligations under this Agreement and the other Credit Documents. The Lenders hereby irrevocably authorize the Administrative Agent and Collateral Agent to, and the Credit Parties, the Administrative Agent and the Collateral Agent shall, enter into such amendments to this Agreement and the other Credit Documents as may be necessary or appropriate in order to establish new tranches or sub-tranches in respect of Term Loans so extended and such technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such new tranches or sub-tranches, in each case on terms consistent with this Section 2.16.  All such amendments entered into with the Borrower by the Administrative Agent or the Collateral Agent hereunder shall be binding and conclusive on the Lenders. Without limiting the foregoing, in connection with any Extensions the respective Credit Parties shall (at their expense) amend (and the Collateral Agent is hereby directed to amend) any Mortgage that has a maturity date prior to the then Latest Maturity Date so that such maturity date is extended to the then Latest Maturity Date (or such later date as may be advised by local counsel to the Required Lenders).

(d)      In connection with any Extension, the Borrower shall provide the Administrative Agent at least five (5) Business Days' (or such shorter period as may be agreed by the Administrative Agent (at the written direction of the Required Lenders)) prior written notice thereof, and shall agree to such procedures (including rendering timing, rounding and other adjustments and to ensure reasonable

administrative management of the credit facilities hereunder after such Extension), if any, as may be established by, or acceptable to, the Administrative Agent, in each case acting reasonably to accomplish the purposes of this Section 2.16.

2.17    Refinancing Amendments

(a)    At any time after the Closing Date, the Borrower may obtain, from any Lender or any Additional Lender, additional Term Loans hereunder that refinance or replace all or any portion of the Term Loans then outstanding under this Agreement (which for purposes of this clause (a) will be deemed to include any then outstanding Refinancing Term Loans, Refinancing Term Loan Commitments and Incremental Term Loans), in the form of Refinancing Term Loans pursuant to a Refinancing Amendment; provided that such Refinancing Term Loans (i) will rank pari passu or junior in right of payment and with respect to guarantees and security with the other Loans and Commitments hereunder, (ii) will have such pricing, fees, premiums, interest and "AHYDO" (in case of Refinancing Term Loans) or optional prepayment or redemption terms as may be agreed by the Borrower and the lenders thereof, (iii) will have a maturity date that is not prior to the maturity date of, and will have a Weighted Average Life to Maturity that is not shorter than, the Term Loans being refinanced (other than to the extent of nominal amortization for periods where amortization has been eliminated or reduced as a result of prepayments of such Term Loans), (iv) shall share ratably in (or if junior in right of payment or as to security, on a junior basis in respect of) any prepayments of Term Loans (unless the Refinancing Term Loans agree to participate on a less than pro rata basis in any voluntary or mandatory prepayments or repayments), (v) [reserved], (vi) any Credit Agreement Refinancing Indebtedness that is junior to the Obligations under this Agreement with respect to security shall be subject to the Applicable Intercreditor Arrangements) and the Borrower and (vii) subject to clauses (ii), (iii) and (iv) above, will have terms and conditions that reflect market terms and conditions at the time of incurrence or issuance (as reasonably determined by the Borrower).  Each Class of Refinancing Term Loans incurred under this Section 2.17 shall be in an aggregate principal amount that is (x) not less than $10,000,000 and (y) an integral multiple of $1,000,000 in excess thereof.

(b)    Upon written confirmation from the Borrower of the effectiveness of each Refinancing Amendment, the Administrative Agent shall promptly notify each Lender as to the effectiveness of each such Refinancing Amendment.  Each of the parties hereto hereby agrees that, upon the effectiveness of any Refinancing Amendment, this Agreement shall be deemed amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Refinancing Term Loans incurred pursuant thereto.  Any Refinancing Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Credit Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section.  For the avoidance of doubt, no existing Lender shall be obligated to provide any Refinancing Term Loans.

(c)    This Section 2.17 shall supersede any provisions in Section 2.07, 13.06 or 13.12 to the contrary.

2.18    Reverse Dutch Auction Repurchases

(a)    Notwithstanding anything to the contrary contained in this Agreement or any other Credit Document, the Borrower and its Subsidiaries (including the Borrower) (any one of them, a "Borrower Party") may, at any time and from time to time after the Closing Date, conduct reverse Dutch auctions in order to purchase Term Loans (each, an "Auction") (each such Auction to be managed by an investment bank or other financial institution of recognized standing selected by the Borrower (in such capacity, the

"Auction Manager")), so long as the following conditions (or, in the case of clause (iv), requirements) are satisfied or waived:

(i)        each Auction shall be conducted in accordance with the procedures, terms and conditions set forth in this Section 2.18, Schedule 2.18 or such other procedures, terms and conditions or otherwise established by the Borrower and the Auction Manager and consented to by the Administrative Agent (such consent to be authorized at the written direction of the Required Lenders and not to be unreasonably withheld, delayed or conditioned);

(ii)        no Event of Default shall have occurred and be continuing on the date of the delivery by the Borrower to the Administrative Agent of written notice of an Auction and at the time of purchase of any Term Loans in connection with any Auction;

(iii)        the principal amount (calculated on the face amount thereof) of all Term Loans that any Borrower Party offers to purchase in any such Auction shall be no less than $5,000,000 (unless another amount is agreed to by the Required Lenders);

(iv)        immediately after giving effect to any such purchase of Term Loans, the aggregate principal amount (calculated on the face amount thereof) of all Term Loans so purchased by a Borrower Party shall automatically and permanently be cancelled and retired by the Borrower on the settlement date of the relevant purchase (and may not be resold);

(v)        no more than one Auction may be ongoing at any one time;

(vi)        at the time of each purchase of Term Loans through an Auction, the Borrower shall have delivered to the Auction Manager, the Administrative Agent, and the Lenders an officer's certificate, signed by an Authorized Officer, certifying as to the compliance with preceding clauses (ii) and (iv) and the following clause (ix);

(vii)        [reserved]; and

(viii)        each Auction shall be open and offered to all Lenders of the relevant Class of Term Loans on a pro rata basis.

(b)        The Borrower must terminate an Auction if it fails to satisfy one or more of the conditions set forth above which are required to be met at the time which otherwise would have been the time of purchase of Term Loans pursuant to the respective Auction. The Borrower shall have no liability to any Lender for any termination of the respective Auction as a result of its failure to satisfy one or more of the conditions set forth above which are required to be met at the time which otherwise would have been the time of purchase of Term Loans pursuant to the respective Auction, and any such failure shall not result in any Default or Event of Default hereunder. With respect to all purchases of Term Loans made by a Borrower Party pursuant to this Section 2.18, (x) the Borrower shall pay on the settlement date of each such purchase all accrued and unpaid interest (except to the extent otherwise set forth in the relevant offering documents), if any, on the purchased Term Loans up to the settlement date of such purchase and (y) such purchases (and the payments made by the Borrower and the cancellation of the purchased Term Loans, in each case in connection therewith) shall not constitute voluntary or mandatory payments or prepayments for purposes of Section 5.01, 5.02 or 13.06 (although the par principal amount of Term Loans of the respective Class so purchased pursuant to this Section 2.18 shall be applied to reduce the remaining scheduled Term Loan repayments of such tranche of Term Loans of the applicable Lenders being repaid on a ratable basis).

(c)    The Auction Manager and the Lenders hereby consent to the Auctions and the other transactions contemplated by this Section 2.18 (provided that no Lender shall have an obligation to participate in any such Auctions) and hereby waive the requirements of any provision of this Agreement (including Sections 5.01, 5.02 and 13.06 (it being understood and acknowledged that purchases of the Term Loans by any Borrower Party contemplated by this Section 2.18 shall not constitute Investments by the Borrower or any of its Restricted Subsidiaries)) or any other Credit Document that may otherwise prohibit any Auction or any other transaction contemplated by this Section 2.18.   Upon written notice to the Auction Manager, the Borrower may withdraw its offer for any Auction under this Section 2.18 prior to the completion thereof.

(d)    Each Lender participating in any Auction hereby acknowledges and agrees that in connection with such Auction, (1) the Borrower Party may have, and later may come into possession of, information regarding the Loans or the Credit Parties hereunder that is not known to such Lender and that may be material to a decision by such Lender to participate in such Auction (such information, the "Excluded Information"), (2) such Lender has independently, without reliance on the Borrower, any of its Subsidiaries, the Administrative Agent, or any of their respective Affiliates, made its own analysis and determination to participate in such Auction notwithstanding such Lender's lack of knowledge of the Excluded Information and (3) none of the Borrower, its Subsidiaries, the Administrative Agent, or any of their respective Affiliates shall have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by law, any claims such Lender may have against the Borrower, its Subsidiaries, the Administrative Agent, and their respective Affiliates, under applicable laws or otherwise, with respect to the nondisclosure of the Excluded Information. Each Lender participating in any Auction further acknowledges that the Excluded Information may not be available to the Administrative Agent, or the other Lenders.

2.19    Benchmark Replacement Setting

(a)    Benchmark Replacement. If a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Credit Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Credit Document and (y) if a Benchmark Replacement is determined in accordance with clause (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Credit Document in respect of any Benchmark setting at or after 5:00 p.m. on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Credit Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.  If the Benchmark Replacement is based upon Daily Simple SOFR, all interest payments will be payable on a monthly basis.

(b)    Benchmark Replacement Conforming Changes.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent (at the written direction of the Required Lenders) will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document.

(c)      Notices; Standards for Decisions and Determinations.  The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.19(d) and (v) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent (at the written direction of the Required Lenders) or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.19, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Credit Document, except, in each case, as expressly required pursuant to this Section 2.19.

(d)      Unavailability of Tenor of Benchmark.  Notwithstanding anything to the contrary herein or in any other Credit Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent (at the written direction of the Required Lenders) or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent (at the written direction of the Required Lenders) may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent (at the written direction of the Required Lenders) may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)      Benchmark Unavailability Period.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, (i) the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Term SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans and (ii) any outstanding affected Term SOFR Loans will be deemed to have been converted to Base Rate Loans at the end of the applicable Interest Period.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Base Rate.

SECTION 3.    [Reserved].

SECTION 4.    Fees; Reductions of Commitment.

4.01    Fees.  The Borrower agrees to pay to the Administrative Agent such fees as set forth in the Fee Letter or as otherwise may be agreed to in writing from time to time by Borrower and the Administrative Agent.

4.02    Mandatory Reduction of Commitments.  The Total Initial Term Loan Commitment (and the Initial Term Loan Commitment of each Lender) shall terminate in its entirety on the Closing Date (after giving effect to the incurrence of Initial Term Loans on such date).

SECTION 5.    Prepayments; Payments; Taxes.

5.01    Voluntary Prepayments

The Borrower shall have the right to prepay the Loans, without premium or penalty (subject to Section 2.11) in whole or in part at any time and from time to time on the following terms and conditions: (i) the Borrower shall give the Administrative Agent prior to 12:00 noon at the Notice Office (x) at least one (1) Business Day's prior written notice of its intent to prepay Base Rate Loans and (y) at least three (3) Business Days' prior written notice of its intent to prepay Term SOFR Loans, which notice (in each case) shall specify the amount of such prepayment, the Types of Loans to be prepaid and, in the case of Term SOFR Loans, the specific Borrowing or Borrowings pursuant to which such Term SOFR Loans were made, and which notice the Administrative Agent shall promptly transmit to each of the applicable Lenders; provided that a notice of prepayment under this Section 5.01 may state that such notice is conditional upon the effectiveness of other credit facilities, the receipt of proceeds from the issuance of other Indebtedness or equity or consummation of an asset sale in which case such notice of prepayment may be rescinded by the Borrower (by written notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied; (ii) each partial prepayment of Term Loans pursuant to this Section 5.01 shall be in an aggregate principal amount of at least $500,000; provided that if any partial prepayment of Term SOFR Loans made pursuant to any Borrowing shall reduce the outstanding principal amount of Term SOFR Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount applicable thereto, then such Borrowing may not be continued as a Borrowing of Term SOFR Loans (and same shall automatically be converted into a Borrowing of Base Rate Loans) and any election of an Interest Period with respect thereto given by the Borrower shall have no force or effect; (iii) each prepayment pursuant to this Section 5.01 in respect of any Loans made pursuant to a Borrowing shall be applied pro rata among such Loans; and (iv) each voluntary prepayment of Term Loans pursuant to this Section 5.01 shall reduce the then remaining Scheduled Initial Term Loan Repayments in such manner as directed by the Borrower and in the absence of such direction, in direct order of maturity.

5.02    Mandatory Repayments

(a)    [Reserved].

(b)    In addition to any other mandatory repayments pursuant to this Section 5.02, the Borrower shall be required to repay to the Administrative Agent for the ratable account of the Lenders holding Initial Term Loans (x)(i) on September 30, 2025, an aggregate principal amount equal to $1,500,000; (ii) on December 31, 2025, an aggregate principal amount equal to $7,500,000; (iii) on each of March 31, 2026, June 30, 2026, September 30, 2026, December 31, 2026 and March 31, 2027, an aggregate principal amount equal to $10,000,000; provided that if the Borrower or any of its Restricted

Subsidiaries receive Rabbi Trust Proceeds in an aggregate amount of at least $10,000,000 by December 26, 2025 (and the Borrower shall have provided written notice to the Administrative Agent as to such receipt), the payments made on each of December 31, 2025 and March 31, 2026 shall be instead in an aggregate principal amount equal to $9,250,000 and $11,750,000, reseipctively; (iv) on June 30, 2027, an aggregate principal amount equal to $7,500,000; and (v) if Rabbi Trust Proceeds have not been received by the Borrower or any of its Restricted Subsidiaries in an aggregate amount of at least $10,000,000 by December 26, 2025, on September 30, 2027, $3,500,000 (each, a "Scheduled Initial Term Loan Repayment Date"); *provided,* that such payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 5.01 (each such repayment, as the same may be reduced or increased as provided herein, a "Scheduled Initial Term Loan Repayment"); *provided further,* that any Scheduled Initial Term Loan Repayment payable to all Lenders may be deferred in full, with the written consent of the Required Lenders provided to the Administrative Agent no later than one (1) Business Day prior to the applicable Scheduled Initial Term Loan Repayment Date, to a later date that is on or prior to the Initial Term Loan Maturity Date and (y) on the Initial Term Loan Maturity Date, the aggregate principal amount of all Initial Term Loans outstanding on such date together with accrued interest thereon.

(c)     If, as of the last day of each Fiscal Quarter (beginning with the first full Fiscal Quarter following the Closing Date), Liquidity would exceed $60,000,000 and the Unrestricted cash of the Borrower and its Restricted Subsidiaries would exceed $50,000,000, the Borrower shall be required, with prior written notice to the Administrative Agent, within five (5) Business Days after the end of such Fiscal Quarter, to repay to the Administrative Agent for the ratable account of the Lenders holding Initial Term Loans an aggregate principal amount equal to the lesser of (i) 100% of Liquidity in excess of $60,000,000 and (ii) 100% of the Unrestricted cash of the Borrower and its Restricted Subsidiaries in excess of $50,000,000.

(d)     In addition to any other mandatory repayments or commitment reductions pursuant to this Section 5.02, on each date on or after the Closing Date upon which the Borrower or any of its Restricted Subsidiaries receives any cash proceeds from any issuance or incurrence by the Borrower or any of its Restricted Subsidiaries of Indebtedness (other than Indebtedness permitted to be incurred pursuant to Section 10.04 (excluding Refinancing Term Loans)), an amount equal to 100% of the Net Debt Proceeds of the respective incurrence of Indebtedness shall be applied on such date as a mandatory repayment of Term Loans in accordance with the requirements of Sections 5.02(h) and (i).

(e)     In addition to any other mandatory repayments or commitment reductions pursuant to this Section 5.02, within five (5) Business Days after each date on or after the Closing Date upon which the Borrower or any of its Restricted Subsidiaries receives any cash proceeds from any Asset Sale, an amount equal to 100% of the Net Sale Proceeds therefrom shall be applied on such fifth (5th) Business Day as a mandatory repayment of Term Loans in accordance with the requirements of Sections 5.02(h) and (i); provided, however, that such Net Sale Proceeds shall not be required to be so applied on such date so long as no Event of Default has occurred and is continuing and such Net Sale Proceeds are reinvested (or committed to be reinvested) to purchase assets used or to be used in the businesses permitted pursuant to Section 9.07 (including Permitted Acquisitions) (within 12 months following the date of such Asset Sale (or, if the Borrower or any of its Restricted Subsidiaries enters into a legally binding commitment to reinvest such Net Sale Proceeds within 12 months following the receipt thereof, within 180 days after such original 12 month period); provided, further, that if all or any portion of such Net Sale Proceeds are not so reinvested within the time period indicated (or such earlier date, if any, as the Borrower or the relevant Restricted Subsidiary determines not to reinvest the Net Sale Proceeds from such Asset Sale as set forth above), such remaining portion shall be applied on the last day of such period (or such earlier date, as the case may be) as provided above in this Section 5.02(e) without regard to the preceding proviso; provided, further that if at the time that any such prepayment would be required, the Borrower is

required to offer to repurchase Incremental Notes that rank pari passu in right of security with the Initial Term Loans (or any Permitted Refinancing thereof that is secured on a pari passu basis with the Obligations) pursuant to the terms of the documentation governing such Indebtedness with the net proceeds of such Asset Sale (such Permitted Refinancing Debt or such Incremental Notes (or Permitted Refinancing thereof) required to be offered to be so repurchased, "Other Applicable Indebtedness"), then the Borrower may apply such Net Sale Proceeds on a pro rata basis (determined on the basis of the aggregate outstanding principal amount of the Term Loans and Other Applicable Indebtedness at such time) to the prepayment of the Term Loans and to the repurchase of Other Applicable Indebtedness, and the amount of prepayment of the Term Loans that would have otherwise been required pursuant to this Section 5.02(e) if there shall not have been any Other Applicable Indebtedness shall be reduced accordingly; provided, further that to the extent the holders of any Other Applicable Indebtedness decline to have such indebtedness repurchased, the declined amount shall promptly (and in any event within five (5) Business Days after the date of such rejection) be applied to prepay the Term Loans in accordance with the terms hereof.

(f)     In addition to any other mandatory repayments or commitment reductions pursuant to this Section 5.02, on each Excess Cash Payment Date, an amount equal to the Applicable Excess Cash Flow Percentage of the Excess Cash Flow for the related Excess Cash Payment Period shall be applied as a mandatory repayment of Term Loans in accordance with the requirements of Sections 5.02(h) and (i); provided, that (i) the repayments of principal of Loans made as a voluntary prepayment pursuant to Section 5.01 (other than with the proceeds of long-term Indebtedness), and (ii) the amount of debt buybacks consummated pursuant to Section 13.04(e) (but limited to the actual cash amount paid by the Borrower in connection with such buyback), in the case of each of the immediately preceding clauses (i) and (ii) (x) during the applicable Excess Cash Payment Period (except to the extent previously applied pursuant to clause (y) below in respect of the preceding Excess Cash Payment Date) and (y) at the option of the Borrower, after the applicable Excess Cash Payment Period and prior to the applicable Excess Cash Payment Date shall, in each case, reduce on a dollar-for-dollar basis the amount of such mandatory repayment otherwise required on the applicable Excess Cash Payment Date pursuant to the foregoing requirement in this Section 5.02(f) (such reductions, the "Excess Cash Payment Reductions") (provided that if any reduction is made pursuant to the foregoing clause (y), such reduction shall not be made for the immediately succeeding Excess Cash Payment Period); provided, further that, if Liquidity would be less than $50,000,000 (calculated based on the most recently delivered Liquidity Certificate) after giving *pro forma* effect to the full amount of such mandatory repayment required on the applicable Excess Cash Payment Date pursuant to the foregoing requirements in this Section 5.02(f) (for the avoidance of doubt, after giving effect to any Excess Cash Payment Reductions), such amount of such mandatory repayment pursuant shall be further reduced by an amount that would not result in Liquidity, after giving *pro forma* effect to such mandatory prepayment (as so further reduced), being less than $50,000,000.

(g)     In addition to any other mandatory repayments or commitment reductions pursuant to this Section 5.02, within five (5) Business Days after each date on or after the Closing Date upon which the Borrower or any of its Restricted Subsidiaries receives any cash proceeds from any Recovery Event (other than Recovery Events where the aggregate Net Recovery Event Proceeds therefrom do not exceed $7,500,000 in any Fiscal Year), an amount equal to 100% of the Net Recovery Event Proceeds from such Recovery Event shall be applied on such fifth (5th) Business Day as a mandatory repayment of Term Loans in accordance with the requirements of Sections 5.02(h) and (i); provided, that such Net Recovery Event Proceeds shall not be required to be so applied on such date so long as no Event of Default has occurred and is continuing and such Net Recovery Event Proceeds are reinvested (or committed to be reinvested) to replace, rebuild or restore any properties or assets or acquire assets useful in their business in respect of which such Net Recovery Event Proceeds were paid within 12 months following the date of the receipt of such Net Recovery Event Proceeds (or, if the Borrower enters into a legally binding commitment to reinvest such net cash proceeds within 12 months following the receipt thereof, within

-71-

180 days after such original 12 month period), and provided, further, that if all or any portion of such Net Recovery Event Proceeds are not so used within the time period indicated (or such earlier date, if any, as the Borrower or the relevant Restricted Subsidiary determines not to reinvest the Net Recovery Event Proceeds relating to such Recovery Event as set forth above), such remaining portion shall be applied on the last day of such period (or such earlier date, as the case may be) as provided above in this Section 5.02(g) without regard to the immediately preceding proviso; provided, further that if at the time that any such prepayment would be required, the Borrower is required to offer to repurchase Other Applicable Indebtedness pursuant to the terms of the documentation governing such Other Applicable Indebtedness with such Net Recovery Event Proceeds, then the Borrower may apply such Net Recovery Event Proceeds on a pro rata basis (determined on the basis of the aggregate outstanding principal amount of the Term Loans and Other Applicable Indebtedness at such time) to the prepayment of the Term Loans and to the repurchase of Other Applicable Indebtedness, and the amount of prepayment of the Term Loans that would have otherwise been required pursuant to this Section 5.02(g) if there shall not have been any Other Applicable Indebtedness shall be reduced accordingly; provided further that to the extent the holders of any Other Applicable Indebtedness decline to have such indebtedness repurchased, the declined amount shall promptly (and in any event within five (5) Business Days after the date of such rejection) be applied to prepay the Term Loans in accordance with the terms hereof.

(h)      The amount of each principal repayment of Initial Term Loans made as required by Sections 5.02(d), (e), (f) and (g) shall be applied to reduce the then remaining Scheduled Initial Term Loan Repayments as directed by the Borrower to the Administrative Agent (and if not so directed, in direct order of maturity).

(i)      With respect to each repayment of Loans required by this Section 5.02, the Borrower may designate the Types of Loans of the respective Class which are to be repaid and, in the case of Term SOFR Loans, the specific Borrowing or Borrowings of the respective Class pursuant to which such Term SOFR Loans were made, provided that  (i) repayments of Term SOFR Loans pursuant to this Section 5.02 may only be made on the last day of an Interest Period applicable thereto unless the Borrower makes payments to Lenders in accordance with Section  2.11; (ii) if any repayment of Term SOFR Loans made pursuant to a single Borrowing shall reduce the outstanding Term SOFR Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount applicable thereto, such Borrowing shall be automatically converted into a Borrowing of Base Rate Loans; and (iii) each repayment of any Loans made pursuant to a Borrowing shall be applied pro rata among such Loans, and shall be applied on a pro rata basis among the applicable Class or Classes being repaid.  In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent (as directed by the Required Lenders in writing) shall, subject to the above, make such designation in its sole discretion with a view, but not an obligation, to minimize breakage cost owing under Section 2.11.

(j)      In addition to any other mandatory repayments pursuant to this Section 5.02, all then outstanding Loans of a respective Class shall be repaid in full on the respective Maturity Date for such Class of Loans.

(k)      The Borrower shall notify the Administrative Agent in writing of any mandatory repayment of Term Loans required to be made pursuant to Section 5.02(d) (if notice has not otherwise been provided pursuant to Section 5.01), (e), (f) or (g) at least three (3) Business Days prior to the date of such repayment.  Each such notice shall specify the date of such repayment and provide a reasonably detailed calculation of the amount of such repayment.  The Administrative Agent will promptly notify each Lender holding Term Loans of the contents of the Borrower's repayment notice and of such Lender's pro rata share of any repayment.  Other than in the case of any repayment with the proceeds of any Refinancing Term Loans, each such Lender may reject all or a portion of its pro rata share of any mandatory prepayment (such declined amounts, the "Declined Proceeds") of Term Loans required to be

made pursuant to Section 5.02 (e), (f) or (g) by providing written notice (each, a "<u>Rejection Notice</u>") to the Administrative Agent and the Borrower no later than 5:00 p.m. on the Business Day after the date of such Lender's receipt of notice from the Administrative Agent regarding such repayment.  Each Rejection Notice from a given Lender shall specify the principal amount of the mandatory repayment of Term Loans to be rejected by such Lender.  If a Lender fails to deliver such Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory repayment of Term Loans to which such Lender is otherwise entitled. Any Declined Proceeds, shall be retained by the Borrower.

(l)       Notwithstanding any other provisions of this Section 5.02, (A) to the extent that any or all of the Net Sale Proceeds of any Asset Sale by a Foreign Subsidiary giving rise to a prepayment event pursuant to Section 5.02(e) (a "<u>Foreign Disposition</u>"), the Net Recovery Event Proceeds of any Recovery Event from a Foreign Subsidiary giving rise to a prepayment event pursuant to Section 5.02(g) (a "<u>Foreign Recovery Event</u>"), or Excess Cash Flow are (x) prohibited or delayed by applicable local law from being repatriated to the United States or (y) restricted by applicable material organizational documents as a result of minority ownership, an amount equal to the portion of the Net Sale Proceeds, Net Recovery Event Proceeds or the relevant Applicable Excess Cash Flow Percentage of such Excess Cash Flow so affected will not be required to be applied to repay Loans at the times provided in this Section 5.02 so long, but only so long, as the applicable local law or the applicable material organizational documents will not permit repatriation to the United States, (B) to the extent that the Borrower has determined in good faith that repatriation of any of or all the Net Sale Proceeds of any Foreign Disposition, Net Recovery Event Proceeds of any Foreign Recovery Event or Excess Cash Flow would have an adverse tax cost consequence (taking into account any foreign tax credit or benefit actually realized in connection with such repatriation) with respect to such Net Sale Proceeds, Net Recovery Event Proceeds or Excess Cash Flow, the Net Sale Proceeds, Net Recovery Event Proceeds or the relevant Applicable Excess Cash Flow Percentage of such Excess Cash Flow so affected shall not be required to be applied in accordance with Section 5.02 and (C) to the extent that the Borrower has determined in good faith that distribution to the Borrower of any of or all the Net Sale Proceeds of any Asset Sale, Net Recovery Event Proceeds or amount of Excess Cash Flow in each case attributable to a C Corporation Subsidiary would have an adverse tax cost consequence to the Borrower or its direct and indirect beneficial owners, the Net Sale Proceeds, net cash proceeds, Net Recovery Event Proceeds or the relevant Applicable Excess Cash Flow Percentage of such Excess Cash Flow so affected shall not be required to be applied in accordance with Section 5.02.  The Borrower hereby agrees to use all commercially reasonable efforts to overcome or eliminate any such restrictions on repatriation, even if the Borrower does not intend to actually repatriate such cash, so that an amount equal to the full amount of such Net Sale Proceeds, Net Recovery Event Proceeds or the relevant Applicable Excess Cash Flow Percentage of such Excess Cash Flow will otherwise be subject to repayment under this Section 5.02(l)), and if at any time within one year following the date on which the respective prepayment would otherwise have been required such repatriation of any of such affected Net Sale Proceeds, Net Recovery Event Proceeds or Excess Cash Flow is permitted under the applicable local law or applicable organizational documents (even if such cash is actually not repatriated) an amount equal to the amount of such Net Sale Proceeds, Net Recovery Event Proceeds or the relevant Applicable Excess Cash Flow Percentage of such Excess Cash Flow that could be repatriated or are no longer restricted, will be promptly (and in any event not later than five (5) Business Days) applied (net of additional taxes payable or reserved against as a result of a repatriation and any additional costs that would be incurred as a result of a repatriation, whether or not a repatriation actually occurs) by the Borrower to the repayment of the Loans pursuant to this Section 5.02 to the extent provided herein.

5.03      <u>Method and Place of Payment</u>

Except as otherwise specifically provided herein, all payments under this Agreement and under any Note shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 2:00 p.m. on the date when due and shall be made in Dollars in immediately available funds at the Payment Office.  All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

5.04    Taxes

For purposes of this Section, the term "applicable law" includes FATCA.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrower under any Credit Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by Borrower.  The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    Indemnification by Borrower.  The Borrower shall indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 13.04(j) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A writing as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender authorizes the Administrative Agent to set off and apply

any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)      Evidence of Payments.  As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Required Lenders and the Administrative Agent.

(f)      Status of Lenders.

(i)      Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (g)(ii)(A), (ii)(B) and (ii)(D) of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)      Without limiting the generality of the foregoing,

(A)      any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Credit Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Credit Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed copies of IRS Form W-8ECI;

(3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit D-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10-percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W 8BEN-E; or

(4)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W 8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-2 or Exhibit D-3, IRS Form W-9, or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-4 on behalf of each such direct and indirect partner;

(C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)      if a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(E)      Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(F)      Each Lender authorizes the Administrative Agent to deliver to the Credit Parties and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to this Section 5.04(f).

(g)     Status of Administrative Agent.  On or prior to the date on which it becomes a party to this Agreement, (i) each Administrative Agent, and any successor or supplemental Administrative Agent, that is a U.S. Person shall provide to the Borrower executed copies of IRS Form W-9, and (ii) Acquiom Agency Services LLC, as the Administrative Agent, and any successor or supplemental Administrative Agent that is not a U.S. Person shall deliver to the Borrower executed copies of IRS Form W-8ECI with respect to payments to be received under the Credit Documents for its own account and executed copies of IRS Form W-8IMY assuming primary responsibility for withholding under Chapters 3 and 4 of the Code with respect to payments to be received under the Credit Documents for the account of Lenders. Whenever a lapse in time or change in circumstance renders any such documentation expired, obsolete or inaccurate in any material respect, the Administrative Agent shall deliver promptly to the Borrower updated or other appropriate documentation or promptly notify the Borrower of its legal ineligibility to do so.

(h)     Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes for which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     Survival.  Each party's obligations under this Section shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.

5.05     Presumption of the Administrative Agent as to Payments of the Borrower

Unless the Administrative Agent shall have been notified by the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower does not intend to make available to the Administrative Agent such payment, the Administrative Agent may assume that the Borrower has made such amount available to the Administrative Agent on such date in accordance herewith and may (but shall not be obligated to), in reliance upon such assumption, make available to the appropriate Lenders, the amount due. If such amount is not in fact made available to the Administrative Agent by the Borrower, the Administrative Agent shall be entitled to recover such amount on demand from the Borrower.  If the Borrower does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the applicable Lenders and such Lenders shall immediately pay the amount made available to them by the Administrative Agent to the Administrative Agent.  The Administrative Agent also shall be entitled to recover on demand from the Borrower or any such Lender, interest on such

amount in respect of each day from the date such amount is recovered by the Administrative Agent, at a rate per annum equal to the greater of (i) if recovered from a Lender, the overnight Federal Funds Rate for the first three days and at the interest rate otherwise applicable to the Loans with respect to which such payment was required to be made for each day thereafter and (ii) if recovered from the Borrower, the rate of interest applicable to the Loan with respect to which such payment was required to be made, as determined pursuant to Section 2.08.  Nothing in this Section 5.05 shall be deemed to relieve the Borrower from its obligation to make any payment hereunder or to prejudice any rights which the Administrative Agent and Lenders may have against the Borrower as a result of any failure by the Borrower to make any payment hereunder.

SECTION 6.     Conditions Precedent to Credit Events on the Closing Date.

The obligation of each Lender to be deemed to make Loans on the Closing Date, is subject at the time of the making of such Loans to the satisfaction of the following conditions:

6.01    Closing Date; Notes

On or prior to the Closing Date, (i) there shall have been delivered to the Lenders and the Administrative Agent an executed counterpart of the Borrower to this Agreement and (ii) there shall have been delivered to the Lenders for the account of each of the Lenders that has requested same at least three (3) Business Days prior to the Closing Date the appropriate Term Note executed by the Borrower, in each case, in the amount, maturity and as otherwise provided herein.

6.02    Officer's Certificate

On the Closing Date, the Lenders and the Administrative Agent shall have received a certificate, dated the Closing Date and signed on behalf of the Borrower by an Authorized Officer of the Borrower, certifying on behalf of the Borrower that all of the conditions in Sections 6.07 and 7.01 have been satisfied on such date.

6.03    [Reserved].

6.04    Company Documents; Proceedings; etc.

(a)     On the Closing Date, the Administrative Agent shall have received a certificate from each Credit Party, dated the Closing Date, signed by an Authorized Officer of such Credit Party, and attested to by another Authorized Officer of such Credit Party, with appropriate insertions, together with copies of the certificate or articles of incorporation and by-laws (or other equivalent organizational documents), as applicable, of such Credit Party and the resolutions and specimen signatures of authorized signatories of such Credit Party referred to in such certificate, and each of the foregoing shall be in form and substance reasonably acceptable to the Administrative Agent (at the direction of the Required Lenders).

(b)     On the Closing Date, the Administrative Agent shall have received good standing certificates from the jurisdiction of organization as of a recent date, for each of the Credit Parties which the Administrative Agent reasonably may have requested, certified by proper Governmental Authorities.

6.05    Plan of Reorganization

(a)     The Plan of Reorganization shall be in a form and substance reasonably acceptable to the Required Lenders, and the effective date of the Plan of Reorganization shall have occurred as of the Closing Date or substantially contemporaneously with the Closing Date.

6.06    [Reserved]

6.07    Material Adverse Change

As of the Closing Date, no Material Adverse Effect has occurred and is continuing.

6.08    [Reserved]

6.09    [Reserved]

6.10    Security Documents

(a)    On the Closing Date, each Credit Party shall have duly authorized, executed and delivered the Pledge Agreement substantially in the form of Exhibit F (as amended, modified, restated, supplemented or extended from time to time, the "Pledge Agreement") and shall have delivered to the Collateral Agent (or its agent), all of the Pledge Agreement Collateral, if any, referred to therein and then owned by such Credit Party, together with executed and undated endorsements for transfer in the case of Equity Interests constituting certificated Pledge Agreement Collateral, and the Pledge Agreement shall be in full force and effect.

(b)    On the Closing Date, each Credit Party shall have duly authorized, executed and delivered the Security Agreement, which shall be in full force and effect, substantially in the form of Exhibit G (as amended, modified, restated, supplemented or extended from time to time, the "Security Agreement"), covering all of such Credit Party's Security Agreement Collateral, together with:

(i)    proper financing statements (Form UCC-1 or the equivalent) for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary to perfect the security interests purported to be created by the foregoing Security Agreement;

(ii)    certified copies of requests for information or copies (Form UCC-11), or equivalent reports as of a recent date, listing all effective financing statements that name the Credit Parties as debtor and that are filed in the jurisdictions referred to in clause (i) above, together with copies of such financing statements that name the Credit Parties as debtor and the results of such other lien search reasonably requested by the Administrative Agent (at the written direction of the Required Lenders) (none of which shall cover any of the Collateral except (x) to the extent evidencing Permitted Liens, or (y) those in respect of which the Administrative Agent shall have received termination statements (Form UCC-3) or such other termination statements as shall be required by local law fully executed for filing);

(iii)    one or more of, as applicable, short-form security agreements that may be filed with the United States Patent and Trademark Office or the United States Copyright Office for the grant of a security interest in (i) United States patents and applications therefor, (ii) trademarks registered or pending applications therefor in the United States, and (iii) copyrights registered in the United States, each in substantially the form attached to the Security Agreement;

(iv)    evidence of the completion of all other recordings and filings of, or with respect to, the Security Agreement or the Pledge Agreement as may be necessary to perfect and protect the security interests in Collateral intended to be created by the Security Agreement or the Pledge Agreement, as and to the extent required by the terms of the Security Agreement or the Pledge Agreement; and

(v)    evidence that all other actions, as and to the extent required by the terms of the Security Agreement or the Pledge Agreement,  necessary to perfect the security interests in Collateral purported to

be created by the Security Agreement or the Pledge Agreement have been taken, and the Security Agreement or the Pledge Agreement shall be in full force and effect. Nothing in Section 6.10(b)(iv) or 6.10(b)(v), or otherwise contained in this Agreement shall require any Credit Party to seek to register or patent, or file any applications for registrations or patents, any intellectual property.

(c)     Notwithstanding anything herein to the contrary, it is understood that, other than with respect to (i) any UCC Filing Collateral and (ii) Stock Certificates of the Borrower and its material Domestic Subsidiaries which are Guarantors to the extent possession of such certificates perfects a security interest therein, to the extent any Lien on any Collateral is not provided and/or perfected on the Closing Date after the Borrower's use of commercially reasonable efforts to do so without undue burden and expense, the provision and/or perfection of a Lien on such Collateral shall not constitute a condition precedent for purposes of this Section 6.10, but shall instead be required to be delivered after the Closing Date in accordance with Section 13.20.

6.11     [Reserved]

6.12     Solvency Certificate

On the Closing Date, the Administrative Agent shall have received a solvency certificate from the Chief Financial Officer (or other officer with reasonably equivalent duties) of the Borrower substantially in the form attached hereto as Exhibit K, certifying that the Credit Parties and their Subsidiaries, on a consolidated basis immediately after giving effect to the Transactions, are Solvent.

6.13     Fees, etc.

On or prior to the Closing Date, all fees and expenses (to the extent, in the case of reimbursement of expenses, invoices are received at least three days before the Closing Date, including all invoiced reasonable out-of-pocket costs, fees and expenses (including invoiced reasonable and out-of-pocket legal fees and expenses reimbursable hereunder)) due and payable to the Administrative Agent and Lenders that are required to be paid on the Closing Date shall have been paid (which amounts may be paid from the proceeds of the Initial Term Loans).

6.14     [Reserved]

6.15     [Reserved]

6.16     Subsidiaries Guaranty

Subject to Section 6.10(c), on the Closing Date, each Subsidiary Guarantor shall have duly authorized, executed and delivered the Subsidiaries Guaranty substantially in the form of Exhibit E (as amended, modified, supplemented or extended from time to time, the "Subsidiaries Guaranty"), and the Subsidiaries Guaranty shall be in full force and effect.

6.17     KYC Information

(a)     At least three (3) Business Days prior to the Closing Date, the Administrative Agent shall have received all documentation and other information reasonably requested in writing at least ten (10) days prior to the Closing Date with respect to Borrower that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act.

(b)        At least three (3) Business Days prior to the Closing Date, to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, any Lender that has requested in writing at least ten (10) days prior to the Closing Date a Beneficial Ownership Certification in relation to the Borrower shall have received such Beneficial Ownership Certification.

In determining the satisfaction of the conditions specified in this Section 6, to the extent any item is required to be satisfactory to any Lender, such item shall be deemed satisfactory to each Lender which has not notified the Administrative Agent in writing prior to the occurrence of the Closing Date that the respective item or matter does not meet its satisfaction.

SECTION 7.        Conditions Precedent to All Credit Events.

The obligation of each applicable Lender to make Loans (including Loans made on the Closing Date with regards to Section 7.02(a) only) is subject, at the time of each such Credit Event (except as hereinafter indicated, including in connection with any Incremental Loans as provided therein), to the satisfaction or waiver of the following conditions:

7.01        No Default; Representations and Warranties

Except as otherwise expressly provided in Section 2.15, at the time of each such Credit Event and also after giving effect thereto (i) there shall exist no Default or Event of Default and (ii) all representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on the date of such Credit Event (it being understood and agreed that (x) any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date and (y) any representation or warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on such date).

7.02        Notice of Borrowing

(a)        Prior to the making of each Loan (other than an Incremental Loan), the Administrative Agent shall have received a Notice of Borrowing meeting the requirements of Section 2.03(a).

Except as otherwise expressly provided herein, each Notice of Borrowing (other than a Notice of Borrowing requesting only a conversion of Loans to the other Type or a continuation of Term SOFR Loans) submitted by the Borrower after the Closing Date shall be deemed to be a representation and warranty that the condition specified in Section 7.01 has been satisfied (or waived) on and as of the date of the applicable Borrowing.

SECTION 8.        Representations and Warranties.

On the dates and to the extent required pursuant to Section 6 or Section 7 hereof, as applicable, the Borrower and the Borrower make the following representations and warranties (each with respect to itself and, if applicable, the Restricted Subsidiaries and, if applicable, in the case of Sections 8.04, 8.05, 8.07, 8.20 and 8.21, the Practice Groups), to the extent provided in this Section 8.

8.01        Company Status

Each of the Borrower and each of its Restricted Subsidiaries (i) is a duly organized and validly existing Company in good standing (or existing, as applicable) under the laws of the jurisdiction of its

organization, (ii) has the Company power and authority to own its material property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is, to the extent such concepts are applicable under the laws of the relevant jurisdiction, duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except in the case of clauses (i) (other than with respect to the Borrower), (ii) and (iii) for failures to be so qualified or authorized or have such power which, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

8.02    Power and Authority

Each Credit Party has the Company power and authority to execute, deliver and perform the terms and provisions of each of the Credit Documents to which it is party and has taken all necessary Company action to authorize the execution, delivery and performance by it of each of such Credit Documents. Each Credit Party has duly executed and delivered each of the Credit Documents to which it is party, and each of such Credit Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent (i) that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law), (ii) of the need for filings and registrations necessary to create or perfect the Liens on the Collateral granted by the Credit Parties in favor of the Collateral Agent and (iii) the effect of foreign laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries and intercompany Indebtedness owed by Foreign Subsidiaries.

8.03    No Violation

Neither the execution, delivery or performance by any Credit Party of the Credit Documents to which it is a party, nor compliance by it with the terms and provisions thereof, (i) will contravene any provision of any material law, statute, rule or regulation or any order, writ, injunction or decree of any court or Governmental Authority, except in the case of any contraventions that would not reasonably be expected, enter individually or in the aggregate, to result in a Material Adverse Effect, (ii) will conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents or Permitted Liens) upon any of the property or assets of any Credit Party pursuant to the terms of any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, in each case to which any Credit Party or any of its Restricted Subsidiaries is a party or by which it or any its property or assets is bound or to which it may be subject, except for any such contravention, breach, default, conflict or Lien that would not reasonably be expected, either individually or in the aggregate, to result in a Material Adverse Effect or (iii) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of any Credit Party or any of its Restricted Subsidiaries.

8.04    Approvals; Governmental Authorizations

No order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, any Governmental Authority is required to be obtained or made by, or on behalf of, any Credit Party (except for (w)  those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date, (x) filings which are necessary to release liens granted pursuant to the document related to the Indebtedness to be Refinanced, (y) filings which are necessary to perfect the security interests created under the Security

Documents, and (z) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect) to authorize, or is required to be obtained or made by, or on behalf of, any Credit Party in connection with, (i) the execution, delivery and performance of any Credit Document or (ii) the legality, validity, binding effect or enforceability of any such Credit Document. Each of the Borrower's, the Borrower's Restricted Subsidiaries' and the Practice Groups' employees and contractors providing additional professional medical services to patients is, and has at all times been, while serving in such capacity under employment of or contract with the Borrower, its Restricted Subsidiaries or the Practice Groups (i) duly licensed and certified (as and where required) by each regulatory body having jurisdiction over services rendered by such Person and (ii) eligible (as and where required) to participate in Governmental Programs, except to the extent that such failure to be licensed, certified or eligible, as the case may be, would not reasonably be expected to have a Material Adverse Effect, either individually or in the aggregate.

8.05    Financial Statements; Financial Condition; Undisclosed Liabilities; No Material Adverse Effect

(a)    The most recently provided financial statements provided pursuant to Section 9.01(a) or (b), as applicable, present fairly, in all material respects, the consolidated financial position and results of operations and cash flows of the Borrower on a consolidated basis as of such dates and for such periods in accordance with GAAP, (x) except as otherwise expressly noted therein, (y) subject, in the case of unaudited financial statements, to the absence of footnotes and normal year-end adjustments and (z) except as may be necessary to reflect any differing entity and/or organizational structure prior to giving effect to the Transactions.

(b)    After giving effect to the Transactions, since the Closing Date, nothing has occurred that has had, or would reasonably be expected to have, a Material Adverse Effect.

8.06    Litigation.  There are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened in writing (i) with respect to the Credit Documents or (ii) that have a reasonable likelihood of adverse determination, and, if adversely determined, have had, or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

8.07    True and Complete Disclosure.  To the Borrower's knowledge (in the case of information with respect to the Borrower and its respective Subsidiaries, and if otherwise, without such qualification), all factual information (when furnished and taken as a whole) furnished by or on behalf of the Borrower or the Borrower in writing to the Administrative Agent or any Lender (including all information contained in the Credit Documents but excluding information of a general economic or industry nature) for purposes of or in connection with this Agreement, the other Credit Documents or any transaction contemplated herein or therein is, and all other such factual information as supplemented (when furnished and taken as a whole) hereafter furnished by or on behalf of the Borrower in writing to the Administrative Agent or any Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (when furnished and taken as a whole) not materially misleading at such time in light of the circumstances under which such information was provided, it being understood and agreed that for purposes of this Section 8.07, such factual information shall not include the Projections, any pro forma financial information, the budgets, other forward looking information or information consisting of statements, estimates or forecasts regarding the future condition of the industries in which they operate.

8.08    Margin Regulations.  No part of any Credit Event (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin

Stock.  Neither the making of any Loan nor the use of the proceeds thereof nor the occurrence of any other Credit Event will violate the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

8.09    <u>Tax Returns and Payments</u>.  Each of the Borrower and each of its Restricted Subsidiaries has timely filed or caused to be timely filed (or filed for extension) with the appropriate taxing authority all federal, state and other returns, statements, forms and reports for Taxes (the "<u>Returns</u>") required to be filed by, or with respect to the income, properties or operations of, the Borrower and/or any of its Restricted Subsidiaries, except where the failure to timely file or cause to be timely filed such Returns would not result in a Material Adverse Effect.  The Returns accurately reflect in all material respects all liability for Taxes of the Borrower and its Restricted Subsidiaries, as applicable, for the periods covered thereby.  The Borrower and each of its Restricted Subsidiaries has paid all Taxes and assessments payable by it that have become due, other than (i) Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are being maintained in accordance with GAAP or (ii) those Taxes the failure of which to pay would not reasonably be expected to have a Material Adverse Effect.

8.10    <u>Compliance with ERISA</u>.

(a)    Each Plan is in compliance in form and operation with its terms and with ERISA and the Code (including the Code provisions compliance with which is necessary for any intended favorable tax treatment) and all other applicable laws and regulations, except where any failure to comply would not reasonably be expected to have a Material Adverse Effect.  Except as would not have a Material Adverse Effect, each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code covering all applicable tax law changes or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS, and to the knowledge of the Borrower, nothing has occurred since the date of such determination that would reasonably be expected to result in the revocation of such determination (or, in the case of a Plan with no determination, to the knowledge of the Borrower, nothing has occurred that would reasonably be expected to materially adversely affect the issuance of a favorable determination letter).  No ERISA Event has occurred or is reasonably expected to occur other than as would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    There exists no Unfunded Pension Liability with respect to any Plan that would have a Material Adverse Effect.

(c)    Except as would not have a Material Adverse Effect, none of the Borrower or any of its Restricted Subsidiaries or any ERISA Affiliate has incurred, or is reasonably expected to incur a complete or partial withdrawal from any Multiemployer Plan.

(d)    There are no actions, suits or claims pending against or involving a Plan (other than routine claims for benefits) or, to the knowledge of the Borrower or any of its Restricted Subsidiaries, threatened in writing, which would reasonably be expected to be asserted successfully and, if so asserted successfully, would reasonably be expected either singly or in the aggregate to have a Material Adverse Effect.

(e)    The Borrower, its Restricted Subsidiaries and any ERISA Affiliate have made all material contributions to or under each Plan and Multiemployer Plan required by law within the applicable time limits prescribed thereby, the terms of such Plan or Multiemployer Plan, respectively, or any contract or agreement requiring contributions to a Plan or Multiemployer Plan save where any failure

to make such contributions, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(f)     Except as would not, individually or in the aggregate, have a Material Adverse Effect: (i) no Plan which is subject to Section 412 of the Code or Section 302 of ERISA has applied for or received an extension of any amortization period, within the meaning of Section 412 of the Code or Section 302 of ERISA; (ii) the Borrower, its Restricted Subsidiaries and any ERISA Affiliate have not ceased operations at a facility so as to become subject to the provisions of Section 4062(e) of ERISA, withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA or ceased making contributions to any Plan subject to Section 4064(a) of ERISA to which it made contributions; and (iii) neither the Borrower or its Restricted Subsidiaries or any ERISA Affiliate has any liability under Section 4069 or 4212(c) of ERISA.  Except as would not have a Material Adverse Effect, no lien imposed under the Code or ERISA on the assets of the Borrower or its Restricted Subsidiaries or any ERISA Affiliate, exists or is reasonably likely to arise on account of any Plan.

(g)     Except as would not individually or in the aggregate, have a Material Adverse Effect, (i) each Foreign Pension Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities, (ii) all contributions required to be made with respect to each Foreign Pension Plan have been timely made, (iii) neither the Borrower nor any of its Restricted Subsidiaries has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan and (iv) the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Pension Plan, determined as of the end of the Borrower's  most recently ended Fiscal Year on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Foreign Pension Plan allocable to such benefit liabilities.

8.11    Security Documents.

(a)     The provisions of the Security Agreement and the Pledge Agreement (each taken as a whole) are effective to create in favor of the Collateral Agent for the benefit of the Secured Creditors a legal, valid and enforceable (except (i) to the extent the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law) and (ii) for the effect of foreign laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries and intercompany Indebtedness owed by Foreign Subsidiaries) security interest in all right, title and interest of the Credit Parties in the Security Agreement Collateral and Pledge Agreement Collateral described therein, and the Collateral Agent, for the benefit of the Secured Creditors, has (or, after the filing of UCC-1 financing statements in the office and with the information specified by the Credit Parties in the Security Agreement, the payment of all applicable fees and the taking of such other actions as are required by the Security Agreement, will have) a fully perfected security interest in the United States in all right, title and interest in all of the Security Agreement Collateral described therein (if and to the extent the Security Agreement Collateral can be perfected by the filing of UCC-1 financing statements and the other actions required by the Security Agreement), subject to no other Liens other than Permitted Liens.  The recordation of (x) the Grant of Security Interest in U.S. Patents and (y) the Grant of Security Interest in U.S. Trademarks each in the respective form attached to the Security Agreement, in each case in the United States Patent and Trademark Office, together with filings on Form UCC-1 made pursuant to the Security Agreement and payment of all applicable fees, will create, as may be perfected by such filings and recordation, a perfected security interest in the United States trademark registrations and applications and United States patents and patent applications that are part of the Security Agreement Collateral, and the recordation of the Grant of Security Interest in U.S. Copyrights substantially in the form attached to the Security Agreement with the United States Copyright Office,

-85-

together with filings on Form UCC-1 made pursuant to the Security Agreement, will create, as may be perfected by such filings and recordation, a perfected security interest in the United States copyright registrations that are part of the Security Agreement Collateral.

(b)    Upon the filing of UCC-1 financing statements in the office and with the information specified by the Credit Parties in the Security Agreement and the taking of such other actions required by the Pledge Agreement and, if applicable, Section 13.20, security interests created under the Pledge Agreement in favor of the Collateral Agent, for the benefit of the Secured Creditors, constitute perfected security interests in the Pledge Agreement Collateral described in the Pledge Agreement (if and to the extent such Pledge Agreement Collateral can be perfected by the filing of UCC 1 financing statements and the taking of such other actions required by the Pledge Agreement and, if applicable, Section 13.20), subject to no security interests of any other Person (other than Permitted Liens).

(c)    Upon filing or recording, as applicable, with the appropriate recording office, each Mortgage shall create, as security for the Obligations, a valid and enforceable (except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law)) perfected security interest in and first-priority mortgage Lien on the respective Mortgaged Property in favor of the Collateral Agent (or such other Person as may be required or desired under local law) for the benefit of the Secured Creditors, superior and prior to the rights of all third Persons and subject to no other Liens other than, in each case, Permitted Liens and Permitted Encumbrances.

The preceding clauses (a), (b) and (c) are subject in all respects to Section 6.10(c).

8.12    Properties.  All Real Property owned or leased by the Borrower or any of its Restricted Subsidiaries as of the Closing Date, and the nature of the interest therein, is correctly set forth in Schedule 8.12.  Each of the Borrower and each of its Restricted Subsidiaries has good and marketable title to all material Real Properties owned in fee simple by it (except as sold, transferred or otherwise disposed of as permitted by the terms of this Agreement), free and clear of all Liens, other than Permitted Liens.  Each of the Borrower and each of its Restricted Subsidiaries has a valid and leasehold interest in the material Real Properties (other than leaseholds disposed in accordance with the terms hereof) leased by it free and clear of all Liens other than Permitted Liens.

8.13    Subsidiaries.  On and as of the Closing Date, the Borrower has no Subsidiaries other than those Subsidiaries listed on Schedule 8.13.  Schedule 8.13 sets forth, as of the Closing Date, the percentage ownership of the Borrower in each class of capital stock or other Equity Interests of each of its Subsidiaries and also identifies the direct owner thereof.  All outstanding Equity Interests of the Borrower and each other Restricted Subsidiary of the Borrower have been duly and validly issued, are fully paid and non-assessable (to the extent applicable).  As of the Closing Date, neither the Borrower nor any Restricted Subsidiary has outstanding any securities convertible into or exchangeable for its Equity Interests or outstanding any right to subscribe for or to purchase, or any options or warrants for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of or any calls, commitments or claims of any character relating to, its Equity Interests or any stock appreciation or similar rights except as disclosed on Schedule 8.13.

8.14    Compliance with Statutes, etc.

Each of the Borrower and each of its Restricted Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property, including all Health

Care Laws, except such non-compliances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.15     Investment Company Act.  Neither the Borrower nor any of the Borrower's Restricted Subsidiaries is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

8.16     Environmental Matters

Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or as set forth on Schedule 8.16:  (a) each of the Borrower and each of its Restricted Subsidiaries is in compliance with all Environmental Laws and has obtained and is in compliance with the terms of any permits required under such Environmental Laws; (b) there are no Environmental Claims pending, or to the knowledge of the Borrower, threatened in writing against the Borrower or any of its Restricted Subsidiaries; (c) no Lien, other than a Permitted Lien, has been recorded, or to the knowledge of the Borrower, threatened in writing under any Environmental Law with respect to any Real Property owned by the Borrower or any Restricted Subsidiary; (d) neither the Borrower nor any of its Restricted Subsidiaries has agreed to contractually assume or accept responsibility for any liability of any other Person under any Environmental Law; and (e) to the knowledge of Borrower, there are no facts, circumstances, conditions or occurrences with respect to the past or present business or operations of the Borrower or any of its Restricted Subsidiaries that would reasonably be expected to give rise to any Environmental Claim against the Borrower or any of its Restricted Subsidiaries or any liability of the Borrower or any of its Restricted Subsidiaries under any Environmental Law.

8.17     Employment and Labor Relations

Neither the Borrower nor any of its Restricted Subsidiaries is engaged in any unfair labor practice that would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.  There (i) is no unfair labor practice complaint pending against the Borrower or any of its Restricted Subsidiaries or, to the knowledge of the Borrower, threatened against any of them, before the National Labor Relations Board, and no grievance or any arbitration proceeding arising out of or under any collective bargaining agreement is so pending against the Borrower or any of its Restricted Subsidiaries or, to the knowledge of the Borrower, threatened in writing against any of them, (ii) is no strike, labor dispute, concerted slowdown or concerted stoppage pending against the Borrower or any of its Restricted Subsidiaries or, to the knowledge of the Borrower, threatened in writing against the Borrower or any of its Restricted Subsidiaries, (iii) is no union representation question existing with respect to the employees of the Borrower or any of its Restricted Subsidiaries, (iv) are no equal employment opportunity charges or other claims of employment discrimination pending or, to the knowledge of the Borrower, threatened in writing against the Borrower or any of its Restricted Subsidiaries and (v) to the knowledge of the Borrower, there is no wage and hour department investigation that has been made of the Borrower or any of its Restricted Subsidiaries, except (with respect to any matter specified in clauses (i) – (v) above, either individually or in the aggregate) such as would not reasonably be expected to have a Material Adverse Effect.

8.18     Intellectual Property, etc.

Each of the Borrower and each of its Restricted Subsidiaries owns or has the right to use all the patents, trademarks, permits, domain names, service marks, trade names, copyrights, licenses, inventions, trade secrets, proprietary information and know-how of any type, whether or not written (including rights in computer programs and databases) and formulas, or rights with respect to the foregoing, without any

known conflict with the rights of others which, or the failure to own or have which, as the case may be, would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

8.19    USA Patriot Act; OFAC; FCPA.

(a)    To the extent applicable, each of the Borrower and its Subsidiaries is in compliance, in all material respects, with (i) the Trading with the Enemy Act of the United States of America (50 U.S.C. App. §§ 1 et seq.) (as amended, the "Trading with the Enemy Act"), and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (ii) the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (as amended from time to time, the "Act"), (iii) the FCPA and (iv) OFAC.

(b)    None of the Borrower, any of the Borrower's Subsidiaries nor, to the knowledge of the Borrower, any director or officer of the Borrower or any Subsidiary is subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC"); and the Borrower will not directly or (to its knowledge) indirectly use the proceeds of the Loans or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person subject to any U.S. sanctions administered by OFAC.

(c)    No part of the proceeds of the Loans will be used by the Borrower or its Restricted Subsidiaries, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.  No Credit Party (i) is a Person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or to its knowledge is otherwise associated with any such Person in any manner that violates Section 2 of such executive order or (iii) is a Person on the list of "Specially Designated Nationals and Blocked Persons" or subject to the limitations or prohibitions under any other OFAC regulation or executive order.

8.20    Practice Groups.  No Practice Group has (a) incurred any Indebtedness in excess of $3,000,000 in the aggregate when taken together with all such Indebtedness of all Practice Groups (other than Indebtedness consisting of Investments permitted to be outstanding in or to a Practice Group pursuant to Section 10.05), (b) granted any Liens (other than Permitted Liens) or (c) owns any assets (whether in the form of personal or real property) other than, with respect to this clause (c), (i) operational equipment which is worth less than $500,000 per Practice Group, (ii) cash which is paid to a Practice Group under and pursuant to the applicable Management/Services Agreement and (iii) accounts generated by such Practice Group in the ordinary course of business and cash and non-cash proceeds received by such Practice Group on account thereof.

8.21    Healthcare Matters.

(a)    Each of the Borrower and its Restricted Subsidiaries and each Practice Group and, to the Borrower's knowledge, each of their licensed employees, and, with respect to their activities pertaining to the business, their agents or contractors, are in compliance with all Health Care Laws applicable to such entity or person, as applicable, such entity's or person's, as applicable, business or operations, except for such non-compliance as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)      None of the Borrower and its Restricted Subsidiaries or Practice Groups, nor any officer, director or managing employee thereof, is (i) excluded from any Governmental Program pursuant to 42 U.S.C. § 1320a-7b and related regulations or (ii) "suspended" or "debarred" from selling products to the U.S. government or its agencies pursuant to the Federal Acquisition Regulation, relating to debarment and suspension applicable to federal government agencies generally (42 C.F.R. Subpart 9.4), or other applicable laws or regulations, (iii) debarred, disqualified, suspended or excluded from participation in Medicare, Medicaid or any other health care program (collectively, "Healthcare Programs") or is listed on the General Services Administration list of excluded parties, nor is any such debarment, disqualification, suspension or exclusion threatened in writing or pending or (iv) party to any other action by any Governmental Authority that would reasonably be expected to result in such Person being prohibited by any Health Care Law from selling products or providing services to any governmental or other purchaser pursuant to any federal, state or local laws or regulations, in each case except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)      There are no pending or, to the Borrower's knowledge, threatened in writing non-ordinary course inquiries, inspections, audits, overpayments, qui tam actions, appeals, investigations or claims or other actions which relate to a violation of any Health Care Laws or legal requirement pertaining to Healthcare Programs or which are reasonably likely to be, if resolved in a manner adverse to the Borrower, its Restricted Subsidiaries  or any Practice Group, would result in the imposition of any penalties, restrict their ability to conduct their respective businesses as currently conducted in any respect or their exclusion from participation in any Healthcare Program, in each case except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.22    Solvency

On the Closing Date, immediately after giving effect to the Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

8.23    Beneficial Ownership.  As of the Closing Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

SECTION 9.    Affirmative Covenants.

The Borrower hereby covenants and agrees (as to itself and, if applicable, the Restricted Subsidiaries and, solely in the case of Section 9.05, the Practice Groups) that on and after the Closing Date and until the Total Commitment has terminated and the Loans, Notes (together with interest thereon), Fees and all other Obligations (other than contingent obligations which are not then due and payable and other than obligations under any Cash Management Agreement, Interest Rate Protection Agreement or Other Hedging Agreement with a Guaranteed Creditor) incurred hereunder and thereunder, are paid in full:

9.01    Information Covenants.  The Borrower will furnish to the Lenders and the Administrative Agent:

(a)      Quarterly Financial Statements.  Within 45 days after the close of each of the first three (3) Fiscal Quarters of the Borrower, beginning with the Fiscal Quarter ended March 31, 2026 (and within 75 days, in the case of the Fiscal Quarters ending June 30, 2025 and September 30, 2025), the consolidated balance sheet of the Borrower and its Consolidated Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of income and retained earnings and statement of cash flows for such quarterly accounting period and for the elapsed portion of the Fiscal Year ended with the last day of such quarterly accounting period, in each case setting forth (x) beginning

with the quarterly accounting period ending June 30, 2026, comparative figures for the corresponding quarterly accounting period in the prior Fiscal Year and (y) beginning with the quarterly accounting period ending June 30, 2026, comparable budgeted figures for such quarterly accounting period as set forth in either (1) in the case of any period ending in Fiscal Year ended December 31, 2025, the Projections or (2) thereafter, the respective projections delivered pursuant to Section 9.01(d), together with management's discussion and analysis describing results of operations in the form customarily prepared by management of the Borrower, all of which shall be certified by an Authorized Officer of the Borrower that they fairly present in all material respects in accordance with GAAP the financial condition of the Borrower and its Consolidated Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes.

(b)      Annual Financial Statements.  Within (x) 150 days after the close of the Fiscal Year of the Borrower ending December 31, 2025 (for the period from the Closing Date to December 31, 2025) and (y) 120 days after the close of each subsequent Fiscal Year of the Borrower, the consolidated balance sheet of the Borrower and its Consolidated Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income and retained earnings and statement of cash flows for such Fiscal Year setting forth (commencing with the Fiscal Year ending December 31, 2026) comparative figures for the preceding Fiscal Year, together with management's discussion and analysis describing results of operations in the form customarily prepared by management of the Borrower, and certified by an independent certified public accounting firm of recognized national standing or any other independent certified public accounting firm reasonably acceptable to the Administrative Agent, accompanied by an opinion of such accounting firm (which opinion shall be without a "going concern" or like qualification or exception and without any qualification or exception as to scope of audit, (other than solely as a result of, (x) current debt maturity and/or (y) any actual or potential inability to satisfy the Financial Covenant and/or exceptions for qualifications relating to change in accounting principles or practices reflecting a change in GAAP and required or approved by such independent certified public accountants).

Simultaneously with the delivery of each set of financial statements referred to in Sections 9.01(a) and (b) above, the Borrower shall furnish, if applicable, the related unaudited financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such financial statements.

(c)      Management Letters.  Promptly after the Borrower's or any of its respective Restricted Subsidiaries' receipt thereof, a copy of any final "management letter" received from its certified public accountants and management's response thereto in connection with each annual audit of the financial statements of the Borrower made by such accountants, subject to such confidentiality limitations as may be required by such independent public accountants in writing.

(d)      Projections.  Within 60 days after the beginning of each Fiscal Year of the Borrower, commencing with the Fiscal Year commencing January 1, 2026, reasonably detailed projections of the Borrower and its Consolidated Subsidiaries, for each Fiscal Quarter of such Fiscal Year, in a form substantially consistent with the Projections (including statements of income, cash flow statement and balance sheets for the Borrower and its Consolidated Subsidiaries) for each of the four Fiscal Quarters of such Fiscal Year in reasonable detail setting forth, with appropriate discussion, the principal assumptions upon which such projections are based.

(e)      Officer's Certificates.  No later than five (5) Business Days after the delivery of the financial statements provided for in Section 9.01(a) (solely with respect to each of the first three quarterly accounting periods in each Fiscal Year of the Borrower) and Section 9.01(b), a compliance certificate from an Authorized Officer of the Borrower in substantially the form of Exhibit H (with blanks

appropriately completed and with any deviations from such form as may be acceptable to the Administrative Agent (acting at the direction of the Required Lenders)) certifying on behalf of the Borrower that, to such officer's knowledge after due inquiry, no Default or Event of Default has occurred and is continuing or, if any Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof, which certificate shall (i) set forth in reasonable detail the calculations required to establish whether the Borrower and its Restricted Subsidiaries were in compliance with the Financial Covenant at the end of such Fiscal Quarter or Fiscal Year, as the case may be, (ii) [reserved], (iii) if delivered with the financial statements required by Section 9.01(b), beginning with the Fiscal Year ending December 31, 2026, set forth in reasonable detail the amount of (and the calculations required to establish the amount of) Excess Cash Flow for the respective Excess Cash Payment Period, and the amount (if any) of the mandatory repayment amount required by Section 5.02(f), (iv) identify each Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary as of the date of delivery of such certificate or a confirmation that there is no change in such information since the later of the Closing Date and the date of the last such certificate, (v) identify each Immaterial Subsidiary as of the date of delivery of such certificate or confirmation that there is no change in such information since the later of the Closing Date and the date of the last such certificate, and (vi) set forth in reasonable detail (and the calculations required to establish) the Available Amount and any utilizations of such Available Amount since the date of the last such certificate.

(f)      Liquidity Reporting. No later than five (5) Business Days prior to (i) the end of each Fiscal Quarter and (ii) each Interest Payment Date (to the extent such Interest Payment Date is not the same date as the last day of the then-current Fiscal Quarter), a certificate from an Authorized Officer of the Borrower in substantially the form of Exhibit L (the "Liquidity Certificate"), which certificate shall set forth, among other things, the calculation (as reasonably projected and determined by the Borrower) of Liquidity as of the last day of such Fiscal Quarter.

(g)      Notice of Default, Litigation and Material Adverse Effect.  Promptly, and in any event within five (5) Business Days after any senior officer of the Borrower or any of its Restricted Subsidiaries obtains knowledge thereof, notice of (i) the occurrence of any event which constitutes an Event of Default, (ii) any litigation or governmental investigation or proceeding pending against the Borrower or any of its Restricted Subsidiaries (x) which, either individually or in the aggregate, has been adversely determined or has a reasonable likelihood of adverse determination and such adverse determination has had, or would reasonably be expected to have, a Material Adverse Effect or (y) with respect to any Credit Document, or (iii) any other event, change or circumstance that has had, or would reasonably be expected to have, a Material Adverse Effect.

(h)      Other Reports and Filings.  Promptly after the filing or delivery thereof, copies of all material financial information, proxy materials and reports, if any, which the Borrower or any of its Restricted Subsidiaries shall publicly file with the Securities and Exchange Commission or any successor thereto (the "SEC") or deliver generally to holders (or any trustee, agent or other representative therefor) of any Junior Financing Documentation for Junior Financing in excess of the Threshold Amount (in each case to the extent not otherwise provided hereunder).

(i)      Other Information.

(i)      Promptly following written request, such other information or documents (financial or otherwise) regarding the operations, business affairs and financial condition of the Borrower or any its Restricted Subsidiaries as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request.

(ii)      (1) Promptly following written request, information and documentation reasonably requested by the Administrative Agent or any Lender (including any prospective Lender) for purposes of compliance with applicable "know your customer" requirements under the Patriot Act, the Beneficial Ownership Regulation or other applicable anti-money laundering laws and (2) promptly upon actual knowledge thereof by an Authorized Officer, written notice of any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

Notwithstanding anything to the contrary contained in this Section 9.01, none of the Borrower or any of its Subsidiaries shall be required to deliver to the Administrative Agent or any Lender any information (i) subject to confidentiality agreements or attorney client or similar privilege or constitutes attorney work-product, (ii) that constitutes non-financial trade secrets or non-financial proprietary information or (iii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by applicable law.

Notwithstanding the foregoing, the obligations in Section 9.01(a), the first paragraph of Section 9.01(b) and Section 9.01(h) shall be satisfied with respect to financial information or other information of the Borrower and its Consolidated Subsidiaries by furnishing (A) the applicable financial statements of the Borrower (or any direct or indirect parent company thereof that, directly or indirectly, holds all of the Equity Interests of the Borrower and holds no other material assets other than the Equity Interests of the Borrower) or (B) the Borrower's (or any direct or indirect parent company thereof that, directly or indirectly, holds all of the Equity Interests of the Borrower and holds no other material assets other than the Equity Interests of the Borrower) Form 8-K, 10-K or 10-Q, as applicable, filed with the SEC; provided, that (x) with respect to clauses (A) and (B), to the extent such information is in lieu of information required to be provided under Section 9.01(b), such materials are accompanied by a report and opinion of an independent registered public accounting firm of recognized nationally standing or other public accounting firm reasonably acceptable to the Administrative Agent, which report and opinion shall otherwise comply with the requirements related thereto in Section 9.01(b) and (y) the information required by the last paragraph of Section 9.01(b) is also so furnished or otherwise provided to the Administrative Agent.

Financial information required to be delivered pursuant to Sections 9.01(a), (b), (d), (e) or (h) (in each case, solely to the extent such financial information is included in materials filed with the SEC or posted on the relevant website, as the case may be) shall be deemed to have been delivered to the Lenders and the Administrative Agent (to the extent received by the Administrative Agent by the Borrower before 5 p.m. on the applicable Business Day) on the date on which such information has been posted on the Borrower's behalf on the Platform (which is accessible to all Lenders) maintained by the Administrative Agent or is available via the EDGAR system of the SEC on the Internet; provided that in each case the Borrower shall (i) promptly notify the Administrative Agent of the posting of any such information, (ii) to the extent such information is in lieu of information required to be provided under the first paragraph of Section 9.01(b), the Borrower separately delivers to the Lenders and the Administrative Agent a report of an independent certified public accounting firm of recognized national standing or other independent certified public accounting firm reasonably acceptable to the Required Lenders, which report shall otherwise comply with the requirements related thereto in Section 9.01(b)) and (iii) promptly deliver paper copies of any such other documents to the Administrative Agent if the Administrative Agent or any Lender (through the Administrative Agent) reasonably requests in writing the Borrower to furnish such paper copies until written notice to cease delivering such paper copies is given by any Lender or the Administrative Agent.

Notwithstanding anything to the contrary contained herein, any requirement in this Agreement that any notice, document or deliverable is required to be delivered or otherwise provided to the Lenders

or the Required Lenders may be satisfied by the posting of such notice, document or deliverable to the Platform (with written notice of such posting to the Administrative Agent), provided, that specifically with respect to the deliverables pursuant to Section 6 due on the date hereof, such deliverables shall be deemed delivered on the Closing Date by delivery to counsel to the Administrative Agent and counsel to the Lenders.

9.02    <u>Books, Records and Inspections; Quarterly Lender Calls</u>.

(a)    The Borrower will, and will cause each of its Restricted Subsidiaries to, keep proper books of record and accounts in which full, true and correct (in all material respects) entries in conformity with GAAP (it being understood and agreed that Foreign Subsidiaries may maintain individual books and records in conformity with generally accepted accounting principles that are applicable in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder) and all requirements of law shall be made of all material dealings and transactions in relation to its business and activities.  The Borrower will, and will cause each of its Restricted Subsidiaries to, permit officers and designated representatives of the Administrative Agent to visit and inspect, under guidance of officers of the Borrower or such Restricted Subsidiary, any of the properties of the Borrower or such Restricted Subsidiary, and to examine the books of account of the Borrower or such Restricted Subsidiary and discuss the affairs, finances and accounts of the Borrower or such Restricted Subsidiary with, and be advised as to the same by, its and their officers and independent accountants, all upon reasonable prior written notice and at such reasonable times as mutually agreed and to such reasonable extent as the Administrative Agent may reasonably request (at the written request of the Required Lenders); <u>provided</u> that the Administrative Agent (at the written request of the Required Lenders) shall give the Borrower an opportunity to participate in any discussions with its accountants; <u>provided</u> <u>further</u> that, (i) only the Administrative Agent on behalf of, and at the written direction of, the Lenders may exercise the rights of the Administrative Agent and the Lenders under this Section 9.02(a) and (ii) in the absence of an Event of Default that has occurred and is continuing, the Administrative Agent shall not exercise its rights under this Section 9.02(a) more often than once during any Fiscal Year (which such sole visit shall be at the Borrower's reasonable expense); and <u>provided</u>, <u>further</u>, that when an Event of Default exists, the Administrative Agent and its designees (at the written direction of the Required Lenders) may do any of the foregoing at the reasonable expense of the Borrower at any time during normal business hours and upon reasonable advance written notice; <u>provided</u>, <u>further</u> that none of the Borrower or any Restricted Subsidiary shall be required to disclose (i) records of the Board of Directors of the Borrower or such Restricted Subsidiary, (ii) information restricted by a third party confidentiality agreement and (iii) other information (x) that constitutes non-financial trade secrets or non-financial proprietary information, (y) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by applicable law or (z) that is subject to attorney client or similar privilege or constitutes attorney work-product.

(b)    Commencing with the Fiscal Quarter ending June 30, 2025, promptly after the date of the delivery (or, if later, required delivery) of the financial information pursuant to Section 9.01(a) or (b), as applicable, if reasonably requested by the Administrative Agent (at the written direction of the Required Lenders), the Borrower will hold a conference call or teleconference, at a time selected by the Borrower and reasonably acceptable to the Administrative Agent, at the written direction of all of the Lenders that choose to participate, to review the financial results of the previous Fiscal Quarter or Fiscal Year, as applicable, and the financial condition of the Borrower and its Restricted Subsidiaries and the projections presented for the current Fiscal Quarter or Fiscal Year, as applicable, of the Borrower and its Restricted Subsidiaries.

9.03    Maintenance of Property; Insurance

(a)    The Borrower will, and will cause each of their respective Restricted Subsidiaries to, (i) keep all tangible property necessary to the business of the Borrower and their respective Restricted Subsidiaries in good working order and condition, ordinary wear and tear excepted and subject to the occurrence of casualty and condemnation events, except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (ii) maintain with financially sound and reputable insurance companies insurance on all such property and against all such risks as is consistent and in accordance with industry practice for companies similarly situated owning similar properties and engaged in similar businesses as the Borrower and their respective Restricted Subsidiaries (after giving effect to any self-insurance reasonable and customary for similar situated Persons engaged in the same or similar business as the Borrower and their respective Restricted Subsidiaries) as reasonably determined by the Borrower, and (iii) furnish to the Administrative Agent, promptly following its reasonable written request therefor, full information as to the insurance carried; provided, so long as no Specified Default or Event of Default pursuant to Section 11.03 (solely as a result of the failure to comply with the Financial Covenant) has occurred and is continuing, the Administrative Agent (at the written direction of the Required Lenders) may only make such request one time in any Fiscal Year.  Such insurance shall include physical damage insurance on all material real and personal property (whether now owned or hereafter acquired) on an all risk basis and business interruption insurance.  The provisions of this Section 9.03 shall be deemed supplemental to, but not duplicative of, the provisions of any Security Documents that require the maintenance of insurance.

(b)    The Borrower will, will cause each other Credit Party to, at all times keep its Collateral insured to the extent required above in favor of the Collateral Agent, and all policies or certificates (or copies thereof) with respect to such insurance (and any other insurance maintained by the Borrower and/or such other Credit Party) (i) shall be endorsed to the Collateral Agent's reasonable satisfaction for the benefit of the Collateral Agent (including by naming the Collateral Agent as loss payee and/or additional insured), (ii) shall state that such insurance policies shall not be canceled without at least 10 days' prior written notice thereof by the respective insurer to the Collateral Agent, and (iii) shall request that such insurance provide that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Collateral Agent and the other Secured Creditors.

(c)    If the Borrower or any of its Restricted Subsidiaries shall fail to maintain insurance in accordance with this Section 9.03, or if the Borrower or any of its Restricted Subsidiaries shall fail to so endorse such policies or certificates with respect thereto, the Administrative Agent shall have the right (but shall be under no obligation), upon ten (10) Business Days' prior written notice from the Administrative Agent (at the written direction of the Required Lenders), to procure such insurance and the Borrower agrees to reimburse the Administrative Agent for all reasonable out-of-pocket costs and expenses of procuring such insurance in accordance with Section 13.01(a) hereof.

(d)    If at any time any improvement on a Mortgaged Property is located in an area identified as a special flood hazard area by the Federal Emergency Management Agency or any successor thereto or other applicable agency with respect to which flood insurance has been made available under the Flood Insurance Laws, then the Borrower will and will cause each of its Restricted Subsidiaries to (i) at all times, maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and on such terms sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable the Administrative Agent (at the written direction of the Required Lenders).  Following the Closing Date, the Borrower shall deliver to the Administrative Agent annual renewals of such flood insurance.  As a condition precedent to any amendment to this Agreement pursuant to which any increase, extension, or renewal of Loans is

contemplated, the Borrower shall cause to be delivered to the Administrative Agent for any Mortgaged Property, a completed "life of the loan" Federal Emergency Management Agency Standard Flood Hazard Determination, duly executed and acknowledged by the appropriate Credit Parties, and evidence of flood insurance, as may be required pursuant to the Flood Insurance Laws.

9.04   Existence; Franchises

The Borrower will, and will cause each of its Restricted Subsidiaries to, do or cause to be done, all things necessary, to preserve and keep in full force and effect its existence and its rights, franchises, licenses, permits, copyrights, trademarks, patents and other intellectual property; provided, however, that nothing in this Section 9.04 shall prevent (i) sales of assets, dispositions and other transactions by the Borrower or any of its Restricted Subsidiaries in accordance with the terms herein, (ii) the withdrawal by the Borrower or any of its Restricted Subsidiaries of its qualification as a foreign Company in any jurisdiction or (other than with respect to the Borrower) failure to otherwise preserve or keep in full force and effect its existence or rights, franchises, licenses, permits, copyrights, trademarks, patents or other intellectual property, if such withdrawal or failure would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (iii) the expiration of copyrights or patents at the end of their statutory term.

9.05   Compliance with Laws, etc.

The Borrower will, will cause each of its Restricted Subsidiaries to, and will use commercially reasonable efforts to cause each Practice Group to, comply with all applicable laws, statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property (including applicable laws, statutes, regulations, orders and restrictions arising under Health Care Laws and Environmental Laws and those laws and regulations referred to in Section 8.19), except such non-compliances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

9.06   Compliance with Environmental Laws

(a)   The Borrower will comply, and will cause each of its Restricted Subsidiaries to comply, with all Environmental Laws and permits issued under Environmental Laws applicable to the Borrower's, or its Restricted Subsidiaries' ownership, lease or use of any Real Property now or hereafter owned, leased or operated by the Borrower or any of its Restricted Subsidiaries, except such noncompliances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and will promptly pay or cause to be paid all costs and expenses incurred in connection with such compliance, and conduct all remedial or corrective actions required under Environmental Laws in connection with such compliance, and will keep or cause to be kept all such Real Property free and clear of any Liens (other than Permitted Liens) imposed pursuant to such Environmental Laws, except for Liens imposed on leased Real Property resulting from the acts or omissions of the owner of such leased Real Property or of other tenants of such leased Real Property who are not within the control of a Credit Party.

(b)   (i) at any time that the Borrower or any of its Restricted Subsidiaries is not in compliance with Section 9.06(a) or (ii) in the event that the Administrative Agent or the Lenders have exercised any of the remedies pursuant to Section 11 relating to an Event of Default, the Borrower will provide, at the sole expense of the Borrower and at the written request of the Administrative Agent (as directed in writing by the Required Lenders), an environmental site assessment report concerning the Real Property owned, leased or operated by the Borrower or any of its Restricted Subsidiaries related to such noncompliance with Section 9.06(a) or such Event of Default, prepared by an environmental consulting

firm reasonably approved by the Administrative Agent, reasonably related in scope to such noncompliance with Section 9.06(a) or Event of Default, indicating, where relevant to the subject matter of the request, the presence of Hazardous Materials and the reasonably expected cost of any removal or remedial action required under Environmental Law in connection with such Hazardous Materials on such Real Property. If the Borrower fails to provide the same within 45 days after such request was made, the Administrative Agent (as directed in writing by the Required Lenders) may order the same, the reasonable cost of which shall be borne by the Borrower, and the Borrower shall grant to the Administrative Agent and the Lenders and their respective agents access to such Real Property to undertake such an assessment at any reasonable time upon reasonable written notice to the Borrower, all at the sole expense of the Borrower.

9.07    Business, etc.

The Borrower will only, and will only permit its Restricted Subsidiaries to, engage directly or indirectly in the businesses engaged in by the Borrower and the Restricted Subsidiaries as of the Closing Date and reasonable extensions thereof and businesses ancillary, corollary, synergistic or complementary thereto.

9.08    [Reserved].

9.09    Payment of Obligations.

The Borrower will, and will cause each of its Restricted Subsidiaries to, pay, discharge or otherwise satisfy as the same shall become due and payable, all of its obligations and liabilities, including Tax liabilities, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP, except to the extent that the failure to pay such amounts would not reasonably be expected to have a Material Adverse Effect.

9.10    Treatment of Restricted Cash.

(a)    On December 31, 2025, the Borrower shall designate as Unrestricted all cash and Cash Equivalents of the Borrower and its Restricted Subsidiaries that were Restricted as of the Closing Date (other than such amounts that were contemplated in the Projections to be used after December 31, 2025), and on such date the Borrower shall deliver to the Administrative Agent and the Lenders an updated consolidated balance sheet of the Borrower and its Restricted Subsidiaries reflecting such designation.

(b)    Within ten (10) Business Days after the incurrence of a Permitted Revolving Facility after the Closing Date, the Borrower shall designate as Unrestricted all cash and Cash Equivalents of the Borrower and its Restricted Subsidiaries that were Restricted as of the Closing Date for the purposes of cash collateral that were necessary for new or existing customer contracts (as set forth in the Projections) but are no longer necessary to be Restricted as a result of availability under such Permitted Revolving Facility, and on such date of designation the Borrower shall deliver to the Administrative Agent and the Lenders an updated consolidated balance sheet of the Borrower and its Restricted Subsidiaries reflecting such designation; provided that the Borrower and is Restricted Subsidiaries shall not be required to make any draw on the Permitted Revolving Facility other than the incurrence of letters of credit thereunder in order to comply with this provision.

9.11    Additional Security; Further Assurances; etc.

(a)    The Borrower will, and will cause each other Credit Party to, grant to the Collateral Agent for the benefit of the Secured Creditors security interests in and Mortgages on such assets and Real

Property of the Borrower and such other Credit Party (other than Excluded Collateral) as are not covered by the Security Documents in effect on the Closing Date and as may be reasonably requested in writing from time to time by the Administrative Agent or the Collateral Agent (at the written direction of the Required Lenders) (collectively, as amended, restated, supplemented or otherwise modified from time to time, the "Additional Security Documents").  All such security interests and Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Collateral Agent, the Lenders, and the Borrower and shall constitute valid, enforceable (except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law)) first-priority Liens (subject to Permitted Liens) under applicable U.S. law and perfected security interests and Mortgages superior to and prior to the rights of all third Persons and subject to no other Liens, in each case, except for Permitted Liens.  The Additional Security Documents or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by U.S. law to establish, perfect (if and to the extent the assets subject to the applicable Additional Security Document can be perfected by the actions required by such Additional Security Document), preserve and protect the Liens in favor of the Collateral Agent required to be granted pursuant to the Additional Security Documents and all material taxes, fees and other charges payable in connection therewith shall be paid in full by the Borrower to the extent due and owing.  Notwithstanding the foregoing, this Section 9.11(a) shall not apply to (and the Borrower and the other Credit Parties shall not be required to grant a Mortgage in) (i) any owned Real Property the Fair Market Value of which (as reasonably determined by the Borrower in good faith) is less than or equal to $5,000,000, or (ii) any Leasehold Real Property.

(b)     The Borrower will, and will cause each of the other Credit Parties to, at the expense of the Borrower, but subject to the limitations set forth herein and the other Security Documents, make, execute, endorse, acknowledge, authorize, file and/or deliver to the Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory collateral assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, real property surveys, reports, assignments, and other documents, assurances or instruments and take such further steps relating to the Collateral  covered by any of the Security Documents as the Collateral Agent may reasonably require in writing.  Furthermore, the Borrower will, and will cause the other Credit Parties to, deliver to the Collateral Agent with respect to each of the Mortgaged Properties such customary opinions of counsel, Mortgage Policies, completed "life of the loan" Federal Emergency Management Agency Standard Flood Hazard Determinations with respect to such Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance), duly executed and acknowledged by the applicable Credit Party if required by the Flood Insurance Laws, together with evidence of flood insurance, to the extent required under Section 9.03(d) hereof and other related documentation as and when may reasonably be requested in writing by the Collateral Agent in order to assure itself that Section 9.11(a) has been complied with.  Notwithstanding the foregoing, nothing in this Agreement shall require any Credit Party to (i) make any filings or take any other action to record or perfect the Collateral Agent's Lien in any Collateral (including, but not limited to, intellectual property) outside the United States or (ii) take any actions in any non-U.S. jurisdiction or that are required by the laws of any non-U.S. jurisdiction in order to (x) create any security interests in assets located or titled outside of the U.S. or (y) perfect such security interests (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction).

(c)     If the Administrative Agent or the Required Lenders reasonably determine that they are required by law or regulation to have appraisals prepared in respect of any Mortgaged Property, the Borrower will, at their own expense, provide to the Administrative Agent appraisals which satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of the Financial Institution

Reform, Recovery and Enforcement Act of 1989, as amended, and which shall otherwise be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

(d)        The Borrower agrees that each action required by clauses (a) through (c) of this Section 9.11 shall, (i) be completed within 60 days after such action is requested in writing to be taken by the Administrative Agent, the Collateral Agent or the Required Lenders (or such later date as extended by the Administrative Agent at the written authorization of the Required Lenders), or (ii) with respect to any Closing Date Mortgaged Property, be completed within 90 days after the Closing Date (or such later date as extended by the Administrative Agent at the written direction of the Required Lenders).

(e)        After the Closing Date, upon (i) the formation (including by division) or acquisition of any Restricted Subsidiary (in each case, other than an Excluded Subsidiary), (ii) any Excluded Subsidiary ceasing to constitute an Excluded Subsidiary or (iii) the designation in accordance with Section 9.12 of any existing Wholly-Owned Domestic Subsidiary (other than an Excluded Subsidiary) as a Restricted Subsidiary: within sixty (60) days after such formation, acquisition, cessation or designation, or such longer period as the Administrative Agent may agree (at the written authorization of the Required Lenders), the Borrower will (I) cause each such Restricted Subsidiary that is required to become a Guarantor to duly execute and deliver to the Administrative Agent or the Collateral Agent (as appropriate) joinders to the applicable Security Documents, as reasonably requested by and in form and substance reasonably satisfactory to the Administrative Agent (at the written direction of the Required Lenders) (consistent with the Security Documents in effect on the Closing Date), in each case granting first-priority Liens (subject to Permitted Liens) required by this Section 9.11 or the Security Documents, (II) cause such Restricted Subsidiary that is required to become a Guarantor to take whatever action (including the recording of Mortgages, the filing of UCC financing statements and delivery of stock and membership interest certificates) as may be necessary in the reasonable opinion of the Collateral Agent (at the written direction of the Required Lenders) to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid and perfected Liens to the extent required by the Credit Documents, and to otherwise comply with the requirements in this Section 9.11 or the Security Documents, (III) cause each such Restricted Subsidiary that is required to become a Guarantor (and the parent of each such Restricted Subsidiary that is a Guarantor) to deliver any and all certificates representing Equity Interests (to the extent certificated) and intercompany notes (to the extent certificated) that are required to be pledged pursuant to the Security Documents, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and (IV) cause each such Restricted Subsidiary that is required to become a Guarantor to duly execute and deliver to the Administrative Agent a guaranty or guaranty supplement, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, guaranteeing the Obligations.

(f)        Notwithstanding anything to the contrary contained in this Section 9.11, the Administrative Agent shall not require perfection in, and no Credit Party shall be required to perfect, any assets constituting Collateral as to which the Administrative Agent shall determine, at the written direction of the Required Lenders, that the cost of perfecting a security interest in such asset is excessive in relation to the value of the security to be afforded thereby.

(g)        [Reserved].

(h)        No Credit Party shall be required to obtain landlord lien waivers, bailment lien waivers or estoppels letters with respect to any leased property of such Credit Party.

(i)        Liens required to be granted from time to time pursuant to this Section 9.11 shall be subject to exceptions and limitations set forth in this Agreement and the Security Documents.

9.12    Designation of Subsidiaries

The board of directors of the Borrower may at any time designate any Restricted Subsidiary (other than the Borrower) as an Unrestricted Subsidiary or designate (or re-designate, as the case may be) any Unrestricted Subsidiary as a Restricted Subsidiary; provided that (i) immediately before and after such designation (or re-designation), no Event of Default shall have occurred and be continuing or would result from any such designation and (ii) the status of any such Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary shall at all times be the same under this Agreement, and the documents governing any Incremental Facility. The designation of any Subsidiary as an Unrestricted Subsidiary shall constitute an Investment by the Borrower therein at the date of designation in an amount equal to the Fair Market Value as determined by the Borrower in good faith of the Borrower's or the applicable Restricted Subsidiary's (as applicable) Investment therein.  The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute, at the time of designation, the incurrence of any Indebtedness or Liens of such Subsidiary existing at such time and a return on any Investment by the Borrower in Unrestricted Subsidiaries pursuant to the preceding sentence in an amount equal to the Fair Market Value as determined by the Borrower in good faith at the date of such designation of the Borrower's or its Subsidiary's (as applicable) Investment in such Subsidiary.

9.13    Permitted Acquisitions

(a)     Subject to the provisions of this Section 9.13 and the requirements contained in the definition of "Permitted Acquisition," the Borrower and each Restricted Subsidiary may from time to time effect Permitted Acquisitions, so long as (in each case except to the extent the Required Lenders otherwise specifically agree in writing in the case of a specific Permitted Acquisition): (i) no Specified Default shall have occurred and be continuing at the time of execution of the agreement in respect of the proposed Permitted Acquisition or immediately after giving effect thereto and (ii) the Aggregate Consideration payable by any Credit Party that is attributable to all Persons and assets purchased or acquired pursuant to Permitted Acquisitions which do not become Credit Parties or Collateral directly held by a Credit Party shall not exceed $15,000,000.

(b)     At the time of each Permitted Acquisition involving the creation or acquisition of a Restricted Subsidiary, or the acquisition of Equity Interests of any Person, the Equity Interests acquired by a Credit Party in connection with such Permitted Acquisition or held by any Person that becomes a Credit Party in connection therewith (in each case other than, for the avoidance of doubt, Excluded Equity Interests) shall be pledged for the benefit of the Secured Creditors pursuant to (and to the extent required by) the Pledge Agreement and Section 9.11.

(c)     The Borrower will cause each Restricted Subsidiary which is formed to effect, or is acquired pursuant to, a Permitted Acquisition to comply with, and to execute and deliver all of the documentation as and to the extent required by, Section 9.11 to the reasonable satisfaction of the Administrative Agent and the Required Lenders.

9.14    Ratings

The Borrower shall use commercially reasonable efforts to obtain and maintain (i) a public corporate family rating of the Borrower and a rating of each Class of the Loans, in each case from Moody's, and (ii) a public corporate credit rating of the Borrower and a rating of each Class of the Loans, in each case from S&P (it being understood and agreed that the requirements of this Section 9.14 shall be deemed satisfied by the obtaining of cost estimates from Moody's and S&P, if such estimated costs are excessive in light of the circumstances (as determined by the Borrower in good faith)); provided that in no event shall the Borrower be required to maintain any specific rating with any such agency.

9.15    Compliance with PATRIOT Act, FCPA, OFAC, Anti-Terrorism and Anti-Money Laundering Laws

The Borrower will, and will cause each of its Restricted Subsidiaries to, comply with the PATRIOT Act, FCPA, OFAC and all other anti-terrorism, anti-corruption and anti-money laundering laws applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 10.    Negative Covenants.

The Borrower hereby covenants and agrees that on and after the Closing Date and until the Total Commitment has terminated and the Loans, Notes (together with interest thereon), Fees and all other Obligations (other than contingent obligations not then due and payable and other than obligations under any Cash Management Agreement, Interest Rate Protection Agreement or Other Hedging Agreement with a Guaranteed Creditor) incurred hereunder and thereunder, are paid in full:

10.01    Liens

The Borrower will not, and will not permit any of their respective Restricted Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property of the Borrower or any of its Restricted Subsidiaries, whether now owned or hereafter acquired; provided that the provisions of this Section 10.01 shall not prevent the creation, incurrence, assumption or existence of the following (Liens described below are herein referred to as "Permitted Liens"):

(i)      Liens for Taxes not yet due or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(ii)      Liens imposed by law, which do not secure Indebtedness for borrowed money, such as carriers,' warehousemen's, materialmen's and mechanics' liens and other similar Liens, in each case, arising in the ordinary course of business, and (x) which do not in the aggregate materially detract from the value of the Borrower's or such Restricted Subsidiary's property or assets or materially impair the use thereof in the operation of the business of the Borrower or such other Restricted Subsidiary or (y) which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(iii)      Liens with respect to any Permitted Surviving Debt, which are listed, and the property subject thereto described, in Schedule 10.01, plus renewals, replacements, refinancings, restructurings and extensions of such Liens; provided that (x) the aggregate principal amount of the Indebtedness, if any, secured by such Liens does not increase from that amount outstanding at the time of any such renewal, replacement or extension, plus accrued and unpaid interest, fees and expenses (including premium) incurred in connection with such renewal, replacement or extension and an amount equal to any unutilized commitments in respect of such Indebtedness and (y) any such renewal, replacement, refinancing, restructuring or extension does not encumber any additional assets or properties (other than the proceeds and products thereof and accessions thereto) of the Borrower or any of its Restricted Subsidiaries, unless such Lien is otherwise permitted under separate provisions of this Section 10.01;

(iv)      Liens created by or pursuant to this Agreement and the Security Documents;

(v)      (x) licenses, sublicenses, leases or subleases granted by the Borrower or any of its Restricted Subsidiaries to other Persons not materially interfering with the conduct of the business of the

Borrower or any of its Restricted Subsidiaries, (y) any interest or title of a lessor, sublessor, licensor or sublicensor under any lease or license agreement permitted by this Agreement to which the Borrower or any of its Restricted Subsidiaries is a party, and (z) licenses or sublicenses granted by the Borrower or any of its Restricted Subsidiaries to customers;

(vi)     Liens upon assets of the Borrower or any of its Restricted Subsidiaries subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by Section 10.04(iv); provided that (x) such Liens only serve to secure the payment of Indebtedness arising under such Capitalized Lease Obligation (or other permitted obligation) and (y) the Lien encumbering the asset giving rise to the Capitalized Lease Obligation does not encumber any asset of the Borrower or any of its Restricted Subsidiaries other than the proceeds of the assets giving rise to such Capitalized Lease Obligation; provided, further, that individual financings provided by one lender may be cross collateralized to other financings provided by such lender;

(vii)     Liens placed upon equipment, machinery or other fixed assets acquired or constructed after the Closing Date and used in the ordinary course of business of the Borrower or any of its Restricted Subsidiaries and placed at the time of the acquisition or construction thereof by the Borrower or such other Restricted Subsidiary or within 270 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition or construction of any such equipment, machinery or other fixed assets or extensions, renewals, refinancings, restructurings or replacements of any of the foregoing for the same or a lesser amount, provided that (x) the Indebtedness secured by such Liens is permitted by Section 10.04(iv) and (y) in all events, the Lien encumbering the equipment, machinery or other fixed asset so acquired or constructed does not encumber any asset of the Borrower or any of its Restricted Subsidiaries (other than the proceeds and products thereof and accessions thereto); provided, further, that individual financings provided by one lender may be cross collateralized to other financings provided by such lender;

(viii)     Liens which may arise as a result of zoning, building codes, and other land use laws regulating the use or occupancy of Real Property or the activities conducted thereon which are imposed by any Governmental Authority and which are not violated in any material way by the current use or occupancy of such Real Property, easements, rights-of-way, restrictions, encroachments, minor survey defects and other similar charges or encumbrances, minor title defects or irregularities affecting Real Property, in each case not securing Indebtedness and not materially interfering with the ordinary conduct of the business of the Borrower or any of its Restricted Subsidiaries, taken as a whole;

(ix)     Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the ordinary course of business;

(x)     attachment and judgment Liens in respect of decrees and judgments to the extent, and for so long as, such judgments and decrees do not, individually or in the aggregate constitute an Event of Default under Section 11.09;

(xi)     statutory and common law landlords' liens under leases to which the Borrower and its Restricted Subsidiaries is a party;

(xii)     Liens (other than Liens imposed under ERISA) incurred in the ordinary course of business in connection with workers compensation claims, unemployment insurance and social security benefits and Liens securing the performance of bids, tenders, public utilities or private utilities, leases and contracts in the ordinary course of business, statutory obligations, surety or appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business (exclusive of

obligations in respect of the payment for borrowed money), and obligations in respect of letters of credit or bank guaranties that have been posted to support payment of the Liens described in this clause (xii);

(xiii)     Permitted Encumbrances;

(xiv)     Liens on property or assets acquired pursuant to a Permitted Acquisition or other permitted Investment, or on property or assets of a Restricted Subsidiary of the Borrower in existence at the time such Restricted Subsidiary is acquired pursuant to a Permitted Acquisition or other permitted Investment; provided that (x) any Indebtedness that is secured by such Liens is permitted to exist under Section 10.04(vii) and (y) such Liens are not incurred in connection with, or in contemplation or anticipation of, such Permitted Acquisition or other permitted Investment and do not attach to any property or assets of the Borrower or any of its Restricted Subsidiaries other than the property and assets subject to such Liens at the time of such Permitted Acquisition or permitted Investment (and the proceeds and products thereof and accessions thereto) together with any extensions, renewals, refinancings, restructurings and replacements of the foregoing, so long as the Indebtedness secured by such Liens is permitted by Section 10.04(vii) and such extension, renewal, refinancing, restructuring or replacement does not encumber any assets or properties of the Borrower or any of its Restricted Subsidiaries (other than the proceeds and products or accessions of the assets subject to such Lien);

(xv)     Liens arising out of any conditional sale, title retention, consignment or other similar arrangements for the sale of goods entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business to the extent such Liens do not attach to any assets other than the goods subject to such arrangements;

(xvi)     Liens (x) incurred in the ordinary course of business in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or assets, and (y) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(xvii)     (w) bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any of its Restricted Subsidiaries, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank or banks with respect to cash management, automated clearing house transfers and operating account arrangements, (x) Liens of a collection bank arising under Section 4-210 of the UCC on items in the course of collection, (y) Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes and (z) Liens that are contractual rights of setoff or rights of pledge relating to purchase orders and other agreements entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(xviii)     Liens on (x) the Collateral securing obligations in respect of Indebtedness permitted under Section 10.04(xvii) that are on a pari passu (or junior) basis with the Liens securing the Obligations and that are subject to the Applicable Intercreditor Arrangements, (y) Indebtedness permitted under Section 10.04(iii), at any time outstanding not to exceed the sum of the Term Loans and the amount permitted under Section 10.04(xiv), that are on a pari passu (or junior) basis with the Liens securing a Permitted Revolving Facility or the Obligations and that are subject to the Applicable Intercreditor Arrangements, and (z) Indebtedness permitted under Section 10.04(xix) that are on a pari passu (or junior) basis with the Liens securing the Obligations and that are subject to the Applicable Intercreditor Arrangements;

(xix)     Liens granted in the ordinary course of business on insurance policies and proceeds thereof securing liability for premiums or reimbursement or indemnification obligations thereunder to the extent the financing is permitted under Section 10.04;

(xx)     (x) Liens on earnest money deposits of cash or Cash Equivalents or cash advances made in connection with any Permitted Acquisition or other permitted Investments or in respect of any anticipated Permitted Acquisition or other permitted Investment or (y) consisting of an agreement to dispose of any property in a disposition permitted under Section 10.02;

(xxi)     Liens on the Collateral securing any Permitted Revolving Facility, which may be senior in priority to the Liens securing the Obligations; provided that, in each case, such Liens shall be subject to the Applicable Intercreditor Arrangements;

(xxii)     Liens on assets of Foreign Subsidiaries or a Restricted Subsidiary that is not a Credit Party securing Indebtedness permitted to be incurred by such Subsidiary pursuant to Section 10.04;

(xxiii)     additional Liens of the Borrower or any of its Restricted Subsidiaries in addition to those otherwise permitted by this Section 10.01 that do not secure obligations, in excess of at any time outstanding the greater of (x) $12,000,000 and (y) 20% of Consolidated EBITDA (on a Pro Forma Basis) for the Test Period then last ended as of such time for which financial statements have been delivered pursuant to Section 9.01(a) or (b);

(xxiv)     in the case of any non-wholly owned Restricted Subsidiary, any put and call arrangements or restrictions on disposition related to its Equity Interests set forth in its organizational documents or any related joint venture or similar agreement;

(xxv)     ground leases in respect of Real Property on which facilities owned or leased by the Borrower or any of its Restricted Subsidiaries are located;

(xxvi)     Liens on property subject to any Sale-Leaseback Transaction permitted pursuant to Section 10.02(xviii);

(xxvii)     Liens securing any Permitted Securitization Financing;

(xxviii)     Liens on Equity Interests of Unrestricted Subsidiaries; and

(xxix)     Liens on cash collateral (y) deposited with issuers of performance or surety bonds or performance and completion guarantees or similar instruments or issuers of letters of credit issued to an issuer of performance or surety bonds or performance and completion guarantees or similar instruments, in each case issued or created in the ordinary course of business or (z) supporting letters of credit issued pursuant to Section 10.04(xxii) and (xxiii).

In connection with the granting of Liens of the type described in clauses (iii), (vi), (vii), (viii), (xiv), (xxi), (xxiii), (xxvi), (xxvii), (xxviii) and (xxix) of this Section 10.01 by the Borrower or any of its Restricted Subsidiaries, the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate by it in connection therewith (including by executing appropriate lien releases or lien subordination agreements in favor of the holder or holders of such Liens, in either case solely with respect to the item or items of equipment or other assets subject to such Liens).

10.02   Consolidation, Merger or Sale of Assets, etc.

The Borrower will not, and will not permit any of its Restricted Subsidiaries to, wind up, liquidate or dissolve, enter into any partnership, joint venture, or transaction of merger or consolidation, or convey, sell, lease or otherwise dispose of all or any part of its property or assets (other than sales of inventory in the ordinary course of business), or enter into any sale-leaseback transactions, except that:

(i)        the Borrower and its Restricted Subsidiaries may liquidate or otherwise dispose of obsolete or worn-out property, worn-out, uneconomical, surplus or no longer used property in the ordinary course of business or dispose of inventory, goods held for sale in the ordinary course of business and immaterial assets (including allowing any registrations or any applications for registration of any intellectual property to be cancelled, to lapse or go abandoned) in the ordinary course of business;

(ii)        Investments may be made to the extent permitted by Section 10.05;

(iii)        the Borrower and its Restricted Subsidiaries may sell assets (other than all or substantially all of the assets of the Borrower and its Restricted Subsidiaries (taken together)), so long as (v) at the time the agreement in respect of the proposed disposition is entered into no Event of Default then exists or would result therefrom, (w) each such sale is in an arm's-length transaction and the Borrower or such Restricted Subsidiary receives at least Fair Market Value, (x) if the assets sold have a Fair Market Value in excess of $7,500,000 for each such sale, the consideration (other than (A) the assumption by the transferee of Indebtedness or other liabilities contingent or otherwise of the Borrower or any of its Restricted Subsidiaries and the valid release of the Borrower or such Restricted Subsidiary, by all applicable creditors in writing, from all liability on such Indebtedness or other liability in connection with such disposition, (B) securities, notes or other obligations received by the Borrower or any of its Restricted Subsidiaries from the transferee that are converted by the Borrower or any of its Restricted Subsidiaries into cash or Cash Equivalents within 180 days following the closing of such disposition, (C) Indebtedness of any Restricted Subsidiary that is no longer a Restricted Subsidiary as a result of such disposition, to the extent that the Borrower and each other Restricted Subsidiary are released from any guaranty of payment of such Indebtedness in connection with such disposition, (D) consideration consisting of Indebtedness of the Borrower (other than Subordinated Indebtedness) received after the Closing Date from Persons who are not the Borrower or any Restricted Subsidiary and (E) in connection with a sale constituting an asset swap, the requirements of this clause (x) shall not apply) received consists of at least 75% cash or Cash Equivalents (<u>provided</u> that any Designated Non-Cash Consideration in respect of such sale paid at the time of the closing of such sale having an aggregate Fair Market Value, taken together with the Designated Non-Cash Consideration in respect of all other sales pursuant to this Section 10.02(iii), not in excess of $7,500,000 (with the Fair Market Value of each item of Designated Non-Cash Consideration being measured as of the time received) shall be deemed to be cash) and (y) the Net Sale Proceeds therefrom are applied and/or reinvested as (and to the extent) required by Section 5.02(e);

(iv)        the Borrower and its Restricted Subsidiaries may lease (as lessee) or license (as licensee) real or personal property (so long as any such lease or license does not create a Capitalized Lease Obligation except to the extent permitted by Section 10.04(iv));

(v)        the Borrower and its Restricted Subsidiaries may sell or discount, in each case without recourse and in the ordinary course of business, accounts receivable arising in the ordinary course of business, in connection with the compromise or collection thereof and not as part of any financing transaction;

(vi)        the Borrower and its Restricted Subsidiaries may grant (x) licenses, sublicenses, leases or subleases to other Persons not materially interfering with the conduct of the business of the Borrower or any of its Restricted Subsidiaries or (y) licenses or sublicenses to customers;

(vii)      the Borrower and its Restricted Subsidiaries may convey, sell or otherwise transfer property to the Borrower or any other Restricted Subsidiary; provided that if the transferor of such property is the Borrower or a Subsidiary Guarantor, (x) the transferee thereof must be the Borrower or a Subsidiary Guarantor or (y) during the term of this Agreement the aggregate amount of dispositions to a transferee that is not the Borrower or a Subsidiary Guarantor shall not exceed the greater of (1) $7,000,000 and (2) 12% of Consolidated EBITDA for the Test Period then last ended as of such time for which financial statements have been delivered pursuant to Section 9.01(a) or (b);

(viii)      any Restricted Subsidiary may merge, amalgamate or consolidate with and into, or (other than with respect to the Borrower) be dissolved or liquidated into, (x) the Borrower; provided that the Borrower shall be the continuing or surviving Person or (y) one or more other Restricted Subsidiaries; provided that when any such other Restricted Subsidiary that is a Credit Party is merging with a Restricted Subsidiary, the Borrower or a Subsidiary Guarantor shall be the continuing or surviving Person or the continuing or surviving Person shall become a Subsidiary Guarantor substantially concurrently with the transaction and the Borrower complies with the applicable requirements of Section 9.11;

(ix)      any Restricted Subsidiary may change its legal form if the Borrower determines in good faith that such action is in the best interest of the Borrower and its Subsidiaries and if not materially disadvantageous to the Lenders (it being understood that in the case of any change in legal form, a Restricted Subsidiary that is a Guarantor will remain a Guarantor unless such Guarantor is otherwise permitted to cease being a Guarantor hereunder);

(x)      Permitted Acquisitions may be consummated in accordance with the requirements of Section 9.13;

(xi)      the Borrower and its Restricted Subsidiaries may liquidate or otherwise dispose of Cash Equivalents;

(xii)      [reserved];

(xiii)      the Borrower and its Restricted Subsidiaries may cancel or abandon or allow lapse of any intellectual property rights which are, in the reasonable business judgment of the Borrower or any Restricted Subsidiary, no longer material to, or no longer used or useful in, the business of the Borrower or such Restricted Subsidiary;

(xiv)      the Borrower and its Restricted Subsidiaries may terminate or unwind any Interest Rate Protection Agreement or Other Hedging Agreement in accordance with its terms;

(xv)      the Borrower and its Restricted Subsidiaries may dispose of property and assets to the extent they were the subject of a casualty or of condemnation proceedings upon the occurrence of the related Recovery Event;

(xvi)      the Borrower and its Restricted Subsidiaries may dispose of property to the extent that (x) such property is exchanged for credit against the purchase price of similar replacement property or (y) the proceeds of such disposition are promptly applied to the purchase price of such replacement property;

(xvii)      to the extent constituting dispositions, the Borrower and its Restricted Subsidiaries may grant liens in the form of Permitted Liens and issue Restricted Payments permitted by Section 10.05;

(xviii)      the Borrower and its Restricted Subsidiaries may dispose of property pursuant to Sale-Leaseback Transactions; provided that the fair market value of all property of the Borrower or a

Subsidiary Guarantor so disposed of after the Closing Date shall not exceed the greater of (x) $6,000,000 and (y) 10% of Consolidated EBITDA for the Test Period then last ended for which financial statements have been delivered pursuant to Section 9.01(a) or (b);

(xix)     the Borrower and its Restricted Subsidiaries may swap assets in exchange for services or other assets in the ordinary course of business of comparable or greater value or usefulness to the business of the Borrower and its Restricted Subsidiaries as a whole, as determined in good faith by the management of the Borrower; provided, that to the extent any such assets constitute Collateral, the assets received in return shall become Collateral and the Borrower shall comply with Section 9.11 with respect to any such assets received in return;

(xx)     the Borrower and its Restricted Subsidiaries may dispose of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(xxi)     the Borrower and its Restricted Subsidiaries may (x) issue or sell any Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary or (y) dispose of other Excluded Collateral not to exceed in the aggregate $12,500,000;

(xxii)     the Borrower and its Restricted Subsidiaries may sell non-core assets acquired in connection with Permitted Acquisitions or other Investments; provided that (x) no Event of Default then exists or would result therefrom and (y) each such sale is in an arm's length transaction and the Borrower or the respective Restricted Subsidiary receives at least Fair Market Value;

(xxiii)     the Borrower and its Restricted Subsidiaries may make dispositions constituting any part of a Permitted Reorganization;

(xxiv)     the Borrower and its Restricted Subsidiaries may make dispositions or discounts made in connection with any Permitted Securitization Financing;

(xxv)     the Borrower and its Restricted Subsidiaries may make the dispositions listed on Schedule 10.02;

(xxvi)     the Borrower and its Restricted Subsidiaries may make dispositions of property not otherwise permitted under this Section 10.02; provided that (x) such dispositions shall not exceed the greater of (A) $6,000,000 and (B) 10% of Consolidated EBITDA and (y) the net cash proceeds therefrom shall not constitute Net Sale Proceeds except to the extent the aggregate amount of such net cash proceeds for all such dispositions pursuant to this clause (xxvi) is in excess of $3,750,000, in which case, such Net Sale Proceeds in excess of such threshold therefrom shall be applied and/or reinvested as (and to the extent) required by Section 5.02(e);

(xxvii)     the Borrower and its Restricted Subsidiaries may terminate leases, subleases, licenses and sublicenses in the ordinary course of business;

(xxviii)     the Borrower and its Restricted Subsidiaries may liquidate, wind up or dissolve Immaterial Subsidiaries so long as any material assets owned or held by such Immaterial Subsidiary are contributed or transferred to the Borrower or any of its Restricted Subsidiaries;

(xxix)     the Borrower or any of its Restricted Subsidiaries may undertake transactions in order to comply with corporate practice of medicine regulations; and

(xxx)      with respect to any Credit Party or any Subsidiary thereof, in each case, that is a limited liability company, (i) if such Person is a Credit Party, division of such Person's assets, liabilities, rights and duties, so long as any resulting Person is a Credit Party or (ii) if such Person is not a Credit Party, division of such Person's assets, liabilities, rights, and duties, so long as any resulting Person is either a Credit Party or a non-Credit Party.

To the extent the Required Lenders waive the provisions of this Section 10.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 10.02 (other than to a Credit Party), such Collateral shall be sold free and clear of the Liens created by the Security Documents, and the Administrative Agent and the Collateral Agent (as directed by the Required Lenders in writing) shall be authorized to take any actions deemed appropriate in order to effect and/or evidence the foregoing.

Notwithstanding anything in this Section 10.02 to the contrary, the Borrower and any of their respective Restricted Subsidiaries shall not permit, directly or indirectly, (i) any Material Intellectual Property to be transferred (whether by disposition, Investment, Restricted Payment, sale, exclusive licenses or otherwise) to an Unrestricted Subsidiary, and (ii) any Subsidiary that holds Material Intellectual Property to be designated as an Unrestricted Subsidiary, except, in each case, in connection with any non-exclusive license with respect to Material Intellectual Property that is on terms, taken as a whole, that are not materially less favorable to the Borrower and the Restricted Subsidiaries than those that would have been obtained at such time in a comparable transaction by the Borrower or a Restricted Subsidiary with a Person other than an Affiliate of the Borrower on an arm's-length basis.

10.03    Restricted Payments

The Borrower shall not, nor shall the Borrower permit any of its Restricted Subsidiaries to, declare, pay or make, directly or indirectly, any Restricted Payment, except that:

(i)      any Restricted Subsidiary of the Borrower may pay Restricted Payments to its equity holders on a pro rata basis; provided that, in the case of any Restricted Payments paid by a non-wholly owned Restricted Subsidiary, the Borrower or its Restricted Subsidiaries which owns the Equity Interest in such Restricted Subsidiary paying such Restricted Payments receives at least its proportionate share thereof (based upon its relative holding of the Equity Interest in the Restricted Subsidiary paying such Restricted Payments and taking into account the relative preferences, if any, of the various classes of Equity Interests of such Restricted Subsidiary);

(ii)      the Borrower may pay cash dividends to any direct or indirect parent of the Borrower so long as the proceeds thereof are reasonably promptly used by such direct or indirect parent to:

(A)      pay franchise Taxes required to maintain its corporate existence to the extent such Taxes are attributable to the operations of the Borrower and its Restricted Subsidiaries;

(B)      pay, for any taxable period for which the Borrower or any of its Subsidiaries are members of a consolidated, combined or unitary tax group for U.S. federal or applicable state or local income Tax purposes of which the Borrower is the common parent (a "Tax Group"), the portion of any U.S. federal, state or local Taxes (as applicable) of such Tax Group for such taxable period that are attributable to the taxable income of the Borrower and its Subsidiaries; provided that Restricted Payments made pursuant to this clause (B) shall not exceed the Tax liability that the Borrower and/or its Subsidiaries (as applicable) would have incurred if such Taxes were determined as if such entities were a stand-alone taxpayer or a stand-alone group; provided further that

-107-

Restricted Payments under this clause (B) with respect to any Taxes attributable to the income of any Unrestricted Subsidiaries of the Borrower may be made only to the extent that such Unrestricted Subsidiaries have made cash payments for such purpose to the Borrower or any of its Restricted Subsidiaries;

(C)     make cash payments in lieu of issuing fractional shares in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Equity Interests of the Borrower or such direct or indirect parent;

(D)     pay operating and overhead costs and expenses of such direct or indirect parent to the extent such costs and expenses are incurred in the ordinary course of business and attributable to the ownership or operations of the Borrower and its Restricted Subsidiaries;

(E)     pay costs (including all professional fees and expenses) incurred by such direct or indirect parent in connection with reporting obligations under or otherwise incurred in connection with compliance with applicable laws, applicable rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, including in respect of any reports filed with respect to the Securities Act, the Exchange Act or their respective rules and regulations promulgated thereunder;

(F)     pay (x) obligations under or in respect of director and officer insurance policies to the extent reasonably attributable to the ownership or operation of the Borrower and its Restricted Subsidiaries, (y) [reserved] or (z) Transaction Expenses;

(G)     be used to pay customary salary, bonus and other benefits payable to officers and employees of such direct or indirect parent to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrower and its Restricted Subsidiaries;

(H)     make the payments permitted by Section 10.06(vii); and

(I)     make Restricted Payments in connection with the Transactions.

(iii)     the Borrower may pay Restricted Payments to any direct or indirect parent thereof for the purpose of enabling the Borrower or such direct or indirect parent thereof to redeem, repurchase or otherwise acquire for value Qualified Equity Interests (or options or warrants to purchase such Qualified Equity Interests) of the Borrower or such direct or indirect parent thereof from present or former officers, directors, employees or consultants of any direct or indirect parent thereof, the Borrower, any of its respective Restricted Subsidiaries or any of the Practice Group, or their estates, descendants, family, spouses or former spouses, provided that the aggregate amount of such Restricted Payments paid by the Borrower shall not exceed in any Fiscal Year $5,000,000 (which shall increase to $10,000,000 in each Fiscal Year after a Qualified IPO) (in each case, net of proceeds received in connection with resales of any Equity Interests so purchased); provided that such amount may be increased by an amount not to exceed the cash proceeds of key man life insurance policies received by the Borrower or its Restricted Subsidiaries after the Closing Date; provided, further, that any unused amounts in any Fiscal Year may be carried forward to the next Fiscal Year;

(iv)     the Borrower may (x) declare and effect Restricted Payments in the form of Qualified Equity Interests and (y) pay dividends on its Qualified Equity Interests pursuant to the terms thereof solely through the issuance of additional shares of such Qualified Equity Interests (but not in cash),

provided that in lieu of issuing additional shares of such Qualified Equity Interests as Restricted Payments, the Borrower may increase the liquidation preference of the shares of Qualified Equity Interests in respect of which such Restricted Payments have accrued (in each case that do not increase the Available Amount or are otherwise applied to any other basket under this Section 10.03);

(v)        the Borrower may make Restricted Payments in an aggregate amount equal to the portion, if any, of the Available Amount on such date that the Borrower elects to apply to this clause (v) paragraph, such election to be specified in a written notice of an Authorized Officer of the Borrower calculating in reasonable detail the amount of Available Amount immediately prior to such election and the amount thereof elected to be so applied;

(vi)        the Borrower and each Restricted Subsidiary may make Restricted Payments (x) on the Closing Date to consummate the Transaction, (y) in respect of working capital adjustments or purchase price adjustments pursuant to any Permitted Acquisition or other permitted Investment and (z) in order to satisfy indemnity or other similar obligations under any Permitted Acquisition or other permitted Investment;

(vii)        to the extent constituting Restricted Payments, the Borrower and its Restricted Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 10.02 (other than Section 10.02(xvii)), Section 10.05 (other than Section 10.05(x)(y) and 10.05(xviii)) or Section 10.06 (other than Section 10.06(i));

(viii)        the Borrower and each of their respective Restricted Subsidiaries may make repurchases of Equity Interests in the Borrower (or any direct or indirect parent thereof) deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(ix)        after a Qualified IPO, (x) the Borrower may declare and effect any Restricted Payment to pay listing fees and other costs and expenses attributable to being (or its parent company being) a publicly traded company and (y) the Borrower may declare and effect Restricted Payments of up to 6.0% per annum of Market Capitalization; provided that with respect to any Restricted Payment pursuant to this clause (ix)(y), on a *pro forma* basis after giving effect to any such Restricted Payment, the Total Net Leverage Ratio does not exceed 3.30:1.00;

(x)        subject to no Event of Default having occurred and continuing immediately after giving effect thereto, the Borrower may pay other Restricted Payments in an aggregate amount not to exceed the greater of (x) $7,500,000 and (y) 12.5% of Consolidated EBITDA for the Test Period then last ended for which financial statements have been delivered pursuant to Section 9.01(a) or (b);

(xi)        to the extent not otherwise used to make Restricted Payments, Investments or payments in reliance on Sections 10.03(v), 10.05(xvi), 10.05(xix), 10.08(ii)(y)(II), or 10.08(ii)(x)(y), respectively, the Borrower and its Restricted Subsidiaries may pay Restricted Payments made solely with Eligible Equity Proceeds or the proceeds of an equity contribution in the form of Eligible Equity Proceeds;

(xii)        the Borrower and its Restricted Subsidiaries may pay Restricted Payments made with the proceeds of any sale of an Unrestricted Subsidiary or any distribution from an Unrestricted Subsidiary (in each case, so long as the primary assets of such Unrestricted Subsidiary are not cash or cash equivalents); and

(xiii)        the Borrower and its Restricted Subsidiaries may make other Restricted Payments; provided that after giving *pro forma* effect thereto and the application of the net proceeds therefrom, (i) no

-109-

Event of Default shall be continuing, and (ii) the Total Net Leverage Ratio for the Test Period immediately preceding the payment of such Restricted Payment would be no greater than 1.05:1.00.

For the avoidance of doubt, this Section 10.03 shall not restrict the making of any AHYDO Payment with respect to, and required by the terms of, any Indebtedness of the Borrower or any Restricted Subsidiary permitted to be incurred under this Agreement.

10.04   Indebtedness

The Borrower will not, and will not permit any of its Restricted Subsidiaries to create, incur, assume or suffer to exist any Indebtedness, except:

(i)      Indebtedness incurred pursuant to this Agreement and the other Credit Documents;

(ii)     Indebtedness outstanding on the Closing Date listed on Schedule 10.04 (as reduced by any repayments of principal thereof other than with the proceeds of Permitted Refinancing Indebtedness), without giving effect to any subsequent extension, renewal, replacement, restructuring or refinancing thereof except through one or more issuances of Permitted Refinancing Indebtedness in respect thereof (the foregoing Indebtedness, together with any replacements, extensions and renewals of any such Indebtedness, the "Permitted Surviving Debt");

(iii)    Indebtedness of the Borrower or any of its Restricted Subsidiaries under (x) Interest Rate Protection Agreements entered into with respect to other Indebtedness permitted under this Section 10.04 and (y) Other Hedging Agreements entered into in the ordinary course of business for *bona fide* hedging activities and are not for speculative purposes, which may be pari passu in payment priority with any Permitted Revolving Facility or the Obligations;

(iv)     Indebtedness of the Borrower and its Restricted Subsidiaries evidenced by Capitalized Lease Obligations and purchase money Indebtedness, in each case whether created or incurred by the Borrower or any of its Restricted Subsidiaries or assumed in connection with a Permitted Acquisition or other permitted Investment, provided that in no event shall the sum of the aggregate principal amount of all Capitalized Lease Obligations and purchase money Indebtedness permitted by this clause (iv) exceed at any time outstanding the greater of (x) $9,000,000 and (y) 15% of Consolidated EBITDA (on a Pro Forma Basis) for the Test Period then last ended as of such time for which financial statements have been delivered pursuant to Section 9.01(a) or (b);

(v)      Indebtedness constituting Intercompany Debt otherwise permitted by Section 10.05; provided that any such Indebtedness of any Restricted Subsidiary that is not a Credit Party that is being incurred pursuant to this clause (v), shall be permitted only to the extent permitted as an Investment pursuant to Section 10.05(viii);

(vi)     guarantees by the Borrower and any of its Restricted Subsidiaries in respect of Indebtedness of the Borrower or any of its Restricted Subsidiary otherwise permitted hereunder; provided that (x) no guarantee of any Junior Financing shall be permitted unless such guaranteeing party shall have also provided a guarantee of the Obligations on the terms set forth herein and (y) if the Indebtedness being guaranteed is subordinated to the Obligations, such guarantee shall be subordinated to the Guaranty of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(vii)    Indebtedness acquired pursuant to a Permitted Acquisition or other permitted Investment (or Indebtedness assumed at the time of a Permitted Acquisition or other permitted Investment of an asset

-110-

securing such Indebtedness), including, but not limited to, seller notes (any such Indebtedness, "Permitted Acquired Debt") and any Permitted Refinancing Indebtedness in respect thereof, provided that (x) [reserved] and (y) (A) if such debt is secured by a Lien on the Collateral that is pari passu with the Lien on the Collateral securing the Obligations, after giving effect thereto, the First Lien Net Leverage Ratio does not exceed 2.30:1.00 or, the First Lien Net Leverage Ratio is no higher than immediately prior to the assumption of such debt, (B) if such debt is secured by a Lien on the Collateral that is junior to the Lien on the Collateral securing the Obligations or secured by assets that do not constitute Collateral, after giving thereto, the Senior Secured Net Leverage Ratio does not exceed 3.30:1.00 or, the Senior Secured Net Leverage Ratio is no higher than immediately prior to the assumption of such debt, and (C) if such debt is unsecured, after giving effect thereto, the Total Net Leverage Ratio does not exceed 4.30:1.00 or, the Total Net Leverage Ratio is no higher than immediately prior to the assumption of such debt (the "Permitted Acquisition Debt Basket"); provided, further that, in the case of any Indebtedness incurred under the Permitted Acquisition Debt Basket (x) no such Indebtedness shall be guaranteed by Persons other than the Credit Parties, (y) any such indebtedness that is a term loan secured on a pari passu basis with Initial Term Loans shall be subject to the First Lien MFN Provisions as if such Indebtedness were Incremental Term Loans incurred pursuant to Section 2.15, and (z) such Indebtedness will have a final stated maturity date no earlier than the Latest Maturity Date then in effect and (b) a Weighted Average Life to Maturity of no less than the Weighted Average Life to Maturity as then in effect for the Initial Term Loans;

(viii)    Indebtedness arising under Cash Management Agreements or from customary cash management services, netting arrangements, automated clearing house transfers, or the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished within ten (10) Business Days after its incurrence;

(ix)    Indebtedness with respect to performance bonds, surety bonds, appeal bonds or customs bonds required in the ordinary course of business, or in connection with any letters of credit or bank guarantees posted to support any such bonds, or in connection with the enforcement of rights or claims of the Borrower or any of its Restricted Subsidiaries or in connection with judgments that do not result in an Event of Default;

(x)    Indebtedness in connection with Permitted Securitization Financings in an aggregate principal amount at any time outstanding for all such Indebtedness not to exceed $40,000,000;

(xi)    Indebtedness of any Restricted Subsidiary that is not a Credit Party; provided that the aggregate principal amount of all such Indebtedness outstanding at any time for all such Restricted Subsidiaries that are not Credit Parties shall not exceed the greater of (x) $12,000,000 and (y) 20% of Consolidated EBITDA (on a Pro Forma Basis) for the Test Period then last ended as of such time for which financial statements have been delivered pursuant to Section 9.01(a) or (b), less the aggregate outstanding principal amount of Indebtedness of Restricted Subsidiaries that are not Credit Parties incurred in reliance on the proviso set forth in Section 10.04(xvii);

(xii)    Indebtedness owed to any Person providing property, casualty, liability, or other insurance to the Borrower or any of its Restricted Subsidiaries, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of (and reasonable fees and expenses in connection therewith), and shall be incurred only to defer the cost of such insurance for the period in which such Indebtedness is incurred;

(xiii)    Indebtedness which may be deemed to exist in connection with agreements providing for indemnification, purchase price adjustments and similar obligations (including earn-out obligations) in

connection with the merger, the acquisition or disposition of assets in accordance with the requirements of this Agreement;

(xiv)     Indebtedness under any Permitted Revolving Facility in an aggregate maximum principal amount of commitments thereunder, at any time outstanding for all such Indebtedness not to exceed $40,000,000;

(xv)     the Borrower or any of its Restricted Subsidiaries may incur or issue Indebtedness constituting "seller paper", earn-out or other deferred or contingent acquisition consideration obligations, in each case, in connection with any Permitted Acquisition or other Investment permitted hereunder; provided that (x) on a Pro Forma Basis after giving effect to any such Indebtedness pursuant to this clause (xv) (and with respect to earn-out or other contingent obligations, accounting for such obligation solely to the extent such obligation is then due and owing and unpaid), the Borrower shall be in compliance with a Total Net Leverage Ratio less than or equal to 3.30:1.00 and (y) the aggregate principal amount of all such Indebtedness outstanding at any time under this clause (xv) (and with respect to earn-out or other contingent obligations, accounting for such obligation solely to the extent such obligation is then due and owing and unpaid) that does not constitute Subordinated Indebtedness shall not exceed at any time outstanding the greater of (1) $9,000,000 and (2) 15% of Consolidated EBITDA (on a Pro Forma Basis) for the Test Period then last ended for which financial statements have been delivered pursuant to Section 9.01(a) or (b);

(xvi)     additional Indebtedness incurred by the Borrower and its Restricted Subsidiaries in an aggregate principal amount not to exceed at any time outstanding the greater of (x) $24,000,000 and (y) 40% of Consolidated EBITDA (on a Pro Forma Basis) for the Test Period then last ended for which financial statements have been delivered pursuant to Section 9.01(a) or (b);

(xvii)     Permitted Ratio Debt and any Permitted Refinancing Indebtedness in respect thereof; provided, that the aggregate principal amount of Indebtedness incurred under this clause (xvii) by Restricted Subsidiaries that are not Subsidiary Guarantors shall not exceed the greater of (x) $12,000,000 and (y) 20% of Consolidated EBITDA (on a Pro Forma Basis) for the Test Period then last ended for which financial statements have been delivered pursuant to Section 9.01(a) or (b), less the aggregate outstanding principal amount of Indebtedness of Restricted Subsidiaries that are not Subsidiary Guarantors incurred in reliance on Section 10.04(xi);

(xviii)     [reserved];

(xix)     (I) Indebtedness  in the form of (A) one or more series of senior secured notes, senior unsecured notes or senior subordinated notes issued by the Borrower (any such notes, the "Incremental Notes") (which may be unsecured, secured on a junior lien basis or on a pari passu basis with the Obligations), in each case, that are issued or made in lieu of Incremental Term Loans; provided that (i) no Event of Default shall have occurred and be continuing or would exist immediately after giving effect to such incurrence; provided that, in connection with any Incremental Notes, the primary purpose of which is to finance a Limited Condition Transaction, the lenders providing such Incremental Notes may waive in full or in part the condition set forth in this clause (i) (other than with respect to any Specified Default), (ii) the aggregate principal amount of Incremental Notes established shall not exceed the Maximum Incremental Facilities Amount at such time (it being understood that for purposes of this clause (ii), in the case of any Incremental Notes and an Incremental Term Loans made that are unsecured, subordinated in right of payment to the Obligations and/or secured by Liens that are junior to the Liens of the Collateral Agent in the Collateral, such Incremental Notes shall be deemed to rank pari passu in right of payment and security with the Initial Term Loans at the time of incurrence and at all times thereafter, and shall be included as first lien Obligations in such calculation), (iii) such Incremental Notes shall not be guaranteed

-112-

by any Person other than the Credit Parties, (iv) if such Incremental Notes are secured, the obligations in respect thereof shall not be secured by any Lien on any asset of the Borrower or any Restricted Subsidiary other than any asset constituting Collateral, (v) if such Incremental Notes are (a) secured on a pari passu or junior basis with the Obligations, then such Incremental Notes shall be subject to the Applicable Intercreditor Arrangements, (vi) such Incremental Notes shall not have a final stated maturity prior to the date that is 91 days after the Latest Maturity Date then in effect and shall not have a shorter Weighted Average Life to Maturity than that of the then existing Term Loans, and (vii) the agreements governing such Incremental Notes contain covenants and events of default that are not materially more restrictive to the Borrower, when taken as a whole, than the terms of the Initial Term Loans unless (1) the Lenders of the Initial Term Loans also receive the benefit of such more restrictive terms, or (2) such provisions apply after the maturity date of the Initial Term Loans or (3) such terms are reasonably satisfactory to the Administrative Agent, and (B) and any Credit Agreement Refinancing Indebtedness, and any Permitted Refinancing Indebtedness in respect of the foregoing clauses (A) or (B);

(xx)    Indebtedness representing deferred compensation or similar obligations to employees incurred in the ordinary course of business;

(xxi)    Indebtedness consisting of take-or-pay obligations contained in supply arrangements in the ordinary course of business;

(xxii)    Indebtedness in respect of letters of credit, bank guarantees, supporting obligations, bankers' acceptances, performance bonds, surety bonds, statutory bonds, appeal bonds, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; provided that any reimbursement obligations in respect thereof are reimbursed within 30 days following the due date thereof;

(xxiii)    obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of its Restricted Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(xxiv)    Indebtedness consisting of obligations under deferred compensation or other similar arrangements incurred by such Person in connection with the Transaction, and Permitted Acquisitions or any other Investment expressly permitted hereunder.

(xxv)    obligations in respect of Disqualified Equity Interests in an amount not to exceed $2,000,000 at any time outstanding;

(xxvi)    to the extent constituting Indebtedness, the Borrower and its Restricted Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 10.05 (other than Sections 10.05(vii) and (viii));

(xxvii)    Indebtedness owing to any Practice Group under any Management/Services Agreement (including, but not limited to, a deficit funding loan agreement);

(xxviii)    to the extent constituting Indebtedness, guarantees by the Borrower or a Restricted Subsidiary of the obligations of a Practice Group to any of such Practice Group's customers or clients in the ordinary course of business; and

(xxix)      all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described above.

For purposes of determining compliance with this Section 10.04, in the event that an item of unsecured Indebtedness or Indebtedness incurred pursuant to Section 10.04(iv) or 10.04(vii) (or any portion thereof) at any time meets the criteria of more than one of the categories described above in this Section 10.04 or is entitled to be incurred pursuant to this Section 10.04, the Borrower, in its sole discretion, may classify or reclassify (or later divide, classify or reclassify) such item of unsecured Indebtedness or Indebtedness incurred pursuant to Section 10.04(iv) or 10.04(vii) (or any portion thereof) and shall only be required to include the amount and type of such unsecured Indebtedness in one of the above clauses

10.05    Advances, Investments and Loans

The Borrower will not, and will not permit any of its Restricted Subsidiaries to lend money or credit or make advances to any other Person, or purchase or acquire any stock, obligations or securities of, or any other Equity Interest in, or make any capital contribution to, any other Person, or the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person (each of the foregoing an "Investment" and, collectively, "Investments"), except that the following shall be permitted:

(i)      the Borrower and its Restricted Subsidiaries may acquire and hold accounts receivables, notes receivable and other extensions of trade credit owing to any of them, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms of the Borrower or such Restricted Subsidiary;

(ii)      the Borrower and its Restricted Subsidiaries may acquire and hold cash and Cash Equivalents (and assets that were Cash Equivalents when such Investment was made);

(iii)      the Borrower and its Restricted Subsidiaries may hold the Investments held by them on the Closing Date and described on Schedule 10.05 (and any increase in the value of such Investments not resulting from an additional Investment), provided that any additional Investments made with respect thereto shall be permitted only if permitted under the other provisions of this Section 10.05;

(iv)      the Borrower and its Restricted Subsidiaries may acquire and own investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers or in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business or upon foreclosure with regard to any secured Investment or other transfer of title with regard to a secured Investment;

(v)      the Borrower and its Restricted Subsidiaries may make loans and advances to their officers, directors, employees or consultants for moving, relocation and travel expenses and other similar expenditures, in each case in the ordinary course of business in an aggregate amount not to exceed $3,750,000 at any one time outstanding (determined without regard to any write-downs or write-offs of such loans and advances);

(vi)      the Borrower and its Restricted Subsidiaries may acquire and hold obligations of their officers, directors, employees or consultants in connection with such officers,' directors' and employees' acquisition of Qualified Equity Interests of the Borrower (or any direct or indirect parent company) (so

-114-

long as no cash is actually advanced by the Borrower or any of its Restricted Subsidiaries in connection with the acquisition of such obligations);

(vii)     the Borrower and its Restricted Subsidiaries may enter into Interest Rate Protection Agreements and Other Hedging Agreements to the extent permitted by Section 10.04(iii);

(viii)     (I) the Borrower or any Restricted Subsidiary may make Investments in (or for the benefit of) the Borrower or any Subsidiary Guarantor, (II) the Borrower or any Subsidiary Guarantor may make Investments in (or for the benefit of) any Restricted Subsidiary which is not the Borrower or any Subsidiary Guarantor, and (III) any Restricted Subsidiary which is not a Credit Party may make Investments in any Restricted Subsidiary which is not a Credit Party (such Investments in the form of intercompany loans and advances referred to in preceding clauses (I) through (III), collectively, the "Intercompany Loans"); provided that (w) at no time shall the aggregate outstanding principal amount of all Investments made pursuant to preceding sub-clause (II) of this clause (viii) (for this purpose, taking the Fair Market Value of any property (other than cash) so contributed at the time of such contribution), exceed at any time the greater of (A) $12,000,000 and (B) 20% of Consolidated EBITDA (on a Pro Forma Basis) for the Test Period then last ended for which financial statements have been delivered pursuant to Section 9.01(a) or (b), as applicable, (x) each Investment in the form of an Intercompany Loan that is evidenced by an Intercompany Note owned or held by the Borrower or any Subsidiary Guarantor shall be pledged to the Collateral Agent pursuant to the Security Agreement (to the extent required therein), (y) each Intercompany Loan made by any Restricted Subsidiary that is not a Credit Party to the Borrower or any Subsidiary Guarantor shall be subject to the subordination provisions contained in the respective Intercompany Note and (z) (A) any Intercompany Loans made to any Subsidiary Guarantor pursuant to subclause (I) of this clause (viii) shall cease to be permitted by subclause (I) if such Subsidiary Guarantor ceases to constitute a Subsidiary Guarantor or (B) any Investment made in (or for the benefit of) any Restricted Subsidiary that subsequently becomes a Subsidiary Guarantor shall hereinafter be deemed permitted under subclause (I) and shall not be included as having been made pursuant to subclause (II);

(ix)     the Transaction and Investments made in connection with the Transaction;

(x)     Investments consisting of (x) transactions permitted under Sections 10.01 and 10.02 (other than Section 10.02(ii)), (y) Restricted Payments permitted by Section 10.03 and (z) repayments or other acquisitions of Indebtedness of the Borrower or any other Restricted Subsidiary not prohibited by Section 10.08;

(xi)     Contingent Obligations (x) permitted by Section 10.04 or (y) to the extent not constituting Indebtedness, incurred in the ordinary course of business, in each case to the extent constituting Investments;

(xii)     Permitted Acquisitions shall be permitted in accordance with the requirements of Section 9.13 and Investments of a Person existing at the time it becomes a Restricted Subsidiary or consolidates, amalgamates or merges with the Borrower or any of its Restricted Subsidiaries in connection with a Permitted Acquisition;

(xiii)     promissory notes and other non-cash consideration received in connection with any asset sale permitted by Section 10.02;

(xiv)     Investments in deposit accounts, securities accounts and commodities accounts maintained by the Borrower or a Restricted Subsidiary;

(xv)     Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(xvi)     additional Investments at any time not in an amount to exceed the portion, if any, of the Available Amount on such date that the Borrower elects to apply to this clause (xvi), such election to be specified in a written notice of an Authorized Officer of the Borrower calculating in reasonable detail the amount of Available Amount immediately prior to such election and the amount thereof elected to be so applied;

(xvii)     in addition to Investments permitted by this Section 10.05, the Borrower and its Restricted Subsidiaries may make additional Investments to or in a Person in an aggregate amount for all Investments made pursuant to this clause (xvii) (determined without regard to any write-downs or write-offs thereof), net of cash repayments of principal in the case of loans, sale proceeds in the case of Investments in the form of debt instruments and cash equity returns (whether as a distribution, dividend, redemption or sale) in the case of equity investments, not to exceed the greater of (x) $12,000,000 and (y) 20% of Consolidated EBITDA (on a Pro Forma Basis) for the Test Period then last ended for which financial statements have been delivered pursuant to Section 9.01(a) or (b) at any time outstanding;

(xviii)     loans and advances to any direct or indirect parent of the Borrower, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof) Restricted Payments permitted to be made to such parent in accordance with Section 10.03; provided that any such loan or advance shall reduce the amount of such applicable Restricted Payment thereafter permitted under Section 10.03 by a corresponding amount (if the applicable subsection of Section 10.03 contains a stated maximum amount);

(xix)     to the extent not otherwise used to make Restricted Payments, Investments or payments in reliance on Sections 10.03(v), 10.03(xi), 10.05(xvi), 10.08(ii)(y)(II) or 10.08(ii)(y), respectively, Investments to the extent that payment for such Investments is made solely with Eligible Equity Proceeds or the proceeds of an equity contribution in the form of Eligible Equity Proceeds;

(xx)     Investments in the nature of pledges or deposits with respect to leases or utilities provided to third parties in the ordinary course of business;

(xxi)     Investments in Practice Groups not to exceed $1,500,000 at any time outstanding;

(xxii)     Investments in joint ventures, taken together with all other Investments made pursuant to this clause (xxii) that are at that time outstanding, without giving effect to the sale of a joint venture to the extent the proceeds of such sale do not consist of, or have not been subsequently sold or transferred for, Cash Equivalents or marketable securities, not to exceed (as of the date such Investment is made) $15,000,000;

(xxiii)     Investments in connection with reorganizations and related activities related to tax planning and reorganization; provided that, after giving effect to any such reorganization and related activities, the security interest of the Lenders or the Collateral Agent in the Collateral, taken as a whole, is not materially impaired (each, a "Permitted Reorganization");

(xxiv)     any acquisition of additional Equity Interests of any Restricted Subsidiary of the Borrower not then held by the Borrower or any Restricted Subsidiary of the Borrower ; provided that the aggregate amount of all payments made by a Credit Party, or advanced by a Credit Party to a Restricted Subsidiary that is not a Credit Party, to acquire the Equity Interests of a Restricted Subsidiary that is not a

Credit Party (and will not become a Credit Party as a result of such acquisition), shall not exceed the greater of (x) $18,000,000 and (y) 30% of Consolidated EBITDA (calculated on a Pro Forma Basis) for the Test Period then last ended as of such time for which financial statements have been delivered pursuant to Section 9.01(a) or 9.01(b), less the aggregate amount of payments previously made in reliance on Section 9.13(a)(ii);

(xxv)    to the extent constituting an Investment, guarantees by the Borrower or a Restricted Subsidiary of the obligations of a Practice Group to any of such Practice Group's customers or clients; and

(xxvi)    Investments in a Special Purpose Securitization Subsidiary in connection with a Permitted Securitization Financing.

For the avoidance of doubt, if an Investment would be permitted under any provision of this Section 10.05 and as a Permitted Acquisition, such Investment need not satisfy the requirements otherwise applicable to Permitted Acquisitions unless such Investments are consummated in reliance on Section 9.13. In addition, to the extent an Investment is permitted to be made by a Restricted Subsidiary directly in any Restricted Subsidiary or any other Person who is not the Borrower or a Subsidiary Guarantor (each such person, a "Target Person") under any provision of this Section 10.05, such Investment may be made by advance, contribution or distribution by a Credit Party to a Restricted Subsidiary, which is further contemporaneously advanced or contributed to a Restricted Subsidiary for purposes of making the relevant Investment in the Target Person without such initial advance, contribution or distribution constituting an Investment for purposes of Section 10.05(viii), (xvi), (xvii), or (xix) (it being understood that such ultimate Investment in the Target Person must satisfy the requirements of, and shall count towards any thresholds in, a provision of this Section 10.05 as if made by the applicable Restricted Subsidiary directly to the Target Person).  For purposes of this Section 10.05, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment (including any write-downs or write-offs thereof) but giving effect to any cash returns or cash distributions received by such Person with respect thereto in an amount not to exceed the original amount of such Investment.

Notwithstanding anything in this Section 10.05 to the contrary, the Borrower and any of its Restricted Subsidiaries shall not permit, directly or indirectly, (i) any Material Intellectual Property to be transferred (whether by disposition, Investment, Restricted Payment, sale, exclusive licenses or otherwise) to an Unrestricted Subsidiary, and (ii) any Subsidiary that holds Material Intellectual Property to be designated as an Unrestricted Subsidiary, except, in each case, in connection with any non-exclusive license with respect to Material Intellectual Property that is on terms, taken as a whole, that are not materially less favorable to the Borrower and the Restricted Subsidiaries than those that would have been obtained at such time in a comparable transaction by the Borrower or a Restricted Subsidiary with a Person other than an Affiliate of the Borrower on an arm's-length basis.

10.06    Transactions with Affiliates

The Borrower will not, and will not permit any of their respective Restricted Subsidiaries to, enter into any transaction or series of related transactions with a value or where payments by the Borrower or any Restricted Subsidiary are required in excess of $5,000,000 on an annual basis, in each case, with any Affiliate of the Borrower or any of its Restricted Subsidiaries, other than in the ordinary course of business and on terms and conditions (taken as a whole) substantially as favorable to the Borrower or such Restricted Subsidiary as would reasonably be obtained by the Borrower or such Restricted Subsidiary at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that the following in any event shall be permitted:

-117-

(i)        Restricted Payments may be paid to the extent provided in Section 10.03;

(ii)       loans may be made and other transactions may be entered into by and among the Borrower and/or one or more Restricted Subsidiaries to the extent permitted by Sections 10.01, 10.02, 10.04, 10.05 and 10.08;

(iii)     customary fees, indemnities and reimbursements may be paid to officers, directors, consultants and employees of the Borrower (or any direct or indirect parent) and the Restricted Subsidiaries;

(iv)     Affiliate transactions constituting any part of a Permitted Reorganization;

(v)      the Borrower and its Restricted Subsidiaries may enter into, and may make payments under, employment agreements, consulting agreements, employee benefits plans, stock option plans, indemnification provisions, other similar compensatory arrangements and severance agreements with officers, employees, consultants and directors of the Borrower and its Restricted Subsidiaries in the ordinary course of business;

(vi)     Restricted Subsidiaries of the Borrower may pay management fees, licensing fees and similar fees to the Borrower or to any of their respective Restricted Subsidiaries;

(vii)    [reserved];

(viii)   any Permitted Acquisition involving any Affiliate of the Borrower, so long as (x) such Permitted Acquisition is approved by the majority of the directors of the Borrower and (y) the Borrower shall have received a favorable fairness opinion from a reputable third-party appraiser of recognized standing;

(ix)     the Transaction and the payment of fees and expenses (including Transaction Expenses) as part of or in connection with the Transaction;

(x)      the Borrower and its Restricted Subsidiaries may enter into transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 10.06 or any amendment thereto (taken as a whole) to the extent such an amendment is not adverse to the Lenders in any material respect;

(xi)     transactions with customers, clients, joint venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and the Restricted Subsidiaries, in the reasonable determination of the board of directors or the senior management of the Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(xii)    [reserved];

(xiii)   entering into Management/Services Agreements and performing its obligations under any of the foregoing, and other transactions among Practice Groups and the Borrower and its Restricted Subsidiaries, in each case in the ordinary course of business or consistent with past practice;

(xiv)   the Borrower and its Restricted Subsidiaries may make the payment of guarantee and intercompany loan fees required under applicable Law and for tax purposes;

(xv)      to the extent not otherwise prohibited under this Agreement, transactions among the Borrower and its Restricted Subsidiaries or any entity that becomes a Restricted Subsidiary as a result of such transaction;

(xvi)      payments by the Borrower or any of its Subsidiaries pursuant to tax sharing agreements with any direct or indirect parent of the Borrower to the extent attributable to the ownership or operation of the Borrower and its Subsidiaries but only to the extent permitted by Section 10.03(ii); and

(xvii)      Affiliate repurchases of the Loans or Commitments to the extent permitted hereunder and to the extent not required to be cancelled hereunder, the holding of such Loans or Commitments and the payments and other transactions contemplated herein in respect thereof.

10.07    Financial Covenant.

(a)      The Borrower shall not permit the First Lien Net Leverage Ratio to be greater than 15.00:1.00 as of the last day of any Test Period (commencing with the Test Period ending September 30, 2025).

(b)      Section 10.07(a) is referred to in this Agreement as the "Financial Covenant".

10.08    Certificate of Incorporation, By-Laws and Certain Other Agreements; Limitations on Voluntary Payments, etc.

The Borrower will not, and the Borrower will not permit any of its Restricted Subsidiaries to:

(i)      amend, modify or change its certificate or articles of incorporation (including by the filing or modification of any certificate or articles of designation), certificate of formation, limited liability company agreement or by-laws (or the equivalent organizational documents), as applicable, if such amendment, modification or change is in a manner materially adverse to the interests of the Lenders;

(ii)      make (or give any notice in respect of (other than any such notice that is expressly contingent upon the repayment in full in cash of all Obligations (other than contingent obligations not then due and payable and other than obligations under any Cash Management Agreement, Interest Rate Protection Agreement or Other Hedging Agreement with a Guaranteed Creditor)) any voluntary or optional payment or prepayment on or redemption, defeasance, repurchase or acquisition for value of, or any prepayment or redemption as a result of any asset sale (other than to the extent of any Declined Proceeds applied in compliance with Section 5.02(k)), change of control or similar required "repurchase" event of (including, in each case by way of depositing with the trustee with respect thereto or any other Person money or securities before due for the purpose of paying when due) (it being understood that payments of regularly scheduled interest or AHYDO Payments shall be permitted), in respect of Junior Financing other than (x) the Borrower and its Restricted Subsidiaries may at any time refinance any Junior Financing pursuant to a Permitted Refinancing thereof, so long as the Borrower shall have delivered to the Administrative Agent an officer's certificate executed by an Authorized Officer of the Borrower, certifying to such officer's knowledge, compliance with the requirements of the definition of "Permitted Refinancing," (y) prepayments, redemptions, purchases, defeasances and other payments in respect of any Junior Financing prior to their scheduled maturity in an aggregate amount not to exceed (I) the greater of (x) $7,500,000 and (y) 12.5% of Consolidated EBITDA for the Test Period then last ended for which financial statements have been delivered pursuant to Section 9.01(a) or (b), plus (II) the portion, if any, of the Available Amount on such date that the Borrower elects to apply to this clause (ii), such election to be specified in a written notice of an Authorized Officer of the Borrower calculating in

reasonable detail the amount of Available Amount immediately prior to such election and the amount thereof elected to be so applied, plus (III) an additional amount, so long as with respect to the amounts pursuant to this clause (III), (1) no Event of Default exists or would result from any such prepayment, redemption or repurchase and (2) the Total Net Leverage Ratio does not exceed 1.05:1.00 on a pro forma basis as of the last day of the Fiscal Quarter most recently ended for which financial statements have been delivered pursuant to Section 9.01(a) or (b), plus (IV) the amount of Eligible Equity Proceeds that the Borrower elects to apply to this clause (ii) (and that is not otherwise applied to Restricted Payments, Investments or other payments pursuant to Section 10.03(v), 10.03(xi), 10.05(xvi), 10.05(xix) or 10.08(ii)(y)(II), respectively); and (z) the conversion of any Junior Financing to Qualified Equity Interests;

(iii)    amend or modify, or permit the amendment or modification of, any provision of, on and after the execution and delivery thereof, Junior Financing Documentation in respect of Junior Financing in excess of the Threshold Amount, if after giving effect thereto, the terms and conditions of such Junior Financing would not meet the requirements of the definition of Permitted Refinancing (as such requirements would apply in the case of a modification, refinancing, replacement, refunding, renewal or extension of such Junior Financing); provided that (x) in no event shall any such amendment or modification be made to the subordination provisions of any such documentation, which results in such subordination provisions being less favorable to the Agents or Lenders and (y) the foregoing provisions of this clause (iii) shall not be construed to apply to a refinancing of any Junior Financing (or any Permitted Refinancing Indebtedness in respect of any of the foregoing Indebtedness) effected in accordance with the requirements of Section 10.08(ii); and

(iv)    amend or waive any provision of any Management/Services Agreement or direct any Practice Group to take any action in violation of the applicable Management/Services Agreement, in each case, in a manner that is material and adverse to the interest of the Lenders, taken as a whole, except to the extent any such amendment, modification, assignment, novation or waiver is required to comply with applicable law (including applicable Health Care Laws and state corporate laws), in each case, as reasonably required, in the good faith judgment of the Borrower.

10.09    Limitation on Certain Restrictions on Restricted Subsidiaries

The Borrower will not, and will not permit any of their respective Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any such Restricted Subsidiary to (a) pay dividends or make any other distributions on its Equity Interest owned by the Borrower or any of its Restricted Subsidiaries or pay any Indebtedness owed to the Borrower or any of its Restricted Subsidiaries, (b) make loans or advances to the Borrower or any of its Restricted Subsidiaries or (c) transfer any of its properties or assets to the Borrower or any of its Restricted Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, rule, regulation or order, (ii) this Agreement and the other Credit Documents, (iii) after the execution and delivery thereof, any documents governing any Permitted Revolving Facility, any Incremental Notes, any Permitted Ratio Debt or any Junior Financing Documentation, (iv) customary provisions restricting subletting, transfer, license or assignment of any lease governing any leasehold interest of the Borrower or any of its Restricted Subsidiaries or otherwise relating to the assets subject thereto, (v) customary provisions restricting transfer, license or assignment of any licensing agreement or other contract (or otherwise relating to the assets subject thereto) entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business, (vi) restrictions on the transfer of any asset or Subsidiary pending the close of the sale of such asset or Subsidiary, (vii) restrictions on the transfer of any asset subject to a Lien permitted by Section 10.01(iii), (vi), (vii), (xiv), (xv), (xvi), (xviii), (xx), (xxi), (xxii), (xxiii), (xxiv), (xxvi), (xxvii), (xxviii) or (xxix); (viii) any agreement or instrument governing Permitted Acquired Debt, which encumbrance or restriction is not applicable to

any Person or the properties or assets of any Person, other than the Person or the properties or assets of the Person acquired pursuant to the respective Permitted Acquisition or Investment and so long as the respective encumbrances or restrictions were not created (or made more restrictive) in connection with or in anticipation of the respective Permitted Acquisition or Investment; (ix) restrictions applicable to any Unrestricted Subsidiary or any joint venture (or the Equity Interests thereof); (x) negative pledges and restrictions on Liens in favor of any holder of Indebtedness for borrowed money permitted under Section 10.04 but only if such negative pledge or restriction expressly permits Liens for the benefit of the Administrative Agent and/or the Collateral Agent and the Lenders with respect to the credit facilities established hereunder and the Obligations under the Credit Documents on a senior basis and without a requirement that such holders of such Indebtedness be secured by such Liens equally and ratably or on a junior basis; (xi) encumbrances or restrictions on cash or other deposits or net worth imposed by customers under agreements entered into in the ordinary course of business; (xii) [reserved]; (xiii) contractual obligations which (x) exist on the Closing Date and (to the extent not otherwise permitted by this Section 10.09) are listed on Schedule 10.09 hereto and (y) to the extent contractual obligations permitted by clause (x) are set forth in an agreement evidencing Indebtedness, or any agreement evidencing any permitted modification, replacement, renewal, extension or refinancing of such Indebtedness so long as such modification, replacement, renewal, extension or refinancing is not (taken as a whole) materially less favorable to the Lenders; (xiv) restrictions binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary of the Borrower, so long as such contractual obligations were not entered into solely in contemplation of such Person becoming a Restricted Subsidiary of the Borrower; (xv) restrictions on (x) cash or other deposits constituting Permitted Liens or (y) cash earnest money deposits in favor of sellers in connection with acquisitions not prohibited hereunder; (xvi)  restrictions imposed by documentation governing Indebtedness permitted by Section 10.04(iv), (x), (xiv), (xvii) or (xix); and (xvii) an agreement effecting a refinancing, replacement or substitution, extension, renewal or restructuring of Indebtedness issued, assumed or incurred pursuant to an agreement or instrument referred to in clause (i) through (xvi) above, provided, that the provisions relating to such encumbrance or restriction contained in any such refinancing, replacement or substitution agreement (taken as a whole) are no less favorable to the Borrower or the Lenders in any material respect than the provisions relating to such encumbrance or restriction contained in the agreements or instruments referred to in such clauses (i) through (xvi).

10.10   [Reserved]

10.11   Accounting Changes

The Borrower shall not, nor shall the Borrower permit any of its Restricted Subsidiaries to, make any change to its Fiscal Year (other than with respect to a Restricted Subsidiary that is acquired after the Closing Date, to change its fiscal year end to align with that of the Borrower's Fiscal Year and other than as required pursuant to GAAP); provided, that the Borrower may, upon written notice to the Administrative Agent, change its Fiscal Year to any other fiscal year reasonably acceptable to the Administrative Agent, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders, to make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

SECTION 11.   Events of Default and Remedies.

Upon the occurrence of any of the following specified events (each, an "Event of Default"):

11.01   Payments

The Borrower shall (i) default in the payment when due of any principal of any Loan or any Note or (ii) default, and such default shall continue unremedied for five (5) or more Business Days, in the payment when due of any interest on any Loan or Note, or any Fees or any other amounts owing hereunder or under any other Credit Document; or

11.02    Representations, etc.

On or after the Closing Date, any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or in any certificate (other than any representation, warranty, or statement regarding projections, estimates, or forward looking information, budgets or general market data) delivered to the Administrative Agent or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made.

11.03    Covenants

The Borrower or any of its Restricted Subsidiaries shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in Section 9.01(g)(i), Section 9.04 (solely with respect to the preservation of the Borrower's existence) or Section 10; or (ii) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement or any other Credit Document (other than those set forth in Sections 11.01, 11.02 and 11.03(i)) and such default shall continue unremedied for a period of (x) in the case of a default in respect of the performance or observance of the covenants contained in Sections 9.01(a), (b), and (e), ten (10) Business Days, and (y) otherwise, thirty (30) days, in each case, after the date on which written notice thereof is given to the Borrower by the Administrative Agent or the Required Lenders; or

11.04    Default Under Other Agreements.  (i) The Borrower or any of its Restricted Subsidiaries shall (x) default in any payment of any Indebtedness (other than the Obligations) beyond the period of grace (after delivery of any notice if required and after giving effect to any waiver, amendment, cure or grace period), if any, provided in an instrument or agreement under which such Indebtedness was created or (y) default in the observance or performance of any agreement or condition relating to any Indebtedness (other than the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause (after delivery of any notice if required and after giving effect to any waiver, amendment, cure or grace period), any such Indebtedness to become due prior to its stated maturity, or (ii) any Indebtedness (other than the Obligations) of the Borrower or any of its Restricted Subsidiaries shall be declared to be (or shall become) due and payable, or required to be prepaid other than by a regularly scheduled required prepayment, prior to the stated maturity thereof (other than, in the case of this clause (ii), (x) any secured Indebtedness that is required to be prepaid as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, (y) any Indebtedness that is required to be converted into Qualified Equity Interests upon the occurrence of certain designated events so long as no payments (other than such conversion and Restricted Payments paid in lieu of fractional shares permitted under Section 10.03(ii)(C)) in cash or otherwise are required to be made in accordance with such conversion and the issuance of such Equity Interests is otherwise permitted under Section 10.04), and (z) any failure under clause (i) or (ii) if such failure is remedied or waived by the holders of such Indebtedness prior to the acceleration of the Loans pursuant to Section 11); provided that it shall not be a Default or an Event of Default under this Section 11.04 unless the aggregate principal amount of all outstanding Indebtedness as described in the preceding clauses (i) and (ii) is at least the Threshold Amount; or

11.05    Bankruptcy, etc.  The Borrower or any of its Restricted Subsidiaries (other than an Immaterial Subsidiary) shall commence a voluntary case concerning itself under Title 11 of the United

States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "Bankruptcy Code"); or an involuntary case is commenced against the Borrower or any of its Restricted Subsidiaries (other than an Immaterial Subsidiary), and the petition is not dismissed within 60 days after the filing thereof, provided, however, that during the pendency of such period, each Lender shall be relieved of its obligation to extend credit hereunder; or a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of the Borrower or any of its Restricted Subsidiaries (other than an Immaterial Subsidiary), to operate all or any substantial portion of the business of the Borrower and its Restricted Subsidiaries, or, except to the extent expressly permitted by Section 10.02, the Borrower or any of its Restricted Subsidiaries (other than an Immaterial Subsidiary) commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Borrower or any of its Restricted Subsidiaries, or there is commenced against the Borrower or any of its Restricted Subsidiaries (other than an Immaterial Subsidiary) any such proceeding which remains undismissed for a period of 60 days after the filing thereof, or the Borrower or any of its Restricted Subsidiaries (other than an Immaterial Subsidiary) is adjudicated insolvent or bankrupt; or any order of relief is entered in any such proceeding; or the Borrower or any of its Restricted Subsidiaries (other than an Immaterial Subsidiary) makes a general assignment for the benefit of creditors or admits in writing its inability to pay its debts as they become due; or any Company action is taken by the Borrower or any of its Restricted Subsidiaries (other than an Immaterial Subsidiary) for the purpose of authorizing any of the foregoing; or

11.06    ERISA

(a)        (i)  one or more ERISA Events shall have occurred,

(ii)      there is or arises an Unfunded Pension Liability (taking into account only Plans with positive Unfunded Pension Liability), or

(iii)     there is or arises any potential withdrawal liability under Section 4201 of ERISA if the Borrower, any Restricted Subsidiary of the Borrower or the ERISA Affiliates were to withdraw completely from any and all Multiemployer Plans;

(b)      there shall result from any such event or events described in clause (a) the imposition of a lien, the granting of a security interest, or a liability or a material risk of incurring a liability; and

(c)      such lien, security interest or liability, individually or in the aggregate, has had or would be reasonably expected to have, a Material Adverse Effect; or

11.07    Security Documents

Any of the Security Documents shall cease to be in full force and effect (other than in accordance with its terms or as a result of an action or inaction on the part of the Administrative Agent, the Collateral Agent or any Lender), or shall cease to give the Collateral Agent for the benefit of the Secured Creditors the Liens, rights, powers and privileges purported to be created thereby (including a perfected security interest  (if and to the extent such Collateral can be perfected by the filing of UCC-1 financing statements and the taking of such other actions required by the applicable Security Document) in, and Lien on, all of the Collateral, in favor of the Collateral Agent, superior to and prior to the rights of all third Persons (except as permitted by Section 10.01), and subject to no other Liens (except as permitted by Section 10.01); provided that the failure to have a perfected (if and to the extent such Collateral can be perfected by the filing of UCC-1 financing statements and the taking of such other actions required by the applicable Security Document) and enforceable Lien on Collateral in favor of the Collateral Agent shall

not give rise to an Event of Default under this Section 11.07, unless the aggregate Fair Market Value of all Collateral over which the Collateral Agent fails to have a perfected and enforceable Lien, represents a material portion of all Collateral, except to extent that any lack of perfection or enforceability results from any act or omission of the Collateral Agent within the sole control of the Collateral Agent (so long as such action or omission does not result from the breach or non-compliance by a Credit Party of the terms of the Credit Documents); or

11.08   Guaranties

Any Guaranty or any provision thereof shall cease to be in full force or effect as to any Guarantor (except as a result of a release of any Subsidiary Guarantor in accordance with the terms thereof), or any Guarantor or any Person acting for or on behalf of such Guarantor shall deny or disaffirm in writing such Guarantor's obligations under the Guaranty to which it is a party; or

11.09   Judgments

One or more final judgments or decrees shall be entered against the Borrower or any of its Restricted Subsidiaries (other than an Immaterial Subsidiary) involving in the aggregate for the Borrower or any of its Restricted Subsidiaries a liability and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal for any period of 60 consecutive days, and the aggregate amount of all such judgments to the extent not paid or covered by a reputable and solvent insurance company or third party indemnities equals or exceeds $25,000,000; or

11.10   Change of Control

A Change of Control shall occur; or

11.11   Invalidity of Credit Documents

Any material provision of the Credit Documents, taken as a whole, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or the satisfaction in full of all the Obligations (other than contingent obligations not then due and payable and other than obligations under any Cash Management Agreement, Interest Rate Protection Agreement or Other Hedging Agreement with a Guaranteed Creditor), ceases to be in full force and effect; or the Borrower or any of its Restricted Subsidiaries contests in writing the validity or enforceability of the Credit Documents, taken as a whole; or the Borrower or any of its Restricted Subsidiaries denies in writing that it has any or further liability or obligation under the Credit Documents to which it is a party, taken as a whole (other than as a result of repayment in full of the Obligations (other than contingent obligations not then due and payable and other than obligations under any Cash Management Agreement, Interest Rate Protection Agreement or Other Hedging Agreement with a Guaranteed Creditor) and termination of the Total Commitments), or purports in writing to revoke or rescind the Credit Documents, taken as a whole;

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, subject to the provisions of Section 11.12, the Administrative Agent, upon the written request of the Required Lenders, shall by written notice to the Borrower, take any or all of the following actions (provided that, if an Event of Default specified in Section 11.05 shall occur with respect to the Borrower, the result which would occur upon the giving of written notice by the Administrative Agent as specified in clauses (i) and (ii) below shall occur automatically without the giving of any such notice):  (i) declare the Total Commitment terminated, whereupon all Commitments of each Lender shall forthwith terminate immediately; (ii) declare the principal of and any accrued interest in respect of all Loans and the Notes

and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived (to the extent permitted by applicable law) by each Credit Party; (iii) [reserved]; (iv) [reserved]; (v) enforce, as Collateral Agent, all of the Liens and security interests created pursuant to the Security Documents in accordance with the terms therein; (vi) enforce each Guaranty in accordance with the terms therein; and (vii) apply any cash collateral held by the Administrative Agent pursuant to Section 5.02 to the repayment of the Obligations.

    11.12    Borrower's Right to Cure

    Notwithstanding anything to the contrary contained in this Section 11, in the event of any Default or Event of Default under the Financial Covenant set forth in Section 10.07(a), from the first day of the applicable Fiscal Quarter until the expiration of the fifteenth Business Day after the date on which a compliance certificate is required to be delivered pursuant to Section 9.01(e) with respect to the applicable Fiscal Quarter hereunder (any such date the "Cure Termination Date"), the Borrower shall have the right (the "Cure Right") to apply the amount of the net cash proceeds received from the issuance of any Qualified Equity Interests of the Borrower (or a direct or indirect parent) (a "Designated Equity Contribution") to any Person other than the Borrower and its Subsidiaries to increase Consolidated EBITDA with respect to such applicable Fiscal Quarter (to the extent such cash proceeds are further contributed to the Borrower as common equity), including each subsequent Test Period that includes such Fiscal Quarter (such quarter, a "Cure Quarter") and if, after giving effect to such increase in Consolidated EBITDA, the Borrower shall then be in compliance with the requirements of Section 10.07(a), the Borrower shall be deemed to have satisfied the requirements set forth therein as of the relevant Test Period with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or default that had occurred shall be deemed cured for purposes of this Agreement; provided that such net cash proceeds (i) are actually received by the Borrower no later than fifteen Business Days after the date on which a compliance certificate is required to be delivered with respect to such Cure Quarter hereunder, and (ii) do not exceed the aggregate amount necessary to cause the Borrower to be in compliance with Section 10.07(a), as the case may be, for the applicable period (but, for such purpose, not taking into account any repayment of Indebtedness (if any) with the proceeds of such Designated Equity Contribution for the Cure Quarter in which the Cure Right was exercised); provided, further, that (x) in each period of four consecutive Fiscal Quarters, there shall be only two Fiscal Quarters in which a Cure Right is exercised and (y) the Borrower shall not exercise more than five Cure Rights during the term of this Agreement.  Neither the Administrative Agent nor any Lender shall exercise the right to accelerate the Loans or terminate the Commitments and none of Administrative Agent, the Collateral Agent, or any Lender shall exercise any right to foreclose on or take possession of the Collateral or exercise any other remedy pursuant to this Section 11 or applicable law, in each case prior to the Cure Termination Date solely on the basis of a Default or an Event of Default having occurred and being continuing under Section 10.07(a) (or the failure to timely give notice thereof) and the Borrower shall not be permitted to borrow Revolving Loans and make any request for a Credit Extension for Letters of Credit, until and unless the Cure Right has been consummated or such Event of Default has otherwise been waived in accordance with the terms hereof.  The parties hereby acknowledge that (i) this Section 11.12 may not be relied on for purposes of calculating any financial ratios or baskets other than as directly applicable to compliance with Section 10.07(a) on the last day of any Fiscal Quarter in the applicable Test Period and shall not result in any increase in any basket amount or in any adjustment to Consolidated EBITDA other than for purposes of compliance with Section 10.07(a) and (ii) there shall be no pro forma reduction of Indebtedness with the proceeds of any Designated Equity Contribution in the Cure Quarter for purposes of determining compliance with Section 10.07(a) for the Fiscal Quarter in which such proceeds are received.

SECTION 12.    The Administrative Agent.

12.01    Appointment

The Lenders hereby irrevocably designate and appoint Acquiom Agency Services LLC as Administrative Agent (for purposes of this Section 12 and Section 13.01, the term "Administrative Agent" also shall include Acquiom Agency Services LLC in its capacity as Collateral Agent pursuant to the Security Documents) to act as specified herein and in the other Credit Documents. Each Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of such Note shall be deemed irrevocably to authorize, the Administrative Agent to take such action on its behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof and such other powers as are reasonably incidental or related thereto. The Administrative Agent may perform any of its respective duties hereunder by or through its officers, directors, agents, employees or Affiliates. The Administrative Agent may perform any of its respective duties hereunder directly or through its agents, attorneys, nominees or Affiliates appointed with due care, and shall not be responsible for any willful misconduct or gross negligence on the part of any agent, attorney, nominee or Affiliate so appointed except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence, bad faith or willful misconduct in the selection of such agent, attorney, nominee or Affiliate.

12.02    Nature of Duties and Protections

(a)    The Administrative Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement and in the other Credit Documents and no implied or fiduciary duties. Neither the Administrative Agent nor any of its officers, directors, agents, employees or Affiliates shall be liable for any action taken or omitted by it or them hereunder or under any other Credit Document or in connection herewith or therewith, unless caused by its or any of their gross negligence or willful misconduct, (in each case, as determined by a court of competent jurisdiction in a final and non-appealable decision). The duties of the Administrative Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have by reason of this Agreement or any other Credit Document a fiduciary relationship in respect of any Secured Creditor or the holder of any Note; and nothing in this Agreement or in any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless and until the Administrative Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." The Administrative Agent will notify the Lenders of its receipt of any such notice. The Administrative Agent shall take such action with respect to any Event of Default as may be directed in writing by the Required Lenders in accordance with Section 11; provided that unless and until the Administrative Agent has received any such written direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

(b)    The Administrative Agent shall not be required to use, risk or advance its own funds or otherwise incur financial liability in the performance of any of its duties or the exercise of any of its rights and powers hereunder. In no event shall the Administrative Agent be liable, directly or indirectly, for any special, indirect, punitive or consequential damages, even if the Administrative Agent has been advised of the possibility of such damages and regardless of the form of action.

(c)     Notwithstanding any other provision of this Agreement or the other Credit Documents, the Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request or direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, to give such request or direction hereunder). The Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing. The Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Credit Document or applicable law. The Administrative Agent shall have no liability for any action taken, or errors in judgment made, in good faith by it or any of its officers, employees or agents, unless it shall have been negligent in ascertaining the pertinent facts.

(d)     Whenever reference is made in this Agreement or any other Credit Document to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Administrative Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Administrative Agent (except for the Administrative Agent's ability to waive the fee set forth in Section 4.01 or in connection with the Administrative Agent's ability to enter into any amendment to the Agent Fee Letter or any other Credit Document to which it is a party when such amendment affects the rights and obligations of the Administrative Agent, each of which shall be made in the Administrative Agent's sole discretion), it is understood that in all cases that the Administrative Agent shall not have any duty to act, and shall be fully justified in failing or refusing to take any such action, if it has not received written instruction, advice or concurrence from the Required Lenders in respect of such action.

(e)     The Administrative Agent shall be entitled to rely upon advice of counsel concerning legal matters and such advice shall be full protection and authorization for any action taken by the Administrative Agent in good faith thereon.

(f)     In connection with the delivery of any information to the Administrative Agent by any other Person to be used in connection with the preparation or distribution of calculations or reports, the Administrative Agent is entitled to conclusively rely on the accuracy of any such information and shall not be required to investigate or reconfirm its accuracy and shall not be liable in any manner whatsoever for any errors, inaccuracies or incorrect information resulting from the use of this information.

(g)     Notwithstanding any provision of this Agreement or the other Credit Documents to the contrary, before taking or omitting any action to be taken or omitted by the Administrative Agent under the terms of this Agreement and the other Credit Documents, the Administrative Agent may seek the written direction of the Required Lenders, which written direction may be in the form of an email, and the Administrative Agent is entitled to rely (and is fully protected in so relying) upon such direction. If the Administrative Agent requests such direction with respect to any action, the Administrative Agent shall be entitled to refrain from such action unless and until the Administrative Agent has received such direction, and the Administrative Agent does not incur liability to any Person by reason of so refraining. In the absence of an express statement in the Credit Documents regarding which Lenders shall direct in any circumstance, the direction of the Required Lenders shall apply and be sufficient for all purposes. If the Administrative Agent so requests, it must first be indemnified to its satisfaction by the Lenders against any and all fees, losses, liabilities and expenses which may be incurred by the Administrative Agent by reason of taking or continuing to take, or omitting, any action directed by any Lender prior to having any obligation to take or omit to take any such action. Any provision of this Agreement or the other Credit

Documents authorizing the Administrative Agent to take any action does not obligate the Administrative Agent to take such action.

      12.03    Lack of Reliance on the Administrative Agent

      Independently and without reliance upon the Administrative Agent, each Lender and the holder of each Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of the Borrower and its Subsidiaries in connection with the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of the Borrower and its Subsidiaries and, except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter.  The Administrative Agent shall not be responsible to any Lender, other Secured Creditor or the holder of any Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of this Agreement or any other Credit Document or the financial condition of the Borrower or any of its Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Credit Document, the creation, perfection or priority of any Lien or the value or such sufficiency of the Collateral or the financial condition of the Borrower or any of its Subsidiaries or the existence or possible existence of any Default or Event of Default.

      12.04    Certain Rights of the Administrative Agent

      If the Administrative Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, the Administrative Agent shall be entitled to act (or refrain from taking such action) unless and until the Administrative Agent shall have received written instructions from the Required Lenders; and the Administrative Agent shall not incur liability to any Lender by reason of so acting (or refraining). Without limiting the foregoing, neither any Secured Creditor nor the holder of any Note shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders.

      12.05    Reliance

      The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that the Administrative Agent believed in good faith to be the proper Person, and, with respect to all matters pertaining to this Agreement and any other Credit Document and its duties hereunder and thereunder, upon advice of counsel selected by the Administrative Agent (or counsel for the Borrower). The Administrative Agent shall be fully protected in failing or refusing to take any action under this Agreement or any other Credit Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all or other Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Credit Documents in accordance with a written request of the Required Lenders (or, if so specified

by this Agreement, all or other Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans. Delivery of reports, documents and other information to the Administrative Agent is for informational purposes only and the Administrative Agent's receipt of the foregoing shall not constitute constructive knowledge of any event or circumstance or any information contained therein or determinable from information contained therein. Information contained in notices, reports or other documents delivered to the Administrative Agent and other publicly available information shall not constitute actual or constructive knowledge. Knowledge of or notices or other documents delivered to the Administrative Agent in any capacity shall not constitute knowledge of or delivery to the Administrative Agent in any other capacity under the Credit Documents or to any affiliate or other division of the Administrative Agent.

12.06    Erroneous Payments.

(a)        Each Lender hereby agrees that if the Administrative Agent notifies such Lender (any such Lender or other recipient, a "Payment Recipient") in writing that the Administrative Agent has determined in its reasonable discretion that the Administrative Agent or its Affiliates mistakenly transmitted funds to such Payment Recipient (as a result of a clerical, mechanical or technological error, whether or not known to such Payment Recipient) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "Erroneous Payment") and demands in writing the return of such Erroneous Payment (or a portion thereof), such Payment Recipient shall make commercially reasonable efforts to promptly return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a written demand was made, in same day funds (in the currency so received). A notice from the Administrative Agent to any Lender under this Section 12.06(a) shall set forth the facts and circumstances resulting in such Erroneous Payment; provided that the Administrative Agent shall not make any demand under this Section 12.06(a) unless the notice described herein is delivered within 15 days after the making of the applicable Erroneous Payment.

(b)        Each Payment Recipient hereby authorizes the Administrative Agent to set off, net and apply any amounts at any time owing to such Payment Recipient under any Credit Document against any amount due to the Administrative Agent under the preceding clause (a).

(c)        The Borrower and each other Loan Party hereby agrees that (i) in the event an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient (and without limiting the Administrative Agent's rights and remedies under this Section 12.06), the Administrative Agent shall be subrogated to all the rights of such Payment Recipient with respect to such amount and (ii) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party; provided that this Section 12.06 shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrower relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent; provided, further, that for the avoidance of doubt, immediately preceding clauses (i) and (ii) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower for the purpose of making such Erroneous Payment. If the amount of any Erroneous Payment is subsequently recovered by the Administrative Agent or its Affiliate, the Administrative Agent or its Affiliate shall return to the applicable Payment Recipient either (x) the Loans acquired pursuant to this clause (c), or (y) if applicable, the proceeds of such Loans.

(d)        In addition to any rights and remedies of the Administrative Agent provided by law, the Administrative Agent shall have the right, without prior notice to any Lender, any such notice being expressly waived by such Lender to the extent permitted by applicable law, with respect to any Erroneous

Payment for which a demand has been made in accordance with this Section 12.06 and which has not been returned to the Administrative Agent, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Administrative Agent or any Affiliate, branch or agency thereof to or for the credit or the account of such Lender. The Administrative Agent agrees promptly to notify the Lender after any such setoff and application made by Administrative Agent; provided that the failure to give such notice shall not affect the validity of such setoff and application

(e)     Each party's obligations under this Section 12.06 shall survive the resignation or replacement of the Administrative Agent, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Credit Document.

(f)     Notwithstanding the foregoing, the Lenders and Payment Recipients shall have no obligation under this Section 12.06 to the extent that, as a result of the Erroneous Payment or in connection therewith (or as a result of the actions described above), (i) the Liens securing the Obligations have been released, the perfection or priority of the Liens has been impaired, or any applicable preference period would be deemed re-started or (ii) the applicable Payment Recipient's claim against any Loan Party would be impaired as a result of such Erroneous Payment.

12.07     Indemnification

To the extent the Administrative Agent (or any affiliate thereof) is not reimbursed and indemnified by the Borrower pursuant to the terms of this agreement, including but not limited to pursuant to Sections 4.01 and 13.01, the Lenders will reimburse and indemnify the Administrative Agent (and any affiliate thereof) in proportion to their respective "percentage" (as would be used in determining whether any approval or consent of the Required Lenders has been obtained (determined as if there were no Defaulting Lenders)) for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent (or any affiliate thereof) in performing its duties hereunder or under any other Credit Document or in any way relating to or arising out of this Agreement or any other Credit Document; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or such affiliate's) gross negligence or willful misconduct of a Credit Document in each case, as determined by a court of competent jurisdiction in a final and non-appealable decision.  The failure of any Lender to reimburse the Administrative Agent promptly upon demand for its ratable share of any amount required to be paid by the Lenders to the Administrative Agent, as the case may be, as provided herein shall not relieve any other Lender of its obligation hereunder to reimburse the Administrative Agent, as the case may be, for its ratable share of such amount, but no Lender shall be responsible for the failure of any other Lender to reimburse the Administrative Agent for such other Lender's ratable share of such amount. The agreements in this Section shall survive the payment of the Loans and all other amounts payable hereunder.

12.08     The Administrative Agent in its Individual Capacity

With respect to its obligation to make Loans, under this Agreement, the Administrative Agent shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lender," "Majority Lenders," "Required Lenders," or any similar terms shall, unless the context clearly indicates otherwise,

include the Administrative Agent in its respective individual capacities.  The Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Credit Party or any Affiliate of any Credit Party (or any Person engaged in a similar business with any Credit Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Credit Party or any Affiliate of any Credit Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders.

12.09    [Reserved].

12.10    Resignation by the Administrative Agent.

(a)    The Administrative Agent may resign from the performance of all its respective functions and duties hereunder and/or under the other Credit Documents at any time by giving twenty (20) Business Days' prior written notice to the Lenders and, unless an Event of Default under Section 11.05 then exists, the Borrower. Such resignation shall take effect upon the appointment of a successor Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)    Upon any such notice of resignation by the Administrative Agent, the Required Lenders shall appoint a successor Administrative Agent hereunder or thereunder who shall be a commercial bank or trust company reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld or delayed (provided that the Borrower's approval shall not be required if an Event of Default under Section 11.01 or 11.05 then exists).

(c)    If no successor Administrative Agent has been appointed pursuant to clause (b) above by the twentieth (20th) Business Day after the date such notice of resignation was given by the Administrative Agent, the Administrative Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Credit Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(d)    Upon a resignation of the Administrative Agent pursuant to this Section 12.09, the Administrative Agent shall remain indemnified to the extent provided in this Agreement and the other Credit Documents and the provisions of this Section 12 (and the analogous provisions of the other Credit Documents) shall continue in effect for the benefit of the Administrative Agent for all of its actions and inactions while serving as the Administrative Agent.

12.11    Collateral Matters.

(a)    Each Lender authorizes and directs the Collateral Agent to enter into the Security Documents (including any intercreditor agreement contemplated by the Applicable Intercreditor Arrangements) for the benefit of the Lenders and the other Secured Creditors.  Each Lender and other Secured Creditor hereby agrees, and each holder of any Note and other Secured Creditor by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Collateral Agent in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Collateral Agent of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.  The Collateral Agent is hereby authorized on behalf of all of the Lenders and other Secured Creditors, without the necessity of any notice to or further consent from any Lender and other Secured Creditor, from time to time, to take any action with respect to any Collateral or Security Documents which may be necessary to

create, perfect and maintain perfected the security interest in and Liens upon the Collateral granted pursuant to the Security Documents (including, in the event of any issuance of Incremental Notes, to secure such Incremental Notes with the Collateral and/or to make such technical amendments as may be necessary or appropriate in the reasonable opinion of the Collateral Agent and the Borrower in connection with the issuance of such Incremental Notes, in each case in accordance with the terms set forth in Section 10.04(xix)).  The Lenders and the other Secured Creditors irrevocably agree that the Collateral Agent may rely exclusively on a certificate of a Responsible Officer of the Borrower as to whether any such other Liens are not prohibited.  Notwithstanding anything to the contrary herein or in any Credit Document, the Collateral Agent and  Administrative Agent shall have no obligation to file or record any financing statements, notices, instruments, documents, agreements, consents or other papers as shall be necessary to (i) create, preserve, perfect or validate any security interest granted to the Collateral Agent and Administrative Agent pursuant to any Credit Document or (ii) enable the Collateral Agent and the Administrative Agent to exercise and enforce its rights under any Credit Document. In addition, the Collateral Agent and the Administrative Agent shall have no responsibility or liability (i) in connection with the acts or omissions of any Person in respect of the foregoing or (ii) for or with respect to the legality, validity and enforceability of any security interest created in the Collateral or the perfection and priority of such security interest.

(b)    The Lenders hereby authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral (i) upon termination of the Commitments and payment and satisfaction of all of the Obligations (other than contingent obligations not due and payable (and Obligations described in clause (ii) of the definition thereof)), (ii) constituting property being sold or otherwise disposed of (to Persons other than Credit Parties) upon the sale or other disposition thereof in compliance with this Agreement, (iii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders hereunder, to the extent required by Section 13.13), (iv) as otherwise may be expressly provided in the relevant Security Documents or the last sentence of each of Sections 10.01 and 10.02, and (v) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty in accordance with the terms therein. Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 12.10.

(c)    The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Credit Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 12.10 or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders.

12.12    <u>Right to Realize on Collateral and Enforce Guarantees</u>

In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, (i) the Administrative Agent (at the written direction of the Required Lenders) (irrespective of whether the principal of any Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise (A) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of any

or all of the Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent allowed in such judicial proceeding, and (B) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same, and (ii) any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under the Credit Documents. Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

### 12.13   Force Majeure

In no event shall the Administrative Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, epidemics, pandemics, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services.

### 12.14   Delivery of Information

The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Credit Party, any Restricted Subsidiary, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Credit Document except as specifically provided in this Agreement or any other Credit Document.

### 12.15   Applicable Intercreditor Arrangements

The Administrative Agent and the Collateral Agent are authorized to enter into any intercreditor agreement (and any amendments, amendments and restatements, restatements or waivers of or supplements to or other modifications to, and extensions, restructuring, renewals, replacements of, such agreements) in connection with the incurrence by any Credit Party of any Indebtedness that is secured by the Collateral and required hereunder to be subject to the Applicable Intercreditor Arrangements, and the parties hereto acknowledge that such intercreditor agreement (if entered into) will be binding upon them. Each Lender (a) hereby agrees that it will be bound by and will take no actions contrary to the provisions of an intercreditor agreement entered into pursuant to the Applicable Intercreditor Arrangements and (b) hereby authorizes and instructs the Administrative Agent and Collateral Agent to enter into such intercreditor agreements (and any amendments, amendments and restatements, restatements or waivers of or supplements to or other modifications to, and extensions, restructuring, renewals, replacements of, such agreements) in connection with the incurrence by any Credit Party of any Indebtedness is secured by the Collateral and required hereunder to be subject to the Applicable Intercreditor Arrangements, in order to permit such Indebtedness to be secured by a valid, perfected Lien (with such priority as may be designated by the Borrower or relevant Restricted Subsidiary, to the extent such priority is permitted by the Credit Documents)), and to subject the Liens on the Collateral securing the Obligations to the provisions thereof.  The foregoing provisions are intended as an inducement to any potential provider of any Indebtedness permitted by the Credit Documents to be secured by the Collateral to extend credit to

the Borrower and such providers of such Indebtedness are intended third-party beneficiaries of such provisions.

12.16   [Reserved]

12.17   Certain ERISA Matters

(a)      Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement,

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)      such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)      In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Credit Document or any documents related hereto or thereto).

SECTION 13.    Miscellaneous.

13.01    Payment of Expenses, etc.

(a)    The Borrower hereby agrees to: (i) (A) to pay or reimburse the Administrative Agent and the Collateral Agent and the Lenders for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication, administration, and execution of this Agreement and the other Credit Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof, and the consummation and administration of the transactions contemplated hereby and thereby (including due diligence expenses, syndication expenses, travel expenses but in the case of legal fees and expenses, limited to  documented fees and documented out-of-pocket charges and disbursements Pryor Cashman LLP (as counsel to the Administrative Agent and the Collateral Agent) (and, if reasonably necessary, of one local counsel each applicable material jurisdiction, which, in each case, shall exclude allocated costs of in-house counsel and in the case of other consultants and advisors, to the fees and expenses of such persons approved by the Borrower) and (B) to pay or reimburse the Administrative Agent, the Collateral Agent, and each Lender for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this Agreement or the other Credit Documents (including all such costs and expenses incurred during any insolvency, bankruptcy or other legal proceeding, which in the case of legal fees and expenses, shall be limited to the reasonable and documented out-of-pocket fees and expenses of one primary counsel to the Administrative Agent and the Collateral Agent, collectively (which, for the avoidance of doubt, shall be Pryor Cashman LLP) and one counsel to the Lenders (and one local counsel in each applicable relevant jurisdiction and, in the event of any actual conflict of interest, one additional counsel of each type to the affected parties), taken as a whole, and in each case, excluding allocated costs of in-house counsel) and in the case of other consultants or advisors, to the fees and expenses of such persons approved by the Borrower), within thirty (30) days after receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail; (ii) indemnify the Administrative Agent (and any sub-agent thereof) and each Lender and each of their affiliates, and each of their respective directors, officers, employees, partners, advisors, agents and other representatives of each of the foregoing and their respective successors (each, an "Indemnified Person") against and hold each Indemnified Person harmless against any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnified Person), incurred by any Indemnified Person or asserted against any Indemnified Person by any Person (including the Borrower) arising out of, in connection with, or as a result of (A) the execution or delivery of this Agreement, any other Credit Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (B) any Loan or the use or proposed use of the proceeds therefrom, (C) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (D) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower, and regardless of whether any Indemnified Person is a party thereto; provided that such indemnity shall not, as to any Indemnified Person, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnified Person, or (y) result from a claim not involving an act or omission of the Borrower and that is brought by an Indemnified Person against another Indemnified Person (other than against the arranger or the Administrative Agent in their capacities as such).  This Section 13.01(a) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(b)      To the full extent permitted by applicable law, each party hereto shall not assert, and hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or incidental damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnified Person shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, including SyndTrak, Intralinks, LendAmend, the internet, email or similar electronic transmission systems, in each case, except to the extent any such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, or willful misconduct of, , such Indemnified Person (or its officers, directors, employees or Affiliates).  None of the Indemnified Persons or the Borrower or any of its Affiliates or the respective directors, officers, employees, advisors, and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Agreement, the other Credit Documents or the transactions contemplated hereby or thereby; provided, that nothing contained in this sentence shall limit the Borrower's indemnification and reimbursement obligations to the extent set forth herein.  The Borrower shall not be liable for any settlement of any legal proceeding effected without its consent (which consent shall not be unreasonably withheld or delayed), but if settled with the Borrower's written consent, or if there is a judgment against an Indemnified Person in any such legal proceeding, the Borrower agrees to indemnify and hold harmless each Indemnified Person in the manner set forth above.  The Borrower shall not, without the prior written consent of an Indemnified Person (which consent shall not be unreasonably withheld or delayed), effect any settlement of any pending or threatened legal proceeding against such Indemnified Person in respect of which indemnity could have been sought hereunder by such Indemnified Person unless (a) such settlement includes an unconditional release of such Indemnified Person from all liability or claims that are the subject matter of such legal proceeding and (b) such settlement does not include any statement as to any admission of fault, culpability or wrongdoing or failure to act. Notwithstanding the foregoing, each Indemnified Person shall be obligated to refund and return any and all amounts paid by the Borrower under this Section 13.01 to such Indemnified Person for any such fees, expenses or damages to the extent such Indemnified Person is not entitled to payment of such amounts in accordance with the terms hereof.

13.02    Right of Setoff

In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent, and each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived (to the extent permitted by applicable law), to set off and to appropriate and apply any and all deposits (general or special) (other than accounts used exclusively for payroll, taxes, fiduciary and trust purposes, and employee benefits and cash on deposit in accounts used exclusively to hold cash that has been received by any Credit Party from third parties and to be remitted by such Credit Party to any court or other Governmental Authority) and any other Indebtedness at any time held or owing by the Administrative Agent, or such Lender (including by branches and agencies of the Administrative Agent, or such Lender wherever located) to or for the credit or the account of any Credit Party against and on account of the Obligations then due and owing (whether at stated maturity, by acceleration or otherwise) and any other liabilities of the Credit Parties then due and owing to the Administrative Agent, or such Lender under this Agreement or under any of the other Credit Documents, including all interests in Obligations purchased by such Lender pursuant to Section 13.04(b), and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document in each case, to the extent then due and owing.

13.03    Notices

(a)    Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including email communication) and mailed, emailed or otherwise delivered:  if to any Credit Party, at 3340 Perimeter Hill Drive, Nashville, Tennessee 37211, Attn: Ben Slocum (BSlocum@Wellpath.us) and Marc Goldstone (MGoldstone@Wellpath.us) with a copy to McDermott Will and Emery LLP, 444 West Lake Street, Suite 4000, Chicago, IL 60606, Attn: Anh Lee (Anhlee@mwe.com); if to any Lender, at its address specified on Schedule 1.01(a) or in the Assignment and Assumption Agreement pursuant to which such Lender became a Party hereto, as applicable; and if to the Administrative Agent, at the Notice Office; or, as to any Credit Party or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to the Borrower and the Administrative Agent.  All such notices and communications shall, when mailed, telegraphed, telecopied, or cabled or sent by overnight courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telecopier, except that notices and communications to the Administrative Agent and the Borrower shall not be effective until received by the Administrative Agent or the Borrower, as the case may be.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender.  Each of the Administrative Agent and the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)    The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by, or on behalf of, the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on SyndTrak, Intralinks, LendAmend or another similar electronic system (each, a "Platform") and (b) certain of the Lenders may be "*public-side*" Lenders (i.e., Lenders that do not wish to receive material nonpublic information with respect to the Borrower or its securities) (each, a "Public Lender").  The Borrower hereby agrees that (i) it will use commercially reasonably efforts to ensure that all Borrower Materials that are to be made available to Public Lenders are clearly and conspicuously marked "*PUBLIC*" which, at a minimum, shall mean that the word "*PUBLIC*" shall appear prominently on the first page thereof, (ii) by marking Borrower Materials "*PUBLIC*," the Borrower shall be deemed to have authorized the Administrative Agent, and the Lenders to treat such Borrower Materials as not containing any material nonpublic information with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 13.17), (iii) all Borrower Materials marked "*PUBLIC*" are permitted to be made available through a portion of the Platform designated as "*Public Investor*" and (iv) the Administrative Agent and the Arrangers shall be entitled to treat any Borrower Materials that are marked "*PUBLIC*" as being suitable for posting on a portion of the Platform not marked as "*Public Investor*."  Notwithstanding the foregoing, the following Borrower Materials shall be deemed to be marked "*PUBLIC*," to the extent the Borrower has had a reasonable opportunity to review, unless the Borrower notifies the Administrative Agent promptly that any such document contains material nonpublic information:  (1) the Credit Documents and (2) any notification of changes in the terms of the credit facilities under this Agreement and (3) all information delivered pursuant to Sections 9.01(a), 9.01(b) and 9.01(e).

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "*Private Side Information*" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to communications that are not made available through the "*Public Side Information*" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "*AS IS*" AND "*AS AVAILABLE.*" NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY CREDIT PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND ARISING OUT OF ANY CREDIT PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

The Administrative Agent agrees that the receipt of notices or other communications by the Administrative Agent at its electronic mail address set forth above shall constitute effective delivery of notices or other communications to the Administrative Agent for purposes of the Credit Documents. Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that notices or other communications have been posted to the Platform shall constitute effective delivery of notices or other communications to such Lender for purposes of the Credit Documents. Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's electronic mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address. Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

13.04   Benefit of Agreement; Assignments; Participations

(a)      This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective permitted successors and assigns of the parties hereto; provided, however, the Borrower may not assign or transfer any of its rights, obligations or interest hereunder without the prior written consent of the Administrative Agent and each of the Lenders and, provided further, that, although any Lender may grant participations to Loan Participants in its rights hereunder, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Commitments hereunder except as provided in Sections 2.13 and 13.04(b)) and the Loan Participant in its capacity as such shall not constitute a "Lender" hereunder and, provided, further, that no Lender shall transfer or grant any participation under which the Loan Participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (i)(x) extend the final scheduled maturity of any Loan or Note or any Commitment in which such Loan Participant is participating, or (y) reduce the rate or extend the time of payment of

interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates, which shall not be considered to be a reduction in the rate of interest or fees) or reduce the principal amount thereof, or increase the amount of the Loan Participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Total Commitment or a mandatory prepayment of the Loans shall not constitute a change in the terms of such participation, and that an increase in any Commitment (or the available portion thereof) or Loan shall be permitted without the consent of any Loan Participant if the Loan Participant's participation is not increased as a result thereof), (ii) release all or substantially all of the Collateral under the Security Documents or all or substantially all Guarantors (except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such Loan Participant is participating or (iii) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement.  The Administrative Agent shall have no responsibility of any kind to ensure that the provisions hereof applicable to participations in Loans are observed by the Lenders. Without limiting Section 13.04(j), in the case of any such participation, the Loan Participant shall not have any rights under this Agreement or any of the other Credit Documents (the Loan Participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the Loan Participant relating thereto) and all amounts payable by the Borrower hereunder shall be determined as if such Lender had not sold such participation.

(b)        (i)  Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees constituting an Eligible Transferee (an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)        the Borrower (with such consent being deemed to have been given with respect to any assignment if the Borrower has not responded within twenty (20) Business Days after its receipt of delivery of written notice of such assignment in accordance with the notice provisions set forth in Section 13.03); provided that no consent of the Borrower shall be required for (i) an assignment of all or a portion of a Term Loan to a Lender, an Affiliate of a Lender or an Approved Fund, (ii) [reserved] or (iii) any assignment if a Specified Default has occurred and is continuing; and

(B)        the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Term Loan to a Lender or an Affiliate of a Lender or an Approved Fund.

Notwithstanding the foregoing or anything to the contrary set forth herein, except pursuant to the provisions of Section 2.18 and 13.04(e), no assignment of any Loans or Commitments may be made to the Borrower or any Subsidiary of the Borrower.

(ii)        Assignments shall be subject to the following additional conditions:

(A)        except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption Agreement with respect to such assignment is delivered to the Administrative Agent) shall not be less than an amount of $1,000,000, and shall be in increments of $1,000,000 in excess thereof unless each of the Borrower and the Administrative Agent otherwise consents; provided that such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any; and

(B)      the parties to each assignment shall execute (i) and deliver to the Administrative Agent an Assignment and Assumption Agreement via an electronic settlement system acceptable to the Administrative Agent or (ii) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Assumption, in each case, together with a processing and recordation fee of $3,500; provided that (i) the Administrative Agent, in its sole discretion, may elect to waive such processing and recordation fee, (ii) only a single processing recordation fee shall apply to a series of related assignments between a Lender or its Approved Funds, on the one hand, and another unaffiliated party and its Affiliates or Approved Funds, on the other and (iii) no such processing and recordation fee shall apply to assignments between a Lender and its Affiliates or Approved Funds; and

(C)      no such transfer or assignment will be effective until recorded by the Administrative Agent on the Register pursuant to Section 13.16.

This paragraph (b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Classes on a non-pro rata basis among such Classes.  To the extent of any assignment pursuant to this Section 13.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments and outstanding Loans.  At the time of each assignment pursuant to this Section 13.04(b) to a Person that is not already a Lender hereunder and that is not a U.S. Person, the respective Assignee shall, to the extent legally entitled to do so, provide to the Borrower the appropriate IRS Forms (and, if applicable, a U.S. Tax Compliance Certificate) and documentation under FATCA described in Section 5.04(f).  To the extent that an assignment of all or any portion of a Lender's Commitments and related outstanding Obligations pursuant to Section 2.13 or this Section 13.04(b) would, at the time of such assignment, result in increased costs under Section 2.10 or 3.06 from those being charged by the respective assigning Lender prior to such assignment, then the Borrower shall not be obligated to pay such increased costs (although the Borrower, in accordance with and pursuant to the other provisions of this Agreement, shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment).

(c)      Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans and Notes hereunder to a Federal Reserve Bank in support of borrowings made by such Lender from such Federal Reserve Bank, and any Lender may pledge all or any portion of its Loans and Notes to its trustee or to a collateral agent providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of such obligations, as the case may be.  No pledge pursuant to this clause (c) shall release the transferor Lender from any of its obligations hereunder.

(d)      Any Lender which assigns all of its Commitments and/or Loans hereunder in accordance with Section 13.04(b) shall cease to constitute a "Lender" hereunder, except with respect to indemnification provisions under this Agreement (including Sections 2.10, 2.11, 3.06, 5.04, 12.06, 13.01 and 13.06), which shall survive as to such assigning Lender.

(e)      Notwithstanding anything to the contrary in this Agreement, any Lender may, at any time, assign all or a portion of its Term Loans under this Agreement (including in accordance with the provisions of Section 2.18) to the Borrower or any Restricted Subsidiary through (x) Dutch auctions or other offers to purchase or take by assignment open to all Lenders on a pro rata basis in accordance with Section 2.18 or (y) bona fide open market purchases for cash consideration made on the secondary market through a third party that is a marketmaker at the prevailing market price; in each case subject to the following limitations:

(i)      [reserved];

(ii)      no Event of Default shall have occurred or be continuing;

(iii)     [reserved];

(iv)     [reserved];

(v)     [reserved];

(vi)     [reserved];

(vii)     any Term Loans so assigned to or purchased by the Borrower or any Restricted Subsidiary shall be automatically and permanently cancelled immediately upon the effectiveness of such assignment and will thereafter no longer be outstanding for any purpose hereunder;

(viii)     [reserved];

(ix)     [reserved]; and

(x)     as a condition to each assignment pursuant to this Section 13.04(e), the Administrative Agent and the Required Lenders shall have been provided a notice substantially in the form of Exhibit I-2 to this Agreement in connection with such assignment.

(f)     [Reserved].

(g)     [Reserved].

(h)     [Reserved].

(i)     Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "SPC") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided, that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 2.10, 2.11 or 5.04), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Credit Document, remain the lender of record hereunder. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500 (which processing fee may be waived by the Administrative Agent in its sole discretion), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or guarantee or credit or liquidity enhancement to such SPC.

(j)      The Borrower agrees that each Loan Participant shall be entitled to the benefits of Sections 2.10, 3.06 and 5.04 (subject to the requirements and limitations therein, including the requirements under Sections 5.04(f) (it being understood that the documentation required under Section 5.04(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment; provided that such Loan Participant (A) agrees to be subject to the provisions of Section 2.13 as if it were an Assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Sections 2.10, 3.06 or 5.04, with respect to any participation, than its participating Lender would have been entitled to receive except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Loan Participant and the principal amounts (and stated interest) of each Loan Participant's interest in the Loans or other obligations under the Credit Documents (the "Participant Register"); provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Loan Participant or any information relating to a Loan Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.  Upon reasonable notice, the Borrower shall have the right to review the Participant Register from time to time.

(k)      The Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Institutions or maintain the list of Disqualified Institutions.  Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans or Commitments, or disclosure of confidential information, to any Disqualified Institution. The list of Disqualified Institutions shall be made available to any Lender upon request to the Administrative Agent, subject to customary confidentiality requirements.

13.05    No Waiver; Remedies Cumulative

No failure or delay on the part of the Administrative Agent, the Collateral Agent or any Lender in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between the Borrower or any other Credit Party and the Administrative Agent, the Collateral Agent or any Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder.  The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent, the Collateral Agent, or any Lender would otherwise have.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent, the Collateral Agent or any Lender to any other or further action in any circumstances without notice or demand.

13.06    Payments Pro Rata

(a)    Except as otherwise provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Borrower in respect of any Obligations hereunder, the Administrative Agent shall distribute such payment to the Lenders entitled thereto (other than any Lender that has consented in writing to waive its pro rata share of any such payment) pro rata based upon their respective shares, if any, of the Obligations with respect to which such payment was received.

(b)    Each of the Lenders agrees that, except as otherwise provided in this Agreement, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise), which is applicable to the payment of the principal of, or interest on, the Loans, of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such Obligation then owed and due to such Lender bears to the total of such Obligation then owed and due to all of the applicable Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other applicable Lenders an interest in the Obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all the applicable Lenders in such amount; provided that if all or any portion of such excess amount is thereafter recovered, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

(c)    Notwithstanding anything to the contrary contained herein, the provisions of the preceding Sections 13.06(a) and (b) shall be subject to the express provisions of this Agreement which, among other things, require, or permit, differing payments to be made to Non-Defaulting Lenders as opposed to Defaulting Lenders.

13.07    [Reserved]

13.08    Several Obligations

The obligation of the Lenders to make Loans and to make payments pursuant to Section 12.06 are several and not joint.  The failure of any Lender to make any Loan or to fund any such participation or to make any payment under Section 12.06 on any date required hereunder shall not relieve any other Lender or its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or, to fund its participation or to make any payment required under Section 12.06.

13.09    GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL

(a)    THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN ANY MORTGAGE, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, EACH PARTY HERETO HEREBY

IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. EACH PARTY HERETO HEREBY FURTHER IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH PARTY, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH PARTY.  EACH PARTY HERETO FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS SET FORTH OPPOSITE ITS SIGNATURE BELOW.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF (i) ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR (ii) THE ADMINISTRATIVE AGENT, ANY LENDER OR THE HOLDER OF ANY NOTE TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE BORROWER IN ANY OTHER JURISDICTION.

(b)     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

13.10    Counterparts

This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  Delivery of a counterpart via facsimile or other electronic transmission shall constitute delivery of an original counterpart.  A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Administrative Agent.

13.11    [Reserved].

13.12    Headings Descriptive.  The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

13.13    Amendment or Waiver; etc.

(a)      Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the respective Credit Parties party hereto or thereto and the Required Lenders (although additional parties may be added to (and annexes may be modified to reflect such additions), and Subsidiaries of the Borrower may be released from, the Subsidiaries Guaranty and the Security Documents in accordance with the provisions hereof and thereof without the consent of the other Credit Parties party thereto or the Required Lenders, provided that no such change, waiver, discharge or termination shall, without the consent of each directly and adversely affected Lender (but not the Required Lenders and except with respect to following clause (i), any Defaulting Lender), (i)(x) extend the final scheduled maturity of any Loan or Note of such Lender holding such Loan or Note or extend the Commitment of such Lender holding such Commitment, or (y) reduce the rate or extend the time of payment of interest, principal or Fees thereon (except in connection with (1) the waiver of applicability of any post-default increase in interest rates or waivers of defaults or events of default and (2) the waiver or declining of any mandatory prepayment of the Loans pursuant to Section 5.02), or reduce (or forgive) the principal amount of any Loan or Note of such Lender holding such Loan or Note (except in connection with the waiver or declining of any mandatory prepayment of the Loans pursuant to Section 5.02), (ii) release all or substantially all of the Collateral under the Security Documents or all or substantially all of the Guaranties (except for any such release expressly provided for in the Credit Documents as of the Closing Date (which such express releases, for the avoidance of doubt, do not require any change, waiver, discharge or termination of any Credit Document), (iii) amend, modify or waive any provision of this Section 13.13(a) which would result in the reduction of the voting thresholds specified herein (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to the Initial Term Loans on the Closing Date or as otherwise provided herein), (iv) amend, modify or waive any provision of Section 13.06 other than as provided herein (including in connection with Replaced Lenders pursuant to Section 2.13 and assignments and/or purchases of Term Loans pursuant to Sections 2.18 or 13.04(e)) or (v) reduce the "majority" voting threshold specified in the definition of "Required Lenders" (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the extensions of Initial Term Loans included on the Closing Date); provided further, that no such change, waiver, discharge or termination shall (1) increase the Commitments of any Lender over the amount thereof then in effect without the consent of such Lender holding such Commitment as well as the consent of Required Lenders if such increase is effectuated other than pursuant to provisions in this Agreement specifically permitting increases of commitments without the further approval of non-increasing Lenders (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the Total Commitment or a mandatory repayment or commitment reduction of Loans shall not constitute an increase of the Commitment of any Lender and any increase, pursuant to the provisions hereof, in the available portion of any Commitment of any Lender shall not constitute an increase of the Commitment of such Lender), (2) [reserved], (3) without the consent of the Administrative Agent, amend, modify or waive any provision of Section 12 or any other provision as same relates to the rights or obligations of the Administrative Agent, (4) without the consent of Collateral Agent, amend, modify or waive any provision relating to the rights or obligations of the Collateral Agent, (5) without the consent of the Administrative Agent affected thereby, amend, modify or waive any provision relating to the rights and obligations of the Administrative Agent, (6) without the consent of the Majority Lenders of the respective Class affected thereby, amend the definition of "Majority Lenders" to reduce the voting threshold (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Majority Lenders on substantially the same basis as the extensions of Loans and Commitments are included on the Closing Date), and (7) subordinate any of the Obligations hereunder, or

any of the Liens granted hereunder or under the other Credit Documents, to any other Indebtedness or Lien on any of the Collateral without the consent of each Lender, as the case may be, except (i) indebtedness that is expressly permitted by this Agreement as in effect as of the Closing Date to be senior to the Obligations and/or be secured by a Lien that is senior to the Lien securing the Obligations (including, for the avoidance of doubt, pursuant to any Permitted Revolving Facility), (ii) any "debtor in-possession" facility; or (iii) any other Indebtedness exchanged for Loans so long as such Indebtedness is offered ratably to all Lenders of the Loans being exchanged, in each case.

(b)     Notwithstanding the foregoing, (x) any provision of this Agreement may be amended by an agreement in writing entered into by the Borrower, the Required Lenders and the Administrative Agent if (i) by the terms of such agreement the Commitment of each Lender not consenting to the amendment provided for therein shall terminate upon the effectiveness of such amendment and (ii) at the time such amendment becomes effective, each Lender not consenting thereto receives payment (including pursuant to an assignment to a replacement Lender in accordance with Section 13.04) in full of the principal of and interest accrued on each Loan made by it and all other amounts owing to it (including, if applicable, pursuant to Sections 2.11 and 4.11(f)) or accrued for its account under this Agreement and (y) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (A) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Credit Documents with the Initial Term Loans and the accrued interest and fees in respect thereof and (B) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

(c)     In addition, notwithstanding the foregoing, this Agreement may be amended or amended and restated with the written consent of the Administrative Agent, the Borrower and the Lenders providing the relevant Replacement Term Loans to permit the refinancing of all outstanding Term Loans (the "Refinanced Term Loans"), with a replacement Term Loan tranche denominated in Dollars (the "Replacement Term Loans") hereunder; provided that (i) the aggregate principal amount of such Replacement Term Loans shall not exceed the aggregate principal amount of, plus accrued interest, fees, expenses and premiums with respect to, such Refinanced Term Loans unless the incurrence of such Indebtedness and Lien is otherwise separately permitted hereby, (ii) the Weighted Average Life to Maturity of such Replacement Term Loans shall not be shorter than the Weighted Average Life to Maturity of such Refinanced Term Loans, at the time of such refinancing (except to the extent of nominal amortization for periods where amortization has been eliminated as a result of prepayment of the applicable Initial Term Loans), (iii) the maturity date of the Replacement Term Loans is not earlier than the maturity date of the Refinanced Term Loans, (iv) such Refinanced Term Loans shall be repaid on a dollar-for-dollar basis and all accrued interest, fees and premiums (if any) in connection therewith shall be paid, on the date any Indebtedness is issued, incurred or obtained pursuant to such Replacement Term Loans and (v) all other terms applicable to such Replacement Term Loans shall reflect market terms and conditions at the time of incurrence or issuance of such Indebtedness (as determined in good faith by the Borrower), except to the extent necessary to provide for covenants and other terms applicable to any period after the Latest Maturity Date then in effect immediately prior to such refinancing.

(d)     Notwithstanding anything to the contrary contained in this Section 13.13, the Borrower, the Administrative Agent and each Lender agreeing to make Incremental Term Loans may, in accordance with the provisions of Section 2.15, enter into an Incremental Amendment without the consent of the Required Lenders, provided that after the execution and delivery by the Borrower, the Administrative Agent and each such Lender of such Incremental Amendment, such Incremental Amendment may thereafter only be modified in accordance with the requirements of Section 13.13(a).

(e)      Notwithstanding anything to the contrary contained in this Section 13.13, (x) Security Documents (including any Additional Security Documents) and related documents executed by Restricted Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent (at the written direction of the Required Lenders) and may be amended, modified, supplemented and waived with the consent of the Administrative Agent (at the written direction of the Required Lenders) and the Borrower without the need to obtain the consent of any other Person if such amendment, modification, supplement or waiver is delivered in order (i) to comply with local Law (including any foreign law or regulatory requirement) or advice of local counsel, (ii) to cure ambiguities, inconsistencies, omissions, mistakes or defects or (iii) to cause such Security Document or other document to be consistent with this Agreement and the other Credit Documents and (y) if following the Closing Date, the Administrative Agent, the Lenders, and any Credit Party shall have jointly identified an ambiguity, inconsistency, obvious error, or mistake or any error, mistake  or omission of a technical or immaterial nature, in each case, in any provision of the Credit Documents (other than the Security Documents), then the Administrative Agent, the Lenders and the Credit Parties shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Credit Documents if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

13.14   Survival

All indemnities set forth herein including in Sections 2.10, 2.11, 3.06, 5.04, 12.06 and 13.01 shall survive the execution, delivery and termination of this Agreement and the Notes and the making and repayment of the Obligations.

13.15   Domicile of Loans

Each Lender may transfer and carry its Loans at, to or for the account of any office, Subsidiary or Affiliate of such Lender (other than to a Disqualified Institution). Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Loans pursuant to this Section 13.15 would, at the time of such transfer, result in increased costs under Section 2.10, 2.11(a), 3.06 or 5.04 from those being charged by the respective Lender prior to such transfer, then the Borrower shall not be obligated to pay for or otherwise indemnify such Lender for such increased costs (although the Borrower shall be obligated to pay for and indemnify such Lender for any other increased costs of the type described above resulting from changes after the date of the respective transfer to the extent provided for in Sections 2.10, 2.11(a), 3.06 or 5.04).

13.16   Register

The Borrower hereby designates the Administrative Agent to serve as its agent, solely for purposes of this Section 13.16, to maintain a register (the "Register") on which it will record the Commitments from time to time of each of the Lenders, the Loans made by each of the Lenders and each repayment in respect of the principal amount of, or stated interest on, the Loans of each Lender.  Failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligations in respect of such Loans.  With respect to any Lender, the transfer of the Commitments of such Lender and the rights to the principal of, and interest on, any Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Commitments and Loans and prior to such recordation all amounts owing to the transferor with respect to such Commitments and Loans shall remain owing to the transferor.  The registration of assignment or transfer of all or part of any Commitments and Loans shall be recorded by the Administrative Agent on the Register upon and only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to Section

13.04(b).  Upon such acceptance and recordation, the assignee specified therein shall be treated as a Lender for all purposes of this Agreement.  Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender the Note (if any) evidencing such Loan, and thereupon one or more new Notes in the same aggregate principal amount shall be issued to the assigning or transferor Lender and/or the new Lender at the request of any such Lender.  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding anything to the contrary.  The Register shall be available for inspection by the Borrower, any Agent and any Lender (but only to entries with respect to itself), in each case at any reasonable time and from time to time upon reasonable prior notice.  The initial Register specifying the Initial Term Loan Commitments and the Initial Term Loans of each Lender will be provided by the Borrower to the Administrative Agent on the Closing Date, and the Administrative Agent shall be able to conclusively rely on such Register provided by the Company without any liability for such reliance.  The Parties intend that all extensions of credit to the Borrower and its Affiliates hereunder shall at all times be treated as being in registered form within the meaning of Treasury Regulation Section 5f.103-1(c) and shall interpret the provisions herein regarding the Register consistent with such intent.

      13.17   <u>Confidentiality</u>

      Each Lender agrees that it will not disclose (without the prior consent of the Borrower) (other than to its employees, agents, representatives, auditors, advisors or counsel, its Affiliates involved in the Transaction or the administration of the Credit Documents on a "need to know" basis or to another Lender if such Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information, provided such Persons shall be subject to the provisions of this Section 13.17 to the same extent as such Lender) any information with respect to the Borrower or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement or any other Credit Document, <u>provided</u> that any Lender may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this Section 13.17(a), (ii) as may be required in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors (<u>provided</u> that the applicable Lender shall give the Borrower prompt notice of such disclosure to the extent permitted by law, rule or regulation), (iii) as may be required in respect to any summons or subpoena or in connection with any litigation (<u>provided</u> that the applicable Lender shall give the Borrower prompt notice of such disclosure to the extent permitted by law, rule or regulation), (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender or as requested by a Governmental Authority (<u>provided</u> that the applicable Lender shall give the Borrower prompt notice of such disclosure to the extent permitted by law, rule or regulation), (v) to the extent such information is received by the Administrative Agent or Lender from a third party that is not known by the Administrative Agent or such Lender to be subject to confidentiality arrangements to the Borrower, its Affiliates or any of its Subsidiaries, (vi) to the Administrative Agent or the Collateral Agent, (vii) to any direct or indirect contractual counterparty in any swap, hedge or similar agreement or to any such contractual counterparty's professional advisor (other than a Disqualified Institution)), so long as such contractual counterparty (or such professional advisor) agrees to be bound by the provisions of this Section 13.17, (viii) to any prospective or actual Eligible Transferee in connection with any contemplated transfer or participation of any of the Notes or Commitments or any interest therein by such Lender otherwise permitted by this Agreement, <u>provided</u> that such prospective transferee agrees to be bound by the confidentiality provisions contained in this Section 13.17, (ix) for purposes of establishing any appropriate defense, (x) to Moody's and S&P in connection with obtaining and maintaining the ratings

described in Section 9.14 in the event the Borrower has failed to comply with such Section, (xi) to enforce its rights under any of the Credit Documents, (xii) solely to the extent that such information is independently developed by the Administrative Agent or such Lender without any confidential information provided by (or on behalf of) any Credit Party and (xiii) to the CUSIP Service Bureau or any similar agency solely to the extent that such information is necessary in connection with the issuance and monitoring of CUSIP numbers with respect to the facilities and on a confidential basis.

13.18   No Advisory or Fiduciary Responsibility

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document), the Borrower and each other Credit Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i)(A) the arranging and other services regarding this Agreement provided by the Administrative Agent are arms-length commercial transactions between the Borrower, each other Credit Party and their respective Affiliates, on the one hand, the Administrative Agent (B) each of the Borrower and each other Credit Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower and each other Credit Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents; (ii) (A) the Administrative Agent is, and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, any other Credit Party or any of their respective Affiliates, or any other Person and (B) the Administrative Agent does not have any obligation to the Borrower, any other Credit Party or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents or as expressly agreed in writing by the relevant parties the Administrative Agent and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, the other Credit Parties and their respective Affiliates, and the Administrative Agent does not have any obligation to disclose any of such interests to the Borrower, any other Credit Party or any of their respective Affiliates.

13.19   PATRIOT ACT

Each Lender subject to the Act hereby notifies the Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower and the other Credit Parties and other information that will allow such Lender to identify the Borrower and the other Credit Parties in accordance with the Act.

13.20   Post-Closing Actions

Notwithstanding anything to the contrary contained in this Agreement or the other Credit Documents, the parties hereto acknowledge and agree that the Borrower and its Restricted Subsidiaries shall be required to take the actions specified in Schedule 13.20 attached hereto as promptly as practicable, and in any event within the time periods set forth in Schedule 13.20 (which time periods may be extended in the discretion of the Administrative Agent).  The provisions of Schedule 13.20 shall be deemed incorporated by reference herein as fully as if set forth herein in its entirety.

All conditions precedent and representations contained in this Agreement and the other Credit Documents shall be deemed modified to the extent necessary to effect the foregoing (and to permit the taking of the actions described above within the time periods required above, rather than as elsewhere provided in the Credit Documents), provided that (x) to the extent any representation and warranty would not be true because the foregoing actions were not taken on the Closing Date, the respective

representation and warranty shall be required to be true and correct in all material respects at the time the respective action is taken (or was required to be taken) in accordance with the foregoing provisions of this Section 13.20 and (y) all representations and warranties relating to the Security Documents shall be required to be true in all material respects immediately after the actions required to be taken by this Section 13.20 have been taken.  The acceptance of the benefits of each Credit Event shall constitute a representation, warranty and covenant by the Borrower to each of the Lenders that the actions required pursuant to this Section 13.20 will be, or have been, taken within the relevant time periods referred to in this Section 13.20 and that, at such time, such affected representations and warranties contained in this Agreement and the other Credit Documents shall then be true and correct in all material respects without any modification pursuant to this Section 13.20, and the parties hereto acknowledge and agree that the failure to take any of the actions required above, within the relevant time periods required above, shall give rise to an immediate Event of Default pursuant to this Agreement.

13.21   Interest Rate Limitation

Notwithstanding anything to the contrary contained in any Credit Document, the interest paid or agreed to be paid under the Credit Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

13.22   [Reserved].

13.23   Lender Action

Each Lender, in its capacity as such, agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Credit Party or any other obligor in each case, under any of the Credit Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Credit Party as a Lender, unless expressly provided for herein or in any other Credit Document.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**NEW WPCC PARENT, LLC**,
as the Borrower

By: _Marc Goldstone_

Name: Marc Goldstone
Title: Chief Legal Officer

**ACQUIOM AGENCY SERVICES LLC**,
as the Administrative Agent and Collateral Agent

By:  *Lisha John*
Name:  Lisha John
Title:  Director

[Signature Page to Exit Credit Agreement]

Lender signatures on file with Administrative Agent.

**<u>Exhibit E</u>**

**Rejected Executory Contracts and Unexpired Leases Schedule**

| Counterparty | Debtor | Lease/Contract Description | Counterparty Address | Rejection Date |
|---|---|---|---|---|
| 1340 PERIMETER HILL PARTNERS LLC | Wellpath LLC | Leases | 3201 TREVER ST, STE 200, NASHVILLE, TN 37209 | July 31, 2025 |
| 1340 PERIMETER HILL PARTNERS LLC | Wellpath LLC | Leases | 3201 TREVER ST, STE 200, NASHVILLE, TN 37209 | July 31, 2025 |
| 1340 PERIMETER HILL PARTNERS LLC | Wellpath LLC | Leases | 3201 TREVER ST, STE 200, NASHVILLE, TN 37209 | July 31, 2025 |
| Addison Group | Wellpath LLC | Staffing Agencies | 125 S WACKER DR, 27TH FL, CHICAGO, IL 60606 | Plan Effective Date |
| ADMINS OF THE TULANE EDUCATIONAL FUND | Wellpath LLC | Vendor Contracts | 1430 TULANE AVE, TW-22, NEW ORLEANS, LA 70112 | Plan Effective Date |
| Advanced EyeCare Professionals | Wellpath LLC | Network Development Providers | 2001 E. Bluewater Hwy., Ste 115, Ionia, Michigan 48846 | Plan Effective Date |
| ALERE TOXICOLOGY | Wellpath LLC | Vendor Contracts | 1111 NEWTON ST, GRETNA, LA 70053 | Plan Effective Date |
| ALLRED, KRISTIN;DOYLE, MIKE; KLEIN, VICTORIA; ALPINE SPECIAL TREATMENT CENTER INC | CCS-CMGC PARENT HOLDINGS LP | Equity Purchase Agreement | 2120 ALPINE BLVD, ALPINE, CA 91901 | Plan Effective Date |
| ALLRED, KRISTIN;DOYLE, MIKE; KLEIN, VICTORIA; ALPINE SPECIAL TREATMENT CENTER INC | Wellpath Holdings, Inc. | Settlement Agreement | 2120 ALPINE BLVD, ALPINE, CA 91901 | Plan Effective Date |
| A-Med Ambulance Service Inc | Wellpath LLC | Network Development Providers | 1800 Monroe Street, Gretna, Louisiana 70053 | Plan Effective Date |
| Andrew S. Riemer DO PC | Wellpath LLC | Network Development Providers | 1775 South Mitchell Street, Cadillac, Michigan 49601 | Plan Effective Date |
| Associated Retinal Consultants PC | Wellpath LLC | Network Development Providers | 39650 ORCHARD HILL PLACE, SUITE 200, NOVI, MI 48375 | Plan Effective Date |
| Associated Retinal Consultants PC | Wellpath LLC | Network Development Providers | 39650 ORCHARD HILL PLACE, SUITE 200, NOVI, MI 48375 | Plan Effective Date |
| Associated Retinal Consultants PC | Wellpath LLC | Network Development Providers | 39650 ORCHARD HILL PLACE, SUITE 200, NOVI, MI 48375 | Plan Effective Date |
| Associated Retinal Consultants PC | Wellpath LLC | Network Development Providers | 39650 ORCHARD HILL PLACE, SUITE 200, NOVI, MI 48375 | Plan Effective Date |
| AWC NETWORKS LLC | Wellpath LLC | Vendor Contracts | 1175 Peachtree St Ne, Ste 1000, Atlanta, GA 30361 | Plan Effective Date |
| AWC Networks, LLC | Wellpath LLC | Network Development Providers | 1175 Peachtree St Ne, Ste 1000, Atlanta, GA 30361 | Plan Effective Date |
| BAART Programs Omaha | Wellpath LLC | Network Development Providers | 1941 South 42nd Street, Suite 210 Omaha, Nebraska 68105 | Plan Effective Date |
| Baraga County Memorial Hospital | Wellpath LLC | Network Development Providers | 18341 US Highway 41, L'Anse, Michigan 49946 | Plan Effective Date |
| BARTON ASSOCIATES INC | Wellpath LLC | Vendor Contracts | PO BOX 417844, BOSTON, MA 02241 | Plan Effective Date |
| Bay Street Orthopedics | Wellpath LLC | Network Development Providers | 4048 Cedar Bluff Dr,Suite 1Petoskey, MI 49770, Petoskey, Michigan 49770 | Plan Effective Date |
| Beth Israel Deaconess Hospital Plymouth | Wellpath LLC | Network Development Providers | 275 SANDWICH ST, PLYMOUTH, MA 02360 | Plan Effective Date |
| Beth Israel Deaconess Hospital Plymouth | Wellpath LLC | Network Development Providers | 275 SANDWICH ST, PLYMOUTH, MA 02360 | Plan Effective Date |
| Boston Medical Center | Wellpath LLC | Network Development Providers | 720 HARRISON AVENUE, 10TH FLOOR, BOSTON, MA 02118 | Plan Effective Date |
| Boston Medical Center | Wellpath LLC | Network Development Providers | 720 HARRISON AVENUE, 10TH FLOOR, BOSTON, MA 02118 | Plan Effective Date |
| Boston Medical Center | Wellpath LLC | Network Development Providers | 720 HARRISON AVENUE, 10TH FLOOR, BOSTON, MA 02118 | Plan Effective Date |
| Boston Medical Center | Wellpath LLC | Network Development Providers | 720 HARRISON AVENUE, 10TH FLOOR, BOSTON, MA 02118 | Plan Effective Date |
| Boston University Eye Associates, Inc. | Wellpath LLC | Network Development Providers | 1 BOSTON MEDICAL CENTER PL, BOSTON, MA 02118 | Plan Effective Date |
| Boston University Medical Center Radiologists, Inc. | Wellpath LLC | Network Development Providers | 840 HARRISON AVE, BOSTON, MA 02118-2905 | Plan Effective Date |
| Boulder Valley Center for Dermatology, Prof LLC | Wellpath LLC | Network Development Providers | 1610 Prairie Center Pkwy #2230, Brighton, Colorado 80601 | Plan Effective Date |
| Brewster Ambulance Service, Inc. | Wellpath LLC | Network Development Providers | 25 MAIN STREET, WEYMOUTH, MA 02188 | Plan Effective Date |
| Brewster Ambulance Service, Inc. | Wellpath LLC | Network Development Providers | 25 MAIN STREET, WEYMOUTH, MA 02188 | Plan Effective Date |
| Brewster Ambulance Service, Inc. | Wellpath LLC | Network Development Providers | 25 MAIN STREET, WEYMOUTH, MA 02188 | Plan Effective Date |
| Brewster Ambulance Service, Inc. | Wellpath LLC | Network Development Providers | 25 MAIN STREET, WEYMOUTH, MA 02188 | Plan Effective Date |
| BRIDGEPOINT HEALTHCARE LOUISIANA LLC | Wellpath LLC | Network Development Providers | 1101 MEDICAL CENTER BLVD FL 7, MARRERO, LA 70072-3147 | Plan Effective Date |
| CANDLER HOSPITAL INC | Wellpath LLC | Network Development Providers | 101 ST. JOSEPH'S/CANDLER DRIVE, POOLER, GA 31322 | Plan Effective Date |
| Cardiology Consultants of East Michigan | Wellpath LLC | Network Development Providers | 1031 Suncrest Dr, Lapeer, Michigan 48446 | Plan Effective Date |
| Center for Behavioral Health Las Vegas, LLC | Wellpath LLC | Network Development Providers | 2290 MCDANIEL STREET, SUITE 1C, NORTH LAS VEGAS, NV 89030 | Plan Effective Date |
| Center for Behavioral Health Las Vegas, LLC | Wellpath LLC | Network Development Providers | 2290 MCDANIEL STREET, SUITE 1C, NORTH LAS VEGAS, NV 89030 | Plan Effective Date |
| Center for Spine and Orthopedics, Inc | Wellpath LLC | Network Development Providers | 9005 Grant Street Ste 200, Thornton, Colorado 80229 | Plan Effective Date |
| CENTURA ST ANTHONY HOSPITAL | Wellpath LLC | Network Development Providers | 11600 W 2ND PL, LAKEWOOD, CO 80228 | Plan Effective Date |
| Charles J. Lilly, MD, PC | Wellpath LLC | Network Development Providers | 2890 Health Pkwy, Mount Pleasant, Michigan 48858 | Plan Effective Date |
| Charlotte Radiology | Wellpath LLC | Network Development Providers | 700 E MOREHEAD ST STE 300, CHARLOTTE, NC 28202 | Plan Effective Date |
| Charter Township of Madison Lenawee County dba Madison Township Fire Department | Wellpath LLC | Network Development Providers | 3804 South Adrian Highway, Adrian, Michigan 49221 | Plan Effective Date |
| Coastal Empire Orthopedics, LLC | Wellpath LLC | Network Development Providers | 6715 FOREST PARK DRIVE, SAVANNAH, GA 31406 | Plan Effective Date |
| Comdata Inc. | WHC LLC | Vendor Contracts | 5301 Maryland Way, Brentwood, TN 37027 | Plan Effective Date |
| Comdata Inc. | Wellpath Holdings, Inc. | Vendor Contracts | 5301 Maryland Way, Brentwood, TN 37027 | Plan Effective Date |
| Compass Health | Wellpath LLC | Network Development Providers | 2175 COOLIDGE RD, EAST LANSING, MI 48823 | Plan Effective Date |
| Compass Health | Wellpath LLC | Network Development Providers | 2175 COOLIDGE RD, EAST LANSING, MI 48823 | Plan Effective Date |
| Compass Health | Wellpath LLC | Network Development Providers | 2175 COOLIDGE RD, EAST LANSING, MI 48823 | Plan Effective Date |
| COMPUTACENTER UNITED STATES INC | Wellpath LLC | Vendor Contracts | 6025 THE CORNERS PKWY, STE 100, NORCROSS, GA 30092 | Plan Effective Date |
| Coquille Valley Hospital | Wellpath LLC | Network Development Providers | 940 E 5th St, Coquille, Oregon 97423 | Plan Effective Date |
| County of Alger | Wellpath LLC | Network Development Providers | 101 Court St., Munising, Michigan 49862 | Plan Effective Date |
| County of Montcalm dba Montcalm County Emergency Services | Wellpath LLC | Network Development Providers | 655 N. State St., Stanton, 0 48888 | Plan Effective Date |
| CRESCENT AUGUSTA | Wellpath LLC | Network Development Providers | 1370 BROWNING RD, COLUMBIA, SC 29210-6938 | Plan Effective Date |
| Cytometry Specialists Inc | Wellpath LLC | Network Development Providers | 2580 Westside Parkway, Alpharetta, Georgia 30004 | Plan Effective Date |
| Degenhart Eye, LLC | Wellpath LLC | Network Development Providers | 440-A Moon River Ct., Savannah, Georgia 31406 | Plan Effective Date |
| Dental One Associates (Stockbridge), LLC dba Dental One Stockbridge | Wellpath LLC | Network Development Providers | 6240 Lake Osprey Drive, Dept 54161, Sarasota, Florida 34240 | Plan Effective Date |
| Dermatology & Skin Surgery Center, PLC | Wellpath LLC | Network Development Providers | 2121 Spring Arbor Road, Jackson, Michigan 49203 | Plan Effective Date |
| Dialysis Clinic, Inc. - Davidson County | Wellpath LLC | Network Development Providers | 1633 CHURCH STREET SUITE 500, NASHVILLE, TN 37203 | Plan Effective Date |
| Dialysis Clinic, Inc. | Wellpath LLC | Network Development Providers | 905 LOUISIANA BOULEVARD NORTHEAST, ALBUQUERQUE, NM 87110 | Plan Effective Date |
| Dialysis Clinic, Inc. | Wellpath LLC | Network Development Providers | 905 LOUISIANA BOULEVARD NORTHEAST, ALBUQUERQUE, NM 87110 | Plan Effective Date |
| Dialysis Clinic, Inc. | Wellpath LLC | Network Development Providers | 905 LOUISIANA BOULEVARD NORTHEAST, ALBUQUERQUE, NM 87110 | Plan Effective Date |
| Dialysis Clinic, Inc. | Wellpath LLC | Network Development Providers | 905 LOUISIANA BOULEVARD NORTHEAST, ALBUQUERQUE, NM 87110 | Plan Effective Date |
| Dialysis Clinic, Inc. | Wellpath LLC | Network Development Providers | 905 LOUISIANA BOULEVARD NORTHEAST, ALBUQUERQUE, NM 87110 | Plan Effective Date |
| Dialysis Clinic, Inc. | Wellpath LLC | Network Development Providers | 905 LOUISIANA BOULEVARD NORTHEAST, ALBUQUERQUE, NM 87110 | Plan Effective Date |
| Dialysis Clinic, Inc. | Wellpath LLC | Network Development Providers | 905 LOUISIANA BOULEVARD NORTHEAST, ALBUQUERQUE, NM 87110 | Plan Effective Date |
| Dialysis Clinic, Inc. | Wellpath LLC | Network Development Providers | 905 LOUISIANA BOULEVARD NORTHEAST, ALBUQUERQUE, NM 87110 | Plan Effective Date |
| Dwarakanath R. Banala M.D. dba Florida Internal Medicine PL | Wellpath LLC | Network Development Providers | 620 S LAKE ST STE 6, LEESBURG, FL 34748 | Plan Effective Date |
| EAR NOSE & THROAT SPECIALTY CARE | Wellpath LLC | Network Development Providers | 411 N WASHINGTON AVE STE 7000, DALLAS, TX 75246 | Plan Effective Date |
| Effingham Hospital, Inc. dba Effingham Health System | Wellpath LLC | Network Development Providers | 459 Ga Hiway 119 S, Springfield, Georgia 31329 | Plan Effective Date |
| Emerson Hospital | Wellpath LLC | Network Development Providers | 133 OLD ROAD TO 9 ACRE COR, CONCORD, MA 01742 | Plan Effective Date |
| Envision Eye Care, PLLC | Wellpath LLC | Network Development Providers | 5310 Hampton Pl Ste. 2, Saginaw, Michigan 48604 | Plan Effective Date |
| EPMG of Michigan PC | Wellpath LLC | Network Development Providers | 5301 E. HURON RIVER DRIVE, ANN ARBOR, MI 48106 | Plan Effective Date |
| EPMG of Michigan PC | Wellpath LLC | Network Development Providers | 5301 E. HURON RIVER DRIVE, ANN ARBOR, MI 48106 | Plan Effective Date |
| EPMG of Michigan PC | Wellpath LLC | Network Development Providers | 5301 E. HURON RIVER DRIVE, ANN ARBOR, MI 48106 | Plan Effective Date |
| Evans Memorial Hospital Inc | Wellpath LLC | Network Development Providers | 200 N RIVER ST, CLAXTON, GA 30417 | Plan Effective Date |
| Family Medical Transport, LLC | Wellpath LLC | Network Development Providers | PO Box 30488, Charleston, South Carolina 29417 | Plan Effective Date |
| FAVORITE HEALTHCARE STAFFING INC | Wellpath LLC | Staffing Agencies | 7255 W 98TH TER, BLDG 5, STE 150, OVERLAND PARK, KS 66212 | Plan Effective Date |
| FEDEX OFFICE AND PRINT SERVICES INC | Wellpath LLC | Vendor Contracts | 7900 LEGACY DR, PLANO, TX 75024 | Plan Effective Date |
| Flint Clinical Pathology, PC | Wellpath LLC | Network Development Providers | 3490 CALKINS RD, FLINT, MI 48532 | Plan Effective Date |
| Forrest City Arkansas Hospital Company LLC dba Forrest City Medical Center | Wellpath LLC | Network Development Providers | 1601 NEWCASTLE ROAD, FORREST CITY, AR 72335 | Plan Effective Date |
| GEO INTERNATIONAL HOLDINGS LLC | Wellpath Holdings, Inc. | Related Party Agreements | 4955 Technology Way, Boca Raton, FL 33431 | Plan Effective Date |
| GEORGIA EYE INSTITUTE SURGERY CENTER | Wellpath LLC | Network Development Providers | 4720 WATERS AVE, STE 3, SAVANNAH, GA 31404 | Plan Effective Date |
| Georgia Eye Institute, LLC dba Georgia Eye Institute Surgery Center | Wellpath LLC | Network Development Providers | 4720 WATERS AVENUE, SAVANNAH, GA 31404 | Plan Effective Date |
| Good Samaritan Medical Center | Wellpath LLC | Network Development Providers | 200 EXEMPLA CIRCLE, LAFAYETTE, CO 80026 | Plan Effective Date |
| GRAND PRAIRIE HEALTHCARE PC | Wellpath LLC | Professional Corporations | 1283 MUIRFREESBORO RD, STE 500, NASHVILLE, TN 37217 | Plan Effective Date |
| Grand Traverse Ophthalmology Clinic, Pc | Wellpath LLC | Network Development Providers | 929 Business Park Dr, Traverse City, Michigan 49686 | Plan Effective Date |
| Grand Traverse Oral Surgery PC | Wellpath LLC | Network Development Providers | 12776 South West Bay Shore Dr, Traverse City, Michigan 49684 | Plan Effective Date |
| GRIFFIN IMAGING LLC | Wellpath LLC | Network Development Providers | 220 ROCK ST, GRIFFIN, GA 30224 | Plan Effective Date |
| Hand and Plastic Surgery Center PLC | Wellpath LLC | Network Development Providers | 245 Cherry St SE Ste. 302, Grand Rapids, Michigan 49503 | Plan Effective Date |
| Hand Surgery Specialists Of Nevada Young LLP | Wellpath LLC | Network Development Providers | 9321 West Sunset Road, Las Vegas, Nevada 89148 | Plan Effective Date |
| Hand Therapy of Petoskey | Wellpath LLC | Network Development Providers | 4048 Cedar Bluff Dr Ste 4, Petoskey, Michigan 49770 | Plan Effective Date |
| Heart and Vascular Institute of Michigan | Wellpath LLC | Network Development Providers | 1075 SUNCREST DR STE C, LAPEER, MI 48446 | Plan Effective Date |
| Helen Newberry Joy Hospital | Wellpath LLC | Network Development Providers | 502 W. Harrie St., Newberry, Michigan 49868 | Plan Effective Date |
| Henry Ford Health Jackson Hospital | Wellpath LLC | Network Development Providers | 2799 West Grand Blvd, Detroit, Michigan 48202 | Plan Effective Date |
| Henry Ford Health Jackson Hospital | Wellpath LLC | Network Development Providers | 2799 WEST GRAND BLVD, DETROIT, MI 48202 | Plan Effective Date |
| Henry Ford Health Jackson Hospital | Wellpath LLC | Network Development Providers | 2799 WEST GRAND BLVD, DETROIT, MI 48202 | Plan Effective Date |
| Henry Ford Health Jackson Hospital | Wellpath LLC | Network Development Providers | 2799 WEST GRAND BLVD, DETROIT, MI 48202 | Plan Effective Date |
| Henry Ford Health System | Wellpath LLC | Network Development Providers | 2799 WEST GRAND BLVD, MI, 48202 | Plan Effective Date |
| Henry Heywood Memorial Hospital | Wellpath LLC | Network Development Providers | 242 GREEN ST, GARDNER, MA 01440-1336 | Plan Effective Date |
| Heywood Medical Group, Inc. | Wellpath LLC | Network Development Providers | 242 GREEN ST, GARDNER, MA 01440 | Plan Effective Date |
| Hillsdale Community Health Center dba Hillsdale Hospital | Wellpath LLC | Network Development Providers | 168 South Howell St, Hillsdale, Michigan 49242 | Plan Effective Date |
| Holicki Eye Center, PC | Wellpath LLC | Network Development Providers | 142 E Chicago Rd, Coldwater, Michigan 49036 | Plan Effective Date |
| HRK MEDICAL STAFFING INC | Wellpath LLC | Staffing Agencies | 1705 19TH PLACE STE C-1, VERO BEACH, FL 32960 | Plan Effective Date |
| Huron Valley Ambulance | Wellpath LLC | Network Development Providers | 1200 State Circle, Ann Arbor, Michigan 48108 | Plan Effective Date |
| Huron Valley Ambulance | Wellpath LLC | Network Development Providers | 1200 STATE CIRCLE, ANN ARBOR, MI 48108 | Plan Effective Date |
| Huron Valley Radiology PC | Wellpath LLC | Network Development Providers | 5333 MCAULEY DRIVE, STE 6016, MI, 48197 | Plan Effective Date |
| Huron Valley Radiology PC | Wellpath LLC | Network Development Providers | 5333 MCAULEY DRIVE, STE 6016, MI, 48197 | Plan Effective Date |

| | | | | |
|---|---|---|---|---|
| Independent Emergency Physicians PC * | Wellpath LLC | Network Development Providers | 37000 Grand River Avenue, Farmington Hills, MI 48335 | Plan Effective Date |
| Independent Emergency Physicians PC * | Wellpath LLC | Network Development Providers | 37000 Grand River Avenue, Farmington Hills, MI 48335 | Plan Effective Date |
| JACKSON & COKER LOCUMTENENS LLC | Wellpath LLC | Vendor Contracts | 2655 NORTHWINDS PARKWAY, ALPHARETTA, GA 30009 | Plan Effective Date |
| Jackson & Coker LocumTenens, LLC | Wellpath LLC | Vendor Contracts | 2655 NORTHWINDS PARKWAY, ALPHARETTA, GA 30009 | Plan Effective Date |
| Jackson Community Ambulance | Wellpath LLC | Network Development Providers | 1200 State Circle, Ann Arbor, Michigan 48108 | Plan Effective Date |
| Jackson Radiology Consultants, PC | Wellpath LLC | Network Development Providers | 350 W. Washington St., Ionia, Michigan 48846 | Plan Effective Date |
| James T. Havens | Wellpath LLC | Network Development Providers | 1841 N Columbia St., Milledgeville, Georgia 31061 | Plan Effective Date |
| Jawad A Shah MD PC | Wellpath LLC | Network Development Providers | 4800 S. Saginaw St. Suite 1800, Flint, Michigan 48507 | Plan Effective Date |
| JOSEPH M STILL BURN CENTERS INC | Wellpath LLC | Network Development Providers | 3675 J DEWEY GRAY CIR STE 300, AUGUSTA, GA 30909 | Plan Effective Date |
| Katranji Reconstructive Surgery Institute PLLC DBA Katranji Hand Center | Wellpath LLC | Network Development Providers | 2111 Merritt Rd, Suite 202, East Lansing, Michigan 48823 | Plan Effective Date |
| Kellam & Associates PC | Wellpath LLC | Network Development Providers | 399 S BROADWAY ST, LAKE ORION, MI 48093 | Plan Effective Date |
| Kellogg Eye Center University of Michigan Health | Wellpath LLC | Network Development Providers | 777 EAST EISENHOWER PARKWAY, ANN ARBOR, MI 48108 | Plan Effective Date |
| Kinross Charter Township | Wellpath LLC | Network Development Providers | 4884 W. Curtis Street, Kincheloe, Michigan 49788 | Plan Effective Date |
| Lansing Surgical Associates P.L.L.C. | Wellpath LLC | Network Development Providers | 3937 Patient Care Dr., Ste. 106, Lansing, Michigan 48911 | Plan Effective Date |
| LBMC STAFFING SOLUTIONS LLC | Wellpath LLC | Vendor Contracts | 3451 S MERCY RD, GILBERT, AZ 85297 | Plan Effective Date |
| LEXISNEXIS | Wellpath LLC | Vendor Contracts | 9443 SPRINGBORO PIKE, MIAMISBURG, OH 45342 | Plan Effective Date |
| Life EMS of Ionia Inc. | Wellpath LLC | Network Development Providers | 350 W. Washington, Ionia, Michigan 48846 | Plan Effective Date |
| Lifecare Ambulance Service | Wellpath LLC | Network Development Providers | 1200 State Circle, Ann Arbor, Michigan 48108 | Plan Effective Date |
| LO Eye Care | Wellpath LLC | Network Development Providers | 2001 Coolidge Road, East Lansing, Michigan 48823 | Plan Effective Date |
| LOCUMTENENS.COM LLC | Wellpath LLC | Staffing Agencies | 2655 NORTHWINDS PARKWAY, ALPHARETTA, GA 30009 | Plan Effective Date |
| Mark Stewart MD | Wellpath LLC | Network Development Providers | 4 Columbus Ave Ste 360, Bay City, Michigan 48642 | Plan Effective Date |
| Mathew A. Page | Wellpath LLC | Network Development Providers | 2797 SPRING ARBOR RD STE A, JACKSON, MI 49203-3605 | Plan Effective Date |
| Mathew A. Page | Wellpath LLC | Network Development Providers | 2797 Spring Arbor Rd Suite A, Jackson, Michigan 49203 | Plan Effective Date |
| McLaren Health Care Corporation Payor Agreement | Wellpath LLC | Network Development Providers | 2701 Cambridge Ct Ste 200 Auburn Hills, Michigan 48325 | Plan Effective Date |
| Med Trans Corp. | Wellpath LLC | Network Development Providers | PO BOX 708, WEST PLAINS, MO 65775-0708 | Plan Effective Date |
| MEDIX STAFFING SOLUTIONS INC | Wellpath LLC | Staffing Agencies | 222 S RIVERSIDE PLZ, STE 2120, CHICAGO, IL 60606 | Plan Effective Date |
| Michigan Ear Institute PLLC | Wellpath LLC | Network Development Providers | 30055 Northwestern Highway #101, Farmington Hills, MI 48334 | Plan Effective Date |
| MidMichigan Health | Wellpath LLC | Network Development Providers | 4000 Wellness Drive., Midland, Michigan 48670 | Plan Effective Date |
| MidMichigan Health | Wellpath LLC | Network Development Providers | 4000 Wellness Drive., Midland, Michigan 48670 | Plan Effective Date |
| Mobile Eye Services, INC | Wellpath LLC | Network Development Providers | 9230 FOUR MILE CREEK RD, GAINESVILLE, GA 30506 | Plan Effective Date |
| Mobile Medical Response, Inc. | Wellpath LLC | Network Development Providers | 834 S WASHINGTON AVE, MI, 48601-2566 | Plan Effective Date |
| Mobile Medical Response, Inc. | Wellpath LLC | Network Development Providers | 834 S WASHINGTON AVE, MI, 48601-2566 | Plan Effective Date |
| Monroe Community Ambulance | Wellpath LLC | Network Development Providers | 1598 WEST 7TH STREET, MONROE, MI 48161 | Plan Effective Date |
| Monroe Community Ambulance | Wellpath LLC | Network Development Providers | 1598 WEST 7TH STREET, MONROE, MI 48161 | Plan Effective Date |
| Morton Hospital | Wellpath LLC | Network Development Providers | 88 WASHINGTON ST, TAUNTON, MA 02780-2499 | Plan Effective Date |
| Morton Hospital | Wellpath LLC | Network Development Providers | 88 WASHINGTON ST, TAUNTON, MA 02780-2499 | Plan Effective Date |
| MOSAIC CONSULTING GROUP | Wellpath LLC | Vendor Contracts | 2503 EUGENIA, NASHVILLE, TN 37211 | Plan Effective Date |
| Mountain View Oral Surgery | Wellpath LLC | Network Development Providers | 1046 NE 3RD ST, MCMINNVILLE, OR 97128-4418 | Plan Effective Date |
| MSI SYSTEMS CORP | Wellpath LLC | Staffing Agencies | 23 VREELAND RD, STE 210, FLORHAM PARK, NJ 07932 | Plan Effective Date |
| MSU Health Care | Wellpath LLC | Network Development Providers | 909 Wilson Rd, East Lansing, Michigan 48824 | Plan Effective Date |
| Munising Memorial Hospital Association dba Munising Memorial Hospital | Wellpath LLC | Network Development Providers | 1500 Sand Point Rd, Munising, Michigan 49862 | Plan Effective Date |
| MUNSON MEDICAL CENTER | Wellpath LLC | Network Development Providers | 1105 6TH ST, TRAVERSE CITY, MI 49685 | Plan Effective Date |
| MUSC PHYSICIANS | Wellpath LLC | Network Development Providers | 171 ASHLEY AVE, CHARLESTON, SC 29425-0100 | Plan Effective Date |
| Muskegon SSC, LLC dba Muskegon Surgery Center | Wellpath LLC | Network Development Providers | 1400 Mercy Drive Suite 150, Muskegon, Michigan 49444 | Plan Effective Date |
| Muskegon Surgical Associates | Wellpath LLC | Network Development Providers | 1316 Mercy Drive, Muskegon, Michigan 49444 | Plan Effective Date |
| MyMichigan Medical Center Sault | Wellpath LLC | Network Development Providers | 500 OSBORN BLVD, SAULT SAINTE MARIE, MI 49783 | Plan Effective Date |
| MYRIAD GENETIC LAB | Wellpath LLC | Network Development Providers | 322 N 2200 WEST, SALT LAKE CITY, UT 84116 | Plan Effective Date |
| Myriad Genetic Laboratories, Inc. | Wellpath LLC | Network Development Providers | 320 WAKARA WAY, SALT LAKE CITY, UT 84108 | Plan Effective Date |
| Nashoba Valley Medical Center | Wellpath LLC | Network Development Providers | 200 GROTON RD, AYER, MA 01432-1168 | Plan Effective Date |
| Nashoba Valley Medical Center | Wellpath LLC | Network Development Providers | 200 GROTON RD, AYER, MA 01432-1168 | Plan Effective Date |
| Nashville Gastroenterology and Hepatology, PLLC | Wellpath LLC | Network Development Providers | 330 WALLACE ROAD SUITE 103, NASHVILLE, TN 37211 | Plan Effective Date |
| Neurology Center PLC | Wellpath LLC | Network Development Providers | 23 N Hanchett St Ste 1, Coldwater, Michigan 49036-1652 | Plan Effective Date |
| North Suburban Medical Center | Wellpath LLC | Network Development Providers | 9191 GRANT ST, THORNTON, CO 80229 | Plan Effective Date |
| ON CALL STAFFING LLC | Wellpath LLC | Staffing Agencies | 4236 COLUMBIA RD, MARTINEZ, GA 30907 | Plan Effective Date |
| ON CALL STAFFING LLC | Wellpath LLC | Staffing Agencies | 4236 COLUMBIA RD, MARTINEZ, GA 30907 | Plan Effective Date |
| ON SITE ENDO LLC | Wellpath LLC | Network Development Providers | 10503 Maumelle Blvd, Ste 4B, North, Little Rock, AR 72113 | Plan Effective Date |
| ON SITE ENDO LLC | Wellpath LLC | Network Development Providers | 3223 North Webb Rd Suite 5, Wichita, KS 67226 | Plan Effective Date |
| ON SITE ENDO LLC | Wellpath LLC | Network Development Providers | 3223 North Webb Rd Suite 5, Wichita, KS 67226 | Plan Effective Date |
| On-Site Endo, LLC | Wellpath LLC | Network Development Providers | 3857 Cooper St, Jackson, MI 49201 | Plan Effective Date |
| On-Site Endo, LLC | Wellpath LLC | Network Development Providers | 3223 North Webb Road #5, Wichita, KS 67226 | Plan Effective Date |
| On-Site Endo, LLC | Wellpath LLC | Network Development Providers | 3223 North Webb Road #5, Wichita, KS 67226 | Plan Effective Date |
| OPTIM MEDICAL CENTER TATTNALL | Wellpath LLC | Network Development Providers | 242 INDUSTRIAL BLVD, DUBLIN, GA 31021-2904 | Plan Effective Date |
| ORAL SURGERY INSTITUTE | Wellpath LLC | Network Development Providers | 145 TRADERS WAY STE A, POOLER, GA 31322 | Plan Effective Date |
| Orson P. Cardon | Wellpath LLC | Network Development Providers | 462 Fox Lake Trail, Horton, Michigan 49246 | Plan Effective Date |
| OrthoArkansas | Wellpath LLC | Network Development Providers | 800 FAIR PARK BLVD, LITTLE ROCK, AR 72204 | Plan Effective Date |
| OrthoArkansas | Wellpath LLC | Network Development Providers | 800 FAIR PARK BLVD, LITTLE ROCK, AR 72204 | Plan Effective Date |
| OrthoCarolina PA | Wellpath LLC | Network Development Providers | 2001 VAIL AVENUE, CHARLOTTE, NC 28207 | Plan Effective Date |
| Orthopedic Associates of Muskegon | Wellpath LLC | Network Development Providers | 1400 Mercy Drive Suite 300, Muskegon, Michigan 49444 | Plan Effective Date |
| Pafford Medical Services, Inc. | Wellpath LLC | Network Development Providers | PO BOX 1120, HOPE, AR 71802-1120 | Plan Effective Date |
| Pahls Family Dentistry | Wellpath LLC | Network Development Providers | 346 N CENTRAL BLVD, COQUILLE, OR 97423 | Plan Effective Date |
| Prime Healthcare Foundations - Southern Regional, LLC dba Southern Regional Medical Center (Facility) | Wellpath LLC | Network Development Providers | 11 Upper Riverdale Road SW, Riverdale, Georgia 30274-2600 | Plan Effective Date |
| Professional Med Team | Wellpath LLC | Network Development Providers | 965 FORK ST, MUSKEGON, MI 49442 | Plan Effective Date |
| ProMedica Charles and Virginia Hickman Hospital | Wellpath LLC | Network Development Providers | 5640 North Adrian Hwy, Adrian, Michigan 49221 | Plan Effective Date |
| ProMedica Coldwater Regional Hospital | Wellpath LLC | Network Development Providers | 274 East Chicago Street, Coldwater, Michigan 49036 | Plan Effective Date |
| ProMedica Health System | Wellpath LLC | Network Development Providers | 5855 Monroe St, Sylvania, Ohio 43560 | Plan Effective Date |
| Radiology Muskegon, PC | Wellpath LLC | Network Development Providers | 605 West Western Avenue, Muskegon, Michigan 49440 | Plan Effective Date |
| RESERVE HEALTH PC | Wellpath LLC | Network Development Providers | 2826 LAKE SHORE RD S, DENVER, NC 28037 | Plan Effective Date |
| RESERVE HEALTH PC | Wellpath LLC | Vendor Contracts | 2826 LAKE SHORE RD S, DENVER, NC 28037 | Plan Effective Date |
| RESERVE HEALTH PC | Wellpath LLC | Vendor Contracts | 2826 LAKE SHORE RD S, DENVER, NC 28037 | Plan Effective Date |
| Retina Specialists of Michigan PC | Wellpath LLC | Network Development Providers | 5030 Cascade Rd SE, Grand Rapids, Michigan 49546 | Plan Effective Date |
| Richmond Lenox EMS Ambulance Authority | Wellpath LLC | Network Development Providers | 34505 32 Mile Road, Richmond, Michigan 48062 | Plan Effective Date |
| Rocky Mountain Cancer Centers | Wellpath LLC | Network Development Providers | 1700 S. POTOMAC ST., AURORA, 80012 | Plan Effective Date |
| Ronnie R. Sorrow, JR | Wellpath LLC | Network Development Providers | 4874 County Ln, Jackson, Michigan 49201 | Plan Effective Date |
| Ryan J. Lilly, MD, PLLC | Wellpath LLC | Network Development Providers | 2890 HEALTH PARKWAY, MI, 48858 0 | Plan Effective Date |
| SAINT JOSEPHS HOSPITAL | Wellpath LLC | Network Development Providers | 11705 MERCY BLVD, SAVANNAH, GA 31419 | Plan Effective Date |
| Sanjeev Gupta MD | Wellpath LLC | Network Development Providers | 601 E SAMPLE RD STE 105, POMPANO BEACH, FL 33064 | Plan Effective Date |
| Sheridan Community Hospital | Wellpath LLC | Network Development Providers | 301 North Main Street, Sheridan, Michigan 48884 | Plan Effective Date |
| Sheridan HealthCorp Inc. | Wellpath LLC | Network Development Providers | 1613 N HARRISON PKWY STE 200, SUNRISE, FL 33323-2853 | Plan Effective Date |
| Shoreline ASC, LLC | Wellpath LLC | Network Development Providers | 1266 E Sherman Blvd, Muskegon, Michigan 49444 | Plan Effective Date |
| Shoreline Ophthalmology, PLLC | Wellpath LLC | Network Development Providers | 1266 E Sherman Blvd, Muskegon, Michigan 49444 | Plan Effective Date |
| SNAPMEDTECH INC | Wellpath LLC | Staffing Agencies | 999 PEACHTREE ST NE, STE 2750, ATLANTA, GA 30309 | Plan Effective Date |
| Sound Inpatient Physicians - Michigan PLLC dba Sound Physicians of Michigan | Wellpath LLC | Network Development Providers | 1105 6th St., Traverse City, Michigan 49684 | Plan Effective Date |
| SOUTH FLORIDA WELLNESS NETWORK INC | Wellpath LLC | Vendor Contracts | 2901 W CYPRESS CREEK RD, #105, FORT LAUDERDALE, FL 33309 | Plan Effective Date |
| Southwest Surgical Center | Wellpath LLC | Network Development Providers | 2373 64th St. SW Suite 2200, Byron, Michigan 49315 | Plan Effective Date |
| Sparrow Health System | Wellpath LLC | Network Development Providers | 1215 E. MICHIGAN AVENUE, LANSING, MI 48912 | Plan Effective Date |
| Sparrow Health System | Wellpath LLC | Network Development Providers | 1215 E. MICHIGAN AVENUE, LANSING, MI 48912 | Plan Effective Date |
| Spectrum Health System | Wellpath LLC | Network Development Providers | 100 Michigan Street Northeast, Grand Rapids, Michigan 49503 | Plan Effective Date |
| St. Elizabeth's Medical Center of Boston | Wellpath LLC | Network Development Providers | 736 CAMBRIDGE ST, BOSTON, MA 02135 | Plan Effective Date |
| Subhash C Gupta, MD | Wellpath LLC | Network Development Providers | 601 E. SAMPLE ROAD SUITE 105, POMPANO BEACH, FL 33064 | Plan Effective Date |
| SURVIVAL FLIGHT INC | Wellpath LLC | Network Development Providers | 705 HEBER SPRINGS RD, BATESVILLE, AR 72501 | Plan Effective Date |
| Survival Flight, Inc. | Wellpath LLC | Network Development Providers | PO BOX 271375, OKLAHOMA CITY, OK 73137 | Plan Effective Date |
| Survival Flight, Inc. | Wellpath LLC | Network Development Providers | PO BOX 271375, OKLAHOMA CITY, OK 73137 | Plan Effective Date |
| Survival Flight, Inc. | Wellpath LLC | Network Development Providers | PO BOX 271375, OKLAHOMA CITY, OK 73137 | Plan Effective Date |
| TALNTLY | Wellpath LLC | Staffing Agencies | 1100 KERMIT DR, STE 201, NASHVILLE, TN 37217 | Plan Effective Date |
| Tattnall Hospital Company, LLC | Wellpath LLC | Network Development Providers | 610 SPARTA ROAD, SANDERSVILLE, GA 31082 | Plan Effective Date |
| Tattnall Hospital Company, LLC | Wellpath LLC | Network Development Providers | 610 SPARTA ROAD, SANDERSVILLE, GA 31082 | Plan Effective Date |
| The Advocacy Group at Cardenas Partners LLC | Wellpath LLC | Lobbying Firms | LLC 204 SOUTH MONROE STREET, TALLAHASSEE, FL 32301 | Plan Effective Date |
| The Chippewa County War Memorial Hospital | Wellpath LLC | Network Development Providers | 500 Osborn Blvd, Sault Sainte Marie, Michigan 49783 | Plan Effective Date |
| The Family Practice & Orthopedic Care Center, PC | Wellpath LLC | Network Development Providers | 410 N Willowbrook Rd, Coldwater, Michigan 49036 | Plan Effective Date |
| Thomson Reuters | Wellpath LLC | Vendor Contracts | 610 Opperman Drive, Eagan, MN 55123 | Plan Effective Date |
| Town of Walpole dba Walpole Fire Department | Wellpath LLC | Network Development Providers | 135 SCHOOL ST, WALPOLE, MA 02081 | Plan Effective Date |

| Tripathi H. Kush, MD | Wellpath LLC | Network Development Providers | 4515 WILES RD, STE 201, COCONUT CREEK, FL 33073 | Plan Effective Date |
|---|---|---|---|---|
| Tulane University Medical Group | Wellpath LLC | Network Development Providers | 1440 Canal St Ste 1501, New Orleans, Louisiana 70112 | Plan Effective Date |
| Tulane University Medical Group | Wellpath LLC | Network Development Providers | 1440 CANAL ST STE 1501, NEW ORLEANS, LA 70112 | Plan Effective Date |
| Tulane University Medical Group | Wellpath LLC | Network Development Providers | 1440 CANAL ST STE 1501, NEW ORLEANS, LA 70112 | Plan Effective Date |
| U.P. Digestive Disease Associates., P.C. | Wellpath LLC | Network Development Providers | 1414 W. Fair Ave., Suite 247, Marquette, Michigan 49855 | Plan Effective Date |
| U.P. Ophthalmology Associates PC | Wellpath LLC | Network Development Providers | 1015 South Lincoln Road, Escanaba, Michigan 49829 | Plan Effective Date |
| United Prosthetics Inc | Wellpath LLC | Network Development Providers | 295 COLUMBIA RD, DORCHESTER, MA 02121-3409 | Plan Effective Date |
| UNIVERSITY OF COLORADO HOSPITAL | Wellpath LLC | Network Development Providers | 12605 E 16TH AVE, AURORA, CO 80045 | Plan Effective Date |
| University Physician Group d/b/a Wayne Health | Wellpath LLC | Network Development Providers | 4201 ST ANTOINE STREET, DETROIT, MI 48201 | Plan Effective Date |
| UNLV Medicine | Wellpath LLC | Network Development Providers | 3016 W. CHARLESTON BLVD, SUITE 100, LAS VEGAS, NV 89102 | Plan Effective Date |
| UP Health System Marquette | Wellpath LLC | Network Development Providers | 850 West Baraga Avenue, Marquette, Michigan 49855 | Plan Effective Date |
| Upper Michigan Associates, LLC dba Upper Peninsula Surgery Center | Wellpath LLC | Network Development Providers | 1414 West Fair Avenue, Suite 235, Marquette, Michigan 49855 | Plan Effective Date |
| Upper Peninsula Audiology, Inc. | Wellpath LLC | Network Development Providers | 801 Memorial Road, Houghton, MI 49931 | Plan Effective Date |
| Upper Peninsula Audiology, Inc. | Wellpath LLC | Network Development Providers | 801 Memorial Road, Houghton, MI 49931 | Plan Effective Date |
| Upper Peninsula Audiology, Inc. | Wellpath LLC | Network Development Providers | 801 Memorial Road, Houghton, MI 49931 | Plan Effective Date |
| UROLOGY SURGERY CENTER OF COLORADO | Wellpath LLC | Network Development Providers | 2777 MILE HIGH STADIUM CIRCLE, DENVER, CO 80211-5222 | Plan Effective Date |
| Urology Surgery Center of Colorado, LLC | Wellpath LLC | Network Development Providers | 2777 MILE HIGH STADIUM CIRCLE, DENVER, CO 80211 | Plan Effective Date |
| Urology Surgery Center of Colorado, LLC | Wellpath LLC | Network Development Providers | 2777 MILE HIGH STADIUM CIRCLE, DENVER, CO 80211 | Plan Effective Date |
| Urology Surgery Center of Colorado, LLC | Wellpath LLC | Network Development Providers | 2777 MILE HIGH STADIUM CIRCLE, DENVER, CO 80211 | Plan Effective Date |
| Urology Surgery Center of Colorado, LLC | Wellpath LLC | Network Development Providers | 2777 MILE HIGH STADIUM CIRCLE, DENVER, CO 80211 | Plan Effective Date |
| Urology Surgery Center of Colorado, LLC | Wellpath LLC | Network Development Providers | 2777 MILE HIGH STADIUM CIRCLE, DENVER, CO 80211 | Plan Effective Date |
| Urology Surgery Center of Colorado, LLC | Wellpath LLC | Network Development Providers | 2777 MILE HIGH STADIUM CIRCLE, DENVER, CO 80211 | Plan Effective Date |
| Urology Surgery Center of Colorado, LLC | Wellpath LLC | Network Development Providers | 2777 MILE HIGH STADIUM CIRCLE, DENVER, CO 80211 | Plan Effective Date |
| Urology Surgery Center of Colorado, LLC | Wellpath LLC | Network Development Providers | 2777 MILE HIGH STADIUM CIRCLE, DENVER, CO 80211 | Plan Effective Date |
| Urology Surgery Center of Colorado, LLC | Wellpath LLC | Network Development Providers | 2777 MILE HIGH STADIUM CIRCLE, DENVER, CO 80211 | Plan Effective Date |
| Urology Surgery Center of Colorado, LLC | Wellpath LLC | Network Development Providers | 2777 MILE HIGH STADIUM CIRCLE, DENVER, CO 80211 | Plan Effective Date |
| Urology Surgery Center of Colorado, LLC | Wellpath LLC | Network Development Providers | 2777 MILE HIGH STADIUM CIRCLE, DENVER, CO 80211 | Plan Effective Date |
| Urology Surgery Center of Colorado, LLC | Wellpath LLC | Network Development Providers | 2777 MILE HIGH STADIUM CIRCLE, DENVER, CO 80211 | Plan Effective Date |
| Urology Surgery Center of Colorado, LLC | Wellpath LLC | Network Development Providers | 2777 MILE HIGH STADIUM CIRCLE, DENVER, CO 80211 | Plan Effective Date |
| Urology Surgery Center of Colorado, LLC | Wellpath LLC | Network Development Providers | 2777 MILE HIGH STADIUM CIRCLE, DENVER, CO 80211 | Plan Effective Date |
| Urology Surgery Center of Colorado, LLC | Wellpath LLC | Network Development Providers | 2777 MILE HIGH STADIUM CIRCLE, DENVER, CO 80211 | Plan Effective Date |
| V DERMATOLOGY | Wellpath LLC | Network Development Providers | 1225 WEST FRONT ST STE C, TRAVERSE CITY, MI 49684-2317 | Plan Effective Date |
| Valdosta Orthopedic Associates, PC | Wellpath LLC | Network Development Providers | 3527 N. Valdosta Road, Valdosta, Georgia 31602 | Plan Effective Date |
| Ventre Medical Associates, LLC | Wellpath LLC | Network Development Providers | 1400 EAST OAKLAND PARK BOULEVARD, SUITE 210, OAKLAND PARK, FL 33334 | Plan Effective Date |
| VISTA STAFFING SOLUTIONS LLC | Wellpath LLC | Staffing Agencies | 2800 EAST COTTONWOOD PKWY, STE 400, COTTONWOOD HEIGHTS, UT 84121 | Plan Effective Date |
| WellSpan Evangelical Community Hospital | Wellpath LLC | Network Development Providers | 1 HOSPITAL DR, LEWISBURG, PA 17833 | Plan Effective Date |
| West Georgia Eye Care Center | Wellpath LLC | Network Development Providers | 2616 WARM SPRINGS ROAD, COLUMBUS, GA 31904 | Plan Effective Date |
| Western Infectious Disease Consultants | Wellpath LLC | Network Development Providers | 3303 West 144th Ave #103, Broomfield, Colorado 80023 | Plan Effective Date |

**Exhibit F**

**Schedule of Retained Causes of Action**

## Schedule of Retained Causes of Action

This Schedule of Retained Causes of Action (the "Schedule") represents the list of the Retained Causes of Action in connection with the Plan (subject to the terms thereof, including the addition of any Retained Causes of Action by any Go-Forward Causes of Action identified by the Post-Restructuring Debtors in accordance with the Plan).[1]  The Debtors expressly reserve the right to alter, amend, remove, augment, supplement, or otherwise modify this Schedule at any time up to confirmation of the Plan, in accordance with the terms therefore, subject to the consent and approval rights, in form and substance, of the Committee and Ad Hoc Group to the extent provided in the Plan.[2]

As set forth in Article IV.L, except as expressly waived, relinquished, exculpated, released, discharged, compromised, or settled in or pursuant to the Plan, the Confirmation Order, or a Final Order (including a Financing Order), the Post-Restructuring Debtors expressly retain and reserve all Causes of Action enumerated herein that they may have or choose to assert, including under any provision of the Bankruptcy Code or any applicable analogous statute or non-bankruptcy law (whether arising before, on, or after the Petition Date), for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.  For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan (including this Schedule or other items in the Plan Supplement), the Retained Causes of Action shall not include (1) any Causes of Action of any kind that were released pursuant to a Final Order of the Bankruptcy Court (including a Financing Order or the H.I.G. Settlement Order), (2) any Cause of Action against an Exculpated Party, (3) any Liquidating Trust Causes of Action, (4) the Causes of Action that were acquired by the Recovery Solutions Purchaser pursuant to the Recovery Solutions Stalking Horse Agreement, (5) any Cause of Action that has been acquired by the NBH Purchaser pursuant to the NBH Purchase Agreement, or (6) any Causes of Action of any kind against any officer, director, or manager of any Debtor to the extent that such officer, director, or manager serves as an officer, director, manager, or employee of a Post-Restructuring Debtor for a period of at least 60 days following the Effective Date (collectively, the "Excluded Actions")

In accordance with section 1141(b) and (c) of the Bankruptcy Code, upon the Effective Date, the Retained Causes of Action shall vest in each respective Post-Restructuring Debtor free and clear of all Liens, Claims, charges, other encumbrances, and interests in accordance with Article IV.K.  Upon Consummation, each Post-Restructuring Debtor, as applicable, shall retain,

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *First Amended Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and Certain of its Debtor Affiliates* [Docket No. 2552-1] (as modified, amended, or supplemented from time to time, the "Plan").  For the avoidance of doubt, the rules of interpretation set forth in Article I.B of the Plan shall apply hereto (*e.g.*, unless otherwise specified, all references herein to "Articles" are references to articles of the Plan).

[2]   Any current or potential party to a Retained Cause of Action may request additional information regarding such Cause of Action by emailing the Debtors' counsel.  Certain Causes of Action listed herein may have been sold or otherwise transferred to buyers of the Debtors' assets during the course of these chapter 11 cases, but remain listed out of an abundance of caution.  Inclusion of any such Cause of Action on this Schedule does not impact the sale or transfer of such Cause of Action to the applicable buyer.

reserve, and be entitled to commence, assert, and pursue all Retained Causes of Action of the Debtors, whether arising before, on, or after the Petition Date.

For the avoidance of doubt, the Post-Restructuring Debtors reserve the right, in their sole and absolute discretion and at any time, to transfer any Retained Cause of Action to the Liquidating Trust, whereupon such Cause of Action shall automatically, and without further action or order of the Bankruptcy Court, be deemed vested in, and administered as part of, the Liquidating Trust Causes of Action set forth on the Schedule of Liquidating Trust Causes of Action.

To the fullest extent permitted by applicable law and the Plan, the Debtors' inclusion or failure to include or describe with sufficient specificity any Retained Cause of Action in the Plan (including this Schedule or other items in the Plan Supplement) or in the Confirmation Order shall not be deemed an admission, denial, or waiver of any Retained Cause of Action that the Debtors, the Post-Restructuring Debtors, or their Estates hold or may hold.  No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation, including any argument of waiver on account of the failure to include or describe with sufficient specificity any Retained Cause of Action in the Plan (including this Schedule or other items in the Plan Supplement) or in the Confirmation Order.

**No Entity may rely on the absence of a specific reference in the Plan (including this Schedule or other items in the Plan Supplement) or in the Confirmation Order to any Retained Cause of Action against them as any indication that the Post-Restructuring Debtors will not pursue any and all available Retained Causes of Action against them.**

## <u>CERTAIN CATEGORIES OF CAUSES OF ACTION</u>

The following is an indicative, but in no way an exhaustive or exclusive, list of categories of Causes of Action that are "Retained Causes of Action"; *provided*, *however*, that none of the categories below shall include any Causes of Action that are Excluded Actions:

### I.      **Claims Related to Insurance Policies.**

All Causes of Action against the Entities identified on **<u>Annex A</u>** hereto based in whole or in part upon any and all insurance policies (collectively with any agreements, documents, or instruments relating thereto, the "<u>Insurance Policies</u>") issued to or for the benefit of any of the Debtors (or any of their predecessors), to which any Debtor or Post-Restructuring Debtor is a party, or pursuant to which any Debtor or Post-Restructuring Debtor (or any of their predecessors) or its respective Estate has any rights whatsoever, regardless of whether such Insurance Policies is specifically identified in the Plan (including in this Schedule or other items in the Plan Supplement), including Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matter against the Entities identified on Annex A hereto. Without limiting the generality of the foregoing, the Debtors and the Post-Restructuring Debtors expressly retain and reserve all Causes of Action against the Entities identified on **<u>Annex A</u>** hereto. Notwithstanding the foregoing, the Retained Causes of Action shall not include Causes of Action

2

based in whole or in part upon any and all Insurance Policies issued to or for the benefit of any of the Debtors (or any of their predecessors), to which any Debtor or Post-Restructuring Debtor is a party, or pursuant to which any Debtor or Post-Restructuring Debtor (or any of their predecessors) or its respective Estate has any rights whatsoever, regardless of whether such Insurance Policies is specifically identified in the Plan (including in this Schedule or other items in the Plan Supplement), that provide coverage on account of the Non-Continuing D&Os.

## II.    Claims Related to Tax Obligations

All Causes of Action against the Entities identified on **Annex B** hereto based in whole or in part upon any and all tax obligations (including any asserted fees, tariffs, charges, penalties, or other amounts associated with or related to any tax obligation) to which any Debtor or Post-Restructuring Debtor (or any of their predecessors) is a party or pursuant to which any Debtor or Post-Restructuring Debtor (or any of their predecessors) or its respective Estate has any rights whatsoever, including against or related to all Entities identified on Annex B that owe or that may in the future owe money related to tax refunds to them, regardless of whether such Entity is specifically identified in the Plan (including in this Schedule or other items in the Plan Supplement).   Without limiting the generality of the foregoing, the Debtors and the Post-Restructuring Debtors expressly retain and reserve all Causes of Action against the Entities identified on Annex B hereto.

## III.    Claims Related to Assumed Contracts and Leases

All Causes of Action based in whole or in part upon any and all contracts and leases to which any of the Debtors or the Post-Restructuring Debtors (or any of their predecessors) is a party or pursuant to which any of the Debtors or the Post-Restructuring Debtors (or any of their predecessors) or their Estates has any rights whatsoever (regardless of whether such contract or lease is specifically identified in the Plan (including in this Schedule or other items in the Plan Supplement)), that are assumed pursuant to the Plan or were previously or will be assumed or assumed and assigned by the Debtors in these chapter 11 cases, including Causes of Action against parties to assumed contracts, including vendors, suppliers of goods and services, or any other parties, for, among other things, the following: (a) overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, contribution, recoupment, or setoff; (b) termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) failure to fully perform or to condition performance on additional requirements under assumed contracts or leases with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts or leases; (d) payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) any liens, including mechanics', artisans', materialmens', possessory, or statutory liens, held by any of the Debtors; (f) claims arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, suppliers of environmental services or goods, or any other Entities; (g) counterclaims and defenses related to any contractual obligations; (h) any turnover actions arising under sections 542 or 543 of the Bankruptcy Code; and (i) unfair competition, licensing or licensing agreements, interference with contract or potential business advantage, conversion,

breach of contract, breach of duty (whether in law, in equity, or otherwise), infringement of intellectual property, or other business tort claims.

## IV.    Avoidance Actions

All Avoidance Actions (*i.e.*, any and all avoidance, recovery, subordination, or other claims and Causes of Action that may be brought by or on behalf of the Debtors, the Post-Restructuring Debtors, or their Estates or other authorized parties in interest to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code or under applicable non-bankruptcy law, including actions or remedies under sections 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code, or other similar or related state, federal, or foreign statutes, common law, or other applicable Law, including fraudulent transfer laws or fraudulent conveyance laws) against the Entities identified on **Annex C** hereto.

## V.    Claims Related to Accounts Receivable and Accounts Payable

Unless otherwise released by the Plan, all Causes of Action concerning accounts receivable as of the Effective Date against all Entities that owe money to the Debtors, the Post-Restructuring Debtors, or their Estates, regardless of whether such Entity is expressly identified in the Plan (including in this Schedule or other items in the Plan Supplement) on account of such money owed to the Debtors, the Post-Restructuring Debtors, or their Estates; *provided, however*, that notwithstanding anything to the contrary in this sentence, the foregoing Causes of Action concerning accounts receivable shall not conflict or interfere with any Liquidating Trust Cause of Action.  Furthermore, the Post-Restructuring Debtors expressly reserve all Causes of Action concerning accounts payable as of the Effective Date against all Entities who assert or may assert that the Debtors, the Post-Restructuring Debtors, or their Estates owe money to them in connection with such assertions.

## VI.    Claims Related to Deposits/Prepayments, Adequate Assurance Postings, and Other Collateral Postings

Unless otherwise released by the Plan, all Causes of Action based in whole or in part upon any and all postings of a security deposit, letter of credit, adequate assurance payment, or any other type of deposit, prepayment, or collateral, regardless of whether such posting is specifically identified in the Plan (including in this Schedule or other items in the Plan Supplement).

***

4

## Annex A

Insurers and Sureties

| |
|---|
| 1970 Group |
| Allied World Insurance Co. Inc. |
| American Zurich Insurance Co. |
| Amwins Special Risk Underwriters |
| Applied Surety Underwriters, LLC |
| Argonaut Insurance Company |
| Arvest Bank |
| Ascot Insurance Company |
| Atlantic Specialty Insurance Company |
| AXA Insurance Company |
| AXIS Ins Co |
| AXIS Surplus Insurance Company |
| Beazley Excess and Surplus Ins, Inc. |
| Berkley Surety Group, LLC |
| Berkshire Hathaway Specialty Insurance Company |
| Chubb Insurance |
| Columbia Casualty Company |
| Coverys Specialty Insurance Company |
| Endurance American Specialty Ins Co. (Sompo) |
| Everest Indemnity Insurance Company |
| Freedom Specialty Insurance Company |
| Golden Bear Insurance Company |
| Hallmark Financial |
| Hamilton (Quota Share) |
| HDI Global Specialty SE |
| HH Risk LLC |
| Homeland Insurance Company of NY |
| Illinois Union Insurance Company |
| Indemnity National Insurance Company |
| Indian Harbor Ins Co (AXA XL) |
| Intact Insurance Specialty Solutions |
| Interstate Fire and Casualty |
| Ironshore Indemnity Inc. |
| Kinsale Insurance Company |
| KS Healthcare Insurance |
| Landmark American Insurance Company |
| Lexington Insurance Company |
| Lloyd's Underwriter Syndicate No. 3902 NOA & Munich Re |
| Lloyd's Underwriter Syndicate No. 4020 ARK |
| Markel American Insurance Company |
| National Fire & Marine Insurance Co |
| Pennsylvania Insurance Company |
| Pennsylvania Joint Underwriting Association |
| ProAssurance Specialty Insurance Company |
| RSUI Indemnity Company |
| Scottsdale Insurance Company |
| Sirius America Insurance Company |
| Starr Surplus Lines Insurance Company |
| Starstone Specialty Insurance Company |

| |
|---|
| Steadfast Insurance Company |
| Texas Insurance Company |
| Travelers Property Company of America |
| Trisura Specialty Insurance Company |
| Underwriters at Lloyd's of London |
| Velocity Risk Underwriters |
| Wellpath Self-Insured |
| Westchester Fire Insurance Company |
| Westfield Specialty Insurance Co |
| Zurich American Insurance Co. |
| Zurich American Insurance Company |
| Zurich American Insurance Company of Illinois |

**Annex B**

Taxing Authorities

| |
|---|
| Abbeville City Tax Collector |
| Alabama Department of Revenue |
| Allegany County Tax & Utility Office |
| Anne Arundel County |
| Appling County Tax Commissioner |
| Arizona Department of Revenue |
| Arkansas Department of Finance and Administration |
| Avoyelles Parish Tax Collector |
| Bacon County |
| Baldwin County Tax Office |
| Barrow County Tax Commissioner |
| Bell County Sheriff's Office |
| Big Rapids Michigan |
| Bleckley County |
| Boyle County Sheriff |
| Boyle County Tax Administrator |
| Broward County |
| Brunswick County Revenue Dept |
| Bucyrus City Income Tax Department |
| Butts County Tax Commissioner |
| Caldwell Parish Sheriff |
| Calhoun County |
| California Tax and Fee Administration |
| Charleston County Government |
| Chatham County Tax Commissioner |
| Chattanooga County Tax Commissioner |
| Chaves County Treasurer |
| Chesapeake City Treasurer |
| Chicot County Collector |
| City of Alexandria   PPTax |
| City of Augusta, Tax Collectors Office |
| City of Beattyville Tax Collector |
| City of Bowling Green |
| City of Central City |
| City of Chester |
| City of College Park |
| City of Delaware |
| City of Detroit |
| City of Eddyville |
| City of Findlay |
| City of Framingham |
| City of Franklin |
| City of Gardner |

| |
|---|
| City of Green Bay Tax Collection |
| City of Hendersonville-Property Tax Office |
| City of Iona |
| City of Jackson |
| City of Juneau Treasurer |
| City of Kansas City, Missouri, Revenue Division |
| City of Lapeer |
| City of Lawrence RE/PP/WS |
| City of Lebanon |
| City of Lebanon Kentucky |
| City of Madison Treasurer |
| City of McRae Tax Collector |
| City of Memphis Treasurer |
| City of Milwaukee |
| City of Morgan |
| City of Muskegon |
| City of Muskegon Heights |
| City of New Orleans Tax Collector |
| City of Newport News |
| City of Oconto Treasurer |
| City of Pontiac |
| City of Soperton |
| City of St. Gabriel |
| City of Sycamore |
| City of Twin City |
| City of Unadilla Tax Dept |
| City of Waukesha |
| City of West Liberty |
| City Treasurer |
| Clallam County Treasurer |
| Clark County Assessor |
| Clark County Assessor, NV |
| Clark County Tax Collector |
| Clayton County Tax Commissioner |
| Cobb County Tax Commissioner |
| Coconino County Treasurer |
| Colorado Department of Revenue |
| Columbia County |
| Comptroller of Maryland |
| Cook County |
| County Of Loudon |
| County Of Loudoun |
| County of Roanoke Virginia |
| County of Santa Barabara |
| Crittenden County Collector |
| Curry County Treasurer |
| David W Jordan Lake County Tax Collector |

| |
|---|
| Davidson Co. Metro. Trustee |
| Davidson County |
| Decatur county |
| DeKalb County |
| Dekalb County Tax Commissioner |
| Delaware Division of Revenue |
| DESOTO COUNTY TAX COLLECTOR |
| Division of Revenue |
| Dodge County |
| Dooly County Tax Commissioner |
| Douglas County Assessor |
| Douglas County Treasurer |
| Durham County Tax Collector |
| Eau Claire County Treasurer |
| Elkhart County |
| Elliot County Sheriff |
| Evans County Tax Commissioner |
| Florida Department of Revenue |
| Forsyth County Tax Collector |
| Fort Bend County Tax Assessor-Collector |
| Franchise Tax Board |
| Fulton County Tax Commissioner |
| Georgia Department of Revenue |
| Guilford County Tax Department |
| Gwinnett County Tax Commissioner |
| Habersham County Tax Commissioner |
| Hancock County |
| Harford County Maryland |
| Hart County Tax Commissioner |
| Hawaii Department of Taxation |
| Hays County |
| Henry C. Levy Treasurer & Tax Collector |
| Henry County |
| Hot Springs County Tax Collector |
| Houston County Tax Commissioner |
| Iberville Parish Tax Collector |
| Idaho State Tax Commission |
| Illinois Department of Revenue |
| Indiana Department of Revenue |
| Iowa Department of Revenue |
| Izard County Collector |
| Jackson County Tax Collector |
| JDY Inc. DBA Regency Office Products |
| Jefferson County Sheriff's Office |
| Jefferson County Tax Assessor-Collector |
| Jefferson County Tax Collector |
| John P Hunt Floyd County Sheriff |

3

| |
|---|
| John Power - Tax Collector |
| Johnson County Tax Commissioner |
| Joseph Lopinto Sheriff & Ex-Officio Tax Collector |
| Josephine County Assessor |
| Kansas Department of Revenue |
| Kentucky Department of Revenue |
| Kentucky Revenue Cabinet |
| Kentucky Revenue Cabinet–Online Taxpayer Service Center |
| Kern County Tax Collector |
| Kerr County Tax Office |
| Kerrville Independent School District |
| King County |
| Lafayette County Collector |
| Lancaster County Treasurer |
| Lane County Tax Collector |
| Lanier County Tax Commissioner |
| Lee County Sheriff Office |
| Lee County Tax Collector |
| Lee County Tax Commissioner |
| Lexington County Treasurer's Office |
| Lexington-Fayette Urban County Government |
| Lincoln County Tax Collector |
| Long County Tax Commissioner |
| Los Angeles County |
| Louisiana Department of Revenue |
| Louisville Metro Revenue Commission |
| Lowndes County |
| Lowndes County Tax Commissioner |
| Lubbock Central Appraisal District |
| Lyon County Sheriff |
| Machiasport Town Assessor |
| Macon County Tax Commissioner |
| Macon-Bibb County |
| Macon-Bibb County Assessor |
| Madison County, Illinois |
| Maine Revenue Services |
| Marion County Treasurer |
| Maryland State Treasurer |
| Massachusetts Department of Revenue |
| Mecklenburg County Tax Collector |
| Miami-Dade County Tax Collector |
| Michigan Department of Treasury |
| Middleton Town |
| Miller County Tax Collector |
| Minnesota Department of Revenue |
| Mississippi County Tax Collector |
| Mississippi Department of Revenue |

| |
|---|
| Missouri Department of Revenue |
| Mitchell County Tax Commissioner |
| Monroe County Tax Commissioner |
| Montana Department of Revenue |
| Montgomery County Tax Assessor/Collector |
| Montgomery County Trustee (TN) |
| Morgan County Sheriff |
| Muhlenburg County Sheriff |
| Muscogee County |
| Muscogee County Tax Commissioner |
| Nebraska |
| Nevada State Treasurer |
| Nevada Department of Taxation |
| New Hampshire Department of Revenue Administration |
| New Hanover Co. Tax Office |
| New Jersey Division of Taxation |
| New Mexico Taxation and Revenue |
| New Orleans Revenue Department |
| New York Department of Taxation & Finance |
| North Carolina Department of Revenue |
| North Dakota State Tax Department |
| Oakland County Treasurer's office |
| Office of Fayette County Sheriff |
| Ohio State Treasurer |
| Oklahoma Tax Commission |
| Oldham County Sheriff |
| Orange County |
| Oregon Department of Revenue |
| Ouachita Parish Tax Collector |
| Palm Beach County |
| Pasco County Tax Collector |
| Paulding County Tax Office |
| Pennsylvania Department of Revenue |
| Pike County |
| Pitt County Tax Collector |
| Placer County Tax Collector |
| Portsmouth City Treasurer |
| Prince Edward County Treasurer |
| Pulaski County Tax Commissioner |
| Pulaski County Treasurer |
| Rap East LLC |
| Regina Morrison Newman - Shelby County Trustee |
| Richard Rozier-Tax Assessor Collector |
| Richland County |
| Richland County Treasurer |
| Richmond County |
| Richmond County Tax Commissioner |

| RITA |
|---|
| Roosevelt County Treasurer |
| Rowan County Taxes |
| Saline County Collector |
| San Diego County Treasurer-Tax Collector |
| San Juan County Treasurer |
| Shelby County Sheriff |
| Sheridan County Treasurer |
| Sonoma County Tax Collector |
| South Carolina Department of Revenue |
| St Lucie County Tax Collector |
| St Martin Parish Sheriff |
| Sumner County Chancery Court |
| Sumner County Trustee |
| Sumter County Tax Commissioner |
| Sutter County Tax Collector |
| Swainsboro City |
| Tattnall County Tax Commissioner |
| Tax Commissioner |
| Tax Division Alaska Department of Revenue |
| Telfair County Tax Commissioner |
| Tennessee Department of Revenue |
| Texas Comptroller of Public Accounts |
| The City of Boston |
| Thurston County Treasurer |
| TN Department of Revenue |
| Town of Billerica |
| Town of Bourne |
| Town of Bridgewater |
| Town of Concord |
| Town of Denton |
| Town of Easton  Tax Collector  PPT |
| Town of Foxborough |
| Town of Middleton |
| Town of Plymouth |
| Town of Salisbury |
| Town of Shirley |
| Town of Walpole |
| Town of West Boylston |
| Town of Windham |
| Town Treasurer/Collector |
| Treasurer, City of Norfolk |
| Treutlen County Tax Commissioner |
| Tulare County Tax Collector |
| Turner County Tax Commissioner |
| Umatilla County |
| Union County |

| |
|---|
| Utah State Tax Commission |
| Vermont Department of Taxes |
| Virginia Department of Taxation |
| Walker County Tax Commissioner |
| Ware County Tax Commissioner |
| Washington County Tax Collector |
| Washington County Tax Commissioner |
| Washington Department of Revenue |
| Waupaca County Treasurer |
| West Feliciana Parish |
| West Virginia Department of Revenue |
| Wheelwright City |
| Wilcox County Tax Commissioner |
| Wisconsin Department of Revenue |
| Yakima County |
| Yuma County Treasurer |

**Annex C**

| |
|---|
| 1199 SEIU United Healthcare Workers East |
| 3340 Perimeter Hill Partners LLC |
| 5 Star Dentistry DBA Miura Dental Specialists |
| 8x8, Inc. |
| A & I ENTERPRISES OF S FLORIDA INC |
| AB Staffing Solutions LLC |
| ABM Industries Inc DBA ABM Industry Groups LLC |
| Acadia Healthcare Company Inc |
| Access Information Mgmt DBA Access |
| Accountable Healthcare Staffing |
| ACCOUNTABLE TEACHING SERVICES |
| Accurate Employment Screening, LLC |
| Adams and Reese LLP |
| Adaptamed LLC DBA EHR Your Way |
| Adaptive Workforce Solutions LLC |
| ADT Security Corporation DBA ADT Security Services |
| ADVANCE MEDICAL SPECIALTY LLC |
| ADVANCED GASTROENTEROLOGY & SURGERY ASSO |
| Advantra Group Inc.DBA Advantra Waste Solutions Inc. |
| ADVENTHEALTH PARKER |
| ADVENTHEALTH WINTER PARK |
| ADVENTIST HEALTH AND RIDEOUT |
| ADVENTIST HEALTH BAKERSFIELD |
| ADVENTIST HEALTH HANFORD |
| Aegis Treatment Centers LLC |
| Aetna |
| AETNA-ALIC |
| AFA Protective Systems, Inc. |
| AFSCME COUNCIL 31 |
| Agility Health, Inc |
| Akin Gump Strauss Hauer & Feld LLP |
| ALACHUA COUNTY FIRE/RESCUE |
| Alameda County Sheriffs Office |
| ALBERT EINSTEIN MEDICAL CENTER |
| Alfred Joshua, MD PC |
| Alfred Williams & Company |
| All Ways Clean |
| ALLEGANY IMAGING PC |
| ALLEGHENY CLINIC |
| ALLEGHENY GENERAL HOSPITAL |
| Allegis Grp Holdings Inc Aerotek Inc DBA Actalent Scientific LLC |
| ALLIANCE CANCER SPECIALISTS PC |
| Alliance Medical Staffing Inc |
| ALLOPLASTIC RECONSTRUCTION INC |
| Allscripts Healthcare Solutions, Inc. |
| Allstar Therapies Inc |
| Alpine Convalescent Center LP |
| ALSCO INC. |

| |
|---|
| Altius Strategic Consulting LLC |
| Alumni Staffing, LLC |
| Amanda Beltrani |
| Amanda Landes |
| Amanda S Pears Hartwell |
| Amazon Capital Services Inc |
| Amazon Web Services Inc |
| AMBULANCE AND CHAIR SERVICE |
| AMERICAN MEDICAL RESPONSE |
| AMERICAN MEDICAL RESPONSE NORTHWEST INC [2] |
| AMERICAN MEDICAL SUPPLIES & EQUIPMENT, INC |
| AMERICAN ONCOLOGIC HOSPITAL |
| AMERICAN ONCOLOGY PARTNERS |
| AMERISOURCEBERGEN DRUG CORP |
| Amisha Robillard |
| AMRO DENTAL CORP |
| AMY H PHAM |
| Amy Mcdermott Ord |
| Angelia Harris DBA One Source Licensing LLC |
| Ankura Consulting Group, LLC |
| Ann Hessil |
| Anthem Health Plans of Kentucky Inc |
| Anthem Health Plans of VA  DBA Anthem Blue Cross and Blue Shield |
| AquaSport Physical Therapy P C |
| ARAPAHOE COUNTY SHERIFF'S OFFICE |
| Arcari Dental Laboratory, Inc. |
| Arias Sanguinetti Wang & Torrijos LLP |
| AristaMD, Inc. |
| ARKANSAS CHILDRENS HOSPITAL |
| Arkansas Nephrology & Hypertension |
| ARKANSAS SPECIALTY SURGERY CENTER |
| ARKANSAS SURGERY & ENDOSCOPY CENTER |
| ARKANSAS SURGICAL HOSPITAL LLC |
| ASCENSION SETON HAYS |
| ASHLEY HILL DISTRIBUTORS |
| Associated Interpreters of the Deaf |
| ATC HEALTHCARE SERVICES,INC. |
| ATS of NC LLC DBA Carolina Treatment Cnt of Fayetteville |
| Audicus, Inc. |
| AVONDALE VILLA POST ACUTE |
| Axon Enterprises Inc |
| Aztec Fire & Safety Inc |
| Babatunde Okuleye DBA Arsenal Forensic Services LTD |
| BACK MOUNTAIN REGIONAL FIRE AND EMS INC |
| Balfour Beatty Construction Gr DBA Balfour Beatty Construction |
| Bank of America, N.A. |
| Banyan Community Health Center, Inc. |
| BAPTIST HEALTH MEDICAL CENTER HOT SPRING |
| BAPTIST MEDICAL CENTER - NASSAU |
| BAPTIST MEDICAL CENTER LITTLE ROCK |

| |
|---|
| BAPTIST MEMORIAL MEDICAL CENTER |
| Barclay Damon, LLP |
| Barnes & Thornburg LLP |
| BAXTER REGIONAL MEDICAL CENTER |
| Baytownies, LLC |
| Beacon Hill Staffing Group LLC |
| BELL AMBULANCE INC |
| Benjamin F Thomas DMD |
| Berger & Burrow Enterprises DBA Dynamic Mobile Imaging |
| Berkshire Hathaway Specialty Insurance Company |
| BERTLING LAW GROUP |
| Bicycle Health Medical Group PA |
| Biddle Consulting Group |
| Billing, Cochran, Lyles, Mauro & Ramsey PA |
| Bio-Haz Solutions, Inc |
| Blackburn Domene & Burchett, PLLC |
| Blaisdell & Songey Inc DBA Blaisdells Business Products |
| BLUE RADIOLOGY SERVICES LLC |
| BlueCross BlueShield of Tennessee Inc |
| Bluegrass Biomedical Inc. |
| Bluewave Acquisition Inc DBA Bluewave Technology Group, LLC |
| Bob Barker Company Inc |
| Bonita Taylor Badgett |
| Box, Inc |
| Brad C Risley |
| Bradley Scott Helton |
| Brady Companies LLC DBA Brady Industries of Tennessee LLC |
| Brandon Jacobson |
| Brett Enterprises, LLC DBA Vanguard Cleaning Systemes of Houston |
| Brian Miller MD |
| BRIGGSMORE KIDNEY CENTER LLC |
| Bright Horizons Capital Corp |
| Brightly Software, Inc |
| Brightview Landscape Services, Inc |
| BROWARD HEALTH MEDICAL CENTER |
| BROWARD HEALTH NORTH |
| BROWNSVILLE AMBULANCE SERVICE INC |
| BRUCE P  BARNETT, MD |
| Bryan Anthony Smith |
| Burns White LLC |
| Butte County Sheriff's Office |
| C A Short Company |
| Cahill Gordon & Reindel LLP |
| Cal Mobile X-Ray & EKG INC |
| CALEDONIA ESSEX AREA AMBULANCE |
| Calendly LLC |
| Calyx Psychological Services |
| CANCER CARE PARTNERSHIP |
| Cardinale Fayard a Prof Law Corp DBA Medical Defense Law Group |
| CareClix Services Inc |

| |
|---|
| Carolina Chillers, LLC |
| Carolina Door & Hardware Inc |
| Caroline Cunningham Woodard |
| Casey Wake |
| Cassiday Schade LLP |
| CDATA Software Inc |
| CDW Direct LLC |
| CENTRA DIAGNOSTIC IMAGING |
| CENTRAL COURIER LLC |
| CENTRASTATE MEDICAL CENTER INC |
| CENTRE EMERGENCY MEDICAL ASSOC |
| Cequel Data Centers LP DBA TierPoint LLC |
| Cerner Corporation DBA Oracle America Inc |
| CH Intermediate Holdings LLC  Corepoint Health LLC DBA Rhapso |
| Change Healthcare Solutions LLC |
| Chapman and Associates PC DBA Chapman Law Group |
| Charm-Tex |
| CHEMTREAT, INC. |
| Cheney Brothers Inc |
| Cheryl Judge |
| CHI ST VINCENT HOSPITAL HOT SPRINGS |
| Christina N Link |
| Christopher J Siedelhofer |
| Christopher Michael Lance |
| Cigna Health and Life Insurance Company |
| CITY OF CONROE |
| CITY OF DUMAS |
| CITY OF PEMBROKE PINES |
| CITY OF WILKES BARRE |
| CLARION HOSPITAL |
| Client Network Services LLC DBA CNSI |
| Clinical Equipment Services |
| CLINTON TOWNSHIP VOLUNTEER FIRE COMPANY |
| Cobb County Board of Commissioners |
| Cobbs Allen Capital LLC DBA CAC Specialty |
| COCHRAN CONGREGATE LIVING INC |
| COLLEGE PARK MEDICINE PA |
| Colorado Treatment Services LLC |
| COLUSA INDIAN DENTAL CLINIC |
| COMM OF LOWERE ALLEN TWP |
| COMMERCIAL ROOFING INDUSTRIES, LLC |
| Commonwealth of Massachusetts |
| Community Medical Svcs AZ-Private LLC DBA Community Medical Svcs |
| Community Memorial Health System |
| CompuMed Inc |
| Concord Healthcare Development, Inc, |
| Concur Technologies Inc. |
| CONEMAUGH MEMORIAL HOSP |
| Consilio Inc DBA Consilio LLC |
| Consilium Staffing, LLC |

| |
|---|
| Consolidated Staffing Inc  DBA Consolidated Medical Staffing |
| COOKS CORRECTIONAL |
| Copeland Stair Kingma Lovell LLP |
| COREMR  L.C. |
| Cornerstone Family Healthcare |
| Cornerstone Government Affairs Inc |
| Corporate Creations International Inc. |
| Correctional Dental Associates |
| Correctional Dialysis Svcs LLC DBA Rendevor Dialysis |
| Correctional Technologies Inc DBA Cortech USA |
| CorVel Healthcare Corporation |
| Cory Scott Mcconnell |
| Costes Davis DDS Dental Practice DBA Hall of Fame Dental |
| COTTAGE HOSE AMBULANCE CORP INC |
| County of Amador Sheriffs Office |
| County of Humboldt |
| County of Inyo |
| County of Kings |
| County of Mono |
| County of Santa Cruz Sheriff's Office |
| County of Siskiyou |
| County of Tuolumne |
| CQ Partners LLC fka The Q Group LLC |
| Crawford County General Health District |
| CROZER TAYLOR SPRINGFIELD |
| CURAHEALTH NEW ORLEANS |
| Curant Health Florida LLC |
| CW Janitorial Service DBA C & W Janitorial Company Inc. |
| Cynthia Lynn Noblett |
| D H Pace Company Inc |
| Dade Paper & Bag |
| Dana M Gorka |
| DANIELS SHARPSMART INC DBA Daniels Health |
| Darren Mcinnis |
| DARTMOUTH HITCHCOCK |
| Dasher Services Inc. |
| David C. Devine |
| David McDonald |
| De La Torre Orthotics & Prosthetics, Inc. |
| De Lage Landen Financial Services |
| Dell Financial Services LLC |
| DELRAY MEDICAL CENTER |
| DELTA MEMORIAL HOSPITAL |
| Dennis Jackson DBA WorX Solutions Management LLC |
| Dental Health Management Solutions, Inc. |
| Dentrust Dental Texas PC |
| DENVER HEALTH & HOSPITAL |
| Department of Health Care Services |
| Desert Shore Capital Partners DBA Paydhealth |
| Desmond Lerone Spence |

| |
|---|
| DESOTO COUNTY |
| DESOTO COUNTY HEALTH DEPT |
| DESOTO COUNTY HOSPITAL DISTRICT dba DeSoto Memorial Hosp |
| Dialysis Care  LLC |
| Diamond Drugs Inc DBA Diamond Pharmacy Services |
| Dianna Ellis |
| DIGESTIVE CARE PA |
| Dinse P.C. |
| DIRECT EMPLOYERS |
| Direct Nursing Care Services Inc |
| Direct Travel |
| DLP CONEMAUGH PHYS GROUP |
| DOCTORS MEDICAL CENTER |
| Doctors Orders Infusion Services LLC |
| Docuphase, LLC |
| Dominion Energy South Carolina Inc. |
| Don Tittle DBA Law Offices of Don Tittle PLLC |
| Dona R Gordon |
| Donald Sawyer |
| Doral Imaging Institute LLC DBA Cira Sarasota |
| Dorchester County Government |
| Doug Hassenpflug PLLC DBA Mobile Vision Professionals |
| Dr Sarah Shelton, LLC |
| Dr. Linda Tharp, PC |
| DRS BOYER & SCHEIVE DDS PC |
| Duane R Greenly DBA JORY Properties II LP |
| DUKE RALEIGH HOSPITAL |
| DUKE UNIVERSITY HOSPITAL |
| Dwayne D Evans |
| EASTERN MAINE MEDICAL CENTER |
| Eastpoint Properties LLC |
| ECOLAB INC |
| EDEN MEDICAL CENTER |
| Edger Associates Inc DBA Mobile Ultra Sound Services |
| EdgeTech Inc |
| Edward Amelemah |
| EI US LLC DBA LearnWell |
| EINSTEIN MONTGOMERY |
| ELK RIVER FIRE AND AMBULANCE |
| ELSEVIER INC CLINICAL SOLUTIONS NA |
| EMERGENCY AMBULANCE SERVICE |
| EMERGENCY PHYS ASSOC OF PA PC |
| EMERGENCY PHYSICIANS |
| EMS SOUTHWEST INC |
| ENCOMPASS FIRST CHOICE LLC |
| Encore Software Services Inc. |
| ENTERGY |
| Enterprise Fleet Management |
| Epiq |
| Equifax (Ethority) |

| |
|---|
| ERIE EYE CLINIC |
| Erin Gaffney |
| ESKENAZI HEALTH SERVICES |
| Esperta Health Inc |
| Etica Inc DBA HIPAA Vault |
| Eugene J. Zappa, PT, PC |
| Exiges Imaging LLC |
| Experian Health, Inc. |
| Express Mobile Diagnostic Services LLC |
| FALCK NORTHERN CALIFORNIA CORP |
| Faraci Leasure LLC |
| FAWCETT MEMORIAL HOSPITAL INC |
| FAXTON ST LUKES HEALTHCARE |
| FCCC-Resident Trust Fund 5863 |
| Feitian Technologies US Inc |
| Ferdinand Santos Samalio |
| FinThrive Inc |
| FIRST CHOICE REHABILITATION |
| First DataBank, Inc. |
| Five Star Dialysis LLC DBA  Five Star Home |
| Five Star Food Service, Inc. |
| FL CLINICAL PRACTICE ASSOC. |
| Fleet Services |
| FLORIDA CANCER SPECIALIST |
| FLORIDA HOSPITAL WATERMAN |
| FLORIDA LINEN SERVICES LLC |
| FLORIDA POWER & LIGHT |
| FLOWERS BAKING COMPANY |
| FMLASource Inc |
| FMR LLC DBA Fidelity Investments Institutional Operations Co LLC |
| Foley, Baron, Metzger & Juip, PLLC |
| Ford & Harrison, LLP |
| Forest Hill physical Therapy LLC |
| Fox Ballard PLLC |
| FOX RIVER AND COUNTRYSIDE FIRE/RESCUE |
| Fresenius Medical Care Holdings, Inc. |
| FRESNO COMMUNITY HOSPITAL |
| Frost Brown Todd LLC |
| FTI Consulting Inc. |
| Garcia Clinical Laboratory, INC |
| Gary R Kerstein |
| Gatorco Lawn & Landscaping |
| GEISINGER BLOOMSBURG HOSPTIAL |
| GEISINGER CLINIC |
| GEISINGER COMMUNITY MEDICAL CENTER |
| GEISINGER JERSEY SHORE HOSPITAL |
| GEISINGER LEWISTOWN HOSPITAL |
| GEISINGER MEDICAL CENTER |
| GEISINGER MEDICAL CENTER MUNCY |
| GEISINGER WYOMING VALLEY |

| |
|---|
| GENE E.MYERS CARDIAC & VASCULAR |
| GENESISCARE USA OF FLORIAD NB2 |
| Genevie Esquivel |
| Gina Geonzon |
| Gina Renee Olson |
| Global Diagnostics Services Inc |
| GLS HOSPITAL |
| Gold & Ferrante, PC |
| GOOD SOURCE SOLUTIONS INC |
| GORDON FOOD SERVICE |
| Gordon Rees Scully Mansukhani LLP DBA Gordon & Rees LLP |
| Grady Judson Bazzel |
| GRAINGER |
| GRAND VIEW HOSPITAL |
| GRAND VILLA CLHF |
| Gregg Bennett |
| GROVE CITY MEDICAL CENTER |
| GUARDANT HEALTH INC |
| Guardian Alarm of Florida LLC DBA Guardian Hawk Security |
| Guardian Pharmacy of Southern CA DBA Rons Pharmacy Svcs |
| GULFSTREAM FIRE SPRINKLERS INC |
| Hall & Evans LLC |
| Hall Booth Smith, P.C. |
| Hancock, Daniel, Johnson & Nagle PC |
| Hardin, Jesson & Terry PLC |
| HashiCorp Inc |
| Hau H Tan MD Inc |
| Hawaii Medical Service Association |
| Hayden Physical Therapy PC |
| HCA FL BAYONET PT HOSP |
| HCA FLORIDA NORTHWEST HOSPITAL |
| HCA Health Services of Florida, Inc. |
| Health Carousel LLC DBA Passport USA |
| HEALTH TECHNOLOGIES, INC DBA CAROLINA NUTRITION CONSULTANTS |
| HealthStream |
| Heather Dawn Barry |
| Hector Ruiz |
| HEMATOLOGY ONCOLOGY ASSOCIATES |
| Henry Schein |
| Henry Schein/60055 |
| Herbert Shane Mcelveen |
| HIGHLAND GENERAL HOSPITAL |
| Highroad Holdings LTD DBA Pineco Investments Limited Partnership |
| Hikma Pharmaceuticals USA Inc |
| Hill-Rom Co Inc |
| Hoang P. Nguyen dba Brian Nguyen PLLC Oral&Maxillofacial Surgery |
| HOLY SPIRIT MEDICAL CENTER |
| Home Depot USA, Inc DBA The Home Depot PRO |
| Honigman LLP |
| HopeRising Psychiatric Consulting PLLC |

8

| |
|---|
| Houlihan Lokey Capital Inc |
| Howard Center Inc |
| HUB International Midwest Limited |
| HUGHSTON CLINIC ORTHOPAEDICS |
| HUNTINGDON AMBULANCE AUTHORITY |
| Husch Blackwell LLP |
| Hutchinson Cox LLC |
| HyBridge Solutions Inc |
| iCIMS, Inc. |
| IFlo Inc DBA Roto Rooter Plumbing & Water Clean Up |
| In Stock Supply Inc |
| Indeed, Inc. |
| INDIANA REGIONAL MEDICAL CENTER |
| Infection Prevention and Control Associates,inc. |
| INFECTIOUS DISEASES ASSOCIATES OF |
| InfoArmor, Inc DBA Allstate Identity Protection |
| Insight Global LLC |
| Inspira Financial Health Inc |
| Institutional Eye Care LLC |
| InTech IT Solutions LLC |
| INTERMOUNTAIN HEALTH PLATTE VALLEY |
| International Business Machine Corporation |
| InTouch Technologies Inc DBA Teladoc Health |
| IPFS Corporation |
| Iron Mountain |
| Jaclyn Greer Koch |
| Jacquelyn Lee Hester |
| Jacques R. Leclerc |
| James D Vess Jr |
| Jason A Terris |
| JAY MAHARAJ LLC DBA CAMELOT DRY CLEANERS |
| JC BLAIR MEMORIAL HOSPITAL |
| JDY Inc. DBA Regency Office Products |
| JEFFERSON REGIONAL MED CT |
| JEFFERSON REGIONAL MEDICAL CENTER |
| Jennifer Castleman |
| Jennifer McAllister |
| Jerome M Varanini DBA Law Offices of Jerome M Varanini |
| Jerry and Joe Scalisi Inc DBA Oceanside Produce Company |
| JERSEY CITY MEDICAL CENTER |
| Jessica Leigh Raak |
| Jessica Mazlum |
| Jessica Sherman |
| JFK MEDICAL CENTER |
| JHS Medical Inc. |
| Joe Patrick Ferrari |
| John J. Caceci |
| JOHNSON & BLANTON LLC |
| JOHNSON CONTROLS, INC. |
| Johnsons Control Security Solutions |

| |
|---|
| JOLIET ORAL SURGEONS |
| Jonathan Perham DBA  Axess Medical LLC |
| Joseph M Taggart |
| Josh Taylor |
| Joshua Aaron Jones |
| JSAS Healthcare Inc |
| Julie Diane Furtado |
| K & A Radiologic Technology Services Inc DBA K & A Services |
| Kaila Shae Christman |
| KAISER FOUNDATION |
| Kaloutas & Company Inc |
| Karen M Schmehl |
| Katalon Inc |
| Kathleen M Barry DBA Physical Therapy Services |
| Kaufman & Canoles PC |
| KCI USA, INC. |
| Keara Mae Conrad |
| Keefe Group LLC |
| Keith Allen Weigle |
| Kenneth Soyemi DBA Premium Primary Care Ltd |
| Kesha Lynne Poland |
| Kevin Stafford |
| Khaleidoscope Health Care Inc |
| Kimberly L Sloan |
| Kimberly Pearson DBA KP Consulting LLC |
| KINDRED HOSPITAL OCALA |
| KINDRED HOSPITAL SOUTH FL FT LAUDERDALE |
| KINDRED HOSPITAL SUGAR LAND |
| Kineret A McDonald |
| KING & SPALDING, LLP |
| King Insurance Partners LLC |
| Kopka Pinkus & Dolin PC |
| Koufman Law Group, LLC |
| KPHS |
| KPMG LLP |
| Kristina Lynn Soto |
| Kummerlen Law PLLC |
| LABCORP/LABORATORY CORPORATION |
| Laboratory Corporation of America |
| LAHEY CLINIC HOSPITAL INC |
| LAKE PULMONARY & SLEEP DISORDER |
| LAKESIDE MEDICAL CENTER |
| Lakewood Ranch Surgical Suites DBA Florida Surgcal Suites |
| LANGLEY HEALTH SERVICES |
| Language Line Services |
| LARKIN COMMUNITY HOSPITAL BEHAVIORAL HEA |
| Larry F Doll |
| Larry Pepper |
| LARRY S. DAVIS, P.A. |
| Laura C Busbin |

| |
|---|
| LAWRENCE GENERAL HOSPITAL |
| Lazard Freres & Co. LLC |
| LBMC PC |
| Lecare |
| Lee Eric Mcgaha |
| LegalBill.com LLC DBA Quovant |
| LEHIGH VALLEY HOSP SCHUYLKILL |
| LEHIGH VALLEY HOSPITAL |
| Lemuel Shattuck Hospital |
| Leonid Cherbukhovsky DBA Pure Physical Therapy LLC |
| Lesa J Coughlin |
| Lewis Brisbois Bisgaard & Smith LLP |
| Lewis Thomason King Krieg & Waldrop P.C. |
| Life Insurance Company of North America (LINA) |
| LIFEFLIGHT OF MAINE |
| LIFENET INC |
| LINCOLN LAKES REGIONAL |
| Linkedin Corporation |
| Livongo Health Inc |
| Lori A Coleman |
| Lynn C Cole |
| MAD RIVER COMMUNITY HOSPITAL |
| MAGEE WOMENS HOSPITAL |
| MAHANOY CITY EMS |
| MAIDU DENTAL |
| MAINE MEDICAL CENTER |
| Maine Medical Partners DBA MMP South Portland Pediatrics |
| MAINEGENERAL MEDICAL CENTER |
| Malone Superior LLC |
| Mansa LLC |
| Marcus J Gadson |
| Mark Samonte DBA Summit Healthcare Inc |
| MARSHALL MEDICAL CENTER |
| MARTIN MEMORIAL MEDICAL CENTER |
| MARTIN MEMORIAL PHYSICIAN CORP |
| MARY HITCHCOCK MEMORIAL HOSPITAL |
| MASSACHUSETTS GENERAL HOSPITAL |
| Massachusetts General Physicians Organization, Inc. |
| Matrix Trust Company |
| Matrix Trust Company - Admin Fees |
| Matthew A Berger, MD PC |
| MAXOR CORRECTIONAL PHARMACY SERVICES |
| MaxorPlus LTD |
| McCarter & English, LLP |
| McDermott Will & Emery |
| McDonald Hopkins |
| MCGEHEE HOSPITAL |
| McGuireWoods LLP DBA McGuireWoods Consulting LLC |
| McKesson Medical - Surgical Inc. |
| MDIS INC. |

| |
|---|
| MEADVILLE AREA AMBULANCE SERVICE LLC |
| MEADVILLE MEDICAL CENTER |
| Mecklenburg Co Sheriff's Ofc. |
| MECKLENBURG COUNTY SHERIFF'S OFFICE |
| MED COLLEGE PHYSICIAN GROUP |
| Medcare Equipment Company LLC |
| MEDFIRST STAFFING, LLC |
| Medical Services of America Inc. |
| MEDI-DOSE,INC. |
| MEDILODGE OF STERLING HEIGHTS |
| Melanie Robin Bush |
| Melanie Wells |
| Melissa S Moberly |
| MEMORIAL HOSPITAL PEMBROKE |
| MEMORIAL REGIONAL HOSPITAL |
| Memphis & Shelby County Pediatric Group |
| Mental Health America of Southeast Florida |
| Mental Health Cooperative |
| Merced County |
| MERCED MRI MEDICAL GROUP |
| MERCY HOSPITAL |
| MERCY MEDICAL CENTER MERC |
| MERCY REDDING |
| Meridian Lawyers LTD |
| MetLife Legal Plans Inc |
| Meyer Fluegge & Tenney Inc PS |
| MIAMI DADE WATER AND SEWER |
| Michael Moore |
| Michael T Staiber |
| Michael V Mcdonald |
| Michele Libman, MD, PA DBA TREASURE COAST URGENTCARE |
| Microsoft Corporation |
| Midland Coating Inc |
| MIDLANTIC UROLOGIC CONSULANTS |
| Midwest Center PC |
| MJC CONSULTING, LLC |
| MMDS of Boston, LLC DBA Onsite Medical Imaging |
| Mobile Images Acquisition, LLC |
| MOBILE ULTRASOUND SERVICES INC |
| Moddy H Kiluvia |
| MONONGAHELA VALLEY HOSPITAL |
| Moody's Investors Service, Inc. |
| MORALES UNISEX #3, INC |
| MOREDIRECT Inc DBA Connection |
| Morehouse School of Medicine GA-HITEC GAHC) |
| Morgan Brown & Joy LLP |
| Morgan Cty Amb Taxing Dist DBA Morgan Cnty Amb Svc |
| Morrison Mahoney LLP |
| Mosaic Solutions and Advocacy LLC |
| MOSES CONE HEALTH SYSTEM |

| |
|---|
| MOUNT NITTANY MEDICAL CENTER |
| MOUNT NITTANY PHYSICIAN GROUP |
| Mphasis Corporation |
| MRH CORP DBA NORTHERN LIGHT MAYO |
| MS HERSHEY MEDICAL CENTER |
| MSHMC PHYSICIAN GROUP |
| MTS Health Partners |
| MUNCY VALLEY HOSPITAL |
| MVHS INC |
| Nalco Company LLC |
| NASON MEDICAL CENTER LLC |
| Nassau Cnty Mental Hlth DBA Starting Point Behavioral Health |
| Natasha Elizabeth Roybal |
| Nathan Darryl Allen |
| National Commission on Correctional Health Care |
| National Eye Center |
| National Mobile X-Ray |
| National Union of Healthcare Workers |
| NATIVIDAD MEDICAL CENTER |
| Natl Assoc State Mental Health Prog Dir Research Inst DBA NASMHP |
| NAVEX Global, Inc. |
| Network Deposition Services Inc |
| New Hope Prosthetics & Orthodics Inc |
| NEW VISTA NURSING AND REHABILITATION CTR |
| New York Life Group Insurance Company of NY |
| Newcare Medical Group a Prof Corp |
| NEWPORT AMBULANCE SERVICE INC |
| Nicole Taylor |
| No Boundaries Ventures LLC DBA Brisk Coffee Roasters USA |
| NORTH COUNTRY HOSPITAL AND HEALTH CENTER |
| NORTHBAY HEALTHCARE GROUP |
| NORTHBAY MEDICAL CENTER |
| NORTHBAY MEDICAL GROUP |
| NORTHEAST HOSPITAL CORP |
| NORTHEASTERN VERMONT REGIONAL HOSPITAL |
| NORTHSHORE UNIVERSITY HEALTHSYSTEM |
| NORTHWESTERN MEDICAL CENTER |
| NOVA MEDICAL CENTERS |
| NOVA SE UNIVERSITY |
| NOVANT HEALTH NEW HANOVER REGIONAL MEDIC |
| OAKBEND MEDICAL CENTER |
| OB-GYN Associates of Erie PC |
| OCALA REGIONAL MEDICAL CENTER |
| Ogletree,Deakins,Nash Smoak & Stewart P.C. |
| Olivia Michelle Cebollero |
| OMAR ELECTRICAL CONTRACTOR |
| Omega Dental LLC |
| Omnicell, Inc |
| ONCOLOGY HEMATOLOGY ASSOCIATION |
| Onspring Technologies LLC |

| |
|---|
| ONVIV, Inc f/k/a Cancer Expert Now Inc |
| Optuminsight Inc |
| ORAL & MAXILLOFACIAL SURGERY ASSOCIATES |
| ORANGE REGIONAL MEDICAL CTR |
| Origami Risk LLC |
| ORLANDO HEALTH DR P PHILLIPS HOSPITAL |
| OROVILLE HOSPITAL |
| Our Interpreter LLC |
| OutsourceBiz India Private Limited |
| PACIFIC CARE II |
| PACIFIC CARE SALIDA |
| PALM BEACH ACUTE CARE CONSULTANTS LLC |
| PALM BEACH COUNTY FIRE RESCUE |
| Palmetto Health USC Medical Group |
| PALMS WEST HOSPITAL |
| PAM HEALTH REHABILITATION HOSPITAL |
| Pam Renee Poole |
| PAM SPECIALTY HOSPITAL OF DENVER LLC |
| Paragon Contracting Services LLC |
| Paris Long |
| Park & Associates, LLC |
| Parks Chesin & Walbert PC |
| Partners Information Technology Inc. |
| Patrick K. Ennis |
| PATTERSON DENTAL SUPPLY INC |
| Paul Frank + Collins PC |
| Paul L. Johnson DBA Johnson Advance Cleaning |
| Paul Lanteigne |
| PayScale, Inc. |
| PEN BAY PHYSICIANS AND ASSOC |
| PENN HIGHLANDS BROOKVILLE HOSPITAL |
| PENN HIGHLANDS CLEARFIELD CAMPUS |
| PENN HIGHLANDS DUBOIS |
| PENN HIGHLANDS HUNTINGDON |
| PENNSYLVANIA AMBULANCE LLC |
| Pennsylvania Correctional Industries |
| Pennsylvania Prof Liability DBA PA Prof Liability Joint Underwri |
| PENOBSCOT BAY MEDICAL CENTER |
| Philip J Frost DBA Maine Coast Mobile Medical LLC |
| Physician Care Collaborative Solutions, LLC |
| Pilgrim Heatlh LLC DBA StaffDocs LLC |
| PIMCC |
| PINE BLUFF PATHOLOGISTS |
| PINNACLE HEALTH HOSPITAL |
| PINNACLE HEALTH MEDICAL GROUP |
| Pitt County Government |
| PITT COUNTY MEMORIAL HOSPITAL |
| PLEASANT GAP FIRE CO NO 1 EMS |
| Point Security, Inc. |
| Portable Medical Diagnostics |

| |
|---|
| POST ACUTE MEDICAL AT NANTICOKE LLC |
| Precise Behavioral Inc |
| Precision Talent Group LLC DBA Precision Healthcare |
| Prestige Radiolog Inc |
| Preti Strategies |
| Preventive Diagnostics Inc. |
| PRIDE Enterprises |
| PRIME HEALTHCARE SHASTA LLC |
| Prisma Health - Midlands DBA Prisma Health Simulation Center |
| Pristine Surgery Center Inc |
| Professional Resource Enterprises Inc DBA United Nursing Intl |
| Progressive Medical Group Inc |
| PROGRESSIVE SURGICAL INSTITUTE, INC |
| PROGRESSIVE VISION INSTITUTE |
| Propet Footwear Inc |
| PROVIDENCE QUEEN OF THE VALLEY MED CTR |
| PROVIDENCE ST JOSEPH HOSPITAL |
| ProviderTrust Inc |
| Quadient Finance USA Inc - Postage |
| Quality Mobile X-Ray,Inc. |
| Quarles & Brady LLP |
| QUEST DIAGNOSTIC CLINICAL LAB- 4239 |
| QUEST DIAGNOSTICS LLC |
| Quintairos, Prieto, Wood & Boyer, P.A. |
| RADIATION ONCOLOGY CENTER |
| RADIOLOGY ASSOCIATES OF CENTRAL FLORIDA |
| Radiology Consultants PLC |
| RADY CHILDRENS SPECIALISTS OF SAN DIEGO |
| Rapid7 LLC |
| Rave Wireless, Inc.DBA Rave Mobile Safety |
| Ready Refresh By Nestle |
| Rebecca Jackson |
| Rebekah Sue Dixon |
| Recast Software, Inc. |
| Recover Together Inc DBA Groups Recover Together |
| Red Gate Software Ltd. |
| Reed Smith LLP |
| REGIONAL HEALTH SERVICES |
| REGIONAL HEALTH SERVICES INC |
| REGIONAL ONE HEALTH |
| RELIABLE MEDICAL SUPPLY |
| Renee Prew |
| Renee Sorrentino MD DBA Institution for Sexual Wellness |
| Rentokil North America Inc DBA Florida Pest Control |
| REPUBLICAN GOVERNORS ASSOC |
| Resource Cnt for the Chem Dependant DBA Morris Co Aftercare Cnt |
| RETINA VITREOUS CONSULTANTS |
| Reveal Group USA Inc |
| Richard Maenza |
| RICHARD W KAPLAN MD DDS PA |

| |
|---|
| Ricky Dharamnauth Parsaram |
| RiskQual Technologies, Inc. |
| ROBERT E ANDERSON DDS |
| Robert Forrest DBA Forensic Psychiatric Consultants |
| Robert J Young Company LLC |
| Roberta J Norris |
| Robin L Jarvis |
| Robinson Republic LLC |
| Robyn M Hodges |
| Ronald Siejak |
| ROYAL AMBULANCE INC |
| Royal Palm Beach Rehab Corp DBA Florida Orthocare |
| RTS Edgewood LLC DBA Riverside Treatment Edgewood |
| RUBEN FELHANDLER DPM PA |
| Rubin Turnbull & Associates, Inc. |
| Russell Wible DMD DBA Century Oral Surgery PC |
| RUTLAND REGIONAL MEDICAL CENTER |
| SACRED HEART RIVERBEND |
| SAINT AGNES MEDICAL CENTER |
| SAINT VINCENT HEALTH CENTER |
| SALINAS VALLEY MEMORIAL HOSPITAL |
| Sally J Johnson |
| Samantha Leigh Kaiser |
| San Diego Gas & Electric |
| SAN JOAQUIN VALLEY IMAGING |
| SAN LEANDRO HOSPITAL |
| SANTA ROSA MEDICAL CENTER |
| SARASOTA MEMORIAL HOSPITAL |
| SARC BY HSH ASC PINE BLUFF LLC |
| SCHUYLKILL ENDOSCOPY CENTER |
| Scott Carruthers |
| SEACOAST EMBROIDERY INC |
| SELECT SPECIALTY HOSPITAL THE VILLAGES [1] |
| Serpe, Jones, Andrews, Callender & Bell PLLC |
| Service Employees International Union Local 721 CTW CLC |
| Seyfarth Shaw LLP |
| SGS Technologie LLC |
| SHANDS UF |
| Sharp & Carter Finance & Acct Unit Trust |
| SHC Services Inc. DBA Supplemental Health Care Services, Inc |
| Shelby Co Healthcare Corp  dba Regional One Health |
| SIERRA VISTA REGIONAL MEDICAL CENTER |
| SKIPPACK EMERGENCY MEDICAL SERVICES INC |
| SKYLINE MEDICAL CENTER |
| Sleep Partners Holdings  LLC DBA Sleep Management Services |
| Smart Data Solutions, Inc |
| SODEXO, Inc |
| SOLACE ORAL SURGERY PC |
| Solano County Sheriff's Office |
| SOMERSET AREA AMBULANCE ASSOCIATION |

| |
|---|
| SOMERSET SURGICAL SERVICES |
| SOMERSET VITTONE EYE SURGICAL ASSOCIATES |
| Sonata Software North America Inc |
| SOUTH ARKANSAS CARDIOLOGY PLLC |
| SOUTH BURLINGTON FIRE AND RESCUE |
| South Carolina SVPT Resident PPA |
| SOUTH MAINE DIALYSIS CENTER |
| SOUTHEAST ARKANSAS EMERG PHYS LLP |
| Southern California Edison |
| Southern California Series of Lockton dba Lockton Ins Brokers |
| SPRINGFIELD HOSPITAL INC |
| ST JOSEPH MERCY HOSPITAL |
| ST JOSEPHS HOSPITAL HEALTH CENTER |
| ST MARYS MEDICAL CENTER |
| St Marys Medical Center Inc DBA St Marys Medical Center |
| ST VINCENT HEALTH SYSTEM |
| ST VINCENT INFIRMARY |
| Stacie Gubler |
| STAFFORD CONSULTING |
| Standard and Poors Financial Services LLC |
| STANFORD HEALTH CARE TRI VALLEY |
| Stanley R Wofford |
| STAPLES BUSINESS ADVANTAGE |
| STAR EMS |
| Stat Radiology Medical Corporation |
| Stefan Cole Cange |
| Stephanie A. Hansen |
| Stericycle Inc |
| STEWARD EMERGENCY PHYSICIANS |
| STEWARD SHARON REGIONAL HEALTH SYSTEM |
| Store Capital Corp DBA Store Master Funding XXI LLC |
| Struck Love Bojanowski & Acedo, PLC |
| SUBURBAN COMMUNITY HOSPITAL |
| SUBURBAN PROPANE LP |
| SUNSET FOODS |
| SUPERIOR AMBULANCE SERVICE INC |
| SUPPLYWORKS |
| Susan L Ulrich |
| Susan M Partin |
| Susan Patrick Harris |
| SUSANA E. PRIETO, MD PA |
| SUSQUEHANNA PHYSICIAN SERVICES |
| SUTTER AUBURN FAITH HOSPITAL |
| Sutter County Sheriffs Office |
| SUTTER ROSEVILLE MEDICAL CENTER |
| SUTTER SANTA ROSA REGIONAL HOSPITAL |
| Sweeny, Wingate, & Barrow, P.A. |
| Sylvester & Cockrum Inc |
| Symphony Diagnostic Services NO 1 LLC DBA TridentCare |
| Sysco Boston, LLC |

17

| |
|---|
| SYSCO COLUMBIA LLC |
| SYSCO FOOD SERVICES OF SE FL |
| Sysco USA I  Inc DBA Sysco Houston |
| Systems Technologies Inc |
| Tamika Renee Hawkins |
| Teague, Campbell, Dennis, & Gorham, LLP |
| Tech Care X-Ray LLC |
| Technical & Scientific Application DBA TSA, INC. |
| Tela M Sigsworth |
| Teledoc Health Inc |
| TEMPLE UNIVERSITY HOSPITAL |
| TEMPLE UNIVERSITY HOSPTIAL |
| Terry Allen Roland |
| THE BLAIR LAW FIRM PC |
| The Brandt Companies LLC |
| The Community Foundation |
| THE JOINT COMMISSION |
| The Mandt System Inc |
| THE MEDICAL CENTER |
| THE UNIV HOSPITAL OF AR |
| THE VILLAGES REGIONAL HOSPITAL |
| THE WASHINGTON HOSPITAL |
| Therapy Innovations Physical Therapy Inc |
| Thomas Martini |
| ThoughtFocus Inc |
| THP Insurance Company |
| Tiffany Tyson |
| Tina Hendrix P.A. |
| TMG Gases, Inc Esprigas DBA Esprigas |
| T-Mobile USA Inc |
| Tommy Curtis DBA Touch Above Painting LLC |
| Total IV Access, LLC |
| Total Renal Care, Inc DBA South Bay Acutes (Davita) |
| TOWN OF BRIDGEWATER AMBULANCE |
| TOWN OF MIDDLETON |
| TOWN OF SPRINGFIELD |
| TOWN OF WARREN AMBULANCE |
| TOWN OF WEST BOYLSTON |
| TRACEY LEWIS MD |
| TRANE US Inc |
| TRANS MED AMBULANCE INC |
| Trevor R. Weathers DDS, PA |
| TRI MED AMBULANCE LLC |
| TRIAD SECURITY GROUP, INC |
| Trinity Services Group, Inc. |
| Tripod Inc DBA Brightstar Care of Ventura & Oxnard |
| Tristan Medical |
| Triumph Modular Inc |
| TYRONE HOSPITAL |
| UF LEESBURG REGIONAL MED CENTER |

| |
|---|
| UKG Kronos Systems LLC |
| ULINE |
| UMASS MEMORIAL MEDICAL CENTER |
| UMASS MEMORIAL MEDICAL GROUP |
| Unilab Corp DBA Quest Diagnostics |
| United States Treasury |
| UNITY HEALTH NEWPORT |
| UNIV HOSP HSC SYRACUSE |
| UNIV OF PITTSBURGH PHYSICIANS |
| University Medical Association Inc |
| University of Arkansas for Medical Sciences |
| University of Colorado Denver, (ARTS) |
| UNIVERSITY OF FL JACKSONVILLE PHYSICIANS |
| UNIVERSITY OF KANSAS HOSPITAL |
| University of Louisville |
| Unlimited Environmental Inc |
| UPCI CANCER SERVICES |
| UPMC ALTOONA |
| UPMC ALTOONA REGIONAL HEALTH SERVICES |
| UPMC CONEMAUGH CANCER CENTER |
| UPMC HAMOT |
| UPMC HORIZON |
| UPMC KANE |
| UPMC MERCY HOSPITAL |
| UPMC PINNACLE HOSPITALS |
| UPMC PRESBY SHADYSIDE |
| UPMC PRESBYTERIAN SHADYSIDE |
| UPMC SOMERSET |
| UPMC ST MARGARET |
| UPMC THE WASHINGTON HOSPITAL CANCER CNTR |
| UPMC WILLIAMSPORT |
| UPPER CHESAPEAKE MEDICAL CENTER |
| UpToDate, Inc. |
| US FOODSERVICE, INC. |
| US Medical Group of Tennessee LLC |
| USUI Behavioral Health Services LLC DBA Rakesh Chandra |
| UVM MEDICAL CENTER |
| Valerie R Buechele |
| Valicom Corp |
| VALLEY MEDICAL INSTRUMENT SERVICE |
| Valley Oral Surgeon |
| VANDERBILT MEDICAL GROUP |
| VANDERBILT UNIV MED CTR |
| Various Counterparties |
| Veilvete Nicole Hood |
| VENTURA COUNTY MEDICAL CENTER |
| Ventura County Sheriff's Department |
| Ventura County Sheriffs Office |
| VENTURA DIALYSIS |
| Veratrix Solutions LLC |

| |
|---|
| Verinext Corp |
| Veritiv Operating Company |
| Verizon Wireless |
| Viking Automatic Sprinkler Company |
| Vincenza A Abbate-Denino |
| VisibleHand Inc |
| VISION CARE OF MAINE LLC |
| VITAL LINK IZARD COUNTY |
| Vital Records Holdings LLC DBA Vital Records Control |
| Viviane G Winthrop DDS DBA Winthrop Dental Consulting LLC |
| Voyce Inc |
| WARNER, PANK, SALZILLO, & SANCHEZ |
| WASHINGTON HEALTH SYSTEM |
| WASHINGTON REGIONAL MED CENTER |
| WASTE MANAGEMENT |
| WASTE MANAGEMENT INC OF FLORIDA |
| Watson Clinic LLP |
| WAYNE MEMORIAL HOSPITAL INC |
| WAYNE MEMORIAL HOSPITAL PHYSICIANS |
| Weber Gallagher Simpson Stapleton Fires & Newby LLP |
| WELLINGTON REGIONAL MEDICAL CENTER |
| Wesley Staggs |
| WEST PENN HOSPITAL |
| WEST TENNESSEE EYE CARE PC |
| Wheeler Trigg ODonnell LLP |
| WHITE COUNTY MEDICAL CENTER |
| WHITE RIVER EMS |
| WHITE RIVER MED CENTER |
| Whiteford Taylor & Preston LLP |
| WILKES BARRE GENERAL HOSPITAL |
| William James Teel DBA Growler Consulting LLC |
| WILLIAMSPORT AREA AMB SERVICE |
| WILLS EYE HOSPITAL |
| WILLS EYE OPHTHALMOLOGY CLINIC |
| Wimbish Gentile McCray & Roeber PLLC |
| Womack Sanitation Inc |
| Workleap Platform Inc DBA Sharegate |
| Youth Villages Inc |
| Yuba County Sheriffs Dept |
| Zachary Blaine Stroud |
| ZOLL LEFECOR CORP |
| Zoom Video Communications, Inc. |
| Zurich North America |

**<u>Exhibit G</u>**

**Schedule of Liquidating Trust Causes of Action**

## Schedule of Liquidating Trust Causes of Action

The Schedule of Liquidating Trust Causes of Action (the "Schedule") set forth herein represents the most current list of certain but not all Causes of Action to be transferred to, and vest in, the Liquidating Trust (the "Liquidating Trust Causes of Actions") in connection with the Plan (subject to the terms thereof).[1] This Schedule supplements the Preliminary Schedule of Liquidating Trust Causes of Action attached as Exhibit G to the Disclosure Statement. The Debtors expressly reserve the right to alter, amend, remove, augment, supplement, or otherwise modify this Schedule at any time in accordance with the terms of the Plan, subject to the consent and approval, in form and substance, of the Committee and Ad Hoc Group.[2]

As set forth in Article IV.N, the Liquidating Trust expressly retains and reserves all of the Debtors' or Estates' Claims and Causes of Action, except those that are not (a) released or waived pursuant to the Plan, (b) listed on the Schedule of the Retained Causes of Action, or (c) Go-Forward Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Liquidating Trust Causes of Action upon, after, or as a consequence of Confirmation or Consummation. For the avoidance of doubt, the Liquidating Trust Causes of Action shall include at least those Claims and Causes of Action on the Schedule of Liquidating Trust Causes of Action, but shall not include (a) any Cause of Action against an Exculpated Party, (b) if the H.I.G. Settlement Motion has been granted pursuant to a Final Order, the H.I.G. Causes of Action, (c) any Cause of Action against any officer, director, manager, or employee of any Debtor to the extent that such officer, director, manager, or employee serves as an officer, director, manager, or employee of a Post-Restructuring Debtor for a period of at least 60 days following the Effective Date, (d) any Cause of Action against any of the Independent Directors, (e) any Cause of Action that has been acquired by the Recovery Solutions Purchaser pursuant to the Recovery Solutions Stalking Horse Agreement, or (f) any Cause of Action that has been acquired by the NBH Purchaser pursuant to the NBH Purchase Agreement.

In accordance with section 1141(c) of the Bankruptcy Code, upon the Effective Date, the Liquidating Trust Causes of Action shall transfer to, and vest in, the Liquidating Trust free and clear of all Liens, Claims, charges, other encumbrances, and interests in accordance with Article IV.N.1. Upon Consummation, the Liquidating Trust shall retain, reserve, and be entitled to, among other things, commence, assert, pursue, prosecute, settle, and otherwise liquidate or dispose of all Liquidating Trust Causes of Action.

To the fullest extent permitted by applicable law, the Debtors' failure to list or describe with sufficient specificity any Liquidating Trust Cause of Action in the Plan (including this

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *First Amended Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and Certain of its Debtor Affiliates* [Docket No. 2552-1] (as modified, amended, or supplemented from time to time, the "Plan"). For the avoidance of doubt, the rules of interpretation set forth in Article I.B of the Plan shall apply hereto (*e.g.*, unless otherwise specified, all references herein to "Articles" are references to articles of the Plan).

[2]   Any current or potential party to a Liquidating Trust Cause of Action may request additional information regarding such Liquidating Trust Cause of Action by emailing the Debtors' counsel.

Schedule or other items in the Plan Supplement), the Liquidating Trust Agreement, or in the Confirmation Order shall not be deemed an admission, denial, or waiver of any Liquidating Trust Cause of Action that the Liquidating Trust holds or may hold.  No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Liquidating Trust Causes of Action upon, after, or as a consequence of Confirmation or Consummation, including any argument of waiver on account of the failure to list or describe with sufficient specificity any Liquidating Trust Cause of Action in the Plan (including this Schedule or other items in the Plan Supplement) or in the Confirmation Order.

**No Entity may rely on the absence of a specific reference in the Plan (including this Schedule or other items in the Plan Supplement) or in the Confirmation Order to any Liquidating Trust Cause of Action against them as any indication that the Liquidating Trust will not pursue any and all available Liquidating Trust Causes of Action against them.**

## <u>CERTAIN CATEGORIES OF CAUSES OF ACTION</u>

The following is an indicative, but in no way an exhaustive or exclusive, list of "Liquidating Trust Causes of Action."

## I.      Claims Related to Insurance Policies.

All Claims or Causes of Action based in whole or in part upon any and all insurance policies (collectively with any agreements, documents, or instruments relating thereto, the "<u>Insurance Policies</u>") issued to or for the benefit of any of the Debtors (or any of their predecessors), to which any Debtor or Post-Restructuring Debtor is a party, or pursuant to which any Debtor or Post-Restructuring Debtor (or any of their predecessors) or its respective Estate has any rights whatsoever, regardless of whether such Insurance Policies is specifically identified in the Plan (including in this Schedule or other items in the Plan Supplement),.  For the avoidance of doubt the Liquidating Trust's ability to seek to collect or recover from Non-Continuing D&Os shall be governed by the terms of the Liquidating Trust Documents, including that (a) the Liquidating Trust shall first look to the proceeds of any D&O Liability Insurance Policies to satisfy any recovery on account of any Liquidating Trust Causes of Action against any Non-Continuing D&O and (b) such individuals shall have the full protections of any such policies to the extent provided by such policies.

## II.      Avoidance Actions

Unless otherwise released by the Plan, all Avoidance Actions (*i.e.*, any and all avoidance, recovery, subordination, or other claims and Causes of Action that may be brought by or on behalf of the Debtors, the Post-Restructuring Debtors, or their Estates or other authorized parties in interest to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code or under applicable non-bankruptcy law, including actions or remedies under sections 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code, or other similar or related state, federal, or foreign statutes, common law, or other applicable Law, including fraudulent transfer laws or fraudulent conveyance laws) that are not Retained Causes of Action.  Without limiting the generality of the foregoing, the Liquidating

2

Trust expressly retains and reserves all Causes of Action against the Entities identified on **Annex A** hereto.

## III.   Pending Causes of Action

Unless otherwise released by the Plan, all claims of causes of action that the Debtors hold against the states of Michigan and Georgia in connection with facilities located in those states:

A.   *Georgia Department of Corrections Litigation*:  From July 2021 through June 2024, Wellpath was the contracted provider of healthcare services for the Georgia Department of Corrections ("GDC").  Throughout the term of the Agreement, the costs to provide the contracted services significantly exceeded the estimates and projections the State provided Wellpath and other contract bidders during the RFP process.  In recognition of this, the State engaged in extended negotiations with Wellpath to substantially increase the compensation payable under the contract to cover these costs. However, as the parties were poised to execute a contract amendment memorializing this correction, the State suddenly reversed course and awarded, without the required RFP process, a new contract to a new vendor with increased pricing. This process violated the State's procurement laws and Wellpath commenced a lawsuit; however, that action was dismissed on sovereign immunity and standing grounds.  The contract also provides a mechanism, known as a risk-share, by which the State would share in cost-overruns (or cost-savings) for out-of-prison care provided to prisoner patients.  Despite Wellpath providing the GDC with contractually agreed upon information and reports reflecting the cost-overruns and offering to meet with the State to address any questions, the State has refused to pay multi-millions of dollars in contractually owed risk share payments unless Wellpath agrees to provide proprietary information and take other steps not required under the agreement. Wellpath now is poised to commence a new action against the State for breach of contract based on the failure to pay the outstanding risk-share amount (which is not subject to the State's sovereign immunity doctrine), which totals approximately $15 million.

B.   *Michigan Department of Corrections Litigation*:  From September 2021 through April 2024, Grand Prairie Healthcare Services, P.C. served as the pharmacy and health care services provider for the Michigan Department of Corrections ("MDOC").  During the bidding process for the contract, the State failed to provide accurate and complete data concerning the health of patients in the system, MDOC's staffing shortfalls and other financial claims information.  Because of the long billing cycles for the MDOC system, Grand Prairie could not and did not discover this information until well into its performance under the agreement. The inaccurate data caused a significant difference between the expected and actual financial performance and left Grand Prairie operating at a significant loss.  Despite the situation, Grand Prairie continued to provide quality care allowing the State to meet its constitutional obligations.  The State was obligated to cover half of the costs incurred for patient specialty care needs through a risk-share provision in the agreement.  However, the State frustrated Grand Prairie's efforts to comply with the risk-share calculation process and failed to perform its risk share payment

3

obligations for multiple quarterly payment periods.  The state's failure to pay has directly impacted Grand Prairie's ability to pay third-party providers; Grand Prairie has subsidized the State's constitutional obligation to provide healthcare to the State's prisoners to the tune of multi-millions of dollars. To help address this, Grand Prairie has filed a notice of intent to sue – a necessary pre-condition to commencing litigation seeking damages – in the Michigan Court of Claims against MDOC.  Perhaps knowing that a claim against it was coming, the State commenced its own lawsuit against Grand Prairie and Wellpath in state court.  In its lawsuit, the State seeks damages, specific performance/injunctive relief (asking the court to order Grand Prairie to pay yet more of Grand Prairie's own monies to third party service providers who are due money) and production of claims data.  Grand Prairie filed an answer to the State's complaint and Wellpath, a non-party of the underlying agreement, filed a motion to dismiss.  The matter is now stayed pursuant to the ongoing Wellpath bankruptcy proceeding.

## IV.    Other Causes of Action

A.    Causes of Action in connection with asserting or exercising the right to object to Claims or Interests.

B.    Causes of Action in connection with asserting or exercising any and all claims and rights pursuant to the Bankruptcy Code, including sections 105, 362, and 1142.

C.    Causes of Action in connection with asserting or exercising claims or defenses, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

D.    Causes of Action in connection with asserting or exercising claims, causes of action, proceedings, controversies, demands, rights, actions, Liens, indemnities, guaranties, suits, obligations, liabilities, interests, debts, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, direct or indirect, secured or unsecured, assertable directly or derivatively, choate or inchoate, reduced to judgment or otherwise, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or any other theory of law.

E.    Causes of Action arising from, relating to, or in connection with any matter arising out of, or relating to, these chapter 11 cases and the Plan including those matters listed in Article XII for which the Bankruptcy Court retains exclusive jurisdiction under the Plan.

To the extent that it is ambiguous whether a Cause of Action that has not been released by the Debtors under the Plan is a Liquidating Trust Cause of Action or Retained Cause of Action, the parties shall engage in good faith negotiations to determine whether such action constitutes a

Liquidating Trust Cause of Action.  If the parties cannot consensually resolve such dispute, the Liquidating Trust may seek a determination from the Bankruptcy Court as to whether such Cause of Action is a Liquidating Trust Cause of Action.

***

**Annex A**

| |
|---|
| ACCOUNTABLE CARE HOSPITALIST GROUP |
| ActualMeds Corporation |
| Adante Pointer DBA Pointer & Buelna LLP |
| Addison Professional Financial Search, LLC |
| Akshara LLC DBA Comfort Inn & Suites |
| Alere Toxicology Services, Inc |
| All Medical Inc |
| American Medical Association |
| Anenye P Aloziem |
| Angus Asphalt Inc |
| Apex & Robert E Lee Moving & Storage DBA Apex Moving & Storage |
| Avison Young Inc DBA AYA Management Services LLC |
| Barton Associates |
| BLUEWATER EMERG PARTNERS OF BRUNSWICK |
| BOSTON MEDICAL CENTER |
| BREWSTER AMBULANCE SERVICE INC |
| BUTLER MEMORIAL HOSPITAL |
| Caren Bock DBA National Leadership Consulting LLC |
| CAROLINAS MEDICAL CENTER |
| Catalant Technologies Inc |
| CENTRAL ARKANSAS RADIATION THERAPY |
| Christopher P Shema DBA Shema Law Firm |
| Christopher Trainor PC DBA Christopher Trainor and Associates |
| CHVAC Services Holdings LLC DBA Alliance Group Services |
| Clearwater Compliance Holding Co LLC DBA CTEK Security LLC |
| CML Security, LLC |
| Coastal Empire Orthopedics LLC |
| Compass Health Systems PA |
| Computacenter United States Inc |
| Cotiviti Inc |
| CRITTENDEN EMS LLC |
| Daniel Mickleburgh |
| DIALYSIS CLINIC INC |
| Dominique A Williams |
| Dover Properties LLC |
| Edgar Snyder & Associates LLC |
| EM ALLIANCE LLC |
| ERI Economic Research Institute |
| EVANGELICAL COMMUNITY HOSPITAL |
| FAVORITE HEALTHCARE STAFFING LLC |
| Fed Ex/660481 |
| FedEx |
| Folkston ICE Processing Center |
| FORREST CITY MEDICAL CENTER |
| FRACKVILLE COMMUNITY AMBULANCE ASSN |
| Gail Gitcho Stategies, LLC |
| Geoffrey C. Sirr Jr DBA NEHC Services, LLC |
| George P Gintoli |

| |
|---|
| GOLD CROSS AMBULANCE SERVICE INC |
| GOOD SAMARITAN MEDICAL CENTER |
| Governmental Consultant Services Inc. |
| Great Lakes Bio- Medical Services |
| Guardian Medical Services LLC |
| HAMOT SURGERY CENTER LLC |
| HOUTZDALE RAMEY EMS |
| InfraWare Inc |
| INTRGRATED SURGICAL INSTITUTE |
| Jackson & Coker Locumtenens, LLC |
| Joshua T Frick DBA Frick Law PA |
| K & M Law Group |
| Kansas City Accident Injury Attorneys |
| Kansas Healthcare Provider Ins. Availability Plan(KaMMCO) |
| Keith Hoogland Limited Partnership |
| Kristin Allred |
| Law Office of Alan H Crede PC |
| LBMC Techologies, LLC |
| Levasseur Electrical Contractors Inc |
| LocumTenens.com LLC |
| MA Correctional Healthcare Svcs, P.C. DBA Jorge R. Veliz |
| Malthouse Construction LLC |
| MANATEE MEMORIAL HOSPITAL DBA  LAKEWOOD RANCH MED CTR |
| MASS GENERAL PHYSICIANS |
| Matthew A Kaufman PLC DBA The Kaufman Law Firm |
| Maxim Healthcare Svcs Holdings Inc DBA Amergis Healthcare Staff |
| McGowan Hood Felder & Phillips LLC |
| MCLAREN MACOMB |
| MCLAREN MEDICAL MGMT INC |
| MCLAREN OAKLAND |
| McLaughlin Dixon LLP |
| Medix Staffing Solutions, Inc. |
| Michael Doyle |
| MORTON HOSPITAL |
| MSI Systems Corp |
| NATERA INC |
| NATIONAL PARK MEDICAL CENTER |
| NEPTUNE DIALYSIS CENTER |
| New England Forensic Associates Inc |
| New Horizon Communications Corp |
| NORTH CAROLINA BAPTIST HOSPITAL |
| NORTH CAROLINA DEPT OF PUBLIC SAFETY |
| OBrien Coleman & Wright LLC |
| Oldham Cnty  Amb Taxing Dist DBA Oldham County EMS |
| Optum360 |
| ORBIT HEALTH, PC |
| ORTHOARKANSAS |
| PAFFORD MEDICAL SVCS |
| Pineapple Contracts US INC |
| Rap East LLC |

| |
|---|
| REGIONAL MEDICAL CENTER |
| RHEUMATOLOGY PARTNERS PLLC |
| Richard Celler Legal PA |
| Risner and Graham |
| RITTENHOUSE HEMATOLOGY AND ONCOLOGY |
| Robert Solomon |
| Rosen Bien Galvan & Grunfeld LLP |
| Safety Rx |
| Sai Ram Associates, LP |
| Salary.com LLC |
| Secure PM LLC |
| SnapMedTech, Inc DBA Snapnurse |
| South Florida Wellness Network Inc |
| Southeastern Biomedical Associates |
| Spiro R Walpert DBA SL United Constructions Inc |
| SURVIVAL FLIGHT INC |
| SystemsTX LLC |
| TA Staffing Temporary Alternatives Inc DBA TALNTLY |
| Talx Corporation DBA Ethority LLC |
| The Advocacy Group at Cardenas Partners LLC |
| The Law Office of Chad Stavley PC |
| The Longstreet Clinic PC |
| ThinkWhy LLC DBA LaborIQ |
| UNIVERSITY MEDICAL CENTER |
| UNLV Medicine |
| Victoria S Klein |
| VILLAGE SURGICENTER OF ERIE |
| Viral Goradia DBA Southern Tier Psychiatry PLLC |
| WADLEY REGIONAL MED CTR |
| Wanger Jones Helsley PC |
| Wisconsin Healthcare Liability Insurance Plan |
| Yopp Properties LLC |

**Exhibit H**

**Restructuring Transactions Memorandum**

## Restructuring Transactions Memorandum

Reorganized Wellpath intends to implement, or cause to be implemented, the following Restructuring Transactions in the following order (except as otherwise indicated) prior to, on, or after the Effective Date of the Chapter 11 bankruptcy restructuring contemplated by the *Further Modified First Amended Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and Certain of its Debtor Affiliates* [Docket No. 2586], dated April 30, 2025 (as may be further supplemented or otherwise modified in accordance with the terms thereof, the "Plan"). Any capitalized term not defined herein shall have the meaning attributed to that term in the Plan.

Unless otherwise set forth below, the following steps shall occur in the order set forth below.

**On or prior to the Effective Date**:

**Step 1**   One or more nominee(s) of the creditors of Wellpath Holdings, Inc. ("Wellpath Holdings") forms [Reorganized Wellpath Parent, LLC], a limited liability company ("Reorganized Parent") and contributes nominal consideration to Reorganized Parent in exchange for all of the membership interests in Reorganized Parent. Reorganized Parent elects to be treated as a corporation for U.S. federal income tax purposes effective as of the date of its formation.

**Step 2**   Reorganized Parent forms [NewCo Intermediate, LLC], a wholly-owned limited liability company ("NewCo Intermediate"). NewCo Intermediate elects to be treated as a corporation for U.S. federal income tax purposes effective as of the date of its formation.

**Step 3**   NewCo Intermediate forms [NewCo Holdings, LLC], a wholly-owned limited liability company ("NewCo Holdings"). NewCo Holdings elects to be treated as a corporation for U.S. federal income tax purposes effective as of the date of its formation.

**On the Effective Date**:

**Step 4**   Reorganized Parent shall enter into the Liquidating Trust Agreement and form the Liquidating Trust.  The members of the Trust Advisory Committee shall be appointed by the Committee and Ad Hoc Group, as applicable, and the Trustee shall be appointed in accordance with the terms of the Liquidating Trust Agreement.

**Step 5**   Reorganized Parent issues and contributes to NewCo Intermediate (i) New Class A Common Units, (ii) New Class B Common Units, (iii) Preferred Units and (iv) the Takeback Facility (together, the "Reorganized Parent Interests").

**Step 6**   NewCo Intermediate contributes all of the Reorganized Parent Interests to NewCo Holdings.

**Step 7**   The following transactions occur simultaneously:

    **a.**   NewCo Holdings exchanges:

        (i)   with Wellpath Holdings for all of its assets, including the stock of Wellpath CFMG, Inc., and certain liabilities: (A) 3% of the Contributed Class A Units (subject to

dilution by transfers described in Step 7(c)), (B) all of the Contributed Class B Units, and (C) a portion of the Takeback Facility; and

    (ii)    with the Equity Financing Participants in exchange for the Equity Financing Amount, the New Preferred Equity and 97% of the New Class A Common Equity (subject to dilution by transfers described in Step 7(c)).

**b.**    NewCo Holdings transfers (i) a portion of the Takeback Facility to certain Equity Financing Participants; and (ii) all of the Liquidating Trust Takeback Debt and the right to receive the Liquidating Trust Subsequent Funding to Wellpath Holdings.

**c.**    NewCo Holdings transfers a portion of the Contributed Class A Common Units to (i) the Backstop Parties in full satisfaction of the Backstop Premium and (ii) the Commitment Parties in full satisfaction of the Commitment Premium.

**Step 8**    The following transactions occur simultaneously:

**a.**    Wellpath Holdings exchanges 3% of the Contributed Class A Common Units and a portion of the Takeback Facility with the Consenting First Lien Lenders in exchange for all of their First Lien Claims.

**b.**    Wellpath Holdings transfers all of the New Class B Common Equity to the Liquidating Trust, and, in exchange for the New Class B Common Equity (as well as the other consideration provided to the Liquidating Trust in accordance with the Plan), the Liquidating Trust assumes the liabilities associated with all of the Second Lien Deficiency Claims and General Unsecured claims (as such Claims are treated and modified under the Plan) from Wellpath Holdings.

**c.**    The Debtors transfer to the Liquidating Trust (i) the Liquidating Trust Causes of Action, (ii) the Liquidating Trust Initial Funding, (iii) all of the Liquidating Trust Takeback Debt, and (iv) the right to receive the Liquidating Trust Subsequent Funding.

**Step 9**    Each of the Equity Financing Participants, the Consenting First Lien Lenders and the Liquidating Trust shall enter into the [Amended & Restated LLCA of Reorganized Parent], substantially in the form approved by the relevant consent parties to which the Equity Financing Participants and Consenting First Lien Lenders hold, as applicable, the New Class A Common Equity and New Preferred Equity, and the Liquidating Trust holds the New Class B Common Equity.

**Step 10**    Reorganized Parent, the lenders party thereto and the agent shall enter into the Takeback Facility Credit Agreement.

**Step 11**    Wellpath Holdings liquidates.

**<u>On or after the Effective Date</u>**:

**Step 12**    Each of CCS-CMGC Intermediate Holdings, Inc., CCS-CMGC Intermediate Holdings 2, Inc. and CCS-CMGC Parent Holdings LP liquidate.

**Step 13** If the H.I.G. Settlement Motion is granted by Final Order, the Reorganized Debtors shall (i) transfer to the Liquidating Trust the full amount of the H.I.G. Initial Payment to the Liquidating Trust, and (ii) notify H.I.G. to direct its counsel transmit the H.I.G. Final Payment.  If the H.I.G. Settlement Motion is denied by Final Order, the Reorganized Debtors shall transfer the H.I.G. Causes of Action to the Liquidating Trust.

**<u>On the First Business Day on or after the first anniversary of the Effective Date</u>**:

**Step 14** The Post-Restructuring Debtors shall transfer $2,000,000 of the Liquidating Trust Subsequent Funding to the Liquidating Trust.

**<u>On the First Business Day on or after the second anniversary of the Effective Date</u>**:

**Step 15** The Post-Restructuring Debtors shall transfer $2,000,000 of the Liquidating Trust Subsequent Funding to the Liquidating Trust.

**<u>On the First Business Day on or after the third anniversary of the Effective Date</u>**:

**Step 16** The Post-Restructuring Debtors shall transfer the remaining $1,000,000 of the Liquidating Trust Subsequent Funding to the Liquidating Trust.

## Exhibit I

**Liquidating Trust Documents**

**WELLPATH HOLDINGS, INC. LIQUIDATING TRUST AGREEMENT**

**Dated as of May 9, 2025**

**PURSUANT TO THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF WELLPATH HOLDINGS, INC. AND CERTAIN OF ITS DEBTOR AFFILIATES**

# TABLE OF CONTENTS

**Page**

ARTICLE I AGREEMENT OF TRUST ............................................................2

    1.1         Creation and Name ...........................................................2
    1.2         Purposes.............................................................................2
    1.3         Transfer of Assets.............................................................2
    1.4         Acceptance of Assets and Assumption of Liabilities.................................3
    1.5         Receipt of Proceeds ..........................................................4
    1.6         Beneficiaries.....................................................................4
    1.7         Jurisdiction ......................................................................4
    1.8         Privileged and Confidential Information.......................4

ARTICLE II POWERS, TRUST ADMINISTRATION, AND REPORTING ............................4

    2.1         Powers..............................................................................4
    2.2         General Administration. ....................................................6
    2.3         Claims Administration. .....................................................7
    2.4         Reporting. .........................................................................7

ARTICLE III ACCOUNTS, INVESTMENTS, AND PAYMENTS .................................7

    3.1         Accounts............................................................................7
    3.2         Investment Guidelines.......................................................8
    3.3         Payment of Operating Expenses.......................................8

ARTICLE IV TRUSTEE; DELAWARE TRUSTEE.............................................10

    4.1         Number............................................................................10
    4.2         Term of Service. .............................................................10
    4.3         Compensation and Expenses of the Trustee....................11
    4.4         Standard of Care; Exculpation. ......................................11
    4.5         Protective Provisions........................................................12
    4.6         Indemnification. ..............................................................13
    4.7         Trustee Independence ......................................................14
    4.8         No Bond ..........................................................................14
    4.9         Reliance by the Trustee ...................................................14
    4.12        Delaware Trustee.............................................................14
    4.13        Trust Meetings.................................................................18
    4.14        Matters Requiring Consultation with TAC ...................18
    4.15        Matters Requiring Consent of TAC ..............................19
    4.16        Trustee's and TAC's Employment of Professionals. ....................19

ARTICLE V LIQUIDATING TRUST OBSERVER FOR REORGANIZED WELLPATH .......20

    5.1         Appointment....................................................................20
    5.2         Term of Service. .............................................................20
    5.3         Compensation and Expenses of the Liquidating Trust Observer. ...............21
    5.4         Standard of Care; Exculpation. ......................................21
    5.5         Protective Provisions........................................................22

i

5.6      Indemnification. ................................................................................23
5.7      Liquidating Trust Observer Independence ........................................23
5.8      No Bond ............................................................................................24
5.9      Confidentiality. .................................................................................24

ARTICLE VI TAX MATTERS ..........................................................................24

6.1      Treatment of Aggregate Settlement Consideration Transfer .......24
6.2      Income Tax Status. ...........................................................................24
6.3      Tax Returns. .....................................................................................24
6.4      Withholding of Taxes and Reporting Related to Trust Operations ............25
6.5      Valuation ..........................................................................................26
6.6      Expedited Determination of Taxes ..................................................26

ARTICLE VII ....................................................................................................26

7.1      Members; Action by Members. .......................................................26
7.2      Duties. ...............................................................................................26
7.3      TAC Information Rights ...................................................................26
7.4      Trust Advisory Committee Subcommittee. ......................................27
7.5      Term of Office. .................................................................................27
7.6      Appointment of Successor. ..............................................................28
7.7      Compensation and Expenses of the TAC. ........................................28
7.8      Procedures for Consultation with and Obtaining the Consent of the TAC. 28

ARTICLE VIII GENERAL PROVISIONS ........................................................30

8.1      Irrevocability ...................................................................................30
8.2      Term; Termination. ..........................................................................30
8.3      Amendments .....................................................................................30
8.4      Severability. .....................................................................................31
8.5      Notices. .............................................................................................31
8.6      Successors and Assigns ....................................................................33
8.7      Limitation on Trust Interests for Securities Laws Purposes ..........33
8.8      Exemption from Registration ...........................................................34
8.9      Entire Agreement; No Waiver ..........................................................34
8.10     Headings. ..........................................................................................34
8.11     Governing Law .................................................................................34
8.12     Dispute Resolution ...........................................................................35
8.13     Effectiveness ....................................................................................36
8.14     Counterpart Signatures .....................................................................36
8.15     Waiver of Jury Trial .........................................................................36

## LIQUIDATING TRUST AGREEMENT

This Liquidating Trust Agreement is made this 9th day of May, 2025 (this "**Trust Agreement**"), by and among (i) the Debtors and Reorganized Debtors (defined below), (ii) Matthew J. Dundon of Dundon Advisers LLC, as trustee for the Liquidating Trust (the "**Trustee**"), (iii) Wilmington Trust, National Association, not in its individual capacity, but solely as Delaware Trustee, (together with any successor  serving in such capacity, the "**Delaware Trustee**"), and (iv) the members of the Trust Advisory Committee who are the individuals further identified on the signature pages hereto (together with any successor serving in such capacity, the "**TAC,**" and together with the foregoing, the "**Parties**") and creates and establishes the Liquidating Trust (the "**Trust**") referenced herein in order to facilitate the implementation of the *First Amended Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and Certain of its Debtor Affiliates (With Technical Modifications)* [Dkt. No. 2586], dated April 30, 2025 (as the same may be amended, modified or supplemented from time to time in accordance with the terms and provisions thereof and including the Plan Supplement, the "**Plan**") filed in the Chapter 11 Cases (defined below) of Wellpath Holdings, Inc. and its affiliated Debtors[1] (the "**Debtors**" and upon emergence from bankruptcy, the "**Reorganized Debtors**"). Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Plan.

## RECITALS

(A)    Contemporaneously with the execution of this Agreement, the Debtors will have reorganized under the provisions of chapter 11 of the Bankruptcy Code in a case filed in the United States Bankruptcy Court for the Southern District of Texas ("**Bankruptcy Court**"), jointly administered and known as *In re: Wellpath Holdings, Inc.*, Case No. 24-90533 (ARP) (collectively, the "**Chapter 11 Cases**").

(B)    The Debtors are executing this Trust Agreement in their capacities as Settlors to implement the Plan and to create the Trust for the benefit of the holders of Second Lien Deficiency Claims and General Unsecured Claims, (collectively, the "**Trust Claims**").

(C)    The Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

(D)    The Plan and Confirmation Order provide, among other things, for the creation of the Trust to satisfy the Trust Claims in accordance with this Trust Agreement, the Plan and the Confirmation Order.

---

[1]    Wellpath Holdings, Inc. and its affiliated Debtors include the following: Physicians Network Association, Inc.; Alpine CA Behavioral Health HoldCo, LLC; CCS-CMGC Intermediate Holdings 2, Inc.; CCS-CMGC Intermediate Holdings, Inc.; CCS-CMGC Parent Holdings, LP; CCS-CMGC Parent GP, LLC; CHC Companies, LLC; Conmed Healthcare Management, LLC; Correct Care Holdings, LLC; Correctional Healthcare Companies, LLC; Correctional Healthcare Holding Company, LLC; HCS Correctional Management, LLC; Healthcare Professionals, LLC; Jessamine Healthcare, LLC; Justice Served Health Holdings, LLC; Missouri JSH Holdco; Missouri JSH Manager, Inc.; Perimeter Hill RPA, LLC; Wellpath CFMG, Inc.; Wellpath Community Care Holdings, LLC; Wellpath Community Care Management, LLC; Wellpath Community Care Centers of Virginia, LLC; Wellpath Education, LLC; Wellpath Group Holdings, LLC; Wellpath Hospital Holding Company, LLC; Wellpath LLC; Wellpath Management, Inc.; Wellpath SF Holdco, LLC; WHC, LLC; WPMed, LLC; Zenova Management, LLC; Zenova Telehealth, LLC

(E)    The Plan and Confirmation Order provide that, on the Effective Date and continuing thereafter until fully funded in accordance with the Plan, the Liquidating Trust Assets (as defined in Section 1.3), as described in **Exhibit 1** shall be transferred to and vested in the Trust free and clear of all liens, encumbrances, charges, claims, interests or other liabilities of any kind of the Debtors or their affiliates, any creditor or any other entity.

(F)    In accordance with the Plan, the Trust is further intended to be exempt from the registration requirements of the Securities Act of 1933, as amended (the "**Securities Act**"), and any applicable state and local laws requiring registration of securities pursuant to section 1145 of the Bankruptcy Code.

NOW, THEREFORE, it is hereby agreed as follows:

## ARTICLE I
## AGREEMENT OF TRUST

**1.1    Creation and Name.**  There is hereby created a trust known as the "Wellpath Liquidating Trust." The Trustee of the Trust may transact the business and affairs of the Trust in the name of the Trust, and references herein to the Trust shall include the Trustee acting on behalf of the Trust. It is the intention of the parties hereto that the Trust created hereby constitutes a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. §§ 3801 *et seq*. (the "**Act**") and that the Confirmation Order, the Plan and this Trust Agreement, including the Exhibits hereto (the Confirmation Order, the Plan and this Trust Agreement, including all Exhibits hereto, collectively, the "**Trust Documents**"), constitute the governing instruments of the Trust.  It is the intention of the Parties that the Trust qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations and that this Trust Agreement constitute the governing instrument of the Trust, except with respect to any Disputed Ownership Fund (as defined in Section 5.1). The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 2**.

**1.2    Purposes**.  The purposes of the Trust are to:

(a)    hold, preserve, maximize, and administer the Liquidating Trust Assets;

(b)    liquidate the Liquidating Trust Assets;

(c)    administer, process, settle, resolve, liquidate, satisfy, and pay all Allowed Trust Claims in a fair, consistent, and equitable manner in accordance with the terms of the Liquidating Trust Distribution Procedures attached hereto as **Exhibit 3** (the "**TDPs**"); and

(d)    be responsible for the Liquidating Trust Causes of Action (on behalf of itself and its beneficiaries), as set forth in **Article IV.D.3** of the Plan, with the net proceeds of such Liquidating Trust Causes of Action to be distributed to the beneficiaries of the Trust under the terms of this Trust Agreement.

**1.3    Transfer of Assets.** Pursuant to the Plan, on the Effective Date, the Trust will receive and hold all right, title and interest in and to the consideration described in Article IV.D of the Plan and set forth on **Exhibit 1** hereto (the "**Aggregate Settlement Consideration**" and

2

together with any income or gain earned thereon and proceeds derived therefrom, collectively, the "**Liquidating Trust Assets**").  The Aggregate Settlement Consideration shall be transferred to the Trust free and clear of any liens, encumbrances, charges, claims, interests or other liabilities of any kind of the Debtors or their affiliates, any creditor or any other person or entity.  The Debtors shall execute and deliver such documents to the Trust as the Trustee reasonably requests to transfer and assign any assets comprising all or a portion of the Aggregate Settlement Consideration to the Trust.

       1.4       **Acceptance of Assets and Assumption of Liabilities.**

       (a)       In furtherance of the purposes of the Trust, the Trust hereby expressly accepts the transfer to the Trust of the Aggregate Settlement Consideration in the time and manner as, and subject to the terms, contemplated in the Plan.

       (b)       In furtherance of the purposes of the Trust, except as otherwise provided in this Trust Agreement or the Plan, the Trust shall have and retain any and all rights and defenses the Debtors had with respect to any Trust Claims immediately before the Effective Date to the extent necessary to administer such Trust Claims in accordance with this Trust Agreement and the Plan.

       (c)       Notwithstanding anything to the contrary herein, no provision herein shall be construed or implemented in a manner that would cause the Trust to fail to qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, except with respect to any Disputed Ownership Fund.

       (d)       Except as otherwise set forth in the Plan, the Confirmation Order, or this Trust Agreement, distributions in accordance with this Trust Agreement, and in accordance with the TDPs, shall be the sole source of recovery, if any, against the Debtors, their Estates, or the Post-Restructuring Debtors in respect of such Trust Claims, and the Holders of such Trust Claims shall have no other or further recourse to the Debtors, their Estates, or the Post-Restructuring Debtors.

       (e)       Notwithstanding the foregoing, and except as otherwise set forth in the Plan, the Confirmation Order, or this Trust Agreement, nothing contained herein shall be deemed to constitute a waiver, modification or release of any rights a holder of a Trust Claim may have to pursue recovery from any applicable insurance policies covering any portion of the Trust Claim or any claim, cause of action, lawsuit, or rights a holder of a Trust Claim may have against any non-Debtor entity or person who is not a Released Party under the Plan regardless of whether it arises out of the same facts or occurrences as the Trust Claim; *provided*, *however*, notwithstanding anything to the contrary in this Trust Agreement, in no event shall Reorganized Wellpath or the Post-Restructuring Debtors have any obligation to satisfy or pay any deductible, retention, advancement, indemnification or other financial obligation under or in connection with the such insurance policies.  All such rights are expressly preserved.

**1.5     Receipt of Proceeds**.  The proceeds of any sale of Liquidating Trust Assets or recoveries from any litigation or claims of the Trust will be deposited in the Trust's accounts and become the property of the Trust.

**1.6     Beneficiaries.**

(a)     The beneficial owners (within the meaning of the Act) of the Trust shall be the holders of Allowed Trust Claims (the "**Trust Beneficiaries**").

(b)     The Trust Beneficiaries shall be subject to the terms of this Trust Agreement and Trust Documents.

**1.7     Jurisdiction**.  The Bankruptcy Court shall have continuing jurisdiction over the Trust, provided, however, that the courts of the State of Delaware, including any federal court located therein, shall also have concurrent jurisdiction over the Trust.

**1.8     Privileged and Confidential Information**.   To the extent that Post-Restructuring Debtors share or provide access to information ("Privileged Information") with the Trust that is protected by the attorney-client privilege, work product doctrine, or other privilege, immunity or protection ("Privileges"), the Trust is assignee and successor to Post-Restructuring Debtors with respect to the Liquidating Trust Causes of Action and shall be treated as such in any sharing of and access to Privileged Information. For the avoidance of doubt, the Parties expressly acknowledge and agree that Reorganized Debtors will retain ownership and control over all Privileges with respect to the Privileged Information. The Trust may assert Privileges with respect to Privileged Information but may not waive the Privileges without Reorganized Debtors' express written consent, which shall not be unreasonably withheld or delayed. Privileged Information may only be shared by the Trustee with its counsel and professionals retained by counsel in order to further the purposes set forth in this Trust Agreement, and may not be publicly disclosed or shared with any person or entity that would diminish the protection provided by the Privileges.

**ARTICLE II**
**POWERS, TRUST ADMINISTRATION, AND REPORTING**

**2.1     Powers.**

(a)     The Trustee is and shall act as a fiduciary to the Trust in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order. The Trustee shall, at all times, administer the Trust in accordance with the purposes set forth in Section 1.2 above and the Plan. Subject to the limitations set forth in this Trust Agreement and the Plan, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2 below, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)     Except as required by applicable law or as otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

4

(c)     Without limiting the generality of Section 2.1(a) above, and except as limited below or by the Plan, the Trustee shall have the power to:

(i)     receive and hold the Aggregate Settlement Consideration and exercise all rights with respect thereto;

(ii)     invest the monies held from time to time by the Trust in accordance with the Investment Guidelines pursuant to Section 3.2 below;

(iii)     incur expenses and other obligations of the Trust necessary to carry out the purposes of the Trust in accordance with the Plan, and pay or satisfy such obligations from the Trust as set forth in the Plan;

(iv)     establish such funds, reserves (including to address confidential liabilities), and accounts within the Trust, including the ability to form entities to hold such fund, reserves and accounts, as the Trustee deems useful in carrying out the purposes of the Trust;

(v)     sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding, as required to reconcile, administer, or defend against the Trust Claims (except for the Second Lien Deficiency Claims);

(vi)     establish, supervise, and administer the Trust and make distributions to Trust Beneficiaries pursuant to the terms of this Trust Agreement, the TDPs, and the Plan;

(vii)     appoint a Liquidating Trust Observer as such term is defined in the Amended and Restated Limited Liability Company Agreement of New WPCC Parent, LLC (the "**LLC Agreement**");

(viii)     pay reasonable compensation from the Trust to the Liquidating Trust Observer and, to the extent not already reimbursed by the Reorganized Debtors, reimburse the Liquidating Trust Observer for all reasonable and documented out-of-pocket costs and expenses incurred by the Liquidating Trust Observer in connection with the performance of his or her duties hereunder;

(ix)     appoint such officers and retain such consultants, advisors, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing, forecasting, and alternative dispute resolution services and activities as the Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his, her or its discretion, deems advisable or necessary in order to carry out the terms of this Trust Agreement;

(x)     pay reasonable compensation from the Trust for any of the Trust's consultants, advisors, independent contractors, experts, counsel, and agents for legal, financial, administrative, accounting, investment, auditing, forecasting, and alternative dispute resolution services and activities as the Trust requires;

5

(xi)     pay reasonable compensation from the Trust for the Trustee, the Delaware Trustee, and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Trustee, the Delaware Trustee, and the TAC for all reasonable and documented out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)     compensate the Trustee, and any professionals with whom the Trustee has consulted prior to the Effective Date, for services, costs and expenses incurred prior to the Effective Date;

(xiii)     enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement or the Plan;

(xiv)     in accordance with Section 4.4 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 4.4 below), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives. No party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.4 below;

(xv)     commence and pursue the Liquidating Trust Causes of Action, and manage and administer any proceeds thereof in accordance with the Plan; and

(xvi)     exercise any and all other rights, and take any and all other actions as are permitted, of the Trustee in accordance with the terms of this Trust Agreement and the Plan.

(d)     The Trust shall not have the power to guarantee any debt of other persons.

(e)     The Trustee shall endeavor to make timely distributions and not unduly prolong the duration of the Trust.

(f)     The Trustee shall consult with the TAC on the matters set forth in Section 4.14 below.  The Trustee shall obtain the consent of the TAC prior to taking action with respect to the matters as set forth in Section 4.15 below, as and to the extent set forth therein.

## 2.2     General Administration.

(a)     The Trustee shall act in accordance with the Trust Documents. In the event of a conflict between the terms of this Trust Agreement and the Plan, the terms of the Plan shall control. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)     The Trustee shall (i) timely file such tax returns and pay any taxes imposed on the Trust in accordance with Section 5.3, (ii) comply with all applicable reporting and withholding obligations in accordance with Section 5.4, (iii) satisfy all requirements necessary to qualify and maintain qualification of the Trust as a "liquidating trust" within the meaning of

Section 301.7701-4(d) of the Treasury Regulations, except with respect to any Disputed Ownership Fund, and (iv) take no action that could cause the Trust to fail to qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, except with respect to any Disputed Ownership Fund.

(c)     Other than the obligations of the Trustee specifically set forth in this Trust Agreement, the Plan, or the Confirmation Order, the Trustee shall have no obligations of any kind or nature with respect to his position as such.

**2.3     Claims Administration**.  In accordance with the terms set forth in the TDPs, the Trustee shall administer, dispute, object to, compromise, or otherwise resolve, as applicable, all Trust Claims.

**2.4     Reporting.**

(a)     The Trustee shall timely prepare, file and distribute such statements, reports and submissions to the extent required by applicable law.

(b)     The Trustee shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event no later than one hundred and twenty (120) days following the end of each fiscal year, an annual report (the "**Annual Report**") containing special-purpose financial statements of the Trust (including, without limitation, a special-purpose statement of assets, liabilities and net claimants' equity, a special-purpose statement of changes in net claimants' equity and a special-purpose statement of cash flows). The Trustee shall not be required to obtain an audit of the Annual Report by a firm of independent certified public accountants.  The Annual Report shall be made available to the Trust Beneficiaries by means of actual notice, provided, however, the Trustee may post the Annual Report on a website maintained by the Trust in lieu of actual notice to each Trust Beneficiary (unless otherwise required by law) (the "**Website**").

**ARTICLE III**
**ACCOUNTS, INVESTMENTS, AND PAYMENTS**

**3.1     Accounts.**

(a)     The Trustee shall maintain one or more accounts (the "**Trust Accounts**") on behalf of the Trust with one or more financial depository institutions (each a "**Financial Institution**").

(b)     Candidates for the position of Financial Institution shall fully disclose to the Trustee any interest in or relationship with the Debtors or its affiliated persons. Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustee shall take any such interest or relationship into account in selecting a Financial Institution.

(c)     The Trustee may replace any retained Financial Institution with a successor Financial Institution at any time, and such successor shall be subject to the considerations set forth in Section 3.1(a) above.

(d)     The Trustee may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as he or she may deem necessary, prudent or useful in order to, among other things, provide for distributions to the Trust Beneficiaries or meet the obligations of the Trust, and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustee shall be held as Liquidating Trust Assets and, except as specifically designated as such in accordance with the provisions of Section 5.3(c) below, are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" or a "disputed ownership fund" within the meaning of the IRC or Treasury Regulations.

### 3.2     Investment Guidelines.

(a)     The Trustee may invest the Liquidating Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 5** (the "**Investment Guidelines**").

(b)     In the event the Trust holds any non-liquid assets, the Trustee shall own, protect, oversee, and monetize such non-liquid assets in accordance with the Trust Documents. This Section 3.2(a) is intended to modify the application to the Trust of the "prudent person" rule, "prudent investor" rule and any other rule of law that would require the Trustee to diversify the Liquidating Trust Assets.

(c)     Cash proceeds received by the Trust in connection with its monetization of the non-liquid Liquidating Trust Assets shall be invested in accordance with the Investment Guidelines until needed for the purposes of the Trust as set forth in Section 1.2 above.

### 3.3     Payment of Operating Expenses.

All operating expenses of the Trust shall be paid from the Trust as provided in the Plan. None of the Trustee, Delaware Trustee, the TAC, the Post-Restructuring Debtors, the Trust Beneficiaries, nor any of their officers, agents, advisors, professionals, or employees shall be personally liable for the payment of any operating expense or other liability of the Trust.

### 3.4     Distributions to Trust Beneficiaries.

(a)     The Trustee will make distributions to Trust Beneficiaries in a fair, consistent and equitable manner in accordance with this Trust Agreement, the TDPs, the Plan and the Confirmation Order.

(b)     Distributions to Trust Beneficiaries shall be made, as determined by the Trustee in his, her or its discretion subject to the terms of the Plan; provided, however, the Trust must distribute at least annually to the Trust Beneficiaries its net income plus all net proceeds from the sale of assets, except that the Trust may retain an amount of net proceeds or net income reasonably necessary to maintain the value of its assets or to meet claims and contingent liabilities (including disputed claims and claims that have been filed in the Chapter 11 Cases but, as of the date of such distributions, are not Allowed Trust Claims). Where a Claimant is engaged in civil litigation with third parties that may share liability for a GUC Claim, the Trustee may, in his, her, or its discretion, consider the status and posture of such litigation as appropriate in determining distributions to the Claimant.

(c)      The Trust may withhold or deduct from amounts distributable to any Person any and all amounts, determined in the Trustee's reasonable sole discretion, required by any law, regulation, rule, ruling, directive, or other governmental requirement (including, without limitation, tax withholding in accordance with Section 5.4 below). Any Liquidating Trust Assets which are undistributable in accordance with this Section 3.3 as of the termination of the Trust shall (i) revert to the Trust (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary); (ii) the Trust Claim with respect to such undistributable amount shall be released, settled, compromised and forever barred, and (iii) the undistributable amount shall be reallocated to the other Trust Claims, in accordance with provisions of the Plan and this Trust Agreement.

(d)      The Trustee may retain a distribution agent for the effective administration and distribution of amounts payable to Trust Beneficiaries; provided, however, that such distribution agent shall have no greater authority than, and shall be subject to the same restrictions as, the Trustee under this Trust Agreement.

(e)      Subject to Bankruptcy Rule 9010, any distribution to a Trust Beneficiary shall be made: (1) at the addresses set forth on the respective proofs of Claim filed by such holders; (2) with respect to Second Deficiency Lien Claims, at the addresses provided by the Second Lien Agent, the Debtors, or the Post-Restructuring Debtors, (3) at the address set forth in any written notices of address changes delivered to the Trustee after the Effective Date; or (4) at the address reflected in the schedules if no proof of Claim is filed with the Trustee (as to Trust Claims administered by the Trust) and the Trustee has not received a written notice of a change of address. Except as set forth in the TDPs, if any Trust Distribution or other communication from the Trust is returned as undeliverable, no further Trust Distribution shall be made to such holder unless the Trustee is notified in writing of such holder's then current address.   Undeliverable Trust Distributions shall remain in the possession of the Trustee until the earlier of (i) such time as a Trust Distribution becomes deliverable or (ii) such undeliverable Trust Distribution becomes "unclaimed property" pursuant to the provisions of the Plan, the TDPs, and this Trust Agreement. Except as required by law, the Trustee (or its duly authorized agent) shall have no obligation to locate any Trust Beneficiary.

(f)      After final Trust Distributions have been made in accordance with the Plan, the TDPs, the Confirmation Order and this Trust Agreement, and adequate provision has been made for all final obligations of the Trust, the Trustee shall have the authority to direct the remaining Liquidating Trust Assets to a tax-exempt organization as selected by the Trustee in his, her or its discretion.

(g)      Checks issued to Trust Beneficiaries shall be null and void if not negotiated within one hundred eighty (180) calendar days after the date of issuance thereof.   Requests for reissuance of any voided check shall be made directly to the Trustee by the Trust Beneficiary to whom such check was originally issued.  Any Trust Claim in respect of such a voided check shall be made within one hundred eighty (180) calendar days after the date of issuance of such check. If no request is made as provided in the preceding sentence, the check shall be deemed undistributable and shall be subject to the provisions of Section 3.3(c).

(h)     Cash payments to foreign Trust Beneficiaries may be made, at the option of the Trustee, in such funds and by such means as are necessary or customary in the foreign jurisdiction of such foreign holder.

(i)     The Trustee shall have the discretion to determine the timing of Trust Distributions in the most efficient and cost-effective manner possible; provided, however, that the Trustee's discretion may not be exercised in a manner inconsistent with any express requirements of the Plan.

(j)     Notwithstanding any provision in the Trust Agreement, the TDPs, the Plan or the Confirmation Order to the contrary, the Trustee, in the Trustee's sole discretion, may decline to make any distribution of $100 or less, due to the economic inefficiency of making a distribution of such a *de minimis* amount.

(k)     Except as may otherwise be approved by the board of managers of the Reorganized Debtors, the Trust may not distribute or otherwise transfer any of the limited liability company interests of the Reorganized Debtors held by the Trust to the Trust Beneficiaries until such time that the Trust is terminated in accordance with Section 8.2 hereof.  Notwithstanding the foregoing, the Trust shall be permitted to transfer any such interests in the Reorganized Debtors to Third Party Purchasers (as such term is defined in the LLC Agreement), subject in all cases to the obligations and limitations set forth in the LLC Agreement.

## ARTICLE IV
## TRUSTEE; DELAWARE TRUSTEE

**4.1     Number**.  In addition to the Delaware Trustee appointed pursuant to Section 4.12 below, there shall be one (1) Trustee who shall be the person named on the signature pages hereof. For the avoidance of doubt, there shall be at least one (1) Trustee serving at all times (in addition to the Delaware Trustee).

**4.2     Term of Service.**

(a)     The Trustee shall serve from the Effective Date until the earliest of (i) his or her death (if a natural person) or its dissolution (if an entity), (ii) his, her or its resignation pursuant to Section 4.2(b) below, (iii) his, her or its removal pursuant to Section 4.2(c) below, or (iv) the termination of the Trust pursuant to Section 8.2 below.

(b)     The Trustee may resign at any time upon written notice filed with the Bankruptcy Court and delivered to the TAC. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     The Trustee may be removed by the consent of the TAC in the event the Trustee becomes unable to discharge his, her or its duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, provided the Trustee has received reasonable notice and an opportunity to be heard. Other good cause shall mean (i) fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony, in each case whether or not connected to the Trust, or (ii) a consistent pattern of neglect and failure

10

to perform or participate in performing the duties of Trustee hereunder. For the avoidance of doubt, any removal of the Trustee pursuant to this Section 4.2(c) shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

(d)     In the event of any vacancy in the office of the Trustee, including the death, resignation or removal of any Trustee, such vacancy shall be filled by the TAC as set forth herein. The TAC will nominate an individual to serve as successor Trustee.  If the majority of the TAC then in office agree upon a successor Trustee, then, subject to the approval of the Bankruptcy Court, such individual shall become the Trustee.  In the event that a majority of the TAC then in office cannot agree on a successor Trustee, the matter will be resolved pursuant to Section 8.12 below.

(e)     Immediately upon the appointment of any successor Trustee pursuant to Section 4.2(d) above, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in and undertaken by the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his, her or its predecessor Trustee. No predecessor Trustee shall be liable personally for any act or omission of his, her or its successor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his, her or its predecessor Trustee.

(f)     Each successor Trustee shall serve until the earliest of (i) his or her death (if a natural person) or its dissolution (if an entity), (ii) his, her or its resignation pursuant to Section 4.2(b) above, (iii) his, her or its removal pursuant to Section 4.2(c) above, and (iv) the termination of the Trust pursuant to Section 8.2 below.

### 4.3     Compensation and Expenses of the Trustee.

(a)     The Trustee shall be compensated for his, her or its service as Trustee in the amount of $15,000 per month for services in 2025 (subject to annual increases consistent with the Trustee's practice and subject to the consent of the TAC, which consent shall not be unreasonably withheld or delayed), paid monthly.

(b)     The Trust will promptly reimburse the Trustee for all reasonable and documented out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of his, her or its duties hereunder. The Trust will reimburse the Trustee for fees and expenses incurred prior to the Effective Date in connection with this Trust Agreement and effectuating a timely, orderly, and efficient transition of duties and obligations to the Trustee as of the Effective Date, (such amount not to exceed $50,000), which shall be paid promptly after the Effective Date.

(c)     The Trust shall include in the Annual Report a description of the amounts paid under this Section 4.3.

### 4.4     Standard of Care; Exculpation.

(a)     As used herein, the term "**Trust Indemnified Party**" shall mean each of (i) the Trustee, (ii) the Delaware Trustee, (iii) the TAC and (iv) the officers, employees, consultants,

advisors, and agents of each of the Trust, the Trustee, and the TAC, each in their capacities as such.

(b)     To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacities as Trust Indemnified Parties, or on behalf of the Trust, except those acts found by a final order of a court of competent jurisdiction ("**Final Order**") to be arising out of their willful misconduct, actual fraud, or gross negligence and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or this Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case except for any actions or inactions found by Final Order to be arising out of their willful misconduct, actual fraud, or gross negligence. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the Trust.

(c)     To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to the Trust or the Trust Beneficiaries, it is hereby understood and agreed by the Parties that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties; provided, however, that with respect to the Trust Indemnified Parties other than the Delaware Trustee the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 4.4 and its subparts.

(d)     The Trust will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties, as determined by the Trustee in his, her or its discretion.

### 4.5     Protective Provisions.

(a)     Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 4.5.

(b)     In the event the Trustee retains his, her or its own counsel (including at the expense of the Trust), the Trustee shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustee be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustee in the performance of duties hereunder. Such attorney-client privilege shall be vested solely in the Trustee, on behalf of the Trust, and not in the TAC, or any other person, committee or subcomponent of the Trust, or any other person (including counsel and other professionals) who has been engaged by, represents, or has represented any holder of a Trust Claim. A successor Trustee shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Party or other person may raise any exception to the attorney-client privilege described herein as any such exceptions are hereby waived by all Parties.

12

(c)     No Trust Indemnified Party shall be personally liable under any circumstances for actions taken in his, her or its capacity as Trust Indemnified Party, except for his, her or its own willful misconduct, actual fraud, or gross negligence as determined by a Final Order.

(d)     No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(e)     In the exercise or administration of the Trust hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

**4.6     Indemnification.**

(a)     To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs but excluding taxes in the nature of income taxes imposed on compensation paid to the Trust Indemnified Parties) in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, actual fraud, or gross negligence. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the Liquidating Trust Assets.

(b)     Reasonable and documented expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the Trust shall be paid by the Trust from the Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by Final Order that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by the Trust. The Trustee may, in his, her or its discretion, authorize an advance of reasonable expenses, costs and fees (including attorneys' fees and costs) to be incurred by or on behalf of the Trust Indemnified Parties, as set forth herein.

(c)     The Trustee is authorized, but not required, to purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustee, which may include insurance with respect to liability asserted against

or incurred by such individual in that capacity or arising from his, her or its status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)      The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)      The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

**4.7**      **Trustee Independence.**  The Trustee shall not, during the term of his, her or its service, hold a financial interest in, act as attorney or agent for, or serve as an officer or as any other professional for the Debtors. The Trustee shall not act as an attorney, agent, or other professional for any Trust Beneficiary or any holder of any Trust Claim. For the avoidance of doubt, this Section 4.7 shall not be applicable to the Delaware Trustee.

**4.8**      **No Bond.**  Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.9**      **Reliance by the Trustee**.  The Trustee may absolutely rely, and shall be fully protected in acting or refraining from acting if he or she relies upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that he or she has no reasonable belief to be other than genuine and to have been signed or presented other than by the proper party or parties or, in the case of facsimile transmissions, to have been sent other than by the proper party or parties, in each case without obligation to satisfy itself that the same was given in good faith and without responsibility for errors in delivery, transmission or receipt.  In the absence of gross negligence, willful misconduct, or fraud in respect of the Trustee's duties as found by a final and non-appealable court of competent jurisdiction, or material breach of this Trust Agreement, the Trustee may rely as to the truth of statements and correctness of the facts and opinions expressed therein and shall be fully protected personally in acting (or, if applicable, not acting) thereon. The Trustee shall have the right at any time to seek and rely upon instructions from the Bankruptcy Court concerning this Trust Agreement, the Plan or any other document executed in connection therewith, and the Trustee shall be entitled to rely upon such instructions in acting or failing to act and shall not be liable for any act taken or not taken in reliance thereon.

**4.12**      **Delaware Trustee.**

(a)      There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act. The Delaware Trustee shall either be (i) a natural person who is at

14

least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee, and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible to serve as Delaware Trustee in accordance with the provisions of this Section 4.12, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.12(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Trustee shall have no liability for the acts or omissions of any Delaware Trustee.

(b)     The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustee set forth herein. The Delaware Trustee shall be a trustee of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of Chapter 38 of title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on the Trust in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. These duties shall be deemed purely ministerial in nature, and the Delaware Trustee shall not be liable except for the performance of such duties, and no implied covenants or obligations shall be read into this Trust Agreement against the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to the Trust or the Trust Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of any Trustee. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, actual fraud, or gross negligence. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustee or any other person pursuant to the provisions of this Trust Agreement unless the Trustee or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Trustee and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustee. The Delaware Trustee may, at the expense of the Trust, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)     The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 4.12(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee;

provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.12(d) below; provided further that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustee. If the Trustee does not act within such sixty (60) day period, the Delaware Trustee, at the expense of the Trust, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his, her or its duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of the Trust in accordance with Section 3810 of the Act.

(e)     Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)     The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between the Trust and the Delaware Trustee, which compensation shall be paid by the Trust. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)     The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of the Trust, the Trustee or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with

16

the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not be regarded as making, nor be required to make, any representations thereto.

(h)     The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(i)     In no event shall the Delaware Trustee be responsible or liable for any action taken in good faith, errors in judgement or any special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Delaware Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(j)     The Delaware Trustee is hereby authorized to take such action as the Trustee specifically directs in written instructions delivered to the Delaware Trustee and shall have no liability for acting in accordance therewith. The Delaware Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties, not only as to due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein.

(k)     Notwithstanding anything herein to the contrary, the Delaware Trustee shall not be required to take any action that is in violation of applicable law.

(l)     The Corporate Transparency Act (31 U.S.C § 5336) and its implementing regulations (collectively, the "**CTA**"), may require the Trust to file reports with the Financial Crimes Enforcement Network ("**FinCEN**") from time to time.  It shall be the Trustee's duty and not the Delaware Trustee's duty to cause the Trust to make such filings, as applicable, and to cause the Trust to comply with its obligations under the CTA, if any.  The parties hereto acknowledge that the Delaware Trustee acts solely as a directed trustee at the direction of the Trustee hereunder and that the Trustee is and shall deemed to be the party with the power and authority to exercise substantial control over the Trust.

17

**4.13**   **Trust Meetings.**

(a)   **Regular Meeting**.  The Trustee shall hold regular Trust meetings with the TAC not less than quarterly, which may be held at such times and at such places as may be determined from time to time by the Trustee.  For the avoidance of doubt, the Delaware Trustee shall not be required or permitted to attend any meetings of the Trustee contemplated by this Section 4.13.

(b)   **Special Meetings**.  Special meetings of the Trustee may be called by the Trustee by giving written notice to the TAC not less than one (1) Business Day prior to the date of the meeting.  Any such notice shall include the time, place, and purpose of the meeting, given by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication.  Notice shall be addressed or delivered to the address as shown upon the records of the Trust or as may have been given to the Trustee for purposes of notice.  Notice by overnight courier shall be deemed to have been given one (1) Business Day after the time that written notice is provided to such overnight courier.  Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)   **Participation in Meetings by Telephone Conference**.  The Trustee may convene, and persons shall in all instances have the option to participate in, a meeting by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all persons participating in such meeting can hear one another. Participation in a meeting pursuant to this Section 4.13(c) shall constitute presence in person at such meeting.

(d)   **Waiver of Notice**.  Notice of a meeting need not be given to any person who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with the Trust records or made a part of the minutes of the meeting. Attendance at a meeting shall constitute a waiver of notice of such meeting. Neither the business to be transacted at, nor the purpose of, any Trust meeting need be specified in any waiver of notice.

(e)   **Adjournment**.  A meeting may be adjourned by the Trustee to another time and place.

**4.14**   **Matters Requiring Consultation with TAC**. The Trustee shall consult with the TAC on each of the following:

18

(a)     The form(s) of acceptance and release to be executed by a Trust Beneficiary for an Expedited Distribution or Non-Expedited Distribution, as set forth on Exhibit 3;

(b)     Any extraordinary circumstance which could have a material impact on the Trust;

(c)     Any proposed act or action to initiate, file, prosecute, enforce, or litigate to judgment any Liquidating Trust Cause of Action; and

(d)     Any proposed act or action to abandon, settle, compromise, release, or withdraw any Liquidating Trust Cause of Action.

**4.15    Matters Requiring Consent of TAC**. The Trustee shall obtain the consent of the TAC, or, otherwise, Bankruptcy Court approval in the event of a dispute in accordance with Section 7.12 hereof, for the items listed below:

(a)     Any proposed modification to the indemnification provisions of the Trust Agreement;

(b)     Any proposed modification or amendment to this Section 4.15 or to ARTICLE VII, which modifications or amendments shall require the unanimous consent of the TAC;

(c)     Any proposed sale, transfer or exchange (or series of related transactions) of Liquidating Trust Assets above the proceeds of which exceed $500,000.00 (any proposed sale of Liquidating Trust Assets below such amount shall not require TAC consent); provided, however, that the Trustee shall obtain the consent of the TAC for any sale, transfer, or exchange of New Class B Common Equity;

(d)     Any proposed material modifications to the Liquidating Trust Agreement, including the TDPs and Exhibit 4 thereto;

(e)     Any proposed removal of the Trustee in accordance with Section 4.2(c);

(f)     Any proposed modification to the compensation of the Trustee after December 31, 2025;

(g)     The schedule of valuations based on claim type, or any other methodology used by the Trust, for use in Valuation of Allowed GUC Claims pursuant to ARTICLE VI.B of the TDPs.

The consent of the TAC shall not be unreasonably withheld, conditioned, or delayed.

**4.16    Trustee's and TAC's Employment of Professionals.**

(a)     The Trustee may, but is not required to, retain and/or consult accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, attorneys, and such

other parties deemed appropriate by the Trustee to assist in matters for the Trust within the Trustee's purview.

(b)     The TAC, collectively, may, but is not required to, retain and/or consult, legal counsel and such other parties deemed appropriate by the TAC to assist in matters within the TAC's purview (the "**TAC Professionals**"), provided that no TAC Professionals may be retained to act on behalf of any holder of a Trust Claim.  The Trust shall promptly reimburse, or pay directly if so requested, the TAC for all reasonable and documented fees and costs associated with the TAC's employment of legal counsel pursuant to this provision in connection with the TAC's performance of its duties hereunder.

**ARTICLE V**
**LIQUIDATING TRUST OBSERVER FOR REORGANIZED WELLPATH**

**5.1**     **Appointment**.  The Trustee shall have the right, in consultation with the board of managers of the Reorganized Debtors, to appoint one (1) Liquidating Trust Observer, who shall execute an engagement letter with the Trustee prior to the beginning of the Liquidating Trust Observer's term of service and such other documents as may be reasonably required by the Reorganized Debtors.  For the avoidance of doubt, the right to appoint the Liquidating Trust Observer is solely the right of the Trust and does not entitle any Trust Beneficiary (including any Trust Beneficiary that subsequently acquires limited liability company interests in the Reorganized Debtors) to such right.  In the event that there is any conflict between the terms of such observer documents (including the LLC Agreement) and the terms of this Agreement, such observer documents shall control.

**5.2**     **Term of Service.**

(a)     The Liquidating Trust Observer shall serve, subject to the terms of the LLC Agreement, from the date of his or her appointment under Section 5.1 above until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 5.2(b) below, (iii) his or her removal pursuant to Section 5.2(c) below, (iv) such time that the Trust no longer has the right to designate an observer pursuant to the terms of the LLC Agreement, or (v) the termination of the Trust pursuant to Section 8.2 below.

(b)     The Liquidating Trust Observer may resign at any time upon written notice delivered to the Trustee. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     The Liquidating Trust Observer may be removed by the Trustee in the event the Liquidating Trust Observer becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause. Other good cause shall mean (i) fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony, in each case whether or not connected to the Trust, or (ii) a consistent pattern of neglect and failure to perform or participate in performing the duties of Trustee hereunder. For the avoidance of doubt, any removal of the Liquidating Trust Observer pursuant to this Section 5.2(c) shall require the approval of the TAC, which approval shall not be unreasonably withheld.

20

(d)     In the event of any vacancy in the position of the Liquidating Trust Observer, including the death, resignation or removal of any Trustee, such vacancy shall be filled by the Trustee in the manner set forth in Section 5.1 above.

(e)     Immediately upon the appointment of any successor Liquidating Trust Observer pursuant to Section 5.2(d) above, all rights, titles, duties, powers and authority of the predecessor Liquidating Trust Observer hereunder shall be vested in and undertaken by the successor Liquidating Trust Observer without any further act.

(f)     Each successor Liquidating Trust Observer shall serve, subject to the terms of the LLC Agreement, until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 5.2(b) above, (iii) his or her removal pursuant to Section 5.2(c) above, (iv) such time that the Trust no longer has the right to designate an observer pursuant to the terms of the LLC Agreement, and (v) the termination of the Trust pursuant to Section 8.2 below.

**5.3     Compensation and Expenses of the Liquidating Trust Observer.**

(a)     The Liquidating Trust Observer shall be compensated for his or her service as Liquidating Trust Observer in the amount to be agreed upon by the Trustee and TAC for services in 2025 (subject to annual increases consistent with the Liquidating Trust Observer's practice and subject to the consent of the Trustee, paid monthly.

(b)     The Trust will promptly reimburse the Liquidating Trust Observer for all reasonable and documented out-of-pocket costs and expenses incurred by the Liquidating Trust Observer in connection with the performance of his or her duties hereunder or under the LLC Agreement; provided, however, that the Liquidating Trust Observer shall first seek payment from the Reorganized Debtors for any such costs and expenses required to be reimbursed by the Reorganized Debtors under the LLC Agreement prior to seeking reimbursement from the Trust.

(c)     The Trust shall include in the Annual Report a description of the amounts paid under this Section 5.3.

**5.4     Standard of Care; Exculpation.**

(a)     To the maximum extent permitted by applicable law, the Liquidating Trust Observer shall not have or incur any liability for actions taken or omitted in his or her capacity as Liquidating Trust Observer, or on behalf of the Trust, except those acts found by a final order of a court of competent jurisdiction ("**Final Order**") to be arising out of his or her willful misconduct, gross negligence, bad faith or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in his or her capacity as Liquidating Trust Observer, or on behalf of the Trust.  Any valid indemnification claim of the Liquidating Trust Observer shall be satisfied from the Trust.

(b)     To the extent that, at law or in equity, the Liquidating Trust Observer has duties (including fiduciary duties) or liability related thereto, to the Trust or the Trust Beneficiaries, it is hereby understood and agreed by the Parties that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Liquidating Trust Observer; provided,

21

however, that with respect to the Liquidating Trust Observer, the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 5.4 and its subparts.

(c)     The Trust will maintain appropriate insurance coverage for the protection of the Liquidating Trust Observer, as determined by the Trustee in his or her discretion.

**5.5     Protective Provisions.**

(a)     Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to the Liquidating Trust Observer shall be subject to the provisions of this Section 5.5.

(b)     In the event the Liquidating Trust Observer retains counsel (including at the expense of the Trust), the Liquidating Trust Observer shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Liquidating Trust Observer be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Liquidating Trust Observer in the performance of duties hereunder. Such attorney-client privilege shall be vested solely in the Liquidating Trust Observer, on behalf of the Trust, and not in the Trustee, the TAC, or any other person, committee or subcomponent of the Trust, or any other person (including counsel and other professionals) who has been engaged by, represents, or has represented any holder of a Trust Claim. A successor Liquidating Trust Observer shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Party or other person may raise any exception to the attorney-client privilege described herein as any such exceptions are hereby waived by all Parties.

(c)     No Liquidating Trust Observer shall be personally liable under any circumstances for actions taken in his, her or its capacity as Liquidating Trust Observer, except for his or her own willful misconduct, gross negligence, bad faith or fraud, as determined by a Final Order.

(d)     No provision of this Trust Agreement shall require the Liquidating Trust Observer to expend or risk his or her own personal funds or otherwise incur financial liability in the performance of his or her rights, duties and powers hereunder.

(e)     In the exercise or administration of his or her duties, the Liquidating Trust Observer (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, subject to the written consent of the Trustee (such consent not to be unreasonably withheld or delayed) and the Liquidating Trust Observer shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Liquidating Trust Observer in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

**5.6     Indemnification.**

(a)     To the maximum extent permitted by applicable law, the Liquidating Trust Observer shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs but excluding taxes in the nature of income taxes imposed on compensation paid to the Liquidating Trust Observer) in defending any and all of his or her actions or inactions in his or her capacity as Liquidating Trust Observer, or on behalf of the Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the carrying out of his or her duties as Liquidating Trust Observer, in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, gross negligence, bad faith or fraud. Any valid indemnification claim of any of the Liquidating Trust Observer shall be satisfied from the Liquidating Trust Assets.

(b)     Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Liquidating Trust Observer in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which he or she is indemnified by the Trust shall be paid by the Trust from the Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Liquidating Trust Observer, to repay such amount in the event that it shall be determined ultimately by Final Order that the Liquidating Trust Observer or any other potential indemnitee are not entitled to be indemnified by the Trust. The Trustee may, in his, her or its discretion, authorize an advance of reasonable expenses, costs and fees (including attorneys' fees and costs) to be incurred by or on behalf of the Liquidating Trust Observer, as set forth herein.

(c)     The Trustee is authorized, but not required, to purchase and maintain appropriate amounts and types of insurance on behalf of the Liquidating Trust Observer, as determined by the Trustee, which may include insurance with respect to liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Liquidating Trust Observer, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)     The indemnification provisions of this Trust Agreement with respect to any Liquidating Trust Observer shall survive the termination of such Liquidating Trust Observer. Modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of the Liquidating Trust Observer hereunder, the person, persons or entity making such determination shall presume that such Liquidating Trust Observer is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)     The rights to indemnification hereunder are not exclusive of other rights which the Liquidating Trust Observer may otherwise have at law or in equity, including common law rights to indemnification or contribution.

**5.7     Liquidating Trust Observer Independence.**  The Liquidating Trust Observer shall not, during the term of his or her service, hold a financial interest in, act as attorney or agent for, or serve as an officer or as any other professional for the Debtors. The Liquidating Trust

Observer shall not act as an attorney, agent, or other professional for any Trust Beneficiary or any holder of any Trust Claim.

**5.8    No Bond.**  The Liquidating Trust Observer shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**5.9    Confidentiality**.  For the avoidance of doubt, the Liquidating Trust Observer shall not be permitted to disclose any Confidential Information (as defined in the LLC Agreement) to Trust Beneficiaries; provided, however, the Liquidating Trust Observer may disclose any such Confidential Information to members of the TAC.

**ARTICLE VI**
**TAX MATTERS**

**6.1    Treatment of Aggregate Settlement Consideration Transfer.**  For all United States federal income tax purposes, all Parties shall treat the transfer of the Aggregate Settlement Consideration to the Trust as (i) a transfer of the Aggregate Settlement Consideration (subject to any obligations related to those assets) directly to the Trust Beneficiaries, followed by (ii) the transfer by such Trust Beneficiaries of such Aggregate Settlement Consideration to the Trust in exchange for an interest in the Trust (a "**Trust Interest**") (other than the Liquidating Trust Assets allocable to Disputed Claims and held as a "disputed ownership fund" within the meaning of Section 1.468B-9 of the Treasury Regulations ("**Disputed Ownership Fund**")). Accordingly, the Trust Beneficiaries shall be treated for United States federal income tax purposes (and, to the extent permitted, for state and local income tax purposes) as the grantors and owners of their respective shares of the Aggregate Settlement Consideration (other than the Liquidating Trust Assets allocable to the Disputed Ownership Fund).

**6.2    Income Tax Status.**

(a)    For United States federal income tax purposes (and for purposes of all state, local and other jurisdictions to the extent applicable) and other than as provided pursuant to Section 5.3(c), this Trust shall be treated as a liquidating trust pursuant to Section 301.7701-4(d) of the Treasury Regulations and as a grantor trust pursuant to Sections 671-679 of the IRC. To the extent consistent with Revenue Procedure 94-45 and not otherwise inconsistent with this Trust Agreement, this Trust Agreement shall be construed so as to satisfy the requirements for liquidating trust status.

(b)    The Trust shall at all times to be administered so as to constitute a domestic trust for United States federal income tax purposes.

**6.3    Tax Returns.**

(a)    In accordance with Section 6012 of the IRC and Section 1.671-4(a) of the Treasury Regulations, the Trustee shall file with the IRS annual tax returns for the Trust on Form 1041 as a grantor trust pursuant to Section 1.671-4(a) of the Treasury Regulations. In addition, the Trustee shall file in a timely manner for the Trust such other tax returns, including any state and local tax returns, as are required by applicable law and pay any taxes shown as due thereon. The Trust's items of taxable income, gain, loss, deduction, and/or credit (other than such items is

24

respect of any assets allocable to, or retained on account of, the Disputed Ownership Fund) will be allocated to the Trust Beneficiaries in accordance with their relative ownership of Trust Interests.  Within a reasonable time following the end of the taxable year, the Trust shall send to each Trust Beneficiary a separate statement setting forth such Trust Beneficiary's items of income, gain, loss, deduction or credit and will instruct each such Trust Beneficiary to report such items on his/her applicable income tax return.

(b)     Any taxes imposed on the Disputed Ownership Fund or its assets will be paid out of the assets of the Disputed Ownership Fund (including any Liquidating Trust Assets allocable to Disputed Claims) and any subsequent distributions in respect of the allowance or disallowance of such claims will be reduced accordingly. In the event, and to the extent, that any Cash in any Disputed Ownership Fund is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of the Disputed Ownership Fund, assets of the Disputed Ownership Fund (including those otherwise distributable) may be sold to pay such tax.

(c)     The Trustee may timely elect to treat any Liquidating Trust Assets allocable to Disputed Claims to a Disputed Ownership Fund, and (2) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes.  If a Disputed Ownership Fund election is made, all parties (including the Trustee and the holders of Trust Interests) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.  The Trust shall file all income tax returns with respect to any income attributable to the Disputed Ownership Fund and shall pay from the Trust all U.S. federal, state and local income taxes attributable to such Disputed Ownership Fund based on the items of income, deduction, credit, or loss allocable thereto.

**6.4     Withholding of Taxes and Reporting Related to Trust Operations.**  The Trust shall comply with all withholding, deduction and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions made by the Trust shall be subject to any applicable withholding, deduction and reporting requirements. The Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with any such withholding, deduction, payment, and reporting requirements. All amounts properly withheld or deducted from distributions to a Trust Beneficiary as required by applicable law and paid over to the applicable taxing authority for the account of such Trust Beneficiary shall be treated as part of the Trust Distribution to such Trust Beneficiary. To the extent that the operation of the Trust or the liquidation of the Liquidating Trust Assets creates a tax liability imposed on the Trust, the Trust shall timely pay such tax liability and any such payment shall be considered a cost and expense of the operation of the Trust payable without Bankruptcy Court order. Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder. All Trust Beneficiaries shall be required to provide any information necessary to effect the withholding and reporting of such taxes. The Trustee may require each Trust Beneficiary to furnish to the Trust (or its designee) its social security number or employer or taxpayer identification number as assigned by the IRS and complete any related documentation (including but not limited to a Form W-8BEN, Form W-8BENE-E, or Form W-9) (the "**Tax Documents**"). The Trustee may condition any and all distributions to any Trust Beneficiary upon the timely receipt of properly executed Tax Documents and receipt of such other documents as the Trustee reasonably requests, and in accordance with the Plan. Notwithstanding any of the foregoing provisions of this Section 5.4, to the extent that any distributions to be made

25

from the Trust that constitute compensation as wages ("**Wage Distributions**"), the Trust shall not bear any liability for the employer portion of any payroll taxes applicable to Wage Distributions, which shall be borne by the Post-Effective Date Debtors.

      **6.5**    **Valuation.**  As soon as reasonably practicable after the Effective Date, but in no event later than 180 days thereafter, the Trustee shall make a good faith valuation of the Liquidating Trust Assets and such valuation shall be used consistently by all parties for United States federal income tax purposes. In connection with the preparation of the valuation contemplated thereby, the Liquidating Trust shall be entitled to retain such professionals and advisors as the Trustee shall determine to be appropriate or necessary, and the Trustee shall take such other actions in connection therewith as he or she determines to be appropriate or necessary. The Liquidating Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such value, including the fees and expenses of any professionals retained by the Trustee in connection therewith. Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties for all United States federal income tax purposes, including for determining tax basis and gain or loss. The Trustee also shall file (or cause to be filed) any other statements, returns or disclosures relating to the Trust that are required by any governmental unit.

      **6.6**    **Expedited Determination of Taxes**.  The Trustee may request an expedited determination of taxes of the Trust, under Section 505 of the Bankruptcy Code for all returns filed for, or on behalf of, the Trust for all taxable periods through the termination of the Trust.

**ARTICLE VII**
**TRUST ADVISORY COMMITTEE**

      **7.1**    **Members; Action by Members.** The TAC shall be composed of seven members appointed to represent the interests of holders of Trust Claims.  The initial TAC members shall be the following: Matt Barry, John Duggan, Teesha Graham, David Murray, Martin Yankellow, Deborah Young Powell, and James Waldeck. Except as otherwise set forth in the Trust Documents, the TAC shall act by majority vote of TAC members then serving, provided, however, the TAC may continue to act in the event of one or more vacancies on the TAC, in which case majority vote of the TAC members then serving shall be required for action by the TAC.

      **7.2**    **Duties.** The members of the TAC shall serve in a fiduciary capacity representing holders of Trust Claims.  The TAC shall not have any fiduciary duties or responsibilities to any party other than holders of Trust Claims and the Trust itself.  Except for the duties and obligations expressed in this Trust Agreement, there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC.  To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the Trust, the other parties hereto, or any Trust Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in this Trust Agreement.

      **7.3**    **TAC Information Rights**. The TAC shall have reasonable access to the Trust's consultants and other advisors retained by the Trust and its staff (if any), and information available to the Trustee, which access shall be made available as determined by the Trustee in his, her or its discretion.

26

**7.4**     **Trust Advisory Committee Subcommittee.**

(a)     As soon as practicable following the creation of the Trust, the TAC shall appoint a Trust Advisory Committee Subcommittee ("**TACS**") whose sole purpose shall be making determinations on behalf of the Trust as to the pursuit of assets beyond insurance proceeds in connection with Trust Claims against any Non-Continuing D&O.

(b)     The TACS shall consist of three members. The holders of Second Lien Deficiency Claims shall have the right to appoint two members (the "**2L Designees**"), and the H.I.G. Releasees shall have the right to appoint one member (the "**H.I.G. Designees**").  The members of the TACS shall not be considered fiduciaries of the Trust and shall not have fiduciary duties or responsibilities to any party.  The members of the TACS shall not be members of the TAC and are not subject to the duties nor party to the rights outlined herein.

(c)     The TACS shall be convened by the Trustee in the event that the Trust is considering seeking assets beyond insurance proceeds in connection with actions against any Non-Continuing D&O.  The TACS shall be solely responsible for determining whether to seek such assets and if so, which assets to seek.  Any determination to seek such assets by the TACS must be made by unanimous vote of each member of the TACS.  Such determination shall be controlling on the Trust, and the Trust lacks the power, authority, or responsibility to: (i) pursue such assets absent affirmative and unanimous authorization by the members of the TACS or (ii) consider seeking such additional assets until the formation and constitution of the TACS.

(d)     Once appointed, in the event that a TACS member is no longer willing or able (such as in the event of death or incapacity) to serve, the holders of Second Lien Deficiency Claims shall appoint the successor 2L Designee(s), and the HIG Releasees shall appoint the successor HIG Designee.  In the event of any vacancy any member of the TACS, the TACS shall not be authorized to conduct its responsibilities, and the Trust shall not be authorized to pursue assets beyond insurance proceeds in connection with Trust Claims against Non-Continuing D&O until all such vacancies have been filled and unanimous and affirmative authorization is provided by each member of the TACS.

**7.5**     **Term of Office.**

(a)     Each member of the TAC shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 6.5(b) below, (iii) his or her removal pursuant to Section 6.5(c) below, and (iv) the termination of the Trust pursuant to Section 8.2 below.

(b)     A member of the TAC may resign at any time by written notice to the other members of the TAC and the Trustee.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than thirty (30) days after the date such notice is given, where practicable.

(c)     A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause, provided the member of the TAC has received reasonable notice and an opportunity to be heard. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case

27

whether or not connected to the Trust or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings. Such removal shall require the majority vote of the other members of the TAC and such removal shall take effect only upon the approval of the Bankruptcy Court.

**7.6**      **Appointment of Successor.**

(a)      In the event of a TAC member vacancy, Trust Beneficiaries holding a majority of the then-outstanding Trust Interests (excluding any Trust Interests on account of Second Lien Deficiency Claims) shall propose an individual as successor, subject to the approval of the Trustee, which approval may not be unreasonably withheld; provided, however, in the event of a vacancy with respect to one of the two seats initially allocated to holders of Second Lien Deficiency Claims, such vacancy may only be filled with an individual appointed by the holders of Second Lien Deficiency Claims. In the event a successor TAC member is not appointed within sixty (60) days following the occurrence of such vacancy, the Bankruptcy Court may appoint a successor TAC member upon motion of the Trustee.

(b)      Each successor member of the TAC shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 6.5(b) above, (iii) his or her removal pursuant to Section 6.5(c) above, and (iv) the termination of the Trust pursuant to Section 8.2 below.

(c)      No successor TAC member shall be liable personally for any act or omission of his or her predecessor TAC member. No successor TAC member shall have any duty to investigate the acts or omissions of his or her predecessor TAC member. No TAC member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**7.7**      **Compensation and Expenses of the TAC.** The members of the TAC shall not be entitled to compensation for their services but shall be reimbursed promptly for all reasonable and documented ordinary and customary out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder, subject to the limitation of Section 7.16 below. The Trust shall include a description of the amounts paid under this Section 6.7 in the Annual Report to be filed with the Bankruptcy Court and posted on the Trust's Website.

**7.8**      **Procedures for Consultation with and Obtaining the Consent of the TAC.**

(a)      Consultation Process.

(i)      In the event the Trustee is required to consult with the TAC pursuant to Section 4.14 above, the Trustee shall provide the TAC with written advance notice of the matter under consideration, to the extent practicable, and with all relevant information and documents concerning the matter as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to the consultants and other advisors retained by the Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such matter, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee, to the extent practicable.

(ii)     In determining when to take definitive action on any matter subject to the consultation procedures set forth in this Section 6.8(a), the Trustee shall take into consideration the time required for the TAC to meet and consult as to such matter.  In any event, the Trustee shall not take definitive action on any such matter until at least five (5) Business Days after providing the TAC with the initial written notice that such matter is under consideration by the Trustee, unless such time period is waived in writing by the TAC or at a meeting where the TAC and Trustee are present, or the Trustee determines in his reasonable discretion that definitive action is required earlier.

(b)     <u>Consent Process</u>.

(i)     In the event the Trustee is required to obtain the consent of the TAC pursuant to the Trust Documents, the Trustee shall provide the TAC with a written notice stating that its consent is being sought, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the TAC as much relevant additional information concerning the proposed action as is requested by the TAC and as is reasonably practicable under the circumstances.  The Trustee shall also provide the TAC with such reasonable access to the Trust consultants and other advisors retained by the Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)     For matters requiring the consent of the TAC:

(A)     The TAC must consider in good faith and in a timely fashion any request for its consent by the Trustee, and must in any event advise the Trustee, in writing, of its consent or its objection to the proposed action within five (5) Business Days of receiving the original request for consent from the Trustee, unless the Trustee extends the time for such response. Consent or withholding of consent shall be based on a majority of the TAC making such a determination. The TAC may not withhold its consent unreasonably.  If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action.  If the TAC does not advise the Trustee, in writing, of its consent or its objections to the action within five (5) Business Days of receiving notice regarding such request (or within such additional time as may be granted by the Trustee in his, her or its discretion), the TAC's consent to the proposed actions shall be deemed to have been affirmatively granted.

(B)     If, after following the procedures specified in this Section 6.8(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TAC shall resolve their dispute pursuant to Section 8.15 below.

29

## ARTICLE VIII
## GENERAL PROVISIONS

**8.1**    **Irrevocability**.  To the fullest extent permitted by applicable law, the Trust is irrevocable.

**8.2**    **Term; Termination.**

     (a)    The term for which the Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 8.2.

     (b)    The Trustee shall make continuing efforts to monetize any non-liquid Liquidating Trust Assets.

     (c)    The Trustee and the Trust shall be discharged or dissolved, as the case may be, at such time as (a) the Trustee determines that the pursuit of additional estate causes of action is not likely to yield sufficient additional Cash to justify further pursuit of such claims, or (b) all distributions of Cash and other Liquidating Trust Assets required to be made by the Trustee under the Plan and this Trust Agreement have been made in accordance with provisions of the Plan and this Trust Agreement, provided, however, that in no event shall the Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made by a party in interest within the six (6) month period prior to such fifth (5th) anniversary (and, in the event of further extension, at least six (6) months prior to the end of any extension period), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery on and liquidation of the Liquidating Trust Assets (the "**Dissolution Date**").

     (d)    On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of the affairs of the Trust by the Trustee and payment of all of the liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in the Trust shall be distributed or disbursed in accordance with Section 3.3 and Section 5.3(c) above.

     (e)    Following the dissolution and distribution of the assets of the Trust, the Trust shall terminate, and the Trustee shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation. A certified copy of the Certificate of Cancellation shall be given to the Delaware Trustee for its records promptly following such filing.

**8.3**    **Amendments**.  Any amendment to or modification of this Trust Agreement, including the TDPs, may be made in writing and only with the consent of the Trustee, the TAC (which consent in each case shall not be unreasonably withheld, conditioned or delayed) and subject to the approval Bankruptcy Court; provided, however, the Trustee may amend this Trust Agreement from time to time without the consent, approval or other authorization of, but with

notice to, the Bankruptcy Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Trustee to effectuate the provisions of this Trust Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing, no amendment or modification of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to make minor modifications or clarifying amendments as necessary to enable the Trustee to effectuate the provisions of this Trust Agreement. Notwithstanding the foregoing, neither this Trust Agreement, nor any Exhibit to this Trust Agreement, shall be modified or amended in any way that could jeopardize, impair, or modify the Trust's "liquidating trust" status. Any amendment affecting the rights, duties, immunities, or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent. Notwithstanding any other provision of this Trust Agreement, no material modifications may be made to this Section 8.3 of this Trust Agreement without the consent of the Trustee, the unanimous consent of the TAC, and subject to the approval of the Bankruptcy Court. Notwithstanding anything to the contrary in this Section 8.3, the terms and provisions of Section 7.4 above may not be amended, modified, waived, supplemented, altered, or otherwise changed without the written consent of the H.I.G. Designee. Notwithstanding anything to the contrary in this Section 8.3, the terms and provisions of Section 4.15 or ARTICLE VII above may not be amended, modified, waived, supplemented, altered, or otherwise changed without the unanimous consent of the TAC.

**8.4**     **Severability**. Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

**8.5**     **Notices.**

(a)     Notices to Trust Beneficiaries shall be given in accordance with such person's claims form submitted to the Trust.

(b)     Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated below, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed below in compliance with the terms hereof.

To the Trust:

Matthew J. Dundon
Dundon Advisers LLC
10 Bank Street, Suite 1100
White Plains, New York 10606
md@dundon.com

With a copy (which shall not constitute notice) to:

Nicholas Zluticky
Zachary Hemenway
Stinson LLP

1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
nicholas.zluticky@stinson.com
zachary.hemenway@stinson.com

and

Brian Rosen
Ehud Barak
Daniel Desatnik
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036
brosen@proskauer.com
ebarak@proskauer.com
ddesatnik@proskauer.com

To the Delaware Trustee:

Wilmington Trust, National Association
Attn: Corporate Trust Department
1100 North Market Street
Wilmington, Delaware 19890-1605

With a copy (which shall not constitute notice) to:

Morris James LLP
c/o Ross Antonacci
500 Delaware Avenue
Suite 1500
Wilmington, DE 19801

To the TAC:

Matt Barry
Prospect Capital Management
10 East 40th Street, 42nd Floor
New York, NY 10016
matt@prospectcap.com

John Duggan
4714 Gettysburg Rd. P.O. Box 2034
Mechanicsburg, PA 17055
jduggan@selectmedical.com

Teesha Graham
c/o Adam C. Flores
Ives & Flores, PA

32

925 Luna Cir. NW
Albuquerque, NM 87102
adam@nmcivilrights.com

David Murray
c/o Scott Melin
Bagley Law Firm, LLC
630 15th Ave #300
Longmont, CO 80501
scott.melin@bagleylawfirm.com

Martin Yankellow
1352 Charwood Rd., Suite C
Hanover, MD 21076
myankellow@correctrxpharmacy.com

Deborah Young Powell
9312 Lenox Drive
McKinney, TX 75071

James Waldeck
Arena Capital Advisors, LLC
12121 Wilshire Blvd, Suite 1010
Los Angeles, CA 90025
jwaldeck@arenaca.com

To the TACS:

All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses.

**8.6**     **Successors and Assigns**.  The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Trust, the Delaware Trustee, the Trustee, the TAC, and their respective successors and assigns, except that neither the Trust, the Delaware Trustee, nor the Trustee, may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in the case of the Delaware Trustee in accordance with Section 4.12 (d), and in the case of the Trustee in accordance with Section 4.2(d) above.

**8.7**     **Limitation on Trust Interests for Securities Laws Purposes**.  No transfer, assignment, pledge, hypothecation or other disposition of a Trust Interest may be effected until (i) the Trustee has provided its prior written consent to such transfer, which consent may be granted or withheld in the Trustee's sole discretion, (ii) the Trustee has received such legal advice or other information that it, in its sole and absolute discretion, deems necessary to assure that any such disposition shall not cause the Trust to be subject to entity-level taxation for U.S. federal, state or local income tax purposes, and (iii) either (x) the Trustee has received such legal advice or other

33

information that it, in its sole and absolute discretion, deems necessary or appropriate to assure that any such disposition shall not require the Trust to comply with the registration and reporting requirements of the Securities Act, the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), the Trust Indenture Act of 1939, as amended, or the Investment Company Act of 1940, as amended, or (y) the Trustee has determined, in its sole and absolute discretion, to cause the Trust to become a public reporting company and/or make periodic reports under the Exchange Act in order to enable such disposition to be made.  In the event that any such disposition is allowed, the Trustee may add such restrictions upon transfer and other terms and conditions of the disposition as are deemed necessary or appropriate by the Trustee, with the advice of counsel, to permit or facilitate such disposition under applicable securities and other laws.  Trust Interests shall not (a) be evidenced by a certificate or other instrument; (b) other than pursuant to Section 7.6(a), possess any voting rights; or (c) be entitled to receive any dividends or interest.

  **8.8**  **Exemption from Registration**.  The Parties hereto intend that the interests of the Trust Beneficiaries under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the Trust Interests will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

  **8.9**  **Entire Agreement; No Waiver**.  The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

  **8.10**  **Headings.**  The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

  **8.11**  **Governing Law**.  The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the Parties hereto intend that the provisions hereof shall control and there shall not be applicable to the Trust, the Trustee, the Delaware Trustee, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents, or employees of a trust; (c) the necessity for

obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of Liquidating Trust Assets; (g) the existence of rights or interests (beneficial or otherwise) in Liquidating Trust Assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the TAC, or the Delaware Trustee set forth or referenced in this Trust Agreement. Section 3540 of the Act shall not apply to the Trust.

**8.12    Dispute Resolution.**

(a)    Unless otherwise expressly provided for herein, the dispute resolution procedures of this Section 8.12 shall be the exclusive mechanism to resolve any dispute arising under or with respect to this Trust Agreement. For the avoidance of doubt, this Section 8.12 shall not apply to the Delaware Trustee in any respect.

(b)    **Informal Dispute Resolution**. Any dispute under this Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("**Notice of Dispute**"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the Notice of Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

(c)    **Formal Dispute Resolution**. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("**Statement of Position**"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing party, the disputing party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 8.12(d) below.

(d)    **Judicial Review**.  The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have jurisdiction over such dispute, such court as has jurisdiction pursuant to Section 1.7 above) and serving on the

counterparty or counterparties and the Trustee, a motion requesting judicial resolution of the dispute.  The motion must be filed within forty-five (45) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph.  The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of the Trust.  Each counterparty shall respond to the motion within the time period allowed by the rules of the court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the court. Notwithstanding anything to the contrary in this Trust Agreement, the Trust shall bear the reasonable costs and expenses of the TAC in connection with any dispute that arises under this Trust Agreement.

**8.13**    **Effectiveness**.  This Trust Agreement shall become effective on the Effective Date.

**8.14**    **Counterpart Signatures**. This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

**8.15**    **Waiver of Jury Trial**. Except provided for in Article I, J of the Trust Distribution Procedures for Trust Claims, each party hereto and each Trust Beneficiary hereof hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to a trial by jury in any legal proceeding arising out of or relating to this Trust Agreement.

36

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

**TRUSTEE**

_____

_____

[Signature Page to Trust Agreement]

**DELAWARE TRUSTEE**

Wilmington Trust, National Association, not in its individual capacity, but solely as Delaware Trustee

By:_____

_____

[Signature Page to Trust Agreement]

**TAC MEMBER**

**TAC MEMBER**

**By:** _____

**By:** _____

**TAC MEMBER**

**TAC MEMBER**

**By:** _____

**By:** _____

**TAC MEMBER**

**TAC MEMBER**

**By:** _____

**By:** _____

**TAC MEMBER**

**By:** _____

[Signature Page to Trust Agreement]

**Wellpath Holdings, Inc.**

By: _____

**Alpine CA Behavioral Health HoldCo, LLC**

By: _____

**Physicians Network Association, Inc.**

By: _____

**CCS-CMGC Intermediate Holdings, Inc.**

By: _____

**CCS-CMGC Intermediate Holdings 2, Inc.**

By: _____

**CCS-CMGC Parent GP, LLC**

By: _____

**CCS-CMGC Parent Holdings, LP**

By: _____

**Conmed Healthcare Management, LLC**

By: _____

**CHC Companies, LLC**

By: _____

**Correctional Healthcare Companies, LLC**

By: _____

**Correct Care Holdings, LLC**

By: _____

**HCS Correctional Management, LLC**

By: _____

**Correctional Healthcare Holding Company, LLC**

By: _____

**Jessamine Healthcare, LLC**

By: _____

**Healthcare Professionals, LLC**

By: _____

**Missouri JSH Holdco**

By: _____

**Justice Served Health Holdings, LLC**

By: _____

**Perimeter Hill RPA, LLC**

By: _____

[Signature Page to Trust Agreement]

**Missouri JSH Manager, Inc.**

By: _____

**Wellpath CFMG, Inc.**

By: _____

**Wellpath Education, LLC**

By: _____

**Wellpath Hospital Holding Company, LLC**

By: _____

**Wellpath Management, Inc.**

By: _____

**WHC, LLC**

By: _____

**Zenova Management, LLC**

By: _____

**Wellpath Community Care Management, LLC**

By: _____

**Wellpath Community Care Holdings, LLC**

By: _____

**Wellpath Community Care Centers of Virginia, LLC**

By: _____

**Wellpath Group Holdings, LLC**

By: _____

**Wellpath LLC**

By: _____

**Wellpath SF Holdco, LLC**

By: _____

**WPMed, LLC**

By: _____

**Zenova Telehealth, LLC**

By: _____

[Signature Page to Trust Agreement]

**EXHIBIT 1.**
**AGGREGATE SETTLEMENT CONSIDERATION**

As outlined in the Plan, the Trust will receive and hold all right, title and interest in the following assets, to be issued and transferred as outlined below.

The Debtors shall fund Plan Distributions pursuant to the Restructuring Transactions, as applicable, with (1) the issuance of the New Common Equity, including through the Equity Financing, (2) the issuance of the New Preferred Equity in connection with the Equity Financing, (3) the issuance of the Takeback Facility, (4) the Liquidating Trust Assets, and (5) Cash on hand. Each distribution and issuance referred to in this Article IV shall be governed by the terms and conditions set forth in the Plan or the Liquidating Trust Agreement applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, Reorganized Wellpath shall issue the New Common Equity and the New Preferred Equity pursuant to the Equity Financing and the Plan. The issuance of the New Common Equity, including the New Class A Common Equity on account of the Commitment Premium and Backstop Premium, and the New Preferred Equity by the Post-Restructuring Debtors shall be authorized without (1) the need for any further corporate, limited liability company, partnership, or other governance action and without any action by the Holders of Claims, members, managers, directors, or officers of the Debtors or Post-Restructuring Debtors, as applicable, or other parties in interest, (2) notice to or order or other approval of the Bankruptcy Court, (3) act or omission under applicable law, regulation, order, or rule, or (4) vote, consent, authorization, or approval of any Person.

On the Effective Date, and in connection with the Equity Financing, Reorganized Wellpath shall issue to each Equity Financing Participant its Pro Rata share of the Equity Financing Securities in accordance with its allocable share of the Equity Financing Amount. The New Preferred Equity shall have an aggregate liquidation preference equal to the Preferred Liquidation Preference and will rank senior to all New Common Equity. All distributions made by Reorganized Wellpath pursuant to the New Organizational Documents shall first be made Pro Rata to holders of New Preferred Equity until the aggregate Preferred Liquidation Preference is reduced to zero. Until payment of the Liquidating Trust Subsequent Funding in full, no cash distributions shall be made on account of the New Preferred Equity or the New Common Equity, including, without limitation, dividends with respect thereto.

All of the shares (or comparable units) of New Common Equity, including in connection with the Commitment Premium and the Backstop Premium, and the New Preferred Equity issued pursuant to the Equity Financing and the Plan shall be duly authorized, validly issued, fully paid, and non-assessable and deemed not to have been issued in violation of any preemptive rights, rights of first refusal or similar rights or any applicable law. Each distribution and issuance of New Common Equity and the New Preferred Equity shall be governed by the terms and conditions set forth in the Equity Financing Documents or the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance

Exhibit 1-1

without the need for execution by any party thereto other than the applicable Post-Restructuring Debtor(s). Any Entity's acceptance of New Common Equity or New Preferred Equity shall be deemed to constitute its agreement to enter into, and the New Common Equity and the New Preferred Equity shall be subject to, the applicable New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms. Neither the New Common Equity nor the New Preferred Equity will be registered under the Securities Act nor listed on any exchange as of the Effective Date and neither will meet the eligibility requirements of the Depository Trust Company.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Equity (other than the New Class A Common Equity offered in the Equity Financing, the Commitment Premium, and Backstop Premium) on account of the Allowed First Lien Secured Claims and to the Liquidating Trust on account of the Second Lien Deficiency Claims and the General Unsecured Claims, in each case in accordance with the terms of the Plan, shall be exempt from the registration and prospectus delivery requirements of the Securities Act and any other applicable federal, state, or local law requiring registration and/or delivery of prospectuses prior to the offering, issuance, distribution, and sale of a security. In addition, pursuant to section 4(a)(2) of the Securities Act, the offering, issuance, and distribution of Equity Financing Securities is exempt from the registration and prospectus delivery requirements of the Securities Act and any applicable federal, state, or local law requiring registration and/or delivery of prospectuses prior to the offering, issuance, distribution, and sale of a security. Such Equity Financing Securities issued under section 4(a)(2) of the Securities Act will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

Exhibit 1-2

**EXHIBIT 2.**
**CERTIFICATE OF TRUST**

## CERTIFICATE OF TRUST OF THE
## WELLPATH LIQUIDATING TRUST

This Certificate of Trust of Wellpath Liquidating Trust (the "Trust"), is being duly executed and filed by Matthew J. Dundon of Dundon Advisers LLC, as Trustee and Wilmington Trust, National Association, a national banking association, not in its individual capacity, but solely as Delaware Trustee, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code, § 3801 et seq.) (the "Act").

1.     Name.  The name of the statutory trust formed hereby is Wellpath Liquidating Trust.

2.     Delaware Trustee.  The name and business address of a trustee of the Trust having its principal place of business in the State of Delaware are Wilmington Trust, National Association, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-1605, Attention: Corporate Trust Administration.

3.     Effective Date.  This Certificate of Trust shall be effective upon filing.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Exhibit 2-1

IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have executed this Certificate of Trust in accordance with Section 3811 of the Act.

Wilmington Trust, National Association,
not in its individual capacity but solely as Delaware
Trustee

By: _____

Name: Michael Bochanski Jr.

Title: Vice President

Trustee:

_____

Exhibit 2-2

**EXHIBIT 3.**
**TRUST DISTRIBUTION PROCEDURES**

# WELLPATH HOLDINGS, INC.

## TRUST DISTRIBUTION PROCEDURES FOR TRUST CLAIMS

### ARTICLE I
### PURPOSE AND GENERAL GUIDELINES

**A.**    **Purpose**.  The purpose of the Trust (or the "**Trust**") is to, among other things, (i) assume legal liability for Trust Claims—*i.e.*, Second Lien Deficiency Claims and General Unsecured Claims (which are referred to herein as "**GUC Claims**"), including indirect General Unsecured Claims, which are referred to herein as "**Indirect Claims**"—pursuant to the terms of the Plan, (ii) prosecute and assert the Liquidating Trust Causes of Action, (iii) to hold, preserve, maximize, liquidate, and administer the Liquidating Trust Assets (the "**Liquidating Trust Assets**") for the benefit of the beneficiaries of the Trust, (iv) liquidate the Liquidating Trust Assets, (v) employ procedures to allow valid Trust Claims (as further set forth herein) in accordance with section 502 of the Bankruptcy Code and/or applicable law (each, an "**Allowed GUC Claim**" or an "**Allowed Indirect Claim**" and, together, "**Allowed Trust Claims**"), (vi) determine an allowed liability amount for each Allowed GUC Claim or Allowed Indirect Claim (the "**Allowed Claim Amount**"), and (vii) process and direct payment of all Allowed Trust Claims.  These Trust Distribution Procedures (the "**TDPs**") are adopted pursuant to the Trust Agreement (the "**Trust Agreement**") and have been approved as fair, equitable, and reasonable by the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").  The TDPs are designed to provide fair, equitable, and substantially similar treatment for Allowed Trust Claims. The TDPs provide the means for resolving all Trust Claims that were assumed by the Trust and for which the Debtors had or is alleged to have legal responsibility.  As set forth in the Trust Agreement, the Trustee (the "**Trustee**") will implement and administer the TDPs, with the goals of securing the just, speedy, fair, reasonable, and cost-efficient determination of every General Unsecured Claim, providing substantially similar treatment to holders of similar, legally valid and supported Allowed Trust Claims as set forth herein, and obtaining and maximizing the benefits of the Liquidating Trust Assets.

**B.**    **General Principles.**  To achieve maximum fairness and efficiency, and recoveries for holders of Allowed Trust Claims, the TDPs are founded on the following principles:

1.    objective claim eligibility criteria;

2.    clear and reliable proof requirements;

3.    administrative transparency;

4.    a rigorous review and evidentiary process that requires the Trustee to determine and reach final determinations and to achieve Allowed Claim Amounts that are fair and reasonable;

5.    robust audit procedures to verify the submission and payment of valid Trust Claims; and

6.    independence of the Trust and the Trustee.

**C.**     **Payment of Allowed GUC Claims.**  Pursuant to the Plan, the Trust has assumed the legal liability for, and obligation to pay, Trust Claims to the extent such Claims are Allowed Claims.  The Liquidating Trust Assets shall be used to fund distributions to Claimants who hold Second Lien Deficiency Claims or who are determined by the Trustee to hold Allowed GUC Claims under the TDPs; *provided*, for the avoidance of doubt, that the Second Lien Deficiency Claims are Allowed in full pursuant to Article III.B.5 of the Plan.  The amounts that certain Claimants who are determined by the Trustee to hold Allowed GUC Claims will be paid on account of their Trust Claims will depend on, among other things, the Trust's ability to liquidate and recover the proceeds of the assigned insurance rights and other causes of action.  The amount of any instalment payments, initial payments, or payment percentages established under the TDPs or the Trust Agreement will be calculated based on (i) any Claimant's Allowed Claim Amount or (ii) the right to payment that the holder of a Trust Claim has against the Debtors, as assumed by the Trust.

**D.**     **Interpretation.**   In the event of any ambiguity or conflict between the terms of these TDPs, the Trust Agreement, the Plan and the Confirmation Order, each document shall have controlling effect in the following order of priority: (1) the Confirmation Order, (2) the Plan, (3) the Trust Agreement, and (4) the TDPs.

## ARTICLE II
## DEFINITIONS AND RULES OF INTERPRETATION

**A.**     **Incorporation of Plan Definitions.**  Capitalized terms used but not defined in the TDPs have the meanings ascribed to them in the Plan or the Trust Agreement and such definitions are incorporated in the TDPs by reference.

**B.**     **Definitions.**  The following terms have the respective meanings set forth below:

1.     "**Acceptance and Release**" shall have the meaning set forth in ARTICLE VIII.E.

2.     "**ADR Procedures**" shall have the meaning set forth in ARTICLE IV.J.

3.     "**Allowed Claim Amount**" shall have the meaning set forth in ARTICLE I.A.

4.     "**Allowed Claim Notice**" shall have the meaning set forth in ARTICLE IV.H.

5.     "**Allowed GUC Claim**" shall have the meaning set forth in ARTICLE I.A.

6.     "**Basic Claim Submission**" shall mean the submission of Identifying Information to the Trust and the election to make or not make the Expedited Distribution Election.

7.     "**Claim Notice**" shall have the meaning set forth in ARTICLE IV.H.

8.     "**Claim Objection**" shall have the meaning set forth in ARTICLE IV.J.

3

9.    "**Claimant**" shall mean the holder of a GUC Claim or the holder of an Indirect Claim.

10.    "**Claims Audit Program**" shall have the meaning set forth in ARTICLE IV.K.

11.    "**Disallowed Claim**" shall have the meaning set forth in ARTICLE IV.E.

12.    "**Disallowed Claim Notice**" shall have the meaning set forth in ARTICLE IV.G.

13.    "**Exigent Hardship Claim**" shall mean a GUC Claim that is compensable hereunder, for which the Trustee, in his, her or its sole discretion, determines that the claimant needs immediate financial assistance based on the claimant's expenses and all sources of available income.

14.    "**Expedited Distribution**" shall have the meaning set forth in ARTICLE V.A.

15.    "**Expedited Distribution Election**" shall mean an irrevocable election made by an individual to receive an Expedited Distribution on account of a GUC Claim.

16.    "**Expedited Distribution Threshold**" shall mean an aggregate dollar amount of Expedited Distributions not to exceed $1,500,000.00.

17.    "**FIFO**" shall mean "first-in-first-out" and refers to the impartial basis for establishing a sequence pursuant to which GUC Claims shall be initially reviewed by the Trust.

18.    "**FIFO Processing Queue**" shall mean the FIFO line-up on which the Trust initially reviews Trust Claims Submissions.

19.    "**Final Determination**" shall have the meaning set forth in ARTICLE IV.I.

20.    "**GUC Claim**" shall be a Second Lien Deficiency Claim or General Unsecured Claim as those terms are defined in the Plan.

21.    "**GUC Claimant**" shall mean the holder of a GUC Claim.

22.    "**GUC Claim Criteria**" shall have the meaning set forth in ARTICLE VI.A.

23.    "**Identifying Information**" shall mean, with respect to the holder of a Trust Claim, the holder's: (a) name; (b) address; (c) social security number or employer identification number (if the holder has one); and (d) counsel serving as the holder's representative (if any) and such counsel's address.

24.    "**Indirect Claim**" shall have the meaning set forth in ARTICLE VII.A.

25.    "**Indirect Claimant**" shall have the meaning set forth in ARTICLE VII.A.

4

26.     "**Indirect Claim Criteria**" shall have the meaning set forth in ARTICLE VII.A.

27.     "**Initial Claims Filing Date**" shall mean the date on which the Trust first provides notice that it is able to accept Trust Claim Submissions.

28.     "**Initial Distribution**" shall have the meaning set forth in ARTICLE VIII.C.

29.     "**Initial Payment Percentage**" shall have the meaning set forth in ARTICLE VIII.A.

30.     "**Liquidating Trust Causes of Action**" shall have the meaning ascribed to it in the Plan.

31.     "**Potentially Liable Party**" means any party that is potentially co-liable with the Trust for a Trust Claim, including governmental entities.  Potentially Liable Parties shall not include any Released Party.

32.     "**Proposed Allowed Claim Amount**" shall have the meaning set forth in ARTICLE IV.H.

33.     "**Reconsideration Request**" shall have the meaning set forth in ARTICLE IV.J.

34.     "**Reconsideration Deadline**" shall have the meaning set forth in ARTICLE IV.J.

35.     "**Rejection Notice**" shall have the meaning set forth in ARTICLE IV.J.

36.     "**Released Parties**" shall have the meaning ascribed to it in the Plan.

37.     "**Revised Proposed Allowed Claim Notice**" shall have the meaning set forth in ARTICLE IV.J.

38.     "**Revised Proposed Allowed Claim Rejection**" shall have the meaning set forth in ARTICLE IV.J.

39.     "**Supplemental Payment Percentage**" shall have the meaning set forth in ARTICLE VIII.D.

40.     "**TAC**" shall mean the Trust Advisory Committee that represents the interests of holders of GUC Claims pursuant to the Plan and Trust Agreement.

41.     "**Threshold Criteria**" shall have the meaning set forth in ARTICLE IV.D.

42.     "**Trust Claim**" shall have the meaning set forth in the Recitals.

43.     "**Trust Claim Submission**" shall mean the submission of additional information beyond the Basic Claim Submission that the Claimant and/or the Trustee

5

believe is relevant to understanding a claim and determining the appropriate Allowed Amount for such claim as described in ARTICLE IV.E.

44. "**Trust Claim Submission Date**" shall have the meaning set forth in ARTICLE IV.E.

**C.** **Interpretation; Application of Definitions and Rules of Construction.** For purposes of the TDPs, unless otherwise provided herein: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference to a person as a holder of a Claim includes that person's estate, successors, and assigns; (3) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the TDPs as a whole and not to any particular article, section, subsection, or clause; (4) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation;" (5) the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory; (6) any effectuating provisions of the TDPs may be reasonably interpreted by the Trustee in such a manner that is consistent with the overall purpose and intent of the TDPs without further notice to or action, order, or approval of the Bankruptcy Court; (7) the headings in the TDPs are for convenience of reference only and shall not limit or otherwise affect the provisions hereof; (8) in computing any period of time prescribed or allowed by the TDP, unless otherwise expressly provided herein, the provisions of Bankruptcy Rule 9006(a) shall apply; (9) "or" is not exclusive; and (10) all provisions requiring the consent of a person shall be deemed to mean that such consent shall not be unreasonably withheld.

# ARTICLE III
# TDP ADMINISTRATION

**A.** **Administration.** Pursuant to the Plan and the Trust Agreement, the Trust and the TDPs shall be administered by the Trustee subject to the consultation and consent provisions applicable to the TAC.

**B.** **Powers and Obligations.** The powers and obligations of the Trustee, and the consultation and consent provisions applicable to the TAC are set forth in the Trust Agreement. For the avoidance of doubt, the TAC shall have no authority or ability to modify, reject, or influence any claim review or Allowed Claim Amount determination under the TDPs.

**C.** **Consent Procedures.** The Trustee shall obtain the consent of the TAC on any amendments to the TDPs pursuant to ARTICLE X.A, and on such matters as are otherwise required below. Such consent shall not be unreasonably withheld, conditioned or delayed.

**D.** **Extension of Deadlines.** The Trustee with the consent of the TAC may extend any deadlines set forth in the TDPs.

# ARTICLE IV
# GENERAL TRUST PROVISIONS

**A.**     **Confidentiality.**  Documents submitted to the Trust by a Claimant are for the sole benefit of the Trust and not third parties or defendants.  All submissions to the Trust by a Claimant, including Trust Claim Submission and any documents submitted therewith, shall be treated as made during settlement discussions between the Claimant and the Trust and are intended by the parties to be confidential and to be protected by all applicable state and federal privileges, including those directly applicable to settlement discussions.  The Trust will preserve the confidentiality of such Claimant submissions and shall disclose the contents thereof only to such persons as authorized by the Claimant, the TDPs, or in response to a valid subpoena of such materials, seeking non-privileged, non-mediation protected materials, issued by the Bankruptcy Court, the United States District Court for the Southern District of Texas, or any other court of competent jurisdiction.  The Trust shall provide counsel for the Claimant, or if the Claimant is unrepresented, the Claimant, with a copy of any such subpoena immediately upon being served.  In such a case, the Trust shall provide notice to counsel for the Claimant, or if the Claimant is unrepresented, the Claimant, to allow such party sufficient time to object to the production.  The Trust shall on its own initiative or upon request of the Claimant or Claimants in question take all necessary and appropriate steps to preserve all privileges.  Notwithstanding anything in the foregoing to the contrary, the Trust may disclose information, documents, or other materials reasonably necessary in the Trust's judgment to (i) one or more consultants and professionals (including a third party claims processing firm) retained by the Trust to assist in the administration of the Trust Claims, and (ii) preserve, obtain, litigate, resolve, or settle insurance coverage, or pursue any other claims transferred or assigned to the Trust by the holder of the Trust Claim or operation of the Plan; *provided*, *however*, that the Trust shall take all steps reasonably feasible to preserve the further confidentiality of such information, documents, and materials.

**B.**     **FIFO Claims Process Queuing and Exigent Claims.**  Except as otherwise provided herein with respect to Exigent Hardship Claims, the Trust shall commence review of all Trust Claim Submissions for processing purposes on a FIFO basis, provided, however, that nothing herein shall require the Trust to complete the review of any Trust Claim prior to reviewing and paying any subsequently filed Trust Claims.  A Claimant's position in the FIFO Processing Queue shall be determined as of the Claimant's Trust Claim Submission Date.  A Claimant that seeks recovery on account of an Exigent Hardship Claim shall be moved in front of the FIFO Processing Queue no matter what the order of processing otherwise would have been under the TDPs.

**C.**     **Statute of Limitations or Repose.**  The statute of limitations and the choice of law determination applicable to claims against the Trust shall be determined by reference to the jurisdiction where a claim was pending on the Petition Date, or where such a claim could have been timely and properly filed as asserted by the Claimant.  To be considered timely submitted and eligible for compensation, all Trust Claims filed against the Trust that are Claims for alleged personal injury, wrongful death, or other similar Claim or Cause of Action arising out of or relating to an injury or death allegedly caused by the Debtors must either (a) in the case of claims first filed against the Debtors prior to the Petition Date, have been filed prior to the applicable federal or state statute of limitations and repose that was in effect at the time of the filing of the claim, and such claim must not have been dismissed prior to the Petition Date; or (b) in the case of claims not filed against the Debtors prior to the Petition Date, have been filed with the Trust prior to the

7

applicable federal or state statute of limitations and repose that was in effect at the time of the filing of a Basic Claim Submission with the Trust.  For the purpose of applying the TDPs, the running of the applicable statute of limitations or repose shall be tolled as of the earliest of:  (a) the actual filing of a claim against the Debtors prior to the Petition Date; (b) the date specified by agreement or otherwise among the Debtors and/or the Trust, on the one hand, and the applicable claimant, on the other hand, (or, if none, the date of the agreement) in the case of tolling prior to the Petition Date by an agreement or otherwise, provided such tolling was still in effect on the Petition Date; or (c) the Petition Date.  The tolling as of the Petition Date shall run and exhaust as of 30 days after the Effective Date of the Plan.  If a Trust Claim meets any of the tolling provisions in the foregoing sentence and the claim was not barred by the applicable federal or state statute of limitations or repose at the time of the relevant tolling event, it shall be treated as timely filed if a Basic Claim Submission in respect of such claim is filed with the Trust within sixth (60) days after the Initial Claims Filing Date.

      **D.**    **Threshold Eligibility.**  To be eligible to potentially receive compensation from the Trust on account of a Trust Claim, except with respect to Second Lien Deficiency Claims, each Claimant must:

      (1)    have timely filed, or have been deemed to have timely filed, or have obtained appropriate leave from the Bankruptcy Court to file late, a Proof of Claim with the Bankruptcy Court;

      (2)    have signed the Proof of Claim attesting to the truth of its contents under penalty of perjury, or, if not, supplements the Proof of Claim to so provide such verification;

      (3)    have filed a Proof of Claim that is free of material defect such that the Trustee is able to determine from the Proof of Claim that Trust Claim is *prima facie* valid and is not barred by any applicable federal or state statute of limitations or repose; and

      (4)    have not previously had the Trust Claim dismissed on the merits or have received payments on the Trust Claim such that no recovery from the Trust would be permissible under the TDPs, including ARTICLE X.

Trust Claims asserted by Claimants who do not satisfy this threshold eligibility criteria (collectively, the "**Threshold Criteria**") shall be deemed by the Trustee to be Disallowed Claims after a Disallowed Claim Notice has been delivered in accordance with ARTICLE IV.H, and shall not be paid by the Trust.  For the avoidance of doubt, holders of Second Lien Deficiency Claims automatically shall be deemed to satisfy the Threshold Criteria.

      **E.**    **Claims Evaluation.**  As soon as practicable following the Effective Date, the Trustee shall create a process by which GUC Claimants can submit additional information relating to their claims beyond the information included in the Basic Claim Submission, Schedules, or a filed Proof of Claim, with such submissions being made electronically or via U.S. Mail.  The process will include a date by which GUC Claimants must submit this additional information (the "Trust Claim Submission Date").  The Trust shall evaluate each GUC Claim (except Second Lien

Deficiency Claims) individually and will follow the uniform procedures and guidelines set forth herein to determine, based on the evidence obtained by the Trust, whether a GUC Claim should be Allowed; *provided*, for the avoidance of doubt, that the Second Lien Deficiency Claims are Allowed in full pursuant to Article III.B.5 of the Plan and (i) shall not be subject to such Claims Evaluation, (ii) automatically are deemed Allowed GUC Claims, and (iii) shall not be required to make a Trust Claim Submission. After a review of the documentation provided by the Claimant in his, her or its Trust Claim Submission and any follow-up materials, the Trust will determine the Trust Claim to be either (i) legally valid and an Allowed GUC Claim or an Allowed Indirect Claim or (ii) legally invalid and ineligible for compensation (a "**Disallowed Claim**").

      **F.**    **Deficiency Notices.**  If the Trust Claim, other than a Second Lien Deficiency Claim, does not include evidence that is presumptively reliable, or the Trustee otherwise determines that additional evidence is reasonably required to establish the validity of a Trust Claim, the Trust may issue deficiency notices to Claimants identifying the information requested by the Trust to cure the deficiency. The failure to provide information requested by the Trust shall be grounds for the Trustee to determine that a claim is a Disallowed Claim.

      **G.**    **Disallowed Claims.**  If the Trustee determines that a Trust Claim, other than a Second Lien Deficiency Claim, is a Disallowed Claim, the Trustee shall provide written notice of his, her or its determination to the relevant Claimant (an "**Disallowed Claim Notice**"). If the Trustee determines that a Trust Claim is a Disallowed Claim, the Trustee will not perform the Allowed Trust Claim valuation analysis described herein.

      **H.**    **Allowed Trust Claims.**  If the Trustee determines that a Trust Claim is an Allowed Trust Claim, the Trustee shall utilize the procedures described in ARTICLE VI.C to determine the value of Trust Claim and the procedures described in ARTICLE VII.C to determine the value for Indirect Claims (each, a "**Proposed Allowed Claim Amount**"), and provide written notice of allowance and the Proposed Allowed Claim Amount to the Claimant (an "**Allowed Claim Notice**" and together with the Disallowed Claim Notice, a "**Claim Notice**") as set forth in ARTICLE IV.J below. To the extent the Trustee determines that sufficient information necessary to determine a Proposed Allowed Claim Amount has not been provided, the Trustee may, at his discretion, request additional information from a GUC Claimant in writing. Notwithstanding anything to the contrary herein, the Allowed Claim Amount of each Second Lien Deficiency Claim shall be based on the amount of the respective positions held by each Holder of a Second Lien Deficiency Claim as evidenced by a register of such claims to be provided by the Second Lien Agent. The Trustee shall have the right to develop additional procedures necessary to determine the value of any Trust Claims that are not subject to ARTICLE VI or ARTICLE VII so that they are valued in accordance with state law or, if applicable, other non-bankruptcy law and result in values consistent with values ascribed to other Trust Claims under the TDPs.

      **I.**    **Claims Determination.**  If the Claimant accepts the Proposed Allowed Claim Amount in the Allowed Claim Notice or the reconsideration process set forth hereinafter in ARTICLE IV.K has been exhausted, the Proposed Allowed Claim Amount shall become the Allowed Claim Amount for such Trust Claim, operating as a final settlement for such Trust Claim and a determination of the Debtors' liability for such Trust Claim (a "**Final Determination**"); *provided* that the Allowed Claim Amount of each Second Lien Deficiency Claim shall automatically be deemed a Final Determination. The holder of each such Allowed Trust Claim

shall be approved for payment in accordance with ARTICLE VIII.B, subject to the Claimant executing the Acceptance and Release set forth in ARTICLE VIII.E; *provided* that, notwithstanding anything to the contrary herein, the holders of Second Lien Deficiency Claims shall not be required to execute an Acceptance and Release.

**J.      ADR Procedures for Reconsideration Requests.**  A Claimant may make a request for reconsideration of (i) a determination that his, her or its Trust Claim is ineligible for compensation, or (ii) the valuation of the Trust Claim by the Trust (a "**Reconsideration Request**") within ninety (90) days of receiving a Disallowed Claim Notice or an Allowed Claim Notice (the "**Reconsideration Deadline**").  Any Claimant who fails to submit a Reconsideration Request to the Trust by the Reconsideration Deadline shall be deemed to accept the disallowance of the Trust Claim or the Proposed Allowed Claim Amount.  The Trustee shall develop non-binding alternative dispute resolution procedures (the "**ADR Procedures**") to resolve Reconsideration Requests. Disputes over the validity of a Trust Claim shall be eligible for reconsideration and resolution under the ADR Procedures.  The Claimant may submit further evidence in support of the Trust Claim with the Reconsideration Request.  The neutral designated in the ADR Procedures will reconsider the Trust Claim—including all new information provided by the Claimant in the Reconsideration Request—and will have the discretion to maintain the prior determination or determine that the Trust Claim in question is an Allowed Trust Claim or should receive a new Proposed Allowed Claim Amount.  If the neutral designated in the ADR Procedures determines upon reconsideration that a Trust Claim is an Allowed Trust Claim and/or should receive a new Proposed Allowed Claim Amount, the neutral designated in the ADR Procedures will deliver their recommendation to the Trustee.

Neither the Trustee nor the Claimant is bound by the neutral's determination.  The Trustee may accept or reject the neutral's recommendation.  If the Trustee accepts the neutral's recommendation in whole or in part, the Trustee will provide the Claimant a written notice containing a revised Proposed Allowed Claim Amount (a "**Revised Proposed Allowed Claim Notice**").  The Claimant may accept this revised Proposed Allowed Claim Amount, or reject it.  If the Claimant rejects the revised Proposed Allowed Claim Amount, the Claimant will provide notice of such rejection to the Trustee within thirty (30) days of receiving a Revised Proposed Allowed Claim Notice (a "**Revised Proposed Allowed Claim Rejection**").  Any Claimant who fails to submit a timely Revised Proposed Allowed Claim Rejection following receipt of a Revised Proposed Allowed Claim Notice shall be deemed to accept the Revised Proposed Allowed Claim Amount. If the Trustee rejects the neutral's recommendation for any reason, then the Trustee shall provide a written notice of such rejection to the Claimant (the "**Rejection Notice**").  Within thirty (30) days of the submission of the Rejection Notice or the receipt of a Revised Proposed Allowed Claim Rejection, the Trustee shall file a written objection to the Trust Claim with the Bankruptcy Court (the "**Claim Objection**").  The Claim Objection creates a contested matter that shall proceed under Fed. R. Bankr. P. 9014 and the Trust Claim shall be allowed in such amount to be determined by entry of a final order of the Bankruptcy Court; *provided, however,* that to the extent a GUC Claim would be subject to 28 U.S.C. § 157(b)(5) and Claimant opposes having the Bankruptcy Court determine the allowed amount for the claim, the Claimant may proceed in the appropriate civil court and litigate such claim with the Liquidating Trust included as a nominal defendant.  In such instances, the Liquidating Trust's liability will be limited to Trust Distributions pursuant to the theses procedures and any judgment obtained against the Liquidating Trust would be used to determine Claimant's Allowed Claim Amount as provided for herein.

10

K.     **Claims Audit Program.**  The Trustee may institute procedures for auditing the reliability of evidence submitted to the Trust involving Trust Claims for which the Trust has legal responsibility (the "**Claims Audit Program**").  The Trustee may utilize the services of a third-party claims processing facility to assist in the evaluation of Trust Claims submitted to the Trust. The filing of any Trust Claim with the Trust, regardless of the treatment sought, shall constitute consent for the Trust to release to any entity overseeing the Claims Audit Program all information submitted to the Trust on behalf of the Claimant and to disclose the status of any such Trust Claim and the amount and date of any payments on account of such Trust Claim.  Any Claimant subject to the Claims Audit Program shall cooperate and provide the Trust with non-privileged information reasonably requested by the Trust and, if requested by the Trust, authorization to obtain information such Claimant has submitted to any other trusts or third parties relating to such Claimant's Trust Claim.  If an audit reveals that fraudulent information has been provided to the Trust, the Trust may penalize any claimant or claimant's attorney by disallowing the Trust Claim or by other means including requiring the return of any payments received from the Trust and requiring the claimant to pay the costs associated with the audit, as well as any other appropriate action or sanction.

## ARTICLE V
## EXPEDITED DISTRIBUTIONS

A.     **Expedited Payment Criteria.**  So long as the Expedited Distribution Threshold has not been reached, a Claimant who meets the following criteria may elect to resolve their GUC Claim for an expedited distribution of $2,500 (the "**Expedited Distribution**"):  (i) the Claimant is a GUC Claimant who makes an Expedited Distribution Election by submitting an Acceptance and Release in the form attached hereto as Exhibit 1-1 (Expedited Distributions); and (ii) the Claimant satisfies the Threshold Criteria.

B.     **Process and Payment of Expedited Distributions.**  GUC Claimants who have elected to receive the Expedited Distribution and who also have met the Threshold Criteria shall be entitled to receive their Expedited Payment upon executing the Acceptance and Release in the form attached hereto as Exhibit 1-1 (Expedited Distributions).  A GUC Claimant who elects to receive the Expedited Distribution shall have no other remedies with respect to their GUC Claim against the Trust and will not be eligible to receive any further distribution on account of their GUC Claim from the Trust.

C.     **Process and Payment of Expedited Distributions.**  Except as otherwise provided herein with respect to Exigent Hardship Claims, the Trust shall commence review of all Expedited Distribution Elections for processing purposes on a FIFO basis, provided, however, that nothing herein shall require the Trust to complete the review of any Trust Claim prior to reviewing and paying any subsequently filed Trust Claims (the "**Expedited Distribution FIFO Processing Queue**").  A Claimant's position in the Expedited Distribution FIFO Processing Queue shall be determined as of the Trust's receipt of the Claimant's Acceptance and Release in the form attached hereto as Exhibit 1-1 (Expedited Distributions).  In the event that the Expedited Distribution Threshold is met prior to the payment of all GUC Claims for which an Expedited Distribution Election has been made, the GUC Claimants for those remaining GUC Claims shall be notified in writing by the Trustee of the exhaustion of the Expedited Distribution Threshold and that the GUC

Claimant's GUC Claim shall be processed and paid under the terms and conditions set forth in Article VI and Article VIII.

## ARTICLE VI
## CLAIMS ALLOWANCE PROCESS FOR GUC CLAIMS

**A.**    **General Criteria for Evaluating Claims.**  In addition to satisfying the Threshold Criteria, to be eligible to receive compensation from the Trust on account of a GUC Claim, each GUC Claimant must have a GUC Claim against the Debtors that is (i) valid under applicable state or federal law, and (ii) not subject to (y) disallowance under section 502 of the Bankruptcy Code, including subsection (b) thereof, or (z) subordination under sections 509(c) or 510 of the Bankruptcy Code, or otherwise under applicable law.  The foregoing requirements are herein referred to as the "**GUC Claim Criteria**."  GUC Claims asserted by GUC Claimants who do not satisfy the GUC Claim Criteria shall be deemed by the Trustee to be Disallowed Claims after a Disallowed Claim Notice has been delivered in accordance with ARTICLE IV.G, and shall not be paid by the Trust.  For the avoidance of doubt, notwithstanding anything to the contrary herein, Second Lien Deficiency Claims shall be (i) Allowed as set forth in the Plan, (ii) deemed to satisfy the GUC Claim Criteria, and (iii) eligible to receive compensation from the Trust as GUC Claims.

**B.**    **Valuation of Allowed GUC Claims.**  If a GUC Claimant has satisfied the GUC Claim Criteria, then it shall have an Allowed GUC Claim and such GUC Claim shall be valued by the Trust utilizing the following factors:  (i) the likelihood that the Claimant is able to show the Debtors was liable to the Claimant on the basis set forth in the Claimant's filed Proof of Claim; (ii) any defenses the Debtors had to the Allowed GUC Claim; (iii) the portion of the Allowed GUC Claim constituting interest, late charges, collection costs or attorneys' fees; (iv) any other factors bearing on the amount set forth in the Claimant's filed Proof of Claim. The Trustee shall, with input from and consent of the TAC and input from any other knowledgeable resources as the Trustee sees fit, develop a schedule of valuations based on claim type to assist with valuation of unliquidated claim types held by multiple Trust Beneficiaries for the purpose of maximizing efficiency and preserving Liquidating Trust Assets for distribution in the valuation of such claims. After analyzing the Allowed GUC Claim under these factors and referencing such schedule as applicable, the Trustee will determine a Proposed Allowed Claim Amount for each Allowed GUC Claim.  For the avoidance of doubt, notwithstanding anything to the contrary herein, the Allowed Claim Amount of each Second Lien Deficiency Claim shall be based on the amount of the respective positions held by each Holder of a Second Lien Deficiency Claim as evidenced by a register of such claims to be provided by the Second Lien Agent.  The Proposed Allowed Claim Amount for an Allowed GUC Claim shall be deemed to be the Debtors' liability for such GUC Claim (*i.e.*, the claimant's right to payment for his, her or its GUC Claim), irrespective of how much the holder of such GUC Claim receives from the Trust pursuant to the payment provisions set forth in ARTICLE VIII.  In no circumstance shall the amount of the Debtors' legal obligation to pay any GUC Claim be determined to be any payment percentages hereunder or under the Trust Agreement (rather than the liquidated value of such GUC Claim as determined under the TDP).

**C.**    **Liquidated Judgments.**  Notwithstanding the process of valuing Allowed GUC Claims set forth in this ARTICLE VI, if (1) prior to the Effective Date an Allowed GUC Claim was liquidated by a judgment of a court of competent jurisdiction that has not been reversed or vacated on appeal, (2) such judgment is not secured by a bond or other collateral such that the

12

judgment can be satisfied by a source other than the Trust, and (3) the holder of such Allowed GUC Claim did not elect to Opt Out pursuant to the Plan, then the Trustee will adopt the judgment amount as the Proposed Allowed Claim Amount.

## ARTICLE VII
## INDIRECT CLAIMS

**A.** **Indirect Claim Eligibility Criteria.**  In addition to the threshold eligibility criteria for Trust Claims set forth in ARTICLE IV.A, to be eligible to receive compensation from the Trust on account of a Claim against the Debtors for defense, contribution, indemnification, reimbursement, or subrogation of any entity that is liable with the Debtors on a GUC Claim held by another creditor, whether contractual or implied by law and whether in the nature of or sounding in contract, tort, warranty, statute, common law, or any other theory of law or equity whatsoever (a "**Indirect Claim**"), each holder of an Indirect Claim (a "**Indirect Claimant**") must:

(i)     have a valid Indirect Claim against the Debtors that is (a) valid under applicable state or federal law, and (b) not subject to (y) disallowance under section 502 of the Bankruptcy Code, including subsection (b) thereof, or (z) subordination under sections 509(c) or 510 of the Bankruptcy Code, or otherwise under applicable law; and

(ii)    must establish to the Trust's satisfaction that:

(a)     such Indirect Claimant has paid in full the liability and/or obligation of the Trust to a GUC Claimant to whom the Trust would otherwise have had a liability or obligation under the TDPs (and which has not been paid by the Trust);

(b)     the Indirect Claim is not otherwise subject to a valid defense; and

(c)     the GUC Claimant and the Indirect Claimant have or will have forever and fully released the Trust in respect of the Indirect Claim.

The foregoing requirements are herein referred to as the "**Indirect Claim Criteria**."  Indirect Claims asserted by Indirect Claimants who do not satisfy the Indirect Claim Criteria shall be deemed by the Trustee to be Disallowed Claims after a Disallowed Claim Notice has been delivered in accordance with ARTICLE IV.H, and shall not be paid by the Trust.

**B.** **Indirect Claimant Trust Claim Submission.**  To properly make a Trust Claim Submission, each submitting Indirect Claimant must, in addition to completing and filing a Basic Claim Submission with the Trust, submit documents sufficient to establish to the Trust's satisfaction that the Indirect Claimant satisfies the Indirect Claim Criteria.  The Trust may develop any additional claim forms for Indirect Claimants so that appropriate documentation is provided by each Indirect Claimant to substantiate and pay Indirect Claims.  The date on which the foregoing is submitted to the Trust by an Indirect Claimant shall be the Trust Claim Submission Date for the applicable Indirect Claim.

**C.     Allowance of Indirect Claims.**  If an Indirect Claimant has satisfied the Indirect Claim Criteria, then it shall have an Allowed GUC Claim and its Indirect Claim shall be valued by the Trust in accordance with applicable law; *provided*, *however*, no Indirect Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has paid to the related GUC Claimant in respect of such claim for which the Trust would have liability, and in no event shall any Indirect Claim exceed the Allowed Claim Amount of the related GUC Claim as determined under the TDPs.  In any case where the Indirect Claimant has satisfied the claim of a GUC Claimant against the Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain a release for the benefit of the Trust substantially in the form and substance of the release provided in Exhibit 1-2.  If the Indirect Claimant can show that it has paid such liability or obligation of the Trust to a GUC Claimant and the Trust has not already paid the GUC Claimant, and the Indirect Claimant provides a release of the Trust pursuant to a document substantially in the form and substance of the release provided in Exhibit 1-2 for the GUC Claim, then the Indirect Claim may be allowable pursuant to the procedures described herein.  In no event shall any Indirect Claimant have any rights against the Trust superior to the rights that the GUC Claimant to whose claim the Indirect Claim relates would have against the Trust under applicable law and the TDPs, including any rights with respect to timing, amount, priority, or manner of payment.

**D.     Offset.**  The liquidated value of any Indirect Claim paid by the Trust shall be treated as an offset to or reduction of the Allowed Claim Amount of any related GUC Claim that has been or will be submitted to the Trust.

## ARTICLE VIII
## PAYMENT OF FINAL DETERMINATION

**A.     Initial Payment Percentage.**  The Trustee shall determine from time to time the Pro Rata share that holders of Allowed Trust Claims are likely to receive from the Liquidating Trust Assets available for distribution on account of compensable Allowed Trust Claims or for reserves on account GUC Claims for which a Final Determination has not been made, as determined by the Trustee (the "**Initial Payment Percentage**").  As soon as practicable after the Effective Date, the Trustee shall establish an Initial Payment Percentage.

**B.     Payment Upon Final Determination.**  Only after the Trustee has established an Initial Payment Percentage in accordance with the Trust Agreement, then once there is a Final Determination of a Trust Claim pursuant to pursuant to ARTICLE IV.J (based on a final settlement reached or entry of a final order by the Bankruptcy Court in accordance with ARTICLE VI and/or ARTICLE VII), will the Claimant receive a payment of such Final Determination based on the Payment Percentage then in effect as described in ARTICLE VIII.A and ARTICLE VIII.D.

**C.     Initial Payment.**  After there is a Final Determination of the Trust Claim, the Trust shall pay an initial distribution (the "**Initial Distribution**") based on the then-existing Payment Percentage established by the Trustee in accordance with the Trust Agreement.

**D.     Supplemental Payment Percentage.**  In the event that the Trustee determines that the then-current estimates of the Trust's assets and its liabilities, as well as the then-estimated value of then-pending Trust Claims, warrant additional distributions on account of the Final Determinations, the Trustee shall set a supplemental payment percentage in accordance with the

14

Trust Agreement (the "**Supplemental Payment Percentage**" and, together with the Initial Payment Percentage, the "**Payment Percentages**"). Such Supplemental Payment Percentages shall be applied to all Final Determinations that became final prior to the establishment of such Supplemental Payment Percentage. Claimants whose Trust Claim becomes a Final Determination after a Supplemental Payment Percentage is set shall receive an Initial Distribution equal to the then-existing aggregate payment percentage. For the avoidance of doubt, the Allowed Claim Amount of each Allowed Trust Claim after Final Determination shall be deemed to be the Debtors' liability for such Allowed Trust Claim irrespective of how much the holder of such Trust Claim actually receives from the Trust pursuant to the payment provisions set forth in this ARTICLE VIII. For example, if the Allowed Claim Amount for an Allowed GUC Claim that has received a Final Determination is $600,000, even if the Trust distributes less than $600,000 to the GUC Claimant on account of such Allowed GUC Claim based on application of the Initial Payment Percentage and any Subsequent Payment Percentage(s), the Allowed Claim Amount for the GUC Claim is still $600,000.

       **E.**    **Acceptance and Release.** For an Allowed Trust Claim to receive payment from the Trust, the Claimant must submit, as a precondition to receiving such payment from the Trust, an executed acceptance and release (the "**Acceptance and Release**"), which shall include a release of the Trust, the Trustee, the TAC, and each of their respective Representatives; *provided* that, notwithstanding anything to the contrary herein, the holders of Second Lien Deficiency Claims shall not be required to execute an Acceptance and Release. The Acceptance and Release shall be in the form attached hereto as Exhibit 1-1 (Expedited Distributions), Exhibit 1-2 (GUC Claims), and Exhibit 1-3 (Indirect Claims). The Acceptance and Release shall be available for completion electronically and may be executed by the Claimant or his, her or its representative through DocuSign or a similar authorized electronic signature program, or such other simplified and expedient means as the Trust may adopt.

## ARTICLE IX
## EXCESS RECOVERIES

       **A.**    **Limitations on Trust Recovery.** A Claimant may not recover more than the Allowed Claim Amount from the Trust when taking into consideration recoveries obtained from other Potentially Liable Parties or insurance recoveries. The sole source of recovery for GUC Claimants who do not elect to "Opt Out" and who do not elect to pursue recoveries from Potentially Liable Parties is from the Trust. GUC Claimants who elect to pursue recoveries from Potentially Liable Parties or applicable insurance may obtain recoveries from sources other than the Trust on account of their GUC Claims. If a GUC Claimant makes demand upon an insurer for payment as to their GUC Claim or receives payment from an insurer for their GUC Claim based on an existing demand, such GUC Claimant must notify the Trust in writing. If a GUC Claimant recovers on account of his, her or its GUC Claim an amount from a Potentially Liable Party, an insurer, or any source other than the Trust that results in such GUC Claimant recovering the Allowed Claim Amount or a portion thereof of such GUC Claims as determined under the TDPs, then notwithstanding anything contained herein, such GUC Claimant shall not be entitled to receive an additional recovery from the Trust on account of such GUC Claim that would cause the GUC Claimant to receive funds in excess of their Allowed Claim Amount. For example, if the Allowed Claim Amount for an Allowed GUC Claim is $600,000, and the GUC Claimant has received distributions from the Trust totaling $200,000, and the GUC Claimant then recovers $400,000

from a Potentially Liable Party or any source other than the Trust such that his, her or its total recovery is $600,000 on account of such GUC Claim, then such GUC Claimant shall not be entitled to receive any further recovery from the Trust, including in circumstances where the Supplemental Payment Percentage is over 33.3%. The Trustee may ask GUC Claimants if they intend to pursue recoveries on account of their GUC Claims from sources other than the Trust and to provide the Trustee with updates regarding such pursuits. GUC Claimants who obtain any such recoveries shall immediately inform the Trust.

     **B.**    <u>**Excess Recovery.**</u>  If a GUC Claimant were to receive a distribution from the Trust on account of his, her or its GUC Claim and then obtain a recovery from a Potentially Liable Party or any source other than the Trust on account of his, her or its GUC Claim such that the GUC Claimant is placed in a position where he or she has recovered more than the Allowed Claim Amount of such GUC Claim as determined under the TDPs, then such GUC Claimant shall be required to return or deliver to the Trust the portion of such recovery that causes such GUC Claimant's total recovery on account of such GUC Claim to exceed the Allowed Claim Amount, <u>provided</u>, <u>however</u>, that in no circumstance shall a GUC Claimant be required to return or deliver to the Trust an amount greater than the distributions received from the Trust on account of his, her or its GUC Claim. For example, if the Allowed Claim Amount for an Allowed GUC Claim is $600,000, and the GUC Claimant has received distributions from the Trust totaling $200,000, and the GUC Claimant then recovers $500,000 from a Potentially Liable Party such that his, her or its total recovery is $700,000, then such GUC Claimant shall be required to return $100,000 to the Trust. If the Allowed Claim Amount for an Allowed GUC Claim is $600,000, and the GUC Claimant has received distributions from the Trust totaling $200,000, and the GUC Claimant then recovers $2,000,000 from a Potentially Liable Party such that his, her or its total recovery is $2,200,000, then such GUC Claimant shall be required to return $200,000 to the Trust (*i.e.*, the distributions received from the Trust on account of his, her or its GUC Claim).

     **C.**    <u>**Potentially Liable Parties.**</u>  Nothing in the TDPs, nor any action taken pursuant to the TDPs, shall determine, limit, reduce, or impact the liability of any Potentially Liable Party for a Trust Claim. Potentially Liable Parties are not third-party beneficiaries, and their liability for any Trust Claim shall not be determined by, or by reference to, the TDPs.

**ARTICLE X**
**<u>MISCELLANEOUS PROVISIONS</u>**

     **A.**    <u>**Amendments.**</u>  Except as otherwise provided herein, the TDPs may be amended with the written consent of the Trustee and the TAC, as provided in the Trust Agreement. The consent of the TAC shall not be unreasonably withheld. Nothing herein is intended to preclude the TAC from proposing to the Trustee, in writing, amendments to the TDPs. Notwithstanding the foregoing, absent Bankruptcy Court approval after appropriate notice and opportunity to be heard, the TDPs may not be modified or amended in a material manner that would have the effect of (i) providing for materially different treatment for Trust Claims or (ii) cause the TDPs to be otherwise inconsistent with the Trust Agreement, the Plan, or the Confirmation Order.

     **B.**    <u>**Severability.**</u>  Should any provision contained in the TDPs be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the TDPs.

16

     **C.**     <u>**Governing Law.**</u>  Each Trust Claim shall be evaluated under the laws of the jurisdiction in which the Trust Claim arose.

**EXHIBIT 1-1**

FORM OF ACCEPTANCE AND RELEASE
(EXPEDITED DISTRIBUTION)

## ACCEPTANCE AND RELEASE (EXPEDITED DISTRIBUTION)

To receive an Expedited Distribution (as defined below) from the Trust (the "**Trust**") created pursuant to the Chapter 11 Plan of Reorganization for Wellpath Holdings, Inc., dated as of [●], 2025 (the "**Plan**"), the holder of a GUC Claim must execute and submit to the Trust this acceptance and release (the "**Release**"). **This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below). A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient**.

## DEFINITIONS

The definitions set forth above for the terms "**Trust**," "**Plan**," and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section. All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Plan.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas, having subject matter jurisdiction over the Chapter 11 Case.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled *In re Wellpath Holdings, Inc..*, Bankruptcy Case No. 24-90533 (ARP).

"**Debtors**" means Wellpath Holdings, Inc., and its debtor affiliates, the Debtors and Debtors-in-possession in the Chapter 11 Cases.

"**Expedited Distribution**" means the compensation a Claimant receives from the Trust on behalf of the Claimant's GUC Claim in the amount of $2,500.

"**GUC Claim**" means a GUC Claim asserted by an entity or an individual (or an individual's estate) against the Debtors.

"**GUC Claimant**" means the holder of a GUC Claim who (a) has satisfied the eligibility criteria section forth in the Trust Distribution Procedures, (b) has had his, her or its GUC Claim assumed by the Trust for evaluation, resolution, and payment pursuant to the Plan, and (c) is signing and executing this Release (or on whose behalf this Release is being signed and executed by a Legal Representative).

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to execute this Release on behalf of the GUC Claimant.

"**Released Parties**" means the Trust, the Trustee, and the TAC and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, Trustee, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, and the TAC.

"**TAC**" means the Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

"**Trustee**" means _____ or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RECITALS

**A.**     **WHEREAS**, the Plan was confirmed by order of the Bankruptcy Court on [●] and became effective on [●].

**B.**     **WHEREAS**, the Plan provides for the assumption of GUC Claims against the Debtors by the Trust and for the treatment of GUC Claims against the Debtors through the Trust.

**C.**     **WHEREAS**, the Claimant has accepted an Expedited Distribution in the amount of $[_____] from the Trust on account of his, her or its GUC Claim and agrees to execute this Release in consideration of the benefit of such Expedited Distribution.

## RELEASE

Each of the foregoing Recitals is hereby incorporated into this Release by reference and is made apart of this Release as if fully restated herein.

In consideration of the benefit of an Expedited Distribution from the Trust, I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, Trustee, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "**I**", "**my**" or "**me**"), do hereby voluntarily, intentionally, knowingly, absolutely, unconditionally and irrevocably waive, release, remit, acquit, forever discharge, and covenant not to sue the Released Parties for my GUC Claim, whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") and fully discharge the Released Parties of their duties and responsibilities (to the extent applicable) under the Trust Documents, including any agreement, document, instrument or certification contemplated by the Trust Documents, from the beginning of time through the execution date of this Release. I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) institute a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) participate, assist, or cooperate in any such action, or (iii) encourage, assist and/or solicit any third party to institute any such action.

I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Expedited Distribution or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Expedited Distribution, to the extent applicable.

Claimant or Legal Representative Printed Name: _____

2

Claimant or Legal Representative Signature: _____

Date: _____

**EXHIBIT 1-2**

FORM OF ACCEPTANCE AND RELEASE
(GUC CLAIM)

## ACCEPTANCE AND RELEASE (GUC CLAIM)

To receive payment on account of an Award (as defined below) from the Trust (the "**Trust**") created pursuant to the Chapter 11 Plan of Reorganization for Wellpath Holdings, Inc., dated as of [●], 2025 (the "**Plan**"), the holder of a GUC Claim must execute and submit to the Trust this acceptance and release (the "**Release**").  **This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below).  A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient**.

## DEFINITIONS

The definitions set forth above for the terms "**Trust**," "**Plan**," and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.  All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Plan.

"**Award**" means the compensation a Claimant receives from the Trust on behalf of the Claimant's GUC Claim.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas, having subject matter jurisdiction over the Chapter 11 Cases.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled *In re Wellpath Holdings, Inc.*., Bankruptcy Case No. 24-90533 (ARP).

"**Debtors**" means Wellpath Holdings, Inc. and its debtor affiliates, the Debtors and Debtors-in-possession in the Chapter 11 Cases.

"**Governmental Payor**" means any federal, state, or other governmental body, agency, department, plan, program, or entity that administers, funds, pays, contracts for, or provides medical items, services, and/or prescription drugs, including, but not limited to, the Medicare Program, the Medicaid Program, Tricare, the Department of Veterans Affairs, and the Department of Indian Health Services.

"**GUC Claim**" means a GUC Claim asserted by an entity or an individual (or an individual's estate) against the Debtors.

"**GUC Claimant**" means the holder of a GUC Claim who (a) has satisfied the eligibility criteria section forth in the Trust Distribution Procedures, (b) has had his, her or its GUC Claim assumed by the Trust for evaluation, resolution, and payment pursuant to the Plan, and (c) is signing and executing this Release (or on whose behalf this Release is being signed and executed by a Legal Representative).

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to execute this Release on behalf of the GUC Claimant.

"**Lien**" or "**Liens**" means (i) any statutory lien of a Governmental Payor or Medicare Part C or Part D Program sponsor, or (ii) any mortgage, lien, pledge, charge, security interest, or legal encumbrance, of any nature whatsoever, held by any other payer or provider, where there is a legal obligation to withhold payment of an Award, or some portion thereof, to a GUC Claimant under applicable federal or state law or for the GUC Claimant to reimburse the Government Payor, other payer or provider for amounts paid on the GUC Claimant's behalf in connection with the Claimant's GUC Claim.

"**Lien Resolution Administrator**" means that person or entity, retained by the Trustee to resolve Medicare Program Part A and B liens, Medicaid Program liens, and Medicare Part C Program liens, using the information provided by the GUC Claimant.

"**Medicaid Program**" means the federal program administered by the states under which certain medical items, services, and/or prescription drugs are furnished to Medicaid beneficiaries under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1, *et seq.*

"**Medicare Part C or Part D Program**" means the program(s) under which Medicare Advantage, Medicare cost, and Medicare health care prepayment plan benefits and Medicare Part D prescription drug plan benefits are administered by private entities that contract with Centers for Medicare & Medicaid Services ("**CMS**").

"**Medicare Program**" means the Medicare Parts A and B federal program administered by CMS under which certain medical items, services, and/or prescription drugs are furnished to Medicare beneficiaries under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*.

"**Released Parties**" means the Trust, the Trustee, and the TAC and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, Trustee, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, and the TAC.

"**TAC**" means the Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

"**Trustee**" means _____ or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RECITALS

A.    **WHEREAS**, the Plan was confirmed by order of the Bankruptcy Court on [●] and became effective on [●].

B.    **WHEREAS**, the Plan provides for the assumption of GUC Claims against the Debtors by the Trust and for the treatment of GUC Claims against the Debtors through the Trust.

C.    **WHEREAS**, the Claimant has received and accepted an Award in the amount of $[_____] from the Trust on account of his, her or its GUC Claim and agrees to execute this Release in consideration of the benefit of such Award.

2

## RELEASE

Each of the foregoing Recitals is hereby incorporated into this Release by reference and is made apart of this Release as if fully restated herein.

In consideration of the benefit of an Award from the Trust, I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, Trustee, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "**I**", "**my**" or "**me**"), do hereby voluntarily, intentionally, knowingly, absolutely, unconditionally and irrevocably waive, release, remit, acquit, forever discharge, and covenant not to sue the Released Parties for my GUC Claim against the Debtors, whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") and fully discharge the Released Parties of their duties and responsibilities (to the extent applicable) under the Trust Documents, including any agreement, document, instrument or certification contemplated by the Trust Documents, from the beginning of time through the execution date of this Release.  I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) institute a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) participate, assist, or cooperate in any such action, or (iii) encourage, assist and/or solicit any third party to institute any such action.

I hereby acknowledge that I am solely and ultimately responsible for the satisfaction and discharge of all Liens.  I shall use my best efforts to resolve all known Liens.

Notwithstanding my responsibilities to resolve all known Liens, I hereby authorize the Lien Resolution Administrator to resolve all Medicare Program liens, Medicaid Program liens, and Medicare Part C Program liens, as set forth in the definition of Lien Resolution Administrator above.  The Lien Resolution Administrator shall use best efforts to resolve the Medicare Program liens, Medicaid Program liens, and Medicare Part C Program liens on my behalf.

In further consideration of the benefit of an Award, I do hereby release, forever discharge, hold harmless, and covenant not to sue the Released Parties from all Claims arising from, relating to, resulting from or in any way connected to, in whole or in part, any act, or failure to act, of the Lien Resolution Administrator.  I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) institute a lawsuit or other action based upon, arising out of, or relating to any Claim released hereby, (ii) participate, assist, or cooperate in any such action, or (iii) encourage, assist and/or solicit any third party to institute any such action.

I hereby acknowledge and agree that to the extent my information is incorrect or incomplete to any substantial degree, after reasonable diligence by the Lien Resolution Administrator, which results in the Lien Resolution Administrator being unable to properly verify coverage or identify Liens for which the Lien Resolution Administrator is responsible, then the Lien Resolution Administrator shall have no further responsibility for such unknown/unresolved Liens.

I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Award, to the extent applicable.

Claimant or Legal Representative Printed Name: _____

Claimant or Legal Representative Signature: _____

Date: _____

**EXHIBIT 1-3**

FORM OF ACCEPTANCE AND RELEASE
(INDIRECT CLAIM)

## ACCEPTANCE AND RELEASE (INDIRECT CLAIM)

To receive payment on account of an Award (as defined below) from the Trust (the "**Trust**") created pursuant to the Chapter 11 Plan of Reorganization for Wellpath Holdings, Inc., dated as of [●], 2025 (the "**Plan**"), the holder of an Indirect Claim must execute and submit to the Trust this acceptance and release (the "**Release**"). **This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below). A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient**.

## DEFINITIONS

The definitions set forth above for the terms "**Trust**," "**Plan**," and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section. All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Plan.

"**Award**" means the compensation a Claimant receives from the Trust on behalf of the Claimant's Indirect Claim.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas, having subject matter jurisdiction over the Chapter 11 Case.

"**Chapter 11 Case**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled *In re Wellpath Holdings, Inc..*, Bankruptcy Case No. 24-90533 (ARP).

"**Debtors**" means Wellpath Holdings, Inc. and its debtor affiliates, the Debtors and Debtors-in-possession in the Chapter 11 Case.

"**Indirect Claim**" means a liquidated or unliquidated, contingent or non-contingent GUC Claim against the Debtors for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction).

"**Indirect Claimant**" means the holder of an Indirect Claim who (a) has satisfied the eligibility criteria section forth in the Trust Distribution Procedures, (b) has had its Indirect Claim assumed by the Trust for evaluation, resolution, and payment pursuant to the Plan, and (c) is signing and executing this Release (or on whose behalf this Release is being signed and executed by a Legal Representative).

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to execute this Release on behalf of the GUC Claimant.

"**Released Parties**" means the Trust, the Trustee, and the TAC and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, Trustee, insurers, beneficiaries,

administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, and the TAC.

"**TAC**" means the Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

"**Trustee**" means _____ or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RECITALS

**A.**     **WHEREAS**, the Plan was confirmed by order of the Bankruptcy Court on [●] and became effective on [●].

**B.**     **WHEREAS**, the Plan provides for the assumption of Claims against the Debtors by the Trust and for the treatment of Claims against the Debtors through the Trust.

**C.**     **WHEREAS**, the Claimant has received and accepted an Award in the amount of $[_____] from the Trust on account of its Indirect Claim and agrees to execute this Release in consideration of the benefit of such Award.

## RELEASE

Each of the foregoing Recitals is hereby incorporated into this Release by reference and is made apart of this Release as if fully restated herein.

In consideration of the benefit of an Award from the Trust, I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, Trustee, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "**I**", "**my**" or "**me**"), do hereby voluntarily, intentionally, knowingly, absolutely, unconditionally and irrevocably waive, release, remit, acquit, forever discharge, and covenant not to sue the Released Parties for my Indirect Claim, whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") and fully discharge the Released Parties of their duties and responsibilities (to the extent applicable) under the Trust Documents, including any agreement, document, instrument or certification contemplated by the Trust Documents, from the beginning of time through the execution date of this Release.  I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) institute a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) participate, assist, or cooperate in any such action, or (iii) encourage, assist and/or solicit any third party to institute any such action.

I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Award, to the extent applicable.

Claimant or Legal Representative Printed Name:   _____

Claimant or Legal Representative Signature:   _____

Date:   _____

**EXHIBIT 4.**
**INVESTMENT GUIDELINES**

      Consistent with the provisions of Rev. Proc. 94-45 and notwithstanding any other provision of the Trust Agreement, the investment powers of the Trustee, other than those reasonably necessary to maintain the value of the assets and to further the liquidating purpose of the trust, must be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills.

Exhibit 4-1

## Exhibit J

**Liquidating Trustee and Members of Liquidating
Trust Advisory Board**

**Liquidating Trustee**

1.  Matthew Dundon

**Members of Liquidating Trust Advisory Committee**

1.  John Duggan

2.  Teesha Graham

3.  David Murray

4.  Martin Yankellow

5.  Deborah Young Powell

6.  James Waldeck

7.  Matthew Barry

**Members of Liquidating Trust Advisory Committee Subcommittee**

1.  One member appointed by the H.I.G. Releasees in accordance with the Liquidating Trust Agreement filed with the Court on April 29, 2025.

2.  Jacob Rothman

3.  Jonathan J. Li

**<u>Exhibit K</u>**

**Liquidating Trust Cooperation Agreement**

## LIQUIDATING TRUST COOPERATION AGREEMENT

LIQUIDATING TRUST COOPERATION AGREEMENT (the "**Agreement**"), dated as of May 9, 2025, by and among (a) Wellpath Holdings, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), and (b) the Liquidating Trust (the "**Trust**"), (each a "**Party**" or collectively the "**Parties**").

**RECITALS:**

**A.**     On April 30, 2025, the Debtors filed that certain First Amended Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, Inc. and certain of Its Debtor Affiliates, dated April 30, 2025, ECF No. 2586, including all exhibits and schedules thereto, and as the same may from time to time be amended or modified and as confirmed by order of the United States Bankruptcy Court for the Southern District of Texas (the "**Plan**"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Plan.

**B.**     The Plan contemplates that a Liquidating Trust Cooperation Agreement shall be executed among the Parties, which agreement shall provide for the process whereby (a) certain books and records of the Debtors as described herein, including certain documents and materials prepared by the Debtors' retained professionals pre- and post-Effective Date (collectively, the "**Documents**")[1] will be shared with, or otherwise made available, to the Trust while fully preserving the applicable privileges, and (b) the Debtors will reasonably cooperate with the Trust in connection with the (1) reconciliation of the claims in Classes 5 and 6 of the Plan, and (2) investigation, preservation, and pursuit of the Liquidating Trust Causes of Action (collectively, the "**Assigned Claims**");

**C.**     The Bankruptcy Court confirmed the Plan by order, dated May 1, 2025 (the "**Confirmation Order**"), ECF No. 2596;

**D.**     The Debtors and the Unsecured Creditors Committee entered into a Stipulated and Agreed to Confidentiality Agreement and Protective Order on February 25, 2025 (the "**Confidentiality Agreement** "); and

**NOW THEREFORE**, in consideration of the above-stated premises, the mutual covenants contained herein, and for good and valuable consideration, the Parties agree as follows:

**AGREEMENT:**

---

[1]     The term "**Document**" shall also refer to all documents, data, testing, information, compilations, physical evidence, correspondence, communications, written materials, records and writings of any type or description, however created, reproduced or retrieved, and in every form, including, without limitation, databases, computer/electronic files, drafts, and partially completed documents maintained by, or in the possession or control of, the Debtors.

# ARTICLE I
# TRANSFER OF CLAIM D&R

**Section 1.1.**   <u>Transfer of Records</u>. From and after the Effective Date, the Debtors and their respective successors in interest, including without limitation, the Post-Restructuring Debtors, shall use their commercially reasonable best efforts to cooperate with the Trust and its retained professionals in connection with the reconciliation of claims in Classes 5 and 6 of the Plan and the investigations into and litigations regarding Litigation Trust Causes of Action. Without limiting the foregoing, within thirty (30) days after the Effective Date, the Post-Restructuring Debtors and the Trust shall agree to the types, categories, scope and format of the Documents to be delivered by the Post-Restructuring Debtors in connection with its obligation to cooperate as provided herein (the "**Scope Date**"). In the event the Trust and the Post Restructuring Debtors are unable to agree to the types, categories, scope and format of the Documents to be delivered, the Trust and the Post-Restructuring Debtors shall submit promptly such issue to the Bankruptcy Court which shall have exclusive jurisdiction to make such determination as to such issues. On or before the date that is (a) sixty-five (65) days after the Effective Date, or such other date as may be agreed upon by the Parties or, (b) in the event there is a dispute between the Parties as to the types, categories, scope, and format of the Documents to be delivered, twenty-five (25) days following the determination of the Bankruptcy Court with respect to such dispute (the period ending on such date, the "**Transfer Period**"), the Debtors and their successors in interest, including, without limitation, the Post-Restructuring Debtors, shall use commercially reasonable best efforts to collect, copy, share, and/or assign to the Trust in an agreed upon format, following a reasonable search and on a rolling basis, the Documents as shall be agreed upon or as determined by the Bankruptcy Court, as may be amended or supplemented by agreement of the Parties within the Cooperation Period (as defined below) (the "**Claim D&R**"). The expiration of the Transfer Period shall not be deemed a basis to (i) withhold any Claim D&R that the Debtors or the Post-Restructuring Debtors, as the case may be, have agreed to provide or (ii) withhold any Claim D&R that the Debtors or the Post-Restructuring Debtors, as the case may be, have agreed to update or supplement beyond the Transfer Period or the Cooperation Period, as applicable. The Post-Restructuring Debtors shall provide such Claim D&R as soon as commercially reasonably practical regardless of the expiration of the Transfer Period or the Cooperation Period, as applicable. In the event additional Documents not among the Claim D&R are subpoenaed or otherwise properly demanded by a defendant to an Assigned Claim, the Parties shall work cooperatively to determine what, if any, additional Documents may need to be provided by the Debtors or the Post-Restructuring Debtors, as the case may be.

**Section 1.2.**   <u>Delivery of Records</u>. The Parties acknowledge that the Trust has separately delivered or will deliver to the Debtors or the Post-Restructuring Debtors, as the case may be, a list of those parties that received payments that are contemplated to be the initial subject of review with respect to Liquidating Trust Causes of Action pursuant to section 547 of the Bankruptcy Code (the "**Assigned Preference Claims Initial Review List**"). Notwithstanding anything to the contrary in Section 1.1 hereof, with respect to each individual or entity set forth on the Assigned Preference Claims Initial Review List, the Post-Restructuring Debtors shall prioritize production of related Claim D&R and use commercially reasonable best efforts to promptly provide such Claim D&R, and, in any event, within sixty (60) days of the Effective Date. To the extent the Trust thereafter, but prior to expiration of the Cooperation Period, seeks Claim D&R with respect to Assigned Preference Claims other than those included on the Assigned Preference Claims Initial

Review List, the Post-Restructuring Debtors should use commercially reasonable efforts to promptly provide such Claim D&R to the Trust and in any event within fifteen (15) Business Days of receipt of such request.

**Section 1.3.**   Cooperation Period. Until the later to occur of (a) two (2) years after the Effective Date and (b) the final determination or resolution of any outstanding appeal of the Confirmation Order (such period, as may be extended by agreement of the Parties, the "**Cooperation Period**"), the Post-Restructuring Debtors shall preserve, or cause to be preserved, the Claim D&R. After the transfer of the Claim D&R to the Trust is complete, the Parties acknowledge and agree that any records in the Post-Restructuring Debtors' possession other than those discussed herein are outside the scope of this Agreement, and the Post-Restructuring Debtors shall have no obligation to the Trust to preserve such Documents for the benefit of the Trust and should maintain and/or destroy books and records in accordance with their regular record management policies.

**Section 1.4.**   Privileged & Protected Information

(a)   The Post-Restructuring Debtors shall share Claim D&R with the Trust that are protected by the attorney-client privilege, work product doctrine, or other privilege or immunity to the extent the Parties determine that such sharing would aid or further the investigation and/or pursuit of the Assigned Claims. Any privileged Claim D&R shared with the Trust shall be clearly marked with a "Privileged" designation; provided, however, that the Post-Restructuring Debtors shall use reasonable efforts to ensure that Claim D&R that are not subject to any of the foregoing privileges are not inadvertently so designated; and, provided, further, that, in the event such privileged or protected Claim D&R are shared with the Trust, any privilege attaching to such Claim D&R shall be extended to and shared with the Trust, and this Agreement shall constitute a common interest agreement between the Parties.

(b)   For purposes of the sharing of Documents or information, the Trust is assignee and successor to the Debtors with respect to the Assigned Claims and shall be treated as such in any sharing of and access to Documents or information protected by the attorney-client privilege, work product doctrine, or other privilege or protection, and for purposes of confidentiality restrictions. For clarity, the Post-Restructuring Debtors will retain ownership and control over the privileges. The Trust may assert the privilege but may not unilaterally waive the privilege without the Post-Restructuring Debtors' consent.

(c)   The extension of privileges encompasses privileges held by any of the Post-Restructuring Debtors, including any predecessors, committees or sub-committees. The Debtors and the Trust shall take any further necessary actions to effectuate the extension of such privileges.

(d)   For the avoidance of doubt, (i) any privileges shall be extended to the Trust for the sole purpose of enabling, and to the extent necessary to enable, the Trust to investigate and/or pursue such Assigned Claims, (ii) absent the Post-Restructuring Debtors' consent, no Claim D&R or information subject to a privilege shall be publicly disclosed by the Trust or the Liquidating Trustee or communicated to any person not entitled to receive such information or in a manner that would diminish the protected status of such information, and (iii) any privileges

shall not be extended and such privileged information shall not be shared with any member of the Trust Advisory Board (as defined in the Trust Documents), or other person engaged for the specific purpose of investigating and/or pursuing the Assigned Claims. Privileged information may be shared with the Trustee and its counsel, and any professionals retained by counsel, so long as the sharing of such information would not serve as a waiver of any applicable privileges or protections.

(e)     Notwithstanding anything to the contrary herein, the Post-Restructuring Debtors shall not be required, except by order of an appropriate court, to produce or make available for inspection:

(i)     any information that is not a Claim Record;

(ii)     any privileged Claim D&R, any other privileged books and records, or other privileged Documents or information solely to the extent such Claim D&R contain legal or factual analysis of the Post-Restructuring Debtors' conduct regarding any Assigned Claims;

(iii)     any privileged Claim D&R that cannot be shared with the Trust without destroying such privilege; or

(iv)     any Claim D&R that the Post-Restructuring Debtors are under a legal obligation, including due to personal privacy issues of an employee or contractual obligation, to refrain from providing to a third party absent subpoena or formal discovery request, whether or not privileged.

(f)     The Post-Restructuring Debtors will cooperate with the Trust regarding the production of a list of all categories of Documents that are withheld from production on the basis of this Section 1.4 and the specific provision(s) of this Agreement under which each such category was withheld.

For purposes of this Agreement, the term "**privilege**" means information protected by the attorney-client privilege, work product doctrine, or other privilege or immunity (or any combination of the foregoing as the case may be) as applied by federal courts in actions based on 28 U.S.C. § 1331 to domestic Documents, and such law shall be used in determining whether or not information is privileged. For the avoidance of doubt, Documents that are marked "Confidential" or "Highly Confidential" pursuant to the Confidentiality Agreement shall not be considered "privileged" unless otherwise subject to such protection.

**Section 1.5.**   Use of Records. The Trust shall use the Claim D&R that are provided to the Trust, subject to any third party confidentiality obligations, solely for the purposes of (a) evaluating, resolving, settling, liquidating, investigating, preserving, and pursuing the Assigned Claims, (b) responding, consistent with applicable law, to third party (including defendant / respondent) requests for Documents in connection with pending or anticipated litigation in connection with the Assigned Claims, and (c) responding, at the Trustee's sole discretion, and with notice to the Post-Restructuring Debtors, to requests for Documents made by Holders of Claims in Classes 5 and 6, and other third parties (collectively, the "**Claimants**"). The Trust shall not share Claim D&R or any other information provided by the Debtors or the Post-Restructuring Debtors pursuant to this Agreement with any third parties (including, without limitation, any accountants,

agents, attorneys, bankers, consultants, executors, financial advisors, investment bankers, transfer agents, representatives, employees) unless and until such third party executes an agreement to abide by the terms of this Agreement in the form attached as Exhibit A hereto (including as contemplated by Section 4.2 hereof), including confinement of such information to use for the purposes outlined in (a)-(c) above in this paragraph.

    **Section 1.6.**    Authentication and Admission. Upon a showing by the Trust that it reasonably believes it is legally required to authenticate one or more Claim Record(s), and upon reasonable request by the Trust to the Post-Restructuring Debtors, the Post-Restructuring Debtors shall use reasonable best efforts to provide the Trust with a factually accurate declaration and sufficient information concerning the Claim D&R to facilitate their admission into evidence. To the greatest extent possible, such declaration shall be in a form sufficient to render the applicable Claim D&R self-authenticating in accordance with Federal Rule of Evidence 902 (or an equivalent rule under applicable state or foreign law) and business records in accordance with Federal Rule of Evidence 803(6) (or an equivalent rule under applicable state or foreign law). In the event the Trust shows that it reasonably believes that the live testimony (including remote testimony) of a witness is required for the foregoing purposes, the Post-Restructuring Debtors shall use reasonable best efforts to identify and provide the Trust with such a witness, to the extent known, subject to the reasonable availability of such witness.

    **Section 1.7.**    Privilege Dispute. In the event of a dispute during the Transfer Period or thereafter regarding whether any Claim D&R should be produced to the Trust, or whether any information is subject to Section 1.4 hereof, such dispute shall be fully and finally resolved by the Bankruptcy Court. In the event the dispute relates to the assertion of common interest privilege shared with a third party, then the Party asserting this privilege will notify the third party of the dispute as soon as reasonably possible and the third party will be permitted to join in defending the privilege as part of the dispute resolution process. Any Claim D&R subject to a dispute under this Section 1.7 shall be held in trust by the Debtors or Post-Restructuring Debtors, as applicable, until such dispute is resolved.

    **Section 1.8.**    Committee Authority. The Parties each hereby authorize the Committee and its agents and professionals to provide to the Trust all data and any other information concerning the Assigned Claims that were provided by the Post-Restructuring Debtors, directly or indirectly, to the Committee or its agents or professionals on or prior to the Effective Date, notwithstanding any agreement or stipulation entered into prior to the Effective Date to the contrary. The Trust shall then use such data and information in accordance with Section 1.5 hereof subject to any confidentiality designations. Upon dissolution of the Committee, the Trust shall succeed to, and exclusively hold, the attorney-client privilege and any other privilege held by the Committee and shall enjoy the work product protections that were applicable or available to the Committee before its dissolution subject to Section 1.4 hereof, including the right of the Trust, as successor to the Committee, to retain Confidential Information (as defined in the Confidentiality Agreement) as set forth in paragraph 31 of the Confidentiality Agreement through and following the closure of each of the Chapter 11 Cases.

## ARTICLE II
## TESTIMONY AND RELATED COOPERATION

**Section 2.1.**   <u>Testimony</u>. In addition to sharing Claim D&R, the Debtors and Post-Restructuring Debtors agree to use commercially reasonable efforts to cooperate with the Trust specifically as follows in connection with, and in anticipation of the Trust's litigation of, any Assigned Claims:

(a)      During the Cooperation Period, upon written request (including via email sent per Section 4.6 hereof) of the Trust (or its professionals) and providing reasonable advance notice, providing the Trust (or its professionals) reasonable access (including remotely) to witnesses then currently employed by the Debtors or those former employees who have continuing obligations to cooperate with the Post-Restructuring Debtors that would enable the Debtors or Post-Restructuring Debtors to request their participation in the form of *de bene esse* depositions, or other mutually agreeable procedure, without the need for a formal subpoena, notice of deposition, or other permissible discovery request, in accordance with the Federal Rules of Civil Procedure (a "**Discovery Request**"), to the extent the Trust and the Post-Restructuring Debtors reasonably agree, or a court orders, over the Post-Restructuring Debtors' objection, that the Trust could obtain the same by Discovery Request, with such information to be used solely for purposes of the investigation and pursuit of the Assigned Claims and in accordance with Section 1.5 hereof. The Trust shall work constructively to structure any access to witnesses so as not to materially detract from or disrupt the Post-Restructuring Debtors' commercial operations. The Parties shall make good-faith efforts to agree on as few witnesses and/or depositions days as possible.

(b)      The Trust and the Post-Restructuring Debtors agree that any *de bene esse* depositions hereunder will be subject to all of the other conditions of this Agreement, and that the Debtors will cooperate in their completion before the end of the Cooperation Period.

**Section 2.2.**   <u>Discovery Requests</u>. The Trust shall be solely responsible for addressing and responding to all Discovery Requests related to the Assigned Claims. To the extent a formal or informal document request, subpoena, or other demand for production of Documents related to the Assigned Claims is served upon the Post-Restructuring Debtors by any party in an action in which the Trust is a named party and the Trust is in possession, custody, or control of all or part of the responsive Documents, the Trust shall undertake to produce such Documents instead of the Post-Restructuring Debtors; <u>provided</u>, <u>however</u>, that this shall not limit the Post-Restructuring Debtors' obligation to produce additional Documents in response to a third party subpoena or otherwise proper demand by a defendant to an Assigned Claim, subject to the time and retention limitations of Sections 1.1, 1.2 and 1.3 hereof.

## ARTICLE III
## TERM OF THIS AGREEMENT

**Section 3.1.**   <u>General</u>. The Debtors' and/or Post-Restructuring Debtors' obligations under this Agreement shall expire on the earlier of (a) one hundred and eighty (180) days after the termination and winding up of the Trust in accordance with the terms of the applicable Trust Documents, and (b) such extended date as the Bankruptcy Court orders (such date, the

"**Expiration Date**").  For the avoidance of doubt, nothing in this Section 3.1 shall change the agreed upon Cooperation Period.

# ARTICLE IV
# MISCELLANEOUS

**Section 4.1.**    Preservation of Privileges and Defenses.

(a)    The Debtors and/or Post-Restructuring Debtors may, but are not obligated to, review and redact privileged information unrelated to the Assigned Claims prior to the sharing of any Documents.

(b)    To the extent the Debtors inadvertently share with the Trust any Documents to which a privilege or immunity attaches and (i) which the Post-Restructuring Debtors contend are exempted from being provided pursuant to Article I of this Agreement or (ii) that are later discovered by the Trust to contain privileged information unrelated to the Assigned Claims (either (i) or (ii), an "**Inadvertently Provided Document**"), the Post-Restructuring Debtors may, in writing, following actual, reasonably diligent, discovery of such inadvertent production, request the return of any Inadvertently Provided Document. Further, with respect to any Inadvertently Provided Document under clause (ii) of this sub-paragraph, the Trust shall, as soon as is practicable, notify the Debtors of such Inadvertently Provided Document, and the Post-Restructuring Debtors shall (as appropriate) provide a version of the Document to the Trust that redacts any such privileged information that is unrelated to the Assigned Claims.

(c)    A request for the return of an Inadvertently Provided Document shall identify the Document inadvertently provided and the basis for withholding such Document from production. In the event the Debtors or Post-Restructuring Debtors request the return, pursuant to this paragraph, of any Inadvertently Provided Document then in the custody of the Trust, the Trust shall within three (3) Business Days (i) return the Inadvertently Provided Document and return or destroy all copies thereof; (ii) undertake reasonable measures to obtain or confirm the destruction of any copies it produced to other parties, and (iii) destroy all notes or other work product reflecting the content of such Inadvertently Provided Document.

(d)    The Trust may challenge such request in accordance with Section 1.7 hereof, but shall not either (i) refuse to return or destroy the Inadvertently Provided Document(s) while any challenge or dispute is being resolved or addressed, or (ii) contend that the provision of the Document constituted a waiver of any applicable privilege or immunity. Notwithstanding the foregoing, in the event that the Trust, upon reasonable inspection, suspects or determines that they possess or have received an Inadvertently Provided Document, the Trust shall, as soon as is practicable, notify the Post-Restructuring Debtors of such Inadvertently Provided Document and shall immediately cease use or any disclosure of such Document.

(e)    It shall not be or become a breach or default of this Agreement if an Inadvertently Provided Document was properly provided to a third party (including a defendant or respondent to an Assigned Claim) before it was recognized as such by the Debtors, Post-Restructuring Debtors or the Trust. In such instance, the Trust shall use its reasonable best efforts to recover possession of, require deletion or destruction of, and prevent the improper use

of such Inadvertently Provided Document, but the failure of such efforts shall not be or become a breach or default of this Agreement.

**Section 4.2.**   Confidentiality.

(a)    Notwithstanding anything contained herein to the contrary, the Trust shall not provide any third party access to any Document that was previously designated Confidential, Highly Confidential, For Professionals' Eyes Only, or filed under seal pursuant to the Confidentiality Agreement (all such material, the "**Subject Material**") unless directed by a court or arbitration panel having jurisdiction over the related Assigned Claim or such third party has executed a protective order and fourteen (14) Business Days' advance notice is given to the party that produced the Subject Material. Such access shall be subject to the terms of this Agreement, including, without limitation, Sections 1.5 and 4.2(c) hereof, and the Subject Material shall maintain its Confidential or Highly Confidential designation.

(b)    The Debtors or Post-Restructuring Debtors shall have the ability to designate information produced pursuant to this Agreement as "Highly Confidential" or for "Professionals' Eyes Only" if the Debtors or Post-Restructuring Debtors in good faith reasonably believe that, if such information were disclosed: (i) it would cause significant competitive or commercial harm to the Debtors; (ii) it would give rise to a safety or similar risk to any person or entity; or personally identifiable information; (iii) it would involve commercially sensitive information the disclosure of which to non-counsel or non-professionals is likely to significantly adversely impact the Debtors or Post-Restructuring Debtors; (iv) it would reveal trade secrets or confidential research, development, or commercial information, including but not limited to product pricing or product pricing strategy, product distribution strategy, or product sales strategy; or (v) it would violate the terms or conditions of a confidentiality agreement, protective order or similar agreement with a third party.

(c)    The terms of the Confidentiality Agreement shall apply in full to the Subject Material and any other information provided pursuant to the terms of this Agreement with the following modifications:

(i)    notwithstanding the terms of the Confidentiality Agreement, information provided pursuant to this Agreement and designated under the Confidentiality Agreement may be used by the Trust in accordance with Section 1.4 hereof consistent with confidentiality designations and associated restrictions on use based on such designations;

(ii)    if the Debtors or the Post-Restructuring Debtors designate information Highly Confidential (the "**Highly Confidential Material**") or Professionals' Eyes Only (the "**PEO Material**") pursuant to Section 4.2(b) hereof, then the Trust may share such information solely with the Trustee, and its retained professionals (collectively, the "**Recipients**");

(iii)    to the extent reasonably practical and so long as the information is otherwise discoverable, the Recipient shall provide ten (10) Business Days' advance written notice (unless circumstances do not afford time for such notice, in which case the Recipient shall endeavor to provide as much notice as possible) to the Post-

8

Restructuring Debtors before disclosing any Highly Confidential Material or PEO Material to the Bankruptcy Court or other court of competent jurisdiction not under seal, orally or in writing, to allow the Post-Restructuring Debtors to obtain a protective order or agreement (if they choose to do so), and if the Post-Restructuring Debtors do not obtain a protective order or agreement, the Recipient shall make any such disclosure under seal, unless such court orders otherwise;

      (iv)    in the event that the Recipient is required or requested (a) by a court of competent jurisdiction, (b) in connection with a foreign proceeding or litigation, or (c) by a federal, state, or local governmental or regulatory body, in each case, to disclose any Highly Confidential Material or PEO Material supplied to the Recipient, the Recipient will provide the Post-Restructuring Debtors with prompt written notice of such request or requirements so that the Post-Restructuring Debtors and/or their Affiliates may seek, at their sole cost and expense, an appropriate protective order or agreement and/or seek appropriate approvals from the Bankruptcy Court and/or any other court, tribunal, or governmental or regulatory body having jurisdiction over the relevant action, litigation, proceeding, or hearing, as applicable; and in the absence of a protective order or the receipt of a waiver hereunder, the Recipient may only disclose, without liability hereunder, that portion of the Highly Confidential Material or PEO Material that it is legally compelled to disclose; and

      (v)    to the extent that the Recipient is subject to examination by a regulatory authority or bank auditor, it shall not be in breach of its obligations hereunder if it permits such authority or bank auditor to review the Highly Confidential Material or PEO Material, without notice to any persons, in connection with a review of the Recipient's files.

**Section 4.3.**  <u>Non-Compilation</u>. Nothing in this Agreement shall require any Party or any third party to create any new documents or to compile or organize any data contained in existing Documents into any new documents, except to the extent of removing any encryption or passwords which would prevent review, and, with respect to Documents kept in electronic form which rely upon electronic links to other Documents, modifying the links or converting the link-sourced data to static data so as to preserve all information of the Document in its as-produced form. Notwithstanding the foregoing, if the burden of deriving or ascertaining particular information from existing Documents would be substantially greater for the Trust than the burden of deriving or ascertaining such information from the Debtors, then the Trust may reasonably request that the Debtors (1) provide specifically identified information by running a report or summary from the Debtors' accounting or other electronic systems or databases, and (2) to timely respond to reasonable requests to explain such reports or summaries.

**Section 4.4.**  <u>Costs</u>. Except as otherwise provided herein, each Party shall be responsible to pay its own reasonable costs and expenses arising out of its obligations under this Agreement during the Cooperation Period. Thereafter, the Trust shall pay all documented and reasonable fees, costs, and expenses associated with any obligations arising out of this Agreement.

**Section 4.5.**  Subject to the terms and provisions of Sections 1.2 and 4.4 hereof, during and after the Cooperation Period, the Post-Restructuring Debtors shall use commercially

reasonable efforts to continue to cooperate with the Trust to facilitate access to information related to the Assigned Claims, or the Class 5 or Class 6 Claims assumed by the Trust. For the avoidance of doubt, every obligation of the Post-Restructuring Debtors under this Agreement shall be subject to commercial reasonableness. The Trust shall use commercially reasonable efforts to provide the Debtors as much notice as is reasonably practicable in requesting cooperation under this Agreement. The Parties will endeavor to work constructively to ensure cooperation under this Agreement does not materially detract from or disrupt the Post-Restructuring Debtors' commercial operations.

      **Section 4.6.**   <u>Notices</u>. All notices, requests, or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be effective when served by electronic mail, electronic facsimile transmission addressed to the Parties at their respective addresses set forth below, or to such other address or addresses as any Party may later specify by written notice to the other Parties:

      (a)    To the Trust:

          Matthew J. Dundon, Trustee
          c/o Dundon Advisers LLC
          10 Bank Street, Suite 1100
          White Plains, New York 10606
          Email: <u>md@dundon.com</u>

          with a copy to:

          Proskauer Rose LP
          Eleven Times Square
          New York, New York 10036
          Attn: Daniel Desatnik, Esq.
          Email: <u>ddesatnik@proskauer.com</u>

          -and-

          Stinson LLP
          1201 Walnut Street, Suite 2900
          Kansas City, Missouri 64106
          Attn: Zachary Hemenway, Esq.
          Email: <u>Zachary.hemenway@stinson.com</u>

      (b)    To the Debtors/Post-Restructuring Debtors:

          Wellpath Holdings, Inc.
          3340 Perimeter Hill Drive
          Nashville, TN 37211
          Attention: General Counsel

with a copy to:

McDermott Will Emery LLP
444 West Lake Street
Chicago, IL 60606
Attn: Felicia Gerber Perlman, Esq.
Email: fperlman@mwe.com

**Section 4.7.**   <u>Effectiveness</u>. This Agreement shall become effective on the Effective Date; <u>provided</u>, <u>however</u>, that nothing herein shall prohibit the Post-Restructuring Debtors and the Committee, prior to the Effective Date, from cooperating to resolve certain General Unsecured Claims within Classes 5 and 6 of the Plan on such terms as such Parties deem reasonable and appropriate, including, without limitation, the production by the Debtors or their retained professionals of certain of the Documents.

**Section 4.8.**   <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

**Section 4.9.**   <u>Governing Law</u>. This Agreement shall be construed in accordance with the laws of the State of Delaware, without regard to any Delaware conflict of law principles that would result in the application of laws of any other jurisdiction.

**Section 4.10.**   <u>Consent to Jurisdiction; Reservation of Rights</u>. The Parties mutually agree that, as relates to the Parties' obligations under this Agreement, the Bankruptcy Court shall retain jurisdiction over all matters regarding the interpretation, implementation, and enforcement of this Agreement and the Parties consent to personal jurisdiction and venue in the Bankruptcy Court after all of the Chapter 11 Cases are closed. Nothing herein shall prohibit the Parties, in the event of a good faith dispute with respect to any of their respective rights and obligations hereunder, including without limitation the nature of any Document, from seeking resolution of such dispute before the Bankruptcy Court.

**Section 4.11.**   <u>Severability; Validity</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but to the extent that any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable, the remainder of this Agreement, and the application of such provision to other persons or circumstances, shall not be affected thereby, unless doing so would alter the fundamental agreements expressed in this Agreement, and to such end, the provisions of this Agreement are agreed to be severable.

**Section 4.12.**   <u>No Partnership Agreement</u>. Nothing contained in this Agreement shall create or be deemed to create an employment, agency, fiduciary, joint venture, or partnership relationship between any of the Parties, on the one hand, or any of such other Parties' employees, on the other hand.

**Section 4.13.**   <u>No Waiver</u>. The Parties agree that no failure or delay by any Party in exercising any right, power, or privilege hereunder will operate as a waiver thereof, and that no

11

single or partial exercise thereof will preclude any other or further exercise thereof or the exercise of any right, power, and privilege hereunder.

**Section 4.14.**  Entire Agreement. This Agreement and the Plan contain the entire agreement of the Parties concerning the subject matter hereof and supersede all prior representations and agreements between or among the Parties as to such subject matter. No modification of this Agreement or waiver of the terms and conditions hereof will be binding upon the Parties unless approved in writing by the Parties.

**Section 4.15.**  Authorization. Each of the undersigned individuals represents and warrants that he/she has the power and authority to enter into this Agreement and bind their respective companies or trust as its authorized representatives.

**Section 4.16.**  Titles. The section titles used herein are for convenience only and shall not be considered in construing or interpreting any of the provisions of this Agreement.

**Section 4.17.**  Binding Effect. The Parties agree that this Agreement is for the benefit of and shall be binding upon the Parties and their respective representatives, transferees, successors, and assigns.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective representatives thereunto duly authorized as of the date set forth below.

**DEBTORS**

**Wellpath Holdings, Inc.**

Signed by:
*Marc Goldstone*

Name: Marc Goldstone
Title: Chief Legal Officer and Secretary

**Physicians Network Association, Inc.**

Signed by:
*Marc Goldstone*

Name: Marc Goldstone
Title: Secretary

**CCS-CMGC Intermediate Holdings 2, Inc.**

Signed by:
*Marc Goldstone*

Name: Marc Goldstone
Title: Chief Legal Officer and Secretary

**CHC Companies, LLC**

Signed by:
*Marc Goldstone*

Name: Marc Goldstone
Title: Secretary

**Correct Care Holdings, LLC**

Signed by:
*Marc Goldstone*

Name: Marc Goldstone
Title: Secretary

**Correctional Healthcare Holding Company, LLC**

Signed by:
*Marc Goldstone*

Name: Marc Goldstone
Title: Secretary

**Alpine CA Behavioral Health HoldCo, LLC**

Signed by:
*Marc Goldstone*

Name: Marc Goldstone
Title: Secretary

**CCS-CMGC Intermediate Holdings, Inc.**

Signed by:
*Marc Goldstone*

Name: Marc Goldstone
Title: Chief Legal Officer and Secretary

**Conmed Healthcare Management, LLC**

Signed by:
*Marc Goldstone*

Name: Marc Goldstone
Title: Secretary

**Correctional Healthcare Companies, LLC**

Signed by:
*Marc Goldstone*

Name: Marc Goldstone
Title: Secretary

**HCS Correctional Management, LLC**

Signed by:
*Marc Goldstone*

Name: Marc Goldstone
Title: Secretary

**Jessamine Healthcare, LLC**

Signed by:
*Marc Goldstone*

Name: Marc Goldstone
Title: Secretary

**Healthcare Professionals, LLC**

Name:  Marc Goldstone
Title:    Secretary

**Justice Served Health Holdings, LLC**

Name:  Marc Goldstone
Title:    Secretary

**Missouri JSH Manager, Inc.**

Name:  Marc Goldstone
Title:    Secretary

**Wellpath CFMG, Inc.**

Name:  Marc Goldstone
Title:    Secretary

**Wellpath Education, LLC**

Name:  Marc Goldstone
Title:    Secretary

**Wellpath Hospital Holding Company, LLC**

Name:  Marc Goldstone
Title:    Secretary

**Wellpath Management, Inc.**

Name:  Marc Goldstone
Title:    Secretary

**Missouri JSH Holdco**

Name:  Marc Goldstone
Title:    Secretary

**Perimeter Hill RPA, LLC**

Name:  Marc Goldstone
Title:    Secretary

**Wellpath Community Care Holdings, LLC**

Name:  Marc Goldstone
Title:    Secretary

**Wellpath Community Care Centers of Virginia, LLC**

Name:  Marc Goldstone
Title:    Secretary

**Wellpath Group Holdings, LLC**

Name:  Marc Goldstone
Title:    Secretary

**Wellpath LLC**

Name:  Marc Goldstone
Title:    Secretary

**Wellpath SF Holdco, LLC**

Name:  Marc Goldstone
Title:    Secretary

[Signature Page to Cooperation Agreement]

**WHC, LLC**

Name:  Marc Goldstone
Title:    Secretary

**WPMed, LLC**

Name:  Marc Goldstone
Title:    Secretary

**Zenova Management, LLC**

Name:  Marc Goldstone
Title:    Secretary

**Zenova Telehealth, LLC**

Name:  Marc Goldstone
Title:    Secretary

**Wellpath Community Care Management, LLC**

Name:  Marc Goldstone
Title:    Secretary

[Signature Page to Cooperation Agreement]

**LIQUIDATING TRUST**

By: _____
Name: Matthew J. Dundon
Title: Trustee

**Exhibit A**

**AGREEMENT TO ABIDE BY LIQUIDATING TRUST COOPERATION AGREEMENT**

I have read the LIQUIDATING TRUST COOPERATION AGREEMENT (the "**Cooperation Agreement**")[1] between the Liquidating Trust and Wellpath Holdings, Inc. and its affiliate debtors and debtor-in-possession, or, the Post-Restructuring Debtors. I understand the terms of the Cooperation Agreement, including, without limitation, Sections 1.1-1.4, 4.2 and 4.4 thereof and restrictions on access and use of Claim D&R and, in particular, Claim D&R that are protected by one or more applicable privileges or other protections. I agree to be fully bound by all applicable terms of the Cooperation Agreement, and hereby submit to the jurisdiction of the United States Bankruptcy Court for the Southern District of Texas for purposes of enforcement of the Cooperation Agreement.

I understand, in particular, that any information marked Confidential, Highly Confidential, or Professionals' Eyes Only, and any copies, excerpts or summaries thereof and materials containing information that is derived from Confidential, Highly Confidential, or Professionals' Eyes Only information contained therein, as well as any knowledge or information derived from any of these items, may be used only for the purposes set forth in the Cooperation Agreement and, absent the prior written agreement of the Debtors (including, as applicable, the Post-Restructuring Debtors or the applicable assignee thereof or successor thereto) may not be used for any other purpose, including, without limitation, any business or commercial purpose.

I further understand that failure to abide fully by the terms of the Cooperation Agreement may result in legal action against me, such as liability for monetary damages.

Dated:_____     Agreed:_____

---

[1]   Capitalized terms used in this agreement and not otherwise defined shall have the meanings ascribed to them in the Cooperation Agreement.